# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| *In Re* Flint Water Cases, | No. 5:16-cv-10444-JEL-MKM (consolidated) |
| | Hon. Judith E. Levy |
| | Mag. Mona K. Majzoub |
| *Walters, et al.,* | No. 5:17-cv-10164-JEL-MKM |
|      *Plaintiffs* | |
| *v.* | |
| *Governor Richard Snyder, State of Michigan, City of Flint, Daniel Wyant, Andrew Dillon, Nick Lyon, Adam Rosenthal, Stephen Busch, Patrick Cook, Michael Prysby, Bradley Wurfel, Jeffrey Wright, Edward Kurtz, Darnell Earley, Gerald Ambrose, Dayne Walling, Howard Croft, Michael Glasgow, Daugherty Johnson, Eden Wells, Nancy Peeler, Robert Scott, Lockwood, Andrews and Newnam, P.C., Lockwood, Andrews and Newnam, Inc., Leo A. Daly Company, Rowe Professional Services Company, Veolia LLC, Veolia Inc., Veolia Water and Veolia S.A., Receivership Transition Advisory Board,* | |
|      *Defendants* | |

## PLAINTIFFS' MASTER LONG FORM COMPLAINT AND JURY DEMAND

Plaintiffs in this consolidated action, collectively, and by and through *Liaison Counsel for Individual Plaintiffs,* file this Master Long Form Complaint and Jury Demand ("Master Complaint") against Defendants, as an administrative device to set forth potential claims that individual Plaintiffs may assert against Defendants in this litigation. Plaintiffs asserting personal injury or property damage as a result of the contamination of the City of Flint's drinking water may bring and/or adopt this Master Complaint, and complain and allege on personal knowledge as to themselves, and on information and belief as to all other matters, as follows:

## PURPOSE OF MASTER COMPLAINT

1.     This Master Complaint is administrative in nature, and sets forth facts and allegations common to those individual Plaintiffs whose claims arise from the contamination of the City of Flint's drinking water. It includes allegations of personal injury, property damage and economic loss, as more fully set forth below.

2.     The claims related to this case are generally brought against two sets of Defendants, as described more fully below, Governmental Defendants, including governmental individuals and entities and Engineering Defendants, which are full service, engineering, planning, architecture and surveying firms, responsible for the administration of placing the Flint Water Plant into operation using the Flint River as a primary source and/or for evaluating the Flint water

2

system for public safety.

3.     Plaintiffs seek compensatory and punitive damages, monetary restitution, equitable relief, and all other available remedies as a result of injuries caused by the Defendants. Plaintiffs claim and allege that their damages and injuries are a direct and proximate result of the Defendants' conduct.

4.     This Master Complaint is intended to serve the administrative functions of efficiency and economy by presenting certain common claims and common questions of fact and law for consideration by this Court. This Master Complaint does not necessarily include all claims asserted in all actions related to the City of Flint's drinking water, and it is not intended to consolidate for any purpose the separate claims of Plaintiffs in their respective actions. It is anticipated that individual Plaintiffs will adopt this Master Complaint and the necessary causes of action herein through use of a separate Short Form Complaint. Any separate facts and additional claims of individual Plaintiffs may be set forth as necessary in the actions filed by the respective Plaintiffs. This Master Complaint does not constitute a waiver or dismissal of any actions or claims asserted in those individual actions and, furthermore, no Plaintiff relinquishes the right to amend their individual claims to include additional claims as discovery proceeds.

5.     As more particularly set forth herein, each Plaintiff maintains, among other things, that Defendants violated their legal duties and caused the Flint Water

Crisis to occur, continue, worsen and persist for a longer period of time. Defendants also exacerbated the crisis by concealing and misrepresenting its scope, failing to take effective remedial action to eliminate it, and then lying about it to cover up their misconduct. Their misconduct has produced a significant effect, long lasting and sometimes permanent, upon public rights, including health, safety, peace, comfort and convenience.

## INTRODUCTORY STATEMENT

7.    This case arises from the poisoning of Plaintiffs, residents of the City of Flint, Michigan, with lead and other toxic substances from Flint's pipes and service lines, as a result of the switch of Flint's drinking water supply to the Flint River, without the use of any corrosion control.

8.    Defendants created and maintained this condition when the State of Michigan subsumed the authority of the local government; and also through the actions of the state's regulatory and administrative entities and employees.

### Summary of the Constitutional and Civil Rights Violations and Injuries

a.    *Due process based on state created danger doctrine*: Plaintiffs have sustained violations of their substantive due process rights, including their fundamental right to not have the state create, inflict and/or exacerbate dangers through the culpable actions of public officials;

4

  b.      *Due process based on bodily integrity doctrine*: Plaintiffs have sustained violations of their substantive due process rights, including their fundamental right to not have their bodily integrity violated;

  c.      *Equal protection, race*: Plaintiffs have sustained serious injuries as a result of some of the Defendants' decision to deliver a superior water product to the water users in the remainder of Genesee County because that community was predominately white, while at the same time delivering a grossly inferior water product to water users in Flint because that community was predominately African American;

  d.      *Equal protection, wealth:* Plaintiffs have sustained serious injuries as a result of some of the Defendants' decision to protect the health of the water users in the remainder of Genesee County because that community was predominately more affluent and at the same time disregard the health of water users in Flint because that community was predominately poor;

  e.      *Violation of 42 U.S.C. § 1985(3):* Plaintiffs have sustained serious injuries as a result of the conspiracy of two or more of the Defendants to directly or indirectly conspire to violate Plaintiffs' constitutional rights, said conspiracy being based on invidious racial animus;

  f.      *Violation of Elliot Larsen Civil Rights Act ("ELCRA"):* Plaintiffs have sustained serious injuries as a result of their denial of the full and equal en-

joyment of services provided by some of the Defendants because they were residents of a predominately African American community; and

9.     Plaintiffs sustained personal injuries, property damage, economic and emotional injuries as a result of the constitutional and civil rights violations of the Defendants and their otherwise actionable conduct.

## Summary of Allegations as to Engineering Defendants

10.     The Engineering Defendants were professionally negligent in failing to administer properly the distribution of water from the Flint River using the Flint Water Treatment Plant ("WTP"), and in failing to report the dangers associated with not installing proper anti-corrosive treatment when using the Flint River as a primary source of water.

11.     By assuming responsibility for the administration of placing the Flint WTP into operation using the Flint River as a primary source and/or for evaluating the Flint water system for public safety, the Engineering Defendants assumed the responsibility to satisfy the standard of a reasonable engineer, and thoroughly failed to meet even the most basic standard of care. As a result, the acidic and corrosive water that Defendants caused to flow through Flint's pipes and appliances has irreparably damaged residents' and businesses' pipes and appliances, and the damage and stigma associated with the water crisis has resulted in a reduction in residential and commercial property values. Despite Flint having

switched back to its prior water source, pipes and appliances in residents' homes and local commercial properties remain corroded and contaminated with lead and Legionella.

12.     The Engineering Defendants were professionally negligent in failing to properly evaluate Flint's water system and in publicly declaring its water safe and potable. The Engineering Defendants failed to conduct a root cause analysis, which would have revealed that the pipes were corroding and causing lead and Legionella to enter the resident's homes. The Engineering Defendants also failed to mention that the addition of a corrosion inhibitor was necessary to prevent these serious and well-known health issues, and mandated the usage of highly acidic ferric chloride.

13.     The profound and enduring injuries alleged in this Master Complaint were proximately caused by the Engineering Defendants.

## JURISDICTION

14.     This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking injunctive and declaratory relief together with monetary damages against Defendants for violations of the Thirteenth and Fourteenth Amendments of the United States Constitution, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, *et seq*.

15.     This Court has jurisdiction over Plaintiffs' 42 U.S.C. § 1983 claims pursuant to 28 U.S.C. § 1331, as those claims arise under the Constitution and laws of the United States; and 28 U.S.C. § 2201, the Declaratory Judgment Act and supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367 because they are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States.

16.     This particular action does not present novel or complex issues of State law that predominate over claims for which this Court has original jurisdiction.

17.     There are no compelling reasons for declining supplemental jurisdiction over those of Plaintiffs' claims that do not arise under 42 U.S.C. § 1983.

18.     All Defendants reside in this district within the meaning of 28 U.S.C. § 1391(c). This Court has personal jurisdiction over all Defendants because a Michigan state court would have personal jurisdiction under MCL 600.701 and MCL 600.705.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(1) and (2).

20.    Mich. Comp. Laws 600.6440 exempt actions against State agencies from the jurisdiction of the Michigan Court of Claims where the claimant has an adequate remedy in the federal courts.

## PARTIES

21.    Plaintiffs have at all times relevant been residents of Flint, Michigan and citizens of the State of Michigan who have suffered personal injuries as a result of exposure to the City of Flint's drinking water, and/or property owners who have had property located in Flint damaged from exposure to the City of Flint's drinking water, and/or have suffered or continue to suffer economic harm caused by the City of Flint's drinking water.

22.    As a result of Defendants' actions, Plaintiffs have suffered injuries including but not necessarily limited to: various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), contract damages and property damages (including but not limited to damaged plumbing and lost real property value).

23.     All individual Defendants are sued in their individual and/or official capacities, as indicated below.

## Governmental Defendants

24.     Defendant Richard Snyder is the Governor of the State of Michigan ("Governor") and is vested with executive power pursuant to Art. V, Section 1 of the Michigan Constitution. The Governor is responsible for the management of state government for the health and welfare of its citizens and residents and is sued by Plaintiffs in both his individual capacity for compensation for the Plaintiffs, insofar as his deliberate conduct constituted an abuse and/or misuse of his authority, and, in his official capacity, for prospective equitable relief to correct the harm caused and prolonged by state government and to prevent future injury. The Governor is sued in his individual capacity for the injuries he caused to Plaintiffs resulting from his deliberately indifferent deprivation of Plaintiffs' constitutional and civil rights.

25.     The City of Flint ("Flint" or "the City") is a Michigan municipal Corporation located in Genesee County, Michigan, so authorized by the laws of the State of Michigan that operates the Department of Public Works and provides water to its residents and property owners as part of its responsibilities and services. Flint is a Defendant because, despite the protests of a number of elected and appointed officials within the organization, the municipal corporation itself, through its

policies, customs and practices deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm it caused Plaintiffs. Flint is also sued because it deprived Plaintiffs of their civil and constitutional rights by violating Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA.

26.    Defendant Daniel Wyant ("Wyant") was Director of Michigan Department of Environmental Quality ("MDEQ") and is sued by Plaintiffs in his individual capacity because he participated in the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm.

27.    Defendant Andrew Dillon ("Dillon") was Treasurer for the State of Michigan and is sued by Plaintiffs in his individual capacity because along with the Governor, Jeff Wright, Dayne Walling, and Edward Kurtz, caused harm to Plaintiffs when they developed an interim water delivery plan in June 2013, which favored the predominately white Genesee County water users and discriminated against the water users in Flint, a predominantly African American community.

28.    Nick Lyon ("Lyon") was Director of the Michigan Department of Health and Human Services ("MDHSS") and is sued by Plaintiffs in his individual capacity because he participated in the decisions that deliberately created, increased

and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

29.   Defendant Adam Rosenthal ("Rosenthal") was a Water Quality Analyst assigned to the Lansing District Office of the MDEQ. Rosenthal is sued in his individual capacity because, as Water Quality Analyst for MDEQ, he approved and participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

30.   Defendant Stephen Busch ("Busch") was District Supervisor assigned to the Lansing District Office of the MDEQ. Busch is sued in his individual capacity because, as District Office Supervisor of MDEQ, he deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

31.   Defendant Patrick Cook ("Cook") was, at all relevant times, a Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ. Cook is sued in his individual capacity because, as Water Treatment Specialist District of MDEQ, he approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

32.     Defendant Michael Prysby ("Prysby") was an Engineer assigned to District 11 (Genesee County) of the MDEQ. Prysby is sued in his individual capacity because, as Engineer assigned to District 11, he approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of harm his department caused Plaintiffs.

33.     Defendant Bradley Wurfel ("Wurfel") was the Director of Communications for MDEQ. Wurfel is sued in his individual capacity because, as Director of Communications for MDEQ, he was responsible for the deliberately misleading and inaccurate communications that increased and prolonged the public health crisis at issue in this case and for making false statements and providing false assurances which caused harm to Plaintiffs.

34.     Defendant Jeffrey  Wright ("Wright") has been the Genesee County Drain Commissioner since 2001. Wright is sued in his individual capacity because, as the Genesee Country Drain Commissioner, he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the Fourteenth Amendment, as well as the Thirteenth  Amendment of the United States Constitution.

13

35.     Defendant Edward Kurtz ("Kurtz") was the Emergency Manager of Flint appointed by the Governor in August 2012 and served in this capacity until July 2013. Kurtz is sued in his individual capacity because, during his term as Emergency Manager of Flint, he deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Kurtz is also sued because he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in or aided and/or abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the Fourteenth Amendment, as well as the Thirteenth Amendment of the United States Constitution. Additionally, as Emergency Manager, he was a policymaker for Defendant City of Flint within the meaning of *Monell*, and as such his actions constituted customs, policies and/or practices of Defendant City of Flint.

36.     Defendant Darnell Earley ("Earley") was the Emergency Manager of the City of Flint appointed by the Governor on November 1, 2013 and served in this capacity until January 12, 2015. Earley is sued in his individual capacity because, during his term as Emergency Manager of Flint, he deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Earley is also sued because he

conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the Fourteenth Amendment, as well as the Thirteenth Amendment of the United States Constitution. Additionally, as Emergency Manager, he was a policymaker for Defendant City of Flint within the meaning of *Monell*, and as such his actions constituted customs, policies and/or practices of Defendant City of Flint.

37.    Earley violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Earley's actions constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

38.    Defendant Gerald Ambrose ("Ambrose") was the Emergency Manager of the City of Flint appointed by the Governor on January 13, 2015 and served in this capacity until April 28, 2015. Ambrose is sued in his individual capacity because, during his term as Emergency Manager of Flint, he deliberately increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Ambrose is also sued because he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate

Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the Fourteenth Amendment, as well as the Thirteenth Amendment of the United States Constitution. Additionally, as Emergency Manager, he was a policymaker for Defendant City of Flint within the meaning of *Monell*, and as such, his actions constituted customs, policies and/or practices of Defendant City of Flint.

39.    Defendant Dayne Walling ("Walling") was Mayor of Flint from August 4, 2009 until November 9, 2015 when he was unseated by Karen Weaver. Walling is sued in both his individual and official capacities. He is individually liable insofar as he personally approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Walling is also sued because he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the Fourteenth Amendment, as well as the Thirteenth Amendment of the United States Constitution. Additionally, as Mayor, he was a policymaker for Defendant City of Flint within the meaning of *Monell*, and as such, his actions constituted customs, policies and/or practices of Defendant City of Flint.

16

40. The actions of lower level City employees, not named as defendants herein, in delivering residents unsafe water were constrained by policies not of their own making. Flint's water treatment employees were inadequately trained, in light of the duties assigned to them the need for more training was obvious, and the inadequacy was so likely to result in the violation of constitutional rights that Flint's policy makers can reasonably said to have been deliberately indifferent to the need for additional training. The City is liable because, through its policy makers, it violated the constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger.

41. Defendant Howard Croft ("Croft") was, at all relevant times, Flint's Department of Public Works Director acting within the scope of his employment and/or authority under color of law. He is sued herein in his individual and official capacities. At all relevant times Croft knew that the City's water treatment plant was unprepared to adequately provide safe drinking water to Flint's residents. He nonetheless caused and allowed unsafe water to be delivered to Flint's residents and did not disclose that Flint's water was unsafe.

42. Defendant Croft also made numerous false statements about the safety and quality of Flint's water that he knew to be untrue. Defendant Croft violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Croft's

actions further constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

43.   Defendant Michael Glasgow ("Glasgow") was, at all relevant times, a water treatment plant operator for the City of Flint acting within the scope of his employment and/or authority under color of law. He is sued herein in his individual and official capacities. Glasgow knew that the City's water treatment plant was unprepared to adequately provide safe drinking water to Flint's residents. He nonetheless allowed unsafe water to be delivered to Flint's residents and did not disclose that Flint's water was unsafe. Defendant Glasgow violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Glasgow's actions further constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

44.   Defendant Daugherty Johnson ("Johnson") was the Utilities Administrator for the City of Flint. Johnson is sued in his individual capacity because, as Utilities Administrator, he approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs.

45.    At all relevant times hereto, the conduct of Defendants Walling, Croft, Glasgow and Johnson was pursuant to the customs, policies and/or practices of Defendant City of Flint.

46.    Defendant Eden Wells ("Wells") was, at all relevant times, Chief Medical Executive within the Population Health and Community Services Department of the MDHHS and was acting within the scope of her employment and/or authority under color of law. She is sued herein in her individual capacity. Wells participated in, directed, and/or oversaw the department's efforts to hide information to save face, and to obstruct the efforts of outside researchers. Further, Wells knew as early as 2014 of problems with lead and Legionella contamination in Flint's water and instead of fulfilling her duty to protect and notify the public, she participated in hiding this information. Defendant Wells violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Wells' actions constitute gross negligence, as she had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

47.    Defendant Nancy Peeler ("Peeler") was, at all relevant times, a MDHHS employee in charge of its childhood lead poisoning prevention program, acting within the scope of her employment and/or authority under color of law. She is sued herein in her individual capacity. She participated in, directed, and/or

oversaw the department's efforts to hide information to save face, and actively sought to obstruct and discredit the efforts of outside researchers. Even when her own department had data that verified outside evidence of a lead contamination problem, she continued trying to generate evidence to the contrary. Defendant Peeler violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Peeler's actions constituted gross negligence, as she had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

48.     Defendant Robert Scott ("Scott") was, at all relevant times, Data Manager for MDHHS's Healthy Homes and Lead Prevention Program, acting within the scope of his employment and/or authority under color of law. He is sued herein in his individual capacity. He participated in, directed, and/or oversaw the department's efforts to hide information to save face, and actively sought to obstruct and discredit the efforts of outside researchers. Even when his own department had data that verified outside evidence of a lead contamination problem, he continued trying to generate evidence to the contrary. He also served a key role in withholding and/or delaying the disclosure of data that outside researchers needed to protect the people of Flint. Defendant Scott violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Scott's actions

constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiff.

