# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

LEANNE WALTERS, *et al.*,

        Plaintiffs,                Case No.: 5:17-cv-10164

v.                              Hon. Judith E. Levy

CITY OF FLINT, *et al.*,           Magistrate Judge Mona K. Majzoub

        Defendants.

---

# OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS FILED IN *WALTERS* (ECF NOS. 137, 138, 139, 140, 141, 142, 143, 144, 145, 147, 148, AND 150)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... viii

CONCISE STATEMENT OF THE ISSUES PRESENTED ..................................xx

CONTROLLING OR MOST APPROPRIATE AUTHORITIES...................... xxiii

BACKGROUND ....................................................................................1

SUMMARY OF FACTUAL ALLEGATIONS ........................................3

    I.    DEFENDANTS DECIDED TO USE THE FLINT RIVER AS THE PRIMARY DRINKING WATER SOURCE FOR THE CITY OF FLINT IN THE FACE OF WELL-KNOWN DANGERS ....................................4

    II.    GOVERNMENT DEFENDANTS DISCOVER A WATER CRISIS IN FLINT ALMOST IMMEDIATELY, AND BEGIN A COVER-UP .........8

    III.    GOVERNMENT OFFICIALS ENGAGE LAN AND VEOLIA, WHO MADE THE PROBLEM WORSE............................................................10

    IV.    DEFENDANTS LIED TO THE PUBLIC REPEATEDLY ....................13

    V.    FLINT'S WATER IS RECONNECTED TO DWSD AND GOVERNMENT BODIES DECLARE STATES OF EMERGENCY ...17

    VI.    LEAD'S DEVASTATING HEALTH EFFECTS ...................................17

    VII.    PROPERTY DAMAGE CAUSED BY DEFENDANTS' CONDUCT ..19

LEGAL STANDARDS ........................................................................20

ARGUMENT .......................................................................................21

    I.    PLAINTIFFS HAVE PROPERLY PLEAD THE ACTS AND OMISSIONS OF DEFENDANTS ........................................................21

    II.    THE FACTUAL ALLEGATIONS IN THE SHORT-FORM COMPLAINT ARE NOT DEFICIENT..................................................22

    III.    PLAINTIFFS' CLAIMS AGAINST THE GOVERNMENT DEFENDANTS MUST PROCEED .......................................................23

A. Plaintiffs' Claims Against the Government Defendants Are Not Barred ........................................................................23

   1. The Eleventh Amendment Does Not Bar Jurisdiction Over the State Defendants Because the *Ex Parte Young* Exception for Prospective Relief Applies .............................................23

      i. Plaintiffs Sufficiently Allege An Ongoing Constitutional Violation .............................................24

      ii. The Relief Plaintiffs Seek Is Prospective and Any Financial Impact on the State is Incidental ..............26

   2. The City of Flint Is Not Entitled to Eleventh Amendment Immunity Because It Is a Municipality and Is Not an "Arm of the State" .......................................................................28

      i. The City of Flint Is Liable for Any Judgement Entered Against the City While Under the Control of an Emergency Manager ..................................................29

      ii. The Appointment of an Emergency Manager Does Not Transform a City into an "Arm of the State" .....32

      iii. The Operation of Waterworks is Traditionally Municipal Function and Does Not Render the City an Arm of the State .........................................................35

   3. Neither Absolute Immunity nor State-Law Privileges Bar Plaintiffs' Claims Against Defendants Wyant and Wurfel .36

      i. Absolute Immunity Does Not Apply to Defendants Wyant and Wurfel Because They Did Not Serve a Prosecutorial Function ...............................................36

      ii. State Law Privileges Cannot Bar Plaintiffs' Federal Constitutional Claims Against Wyant and Wurfel....38

   4. Glasgow and Johnson Do Not Have Governmental Immunity Under State Law ..................................................40

   5. Defendants Wyant and Wurfel Cannot Seek Refuge Behind a Shield of Immunity .........................................................43

     i.    Michigan's Governmental Immunity Doctrine Does Not Shield Defendant Wyant's and Wurfel's Conduct ....................................................................43

     ii.    Wyant and Wurfel Are Not Entitled to Absolute Immunity Because MDEQ Employees Are Not Federal Employees ....................................................46

  6.  The MDEQ Defendants Are Not Immune From Suit...............49

     i.    MDEQ Employees Are Not Federal Employees.......49

     ii.    Michigan's Governmental Immunity Doctrine Does Not Shield Defendants' Conduct...............................52

     iii.    Shekter Smith Is Not Absolutely Immune by Virtue of Her Mid-Level Management Position.......................53

  7.  The Safe Drinking Water Act Does Not Preempt Plaintiffs' Constitutional Claims .........................................................56

B.  The Complaint Plausibly Alleges that Government Defendants Violated Plaintiffs' Substantive Due Process Rights................58

  1.  Government Defendants' Conduct Shocks the Conscience .....59

  2.  The Complaint Sufficiently States a Claim for Government Defendants' Violation of Plaintiffs' Fundamental Constitutional Right to Bodily Integrity .............................62

  3.  The Complaint Sufficiently States a Claim for Government Defendants' Violation of Plaintiffs' Fundamental Constitutional Right to Bodily Integrity .............................72

     i.    Government Defendants Committed Affirmative Acts That Created or Increased the Risk That Plaintiffs Would be Exposed to Injury......................................72

     ii.    Government Defendants Knew or Should Have Known That Their Actions Specifically Endangered Plaintiffs....................................................................75

        iii.     Government Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' State-Created Danger Claim ....................................................................76

   C.    The Complaint Plausibly Alleges that Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Early Violated Plaintiffs' Constitutional Right to Equal Protection ................77

       1.    The Court Should Apply Strict Scrutiny to Plaintiffs' Equal Protection Claims ................................................................78

       2.    Plaintiffs Plausibly Allege an Equal Protection Claim for Race-Based Discrimination .................................................79

       3.    Plaintiffs Plausibly Allege an Equal Protection Claim for Wealth-Based Discrimination That Burdened Plaintiffs' Fundamental Right to Bodily Integrity ...............................88

   D.    Plaintiffs Sufficiently State a Claim Against Defendants Dillon, Lyon, RTAB, Snyder, Wells, Ambrose, Croft, Earley, City of Flint, Glasgow, and Johnson for Conspiracy to Violate Plaintiffs' Rights on the Basis of Race in Violation of § 1985 89

   E. Plaintiffs State a Claim Against the City Under *Monell* ................91

   F.    Plaintiffs Sufficiently State a Claim Under the Elliott-Larson Civil Rights Act Against Snyder, the State of Michigan, Dillon, Wright, Walling, Ambrose, Kurtz, Earley, and the City of Flint for Intentional Discrimination on the Basis of Race ...............92

IV.   PLAINTIFFS' CLAIMS AGAINST THE ENGINEERING DEFENDANTS MUST PROCEED ......................................................96

       1.    Plaintiffs May Pursue Simultaneous Claims for Professional and Ordinary Negligence .....................................................97

       2.    The Complaint Plausibly Alleges LAN and Veolia's Gross Negligence .......................................................................101

       3.    The Complaint Plausibly Alleges a Claim for Negligent Infliction of Emotional Distress Against LAN and Veolia ...........................................................................105

4.      The Complaint Plausibly States a Claim of Intentional
Infliction of Emotional Distress..........................................108

V.    PLAINTIFFS HAVE ADEQUATELY PLEAD STATE LAW CAUSES
OF ACTION AGAINST THE REMAINING DEFENDANTS ...........111

A.    Plaintiffs Have Adequately Pled Unjust Enrichment .............111

B.    Plaintiffs Have Adequately Pled Intentional Infliction of
Emotional Distress ..................................................................113

C.    Defendants' Poisoning of the Flint Water Supply is Either a
Trespass or a Nuisance, It Cannot Be Neither ........................115

1.  Plaintiffs Have Stated a Claim for Trespass ...........................116

2.  Plaintiffs Have Stated a Claim for Nuisance ..........................118

D.    Plaintiffs Have Adequately Pled their Breach of Contract Claim
...................................................................................................119

E.    Plaintiffs Have Adequately Pled their Punitive Damages Claim
...................................................................................................120

F.    Plaintiffs Have Stated a Claim Entitling Them to Seek
Exemplarily Damages ..............................................................122

G.    This Court Should Exercise Supplemental Jurisdiction over
Plaintiffs' State Law Claims ....................................................125

H.    The Michigan Safe Drinking Water Act Does Not Preclude
State Tort Claims .....................................................................126

1.  The MSDWA Does Not Expressly Abrogate the Common Law
...................................................................................................126

2.  The MSDWA Cannot Preempt Plaintiffs' Right to Due Process
...................................................................................................129

I.    Plaintiffs have Adequately Plead a Claim for Gross Negligence
...................................................................................................130

J.    Defendants Had a Duty to Refrain from Actions and Omissions
Foreseeably Poisoning Thousands of People ..........................130

K.      Somebody Caused the Flint Water Crisis ...............................134

VI.   PLAINTIFFS HAVE SATISFIED THE PLEADING REQUIREMENTS
       OF RULE 12(E) IN REGARD TO THEIR CLAIMS AGAINST LAN
       .................................................................................................134

CONCLUSION ......................................................................................140

# TABLE OF AUTHORITIES

## CASES

*Abnet v. Coca-Cola Co.*, 786 F. Supp. 2d 1341 (W.D. Mich. 2011)....................123

*Adams v. Cleveland-Cliffs Iron Co.*, 602 N.W.2d 215 (Mich. App. 1999)..122, 123

*Adkins v. Thomas Solvent Co.*, 487 N.W.2d 715 (Mich. 1992)...........................121

*Albright v. Oliver*, 510 U.S. 266 (1994) ..................................................................62

*Apostle v. Booth Newspapers, Inc.*, 572 F. Supp. 897 (W.D. Mich. 1983)..111, 112

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009)................................ 21, 113

*Ass'n Research & Dev. Corp. v. CNA Fin. Corp.*, 123 Mich. App. 162 (1983) ...126

*Bailey v. Fitzpatrick*, No. 329516, 2017 WL 104546 (Mich. Ct. App. Jan. 10, 2017) ................................................................................................................107

*Bandfield v. Bandfield*, 117 Mich. 80 (1898) ........................................................131

*Bartell v. Lohiser*, 215 F.3d 550 (6th Cir. 2000) .....................................................89

*Bass v. Robinson*, 167 F.3d 1041 (6th Cir. 1999)....................................................89

*Batson v. Kentucky*, 476 U.S. 79 (1986)........................................................... 80, 82

*Baynes v. Cleland*, 799 F.3d 600 (6th Cir. 2015) ....................................................67

*Beaudrie v. Henderson*, 465 Mich. 124 (Mich. 2001)............................... 44, 52, 137

*Bell Atlantic Corp.v. Twombly*, 550 U.S. 544 127 S. Ct. at 1965, 1969 (2007).....21, 113

*Belle Isle Grill Corp. v. City of Detroit,* 256 Mich. App. 463 (2003) ...................117

*Berna v. City of Detroit*, No. 2:05CV74521, 2006 WL 901260 (E.D. Mich. Feb. 15, 2006) .............................................................................................................142

*Bernal v. Fainter*, 467 U.S. 216 (1984) ...................................................................79

*Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017) ................................................ passim

*Borg-Warner Acceptance Corp v. Department of State*, 433 Mich. 16 (1989).....116

*Bradley v. Milliken*, 411 F. Supp. 937 (E.D. Mich. 1975)....................................142

*Browder v. Tipton*, 630 F.2d 1149 (6th Cir. 1980) ...................................................89

*Bryant v. Oakpointe Villa Nursing Ctr., Inc.*, 684 N.W.2d 864 (Mich. 2004).... 103, 104, 105

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) ........................................... 37, 47, 50

*Buckner v. Roy*, No. 2:15-cv- 10441, 2015 WL 4936694 (E.D. Mich. Aug. 18, 2015) .........................................................................................................107

*Burns v. Reed*, 500 U.S. 478 (1991); ................................................................ 36, 37

*Butz v. Economou*, 438 U.S. 478 (1978)................................................ 36, 46, 47, 49

*cf. Friends of Moon Creek v. Diamond Lake Improvement, Ass'n, Inc.*, No. CV-13-0396-JLQ, 2014 WL 794288 (E.D. Wash. Feb. 27, 2014)..................................26

*Cf. Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966) ..............................88

*Cf. Heinrich ex rel. Heinrich v. Sweet*, 62 F. Supp. 2d 282 (D. Mass. 1999) .........60

*Charvat v. E. Ohio Reg'l Wastewater Auth.*, 246 F.3d 607 (6th Cir. 2001)............58

*Chivas v. Koehler*, 453 N.W.2d 264 (Mich. App. 1990)................................. 55, 56

*City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156 (1997) ..........................130

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985).............................86

*City of Dearborn v. DLZ Corp.*, 111 F. Supp. 2d 900 (E.D. Mich. 2000) ............104

*City of Huntington Woods v. Orchard, Hiltz & McCliment, Inc.*, No. 301987, 2012 WL 1649782 (Mich. Ct. App. May 10, 2012)...................................................104

*Collins v. Ferguson*, No. 17-CV-10898, 2017 WL 4387287 (E.D. Mich. Oct. 3, 2017) ..................................................................................................107

*Compuware Corp. v. Int'l Bus. Machs.*, 259 F. Supp. 2d 597 (E.D. Mich. 2002) 140

*Coshow v. City of Escondido*, 34 Cal. Rptr. 3d 19 (Cal. Ct. App. 2005) ...............67

*Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990) ............ 62, 68

*Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)......................................... passim

*Cummings v. City of Akron*, 418 F.3d 676 (6th Cir. 2005)...................................68

*Cummins v. Robinson Twp.*, 770 N.W.2d 421 (Mich. App. 2009).............. 136, 138

*Daley v. LaCroix*, 179 N.W.2d 390 (Mich. 1970)....................................... 110, 111

*Davis v. City of Detroit*, 711 N.W.2d 462 (Mich. App. 2005) ...............................55

*Dawe v. Dr. Reuven Bar-Levav & Assocs.*, P.C., 485 Mich. 20 (2010) ...............133

*Dockweiler v. Wentzell*, 425 N.W.2d 468 (Mich. Ct. App. 1988)...........................95

*Eichhorn v. Lampere Sch. Dist.*, 421 N.W.2d 230 (Mich. App. 1988) ..................55

*Ellis v. Dykema Gossett PLLC*, No. 301131, 2013 WL 3717799 (Mich. Ct. App. July 16, 2013).......................................................................................................128

*Environmental Defense Fund v. Tidwell*, 837 F. Supp. 1344 (E.D.N.C. 1992) ......98

*Ernst v. Rising*, 427 F.3d 351 (6th Cir. 2005)............................................. 29, 32, 35

*Estate of Romain v. City of Grosse Pointe Farms*, No. CIV. 14-12289, 2015 WL 4620588 (E.D. Mich. July 31, 2015) ....................................................................39

*Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003) ............................... 73, 76

*Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002) ..................................60

*Ex parte Young*, 209 U.S. 123 (1908)....................................................................23

*Farm Labor Org. Comm. v. Ohio State Hwy. Patrol*, 308 F.3d 523 (6th Cir. 2002) ................................................................................................................................79

*Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009) ..................................58

*Freeman v. Kelvinator, Inc.*, 469 F. Supp. 999 (E.D. Mich. 1979)......................130

*Genesee Cty. Drain Comm'r v. Genesee Cty.*, 908 N.W.2d 313 (Mich. Ct. App. 2017) ....................................................................................................................117

*Giffen v. Ortho McNeil Pharm., Inc.*, No. 3:12 oe 40001, 2014 U.S. Dist. LEXIS
    136587 (N.D. Ohio Sep. 26, 2014) ........................................................22

*Gilbert v. DaimlerChrysler Corp.*, 470 Mich. 749 (2004) ....................................126

*Gonyea v. Motor Parts Fed. Credit Union*, 480 N.W.2d 297 (Mich. 1991) ..........39

*Graham v. Ford*, 237 Mich. App. 670, 604 N.W.2d 713 (1999) ......... 114, 118, 119

*Grahovac v. Munising Twp.*, 689 N.W.2d 498 (Mich. App. 2004).................. 54, 55

*Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009) ......................................................68

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) ...........................................................89

*Grutter v. Bollinger*, 539 U.S. 306 (2003)..............................................................79

*Guertin v. Michigan*, No. 16-CV-12412, 2017 WL 2418007 (E.D. Mich. June 5,
    2017) ............................................................................................... passim

*Gurley v. Rhoden*, 421 U.S. 200 (1975)..................................................................84

*Hallstrom v. Tillamook Cty*, 493 U.S. 20 (1989)............................................. 97, 98

*Harrison v. Dir., Dep't of Corrs.*, 487 N.W.2d 799 (Mich. App. 1992).................55

*Hayley v. Allstate Ins. Co.*, 262 Mich. App. 571, 686 N.W. 2d 273 (2004) 114, 115,
    118, 120

*Haynes v. Neshewat*, 729 N.W.2d 488 (Mich. 2007) ..............................................95

*Hazle v. Ford Motor Co.*, 628 N.W.2d 515 (Mich. 2001)................................ 93, 95

*Hearne v. Manpower of Indiana, L.P.*, No. 15-12113, 2015 WL 10353133 (E.D.
    Mich. Nov. 23, 2015), *report and recommendation adopted,* No. 15-12113, 2016
    WL 704959 (E.D. Mich. Feb. 23, 2016)..............................................................144

*Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124 (9th Cir. 2008).............144

*Hill v. City of Saginaw*, 399 N.W.2d 398 (Mich. App. 1986) ...............................119

*Hoerstman Gen. Contracting, Inc. v. Hahn*, 474 Mich. 66 (2006).......................134

*Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564 (5th Cir. 2011) ...................82

*Hope v. Pelzer*, 536 U.S. 730 (2002) ....................................................................68

*Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529 (6th Cir. 2008).....62

*In re Jackson Lockdown/MCO Cases*, 568 F. Supp. 869 (E.D. Mich. 1983)........143

*Jackson Printing Co. v. Mitan*, 425 N.W.2d 791 (Mich. Ct. App. 1988)..............129

*Kewin v. Massachusetts Mutual Life Ins Co.*, 409 Mich. 401 (1980) ...................126

*Kincaid v. City of Flint*, 874 N.W.2d 193 (Mich. Ct. App. 2015).................... 33, 34

*Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996)................................................. 73, 75

*Kraft v. Detroit Entm't, L.L.C.*, 261 Mich. App. 534 (2004).................................133

*Kreipke v. Wayne State Univ.*, 807 F.3d 768 (6th Cir. 2015) ............................ 29, 31

*Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391 (1979) .....................................................................................................................35

*Lake v. City of Southgate*, No. 16-10251, 2017 WL 767879 (E.D. Mich. Feb. 28, 2017) ............................................................................................................ 66, 67

*Law Offices of Lawrence J. Stockler, P.C. v. Rose*, 436 N.W.2d 70 (Mich. Ct. App. 1989) .........................................................................................................129

*Lawrence v. Texas*, 539 U.S. 558 (2003)..............................................................78

*Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996 (6th Cir. 2017) ..82

*Loving v. Virginia*, 388 U.S. 1 (1967) ..................................................................78

*Mack v. Detroit*, 649 N.W.2d 47 (Mich. 2002) ............................................... 43, 51

*Maddy v. Vulcan Materials Co.*, 737 F. Supp. 1528 (D. Kan. 1990) ...................121

*Maher v. Roe*, 432 U.S. 464 (1977) ......................................................................78

*Maiden v. Rozwood,* 597 N.W.2d 817 (Mich. 1999)............................................138

*Maldonado v. National Acme Co.*, 73 F.3d 642 (6th Cir. 1996) .......... 110, 111, 112

*Mallory v. City of Ferndale*, No. 10- 10581, 2011 WL 891212 (E.D. Mich. Mar. 11, 2011) ........................................................................................................107

*Marquis v. Hartford Acc. & Indem.*, 444 Mich. 638 (1994)......................... 131, 132

*Martin v. Reynolds Metals Co.*, 342 P.2d 790 (Or. 1959) ....................................120

*Martinez v. California*, 444 U.S. 277 (1980)..................................................... 38, 39

*Mayer v. Weiner*, No. 2:17-CV- 12333, 2017 WL 4173680 (E.D. Mich. Sept. 21, 2017) .............................................................................................................140

*Mays v. Snyder*, No. 335555, 2018 WL 559726 (Mich. Ct. App. Jan. 25, 2018) ...34

*McGowan v. Maryland*, 366 U.S. 420 (1961) .................................................. 79, 84

*MCM Marine, Inc. v. Ottawa County Road Commission*, Nos. 286294, 290702, 2010 WL 1461557 (Mich. Ct. App. Apr. 13, 2010)............................................104

*McPeak v. McPeak*, 233 Mich. App. 483 (1999) .................................................126

*McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460 (6th Cir. 2006)..............................72

*Midfield Concession Enterprises, Inc. v. Areas USA, Inc.*, 130 F. Supp. 3d 1122 (E.D. Mich. 2015) ................................................................................................126

*Miller v. Calhoun Cty.*, 408 F.3d 803 (6th Cir. 2005) ............................................91

*Millross v. Plum Hollow Golf Club*, 429 Mich. 178 (1987) ..................................131

*Mills v. City of Roanoke*, 518 F. Supp. 2d 815 (W.D. Va. 2007) ...........................84

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)...............................................91

*Moon v. Mich. Reprod. & IVF Ctr., P.C.*, 810 N.W.2d 919 (Mich. Ct. App. 2011) ...............................................................................................................................95

*Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274 (1977) ..............28

*Munger v. City of Glasgow Police Department*, 227 F.3d 1082 (9th Cir. 2000) ....73

*Muslim Cmty. Ass'n of Ann Arbor & Vicinity v. Pittsfield Charter Twp.*, 947 F. Supp. 2d 752 (E.D. Mich. 2013).........................................................................85

*N. Ins. Co. of New York v. Chatham Cty.*, 547 U.S. 189 (2006) ............................35

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).......................................................78

*Odom v. Wayne Cty.*, 482 Mich. 459 (2008) ........................................... 40, 41, 122

*Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320 (6th Cir. 1990) .................20

*Palmer v. City of Monticello*, 31 F.3d 1499 (10th Cir. 1994)...................................39

*Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928) .................................139

*Papasan v. Allain*, 478 U.S. 265 (1986) ................................................................27

*Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) ............. 74, 76, 77

*Perma- Liner Indus., Inc. v. U.S. Sewer & Drain, Inc.*, 630 F. Supp. 2d 516 (E.D. Pa. 2008) ..........................................................................................................140

*Peters v. Bay Fresh Start, Inc.*, 411 N.W.2d 463 (Mich. 1987)) .....................43, 52

*Phila. Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645 (6th Cir. 2013) ............109

*Phillips v. Snyder*, 836 F.3d 707 (6th Cir. 2016) ..............................................32, 77

*Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833 (1992)....................62, 64

*Pohutski v. City of Allen Park*, 465 Mich. 675; 641 N.W.2d 219 (2005)..............121

*Postma v. Cty. of Ottawa*, 2004 WL 1949317 (Mich. App. Sept. 2, 2004)...........123

*Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752 (6th Cir. 2010)...................................32

*Radvansky v. City of Olmsted Falls*, 395 F.3d 291 (6th Cir. 2005)........................77

*Rakowski v. Sarb*, 713 N.W.2d 787 (Mich. App. 2006) .......................................138

*Range v. Douglas*, 763 F.3d 573 (6th Cir. 2014)...............................................59, 60

*Reinhardt v. Dennis*, 399 F. Supp. 2d 803 (W.D. Mich. 2005) ..............................95

*Rietcheck ex rel. Rietcheck v. City of Arlington*, No. 04-CV-1239-BR, 2006 WL 37843 (D. Or. Jan. 4, 2006) ...............................................................................74

*Robinson v. City of Detroit*, 462 Mich. 439 (Mich. 2000)......................................42

*Rochin v. California*, 342 U.S. 165 (1952).............................................................59

*Rodgers v. Johnson*, 174 Fed. App'x. 3 (3rd Cir. 2006).........................................84

*Rogers v. Int'l Ass'n of Lions Clubs*, 636 F. Supp. 1476 (E.D. Mich. 1986) ..........95

*Ross v. Consumers Power Cp.*, 363 N.W.2d 641 (Mich. 1984) ................ 43, 45, 52

*Rusinek v. Schultz, Snyder & Steele Lumber Co.*, 411 Mich. 502 (1981) ............132

*S & M Brands, Inc. v. Cooper*, 527 F.3d 500 (6th Cir.2008) ..................................23

*Sa v. Red Frog Events, LLC*, 979 F. Supp. 2d 767 (E.D. Mich. 2013)................108

*Sailors v. Bd. of Ed. of Kent Cty.*, 387 U.S. 105 (1967) ..........................................33

*Salmon v. Wilkerson*, 2002 WL 1603180 (Mich. App. July 19, 2002) ..................55

*Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005)......................................................68

*Samson v. Saginaw Prof'l Bldg., Inc.,* 224 N.W.2d 843 (Mich. 1975).................138

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) .............................78

*Schneider v. Franklin Cty.*, 288 F. App'x 247 (6th Cir. 2008)........................ 72, 76

*Segue v. Wayne County*, 2014 WL 2154976 (Mich. App. May 22, 2014). 33, 54, 55

*Selph v. Gottlieb's Fin. Servs., Inc.*, 35 F. Supp. 2d 564 (W.D. Mich. 1999).......112

*Smith v. Dep't of Pub. Health*, 410 N.W.2d 749 (Mich. 1987) ...................... passim

*Solo v. United Parcel Serv. Co.*, 819 F.3d 788 (6th Cir. 2016) ..............................20

*South Carolina Wildlife Federation v. Alexander*, 457 F. Supp. 118 (D.S.C. 1978) ...............................................................................................................................98

*Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999)...............................................37

*Student Pub. Interest Research Group of New Jersey v. Tenneco Polymers, Inc.* 602 F. Supp. 1394 (D.N.J. 1985) ..........................................................................98

*Sturgis Bank & Tr. Co. v. Hillsdale Cmty. Health Ctr.*, 708 N.W.2d 453 (Mich. Ct. App. 2005) ............................................................................................... 104, 105

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002).........................................................94

*Tech. Recycling Corp. v. Woodward- Manchester Corp.*, No. 231312, 2003 WL 21362977 (Mich. Ct. App. June 12, 2003) .......................................................108

xv

*Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 274 (6th Cir. 2010) ...............................3

*Trowell v. Providence Hosp. & Med. Ctrs., Inc.*, 893 N.W.2d 112 (Mich. Ct. App. 2016) .......................................................... 103, 105, 106

*Tschirhart v. Pamar Enters., Inc.*, No. 327125, 2016 WL 3541827 (Mich. Ct. App. Jun. 28, 2016) ...................................................................................112

*Unibar Maint. Servs., Inc. v. Saigh*, 769 N.W.2d 911 (Mich. Ct. App. 2009).... 128, 130

*Unibar Maintenance Services, Inc v. Saigh*, 283 Mich.App 609 (2009) ..............126

*Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250 (1891) .............................................62

*United States ex rel. Garst v. Lockheed–Martin Corp.*, 328 F.3d 374 (7th Cir. 2003) ...................................................................................145

*United States v. Bestfoods,* 524 U.S. 51 (1998) ....................................................100

*Van Buren v. Crawford Cty.*, No. 13-14565, 2014 WL 2217016 (E.D. Mich. May 29, 2014) ...................................................................................107

*Van Orden v. Borough of Woodstown*, 5 F. Supp. 3d 676 (D.N.J. 2014) ..............74

*Velez v. Tuma*, 492 Mich. 1 (2012) ............................................................. 131, 132

*Wang v. MidMichigan Health*, No. 15-cv-14403, 2016 WL 4073538 (E.D. Mich. Aug. 1, 2016) ...................................................................................104

*Washington v. Grace*, 353 F. App'x 678 (3d Cir. 2009) ......................................144

*Washington v. Harper*, 494 U.S. 210 (1990) ................................................... 62, 68

*Water Keeper All., Inc. v. Smithfield Foods, Inc.*, 2002 U.S. Dist. LEXIS 27973 (E.D.N.C. 2002) ...................................................................................98

*Wilson v. Elliott Cty.*, 198 F. App'x 471 (6th Cir. 2006).........................................38

*Wold Architects & Eng'rs v. Strat*, 474 Mich. 223 (2006) ....................................132

*Wudtke v. Davel*, 128 F.3d 1057 (7th Cir. 1997).....................................................76

*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004)..................................................144

*Xu v. Gay*, 668 N.W.2d 166 (Mich. Ct. App. 2003) ..............................................108

*Yong v. I.N.S.*, 208 F.3d 1116 (9th Cir. 2000) .......................................................57

**STATUTES**

28 U.S.C. § 1367(a) .................................................................................................130

28 U.S.C. § 1367(c)(1) ...............................................................................................95

28 U.S.C. § 2674 .................................................................................................. 48, 51

28 U.S.C. § 2679(c) .............................................................................................. 48, 51

28 U.S.C. § 2679(d)(3) ......................................................................................... 49, 51

40 C.F.R. § 141.81-.82 ............................................................................................101

40 C.F.R. § 141.85 ..................................................................................................101

40 C.F.R. §§ 135.10-135.13 ......................................................................................97

42 U.S.C. § 300g-2 ..................................................................................................100

42 U.S.C. § 300g-2, g-3 ...................................................................................... 48, 50

42 U.S.C. § 300g-3(i) ..............................................................................................101

42 U.S.C. § 300j-8 ...................................................................................................101

42 U.S.C. § 300j-8(a)(1) .........................................................................................100

42 U.S.C. § 300j-8(b) ................................................................................................97

42 U.S.C. § 300j-8(b)(1) ...........................................................................................96

42 U.S.C. §300g-2 ...................................................................................................100

Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2302 ...............................92

Flint Code of Ord. §§ 46-25, 46-26, 46-50(b) .........................................................59

M Civ JI 108.04 ........................................................................................................93

M.C.L. § 325.1003 ..................................................................................................101

MCL § 325.1001a ................................................................132

MCL § 440.1103(1) .............................................................134

MCL § 691.1401 ............................................................ 44, 52

MCL § 691.1407 ..................................................................40

MCL § 691.1407(2) .............................................................41

MCL § 691.1407(3) ...................................................... 118, 121

MCL § 691.1407(5) .............................................................53

MCL § 691.1407(8)(a) .........................................................42

MCL § 117.1 .......................................................................32

MCL § 141.1552(ee) ...................................................... 32, 34

MCL § 141.1560(5) .............................................................31

MCL § 141.1572 .................................................................30

MCL § 37.2701(b) ...............................................................92

MCL § 600.6458(2) .............................................................30

MCL §§ 141.1552(dd) .................................................... 32, 34

## OTHER AUTHORITIES

5 Charles Alan Wright et al., *Federal Practice and Procedure* § 1218 (3d ed. 2017)
........................................................................ 140, 144

Black's Law Dictionary (10th ed. 2014) ...............................42

Dobbs' Law of Torts § 251 (2d ed. 2016) ..........................136

Dobbs' Law of Torts § 37 (2d ed. 2016) ............................119

Dobbs' Law of Torts § 401 (2d ed. 2016) ..........................124

Dobbs' Law of Torts § 51 (2d ed. 2016) ............................120

Leonardo Trasande & Yinghua Liu, *Reducing the Staggering Costs of Environmental Disease in Children, Estimated at $76.6 Billion in 2008*, Health Affairs 30, no. 5 (2011): 863–70 ..........................................................18

Mich. Const. art. III, § 7..........................................................................131

Rest. (3d) Torts: Physical & Emotional Harm § 42 (2010)...................................137

Rest. (3d) Torts: Physical & Emotional Harm § 7 (2010)....................................136

U.S. Const. art. VI, cl. 2.........................................................................135

**RULES**

Fed. R. Civ. P. 12(e)....................................................................... 1, 2, 140

Federal Rule of Civil Procedure 8(a)(2) .................................................................21

## CONCISE STATEMENT OF THE ISSUES PRESENTED

1.    Does the *Ex parte Young* exception to State Eleventh Amendment immunity apply because Plaintiffs seek from the State Defendants prospective relief for ongoing violations of Plaintiffs' rights?

