# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| *In Re* Flint Water Cases, | No. 5:17-cv-10164-JEL-MKM |
| | Hon. Judith E. Levy |
| | Mag. Mona K. Majzoub |

*Walters, et al.,*

      *Plaintiffs*

*v.*

*Governor Richard Snyder, State of Michigan, City of Flint, Daniel Wyant, Andrew Dillon, Nick Lyon, Adam Rosenthal, Stephen Busch, Patrick Cook, Michael Prysby, Liane Shekter-Smith, Bradley Wurfel, Jeffrey Wright, Darnell Earley, Gerald Ambrose, Dayne Walling, Howard Croft, Michael Glasgow, Daugherty Johnson, Lockwood, Andrews and Newnam, P.C., Lockwood, Andrews and Newnam, Inc., Leo A. Daly Company, Rowe Professional Services Company, Veolia LLC, Veolia Inc., Veolia Water and Veolia S.A.,*

      *Defendants*

## PLAINTIFFS' AMENDED MASTER LONG FORM COMPLAINT AND JURY TRIAL DEMAND

Plaintiffs in this consolidated action, collectively, and by and through

*Liaison Counsel for Individual Plaintiffs,* file this First Amended Master Long

Form Complaint and Jury Demand ("Amended Master Complaint") against Defendants, as an administrative device to set forth potential claims that individual Plaintiffs may assert against Defendants in this litigation. Plaintiffs asserting personal injury or property damage as a result of the contamination of the City of Flint's drinking water may bring and/or adopt this Amended Master Complaint, and complain and allege on personal knowledge as to themselves, and on information and belief as to all other matters, as follows:

## PURPOSE OF MASTER COMPLAINT

1.      This Amended Master Complaint is administrative in nature, and sets forth facts and allegations common to those individual Plaintiffs whose claims arise from the contamination of the City of Flint's drinking water. It includes allegations of personal injury, property damage and economic loss, as more fully set forth below.

2.      The claims related to this case are generally brought against two sets of Defendants, as described more fully below, Governmental Defendants, including governmental individuals and entities and Engineering Defendants, which are full service, engineering, planning, architecture and surveying firms, responsible for the administration of placing the Flint Water Plant into operation using the Flint River as a primary source and/or for evaluating the Flint water system for public safety.

3.     Plaintiffs seek compensatory and punitive damages, monetary restitution, equitable relief, and all other available remedies as a result of injuries caused by the Defendants. Plaintiffs claim and allege that their damages and injuries are a direct and proximate result of the Defendants' conduct.

4.     This Amended Master Complaint is intended to serve the administrative functions of efficiency and economy by presenting certain common claims and common questions of fact and law for consideration by this Court. This Master Complaint does not necessarily include all claims asserted in all actions related to the City of Flint's drinking water, and it is not intended to consolidate for any purpose the separate claims of Plaintiffs in their respective actions. It is anticipated that individual Plaintiffs will adopt this Amended Master Complaint and the necessary causes of action herein through use of a separate Short Form Complaint. Any separate facts and additional claims of individual Plaintiffs may be set forth as necessary in the actions filed by the respective Plaintiffs. This Amended Master Complaint does not constitute a waiver or dismissal of any actions or claims asserted in those individual actions and, furthermore, no Plaintiff relinquishes the right to amend their individual claims to include additional claims as discovery proceeds.

5.     As more particularly set forth herein, each Plaintiff maintains, among other things, that Defendants violated their legal duties and caused the Flint Water

Crisis to occur, continue, worsen and persist for a longer period of time. Defendants also exacerbated the crisis by concealing and misrepresenting its scope, failing to take effective remedial action to eliminate it, and then lying about it to cover up their misconduct. Their misconduct has produced a significant effect, long lasting and sometimes permanent, upon public rights, including health, safety, peace, comfort and convenience.

## INTRODUCTORY STATEMENT

6.     This case arises from the poisoning of Plaintiffs, residents of the City of Flint, Michigan, with lead from Flint's pipes and service lines, as a result of the switch of Flint's drinking water supply to the Flint River, without the use of any corrosion control.

7.     Defendants created and maintained this condition when the State of Michigan subsumed the authority of the local government; and also through the actions of the state's regulatory and administrative entities and employees.

## Summary of the Constitutional and Civil Rights Violations and Injuries

8.     *Due process based on state created danger doctrine*: Plaintiffs have sustained violations of their substantive due process rights, including their fundamental right to not have the state create, inflict and/or exacerbate dangers through the culpable actions of public officials;

4

9.   *Due process based on bodily integrity doctrine*: Plaintiffs have sustained violations of their substantive due process rights, including their fundamental right to not have their bodily integrity violated;

10.   *Equal protection, race*: Plaintiffs have sustained serious injuries as a result of some of the Defendants' decision to deliver a superior water product to the water users in the remainder of Genesee County because that community was predominately white, while at the same time delivering a grossly inferior water product to water users in Flint because that community was predominately African American;

11.   *Equal protection, wealth:* Plaintiffs have sustained serious injuries as a result of some of the Defendants' decision to protect the health of the water users in the remainder of Genesee County because that community was predominately more affluent and at the same time disregard the health of water users in Flint because that community was predominately poor;

12.   *Violation of 42 U.S.C. § 1985(3):* Plaintiffs have sustained serious injuries as a result of the conspiracy of two or more of the Defendants to directly or indirectly conspire to violate Plaintiffs' constitutional rights, said conspiracy being based on invidious racial animus;

13.   *Violation of Elliot Larsen Civil Rights Act ("ELCRA"):* Plaintiffs have sustained serious injuries as a result of their denial of the full and equal en-

joyment of services provided by some of the Defendants because they were residents of a predominately African American community; and

14.    Plaintiffs sustained personal injury, property damage, economic and emotional injury as a result of the constitutional and civil rights violations of the Defendants.

## Summary of Allegations as to Engineering Defendants

15.    The Engineering Defendants were professionally negligent in failing to administer properly the distribution of water from the Flint River using the Flint Water Treatment Plant ("WTP"), and in failing to report the dangers associated with not installing proper anti-corrosive treatment when using the Flint River as a primary source of water.

16.    By assuming responsibility for the administration of placing the Flint WTP into operation using the Flint River as a primary source and/or for evaluating the Flint water system for public safety, the Engineering Defendants assumed the responsibility to satisfy the standard of a reasonable engineer, and thoroughly failed to meet even the most basic standard of care. As a result, the acidic and corrosive water that Defendants caused to flow through Flint's pipes and appliances has irreparably damaged residents' and businesses' pipes and appliances, and the damage and stigma associated with the water crisis has resulted in a reduction in residential and commercial property values. Despite Flint having

switched back to its prior water source, pipes and appliances in residents' homes and local commercial properties remain corroded and contaminated with lead and Legionella.

17.     The Engineering Defendants were professionally negligent in failing to properly evaluate Flint's water system and in publicly declaring its water safe and potable. The Engineering Defendants failed to conduct a root cause analysis, which would have revealed that the pipes were corroding and causing lead and Legionella to enter the resident's homes. The Engineering Defendants also failed to mention that the addition of a corrosion inhibitor was necessary to prevent these serious and well-known health issues, and mandated the usage of highly acidic ferric chloride.

18.     The profound and enduring injuries alleged in this Master Complaint were proximately caused by the Engineering Defendants.

## **JURISDICTION**

19.     This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking injunctive and declaratory relief together with monetary damages against Defendants for violations of the Thirteenth and Fourteenth Amendments of the United States Constitution, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, *et seq*.

20.    This Court has jurisdiction over Plaintiffs' 42 U.S.C. § 1983 claims pursuant to 28 U.S.C. § 1331, as those claims arise under the Constitution and laws of the United States; and 28 U.S.C. § 2201, the Declaratory Judgment Act and supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367 because they are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States.

21.    This particular action does not present novel or complex issues of State law that predominate over claims for which this Court has original jurisdiction.

22.    There are no compelling reasons for declining supplemental jurisdiction over those of Plaintiffs' claims that do not arise under 42 U.S.C. § 1983.

23.    All Defendants reside in this district within the meaning of 28 U.S.C. § 1391(c). This Court has personal jurisdiction over all Defendants because a Michigan state court would have personal jurisdiction under MCL 600.701 and MCL 600.705.

24.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(1) and (2).

25.    Mich. Comp. Laws 600.6440 exempt actions against State agencies from the jurisdiction of the Michigan Court of Claims where the claimant has an adequate remedy in the federal courts.

## **PARTIES**

26.    Plaintiffs have at all times relevant been residents of Flint, Michigan and citizens of the State of Michigan who have suffered personal injuries as a result of exposure to the City of Flint's drinking water, and/or property owners who have had property located in Flint damaged from exposure to the City of Flint's drinking water, and/or have suffered or continue to suffer economic harm caused by the City of Flint's drinking water.

27.    As a result of Defendants' actions, Plaintiffs have suffered injuries including but not necessarily limited to: various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), contract damages and property damages (including but not limited to damaged plumbing and lost real property value).

28.    All individual Defendants are sued in their individual and/or official capacities, as indicated below.

## Governmental Defendants

29.    Defendant Richard Snyder is the Governor of the State of Michigan ("Governor") and is vested with executive power pursuant to Art. V, Section 1 of the Michigan Constitution. The Governor is responsible for the management of state government for the health and welfare of its citizens and residents and is sued by Plaintiffs in both his individual capacity for compensation for the Plaintiffs, insofar as his deliberate conduct constituted an abuse and/or misuse of his authority, and, in his official capacity, for prospective equitable relief to correct the harm caused and prolonged by state government and to prevent future injury. The Governor is sued in his individual capacity for the injuries he caused to Plaintiffs resulting from his deliberately indifferent deprivation of Plaintiffs' constitutional and civil rights.

30.    The City of Flint ("Flint" or "the City") is a Michigan municipal Corporation located in Genesee County, Michigan, so authorized by the laws of the State of Michigan that operates the Department of Public Works and provides water to its residents and property owners as part of its responsibilities and services. Flint is a Defendant because, despite the protests of a number of elected and appointed officials within the organization, the municipal corporation itself, through its

policies, customs and practices deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm it caused Plaintiffs. Flint is also sued because it deprived Plaintiffs of their civil and constitutional rights by violating Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA.

31.    Defendant Daniel Wyant ("Wyant") was Director of Michigan Department of Environmental Quality ("MDEQ") and is sued by Plaintiffs in his individual capacity because he participated in the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm.

32.    Defendant Andrew Dillon ("Dillon") was Treasurer for the State of Michigan and is sued by Plaintiffs in his individual capacity because along with the Governor, Jeff Wright, Dayne Walling, and Edward Kurtz, caused harm to Plaintiffs when they developed an interim water delivery plan in June 2013, which favored the predominately white Genesee County water users and discriminated against the water users in Flint, a predominantly African American community.

33.    Nick Lyon ("Lyon") was Director of the Michigan Department of Health and Human Services ("MDHSS") and is sued by Plaintiffs in his individual capacity because he participated in the decisions that deliberately created, increased

and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

34.    Defendant Adam Rosenthal ("Rosenthal") was a Water Quality Analyst assigned to the Lansing District Office of the MDEQ. Rosenthal is sued in his individual capacity because, as Water Quality Analyst for MDEQ, he approved and participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

35.    Liane Shekter-Smith ("Smith") was Chief of the Office of Drinking Water and Municipal Assistance for MDEQ, holding that position until October 19, 2015 when she was removed from her position. Smith is sued in her individual capacity because during her term as Chief of Drinking Water for MDEQ, she approved and participated in the decisions that deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm her department caused Plaintiffs.

36.    Defendant Stephen Busch ("Busch") was District Supervisor assigned to the Lansing District Office of the MDEQ. Busch is sued in his individual capacity because, as District Office Supervisor of MDEQ, he deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

12

37.     Defendant Patrick Cook ("Cook") was, at all relevant times, a Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ. Cook is sued in his individual capacity because, as Water Treatment Specialist District of MDEQ, he approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

38.     Defendant Michael Prysby ("Prysby") was an Engineer assigned to District 11 (Genesee County) of the MDEQ. Prysby is sued in his individual capacity because, as Engineer assigned to District 11, he approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of harm his department caused Plaintiffs.

39.     Defendant Bradley Wurfel ("Wurfel") was the Director of Communications for MDEQ. Wurfel is sued in his individual capacity because, as Director of Communications for MDEQ, he was responsible for the deliberately misleading and inaccurate communications that increased and prolonged the public health crisis at issue in this case and for making false statements and providing false assurances which caused harm to Plaintiffs.

13

40.     Defendant Jeffrey Wright ("Wright") has been the Genesee County Drain Commissioner since 2001. Wright is sued in his individual capacity because, as the Genesee Country Drain Commissioner, he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the Fourteenth Amendment, as well as the Thirteenth Amendment of the United States Constitution.

41.     Defendant Darnell Earley ("Earley") was the Emergency Manager of the City of Flint appointed by the Governor on November 1, 2013 and served in this capacity until January 12, 2015. Earley is sued in his individual capacity because, during his term as Emergency Manager of Flint, he deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Earley is also sued because he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the Fourteenth Amendment, as well as the Thirteenth Amendment of the United States Constitution. Additionally, as Emergency Manager, he was a policymaker for Defendant City of Flint within the

14

meaning of *Monell*, and as such his actions constituted customs, policies and/or practices of Defendant City of Flint.

42.    Earley violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Earley's actions constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

43.    Defendant Gerald Ambrose ("Ambrose") was the Emergency Manager of the City of Flint appointed by the Governor on January 13, 2015 and served in this capacity until April 28, 2015. Ambrose is sued in his individual capacity because, during his term as Emergency Manager of Flint, he deliberately increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Ambrose is also sued because he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the Fourteenth Amendment, as well as the Thirteenth Amendment of the United States Constitution. Additionally, as Emergency Manager, he was a policymaker for Defendant City of Flint within the meaning of *Monell*, and as such, his actions constituted customs, policies and/or practices of Defendant City of Flint.

15

44.     Defendant Dayne Walling ("Walling") was Mayor of Flint from August 4, 2009 until November 9, 2015 when he was unseated by Karen Weaver. Walling is sued in both his individual and official capacities. He is individually liable insofar as he personally approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Walling is also sued because he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the Fourteenth Amendment, as well as the Thirteenth Amendment of the United States Constitution. Additionally, as Mayor, he was a policymaker for Defendant City of Flint within the meaning of *Monell*, and as such, his actions constituted customs, policies and/or practices of Defendant City of Flint.

45.     The actions of lower level City employees, not named as defendants herein, in delivering residents unsafe water were constrained by policies not of their own making. Flint's water treatment employees were inadequately trained, in light of the duties assigned to them the need for more training was obvious, and the inadequacy was so likely to result in the violation of constitutional rights that Flint's policy makers can reasonably said to have been deliberately indifferent to the need

for additional training. The City is liable because, through its policy makers, it violated the constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger.

46.    Defendant Howard Croft ("Croft") was, at all relevant times, Flint's Department of Public Works Director acting within the scope of his employment and/or authority under color of law. He is sued herein in his individual and official capacities. At all relevant times Croft knew that the City's water treatment plant was unprepared to adequately provide safe drinking water to Flint's residents. He nonetheless caused and allowed unsafe water to be delivered to Flint's residents and did not disclose that Flint's water was unsafe.

47.    Defendant Croft also made numerous false statements about the safety and quality of Flint's water that he knew to be untrue. Defendant Croft violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Croft's actions further constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

48.    Defendant Michael Glasgow ("Glasgow") was, at all relevant times, a water treatment plant operator for the City of Flint acting within the scope of his employment and/or authority under color of law. He is sued herein in his individual and official capacities. Glasgow knew that the City's water treatment plant was

17

unprepared to adequately provide safe drinking water to Flint's residents. He nonetheless allowed unsafe water to be delivered to Flint's residents and did not disclose that Flint's water was unsafe. Defendant Glasgow violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Glasgow's actions further constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

49.    Defendant Daugherty Johnson ("Johnson") was the Utilities Administrator for the City of Flint. Johnson is sued in his individual capacity because, as Utilities Administrator, he approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs.

50.    At all relevant times hereto, the conduct of Defendants Walling, Croft, Glasgow and Johnson was pursuant to the customs, policies and/or practices of Defendant City of Flint.

51.    [Intentionally left blank]

52.    [Intentionally left blank]

53.    [Intentionally left blank]

**Engineering Defendants**

18

54.     Defendant Lockwood, Andrews and Newnam, P.C. ("LAN PC") is a Michigan professional corporation with its principal place of business located at 1311 South Linden Road, Suite B, Flint, Genesee County, Michigan 48532. In 2008, LAN PC was incorporated by Lockwood, Andrews and Newnam, Inc., ("LAN Inc.") after it was retained to conduct studies and reports of a new water supply that was being developed for Flint, Genesee County. At this Flint location, LAN PC held itself out to the world as a Leo A. Daly Company ("LAD").

55.     Defendant LAN Inc. is a Texas corporation with its principal place of business in Houston, Texas. At all relevant times, LAN Inc. conducted business in Genesee County, Michigan through LAN PC. Per its website, LAN Inc.'s Michigan office is located at 1311 South Linden Road, Suite B, Flint, Michigan 48532. LAN Inc. holds itself out as a full-service consulting firm offering planning, engineering and program management services, including civil infrastructure engineering and municipal water treatment and design.

56.     Defendant LAD is a Nebraska corporation with its principal place of business in Omaha, Nebraska. Per its website, LAD's "[s]ervices are extended through [LAN Inc.]." LAD's own website reveals that it advertises itself to the world as having "experience, creativity and technical experience …  in every service we offer[,]" which includes "[p]lanning, architecture, *engineering* and interior design, and program management [] delivered by multidisciplinary teams

hand-picked to provide the precise combination of expertise required for project success." Additionally, LAD, "[a]s a multi-disciplinary firm, _engineering is an integral part of **our** process_ from the beginning of each project. _Our engineers_ work closely with planners, architects and interior designers … _Our in-house engineers_ also provide services for engineering projects independent of architectural design services."

57.    The corporate structure of LAD and LAN Inc. is such that LAD exerts nearly unfettered control over its subsidiary. The top executives between Defendants are identical – Leo A. Daly, III serves as Chairman and CEO of both LAD and LAN, and Dennis W. Petersen is the President of both. Three of LAN's seven directors are high ranking LAD executives, including Mr. Daly, Mr. Petersen and James B. Brader, the CFO of LAD. While LAN does not appear to retain a CFO, LAD's CFO is one of LAN's seven board members. On information and belief, Mr. Brader serves as the _de facto_ CFO of LAN and controls LAN's finances. LAD and LAN Inc. share offices in Houston (LAN's principal place of business), Los Angeles and Miami.

58.    Defendants LAN PC, LAN Inc. and LAD (collectively the "LAN Defendants") are defendants in this action based on their collective failure to properly place the Flint Water Plant into operation using the Flint River as a primary source, specifically neglecting to ensure the viability of the water source

20

for use by the public, and failing to insist upon and implement the necessary safeguards through the plant to allow the water to be safely consumed by the public, and failure to report the dangers associated with not installing proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

59.    The LAN Defendants maintain an office in Flint, Genesee County, Michigan; they regularly conduct business in Flint, Genesee County, Michigan; and they have committed a tort in Flint, Genesee County, Michigan, which are among the basis for personal jurisdiction under MCL 600.705.

60.    Defendant Rowe Professional Services Company ("Rowe") is a Michigan corporation with its principal place of business in Flint Michigan. Per its website, Rowe "has grown to be a leading professional consulting firm, driving infrastructure and development projects for our public, private, governmental, tribal, and not-for-profit client." Its services include civil engineering, surveying, aerial photography and mapping, landscape architecture, planning, and land development.

61.    Defendant Veolia LLC is a Delaware Limited Liability Company with its principal place of business at 200 East Randolph Drive, Suite 7900, Chicago, Illinois 60601.

21

62.     Defendant Veolia Inc. is a Delaware Limited Liability Company with its principal place of business at 200 East Randolph Drive, Suite 7900, Chicago, Illinois 60601.

63.     Defendant Veolia Water is a Delaware Limited Liability Company with its principal place of business at 101 West Washington Street, Suite 1400 East, Indianapolis, Indiana 46204.

64.     Veolia LLC, Veolia Inc. and Veolia Water design and provide water solutions for communities and industries across North America under the banner "Veolia North America."

65.     Defendant Veolia S.A. is a French transnational corporation with its principal place of business at 36-38 Avenue Kleber, 75116, Paris, France. Veolia S.A. provides its services through, and thus derives its revenues from, its four global divisions — water management, waste management, public transport and energy services. The divisions provide its services across the globe, and in North America, those services are provided under the aforementioned moniker "Veolia North America."

66.     In or around 2005, Veolia S.A. united these four global divisions under a single umbrella, and since then, has held out itself and all other Veolia entities to the world simply as one "Veolia." Indeed, Veolia S.A. adopted this

simple "Veolia" branding across all of its businesses, which is evidenced on its website and press releases.

67.     The four global divisions are composed of the subsidiaries and other businesses owned and otherwise controlled by Veolia S.A.

68.     Veolia S.A. and its divisions also underwent a restructuring beginning around 2011. As described by Veolia S.A. Chair and CEO Antoine Frerot, "[o]ur new organization is based on some simple principles—operating as an integrated company, *establishing a single Veolia in each country*, setting up regional management teams and strengthening corporate management functions." Veolia 2013 Annual and Sustainability Report at 10 (emphasis added), available at http://www.veolia.com/en/2013-activity-and-sustainability-report.          Stated differently, "[t]he new Veolia is one Veolia." *Id*. at 14.

69.     As a result, the corporate structure of Veolia S.A., Veolia LLC, Veolia Inc. and Veolia Water (collectively, the "Veolia Defendants") is such that Veolia S.A. exerts nearly unfettered control over the entire Veolia empire. The Veolia Defendants hold themselves out to the world as a single entity, examples of which are numerous and readily observed in the public domain.

70.     For example, the Veolia website makes no effort to distinguish or advertise any distinct legal entities, instead grouping them together and collectively

23

presenting themselves to the world as "Veolia." When "Veolia" advertises the number of its employees and reports its annual revenue, it does so collectively.

71.     Upon information and belief, the Veolia Defendants are controlled by the same top executives, and revenues are commingled and reported as one.

72.     As such, the Veolia Defendants disregard corporate formalities and do not adequately or separately capitalize each of their respective businesses.

73.     The Veolia Defendants collectively maintain several offices in Michigan, including Westland, Livonia and Grand Rapids; regularly conduct business in Michigan; and have committed torts in Michigan, which are bases for personal jurisdiction in this Court pursuant to MCL § 600.715.

74.     The Veolia Defendants are parties to this action based upon providing professionally negligent engineering services in reviewing Flint's water system and declaring the water safe to drink.

75.     The Veolia Defendants have abused the corporate form to avoid liability in this matter. Indeed, while it appears Veolia Water may have executed the subject contract with the City of Flint, the Veolia Defendants, together, as indistinguishable entities, performed services and presented their conclusions as "Veolia." At all relevant times, the Veolia Defendants have represented to the world that they are not distinct legal entities, but rather one and the same.

76.     The Veolia and LAN Defendants are parties to this action because,

24

among other reasons, they were professionally negligent in failing to conduct a root cause analysis which would have revealed that the pipes were corroding and causing lead and Legionella to enter the residents' homes, failing to advise the City that they were out of compliance with the Safe Drinking Water Act's Lead and Copper Rule, failing to advise the City that the addition of a corrosion inhibitor was necessary to prevent lead poisoning and Legionnaires' Disease, and advising the City to use or even increase the dosage of highly acidic ferric chloride.

## STATEMENT OF FACTS

77.    From 1964 to 2014, Flint water users received their water from Lake Huron via the Detroit Water and Sewerage Department ("DWSD"). During this 50 year span, the Flint water users enjoyed safe, clean, fresh water in their homes, businesses, schools, hospitals and other places of public services.

## I.    Relevant Facts – Governmental Defendants

78.    Motivated principally by the actions, political pressure and efforts of Genesee County Drain Commissioner Jeffrey Wright, in 2009, the communities of Flint, Genesee County, Sanilac County, Lapeer County and City of Lapeer, formed the Karegnondi Water Authority ("KWA") to explore the development of a water delivery system which would draw water from Lake Huron and serve as an alternative to water delivered by the DWSD.

79.    Wright, in testimony to the Michigan Department of Civil Rights, said

that he was motivated to develop an alternative water source for the County because, in his opinion and in the opinion of others, the DWSD operation was "the poster child for Detroit corruption."

80.    The projected construction cost of building the KWA water system was approximately $300 million based on the sale of 60 million gallons per day.

81.    Flint's share of this cost was about $85 million. The GCDC promised to buy 42 million gallons per day of water from KWA and ultimately Flint agreed to buy 18 million gallons per day with the GCDC being responsible for 65.8 % of the debt service and Flint responsible for 34.2% of the debt service.

82.    To supply Lake Huron water to its contracting members, the KWA would be required to construct a lake water intake, 63 miles of pipe from the intake plant to Flint and 2 pump stations. The intake facility was financed from a $35 million bond sale consummated in October of 2013. The KWA is authorized to draw up to 85 million gallons per day from Lake Huron.

83.    Unlike the finished water from DWSD, the water to be delivered to Flint through the KWA system would be raw, requiring considerable treatment at the Flint WTP.

84.    In 2011, Flint officials commissioned a study to determine if the Flint River could be safely used by the city as the primary source of drinking water. The "Analysis of the Flint River as a Permanent Supply for the City of Flint, July

2011" ("2011 Report"), prepared by Rowe and LAN cautioned against the use of the Flint River water and the dormant Flint WTP, which would cost millions of dollars to upgrade.

85.     Use of the Flint River as a primary drinking source was rejected in 2011.

86.     In August 2012, the Governor appointed Edward Kurtz as Flint's Emergency Manager. Kurtz, who had the authority to obligate Flint to the KWA, was allied with Wright in presenting arguments for approval to state Treasurer Andy Dillon ("Dillon") and Governor Snyder. Opposing Wright and Kurtz was the DWSD which had a strong financial interest in maintaining Flint and the GCDC as customers.

87.     In November of 2012, Kurtz wrote to State of Michigan Treasurer Andy Dillon suggesting that Flint join the KWA due to projected cost savings over DWSD. This was pursuant to the Emergency Manager's mandate to cut costs, and consistent with political pressure from Genesee County Drain Commissioner Jeff Wright, who had encouraged the formation of the KWA in 2009

88.     Throughout 2012, DWSD presented to Kurtz, Wright, Dillon, Walling and the Governor compelling arguments, based on numerous studies, demonstrating that from a cost and water reliability standpoint, Flint needed to reject Wright's pressure to join KWA and continue to receive water from DWSD.

Most, if not all, discourse about Flint joining KWA or continuing with DWSD included Wright, who consistently raised arguments designed to persuade Kurtz, Dillon and the Governor that the DWSD cost studies were wrong.

89.    In late 2012, Dillon, reacting to Wright's contention that the DWSD cost studies were wrong, requested the independent engineering firm of Tucker, Young, Jackson and Tull ("TYJT") to assess whether it would be cost-effective for Flint to switch from water supplied by DWSD and join the KWA water delivery system.

90.    In February 2013, TYJT concluded that it would be more cost-effective for Flint on both a short term and long-term basis to continue to be supplied with water from DWSD.

91.    In an email from Treasurer Dillon to Governor Snyder dated March 17, 2013, Dillon noted that the KWA representatives were misrepresenting the benefits of the deal and that the "(r)eport that I got is that Flint should stay w DWSD."

92.    On March 26, 2013, in preparation for a conference call between MDEQ and the Department of Treasury personnel, Stephen Busch emailed MDEQ Director Dan Wyant, deputy director Jim Sygo, Liane Shekter-Smith, and other MDEQ officials raising concerns about using the Flint River as the City's water source. Specifically, he noted that continuous use of Flint River water to supply the

28

City of Flint would "[p]ose an increased microbial risk to public health[;]" "[p]ose an increased risk of disinfection by-product (carcinogen) exposure[;]" "[t]rigger additional regulatory requirements under the Michigan Safe Drinking Water Act . . . ;" and "[r]equire significant enhancements to treatment at the Flint WTP, beyond those identified in the TYJT report . . . ." Busch further explained that using the Flint River would impose substantial costs and upgrades to the Flint Water Treatment Plant due to the need to provide softening, limitations on disposal options for lime sludge, increased ozone capacity, and additional backup power.

