UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

In re FLINT WATER CASES

                                              Civil Action No. 5:16-cv-10444-JEL-MKM (consolidated)

                                              Hon. Judith E. Levy
                                              Mag. Mona K. Majzoub

_____

LeeAnne Walters, et al.

                     Plaintiffs             Civil Action No. 5:17:cv-10164-JRL-MKM

vs.

Governor Rick Snyder, et al.

                     Defendants

_____

## **NOTICE OF NONPARTIES AT FAULT BY DEFENDANTS VEOLIA NORTH AMERICA, LLC, VEOLIA NORTH AMERICA, INC., AND VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC**

The Defendants, Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC (collectively "the VNA Defendants"), hereby file their ***Notice of Nonparties at Fault*** in this matter in compliance with substantive Michigan law governing the tort law claims for money damages arising out of personal injuries and property damages the various plaintiffs

allege they have sustained as a consequence of the acts and omissions of federal, state, county, and city officials in changing the source of drinking water from Lake Huron to the Flint River in 2014. *See* MCR 2.112(K).

The VNA Defendants have repeatedly told the Court—as well as putative class counsel, attorneys representing individual claimants, and counsel for the various state and local government defendants, and engineering defendants, and McLaren Hospital in the Flint Water Cases—that:

- None of the VNA Defendants arrived on scene until nine-and-a-half months after the City's water contamination began.

- The VNA Defendants' involvement in the City of Flint spanned a month and a half (beginning in January 2015 and ending in March 2015).

- The VNA Defendants had no control over any aspect of Flint's drinking water.

- Despite the limited scope of the VNA Defendants' engagement, the VNA Defendants advised the City of Flint that the Flint River water was corrosive and advised of the need for corrosion control, but this advice was not followed.

- The City of Flint did not implement the VNA Defendants' recommendations, particularly as to use of ferric chloride; and

- Legal responsibility for any particular claimant's injuries and damages reposes entirely with other persons and entities, including (without limitation) each defendant sued by plaintiffs in this or other Flint Water Litigation in this or other courts.

The VNA defendants add the following facts to those recited immediately above:

2

- The VNA defendants did not manufacture or distribute lead or lead containing products, such as lead paint, tetraethyl lead, lead gasoline, or toys or furniture containing lead;

- The VNA defendants did not operate manufacturing facilities in Flint, Michigan or its surrounding communities, such as smelters, metal processing plants, motor vehicle assembly plants, or motor vehicle paint shops;

- The VNA defendants did not operate power generating plants in Flint, Michigan or its surrounding communities or any other facilities that produced plumes of ash and smoke from the products of combustion, including lead particles;

- The VNA defendants did not cause or contribute to the extensive background of lead contamination of Flint, Michigan soils; and

- The VNA defendants did not construct, own, or lease residential or commercial properties in Flint, Michigan burdened with lead paint or lead contaminated soils and dust.

Through this Notice of Nonparties at Fault, the VNA Defendants state their intent (and preserve their right) to have the jury allocate fault on the verdict form to each listed entity or person who caused or contributed to the harm or damages proven by the Plaintiffs, including, without limitation, each entity or person sued by each and every plaintiff in each lawsuit in state and federal court, collectively referenced as the Flint Water Litigation (or the "Flint Water Cases"). Further, the VNA defendants state their intent to amend and modify this Notice prior to trial as the litigation develops. Non-parties at fault, such as the plaintiffs' various federal, state, and local government, commercial, and residential landlords who provided substandard housing contaminated with lead painted surfaces, pipes, and soils have

3

yet to be identified. The VNA defendants will add to the Notice those non-parties at fault who are identified during the discovery process.

## 1. THE UNITED STATES OF AMERICA

### A. Environmental Protection Agency
Attorney Michael L. Williams
United States Department of Justice
Civil Division Environmental Tort Litigation
P.O. Box 340, Ben Franklin Station
Washington, D.C., 20044

The Environmental Protection Agency ("EPA") is an independent agency of the federal government charged with the establishment and enforcement of environmental protection standards and providing support and technical assistance to the states for the protection of human health and the environment.[1] The EPA is charged by Congress with implementing and enforcing drinking water standards under the Safe Drinking Water Act ("SDWA"), including standards applicable to lead. The SDWA was established to protect the quality of drinking water in the United States, including in Flint, Michigan.

Under the SDWA, the EPA granted the State of Michigan the authority to implement and enforce SDWA regulations in an arrangement referred to as "primacy." Where states are granted primacy, the EPA retains the duty to ensure that public drinking water systems comply with health-based federal standards for

---

[1] 40 C.F.R. § 1.1; Reorganization Plan No. 3 of 1970.

contaminants.[2] The EPA has the duty to monitor and oversee state primacy for compliance with the SDWA.[3]

EPA's headquarters maintains overall planning, coordination and control of EPA programs.[4] EPA Regional Offices have a duty to execute EPA's programs within the boundaries of their regions.[5] EPA Region 5 Office of Drinking Water program staff and managers have a duty to oversee SDWA implementation in regional primacy states, including Michigan, through enforcement actions and by providing guidance and technical information to state agencies and local utilities within its region.[6] EPA has a duty to notify state officials and a public water system if it determines that a water system is out of compliance with the SDWA, including the Lead and Copper Rule ("LCR"). In such situations, the EPA has a duty to provide technical assistance to the state and public water system to bring the system into compliance "by the earliest feasible time."[7] If compliance is not achieved and the State has not commenced an enforcement action after thirty days, the EPA has a duty to issue a compliance order or commence a civil action.[8] Additionally, treatment technique violations, including failure to install corrosion control treatment, require

---

[2] 42 U.S.C. § 300g-3(a); 300j-4.
[3] *Id.*
[4] 40 C.F.R. § 1.5.
[5] *Id.*
[6] 40 C.F.R. § 1.49(d).
[7] 42 U.S.C. §300g-3 (a)(1)(A).
[8] 42 U.S.C. §300g-3 (a)(1)(B).

public notification.[9] The EPA is empowered and required to intervene when states do not fulfill their responsibilities to protect the public's health. The SDWA authorizes the EPA to request information, take independent enforcement actions, and revoke state primacy when states do not implement the SDWA with the stringency required by federal law. Additionally, the EPA may override state decisions regarding issues such as corrosion control treatment.[10] If states fail to take enforcement action within applicable frames, EPA may issue administrative orders or commence civil actions.[11] EPA can also issue emergency orders when state of local authorities fail to respond adequately to imminent and substantial public health threats.[12]

EPA's authority under the SDWA allow it to exercise preemptory jurisdiction. Under the LCR, *an EPA regional administrator can override a state determination about corrosion control treatment if the state determination is not defensible under federal law*.[13] The Regional Administrator can then issue a federal treatment determination in its place. EPA's enforcement authority can also be understood to retain general preemptory jurisdiction since EPA is able to bring an enforcement

---

[9] 42 U.S.C. §300g-3(c).
[10] 40 C.F.R. §42.18-19.
[11] 42 U.S.C. §300g-3, commonly referred to by its section number within the SDWA, section 1414.
[12] 42 U.S.C. §300i(a), commonly referred to by its section number within the SDWA, section 1431.
[13] 40 C.F.R. §141.82(h)(i).

action against a public water supply if the state fails to do so. EPA must first notify the state of a public water supply's noncompliance and give the state 30 days to address it; EPA can then issue an administrative order or commence a civil action if the state doesn't take appropriate action within that timeframe.[14] If it determines an emergency exists and that state and local authorities have not taken appropriate action, EPA has broad authority to issue emergency orders necessary to protect the public, including ordering those who caused the endangerment to provide an alternative water supply.[15] There are two sections of the SDWA that give the EPA authorization to act. They are Sections 1414 (42 USC §300g-3) and 1431 (42 USC § 300i(a)).

**Section 1414**. When the EPA finds a public water system out of compliance, the EPA must notify the state and public water system of the violation. If after 30 days the state has not commenced enforcement action, then the EPA *must* issue an order to comply. In the case of Flint, EPA did not use this authority as required by the SDWA.

**Section 1431**. The SWDA provides the EPA with emergency authority to address imminent and substantial endangerment to human health from drinking water contamination. Specifically, sec. 1431 grants emergency powers to the EPA

---

[14] 42 U.S.C. §300g-3(a).
[15] 42 U.S.C. §3001(a).

when the regional administrator is aware of a contaminant or threat "*which may present an imminent and substantial endangerment to the health of persons, and that appropriate state and local authorities have not acted to protect the health of such persons, the EPA Administrator may take such actions as he or she may deem necessary in order to protect the health of such persons.*" The EPA can use this discretionary authority whenever: (1) contamination is in or likely to enter a drinking water source which may present an imminent and substantial endangerment to the health of persons; and (2) the appropriate state and local authorities have not acted to protect human health.

The EPA's authorized actions include issuing administrative orders requiring specific actions that are necessary to protect human health or commencing a civil judicial action. In 1994, the EPA Administrator delegated the authority to issue administrative emergency orders under Section 1431 to EPA regional administrators and, in multi-regional cases or cases of national significance, to the Assistant Administrator for OECA. The authority to make a Section 1431 judicial referral, however, remains with headquarters. The EPA's *Final Guidance on Emergency Authority under Section 1431 of the Safe Drinking Water Act (1991)* is designed to encourage more widespread use of the EPA's Section 1431 authority by more fully explaining situations where this authority may be applied. The EPA's 1991 guidance describes how and when the EPA can use its emergency authority even if a state or

local agency acts: "*The Regions should not view this standard - whether a State or local authority has acted to protect the health of persons - as an issue of whether these authorities have "failed" to protect public health. Instead, these authorities intentionally may defer action to EPA because the Section 1431 authority may be more powerful or expeditious.... Further, State or local authorities may decide to take action jointly with EPA. In such cases, EPA would determine that State and local authorities have not acted (on their own) to protect the health of persons. Therefore, EPA may proceed with Section 1431 actions when State and local authorities are working jointly with EPA.*"

The guidance clarifies that the EPA may use its emergency authority even when a state is acting or is going to act. Regarding whether the state action is in fact protecting the public from the contaminants in a timely fashion, the guidance provides: *If EPA has information that State/local agencies are going to act, EPA must decide whether the action is timely and protective of public health. If EPA determines that the action is insufficient and State and local agencies do not plan to take stronger or additional actions to ensure public health protection, in a timely way, EPA should proceed with an action under Section 1431.* The EPA invoked this authority when it issued its emergency administrative order on January 21, 2016.

The EPA possesses emergency powers if a contaminant in drinking water poses an imminent threat or danger to the public health.[16] Though the EPA ultimately found exactly such circumstances to exist in Flint, it did not take action to address them until late January 2016, when it issued an emergency administrative order pursuant to Section 1431 of the SDWA. Although the EPA was aware of the City's non-compliance with relevant standards, including the LCR, at least as early as April 2015, when the Michigan Department of Environmental Quality ("MDEQ") confirmed to the EPA that Flint had no corrosion control treatment, it did nothing until January 21, 2016. And as it sat by idly, the EPA allowed Flint residents to consume lead-contaminated water knowing that serious, long term physical injuries could come about, including specifically to small children.

Appearing before Congress, EPA Administrator Gina McCarthy acknowledged that her agency was too slow to intervene in Flint and should have been more forceful in testing the water and requiring changes, colorfully testifying that she "wished we had yelled from the tree tops." Instead, the EPA, with actual knowledge of Flint's non-compliance, remained silent, refusing to inform the public for a substantial period of time. Without EPA intervention, "the conditions in Flint

---

[16] 42 U.S.C.§ 300j-1.

persisted, and the state continued to delay taking action to require corrosion control or provide alternative drinking water supplies."[17]

### *EPA's Office of Inspector General*

The EPA's Office of Inspector General is a part of the EPA, although Congress separately funds it from the agency so as to ensure its independence. The EPA's Office of Inspector General was created pursuant to the Inspector General Act of 1978, as amended. In its capacity as an independent office within the EPA, the Office of Inspector General helps the agency protect the environment, in part, through its audits and investigations of the EPA to promote economy and efficiency and to prevent and detect fraud, waste and abuse.[18]

Pursuant to its statutory and regulatory authority, the Office of the Inspector General conducted a comprehensive "performance" audit of the Flint Water Crisis from February 2016 through April 2018 in accordance with generally accepted government auditing standards. Those standards require that it plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for its findings and conclusions based on its audit objectives. In its performance audit, the

---

[17] EPA OIG, Management Weaknesses Delayed Response to Flint Water Crisis, Report No. 18-P-0221 (July 19, 2018) ("OIG Report").
[18] U.S. EPA, *EPA's Office of Inspector General*, https://www.epa.gov/office-inspector-general (last visited on October 27, 2020).

Office of the Inspector General concluded that the evidence obtained provided it with a reasonable basis for its findings and conclusions based on its audit objectives.

Prior to reaching its conclusions, the Office of the Inspector General reviewed the laws, regulations, policies, procedures and guidance related to the SDWA program. At EPA headquarters, it interviewed the former EPA Administrator (Gina McCarthy); the former EPA Deputy Administrator (Susan Hedman); and staff and officials from the EPA's Office of General Counsel, the Office of Water, and the Office of Enforcement and Compliance Assurance. It also interviewed EPA Region 5 staff and officials, including the former Regional Administrator (who served until January 2016), and the former acting Regional Administrator (who served from January 2016 through January 2018). Further, it interviewed MDEQ's Office of Drinking Water and Municipal Assistance personnel, former and current employees of the City of Flint, residents of Flint, and external experts. It also reviewed documents from the EPA and the MDEQ.[19]

The Office of the Inspector General issued its official report No. 18-P-0221 entitled "Management Weaknesses Delayed Response to Flint Water Crisis" on July 19, 2018 ("OIG Report").[20] In the OIG Report, the Office of the Inspector General

---

[19] OIG Report at pp. 11-12.
[20] The OIG report is admissible evidence under federal and state law.

established the EPA's duties, failures to meet those duties, and causal relationship to the injuries and damages that Plaintiffs allege they have sustained.[21]

**EPA's Duties and Responsibilities.** Although the EPA chose to assign "primary" enforcement responsibility under the SDWA to the State of Michigan, the EPA remained at all times the governmental agency with ultimate authority for compliance with the SDWA. The EPA's duties were non-delegable as a matter of law.[22] EPA Region 5 drinking water program staff and managers primarily oversee SDWA implementation in regional primacy states, including Michigan. Two headquarters offices also help EPA regions implement the SDWA: the Office of Water ("OW"), which provides programmatic and implementation guidance; and the Office of Enforcement and Compliance Assurance ("OECA"), which advises EPA

---

[21] The OIG findings, including the enumeration of duties and responsibilities under the LCR, are definitive and put to rest any purported "disagreement" between the State of Michigan (MDEQ) and the EPA over the proper "interpretation" of the regulations.

[22] "The law assigns the EPA Administrator the ultimate authority to protect public health by setting and enforcing drinking water quality standards. However, the SDWA allows the EPA to grant states the authority to implement and enforce SDWA regulations in an arrangement referred to as 'primacy.' …When states are granted primacy, the EPA retains the responsibility for overseeing state implementation and federal enforcement authority. … Guidance from the EPA's Office of Enforcement and Compliance Assurance (OECA) instructs EPA regional offices to 'ensure that primacy agencies fulfill the enforcement conditions of their primacy agreements.' … Specifically, the SDWA authorizes the EPA to request information, take independent enforcement actions, and revoke state primacy when states do not implement the SDWA with the stringency required by federal law." OIG Report at 2.

regions about enforcing SDWA provisions.[23] The Office of Drinking Water ("ODW"), a program within the Office of Water and under the supervision of the Director, has a duty to develop regulations and guidelines to protect drinking water quality, evaluate compliance with the regulations, and provide program policy direction for technical assistance and training activities in the water supply area.[24]**The Lead and Copper Rule.** In the OIG Report, the Office of the Inspector General definitively relates the obligations imparted by the Lead and Copper Rule ("LCR").[25]

> …[T]he LCR established the treatment technique requirements to minimize exposure. These requirements compel drinking water systems to conduct tap sampling for lead and copper to determine the treatment techniques and other steps systems must take to reduce exposure. To adhere to the LCR, utilities must conduct monitoring for lead and copper in water systems, and demonstrate that they comply with monitoring and treatment technique requirements.
>
> \*\*\*
>
> Some LCR requirements vary based on the water system size and type. … Flint is a large community system … serving more than 50,000.
>
> In 1986, Congress amended the SDWA to prohibit the use of pipes, solder or flux that are not 'lead free' in public water systems, or in plumbing where facilities provide water for human consumption. In 1996, Congress further

---

[23] OIG Report at p. 11.

[24] 40 C.F.R. § 1.49(d).

[25] In 1991, the EPA issued the LCR, 40 CFR § 141.80, *et seq.*, to minimize lead and copper in drinking water.

amended the SDWA by prohibiting the sale of any pipe or plumbing fixture that was not lead free, except for a pipe used in manufacturing or industrial processing. In 2000, the EPA published revisions to the LCR to address implementation issues arising from legal challenges to the 1991 rule. The revisions also streamlined and reduced the monitoring and reporting burden. In 2007, the EPA revised the LCR to enhance implementation in the areas of monitoring, treatment, customer awareness and lead service line replacement.

\*\*\*

The LCR requires community water systems to optimize corrosion control. Utilities have optimized corrosion control when the treatment method that they use has minimized the potential for corrosion in the distribution system, thus minimizing lead contamination.

\*\*\*

The LCR required large water systems to install optimal corrosion control treatment by January 1, 1997, unless they qualified for certain exemptions.[26]

\*\*\*

According to the LCR, if a water system has optimized its corrosion control treatment and plans to change water sources or drinking water treatment methods, the state must review and approve plans before the change can be implemented.

The LCR requires states to review and approve the optimized corrosion control treatment for all systems. The LCR also requires states to designate optimal water quality parameters intended to represent the conditions under which systems must operate their corrosion control treatment. The rule requires that water systems measure against those parameters, which are typically set as ranges or minimums. Without set water quality parameters, a

---

[26] None of the exemptions applied to Flint.

15

state does not have a reliable method for gauging the adequacy of corrosion control treatment or determining compliance.

\*\*\*

After a system has optimized corrosion control, the LCR requires water systems to monitor for changes in lead concentration on a regular basis. These tests verify that when drinking water reaches the consumer, lead concentrations do not exceed the federal action level of 15 ppb in more than 10 percent of homes.

To conduct the monitoring, the LCR requires utilities to identify the highest- priority sampling sites, such as single-family homes served by lead service lines. The highest-priority sampling sites are identified as "tier 1" locations and, for Flint, constitute the entire sampling pool for regular testing.

The LCR instructs water systems to regularly report tap water sample results from tier 1 sites. Water systems monitor tap water on a semiannual, annual or triennial basis to verify lead contamination does not exceed the federal action level. When a large water system exceeds that level in more than 10 percent of home tap water samples, the water system must provide public education on lead, remove a percentage of lead service lines, and conduct source water monitoring.

The LCR requires systemwide public education when tap-monitoring results show that a system exceeds the federal action level for lead. There are also supplemental lead-monitoring requirements for all water systems to provide consumer notices to those whose taps were tested. The purpose of public education is to inform consumers about lead results, the health effects of lead, and steps the public can take to reduce exposure.

16

Water systems must submit all written public education materials to the state prior to releasing the information to the public.

In the event of a lead action level exceedance, the LCR requires water systems to identify the number of lead service lines present in the distribution system, and requires water systems to meet the minimum 7 percent replacement rate through either physically replacing lead service lines or individually testing them to demonstrate their lead concentrations are below 15 ppb. … In addition, if a system is in violation of 40 CFR § 141.81 for failure to install corrosion control treatment, the state can require the system to commence lead service line replacement until the system is below the lead action level for two consecutive monitoring periods.[27]

**OIG Findings**: The Office of the Inspector General investigated the facts and circumstances causing the contamination of Flint's drinking water. With regard to the MDEQ and the City of Flint, the OIG found:

• Under the MDEQ's oversight, the Flint water treatment plant ("WTP") did not adhere to two LCR requirements: (1) identify and maintain a pool of tier 1 sampling sites, and (2) install and maintain corrosion control treatment throughout the system. State and local decisions to not adhere to these LCR requirements led to the corrosion of the Flint distribution system, which exposed residents to lead in their drinking water.

• The City of Flint did not develop or maintain accurate records of lead service line locations to identify tier 1 sampling sites. Primacy states like Michigan must require water systems to collect and maintain lead service line information, in accordance with the LCR. Without this information, Flint could not prioritize its sampling efforts to collect water samples where higher levels of lead contamination were most likely to occur, as required by the LCR.

---

[27] Lead Contamination and SDWA, OIG Report at pp. 3-7, n. 4-5.

17

- Corrosion control treatment was not maintained.

- The MDEQ did not require Flint's water system to maintain corrosion control treatment when Flint changed water sources in April 2014. According to EPA Region 5, MDEQ concluded that Flint's change in source water would require Flint to revert to the LCR provision that required the water system to conduct tests to determine whether corrosion control treatment was necessary. To do this, MDEQ personnel instructed Flint system staff to conduct monitoring during two consecutive 6-month periods to determine whether corrosion control treatment was necessary.

- EPA Region 5 disagreed with MDEQ's interpretation. The LCR treats systems (such as Flint's) that change their source water or treatment as an existing system. As a result, Region 5 concluded that Flint's system was an existing system with a new source. Therefore, under the LCR, the City needed to maintain continuous corrosion control treatment.

- In January 2015, results from Flint's first round of testing found a 90th percentile lead concentration of 6 ppb. However, MDEQ did not instruct Flint to install corrosion control treatment (per the LCR), but instead required an additional 6-month round of sampling. In July 2015, results from the second round of 6-month tests showed 90th percentile lead concentrations had increased to 11 ppb.

- In October 2015, instead of installing corrosion control treatment, Flint's water system returned to purchasing drinking water from the Great Lakes Water Authority (formerly called the Detroit Water and Sewerage Department), which already included corrosion control treatment. At the time of this change, almost a year-and-a-half of exposure to improperly treated water had damaged the City's drinking water infrastructure, and lead concentrations continued to rise. In December 2015, MDEQ reported that Flint began supplementing Detroit water with additional corrosion control treatment. However, due to the damage done to the Flint distribution system, the lead levels in drinking water did not fall below the federal action level until late 2016.

- MDEQ did not enforce LCR provisions that required Flint's water system to keep an accurate and complete inventory of tier 1 sample site

locations, or maintain corrosion control treatment. As a primacy agency, MDEQ bore responsibility for advising Flint's water system staff about the drinking water source change and meeting SDWA standards. However, MDEQ personnel misinterpreted the law, which led them to provide incorrect advice to Flint on corrosion control treatment requirements. This resulted in infrastructure damage and the prolonged exposure of Flint residents to lead in their drinking water.[28]

With regard to the EPA, the OIG found:

- Despite its authority and responsibility to oversee states with primacy over their drinking water programs, the EPA Region 5 staff and managers did not establish clear roles and responsibilities needed to foster a constructive federal-state relationship with the MDEQ's drinking water program staff. … [T]he EPA's National Program Manager Guidance directs EPA regions to "ensure that primacy agencies fulfill the enforcement conditions of their primacy agreements" under the SDWA.

- As early as 2010, the EPA reviewed MDEQ's drinking water program and identified MDEQ implementation deficiencies. The EPA knew that MDEQ disinvested from 10 SDWA requirements, which Michigan designated as "temporary and non-health related."

- The EPA knew that MDEQ continued these disinvestments through 2015, and the OIG concluded that the disinvestments did in fact have potential public health effects. However, EPA Region 5 did not intervene to ensure that MDEQ's drinking water program met minimum federal standards. It was not until 2016, while under the emergency order, that MDEQ discontinued the majority of the disinvestments

- MDEQ personnel falsely informed Region 5 regarding corrosion control treatment in Flint. In February 2015, when EPA Region 5 staff asked about corrosion control, MDEQ personnel told them that Flint had an optimized corrosion control program in place, that the City conducted quarterly water quality parameter monitoring and did not

---

[28] Circumstances Leading to Flint Drinking Water Contamination and EPA Emergency Administrative Order, OIG Report, Chapter 2 at pp. 13-15.

have any unusual results, and that Flint continued to meet all applicable plant tap standards and treatment technique requirements. However, no later than April 2015, the EPA knew that Flint was not using corrosion control treatment.

- In April 2015, EPA Region 5 managers, instructed MDEQ that the LCR required Flint to maintain consistent corrosion control treatment, but nonetheless did not advise them to initiate corrosion control at that point.

- In 2016, EPA Region 5 knew that MDEQ personnel did not establish water quality parameters required by the LCR.

- Despite known economic challenges in the City, EPA Region 5 staff did not identify Flint's source water switch as an event that could impact the City's ability to comply with the SDWA. As early as May 2014, problems emerged that informed the EPA about the risk.

- Between May 2014 and the issuance of the EPA Emergency Administrative Order in January 2016, EPA Region 5 staff received 87 citizen complaints about drinking water conditions in Flint. The complaints described distress about water quality (color and odor), more specific concerns about total trihalomethanes, total coliform and E. coli, Legionella and, ultimately, lead. Of the complaints received before the order, 30 (34.5 percent) included concerns about lead. EPA Region 5 ignored the volume of complaints and responded with form letters that recommended citizens resolve their concerns by contacting the MDEQ or Flint's water system staff. In six cases, Region 5's response came more than a year after the citizen made the complaint. In 11 cases, EPA Region 5 did not respond at all.

- Staff and managers in Region 5 did not have a system for cataloguing and responding to citizen complaints, nor did they use citizen complaints or the volume of calls as indicators of problems with Flint's water system. As a result, Region 5 did not assess the severity of the situation, and did not alert management to an emerging incident.

- [T]he volume of complaints should have alerted Region 5 to a developing drinking water risk in Flint. A more proactive approach

would have enabled the region to respond more swiftly to the contamination incident.

- [T]he EPA … regional staff knew of the source switch soon after it happened. When the region was informed—a year after the switch— that Flint did not have corrosion control treatment, the region should have intervened earlier to verify the changes occurred in accordance with SDWA regulations.

- Sampling results from two 6-month tests indicated the 90th percentile of the results exceeded the 5 ppb limit at which optimized corrosion control treatment is required, and lead concentrations increased over the course of testing. According to Region 5 officials, these results did not alert the region to widespread problems in Flint's water system. However, if the results of these tests were combined with other issues identified in Flint, this could have signaled problems in Flint's water system and the region could have intervened more forcefully. For example, Region 5 could have done the following: Taken enforcement action under SDWA § 1414, which would have required Flint to install corrosion control treatment after notifying the state. Issued an order under SDWA § 1431 when the region had evidence there was "imminent and substantial endangerment" to human health, and when the region knew the state did not act. Alerted Flint residents about the potential harm to public health (although not required under the SDWA).

- The Flint water crisis demonstrates that public health is not protected when EPA regional staff—with multiple warning signs—do not use the agency's SDWA authorities in conjunction with EPA oversight tools.

- Conclusion. During the Flint water crisis, Region 5 leadership did not employ many of its SDWA authorities, as the state continued to debate LCR requirements and residents continued to drink potentially contaminated water. Flint drinking water contamination continued, in part, because the public health protection authorities of the SDWA were not used effectively.[29]

---

[29] EPA Region 5's Management Weaknesses Delayed Federal Intervention, OIG Report, Chapter 3 at pp. 17-27.

21

**The EPA Senior Staff: Gina McCarthy (EPA Administrator); Susan Hedman (Region 5 Administrator); Tinka Hyde (Region 5 Director of the Water Division); Thomas Poy (Region 5 Chief Ground Water Drinking Water Branch and Member of the Flint Safe Drinking Water Task Force); Jennifer Crooks (Region 5 Michigan Program Manager Ground Water and Drinking Water Branch); Andrea Porter (Region 5 Employee); Miguel Del Toral (Regulations Manager, Ground Water and Drinking Water Branch); Michael Schock (Chemist, Office of Research and Development); Darren Lytle (Environmental Engineer, Office of Research and Development)**

> 1.  <u>Gina McCarthy</u>
>      Attorney Michael L. Williams
>      United States Department of Justice
>      Civil Division Environmental Tort Litigation
>      P.O. Box 340, Ben Franklin Station
>      Washington, D.C., 20044

Gina McCarthy ("McCarthy") served as the EPA's Administrator from July 2013 to January 2017. Prior to that, she held the position of Assistant Administrator for the EPA's Office of Air and Radiation from 2009-2013. Despite learning in June 2015 that three homes in Flint had lead-contaminated water and expressing her concern over the situation in a September 2015 email to EPA staff, Ms. McCarthy did not use her emergency powers until late January 2016 to force the MDEQ to install corrosion control treatment to protect Flint's residents from consuming lead-tainted water. While she served as Administrator, the EPA failed in its oversight role and its obligation to warn the public. The EPA had sufficient authority and information to issue an emergency order to protect Flint residents from lead-contaminated water as early as June 2015, but didn't act until nearly 7 months later when it declared an emergency. Without such EPA intervention, the conditions in

22

Flint persisted, and the state continued to delay taking any action to require corrosion control treatment or provide an alternative drinking water supply. Michigan officials declared a public emergency in October 2015; however, the EPA's emergency order was not issued until 3 months later in January 2016. Accordingly, Ms. McCarthy breached her duty of care to the residents of Flint.

2.   Miguel Del Toral
     Attorney Michael L. Williams
     United States Department of Justice
     Civil Division Environmental Tort Litigation
     P.O. Box 340, Ben Franklin Station
     Washington, D.C., 20044

Miguel Del Toral ("Del Toral") spent his entire professional career with the EPA beginning in 1987.[30] For the past 29 years, he worked exclusively for Region 5's Groundwater and Drinking Water Program, where he reported to Thomas Poy, Chief of the Region 5 Ground and Drinking Water Program,.[31] In his position as Regulations Manager, Del Toral worked within the EPA to develop proposed

---

[30] Mr. Del Toral was deposed over the course of two days on June 11-12, 2020. The VNA defendants intend to rely on his testimony at trial.

[31] Mr. Del Toral was interviewed by the Office of the Inspector General as part of its investigation and performance audit. On information and belief, he is one of the persons identified in the OIG Report, Attachment A, Timeline of Key Events, as the Region 5 "staff member" or "scientist" or "Region 5" for events occurring in 2014 on February, 26 and 27, April 7, 24, 25, and 27, May 6 and 13, and June 10 and 14. Mr. Del Toral testified on multiple days in the criminal court preliminary hearings involving the MDEQ officials Liane Shekter-Smith, Stephen Busch, Patrick Cook, and Michael Prysby. He also gave deposition testimony in the federal tort claims act cases brought against the EPA for its handling of the Flint drinking water matters. The VNA defendants rely on all of his statements and testimony.

regulations, promulgate final rules, and provide instruction and guidance to both state and EPA officials on implementation of those rules, including developing technical  guidance documents, training, webinars, and fact sheets. Mr. Del Toral was employed in the Ground and Drinking Water Program in 1991 when the Lead and Copper Rule ("LCR") was promulgated; he worked directly on the 2007 revisions to the Rule. Mr. Del Toral was responsible for providing education, training, technical assistance, and guidance to EPA officials and to the State of Michigan (among other Region 5 states) regarding LCR compliance for public water systems. Mr. Del Toral was the most knowledgeable individual within EPA Region 5 on issues dealing with lead in drinking water. He is an expert on EPA drinking water regulations, the LCR, corrosion control, and the potential impacts resulting from a water source change on the passivation layer in drinking water distribution systems.

On or before February 26, 2015, Messrs. Del Toral and Poy and Jennifer Crooks[32] (and therefore the EPA) knew that extraordinary high levels of iron were found in black sediment in drinking water in the home of a Flint resident with two minor children. Mr. Del Toral, Jennifer Crooks, and Thomas Poy[33] (and therefore the EPA) also knew that high levels of iron meant high levels of lead and that the

---

[32] No later than February 27, 2015, Andrea Porter also gained such knowledge.
[33] *Id.*

black sediment likely meant particulate lead (with lead concentrations reaching 95%) so pinpointing the root cause and scope of the problem required an immediate investigation.[34] Mr. Del Toral, Jennifer Crooks, and Thomas Poy[35] (and therefore the EPA) further knew that lead service lines were prevalent in Flint and they knew about the possible leaching of lead from service lines without appropriate corrosion control . Mr. Del Toral personally interviewed the Flint resident and inspected her home in Flint and had discussions directly with MDEQ officials regarding LCR compliance issues, including corrosion control and sampling and treatment requirements.

Mr. Del Toral knew that the absence of corrosion control could be determined by an inspection of the WTP and data. By April 2015, Mr. Del Toral (and therefore the EPA) learned from the WTP's monthly operating reports that Flint was not using phosphates for corrosion control. As a consequence of learning that information, Mr. Del Toral emailed Patrick Cook at MDEQ on April 23, 2015 to inquire into what Flint's WTP was using for corrosion control treatment. The next day, April 24, Mr. Cook responded that no corrosion control treatment was in place in Flint. In response, Mr. Del Toral emailed Mr. Cook on April 25 expressing his concerns over

---

[34] "This no surprise. lead lines + no treatment = high lead in water = lead poisoned children." Del Toral email to Thomas Poy, Rita Bair, Nicholas Damato with copies to Joanna Glowacki, Andrea Porter, and Heather Shoven, sent on September 22, 2015 at 7:06:37.
[35] *Id.*

Flint's lack of corrosion control treatment and pre-flushing, noting that Flint did not appear to meet the requirement for optimized corrosion control under the LCR without such treatment. Two days later, on April 27, Mr. Del Toral emailed Mr. Poy and other colleagues stating that Mr. Cook had confirmed that Flint was not utilizing corrosion control treatment, which he said was "very concerning given the likelihood of lead service lines in the city."

By April 24, 2015, Mr. Del Toral (and therefore the EPA) were told unequivocally by Mr. Cook and MDEQ that Flint was not using corrosion control. As a result, no later than April 24, 2015, Mr. Del Toral (and therefore the EPA) knew (or should have known) that the high lead levels found in the Flint residence in February 2015 were not an isolated incident and that in all probability the high lead levels evidenced a system-wide problem with lead in drinking water.

On April 29, 2015, Messrs. Del Toral and Poy, specifically directed MDEQ's Drinking Water Director, Liane Shekter-Smith, that the LCR mandated the use of corrosion control at Flint's WTP. However, Ms. Shekter Smith/MDEQ incorrectly determined that corrosion control treatment was not required immediately and, instead, that Flint could complete two 6-month monitoring periods and that MDEQ would then determine whether corrosion control treatment was necessary. On May 1, 2015, Mr. Del Toral emailed Mr. Cook to again inquire about Flint's use of corrosion control and Mr. Cook responded that MDEQ was delaying any decision

pending completion of the second 6-month monitoring period in June 2015, noting that Flint would be switching water sources again in another year to the Karegnondi Water Authority (KWA) so "requiring a [corrosion control] study at the current time will be of little to no value." Mr. Del Toral believed that the decision to proceed with a new water source without corrosion control was "insane" and characterized the delay to implement corrosion control until the City connected to KWA as "very dangerous". The "insanity" of that decision was founded in the likelihood of consequent exposure of Flint's children to lead in drinking water the severe health hazards that would result. During a June 10, 2015 semi-annual conference call, EPA staff expressed concern to MDEQ about increasing concentrations of lead in Flint drinking water and the lack of corrosion control and recommended that MDEQ offer technical assistance to Flint on managing the City's water quality issues, including lead, but MDEQ refused the EPA's offer of assistance and refused to require corrosion control treatment.

Four months after learning about the high lead levels found in the Flint residence in February 2015, Mr. Del Toral memorialized the LCR violations in an interim June 24, 2015 memorandum entitled "High Lead Levels in Flint, Michigan." In his report, which was prepared at the direction of his direct supervisor, Thomas Poy, Mr. Del Toral expressed numerous concerns, including the high lead levels found at multiple Flint residences, MDEQ's sampling methodology and the lack of

corrosion control treatment at Flint's WTP. Mr. Del Toral reported: "In accordance with the Lead and Copper Rule (LCR), all large systems (serving greater than 50,000 persons) are required to install and maintain corrosion control treatment for lead and copper."[36] Mr. Del Toral recommended that "U.S. EPA should review the compliance status of the City of Flint with respect to whether the system is in violation of the LCR requirement to install and maintain optimal corrosion control and whether the MDEQ is properly implementing the LCR provisions regarding optimal corrosion control treatment requirements for large systems."[37] Further, Mr. Del Toral recommended that the EPA review whether relevant resident-requested samples were being included by the City of Flint in calculating the 90th percentile compliance value for lead.[38]

On June 26, 2015, Mr. Del Toral wrote to Rita Bair, the EPA Section Chief of Ground Water and Drinking Water, describing the situation in Flint and MDEQ's actions as "bordering on criminal neglect," informing her that the state was "complicit" and that "public has a right to know what they [MDEQ] are doing because it is their children that are being harmed." He said he had sufficient information to cause the City to act and implement corrosion control treatment,

---

[36] Miguel Del Toral, US EPA, High Lead Levels in Flint, Michigan-Interim Report (June 24, 2015) ("Del Toral Memo").
[37] *Id.* at 5.
[38] *Id.*

saying in his world he would have told MDEQ in April 2015 "either you do it [CCT] or I will." On July 2, 2015, EPA Region 5 Water Division Director Tinka Hyde emailed MDEQ that Region 5 was "concerned about the lead situation," but would await the results of the second round of monitoring. The same day. EPA Region 5 Administrator Susan Hedman wrote Flint Mayor Dayne Walling to say that EPA would work with MDEQ on issues related to lead in water and that "it would be premature to draw any conclusions" based on Mr. Del Toral's interim memo regarding lead. On July 21, 2015, EPAS and MDEQ held a conference call to discuss corrosion control treatment. During the call, EPA informed MDEQ of its interpretation of the LCR and that it wanted corrosion control treatment implemented in Flint. However, in a follow up email to the call, Ms. Shekter Smith/MDEQ emailed Ms. Hyde/EPA that MDEQ disagreed with EPA's approach, which she said was "premature," and that a study was needed to determine the type of corrosion control to implement. Ms. Shekter Smith requested EPA concurrence on MDEQ's approach, but such concurrence was never provided by EPA.

