# EXHIBIT A

# REDACTED VERSION OF DOCUMENTS TO BE SEALED

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

*Walters, et al.,*                                      Case No: 5:17-cv-10164-JEL-MKM

      Plaintiffs,                                 Honorable Judith E. Levy

v

*City of Flint, et al.,*

      Defendants.

_____/

**<u>BRIEF OF THE LAN DEFENDANTS IN SUPPORT<br>OF THEIR MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

INDEX OF AUTHORITIES ..............................................................................iv

STATEMENT OF ISSUES PRESENTED.......................................................... 1

INTRODUCTION.................................................................................................. 2

PLAINTIFFS' ALLEGATIONS............................................................................ 4

LEGAL STANDARD ............................................................................................ 7

STATEMENT OF FACTS ................................................................................... 8

     Phase I Work by Numerous Nonparty Companies....................................... 8

     Phase II Work by Numerous Nonparty Companies, Including a
     Treatability Report.......................................................................................... 9

     The 2009 KWA Report.................................................................................. 12

     The July 2011 Rowe Report......................................................................... 12

     Communications Between the City and the City Engineer and the
     MDEQ, the KWA, the Governor's Office and the Department of
     Treasury during 2012 and Early 2013 ....................................................... 14

     May-June 2013--Initial Contact of LAN by the City of Flint
     Through LAN's Initial Proposal................................................................... 23

     The June 26, 2013 Meeting Between the City, the MDEQ, LAN and
     Others (and the June 24, 2013 Pre-Meeting) and LAN's Initial
     Contract with the City of Flint in July 2013 ............................................. 29

     Summer 2013--The Initial Plant Test Run Was Unsuccessful
     Because the Plant Needed Repairs and the City Acted to Narrow
     LAN's Scope of Services............................................................................... 34

     Continuing Discussions Regarding LAN's Scope of Work in Late
     August of 2013 and Change Order No. 2 Dated November 18,
     2013................................................................................................................. 38

     LAN's Design Work in Fall 2013 and Winter 2014..................................... 43

     December 2013—LAN is Asked to Provide Information to
     Raftelis Financial Services for a Rate Study.............................................. 44

     FWTP Operator Mike Glasgow Planned to Use Phosphates After
     the June 26, 2013 Meeting and Even as Late as March of 2014............. 46

In the Spring of 2014, FWTP Operator Mike Glasgow Became Increasingly Concerned About the Condition of the FWTP and Its Inability to Adequately Treat Flint River Water ........................................... 47

The Change to Use of the Flint River Water Source in April 2014 ......... 49

LAN Not Involved in Monitoring of Water Quality Following Switch to the Flint River Water Source ................................................. 49

The City Bypassed Lime Softening for 75% of the Water from the FWTP for an Unknown Period of Time in Mid-2014 ................................. 50

The City Experiences Problems in 2014 with Fecal Coliform Bacteria and Total Trihalomethanes (TTHM) ................................. 51

The City Rebuffs an Offer by LAN to Address Water Quality in Fall 2014 and Chooses a Different Water Quality Consultant ................. 54

The Final Report from Veolia, the Decisions of the City Regarding Veolia's Recommendations, and LAN's Recommendation to Place a Water Quality Engineer at the FWTP ................................................. 55

ARGUMENT ................................................................................................ 57

I.    Plaintiffs' Claims Against the LAN Defendants for professional negligence Should Be Dismissed On Summary Judgment Where the plaintiffs are unable to demonstrate the elements of duty, breach of duty or proximate causation through expert testimony as required Under Michigan Law. ................................................................................ 57

   A.        Governing Law .......................................................................... 57

      1.   The elements of a claim for professional negligence. ............... 57

         a.  Generally .......................................................................... 57

         b.  Duty and breach of duty .................................................. 58

         c.  Proximate cause ................................................................ 64

      2.   Under Michigan law, Plaintiffs are required to prove the elements of duty, breach of duty and proximate causation through the testimony of a qualified expert witness. ................................................................................ 65

   B.        The Claim for Professional Negligence Against the LAN Defendants Should Be Dismissed on Summary Judgment █████ ███████████████████████████████████████████ ██████████████████████████████████████████████. ................ 68

   C.     ██████████████████████████████████████████████ ██████████████████████████████████████████████

███████████████████████████████████████
███ So Those Claims Must be Dismissed on Summary Judgment.......... 71

D.   ██████████████████████████████████
███████████████████████████████████████
███████████████████████████████████t. ......... 72

    ███████████████████████████.............................. 73

    ████████████████████████████████████
    ██████████████████████████████████
    █████████████.............................................. 74

    ████████████████████████████████████
    ██████████████........................................... 84

E.   Applying the Law to the Facts of the Case, ████████████
████████████████████████, Plaintiffs are Unable to Prove Duty,
Breach of Duty or Proximate Causation for Either of Their
Theories of Liability.................................................................. 87

    1.   Plaintiffs' claim that the LAN Defendants allegedly failed
         to make certain that the City of Flint was using a
         corrosion inhibitor prior to the change in water source
         in April of 2014.................................................... 87

    2.   Plaintiffs' claim that the LAN Defendants allegedly failed
         to inform the City of Flint the necessary upgrades to the
         plant could not be completed by April of 2014. ........................... 95

II.   THE DECISIONS OF THE GOVERNMENTAL ENTITIES
CONSTITUTE INTERVENING CAUSATION AS A MATTER OF LAW.............. 97

III.   JOINDER BY THE LAN DEFENDANTS IN THE CAUSATION
ARGUMENTS BY THE VNA DEFENDANTS IN SECTION III OF THEIR
ARGUMENT.................................................................................102

CONCLUSION .................................................................................103

iii

# INDEX OF AUTHORITIES

**Page**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .............................................................................................. 7

*Broz v. Plante & Moran*,
331 Mich. 39; 951 N.W.2d 64 (2020) ................................................................ 65

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *accord Viet v. Le*, 951
F.3d 818, 823 (6th Cir. 2020) ............................................................................ 7

*City of Huntington Woods v. Orchard, Hiltz & McCliment, Inc.*,
2012 W.L. 1649782 (Mich. App. 5/10/2012) (unpublished) .................... 66, 67

*Coy v. Richard's Industries, Inc.*,
170 Mich. App. 665; 428 N.W.2d 734 (1988) ............................................... 99

*Craig v. Oakwood Hosp.*,
471 Mich. 67; 684 N.W.2d 296 (2004) ............................................................. 67

*Crestmark Bank v. Electrolux Home Prods. Inc.*,
155 F. Supp. 3d 723 (E.D. Mich. 2016) ............................................................ 8

*Decker v. Rochowiak*,
287 Mich. App. 666; 791 N.W.2d 507 (2010) ............................................... 66

*Elher v. Misra*,
499 Mich. 11; 878 N.W.2d 790 (2016) .............................................................. 66

*Glittenberg v. Doughboy Recreational Indust., Inc. (On Rehearing)*, 441
Mich. 379, 403; 491 N.W.2d 208 (1992) ....................................................... 57

*Hill v. Sears, Roebuck and Co.*,
492 Mich. 651; 882 N.W.2d 190 (2012) ................................................ 58, 60, 61

*In re Certified Question*,
479 Mich. 498 (2007) ........................................................................... 60, 61, 62

*In re Flint Water Cases*, 384 F. Supp. 3d 802, 874 (E.D. Mich. 2019) ...................... 5

*In re NM Holdings Co.*, 622 F.3d 613, 618 (6th Cir. 2010), citing *Haliw v.
Sterling Heights*, 464 Mich. 297, 309-310; 627 N.W.2d 581 (2001) .................. 5

*Jackson v. Oliver*,
2004 Mich. App. 122; 514 N.W.2d 195 (1994) ........................................ 20, 58, 86

*Johnson v. Doodson Ins. Brokerage, LLC.*,
793 F.3d 674 (6th Cir. 2015) ............................................................................. 64

*Kaminski v. Grand Trunk W.R. Co.*,
  347 Mich. 417; 79 N.W.2d 899 (1956)............................................................................ 64

*Law Offices of Lawrence J. Stockler, P.C. v. Rose*,
  174 Mich. App. 14; 436 N.W.2d 70 (1989) .................................................................... 6

*Locke v. Pachtman*,
  446 Mich. 216; 521 N.W.2d 786 (1994) ........................................................................ 66

*MacDonald v. PKT, Inc.*,
  464 Mich. 322 (2001)......................................................................................................100

*Martin v. Sizemore*,
  38 S.W.3d 249 (Tenn. App. 2001) .................................................................................. 66

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587
  (1986). ................................................................................................................................ 7

*McMillian v. Vliet*,
  422 Mich. 570; 374 N.W.2d 679 (1985) ........................................................................ 98

*Moning v. Alfano*,
  400 Mich. 425; 254 N.W.2d 759 (1977) ........................................................................ 57

*Moore v. Philip Morris Cos., Inc.*,
  8 F.3d 335 (6th Cir. 1993) .............................................................................................. 7

*Perez v. K.F.C. National Mgt. Co., Inc.*,
  183 Mich. App. 265; 454 N.W.2d 145 (1990) .............................................................. 57

*Poe v. Detroit*,
  179 Mich. App. 564; 466 N.W.2d 523 (1989) .............................................................. 99

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) .......................................................................................................... 8

*Sabbagh v. Hamilton Psychological Services, PLC*,
  329 Mich. App. 324 (2019) ............................................................................................ 62

*Singerman v. Municipal Service Bureau, Inc.*,
  455 Mich. 135; 565 N.W.2d 383 (1997) ........................................................................ 65

*Skinner v. Square D, Co.*,
  445 Mich. 153; 560 N.W.2d 475 (1994) ........................................................................ 64

*Stewart v. Rudner*,
  249 Mich. 459; 84 N.W.2d 816 (1957).......................................................................... 65

*Thomas v. McGinnis*,
  239 Mich. App. 636; 609 N.W.2d 222 (2000) .............................................................. 67

*Thomas v. McPherson,*
   155 Mich. App. 700; 400 N.W.2d 629 (1986) ........................................................... 68

*Valentine v. Jones Lang LaSalle Americas, Inc.,*
   2014 WL 4906726 (E.D. Mich. Sept. 30, 2014) ....................................................... 63

*Weissert v. City of Escanaba,*
   298 Mich. 443; 299 N.W. 139 (1941) ........................................................................ 98

*Wulff v. Otis Elevator Co.,*
   2011 WL 3903213 (Mich. App. Sept. 6, 2011) ........................................................ 63

## <u>STATUTES</u>

M.C.L. 600.2912 ..................................................................................................................... 65

## <u>RULES</u>

Department of Licensing and Regulatory Affairs ("LARA") Rule
   339.16001 et. al; R339.16021 ..................................................................................... 65

## <u>OTHER AUTHORITIES</u>

57A Am. Jur. 2d Negligence § 63 ........................................................................................ 99

## STATEMENT OF ISSUES PRESENTED

1. Should the Court grant LAN summary judgment on Plaintiffs' professional negligence claims because LAN did not owe any Plaintiff a duty of professional care, and in any event, Plaintiffs cannot prove that LAN breached any duty supposedly owed to any Plaintiff?

      **LAN answers:** "Yes."

      **Plaintiffs answer:** "No."

2. Should the Court grant LAN summary judgment on Plaintiffs' professional negligence claims because there is insufficient evidence that LAN's actions caused or contributed to any Plaintiff's alleged injuries?

      **LAN answers:** "Yes."

      **Plaintiffs answer:** "No."

3. Should the Court grant LAN summary judgment on Plaintiffs' professional negligence claims because the actions of the governmental entities constitute an intervening and superceding cause of any harm to Plaintiffs as a matter of law?

      **LAN answers:** "Yes."

      **Plaintiffs answer:** "No."

## BRIEF IN SUPPORT OF DEFENDANTS
## LOCKWOOD, ANDREWS & NEWNAM, P.C.,
## LOCKWOOD, ANDREWS & NEWNAM, INC. AND
## LEO A. DALY COMPANY'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

The LAN Defendants are entitled to summary judgment as to the claims against them for professional negligence because Plaintiffs have failed to provide any expert evidence sufficient to prove any of the elements of the tort against them. ██████████████████████████████████████████ ████████████████████████████, to provide sufficient evidence that the LAN Defendants owed a legal duty to Plaintiffs, that they breached such a duty or that the conduct of these Defendants was the proximate legal cause of any harm to Plaintiffs.

The LAN Defendants provide a lengthy, detailed, mostly chronological statement of facts summarizing LAN's role as a consulting engineer to the City of Flint during the relevant period. The role of the LAN Defendants was very different than Plaintiffs have sought to portray in this litigation. The role of the LAN Defendants was limited by the City of Flint to the design of five specific components of the water plant which are all performing well as designed and which no one asserts caused any harm to Plaintiffs.

2

Although Plaintiffs assert that the LAN Defendants should have designed a corrosion control additive feed system in 2013-14, the truth is that the LAN Defendants did recommend that the City use corrosion control. The LAN Defendants recommended both the possible use of phosphates as a corrosion control inhibitor and the use of full softening. Importantly, the LAN Defendants also recommended that the City conduct a 60-90 day plant test run during which final decisions would be made about chemicals, including the need for a phosphate inhibitor. Unfortunately, none of these recommendations, and numerous other recommendations by LAN, were not followed by the City of Flint. In many instances, the City of Flint did not follow LAN's recommendations, because the Michigan Department of Environmental Quality told the City it was not necessary.

In Argument section I.A., LAN lays out the applicable case law regarding the elements of professional negligence and legal requirement that the elements be proven via expert testimony. In Argument section I.B., LAN asserts that the claims of professional negligence against it should be dismissed on summary judgment ███████████████████████ ███████████████████████ (LAN is filing a gatekeeper motion seeking an order ██████████████████████.)

In Argument section I.C., LAN provides ███████████████████████

███████████████████████████████, theories of liability which he

did not attempt to support must be dismissed on summary judgment. In

Argument section I.D, LAN explicates ████████████████████ as it

relates to the only theories of liability he articulates against LAN.

And in Argument section I.E., LAN summarizes the key material facts

from both the Statement of Facts ████████████████████, and then

applies the law to the facts to demonstrate why it is entitled to summary

judgment. LAN suggests that one good way to read this brief would be to read

section I.E. of the Argument at the beginning.

