## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE FLINT WATER LITIGATION | Case No. 5:16-cv-10444-JEL-MKM <br> Hon. Judith E. Levy |
| This Document Relates To: <br> *Gaddy et al. v. Flint et al.* <br> *Meeks et al. v. Flint et al.* | Case No. 5:17-cv-11166-JEL-MKM <br> Case No. 5:17-cv-11165-JEL-MKM |

_____

### DEFENDANTS VEOLIA NORTH AMERICA, LLC, VEOLIA NORTH AMERICA, INC., AND VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC'S MOTION FOR SUMMARY JUDGMENT AGAINST BELLWETHER PLAINTIFFS E.S., A.T., R.V., AND D.W.

Pursuant to Fed. R. Civ. P. 56, Defendants Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC (collectively, VNA) move for summary judgment on the professional negligence claims brought by bellwether plaintiffs E.S., A.T., R.V., and D.W. (Plaintiffs).[1]  As explained in the accompanying brief, the Court should grant VNA summary judgment because Plaintiffs cannot prove the duty, breach, and causation elements of professional negligence against VNA.  Three Plaintiffs stopped drinking Flint water well before VNA's engagement with the City of Flint in February-March 2015, and no Plaintiff can establish a harmful level of exposure to water lead levels after that time.  Plaintiffs also cannot prove that VNA owed them a duty of

---

[1]    To be precise, the guardians of E.S., A.T., R.V., and D.W. are the actual plaintiffs. But for the sake of simplicity, VNA refers to E.S., A.T., R.V., and D.W. as Plaintiffs.

professional care or breached a duty of professional care, and no Plaintiff can prove that VNA either caused or contributed to his or her alleged injuries.

As Local Rule 7.1(a) requires, VNA conferred with Plaintiffs' counsel concerning this motion. After VNA explained the nature and legal basis for the motion, Plaintiffs' counsel said that they would oppose it.

Respectfully submitted,

| | |
|---|---|
| **CAMPBELL, CONROY & O'NEIL P.C.** | **BUSH SEYFERTH PLLC** |
| By: /s/ *James M. Campbell* | By: /s/ *Cheryl A. Bush* |
| James M. Campbell | Cheryl A. Bush (P37031) |
| Alaina M. Devine | Michael R. Williams (P79827) |
| One Constitution Wharf, Suite 310 | 100 W. Big Beaver Road, Suite 400 |
| Boston, MA 02129 | Troy, MI 48084 |
| (617) 241-3000 | (248) 822-7800 |
| jmcampbell@campbell-trial-lawyers.com | bush@bsplaw.com |
| adevine@campbell-trial-lawyers.com | williams@bsplaw.com |

*Attorneys for Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC*

Dated: May 11, 2021

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| IN RE FLINT WATER LITIGATION | Case No. 5:16-cv-10444-JEL-MKM |
|---|---|
| | Hon. Judith E. Levy |
| This Document Relates To: | |
| *Gaddy et al. v. Flint et al.* | Case No. 5:17-cv-11166-JEL-MKM |
| *Meeks et al. v. Flint et al.* | Case No. 5:17-cv-11165-JEL-MKM |

---

**BRIEF IN SUPPORT OF DEFENDANTS VEOLIA NORTH AMERICA, LLC, VEOLIA NORTH AMERICA, INC., AND VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC'S MOTION FOR SUMMARY JUDGMENT AGAINST BELLWETHER PLAINTIFFS E.S., A.T., R.V., AND D.W.**

## STATEMENT OF ISSUES PRESENTED

1.   Should the Court grant VNA summary judgment on R.V.'s, D.W.'s, and E.S.'s claims because there is no evidence that those Plaintiffs consumed Flint water after VNA started its work in Flint, so VNA could not possibly have caused those Plaintiffs any injuries?

> **VNA answers:** "Yes."

> **Plaintiffs answer:** "No."

2.   Should the Court grant VNA summary judgment on Plaintiffs' professional negligence claims because VNA did not owe any Plaintiff a duty of professional care, and in any event, Plaintiffs cannot prove that VNA breached any duty supposedly owed to any Plaintiff?

> **VNA answers:** "Yes."

> **Plaintiffs answer:** "No."

3.   Should the Court grant VNA summary judgment on Plaintiffs' professional negligence claims because there is insufficient evidence that VNA's actions caused or contributed to any Plaintiff's alleged injuries?

> **VNA answers:** "Yes."

> **Plaintiffs answer:** "No."

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)

*In re Certified Question from Fourteenth Dist. Ct. of Apps. of Tex.*,
    479 Mich. 498 (2007)

*In re Flint Water Cases*, 329 F. Supp. 3d 369 (E.D. Mich. 2018)

*Guertin v. Michigan*, No. 16-cv-12412,
    2017 WL 2991768 (E.D. Mich. July 14, 2017)

*Henry v. Dow Chem. Co.*, 473 Mich. 63 (2005)

*Hill v. Sears, Roebuck & Co.*, 492 Mich. 651 (2012)

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)

*Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671 (6th Cir. 2011)

*Powell-Murphy v. Revitalizing Auto Cmtys. Env't Response Tr.*,
    — Mich. App. —, No. 348690, 2020 WL 4722070 (Aug. 13, 2020)

*Simko v. Blake*, 448 Mich. 648 (1995)

*Skinner v. Square D Co.*, 445 Mich. 153 (1994)

*Stark v. Armstrong World Indus., Inc.*, 21 F. App'x 371 (6th Cir. 2001)

Fed. R. Civ. P. 56

Fed. R. Evid. 701

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................1

LEGAL STANDARD ...........................................................3

ARGUMENT ......................................................................5

I.    VNA Could Not Have Caused Or Contributed To Plaintiffs R.V.'s, D.W.'s, Or E.S.'s Alleged Injuries Because They Stopped Using Flint Water Before VNA Arrived In Flint ................................................6

      A.  R.V., D.W., And E.S. Stopped Using Flint Water Before VNA Started Its Work In Flint In February 2015 ..............................6

          1.  R.V.'s Family Stopped Using Flint Water In 2014 .............7

          2.  D.W.'s Family Stopped Using Flint Water in 2014 ...........9

          3.  E.S.'s Family Stopped Using Flint Water In 2014 ...........11

      B.  VNA Cannot Be Liable For Any Injuries That Occurred Before Its Engagement In Flint .........................................................13

II.   No Plaintiff Can Establish Duty Or Breach ......................................17

      A.  VNA Had A Limited Engagement In Flint ..............................19

          1.  City And State Officials Caused The Flint Water Crisis By Switching From Detroit Water To Flint River Water ........................20

          2.  The Switch To Flint River Water Caused Numerous Problems With Flint Water Including Some That City And State Officials Covered Up ...............................................................22

          3.  The City Engaged VNA For A Short Consulting Project ..................24

      B.  Plaintiffs Lack Expert Evidence To Support All But Two Of Their Theories Of Professional Negligence .........................................28

      C.  VNA Did Not Owe Plaintiffs A Duty Of Professional Care As A Matter Of Law ...............................................................29

          1.  VNA Did Not Owe Plaintiffs A Duty Of Professional Care Because Plaintiffs Were Not VNA's Clients .........................30

          2.  Michigan Law Does Not Support Extending VNA's Duty Of Professional Care To Plaintiffs .........................................32

              a.  Plaintiffs Cannot Establish A Sufficient Relationship With VNA ..........................................................34

iii

**TABLE OF CONTENTS**
**(continued)**

**Page**

      i.   There was no connection between VNA and Plaintiffs ........34

      ii.   Plaintiffs cannot rely on the voluntary undertaking doctrine to establish a relationship ........................39

    b.   Plaintiffs' Alleged Injuries Were Not Reasonably Foreseeable ..................................................................42

    c.   The Public-Policy Factor Weighs Against Holding That VNA Owed A Duty Of Professional Care To Plaintiffs .............45

D.   VNA Did Not Owe Plaintiffs The Specific Duties That Plaintiffs Ascribe To VNA ...........................................................47

    1.   VNA Did Not Owe Anyone The Duties Humann Described ............48

    a.   VNA Did Not Have A Duty To Insert Itself Into The Water Crisis Before The City Hired VNA In February 2015 ................48

    b.   VNA Had No Duty To Insist That The City Follow Its Recommendation To Add Corrosion Controls Or Return To Detroit Water ..............................................................49

      i.   VNA had no duty to insist that the City add corrosion controls..................................................................49

      ii.   VNA had no duty to insist that the City return to Detroit water....................................................................52

    2.   Even If VNA Owed The Duties Humann Described To The City, VNA Did Not Owe Those Duties To Plaintiffs ...................................53

E.   Plaintiffs Do Not Establish That VNA Breached Any Duty Of Care........55

III.   No Plaintiff Can Establish Causation.................................................................56

A.   There Is Insufficient Evidence That Any Breach By VNA Of Humann's Proposed Duties Either Caused Or Contributed To Elevated Water Lead Levels In Flint...........................................................58

    1.   No Reasonable Jury Could Find That The City Would Have Implemented Corrosion Controls Or Switched Back To Detroit Water In February-March 2015 If Only VNA Had Insisted That It Do So................................................................................59

iv

## TABLE OF CONTENTS
### (continued)

Page

    a.    The Evidence Establishes That The City Would Not Have Implemented Corrosion Controls Or Switched Back To Detroit Water ...............................................................................59

    b.    City Officials' Self-Serving, After-The-Fact Testimony Does Not Create A Genuine Issue Of Material Fact ...................62

  2.  No Reasonable Jury Could Find That Water Lead Levels Would Have Decreased If The City Had Implemented Corrosion Controls Or Switched Back To Detroit Water In February-March 2015 ....................................................................................68

    a.    Plaintiffs Lack Expert Evidence About What Water Lead Levels Would Have Been ............................................................69

    b.    The Evidence Shows That Water Lead Levels Already Had Returned To Pre-Crisis Levels By The Time VNA Arrived In Flint .....................................................................................70

B.  Plaintiffs Cannot Prove That Any Amount Of Lead-Contaminated Water They May Have Consumed After February 18, 2015, Was Sufficient To Cause Or Contribute To Their Alleged Injuries .................74

  1.  Plaintiffs Must Present Evidence Of Their Level Of Lead Exposure After February 18, 2015 .....................................................75

    a.    CDC Guidelines Cannot Be Used To Prove Harmful Exposure Here .............................................................................76

    b.    The Single-Molecule Theory Of Causation Is Incompatible With Michigan Law And Sixth Circuit Precedent .......................77

  2.  Plaintiffs' Experts Concede That They Do Not, And Cannot, Identify Plaintiffs' Level Of Lead Exposure After February 18, 2015 ....................................................................................81

  3.  The Factual Record Confirms That Plaintiffs Were Not Exposed To Enough Water-Borne Lead After February 18, 2015 To Have Been Injured .........................................................................84

    a.    There Is No Evidence That Plaintiffs Consumed A Significant Amount Of Tap Water After February 18, 2015 .......85

## TABLE OF CONTENTS
### (continued)

Page

    b.  There Is No Evidence From Which A Jury Could Find That Any Flint Tap Water That Plaintiffs Might Have Consumed Contained Elevated Levels Of Lead..............................................87

    c.  Plaintiffs' Blood Lead Test Results Cannot Support A Finding That Plaintiffs Consumed Harmful Amounts Of Lead In Flint Tap Water After February 18, 2015 ......................91

    d.  Plaintiffs' Bone Lead Measurements Cannot Support A Finding That They Consumed Harmful Amounts Of Lead In Flint Tap Water After February 18, 2015 ...................95

C.  Plaintiffs Provide No Evidence Tying Their Injuries to VNA, As Opposed To Other Potential Causes...........................................99

    1.  There Are Many Other Potential Sources Of Plaintiffs' Alleged Injuries ...............................................................................100

    2.  Plaintiffs' Experts Do Not Rule Out Any Potential Alternative Causes Of Injuries ............................................................104

CONCLUSION .................................................................................106

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adams v. Cooper Indus., Inc.*,
   Civ. No. 03-476-JBC, 2007 WL 2219212 (E.D. Ky. July 30, 2007) ................75

*Alpert v. United States*,
   481 F.3d 404 (6th Cir. 2007) ..........................................................................67

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).........................................................................................4

*Antcliff v. State Emps. Credit Union*,
   414 Mich. 624 (1982) .....................................................................................47

*Atlanta Int'l Ins. v. Bell*,
   438 Mich. 512 (1991) ..........................................................................31, 32, 40

*Auburn Hills Tax Increment Fin. Auth. v. Haussman Constr. Co.*,
   No. 333972, 2018 WL 385057 (Mich. Ct. App. Jan. 11, 2018).......................35

*Barabin v. Scapa Dryer Fabrics, Inc.*,
   No. 07-cv-1454, 2018 WL 840147 (W.D. Wash. Feb. 12, 2018) .....................81

*Bailey v. Schaaf*,
   494 Mich. 595 (2013) .....................................................................................54

*Barlow v. John Crane-Houdaille, Inc.*,
   191 Mich. App. 244 (1991) ..........................................................................6, 16

*Best v. Lowe's Home Ctrs., Inc.*,
   563 F.3d 171 (6th Cir. 2009) .........................................................................106

*Broz v. Plante & Moran, PLLC*,
   331 Mich. App. 39 (2020) ................................................................................5

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).........................................................................................4

*In re Certified Question from Fourteenth Dist. Ct. of Apps. of Tex.*,
   479 Mich. 498 (2007) ...............................................................................*passim*

vii

# TABLE OF AUTHORITIES
### (continued)

**Cases (continued)**                                                              **Page(s)**

*Charles Reinhart Co. v. Winiemko*,
  444 Mich. 579 (1994) ........................................................................................6

*City of Huntington Woods v. Orchard, Hiltz & McCliment, Inc.*,
  No. 301987, 2012 WL 1649782 (Mich. Ct. App. May 10, 2012)................6, 28

*Clark v. Dalman*,
  379 Mich. 251 (1967) ........................................................................................31

*Craig ex rel. Craig v. Oakwood Hosp.*,
  471 Mich. 67 (2004) ..........................................................................................16

*Crestmark Bank v. Electrolux Home Prods. Inc.*,
  155 F. Supp. 3d 723 (E.D. Mich. 2016) .............................................................5

*In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*,
  756 F.3d 917 (6th Cir. 2014) .............................................................................47

*Dyer v. Trachtman*,
  470 Mich. 45 (2004) ....................................................................................34, 53

*Elher v. Misra*,
  499 Mich. 11 (2016) ..........................................................................................69

*In re Flint Water Cases*,
  329 F. Supp. 3d 369 (E.D. Mich. 2018) ...........................................................13

*In re Flint Water Cases*,
  384 F. Supp. 3d 802 (E.D. Mich. 2019) ...........................................................13

*In re Flint Water Cases*,
  No. 5:17-cv-10164, 2019 WL 3530874 (E.D. Mich. Aug. 2, 2019) ...................5

*Francisco v. Manson, Jackson & Kane, Inc.*
  145 Mich. App. 255 (1985) ...............................................................................35

*Friedman v. Dozorc*,
  412 Mich. 1 (1981) ............................................................................................31

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                 **Page(s)**

*Fultz v. Union-Commerce Assocs.*,
470 Mich. 460 (2004) ............................................................................32, 39, 54

*Gerling Konzern Allgemeine Versicherungs AG v. Lawson*,
472 Mich. 44 (2005) ......................................................................................32

*Gregg v. Allen-Bradley Co.*,
801 F.2d 859 (6th Cir. 1986) .........................................................................95

*Griffin v. Hardrick*,
604 F.3d 949 (6th Cir. 2010) .........................................................................67

*Groncki v. Detroit Edison Co.*,
453 Mich. 644 (1996) ....................................................................................46

*Guertin v. Michigan*,
No. 16-cv-12412, 2017 WL 2991768 (E.D. Mich. July 14, 2017) .............28, 55

*Harrow Prods., Inc. v. Liberty Mut. Ins.*,
64 F.3d 1015 (6th Cir. 1995) .........................................................................17

*Haskins v. 3M Comp.*,
No. 15-cv-02086, 2017 WL 3118017 (D.S.C. July 21, 2017) ..........................81

*Henry v. Dow Chem. Co.*,
473 Mich. 63 (2005) ........................................................................................6

*Hill v. Kokosky*,
186 Mich. App. 300 (1990) ...........................................................................38

*Hill v. Sears, Roebuck & Co.*,
492 Mich. 651 (2012) ...........................................................................*passim*

*Krik v. Exxon Mobil Corp.*,
870 F.3d 669 (7th Cir. 2017) ....................................................................79, 80

*Lee v. City of Flint*,
No. 17-cv-11726, 2021 WL 1178059 (E.D. Mich. Mar. 29, 2021) ...........*passim*

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)** **Page(s)**

*Lindstrom v. A-C Prod. Liab. Tr.*,
424 F.3d 488 (6th Cir. 2005) .................................................................79, 80, 84

*Locke v. Pachtman*,
446 Mich. 216 (1994) ...................................................................................55, 56

*Loweke v. Ann Arbor Ceiling & Partition Co.*,
489 Mich. 157 (2011) ...........................................................................................54

*Lowery v. Enbridge Energy Ltd. P'ship*,
500 Mich. 1034 (2017) ......................................................................69, 74, 100

*MacDonald v. PKT, Inc.*,
464 Mich. 322 (2001) ...........................................................................................44

*Malik v. William Beaumont Hosp.*,
168 Mich. App. 159 (1988) .................................................................................31

*Martin v. Cincinnati Gas & Elec. Co.*,
561 F.3d 439 (6th Cir. 2009) .............................................................................80

*Mascarenas v. Union Carbide Corp.*,
196 Mich. App. 240 (1992) .........................................................................16, 58

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)..................................................................................................76

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).....................................................................................4, 106

*McClain v. Metabolife Int'l, Inc.*,
401 F.3d 1233 (11th Cir. 2005) ...................................................................76, 77

*Mieras v. DeBona*,
452 Mich. 278 (1996) ...................................................................................*passim*

*Moeller v. Garlock Sealing Techs., LLC*,
660 F.3d 950 (6th Cir. 2011) .......................................................................16, 79

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                    **Page(s)**

*Monks v. Gen. Elec. Co.*,
   919 F.2d 1189 (6th Cir. 1990) ...................................................................99, 106

*Moore v. Philip Morris Cos.*,
   8 F.3d 335 (6th Cir. 1993) ...................................................................................4

*Naccarato v. Grob*,
   384 Mich. 248 (1970) ..........................................................................................7

*NBD Bank, NA Tr. Div. v. Barry*,
   223 Mich. App. 370 (1997) ................................................................................38

*Nelson v. Am. Sterilizer Co.*,
   223 Mich. App. 485 (1997) ................................................................................69

*Oja v. Kin*,
   229 Mich. App. 184 (1998) ................................................................................54

*Pluck v. BP Oil Pipeline Co.*,
   640 F.3d 671 (6th Cir. 2011) ...........................................................74, 75, 100

*Powell-Murphy v. Revitalizing Auto Cmtys. Env't Response Tr.*,
   — Mich. App. —, No. 348690, 2020 WL 4722070 (Aug. 13, 2020) .........*passim*

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000)..................................................................................4, 62

*Roberts v. Owens-Corning Fiberglas Corp.*,
   726 F. Supp. 172 (W.D. Mich. 1989) ................................................................16

*Roberts v. Salmi*,
   308 Mich. App. 605 (2014) ........................................................................*passim*

*Sabbagh v. Hamilton Psychological Servs., PLC*,
   329 Mich. App. 324 (2019) .........................................................................37, 38

*Samson v. Saginaw Prof'l Bldg., Inc.*,
   393 Mich. 393 (1975) ........................................................................................39

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                                **Page(s)**

*Sassaman v. Estes*,
  No. 205552, 1999 WL 33439656 (Mich. Ct. App. July 16, 1999) ..............55, 56

*Saur v. Probes*,
  190 Mich. App. 636 (1991) .........................................................................18, 31

*Scott v. Harris*,
  550 U.S. 372 (2007)............................................................................................67

*Simko v. Blake*,
  448 Mich. 648 (1995) .....................................................................................29, 56

*Skinner v. Square D Co.*,
  445 Mich. 153 (1994) ..................................................................................*passim*

*Smith v. Allendale Mut. Ins.*,
  410 Mich. 685 (1981) ...........................................................................39, 41, 46

*Stallings v. Georgia-Pacific Corp.*,
  675 F. App'x 548 (6th Cir. 2017) ................................................................16, 79

*Stark v. Armstrong World Indus., Inc.*,
  21 F. App'x 371 (6th Cir. 2001) ................................................................75, 79

*Tamraz v. Lincoln Elec. Co.*,
  620 F.3d 665 (6th Cir. 2010) ...............................................................100, 104

*Trice v. Oakland Dev. Ltd. P'ship*,
  No. 278392, 2008 WL 7488023 (Mich. Ct. App. Dec. 16, 2008).....................75

*Viet v. Le*,
  951 F.3d 818 (6th Cir. 2020) .............................................................................4

*Washington v. Dep't of Transp.*,
  8 F.3d 296 (5th Cir. 1993) .................................................................................63

*Wheeler v. Estes Exp. Lines*,
  53 F. Supp. 3d 1032 (S.D. Ohio 2014) .............................................................63

## TABLE OF AUTHORITIES
### (continued)

**Cases (continued)**                                                      **Page(s)**

*Williams v. Cunningham Drug Stores, Inc.*,
   429 Mich. 495 (1988) ...................................................................................51

*Wilson v. Bradlees of New Eng., Inc.*,
   250 F.3d 10 (1st Cir. 2001)..........................................................................63

**Regulations and Rules**

40 C.F.R. § 141.64 ..........................................................................................23, 67

40 C.F.R. § 141.80 ..........................................................................................23, 88

Fed. R. Civ. P. 56 ..............................................................................................3, 67

Fed. R. Evid. 701 ...................................................................................................63

Fed. R. Evid. 702 .....................................................................................94, 96, 104

**Other Authorities**

ACLU Michigan, *Hard To Swallow:  Toxic Water Under A Toxic System
   in Flint, An ACLU of Michigan Documentary* (June 25, 2015) .........................60

CDC, *Blood Lead Levels In Children* (April 5, 2021).............................................76

CDC, *Lead in Drinking Water* (Nov. 18, 2020) .....................................................86

FDA, *FDA Announces New Actions Aimed at Further Reducing Toxic
   Elements in Food for Babies, Young Children* (Mar. 5, 2021).........................101

Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* (2d ed. 2000) ...........75, 76

Restatement (Second) Torts (1965) ...................................................................39, 40

Restatement (Third) of The Law Governing Lawyers (2000)................................53

**INTRODUCTION**

Plaintiffs are four children who allegedly were injured from exposure to lead in Flint water. They each bring a claim for professional negligence against VNA, arising out of VNA's short consulting engagement for the City of Flint nearly one year after the start of the Flint water crisis. There are many reasons why the Court should grant summary judgment to VNA on those claims.