49.    At all relevant times, Defendant Receivership Transition Advisory Board managed and monitored the affairs of the City of Flint, and charged Plaintiffs and other Flint residents for the use of water that was detrimental to Plaintiffs' health and safety.

## Engineering Defendants

50.    Defendant Lockwood, Andrews and Newnam, P.C. ("LAN PC") is a Michigan professional corporation with its principal place of business located at 1311 South Linden Road, Suite B, Flint, Genesee County, Michigan 48532. In 2008, LAN PC was incorporated by Lockwood, Andrews and Newnam, Inc., ("LAN Inc.") after it was retained to conduct studies and reports of a new water supply that was being developed for Flint, Genesee County. At this Flint location, LAN PC held itself out to the world as a Leo A. Daly Company ("LAD").

51.    Defendant LAN Inc. is a Texas corporation with its principal place of business in Houston, Texas. At all relevant times, LAN Inc. conducted business in Genesee County, Michigan through LAN PC. Per its website, LAN Inc.'s Michigan office is located at 1311 South Linden Road, Suite B, Flint, Michigan 48532. LAN Inc. holds itself out as a full-service consulting firm offering planning, engineering

and program management services, including civil infrastructure engineering and municipal water treatment and design.

52.     Defendant LAD is a Nebraska corporation with its principal place of business in Omaha, Nebraska. Per its website, LAD's "[s]ervices are extended through [LAN Inc.]." LAD's own website reveals that it advertises itself to the world as having "experience, creativity and technical experience …  in every service we offer[,]" which includes "[p]lanning, architecture, _engineering_ and interior design, and program management [] delivered by multidisciplinary teams hand-picked to provide the precise combination of expertise required for project success." Additionally, LAD, "[a]s a multi-disciplinary firm, _engineering is an integral part of **our** process_ from the beginning of each project. _Our engineers_ work closely with planners, architects and interior designers … _Our in-house engineers_ also provide services for engineering projects independent of architectural design services."

53.     The corporate structure of LAD and LAN Inc. is such that LAD exerts nearly unfettered control over its subsidiary. The top executives between Defendants are identical – Leo A. Daly, III serves as Chairman and CEO of both LAD and LAN, and Dennis W. Petersen is the President of both. Three of LAN's seven directors are high ranking LAD executives, including Mr. Daly, Mr. Petersen and James B. Brader, the CFO of LAD. While LAN does not appear to retain a

CFO, LAD's CFO is one of LAN's seven board members. On information and belief, Mr. Brader serves as the *de facto* CFO of LAN and controls LAN's finances. LAD and LAN Inc. share offices in Houston (LAN's principal place of business), Los Angeles and Miami.

54.     Defendants LAN PC, LAN Inc. and LAD (collectively the "LAN Defendants") are defendants in this action based on their collective failure to properly place the Flint Water Plant into operation using the Flint River as a primary source, specifically neglecting to ensure the viability of the water source for use by the public, and failing to insist upon and implement the necessary safeguards through the plant to allow the water to be safely consumed by the public, and failure to report the dangers associated with not installing proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

55.     The LAN Defendants maintain an office in Flint, Genesee County, Michigan; they regularly conduct business in Flint, Genesee County, Michigan; and they have committed a tort in Flint, Genesee County, Michigan, which are among the basis for personal jurisdiction under MCL 600.705.

56.     Defendant Rowe Professional Services Company ("Rowe") is a Michigan corporation with its principal place of business in Flint Michigan. Per its website, Rowe "has grown to be a leading professional consulting firm, driving

infrastructure and development projects for our public, private, governmental, tribal, and not-for-profit client." Its services include civil engineering, surveying, aerial photography and mapping, landscape architecture, planning, and land development.

57.     Defendant Veolia LLC is a Delaware Limited Liability Company with its principal place of business at 200  East Randolph Drive, Suite 7900, Chicago, Illinois 60601.

58.     Defendant Veolia Inc. is a Delaware Limited Liability Company with its principal place of business at 200  East Randolph Drive, Suite 7900, Chicago, Illinois 60601.

59.     Defendant Veolia Water is a Delaware Limited Liability Company with its principal place of business at 101  West Washington Street, Suite 1400 East, Indianapolis, Indiana 46204.

60.     Veolia LLC, Veolia Inc. and Veolia Water design and provide water solutions for communities and industries across North America under the banner "Veolia North America."

61.     Defendant Veolia S.A. is a French transnational corporation with its principal place of business at 36-38 Avenue Kleber, 75116, Paris, France. Veolia S.A. provides its services through, and thus derives its revenues from, its four global divisions — water management, waste management, public transport and

energy services. The divisions provide its services across the globe, and in North America, those services are provided under the aforementioned moniker "Veolia North America."

62.    In or around 2005, Veolia S.A. united these four global divisions under a single umbrella, and since then, has held out itself and all other Veolia entities to the world simply as one "Veolia." Indeed, Veolia S.A. adopted this simple "Veolia" branding across all of its businesses, which is evidenced on its website and press releases.

63.    The four global divisions are composed of the subsidiaries and other businesses owned and otherwise controlled by Veolia S.A.

64.    Veolia S.A. and its divisions also underwent a restructuring beginning around 2011. As described by Veolia S.A. Chair and CEO Antoine Frerot, "[o]ur new organization is based on some simple principles—operating as an integrated company, _establishing a single Veolia in each country_, setting up regional management teams and strengthening corporate management functions." Veolia 2013 Annual and Sustainability Report at 10 (emphasis added), available at http://www.veolia.com/en/2013-activity-and-sustainability-report.          Stated differently, "[t]he new Veolia is one Veolia." _Id._ at 14.

65.    As a result, the corporate structure of Veolia S.A., Veolia LLC, Veolia Inc. and Veolia Water (collectively, the "Veolia Defendants") is such that Veolia

S.A. exerts nearly unfettered control over the entire Veolia empire. The Veolia Defendants hold themselves out to the world as a single entity, examples of which are numerous and readily observed in the public domain.

66.    For example, the Veolia website makes no effort to distinguish or advertise any distinct legal entities, instead grouping them together and collectively presenting themselves to the world as "Veolia." When "Veolia" advertises the number of its employees and reports its annual revenue, it does so collectively.

67.    Upon information and belief, the Veolia Defendants are controlled by the same top executives, and revenues are commingled and reported as one.

68.    As such, the Veolia Defendants disregard corporate formalities and do not adequately or separately capitalize each of their respective businesses.

69.    The Veolia Defendants collectively maintain several offices in Michigan, including Westland, Livonia and Grand Rapids; regularly conduct business in Michigan; and have committed torts in Michigan, which are bases for personal jurisdiction in this Court pursuant to MCL § 600.715.

70.    The Veolia Defendants are parties to this action based upon providing professionally negligent engineering services in reviewing Flint's water system and declaring the water safe to drink.

71.    The Veolia Defendants have abused the corporate form to avoid liability in this matter. Indeed, while it appears Veolia Water may have executed

the subject contract with the City of Flint, the Veolia Defendants, together, as indistinguishable entities, performed services and presented their conclusions as "Veolia." At all relevant times, the Veolia Defendants have represented to the world that they are not distinct legal entities, but rather one and the same.

72.    The Veolia and LAN Defendants are parties to this action because, among other reasons, they were professionally negligent in failing to conduct a root cause analysis which would have revealed that the pipes were corroding and causing lead and Legionella to enter the residents' homes, failing to advise the City that they were out of compliance with the Safe Drinking Water Act's Lead and Copper Rule,  failing to advise the City that the addition of a corrosion inhibitor was necessary to prevent lead poisoning and Legionnaires' Disease, and advising the City to use or even increase the dosage of highly acidic ferric chloride.

## STATEMENT OF FACTS

73.    From 1964 to 2014, Flint water users received their water from Lake Huron via the Detroit Water and Sewerage Department ("DWSD"). During this 50 year span, the Flint water users enjoyed safe, clean, fresh water in their homes, businesses, schools, hospitals and other places of public services.

## Relevant Facts – Governmental Defendants

74.    Motivated principally by the actions, political pressure and efforts of Genesee County Drain Commissioner Jeffrey Wright, in 2009, the communities of

Flint, Genesee County, Sanilac County, Lapeer County and City of Lapeer, formed the Karegnondi Water Authority ("KWA") to explore the development of a water delivery system which would draw water from Lake Huron and serve as an alternative to water delivered by the DWSD.

75.    In 2011, Flint officials commissioned a study to determine if the Flint River could be safely used by the city as the primary source of drinking water. The "Analysis of the Flint River as a Permanent Supply for the City of Flint, July 2011" ("2011 Report"), prepared by Rowe and LAN cautioned against the use of the Flint River water and the dormant Flint WTP, which would cost millions of dollars to upgrade.

76.    Use of the Flint River as a primary drinking source was rejected in 2011.

77.    In August 2012, the Governor appointed Kurtz as Flint's Emergency Manager.

78.    Throughout 2012, DWSD presented to Kurtz, Wright, Dillon, Walling and the Governor compelling arguments, based on numerous studies, demonstrating that from a cost and water reliability standpoint, Flint needed to reject Wright's pressure to join KWA and continue to receive water from DWSD.

79.    Most, if not all, discourse about Flint joining KWA or continuing with DWSD included Wright, who consistently raised arguments designed to persuade

Kurtz, Dillon and the Governor that the DWSD cost studies were wrong.

80.    In late 2012, Dillon, reacting to Wright's contention that the DWSD cost studies were wrong, requested the independent engineering firm of Tucker, Young, Jackson and Tull ("TYJT") to assess whether it would be cost-effective for Flint to switch from water supplied by DWSD and join the KWA water delivery system.

81.    In February 2013, TYJT concluded that it would be more cost-effective for Flint on both a short term and long term basis to continue to be supplied with water from DWSD.

82.    On March 27,  2013, MDEQ officials, sensing that Kurtz, Wright, Walling and Dillon were pushing the Governor to approve Flint joining the KWA, acknowledged that the decision to switch the water source for Flint was not based on a scientific assessment of the suitability of the Flint River water.[1]

83.    On March 28, 2013, in an email from Dillon to Governor  Snyder, with copies to numerous other Treasury officials and Wyant, Dillon recommended that he authorize the KWA going forward, even though the independent firm he

_____

[1] The March 2016 Flint Water Advisory Task Force Final Report ("Task Force Report") is attached as Exhibit A and the Task Force Timeline is attached as Exhibit B. Sygo/MDEQ e-mails with Busch re: Flint River water source switch. "As you might guess we are in a situation with Emergency Financial Managers so it's entirely possible that they will be making decisions relative to cost." Exhibit B, Task Force Timeline at 4.

hired to perform a cost evaluation said staying with DWSD made the most economic sense.[2] Dennis Muchmore, Governor Snyder's Chief of Staff, confirmed in a subsequent email that it was Dillon who made "the ultimate decision" to switch Flint water from the DWSD to the KWA.

84.     Governor Snyder participated in discussions between his appointed Emergency Manager of Flint, Kurtz, and his appointed Emergency Manager of Detroit, Kevin Orr. At the time the Governor authorized his Emergency Manager to contractually bind Flint to the KWA project, the Governor and State officials knew that the Flint River would be used as an interim source.

85.     In June 2013, Dillon, Kurtz, Wright and Walling developed an interim plan ("Interim Plan") to use the Flint River water before the KWA became operational. The Interim Plan would cover 2.5 years (April 25, 2014 until approximately October 2016).

86.     Dillon, Kurtz, Wright and Walling knew that in 2011 the Flint River was professionally evaluated and rejected as a drinking source and that upgrades for the Flint WTP would cost millions.

---

[2] Dillion stated in his March 28, 2013 email: "Governor, based upon today's presentations to the DEQ by the City of Flint, KWA and the engineering firm (Tucker Young) Treasury hired to vet the options as to whether Flint should stay with DWSD or join KWA, I am recommending we support the City of Flint's decision to join KWA. The City's Emergency Manager, Mayor, and City Council all support this decision. Dan Wyant likewise concurs and will confirm via email."

87. When the Governor authorized the use of the Flint River as an interim source of water for Flint, he knew that in 2011 the use of the Flint River water as a primary drinking source had been professionally evaluated and rejected as dangerous and unsafe.

88. The Governor, in a timeline prepared by his office, confirmed that in June 2013, he knew that Flint River water would be used as an interim source of water.[3]

89. In May 2013, Emergency Manager Kurtz announced his resignation effective July 2013. The Governor reappointed Michael Brown as Flint's Emergency Manager.

90. In September 2013, after Emergency Manager Brown resigned, Darnell Earley was appointed by the Governor as Flint's Emergency Manager.

91. Michael Glasgow, the City of Flint's water treatment plant's laboratory and water quality supervisor informed the MDEQ on April 16, 2014, that the WTP was not fit to begin operations and that "management" was not listening to him because "they seem to have their own agenda."[4]

---

[3] "City of Flint decides to use the Flint River as a water source, per Gov. Snyder timeline." Exhibit A, Task Force Report at 5.

[4] Glasgow said on April 16, 2014 that " .... it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible . . . . I would like to make sure we are monitoring, reporting and meeting requirements before I give the OK to start distributing water." The next day,

92.     On April 25, 2014, under the direction of Emergency Manager Earley and State officials from MDEQ, Flint water users began receiving Flint River water from their taps even though Glasgow warned that the WTP was not ready.

93.     Beginning in June 2013 and continuing through April 25, 2014, the State created a dangerous public health crisis for the users of Flint tap water when it, Kurtz and Earley ordered and set in motion the use of highly corrosive and toxic Flint River water knowing that the WTP was not ready.

94.     For at least a year prior thereto, the State knew that using the Flint River water was dangerous and could cause serious public health issues.[5]

95.     As early as May 2014, the State knew that it had indeed created a dangerous public health crisis, yet failed to take any remedial steps.[6]

96.     In June 2014, citizen complaints about contaminated water continued

---

Glasgow wrote Prysby and Busch of the MDEQ, that "..... I have people above me making plans to distribute water ASAP. I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda."

[5] "January 23, 2013: Mike Prysby/MDEQ e-mails colleague Liane Shekter Smith and others about feasibility of Flint switching to the Flint River, highlighting water quality concerns." Exhibit A, Task Force Report at 16.

[6] The Governor's office received citizen complaints and was well aware of numerous press stories about water quality problems as early as May 2014 and continuing throughout 2015." Id. at 36.

without the State doing anything to address these complaints. Many Flint water users reported that the water was making them ill.

97.     On October 14, 2014, Flint's public health emergency was a topic of significant discussion in the Governor's office.[7]

98.     By October 2014, the Governor and his staff knew full well of the on-going public health threat to the people of Flint, yet he did absolutely nothing to assist the desperate people of Flint.[8]

99.     By October 2014, the threat of deadly Legionnaires disease was adding to the public health safety crisis.[9]

---

[7] "Valerie Brader, State Deputy Legal Counsel and Senior Policy Advisor, e-mails [on October 14th the] Governor's Chief of Staff Dennis Muchmore and other top aides arguing for a return to DWSD because of water quality problems. Michael Gadola, then the Governor's Legal Counsel, responds by agreeing with Brader. Brader and Rich Baird, another senior aide to the Governor, then discuss the idea with Emergency Manager Darnell Earley, who maintains the water quality problems can be solved and it would be cost-prohibitive to return to DWSD." Id. at 17-18.

[8] The Task Force Report was critical of the Governor's failure to answer the Flint citizen calls for help in October 2014. "The suggestion made by members of the Governor's executive staff in October 2014 to switch back to DWSD should have resulted, at a minimum, in a full and comprehensive review of the water situation in Flint, similar to that which accompanied the earlier decision to switch to KWA. It was disregarded, however, because of cost considerations and repeated assurances that the water was safe. The need to switch back to DWSD became even more apparent as water quality and safety issued continued and lead issues began to surface in 2015, notwithstanding reassurances by MDEQ." Id. at 38.

[9] "[October 2014] Genesee County Health Department initially expresses concern to Flint Water re: increased incidence of Legionellosis and possible connection to water supply." Exhibit B, Task Force Timeline at 7.

100.   On October 13, 2014, the General Motors Corporation announced that it would no longer use Flint River water in its Flint plant. Despite this clear evidence of serious and significant danger, none of the Defendants took any action to alter the course of the health crisis.[10]

101.   On October 17, 2014, Flint officials became aware of the threat of Legionnaires disease resulting from the use of Flint River water. No action was taken by Flint or Genesee County Health officials.[11]

102.   On October 21, 2014, the MDHHS was notified of the health crisis caused by the Flint River water. Again, no action was taken.[12]

103.   In January 2015, State officials met to discuss the ongoing threat to public health posed by the Legionella bacteria in the Flint River water.[13] The public health crisis was not addressed in any serious and/or non-frivolous way.

---

[10] "GM announces it is switching from City of Flint water system to Flint Township (Lake Huron) water for its Flint Engine Operations facility until KWA connection is complete, citing corrosion concerns. Prysby/MDEQ notes Flint water chloride levels are "easily within" public health guidelines. Annual revenue loss of $400,000. Id. at 7.

[11] "Genesee Co. Health Department (GCHD) representatives hold conference call with Glasgow and Wright/Flint DPW re: county's concerns about Legionellosis outbreak and possible connection to city's water system. DPW "acknowledges that the distribution system has areas of concern." Id. at 7.

[12] "Susan Bohm/MDHHS e-mails GCHD officials re: Shekter Smith's concern that Flint water would be publicly linked to Legionellosis outbreak in Flint.' I told her the Flint water was at this point just a hypothesis.'" Id. at 7.

[13] "January 2015 (date unclear): Staff from Genesee County hospitals, MDHHS, MDEQ and GCHD meet, and MDHHS Director Nick Lyon directs GCHD to

34

104.   On January 13, 2015, Earley resigned his position as Emergency Manager and the Governor replaced him with Gerald Ambrose.

105.   On January 21, 2105, State officials ordered water coolers to be installed in State buildings operating in Flint. State officials were concerned that this action, if it became widely known by the public, would reveal their dishonesty because they had been advising the residents of Flint that it was safe to drink the tap water and at the same time arranging for alternative water sources for the State employees who were working in Flint.[14]

106.   On January 27, 2015, Flint was placed on notice that the Genesee County Health Department ("GCHD") believed there was an association between the spike in Legionella disease reports and the onset of the use of Flint River water. Again, Defendants did nothing about the impending health catastrophe.[15]

107.   On January 29, 2015, State officials recognized that the public health crisis was caused by the corrosion of the entire infrastructure of the Flint water

_____

conduct and complete its evaluation of the causes of the increased Legionellosis cases that had begun to occur in 2014." Id. at 18.