   **Plaintiffs' Answer:** Yes

2.    Is the City of Flint—a municipality—entitled to Eleventh Amendment immunity?

   **Plaintiffs' Answer:** No

3.    Are Defendants Wyant and Wurfel entitled to absolute immunity?

   **Plaintiffs' Answer:** No

4.    Can state-law privileges bar Plaintiffs' constitutional claims against Defendants Wyant and Wurfel?

   **Plaintiffs' Answer:** No

5.    Does the Safe Drinking Water Act preempt Plaintiffs' Constitutional claims?

   **Plaintiffs' Answer:** No

6.    Does the Complaint plausibly allege that the Government Defendants' conduct shocks the conscience, such that it violated Plaintiffs' fundamental substantive due process rights?

   **Plaintiffs' Answer:** Yes

7.    Does the Complaint plausibly allege that the Government Defendants violated Plaintiffs' clearly established fundamental right to bodily integrity?

   **Plaintiffs' Answer:** Yes

8.    Does the Complaint plausibly allege that the Government Defendants violated Plaintiffs' clearly established fundamental right to be free from state-created danger?

   **Plaintiffs' Answer:** Yes

9.   Does the Complaint plausibly allege that Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley violated Plaintiffs' clearly established Constitutional right to Equal Protection based on racial discrimination, and based on wealth-based discrimination that burdened Plaintiffs' fundamental right to bodily integrity?

   **Plaintiffs' Answer:** Yes

10.   Should the Court apply strict scrutiny to Plaintiffs' Equal Protection claims?

   **Plaintiffs' Answer:** Yes

11.   Does the Complaint plausibly allege that Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley conspired to violate Plaintiffs' rights on the basis of race in violation of § 1985?

   **Plaintiffs' Answer:** Yes

12.   Does the Complaint sufficiently state a claim against the City of Flint under *Monell*?

   **Plaintiffs' Answer:** Yes

13.   Does the Complaint sufficiently state a claim against Defendants Snyder, the State of Michigan, Dillon, Wright, Walling, Ambrose, Kurtz, Earley, and the City of Flint under the Elliot-Larson Civil Rights Act for intentional discrimination based on race?

   **Plaintiffs' Answer:** Yes

14.   Are any of the Government Defendants entitled to qualified immunity on any of Plaintiffs' claims?

   **Plaintiffs' Answer:** No

15.   May Plaintiffs pursue simultaneous claims for professional and ordinary negligence against the Engineering Defendants?

   **Plaintiffs' Answer:** Yes

16.   Does the Complaint plausibly allege the Engineering Defendants' gross negligence?

**Plaintiffs' Answer:** Yes

17.   Does the Complaint plausibly allege a claim for negligent infliction of emotional distress against the Engineering Defendants?

**Plaintiffs' Answer:** Yes

18.   Have Plaintiffs sought appropriate relief from the Engineering Defendants?

**Plaintiffs' Answer:** Yes

19.   Have Plaintiffs satisfied the pleading requirements of Rule 12(e) in regard to their claims against LAN?

**Plaintiffs' Answer:** Yes

20.   Did Plaintiffs plead sufficient facts to state plausible state law claims?

**Plaintiffs' Answer:** Yes

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

**Cases**

*Batson v. Kentucky*, 476 U.S. 79 (1986)

*Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017)

*Butz v. Economou*, 438 U.S. 478 (1978)

*Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990)

*Ernst v. Rising*, 427 F.3d 351 (6th Cir. 2005)

*Guertin v. Michigan*, No. 16-CV-12412, 2017 WL 2418007 (E.D. Mich. June 5, 2017)

*Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966)

*Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996)

*Martinez v. California*, 444 U.S. 277 (1980)

*McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460 (6th Cir. 2006)

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)

*Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082 (9th Cir. 2000)

*Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997)

*Range v. Douglas*, 763 F.3d 573 (6th Cir. 2014)

*Rietcheck ex rel. Rietcheck v. City of Arlington*, No. 04-CV-1239-BR, 2006 WL 37843 (D. Or. Jan. 4, 2006)

*Schneider v. Franklin Cty.*, 288 F. App'x 247 (6th Cir. 2008)

*Trowell v. Providence Hosp. & Med. Ctrs., Inc.*, 893 N.W.2d 112 (Mich. Ct. App. 2016)

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*Unibar Maint. Servs., Inc. v. Saigh*, 769 N.W.2d 911 (Mich. Ct. App. 2009)

*Washington v. Harper*, 494 U.S. 210 (1990)

**United States Constitution**

U.S. Const. amend. XI

U.S. Const. amend. XIV

**Rules**

Fed. R. Civ. P. 12(b)(6)

Fed. R. Civ. P. 12(e)

**Statutes**

42 U.S.C. § 1983

42 U.S.C. § 1985

Mich. Comp. Laws § 37.2302

## BACKGROUND

On December 12, 2017, Plaintiffs filed a Master Complaint for Individual Plaintiffs (the "Master Amended Complaint"). *Walters*, 5:17-cv-10164, ECF No. 115. On February 1, 2018, Plaintiffs filed a Short Form Complaint adopting Counts I through XVIII from the Master Amended Complaint against all named Defendants with the exception of Veolia Environmental, S.A., which was not named as a Defendant (the "*Walters* Complaint"). *Walters* ECF No. 125.

The Defendants in the *Walters* Complaint have filed twelve separate motions to dismiss under Fed. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(6). Defendants Lockwood, Andrews & Newnam, Inc., Lockwood, Andrews & Newnam, P.C., and Leo A. Daly Company have also filed a motion for a more definite statement under Fed. R. Civ. P. 12(e). On May 29, 2018, the Parties stipulated to an order allowing Plaintiffs to file a consolidated response to Defendants' Motions to Dismiss and enlarging the page limit for Plaintiffs' consolidated response, which was entered by Court (ECF No. 151). Accordingly, this Consolidated Response opposes the following Motions to Dismiss the *Walters* Complaint:

1. **ECF No. 137** – Joint Motion to Dismiss Plaintiffs' Master Long-Form Complaint [Dkt. 115] and Short-Form Complaint of Plaintiffs Sirls and Walters by Gerald Ambrose, Howard Croft, Darnell Earley, City of Flint, Michael Glasgow, Daugherty Johnson, Dayne Walling

2. **ECF No. 138** – Motion to Dismiss Plaintiffs' Master Short Form Complaint and Jury Demand by Jeff Wright

3.    **ECF No. 139 –** Motion to Dismiss Plaintiffs' Master Short Form Complaint by Stephen Busch, Patrick Cook, Michael Prysby, Liane Shekter Smith

4.    **ECF No. 140 –** Motion to Dismiss Plaintiff's Short-Form Complaint by Veolia North America Operating Services, LLC, Veolia North America, Inc., Veolia North America, LLC

5.    **ECF No. 141 –** Motion to Dismiss Plaintiffs' Master Short Form Complaint and Jury Demand by Daniel Wyant

6.    **ECF No. 142 –** Motion to Dismiss Plaintiffs' Master Short Form Complaint and Jury Demand by Bradley Wurfel

7.    **ECF No. 143 -** Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6) by Andy Dillon, Nick Lyon, Receivership Transition Advisory Board, Richard Snyder, Eden Victoria Wells, M.D.

8.    **ECF No. 144 -** Motion to Dismiss Under Rules 12(b)(1) and 12(b)(6), and Motion for More Definite Statement Under Rule 12(e) by Lockwood, Andrews & Newnam, Inc., Lockwood, Andrews & Newnam, P.C., and Leo A. Daly Company

9.    **ECF No. 145 -** Motion to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction,[1] Rule 12(b)(2), for Failure to State a Claim Upon Which Relief Can Be Granted, Rules 12(b)(1) and 12(b)(6), and for More Definite Statement Under Rule 12(e) by Leo A. Daly Company

10.    **ECF No. 147 –** Motion to Dismiss by Robert Scott

---

[1] In *Waid,* 5:16-cv-10444, Leo A. Daly previously moved to dismiss on jurisdictional grounds (ECF. 278). All plaintiffs responded (ECF. 369 and ECF 402). The Court entered an order denying in part Leo A. Daly's motion on April 5, 2018 (ECF 437). Leo A. Daly has incorporated its prior briefing to preserve the issue for appeal. Plaintiffs likewise adopt the prior oppositions to Leo A. Daly's jurisdictional challenge.

11. **ECF No. 148 –** Motion to Dismiss Plaintiff's Master Long-Form Complaint [Dkt. 115] and Short Form Complaints of Plaintiffs Sirls and Walters and Joinder in Motions to Dismiss of Co-Defendants by Nancy Peeler

12. **ECF No. 150 -** Motion to Dismiss by Adam Rosenthal

In addition, Defendant Adam Rosenthal has filed a notice that he joins in the Motion to Dismiss filed by Defendants Stephen Busch, Michael Prysby, Patrick Cook, and Liane Shekter Smith and seeks the same relief (ECF No. 149). Defendants' Motions should be denied for the reasons that follow.

## SUMMARY OF FACTUAL ALLEGATIONS

The *Walters* Short-Form Complaint incorporates the Master Amended Complaint. The Court must accept all of the factual allegations in the two Complaints as true for the purposes of deciding Defendants' motions to dismiss. *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 274 (6th Cir. 2010).

Plaintiffs are residents of Flint, Michigan ("Flint" or "the City") who have suffered a variety of personal injuries as a result of exposure to lead in the City of Flint's drinking water. Master Amended Compl. ¶¶ 21–22. Plaintiffs also sustained property damage or economic losses caused by the City's water. *Id.* ¶ 21. These injuries were caused by two groups of Defendants: various government officials and bodies, *id.* ¶¶ 24–49, and professional engineering companies, *id.* ¶¶ 50–72. Together, these defendants created, implemented, concealed, and perpetuated a catastrophic drinking water plan for the City of Flint.

3

I.    **DEFENDANTS DECIDED TO USE THE FLINT RIVER AS THE PRIMARY DRINKING WATER SOURCE FOR THE CITY OF FLINT IN THE FACE OF WELL-KNOWN DANGERS**

Prior to 1964, Flint drew its water from the Flint River, treating it at the Flint Water Treatment Plant ("WTP"). *Id.* ¶ 146. However, prompted by a 1964 U.S. Geological Survey finding high levels of chloride in the Flint River, Flint evaluated alternatives and ultimately chose to draw its water from Lake Huron via the Detroit Water and Sewerage Department ("DWSD"). *Id.* ¶¶ 73, 147. For that half century from 1964 to 2014, Flint users enjoyed safe, clean, fresh water in their homes, businesses, schools, hospitals, and other public accommodations. *Id.* ¶¶ 73, 147–48.

Under the political pressure of Genesee County Drain Commissioner Jeffrey Wright ("Wright"), several communities, including the City of Flint and Genesee County, formed the Karegnondi Water Authority ("KWA") in 2009 to explore the development of a water delivery system other than the DWSD. *Id.* ¶ 74.

In 2011, Flint officials commissioned a study to determine if the Flint River could be safely used as the City's primary source of drinking water. *Id.* ¶ 75. The ensuing report ("2011 Report") was prepared by Defendant Rowe Professional Services Company ("Rowe") and Lockwood, Andrews and Newnam, P.C. ("LAN PC"), LAN Inc. ("LAN Inc."), and Leo A. Daly Company ("LAD") (collectively, the "LAN Defendants"). *Id.* The 2011 Report cautioned against drawing water

4

from the Flint River; it would cost millions to upgrade the long-dormant Flint WTP. *Id.* Use of the Flint River as a primary drinking water source was rejected in 2011. *Id.* ¶ 76.

The 2011 Report was in line with previous studies noting the sensitivity of Flint River, including a 2001 Department of Natural Resources report that acknowledged businesses along Flint River had been granted permits to discharge runoff from industrial and mining activities, as well as petroleum and gasoline cleanups, as well as a 2004 technical assessment prepared by the U.S. Geological Survey that concluded the Flint River was "susceptible to contamination." *Id.* ¶¶ 150–51.

Throughout 2012, DWSD presented several government officials, including Governor Richard Snyder ("Snyder" or "the Governor"), State of Michigan Treasurer Andrew Dillon ("Dillon"), Flint Emergency Manager Edward Kurtz ("Kurtz"), Flint Mayor Dayne Walling ("Walling"), and Genesee County Drain Commissioner Wright with compelling information, based on numerous studies, demonstrating that Flint would be better served, both from a cost and water quality standpoint, by remaining with DWSD and not joining the KWA. *Id.* ¶ 78. Treasurer Dillon himself requested an independent study, which likewise concluded that remaining with the DWSD was more cost-effective on both a long-term and short-term basis. *Id.* ¶¶ 80–81. Moreover, in March 2013, Daniel Wyant

("Wyant"), Director of the Michigan Department of Environmental Quality ("MDEQ"), and Steven Busch ("Busch"), District Supervisor of the MDEQ Lansing District Office, lamented the decision to switch Flint's water source was not based on any scientific assessment of the suitability of the Flint River water. *Id.* ¶ 82.

Ignoring these patent risks, Dillon recommended to Governor Snyder and others in 2013 to authorize Flint to join the KWA. *Id.* ¶ 83. In response, Governor Snyder authorized Kurtz to contractually bind Flint to the KWA project, knowing that the Flint River would be the interim source of water until the KWA water was available. *Id.* ¶¶ 84, 87–88. In fact, in June 2013, Dillon, Kurtz, Wright, and Walling developed an interim plan ("Interim Plan") to use the Flint River water for two-and a-half years until the KWA became operational, knowing full well the Flint River had been evaluated as a possible drinking water source in 2011 and was rejected as unsafe and unjustifiably costly. *Id.* ¶¶ 85–86.

As part of the Interim Plan, Flint hired LAN to advise the City with respect to using the Flint River as the City's drinking water source. *Id.* ¶¶ 166, 170. LAN met with Flint and Genesee County officials to discuss, among other things, water quality control and the difficulty of treating the Flint River water. *Id.* ¶¶ 175–76. Indeed, a well-known challenge that the transition to using Flint River as a primary water source posed was the fact that water from the DWSD did not need to be

6

treated since it was already treated elsewhere. *Id.* ¶ 173. Although the City recognized that water from the Flint River "would be more difficult to treat," it concluded, based upon LAN's recommendation, that the Flint River was nonetheless "viable as a source" for the City's water. *Id.* ¶ 171.

But the Flint River was, in fact, not a viable option: its water contains significant amount of chloride—eight times more than the Detroit water—which makes it corrosive. *Id.* ¶ 173. It is well known that corrosive water that is not properly treated corrodes pipes, such that the pipe metals, including lead, leach into the water. *Id.*

The Interim Plan was not capable of addressing these threats. Days before the Interim Plan went into effect, Flint WTP Supervisor Michael Glasgow ("Glasgow") told MDEQ officials that the WTP was not fit to begin operations and that "management" was not listening to him because "they seem to have their own agenda." *Id.* ¶ 91. On April 25, 2014, under direction from MDEQ officials and new Flint Emergency Manager Darnell Earley ("Earley"), Flint water users began receiving Flint River water despite Glasgow's warnings. *Id.* ¶ 92.

The Defendants pressed forward with the Interim Plan. *Id.* ¶ 316. Under the Interim Plan, the predominantly African American Flint water users received the unsafe, corrosive, and toxic water from the Flint River, while the predominantly white water users received the safe and superior water from DWSD. *Id.* The cost of

7

continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially lower than the cost of upgrading the Flint WTP in order to safely process the dangerous, raw Flint River water. *Id.* ¶ 317.

## II. GOVERNMENT DEFENDANTS DISCOVER A WATER CRISIS IN FLINT ALMOST IMMEDIATELY, AND BEGIN A COVER-UP

In May 2014, the Governor's Office began receiving a deluge of citizen complaints regarding the smell, taste, and color of the drinking water; Flint water users also reported that the water was making them ill. *Id.* ¶¶ 95–96 & n.6, 187. On August 14, 2014, Flint's water tested above legal limits for total coliform and E. coli bacteria. *Id.* ¶ 189. In response to the bacteria problem, the water was treated with more and more chlorine; however, a byproduct of the increased chlorine treatment was increased trihalomethanes (often referred to as "Total Trihalomethanes" or "TTHM") because of the chlorine's interaction with Flint's bare pipes. *Id.* ¶¶ 190–91. The readily apparent heightened TTHM levels were a red flag that high salt concentrations had laid bare the steel in Flint's pipes. *Id.* ¶ 192. In September 2014, the Michigan Department of Health and Human Services ("MDHHS") noticed that lead poisoning rates "were higher than usual for children under age 16 living in the City of Flint during the months of July, August, and September, 2014." *Id.* ¶ 195.

8

On October 14, 2014, the Flint water crisis was a topic of significant discussion in the Governor's Office. *Id.* ¶ 97. Not only were Flint water users complaining, General Motors Corporation announced it would no longer use Flint River water at its plant. *Id.* ¶¶ 100, 198. In addition, on October 17, 2014, Flint officials became aware that the threat of Legionnaires disease (a severe and often fatal form of pneumonia) in the Flint River water was compounding the public health crisis. *Id.* ¶¶ 99, 101, 193–94. But the Governor and his staff did nothing to assist the desperate people of Flint. *Id.* ¶ 98.

The crisis grew worse. On December 31, 2014, the first round of lead monitoring showed results exceeding the limit set by the EPA's Lead and Copper Rule. *Id.* ¶ 199. Worse yet, the samples were not drawn from the highest risk homes as required by the Lead and Copper Rule. *Id.* On January 9, 2015, the University of Michigan turned off water fountains after discovering high lead levels at two locations. *Id.* ¶ 200. On January 27, 2015, the Genesee County Health Department ("GCHD") informed Flint it believed there was an association between the spike in Legionella disease reports and the onset of the use of Flint River water. *Id.* ¶ 106.

Yet, the State and local government officials continued to do nothing. And worse, Defendants continued to misinform citizens about the quality and safety of their water.

9

### III.   GOVERNMENT OFFICIALS ENGAGE LAN AND VEOLIA, WHO MADE THE PROBLEM WORSE

Recognizing the emerging crisis, Flint solicited bids to "review and evaluate the City's water treatment process . . . and procedures to maintain and improve water quality," and to "develop and report with recommendations to maintain compliance with" state and federal agencies. *Id.* ¶ 214. Veolia submitted a proposal "to address the immediate reliability and operational needs" of Flint's water system, but added that the solution "is much more complex than the recommendations study and advisory services outlined" in Flint's request; consequently, Veolia proposed to expand the scope of work. *Id.* ¶¶ 213, 215. The City hired Veolia in February 2015. *Id.* ¶ 218. The City and Veolia then issued a joint press release, lauding Veolia as an "urban water expert" in "handling challenging river water sources." *Id.*

Both LAN and Veolia were hired to ensure Flint's water system was protective of human health and compliant with federal and state environmental laws. *Id.* ¶ 232. LAN submitted a report, "Trihalomethane Formation Concern," in February 2015. *Id.* Neither Veolia nor LAN conducted a root cause analysis of why the high TTHM levels existed. *Id.* A root cause analysis is the standard process used by engineers to determine the origin, case, and interrelationship of events. *Id.*

Any reasonable water engineer would have conducted a root cause analysis to determine whether there was a single cause for the problems with Flint's water. Indeed, publicly available information at the time the reports were being authored strongly suggested a root cause:

- decades of road salt runoff pollution (which contains chloride) in the Flint River;
- the ubiquity of lead and steel pipes, the protective surfaces of which are stripped by chloride, which in turn frees lead and *Legionella*;
- a significant Legionnaires' outbreak in the summer of 2014;
- high levels of E. coli in urban rivers;
- the initial ineffectiveness of adding chlorine to water, which signals that bare metal has been exposed in the pipes;
- excessive TTHM levels;
- General Motors' decision to stop using Flint River water due to concerns of excessive corrosiveness;
- the University of Michigan's discovery of lead and decision to shut down its water fountains;
- elevated lead levels in drinking water in and before February 2015. *Id.* ¶¶ 234–35.

Despite its representations that it would conduct a thorough, all-encompassing review of Flint's water system, Veolia issued an interim report just six days after being hired. *Id.* ¶ 221. Veolia's report stated that Flint's water was "in compliance with drinking water standards," and noted that "[s]afe [equals] compliance with state and federal standards are required testing." *Id.* ¶ 222. Veolia's interim report *did* point out that Flint's water discoloration "raises questions" but waived off the concern, stating the discoloration "[d]oesn't mean the water is unsafe." *Id.* ¶ 223.

11

Veolia issued a final report less than a month after its interim report, on March 12, 2015. *Id.* ¶ 225. Veolia declared it had conducted a "160-hour assessment of the water treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget." *Id.* § 226. The final report concluded that "a review of water quality records for the time period under our study indicates compliance with State and Federal water quality regulations." *Id.* While the final report acknowledged frustration on the part of the public with "discolored and hard water," the final report reiterated Veolia's position that "the water [is] in compliance with State and Federal regulations, and based on those standards, the water is considered to meet drinking water requirements." *Id.* ¶ 227.

The final report entirely missed the connection between the lack of corrosion control and lead contamination. *Id.* ¶ 228. Far from addressing a lack of corrosion control leading to excessive lead levels, Veolia was focused on aesthetics. *Id.* Veolia stated that the discolored water "primarily appears to be iron from the old unlined cast iron pipes," and suggested "[t]he water system could add a polyphosphate to the water as a way to minimize the amount of discolored water." *Id.* In fact, not only did the report fail to discuss lead corrosion, but Veolia's suggested solution—addition of polyphosphate—could actually exacerbate lead corrosion. *Id.*

12

Veolia also recommended doubling the dosage of the highly potent acid ferric chloride—in direct contravention of federal rules. *Id.* ¶¶ 243, 245. Instead, Veolia should have recommended maintaining a neutral pH in the water since the increased acidity associated with the addition of water quality treatment chemicals like ferric chloride increases the corrosion of pipes. *Id.* ¶¶ 241–43. LAN made the same recommendation to increase the dose of ferric chloride in August 2015. *Id.* ¶ 247. Both entities should have informed the city to reduce the ferric chloride concentration and specified that adding phosphate as a pH buffer was mandatory. *Id.* ¶ 248.

As an unsurprising result of LAN's and Veolia's recommendations to increase ferric chloride in the water, the pH became sharply more acidic in the months after Veolia's final report in March. *Id.* ¶¶ 249–50. Indeed, the pH of Flint's treated water dropped from a nearly neutral 7.9 in March to 7.3 by August. *Id.* ¶ 250. Since pH is a logarithmic scale, this change represented a nearly tenfold increase in acidity. *Id.* In short, rather than helping the people of Flint or alerting them to the disaster in their drinking water, LAN and Veolia missed routine and well-known red flags and dramatically worsened the Flint water crisis.

## IV.    DEFENDANTS LIED TO THE PUBLIC REPEATEDLY

State officials undertook a cover-up that put the health and lives of Flint residents at risk. On January 30, 2015, MDEQ Director of Communications

Bradley Wurfel ("Wurfel") emailed Governor Snyder's press secretary, saying he didn't want MDEQ Director Wyant "to say publicly that the water in Flint is safe until we get the results of some county health department trace back work on 42 cases of Legionellosis in Genesee County since last May." *Id.* ¶ 110 n.17. On January 21, 2015, State officials ordered water coolers to be installed in State buildings operating in Flint. *Id.* ¶ 105. At the same time, however, State officials were advising the residents of Flint that it was safe to drink the City's tap water. *Id.*

Far from working to quell the crisis, the Government Defendants actively covered the problems for months. For example, by late 2014 or early 2015, MDHSS Director Nick Lyon ("Lyon") had received data showing a dramatic increase in the percentage of Flint's children with elevated blood lead levels during late 2014, and that Legionnaires' disease was on the rise during the same period. *Id.* ¶ 132. Lyon knew these elevated blood lead levels correlated with the introduction of the corrosive Flint River water into the Flint water system. *Id.* ¶ 133. Yet, he did nothing to warn the residents and water users of Flint. *Id.* ¶ 132–34. On the contrary, he baselessly accused the doctor who gathered the relevant information, Dr. Hanna-Attisha, of providing false information to the public. *Id.* ¶ 135.