93.     Likewise, on March 26, 2013, Busch sent an email to Wyant, copying Shekter-Smith, discussing the risks associated with using the Flint River as a drinking water source for the City of Flint. Indeed, Busch stated that the use of Flint River water would pose increased health risks to the public, including a microbial risk, an increased risk of disinfection by-product [trihalomethanes often referred to as "Total Trihalomethanes" or "TTHM"] exposure, the triggering of additional regulatory requirements, and significant upgrades to the Flint Water Treatment Plant.

94.     During this time, Flint continued to negotiate with DWSD to determine whether participation in the KWA or purchasing water from DWSD provided greater financial benefits for the City in the short and long term. On April 16, 2013, DWSD presented Flint/Genesee County with a proposal that purported to

save Flint/Genesee 50% immediately and 20% compared to KWA over the following 30 years. Regardless, Flint rejected DWSD's offer. In response, Dennis Muchmore, Governor Snyder's then chief of staff asked, "if the last DWSD proposal saves so much money, why are we moving ahead with KWA? I take it that Flint doesn't trust them and is just fed up? Does Kurtz have his head on straight here?" In response, Andy Dillon replied, "That is the $64,000 question. DEQ is firm that KWA is better. Are they an honest broker?" (emphasis added). Unfortunately, that question was soon to be answered in the negative when MDEQ played a key role in helping Flint obtain a fraudulent ACO.

95.    On March 27, 2013, MDEQ officials, sensing that Kurtz, Wright, Walling and Dillon were pushing the Governor to approve Flint joining the KWA, acknowledged that the decision to switch the water source for Flint was not based on a scientific assessment of the suitability of the Flint River water.[1]

96.    On March 28, 2013, in an email from Dillon to Governor Rick Snyder, with copies to numerous other Treasury officials and Wyant, Dillon recommended that he authorize KWA going forward, even though the independent

---

[1] The March 2016 Flint Water Advisory Task Force Final Report ("Task Force Report") is attached as Exhibit A and the Task Force Timeline is attached as Exhibit B. Sygo/MDEQ e-mails with Busch re: Flint River water source switch. "As you might guess we are in a situation with Emergency Financial Managers so it's entirely possible that they will be making decisions relative to cost." Exhibit B, Task Force Timeline at 4.

firm he hired to perform a cost evaluation said staying with DWSD made the most economic sense. Dillon wrote the Governor, explaining that, "based upon today's presentations to the DEQ by the City of Flint, KWA and the engineering firm (Tucker Young) Treasury hired to vet the options as to whether Flint should stay with DWSD or join KWA, I am recommending we support the City of Flint's decision to join KWA. The City's Emergency Manager, Mayor, and City Council all support this decision. Dan Wyant likewise concurs and will confirm via email."

97.     By the spring of 2013, Wright had secured 30-year commitments from KWA member communities—except for Flint—to purchase millions of gallons of water. These commitments were necessary in order to sell $280 million worth of bonds to finance the project.

98.     In what became known in the media as "Michigan's Water War," Wright, in March and April of 2013, turned his attention to securing Flint's commitment to purchase millions of gallons of water from the KWA.

99.     Without Flint's participation in the KWA project, Wright knew that it was doubtful that the KWA would be able to finance the project through the sale of $280 million worth of bonds.

100.    It was anticipated that if the financing for the KWA project was secured by April of 2014, the project could be completed by the end of 2016.

101.    In order to "win the war," Wright took on the role as Flint's surrogate.

31

For example, after the TYJT report recommended that he not authorize Flint EM Kurtz to sign up with KWA because staying with DWSD was a better deal for the people of Flint, Wright aggressively argued Flint's case in communicating with Dillon and in the media.

102.   All state and local officials involved in the decision-making process knew that if Flint stayed with the DWSD as its source of drinking water, the Flint Water Treatment Plant ("FWTP" or "WTP") would not have to be upgraded. On the other hand, they all knew that if Flint went with KWA, the Flint WTP would have to be upgraded to treat the raw water coming from Lake Huron.

103.   Governor Snyder was personally involved in the decisional process which led to the transition from DWSD to the KWA. Indeed, because both the City of Flint and the City of Detroit were under State of Michigan emergency management at the time, Snyder was briefed on reports from both Flint's and Detroit's emergency managers and issued directions to both managers as it related to the transition.

104.  On April 4, 2013, Governor Snyder's Chief of Staff Dennis Muchmore emailed Governor Snyder and stated that "(a)s you know, the Flint people have requested Dillon's ok to break away from the DWSD." Snyder instructed Muchmore, Dillon, Detroit's Emergency Manager Kevin Orr, DWSD personnel, and Flint Emergency Manager Ed Kurtz to require DWSD to submit an

additional offer to continue as Flint's water provider before allowing Dillon to authorize the transition away from DWSD.

105.  Later in April, DWSD submitted a final proposal to Flint's Emergency Manager Ed Kurtz and the proposal, detailed background, and financial information were all forwarded to Governor Snyder by his Executive Director, Allison Scott, with an email stating "looks like they were following your instructions."

106.  Shortly thereafter, Brom Stiblitz, a Senior Policy Advisor in the Michigan Department of Treasury emailed Snyder's Executive Director, Ms. Scott, and informed her that Flint's Emergency Manager Kurtz and Detroit's Emergency Manager Orr had spoken and that "Flint will not accept the last offer from DWSD." Again, Ms. Scott forwarded the information to Governor Snyder in an email dated April 29, 2013 and stated "(l)ooks like they adhered to the plan."

107.  Governor Snyder authorized Kurtz, through Department of Treasury officials, to enter into a contractual relationship with KWA for the purpose of supplying water to Flint beginning in mid-year 2016 or 2017.

108.  Governor Snyder participated in discussions between his appointed Emergency Manager of Flint, Kurtz, and his appointed Emergency Manager of Detroit, Kevin Orr. At the time the Governor authorized his Emergency Manager to contractually bind Flint to the KWA project, the Governor and State officials

33

knew that the Flint River would be used as an interim source.

109.   Governor Snyder knew at the time he authorized the switch to the Flint River that there was no agreed upon plan in place to implement the necessary remediation at the FWTP in order to use Flint River water as Flint's sole source of water.

110.   In June 2013, Dillon, Kurtz, Wright and Walling developed an interim plan ("Interim Plan") to use the Flint River water before the KWA became operational. The Interim Plan would cover 2.5 years (April 25, 2014 until approximately October 2016).

111.   Dillon, Kurtz, Wright and Walling knew that in 2011 the Flint River was professionally evaluated and rejected as a drinking source and that upgrades for the Flint WTP would cost millions.

112.   A critical part of the of the interim water plan was to shift funds that would have gone to DWSD to purchase finished water to the WTP upgrades which would enable the WTP to treat the Flint River water and then later treat the raw Lake Huron water delivered when KWA became operational.

113.   When the Governor authorized the use of the Flint River as an interim source of water for Flint, he knew that in 2011 the use of the Flint River water as a primary drinking source had been professionally evaluated and rejected as dangerous and unsafe.

114.   The Governor, in a timeline prepared by his office, confirmed that in June 2013, he knew that Flint River water would be used as an interim source of water.[2]

115.   In May 2013, Emergency Manager Kurtz announced his resignation effective July 2013. The Governor reappointed Michael Brown as Flint's Emergency Manager.

116.   In July of 2013, Governor Snyder reappointed Michael Brown as Flint's Emergency Manager.

117.   In September 2013, after Emergency Manager Brown resigned, Darnell Earley was appointed by the Governor as Flint's Emergency Manager.

118.   As Emergency Manager, Earley was, by his own admission, responsible for ensuring that the City of Flint was in compliance with state and federal laws regarding safe drinking water. In his testimony to the United States House Committee on Oversight and Government Reform on March 15, 2016, he stated "the [e]mergency [m]anager obviously is the person responsible for making sure that those things get done, and I've always accepted that."

119.   On March 14, 2014, Brian Larkin, then associate director of the Michigan Governor's Office of Urban and Metropolitan Initiatives, foretold of the

---

[2] "City of Flint decides to use the Flint River as a water source, per Gov. Snyder timeline." Exhibit A, Task Force Report at 5.

crisis in an email to several others in the governor's office stating, "The expedited timeframe," of switching Flint's water sources, "is less than ideal and could lead to some big potential disasters down the road."

120.   Despite having been copied on an email alerting her to the potential dangers of switching Flint 's water source nearly a year earlier, on March 20, 2014 Shekter-Smith played an integral role in ensuring that the City of Flint received an Administrative Consent Order that (i) required Flint to make use of the Flint Water Treatment Plant, (ii) attempted to prevent Flint from ever returning to the DWSD and (iii) mandated Flint to "undertake the KWA public improvement project or undertake other public improvement projects to continue to use the Flint River, such as additional Flint Water Treatment Plant public improvements, source water protection public improvements, and public improvements to obtain a backup water supply, in order to comply with Act 399."

121. Michael Glasgow, the City of Flint's water treatment plant's laboratory and water quality supervisor informed the MDEQ on April 17, 2014, that the FWTP was not fit to begin operations and that "management" was not listening to him because "they seem to have their own agenda." Glasgow had told Rosenthal the day before, in the same e-mail chain, ". . . it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible . . . . I would like to make sure we are monitoring, reporting and

meeting requirements before I give the OK to start distributing water." The next day, Glasgow wrote Prysby and Busch of the MDEQ, that ". . . I have people above me making plans to distribute water ASAP. I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda."

122.   Johnson and Croft had the professional capacity and power to require Glasgow to undertake the switch to the Flint River water.

123.   Glasgow later told State investigators that he received pressure from superiors—particularly Defendants Johnson and Croft—to begin the switch to the Flint River.

124.   On April 18, 2014, Joshua Spencer, who was responsible for handling public relations for the City of Flint, urged the City to issue a press release stating, "The Tests are in. The Water is Good!;" "In an effort to dispel myths and promote the truth about the Flint River and its viability as a residential water resource, there have been numerous studies and tests conducted on its water by several different independent organizations;" and "For nearly 10 years Mike Glasgow has worked in

37

the laboratory at the City of Flint Water Service Center. He has run countless tests on our drinking water to ensure its safety for public use. Mike has not only conducted tests on water provided to us by Detroit, but also on local water from nearby rivers, lakes and streams including the Flint River. When asked if over the last decade of he has seen any abnormalities of major concern in the water, his response was an emphatic, 'No.'" Johnson told Early that as an MDEQ Official, he was "comfortable releasing the ad."

125.   MDEQ's Cook signed a permit in 2014 that was the last approval necessary for the use of the Flint Water Treatment Plant.

126.   On April 25, 2014, under the direction of Emergency Manager Earley and State officials from MDEQ, Flint water users began receiving Flint River water from their taps even though Glasgow warned that the WTP was not ready.

127.   Beginning in June 2013 and continuing through April 25, 2014, the State created a dangerous public health crisis for the users of Flint tap water when it, Kurtz and Earley ordered and set in motion the use of highly corrosive and toxic Flint River water knowing that the WTP was not ready.

128.   For at least a year prior thereto, the State knew that using the Flint

River water was dangerous and could cause serious public health issues.[3]

129.  In addition, recognizing that WTP could not process water for both Flint and Genesee County, a group of people including Wright, Dillon, and Walling decided that the people of Flint would receive its drinking water from the Flint River and that the out-county residents would continue to receive water directly from DWSD.

130.  At the time that this decision was made, the County and City water systems were physically connected so that the WTP could have processed drinking water from the Flint River and delivered to the County customers.

131.  The City and County operated their water systems jointly. Wright was in control of the County side of the jointly operated water systems and Walling, Kurtz, Ambrose, and Earley, together with the Governor and Treasure Dillon exercised control over the Flint side of the combined water systems during the relevant time. Moreover, the two water systems were operated for decades as a unified system. Because the two systems were physically connected, the County could have been the recipient of the Flint River water output from the WTP. And because of the joint operation of the combined water systems, each of these officials played a role in the decision to provide the predominately African

---

[3] "January 23, 2013: Mike Prysby/MDEQ e-mails colleague Liane Shekter Smith and others about feasibility of Flint switching to the Flint River, highlighting water quality concerns." Exhibit A, Task Force Report at 16.

American Flint community with the high risk water and provide the predominately white customers of the County with the safe water from DWSD.

132.   Wright had apparent contractual authority over the water supply choices that were made in 2013 and 2014. Wright, in a April 1, 2014 Official Statement to prospective bond purchasers stated, "[i]nasmuch as the County Agency has a valid contract with Flint for the supply of water via DWSD, Flint is contractually obligated to continue to purchase water from DWSD in order to supply water to the County Agency. This may be accomplished, notwithstanding Flint utilizing the Flint River for a water source, by Flint continuing to purchase water from DWSD and directing the water to be transmitted directly to the County Agency by isolation valves currently installed in the Flint System."

133.   In the same Official Statement, Wright noted that the County entered into contract negotiations with DWSD to secure water directly from DWSD. Wright noted that during the interim period DWSD had agreed to supply water to the County via Flint without a contract being in place.

134.   Despite Wright's statement, the 1973 water supply contract between the City and County required the City to supply drinking water to the County which met regulatory standards. The contract did not require the City to sell to the County DWSD water.

135.   In his Official Statement, Wright points out that Flint negotiated an

administrative consent order ("ACO") with MDEQ—discussed further below— that permitted the temporary use of the Flint River and that the ACO required Flint to upgrade the WTP and eventually become part of the KWA.

136.   Wright believed the KWA project, as he envisioned it, would not materialize without Flint's participation. The Home Rule debt limit prohibited Flint's participation in the bond sale unless an "emergency" could be created.

137.   Wright, with the assistance of Emergency Manger's Earley and Ambrose, created an "emergency" which required a "sweetheart" ACO to be developed.

138.   The State of Michigan has alleged in criminal indictments that the ACO process was a fraudulent scheme designed to move Flint into Wright's KWA project and to permit the issuance of bonds to cover Flint's share of the debt service.

139.   According to the criminal indictment of Emergency Manager's Darnell Early and Gerald Ambrose, they allegedly participated in a process that allowed the use of bonds to fund the construction of the KWA pipeline despite Flint's problem with its high debt level.

140.   The City of Flint, with MDEQ approval, used an exception to state law by claiming the bonds were needed to fund an emergency cleanup of a retention pond, when in fact the funds were intended to pay for Wright's KWA

41

project.

141.   During that time, Early and others actively worked in various fashions to discourage a return to using water produced by the Detroit Water and Sewer Department, required the use of Flint River water through a Flint Water Treatment Plant, that was deemed unready for service by several people involved with its management, and to ensure the construction of the KWA.

142.   As early as May 2014, the State knew that it had indeed created a dangerous public health crisis, yet failed to take any remedial steps.[4]

143.   In June 2014, citizen complaints about contaminated water continued without the State doing anything to address these complaints. Many Flint water users reported that the water was making them ill.

144.   On October 14, 2014, Flint's public health emergency was a topic of significant discussion in the Governor's office.

145.   By October 2014, the Governor and his staff knew full well of the on-going public health threat to the people of Flint, yet he did absolutely nothing to assist the desperate people of Flint.[5]

_____

[4] The Governor's office received citizen complaints and was well aware of numerous press stories about water quality problems as early as May 2014 and continuing throughout 2015." Id. at 36.

[5] The Task Force Report was critical of the Governor's failure to answer the Flint citizen calls for help in October 2014. "The suggestion made by members of the Governor's executive staff in October 2014 to switch back to DWSD should have

146. By October 2014, the threat of deadly Legionnaires disease was adding to the public health safety crisis.[6]

147. On October 13, 2014, the General Motors Corporation announced that it would no longer use Flint River water in its Flint plant. Despite this clear evidence of serious and significant danger, none of the Defendants took any action to alter the course of the health crisis.[7]

148. Governor Snyder's senior executive staff was immediately aware of the ramifications of GM's decision and the adverse health effects confronting the citizenry of Flint. In an email written only the day after GM's decision to withdraw from Flint River-sourced water, Deputy Legal Counsel and Senior Policy Advisor to the Governor Valerie Brader wrote:

> Now we are getting comments about being lab rats in the media, which are going to be exacerbated when it comes out that after the

---

resulted, at a minimum, in a full and comprehensive review of the water situation in Flint, similar to that which accompanied the earlier decision to switch to KWA. It was disregarded, however, because of cost considerations and repeated assurances that the water was safe. The need to switch back to DWSD became even more apparent as water quality and safety issued continued and lead issues began to surface in 2015, notwithstanding reassurances by MDEQ." Id. at 38.

[6] "[October 2014] Genesee County Health Department initially expresses concern to Flint Water re: increased incidence of Legionellosis and possible connection to water supply." Exhibit B, Task Force Timeline at 7.

[7] "GM announces it is switching from City of Flint water system to Flint Township (Lake Huron) water for its Flint Engine Operations facility until KWA connection is complete, citing corrosion concerns. Prysby/MDEQ notes Flint water chloride levels are "easily within" public health guidelines. Annual revenue loss of $400,000. Id. at 7.

boil water order, there were chemicals in the water that exceeded health-based water quality standards. I think we should ask the EM to consider coming back to the Detroit system in full or in part as an interim solution to both the quality, and now the financial, problems that the current solution is causing.

149. Brader's email was addressed to Dennis Muchmore, Governor Snyder's Chief of Staff, Michael Gadola, the Governor's Legal Counsel and Jarrod Agen, the Governor's Communications Director. Brader also noted that she intentionally did not distribute her email to officials at MDEQ to keep the communication secret and hidden under the Freedom of Information Act. But she noted that she had been in touch with MDEQ officials to brief Flint's Emergency Manager "directly on the water quality issues."

150. Richard Baird, Governor Snyder's "Transformation Manager" and close confidant, who also received a copy of Brader's email, was then present for a conference call with Earley during which Earley rejected the idea of returning to the Detroit Water & Sewer Department.

151. The following day, Governor Snyder's Legal Counsel Michael Gadola issued a more frank assessment of the health issues associated with using the Flint River as the drinking water source for the population of Flint calling its use "downright scary." Gadola advised that, "[t]hey should try to get back on the Detroit system as a stopgap ASAP before this thing gets too far out of control."

152. On October 17, 2014, Flint officials became aware of the threat of

Legionnaires disease resulting from the use of Flint River water. No action was taken by Flint or Genesee County Health officials.[8]

153.   On October 21, 2014, the MDHHS was notified of the health crisis caused by the Flint River water. Again, no action was taken.[9]

154.   In January 2015, State officials met to discuss the ongoing threat to public health posed by the Legionella bacteria in the Flint River water.[10] The public health crisis was not addressed in any serious and/or non-frivolous way.

155.   On January 13, 2015, Earley resigned his position as Emergency Manager and the Governor replaced him with Gerald Ambrose.

156.   On January 21, 2105, State officials ordered water coolers to be installed in State buildings operating in Flint. State officials were concerned that this action, if it became widely known by the public, would reveal their dishonesty because they had been advising the residents of Flint that it was safe to drink the

---

[8] "Genesee Co. Health Department (GCHD) representatives hold conference call with Glasgow and Wright/Flint DPW re: county's concerns about Legionellosis outbreak and possible connection to city's water system. DPW "acknowledges that the distribution system has areas of concern." Id. at 7.

[9] "Susan Bohm/MDHHS e-mails GCHD officials re: Shekter Smith's concern that Flint water would be publicly linked to Legionellosis outbreak in Flint.' I told her the Flint water was at this point just a hypothesis.'" Id. at 7.

[10] "January 2015 (date unclear): Staff from Genesee County hospitals, MDHHS, MDEQ and GCHD meet, and MDHHS Director Nick Lyon directs GCHD to conduct and complete its evaluation of the causes of the increased Legionellosis cases that had begun to occur in 2014." Id. at 18.

tap water and at the same time arranging for alternative water sources for the State employees who were working in Flint.[11]

157.  On January 27, 2015, Flint was placed on notice that the Genesee County Health Department ("GCHD") believed there was an association between the spike in Legionella disease reports and the onset of the use of Flint River water. Again, Defendants did nothing about the impending health catastrophe.[12]

158.  Nick Lyon, the director of the MDHHS, received materials on or about January 28, 2015 from a departmental epidemiologist showing an outbreak of Legionnaires' disease in Genesee County in 2014.

159.  On January 29, 2015, State officials recognized that the public health crisis was caused by the corrosion of the entire infrastructure of the Flint water system. No action was taken to warn the public of the health crisis or to correct the

---

[11] "MDEQ staff (Prysby, Shekter Smith, Benzie, numerous others) communicate via e-mail re: decision to provide water coolers at Flint's State Office building. Some discussion re: how this decision will affect Flint residents' perceptions of drinking water safety, and how the decision will "make it more difficult . . . for ODWMA staff." Id. at 8.

[12] "FOIA request sent by GCHD environmental hygienist James Henry to Flint DPW and Flint Mayor for information on water treatment to support the county's investigation of Legionellosis cases." Exhibit A, Task Force Report at 18.

harm caused by the State's decision to switch from DWSD water to Flint River water.[13]

160.   On January 29, 2015, Sue McCormick, the Director of DWSD, offered Ambrose an opportunity to purchase DWSD water at attractive rates. DSWD's proposal included waiving the reconnection fee. This offer was rejected by Ambrose.

161.   In January 2015, Flint home owner, LeeAnne Walters, called the United States Environmental Protection Agency ("EPA") regarding water issues that she was experiencing at her Flint home. She informed the EPA that she and her family members were becoming physically ill from exposure to the Flint River water coming from her tap.

162.   By the end of January 2015, the Governor's office was fully aware of the public health emergency caused by the rise in Legionella bacteria found in the Flint River and launched a cover-up of the public health crisis.[14]

---

[13] Sygo and Shekter Smith/MDEQ e-mail re: Flint water quality problems. Shekter Smith identifies the problem as corrosion across the distribution system rather than a 'premise plumbing' issue." Exhibit B, Task Force Timeline at 8.

[14] "January 30, 2015: Brad Wurfel/MDEQ e-mails Dave Murray, Governor Snyder's deputy press secretary, re: Legionella, saying said he didn't want MDEQ Director Wyant "to say publicly that the water in Flint is safe until we get the results of some county health department trace back work on 42 cases of Legionellosis in Genesee County since last May." Exhibit A, Task Force Report at 18.

163.   On February 1, 2015, the Governor was fully informed of the health crisis in Flint. Given the months of complaints from Flint water users that the water was discolored, foul smelling/tasting and making them visibly sick, the Governor knew that there was an imminent threat to the people of Flint.[15]

164.   Yet, neither the Governor, nor State and local public officials, took corrective action.

165.   On February 17, 2015, Flint water users staged public demonstrations demanding that Flint reconnect with DWSD. Once again, Ambrose refused to restore Detroit water for Flint water users. State and local public officials falsely insisted that the water was acceptable for use and took no action.

166.   On February 26, 2015, Jennifer Crooks of the EPA wrote an email to MDEQ and EPA representatives. Crooks noted that Walters complained of "black sediment in her water." She noted that the iron contamination was so high that the testing instrumentation could not measure it.[16]

---

[15] Briefing memo is prepared for Gov. Snyder on Flint water situation, including info on residents' complaints about water quality, Mayor Walling's call for assistance, and MDEQ 'backgrounder' downplaying health risks." Wurfel: "It's not like an imminent threat to public health." Exhibit B, Task Force Timeline at 9.

[16] Crooks said in her email: "But, because the iron levels were so high [Michael Glasgow, Flint Utilities Administrator], suggested testing for lead and copper. WOW!!!! Did he find the LEAD! 104 ppb. She has 2 children under the age of 3. ..Big worries here. ..I think Lead is a good indication that other contaminants are also present in the tap water that obviously were not present in the compliance samples taken at the plant. .We also talked about Dr. Joan Rose from Michigan

167.   In a second email on February 26, 2015, Crooks stated that Miguel Del Toral ("Del Toral") of the EPA is of the opinion that the "black sediment" in the Walters water was actually lead.[17]

168.   On February 27, 2015, Stephen Busch advised Del Toral that the City was using corrosion control. This statement was false and Busch knew it was false when he made this statement to the EPA.[18]

169.   Defendant Cook similarly misled the EPA regarding the necessity of using corrosion control in Flint after the switch when he allegedly forwarded information he knew to be false to the EPA in response to its inquiry.

170.   Likewise, Defendant Johnson inhibited efforts by Genessee County Health Department ("GCHD") to obtain information about Flint's water through the Freedom of Information Act ("FOIA"). On January 27, 2015, James Henry, Environmental Health Supervisor at the GCHD, sent a FOIA request to the City of Flint requesting "testing locations and laboratory results within the City of Flint

---

State being on the Flint Tech Advisory committee--would want to dive further into this. .she and her family are also exhibiting the rashes when exposed to the water, and her daughter's hair is falling out in clumps."

[17] Crooks stated that "Miguel is wondering if Flint is feeding Phosphates. Flint must have Optimal Corrosion Control Treatment-is it phosphates? From a public health perspective, can we assume that the high lead levels in Mrs. Walters' neighborhood are isolated to just her area? Or are they more widespread?"

[18] "Busch/MDEQ responds to Del Toral/EPA saying that the City of Flint 'Has an Optimized Corrosion Control Program,' LeeAnne Walters's house is 'not part of the City's established sample site pool' and the residence has PVC plumbing." Exhibit B, Task Force Timeline at 10.

public water system for Coliform, E-Coli, Heterotrophic Bacteria and Trihalomethanes from January 1, 2010 to January 27, 2015. . . [and] a map or list of locations, detailing dead ends, pooling, [and] low pressure . . . areas." A week later, on February 5, 2015, Flint Utilities Administrator Johnson responded that he had not received Mr. Henry's FOIA request but would "fulfill [the] request as soon as possible." Despite Johnson's assurances, by March 2015, GCHD still had not received the information they requested by FOIA.

171.   On March 5, 2015, the Governor and officials in the Governor's office realized that they had a massive public health emergency which *probably included widespread lead poisoning* on their hands and began discussing distributing water filters to Flint water users. These public officials took no action to warn or otherwise protect Plaintiffs, and continued to conceal from them and the public the true nature, extent and severity of the public health crisis.[19]

172.   By March 10, 2015, James Henry of the GCHD raised concerns that he was being stonewalled by the State and City in accessing public health information about the Legionella outbreak in Genesee County. The concealment of the public health emergency by City and State officials – Defendants herein – was shocking and unconscionable.

---

[19] "Officials in Governor's Office and MDEQ begin discussing providing water filters to Flint citizens." *Id.*

173.   As of March 10, 2015, the Defendants knew that the extreme public health emergency involved lead poisoning, deadly Legionella bacteria and a host of other ailments.[20]

174.   Indeed, Defendant Shekter-Smith acknowledged as much on March 12, 2015 when, in connection with a FOIA request from the Genesee County Health Department regarding the outbreak of legionella, she emailed MDEQ employees Brad Wurfel, Jim Sygo, and Sarah Howes that "[w]hile the change in source may have created water quality conditions that could provide additional

---

[20] "James Henry/GCHD e-mails Howard Croft/Flint DPW, Prysby/MDEQ, Mayor Walling and others citing the city's and state's lack of cooperation and failure to respond to his requests for information ---- and a Jan. 2015 FOIA ---- to support county's investigation of potential causes of Legionellosis outbreak in Flint. 'This is rather glaring information and it needs to be looked into now, prior to the warmer summer months when Legionella is at its peak and we are potentially faced with a crisis.'" Exhibit B, Task Force Timeline at 9. The Task Force Report highlights the government misconduct which prolonged the danger created by the State when it decided to use the highly corrosive Flint River water. The Task Force stated in its report that "[a]s the Flint water crisis unfolded, certain state agencies' perceived need to defend the original decision to switch to the Flint River and resist a return to DWSD resulted in public relations and communications efforts that have, at times, been inappropriate. In the spring and summer of 2015, for example, this perceived need to defend a flawed decision manifested itself in attempts by MDEQ and MDHHS to discredit accurate information on lead in drinking water and elevated blood lead levels provided by outside experts. Citizen concerns were at times derided and dismissed, in spite of the fact that various members of the Governor's staff had expressed—and were expressing—concerns about the water situation in Flint at the same time."...**In any event, the facts in this case point to the reality that state government, as the entity in charge of Flint decision-making, failed to protect the health of the city's residents.** Emphasis added. Exhibit A., Task Force Report at 37, 40.

organic nutrient source to support legionella growth, there is no evidence or confirmation of legionella coming directly from the Water Treatment Plant or in the community water supply distribution system at this time" (emphasis added).