Restated, no later than the end of June 2015, Messrs. Del Toral and Poy and Mses. Hedman, Hyde and Bair (and the EPA) knew the following facts:

- Flint's WTP was not using corrosion control treatment despite the requirements of the LCR;

- The City had lead service lines and the compliance sampling techniques employed by the City (and approved by MDEQ) were not accurately capturing the lead levels;

29

- The failure to use corrosion control could cause lead to leach from the City's lead service lines and cause serious health concerns and widespread lead issues;

- The high lead levels found in the water of multiple Flint residents likely evidenced a system-wide problem with lead in the drinking water;

- As the "primacy" agency in Michigan responsible for enforcement of the SDWA (including the LCR), MDEQ misinterpreted the LCR and misapplied its requirements, advising Flint WTP staff that corrosion control treatment was not required;

- MDEQ inaccurately reported information about Flint's corrosion control to EPA, stating that Flint had an optimized corrosion control program when, in fact, it was not employing corrosion control treatment; and

- EPA requested corrosion control treatment in Flint for LCR compliance, but MDEQ believed such treatment was "premature" and EPA refused to order such treatment, knowing that the residents of Flint confronted a significant health hazard from drinking water that was likely contaminated with lead.

The EPA could have exercised its statutory powers under Section 1414 and Section 1431 of the SDWA or under the LCR, 40 CFR 141.82(i), but failed to properly exercise its authority prior to January 2016. Despite the clear intent of the LCR, the EPA was hesitant and slow to insist on proper corrosion control treatment in Flint. The EPA's deference to MDEQ, the state primacy agency, even after Mr. Del Toral identified specific reasons for continued concern with MDEQ's actions, delayed appropriate intervention and remedial measures that prolonged residents' exposure to high lead levels.

3.   Dr. Susan Hedman

30

Attorney Michael L. Williams
United States Department of Justice
Civil Division Environmental Tort Litigation
P.O. Box 340, Ben Franklin Station
Washington, D.C., 20044

Dr. Susan Hedman ("Hedman") was the Regional Administrator for EPA's Region 5, covering the Great Lakes region and Michigan.[39] She resigned in January 2016.[40] Dr. Hedman is a licensed attorney who also holds a PhD. in environmental studies. Prior to taking a position with the EPA, she served as an environmental lawyer and policy adviser to state agencies and non-governmental organizations.

As Region 5 Administrator, Dr. Hedman held herself out as a leader among those working in the environmental field, highlighted common environmental dangers that threaten women's health, and discussed EPA efforts to protect women and children from unnecessary chemical poisoning. She once pronounced that "[a] child born today will be exposed to more chemicals than a child from any other generation," and that chemicals affect women's endocrine system, pre-natal development, and contaminate breast milk.[41] Dr. Hedman issued numerous written and oral statements after June 2015 and gave testimony on the Flint drinking water

---

[39] Dr. Hedman was deposed over the course of two days on July 16-17, 2020. The VNA defendants intend to rely on her testimony at trial.

[40] Dr. Hedman "offered her resignation" and EPA Administrator Gina McCarthy "accepted" it.

[41] Keynote Speech, Western Michigan Environmental Action Council, April 3, 2012 (Susan Hedman Fights for Women's Health).

problem before Congress. She also responded to an interview by the EPA's Office of the Inspector General.[42]

As the Region 5 Administrator, Dr. Hedman oversaw implementation and enforcement of environmental regulations for the State of Michigan, including drinking water regulations and the LCR. She was directly responsible for the execution of the EPA's programs within the boundaries of her region,[43] including conducting effective regional enforcement and compliance programs, exercising approval authority for proposed state standards and implementation plans, and providing for overall and specific evaluations of regional programs and state activities.[44] Under the SDWA and the LCR, the Regional Administrator is duty bound to determine if a state's corrosion control activities are appropriate.[45] As Regional Administrator, Dr. Hedman had the statutory and regulatory power to issue corrosion control treatment orders to the state to meet LCR requirements.[46]

Dr. Hedman claimed in her testimony before Congress and in her deposition that she learned of Flint's lack of corrosion control treatment on June 30, 2015.[47]

---

[42] The VNA defendants rely on all of her statements made before and after her discharge.

[43] 40 C.F.R. § 1.5.

[44] 40 C.F.R. § 1.61(d), (f)-(g).

[45] 40 C.F.R. § 142.19(a).

[46] 40 C.F.R. § 141.82(i).

[47] Dr. Hedman certainly knew long before June 30, 2015 that Flint had changed the source of its drinking water from Lake Huron to the Flint River, that the change brought about discolored and foul smelling water, that boil water advisories had been

She told Congress that just after learning that Flint was not using corrosion control on June 30, she issued a statement urging Flint residents to get their water tested. She agreed that the word "urgent" did not appear in the statement. She also agreed that the statement did not provide details on how to address lead issues, but instead directed Flint residents to a website for more information.

At that time, Dr. Hedman was also aware that high lead levels had been discovered in some Flint residents' tap water. But, despite her April 2012 professed commitment to protecting women and children from environmental dangers (and specifically from unnecessary chemical poisoning), Region 5 was slow to address what Dr. Hedman admitted was a known public health threat in Flint from lead release. By early July 2015, she had before her Mr. Del Toral's interim June 24, 2015 memorandum entitled "High Lead Levels in Flint, Michigan." She knew that her Region 5 expert on the LCR reported unequivocally that "[i]n accordance with the Lead and Copper Rule (LCR), all large systems (serving greater than 50,000 persons) are required to install and maintain corrosion control treatment for lead and copper" and that MDEQ was misinterpreting the LCR[48] Dr. Hedman claims she immediately pushed for a switch back to DWSD water, but was told repeatedly by

---

issued as a result of fecal contamination of the water, that chlorination of the water led to TTHM exceedances, and that Flint residents were vehemently protesting against these conditions.

[48] Del Toral Memo at 2.

MDEQ that it would be cost-prohibitive. She knew that Mr. Del Toral recommended that "U.S. EPA should review the compliance status of the City of Flint with respect to whether the system is in violation of the LCR requirement to install and maintain optimal corrosion control and whether the MDEQ is properly implementing the LCR provisions regarding optimal corrosion control treatment requirements for large systems"[49] She knew that on June 26, 2015, Mr. Del Toral described the situation in Flint and MDEQ's actions in the most dire terms as "bordering on criminal neglect" and that the "public has a right to know what they [MDEQ] are doing because it is their children that are being harmed." Dr. Hedman claims she was "immediately concerned" when she heard Flint lacked corrosion control treatment and that EPA needed to act "as quickly as possible" and was "alarmed" by MDEQ's inaction and that some of her staff were pushing for a treatment technical violation for Flint, but she was unwilling to confront MDEQ about its misinterpretation of the LCR even as EPA obtained more information about high lead levels at Flint residences.

Instead of issuing an emergency order under Section 1431, EPA issued a press release on July 10, 2015 that [ADD]. Dr. Hedman acknowledged that the press release did not include warnings about possible widespread lead contamination, nor did it warn Flint parents that they should use filtered water or premixed formula for their children. Dr. Hedman also chose to ignore Mr. Del Toral's warnings, shun him

---

[49] *Id.* at 5.

because he had the audacity to speak out, and downplay the seriousness of his work and findings.[50] On July 2, 2015, she wrote to Flint Mayor Dayne Walling that Del Toral's report was "a preliminary draft and that it would be premature to draw any conclusions based on that draft." Dr. Hedman was unwilling to confront MDEQ about its misinterpretation of the LCR, even when the consequences of MDEQ's error were becoming clear. Despite the fact that she and her staff knew that Flint was not utilizing corrosion control treatment in violation of the LCR, Region 5 staff did not formally brief the EPA's Office of Enforcement and Compliance Assurance ("OECA") about the issue until September 2015. On September 27, 2015, while acknowledging a potential health crisis, she chose the path of least resistance by offering technical assistance to MDEQ on corrosion control optimization and water quality testing protocols instead of immediate enforcement action.[51] On September 29, 2017, Dr. Hedman circulated a "ten point plan" which included a proposed start date for corrosion control treatment of January 16, 2016. However, during the key months of July, August and September after she learned that Flint was not using

---

[50] In a July 8, 2015 email to his superior, Mr. Del Toral commented on this shunning: "It almost sounds like I'm to be stuck in a corner holding up a potted plant because of Flint. One mis-step in 27+ years here and people lose their minds."

[51] Mr. Del Toral properly described the policy and practice of EPA Region 5: "At every stage of this process, it seems that we spend more time trying to maintain State/local relationships than we do trying to protect the children." Del Toral email to Thomas Poy, Rita Bair, Nicholas Damato with copies to Joanna Glowacki, Andrea Porter, and Heather Shoven, sent on September 22, 2015 at 7:06:37.

corrosion control treatment, Dr. Hedman was out of the office most days traveling around to the different Indian tribes in Region 5 to address a concern she had with the display of Indian tribal flags so did not know that her staff had received numerous complaints from Flint residents about water quality issues.

Dr. Hedman failed to enforce LCR requirements until an emergency order was issued by the EPA in January 2016, downplayed concerns about the safety of Flint's drinking water, and failed to protect the health of Flint residents when she knew that they were being exposed to lead-contaminated water. Ms. Hedman's attitude toward the situation in Flint was perhaps best characterized by Professor Marc Edwards in his testimony before Congress as "willful blindness." Professor Edwards also accused the EPA of silencing Mr. Del Toral following the publication of his June 2015 memo. "Even before Del Toral wrote that memo, he told me he had to protect Flint's children while minimizing the possibility that he would be retaliated against." Professor Edwards also testified that "I don't think Ms. Hedman understands the climate she created." The climate that Dr. Hedman created at Region 5 is perhaps best exemplified by Debbie Baltazar, Chief of the Region 5 Water Division's State and Tribal Programs Branch, who in a September 24, 2015 internal memo regarding funding for residential drinking water devices stated: "We've included information on Flint's financial practices, as we think Susan needs to be aware. … Perhaps she already knows all this, but I'm not so sure Flint is the community we want to go out

on a limb for."[52] Accordingly, Dr. Hedman breached her duty of care to the residents

of Flint

        4.    <u>Tinka Hyde</u>
              Attorney Michael L. Williams
              United States Department of Justice
              Civil Division Environmental Tort Litigation
              P.O. Box 340, Ben Franklin Station
              Washington, D.C., 20044

Tinka Hyde ("Hyde") was the EPA Region 5 Water Division Director from

2007 until late 2016, where she was responsible for overseeing approximately 180-

200 staff members.[53] Ms. Hyde previously served as EPA Region 5's Director of the

Office of Enforcement and Compliance Assurance for approximately 10-12 years.

She had substantial education, training, and experience with the SDWA in the years

leading up to the Flint drinking water crisis. From 2014 – 2016, Ms. Hyde was

Thomas Poy's direct supervisor and reported directly to the EPA Region 5

Administrator, Dr. Susan Hedman. In Region 5's management hierarchy with regard

to the SDWA, she was second in command. Ms. Hyde met weekly with Dr. Hedman

and was directly responsible for bringing matters of consequence within her

department to Dr. Hedman's attention. Ms. Hyde also had ultimate responsibility

within Region 5 for responding directly to citizen complaints, including complaints

---

[52] EPA-R5-2015-01129900007197-00002, disclosed by the EPA as "an Internal Deliberative Document" to the Congress only for use in its oversight.
[53] Ms. Hyde was deposed over the course of two days on May 28-29, 2020. The VNA defendants intend to rely on her testimony at trial.

directed to Region 5 from Members of Congress or the White House, and had the authority to elevate issues relating to drinking water to EPA headquarters.

Ms. Hyde was aware in May 2014 that Flint changed its drinking water source from Lake Huron to the Flint River. She was also aware of complaints by Flint residents with respect to water quality shortly after the source switch in 2014. She also had a conversation with a Flint resident in mid-May 2014 regarding his complaints of rashes from exposure to the drinking water.[54] At that time, Jennifer Crooks told her supervisors, Ms. Hyde and Mr. Poy, and other EPA employees that "Flint River quality is not great," but Ms. Hyde did not follow up on the resident's complaints. On February 26, 2015, Ms. Hyde received an email from Mr. Poy regarding the high levels of lead that were found in a Flint resident's drinking water: "[o]ne resident in Flint had sediment in her water and the water plant tested it and found high iron and lead."[55] Mr. Poy was relating Mr. Del Toral's report that extraordinary high levels of iron were found in black sediment in drinking water in the home of a Flint resident with two minor children, that high levels of iron meant high levels of lead and that the black sediment likely meant particulate lead (with lead concentrations reaching 95%), that that pinpointing the root cause and scope of

---

[54] May 15, 2014- Jennifer Crooks/EPA e-mails colleagues Mindy Eisenberg, Thomas Poy and Tinka Hyde/EPA re: concerns about Flint drinking water expressed by resident Lathan Jefferson.

[55] February 26, 2015, 4:25 PM Tom Poy Email to Tinka Hyde and Timothy Henry ("FW: HIGH LEAD: FLINT Water testing Results")

the problem required an immediate investigation, and the City of Flint's use of phosphates for corrosion control was an essential part of the inquiry. On and after June 24, 2015, Ms. Hyde knew that there was no corrosion control being utilized for the water in Flint, that lead service lines were prevalent throughout the City, and that the City was improperly pre-flushing pipes so that samples would minimize the levels of lead in the water. On July 2, Ms. Hyde communicated that Region 5 was "concerned about the lead situation in Flint" to MDEQ officials.

Despite the fact that she was the Water Division Director for Region 5, Ms. Hyde was unaware of MDEQ's disinvestments in SDWA enforcement, or that in 2015, MDEQ was disinvested from nearly a dozen SDWA requirements. She was also not aware that MDEQ disinvested from certain LCR compliance activities. In its report, the EPA's OIG found that several of MDEQ's disinvestments in the LCR had public health effects.[56] It was not until 2016, while under the emergency order, that MDEQ discontinued the majority of the disinvestments.[57] Ms. Hyde acknowledged that Region 5 did not conduct any analysis to determine whether MDEQ's disinvestments in LCR enforcement slowed EPA's response in Flint.

On and before February 2015, Ms. Hyde oversaw the response to Flint citizens' expressed concerns over water quality issues, including requests to return

---

[56] OIG Report at pp. 18-19.
[57] Id.

to Detroit water. From March 2015 through January 2016, Ms. Hyde chose to respond to Flint residents with evasion and jargon, falsely asserting that she had no power to help them.[58] The OIG spoke directly to Ms. Hyde's incompetence in its findings on Region 5's myriad failures to respond to complaints by Flint residents and to use the information learned from doing so to resolve serious problems related to their health and safety.[59]

Ms. Hyde, under the direction of her superior Dr. Hedman, actively denigrated Mr. Del Toral and the seriousness of his findings and recommendations to Region 5. On June 30, after Mr. Del Toral's report was made public, Ms. Hyde told MDEQ that Region 5 was "still being briefed on the lead issues" and that Mr. Del Toral's report would not be shared with MDEQ until "Miguel addresses our comments." On July 21, 2015, Ms. Hyde convened a conference call between Region 5 and MDEQ

---

[58] "Some citizens have suggested that the source of drinking water would be switched back to Detroit drinking water which comes from Lake Huron. EPA does not have the authority to require Flint to change its source of drinking water back to Detroit drinking water. The decision to change the source of Flint's drinking water was a local decision, and continues to be a local decision only. However, Flint is obligated to take actions to meet drinking water standards." See also, March 2, 2015 and May 27, 2015 Tinka Hyde Letters to Flint Residents.

[59] See, *infra* at 13-14. Between May 2014 and January 2016, EPA Region 5 staff received 87 citizen complaints about drinking water quality in Flint. More than 34% included concerns about lead. Region 5 responded with form letters. In six cases, Region took more than a year to respond. In 11 cases, Region 5 did not respond at all. Region 5 did not use citizen complaints or the volume of calls as indicators of problems with Flint's water system. Region 5 did not assess the severity of the situation and did not alert management to an emerging incident.

40

regarding LCR compliance. In that conference call, Ms. Hyde effectively disparaged Mr. Del Toral, calling his report "his own research" that was "not reviewed by management." Ms. Hyde has now confirmed at her deposition in this case that Mr. Del Toral was acting on behalf of the EPA and at the direction of his supervisor, Tom Poy.

Despite the fact the she knew Flint was not utilizing corrosion control in April 2015, that lead service lines were prevalent in the City, that Flint was pre-flushing as part of its compliance sampling and that high lead levels had been detected at Walter's residence in June 2015, Ms. Hyde failed to act or elevate the need for Flint to utilize corrosion control to the highest authorities within EPA despite the fact that she was "concerned' about the lead situation in Flint. As the former Director of EPA's OECA, Ms. Hyde was aware of EPA's enforcement authority under Sections 1414 and 1431 of the SDWA. Consequently, she knew EPA had the statutory authority to mandate corrosion control treatment so her (and EPA's) decision to delay corrosion control treatment resulted in the prolonged exposure of Flint residents to lead in their drinking water. Accordingly, Ms. Hyde breached her duty of care to the residents of Flint

        5.    <u>Thomas Poy</u>
              Attorney Michael L. Williams
              United States Department of Justice
              Civil Division Environmental Tort Litigation
              P.O. Box 340, Ben Franklin Station
              Washington, D.C., 20044

Thomas Poy ("Poy") was the Chief of EPA Region 5's Ground Water and Drinking Water Branch.[60] He joined the EPA in 1985 and has worked for Region 5 for over 30 years and served as Chief of the Ground Water and Drinking Water Branch for 12 years.[61] From 2014 – 2016, Mr. Poy reported directly to Tinka Hyde, then the Director of the Water Division, and supervised Jennifer Crooks, Rita Bair and Miguel Del Toral. Mr. Poy also served as a member of the EPA's "Flint Safe Drinking Water Task Force"[62] and the Chair of the "Flint Drinking Water Technical Support Team." The Ground Water and Drinking Water Branch is responsible for implementing the drinking water program in Region 5. As Branch Chief, Mr. Poy was responsible for overseeing primacy states, including Michigan, and their compliance with the SDWA and LCR. Mses. Crooks and Bair and Mr. Del Toral

---

[60] The Ground Water and Drinking Water Branch is a department within the Water Division (which is one of eight divisions in Region 5).

[61] Mr. Poy was deposed over the course of two days on July 22-23, 2020. The VNA defendants intend to rely on his testimony at trial.

[62] The Task Force was a Fall 2015 effort by the EPA to correct the problems caused by the change in water source from Lake Huron to the Flint River. The EPA charged the Task Force with providing "technical assistance to the MDEQ and the City of Flint to reconnect the Flint system to a new source of drinking water (to be supplied by the Great Lakes Water Authority) and to optimize corrosion control for the Flint system, starting in October 2015. The Task Force was also charged with providing "technical assistance to the MDEQ and the City of Flint, as needed, in advance of and following connection of the Flint water system to a new source of drinking water (to be supplied by the Karegnondi Water Authority) and to optimize corrosion control for the Flint system, starting in 2016."

reported directly to Mr. Poy. Mr. Poy recognized Mr. Del Toral as the Region 5 expert in drinking water regulations and the "go to" person on LCR implementation.

At least as early as 2012-2013, Mr. Poy (in a report co-authored by MDEQ) recognized the need to "plan for circumstances where [financial] resources are inadequate to implement the entire drinking water protection program." By September 2014 (and with knowledge of Flint's fiscal problems), Mr. Poy expressed concern about the quality of the Flint River as a source of drinking water. Mr. Poy knew that Flint was experiencing significant problems with the quality of its drinking water, including public health problems such as rashes. He knew that his subordinate, Jennifer Crooks, had been "inundated" with resident complaints related to water quality, including health concerns. But, Mr. Poy had no idea how many complaints she had received and failed to take any steps to implement a system to track and evaluate these complaints. On September 14, 2014, Mr. Poy knew that Savannah Young, a concerned Flint resident, had tap water that was "disgusting" and not "possibly safe to drink." Mr. Poy knew that Ms. Young explicitly complained that the EPA, City and State were not adequately addressing the problem: "[no] person is available to discuss this issue with me… This has not been addressed or even acknowledged by the city… [T]hey are not even informing the

citizens that it is happening."[63] Mr. Poy did not assign any staff or scientists at the EPA to investigate the City's drinking water problems at that time.

Mr. Poy learned of the high concentrations of lead found in a Flint resident's home in February 2015.[64] He knew that lead was entering the water as part of the corrosion process. Mr. Del Toral told him that "where you find Pb values that high, it is usually due to particulate lead. Not always, but generally. Particulate lead is released sporadically from lead service lines, leaded solder and leaded brass in a number of ways and folks tend to discount these values as anomalies, but particulate lead is a normal part of the corrosion process and it is universal (common) in all systems." Mr. Del Toral expressed concern to him about Flint's optimized corrosion control treatment: "I was wondering what their OCCT was. They are required to have OCCT in place which is why I was asking what they are using." Mr. Poy has testified that he should have recommended to citizens of Flint with lead in their water, such as Ms. Walters, that they use a filter or alternative water; but that he never made that recommendation (or any other health and safety warning) to the Flint community.

---

[63] September 14, 2014, 4:15 PM Savannah Young Complaint to EPA; FWD to Poy on September 16, 2014 at 3:01 PM ("FWD: (SDWA – FY14-121728-3715-CV) Referred to Region – Michigan").

[64] February 27, 2015, 4:58 AM Miguel Del Toral Email to EPA and MDEQ Employees ("Re: HIGH LEAD: FLINT Water testing Results").

In mid-April 2015, Mr. Poy authored an "issue paper" intended for his superiors in Region 5 entitled "Flint Drinking Water Issues". The paper was intended to covey concerns about prior bacterial and disinfection byproducts in Flint's water supply. Although the paper made reference to the high concentrations of lead found in a Flint resident's home, Mr. Poy did not identify lead as an issue.

Mr. Poy learned that Flint was not using any corrosion control treatment in late April 2015. Between that time and June 2015, he also became aware of lead test result from two more homes, one of which exceeded the LCR action limit. By June 2015, Mr. Poy was concerned about the potential health effects from lead release. Mr. Del Toral's interim report only served to heighten his concern. He participated in discussions with MDEQ in June and July 2015 regarding the need for corrosion control and offered certain technical support, but EPA took no direct corrective actions regarding Flint's water treatment and undertook no studies to determine the extent or severity of the lead release issue in Flint.

By June 2015, Mr. Poy knew that Flint was not practicing corrosion control, that lead service lines were prevalent in Flint and that Mr. Del Toral was concerned that the high lead levels found at Ms. Walters' home potentially indicated a systemwide problem in Flint's water system, but he failed to take any action to correct the problem. In response to Mr. Del Toral's request for additional sampling to determine whether a systemwide problem with lead existed in Flint, Mr. Poy

denied the request, stating that he was "comfortable" waiting for the results of the City's second round of 6-month compliance monitoring. Mr. Poy's reluctance to act is emblematic of the EPA's lack of urgency in responding to the water crisis in Flint and delayed enforcement of the SDWA and LCR, which only served to prolong the crisis and residents' exposure to high lead levels. Mr. Poy's malfeasance or nonfeasance (or both) despite his concern regarding the potential harmful impact of Flint's drinking water and despite Region 5's belief that state and local authorities were not acting quickly to protect human health is quintessential make-nice politics and consistent with the non-confrontational or "cooperative federalism" approach promoted by Administrator McCarthy: "Region 5 was going through its process of working with the State to deal with the issue."

As of July 2015, despite internal EPA discussion (including discussion at EPA headquarters) about whether a LCR violation under the SDWA and public notice should be issued, Mr. Poy (and the EPA) decided to "work with the state, stressing the need to have Flint implement corrosion control." When no action had been taken by August 2015, rather than act to protect the public, Mr. Poy chose a path of least resistance with MDEQ asking Liane Shekter-Smith: "[a]ny news on Flint since our call a couple of weeks ago? Has the letter been sent to inform them that they are not optimized for lead based on their monitoring? Have they been approached about starting corrosion control sooner rather than later?" Despite EPA recognition as early

as February 2015 that the LCR required corrosion control treatment, Mr. Poy also played an integral role in EPA's delayed response to the crisis by passing the problem off to EPA lawyers for a legal opinion on the interpretation of the LCR.[65]

Mr. Poy also actively participated in Region 5's disparagement of Mr. Del Toral (after disclosure of his interim memo in June 2015 reporting on potential systemwide lead release in Flint). Mr. Poy called Mr. Del Toral's recommendations "personal opinions" and rejected Mr. Del Toral's statement that the EPA was obligated to review Flint's corrosion control compliance status in June 2015. Mr. Poy did not order the additional testing Mr. Del Toral requested until 2016 because he was not sure there was a systemwide problem with lead in Flint. According to Mr. Poy, EPA was unable to come to any firm conclusions about the extent of lead release in Flint. While EPA suspected that release of lead from service lines was occurring, it never undertook any studies to determine the extent or severity of lead release in Flint, or conduct any exhumed pipe studies. Accordingly, Mr. Poy breached his duty of care to the residents of Flint.

6.     Jennifer Crooks
       Attorney Michael L. Williams
       United States Department of Justice
       Civil Division Environmental Tort Litigation

---

[65] The LCR required large water systems to install optimal corrosion control treatment by January 1, 1997, unless they qualified for certain exemptions. *Lead Contamination and SDWA*, OIG Report at 3-7, including Notes 4 and 5; see infra at 8.

P.O. Box 340, Ben Franklin Station
Washington, D.C., 20044

Jennifer Crooks ("Crooks") was employed as the Michigan Program Manager for EPA Region 5 Water Division, Ground Water and Drinking Water Branch.[66] She has held that position for more than twenty years. She reports to Mr. Poy, the Chief of the Ground Water and Drinking Water Branch. As the Michigan Program Manager, she was responsible for communicating directly with the residents of Flint through the EPA's State Drinking Water Hotline and otherwise. The flow of communications and consequent information ran between her, Mr. Poy, and ultimately Ms. Hyde. EPA uses a variety of tools to oversee state drinking water implementation, such as providing technical assistance and regularly conferring with state agencies, so Crooks communicated regularly with MDEQ employees, including Michael Prysby, Stephen Busch, and Richard Benzie, regarding Flint's drinking water system. Prysby was MDEQ's District Engineer and Busch was MDEQ's District Supervisor. Another tool that the EPA uses to oversee the regulatory actions of state and local agencies to ensure that public water systems adhere to the standards set forth under the SDWA is monthly operating reports. Primacy agencies like MDEQ are required to report certain information and other data to the EPA. Ms. Crooks received monthly operating reports from Flint

---

[66] Ms. Crooks was deposed on July 6, 2020. The VNA defendants intend to rely on her testimony at trial

48

beginning in June 2014 which indicated that Flint was not using corrosion control, but she never raised the issue with her supervisors. If she had, they may have been able to do something immediately.

Ms. Crooks learned in 2013 that Flint decided to join the KWA and that Flint began using Flint River water as its drinking water source in April 2014. After the City switched from the DWSD to the Flint River in April 2014, Ms. Crooks began receiving complaints from Flint residents regarding drinking water quality. She stated that the complaints ranged from odor, appearance and taste to rashes. The complaints were forwarded to MDEQ for follow up, but she acknowledged that she was also required to conduct a thorough investigation in response to such complaints and to provide residents with accurate and truthful information. She did not identify the volume of complaints as any indicator of unusual problems with Flint's water system.

On May 15, 2014, less than one month after the water switch,[67] Ms. Crooks informed Ms. Hyde and other EPA employees that, with regard to SDWA standards, "Flint River quality is not great … ." By September 17, 2014, she has already become dismissive about resident complaints regarding Flint's drinking water quality; when she was charged with investigating a Flint resident's concern about

---

[67] June 12, 2014 - Jennifer Crooks/EPA e-mails colleagues Mindy Eisenberg, Thomas Poy and Tinka Hyde/EPA re: concerns about Flint drinking water expressed by resident Lathan Jefferson

her brown tap water, Ms. Crooks informed MDEQ officials by stating: "[y]ep, have another Flint complaint."[68]

In February 2015, Ms. Crooks learned about the elevated lead sample collected from Ms. Walters's house after Ms. Walters contacted her to discuss the results. Ms. Crooks emailed Messrs. Busch and Prysby to notify them of the tests results, saying "WOW!!!! Did he [Mike Glasgow] find the LEAD! 104 ppb. She has 2 children under the age of 3 … Big worries here." Ms. Crooks speculated that the corrosive Flint River water was leaching contaminants from pipes so emailed MDEQ inquiring about whether optimized corrosion control treatment was in place in Flint. She copied her supervisor, Thomas Poy, and Miguel Del Toral, on the email. In response, MDEQ initially told the EPA that Flint had an OCCT program in place. In April 2015, however, MDEQ admitted that Flint was not using corrosion control, but took the position that none was required. The next day, April 25, Mr. Del Toral emailed Pat Cook/MDEQ to express concern regarding Flint's lack of corrosion control treatment, pre-flushing and high lead levels. He said Flint did not appear to meet requirements for OCCT without treatment and questioned how a large water system like Flint could be deemed to have optimal corrosion control without treatment, citing federal regulations providing the only two scenarios for large

---

[68] September 17, 2014, 11:04 AM Jennifer Crooks Email to MDEQ ("FW: (SDWA – FY14-121728-3715-CV) Referred to Region – Michigan)").

systems to be deemed to have optimized corrosion control, and showing that Flint did not meet either of the two scenarios. He explained to Mr. Cook, as well as Ms. Crooks and Mr. Poy, who he copied on the email, why corrosion control treatment was required, citing specific federal statutes and explaining that if Flint's first round of testing showed a 90th-percentile level of 6 ppb, it could not demonstrate a level of under 5 ppb for two six-month periods. Mr. Del Toral wrote: "Given the very high lead levels found at one home … I'm worried that the whole town may have much higher lead levels than the compliance results indicated."

On April 27, Mr. Del Toral emailed Mr. Poy and Ms. Crooks stating that Mr. Cook had confirmed that Flint was not using corrosion control treatment since switching to the Flint River, which he said was "very concerning given the likelihood of lead service lines in the city." The same day, he and Ms. Crooks meet with Ms. Walters at her home to conduct sequential lead sampling to determine whether the source of the lead was Ms. Walters' internal plumbing or the City-owned portion of the service line. The samples were sent to Marc Edwards/VT to be tested and Mr. Del Toral was asked to prepare a summary of his findings. The samples showed lead levels ranging from 200 ppb to 13,200 ppb.

There was a disagreement within the EPA as to how to deal with MDEQ. Ms. Crooks emailed Messrs. Poy and Del Toral and Ms. Bair on June 4 recommending a "middle-of-the road approach" to MDEQ requesting that Flint begin adding

51

phosphates to its drinking water. In response, Mr. Del Toral recommended that a comprehensive evaluation of the system be completed before any treatment recommendations could be made. He suggested that EPA's experts on lead (Michael Schock and Darren Lytle) be added to Flint's Technical Advisory Committee to assist MDEQ/Flint in determining the best way to proceed to minimize lead in the City's drinking water during its interim use of the Flint River until the KWA pipeline was completed.

On June 24, 2015, Mr. Del Toral issued his interim report. The report summarized the high lead levels in Flint, in particular the absence of corrosion control in Flint, the City's faulty sampling procedures, and EPA's recommendation that Mr. Schock assist the City. But after Mr. Del Toral's report was issued, the EPA dismissed his report as a "limited drinking water sampling for lead in Flint in response to a citizen complaint." MDEQ was copied on Del Toral's report, but Ms. Hyde instructed Ms. Crooks not to send MDEQ a copy of the report because she instructed Mr. Del Toral to re-write the memo so did not want the interim report shared with anyone beyond the EPA until the "final" report was issued.

On July 9, Ms. Crooks emailed her EPA colleagues Rita Bair and Andrea Porter that "Flint may have violated the LCR by not maintaining corrosion control," but added that MDEQ would likely "take this personally" and "they may get VERY defensive." So there was little use in requiring MDEQ to issue a violation notice to

the City for failing to treat its water in the way that EPA prescribed. She added: "We need to move forward and work with the State as our partner ... I don't see the benefit in rubbing their nose in the fact that we're right, and they're wrong." Mr. Del Toral disagreed with the non-confrontational approach, stating "[i]f you open this door for Flint ... other systems elsewhere inside/outside [Region 5] are going to want the same treatment." Ms. Crooks acknowledged that the EPA's role is to enforce the national drinking water standards under the SDWA and that the SDWA provides the EPA with the authority to order actions when an imminent and substantial endangerment exists and when the actions taken by the state and/or local authorities are inadequate.

Ms. Crooks understood that the EPA issue the LCR to minimize lead and copper in drinking water. The LCR treats systems (such as Flint's) that change their source water as an existing system which need to maintain continuous corrosion control treatment. MDEQ improperly concluded that the City's change in source water in April 2014 would require the City to revert to the LCR provision that required the City to conduct tests to determine whether corrosion control treatment was necessary. Ms. Crooks said that EPA disagreed with MDEQ's interpretation. Instead of immediately requiring the City to implement corrosion control, however, the EPA and MDEQ reached a "middle-of-the road" agreement that required the City to begin corrosion control treatment as soon as possible prolonging Flint residents' exposure to lead-contaminated water. As a result, the lead levels in Flint's

drinking water did not fall below the federal action level until late 2016 when EPA finally issued its emergency order.

As a result of Mr. Del Toral's interim report, Ms. Crooks knew by July 2015 that blood levels in Flint children were elevated since the Flint River became the source of the City's drinking water and that exposure to the Flint River drinking water was causing skin rashes. Ms. Crooks had also heard from residents that the drinking water was causing hair to fall out in clumps. Ms. Crooks testified that despite assuring numerous Flint residents about the safety of their drinking water, she never followed up with any of the residents about their health concerns.

In September 2015, Ms. Crooks emailed Liane Shekter Smith/MDEQ the notes from an August 31, 2015 conference call between EPA and MDEQ. In the notes. Ms. Crooks stated that "EPA acknowledged that to delay installation of corrosion control treatment in Flint would likely cause even higher levels of lead over time as Flint's many lead service lines are continuously in contact with corrosive water" As the drinking water problems in Flint became more fraught and nationally significant, Ms. Crooks took steps to protect the bureaucracies at Region 5 and MDEQ by denigrating Mr. Del Toral and plausibly denying receipt of his critical report.[69] Throughout all of the relevant time period, Ms. Crooks knew that

---

[69] On September 11, 2015, in an email to Mr. Poy and MDEQ officials, Ms. Crooks proposed her orchestration plan: "I wanted to remind you that Miguel's report has DEQ cc.d. So if the Legislature or who ever might say you all were cc.d, you can

after the City switched from the DWSD to the Flit River in April 2004, residents began reporting to the EPA that there were odor and other problems with the water. She also learned of the high lead results at Walters' home in February 2015. She also knew that Flint had significant numbers of lead service lines, that it was not performing optimized corrosion control, and that lead was leaching into the drinking water. She further knew that EPA had the authority to issue an emergency order in June 2015 after receiving Mr. Del Toral interim memo raising concerns about a possible widespread lead problem to protect Flint residents from lead contaminated water, but that EPA did not issue such an order until January 2016 after the City has already switched back to DWSD which prolonged Flint residents' exposure to lead. Accordingly, Ms. Crooks breached her duty of care to the residents of Flint.

> 7.   Rita Bair
>       Attorney Michael L. Williams
>       United States Department of Justice
>       Civil Division Environmental Tort Litigation
>       P.O. Box 340, Ben Franklin Station
>       Washington, D.C., 20044

Rita Bair ("Bair") served as a Supervisor in Region 5's Groundwater and Drinking Water Branch.[70] She supervised Mr. Del Toral from 2014 to 2016. She

---

truthfully respond that it was EPA's request that the report not be sent to the cc.s. Consequently, you all never received the report from Miguel."

[70] Ms. Bair was deposed over the course of two days on May 15-15, 2020. The VNA defendants intend to rely on her testimony at trial

reported directly to Thomas Poy, Branch Director, who reported to Tinka Hyde, Director.

From mid-June to mid-July 2015, Ms. Bair served as the acting Chief of the Ground Water and Drinking Branch while Mr. Poy was out of the office. In that capacity, she was responsible for supervising the implementation, regulation, and enforcement of the SDWA by her staff members. While serving as the acting Chief, Ms. Bair orchestrated Region 5's public disparagement and denigration of Mr. Del Toral following the publication of his June 2015 interim report of MDEQ's failure to meet the requirements of the SDWA and LCR. Ms. Bair dismissed Mr. Del Toral's report as "his opinions" and merely "scientific statements." She said the report offered "one scientist's opinion not supported by facts" and denied that the report conveyed to her an emerging crisis of widespread lead release. On June 25, 2015, Ms. Bair challenged Mr. Del Toral's characterization of Flint's drinking water lead problem as "widespread." In response, Mr. Del Toral asked that a team be sent out to collect samples to prove that the problem was widespread. Mr. Del Toral accused the state of being "complicit," highlighted the fact that children were being harmed, and championed the public's right to know the facts and the truth. Ms. Bair ignored Mr. Del Toral's requests and adjudged "his opinions" as outside the requirements of the regulations. Ms. Bair characterized Mr. Del Toral in jaundiced terms, stating that he was not presenting "logical, clear statements" and was being overly "dramatic."