In Argument II, LAN asserts that the actions of the governmental entities

constitute intervening, superseding actions which preclude liability against

LAN for professional negligence.

In Argument III, the LAN Defendants join in many of the causation

arguments set forth by the VNA Defendants in part III of its Argument in its

Brief in Support of Its Motion for Summary Judgment.

## PLAINTIFFS' ALLEGATIONS

Plaintiffs in this bellwether proceeding are four minor children who

were less than six years old at the time of the change in water source to the

Flint River in April 2014: AT, RV, DW and ES. The operative complaints are the

4

short-form complaints filed on behalf of numerous Plaintiffs, including the four bellwether Plaintiffs.[1] Each of these short-form complaints incorporates by reference the Plaintiffs' Amended Master Long Form Complaint and Jury Trial Demand (hereinafter "LFC") filed on December 3, 2018 in the case of *Walters, et al. v. Governor Richard Snyder, et al.,* Case No. 5:17-cv-10164. (ECF No. 186 in that case)

Plaintiffs sued 24 defendants including city and state officials, the City of Flint, several state agencies, the VNA Defendants, the LAN Defendants, and Rowe Professional Services. (LFC ¶¶ 29-76) All Defendants other than VNA and LAN have preliminarily agreed to settle the claims against them.

Plaintiffs' only remaining cause of action against the LAN Defendants is Count IX for professional negligence. *See In re Flint Water Cases*, 384 F. Supp. 3d 802, 874 (E.D. Mich. 2019). To prevail on that cause of action, each Plaintiff must establish the elements of duty, breach of duty, causation and injury with respect to LAN, and then must establish each person's damages. *See In re NM Holdings Co.*, 622 F.3d 613, 618 (6th Cir. 2010), citing *Haliw v. Sterling Heights*, 464 Mich. 297, 309-310; 627 N.W.2d 581 (2001). Subject to exceptions inapplicable here, the duty, breach of duty and causation elements must be

---

[1]ECF No. 47 in *Meeks, et al. v. City of Flint, et al.*, Case No. 5:17-cv-11165, and ECF No. 49 in *Gaddy, et al. v. City of Flint, et al.*, Case No. 5:17-cv-11166.

supported by expert testimony. *Law Offices of Lawrence J. Stockler, P.C. v. Rose*, 174 Mich. App. 14, 49; 436 N.W.2d 70 (1989).[2]

In the LFC, Plaintiffs allege the LAN Defendants were negligent in: (1) failing to require "water quality standards . . . be set for the Flint River water that would be delivered to Flint residents and property" (¶ 286); (2) failing to "address the hazard of lead associated with the corrosive water [in LAN's draft] 20-page Operational Evaluation Report on November 26, 2014" (¶ 310); (3) failing to conduct a "root cause analysis of why the high TTHM's existed [in LAN's] report 'Trihalomethane Formation Concern'" in February 2015 (¶ 337); (4) recommending the City increase the dosage of the coagulant ferric chloride in August of 2015 (¶ 352); (5) providing assurance the Flint water was safe to drink—when it was not (¶ 359); and (6) failing "to exercise reasonable care when they did not ensure corrosion control measures were implemented in a water supply system containing lead pipes." (¶ 608).[3]

---

[2] "The exception applies where the absence of professional care is so manifest that within the common knowledge and experience of an ordinary layman it can be said that the defendant was careless." *Id.* at 48.

[3] As will be discussed at length below, Plaintiffs do not even attempt to support many of these claims through expert testimony, and thus they must be dismissed on summary judgment.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a court should grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party is entitled to summary judgment when the nonmoving party cannot "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *accord Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020).  When "the record taken as a whole could not lead a rational trier of fact to find" in the non-moving party's favor, the Court should grant summary judgment.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party may show that no genuine issue of material fact exists by pointing out the "absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.  The "mere existence of a scintilla of evidence" supporting the nonmoving party is insufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (nonmoving party must present "significant probative evidence").  In assessing the evidence, "the court should give credence to the evidence favoring the non-movant as well as that evidence

supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (internal quotation marks omitted).

When there are no disputed material facts, and the motion presents a pure question of law, trial is unnecessary, and the Court should grant summary judgment. *See, e.g.*, *Crestmark Bank v. Electrolux Home Prods. Inc.*, 155 F. Supp. 3d 723, 747 (E.D. Mich. 2016) (Levy, J.).

## STATEMENT OF FACTS

### Phase I Work by Numerous Nonparty Companies

During the late 1990's and early 2000's, substantial work, including both design work and construction, was performed at the Flint Water Treatment Plant (the "FWTP") in an effort to prepare the plant to serve as a back-up source of drinking water using the Flint River as the water source. At the time, the City of Flint was receiving treated water from the Detroit Water and Sewerage Department (the "DWSD") as its primary source of drinking water. On or about April 10, 1998 and at the City's request, a report entitled, "Preliminary Design, Plans and Proposed Equipment for Rehabilitation of the Flint Water Plant," was issued by a group of engineering firms led by Snell

Environmental Group.[4]  (Exhibit 1) Warren Green, now employed by LAN, was at the time a principal of AB&H and participated in this work as a member of that firm.  This report is commonly referred to as the "Phase I report." The Phase I report included the use of phosphate additives for corrosion control treatment.  (*Id.* at pp 25-26 of 258)

## Phase II Work by Numerous Nonparty Companies, Including a Treatability Report

In the early 2000's, the City again engaged several engineering firms[5] to perform a Phase II study addressing water treatment and necessary improvements needed to operate the FWTP on a full-time basis using the Flint River water source. In 2002, AB&H issued a treatability report regarding the operation of the FWTP using Flint River Water.  (Exhibit 2)[6]  After extensive bench scale testing of various alternatives, this treatability report called for the use of ferric chloride as the coagulant, with both coagulation and flocculation aids. In addition, this treatability report did not initially include the use of full softening (using both lime and soda ash), but full softening was

---

[4] The other firms contributing to the report included Alvord, Burdick and Howson, LLC ("AB&H"), Prein & Newhof, and Gould Engineering.

[5] The engineering firms working on this phase of the work included O'Malia Consulting, AB&H and Dmytra Jacobs Engineers, Inc.

[6] A draft copy of this report was obtained by Warren Green from the City of Flint in 2011 after he was contacted regarding providing assistance to Rowe Engineering, as discussed below.

subsequently required by the Michigan Department of Environmental Quality (the "MDEQ"). (Exhibit 3, Deposition of Green, pp 14–17, 934)[7]  Mike Kovach, an MDEQ Engineer, required that the plant Phase II upgrades include full softening, rather than just partial (lime only) softening, for the reason that the plant had historically run using full softening.[8]

---

[7]  The term "full softening" refers to the use of both lime and soda ash to soften the water by addressing both carbonate and noncarbonate hardness. Both lime only softening (for carbonate hardness) and full softening, together with appropriate pH and alkalinity control, are accepted forms of corrosion control treatment pursuant to the applicable EPA guidance. (Exhibit 4)

[8] While there has been much discourse in the media about the failure of the FWTP to add a corrosion control inhibitor, such an inhibitor is not necessarily a viable solution.  One purpose of the 60-90 day plant run test run, discussed herein, would have been to allow the operator to determine whether an inhibitor adequately controlled corrosion. Moreover, even if the inhibitor was able to control corrosion, the addition of such an inhibitor may impact the water quality in other ways.  For instance, excessive amounts of a phosphate inhibitor can and will promote detrimental algae growth in the water causing other health concerns for the public.

    The use of full softening is another way to control corrosion in the treatment of surface water that has been proven successful under circumstances similar to those at the FWTP.  There are several examples of existing surface water treatment plants that utilize full softening in treating river water with similar characteristics to those of the Flint River.  These other surface water treatment plants are also located in the upper Midwest and experience the same fluctuations in temperature, run-off chemicals, and other water quality factors impacting the Flint River.  Moreover, those plants are able to control corrosion through the use of a full softening program. However, the development of a successful program is largely dependent on the unique characteristics of the Flint River and the nuances of the FWTP. That program is properly developed through an iterative process during the recommended 60-90 plant test run.

In addition, Warren Green and AB&H recommended that the City perform a final plant test run to test the water for certain water quality parameters, including whether a corrosion control additive such as phosphates should be used.  This 2002 treatability study was prepared following extensive testing which took thousands of engineer hours and cost the City of Flint hundreds of thousands of dollars (approximately $384,000). (Exhibit 3, Deposition of Green, pp 14-16, 103, 852)

In December of 2003, AB&H issued a report entitled, "Final Report— Water Treatment Plant Rehabilitation—Phase II."  (Exhibit 5) This report is commonly referred to as the "Phase II report." This report set forth $23,335,420 in improvements which AB&H recommended be done at that time to put the FWTP into full-time operation treating Flint River water as the city's primary water source. Among the recommended improvements, this report called for the addition of two soda ash feeders rated at 1000 lbs/hour at a cost of $345,000 in order to implement full softening.  Following this report, the work recommended for Phase II was not implemented, and instead the FWTP continued to be used only as a back-up plant and emergency water source. In particular, the City did not install soda ash feed systems for full softening at that time. (See Exhibit 6, 11/21/12 Brent Wright email)

**The 2009 KWA Report**

In September of 2009, a group of engineering companies[9] headed by Jim Redding from Rowe (Exhibit 7, Redding deposition, pp 47-49), issued a report to the Karegnondi Water Authority entitled, "Preliminary Engineering Report—Lake Huron Water Supply—Karegnondi Water Authority." (Exhibit 8) LAN's work in connection with this report was focused on the design for the water intake at Lake Huron and one section of pipeline (one of many) to convey water from Lake Huron to the participant communities. Appendix No. 9 to the report is a Technical Memorandum entitled "City of Flint Water Treatment Plant" prepared by Wade Trim, Inc. In this Technical Memorandum, a phosphate feed system for corrosion control is expressly included in the upgrades needed for the Flint Water Treatment Plant. (Exhibit 8, Appendix No. 9, pp 8, 15 of 20) At section 9.5 entitled, "Engineer's Opinion of Probable Cost," Wade Trim Estimates that "the cost to update the Flint WTP in order for the plant to treat water from Lake Huron is . . . approximately $7.1 million." This estimate included $152,000 for a phosphoric acid feed system. (Exhibit 8, Appendix 9, pp 16-18 of 20)

**The July 2011 Rowe Report**

---

[9] AECOM, Gannett Fleming, Inc., Jones and Henry, Ltd., LAN, Inc., O'Malia Consulting, Rowe Professional Services Company and Wade Trim, Inc.

Sometime in 2010 or early 2011, Rowe Engineering was approached by the Genesee County Drain Commissioner and asked to prepare a report regarding upgrading the Flint Water Treatment Plant to operate full-time using the Flint River water source. Again, Jim Redding of Rowe was lead on the project. (Exhibit 7, Redding deposition, p 57) The report was issued by Rowe Engineering in July of 2011 and entitled, "Analysis of the Flint River as a Permanent Water Supply Source." (Exhibit 9) Warren Green, now an acting principal and engineer with LAN, was asked by Mr. Redding to prepare a cost analysis for the report; the only portion of the report prepared by Mr. Green was Appendix No. 8, entitled, "Technical Memorandum--Cost of Service Study—Flint Water Treatment Plant." In the Introduction at page 1 of this technical memorandum, Mr. Green expressly states: "The primary foundations for this evaluation were the 'Water Treatment Plant Rehabilitation—Phase II' report dated December 2003 and the 'Preliminary Engineering Report, Lake Huron Water Supply, Karegnondi Water Authority' dated September 2009."[10] At page 9 of Appendix 8, Mr. Green estimated that the probable cost of the proposed upgrades to the FWTP for full-time, continuous operation treating Flint River water would be approximately $49,888,000. In addition, Mr. Green

---

[10] As noted above, the December 2003 Phase II report was in turn based on the Treatability Study performed in 2002.

identified and listed (on page 10 in the Appendix) both soda ash for full softening and the corrosion control additive phosphate[11] in estimating the cost of chemicals to be utilized in operating the plant.  In addition, the attached spreadsheets (which were provided to the City with the 2011 report) referenced the cost of complying with the Lead and Copper Rule (the "LCR") under the subheading "SDWA Impact Costs." Thus, Mr. Green and LAN expressly anticipated the possible need[12] for and recommended corrosion control methods (*i.e.* the use of phosphate additives and/or the use of full softening)--and the need to consider and ultimately comply with the LCR--if the Flint River was to be used as a full-time, continuous water source for the City of Flint.

### Communications Between the City and the City Engineer and the MDEQ, the KWA, the Governor's Office and the Department of Treasury during 2012 and Early 2013

Following the 2011 Rowe report, the City of Flint further evaluated the ongoing cost of obtaining treated water from the DWSD and the need to consider other, less expensive water sources—including the possibility of joining a potential new water authority known as the Karegnondi Water

---

[11] The dose of 1 mg/l is the same dose set forth in both the 1998 Phase I Report and the 2009 KWA Report.

[12] The need for these different types of corrosion control chemicals would have been properly evaluated by the City during the 60-90 day pre-distribution plant test run recommended by LAN.

Authority (the "KWA") which would provide untreated water from Lake Huron.  Numerous meetings regarding the tentative plan to have the City of Flint participate in the KWA project and upgrade the FWTP were held during 2012 and into early 2013 between representatives of the City of Flint, the MDEQ, the KWA, Rowe Engineering, O'Malia Consultants, the Governor's office and the Michigan Department of Treasury.  No representatives of LAN were invited to or attended any of these meetings during this period. (Exhibit 3, Green deposition, p 787-790)

On January 25-26, 2012, Howard Croft, Director of the Department of Public Works for the City, communicated with the Acting City Engineer, Rick Freeman of Rowe, regarding using the Flint River during an interim period until the KWA water was available. (Exhibit 10) In his January 25, 2012 email, Mr. Freeman asks Mr. Croft for guidance on the analysis the City wanted:

> The analysis is to determine the benefit to the City of placing the water plant online to produce quality water to residents and possibly the county between 'now' and when Karegoundi [sic] comes online . . . is this the correct basis for analysis?

> Mr. Croft responded the next day and stated:

> Yes we want to look at using the Flint River only until Karegondi [sic] comes online and then using it as our backup. I am hoping this would be a four-year period. We want to determine how much revenue (water bill charges vs. cost to deliver from the river) would we realize in those four years.  . . . Number one hope is that we could accomplish everything needed ASAP targeting

within two years. Any input from Mike Prysby would be helpful, *but I am planning to push this direction very hard if it is feasible.*

(Exhibit 10, emphasis added) LAN was not included in these discussions.