*First*, three of the four Plaintiffs' claims fail for the simple reason that they stopped consuming Flint water before VNA started its work in Flint. VNA therefore cannot possibly have caused them any injuries. This Court has recognized that VNA "can't be held responsible for things that happened before" it "showed up" in Flint. So the Court should grant summary judgment against those Plaintiffs at the outset.

*Second*, no Plaintiff can establish the elements of duty or breach. Although the complaint alleges various theories of negligence, Plaintiffs present expert evidence only on two of those theories—that VNA breached a duty to "insert" itself into Flint before it even was hired by the City, and that VNA breached a duty to "insist" that the City either use corrosion controls or return to Detroit water (even though VNA did recommend corrosion controls, and city officials told VNA that they would not return to Detroit water). The Court therefore should grant VNA summary judgment as to all other theories of negligence alleged in the complaint.

1

The Court also should grant VNA summary judgment as to the two theories for which Plaintiffs do present expert evidence.  As a matter of law, VNA did not owe Plaintiffs any duty of professional care.  VNA was hired by the City, not Plaintiffs, and the general rule under Michigan law is that a professional's duty runs only to its client.  Michigan courts extend a professional's duty to a third party only in limited circumstances not present here.  Extending VNA's duty of care to Plaintiffs would massively expand the scope of professional-services liability.  Although this Court held in *Lee v. City of Flint*, No. 17-cv-11726, 2021 WL 1178059 (E.D. Mich. Mar. 29, 2021), that VNA's duty could extend to certain third parties, that decision failed to address key aspects of Michigan law.

Even if VNA may have owed some duty of care to Plaintiffs, VNA did not owe them the two duties their expert asserts, and Plaintiffs cannot prove that VNA breached those duties.  Both theories—that VNA should have inserted itself into Flint before the City hired it and that VNA should have insisted that the City follow its advice—are invalid as a matter of law and are unsupported by the evidence.  VNA could not have owed the City any duty before it was hired, and a consulting engineer cannot "insist" that its client do anything.

*Third*, Plaintiffs' claims fail for lack of causation.  City officials told VNA not to address the possibility of returning to Detroit water and made clear that the City would not add corrosion controls unless ordered to by the State.  So no reasonable

jury could find that the City would have acted differently if only VNA had insisted. And even if the City would have acted differently, there is no evidence that water lead levels would have meaningfully fallen as a result (because they already had fallen to pre-crisis levels by the time VNA was hired in Flint).

Further, Plaintiffs have no evidence that any of them were exposed to enough lead from drinking tap water after VNA began its work in Flint for that exposure to have caused or aggravated their injuries. Their blood lead tests ██████████ ██████████████████, and they lived in homes without lead service lines. Plaintiffs argue that *any* lead exposure causes injury, but Michigan courts have rejected that theory as legally insufficient and scientifically invalid. Plaintiffs also attempt to show exposure through bone lead scans. Not only are those scans unreliable, but they cannot show the source or timing of any lead exposure. Finally, Plaintiffs make no attempt to rule out alternative sources of lead exposure or alternative causes of their injuries, so they cannot show that VNA was responsible for those injuries.

For all of these reasons, the Court should grant summary judgment to VNA.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a court should grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The

3

moving party is entitled to summary judgment when the nonmoving party cannot "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *accord Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020). When "the record taken as a whole could not lead a rational trier of fact to find" in the non-moving party's favor, the Court should grant summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party may show that no genuine issue of material fact exists by pointing out the "absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The "mere existence of a scintilla of evidence" supporting the nonmoving party is insufficient, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); rather, the nonmoving party must present "significant probative evidence," *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[T]he court should give credence to the evidence favoring the non-movant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (internal quotation marks omitted).

When there are no disputed material facts, and the motion presents a pure question of law, trial is unnecessary, and the Court should grant summary judgment.

*See, e.g.*, *Crestmark Bank v. Electrolux Home Prods. Inc.*, 155 F. Supp. 3d 723, 747 (E.D. Mich. 2016) (Levy, J.).

### ARGUMENT

Plaintiffs E.S., A.T., R.V., and D.W. are four children who lived in Flint during 2014 and 2015. They claim that they were injured from exposure to lead in Flint drinking water during the Flint water crisis. *See* Fifth Am. Case Mgmt. Order at 61, *In re Flint Water Litig.*, No. 16-cv-10444 ECF No. 1255, PageID.39324 (plaintiffs in first bellwether group "only claim lead-induced injuries"). Their only cause of action against VNA is for professional negligence. *See* Pls.' Am. Master Long Form Compl. ¶¶ 637-59, *Walters v. Snyder*, No. 5:17-cv-10164 ECF No. 186, PageID.5446-5450 (LFC) (professional negligence count); *In re Flint Water Cases*, No. 5:17-cv-10164, 2019 WL 3530874, at *43 (E.D. Mich. Aug. 2, 2019) (dismissing other causes of action).[2]

Under Michigan law, a claim for professional negligence "requires proof of simple negligence based on a breach of a professional standard of care." *Broz v. Plante & Moran, PLLC*, 331 Mich. App. 39, 52-53 (2020). The elements of professional negligence are: "(1) that [the] defendant owed [the plaintiffs] a duty of care, (2) that [the] defendant breached that duty, (3) that [the] plaintiffs were injured,

---

[2] Plaintiffs' Short Form Complaints adopt the *Walters* Long Form Complaint. Short Form Compl. 1, *Gaddy v. Flint*, No. 5:17-cv-11166 ECF No. 49, PageID.364; Short Form Compl. 1, *Meeks v. Flint*, No. 5:17-cv-11165 ECF No. 47, PageID.361.

and (4) that [the] defendant's breach caused [the] plaintiffs' injuries." *Henry v. Dow Chem. Co.*, 473 Mich. 63, 71-72 (2005); *see City of Huntington Woods v. Orchard, Hiltz & McCliment, Inc.*, No. 301987, 2012 WL 1649782, at *2 (Mich. Ct. App. May 10, 2012). The "plaintiff has the burden of proving all the elements" of professional negligence. *Charles Reinhart Co. v. Winiemko*, 444 Mich. 579, 586 (1994).

Plaintiffs cannot meet their burden to prove duty, breach, and causation.

## I.   VNA Could Not Have Caused Or Contributed To Plaintiffs R.V.'s, D.W.'s, Or E.S.'s Alleged Injuries Because They Stopped Using Flint Water Before VNA Arrived In Flint

The most basic problem with R.V.'s, D.W.'s, and E.S.'s claims against VNA is that these three Plaintiffs stopped consuming unfiltered Flint tap water long before VNA began its engagement in Flint.[3] VNA therefore could not possibly have caused or contributed to their injuries. The Court need look no further to grant VNA summary judgment on E.S.'s, R.V.'s, and D.W.'s claims.

### A.   R.V., D.W., And E.S. Stopped Using Flint Water Before VNA Started Its Work In Flint In February 2015

The "threshold requirement" in a toxic-tort case "is proof that an injured plaintiff was exposed to a [toxin] for which a defendant is responsible." *Barlow v. John Crane-Houdaille, Inc.*, 191 Mich. App. 244, 247 (1991). Otherwise, a plaintiff cannot prove that the defendant caused the alleged injuries, as required by Michigan

---

[3]   The evidence of A.T.'s water usage in 2015 is equivocal, *see* pp. 85-87, *infra*, so VNA is not seeking summary judgment against ■ on this ground.

law.  *See, e.g.*, *Powell-Murphy v. Revitalizing Auto Cmtys. Env't Response Tr.*, — Mich. App. —, No. 348690, 2020 WL 4722070, at *6 (Aug. 13, 2020).

To meet that requirement here, Plaintiffs need evidence that they consumed lead-contaminated tap water after the earliest date of any allegedly negligent act or omission by VNA.  *See Naccarato v. Grob*, 384 Mich. 248, 255 (1970) (agreeing that second tortfeasor "ought to be liable for only that portion of damages fairly found to have occurred after" his alleged malpractice).  The start date of VNA's contract with the City was February 10, 2015—about nine and a half months after the switch from Detroit water to Flint River water.  *See* Ex. 2, VWNAOS018932 at 9 (Contract); *see also* pp. 19-27, *infra*.  The earliest that VNA did anything that Plaintiffs could contend was negligent was on February 18, 2015, when VNA issued its Interim Report.  *See* Ex. 3, VWNAOS020165 at 1 (VNA Interim Report).  Thus, to prove causation, Plaintiffs must show that they consumed Flint tap water after February 18, 2015.  R.V., D.W., and E.S. cannot make that showing.

### 1.    R.V.'s Family Stopped Using Flint Water In 2014

R.V. was born on ███████████.  Ex. 4, Pl.'s Fact Sheet (R.V.) 5.  In September 2014, when R.V. ███████████████, ██ family moved from ██████ to a residence located at ███████████████ in Flint.  Ex. 5, ███████████ Dep. 9:3-7, 11:3-9, 20:20-21:7.

In late 2014, R.V.'s family stopped using tap water for drinking or cooking, and instead began using bottled water—.

Ex. 5, ██████████ Dep. 60:20-61:11, 81:1-12, 118:18-22. R.V.'s mother, ██████ ██████████, testified that her family, including R.V., stopped drinking and cooking with the tap water in November or December 2014 (which was shortly after the family moved to Flint in September 2014) because they learned that the water was unsafe, *see id*. at 58:11-59:22, 60:20-61:11, 75:6-9, 81:1-7:

> Q.  And so when you heard those news reports in late 2014, you and your family stopped drinking the water?
>
> A.  Correct. . . .
>
> Q.  And [your children] also stopped drinking the water at that time?
>
> A.  Yes. . . .
>
> Q.  And did you also at the same time, late 2014, stop using the water out of the faucets or taps for cooking?
>
> A.  Yes.

*Id*. at 60:20-22, 61:5-11.  Their family, including R.V., began using bottled water after that time:

> Q.  . . .  [I]s it an accurate statement that as of about October or November of 2014 ███████████████, were you using bottled water at that point?
>
> A.  Yes.

*Id*. at 118:18-22.  Ms. ████████ further testified that R.V. *never* consumed Flint water away from home after they stopped using the water in late 2014, and the record contains no evidence to the contrary:

Q. . . . My understanding is that after you and your children stopped drinking tap water in late 2014, [R.V.] wasn't drinking tap water at any other place in Flint, was 

A. No.

*Id.* at 76:8-12. Indeed, R.V. could not have consumed Flint water at school because

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Ex. 6,

Finely Report 52. As of February 2020, the R.V.'s family was still using only bottled

water for drinking and cooking. Ex. 5, ▉▉▉▉▉▉ Dep. 74:12-16.

## 2.    D.W.'s Family Stopped Using Flint Water in 2014

D.W. was born on ▉▉▉▉▉▉. Ex. 7, Pl.'s Fact Sheet (D.W.) 5. In April

2014, at the start of the Flint water crisis, D.W. was ▉▉▉▉▉▉. From April 2014

until November 2015, D.W. lived with ▉ family in an apartment building located

at ▉▉▉▉▉▉▉▉ in Flint. Ex. 8, ▉▉▉ Dep. 44:19-45:10.

D.W.'s family, including D.W., stopped drinking, cooking, and bathing with

Flint tap water before the end of the summer of 2014. D.W.'s mother, ▉▉▉▉▉▉

▉▉, testified that her family, including D.W., stopped drinking the tap water in

2014 on the advice of a pediatrician, Ex. 8, ▉▉▉ Dep. 69:1-70:1:

Q. And this is in 2014 when you noticed these changes in the water?

A. Yes.

Q. And when you expressed these concerns, what did the doctor tell you?

A. I was—that it might not be the water—well, not to drink the water.

Q. So they told you don't drink the water?

A. Yes.

9

Q. And I assume you followed that advice?

A. Yes. . . .

Q. Including [D.W.]? . . .

A. Yes.

*Id*. at 69:4-20. Specifically, D.W. stopped drinking the tap water by "late spring [or]

early summer of 2014," *id*. at 70:2-4:

Q. So when in 2014 was it that you and your children stopped drinking
the water coming out of the taps?

A. I can't exactly recall exactly when we stopped drinking the water,
but it wasn't too long after it—after April.

Q. . . . So sometime by late spring or early summer?

A. Yes. Yes.

*Id*. at 69:21-70:3. Ms. ███ also stopped using tap water to make food for D.W.

"by midsummer or so of 2014," *id*. at 70:13-17:

Q. Did you stop using it for cooking also at the same time?

A. Yes. A little after that.

Q. . . . So by midsummer or so of 2014?

A. Yes.

*Id*. Ms. ███ confirmed that they were "for sure" using only bottled water for

"[c]ooking and drinking" by the end of the summer of 2014. *Id*. at 74:5-9. Ms.

███ specified that, after mid-2014, the family used only bottled water for

drinking, cooking, and bathing. *Id*. at 74:5-11. She explained that when she stopped

using tap water at home in 2014, she told D.W. to stop drinking Flint water anywhere

else:

Q.  . . .  Did you ever tell [D.W.] after you decided to stop giving ▮ water at home that ▮ shouldn't drink Flint water anywhere else?

A.  Yes, I did tell ▮.

*Id*. at 109:9-12.  The record contains no evidence that D.W. ever disregarded that instruction at school or elsewhere.  As of February 2020, D.W. and ▮ family still were using only bottled water for drinking and cooking.  *Id*. at 73:19-74:4.

### 3.    E.S.'s Family Stopped Using Flint Water In 2014

E.S. was born ▮▮▮▮. Ex. 9, Pl.'s Fact Sheet (E.S.) 5. ▮ was ▮▮▮ in April 2014, at the start of the Flint water crisis.  Since April 2014, E.S. and ▮ family have lived at ▮▮▮ in Flint.  *Id.*

E.S.'s family stopped using Flint tap water for drinking and cooking in 2014, when they switched to bottled water for both purposes. Ex. 10, ▮▮ Dep. 157:1-13; 158:10-159:7; 165:18-23; 186:10-18; 187:2-11; 264:15-22.  There is no evidence that E.S. consumed unfiltered Flint tap water at any time after ▮ family stopped using Flint tap water.  E.S.'s mother, ▮▮▮, testified repeatedly that her family, including E.S., stopped drinking and cooking with the tap water at home in 2014 after hearing that the water was unsafe:

Q.  . . .  So then did you stop drinking the water shortly after April 25, 2014?

A.  Correct, because they told us not to drink the water.

Q.  Okay.  So was it a month, two months after?  Was that a fair estimation?

A.  I wouldn't—I can't—I don't know.

Q. Three months?

A. . . . I don't have an exact date.

Q. But it was in 2014?

A. Correct.

*Id.* at 158:10-159:1.  Their family began using bottled water at home after 2014, and

indeed, Ms. ▮▮▮▮ reported that they continued to use only bottled water for

drinking and cooking as of the time of her deposition in 2020, *id.* at 186:13-187:11:

Q. . . . [Y]ou indicated that you stopped drinking the water in 2014, right?

A. Correct.

Q. Okay.  And then did you start drinking bottled water at that point?

A. Yes.

*Id.* at 165:18-23.

There is no evidence that E.S. drank Flint water at other locations.  E.S.

sometimes visited ▮ grandmother and other family members who lived in Flint, *see*

Ex. 10, ▮▮▮▮ Dep. 210:16-18, 211:2-3, but there is no evidence that ▮ drank

unfiltered water at their homes.  Plaintiffs' toxicologist Dr. Robert Michaels agrees

that the evidence indicates that E.S.'s grandmother also stopped using unfiltered tap

water for drinking in 2014.  *See* Ex. 11, Michaels Report 47.[4]  Ms. ▮▮▮▮ testified

that E.S. never attended ▮▮▮▮ and did not spend time at the homes of non-family

---

[4]    During her deposition, Ms. Wheeler mentioned one instance in which E.S.'s brother claimed that her mother had cooked for E.S. using Flint water, but Ms. Wheeler believed that the water was filtered.  Ex. 10, Wheeler Dep. 161:13-162:15.

members in 2014-2015.  Ex. 10, ███████ Dep. 210:13-211:1.  And E.S. could not

have consumed unfiltered tap water at school during the crisis because █ did not

███████████████████—after the plumbing in █ school had been renovated

and filters had been added.  *See* Ex. 6, Finley Report 35, 40; Ex. 10, ██████ Dep.

107:11-12.

## B.     VNA Cannot Be Liable For Any Injuries That Occurred Before Its Engagement In Flint

Because R.V., D.W., and E.S., cannot show that they consumed Flint water

after February 18, 2015, VNA cannot be liable for their alleged injuries.  As the

Court has recognized, VNA "can't be held responsible for things that happened

before" VNA "showed up" in Flint.  Tr. of Nov. 6, 2019, Status Conference at 22-

23, *In re Flint Water Litig.*, No. 16-cv-10444 ECF No. 1009, PageID.26085-26086

(Nov. 6, 2019, Tr.) ("That's the one thing in this whole case that seems

uncomplicated to me.").  Accordingly, the Court previously dismissed the claims of

Amber Brown and her infant daughter K.L.D. because "Brown and K.L.D.'s

allegations of harm end at the date of K.L.D.'s birth, months before Veolia became

involved in this crisis."  *In re Flint Water Cases*, 329 F. Supp. 3d 369, 424-25 (E.D.

Mich. 2018), *vacated*, 2018 WL 11290626 (E.D. Mich. Nov. 9, 2018); *see In re Flint

Water Cases*, 384 F. Supp. 3d 802, 866, 874 (E.D. Mich. 2019) (confirming that

Brown's and K.L.D.'s claims remain dismissed).

That is just common sense.  As Plaintiffs' pediatrician Dr. William Bithoney

admitted, "[i]f [Plaintiffs] weren't drinking [the water], they weren't exposed," and

cannot have been injured as a result, Ex. 12, Bithoney Dep. 231:21-22:

> Q.  Same question for all of the four bellwethers.  The period of time
> over which they were exposed to lead from the water from having been
> drinking the water would be the period of time based on . . . whatever
> period of time it is that they said they were drinking the water, from
> April 2014 through the period of time that they stopped, right?
>
> A.  Yes. . . .
>
> Q.  And then so therefore to the extent that lead caused any of the
> problems and conditions . . . that you believe w[ere] caused by lead, . . .
> the exposure period would have ended as of the point in time that they
> stopped drinking the water, right?
>
> A.  Yes.

*Id*. at 236:16-24, 237:18-24; *see* Ex. 6, Finley Report 66.

Plaintiffs' counsel agreed that VNA can be liable for a plaintiff's injuries only

if that plaintiff can show that he or she drank water after VNA's alleged negligence.