[14] "MDEQ staff (Prysby, Shekter Smith, Benzie, numerous others) communicate via e-mail re: decision to provide water coolers at Flint's State Office building. Some discussion re: how this decision will affect Flint residents' perceptions of drinking water safety, and how the decision will "make it more difficult . . . for ODWMA staff." Id. at 8.

[15] "FOIA request sent by GCHD environmental hygienist James Henry to Flint DPW and Flint Mayor for information on water treatment to support the county's investigation of Legionellosis cases." Exhibit A, Task Force Report at 18.

system. No action was taken to warn the public of the health crisis or to correct the harm caused by the State's decision to switch from DWSD water to Flint River water.[16]

108.   On January 29, 2015, Sue McCormick, the Director of DWSD, offered Ambrose an opportunity to purchase DWSD water at attractive rates. DSWD's proposal included waiving the reconnection fee. This offer was rejected by Ambrose.

109.   In January 2015, Flint home owner, LeeAnne Walters, called the United States Environmental Protection Agency ("EPA") regarding water issues that she was experiencing at her Flint home. She informed the EPA that she and her family members were becoming physically ill from exposure to the Flint River water coming from her tap.

110.   By the end of January 2015, the Governor's office was fully aware of the public health emergency caused by the rise in Legionella bacteria found in the Flint River and launched a cover-up of the public health crisis.[17]

---

[16] Sygo and Shekter Smith/MDEQ e-mail re: Flint water quality problems. Shekter Smith identifies the problem as corrosion across the distribution system rather than a 'premise plumbing' issue." Exhibit B, Task Force Timeline at 8.

[17] "January 30, 2015: Brad Wurfel/MDEQ e-mails Dave Murray, Governor Snyder's deputy press secretary, re: Legionella, saying said he didn't want MDEQ Director Wyant "to say publicly that the water in Flint is safe until we get the results of some county health department trace back work on 42 cases of

111.   On February 1, 2015, the Governor was fully informed of the health crisis in Flint. Given the months of complaints from Flint water users that the water was discolored, foul smelling/tasting and making them visibly sick, the Governor knew that there was an imminent threat to the people of Flint.[18]

112.   Yet, neither the Governor, nor State and local public officials, took corrective action.

113.   On February 17, 2015, Flint water users staged public demonstrations demanding that Flint reconnect with DWSD. Once again, Ambrose refused to restore Detroit water for Flint water users. State and local public officials falsely insisted that the water was acceptable for use and took no action.

114.   On February 26, 2015, Jennifer Crooks of the EPA wrote an email to MDEQ and EPA representatives. Crooks noted that Walters complained of "black sediment in her water." She noted that the iron contamination was so high that the testing instrumentation could not measure it.[19]

Legionellosis in Genesee County since last May." Exhibit A, Task Force Report at 18.

[18] Briefing memo is prepared for Gov. Snyder on Flint water situation, including info on residents' complaints about water quality, Mayor Walling's call for assistance, and MDEQ 'backgrounder' downplaying health risks." Wurfel: "It's not like an imminent threat to public health." Exhibit B, Task Force Timeline at 9.

[19] Crooks said in her email: "But, because the iron levels were so high [Michael Glasgow, Flint Utilities Administrator], suggested testing for lead and copper. WOW!!!! Did he find the LEAD! 104 ppb. She has 2 children under the age of 3. ..Big worries here. ..I think Lead is a good indication that other contaminants are

115.   In a second email on February 26, 2015, Crooks stated that Miguel Del Toral ("Del Toral") of the EPA is of the opinion that the "black sediment" in the Walters water was actually lead.[20]

116.   On February 27, 2015, Stephen Busch advised Del Toral that the City was using corrosion control. This statement was false and Busch knew it was false when he made this statement to the EPA.[21]

117.   On March 5, 2015, the Governor and officials in the Governor's office realized that they had a massive public health emergency which *probably included widespread lead poisoning* on their hands and began discussing distributing water filters to Flint water users. These public officials took no action

---

also present in the tap water that obviously were not present in the compliance samples taken at the plant. .We also talked about Dr. Joan Rose from Michigan State being on the Flint Tech Advisory committee--would want to dive further into this. .she and her family are also exhibiting the rashes when exposed to the water, and her daughter's hair is falling out in clumps."

[20] Crooks stated that "Miguel is wondering if Flint is feeding Phosphates. Flint must have Optimal Corrosion Control Treatment-is it phosphates? From a public health perspective, can we assume that the high lead levels in Mrs. Walters' neighborhood are isolated to just her area? Or are they more widespread?"

[21] "Busch/MDEQ responds to Del Toral/EPA saying that the City of Flint 'Has an Optimized Corrosion Control Program,' LeeAnne Walters's house is 'not part of the City's established sample site pool' and the residence has PVC plumbing." Exhibit B, Task Force Timeline at 10.

to warn or otherwise protect Plaintiffs, and continued to conceal from them and the public the true nature, extent and severity of the public health crisis.[22]

118.   By March 10, 2015, James Henry of the GCHD raised concerns that he was being stonewalled by the State and City in accessing public health information about the Legionella outbreak in Genesee County. The concealment of the public health emergency by City and State officials – Defendants herein – was shocking and unconscionable.

119.   *As of* March *10, 2015, the Defendants knew that the extreme public health emergency involved lead poisoning, deadly Legionella bacteria and a host of other ailments.*[23]

---

[22] "Officials in Governor's Office and MDEQ begin discussing providing water filters to Flint citizens." *Id.*

[23] "James Henry/GCHD e-mails Howard Croft/Flint DPW, Prysby/MDEQ, Mayor Walling and others citing the city's and state's lack of cooperation and failure to respond to his requests for information ---- and a Jan. 2015 FOIA ---- to support county's investigation of potential causes of Legionellosis outbreak in Flint. 'This is rather glaring information and it needs to be looked into now, prior to the warmer summer months when Legionella is at its peak and we are potentially faced with a crisis.'" Exhibit B, Task Force Timeline at 9. The Task Force Report highlights the government misconduct which prolonged the danger created by the State when it decided to use the highly corrosive Flint River water. The Task Force stated in its report that "[a]s the Flint water crisis unfolded, certain state agencies' *perceived need to defend the original decision to switch to the Flint River and resist a return to DWSD resulted in public relations and communications efforts that have, at times, been inappropriate. In the spring and summer of 2015, for example, this perceived need to defend a flawed decision manifested itself in attempts by MDEQ and MDHHS to discredit accurate information on lead in drinking water and elevated blood lead levels provided by outside experts. Citizen*

120.  On March 25, 2015, Flint City Council voted to reconnect to Detroit's water system. Governor Snyder's appointed Emergency Manager, Gerald Ambrose, exacerbated the State-created danger by rejecting this vote of the Flint public officials.[24]

121.  On June 24, 2015, Del Toral of the EPA prepared a memorandum entitled, "**High Lead Levels in Flint Michigan-Interim Report**" ("Del Toral Report"). On the following day, Del Toral wrote an internal email with respect to the elevated lead in Flint water at EPA stating:

> "I understand that this is not a comfortable situation, but the State is complicit in this and the public has a right to know what they are doing because it is their children that are being harmed."

Del Toral further warned that the failure to inform Flint water users of the elevated lead levels was "bordering on criminal neglect."

---

concerns were at times derided and dismissed, in spite of the fact that various members of the Governor's staff had expressed—and were expressing—concerns about the water situation in Flint at the same time."…**In any event, the facts in this case point to the reality that state government, as the entity in charge of Flint decision-making, failed to protect the health of the city's residents.** Emphasis added. Exhibit A., Task Force Report at 37, 40.

[24] The Task Force further notes that in March, 2015, Emergency Manager Ambrose completely ignored numerous alarms and warnings that the Flint River water was dangerous to the health of the Flint water users. "Flint City Council votes 7--1 to end Flint River service and return to Detroit water service; the vote is non-binding since Flint is under EM control Flint EM Ambrose: 'It is incomprehensible to me that… Flint City Council would want to send more than $12 million a year to the system serving Southeast Michigan, even if Flint rate payers could afford it. (Lake Huron) water from Detroit is no safer than water from Flint.'" Exhibit B, Task Force Timeline at 10.

122.   The Del Toral Report was shared with, among others, MDEQ's Chief of Office of Drinking Water and Municipal Assistance, Liane Shekter-Smith, MDEQ's Water Treatment Specialist, Patrick Cook, MDEQ's District Supervisor, Stephen Busch, and MDEQ's Engineer assigned to District 11 (Genesee County), Michael Prysby.

123.   Nonetheless, State and local public officials failed to undertake any measures to effectively address any of the dangers, including lead poisoning, identified by EPA Agent Del Toral.

124.   On June 30, 2015, Mayor Walling notified EPA Region 5 Director, Dr. Susan Hedman ("Hedman") that Del Toral was speaking publicly about the Flint environmental crisis.

125.   On July 2, 2015, Hedman advised Walling that he was given a preliminary draft and that it would be premature to draw any conclusions based on that draft."

126.   On July 10, 2015, MDEQ official Brad Wurfel, in an effort to conceal the public health crisis, appeared on public radio and advised listeners that Flint water was safe and that it was not causing "any broad problem" with lead leaching into residential water. Parents, worried about the lead poisoning of their children, demanded answers from Wurfel. He told the concerned parents, "*[l]et me start*

*here-anyone who is concerned about lead in the drinking water can relax."*
Wurfel, at the time he made this statement, knew his statements were false and he deliberately misled the public about the seriousness of the crisis.

127.   By July 2015, multiple agencies within the State of Michigan, including the Governor, the Governor's Office and MDEQ, had actual notice of high lead exposure and other dangers, including Legionnaires' disease, associated with Flint water.

128.   On July 22, 2015, Governor Snyder's Chief of Staff, Dennis Muchmore, wrote to MDHHS Director Lyon and stated that the Plaintiffs' concerns regarding lead poisoning and other dangers were being "blown off" by the Defendants.

129.   On July 24, 2015, Wurfel continued to promote the cover-up of the health crisis. In response to the recognition that the Defendants were blatantly ignoring the concerns of Flint residents, he stated, "In terms of near-future issues, the bottom line is that residents of Flint do not need to worry about lead in their water supply, and DEQ's recent sampling does not indicate an imminent health threat from lead or copper."

130.   In August 2015, Professor Marc Edwards of Virginia Polytechnic Institute and State University ("Virginia Tech"), determined that there was serious

lead contamination of the Flint water system and stated that the people of Flint faced a major public health emergency.

131.  Wurfel, speaking for the State, immediately dismissed and discredited Edwards by stating that Edwards's team "only just arrived in town and (have) quickly proven the theory they set out to prove, and while the state appreciates academic participation in this discussion, offering broad, dire public health advice based on some quick testing could be seen as fanning political flames irresponsibly."

132.  By late 2014 or early 2015, Lyon was aware from MDHHS data that there was a dramatic increase in the percentage of Flint children with elevated blood lead level readings from blood drawn during the second and third quarters of 2014, and that Legionnaires' disease was on the rise during the same period of time. Lyon was aware of this dangerous condition but did nothing to report the findings to the Plaintiffs or the public.

133.  Lyon knew that these elevated blood lead levels, and an increase of Legionnaires' disease found in its own database, correlated with the introduction of the corrosive Flint River water into the Flint water distribution system. Lyon did not order that any action be taken to warn the public.

134.   The increase in elevated blood lead levels in Flint's children, and Lyon's failure to do anything to prevent further injury to the people of Flint, identifies yet another aspect of this unconscionable government-created health and public safety emergency. Lyon, aware of the elevated blood lead levels in Flint's children, failed to report the evidence to the MDEQ, Governor's Office, EPA or the Flint community. His concealment of this critical information increased the risk and exacerbated the danger.[25]

135.   The Defendants and the MDHHS immediately accused Dr. Hanna-Attisha of providing false information to the public.

---

[25] The Task Force Report states that in July, 2015, the MDHHS knew that there was a spike in elevated blood lead levels of Flint children which correlated with the onset of the Flint River water as a drinking water source for Flint water users. The MDEQ knew its public statement in September about no elevated blood lead levels was false. ("July 28, 2015: MDHHS epidemiologist Cristin Larder finds that children's blood lead tests conducted in summer 2014 "lie outside the control limit" compared with prior years and that this finding "does warrant further investigation." On the same day, CLPPP data manager Robert Scott analyzes the data over a 5-year period and concludes that "water was not a major factor." Later that day, CLPPP manager Nancy Peeler concludes that the lack of persistently elevated blood lead levels in children in Flint beyond the summer months indicates no connection to the change in water in Flint in 2014. Larder then receives email communication from Peeler: Peeler has concluded from CLPPP data and communicated with MDHHS leadership that there is no problem with children's lead levels in Flint." Exhibit A, Task Force Report at 20.

136.   In September 2015, the MDEQ continued to falsely assure the public that use of Flint Water was safe and continued to deny the public health crisis at hand.[26]

137.   On September 25, 2015, Wurfel falsely advised media and the public that MDHHS officials have reexamined its blood lead level data and that the MDHHS statistics do not show the same upward trend documented by Dr. Hanna-Attisha.

138.   On September 28, 2015, Wurfel stated publically that the Flint water crisis was becoming "near-hysteria" because of Dr. Hanna-Attisha's report. He said that he wouldn't call her reports "...irresponsible. I would call them unfortunate." Wurfel finished his remarks that day by falsely stating that "Flint's drinking water is safe in that it's meeting state and federal standards."

---

[26] An example of this type of misleading public statement is found in a MDEQ document entitled, "*DEQ Frequently Asked Questions, Water Lead Levels in the City of Flint, September, 2015*" which stated, **"Are there other ways the city monitors for lead exposure?** The County Health Departments, overseen statewide by the Michigan Department of Health and Human Services, *regularly monitors blood levels* in children throughout Michigan communities. The *leading cause of lead poisoning is exposure to lead paint*. Blood lead level testing results for the 12-month period just after the City of Flint changed its water source (May 2014 – April 2015) *showed no significant change* in the pattern of blood lead levels in Flint, compared to the previous three years. This data *suggests the recent change in water source by the City of Flint has not contributed to an increase in lead exposure* throughout the community." (Emphasis added)

139. On September 29, 2015, Wurfel referred to EPA Del Toral as a "rogue employee."

140. By late September 2015, reconnecting to the Detroit water system was the only reasonable option to protect the health and safety of the Flint water users. Yet the State deliberately chose not to proceed in this fashion. Instead, on or about October 2, 2015, State officials announced that the State would appoint a Flint Water Advisory Task Force and would provide water filters designed to eliminate the lead in the water to Flint water users.

141. On October 8, 2015, the Governor recognized that he could no longer pretend that the water from the Flint River was safe. He finally ordered Flint to reconnect with the Detroit water system, which contained corrosion control chemicals.

142. The reconnect to DWSD took place on or about October 16, 2015.

143. Flint is currently in a State of Emergency: Mayor Karen Weaver declared a State of Emergency on December 14, 2015. On January 4, 2016, the Genesee County Commissioners declared a State of Emergency. On January 5, 2016, Governor Snyder declared a State of Emergency. On January 13, 2016, the Governor activated the Michigan National Guard to assist the people of Flint. On January 14, 2016, the Governor asked President Barak Obama and the Department

of Homeland Security, Federal Emergency Management Agency ("FEMA") to declare Flint a Major Disaster. On January 16, 2016, FEMA issued an emergency declaration to assist the people of Flint.

144.   The relief efforts of State public officials have been ineffective, indeed often frivolous, in mitigating the devastation caused by its creation of the public health crisis. The ineffective relief efforts have prolonged the dangerous conditions and, in many cases, the failed mitigation efforts have further exacerbated the effects of the public health calamity created by the State.

## Relevant Facts – Engineering Defendants

145.   Like the residents of any American city, residents of Flint rely on a steady supply of safe and clean water to go about their daily lives. Flint also has commercial and other non-residential properties whose owners rely upon clean and safe water.

146.   The Flint WTP was constructed in 1917 to draw water from the Flint River as the source of Flint's drinking water for nearly 50 years until 1964.

147.   As early as 1964, the U.S. Geological Survey ("USGS") noted high levels of chloride in the Flint River. Due to the concerns regarding the adequacy of the Flint River to provide safe drinking water, Flint evaluated alternatives for a new water supply, and ultimately switched providers. From 1964 to 2014, Flint

water users received their water from Lake Huron via purchase from the Detroit Water and Sewerage Department ("DWSD"). This water did not require treatment through the Flint WTP.

148.   During this half-century, Flint water users enjoyed safe, clean, fresh water in their homes, businesses, hospitals and other places of public services.

149.   However, since approximately the 1990s, Flint and other local governmental entities had growing concerns over the cost of the DWSD water supply. Amidst these growing concerns, Flint and the other local governmental entities, which included Genesee County, Lapeer County and Sanilac County, commissioned studies for alternative water supplies. Certain studies were completed in 1992.

150.   A 2001 report by the Department of Natural Resources noted that certain businesses along the Flint River had permits to discharge runoff from industrial and mining activities, as well as petroleum and gasoline cleanups.

151.   In 2004, a technical assessment of the Flint River raised concerns about using the river as a source of drinking water. One of the key points from the technical assessment, entitled "Source Water Assessment Report for the City of Flint Water Supply – Flint River Emergency Intake," prepared by the U.S. Geological Survey, the MDEQ  and the Flint Water Utilities Department, was that the Flint River was a highly sensitive drinking water source that was susceptible to

contamination.

152.   Flint and the local governmental entities again commissioned studies for alternative water supplies, which were completed in 2006 and 2009.

153.   The 2009 study, prepared by Rowe, LAN and others, evaluated two alternatives for water supply – continue to purchase from DWSD or construct a new pipeline (later known as the Karegnondi Water Authority ("KWA") pipeline) from Lake Huron.

154.   Also in 2011, Flint government officials commissioned a study (or studies) by LAN and Rowe to determine if the Flint River could be safely used by the City as the primary source of drinking water. One of those studies, entitled "Analysis of the Flint River as a Permanent Water Supply for the City of Flint" (the "2011 Report"), which bore LAN's and Rowe's respective logos, was published in July 2011.