The Government Defendants also lied in the face of real opportunities to alter the course of the public health crisis. On January 29, 2015, Sue McCormick,

Director of DWSD, offered then-Flint Emergency Manager Gerald Ambrose ("Ambrose") DWSD water at attractive and fair rates, free of any reconnection charge. *Id.* ¶ 108. Unthinkably, Ambrose rejected the offer. *Id.* When Flint water users staged demonstrations demanding the City reconnect with the DWSD, Ambrose refused—and other State and local government officials falsely insisted that the water was safe. *Id.* ¶ 113. Even after the Flint City Council voted to reconnect to the DWSD water system on March 25, 2015, Ambrose exacerbated the crisis by rejecting the vote. *Id.* ¶ 120.

EPA Regulations Manager Miguel A. Del Toral prepared a memorandum on June 24, 2015 detailing the high lead levels in Flint (the "Del Toral Report"). The Del Toral Report was shared with several MDEQ officials, yet State and local public officials failed to undertake any measures to address any of the dangers identified in the Del Toral Report. *Id.* ¶¶ 121–23. Quite the opposite, less than a week later, Mayor Walling contacted Mr. Del Toral's supervisor to express concern that Mr. Del Toral was speaking publicly about the water contamination. *Id.* ¶ 124. A few months later, Wurfel referred to Mr. Del Toral as a "rogue employee." *Id.* ¶ 139.

Far from working to inform the public or address the public health crisis, Wurfel undertook an astonishing disinformation campaign in the summer of 2015. On July 10, 2015, Wurfel appeared on public radio to assure listeners that the

15

water was safe, was not causing "any broad problem," and that "anyone who is concerned about lead in the drinking water can relax." *Id.* ¶ 126. On July 24, 2015, Wurfel stated, "the bottom line is that residents of Flint do not need to worry about lead in their water supply, and DEQ's recent sampling does not indicate an imminent health threat from lead or copper." *Id.* ¶ 129.

After Professor Marc Edwards of Virginia Polytechnic Institute and State University determined there was a serious lead contamination of the Flint water system in August 2014 and stated that the people of Flint faced a real and dire public health, emergency, Wurfel again leapt into action. *Id.* ¶¶ 130–31. Speaking for the State, he stated Professor Edwards's team "only just arrived in town and [have] quickly proven a theory they set out to prove." *Id.* ¶¶ 130–31. Wurfel went on, accusing Professor Edwards of "offering broad, dire public health advice based on some quick testing" and "fanning political flames irresponsibly." *Id.* ¶ 131.

As the public health crisis continued into the Fall, so did Wurfel. On September 25, 2015, Wurfel falsely advised media and the public that MDHHS had reexamined MDHHS's blood lead level data and that the statistics do not show the same upward trend documented by Dr. Hanna-Attisha. *Id.* ¶ 137. A few days later, Wurfel belittled the crisis, stating publicly that it was becoming "near-hysteria" because of Dr. Hanna-Attisha's report. *Id.* ¶ 138. He attached her reports

16

and falsely asserted again that "Flint's drinking water is safe in that it's meeting state and federal standards." *Id.*

## V.  FLINT'S WATER IS RECONNECTED TO DWSD AND GOVERNMENT BODIES DECLARE STATES OF EMERGENCY

Finally, on October 8, 2015, the Governor recognized that he could no longer pretend that the water from Flint River was safe. *Id.* ¶ 141. On or about October 16, 2015, the City's water was reconnected to DWSD. *Id.* ¶ 142. On December 14, 2015, Mayor Karen Weaver declared a State of Emergency. *Id.* ¶ 143. On January 4, 2016, the Genesee County Commissioners declared a State of Emergency. *Id.* On January 5, 2016, Governor Snyder declared a State of Emergency. *Id.*

## VI.  LEAD'S DEVASTATING HEALTH EFFECTS

Lead poisoning poses indisputable and tragic health effects—and children are especially vulnerable. According to the EPA, "[y]oung children, infants, and fetuses are particularly vulnerable." *Id.* ¶ 255. In children, even "low levels of exposure to lead have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells." *Id.* The EPA has found that lead poisoning is so harmful that "ingestion of lead can cause seizures, coma and even death."

17

According to the World Health Organization, "lead affects children's brain development resulting in reduced intelligence quotient (IQ), behavior changes such as shortening of attention span and increased antisocial behavior, and reduced educational attainment." *Id.* ¶ 256. "Lead exposure also causes anemia, hypertension renal impairment, immunotoxicity and toxicity to the reproductive organs. The neurological and behavioral effects of lead are believed to be irreversible." *Id.*

To be sure, lead is also harmful to adults. *Id.* ¶ 260. Adult lead exposure can cause: Cardiovascular effects, increased blood pressure and incidence of hypertension, deceased kidney function, and reproductive problems. *Id.*

The costs of lead poisoning are real and substantial. A 2008 study estimated that an individual case of childhood lead poisoning leads to $5.9 million in medical care costs over the course of appropriate treatment. *Id.* ¶ 261 (citing Leonardo Trasande & Yinghua Liu, *Reducing the Staggering Costs of Environmental Disease in Children, Estimated at $76.6 Billion in 2008*, Health Affairs 30, no. 5 (2011): 863–70).

More tragically, Flint's children have suffered and will suffer catastrophic lost opportunity costs—inhibited development and diminished intelligence leading to lower economic productivity–over the course of their lives: a conservative estimate in a 2009 study places the present value of Michigan's economic losses

attributable to lead exposure between $3.19 billion (using U.S. blood lead levels) and $4.85 billion. *Id.* ¶¶ 266–68. A less conservative estimate pegs the aggregate economic losses due to lead poisoning at $50.9 billion per year. *Id.* ¶ 269.

## VII.   PROPERTY DAMAGE CAUSED BY DEFENDANTS' CONDUCT

In addition to the lifelong health effects and lost economic productivity of Flint's children, Flint water users have suffered significant property damage. *Id.* ¶ 271–72.

Plaintiff-owned pipes and appliances have been corroded just like the City-owned pipes, shortening the pipes' and appliances' lifespans. *Id.* ¶ 272. Residents have already reported damage to major appliances such as dishwashers and washing machines following Flint's decision to switch water sources to the Flint River. *Id.* ¶ 278. Of course, the corroded pipes and appliances remain a continuing source of lead potentially *Legionella*, and therefore Plaintiff-owned pipes and appliances must themselves be replaced or else remain a continuing source of harmful exposure. *Id.*

Even though the City has stated it intends to begin replacing some City-owned pipes, Flint's drinking water will remain suspect since lead piping in homes has also been corroded and compromised. *Id.* ¶ 281. In other words, it is necessary to replace not only the City-owned pipes, but pipes in each home and business to guarantee that a home or business will not be suffer from corrosion, lead, and

*Legionella* in the future. *Id.* ¶ 283. The Governor's Office offers the conservative estimate that replacing a single household's pipes could between $6,000 and $8,000. *Id.* ¶ 279. Other estimates range into the tens of thousands per structure. *Id.* ¶ 283.

To make matters worse, many banks have refused to offer refinancing to help pay for retrofitting. *Id.* ¶ 282. Some banks have refused to make loans unless the borrower establishes that the water is potable. *Id.* ¶ 285. Consequently, Flint residents face a *Catch-22* in which their water remains unsafe because of corrosion of home pipes and appliances, yet Flint residents cannot obtain financing to replace pipes and appliances until the water is deemed safe. *Id.* ¶ 286. These problems associated with Flint's water have had and are having a significant impact on Flint's residential and commercial property values: home values in a an already distressed community are plummeting because the residents were first exposed to hazardous water and now cannot obtaining financing to fix the problem. *Id.* ¶ 284.

## LEGAL STANDARDS

In evaluating a motion to dismiss under Rule 12(b)(6), the Court must construe the Complaint in the light most favorable to the Plaintiffs, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in favor of the Plaintiffs. *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 793 (6th Cir. 2016). If the Complaint pleads sufficient factual matter, accepted as true, to state a claim to

relief that is plausible on its face, the Court may not dismiss the suit. *Id.* A Rule 12(b)(1) motion that attacks jurisdiction with facial rather than factual arguments is evaluated under the same standard. *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

## ARGUMENT

## I.   PLAINTIFFS HAVE PROPERLY PLEAD THE ACTS AND OMISSIONS OF DEFENDANTS[2]

The detailed allegations in Plaintiffs' Master Long Form Complaint and Jury Demand (ECF No. 115, *Walters, et al., v. Snyder, et al.,* 17-cv-10164) (the "Master Complaint") easily meets the plausibility standard necessary to state their claims. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" and "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp.v. Twombly*, 550 U.S. 544, 577, 127 S. Ct. at 1965, 1969 (2007)). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, at 556, 127 S.Ct. 1955, 1965 (2007). The complaint must set

---

[2] The *Walters* Plaintiffs have not adopted Count XIX (Fraud as against the Veolia Defendants). To the extent Defendants raise arguments regarding these claims in their respective motions to dismiss, these issues are not ripe for discussion on the present motions and this omnibus opposition as the plaintiffs who have raised have not received an opportunity to oppose dismissal.

forth "a statement of facts that merely creates a suspicion [of] a legally cognizable right of action" and "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly,* at 561, 127 S.Ct. 1969. The Master Complaint allegations are far more than "unadorned, the-defendant-unlawfully-harmed-me accusations." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).

## II.    THE    FACTUAL    ALLEGATIONS    IN    THE    SHORT-FORM COMPLAINT ARE NOT DEFICIENT

To the extent that Defendants argue that Plaintiffs' allegations in their Short-Form Complaint, and by incorporation, the Master Amended Complaint, are deficient, Defendants are merely attempting to re-litigate the Court-approved pleadings and procedures adopted by the Court that allow for the efficient resolution of thousands of cases arising from one of the worst drinking water contamination catastrophes in American history. The Court should deny this second bite of the apple. The Master Complaint sets out in extensive detail the conduct of the Defendants that gives rise to each claim. The Short Form Complaint identifies the individual plaintiffs, their addresses, and clearly identifies the claims alleged by those plaintiffs. Nothing more is required to satisfy Fed. R. Civ. P. 8(a)(2).

Defendants' arguments are also premature in that the information they complain is lacking—specifics about individual plaintiffs' injuries and damages—

22

will be included in the Plaintiff fact sheets that will be provided to Defendants pursuant to a Court-approved schedule. Details included in the Plaintiff fact sheets in a consolidated mass-tort proceeding are considered in determining whether Plaintiffs have stated a claim under Fed. R. Civ. P. 8. *See, e.g.*, *Giffen v. Ortho McNeil Pharm., Inc*., No. 3:12 oe 40001, 2014 U.S. Dist. LEXIS 136587, at *13 (N.D. Ohio Sep. 26, 2014) ("after review of the complaint, Plaintiff's amended fact sheet, Missouri law, and Plaintiff's reply brief, the Court finds Plaintiff's claims satisfy the requirements of Rule 8(a)(2), *Iqbal*, and *Twomby*").

## III.  PLAINTIFFS' CLAIMS AGAINST THE GOVERNMENT DEFENDANTS MUST PROCEED

### A.  Plaintiffs' Claims Against the Government Defendants Are Not Barred

#### 1.  The Eleventh Amendment Does Not Bar Jurisdiction Over the State Defendants Because the *Ex Parte Young* Exception for Prospective Relief Applies

Longstanding precedent permits plaintiffs to seek prospective relief from state officials sued in their official capacity in order to prevent future federal constitutional or statutory violations. *See Boler v. Earley*, 865 F.3d 391, 412 (6th Cir. 2017) (quoting *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir.2008)); *see also Ex parte Young*, 209 U.S. 123 (1908). Defendants' Governor Snyder, the Receivership Transition Advisory Board, former State Treasurer Andy Dillon, Director Nick Lyon and Dr. Eden Wells (hereinafter the "State Defendants") argument that the Eleventh Amendment deprives this Court of

23

jurisdiction mischaracterizes Individual Plaintiffs' claims as seeking retrospective relief. The relief Individual Plaintiffs seek from the State Defendants in their official capacities is nearly identical to the relief the Sixth Circuit has held to be "properly characterized as prospective." *Boler*, 865 F.3d at 413. Here, as in *Boler*, the *Ex parte Young* exception to Eleventh Amendment immunity applies. Plaintiffs' claims against State Defendants should therefore proceed.

To determine whether *Ex parte Young* applies, the Court "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Boler*, 865 F.3d at 412 (quoting *Dubuc v. Mich. Bd. of Law Exam'rs*, 342 F.3d 610, 616 (6th Cir. 2003)). The Master Complaint satisfies both prongs of this inquiry.

i. *Plaintiffs Sufficiently Allege An Ongoing Constitutional Violation*

The Master Complaint alleges serious and ongoing violations of Individual Plaintiffs' constitutional rights. Defendants' conduct caused severe personal injuries and property damage; "by creating and perpetuating the ongoing exposure to contaminated water, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Plaintiffs.," Compl. ¶ 303. Moreover, Plaintiffs allege that "[t]he relief efforts of State public officials have been ineffective," and "often frivolous, in mitigating the devastation caused by [their]

creation of the public health crisis." *Id.* ¶ 144.[3] As the Sixth Circuit held, "[t]his is sufficient to show an ongoing violation of the Plaintiffs' constitutional rights, especially considering that they bring claims for, among other things, state-created danger and violation of their fundamental right to bodily integrity." *Boler*, 865 F.3d at 413.

Importantly, the Sixth Circuit has already rejected State Defendants' argument that Plaintiffs cannot show an ongoing violation because "Flint has reconnected to the Detroit water system," State Br. at 18, reasoning that "this takes too narrow a view of the ongoing constitutional violations that the Plaintiffs allege." *Boler*, supra at 413.[4] This Court should likewise reject State Defendants' attempt to mischaracterize Individual Plaintiffs' allegations.

---

[3] To the extent some limited relief has been provided by the settlement in *Concerned Pastors*, Order Approving Settlement Agreement and Dismissing Case, No. 16-cv-10277-DML-SDD (E.D. Mich. Mar. 28, 2017), ECF No. 152, such relief is plainly insufficient. First, "[t]he *Concerned Pastors* settlement fails to impose an ongoing obligation for the Government Defendants to repair" the "private service lines and appliances," which continue to threaten Individual Plaintiffs.

[4] To the extent this court expressed skepticism about whether there was an ongoing violation in *Guertin*, the instant case is distinguishable. First, *Guertin* was decided without the benefit of the Sixth Circuit's guidance in *Boler*. Second, Plaintiffs here allege more substantial ongoing violations than did the plaintiffs in *Guertin*. *See Guertin v. Michigan*, No. 16-CV-12412, 2017 WL 2418007, at *15 (E.D. Mich. June 5, 2017) ("The closest plaintiffs come to pleading an ongoing violation of federal law in the complaint is alleging that 'the damage had been done[,] lead has continued to leach from pipes into the water," and "the water [ ] continues to poison them.'").

ii.    *The Relief Plaintiffs Seek Is Prospective and Any Financial Impact on the State is Incidental*

The *Ex parte Young* exception also applies because Plaintiffs seek prospective relief. In *Boler*, the Sixth Circuit held that the consolidated plaintiffs in *Mays v. Snyder* appropriately pled prospective relief because they sought "[a]n injunctive order to remediate the harm caused by Defendants' unconstitutional conduct including, but not limited to: repairs of private property and establishment of medical monitoring to provide healthcare and other appropriate services to Class members for a period of time deemed appropriate by the Court," as well as the "[a]ppointment of a monitor who will assist in the development of remedial plans including, but not limited to: early education, education intervention programs, [and] criminal and juvenile justice evaluations." *Boler*, 865 F.3d at 413. Individual Plaintiffs here seek the same relief, Compl. ¶¶ 271-275 and as the Sixth Circuit has held, "this relief is properly characterized as prospective." *Boler*, 865 F.3d at 413.

That likely explains why the Sixth Circuit already has rejected State Defendants' attempt to mischaracterize the relief sought as retrospective. *See id.*; *cf. Friends of Moon Creek v. Diamond Lake Improvement, Ass'n, Inc.*, No. CV-13-0396-JLQ, 2014 WL 794288, at *3 (E.D. Wash. Feb. 27, 2014) (finding *Ex parte Young* applied where, inter alia, "[t]he [complaint] . . . also contain[ed] the allegation that the 'conduct of Defendants individually and collectively has caused, and if allowed to continue will further cause, Plaintiff's affected members to suffer

26

irreparable injuries'") (citation omitted) (emphasis added). The Sixth Circuit likewise addressed and rejected State Defendants' contention that such relief has the effect of seeking money damages, observing that the *Ex parte Young* exception applies "regardless of whether compliance might have an ancillary effect on the state treasury." *Boler*, 865 F.3d at 412 (quoting *S & M Brands*, 527 F.3d at 507).[5]

Individual Plaintiffs acknowledge that this Court in *Guertin* was reluctant to appoint a monitor in the absence of a similar injunction against the municipality. *Guertin*, 2017 WL 2418007, at *16. To the extent this reflects the Court's view that a monitor will have little impact absent an injunction against the City, Individual Plaintiffs respectfully assert that an injunction against the municipality itself is unnecessary to provide the relief they seek. A court appointed monitor is an agent of the court, not of either one of the parties. Fed. R. Civ. P. 53. The

---

[5] Although the Sixth Circuit's decision in *Boler* does not directly address the State Defendants' argument that *Ex parte Young* does not apply because "Plaintiffs do not allege that any laws or rules are illegal," State Br. at 21, the State of Michigan and Governor Snyder raised it in their brief to the Sixth Circuit in that case. *See* Brief for Defendants-Appellees State of Michigan, Michigan Department of Environmental Quality, Michigan Department of Health and Human Services and Governor Rick Snyder at 36, *Boler v. Earley*, No. 16-1684 (6th Cir. Oct. 26, 2016), ECF No. 36. Nonetheless, the Sixth Circuit held that the *Ex parte Young* exception applied to those plaintiffs' claims against Governor Snyder. Moreover, State Defendants' reliance on *Papasan v. Allain*, 478 U.S. 265, 276 (1986), is misplaced, as that case did not address a situation where Defendants incorrectly interpreted or applied an underlying authorization. Finally, Plaintiffs allege a plethora of unlawful conduct by State officials, including significant constitutional violations.

27

monitor can and will fulfill the Court's orders as well as report progress to the Court.

The Sixth Circuit's decision in *Boler* squarely controls this issue. The *Ex parte Young* exception applies, and Plaintiffs' claims against State Defendants should proceed.[6]

> 2.    <u>The City of Flint Is Not Entitled to Eleventh Amendment Immunity Because It Is a Municipality and Is Not an "Arm of the State"</u>

It is axiomatic that Eleventh Amendment immunity does not extend to "counties and similar municipal corporations." *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 280 (1977); *see also Boler*, 865 F.3d at 414 ("Eleventh Amendment sovereign immunity does not apply to municipalities."). Nevertheless, the City of Flint wrongly attempts to invoke Eleventh Amendment immunity, arguing that it somehow was transformed into an "arm of the state" during the period relevant to this action because it was run by an emergency

---

[6] Defendant Nancy Peeler's argument that she is entitled to Eleventh Amendment immunity to the extent she is sued in her official capacity is inapposite. Peeler is sued in her individual capacity only. Compl. ¶ 47. Similarly, State Defendants Dillon, Lyon, and Wells are sued only in their individual capacities. *Id.* ¶¶ 27–28; 46. The State summarily argues the Eleventh Amendment bars all claims against the State, and Defendants Snyder, Dillon, and Lyon, but concedes that the Eleventh Amendment applies only to claims brought against the State, or against officials in their official capacities. State Br. at 15–16. State Defendants provide no basis to dismiss claims against Dillon, Lyon, and Wells in their individual capacities under the Eleventh Amendment; thus, their cursory attempt to dismiss the claims against Dillon and Lyon on the basis of Eleventh Amendment immunity should be denied.

manager appointed by the Governor. As this Court recognized in rejecting the same argument in Guertin, the City is plainly incorrect.

Courts in this Circuit consider four factors to determine whether an entity is an "arm of the state" such that it may claim Eleventh Amendment immunity, or instead whether it is a "political subdivision" not entitled to such immunity:

> (1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes, and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government

*Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (internal citations omitted). The state's liability for a judgment against the entity "is the foremost factor" and is given substantial weight. *Kreipke v. Wayne State Univ*., 807 F.3d 768, 775 (6th Cir. 2015). Neither that nor the other three factors support the City's argument that it is entitled to Eleventh Amendment immunity as an "arm of the state."

i.     *The City of Flint Is Liable for Any Judgement Entered Against the City While Under the Control of an Emergency Manager*

Appointment of an emergency manager under Michigan law does not automatically render the State liable for judgments against a city. The Local Financial Stability and Choice Act, which provides for the appointment of emergency managers under certain circumstances, provides that if an emergency manager is "subject to a claim, demand, or lawsuit arising from an action taken

during the services of that emergency manager[,] . . . litigation expenses . . . shall be paid out of the funds of the local government that is or was subject to the receivership administered by that emergency manager." Mich. Comp. Laws § 141.1560(5) (emphasis added). Indeed, this Act expressly disclaims that the appointment of an emergency manager by the State imposes financial liability on the State. *See* Mich. Comp. Laws § 141.1572 ("This act does not impose any liability or responsibility in law or equity upon this state . . . for any action taken by any local government under this act . . . .").

The City's contention that under the Court of Claims Act, Mich. Comp. Laws § 600.6458(2), the State is responsible for paying any judgments against an "arm of the state" if that arm cannot pay was addressed and rejected by this Court in *Guertin*, 2017 WL 2418007, at *15. The City's reliance on that statute continues to be misplaced. This section of the Court of Claims Act does not define an "arm of the state" for purposes of evaluating the State's potential liability to pay a judgment; rather, it simply provides that when a judgment is entered against an "arm of the state" then the State must pay if the "arm" cannot pay. However, the City's argument assumes the conclusion. "That the state may be on the hook for judgments against arms of the state does not make the city of Flint an arm of the state." *Id.*

30

The City knows this. In a brief it filed on this very issue in *Mays v. Snyder*, another case arising out of the Flint Water Crisis, the City conceded that the first *Ernst* factor did not weigh in its favor because "[d]espite depriving the City of any control over Emergency Manager (EM) activities, the Michigan Local Financial Stability and Choice Act . . . assigns the City financial responsibility for the EMs actions." City Br. In Support of Mot. to Dismiss at 11, *Mays v. Snyder*, No. 15-cv-14002-JEL-MKM (E.D. Mich. Apr. 18, 2016), ECF No. 78 ("*Mays* City Br.") (citing Mich. Comp. Laws § 141.1560(5)).[7] The City's current argument to the contrary is both incorrect and at odds with its own prior interpretation of the law.

The remainder of the City's analysis of the first *Ernst* prong is irrelevant to an inquiry into the State's potential liability for a judgment. Its attempt to shoehorn these issues into the first and "foremost" factor is misguided. As this Court properly held, the City of Flint, not the State of Michigan, would be liable for any judgment entered against the City while under emergency management, thereby creating a "strong presumption" that the City was not an arm of the state. *Kreipke*, 807 F.3d at 778. None of the remaining *Ernst* factors weigh in the City's favor, and thus they do not outweigh the first "near-determinative factor." *Guertin*, 2017 WL

---

[7] The City also conceded in *Mays* that the fourth factor did not weigh in its favor because "the challenged activity—the operation of the City's waterworks—is traditionally a function of local government," *Mays* City Br. at 11, directly contradicting its argument here that waterworks are a state function

31

2418007, at *15 (*quoting Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 761 (6th Cir. 2010)).

      ii.    *The Appointment of an Emergency Manager Does Not Transform a City into an "Arm of the State"*

The second and third *Ernst* factors consider the language by which state statutes and courts refer to the entity, the degree of state control over the entity's actions, and whether state or local officials appoint the board members of the entity. *Ernst*, 427 F.3d at 359. These factors do not weigh in the City's favor.

The City contends that while under emergency management, it was under state control and therefore became an "arm of the state." But the appointment of an emergency manager "does not remove local elected officials; it simply vests the powers of the local government in an emergency manager." *Phillips v. Snyder*, 836 F.3d 707, 718 (6th Cir. 2016). Indeed, unless a municipality is disincorporated or dissolved—which did not occur here—the emergency manager acts "for and on behalf of the local government," Mich. Comp. Laws §§ 141.1552(dd) and (ff)(2), and has the power to "exercise any power or authority. . . relating to the operation of the local government." Mich. Comp. Laws § 141.1552(ee).

Further to that point, nothing in the Local Financial Stability and Choice Act strips local governments of their status as entities separate from the State thorough the appointment of an emergency manager. The Home Rule Act plainly provides that, "[e]ach organized city shall be a body corporate." Mich. Comp. Laws § 117.1.

The Local Financial Stability and Choice Act does not affect a city's status as a municipal entity separate from the State under Mich. Comp. Laws § 117.1.[8] As it did in Guertin, this Court should again reject the City's argument to the contrary. *Guertin*, 2017 WL 2418007, at *15 (citing *Kincaid v. City of Flint*, 874 N.W.2d 193, 200–01 (Mich. Ct. App. 2015)).

The mere fact that the City was "subordinate" to the State while it had an emergency manager does not transform the City into an "arm of the state" for Eleventh Amendment purposes. Indeed, municipalities and political subdivisions are "traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions," and "never were and never have been considered as sovereign entities." *Sailors v. Bd. of Ed. of Kent Cty.*, 387 U.S. 105, 107 (1967). States may create municipalities and other political subdivisions, and although they are "subordinate governmental instrumentalities," they are by definition not sovereign entities within the meaning of the Eleventh Amendment.

The third *Ernst* factor involves an analysis of whether state or local officials appoint the board members of the entity. Although the governor appoints an emergency manager, an emergency manager only has the power granted by statute to act on behalf of the local community while it is in receivership. *Kincaid*, 874

---

[8] Indeed, there is no reference to the Home Rule Act anywhere in the Local Financial Stability and Choice Act.

N.W.2d at 200–01. That is, although vested with power granted by the State, an emergency manager "exercise[s] any power or authority . . . , whether elected or appointed, relating to the operation of the local government." Mich. Comp. Laws § 141.1552(ee); *see also*, Mich. Comp. Laws §§ 141.1552(dd) and (ff).

The City of Flint's argument for Eleventh Amendment immunity ultimately turns on the false premise that because the emergency manager was appointed by the state to act as its "receiver" to take over the day-to-day operation and governance of the City of Flint, that somehow transformed the City of Flint into the State. Not so. Michigan courts have flatly repudiated this argument, holding that although an emergency manager is appointed by the governor, he or she acts "only on behalf of numerous local officials," and his or her "authority is limited to the local level." *Kincaid*, 874 N.W.2d at 201 (emphasis added). Thus, the Emergency Manager's status as an official appointed by the governor does not transform the City of Flint into an "arm of the state" for Eleventh Amendment purposes.[9]

---

[9] The Michigan Court of Appeals' recent decision in *Mays v. Snyder*, No. 335555, 2018 WL 559726 (Mich. Ct. App. Jan. 25, 2018), does not alter this conclusion. Although that court found that emergency managers were state employees for purposes of jurisdiction in the Michigan Court of Claims, it also expressly stated that "the question whether an official is a state officer in a particular circumstance is 'governed by the purpose of the act or clause in connection with which it is employed.'" *Id.* at *13, 16 (quoting *Schobert v. Inter-Cty. Drainage Bd. of Tuscola, Sanilac & Lapeer Ctys. for White Creek No. 2 Inter-Cty. Drain*, 69 N.W.2d 814, 820 (Mich. 1955)). Moreover, the Michigan Court of

      iii.    *The Operation of Waterworks is Traditionally Municipal Function and Does Not Render the City an Arm of the State*

Turning to the fourth *Ernst* factor, "whether the entity's functions fall within the traditional purview of State or local government," *Ernst*, 427 F.3d at 359, the City contends that by operating waterworks, and thereby "acting in the interest of public health," it performs a traditional state function as an "arm of the state." *See* City Br. at 26.

The City acknowledges that the "day-to-day operations of a waterworks generally fall within the purview of local authorities." *Id*. That the MDEQ has certain authority over standards for the treatment of water does not render the operation of waterworks a state function. A municipality is not transformed into an arm of the state merely by exercising state-granted power. *See N. Ins. Co. of New York v. Chatham Cty.*, 547 U.S. 189, 193–94 (2006) (observing that the Supreme Court "has repeatedly refused to extend sovereign immunity to counties" and municipalities, even where "such entities exercise a 'slice of state power'") (quoting *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979)). For the foregoing reasons, the City's argument regarding

---

Appeals properly limited its decision to the issue before it, reasoning, "the question presented here is one of jurisdiction, and it is the intent behind the Legislature's grant of jurisdiction to the Court of Claims . . . that must direct this Court's analysis." *Id.* at \*13.