175. Despite acknowledging internally that the switch could have caused the legionella outbreak, the very next day, on March 13, 2015, Shekter-Smith approved and praised Stephen Busch on his on his response to the Genesee County Health Department wherein Defendant Busch stated, among other things, that:

- "conclusions that legionella is coming from the public water system without the presentations of any substantiating evidence from your epidemiologic investigations appears premature and prejudice toward that end;

- "[i]t is highly unlikely that legionella would be present in treated water coming from the City of Flint water treatment plan given the treatment plant's use of ozone along with complete treatment and chlorine disinfect contact time to comply with federal surface water treatment rules for potable water;" and

- "there is no direct correlation that can be made to the presence of legionella."

176. That same day, Wurfel wrote in an email to Snyder administration officials, "Political flank cover out of the City of Flint today regarding the spike in Legionnaire cases. . . . Also, area ministers put a shot over the bow last night … with a call for Snyder to declare a state of emergency there and somehow 'fix' the water situation …"

177.   On March 25, 2015, Flint City Council voted to reconnect to Detroit's water system. Governor Snyder's appointed Emergency Manager, Gerald Ambrose, exacerbated the State-created danger by rejecting this vote of the Flint public officials.[21]

178.   In March 2015, Jarrod Agen, Governor Snyder's Director of Communications and later Chief of Staff, participated in conference calls with Harvey Hollins, an aide to the Governor, and others in which Hollins stated that he was hearing from Flint-area pastors that people were complaining about the odor and the look of the water and that they had requested water filters.

179.   On April 24, 2015, Patrick Cook of the MDEQ emailed Miguel Del Toral at the U. S. EPA and in referring to Flint's Water Treatment Plant ("WTP") stated: "Flint is currently not practicing corrosion control at the WTP."

180.   On April 28, 2015, Governor Snyder's Chief of Staff Dennis Muchmore emailed Governor Snyder, his Executive Director Allison Scott, his Director of Communications Jarrod Agen, his Chief Legal Counsel Elizabeth

---

[21] The Task Force further notes that in March, 2015, Emergency Manager Ambrose completely ignored numerous alarms and warnings that the Flint River water was dangerous to the health of the Flint water users. "Flint City Council votes 7--1 to end Flint River service and return to Detroit water service; the vote is non-binding since Flint is under EM control Flint EM Ambrose: 'It is incomprehensible to me that... Flint City Council would want to send more than $12 million a year to the system serving Southeast Michigan, even if Flint rate payers could afford it. (Lake Huron) water from Detroit is no safer than water from Flint.'" Exhibit B, Task Force Timeline at 10.

Clement, Lieutenant Governor Calley to propose announcing that "Flint is ready to take its city under its own control…" The email warned as follows: "Outside of the issues over the water we feel pretty confident going forward. The water issue continues to be a danger flag." (emphasis added).

181.   On June 24, 2015, Del Toral of the EPA prepared a memorandum entitled, "**High Lead Levels in Flint Michigan-Interim Report**" ("Del Toral Report"). On the following day, Del Toral wrote an internal email with respect to the elevated lead in Flint water at EPA stating:

> "I understand that this is not a comfortable situation, but the State is complicit in this and the public has a right to know what they are doing because it is their children that are being harmed."

182.   Del Toral further warned that the failure to inform Flint water users of the elevated lead levels was "bordering on criminal neglect."

183.   The Del Toral Report was shared with, among others, MDEQ's Chief of Office of Drinking Water and Municipal Assistance, Liane Shekter-Smith, MDEQ's Water Treatment Specialist, Patrick Cook, MDEQ's District Supervisor, Stephen Busch, and MDEQ's Engineer assigned to District 11 (Genesee County), Michael Prysby.

184.   Nonetheless, State and local public officials failed to undertake any measures to effectively address any of the dangers, including lead poisoning, identified by EPA Agent Del Toral.

185.   On June 24, 2015, the aforementioned Del Toral Report warned of "High Lead Levels in Flint Michigan." On the following day, Del Toral wrote an internal email with respect to the elevated lead in Flint water at EPA stating:

I understand that this is not a comfortable situation, but the State is complicit in this and the public has a right to know what they are doing because it is their children that are being harmed.

186.   On June 30, 2015, Mayor Walling notified EPA Region 5 Director, Dr. Susan Hedman ("Hedman") that Del Toral was speaking publicly about the Flint environmental crisis.

187.   On July 2, 2015, Hedman advised Walling that he was given a preliminary draft and that it would be "premature to draw any conclusions based on that draft."

188.   On July 10, 2015, MDEQ official Brad Wurfel, in an effort to conceal the public health crisis, appeared on public radio and advised listeners that Flint water was safe and that it was not causing "any broad problem" with lead leaching into residential water. Parents, worried about the lead poisoning of their children, demanded answers from Wurfel. He told the concerned parents, "*[l]et me start here-anyone who is concerned about lead in the drinking water can relax.*" Wurfel, at the time he made this statement, knew his statements were false and he deliberately misled the public about the seriousness of the crisis.

55

189.   By July 2015, multiple agencies within the State of Michigan, includ-ing the Governor, the Governor's Office and MDEQ, had actual notice of high lead exposure and other dangers, including Legionnaires' disease, associated with Flint water.

190.   But there is no doubt that the Government Defendants were well aware of the dangers facing Flint's residents. On July 9, 2015—nearly three months before the City first issued a lead advisory to the public—Mike Glasgow sent an email to MDEQ's Adam Rosenthal with the following "Key Points" listed in all caps:

   a.   Flint has lots of lead pipe, no corrosion control treatment, and has had no legitimate LCR testing for at least a year.

   b.   Amongst low income infants, breast feeding rates are lower, and formula use is higher. Many Flint[] residents cannot afford to flush due to higher water rates. They cannot afford bottled water. This is an unprecedented situation and EPA needs to take this seriously. Now.

   c.   We have one child with an elevated blood lead already…In fact, that is the only reason we know about any of the above.

   d.   MDEQ is still publicly insisting Flint water has tested safe, is safe, and that flint has no violations of any sort.

191.   On July 22, 2015, Governor Snyder's Chief of Staff, Dennis Much-more, wrote to MDHHS Director Lyon and stated that the Plaintiffs' concerns regarding lead poisoning and other dangers were being "blown off" by the Defendants.

192.   Also in the Summer of 2015, Harvey Hollins, Governor Snyder's Director of Urban Initiatives, spoke directly to Governor Snyder and advised him of the growing concerns among Flint residents that they were being exposed to toxic levels of lead.

193.   On July 24, 2015, Wurfel continued to promote the cover-up of the health crisis. In response to the recognition that the Defendants were blatantly ignoring the concerns of Flint residents, he stated, "In terms of near-future issues, the bottom line is that residents of Flint do not need to worry about lead in their water supply, and DEQ's recent sampling does not indicate an imminent health threat from lead or copper."

194.   But the State's sampling did not comply with regulations. Rather, the sampling purposefully skewed results to minimize the crisis. According to an email from Professor Marc Edwards of Virginia Tech that was forwarded to Shekter-Smith and Stephen Busch, among others, on September 21, 2015, the State did, "not have an approved lead sampling pool. Only 13 of the lowest lead sampled homes from 2014, were resampled in 2015. The homes sampling high in 2014, were not asked to be resampled." Professor Edwards continues on to describe a video available on the ACLU website in which, "Mike Glasgow (Flint LCR program) notes what is perfectly obvious from looking at the MDEQ FOIA materials. 'we threw out bottles everywhere just to collect as many as we can, just

to hit our number, and we just turn in every result we get in.'" Professor Edwards then proceeds to note several instances in which the MDEQ covered up high samples.

195.   Indeed, Michael Glasgow essentially admitted that the City's testing procedures were inadequate when he pleaded no contest to willful neglect of duty and agreed to cooperate with the Attorney General's investigation after being accused of distorting the City's water test results by instructing residents to run their water—or "flush" it—before testing, and failing to obtain water from certain houses. These inaccurate results were reported in a February 27, 2015 report entitled, Lead and Copper Report and Consumer Notice of Lead Result."

196.   Several MDEQ officials—including Defendants Busch, Rosenthal, and Prysby—similarly deceived the public about the water's quality. Glasgow has stated publicly that Defendants Busch and Prysby directed him to alter water quality reports and remove the highest lead levels. And following an investigation involving numerous witness interviews and reviewing thousands of documents, the Michigan Attorney General's office charged both Busch and Prysby for their involvement in the crisis. The Attorney General's investigation similarly led to criminal charges against Rosenthal, including for his willful participation in the manipulation of lead testing results and falsely reported that the 90th percentile of the results for lead water testing was below the federal action level. Eventually, a

July 28, 2015 report was altered to exclude some high lead tests and Rosenthal forwarded the altered report on.

197. In August 2015, Professor Marc Edwards of Virginia Polytechnic Institute and State University ("Virginia Tech"), determined that there was serious lead contamination of the Flint water system and stated that the people of Flint faced a major public health emergency.

198. Wurfel, speaking for the State, immediately dismissed and discredited Edwards by stating that Edwards's team "only just arrived in town and (have) quickly proven the theory they set out to prove, and while the state appreciates academic participation in this discussion, offering broad, dire public health advice based on some quick testing could be seen as fanning political flames irresponsibly."

199. By late 2014 or early 2015, Lyon was aware from MDHHS data that there was a dramatic increase in the percentage of Flint children with elevated blood lead level readings from blood drawn during the second and third quarters of 2014, and that Legionnaires' disease was on the rise during the same period of time. Lyon was aware of this dangerous condition but did nothing to report the findings to the Plaintiffs or the public.

200. Lyon knew that these elevated blood lead levels, and an increase of Legionnaires' disease found in its own database, correlated with the introduction of

59

the corrosive Flint River water into the Flint water distribution system. Lyon did not order that any action be taken to warn the public.

201.    The increase in elevated blood lead levels in Flint's children, and Lyon's failure to do anything to prevent further injury to the people of Flint, identifies yet another aspect of this unconscionable government-created health and public safety emergency. Lyon, aware of the elevated blood lead levels in Flint's children, failed to report the evidence to the MDEQ, Governor's Office, EPA or the Flint community. His concealment of this critical information increased the risk and exacerbated the danger.[22]

202.    The Defendants and the MDHHS immediately accused Dr. Hanna-Attisha of providing false information to the public.

---

[22] The Task Force Report states that in July, 2015, the MDHHS knew that there was a spike in elevated blood lead levels of Flint children which correlated with the onset of the Flint River water as a drinking water source for Flint water users. The MDEQ knew its public statement in September about no elevated blood lead levels was false. ("July 28, 2015: MDHHS epidemiologist Cristin Larder finds that children's blood lead tests conducted in summer 2014 "lie outside the control limit" compared with prior years and that this finding "does warrant further investigation." On the same day, CLPPP data manager Robert Scott analyzes the data over a 5-year period and concludes that "water was not a major factor." Later that day, CLPPP manager Nancy Peeler concludes that the lack of persistently elevated blood lead levels in children in Flint beyond the summer months indicates no connection to the change in water in Flint in 2014. Larder then receives email communication from Peeler: Peeler has concluded from CLPPP data and communicated with MDHHS leadership that there is no problem with children's lead levels in Flint." Exhibit A, Task Force Report at 20.

203.  No genuine effort was made to investigate Dr. Hanna-Attisha's findings. To the contrary, on September 28, 2015, in response to Dr. Hanna-Attisha's testing results, Defendant Lyon directed his staff to provide "an analysis of the Vtech/Hurley data and their conclusions," in addition to demanding a "strong statement with a demonstration of proof that the lead blood levels seen are not of the ordinary and are attributable to seasonal fluctuations."

204.  In September 2015, the MDEQ continued to falsely assure the public that use of Flint Water was safe and continued to deny the public health crisis at hand.[23]

205.  On September 25, 2015, Wurfel falsely advised media and the public that MDHHS officials have reexamined its blood lead level data and that the MDHHS statistics do not show the same upward trend documented by Dr. Hanna-Attisha.

---

[23] An example of this type of misleading public statement is found in a MDEQ document entitled, "*DEQ Frequently Asked Questions, Water Lead Levels in the City of Flint, September, 2015*" which stated, **"Are there other ways the city monitors for lead exposure?** The County Health Departments, overseen statewide by the Michigan Department of Health and Human Services, *regularly monitors blood levels* in children throughout Michigan communities. The *leading cause of lead poisoning is exposure to lead paint*. Blood lead level testing results for the 12-month period just after the City of Flint changed its water source (May 2014 – April 2015) *showed no significant change* in the pattern of blood lead levels in Flint, compared to the previous three years. This data *suggests the recent change in water source by the City of Flint has not contributed to an increase in lead exposure* throughout the community." (Emphasis added)

206.    On September 28, 2015, Wurfel stated publicly that the Flint water crisis was becoming "near-hysteria" because of Dr. Hanna-Attisha's report. He said that he wouldn't call her reports "...irresponsible. I would call them unfortunate." Wurfel finished his remarks that day by falsely stating that "Flint's drinking water is safe in that it's meeting state and federal standards."

207.    On September 29, 2015, Wurfel referred to EPA Del Toral as a "rogue employee."

208.    By late September 2015, reconnecting to the Detroit water system was the only reasonable option to protect the health and safety of the Flint water users. Yet the State deliberately chose not to proceed in this fashion. Instead, on or about October 2, 2015, State officials announced that the State would appoint a Flint Water Advisory Task Force and would provide water filters designed to eliminate the lead in the water to Flint water users.

209.    On October 8, 2015, the Governor recognized that he could no longer pretend that the water from the Flint River was safe. He finally ordered Flint to reconnect with the Detroit water system, which contained corrosion control chemicals.

210.    The reconnect to DWSD took place on or about October 16, 2015.

211.   Throughout the period of time between April 2014 (when Flint's water source changed to the Flint River) through October 16, 2015 (when Flint 's water source switched back to the DWSD) MDEQ officials either:

a.   Falsely represented that Flint was using optimized corrosion control chemicals to treat the water for purposes of preventing lead poisoning, when in fact, they were not; or

b.   Adhered to the faulty regulatory position that Flint could poison its citizens with lead contaminated water for two six month monitoring intervals and then decide if corrosion control chemicals were necessary.

212.   On October 18, 2015, MDEQ Director Wyant emailed Governor Snyder and admitted that the delayed implementation of optimized corrosion control for two six-month intervals while Flint's citizens were being lead poisoned was improper. Wyant wrote:

> Simply said, our staff believed that they were constrained by two consecutive six-month tests. We followed and defended that protocol. I believe now we made a mistake. **For communities with a population above 50,000, optimized corrosion control should have been required from the beginning**. (emphasis added).

213.   The next day, on October 19, 2015, City of Flint Technical Advisory Committee meeting, LAN was listed as the "owner" of the "corrosion control" issue.

214.   Starting in approximately November of 2015, the State of Michigan Department of Health and Human Services began publicly reporting blood lead level test results for "Flint Zip Codes 48501-48507." However, the use of zip code

level data for these reports is misleading and significantly underreports the prevalence of lead contamination in blood for Flint residents. Academics studying the data have noted that the zip codes relied upon by MDHHS (48501-48507) include both people who receive their water from the City of Flint and large geographic areas outside of the City of Flint where people receive their water from safe sources. In spite of these noted inaccuracies in the data, MDHHS officials (and their attorneys in court) continue to misleadingly rely upon this inaccurate data to downplay the severity of the crisis.

215.  In December of 2015, Governor Snyder was advised by Harvey Hollins that in addition to the elevated levels of lead in Flint water, there was also a public health threat from potential exposure to legionella.

216.   Flint is currently in a State of Emergency: Mayor Karen Weaver declared a State of Emergency on December 14, 2015. On January 4, 2016, the Genesee County Commissioners declared a State of Emergency. On January 5, 2016, Governor Snyder declared a State of Emergency. On January 13, 2016, the Governor activated the Michigan National Guard to assist the people of Flint. On January 14, 2016, the Governor asked President Barak Obama and the Department of Homeland Security, Federal Emergency Management Agency ("FEMA") to declare Flint a Major Disaster. On January 16, 2016, FEMA issued an emergency declaration to assist the people of Flint.

217.    The relief efforts of State public officials have been ineffective, indeed often frivolous, in mitigating the devastation caused by its creation of the public health crisis. The ineffective relief efforts have prolonged the dangerous conditions and, in many cases, the failed mitigation efforts have further exacerbated the effects of the public health calamity created by the State.

218.    Governor Snyder was directly aware of potential exposure of Flint's residents to legionella bacteria and, for a period of at least three weeks, failed to disclose those risks to the citizens of Flint. Governor Snyder was also aware by the Summer of 2015 that lead contaminants in Flint Water posed a significant public health threat to the citizens of Flint. In spite of this knowledge, Governor Snyder's Administration continued to issue statements that misleadingly, and dangerously, downplayed the public health threat of consuming Flint Water until January 5, 2016 (for lead) and January 13 (for legionella).

219.    Governor Snyder has entered into a joint defense agreement with other State Defendants, including several who have been criminally charged for their participation in the Flint Water crisis, which provides that they will coordinate their defense of this action.

220.    Governor Snyder testified to the House Oversight and Governmental Reform Committee that he did not know that Flint's water contained dangerous levels of lead until October 1, 2015.

65

221.    But on September 25, 2015, Mr. Muchmore wrote Governor Snyder, (at what appears to be his personal email address because it is redacted as "PPI"), "The issue of Flint water and its quality continues to be a challenging topic. The switch over to use Flint river water has spurred most of the controversy and contention. The DEQ and DCH feel that some in Flint are taking the very sensitive issue of children's exposure to lead and trying to turn it into a political football claiming the departments are underestimating the impacts on the populations and particularly are trying to shift responsibility to the state" (emphasis added). So at least five days before Governor Snyder admits knowing that Flint's children were exposed to lead, he was trading emails with his Chief of Staff about the political implications of that exposure.

222.    Mr. Muchmore continued, "We have put an incredible amount of time and effort into this issue because of the impacted neighbors and their children, and the KWA/DWSD controversy and Dillon's involvement in the final decision. Kildee is asking for a call with you. That's tricky because he's sure to use it publicly, but if you don't talk with him it will just fan the narrative that the state is ducking responsibility. I can't figure out why the state is responsible except that Dillon did make the ultimate decision so we're not able to avoid the subject." Mr. Muchmore further states, "the real responsibility rests with the County, city and KWA."

66

223.   But of course, Mr. Muchmore knew exactly what he and the Governor had done to contribute to the problems in Flint—they had actively ignored them and undermined them. Mr. Muchmore came close to admitting as much in a partially redacted email to Wayne Workman at treasury where he stated, "I have a lot of complaints about myself and this Flint thing. If I had acted more quickly on some of my minister's complaints we at least would have had a more robust discussion." But rather than act quickly on those complaints, he dismissed them as simply a product of "old-time negative racial experiences" to use his own words.

224.   Several facts suggest that Governor Snyder knew about the serious safety concerns involving Flint's water long before he admits having known that the "state's experts were wrong" on October 1, 2015 or received Mr. Muchmore's September 25, 2015 email.

225.   At least as early as February 18, 2015 Governor Snyder's right-hand man, Dennis Muchmore was putting the pieces in place to evade responsibility for the Flint water crisis. In response to his office's efforts to try and negotiate an arrangement that would allow Flint to resume purchasing water from DWSD he stated, "[t]his train is leaving and we'll be holding the bag if we don't work out a deal on DWSD for Flint."

67

226.    In fact, for many months before Governor Snyder admits having become aware of the existence of toxic lead in Flint's water several of his most senior advisors—including Dennis Muchmore his chief of staff; Harvey Hollins, his director of Urban Initiatives; Treasury officials Thomas Saxton and Wayne Workman; and Stacie Clayton. Indeed, one of the Governor's spokespersons—Sara Wurfel—was married to the MDEQ employee who is alleged to have knowingly lead the disinformation campaign designed to wrongly assure Flint citizens that the water was safe.

227.    Moreover, for at least the month of September 2015, and possibly longer, MDEQ officials were working with EPA to devise a plan for addressing lead in Flint's water and the attendant need for corrosion control. Additionally, emails from that time reflect planning for a press conference regarding the lead issues that occurred in late September—prior to the conference in early October 2015. It is highly unlikely that the MDEQ devised a plan for addressing lead issues in conjunction with the EPA and scheduled a press conference without the Governor being informed about the situation.

228.    For Governor Snyder's testimony before the House Committee to be accurate, he would have had to disbelieve months of news articles regarding lead in Flint's drinking water and have been shielded from the issue by his Chief of Staff, at least four other senior officials in the Governor's office, the MDEQ, the

EPA, and the communications preparing for the press conference. This is especially so in light of Mr. Muchmore's April 28, 2015 email to Governor Snyder accurately warning that, "[t]he water issue" in Flint "continues to be a danger flag."

229.    Plaintiffs allege, pursuant to Federal Rule of Civil Procedure 11(b)(3), that after a reasonable opportunity for further investigation or discovery, there will likely be evidentiary support that Governor Snyder personally knew:

a.    by, at the latest, the Summer of 2015, that there were imminent public health hazards posed by Flint Water and its role in causing lead poisoning;

b.    by, at the latest, January of 2015, that there were imminent public health hazards posed by Flint Water and its role in causing legionella outbreaks; and

c.    that public assurances provided by members of his Administration that Flint's water was "safe" were recklessly false, and caused or contributed to the poisoning of Flint's citizenry.

230.    The likelihood of evidentiary support alleged pursuant to Federal Rule of Civil Procedure 11(b)(3) is based upon, among other things, the breadth of knowledge of the danger associated with Flint Water within high levels of Governor Snyder's cabinet and Executive Office and the multiple staffers who reported to the Governor, his cabinet members, and Executive Office staff about the problems associated with Flint Water, including inter alia, the following:

a.      Communications within the Governor's Executive Office in March of 2014 that the expedited timeframe for transition to Flint River water "could lead to some big potential disasters down the road";

b.      Communications among officials within the MDHHS in the Summer of 2014 identifying an outbreak in Legionnaires disease;

c.      Public communications in October 2014 that General Motors was switching off of Flint water, and the internal communications within multiple members of Governor Snyder's cabinet and Executive Office staff, including the recommendation of the Governor's legal counsel that Flint's water was "downright scary" and that "[t]hey should try to get back on the Detroit system as a stopgap ASAP before this thing gets too far out of control";

d.      January 2015 communications within the MDHHS and between MDHHS Director Nick Lyon, the Governor and his cabinet regarding the existence of legionella contamination in Flint water;

e.      Communications in March 2015 from (i) the Governor's Director of Urban Initiatives Harvey Hollins identifying lead poisoning in Flint, (ii) communications from Defendant Wurfel that they cover their "political flank" regarding legionella contamination; and (iii) the email from Governor Snyder's Chief of Staff Muchmore to the Governor stating that Flint water continued to be a "danger flag";

70

f.      Public reports in the Summer of 2015 from EPA officials identifying that State of Michigan actions related to Flint water "bordered on criminal neglect"; and

g.      Communications between Harvey Hollins and Governor Snyder in the Summer of 2015 that identified the existence of lead contamination in Flint Water.

231.    The relief efforts of State public officials have been ineffective, indeed often frivolous, in mitigating the devastation caused by its creation of the public health crisis. The ineffective relief efforts have prolonged the dangerous conditions and, in many cases, the failed mitigation efforts have further exacerbated the effects of the public health calamity created by the State.

232.    Moreover, the reaction of many of the Defendants to this wholly preventable crisis has been cold to say the least. For example, when Wurfel was forwarded a response from Bob Wheaton (Manager of Communications for MDHHS), in which ABC News asked about Head start programs giving bottled water to children in Flint after a DHS report talked about the risks of lead. Wheaton had responded to ABC News saying that the bottled water report "was a recommendation – not an order." Wurfel forwarded it to his wife and David Murray, saying only: "Laughing so hard I'm crying right now."

## II.     <u>Relevant Facts – Engineering Defendants</u>

71

233.  Like the residents of any American city, residents of Flint rely on a steady supply of safe and clean water to go about their daily lives. Flint also has commercial and other non-residential properties whose owners rely upon clean and safe water.

234.  The Flint WTP was constructed in 1917 to draw water from the Flint River as the source of Flint's drinking water for nearly 50 years until 1964.

235.  As early as 1964, the U.S. Geological Survey ("USGS") noted high levels of chloride in the Flint River. Due to the concerns regarding the adequacy of the Flint River to provide safe drinking water, Flint evaluated alternatives for a new water supply, and ultimately switched providers. From 1964 to 2014, Flint water users received their water from Lake Huron via purchase from the Detroit Water and Sewerage Department ("DWSD"). This water did not require treatment through the Flint WTP.

236.  On June 9, 1964, Detroit and Flint signed an initial water service agreement. This agreement stated that Detroit would provide water from its Lake Huron Intake when it completed its pipeline to Flint and that Flint would buy its drinking water from Detroit. This Agreement also gave Flint exclusive rights to distribute Detroit water throughout the rest of Genesee County. Flint did not receive water under this agreement until the pipeline was completed in 1967.

237.  On December 20, 1965, Flint "mothballed" the WTP and contracted

72

with the DWSD for treated water pumped along a 70-mile pipeline extending from Lake Huron west to Flint. Flint resold the water to the Genesee County Drain Commission ("GCDC"), which then resold the water to many of its wholesale and retail customers.

238.   On June 28, 1973, Genesee County, acting through the County Agent, GCDC, agreed to "accept water as delivered from the water system of the City provided said water meets all requirements of the various State regulatory Agencies." The 1973 water supply contract did not require Flint to supply the County with DWSD water.

239.   The County water system mains were connected to the City system "to provide an adequate water supply from the City system to the County's system…." In addition, the City agreed that it "shall provide water to the County system at such points as may be mutually agreed upon and in amounts generally sufficient to supply the County's system use."

240.   In October 2003, the 1973 City/County water agreement was supplemented. The "City agree[d] to sell water to the County Agency in such quantities as will meet the demands of the County Agency's customers" and "the County Agency agree[d]to purchase water exclusively from the City through the term of this Agreement or the date it may be earlier terminated . . . ."

241.   During this half-century, Flint water users enjoyed safe, clean, fresh

73

water in their homes, businesses, hospitals and other places of public services.

242. However, since approximately the 1990s, Flint and other local governmental entities had growing concerns over the cost of the DWSD water supply. Amidst these growing concerns, Flint and the other local governmental entities, which included Genesee County, Lapeer County and Sanilac County, commissioned studies for alternative water supplies. Certain studies were completed in 1992.

243. A 2001 report by the Department of Natural Resources noted that certain businesses along the Flint River had permits to discharge runoff from industrial and mining activities, as well as petroleum and gasoline cleanups.

244. In 2004, a technical assessment of the Flint River raised concerns about using the river as a source of drinking water. One of the key points from the technical assessment, entitled "Source Water Assessment Report for the City of Flint Water Supply – Flint River Emergency Intake," prepared by the U.S. Geological Survey, the MDEQ and the Flint Water Utilities Department, was that the Flint River was a highly sensitive drinking water source that was susceptible to contamination.

245. Flint and the local governmental entities again commissioned studies for alternative water supplies, which were completed in 2006 and 2009.

246. The 2009 study, prepared by Rowe, LAN and others, evaluated two

alternatives for water supply – continue to purchase from DWSD or construct a new pipeline (later known as the Karegnondi Water Authority ("KWA") pipeline) from Lake Huron.