When Ms. Crooks sent her and EPA colleague Andrea Porter an email on July 9, 2015 stating that it was "apparent that Flint may have violated the LCR by not maintaining corrosion control" and that the state would "take this personally" and "they may get VERY defensive," Ms. Bair instructed Ms. Crooks not to contact any of the MDEQ engineers directly about Mr. Del Toral's report. Ms. Bair also participated in the "management level" conference call on July 10, 2015 among EPA and MDEQ officials, where Mr. Del Toral's findings were again downplayed and dismissed. Ms. Bair repeated her disparagement of Mr. Del Toral, calling his opinions on corrosion control "above and beyond their regulatory process." While she acknowledged that Region 5 saw no ambiguity in the LCR regarding the requirement for continued corrosion control treatment in Flint and she knew that Flint was not practicing corrosion control, the EPA was slow to act in response. Ms. Bair also attended and prepared notes on a July 21, 2015 call with MDEQ  The notes end with action items for Region 5 and MDEQ. Ms. Bair wrote that MDEQ and the Region were in agreement to get phosphate addition going "as soon as possible" in Flint. She acknowledged, however, that did not happen until Flint has switched back to DWSD. She also acknowledged that there was no action item for public notice of a lead problem in Flint because, she said, things were "not at the point of public notice." Ms. Bair understood that Flint would continue using the Flint River as its

interim water source. Accordingly, Ms. Bair breached her duty of care to the residents of Flint.

> 8.  Andrea Porter
>     Attorney Michael L. Williams
>     United States Department of Justice
>     Civil Division Environmental Tort Litigation
>     P.O. Box 340, Ben Franklin Station
>     Washington, D.C., 20044

Andrea Porter ("Porter") served as an Environmental Engineer for EPA's Region 5.[71] She began working for Region 5 in 2009 so has extensive experience with the LCR.[72] In July 2013, Ms. Porter published a field study with Miguel Del Toral (EPA) and Michael Schock (EPA) regarding elevated lead release from lead service lines and assessing lead levels in the Chicago public water supply.[73] Ms. Porter reported that "the existing regulatory sampling protocol under the U.S. Lead and Copper Rule systematically misses the high lead levels and potential human exposure." Ms. Porter knew that "[m]ost lead in drinking water comes from premise plumbing materials and lead service lines." She also knew that "lead service lines are generally the largest source of lead in drinking water when they are present in

---

[71] Ms. Porter was deposed on September 9, 2020. The VNA defendants intend to rely on her testimony at trial

[72] *See, e.g.*, Porter, A., *Handy Tools for the Lead and Copper Rule*, 15th Annual EPA Drinking Water Workshop, September 28, 2018.

[73] Del Toral M. A., Porter A., Schock M. R., *Detection and Evaluation of Elevated Lead Release from Service Lines: A Field Study*, Environmental Science & Technology, July, 2013, 47, 9300−9307.

public water systems."[74] She also knew that "a legacy of millions of partial or whole LSLs remains in many public water systems.[75] She further knew that "lead corrosion" referred to the corrosion of lead plumbing materials and "result[ed] in the transfer of dissolved or particulate lead into the drinking water."

Ms. Porter first became aware of complaints from Flint residents regarding drinking water quality in September 2014. The complaints were typically handled by Jennifer Crooks. There was no database of customer complaints in 2014-15 so Region 5 staff did not identify the volume of complaints or the bacterial contaminations as any indicator of unusual problems with Flint's water system.

Ms. Porter first learned of Ms. Walters' high lead test results in February 2015. On February 27, Stephen Busch emailed Ms. Crooks and Mr. Del Toral responding that Flint had an optimized corrosion control program. Based on the February 2015 email from Mr. Busch, Ms. Porter believed Flint was using corrosion control. She first learned that Flint was not using any corrosion control treatment in April 2015 when Mr. Del Toral emailed Pat Cook about Flint's corrosion control treatment and he responded that Flint was not using corrosion control and was instead waiting for

---

[74] Sandvig, A.; Kwan, P.; Kirmeyer, G.; Maynard, B.; Mast, D.; Trussell, R. R.; Trussell, S.; Cantor, A. F.; Prescott, A. *Contribution of Service Line and Plumbing Fixtures to Lead and Copper Rule Compliance Issues*; Research Report 91229; American Water Works Association Research Foundation: Denver, CO, 2008.

[75] Triantafyllidou, S.; Edwards, M., *Lead (Pb) in tap water and in blood: Implications for lead exposure in the United States*, Crit. Rev. Environ. Sci. Technol. 2012, 42, 1297−1352.

results from two 6-month monitoring periods to determine whether it was necessary. Ms. Porter agreed with Mr. Del Toral's expressed concerns regarding Flint's lack of corrosion control treatment, pre-flushing and high lead levels. She also agreed that Flint did not appear to meet the LCR requirements for OCCT without such treatment and that the City's lead levels could be much higher than the compliance results indicated given the likelihood of lead service lines in the City, but she did not act to correct the problem.

The EPA uses a variety of tools to oversee the regulatory actions of state and local agencies to ensure that public water systems adhere to the standards set forth under the SDWA, such as the EPA's Safe Drinking Water Information System (or SDWIS), which requires primacy agencies like MDEQ to report certain drinking water information periodically to the EPA. The information and other data provided by the primacy agencies included the use of corrosion control.

In April 2015, Mr. Del Toral asked Ms. Porter to check the SDWIS data for Flint to see if it contained information about corrosion control. Based on the data, Ms. Porter determined that Flint wasn't using corrosion control. The SDWIS data was available going back to 2014, but was never checked by EPA.

Ms. Porter was copied on the many communications exchanged between MDEQ and EPA  in February 2015 regarding Ms. Walters' high test results. She also participated in discussions in April 2015 regarding Flint's lack of corrosion

control. On June 25, 2015, after the release of Mr. Del Toral's interim report, Mr.

Del Toral responded by email to questions by other EPA officials about his work, in

part, by seeking Ms. Porter's support. Mr. Del Toral stated that "the fact that their

sampling is designed not to capture lead (everything is fine) does not negate our

scientific understanding of what is going on." Mr. Del Toral went on to state:

> "I am really tired of the bad actors being defended, the bad
> actions being ignored, and people trying to do the right
> thing are constantly being subjected to intense scrutiny as
> if we were doing something wrong. It's all of this 'don't
> find anything bad' crap at EPA that is the reason I
> desperately want to leave. I am not happy to find bad
> things. It is completely stressful because it means children
> are being damaged and I have to put up with all of the
> political crap, but where these problems exist I will not
> ignore them."

On July 15, 2015, Mr. Del Toral sent an email to EPA officials, including

Mses. Crooks, Bair, and Porter, acknowledging that it was a "tough situation" but

urging officials to take action by issuing a treatment technique violation which

would have provided for public notice. Ms. Porter agreed with Mr. Del Toral that

there was no justification for MDEQ not requiring corrosion control treatment when

the City switched to the Flint River in April 2014, but EPA was hesitant and slow to

insist on proper corrosion control measures in Flint. .Despite the fact that Region 5

had information that systems designed to protect Flint drinking water from lead

contamination were not in place, residents had reported multiple abnormalities in the

water, and test results from some homes showed lead levels above the federal action

level; EPA did not issue an emergency order until January 2016 prolonging the crisis. When MDEQ and EPA finally decided to act on the information they had in February, Porter was present at a meeting on August 31, 2015, where it was acknowledged "that to delay installation of corrosion control treatment in Flint would likely cause even higher levels of lead over time as Flint's approximately 15,000 lead service lines are continuously in contact with corrosive water."

Like other MDEQ and EPA employees, Ms. Porter was aware that Flint was not practicing corrosion control, which increased the likelihood that its citizens were exposed to dangerous levels of lead, but she failed to act. Accordingly, Ms. Porter breached her duty of care to the residents of Flint.

> 9.  Michael R. Schock
>     Attorney Michael L. Williams
>     United States Department of Justice
>     Civil Division Environmental Tort Litigation
>     P.O. Box 340, Ben Franklin Station
>     Washington, D.C., 20044

Mr. Schock is a chemist with the EPA's Office of Research and Development (ORD), which is a scientific research arm of the EPA. He worked in a laboratory within the Drinking Water Treatment and Distribution Branch, Water Systems Division, at ORD known as the National Risk Management Research Laboratory, primarily on drinking water corrosion issues. Researchers in the EPA's lab in Cincinnati, Ohio provide technical support to state agencies and their communities to address environmental problems and related public health challenges.

Mr. Schock is the EPA's expert on drinking water treatment. He has spent 31 years with the EPA's drinking water research program where he has conducted in-house and field research into drinking water treatment emphasizing corrosion control in domestic plumbing and municipal distribution systems. He routinely provides technical consultation to other EPA offices and state agencies with respect to drinking water treatment issues.

Documents released by the EPA show that in late February 2015, Mr. Schock was copied on an email exchange between Miguel Del Toral and other Region 5 personnel and MDEQ concerning the reported high tap water lead results at LeeAnn Walters' home in Flint. Mr. Schock was also aware at the time of the City's water source change to the Flint River. In February 2015, Mr. Del Toral and Jennifer Crooks, also of EPA's Region 5, separately referred Stephen Busch and Mike Prysby to Mr. Schock at MDEQ as a contact on corrosion control issues, but they never followed up with him and he never followed up with them to offer technical assistance. In late April 2015, Mr. Schock also learned from Mr. Del Toral that the City was not practicing corrosion control. He was also copied on Mr. Del Toral's June 2015 memo linking the City's lack of corrosion control to possible public health concerns. Mr. Schock joined the City's Technical Advisory Committee in September 2015 and also participated in the EPA's Flint Task Force and provided certain technical support to Region 5 personnel and MDEQ, including Messrs. Prysby and

Busch, regarding corrosion control, but did not immediately recommend that corrosion control be implemented even though he was aware of the potential for lead release in the Flint system due to the absence of corrosion control.

Schock is a longtime EPA scientist and a distinguished researcher in water supply corrosion issues. He advised EPA's Region 5 staff regarding technical matters in Flint and was involved in the EPA's internal Flint Task Force, as well as the City's Technical Advisory Committee. Despite the fact that he's an expert on corrosion and knew that the City was no longer practicing corrosion control treatment so was aware of the potential for lead release, he did not immediately recommend that corrosion control be implemented. As a result of Mr. Schock's failure to take immediate action, Flint residents were exposed to lead contaminated water for much longer than they would have if prompt action had been taken. Accordingly, Dr. Schock breached his duty of care to the residents of Flint.

10. <u>Darren Lytle</u>
   Attorney Michael L. Williams
   United States Department of Justice
   Civil Division Environmental Tort Litigation
   P.O. Box 340, Ben Franklin Station
   Washington, D.C., 20044

Dr. Lytle is an environmental engineer with the EPA's Office of Research and Development, National Risk Management Research Laboratory, in Cincinnati, Ohio. Since beginning work at the EPA in 1990, Dr. Lytle's work has been focused

on drinking water quality issues. He has conducted drinking water research as an engineer in the areas of corrosion, microbial contaminants, distribution issues, and inorganic contaminants. Over the years, he has investigated and published works on drinking water systems, focusing on distribution system corrosion control and water quality, including lead and copper corrosion control. He has extensive experience in corrosion and corrosion control treatment so is familiar with the Safe Drinking Water Act and Lead and Copper Rule requirements for corrosion control.

Dr. Lytle joined the City's Technical Advisory Committee in late September 2015 along with Michael Schock. He also become involved with the EPA's Flint Task Force and provided corrosion control recommendations to MDEQ. As an expert in drinking water distribution systems and corrosion, Dr. Lytle knew that in the absence of corrosion control treatment, drinking water leaving the Flint plant could corrode the City's lead pipes and domestic plumbing in homes releasing lead into the drinking system. Dr. Lytle was copied on Miguel Del Toral's June 2015 memo regarding the City's water source change to the more corrosive Flint River in April 2014 and his concerns with respect to the City's elevated lead issues, sampling methodology and lack of corrosion control treatment.

Dr. Lytle learned of Dr. Marc Edwards/VT's water sampling test results and Dr. Mona Hanna-Attisha's blood lead test results in August and September 2015. While EPA offered Dr. Lytle's technical assistance to Stephen Busch and Mike

Prysby at MDEQ in June 2015, they never followed up with him and he never followed up with them until September 2015, when Dr. Lytle and Mr. Schock were both asked to join the City's Technical Advisory Committee. Despite the fact that he's an expert on corrosion and knew that the City was no longer practicing corrosion control treatment so was aware of the potential for lead release and also learned from Mr. Edwards about the broader scope of lead contamination in the City and elevated blood lead levels in Flint children, Dr. Lytle did not recommend that corrosion control be implemented immediately. As a result of Dr. Lytle's failure to take immediate action, Flint residents were exposed to lead contaminated water for much longer than they would have if prompt action had been taken. Accordingly, Dr. Lytle breached his duty of care to the residents of Flint.

## II.    THE STATE OF MICHIGAN
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909

The State of Michigan is a sovereign body politic that acts through its executive branch, departments, agencies, officers, and employees. Consequently, the acts (and omissions) of its departments, agencies, officers, and employees, undertaken within the scope of their employment, constitute the acts (and omissions) of the State. Likewise, knowledge acquired by its departments, agencies, officers, and employees acquired within the scope of their employment is imputed to the State. In consequence, the State cannot plead innocence by asserting that   the

66

information obtained by several departments, agencies, officers, and employees was not acquired by any one individual employee who then comprehended its full import. Rather, the State is considered to have acquired the collective knowledge of its employees and is held responsible for their failure to act accordingly.[76]

On October 21, 2015, in conformity with his power and authority as the chief executive of the State of Michigan, former Governor Rick Snyder officially formed, and commissioned, the Flint Water Advisory Task Force to undertake "an independent review of the contamination of the Flint water supply: what happened, why it occurred, and what is needed to prevent a reoccurrence in Flint or elsewhere in the state." On March 21, 2016, the Flint Water Advisory Task Force issued its final report and established the duties, failures to meet those duties, and causal relationship to the injuries and damages that the plaintiffs allege they have sustained.[77] In the Executive Summary of its 62-page report, the Flint Water Advisory Task Force gives an overview of its investigation and conclusions:

> The Flint water crisis is a story of government failure, intransigence, unpreparedness, delay, inaction, and environmental injustice. The Michigan Department of Environmental Quality (MDEQ) failed in its fundamental responsibility to effectively enforce drinking water

---

[76] *In re NM Holdings Co*., LLC, 622 F.3d 613, 620 (6th Cir. 2010) (citing *Upjohn Co. v. N.H. Ins. Co.*, 438 Mich. 197, 76 N.W.2d 392 (1991)).

[77] See Flint Water Advisory Task Force Report, March 2016. The Report is admissible evidence under federal and state law.

regulations. The Michigan Department of Health and Human Services (MDHHS) failed to adequately and promptly act to protect public health. Both agencies, but principally the MDEQ, stubbornly worked to discredit and dismiss others' attempts to bring the issues of unsafe water, lead contamination, and increased cases of Legionellosis (Legionnaires' disease) to light. With the City of Flint under emergency management, the Flint Water Department rushed unprepared into fulltime operation of the Flint Water Treatment Plant, drawing water from a highly corrosive source without the use of corrosion control. Though MDEQ was delegated primacy (authority to enforce federal law), the United States Environmental Protection Agency (EPA) delayed enforcement of the Safe Drinking Water Act (SDWA) and Lead and Copper Rule (LCR), thereby prolonging the calamity.[78] Neither the Governor nor the Governor's office took steps to reverse poor decisions by MDEQ and state-appointed emergency managers until October 2015, in spite of mounting problems and suggestions to do so by senior staff members in the Governor's office, in part because of continued reassurances from MDEQ that the water was safe.

The specific events that led to the water quality debacle, lead exposure, heightened Legionella susceptibility, and infrastructure damage are a litany of questionable decisions and failures related to several issues and events, including, but not limited to:

- Decisions related to the use of the Flint River as an interim water supply source.

- Inadequate preparation (for example, staffing, training and plant upgrades) for the switch to full-time use of the Flint

---

[78] The Environmental Protection Agency's duties, breaches of duties, and causal relationship to the plaintiffs' alleged injuries and damages are set out in detail in the OIG Report and infra at pages 4-43. The OIG Report also establishes the fault of the State of Michigan and its executive branch department, the MDEQ.

Water Treatment Plant using the Flint River as the primary water supply source.

• Inadequate and improper sampling of distribution system water quality, potentially in violation of the Safe Drinking Water Act.

• Intransigent disregard of compelling evidence of water quality problems and associated health effects.

• Callous and dismissive responses to citizens' expressed concerns.

• Persistent delays in coordinating appropriate responses to the resultant public health crises once irrefutable evidence of exposure and poisoning was presented.
We cannot begin to explain and learn from these events— our charge— without also highlighting that the framework for this decision-making was Michigan's Emergency Manager Law. This law replaces the decision- making authority of locally elected officials with that of a state-appointed emergency manager. While one must acknowledge that emergency management is a mechanism to address severe financial distress, it is important to emphasize that the role of the emergency manager in Flint places accountability for what happened with state government.

Separate and apart from the Governor's Flint Water Advisory Task Force, the evidence establishing the duties and breach of duties of numerous government entities, officers and employees and the causal relationship of those breaches of duties to the plaintiffs alleged injuries and damages is found in the plaintiffs' manifold and manifest admissions in their complaints, in numerous pleadings and

briefs presented to the Court, and in representations made by their lawyers during arguments to the Court.

## A.     The Governor's Office

1.     <u>Former Governor Richard Snyder</u>
Assistant Attorney General Richard Kuhl
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909

Mr. Snyder took office as the elected Governor of Michigan on January 1, 2011. As Governor of Michigan, Snyder had executive power and the duty to supervise the faithful execution of laws by state agencies.[79] The governor has the power and duty to investigate the acts of any public office or public officer, elective, or appointee and may remove or suspend a public official from office.[80] Moreover, the governor is "responsible for coping with dangers to [the] state or the people of [the] state presented by a disaster or emergency" including natural or human-made water contamination, and may issue an emergency declaration accordingly.[81]

Through his first executive order, Governor Snyder divided the Department of Natural Resources and Environment into two distinct departments as they were configured a few years beforehand: the Department of Natural Resources and the Department of Environmental Quality. Governor Snyder appointed Andy Dillon  as

---

[79] Mich. Const. Article V, §§ 1, 8.
[80] Mich. Const. Article V, § 10.
[81] M.C.L. § 30.403; 30.402(h).

the State Treasurer, Nick Lyon as Director of MDHHS, and Dan Wyant as Director of MDEQ and had duty to supervise their execution of law. On March 16, 2011 (and again in December, 2012), he signed bills into law that increased the powers of Emergency Managers of local municipalities to resolve financial matters. Governor Snyder also appointed the Emergency Managers who ran the City of Flint during the time periods relevant to the City of Flint's water contamination. Flint's Emergency Managers reported to Governor Snyder through the Department of the Treasury and its executive, the State Treasurer. Simply put, Governor Snyder and his subordinate, the State Treasurer, had complete power and authority to direct the Flint Emergency Managers to undertake actions that were necessary and proper to protect the health and safety of Flint residents. Governor Snyder also had complete power and authority over Emergency Managers appointed in the City of Detroit and the ability to coordinate and implement a long term or short term contract for drinking water between Flint and the Detroit Water and Sewer Department at any time before or during the crisis.[82]

Governor Snyder was involved in and apprised of the decision for the City of Flint to join the KWA and leave the DWSD.[83] Governor Snyder was informed of the

---

[82] Deposition of Richard Snyder, Pg. 138-140, 149, 214, *In Re Flint Water Cases* (June 25, 2020).
[83] Deposition of Richard Snyder, Pg. 105-106, 125, *In Re Flint Water Cases* (June 25, 2020).

Case 5:17-cv-10164-JEL-MKM   ECF No. 324, PageID.12878   Filed 12/23/20   Page 72 of 231

Flint water switch in April, 2014. In October, 2014, after reports of water quality concerns and violation notices, the MDEQ sent Governor Snyder a "briefing paper" discussing various water quality issues and infrastructure problem in the City of Flint affecting their ability to distribute safe water. That same month, Governor Snyder's senior staff referred to the water contamination situation as an "urgent matter to fix" yet the Governor took no action.

By July 2015, Governor Snyder knew of reports of elevated lead levels found in homes throughout the city. On September 5, 2015, Governor Snyder knew that 1,500 kitchen water filters had been distributed to Flint residents in 4 hours "as a way of providing added comfort amid concerns about Flint's water quality." Lacking urgency and concerned about public perception, Governor Snyder stated his main concern as "how did it go over with the residents?" On September 25, 2015, in a written communication to Governor Snyder, his Chief of Staff reported: "I can't figure out why the state is responsible except that Dillon did make the ultimate decision so we're not able to avoid the subject" and warned that Governor Snyder should not "fan the narrative that the state is ducking responsibility." On October 2, 2015, a day after Genesee County declared a public health emergency advising citizens not to drink the water due to high lead levels, Governor Snyder continued to place cost over public health, expressing the need to conduct a cost analysis of "the consequences of changing back [to DWSD] vs. staying [on the Flint River] and

then determine what financing mechanisms we have available."[84] On October 8, 2015, a full year after his staff made the recommendation, Governor Snyder, exercising his power and control over Flint's water issues, ordered the return to Lake Huron for drinking water by reconnecting to the Detroit Water and Sewer Department.

Governor Snyder had complete authority over the key state agencies responsible for implementing state and federal safe drinking water regulations, including the power to intervene, demand additional information or action, or reorganize resources or departments to ensure the public health. Governor Snyder failed adequately to supervise the acts of his state agencies and their department directors, including Nick Lyon and Dan Wyant. Governor Snyder failed to intervene appropriately or to take emergency action to prevent further harm to the general public caused by contaminated drinking water. Governor Snyder has admitted that the Flint Water Crisis was a failure at all levels of government, including in his own administration, and that he takes responsibility for the state's role in the crisis.[85]

      2.    <u>Dennis Muchmore (Chief of Staff)</u>
              Assistant Attorney General Richard Kuhl
              Michigan Department of Attorney General
              P.O. Box 30755
              Lansing, MI 48909

---

[84] Oct-7-2016 EGLE0168732
[85] Deposition of Richard Snyder, Pg. 64-69, *In Re Flint Water Cases* (June 25, 2020).

Members of the Governor's Office Senior Staff had direct supervisory duties and authority over the Emergency Managers in Flint.[86] They had a duty and obligation to keep Governor Snyder informed of the events in Flint, including related to the Flint water issues in 2014 and 2015, and to recommend actions necessary to protect public health. As Chief of Staff to Governor Snyder, Mr. Muchmore has described himself as the "fireman" who puts out and prevents fires the best he can for Governor Snyder. He was responsible for ensuring that Governor Snyder had sufficient information and resources to make good policy decisions and acknowledged that it was important to provide accurate information, especially when public health is at issue.

Mr. Muchmore has acknowledged that the decision to use the Flint River as an interim drinking water source was for cost savings to the City. As reflected in internal emails, the governor's office staff had knowledge that the Flint Water Treatment Plant was rushed online and not ready to distribute water, primarily as a result of cost-savings measures.[87] Governor Snyder's Chief of Staff has acknowledged that the Flint River was not the preferred drinking water source for Flint residents and that the Flint Water treatment plant was neglected and in need of upgrades, but that the City had no money to make them. A March 17, 2014 email

---

[86] Mich. Comp. L. § 141.1549(2).

[87] Deposition of Dennis Muchmore, Pg. 93-94, *In Re Flint Water Cases* (June 8, 2020).

circulated amongst the governor's office states: "the expedited time frame is less than ideal and could lead to some big potential disasters down the road." After the switch, the members of Governor Snyder's executive office were aware of immediate water quality issues, including Mr. Muchmore who was presented with jugs of brown water by Flint residents.[88]

Members of Governor Snyder's senior staff, including Dennis Muchmore, became aware of serious issues with Flint's water, including potential lead issues, sometime in the May, June, or July 2015 time frame.[89]   In July 22, 2015, Mr. Muchmore met with the Concerned Pastors in Flint and learned that, according to the group, lead was a serious issue in the City of Flint. Mr. Muchmore sent MDHHS Director Nick Lyon a written communication requesting that he look into Flint's water issues, but public notification was not made until over a year later, in January 2016. By July 2015, the Governor Snyder knew of reports of high levels of lead in the water supply, yet Governor Snyder and members of his senior staff worked to appease residents and dispel concerns over drinking water quality.

In September 2015, in an effort to dodge responsibility, the Governor's office attempted to place blame for the problem on others, with Mr. Muchmore

---

[88] Deposition of Dennis Muchmore, Pg. 105-106, *In Re Flint Water Cases* (June 8, 2020).
[89] Deposition of Dennis Muchmore, Pg. 162-164, *In Re Flint Water Cases* (June 8, 2020).

acknowledging that "[t]he real responsibility rests with the county, city and KWA" and that "it's really the city's water system that needs to deal with it."

> 2. <u>Valerie Brader (Senior Policy Advisor)</u>
> Assistant Attorney General Richard Kuhl
> Michigan Department of Attorney General
>  P.O. Box 30755
> Lansing, MI 48909

Valerie Brader served as deputy legal counsel and senior policy advisor to Governor Snyder from 2013-2015. Ms. Brader has acknowledged that the Governor's office had a duty and responsibility to supervise state agencies, including the MDEQ, and ensure that regulations and laws—including those affecting the public health—were being followed by those agencies. As a member of Governor Snyder's staff, Ms. Brader had the ability and authority to call meetings with department heads and technical staff to demand information and answers related to Flint's drinking water to protect public health.

In October 2014, nearly six months after Flint had begun using the Flint River water to save money, and four to five months before the VNA defendants conducted their approximate 30 day engagement for the City of Flint, Valerie Brader, Governor Snyder's senior policy adviser and deputy legal counsel, and his chief legal counsel, Michael Gadola, raised concerns to him about Flint's drinking water. Ms. Brader had considerable education, training, and experience in environmental matters. A Rhodes Scholar, Ms. Brader received her undergraduate degree, magna cum laude,

76

from Harvard, a master's degree from the University of Oxford (environmental change and historical studies), and a law degree, magna cum laude, from Georgetown University. She clerked for a federal judge in the Eastern District of Michigan and served as a special master in the federal court overseeing environmental compliance of a large public utility. She was a partner at Bodman PLC practicing environmental law, and had been an environmental and business process consultant for the EPA and the Department of Defense. Through her past work experience, she was familiar with the environmental issues of communities (like Flint) serviced the by Detroit Water and Sewer Department.

On October 14, 2014, Ms. Brader, in her capacity as a Senior Advisor to Governor Snyder, sent the following communication to "the members of the senior staff team", calling the situation an "urgent matter to fix" and recommending that Flint reconnect to or blend with DWSD (i.e., Lake Huron water):

From: Brader, Valerie (GOV)
Sent: Tuesday, October 14, 2014 3:30 PM
To: Muchmore, Dennis (GOV); Gadola, Michael (GOV); Agen, Jarrod (GOV); Clement, Elizabeth (GOV)
Subject: Flint water

As you know there have been problems with the Flint water quality since they left the DWSD system, which was a decision by the emergency manager there. Specifically, there has been a boil water order due to bacterial contamination. What is not yet broadly known is that attempts to fix that have led to some levels of chlorine-related chemicals that can cause long-term damage if not remedied (though we believe they will remedy them before any damage would occur in the population). Now apparently the reduced quality is causing GM to leave due to rusted parts.

I am fairly sure that GM's departure now means the economic rationale for Flint leaving DWSD in the interim while the new intake is constructed has just been eliminated. Moreover, our DEQ has been working with Flint's team to try to address the technical problem, but doing a blend of DWSD water and Flint water, or going back altogether for a year or two while the new lake intake is constructed, have not really been solutions on the table.

Now we are getting comments about being lab rats in the media, which are going to be exacerbated when it comes out that after the boil water order, there were chemicals in the water that exceeded health-based water quality standards. I think we should ask the EM to consider coming back to the Detroit system in full or in part as an interim solution to both the quality, and now the financial, problems that the current solution is causing. That additional revenue would also help DWSD, obviously, and the infrastructure is already in place, so this could be implemented quickly. I am not sure who is the best person to initiate that conversation with the EM, but I see this as an urgent matter to fix.

--Valerie

P.S. Note:I have not copied DEQ on this message for FOIA reasons. I have sent them the below message from the Senator's office and had conversations with them re making sure to brief the EM directly on the water quality issues.

The Chief Legal Counsel provided a full-throated warning in response:

From: Gadola, Michael (GOV)
Sent: Tuesday, October 14, 2014 3:42 PM
To: Brader, Valerie (GOV); Muchmore, Dennis (GOV); Agen, Jarrod (GOV); Clement, Elizabeth (GOV)
Subject: RE: Flint water

Good gravy. First, just to clarify, when Valerie says GM is leaving, she means leaving the Flint water system, not abandoning the City altogether.

Second, to anyone who grew up in Flint as I did, the notion that I would be getting my drinking water from the Flint River is downright scary. Too bad the EM didn't ask me what I thought, though I'm sure he heard it from plenty of others. My Mom is a City resident. Nice to know she's drinking water with elevated chlorine levels and fecal coliform.

I agree with Valerie. They should try to get back on the Detroit system as a stopgap ASAP before this thing gets too far out of control.

Ms. Brader has testified that Richard Baird, Transformation Manager in Governor Snyder's Executive Office, contacted her about setting up a call with the Flint Emergency Manager to discuss the concerns expressed in her October 14 email. She recalls that she went down to Mr. Baird's office and that together they called Flint's Emergency Manager, Darnell Earley, from Baird's office. Ms. Brader testified that Emergency Manager Earley told them that he had recently spoken with MDEQ staff about the health violations, but that the problems could be fixed and

78

that the switch back to Lake Huron water would be too expensive. Despite Flint Emergency Manager Earley's statements, Ms. Brader did not change her recommendation to switch back to Lake Huron water to or blend water with DWSD. Indeed, it was the prevailing view of the Governor's office by January 2015 that Flint switch back to DWSD, but the Governor's office failed to intervene citing cost considerations and false assurances provided by the MDEQ.  The members of Governor Snyder's senior staff kept Governor Snyder aware and apprised of the water quality issues in Flint in 2014 and 2015, but failed to authorize a switch back to DWSD until one year later in October, 2015. Despite weekly meetings with Governor Snyder regarding Detroit's bankruptcy proceedings from 2013-2015, extensive experience in environmental issues, and growing concerns over Flint water quality in 2015, Ms. Brader was never further investigated Flint's water issues or assisted in effectuating a switch back to DWSD.

3.   Harvey Hollins III (Director of Urban Initiatives)
     Assistant Attorney General Richard Kuhl
     Michigan Department of Attorney General
      P.O. Box 30755
     Lansing, MI 48909

Harvey Hollins III worked as the Director of Urban and Metropolitan initiatives in Governor Snyder's office beginning in 2011. Mr. Hollins was responsible for economic development and growth in core urban areas in Michigan, including in Flint. Mr. Hollins' job was to serve as the liaison between the Governor

and Michigan's mayors on matters related to urban and regional economic initiatives contributing to job growth. Mr. Hollins knew that Flint was in serious economic decline prior to the water switch in April 2014 and that the City's water system suffered from a lack of infrastructure investment. Mr. Hollins worked directly with Emergency Managers in Flint to restore the City to financial solvency by reducing costs.

Prior to the switch to the Flint River water as an interim drinking water source, Mr. Hollins served as the point person for the state's response to the Flint water issues, including as a liaison between the city, Detroit Water and Sewage Department ("DWSD"), Department of Treasury, and consultants working for the city regarding the potential cost implications of the various drinking water sources. Mr. Hollins was intimately involved in coordinating the water quality concerns of Flint residents and activists, including communicating water quality concerns to the emergency manager. Early in 2015, Mr. Hollins knew of a potential Legionnaires' disease outbreak but failed to notify Governor Snyder or other members of the senior staff. Also in March 2015, members of the Governor's Office, including Mr. Hollins, began looking into purchasing bottled water for Flint residents due to the poor water quality. Throughout 2014 and 2015, Mr. Hollins was aware early on of the lack of response from city officials and state agencies over growing health concerns and lead issues in Flint, yet he failed to intervene.

    4.    <u>Richard Baird (Transformation Manager)</u>
          Assistant Attorney General Richard Kuhl
          Michigan Department of Attorney General
          P.O. Box 30755
          Lansing, MI 48909

Richard Baird served as a senior advisor to Governor Snyder beginning in 2010. Mr. Baird had a duty and obligation to keep Governor Snyder informed of the events in Flint, including related to the Flint water issues in 2014 and 2015, and to recommend actions necessary to protect public health. In October 2014, Valerie Brader recommended to her superiors in the Governor's Office, including the Chief of Staff Dennis Muchmore and Mr. Baird, that the Emergency Manager in Flint be urged to return to DWSD water urgently because of serious health and safety concerns with the water. Despite these concerns, Mr. Baird did not challenge the decisions of the Emergency Managers Darnell Earley and Gerald Ambrose throughout 2014 and 2015 that a return to DWSD was cost-prohibitive.

Mr. Baird also participated in efforts by the Governor's office to downplay and deflect Flint's water issues. On November 26, 2015, Mr. Baird instructed the Michigan state police: "…boss [Snyder] wants us to work through this without a disaster declaration if possible. Dan [Wyant, MDEQ] and Nick [Lyon] and I are working on it." The Governor, directly and through his senior staff, failed properly to advise or to take action to protect the general public from health hazards caused by contaminated water.

5.    <u>Sara Wurfel (Press Secretary)</u>
      Assistant Attorney General Richard Kuhl
      Michigan Department of Attorney General
      P.O. Box 30755
      Lansing, MI 48909

Sara Wurfel served as press secretary for Governor Snyder's office from 2010 to 2015. Ms. Wurfel had near daily contact with and access to Governor Snyder during this time and had a duty to keep Governor Snyder informed of policy and media related issues. Ms. Wurfel had a duty to regularly and accurately communicate with other state agencies and to the public about Flint water issues, including the safety of drinking water. Ms. Wurfel has acknowledged that it was an important part of her job to be sure that Governor Snyder had a positive media presence and that he wanted problems fixed, including Flint water issues.

Despite increasing public health and water quality issues in 2014 and 2015, Ms. Wurfel relied solely and exclusively on the briefings she received from MDEQ that the water was safe and complied with all regulations, which she later admitted were inaccurate. Ms. Wurfel and the governor's office were aware of lead issues by the July 2015 but delayed in acting until September because of their continued reliance on state experts and their assurances that there was no lead issue and that the water was safe. Ms. Wurfel failed to clearly and effectively community Flint's water issues to members of Governor Snyder's staff and to the public.

6.   David (Press Secretary/Communications Director)
     Assistant Attorney General Richard Kuhl
     Michigan Department of Attorney General
     P.O. Box 30755
     Lansing, MI 48909

David Murray served as Governor Snyder's Deputy Press Secretary from July 2013-December 2015 and as Press Secretary from December 2015-March 2016. As Deputy Press Secretary, Murray was responsible for responding to media inquiries and coordinating communications activities, including writing press releases and social media posts, talking points, and acting as spokesperson and media liaison for the Governor's Office. Mr. Murray has acknowledged that the people in Flint had a right to know if their water was safe and a right to expect that important health and safety issues were communicated accurately.

As Deputy Press Secretary in 2014 and 2015, Mr. Murray continued to rely on false information about Flint water issues from MDEQ and MDHHS, despite contrary evidence that such information was inaccurate. Mr. Murray was aware of growing water quality concerns in 2014 and 2015, including Legionnaires' disease and lead issues, but failed to effectively communicate the dangers to either the governor or the public, and at times issued public statements that he has since acknowledged were unprofessional and inappropriate.

**B.      Members of the Flint Receivership Transition Advisory Board: Michael A. Townsend, David McGhee, Michael A. Finney, and Beverly Walker-Griffea**

Assistant Attorney General Richard Kuhl
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909

Michael A. Townsend, David McGhee, Michael A. Finney, and Beverly Walker-Griffea were all members of the Flint Receivership Transition Advisory Board ("FRTAB"). The FRTAB took over control of Flint's government from Emergency Manager Gerald Ambrose at the end of April, 2015. Upon taking over Flint's government, the FRTAB had all the powers that the Emergency Managers possessed—the FRTAB had to approve contracts and all resolutions, ordinances, and budget amendments adopted by the City Council before they could take effect. The FRTAB owed a duty to the public to safeguard the public's health, welfare, and safety.

By the time the FRTAB took over Flint's government, the lead problem was already well-established. Despite this, the FRTAB did not immediately take action to remedy the lead problem. Instead, the FRTAB dithered. Indeed, it was not until more than six months after the FRTAB took over Flint's government—in mid-October, 2015—that Flint reconnected to DWSD water. If the FRTAB had acted sooner to return Flint to DWSD water, the effects of this crisis may have been mitigated.