On February 13, 2012, Mr. Freeman and Mr. Croft again exchanged emails regarding the topic, "Flint River Analysis." (Exhibit 11) At 3:32 pm, Mr. Freeman stated: "I'm nearly done with the report and am finalizing costs/timelines and some of this data that is in their [the County's] reports." At 7:56 pm, Mr. Croft mentions in his response that he had "met with the State Treasurer today and discussed options . . .." At 8:21 pm, Mr. Freeman stated: "Thanks . . . I should have everything pulled together within the next day or two. My biggest concern are [sic] the intangibles such as the softening issues . . .. These [the intangibles] could easily eat up *our window of capitalizing on the reduced costs from Detroit.*" (Exhibit 11, emphasis added) Neither the City nor Rowe included LAN in these discussions.

These two emails (Exhibits 10 and 11) strongly suggest that the City planned in early 2012 to save money by using the Flint River as its water source during the interim period and thereby avoid having to pay DWSD for water. The fact that this became the City's plan was confirmed by a memo from and the testimony of Gerald Ambrose. In a memo to Wayne Workman at Treasury dated March 3, 2015, Mr. Ambrose stated,

16

A third decision[13] was to utilize the Flint River on an interim basis when DWSD unilaterally terminated the City's contract for water purchase. *That decision was made because it also offered an immediate cost savings opportunity which translated into the ability to upgrade the Water Treatment Plant without having to seek financing. It was a reasonable decision because of our experience in using the river in a back-up capacity, including test runs on a quarterly basis for several decades.*

(Exhibit 12, emphasis added) At his deposition, Mr. Ambrose stated that this decision was made by at least June 7, 2013 by Mr. Kurtz as Emergency Manager, as discussed below. (Exhibit 13, Deposition of Ambrose, pp 169, 178-179)

In discovery, Defendant Rowe produced a draft document dated February 16, 2012, and entitled, "Technical Memorandum—Analysis of the Flint River as an Interim Water Supply." (Exhibit 14) Notably, this document is dated three days after Mr. Freeman indicated that he would have his analysis of the Flint River completed in "the next day or two."

Mr. Redding summarized the conclusions by Rowe in this report as follows:

As I recall, the conclusions were that it was—the trouble with using it as an interim supply then going to KWA is you ended up having to make improvements for both KWA and the Flint River. And the improvements that you're doing for the Flint River, you're only going to use for a few years so the payback period was pretty

---

[13] Mr. Ambrose stated that the first decision was to cut the city's budget and the second decision was to leave the DWSD.

short. And then you still had all those intangibles to deal with for an interim period.

(Exhibit 7, Redding Deposition, p 208)

In addition, the report itself states:

The characteristics and quality of raw water from the river is different than water from Lake Huron. Additional treatment processes are needed to treat water from the river than water from Lake Huron, even for a limited period of time. The 2011 study evaluated the existing WTP to identify upgrades needed to treat water from the river and the costs of providing treatment.

(Exhibit 7, p 213) Again, LAN was not involved.

Although the City had requested the analysis and despite the importance of the issue, *Mr. Redding of Rowe stated that he did not know if this February 2012 draft memorandum was ever provided to the City*. At his deposition on September 14, 2020, Mr. Freeman was asked about his February 2012 email exchange with Mr. Croft, and he stated that he did not recall the exchange and referred the parties to Mr. Redding.  (Exhibit 15, Freeman Deposition, p 79, emphasis added).   When Mr. Redding was examined three days later, he stated that he prepared the report but does not know whether it was provided to the City. Instead, he stated that he believes that he discussed the results with Mr. Freeman, and he does not know whether or not Mr. Freeman ever discussed those results with the City. (Exhibit 7, Redding Deposition, pp 207, 293-294) LAN was not asked to

18

participate in any way in this February 2012 draft report and did not learn of its existence until it was produced in discovery.

On or about March 20, 2012, a meeting of representatives of the City, the KWA, the MDEQ and O'Malia Consulting was held.  (Exhibit 16) Again, LAN was not notified of or otherwise aware of this meeting.  During this meeting (according to the meeting minutes prepared by John O'Malia), the attendees discussed the option of the City contracting with KWA to provide water in the long-term and utilizing the FWTP to treat a blended water source (from Lake Huron and the Flint River) "in the interim [to save cost]."  In addition, the following entry appears in the minutes: "10—Lead/copper compliance should be evaluated.  Could add corrosion control as a precaution." *Id.* Thus, these minutes demonstrate that representatives of the City, the MDEQ and the KWA were aware of and considered both: (1) the full-time use of the FWTP using Flint River water to save costs during the interim period while awaiting completion of the KWA project and (2) the need to comply with the Lead and Copper Rule through the possible use of a corrosion control additive as a "precaution" in 2012--without any representative of the LAN Defendants present or otherwise involved.

On or about October 26, 2012, Director of DPW Howard Croft sent an email to former Emergency Manager Mike Brown, then current Emergency

Manager Edward Kurtz and legal counsel Peter Bade providing a link to a copy of the 2011 Rowe Report with the cost study prepared by LAN and stated: "Hope this helps, it is the only data I am aware of addressing the Flint River this way."[14]   (Exhibit 17) Thus, the key decision makers at the City were considering the use of the Flint River in the Fall of 2012 and were made aware of the July 2011 Rowe report (but not the February 2012 Rowe draft report).

Sometime in 2012, the Department of Treasury retained the engineering firm of Tucker, Young, Jackson and Tull ("TYJT"), to assist the Department by comparing the options of DWSD water and KWA water. On December 21, 2012, Tucker Young made a presentation to the City, the MDEQ, and others. (Exhibit 18) Again, LAN was not invited to and did not attend this presentation. Following the presentation, Jim Redding of Rowe was asked to review and comment on the presentation. In a document entitled, "Draft Comments Regarding TYJT December 21, 2012 Presentation—City of Flint Water Supply Assessment," Mr. Redding made the note, "City and ROWE need to agree on what is needed" in the context of a discussion of the upgrades needed at the FWTP. (Exhibit 19) And on January 7, 2013, Mr. Redding sent an

---

[14] As we have just seen, Mr. Croft had asked Rowe to study the use of the Flint River water source at the FWTP on an interim basis in January-February 2012.

email to Kurtz, Brown, Croft and Ambrose at the City regarding the TYJT

presentation and stated:

> I think it will be beneficial to make sure that we (the City and
> Rowe) agree on what level of treatment (and WTP upgrades) is
> needed for different options that were analyzed, because I think
> this is what makes the difference on comparing the costs. We
> should all be on the same page, whatever it is.

(Exhibit 20)

On or about February 5, 2013, a staffer in the Governor's office sent an

internal email to the Governor and his senior staff stating, "The EFM is nearing

a decision on whether to join the [KWA] or continuing with the [DWSD].

Treasury has been consulted throughout this process.  A decision is expected

in the coming weeks." (Exhibit 21)

On or about March 25, 2013, the City Council, with support from the

Mayor, voted 7-1 to approve a resolution to purchase water from the KWA.

(Exhibit 22)  Again, LAN was not involved in, aware of or asked to participate

in any of these discussions as to the City's decision to join the KWA or the

utilization of the Flint River as a temporary water source during the interim

period.

On or about March 26, 2013, Steve Busch of the MDEQ sent an email to

Dan Wyant, Liane Shekter Smith and others at the MDEQ stating that regular

use of the Flint River would both "pose an increased microbial risk to the

public" and "pose an increased risk of disinfection by-product (carcinogen) exposure to public health." (Exhibit 23) On the following day, March 27, 2013, Jim Sygo (Deputy Director of the MDEQ) responded,

> As you might guess, we are in a situation with an Emergency Financial Manager, so it's entirely possible that they will be making decisions relative to cost. The concern in either situation is that a compliant supply of source water and drinking water can be supplied.

(Exhibit 24)

On or about March 29, 2013, the Emergency Manager (Kurtz), the City Attorney and the Finance Director executed a resolution authorizing the City to enter into a contract to purchase water from the KWA. (Exhibit 25) On or about April 11, 2013, State of Michigan Treasurer Andy Dillon sent EM Kurtz a letter formally notifying the City and the EM that he was approving the decision to enter into a contract with the KWA pursuant to his statutory authority under section 12(3) of PA 436 of 2012. (Exhibit 26)

After learning of the City's plan to join the KWA, the DWSD informed the City of Flint that it would stop its delivery of water in one year. On April 17, 2013, Sue McCormick of DWSD sent a letter to Inez Brown, City Clerk, notifying the City that the DWSD was terminating its agreement with the City to provide water effective in one year or on April 17, 2014. (Exhibit 27)

On June 7, 2013, Mr. Kurtz wrote a letter to the DWSD stating,

> Detroit has provided notice of termination of Flint water contract effective April 17, 2014.  *Upon termination of service, Flint will begin using Flint River water for consumption.*  It would be very helpful if we were allowed to gradually introduce Flint River water during the upcoming months so as to better ensure a seamless transition and [a] safe, healthy water supply.

(Exhibit 28, emphasis added) Thus, the decision to use the Flint River water source during the interim period until water from the KWA was available was made by Mr. Kurtz acting as Emergency Manager at least by June 7, 2013, prior to LAN even submitting its initial proposal.

## May-June 2013--Initial Contact of LAN by the City of Flint Through LAN's Initial Proposal

LAN was first contacted by the City of Flint directly regarding work relating to the FWTP on or about May 13, 2013,[15] when Brent Wright from the City of Flint contacted Warren Green of LAN and asked Mr. Green to attend a meeting regarding LAN potentially assisting the City in making improvements to the FWTP.  Brent Wright testified that the City had decided to use the Flint River as its water source during the interim period before he met with representatives from LAN in 2013:

Q      Do you recall that a decision had been made by the City of Flint to run off of the Flint River before you met with LAN in May of 2013?

A      Yes.

---

[15] LAN's work on the 2011 Rowe report was as a subconsultant to Rowe Engineering.

23

Q      And what do you recall?

A      I recall a meeting taking place in the Mayor's conference room.

* * *

Q      And your recollection is that the participants at this meeting were operating with the understanding that the City was going to use the Flint River during the interim period?

A      Correct.

Q      And by interim period, do you understand that I'm talking about the period between the time that Detroit cut off the water and the time when the KWA water would be available?

A      Correct.

(Exhibit 29, B. Wright deposition, pp 78-79)

On May 22, 2013, Brent Wright and Mike Glasgow of the City and Warren Green and Jeff Hansen from LAN first met to discuss LAN's possible engagement.  At the initial meeting, LAN was told at the outset that the City had already discussed the project with Mike Prysby and his boss, Steve Busch, from the MDEQ. In his notes from the May 22, 2013 meeting, Mr. Hansen wrote as follows: "Flint has already discussed concept of using Flint River temporarily until KWA is online with MDEQ.  MDEQ (Prysby and Steve Bush [sic]) are OK with it." (Exhibit 30, Jeff Hansen 5/22/13 typed notes) The City further stated that they planned to save money during the interim period until

KWA water was available by using the Flint River. On this point, Mr. Hansen's notes state: "Flint estimate[d] they could save up to $10 million by running off Flint River for [approximately] 2 years until KWA system is online vs. purchasing from Detroit." *Id.* This was the first time LAN was told about the City's decision to switch water sources to the KWA and utilize the Flint River as the primary water source during the interim period.

A second meeting between LAN and the City was held on May 29, 2013. Prior to this meeting, LAN had provided the City with a draft scope of services prepared by Warren Green on or about May 27, 2013, which included full softening with lime and soda ash. (Exhibit 31) This meeting was attended by Warren Green and Jeff Hansen from LAN and by Ed Kurtz, Howard Croft, Dougherty ("Duffy") Johnson, Brent Wright and Michael Glasgow for the City. (Exhibit 32, Jeff Hansen 5/29/13 handwritten and typed meeting notes) During this meeting, the City informed LAN that MDEQ was not requiring full softening (with both lime and soda ash) during the interim period. Warren Green responded that the LAN recommendation for full softening was based on the prior treatability report prepared by AB&H after thousands of hours of testing and at a cost of hundreds of thousands of dollars to the City. In response, Ed Kurtz made it abundantly clear that the City was not going to approve any work (such as the use of full softening) which was not required

25

by the MDEQ.  (Exhibit 3, Green deposition, p 29)  At his deposition, Mr. Croft stated that he recalled Mr. Kurtz' statement at this meeting as follows: "Do only the minimum that MDEQ requires, no extras." (Exhibit 33, Croft deposition, p 112) Despite Mr. Kurtz' statement on behalf of the City, Mr. Green recommended that, at a minimum, the City would need to perform a final plant test run for at least 60-90 days to test water quality parameters prior to distributing water to the public, and he was assured by the City officials that this would be done.   (Exhibit 3, Green Deposition, pp 36, 100, 119, 135, 262-263, 848-850)

Several City of Flint witnesses testified that they understood LAN's recommendation to perform a 60-90 day final plant test run. (Exhibit 29, B. Wright deposition, p 314) (Exhibit 34, Glasgow deposition, pp 229-230) (Exhibit 35, Johnson deposition, pp 55-56, 158-159, 200, 300) When asked about LAN's recommendation for a 60-90 day plant test run, Mr. Bincsik, the lead employee in the water distribution system for the City, stated:

> I'm going to say that I don't specially remember him [using a specific term], but *I remember there being conversations over a long period of time, you know, several months*, talking about how different portions of the process really need to be—they really needed to be assessed, they needed to be ran, we needed to make sure that we could deliver what we needed to do.