In opposing the class plaintiffs' motion for class certification, counsel for these

Plaintiffs admitted that any claimant "will need to show that [he or she] consumed

public water, rather than strictly bottled water."  Co-Liaison Counsel's Opp. to

Interim Co-Lead Counsel for the Putative Class's Mot. for Class Certification at 11,

*In re Flint Water Litig.*, No. 16-cv-10444 ECF No. 1392, PageID.54006 (Pls.' Class

Cert. Opp.).  They further admitted—correctly—that because "some class members

shifted promptly to bottled water for drinking after the April 25, 2014 switchover to

Flint River water," *id.* at 13, PageID.54008, and before VNA began providing its

14

services to the City in 2015, "not every episode of . . . engineering negligence will be a proximate cause of every class member's claim," *id*. at 20, PageID.54015.

Plaintiffs R.V., D.W., and E.S. cannot show that they consumed Flint water after VNA's engagement, and so they cannot show causation. There is *no* evidence that any of them consumed unfiltered Flint tap water after VNA was hired. To the contrary, it is undisputed that each of their families stopped using Flint tap water for drinking and cooking at their homes in 2014, well before VNA arrived in Flint—and all the evidence is that none of them drank unfiltered tap water at any other location in Flint thereafter. Dr. Bithoney concedes that they stopped drinking the water at home in 2014. *See* Ex. 13, Bithoney Report (E.S.) 3; Ex. 14, Bithoney Report (R.V.) 2; Ex. 15, Bithoney Report (D.W.) 4; *see also* Ex. 16, Gaitanis Report (E.S.) 5; Ex. 17, Gaitanis Report (R.V.) 4; Ex. 18, Gaitanis Report (D.W.) 5.

Dr. Bithoney and Dr. Michaels speculate that, even after R.V., D.W., and E.S. stopped drinking tap water at home, they *could have* been exposed to lead-contaminated water at school or elsewhere in Flint. Ex. 12, Bithoney Dep. 239:04-08, 239:21-240:1; Ex. 19, Michaels Dep. 70:21-71:2.[5] But Plaintiffs have not provided any evidence that they *did* consume unfiltered Flint tap water anywhere

---

[5]   Plaintiffs' third expert on causation, Dr. Joseph Graziano, provides no opinion as to whether Plaintiffs' alleged lead exposure was from Flint water, let alone from Flint water after VNA began its work for the City. *See* Ex. 20, Graziano Dep. 87:10-88:3.

after 2014. And the record evidence shows that they did not. Because Plaintiffs have the burden to prove that VNA caused their alleged injuries, their experts' speculation that they "may have" been exposed to the water after VNA arrived in Flint is insufficient. *Mascarenas v. Union Carbide Corp.*, 196 Mich. App. 240, 250 (1992) (plaintiffs' evidence that they "may have used" defendants' products was insufficient), *overruled in part on other grounds by Trentadue v. Buckler Lawn Automatic Sprinkler*, 479 Mich. 378 (2007); *see, e.g.*, *Roberts v. Owens-Corning Fiberglas Corp.*, 726 F. Supp. 172, 174 (W.D. Mich. 1989) (there is no "presumption of exposure" under Michigan law).

Michigan law is clear that a "mere possibility" of causation is insufficient to establish negligence. *Skinner v. Square D Co.*, 445 Mich. 153, 165 (1994); *see Craig ex rel. Craig v. Oakwood Hosp.*, 471 Mich. 67, 87 (2004) (plaintiff cannot prove causation "by showing only that [the defendant] *may* have caused [his or her] injuries.").[6] R.V., D.W., and E.S. can prove no more than that here. "[S]peculation"

---

[6]   For example, Michigan courts have entered judgment for defendants in asbestos cases when the evidence showed only that the defendants' asbestos-containing products were present "somewhere at [the plaintiff's] workplace" but not that the products were "used in the specific area where [the plaintiff] worked." *Barlow*, 191 Mich. App. at 248; *accord Moeller v. Garlock Sealing Techs., LLC*, 660 F.3d 950, 955 (6th Cir. 2011) (reversing denial of defendant's motion for judgment as a matter of law because plaintiff "presented no evidence quantifying [his] exposure to asbestos from" defendant's products); *Stallings v. Georgia-Pacific Corp.*, 675 F. App'x 548, 551 (6th Cir. 2017) (affirming summary judgment for defendant because

by Plaintiffs' experts "is insufficient to withstand summary judgment." *Harrow Prods., Inc. v. Liberty Mut. Ins.*, 64 F.3d 1015, 1020 (6th Cir. 1995).

Because E.S., R.V., and D.W. did not consume unfiltered Flint tap water after the City hired VNA, they cannot trace any part of their claimed injuries to VNA, and the Court should grant VNA summary judgment on their claims.

## II.     No Plaintiff Can Establish Duty Or Breach

The Court should grant VNA summary judgment on all claims because no Plaintiff can show that VNA owed him or her a duty of professional care or that VNA breached that duty of care.

As an initial matter, the Court should grant summary judgment to VNA as to all theories of professional negligence alleged in the complaint for which Plaintiffs do not present expert evidence.   A plaintiff bringing a claim for professional negligence must present expert evidence to establish negligence.  Plaintiffs present expert evidence on only two theories of negligence:  that VNA negligently failed to advise the City on lead mitigation in 2014, and that it negligently failed to insist that the City add a corrosion-control chemical or switch back to Detroit water in 2015.  The Court therefore should grant VNA summary judgment as to all other theories of negligence alleged in the complaint.

---

plaintiff "failed to present evidence showing that [defendant's] products were a probable, as opposed to a merely possible, cause of [plaintiff's] disease").

The Court should also grant VNA summary judgment as to the two theories that Plaintiffs do attempt to support with expert evidence.  As a matter of law, VNA did not have a duty of professional care to Plaintiffs because its duty was to the City, not to Plaintiffs.  The general rule under Michigan law is that a professional owes a duty of care only to its clients.  *Saur v. Probes*, 190 Mich. App. 636, 638 (1991).  In deciding whether to impose a duty, the Michigan Supreme Court considers the strength of the relationship between the parties, the foreseeability of the harm, and whether imposing a duty comports with sound public policy.  *In re Certified Question from Fourteenth Dist. Ct. of Apps. of Tex.*, 479 Mich. 498, 508 (2007).

Here, VNA had no relationship with Plaintiffs, and VNA could not have foreseen the extensive misconduct of state and city officials that caused and exacerbated the Flint water crisis.  Imposing a duty on VNA would stretch professional-services liability in Michigan beyond the breaking point, chilling the provision of professional services in the State.  Although the Court has previously concluded that VNA owed a duty of care to a delivery driver who visited Flint for his work, the Court did not address key aspects of Michigan law (including the relationship factor).  *See Lee*, 2021 WL 1178059, at *4-5.

In any event, even if VNA owed Plaintiffs some duty, it did not owe them the duties they assert.  VNA had no obligation to insert itself into the Flint water crisis before the City hired it in 2015 or to insist that the City take action at the time of

18

VNA's limited consulting engagement.  And even if VNA may have owed those duties to the City, it did not owe them to *Plaintiffs*.  Further, the opinions of Plaintiffs' expert are insufficient to establish breach:  His opinions are unreliable and unsupported, and he never purports to show that the standard of care required VNA to do what he thinks it should have done.

## A.     VNA Had A Limited Engagement In Flint

As Plaintiffs themselves allege, city and state officials caused the Flint water crisis by switching Flint's drinking water to a new source without ensuring that doing so would be safe for Flint residents.  LFC ¶¶ 77-141, PageID.5273-5290.  The officials then compounded the water crisis by downplaying and covering up the problems with the water and by refusing to take (and then delaying) steps to remediate the problems.  *Id.* ¶¶ 142-232, PageID.5290-5319.  As the Flint Water Advisory Task Force found, "[t]he Flint water crisis is a story of government failure, intransigence, unpreparedness, delay, [and] inaction."  Ex. 21, Flint Water Advisory Task Force, *Final Report* 1 (Mar. 2016) (Task Force Report); *see* LFC ¶¶ 29-50, PageID.5258-5266 (identifying city and state defendants); Compl., *Meeks v. United States*, No. 5:19-cv-13359 ECF No. 1, PageID.1-54 (E.D. Mich.) (claims against federal government).[7]  In contrast, the Task Force report does not mention VNA.

---

[7]   Three of the four bellwether plaintiffs (E.S., A.T., and D.W.) also are plaintiffs in *Meeks v. United States*, a case raising claims against the United States under the Federal Tort Claims Act for the EPA's role in the Flint water crisis.  On April 29,

### 1.   City And State Officials Caused The Flint Water Crisis By Switching From Detroit Water To Flint River Water

In 2011, then-Governor Snyder appointed an emergency manager to take over the management of the City's financial decision making.  *See* Ex. 22, Mar-30-2020 GOV0036300.  In 2013, the City's Emergency Manager decided that the City would stop buying drinking water from Detroit and instead would join a consortium of municipalities to create a new public water supply system, the Karegnondi Water Authority.   LFC ¶¶ 78-109, 262-264, PageID.5273-5282, 5326-5327; Ex. 23, COF_FED_0043822 at COF_FED_0043824.  But the new system would not be ready until 2016 at the earliest.   LFC ¶ 266, PageID.5327; Ex. 24, COF_FED_0032174 at COF_FED_0032174.  The City's temporary solution was to use the existing Flint Water Treatment Plant to treat and distribute Flint River water. LFC ¶ 271, PageID.5328; Ex. 24, COF_FED_0032174 at COF_FED_0032174.

Using the Flint Water Treatment Plant required significant upgrades to the plant.  Since the 1960s, the City had used the plant only in emergencies.  LFC ¶ 278, PageID.5332; Ex. 25, Oct-7-2019 EGLE0058088 at 1.  But the City proposed overhauling the plant for full-time use during the interim period, turning to Lockwood, Andrews & Newnam, Inc., Lockwood, Andrews & Newnam, P.C., and

---

2020, this Court consolidated *Meeks v. United States* with the other Flint water cases pending before the Court.  *See* Order, *Walters v. Snyder*, No. 5:17-cv-10164 ECF No. 294, PageID.8505-8512.

Leo A. Daly Company (collectively, LAN) to provide recommendations for the necessary upgrades and improvements to the plant.  LFC ¶¶ 267-286, PageID.5327-5334; Ex. 25, Oct-7-2019 EGLE0058088 at 8-10; Ex. 26, LAN_FLINT_00063889 at LAN_FLINT_00063904.  The Governor's Office, Department of Environmental Quality (MDEQ), and Treasurer's Office all approved that plan.  LFC ¶¶ 107-114, 120, 125, PageID.5281-5283, 5284, 5286; *see* Ex. 21, Task Force Report 16-17; Ex. 27, 6-6-2016 SOM-MASON 00063591; Ex. 28, Mar-30-2020 TREAS037224.

The refurbishment of the Flint Water Treatment Plant was inadequate.  The City knew that Flint River water was challenging to treat because of high levels of industrial run-off, organic matter, and contaminants in the water.  LFC ¶¶ 83, 243-244, 248, PageID.5274, 5322-5323; Ex. 25, Oct-7-2019 EGLE0058088 at 7-8.  But the City did not upgrade the Plant with necessary treatment equipment and did not adequately train the Plant's staff.  LFC ¶ 121, PageID.5284-5285; Ex. 29, Green Dep. 30:8-34:8; Ex. 30, COF_FED_0540536 at COF_FED_0540574; Ex. 31, 04-15-2016 SOM0024921.  MDEQ, the regulatory agency in charge of supervising the water-source switch, told the City that it did not need to use corrosion controls or fully study the corrosion-control issue before the switch.  LFC ¶ 281, PageID.5332; Ex. 21, Task Force Report 27; Ex. 32, Glasgow Dep. 73:18-74:8, 218:12-16.

A week before the switch, the Plant's manager, Michael Glasgow, warned city and state officials that his staff and equipment were not prepared for the switch.  LFC

¶ 121, PageID.5284-5285; Ex. 31, 04-15-2016 SOM0024921.  But the officials

ignored the warnings.  LFC ¶¶ 122-123, 126, PageID.5285-5286; Ex. 32, Glasgow

Dep. 479:20-480:6.  On April 25, 2014, the City switched to Flint River water.  LFC

¶ 287, PageID.5334; Ex. 24, COF_FED_0032174.

### 2. The Switch To Flint River Water Caused Numerous Problems With Flint Water Including Some That City And State Officials Covered Up

Almost immediately, Flint residents complained of problems.  LFC ¶ 288,

PageID.5334; Ex. 32, Glasgow Dep. 488:16-20.  Residents stated that the water

smelled bad and was discolored, and that they felt ill after drinking it.  LFC ¶ 288,

PageID.5334; Ex. 32, Glasgow Dep. 512:6-15; Ex. 33, Johnson Dep. 569:9-17.

Plaintiffs' own experiences are representative:  After the switch from Detroit water,

the water at their homes began to look, smell, and taste different.  *See* Ex. 8, ▮▮▮▮

Dep. 63:20-67:3 ("looked like urine"; "feces odor"; "didn't taste like water"); Ex.

10, ▮▮▮ Dep. 154:22-155:21; Ex. 34, ▮▮▮ Dep. 98:5-99:13.[8]

Other problems quickly arose.  In August-September 2014, the City issued

boil-water advisories due to high levels of *E. coli*.  LFC ¶ 290, PageID.5335; Ex. 35,

COF_FED_0042553; Ex. 36, COF_FED_0007288; Ex. 37, COF_FED_0010485.

The City responded to the *E. coli* problem by increasing the concentration of chlorine

---

[8]   In response to these problems, many Flint residents, including Plaintiffs R.V., D.W., and E.S., stopped using the water.  *See* pp. 6-13, *supra*.  Indeed, from 2013 to 2015, tap water use in Flint declined by 67%.  *See* Ex. 6, Finley Report 18.

in the water.  LFC ¶ 291, PageID.5335; Ex. 37, COF_FED_0010485.  That higher

concentration of chlorine led to increased levels of a disinfection byproduct called

trihalomethanes (TTHMs), which over time can be toxic and carcinogenic above a

certain level.  LFC ¶ 292, PageID.5335; *see* 40 C.F.R. § 141.64 (setting an upper

limit on the levels of TTHMs).  In December 2014, when the TTHM levels in Flint

water exceeded federal standards for the second quarter in a row, MDEQ sent the

City a violation notice.  LFC ¶ 311, PageID.5340; Ex. 38, COF_FED_1151228.

City and state officials also had reason to believe that there were problems

with the City's approach to corrosion controls.  On February 24, 2015, the City

learned of test results showing elevated lead levels at the home of Flint resident

Leanne Walters.  LFC ¶ 166 n.16, PageID.5296-5297; Ex. 39, CROFT-0000000125.

City and state officials covered those results up.   LFC ¶¶ 166 n.16, 171,

PageID.5296-5298;  Ex.  32,  Glasgow  Dep.  756:7-758:18;  Ex.  40,

COF_FED_0103992; Ex. 41, 04-15-2016 SOM0007271.  Michael Glasgow, the

manager of the Flint Water Treatment Plant, then falsified test results to be able to

report that the City was in compliance with the federal Lead and Copper Rule, by

deliberately excluding results showing elevated levels of lead that would have put

the City out of compliance.  LFC ¶¶ 194-196, PageID.5305-5307; Ex. 32, Glasgow

Dep. 722:10-725:9; Ex. 42, Mar-23-2020 GOV0206271 at 2-3; *see* 40 C.F.R.

§ 141.80(c).  MDEQ officials falsely represented to the EPA that the City had

implemented corrosion controls.  LFC ¶ 168, PageID.5297; Ex. 43, Aug-14-2019

EGLE0260445.[9]

### 3.    The City Engaged VNA For A Short Consulting Project

On January 15, 2015, shortly after receiving the TTHM violation notice from

MDEQ, the City issued a request for proposals for a consultant to help the City

"review and evaluate the water treatment process and distribution system."  LFC

¶ 319, PageID.5341; Ex. 44, COF_FED_0029138.

VNA responded to the City's request.  LFC ¶ 318, PageID.5341.  Although

VNA proposed to conduct a full review of the Flint water system, *id.* ¶ 320,

PageID.5341-5342, the City ultimately hired VNA for a more limited project, Ex. 2,

Contract 9.  The contract called for a "[o]ne [w]eek" technical review and provided

that VNA's "services will be utilized as needed and as determined solely by the City

of Flint."  *Id.* at 2, 9.  The contract required "a letter or power point presentation

reviewing   actions   taken   by   the   City   to   date,"   which   would   include

"recommendations for other ideas to try."  *Id.* at 9.

VNA reviewed specific water-quality issues at the direction of city officials,

particularly TTHMs.  Ex. 45, COF_FED_0072895 (City of Flint's statement to the

---

[9]    The EPA also knew in 2015 of elevated lead results in Flint, *see* LFC ¶¶ 167,
181, PageID.5297, 5302, but "spent way too long trusting the State" to do "the right
thing," McCarthy Testimony at 14, 40, *In re Flint Water Litig.*, No. 16-cv-10444
ECF No. 1208-1, PageID.34579, 34605.

Michigan Treasury Department that "Veolia's commissioned scope of work was to focus on the TTHM concerns"); Ex. 46, VWNAOS087372 at 2 (VNA Final Report) ("[T]he primary focus of [VNA's] review was based on solving the TTHM problem."). City officials instructed VNA *not* to review the decision to switch to Flint River water and *not* to recommend switching back to Detroit water. LFC ¶ 326, PageID.5343; Ex. 47, Gnagy Dep. 150:20-151:9; Ex. 48, Ambrose Dep. 387:12-388:9 (Emergency Manager Ambrose agreeing that he "didn't want Veolia to revisit the decision to use the Flint River"); *see also* Ex. 3, VNA Interim Report 2 ("the change from [Detroit water]" was "[n]ot in scope").

The City and VNA signed the contract on February 10, 2015. LFC ¶ 323, PageID.5342; Ex. 2, Contract 8. VNA completed the project on March 12, 2015. LFC ¶ 330, PageID.5344; Ex. 46, VNA Final Report 1. Pursuant to the contract, the City paid VNA $40,000 for its limited review. Ex. 2, Contract 9.

The City hid critical information about water lead levels from VNA. For example, the City never shared the results showing elevated lead levels at Leanne Walters' home with VNA, even though VNA's engineers were in Flint at the time. Ex. 47, Gnagy Dep. 691:10-692:10. Instead, the City provided other test results to

VNA—results that did not show any problems with the water.  *See id.* at 223:22-227:23, 651:8-24; Ex. 49, VWNAOS134132; Ex. 50, VWNAOS020758.[10]

Based on the test results that the City selectively provided, VNA issued an Interim Report on February 18, 2015, stating that Flint water was within applicable state and federal safety limits.  LFC ¶¶ 326-27, PageID.5343-5344; Ex. 3, VNA Interim Report 3.  Nonetheless, VNA's engineers told city officials that the corrosivity of the water, if left untreated, could create problems with lead in the future and that the City "needed to add phosphate to [the] water to help prevent" those problems.  Ex. 39, CROFT-0000000125; *see* Ex. 52, Bincsik Dep. 118:22-119:12.  VNA repeated that advice to City, MDEQ, and EPA officials at a meeting in early March 2015.  Ex. 53, VWNAOS060386 at 3 (presentation expressly recommending that the City "[a]dd corrosion control").

In its March 12, 2015, Final Report, VNA provided the City with a number of recommendations to address Flint's water-quality problems.  LFC ¶¶ 330-33, PageID.5344-5345; Ex. 46, VNA Final Report 4-8.  To address TTHMs, VNA

---

[10] Although VNA's engineers learned shortly before arriving in Flint of a news story about elevated lead levels at the University of Michigan-Flint, *see* Ex. 51, VWNAOS005704 at VWNAOS005704, the story involved only "isolated" sinks and fountains at two buildings on the campus, *id.* at VWNAOS005705. When VNA requested lead testing data from the City upon arriving in Flint, the data showed no lead problems.  *See* Ex. 47, Gnagy Dep. 117:13-118:10, 211:4-213:5, 450:23-452:11, 782:10-783:4.  VNA nevertheless recommended actions to address potential lead problems.

recommended that the City add a charcoal filter and increase dosages of ferric chloride, a chemical that helps remove impurities in the water.   LFC ¶ 348, Page.ID.5354; Ex. 46, VNA Final Report 9-10.   VNA also recommended that the City "initiate discussions with the State on the addition of a corrosion control chemical," such as "0.5mg/L [of] phosphate."   Ex. 46, VNA Final Report 10; *see* LFC ¶¶ 333, 349, PageID.5345, 5353-5354.   Those recommendations matched those of LAN.   LFC ¶¶ 249, 352, PageID.5323-5324, 5355; Ex. 29, Green Dep. 52:17-23, 64:2-24.   The only one of VNA's recommendations that the City adopted was to add a filter; it did not increase ferric chloride dosages or implement corrosion controls. Ex. 29, Green Dep. 41:11-43:5, 52:17-23, 64:2-24; Ex. 32, Glasgow Dep. 646:23-647:6.