155.   The 2011 Report stated that chemically treating Flint River water on a continuous basis would be a challenge and more expensive than chemically treating lake water. It concluded that "water from the river can be treated to meet current regulations; however, additional treatment will be required than for Lake Huron Water …  Although water from the river can be treated to meet regulatory requirements, aesthetics of the finished water will be different than that from Lake Huron." The study further concluded that such treatments to Flint River water

49

could be done if improvements were made to the Flint WTP. However, if used as a water supply, the study noted that "a source water protection management plan should be developed to … identify potential sources of contamination … "

156.   LAN also prepared an additional analysis, attached to the 2011 Report as an appendix, which detailed over $69 million in improvements that would have to be made to bring the Flint WTP up to current standards. This additional analysis specifically projected costs for corrosion control chemicals that would be required to ensure the safety of water to be drawn from the Flint River.

**Rowe Served As City Engineer for Flint during the Relevant Time Period**

157.   The Flint City Charter requires that Flint have somebody serving in the capacity of City Engineer. In order to receive State and Federal funding for projects, it is mandatory for Flint to have a City Engineer to certify and submit required documentation.

158.   In 2007, Rowe was awarded the job to provide professional engineering services as City Engineer to Flint for a five-year period. Rowe provided those services to Flint pursuant to City Contract 07-103 under the broad categories of engineering, surveying, and project management / administration (both design and construction) and technical assistance.

159.   In January 2012, Flint Emergency Manager Jerry Ambrose executed a resolution authorizing Flint to enter into Change Order No. 9, which would extend

Rowe's contract as City Engineer from January 1, 2012 to June 30, 2013.

160.   In September 2013, Rowe was re-hired by Flint for professional services for the 2014 fiscal year, wherein Rowe would continue to serve as City Engineer.

## Flints Water Supply is Switch to the Flint River Without the Provision of Corrosion Control

161.   In November 2012, Emergency Manager Ed Kurtz wrote to State of Michigan Treasurer Andy Dillon suggesting that Flint join the yet to be formed KWA due to projected cost savings over DWSD. This was pursuant to the Emergency Manager's mandate to cut costs.

162.   In December 2012, during a meeting with the State of Michigan Treasury, Flint rejected the Flint River as a water source because of the comparatively high costs of preparing the Flint WTP to treat water drawn from the Flint River to applicable standards.

163.   In early 2013, Flint Emergency Manager Kurtz signed an agreement to switch Flint's primary drinking water source from the DWSD to the newly formed KWA, which was scheduled to become operational sometime in 2016. Upon information and belief, Flint assumed it would continue to purchase its water from DWSD until the KWA pipeline became operational.

164.   Upon discovery of Flint joining the KWA, DWSD protested,

attempted to convince Flint to reconsider switching over to the KWA, and continue purchasing its water from the DWSD. Flint declined, so in April 2013, DWSD gave Flint notice that their long-standing water agreement would terminate in April 2014.

165. The KWA depended on an infrastructure that had not yet been built, and that would not be completed until at least 2016. Kurtz then proposed drawing drinking water from the Flint River until the KWA was completed as a cost-cutting measure.

166. In or around June 2013, Emergency Manager Kurtz hired LAN to advise the City with respect to using the Flint River as the City's water source during the construction of infrastructure for the KWA. LAN advised the City regarding the design of an upgrade to the Flint Water Plant and stated that "quality control could be addressed."

167. On June 10, 2013, LAN submitted a proposal to Flint for upgrading the Flint WTP entitled "Flint Water Treatment Plant Rehabilitation – Phase II." The proposal was to make "improvements . . . intended to help the City operate[] the plant on a full time basis using the Flint River." The proposal was signed by J. Warren Green, Professional Engineer (Project Director) and Samir F. Matta, Professional Engineer (Senior Project Manager).

168. LAN claimed in its proposal that it's "staff has the knowledge,

expertise and the technical professionals to handle all aspects of the projects. Our

staff has firsthand knowledge of the [Flint WTP] …

169.   The proposal included the following relevant sections:

a.   A "Scope of Services" section that stated the "project involves the evaluation and upgrade of the Flint Water Plant to provide continuous water supply service to the City of Flint (Flint) and its customers." The upgrades and improvements would allow the use of the Flint River as a water supply.

b.   A "Standards of Performance" section where LAN "agree[d] to exercise independent judgment and to perform its duties under this contract in accordance with sound professional practices." As part of the proposal, it was understood that Flint was relying upon the professional reputation, experience, certification and ability of LAN.

170.   On or about June 26, 2013, Kurtz signed a resolution authorizing Flint

to enter into a professional services contract with LAN to place the Flint WTP into

full-time operational use, which would draw water from the Flint River as its

primary source of water until the completion of the KWA.

171.   Flint formally retained LAN as the design engineer for improvements

and upgrades to the Flint WTP for the treatment of new water sources, including

both the Flint River and the KWA pipeline. In deciding to proceed with the

transition to the Flint River, the City of Flint noted LAN's "extensive experience in

this field," and relied upon LAN's identification of the "engineering, procurement,

and construction needs" for the project." Although the City recognized that water

from the Flint River "would be more difficult to treat," the City concluded, based

on LAN's recommendations, that the Flint River was "viable as a source" for the City's water. *See* City of Flint, Water System Questions & Answers (Jan. 13, 2015), available at:

> *http://mediad.publicbroadcasting.netlp/michiganlfiles/201512/CoF-Water-SystemFAQ-1-16-2015.pdf.*

172.   LAN continued to advise the City with respect to its transition to the Flint River through 2015, and ultimately was paid more than $3.8 million for its engineering services. City officials, including then-Mayor Walling, relied upon LAN's advice in pronouncing the City's water to be safe.

173.   The transition to the Flint River as a primary water source presented many well-known challenges and dangers. Flint's water treatment plant had not been needed to treat the water received from DWSD, as DWSD provided the water in an already treated state. It is critical that a new source of water be properly studied and treated to ensure that its use will not result in the corrosion of pipes in the delivery system. This is particularly important where portions of the delivery system, included but not limited to service lines, are made of lead. According to the EPA, "it is critical that public water systems, in conjunction with their primacy agencies and, if necessary, outside technical consultants, evaluate and address potential impacts resulting from treatment and/or source water changes." Various factors specific to individual water sources necessitate different treatments,

including but not limited to the use of chemical additives. The water obtained from the Flint River was substantially more corrosive than the treated water Flint had been receiving from DWSD. Water becomes more corrosive when it contains greater quantities of chloride, which can enter the water from manmade and natural sources. Flint River water is known to contain about  eight times more chloride than Detroit water. It is well known that corrosive water that is not properly treated results in the corrosion of pipes, such that the metals in the pipes, including lead, will leach into drinking water. Phosphates are often added to corrosive water as a method of corrosion control, to prevent metals from leaching into the water.

174.   Upon information and belief, there were no bids submitted by LAN or any other firm for this work, nor were any other firms considered for this work. The contract was awarded without competitive bidding.

175.   On June 29, 2013, LAN met with representatives of Flint, the Genesee County Drain Commissioners Office and the MDEQ to discuss:

a.      Using the Flint River as a water source;

b.      The ability to perform the necessary upgrades to the Flint WTP;

c.      The ability to perform quality control;

d.      The ability for Flint to provide water to Genesee County;

e.      The ability to meet an April or May 2014 timeline; and

f.      Developing a cost analysis.

176.   According to incomplete meeting minutes, "the conversation was guided with focus on engineering, regulatory, and quality aspects … " of the items previously referenced, and the following determinations were made:

a.   The Flint River would be more difficult to treat, but was viable as a source;

b.   It was possible to engineer and construct the upgrades needed for the treatment process;

c.   It was possible to perform quality control "with support from LAN engineering which works with several water systems around the state, quality control could be addressed";

d.   The Flint WTP did not have the capacity to treat and distribute sufficient water to meet the needs of Flint and Genesee County;

e.   There were many obstacles to overcome, but completion by the April or May 2014 timeline was reachable; and

f.   The next steps were for LAN to present Flint with a proposal that would include engineering, procurement and construction needs for the project along with cost estimates.

177.   Upgrading the Flint WTP would have its challenges. Since 1965, the Flint WTP served as a secondary and backup water supply system to the DWSD. Typically, a secondary supply for a public water system would be needed only during emergency situations, and is normally designed for short-term operation, such as providing the average daily demand for only a few days.

178.   Upon information and belief, the Flint WTP was previously upgraded in or around 2004 in order to allow it to operate for an extended short-term period

(i.e., approximately six weeks) because of a perceived high risk that the DWSD supply would fail and remain out of service for an extended duration.

179.   Due to the aforementioned 2013 agreement, the Flint WTP needed upgrading to operate on a full-time basis, otherwise it would be unable to provide the citizens of Flint with sufficient quantities of water.

180.   In April 2014, LAN, Flint and MDEQ officials addressed and discussed optimization for lead, and they decided that having more data was advisable before implementing an optimization method.

181.   On April 9, 2014, the City received the necessary permits from MDEQ to draw Flint River water for distribution as the supply source for its water distribution system during the multi-year transition to the new KWA facility.

182.   Despite receiving these permits, the water system was not ready to become operational.

183.   The Flint water system was not prepared for the switch to Flint River water. The Flint River, it turned out, was contaminated 'with rock-salt chlorides washed into the river from road surfaces over the course of many harsh Michigan winters. The level of chlorides in the Flint River was eight times the levels provided in DWSD water. Chlorides are highly corrosive, and must be neutralized with anticorrosive agents before entering public water systems.

184.   LAN knew, if not recommended, that the Flint WTP would begin

57

drawing water from the Flint River later that month that would not be treated with anti-corrosive measures. Moreover, the potential consequences in endangering the public health as a result of not using anti-corrosive treatments when using water from the Flint River as the primary source were or should have been well-known and foreseeable to LAN, an engineering firm that, according to its website, is a "national leader in the heavy civil infrastructure engineering industry," "one of the most respected engineering firms in the United States today," and "a recognized leader in the industry with a rich history of serving a diverse group of heavy civil infrastructure clients across the country."

185.   From July 2013 through April 2014, LAN provided its professional services, but failed to meet its duty of care and competence. LAN was responsible for providing engineering services to make Flint's inactive water treatment plant sufficient to treat water from each of its new sources. LAN's actions facilitated the transfer of Flint's water source to river water without proper corrosion control treatment. The improvement and upgrade plans to the Flint WTP were approved by MDEQ in April 2014, pursuant to plans and specifications signed and sealed by LAN. LAN, as Flint's outside contractor, had a duty to recognize the need for corrosion control and advise that it should be implemented. Yet, incredibly, at the time of the switch to Flint River water, no phosphates were being added to the water supply. In fact, nothing whatsoever was being done to account for the

corrosive nature of the Flint River water. Moreover, LAN did not require water quality standards to be set for the Flint River water that would be delivered to Flint's residents and property.

186.   On April 25, 2014, Flint officially began using the Flint River as its primary water source, despite the fact that the proper preparations had not been made.

187.   Within weeks of switching water sources, complaints began to pour in from residents regarding the smell, taste, and color of the drinking water.

188.   In the midst of growing concerns about the safety of its water, Flint engaged two engineering companies to provide their professional opinion regarding the necessary changes to render the water compliant with state and federal laws. First, the City engaged LAN.

189.   On August 14, 2014, Flint's water tested above legal limits for total coliform and E. coli bacteria. The City issued boil water advisories on August 16, 2014 and September 5, 2014 in response.

190.   To address the bacteria problem, the water was treated with additional chlorine. However, as has been well known for decades, in corroded pipes, chlorine preferentially reacts with the bare metal instead of attacking solely bacteria. The addition of substantial amounts of chlorine to a water supply was thus ineffective in treating bacteria – so more chlorine was added.

191.   The use of chlorine to disinfect water produced various disinfection byproducts, including trihalomethanes (often referred to as "Total Trihalomethanes" or "TTHM"). When bare pipes are not protected with a corrosion control protocol, more chlorine yields more TTHM.

192.   Immediately after the discovery of Flint's bacterial problems, it was apparent that Flint's TTHM levels were high. This should have been a red flag that the steel in the pipes had been laid bare by the high salt concentrations the water pumped from the Flint River.

193.   As officials were beginning to assess the extent of Flint's TTHM problems, another problem emerged in the summer of 2014; MDHHS reported an outbreak of Legionnaires' disease – another red flag.

194.   Legionnaires' disease is a severe form of pneumonia which, when treated early enough, has a mortality rate of 20%; if left untreated, the rate rises to 80%. Infection in humans occurs when water droplets contaminated with Legionella bacteria are inhaled or when water-containing Legionella enters the trachea. Extensive studies of Legionella have established that the pathogen enters the water supply when the "bio-film" protecting pipes is stripped away, which is exactly what happened when the River's corrosive water entered the City's pipes.

195.   In addition to a rise in the reported incidence of Legionnaires' disease, MDHHS first noted another potential problem related to Flint's water in September

2014; lead poisoning rates "were higher than usual for children under age 16 living in the City of Flint during the months of July, August and September, 2014."

196.   As early as October 1, 2014, it was known that one of the causes of the bacterial contamination was the existence of iron pipes in the City's water distribution system.

197.   Most of Flint's 550 miles of water mains are now over 75 years old and constructed of cast iron piping. Cast iron pipe is subject to internal corrosion, called tuberculation, which causes buildup on the pipe interior, leading to water quality issues, reduced flow and pressures, and leakage. Tuberculation also encourages the development of biofilms, layers of bacteria that attach to the interior pipe wall.

198.   On October 13, 2014, the General Motors Corporation ceased the use of Flint River water at its engine plant because of fears that it would cause corrosion due to high levels of chloride.

199.   On December 31, 2014, the first round of lead monitoring showed results exceeding the Lead and Copper Rule's action levels for lead, 15 parts per billion ("ppb"). Worse yet, these samples were not drawn from the highest risk homes as required by the Lead and Copper Rule.

200.   On January 9, 2015, the University of Michigan – Flint water tests revealed high lead levels in two locations on campus, causing the university to turn off certain water fountains.

### The Corrosive Water Cause Widespread Damage

201.   As a result of the failure to properly treat water from the Flint River, corrosive water was delivered throughout the Flint Water System. The water predictably corroded metal pipes, causing them to leach into water. An estimated 15,000 of Flint's 30,000 residential service lines are composed, at least partially, of lead. The exact number is presently unknown.

202.   Setting standards and optimal ranges for water quality is necessary to prevent widespread impacts from substandard or dangerous water. Lead is a powerful neurotoxin that can have devastating, irreversible impacts on the development of children. There is no safe level of lead, as its effects are harmful even at low levels. Lead exposure in children causes heightened levels of lead in the blood and body, resulting in problems including decreased IQ, behavioral problems, hearing impairment, impaired balance and nerve function, infections, skin problems, digestive problems and psychological disorders.

203.   Lead contamination is not the only problem that is caused when corrosive water is distributed in a public water system. When water corrodes iron pipes, the iron leaching into the water system can consume chlorine. This can

eliminate the chlorine necessary to prevent the growth of microorganisms that can cause disease. With chlorine consumed by iron, the risk of infection by organisms such as Legionella increases.

### LAN Was Asked to Evaluate the Problems But Failed to Do So Properly

204.   In November 2014, LAN was on actual notice of the need to assess the factors contributing to high TTHM levels following the water source change because LAN was engaged to evaluate this issue by Flint and provide a report of its findings, which it did in August 2015.

205.   LAN issued a 20-page Operational Evaluation Report on November 26, 2014, intended to address compliance with EPA and MDEQ operations and regulations. LAN entirely failed to address the hazard of lead associated with the corrosive water flowing through the pipes, at least half of which were made of lead.

### The Water Problem Became Publicly Known

206.   On January 2, 2015, the City of Flint mailed a notice to its water customers indicating that it was in violation of the Safe Drinking Water Act ("SWDA") due to the presence of trihalomethanes, which was a product of attempting to disinfect the water. It was claimed that the water was safe to drink for most people with healthy immune systems.

207.   The fact that the Flint River water contained such high levels of

63

bacteria is a product of the horrific decision not to implement corrosion control.

208.   In late 2014 or early 2015, a study by MDHHS was published that showed a dramatic spike in elevated blood lead levels in Flint's youngest children. The testing occurred in the Third Quarter of 2014.

209.   This aforementioned spike meant that, by the Third Quarter of 2014, the percent of Flint children with known elevated blood lead level tests rose from 2.5% to about 7%.

210.   This upward spike coincided precisely with the exposure of Flint's children to the toxic water of the untreated Flint River, in their homes, schools and other public locations.

211.   That the aforementioned spike occurred at the time of the exposure to the Flint River water constituted clear and certain notice that a major health emergency confronted the children of Flint.

212.   On January 9, 2015, the University of Michigan – Flint discovered lead in campus drinking fountains.

**Veolia Was Hired to Evaluate and Respond to the Water Problem**

213.   Veolia submitted to Flint its "Response to Invitation to Bid for Water Quality Consultant," Proposal No. 15-573. Veolia proposed "to address the immediate reliability and operational needs" of Flint's water system.

214.   Flint had requested engineering services:

a. To review and evaluate "the City's water treatment process . . . and procedures to maintain and improve water quality";

b. To develop and report with recommendations "to maintain compliance with both State of Michigan and federal agencies"; and

c. To assist the City in implementing the recommendations.

215. Veolia, however, responded that "addressing the fundamental issues concerning water quality compliance and operational reliability is much more complex than the recommendations study and advisory services outlined [in City of Flint's request]." Veolia proposed to respond to Flint's requested scope of work by:

a. Calibrating "daily water quality samples with the City's hydraulic model";

b. Refining "the operational strategies for the plant and distribution system";

c. Coordinating "daily efforts across plant, operations and maintenance staff"; and

d. Alleviating "continued concerns from the public communications process."

216. In February 2015, Veolia was hired through a resolution that incorporated a standard of performance clause, which stated that "the City is relying upon the professional reputation, experience, certification, and ability of [Veolia]."

217. Defendant Veolia's task was to review Flint's public water system, including treatment processes, maintenance procedures and actions taken. As water

treatment professionals, Veolia had an opportunity to catch what LAN and Rowe had missed or refused to warn about – corrosive water was being pumped through lead pipes into the homes of Flint residents without corrosion control.

218.   On February 10, 2015, Veolia and the City issued a joint press release to the community at large, indicating that Veolia was an "urban water expert" in "handling challenging river water sources" and that it would be evaluating all of the City's water treatment processes.