Eleventh Amendment immunity fails, and the City of Flint is not entitled to the same protections that a state enjoys under the Eleventh Amendment.

For the foregoing reasons, the City's argument regarding Eleventh Amendment immunity fails, and the City of Flint is not entitled to the same protections that a state enjoys under the Eleventh Amendment.

    3.    <u>Neither Absolute Immunity nor State-Law Privileges Bar Plaintiffs' Claims Against Defendants Wyant and Wurfel</u>

    i.    *Absolute Immunity Does Not Apply to Defendants Wyant and Wurfel Because They Did Not Serve a Prosecutorial Function*

There is a strong presumption that all individuals, no matter their position in government, are subject to the law. Those who seek absolute exemption from liability for their unconstitutional conduct and violation of citizens' rights have a heavy burden to demonstrate an entitlement to exemption. If appropriate, qualified immunity is sufficient to protect governmental officials in the exercise of their acts. *Burns v. Reed*, 500 U.S. 478, 486–87 (1991); *see also Guertin*, 2017 WL 2418007, at *16 (recognizing "officials are generally entitled only to qualified immunity," not absolute immunity) (citing *Butz v. Economou*, 438 U.S. 478, 507 (1978)).

Absolute immunity should be available only to "officials exercising judicial or quasi-judicial functions, such as executive action 'analogous to those of a prosecutor' exercising prosecutorial discretion." *Guertin*, 2017 WL 2418007, at *16 (quoting *Butz*, 438 U.S. at 515); *see also Buckley v. Fitzsimmons*, 509 U.S.

259, 276–78 (1993) (denying absolute immunity even to a prosecutor for certain investigatory actions and statements to the media because neither served a prosecutorial function). Absolute immunity is limited to providing a shield for those intimately involved in the judicial process, "not a sword allowing [state officials] to trample the statutory and constitutional rights of others." *Spurlock v. Satterfield*, 167 F.3d 995, 1003–04 (6th Cir. 1999).

Defendants Wyant and Wurfel have not met their burden of showing that they acted in a prosecutorial function that is "intimately associated with the judicial phase of the criminal process." *Burns*, 500 U.S. at 486–87.[10] Neither Wyant nor Wurfel—who, during the relevant timeframe, worked as the MDEQ Director and Director of Communications, respectively—were acting in a quasi-prosecutorial role during the Flint Water Crisis. Moreover, none of the actions that are the source of Wyant or Wurfel's liability, including their decisions that deliberately created and exacerbated the public health crisis that harmed Individual Plaintiffs, involve anything akin to a prosecutorial or judicial act that may give rise to a legitimate assertion of absolute immunity. As in *Guertin*, "[n]othing about the governmental defendants' alleged actions in this case indicate they were performing judicial or quasi-judicial functions." *Guertin*, 2017 WL 2418007, at \*17.

---

[10] Indeed, the cases on which Wyant and Wurfel rely where an official was entitled to absolute immunity involved some form of prosecutorial role, legislative role, or adjudicative process, and thus are not applicable here

Neither Wyant nor Wurfel provide support for their contention that enforcing Safe Drinking Water Act ("SDWA") provisions is a "quasi-prosecutorial function," nor is there any factual basis to conclude that either had a "quasi-prosecutorial" role in such enforcement.[11] *See* Wyant Br. at 25; Wurfel Br. at 20. To the extent Wyant and Wurfel contend failure to enforce SDWA provisions is the only basis for Plaintiffs' claims against them, they inappropriately narrow the allegations and claims in the Master Complaint. Simply put, Wyant and Wurfel fail to demonstrate a prosecutorial status or quasi-judicial acts or proceedings to warrant absolute immunity.

ii. *State Law Privileges Cannot Bar Plaintiffs' Federal Constitutional Claims Against Wyant and Wurfel*

Plaintiffs assert two claims against Defendants Wyant and Wurfel under 42 U.S.C. § 1983 for violating the substantive Due Process Clause of the Fourteenth Amendment. "Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law." *Martinez v. California*, 444 U.S. 277, 284 n.8 (1980); *see also Wilson v. Elliott Cty.*, 198 F. App'x 471, 474 (6th Cir. 2006) (same); *Estate of Romain v. City of Grosse Pointe Farms*, No. CIV. 14-12289, 2015 WL 4620588, at *4 (E.D. Mich.

---

[11] Curiously, Wurfel argues that "[d]eciding whether SDWA enforcement actions should be taken, or otherwise enforcing its provisions, is a quasi-judicial function," while claiming that he "played no role in regulatory enforcement." Wurfel Br. at 20.

July 31, 2015) (same) (quoting *Palmer v. City of Monticello*, 31 F.3d 1499, 1504 (10th Cir. 1994)).

As the Supreme Court has recognized, "[a] construction of [a] federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the Supremacy Clause of the Constitution insures that the proper construction may be enforced." *Martinez*, 444 U.S. at 284 n.8. Plaintiffs allege only federal constitutional claims against Wyant and Wurfel. These claims therefore cannot be curtailed—let alone barred— by absolute or qualified privilege under Michigan law.[12]

---

[12] Wyant and Wurfel's contention that Michigan's absolute and qualified privileges from defamation have been applied to other types of torts is inapposite, as Plaintiffs do not allege state-law tort claims against either. And, even assuming, *arguendo*, that either of these privileges applied, neither Wyant nor Wurfel would meet the standard. Wyant invokes these privileges only in relation to an October 15, 2015 email. *See* Wyant Br. at 11–12. But that email is not the sole basis for Plaintiffs' claims against Wyant; it is simply one piece of evidence of Wyant's knowledge and admission. Compl. ¶ 83. Moreover, Wurfel's contention that Plaintiffs have not alleged malice is incorrect. Under Michigan law, "malice" in this context includes making a statement with "knowledge of its falsity or reckless disregard of the truth." *Gonyea v. Motor Parts Fed. Credit Union*, 480 N.W.2d 297, 300 (Mich. 1991). Plaintiffs repeatedly and plausibly allege that Wurfel made false statements with knowledge of their falsity. *See, e.g.*, Compl. ¶ 126, 129. Thus, even if these privileges applied here—which they do not—Wyant and Wurfel's arguments would fail.

4.   <u>Glasgow and Johnson Do Not Have Governmental Immunity Under State Law</u>

Defendants Glasgow and Johnson are not protected by the limited immunity from suit provided by MCL § 691.1407.[13]

First, Glasgow and Johnson are liable for the intentional torts of intentional infliction of emotional distress, trespass, and nuisance. In order to avoid liability for intentional torts, *both Glasgow and Johnson* "must . . . establish that he was acting in 'good faith.'" *Odom v. Wayne Cty.*, 482 Mich. 459, 473 (2008). Plaintiffs allege that Glasgow (1) helped switch the Flint water system to Flint River water despite the system's inadequate staffing, training, and planning, Compl. ¶¶ 91,92 and (2) knowingly failed to comply with EPA-required testing protocols, resulting in the failure to identify lead hazards and the delay of corrective action, *id.* ¶¶ 101, note 11. Michigan law allows governmental employees to be held liable for intentional torts (such as trespass and nuisance) when "the government employee

---

[13] Plaintiffs concede that Michigan law confers absolute immunity on Earley, Ambrose, Walling, and Croft for their alleged actions – even those actions that unconstitutionally deprived Plaintiffs of their liberty and property rights. Plaintiffs concede that, under the current state of Michigan and federal law, the Complaint does not state a claim against the MDEQ Defendants for negligence, negligent infliction of emotional distress, Safe Drinking Water Act violations, inverse condemnation, or unjust enrichment. Plaintiffs also concede that the Complaint should not be construed as requesting declaratory judgment as an Plaintiffs also concede that the Master Complaint should not be construed as seeking joint and several liability.

acts…with *a wanton or reckless disregard of the rights of another.*"[14] *Odom*, 482 Mich. at 472-74. Glasgow's willingness to gamble with the safety of Flint's water system meets this standard, both in the initial decision to pump Flint River water without proper safety protocols and in his follow-up failure to ensure adequate lead testing.[15]

Glasgow is also liable for torts of gross negligence. MCL § 691.1407 provides that a governmental employee is immune from liability for non-intentional torts only if:

> (a) They are "acting or reasonably believes he or she is acting within the scope of his or her authority";
>
> (b) "The governmental agency is engaged in the exercise or discharge of a governmental function"; *and*
>
> (c) The employee's conduct "does not amount to gross negligence that is the proximate cause of the injury or damage."

MCL § 691.1407(2) (emphasis added).

Glasgow and Johnsons' gross negligence in switching to the Flint River and failing to comply with required testing protocols is evident. As Utilities Administrators for the City of Flint, they should have known that decisions

---

[14] The City Defendants suggest that Plaintiffs must prove that Glasgow acted "with malice." As the quote from *Odom* above demonstrates, this is incorrect.

[15] The City Defendants appear to suggest in passing that Glasgow's actions were not "discretionary," City Defs.' Br. at 45. This would place Glasgow *outside* the scope of immunity. *See Odom*, 482 Mich, 459 at 474-75.

regarding the Flint water system would have devastating consequences for the 100,000 residents of Flint. Their conduct was certainly "so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL § 691.1407(8)(a).

Glasgow and Johnson's complicity in the ill-planned switch to Flint River water, and their failure to test for lead in accordance with proper federal protocols, caused Plaintiffs harm under the ordinary common-law meaning of "proximate cause." That is, each is an "act or omission that is considered in law to result in a consequence, so that liability can be imposed on the actor" *and* "[a] cause that directly produces an event and without which the event would not have occurred." Black's Law Dictionary (10th ed. 2014).

The Michigan Supreme Court has interpreted "the proximate cause" in MCL § 691.1407 to mean "the one most immediate, efficient, and direct cause preceding an injury, not 'a proximate cause.'" *Robinson v. City of Detroit*, 462 Mich. 439, 475 (Mich. 2000). However, Plaintiffs have alleged dozens of acts and omissions by Defendants that, if true, reasonably constitute "the" proximate cause of plaintiffs' harm. Glasgow and Johnson's actions are among them. Plaintiffs need not commit themselves, at this stage of the case, to a single theory of the case, and it would be premature at this point to say which allegations predominate in the causal chain of this disaster. At this point, it should be sufficient that

42

Glasgow and Johnson's alleged actions, taken as true and drawing all inferences in favor of the Plaintiffs, *could* be "the" proximate cause of the Flint crisis.

At any rate, if the City Defendants are correct, and Glasgow and Johnson are entitled to immunity under state law, then they, like Earley, Ambrose, Walling, and Croft may be held liable under 42 U.S.C. § 1983, because thhe deprived Plaintiffs of their constitutionally- protected liberty and property interests without due process of law.

5.   Defendants Wyant and Wurfel Cannot Seek Refuge Behind a Shield of Immunity

Defendant Wyant argues that his conduct cannot be challenged by this Court or any court because he is immune. Mot. at 17-24, 28-30. But neither the federal nor state doctrines of absolute, qualified or governmental immunity bar this suit.

i.   *Michigan's Governmental Immunity Doctrine Does Not Shield Defendant Wyant's and Wurfel's Conduct*

Under Michigan law, the State of Michigan and its agencies may be held liable for torts arising from the exercise of a nongovernmental function. *Mack v. Detroit*, 649 N.W.2d 47, 57 (Mich. 2002). They may also be vicariously liable when state employees, acting during the course of their employment and within the scope of their authority, nonetheless use their state-granted powers to pursue nongovernmental functions. *Ross v. Consumers Power Cp.*, 363 N.W.2d 641, 663-

43

64 (Mich. 1984) (abrogated by statute on other grounds, *Peters v. Bay Fresh Start, Inc.*, 411 N.W.2d 463, 466 (Mich. 1987)).

Plaintiffs allege several instances in which state employees flatly lied to regulators and the public. Compl. ¶¶ 94, 95, 105, 107, 126, 129, 131, and 138. Lying to regulators and the public is not a "governmental function" that is "expressly or impliedly authorized by constitution, statute…or other law." MCL § 691.1401. Though Michigan grants broad governmental immunity to employees acting in pursuit of legitimate state objectives, *see Smith v. Dep't of Pub. Health*, 410 N.W.2d 749, 779 (Mich. 1987), it does not allow state employees to co-opt the machinery of the state for their own illegitimate ends, and cloak themselves in immunity to boot. In fact, the Michigan Legislature has expressed "its intent to subject lower-level government employees to potential liability for performing their jobs in a grossly negligent manner." *Beaudrie v. Henderson*, 465 Mich. 124, 139 (Mich. 2001).

Defendants Wyant and Wurfel rest their argument on *Smith*, which held that immunity is determined by the "general activity" rather than the "specific conduct" at issue in a tort suit. *Smith*, 410 N.W.2d at 779. In *Smith*, the Michigan Supreme Court considered a plaintiff who had been committed to a mental institution in violation of the legislatively prescribed procedure. The Court held that, though the *specific conduct* – commitment without process – was not "authorized by

44

constitution, statute, or other law," nonetheless the *general activity* – the business of the agency of providing for the community's mental health – *was* legitimate. *Id.* at 778-80 (quoting *Ross*, 363 N.W.2d at 661). But the *Smith* court explicitly cautioned against the extension Wyant and Wurfel are trying to argue here: "intentional torts are immune if committed within the scope of a governmental function; however, the intentional use or misuse of a badge of governmental authority for a purpose unauthorized by law is not the exercise of a governmental function." *Smith*, 410 N.W.2d at 780.

The *Smith* court located the "governmental function" inquiry at the level of "general activity" to protect the state from liability for governmental actors (such as police officers) who occasionally commit intentional torts in (misguided) service of legitimate governmental objectives. The doctrine was a reaction to arguments that intentional torts were *necessarily* outside the scope of governmental immunity because an intention to commit a tort is never a legitimate governmental function. *See id.* at 778 (quoting plaintiff's argument that "[i]t would be a perversion of the English language to say that this transfer, in clear violation of law, was 'authorized by law.' Because the transfer was not authorized by law, it was *ultra vires*"). *Smith* clarified that, under some circumstances, intentional torts *may* nonetheless serve governmental functions. *Id.* at 780 (noting that if "in bypassing the legislatively prescribed procedure for plaintiff's commitment, it was

45

not the intent of the defendant to confine someone who could not properly be confined, but rather the confinement was occasioned by time constraints or a desire to cut costs, it would still be within its governmental purpose"). The court carefully excepted from immunity actors who hijack "a badge of governmental authority for a purpose unauthorized by law." *Id.*

This intentional misuse of governmental authority for an illegitimate end is precisely what is alleged here. Plaintiffs allege that state actors intentionally lied to regulators and the public to conceal their failure to comply with federal law and provide safe drinking water to the residents of Flint. "MDEQ's regulatory oversight of the Flint Water System . . . is expressly mandated and authorized by statute" as Mr. Wyant argues, a legitimate governmental function. Mot. at 30. But there is no way to construe knowingly lying to EPA and the public as "performing oversight," and the lies alleged above did not serve the ends of regulatory oversight. Rather, MDEQ employees deliberately used their official capacities to obscure and deny their own misdeeds – objectives outside the scope of governmental immunity.

      ii.    *Wyant and Wurfel Are Not Entitled to Absolute Immunity Because MDEQ Employees Are Not Federal Employees*

Defendant Wyant's attempt to invoke the doctrine of absolute immunity is also misplaced. Wyant Br. 28-30. Contrary to this assertion, Defendant Wyant's actions and lies related to the Flint water crisis do not fall under the umbrella of

absolute immunity as set forth by the Supreme Court in *Butz v. Economou,* 438 U.S. 478 (1978).

Wyant first argues that he is, functionally, a federal employee, and that as such he is entitled to absolute immunity from liability under state tort law. Mot. at 28-30. Defendant Wyant is not a federal employee, and even if he was, he would not be entitled to dismissal.

To start, neither of the two cases Defendant Wyant cites provide any support for the proposition that he should be treated as a federal employee for immunity purposes. The very first words of *Butz v. Economou* make clear that the case "concerns the personal immunity of *federal officials* in the Executive Branch from claims for damages arising from their violations of citizens' *constitutional* rights." 438 U.S. 478, 480 (1978). The suit was brought against U.S. Department of Agriculture employees, and has nothing whatsoever to do with whether state employees tasked with primary enforcement under the SDWA are immune from state law. Similarly, *Buckley v. Fitzsimmons* involved the scope of the immunity of *state* prosecutors from liability for *constitutional* harms under §1983. 509 U.S. 259, 261-67 (1993). As cases addressing immunity from constitutional harms, these cases are only tangentially relevant to whether federal officials are immune from state torts; they are completely inapposite to the question of whether Defendant Wyant should be accorded the same immunities as a federal official.

47

Unsurprisingly, Plaintiffs offer no case law supporting the notion that the SDWA's grant of primary enforcement responsibility to MDEQ renders MDEQ employees, including Wyant, the functional equivalents of federal officers. Defendant Wyant does not even cite the SDWA or explain how an MDEQ Employee's actions are "authorized and controlled by" federal statute. In fact, though qualifying state agencies are tasked with primary implementation of the SDWA, it is the *EPA* that has ultimate enforcement authority, including authority to (a) determine states' primacy designations; and (b) order compliance in both primacy and nonprimacy states. 42 U.S.C. § 300g-2, g-3. Further, the *states* decide whether to take the *option* of primary responsibility, and state regulators implement their *own* parallel or more stringent regulations alongside SDWA's. *Id.* § 300g-2. Moreover, nothing in the SDWA gives EPA managerial control over MDEQ employees.

To the extent Defendants Wyant and Wurfel *think* they are immune from state tort liability as an agent of the federal government, Wyant and Wurfel have failed to assert it correctly. Under the Westfall Act, federal employees sued for actions "within the scope of [his] office" must seek certification from the Attorney General that they were acting within the scope of their office or employment. 28 U.S.C. § 2679(c). If the Attorney General so certifies, the United States is substituted as a defendant, *id.* at (d)(1), and will be held liable "in the same manner

48

and to the same extent as a private individual." *Id.* § 2674. If the Attorney General denies certification, the defendants may seek judicial review of the determination and, if successful, the United States will again be substituted. *Id.*§ 2679(d)(3).

In short, even if the Defendants Wyant and Wurfel are right in their unsupported argument that they mystically partakes of the nature of federal employees in their roles as a state regulator—a position with no support in the case law, contrary to policy and common sense—they are wrong that characterizing their activities as federal would justify dismissing the suit.

### 6. The MDEQ Defendants Are Not Immune From Suit

The MDEQ Defendants first argue that they are absolutely immune from liability under state law. They are wrong.

#### i. *MDEQ Employees Are Not Federal Employees*

The MDEQ Defendants first argue that they are, functionally, federal employees, and that as such they are entitled to absolute immunity from liability under state tort law. MDEQ Defendants' Br. at 8-10. The MDEQ Defendants are not federal employees, and even if they were they would not be entitled to dismissal.

To start, neither of the two cases the MDEQ Defendants cite provide any support for the proposition that they should be treated as federal employees for immunity purposes. The very first words of *Butz v. Economou* make clear that the

case "concerns the personal immunity of *federal officials* in the Executive Branch from claims for damages arising from their violations of citizens' *constitutional* rights." 438 U.S. 478, 480 (1978). That suit was against U.S. Department of Agriculture employees, and has nothing whatsoever to do with whether state employees tasked with primary enforcement under the SDWA are immune from state law. Similarly, *Buckley v. Fitzsimmons* involved the scope of the immunity of *state* prosecutors from liability for *constitutional* harms under §1983. 509 U.S. 259, 261-67 (1993). As cases addressing immunity from constitutional harms, these cases are only tangentially relevant to whether federal officials are immune from state torts; they are completely inapposite to the question of whether the MDEQ Defendants should be accorded the same immunities as federal officials.

Unsurprisingly, Defendants offer no case law supporting the notion that SDWA's grant of primary enforcement responsibility to MDEQ renders MDEQ employees the functional equivalents of federal officers. The MDEQ Employees provide no authority within the SDWA and fail to explain how MDEQ Employees' actions are "authorized and controlled by" federal statute.[16]

---

[16] In fact, though qualifying state agencies are tasked with primary implementation of SDWA, *EPA* has ultimate enforcement authority, including authority to (a) determine states' primacy designations; and (b) order compliance in both primacy and nonprimacy states. 42 U.S.C. § 300g-2, g-3. It is *states* that decide whether to take the *option* of primary responsibility, and state regulators implement their *own* parallel or more stringent regulations alongside SDWA's. *Id.*

To the extent MDEQ employees *argue* they are immune from state tort liability as agents of the federal government, they miss their mark because they cannot show that Plaintiffs' claims against them are based on specific actions *directed* by the EPA. Indeed, immunity is not automatic for federal employees.

Under the Westfall Act, federal employees sued for actions "within the scope of [their] office" must seek certification from the Attorney General that they were acting within the scope of their office or employment. 28 U.S.C. § 2679(c). If the Attorney General so certifies, the United States is substituted as a defendant, *id.* at (d)(1), and will be held liable "in the same manner and to the same extent as a private individual." *Id.* § 2674. If the Attorney General denies certification, the defendants may seek judicial review of the determination and, if successful, the United States will again be substituted. *Id.* § 2679(d)(3).

In short, the MDEQ Defendants have not and cannot show that they are being sued for actions taken under the specific direction of EPA officials, as set out in greater detail *infra*, therefore they cannot characterize their activities as the actions of federal employees and dismissal is not justified.

---

§ 300g-2. Moreover, nothing in the SDWA gives EPA managerial control over MDEQ employees.

ii. *Michigan's Governmental Immunity Doctrine Does Not Shield Defendants' Conduct*

Under Michigan law, the State of Michigan and its agencies may be held liable for torts arising from the exercise of a nongovernmental function. *Mack v. Detroit*, 649 N.W.2d 47, 57 (Mich. 2002). They may also be vicariously liable when state employees, acting during the course of their employment and within the scope of their authority, nonetheless use their state-granted powers to pursue nongovernmental functions. *Ross v. Consumers Power Cp.*, 363 N.W.2d 641, 663-64 (Mich. 1984) (abrogated by statute on other grounds, *Peters v. Bay Fresh Start, Inc.*, 411 N.W.2d 463, 466 (Mich. 1987)).

Plaintiffs allege several instances in which state employees flatly lied to regulators and the public. *See supra*, Background Section II. Lying to regulators and the public is not a "governmental function" that is "expressly or impliedly authorized by constitution, statute…or other law." MCL § 691.1401. Though Michigan grants broad governmental immunity to employees acting in pursuit of legitimate state objectives, *see Smith v. Dep't of Pub. Health*, 410 N.W.2d 749, 779 (Mich. 1987), it does not allow state employees to co-opt the machinery of the state for their own illegitimate ends, and cloak themselves in immunity to boot. In fact, the Michigan Legislature has expressed "its intent to subject lower-level government employees to potential liability for performing their jobs in a grossly negligent manner." *Beaudrie v. Henderson*, 465 Mich. 124, 139 (Mich. 2001).

52

Plaintiffs allege that state actors intentionally lied to regulators and the public to conceal their failure to comply with federal law and provide safe drinking water to the residents of Flint. MDEQ Defendants argue that "governmental immunity from intentional tort liability is warranted if the act was undertaken during the course of his employment, the employee was acting or reasonably believed that he was acting, within the scope of his authority, the acts were undertaken in good faith and without malice, and the acts were discretionary, as opposed to ministerial." Mot. at 37. But there is no way to construe knowingly lying to EPA and the public as "acting or reasonably believed" they were acting within the scope of his or her authority, and the lies alleged above did not serve the ends of regulatory oversight. Rather, MDEQ employees deliberately used their official capacities to obscure and deny their own misdeeds – objectives outside the scope of governmental immunity. *See Smith v. Dep't of Pub. Health*, 410 N.W.2d 749, 778 (Mich. 1987).

### iii. *Shekter Smith Is Not Absolutely Immune by Virtue of Her Mid-Level Management Position*

Shekter Smith also argues that she has absolute immunity from state tort liability under MCL § 691.1407(5), which says that "the elective or highest appointive executive of all levels of government are immune from tort liability . . . if he or she is acting within the scope of his or her judicial, legislative, or executive authority." Mot. at 32-36.

Shekter Smith argues that the MDEQ's Office of Drinking Water and Municipal Assistance is a "level of government" for the purposes of the immunity statute. Michigan law has given some guidance on how to determine whether a governmental organization is a "level of government." The inquiry focuses on several factors, including:

> 'whether the entity shares aspects of governance with other political subdivisions, such as the power to levy taxes, the power to make decisions having a wide effect on members of the community, or the power of eminent domain.' We also consider the extent to which the governmental employee exercises 'broad-based jurisdiction or extensive authority similar to that of a judge or legislator,' and whether the entity at issue has certain autonomous authority.

*Segue v. Wayne Co.*, 2014 Mich. App. LEXIS 917 (Mich. App. May 22, 2014) (quoting *Grahovac v. Munising Twp.*, 689 N.W.2d 498, 500-01 (Mich. App. 2004) (internal citations omitted). Shekter Smith grasps the vaguest of these factors, "broad-based jurisdiction or extensive authority," and argues that her jurisdiction to implement drinking-water regulations (and, inter alia, regulating septic tanks, campgrounds, and swimming pools) is "broad-based" and her authority over that domain "extensive." Mot. at 34. Relative to what, though? Smith has merely identified her duties and attached the words "broad-based" and "extensive" to their scope.

Shekter Smith does not and cannot argue that MDEQ's Office of Drinking Water and Municipal Assistance can levy taxes or exercise eminent domain. Nor

54

does she compare the "broad base" of her jurisdiction or the boundaries of her "extensive authority" to that of, say, a county, city, or town. She does not argue that she has autonomous authority—presumably because her decisions could be overruled by her boss, the Director of MDEQ (not to mention the governor).

Michigan courts provide some guidance. For example, in *Segue*, the Court of Appeals found that the Wayne County Department of Economic Development Growth Engine was not a level of government, *Segue*, 2014 Mich. App. LEXIS 917, at *1-2; neither is the chief of a volunteer fire department, *Grahovac*, 689 N.W.2d at 501. Directors of the Michigan Department of Corrections are entitled to immunity, but *their subordinates are not*, even when they have a realm of independent authority (e.g., prison warden). *Harrison v. Dir., Dep't of Corrs.*, 487 N.W.2d 799, 803 (Mich. App. 1992); *accord Chivas v. Koehler*, 453 N.W.2d 264, 266 (Mich. App. 1990). The highest authority of autonomous units of broad authority in local governments may be immune, *see Davis v. City of Detroit*, 711 N.W.2d 462, 465-66 (Mich. App. 2005); but middle managers—even those who wield substantial authority over their own domain, like a school principal—are not. *Eichhorn v. Lampere Sch. Dist.*, 421 N.W.2d 230, 235 (Mich. App. 1988).

These examples—and common sense—make clear that Shekter Smith, a mid-level manager at MDEQ,[17] is not a "highest executive official" entitled to absolute immunity under Michigan law.[18]

> 7.    The Safe Drinking Water Act Does Not Preempt Plaintiffs' Constitutional Claims

Defendants' claims about preemption fail. The Sixth Circuit already has held that the SDWA does not preempt § 1983 claims for violations of the Constitution. *Boler*, 865 F.3d at 409.[19] In that case, the court reviewed the text and legislative history of the SDWA, conducted a thorough analysis of § 1983 preclusion jurisprudence, and concluded that (1) there was "no clear inference from either the

---

[17] Moreover, the Complaint contains no allegations supporting the proposition that Shekter Smith is entitled to highest-executive immunity. To the extent that Shekter Smith's argument depends on *facts* beyond the scope of judicial notice— e.g., her actual responsibilities, her office's internal role, or her contact with Director Wyant in day-to-day operations—rather than, e.g., Michigan law, the Court may not accept Shekter Smith's argument as fact on a 12(b)(6) motion.

[18] Shekter Smith argues in the alternative that even if she is "not the highest official of the MDEQ" (as she undisputedly is not), she is nonetheless entitled to immunity "based upon her position as Chief of the ODWMA." Br. at 34. Her cases, however, do not support the conclusion that she could inherit the immunity of her superiors without herself qualifying as a highest executive. *Chivas* found independent highest-executive authority in both the Director and Deputy Director of the MDOC, whose authorities apparently did not overlap, giving the Deputy unreviewed jurisdiction over prisoner transfers—the subject matter of the suit. 453 N.W.2d at 266.