247. Also in 2011, Flint government officials commissioned a study (or studies) by LAN and Rowe to determine if the Flint River could be safely used by the City as the primary source of drinking water. One of those studies, entitled "Analysis of the Flint River as a Permanent Water Supply for the City of Flint" (the "2011 Report"), which bore LAN's and Rowe's respective logos, was published in July 2011.

248. The 2011 Report stated that chemically treating Flint River water on a continuous basis would be a challenge and more expensive than chemically treating lake water. It concluded that "water from the river can be treated to meet current regulations; however, additional treatment will be required than for Lake Huron Water …   Although water from the river can be treated to meet regulatory requirements, aesthetics of the finished water will be different than that from Lake Huron." The study further concluded that such treatments to Flint River water could be done if improvements were made to the Flint WTP. However, if used as a water supply, the study noted that "a source water protection management plan should be developed to …   identify potential sources of contamination … "

249. LAN also prepared an additional analysis, attached to the 2011 Report

as an appendix, which detailed over $69 million in improvements that would have to be made to bring the Flint WTP up to current standards. This additional analysis specifically projected costs for corrosion control chemicals that would be required to ensure the safety of water to be drawn from the Flint River.

## III.   Rowe Served As City Engineer for Flint during the Relevant Time Period

250.   The Flint City Charter requires that Flint have somebody serving in the capacity of City Engineer. In order to receive State and Federal funding for projects, it is mandatory for Flint to have a City Engineer to certify and submit required documentation.

251.   In 2007, Rowe was awarded the job to provide professional engineering services as City Engineer to Flint for a five-year period. Rowe provided those services to Flint pursuant to City Contract 07-103 under the broad categories of engineering, surveying, and project management / administration (both design and construction) and technical assistance.

252.   In January 2012, Flint Emergency Manager Jerry Ambrose executed a resolution authorizing Flint to enter into Change Order No. 9, which would extend Rowe's contract as City Engineer from January 1, 2012 to June 30, 2013.

253.   On January 7, 2013, Rowe sent a letter to Kurtz regarding Rowe's review of the December 21, 2012 TJYT presentation on the City of Flint's Water

Supply Assessment.

254.   Rowe's cost analysis review of the TYJT presentation "summarizes the primary differences between the TYJT assessment and [Rowe's] previous studies and provides explanations of why we believe there are differences."

255.   The January 7, 2013 letter states that "it will be necessary to upgrade the Flint WTP and dams to provide reliable, continuous service and compliance with recent surface water treatment regulations."

256.   The letter further states that "Water from the river will require greater effort to treat than water from Lake Huron (more chemicals, power, and residuals)."

257.   In August 2013 Rowe Professional Services Company completed an engineering proposal for improvements to the Flint WTP that would allow continuous operation of the WTP utilizing the Flint River in lieu of continuing service from the DWSD until completion of the KWA pipeline.

258.   The August 2013 Rowe report failed to recommend the use of any corrosion control, including phosphates, to make the Flint River water less corrosive.

259.   On August 22, 2013, James Redding, Director of Engineering for Rowe, emailed Prysby a summary of the upgrades Rowe proposed that are necessary at the Flint Water Treatment Plant. None of the proposed upgrades from

the August 22, 2013 email included any corrosion control.

260.   In September 2013, Rowe was re-hired by Flint for professional services for the 2014 fiscal year, wherein Rowe would continue to serve as City Engineer.

## IV.   Flint's Water Supply is Switch to the Flint River Without the Provision of Corrosion Control

261.   In August 2012, the Governor appointed Edward Kurtz as Flint's Emergency Manager.

262.   In November 2012, Emergency Manager Ed Kurtz wrote to State of Michigan Treasurer Andy Dillon suggesting that Flint join the yet to be formed KWA due to projected cost savings over DWSD. This was pursuant to the Emergency Manager's mandate to cut costs.

263.   In December 2012, during a meeting with the State of Michigan Treasury, Flint rejected the Flint River as a water source because of the comparatively high costs of preparing the Flint WTP to treat water drawn from the Flint River to applicable standards.

264.   In early 2013, Flint Emergency Manager Kurtz signed an agreement to switch Flint's primary drinking water source from the DWSD to the newly formed KWA, which was scheduled to become operational sometime in 2016. Upon information and belief, Flint assumed it would continue to purchase its water

78

from DWSD until the KWA pipeline became operational.

265.  Upon discovery of Flint joining the KWA, DWSD protested, attempted to convince Flint to reconsider switching over to the KWA, and continue purchasing its water from the DWSD. Flint declined, so in April 2013, DWSD gave Flint notice that their long-standing water agreement would terminate in April 2014.

266.  The KWA depended on an infrastructure that had not yet been built, and that would not be completed until at least 2016. Kurtz then proposed drawing drinking water from the Flint River until the KWA was completed as a cost-cutting measure.

267.  In or around June 2013, Emergency Manager Kurtz hired LAN to advise the City with respect to using the Flint River as the City's water source during the construction of infrastructure for the KWA. LAN advised the City regarding the design of an upgrade to the Flint Water Plant and stated that "quality control could be addressed."

268.  On June 10, 2013, LAN submitted a proposal to Flint for upgrading the Flint WTP entitled "Flint Water Treatment Plant Rehabilitation – Phase II." The proposal was to make "improvements . . . intended to help the City operate[] the plant on a full time basis using the Flint River." The proposal was signed by J. Warren Green, Professional Engineer (Project Director) and Samir F. Matta,

79

Professional Engineer (Senior Project Manager).

269.   LAN claimed in its proposal that it's "staff has the knowledge, expertise and the technical professionals to handle all aspects of the projects. Our staff has firsthand knowledge of the [Flint WTP] …

270.   The proposal included the following relevant sections:

a.     A "Scope of Services" section that stated the "project involves the evaluation and upgrade of the Flint Water Plant to provide continuous water supply service to the City of Flint (Flint) and its customers." The upgrades and improvements would allow the use of the Flint River as a water supply.

b.     A "Standards of Performance" section where LAN "agree[d] to exercise independent judgment and to perform its duties under this contract in accordance with sound professional practices." As part of the proposal, it was understood that Flint was relying upon the professional reputation, experience, certification and ability of LAN.

271.   On or about June 26, 2013, Kurtz signed a resolution authorizing Flint to enter into a professional services contract with LAN to place the Flint WTP into full-time operational use, which would draw water from the Flint River as its primary source of water until the completion of the KWA.

272.   Flint formally retained LAN as the design engineer for improvements and upgrades to the Flint WTP for the treatment of new water sources, including both the Flint River and the KWA pipeline. In deciding to proceed with the transition to the Flint River, the City of Flint noted LAN's "extensive experience in this field," and relied upon LAN's identification of the "engineering, procurement,

and construction needs for the project." Although the City recognized that water from the Flint River "would be more difficult to treat," the City concluded, based on LAN's recommendations, that the Flint River was "viable as a source" for the City's water. *See* City of Flint, Water System Questions & Answers (Jan. 13, 2015), available at http://mediad.publicbroadcasting.netlp/michiganlfiles/201512/ CoF-Water-SystemFAQ-1-16-2015.pdf. LAN continued to advise the City with respect to its transition to the Flint River through 2015, and ultimately was paid more than $3.8 million for its engineering services. City officials, including then-Mayor Walling, relied upon LAN's advice in pronouncing the City's water to be safe.

273.   The transition to the Flint River as a primary water source presented many well-known challenges and dangers. Flint's water treatment plant had not been needed to treat the water received from DWSD, as DWSD provided the water in an already treated state. It is critical that a new source of water be properly studied and treated to ensure that its use will not result in the corrosion of pipes in the delivery system. This is particularly important where portions of the delivery system, included but not limited to service lines, are made of lead. According to the EPA, "it is critical that public water systems, in conjunction with their primacy agencies and, if necessary, outside technical consultants, evaluate and address potential impacts resulting from treatment and/or source water changes." Various

factors specific to individual water sources necessitate different treatments, including but not limited to the use of chemical additives. The water obtained from the Flint River was substantially more corrosive than the treated water Flint had been receiving from DWSD. Water becomes more corrosive when it contains greater quantities of chloride, which can enter the water from manmade and natural sources. Flint River water is known to contain about eight times more chloride than Detroit water. It is well known that corrosive water that is not properly treated results in the corrosion of pipes, such that the metals in the pipes, including lead, will leach into drinking water. Phosphates are often added to corrosive water as a method of corrosion control, to prevent metals from leaching into the water.

274.   Upon information and belief, there were no bids submitted by LAN or any other firm for this work, nor were any other firms considered for this work. The contract was awarded without competitive bidding.

275.   On June 29, 2013, LAN met with representatives of Flint, the Genesee County Drain Commissioners Office and the MDEQ to discuss:

a.     Using the Flint River as a water source;

b.     The ability to perform the necessary upgrades to the Flint WTP;

c.     The ability to perform quality control;

d.     The ability for Flint to provide water to Genesee County;

e.     The ability to meet an April or May 2014 timeline; and

82

f.      Developing a cost analysis.

276.    According to incomplete meeting minutes, "the conversation was guided with focus on engineering, regulatory, and quality aspects … " of the items previously referenced, and the following determinations were made:

a.      The Flint River would be more difficult to treat, but was viable as a source;

b.      It was possible to engineer and construct the upgrades needed for the treatment process;

c.      It was possible to perform quality control "with support from LAN engineering which works with several water systems around the state, quality control could be addressed";

d.      The Flint WTP did not have the capacity to treat and distribute sufficient water to meet the needs of Flint and Genesee County;

e.      There were many obstacles to overcome, but completion by the April or May 2014 timeline was reachable; and

f.      The next steps were for LAN to present Flint with a proposal that would include engineering, procurement and construction needs for the project along with cost estimates.

277.    LAN was directly involved in conversations about the potential for lead contamination following the switch. According to a September 3, 2015 email with the subject "Flint Water," sent to Warren Green and Samir Matta of LAN, along with various city and state officials, Public Works Director Howard Croft addressed concerns about the amount of lead found in the water, stating, "[a]t the onset of our plant design, optimization for lead was addressed and discussed with

the engineering firm and with the DEQ."

278.   Upgrading the Flint WTP would have its challenges. Since 1965, the Flint WTP served as a secondary and backup water supply system to the DWSD. Typically, a secondary supply for a public water system would be needed only during emergency situations, and is normally designed for short-term operation, such as providing the average daily demand for only a few days.

279.   Upon information and belief, the Flint WTP was previously upgraded in or around 2004 in order to allow it to operate for an extended short-term period (i.e., approximately six weeks) because of a perceived high risk that the DWSD supply would fail and remain out of service for an extended duration.

280.   Due to the aforementioned 2013 agreement, the Flint WTP needed upgrading to operate on a full-time basis, otherwise it would be unable to provide the citizens of Flint with sufficient quantities of water.

281.   In April 2014, LAN, Flint and MDEQ officials addressed and discussed optimization for lead, and they decided that having more data was advisable before implementing an optimization method.

282.   On April 9, 2014, the City received the necessary permits from MDEQ to draw Flint River water for distribution as the supply source for its water distribution system during the multi-year transition to the new KWA facility.

283.   Despite receiving these permits, the water system was not ready to

84

become operational.

284.   The Flint water system was not prepared for the switch to Flint River water. The Flint River, it turned out, was contaminated 'with rock-salt chlorides washed into the river from road surfaces over the course of many harsh Michigan winters'. The level of chlorides in the Flint River was eight times the levels provided in DWSD water. Chlorides are highly corrosive, and must be neutralized with anticorrosive agents before entering public water systems.

285.   LAN knew, if not recommended, that the Flint WTP would begin drawing water from the Flint River later that month that would not be treated with anti-corrosive measures. Moreover, the potential consequences in endangering the public health as a result of not using anti-corrosive treatments when using water from the Flint River as the primary source were or should have been well-known and foreseeable to LAN, an engineering firm that, according to its website, is a "national leader in the heavy civil infrastructure engineering industry," "one of the most respected engineering firms in the United States today," and "a recognized leader in the industry with a rich history of serving a diverse group of heavy civil infrastructure clients across the country."

286.   From July 2013 through April 2014, LAN provided its professional services, but failed to meet its duty of care and competence. LAN was responsible for providing engineering services to make Flint's inactive water treatment plant

sufficient to treat water from each of its new sources. LAN's actions facilitated the transfer of Flint's water source to river water without proper corrosion control treatment. The improvement and upgrade plans to the Flint WTP were approved by MDEQ in April 2014, pursuant to plans and specifications signed and sealed by LAN. LAN, as Flint's outside contractor, had a duty to recognize the need for corrosion control and advise that it should be implemented. Yet, incredibly, at the time of the switch to Flint River water, no phosphates were being added to the water supply. In fact, nothing whatsoever was being done to account for the corrosive nature of the Flint River water. Moreover, LAN did not require water quality standards to be set for the Flint River water that would be delivered to Flint's residents and property.

287.   On April 25, 2014, Flint officially began using the Flint River as its primary water source, despite the fact that the proper preparations had not been made and Glasgow had warned that the FWTP was not ready.

288.   Within weeks of switching water sources, complaints began to pour in from residents regarding the smell, taste, and color of the drinking water.

289.   In the midst of growing concerns about the safety of its water, Flint engaged two engineering companies to provide their professional opinion regarding the necessary changes to render the water compliant with state and federal laws. First, the City engaged LAN.

86

290.   On August 14, 2014, Flint's water tested above legal limits for total coliform and E. coli bacteria. The City issued boil water advisories on August 16, 2014 and September 5, 2014 in response.

291.   To address the bacteria problem, the water was treated with additional chlorine. However, as has been well known for decades, in corroded pipes, chlorine preferentially reacts with the bare metal instead of attacking solely bacteria. The addition of substantial amounts of chlorine to a water supply was thus ineffective in treating bacteria – so more chlorine was added.

292.   The use of chlorine to disinfect water produced various disinfection byproducts, including trihalomethanes (often referred to as "Total Trihalomethanes" or "TTHM"). When bare pipes are not protected with a corrosion control protocol, more chlorine yields more TTHM.

293.   Immediately after the discovery of Flint's bacterial problems, it was apparent that Flint's TTHM levels were high. This should have been a red flag that the steel in the pipes had been laid bare by the high salt concentrations the water pumped from the Flint River.

294.   Moreover, PowerPoint slides circulated among MDEQ officials— including Busch, Prysby, and Rosenthal—in March and April 2015 showed that MDEQ officials knew as early as May 2014 that the water contained TTHM levels above the EPA's maximum contaminant level. According to the presentation, the

City and MDEQ had also been receiving complaints about the water for some time, including about the water's taste, odor, color, and that it was causing rashes but this failed to prompt any action

295.  As officials were beginning to assess the extent of Flint's TTHM problems, another problem emerged in the summer of 2014; MDHHS reported an outbreak of Legionnaires' disease – another red flag.

296.  Legionnaires' disease is a severe form of pneumonia which, when treated early enough, has a mortality rate of 20%; if left untreated, the rate rises to 80%. Infection in humans occurs when water droplets contaminated with Legionella bacteria are inhaled or when water-containing Legionella enters the trachea. Extensive studies of Legionella have established that the pathogen enters the water supply when the "bio-film" protecting pipes is stripped away, which is exactly what happened when the River's corrosive water entered the City's pipes.

297.  In addition to a rise in the reported incidence of Legionnaires' disease, MDHHS first noted another potential problem related to Flint's water in September 2014; lead poisoning rates "were higher than usual for children under age 16 living in the City of Flint during the months of July, August and September, 2014."

298.  As early as October 1, 2014, it was known that one of the causes of the bacterial contamination was the existence of iron pipes in the City's water distribution system.

299.   Most of Flint's 550 miles of water mains are now over 75 years old and constructed of cast iron piping. Cast iron pipe is subject to internal corrosion, called tuberculation, which causes buildup on the pipe interior, leading to water quality issues, reduced flow and pressures, and leakage. Tuberculation also encourages the development of biofilms, layers of bacteria that attach to the interior pipe wall.

300.   On October 13, 2014, the General Motors Corporation ceased the use of Flint River water at its engine plant because of fears that it would cause corrosion due to high levels of chloride.

301.   On December 31, 2014, the first round of lead monitoring showed results exceeding the Lead and Copper Rule's action levels for lead, 15 parts per billion ("ppb"). Worse yet, these samples were not drawn from the highest risk homes as required by the Lead and Copper Rule.

302.   In January 2015, David Murray, Governor Snyder's deputy press secretary, saw an email from Wurfel stating, "I don't want my director to say publicly that the water in Flint is safe until we get back the results of some county health department of epidemiological trace-back work on 41 cases of Legionnaires' disease in Genesee County since last May."

303. On January 9, 2015, the University of Michigan – Flint water tests revealed high lead levels in two locations on campus, causing the university to turn off certain water fountains.

304. That same day, Earley refused to return to DWSD water, according to the Attorney General's investigation into the crisis.

305. In addition to these events, the City conducted six (6) sampling events on the corrosivity of the "treated" drinking water that occurred either before or concurrently with the creation of reports by the Engineering Defendants. The sampling events were in May 2014, August 2014, October 2014, February 2015, May 2015, and August 2015. The sampling results all showed that the drinking water was very corrosive, and yet none of the reports produced by the Engineering Defendants mentioned these sampling results.

## V.    The Corrosive Water Cause Widespread Damage

306. As a result of the failure to properly treat water from the Flint River, corrosive water was delivered throughout the Flint Water System. The water predictably corroded metal pipes, causing them to leach into water. An estimated 15,000 of Flint's 30,000 residential service lines are composed, at least partially, of lead. The exact number is presently unknown.

307. Setting standards and optimal ranges for water quality is necessary to prevent widespread impacts from substandard or dangerous water. Lead is a

powerful neurotoxin that can have devastating, irreversible impacts on the development of children. There is no safe level of lead, as its effects are harmful even at low levels. Lead exposure in children causes heightened levels of lead in the blood and body, resulting in problems including decreased IQ, behavioral problems, hearing impairment, impaired balance and nerve function, infections, skin problems, digestive problems and psychological disorders.

308.    Lead contamination is not the only problem that is caused when corrosive water is distributed in a public water system. When water corrodes iron pipes, the iron leaching into the water system can consume chlorine. This can eliminate the chlorine necessary to prevent the growth of microorganisms that can cause disease. With chlorine consumed by iron, the risk of infection by organisms such as Legionella increases.

## VI.    LAN Was Asked to Evaluate the Problems But Failed to Do So Properly

309.    In November 2014, LAN was on actual notice of the need to assess the factors contributing to high TTHM levels following the water source change because LAN was engaged to evaluate this issue by Flint and provide a report of its findings, which it did in August 2015.

310.    LAN issued a 20-page Operational Evaluation Report on November 26, 2014, intended to address compliance with EPA and MDEQ operations and regulations. LAN entirely failed to address the hazard of lead associated with the

91

corrosive water flowing through the pipes, at least half of which were made of lead.

## VII.  The Water Problem Became Publicly Known

311.  On January 2, 2015, the City of Flint mailed a notice to its water customers indicating that it was in violation of the Safe Drinking Water Act ("SWDA") due to the presence of trihalomethanes, which was a product of attempting to disinfect the water. It was claimed that the water was safe to drink for most people with healthy immune systems.

312.  The fact that the Flint River water contained such high levels of bacteria is a product of the horrific decision not to implement corrosion control.

313.  In late 2014 or early 2015, a study by MDHHS was published that showed a dramatic spike in elevated blood lead levels in Flint's youngest children. The testing occurred in the Third Quarter of 2014.

314.  This aforementioned spike meant that, by the Third Quarter of 2014, the percent of Flint children with known elevated blood lead level tests rose from 2.5% to about 7%.

315.  This upward spike coincided precisely with the exposure of Flint's children to the toxic water of the untreated Flint River, in their homes, schools and other public locations.

316.  That the aforementioned spike occurred at the time of the exposure to

92

the Flint River water constituted clear and certain notice that a major health emergency confronted the children of Flint.

317.   On January 9, 2015, the University of Michigan – Flint discovered lead in campus drinking fountains.

## VIII.   Veolia Was Hired to Evaluate and Respond to the Water Problem

318.   Veolia submitted to Flint its "Response to Invitation to Bid for Water Quality Consultant," Proposal No. 15-573. Veolia proposed "to address the immediate reliability and operational needs" of Flint's water system.

319.   Flint had requested engineering services:

   a.   To review and evaluate "the City's water treatment process . . . and procedures to maintain and improve water quality";

   b.   To develop and report with recommendations "to maintain compliance with both State of Michigan and federal agencies"; and

   c.   To assist the City in implementing the recommendations.

320.   Veolia, however, responded that "addressing the fundamental issues concerning water quality compliance and operational reliability is much more complex than the recommendations study and advisory services outlined [in City of Flint's request]." Veolia proposed to respond to Flint's requested scope of work by:

   a.   Calibrating "daily water quality samples with the City's hydraulic model";

    b.  Refining "the operational strategies for the plant and distribution system";

    c.  Coordinating "daily efforts across plant, operations and maintenance staff"; and

    d.  Alleviating "continued concerns from the public communications process."

321. In February 2015, Veolia was hired through a resolution that incorporated a standard of performance clause, which stated that "the City is relying upon the professional reputation, experience, certification, and ability of [Veolia]."

322. Defendant Veolia's task was to review Flint's public water system, including treatment processes, maintenance procedures and actions taken. As water treatment professionals, Veolia had an opportunity to catch what LAN and Rowe had missed or refused to warn about – corrosive water was being pumped through lead pipes into the homes of Flint residents without corrosion control.

323. On February 10, 2015, Veolia and the City issued a joint press release to the community at large, indicating that Veolia was an "urban water expert" in "handling challenging river water sources" and that it would be evaluating all of the City's water treatment processes.

324. The press release contained no limitation on Veolia's scope of work. David Gadis, the Vice President of Veolia North America's Municipal &

Commercial Business stated, "We understand the frustration and urgency in Flint[.] We are honored to support your community with our technical expertise so that together we can ensure water quality for the people of the city of Flint." He continued, "We have extensive experience handling challenging river water sources, reducing leaks and contaminants and in managing discolored water." Based on these representations, the people of Flint had every reason to rely on Veolia's subsequent representations of safety.

325.   On February 12, 2015, Rob Nicholas, Veolia's Vice President stated, "We're going to look at the numbers, we're going to look at the plant, we're going to decide how the equipment's functioning, look at the raw water, look at the finished water, decide how it's getting through the pipe to the house, and from that, decide how to fix each of those problems as we go forward."

326.   Despite its representations that it would conduct a thorough, all-encompassing review of the Flint Water system, it took Veolia only six days to issue an interim report on its findings, which it presented to a committee of Flint's City Council on February 18, 2015. Per the interim report, the only issue not in Veolia's scope of study was "why the change from [Lake Huron water via the Detroit system pipeline to Flint River water] or the history of the utility."

327.   In the interim report, Veolia indicated that Flint's water was "in compliance with drinking water standards." It also noted that "[s]afe [equals]

compliance with state and federal standards and required testing." Veolia effectively declared publicly that Flint's water was safe.

328. Veolia's interim report also noted that the discoloration in Flint's water "raises questions," but "[d]oesn't mean the water is unsafe." It noted that among Veolia's "next steps" were to "carry out more detailed study of initial findings" and "[m]ake recommendations for improving water quality."

329. In response to potential questions about "[m]edical problems," Veolia's interim report dismissively claimed that "[s]ome people may be sensitive to any water."

330. Veolia issued its final "Water Quality Report" dated March 12, 2015.

331. In the final report, Defendant Veolia noted that it had conducted a "160-hour assessment of the water treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget." The final report claims that "a review of water quality records for the time period under our study indicates compliance with State and Federal water quality regulations."

332. The final report states that "the public has also expressed its frustration of discolored and hard water. Those aesthetic issues have understandably increased the level of concern about the safety of the water. The review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and based on those

96

standards, the water is considered to meet drinking water requirements."

333.   Specifically addressing the lack of corrosion control, the final report notes that "[m]any people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes. The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water. Polyphosphate addition will not make discolored water issues go away. The system has been experiencing a tremendous number of water line breaks the last two winters. Just last week there were more than 14 in one day. Any break, work on broken valves or hydrant flushing will change the flow of water and potentially cause temporary discoloration."

334.   Therefore, in addition to missing the connection between the lack of corrosion control and lead contamination, Defendant Veolia made a permissive "could" suggestion aimed only at reducing aesthetic deficiencies while suggesting that Flint's drinking water met all applicable requirements and was safe to drink.

335.   In fact, not only did the report fail to discuss lead corrosion, the use of polyphosphate, as suggested, only deals with iron corrosion and could worsen lead corrosion.

336.   As a result of Veolia's actions, the residents of Flint, including Plaintiffs, continued to be exposed to poisonous water beyond February and March

of 2015.

## IX.    LAN and Veolia Fail to Conduct a Root Cause Analysis

337.   Both LAN and Veolia were hired to ensure Flint's water system was protective of human health and compliant with federal and state environmental statutes. In February 2015, LAN issued its report "Trihalomethane Formation Concern," and on March 12, 2015, Veolia issued its report, "Flint Michigan Water Quality Report." Critically absent from both reports was a root cause analysis of why the high TTHM levels existed. A root cause analysis is the standard process used by engineers to determine the origin, case and interrelationship of events. It is a standard practice used by environmental, health, safety and infrastructure engineers whenever an adverse event occurs. Understanding why an event occurred is critical to developing effective recommendations for dealing with an event. It is important to note that a root cause analysis would not have required invasive testing, just consideration of the facts known to date and drawing a conclusion about their interrelationship. Had such an analysis been done, the consultants would have discovered the corrosion of the pipes, and the presence of lead and *Legionella* in the water system.

338.   The causal relationship of events leading to the high TTHM levels is not complex science. It is widely known in the scientific community that:

- Road salt from decades of deicing contaminates northern rivers such as the Flint River;
- Road salt contains chloride, which is highly corrosive to steel and lead pipes and that such pipes are used throughout Michigan and Flint;
- Chloride strips pipes of protective surfaces, which frees *Legionella* and lead;
- Urban rivers contain high levels of E. coli;
- While chlorine is effective in treating E. coli, it becomes far less effective when bare metal has been exposed because the chlorine preferentially reacts with the metal;
- The need to add excessive chlorine indicates that bare metal has been exposed and that corrosion is occurring; and
- Excessive chlorination causes high TTHM levels.

339. LAN's and Veolia's failure to conduct a root cause analysis recognizing the corrosion's role in Flint's water problems is truly inexplicable because, as detailed above, all of these events had been highly publicized before they issued their report:

- The Flint River had been highly impacted by road salt for decades — the river had eight times more salt than water supplied by the DWSD;
- Lead and steel pipes are ubiquitous in the United States, Michigan and Flint;
- In the summer of 2014, Flint suffered one of the worst outbreaks of Legionnaires' disease in U.S. history;
- On October 14, 2014, the General Motors Corporation stops using the City's water because of corrosivity. It was reported next day in press;
- On January 9, 2015, the University of Michigan – Flint shut its water fountains because lead exceed federal standards; and
- In February 2015, if not before, lead in drinking water in other locations also exceed the standards.

99

340.   Any of these red flags, and indeed the general knowledge in the scientific community, should have alerted LAN and Veolia to the extensive corrosion and resultant release of lead and Legionella in the City's drinking water system.

341.   For example, it should have been obvious to LAN and Veolia, as professed experts on water quality and treatment issues, that a small river in an urban environment, such as the Flint River, would be contaminated by chlorides from salt used in road de-icing operations during many Michigan winters. Indeed, in February 2004, the MDEQ, the U.S. Geological Survey ("USGS"), and the City completed an assessment of the Flint River as a possible source of drinking water and concluded that it had a very high susceptibility to potential contamination sources. Moreover, a simple comparison of the chloride levels in the Flint River with that provided by the DWSD, Flint's prior water source, should have quickly alerted LAN and Veolia to potentially serious corrosion issues as the Flint River contains about eight times more chloride than the DWSD-supplied water. The Flint River water also had an extremely high chloride-to-sulfate mass ratio ("CSMR") of 1.6. Normally, a CSMR ratio of greater than 0.5 is a cause for serious concern. Had LAN or Veolia investigated the chloride-to-sulfate ratio in the Flint River, as would be expected of an engineer of ordinary diligence, they would have immediately had reason to believe that Flint's CSMR posed serious corrosion

100

risks.