84

**C.** **Michigan Department of Treasury**
Austin Building
430 W. Allegan Street
Lansing, MI 48922

Assistant Attorney General Richard Kuhl
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909

The State Treasurer of Michigan is an unelected officer appointed by the Governor, operates the Department of Treasury within the executive branch, and functions as the chief financial officer for the State.[90] The State Treasurer oversees the collection, investment, and disbursement of all state monies, and also administers major tax laws, safeguards the credit of the state, and distributes revenue sharing monies to local units of government.[91] As part of its responsibility to safeguard the credit of the state, the Department of the Treasury oversees the Emergency Managers appointed by the Governor, including the delivery of services essential to the public health, safety, and welfare of residents.[92]

The Michigan Department of Treasury approved the 2013 decision for Flint to switch to the Karegnondi Water Authority ("KWA")[93] but abdicated its

---

[90] Deposition of Heather Frick, as 30(b)(6) Representative of State of Michigan (Treasury Department), Pg. 21-24, *In Re Flint Water Cases* (October 5, 2020).
[91] *Id.*
[92] Deposition of Andrew Dillon, Pg. 21 & 149, *In Re Flint Water Cases* (July 7, 2020).
[93] March 28, 2013 Flint Resolution to Purchase Capacity from Karegnondi Water Authority.

responsibility to assess the economic implications of entering the KWA, and ensure that a safe interim water source was available to the residents of Flint between Flint's termination of its contract with the DWSD and the KWA becoming operational. Instead of undertaking that assessment itself, it looked to the Michigan Department of Environmental Quality ("MDEQ") for guidance, even though MDEQ is not an agency equipped to make economic-focused decisions like these.[94] The Department of Treasury also independently approved contracts for the City of Flint that exceeded $50,000, including contracts for treatment upgrades and similar activities that have now been demonstrated as woefully inadequate. In addition, the Department of Treasury worked with others to secure the Administrative Consent Order ("ACO") that was necessary to secure financing for the KWA, even though the ostensible purpose of the ACO was to clean a lagoon at the Flint Water Treatment Plant's lime-sludge facility. Finally, once it became apparent that the water being provided to the residents of Flint was unsafe for consumption, Treasury failed to exercise its power or authority to effectuate a timely transition to a safe drinking water source, prolonging any adverse effects suffered by the residents of Flint.[95]

---

[94] August 6, 2016 Detroit Free Press Article: "Professor: Blame Treasury, not just DEQ, in Flint water mess."
[95] September 3, 2015, 5:36 PM Thomas Saxton Email to James Redford and Dennis Muchmore ("Re: FW: Flint Water").

All told, the Treasury Department: 1) failed in its duty to adequately supervise the Flint Emergency Manager's financially motivated decision to join the KWA, ceding to local political sentiments; played an active role in assisting the City of Flint in obtaining financing to transition to the KWA; and, 3) subsequently failed to appreciate the health risks Flint River water posed to Flint residents or affirmatively act to reconnect Flint to a safe water source.

> 1.  Andy Dillon
> Assistant Attorney General Richard Kuhl
> Michigan Department of Attorney General
> P.O. Box 30755
> Lansing, MI 48909

Governor Snyder appointed Andy Dillon as State Treasurer on January 1, 2011.[96] He held that position through October 11, 2013 but continued to be employed at the same salary as "Senior Advisor" to his successor, R. Kevin Clinton.[97] In his capacity as Treasurer of the State of Michigan, Mr. Dillon had a duty to oversee the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and welfare of Flint residents.[98,99] The delivery of services essential to the public health, safety, and welfare includes the provision of safe drinking water.[100]

---

[96] Deposition of Andrew Dillon, Pg. 15, *In Re Flint Water Cases* (July 7, 2020).
[97] *Id.* at Pg. 16.
[98] *Id.* at Pg. 21
[99] *Id.* at Pg. 149
[100] *Id.* at Pg. 200

Dillon was on notice of significant concerns regarding the potability of Flint River water prior to Flint's decision to use the Flint River as its primary source of drinking water.[101]

However, Dillon still played a pivotal role in the decision-making by Flint's Emergency Managers resulting in the change of the source of Flint's drinking water from Lake Huron to the Flint River.[102] Despite his responsibility to ensure that the Flint Emergency Manager delivered services essential to the public health, safety, and welfare of the citizens of Flint, Dillon abdicated the analysis of a potential transition to the KWA to his counterparts at the DEQ and an outside consulting firm Tucker, Young, Jackson, Tull, Inc. ("Tucker Young").[103] Dillon did so notwithstanding his own express concerns regarding both entities' interest in the outcome of the decision, and his employees' concerns regarding the data relied upon throughout the decision-making process.[104,105]

Ultimately, and without taking additional steps to ensure that all necessary data was available, or to resolve concerns regarding the credibility of his advisors,

---

[101] March 27, 2013, 6:13 PM Dan Wyant Email to Andy Dillon ("Re: FW: ODWMA Response - Flint KWA-DWSD Report").

[102] March 28, 2013, 6:18 PM Andy Dillon Email to Rick Snyder, et. al. ("Re: KWA").

[103] *Id.*

[104] April 17, 2013, 8:43 AM Andy Dillon Email to Dennis Muchmore ("Re: KWA and City of Flint. Urgent").

[105] February 15, 2013 Eric Cline Memorandum to Edward Koryzno ("Re: Updated Flint Water System Assessment").

on March 28, 2013, Dillon communicated to Governor Snyder that "based upon today's presentations to the DEQ by the City of Flint, KWA and the engineering firm (Tucker Young) Treasury hired to vet the options as to whether Flint should stay with DWSD or join KWA. I am recommending we support the City of Flint's decision to join KWA. The City's EM, Mayor and City Council all support this decision. Dan Wyant likewise concurs and will confirm via email."[106]

A few weeks later, on April 11, 2013, in a letter to Flint Emergency Manager Ed Kurtz, Mr. Dillon listed off the reasons that leaving the DWSD and joining the KWA was the right move for Flint:

> First, there is widespread support in the city for this move, including the support of the Mayor, the City Council, and the Emergency Manager. Second, this move will provide a unique opportunity for the City and County to partner on an important project, which will hopefully lead to future regional collaboration. Third, the Department of Environmental Quality is supportive of the City participating in the KWA project. Finally, your representations that this deal will lead to substantial savings for the City over the coming decades, savings that are desperately needed to help with the turnaround of the City of Flint.[107]

Continuing, Mr. Dillon acknowledged that regardless of what the DWSD's final best offer was, Flint was joining the KWA: "[i]t is my understanding that the Detroit Water and Sewer Department is making a final best offer to Genesee County

---

[106] March 28, 2013, 6:18 PM Andy Dillon Email to Governor Snyder ("KWA").
[107] April 11, 2013 Andy Dillon Letter to Ed Kurtz.

and the City of Flint next Monday, April 15, 2013. As such, this approval will be effective at 5 pm on April 16, 2013 after receiving written notice from the City that either no such offer was presented to the county and the City or that an offer was received and was rejected in good faith based upon specified objections."[108] Admittedly, Dillon's decision was influenced by local political sentiments and rushed to meet Spring construction deadlines.[109,110]

Further, Dillon failed to ensure that a safe interim water source would be made available to the City of Flint prior to the completion of the KWA, or anticipate that Flint might use the Flint River as an interim source of water: "I assumed they would work something out with Detroit."[111] Joining the KWA was the first move Flint made that led to its public health crisis. Without Mr. Dillon's facilitation at the highest levels of Michigan state government, Flint may have never left the DWSD, and this crisis may have been averted. Lastly, had Dillon acted to ensure that Flint continued to receive drinking water from DWSD and the City of Detroit, which was also under Emergency Management, prior to the completion of the KWA, Flint would not have switched to the Flint River water source.

---

[108] *Id*.
[109] Deposition of Andrew Dillon, Pg. 163, *In Re Flint Water Cases* (July 7, 2020).
[110] *Id.* at 63.
[111] Fonger, Ron, *Former state treasurer assumed Flint wouldn't use river for drinking water*, Mlive (January 21, 2016), available at https://www.mlive.com/news/flint/index.ssf/2016/01/former_michigan_state_treas ure.html (last visited July 12, 2019).

    2.    <u>R. Kevin Clinton</u>
        Assistant Attorney General Richard Kuhl
        Michigan Department of Attorney General
        P.O. Box 30755
        Lansing, MI 48909

R. Kevin Clinton ("Clinton") served as State Treasurer from October 11, 2013 until April 17, 2015 and, as such, was directly responsible for decision-making related to the switch of Flint's drinking water source from Lake Huron to the Flint River.[112] Mr. Clinton was the State Treasurer in April of 2014, when Flint transitioned to the Flint River as a source of drinking water,[113] and in October 2014, when the Governor's control group raised the need to return the City of Flint to Lake Huron as the source of its drinking water.

As Treasurer, Clinton swore an oath to uphold the constitutions and laws of the United States and the State of Michigan.[114] Clinton also understood that as Treasurer, the health of all of the citizens of Michigan were of paramount concern to the State of Michigan, and that the conservation and development of the natural resources of the state had been constitutionally declared to be of paramount public concern to the health, safety and general welfare of the people.[115]

---

[112] Deposition of R. Kevin Clinton, Pg. 80, *In Re Flint Water Cases* (April 30, 2020).
[113] *Id.* at 82.
[114] *Id.* at 37.
[115] *Id.* at 66-67.

Despite his predecessor's relatively active involvement in Distressed Cities, and role in decision-making regarding Flint's drinking water source, Clinton (at the direction of Dennis Muchmore) avoided nearly all involvement in the supervision of Distressed cities.[116] Notwithstanding his statutory duty to supervise Flint's Emergency Managers, Clinton failed to exercise adequate supervision. Notably, Clinton was unaware that Emergency Managers were required to submit regular reports to his office,[117] and reports to the Governor's Office regarding the Emergency Manager's performance (bearing Clinton's name) were neither authored nor reviewed by Clinton personally.[118]

During Clinton's tenure as state treasurer: 1) not one, but two boil water advisories were issued in Flint; 2) Flint experienced elevated levels disinfectant byproducts in its drinking water; 3) Professor Rose rendered her advice to the City of Flint that testing for lead should be performed; 4) LeeAnne Walters' home drinking water test results demonstrated extraordinarily high levels of lead; 5) the EPA began investigating the issue of lead in Flint's drinking water; and, 6) Flint DPW's Rob Bincsik voiced concerns that high lead level test results within Flint's

---

[116] *Id.* at 45-46.

[117] *Id.* at 114.

[118] *Id.* at 58-59.

drinking water might be a city-wide problem.[119] Yet, Clinton failed to take any action to transition Flint to a safe source of drinking water.

Accordingly, Mr. Clinton failed in his duty to oversee the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and welfare of Flint residents.

        3.    <u>Wayne Workman</u>
              Assistant Attorney General Richard Kuhl
              Michigan Department of Attorney General
              P.O. Box 30755
              Lansing, MI 48909

Wayne Workman was Deputy State Treasurer from July 2013 to January 2016.[120] . As Deputy State Treasurer Workman oversaw the local government division of the Treasury Department.[121] This responsibility included the direct oversight of the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and welfare of Flint residents.[122]

Although, the City's decision to join KWA was made before Workman became the Deputy Treasurer in July 2013, Workman oversaw Flint Emergency Manager Darnell Earley when Flint actually transitioned the Flint River as its interim water source in April 2014. Workman also oversaw Earley at the time that Earley

---

[119] *Id.* at 83-85.
[120] Deposition of Wayne Workman, Pg. 18, *In Re Flint Water Cases* (June 15, 2020).
[121] *Id.* at 19.
[122] *Id.* at 136-137.

misinterpreted DWSD's termination letter as notice of a water cutoff, necessitating an alternate water source. Aside from merely overseeing Flint's Emergency Managers during the transition to the Flint River as a primary water source, Workman went a step further in March 2014 by directing a colleague to, "get a call in to," the Director of the DEQ to, "push through," an Administrative Consent Order which would enable the City of Flint to secure its share of funding for participation in the KWA.[123] Notably, this Administrative Consent Order specifically required Flint to use the Flint River as a temporary source of untreated water until KWA water became available, and was prepared under the guise that funds would be used to clean the Bray Road lagoon in order to access the funding.[124]

Once safety concerns regarding the City of Flint's drinking water became apparent, Workman failed to take prompt action to provide safe drinking water to the citizens of Flint. Instead, Workman continued to prioritize financial concerns regarding a switch back to DWSD and failed to appreciate the severity of the situation. For example, between October 14 & 15, 2014, Workman responded to Dennis Muchmore's request that Workman and his colleague, Thomas Saxton, step-in to evolving concerns stemming from Valerie Brader's memorandum regarding General Motor's decision to cease use of Flint Water, by stating that they, "will

---

[123] March 19, 2014, 7:19 AM Wayne Workman Email to Thomas Saxton and Brom Stibitz (Re: FW: order for Flint).
[124] March 21, 2014 Administrative Consent Order at § 3.13.

escalate their involvement."[125] Workman later added that with respect to these evolving concerns regarding Flint's water, he planned to, "control what people say."[126] Later that day, Gerald Ambrose emailed Workman suggesting the MDEQ sit in on an October 15, 2014 telephone conference regarding Flint's Water concerns.[127] Aside from his pledge to, "control what people say," Workman failed to act with urgency to undertake a substantive investigation of the concerns, or exercise Treasury's authority to see that Flint and DWSD returned to the negotiating table in any meaningful way.

On January 16, 2015, Thomas Saxton sent an email to Workman stating: "I spoke to Jerry Ambrose on the water issue. He indicated KWA water will be available in late 2016. They are in the process of hiring water consultant to assist. They don't want to pay and would have difficulty paying DWSD an estimated 1M per month."[128]

On February 11, 2015, Saxton forwarded a memorandum from Workman regarding the increase in water and sewer rates in Flint since 2010 and added that

---

[125] October 15, 2014, 6:56 AM Wayne Workman Email to Thomas Saxton and Dennis Muchmore (Re: "Flint water").

[126] *Id.*

[127] October 15, 2014, 11:30 AM Gerald Ambrose Email to Wayne Workman, et. al. (Re: "Noon phone call").

[128] January 16, 2015, 2:56 PM Thomas Saxton Email to Wayne Workman, et. al. (Re: "Document for Review").

Flint "could be hooked up to DWSD by the end of the calendar year."[129] Saxton

continued to note, "Whether you hooked up to DWSD thru county or directly it is

an add'l $1M to the budget and 130% increase in rates over existing."[130]

On March 2-3, 2015, Dennis Muchmore forwarded an email to Workman and

others entitled "Contaminated Drink Water if [sic] Flint."[131] In that email,

Muchmore states:

> "Might want to get Jarrod and Terry Stanton on this as well
> as Harvey. Otherwise it will get out of hand. It's in the
> city's long-term interest to make the KWA work and we
> can make the river water safe, but we need to work with
> the ministers this week to help them out. It's tough for
> everyday people to listen to financial issues and water
> mumbo jumbo when all they see is problems. You can't
> expect the ministers to hold the tide on this problem. How
> about cutting a deal with Ice Mountain or Bill Young and
> buying some water for the people for a time? $250K buys
> a lot of drinking water and we could distribute it through
> the churches while we continue to make the water even
> safer. If we procrastinate much longer in doing something
> direct we'll have real trouble."[132]

Workman responded to this email by stating, "If this does happen, we need to

figure who would hand out the water. It should not be the City. It would undercut

---

[129] February 11, 2015, 12:27 PM Thomas Saxton Email to Dennis Muchmore, et. al.
(Re: FW: "Flint water").

[130] *Id.*

[131] March 3, 2015, 10:04 PM Dennis Muchmore Email to Wayne Workman, et. al.
(Re: FW: "Contaminated Drink Water if Flint").

[132] *Id.*

every point they are making. It probably should also be reserved for people who can't afford to buy water."[133]

On July 28, 2015, Eric Cline authored a memorandum to Randall Byrne, in response to several questions regarding the City of Flint's Water System posed by Wayne Workman at a July 23, 2015 meeting.[134] In the memorandum Cline notes that on March 3, 2015, Emergency Manager Ambrose advised Workman that Ambrose had been informed by DWSD that a reconnection to DWSD would result in an immediate fixed cost to the city of Flint of $10.1 million per year, a 30% increase in water rates, and that DWSD insisted that Flint enter into a 30-year contract with DWSD.[135]

Despite ongoing concerns regarding the safety of Flint's water supply, on September 3, 2015 Saxton forwarded a description of the costs to reconnect to DWSD to Muchmore and Workman and added, "I assume/hope no one is still seriously considering that option but if you need anything more give us a call."[136]

On October 1, 2015, Saxton forwarded an email to Dennis Muchmore, copying Workman and others outlining the latest estimate of the costs to return to

---

[133] *Id.*
[134] July 28, 2015 Eric Cline Memorandum to Randall Byrne ("Re: Questions Regarding City of Flint Water System").
[135] *Id.*
[136] September 3, 2015, 5:36 PM Thomas Saxton Email to James Redford, et. al. (Re: FW: "Flint Water").

DWSD.[137] Saxton adds that the estimate seems to be an improvement over DWSD's prior offers but only represents a ballpark, and, "While this can be pulled together in less than a week it will not mean that lead concerns will go away in one week."[138]

Subsequently, on October 5, 2015 Workman sent a memorandum addressed to Governor Snyder entitled, "Status of Financially Distressed Local Governments."[139] In this memorandum, Workman states, "Concerns have been raised about the amount of lead in the city's water system after a study by Virginia Tech University suggests that the amount is much higher than standard testing shows. The city is in compliance with state and federal lead standards but will be adding a corrosion inhibitor into the treatment process to reduce the amount of lead leaching into the system. The city is also providing free and independent water quality testing to residents. Treasury is monitoring this issue closely."[140]

Lastly, on October 9, 2015, Randall Byrne sent an email to Workman forwarding Drew Vandegrift's recommendation that, "the best way forward to [sic] reconnect to DWSD."[141]

---

[137] October 1, 2015, 8:25 PM Thomas Saxton Email to Dennis Muchmore, et. al. (Re: FW: "follow up").
[138] *Id.*
[139] October 5, 2015 Wayne Workman Memorandum to Rick Snyder ("Re: Status of Financially Distressed Local Governments").
[140] *Id.*
[141] October 9, 2015, 7:52 AM Randall Byrne Email to Wayne Workman, et. al. (Re: FW: "Flint Water Issue").

Despite Workman and Treasury's growing awareness that safety issues permeated Flint's water supply it was not until October 16, 2015, that Flint reverted to the DWSD.

Accordingly, Workman's failure to act promptly unreasonably prolonged the Flint Water Crisis and compounded the threat posed to Flint's residents.

4. <u>Frederick Headen</u>
Assistant Attorney General Richard Kuhl
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909

Frederick Headen ("Headen") served as Legal Adviser to the State Treasurer from November 2012- through 2016.[142] For the 10 years prior to assuming his role as Legal Adviser to the State Treasurer Headen served as Director of the Bureau of Local Government Services within the Department of Treasury.[143]

In his capacity as an employee of the Department of Treasury, Headen had a duty to oversee the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and welfare of Flint residents. Headen reported that he provided legal advice concerning law and policy matters directly to the Treasurer and Chief Deputy Treasurer.[144] Notably, Flint's former Emergency

---

[142] Deposition of Fredrick Headen, Pg. 10-11, *In Re Flint Water Cases* (October 7, 2020).
[143] *Id.*
[144] *Id.* at 11-12.

Manager, Ed Kurtz, explained in sworn testimony that Headen was the Emergency Manager's primary point of contact with the Department of Treasury.[145] Kurtz testified that he would provide weekly updates to Headen.[146] Headen was thus aware of the decision to switch from DWSD water and join the KWA and supported that decision. If Flint had not abandoned the DWSD as its drinking water source, it would never have had to use the Flint River as an interim source of water, and this crisis may have been averted.

Around April of 2015, Headen was named the Chairperson of the FRTAB, which took over control of Flint's government from Emergency Manager Gerald Ambrose at the end of April, 2015.[147] Upon taking over Flint's government, the FRTAB had all the powers that the Emergency Managers possessed—the FRTAB had to approve certain contracts and all resolutions, ordinances, and budget amendments adopted by the City Council before they could take effect.[148] The FRTAB accordingly owed a duty to safeguard the public's health, welfare, and safety.

---

[145] Deposition of Edward Kurtz, Pg. 29, *In Re Flint Water Cases* (November 21, 2019).

[146] *Id.* at 37.

[147] Deposition of Fredrick Headen, Pg. 100, *In Re Flint Water Cases* (October 7, 2020).

[148] *Id.* at 104-107.

By the time Headen and the FRTAB took over Flint's government, Flint's lead problem was well-established. Despite Treasury's awareness of these various safety concerns, Headen and the FRTAB did not immediately take action to remedy the lead problem or initiate a switch to a safe water source. Instead, Headen and the FRTAB dithered. Indeed, it was not until more than six months after the FRTAB took over Flint's government—in mid-October, 2015—that Flint reconnected to DWSD water. If Headen and the FRTAB had acted sooner to return Flint to DWSD water, the effects of this crisis may have been mitigated.

5.     <u>Edward Koryzno</u>
             Assistant Attorney General Richard Kuhl
             Michigan Department of Attorney General
             P.O. Box 30755
             Lansing, MI 48909

Edward Koryzno ("Koryzno") was an Administrator in the Office of Fiscal Responsibility within the Department of Treasury between 2012 and 2014.[149] Subsequently, Koryzno was promoted to Director of Bureau of Local Government.[150] Koryzno recalled that this office, "was created as part of, I believe, public act four and -- and so the intent was to assemble a team of people to assist local governments that were in financial trouble. So my first task was to hire a staff and then once that staff was assembled to develop a game plan to – to seek out

---

[149] Deposition of Edward Koryzno, Pg. 16, *In Re Flint Water Cases* (May 26, 2020).
[150] *Id.* at 18.

communities that were having difficulties financially and offer our assistance."[151]

Additionally, Treasurer Dillon specifically tasked the Office of Fiscal Responsibility with the responsibility of: 1) assessing the different projected construction costs provided by TYJT and by the City of Flint/KWA; 2) explaining why Treasury believes that the projects provided by Flint/KWA are acceptable; and, 3) identifying the construction contingencies included in the TYJT and Flint/KWA projections, as well as the options Flint will utilize in the event of a construction cost overrun or a delay in construction by KWA.[152] Therefore, in his capacity as an employee of the Department of Treasury, Koryzno had a duty to oversee the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and welfare of Flint residents, specifically, assessing the viability of the KWA as a source of safe drinking water.

According to Treasurer Dillon, Koryzno was Flint's primary point of contact at Treasury.[153] Once Koryzno and his department were assigned to evaluate the competing proposals between DWSD and the KWA, Koryzno delegated much of this responsibility to his subordinate Eric Cline.[154] Therefore, Koryzno received Cline's February 21, 2013 memorandum concluding that the KWA proved to be the

---

[151] *Id.* at 17.
[152] *Id.* at 69.
[153] Deposition of Andrew Dillon, Pg. 12, *In Re Flint Water Cases* (July 7, 2020).
[154] Deposition of Edward Koryzno, Pg. 161-162, *In Re Flint Water Cases* (May 26, 2020).

cheaper option but noting several difficulties in arriving at this conclusion. These difficulties included: 1) the number of proposals involved; 2) differences of opinion regarding the conclusions of various engineering analyses; 3) the comparison between an existing water system and one that has yet to be designed; 4) an inability to identify the City of Flint's true water needs; 5) the short timeframe within which Tucker Young attempted to perform its analysis; and, 6) that all available information may not have been provided to Tucker Young.[155] Cline emphasized this point by adding, "the only way to verify the accuracy of either estimate would be to utilize a third engineering firm to independently review both TYJT and KWA's estimates.[156]

As Cline's supervisor, Koryzno was in a position to escalate these concerns and object to Treasury basing its approval of Flint joining the KWA on the information available at that time, but failed to do so. Further, Koryzno stood by while the Emergency Manager Ed Kurtz unilaterally withdrew from consideration several potentially more cost-effective alternatives, including those involving a blending of Flint River water with water supplied by the DWSD.[157]

---

[155] February 21, 2013 Eric Cline Memorandum to Edward Koryzno ("Re: Updated Flint Water System Assessment").
[156] Id.
[157] February 15, 2013 Eric Cline Memorandum to Edward Koryzno ("Re: Updated Flint Water System Assessment").

Additionally, Koryzno knew that the KWA would not be able to supply Flint with water until 2016, and that DWSD would stop supplying Flint with water as of April, 2014.[158] Koryzno also knew that the Flint River was under consideration as Flint's interim water source until the KWA came online.[159] But Koryzno also knew that the Flint Water Treatment Plant was woefully inadequate to supply safe water.[160] By June, 2013, Koryzno was told that significant upgrades to the Flint Water Treatment Plant would be necessary in order for the Flint River to safely provide drinking water to Flint's residents.[161]As a result, Koryzno approved Flint's request to contract with LAN to consult regarding necessary upgrades to the Flint Water Treatment Plant.[162] Koryzno advised then-Emergency Manager Michael Brown to submit a request for an additional $11 million from the State of Michigan to make the Flint Water Treatment Plant operational. Accordingly, Koryzno knew or should have known that when the Flint Water Treatment Plant became operational in April, 2014, it could not supply safe drinking water. Had Koryzno not supported the switch to KWA and had Koryzno not supported the use of an inadequate Flint Water Treatment Plant, this crisis may have been averted.

---

[158] Deposition of Edward Koryzno, Pg. 121, *In Re Flint Water Cases* (May 26, 2020).
[159] June 19, 2013 Edward J. Kurtz Letter to Edward Koryzno.
[160] Deposition of Edward Koryzno, Pg. 120-121, *In Re Flint Water Cases* (May 26, 2020).
[161] June 25, 2013, 8:22 AM Maxine Murray Email to Edward Koryzno, et. al. (Re: "Electronic Communication – Flint Water Plant").
[162] *Id.*

6.   Eric Cline
Assistant Attorney General Richard Kuhl
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909

Eric Cline ("Cline") was a Unit Operations Specialist in the Office of Fiscal Responsibility within the Department of Treasury between 2012 and 2016.[163] As a Unit Operations Specialist, Cline's responsibilities included assisting local units of government that were experiencing various degrees of operational or financial distress and to, "engage with these local units, try and figure out what issues they were having, advise them on maybe ways to correct the issues, or help them try and figure out sort of a plan of action."[164] By virtue of these responsibilities and Treasury's general duty of superintendence, Cline had a duty to oversee the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and welfare of Flint residents.

In February, 2013, Edward Koryzno delegated to Cline the responsibility of: 1) assessing the different projected construction costs provided by TYJT (in support of the DWSD option) and by the City of Flint (in support of the KWA option); 2) explaining why Treasury believes that the projects provided by Flint/KWA are acceptable; and, 3) identifying the construction contingencies included in the TYJT

---

[163] Deposition of Richard E. Cline, Pg. 20, *In Re Flint Water Cases* (April 13, 2020).
[164] *Id.*

and Flint/KWA projections, as well as the options Flint will utilize in the event of a construction cost overrun or a delay in construction by KWA.[165] Cline's analysis of these issues culminated in two February 2013 memoranda to Koryzno in which Cline concluded:

> KWA presents the best future option to provide potable water for the City of Flint in the future. Long-term, KWA appears to be the cheaper option; the quality of water will almost certainly improve; Genesee County appears willing to assist the City in securing the financial resources for their portion of the project; this project could signify the beginning of better collaboration between the City of Flint and Genesee County; the KWA project has both political and popular support.[166,167]

However, in his analysis, Cline also noted several difficulties in arriving at this conclusion.[168] These difficulties included: 1) the number of proposals involved; 2) differences of opinion regarding the conclusions of various engineering analyses; 3) the comparison between an existing water system and one that has yet to be designed; 4) an inability to identify the City of Flint's true water needs; 5) the short timeframe within which Tucker Young attempted to perform its analysis; and, 6)

---

[165] Deposition of Edward Koryzno, Pg. 69, *In Re Flint Water Cases* (May 26, 2020).
[166] February 21, 2013 Eric Cline Memorandum to Edward Koryzno ("Re: Updated Flint Water System Assessment").
[167] February 15, 2013 Eric Cline Memorandum to Edward Koryzno ("Re: Updated Flint Water System Assessment").
[168] *Id.*

that all available information may not have been provided to Tucker Young.[169] Cline emphasized this point by adding, "the only way to verify the accuracy of either estimate would be to utilize a third engineering firm to independently review both TYJT and KWA's estimates.[170]

While these difficulties did not stop Cline from rendering an opinion, he also did not question Flint Emergency Manager Ed Kurtz's decision to withdraw from consideration several potentially more cost-effective alternatives, including those involving a blending of Flint River water with water supplied by DWSD.[171]

Subsequently, in April 2013, Cline was tasked with comparing DWSD's final offer to Flint relative to the costs of joining the KWA.[172,173] Cline concluded in his report of April 16, 2013 that the DWSD's final offer "could be cheaper" than the KWA option but that the proposal lacked specificity and "without delaying a final decision and conducting more analysis it is difficult to determine."[174] Cline once again formulated an opinion based on admittedly insufficient information.

---

[169] February 21, 2013 Eric Cline Memorandum to Edward Koryzno ("Re: Updated Flint Water System Assessment").

[170] *Id.*

[171] *Id.*

[172] April 16, 2013, 12:42 PM Edward Koryzno Email to Richard Cline, et. al. (Re: "KWA and City of Flint").

[173] April 18, 2013 Eric Cline Memorandum to Brom Stibitz ("Re: Flint Water System Summary").

[174] April 16, 2013, 12:42 PM Edward Koryzno Email to Richard Cline, et. al. (Re: "KWA and City of Flint").

Ultimately, Cline's recommendations in support of the KWA option, which were based on incomplete and/or insufficient information, formulated the basis of Treasury's support for Flint joining the KWA as a long-term water source. If Flint had not committed to using the KWA, it would not have had to use Flint River water a short-term interim water source, and this crisis may have been averted.

> 7.   <u>Thomas Saxton</u>
>       Assistant Attorney General Nathan Gambill, Esq
>       Michigan Department of Attorney General
>       6th Floor G. Mennen Williams Building
>       525 West Ottawa Street
>       Lansing, Michigan 48909

Thomas Saxton ("Saxton") was employed as the Deputy Treasurer for Finance within the State Treasury Department between 2008 and June 2013.[175] In June 2013, Saxton was promoted to Chief Deputy Treasurer where he served until his retirement in June 2016.[176] As Deputy Treasurer for Finance, Saxton's duties and responsibilities included assisting local units of government with their debt and bond issuance, as well as education financing.[177] Later, as Chief Deputy, Saxton's duties and responsibilities expanded to include general supervision over many of the department's administrative functions. [178] These expanded responsibilities included oversight of local government operations.[179] Saxton acknowledged that Emergency

---

[175] Deposition of Thomas Saxton, Pg. 23, *In Re Flint Water Cases* (October 1, 2020).
[176] *Id.* at. 19-21.
[177] *Id.* at 24-27.
[178] *Id.* at 21-23.
[179] *Id.* at 21-23.

Managers were appointed through a joint effort between the Governor's Office and the Treasury, and that the Emergency Managers generally reported to the State Treasurer through the Office of Local Government.[180] By virtue of these responsibilities and Treasury's general duty of superintendence, Saxton had a duty to oversee the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and welfare of Flint residents.

Saxton was put on notice of Flint's intention to join the KWA as far back as March 18, 2013, when Brom Stibitz forwarded an excerpt of Eric Cline's February 2013 memorandum indicating that Flint officials had withdrawn from consideration all DWSD related options with exception to either joining the KWA or continuing to receive 100% of Flint's drinking water from DWSD.[181]

Subsequently, on April 19, 2013, Saxton was instructed by Treasurer Dillon to review a letter from Detroit's Bond Counsel, Clark Hill, outlining several cost-related concerns regarding Flint's decision to join the KWA. [182,183] These concerns were purportedly not addressed in Tucker Young's final analyses of the overall cost associated with Flint joining the KWA, and included specific concerns regarding

---

[180] *Id.* at 42-43

[181] March 18, 2013, 1:48 PM Brom Stibitz Email to Andy Dillon and Thomas Saxton (Re: "KWA Memo").

[182] April 19, 2013, 1:48 PM Andy Dillon Email to Thomas Saxton (Re: "DWSD / KWA Clark Hill Letter").

[183] April 19, 2013, Clark Hill Letter to James Fausone (Re: "KWA Proposal").

Flint's compliance with the Local Financial Stability and Choice Act's competitive bidding requirement.[184] Notwithstanding these concerns, and/or Saxton's senior position within the Treasury Department, it is unclear that Saxton undertook any substantive review of the issues presented. To the contrary, on March 19, 2014, Wayne Workman actually enlisted Saxton's assistance in, "get[ting] a call in to," the Director of the DEQ to, "push through," an Administrative Consent Order which would enable the City of Flint to secure its share of funding for participation in the KWA.[185] Notably, this Administrative Consent Order was secured within one week of Workman's email, specifically required Flint to use the Flint River as a temporary source of untreated water until KWA water became available and was prepared under the guise that funds would be used to clean the Bray Road lagoon in order to access the funding.[186]

Had Saxton exercised his discretion to object to Flint's decision to join the KWA, in light of these obvious, "red flags," it is possible that Flint may not have secured the approval's necessary to make the switch and Flint would have continued to receive the same quality Lake Huron water that it received for decades.

---

[184] *Id.*

[185] March 19, 2014, 7:19 AM Wayne Workman Email to Thomas Saxton and Brom Stibitz (Re: FW: order for Flint).

[186] March 21, 2014 Administrative Consent Order at § 3.13.

Within six-months of Flint's transition to the Flint River as an interim drinking water source, Saxton became aware of significant health concerns regarding the potability of Flint's drinking water. Specifically, on October 14, 2014, Dennis Muchmore forwarded to Saxton and Wayne Workman an email chain outlining Valerie Brader and Michael Gadola's urgent concerns regarding bacterial contamination in Flint's water and General Motors' decision to leave the Flint Water system.[187] Significantly, both Brader and Gadola advocated for an immediate return to the DWSD at that time.[188] However, Saxton simply responded by exchanging emails with Workman noting that an upcoming conference call regarding the issue, "could get a little crazy depending who is on," to which Workman replied, "I am [on the call] and plan to control what people say."[189]

Rather than heed the advice of Brader and Gadola, Saxton persisted in prioritizing Flint's financial goal of returning to financial solvency by minimizing the extent of the health concerns for an entire year.[190]  For example, on January 19, 2015, Dennis Muchmore forwarded to Saxton an email from Flint Mayor, Dayne Walling, wherein Walling pleads for the Governor's assistance in addressing Flint's

---

[187] October 14, 2014, 10:56 AM Wayne Workman Email to Thomas Saxton (Re: "Flint water).

[188] *Id.*

[189] *Id.*

[190] Deposition of Thomas Saxton, Pg. 147-149, *In Re Flint Water Cases* (October 1, 2020).

water issues.[191] In response to Muchmore's query, "now what?", Saxton replied in relevant part, "at this point we are trying to determine whether this (DWSD offer) makes economic sense."

Saxton remained steadfast in his support for KWA's economic benefits throughout the Spring and Summer of 2015, despite numerous warning signs and mounting concerns regarding the safety of Flint's water.[192,193,194] By the Summer of 2015, Saxton had not only attended an in-person meeting with the Concerned Pastors regarding Flint water concerns, but also advised that Flint was not incorporating phosphate optimization into its finished water.[195,196]

Saxton's unwillingness to take reasonable measures to either connect Flint to a safe drinking water source or adequately investigate concerns regarding Flint's drinking water culminated in a September 3, 2015 email to James Redford, Dennis

---

[191] January 19, 2015, 3:44 PM Dennis Muchmore Email to Thomas Saxton (Re: "Flint Water).

[192] February 4, 2015, 11:35 PM Wayne Workman Email to Dennis Muchmore and Thomas Saxton (Re: "Flint Meeting").

[193] February 11, 2015, 8:01 PM Wayne Workman Email to Thomas Saxton (Re: "Flint water").

[194] February 19, 2015, 5:30 PM Thomas Saxton Email to Dennis Muchmore et. al. (Re: "Flint").

[195] Deposition of Thomas Saxton, Pg. 135, *In Re Flint Water Cases* (October 1, 2020).

[196] July 24, 2015, 4:180 PM Thomas Saxton Email to Nick Lyon (Re: FW: "Need update on lead / copper tests for Flint").

Muchmore and Wayne Workman.[197] Tellingly, Saxton's email read, "Gentlemen…in the attached (which you have likely seen before) is a description of the cost to reconnect to DWSD. I assume/hope no one is still seriously considering that option but if you need anything more give us a call."

Saxton's failure to act, despite his clear duty and ability to intercede, demonstrates his callous prioritization of economic and political goals over the health and safety of Flint's citizens.

> 8.  Terry Stanton
>     Assistant Attorney General Richard Kuhl
>     Michigan Department of Attorney General
>     P.O. Box 30755
>     Lansing, MI 48909

Between 2001 and April 2016, Terry Stanton ("Stanton") at all times served as either the Press Secretary or Public Information Officer within Treasury's communications department.[198] Stanton recalled that, "the Department of Treasury in its role would -- would work with emergency managers after they were appointed. Our Bureau of Local Government Services generally was the main point of contact with emergency managers. From my perspective, I would have been the communication conduit between the department and financially troubled local

---

[197] September 3, 2015, 5:36 PM Thomas Saxton Email to Dennis Muchmore et. al. (Re: "Flint Water").

[198] Deposition of Terry Stanton, Pg. 19-21, *In Re Flint Water Cases* (April 21, 2020).

units.[199] Stanton also understood that Treasury oversaw the actions Emergency Managers were taking in various municipalities, and that he personally was responsible for communicating that message that Treasury would put out in a certain circumstance.[200]

By virtue of these responsibilities and Treasury's general duty of superintendence, Stanton and the Treasury Department had a duty to oversee the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and welfare of Flint residents, and ensure that the public received pertinent, truthful and accurate information related to the provision of such services.