(Exhibit 36, Bincsik deposition, pp 298-299, emphasis added)

At the City's request, on or about June 10, 2013, LAN prepared and submitted a written proposal to the City with a revised scope of services. The updated scope of services referred to "three primary tasks that must be performed to develop a cost-effective plan for the Flint immediate and long term needs." Task 1 was to be present for and to perform certain tasks related to an initial Plant Test Run to be conducted by the City. Task 2 was the preparation of an Engineering Planning Report based on the data to be gathered during the initial Plant Test Run. Task 3 was entitled, "Design Phase Services." Task 3, section 1) provided: "Final design parameters as required will be determined during the investigative phase of this work, . . .." Task 3, section 2) listed 11 items which LAN anticipated would be performed based on the prior Phase II report and the July 2011 Rowe Report. (Exhibit 37, pp 7-9) LAN's proposed fee for Tasks 1 and 2 was $171,000.[16] LAN's proposed fee for Task 3 was nearly $2.4 million. (Exhibit 37, Appendix A, pp 12-13)

On June 19, 2013, Mr. Kurtz wrote to Mr. Koryzno at Treasury seeking approval to contract with LAN to perform only tasks 1 and 2 from LAN's proposal. (Exhibit 38) In the body of the letter, Mr. Kurtz specifically mentions

---

[16] As will be discussed below, only Tasks 1 and 2 were made part of the initial contract between the City and LAN in early July 2013. Task 3 was never authorized. Instead, the parties executed Change Order No. 2, also discussed below.

27

Tasks 1 and 2 and makes no mention of Task 3. In addition, the attachments to the letter are taken from the proposal and reference only Tasks 1 and 2. Thus, the City only sought approval for a contract in the amount of $171,000 to perform Tasks 1 and 2.

At his deposition, Mr. Ambrose freely admitted that LAN's original contract only included Tasks 1 and 2:

> Q.    And would you agree with me based on this letter, and you can review anything else that you need to, that when Mr. Kurtz requested authorization from Treasury to enter into a contract with LAN, he only requested authorization to contract with LAN to perform Tasks 1 and 2 at this time?
>
> A.    Yes, this –- it would appear that this recommendation at this time was for a contract with LAN for $171,000 for Phase I, Tasks 1 and 2.
>
> Q.    Thank you.  And would you - - would you agree with me - - and we just looked at the proposal.  We can go back to it if you would like, but would you - - would you agree with me that Mr. Kurtz did not request authorization at this time to have LAN perform actual design services?
>
> A.    I agree at this time Mr. Kurtz was not recommending a contract that would have LAN provide final design.
> (Exhibit 13, Ambrose deposition, pp 187-188).

Later in his deposition, Mr. Ambrose also testified that, although the City ultimately retained LAN in November of 2013 to perform some design work, it was not obligated to do so based upon the original contract from July 2013.

Q.    And would you agree with me that it was - - that your belief in November of 2013 was that the City was not obligated to contract with LAN to do the design improvements for the water plant, correct?

A.    Right.  We did not have a contract with LAN for them to do those improvements, that was right.

Q.    And that's because the initial contract with LAN only covered Tasks 1 and 2 which was the initial plant test run and the initial engineering planning report, correct?

A.    Correct.
. . .
Q.    If the City had chosen to, in the fall of 2013, they could have hired a different engineering firm to the do the plant upgrades, correct?

A.  That's correct.  (Exhibit 13, Ambrose deposition, p 622)

Brent Wright also admitted that the initial contract between the City and LAN only covered tasks 1 and 2 of the proposal. (Exhibit 29, B. Wright deposition, pp 88-91)

**The June 26, 2013 Meeting Between the City, the MDEQ, LAN and Others (and the June 24, 2013 Pre-Meeting) and LAN's Initial Contract with the City of Flint in July 2013**

On June 24, 2013, representatives from LAN, the City and Rowe Engineering met to prepare for a meeting with the MDEQ, which was set for June 26, 2013, to discuss the City's intention to switch water sources and utilize the FWTP for full time operation.  At this prep meeting, LAN again raised the issue of full softening (with both lime and soda ash) and restated its

29

belief that full softening needed to be used  in the FWTP's treatment process. Specifically, the notes from this prep meeting prepared by Jeff Hansen state, "non-carbonate needs soda ash" which references the need for full softening. (Exhibit 39, Jeff Hansen 6/24/13 handwritten notes)

Two days later, on June 26, 2013, representatives from LAN (Warren Green and Jeff Hansen), the City (Brent Wright, Daugherty Johnson, Robert Bincsik, and Mike Glasgow), the MDEQ (Mike Prysby, Steve Busch and Jon Bloemker), Rowe Engineering (Jim Redding), KWA (David Jansen) and O'Malia Consulting (Elgar Brown) met to discuss the City's plans with regard to the changeover in water sources and an initial plant test run.[17]   During this meeting, LAN again raised for discussion the need for full softening to address both carbonate and noncarbonate hardness, but the MDEQ said that it was requiring only lime softening. (Exhibit 3, Green Deposition, pp. 26-29, 104) Near the end of the meeting, Brent Wright asked the MDEQ if the City would be required to use a corrosion control additive. Mr. Busch and Mr. Prysby conferred, and Mr. Busch responded that the MDEQ was not going to require a corrosion control additive at that time and instead would require two six-month monitoring periods to test for compliance with the Lead and Copper Rule. Mr. Green asked about the basis for not requiring corrosion control, and

---

[17] As contemplated by Task 1 in LAN's proposal to the City.

Mr. Busch responded and stated, among other things, that lime softening was a form of corrosion control. (Exhibit 3, Deposition of Green, pp 28-29)[18]

Immediately after the meeting on June 26, 2013, Warren Green attempted to discuss the issue of a corrosion control additive with Mr. Johnson, the Director of Utilities for the City.  Mr. Green stated that the City needed to revisit the issue of corrosion control. Mr. Johnson replied that he had been instructed that if the MDEQ doesn't require it, then the City is not doing it (echoing Mr. Kurtz' statement from the May 29, 2013 meeting). (Exhibit 3, Green deposition, p 29)

Mr. Brent Wright testified at his deposition that it was commonly discussed within the City in the Spring of 2013 that the City was not going to do anything that was not required by the MDEQ and that this understanding was conveyed by management to him and other the staff. (Exhibit 29, B. Wright deposition, pp 82, 312)

Mr. Brent Wright, Mr. Glasgow and Mr. Johnson all admitted in their depositions that they knew that the use of phosphates for corrosion control had been included in the 2009 KWA report (by Wade Trim) and in Appendix 8 of the 2011 report (by LAN). (Exhibit 29, B. Wright deposition, pp 67-71, 73-

---

[18] The notes of Jeff Hansen from the June 26, 2013 meeting demonstrate that both full softening and the need for lead and copper monitoring were addressed during the meeting. (Exhibit 40)

74, 313) Mr. Brent Wright testified that the City decided not to use phosphate additives for corrosion control, because the MDEQ said it was not required and because Mr. Glasgow said "we wouldn't need them, being a softening [plant]."[19] *Id.*

Mr. Glasgow stated in his deposition that the City did not use phosphates for corrosion control, because the MDEQ did not require it. (Exhibit 35, Glasgow deposition, p 752) In addition, Mr. Glasgow stated in an August 31, 2015 email:

> In our last communication from DEQ, which was received at the end of last week states that even though we are in compliance, our corrosion control is "not optimized" and they recommend the addition of phosphate as a corrosion inhibitor. *We originally had this chemical in the design, but the DEQ did not mandate it from the start, they informed us to wait and see the results of our lead and copper sampling to determine if it was necessary*.

(Exhibit 41, emphasis added) This was consistent with an email that Mr. Glasgow wrote in March of 2014, just weeks before the plant started distributing water in April of 2014, indicating he still was planning to use phosphates .[20]

---

[19] As noted above in footnote 7, lime softening, together with appropriate pH and alkalinity control, is an accepted form of corrosion control pursuant to EPA guidance.

[20] See Exhibit 55 below.  As with so many other aspects of the FWTP's operation, LAN was not part of or even aware of these discussions.

In testimony in open court at a criminal preliminary examination on October 29, 2018, Mr. Johnson stated that LAN had recommended the use of orthophosphates for corrosion control and that the City did not use orthophosphates initially because the MDEQ did not require it. (Exhibit 42, Johnson criminal testimony, p 134) And Mr. Johnson reiterated this testimony in his deposition in this litigation. (Exhibit 35, Johnson deposition, pp 124-125)

Mr. Brent Wright further testified that he understood that LAN had recommended the use of soda ash for full softening when treating water from the Flint River and that the City did not do so because it was not required by the MDEQ. (Exhibit 29, B. Wright deposition, pp 73, 313-314)

Shortly after the June 26, 2013 meeting, the City executed a contract with LAN to perform only Tasks 1 and 2 from its prior proposal:  assistance with an Initial Plant test Run and preparation of an Engineering Planning Report.  As discussed above, the City only sought authorization from Treasury to contract for Tasks 1 and 2 at that time, and the contract documents, including the contract amount of $171,000, demonstrate that this contract

covered only Tasks 1 and 2.[21] (Exhibit 43) Importantly, the "Compensation" term in the contract states:

> Contractor [LAN] recognizes that the City does not guarantee it will require any set amount of services. Contractor's services will be utilized as needed and as determined solely by the City of Flint.

(*Id*. at p 4 of 73)

## Summer 2013--The Initial Plant Test Run Was Unsuccessful Because the Plant Needed Repairs and the City Acted to Narrow LAN's Scope of Services

In the Summer of 2013, LAN was present as the City attempted an initial plant test run as required under Task 1 of the contact between LAN and the City.  However, while the plant's hydraulics worked (the ability of the plant to push the water through the system), the City encountered significant problems with multiple water treatment systems which prevented the plant from operating properly.  The plant systems that did not operate properly included at least the SCADA system, the east side clarifier (part of the softening system), the coagulant and flocculant aid polymer system, the ozone system and the chlorination system.  Brent Wright terminated the test run because no usable data (other than hydraulic data) was being produced.

---

[21] LAN believes that this contract is properly dated in July 2013. It is executed by Michael Brown as Emergency Manager, and Mr. Brown succeeded Mr. Kurtz as EM on July 1, 2013. Mr. Brown's signature on the contract is not dated.

(Exhibit 3, Deposition of Green, pp 148, 163) (Exhibit 29, Deposition of B. Wright, pp 97-100)

Following this failed initial plant test run, the City asked LAN, which had begun a draft preliminary engineering report, to stop working on that report and to focus its efforts on addressing specific items or design tasks which would help prepare the plant to operate using water from the KWA project when available.  Those discussions between the City, LAN and the MDEQ took place over several weeks in August 2013, as a result of which the City told LAN that it (LAN) would not be responsible for water quality. (And in fact LAN was not provided with any water quality data either prior to or in the months following the change in water source to the Flint River in April 2014).[22] (Exhibit 3, Green deposition, pp 35-36,  124-127,  607-615 631-633, 666, 706-708, 898-902, 909-910, 914-916)

As events unfolded, the representatives of the MDEQ took on a greater role in the project assisting the City in preparing the FWTP to receive and treat water from the Flint River. (Exhibit 3, Green deposition, pp 164-165) For example, during a meeting on August 27, 2013, in discussing the need to calculate the contact time needed for the chlorination process, Mr. Prysby

---

[22] Beginning in the Fall of 2014 LAN was provided with some water quality data in connection with its work on the TTHM issue, but the City again limited LAN's scope of work. This is discussed in detail below.

from the MDEQ stated that he would do the calculation and the City agreed. (Exhibit 29, B. Wright Deposition, p 112)

In testimony in open court on October 29, 2018, Mr. Johnson explained that MDEQ told the City what upgrades were being required and then the City asked LAN to design the upgrades required by MDEQ. (Exhibit 42, Johnson criminal testimony, pp 141-143)

In early August of 2013, at the request of the City, LAN provided the City with a further estimate of the cost of upgrading the FWTP in the amount of approximately $20,000,000.   The reaction to this estimate at the City was swift, and several at the City expressed surprise and dismay. In an email dated August 12, 2013, Mr. Johnson notified Mr. Brown (the EM), Mr. Croft and Mr. Ambrose of this development stating, "I met with LAN, the firm we hired to assess the upgrade costs for our Water Plant. The numbers came in significantly higher than the KWA report." (Exhibit 44) Mr. Brown responded at 12:24 pm and stated: "I need to know if these are requirements. This is very different from Rowe['s] projections of $7M for required upgrades. I have asked Howard to get with you and Rowe immediately to determine if those original estimates were accurate." Mr. Johnson responded at 10:34 pm and stated: "These upgrades need to be completed and in a perfect world right away. Some of it can be deferred though but *that is a risk/cost comparison*

*we'll need to make.*" (*Id.*, emphasis added) Mr. Brown responded again at 10:34 pm and stated: "If this is the real cost [of upgrading the FWTP] then Rowe's credibility and our credibility with the state is in real jeopardy. This gives Tucker Young and DWSD plenty of ammunition with the Treasurer and other skeptics about our numbers. Very disappointing!" *Id.*

On August 15, 2013, at 12:29 am, Mr. Johnson distributed a spreadsheet comparing the estimates for plant upgrades prepared by LAN in August 2013 ($20,312,990) and Wade Trim from the 2009 Report ($7,101,395). (Exhibit 45) As admitted by several City witnesses, this was not an apples to apples comparison, because LAN was addressing the cost of upgrading the plant to operate off of the Flint River water and then Lake Huron water whereas Wade Trim had estimated only the cost of upgrading the plant to operate off of Lake Huron water only—without regard to using the Flint River. (Exhibit 29, B. Wright Deposition, pp 101-102)(Exhibit 13, Ambrose Deposition, p 96) As discussed above, the Rowe draft report dated February 16, 2012 (Exhibit 14) had highlighted this difference, but it is unknown if the report was ever provided to the City. However, it is apparent that: 1) many City officials were still believing in mid-August 2013 that the cost to upgrade the FWTP would be only approximately $7 million and 2) the City planned to

37

finance those upgrades by using the Flint River water source during the interim period until water from KWA became available.

On August 15, 2013, at 9:46 am, Mr. Ambrose followed up on the estimates for upgrading the water treatment plant and distinguished between "improvements which must be done to prepare for KWA and for using the river" and "improvements to be done before April, 2014 if we are to use the River." (Exhibit 46) Howard Croft responded at 10 am and scheduled a meeting for the same day at noon "to confirm that we all have the same view going forward and what our next steps are." *Id*. LAN was not privy to these internal City emails and was not invited to and did not attend this internal City meeting on August 15, 2013 at noon.