VNA's engagement was limited to these two reports.   VNA's contract with the City called for only a "One Week Assessment" for a contract price "not to exceed $40,000," which would include "two water and two communication experts for a total of 40 hours each at $225 an hour plus expenses."   Ex. 2, Contract 2, 9.   None of the Plaintiffs even had heard of VNA or had any knowledge of VNA's work before filing their lawsuits.   *See* Ex. 5, ███████ Dep. 107:11-18; Ex. 8, ███ Dep. 115:4-20; Ex. 10, █████ Dep. 196:3-16; Ex. 34, ███ Dep. 160:19-22.

In October 2015, Governor Snyder finally ordered the City to switch back to Detroit water.   LFC ¶¶ 209-210, PageID.5310; Ex. 54, 04-15-2016 SOM0008786.

## B.  Plaintiffs Lack Expert Evidence To Support All But Two Of Their Theories Of Professional Negligence

To prove their claims of professional negligence, Plaintiffs must put on expert evidence to establish that VNA breached the standard of care. *Guertin v. Michigan*, No. 16-cv-12412, 2017 WL 2991768, at *2 (E.D. Mich. July 14, 2017); *see City of Huntington Woods*, 2012 WL 1649782, at *3 (plaintiffs in a professional negligence case must present expert testimony that a "professional engineer of ordinary learning, judgment, or skill" would not have done what the defendant allegedly did).

Plaintiffs' only expert on the standard of care is Richard Humann, a water-engineering consultant.  Humann opines that VNA was negligent in only two respects.  First, he contends that because VNA was working for the City of Detroit in 2014 and knew that the City of Detroit added a corrosion-control chemical to the water that it previously sold to the City of Flint, VNA should have "insert[ed] its expertise" into the Flint water crisis in 2014—even before VNA had been hired by the City—to "offer solutions to mitigate the lead contamination."  Ex. 55, Humann Report 20; *see id.* at 18.  Second, he asserts that VNA should have recommended more "[s]trong[ly]" in March 2015 that the City "immediately either implement a corrosion inhibitor or return to the [Detroit water] supply."  *Id*. at 20; *see id.* at 18 ("Veolia was obligated to insist that a corrosion inhibitor be employed—and if not, that the supply be returned to [Detroit water]").

The complaint alleges other theories, but Plaintiffs provide no expert testimony on those theories.   Specifically, the complaint alleges that VNA negligently "fail[ed] to conduct a root cause analysis" of the high TTHM levels, LFC ¶ 339, PageID.5347; "recommended increasing the dosage of ferric chloride," *id*. ¶ 348, PageID.5352; "declared that Flint's drinking water met federal and/or state and/or all applicable requirements," *id*. ¶ 644, PageID.5447; "represented that Flint's drinking water was safe," *id*. ¶ 645, PageID.5447; "failed to warn about the dangers of lead leaching into Flint's water system," *id*. ¶ 647, PageID.5448; and "recommended the addition of phosphates to the water," *id*. ¶ 649, PageID.5448. But Plaintiffs offer no expert evidence that any of these alleged actions or omissions breached the standard of care.  The Court thus should grant summary judgment on every theory of VNA's negligence that is not supported by expert opinion.

## C.    VNA Did Not Owe Plaintiffs A Duty Of Professional Care As A Matter Of Law

The Court also should grant VNA summary judgment on the two theories Plaintiffs attempt to support with expert evidence.   A plaintiff bringing a professional negligence claim must establish that the defendant owed him or her a duty of professional care. *Simko v. Blake*, 448 Mich. 648, 655 (1995).  Whether a defendant owes a duty to a plaintiff is a matter of law for the court to decide.  *Id*.

Under Michigan law, professionals generally owe a duty of professional care only to their clients.  *See Mieras v. DeBona*, 452 Mich. 278, 297 (1996).  Michigan

courts extend the professional's duty of care to third parties only in very narrow circumstances.  There must be some special relationship between the professional and the third party sufficient to justify the imposition of a duty.  *Roberts v. Salmi*, 308 Mich. App. 605, 614 (2014) (citing *In re Certified Question*, 479 Mich. at 505).  The harm to the third party must have been reasonably foreseeable.  *Id.*  And the social benefits of imposing a duty must outweigh the social costs.  *Id.*  Michigan confines a professional's duty in this way to avoid the threat of "limitless liability." *In re Certified Question*, 479 Mich. at 511.

Here, Plaintiffs were not VNA's clients, and there is no reason to extend VNA's duty to Plaintiffs.  There was no relationship between Plaintiffs and VNA. It was not foreseeable that VNA's actions would injure Plaintiffs, given VNA's limited role and the extensive misconduct of city and state officials.  And holding that VNA owed a duty to Plaintiffs would expose professionals to virtually limitless liability, which would significantly chill the provision of professional services in Michigan in contravention of public policy.  VNA recognizes that the Court held in *Lee* that VNA owed a duty of care even to a nonresident of Flint, but the Court's analysis was mistaken.

### 1.    VNA Did Not Owe Plaintiffs A Duty Of Professional Care Because Plaintiffs Were Not VNA's Clients

VNA did not have a professional relationship with Plaintiffs, so VNA did not owe them a duty of professional care.  A legal duty—an obligation to act for the

benefit of a particular plaintiff—arises from the relationship between the parties. *Friedman v. Dozorc*, 412 Mich. 1, 22 (1981); *see, e.g.*, *Clark v. Dalman*, 379 Mich. 251, 260 (1967) ("Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other."). "Where there is no relationship between the parties, no duty can be imposed." *In re Certified Question*, 479 Mich. at 508.

In general, the "duty owed by one rendering professional services" extends only to a "person who has contracted for such services"—that is, only to the professional's client. *Saur*, 190 Mich. App. at 638; *see, e.g.*, *Atlanta Int'l Ins. v. Bell*, 438 Mich. 512, 518 (1991). A third party usually cannot sue for a professional's negligence, even if that negligence affected the third party. *See, e.g.*, *Mieras*, 452 Mich. at 297 ("Absent unique circumstances, an attorney is only liable in negligence to his client."); *Malik v. William Beaumont Hosp.*, 168 Mich. App. 159, 168-69 (1988) (plaintiff failed to state a claim for "the injuries inflicted upon him which resulted from the alleged malpractice committed upon [his sister]").

That rule makes sense. It ensures that a professional's loyalty is to the professional's client. Clients depend on their professional-service providers to provide unbiased advice. *See Atlanta Int'l Ins.*, 438 Mich. at 518. Extending the professional's duty to perform within the standard of care to third parties risks

adversely influencing the advice professionals provide to their clients, to the ultimate detriment of the professional, the client, and society at large. *See id.* at 518-19, 523.

Here, only the City was VNA's client. VNA entered into a contract with the City; the only signatories are VNA and the City. Ex. 2, Contract 1, 8. The contract specifies that there are no third-party beneficiaries. *Id.* at 5. So under the general rule in Michigan, VNA's duty extended only to the City, and not to Flint residents such as Plaintiffs. If VNA's advice led the City to do something that injured Plaintiffs, Plaintiffs can sue the City, and the City could seek redress against VNA, subject to any limitations in the contract. *See Gerling Konzern Allgemeine Versicherungs AG v. Lawson*, 472 Mich. 44, 52-55 (2005); *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460, 469-70 (2004). But Plaintiffs have no basis to sue VNA directly.

### 2. Michigan Law Does Not Support Extending VNA's Duty Of Professional Care To Plaintiffs

Michigan courts deviate from the general rule limiting the duty of professional care to clients only in very narrow circumstances. The Michigan Supreme Court has explained that the factors courts should assess in deciding whether to impose a common-law duty include "the relationship of the parties," "the foreseeability of the harm," and whether imposing a burden makes sense as a matter of public policy, based on "the burden that would be imposed on the defendant" and "the nature of

the risk presented." *In re Certified Question*, 479 Mich. at 508; *see Hill v. Sears, Roebuck & Co.*, 492 Mich. 651, 661 (2012).

The first two factors are indispensable prerequisites.  "The most important factor to be considered is the relationship of the parties": "[w]here there is no relationship between the parties, no duty can be imposed." *In re Certified Question*, 479 Mich. at 505, 508.  "Likewise, where the harm is not foreseeable, no duty can be imposed." *Id.* at 509.  "If either of these two factors is lacking, then it is unnecessary to consider any of the remaining factors." *Hill*, 492 Mich. at 661.

Even if those two factors are present, "a duty still does not necessarily exist." *In re Certified Question*, 479 Mich. at 505, 508.  Then, "the court assesses the remaining factors to determine whether "the social benefits of imposing a duty outweigh the social costs of imposing a duty." *Id.*  The Michigan Supreme Court has directed courts to rigorously apply the duty factors to avoid "the specter of limitless liability"; it is not the case that "everybody owes a duty to everybody else." *Id.* at 509 n.10, 511 (internal quotation marks omitted).[11]

Here, none of the factors supports imposition of a duty to Plaintiffs.

---

[11]  Although *In re Certified Question* involved ordinary negligence, not professional negligence, Michigan courts use the factors and framework set out in *In re Certified Question* in professional negligence cases.  *See, e.g.*, *Roberts*, 308 Mich. App. at 621.

### a.   Plaintiffs Cannot Establish A Sufficient Relationship With VNA

For a professional to owe a duty of care to a third party, there must be some special connection between the professional and the third party that makes the relationship between the two independently substantial.  That connection is lacking here; VNA did not interact with Plaintiffs in any way.  In addition, under the common law, a person also can form a relationship with a third party when the person voluntarily undertakes to perform an action for the protection of the third party.  Plaintiffs invoke that theory, but it applies only in limited circumstances not present here.

### i.   There was no connection between VNA and Plaintiffs

A professional can form a cognizable relationship with a third party if there is some special and substantial connection between the two.  For example, a physician forms a limited relationship with a third party, giving rise to a limited duty, when the physician performs a medical examination of the third party as part of a lawsuit, *Dyer*, 470 Mich. at 53-54; an attorney can owe a limited duty of professional care to the named beneficiary of a client's will, *see Mieras*, 452 Mich. at 299-300; and a

psychiatrist can owe a limited duty of professional care to a patient's parent, *see* *Roberts*, 308 Mich. App. at 621.[12]

In *Mieras*, for example, the Michigan Supreme Court held that a lawyer owes a duty to the named beneficiaries of a will to use due care in drafting the will in accordance with the client's instructions. 452 Mich. at 302. The court explained that this duty arises out of the special "status" of the named beneficiaries in relation to the attorney and the client. *Id.* at 299-300. The court further explained that imposing this limited duty would not interfere with the attorney-client relationship, because the duty consists solely of ensuring that the attorney uses the requisite care to draft a will that correctly reflects the client's intent—so there is no possibility of a conflict of interest. *Id.* at 301. The court made clear that, absent this type of "unique" circumstance, an attorney is not liable to a third party. *Id.* at 297.

---

[12] To the extent that *Francisco v. Manson, Jackson & Kane, Inc.* 145 Mich. App. 255 (1985), suggests that an architect's duty of care extends to all foreseeable plaintiffs, it is no longer good law and this Court should not follow it. *Francisco* predates and is inconsistent with *Hill* and *In re Certified Question*. *Cf. Auburn Hills Tax Increment Fin. Auth. v. Haussman Constr. Co.*, No. 333972, 2018 WL 385057, at \*4 (Mich. Ct. App. Jan. 11, 2018) (recognizing that a pre-1990 Michigan Court of Appeals case with a more expansive view of duty is no longer good law in light of intervening Michigan Supreme Court decisions). In any event, *Francisco* is distinguishable: In that case, the defendant created a new hazard for the plaintiff, by designing an allegedly unsafe diving board that the plaintiff used. 145 Mich. App. at 261-62. Here, VNA's alleged negligence did not create or increase any risk to Plaintiffs. *See* pp. 40-41, *infra*.

35

Similarly, in *Roberts*, the Michigan Court of Appeals held that a psychiatrist owed a duty to the father of a patient not to use therapies that could cause the patient to claim, falsely, that her father had sexually abused her. 308 Mich. App. at 615-16. The court explained that this duty was rooted in the unique nature of the parent-child relationship, which "is so fundamental to human relations that a parent cannot be equated with a third party in the ordinary sense." *Id.* at 619-20. The court made clear that there would not be a duty without that "significant" connection, reiterating that courts ordinarily "do not recognize that a [psychiatrist] may be liable to third parties solely for misdiagnosing [the] patient." *Id.* at 622 n.7.

The required connection is missing in this case. Plaintiffs had no interaction with VNA. Plaintiffs were not VNA's clients, and VNA did not enter into an agreement with Plaintiffs or provide services to them. And there was no other significant relationship, like the parent-child relationship involved in *Roberts*, that could justify imposing on VNA a duty to Plaintiffs. In fact, there is no evidence that Plaintiffs (or their parents) interacted with VNA at all. VNA interacted solely with city officials (VNA's clients) and made a public presentation that neither Plaintiffs nor their parents attended. None of the Plaintiffs' parents had even heard of VNA. *See* Ex. 5, ▮▮▮▮▮ Dep. 107:11-18; Ex. 8, ▮▮▮ Dep. 115:4-20; Ex. 10, ▮▮▮ Dep. 196:3-197:8; Ex. 34, ▮▮▮ Dep. 160:19-161:8. Further, extending VNA's duty to cover Plaintiffs would interfere with VNA's obligations to the City—

Plaintiffs here, for example, allege that VNA was negligent for not insisting that the City switch back to Detroit water even though the City expressly instructed VNA not to consider that subject. *See* pp. 52-53, *infra*.

This case is like *Sabbagh v. Hamilton Psychological Services, PLC*, 329 Mich. App. 324 (2019), in which the Michigan Court of Appeals held that a human resources company that had contracted with a municipal agency did not owe a duty of professional care to job applicants. *Id.* at 350-51. The plaintiffs in *Sabbagh* applied for jobs with the municipal agency; as part of that process, they underwent psychological evaluations. *Id.* at 331. Under its contract with the agency, the human resources company selected the psychologist who conducted the applicants' evaluations. *Id.* The applicants brought professional negligence claims against the human resources company, alleging that the company had negligently selected the psychologist. *Id.* at 333-34. The court held that the company did not owe the applicants a duty of care, explaining that because the company's client was the agency and the company had not interacted with the applicants, any relationship between the company and the applicants "was too tenuous to create any type of duty." *Id.* at 350. That is exactly the situation here: VNA's client was the City, and VNA did not interact with Plaintiffs in any way, so there is no relationship adequate to create a duty.

37

*Sabbagh* is not an outlier.  In analogous cases involving medical malpractice, Michigan courts repeatedly have held that a physician who gave advice to the plaintiff's treating physician, but did not have a physician-patient relationship with the plaintiff and did not directly interact with the plaintiff, did not owe the plaintiff a duty of professional care.  *See NBD Bank, NA Tr. Div. v. Barry*, 223 Mich. App. 370, 373 (1997) (physician who provided recommendations to patient's treating physician did not owe patient a duty of care because the treating physician "was free to accept or reject" the recommendations and the consulting physician did not interact directly with the patient); *Hill v. Kokosky*, 186 Mich. App. 300, 304-05 (1990) (same).  Similarly here, VNA did not have client relationships with Plaintiffs and did not interact directly with Plaintiffs, so VNA did not owe Plaintiffs a duty of professional care in providing its recommendations to the City.

VNA acknowledges that the Court recently held that VNA plausibly may have owed a duty of care to a nonresident delivery driver, because that person foreseeably "would come in contact with Flint water regularly."  *Lee*, 2021 WL 1178059, at *4. VNA has moved for reconsideration of that decision, because the Court did not consider whether there was an adequate relationship between VNA and the plaintiff in that case.  *See* VNA's Br. in Support of Mot. for Reconsideration at 1, *Lee*, No. 17-cv-11726 ECF No. 95, PageID.1164.  The Court did not address *In re Certified Question*, *Sabbagh*, *Roberts*, or other cases addressing the relationship factor.

### ii.   Plaintiffs cannot rely on the voluntary undertaking doctrine to establish a relationship

Under the common law, a person can form a relationship with a third party in certain circumstances when the person undertakes to "render services to another which [the professional] should recognize as necessary for the protection of [the] third [party]."  Restatement (Second) Torts § 324A (1965); *see Samson v. Saginaw Prof'l Bldg., Inc.*, 393 Mich. 393, 406 n.2 (1975) (explaining that Section 324A describes one of the "types of relationships which may impose a legal duty to act upon the actor").  The Amended Long Form Complaint appears to invoke the voluntary undertaking doctrine by alleging that VNA "undertook, for consideration, to render services for the City of Flint, which [VNA] should have recognized as necessary for the protection of Plaintiffs."  LFC ¶ 638, PageID.5447.

The Michigan Supreme Court has never applied the voluntary undertaking doctrine to extend a duty of professional care.  And it has explained that Michigan courts should not apply Restatement provisions "uncritically or without regard to limiting principles within [Michigan] case law."  *Fultz*, 470 Mich. at 464-65 (citing *Smith v. Allendale Mut. Ins.*, 410 Mich. 685, 712-13 (1981)).  Courts therefore should "reconcile the principles expressed in [Section] 324A with [Michigan] case law that limits their breadth."  *Id.* at 465.  Michigan case law recognizes the paramount importance of ensuring that a professional's loyalty is to its client and that courts should not impose tort duties on the professional that would interfere with

39

that duty of loyalty.  *See Atlanta Int'l Ins.*, 438 Mich. at 518; *see also, e.g.*, *Mieras*, 452 Mich. at 301.  The Court therefore should not view the voluntary undertaking doctrine as a way to extend VNA's duty of professional care in this case.

Anyway, the voluntary undertaking doctrine applies only in limited circumstances not present here.  The doctrine applies in three circumstances: (1) when the actor's "failure to exercise reasonable care increases the risk of [physical] harm" to the third party, Restatement (Second) Torts § 324A(a); (2) when the actor "has undertaken to perform a duty owed by the other to the third person" and negligently performs that duty, *id.* § 324A(b); or (3) when the actor fails to use exercise reasonable care in performing the undertaking and "the harm is suffered because of reliance of the other or the third person upon the undertaking," *id.* § 324A(c).

First, VNA's alleged "failure[s] to exercise reasonable care" did not increase Plaintiffs' risk of harm.  Plaintiffs' expert, Humann, identifies only two ostensible deficiencies in VNA's performance.  Humann's first opinion is that VNA should have "insert[ed]" itself into Flint in November 2014, before the City hired it in 2015. Ex. 55, Humann Report 20.  But it is undisputed that the City and State created the Flint water crisis in April 2014, seven months *before* Humann says VNA should have gotten involved.  Accordingly, VNA's failure to "insert" itself into the ongoing crisis in 2014 did not increase the risk of harm to Plaintiffs from the crisis.

Humann's other opinion is that VNA should have "insist[ed]" that the City use corrosion control or return to Detroit water. *Id.* But at worst, VNA's failure to "insist" meant that the City continued to do what it had been doing. "At most," VNA's alleged failures "left the risks presented by [Flint water] as they initially were," and therefore are not actionable. *Smith*, 410 Mich. at 725 n.33.

Second, VNA did not undertake to perform a duty owed by the City to Plaintiffs. VNA's only role in Flint was to "mak[e] recommendations" to the City. Ex. 2, Contract 9. VNA's contract with the City expressly stated that there were no third-party beneficiaries to the contract. *Id.* The *City*, not VNA, was responsible for operating the Flint water system and for providing safe water to Plaintiffs. VNA never undertook those obligations. Plaintiffs' expert, Humann, implicitly recognizes as much; he faults VNA only for failing to provide its recommendations earlier or to insist that the City follow those recommendations once it made them. Ex. 55, Humann Report 20. He does not allege that VNA directly operated the Flint water system, and no evidence would support that allegation.