219.   The press release contained no limitation on Veolia's scope of work. David Gadis, the Vice President of Veolia North America's Municipal & Commercial Business stated, "We understand the frustration and urgency in Flint[.] We are honored to support your community with our technical expertise so that together we can ensure water quality for the people of the city of Flint." He continued, "We have extensive experience handling challenging river water sources, reducing leaks and contaminants and in managing discolored water." Based on these representations, the people of Flint had every reason to rely on Veolia's subsequent representations of safety.

220.   On February 12, 2015, Rob Nicholas, Veolia's Vice President stated, "We're going to look at the numbers, we're going to look at the plant, we're going to decide how the equipment's functioning, look at the raw water, look at the finished water, decide how it's getting through the pipe to the house, and from that,

decide how to fix each of those problems as we go forward."

221.  Despite its representations that it would conduct a thorough, all-encompassing review of the Flint Water system, it took Veolia only six days to issue an interim report on its findings, which it presented to a committee of Flint's City Council on February 18, 2015. Per the interim report, the only issue not in Veolia's scope of study was "why the change from [Lake Huron water via the Detroit system pipeline to Flint River water] or the history of the utility."

222.  In the interim report, Veolia indicated that Flint's water was "in compliance with drinking water standards." It also noted that "[s]afe [equals] compliance with state and federal standards and required testing." Veolia effectively declared publicly that Flint's water was safe.

223.  Veolia's interim report also noted that the discoloration in Flint's water "raises questions," but "[d]oesn't mean the water is unsafe." It noted that among Veolia's "next steps" were to "carry out more detailed study of initial findings" and "[m]ake recommendations for improving water quality."

224.  In response to potential questions about "[m]edical problems," Veolia's interim report dismissively claimed that "[s]ome people may be sensitive to any water."

225.  Veolia issued its final "Water Quality Report" dated March 12, 2015.

226.  In the final report, Defendant Veolia noted that it had conducted a

"160-hour assessment of the water treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget." The final report claims that "a review of water quality records for the time period under our study indicates compliance with State and Federal water quality regulations."

227.    The final report states that "the public has also expressed its frustration of discolored and hard water. Those aesthetic issues have understandably increased the level of concern about the safety of the water. The review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and based on those standards, the water is considered to meet drinking water requirements."

228.    Specifically addressing the lack of corrosion control, the final report notes that "[m]any people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes. The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water. Polyphosphate addition will not make discolored water issues go away. The system has been experiencing a tremendous number of water line breaks the last two winters. Just last week there were more than 14 in one day. Any break, work on broken valves or hydrant flushing will change the flow of water and potentially cause temporary discoloration."

229.   Therefore, in addition to missing the connection between the lack of corrosion control and lead contamination, Defendant Veolia made a permissive "could" suggestion aimed only at reducing aesthetic deficiencies while suggesting that Flint's drinking water met all applicable requirements and was safe to drink.

230.   In fact, not only did the report fail to discuss lead corrosion, the use of polyphosphate, as suggested, only deals with iron corrosion and could worsen lead corrosion.

231.   As a result of Veolia's actions, the residents of Flint, including Plaintiffs, continued to be exposed to poisonous water beyond February and March of 2015.

**LAN and Veolia Fail to Conduct a Root Cause Analysis**

232.   Both LAN and Veolia were hired to ensure Flint's water system was protective of human health and compliant with federal and state environmental statutes. In February 2015, LAN issued its report "Trihalomethane Formation Concern," and on March 12, 2015, Veolia issued its report, "Flint Michigan Water Quality Report." Critically absent from both reports was a root cause analysis of why the high TTHM levels existed. A root cause analysis is the standard process used by engineers to determine the origin, case and interrelationship of events. It is a standard practice used by environmental, health, safety and infrastructure engineers whenever an adverse event occurs. Understanding why an event

occurred is critical to developing effective recommendations for dealing with an event. It is important to note that a root cause analysis would not have required invasive testing, just consideration of the facts known to date and drawing a conclusion about their interrelationship. Had such an analysis been done, the consultants would have discovered the corrosion of the pipes, and the presence of lead and *Legionella* in the water system.

233. The causal relationship of events leading to the high TTHM levels is not complex science. It is widely known in the scientific community that:

- Road salt from decades of deicing contaminates northern rivers such as the Flint River;
- Road salt contains chloride, which is highly corrosive to steel and lead pipes and that such pipes are used throughout Michigan and Flint;
- Chloride strips pipes of protective surfaces, which frees *Legionella* and lead;
- Urban rivers contain high levels of E. coli;
- While chlorine is effective in treating E. coli, it becomes far less effective when bare metal has been exposed because the chlorine preferentially reacts with the metal;
- The need to add excessive chlorine indicates that bare metal has been exposed and that corrosion is occurring; and
- Excessive chlorination causes high TTHM levels.

234. LAN's and Veolia's failure to conduct a root cause analysis recognizing the corrosion's role in Flint's water problems is truly inexplicable because, as detailed above, all of these events had been highly publicized before they issued their report:

- The Flint River had been highly impacted by road salt for decades
  — the river had eight times more salt than water supplied by the
  DWSD;
- Lead and steel pipes are ubiquitous in the United States, Michigan
  and Flint;
- In the summer of 2014, Flint suffered one of the worst outbreaks of
  Legionnaires' disease in U.S. history;
- On October 14, 2014, the General Motors Corporation stops using
  the City's water because of corrosivity. It was reported next day in
  press;
- On January 9, 2015, the University of Michigan – Flint  shut its
  water fountains because lead exceed federal standards; and
- In February 2015, if not before, lead in drinking water in other
  locations also exceed the standards.

235.   Any of these red flags, and indeed the general knowledge in the
scientific community, should have alerted LAN and Veolia to the extensive
corrosion and resultant release of lead and Legionella in the City's drinking water
system.

236.   For example, it should have been obvious to LAN and Veolia, as
professed experts on water quality and treatment issues, that a small river in an
urban environment, such as the Flint River, would be contaminated by chlorides
from salt used in road de-icing operations during many Michigan winters. Indeed,
in February 2004, the MDEQ, the U.S. Geological Survey ("USGS"), and the City
completed an assessment of the Flint River as a possible source of drinking water
and concluded that it had a very high susceptibility to potential contamination
sources. Moreover, a simple comparison of the chloride levels in the Flint River

with that provided by the DWSD, Flint's prior water source, should have quickly alerted LAN and Veolia to potentially serious corrosion issues as the Flint River contains about eight times more chloride than the DWSD-supplied water. The Flint River water also had an extremely high chloride-to-sulfate mass ratio ("CSMR") of 1.6. Normally, a CSMR ratio of greater than 0.5 is a cause for serious concern. Had LAN or Veolia investigated the chloride-to-sulfate ratio in the Flint River, as would be expected of an engineer of ordinary diligence, they would have immediately had reason to believe that Flint's CSMR posed serious corrosion risks.

237. The City's inability to effectively treat *E. coli* with chlorine should have likewise alerted LAN and Veolia to the existence of corrosion. It is well established by governmental authorities and the scientific community that the inability to treat *E. coli* with chlorine is often caused by heavily corroded piping. According to a study published by the EPA, high *E. coli* concentrations are a product of corrosion, and the inability to treat *E. coli* with chlorine is caused by corroded pipes. Flint's inability to treat *E. coli* with moderate amounts of chlorine, – and the resulting high TTHM concentrations, should have placed LAN and Veolia on notice that Flint's pipes were corroding and releasing lead and other materials into the drinking water supply. The uptick in reported cases of Legionnaires' disease, reported during a press conference prior to LAN's and

Veolia's retention, should have put LAN and Veolia on notice that Flint's water system exhibited signs of corrosion. *Legionella*, the bacteria that causes Legionnaires' disease, grows on the film on the inside of pipes, which when stripped away by corrosion frees the Legionella into the drinking water system. Outbreaks of Legionnaires' disease are rare unless pipes have been stripped of their bio-film by warm, corrosive water, which is exactly what exists in the Flint River and water supply. Yet neither LAN nor Veolia drew a connection between the outbreak and the cause of the outbreak. Nor for that matter, did they make any recommendations to treat the water to prevent or abate an outbreak.

238.   In addition, it was also very well known in the scientific community that pipes, especially old municipal water service lines, contain lead and that corroded pipes leach lead into the drinking water supply. "Lead has been a challenge and a bane for water suppliers since historical times … The numerous articles printed in leading scientific journals, in the United Kingdom and United States, in the late nineteenth century, documenting thousands of cases of lead poisoning caused by lead water pipes, have largely faded in the mist of history. These cases often resulted in death, paralysis, blindness, insanity, convulsions, miscarriages and still births." Dr. Colin Hayes *et al.*, Best Practice Guide on the Control of Lead in Drinking Water, Foreword (Dr. Colin Hayes ed. 2010). As just one of hundreds of examples, a summer 2010 report by the Water Research

Foundation stated, "Lead concentrations in tap water are strongly influenced by distribution system water chemistry. In response to changes in water chemistry, high lead concentrations can also be observed in systems with no previous history of a lead problem … Solubility and dissolution rates of corrosion products are affected by water chemistry parameters including pH, dissolved inorganic carbon, orthophosphate, and the concentration and type of disinfectant residual." These are the exact conditions that existed in Flint's water supply. Finally, just the color of Flint's water should have led any reasonable engineer to the conclusion that Flint's pipes were dangerously corroded. The source of Flint's water discoloration was rust, a product of steel and lead corrosion. The presence of rust in the water should have alerted LAN and Veolia that Flint's water was corroding its pipes, and that there was thus a danger that lead was leaching into the Flint water system.

### LAN and Veolia's Conclusions Made the Situation Worse

239.   The conditions leading to the release of lead are heavily regulated by the federal government, and indeed Veolia agreed in its scope of work with the City to determine whether such regulatory standards had been met. The federal government mandates the implementation of corrosion control protocols in order to protect the public against the possibility of lead entering the drinking water due to corroding pipes. Concern over lead concentrations in drinking water motivated the passage of the *Lead* and Copper Rule ("LCR") in 1991. The LCR requires utilities

74

to implement methods to control lead corrosion if the 90th percentile of samples exceeds the action level of 0.015 mg/L. *See* 40 C.F.R. pt. 141, sub. E and I. Flint's own sampling analysis indicated that its system violated the LCR standards.

240.   Veolia, however, failed to conduct any analysis. Nevertheless, it made the false statement in its March 12, 2015 report that its "review of water quality records for the time period under our study indicates compliance with State and Federal water regulations."  Veolia and LAN knew, or should have known, that the Flint water system was in violation of federal safe drinking water standards. Veolia's statement that Flint's water system complied with the LCR prolonged the crisis to this day.

241.   Another reason for the corrosion of pipes is the drinking water's acidity. It is well known that the decay of pathogens and other organic materials such as those found in the Flint River causes water to become more acidic.

242.   It is also well known to water quality engineers that the addition of acidic water quality treatment chemicals, such as ferric chloride which is used as a coagulant to settle out particles at the water treatment plant, can further increase the water's acidity. According to the EPA, "[i]f the raw water for a utility has a relatively high concentration of chloride and a history of lead corrosion problems, coagulants that add to chloride concentration should be avoided. Also, since a lower pH will increase corrosion in almost all cases, a utility should consider the

finished water pH goal before implementing enhanced coagulation." U.S. EPA Office of Water, *Enhanced Coagulation and Enhanced Precipitative Softening Guidance Manual* § 6.4, (EPA 815-R-99-012, May 1999).

243.   Veolia should have recommended maintaining the drinking water's neutral pH by adding phosphate, but instead, in direct contradiction of federal authorities, recommended increasing the dosage of ferric chloride – a very potent, corrosive acid. According to the Centers for Disease Control and Prevention:

> Chemical additives are added to water during the water treatment process. More than 40 chemical additives can be used to treat drinking water. Many of these commonly used additives are acidic, such as ferric chloride and aluminum sulfate, which are added to remove turbidity and other particulate matter …   These acidic water treatment additives can interfere with corrosion protection …   Lead and copper are rarely detected in most drinking water supplies. However, these metals are a concern to consumers. Because some household plumbing fixtures may contain lead or copper, corrosive waters may leach (pick up) lead and copper from household plumbing pipes after entering a home …   The most common reason for water utilities to add corrosion inhibitors is to avoid lead and copper corrosion with older homes, and the second most common reason is to minimize corrosion of pipes in the distribution system …   The tendency of water to be corrosive is controlled principally by monitoring or adjusting the pH, buffer intensity, alkalinity, and concentrations of calcium, magnesium, phosphates, and silicates in the water.

Centers for Disease Control and Prevention, *Fluoridation of Drinking Water and Corrosion of Pipes in Distribution Systems Fact Sheet*, http://www.cdc.gov/fluoridation/factsheets/engineering/corrosion.htm (last updated July 10, 2013).

244.   Nowhere did Veolia recommend that the City take steps to institute corrosion control to prevent lead and *Legionella* from spreading throughout the City's water supply.  Veolia merely suggested the implementation of corrosion control (here the addition of phosphates or other corrosion controls) as a *possible*, but not wholly effective means for minimizing *water discoloration*. There was no mention of the need to add corrosion control to prevent the release of lead and *Legionella*.  Veolia's report states, "The water system *could* add a polyphosphate to the water as a way to minimize the amount of *discolored water*." (Emphasis added).   The report explains that, "Polyphosphate addition will not make *discolored water* issues go away." (Emphasis added).   Thus, rather than recognizing that corrosion control was *required* to render Flint's water system compliant with federal regulations and prevent catastrophic corrosion, Veolia merely suggested adding phosphate to address water discoloration. Even Veolia's *suggested* dosage to address discoloration, 0.5 mg/L was far too low. In February 2016, the City was adding four to eight times as much phosphate, 2 to 4 mg/L.

245.  Veolia's conclusion that no efforts needed to be undertaken to maintain the neutrality of the water supply, is presented as a scientific certainty however. Its March 2015 report states that prior to arriving at its conclusions, Veolia undertook "laboratory testing" and concluded that, "[c]urrent ferric chloride dosages are too low and dosages of 100 mg/L or more are recommended." Veolia

acknowledged that its recommended increase was significant: "This increase to 100 mg/L is twice what is currently being fed and much higher than what had previously been fed last year."

246.   At the same time that Veolia gave the unqualified opinion that the current dosage is "too low," and should be doubled, Veolia knew that the City had no corrosion control protocol and knew, or should have known, that significant corrosion was already occurring. Veolia's directive that the City double its dosage of ferric chloride was unqualified and in no way warned that acidic water would increase corrosion.

247.   In August 2015, LAN made the same recommendation to increase the dose of ferric chloride.

248.   LAN and Veolia should have told the City to *reduce* the concentration of ferric chloride, and that adding phosphate as a pH buffer was *mandatory*. No such recommendation was made, and as a result, the lead and *Legionella* courses through the City's water supply to this day.

249.   A graph prepared by the Flint Water Study Group from Virginia Tech shows that the pH of Flint's water distribution system became more acidic after the Veolia Report was issued in March, even as the pH in the Flint River became less acidic:



250.  The graph above shows that the Flint River had a harmless pH at or above 8.0 for all of 2015, and steadily increased after June. By comparison, the graph shows that the pH in Flint's municipal water supply started dropping steadily from 7.9 in March (just after Veolia made its recommendation to double the ferric chloride concentration) to 7.3 in August. This difference is significant. pH is measured on a logarithmic scale, meaning that a pH of one whole number, such as 7.0 is ten times more corrosive than a pH of another whole number, such as 8.0 The drop in pH from 7.9 to 7.3 indicates a dramatic increase in the corrosivity of Flint's water.

251.  The graph above is punctuated with quotes from Defendants' emails and other documents that illustrate the contradictory information provided by State officials regarding the existence of corrosion control measures and lead in Flint's drinking water.

252.  On June 24, 2015, the EPA reached a similar conclusion about the

City's addition of ferric chloride:

> In addition, following the switch to using the Flint River, the City of Flint began adding *ferric chloride*, a coagulant used to improve the removal of organic matter, as part of the strategy to reduce the TTHM levels. Studies have shown that an increase in the *chloride-to-sulfate* mass ratio in the water can adversely affect lead levels by *increasing the galvanic corrosion of lead in the plumbing network*.

Memorandum, High Lead Levels in Flint, Michigan - Interim Report, from Miguel A. Del Toral, Regulations Manager, Ground Water and Drinking Water Branch, to Thomas Poy, Chief Ground Water and Drinking Water Branch (June 24, 2015) (emphasis added).

253.   Both LAN and Veolia analyzed the pH in Flint's water. Both made recommendations about the addition of chemicals that affect pH. Both were negligent in their analysis of the pH and their recommendations. Had the City started adding polyphosphate or otherwise controlled for corrosion, or decreased the dosage of ferric chloride, less lead and Legionella would have been released into Flint's water supply.

### Veolia and LAN Mislead the Public, Falsely Assuring Them Water Was Safe

254.   Not only were LAN and Veolia hired for the express purpose of determining the cause of Flint's water problems and identifying the corrective measures necessary to render Flint's water system compliant with state and federal regulations, they were hired to give assurances to the residents that their water was,

quite simply, safe to drink.  LAN and Veolia complied with their mandate, and provided assurances that the water was safe to drink — when it was not.

### Lead's Devastating Health Effects and Other Personal Injuries Cause by Flint's Water Crisis

255.   Lead's catastrophic effects are indisputable. According to the EPA, "[y]oung children, infants, and fetuses are particularly vulnerable to lead because the physical and behavioral effects of lead occur at lower exposure levels in children than in adults. A dose of lead that would have little effect on an adult can have a significant effect on a child. In children, low levels of exposure have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells."

256.   According to the World Health Organization, "lead affects children's brain development resulting in reduced intelligence quotient (IQ), behavioral changes such as shortening of attention span and increased antisocial behavior, and reduced educational attainment. Lead exposure also causes anemia, hypertension, renal impairment, immunotoxicity and toxicity to the reproductive organs. The neurological and behavioral effects of lead are believed to be irreversible."

257.   The behavioral effects of lead poisoning in children cannot be overstated. According to many of the leading researchers on lead, increased lead

levels in childhood are associated with an increased likelihood of ADHD behaviors, delinquent behaviors and arrests, including arrests involving violent offenses.