[19] Even before that decision was issued, this Court similarly held that the procedural requirements and remedial restrictions set forth in the SDWA did not demonstrate an intention on the part of Congress to preempt § 1983 claims under the Constitution. *Guertin*, 2017 WL 2418007, at *11–14.

text of the statute or its legislative history that Congress intended for the SDWA's remedial scheme to displace § 1983 suits enforcing constitutional rights;" (2) "the remedial schemes in the SDWA are not so comprehensive as to demonstrate congressional intent to preclude remedies under § 1983 for constitutional violations;" and (3) "the contours of the rights and protections found in the constitutional claims diverge from those provided by the SDWA such that we infer lack of congressional intention to foreclose § 1983 claims." *Id.* at 405–09.

Here, Plaintiffs raise the same § 1983 claims at issue in the *Mays* case that was consolidated with *Boler* on appeal: violations of Plaintiffs' substantive due process rights through state-created danger and an invasion of the fundamental right to bodily integrity, and violations of the Equal Protection Clause based on intentional race discrimination and impermissible wealth-based discrimination. *See id.* at 400 (listing claims in *Mays v. Snyder*).

The *Boler* decision controls as binding precedent, and Defendants raise no arguments which would distinguish that decision from the instant case on the issue of SDWA preemption.[20] Nor does the pending Petition for a Writ of Certiorari in that case render the Sixth Circuit's decision non-binding. *See Yong v. I.N.S.*, 208 F.3d 1116, 1119 n.2 (9th Cir. 2000) (citing *McClellan v. Young*, 421 F.2d 690, 691 (6th Cir. 1970)) ("[O]nce a federal circuit court issues a decision, the district courts

---

[20] Indeed, the State Defendants and Defendant Wright acknowledge that they raised the issue in order to preserve it pending a petition to the Supreme Court.

within that circuit are bound to follow it and have no authority to await a ruling by the Supreme Court before applying the circuit court's decision as binding authority.").

Both the Sixth Circuit decision in *Boler* and this Court's decision in *Guertin* were well-reasoned and correct on the issue of SDWA preemption, and faithful to the Supreme Court's admonition that courts should "not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for a substantial [constitutional] claim." *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 256 (2009) (citation omitted).

Defendants have not met their burden to prove preclusion,[21] and their argument that Plaintiffs' § 1983 claims are preempted by the SDWA fails.

### B.    The Complaint Plausibly Alleges that Government Defendants Violated Plaintiffs' Substantive Due Process Rights

The Due Process Clause protects individuals from "arbitrary" government actions. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). But "only the most egregious official conduct . . . [is] 'arbitrary in the constitutional sense.'" *Id.* at 846 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)). Thus, to plead a substantive due process claim against a government official, a plaintiff must allege that the

---

[21] This Circuit has held that "[t]he burden . . . lies with the defendant in a § 1983 action to prove preclusion." *Charvat v. E. Ohio Reg'l Wastewater Auth.*, 246 F.3d 607, 615 (6th Cir. 2001).

official (1) engaged in "conscience-shocking" behavior, which (2) invaded a fundamental constitutional right. *See id.* at 846–47. Here, Plaintiffs have alleged that, contrary to all dictates of conscience, the Government Defendants knowingly supplied poisoned water to Flint residents while insisting that the water was safe to conclusion drink. That deliberately callous behavior infringed Plaintiffs' constitutional rights to bodily integrity and freedom from state-created dangers.

### 1.    Government Defendants' Conduct Shocks the Conscience

Conduct "shocks the conscience" when it is so "offensive that it [does] not comport with traditional ideas of fair play and decency." *Lewis*, 523 U.S. at 847 (citations omitted); *see also Rochin v. California*, 342 U.S. 165, 169 (1952). As the Michigan Court of Appeals recently recognized, the Government Defendants' cold, consistent indifference to the lives and health of Flint residents was indecent by any standard. *See Mays*, 2018 WL 559726, at *18. In determining whether a government official's deliberate indifference toward a plaintiff's life was indecent, the Sixth Circuit considers: (1) "the voluntariness of the plaintiff's relationship with the government" official; (2) "whether there was time for the government [official] to deliberate" before acting; and (3) "whether the government [official] was pursuing a legitimate governmental purpose." *Range v. Douglas*, 763 F.3d 573, 590 (6th Cir. 2014). Weighing all three factors, the Government Defendants' conduct was, by any measure, so indecent as to shock the conscience.

First, Plaintiffs did not have a voluntary relationship with the Defendants. Under state and municipal law, Plaintiffs had to accept whatever tap water Defendants provided. *See* Flint Code of Ord. §§ 46-25, 46-26, 46-50(b). "Even had plaintiffs wanted to receive water from a different source, they would not have been permitted to." *Guertin*, 2017 WL 2418007, at *24. Perhaps most problematically, as a result of the Government Defendants' persistent lies, Plaintiffs did not understand that Defendants were giving them toxic water, so they could not ask their political representatives—or a court—to make the Government Defendants' change their behavior. Thus, Plaintiffs had an involuntary relationship with Defendants. *Cf. Heinrich ex rel. Heinrich v. Sweet*, 62 F. Supp. 2d 282, 313-14 (D. Mass. 1999) (suggesting that the plaintiffs had an "involuntary" relationship with defendants who administered their radiation treatments because defendants did not present the risks and benefits of the treatment honestly).

Second, the Government Defendants had sufficient time to deliberate before deciding to supply poisonous water to Flint residents. As the Sixth Circuit has noted, an officer has adequate time to deliberate if that person has a chance to appreciate the probability that their conduct will cause harm and the severity of the harm. *Range*, 763 F.3d at 591. Even a few hours can be enough for an officer to appreciate the probability and severity of medical risks. *See, e.g.*, *Ewolski v. City of Brunswick*, 287 F.3d 492, 511 (6th Cir. 2002) (five hours was enough time for

police officers to appreciate the risk that tear gas would harm hostages). Here, Defendants had not just hours—but months and *years*—to consider the consequences of their actions, including the act of deciding to switch Plaintiffs' water source, as well as the act of concealing the disastrous effect of the switch. Flint residents, government experts, and independent experts consistently provided the same dire warnings to government officials, yet the officials continued to lie, reassuring residents that the water was safe. By ignoring persistent warnings over an appallingly long time, the Government Defendants engaged in indecent behavior. *See Lewis*, 523 U.S. at 853 (noting the indecency of violating constitutional rights after opportunities for "repeated reflection, largely uncomplicated by the pulls of competing obligations.").

Third, Defendants were not pursuing any legitimate government purpose by poisoning the people of Flint. Using the Flint River as the City's water source was both deeply harmful to the community and more expensive than continuing to use water from Lake Huron. Compl. ¶ 74. There was simply no upside to the Government Defendants' baffling conduct. Moreover, to the extent the Government Defendants dispute these assertions, their factual disputes are not properly resolved at this juncture.

The three *Range* factors confirm what is clear on the face of the Complaint: the Government Defendants' actions—described in further detail herein—shocked

the conscience when, over the course of months and years, they knowingly exposed Flint's children, and other members of the community, to fatal and brain damaging toxins and other contaminants. *Cf. Lewis*, 523 U.S. at 850 (government officials shock the conscience when they ignore "the medical needs" of individuals in their custody); *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 536 (6th Cir. 2008) (same).

>    2.    <u>The Complaint Sufficiently States a Claim for Government Defendants' Violation of Plaintiffs' Fundamental Constitutional Right to Bodily Integrity</u>

The Supreme Court has long recognized that the Fourteenth Amendment protects individuals' fundamental right to "bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994). Indeed, as far back as 1891, the Court held that "[n]o right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891).

Government officials violate this sacred right when they unjustifiably put a substance into someone's body without consent, or place unreasonable restrictions on someone's ability to make his or her own medical decisions. *See, e.g.*, *Washington v. Harper*, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."); *Cruzan by Cruzan v. Dir., Mo. Dep't of*

62

*Health*, 497 U.S. 261, 278 (1990) ("[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment . . . ."); *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 857 (1992) (women's right to "bodily integrity" includes a right to make reproductive health decisions).

Here, the Government Defendants did both: they unjustifiably put contaminants, including lead and deadly *legionella* bacteria, into Plaintiffs' bodies without their consent, and they lied to Plaintiffs about the contents of their water, which prevented Plaintiffs from deciding whether and when to seek testing and treatment for lead poisoning and other water-related illnesses.

The City Defendants nonetheless insist that they did not violate Plaintiffs' fundamental right to bodily integrity because they did not "invade[]" anyone's body. City Br. at 29. But that simply is not true. As the City Defendants acknowledge, government actors can invade a person's body by giving that person dangerous medications. *See* City Br. at 30 (citing *Barrett v. United States*, 798 F.2d 565, 575 (2d Cir. 1986), for the proposition that government actors can invade a body by "administering dangerous drugs to [a] human subject[]."); *id.* (citing *Lojuk v. Quandt*, 706 F.2d 1456, 1465–66 (7th Cir. 1983), for the proposition that government actors can invade a body though "treatment with anti-psychotic drugs.").

As this Court recognized in *Guertin*, if administering a medication qualifies as a constitutionally suspect invasion of someone's body, then *a fortiori* administering lead—a "life-threatening substance" with "zero therapeutic benefit"—qualifies as a constitutionally suspect invasion. *Guertin*, 2017 WL 2418007, at *23.

Moreover, as the Supreme Court has recognized, it is possible for a government official to impinge upon a person's fundamental right to bodily integrity without physically touching his or her body. For example, a government official may impermissibly curtail a person's fundamental right to bodily integrity by limiting that person's ability to make informed medical decisions. *See Casey*, 505 U.S. at 857 (unreasonable interference with a woman's ability to make informed reproductive health care decisions infringes her fundamental rights to "personal autonomy and bodily integrity."). That is precisely what happened here. In addition to deliberately introducing toxic substances into Plaintiffs' bodies, Defendants lied to cover their actions, thereby limiting Plaintiffs' ability to make informed decisions about whether and when to seek medical treatment for the illnesses caused by Defendants' conduct.

The City Defendants also argue that Defendants did not violate Plaintiffs' fundamental right to bodily integrity because Defendants' conduct was not "targeted" at Plaintiffs. City Br. at 35. Not so. Defendants' conduct was "targeted"

64

at all residents and businesses within the boundaries of the City of Flint. The Government Defendants knew that their conduct would cause harm to those specific people because they all received the contaminated water that flowed out of the City's pipes. The Government Defendants' conduct does not cease to be targeted simply because it was aimed at thousands of people. To hold otherwise would allow government officials to escape constitutional liability in the most heinous cases, where they knowingly injure entire communities. And that would fly in the face of the Supreme Court's insistence that substantive due process claims are designed to redress conduct at the far "end of the culpability spectrum." *Lewis*, 523 U.S. at 849.

For their part, Defendants Wyant and Peeler argue that it is impermissible to hold Defendants liable for violating Plaintiffs' right to bodily integrity because Defendants did not engage in affirmative misconduct. *See* Wyant Br. at 7; Peeler Br. at 18. Contrary to Wyant and Peeler's assertion, however, Defendants affirmatively switched Flint's water source to the Flint River, knowing that the switch would injure Flint residents.[22] That triggered constitutional liability. Alternatively, the City Defendants, State Defendants, and some individual Government Defendants contend that they cannot be liable for violating Plaintiffs' fundamental right to bodily integrity because that right does not encompass a right

---

[22] Specific allegations regarding each Government Defendants' conduct are discussed further in the Background Section II and IV, and in this Section, *infra*.

65

to a clean or healthful environment. If individuals could bring due process claims against government officials every time the officials failed to protect them from environmental contamination, these Defendants argue, the Constitution would open the floodgates to claims against the government. *See* City Br. at 10–12; Wurfel Br. at 13–14, 18; State Br. at 19–20; Peeler Br. at 4–8. This argument wildly misses the mark. As a preliminary matter, these Defendants misstate the right Plaintiffs seek to vindicate. The constitutional right at issue is not a freestanding right to receive contaminant-free drinking water, but rather the "clearly established right to be free from conscience-shocking, arbitrary executive action that invades their bodily integrity without their consent . . . ." *Guertin*, 2017 WL 2418007, at *22.[23]

The Supreme Court has already created a mechanism to prevent the Constitution from becoming a "font of tort law": the shocks-the-conscience test. *Lewis*, 523 U.S. at 848 (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)). As noted above, courts can only countenance substantive due process claims against government officials when the defendants have engaged in conscience-shocking behavior. The Government Defendants in this case shocked the conscience when they switched the City's water source to the Flint River, knowing that their conduct

---

[23] For the same reasons, certain Government Defendants' contention that they are entitled to qualified immunity because Plaintiffs have no clearly established right to clean drinking water fails

66

would introduce harmful and in some cases deadly toxins into Plaintiffs' bodies, and then lied to cover their tracks. That is enough to distinguish this case from cases like *Lake v. City of Southgate*, No. 16-10251, 2017 WL 767879 (E.D. Mich. Feb. 28, 2017), in which government officials negligently failed to notice and mitigate environmental risks created by other people, and cases like *Coshow v. City of Escondido*, 34 Cal. Rptr. 3d 19 (Cal. Ct. App. 2005), where the government openly introduced a harmless substance (fluoride) into drinking water. *See Lake*, 2017 WL 767879, at *5 ("[N]o reasonable jury could find that [defendant's] conduct shock[ed] the conscience."); *Coshow*, 34 Cal. Rptr. 3d at 31 (because defendant told the community that fluoride was in the water, plaintiffs could make an informed choice not to drink it).

Finally, the individual Government Defendants argue that they cannot be held liable for violating Plaintiffs' substantive due process right to bodily integrity, either because they are entitled to qualified immunity or because they were not personally involved in the conduct that injured Plaintiffs. These Defendants are wrong on both fronts.

The doctrine of qualified immunity shields "government officials performing discretionary functions" from liability in cases in which the officials did not have adequate notice that his or her conduct was unlawful. *Baynes v. Cleland*, 799 F.3d 600, 609–10 (6th Cir. 2015). Thus, qualified immunity shields

officials who violate constitutional rights if those rights were not "clearly established" at the time of the violation." *Id.* A right was clearly established if "[t]he contours of the right [were] sufficiently clear that a reasonable official would [have] underst[ood]" that his or her conduct "violate[d] that right." *Id.* at 610.

"[O]fficials can . . . be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Sometimes, "[i]n an obvious case," an official can know that her conduct violates constitutional rights, "even without a body of relevant case law." *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)); *see also Grawey v. Drury*, 567 F.3d 302, 313–14 (6th Cir. 2009) ("[T]here need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional.") (quoting *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005)).

While Defendants' conduct was novel in its cruelty, any reasonable official involved in the decision to use the Flint River as a primary source of water for the City would have known that his or her conduct violated Plaintiffs' fundamental constitutional right to bodily integrity. As this Court observed in *Guertin*, the Supreme Court has long recognized that officials interfere with individuals'

fundamental constitutional right to bodily integrity when they administer medication—*i.e.*, chemicals with therapeutic benefits—to the individuals without their consent. *See Guertin*, 2017 WL 2418007, at *22; *see also Cruzan*, 497 U.S. at 278 ("[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment . . . ."); *Harper*, 494 U.S. at 229–30 (noting that individuals have a substantial liberty interest in avoiding non-consensual treatment with psychiatric drugs). In light of that precedent, any reasonable officer should have realized that knowingly administering lead—a dangerous chemical *without* therapeutic benefits—and other contaminants to Flint residents without their consent was unconstitutional. *See Guertin*, 2017 WL 2418007, at *22–23. Thus, the Government Defendants are not entitled to qualified immunity.

Nor can the Individual Defendants claim that they were not personally involved in the conduct that violated of Plaintiffs' rights: According to the Complaint, all of the Government Defendants were "decision makers responsible for knowingly causing plaintiffs to ingest water tainted with dangerous levels of lead[] . . . and hiding the danger from them." *See Guertin*, 2017 WL 2418007, at *23. While the Government Defendants' personal involvement was described in detail in the Background section and in the Complaint, it is worth repeating the more egregious conduct the individual Government Defendants engaged in, which

shows that they were active participants in the long-running scheme to provide poisoned water to Flint residents, while insisting that the water was safe:

- Both Snyder and Dillon authorized the switch of Flint's water source from safe Detroit water to the KWA for reasons that had nothing to do with saving money, and despite knowing the Flint River would not be a safe interim source of water. Compl. ¶¶ 80–81, 85, 88, 314.

- Earley ordered and set into motion the use of highly corrosive and toxic Flint River water for the City's drinking water supply with no effective treatment system in place. *Id.* ¶ 94.

- Dillon, Kurtz, Wright, and Walling developed an Interim Plan to use the Flint River water before KWA became operational, despite knowledge that it had previously been rejected as a drinking water source. *Id.* ¶ 80, 86, 88.

- Wright affirmatively and consistently urged State and City officials to approve use of highly corrosive and toxic Flint River water for the City's drinking water supply, with knowledge that the Flint River had recently (in 2011) been professionally evaluated and rejected as a drinking water source. *See id.* ¶ 78, 88. • Croft and Johnson pressured City officials into switching to the Flint River as the source of the City's drinking water supply. *Id.* ¶¶ 109–10, 122. Johnson further approved issuance of a City press release on April 18, 2014 that assured readers that the Flint River water had been tested as safe, with no abnormalities of major concern. *Id.* ¶ 111.

- Ambrose prolonged the crisis by refusing more than once to restore Flint's water source to the DWSD after information about the elevated lead levels in the Flint drinking water was publicized and became known to State and City Officials, and by overruling a vote by Flint's City Council to re-connect the City's water system to the DWSD. *Id.* ¶¶ 103, 114.

- Specific State, MDEQ, and MDHHS employees affirmatively undertook an aggressive scheme to conceal from the people of Flint what had become known to them that lead and *legionella*, along with other toxins, were seriously and immediately endangering the people of Flint, all the

70

while knowing that to do so would place people at grave risk. *See, e.g.*, *id.* ¶¶ 82, 84, 91–92, 96, 97, 104, 106, 108, 111-12, 121-24, 127, 128, 131-34, 138, 144, 249, 252.

- Earley responded to a warning about a spike in cases of Legionnaires' disease by crafting a "message" that the increase should be attributed to a local hospital, and not the water supply, thereby misleading the public as to the water's safety and increasing their risk of harm. *Id.* ¶ 195.

- Johnson inhibited efforts by the Genesee County Health Department to obtain information about the Flint River water by stalling and, ultimately, failing to respond to the County's FOIA request for testing and laboratory results. *Id.* ¶ 117.

These and other allegations contained in the Complaint detail how the Government Defendants were both involved in violations of Plaintiffs' rights and engaged in conduct that went far beyond a mere failure to act. They made decisions that created and increased the risk of harm to Plaintiffs and subsequently took further action to conceal these dangers from Plaintiffs and the public. This more than satisfies Plaintiffs' burden at this stage.[24] Accordingly, Plaintiffs have sufficiently stated a substantive due process claim for violation of their fundamental right to bodily integrity against the Government Defendants.

---

[24] State Defendants' and Wyant's argument that they cannot be held liable under a *respondeat superior* theory is inapposite. State Br. at 57-58; Wyant Br. at 12–13. Plaintiffs do not rely on *respondeat superior* to hold these Defendants accountable; rather, they rely on each of these Defendants' active misconduct, including authorizing and approving unconstitutional behavior.

3.    <u>The Complaint Sufficiently States a Claim for Government Defendants' Violation of Plaintiffs' Fundamental Constitutional Right to Bodily Integrity</u>

Defendants also deprived Plaintiffs of their fundamental constitutional right to be free from state-created danger. More specifically, the Complaint alleges that Defendants: (1) engaged in affirmative acts that created or increased a risk that Plaintiffs would be exposed to injury or violence; (2) exposed Plaintiffs to a special danger, distinguishable from a risk that affects the public at large; and (3) knew or should have known that their actions specifically endangered Plaintiffs. *See Schneider v. Franklin Cty.*, 288 F. App'x 247, 252 (6th Cir. 2008).

   i.    *Government Defendants Committed Affirmative Acts That Created or Increased the Risk That Plaintiffs Would be Exposed to Injury*

The Complaint details numerous affirmative acts taken by the Government Defendants that created, prolonged, and increased dangers to Plaintiffs that Plaintiffs would not otherwise have faced. These actions have been detailed herein in the Background Section II, *supra*. The Government Defendants argue that Plaintiffs fail to point to a third-party actor who was likely to harm Plaintiffs as a consequence of state action; but not all decisions regarding state-created danger require a third or private party as the source of potential danger or harm to the plaintiff. Indeed, the Sixth Circuit has applied the state-created danger doctrine in circumstances that did not involve a private third party. In *Schneider*, the Sixth

Circuit held that the plaintiff established a claim under the state-created danger doctrine where police officers insisted that she walk on an injured ankle, causing her ankle to break. 288 F. App'x at 253; *see also Stiles ex rel. D.S. v Grainger Cty.*, 819 F.3d 834, 854 (6th Cir. 2016) (articulating the standard merely as "an affirmative act that *creates* or increases the risk to the plaintiff.") (emphasis added); *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 464 (6th Cir. 2006) (same). Other circuits similarly "have not limited the [state-created danger] doctrine to cases where third parties caused the harm," and have found a cognizable state-created danger claim where no third-party harm was involved. *See Estate of Smith v. Marasco*, 318 F.3d 497, 506, 510 (3d Cir. 2003) (holding "a reasonable jury could find that there was a constitutional violation" where plaintiffs' decedent suffered a heart attack brought on by stress following events directly involving state troopers). The Third Circuit in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996), held that the plaintiff properly stated a claim for relief under a state-created danger theory where police officers left an intoxicated woman to walk home alone on a cold night which resulted in her falling down an embankment and suffering hypothermia. *Id.* at 1201–03. The Ninth Circuit reached a similar conclusion in *Munger v. City of Glasgow Police Department*, 227 F.3d 1082 (9th Cir. 2000), concluding that police officers could be held liable for a state-created danger claim where they "affirmatively ejected Munger from a bar late at night when the outside

73

temperatures were subfreezing," and Munger ultimately died of hypothermia. *Id.* at 1085, 1087.[25]

And in a case similar to the one before the Court, the District of Oregon held that plaintiffs had sufficiently stated a substantive due process claim for violating the plaintiffs' right to be free from state-created danger when they alleged the defendants "intentionally abused their power and authority as City officials when they knowingly allowed a contaminated water source to be hooked up to Plaintiffs' household water supply," and "acted with deliberate indifference to a known and obvious danger when they subjected Plaintiffs to contaminated water." *Rietcheck ex rel. Rietcheck v. City of Arlington*, No. 04-CV-1239-BR, 2006 WL 37843, at *4 (D. Or. Jan. 4, 2006).[26]

---

[25] The Second Circuit has acknowledged that plaintiffs could show an affirmative act by government officials in the state-created danger context where government officials' knowingly false assurances lead to exposure to toxic chemicals. *See Lombardi v. Whitman*, 485 F.3d 73, 74, 81 (2d Cir. 2007) (addressing state-created danger doctrine where plaintiffs—first responders at the World Trade Center following the September 11, 2011 terror attack—alleged that federal officials' knowingly false reassurances about air quality in lower Manhattan led them to work without respiratory protection). Although the *Lombardi* court ultimately ruled that the plaintiffs failed to state a state-created danger claim, that ruling was based on the extenuating and emergency situation surrounding the aftermath of the September 11 attacks, which led the court to conclude that the officials' conduct did not shock the conscience. *Id.* at 82. This was not the situation in Flint, where, as discussed above, Defendants had sufficient time to deliberate, to reflect, and to make unhurried decisions.

[26] *See also Van Orden v. Borough of Woodstown*, 5 F. Supp. 3d 676, 679 (D.N.J. 2014) (plaintiffs properly asserted a claim for state-created danger "after officials opened floodgates to the Veterans Memorial Lake Dam in anticipation of

As these cases recognize, plaintiffs may state claims for violation of their right to be free from state-created danger when "affirmative conduct on the part of a state actor places a plaintiff in danger," or the official's "affirmative actions . . . significantly increased the risk facing" plaintiff or their decedent. *Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997) (holding state-created danger claim viable against police officers who, after finding a man in grave need of medical care, cancelled a request for paramedics and locked him in his home).

Here, the Government Defendants deliberately switched the source of Flint's drinking water to the Flint River despite knowing it was unsafe, and then exacerbated and prolonged the harm by subsequently making knowingly false statements assuring the public that the contaminated drinking water was safe. There is no question that Plaintiffs' Complaint sufficiently alleges that the Government Defendants affirmatively placed them "in a worse position after the [Government Defendants] intervened than [Plaintiffs] would have been if they had not done so." *See Kneipp*, 95 F.3d at 1209, 1211.

ii.   *Government Defendants Knew or Should Have Known That Their Actions Specifically Endangered Plaintiffs*

The Complaint alleges sufficient facts about the Government Defendants' knowledge that the Flint River had been rejected as a source of drinking water in

---

the arrival of Hurricane Irene without closing the affected road," resulting in the drowning of plaintiff's daughter).

the past and that studies indicated the water was unsafe. Nonetheless, they implemented an Interim Plan to provide Flint River water to Plaintiffs without proper treatment. Further, upon receiving reports of problems with the water, including odor, color, and taste, and reports of legionella, the Government Defendants affirmatively concealed the problems with Flint River water, misled Plaintiffs about its safety, and put them at further risk of harm. *See* Background Section II, *supra*. Plaintiffs have sufficiently stated a claim against each Government Defendant.[27]

    iii.    *Government Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' State-Created Danger Claim*

Plaintiffs' allegations that each Government Defendant took specific, affirmative acts that created or increased Plaintiffs' risk of exposure to and harm from toxic Flint River water state a cognizable violation of a clearly established right. Indeed, courts in this Circuit and others have long held that plaintiffs have a clearly established right to be free from conscience shocking government action that puts plaintiffs at risk of injury or increases the risk of injury such that plaintiffs are in a worse position than they were before the government officials intervened.

---

[27] The MDEQ Defendants' argument that business Plaintiffs cannot state a state-created danger claim is misplaced. The Due Process Clause protects life, liberty, and *property*, and the Seventh Circuit decision cited by the MDEQ Defendants is inapposite, as it establishes a special rule for state-created property interests, which are not at issue here. *See Wudtke v. Davel*, 128 F.3d 1057, 1062 (7th Cir. 1997).

*See, e.g.*, *Schneider*, 288 F. App'x at 253; *Penilla*, 115 F.3d at 710; *Estate of Smith*, 318 F.3d at 506, 510. Moreover, at the time of Defendants' misconduct, it was clearly established that the state-created danger doctrine applied to situations where no third party was involved. *See* Section I.B.3.a, *supra*; *see also, e.g.*, *Schneider*, 288 F. App'x at 253; *Penilla*, 115 F.3d at 710; *Estate of Smith*, 318 F.3d at 506, 510.

Further, as discussed at length in above, the Master Complaint alleges that each Government Defendant personally engaged in conduct that caused or magnified the Flint Water Crisis. Their affirmative conduct placed Plaintiffs in danger and "significantly increased the risk[s]" Plaintiffs faced. *Penilla*, 115 F.3d at 710. Thus, Plaintiffs' state-created danger claim should proceed.

### C. The Complaint Plausibly Alleges that Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Early Violated Plaintiffs' Constitutional Right to Equal Protection

The Fourteenth Amendment requires that all people be provided with equal protection under the law. U.S. Const. amend. XIV, § 1. The Equal Protection Clause prohibits distinctions that burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005). In Counts III and IV of the Complaint, Plaintiffs assert claims for relief under the Equal Protection Clause for both racial discrimination and

wealth-based discrimination burdening Plaintiffs' fundamental right to bodily integrity. These are viable claims.

To defeat a motion to dismiss, plaintiffs need only plead "some facts that demonstrate the plausibility that" defendants have acted in an "intentionally discriminatory manner." *Phillips v. Snyder*, No. 13-cv-11370, 2014 WL 6474344, at *11 (E.D. Mich. Nov. 19, 2014). Plaintiffs have stated a plausible claim for relief under the Equal Protection Clause—both for racial discrimination and wealth-based discrimination burdening a fundamental right—against Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley.