342.   The City's inability to effectively treat *E. coli* with chlorine should have likewise alerted LAN and Veolia to the existence of corrosion. It is well established by governmental authorities and the scientific community that the inability to treat *E. coli* with chlorine is often caused by heavily corroded piping. According to a study published by the EPA, high *E. coli* concentrations are a product of corrosion, and the inability to treat *E. coli* with chlorine is caused by corroded pipes. Flint's inability to treat *E. coli* with moderate amounts of chlorine, – and the resulting high TTHM concentrations, should have placed LAN and Veolia on notice that Flint's pipes were corroding and releasing lead and other materials into the drinking water supply. The uptick in reported cases of Legionnaires' disease, reported during a press conference prior to LAN's and Veolia's retention, should have put LAN and Veolia on notice that Flint's water system exhibited signs of corrosion. *Legionella*, the bacteria that causes Legionnaires' disease, grows on the film on the inside of pipes, which when stripped away by corrosion frees the Legionella into the drinking water system. Outbreaks of Legionnaires' disease are rare unless pipes have been stripped of their bio-film by warm, corrosive water, which is exactly what exists in the Flint River and water supply. Yet neither LAN nor Veolia drew a connection between

the outbreak and the cause of the outbreak. Nor for that matter, did they make any recommendations to treat the water to prevent or abate an outbreak.

343.   In addition, it was also very well known in the scientific community that pipes, especially old municipal water service lines, contain lead and that corroded pipes leach lead into the drinking water supply. "Lead has been a challenge and a bane for water suppliers since historical times … The numerous articles printed in leading scientific journals, in the United Kingdom and United States, in the late nineteenth century, documenting thousands of cases of lead poisoning caused by lead water pipes, have largely faded in the mist of history. These cases often resulted in death, paralysis, blindness, insanity, convulsions, miscarriages and still births." Dr. Colin Hayes *et al.*, Best Practice Guide on the Control of Lead in Drinking Water, Foreword (Dr. Colin Hayes ed. 2010). As just one of hundreds of examples, a summer 2010 report by the Water Research Foundation stated, "Lead concentrations in tap water are strongly influenced by distribution system water chemistry. In response to changes in water chemistry, high lead concentrations can also be observed in systems with no previous history of a lead problem …  Solubility and dissolution rates of corrosion products are affected by water chemistry parameters including pH, dissolved inorganic carbon, orthophosphate, and the concentration and type of disinfectant residual." These are the exact conditions that existed in Flint's water supply. Finally, just the color of

Flint's water should have led any reasonable engineer to the conclusion that Flint's pipes were dangerously corroded. The source of Flint's water discoloration was rust, a product of steel and lead corrosion. The presence of rust in the water should have alerted LAN and Veolia that Flint's water was corroding its pipes, and that there was thus a danger that lead was leaching into the Flint water system.

## X.    LAN and Veolia's Conclusions Made the Situation Worse

344.   The conditions leading to the release of lead are heavily regulated by the federal government, and indeed Veolia agreed in its scope of work with the City to determine whether such regulatory standards had been met. The federal government mandates the implementation of corrosion control protocols in order to protect the public against the possibility of lead entering the drinking water due to corroding pipes. Concern over lead concentrations in drinking water motivated the passage of the Lead and Copper Rule ("LCR") in 1991. The LCR requires utilities to implement methods to control lead corrosion if the 90th percentile of samples exceeds the action level of 0.015 mg/L. *See* 40 C.F.R. pt. 141, sub. E and I. Flint's own sampling analysis indicated that its system violated the LCR standards.

345.   Veolia, however, failed to conduct any analysis. Nevertheless, it made the false statement in its March 12, 2015 report that its "review of water quality records for the time period under our study indicates compliance with State and Federal water regulations." Veolia and LAN knew, or should have known, that the

Flint water system was in violation of federal safe drinking water standards. Veolia's statement that Flint's water system complied with the LCR prolonged the crisis to this day.

346.   Another reason for the corrosion of pipes is the drinking water's acidity. It is well known that the decay of pathogens and other organic materials such as those found in the Flint River causes water to become more acidic.

347.   It is also well known to water quality engineers that the addition of acidic water quality treatment chemicals, such as ferric chloride which is used as a coagulant to settle out particles at the water treatment plant, can further increase the water's acidity. According to the EPA, "[i]f the raw water for a utility has a relatively high concentration of chloride and a history of lead corrosion problems, coagulants that add to chloride concentration should be avoided. Also, since a lower pH will increase corrosion in almost all cases, a utility should consider the finished water pH goal before implementing enhanced coagulation." U.S. EPA Office of Water, *Enhanced Coagulation and Enhanced Precipitative Softening Guidance Manual* § 6.4, (EPA 815-R-99-012, May 1999).

348.   Veolia should have recommended maintaining the drinking water's neutral pH by adding phosphate, but instead, in direct contradiction of federal authorities, recommended increasing the dosage of ferric chloride – a very potent, corrosive acid. According to the Centers for Disease Control and Prevention:

Chemical additives are added to water during the water treatment process. More than 40 chemical additives can be used to treat drinking water. Many of these commonly used additives are acidic, such as ferric chloride and aluminum sulfate, which are added to remove turbidity and other particulate matter … These acidic water treatment additives can interfere with corrosion protection … Lead and copper are rarely detected in most drinking water supplies. However, these metals are a concern to consumers. Because some household plumbing fixtures may contain lead or copper, corrosive waters may leach (pick up) lead and copper from household plumbing pipes after entering a home … The most common reason for water utilities to add corrosion inhibitors is to avoid lead and copper corrosion with older homes, and the second most common reason is to minimize corrosion of pipes in the distribution system … The tendency of water to be corrosive is controlled principally by monitoring or adjusting the pH, buffer intensity, alkalinity, and concentrations of calcium, magnesium, phosphates, and silicates in the water.

Centers for Disease Control and Prevention, *Fluoridation of Drinking Water and Corrosion of Pipes in Distribution Systems Fact Sheet*, http://www.cdc.gov/fluoridation/factsheets/engineering/corrosion.htm (last updated July 10, 2013).

349. Nowhere did Veolia recommend that the City take steps to institute corrosion control to prevent lead and *Legionella* from spreading throughout the City's water supply. Veolia merely suggested the implementation of corrosion control (here the addition of phosphates or other corrosion controls) as a *possible*, but not wholly effective means for minimizing *water discoloration*. There was no mention of the need to add corrosion control to prevent the release of lead and *Legionella*. Veolia's report states, "The water system *could* add a polyphosphate to

105

the water as a way to minimize the amount of *discolored water*." (Emphasis added). The report explains that, "Polyphosphate addition will not make *discolored water* issues go away." (Emphasis added). Thus, rather than recognizing that corrosion control was *required* to render Flint's water system compliant with federal regulations and prevent catastrophic corrosion, Veolia merely suggested adding phosphate to address water discoloration. Even Veolia's *suggested* dosage to address discoloration, 0.5 mg/L was far too low. In February 2016, the City was adding four to eight times as much phosphate, 2 to 4 mg/L.

350.  Veolia's conclusion that no efforts needed to be undertaken to maintain the neutrality of the water supply, is presented as a scientific certainty however. Its March 2015 report states that prior to arriving at its conclusions, Veolia undertook "laboratory testing" and concluded that, "[c]urrent ferric chloride dosages are too low and dosages of 100 mg/L or more are recommended." Veolia acknowledged that its recommended increase was significant: "This increase to 100 mg/L is twice what is currently being fed and much higher than what had previously been fed last year."

351.  At the same time that Veolia gave the unqualified opinion that the current dosage is "too low," and should be doubled, Veolia knew that the City had no corrosion control protocol and knew, or should have known, that significant corrosion was already occurring. Veolia's directive that the City double its dosage

of ferric chloride was unqualified and in no way warned that acidic water would increase corrosion.

352.   In August 2015, LAN made the same recommendation to increase the dose of ferric chloride.

353.   LAN and Veolia should have told the City to *reduce* the concentration of ferric chloride, and that adding phosphate as a pH buffer was *mandatory*. No such recommendation was made, and as a result, the lead and *Legionella* courses through the City's water supply to this day.

354.   A graph prepared by the Flint Water Study Group from Virginia Tech shows that the pH of Flint's water distribution system became more acidic after the Veolia Report was issued in March, even as the pH in the Flint River became less acidic:



355.   The graph above shows that the Flint River had a harmless pH at or above 8.0 for all of 2015, and steadily increased after June. By comparison, the

graph shows that the pH in Flint's municipal water supply started dropping steadily from 7.9 in March (just after Veolia made its recommendation to double the ferric chloride concentration) to 7.3 in August. This difference is significant. pH is measured on a logarithmic scale, meaning that a pH of one whole number, such as 7.0 is ten times more corrosive than a pH of another whole number, such as 8.0 The drop in pH from 7.9 to 7.3 indicates a dramatic increase in the corrosivity of Flint's water.

356.   The graph above is punctuated with quotes from Defendants' emails and other documents that illustrate the contradictory information provided by State officials regarding the existence of corrosion control measures and lead in Flint's drinking water.

357.   On June 24, 2015, the EPA reached a similar conclusion about the City's addition of ferric chloride:

> In addition, following the switch to using the Flint River, the City of Flint began adding *ferric chloride*, a coagulant used to improve the removal of organic matter, as part of the strategy to reduce the TTHM levels. Studies have shown that an increase in the *chloride-to-sulfate* mass ratio in the water can adversely affect lead levels by *increasing the galvanic corrosion of lead in the plumbing network*.

Memorandum, High Lead Levels in Flint, Michigan - Interim Report, from Miguel A. Del Toral, Regulations Manager, Ground Water and Drinking Water Branch, to Thomas Poy, Chief Ground Water and Drinking Water Branch (June 24, 2015)

(emphasis added).

358.   Both LAN and Veolia analyzed the pH in Flint's water. Both made recommendations about the addition of chemicals that affect pH. Both were negligent in their analysis of the pH and their recommendations. Had the City started adding polyphosphate or otherwise controlled for corrosion, or decreased the dosage of ferric chloride, less lead and Legionella would have been released into Flint's water supply.

## XI.   Veolia and LAN Mislead the Public, Falsely Assuring Them Water Was Safe

359.   Not only were LAN and Veolia hired for the express purpose of determining the cause of Flint's water problems and identifying the corrective measures necessary to render Flint's water system compliant with state and federal regulations, they were hired to give assurances to the residents that their water was, quite simply, safe to drink. LAN and Veolia complied with their mandate, and provided assurances that the water was safe to drink — when it was not.

## XII.   Lead's Devastating Health Effects and Other Personal Injuries Cause by Flint's Water Crisis

360.   Lead's catastrophic effects are indisputable. According to the EPA, "[y]oung children, infants, and fetuses are particularly vulnerable to lead because the physical and behavioral effects of lead occur at lower exposure levels in children than in adults. A dose of lead that would have little effect on an adult can

have a significant effect on a child. In children, low levels of exposure have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells."

361.   According to the World Health Organization, "lead affects children's brain development resulting in reduced intelligence quotient (IQ), behavioral changes such as shortening of attention span and increased antisocial behavior, and reduced educational attainment. Lead exposure also causes anemia, hypertension, renal impairment, immunotoxicity and toxicity to the reproductive organs. The neurological and behavioral effects of lead are believed to be irreversible."

362.   The behavioral effects of lead poisoning in children cannot be overstated. According to many of the leading researchers on lead, increased lead levels in childhood are associated with an increased likelihood of ADHD behaviors, delinquent behaviors and arrests, including arrests involving violent offenses.

363.   Lead is so harmful that, according to the EPA, "ingestion of lead can cause seizures, coma and even death."

364.   The effects of lead exposure are long lasting. The EPA has explained that, "[l]ead can accumulate in our bodies over time, where it is stored in bones along with calcium. During pregnancy, lead is released from bones as maternal

110

calcium and is used to help from the bones of the fetus. This is particularly true if a woman does not have enough dietary calcium. Lead can also cross the placental barrier exposing the fetus to lead. This can result in serious effects to the mother and her developing fetus, including: reduced growth of the fetus [and] premature birth."

365. Lead is also harmful to adults. The EPA warns that "[a]dults exposed to lead can suffer from: Cardiovascular effects, increased blood pressure and incidence of hypertension, [d]ecreased kidney function, [and] [r]eproductive problems (in both men and women)."

366. The costs of lead poisoning are real and substantial. It has been estimated that each case of childhood lead poisoning leads to $5.9 million in medical care costs over the course of appropriate treatment. Leonardo Trasande and Yinghua Liu, *Reducing The Staggering Costs Of Environmental Disease In Children, Estimated At $76.6 Billion In 2008*, Health Affairs, 30, no.5 (2011): 863-870.

367. The World Health Organization explains that the direct medical costs of lead exposure include treatment for acute lead poisoning (typically chelation therapy), as well as the treatment of cardiovascular disease in adults who develop hypertension following lead exposure.

368. Given the long-lasting risks of lead exposure and the potential for lead

111

sediment to be disturbed and re-mobilized into the water system, Plaintiffs will require regular medical and tap water testing and evaluation, at bare minimum, in accordance with government standards.

369. Additionally, as described more fully above, the water crisis in Flint caused an outbreak of Legionnaires' disease. As explained above, the presence of Legionella was a direct and proximate result of the switch to the Flint River as a water source and related conduct. At least 87 Flint residents contracted Legionnaires' and at least nine died. Those individuals who became infected with Legionnaires' disease suffered death, and for those who lived, incurred pain and suffering as well as substantial medical costs due to Defendants' conduct.

370. Finally, as a direct and proximate result of Defendants' conduct, Plaintiffs have suffered extreme emotional distress.

## XIII. Flint's Children: Catastrophic Lifetime Losses

371. Flint's most vulnerable, its children, have suffered the most disastrous consequences from lead exposure – diminished potential over the entire course of their lives. The World Health Organization states, "[t]hese costs are sometimes referred to as *lost opportunity costs ...* When exposure to lead is widespread in a society, the aggregate loss of intelligence (and thus economic productivity) can be substantial."

372. Notably, this estimate is conservative as it relates solely to lost

112

earning potential and does not include costs related to special educational, medical, sociological, disability and occupational services, or long-term monitoring and treatment costs.

373.   According to an analysis of the economic losses attributable to lead exposure in 2009, "[t]he present value of Michigan's economic losses attributable to lead exposure in the 2009 cohort of 5 year-olds ranges from $3.19 billion (using U.S. blood lead levels) to $4.85 billion (using Michigan blood lead levels) per year in loss of future lifetime earnings." Michigan Network for Children's Environmental Health, *The Price of Pollution: Cost Estimates of Environment Related Childhood Diseases in Michigan* (June 2010). This report, of course, does not include estimates of the fallout from Flint's lead crisis.

374.   Other researchers have estimated the economic impact of childhood lead poisoning to be as high as $50.9 billion per year in lost economic productivity resulting from reduced cognitive potential from preventable childhood lead exposure. *See supra,* Trasande & Liu.

375.   As a direct and proximate result of Defendants' conduct, Flint's children have suffered specific, measurable damages in the form of lost earning potential. They have also incurred damages in the form of required special educational, medical, sociological, occupational and disability services and related education assistance programs.

113

## XIV.  Property Damage Caused by Defendants' Conduct

376.  In addition to the devastating health effects and lost economic productivity caused by lead exposure, Defendants' conduct, as described above, has caused significant property damage.

377.  The property damages sustained by Plaintiffs fall into three basic categories. First, the Plaintiff owned pipes and appliances themselves have corroded, shortening their life span, and causing further damage when they break. Second, the corroded pipes and appliances remain a continuing source of lead and potentially Legionella, thus pipes and appliances must be replaced or else remain a continuing source of harmful exposure. Finally, the value of Plaintiffs' real property has been substantially diminished as a result of the continuing questionable safety of Flint's water and existence of corroded pipes and appliances.

378.  Although the City has begun adding polyphosphate to its system to reduce the leaching of lead from its service lines, this is unlikely to render Flint's water safe because many of the pipes have become so corroded that not even phosphate will be able to fully encapsulate the surface of the pipes and prevent lead from leaching into the water supply.

379.  The residents' homes have been affected in the same fashion. Even with the addition of phosphate, their pipes and appliances will remain corroded until replaced, and continue to be a source of lead and potentially Legionella.

114

Solubilized and particulate lead and Legionella remain in portions of the piping system and appliances, and can become remobilized at any time, causing further damage and health effects.

380.   The effect of corrosive water on residential and commercial piping and appliances is well understood. For example, a 2014 study by the Water Research Watershed Center stated, "[w]ith respect to the corrosion potential of YOUR drinking water, the primary concerns include the potential presence of TOXIC Metals, such as lead and copper; deterioration and damage to the household plumbing, and aesthetic problems such as: stained laundry, bitter taste, and greenish-blue stains around basins and drains."

381.   The Water Research Watershed Center has further explained that, "The cost of corrosion can be expensive. Corrosion can impact you and your family's health, aesthetic quality of your water, waste money, and damage your household piping and fixtures."

382.   Not only does corrosion cause the "premature failure of household plumbing and plumbing fixtures," the Water Research Watershed Center has explained, corrosion also "decreases the efficiency of hot water heaters and may cause premature failure to the heater." According to a Michigan Radio news story, Virginia Tech researchers have recently returned to Flint out of concern that "lead and other metals leaching from damaged pipes have accumulated in their hot water

heaters making bathing hazardous." The Virginia Tech researchers will be testing water heaters for lead and Legionella bacteria.

383.   Moreover, residents have already reported damage to major appliances such as dishwashers and washing machines following Flint's decision to switch water sources.

384.   According to emails from Governor Snyder's office, the State estimates that replacing Residents' pipes alone could cost between $6,000 and $8,000 per household. Other estimates of those replacement costs are far higher.

385.   Corroded pipes not only present a continuing health threat, they also risk further damage to one's property because corrosion can result in deep pits in the pipe or tank walls that can eventually break, causing substantial water damage to homes and businesses.

386.   Although the City has stated it intends to begin replacing some City-owned pipes, this is far from sufficient to render Flint's water safe. Sergio Kapusta, a fellow at NACE International, an industry organization that develops corrosion prevention and control standards in Houston, has explained that "changing all the mains in the city will not really solve the problem for the homeowners" because the lead piping in these homes probably has been severely compromised. "The corrosion is not going away. It's still there."

387.   Plaintiffs have been left to pay for the damage caused by the

Engineering and Governmental Defendants. This has proven nearly impossible, as many of the City's residents survive on very little money. To make matters worse, the Washington Post has reported that, "many in Flint say banks are refusing to offer refinancing that could free up money to pay for the retrofitting, and that the costs are not covered by insurance. The crisis has created a perfect storm to strip their houses of their remaining value, they say."

388.    Replacing the piping and affected appliances in each home and business is the only way to guarantee that a home or business will be unaffected by corrosion and lead. The cost of such replacements will range into the tens of thousands, if not more, per structure.

389.    Moreover, the problems associated with Flint's water have had and are having a significant impact on residential and commercial property values and rental rates in the City. As Daniel Jacobs, an executive with Michigan Mutual explained, "[t]he tragedy is an already depressed community is now likely to see housing values plummet not only because of the hazardous water, but because folks cannot obtain financing."

390.    Certain banks and mortgage companies have refused to make loans, unless the borrower establishes that its water is potable. A Wells Fargo & Co. spokeswoman said it is reviewing government lending guidelines: "[u]ntil [water] testing and potability is affirmed, it will be difficult to lend," said the

spokeswoman, who said such difficulties would apply to all lenders. Representatives from Bank of America and J.P. Morgan similarly have acknowledged requiring verification of potable water to provide financing to Flint's residents. Lenders claim their hands are tied. As the Federal Housing Administration, which backs loans to less-creditworthy borrowers, explained, government regulations require "a continuing and sufficient supply of safe and potable water" to provide home financing.

391.   This creates a catch-22. Despite having switched back to receiving its water from DWSD, the current extent of corrosion in Flint renders the water unsafe because the pipes and appliances will remain corroded and sources of lead until they are replaced. However, residents cannot obtain financing to replace their pipes and appliances until the water is deemed safe.

## XV.   Defendants' Miscount Has Resulted in Criminal Charges and Other Government Investigations

392.   As the events that gave rise to this lawsuit emerged, multiple government investigations were launched including congressional hearings.

393.   One such investigation has been spearheaded by the Michigan Attorney General's Flint legal team which interviewed over 180 witnesses, reviewed hundreds of thousands of documents, and ultimately filed criminal charges against several current and former City and State officials, many of whom

118

are Defendants in this case. The Attorney General's investigation resulted in the

following charges[24]:

| Defendants | Criminal Charges |
|---|---|
| City Officials | |
| Darnell Earley – Emergency Manager | <ul><li>False Pretenses, Felony</li><li>Conspiracy to Commit False Pretenses, Felony</li><li>Misconduct in Office, Felony</li><li>Willful Neglect of Duty in Office, Misdemeanor</li></ul> |
| Gerald Ambrose - Emergency Manager | <ul><li>False Pretenses, Felony</li><li>Conspiracy to Commit False Pretenses, Felony</li><li>Misconduct in Office, Felony</li><li>Willful Neglect of Duty, Misdemeanor</li></ul> |
| Michael Glasgow - City of Flint Laboratory and Water Quality Supervisor | <ul><li>Willful Neglect of Duty, Misdemeanor (pleaded no contest)</li><li>Tampering with Evidence, Felony (charged dismissed as part of plea)</li></ul> |
| Howard Croft – City of Flint Director of the Department of Public Works | <ul><li>False Pretenses, Felony</li><li>Conspiracy to Commit False Pretenses, Felony</li></ul> |
| Daugherty Johnson – City of Flint Utilities Director for the Department of Public Works | <ul><li>False Pretenses, Felony (charge dismissed as part of plea agreement)</li><li>Conspiracy to Commit False Pretenses, Felony (charged</li></ul> |

---

[24] Corinne Miller, MDHHS Former Director of the Bureau of Epidemiology and State Epidemiologist, was also charged as part of the Attorney General's investigation. As part of a plea agreement, Miller pleaded no contest to willful neglect of duty and must cooperate with the Attorney General's investigation into the Flint Water Crisis.

| | |
|---|---|
| | dismissed as part of plea agreement) <br> • Pled no contest to one added misdemeanor public records charge as part of plea agreement |
| MDEQ Officials | |
| Stephen Busch - MDEQ District 8 Water Supervisor | • Misconduct in Office, Felony <br> • Conspiracy – Tampering with Evidence, Felony <br> • Tampering with Evidence, Felony <br> • Treatment Violation, Michigan Safe Drinking Water Act, Misdemeanor <br> • Monitoring Violation, Michigan Safe Drinking Water Act, Misdemeanor |
| Michael Prysby – MDEQ District 8 Water Engineer | • Two counts of Misconduct in Office, Felony <br> • Conspiracy – Tampering with Evidence, Felony <br> • Tampering with Evidence, Felony <br> • Treatment Violation, Michigan Safe Drinking Water Act, Misdemeanor <br> • Monitoring Violation, Michigan Safe Drinking Water Act, Misdemeanor |
| Liane Shekter-Smith - MDEQ Former Chief of Drinking Water and Municipal Assistance | • Misconduct in Office, Felony <br> • Willful Neglect of Duty, Misdemeanor |
| Adam Rosenthal - MDEQ Water Quality Analyst | • Misconduct in Office, Felony ▪ Willful Neglect of Duty, <br> • Misdemeanor <br> • Tampering with Evidence, |

120

| | Felony<br>• Conspiracy – Tampering with Evidence, Felony[25] |
|---|---|
| Patrick Cook - MDEQ Specialist for Community Drinking Water Unit | • Willful Neglect of Duty, Misdemeanor<br>• Misconduct in Office, Felony<br>• Conspiracy, Felony |
| MDHHS Officials | |
| Nick Lyon - MDHHS Director | • Involuntary Manslaughter, Felony<br>• Misconduct in Office, Felony |

## XVI.  Efforts to Remediate the Harms Alleged Herein Are Inadequate

394.   In March 2017, a settlement was reached in Concerned Pastors for Social Action v. Khouri, Case No. 2:16-cv-10277 (E.D. Mich. filed Jan. 27,2016). That suit was brought by citizens of Flint, Michigan against the State of Michigan and related entities for their failure to comply with the Safe Drinking Water Act, 42 U.S.C. § 300j-8(a). The settlement provides that the State of Michigan will provide $97 million for service line replacement, tap water monitoring, filter installation, bottled water distribution, and health programs.

395.   The prospective relief provided for in the Concerned Pastors settlement fails to adequately fund service line pipe replacement or necessary

---

[25] In December 2017, Adam Rosenthal agreed to plead no contest to a public records charge, resulting in dismissal of all previous charges. The public records charge was later dismissed in September 2018. Nancy Peeler was charged with Misconduct in Office, Felony, Conspiracy, Felony, and Willful Neglect of Duty, Misdemeanor. Robert Scott was charged with Misconduct in Office, Felony, Conspiracy, Felony, and Willful Neglect of Duty, Misdemeanor. Finally, Eden Wells was charged with charged with Obstruction of Justice, Felony, and Lying to a Peace Officer, Misdemeanor.

121

health programs. Moreover, it does not even attempt to remediate the harm caused by the Government Defendants' unconstitutional conduct.

396.   For example, corroded private service lines and appliances present an ongoing public health concern as these stripped pipes are a breeding ground for potentially life-threatening bacteria. The Concerned Pastors settlement fails to impose an ongoing obligation for the Government Defendants to repair this private property.

397.   Moreover, the health effects of lead poisoning often go undetected for some time—the Concerned Pastors settlement does not provide for ongoing medical monitoring nor does it provide for educational programs or other remedial programs necessary to remediate the broad societal impact resulting from the Government Defendants' unconstitutional conduct.

## XVIII.   Governor Snyder and MDEQ Treated Flint's Predominantly African American Citizens Differently than Other Communities in Flint.

398.   The preceding paragraphs describe in detail how the legal protections that exist to prevent tragedies of this magnitude were not afforded to the citizens of Flint. As described in more detail in the following section, key MDEQ officials including Defendants Dan Wyant, Liane Shekter-Smith, Michael Prysby, and Stephen Busch blatantly and unjustifiably ignored and transgressed the very

122

environmental laws they were charged with enforcing. No rational basis exists for MDEQs failure to apply the law to the Citizens of Flint. Moreover, the number and significance of these transgressions, their disproportionate effect on African Americans and persons of color, MDEQ's serious and unexplained deviations from its existing procedures, internal correspondence demonstrating a callousness toward the people of Flint, and MDEQ's history of discrimination toward African Americans and willful refusal to enact a satisfactory nondiscrimination policy warrant an inference of discriminatory intent.

399. State law grants MDEQ the, "power and control over public water supplies and suppliers of water."[26] Thus throughout the course of the events described in this complaint, MDEQ had jurisdiction and authority to regulate the public water supplies in Flint and throughout the state.

400. MDEQ officials failed to comply with the law and their own internal policies in the following respects: (1) granting a fraudulent Administrative Consent Order to allow Flint to borrow funds to participate in the KWA; (2) issuing the Flint Water Treatment Plant a permit pursuant to the Michigan Safe Drinking Water Act without observing the statutorily mandated 45-day notice and comment period; (3) failing to comply with sampling and optimized corrosion control protocols as required under the State and Federal Lead and Copper Rule; and (4)

---

[26] MCLA 325.1003.

123

lacking any nondiscrimination policy for more than 30 years and ignoring EPA requirements to update its policy for years.

401. The misconduct described herein was exacerbated by Governor Snyder's refusal to acknowledge the unfolding crisis in Flint and declare a state of emergency. Article V, Section 1 of the Michigan Constitution provides that, "[t]he executive power is vested in the governor." Additionally, pursuant to the Michigan Emergency Management Act, the Governor may declare a "state of emergency" or "state of disaster" and "activate applicable relief forces if an emergency or disaster or imminent threat thereof exists."[27] Therefore, throughout Governor Snyder's tenure as Governor, he has had the authority to declare a state of emergency for any city, state, or other community within the State of Michigan.