However, Stanton failed to use his platform to inform the public of growing concerns regarding the safety of Flint's water, even though the Treasury had assumed supervision over the provision of necessary services to Flint. For instance, Stanton was unaware until sometime later that, during January to July, 2015 state and federal agencies engaged in an ongoing discourse regarding the presence of lead in Flint's water or the need for corrosion control.[201]

---

[199] *Id.* at 32-34.
[200] *Id.* at 25,36.
[201] *Id.* at 98.

Additionally, Stanton did not make public any concerns regarding the safety of Flint's water following conversations within State government regarding the possibility of handing out bottled water.[202]

Yet again, on February 5, 2015, when informed of Concerned Pastor's request for immediate reconnection to Lake Huron, rather than give a voice to the Pastors or recognize the request as a warning sign Treasury's constituents should be aware of, Stanton participated in an echo chamber amongst his colleagues in State government suggesting that the costs to reconnect to DWSD were simply more than the city could afford.[203]

Finally, Stanton admits that the Treasury Department, among other governmental entities, played a role in the Flint Water Crisis.[204]

### D. Michigan Department of Environmental Quality
Presently the Michigan Department of Environment, Great Lakes, and Energy
525 West Allegan Street
Lansing, MI 48909-7973

Assistant Attorney General Richard Kuhl
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909

---

[202] *Id.* at 109.
[203] *Id.* at 102.
[204] *Id.* at 125-126.

The Department of Environmental Quality ("MDEQ") was created in 1995 by Executive Order No. 1995-18, which transferred environmental regulatory functions from the Michigan Department of Natural Resources to the newly created department. In 1996, Executive Order No. 1996-1 transferred oversight of environmental health programs "relating to drinking water and radiological protection" from the Michigan Department of Public Health to the MDEQ. In his first-ever executive order, Executive Order 2011-1, Governor Rick Snyder reversed a prior action by his predecessor, Governor Jennifer Granholm, split the Department of Natural Resources and Environment that she created, and returned the MDEQ its status as a separate department of the executive branch of the state government. Governor Snyder's stated purpose for the reorganization  was allowing the MDEQ to focus on its core mission: "promot[ing] wise management of Michigan's air, land, and water resources to support a sustainable environment, healthy communities, and vibrant economy." MDEQ set its "guiding principles"  as being a leader in environmental stewardship, a partner in economic development, and a provider of excellent customer service. The MDEQ  established as its strategic goals protecting public health, improving the quality of air, land and water resources, and implementing Michigan's water strategy.

The MDEQ was charged with the primary duty to enforce both the state and federal Safe Drinking Water Act and has primary legal authority and responsibility

116

for safe drinking water monitoring and enforcement in Michigan with oversight authority from the EPA. The MDEQ also had a duty to serve as the environmental health agency for the state and is required to advise the governor and other state agencies "on matters of the environment as those matters affect the health of the people of the state." The MDEQ was required to monitor and evaluate conditions which represent potential or actual environmental health hazards.

MDEQ had the duty to maintain power and control over public water supplies and is required to evaluate the adequacy of proposed waterworks systems and proposed surface water sources to protect the public health. The MDEQ had a duty to notify the supplier of water of necessary changes to the treatment, operations or capacity of a system in compliance with state drinking water standards. Additionally, the MDEQ had a duty to require proper testing and sampling in accordance with lead and copper standards and is required to determine the appropriate corrosion control treatment methods. If the system is found not to be in compliance with state or federal drinking water standards, the MDEQ has a duty to require that a supplier notify its users. According to Flint Water Treatment Plant's F-1 operator, Michael Glasgow, the MDEQ served as his "coaches and cops"… "they were there to guide us along but make sure we were doing things correctly."[205] The MDEQ charged the

---

[205] Deposition of Michael Glasgow, Pg. 38, *In Re Flint Water Cases* (February 24, 2020).

117

City of Flint a water management fee in exchange for the provision of management oversight and regulatory compliance.

As early as 2004, the MDEQ was aware of potential concerns about using the Flint River as a source of drinking water. A technical assessment completed that year noted that "the Flint River was a highly sensitive drinking water source that was susceptible to contamination." Sanitary surveys completed at the Flint Water Treatment Plant by MDEQ's Michael Prysby reveal that in the years leading up to the switch, MDEQ's main concern was with the "condition of the piping" and the system was known to be approximately 80% lead service lines. By 2007, MDEQ deemed the City of Flint's distribution system to be "deficient." A 2011 report from LAN detailed over $69 million in improvements that would be needed to the Flint Water Treatment Plant to bring the system up to current standards. In January 2013, MDEQ officials discussed the feasibility of using the Flint River, acknowledging that they "agree that the city should have concerns of fully using the Flint River…". MDEQ's Adam Rosenthal has testified that the MDEQ knew that "going to the river and having them fire up the basically mothballed plant was a mistake."[206]

After the Flint City Council approved the resolution to buy water from the KWA on March 25, 2013, MDEQ officials, including the Director himself, continued to discuss the risks associated with using the Flint River, including that

---

[206] Deposition of Adam Rosenthal, Pg. 40, *In Re Flint Water Cases* (March 5, 2020).

the use of Flint River water would pose increased health risks to the public. In June 2013, MDEQ officials were advised that corrosion control treatment should be implemented upon the switch to the Flint River, but they chose to ignore the advice and instructed the City of Flint that corrosion control treatment was not necessary. As the prospect of the KWA deal and use of the Flint River as an interim water source became apparent, MDEQ Deputy Director Jim Sygo acknowledged that "[a]s you might guess we are in a situation with Emergency Financial Managers so it's entirely possible that they will be making decisions relative to cost." From March 2013 to April 2014, MDEQ staff visited the Flint Water Treatment Plant on several occasions and were aware that the plant was not yet ready to distribute safe water in accordance with state and federal standards. Nonetheless, in April 2014, MDEQ issued the necessary permits to permit the city to draw from Flint River water.

The MDEQ also played a central role in the development and success of KWA. In August 2009, the MDEQ issued a permit to the Genesee County Drain Commission to withdraw large quantities of water from Lake Huron for the KWA. The MDEQ was apprised of the efforts to transfer the vote on the KWA back to local government "to approve the KWA agreement and not be challenged in court." When Flint's financial troubles threatened their ability to join the KWA, the MDEQ also put together a "sweetheart deal" in the form of an administrative consent order to exempt Flint's portion of the costs from being counted against Flint's debt limits by

requiring Flint to fix lagoons at the water treatment plant and tying the project to KWA development.

Even before the switch to the Flint River, MDEQ employees were aware of resident complaints about the Flint River "that the water was brown, and it  smelled like eggs."[207] After the switch to Flint River water, resident complaints began, and the city was forced to issue several containment violations. The MDEQ, with knowledge of the growing dangers to the public health, failed to adequately respond and undertook efforts to downplay any correlation between the Flint River and both the Legionnaires' disease outbreak or the lead issues, choosing politics over public health. Additionally, the MDEQ was aware that Flint's sampling protocols did not comply with the regulations, and according to MDEQ's Adam Rosenthal, the MDEQ still to this day the has failed to verify where lead service lines in the City of Flint are located.[208] The MDEQ, through its agents and employees, misapplied the lead and copper rule and violated their own department policy requiring corrosion control to remain optimized with any changes in source water,[209] causing corrosion to the lead service lines immediately after the switch and covering up a potential danger to public health by lying to the EPA. MDEQ officials instructed Flint water

---

[207] Deposition of Adam Rosenthal, Pg. 76-77, *In Re Flint Water Cases* (March 5, 2020).
[208] Deposition of Adam Rosenthal, Pg. 83, *In Re Flint Water Cases* (March 5, 2020).
[209] MDEQ, Office of Drinking Water and Municipal Assistance, Lead and Copper Rule Implementation Policy (No. ODWMA-399-027), January 17, 2013.

treatment staff to manipulate test results through targeted flushing and altering of water quality reports. The MDEQ continued to assure residents that the water was safe despite their explicit knowledge to the contrary and their duties to protect the public health.

The State of Michigan charged the following MDEQ officials with committing significant crimes in relation to the Flint drinking water crisis: Liane Shekter-Smith (Chief, Office of Drinking Water and Municipal Assistance); Adam Rosenthal (Water Quality Analyst, Lansing District Office); Stephen Busch (District Supervisor, Lansing District Office); Patrick Cook (Water Treatment Specialist, Lansing Community Drinking Water Unit); and Michael Prysby (Engineer, District 11). The plaintiffs admit that MDEQ and the officials referenced above as well as MDEQ Director of Communications Bradley Wurfel intentionally deceived them, keeping from them critically important information about the hazardous conditions they confronted. The plaintiffs also admit that MDEQ officials Wyant, Wurfel, Shekter-Smith, Rosenthal, Busch, Cook, and Prysby intentionally caused them bodily harm (in the nature of invading their bodily integrity).[210] MDEQ proximately caused further exposure, personal injuries, and damages to the plaintiffs.

**MDEQ Director Wyant and the Relevant Senior Staff including: Liane Shekter-Smith (Chief, Division of Drinking Water and Municipal Assistance); Bradley Wurfel (Communications Director); Eric Oswald (Director, Division**

---

[210] The plaintiffs' admissions made in their complaints are incorporated by reference. The admissions are too voluminous to incorporate into the body of the Notice.

**Drinking Water and Municipal Assistance); Richard Benzie (Assistant Division Director, Division Drinking Water and Municipal Assistance); Stephen Busch (District Supervisor, Lansing Office, Division Drinking Water and Municipal Assistance); Adam Rosenthal (Water Quality Analyst, Lansing District Office, Division Drinking Water and Municipal Assistance); Patrick Cook (Water Treatment Specialist, Lansing Office, Division Drinking Water and Municipal Assistance ); Michael Prysby (Engineer, District 11 [Genesee County] Division Drinking Water and Municipal Assistance); Jim Sygo (Deputy Director); Keith Creagh (MDEQ Director).**

> 1.   <u>Director Dan Wyant</u>
>       Attorney Michael J. Pattwell
>       Clark Hill, PLC
>       212 E. Cesar E. Chavez Avenue
>       Lansing, MI 48906

Dan Wyant ("Wyant") was the Director of the MDEQ during the relevant time frame. Governor Snyder appointed Mr. Wyant to the position of Director of the MDEQ in 2011; he held the position until December 29, 2015. As Director of the MDEQ, Mr. Wyant had a duty to exercise judgment to determine whether a violation, or a condition that may cause a violation, of the state drinking water standards constitutes a "imminent hazard" requiring immediate action to prevent endangering the health of people. Michigan Safe Water Drinking Act §325.1002(i); 325.1015(3). Director Wyant "resigned," after "reassigning" Liane Shekter-Smith's employment as Chief of the Office of Drinking Water and Municipal Assistance, appointed his Deputy James Sygo as her replacement. MDEQ Communications Director Bradley Wurfel also "resigned." In conjunction with these personnel changes, Director  Wyant  admitted that the MDEQ failed to enforce the EPA lead

and copper rule mandate for corrosion control in its oversight of the Flint Water Treatment Plant's delivery of drinking water to residents of Flint. The federal Environmental Protection Agency delegated to MDEQ "primary" responsibility for enforcement of safe water drinking act requirements, including its lead and copper regulation. Under Director Wyant, the MDEQ ignored its core mission by failing to manage wisely Michigan's drinking water sources in support of healthy communities.

Instead, Director Wyant advanced a drinking water source that was "downright scary" to some of the highest-ranking state officials, maintained that drinking water source in the face of flagrant health problems, and produced a demonstrably unhealthy City for Flint residents. Likewise, Director Wyant abandoned the MDEQ's "guiding principle" of being a leader in environmental stewardship and a provider of excellent customer service. The MDEQ did not provide any service to its customers in Flint, hiding behind an impenetrable bureaucratic wall when confronted with serious problems regarding the quality of Flint's drinking water. The fundamental core of "stewardship" is the ethical and responsible management of public resources. Under Mr. Wyant, the MDEQ demonstrated a complete lack of ethics and irresponsible management of Flint's drinking water. Public health was secondary to political expediency and self-preservation of the bureaucracy.

Specifically, Mr. Wyant had no experience in providing safe drinking water to residents before taking the position.[211] He had no familiarity with the SWDA, the statute he was charged with enforcing,[212] and he received no training on the SWDA.[213] When he took the job, he did "not know what a lead service line was."[214] He was not aware that in 2013 MDEQ had identified deficiencies in the Flint Distribution system including 80% lead service lines.[215] He did not know about Lee Ann Walter's February 2015 high water lead test results or the EPA's ensuing investigation until July 2015.[216] On October 18, 2015, Mr. Wyant admitted to Governor Snyder, "I now believe we made a mistake."[217]

2.    Liane Shekter-Smith
      Attorney Thaddeus E. Morgan
      Attorney Brian P. Morley Fraser Trebilcock
      124 W. Allegan Street
      Suite 1000
      Lansing, MI 48933

Liane Shekter-Smith ("Shekter-Smith") was the Chief of the Division of Drinking Water at the MDEQ until October 19, 2015. Ms. Shekter-Smith has worked in environmental agencies for the State of Michigan for over 30 years. As Chief,

---

[211] Deposition of Dan Wyant, Pg. 29, *In Re Flint Water Cases* (July 2, 2020).
[212] *Id.* at 25.
[213] *Id.* at 26.
[214] *Id.* at 88.
[215] *Id.* at 117.
[216] *Id.* at 84.
[217] *Id.* at 141; Exhibit 10.

Shekter-Smith's coordinated drinking water compliance efforts with state and local agencies (among other tasks), including supervision of water supply operations for the provision of safe drinking water. In her position at MDEQ, Ms. Shekter-Smith was responsible for having (and developing) knowledge of contaminants and their impact on public health and, as well, for collecting and analyzing environmental data. Ms. Shekter-Smith was abundantly aware that it was the responsibility of the MDEQ to enforce the SDWA which includes the LCR.[218] She also knew that the MDEQ's roles and responsibilities in 2014 and 2015 included being "relied upon to provide technical assistance and guidance on water treatment processes, approaches to managing distribution system water quality, and overall utility management."[219] During the period of 2011 to 2015, Shekter-Smith consistently promoted a practice of minimalist or "technical" compliance with environmental laws and regulations, choosing politics and self-preservation over protection of the public health, in direct violation of her duties and the spirit of the regulations she was responsible for enforcing. Ms. Shekter-Smith's minimalist attitude is evidenced through her interpretation of the LCR, as she felt the rule "philosophically" required corrosion control but not "regulatorily."[220]

---

[218] Deposition of Lianne Shekter-Smith, Pg. 29, *In Re Flint Water Cases* (June 18, 2020).

[219] *Id.* at 32.

[220] Deposition of Lianne Shekter-Smith, Pg. 95, *In Re Flint Water Cases* (June 18, 2020).

Ms. Shekter-Smith was involved in the discussions and planning between the KWA and the City of Flint as early as 2011, three years after KWA had been issued the necessary withdrawal permit by the MDEQ. In December 2012, Ms. Shekter-Smith was involved in conversations involving the City of Flint accepting an offer to join the KWA. In January 2013, Ms. Shekter-Smith became involved in discussions about potential water treatment options for the City of Flint with the Department of Treasury. By March 2013, Ms. Shekter-Smith was well aware of the potential risks involved in using the Flint River, including concerns about public health and exposure to harmful contaminants. Ms. Shekter-Smith also knew that river sources were generally more difficult to treat than water from the Great Lakes.[221]She was also aware that "older communities like the City of Flint most likely had a significant number of lead service lines."[222] However, and even though she was director of the office of Drinking Water and Municipal Assistance, Shekter-Smith had no recollection of ever asking or ordering that an assessment be performed to evaluate the impact of a new water source on the City of Flint's distribution system.[223] This was in spite of the fact Shekter-Smith knew as early as March 2013 that switching to the Flint River could pose an increased risk of microbial hazards to

---

[221] *Id.* at 145

[222] *Id.* at 86.

[223] Deposition of Lianne Shekter-Smith, Pg. 67, *In Re Flint Water Cases* (June 18, 2020).

public health, disinfectant byproducts, trigger additional regulatory requirements under the SDWA, and that the Flint WTP required significant enhancements beyond those identified in the Tucker Young report. Furthermore, Ms. Shekter-Smith was told by Stephen Busch in March 2014 that starting the Flint Water Treatment plant for continuous operation would carry significant changes in regulatory requirements. Shekter-Smith was also aware of the fact that the Flint WTP had operational issues prior to the switch to the Flint River.[224] Nonetheless, Ms. Shekter-Smith played in integral role in securing an Administrative Consent Order for the City of Flint to allow for funding of the KWA project and the use of the Flint River as an interim water source. Less than one month prior to the change in drinking water from Lake Huron to the Flint River, Ms. Shekter-Smith advocated the existence of an ambiguity (a "very grey area") about the LCR requirements for full time operation of the Flint water treatment plant. Although Ms. Shekter Smith discussed lead and copper monitoring pursuant to the LCR with Stephen Busch and Richard Benzie[225] Ms. Shekter-Smith advanced the assertion that Flint was not required implement corrosion control treatment under the LCR prior to delivering drinking water to its residents. When Michael Glasgow communicated to the MDEQ on April 17, 2014, a mere eight (8) days before the switch to the Flint River, that the Flint WTP would

---

[224] *Id.* at 56.
[225] *Id.* at 61.

not be ready to supply water to the City, Shekter-Smith failed to take appropriate action because she apparently felt it was merely an "informational email that went to staff."[226]

After the switch in water source, Ms. Shekter-Smith repeatedly downplayed water quality issues and resident complaints, including complaints about lead contamination and legionella, insisting at all times that the water was safe to drink. In October 2014, after Ms. Shekter-Smith was informed of a potential Legionnaires' disease outbreak, she relayed to MDHHS that she was "concerned that [MDHHS] were going to be making some sort of announcement" and warned MDHHS officials:

> There have been numerous complaints about Flint water, that the Governor's Office had been involved, and that any announcement by public health about the quality of the water would certainly inflame the situation.

As the Genesee County Health Department began closely investigating the Legionnaires' disease outbreak in the spring of 2015, Ms. Shekter-Smith stressed a clear message to MDEQ officials, including spokesman Brad Wurfel:

> While the change in source may have created water quality conditions that could provide additional organic nutrient source to support legionella growth, there is no evidence or confirmation of legionella coming directly from the Water Treatment Plant or in the community water supply distribution system at this time.

---

[226] Deposition of Lianne Shekter-Smith, Pg. 64-65, *In Re Flint Water Cases* (June 18, 2020).

The next day, Ms. Shekter-Smith approved MDEQ's response to the Genesee County Health Department asserting that Legionnaires' disease was not regulated under the Safe Drinking Water Act adding:

> It is highly unlikely that legionella would be present in treated water coming from the City of Flint water treatment plan given the treatment plant's use of ozone along with complete treatment and chlorine disinfect contact time to comply with federal surface water treatment rules for potable water."

When Ms. Shekter-Smith discovered violations of the drinking water regulations she had a duty to enforce, she failed to take corrective action. This was in spite of the fact that Ms. Shekter-Smith had suspected as early as January 29, 2015 that the corrosive water in Flint had likely sloughed the inner coating off the pipes, and that this meant it was likely a "distribution system problem".[227] Ms. Shekter Smith went to great lengths repeatedly to downplay concerns regarding corrosion and lead, meanwhile acknowledging her concerns internally. For example, she stated her concern for the optics of "[t]he decision to provide bottled water [to state employees] when the public notice was not a 'do not drink'" and the possibility of a "distribution system problem" in Flint. Nonetheless, on January 21, 2015, Ms. Shekter-Smith reiterated MDEQ's minimalist position on the Flint drinking water problems to her colleagues:

---

[227] Deposition of Lianne Shekter-Smith, Pgs. 81-82; Exhibit 8, *In Re Flint Water Cases* (June 18, 2020).

> Our position has always been that we do not dictate which
> acceptable option(s) a water supply may choose. Our
> responsibility is to see that operations are managed
> properly, regulations are met, and safe water is delivered.
> For example, when Flint decided to leave Detroit and
> operate using the River, our role wasn't to tell them our
> opinion; only what steps would be necessary to make the
> switch.

Upon reports of high levels of lead in one Flint home, on February 26, 2015, Ms. Shekter-Smith wrote to MDEQ's Richard Benzie stating that "the city is meeting 90th percentile. Not sure why region 5 [EPA] sees this one sample as such a big deal." A day later, MDEQ officials, with Ms. Shekter-Smith on the distribution, lied in writing to the EPA informing them that Flint had an "optimized corrosion control program." After it became known to the EPA that Flint was not practicing corrosion control, Ms. Shekter-Smith worked with EPA officials to disparage and discredit Mr. Del Toral's analysis and report, explicitly refused to mandate corrosion control despite the readily apparent risks and faulty sampling protocols, and maintained that the water was safe to drink. Moreover, Ms. Shekter-Smith was aware that the MDEQ had eliminated samples evidencing high lead levels in the City of Flint's water supply because she thought they were "artificially skewing the results."[228] In August 2015, two months before the switch back to Lake Huron water, Ms. Shekter-Smith met directly with Flint residents, assured them that

---

[228] Deposition of Lianne Shekter-Smith, Pg. 108, *In Re Flint Water Cases* (June 18, 2020).

the water was safe to drink, refused to acknowledge the importance and accuracy of Mr. Del Toral's findings, and further delayed the implementation of corrosion control.

3.   Bradley Wurfel
Attorney Christopher Clare
Clark Hill, PLC
212 E. Cesar E. Chavez Avenue
Lansing, MI 48906

Bradley Wurfel ("Wurfel") was the Director of Communications for MDEQ during the 2014 to 2016 time period. As spokesperson for the state's environmental agency responsible for regulating drinking water, Mr. Wurfel held a position of public trust intended to have the general public and other state and local agencies to rely on his statements regarding environmental health matters. Contrary to Mr. Wurfel's duties within the department, he intentionally disseminated deliberately misleading and inaccurate communications and unleashed a campaign to discredit residents and community representatives and to spread false messages about the safety of the drinking water.

By January 2015, Mr. Wurfel was aware of the issues with Flint water quality, including reports of an uptick in Legionnaires' disease.[229] On January 30, 2015, Mr. Wurfel acknowledged to the governor's office that he didn't want MDEQ's Director

---

[229] Deposition of Bradley Wurfel, Pgs. 129-130; Exhibit 17, *In Re Flint Water Cases* (May 26, 2020).

"to say publicly that the water in Flint is safe until we get the results of some county health department trace back work on 42 cases of Legionellosis in Genesee County since last May."[230] Despite his concerns, on March 13, 2015, Mr. Wurfel assured the governor's office that the local health department's efforts to attribute the increase in Legionnaires' disease to the Flint water was "beyond irresponsible." That same day, Mr. Wurfel communicated with the governor's office about coordinating communications on Legionnaires' disease, stating: "Political flank cover out of the City of Flint today regarding the spike in Legionnaires' disease cases. See enclosed. Also, area ministers put a shot over the bow last night… with a call for Snyder to declare state of emergency there and somehow 'fix' the water situation."[231]

By February 2015, Mr. Wurfel had been included on communications regarding reports of high lead levels at a home in Flint.[232] On July 9, Mr. Wurfel emailed Del Toral's now-public interim memo about violations of the Safe Drinking Water Act and potential widespread lead issues to several MDEQ officials, noting: "Miguel apparently asserts that the DEQ and EPA are at odds on proper protocol. Which seems weird."[233] Four days later, Mr. Wurfel gave a comment to Michigan Radio that "anyone who is concerned about lead in the drinking water in Flint can

---

[230] *Id.* at 133; Exhibit 16.
[231] *Id.* at 335; Exhibit 49.
[232] *Id.* at 150; Exhibit 49.
[233] Deposition of Bradley Wurfel, Pg. 166, *In Re Flint Water Cases* (May 26, 2020).

relax."[234] Mr. Wurfel later referred to Del Toral as a "rogue employee"[235] and consistently reported to the governor's office that "the city is in compliance for lead and copper" and that "Flint residents do not need to worry about lead in their water supply."

Over the course of the next three months, Mr. Wurfel continued on a quest to downplay resident concerns both in the public and with the governor's office in an effort to protect his agency and the governor. On July 25, Mr. Wurfel urged his colleagues to produce an update on the January/June lead testing results after Flint Ministers met with the Governor's office producing 80 water tests in Flint that show high lead levels. Shortly thereafter, Mr. Wurfel went on attack against Dr. Mona Hanna-Attisha and Professor Edwards—Mr. Wurfel referred to Dr. Mona Hanna-Attisha's work as "unfortunate" and a "very emotional approach"[236] and that Professor Edwards' team "specializes in looking for high lead problems…they pull that rabbit out of that hat everywhere they go" and that they were "fanning political flames irresponsibly."[237] The Governor's Task Force report cites the "substance and tone" of the MDEQ's communications as one of the department's key failures.[238]

---

[234] *Id.* at 179.
[235] *Id.* at 198.
[236] *Id.* at 206; Exhibit 29
[237] Deposition of Bradley Wurfel, Pgs. 201-203; Exhibit 28, *In Re Flint Water Cases* (May 26, 2020).
[238] *Id*. at 208; Exhibit 30.

Mr. Wurfel resigned from his position in December 2015,[239] acknowledging a dereliction of his duties, including that "the human element got lost in the press account." Mr. Wurfel confessed that he was "simply wrong"[240] and "had I understood then what I know now, I would have definitely brought a different tone to the conversation."[241]

> 4. Richard Benzie
> Assistant Attorney General Richard Kuhl
> Michigan Department of Attorney General
> P.O. Box 30755
> Lansing, MI 48909

Richard Benzie ("Benzie") was the Assistant Division Director, Division Drinking Water and Municipal Assistance at the MDEQ during the relevant time frame. Benzie continues his employment as an official at the MDEQ and was Stephen Busch's ("Busch") direct supervisor. Mr. Benzie also oversaw various districts across the State of Michigan to ensure they comply with EPA regulations.[242] By June 12, 2014 Mr. Benzie was aware that some Flint residents were experiencing significant problems with their drinking water.[243] Mr. Benzie was aware that lead may be leaching into Flint's water supply at or around January 29, 2015 when Ms.

---

[239] *Id.* at 210.

[240] *Id.* at 212.

[241] Deposition of Bradley Wurfel, Pg. 612, *In Re Flint Water Cases* (May 27, 2020).

[242] Deposition of Richard Benzie, Pgs. 35-36, *In Re Flint Water Cases* (July 14, 2020).

[243] June 12, 2014, 1:16 PM Stephen Busch Email to MDEQ ("Media Contact – Flint WTP").

Shekter-Smith conveyed her belief in writing that the corrosive water was sloughing water off the inner coating of the pipes and that it was likely a distribution system problem.[244] Nevertheless, he failed to do anything about the problem. Further underscoring the MDEQ's callousness and utter lack of regard for the people of Flint's health and wellbeing was when Mr. Benzie stated that the notion of requiring a study of the Flint River as a water source prior to the switch "will be of little to no value", an opinion which Mr. Benzie still holds to this day.[245] On February 26, 2015 and February 27, 2015, Mr. Benzie received the communications constituting discussions among EPA and MDEQ employees regarding the high lead levels found in some Flint drinking water.[246] While Mr. Benzie knew about the importance of corrosion control generally, he also observed that Mr. Del Toral stressed its importance in these February 26, 2015 and February 27, 2015 communications.[247] When Mr. Del Toral inquired about the nature and type of corrosion control that Flint was using, Mr. Benzie's subordinate, Mr. Busch, falsely represented that Flint "[h]as an Optimized Corrosion Control Program."[248] Mr. Benzie did nothing to

---

[244] Deposition of Richard Benzie, Pg. 239, *In Re Flint Water Cases* (July 14, 2020).
[245] *Id.* at 255-257.
[246] February 26, 2015 – February 27, 2015 MDEQ and EPA Email Correspondence ("HIGH LEAD: FLINT Water testing Results").
[247] *Id*.
[248] February 27, 2015, 1:48 PM Stephen Busch Email to EPA and MDEQ Employees ("RE: HIGH LEAD: FLINT Water testing Results").

correct the false information given to the EPA or to implement corrosion control at the Flint Water Treatment Plant.

Months later, on April 24, 2015, MDEQ employee Patrick Cook finally informed Mr. Del Toral that "Flint is not currently practicing corrosion control at the [Water Treatment Plant]."[249] After this revelation, on April 25, 2015, Mr. Del Toral expressly warned Mr. Cook of the dangerous levels of lead exposure that can occur when a city has lead service lines and does not practice corrosion control. Yet, Mr. Cook responded to Mr. Del Toral, with Mr. Benzie's apparent approval as a participant in the communication, with total disregard for the gravity of the situation. Instead of solving Flint's contaminated drinking water problems, the MDEQ including Mr. Benzie instead chose to promote the false narrative that Flint met "all current state and federal [drinking water] requirements even with a lack of corrosion control" and that controlling the "chronic contaminants" would be "of little to no value in the long term" because Flint would eventually get its water supply from KWA. In other words, the MDEQ including Mr. Benzie consistently marginalized the health and safety of Flint residents. Mr. Benzie was aware of the abhorrent drinking water conditions in Flint; he was aware that the City lacked optimized corrosion control; and he was aware that most City residents had lead service lines

---

[249] April 24, 2015, 10:43 AM Pat Cook Email to EPA Employees ("RE: Flint Corrosion Control?"). May 1, 2015.

connecting their residences to water mains. He knew lead was a "chronic contaminant" of Flint's drinking water and he failed to take any action.

     5.    <u>Stephen Busch</u>
Philip A. Grashoff, Jr.
Smith Haughey Rice & Roegge
100 Monroe Center, NW
Grand Rapids, MI 48304

Attorney Mark J. Kriger
LaRene & Kriger
645 Griswold Street, Suite 1717
Detroit, MI 48226

Stephen Busch ("Busch") was the District 8 (Lansing) Water Supervisor at the MDEQ during 2012-2016 time period. Mr. Busch reported to Ms. Liane Shekter-Smith and oversaw the work of District Engineers Michael Prysby and Patrick Cook. Mr. Busch's duties included advising and consulting with water systems and state and local agencies regarding regulatory compliance and water quality issues for the purposes of providing safe drinking water to communities. Mr. Busch was intimately involved with both the decision to use the Flint River as a drinking water source in both 2013 and 2014, assisted water treatment plant staff with treatment and compliance issues, and met directly with Flint residents to discuss various water quality issues. Mr. Busch, along with his co-workers at the MDEQ, had a duty to approve and implement optimized corrosion control treatment protocols, dosage

parameters, and monitoring.[250] In violation of his duties as an employee at the MDEQ and to the citizens of Flint, Mr. Busch made false and misleading statements regarding water quality and requirements for the Flint water treatment plant and caused an unnecessary and prolonged exposure to potential public health hazards.

As early as 2012, Busch was aware that the Flint River was contaminated and highly corrosive not meeting standards even for fish consumption. On March 26, 2013, Busch himself acknowledged the risks associated with using the Flint River as an interim water source. In a communication to MDEQ colleagues, including Director Wyant, Mr. Busch warned that substantial updates would be needed to the treatment plant and that use of the river water would pose increased health risks to the public, including a microbial risk, an increased risk of disinfection by-product ("TTHM") exposure.[251]

Despite these known risks, Mr. Busch actively participated in the series of events from 2013-2014 that resulted in distribution of contaminated water from the treatment plant, including coordinating with Flint attorneys to achieve the Administrative Consent Order in February 2014 and coordinating with treatment plant staff to move the plant into full time use despite glaringly obvious operational

---

[250] Deposition of Stephen Busch, Pg. 265, *In Re Flint Water Cases* (January 10, 2020).
[251] Deposition of Stephen Busch, Pgs. 101-102; Exhibit 179, *In Re Flint Water Cases* (January 9, 2020).

and staffing issues. On March 24, 2014, just one month prior to the switch, Mr. Busch wrote to MDEQ colleagues acknowledging these operational shortcomings and regulatory issues, stating "starting [the plant] up for continuous operation will carry significant changes in the regulatory requirements so there is a very gray area as to what we consider for start up."[252] Mr. Busch also had discussions with the Genesee County Drain Commissioner's Office after formal announcement of the use of the Flint River as a primary water source during which Mr. Busch acknowledged that the plant was not ready but that he nonetheless authorized the city to activate the water plant "because he was directed to." Mr. Busch provided Mr. Wurfel various talking points in April 2014, including that "[w]hile the Department is satisfied with the City's ability to treat water from the Flint River, the Department looks forward to the long term solution of continued operation of the City of Flint Water Treatment Plant using water from the KWA as a more consistent and higher quality source water."[253] Mr. Busch has since admitted that he believes Mr. Glasgow was "nervous" about operating the Flint Water Treatment Plant given his lack of experience but failed to notify his superiors of Mr. Glasgow's warnings to the MDEQ about his inability to operate the plant safely.[254]

---

[252] Deposition of Stephen Busch, Pgs. 129-130; Exhibit 179, *In Re Flint Water Cases* (January 10, 2020).
[253] Deposition of Bradley Wurfel, Exhibit 8, *In Re Flint Water Cases* (May 26, 2020).
[254] *Id.* at 317-318.

After the water switch, Mr. Busch actively sought to downplay concerns over water quality in direct violation of his duties, including concerns over lead and legionella. Mr. Busch played in integral role in failing to require corrosion control treatment at the water treatment plant, and on February 27, 2015, after reports of elevated lead levels, Mr. Busch lied to the EPA by stating that the city was, in fact, using corrosion control, and has since admitted under oath that at that point the City "had not been deemed to have optimized corrosion control treatment."[255] In March 2015, Mr. Busch was aware that the EPA had been "inundated" with citizen complaints over water quality, yet he failed to act.[256] In April 2015, Mr. Busch began the process of denigrating and disparaging Mr. Del Toral by advising his MDEQ colleagues that it may be necessary to alert the EPA to Del Toral's "over-reaches" in investigating elevated lead levels and advising on corrosion control.[257]

Despite knowledge of faulty sampling procedures, on June 10, 2015, Mr. Busch falsely assured the EPA that "almost all of the lead sample sites are lead service lines and the State is not seeing large increases in lead levels at the tap."[258] Mr. Busch vigorously defended an incorrect application of the lead and copper rule even after evidence of elevated lead levels and falsely assured Flint residents and

---

[255] Deposition of Stephen Busch, Pg. 351-352, *In Re Flint Water Cases* (January 10, 2020).
[256] *Id.* at 369-370.
[257] *Id.* at 482-483.
[258] *Id.* at 295-296; Exhibit 199.

activists that the water was safe at a meeting at the governor's office in August 2015.

Mr. Busch also provided deceptive and misleading advice to the MDEQ and both

state and local health agencies during the spring and summer of 2015 that "there is

no evidence or confirmation of legionella coming directly from the Water Treatment

Plant or in the community water supply distribution system" and called these

conclusions "premature."[259] Mr. Busch was criminally charged for his acts and

omissions related to the operation and management of the Flint water treatment plant

and for violations of the Safe Drinking Water Act.[260] His conduct caused the

plaintiffs alleged injuries and damages.

   6. <u>Adam Rosenthal</u>
    Attorney James W. Burdick
    Burdick Law, P.C.
    1760 S. Telegraph Road
    Suite 300
    Bloomfield Hills, MI 48302-0183

Adam Rosenthal ("Rosenthal") is a former Environmental Quality Analyst at

the MDEQ. Mr. Rosenthal had a duty to ensure that Flint maintained compliance

with the lead and copper regulations.[261] Throughout the period in which the City of

Flint received its drinking water from the Flint River, as a water quality analyst it

---

[259] Deposition of Stephen Busch, Pgs. 194-195; Exhibit 186, *In Re Flint Water Cases* (January 9, 2020).
[260] *Id.* at 205.
[261] Deposition of Adam Rosenthal, Pg. 19-20, *In Re Flint Water Cases* (March 5, 2020).

was Mr. Rosenthal's duty to analyze water quality reports, operation and monitoring reports, to determine whether a violation exists and to recommend courses of action for returning the City to compliance.[262] On April 17, 2014, a week before Flint began using the Flint River as its source for drinking water, Mr. Rosenthal was made aware that the Flint Water Treatment Plant was not prepared to begin processing drinking water for Flint residents. By then, Mr. Rosenthal was aware that testing at the Flint WTP leading up to the switch "went poorly."[263] On that date, Mr. Rosenthal received an email from Michael Glasgow, the highest ranking technically qualified employee at the Flint Water Treatment Plant stating that: "[i]f water is distributed from this plant in the next couple weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda."[264] Prior to April 17, 2014, Mr. Rosenthal was not aware of anyone at the MDEQ who had provided the Flint WTP personnel with information relating to revised water quality and lead and copper monitoring plans for the Flint River, a new water source.[265] Mr. Rosenthal also received the February 26, 2015 and February 27, 2015 memoranda setting forth the discussions among MDEQ and EPA employees

---

[262] Deposition of Stephen Busch, Pg. 18, *In Re Flint Water Cases* (January 9, 2020).
[263] *Id.* at 46.
[264] April 17, 2014, 11:05 AM Mike Glasgow Email to Adam Rosenthal and Mike Glasgow ("Re: Proposed Water Monitoring – City of Flint").
[265] Deposition of Adam Rosenthal, Pg. 48, *In Re Flint Water Cases* (March 5, 2020).

regarding Flint's drinking water lead problem.[266] At the same time, Flint officials were far behind in their testing responsibilities, and Mr. Del Toral's communications forced Mr. Rosenthal to finally reach out to Mr. Glasgow about the lead and copper certification form that was six weeks delinquent: "I need your lead/copper cert form - it was due by 1/10/15. I also need your WQPs for 2014. EPA is asking due to your 104 hit on lead. If you can, I need them today."[267]

Mr. Rosenthal knew that it was the MDEQ's responsibility to intervene in situations where there were discrepancies in water monitoring data.[268] As early as June 2014, Mr. Rosenthal was aware that Flint had failed to send the MDEQ the May 2014 operating report of the list of Tier 1 and Tier 2 lead and copper sites[269] and, as of June 30, 2014, the MDEQ still had not approved a list of sampling sites yet.[270] At the end of the first six (6) month round of lead and copper monitoring in December 2014, Mr. Rosenthal knew that Flint provided the MDEQ with only twelve (12) sample sites of the one-hundred (100) that were required and that the MDEQ *still* had not received a list of sampling sites from the City[271]. However, when

---

[266] February 26, 2015 – February 27, 2015 MDEQ and EPA Email Correspondence ("HIGH LEAD: FLINT Water testing Results").
[267] February 27, 2015, 9:13 AM Adam Rosenthal Email to Mike Glasgow ("Lead Copper Cert form").
[268] Deposition of Adam Rosenthal, Pg. 24, *In Re Flint Water Cases* (March 5, 2020).
[269] *Id.* at 87.
[270] *Id.* at 88-89.
[271] Deposition of Adam Rosenthal, Pg. 94, *In Re Flint Water Cases* (March 5, 2020).