## Continuing Discussions Regarding LAN's Scope of Work in Late August of 2013 and Change Order No. 2 Dated November 18, 2013

On or about August 20, 2013, LAN and Rowe provided the City with a document entitled, "Proposed Scope of Upgrades to Flint WTP" which identified 8 items or tasks: 1) Chemical Systems/Ozone, 2) Electrical, 3) Mid-point Chlorination, 4) Security Measures, 5) Low and High Service Pump station no. 4, 6) Filter Transfer Station, 7) SCADA, and 8) Raw Water Piping Connection. (Exhibit 47)[Redding #8] *Jim Redding of Rowe (the acting City Engineer) prepared this document initially* and sent it to Warren Green.

(Exhibit 7, Redding deposition, pp 93-94)(Exhibit 3, Green Deposition, pp 699-700) Because the WTP was in such a state of disrepair that water quality parameters could not be determined, this scope of work did not include all work necessary to prepare the FWTP to receive and treat water from the Flint River. To account for this, Warren Green added section 3 entitled "Other Items to Address to Finalize Scope of Work," which stated:

> In addition to the upgrades proposed above, the following issues/questions need to be addressed before finalizing the scope of proposed upgrades to the WTP:
> . . .
> b)  Requirements for CT and enhanced treatment
> c)  Impacts of using river as continuous supply (quantity, quality[,] monitoring & control, reservoir operating levels) . . .."

As stated in the cover email, a meeting/call to discuss the proposed scope of work was set for August 27, 2013 at 9 am. *Id.*

Mr. Brent Wright testified that when the August 20, 2013 scope of work document was provided to him, he understood from section 3 that the items included in the document above that section were not a final scope of work for what needed to be done to prepare the FWTP to treat water from the Flint River. (Exhibit 29, B. Wright deposition, p 316)

On August 22, 2013, Jim Redding of Rowe sent a copy of the August 20, 2013 draft scope work document to Mike Prysby at MDEQ and stated: "Attached are copies of a summary of upgrades we are thinking are needed at

39

the Flint WTP. Let me know if there are questions or if you'd like additional information in advance of the meeting next week." (Exhibit 48)

On or about August 27, 2013, representatives from LAN, the City, Rowe Engineering and the MDEQ met to discuss LAN's proposed scope of services. (Exhibit 49, Jeff Hansen 8/27/13 meeting notes including on scope document) Rather than expanding LAN's scope of work to address the "[i]mpacts of using river as continuous supply," the City and the MDEQ instead narrowed LAN's scope of work even further--limiting it to only to certain design work for specific components at the FWTP.  (*See* Exhibit 47 and Exhibit 50)

After this meeting, and at the direction of the City, LAN prepared a revised scope of services which narrowed the items or tasks it was authorized to perform to the following six items: 1) Chemical Systems/Ozone, 2) Electrical, 3) Mid-point Chlorination, 4) Low and High Service Pump station no. 4, 5) Raw Water Piping Connection and 6) Softening Residuals Disposal. (Exhibit 50) This revised scope of services was then incorporated into Change Order #2 which was executed on November 18, 2013, thereby narrowing LAN's scope of work.[23] *Id*. In addition, this scope of work document expressly

---

[23] Of the 11 tasks identified in LAN's June 10, 2013 Proposal (in proposed Task 3 which was not authorized), the City decided not to complete five of them, two were only partially completed by LAN (at the City's direction) and one was only partially completed by the City.  Thus, only three of the 11 tasks

states: "Any other work beyond the Scope of Services herein will require a subsequent Work Authorization with prior approval from the City." *Id.*

Significantly, all five of the plant components LAN was asked to work on[24] were components which would be needed for running the FWTP using KWA water. (Exhibit 29, B. Wright deposition, pp 110-111)

As Mr. Johnson testified on October 29, 2018, the MDEQ told the City what was required and then the City asked LAN to design what was required. (Exhibit 43, pp 141-143)



were fully completed. In addition, the estimated cost of the 11 tasks proposed by LAN in its June 10, 2013 proposal was approximately $33,000,000.  It is believed that the City of Flint ultimately spent less than one-third of that amount in upgrading the FWTP in 2013-2014.

[24] LAN was also asked to perform work relating to the Bray Road site which was to be used for disposal of lime sludge.

Moreover, none of the work performed by LAN at the FWTP was needed for the plant to start operating during the interim period using the Flint River water source. Mr. Green testified about this at length at his deposition:

> Q.     . . . In your business, and in Flint in particular, the actions you were taking in making design decisions were going to potentially affect the health of thousands of people.  Right?
>
> A.     No.
>
> Q.     No?  Putting a water treatment plant into service wasn't potentially going to affect every building and individual who connected to the water supply?
>
> A.     LAN was not designing improvements to the treatment system, the water plant.  We were designing electrical and mechanical system.  Plant could have been started without those electrical and mechanical systems being in place, with the exception of some chlorine piping.
>
> So your question of the work of putting the plant in service was not LAN.  That was the City of Flint.
>
> (Exhibit 3, Warren Green deposition, p 294)
>
> Q.     . . . And – and we can agree that without those applications and – and the favorable reaction by the state, the plant could not have started up, right?
>
> A..     No, sir.  That's not a correct conclusion.  The plant could start.  None of the systems that LAN designed would have been needed for the plant to start.  They had a substation.  We designed a new substation.  Their other substation was aged, needed to be replaced, but the substation was there, and they  had used it in the past.

The same with the electrical motor control center.  The same with the LOX and LIN tanks.  They existed, but they needed some additional tanks for redundancy.  The redundancy was a financial evaluation of either putting in tanks or an operational consideration of bringing additional loads in.

The pump we designed, which wasn't even finished before the startup in April, was just to put in a more electrically efficient pumping arrangement.  They had a pump, so they could have started.

The only request for improvement was a request by the MDEQ to relocate the midpoint chlorination.  The City had already purchased the equipment.  All they had us do was a design a few hundred feet of plastic pipe and stick it in the side of a chamber.

Q.     Okay.  I understand that.

A.     So the plant could have started without any of those improvements.

(Exhibit 3, Warren Green deposition, pp 306-307)

## LAN's Design Work in Fall 2013 and Winter 2014

Beginning in the Fall of 2013 and continuing into the Winter of 2014, LAN performed the design work on the five plant components it had been asked by the City to address: 1) Chemical Systems/Ozone, 2) Electrical, 3) Mid-point Chlorination, 4) Low and High Service Pump station no. 4, 5) Raw Water Piping Connection. None of the work performed by LAN impacted

water quality.[25] (Exhibit 52, Green criminal testimony, January 11, 2018, pp 123-128) The work that LAN performed under item 1) was simply designing redundant storage for liquid oxygen and liquid nitrogen. (*Id.*) With respect to mid-point chlorination, the MDEQ mandated moving the chlorination process in the treatment train, the City had already purchased the chlorination equipment (and thus LAN did not specify it), and the chlorine dosage was determined by the City and the MDEQ, not LAN. Thus, the work performed by LAN regarding the chlorination system was straightforward mechanical engineering (i.e., design of pipes), and much of that work was subcontracted to Rowe. (Exhibit 3, Green deposition, pp 791-793) The raw water piping connection was to provide a conduit for the anticipated KWA water, and thus has never been used. (Exhibit 52, Green criminal testimony, January 11, 2018, p 127) There have been no assertions by Plaintiffs that any of the components designed by LAN caused or contributed in any way to the issues in this litigation.

### December 2013—LAN is Asked to Provide Information to Raftelis Financial Services for a Rate Study

In the late Fall of 2013, Warren Green was contacted by Tom Beckley of Raftelis Financial Services ("Raftelis") and asked to provide assistance in

---

[25] ███████████████████████████████████████████████████
██████████. See below at p 84.

connection with a rate study (to establish rates for the water utility) which Raftelis was performing for the City of Flint. Because this task was outside the scope of work given to LAN in Change Order No. 2 in November 2013, Daugherty Johnson orally provided Mr. Green with a change in LAN's scope of services to allow him to provide this information. (Exhibit 3, Green deposition, pp 569-570) On December 4, 2013, Warren Green provided the requested cost information to Tom Beckley of Raftelis. (Exhibit 53) In providing the cost of chemicals to be utilized at the water plant, Warren Green included the cost of using a phosphate additive for corrosion control for both the Flint River water source and the Lake Huron water source.  Warren Green had been told by the City in the Spring of 2013 that the City would perform a final plant test run for a minimum of 60-90 days for the purpose of testing regulatory water quality parameters, which would include corrosivity, and he included phosphates in the rate study information as a placeholder for a corrosion control additive if it was necessary based on the final plant test run. (Exhibit 3, Green deposition, pp 106-107, 161-162, 189, 344-345, 428-429, 645-647, 767-768)

On December 6, 2013, Daugherty Johnson at the City requested a copy of the cost information provided by LAN to Raftelis, and a copy was forwarded to Mr. Johnson on the same date. (Exhibit 53) Thus, the City was given the

45

same information as Raftelis and was again made aware that corrosion control additives, such as phosphates, should be used if needed based on water quality testing during the final 60-90 day plant test run.

**FWTP Operator Mike Glasgow Planned to Use Phosphates After the June 26, 2013 Meeting and Even as Late as March of 2014**

At a meeting with representatives from the City on August 9, 2013, LAN was informed by the City that, "MDEQ may require a corrosion inhibitor study." (Exhibit 54, 8/9/13 Hansen meeting note) This note demonstrates both that the City continued to have communications with the MDEQ without LAN's participation and that the City and the MDEQ had discussed the issue of using a corrosion inhibitor after the June 26, 2013 meeting.

In addition, a March 26, 2014 email discussing the expected effluent[26] from the plant with a co-worker, FWTP Operator Mike Glasgow stated: "There will be at least 1 mg/l of total phosphorous [in the backwash water], because we will be adding phosphate at that level for corrosion control in the distribution system, and I expect more depending on the river water quality." (Exhibit 55)

---

[26] The water to be discharged from the FWTP back into the river.

**In the Spring of 2014, FWTP Operator Mike Glasgow Became Increasingly Concerned About the Condition of the FWTP and Its Inability to Adequately Treat Flint River Water**

In addition, in April of 2014, Mike Glasgow at the City attempted to warn the MDEQ that the FWTP was not ready to distribute water at that time. On or about April 16, 2014, Mr. Glasgow sent an email to Adam Rosenthal at the MDEQ stating,

> I am expecting changes to our Water Quality Monitoring parameters, and possibly our DBP and lead & copper monitoring plan. Also, I am wondering about our MOR required testing. . . . Any information would be greatly appreciated, because it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible.

(Exhibit 56) On the same day, Mr. Rosenthal responded and stated that a revised drinking water monitoring schedule was being sent out by Mr. Prysby. *Id.* And, in fact, the MDEQ did sent a letter signed by Mr. Prysby and Mr. Rosenthal dated April 16, 2014 with a Revised Drinking Water Monitoring Schedule for 2014. (Exhibit 57) Notably, this revised monitoring schedule did not include monitoring for orthophosphates, and the City was unable to add any chemicals to the water without the approval of the MDEQ. (Exhibit 34, Glasgow deposition, p 287)

On the following day, April 17, 2014, Mr. Glasgow sent a further email to Mr. Rosenthal stating,

Thank you for the quick response. I assumed there would be dramatic changes to our monitoring. I have people above me making plans to distribute water ASAP.  I was reluctant before, but after looking at the monitoring schedule and our current staffing, *I do not anticipate giving the OK to begin sending water out anytime soon.  If water is distributed from this plant in the next couple weeks, it will be against my direction.*  I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready.  I will reiterate this to management above me, but they seem to have their own agenda. (Exhibit 56, emphasis added).

Mr. Bincsik recalled at his deposition that, at the time of these emails in April of 2014, Mr. Glasgow expressed concern that "the water plant in its current configuration that it was in then had never really been run for a 60 to 90-day period as part of a program really to commission it"[27] and that Mr. Glasgow sought time to do this. (Exhibit 36, Bincsik deposition, pp 213-214)

Consistent with the fact that it was not responsible for water quality issues and had only a limited role in specified design improvements to the FWTP, LAN was totally unaware of Mr. Glasgow's concerns and his warning to the MDEQ appears to have gone unheeded. Neither Mr. Glasgow, anyone else from the City, nor the MDEQ sought to consult LAN regarding these concerns at the time, and LAN did not become aware of the emails from Mr. Glasgow to the MDEQ until after the onset of litigation.

---

[27] As had been recommended by LAN, see p 26 above.

**The Change to Use of the Flint River Water Source in April 2014**

Nor was LAN asked (in Change Order #2 or otherwise) to participate in pre-distribution testing of the water from the FWTP in the Spring of 2014. (Exhibit 3, Green deposition, pp 799-800)

The City of Flint changed to the use of the Flint River water source on or about April 25, 2014,  according to a press release issued by the City on that date.  The press release notes, "Officials from the City of Flint, the Genesee County Drain Commission and the [MDEQ] were all on hand to witness the historic event." (Exhibit 58) Former Mayor Dayne Walling is quoted as saying, "It's regular, good, pure drinking water, and it's right in our backyard." Howard Croft is quoted as saying, "The test results have shown that our water is not only safe, but of the high quality that Flint customers have come to expect." *Id.*

**LAN Not Involved in Monitoring of Water Quality Following Switch to the Flint River Water Source**

LAN was not involved in the changeover to the Flint River water source in April of 2014 and was not responsible for operational issues at the plant or water quality at that time.  Shortly after the changeover, however, Warren Green placed phone calls to Brent Wright and Mike Glasgow at the City.  In speaking with both Mr. Wright and Mr. Glasgow, Mr. Green inquired as to how

things were going following the changeover. Both Mr. Wright and Mr. Glasgow assured Mr. Green that the City was in compliance with the SDWA. (Exhibit 3, Green deposition, pp 387, 439, 803-804) These representations continued throughout the period from April of 2014 until late August of 2015, and Flint representatives consistently informed LAN that testing by the MDEQ showed that the City was in compliance with, among other regulations, the Lead and Copper Rule.  (Exhibit 3, Green deposition, pp 387, 439, 803-804)

LAN had no involvement with the sampling by the City or the testing by the MDEQ during the two six-month monitoring periods required by MDEQ in late 2014 and early 2015, and no one from LAN had any awareness of any problems with the LCR sampling and testing conducted by the City and the MDEQ. (Exhibit 3, Green deposition, pp 803-804)

**The City Bypassed Lime Softening for 75% of the Water from the FWTP for an Unknown Period of Time in Mid-2014**

In June of 2014, shortly after the changeover, MLive reported that the City was bypassing lime softening[28] for as much as 75% of the water being distributed from the plant. On June 12, 2014, Finance Director Ambrose sent Mr. Johnson (Director of Utilities) an email asking why management was not

---

[28] As noted above, the City did not follow LAN's recommendation for full softening using both lime and soda ash for both carbonate and non-carbonate hardness, because the MDEQ said it was not required. But the City was supposed to be softening with lime.

informed and had to learn about this issue from the media. (Exhibit 59) In his response, Mr. Johnson confirmed that the MLive report had been accurate and stated that he was working to try and correct the problem. *Id*.