Third, Plaintiffs' alleged harm was not caused by their reliance or the City's reliance on VNA's alleged negligence. No Plaintiff even had heard of VNA before the start of this litigation, or claims to have read VNA's reports. *See* Ex. 5, ███████ Dep. 107:11-18; Ex. 8, ████ Dep. 115:4-20; Ex. 10, ████ Dep. 196:3-197:8; Ex. 34, ███ Dep. 160:19-161:8. The City, for its part, obviously did

41

not rely on VNA to provide recommendations before it hired VNA. Nor did the City rely on VNA to provide recommendations about lead or corrosion controls—it did not direct VNA to study those issues and did not follow VNA's recommendations on those issues even when VNA made them. *See* Ex. 29, Green Dep. 41:11-42:23, 52:17-23, 64:2-24; Ex. 32, Glasgow Dep. 646:23-647:6; Ex. 45, COF_FED_0072895. The City also did not rely on VNA to evaluate whether to return to Detroit water. On the contrary, the City expressly instructed VNA not to consider that option. *See, e.g.*, Ex. 3, VNA Interim Report 2; Ex. 47, Gnagy Dep. 150:20-151:9.

Accordingly, Plaintiffs cannot invoke the voluntary undertaking doctrine to establish the relationship required for a duty of care.

### b. Plaintiffs' Alleged Injuries Were Not Reasonably Foreseeable

Plaintiffs also cannot satisfy the requirement of foreseeability. Given VNA's limited role, and the extensive undisclosed misconduct of the city and state officials (the people who ultimately controlled the Flint Water Treatment Plant), VNA could not reasonably have foreseen Plaintiffs' injuries.

City and state officials created the Flint Water Crisis in 2014, long before VNA's engagement in Flint began. They continued to exacerbate the crisis after VNA's engagement ended in March 2015. And they deliberately covered up the problems with Flint water both while VNA was attempting to perform its

42

engagement and afterward.  *See* LFC ¶¶ 77-232, PageID.5273-5319; Ex. 21, Task Force Report 1.  City officials misrepresented how they conducted water tests for lead, claiming that the tests complied with federal and state standards when in fact the officials conducted the tests in a way that minimized lead levels.  Ex. 56, Hyde Dep. Ex. 16.  When those tests showed elevated lead levels, the officials did not provide VNA with the results.  Ex. 47, Gnagy Dep. 691:10-692:10; *see* Ex 57, Hubbs Report 25-26.  In fact, city officials falsified their reports by deliberately excluding high lead readings that would have pushed the results over federal and state standards.  Ex. 32, Glasgow Dep. 722:10-725:9.

Based on this conduct, the State charged and convicted several city and state officials for their roles in the Flint water crisis.  *See* LFC ¶¶ 392-393, PageID.5366-5369.  It has now indicted nine more.  As Solicitor General Hammoud stated in announcing the indictments, the Flint water crisis is the result of a "categorical failure of public officials at all levels of government, who trampled upon their trust, and evaded accountability for far too long."  Ex. 58, Press Release, Mich. Dep't of Att'y Gen., *Nine Indicted on Criminal Charges in Flint Water Crisis Investigation* (Jan. 14, 2021).

In contrast to the extensive misconduct of city and state officials, VNA had a limited engagement in Flint.  The City engaged VNA for a short technical review.  Ex. 2, Contract 9.  VNA could only make recommendations; the City was

responsible for the day-to-day management of the Flint Water Treatment Plant. *See, e.g.*, *id.* The Emergency Manager was calling the shots about anything that would materially increase the costs of delivering water to Flint residents. *See, e.g.*, Ex. 21, Task Force Report 39-42.

Critically, in making its recommendations, VNA relied on the City to provide it complete and accurate testing results. *See* Ex. 2, Contract 9 ("The City would provide . . . records for review."). VNA could not reasonably have foreseen that the City would hide some test results and intentionally falsify other results. In general, criminal acts are not foreseeable unless the defendant has special knowledge of a likelihood of criminal behavior. *See MacDonald v. PKT, Inc.*, 464 Mich. 322, 334-35 (2001). There was no reason for VNA to suspect that the City was hiding—much less falsifying—the critical information that VNA needed to provide accurate advice to the City.

VNA recognizes that, in *Lee*, the Court held that the harm to the plaintiff was foreseeable. But the Court did not consider the extensive misconduct of city and state officials in creating and covering up the Flint water crisis—possibly because that case was only "at the pleading stage." *Lee*, 2021 WL 1178059, at *4. Here, on summary judgment, the Court should consider all of the facts relevant to foreseeability. Those facts make clear that, because of the city and state officials'

44

extensive criminal conduct, VNA could not reasonably have foreseen that its actions might harm Plaintiffs.

### c. The Public-Policy Factor Weighs Against Holding That VNA Owed A Duty Of Professional Care To Plaintiffs

Plaintiffs cannot satisfy either the relationship or foreseeability factors.  And if they could, public policy considerations would weigh against imposing a duty on VNA here.

Under Michigan law, the factors bearing on public policy are the "burden on the defendant" and the "nature of the risk presented."  *In re Certified Question*, 479 Mich. at 505.  Here, the burden Plaintiffs seek to impose on VNA is disproportionate to the negligence alleged.  Plaintiffs claim that VNA was negligent in performing a limited consulting engagement for the City.  Yet they seek to hold VNA liable to potentially more than 90,000 residents of Flint.  That would be "extraordinarily onerous and unworkable."  *In re Certified Question*, 479 Mich. at 516.

Further, the consequences would be significant.  Imposing a duty of professional care to all residents within the jurisdiction of a governmental entity that contracts for professional services would dramatically expand the potential liability of all types of professional-services providers, not just engineering firms.  That would make it difficult (if not impossible) for those service providers to obtain professional-liability insurance, which in turn would immediately and severely chill

45

those professionals from providing provide public-sector consulting services.  Even if service providers were willing to work on those engagements and could obtain appropriate insurance, the need to engage in the consulting equivalent of defensive medicine to head off liability would significantly increase costs, and the costs "would certainly . . . be passed on to the consuming public."  *Groncki v. Detroit Edison Co*., 453 Mich. 644, 661 (1996).  It thus is not "appropriate public policy," *Smith*, 410 Mich. at 716 n.24, to impose on public-sector professional-services providers a duty of professional care to all residents of the governmental entities for which they provide services.

In *Lee*, this Court concluded that extending VNA's duty of professional care to a "foreseeable, regular City water user" would not have "far-reaching effect on . . . professional services contractors."  2021 WL 1178059, at *4.  But if the Court imposed a duty in this case, it would have far-reaching effects.  Under that reasoning, a contractor to the federal government could owe a duty of care that extends to every resident of the United States.  It is hard to imagine a broader duty on that contractor.

Because "any relationship between [Plaintiffs] and [VNA] was highly tenuous, the harm was, in all likelihood, not foreseeable, [and] the burden on [VNA] would be onerous and unworkable," "the imposition of a duty, under these circumstances, would expand traditional tort concepts beyond manageable bounds." *In re Certified Question*, 479 Mich. at 525 (internal quotation marks omitted).  Such

a duty "should not be imposed," *id.*—particularly because, "[w]hen given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, [federal courts] should choose the narrower and more reasonable path," *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014).  The Court therefore should grant VNA summary judgment.

### D. VNA Did Not Owe Plaintiffs The Specific Duties That Plaintiffs Ascribe To VNA

Separately, Plaintiffs cannot prove duty and breach with respect to the two specific theories of professional negligence they allege.  Like the existence of duty, whether VNA owed Plaintiffs the specific duties alleged is a question of law.  *See Antcliff v. State Emps. Credit Union*, 414 Mich. 624, 635, 641 (1982) (reviewing "as a question of law" whether defendant's "standard of care" encompassed specific duty to "instruct on or give directions for" safe use of product); *Hill*, 492 Mich. at 663-64 (holding, as a matter of law, that warning homeowner of uncapped gas line was not in the scope of the duty owed).

Humann's opinions on the scope of VNA's duty of professional care fail as a matter of law.  VNA had no duty to act before it was hired by the City.  Nor did VNA have any duty to "insist" that the City add corrosion controls or else return to Detroit water.  And even if VNA owed those duties to the *City*, it did not owe them to Plaintiffs.

47

### 1.     VNA Did Not Owe Anyone The Duties Humann Described

##### a.     VNA Did Not Have A Duty To Insert Itself Into The Water Crisis Before The City Hired VNA In February 2015

Humann asserts that VNA had "the obligation to insert its expertise into the growing crisis and offer solutions to mitigate the lead contamination" in November 2014 as a result of its consulting work for the City of Detroit.  Ex. 55, Humann Report 20.  But as this Court has already recognized, VNA "can't be held responsible for things that happened before" it "showed up" in Flint.  Nov. 6, 2019, Tr. at 22-23, No. 16-cv-10444 ECF No. 1009, PageID.26085-26086.  That is because, among other reasons, "[w]here there is no relationship between the parties, no duty can be imposed."  *In re Certified Question*, 479 Mich. at 506, 508.  VNA's relationship with the City did not begin until February 10, 2015, when the parties signed the contract. There is no evidence that VNA had any relationship with the City or its residents or voluntarily undertook to assist them before then.  Accordingly, even if the Court imposes some duty here, that duty could not begin until February 10, 2015, the date on which VNA began its contractual relationship with the City.

**b.  VNA Had No Duty To Insist That The City Follow Its Recommendation To Add Corrosion Controls Or Return To Detroit Water**

**i.  VNA had no duty to insist that the City add corrosion controls**

Humann does not opine that VNA breached its professional duties by failing to recommend to the City that it implement corrosion controls. That is because VNA *did* recommend corrosion controls. VNA engineer Marvin Gnagy told the City that because some of the City's service lines were made of lead, the City "needed to add phosphate to [its] water to help prevent" future lead problems. Ex. 39, CROFT-0000000125. Robert Bincsik, the City's Director of Public Works, understood that the City "need[ed] to move on this sooner rather than later" due to the number of lead service lines in Flint, and he communicated that to other city officials. *Id*.; *see* Ex. 52, Bincsik Dep. 120:17-122:11. VNA repeated its recommendation to "[a]dd corrosion control" in a presentation to city, state, and federal officials in March 2015, albeit without mentioning lead. Ex. 53, VWNAOS060386 at 3. VNA made the recommendation again in its final report to the City, advising the City to "initiate discussions with the State on the addition of a corrosion control chemical," such as "0.5mg/L [of] phosphate." Ex. 46, VNA Final Report 10; *see id*. at 5.

Because VNA *did* recommend that the City implement corrosion controls, Humann could not fault VNA for failing to do so. Rather, the only way he could pin blame on VNA was to assert that VNA should have "insist[ed]" that the City follow

49

its recommendation.  Ex. 55, Humann Report 18; *see id.* (VNA "weakly suggests" adding corrosion controls); *id.* at 20 ("Strong conclusion and recommendation should have been issued by Veolia immediately to . . . implement a corrosion inhibitor").

What is the source of such a duty?  Humann offers nothing other than his own say-so.  And he does not explain how a provider of consulting services—whose job it is to make recommendations—can force its clients to do anything.  Humann provides no statutory or regulatory references, no case law, no professional standards, and no examples of consultants either insisting that their clients adopt their recommendations or being disciplined for failing to do so.

Humann's view is inconsistent with Michigan law.  The Michigan Supreme Court has made clear that when "only a limited relationship exist[s], only a limited duty [can] be imposed."  *Hill*, 492 Mich. at 662.  In *Hill*, a homeowner entered into a limited contract with the defendant to install an electric washer and dryer.  The defendant's employees "entered plaintiffs' home for this limited purpose only once, for a total of 12 minutes."  *Id.* at 663.  Four years later, the homeowner inadvertently turned on the gas, and her adult daughter lit a candle, which ignited the gas, causing an explosion.  The homeowner and her children sued the defendant for failing to "inspect the uncapped gas line, discover the uncapped gas line, cap the gas line, and warn or give notice to plaintiffs of the uncapped gas line."  *Id.* at 657.  The Michigan

50

Supreme Court held that, although the defendant owed the plaintiffs a duty to properly deliver and install the washer and dryer, it did not have a "duty to take action with regard to the gas line," because the defendant had "not undertaken by contract or otherwise to act on the gas line." *Id*. at 662-63, 665. Thus, the plaintiffs' negligence claim failed as a matter of law.

Humann's contention that VNA owed a duty to insist that the City add corrosion controls is just like the asserted duty to take action about the gas line in *Hill*. As in *Hill*, VNA had a limited relationship with the City. It is undisputed that VNA had no authority over the management of the Flint Water Plant; it undertook only a limited, 30-day contract to provide "water quality consulting in an amount not to exceed $40,000." Ex. 2, Contract at VWNAOS018930. VNA provided those services, which included recommending the addition of corrosion controls. VNA's contract did not create any duty to insist that the City follow that recommendation.

There is good reason not to impose a duty on a professional to insist that the client follow its advice. For one thing, such a duty would be completely undefined. No professional could ever know in advance whether it has pounded the table hard enough and often enough. *Cf. Williams v. Cunningham Drug Stores, Inc.*, 429 Mich. 495, 502-03 (1988) (refusing to impose duty of care on merchants to protect against criminal acts of third parties because, among other things, "any duty we might impose . . . would be inevitably vague, given the nature of the harm involved"). And

51

the risk of guessing wrong could be—as it is here—enormous. Imposing on consultants a duty to insist would inevitably discourage limited-scope agreements like the one VNA entered into with the City. *See Hill*, 492 Mich. at 669-70 (noting that the burden on "similarly situated defendants" that would result from imposition of a duty that goes beyond the scope of the contract would be "onerous and unworkable"). For all these reasons, the Court should refuse to recognize such a duty.

### ii.    VNA had no duty to insist that the City return to Detroit water

Similarly, VNA had no obligation to insist that the City switch back to Detroit water. Second-guessing the City's decision to switch to Flint River water was "[n]ot in [the] scope" of VNA's limited engagement. Ex. 3, VNA Interim Report 2. VNA was specifically instructed not to recommend switching back to Detroit water. *See* Ex. 47, Gnagy Dep. 150:20-152:6 (switching back to Detroit water "was taken off the table" by the City); Ex. 48, Ambrose Dep. 387:12-388:9 (VNA was not "to revisit the decision to use the Flint River"). The City simply was not willing to consider the issue.

VNA cannot have had a duty to insist that the City do something that the City had expressly told VNA, and said publicly, that it would not do. Holding otherwise would be inconsistent with the Michigan Supreme Court's decision in *Hill*. *See* 492 Mich. at 664. It also would be unworkable. If professionals who enter into limited

engagements could be retroactively held liable for not going beyond the scope of the engagement, they would have no way to estimate their risk when they take on assignments.

For example, lawyers and clients routinely circumscribe their engagements in order to control costs, among other reasons. *See generally* Restatement (Third) of The Law Governing Lawyers § 19 (2000) ("[A] client and lawyer may agree to limit [the lawyer's] duty."). If a client limits the scope of an engagement—say, by telling a lawyer to handle the purchase of real estate but not to investigate possible zoning restrictions—the lawyer cannot be held liable for not investigating the zoning restrictions. The same is true here. The Court therefore should grant partial summary judgment as to the theory that VNA should have insisted that the City switch back to Detroit water.

## 2. Even If VNA Owed The Duties Humann Described To The City, VNA Did Not Owe Those Duties To Plaintiffs

Assuming VNA owed the City a duty to intervene in Flint before being hired or to insist that the City follow its advice, that would not mean that VNA owed those duties to *Plaintiffs*. The Michigan Supreme Court repeatedly has explained that the scope of a defendant's duty to a plaintiff is limited by the scope of the defendant's relationship with that plaintiff. *See Hill*, 492 Mich. at 662; *Dyer*, 470 Mich. at 53-54. So even if there were some relationship between VNA and Plaintiffs sufficient

to impose some kind of duty of care, the scope of that duty was not as extensive as the duty of professional care VNA owed to the City.

That rule is consistent with the rule in Michigan that a third party cannot invoke a party's contractual obligations as the basis for a duty to the third party, but must rely on the common law. *See Loweke v. Ann Arbor Ceiling & Partition Co.*, 489 Mich. 157, 169 (2011). VNA owed a duty of professional care to the City only because it entered into a contract with the City to provide the City with professional services. *See Oja v. Kin*, 229 Mich. App. 184, 190 n.2 (1998) ("It is only with a [professional's] consent . . . that the [professional-client] relationship comes into being." (internal quotation marks omitted)). Since Plaintiffs were not parties to or beneficiaries of that contract, Plaintiffs must rely on the common law.

Under the common law, whatever duty VNA owed Plaintiffs did not include the duties that Humann describes. In Michigan, a contracting party generally owes a third party a duty of care only to the extent that the contracting party's performance under the contract creates a "new hazard" for the third party. *Loweke*, 489 Mich. at 167 (quoting *Fultz*, 470 Mich. at 469); *see Bailey v. Schaaf*, 494 Mich. 595, 604 (2013) ("[A]s a general rule, there is no duty that obligates one person to aid or protect another." (internal quotation marks omitted)). As explained, VNA's alleged failures to insert itself into the Flint water crisis before 2015 or to insist that the City follow its recommendations did not increase the risk of harm to any Plaintiff, and

54

therefore did not create a "new hazard" for any Plaintiff. *See* pp. 40-41, *supra*. For this reason also, the Court should grant VNA summary judgment on the two theories of negligence Plaintiffs allege.

### E.    Plaintiffs Do Not Establish That VNA Breached Any Duty Of Care

Even if VNA owed Plaintiffs some duty of care, they cannot prove that VNA breached that duty. Humann is Plaintiffs' only expert on duty and breach, so if the Court excludes his testimony, Plaintiffs will be unable to establish breach. *See Guertin*, 2017 WL 2991768, at *2. As VNA explains in its accompanying motion to exclude Humann's testimony and report, Humann's opinion that VNA violated the standard of care is supported by nothing other than his own say-so. His opinions thus are inadmissible.

Even if Humann's opinions were not inadmissible, they are insufficient to establish breach of the standard of care under Michigan law because they are based only on his personal opinions, and not any evidence about what a reasonably prudent engineer would have done under the circumstances. The job of a standard-of-care expert in a professional-negligence case is to "determine whether [the defendant's conduct] squares with the standard of . . . professional practice in the community." *Locke v. Pachtman*, 446 Mich. 216, 223 (1994). Thus, expert testimony must address "how a reasonable similarly-situated practitioner would act, not . . . how the witness himself would act." *Sassaman v. Estes*, No. 205552, 1999 WL 33439656,

at *2 (Mich. Ct. App. July 16, 1999).  A mere difference in "professional opinion" does not prove a breach of duty, even if the expert believes that the defendant made "errors in judgment."  *Simko*, 448 Mich. at 658, 660.

While Humann has opined on "what [he] believe[s] [VNA] should have done," Ex. 55, Humann Dep. 72:1-2, he has provided no basis for finding that his personal beliefs reflect the "professional practice in the community," *Locke*, 446 Mich. at 223, rather than how he "himself would act," *Sassaman*, 1999 WL 33439656, at *2.  The best he could do at his deposition was vaguely assert that his beliefs are based on his "experience over the years."  Ex. 59, Humann Dep. 204:9-19; *see id.* at 69:1-2.  He supported his opinion with no statutes, regulations, case law, professional codes, or relevant examples of professional practice from which a reasonable juror could conclude that VNA's alleged failures were not just purported "errors in judgment" but breaches of the standard of care.  *Simko*, 448 Mich. at 658.  Humann's testimony thus is insufficient to prove breach, and the Court should grant VNA summary judgment.

## III.   No Plaintiff Can Establish Causation

None of the Plaintiffs here can establish causation.  Under Michigan law, Plaintiffs must show:  (1) that VNA's alleged negligence was a but-for cause of their exposure to lead in Flint water; (2) that the exposure was capable of causing their alleged injuries (general causation); and (3) that the exposure in fact caused their

injuries (specific causation)—including by ruling out other potential causes of their injuries.  As already explained, three Plaintiffs cannot show but-for causation because they stopped using Flint water before VNA arrived in Flint.  And as explained below, Plaintiffs also cannot show but-for causation because Plaintiffs have no evidence that the City would followed VNA's advice if VNA had volunteered advice in 2014 or insisted that the City take its advice in 2015.  Further, Plaintiffs cannot show but-for causation because water lead levels had returned to normal before VNA arrived in Flint, so nothing VNA did (or did not do) could have contributed to Plaintiffs' injuries.

Plaintiffs also cannot show that any exposure to lead attributable to VNA in fact caused their injuries.  Plaintiffs argue that any amount of lead is enough to cause injury, but that theory is invalid as matter of Michigan law.  And no Plaintiff has presented evidence showing that he or she was exposed to an amount of lead after February 18, 2015, sufficient to cause or aggravate the claimed injuries.  To the contrary, the evidence indicates that ███████████████████████████████ ███████████████████████.  None of the Plaintiffs lived in homes with service lines made of lead—the principal source of lead in water—████████████████████████ ███████████████████████.  Plaintiffs attempt to rely on bone lead scans, but the tests they performed are unreliable, and the results are meaningless because there are no

standards for determining what bone lead levels represent ██████████████████.

In any case, the tests do not indicate the source or the timing of their exposure.