258.   Lead is so harmful that, according to the EPA, "ingestion of lead can cause seizures, coma and even death."

259.   The effects of lead exposure are long lasting. The EPA has explained that, "[l]ead can accumulate in our bodies over time, where it is stored in bones along with calcium. During pregnancy, lead is released from bones as maternal calcium and is used to help from the bones of the fetus. This is particularly true if a woman does not have enough dietary calcium. Lead can also cross the placental barrier exposing the fetus to lead. This can result in serious effects to the mother and her developing fetus, including: reduced growth of the fetus [and] premature birth."

260.   Lead is also harmful to adults. The EPA warns that "[a]dults exposed to lead can suffer from: Cardiovascular effects, increased blood pressure and incidence of hypertension, [d]ecreased kidney function, [and] [r]eproductive problems (in both men and women)."

261.   The costs of lead poisoning are real and substantial. It has been estimated that each case of childhood lead poisoning leads to $5.9 million in medical care costs over the course of appropriate treatment. Leonardo Trasande

and Yinghua Liu, *Reducing The Staggering Costs Of Environmental Disease In Children, Estimated At $76.6 Billion In 2008*, Health Affairs, 30, no.5 (2011): 863-870.

262.   The World Health Organization explains that the direct medical costs of lead exposure include treatment for acute lead poisoning (typically chelation therapy), as well as the treatment of cardiovascular disease in adults who develop hypertension following lead exposure.

263.   Given the long-lasting risks of lead exposure and the potential for lead sediment to be disturbed and re-mobilized into the water system, Plaintiffs will require regular medical and tap water testing and evaluation, at bare minimum, in accordance with government standards.

264.   Additionally, as described more fully above, the water crisis in Flint caused an outbreak of Legionnaires' disease. As explained above, the presence of Legionella was a direct and proximate result of the switch to the Flint River as a water source and related conduct. At least 87 Flint residents contracted Legionnaires' and at least nine died. Those individuals who became infected with Legionnaires' disease suffered death, and for those who lived, incurred pain and suffering as well as substantial medical costs due to Defendants' conduct.

265.   Finally, as a direct and proximate result of Defendants' conduct, Plaintiffs have suffered extreme emotional distress.

## Flint's Children: Catastrophic Lifetime Losses

266.   Flint's most vulnerable, its children, have suffered the most disastrous consequences from lead exposure – diminished potential over the entire course of their lives. The World Health Organization states, "[t]hese costs are sometimes referred to as *lost opportunity costs* ... When exposure to lead is widespread in a society, the aggregate loss of intelligence (and thus economic productivity) can be substantial."

267.   Notably, this estimate is conservative as it relates solely to lost earning potential and does not include costs related to special educational, medical, sociological, disability and occupational services, or long-term monitoring and treatment costs.

268.   According to an analysis of the economic losses attributable to lead exposure in 2009, "[t]he present value of Michigan's economic losses attributable to lead exposure in the 2009 cohort of 5 year-olds ranges from $3.19 billion (using U.S. blood lead levels) to $4.85 billion (using Michigan blood lead levels) per year in loss of future lifetime earnings." Michigan Network for Children's Environmental Health, *The Price of Pollution: Cost Estimates of Environment Related Childhood Diseases in Michigan* (June 2010). This report, of course, does not include estimates of the fallout from Flint's lead crisis.

269.   Other researchers have estimated the economic impact of childhood

lead poisoning to be as high as $50.9 billion per year in lost economic productivity resulting from reduced cognitive potential from preventable childhood lead exposure. *See supra,* Trasande & Liu.

270.   As a direct and proximate result of Defendants' conduct, Flint's children have suffered specific, measurable damages in the form of lost earning potential. They have also incurred damages in the form of required special educational, medical, sociological, occupational and disability services and related education assistance programs.

## Property Damage Caused by Defendants' Conduct

271.   In addition to the devastating health effects and lost economic productivity caused by lead exposure, Defendants' conduct, as described above, has caused significant property damage.

272.   The property damages sustained by Plaintiffs fall into three basic categories. First, the Plaintiff owned pipes and appliances themselves have corroded, shortening their life span, and causing further damage when they break. Second, the corroded pipes and appliances remain a continuing source of lead and potentially Legionella, thus pipes and appliances must be replaced or else remain a continuing source of harmful exposure. Finally, the value of Plaintiffs' real property has been substantially diminished as a result of the continuing questionable safety of Flint's water and existence of corroded pipes and appliances.

273.   Although the City has begun adding polyphosphate to its system to reduce the leaching of lead from its service lines, this is unlikely to render Flint's water safe because many of the pipes have become so corroded that not even phosphate will be able to fully encapsulate the surface of the pipes and prevent lead from leaching into the water supply.

274.   The residents' homes have been affected in the same fashion. Even with the addition of phosphate, their pipes and appliances will remain corroded until replaced, and continue to be a source of lead and potentially Legionella. Solubilized and particulate lead and Legionella remain in portions of the piping system and appliances, and can become remobilized at any time, causing further damage and health effects.

275.   The effect of corrosive water on residential and commercial piping and appliances is well understood. For example, a 2014 study by the Water Research Watershed Center stated, "[w]ith respect to the corrosion potential of YOUR drinking water, the primary concerns include the potential presence of TOXIC Metals, such as lead and copper; deterioration and damage to the household plumbing, and aesthetic problems such as: stained laundry, bitter taste, and greenish-blue stains around basins and drains."

276.   The Water Research Watershed Center has further explained that, "The cost of corrosion can be expensive. Corrosion can impact you and your

family's health, aesthetic quality of your water, waste money, and damage your household piping and fixtures."

277.   Not only does corrosion cause the "premature failure of household plumbing and plumbing fixtures," the Water Research Watershed Center has explained, corrosion also "decreases the efficiency of hot water heaters and may cause premature failure to the heater." According to a Michigan Radio news story, Virginia Tech researchers have recently returned to Flint out of concern that "lead and other metals leaching from damaged pipes have accumulated in their hot water heaters making bathing hazardous." The Virginia Tech researchers will be testing water heaters for lead and Legionella bacteria.

278.   Moreover, residents have already reported damage to major appliances such as dishwashers and washing machines following Flint's decision to switch water sources.

279.   According to emails from Governor Snyder's office, the State estimates that replacing Residents' pipes alone could cost between $6,000 and $8,000 per household. Other estimates of those replacement costs are far higher.

280.   Corroded pipes not only present a continuing health threat, they also risk further damage to one's property because corrosion can result in deep pits in the pipe or tank walls that can eventually break, causing substantial water damage to homes and businesses.

281.   Although the City has stated it intends to begin replacing some City-owned pipes, this is far from sufficient to render Flint's water safe. Sergio Kapusta, a fellow at NACE International, an industry organization that develops corrosion prevention and control standards in Houston, has explained that "changing all the mains in the city will not really solve the problem for the homeowners" because the lead piping in these homes probably has been severely compromised. "The corrosion is not going away. It's still there."

282.   Plaintiffs have been left to pay for the damage caused by the Engineering and Governmental Defendants. This has proven nearly impossible, as many of the City's residents survive on very little money. To make matters worse, the Washington Post has reported that, "many in Flint say banks are refusing to offer refinancing that could free up money to pay for the retrofitting, and that the costs are not covered by insurance. The crisis has created a perfect storm to strip their houses of their remaining value, they say."

283.   Replacing the piping and affected appliances in each home and business is the only way to guarantee that a home or business will be unaffected by corrosion and lead. The cost of such replacements will range into the tens of thousands, if not more, per structure.

284.   Moreover, the problems associated with Flint's water have had and are having a significant impact on residential and commercial property values and

rental rates in the City. As Daniel Jacobs, an executive with Michigan Mutual explained, "[t]he tragedy is an already depressed community is now likely to see housing values plummet not only because of the hazardous water, but because folks cannot obtain financing."

285.   Certain banks and mortgage companies have refused to make loans, unless the borrower establishes that its water is potable. A Wells Fargo & Co. spokeswoman said it is reviewing government lending guidelines: "[u]ntil [water] testing and potability is affirmed, it will be difficult to lend," said the spokeswoman, who said such difficulties would apply to all lenders. Representatives from Bank of America and J.P. Morgan similarly have acknowledged requiring verification of potable water to provide financing to Flint's residents. Lenders claim their hands are tied. As the Federal Housing Administration, which backs loans to less-creditworthy borrowers, explained, government regulations require "a continuing and sufficient supply of safe and potable water" to provide home financing.

286.   This creates a catch-22. Despite having switched back to receiving its water from DWSD, the current extent of corrosion in Flint renders the water unsafe because the pipes and appliances will remain corroded and sources of lead until they are replaced. However, residents cannot obtain financing to replace their pipes and appliances until the water is deemed safe.

## COUNT I: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER GOVERNMENTAL DEFENDANTS

287.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

288.   Plaintiffs have a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

289.   Defendants, while acting under color of state law, affirmatively created or exacerbated the dangers and dangerous situations to which Plaintiffs were exposed, making them more vulnerable to said dangers, and these Defendants did so with an extreme degree of culpability.

290.   Defendants, while acting under color of state law, affirmatively continued, increased and perpetuated the dangers, risks of harm and dangerous situations creating the public health crisis, when they deliberately and affirmatively denied, lied about, covered up, deceived, discredited and ignored said known dangers and risks of harm to which they exposed Plaintiffs making them more vulnerable to said dangers.

291.   Defendants were aware that their conduct could result in the depriva-

tion of Plaintiffs' due process rights to be protected from the dangers, dangerous situations, or being made more vulnerable to the dangers affirmatively created and perpetuated by them.

292.   This conduct was reckless, deliberately indifferent and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as these Defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs.

293.   The dangers and risks of harm were discreet and special to Plaintiffs, as Flint water users and property owners in particular, and not risks affecting the public at large.

294.   The dangers and risks of harm to Plaintiffs from the ongoing exposure to the water toxins which were created and perpetuated by Defendants, were so extreme as to be equivalent to private acts of violence visited upon them.

295.   These actions of Defendants constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional and economic harm to Plaintiffs.

296.   As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this Master Complaint, Plaintiffs suffered violations of their fundamental rights to bodily integrity, property and liberty interests, including, but not limited to:

a.  Serious and in some cases life threatening and irreversible bodily injury;

b.  Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

c.  Pain and suffering;

d.  Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

297.   Plaintiffs have further suffered property damage to their homes and/or places of business in the form of lost property values and lost business profits.

298.   The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

### COUNT II: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY GOVERNMENTAL DEFENDANTS

299.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

300.   Plaintiffs have a clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to bodily integrity.

301.   The conduct of Defendants, all while acting under color of law, endangered and/or threatened Plaintiffs' fundamental liberty interest to bodily integ-

rity as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

302.   Defendants were aware that their conduct could result in the deprivation of Plaintiffs' fundamental due process rights to bodily integrity.

303.   Defendants deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiffs by creating and perpetuating the ongoing exposure to contaminated water, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Plaintiffs.

304.   Defendants had the opportunity to reflect and deliberate before they acted and/or failed to act.

305.   As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this Master Complaint, Plaintiffs have suffered violations of their fundamental rights to bodily integrity, property and liberty interests, including, but not limited to:

    a.    Serious and in some cases life threatening and irreversible bodily injury;

    b.    Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

    c.    Pain and suffering;

    d.    Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

306.   The conduct of Defendants was both reckless and outrageous, enti-tling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988, as well as costs and reasonable attor-ney fees, pursuant to 42 U.S.C. §1988.

### COUNT III: 42 U.S.C. § 1983 – 5th AND 14th AMENDMENTS EQUAL PROTECTION OF THE LAW: RACE BASED DEFENDANTS SNYDER, DILLON, WRIGHT, WALLING, AMBROSE, KURTZ, AND EARLY

307.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

308.   Defendants Governor Snyder, Dillon, Wright, Walling, Ambrose, Kurtz and Earley, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution.

309.   Amendment Fourteen, § 1 states in pertinent part, "No state shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws."

310.   The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

311.   Defendants' conduct deliberately exposed Plaintiffs to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

312.   In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational).

313.   These Defendants knew that the water from the Flint River was grossly inferior to the Lake Huron water Flint and Genesee County citizens had been receiving from DWSD.

314.   These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP, which required millions of dollars of upgrades.

315.   These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

316.   Recognizing these facts, Defendants devised an Interim Plan that caused the predominately white water users of those areas of Genesee County outside of Flint to receive the safe and superior water from DWSD, whereas the water users of predominantly African American Flint received water that was known to

be grossly inferior and unsafe, i.e. Flint River water.

317.   As evidence of the fact that race discrimination was the reason for treating the two groups of water users differently, the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

318.   Given the clear difference in the treatment between these two groups of similarly situated water users, the deliberate and intentional decisions and actions of these Defendants in devising the Interim Plan was the product of racial discrimination in violation of the Equal Protection Clause.

319.   If Plaintiffs' community had been predominately white, Plaintiffs would have been treated in the same manner as their predominantly white neighbors in Genesee County, and they too would have received DWSD water as part of the Interim Plan.

320.   Because Plaintiffs were water users in a predominately African American community, their complaints were dismissed and disrespected as exaggerated, without merit or inconsequential. If Plaintiffs' community had been predominately white, citizen complaints would have been taken seriously, treated as valid and the MDEQ and Flint public officials would have taken timely action to

address the concerns.[27]

321.   As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this Master Complaint, Plaintiffs have suffered violations of their fundamental constitutional rights including, but not limited to:

a.   Serious and in some cases life threatening and irreversible bodily injury;

b.   Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

c.   Pain and suffering;

d.   Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

322.   The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

### COUNT IV: 42 U.S.C. § 1983 – 5th AND 14th AMENDMENTS EQUAL PROTECTION OF THE LAW: WEALTH-BASED DEFENDANTS SNYDER, DILLON, WRIGHT, WALLING, AMBROSE, KURTZ, AND EARLY

323.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

---

[27] "Citizen concerns were at times derided and dismissed, in spite of the fact that various members of the Governor's staff had expressed-and were expressing-concerns about the water situation in Flint at the same time." Exhibit A, Task Force Report at 37.

324.   Defendants Governor Snyder, Dillon, Wright, Walling, Ambrose, Kurtz and Earley, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution.

325.   Amendment Fourteen, § 1 states in pertinent part, "No state shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws."

326.   The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

327.   Defendants' conduct deliberately exposed Plaintiffs to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

328.   In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational.)

329.   These Defendants knew that the water from the Flint River was gross-

98

ly inferior to the water Flint and Genesee County citizens had been receiving from DWSD.

330.   These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP, which required millions of dollars of upgrades.

331.   These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

332.   Recognizing these facts, Defendants' devised an Interim Plan that allowed the predominately more affluent water users of Genesee County to receive the safe, superior water from DWSD and the predominately impoverished water users of Flint would have to accept during the interim period grossly inferior, previously rejected and dangerous Flint River water.

333.   There was no rational economic or fiscal justification for treating the predominately more affluent water users of Genesee County differently than the predominately impoverished water users of Flint, because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

334.   Given the unexplained difference in treatment between these two groups of similarly situated water users, considering the absence of any rational

economic justification, and taking into account the economic and class makeup of the group which received the grossly inferior and dangerous water product, the deliberate decisions and actions of these Defendants in devising the Interim Plan can fairly be said to be the product of income and class discrimination, in violation of the Equal Protection Clause of the Fourteenth Amendment.

335.   If Plaintiffs' community had been predominately more affluent, Plaintiffs would have been treated just like their more affluent neighbors in Genesee County, and they too would have received DWSD water as part of the Interim Plan.

336.   Because Plaintiffs were in a predominately impoverished community, their complaints were dismissed as exaggerated, without merit or inconsequential. If Plaintiffs' community had been predominately more affluent, citizen complaints would have been treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns.

337.   As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this Master Complaint, Plaintiffs have suffered violations of their fundamental constitutional rights including, but not limited to:

   a.   Serious and in some cases life threatening and irreversible bodily injury;

   b.   Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

     c.     Pain and suffering;

     d.     Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

338.   The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT V: 42 U.S.C. § 1985(3) – INVIDIOUS RACIAL ANIMUS DEFENDANTS SNYDER, DILLON, WRIGHT, WALLING, AMBROSE, KURTZ, AND EARLY

339.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

340.   Defendants Governor Snyder, Dillon, Wright, Walling, Ambrose, Kurtz and Earley, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated Plaintiffs' rights under the Thirteenth Amendments to the United States Constitution.

341.   42 U.S.C § 1985 (3) secures the rights of the Plaintiffs to be free from conspiracies, founded on invidious racial animus, to violate the constitutional rights of Plaintiffs to equal protection and due process.

342.   The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

343.   Defendants' conduct deliberately exposed Plaintiffs to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

344.   In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational).

345.   These Defendants knew that the water from the Flint River was grossly inferior to the water Flint and Genesee County citizens had been receiving from DWSD.

346.   These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP, which required millions of dollars of upgrades.

347.   These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

348.   Recognizing these facts, Defendants' conspired to devise an Interim Plan that allowed the predominately white water users of Genesee County to receive the safe, superior water from DWSD and the predominately black water

users of Flint would have to accept during the interim period grossly inferior, previously rejected and potentially unsafe Flint River water.

349.   There was no rational economic or fiscal justification for treating the predominately white water users of those parts of Genesee County outside if Flint differently than the water users in the predominately African American community of Flint, because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

350.   Given the unexplained difference in treatment between these two groups of similarly situated water users, considering the absence of any rational economic or fiscal justification and taking into account the racial makeup of the community that received the grossly inferior and dangerous water product, the deliberate decisions and actions of these conspiring Defendants in devising the Interim Plan can fairly be said to be the product of invidious racial animus in violation of the Thirteenth Amendment. The provision of unhealthy and dangerous food and water is a badge, vestige and symbol of slavery abolished and prohibited by the Thirteenth Amendment.

351. If Plaintiffs' community had been predominately white, Plaintiffs would have been treated the same as their white neighbors in Genesee County, and they too would have received DWSD water as part of the Interim Plan.

352. Because Plaintiffs were water users in a predominately African American community, their complaints were disrespected and dismissed as exaggerated, without merit or inconsequential. If Plaintiffs' community had been predominately white, citizen complaints would have been treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns. This disrespect and dismissive response arose directly from the conspiracy between these Defendants founded on invidious racial animus.

353. As a direct and proximate result of the conspiracy and the unconstitutional acts of Defendants as alleged in this Master Complaint, have suffered violations of their fundamental constitutional rights including, but not limited to:

    a.    Serious and in some cases life threatening and irreversible bodily injury;

    b.    Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

    c.    Pain and suffering;

    d.    Embarrassment, outrage, mental anguish, fear and mortification and stress related physical symptoms.