1.   <u>The Court Should Apply Strict Scrutiny to Plaintiffs' Equal Protection Claims</u>

When a defendant's conduct impedes the exercise of a fundamental right or targets a protected class, that conduct must receive strict scrutiny. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 19–20 (1973). The Equal Protection Clause protects against discriminatory violations of fundamental rights regardless of the class being discriminated against. *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015); *see also Loving v. Virginia*, 388 U.S. 1, 12 (1967); *Lawrence v. Texas*, 539 U.S. 558, 566–67 (2003).

Here, the Court must apply strict scrutiny because these Defendants discriminated against Plaintiffs on the basis of race; but even if that were not the case, strict scrutiny applies because Defendants discriminated against Plaintiffs on

78

the basis of wealth in a manner that burdened Plaintiffs' fundamental right to bodily integrity. *See San Antonio Indep. Sch. Dist.*, 411 U.S. at 17 (wealth-based discrimination is subject to strict judicial scrutiny when the state's conduct "impinges upon a fundamental right explicitly or implicitly.").[28] Strict scrutiny requires that the differing treatment be narrowly tailored to further a compelling state interest. *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003). The state must employ the least restrictive means to advance that interest. *Bernal v. Fainter*, 467 U.S. 216, 219 (1984).

### 2. Plaintiffs Plausibly Allege an Equal Protection Claim for Race-Based Discrimination

The Equal Protection Clause prohibits actions taken by public officials that treat some groups of similarly situated persons differently than others. *McGowan v. Maryland*, 366 U.S. 420 (1961). The Equal Protection Clause is implicated when state actors' conduct detrimentally impacts a greater proportion of one group over another, with "a discriminatory effect . . . and [is] motivated by a discriminatory

---

[28] Defendant Wright's reliance on *Maher v. Roe*, 432 U.S. 464, 470–71 (1977) and *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) for the proposition that wealth is not a protected class is misplaced. Wright Br. at 16. In *Maher*, the court held that classifications based on wealth are not subject to strict scrutiny unless the state action infringes on a fundamental right. Similarly, the *Johnson* court held that in the absence of a fundamental right to vote, wealth alone is not a suspect class. But Plaintiffs do not argue for strict scrutiny on the basis that wealth is a protected class. Plaintiffs have alleged a violation of their fundamental rights to bodily integrity. As a result, Defendants' discriminatory actions are subject to strict scrutiny, *regardless* whether the discrimination was based on wealth or on membership in a protected class.

purpose." *Farm Labor Org. Comm. v. Ohio State Hwy. Patrol*, 308 F.3d 523, 533–34 (6th Cir. 2002) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Purpose can be shown by discriminatory impact plus "circumstances [in which] the discrimination is very difficult to explain on nonracial grounds." *Batson v. Kentucky*, 476 U.S. 79, 93 (1986) (citation omitted).

Here, Plaintiffs allege discrimination based on Flint's status as a majority African-American community, pleading both that they are similarly situated to white members of the surrounding communities and that Defendants intentionally discriminated against them on the basis of their race.

The circumstances surrounding the decision to use the Flint River as part of the Interim Plan evince both a discriminatory impact and a host of factors from which this Court can infer discriminatory purpose. Plaintiffs allege that in devising an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built, Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley "devised an Interim Plan that caused the predominately white water users of those areas of Genesee County outside of Flint to receive the safe and superior water from DWSD, whereas the water users of predominantly African-American Flint received water that was known to be grossly inferior and unsafe, i.e. Flint River water." Compl. ¶ 316.

These Defendants did so despite knowing that "the water from the Flint River was grossly inferior to the Lake Huron water Flint and Genesee County citizens had been receiving from DWSD," and that "the raw water from the Flint River would have to be processed at the Flint [Water Plant] which would have required millions of dollars of upgrades." *Id.* ¶¶ 314-15. Moreover, following the switch to the Flint River, these Defendants concealed the fact that the Flint River water was poisoning Plaintiffs, prolonging and exacerbating Flint residents' exposure to toxic Flint River water. *See, e.g.*, *id.* ¶¶ 104, 109, 111-112, 195, 146–47, and 152–53. These detailed allegations demonstrate that Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley each played an active role as decision-makers for an Interim Plan that exposed the primarily African-American residents of Flint—and not residents in surrounding Genesee County—to toxic Flint River water.[29]

There is no dispute that Flint is a predominately African-American area surrounded by predominately white areas in Genesee County. Plaintiffs are water users of a city that is 65.4% non-white and approximately 57% black. Conversely, cities in Genesee County not forced to use Flint River water are predominately white, including: 1) the city of Montrose, Michigan, which is 98.6% white; 2) the

---

[29] Wright's contention—based on two paragraphs in the Complaint—that Plaintiffs' Equal Protection allegations do not refer to him in any meaningful way ignores these detailed allegations.

city of Flushing, Michigan, which is 94.8% white; 3) the township of Flushing, Michigan, which is 98.4% white; 4) the city of Columbiaville, Michigan, which is 95.2% white; and 5) the city of Lapeer, Michigan, which is 88.6% white.[30]

Yet, Flint was the only area within Genesee County to have its water source switched to the poisonous Flint River. The remainder of Genesee County continued to receive uncontaminated water from Lake Huron via the DWSD. Although non-minority residents of Flint have also been injured by Defendants' discriminatory decisions, the Master Complaint alleges there is no rational economic or fiscal justification for why the only area to be targeted was the predominately African-American area of Genesee County. Indeed, the cost of continuing with the DWSD "for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint [Water Plant] in order to safely process the raw Flint River water." Compl. ¶ 317. At this juncture, Plaintiffs have alleged facts sufficient to show "circumstances [in which] the discrimination is very difficult to explain on nonracial grounds." *Batson*, 476 U.S. at 93.

---

[30] U.S. Department of Commerce, Economics and Statistics Administration, U.S. Census Bureau, *Michigan: 2010, Summary Population and Housing Characteristics*. 2010 Census of Population and Housing http://www.census.gov/prod/cen2010/cph-1-24.pdf. *See Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571–72 (5th Cir. 2011) ("United States census data is an appropriate and frequent subject of judicial notice."); *see also Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1011 (6th Cir. 2017) (taking judicial notice of information from U.S. Census Bureau).

Moreover, Plaintiffs were similarly situated to other Genesee County water users for purposes of developing interim plans.[31] Plaintiffs have pled a policy created and implemented by the Defendants, including Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley, with a jurisdictional reach that included both Flint and other Genesee County water users. Compl. ¶¶ 86, 94, 243, 313–14, 317–20. Plaintiffs allege that all the communities which were part of the KWA had to develop an interim plan to deliver water to all those communities in Genesee County, including Flint, while the KWA water system was being built. *Id.* ¶¶ 86, 313, 317.[32] The plan developed by these Defendants provided that the predominantly white communities of Genesee County would continue to receive

---

[31] The State's focus on P.A. 436 for purposes of Plaintiffs' equal protection argument is inapposite, as Plaintiffs do not allege that statute is the basis of their Equal Protection claims.

[32] Wright also appears to argue that Flint was acting on its own in making decisions to obtain water while the KWA pipeline was under construction. Wright Br. at 3. However, Flint was simply one of several entities participating in the KWA and therefore required an interim plan to obtain water. Flint was part of the interim planning in which Wright was an active participant. Wright participated in: the decisions by the Defendants to approve Flint's participation in the KWA; the negotiations with DWSD which ultimately failed and led to the KWA agreement; the development and implementation of the Interim Plan by which all participants in the KWA (meaning, both Flint and the Genesee County communities), were to obtain water during construction of the KWA pipeline; and the decision by which his constituents would continue to obtain water from the DWSD while Flint residents were forced to use the toxic Flint River, with inadequate treatment by the until then dormant Flint Water Plant. *See* Compl. ¶¶ 78–86. Thus, Plaintiffs have properly pled a claim of race discrimination against all Defendants who participated in such decisions, including Wright.

the safe and superior water from DWSD, while the water users of "predominantly African American Flint received [Flint River] water that was known to be grossly inferior and unsafe." *Id.* ¶ 316. This occurred even though it would have been fiscally preferable for *all* communities, including Flint, to continue using safer DWSD water. *Id.* ¶ 334. Put simply, the policy at issue affected residents of Flint as well as other communities in Genesee County. Accordingly, the "jurisdictional reach" of the policy extended beyond Flint, rendering the comparison to water users from those communities relevant.[33]

Defendants' argument that Plaintiffs' claim fails because Plaintiffs are not similarly situated to and cannot be compared to residents outside the City of Flint is wrong. Plaintiffs' comparison between Flint water users and other Genesee County water users is appropriate. As the Supreme Court has held, "territorial uniformity is not a constitutional prerequisite" in an Equal Protection challenge.

---

[33] The cases cited by Walling, Earley, and Ambrose, City Br. at 33-34, are inapposite as plaintiffs there challenged laws applicable only to a specific jurisdiction and then alleged an Equal Protection violation because other jurisdictions were not subject to the same laws or policies. *See Mills v. City of Roanoke*, 518 F. Supp. 2d 815, 823 (W.D. Va. 2007) (defendant's policymaking authority did not extend beyond Roanoke, thus other jurisdictions were not similarly situated); *Rodgers v. Johnson*, 174 Fed. App'x. 3, at *5 (3rd Cir. 2006) (counties outside of Philadelphia were not similarly situated to those in the city who were subjected to a particular policy); *Gurley v. Rhoden*, 421 U.S. 200, 212 (1975) (state-dealers outside Mississippi were not subject to its sale tax hence not similarly situated). Here, the predominantly white communities are similarly situated to Flint since all joined the KWA and were required to set forth interim plans until the KWA pipeline was completed.

*McGowan*, 366 U.S. at 427. The relevant consideration is the "jurisdictional reach of a policy." *Mills v. City of Roanoke*, 518 F. Supp. 2d 815, 823 (W.D. Va. 2007).

Nor does the fact that Flint was subject to an emergency manager render residents of Flint differently situated from other Genesee County water users in any material respect. Flint and every other community in Genesee signed on to leave the DWSD and join the KWA, thereby forcing each community to devise an interim plan to obtain and deliver water until the KWA was complete. Compl. ¶ 345. Yet the other communities—all predominately white—were permitted to continue to rely on the DWSD until the permanent switch to KWA became available. Predominately African-American Flint, on the other hand, was the only community removed from DWSD water and switched to the Flint River, despite the fact it was fiscally preferable for all communities, including Flint, to stay with the safer DWSD water. *Id.* ¶¶ 349–51.

Plaintiffs need not show on a motion to dismiss every way in which they were similarly situated to Genesee County water users. *See Muslim Cmty. Ass'n of Ann Arbor & Vicinity v. Pittsfield Charter Twp.*, 947 F. Supp. 2d 752, 767 (E.D. Mich. 2013) ("To satisfy Rule 8's pleading requirements, the Court does not believe Plaintiff needs to expand its complaint . . . to allege every fact relevant to whether the cited comparators are similarly situated in all relevant respects.").

Defendants' decision to switch to Flint River water was not narrowly tailored to further any state interest, let alone a compelling one. Defendants' assertion that the financial distress in Flint constitutes a compelling reason justifying differing treatment, City Br. at 20; State Br. at 26, 51-52, is another red herring. While a genuine financial emergency may be a compelling state interest, the Complaint alleges that it was not in Flint's financial interest to switch to the Flint River. Moreover, even if it were, the affirmative decision to expose Flint water users to a known toxic water supply and then deny doing so is not narrowly tailored or even rationally related to remedying the alleged financial emergency in Flint. In fact, Defendants' conduct resulted in substantially more severe financial distress for Flint.

State Defendants further suggest that Plaintiffs cannot challenge Defendants' financial excuses because they are entitled to "wide latitude" over their decisions. State Br. at 55-56 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). However, Defendants' justifications improperly assume facts not in the Complaint. Further, *City of Cleburne* specifically stated that "wide latitude" is not appropriate and "gives way" in a race-based Equal Protection challenge or when a policy impinges on a fundamental right protected by the Constitution. *See id.* Thus, the Court should not give Defendants' decisions wide latitude here.

Finally, Flint's ownership of a water treatment plant does not constitute a material factor that distinguishes Flint from other KWA communities. As set forth in the Complaint, Flint's Water Treatment Plant had been dormant and required millions of dollars in upgrades to be functional. Compl. ¶¶ 75, 88. In addition, the required improvements to the Water Treatment Plant were more expensive than remaining with the DWSD. In order to continue to use DWSD water, Genesee County had to purchase or pay to use Flint's water distribution system. In any event, that system was the back-up plan for Genesee County. Thus, the existence of a dormant water treatment plant does not defeat Plaintiffs' Equal Protection claims.[34]

Plaintiffs have pled a race-based Equal Protection claim against Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley, including detailed allegations of these Defendants' conduct. Plaintiffs' Equal Protection claim based on racial discrimination should proceed.

---

[34] Defendant Wright argues that Flint water users cannot be compared to Genesee County water users because the two had "entirely separate," unrelated water distribution systems. *See* Wright Br. at 21. This premise—even if true—assumes facts not alleged in the Complaint and makes inferences in Wright's favor rather than in Plaintiffs' favor.

3.   <u>Plaintiffs Plausibly Allege an Equal Protection Claim for Wealth-Based Discrimination That Burdened Plaintiffs' Fundamental Right to Bodily Integrity</u>

Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley's active participation in the decision to switch to Flint River water—described in detail above—also violated Plaintiffs' fundamental right to bodily integrity in a manner that discriminated based on wealth. The Michigan Civil Rights Commission found that the people of Flint did not enjoy the equal protection of environmental or public health laws, nor did they have a meaningful voice in the decisions leading up to the Flint Water Crisis. *Id.* Defendants' decisions violated Plaintiffs' equal protection rights by making their affluence a factor in decisions that ultimately burdened their fundamental right to bodily integrity. *See* Background, III and IV, *supra*. Such conduct violates the Equal Protection Clause. *Cf. Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666–68 (1966) (holding that a state violates the Fourteenth Amendment's Equal Protection Clause "whenever it makes the affluence of the voter . . . an electoral standard," recognizing that "[t]o introduce wealth . . . as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor. The degree of the discrimination is irrelevant."). And, as described above, these Defendants' decisions were not narrowly tailored to further any state interest. Finally, even if Defendants' decision to expose Plaintiffs to poisonous water were not subject to strict scrutiny, no rational basis exists for

Defendants' discrimination on the basis of wealth on the face of the Complaint. *See* Compl. ¶¶ 84, 319, and 334-335. As discussed *supra*, neither Flint's financial status nor the appointment of an emergency manager would justify the decision to provide dangerous water to the residents of Flint, when their similarly-situated neighbors received water of a much higher quality. Thus, Plaintiffs have stated a claim for relief from wealth-based discrimination burdening their fundamental right to bodily integrity, in violation of the Equal Protection Clause.

### D. Plaintiffs Sufficiently State a Claim Against Defendants Dillon, Lyon, RTAB, Snyder, Wells, Ambrose, Croft, Earley, City of Flint, Glasgow, and Johnson for Conspiracy to Violate Plaintiffs' Rights on the Basis of Race in Violation of § 1985

Plaintiffs also sufficiently state a claim against Defendants Dillon, Lyon, RTAB, Snyder, Wells, Ambrose, Croft, Earley, City of Flint, Glasgow, and Johnson for violating 42 U.S.C. § 1985(3), which secures the rights of Plaintiffs and the class they represent to be free from conspiracies founded on invidious racial animus. A § 1985(3) claim requires a claimant to show that:

1) the defendants conspired "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws"; and

2) the defendants committed acts that deprived the claimant "of having and exercising any right or privilege of a citizen of the United States."

*Bartell v. Lohiser*, 215 F.3d 550, 559 (6th Cir. 2000) (citing 42 U.S.C. § 1985(3));

*Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971). The class must be one that

receives heightened protection under the Equal Protection Clause and that the individuals "join together as a class for the purpose of asserting certain fundamental rights." *Browder v. Tipton*, 630 F.2d 1149, 1150 (6th Cir. 1980).

Plaintiffs' Complaint is replete with allegations that Defendants singled out Flint, a poorer and predominately black community,[35] by conspiring to devise an Interim Plan which allowed predominately white water users of Genesee County to receive superior water. *See, e.g.*, Compl. ¶¶ 345–53. Throughout this process, Defendants took affirmative steps in furtherance of their conspiracy to ensure that the Interim Plan was fulfilled at Plaintiffs' expense. *Id.*

Moreover, as demonstrated above, Plaintiffs *have* alleged that they suffered violations of fundamental rights to bodily integrity, property, and liberty interests sufficient to support a § 1985(3) claim. Thus, Defendants' contention that Plaintiffs cannot succeed on their § 1985(3) claim because the underlying Equal Protection claim fails is meritless. Moreover, as discussed above, Plaintiffs have pled that each of these Defendants actively participated in a decision to provide Flint residents with water from the Flint River as part of the Interim Plan. The City's cursory contention that the Complaint contains only conclusory allegations of conspiracy ignores these detailed allegations. Plaintiffs have pled sufficient

---

[35] Plaintiffs have alleged "the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus." *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999).

allegations to sustain their § 1985(3) claim against these Defendants, and this claim should proceed.

### E.    Plaintiffs State a Claim Against the City Under *Monell*

Plaintiffs' *Monell* claims against Flint are viable. It has long been settled law that cities are "persons" within the meaning of § 1983 and may be sued as such. Indeed, since 1978, the U.S. Supreme Court has consistently held that "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief" where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

As discussed thoroughly herein, Defendants Kurtz, Earley, Ambrose, Walling, Croft, Glasgow, and Johnson committed serious violations of Plaintiffs' constitutional rights. *See* Background, generally. Thus, to the extent the City moves to dismiss the *Monell* claims against it on the basis that the Complaint has not alleged underlying violations against City officials, that argument fails. City Br. at 41.

The Emergency Manager's state-appointed status in no way relieves the City of liability under *Monell*. Under *Monell*, a municipality is liable for constitutional violations "when execution of a government's policy or custom, whether made by

its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]" *Monell*, 436 U.S. at 694. Put simply, "[m]unicipal liability may attach for policies promulgated by the official vested with final policymaking authority for the municipality." *Miller v. Calhoun Cty.*, 408 F.3d 803, 813 (6th Cir. 2005).

Here, the City does not deny that the Emergency Managers were vested with final policymaking authority for the City. The Emergency Manager's status as a state-appointed official is irrelevant to that question. As such, *Monell* liability properly attaches to the City for policies promulgated by the Emergency Managers.

The City does not otherwise contest Plaintiffs' assertion that these Defendants' conduct constituted and was conducted pursuant to "customs, policies, and/or practices of Defendant City of Flint." Compl. ¶¶ 45; *see also id.* ¶ 405. Thus, Plaintiffs' constitutional claims against the City must proceed under *Monell*.

### F.    Plaintiffs Sufficiently State a Claim Under the Elliott-Larson Civil Rights Act Against Snyder, the State of Michigan, Dillon, Wright, Walling, Ambrose, Kurtz, Earley, and the City of Flint for Intentional Discrimination on the Basis of Race

Count VI of the Plaintiffs' Complaint alleges a violation of the public accommodations provision of the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2302 ("ELCRA"). Plaintiffs have sufficiently alleged that Defendants Snyder, the State of Michigan, Dillon, Wright, Walling, Ambrose, Kurtz, Earley, and the City of Flint either failed to provide water services to Plaintiffs or that they

aided and abetted the public service provider to deny Plaintiffs full and equal enjoyment of public water service on the basis of race.[36] Compl. ¶¶ 358-359. Thus, Defendants' motions to dismiss this claim fail.

To prevail on this claim, Plaintiffs must allege sufficient facts to show that these Defendants intentionally discriminated or aided and abetted others to intentionally discriminate against Plaintiffs on the basis of race. "Intentional discrimination means that one of the motives or reasons for the alleged denial of the full and equal enjoyment of a . . . public service was [race]." M Civ JI 108.04. Race "does not have to be the only reason, or even the main reason, but it does have to be one of the reasons that made a difference in determining whether to afford plaintiff the full and equal enjoyment of a . . . public service." *Id.*

Plaintiffs allege sufficient evidence of racial bias to state a plausible and viable claim under ELCRA. *See* Background, supra. Defendants, however, suggest that Plaintiffs' claim fails because not all Plaintiffs are African-American.[37] This

---

[36] ELCRA also makes it illegal for any person to "[a]id, abet, incite, compel, or coerce a person to engage in a violation" of the Act. Mich. Comp. Laws § 37.2701(b).

[37] Other Defendants, specifically the City Defendants, claim that Plaintiffs did not allege that they were a protected class. However, Plaintiffs identified themselves and the class as the water users of the predominantly African-American City of Flint. Furthermore, the Complaint recognized that the Michigan Department of Civil Rights found that Plaintiffs were denied their civil rights and equal protection of the law because they resided in a predominantly African-American and impoverished city. Compl. ¶ 368.

argument lacks merit. Although not all Plaintiffs are of the same race, Plaintiffs are all water users of the only predominantly non-white municipality through which the Flint River flows. Compl. ¶¶ 365-366.

Similarly, Plaintiffs have adequately pled that they were similarly situated to other Genesee County water users. *See* Section I.C.2. Moreover, that is not a necessary element in an ELCRA case. Rather, Plaintiffs can establish discrimination by producing any evidence sufficiently probative of impermissible bias. *See Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520–21 (Mich. 2001).

Although the Flint River flows through six municipalities, the predominantly non-white City of Flint was the sole community forced to disconnect from the DWSD water source and switch to Flint River water. Compl. ¶¶ 333-334. There was no rational economic justification for this decision, because continuing with the water product from the DWSD for all six municipalities would have been substantially less costly than the necessary treatment to safely process the Flint River water. *Id.* ¶ 351. Therefore, the plan to switch the city of Flint's water source to the untreated, unsafe Flint River was racially motivated and discriminatory, in violation of Mich. Comp. Laws § 37.2302(a). Defendants either developed or aided the development of this racially motivated Interim Plan. *Id.* ¶ 358.[38]

---

[38] Plaintiffs make numerous allegations in the Complaint sufficient to state a claim that Snyder aided and abetted in this endeavor, belying the State Defendants' cursory argument that such allegations are lacking. *See generally*, Background.

To the extent the City Defendants contend Plaintiffs have not pled facts sufficient to satisfy the evidentiary models they identify—direct evidence, disparate treatment, and disparate impact—that position is belied by Plaintiffs' detailed allegations that Flint, a predominantly African-American City was provided poisonous water while the primarily white Genesee County water users outside of Flint were not. Moreover, those models are not pleading standards. *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002). Nor are they the only methods by which discrimination can be proven. Plaintiffs can establish discrimination by producing any evidence sufficiently probative of impermissible bias. *Hazle*, 628 N.W.2d at 520–21. Thus, Plaintiffs need only plead facts sufficient to state a plausible race discrimination claim without reliance on any specific model or formula. Plaintiffs have met this burden.

Finally, the Court should exercise supplemental jurisdiction over Plaintiffs' ELCRA claim. Contrary to the State Defendants' unsupported assertion, Plaintiffs' ELCRA claim does not "raise[] a novel or complex issue of law[.]" 28 U.S.C. § 1367(c)(1). While federal courts can decline to exercise supplemental jurisdiction over state claims that are new or evolving in state law, *see Reinhardt v. Dennis*, 399 F. Supp. 2d 803, 805 (W.D. Mich. 2005), Plaintiffs' ELCRA claim is well-settled under Michigan law, *see generally Haynes v. Neshewat*, 729 N.W.2d 488 (Mich. 2007); *Dockweiler v. Wentzell*, 425 N.W.2d 468 (Mich. Ct. App. 1988);

*Moon v. Mich. Reprod. & IVF Ctr., P.C.*, 810 N.W.2d 919 (Mich. Ct. App. 2011). In fact, federal courts have exercised supplemental jurisdiction over such claims for decades. *See Rogers v. Int'l Ass'n of Lions Clubs*, 636 F. Supp. 1476, 1477–81 (E.D. Mich. 1986). Therefore, this Court should exercise supplemental jurisdiction over Plaintiffs' ELCRA claim.

Plaintiffs have properly pled an ELCRA claim by alleging that Defendants deprived or aided the provider of water services in depriving Plaintiffs of their full and equal enjoyment of a clean, safe water source on the basis of race. Accordingly, the Court should deny Defendants' motions to dismiss this claim.

## IV.  PLAINTIFFS' CLAIMS AGAINST THE ENGINEERING DEFENDANTS MUST PROCEED

In addition to detailing serious misconduct and violations of Plaintiffs' rights committed by the Government Defendants, the Complaint also alleges plausible claims against Engineering Defendants LAN and Veolia.

### A.  Plaintiffs Have Stated Viable Claims Against LAN and Veolia

As described in depth in the Complaint, Plaintiffs have sustained serious, ongoing injuries as a result of LAN and Veolia's negligence in failing to properly evaluate Flint's water system and in publicly declaring its water safe and potable. These Defendants ignored obvious red flags and failed to conduct a root cause analysis, which would have revealed that using water from the Flint River was corroding Flint's pipes and causing lead, *legionella*, and other contaminates to

enter residents' homes. Compl. ¶¶ 233–238. They also failed to mention that the addition of a corrosion inhibitor was necessary to prevent these serious and well known health issues, and mandated the usage of highly acidic ferric chloride, rather than advising that the pH of the water should be increased. *Id.* ¶¶ 103, 241.

LAN and Veolia knowingly or recklessly misinformed the public about the existence and extent of the public health crisis. LAN and Veolia do not move to dismiss Plaintiffs' professional negligence claim. Rather, they merely quibble over the type of negligence applicable to their tortious actions, impliedly recognizing that the Complaint as a whole states a claim for professional negligence. That is because it does. And it further states claims against LAN and Veolia for ordinary negligence, gross negligence, and negligent infliction of emotional distress.

1.   Plaintiffs May Pursue Simultaneous Claims for Professional and Ordinary Negligence

Neither LAN nor Veolia seriously disputes the plausibility of Plaintiffs' negligence claim, instead proffering that this claim is properly brought only as a professional negligence claim because LAN and Veolia are professional engineers. Veolia Br. at 3–4; LAN Br. at 7–8. Not so. The key distinction between a claim for negligence and one for professional malpractice relates to the appropriate standard of care: negligence is established when one fails to act as a reasonable *person*, while professional malpractice is established when one fails to act as a reasonable *professional* (in this case, a reasonable engineer).

Plaintiffs allege that LAN and Veolia violated both standards of care, and neither the cases cited by LAN and Veolia nor by this Court in *Guertin* preclude bringing an ordinary negligence claim against a professional.[39] That makes sense because not every negligent act by a professional necessarily implicates professional judgment. *See Trowell v. Providence Hosp. & Med. Ctrs., Inc.*, 893 N.W.2d 112, 124 (Mich. Ct. App. 2016) ("[A] claim of failure to take steps or respond generally sounds in ordinary negligence."); *Bryant v. Oakpointe Villa Nursing Ctr., Inc.*, 684 N.W.2d 864, 876 (Mich. 2004) ("No expert testimony is necessary to show that the defendant acted negligently by failing to take any corrective action after learning of [a] problem."). Indeed, Michigan courts have held the opposite: "that the plaintiff's claim may *possibly* sound in [professional] malpractice . . . does not mean that the plaintiff's claim *certainly* sounds in [professional] malpractice." *Bryant*, 684 N.W.2d at 871. Thus, that LAN and Veolia are professional engineers does not preclude liability for ordinary negligence.

---

[39] To the extent LAN and Veolia rely on this Court's decision in *Guertin* to support their argument, they ignore that unlike the *Guertin* plaintiffs, Plaintiffs in the instant case have pled separate claims for ordinary and professional negligence. *Compare* Compl. & Jury Demand at 75, *Guertin v. Michigan*, No. 5:16-cv-12412-JEL-MKM (E.D. Mich. June 27, 2016), ECF No. 1 ("Count X Negligence/Professional Negligence/Gross Negligence") *with* Compl. ¶¶ 445–64, 468–83 (alleging separate counts of professional negligence, negligence, and gross negligence). Further distinctions between this case and *Guertin* on the issue of ordinary negligence are discussed *infra*.