402. Governor Snyder's decision to wait months before formally recognizing the public health emergency facing Flint denied citizens' access to key State resources, unnecessarily prolonging citizens' exposure to toxic substances including lead. Governor Snyder's delay deviated from his swift response to disasters in white and/or affluent communities and lacked any rational basis.

403. Flint as it exists today is a product of racial discrimination and segregation. The Michigan Civil Rights Commission's Report entitled, "The Flint

---

[27] Michigan State Police, Disaster Declaration Process, https://www.michigan.gov/msp/0,4643,7-123-72297_60152_68994-318833--,00.html.

Water Crisis: Systemic Racism Through the Lens of Flint" (February 17, 2017), explains that because of discriminatory (and now illegal) zoning restrictions and hiring practices, Flint was originally home to a majority-white population. When the City's largest employer—GM—required additional workers to help it respond to increased demand from World War II and changed its hiring practices to allow African Americans to occupy a larger number of positions, Flint's African American population quickly grew, more than quadrupling between 1940 and 1960. Subsequent policies aimed at promoting homeownership in certain neighborhoods resulted an exodus of Flint's white citizens.[28]

404.   Today Flint's 102,290 citizens are 54.3% African American or Black and 59.6% minority/non-white.[29] By comparison, the State of Michigan is only 14.1% African American or Black and only 20.6% minority/non-white.[30] This places Flint in the top ten cities with 100,000 or more total population and the highest percentages of Blacks or African Americans, alone or with other races.[31] Flint's citizens are also poor as compared the rest of the State. In Flint, the median

---

[28] *See The Flint Water Crisis: Systemic Racism Through the Lens of Flint* at 23-85, Michigan Civil Rights Commission (Feb. 17, 2017), https://www.michigan.gov/documents/mdcr/VFlintCrisisRep-F-Edited3-13-17_554317_7.pdf.

[29] QuickFacts – Flint City, Michigan, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/flintcitymichigan/PST045217.

[30] QuickFacts – Michigan, U.S. Census Bureau, https://www.census.gov/quickfacts/mi.

[31] The Black Population: 2010 at Table 7, U.S. Census Bureau (Sept. 2011), https://www.census.gov/prod/cen2010/briefs/c2010br-06.pdf.

income is only $25,650[32] as compared to $50,803 in the rest of the state[33]—a difference of nearly 200%.

405.   The Michigan Civil Rights Commission asked, "Would the Flint water crisis have been allowed to happen in Birmingham, Ann Arbor or East Grand Rapids?" and concluded, "We believe the answer is no[.]"[34] The allegations set forth herein provide context and support for the Commission's conclusion.

### 1. MDEQ Officials Deviated From The Law and Their Own Internal Policies in Issuing a Fraudulent Administrative Consent Order.

406.   As discussed herein, the switch to the Flint River as a drinking source followed from the decision of Flint to join the KWA.   However, subsequent investigation has revealed that Flint was only able to fund its portion of the KWA because of a fraudulent ACO issued by MDEQ officials and premised on the use of the Flint River as a water source.

407.   When Flint and MDEQ initially considered interim sources of water in the event Flint chose to join the KWA, use of the Flint River as a sole water source was rejected. According to notes from a March 20, 2012 meeting between officials from the KWA, City of Flint, and MDEQ, it was recognized that the Flint Water Treatment Plant ("Flint WTP") could not safely treat water from the Flint

---

[32] U.S. Census Bureau, QuickFacts – Flint City, Michigan, supra note 7.
[33] U.S. Census Bureau, QuickFacts – Michigan, supra note 8.
[34] Michigan Civil Rights Commission, supra note 6, at 4.

River. The meeting minutes provide that, "Rehabilitation of the Flint WTP, for daily operation using Flint River water, is not an option." The minutes further explain that, "high bacteria and high carbon concentrations are present in Flint River water and fluctuate depending on rain events." Accordingly, "[t]here was strong opinion expressed that Flint River water is a difficult water to treat due to temperature, flow variability and water quality changes in general!" Participants further noted that use of the Flint River "could require tertiary treatment at both [waste water treatment plant] facilities, if the WTP withdraws too much water, even in the interim period. Truly a concern for both the County and City!"

408.   Because of the difficulties presented in treating the Flint River and concerns regarding whether it could supply sufficient yields, the minutes reflect that the participants affirmatively rejected using the Flint River as the primary source of water, instead choosing to explore whether Flint's WTP could adequately treat blended water from Lake Huron and the Flint River or DWSD and Lake Huron. The notes state that it was, "agreed that Flint City would draft a proposal, soon, ON BLENDING, and give to MDEQ for review and approval."

409.   Throughout 2012 and into 2013, City and State officials continued to explore the financial advantages of joining the KWA versus negotiating a new contract with DWSD. On January 8, 2013, Eric Kline from the Department of Treasury called Mike Prysby as part of Treasury's investigation into whether it was

in Flint's financial interest to stay with DWSD or join the KWA project. According to Prysby's notes from the call, Flint was still only exploring the option of using Flint's WTP for blended water. He wrote, "The city of Flint may elect to utilize their WTP for the blending of treated water from the Flint River with water purchased from DWSD or KWA provided that all applicable drinking water standards are maintained."

410.   On March 26, 2013, in preparation for a conference call between MDEQ and the Department of Treasury personnel, Stephen Busch emailed MDEQ Director Dan Wyant, deputy director Jim Sygo, Liane Shekter-Smith, and other MDEQ officials raising concerns about using the Flint River as the City's water source. Specifically, he noted that continuous use of Flint River water to supply the City of Flint would "[p]ose an increased microbial risk to public health[;]" "[p]ose an increased risk of disinfection by-product (carcinogen) exposure[;]" "[t]rigger additional regulatory requirements under the Michigan Safe Drinking Water Act. . . ;" and "[r]equire significant enhancements to treatment at the Flint WTP, beyond those identified in the TYJT report . . . ." Busch further explained that using the Flint River would impose substantial costs and upgrades to the Flint Water Treatment Plant due to the need to provide softening, limitations on disposal options for lime sludge, increased ozone capacity, and additional backup power.

411.   During this time, Flint continued to negotiate with DWSD to

128

determine whether participation in the KWA or purchasing water from DWSD provided greater financial benefits for the City in the short and long term. On April 16, 2013, DWSD presented Flint/Genesee County with a proposal that purported to save Flint/Genesee 50% immediately and 20% compared to KWA over the following 30 years. Regardless, Flint rejected DWSD's offer. In response, Dennis Muchmore, Governor Snyder's then chief of staff asked, "if the last DWSD proposal saves so much money, why are we moving ahead with KWA? I take it that Flint doesn't trust them and is just fed up? Does Kurtz have his head on straight here?" In response, Andy Dillon replied, "That is the $64,000 question. DEQ is firm that KWA is better. Are they an honest broker?" (emphasis added). Unfortunately, that question was soon to be answered in the negative when MDEQ played a key role in helping Flint obtain a fraudulent ACO.

412.   EM Kurtz ultimately rejected DWSD's final offer, choosing instead to join KWA. Dillon subsequently approved this decision. However, the decision to participate in KWA raised a key question: how would Flint, pay for such a substantial financial undertaking? Flint's share of the $220.5 million project was 34.2%--more than $70 million.

413.   Because Flint was in receivership at the time, the Home Rule City Act limited the City's ability to borrow funds. The Home Rule City Act contained an exception, however, that would allow the City to borrow additional funds only

under the following circumstances: "[i]n case of fire, flood, or other calamity, the legislative body may borrow for the relief of the inhabitants of the city and for the preservation of municipal property . . . ." Taking advantage of this provision, however, required the City to obtain an Administrative Consent Order ("ACO") from a State Agency attesting to some sort of "calamity."

414.  On December 19, 2013 Nicole Zacharda of MDEQ's Water Resource Division emailed several other MDEQ employees including Liane Shekter-Smith and Stephen Busch. She wrote that she had recently, "received a call form Mike Robinson (he'd initially contacted Barry) seeking what [she'd] characterize as a

415.  'sweetheart' ACO intended to ease the City's ability to access bond funding for their possible new water intake from Lake Huron. As a trade of sorts, Mike was suggesting that his client would resolve Part 31 issues at their water treatment residual lagoon. I told Mike that while I understood the Part 31 angle, this really seems like a Drinking Water program lead." Mike Robison was a lawyer for Warner Norcross who handled environmental issues for the City of Flint.

416.  Ms. Zachardo then wrote, "Having met with Steve Busch [of the DEQ drinking water section] and others ... my suspicions have been confirmed and this really does not strike me as our issue in the WRD (Water Resources Division)." She continued, "[p ]rovided that you & Liane concur, my recommendation at this point is that I check back in with Mike Robinson and suggest that he work through

Steve and his staff . . . ."

417.   Liane Shekter-Smith's initial reaction was hesitant, stating that she, "need[ed] more information" because her division did not "have an enforcement action" with the City. She then stated she would, "need to speak to Stephen Busch to understand what the 'ask' is . . . ." Indeed, it is believed that Shekter-Smith's initial hesitancy regarding the inappropriateness of this request was shared by others.

418.   MDEQ's hesitancy was short-lived, however, and they soon became an active participant in helping push through the bogus ACO. On February 10, 2014, Michael Robinson, an attorney assisting the City of Flint with environmental, emailed Stephen Busch dictating the language that the City's bond counsel required in the consent order so that the City could move forward with obtaining bonds to pursue the KWA. That language stated, "The respondent plans to use the Flint River as its temporary source of untreated water supply until KWA water is available. The respondent must undertake the KWA public improvement project or undertake other public improvement projects to continue to use the Flint River, such as additional water treatment plant improvements, source water protection public improvements and public improvements to obtain back-up water supply, in order to comply with Act 399."

419.   On February 14, 2014, Busch responded that, "[t]he language you

provided in relation to the bond counsel's needs appears to be acceptable and should be added to the final version." Eight days later, on February 18, 2014, Stephen Busch emailed Richard Brim, John Craig, and Jim Arduin—all of the MDEQ— asking them to insert the exact language in the ACO that Mr. Robinson had said the City's bond counsel required.

420. When the process slowed, KWA's bond attorney, David Massaron, emailed to Flint-finance director Gerald Ambrose and EM Early to emphasize the urgency of obtaining the ACO. He explained that KWA was ready to proceed with a $220-million bond issue so it could continue pipeline construction. "However, we cannot take that step until the DEQ Administrative Consent Order . . . is effective," Massaron wrote, and "the City needs the ACO in place by the end of this week. . . . In order to ensure that the entire project can be financed . . . and that the City will have some debt capacity in the future, the ACO is a condition precedent to proceeding . . . ." Unless the MDEQ and City moved quickly to get the ACO, Massaron continued, "the KWA will have expended its initial resources and be forced to stop construction and the project will be delayed for at least one construction cycle."

421. Not wanting to risk KWA's ability to push forward with the bond offering on its desired schedule, officials from the department of Treasury intervened to ensure MDEQ's cooperation. On March 18, 2014, Gerald Ambrose

forwarded Massaron's email to Wayne Workman of the Department of Treasury, and stated the following: "We greatly appreciate the call made after our last meeting to [M]DEQ by Eric Cline regarding the pending ACO. It has moved along, but still in process. Any additional assistance you an [sic] give would be greatly appreciated."

422.   MDEQ received the message and quickly finalized efforts to push the ACO through. The ACO was executed on March 20, 2014. Pursuant to the aforementioned ACO, the City of Flint was bound to the use of the Flint River as its interim water source. After obtaining the ACO, Flint entered a Bond Purchase Agreement allowing it to borrow funds despite being in receivership so that the KWA could move on to the next phase of construction. Unfortunately, the Flint Water Treatment Plant was nowhere near ready to begin distributing water.

## 2. MDEQ Officials Deviated from the Law and MDEQ's Own Internal Practices and Procedures in Issuing the April 9, 2014 Permit for the Flint Water Treatment Plant.

423.   With the ACO executed, KWA moved forward with the bond issuance and City and MDEQ officials were left to fulfill the requirements of the ACO: namely obtaining a permit to upgrade the Flint Water Treatment Plant such that it would treat and distribute Flint River water.

424.   The Lead and Copper Rule requires states to "review and approve the addition of a new source or long-term change in water treatment before it is

133

implemented by the water system." 40 C.F.R. 141.81(b)(3)(iii). The Michigan Safe Drinking Water Act regulates the MDEQ's authority over Michigan's water systems as well as its authority for issuing permits impacting the state's water systems. Section 325.1004 of the Michigan SDWA details the requirements for evaluating and issuing permits for proposed water systems. It provides that, "The department shall provide public notice that it is conducting an evaluation under subsection (3) and shall provide a public comment period of not less than 45 days before making a determination on that evaluation." MCL 325.1004(4). Subsection 3 outlines the types of water systems subject to this requirement to include water systems that would, "[p]rovide new total designed withdrawal capacity of more than 2,000,000 gallons of water per day from the waters of the state." MCL 325.1004(3).

425.   The Flint Water Treatment Plant was intended to withdraw more than 14,000,000 gallons of water per day from the Flint River[35] and thus would have been subject to the Michigan SDWA's requirement for public comment.

426.   As of March 28, 2014, three weeks before the City planned to start using the Flint River as its primary water source, the City had not even submitted

---

[35] City of Flint Water Reliability Study at 26, Rowe Professional Services Company & Potter Consulting (Dec. 2013), https://www.michigan.gov/documents/snyder/Rowe_2013_Reliablity_Study_compressed_515343_7.pdf.

an application to the State for approval to make the change. Stephen Busch is quoted in the article as stating, "[i]n regards to the actual application, we haven't received one.. . . We've received preliminary design plans and preliminary specifications and we've commented on those. They may be waiting until they have the commentsworked out before they submit the application."[36]

427.   According to an article in Michigan Live, Busch explained that, "If the state hasn't approved Flint's use of river water by April 18, Busch said, the city would just continue to buy water from Detroit on a non-contract price until Flint has state [sic] OK to begin using the river."[37]   The article also stated, "[Howard] Croft said there will be a series of public forums where residents can ask questions about the city's water transition, what that will mean for rates and others."[38]

428.   According to the issued permit, the City of Flint submitted its application for a permit three days later on March 31, 2014. The application proposed various, "[i]mprovements to the City of Flint Lime Sludge Lagoons . . . to allow lime sludge form the Flint WTP to be stored during the interim period when the plant [would] be treating Flint River water." The application further provided for, "[p]lugging and abandonment of 8" inlet piping; construction of 306

---

[36] Dominic Adams, *State says Flint hasn't applied for permit to use river as drinking water source*, Michigan Live (Mar. 28, 2014), http://www.mlive.com/news/flint/index.ssf/2014/03/state_says_flint_hasnt_applied _1.html.

[37] *Id.*

[38] *Id.*

135

LF of new inlet piping; installation of bulkhead on existing outlet structure to prevent discharge to surface water." Additionally, the application proposed to construct a, "new decant tower structure, 8" gravity sewer, and decant pump station" and other changes.

429.   On April 9, 2014—just nine days after the application was submitted – the MDEQ issued the permit. It was signed by Defendant Cook who writes in the line designated, "Reviewed by," "Patrick Cook for MFP for Mike Prysby."

430.   MDEQ's Public Involvement Handbook provides that, "[p]ublic involvement in decision-making and in policy formation is an essential element of environmental programs."[39]  The Handbook further provides that, "The DEQ is a regulatory agency. It's charge of environmental protection is often facilitated through the use of permits, which are issued to prevent adverse effects to the environment. . . . Many of the DEQ permit programs inform the public about pending permit decisions through newspaper legal ads, the DEQ Calendar, bulletins, online permit tracking systems, and mailing lists. Often these public notices provide a time period (usually a 30 day public comment period) for interested persons to send comments to the DEQ on a permit before it is issued or

---

[39] Public Involvement Handbook at i, Michigan Department of Environmental Quality (Jan. 2014), https://www.michigan.gov/documents/deq/deq-oea-caupublicinvolvementhandbook_415012_7.pdf.

denied."[40]

431.   When MDEQ issued the April 9th FWTP permit, it not only failed to comply with Michigan laws by ignoring the mandatory 45-day notice and comment period, it also failed to adhere to its own policies as articulated in the Public Involvement Handbook which seek public involvement in decision-making. According to MDEQ calendars from that year it does not appear that there was any notice of the permit application.

432.   The permit issued by MDEQ would not have fallen under the State SDWA's provision for expedited permits because that provision expressly excludes permits "involving water treatment processes, ground or elevated storage tanks, chemical feed systems, wells, booster stations, pumps, new proposed water works systems subject to a capacity assessment, or projects funded under the state drinking water revolving fund established under section 16b of the shared credit rating act, 1985 PA 227, MCL 141.1066b."  MCLA    325.1004a(7).The    permit application expressly involved several of these matters.

433.   The April 9, 2014 FWTP permit was a construction permit that provided for the construction of several different plant components. Many water treatment components are not "off the shelf" and instead must be manufactured specifically for the plant they're intended for. Given the scope of work described in

[40] *Id.* at 6.

the April 9, 2014 FWTP permit, completion of the identified projects would likely have taken at least 60 days. Regardless, the FWTP began distributing water just 16 days later.

### 3. MDEQ Officials Abdicated Their Responsibility to Enforce Michigan's Safe Drinking Water Act, the Lead and Copper Rule, and MDEQ Internal Procedures.

434. As discussed in more detail herein MDEQ officials failed to correctly apply LCR sampling protocols as well as the LCR's rule requiring optimized corrosion control.

435. MDEQ subsequently claimed to have "misinterpreted" the Safe Drinking Water Act's requirements that water systems such as Flint's include optimized corrosion control. But documents from MDEQ's files belie their lack of knowledge. Specifically, on April 21, 2004 then-director of the MDEQ Steven Chester wrote the U.S. EPA regarding MDEQ's obligations under the Lead and Copper Rule (LCR) pertaining to schools and day care facilities. In that letter, he specifically acknowledged that in "schools and day care centers connected to CPWS [community public water systems] serving more than 50,000 residents" those "water systems have had to demonstrate and maintain optimal corrosion control." Jim Sygo, then Deputy Director of MDEQ, was copied on the letter and continued to work at MDEQ throughout the Flint Water Crisis.

436. There is also evidence that disputes MDEQ's claim that it lacked

knowledge that samples taken to assess compliance with the LCR should be done after flushing. As early has 1990, MDEQ documentation states, "Samples should be taken from cold water fixtures only. The fixture must not have received prior use the day of sampling. Capture the first flow out of the fixture and fill the sample container." (handwritten underlining in the original; this paragraph is also surrounded by two handwritten stars).

437.   Unfortunately, these were not the only ways in which MDEQ failed to enforce Michigan's SDWA. For example, the Michigan Safe Drinking Water Act required the MDEQ to notify the public if, "a public water supply is found not to be in compliance with the state drinking water standards." MCLA 325.1019(1). As recounted above, the first warning signs regarding the safety of Flint having switched to the Flint River as its drinking source were spikes in the levels that triggered a boil water advisory.

438.   Defendant Prysby admitted in an email to Stephen Busch and Adam Rosenthal dated August 19, 2014 that the press release issued by the City accompanying the advisory falsely attributed the reason for the boil water advisory to an "abnormal test." Specifically, he wrote, "the statement defers to an 'abnormal test' due to sampling error over the most recent 48 hours as the trigger for the BWA. This is false as the BWA was in effect for over 72 hours at the time of the press release and was issued because of the fecal coliform result and the number of

total coliform results obtained from the affected area between the 12th and the 14th. Also, while sampling error could be possible…other potential causes (LOP, mainbreak, Xconn, improper connects, etc.) should have been discussed in the press release."

439.   Additionally, on March 10, 2015, James Henry of the Genesee County Health Department wrote Howard Croft, Mike Prysby, Jerry Ambrose, Mayor Walling, and other city and other officials from GCHD regarding the "significant increase of confirmed Legionella illnesses relative to previous years" and explaining that, "Legionella can be a deadly, waterborne disease that typically affects the respiratory system." He expressly noted that, "[t]he increase of the illnesses closely corresponds with the timeframe of the switch to Flint River water. The majority of the cases reside or have an association with the City. Also, McLaren Hospital identified and mitigated Legionella in their water system. This is rather glaring information and it needs to be looked into now . . . ." Importantly, he noted that, "In the past, I have requested to meet with the water plant staff and MDEQ regarding Legionella concerns. I did not receive a response from the water plant staff and MDEQ declined." (emphasis added).

440.   In response, Stephen Busch acknowledged that, "the change in [water] source may have created water quality conditions that could provide additional organic nutrient source to support legionella growth," but deflects blame,

140

explaining that, "there is no evidence or confirmation of legionella coming directly from the Water Treatment Plant or in the community water supply distribution system at this he made no efforts to actually investigate that issue. In this way, MDEQ deviated from its response to other assertions of unsafe environmental conditions.

441. No other city or county in Michigan has experienced the total disregard MDEQ showed Flint. Indeed, over the last five years, there have been dozens of new water projects that MDEQ oversaw. Several of these projects took place in cities or counties with known lead pipes. Notably, each of these cities is predominately white and in none of these instances did MDEQ turn the other way in the face of blatant violations.

### 4. The EPA Civil Rights Office Found MDEQ's Nondiscrimination Procedures Insufficient Under Federal Law and MDEQ's Prior Notice and Comment Procedures Discriminatory Towards African Americans.

442. The crisis in Flint is not the first time MDEQ has demonstrated its unwillingness to provide African Americans the same level of protection from the environmental laws as Michigan's white citizens. Indeed, Flint is home to more hazardous sites than other, affluent and white areas of the State.

443. Even more relevant, on January 19, 2017, the United States Environmental Protection Agency's ("EPA") External Civil Rights Compliance

Office (ECRCO) issued a letter providing its conclusions following an investigation into whether the MDEQ had violated Title VI of the Civil Rights Act of 1964, as amended, 52 U.S.C. §§ 2000d *et seq.*, (Title VI) and the EPA's nondiscrimination regulations found at 40 C.F.R. Part 7.[41]

444.   That letter addressed a complaint submitted on December 15, 1992 that alleged the MDEQ[42] discriminated against the citizens of Flint in relation to granting a permit to the Genesee Power Station.  In granting the permit, the EPA found, "that the preponderance of evidence supports a finding of discriminatory treatment of African Americans by MDEQ in the public participation process for the GPS permit considered and issued from 1992 to 1994."[43] The letter noted that, "Flint was and continues to be predominately African American." (footnote omitted). Additionally, while the EPA explained that during the relevant time period the, "MDEQ had written no formalized operating procedures for conducting its meetings or hearings.

445.   [T]here were a series of unwritten standard operating procedures that EPA was told existed or that could be discerned from hearing records." The EPA concluded that the MAPCC, "deviated from those standard operating procedures on

---

[41] 2017 EPA Civil Rights Letter to MDEQ, Environmental Protection Agency (Jan. 17, 2017), https://www.epa.gov/sites/production/files/2017-01/documents/finalgenesee- complaint-letter-to-director-grether-1-19-2017.pdf.

[42] Formerly referred to as the Michigan Department of Natural Resources (MDNR) and later becoming the MDEQ.

[43] 2017 EPA Civil Rights Letter to MDEQ, supra note 19, at 3.

more than one occasion to the detriment of African Americans."[44]

446.   Given the deviations, the EPA found that, "[t]he totality of the circumstances described above supported by a preponderance of the evidence in the EPA's record would lead a reasonable person to conclude that race discrimination was more likely than not the reason why African Americans were treated less favorably than non-African Americans during the 1992-1994 public participation for the GPS permit."[45]

447.   The letter also stated that EPA had, "concerns that MDEQs current policies are insufficient to address the potential for discrimination given the deficiencies in MDEQ's public participation program."[46]

448.   More specifically, the "EPA determined that MDEQ had not been in compliance with its longstanding obligation to establish procedural safeguards required by EPA's regulations implementing the federal non-discrimination statutes. For almost 30 years, MDEQ failed to provide the foundational nondiscriminatory program as required by non-discrimination regulations to: provide a continuing notice of non-discrimination; adopt grievance procedures that assure the prompt and fair resolution of complaints alleging violations of the non-discrimination statutes and EPA's implementing regulations, and designate at least one person to coordinate

---

[44] *Id.* at 16.
[45] *Id.* at 17.
[46] *Id.* at 3.

its efforts to comply with its obligations under the federal non-discrimination statutes and EPA's implementing regulations."[47]

449.   In July 2014 the EPA informed MDEQ that it was not in compliance with the EPA's requirement that it have in place a non-discrimination policy; the EPA followed up with MDEQ again on this issue in a phone call on August 20, 2015 during which it informed MDEQ regarding how to remedy the agency's nearly 30 years of non-compliance.  On November 6, 2015, MDEQ provided EPA with a copy of its October 28, 2015 "Policy and Procedure Number: 09-024, Subject: Non Discrimination in Programs Receiving Federal Assistance from the U.S. Environmental Protection Agency." That policy was signed by then-Director of the MDEQ, Dan Wyant.

450.   On December 3, 2015, the EPA informed MDEQ that its policy was still insufficient in several respects outlined in the table below.  Critically, however, despite having been informed of these deficiencies nearly three years ago by the EPA, MDEQ has taken no steps to remedy these deficiencies and the same defective policy remains in place.

---

[47] *Id.*

144

| EPA's Identified Deficiencies in MDEQ's Nondiscrimination Policy (Jan. 2017) | Current Status of MDEQ's Nondiscrimination Policy (October 2018)[48] |
|---|---|
| Does not list the Federal nondiscrimination statutes to inform people about the statutes that protect them and on what bases complaints may be filed through MDEQ's grievance procedure. | Same. |
| The notice is not prominently displayed on MDEQ's home page. | The nondiscrimination policy is nearly impossible to find – one has to click on the "DEQ policies" in the bottom, right-hand corner of MDEQ's homepage and then click on the first "Department" link in the list of DEQ policies and procedures (there are two) and then read through the policies to find the nondiscrimination policy. |
| Searching MDEQ's website for "race," "title VI," "discrimination," and "disability" does not lead to the notice. | Same. |
| The Notice is in English only with a note informing those with limited English proficiency that they can requires the notice in other languages. | Same. |
| While the notice states that MDEQ will accommodate those with impaired vision or hearing, there is no evidence on MDEQ's website that those services are available or how to access them. | Same. Their home page has a link for "ADA" but this only links users to Michigan's general disability resources center – there is no information about how those with impaired vision or hearing could access MDEQ services. |

---

[48] Nondiscrimination in Programs Receiving Federal Assistance from the U.S. Environmental Protection Agency, Michigan Department of Environmental Quality (Oct. 28. 2015), https://www.michigan.gov/documents/deq/deq-Final-_DEQ-_Procedure_09-024_10-28-15_505494_7.pdf.

| | |
|---|---|
| The Notice provides that the Nondiscrimination Compliance Coordinator was responsible for coordinating MDEQ's compliance with federal nondiscrimination statutes and EPA's implementing regulations but does not identify this | Same. |
| The grievance procedure fails to identify the type of discrimination prohibited or the applicable Federal nondiscrimination statutes. | Same. |
| The policy fails to contain assurances that retaliation is prohibited and that claims of retaliation will be handled promptly. | Same. |
| The policy fails to provide for periodic assessments of the efficacy of MDEQ's effort to maintain compliance with federal nondiscrimination statutes. | Same. |
| The policy fails to provide for conduct reviews of formal or informal discrimination complaints filed with the MDEQ to identify and address any patterns or systemic problems. | Same. |

| The policy fails to provide for appropriate training for persons involved in informal resolution of discrimination complaints filed with DEQ under federal nondiscrimination statutes. | Same. |
|---|---|

451.  The EPA concluded that at the time of issuing the letter in 2017, "EPA ha[d] significant concerns about MDEQ's current public participation program and whether MDEQ can ensure that discriminatory treatment would not occur today. Similarly, EPA . . . is deeply concerned that MDEQ does not take seriously its responsibility to implement a properly functioning non-discrimination program as required under EPA regulations."