Glasgow and Brent Wright once again failed in their water testing duties during the second six (6) month round of lead and copper monitoring, Rosenthal reached out to them and let them know what he would like them to find: "[w]e hope you have 61 more lead/copper samples collected and sent to the lab by 6/30/15, and that they are will be below the AL for lead. As of now with 39 results, Flint's 90th percentile is over the AL for lead."[272] Mr. Rosenthal was also personally involved in the decision to omit the pool of high lead samples from the results which, if not excluded, would have meant the City were in violation of the LCR.[273] Despite the fact that Mr. Rosenthal was aware that the Flint Water Treatment Plant was not prepared to treat Flint River water, that Flint had a serious lead problem, that Flint was not capable of adequately performing its water testing responsibility, he took no action to help the residents of Flint. Instead, Mr. Rosenthal chose to "hope"[274] that Mr. Glasgow and Brent Wright would not find actionable levels of lead in Flint's water.

On August 3, 2016, Mr. Rosenthal was charged with misconduct in office, tampering with evidence, and conspiracy to tamper with evidence, and a misdemeanor charge of willful neglect of duty. The charges stem from Rosenthal's participation in, and falsification of, Flint's drinking water lead test results.

---

[272] June 26, 2015, 12:00 PM Adam Rosenthal Email to Mike Glasgow and Brent Wright ("Re: 6/30 & 7/1/15 deadlines")

[273] Deposition of Adam Rosenthal, Pg. 135, *In Re Flint Water Cases* (March 5, 2020).

[274] *Id*.

      7.     <u>Patrick Cook</u>
            Attorney Allison M. Collins
            Foster, Swift, Collins & Smith, P.C.
            313 S. Washington Square
            Lansing, MI 48933

            John Smietanka
            Smietanka, Buckleitner, Steffes & Gezon
            4250 Chicago Dr., S.W.
            Suite B
            Grandville, MI 49418

Patrick Cook ("Cook") was a Water Treatment Specialist with the Division of Drinking Water and Municipal Assistance at the Lansing office of the MDEQ. A professional engineer with extensive experience at the MDEQ, Mr. Cook was extensively trained in the SDWA and EPA rules and regulations; he was considered a specialist in the Safe Drinking Water Act Lead and Copper Rule at the MDEQ.[275] Mr. Cook regularly consulted on water treatment development and plans and attended training sessions at the EPA regarding corrosion control.[276] As part of his duties, Mr. Cook was responsible for the interpretation and implementation of the legal requirements of the Lead and Copper rule at the Flint Water Treatment Plant.[277] Mr. Cook failed at his essential duties to the plaintiffs by failing to insist on corrosion control when the City changed its drinking water source from Lake Huron to the

---

[275] Deposition of Patrick Cook, Pg. 33; Exhibit 19, *In Re Flint Water Cases* (June 30, 2020).

[276] *Id.* at 51.

[277] *Id.* at 53.

Flint River in April 2014, and by acquiescing to department politics and advancing a false interpretation of the Lead and Copper rule resulting in distribution of corrosive water hazardous to the public health.

Without requiring implementation of corrosion control treatment, on April 9, 2014, Cook signed the last permit required by the MDEQ to allow the City to make the change in the drinking water source to go forward.[278] It was not until approximately one year later, on April 23, 2015, that Mr. Cook first inquired of other DEQ staff "what is Flint doing now (post Detroit) for corrosion control treatment?"[279] Mr. Cook, aware of MDEQ's false interpretation of the lead and copper rule, forwarded MDEQ's position to Del Toral in an effort to further mislead the EPA and delay treatment. On May 1, 2015, Mr. Cook, advancing the MDEQ party line and its false interpretation of the rules, informed the EPA that the MDEQ would not require any corrosion control decisions until after June 30, 2015 and that "requiring a [corrosion control] study at the current time will be of little to no value in the long term control of these chronic contaminants."[280] Mr. Cook was criminally charged as a result of his efforts to mislead the EPA and in violation of his duties to

---

[278] Deposition of Patrick Cook, Pg. 72, *In Re Flint Water Cases* (June 30, 2020).
[279] *Id.* at 92-93.
[280] *Id.* at 225-226; Exhibit 25

implement the lead and copper rule.[281] His conduct caused the plaintiffs alleged injuries and damages.

        8.    <u>Michael Prysby</u>
               Attorney Allison M. Collins
               Foster, Swift, Collins & Smith, P.C.
               313 S. Washington Square
               Lansing, MI 48933

               Attorney Richard Hillman
               Foster, Swift, Collins & Smith, P.C. 3
               13 S. Washington Square Lansing, MI 48933

Michael Prysby ("Prysby") was an Engineer in the Division of Drinking Water and Municipal Assistance for District 11 (Genesee County) in the MDEQ's Lansing office.[282] Mr. Prysby's duties included advising and assisting in water treatment plant operations, development, and treatment plans. A professional engineer, Prysby was intimately involved in the decision to use the Flint River as an interim water source, assisting the treatment plant into full time operation, and consulting on water quality issues after the switch from Lake Huron water to the Flint River water. Mr. Prysby failed at his duties to Flint residents by approving use of a contaminated water source, manipulating test results to achieve technical compliance with knowledge of potential public health consequences, and falsely

---

[281] Deposition of Patrick Cook, Pg. 121, *In Re Flint Water Cases* (June 30, 2020).
[282] Deposition of Michael Prysby, Pg. 19, *In Re Flint Water Cases* (June 16, 2020).

assuring state and local agencies and the public about the safety of the Flint River water.

By 2012, Prysby was involved early on in the approval and development of the KWA, including achieving Flint's participation. Secretly, Mr. Prysby told his colleagues that "the city should have concerns of fully utilizing the Flint River (100%) for the following: the need to soften, the potential for more advanced treatment after next round of crypto monitoring, available capacity in Flint River at 100-year low flow, residuals management (disposal of lime sludge)."[283] Over the course of 2013-2014, Mr. Prysby met regularly with Flint treatment plant staff and had direct knowledge of the plant's inability to distribute safe water and staffing issues. Mr. Prysby was a recipient of Michael Glasgow's April 17, 2014 email warning: "If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready."[284] Mr. Prysby was aware and approved of the decision to forego implement corrosion control.[285] Mr. Prysby failed to act or provide the requested assistance to Flint treatment plant staff.

---

[283] Deposition of Michael Prysby, Pg. 215; Exhibit 16, *In Re Flint Water Cases* (June 16, 2020).
[284] *Id.* at 298-299; Exhibit 25.
[285] *Id.* at 259-260.

Mr. Prysby agreed that corrosion control can be a contributing factor in causing lead and copper to leech into the distribution system.[286] His sanitary survey of 2013 determined that at least 70% of the pipes in Flint were made of lead.[287] Mr. Prysby knew that Detroit was using orthophosphate as part of their corrosion control program.[288] MDEQ did not require a corrosion control study of the Flint River before actually using it.[289] Instead of requiring corrosion control, MDEQ established a monitoring program of two consecutive six month rounds of testing to determine if there was a corrosion control problem occurring in Flint's distribution system.[290]

One month after the switch, according to EPA notes, Mr. Prysby falsely assured EPA officials that "Flint River quality is not great, but there is a surface water treatment plan producing water that is currently meeting SDWA standards." In August, after violations of the SDWA were apparent, Mr. Prysby instructed the Flint water treatment plant staff "off the record" to improve TTHM results through targeted flushing of hydrants near sampling sites. After receiving news of General Motors Corporation abandoning Flint's distribution system due to corrosive water, Mr. Prysby "stressed the importance of not branding Flint's water as 'corrosive'

---

[286] Deposition of Michael Prysby, Pgs. 91-92, *In Re Flint Water Cases* (June 16, 2020).
[287] *Id.* at 123.
[288] Deposition of Michael Prysby, Pg. 667, *In Re Flint Water Cases* (June 17, 2020).
[289] Deposition of Michael Prysby, Pgs. 139-140, *In Re Flint Water Cases* (June 16, 2020).
[290] *Id.* at 122

from a public health standpoint simply because it does not meet a manufacturing facility's limit for production."

In January 2015, Mr. Prysby repeatedly assured local health officials that "the municipal water system is in compliance with the Safe Water Drinking Act" and declined the health department's requests to meet to discuss the potential Legionnaires' disease outbreak. As early as February 2015, Mr. Prysby was informed by Ms. Glasgow that the lead sampling cites in the City of Flint did not comply with the lead and copper rule, rending the lead and copper data non-verifiable.[291] Upon receiving reports of a potential lead issue in February 2015, Mr. Prysby took no action and acquiesced to MDEQ's lies to the EPA regarding Flint's corrosion control, even after Mr. Cook informed him that "high levels of iron usually bring high levels of lead."[292] By early 2015, Mr. Prysby was explicitly informed by Flint water treatment plant officials that the lead sampling protocols were faulty and that the City wasn't aware of where the lead service lines and Tier 1 sampling sites were located in violation of the lead and copper rule.[293] Mr. Prysby also played an integral role in "scrubbing" the June 2015 lead and copper reports to achieve compliance, all the while assuring the public of the water's safety and dismissing

---

[291] Deposition of Michael Glasgow, Pg. 180-181, *In Re Flint Water Cases* (February 24, 2020).
[292] Deposition of Michael Prysby, Pgs. 172-173, *In Re Flint Water Cases* (June 16, 2020).
[293] *Id.* at 162.

reports to the contrary, prolonging the distribution of contaminated water. Mr. Prysby was criminally charged for his role and his failure to fulfill his duties and responsibilities under the Safe Drinking Water Act and within the MDEQ causing harm to the public.[294] His conduct caused the plaintiffs' alleged injuries and damages.

9. Jim Sygo
   Formerly of Saginaw, MI

Jim Sygo ("Sygo") was the former Deputy Director of the MDEQ during the relevant time frame. Mr. Sygo's duties included oversight over implementation of the state's drinking water program. Prior to the switch to Flint River water, Mr. Sygo was aware of the river water quality issues expressed by his own staff. Mr. Sygo acknowledged internally that "[a]s you might guess we are in a situation with Emergency Financial Managers so it's entirely possible that they will be making decisions relative to cost." In early 2015, Mr. Sygo was aware that the Legionnaires' disease outbreak and its correlation to the Flint River water was a "mounting problem." Despite Director Wyant's admission that the MDEQ violated the LCR in April 2014, Mr. Sygo vigorously defended the MDEQ's faulty interpretation.

10. Keith Creagh
    Assistant Attorney General Richard Kuhl
    Michigan Department of Attorney General
    P.O. Box 30755

---

[294] Deposition of Michael Prysby, Pg. 29, *In Re Flint Water Cases* (June 16, 2020).

Lansing, MI 48909

Keith Creagh ("Creagh") is the former Director of the Department of Natural Resources ("DNR") and served as interim Director of the MDEQ from December 2015 to June 2016. Mr. Creagh has been in state government service since 1974 and has extensive experience in policy development and environmental stewardship.

Creagh has openly admitted that the acts of MDEQ officials during the relevant time period were a "mistake." Specifically, Mr. Creagh has stated that state officials, in applying both state and federal safe drinking water regulations, "relied on technical compliance instead of assuring safe drinking water." Mr. Creagh has also blamed the EPA for lack of urgency and a failure to elevate legitimate concerns over water quality issues.

### E.   Michigan Department of Health and Human Services
333 S. Grand Ave
P.O. Box 30195
Lansing, Michigan 48909

Assistant Attorney General Richard Kuhl
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909

The Michigan Department of Health and Human Services ("MDHHS") is a principal department of the State of Michigan, headquartered in Lansing, that provides public assistance, child and family welfare services, and oversees health policy and management. Governor Rick Snyder merged the Department of Human

152

Services ("DHS") and the Department of Community Health in his 2015 State of the State address. MDHHS oversees The Bureau of Epidemiology and Population Health and the Childhood Lead Poisoning Prevention Program, a section responsible for protecting, detecting, and monitoring childhood lead poisoning from a variety of sources, including exposure to lead contamination in dwellings and adjacent surroundings, in compliance with state and federal laws.

Pursuant to Section 51 of Article 4 of the state constitution of 1963 and state Public Health Code, MDHHS is commanded to "continually and diligently endeavor to prevent disease, prolong life, and promote the public health through organized programs."[295] These duties include "prevention and control of environmental health hazards, prevention and control of diseases, prevention and control of health problems of particularly vulnerable population groups, development of health care facilities and agencies and health services delivery systems, and regulation of health care facilities and agencies and health services delivery systems to the extent provided by law."[296] MDHHS has broad powers and duties under the public health code, including:

> (a) general supervision of the interests of the health and life of the people of the state;
>
> (b) the implementation and enforcement of laws within the area of its vested responsibility;

---

[295] M.C.L. 333.2221.

[296] *Id*.

> (c)    the collection and utilization of vital and health statistics and the conduct of epidemiological and other research studies for the purpose of protecting the public health;
>
> (d)    the conduct of investigations and inquiries as to:
> > (i)    the causes of disease and especially of epidemics;
> > (ii)    the causes of morbidity and mortality; and
> > (iii)    the causes, prevention, and control of environmental health hazards, nuisances, and sources of illness;
>
> (d)    planning, implementing, and evaluating health education by the provision of expert technical assistance and financial support;
>
> (e)    undertaking appropriate affirmative action to promote equal employment opportunity within the department and local health departments and promoting equal access to governmental financed health services to all individuals in the state in need of service;
>
> (f)    exercising the powers necessary or appropriate to perform its duties and which are not otherwise prohibited by law; and
>
> (h)    planning, implementing, and evaluating nutrition services by the provision of expert technical assistance and financial support.[297]

Further, MDHHS has a duty to promote local health services through the coordination and integration of public health activities, including effectively cooperating with local health departments so as to provide a unified system of statewide healthcare.[298] MDHHS' broad investigatory powers ensure compliance with the laws and regulations set forth by the department and animate its obligation

---

[297] *Id.*
[298] M.C.L. 333.2224.

to report periodically to the governor and the legislature regarding matters of public health.[299]

Lead contamination of Flint's residential dwellings and soils was a longstanding problem dating back several decades. Lead-based paint (banned in 1978) and lead service lines connecting water mains to residential dwellings (initially subjected to mandatory replacement by the 1991 EPA lead and copper rule) were ubiquitous throughout the City of Flint. According to the Genesee County Community Action Resource Department, 82.9% of the housing structures in Flint were built before 1969 (91.8% before 1980).[300] Soils, long contaminated by combustion of leaded gasoline, were made worse by the use of lead coated wood construction debris as fuel by the Genesee Power Station in Flint's North End.[301] MDHHS, through its officials and employees and in accordance with such funded programs as the Childhood Lead Poisoning Prevention Program, failed to carry out its duties to prevent and minimize residential lead exposure in the Flint community, including from paint, lead service lines, soil, and dust. MDHHS, through its officials

---

[299] M.C.L. 333.2231, 2241.

[300] The number of vacant homes (most of which are undoubtedly encrusted in lead paint) has increased 74% since 2000.

[301] Flint's NAACP, an activist group called United for Action, and Flint residents filed a lawsuit challenging the Genesee Power Station because its plume of lead-laden smoke and ash contaminated the City and exposed residents to physical injuries and diseases associated with lead (e.g., brain injury, premature births, and learning disabilities). Highsmith, A.R., *Demolition Means Progress*, University of Chicago Press (2015) at 254.

and employees, did not meet its most basic duties in failing effectively to respond either to spikes in elevated blood lead levels among Flint children or to the Legionnaires' disease outbreak in the Flint area following on the heels of the change in the source of Flint's drinking water from Lake Huron to the Flint River. Worse yet, MDHHS engaged in efforts to conceal the public health problems, to prevent public notification about them, and to coordinate local public health efforts to address them, including taking steps to downplay scientific and public health data.

The State of Michigan charged the following MDHHS officials with committing significant crimes in relation to the Flint drinking water crisis: Nick Lyon (Director); Corinne Miller (Director, Bureau of Epidemiology); Eden Wells (Chief Medical Officer); Nancy Peeler (Director, Maternal, Infant, and Early Childhood Home Visiting Program); and Robert Scott (Data Manager, Healthy Homes and Lead Prevention Program). The plaintiffs admit that MDHHS and the officials referenced above intentionally deceived them, keeping from them critically important information about the hazardous conditions they confronted. The plaintiffs also admit that MDHHS Director Nick Lyon and MDHHS Director, Maternal, Infant, and Early Childhood Home Visiting Program, Nancy Peeler intentionally caused them bodily harm (in the nature of invading their bodily

integrity).[302] MDHHS proximately caused further exposure, personal injuries, and

damages to the plaintiffs.

**MDHHS Director Lyon and the Relevant Senior Staff including: Sue Moran (Deputy Director for Public Health) Corinne Miller (Director Bureau of Epidemiology); Lynda Dykema (Director, Division of Environmental Health); Eden V. Wells (Chief Medical Executive); Nancy Peeler (Director, Maternal, Infant and Early Childhood Home Visiting Program); Robert Scott (Data Manager, Healthy Homes and Lead Prevention Program); Jim Collins (Director of the Communicable Disease Division); Dr. Matthew Davis (Chief Medical Executive); Jay Fiedler (Section Manager, Infectious Diseases Surveillance Section); Susan Bohn (Unit Manager, Respiratory Disease Section); Tim Bolen (Regional Epidemiologist); Jim Rudrik, Ph.D. (Director, Infectious Disease Division)**

      1.    <u>Director Nicholas Lyon</u>
            Assistant Attorney General Richard Kuhl
            Michigan Department of Attorney General
            P.O. Box 30755
            Lansing, MI 48909
            Attorney John Bursch
            Bursch Law PLCC
            9339 Cherry Valley Ave SE, #78
            Caledonia, Michigan 4931

Nicolas Lyon was the Director of the Department of Health and Human

Services and held that position since September 2014. Prior to that, Mr. Lyon served

as the agency's Chief Deputy Director since 2011. In his role as Director, Lyon

exercises all powers and duties vested in the Department as well as overseeing the

daily departmental operations.[303] As Director, Mr. Lyon was required to "continually

---

[302] The plaintiffs' admissions made in their complaints are incorporated by reference. The admissions are too voluminous to incorporate into the body of the Notice.
[303] M.C.L. 333.2205(1).

and diligently endeavor to prevent disease" and to "[c]ollect and utilize vital and health statistics . . . for the purpose of protecting the public health."[304]

As early as September 2014, Mr. Lyon through his subordinates learned that McLaren Hospital experienced a significant outbreak in Legionnaires' disease. On October 13, 2014, an MDHHS epidemiologist identified a potential correlation between the outbreak and Flint's change of its water source from Lake Huron to the Flint River:

> I spoke with Tim [Bolen, MDHHS] late last week about the ongoing Legionnaire's [sic] increase in Genesee County. They've had 30 cases of Legionnaire's [sic] Disease reported into the [Michigan Disease Surveillance System] from June to present this year, where in previous years (2009-2013) they've had a range from 2- 9 cases reported during this same time frame. Genesee initially thought the increase was associated with McLaren Flint Hospital as a source, but after Tim and I both reviewed the preliminary data it was pretty clear that many of the cases did not fit with this hypothesis. In addition, the picture has been clouded by the fact that most cases being reported did not have onset dates recorded. The current hypothesis is that the source of the outbreak may be the Flint municipal water.

Mr. Lyon learned on January 28, 2015, that there was an outbreak of Legionnaires' disease in Genesee County and that the initial outbreak coincided with the change in water source from Lake Huron to the Flint River. State Epidemiologist Corrine Miller met with Mr. Lyon and presented him with data and graphs on the

---

[304] M.C.L. 333.2221(2)(c).

monthly case counts of Legionnaires' disease between January 1, 2009 and January 2015 and pointed out the relationship in time with the Flint water switch. That same day, Deputy Director Sue Moran forwarded Mr. Lyon a summary from a call held between MDHHS, MDEQ and Flint area hospitals. According to Ms. Miller, "MDEQ expressed concern that this issue might reach the Governor's office and I indicated it already had (and that [DHHS] would be assisting the locals in the investigation)."

While cases of Legionnaires' disease continued to be reported, on May 29, 2015, MDHHS officials mailed a letter to McLaren Hospital declaring the outbreak of Legionnaire's Disease over. McLaren Hospital officials "found it very strange that [the outbreak] was declared as over because it was never declared to begin with and we were still seeing cases." On July 22, 2015, Governor Snyder's Chief of Staff Dennis Muchmore sent Mr. Lyon an email requesting that he look into Flint's water issues. With the assistance of his staff, Mr. Lyon falsely responded to Mr. Muchmore's inquiry by stating that 73% of the cases involved individuals who were not consumers of Flint drinking water. MDHHS staff testified in preliminary criminal hearings involving Mr. Lyon that in early January 2016, he was presented with substantially similar information that Corrine Miller had presented Mr. Lyon nearly a year earlier, yet he acted as though he had never seen the information before. Despite his extensive knowledge of the outbreak, Mr. Lyon failed to act or inform

the public until January 13, 2016, during a news conference with Governor Snyder and Dr. Eden Wells.

Moreover, Lyon treated reports of elevated blood lead levels among Flint children with a similar "glib and dismissive" approach. In July 2015, MDHHS knew that there was a spike in elevated blood lead levels of Flint children which correlated with the onset of use of the Flint River water as a drinking water source. Despite Mr. Lyon's obligations to investigate public health concerns, in September 28, 2015, after the blood lead level issue had garnered media attention, Mr. Lyon sought assistance from MDHHS staff to disprove any correlation to the Flint water:

> I need an analysis of the Virginia Tech/Hurley data and their conclusions. I would like to make a strong statement with a demonstration of proof that the blood lead levels seen are not out of the ordinary and are attributable to seasonal fluctuations.

Mr. Lyon also actively participated in the political cover-up from the Governor's office. On November 26, 2015 Richard Baird, a top advisor to Governor Snyder, advising the Michigan state police: "…boss wants us to work through this without a disaster declaration if possible. Dan [Wyant, MDEQ] and Nick [Lyon] and I are working on it."

Mr. Lyon actively minimized the drinking water problems and their potential effect on public health. MDHHS, with Lyon at the helm, disregarded scientific data

160

and engaged in a scheme to undermine and obscure the truth at the expense of the public.

> 2.  <u>Sue Moran</u>
> Assistant Attorney General Richard Kuhl
> Michigan Department of Attorney General
> P.O. Box 30755
> Lansing, MI 48909

Sue Moran ("Moran") was the Deputy Director for Public Health at MDHHS. Ms. Moran reported to Deputy Director, Timothy Becker, who reported directly to MDHHS Director Nick Lyon. Ms. Moran's duties included consulting the Director's office on public health issues, including communicable disease outbreaks. Ms. Moran failed at her essential duties to investigate and prevent disease and promote the public health, including failing to urgently and properly respond to both reports of elevated blood lead levels and the Legionnaires' disease outbreak.

Ms. Moran became aware of the Legionnaires' disease outbreak in January 2015. Despite this, Ms. Moran failed to adequately respond and assist the local health department in accessing information and informing the public throughout 2015. Notably, eleven months later, in December 2015, Ms. Moran and Dr. Eden Wells criticized the Genesee County Health Department for "going behind their back" and not being a "team player" in drafting a press release regarding the outbreak.

In September 2015, Director Lyon contacted Ms. Moran directly stating that he wanted to make a "strong statement" that the elevated blood lead levels reported

in the media were merely seasonal variation. In line with department politics, that same month, Ms. Moran had emailed MDHHS staff informing them that the "front office" was asking about Flint water and stressing that "while this is a public health concern, this is largely DEQ/local jurisdiction." Ms. Moran declined to accept that any issues related to water quality were the responsibility of the MDHHS, in direct contradiction to her duties to protect the public health.

      3.    Corrine Miller
               Attorney Kristen E. Guinn
               Smith Haughey Rice & Roegge
               100 Monroe Center, NW
               Grand Rapids, MI 49503

Corinne Miller ("Miller") was the Director of the Bureau of Epidemiology at MDHHS. Ms. Miller reported to Sue Moran. Ms. Miller's duties as Director included providing review of data reports and feedback, consultation, and crisis management for public health investigations, including communicable diseases. Ms. Miller's duties also included oversight over the legionella investigation.

Ms. Miller became aware of the Legionnaires' disease outbreak by January 2015 and had discussions with Linda Dykema about the correlation between the water switch and the increase in the cases of Legionnaires' disease. Ms. Miller has admitted that notice could have been released to the public as early as January 2015, but that there were "political overtones" and that news of a Flint water related disease outbreak could have been "embarrassing" or "cause a difficult situation" for the

governor because that decision had been made under emergency management. By March 2015, Ms. Miller was aware of the challenges the Genesee County Health Department (GCHD) faced in investigating the Legionnaires' disease outbreak. Ms. Miller had the power and ability to provide additional assistance or request epidemiologic assistance from the CDC but she failed to do so until after public notification was made, even when GCHD themselves requested CDC's assistance.

In July 2015, Ms. Miller was aware that one of her epidemiologists, Cristin Larder, had determined that the blood lead levels in Flint children in the summer of 2014 were higher than previous years and that it warranted further investigation. However, Ms. Miller chose to play politics by instructing others not to take action and to delete emails pertaining to Ms. Larder's report. Despite knowledge and access to data evidencing elevated blood lead levels from her own staff, on September 17, 2015, Ms. Miller reminded MDHHS staff that "[p]er the MDEQ, the compliance monitoring for lead within the city has never exceeded the EPA action level for lead." Worse yet, after the blood lead level issues became public, Ms. Miller pressured MDHHS staff to provide false statements to the media regarding reports of elevated blood lead levels. Ms. Miller was criminally charged for her involvement.

       4.    <u>Linda Dykema</u>
           Assistant Attorney General Richard Kuhl
           Michigan Department of Attorney General
           P.O. Box 30755

Lansing, MI 48909

Linda Dykema ("Dykema") was the Director of the Division of Environmental Health at MDHHS from May 2014 to October 2016. Her duties included serving as a liaison to the MDEQ, managing the toxicology and response section, and conducting public health assessments of environmental contamination. Ms. Dykema also oversaw the Lead Hazard Remediation Program, responsible for assessing and cleaning up lead contaminated housing.

Ms. Dykema became aware of the Legionnaires' disease outbreak in January 2015 and had discussions with Corrine Miller about the correlation between the water switch and the increase in the cases of Legionnaires' disease. In effort to protect her department and the Governor from an "embarrassing" and "difficult situation," Ms. Dykema instructed MDHHS employees to refer calls from the public complaining about the water to her attention, warning that "there is a political situation that we don't want to stumble into should we get hotline calls."

Ms. Dykema also worked with the MDEQ beginning in and about July 2015 to downplay the seriousness of the lead issues and other health concerns related to the water and to diminish and disparage Mr. Del Toral. On July 23, 2015, Ms. Dykema reiterated to several MDHHS officials, including Corrine Miller, Nancy Peeler, and the "front office," that the city is in compliance with the lead and copper rule and that Mr. Del Toral's report was "issued as a result of his own research and

164

…not reviewed or approved by EPA management. He has essentially acted outside his authority."[305] On September 29, 2015, after Dr. Mona Hanna- Attisha's work became public, Ms. Dykema expressed to other MDHHS officials the need for the department to have a unified response: "It's bad enough to have a data war with outside entities, we absolutely cannot engage in competing data analyses within the Department, or, heaven forbid, in public releases." Ms. Dykema has since expressed her frustration that the department did not share the lead concerns with the public sooner. Ms. Dykema, in her role as the Director of the Division of Environmental Health, failed in her duties to investigate, prevent, and control environmental health hazards. By her conduct, she exacerbated the plaintiffs' injuries and damages.

     5.    <u>Eden Wells</u>
           Assistant Attorney General Richard Kuhl
           Michigan Department of Attorney General
           P.O. Box 30755
           Lansing, MI 48909

           Attorney Steven Ramontin
           24 Frank Lloyd Wright Dr Ste D2000
           Ann Arbor, MI 48105

Dr. Eden Wells ("Wells") was the Chief Medical Executive for MDHHS and held that position since May 1, 2015. Prior to that, Dr. Wells served as the Associate Chief Medical Executive from January 1, 2015 to May 1, 2015. Pursuant to M.C.L.

---

[305] July 23, 2015, 10:07 AM Linda Dykema Email to DCH Employees ("RE: Director's Office Assignment – Flint – need update asap").

333.2202, if the Director of MDHHS is not a physician, the director "shall designate a physician as chief medical executive of the department. The chief medical executive shall be a full-time employee and shall be responsible to the director for the medical content of policies and programs." Dr. Wells' duties included assisting with disease outbreak coordination and investigation and to provide the department with professional medical guidance.

Dr. Wells was aware of the Legionnaires' disease outbreak as early as May 2015. She was consistently informed and updated on the nature and scope of the outbreak during 2015. However, she and MDHHS did not inform the public about the outbreak until January 16, 2016. Dr. Wells failed to take steps to investigate the source of the outbreak or notify the public. Moreover, Dr. Wells actively participated in efforts to undermine the Genesee County Health Department's ("GCHD") attempts to investigate the outbreak and notify the public, accusing GCHD officials of "going behind [MDHHS'] back" and not being a "team player." Dr. Wells was aware of the report of elevated blood lead levels as early as August 2015 and took steps to limit scientific access to data and downplay the reports in the media. Despite her duty to protect the public from health outbreaks and alert the public of known dangers, Dr. Wells failed to act accordingly and was charged criminally for her conduct.

6.   Nancy Peeler
Attorney Michael S. Cafferty

166

Michael S. Cafferty & Assoc.
333 W. Fort Street
Suite 1400
Detroit, MI 48226

Attorney Harold Z. Gurewitz
Gurewitz & Raben, PLC
333 W. Fort Street, Suite 1400
Detroit, MI 48226

Nancy Peeler ("Peeler") was Director of the Maternal, Infant and Early Childhood Home Visiting Program ("MIECHV") at MDHHS during the relevant time frame. MIECHV program is designed to promote maternal, infant and early childhood health, development and safety. This program includes the State's childhood lead poisoning prevention program, which provides education and outreach regarding lead hazards and the impact of lead poisoning and maintains a registry of blood lead levels throughout the state. Ms. Peeler was specifically assigned the task of responding to an inquiry from the MDHHS Director's office regarding elevated lead levels and the potential impact on public health.

By July 2015, the MDHHS knew that there was a spike in elevated blood lead levels among Flint's children. Prior to July 2015, MDHHS had the necessary data to analyze the issue of elevated blood lead levels but failed to do so. CLPPP's 2014 Annual Report showed that the percentage of tested Flint children under age 6 with an Elevated Blood Lead level increased from 3.6% in 2013 to 4.5% in 2014. MDHHS failed to initiate the appropriate investigation and inquiry into that increase.

Emails produced by the State of Michigan reveal that the surveillance responsibility of the CLPPP program had largely fallen by the wayside.   Robert Scott, the responsible data analyst for CLPPP, reported on October 1, 2015 that CLPPP:

> …reports on testing and elevated levels annually by fiscal year…We used to produce similar reports by quarter, and even a special monthly report for funded Health Departments.  But as we have lost funding and staff, and as my own time has been pulled in different directions, these other more frequent reports have fallen away.[306]

Ms. Peeler, who is not an epidemiologist herself, finally in late July 2015 assigned MDHHS' epidemiologists to evaluate any increase in child blood lead levels in the summer of 2014 that may be attributable to the change in drinking water from Lake Huron to the Flint River. On July 28, 2015 MDHHS epidemiologist Cristin Larder found and reported to Ms. Peeler that children's blood lead tests conducted in summer 2014 "lie outside the control limit" compared with prior years and that this finding "does warrant further investigation."[307] Despite this, Ms. Peeler falsely reported that there was no significant jump in lead levels other than the normal, seasonal variation.[308] Ms. Peeler's report was brought to the Director and ultimately to the Governor's office. When Ms. Larder again reported that, based on

---

[306] *See* SOM 0106804.

[307] Deposition of Cristin Larder, Pg. 60-70, 81-82, 87-88, *In Re Flint Water Cases* (June 2, 2020).

[308] *See* Peeler email 7/28/15, SOM 0072071-72.

additional data provided to her, there was still "a higher proportion of EBLL last summer than usual," Ms. Peeler took no steps to correct her report to the Director and Governor or to conduct a further  analysis.[309] Ms. Peeler effectively buried Ms. Larder's work, choosing politics over public health. When Ms. Larder learned, months later, of Ms. Peeler's alternative report she communicated with members of the recently appointed Governor's Flint Water Advisory Task Force that the results of her 2015 analysis "were actively blocked from reaching Director Lyon."[310]

Further, Ms. Peeler took steps in line with her department to disparage Dr. Mona Hanna-Attisha's work and further to mislead the public regarding any correlation between elevated blood lead levels and the change in the source of the drinking water. On September 23, 2015 Ms. Peeler sent an email internally to MDHHS staff stressing the "seasonal impact associated with lead poisoning" and insisting that staff hold forth with the talking point that "[w]e do NOT see a different pattern of results for the 2014-2015 year, right after the change in the water source." On September 24, 2015, Ms. Peeler proofread a response drafted by Robert Scott to Professor Marc Edward's request for data on blood lead levels and expressing his frustration about the state's lack of response. Ms. Peeler instructed Mr. Scott to

---

[309] Larder's report to Peeler, SOM 0080134-35.
[310] *See* MDHHS 0490076.

"apologize less" and explicitly warned: "The email you received could be read as an intent to escalate and spin things, and I don't think you need to get caught up in that."

On September 25, 2015, a day before Dr. Mona Hanna-Attisha's work became public, Ms. Peeler communicated with MDHHS leaders stating:

> Based on questions coming through, I do think we need to run our Flint charts for the same population group that the Flint docs ran (as close as we can approximate the sample) but I'd look at it across the five years again. Depending on what our charts show, we may want to consider having (state epidemiologists) help us run an analysis more like the docs ran – but let's look at the revised charts as a starting point.

That same day, Ms. Peeler assigned Mr. Scott to respond to a Detroit Free Press article about lead increases in Flint and expressed her "secret hope…that we can work in the fact that this pattern is similar to the recent past." The next day, despite her knowledge of elevated childhood blood lead levels nearly two months prior, Ms. Peeler acquiesced to Director Lyon's mandate to send a strong message of "season variation." Specifically, Ms. Peeler coordinated with Robert Scott and MDHHS' Deputy Director for External Relations and Communications Geralyn Lasher to "put[] together talking points about this 'study' that the physicians will be discussing that claims an increase in elevated blood levels in children since the change to the water system source." Ms. Peeler was criminally charged for her deception and failure to act in accordance with her duties.

       7.   <u>Robert Scott</u>

Attorney Mary Chartier-Mittendorf
1905 Abbot Road, Suite 1
East Lansing, MI 48823

Robert Scott ("Scott") was the Data Manager for the Healthy Homes and Lead

Prevention program Childhood Lead Prevention Program. Mr. Scott, who is not an

epidemiologist, was responsible for tracking and organizing child blood lead level

data for the program. In July 2015, Mr. Scott was asked by Nancy Peeler to assist in

providing a limited data set to MDHHS epidemiologists to determine whether there

was an increase in child blood lead levels in Flint related to the change in the source

of drinking water from Lake Huron to the Flint River. After MDHHS epidemiologist

Cristin Larder reported on the morning of July 28, 2015 that there was, in fact, an

increase in child blood lead levels in the summer of 2014, Mr. Scott took it upon

himself to also analyze state data. Before receiving the final report from Ms. Larder,

Scott wrote to Ms. Peeler:

> I said this morning I'd look to see if the distribution of
> (elevated blood lead levels) in the July-September 2014
> 'spike' was any different from the typical distribution of
> (elevated blood lead levels) in Flint. I compared totals by
> zip code vs. totals by zip code from 2010. The pattern is
> very similar and is further evidence, I think, that the water
> was not a major factor here.

Scott chose to ignore the experts in his own department and his obligation to protect

the public health by advancing efforts to ignore and to bury Ms. Larder's work.