**The City Experiences Problems in 2014 with Fecal Coliform Bacteria and Total Trihalomethanes (TTHM)**

In the Summer of 2014, the City began experiencing elevated levels of fecal coliform bacteria in the water supply, and the City issued water boil advisories regarding this issue in both August and September of 2014.  LAN was not consulted by the City regarding this issue at the time. (Exhibit 3, Green deposition, pp 164-165, 246-247)

On or about September 10, 2014, Mike Prysby of the MDEQ sent a letter notice of violation to the City informing it that testing showed elevated TTHM concentrations above regulatory standards and requesting an "Operational Evaluation in accordance with Administrative Rule 719l." (Exhibit 60)[29] The City subsequently asked LAN to prepare an evaluation of the elevated TTHM levels. On or about October 8, 2014, LAN revised and resubmitted a "Client

---

[29] As a by-product of the chlorine disinfection process, the treated water also experienced an increase in the amount of trihalomethanes (THM).  Certain THMs are regulated by the EPA under the Safe Drinking Water Act.  More specifically, the concentration of four types of THMs (out of many): chloroform, bromoform, bromodichloromethane and dibromochloromethane (collectively Total Trihalomethanes or "TTHM") are regulated by the EPA.

Additional Services Authorization" form outlining additional services to address the TTHM issue (along with other work). (Exhibit 61)

On or about October 23, 2014, the City approved Change Order #3 in the amount of $244,900. (Exhibit 61) In performing this work, LAN was directed to evaluate how to best reduce the TTHM concentration using only the existing systems at the FWTP. In order to accomplish this limited task, LAN performed a specific analysis to determine the cause of the TTHM increase. LAN determined that the City needed to reduce the total organic carbon (TOC), which was interacting with the chlorine used for disinfection, and thereby causing the increase to the TTHM concentrations. (Exhibit 3, Green deposition, pp 58-59) LAN was not asked to evaluate overall water quality or any other water quality issues.[30] The City continued to assure LAN that it was meeting all of its water quality requirements, except for the TTHM violation.

In November 2014, LAN issued a draft report entitled, "Operational Evaluation Report—City of Flint--Trihalomethane Formation Concern." (Exhibit 62) In this draft report, LAN made numerous recommendations for actions by the City to address the elevated TTHM:

"Stage 1—Immediate Actions

---

[30] Instead, the City issued an Invitation to Bid seeking to retain a different consultant to study water quality more broadly, as discussed below.

- Hire ozone system manufacturer to troubleshoot ozone system
- Bench scale jar testing
- WTP operational changes
- Increase water main flushing efforts to minimize stagnant water
- Water system modeling to identify areas with high water age and potential solutions

Stage 2—Contingent Actions [to be implemented if Stage 1 actions don't reduce TTHM levels sufficiently]

- Fix ozone system
- Start feeding coagulation and flocculation polymer aids to lower TOC, if not completed in Stage 1
- Convert to lime and soda ash softening
- Change disinfectant to chloramine or chlorine dioxide until KWA
- Install pre-oxidant feed at intake to optimize ozone disinfection
- Implement advanced treatment of THM precursor removal
- Increased main flushing based on water modeling results
- Continue valve replacements with water model assistance
- Emphasize cast iron pipes on water main replacement priority list"

In this draft report, LAN specifically referenced the 2002 Treatability Report (Exhibit 2), and noted that the City had not followed several of the previous recommendations for water treatment in the report when it restarted the FWTP in April of 2014.  "Of the recommended items, zebra mussel control, coagulant and flocculation polymer aids and soda ash feed have not been incorporated into the treatment process." (Exhibit 62, p 5 of 16)

When Warren Green visited the FWTP in the Fall of 2014 in connection with the TTHM work being done by LAN, he observed that the east side clarifier (which was not functioning properly at the time of the initial plant

53

test run in Summer 2013) had still not been repaired.  Mr. Green  insisted that the equipment be repaired right away.  Mr. Green recalls stating, "Brent, you can't just be bypassing water through here.  . . . [T]hat water's got to be treated." (Exhibit 3, Green deposition, pp 213) Given the state of the equipment in the Fall of 2014, it also appeared to LAN that the City had been bypassing the softening process for part of the water being distributed from the FWTP throughout at least the first 5-6 months of operation. Thus, the "WTP operational changes" recommended by LAN in its draft report in November 2014 included that the City discontinue bypassing softening for a portion of the flow through the plant.

### The City Rebuffs an Offer by LAN to Address Water Quality in Fall 2014 and Chooses a Different Water Quality Consultant

Also, in the Fall of 2014, when it was asked to address the TTHM issue, LAN (i.e. Warren Green) offered to conduct comprehensive testing regarding water quality, rather than addressing just the TTHM issue. The City told Mr. Green at that time that it wanted LAN to continue focusing on the TTHM issue using only the existing systems and that it planned to hire a different water consultant to study water quality issues more broadly.  (Exhibit 3, Green deposition, pp 807-808) Sometime shortly after this, the City sent out an Invitation to Bid soliciting bids from a "Water Quality Consultant" to

address water quality more broadly.   (Exhibit 63)[31] Ultimately, the City contracted with Veolia Water North America Operating Services to review certain water quality issues during the Winter of 2015.

**The Final Report from Veolia, the Decisions of the City Regarding Veolia's Recommendations, and LAN's Recommendation to Place a Water Quality Engineer at the FWTP**

Veolia issued its final report on or about March 12, 2015. (Exhibit 64) In the report, Veolia made several recommendations at pages 9-10, including "changing the filter media to GAC [granular activated carbon]" and "the addition of a corrosion control chemical." The Emergency Manager at the time, Mr. Ambrose, testified that he expected that all of the recommendations of Veolia would be implemented and that he communicated his expectations to Mayor Walling, City Administrator Henderson and Public Works Director Croft. (Exhibit 13, Ambrose deposition, pp 600-601) Following receipt of the Veolia report, Mr. Green met with Mr. Croft and offered to begin implementing

---

[31] Specifically, the Scope of Services set forth in the Invitation to Bid states as follows: "The City is seeking a consultant to review and evaluate the water treatment process and distribution system, provide recommendations to maintain compliance with both state and federal agencies, and assist in implementing accepted recommendations.  The City will have the selected vendor provide reports to reflect their findings and provide continual oversight in implementing any approved recommended practices to improve the quality of water until implementation of the KWA project." Significantly, the Invitation to Bid attached as Exhibit A the draft Operational Evaluation Report prepared by LAN, thus inviting a review of LAN's work by the Water Quality Consultant.

all of the recommendations of Veolia, but the City only chose to replace the GAC filter media and deferred the corrosion control recommendation (and other recommendations). (Exhibit 3, Green deposition, pp 819-821) LAN even offered to assist the City by placing a water quality engineer at the FWTP on a full-time or part-time basis and submitted two different proposals to accomplish this on March 25, 2015, but the City refused this recommendation as well. (Exhibit 65, Client Additional Services Authorization forms) (Exhibit 3, Green deposition, pp 821)

In late September of 2015, in responding to an inquiry from the Department of Treasury, the City stated as follows:

> Veolia's commissioned scope of work was to focus on the TTHM concerns but they did make corrosion control one of their recommendations and the City along with LAN engineering started the process of developing a plan. The plan was to work with the DEQ to establish corrosion control following the installation of the new filters.

(Exhibit 66, 9/29/15 Croft email with responses to Treasury) This response from Mr. Croft is at best misleading.

In truth, despite repeated inquiries by LAN, the City did not request or authorize LAN to begin work on a phosphate feed system until after the City received an August 17, 2015 letter from the MDEQ directing the City to implement corrosion control and recommending the use of phosphates for

that purpose. (Exhibit 65, 8/17/15 Rosenthal letter)(Exhibit 3, Green deposition, pp 42-47, 442-443, 653-654) Once the City asked LAN to do this work, the phosphate feed system was fast-tracked and was designed, constructed and in use by December of 2015, well before the MDEQ deadline of January 1, 2016 for simply selecting a corrosion control method. (Exhibit 3, Green deposition, pp 43, 830-831)

<strong>ARGUMENT</strong>

**I.   PLAINTIFFS' CLAIMS AGAINST THE LAN DEFENDANTS FOR PROFESSIONAL NEGLIGENCE SHOULD BE DISMISSED ON SUMMARY JUDGMENT WHERE THE PLAINTIFFS ARE UNABLE TO DEMONSTRATE THE ELEMENTS OF DUTY, BREACH OF DUTY OR PROXIMATE CAUSATION THROUGH EXPERT TESTIMONY AS REQUIRED UNDER MICHIGAN LAW.**

**A.   Governing Law.**

    **1.   The elements of a claim for professional negligence.**

        **a.   Generally**

Not every injury warrants a legal remedy. *Glittenberg v. Doughboy Recreational Indust., Inc. (On Rehearing)*, 441 Mich. 379, 403; 491 N.W.2d 208 (1992). Instead, there must be a duty of care owing from the defendant to the plaintiff, an essential prerequisite to every negligence case. *Perez v. K.F.C. National Mgt. Co., Inc.*, 183 Mich. App. 265, 268; 454 N.W.2d 145 (1990); *Moning v. Alfano*, 400 Mich. 425, 438-439; 254 N.W.2d 759 (1977); *Jackson v.*

57

*Oliver*, 2004 Mich. App. 122, 125; 514 N.W.2d 195 (1994).[32] The plaintiff carries the burden of demonstrating duty, as well as breach of duty and proximate cause.  *Hill v. Sears, Roebuck and Co*., 492 Mich. 651, 660; 882 N.W.2d 190 (2012), quoting *Loweke v. Ann Arbor Ceiling & Partition Co., L.L.C.*, 489 Mich. 157, 162; 809 N.W.2d 553 (2011).  The existence of a duty of care is a question of law.  *Hill,* 465 Mich. at 130.

### b.    Duty and breach of duty

In *Fultz v. Union-Commerce Assocs*., 470 Mich. 460; 683 N.W.2d 587 (2004), the Michigan Supreme Court held a contractor hired by a premises owner to plow and salt a snow and ice-covered parking lot did not owe a duty to a third party who slipped and fell in the parking lot. *Id*. at 468.[33]   The

---

[32]  A professional malpractice claim is simply a tort negligence claim predicated on the failure of a defendant to exercise the requisite professional skill.  *Broz v. Plante & Moran, PLLC*, 331 Mich. App. 39, 50; 90 N.W.2d 64 (2020); see generally *Miller-Davis Co. v. Ahrens Const., Inc.*, 489 Mich. 355, 364-365; 802 N.W.2d 33 (2011) (where an action brought against engineer involves a nonconsensual duty or one imposed by law, the action is one for personal injury).

[33] The plaintiff contended that the contractor breached a duty under common-law tort principles expressed in Restatement of Torts (Second) § 324A which indicates that one who undertakes, gratuitously or for consideration, to render services he should recognize as necessary for the protection of a third person or his property, is liable for the failure to exercise reasonable care.  Nonetheless, the claim failed because the plaintiff failed to plead a duty on the part of the contractor that was independent or "separate and distinct" from its contractual duty to the premises owner. *Id.* Apart from the contract, the

resulting rule of law is a tort action will not lie where it is based solely on the nonperformance of a contractual duty.  470 Mich. at 466, 469.  The *Fultz* court maintained the position that no tort action based on contract will lie--there must be an independent duty.

The Michigan Supreme Court clarified the rule in *Loweke,* explaining the controlling question is not whether the defendant was acting in the scope of the contract when the alleged wrongful act was committed, but whether the contracting party violated a legal duty to the plaintiff which would have existed independent of the contract. *Id.* at 169-71.[34]  In *Loweke*, the Supreme Court recognized a duty may be imposed because of a special relationship between the parties, citing *Williams v. Cunningham Drug Stores*, 429 Mich. 495, 499; 418 N.W.2d 381 (1988), as was acknowledged in *Fultz*, 470 Mich. at 468, n.4.  *Loweke*, 489 Mich. at 170.  *See also Davis v. Venture One Constr. Inc.*, 568 F.3d 570, 576 (6th Cir. 2009) (contractor violated a duty independent of

---

defendant had no obligation to remove the snow and ice from the parking lot. "In this case, the Court of Appeals analysis is flawed because defendant CML's failure to carry out its snow-removal duties owed to defendant created no new hazard to plaintiff...CML could not logically breach a duty it did not owe." *Id.*

[34] Thus, in *Loweke*, the plaintiff could assert claims against a subcontractor whose employees had stacked cement boards against a wall in an unstable position. In effect, the subcontractor had created a new hazard apart from the work it was performing on the contract.

the contract when it created new hazard by placing an unhinged door in a dangerous location).

Following *Loweke*, the basic rule in *Fultz* that a tort claim cannot be based on the failure to fulfill a contractual duty remains undisturbed. As the *Loweke* Court explained:

> "[I]n cases of nonfeasance, a defendant who fails to perform his contractual duties is ordinarily not liable in tort because, as a general rule, 'there is no duty that obligates one person to aid or protect another.' As a result, when a defendant completely fails to perform his contractual obligations, '[w]hat we are left with is defendant's failure to complete his contracted-for performance,' which 'is not a duty imposed by the law upon all, the violation of which gives rise to a tort action' but, instead, is a 'duty arising out of the intentions of the [contracting] parties themselves and owed only to those specific individuals to whom the promise runs."

*Loweke*, 489 Mich. at 164 (citations omitted). To determine whether a duty exists independent of contract, the Courts look to the common law.

The leading cases from the Michigan Supreme Court addressing duty issue under the common law are *In re Certified Question*, 479 Mich. 498 (2007), and *Hill v. Sears, Roebuck & Co.*, 492 Mich. 651 (2012). In *Hill*, the Michigan Supreme Court held that a retailer and installer whose employees had delivered and installed a dryer to plaintiff's home and did not warn of a dangerous uncapped gas line near the dryer did not owe a duty to the homeowners with respect to the gas line. Having contracted only to install the

dryer, the relationship between the parties--and any resulting duty--was limited to the installation of the dryer. Id. at 663. The installers of the dryer did not worsen the condition of the preexisting uncapped gas line and consequently could not be liable to the homeowners in negligence. Id. at 671-72.