Finally, there is no evidence that any injuries were from consuming lead in Flint water after VNA arrived in Flint, as opposed to some other source. Under Michigan law, a plaintiff in a toxic-tort case must present a "differential etiology"— a medical diagnosis—ruling out alternative causes of his or her injury. *Powell-Murphy*, 2020 WL 4722070, at *5. Plaintiffs made no effort to exclude any alternative causes of their injuries.

### A. There Is Insufficient Evidence That Any Breach By VNA Of Humann's Proposed Duties Either Caused Or Contributed To Elevated Water Lead Levels In Flint

Plaintiffs cannot establish but-for causation because they cannot show that VNA's alleged negligence caused their exposure to lead. Under Michigan law, they are required to show that their injuries "would not have occurred" "'but for' [VNA's] actions." *Skinner*, 445 Mich. at 163. Here, Plaintiffs allege that VNA was negligent in failing to insist that the City implement corrosion controls or return to Detroit water, so to establish causation they must show that the City would have followed that advice, and that doing so would have caused lead levels to drop. *See Mascarenas*, 196 Mich. App. at 251 (plaintiff's failure-to-warn claim failed at summary judgment because plaintiff had no evidence that precautions would have been taken had warnings been given). Plaintiffs do not make that showing. No

reasonable jury could find that the City would have added corrosion controls or switched back to Detroit water if only VNA had insisted. And no reasonable jury could find that taking either step would have caused water lead levels to drop below where they already were in February-March 2015.

> **1.    No Reasonable Jury Could Find That The City Would Have Implemented Corrosion Controls Or Switched Back To Detroit Water In February-March 2015 If Only VNA Had Insisted That It Do So**

The evidence is overwhelming that the City would have ignored recommendations to either return to Detroit water or implement corrosion controls, no matter how vehemently VNA insisted. No admissible evidence shows otherwise.

> **a.    The Evidence Establishes That The City Would Not Have Implemented Corrosion Controls Or Switched Back To Detroit Water**

During VNA's engagement, city officials took the possibility of returning to Detroit water completely off the table because they viewed it as too expensive. In February 2015 (before VNA arrived in Flint), Emergency Manager Gerald Ambrose prevented the City from returning to Detroit water even when the City risked running out of drinking water altogether. Ex. 60, Wright Dep. 306:3-308:14. At that time, the City's water reserves had neared critically low levels because of a high number of water main leaks. *Id.* Flint Water Treatment Plant staff started to prepare to switch Flint back to Detroit water, in case the City's drinking water reserves reached depletion. *Id.* Ambrose overruled those emergency preparations, telling the staff

that a switch back to Detroit water "wasn't going to happen." *Id.* Ambrose made clear that he viewed the cost to be too high. Ex. 33, Johnson Dep. 73:1-23.

Ambrose repeated that view in a March 3, 2015, letter to the Michigan Treasury Department, in which he stated that the "oft-repeated suggestion" to return to Detroit water "would, in [his] judgment, have extremely negative financial consequences to the water system." Ex. 61, COF_FED_0009724. And two days later, Flint Interim Treasury Manager Al Mooney told the audience at a public meeting that "we [can] hook up again to the Detroit water" only if "we ha[d] a money tree." ACLU Michigan, *Hard To Swallow: Toxic Water Under A Toxic System in Flint, An ACLU of Michigan Documentary* at 4:45-4:57 (June 25, 2015), https:// bit.ly/3hh7uhd.

Unsurprisingly, city officials told VNA in no uncertain terms that the option of returning to Detroit water was off the table. Ex. 47, Gnagy Dep. 150:20-151:9; Ex. 48, Ambrose Dep. 387:12-388:9. Even after the City Council voted to return to Detroit water on March 23, 2015—right after VNA had wrapped up its engagement—Ambrose steadfastly refused to do so, calling the vote "incomprehensible." Ex. 62, Ambrose Dep. Ex. 32. There is no reason to believe that Ambrose would have listened to VNA at the very time that he was overruling the City Council's vote and rejecting recommendations by the City's public works

staff and utilities administrator.  Thus, any recommendation from VNA to switch back to Detroit water, however "strong," would not have been followed.

Further, no reasonable jury could find, based on the record as a whole, that city officials would have added a corrosion inhibitor if VNA had recommended it more strongly.  City officials—based on regulatory guidance from MDEQ—already had decided that corrosion controls were unnecessary in Flint.  *See* Ex. 32, Glasgow Dep. 73:18-74:8; Vol. 2, 485:15-486:9; Ex. 60, Wright Dep. 64:8-66:2; 166:5-168:3.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████  Ex. 63, Tr. of B.W. 67:11-68:1.  That was despite VNA's warning that the City "needed to add phosphate to [its] water to help prevent" lead problems.  Ex. 39, CROFT-0000000125 at 1.  In fact, City officials were so adamant in refusing to acknowledge the possibility of lead problems that could require corrosion controls that they deliberately falsified lead test results to avoid disclosing elevated lead levels in Flint.  *See* Ex. 32, Glasgow Dep. 722:10-725:9; Ex. 42, Mar-23-2020 GOV0206271 at 2-3.

Moreover, LAN's engineers also had repeatedly advised city officials that they would need to implement a plan for corrosion control in order to source drinking water from the Flint River.  *See* Ex. 29, Green Dep. 29:8-9, 47:17-21, 52:17-23; *see also* Ex. 64, Redding Dep. Ex. 4, App'x 8, at 10 (July 2011 LAN report to the City

recommending addition of phosphate).  City officials rejected that advice as well. Ex. 29, Green Dep. 29:12-14.  They said that they would not add corrosion controls until they were required to do so by MDEQ.  *Id.*  As Flint utilities administrator Daugherty Johnson testified, "a recommendation [from LAN] for corrosion control was not done because it wasn't required by the MDEQ."  Ex. 33, Johnson Dep. 59:13-60:5.  At the time of VNA's engagement in Flint, MDEQ had determined that corrosion control was unnecessary in Flint.  *See* Ex. 65, 04-15-2016 SOM0007264 (MDEQ letter to EPA purporting to explain why the Lead and Copper Rule did not require corrosion control in Flint).  It was not until August 2015 that MDEQ changed its mind and directed the City to begin adding phosphates to the water in Flint. Ex. 66, Wright Dep. Ex. 57; *see* Ex. 60, Wright Dep. 174:11-17.  The "uncontradicted and unimpeached" evidence, *Reeves*, 530 U.S. at 151, shows that the City would not have given in and asked MDEQ to authorize the use of corrosion controls if only VNA had insisted more forcefully.

> **b.    City Officials' Self-Serving, After-The-Fact Testimony Does Not Create A Genuine Issue Of Material Fact**

The only evidence that even arguably suggests that the City might have acted differently if VNA had insisted is equivocal, after-the-fact testimony by city and state officials who have been indicted for their role in the Flint water crisis.  The officials assert that they might have taken different actions if VNA had given different advice.  That evidence is inadmissible.  A non-expert's opinion testimony

must be "rationally based on the witness's perception," Fed. R. Evid. 701—meaning what the witness personally observed. By definition, a witness's "self-serving speculation" "as to what [he or she] *would have done*" in a hypothetical situation is not "based upon [his or her] perception." *Washington v. Dep't of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993) (emphasis in original); *accord, e.g.*, *Wilson v. Bradlees of New Eng., Inc.*, 250 F.3d 10, 15, n.8 (1st Cir. 2001). "Federal law" thus "is clear that speculative testimony as to what a witness would have done under different circumstances" is inadmissible. *Wheeler v. Estes Exp. Lines*, 53 F. Supp. 3d 1032, 1042 n.9 (S.D. Ohio 2014) (internal quotation marks and brackets omitted).

Even if the testimony were admissible, it would not be enough, in the context of the record as a whole, to permit a reasonable jury to find that the officials would have followed VNA's recommendations. Start with Gerald Ambrose, the Emergency Manager. He personally overrode the City Council's vote to return to Detroit water. Ex. 62, Ambrose Dep. Ex. 32. But when asked in his deposition what he "hypothetically" would have done if a VNA executive "said to [him], Jerry, I know you've paid us 40 grand, [and] I understand what we were hired to do," but "you are better served to go back to Detroit," he said, "I believe . . . we would have had to look at how to achieve that." Ex. 48, Ambrose Dep. 473:12-22-474:1.

Ambrose's statement that he "would have had to look at how to achieve" a return to Detroit water is not evidence that he ultimately would have made it happen.

Nor is that a reasonable inference in light of his decision to override the City Council's vote to switch back to Detroit water, his refusal to reconnect with Detroit in the event that the City were to run out of drinking water, his statement that switching back was "incomprehensible," and the fact that the City did not return to Detroit water until the Governor ordered it to do so seven months later.

Flint utilities administrator Howard Croft testified that he "would have recommended that the city switch back to the Detroit water source" if VNA had made the health and safety risks of using Flint water clearer.  Ex. 67, Croft Dep. 403:9-14.  But the City was under emergency management at the time, so Croft had no authority to return the City to Detroit water.   In any case, ███████████████

███████████████████████████████████.  *See, e.g.*, Ex. 63, Tr. of B.W. 67:11-68:1.  So his later testimony about what he supposedly would have done is insufficient evidence that VNA might have changed his mind.

Former Flint Mayor Dayne Walling testified that, had VNA advised the City to reconnect to Detroit water, "I would definitely consider it."  Ex. 68, Walling Dep. 457:9-22.  As with Ambrose, that is nowhere close to evidence that he would have made it happen.  And like Croft, he could not have made it happen.  Only the Emergency Manager or the Governor could do that.

For his part, former Governor Snyder testified that if VNA had advised him to switch Flint back to Detroit water, he would have "listened," Ex. 69, Snyder Dep.

358:16-23, and "considered taking action," *id.* at 357:21-358:1; *see* Ex. 70, Dillon Dep. 164:15-16 (testimony of former Treasurer Dillon that he would have "follow[ed]-up" on advice by VNA).  Again, that is not the same as saying that he would have immediately ordered a return to Detroit water.  The evidence refutes any such inference:  Snyder delayed ordering a return to Detroit water until October 2015—well after he and other State officials already knew everything that VNA could have conveyed.  *See, e.g.*, LFC ¶ 189, PageID.5304 (alleging that Governor's office had "actual notice of high lead exposure" by July 2015).[13]

In sum, even if the testimony of these officials were admissible, when taken in the context of the record as a whole, it does not support a finding that the insolvent City would have promptly freed up the needed funds and returned to Detroit water had VNA insisted it do so.

The testimony of city officials also is insufficient to show that they would have added corrosion controls if only VNA had insisted on it.  For example, Glasgow, the manager of the Flint Water Treatment Plant, testified that if VNA had "spoken up" about the lack of corrosion control, he would have "take[n] it into account" and had "a frank discussion" with his "supervisors."  Ex. 32, Glasgow Dep.

---

[13] In any event, Humann did not opine that VNA should have communicated directly with State officials.  So even if Snyder would have followed advice from VNA to order a return to Detroit water, that does not show that VNA was negligent by not insisting to the City that it do so.

575:5-16, 649:15-650:7.  Ambrose testified that the City did not add corrosion controls because "there [was not] anything in [VNA's Final Report] that would lead [him] to conclude that corrosion control had something to do with water safety issues."  Ex. 48, Ambrose Dep. 408:8-11; *see* Ex. 68, Walling Dep. 185:9-24.

But neither Ambrose nor Glasgow nor any other city official ever said categorically that they would have requested MDEQ's permission to implement corrosion controls if VNA had more strongly recommended it.  Indeed, ████████ ████████, ████ and Johnson, made clear that they were opposed to corrosion-control measures despite the warnings they received.  Ex. 33, Johnson Dep. 59:13-60:5; Ex. 63, Tr. of B.W. 67:11-68:1.  The only reasonable inference from the record as a whole is that nothing would have changed if Glasgow had had a "discussion" with them about the issue.  Similarly, Ambrose's stated view that VNA's proposals were "very expensive," Ex. 71, Mar-30-2020 TREAS024217 at 1, makes clear that he would not have authorized the City to add corrosion controls no matter what VNA said about their role in ensuring water safety.

The City's failure to implement other recommendations that VNA identified as necessary to comply with federal water-safety standards confirms this point.  VNA's Final Report recommended both the addition of permanganate "to help eliminate the possibility of violating the bromate limit" and an increased dosage of ferric chloride to "remov[e] [Total Organic Carbon], a precursor to TTHM

formation." Ex. 46, VNA Final Report 4; *see* 40 C.F.R. § 141.64. Despite the clear link between those actions and water safety, the City did neither. Ex. 29, Green Dep. 45:21-46:3, 64:17-65:4, 167:11-17. Ambrose's testimony that VNA's report failed to alert him to the health and safety implications of not implementing corrosion controls thus is insufficient to show that he would have done anything differently.

The after-the-fact testimony of city officials (most of whom have been indicted) about what they might have done cannot create a genuine issue of material fact. That testimony is not admissible and therefore cannot be considered at summary judgment. *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) ("Evidence submitted in opposition to a motion for summary judgment must be admissible." (brackets omitted)); *see also* Fed. R. Civ. P. 56(c)(2). And if admissible, it is not sufficient. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *accord Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010).

Comparing what these former officials now say (when facing criminal liability) with what they actually did at the time, no reasonable jury could conclude that they would have caused the City to return to Detroit water or add corrosion controls if only VNA had insisted that they do so.

### 2. No Reasonable Jury Could Find That Water Lead Levels Would Have Decreased If The City Had Implemented Corrosion Controls Or Switched Back To Detroit Water In February-March 2015

For Plaintiffs to prove that VNA was a but-for cause of their exposure to lead in Flint water, they must show that following VNA's involvement in Flint in February-March 2015, water lead levels were higher than they would have been had the City immediately implemented corrosion controls or switched back to Detroit water. *See Skinner*, 445 Mich. at 163. Unless the water levels were higher than they otherwise would have been, Plaintiffs cannot attribute their injuries to VNA.

To make that showing, Plaintiffs need expert evidence—but none of their experts presents an opinion about what the water lead levels would have been had the City switched back to Detroit water or implemented corrosion controls in March 2015. Further, the evidence shows that the water lead levels were *not* higher than they would have been: the evidence shows that there was lead in Flint's drinking water before April 2014; the lead levels spiked right after the switch to Flint River water in April 2014; and the water lead levels returned to normal by the time VNA arrived in Flint in February 2015. Plaintiffs have no evidence that water lead levels would have fallen further but for VNA's alleged negligence.

### a.     Plaintiffs Lack Expert Evidence About What Water Lead Levels Would Have Been

Under Michigan law, plaintiffs in toxic-tort cases must present expert evidence supporting their theories of causation if those theories are not "within the common knowledge and experience of an ordinary layperson." *Powell-Murphy*, 2020 WL 4722070, at *5 (quoting *Lowery v. Enbridge Energy Ltd. P'ship*, 500 Mich. 1034, 1049 (2017) (Markman, C.J., concurring) (collecting cases)); *see, e.g.*, *Elher v. Misra*, 499 Mich. 11, 21-22 (2016).  What water lead levels would have been if the City had taken different actions is not within the ordinary knowledge and experience of a layperson—it is information "scientific in nature," and therefore expert testimony is "indispensable." *Nelson v. Am. Sterilizer Co.*, 223 Mich. App. 485, 489 (1997).

Plaintiffs lack the necessary expert testimony.  Humann is Plaintiffs' expert on breach of the standard of care.  But he does not offer any opinion about causation.  At his deposition, Plaintiffs' counsel expressly stated that Humann was offering opinions only about VNA's professional "standard of care," and objected to questions going to causation as "way outside [Humann's] expertise."  Ex. 55, Humann Dep. 222:4-6.  Plaintiffs also present the opinions of John Hoaglund, a hydrogeologist and geochemist.  He opines that Flint River water was more corrosive than Detroit water, Ex. 72, Hoaglund Report 23-24, but he says nothing about what effect corrosion controls would have had on water lead levels.  In any

69

event, as VNA explains in its *Daubert* motion, Dr. Hoaglund would not be qualified to offer any opinions about water treatment processes.

Plaintiffs have disclosed no other expert who will testify that water lead levels in Flint were higher than they would have been had the City implemented corrosion controls or switched back to Detroit water in February-March 2015.   Indeed, Plaintiffs have disclosed no expert who can testify as to what the water lead levels in Flint were at any time during the Flint water crisis.  Nor do their experts offer any opinions about where the lead came from, or how it got into the water, or whether a corrosion-control chemical would have reduced water lead levels, or by how much it would have reduced them.   Without that testimony, Plaintiffs cannot show causation.

**b.      The Evidence Shows That Water Lead Levels Already Had Returned To Pre-Crisis Levels By The Time VNA Arrived In Flint**

The only relevant expert evidence about water lead levels shows that adding corrosion controls or switching back to Detroit water in early 2015 would not have caused water lead levels to drop further.  Although Flint water was not lead-free in 2015, it also was not lead-free even before the crisis when the City was purchasing corrosion-controlled water from Detroit—as one Plaintiffs' experts on the health effects of lead, Dr. Graziano, admits.  *See* Ex. 20, Graziano Dep. 164:2-12 ("[I]t's safe to assume that there was some lead in drinking water [in Flint before April

2014].").  Dr. Marc Edwards—a professor at the Virginia Polytechnic Institute and State University and one of the first experts to discover the problems with lead in Flint water—studied historical samples of biosolids (organic matter) in Flint's sewage and concluded that water lead levels in Flint spiked in 2014 but had already declined to pre-crisis levels by the time VNA began its engagement in Flint.

In particular, in studies published in 2019 and 2020, Professor Edwards determined that the release of lead into Flint water occurred in the summer of 2014, well before VNA began its engagement in Flint in February 2015.  *See* Ex. 73, Edwards Dep. Ex. 33 at 481 (Roy, Ting, & Edwards 2019); Ex. 74, Graziano Dep. Ex. 12 (Roy & Edwards 2020).  According to him, the principal cause of the problems with Flint water was the release of lead particles from build-up on the interior of lead service lines following the switch to Flint River water in April 2014. *See* Ex. 75, Edwards Dep. 436:11-437:10.  As VNA's experts have explained, and Plaintiffs' experts do not dispute, during the years when Flint purchased its water from Detroit, the metal in service lines or interior pipes made of iron or lead reacted with the chemicals in the water to form a protective scale on the inside of the pipes. Ex. 76, Duquette Report 8-9.  The City did not undertake, and MDEQ did not require, a corrosion-control study to assess how the scale would react to Flint River water, which has a different chemistry than Detroit water.  *Id.*

71

When the City started using Flint River water, the outer layers of the scale started to break down, and pieces of the scale (which included particles of lead and iron) entered the water supply.  Ex. 76, Duquette Report 8-9.  Nearly all of that scale release occurred within the first few months of the switch to Flint River water, and there were almost no lead particles left to be released into the water after that time. *Id*.  Thus, the lead release occurred within the first few months after the switch— well before VNA's engagement with Flint.

In particular, by analyzing the historical samples of biosolids in Flint, Professor Edwards discovered that the water lead levels spiked in June through August 2014.  *See* Ex. 75, Edwards Dep. 253:12-254:14; *see also* Ex. 73, Roy, Ting, & Edwards 2019 at 478; Ex. 77, Oswald Dep. Ex. 32 (Roy & Edwards, *Opinion: From Sewage Sludge, a New Perspective on the Flint Water Crisis* 3, Undark (Sept. 17, 2020), https://bit.ly/3y0yTtX (From Sewage Sludge)).  The graph below presents Professor Edwards's extrapolations from the biosolids data of the "90th percentile" water lead levels in Flint from 2010 to 2019.  It shows that by September 2014, lead levels had already declined to where they had been in 2013, when the City was purchasing its water from Detroit:



**Figure 9.** *Predicted water lead levels based on biosolids data. Figure 1B from Roy and Edwards (2020).*

Ex. 6, Finley Report 17; *see* Ex. 74, Roy & Edwards 2020 at 3; *see also* Ex. 73, Roy, Ting, & Edwards 2019 at 478; Ex. 76, Duquette Report 7.  In fact, the average lead level in 2015 was even lower than it was in 2013, when the City was still using Detroit water.  *See* Ex. 6, Finley Report 17; Ex. 76, Duquette Report 7.  Because the lead was released and its effects had ended before VNA's engagement in Flint began, VNA could not have caused Plaintiffs' alleged injuries.