354.   The conduct of Defendants was reckless and outrageous, entitling Plaintiffs an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

### COUNT VI: MCL 37.2303 – VIOLATION OF PUBLIC SERVICE PROVISIONS OF ELCRA DEFENDANTS SNYDER, DILLON, WRIGHT, WALLING, AMBROSE, KURTZ, EARLY, AND CITY OF FLINT

355.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

356.   Flint and Emergency Managers Kurtz, Walling, Ambrose and Earley represent a public facility, agency, board owned and operated by a political subdivision of the state established to provide public service to the public. MCL 37.2301(b).

357.   If not "provider[s]" of a public service, Wright, Walling, Ambrose, Kurtz, Earley are liable under MCL 37.2701 because they aided or abetted the "provider" to violate MCL 37.2302(a).

358.   Governor Snyder and Dillon are liable under MCL 37.2701 because they aided the "provider" of water services to Plaintiffs in the acts which denied Plaintiffs of the full and equal enjoyment of water services because of race.

359.   These Defendants were under a statutory duty to either provide water services to Plaintiffs so that they would not be denied the full and equal enjoyment

of public water service on account of race, or they aided and abetted the public service provider to deny Plaintiffs full and equal enjoyment of public water service.

360.   In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational).

361.   These Defendants knew that the water from the Flint River was grossly inferior to the water Flint and Genesee County citizens had been receiving from DWSD.

362.   These Defendants knew that the water from the Flint River would have to be processed at the Flint WTP, which required millions of dollars of upgrades.

363.   These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

364.   Recognizing these facts, Defendants devised an Interim Plan that allowed the predominately white water users of Genesee County to receive the safe, superior water from DWSD and the predominately black water users of Flint would have to accept during the interim period grossly inferior, previously rejected and potentially unsafe Flint River water.

365.   There was no rational economic justification for treating the predominately white water users from those areas of Genesee County outside of Flint differently than the users of water from Flint, a predominately African American community. This is so because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

366.   Given the unexplained difference in treatment between these two groups of similarly situated water users, considering the absence of any rational economic or fiscal justification, and taking into account the racial makeup of the community that received the grossly inferior and dangerous water product, the deliberate decisions and actions of these conspiring Defendants in devising the Interim Plan can fairly be said to be the product of racial discrimination in violation of MCL 37.2302(a).

367.   If Plaintiffs' community had been predominately white, Plaintiffs would have been treated just like their neighbors from the predominantly white neighbors in Genesee County, and they too would have received DWSD water as part of the Interim Plan.

368.   As a direct and proximate result of the violation of the ELCRA as alleged in this Master Complaint, Plaintiffs have experienced damages including, but not limited to:

a.   Serious and in some cases life threatening and irreversible bodily injury;

b.   Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

c.   Pain and suffering;

d.   Embarrassment, outrage, mental anguish, fear and mortification and stress related physical symptoms.

## COUNT VII: BREACH OF CONTRACT
## CITY OF FLINT

369.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

370.   Defendant City of Flint, by its statutes and by offering services to its residents, offers to sell potable, safe drinking water to its residents.

371.   Plaintiffs accepted the offer by utilizing Flint's water, agreeing to pay for the water, and tendering payment for the water.

372.   Plaintiffs and Defendant City of Flint entered into a contract for the purchase and sale of potable, safe drinking water.

373.   Defendant State of Michigan overtook the local government of Flint and assumed and/or shared its duties under the contract to sell potable, safe drinking water to Plaintiffs.

374.   Defendants materially and irreparably breached the contract with Plaintiffs by failing to provide potable, safe drinking water, and instead providing harmful, foul, contaminated water unfit for human consumption.

375.   As a result of Defendants' breach, Plaintiffs suffered damages in the amount of all debts and obligations for Flint water, whether tendered or untendered, and as stated throughout this complaint.

376.   Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

377.   As a direct and proximate result of the above Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries including, but not limited to: various health problems (including without limitation, hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions),

contract damages and property damages (including but not limited to damaged plumbing and lost real property value), and exemplary damages.

## COUNT VIII: BREACH OF IMPLIED WARRANTY
## CITY OF FLINT

378.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

379.   The City of Flint directly promised to provide water that was fit for human consumption and/or impliedly promised that the water was fit for human consumption.

380.   The City of Flint has admitted that the water it supplied was contaminated, including being poisoned with lead, and therefore clearly not fit for its intended use of human consumption.

381.   The provision of water unfit for its intended purpose and/or the admission that the water was not fit for its intended purpose constitute material breaches of an implied warranty and/or contract.

382.   Defendants are liable to Plaintiffs for all amounts billed and/or charged and/or collected, whether paid or unpaid, for water that was unfit for human consumption.

383.   Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

As a direct and proximate result of the individual Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), contract damages and property damages (including but not limited to damaged plumbing and lost real property value), and exemplary damages.

## COUNT IX: NUISANCE
## ALL DEFENDANTS

384.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

385.   Defendants' actions in causing foul, poisonous, lead contaminated water to be delivered to the homes of Plaintiffs resulted in the presence of contaminants in Plaintiffs' properties and/or persons.

386.   Defendants' actions substantially and unreasonably interfered with Plaintiffs' comfortable living and ability to use and enjoy their homes, constituting a nuisance.

111

387.   Plaintiffs did not consent for foul, poisonous, lead contaminated water to physically invade their persons or property.

388.   Plaintiffs suffered injuries and damage to their persons and/or properties as a direct and proximate result of Defendants' actions in causing lead contaminated water to be delivered to their homes.

389.   Defendants' actions in causing a substantial and unreasonable interference with Plaintiffs' ability to use and enjoy their properties constitutes a nuisance and Defendants are liable for all damages arising from such nuisance, including compensatory and exemplary relief.

390.   Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

391.   As a direct and proximate result of the Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions),

contract damages and property damages (including but not limited to damaged plumbing and lost real property value), as well as exemplary damages.

## COUNT X: TRESPASS
## ALL DEFENDANTS

392.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

393.   Defendants' negligent, grossly negligent, willful, and/or wanton conduct and/or failures to act caused contaminants to enter upon Plaintiffs' property and into Plaintiffs' persons.

394.   Upon information and belief, Defendants had exclusive control over the facilities providing Plaintiffs' water at all relevant times.

395.   Defendants, knowingly or in circumstances under which they should have known, engaged in deliberate actions that released contaminants which were substantially certain to invade the properties of Plaintiffs.

396.   Defendants knew, or should have known, of the likelihood that corrosive water would cause lead to drink into Plaintiffs' drinking water.

397.   Defendants' actions resulted in contaminants entering into Plaintiffs' persons and properties, causing injury and damage to person and property.

398.   Defendants' actions were done with actual malice or wanton, reckless or willful disregard for Plaintiffs' safety, rights, and/or property.

399.   Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

400.   As a direct and proximate result of the Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), contract damages and property damages (including but not limited to damaged plumbing and lost real property value), and exemplary damages.

## COUNT XI: UNJUST ENRICHMENT
## CITY OF FLINT

400.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

401.   Defendants have received the benefits of the funds paid by Plaintiffs for contaminated water that was and is unfit for human consumption.

402. Defendants have utilized these funds for the operation of the government(s) of Flint and/or Michigan.

403.   The retention of the benefit of the funds paid by Plaintiffs constitutes unjust enrichment in the amount of all funds paid for water that was unfit for human consumption.

404.   It would be unjust to allow Defendants to retain the benefit they obtained from Plaintiffs.

**COUNT XII: GROSS NEGLIGENCE**
**ALL DEFENDANTS**

405.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

406.   Defendants independently owed Plaintiffs a duty to exercise reasonable care.

407.   Defendants undertook, for consideration, to perform a duty owed to Plaintiffs and by the City of Flint and/or the State of Michigan.

408.   Based on their undertakings, Defendants had a duty to Plaintiffs to exercise reasonable care to protect that undertaking.

409.   Plaintiffs relied on the City, State, and/or Defendants to perform the duty to ensure the proper treatment of Flint River Water.

410.   Plaintiffs relied on the City, State, and/or Defendants to perform the duty to disclose known hazards in their drinking water.

411.   Defendants failed to exercise reasonable care.

412.   Defendants breached their duties to Plaintiffs in ways including but not limited to the following:

a.      Failing to require corrosion control treatment of Flint River water;

b.      Failing to conduct proper testing of Flint's water;

c.      Failing to require proper testing of Flint's water;

d.      Failing to respond to evidence that Flint's water was improperly treated;

e.      Misrepresenting that corrosion control treatment had been implemented;

f.      Publicly declaring unsafe water to be safe to drink;

g.      Ignoring evidence that Flint's water was unsafe to drink;

h.      Withholding information that showed that Flint's water was unsafe to drink;

i.      Publicly discrediting those who claimed that Flint's water may not be safe to drink;

j.      Failing to warn Plaintiffs and the public that Flint's water was not safe to drink.

413.   Plaintiffs suffered harm resulting from Defendants' failures to exercise reasonable care.

414.   Plaintiffs suffered harm resulting from Defendants' failures to exercise reasonable care to protect their undertakings.

415.   Defendants' failures to exercise reasonable care to protect their undertakings proximately caused the Plaintiffs' injuries and were entirely foreseeable.

416.   Defendants are liable to Plaintiffs for all harms resulting to themselves and their property from Defendants' failures to exercise reasonable care.

417.   Defendants' liability includes without limitation: personal injuries, illnesses, exposure to toxic substances and property damage suffered by Plaintiffs as a result of Defendants' failures to exercise reasonable care.

418.   Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

419.   All of the above individual Defendants' conduct and/or failure to act constitute gross negligence because it was so reckless that it demonstrates a substantial lack of concern for whether injury would result.

420.   The performance of governmental functions constituting gross negligence falls within the exceptions of governmental immunity pursuant to MCL 691.1407.

421.   As a direct and proximate result of the above individual Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), contract damages and property damages (including but not limited to damaged plumbing and lost real property value), as well as punitive and/or exemplary damages.

# COUNT XIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## ALL DEFENDANTS

422.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

423.   Defendants' outrageous conduct in causing, prolonging, and obscuring Plaintiffs' exposure to toxic, lead contaminated water exceeds all bounds of decency in a civilized society.

424.   Defendants' outrageous conduct was intentional and/or reckless and made with a conscious disregard for the rights and safety of Plaintiffs.

425.   Defendants' outrageous conduct caused severe distress to Plaintiffs.

426.   Defendants' outrageous conduct was the proximate cause of Plaintiffs' injuries.

427.   As a direct and proximate result of the above individual Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including, without limitation, hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), contract damages and property damages (including but not limited to damaged plumbing and lost real property value), as well as punitive and/or exemplary damages.

## COUNT XIV: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ALL DEFENDANTS

428.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

429.   Defendants were in a special relationship to Plaintiffs, being persons entrusted with the protection of their most basic needs – water, health, and safety.

430.   The distress caused to Plaintiffs by Defendants was highly foreseeable.

431.   Defendants placed Plaintiffs in a zone of physical danger, causing them severe emotional distress.

432.   Plaintiffs have contemporaneously perceived the exposure of their immediate family members to lead contaminated water.

433.   Defendants' negligent acts were the proximate cause of Plaintiffs' contemporaneous perception of their loved ones exposure to lead contaminated water.

434.   Defendants' negligent acts were the proximate cause of Plaintiffs being placed into a zone of physical danger and resulting severe emotional distress.

435.   Defendants' negligent acts were the proximate cause any and all severe emotional distress related to their own exposure and their families' exposure to lead contaminated water.

436.   As a direct and proximate result of the above individual Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and

suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), contract damages and property damages (including but not limited to damaged plumbing and lost real property value), as well as punitive and/or exemplary damages.

437.   At critical times, including during gestation and her developmental years, the minor plaintiff has been exposed to damaging levels of lead and other toxic substances. Plaintiffs' damages and losses include, but are not limited to, physical and psychological injuries, learning and other permanent disabilities, weight loss, stunted growth, anemia, headaches, abdominal and other pain, mental anguish, emotional distress, the cost of medical, educational, and rehabilitation expenses, other expenses of training and assistance, and loss of income and earning capacity

438.   Plaintiffs, at the time of sustaining the injuries complained of herein, have been the owners, lessees and/or occupants of certain real property located in Flint, Michigan, that received highly corrosive and contaminated water pumped from the Flint River.

439.   Upon information and belief, Defendants, who were acting under the color of law, deprived Plaintiffs of their rights under the Fourteenth Amendment to the United States Constitution. Specifically, Defendants deprived Plaintiffs of life,

liberty and property without due process of law when the decision to switch to the Flint River was made, thus providing Plaintiffs with toxic and unsafe water.

## COUNT XV: PUNITIVE DAMAGES
## ALL DEFENDANTS

440.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

441.   Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing property damage, nuisances, and trespasses upon Plaintiffs' persons and properties, disregarding the rights of Plaintiffs.

442.   Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to:

a.   Failure to provide safe drinking water to the residents of Flint;

b.   Failure to implement adequate corrosion controls for Flint River water; and

c.   Underestimating the seriousness of the lead contamination in Flint's water system.

443.   Defendants have caused great harm to Plaintiffs' property and water supplies and demonstrated an outrageous conscious disregard for Plaintiffs' safety with implied malice, warranting the imposition of punitive damages.

## COUNT XVI – PROFESSIONAL NEGLIGENCE
## LAN PC, LAN INC. and LAD

444.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

121

445.   The LAN Defendants undertook, for consideration, to render services for the City of Flint, which they should have recognized as necessary for the protection of Plaintiffs.

446.   The LAN Defendants undertook to perform a duty owed to Plaintiffs by the City of Flint and/or the State of Michigan.

447.   Based on their undertaking, the LAN Defendants had a duty to Plaintiffs, as residents and property owners in the City of Flint, to exercise that degree of care consistent with the greater degree of knowledge and skill possessed by design professionals, as well as an ethical duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

448.   The LAN Defendants also owed a duty to Plaintiffs to notify the proper authorities of unethical illegal practices of others whose actions or decisions posed threats to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

449.   The LAN Defendants' duties to Plaintiffs included but were not limited to: a duty to properly administer the placing of the Flint WTP into operation using the Flint River as a primary source, a duty to do so in such a manner that would not endanger the health and property of Plaintiffs, a duty to take other actions consistent with the greater degree of knowledge and skill possessed

by design professionals and/or the duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or provide proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

450.   Plaintiffs relied on the LAN Defendants to perform their duties.

451.   The LAN Defendants failed to exercise reasonable care in performing their duties, including in preparing for and executing the transition from treated DWSD water to untreated Flint River water, which was unsafe, toxic and unsuitable for human use.

452.   The LAN Defendants failed to undertake reasonable care and conduct as a professional engineering firm.

453.   The LAN Defendants failed to exercise reasonable care when they did not ensure that corrosion control measures were implemented in a water supply system containing lead pipes that was being transitioned onto a highly corrosive water source.

454.   There is also an inference that the LAN Defendants breached their collective duties to Plaintiffs, since the spike in lead levels does not normally occur unless water is not properly treated, such as when there is a failure to use anti-corrosion treatments in providing finished water drawn from a water source and transported through a pipe system, when it is known, or should have been known, that such anti-corrosion treatments must be used to protect health and safety.

455.   Plaintiffs suffered harm resulting from the LAN Defendant's failures to exercise reasonable care.

456.   The LAN Defendants' failure to exercise reasonable care was direct and proximate cause of the Plaintiffs' injuries, which were entirely foreseeable.

457.   The LAN Defendants are liable to Plaintiffs for all harms resulting to them from the LAN Defendants' failures to exercise reasonable care.

458.   As a direct and proximate result of the LAN Defendants' actions and/or omissions, Plaintiffs have been lead poisoned and/or suffered from life threatening Legionella pneumonia, infections, dementia, and have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits and lost earning capacity).

459.   Further, as a direct and proximate cause of the LAN Defendants' acts and omissions, Plaintiffs' property has been damaged in the form of damaged pipes, service lines, and appliances in their homes, a diminution of property values, and other property damages.

460.   The LAN Defendants' conduct and/or failure(s) to act constitutes gross negligence because they were so reckless that they demonstrated a substantial lack of concern for whether an injury would result.

461.   In addition to the damages alleged above, Plaintiffs seek exemplary damages against the LAN Defendants.

462.   The LAN Defendants' professional negligence was voluntary conduct that inspired humiliation, outrage and indignity by the Plaintiffs.

463.   The LAN Defendants' conduct was malicious, willful and wantonly as to disregard the Plaintiffs' rights, for the following reasons:

a.   The LAN Defendants knew that Plaintiffs were relying upon them to provide Flint with safe water;

b.   The LAN Defendants knew that the failure to include corrosion control chemicals posed threats to public health and property that would result in injury and damages to Plaintiffs; and/or

c.   The LAN Defendants knew that the failure to notify and/or report to the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health and property that would result in injury and damages to Plaintiffs.

464.   As a result of the foregoing, Plaintiffs seek an award of exemplary damages from the LAN Defendants so as to deter such morally reprehensible conduct by the LAN Defendants and similarly situated corporations in the future.

## COUNT XVII – PROFESSIONAL NEGLIGENCE
## ROWE

465.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

466.   Rowe undertook, for consideration, to render services for the City of Flint, which it should have recognized as necessary for the protection of Plaintiffs.

467.  Rowe undertook to perform a duty owed to Plaintiffs by the City of Flint and/or the State of Michigan.

468.  Based on its undertaking, Rowe had a duty to Plaintiffs to exercise reasonable care.

469.  Rowe failed to undertake reasonable care and conduct as a professional engineering firm.

470.  Rowe failed to exercise reasonable care when it failed to insist upon the implementation of corrosion control chemical in a system containing lead pipes that was transporting highly corrosive water from the Flint River to the Flint WTP to the residents and property owners of Flint, including Plaintiffs.

471.  Plaintiffs relied on Rowe to perform their duties.

472.  Plaintiffs suffered harm resulting from Rowe's failure to exercise reasonable care.

473.  Rowe's failure to exercise reasonable care was a direct and proximate cause of the Plaintiffs' injuries, which were entirely foreseeable.

474.  Rowe is liable to Plaintiffs for all harms resulting to them from Rowe's failures to exercise reasonable care.

475.  As a direct and proximate result of Rowe's actions and/or omissions, Plaintiffs have been lead poisoned and/or suffered from life threatening Legionella pneumonia, infections, dementia, and have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems),

physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits and lost earning capacity).