Moreover, none of the cases cited by LAN or Veolia, or by this Court in *Guertin*, hold that Plaintiffs cannot pursue both theories simultaneously.[40] LAN and Veolia's own cited authority expressly recognizes that one may bring simultaneous claims of professional malpractice and negligence. *See Bryant*, 684 N.W.2d at 871–76 (holding lower court erred in dismissing claims of professional malpractice and ordinary negligence against nursing home).

To the extent a court must at some point determine which standard of care is applicable to specific negligent acts, it need not do so on a motion to dismiss when, as here, "[f]urther factual development is required to properly ascertain whether plaintiff's claims sound[] in [professional] malpractice or ordinary negligence, and

---

[40] *MCM Marine, Inc. v. Ottawa County Road Commission*, Nos. 286294, 290702, 2010 WL 1461557 (Mich. Ct. App. Apr. 13, 2010), and *City of Huntington Woods v. Orchard, Hiltz & McCliment, Inc.*, No. 301987, 2012 WL 1649782 (Mich. Ct. App. May 10, 2012), addressed only whether the plaintiffs had stated a claim for malpractice, and did not address whether they could also bring claims for ordinary negligence. In *City of Dearborn v. DLZ Corp.*, 111 F. Supp. 2d 900, 903–04 (E.D. Mich. 2000), the plaintiff failed to allege any duty outside the professional duty. Similarly, other cases cited by Defendants suggest plaintiffs *can* allege claims of professional malpractice and negligence but simply failed to do so in those particular cases. *See Wang v. MidMichigan Health*, No. 15-cv-14403, 2016 WL 4073538, at *3 (E.D. Mich. Aug. 1, 2016) (explaining that professional relationship alone does not render the claim a malpractice claim); *Sturgis Bank & Tr. Co. v. Hillsdale Cmty. Health Ctr.*, 708 N.W.2d 453, 460–61 (Mich. Ct. App. 2005) (same). The mere fact that plaintiffs in those cases had not plausibly alleged professional malpractice and negligence does not imply that plaintiffs cannot, as a matter of law, plead claims of professional malpractice and negligence.

perhaps the suit presents a mix of such claims." *Trowell*, 893 NW.2d at 125.[41] The standard-of-care inquiry requires "[t]he court [to] examine the particular factual setting of the plaintiff's claim in order to determine whether the circumstances . . . implicate [professional] judgment," and whether a jury would require expert testimony to evaluate the standard of care. *See id.* at 119–20 (quoting *Bryant*, N.W.2d at 870 n.9). Indeed, in many of the cases on which LAN and Veolia rely, the court had a developed factual record on which to determine that expert testimony would be required to establish the appropriate standard of care. *See, e.g.*, *Bryant*, N.W.2d at 873–74 (relying in part on expert testimony to determine that specialized knowledge would be necessary to assess the risk at issue); *Sturgis Bank & Tr. Co. v. Hillsdale Cmty. Health Ctr.*, 708 N.W.2d 453, 460–61 (Mich. Ct. App. 2005) (considering documentary evidence, including deposition testimony submitted by the parties in analysis of whether claim was one of ordinary or professional negligence).

Certainly, some of LAN and Veolia's acts were professionally negligent and may require expert testimony regarding the standard of care, which is why Plaintiffs also allege professional negligence against both (and why LAN and Veolia have declined to seek dismissal of Plaintiffs' professional negligence

---

[41] The question whether this issue is best decided after some discovery is an issue this Court did not address in *Guertin*, further distinguishing the ordinary negligence claim here

claims). But not every negligent act by LAN and Veolia necessarily implicates professional judgment. *See* Compl. ¶ 254 (alleging that upon learning of the danger to Plaintiffs, LAN and Veolia failed, *inter alia*, to notify Plaintiffs or take corrective action); *see also Trowell*, 893 N.W.2d at 124 ("[A] claim of failure to take steps or respond generally sounds in ordinary negligence."). And the mere fact that LAN and Veolia employ professional engineers is not dispositive to this inquiry.

Plaintiffs have plausibly alleged LAN and Veolia's conduct amounted to both professional malpractice and negligence. Nothing in the Federal Rules or Michigan law prevents Plaintiffs from pursuing both theories simultaneously. Accordingly, LAN and Veolia's attempt to dismiss Plaintiffs' negligence claim as duplicative, or merely because they are professionals, should be denied.

### 2. The Complaint Plausibly Alleges LAN and Veolia's Gross Negligence

In their attempt to dismiss Plaintiffs' gross negligence claim, Veolia and LAN rely heavily on this Court's conclusion in *Guertin* that gross negligence is not an independent cause of action in Michigan. Veolia Br. at 5; LAN Br. at 8. Plaintiffs respectfully ask the Court to reexamine that determination here. The cases cited by this Court in *Guertin* and by LAN and Veolia in their opening briefs do not preclude an independent cause of action for gross negligence. Rather, those cases involved claims of excessive force against law enforcement officers, and

101

held only that a claim of gross negligence cannot be based upon the same facts as an excessive force claim or intentional tort. *See, e.g.*, *Buckner v. Roy*, No. 2:15-cv-10441, 2015 WL 4936694, at *8 (E.D. Mich. Aug. 18, 2015) (holding plaintiff could not state claim for gross negligence "[w]here, as here, a claim for gross negligence is fully premised on the same facts or events as a claim for excessive force."); *Collins v. Ferguson*, No. 17-CV-10898, 2017 WL 4387287, at *6–8 (E.D. Mich. Oct. 3, 2017) (explaining rationale for "the rule that a gross negligence claim cannot lie *in certain circumstances* where the police conduct at issue forms the basis for an intentional tort.") (emphasis added).[42]

This authority is properly limited to that context, as it is based on the proposition that police do not owe a duty not to act negligently to a "fleeing wrongdoer." *See Collins*, 2017 WL 4387287, at *7 (citing *Robinson v. City of Detroit*, 613 N.W.2d 307, 313–14 (Mich. 2000)).[43] Plaintiffs here are not "fleeing wrongdoers" to whom Defendants owe no duty not to act negligently, and thus the

---

[42] *See also Van Buren v. Crawford Cty.*, No. 13-14565, 2014 WL 2217016, at *4 (E.D. Mich. May 29, 2014) (relying on *Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011), which held that "[t]he only cause of action available to plaintiff *for allegations of this nature* [excessive force] would be for assault and battery" rather than gross negligence) (emphasis added); *Mallory v. City of Ferndale*, No. 10-10581, 2011 WL 891212, at *7 (E.D. Mich. Mar. 11, 2011) (concluding in excessive force case that gross negligence claim was "not cognizable under Michigan law *under these circumstances*.") (emphasis added).

[43] *See also Bailey v. Fitzpatrick*, No. 329516, 2017 WL 104546, at *4 (Mich. Ct. App. Jan. 10, 2017) (in excessive force case, stating standard required to proceed with gross negligence, but finding it not met in that case).

cases cited by Defendants and relied on in *Guertin* do not bar Plaintiffs' gross negligence claims in the instant case.

Nor do the cases cited in *Guertin* limit gross negligence to a mere standard considered in the context in which plaintiffs have signed a liability waiver. Indeed, in both cited cases, gross negligence was pleaded as an independent claim. *Xu v. Gay*, 668 N.W.2d 166, 168 (Mich. Ct. App. 2003) (noting plaintiff's "second amended complaint . . . alleged a claim of gross negligence against defendant"); *Sa v. Red Frog Events, LLC*, 979 F. Supp. 2d 767, 769 (E.D. Mich. 2013) ("Plaintiff filed a three-count Complaint, asserting negligence, gross negligence, and willful and wanton misconduct.").

Moreover, gross negligence claims are brought under Michigan law outside the limited context of liability waivers. *See Tech. Recycling Corp. v. Woodward-Manchester Corp.*, No. 231312, 2003 WL 21362977, at *4 (Mich. Ct. App. June 12, 2003) ("At the close of evidence, the trial court . . . allowed the . . . gross negligence claims to be decided by the jury."). Such claims are not precluded by Michigan courts and consequently this Court should not dismiss Plaintiffs' gross negligence claim on that basis.

The facts alleged in the Complaint give rise to a claim for gross negligence against LAN and Veolia. At this stage, Plaintiffs need only plead sufficient facts to establish that it is plausible LAN and Veolia demonstrated a substantial lack of

concern for whether injury would result from their actions. *See Phila. Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013). The Complaint does just that. *See, e.g.*, Compl. ¶¶ 233–49. Ignoring the extensive, detailed allegations describing LAN and Veolia's misconduct, both LAN and Veolia argue based on cherry-picked paragraphs that Plaintiffs have not stated a claim for gross negligence. Veolia Br. at 6 (citing Compl. ¶ 419); LAN Br. at 9 (citing Compl. ¶¶ 460). LAN and Veolia cite these paragraphs in isolation but ignore the substantial allegations preceding these paragraphs.

The Complaint alleges that LAN and Veolia not only failed to conduct a root cause analysis in contravention of standard engineering protocols, but that both LAN and Veolia recommended that Flint increase the ferric chloride added to the City's water. Compl. ¶¶ 233, 235, 246–49. It is certainly plausible to infer from these factual allegations that LAN and Veolia demonstrated substantial disregard as to whether injury would result to the residents of Flint when it told the City to add a highly acidic compound to its water despite having conducted no investigation whatsoever into the root cause of Flint's water problems. The detailed nature of these allegations renders LAN and Veolia's argument that Plaintiffs have merely added the word "reckless" to allegations of negligence spurious. Moreover, their suggestion that the Complaint merely pleads ignorance of industry standards ignores Plaintiffs' detailed allegations, and fails to view them

in the light most favorable to Plaintiffs. As the misconduct attributed to LAN and Veolia plausibly establishes that they demonstrated a substantial lack of concern for whether injury would result, Plaintiffs should be permitted an opportunity to proceed on these claims.

>    3.    The Complaint Plausibly Alleges a Claim for Negligent Infliction of Emotional Distress Against LAN and Veolia

Plaintiffs have also sufficiently stated a claim for Negligent Infliction of Emotional Distress ("NIED"). LAN and Veolia's entire rationale for dismissal of this claim mistakenly assumes that Michigan law only permits recovery for NIED by an injured third party (i.e. "bystander recovery"). LAN Br. at 15–17; Veolia Br. at 13-16. LAN and Veolia are wrong. NIED claims in Michigan are not limited to that context. *See Maldonado v. National Acme Co.*, 73 F.3d 642, 647 (6th Cir. 1996) (observing that Michigan's "Bystander Recovery Rule does not preclude a claim for fearing for one's personal safety"). To the contrary, Michigan law permits a plaintiff to "bring an action as both bystander and direct victim." *Id.* at 646.

Indeed, the Michigan Supreme Court has recognized and permitted recovery for NIED when emotional shock is inflicted upon a plaintiff by the negligent conduct of the defendant, which is directly felt by that plaintiff rather than by a third party. *Daley v. LaCroix*, 179 N.W.2d 390, 394–95 (Mich. 1970) (holding that the plaintiffs stated a valid claim for NIED even though no third party was injured

in the matter); *see also Apostle v. Booth Newspapers, Inc.*, 572 F. Supp. 897, 900 (W.D. Mich. 1983), *supplemented*, 577 F. Supp. 962 (W.D. Mich. 1984) ("[T]he Michigan Supreme Court has clearly recognized that when emotional shock is inflicted on the plaintiff by negligent conduct of the defendant which is felt directly by the plaintiff, a cause of action may lie for emotional distress."); *Maldonado*, 73 F.3d at 646 ("We agree with [plaintiff], however, when he argues that he would have had a cause of action whether or not he observed [his co-worker's] death, to the extent that he claims injuries resulting from his fear for his own safety.") (citing Restatement (Second) of Torts § 436(2) (1965)).

Plaintiffs sufficiently allege the physical manifestation of emotional distress to themselves brought forth by the negligence of the Engineering Defendants. For example, the Complaint alleges that Plaintiffs suffered severe emotional distress, "physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning capacity." Compl. ¶ 498. This is a legally cognizable claim under Michigan law. *See Daley*, 179 N.W.2d at 395 ("[W]here a definite and objective physical injury is produced as a result of emotional distress proximately caused by defendant's negligent conduct, the plaintiff in a properly pleaded and proved action may recover in damages for such

106

physical consequences to himself notwithstanding the absence of any physical impact upon plaintiff at the time of the mental shock.").

The purported deficiencies that LAN and Veolia contend defeat Plaintiffs' claims are all limitations on *bystander recovery*, and thus are inapplicable to a direct NIED claim. *See Maldonado*, 73 F.3d at 645. ("[T]o the extent that [plaintiff's] injuries resulted from his fear for his own safety, the limitations of the Bystander Recovery Rule would be irrelevant."); *Selph v. Gottlieb's Fin. Servs., Inc.*, 35 F. Supp. 2d 564, 570 n.5 (W.D. Mich. 1999) ("To succeed on a 'bystander' claim, a plaintiff must be a member of the victim's immediate family . . . whereas there is no such requirement in a 'direct victim' emotional distress claim.").49 The limitations on bystander recovery NIED claims were meant to stem potential floodgates of litigation resulting from bystander recovery. *See Apostle*, 572 F. Supp. at 900 ("Michigan courts have been willing to impose limitations on the tort in the third party injury context, where there would otherwise be potentially unending liability for the 'shock waves' which flow outward infinitely from an injury."). However, "[t]he same analysis does not apply when no third party is involved." *Id.* Thus, LAN and Veolia's attempt to dismiss Plaintiffs' direct NIED claim fails.[44]

---

[44] Nor is *Tschirhart v. Pamar Enters., Inc.*, No. 327125, 2016 WL 3541827 (Mich. Ct. App. Jun. 28, 2016), relied on by Veolia, applicable here. In that case, the negligent infliction of emotional distress claim was ultimately dismissed

But even if Plaintiffs' NIED claims could be construed as bystander recovery claims, the Court should not dismiss them. LAN and Veolia challenge the underlying facts of Plaintiffs' NIED claim, ignoring the well-established legal principle that a claim need only have facial plausibility such that a complaint allows a court to draw reasonable inferences that the defendants are liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Plaintiffs allege LAN and Veolia materially contributed to the events resulting in the poisoning of Flint's water system. Over the last several years, Plaintiffs have had no choice but to stand by and observe as their family members endured *E. coli* infections, contracted Legionnaires' disease, and learned of the incurable and catastrophic effects of lead poisoning. Plaintiffs have plausibly stated this claim in a manner sufficient to survive a motion to dismiss.

    4.   <u>The Complaint Plausibly States a Claim of Intentional Infliction of Emotional Distress</u>

To plausibly allege a claim for Intentional Infliction of Emotional Distress (IIED), Plaintiffs must allege: "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Hayley v. Allstate*

---

because the allegations were centered on distress caused by harm to the plaintiffs' properties and due to the lack of a physical manifestation of their emotional distress. Here, Plaintiffs allege injury to their bodies and a physical manifestation thereof.

*Ins. Co.*, 262 Mich. App. 571, 577, 686 N.W. 2d 273, 276 (2004) (quoting *Graham v. Ford*, 237 Mich. App. 670, 674, 604 N.W.2d 713 (1999)). Plaintiffs have pled each of these elements despite LAN's half-hearted attempt to argue otherwise.

To begin, there can be no doubt that Plaintiffs suffered emotional distress as a result of the Flint Water Crisis caused, in part, by LAN. This is not the type of "accident" that a person or City witnesses and then recovers from – lead poisoning is additive and permanent, and its effects have, and will continue to, dramatically alter the lives of Plaintiffs. Furthermore, damage done to infrastructure pipes and Plaintiffs' pipes have not been fixed, and Plaintiffs live in fear of continuing exposure as a result of pipe damage, while helpless and distressed that the City of Flint will not fix the damage. One need only possess the slightest amount of empathy to understand the extreme emotional distress caused by this crisis.

Moreover, LAN's conduct, as alleged in the Complaint, readily qualifies as "outrageous" to an average member of the community. *See Graham v. Ford*, 237 Mich. App. 670, 675, 604 N.W.2d 713, 716 (1999). The City of Flint hired LAN based on its asserted expertise as a water engineer. This is not a situation in which LAN simply failed to perform some ministerial function of its contract adequately – the Complaint alleges LAN not only ignored red flags that should have alerted it to serious problems with Flint's water but also that LAN affirmatively

recommended the addition of chemicals to Flint's water that substantially increased the rate of corrosion – and resulting poisoning – of the water systems.

Furthermore, it cannot be disputed that the very purpose of LAN's involvement was directed at the people of Flint, Michigan and that the citizens of Flint – including Plaintiffs – were "present" during the period in which LAN substantially contributed to this crisis. LAN's invocation of Californian precedent notwithstanding, this element has been plausibly alleged.

LAN's final argument related to Plaintiffs' IIED claim – that Plaintiffs have failed to allege intent – is similarly unavailing. LAN argues, without citation, that Plaintiffs must allege LAN intended to cause Plaintiffs emotional distress. Br. at 14. This cabined reading of the "intent" element of an IIED claim is unpersuasive. Plaintiffs need only show that LAN intentionally committed some act with reckless disregard to Plaintiffs' emotional distress. *See Hayley*, 262 Mich. App. 571, 686 N.W. 2d 273. While some of the misconduct ascribed to LAN may only rise to the level of gross negligence, it cannot be disputed that LAN intentionally recommended that Flint double the ferric chloride in its water and, in doing so, was reckless with regard to Plaintiffs' physical safety and emotional distress. As such, Plaintiffs have plausibly alleged an IIED claim.

110

## V.    PLAINTIFFS HAVE ADEQUATELY PLEAD STATE LAW CAUSES OF ACTION AGAINST THE REMAINING DEFENDANTS[45]

### A. Plaintiffs Have Adequately Pled Unjust Enrichment

The City Defendants claim that Plaintiffs' unjust enrichment claim should be dismissed because an implied contract does not exist between the City and Plaintiffs. This argument is flawed for the simple reason that the City is not a state agent under PA 436. *See supra*, Background. The only case cited by Defendants is clearly apposite, since that was an unjust enrichment claim against the state, not a local governmental body. *See Borg-Warner Acceptance Corp v. Department of State*, 433 Mich. 16 (1989). Thus, since the City of Flint is not a state agency, it can be held liable for unjust enrichment.

Here, Plaintiffs have alleged that Plaintiffs were sold toxic drinking water that was unfit for human consumption instead of receiving clean, safe drinking water, as promised. Compl. ¶417. Moreover, the City Defendants unjustly received the benefits of payments from Plaintiffs in exchange for contaminated water that

---

[45] Plaintiffs concede that, under the current state of Michigan and federal law, the Complaint does not state a claim against the City Defendants for negligence or negligent infliction of emotional distress. Plaintiffs also recognize this Court's prior opinion in *Guertin*, which dismissed several state law causes of action against various Defendants. *See* Opinion and Order, ECF No. 151 at Section IV, *Guertin, et al., v. State of Michigan, et al.,* 16-cv-12412 (June 5, 2018) (dismissing Count 3 - substantive due process state-created danger claim; Count 5 – breach of contract; Count 7 – nuisance; Count 8 – trespass; Count 12 – gross negligence; Count 13 – IIED; and Count 14 – NIED). Plaintiffs maintain that these claims were wrongly dismissed in *Guertin*, and now bring forth these claims to preserve arguments on appeal.

was unfit for human consumption, and used those payments for the operation of the City of Flint. Compl. ¶ 372. The City Defendants received a monetary benefit in selling water unfit for consumption, and saving millions of dollars by not upgrading Flint's system. The Master Complaint certainly shows that 1) the City Defendants received a benefit from plaintiff; and 2) plaintiff suffered an inequity as a result of the benefit. *See Belle Isle Grill Corp. v. City of Detroit,* 256 Mich. App. 463, 478 (2003) (internal citations omitted).

Moreover, the City Defendants have not distinguished this case from this Court's recent decision in *Genesee Cty. Drain Comm'r v. Genesee Cty.*, 908 N.W.2d 313 (Mich. Ct. App. 2017). There, this Court held that "a claim based on the equitable doctrine of unjust enrichment ultimately involves contract liability, not tort liability. It merely involves a situation in which the contract is an implied one imposed by the court in the interests of equity rather than an express contract entered into by the parties. Accordingly, the claim is not barred by the GTLA." Thus, the City Defendants' argument that the unjust enrichment claim is a tort should be rejected.

Accordingly, Plaintiffs have adequately pled their unjust enrichment claims and the City Defendants' motion should be denied.

**B.** **Plaintiffs Have Adequately Pled Intentional Infliction of Emotional Distress**

The City Defendants make Plaintiffs' case for them in arguing against a claim of intentional infliction of emotional distress. The elements of an IIED claim are, indeed (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation;[46] and (4) severe emotional distress. *Hayley v. Allstate Ins. Co.*, 686 N.W.2d 273 (Mich. App. 2004). Plaintiffs have pled each of these elements.

The City Defendants first argue that the alleged conduct was not extreme and outrageous. "The test is whether the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Graham v. Ford*, 604 N.W.2d 670, 675 (Mich. App. 1999). The City Defendants are alleged to have ignored repeated warnings that a poisonous metal was leaching into the drinking water of 100,000 Flint residents, and then to have lied about the problem to regulators and the public. Plaintiffs submit that, as a matter of law, these facts could be expected to arouse resentment in the average member of the community and lead him or her to exclaim "Outrageous!"

Similarly, the MDEQ Defendants also argue that their active refusal to do their jobs in the face of a public health crisis cannot be considered an intentional

---

[46] Note that intentional torts are not subject to *Robinson*'s proximate cause rule, because governmental employees are liable for intentional torts according to the common law as it existed before July 7, 1986. MCL § 691.1407(3).

113

tort. MDEQ Defendants' Br. at 56-58. It is true that "[g]enerally, where the act complained on is one of omission rather than commission, it is not an intentional tort." *Hill v. City of Saginaw*, 399 N.W.2d 398, 403 (Mich. App. 1986). But *Hill* makes clear that, where the omission amounts to "willful and wanton misconduct" because it demonstrates "an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does," intent will be found. *Id.* This is consistent with the more general common-sense rule that a failure to act in the face of an affirmative duty is equivalent to an affirmative act. *Cf.* Dobbs' Law of Torts § 37 (2d ed. 2016) (noting that defendants under an affirmative duty to intervene who knowingly refuse to do so may be held liable for the intentional tort of battery).

Next, Veolia's conduct, as alleged in the Master Complaint, readily qualifies as "outrageous" to an average member of the community. *See Graham v. Ford*, 237 Mich. App. 670, 675, 604 N.W.2d 713, 716 (1999). The City of Flint hired Veolia based on its asserted expertise as a water engineer. It failed, and its reckless recommendations made the situation significantly worse. The result: Plaintiffs and were poisoned. This is not a simple failure to perform some ministerial function of its contract adequately.

Furthermore, it cannot be disputed that the very purpose of Veolia's involvement was directed at the people of Flint, Michigan and that the citizens of

Flint – including Plaintiffs – were "present" during the period in which Veolia substantially contributed to this crisis. This element has been plausibly alleged.

Plaintiffs need only show that Veolia intentionally committed some act with reckless disregard to Plaintiffs' emotional distress. *See Hayley*, 262 Mich. App. 571, 686 N.W. 2d 273. It cannot be disputed that Veolia intentionally recommended that Flint double the ferric chloride in its water and, in doing so, was reckless with regard to Plaintiffs' and the Class's physical safety and emotional distress. As such, Plaintiffs have plausibly alleged an IIED claim.

## C. Defendants' Poisoning of the Flint Water Supply is Either a Trespass or a Nuisance, It Cannot Be Neither

The City Defendants argue that they are liable for neither trespass nor nuisance. Nonetheless, the Complaint alleges that they intentionally caused lead contamination to enter Plaintiffs' property, causing damage. "The line between nuisance and trespass has never been precisely marked, and some modern cases have blurred it further by characterizing the intrusion of harmful microscopic particles as trespasses rather than as nuisances . . . ." Dobbs' Law of Torts § 51 (2d ed. 2016). Such cases "prefer to emphasize the object's energy or force rather than its size" in recognition of the tremendous impact such microscopic particles can have. *Martin v. Reynolds Metals Co.*, 342 P.2d 790, 793 (Or. 1959). A growing number of states recognize "pollution may constitute a trespass, where the plaintiff can demonstrate physical damage to his property." *Maddy v. Vulcan Materials Co.*,

115

737 F. Supp. 1528, 1540 (D. Kan. 1990). Such physical damage has obviously been alleged here.

A claim for private nuisance covers any "non-trespassory invasion of another's interest in the private use and enjoyment of land." *Adkins v. Thomas Solvent Co.*, 487 N.W.2d 715, 719 (Mich. 1992). "There are countless ways to interfere with the use and enjoyment of land including interference with the physical condition of the land itself, disturbance in the comfort or conveniences of the occupant including his peace of mind, and threat of future injury that is a present menace and interference with enjoyment." *Id.* at 720. The Complaint also alleges interference with the use and enjoyment of Plaintiffs' property. One way or the other, the City Defendants' intentional acts causing lead contamination on Plaintiffs' property entitle Plaintiffs to relief under Michigan law.

1.   Plaintiffs Have Stated a Claim for Trespass

As an initial matter, the MDEQ Defendants' citation to *Pohutski v. City of Allen Park*, 465 Mich. 675, 689-690; 641 N.W.2d 219 (2005) is a red herring. Mot. at 32. Plaintiffs do not seek to apply a "trespass-nuisance exception" to governmental liability; rather, they seek to hold the MDEQ Defendants accountable for their intentional torts, for which they are liable under the common law as of July 7, 1986. MCL § 691.1407(3). Governmental employees are not entitled to immunity from liability for intentional torts if they did not act in good

116

faith. *Odom v. Wayne Cty.*, 760 N.W.2d 217, 218 (Mich. 2008). The MDEQ Defendants do not challenge the Master Complaint's allegation that they acted in bad faith. Compl. ¶ 543. Nor can they at this stage of the litigation.

The MDEQ defendants also argue that Plaintiffs failed to allege facts showing an actual intrusion. Mot. at 52. They paint as "conclusory" the allegation that lead entered on Plaintiffs' land (Compl. ¶¶ 271-274), without recognizing any of the hundreds of prior allegations forming the basis for that inference. They ignore the entire story told by the Complaint—the switch to corrosive Flint River Water, the failure of the MDEQ Defendants to ensure appropriate corrosion control, the addition of highly corrosive ferric chloride to the water, and the subsequent cover-up. Plaintiffs alleged that the entire water *system* is contaminated with lead. *See, e.g.*, Compl. ¶93, 99, 109, 130, 201-203. These allegations support Plaintiffs' claim of an actual trespass of lead and bacteria onto their property.

The MDEQ Defendants' argument that lead and bacteria cannot create a trespass is also wrong. It is true that Michigan courts have not recognized trespass from microscopic particles that do not "present [themselves] as a significant physical intrusion." *Adams v. Cleveland-Cliffs Iron Co.*, 602 N.W.2d 215, 223 (Mich. App. 1999). Such particles are usually considered "intangible" because they "do not normally occupy the land on which they settle in any meaningful sense; instead, they simply become a part of the ambient circumstances of that space." *Id.*

117

But Plaintiffs here have alleged a much more substantial, tangible intrusion—one which has caused irreparable physical harm to their property. ¶¶ 271-274. Such physical damages to property, even if caused by physical forces invisible to the naked eye, are distinct from the kinds of "intangible" invasions discussed in the cases cited by the MDEQ Defendants. *See Adams*, 602 N.W.2d at 223 (dust, noise, and vibrations); *Abnet v. Coca-Cola Co.*, 786 F. Supp. 2d 1341, 1345-46 (W.D. Mich. 2011) (groundwater contamination with no reported physical damages to property); *Postma v. Cty. of Ottawa*, 2004 Mich. App. LEXIS 2307 (Mich. App. Sept. 2, 2004) (same).

2.    Plaintiffs Have Stated a Claim for Nuisance

The MDEQ Defendants raise similar arguments why they should not be held liable for nuisance; these arguments are similarly unavailing.

First, as with their trespass claims, Plaintiffs' nuisance claims are intentional torts brought under the common law, rather than relying on an exception to governmental immunity.