452.  Those concerns are well-founded. Despite *years* having passed since the EPA issued its initial set of concerns regarding MDEQ's nondiscrimination policy and MDEQ failing to take *any* steps to remedy those concerns, in regard to the Flint Water Crisis, MDEQ flagrantly ignored Michigan law as well as its own internal procedures to the detriment of Flint's predominantly Black/African American citizens. With regard to the Flint Water crisis, the EPA stated that it has, "informed MDEQ that it will conduct an investigation into MDEQ's procedures for public notification and involvement as well as compliance with its non-discrimination requirements." To date, nothing has been made public as to the results of that investigation, however the minority populations in Flint continue to

suffer as a result of MDEQ's failure to abide by and enforce Michigan's environmental laws and regulations as well as federal nondiscrimination statutes.

**5. The EPA Civil Rights Office Found MDEQ's Nondiscrimination Procedures Insufficient Under Federal Law and MDEQ's Prior Notice and Comment Procedures Discriminatory Towards African Americans.**

453. Governor Snyder's response to the public health crisis in Flint unnecessarily prolonged the crisis, depriving Flint of key state resources that could have hastened efforts to provide Flint with safe water.

454. While the sheer number of individuals in Governor Snyder's administration with knowledge of the lead levels in Flint suggests that the Governor became aware of this crisis far earlier than he has admitted, by his own admission he learned "On October 1st, 2015 . . . that our state experts were wrong. Flint's water had dangerous levels of lead.  On that day, I took immediate action.  First, we quickly reconnected to the Detroit water supply to begin sealing the damages pipes. Second, I ordered the immediate distribution of water filters and extensive blood level testing in schools and homes to identify those at the highest risk so they received healthcare, nutrition and additional support."

455. Thus, even if Governor Snyder is to be believed that he did not learn about the heightened lead levels until October 15, 2015, he still waited *months* to impose a State of Emergency in Flint – a declaration that would provide key

resources to the residents of Flint.

456.   Critically, Governor Snyder did not demonstrate this type of delay in recognizing and responding to various emergencies in other cities and counties where the population was predominately white:[49]

| Declaration | Date of Emergency Declarat | Date Emergency Noted in | Time from Emergency to Govern | Cause | Location | Demographics (Census Bureau - 2017 est.) |
|---|---|---|---|---|---|---|
| State of Emergency | 5/14/2012 | 5/3/2012 to 5/4/2012 | 10-11 days | Flooding | Genesee County | 75.4% White; 20.3% African American |
| State of Disaster | 5/25/2012 | 5/21/2012 | 4 days | Wildfire | Luce County | 79.1% White; 11.7% African American |
| State of Disaster | 5/25/2012 | 5/21/2012 | 4 days | Wildfire | Schoolcraft County | 86.3% White; 0.5% African American |
| State of Disaster | 5/9/2013 | 4/12/2013 to 4/25/2013 | 14-27 days | Flooding | Kent County | 82.5% White; 10.5% African American |
| State of Emergency | 8/13/2014 | 8/11/2014 | 2 days | Flooding | Wayne County | 54.6% White; 39.0% African American |
| State of Emergency | 8/13/2014 | 8/11/2014 | 2 days | Flooding | Oakland County | 75.7% White; 14.2% African American |
| State of Emergency | 8/13/2014 | 8/11/2014 | 2 days | Flooding | Washtenaw County | 74.2% White; 12.4% African American |
| State of Emergency | 1/5/2016 | Gov. Snyder testified he knew as of Oct. | 3 months 10 days - more than 6 months | Water Contamination | Genesee County | Declaration declared for entire County; toxic water. |

---

[49] Governor Snyder also declared a "State of Emergency" for Detroit during his tenure as Governor. Because that declaration related to Detroit's financial status—rather than some type of disaster—and because it was in response to an "emergency" that evolved over a long period of time, it is not included in the current chart.

| State of Emergency | 1/6/2017 | 12/24/2016 | 13 days | Sewer Line Collapse; Sinkhol | Macomb County | 81.4% White; 12.0% African American |
|---|---|---|---|---|---|---|
| State of Emergency | 6/26/2017 | 6/23/2017 | 3 days | Flooding | Isabella County | 88.2% White; 2.8% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Allegan County | 95.0% White; 1.5% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Arenac County | 96.5% White; 0.4% African |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Barry County | 97.0% White; 0.6% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Berrien County | 79.7% White; 15.1% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Cass County | 89.5% White; 5.3% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Clare County | 96.5% White; 0.7% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Eaton County | 87.6% White; 7.0% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Ingham County | 76.1% White; 12.1% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Ionia County | 92.5% White; 4.8% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Kalamazoo County | 81.5% White; 11.7% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Kent County | 82.5% White; 10.5% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Mecosta County | 93.1% White; 2.9% African American |

| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Newaygo County | 95.8% White; 1.2% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Ogemaw County | 96.5% White; 0.4% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Oscoda County | 96.8% White; 0.4% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Ottawa County | 92.6% White; 1.8% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | St. Joseph County | 93.6% White; 2.7% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | City of Grand Rapids | 68.3% White; 19.7% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | City of Lansing | 61.2% White; 21.7% African American |
| State of Disaster | 6/18/2018 | 6/17/2018 | 1 day | Flooding | Houghton County | 93.6% White; 0.9% African American |
| State of Disaster | 6/18/2018 | 6/17/2018 | 1 day | Flooding | Menominee County | 94.4% White; 0.7% African American |
| State of Disaster | 7/25/2018 | 7/12/2018 | 1 day | Flooding | Houghton County | 93.6% White; 0.9% African American |
| State of Emergency | 7/29/2018 | 7/26/2016 | 3 days | Water Contamination | Kalamazoo County | 81.5% White; 11.7% African American |

457.   The most analogous crisis involves the July 2018 declaration of emergency by Lt. Gov. Brian Calley (at Governor Snyder's request because Snyder was out of the State) for Kalamazoo County due to health and safety concerns related to per- and polyfluoralkyl (PFAs) contamination in the drinking water for

151

Kalamazoo County. According to Lt. Gov. Calley, declaring a state of emergency was important because, "[t]his declaration will allow the state to supply additional resources to help with response efforts and ensure the health and safety of residents in Parchment and Cooper Township." Indeed, by declaring a state of emergency, many state resources become available and the Michigan State Police, Emergency management and Homeland Security Division is authorized to coordinate state relief efforts. Critically, the declaration was made exactly *three days* after test results revealed unacceptable levels of PFAs.

458. In contrast, the State of Michigan affirmatively lied to Flint residents for *months*, denying and dismissing their fears regarding the water quality. Indeed, even after the Governor's office acknowledged that Flint's water was dangerous, their talking points contained several knowing lies including:

- The falsely state that Flint used lime as a corrosion control and that "Flint was within federal protocols when it chose to use lime, and this is consistent with what every other community was required to do." In truth, MDEQ and other State officials were aware by this point that Flint's lack of optimized corrosion control was in violation of federal and state law. Indeed the very talking points that suggest that lime softening is sufficient includes the statement that, "[o]perators of large systems are required to implement corrosion control measures, and Flint is doing that on a very abbreviated schedule" – a clear recognition that (a) corrosion control was necessary and (b) Flint did not have corrosion control measures at the time.

152

- The talking points continued to falsely assert that Flint, "system [was] in compliance with federal lead and copper rules, based on testing."

- The talking points misleadingly assert that, "[t]he state was opposed to Flint leaving DWSD – not because of concerns about water quality, but because at the time the city was working through its bankruptcy and the state felt the move would incur more expenses for both cities. Flint made the case it could save money in the period that KWA was constructing its pipe, and the state leaders – including the Emergency Financial Manager – eventually granted the city its request." In truth, Emergency Manager Kurtz advocated for joining the KWA which State officials, including Defendant Dillon, affirmatively signed off on.

459.   The Governor's own task force concluded that, ***"[n]either the Governor*** nor the Governor's office took steps to reverse poor decisions by MDEQ and state-appointed emergency managers until October 2015, in spite of mounting problems and suggestions to do so by senior staff members in the Governor's office, in part because of continued reassurances from MDEQ that the water was safe." (emphasis added).[50]

460.   The Flint Water Advisory Task force concluded that, "The suggestion made by members of the Governor's executive staff in October 2014 to switch back

---

[50] *Flint Water Advisory Task Force Final Report* at 1, Flint Water Advisory Task Force (Mar. 2016),
https://www.michigan.gov/documents/snyder/FWATF_FINAL_REPORT_21March2016_51780
5_7.pdf.

to DWSD should have resulted, at a minimum, in a full and comprehensive review of the water situation in Flint, similar to that which accompanied the earlier decision to switch to KWA. It was disregarded, however, because of cost considerations and repeated assurances that the water was safe."[51]

### 6. Internal Correspondence From MDEQ, the City of Flint, and Senior Officials in the Governor's Office Evidence a Callousness Toward Flint's Citizens.

461. Thus far, the only documents provided in this litigation have been those selected for distribution *by defendants*. However, even this incomplete production paints a troubling picture of government officials callously dismissing the desperate pleas of Flint citizens. Some of the correspondence produced contains racially charged language while other documents bluntly explain how Flint's concerns were easily dismissed as simply the product of "old time negative racial experiences."

462. In one example of such racially charged language, EM Mike Brown emailed Gerald Ambrose with a draft memorandum he intended to send to Governor Snyder regarding his administration. He wrote, "In my opinion, the group making the noise about civil unrest, violence, MSP shootings and an EM, are the naysayers in the community. Too many of them have their handout and their voices raised but do very little to contribute to solutions in Flint." EM Brown explained, "I have offered them many ways to contribute to improving conditions for Flint citizens

---

[51] *Id.* at 7.

since I became Emergency manager. I have not offered them money, or simply caved into their demands. This type of submission to their demands has helped create an unhealthy culture in Flint.  Past administrations have bowed to the demands of this group. It is part of the reason Flint has been placed in receivership twice in the past decade."

463.   EM Brown attempted to dismiss any improper motives for his attitude toward the citizens of Flint by explaining that, "I have spent 35 years in Flint. My credibility permeates every sector of the community.  I grew up on the North end in one of the few integrated Flint neighborhoods." But then he continued his tirade against Flint's "culture" explaining how he had, "challenged the culture at city hall since we arrived. It is difficult to understand that culture unless you are there everyday confronting it.  My team has challenged that culture on a daily basis.  It is an entitlement mentality. It is a mentality that goes beyond city hall. There are individuals and groups in the community who simply expect certain things from city hall.  If they don't get 'their perceived share' of the pie, they scream to anyone who will listen."

464.   In response, Jerry Ambrose encouraged EM Brown, stating that his memo is a "great start." He agreed with EM Brown's assessment, stating that EM Brown had, "also taken great pains to develop Flint based emerging leaders who are NOT from the same mold as the old leaders. While this approach has meant that

many things have taken longer to achieve than it might otherwise take, it has been with the realization that CHANGING THE CULTURE OF CITY HALL IS IMPERATIVE IF HISTORY IS NOT TO REPEAT ITSELF.  Turn Flint back to the same old groups without change and history WILL repeat itself" (capitalization in original).

465.  In March of 2015, as concerns regarding lead in the water grew, Arlington Dumas wrote an email to Mayor Walling and several news outlets and city officials stating that, "the water is dangerous to our health! GM will not use the water at its Engine Plant in Flint to wash engines parts!  We need your help to guide us to the profession people that know about 'Bad Drinking Water and Environmental Racism'  I truly believe it's 'Environmental Racism' at its worst or I should say best! . . . I have challenged our elected officials to step up to the plate and fix this water problem!"

466.  Mayor Walling forwarded the message to additional Flint officials including then EM Ambrose whose response to the charge of environmental racism and seriously dangerous water conditions was to forward the message to the City's outside public relations firm stating simply, "Welcome to Monday."

467.  Having failed to get the MDEQ, City, or State to take their concerns regarding Flint's water safety issues seriously, in early April 2015, a group of Concerned Pastors from the City of Flint warned they might have to seek judicial

156

intervention. Once again, government officials' response to the City's desperate pleas for help are callously dismissed. Indeed, Governor Snyder's Chief of Staff wrote simply, "[w]hy not, we haven't anything else to do except spend our time chasing our tail. This issue isn't going to go away until we do some serious comms work in the city."

468.   Instead of using State resources to provide Flint safe drinking water, Mr. Muchmore instead urged senior treasury officials, "[w]e need to up our comms efforts in Flint area. How would we ever afford this now?" In response, Harvey Hollins suggested that the City use its scant resources not to investigate the safety of the drinking water or provide bottled water to the people of Flint, but rather to hire "a good firm for several months to help weather this."

469.   Meanwhile, MDEQ employees were actively and knowingly concealing the extent of the problem. In response to an email from EPA Program Manager Jennifer Crooks on May 7, 2015 reiterating serious concerns regarding lead poisoning in Flint, Mike Prysby wrote to Adam Rosenthal, "[j]ust a heads up. . . . EPA Region V is really delving into the Flint lead issue…..only thing is…..there isn't an issue…..yet[.]"

470.   On July 22, 2015, Dennis Muchmore wrote Dan Wyant of the MDEQ, "I'm frustrated by the water issue in Flint. I really don't think people are getting the benefit of the doubt. Now they are concerned and rightfully so about the lead level

studies they are receiving from the DEQ samples. . . . These folks are scared and worried about the health impacts and they are basically getting blown off by us (as a state, we're just not sympathizing with their plight)." That same day, it appears that Flint's water system and shift to the KWA was placed on the Governor's calendar for a meeting with senior staff.

471. In response, Defendant Wyant forwarded the message to Brad Wurfel and several other MDEQ employees. Wurfel's response demonstrates a total lack of concern for the people of Flint. First, he suggested that those citizens with lead poisoning deserve what they got because, "[w]e aren't talking about lead in the water supply here.  We are talking about people with lead in their premise plumbing . . . ." He then continued, "[w]hat of the folks who test high?  The city contacts them to let them know they have elevated levels and should get a plumber to check and replace their lead transmission hardware."  He ended his rant by attacking one of the entities that tried to bring this tragedy to light, stating, "[t]he ACLU's fear campaign on this issue is an embarrassment."

472. Eventually, MDEQ did respond to Muchmore's request for information, falsely stating that, "[b]y the tenants of the federal statute, the city is in compliance for lead and copper" but admitting as early as July 24, 2015 that, "they have not optimized their water treatment (for the most part, this means adding phosphates to minimize the degree that the water Ph mobilizes lead and copper in

people's home plumbing)." Mr. Muchmore also emailed Wayne Workman of treasury, acknowledging that, "The people there [in Flint] just seem to be getting a raw deal from the city particularly in terms of the information they are getting."

473.   In early August 2015, Dennis Muchmore met with various leaders from Flint regarding issues with the water quality. Following the meeting, Mr. Muchmore emailed Harvey Hollins and Stacie Clayton—senior officials within the Governor's office, dismissing Flint's concerns with the water's safety. He wrote, "We can't do too many more of these. The three activists in the room just want to be right, they don't want answers. No matter what we say they'll always want something else to be the answer." He then dismissed these concerns, stating that one of the women who tended to "lecture[]" just expressing, "some of the old time negative racial experiences she's had." But these leaders' concerns were not just a product of their "old time negative racial experiences"—as we now know, their concerns were entirely valid.

474.   In response, Harvey Hollins wrote, "I agree. It's hard to get to yes or satisfaction with certain types of community advocates because no matter what you do, they will always grind an ax on something." He then stated, "I agree, I think one more meeting with the pastors and maybe the professor from kettering (who I think is reasonable) to put closure on the outstanding questions is warranted. The other women who were there to argue for the sake of arguing should not be apart [sic] of

that meeting."

475.  As described above, Flint issued a Lead Advisory Release on September 26, 2015.  Dennis Muchmore forwarded that release to Governor Snyder (once again, apparently at his personal email address given that part of the address is redacted as, "PPI") and several other high-ranking officials in the Governor's office. Despite the mounting evidence of a serious problem, Muchmore continued to dismiss Flint's concerns, lamenting that, "[n]ow we have the anti-everything group turning to the lead content . . . ."  He wrote, "some of the Flint people respond by looking for someone to blame instead of working to reduce anxiety." But the people of Flint had every reason to want to get to the bottom of who was responsible for the situation.

### 7.  MDEQ Officials Rewarded for Failing to Protect Citizens of Flint from Dangerous Drinking Water

476.  Two days before the Governor finally acknowledged the existence of lead poisoning in a press conference, Richard Benzie, the Chief of the Field Operations Section of the Office of Drinking Water and Municipal Assistance of the MDEQ emailed Defendants Busch, Prysby, Rosenthal, Shekter-Smith, and Cook, as well as a few other MDEQ employees, about how to further mislead Flint residents who called regarding concerns about their drinking water. Benzie emphasized the importance of keeping their "message" consistent and provided that callers be

informed that, "the drinking water distributed to city customers currently meets all drinking water standards and is considered safe.  However, there is no safe level for lead."  But at this point MDEQ – including specifically the Defendants who received this email – was keenly aware that its failure to have optimized corrosion control qualified as noncompliance with federal and state drinking water requirements.

477.   Despite MDEQ's total failure to adhere to, and enforce, its own policies and procedures as well as State and Federal environmental laws, Benzie then stated, "I also want to thank you for the effort you have made to respond to this issue.  It is noticed and appreciated. ***In recognition of your performance, I have arranged for you to receive a 2 percent merit increase starting tomorrow***." (emphasis added). This likely amounted to more than $1000 per employee, per year of taxpayer dollars for allowing tragedy to unfold upon the people of Flint, staying quiet about the events that caused that tragedy, or both.

478.   Were there any doubt that the actions of the MDEQ Defendants reflected a culture within MDEQ that not only tolerated but *rewarded* conduct that negatively impacted African Americans, MDEQ's decision to reward several of the individuals who played key roles in causing this crisis – many of whom are currently facing criminal charges – dispels those doubts.

    **8.  MDEQ's and Governor Snyder's Deviation from Prior Practice and Existing Law Disproportionately Injured African Americans in Flint**

479.   MDEQ's flagrant violation of Michigan and Federal law with regard to its issuance of the ACO, approval of the FWTP construction permit, noncompliance with Michigan SDWA notice requirements, refusal to implement nondiscrimination policies, refusal to require Flint to utilize corrosion control, noncompliance with LCR sampling requirements, refusal to coordinate with other departments to investigate the Legionnaires outbreak, and subsequent cover-up of the crisis disproportionately impacted African Americans.

480.   Leading scholars agree that race played a critical role in the events that caused the Flint Water Crisis. For example, Robert D. Bullard, Dean of the School of Public Affairs at Texas Southern University and a pioneering scholar in the field of environmental justice explained, "What happened in Flint is a blatant example of environmental injustice. The more information comes out, the clearer it is that this community was not treated according to the usual protocols. It was almost as if regulators didn't believe them and thought their health wasn't important.  In studying the history of environmental justice, you see over and over that it generally takes longer for poor communities to be heard when they make complaints. Government officials received complaints in April 2014 expressing that something was wrong with the water in Flint. If regulators at the Michigan Department of Environmental Quality had had to drink that water, or serve it to their children, their response would

have been different."[52]

481.   Moreover, the Commission concluded, "Environmental Justice requires that all people and communities receive the equal protection of environmental and public health laws, and should have an equal and meaningful voice in decisions related to their environment. . . . The people of Flint did not enjoy the equal protection of environmental or public health laws, nor did they have a meaningful voice in the decisions leading up to the Flint Water Crisis. Many argue they had *no* voice." (emphasis in original)[53]   As described above, the people of Flint were deprived of an opportunity to have a voice in this process when MDEQ issued a permit for the FWTP without observing the statutorily required 45-day notice and comment period.

482.   Most definitively, the Report provides, "The Commission believes we have answered our initial question, 'was race a factor in the Flint Water Crisis?' Our answer is an unreserved and undeniable -- 'yes'."[54]

483.   Similarly, the Flint Water Advisory Task Force found that, "Flint residents, who are majority Black or African American and among the most impoverished of any metropolitan area in the United States, did not enjoy the same

---

[52] Flint's Water Crisis Is A Blatant Example Of Environmental Injustice, IFLScience, https://www.iflscience.com/environment/flint-s-water-crisis-blatantexample- environmental-injustice/.
[53] Michigan Civil Rights Commission, supra note 6, at 4.
[54] *Id.* at 6.

degree of protection from environmental and health hazards as that provided to other communities.  Moreover, by virtue of their being subject to emergency management, Flint residents were not provided equal access to, and meaningful involvement in, the government decision-making process."[55]

484.    The task force further found that "MDEQ, specifically its Office of Drinking Water and Municipal Assistance (ODWMA), suffers from cultural shortcomings that prevent it from adequately serving and protecting the public health of Michigan residents."[56]

485.    Regardless of Defendants' motivations in entirely failing to adhere to and enforce state and federal environmental laws, no rational basis exists for issuing a fraudulent ACO allowing Flint to borrow funds, issuing a construction permit under the Michigan Safe Drinking Water Act without observing the mandatory 45- day notice and comment period, failing enforce sampling protocols and optimized corrosion control requirements mandated by state and federal law, and refusing to implement a nondiscrimination policy that informs persons of color of their rights and provides them with a viable basis for raising complaints related to discrimination. These laws, regulations, and policies exist for a reason: to prevent exactly the type of crisis that unfolded in Flint and provide some basis of

---

[55] Flint Water Advisory Task Force Final Report, supra note 28, at 54.
[56] *Id*. at 6.

protection for historically disempowered minorities. The MDEQ Defendants' blatant disregard for enforcing these laws to protect the predominantly African American and poor citizens of Flint deprived them of their right to equal protection of the law.

486.     Likewise, no rational basis exists that justifies Governor Snyder's refusal to issue a declaration of emergency for at least three months after he *admits* having become aware of the crisis unfolding in Flint (and likely much longer) in light of his prompt response to emergencies in affluent, predominantly white cities and counties throughout Michigan. This refusal denied Flint citizens access to key resources, unnecessarily prolonging their exposure to toxic chemicals including lead.

**COUNT I: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT
SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER
GOVERNMENTAL DEFENDANTS**

487.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

488.   Plaintiffs have a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vul-nerable to increased risk of harms, affirmatively created and/or caused by persons

165

acting under color of state law.

489.   Defendants, while acting under color of state law, affirmatively created or exacerbated the dangers and dangerous situations to which Plaintiffs were exposed, making them more vulnerable to said dangers, and these Defendants did so with an extreme degree of culpability.

490.   Defendants, while acting under color of state law, affirmatively continued, increased and perpetuated the dangers, risks of harm and dangerous situations creating the public health crisis, when they deliberately and affirmatively denied, lied about, covered up, deceived, discredited and ignored said known dangers and risks of harm to which they exposed Plaintiffs making them more vulnerable to said dangers.

491.   Defendants were aware that their conduct could result in the deprivation of Plaintiffs' due process rights to be protected from the dangers, dangerous situations, or being made more vulnerable to the dangers affirmatively created and perpetuated by them.

492.   This conduct was reckless, deliberately indifferent and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as these Defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs.

493.   The dangers and risks of harm were discreet and special to Plaintiffs,

166

as Flint water users and property owners in particular, and not risks affecting the public at large.

494.   The dangers and risks of harm to Plaintiffs from the ongoing exposure to the water toxins which were created and perpetuated by Defendants, were so extreme as to be equivalent to private acts of violence visited upon them.

495.   These actions of Defendants constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional and economic harm to Plaintiffs.

496.   As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this Master Complaint, Plaintiffs suffered violations of their fundamental rights to bodily integrity, property and liberty interests, including, but not limited to:

    a.   Serious and in some cases life threatening and irreversible bodily injury;

    b.   Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

    c.   Pain and suffering;

    d.   Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

497.   Plaintiffs have further suffered property damage to their homes and/or

places of business in the form of lost property values and lost business profits.

498.   The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

### COUNT II: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY GOVERNMENTAL DEFENDANTS

499.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

500.   Plaintiffs have a clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to bodily integrity.

501.   The conduct of Defendants, all while acting under color of law, endangered and/or threatened Plaintiffs' fundamental liberty interest to bodily integrity as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

502.   Defendants were aware that their conduct could result in the deprivation of Plaintiffs' fundamental due process rights to bodily integrity.

503.   Defendants deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiffs by creating and perpetuating the ongoing exposure to contaminated water, with deliberate indifference to the known risks of

harm which said exposure would, and did, cause to Plaintiffs.

504.   Defendants had the opportunity to reflect and deliberate before they acted and/or failed to act.

505.   As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this Master Complaint, Plaintiffs have suffered violations of their fundamental rights to bodily integrity, property and liberty interests, including, but not limited to:

<ol type="a">
<li>Serious and in some cases life threatening and irreversible bodily injury;</li>
<li>Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;</li>
<li>Pain and suffering;</li>
<li>Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.</li>
</ol>

506.   The conduct of Defendants was both reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

**COUNT III: 42 U.S.C. § 1983 – 5th AND 14th AMENDMENTS
EQUAL PROTECTION OF THE LAW: RACE BASED BY
AFRICAN AMERICAN PLAINTIFFS AGAINST SNYDER, DILLON,**

169

## WRIGHT, AMBROSE, KURTZ, EARLEY, WYANT, SHEKTER-SMITH, PRYSBY & BUSCH

507.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

508.   Defendants Governor Snyder, Dillon, Wright, Walling, Ambrose, and Earley, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution.

509.   Amendment Fourteen, § 1 states in pertinent part, "No state shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws."

510.   The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

511.   Defendants' conduct deliberately exposed Plaintiffs to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

512.   In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being

170

built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational).

513.   These Defendants knew that the water from the Flint River was grossly inferior to the Lake Huron water Flint and Genesee County citizens had been receiving from DWSD.

514.   These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP, which required millions of dollars of upgrades.

515.   These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

516.   Recognizing these facts, Defendants devised an Interim Plan that caused the predominately white water users of those areas of Genesee County outside of Flint to receive the safe and superior water from DWSD, whereas the water users of predominantly African American Flint received water that was known to be grossly inferior and unsafe, i.e. Flint River water.

517.   As evidence of the fact that race discrimination was the reason for treating the two groups of water users differently, the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint

WTP in order to safely process the raw Flint River water.

518.   Given the clear difference in the treatment between these two groups of similarly situated water users, the deliberate and intentional decisions and actions of these Defendants in devising the Interim Plan was the product of racial discrimination in violation of the Equal Protection Clause.

519.   If Plaintiffs' community had been predominately white, Plaintiffs would have been treated in the same manner as their predominantly white neighbors in Genesee County, and they too would have received DWSD water as part of the Interim Plan.

520.   Because Plaintiffs were water users in a predominately African American community, their complaints were dismissed and disrespected as exaggerated, without merit or inconsequential. If Plaintiffs' community had been predominately white, citizen complaints would have been taken seriously, treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns.[57]

521.   As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this Master Complaint, Plaintiffs have suffered violations of

---

[57] "Citizen concerns were at times derided and dismissed, in spite of the fact that various members of the Governor's staff had expressed-and were expressing-concerns about the water situation in Flint at the same time." Exhibit A, Task Force Report at 37.

their fundamental constitutional rights including, but not limited to:

    a.    Serious and in some cases life threatening and irreversible bodily injury;

    b.    Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

    c.    Pain and suffering;

    d.    Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

522.   The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

### COUNT IV: 42 U.S.C. § 1983 – 5th AND 14th AMENDMENTS
### EQUAL PROTECTION OF THE LAW: WEALTH-BASED
### BY ALL PLAINTIFFS AGAINST
### SNYDER, DILLON, WRIGHT, AMBROSE, KURTZ, EARLEY, WYANT, SHEKTER-SMITH, PRYSBY & BUSCH

523.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

524.   Defendants Governor Snyder, Dillon, Wright, Walling, Ambrose, and Earley, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution.

525. Amendment Fourteen, § 1 states in pertinent part, "No state shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws."

526. The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

527. Defendants' conduct deliberately exposed Plaintiffs to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

528. In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational.)

529. These Defendants knew that the water from the Flint River was grossly inferior to the water Flint and Genesee County citizens had been receiving from DWSD.