171

Upon receipt of a September 11, 2015 email from Professor Marc Edwards describing "severe chemical/biological health risks for Flint residents" related to corrosion of pipes, Mr. Scott forwarded the information to several MDHHS colleagues, including Nancy Peeler, writing: "[s]ounds like there might be more to this than what we learned previously. Yikes!" Mr. Scott also participated in efforts to discredit Dr. Mona Hanna-Attisha's work. On September 24, 2015, Mr. Scott attempted to recreate Dr. Hanna-Attisha's work, and, ignoring the work of MDHHS epidemiologists and despite a lack expertise in the field, informed Ms. Peeler that he saw a difference between the two years, but not as significant as Dr. Hanna-Attisha's. The following day, Mr. Scott instructed MDHHS staff to inform the Detroit Free Press that "[w]hile the trend for Michigan as a whole has shown a steady decrease in lead poisoning year by year, smaller areas such as the city of Flint have their bumps from year to year while still trending downward overall." Mr. Scott was criminally charged for his deception and failure to meet his duties to the public.

8.  Jim Collins
    Assistant Attorney General Richard Kuhl
    Michigan Department of Attorney General
    P.O. Box 30755
    Lansing, MI 48909

Jim Collins ("Collins") was the Director of the Communicable Disease Division at MDHHS. As Director of the department, his duties included oversight and responsibility for providing support and consultation to local health departments

closely monitor and track disease outbreaks. Additionally, the division was responsible for collecting and analyzing data on communicable diseases, assist in strategies to control disease, and, when necessary, partner with the Centers for Disease Control ("CDC") on issues related to communicable diseases. Mr. Collins division also includes oversight of the emergency notification network and Michigan Disease Surveillance System ("MDSS"), including "surveillance and control of respiratory infections, such as influenza and legionellosis."

In October 2014, Collins was informed of an "ongoing Legionnaires' increase in Genesee County" including 30 cases reported into the MDSS since June 2014, and a potential correlation with the Flint River water as nearly all of the cases had been mapped in Flint. Collins was aware at that time of conversations between his staff and the DEQ, including that the governor's office had been involved with complaints about the Flint water and that "any announcement by public health about the quality of the water would certainly inflame the situation." MDHHS assured MDEQ staff that they would work with Genesee County to coordinate water testing.

By January, Collins had concerns about GCHD's progress in investigating the Legionaries' disease outbreak, noting that "we believe that this increase warrants additional evaluation on the part of public health" and acknowledging the "pressures on [GCHD] of late from the public and media alike about the water quality questions in Flint." GCHD responded by requiring MDHHS' assistance with additional testing

of clinical and environmental samples and obtaining information from MDEQ. Despite this request, from September 2014 to May 2015, MDHHS provided GCHD with no information related to the status of the Legionella outbreak, and never sent any staff members to assist GCHD's efforts including obtaining environmental or clinical samples.

After the GCHD requested assistance from the CDC in February and April 2015, Collins subsequently issued a memorandum in June 4, 2015, Cc'ing the CDC, declaring the Legionella outbreak despite the fact that two new cases were reported on June 1 and June 2 in MDHHS' surveillance reporting system. Collins also harshly criticized GCHD's efforts to contact the CDC: "Relative to communications around the investigation, I believe that CDC is in agreement that their involvement really should be at the request of the state, rather than the local health department. To be clear, we do value the skills and resources of our CDC colleagues, but we also recognize that their involvement needs to have some structure. I want to reinforce the necessity that investigation communications from the Genesee County Health Department need to be directed to staff at the MDHHS."

9.   Dr. Matthew Davis
300 North Ingalls, 6A18
Ann Arbor, MI 48109-5456

Matthew M. Davis ("Davis") was the Chief Medical Executive from March 2013 to April 2015. Pursuant to M.C.L. 333.2202, the chief medical executive is

responsible to the director of MDHHS for the medical content of policies and programs. Dr. Davis' duties included assisting with disease outbreak coordination and investigation and to provide the department with professional medical guidance. Dr. Davis was notified of the Legionnaires' disease outbreak and the potential correlation to the change in water source by January 2015. Dr. Davis failed to investigate or assess the degree of the public health risk, failed to effectively cooperate with other state agencies in the interest of public health, and failed to properly advise his own department or the director of the need to investigate and respond. Dr. Davis' actions resulted in a lack of public notification and harm to the plaintiffs.

      10.    <u>Jay Fiedler</u>
              Assistant Attorney General Richard Kuhl
              Michigan Department of Attorney General
              P.O. Box 30755
              Lansing, MI 48909

Jay Fielder ("Fiedler") was the Section Manager for the Infectious Diseases Surveillance Epidemiology Section at MDHHS during the relevant time frame. Fiedler's duties at MDHHS include monitoring disease outbreaks and coordinating with the local health departments. By October 2014, Mr. Fiedler was aware of a potential correlation between an uptick in Legionnaires' disease and the switch to Flint River water. Mr. Fiedler knew of the frustrations by local health officials in investigating the Legionnaires' disease outbreak. Mr. Fiedler failed to provide the

necessary information to assist in the effective coordination of data for the protection of public health and was openly critical of the Genesee County Health Department's efforts. Mr. Fiedler has admitted that public notice of the outbreak should have been provided by MDHHS early in 2015.

> 11. <u>Susan Bohm</u>
> Assistant Attorney General Richard Kuhl
> Michigan Department of Attorney General
> P.O. Box 30755
> Lansing, MI 48909

Susan Bohn ("Bohn") was the Unit Manager for the Respiratory Disease Epidemiology Section at MDHHS during the relevant time frame. Ms. Bohn's duties included monitoring and investigating respiratory disease outbreaks, including Legionnaire's disease. By October 2014, Ms. Bohn was aware of a potential correlation between an uptick in Legionnaires' disease and the switch to Flint River water. Despite her knowledge and duties, Ms. Bohn coordinated with MDEQ officials to downplay any correlation, stating that "the Flint water was at this point just a hypothesis." Ms. Bohn also communicated to other MDHHS staff members MDEQ's concern that "any announcement by public health about the quality of the water would certainly inflame the situation."

> 12. <u>Tim Bolen</u>
> Assistant Attorney General Richard Kuhl
> Michigan Department of Attorney General
> P.O. Box 30755
> Lansing, MI 48909

Tim Bolen ("Bolen") was an epidemiologist at MDHHS during the relevant time frame. Mr. Bolen had direct communications with staff at McLaren Hospital in June and September 2014 about a Legionnaire's disease outbreak. By October 2014, Mr. Bolen knew that the source of the outbreak was likely correlated to the Flint municipal water. Mr. Bolen failed to act accordingly to protect the public health and ensure public notification.

13.   <u>James Rudrik</u>
       Assistant Attorney General Richard Kuhl
       Michigan Department of Attorney General
       P.O. Box 30755
       Lansing, MI 48909

James Rudrik ("Rudrik") was the Director of the Infectious Disease Division at MDHHS during the relevant time frame. By October 2014, Mr. Rudrik knew that the source of the outbreak was likely correlated to the Flint municipal water. Mr. Rudrik participated in the lack of urgency displayed by MDHHS in failing to properly investigate or notify the public of a disease outbreak.

**F.   Flint Emergency Managers**

As part of its responsibility to safeguard the credit of the state, the Department of the Treasury oversaw the Emergency Managers appointed by the Governor. The Emergency Manager law, promulgated by the Legislature through Public Act 72 of

1990,[311] authorized the state to intervene in units of local government that experience financial emergencies. According to a public communication by the Governor, State Treasurer Andy Dillon was charged with "leading the administration's effort to ensure emergency managers that may be necessary in the future are properly trained."[312] In the same communication, the Governor declared that "Emergency managers are accountable to both the governor and the Legislature. …"[313] An Emergency Manager stands in the place of the governing body, chief executive officer, or chief administrative officer of the local government and has the authority to remove any of the unit's elected officials should they refuse to provide any information or assistance. The Flint Emergency Managers had complete control over the municipality with the ability to reduce pay, outsource work, reorganize departments, modify employee contracts, and determine municipal business

---

[311] The financial emergency status, along with the Emergency Financial Manager (EFM) position, was first created in Public Act 101 of 1988 for the specific emergency in Hamtramck. Public Act 101 was amended by Public Act 72 of 1990, allowing an Emergency Financial Manager to be appointed for any local governmental unit. PA 72 in turn was replaced by Public Act 4 of 2011, which renamed the position to Emergency Manager (EM) and gave the Manager additional authority. The state legislature, in the Local Financial Stability and Choice Act of 2012, Mich. Comp. Laws § 141.1541 et seq. created and further defined the position of "emergency manager."

[312] State of Michigan, *Emergency Manager Fact Sheet*, https://www.michigan.gov/documents/snyder/EMF_Fact_Sheet2_347889_7.pdf (last visited April 2, 2020).

[313] *Id.*

activities, including the sale and delivery of drinking water to Flint residents and operation of the Flint Water Treatment Plant.[314]

Emergency managers have broad authority and powers to "rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare."[315] Because the Emergency Managers were appointed by, and accountable to, the Governor and Legislature and because they were trained by, and reported directly to the State Treasurer, the State of Michigan is charged with knowledge of all facts and circumstances known by them and with responsibility for their acts and omissions. In addition, because the sale and delivery of drinking water is deemed a municipal business activity under Michigan decisional law, the City of Flint is responsible for their acts and omissions related to drinking water as well.

The identity of each of Flint's Emergency Managers, his time in office, and the Governor who appointed him is set forth in this chart:

| Jul 2002 - Jun 2004 | Ed Kurtz | John Engler |

---

[314] Longley, Kristin, *Other emergency managers provide glimpse of what Flint can expect under state takeover*, Flint Journal (November 18, 2011), available at http://www.mlive.com/news/flint/index.ssf/2011/11/other_emergency_managers_provi.html (last visited July 12, 2019).

[315] Act No. 4, Public Acts of 2011, State of Michigan, Enrolled House Bill No. 4214.

| Dec 2011 - Aug 2012 | Michael Brown | Rick Snyder |
|---|---|---|
| Aug 2012 - July 2013 | Ed Kurtz | Rick Snyder |
| July 2013 - October 2013 | Michael Brown | Rick Snyder |
| October 2013 - January 2015 | Darnell Earley | Rick Snyder |
| January 2015–April 30, 2015 | Jerry Ambrose | Rick Snyder |

The State of Michigan charged Darnell Earley and Gerald Ambrose with serious crimes arising from their acts and omissions while serving as Emergency Managers for the City of Flint. The plaintiffs admit that Darnell Earley, Gerald Ambrose, and Ed Kurtz intentionally caused them bodily harm (in the form of invasion of their bodily integrity).[316]

According to sworn testimony taken in connection with the Flint Water Cases, MDEQ staff actively opposed full-time operation of the Flint Water Treatment plant, as both the plant and the distribution system were not ready for full time operation. MDEQ informed the City of Flint that it could not use the Flint River as a primary water source but the emergency managers, controlled by treasury and the governor's office, "overrode" their decision in a "set up" engineered by the emergency

---

[316] The plaintiffs' admissions made in their complaints are incorporated by reference. The admissions are too voluminous to incorporate into the body of the Notice.

managers, for the benefit of saving money and at the expense of the health and safety of the residents of Flint.[317]

1. <u>Darnell Earley</u>
   Attorney Todd Russell Perkins
   615 Griswold
   Suite 400
   Detroit, MI 48226

Darnell Earley ("Earley") was appointed Emergency Manager for the City of Flint from October 2013 to January 2015. Earley readily admits that he was responsible for ensuring that the City of Flint was in compliance with state and federal laws regarding safe drinking water.[318] Mr. Earley played an integral role in authorizing and coordinating full-time operation of the Flint Water Treatment plant and the use of the Flint River as its drinking water source despite known public health hazards. However, at no point after becoming emergency manager did Mr. Earley investigate the safety of Flint River water.[319]

In March 2014, one month prior to the change from Lake Huron to the Flint River, Mr. Earley was aware that the Flint water treatment plant did not have the appropriate resources, upgrades, or regulatory requirements to distribute drinking water safely. In a letter to the Detroit Water and Sewer Department, Mr. Earley

---

[317] Deposition of Adam Rosenthal, Pages 41-45, *In Re Flint Water Cases* (March 5, 2020).

[318] Deposition of Darnell Earley, Pages 20-21, *In Re Flint Water Cases* (July 30, 2020).

[319] Deposition of Darnell Earley, Page 35, *In Re Flint Water Cases* (July 30, 2020).

acknowledged: "in the very unlikely event that the City of Flint is not able to draw water from the Flint River no later than April 17, 2014, then the City would like the option of continuing to purchase water from the DWSD, for a period of time, up to the time water is available from KWA."[320] Mr. Earley intentionally misled the public by falsely stating that the plant was capable of producing safe drinking water and by authorizing its distribution.

After the change in the source of drinking water from Lake Huron to the Flint River, Mr. Earley consistently refused to acknowledge water quality issues.  In October 2014, after learning of a spike in cases of Legionnaires' disease, Mr. Earley obstructed and hindered the local health department's investigation into the disease outbreak. Specifically, Mr. Earley insisted that the City's "message" should be that the outbreak was "an internal issue at McLaren [Hospital] that they are working on with our assistance, not a Flint water problem that we are trying to resolve."[321] In October 2014, after boil-water advisories and TTHM violations were issued by the City and General Motors Corporation's exit from the Flint water distribution, Mr. Earley was contacted by the governor's office regarding public health concerns and a request to return to the DWSD "as an interim solution to both the quality, and now

---

[320] March 7, 2014 letter from Darnell Earley to Sue McCormick ("DWSD Water Rates").
[321] October 3, 2014 e-mail from Darnell Earley to Elizabeth Murphy ("McLaren Bacteria Brief").

the financial, problems that the current solution is causing."[322] However, Mr. Earley refused, placing financial obligations over public health. In particular, he was steadfast that using the Flint River allowed the City of Flint to save money that it would otherwise need to borrow to make the requisite upgrades for its ultimate switch to the KWA.

On January 9, 2015, after the University of Michigan-Flint water tests revealed high lead levels in two separate campus locations elevating water quality concerns, Mr. Earley again refused the opportunity to return to DWSD. In a press release, Mr. Earley stated:

> Suggestions have been made that the City of Flint should return to using water purchased through the Detroit Water and Sewerage Department. For many reasons financial and otherwise the City of Flint can ill-afford to switch courses at this point. Thus, we will continue following the guidelines and directives of the Michigan DEQ in the implementation of our water quality plan and operational report until the KWA water source is available. The estimated cost to go back to the water provided by DWSD is approximately $1 million per month and the City expects to be using the [KWA] Lake Huron water within the next eighteen months. It is not financially prudent to spent $18 million to purchase water that meets the same DEQ standards as the water now available from the Flint River.[323]

---

[322] October 14, 2014 e-mail from Valerie Brader to Dennis Muchmore, et. Al ("Flint Water").

[323] House of Representatives, Hearing Before the Committee on Oversight and Government Reform, *Examining Federal Administration of the Safe Drinking Water Act in Flint, Michigan, Part II,* March 15, 2016.

Mr. Earley refused overtures on the DWSD for a third time on January 12, 2015 when DWSD Director offered Mr. Earley immediate reconnection "to the DWSD system at no additional charge to the City and at the same 'expired contract' rate that the City was paying in April, 2014."[324] Mr. Earley did not act on this offer. Mr. Earley violated his duties by failing to provide necessary governmental services essential to the public health, safety, and welfare through his deliberate indifference to state and federal safe drinking water regulations, water quality, and the public health. Mr. Earley was criminally charged for his acts and omissions. His conduct caused the plaintiffs' alleged injuries and damages.

> 2. <u>Gerald Ambrose</u>
> Attorney Barry A. Wolf
> Barry A. Wolf, Attorney at Law, PLLC
> 503 S. Saginaw Street, Suite 1410
> Flint, MI 48502

Gerald Ambrose ("Ambrose") was the Emergency Manager for the City of Flint from January 2015 to April 2015. As Emergency Manager, Mr. Ambrose was cognizant of his duty to provide necessary governmental services essential to the public health, safety, and welfare.[325]  Mr. Ambrose previously served as a financial advisor to the City, responsible for analyzing the cost benefit to the City of

---

[324] Deposition of Darnell Earley, Pages 109-10, *In Re Flint Water Cases* (July 30, 2020).

[325] Deposition of Gerald Ambrose, Pages 26-27, *In Re Flint Water Cases* (June 10, 2020).

participating in the KWA as compared to continuing to purchase water from the DWSD. Prior to his tenure as Emergency Manager, Mr. Ambrose played an integral role in assuring the success of the KWA through Flint's participation, including involvement in the Administrative Consent Order and use of the Flint River as an interim source.[326]

In October 2014, Ambrose expressed frustration with the "instant connection" between the uptick in Legionnaires' disease and Flint Water, criticizing Michael Glasgow's assistance in testing for bacteria. In January 2015, Mr. Ambrose assisted Mr. Earley in crafting a response to the DWSD, rejecting the offer to return despite water quality concerns. Additionally, after assuming the role of Emergency Manager from Mr. Earley, Mr. Ambrose did not attempt to negotiate with DWSD to determine if the City could reconnect to the DWSD on a short-term basis.[327]

In February 2015, city councilman Joshua Freeman requested that Mr. Ambrose revisit DWSD's invitation to rejoin, however, Mr. Ambrose responded by stressing the importance of cost over public health, stating "[n]o [matter] how many times you send it to me, it doesn't change the cost (or my mind)."[328] Again in

---

[326] Deposition of Gerald Ambrose, Pages 161-65, *In Re Flint Water Cases* (June 10, 2020).
[327] Deposition of Gerald Ambrose, Pages 595-96, *In Re Flint Water Cases* (June 11, 2020).
[328] February 28, 2015 e-mail from Gerald Ambrose to Joshua Freeman ("Detroit Water and Sewage Department's Response").

February 2015, Mr. Ambrose rejected efforts by Flint Water Treatment Plant staff to return to DWSD after staff expressed concern that the plant would run out of treated water.[329] In his role as Emergency Manager, Mr. Ambrose knew of increasing public health concerns and water quality problems, but staunchly maintained that the water "was within standards" and the City should continue to draw its water from the Flint River.[330] To this end, Mr. Ambrose instructed VNA "not to be drawn into discussion" on the history or merits of the switch from Detroit water. Despite his knowledge, on March 24, 2015, after Flint City Council voted to "do all things necessary" to reconnect to DWSD, Mr. Ambrose rejected the decision and falsely stated: "[i]t is incomprehensible to me that... Flint City Council would want to send more than $12 million a year to the system serving Southeast Michigan, even if Flint rate payers could afford it. (Lake Huron) water from Detroit is no safer than water from Flint."[331] Mr. Ambrose has conceded that this $12 million was used to finance improvements to the Flint Water Treatment Plant that were necessary for the City's switch to the KWA.[332]

---

[329] Deposition of Brent Wright, Pages 306-308, *In Re Flint Water Cases* (December 4, 2019).
[330] Deposition of Gerald Ambrose, Page 116, *In Re Flint Water Cases* (June 10, 2020).
[331] March 24, 2014 press release from Jason Lorenz ("Statement on Flint's Water").
[332] Deposition of Gerald Ambrose, Page 135, *In Re Flint Water Cases* (June 10, 2020).

Despite his duty to provide services necessary for the public health, Mr. Ambrose consistently placed financial concerns over the health of the citizens and, despite his power to do so, repeatedly declined officers to reconnect to DWSD. Mr. Ambrose was criminally charged for his acts and omissions. His conduct caused the plaintiffs' alleged injuries and damages.

      3.     <u>Ed Kurtz</u>
            Attorney Michael J. Gildner
            Simen, Figura and Parker, PLC
            5206 Gateway Centre, Suite 200
            Flint, MI 48507

Ed Kurtz ("Kurtz") served as Flint's Emergency Manager from August 2012 to July 2013. As Emergency Manager, Mr. Kurtz was responsible for managing the City's finances such that necessary governmental services would be provided that were necessary to the public's health, safety, and welfare.[333]

Mr. Kurtz was instrumental in Flint's decision to leave the DWSD and join the KWA and ignored compelling arguments from both an engineering and economics standpoint that Flint should reject the pressures to join the KWA. Mr. Kurtz testified that the basis of his decision to switch to the KWA was "50/50" between financial implications and health/safety implications.[334] Moreover, Mr. Kurtz sought to enlist others in support of his position, including Treasurer Dillon.[335]

---

[333] Deposition of Ed Kurtz, Page 88, *In Re Flint Water Cases* (November 21, 2019).
[334] Deposition of Ed Kurtz, Page 189, *In Re Flint Water Cases* (November 21, 2019).
[335] Deposition of Ed Kurtz, Page 93, *In Re Flint Water Cases* (November 21, 2019).

When the option was being considered, on January 7, 2013, Mr. Kurtz received an Assessment and Cost Analysis from Rowe Professional Services.[336] That engineering study was one of the key first steps in switching to the Flint River as a drinking water source. Mr. Kurtz knew that "[w]ater from the river will require greater effort to treat than water from Lake Huron (more chemicals, power, and residuals)."[337] At this time, one of the main considerations was a blending of Flint River water with DWSD water, and even then it was acknowledged that "there is a potential for challenges with chemistry and treatment."[338]

Mr. Kurtz signed off on the March 28, 2013 Resolution to Purchase Capacity from the KWA that described it as being "in the long term best interests of the City of Flint to enter into a contract with the KWA."[339]   On April 17, 2013, DWSD informed the City that it was terminating its water supply services effective April 17, 2014.[340]   DWSD's decision surprised Mr. Kurtz.  Because Mr. Kurtz' primary focus had been on joining the KWA, he had done little to ensure the continued

---

[336] January 7, 2013 Rowe Professional Services Company Letter to Ed Kurtz ("Review of TYJT December 21, 2012 Presentation – City of Flint Water Supply Assessment").

[337] *Id*.

[338] *Id*.

[339] March 29, 2013 Resolution to Purchase Capacity from Karegnondi Water Authority.

[340] April 17, 2013 letter from McCormick to Brown ("Termination of Contract for the Provision of Water Services by the City of Detroit, Water and Sewerage Department").

provision of safe drinking water to Flint in the event that DWSD terminated its contract prior to the City's connection to the KWA.

Kurtz enabled this disaster; with his powers as Emergency Manager he led Flint down this perilous path. His conduct caused or contributed to the plaintiffs' alleged injuries and damages.

> 4.   <u>Michael Brown</u>
>       Attorney William Young Kim
>       City of Flint Law Dept.
>       1101 S. Saginaw Street, Third Floor
>       Flint, MI 48502

Michael Brown ("Brown") served as the Emergency Manager for the City of Flint from December 1, 2011 to August 5, 2012. At a February 10, 2011 meeting, Mr. Brown participated in discussions regarding the options for Flint's future water supply sources. At that time, the discussion included "continued service from Detroit, establishing a new surface water source from Lake Huron – Karegnondi project (as a joint venture with other communities), or utilization of Flint's existing resources." Brown was also Flint's Emergency Manager from July 2013 to October 2013. In September 2013, Mr. Brown "approved an order for a contract among Flint, Genesee County and the KWA." This contract was a precipitating event of the Flint water crisis. Mr. Brown, in his role as Emergency Manager, was a key factor in these early decisions that ultimately led to Flint leaving the DWSD and joining the KWA.

> **G.   City of Flint**
>         Attorney William Kim

City of Flint Law Dept.
1101 S. Saginaw St., Third Floor
Flint, MI 48502

The City of Flint is a body politic incorporated in 1855. Like the State of Michigan, the City of Flint is a body politic that acts through its executive branch (including specifically the various Emergency Managers appointed by the Governor), departments and boards, officers, and employees. The City of Flint operates the Department of Public Works and has a duty to provide drinking water to its residents and property owners as part of its responsibilities and services.[341] This duty includes operating, maintaining, and managing Flint's water supply on a daily basis in compliance with federal and state safe drinking water standards to assure the safety of public drinking water.[342]  The City of Flint also had a duty to provide for competent and sufficient personnel certified to operate Flint's water treatment plant and to maintain both the water treatment plant and distribution system to provide safe drinking water to Flint's residents.[343] The City of Flint, in conjunction with the MDEQ, has a duty to determine appropriate treatment, including for lead and copper, and to establish and implement monitoring plans for its water system

---

[341] Flint, Mich. Code of Ordinances § 46-7 (Ord. 1778, passed 6-29-1964; Ord. 2817, passed 12-7-1981).
[342] *Id*.
[343] Mich. Admin. Code. R. 325.11901-11903.

necessary for the protection of public health.[344] When the City of Flint's water quality monitoring revealed elevated lead levels, the presence of other contaminants, or evidence indicating a waterborne disease outbreak, the City of Flint had a legal obligation to notify the public.[345]

Although Flint's Emergency Managers were appointed by, and accountable to, the Governor and the State of Michigan,[346] the Emergency Manager law authorized Flint's Emergency Managers to stand in the place of local government to "rectify the financial emergency and to assure the fiscal accountability of the local government" through complete control of the municipality.[347] From 2013 to 2015, Flint's Emergency Managers, including Darnell Earley, Ed Kurtz, Gerald Ambrose, and Michael Brown actively controlled and participated in decision making on behalf of the City of Flint, specifically regarding Flint's public drinking water system.[348] Because the sale and delivery of drinking water is deemed a municipal business activity under Michigan decisional law, the City of Flint is responsible for

---

[344] See 40 C.F.R. § 141.82(e); Michigan Safe Drinking Water Act §325.1015(1); Mich. Admin. Code R. 325.10710a-10710d.

[345] Mich. Admin. Code. R. 325.10401-10402.

[346] Mich. Comp. Laws § 141.1549(1), (3).

[347] Mich. Comp. Laws § 141.1549(1).

[348] It was EM Kurtz who made the ultimate decision to reply upon the Flint River and put the Flint Water Treatment Plant into operation. *See* Flint Water Advisory Task Force Report (March 2016) at 17. Later, it was EM Ambrose who decided that Flint would not enter into a new contract with DWSD. See Deposition of Gerald Ambrose, Pages 122, 595-96, *In Re Flint Water Cases* (June 10-11, 2020).

the Emergency Manager's acts and omissions related to drinking water.[349] Consequently, the acts and omissions of its Emergency Managers, departments and boards, officers, and employees undertaken within the scope of their employment, constitute the acts and omissions of the City. Likewise, knowledge acquired by its Emergency Managers, departments and boards, officers, and employees acquired within the scope of their employment is imputed to the City. In consequence, the City cannot plead innocence by asserting that the information obtained by different Emergency Managers, several departments and boards, officers, and employees was not acquired by any one individual employee who then would have comprehended its full import. Rather, the City is considered to have acquired the collective knowledge of its Emergency Managers, departments and boards, officers, and employees and is held responsible for their failure to act accordingly.[350]

The City of Flint (acting through its Emergency Managers, departments and boards, officers, and employees) failed in its duties to Flint Residents and to the named plaintiffs by approving, participating in, and enacting the switch to the Karegnondi Water Authority and the use of the Flint River as an interim drinking water source, thereby both creating and prolonging the water crisis in Flint. The City of Flint also failed to properly maintain and upgrade the Flint Water Treatment Plant

---

[349] Mich. Comp. Laws § 141.1550(10).

[350] *In re NM Holdings Co., LLC*, 622 F.3d 613, 620 (6th Cir. 2010) (citing *Upjohn Co. v. N.H. Ins. Co.*, 438 Mich. 197, 76 N.W.2d 392 (1991)).

and distribution system sufficient to provide safe drinking water to Flint residents. The City of Flint failed to comply with its legal obligations under the state and federal Safe Drinking Water Act, including employing insufficient untrained staff, failing to maintain an accurate inventory of lead services lines, failing to properly treat Flint River water, utilizing improper monitoring and sampling techniques, and falsifying water quality data. The City of Flint failed to keep Flint residents adequately informed of water quality issues and refused, even despite warnings by its own employees, to return to the Detroit Water and Sewerage Department as Flint's drinking water source.

Flint is the largest city in, and seat of, Genesee County and currently has a population of approximately 102,000. From the late 19th century to the mid-20th century, the city (known as "Vehicle City") was the site for leading manufacturers of carriages and later automobiles. General Motors Corporation was founded in Flint in 1908 and grew into the largest automobile manufacturer in the world. General Motors Corporation housed its Buick and Chevrolet divisions in Flint until the 1970s. General Motors Corporation significantly downsized its workforce in the Flint area from a 1978 high of 80,000 to under 8,000 by 2010. Flint's population declined dramatically from 196,940 in 1960 to 102,434 in 2010. Flint's historical population data follows.

| Historical population | | |
|---|---|---|
| Census | Pop. | %± |
| 1850 | 1,670 | — |
| 1860 | 2,950 | 76.6% |
| 1870 | 5,386 | 82.6% |
| 1880 | 8,409 | 56.1% |
| 1890 | 9,803 | 16.6% |
| 1900 | 13,103 | 33.7% |
| 1910 | 38,550 | 194.2% |
| 1920 | 91,599 | 137.6% |
| 1930 | 156,492 | 70.8% |
| 1940 | 151,543 | −3.2% |
| 1950 | 163,143 | 7.7% |
| 1960 | 196,940 | 20.7% |
| 1970 | 193,317 | −1.8% |
| 1980 | 159,611 | −17.4% |
| 1990 | 140,761 | −11.8% |
| 2000 | 124,943 | −11.2% |
| 2010 | 102,434 | −18.0% |
| Est. 2017 | 96,448 | [5] −5.8% |

According to the 2010 census, the racial makeup of the city was 56.6% African American, 37.4% White, Hispanic or Latino of any race 3.9%, Native American, 0.5% Asian, 1.1% from other races, and 3.9% from two or more races. Non-Hispanic Whites were 35.7% of the population in 2010, compared to 70.1% in 1970.

Flint's various neighborhoods historically have been divided along racial lines with the population density and the quality of housing stock following suit.[351] Many (if not most) of Flint's neighborhoods were comprised of poorly constructed wood frame structures sealed or coated in lead paint.[352] According to Realty Trac, a real estate information company and an online marketplace for foreclosed and defaulted properties, by January 2016, 9,800 homes were empty in Flint, constituting 16.5 percent of all residential properties. By the mid-2000s, Flint became known for its high crime rates and has repeatedly been ranked among the most dangerous cities in the United States. Danielle Lewinski, vice president and director of Michigan initiatives at the Center for Community Progress, explained the implications of industrial disinvestment, declining population, and property abandonment on cities like Flint:

> Distressed cities like Flint struggle to generate enough
> revenue locally to reinvest back into critical infrastructure,

---

[351] Indeed, Flint was one of the first "red-lined" cities in the nation.

[352] Highsmith, A.R., *Demolition Means Progress*, University of Chicago Press (2015).

such as water systems. Decades of disinvestment and job and population loss have led to a phenomenal erosion of the tax base, both in terms of the number of taxpayers and in terms of the value of the land. As a result, cities with high levels of abandonment, like Flint, are faced with the financial challenge of needing to maintain and reinvest in a scale of infrastructure that was once supported by a tax base more than twice its current size.[353]

**The City of Flint's Relevant Departments and Boards and Senior Staff: Mayor Dayne Walling; Flint Department of Public Works; Flint Water Treatment Department; Daugherty Johnston (Utilities Manager); Brent Wright Water Plant Supervisor); Howard Croft (Director of Flint Department of Public Works); Michael Glasgow (Water Quality Specialist); Natasha Henderson (City Administrator).**

       1.     <u>Dayne Walling</u>
                 Attorney Archie L. Hayman
                 503 S. Saginaw St., Ste. 510
                 Flint, MI 48502

Dayne Walling ("Walling") is the former mayor of the City of Flint and Chairman of the KWA Board. He was in office from August 6, 2009 through November 3, 2015. In part for his own personal political gain, Mayor Walling was a strong proponent of the KWA, and was chairperson of the KWA board.[354] Further, he actively participated in the success of the project and the development and use of

---

[353] Kate Abbey-Lambertz, *These Are The American Cities With The Most Abandoned Homes*, Huffington Post (February 13, 2016), available at https://www.huffingtonpost.com/entry/cities-with-most-abandoned-houses-flint_us_56be4e9ae4b0c3c5505171e7 (last visited July 12, 2019).

[354] Deposition of Dayne Walling, Page 29, *In Re Flint Water Cases* (February 20, 2020).

the Flint River as an interim drinking water source.[355] Despite emergency

management, Walling was a critical public advisor during the time period of the

change in the source of drinking water from Lake Huron to the Flint River and was

a pivotal advocate in communications with residents, the city council, and local

agencies on matters related to the Flint River and implications on the city's finances

and public health.

Prior to the change in the source of drinking water from Lake Huron to the

Flint River in April 2014, Mayor Walling was aware of the required upgrades to the

Flint Water Treatment Plant to service the residents of Flint, the lack of financial

resources to do the work properly, and the potential dangers of using the Flint River

as an interim drinking water source. In January 2013, Mr. Walling attended a

meeting with Treasury where the Flint River as a primary drinking water source was

eliminated. Mr. Walling also knew that the Flint Water Treatment Plant was "thin

on experienced manpower" and the public perception in Flint was that Lake Huron

water would be preferable to Flint River water.[356]

After the change in the source of drinking water from Lake Huron to the Flint

River, Mayor Walling repeatedly sought to reassure the public that the water was

---

[355] Deposition of Dayne Walling, Page 31, *In Re Flint Water Cases* (February 20, 2020).
[356] Deposition of Dayne Walling, Page 561, *In Re Flint Water Cases* (February 21, 2020).

safe, even though he knew of reports of Legionnaires' disease and lead contamination.[357] Indeed, Mayor Walling publicly declared that the Flint River water was "regular, good, pure drinking water, and it's right in our backyard." In response to complaints about the water two months after the change in the source of drinking water from Lake Huron to the Flint River, Mayor Walling remarked that he thought "people [were] wasting their precious money buying bottled water."

In April 2015, after the city's financial emergency was declared over, Mayor Walling regained control of his elected office. Specifically, Mayor Walling was assigned responsibility for the Department of Public Works.[358] That same month, he assured the public that his family "drink and use the Flint water every day, at home, work, and schools" and stated that the water was comparable to Lake Huron water, all the while participating in internal City of Flint meetings were recent "lead tests" were being discussed.[359] Mayor Walling communicated with EPA Region 5 Director Susan Hedman regarding Mr. Del Toral's interim report, advising her that Mr. Del Toral was speaking publicly about a potential crisis.[360] With knowledge of the interim report and a potential widespread lead contamination, Mayor Walling

---

[357] Deposition of Dayne Walling, Pages 165-66, *In Re Flint Water Cases* (February 20, 2020).

[358] June 20, 2014, Emergency Manager Order No. 15.

[359] Deposition of Dayne Walling, Pages 165-66, *In Re Flint Water Cases* (February 20, 2020).

[360] Deposition of Dayne Walling, Pages 362-63, *In Re Flint Water Cases* (February 21, 2020).

boastfully drank Flint water in a television broadcast in Jul 2015, for the specific purpose of giving Flint residents a sense of safety.  As Mayor, Mr. Walling was a driving force behind the City's transition to the KWA and, after accomplishing that goal, undertook a campaign to assure City residents that the Flint River water they were consuming was safe.

        2.     <u>Flint Department of Public Works</u>
                1101 Saginaw St. # 105
                Flint, MI 48502

Flint's Department of Public Works (DPW) had the primary duty to operate, maintain, and manage the water supply on a day-to-day basis, to comply with state and federal law to assure the safety of the public drinking water supply, and to coordinate with the MDEQ on issues of staffing, engineering, corrosion control, and sampling protocols. The DPW failed in its duties by knowingly permitting contaminated water to be provided to the public despite lack of necessary upgrades, prepared staff, and water treatment. Additionally, the DPW failed to establish an appropriate sampling pool under the LCR and worked with the MDEQ to collect improperly water samples for testing and falsified test results to achieve technical compliance under the SWDA. In August 2013, Mr. Bincsik, the Flint Distribution System Manager, warned that "[o]ur underground infrastructure in the City of Flint is terrible, and any number of tragedies caused from its failures are also lurking

around the corner" but his warnings were ignored.[361] These acts and omissions resulted in a significant underreporting of water contaminants and a prolonging of the distribution of contaminated water to the citizens of Flint.

3.  Daugherty Johnson
    Attorney Edwar A. Zeineh
    Law Office of Edwar A. Zeineh, PLLC
    2800 E. Grand River Ave., Suite B
    Lansing, MI 48912

Daugherty Johnson ("Johnson") served as the Utilities Administrator for the City of Flint and had held that position since 2012. Johnson worked for the City of Flint for over 30 years and answered to Howard Croft during the 2012 – 2016 time period. As Utilities Administrator, he had a duty to oversee the operations of the Flint Water Treatment Plant, including control over its compliance with state and federal standards and responsibility for providing safe and reliable water to the citizens of Flint.[362] He recognized that it was his responsibility and duty from an administrative perspective to provide safe and reliable quality water to the citizens.[363]

---

[361] Deposition of Michael Glasgow, Pg. 48-49, *In Re Flint Water Cases* (February 24, 2020).

[362] Deposition of Daugherty Johnson, Page 14-16, *In Re Flint Water Cases* (December 17, 2019).

[363] Deposition of Daugherty Johnson, Page 21, *In Re Flint Water Cases* (December 17, 2019).

Mr. Johnson actively participated in the decision to join the KWA and use the Flint River as an interim water source.[364] Mr. Johnson was present and participated in discussions on May 1, 2012, when Flint's future drinking water options were being decided. Mr. Johnson knew from these discussions (as memorialized by MDEQ's Mike Prysby), that changing the source of drinking water from Lake Huron to the Flint River would necessarily mean its lead and copper monitoring program would change.[365] From 2013-2014, Mr. Johnson worked with Flint Water Treatment Plant staff and the MDEQ to determine the necessary upgrades, drinking water treatment requirements, and additional staffing needed to bring the plant into full time operation. Throughout the process of transitioning the change in the source of drinking water from Lake Huron to the Flint River, Mr. Johnson actively took steps to discourage a return to Lake Huron water while pressuring employees to get the Flint Water Plant operational at any cost, stating that they would be "heroes" if they changed the source of drinking water from Lake Huron to the Flint River and saved the City money. When residents initially expressed skepticism about the use of the

---

[364] Deposition of Daugherty Johnson, Page 405, *In Re Flint Water Cases* (December 18, 2019).