In discussing the common law of duty, the *Hill* court cited *In re Certified Question* and stated:

> At common law, "[t]he determination of whether a legal duty exists or not is a question of whether the relationship between the actor and the plaintiff gives rise to a legal obligation on the actor's part *to act* for the benefit of the subsequently injured person." "[T]he ultimate inquiry in determining whether a legal duty should be imposed is whether the social benefits of imposing a duty outweigh the social costs of imposing a duty." Factors relevant to the determination of whether a legal duty exists include "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." We have recognized, however, that "[t]he most important factor to be considered [in this analysis] is the relationship of the parties" and also that there can be no duty imposed when the harm is not foreseeable. In other words, "[b]efore a duty can be imposed, there must be a relationship between the parties and the harm must have been foreseeable." If either of these two factors is lacking, then it is unnecessary to consider any of the remaining factors.

*Hill*, 492 Mich at 661, *quoting In re Certified Question*, 479 Mich. at 505-509.

Moreover, even if both the relationship and foreseeability factors are present, "a duty still does not necessarily exist"; instead, the court assesses the

remaining factors to determine whether "the social benefits of imposing a duty outweigh the social costs of imposing a duty." *In re Certified Question*, 479 Mich. at 505, 508.  The Michigan Supreme Court has directed courts to rigorously apply the duty factors to avoid "the specter of limitless liability"; it is not the case that "everybody owes a duty to everybody else." *Id.* at 509, n.10, 511 (internal quotation marks omitted).

In the recent case of *Sabbagh v. Hamilton Psychological Services, PLC*, 329 Mich. App. 324 (2019), former Wayne County deputy sheriffs brought an action against a human resources company, Ulliance, Inc., that selected psychologists whom interviewed plaintiffs when they sought employment with Dearborn Police Department (DPD). When plaintiffs were not hired by DPD, they sued Ulliance along with the psychologists and their company. The trial court dismissed the case against Ulliance based on a lack of duty and the court of appeals affirmed.

The *Sabbaugh* court first discussed the proceedings below and stated:

> In its motion for summary disposition, Ulliance argued it did not owe a duty to plaintiffs because it had no relationship with them, there was no contract with them, and it had never spoken with or contacted them. The burden then shifted to plaintiffs to explain the legal basis for the relationship it believed was imposing a duty on Ulliance to cite the facts in the record that established the existence of that relationship. In response, plaintiffs averred that Ulliance "had a duty to apply the knowledge, skill and ability that a reasonabl[y] careful professional in the field of human resources

62

would exercise under the circumstances." With no explanation or citation of authority, the plaintiffs argued that it was foreseeable that injury would result from the breach. The trial court ruled that without any relationship between plaintiffs and Ulliance, Ulliance did not owe any common-law duty to plaintiffs.

329 Mich. App. at 349. The court then affirmed and stated:

> In this case, plaintiffs did not establish that they had a relationship with Ulliance. Ulliance is a human resources company that had a contract with the City of Dearborn. Ulliance, as part of its contract, referred Plaintiffs to [psychologist] Frendo for pre-employment psychological examinations. We agree with the trial court that this "relationship" between plaintiffs and Ulliance was too tenuous to create any type of duty. While Ulliance had a relationship with the city of Dearborn, and with it an obligation to select adequate suppliers, it had no such relationship with plaintiffs and therefore did not owe Plaintiffs any duty or obligation.

329 Mich. App. at 350.

*See also Valentine v. Jones Lang LaSalle Americas, Inc.*, 2014 WL 4906726 at *6 (E.D. Mich. Sept. 30, 2014) (a claim by an accident victim against a company which had contracted with the State of Michigan to inspect, maintain and repair the elevators in Cadillac Place was barred by law where the claimants alleged the company had failed to perform its obligations under the contract, but had not created a new hazard); *Wulff v. Otis Elevator Co.*, 2011 WL 3903213 at *6. (Mich. App. Sept. 6, 2011) (company hired to maintain elevator owed no duty in absence of evidence it created a new and hazardous condition; failure to repair condition that injured plaintiff was merely failure

63

to perform under contract);  *Johnson v. Doodson Ins. Brokerage, LLC.*, 793 F.3d 674, 677 (6th Cir. 2015)  (an insurance brokerage that failed to procure liability insurance as instructed by a customer owed no duty to a third party tort victim because the alleged duty stemmed from failure to perform a contractual obligation owed to customer, and an "obligation to procure insurance against suits by injured parties does not implicate a risk of harm that the broker had any common law duty to prevent.")

### c.    Proximate cause

The concept of proximate cause encompasses both cause in fact and legal cause.  *Skinner v. Square D, Co.*, 445 Mich. 153, 162-163; 560 N.W.2d 475 (1994).  "Cause in fact" requires a showing that "but for" defendant's action, plaintiff would not have been injured, whereas "legal cause" focuses on foreseeability and whether a defendant should be held legally responsible for such consequences.  A plaintiff must adequately establish cause in fact in order for legal cause or "proximate cause" to become a relevant issue.  *Id.*  To establish "but for" causation there must be a logical sequence of cause and effect.  *Kaminski v. Grand Trunk W.R. Co.*, 347 Mich. 417, 422; 79 N.W.2d 899 (1956).  To establish legal causation, it is insufficient to merely provide the condition or occasion affording opportunity for other events to produce the

injury.  *Singerman v. Municipal Service Bureau, Inc.*, 455 Mich. 135, 145; 565 N.W.2d 383 (1997).

> ### 2. Under Michigan law, Plaintiffs are required to prove the elements of duty, breach of duty and proximate causation through the testimony of a qualified expert witness.

As members of a state-licensed profession,[35] engineers are subject to liability for malpractice under the common law in accordance with M.C.L. 600.2912.[36]  Under the common law, a professional malpractice claim is a tort claim predicated on the failure of the defendant professional to exercise the requisite professional skill.  *Stewart v. Rudner*, 249 Mich. 459, 468; 84 N.W.2d 816 (1957).  "A malpractice claim requires proof of simple negligence based on a breach of a professional standard of care."  *Broz v. Plante & Moran*, 331 Mich. 39, 52-53; 951 N.W.2d 64 (2020).  To establish both the applicable professional standard of care and breach thereof, the plaintiff is usually required to introduce expert testimony unless the lack of professional care is so obvious as to be within the common knowledge and experience of an

---

[35] Department of Licensing and Regulatory Affairs ("LARA") Rule 339.16001 et. al; R339.16021.

[36] "A civil action for malpractice may be maintained against any person professing or holding himself out to be a member of a state licensed profession.  The rules of the common law applicable to actions against members of a state licensed profession, for malpractice, are applicable against any person who holds himself out to be a member of a state licensed profession."  M.C.L. 600.2912(1).

ordinary layperson.  *Elher v. Misra*, 499 Mich. 11, 21-22; 878 N.W.2d 790 (2016).  "Expert testimony is necessary to establish the standard of care because the ordinary layperson is not equipped by common knowledge and experience to judge the skill and competence of the service and determine whether it meets the standard of practice in the community."  *Decker v. Rochowiak*, 287 Mich. App. 666, 686; 791 N.W.2d 507 (2010).  Where a plaintiff fails to present expert testimony regarding the standard of care, a malpractice claim is subject to dismissal.  *Locke v. Pachtman*, 446 Mich. 216, 224-226; 521 N.W.2d 786 (1994).  The Michigan Court of Appeals has ruled specifically for the need of expert testimony in a claim made against a professional engineer.  *City of Huntington Woods v. Orchard, Hiltz & McCliment, Inc.*, 2012 W.L. 1649782 (Mich. App. 5/10/2012) (unpublished) (*2-4).[37]

Here, the intricacies of the standard of care governing professional engineering services as applicable to the facts of this case are hardly within the realm of common knowledge and the ordinary understanding of laypersons.  See *City of Huntington Woods* at *3 ("whether an engineer is negligent for failing to strictly comply with plans and specifications is not within the common knowledge of lay people."); *Martin v. Sizemore*, 38 S.W.3d 249, 272-273 (Tenn. App. 2001) (disciplinary action brought against licensed

---

[37] All unpublished cases are provided at Exhibit 68.

architect; professional negligence[38] must be "as plain as a fly floating in a bowl of buttermilk" to trigger the common knowledge exception; the exception does not apply when understanding the alleged professional negligence requires scientific or technical analysis or discussion). Thus, under Michigan law where expert testimony is needed and not provided, a factual question is not created on whether the professional breached a standard of care and a professional malpractice claim must be dismissed as a matter of law. *Thomas v. McGinnis*, 239 Mich. App. 636, 644; 609 N.W.2d 222 (2000); *Craig v. Oakwood Hosp.*, 471 Mich. 67, 77; 684 N.W.2d 296 (2004). Such deficiency also applies to the lack of expert testimony on proximate cause when the claim is made against a professional, and the common knowledge exception is likewise not applicable for the very same reasons the jurors cannot appreciate the standard of care, and thus could not appreciate any causal link between the alleged breach of the standard of care and the asserted damages. Expert

---

[38] In an engineering professional malpractice case, the Michigan Court of Appeals has used the explanation of professional negligence found in M. Civ. J.I. 30.01, as follows:

> "[T]he failure to do something which a [name of profession] of ordinary learning, judgment or skill in [this community or a similar one] would do, or the doing of something which a [named profession] of ordinary learning, judgment or skill would not do, under the same or similar circumstances [.]" *City of Huntington Woods* at *3.

testimony is required in a professional malpractice case on the issue of proximate cause. *Thomas v. McPherson*, 155 Mich. App. 700, 705; 400 N.W.2d 629 (1986).

**B.    The Claim for Professional Negligence Against the LAN Defendants Should Be Dismissed on Summary Judgment** ██████████████████████
███████████████████████████████████████████████

The claims against the LAN Defendants should be dismissed on summary judgment because Plaintiffs are unable to prove the existence of a legal duty, breach of duty or proximate causation by expert testimony.

The LAN Defendants also have filed on this date a gatekeeper motion seeking to exclude ██████████████████████████████ for all of the reasons stated therein. Without repeating all of the bases for excluding ██████████████████████ set forth in the motion, it bears repeating ███████████████████████████████ about the events in Flint surrounding the water issues in 2013-2016. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

69

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████ does not assert any duty or breach of duty on the part of the

LAN Defendants which could form the basis of a claim for professional

negligence. Moreover, ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████[39]

**C.** ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████ **So Those Claims Must be Dismissed on Summary Judgment.**

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[39] ████████████████████████████████████████████████
████████████████████████████

███████████████████████████████████████

████████████████████████ ██████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████ Therefore, those allegations should be stricken and cannot be used to support Plaintiffs' claims of professional negligence against the LAN Defendants.

**D.**   ████████████████████████████████████
████████████████████████████

As to the Plaintiffs' assertions, ██████████████████████, that the LAN Defendants 1) failed to inform the City of Flint the necessary upgrades to the plant could not be completed by April of 2014 and 2) failed to take steps to make certain the City of Flint was using a corrosion inhibitor prior to the change over to the use of the Flint River water source in April of 2014,

███████████████████████████████████████

██████████████████████████

---

40 █████████████████████████████████████
███████████████████████████████████████
████████████████████████████████.



73

- ███████████████████████████████████████
  ███████████████████████████████████████
  ████████████████

- ████████████████████████████████

- ██████████████████████████████████

- ███████████████████████████████████

████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

As to what the City officials at the Flint Water Plant derived from the

2011 Report regarding corrosion control, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

- ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████

- ██████████████████████████████████
- ████
- ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████)

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████





n whatsoever regarding the process by which LAN's scope of work









86



**E.   Applying the Law to the Facts of the Case,** ███████████
███████████ **Plaintiffs are Unable to Prove Duty, Breach of Duty
or Proximate Causation for Either of Their Theories of Liability**

**1.   Plaintiffs' claim that the LAN Defendants allegedly failed to
make certain that the City of Flint was using a corrosion
inhibitor prior to the change in water source in April of 2014**

Based on all of the foregoing, the Court should dismiss the claim of

professional negligence by Plaintiffs based on the assertion that LAN should

have somehow required the City to use a corrosion inhibitor when it started

operating the FWTP off of the Flint River in April of 2014. ███████████

███████████████████████████, Plaintiffs cannot

demonstrate a duty by LAN to require the City to use a corrosion inhibitor,

breach of such a duty or proximate causation.

███████████████████████████████████ █ ███████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████

The possible need for phosphates as a corrosion control additive was identified and discussed in both the 1998 Phase I Report (regarding operating the FWTP off of the Flint River) (Exhibit 1) and the 2009 KWA Report (regarding operating the FWTP off of KWA water from Lake Huron). (Exhibit 8) In addition, the cost memorandum Warren Green prepared for the 2011 Rowe report included phosphates as a placeholder for a possible corrosion control inhibitor to be determined via testing. (Exhibit 9)

Brent Wright, Mike Glasgow and Daugherty Johnson from the City all testified that they understood that LAN had recommended the use of phosphates as a corrosion control additive and that they did not use it because the MDEQ did not require it and instead directed the City to perform two six-month rounds of sampling and testing under the LCR prior to evaluating the need for corrosion control.[43] As Mr. Glasgow stated in his August 31, 2015 email, written just as lead was becoming a public issue, "We originally had this

---

[41] See Argument section I.D.1.
[42] See Argument section I.D.1.
[43] See Statement of Facts, pp 31-32)

chemical [phosphates] in the design, but the DEQ did not mandate it from the start, they informed us to wait and see results of our lead and copper sampling to determine if it was necessary." (Exhibit 41)

Similarly, LAN consistently recommended the use of full softening with both lime and soda ash to address both carbonate and noncarbonate hardness (an alternative type of corrosion control), but the City also did not follow this recommendation. And similarly, the City did not use full softening, because the MDEQ did not require it to do so.[44]

When Mr. Green pressed the Emergency Manager about using full softening on May 29, 2013, Mr. Kurtz declined to agree and stated that the City was not going to do anything that the MDEQ did not require. Mr. Croft, the Director of Public Works, recalled Mr. Kurtz' statement as follows: "Do only the minimum that MDEQ requires, no extras." (Exhibit 33, p 112)

Similarly, when Mr. Green tried to revisit the issue of using a corrosion control additive with Mr. Johnson following the June 26, 2013 meeting, Mr. Johnson stated again that the City was not going to do anything that the MDEQ did not require.[45] And Mr. Brent Wright confirmed in his testimony that

---

[44] See Statement of Facts, p 33)
[45] See Statement of Facts, p 31)

this directive from management to staff was discussed frequently in the Spring of 2013.[46]

Despite the City not following its recommendations, the LAN Defendants were not aware of a threat to the public health or welfare in the Spring of 2013--or at any time prior to late August or early September of 2015. In the Spring of 2013, the City and LAN were being told by the regulatory agency with primacy authority to apply the Safe Drinking Water Act and the LCR that it was not necessary to evaluate whether a corrosion control additive was needed until after two six-month rounds of sampling and testing. Moreover, at that time: 1) the City had its own professional staff operating the FWTP led by F-1 operator Mike Glasgow and Plant Supervisor Brent Wright; 2) the City was required by the MDEQ to provide lime only softening, which is itself an accepted and widely used form of corrosion control; and 3) the City had agreed at the meeting on May 29, 2013 to perform a final plant test run of 60-90 days to test all water quality parameters prior to distributing water to the public.