Plaintiffs have never challenged Professor Edwards's findings, or disclosed any expert qualified to challenge those findings.  At most, their experts have identified evidence that the drinking water at some individual properties in Flint (like the Walters residence) had elevated lead levels in mid-2015.  *See* Ex. 11, Michaels Report 8-10 (describing residential water testing from 2015 showing that a small percentage of water samples had lead levels above the maximum contaminant level

of 15 ppb).  But they have no evidence that the lead levels at *Plaintiffs'* properties exceeded pre-switch levels.  And Plaintiffs do not have any expert evidence demonstrating that elevated lead levels at *other* properties resulted from system-wide problems with the Flint water system, or that any action that VNA could have taken in February-March 2015 would have reduced the lead levels at those properties. Plaintiffs therefore cannot prove causation.

### B. Plaintiffs Cannot Prove That Any Amount Of Lead-Contaminated Water They May Have Consumed After February 18, 2015, Was Sufficient To Cause Or Contribute To Their Alleged Injuries

Separately, Plaintiffs cannot prove specific causation because they cannot show that their level of exposure to lead from consuming Flint water after VNA's engagement was sufficient to cause or contribute to their injuries.

To prove causation in a toxic-tort case, a plaintiff must establish both general causation and specific causation.  To establish general causation, the plaintiff must show that the toxin at issue is *capable* of causing the alleged injuries; to establish specific causation, the plaintiff must show that he or she was exposed to an amount of the toxin sufficient to cause his or her injuries and that the exposure actually caused those injuries.  *See Lowery*, 500 Mich. at 1044 (Markman, C.J., concurring)[14]; *see also Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 677 (6th Cir. 2011).

---

[14] Chief Justice Markman's concurring opinion in *Lowery* was adopted by the Michigan Court of Appeals in *Powell-Murphy*.  *See Powell-Murphy*, 2020 WL 4722070, at *5.

"[T]he mere existence of a toxin in the environment is insufficient to establish" specific causation. *Powell-Murphy*, 2020 WL 4722070, at \*5; *accord Stark v. Armstrong World Indus., Inc.*, 21 F. App'x 371, 376, 379-80 (6th Cir. 2001) (applying Michigan law). Instead, toxic-tort plaintiffs must prove not only that they were exposed to the harmful substance, but also that they were exposed to it in an amount that was "toxic and harmful." *Powell-Murphy*, 2020 WL 4722070, at \*5; *see Trice v. Oakland Dev. Ltd. P'ship*, No. 278392, 2008 WL 7488023, at \*12 (Mich. Ct. App. Dec. 16, 2008) ("[W]ithout evidence that [the plaintiff] had been exposed to any chemicals at a level that would be harmful, [the plaintiff] [can]not establish specific causation."); *Pluck*, 640 F.3d at 677 (plaintiffs must prove that their "level of exposure was sufficient to induce the complained-of medical condition").

### 1. Plaintiffs Must Present Evidence Of Their Level Of Lead Exposure After February 18, 2015

Plaintiffs' theory of harm is that there is no safe level of lead and that any amount of lead, no matter how small, is toxic and harmful. That theory is inconsistent with the fundamental tenet of toxicology is that "the dose makes the poison." *Adams v. Cooper Indus., Inc.*, Civ. No. 03-476-JBC, 2007 WL 2219212, at \*3 (E.D. Ky. July 30, 2007) (quoting Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 403 (2d ed. 2000)). That theory also is not allowed under Michigan law. So that theory cannot be used to establish causation here.

### a.    CDC Guidelines Cannot Be Used To Prove Harmful Exposure Here

Plaintiffs cannot satisfy their burden of proof by presenting expert testimony that there is no known safe level of lead.  Plaintiffs' experts rely on various government agency risk assessments of childhood lead exposure, including a CDC advisory cautioning that "[n]o safe blood lead level in children has been identified." CDC, *Blood Lead Levels In Children* (April 5, 2021), https://bit.ly/3xZskI6; *see, e.g.*, Ex. 11, Michaels Report 101; Ex. 78, Graziano Report 5.  But the CDC's advisory does not mean that any exposure to lead is harmful.

Courts have distinguished public-health guidelines from the legal proof necessary to establish causation.  As the Supreme Court has explained, regulatory guidelines may be based on evidence that "suggests, but does not prove, causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 42 (2011).  The Eleventh Circuit has contrasted "the type of risk assessment that a government agency follows for establishing public health guidelines versus an expert analysis of toxicity and causation in a toxic tort case."  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1249 (11th Cir. 2005).  Risk assessment "calls for a cost-benefit analysis" based on "any evidence that points to a need for caution," rather than on "the likelihood that a causal relationship in a specific case is more likely than not."  *Id*. (quoting Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 33 (2d ed. 2000)).  Public-health

guidelines "are intended to be protective of all individuals in a population," so they "generally overestimate potential toxicity levels." *Id.*

Accordingly, even though the CDC has not identified a safe level of lead, it does not follow that any amount of lead exposure is capable of causing injury. In fact, the CDC has adopted a blood lead level of 5 µg/dL (micrograms per deciliter) as a "reference value" to identify children who have statistically high blood lead levels, and it does not recommend any follow-up action for children with blood lead levels below 5 µg/dL. *See* Ex. 6, Finley Report 29; Ex. 79, Benson Report 12.

Public-health guidelines stating that there is no known safe level of lead thus are insufficient as a matter of law to prove that any of the plaintiffs was exposed to enough lead as a result of VNA's conduct to have been injured.

### b. The Single-Molecule Theory Of Causation Is Incompatible With Michigan Law And Sixth Circuit Precedent

Plaintiffs also cannot satisfy their burden by invoking the opinion of one of their toxicologists, Dr. Michaels, that exposure to any amount of lead—even "one molecule"—is harmful. Ex. 11, Michaels Report 103 ("The theoretical lowest causative [lead] exposure is one molecule."). This "one molecule" or "no safe dose" theory was flatly contradicted by Plaintiffs' other toxicologist Dr. Graziano, who conceded at his deposition that low-level lead exposures below 1 µg/dL are *not* harmful. *See* Ex. 20, Graziano Dep. 152:9-19, 241:4-6. More fundamentally, the

"no safe dose" theory is incompatible with Michigan law, which requires toxic-tort plaintiffs to prove "the estimated amount and duration of exposure." *Powell-Murphy*, 2020 WL 4722070, at *5.

In *Powell-Murphy*, the plaintiffs alleged that they suffered personal injuries as a result of exposure to various chemicals at their workplace. The Michigan Court of Appeals considered whether the plaintiffs had to present "evidence of the level of the toxic emissions to which they were exposed" and "whether that level was sufficient to cause the alleged health effects." *Powell-Murphy*, 2020 WL 4722070, at *6. The plaintiffs acknowledged that they had not presented such evidence. *Id*. But they maintained that they could survive summary disposition based on evidence that methane levels "in parts of" the facility had become elevated and that they "suffered health effects that can be attributed to those emissions." *Id*.

The Michigan Court of Appeals concluded that this evidence was not enough to prove causation, because it did not prove the "specific levels of methane" "to which plaintiffs were exposed." *Powell-Murphy*, 2020 WL 4722070, at *6; *see id.* at *8 (plaintiffs' evidence did not "prove a genuine issue of material fact regarding causation" because it did not "prov[e] the level of exposure . . . suffered by plaintiffs"). *Powell-Murphy* explains that Michigan law requires toxic-tort plaintiffs to prove the "estimated amount" of exposure. *Id*. at *5. So Dr. Michaels' theory, which "posit[s] that any exposure" to lead, "regardless of the amount," may be "an

78

underlying cause of injury," is invalid as a matter of law. *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 672 (7th Cir. 2017).

For its part, the Sixth Circuit has repeatedly refused to allow toxic-tort plaintiffs to use a "one molecule" or "no safe dose" theory to demonstrate causation, on the ground that it would allow plaintiffs to avoid their burden to prove that an alleged exposure caused their injuries. Thus, in an asbestos-liability case, the Sixth Circuit rejected the plaintiff's "every exposure" theory, reasoning that it would permit the "imposition of liability on the manufacturer of any [asbestos] product with which a worker had the briefest of encounters on a single occasion." *Lindstrom v. A-C Prod. Liab. Tr.*, 424 F.3d 488, 493 (6th Cir. 2005), *abrogated on other grounds*, *Air & Liquid Sys. Corp. v. DeVries*, 139 S. Ct. 986 (2019).

In case after case, the Sixth Circuit has reached the same result, including when applying Michigan law. *See Stark*, 21 F. App'x at 376 ("A defendant does not become liable based on a bare demonstration of 'minimal exposure.'") (Michigan law); *see also Stallings v. Georgia-Pacific Corp.*, 675 F. App'x 548, 551 (6th Cir. 2017) (holding that the "'any' or 'every exposure' theory of causation cannot satisfy" the "'substantial factor' standard" and would "render[] that standard . . . all but 'meaningless'") (Kentucky law); *Moeller v. Garlock Sealing Techs., LLC*, 660 F.3d 950, 955 (6th Cir. 2011) ("[S]aying that exposure to [defendant's products] was a substantial cause of [plaintiff's] mesothelioma would be akin to saying that one

who pours a bucket of water into the ocean has substantially contributed to the ocean's volume.") (Kentucky law); *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (rejecting argument that "mesothelioma is a progressive disease" so "any exposure is a substantial cause") (Kentucky law).

Despite saying in his report that "[t]he theoretical lowest causative [lead] exposure is one molecule," Ex. 11, Michaels Report 103, Dr. Michaels attempted to disavow the "one molecule" theory at his deposition, stating that he "certainly would not say" and "did not say" that "one-hit" of lead can have negative health effects, Ex. 19, Michaels Dep. 136:1-5.  Instead, he explained that because every person already has some preexisting background exposure to lead in the environment, every additional molecule of lead incrementally increases a person's lead levels, which in turn can exacerbate the negative health effects from cumulative lead exposure.  *Id.* at 138:7-14; *see* Ex. 11, Michaels Report 125.

This cumulative-exposure theory is defective for the same reason as the "one molecule" theory.  Indeed, they are the same theory.  As the Seventh Circuit explained, neither theory "rel[ies] on any particular dose or exposure," and each instead assumes that "all exposures contribute to a cumulative dose." *Krik*, 870 F.3d at 677.  Accordingly, the Seventh Circuit reasoned, the cumulative-exposure theory, like the "each and every exposure" theory, impermissibly relieves plaintiffs of their "ultimate burden of proof on the element of causation." *Id.* (citing *Lindstrom*, 424

80

F.3d at 493); *accord Barabin v. Scapa Dryer Fabrics, Inc.*, No. 07-cv-1454, 2018 WL 840147, at *13 (W.D. Wash. Feb. 12, 2018) (rejecting "cumulative exposure" theory); *Haskins v. 3M Comp.*, No. 15-cv-02086, 2017 WL 3118017, at *6 (D.S.C. July 21, 2017) (same).

In short, Dr. Michaels' cumulative-exposure fallback would permit Plaintiffs to satisfy their burden of proof by showing any exposure to lead in Flint tap water—one sip from a water fountain would do. That result is incompatible with Michigan law, which imposes on Plaintiffs the burden to prove by more than "mere speculation" that an amount of exposure was sufficient to cause their injuries. *Powell-Murphy*, 2020 WL 4722070, at *3-4 (quoting *Skinner*, 445 Mich. at 164).

### 2. Plaintiffs' Experts Concede That They Do Not, And Cannot, Identify Plaintiffs' Level Of Lead Exposure After February 18, 2015

Plaintiffs must show that the amount of lead they consumed after VNA arrived in Flint was sufficient to cause their injuries. None of them can show that because they have no evidence about how much water they drank, or the composition of that water. Neither of Plaintiffs' experts on lead exposure (Dr. Bithoney and Dr. Michaels) made any effort to quantify Plaintiffs' exposure to lead during the time relevant to VNA, or even during the Flint water crisis generally.[15]

---

[15] Plaintiffs' expert Dr. Graziano agreed that his report did not address individual Plaintiffs and that he could not opine on the extent of their exposures to lead-contaminated water. Ex. 20, Graziano Dep. 67:6-68:11, 87:10-88:3.

Dr. Bithoney asserts that each Plaintiff was ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████. *See* Ex. 13, Bithoney Report (E.S.) 12-13; Ex. 14, Bithoney Report

(R.V.) 11-12; Ex. 15, Bithoney Report (D.W.) 12; Ex. 80, Bithoney Report (A.T.)

11-12.   But at his deposition, he admitted he ██████████████████

████████████████████████████████████████████████████████████

████████:



Ex. 12, Bithoney Dep. 238:5-239:1.

Dr. Michaels likewise does not show how much water Plaintiffs consumed or

the composition of that water.  He asserts that the ██████████████████

████████████████████████████████████████████████████████████



Ex. 11, Michaels Report 123 (E.S.); *id*. at 123-24 (A.T.); *id*. at 124 (R.V.); *id*. at 125 (D.W.).  But at his deposition, he admitted that he

Ex. 19, Michaels Dep. 160:22-161:5, 161:19-22, 162:8-16.  Nor did he

*Id.* at 163:12-164:17.

Dr. Michaels admitted that the evidence



Given their experts' concessions, Plaintiffs cannot prove their level of exposure after VNA was hired in Flint, and as a result they cannot show that VNA caused their injuries. *See Powell-Murphy*, 2020 WL 4722070, at *5.

### 3. The Factual Record Confirms That Plaintiffs Were Not Exposed To Enough Water-Borne Lead After February 18, 2015 To Have Been Injured

Leaving aside Dr. Michaels' "one molecule" theory, Plaintiffs' experts agree, as they must, that "[m]inimal exposure" is "insufficient" to cause any harm. *Lindstrom*, 424 F.3d at 492; *see* Ex. 20, Graziano Dep. 152:16-17, 241:4-6 (testifying that a consistent blood lead level of 2 µg/dL would not impact a child's intellectual development "much at all" and that a level of 1 µg/dL may "ha[ve] no effect on intelligence").

The factual record does not contain evidence sufficient for a reasonable jury to conclude that Plaintiffs were exposed to a significant amount of lead in Flint tap water after February 18, 2015. In fact, the record affirmatively indicates that ███████████████████████████████████████████████████ ███████████████████████████████

### a. There Is No Evidence That Plaintiffs Consumed A Significant Amount Of Tap Water After February 18, 2015

First, there is no evidence that, after VNA arrived in Flint, any of the four Plaintiffs ingested enough unfiltered Flint water to cause them harm. For E.S., R.V., and D.W., that is because there is no evidence that they ingested *any* Flint tap water after that date. *See* pp. 6-13, *supra*. For the fourth Plaintiff, A.T., there is evidence that A.T. never entirely stopped drinking the tap water at home, but there is no basis in the record to infer that ███ consumed enough lead-contaminated water to cause the harms claimed.

A.T. was born on ████████████ Ex. 81, Pl.'s Fact Sheet (A.T.) 5. Between 2013 and 2018, A.T. lived with ███ family at ████████████████ in Flint. *Id.* at 6. A.T.'s mother, ████████████, testified that A.T. reduced the amount of tap water ███ drank in 2014-2015. Ms. ██████ testified that during the water crisis, she "tried to get bottled water." Ex. 34, ██████ Dep. 99:17; *see id.* at 104:5 ("I still use a lot of bottled water now."); *id.* at 110:8-9 ("[W]e did start getting more water bottles when

they started passing them out.").  On occasions when they did not have bottled water,

A.T. would sometimes drink the tap water, *id*. at 111:2-7, 112:4-20.  But Ms. ▮▮▮

"[a]bsolutely picked bottled water" for A.T. to drink when it was available:

> Q.  So if you had to pick between tap water at the time or bottled water, is it fair you would have chosen bottled water?
>
> A.  Absolutely picked bottled water.  Absolutely.

*Id*. at 112:21-24.

Moreover, while A.T. was drinking "[t]hree, four, glasses" of tap water a day

at home around the start of the water crisis, Ex. 34, ▮▮▮ Dep. 100:7-15, Ms. ▮▮▮

stated that A.T. might drink "a glass or less a day" at home "after [they] knew about"

the problems with the water.  *Id*. at 112:11-12.  Ms. ▮▮▮ could not say how much

water (if any) A.T. was drinking at school at that time.  *Id*.  And when using the tap

water at home, Ms. ▮▮▮ would run the tap for a few minutes first.  *Id*. at 100:17-23,

102:2-4.  That procedure tends to reduce the amount of any lead in the water.  *See*

CDC, *Lead in Drinking Water* (Nov. 18, 2020), https://bit.ly/33tDKpq.

Especially given Ms. ▮▮▮'s testimony regarding A.T.'s increased use of

bottled water and reduced consumption of tap water, there is insufficient evidence

that A.T. ingested enough Flint tap water during the relevant period to cause ▮▮▮

harm.  As discussed above, Plaintiffs' experts could not confirm for *any* Plaintiff the

degree of his or her lead exposure from the water or whether it was harmful, so there

is no basis to conclude that the amount of potentially lead-contaminated water that A.T. continued to drink after February 18, 2015, was harmful.

Plaintiffs' expert Dr. Bithoney opines only that drinking "between 4 and 6 glasses of tap water per day" may be a "significant source of potential [lead] exposure." Ex. 80, Bithoney Report (A.T.) 7. The evidence indicates that A.T. was drinking far less than that by February 18, 2015. Accordingly, A.T.'s claims fail for lack of causation.

> **b.      There Is No Evidence From Which A Jury Could Find That Any Flint Tap Water That Plaintiffs Might Have Consumed Contained Elevated Levels Of Lead**

Independently, there is no evidence that any water Plaintiffs may have consumed contained a significant amount of lead.

Undisputed evidence indicates that Plaintiffs' water sources did *not* have elevated lead levels in 2015. City records show that the service lines that supplied water to all four Plaintiffs' residences in 2014 and 2015 were made of copper, not lead or galvanized steel, and thus did not need to be replaced as part of the City's lead pipe replacement project. *See* Ex. 82, Edwards Decl. ¶¶ 7-8; Ex. 83, Phaneuf Decl. ¶¶ 13-14; *see also* Ex. 6, Finley Report 34-35 (E.S); *id.* at 44-45 (A.T.); *id.* at 52 (R.V.); *id.* at 60 (D.W.).

That is significant, because lead service lines were the main source of the elevated lead levels in 2014. *See* Ex. 76, Duquette Report 4; Ex. 84, Gagnon

Report 4.   Plaintiffs have not disclosed any expert who disputes those facts. Although Dr. Michaels notes that E.S.'s home (which did not have lead service lines) supposedly had internal pipes containing lead solder, Ex. 11, Michaels Report 8, 47, he does not opine that lead solder was a source of elevated water lead levels.   And, as VNA's expert explained, there is no evidence that it was.   *See* Ex. 76, Duquette Report 11.   The protective inner coating on the pipes would need to have been breached for the lead solder to have increased water lead levels, and there is no evidence that it was breached at E.S.'s home (or anywhere else in Flint).   *Id.*

Further, the record does not contain any test results showing that the water lead levels at Plaintiffs' residences were elevated, at any time.   There is no evidence that *any* water lead tests were performed at A.T.'s or R.V.'s residences around the time of the water crisis.   MDEQ tested the water at D.W.'s ████████████ address in 2016, but that test showed a lead level of 2 ppb (parts per billion).   Ex. 6, Finley Report 60.   That is almost an order of magnitude below the 15 ppb "action level" used by the U.S. Environmental Protection Agency (EPA) to determine whether drinking water requires treatment for lead.   *See* 40 C.F.R. § 141.80(c). E.S.'s mother, Ms. ██████, testified that she used a home "water testing kit" to test the tap water at her home in 2015 or 2016 and that it "turned red" rather than green, supposedly indicating that the water was "bad."   Ex. 10, ██████ Dep. 180:7-182:1. But Ms. ██████ did not testify as to how "bad" a lead level was indicated by the

test kit, or whether the "bad" result was due to lead or something else.  And she provided no information about the test kit that would permit assessment of whether the results were reliable.

Plaintiffs' experts rely on 2015 lead testing of water samples in Flint performed by Professor Edwards to argue that ███████████████.  That testing showed that "17% of an unselected sample of homes had [lead] levels in the water greater than 15 ppb."  *E.g.*, Ex. 13, Bithoney Report (E.S.) 4; *see* Ex. 11, Michaels Report 118-19.  Plaintiffs' experts also rely on citywide data from 2019 showing that many Flint homes had lead or galvanized steel service lines during the Flint water crisis.  *E.g.*, Ex. 13, Bithoney Report (E.S.) 4.  But none of this is connected to Plaintiffs.  No evidence shows that their homes had elevated water lead levels, and the evidence affirmatively shows that their homes did not have lead service lines; neither Dr. Michaels nor Dr. Bithoney was even aware of that evidence.  Ex. 12, Bithoney Dep. 196:2-21; Ex. 19, Michaels Dep. 282:14-284:13.[16]

In his report, Dr. Michaels cites water lead testing performed by MDEQ in 2015 and 2016 at Flint ███████████ attended by three of the Plaintiffs:

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[16]  Plus, Professor Edwards's uncontroverted testimony establishes that water lead levels in Flint had returned to normal by mid-2014.  *See* pp. 70-74, *supra*.