476. Further, as a direct and proximate cause of Rowe's acts and omissions, Plaintiffs' property has been damaged in the form of damaged pipes, service lines, and appliances in their homes, a diminution of property values and other property damages.

477. Rowe's conduct and/or failure(s) to act constitutes gross negligence because it was so reckless that it demonstrated a substantial lack of concern for whether an injury would result.

478. In addition to the damages alleged above, Plaintiffs seek exemplary damages against Rowe.

479. Rowe's professional negligence was voluntary conduct that inspired humiliation, outrage and indignity by the Plaintiffs.

480. Rowe's conduct was malicious, willful and wantonly as to disregard the Plaintiffs' rights for the following reasons:

a. Rowe knew, or should have known, that Plaintiffs were relying upon them to provide Flint with safe water;

b. Rowe knew, or should have known, that the failure to include corrosion control chemicals posed threats to public health and property that would result in injury and damages to Plaintiffs; and/or

c. Rowe knew, or should have known, that the failure to notify and/or report to the proper authorities of unethical or illegal practices of

others whose actions or decisions posed threats to public health and property that would result in injury and damages to Plaintiffs.

481. As a result of the foregoing, Plaintiffs seek an award of exemplary damages from Rowe so as to deter such morally reprehensible conduct by Rowe and similarly situated corporations in the future.

## COUNT XVIII – PROFESSIONAL NEGLIGENCE
## VEOLIA LLC, VEOLIA INC., VEOLIA WATER AND VEOLIA S.A.

482. Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

483. The Veolia Defendants undertook, for consideration, to render services for the City of Flint, which they should have recognized as necessary for the protection of Plaintiffs.

484. The Veolia Defendants undertook to perform a duty owed to Plaintiffs by the City of Flint and/or the State of Michigan.

485. Based on their undertaking, the Veolia Defendants had a duty to Plaintiffs to exercise reasonable care.

486. Plaintiffs relied on the Veolia Defendants to perform the duty to inspect the City's water supply to make sure that it was safe.

487. The Veolia Defendants failed to undertake reasonable care and conduct as a professional engineering firm.

488.   The Veolia Defendants failed to exercise reasonable care in inspecting the city's water system and issuing its interim and final reports.

489.   The Veolia Defendants failed to exercise reasonable care when they declared that Flint's drinking water met federal and/or state and/or all applicable requirements.

490.   The Veolia Defendants failed to exercise reasonable care when they represented that Flint's drinking water was safe.

491.   The Veolia Defendants failed to exercise reasonable care when they discounted the possibility that problems unique to Flint's water supply were causing medical harms.

492.   The Veolia Defendants failed to exercise reasonable care when they failed to warn about the dangers of lead leaching into Flint's water system.

493.   The Veolia Defendants failed to exercise reasonable care when they did not forcefully recommend the immediate implementation of corrosion control for purposes of preventing lead contamination in Flint's water supply.

494.   The Veolia Defendants failed to exercise reasonable care when they recommended the addition of phosphates to the water, when phosphates exacerbate the problem of lead leaching, and in fact made the lead poisoning worse.

495.   Plaintiffs suffered harm resulting from the Veolia Defendants' failures to exercise reasonable care to protect its undertaking.

496.   The Veolia Defendants' failures to exercise reasonable care to protect their undertaking directly and proximately caused the Plaintiffs' injuries and were entirely foreseeable.

497.   The Veolia Defendants are liable to Plaintiffs for all harms resulting to them from their failures to exercise reasonable care.

498.   As a direct and proximate result of the Veolia Defendants' actions and/or omissions, Plaintiffs have been lead poisoned and/or suffered from life threatening Legionella pneumonia, infections, dementia, and have suffered past, present and future personal injuries, including but not limited to: various health problems (including, without limitation, hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning capacity.

499.   Further, as a direct and proximate cause of the Veolia Defendants' acts and omissions, Plaintiffs' property has been damaged in the form of damaged pipes, service lines, and appliances in their homes, a diminution in property values, and other property damages.

500.   The Veolia Defendants' conduct and/or failure(s) to act constitute gross negligence because it was so reckless that they demonstrated a substantial lack of concern for whether an injury would result.

501.   In addition to the damages alleged above, Plaintiffs seek exemplary damages against Veolia.

502.   The Veolia Defendants' professional negligence was voluntary conduct that inspired humiliation, outrage, and indignity by the Plaintiffs.

503.   The Veolia Defendants' conduct was malicious, willful and wantonly as to disregard the Plaintiffs' rights for the following reasons:

    a.    The Veolia Defendants knew, or should have known, that Plaintiffs were relying upon them to provide Flint with safe water;

    b.    The Veolia Defendants knew, or should have known, that the failure to include corrosion control chemicals posed threats to public health and property that would result in injury and damages to Plaintiffs; and/or

    c.    The Veolia Defendants knew, or should have known, that the failure to notify and/or report to the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health and property that would result in injury and damages to Plaintiffs.

504.   As a result of the foregoing, Plaintiffs seek an award of exemplary damages from the Veolia Defendants so as to deter such morally reprehensible conduct by the Veolia Defendants and similarly situated corporations in the future.

## COUNT XIX – FRAUD
## VEOLIA LLC, VEOLIA INC., VEOLIA WATER AND VEOLIA S.A.

505.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

506.   Upon information and belief, the Veolia Defendants made false and material representations regarding the safety of Flint's water, the nature and cause of the water quality problems in Flint, and the risks to public health.

507.   Upon information and belief, the false and material representations include, but are not limited to, statements in the Veolia Defendants' 2015 Interim Report that:

    a.    Flint's water was "safe" and "in compliance with drinking water standards[.]"

    b.    The observed discoloration was merely aesthetic and not indicative of water quality or health problem; and

    c.    Medical problems are because "[s]ome people may be sensitive to any water."

508.   Upon information and belief, the material representations and other acts and omissions of the Veolia Defendants constitute fraud.

509.   Upon information and belief, the Veolia Defendants knew the representations were made recklessly without any knowledge about their veracity.

510.   Upon information and belief, the Veolia Defendants made the representations with the intention that Plaintiffs would act and rely on them, which

they did.

511.   As a direct and proximate result, Plaintiffs suffered and continue to suffer injuries and damages.

## COUNT XX: VIOLATION OF SAFE DRINKING WATER ACT'S NOTIFICATION REQUIREMENTS, 40 C.F.R. § 141.85: DEFENDANTS CITY OF FLINT AND RICHARD D. SNYDER

512.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

513.   The Safe Drinking Water Act ("SDWA") was passed by Congress in 1974, with subsequent amendments in 1986 and 1996, to ensure and protect the quality of Americans' drinking water. Under the SDWA, the United States Environmental Protection Agency ("EPA") is given authority to set the standards for drinking water quality and oversee states, localities, and water suppliers who implement those standards.

514.   Through the SDWA, all public water systems in the United States need to follow the standards and regulations set by the EPA. The EPA has set maximum contaminant levels and/or treatment technique requirements for over 90 different contaminants in public drinking water, including microorganisms, disinfectants, disinfections by-products, inorganic chemicals, organic chemicals and radionuclides.

515.   Plaintiffs provided Defendants, the Administrator of the U.S. EPA ,
and the Michigan Attorney General with at least sixty days' written notice of the
violations of law alleged here in the form and manner required by the Safe
Drinking Water Act. 42 U.S.C. §300j-8(b); 40 C.F.R. §§ 135.11-.13.[28]

516.   The Defendants operate a "public water system" pursuant to the Safe
Drinking Water Act. 42 U.S.C. § 300(f); 40 C.F.R. §141.2.

517.   Regulations established under the SDWA require that, ". . .all water
systems must provide a consumer notice of lead tap water monitoring results to
persons served at the sites (taps) that are tested. Any system exceeding the lead
action level shall implement the public education requirements." 40 C.F,R,
§141.80(g).

518.  Since April 24, 2015, Defendants have violated and continue to
violate the Safe Drinking Water Act by failing to comply with the requirement that
water systems notify customers of the individual results of tap water samples
collected and tested for lead within thirty days after the water system receives the
results. 40 C.F.R. §§ 141.85(d)(1),(d)(2).

---

[28] Each Plaintiff adopting the Master Complaint must verify in the accompanying
Short Form Complaint that sixty days' notice has been provided against
Defendants Richard D. Snyder and City of Flint pursuant to 42 U.S.C. §300j-8(b);
40 C.F.R. §§ 135.11-.13.

519.   For all monitoring conducted since the switch to the Flint River was made on April 24, 2015, Defendants have failed to notify Plaintiffs and those residing at each sampling site of the presence of elevated lead levels in the public water supply.

<u>COUNT XXI:</u>
<u>VIOLATION OF SAFE DRINKING WATER ACT'S REQUIREMENT TO OPERATE OPTIMAL CORROSION, 40 C.F.R. § 141.81-.82:</u>
<u>DEFENDANTS CITY OF FLINT AND RICHARD D. SNYDER</u>

520.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

521.   Plaintiffs provided Defendants, the Administrator of the U.S. Environmental Protection Agency (EPA), and the Michigan Attorney General with at least sixty days' written notice of the violations of law alleged here in the form and manner required by the Safe Drinking Water Act. 42 U.S.C. §300j-8(b); 40 C.F.R. §§ 135.11-.13.[29]

522.   The Defendants operate a "public water system" pursuant to the Safe Drinking Water Act. 42 U.S.C. § 300(f); 40 C.F.R. § 141.2.

523.   To address corrosion of lead and copper into drinking water, the EPA issued the Lead and Copper Rule ("LCR") under the authority of the SDWA. 42

---

[29] Each Plaintiff adopting the Master Complaint must verify in the accompanying Short Form Complaint that sixty days' notice has been provided against Defendants Richard D. Snyder and City of Flint pursuant to 42 U.S.C. §300j-8(b); 40 C.F.R. §§ 135.11-.13.

U.S.C §§ 300(f) to 300j-26; 40 C.F.R. § 141.80-141.91. One requirement of the LCR is corrosion control treatment to prevent lead and copper from contaminating drinking water. Corrosion control treatment means utilities must make drinking water less corrosive to the materials it comes into contact with on its way to consumers' taps. The regulations implementing the LCR, 40 C.F.R. § 141.80-141.91, "constitute the national primary drinking water regulations for lead and copper. Unless otherwise indicated, each of the provisions of this subpart applies to community water systems and non-transient, non-community water systems (hereinafter referred to as "water systems" or "systems")." 40 C.F.R. § 141.80(a).

524.   The LCR establishes a treatment technique that includes requirements for corrosion control treatment, source water treatment, lead service line replacement, and public education. "These requirements are triggered, in some cases, by lead and copper action levels measured in samples collected at consumers' taps." 40 C.F.R. § 141.80(b).

525.   The LCR requires systems to monitor drinking water at customer taps. If lead concentrations exceed an action level of 15 ppb in more than 10% of customer taps sampled, the system must undertake a number of additional actions to control corrosion.

526.   As described more fully herein, the lead levels in Flint's water exceeded the thresholds established under the LCR.

527.  Since the switch to the Flint River was made on April 24, 2015, Defendants have violated and continue to violate the Safe Drinking Water Act by failing to operate and maintain optimal corrosion control treatment.  40 C.F.R. § 141.82(g).

528.  Defendants have failed to maintain optimal corrosion control treatment because it did not treat the water being sold to Flint residents with corrosion-inhibiting chemicals to minimize the amount of lead leaching into the public water supply.

529.  The absence of optimal corrosion control treatment caused and continues to cause dangerous amounts of lead to enter the public water supply relied upon by Plaintiffs.

530.  Additionally, the LCR provides that "[a]ny system exceeding the lead action level after implementation of applicable corrosion control and source water treatment requirements shall complete the lead service line replacement requirements contained in § 141.84." 40 C.F.R. § 141.80(f). A water system must replace annually, at least 7% of the initial number of lead service lines in its distribution system. The initial number of lead service lines is the number of lead lines in place at the time the replacement program begins. The system must identify the initial number of lead service lines in its distribution system, including an identification of the portion(s) owned by the system, based on a materials

evaluation, including the evaluation required under § 141.86(a) and relevant legal authorities (*e.g.*, contracts, local ordinances) regarding the portion owned by the system. The Government Defendants have yet to comply with these requirements.

## COUNT XXII:
## VIOLATION OF THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION & LIABILITY ACT (CERCLA) 42 U.S.C. § 9601 et seq. GOVERNMENTAL DEFENDANTS

531.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

532.   CERCLA permits private parties such as Plaintiffs to sue Defendants under CERLCA for the recovery of response costs Plaintiffs have had to incur as a result of Defendants' violation of CERCLA.

533.   Defendants own or operate the Flint River Water Treatment Plant, and are responsible for the maintenance and care of the Flint River.

534.   In *United States v. Bestfoods*, 524 U.S. 51 (1998), the United States Supreme Court held "under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility."

535.   In *United States v. Bestfoods*, 524 U.S. 51 (1998), the United States Supreme Court further held, "[t]o sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations

having to do with the leakage or disposal of hazardous waste, *or decisions about compliance with environmental regulations*" (emphasis added).

536.   *All* of the Defendants either owned the Flint River Water Treatment plant or operated the Flint River Water Treatment Plant by managing it, directing its actions, conducting its affairs or making decisions about complying with environmental regulations.

537.   Flint, the MDEQ Defendants and the City of Flint arranged for disposal or treatment of hazardous substances at the Flint River Water Treatment Plant.

538.   MDEQ made the decisions, and was ultimately responsible for ensuring that the Flint River Water Treatment Plant complied with environmental regulations.

539.   According to MDEQ's website, MDEQ's role, among others, is to "Protect Michigan's Water" and "ensure Michigan's water resources remain clean and abundant by establishing water quality standards, overseeing public water supplies, regulating the discharge of industrial and municipal wastewaters, monitoring water quality and the health of aquatic communities, developing policy, and fostering stewardship."

540.   MDEQ's website states that it "has primary enforcement authority in Michigan for the Federal Safe Drinking Water Act… [and therefore] has regulatory oversight for all public water supplies ..."

541.   MDEQ's enforcement authority includes compliance with the Lead and Copper Rule.

542.   MDEQ's website further states that MDEQ "also investigates drinking water well contamination, and oversees remedial activities at sites of groundwater contamination affecting drinking water wells."

543.   MDEQ had the authority, and ultimately decided that corrosion control treatment at the Flint Water Treatment Plant was not necessary.

544.   Defendant Snyder and the Emergency Manager Defendants also made directed decisions concerning the Flint Water Treatment Plant.

545.   The Flint River Water Treatment Plant is a facility within the meaning of 42 U.S.C. § 9601(9) because it is considered to be a building, structure or pipeline, and because untreated lead-contaminated water is place and stored at the Flint River Water Treatment Plant.

546. CERCLA assigns liability for the release of contaminants and hazardous substances into drinking water.

547.   Section 9601(14) of CERCLA defines "hazardous substance" as "any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act."

548.   The toxic pollutant list, found at 40 CFR § 401.15, includes lead and its compounds.

549.   Defendants release untreated lead-contaminated water from the Flint River. Defendants are responsible for a "release" as defined by CERCLA at the Flint River Water Treatment Plant and, as such, are responsible for necessary costs of response, as well as damages and health assessments, pursuant to 42 U.S.C. §§ 9607(a)(1) and 9607(a)(4).

550.   As a result of Defendants' actions, the Flint River became a hazardous waste site that cause Plaintiffs to suffer damages.

551.   Plaintiffs have and will continue to incur response costs within the meaning of CERCLA. These response costs include, but are not limited to, costs for bottled water, costs to repair and replace damaged appliances, medical testing, physical treatment, emotional treatment, and litigation cost.

552.   Defendants have directly or indirectly released into the Flint River the hazardous substance of lead, and such contaminated water have injured Plaintiffs.

553.   Defendants' release of lead into the water Plaintiffs used and consumed violated CERCLA.

554.   Plaintiffs' response costs were necessary responses to the water contamination, and Plaintiffs are entitled to reimbursement under 42 U.S.C. §9607.

555.   Plaintiffs also demand such remediation as may be necessary pursuant to 42 U.S.C. § 9659.

556.   Plaintiffs are entitled to reasonable attorney fees for bringing suit for response costs and remediation, pursuant to 42 U.S.C. 9659.

557.   Plaintiffs have been damaged and seek all allowable damages authorized by the statute.

## DEMAND FOR JURY TRIAL

530.   Plaintiffs hereby demand a jury trial pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable in this action.

## RELIEF REQUESTED
## GOVERNMENTAL DEFENDANTS

531.   Plaintiffs request the following relief from the court:

a.   An order declaring the conduct of Defendants unconstitutional;
b.   An injunctive order to remediate the harm caused by Defendants' unconstitutional conduct including, but not limited to: repairs of private property and establishment of medical monitoring to provide health care and other appropriate services to Plaintiffs for a period of time deemed appropriate by the Court;
c.   Appointment of a monitor who will assist in the development of remedial plans including, but not limited to: early education, education intervention programs, criminal and juvenile justice evaluations;
d.   An order for an award of compensatory damages;
e.   An order for an award of punitive damages;

f.   An order for an award of actual reasonable attorney fees and litigation expenses; and

g.   An order for all such other relief the court deems equitable.

## RELIEF REQUESTED
## ENGINEERING DEFENDANTS

532.   Plaintiffs demand judgment against Engineering Defendants for:

a.   Compensatory damages;

b.   Punitive damages;

c.   Exemplary damages;

d.   Equitable relief;

e.   Declaratory judgment;

f.   Reasonable Value of Needed Services;

g.   Pre-judgment and post-judgment interest;

h.   Attorneys' fees and litigation expenses; and

i.   An order for such other relief the court deems equitable.

Respectfully submitted,

**LEVY KONIGSBERG, LLP**

By: /s/ Corey M. Stern
Corey M. Stern, Esq.
800 Third Avenue, Suite 11th Floor
New York, NY, 10022
(212) 605-6200
cstern@levylaw.com

**NAPOLI SHKOLNIK PLLC**

By: /s/ Hunter Shkolnik
Hunter J. Shkolnik, Esq.
360 Lexington Avenue, 11th Floor
New York, NY, 10017
(212) 397-1000
hunter@napolilaw.com

*Co-Liaison Counsel for Personal Injury Claims*

Dated: December 15, 2017