Second, the MDEQ Defendants' protest that there has been no invasion of Plaintiffs' property continues to ignore both the straightforward allegations of the and the entire factual narrative of the complaint. The MDEQ Defendants' argument that the invasion does not interfere with Plaintiffs' quiet enjoyment of the property is baffling, as is their argument that the damage to their property is not

118

permanent. The Complaint makes quite clear that the MDEQ Defendants caused permanent damage to Plaintiffs' property requiring a complete replacement of pipes and appliances. ¶¶ 271-286.

Finally, the MDEQ Defendants appear to argue that it was not unreasonable to permit the City of Flint to poison its residents; ignore constant warnings of danger; and lie to regulators and the public about the safety of the water system. Plaintiffs beg to differ. First, the unreasonableness required by nuisance law "is not like 'unreasonable' in the law of negligence, for it does not refer to risk-creating conduct of the defendant but to the reasonable expectations of a normal person occupying the plaintiff's land." Dobbs' Law of Torts § 401 (2d ed. 2016). So the MDEQ Defendants are dissembling by seeking to focus on the reasonableness of their actions. Second, however, their actions were also manifestly, horrifically unreasonable, as the facts recited above demonstrate.

### D.    Plaintiffs Have Adequately Pled their Breach of Contract Claim

The City Defendants argue that "Plaintiffs' contract claims fail because they allege that the City was an agent of the State." City Defendants' Br. at 76. The City's argument is, at best, disingenuous, and must be rejected.

The City neglects to cite to Flint ordinance 46-16, which provides in pertinent part that:

> (a) *Definition.* For the purpose of this section, the following definition shall apply unless the context clearly indicates or requires a different meaning.

119

***CONSUMER.*** The person making application for water service or receiving the benefit of water service or who is legally liable for the payment of bills for the water service.

(b) *Commodity.* The furnishing of water service shall be deemed the sale of a commodity and the relationship between the Division of Water Supply of the City, and the consumer, that of vendor and purchaser.

(c) *Service.* Service may be denied to any consumer who is in default to the Division of Water Supply or to the City.

As such, under Flint's own ordinances, those persons receiving the benefit of

water service are deemed "consumers" and "the furnishing of water service shall

be deemed the sale of a commodity…." And the relationship between the City and

its consumers is "that of vendor and purchaser." The ordinance section also allows

the City to deny service to any consumer who is in default. While the precise

nature of the contractual relationship may be governed a Flint ordinance—as one

would expect with a municipality—by the plain language of Flint's own ordinance

the relationship between the vendor and the purchaser is clearly a contractual

relationship.

## E.   Plaintiffs Have Adequately Pled their Punitive Damages Claim

Defendants seek to dismiss Plaintiffs' "punitive damages" claim on the basis

that Michigan law does not permit the recovery of punitive damages. Defendants

do acknowledge that Michigan law does permit the recovery of "exemplary

damages."

While Michigan law does disfavor punitive damages (*Ass'n Research &*

*Dev. Corp. v. CNA Fin. Corp.*, 123 Mich. App. 162, 172 (1983)), it does permit

them when authorized by statute (*Gilbert v. DaimlerChrysler Corp.*, 470 Mich. 749, 765 (2004)). In a claim for exemplary damages, the plaintiff must show that the injuries were maliciously, willfully, and wantonly inflicted. *Midfield Concession Enterprises, Inc. v. Areas USA, Inc.*, 130 F. Supp. 3d 1122, 1144 (E.D. Mich. 2015). These damages are "are recoverable as compensation to the plaintiff, not as punishment of the defendant." *Kewin v. Massachusetts Mutual Life Ins Co.*, 409 Mich. 401, 419 (1980). Exemplary damages exist when pecuniary and compensatory damages are insufficient to make the injured party whole by providing recovery for intangible injuries such as injuries to feelings. *Unibar Maintenance Services, Inc v. Saigh*, 283 Mich.App 609, 630 (2009). Further, the act or conduct complained of must be voluntary and the act must inspire feelings of humiliation, outrage, and indignity. *McPeak v. McPeak*, 233 Mich. App. 483, 487 (1999). All of these requirements are met in the present case.

In the present case, Defendants' actions have been willful, malicious, and wanton, as alleged in ¶441 of the Master Complaint. Further, ¶441 lays out this conduct as follows:

Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to:

a. failure to provide safe drinking water to the residents of Flint;
b. failure to implement adequate corrosion controls for Flint River water; and

121

c. underestimating the seriousness of the lead contamination in Flint's water system;

(Master Complaint, ¶441).

This conduct harmed both the persons and property of Flint in a way that cannot be fully compensated by pecuniary or compensatory damages. Plaintiffs now live in daily fear and anxiety over the injuries that they sustained and illnesses they acquired as a result of their use and consumption of Flint's toxic and tainted water supply. The daily anxiety and stress suffered by Plaintiffs more than meets the standard of "injured feelings." Moreover, the drastic decrease in property values sustained by their owners, coupled with the anxiety of not knowing the full extent of the damage to the properties' infrastructure, and the greatly stigmatized location itself, have all contributed to the feelings of humiliation, outrage, and indignity of the Plaintiffs and make exemplary damages appropriate in the present situation.

## F.   Plaintiffs Have Stated a Claim Entitling Them to Seek Exemplarily Damages[47]

As this Court explained in *Guertin*, "exemplary damages are distinct from punitive damages and are designed to compensate plaintiffs for humiliation, outrage, and indignity resulting from a defendant's willful, wanton, or malicious

---

[47] Plaintiffs agree that, while punitive damages—as distinct from exemplary damages—are available against the Government Defendants, they are not available against the Veolia and LAN Defendants under Michigan law absent a specific authorizing statute.

conduct"; and, as this Court further found, plaintiffs stated a claim for such damages. *Guertin*, 2017 WL 2418007, at \*31 (quoting *Fellows v. Superior Prods. Co.*, 506 N.W.2d 534, 536 (Mich. Ct. App. 1993)).

Michigan law permits exemplary damages when a defendant's willful or malicious conduct causes a plaintiff "intangible injuries or injuries to feelings, which are not quantifiable in monetary terms." *Unibar Maint. Servs., Inc. v. Saigh*, 769 N.W.2d 911, 923 (Mich. Ct. App. 2009). In particular, plaintiffs may recover exemplary damages where a defendant's "reckless disregard of plaintiff's rights" causes a plaintiff "humiliation, outrage, and indignity." *Ellis v. Dykema Gossett PLLC*, No. 301131, 2013 WL 3717799, at \*21 (Mich. Ct. App. July 16, 2013) (citation omitted). Plaintiffs' Complaint expressly alleges such feelings caused by Veolia and LAN's reckless disregard of their rights. These harms "are not quantifiable in monetary terms," and thus entitle Plaintiffs to exemplary damages.

Plaintiffs expressly plead "physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification" as a consequence of Veolia and LAN's wanton and malicious actions, Compl. ¶ 458, thus pleading precisely the sort of feelings identified by Defendants' own cited authority as warranting an award of exemplary damages, *see Law Offices of Lawrence J. Stockler, P.C. v. Rose*, 436 N.W.2d 70, 86 (Mich. Ct. App. 1989) (stating exemplary damages

require that defendants' conduct cause plaintiffs' "humiliation, outrage and indignation"); *Jackson Printing Co. v. Mitan*, 425 N.W.2d 791, 794 (Mich. Ct. App. 1988) (exemplary damages awardable for defendants' actions causing plaintiffs' "humiliation, outrage, and indignity").

Plaintiffs support these direct allegations with numerous facts setting forth the daily fear and anxiety Plaintiffs have suffered and continue to suffer as a result of their use and consumption of Flint's toxic water. *See, e.g.*, Compl. ¶ 296 (stating, for example, Plaintiffs have suffered "[e]mbarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms").

Similarly, Plaintiffs' Complaint lays out Veolia and LAN's reckless disregard for Plaintiffs' rights including their failure to recommend corrosion control procedures, despite knowing that Plaintiffs were relying upon them to provide Flint with safe water and would suffer harm as a consequence; their knowing failure to report imminent public health threats presented by the toxic state of Flint's water. *See generally* Compl. ¶¶ 204-205; 213-254. These allegations entitle Plaintiffs to exemplary damages under Michigan law.

Finally, Plaintiffs' damages exceed those recoverable as compensable damages: Plaintiffs have pleaded emotional injury, as well as additional forms of "intangible injuries . . . not quantifiable in monetary terms," *Unibar Maint. Servs.*, 769 N.W.2d at 923, including the humiliation of having their home become

124

synonymous with toxic water and failed public services, and the outrage of having been subjected to racial discrimination, s*ee Freeman v. Kelvinator, Inc.*, 469 F. Supp. 999, 1004 (E.D. Mich. 1979) ("As anyone who has been the victim of discrimination can attest, the wounds run deeper than the pocketbook."). Compensatory damages thus will not suffice to make Plaintiffs whole, and their claim for exemplary damages must proceed.

### G. This Court Should Exercise Supplemental Jurisdiction over Plaintiffs' State Law Claims

Under 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over all state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." The Supreme Court instructs that district courts should exercise their discretion in granting supplemental jurisdiction over pendent claims "in the manner that best serves the principles of economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172-73 (1997) (citations omitted).

Defendant Wright argues that the Court should decline to exercise supplemental jurisdiction over all of Plaintiffs' state law claims under § 1367(c). Defendant Wright's proffered reasons to decline supplemental jurisdiction is not persuasive.

125

**H.      The Michigan Safe Drinking Water Act Does Not Preclude State Tort Claims**

   1.      <u>The MSDWA Does Not Expressly Abrogate the Common Law</u>

"The common law remains in force until 'changed, amended or repealed.'" *See Velez v. Tuma*, 492 Mich. 1, 11 (2012) quoting Mich. Const. art. III, § 7. Whether the Michigan Safe Drinking Water Act abrogates common law remedies remains a question of statutory interpretation. *See Millross v. Plum Hollow Golf Club*, 429 Mich. 178, 183 (1987).

For more than one hundred years, however, Michigan has held that, "'[t]he legislature should speak in no uncertain manner when it seeks to abrogate the plain and long-established rules of the common law. Courts should not be left to construction to sustain such bold innovations.'" *Marquis v. Hartford Acc. & Indem.*, 444 Mich. 638, 652 (1994) quoting *Bandfield v. Bandfield*, 117 Mich. 80, 82 (1898). Accordingly, while "a statute which *expressly* extinguishes a common-law right is a proper exercise of legislative authority, statutes in derogation of the common law must be strictly construed, and will not be extended by implication to abrogate established rules of common law." *Rusinek v. Schultz, Snyder & Steele Lumber Co.*, 411 Mich. 502, 508 (1981) (emphasis added).

Nothing in the plain language of the MSDWA expressly (or impliedly) abrogates common law remedies. To the contrary, the intent of the statute is quite clear: a section titled "Legislative Intent," provides that, "It is the intent of the

126

legislature to provide adequate water resources research institutes and other facilities within the state of Michigan so that the state may assure the long-term health of its public water supplies and other vital natural resources." MCL § 325.1001a. "The Legislature is presumed to know of the existence of the common law when it acts. When wording the [statute], the Legislature could easily have stated an intent to abrogate common–law." *Wold Architects & Eng'rs v. Strat,* 474 Mich. 223, 234 (2006). The Michigan Legislature did not do so here.

"[I] n the absence of a contrary expression by the Legislature, well-settled common-law principles are not to be abolished by implication in the guise of statutory construction." *Marquis,* 444 Mich. at 652. Accordingly, where, as here, the Legislature is silent on the issue, courts have uniformly held that the common law remains in effect. *See, e.g., Velez,* 492 Mich. at 12 (holding that enaction of legislation related to joint and several liability did not preempt common-law setoff rule where silent on the issue); *Wold,* 474 Mich. at 234 (holding that Michigan Arbitration Act did not preempt the common law); *Rusinek.,* 411 Mich. at 508 (holding that where No-Fault Insurance Act limited non-economic tort remedies but did not expressly abolish common law tort of consortium Court would not find common law tort preempted).

Where laws are intended to preempt the common law, the statutory language to that effect has been express. *See, e.g., Kraft v. Detroit Entm't, L.L.C.,* 261 Mich.

127

App. 534, 546 (2004) (holding Michigan Gaming Control and Revenue Act precluded common law claims where statute included language that, "Any other law that is inconsistent with this act does not apply to casino gaming as provided for by this act."). As discussed above, the narrow scope of the Legislature's intent in drafting the MSDWA, and regulatory focus of the statute itself, suggests the MSDWA was intended to operate in tandem with, rather than in lieu of, the common law. *See, e.g., Dawe v. Dr. Reuven Bar-Levav & Assocs*., P.C., 485 Mich. 20, 29 (2010) (holding that common-law duties remained in effect where statute expressly abrogated certain duties thus limiting the scope of the statute's provisions).

"This conclusion is reinforced by the fact that, unlike some other statutory schemes, the statutory language [] is not so comprehensive as to indicate that it is intended to completely abrogate the common law in this area." *Dawe*, 485 Mich. at 31 (2010). Notably, the MDSWA includes no language requiring that it, "must be liberally construed and applied," *see* Uniform Commercial Code (UCC), MCL § 440.1103(1), nor does it purport to apply to every action touching on the provision of safe drinking water, *compare* UCC MCL § 440.1104 (providing that the UCC is "a general act intended as a unified coverage of its subject matter"). Accordingly, the MSDWA cannot be construed as a comprehensive scheme supplanting common law remedies. *Compare Hoerstman Gen. Contracting, Inc. v. Hahn*, 474

Mich. 66, 74 (2006) (holding that the UCC presents a comprehensive scheme that supplants common law remedies).

The long-standing and overwhelming weight of authority in Michigan holds that the common law may only be abrogated via an express mandate from the legislature. No such mandate exists here, nor does the MSDWA provide an appropriate mechanism for Plaintiffs to hold Defendants accountable for their misconduct. For these reasons, the common law torts alleged in Plaintiffs complaint remain viable.

### 2.   The MSDWA Cannot Preempt Plaintiffs' Right to Due Process

As explained in more detail above, neither the federal SDWA nor Michigan's corollary statute displaces Plaintiffs' procedural due process claim. *See Communities for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 684-85 (6th Cir. 2006). The Constitution of the United States provides that "the Laws of the United States which shall be made in Pursuance" of the Constitution "shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Accordingly, even if the Court were to construe the MSDWA as preempting Plaintiffs' common law claims, Plaintiffs' procedural due process claim remains actionable.

## I.      Plaintiffs have Adequately Plead a Claim for Gross Negligence

The City of Flint, Individual City Defendants, Defendant Wright, MDEQ Defendants, Defendant Wyant, the State Defendants, LAN Defendants, Veolia Defendants and Robert Scott appear to generally rest their argument for dismissal of Plaintiffs' gross negligence claims on (1) gross negligence is not a cognizable claim under Michigan law; and (2) Michigan's restriction of governmental liability to "the" proximate cause of a harm. Neither of these arguments justifies dismissal.

## J.      Defendants Had a Duty to Refrain from Actions and Omissions Foreseeably Poisoning Thousands of People

The Complaint pleads as an element of its gross negligence claim that the Defendants owed Plaintiffs and the putative class a duty of reasonable care. The MDEQ Defendants argue that Plaintiffs ought to have made specific factual allegations under the *Rakowski* standard Michigan courts use to analyze duty. Mot. at 41. This is confusing, because the cited *Rakowski* factors are obviously *legal* considerations, which the Court weighs in light of the facts pled. Indeed, on the prior page the MDEQ Defendants are clear that the existence of a duty is a matter of law. Mot. at 40.

The factual narrative of the Complaint explains who the Defendants are, what they did, why it was harmful, and why they should have known it was harmful. For example, Defendants neglected their duties and obligations, to the foreseeable detriment of the people they were charged with protecting. They

ignored a long series of increasingly glaring warning signs that Flint's water was poisoning its citizens. Rather than doing their jobs, they instead bent over backwards to sweep the impending calamity under the rug, sometimes going so far as to flatly lie about the water's safety and regulatory compliance to federal regulators and the public. *See generally* Background, *supra*. It is the Court's job to determine whether these circumstances gave rise to a legal duty for Defendants to exercise reasonable care (or at least refrain from gross negligence) toward Plaintiffs and the class.

The common law, of course, is unequivocal on this question. "An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." Rest. (3d) Torts: Physical & Emotional Harm § 7 (2010); *accord* Dobbs' Law of Torts § 251 (2d ed. 2016) ("[W]here the defendant by some action on his part creates, maintains, or continues a risk of physical harm, the general standard or duty is the duty of reasonable care, that is, the duty to avoid negligent conduct."); *see also Cummins v. Robinson Twp.*, 770 N.W.2d 421, 434 (Mich. App. 2009) ("A duty of care may arise . . . . by operation of the common law, which imposes an obligation to use due care or to act so as not to unreasonably endanger other persons or their property."). At a bare minimum, then, the Defendants have a duty to refrain from actions that exacerbate the risk of harm.

131

The common law also establishes the MDEQ Defendants' duty when confronted with warning signs of the impending catastrophe:

> An actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to the other has a duty of reasonable care to the other in conducting the undertaking if (a) the failure to exercise such care increases the risk of harm beyond that which existed without the undertaking, or (b) the person to whom the services are rendered or another relies on the actor's exercising reasonable care in the undertaking."

Rest. (3d) Torts: Physical & Emotional Harm § 42 (2010). Michigan law affirms that "government employees may be held liable for performing their jobs in a grossly negligent manner" and has specifically rejected the so-called "public duty doctrine" that "a duty to all . . . is a duty to none." *Beaudrie v. Henderson*, 631 N.W.2d 308, 314, 316 (Mich. 2001).

The cases the MDEQ Defendants cite involve unanticipated dangers to unanticipated victims, or plaintiffs trying to capitalize on an obligation to some third party.[48] In *Rakowski*, the court found that a municipal building inspector was not liable to a *third party invitee* who was injured by a faulty structure on the inspected premises; the court found that the inspector, whose statutory role was limited to visual inspection of the property, did not have a duty to the plaintiff in

---

[48] Puzzlingly, the MDEQ Defendants also cite *Samson v. Saginaw Professional Bldg., Inc.*, a case involving a couple injured by a mental patient in a private building, the court *did* find that a landlord who "is informed by his tenants that a possible dangerous condition exists in the building . . . has a duty to investigate and take available preventive measures." 224 N.W.2d 843, 851 (Mich. 1975). Needless to say, this reasoning *supports* a finding of duty here.

light of the tenuous relationship between the inspector and the injured victim. *Rakowski v. Sarb*, 713 N.W.2d 787, 796-98 (Mich. App. 2006). *Cummins* found that employees of a government agency had no duty to "interpret the building code to impose as little economic effect as possible." 770 N.W.2d at 421, 434. Such a duty "would not advance the public interest," the *Cummins* court found, because the "building codes balance several factors, including ensuring adequate maintenance of buildings and structures while still adequately protecting the health, safety, and welfare of the people." *Id.* And in *Maiden v. Rozwood*, the court determined that a Medical Examiner's statutory obligation to testify on behalf of the state did not create a separate duty to an accused murderer. 597 N.W.2d 817, 829 (Mich. 1999).

This disaster was also foreseeable, thus *Palsgraf* is inapposite. The Complaint alleges that at some point, Defendants knew of circumstances posing an imminent and grave threat to the health and safety of Flint's residents. The potential harm was not remote or unforeseeable—the chance ricochet of an unanticipated box of fireworks. *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928). But rather than disclose this threat to the public and work to reduce its harm, Defendants did nothing, or actively worked to prevent the public from knowing the truth.

133

### K.      Somebody Caused the Flint Water Crisis

Plaintiffs have alleged dozens of acts and omissions by Defendants that, if true, reasonably constitute "the" proximate cause of plaintiffs' harm. Plaintiffs need not commit themselves, at this stage of the case, to a single theory of the case, and it would be premature at this point to say which allegations predominate in the causal chain of this disaster. Further, a 12(b)(6) motion is an inappropriate point at which to identify "the one most immediate, efficient, and direct cause" of Plaintiffs' injuries. *Robinson v. Detroit,* 613 N.W.2d 307, 311 (2000). At this point, it should be sufficient that the Defendants' alleged actions, taken as true and drawing all inferences in favor of the Plaintiffs, *could* be "the" proximate cause of the Flint crisis, and the allegations in the Complaint make clear that *each* of the Defendants was grossly negligent. The ultimate apportionment of responsibility is a question for a jury to decide.

## VI.   PLAINTIFFS      HAVE      SATISFIED      THE      PLEADING REQUIREMENTS OF RULE 12(E) IN REGARD TO THEIR CLAIMS AGAINST LAN

The 143-page Complaint describes in detail allegations against each Defendant. LAN's argument for a more definite statement misconstrues the requirements of Federal Rule of Civil Procedure 12(e). A party may move for a more definite statement under Rule 12(e) only when a pleading is so "vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P.

12(e). Motions for a more definite statement are "highly disfavored since the overall scheme of the Federal Rules calls for relatively skeletal pleadings and places the burden of unearthing factual details on the discovery process." *Perma-Liner Indus., Inc. v. U.S. Sewer & Drain, Inc.*, 630 F. Supp. 2d 516, 526 (E.D. Pa. 2008) (quoting *Sony BMG Music Entm't v. Cloud*, No. cv 08-1200, 2008 WL 3895895, at *2 (E.D. Pa. Aug. 21, 2008)); *see also Mayer v. Weiner*, No. 2:17-CV-12333, 2017 WL 4173680, at *2 (E.D. Mich. Sept. 21, 2017) (motions for more definite statement are "not favored") (citation omitted). Accordingly, "polishing the pleadings by means of motion practice rarely is worth the effort," 5 Charles Alan Wright et al., *Federal Practice and Procedure* § 1218 (3d ed. 2017), and any additional "evidentiary detail a defendant may require is more properly the subject of discovery." *Compuware Corp. v. Int'l Bus. Machs.*, 259 F. Supp. 2d 597, 600 (E.D. Mich. 2002).

Plaintiffs' allegations provide more than sufficient detail for LAN to formulate a response, and accordingly satisfy the requirements of Rule 12(e). Specifically, Plaintiffs allege that LAN:

- failed to properly place the Flint Water Treatment Plant into operation using the Flint River as a primary source, specifically neglecting to ensure the viability of the water source for use by the public;

- failed to insist upon and implement the necessary safeguards through the plant to allow the water to be safely consumed by the public; and

135

- failed to report the dangers associated with not installing proper anticorrosive treatment when using the Flint River as a primary source of drinking water.

Compl. ¶ 54. Plaintiffs' Complaint then describes each of these actions in greater detail. *See* Compl. ¶¶ 213-254.

The Complaint separately identifies the actions taken by each individual Defendant: specifically, LAN worked in concert such that each LAN Defendant committed each act attributed to the LAN Defendants collectively. The Complaint explains that, as a consequence of the corporate structure of Leo A. Daly Company ("LAD") and LAN Inc., LAD exerts "nearly unfettered control" over LAN Inc., *id.* ¶ 53, and additionally identifies top executives shared by LAD and LAN Inc., including a shared CEO and President; three LAN Inc. Directors who serve as high ranking LAD officials; and a *de facto* shared CFO. *Id.*

LAN argues that absent abuse of the corporate form, Michigan presumes parent and subsidiary companies are separate and distinct entities. That may be so. It does not justify, however, LAN's motion under Rule 12(e). As explained above, and contrary to LAN's assertions, Plaintiffs have alleged LAN's abuse of the corporate form. But putting that aside, nothing in the Federal Rules prevents separate entities from being identified together as "defendants," so long as a complaint provides sufficient facts for the defendants to discern which claims apply to them and the factual basis upon which those claims rest. *Cf. JAC Holding*

136

*Enters.*, 997 F. Supp. 2d at 728 (finding general references to "the Conspirators" satisfied even Rule 9(b)'s heightened pleading standard where defendants could discern from the pleadings what acts were attributed to each).

LAN's authority does not state otherwise. Rather, LAN relies on a case in which the complaint gave "no indication of which of the counts being alleged apply to which of the many Defendants," *Berna v. City of Detroit*, No. 2:05CV74521, 2006 WL 901260, at *2 (E.D. Mich. Feb. 15, 2006), and one in which seventy-eight defendants were grouped indiscriminately despite a lack of any supporting factual allegations applicable to those defendants, *see Bradley v. Milliken*, 411 F. Supp. 937, 942 (E.D. Mich. 1975). Here, in contrast, Plaintiffs have alleged (1) specific acts committed; (2) that LAN committed each of those acts in concert; and (3) a factual basis to support both occurrence of the acts and the contention that LAN acted together in their commission.

Finally, to the extent that the Court believes more detailed pleadings would be fruitful, the proper course at the motion to dismiss stage would be to permit amendment after discovery. *In re Jackson Lockdown/MCO Cases*, 568 F. Supp. 869, 889 (E.D. Mich. 1983) ("Rather than order amendment of the complaints" in response to a motion under Rule 12(e), "it would seem more appropriate to defer the issue until completion of the first round of discovery."); *Compuware Corp.*, 259 F. Supp. 2d at 600 ("Any evidentiary detail a defendant may require is more

properly the subject of discovery."); *Mayer*, 2017 WL 4173680, at *2 ("[T]he [Rule 12(e)] motion will usually be denied on the grounds that discovery is the more appropriate vehicle for obtaining the detailed information.") (citation omitted).

After arguing that Plaintiffs' Complaint lacks sufficient information, LAN next contends that the Complaint in fact contains *too much* information and that it therefore fails to provide sufficient notice of Plaintiffs' claims. Plaintiffs' Complaint lays out the charges applicable to LAN. It provides a succinct summary of the claims made against the LAN Defendants in a single paragraph at the outset of the pleading, Compl. ¶ 54; sets forth the supporting factual allegations in clearly-labeled sections organized in chronological order, *id.* ¶¶ 103, 167–69, 181, 185– 86, 205–06, 233–39, 249–50, 199; and concludes by setting forth the specific counts charged against LAN, *id.* ¶¶ 445–64.

The Complaint thus stands in stark contrast to the very rare instances in which a court in this district has found that a plaintiff's complaint "contains nothing but repetitive, incomprehensible gibberish," and thus fails to communicate to defendants the claims being brought against them in violation of Rule 8(a). *Hearne v. Manpower of Indiana, L.P.*, No. 15-12113, 2015 WL 10353133, at *4 (E.D. Mich. Nov. 23, 2015), *report and recommendation adopted,* No. 15-12113, 2016 WL 704959 (E.D. Mich. Feb. 23, 2016).

138

The Complaint seeks to vindicate the rights of a broad class of Plaintiffs based on a complicated set of events, and accordingly requires a comprehensive complaint. The complex nature of the underlying events, and Plaintiffs' effort to provide sufficient information to support their claims and put Defendants on notice of their own alleged conduct, do not violate the Federal pleading rules. *See* 5 Charles Alan Wright et al., *Federal Practice and Procedure* § 1217 (3d ed. 2017) ("[I]n the context of a multiparty, multiclaim complaint each claim should be stated as succinctly and plainly as possible *even though the entire pleading may prove to be long and complicated* by virtue of the number of parties and claims.") (emphasis added).[49]

---

[49] *See also Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1131 (9th Cir. 2008) ("verbosity or length is not by itself a basis for dismissing a complaint based on Rule 8(a)."); *Washington v. Grace*, 353 F. App'x 678, 680 (3d Cir. 2009) (holding that, "[a]lthough [the] complaint is lengthy, at nearly 80 pages, and lacks clarity in some places, we do not agree that it violated the basic pleading requirements under Rule 8. At a minimum the amended complaint provided defendants with 'fair notice' of [plaintiff's] claims."); *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004) (holding that district court erred in dismissing on Rule 8 grounds when the complaint, though long, was not "so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.") (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988); *United States ex rel. Garst v. Lockheed–Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("Some complaints are windy but understandable. Surplusage can and should be ignored. Instead of insisting that the parties perfect their pleadings, a judge should bypass the dross and get on with the case.").

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court enter an order denying Defendants' motions to dismiss and LAN's Motion for a more definite statement in their entirety.

Dated: May 30, 2018

Respectfully submitted,

**LEVY KONIGSBERG, LLP**

By: /s/ Corey M. Stern
Corey M. Stern, Esq.
800 Third Avenue, Suite 11th Floor
New York, NY, 10022
(212) 605-6200
cstern@levylaw.com

*Co-Liaison Counsel for the Individual Cases*

140

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2018, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing upon counsel of record.

Dated: May 30, 2018

_____/s/ Corey Stern_____

141