530. These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP, which required millions of dollars of upgrades.

531.   These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

532.   Recognizing these facts, Defendants' devised an Interim Plan that allowed the predominately more affluent water users of Genesee County to receive the safe, superior water from DWSD and the predominately impoverished water users of Flint would have to accept during the interim period grossly inferior, previously rejected and dangerous Flint River water.

533.   There was no rational economic or fiscal justification for treating the predominately more affluent water users of Genesee County differently than the predominately impoverished water users of Flint, because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

534.   Given the unexplained difference in treatment between these two groups of similarly situated water users, considering the absence of any rational economic justification, and taking into account the economic and class makeup of the group which received the grossly inferior and dangerous water product, the deliberate decisions and actions of these Defendants in devising the Interim Plan can fairly be said to be the product of income and class discrimination, in violation of the Equal Protection Clause of the Fourteenth Amendment.

535.   Governor Snyder additionally prolonged Plaintiffs' exposure to toxic Flint Water, and limited their access to state resources, by failing to declare a state of emergency in Flint until several months after he acknowledges becoming aware that Flint's water was dangerous. Governor Snyder responded to similar emergencies affecting predominantly affluent communities substantially faster— often declaring a state of emergency or state of disaster in a matter of days.

536.   Additionally, Defendants Wyant, Shekter-Smith, Prysby, and Busch— all MDEQ officials—refused to enforce environmental and nondiscrimination laws to protect the predominantly poor citizens of Flint by (1) granting a fraudulent Administrative Consent Order to allow Flint to borrow funds to participate in the KWA; (2) issuing the Flint Water Treatment Plant a permit pursuant to the Michigan Safe Drinking Water Act without observing the statutorily mandated 45-day notice and comment period; (3) failing to comply with sampling and optimized corrosion control protocols as required under the State and Federal Lead and Copper Rule; and (4) lacking any nondiscrimination policy for more than 30 years and ignoring EPA requirements to update its policy for years.

537.   Defendants Wyant, Shekter-Smith, Prysby, and Busch adhered to the requirements of the Michigan Safe Drinking Water Act for other cities and counties in more affluent areas of the State. Specifically, multiple water projects went forth during the time of the Flint Water crisis—including several in areas

176

with lead pipes —and those projects adhered to the notice requirements and did not result in the serious disaster that occurred in Flint.

538.   If Plaintiffs' community had been predominately more affluent, Plaintiffs would have been treated just like their more affluent neighbors in Genesee County and throughout the State, and they too would have received DWSD water as part of the Interim Plan, enjoyed the protection of Michigan's environmental statutes and regulations, and, should an emergency have occurred, received a prompt declaration of emergency by the Governor and the attendant resources such a declaration provides.

539.   Because Plaintiffs were in a predominately impoverished community, their complaints were dismissed as exaggerated, without merit or inconsequential. If Plaintiffs' community had been predominately more affluent, citizen complaints would have been treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns.

540.   As a direct and proximate result of the unconstitutional acts of De-fendants as alleged in this Master Complaint, Plaintiffs have suffered violations of their fundamental constitutional rights including, but not limited to:

      a.    Serious and in some cases,  life threatening and irreversible bodily injury;

    b.    Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

    c.    Pain and suffering;

    d.    Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

541.   The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT V: 42 U.S.C. § 1985(3) – INVIDIOUS RACIAL ANIMUS BY AFRICAN AMERICAN PLAINTIFFS AGAINST SNYDER, DILLON, WRIGHT, AMBROSE, KURTZ & EARLEY

542.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

543.   Defendants Governor Snyder, Dillon, Wright, Walling, Ambrose, and Earley, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated Plaintiffs' rights under the Thirteenth Amendments to the United States Constitution.

544.   42 U.S.C § 1985 (3) secures the rights of the Plaintiffs to be free from conspiracies, founded on invidious racial animus, to violate the constitutional rights of Plaintiffs to equal protection and due process.

545.   The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

546.   Defendants' conduct deliberately exposed Plaintiffs to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

547.   In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational).

548.   These Defendants knew that the water from the Flint River was grossly inferior to the water Flint and Genesee County citizens had been receiving from DWSD.

549.   These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP, which required millions of dollars of upgrades.

550.   These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

551.   Recognizing these facts, Defendants' conspired to devise an Interim Plan that allowed the predominately white water users of Genesee County to receive the safe, superior water from DWSD and the predominately black water users of Flint would have to accept during the interim period grossly inferior, previously rejected and potentially unsafe Flint River water.

552.   There was no rational economic or fiscal justification for treating the predominately white water users of those parts of Genesee County outside if Flint differently than the water users in the predominately African American community of Flint, because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

553.   Given the unexplained difference in treatment between these two groups of similarly situated water users, considering the absence of any rational economic or fiscal justification and taking into account the racial makeup of the community that received the grossly inferior and dangerous water product, the deliberate decisions and actions of these conspiring Defendants in devising the Interim Plan can fairly be said to be the product of invidious racial animus in violation of the Thirteenth Amendment. The provision of unhealthy and dangerous

180

food and water is a badge, vestige and symbol of slavery abolished and prohibited by the Thirteenth Amendment.

554.   Governor Snyder additionally prolonged Plaintiffs' exposure to toxic Flint Water, and limited their access to state resources, by failing to declare a state of emergency in Flint until several months after he acknowledges becoming aware that Flint's water was dangerous. Governor Snyder responded to similar emergencies affecting predominantly affluent communities substantially faster— often declaring a state of emergency or state of disaster in a matter of days.

555.   Additionally, Defendants Wyant, Shekter-Smith, Prysby, and Busch— all MDEQ officials—refused to enforce environmental and nondiscrimination laws to protect the predominantly poor citizens of Flint by (1) granting a fraudulent Administrative Consent Order to allow Flint to borrow funds to participate in the KWA; (2) issuing the Flint Water Treatment Plant a permit pursuant to the Michigan Safe Drinking Water Act without observing the statutorily mandated 45-day notice and comment period; (3) failing to comply with sampling and optimized corrosion control protocols as required under the State and Federal Lead and Copper Rule; and (4) lacking any nondiscrimination policy for more than 30 years and ignoring EPA requirements to update its policy for years.

556.   Defendants Wyant, Shekter-Smith, Prysby, and Busch adhered to the requirements of the Michigan Safe Drinking Water Act for other cities and

181

counties in more affluent areas of the State. Specifically, multiple water projects went forth during the time of the Flint Water crisis—including several in areas with lead pipes —and those projects adhered to the notice requirements and did not result in the serious disaster that occurred in Flint.

557.  If Plaintiffs' community had been predominately white, Plaintiffs would have been treated the same as their white neighbors in Genesee County, and they too would have received DWSD water as part of the Interim Plan.

558.  Because Plaintiffs were water users in a predominately African American community, their complaints were disrespected and dismissed as exaggerated, without merit or inconsequential. If Plaintiffs' community had been predominately white, citizen complaints would have been treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns. This disrespect and dismissive response arose directly from the conspiracy between these Defendants founded on invidious racial animus.

559.  As a direct and proximate result of the conspiracy and the unconstitutional acts of Defendants as alleged in this Master Complaint, have suffered violations of their fundamental constitutional rights including, but not limited to:

   a.  Serious and in some cases life threatening and irreversible bodily injury;

182

    b.     Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

    c.     Pain and suffering;

    d.     Embarrassment, outrage, mental anguish, fear and mortification and stress related physical symptoms.

560. The conduct of Defendants was reckless and outrageous, entitling Plaintiffs an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

<u>**COUNT VI: MCL 37.2303 – VIOLATION OF
PUBLIC SERVICE PROVISIONS OF ELCRA
AFRICAN AMERICAN PLAINTIFFS AGAINST SNYDER, DILLON,
WRIGHT, AMBROSE, KURTZ, EARLEY, THE CITY OF FLINT,
WYANT, SHEKTER-SMITH, PRYSBY & BUSCH**</u>

561. Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

562. Flint and Emergency Managers Walling, Ambrose and Earley represent a public facility, agency, board owned and operated by a political subdivision of the state established to provide public service to the public. MCL 37.2301(b).

563. If not "provider[s]" of a public service, Wright, Walling, Ambrose, Earley are liable under MCL 37.2701 because they aided or abetted the "provider" to violate MCL 37.2302(a).

564.   Governor Snyder and Dillon are liable under MCL 37.2701 because they aided the "provider" of water services to Plaintiffs in the acts which denied Plaintiffs of the full and equal enjoyment of water services because of race.

565.   These Defendants were under a statutory duty to either provide water services to Plaintiffs so that they would not be denied the full and equal enjoyment of public water service on account of race, or they aided and abetted the public service provider to deny Plaintiffs full and equal enjoyment of public water service.

566.   In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational).

567.   These Defendants knew that the water from the Flint River was grossly inferior to the water Flint and Genesee County citizens had been receiving from DWSD.

568.   These Defendants knew that the water from the Flint River would have to be processed at the Flint WTP, which required millions of dollars of upgrades.

569.   These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

570.   Recognizing these facts, Defendants devised an Interim Plan that allowed the predominately white water users of Genesee County to receive the safe, superior water from DWSD and the predominately black water users of Flint would have to accept during the interim period grossly inferior, previously rejected and potentially unsafe Flint River water.

571.   There was no rational economic justification for treating the predominately white water users from those areas of Genesee County outside of Flint differently than the users of water from Flint, a predominately African American community. This is so because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

572.   Given the unexplained difference in treatment between these two groups of similarly situated water users, considering the absence of any rational economic or fiscal justification, and taking into account the racial makeup of the community that received the grossly inferior and dangerous water product, the deliberate decisions and actions of these conspiring Defendants in devising the Interim Plan can fairly be said to be the product of racial discrimination in violation of MCL 37.2302(a).

573.   Governor Snyder additionally prolonged Plaintiffs' exposure to toxic

185

Flint Water, and limited their access to state resources, by failing to declare a state of emergency in Flint until several months after he acknowledges becoming aware that Flint's water was dangerous. Governor Snyder responded to similar emergencies affecting predominantly affluent communities substantially faster—often declaring a state of emergency or state of disaster in a matter of days.

574.  Additionally, Defendants Wyant, Shekter-Smith, Prysby, and Busch—all MDEQ officials—refused to enforce environmental and nondiscrimination laws to protect the predominantly poor citizens of Flint by (1) granting a fraudulent Administrative Consent Order to allow Flint to borrow funds to participate in the KWA; (2) issuing the Flint Water Treatment Plant a permit pursuant to the Michigan Safe Drinking Water Act without observing the statutorily mandated 45-day notice and comment period; (3) failing to comply with sampling and optimized corrosion control protocols as required under the State and Federal Lead and Copper Rule; and (4) lacking any nondiscrimination policy for more than 30 years and ignoring EPA requirements to update its policy for years.

575.  Defendants Wyant, Shekter-Smith, Prysby, and Busch adhered to the requirements of the Michigan Safe Drinking Water Act for other cities and counties in more affluent areas of the State. Specifically, multiple water projects went forth during the time of the Flint Water crisis—including several in areas with lead pipes —and those projects adhered to the notice requirements and did not

186

result in the serious disaster that occurred in Flint.

576.   If Plaintiffs' community had been predominately more affluent, Plaintiffs would have been treated just like their more affluent neighbors in Genesee County and throughout the State, and they too would have received DWSD water as part of the Interim Plan, enjoyed the protection of Michigan's environmental statutes and regulations, and, should an emergency have occurred, received a prompt declaration of emergency by the Governor and the attendant resources such a declaration provides.

577.   As a direct and proximate result of the violation of the ELCRA as alleged in this Master Complaint, Plaintiffs have experienced damages including, but not limited to:

a.   Serious and in some cases life threatening and irreversible bodily injury;

b.   Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

c.   Pain and suffering;

d.   Embarrassment, outrage, mental anguish, fear and mortification and stress related physical symptoms.

## COUNT VII: GROSS NEGLIGENCE
**SNYDER, DILLON, LYON, SHEKTER-SMITH, ROSENTHAL, BUSCH, COOK, PRYSBY, WURFEL, WRIGHT, KURTZ, EARLEY, AMBROSE, CROFT, JOHNSON, & GLASGOW**

578. Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

579. Defendants independently owed Plaintiffs a duty to exercise reasonable care.

580. Defendants undertook, for consideration, to perform a duty owed to Plaintiffs and by the City of Flint and/or the State of Michigan.

581. Based on their undertakings, Defendants had a duty to Plaintiffs to exercise reasonable care to protect that undertaking.

582. Plaintiffs relied on the City, State, and/or Defendants to perform the duty to ensure the proper treatment of Flint River Water.

583. Plaintiffs relied on the City, State, and/or Defendants to perform the duty to disclose known hazards in their drinking water.

584. Defendants failed to exercise reasonable care.

585. Defendants breached their duties to Plaintiffs in ways including but not limited to the following:

    a. Failing to require corrosion control treatment of Flint River water;

    b. Failing to conduct proper testing of Flint's water;

    c. Failing to require proper testing of Flint's water;

    d. Failing to respond to evidence that Flint's water was improperly treated;

188

    e.  Misrepresenting that corrosion control treatment had been implemented;

    f.  Publicly declaring unsafe water to be safe to drink;

    g.  Ignoring evidence that Flint's water was unsafe to drink;

    h.  Withholding information that showed that Flint's water was unsafe to drink;

    i.  Publicly discrediting those who claimed that Flint's water may not be safe to drink;

    j.  Failing to warn Plaintiffs and the public that Flint's water was not safe to drink.

586.  Plaintiffs suffered harm resulting from Defendants' failures to exercise reasonable care.

587.  Plaintiffs suffered harm resulting from Defendants' failures to exercise reasonable care to protect their undertakings.

588.  Defendants' failures to exercise reasonable care to protect their undertakings proximately caused the Plaintiffs' injuries and were entirely foreseeable.

589.  Defendants are liable to Plaintiffs for all harms resulting to themselves and their property from Defendants' failures to exercise reasonable care.

590.  Defendants' liability includes without limitation: personal injuries, illnesses, exposure to toxic substances and property damage suffered by Plaintiffs as a result of Defendants' failures to exercise reasonable care.

189

591.   Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

592.   All of the above individual Defendants' conduct and/or failure to act constitute gross negligence because it was so reckless that it demonstrates a substantial lack of concern for whether injury would result.

593.   The performance of governmental functions constituting gross negligence falls within the exceptions of governmental immunity pursuant to MCL 691.1407.

594.   As a direct and proximate result of the above individual Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), contract damages and property damages (including but not limited to damaged plumbing and lost real property value), as well as punitive and/or exemplary damages.

## COUNT VIII: PUNITIVE DAMAGES

## ALL DEFENDANTS

595.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

596.   Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing property damage, nuisances, and trespasses upon Plaintiffs' persons and properties, disregarding the rights of Plaintiffs.

597.  Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to:

> a.  Failure to provide safe drinking water to the residents of Flint;
>
> b.  Failure to implement adequate corrosion controls for Flint River water; and
>
> c.  Underestimating the seriousness of the lead contamination in Flint's water system.

598.   Defendants have caused great harm to Plaintiffs' property and water supplies and demonstrated an outrageous conscious disregard for Plaintiffs' safety with implied malice, warranting the imposition of punitive damages.

## COUNT IX – PROFESSIONAL NEGLIGENCE
## LAN PC, LAN INC. and LAD

599.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

600.   The LAN Defendants undertook, for consideration, to render services for the City of Flint, which they should have recognized as necessary for the protection of Plaintiffs.

601.   The LAN Defendants undertook to perform a duty owed to Plaintiffs by the City of Flint and/or the State of Michigan.

602.   Based on their undertaking, the LAN Defendants had a duty to Plaintiffs, as residents and property owners in the City of Flint, to exercise that degree of care consistent with the greater degree of knowledge and skill possessed by design professionals, as well as an ethical duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

603.   The LAN Defendants also owed a duty to Plaintiffs to notify the proper authorities of unethical illegal practices of others whose actions or decisions posed threats to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

604.   The LAN Defendants' duties to Plaintiffs included but were not limited to: a duty to properly administer the placing of the Flint WTP into operation using the Flint River as a primary source, a duty to do so in such a manner that would not endanger the health and property of Plaintiffs, a duty to take other actions consistent with the greater degree of knowledge and skill possessed

by design professionals and/or the duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or provide proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

605. Plaintiffs relied on the LAN Defendants to perform their duties.

606. The LAN Defendants failed to exercise reasonable care in performing their duties, including in preparing for and executing the transition from treated DWSD water to untreated Flint River water, which was unsafe, toxic and unsuitable for human use.

607. The LAN Defendants failed to undertake reasonable care and conduct as a professional engineering firm.

608. The LAN Defendants failed to exercise reasonable care when they did not ensure that corrosion control measures were implemented in a water supply system containing lead pipes that was being transitioned onto a highly corrosive water source.

609. There is also an inference that the LAN Defendants breached their collective duties to Plaintiffs, since the spike in lead levels does not normally occur unless water is not properly treated, such as when there is a failure to use anti-corrosion treatments in providing finished water drawn from a water source and transported through a pipe system, when it is known, or should have been known, that such anti-corrosion treatments must be used to protect health and safety.

610. Plaintiffs suffered harm resulting from the LAN Defendant's failures to exercise reasonable care.

611. The LAN Defendants' failure to exercise reasonable care was direct and proximate cause of the Plaintiffs' injuries, which were entirely foreseeable.

612. The LAN Defendants are liable to Plaintiffs for all harms resulting to them from the LAN Defendants' failures to exercise reasonable care.

613. As a direct and proximate result of the LAN Defendants' actions and/or omissions, Plaintiffs have been lead poisoned and/or suffered from life threatening Legionella pneumonia, infections, dementia, and have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits and lost earning capacity).

614. Further, as a direct and proximate cause of the LAN Defendants' acts and omissions, Plaintiffs' property has been damaged in the form of damaged pipes, service lines, and appliances in their homes, a diminution of property values, and other property damages.

615. The LAN Defendants' conduct and/or failure(s) to act constitutes gross negligence because they were so reckless that they demonstrated a substantial lack of concern for whether an injury would result.

616.   In addition to the damages alleged above, Plaintiffs seek exemplary damages against the LAN Defendants.

617.   The LAN Defendants' professional negligence was voluntary conduct that inspired humiliation, outrage and indignity by the Plaintiffs.

618.   The LAN Defendants' conduct was malicious, willful and wantonly as to disregard the Plaintiffs' rights, for the following reasons:

      b.   The LAN Defendants knew that Plaintiffs were relying upon them to provide Flint with safe water;

      c.   The LAN Defendants knew that the failure to include corrosion control chemicals posed threats to public health and property that would result in injury and damages to Plaintiffs; and/or

      d.   The LAN Defendants knew that the failure to notify and/or report to the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health and property that would result in injury and damages to Plaintiffs.

619.   As a result of the foregoing, Plaintiffs seek an award of exemplary damages from the LAN Defendants so as to deter such morally reprehensible conduct by the LAN Defendants and similarly situated corporations in the future.

## COUNT X – PROFESSIONAL NEGLIGENCE
## ROWE

620.  Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

621.  Rowe undertook, for consideration, to render services for the City of Flint, which it should have recognized as necessary for the protection of Plaintiffs.

622.  Rowe undertook to perform a duty owed to Plaintiffs by the City of Flint and/or the State of Michigan.

623.  Based on its undertaking, Rowe had a duty to Plaintiffs to exercise reasonable care.

624.  Rowe failed to undertake reasonable care and conduct as a professional engineering firm.

625.  Rowe failed to exercise reasonable care when it failed to insist upon the implementation of corrosion control chemical in a system containing lead pipes that was transporting highly corrosive water from the Flint River to the Flint WTP to the residents and property owners of Flint, including Plaintiffs.

626.  Plaintiffs relied on Rowe to perform their duties.

627.  Plaintiffs suffered harm resulting from Rowe's failure to exercise reasonable care.

628.  Rowe's failure to exercise reasonable care was a direct and proximate cause of the Plaintiffs' injuries, which were entirely foreseeable.

629.  Rowe is liable to Plaintiffs for all harms resulting to them from Rowe's failures to exercise reasonable care.

196

630.   As a direct and proximate result of Rowe's actions and/or omissions, Plaintiffs have been lead poisoned and/or suffered from life threatening Legionella pneumonia, infections, dementia, and have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries (including without limitation cognitive deficits and lost earning capacity).

631.   Further, as a direct and proximate cause of Rowe's acts and omissions, Plaintiffs' property has been damaged in the form of damaged pipes, service lines, and appliances in their homes, a diminution of property values and other property damages.

632.   Rowe's conduct and/or failure(s) to act constitutes gross negligence because it was so reckless that it demonstrated a substantial lack of concern for whether an injury would result.

633.   In addition to the damages alleged above, Plaintiffs seek exemplary damages against Rowe.

634.   Rowe's professional negligence was voluntary conduct that inspired humiliation, outrage and indignity by the Plaintiffs.

635.   Rowe's conduct was malicious, willful and wantonly as to disregard the Plaintiffs' rights for the following reasons:

197

a.  Rowe knew, or should have known, that Plaintiffs were relying upon them to provide Flint with safe water;

b.  Rowe knew, or should have known, that the failure to include corrosion control chemicals posed threats to public health and property that would result in injury and damages to Plaintiffs; and/or

c.  Rowe knew, or should have known, that the failure to notify and/or report to the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health and property that would result in injury and damages to Plaintiffs.

636.   As a result of the foregoing, Plaintiffs seek an award of exemplary damages from Rowe so as to deter such morally reprehensible conduct by Rowe and similarly situated corporations in the future.

## COUNT XI – PROFESSIONAL NEGLIGENCE
## VEOLIA LLC, VEOLIA INC., VEOLIA WATER AND VEOLIA S.A.

637.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

638.   The Veolia Defendants undertook, for consideration, to render services for the City of Flint, which they should have recognized as necessary for the protection of Plaintiffs.

639.   The Veolia Defendants undertook to perform a duty owed to Plaintiffs by the City of Flint and/or the State of Michigan.

640.   Based on their undertaking, the Veolia Defendants had a duty to Plaintiffs to exercise reasonable care.

641.   Plaintiffs relied on the Veolia Defendants to perform the duty to inspect the City's water supply to make sure that it was safe.

642.   The Veolia Defendants failed to undertake reasonable care and conduct as a professional engineering firm.

643.   The Veolia Defendants failed to exercise reasonable care in inspecting the city's water system and issuing its interim and final reports.

644.   The Veolia Defendants failed to exercise reasonable care when they declared that Flint's drinking water met federal and/or state and/or all applicable requirements.

645.   The Veolia Defendants failed to exercise reasonable care when they represented that Flint's drinking water was safe.

646.   The Veolia Defendants failed to exercise reasonable care when they discounted the possibility that problems unique to Flint's water supply were causing medical harms.

647.   The Veolia Defendants failed to exercise reasonable care when they failed to warn about the dangers of lead leaching into Flint's water system.

648.   The Veolia Defendants failed to exercise reasonable care when they did not forcefully recommend the immediate implementation of corrosion control for purposes of preventing lead contamination in Flint's water supply.

649.   The Veolia Defendants failed to exercise reasonable care when they recommended the addition of phosphates to the water, when phosphates exacerbate the problem of lead leaching, and in fact made the lead poisoning worse.

650.   Plaintiffs suffered harm resulting from the Veolia Defendants' failures to exercise reasonable care to protect its undertaking.

651.   The Veolia Defendants' failures to exercise reasonable care to protect their undertaking directly and proximately caused the Plaintiffs' injuries and were entirely foreseeable.

652.   The Veolia Defendants are liable to Plaintiffs for all harms resulting to them from their failures to exercise reasonable care.

653.   As a direct and proximate result of the Veolia Defendants' actions and/or omissions, Plaintiffs have been lead poisoned and/or suffered from life threatening Legionella pneumonia, infections, dementia, and have suffered past, present and future personal injuries, including but not limited to: various health problems (including, without limitation, hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation,

and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning capacity.

654.   Further, as a direct and proximate cause of the Veolia Defendants' acts and omissions, Plaintiffs' property has been damaged in the form of damaged pipes, service lines, and appliances in their homes, a diminution in property values, and other property damages.

655.   The Veolia Defendants' conduct and/or failure(s) to act constitute gross negligence because it was so reckless that they demonstrated a substantial lack of concern for whether an injury would result.

656.   In addition to the damages alleged above, Plaintiffs seek exemplary damages against Veolia.

657.   The Veolia Defendants' professional negligence was voluntary conduct that inspired humiliation, outrage, and indignity by the Plaintiffs.

658.   The Veolia Defendants' conduct was malicious, willful and wantonly as to disregard the Plaintiffs' rights for the following reasons:

      a. The Veolia Defendants knew, or should have known, that Plaintiffs were relying upon them to provide Flint with safe water;

      b. The Veolia Defendants knew, or should have known, that the failure to include corrosion control chemicals posed threats to public health and property that would result in injury and

damages to Plaintiffs; and/or

c. The Veolia Defendants knew, or should have known, that the failure to notify and/or report to the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health and property that would result in injury and damages to Plaintiffs.

659.   As a result of the foregoing, Plaintiffs seek an award of exemplary damages from the Veolia Defendants so as to deter such morally reprehensible conduct by the Veolia Defendants and similarly situated corporations in the future.

## COUNT XII – FRAUD
## VEOLIA LLC, VEOLIA INC., VEOLIA WATER AND VEOLIA S.A.

660.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

661.   Upon information and belief, the Veolia Defendants made false and material representations regarding the safety of Flint's water, the nature and cause of the water quality problems in Flint, and the risks to public health.

662.   Upon information and belief, the false and material representations include, but are not limited to, statements in the Veolia Defendants' 2015 Interim Report that:

a. Flint's water was "safe" and "in compliance with drinking water standards[.]"

202

    b. The observed discoloration was merely aesthetic and not indicative of water quality or health problem; and

    c. Medical problems are because "[s]ome people may be sensitive to any water."

663. Upon information and belief, the material representations and other acts and omissions of the Veolia Defendants constitute fraud.

664. Upon information and belief, the Veolia Defendants knew the representations were made recklessly without any knowledge about their veracity.

665. Upon information and belief, the Veolia Defendants made the representations with the intention that Plaintiffs would act and rely on them, which they did.

666. As a direct and proximate result, Plaintiffs suffered and continue to suffer injuries and damages.

## DEMAND FOR JURY TRIAL

667. Plaintiffs hereby demand a jury trial pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable in this action.

## RELIEF REQUESTED
## GOVERNMENTAL DEFENDANTS

668. Plaintiffs request the following relief from the court:

    a. An order declaring the conduct of Defendants unconstitutional;

    b. An injunctive order to remediate the harm caused by Defendants' unconstitutional conduct including, but not limited to: repairs of private property and establishment of medical monitoring to provide

health care and other appropriate services to Plaintiffs for a period of time deemed appropriate by the Court;

c.  Appointment of a monitor who will assist in the development of remedial plans including, but not limited to: early education, education intervention programs, criminal and juvenile justice evaluations;

d.  An order for an award of compensatory damages;

e.  An order for an award of punitive damages;

f.  An order for an award of actual reasonable attorney fees and litigation expenses; and

g.  An order for all such other relief the court deems equitable.

## RELIEF REQUESTED
## ENGINEERING DEFENDANTS

669.  Plaintiffs demand judgment against Engineering Defendants for:

a.  Compensatory damages;
b.  Punitive damages;
c.  Exemplary damages;
d.  Equitable relief;
e.  Declaratory judgment;
f.  Reasonable Value of Needed Services;
g.  Pre-judgment and post-judgment interest;
h.  Attorneys' fees and litigation expenses; and
i.  An order for such other relief the court deems equitable.

Respectfully submitted,

Dated: December 3, 2018

**LEVY KONIGSBERG, LLP**

By: /s/ Corey M. Stern
Corey M. Stern, Esq.
800 Third Avenue, Suite 11th Floor
New York, NY, 10022
(212) 605-6200
cstern@levylaw.com

**NAPOLI SHKOLNIK PLLC**

By: /s/ Hunter Shkolnik
Hunter J. Shkolnik, Esq.
360 Lexington Avenue, 11th Floor
New York, NY, 10017
(212) 397-1000
hunter@napolilaw.com

*Co-Liaison Counsel for Personal Injury Claims*