[365] Deposition of Daugherty Johnson, Page 40, *In Re Flint Water Cases* (December 17, 2019).

Flint River as a water source, Mr. Johnson told them that it would be safe because the water intake was upstream of industrial sites.[366]

Mr. Johnson knew in March 2013 that the Flint Water Treatment Plant was not ready to distribute drinking water because it had not completed the necessary upgrades and was not adequately staffed with qualified, competent engineers and technicians. In April 2014, in callous defiance of the warnings from the Flint Water Treatment Plant employees, Mr. Johnson gave his "administrative stamp of approval" permitting and pressuring the Flint Water Treatment Plant employees to release contaminated water to the public. Mr. Johnson falsely praised the system after the change in the source of drinking water from Lake Huron to the Flint River, calling it a "great system" and a "great asset" for the City. Mr. Johnson dug in and refused to acknowledge that Flint had a serious health problem. Mr. Johnson worked with Emergency Manager Ambrose to draft a "thanks…but no thanks" response to DWSD's January 21, 2015 offer to reconnect to Lake Huron drinking water.

Mr. Johnson undertook other efforts to minimize and conceal the public health risks, including GCHD's investigation into the Legionnaires' disease outbreak. After the city refused to respond to the health department's FOIA request for water test results, on February 5, 2015, Mr. Johnson responded the he would "fulfill [the]

---

[366] Deposition of Daugherty Johnson, Page 394, *In Re Flint Water Cases* (December 18, 2019).

request as soon as possible" but took no action to provide the results or to cooperate with the investigation. Mr. Johnson was criminally charged for conspiracy to commit false pretenses by intentionally misleading the public about the safety of the water and for violating his duties, including failing to ensure that the Flint Water Treatment plant was capable of producing safe water. The plaintiffs admit that Mr. Johnson intentionally caused them bodily harm (in the nature of interference with their bodily integrity).

4. <u>Howard Croft</u>
Attorney Alexander S. Rusek
White Law PLLC
2549 Jolly Road, Suite 340
Okemos, MI 48864

Howard Croft ("Croft") was the Director of the Flint Department of Public Works during through November 2015. As Director of DPW, Mr. Croft was responsible for overseeing the Utilities Department for the City of Flint, and its employees who were responsible for the provision of safe drinking water to residents.[367] Mr. Croft was involved in the decision to use the Flint River as an interim drinking water source and a strong advocate of the  KWA. By  February 2012, Mr. Croft had met with KWA representatives to discuss Flint's involvement in it and the use of the Flint River as an interim source for drinking water, reporting to then Emergency Manager Michael Brown his belief that under a "best case

---

[367] Deposition of Howard Croft, Page 40, *In Re Flint Water Cases* (May 28, 2020).

scenario" Flint River could be used as a temporary solution with the approval of the MDEQ.

Mr. Croft was aware that, for decades, the Flint Water Treatment Plant had been used for emergencies only and lacked the manpower and operational capabilities to be fully operational as the primary supplier of safe drinking water. Several city and county individuals, including Robert Bincsik, Water Distribution Supervisor, and Michael Glasgow, Flint's Laboratory and Water Quality Supervisor, repeatedly warned Mr. Croft, about the plant's lack of staffing and resources and its inability to produce safe water. Despite these explicit warnings, Mr. Croft participated with Mr. Johnson to pressure the Flint Water Treatment Plant employees to distribute drinking water to City residents. In October 2014, after the change in the source of drinking water from Lake Huron to the Flint River, Mr. Bincsik brought Mr. Croft a pipe from the City's distribution system that was bare inside, having lost all of its inner diameter protection from the corrosivity of the water.[368] Despite knowledge of the water's corrosivity and the destruction of protective scale on pipes' inner surfaces, Mr. Croft failed to act and continued to falsely assure the public that the water was "high quality" and in compliance with all state and federal standards.

---

[368] Deposition of Howard Croft, Pages 770-71, *In Re Flint Water Cases* (September 11, 2020).

In January 2015, Michigan State Professor Joan Rose advised Mr. Croft and others in the City of Flint that "I definitely think more testing for hardness, iron, TDS, E.coli maybe lead from people who are having aesthetic issues is needed."[369] In February 2015, Mr. Croft was informed by both Mr. Glasgow and Mr. Bincsik of high lead levels in Flint's distribution system and the potential for more widespread lead issues but failed to act to investigate further and informed his staff to "move quickly" to isolate the issue to a single home, if possible.[370] By March 2015, Mr. Croft knew that Legionnaires' disease had increased in the City of Flint and that the City's employees were not cooperating with County health officials. Mr. Croft participated in Flint's Technical Advisory Committee and worked directly with residents regarding water quality concerns. Mr. Croft knew that residents and professionals were concerned about health issues regarding TTHMs in the water supply and that the public believed that he was "in charge not just of the water but of the public trust." Mr. Croft consistently responded to resident concerns dismissively, on one occasion by rolling his eyes and stating, "[N]ow we are going to hear more complaints from residents about their rashes." During this time period, Mr. Croft falsely assured the public of the safety of the drinking water distributed

---

[369] Deposition of Howard Croft, Page 794, *In Re Flint Water Cases* (September 11, 2020).
[370] February 24, 2015 e-mail from Howard Croft to Robert Bincsik ("LeeAnne Walters – 212 Browning").

from the treatment plant. In September 2015, Mr. Croft acknowledge in a response to the Department of Treasury that VNA's limited engagement was to be "focused on TTHM concerns" but noted that VNA "did make corrosion control one of their recommendations"—a recommendation that was not followed.[371]

Mr. Croft was criminally charged for conspiracy to commit false pretenses by intentionally misleading the public about the safety of the water. He was also charged with involuntary manslaughter in causing the death of a person who contracted legionella disease. The plaintiffs admit that Mr. Croft intentionally caused them bodily harm (in the nature of interference with their bodily integrity).

5.  Brent Wright
    Attorney Archie L. Hayman
    503 S. Saginaw St., Ste. 510
    Flint, MI 48502

Brent Wright ("Wright") was the Water Plant Supervisor for the City of Flint. His duties included day-to-day oversight and operation of water distribution system for the supply of water safe for human consumption and in compliance with state and federal drinking water regulations.[372] Mr. Wright was involved in the decision to use the Flint River as an interim drinking water source, and was aware of how it differed in chemistry from Lake Huron water and the necessary upgrades to the

---

[371] September 29, 2015, Response to Treasury Questions.
[372] Deposition of Brent Wright, Pages 29-30, *In Re Flint Water Cases* (December 3, 2019).

treatment plant in order to safety distribute water.[373] Although the Flint Water Treatment Plant was operated periodically throughout the year to maintain its emergency status, water drawn from the Flint River during these tests was not sent through the distribution system.[374] As such, it was not known what effect Flint River water would have on the distribution system.[375] Furthermore, test runs of the Flint Water Treatment Plant shortly before the switch were cut short due to issues with softening.[376] By April 2014, Mr. Wright knew that the Flint Water Treatment Plant was not ready to begin full-time operations to safely distribute Flint River water but failed to act accordingly.

As the Water Plant Supervisor for Flint, Mr. Wright had a duty to ensure proper sampling protocols under the LCR.[377] Mr. Wright was actively involved in the treatment of Flint drinking water and in the collection and testing of Flint drinking water samples. Mr. Wright knew that the Flint Water Treatment Plant was unable to collect proper compliance samples because it did not know where the "Tier 1" sampling sites were located. On March 17, 2015, Mr. Busch informed Mr. Wright

---

[373] Deposition of Brent Wright, Page 53, *In Re Flint Water Cases* (December 3, 2019).

[374] Deposition of Brent Wright, Page 54, *In Re Flint Water Cases* (December 3, 2019).

[375] *Id.*

[376] Deposition of Brent Wright, Pages 97-98, *In Re Flint Water Cases* (December 3, 2019).

[377] Deposition of Brent Wright, Pages 33-34, *In Re Flint Water Cases* (December 3, 2019).

that "the City should be taking action to optimize water quality in the City's distribution system" and that "[a]ny optimized corrosion control plan practices regarding pH levels must be taken into consideration."[378] Further, having received a letter from Mr. Rosenthal on March 30, 2015, Mr. Wright knew that:

> Ninety percent of the sites [FWTP] tested are within action levels under the administrative rules promulgated under the Michigan Safe Drinking Water Act, 1976 PA 399, as amended. These results must be reported on your 2014 Consumer Confidence Report (CCR) due to our office, your customers, and the local health department, by July 1, 2015.

As Marc Edwards described in a September 20, 2015 email to the EPA, Flint's sampling methods, of which Wright was directly responsible, were improper:

> [t]hey do not have an approved lead sampling pool. Only 13 of the lowest lead sampled homes from 2014, were resampled in 2015. The homes sampling high in 2014, were not asked to be resampled. At best, their program is sending out sampling bottles at random across the city.

Despite his active involvement in the treatment of Flint water and the collection and testing of drinking water samples, and his knowledge that Flint should be using optimized corrosion control, Mr. Wright took no action to remedy the situation. If Mr. Wright had done his job properly, the citizens of Flint would have been protected from dangerous levels of lead exposure.

6.    Michael Glasgow

---

[378] Deposition of Brent Wright, Pages 283-84, *In Re Flint Water Cases*, (December 4, 2019).

Attorney Brett T. Meyer
Attorney Christopher James Marker
O'Neill, Wallace, and Doyle, PC
300 St. Andrews Road, Suite 302
Saginaw, MI 48605-1966

Michael Glasgow ("Glasgow") was the Laboratory and Water Quality Specialist at the Flint Water Treatment Plant during the 2012–2016 time period. Mr. Glasgow had an F1 Operator's License, making him the highest technically qualified individual at the plant. Although Brent Wright was his titular supervisor, Mr. Glasgow was the decision-make at the Flint Water Treatment Plant with respect to operations.[379] Up until April of 2014, Mr. Glasgow had no experience in producing drinking water other than two emergency and test run occasions.[380] Mr. Glasgow was responsible for overseeing the operations  of  the  plant, including   water quality  monitoring,  reporting,   and collection of compliance samples under the state and federal safe drinking water regulations.[381]

Mr. Glasgow was aware that there would be "some differences" in the chemistry of the Flint River as compared to DWSD water.[382]  During 2013-2014,

---

[379] Deposition of Michael Glasgow, Page 46, *In Re Flint Water Cases,* (February 24, 2020).

[380] Deposition of Michael Glasgow, Pg. 31-32, *In Re Flint Water Cases,* (February 24, 2020).

[381] Deposition of Michael Glasgow, Page 489, *In Re Flint Water Cases,* (February 25, 2020).

[382] Deposition of Michael Glasgow, Page 50, *In Re Flint Water Cases,* (February 24, 2020).

Mr. Glasgow met with MDEQ officials regarding necessary improvements and regulatory requirements to the water treatment plant before distributing water. Mr. Glasgow knew that the Flint Water Treatment Plant did not implement corrosion control treatment after the change in the source of drinking water from Lake Huron to the Flint River. Prior to the change in the drinking water source, Mr. Glasgow knew that the Flint Water Treatment Plant did not have the necessary, qualified, and competent staff, the time, or the procedures to produce safe drinking water. Moreover, nothing was done to evaluate the impact of treated Flint River water on the City's distribution system.[383]   On April 18, 2014, Mr. Glasgow contacted the MDEQ to voice his concerns:

> I have people above me making plans to distribute water ASAP. I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda.[384]

Nonetheless, Glasgow permitted drinking water to be distributed to Flint residents in violation of his duties.

---

[383] Deposition of Michael Glasgow, Pages 54-55, *In Re Flint Water Cases,* (February 24, 2020).

[384] April 17, 2014 e-mail from Michael Glasgow to Adam Rosenthal ("Proposed Water Monitoring – City of Flint").

After the change in the source of drinking water from Lake Huron to the Flint River, Mr. Glasgow maintained that, "Our treatment process results in the water being mildly scale forming, so it should not lead to any corrosion of the distribution pipes in household plumbing."[385] Further, Mr. Glasgow actively distorted the City's water test results. Mr. Glasgow has testified that he had a duty to investigate high lead levels in the City of Flint, including concerns about the physical well-being from drinking water.[386]

Mr. Glasgow was involved in lead testing at the Walters home in February 2015 and, as a result, knew that very high lead levels were found. Indeed, on February 24, 2015, Mr. Glasgow notified his colleagues that, "There is definitely a pressing issue here, and with this recent lead result and the previous iron results, [Walters] has some data to prove it."[387]  Nonetheless, Mr. Glasgow knew that Flint's sampling procedures were not capturing the highest lead levels from the higher risk "Tier 1" locations, admitting that "we threw out bottles everywhere just to collect as many as we can, just to hit our number, and we just turn in every  result we get in."

---

[385] November 18, 2014 e-mail from Michael Glasgow to Daugherty Johnson ("Lead and Copper Sample Instructions").
[386] Deposition of Michael Glasgow, Pg. 153-154, *In Re Flint Water Cases* (February 24, 2020).
[387] February 24, 2015 e-mail from Michael Glasgow to Howard Croft, Daugherty Johnson, Robert Bincsik, and Brent Wright ("Leeanne Walters – 212 Browning").

Further, Mr. Glasgow did not know which houses were serviced by lead lines.[388]

Mr. Glasgow agreed to MDEQ's instructions to alter the June 2015 water quality

reports and remove the highest lead levels.[389] Mr. Glasgow was criminally charged

for willful neglect of his duties and intentional manipulation of water quality reports.

The plaintiffs admit that Mr. Glasgow intentionally caused them bodily harm (in the

nature of interference with their bodily integrity).

> 7.  Natasha Henderson
>     Attorney Katherine Smith Kennedy
>     Pinsky Smith Fayette & Kennedy
>     146 Monroe Center St. NW # 805
>     Grand Rapids, MI 49503

Natasha Henderson ("Henderson") was appointed City Administrator for the

City of Flint in December 2014 by Emergency Manager Darnell Earley. Ms.

Henderson began serving in her position in February 2015 and was actively involved

in the Flint water quality concerns, including early knowledge of research regarding

elevated blood lead levels. During 2015, Ms. Henderson, along with other city

officials, downplayed the seriousness of growing public health concerns, expressing

her hesitancy over declaring a state of emergency in the city given the potential

impact on the state and the governor.

### H.    Genesee County Health Department

---

[388] Deposition of Michael Glasgow, Page 773, *In Re Flint Water Cases,* (February
26, 2020).
[389] Deposition of Michael Glasgow, Page 160, *In Re Flint Water Cases* (February
24, 2020).

630 Saginaw St #4
Flint, MI 48503

The Genesee County Health Department ("GCHD") is responsible for all government public health functions for residents of Genesee County, including the City of Flint. GCHD's duties include the prevention, investigation, and control of environmental health hazards. GCHD has broad authority to investigate potential public health threats and has the power to take emergency actions (including public health notices). GCHD, in conjunction with MDHHS, had a duty to conduct in-home assessments to determine sources of contamination for those with elevated blood lead levels.

Here, however, GCHD did not satisfy its duties and obligations. As of January 2016, only about 20% of these in-home assessments had been completed. Further, although GCHD was aware of outbreaks of Legionella related illness in the City of Flint, it did not advise the public about it. GCHD's failure to undertake expeditious, affirmative emergency actions to protect public health exacerbated the plaintiffs' alleged injuries and damages.

## I.     Genesee County Drain Commissioner's Office
4608 Beecher Rd
Flint, MI 48532

The Genesee County Drain Commissioner's Office ("GCDC"), through its elected Commissioner, is the County Agency for water supply, wastewater

collection, and treatment.[390] The GCDC has a duty to administer the state's Drain Code. The GCDC has broad duties and powers to sue and be sued, contract, levy taxes, borrow money, acquire interests in real or personal properly, acquire and grant easements, condemn or dispose of property, and may locate, establish, and alter existing drains, creeks, rivers and watercourses "whenever the same shall be conducive to the public health, convenience, and welfare."[391]

The GCDC through its commissioner and agents, were deeply involved in the development and funding of the KWA, including Flint's participation and the use of the Flint River as an interim source of drinking water to achieve and finalize KWA's development. In June 2013, GCDC staff met with state and local officials to discuss the evaluation of the river as a drinking water source and necessary upgrades to the water treatment plant. In April 2014, GCDC officials with extensive experience in water treatment toured the Flint treatment plant spoke directly to MDEQ officials about the plant's preparedness and operation and had direct knowledge that the plant was incapable of producing safe water. The GCDC office, in the interest of preserving the KWA deal, neglected its duties and broad authority by permitting contaminated water to be distributed to the citizens of Flint.

        1.    <u>Jeffrey Wright</u>
                Attorney Matthew Wise
                Foley & Mansfield, PLLP

---

[390] Act 342 Michigan P.A. of 1939.
[391] M.C.L.A. § 280.2.

130 E. 9 Mile Rd.
Ferndale, MI 48220

Jeffery Wright ("Wright") was the Genesee County Drain Commissioner during the 2012-2016 time period. The Commissioner has a duty to cooperate with state and federal agencies to enforce pollution laws, and assist in coordinating federal, state, and regional flood control and water quality plans. The duties of the Drain Commissioner include the construction and maintenance of drains, apportioning costs of drains among property owners, and awarding contracts for drain construction. As Commissioner, Mr. Wright had broad authority and power to impose his plans for the KWA upon a municipality such as the City of Flint.

Using his political prowess as County Drain Commission, Mr. Wright engaged and funded private consultants and local and state officials to orchestrate, manipulate, and carry out the development and funding for the KWA, of which Mr. Wright was the CEO. In 2013, Mr. Wright, in his role as GCDC, twice spoke directly to Flint citizens and city councilman providing false advice on the advantages of the KWA for the City of Flint and misleading both citizens and officials about the required upgrades to the Flint water treatment plant. Mr. Wright recklessly disregarded the public's health and wellbeing by placing money and politics over the provision of safe drinking water. Mr. Wright and his office knew that Flint did not have the resources or capabilities of making the necessary upgrades to the treatment plant and was aware at the time of the switch from Lake Huron as the

215

source of drinking water that the plant was not prepared to go into  full time

operation. Nonetheless, using his political power both through the Drain

Commissioner's Office and through the KWA, Mr. Wright took advantage of Flint's

lack of options and resources at the expense of the public health. The plaintiffs admit

that Jeff Wright intentionally caused them bodily harm (in the form of invasion of

their bodily integrity) because, like Treasurer Dillon, he knowingly exposed all Flint

water users to the contaminated water from the Flint River.[392]

### III.   ROWE PROFESSIONAL SERVICES
Attorney Craig S. Thompson
Sullivan, Ward, Asher & Patton, PC
25800 Northwestern Highway, Suite 1000
Southfield, MI 48075-1000

Rowe Professional Services Company ("Rowe", formally known as Rowe

Engineering, Inc.) served as the City of Flint's Engineer from July 2002 – June 30,

2016, as required by the City's charter. Rowe provided engineering, surveying,

project management, and technical assistance services to Flint. As the City's

engineer, Rowe worked with nearly all departments within the City to assist with

resolving engineering issues relating to road, bridges, water, sewer, facilities, parks,

and community centers.

---

[392] The plaintiffs' admissions made in their complaints are incorporated by reference.
The admissions are too voluminous to incorporate into the body of the Notice.

In April, 2005, Rowe prepared the "Preliminary Report: Long-Term Water Supply for Genesee County" for Jeffrey Wright/GCDC, which evaluated options for a new long-term water supply for Genesee County, who was purchasing its water from Flint, who in turn was supplied by the DWSD. The study concluded that no change in Genesee County's water supply would result in a lower unit cost of water than direct DWSD supply, but that the new Lake Huron water supply would ultimately result in a lower cost over the long-term.

In 2008, Rowe was contracted by the City to conduct an evaluation of the City's water distribution system after MDEQ rated the system as "deficient," citing key necessary improvements to the water supply, including the distribution system, transmission system and pumping stations.

In September, 2009, Rowe prepared a report for the City of Flint, Genesee County, Lapeer County, and Sanilac County titled "Preliminary Engineering Report Lake Huron Water Supply" to evaluate two of the options from the April 2005 Report: continued purchase from the DWSD and development of a new Lake Huron water supply. The continued supply from the DWSD required a 30-year partnering agreement with the DWSD, and Flint and Genesee County would be responsible for constructing and operating a portion of new pipeline that DWSD was planning to construct in 2010, estimated at $346M in exchange for a 45% reduction in the purchase price of water from DWSD.

The study also included an evaluation of the FWTP to determine needed upgrades and operating costs for treating water from a new Lake Huron water supply, which were estimated at $5.9M. Flint's share of the new Lake Huron Water Supply was estimated at $168M. The study concluded that once the debt for the construction of the KWA pipeline was repaid, the cost of water from the new Lake Huron water supply proved substantially more cost effective than continuing to purchase water from DWSD.

On May 2, 2011, Rowe developed a "proposal for completing an evaluation of the FWTP with the Flint River as a water source for an alternative water supply for the City of Flint" for a fee of $25,000. The proposed scope of work included "Meet with MDEQ to identify regulatory requirements associated with utilizing Flint WTP and Flint River as water source to supply drinking water to City of Flint customers."

In July, 2011, Rowe conducted an "Analysis of the Flint River as a Permanent Water Supply" for City of Flint Mayor Dayne Walling "to evaluate[] the feasibility of utilizing the City of Flint's water treatment plant (WTP) and Flint River as the primary water supply for the City of Flint." "The study evaluate[d] whether the Flint River [was] an adequate source of water for the City of Flint and identifie[d] upgrades needed to reliably supply water on a continuous basis." Further, in order to evaluate this alternative, the Flint River and the FWTP would "be examined to

218

determine their ability to supply water in sufficient quantity meeting current and anticipated regulations."

In a portion of the report titled "Source Water Quality," Rowe opined that "water from the river can be treated to meet current regulations; however, additional treatment will be required than for Lake Huron water" and "aesthetics of the finished water will be different than that from Lake Huron." The Analysis further noted that "A detailed investigation of potential sources of contamination has not been completed," and "if used for water supply, a source water protection management plan should be developed to study the watershed, identify potential sources of contamination, and enact safeguards to prevent or control future threats." The Analysis concluded that "the cost of supplying water from the Flint River on a continuous basis will be greater than the proposed KWA Raw Water Supply Contract but less than the continued supply from Detroit."

In January, 2012, Howard Croft requested Rowe to conduct an analysis of using the Flint River as an interim water supply until the KWA was ready for use. Rowe responded that "It won't take long to make the upgrades at the City's WTP."

In December, 2012, Howard Croft requested that Rowe review and summarize the primary differences between the Tucker, Young, Jackson & Tull (TYJT) assessment and Rowe's previous studies to explain why there were differences between the entities' cost estimates for Flint's water supply alternatives. Again,

Rowe concluded that the proposed KWA water supply would be the most cost effective. In 2013, Rowe renewed its contract with the City of Flint to aid in its transition to the Flint River as source water, serving as City Engineer.

In early 2016, Rowe was awarded a no-bid contract to develop a program to identify and replace lead service lines from the curb to meter, and to update Rowe's December 2013 "City of Flint Water Reliability Study: Distribution System" to secure federal funding.

## IV.  BUSINESS ENTITIES AND INDIVIDUALS THAT CAUSED OR CONTRIBUTED TO THE PRESENCE OF LEAD IN FLINT SOILS, WATER, AND OTHER MATERIALS

The plaintiffs claim that they are (or were) residents of the City of Flint or regular visitors to the City as workers, students or faculty members, or consumers. A common assertion among the various plaintiffs is exposure to lead after the governmental officials brought about the change in the source for drinking water from Lake Huron to the Flint River. The incontrovertible fact, however, is that residents and visitors to the City of Flint have been exposed to lead for decades in quantities measurably greater than any lead found in Flint drinking water after the change in water source.  Lead exposure in the City of Flint came about "from many sources, such as older housing containing lead-contaminated paint, water,

dust, or soil."[393] "Flint is a 'rust-belt' community with a high percentage of Medicaid recipients matching the socioeconomic profile of a city with children at greater risk for lead exposure from multiple sources."[394]

Flint soils are primarily contaminated by lead deposits over decades from internal combustion engines fueled by tetraethyl lead gasoline (TEL), a product manufactured by the now defunct Ethyl Corporation, in order to address engine knock.[395] Flint housing stock is also contaminated by lead paint applied to its historically wood frame residential structures.

### A.   Genesee Power Station Limited Partnership
5310 Dort Hwy
Flint, MI 48505

Contamination of Flint soils from lead paint came about, in part, by degradation of wood frame residential structures over decades but also, in part, by

---

[393] Gómez, H. F., MD, Borgialli, D.A., DO, MPH, Sharman, M, MD, Shah, K.K., BA, Anthony J. Scolpino, A.J., BS, Oleske, J.M., MD, MPH, and John D. Bogden, J.D., PhD, Blood Lead Levels of Children in Flint, Michigan: 2006-2016, Journal of Pediatrics, accepted for publication Dec. 20, 2017.

[394] *Id.*

[395] Clark, A., The Poisoned City: Flint's Water and the American Urban Tragedy, chapter 5 (Alchemy) at 86 – 90 ; Dentworth, L., Toxic Truth at 58. Charles Kettering (along with Thomas Midgley Jr) identified tetraethyllead (TEL) in December 1921 as an additive that would eliminate engine knocking at a dilution of one thousand to one. Robert A. Kehoe, later proclaimed as the foremost  medical apologist for TEL and the architect of intentionally false research, promoted the use of tetraethyllead as an additive in gasoline and even proclaimed that leaded gasoline was safe for humans. That its use was an ecological disaster leading to a global lead contamination was not acknowledged until many decades later. In 2004, Ethyl Corporation became a subsidiary of NewMarket Corporation.

the Genesee Power Station Limited Partnership's (owner and licensee of the Genesee Power Station) use of combustible wood frame housing construction debris as fuel for its power plant. The Genesee Power Station is located within the Dort-Carpenter Industrial Center on Flint's northeast side and near I-475. Describing the "irony and indignity" of Flint residents sequentially enduring foundry pollution, the City's disinvestment program, and loss of homes to urban renewal, "only to be poisoned by the burning of some of those same toxic structures," University of California Irvine Professor Andrew R. Highsmith documented the Genesee Power Station's contribution to Flint's contaminated soils.

> The freeway and urban renewal projects did enable several new business openings in and around the North End, but the resulting job creation was minimal. … One such venture was the Genesee Power Station, an eighty-million-dollar waste incinerator and electric power- generating facility that opened in 1992 in an area just north of the demolished St. John neighborhood. Hoping to make a profit from the mountains of demolition waste created annually by urban renewal and other activities in the Flint region, the operators of the facility designed it to run entirely on wood fuel. The burning of the demolition wood also created a substantial amount of electric power, which the operators sold to Consumers Power Company, the Flint area's primary energy provider. Much of the wood burned at the Genesee Power Station was coated in lead-based paint, however, which resulted in the release of dangerous toxins into the air. Although local residents and activists were quick to point out the many dangers associated with lead exposure – which include high blood pressure, kidney and brain damage, premature birth, and learning disabilities – officials from the Michigan Department of Environmental Quality, unwilling to block

a job-creating venture in the midst of a long-term economic slump, ultimately approved the plant's operations.[396]

As Genesee Power Limited Partnership deposited substantial quantities of lead on the Flint community and its soils, it bears substantial responsibility for any personal injuries or damages caused by lead exposure.

## B.  Flint Governmental, Commercial, and Residential Property Owners and Landlords

In a comprehensive study of Flint blood lead levels by a team of physicians, public health professionals, and toxicologists from the University of Michigan, Michigan State University (Hurley Medical Center), and Rutgers New Jersey Medical School, "annual [blood lead level] changes in children in Flint, Michigan, over the last decade [2006 to 2016], including the months of exposure to Flint River water [were analyzed and placed in historical context… thus, [providing] a complete assessment of their lead exposure." The researchers established that blood lead levels "during the Flint River water exposure did not exceed values found before 2013." Indeed, the data published by the researchers (see the chart below) show that children living in Flint during the calendar years 2006, 2007, 2008, 2009, 2010, 2011, and 2012 had higher blood lead levels (and, therefore, exposure to greater concentrations

---

[396] Highsmith, A.R., Demolition Means Progress, University of Chicago Press (2015) at 254.

of lead) than children living in Flint when the Flint River was the City's source for drinking water.



Children born before the April 2014 were exposed throughout their lives to lead from sources unconnected to the Flint Water Treatment Plant and the switch from Lake Huron to the Flint River for Flint's drinking water. Restated, lead exposure attributable to the switch was at best a fractional addition to the background lead exposure already present in their lives and to the lead physically in their bodies. Similarly, children born after the April 2014 switch from Lake Huron to the Flint River for Flint's drinking water were likewise exposed to Flint's background lead levels from sources other than Flint Water Treatment Plant. That is to say, these newborns were bought into an existing lead contaminated environment.

   The problems with Flint's drinking water were manifest after the April

2014 change in source to the Flint River, and the public discord over it was continuous, robust, and dominant in Flint (if not the State of Michigan and the nation). By late Spring or early Summer 2015, the general public was aware that a significant health hazard tied to the presence of lead present in Flint's drinking water. Public awareness of the presence of lead in Flint soils, in wood frame houses, and in the plume of ash and smoke from the Genesee Power Station, however, dates back to at least 1992. Flint's property owners (whether government owned or sponsored entities, commercial businesses, or individuals) knew of the presence of lead on their properties and the public health hazards attributed lead. Property owners had legal duties to remediate those hazards, arising by statute, regulation, and the common law.

In 1991, the EPA lead and copper rule mandated utility companies to replace a percentage of all service lines containing lead, and after revising the rule in 1993, made homeowners responsible for replacing service lines containing lead from their property line to the discharge tap within the dwelling. Lead-based paint was outlawed in 1978. Since 82.9% of the residential housing structures in Flint were built before 1969, most homes in Flint are contaminated with lead paint. Congress enacted the Residential Lead-Based Paint Hazard Reduction Act in 1992. EPA regulations implementing Title X of the act apply to rental property built before 1978 and require that before the sale or lease of a home, a landlord or homeowner

225

must execute a written disclosure identifying any known lead-based paint or hazards.

U.S. Housing and Urban Development associated housing (including housing vouchers) have heightened duties under the Lead Safe Housing Rule, 24 CFR 35. The Lead Safe Housing Rule applies to all "target housing" (generally meaning any housing constructed before 1978) that is federally owned or receiving federal assistance. Similarly, under the Michigan Lead Abatement Act, owners of "target housing" offered for rent or lease (again meaning generally any housing constructed before 1978) must register the property with the MDCH (now MDHHS).[397] Michigan landlord-tenant law imposes a duty on landlords to provide safe, habitable, and fit premises in compliance with state health and safety codes.[398] The Michigan state building code makes it unlawful for any owner or agent to maintain a dwelling which qualifies as a "dangerous building."[399] A dangerous building includes the grounds and the buildings, or portions thereof, that are "unsanitary or unfit for human habitation" or in a condition that is likely "to injure the health, safety, or general welfare of people living in the dwelling." The common law imparts premises liability for failure to give notice of the presence of lead in a dwelling or for leasing a unit with known lead hazards. Landlords who leased or

---

[397] M.C.L. § 333.5474b[1](5).

[398] M.C.L §554.139.

[399] M.C.L. § 125.538.

rented dwellings (1) contaminated by lead paint or by lead laden soils and dust or (2) connected to water mains by lead service lines caused the plaintiffs alleged injuries and damages. The VNA Defendants identify non-parties at fault to include government, commercial, and residential landlords, including, but not limited to, FG&S Investments, and other potential landlords who provided substandard housing contaminated with lead painted surfaces, pipes, and soils who have yet to be identified in discovery.

## V.   BANKS ANDS UNDERWRITERS

### A. J.P. Morgan Chase & Co.
383 Madison Avenue
New York, NY 10017

### Wells Fargo Bank National Association
101 North Phillips Avenue
Sioux Falls, SD 57104

### Stifel, Nicolaus & Company, Incorporated
501 North Broad Way Street
St. Louis, MO 63102

In 2009, under the tutelage of Genesee County Drain Commissioner Jeffrey Wright, the communities of Flint, Genesee County, Sanilac County, Lapeer County, and the City of Lapeer formed the KWA as an alternative to water delivered by the DWSD. The projected cost of the project was approximately $300 million. By the spring of 2013, Wright had secured 30-year commitments from all of the KWA member communities to purchase millions of gallons of waters,

except for Flint. Flint's contribution to the KWA was necessary for the project to move forward.

In the spring of 2013, officials from the State of Michigan, Genesee County, Lapeer County, Sanilac County, and the City of Flint reached out to J.P. Morgan Chase & Co. ("J.P. Morgan"), Wells Fargo Bank National Association ("Wells Fargo"), and Stifel, Nicolaus & Company, Incorporated ("Stifel") to secure financing through a bond sale of the KWA construction.

On August 1, 2013, Flint executed a financing contract with the KWA, which required the City of Flint to pay its pro rata share of the $300 million KWA contract. The City of Flint's share was approximately $85 million; however, the City already had significant debt obligations that it had difficulty meeting and had been under emergency management since 2011.

In the spring of 2014, J.P. Morgan, Wells Fargo, and Stifel underwrote a municipal bond sale, which financed and enabled the City of Flint's participation in the KWA. Without this bond financing, the City of Flint would not have been able to bear its share of the costs in constructing the KWA pipeline, and thus the KWA would not have been able to commence construction, to the likely detriment of the other entities participating in the KWA. Moreover, it was anticipated that if the financing for the KWA project was secured by April 2014, then the project could be completed by the end of 2016.

228

J.P. Morgan, Wells Fargo, and Stifel all knew that the City of Flint would use the Flint River as an interim drinking water source from April 2014 through the completion of the KWA. The three underwriting entities all knew that if the City of Flint stayed with the DWSD as its water source, then the Flint Water Treatment Plant would not need to be upgraded. However, if Flint joined the KWA, the Flint Water Treatment Plant would have to be upgraded to treat the raw water coming from Lake Huron.

To help achieve its $85 million share of the financing, the Government Defendants used a March 21, 2014 Administrative Consent Order under the guise of responding to and remediating unresolved allegations of an open dump site created at the Bray Road lime sludge lagoon, which had not been used for its intended purpose for decades. Moreover, the City's bond counsel required the MDEQ to include the following language in the ACO for the City to move forward with the ACO:

> The respondent plans to use the Flint River as its temporary source of untreated water supply until KWA water is available. The respondent must undertake the KWA public improvement project or undertake other public improvement projects to continue to use the Flint River, such as additional water treatment plant public improvements, source water protection public improvements and public improvements to obtain back-up water supply, in order to comply with Act 399.

Pursuant to the terms of the April 4, 2014 Bond Financing Agreement, Flint

was required to "make an estimated $8,000,000 in improvements to convert the plant from stand-by to fully operational and to accommodate the flow of water from the System (KWA)." However, this was not being financed through the municipal bond sale, and there was not enough time to complete $8 million worth of upgrades by April 25, 2014.

Despite knowing that the City of Flint had been under emergency management since 2011 and that private engineering firms had cautioned against the use of the Flint River and the Flint Water Treatment Plant without substantial upgrades, which could not reasonably be completed in one month, the underwriting entities still agreed to underwrite the KWA bond financing. The three underwriting entities also knew that the entire KWA project, and their revenue, would fall through if Flint did not obtain sufficient financing in an expedited fashion.

## VI.   ADDITIONAL PARTIES

The VNA defendants have herein named all the nonparties at fault that, at this time, they can ascertain with the exercise of reasonable diligence. The VNA defendants reserve the right, as new facts present themselves, to amend this notice to include additional parties that, at this time, were not and could not have been known to The VNA defendants through the exercise of reasonable diligence, including but not limited to agents, servants and employees of: the EPA; the State of

Michigan; the MDEQ; the MDHHS; the City of Flint (including the Flint Housing Commission and Flint City Building and Safety Inspections Department); the Flint WTP; the Michigan Department of Treasury; the DWSD; the Genesee County Health Department; the Genesee County Drain Commissioner's Office; Tucker Young Jackson Tull; and unidentified homeowners and landlords.

| CAMPBELL CONROY & O'NEIL, P.C. | BUSH SEYFERTH PLLC |
|---|---|
| /s/ Alaina N. Devine | /s/ Michael Williams |
| James M. Campbell | Cheryl A. Bush (P37031) |
| Alaina N. Devine | Michael R. Williams (P79827) |
| One Constitution Wharf, Suite 310 | 100 W. Big Beaver Road, Suite 400 |
| Boston, MA 02129 | Troy, MI 48084 |
| (617) 241-3000 | (248) 822-7800 |
| jmcampbell@campbell-trial-lawyers.com | bush@bsplaw.com |
| adevine@campbell-trial-lawyers.com | williams@bsplaw.com |

*Attorneys for Veolia Water North America Operating Services, LLC*
*Veolia North America, LLC, and Veolia North America, Inc.*

Dated: December 23, 2020

<u>CERTIFICATE OF SERVICE</u>

I, Alaina N. Devine, one of the counsel of record for the defendants Veolia Water North America Operating Services, LLC, Veolia North America, LLC, and Veolia North America, Inc., certify that on December 23, 2020, I caused the within discovery requests to be served via electronic mail to all counsel of record for all parties listed on the Court's ECF filing system.

/s/ Alaina N. Devine
Alaina N. Devine
adevine@campbell-trial-lawyers.com