As with the LAN recommendations regarding the use of phosphate and the use of full softening, all of the key staff at the City (including Brent Wright, Mike Glasgow, Daugherty Johnson and Rob Bincsik) testified that they

_____

[46] See Statement of Facts, p 31)

understood LAN's recommendation to perform a 60-90 day plant test run.[47]

Unfortunately, LAN was never asked to participate in a final plant test run, and

it does not appear that the City did a proper final plant test run. If fact, Mr.

Bincsik testified that one of the reasons Mr. Glasgow sent his now infamous

emails to the MDEQ on April 16-17, 2014 was to attempt to get more time to

complete a 60-90 day plant test run as had been recommended by LAN.

(Exhibit 56 and Exhibit 36, pp 213-214)

It should also be noted here that the LAN Defendants had no

involvement or input whatsoever into the sampling and testing actually

conducted by the City and the MDEQ in coordination with one another, and

the reporting of same.

This is not a situation in which the governmental actors were unaware

of the need for corrosion control measures, as alleged. Instead, as the ultimate

decision-makers, the City and the MDEQ affirmatively decided not to use full

softening and to wait until after two six-month cycles of sampling and testing

under the LCR to evaluate the need for a corrosion control additive.

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

---

[47] See Statement of Facts, p 26)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████.[51]

---

[48] See Argument section I.D.2.
[49] See Argument section I.D.2.
[50] See Argument section I.D.2.
[51] See Argument section I.D.2.

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

Applying the law from section I.A. to the foregoing facts, LAN did not owe a duty to Plaintiffs where there was no relationship between any of the Plaintiffs and LAN, and the harm complained of by Plaintiffs was not reasonably foreseeable. It is undisputed that there was absolutely no

---

[52] See Argument section I.D.2.

relationship between LAN and any of the four Plaintiffs in this bellwether proceeding.

At the time the City decided not to use a corrosion control inhibitor when starting the plant using the Flint River in April of 2014, the City had operated the plant for years as a backup water plant and the City had its own professional staff operating the plant lead by Plant Supervisor Brent Wright and F-1 Operator Mike Glasgow. In addition, the City had agreed to perform lime softening (which is itself an approved form of corrosion control under EPA guidance) and to perform two six-month rounds of sampling and testing under the lead and copper rule.

The LAN Defendants cannot breach a duty they did not owe to Plaintiffs. Moreover, the City did not follow LAN's recommendations regarding corrosion control relating to the possible use of a corrosion inhibitor, the use of full softening and the need for a 60-90 day pre-distribution plant test run.



---

[53] See Argument section I.D.2.

**2.      Plaintiffs' claim that the LAN Defendants allegedly failed to inform the City of Flint the necessary upgrades to the plant could not be completed by April of 2014.**

Based on all of the foregoing, the Court should dismiss the claim of professional negligence by Plaintiffs based on the assertion that LAN should have warned the City that the necessary upgrades to the FWTP could not be prepared in the available time. ████████████████████████

████████████████████, Plaintiffs cannot demonstrate LAN had a duty to warn the City that necessary improvements needed to operate off of the Flint River could not be completed by April 2014, breach of such a duty or proximate causation.

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████.[54]

---

[54] See Argument section I.D.1.

[REDACTED][55][56][57][58][59]

---

56 See Argument section I.D.3.
57 See Argument section I.D.2.
58 See Argument section I.D.3.
59 In fact, once the City asked LAN to do this work in late August or early September of 2015, the phosphate feed system was fast-tracked and was designed, constructed and in use in less than three months. See Statement of Facts, pp 56-57.

████████████████████████████████████

████████████████████████████████████

████████████████[60]

The LAN Defendants did not owe a legal duty to Plaintiffs. It is undisputed that there was no relationship between the LAN Defendants and Plaintiffs. Moreover, there is no duty to warn the City that the needed improvements could not be ready by April of 2014 where Plaintiffs' expert admits that the only task that needed to be done (which was not done) was a corrosion inhibitor and that there was ample time to construct a corrosion inhibitor feed system. Plaintiffs also cannot show breach of duty or proximate cause on these facts.

## II.   THE DECISIONS OF THE GOVERNMENTAL ENTITIES CONSTITUTE INTERVENING CAUSATION AS A MATTER OF LAW

The governmental actors' exclusive control and decision-making regarding both 1) the decision to operate off of the Flint River beginning in April of 2014 and 2) the decision to not evaluate the need to add a corrosion control additive such as phosphates until after two six-month rounds of testing under the Lead and Copper Rule breaks any alleged causal link between LAN's hypothetical duty to so ensure the use of a corrosion control

---

[60] See Argument section I.D.2.

additive and the damages allegedly sustained by the bellwether Plaintiffs. The MDEQ and the City of Flint affirmatively decided not to use a corrosion control inhibitor additive at the time of the change in water sources. Thus, even if the bellwether Plaintiffs could establish proximate cause, the decisions made by the governmental entities constitute intervening causation as a matter of law, breaking the causal link required under Michigan law for the bellwether Plaintiffs to recover for their alleged injuries.

Under Michigan law, "it is not enough to prove that the accident is a natural consequence of the negligence, [but] it must also have been the probable consequence" and defendants are "bound to anticipate only such combinations of circumstances and accidents and injuries therefrom as they may reasonably forecast is likely to happen, taking into account their own past experience and the experience and practice of others in similar situations. *Weissert v. City of Escanaba*, 298 Mich. 443, 452-453; 299 N.W. 139 (1941). Proximate cause must take into account the presence of any intervening cause which severs the chain of causation between the defendant's actions and the plaintiff's damages.  An "intervening cause" is "one which actively operates in producing harm to another after the actor's negligent act or omission has been committed."  *McMillian v. Vliet*, 422 Mich. 570, 576; 374 N.W.2d 679 (1985), citing 2 Restatement Towards, § 441, page 465.  An intervening cause relieves

a defendant from liability, and it is largely a matter of policy.  *Poe v. Detroit*, 179 Mich. App. 564, 577; 466 N.W.2d 523 (1989). A defendant is relieved from liability if the intervention is a superseding cause, irrespective of whether the defendant's antecedent negligence is found to be a substantial factor in bringing about the alleged injury.  *Poe, supra*; *Coy v. Richard's Industries, Inc.*, 170 Mich. App. 665; 428 N.W.2d 734 (1988).

The LAN Defendants incorporate by reference their prior arguments regarding the break in any causal chain between their alleged acts or omissions with respect to insuring proper corrosion control measures and the intervening, superseding and controlling decisions by the governmental entities that they would begin operating the FWTP using the Flint River in April 2014 and they would evaluate the need for corrosion control following two six-month rounds of sampling and testing under the LCR.

Additionally, case law is legion that criminal acts of third persons necessarily break the causal link required of a plaintiff to establish proximate cause. See 57A Am. Jur. 2d Negligence § 63.  And there is no "foreseeability" exception that applies here where the LAN Defendants lacked control over whether or when corrosion control measures would be used. In general, criminal acts are not foreseeable unless the defendant has special knowledge

of a likelihood of criminal behavior.  *See MacDonald v. PKT, Inc.*, 464 Mich. 322,

334-35 (2001).

On January 14, 2021, the Michigan Attorney General's Office announced

criminal charges for eight former state officials for their alleged roles in the

Flint Water Crisis.[61]  These charges demonstrate both that control of the use of

---

[61] The following defendants were charged by Michigan Solicitor General
Fadwa Hammoud and Wayne County Prosecutor Kym L. Worthy as part of the
criminal investigation into the Flint Water Crisis:

- Jarrod Agen – Former Director of Communications and Former Chief of
  Staff, Executive Office of Gov. Rick Snyder
  - One count of perjury – a 15-year felony
- Gerald Ambrose – Former City of Flint Emergency Manager
  - Four counts of misconduct in office – each a five-year felony
    and/or $10,000 fine
- Richard Baird – Former Transformation Manager and Senior Adviser,
  Executive Office of Gov. Snyder
  - One count of perjury – a 15-year felony
  - One count of official misconduct in office – a five-year felony
    and/or $10,000 fine
  - One count of obstruction of justice – a five-year felony and/or
    $10,000 fine
  - One count of extortion – a 20-year felony and/or $10,000 fine
- Howard Croft – Former Director of the City of Flint Department of
  Public Works
  - Two counts of willful neglect of duty – each a one-year
    misdemeanor and/or $1,000 fine
- Darnell Earley – Former City of Flint Emergency Manager
  - Three counts of misconduct in office – each a five-year felony
    and/or $10,000 fine
- Nicolas Lyon – Former Director, Michigan Department of Health and
  Human Services

corrosion control chemicals were exclusively that of the governmental defendants, for which they are responsible, and the concomitant conclusion that such conduct was independent, subsequent to, and outside the control of the LAN Defendants.

Shortly after the changeover, Warren Green placed phone calls to Brent Wright and Mike Glasgow at the City and inquired as to whether the City was "making its numbers." Both Mr. Wright and Mr. Glasgow assured Mr. Green that the City was in compliance with the SDWA. (Exhibit 3, Green deposition, pp 387, 439, 803-804) These representations continued throughout the

---

- o    Nine counts of involuntary manslaughter – each a 15-year felony and/or $7,500 fine
- o    One count of willful neglect of duty – a one-year misdemeanor and/or $1,000 fine
- Nancy Peeler – Current Early Childhood Health Section Manager, Michigan Department of Health and Human Services
  - o    Two counts of misconduct in office– each a five-year felony and/or $10,000 fine
  - o    One count of willful neglect of duty – a one-year misdemeanor and/or $1,000 fine
- Richard Snyder – Former Governor of Michigan
  - o    Two counts of willful neglect of duty – each a one-year misdemeanor and/or $1,000 fine
- Eden Wells – Former Chief Medical Executive, Michigan Department of Health and Human Services
  - o    Nine counts of involuntary manslaughter – each a 15-year felony and/or $7,500 fine
  - o    Two counts of misconduct in office – each a five-year felony and/or $10,000 fine

o    One count of willful neglect of duty – a one-year misdemeanor and/or $1,000 fine

period from April of 2014 until late August of 2015, and Flint representatives consistently informed LAN that testing by the MDEQ showed that the City was in compliance with, among other regulations, the Lead and Copper Rule. (Exhibit 3, Green deposition, pp 387, 439, 803-804,) There was no reason for LAN to suspect that the City was hiding—much less falsifying—the sampling and testing data.[62]

### III.    JOINDER BY THE LAN DEFENDANTS IN THE CAUSATION ARGUMENTS BY THE VNA DEFENDANTS IN SECTION III OF THEIR ARGUMENT

The LAN Defendants join in all of the causation arguments set forth by the VNA Defendants in section III (including all subsections) of the Brief in Support of the VNA Defendants in Support of Their Motion for Summary Judgment Against Bellwether Plaintiffs E.S., A.T., R.V. and D.W., except to the extent such arguments are based solely on the timing of VNA's involvement in February and March of 2015.

---

[62] See VNA Brief in Support of Its Motion for Summary Judgment, Section II.C.2.ii.b.

## CONCLUSION

The Court should grant summary judgment to LAN on Plaintiffs' claims of professional negligence.

Respectfully submitted,

/s/ Wayne B. Mason
Wayne B. Mason (SBOT 13158950)
Travis S. Gamble (SBOT 00798195)
S. Vance Wittie (SBOT 21832980)
David C. Kent (SBOT 11316400)
FAEGRE DRINKER BIDDLE & REATH
1717 Main St., Suite 5400
Dallas TX 75201
(469) 227-8200
wayne.mason@faegredrinker.com
travis.gamble@faegredrinker.com
vance.wittie@faegredrinker.com
david.kent@faegredrinker.com

ATTORNEYS FOR DEFENDANTS
LOCKWOOD, ANDREWS & NEWNAM,
INC. and LOCKWOOD, ANDREWS &
NEWNAM, P.C.

/s/ Philip A. Erickson
Philip A. Erickson (P37081)
Robert G. Kamenec (P35283)
Saulius K. Mikalonis (P39486)
PLUNKETT COONEY
101 N. Washington Square, Ste 1200
Lansing, MI 48933
(517) 324-5608
perickson@plunkettcooney.com
rkamenec@plunkettcooney.com
smikalonis@plunkettcooney.com

ATTORNEYS FOR DEFENDANTS
LOCKWOOD, ANDREWS & NEWNAM,
INC. and LOCKWOOD, ANDREWS &
NEWNAM, P.C.

Dated:  May 11, 2021

### CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2021, I electronically filed LAN Defendants' Motion and Brief for Summary Judgment with the Clerk of the Court using the ECF system and via email submission of such filing to all attorneys of record.

By:   /s/ Philip A. Erickson
Philip A. Erickson (P37081)
Attorney for LAN Defendants
325 East Grand River Ave., Ste 250
East Lansing, MI  48823
(517) 324-5608
perickson@plunkettcooney.com

Open.25633.72612.26371905-1

103

Open.25633.72612.26371905-1

# Exhibit 51

# Exhibit 69

# Exhibit 70

# Exhibit 71