. *See* Ex. 11,

Michaels Report 49, 55, 65.[17]  MDEQ found lead levels at each of those three schools

ranging from < 1 ppb ("non-detect") to over 300 ppb (and in one instance, as high

as 2,856 ppb).  *See* Ex. 6, Finley Report 35, 45, 61.  But that does not show that these

Plaintiffs drank lead-contaminated water at school, or that the schools were even

allowing students to drink the tap water there as of February 2015.  In E.S.'s case,

that evidence is also irrelevant because ███████████████████████████, by

which time his school had installed filters on the drinking fountains; retesting by

MDEQ showed no detectable lead in any water at the school.  *Id*. at 35.

Moreover, the elevated lead levels at Plaintiffs' schools accounted for only a

small percentage of the water samples tested at each school.  *See* Ex. 6, Finley Report

35, 45, 61.  There is no evidence that elevated levels were detected at outlets from

which Plaintiffs drank.  In particular, there is no evidence that elevated levels were

detected at any outlet in Plaintiffs' classrooms or in common areas rather than in

---

[17]  Dr. Michaels accepts that R.V. was not exposed to lead-contaminated water at
school because ████████████████.  *See* Ex. 11, Michaels Report 60.  R.V.
███████████████████████████████████████████████████
████████████.  Ex. 4, Pl.'s Fact Sheet (R.V.) 9-10.

90

different classrooms or in areas that would have been inaccessible to Plaintiffs. Plaintiffs therefore have provided no evidence that any water they drank had elevated lead levels.

<blockquote>

**c. Plaintiffs' Blood Lead Test Results Cannot Support A Finding That Plaintiffs Consumed Harmful Amounts Of Lead In Flint Tap Water After February 18, 2015**

</blockquote>

Critically, the record contains no evidence that Plaintiffs' blood lead levels ██████████████ .

Blood lead tests are the standard method for demonstrating that a person has been exposed to a harmful amount of lead. *See, e.g.*, Ex. 6, Finley Report 28, 80; Ex. 18, Gaitanis Report (D.W.) 7-8. Intravenous (IV) blood tests are the preferred method for assessing blood lead levels because they can detect very low levels of blood lead. In contrast, capillary or "finger-prick" blood tests are less precise and generally cannot detect lead levels below around 3.3 µg/dL. *See* Ex. 6, Finley Report 28; Ex. 11, Michaels Report 10-12. The CDC uses 5 µg/dL as the "reference value" to identify children who have a statistically high blood lead level; it does not recommend any follow-up action for children with blood lead levels below 5 µg/dL. *See* Ex. 6, Finley Report 29; Ex. 79, Benson Report 12.

███████████████████████████████████████████████

███████████████████████████████████████████████



Although three of the four Plaintiffs' blood lead levels ███████████████ ██████████████████████████████████████, all of the Plaintiffs'

██████████ are consistent with estimates of their blood lead levels during that time prepared by VNA's toxicology expert, Dr. Brent Finley.  He estimated each Plaintiff's potential exposures to lead in food, soil, house dust, air pollution, residential tap water (███████), and school tap water (████████████████).  *See* Ex. 6, Finley Report 39 (estimating E.S.'s blood lead level from February to October 2015 at ████████); *id.* at 49 (estimating A.T.'s blood lead level at ████████); *id.* at 56 (estimating R.V.'s blood lead level at ████████); *id.* at 64 (estimating D.W.'s blood lead level at ████████).  As R.V.'s actual blood lead level of ████████ in September 2015 confirms, these estimates, ████████, are conservative.

Not only are Plaintiffs' confirmed and estimated blood lead levels during and after the crisis ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████.  Ex. 20, Graziano Dep. 241:4-6.  Indeed, ██████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████.  *Id.* at 152:17.  Moreover, ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████, they cannot provide any basis to infer that the water crisis in general (or VNA's alleged negligence in particular)

caused ████████████████████. And ██████████████████

████████████████████████████████ The

blood lead evidence thus cannot show that any of the Plaintiffs were exposed to

enough lead after February 18, 2015, to have suffered injury.

Plaintiffs' experts speculate that Plaintiffs ███████████████

██████████████████████████████████████

████. Specifically, Dr. Bithoney and Dr. Aaron Specht opine that the half-life of

lead is thirty days or less for children, so ████████████████████

██████████████████████████████████████

██████████████████████████████. *E.g.*, Ex.

15, Bithoney Report (D.W.) 6; *see* Ex. 94, Specht Report 3.  But even if it is possible

that Plaintiffs ████████████████████████████

████████████████████████████████[18]

Dr. Bithoney himself concedes that ██████████████████

██████████████████████████████████████

████. Ex. 12, Bithoney Dep. Vol. 1, 204:13-17.  Further, the only evidence in the

---

[18]  Moreover, as VNA explains in its contemporaneously filed *Daubert* motion, Dr. Specht's opinions about the half-life of blood lead are unreliable and should be excluded under Rule 702.

record, the blood level estimates made by VNA's expert Dr. Finley, ████████

███████████████████████████████████████████████.

In the face of that evidence, Plaintiffs' "[e]vidence suggesting a mere

possibility" that ████████████████████████████████████████████

████████████████ "is not enough to get past the summary judgment stage." *Gregg*

*v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986); *see Powell-Murphy*, 2020

WL 4722070, at *3 (the "mere possibility of causation is insufficient") (citing

*Skinner*, 445. Mich. at 165).

>    **d.    Plaintiffs' Bone Lead Measurements Cannot Support
>    A Finding That They Consumed Harmful Amounts Of
>    Lead In Flint Tap Water After February 18, 2015**

Plaintiffs' bone lead tests also are insufficient to show that Plaintiffs

consumed harmful amounts of lead in tap water during the relevant period.  Those

tests, conducted under the supervision of their medical physicist Dr. Aaron Specht,

purport to show that Plaintiffs each had a bone lead level between ████████████

(micrograms per gram) on the date of the test.  *See* Ex. 94, Specht Report 14, 15, 17,

19; Ex. 95, Bone Lead Test (E.S.) (████████); Ex. 96, Bone Lead Test (A.T.) (████

████); Ex. 97, Bone Lead Test (R.V.) (████████); Ex. 98, Bone Lead Test (D.W.)

(████████).   Dr. Specht asserts that each plaintiff's bone lead level ████████

████████████████████.  Ex. 94, Specht Report 15, 17, 18, 20.  That is wrong;

the bone lead tests cannot meet Plaintiffs' burden of proof for three reasons.

95

First, Dr. Specht's opinions and the data underlying them are unreliable and thus should be excluded under Rule 702, as VNA explains in its accompanying *Daubert* motion.  Plaintiffs' other experts rely on Dr. Specht's opinions about Plaintiffs' bone lead measurements.  *See* Ex. 11, Michaels Report 116-119; Ex. 13, Bithoney Report (E.S.) 5; Ex. 14, Bithoney Report (R.V.) 4; Ex. 15, Bithoney Report (D.W.) 3; Ex. 80, Bithoney Report (A.T.) 4-5.  Plaintiffs have no other evidence to prove ████████████████████.

Second, the bone lead results do not prove that Plaintiffs were ever exposed to a harmful amount of lead.  There are no established benchmarks for assessing whether a child's bone lead level is either statistically high or indicative of substantial exposure.  For example, the CDC has not established a "reference value" for bone lead levels comparable to its 5 µg/dL reference value for blood lead levels. At his deposition, Dr. Specht conceded that "there has been no scientific conclusion as to what the usual bone lead would be versus a high bone lead."  Ex. 99, Specht Dep. 334:8-10.  He also was unaware of any database of bone lead measurements like the one the CDC used to calculate the 5 µg/dL reference value for blood lead levels.  *Id.* at 452:9-10; *see* Ex. 79, Benson Report 12.  Dr. Specht also did not ever test a "control group" of non-Flint children to assess whether Plaintiffs' bone lead results were elevated compared to the control group's results.  Ex. 99, Specht Dep.

338:10-17.  Without a baseline reference point, there is no scientific way to conclude

that ███████████████████████████.  *See* Ex. 6, Finley Report 92.

Dr. Specht states that he derived a 10 µg/g reference value for ████████

████████ from the scientific literature.  *See* Ex. 99, Specht Dep. 432:9-10; *see also,*

*e.g.*, Ex. 13, Bithoney Report (E.S.) 5 ("Levels of > 10 mcg per gram . . . indicate

████████████████████.").  He conceded, however, that the 10 µg/g value was

based on studies of "adult exposures" and "wouldn't be relevant" in the bellwether

cases.  Ex. 99, Specht Dep. 432:10-12.  He further conceded that he has no other

reference value for identifying children with a ████████████  *Id*. at 433:15-

23.  Anyway, even if the 10 µg/g value were valid, ██████████████████

████████████████████████████████████████████

██████████████████████████.

Dr. Specht also asserts that ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████.[19]

_____

[19] ████████████████████████████████████████████
████████████████████████████████████████████



Third, the bone lead tests cannot show that Plaintiffs were ███████████ ██████████████████████████████████ because those results do not show when Plaintiffs ingested lead, or from what source.  Dr. Specht does not offer an opinion about either the source of Plaintiffs' purported lead exposures or the timeframe in which they were exposed.  In fact, he admits that a bone lead measurement simply "reflects the lead exposure during a time period . . . in an individual's past."  Ex. 94, Specht Report 4.  At his deposition, Dr. Specht confirmed that he "did not undertake any analysis or study to determine the amount of lead exposure" that resulted from lead in "dust, paint, [or] soil" as opposed to "water."  Ex. 99, Specht Dep. 229:4-9.  He further agreed that he did not know "when

specifically the exposure to lead occurred for any individual plaintiff," "apart from the fact that it was over the course of their lifetime." *Id*. at 228:22-229:3; 229:10-21. The test results therefore "could not lead a rational trier of fact" to conclude that Plaintiffs more likely than not were ████████████████████████████████ ████████████████████████████████. *Monks v. Gen. Elec. Co.*, 919 F.2d 1189, 1193 (6th Cir. 1990); *see* Ex. 16, Gaitanis Report (E.S.) 9; Ex. 17, Gaitanis Report (R.V.) 7-8; Ex. 18, Gaitanis Report (D.W.) 6-7; Ex. 100, Gaitanis Report (A.T.) 6-7.

In sum, Plaintiffs failed to present evidence that they were exposed to enough lead in Flint water after VNA arrived in Flint to cause or exacerbate their alleged injuries. Their claims fail as a matter of law.

## C. Plaintiffs Provide No Evidence Tying Their Injuries to VNA, As Opposed To Other Potential Causes

Plaintiffs' claims also fail because none of them has adduced sufficient evidence that exposure to lead in Flint water during the time period relevant to VNA—as opposed to something else—played any role in causing his or her alleged injuries.

Under Michigan law, to show that an alleged exposure "more likely than not caused the plaintiff's injury," a toxic-tort plaintiff must produce evidence that "excludes other reasonably relevant potential causes of [the] plaintiff's symptoms." *Powell-Murphy*, 2020 WL 4722070, at *5 (internal quotation marks omitted). That

99

requires a "differential etiology," which is sometimes called a "differential diagnosis." *Pluck*, 640 F.3d at 678.

A differential etiology requires three steps: The expert must "make an accurate diagnosis of the nature of the disease"; "reliably rule in the possible causes of it"; and "reliably rule out the rejected causes." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010). Unless a plaintiff uses that method to rule out alternative causes, the "[two] or more plausible explanations" of the plaintiff's injuries "remain conjectures only" and cannot prove causation. *Lowery*, 500 Mich. at 1046 (Markman, C.J., concurring) (quoting *Skinner*, 445 Mich. at 164).

There are myriad potential alternative sources of their alleged injuries, and Plaintiffs were required to rule those sources out. They have not done so.

### 1. There Are Many Other Potential Sources Of Plaintiffs' Alleged Injuries

Dr. Mira Krishnan, Plaintiffs' neuropsychologist, asserts that



Dr. Bithoney, in turn, asserts that exposure to lead can cause ,

*see, e.g.*, Ex. 13, Bithoney Report (E.S.) 10-12; *see also* Ex. 12, Bithoney Dep.

201:13-205:8, 207:20-208:8, 211:23-212:18—although, as VNA explains in its *Daubert* motion, his opinions lack reliable foundation.

But assuming that lead can cause Plaintiffs' alleged injuries, Plaintiffs' claimed injuries easily could have been caused by exposure to lead from sources other than Flint water after VNA arrived in Flint. They could have been caused by elevated water lead levels from before February 18, 2015—whether during the early days of the Flint water crisis, or sometime before then. The claimed injuries also could be due to other sources of lead. *See* Ex. 6, Finley Report 91. Children in the United States, especially in urban areas like Flint, regularly are exposed to lead in paint, dust, and soil. *See id.* at 6; Ex. 20, Graziano Dep. 68:12-69:4. This risk was especially acute in Flint, where a 2013 program to demolish abandoned properties increased the likelihood that children would be exposed to lead in dust and soil because the demolitions targeted older properties that were likely to contain lead paint. Ex. 6, Finley Report 13. Children are also exposed to lead through many other sources—to take one example, many brands of baby food contain material amounts of lead. *See* Ex. 105, H. Comm. on Oversight and Reform, Subcomm. on Econ. & Consumer Pol'y, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (Feb. 4, 2021); *see also* FDA, *FDA Announces New Actions Aimed at Further Reducing Toxic Elements in Food for Babies, Young Children* (Mar. 5, 2021), https://bit.ly/2SmNdwn.

Counsel for these Plaintiffs made precisely the same points in opposing the class plaintiffs' motion for class certification.  They recognized that minors in Flint "may have had alternate sources of lead exposure."  *See* Pls.' Class Cert. Opp. at 22, No. 16-cv-10444 ECF No. 1392, PageID.54017.  They explained that "Class Counsel's own evidence reveals that drinking water is not the only source of lead exposure."  *Id.* at 14, PageID.54009.  They embraced the opinion of one of the class plaintiffs' experts that "[p]eople who live in older homes and rental housing are also at increased risk for higher blood lead concentration, as are people who consume diets low in nutrients and calories," which "create[s] opportunities for defendants to argue that lead exposure from Flint River water is not the only potential cause of a particular class member's injury."  *Id.* at 15, PageID.54010 (internal quotation marks omitted).  And they noted that "even prior to the Flint water crisis, 2.4% of children suffered from blood lead levels greater than 5 μg/dL—pointing to sources of lead exposure other than contaminated tap water from the Flint River."  *Id.*

The undisputed evidence shows that █████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████

Further, Plaintiffs' injuries could have been caused by other toxic substances or other causes altogether.  VNA's epidemiology experts, Dr. Stacey Benson and Dr. Douglas Weed, identify a host of factors other than lead that can cause the same ███████████████ as lead, such as exposure to heavy metals or secondhand smoke, socioeconomic status, and a family history of psychological disorders.  *See* Ex. 79, Benson Report 9-12; Ex. 106, Weed Report 14-30.

Again, Plaintiffs' counsel recognized this principle in opposing class certification.  They explained that due to potential "pre-existing condition[s]," any ██████████████████ in minors in Flint "may not be fully attributable to lead exposure."  Pls.' Class Cert. Opp. at 16, No. 16-cv-10444 ECF No. 1392, PageID.54011 (internal quotation marks omitted).  In particular, they referenced a class expert's opinion that "[m]any people in Flint already experience poor nutrition, poverty, and exposure to other toxic chemicals, like air pollution and tobacco smoke and  risk  developing  ███████████████████████ ████████ as well as a second class expert's opinion that "several important measures of vulnerability in the Flint community"—such as poverty and crime rates—"existed prior to the Flint Water Crisis."  *Id.* (internal quotation marks omitted).

Given all of these potential alternative sources of their alleged injuries, Plaintiffs need to present evidence to establish that their consumption of Flint water after February 18, 2015, actually caused or contributed to the alleged injuries.

### 2. Plaintiffs' Experts Do Not Rule Out Any Potential Alternative Causes Of Injuries

Plaintiffs have not carried their burden.  The most they have is Dr. Bithoney's opinion that their alleged injuries were either caused by or exacerbated by their exposure to lead in Flint water during the crisis.  Ex. 13, Bithoney Report (E.S.) 12-13; Ex. 14, Bithoney Report (R.V.) 11-12; Ex. 15, Bithoney Report 12 (D.W.); Ex. 80, Bithoney Report (A.T.) 11-12.  None of Plaintiffs' other experts opines that Plaintiffs' injuries were actually caused by exposure to lead-contaminated water during the crisis.[20]

There are three problems with Dr. Bithoney's opinion.  First, as VNA discusses in its motion to exclude Dr. Bithoney's opinions, Dr. Bithoney did not "reliably rule out" alternative causes of Plaintiffs' alleged injuries, *Tamraz*, 620 F.3d at 674, so his opinions should be excluded under Rule 702.  Because Plaintiffs have no other evidence to prove that their injuries resulted from drinking contaminated water during the crisis, the Court should grant VNA summary judgment.

---

[20]  Dr. Michaels conceded that he was not offering any opinions about whether any individual Plaintiff's alleged exposure to lead "actually caused any harm to that child."  Ex. 19, Michaels Dep. 198:15-199:3; *see id.* at 93:17-95:15.  Although each of Dr. Krishnan's reports says that lead exposure during the Flint water crisis likely caused Plaintiffs' alleged disorders, Plaintiffs previously informed the Court that they would not be relying on Dr. Krishnan to prove causation.  *See* Tr. of Oct. 2, 2020, Hearing at 5-7, *In re Flint Water Litig.*, No. 16-cv-10444 ECF No. 1285, PageID.39733-39735.  In any case, Dr. Krishnan's cursory statements about etiology suffer from the same fatal flaws as Dr. Bithoney's.

Second, even if Dr. Bithoney could show that Plaintiffs' injuries were caused by the water crisis in general, he did not attempt to show causation as to VNA. Neither Dr. Bithoney nor any of Plaintiffs' other experts opine that any additional lead exposure from consuming Flint water *after* VNA's engagement in Flint exacerbated the alleged harm that Plaintiffs suffered from consuming lead-contaminated water before then—when all Plaintiffs were still drinking unfiltered tap water, and when the evidence indicates that lead levels were higher.[21]

Third, Dr. Bithoney did nothing to exclude the possibility that water consumption before the Flint water crisis caused Plaintiffs' alleged injuries. Indeed, Professor Edwards has concluded that "the Flint water crisis wasn't even the city's worst lead exposure event of th[e] decade." Ex. 77, From Sewage Sludge 2. As Professor Edwards has shown—as depicted in the graph on p. 73, *supra*—there was a spike in water lead levels in Flint in 2011 that was even higher than the spike in 2014. *See* Ex. 6, Finley Report 17; Ex. 73, Roy, Ting, & Edwards 2019 at 479; Ex. 74, Roy & Edwards 2020 at 3; Ex. 76, Duquette Report 6-7. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████.[22]

---

[21] As discussed above, Professor Edwards concluded that, after a citywide spike following the switch to Flint water, water lead levels returned to pre-crisis levels by late summer 2014, and were even lower by early 2015. *See* pp. 70-74, *supra*.

[22] ████████████████████████████████████████████████████

An expert offering a differential etiology "must provide a reasonable explanation as to why he or she has concluded that any alternative cause suggested by the defense was not the sole cause." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 179 (6th Cir. 2009) (internal quotation marks and brackets omitted). Dr. Bithoney did not do that here. His opinions—which are no more than bare assertions—could not "lead a rational trier of fact" to find that VNA caused Plaintiffs any injury. *Monks*, 919 F.2d at 1193 (quoting *Matsushita*, 475 U.S. at 587).

## CONCLUSION

The Court should grant summary judgment to VNA on E.S.'s, A.T.'s, R.V.'s, and D.W.'s professional negligence claims.

Respectfully submitted,

**CAMPBELL, CONROY & O'NEIL P.C.**

By: /s/ *James M. Campbell*
James M. Campbell
Alaina M. Devine
One Constitution Wharf, Suite 310
Boston, MA 02129
(617) 241-3000
jmcampbell@campbell-trial-lawyers.com
adevine@campbell-trial-lawyers.com

**BUSH SEYFERTH PLLC**

By: /s/ *Cheryl A. Bush*
Cheryl A. Bush (P37031)
Michael R. Williams (P79827)
100 W. Big Beaver Road, Suite 400
Troy, MI 48084
(248) 822-7800
bush@bsplaw.com
williams@bsplaw.com

*Attorneys for Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC*

Dated: May 11, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF System, which will send notification to the ECF counsel of record.

Respectfully submitted,

*/s/ James M. Campbell*

Dated:  May 11, 2021