# EXHIBIT 60

1                  UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF MICHIGAN

3                      SOUTHERN DIVISION

4        _____

                                     )

5                                    )      Civil Action No.

         In Re FLINT WATER CASES     )      5:16-CV-10444-JEL-MKM

6                                    )      (Consolidated)

                                     )

7                                    )      Hon. Judith E. Levy

                                     )      Mag. Mona K. Majzoub

8                                    )

         _____)

9

10

11                       HIGHLY CONFIDENTIAL

12           VIDEOTAPED DEPOSITION OF BRENT WRIGHT

13                   Tuesday, December 3, 2019

14                        at 9:08 a.m.

15

16

17

18    Taken at:      Butzel Long

                     41000 Woodward Avenue

19                   Bloomfield Hills, Michigan  48304

20

21    REPORTED BY:   LAURA STEENBERGH, RPR, CRR, RMR, CSR-3707

22

23                   GOLKOW LITIGATION SERVICES

               877.370.3377 ph | 917.591.5672 fax

24                      deps@golkow.com

```
 1                A P P E A R A N C E S
 2                     - - -
 3   On behalf of the Class Plaintiffs:
 4   JESSICA B. WEINER, ESQUIRE
     COHEN MILSTEIN SELLERS & TOLL PLLC
 5   1100 New York Avenue NW, Fifth Floor
     Washington, DC  20005
 6   202-408-4600
     jweiner@cohenmilstein.com
 7
 8   On behalf of Moore and Rogers and Legionella Plaintiffs:
 9   DONALD H. DAWSON, JR., ESQUIRE
     FIEGER LAW
10   19390 West Ten Mile Road
     Southfield, Michigan  48075-2463
11   214-355-5555
     d.dawson@fiegerlaw.com
12
13   On behalf of the Mason State Court Plaintiffs (via
     teleconference):
14
15   ADAM SCHNATZ, ESQUIRE
     MCALPINE PC
16   3201 University Drive, Suite 200
     Auburn Hills, Michigan  48236-2395
17   248-373-3700
     atschnatz@mcalpinepc.com
18
19   On behalf of Individual Plaintiffs (via
     teleconference):
20
     LOUISE R. CARO, ESQUIRE
21   NAPOLI SHKOLNIK, PLLC
     2665 South Bayshore Drive, Suite 220
22   Coconut Grove, Florida 33133
     786-837-5442
23   lcaro@napolilaw.com
24
```

Highly Confidential - Brent Wright

```
 1                 A P P E A R A N C E S (CONT'D)
 2                          - - -
 3    On behalf of McLaren (via teleconference):
 4    SUSAN E. SMITH, ESQUIRE
      BEVERIDGE & DIAMOND P.C.
 5    456 Montgomery Street, Suite 1800
      San Francisco, California 94104
 6    415-262-4023
      ssmith@bdlaw.com
 7
 8    On behalf of Defendants Veolia Water North America
      Operating Services, LLC, Veolia North America, LLC,
 9    and Veolia North America, Inc.:
10    RICHARD P. CAMPBELL, ESQUIRE
      ALAINA N. DEVINE, ESQUIRE
11    CAMPBELL CONROY & O'NEIL,P.C.
      1 Constitution Wharf, Suite 310
12    Boston, Massachusetts  02129
      617-241-3037
13    rcampbell@campbell-trial-lawyers.com
      adevine@campbell-trial-lawyers.com
14
15    On behalf of Defendant City of Flint:
16    WILLIAM KIM, ESQUIRE
      CITY of FLINT LEGAL DEPARTMENT
17    1101 S. Saginaw St., 3rd Floor, Room 307
      Flint, Michigan  48502
18    810-766-7146
      wkim@cityofflint.com
19
20
21
22
23
24
```

```
 1              A P P E A R A N C E S (CONT'D)
 2                        - - -
 3   On behalf of Defendants Leo A. Daly Company and
     Lockwood, Andrews & Newham, Inc.:
 4
 5   PHILIP A. ERICKSON, ESQUIRE
     PLUNKETT COONEY
 6   325 E. Grand River, Suite 250
     East Lansing, Michigan 48823-4356
 7   517-324-5608
 8   On behalf of Defendant Adam Rosenthal (via
     teleconference):
 9
10   JAMES A. FAJEN, ESQUIRE
     FAJEN & MILLER, PLLC
11   3646 West Liberty Road
     Ann Arbor, Michigan  48103
12   734-995-0181
     fajenlaw@fajenmiller.com
13
14   On behalf of Defendant for Howard Croft (via
     teleconference):
15
16   ALEXANDER RUSEK, ESQUIRE
     WHITE LAW PLLC
17   2549 Jolly Road, Suite 340
     Okemos, Michigan 48864-3679
18   517-316-1195
     alexrusek@whitelawpllc.com
19
20
21
22
23
24
```

Highly Confidential - Brent Wright

```
 1              A P P E A R A N C E S (CONT'D)
 2                       - - -
 3   On behalf of DEQ Employee Defendants (via
     teleconference):
 4
 5   CHRISTOPHER B. CLARE, ESQUIRE
     CLARK HILL
 6   1001 Pennsylvania Avenue NW
     Suite 1300 South
 7   Washington, DC 20004
     202-572-8671
 8   cclare@clarkhill.com
 9   On behalf of Rowe Professional:
10   CRAIG S. THOMPSON, ESQUIRE
     SULLIVAN WARD ASHER & PATTON, PC
11   25800 Northwestern Highway, Suite 1000
     Southfield, Michigan 48075-8412
12   248-746-2776
     cthompson@swappc.com
13
14   On behalf of the State of Michigan:
15   RICHARD KUHL, ESQUIRE
     MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
16   ENVIRONMENT, NATURAL RESOURCES, AND AGRICULTURAL
     DIVISION
17   525 West Ottawa Street, Floor 6
     Lansing, Michigan 48933-1067
18   517-335-0696
     kuhlr@michigan.gov
19
20   On behalf of Defendant Jeff Wright (via
     teleconference):
21
     MATTHEW T. WISE, ESQUIRE
22   FOLEY & MANSFIELD, PLLP
     130 East 9 Mile Road
23   Ferndale, Michigan  48220
     248-721-4200
24   mwise@foleymansfield.com
```

```
 1   On behalf of Defendant Steven Busch (via
     teleconference):

 2

 3   KRISTA A. JACKSON, ESQUIRE
     SMITH HAUGHEY RICE & ROEGGE

 4   100 Monroe Center Street NW
     Grand Rapids, Michigan 49503-2802

 5   616-774-8000
     Kjackson@shrr.com

 6

 7   On behalf of the Witness:

 8   ROBERT J. MORAD, ESQUIRE
     LAW OFFICES OF ROBERT J. MORAD, PLLC

 9   355 S. Old Woodward Avenue, Suite 100
     Birmingham, Michigan  48009

10   248-646-2920
     Robert@rjmoradlaw.com

11

12   ALSO PRESENT:

13       Jeff Gudme - Videographer

14

15               *       *       *       *

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Brent Wright

```
1   A.   Because I -- we had to do it.

2   Q.   You had to do it to make the water safe?

3   A.   Well, we had to do it with Lake Huron water.

4   Q.   Yep.

5   A.   So going forward you're looking at running this plant in

6        an interim of two to maybe three years, and then

7        switching over to KWA.  So there were things that, like

8        we have to soften Flint water.  I don't have to soften

9        Lake Huron water.  But softening produces a lot of

10       sludge.

11            So we looked at -- first we looked into sludge

12       presses, which also has to be operated by one individual

13       24/7, you know, so you had to have guys that just worked

14       the sludge press system.  That was $20 million.  It

15       didn't make sense.  Why would we put $20 million into a

16       system we're going to use for two to three years.

17            So we went for the DEQ about using our Bray

18       Road sludge lagoon that was used back in the '60s, and

19       they said we could do that if we met some different

20       criteria.  So that's what we did, we hired -- and it

21       cost us about $2 million to upgrade that system and do

22       what we needed -- what the DEQ wanted us to do, and

23       implement that so we could use it.  I want to say it was

24       like July of 2013 I sat in a meeting with the DEQ.
```

Highly Confidential - Brent Wright

```
1   Q.   Is that Busch and Prysby?

2   A.   Yes.  And went through everything that -- on a list, and

3        Mr. Green was in the room, too, so was Mike Glasgow.

4        Went through a list of requirements that the DEQ was

5        looking at us to do to get this plant up and going by

6        the spring of 2014.  The last thing on the list was

7        corrosion control.

8   Q.   Corrosion control.  Why did you want corrosion control?

9   A.   We were already -- there was already a -- Detroit's

10       already feeding it, we knew we'd have to feed it when

11       Lake Huron water got here.  It's not expensive.

12  Q.   You said it was not expensive?

13  A.   It's not expensive.

14  Q.   Okay.

15  A.   It doesn't hurt.  I mean, the system's not expensive.

16       The system to put in to pump it in.

17  Q.   It helps create and maintain the passivation layer

18       inside the pipes, right?

19  A.   Correct.

20  Q.   Okay.  So you wanted to do this?

21  A.   Yeah, I did.

22  Q.   Who put the kibosh on it?

23  A.   We were told by the State, Steve Busch and Mike Prysby,

24       let's see what your lead and copper sampling does first.
```

Highly Confidential - Brent Wright

1   Q.   Okay.  So --

2   A.   Before we're going to require you to implement that.

3   Q.   Did anybody in this meeting that you just referenced

4        where Busch and Prysby said, oh, let's just wait and

5        see, anybody say do we have the right to utilize

6        pregnant women and infant children in the City of Flint

7        as guinea pigs to determine whether or not the water was

8        sufficiently potable and drinking without getting them

9        sick?  Anybody raise that topic?

10               MR. KIM:  Object as to form.

11  BY MR. CAMPBELL:

12  Q.   You can answer.

13               MR. MORAD:  Do you understand the question?

14               THE WITNESS:  Yeah, I understand the question.

15  A.   I would say no, that was not said.  But looking at

16       previous lead and copper sampling, we were fine, but we

17       also, you know, like I said, they maintained a

18       maintenance level from Detroit on phosphate.  I was

19       instructed by Mr. Glasgow that we were a softening plant

20       and our water won't be corrosive.

21  BY MR. CAMPBELL:

22  Q.   Okay.  So the decision-makers on corrosion control in

23       the context of the switch to the Flint River were

24       effectively Mr. Busch and Mr. Prysby?

Highly Confidential - Brent Wright

```
 1                    MR. KUHL:  Objection to form.

 2                    THE WITNESS:  Yes.

 3                    MR. CAMPBELL:  All right.  I'll pass the

 4          witness, reluctantly.

 5                    MR. ERICKSON:  Let's go off the record.

 6                    THE VIDEOGRAPHER:  We're going to go off the

 7          record, the time is 10:19.

 8                    (A short recess was taken)

 9                    THE VIDEOGRAPHER:  We're back on the record at

10          10:41.

11                    MR. ERICKSON:  Good morning, Mr. Wright.  As I

12          introduced myself earlier, my name is Phil Erickson, I

13          represent the LAN Defendants and their parent company,

14          Leo A Daly, and I'll be the next questioner for roughly

15          the next hour.

16   EXAMINATION BY MR. ERICKSON:

17   Q.    When you became -- in you connection with your work at

18          the Flint water plant, did there come a point in time

19          when you became aware of a report called the Phase II

20          report?

21   A.    Yes.

22                    WRIGHT EXHIBIT 37

23                    Final Report Water Treatment

24                    Plant Rehabilitation - Phase II
```

Highly Confidential - Brent Wright

```
 1                    WAS MARKED BY THE REPORTER

 2                    FOR IDENTIFICATION

 3   BY MR. ERICKSON:

 4   Q.   Take a look at what we've marked as Exhibit 37.

 5                    MR. ERICKSON:  And there are extra copies for

 6        you, Mr. Morad.

 7   BY MR. ERICKSON:

 8   Q.   Is this the Phase II report that you recall referencing

 9        in connection with your work for the City of Flint?

10   A.   Yes.

11   Q.   I'm not going to ask you anymore questions about it

12        right now.

13                    WRIGHT EXHIBIT 38

14                    Preliminary Engineering Report -

15                    Karegnondi Water Authority

16                    WAS MARKED BY THE REPORTER

17                    FOR IDENTIFICATION

18   BY MR. ERICKSON:

19   Q.   Next let me show you what we've marked as Exhibit 38.

20        It's the top one there.

21                    In connection with your work at the City of

22        Flint, did you become aware of a report called

23        Preliminary Engineering Report, Lake Huron Water Supply

24        Karegnondi Water Authority from September 2009?
```

Highly Confidential - Brent Wright

```
 1        keeping MDEQ informed about what the city was doing

 2        during that time?

 3   A.   Yes.

 4   Q.   At the water plant.  What kind of information were you

 5        providing to MDEQ?

 6   A.   Just progress.  If I, you know, if we needed to do --

 7        MDEQ has to approve any changes, mechanical changes, you

 8        know, equipment changes, we'd send them engineering

 9        drawings and reports and they have to do a final

10        approval on those before we can even implement doing any

11        upgrades or doing any repair work.  I mean, repair work

12        is not -- you know, you never had to really get a hold

13        of DEQ for that, you know, I'm repairing a pump that

14        went down, but if you're putting new, something new in,

15        they had to -- it had to go through the DEQ before you

16        could even do the work.

17   Q.   So as far as you know, was MDEQ informed about all of

18        the upgrades that were done to the plant between 2013

19        and 2015?

20   A.   Yes.

21   Q.   Okay.  I want to direct your attention to what I believe

22        Mr. Erickson previously offered as Exhibit 45.

23   A.   Yes.

24   Q.   And you can see that your name is there at the top of
```

Highly Confidential - Brent Wright

```
 1        this sheet, correct?

 2   A.   Correct.

 3   Q.   Okay.  And you mentioned Warren Green from LAN earlier,

 4        this would be -- he was present at that meeting as well?

 5   A.   Yes.

 6   Q.   Okay.  Let me just go back.

 7               And this is the -- you understand that this is

 8        the sign-in sheet for a meeting that was held on June

 9        26th, 2013, is that your understanding?

10   A.   Yes.

11   Q.   Okay.  And is the name below Warren Green Jeff Hansen?

12   A.   Yes.

13   Q.   And was he present that day, to your recollection?

14   A.   Yes.

15   Q.   Okay.  And do you know the name that's written below

16        that?  It's --

17   A.   Jon Bloemker.

18   Q.   Jon Bloemker?

19   A.   Yeah.

20   Q.   And do you recall he's from DEQ?

21   A.   Yes.

22   Q.   Do you know what his role was at DEQ?

23   A.   At that time, no.

24   Q.   Okay.  And then the name below that is Elger Brown?
```

Highly Confidential - Brent Wright

```
 1   A.   Yes.

 2   Q.   And do you recall him being present?

 3   A.   Yes.

 4   Q.   Do you know what organization or entity he was there as

 5        a part of?

 6   A.   He worked for O'Malley Consulting.

 7   Q.   And what was their role?

 8   A.   Their -- I think they were more involved with the KWA.

 9   Q.   Okay.

10   A.   O'Malley Consulting was involved with Flint on Phase I.

11        During Phase I from 1998 to 2005, '06, O'Malley

12        Consulting was involved then.  But I think their role

13        was with KWA then.  They didn't really have a role with

14        Flint.

15   Q.   And the name below that is David Jansen, do you see

16        that?

17   A.   Yes.

18   Q.   Do you recall if he was present at that meeting?

19   A.   Yes.

20   Q.   And it appears the Genesee County WWS?

21   A.   Yeah.

22   Q.   Do you know what that WWS stands for?

23   A.   Water and Waste Services.

24   Q.   Okay.  And do you know what his role at Genesee County
```

Highly Confidential - Brent Wright

```
1           Water and Waste Services is?

2    A.     Yeah.  He was assistant director.

3    Q.     Okay.  Below that, Jim Redding?

4    A.     Yes.

5    Q.     And do you see that he's from Rowe, according to the

6           sign-in sheet?

7    A.     Um-hum (affirmatively).

8    Q.     Do you recall him being present?

9    A.     Yes.

10   Q.     Okay.  And then do you see below that Steven Busch from

11          DEQ?

12   A.     Yes.

13   Q.     And Michael Prysby from DEQ?

14   A.     Yes.

15   Q.     And do you recall that they were present?

16   A.     Yes.

17   Q.     And then below that you see Daugherty Johnson, Robert

18          Bincsik and Mike Glasgow from the city of Flint?

19   A.     Yes.

20   Q.     And do you recall them being present?

21   A.     Yes.

22   Q.     Now, I believe you previously -- if you can turn your

23          attention to what was previously offered as Exhibit 46.

24   A.     Yes.
```

Highly Confidential - Brent Wright

```
 1   Q.   And the second page of that, I believe.  I believe that
 2        was -- okay.  And again, the handwriting here is
 3        sometimes hard to read.  But you can see that those
 4        notes reflect that other regulatory issues was
 5        discussed?
 6   A.   Yeah, I see that.
 7   Q.   And do you recall discussing regulatory issues at that
 8        June 26th meeting?
 9   A.   I don't remember.
10   Q.   Okay.  Do you remember discussing lead and copper rule
11        issues at the June 26th meeting?
12   A.   No, I don't remember.
13   Q.   Okay.  I believe earlier you testified that the -- that
14        the issue of whether corrosion control came up at that
15        meeting?  Is that -- do you remember that?
16   A.   What meeting?
17   Q.   At the June 26th meeting you -- well, today earlier you
18        testified that at that June 26th meeting that the issue
19        of corrosion control was raised?
20   A.   I don't recall this meeting.  I mean, I don't recall.
21        The only meeting that I recall that corrosion control,
22        only a handful of these people were in that meeting.
23   Q.   Okay.  When was the meeting at which -- when was the
24        meeting that you remember discussing corrosion control
```

Highly Confidential - Brent Wright

```
 1       at?

 2  A.   It was either late June, early July.  And that's when I

 3       sat down with the DEQ and --

 4  Q.   Okay.  And so in that meeting the DEQ was present?

 5  A.   Yeah.  That was the meeting that I spoke of earlier that

 6       Steve Busch, Mike Prysby, Mike Glasgow and myself, Jeff

 7       Hansen and Warren Green, and we were going through a

 8       list of things that we needed to move forward on when we

 9       switched in 2014.

10  Q.   Okay.

11  A.   And that's when I -- that's the meeting I recall where I

12       had brought up, you know, it was the last thing on the

13       list, it's the last thing that would get fed out of the

14       plant, was the phosphate feed system or corrosion

15       control.

16  Q.   Okay.  Now, you say late June, early July.  Is that late

17       June, early July of 2013?

18  A.   Yes.

19  Q.   Okay.  And what was the response when you brought the

20       phosphate feed system?

21  A.   Like I stated earlier, they said let's see what your

22       lead and copper sampling.

23  Q.   And who was they in that case?

24  A.   I'm sorry.  Mike Prysby and Steve Busch.
```

Highly Confidential - Brent Wright

```
 1   Q.   Okay.  I'm going to direct your attention to what I'm

 2        offering as Exhibit Number 54.

 3                  WRIGHT EXHIBIT 54

 4                  4/16/14 MDEQ Letter - Bates

 5                  Number 7-6-16 SOM-Mason 00070745

 6                  WAS MARKED BY THE REPORTER

 7                  FOR IDENTIFICATION

 8   BY MR. KIM:

 9   Q.   Okay.  Now, is this a letter from the MDEQ to yourself?

10   A.   Yes.

11   Q.   And did you receive this on or some -- shortly after

12        April 16th, 2014?

13   A.   Um-hum (affirmatively).

14   Q.   And did this letter set out the drinking water

15        monitoring schedule that was to be used given that the

16        Flint water plant would be put into operation as the

17        primary water plant for the city of Flint?

18   A.   Yes.

19   Q.   Okay.  Would the water monitoring schedule -- if there

20        was a requirement to implement corrosion control would

21        the water monitoring schedule have reflected that?

22   A.   Yes.

23   Q.   And so did the monitoring schedule that you were

24        provided reflect that there was any corrosion control
```

Highly Confidential - Brent Wright

1        requirements?

2   A.   Depending on when we did the testing and what our

3        results were that came back from that testing.

4   Q.   Okay.  So the only directive in the instructions that

5        you were given by MDEQ was that the city was to be

6        monitoring --

7   A.   Lead and copper.

8   Q.   -- for lead and copper level?

9   A.   Yes.

10  Q.   So there was no directive at that time, that time being

11       April 16th, 2014, to implement any form of corrosion

12       control from the MDEQ?

13  A.   No.

14  Q.   I'm going to direct your attention to what I've offered

15       as Exhibit Number 55.

16                  WRIGHT EXHIBIT 55

17                  Water Quality Optimization Strategy -

18                  Bates Number COF_FED_0551494

19                  WAS MARKED BY THE REPORTER

20                  FOR IDENTIFICATION

21  BY MR. KIM:

22  Q.   Now, this is a March -- an e-mail that was sent by

23       Steven Busch on March 17th, 2015.

24                  Do you agree?

Highly Confidential - Brent Wright

```
 1   A.   Yes.

 2   Q.   Okay.  Do you recall receiving this e-mail?

 3   A.   It looks familiar.

 4   Q.   Okay.

 5              MR. KUHL:  What's the number on that one?

 6              MR. KIM:  The Bates number is COF --

 7              MR. KUHL:  No, exhibit number.

 8              MR. KIM:  Exhibit Number 55.

 9   BY MR. KIM:

10   Q.   Now, does this e-mail discuss essentially improving the

11        City's water quality?

12   A.   Yes.

13   Q.   Okay.  And are these essentially instructions from DEQ

14        as to steps that the city should be taking?

15   A.   Yes.

16   Q.   Did you interpret these as instructions from the DEQ as

17        to steps the city should be taking?

18   A.   Yes.

19   Q.   To your knowledge did anyone at the city consider these

20        to be optional?

21   A.   Not to my knowledge.

22   Q.   Okay.  If you can review the actions that were -- that

23        are listed here, do any of these actions have to do with

24        corrosion issues?
```

Highly Confidential - Brent Wright

```
 1   A.   Yeah.

 2   Q.   Okay.  And does this document say -- does this document

 3        report on the lead and copper testing that had been

 4        conducted in the city of Flint from the second -- from

 5        the second half of 2014 and the first half of 2015?

 6   A.   Yes.

 7   Q.   Or actually, let me correct that.  It says January 1,

 8        2015 through June 30th, 2015?

 9   A.   Yeah.

10   Q.   And did that testing -- did this show that the 90

11        percentile for lead was an 11 parts per billion?

12   A.   Yes.

13   Q.   And does that -- does the document also state that the

14        action level for lead is 15 parts per billion?

15   A.   Yes.

16   Q.   Okay.  And does that match with your understanding of

17        what the regulatory requirements were?

18   A.   Yes.

19   Q.   Can you turn to page 2.  The second paragraph there.

20        Can you read the first sentence of that paragraph?

21   A.   It says:

22                  While the City's LCR compliance monitoring has

23        continued to meet action level requirements, LCR also

24        requires all large systems of serving over 15,000 people
```

Highly Confidential - Brent Wright

```
 1          to optimize corrosion control regardless of the 90th

 2          percentile lead concentration.

 3    Q.    Okay.  So at this time to your knowledge did the city

 4          have in place a corrosion control -- had the city

 5          implemented an optimized corrosion control policy

 6          program?

 7    A.    Not to my knowledge.

 8    Q.    Okay.  Until this time had the city been instructed to

 9          implement a corrosion control program by the MDEQ?

10    A.    Not that I can remember.

11    Q.    Okay.  So to the best of your recollection does this --

12          would this be the -- this document, dated August 17th,

13          2015, represent the first time that the MDEQ imposed a

14          requirement to implement corrosion control with the city

15          of Flint's water plant after the switched to the Flint

16          River?

17    A.    Yes.  It would --

18    Q.    Okay.  If I can direct your attention to Exhibit 58.

19                    WRIGHT EXHIBIT 58

20                    9/10/15 E-Mail - Bates

21                    Number COF_0154438

22                    WAS MARKED BY THE REPORTER

23                    FOR IDENTIFICATION

24
```

Highly Confidential - Brent Wright

```
 1   BY MR. KIM:

 2   Q.   And is this an e-mail that you sent on September 10th,

 3        2015?

 4   A.   Yes.

 5   Q.   Do you remember sending this e-mail?

 6   A.   Vaguely, yes.

 7   Q.   Okay.  Do you remember who Jeremy Nakashima is?

 8   A.   Yes.

 9   Q.   Who is Jeremy Nakashima?

10   A.   He's an engineer for LAN.

11   Q.   And what was the purpose of sending this e-mail?

12   A.   I believe that at this time we were installing a

13        phosphate feed system.

14   Q.   Okay.  And what is a phosphate feed system?

15   A.   It introduces phosphoric acid into the distribution

16        system to coat pipes.

17   Q.   And so is that a method of corrosion control?

18   A.   Yes.

19   Q.   So it would be fair to say that within -- now, this is

20        September 10th, 2015, which is less than a month after

21        you received the August 15 letter from the MDEQ

22        instructing the city to implement corrosion control the

23        city had done preparations to implement corrosion

24        control?
```

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF MICHIGAN

3                        SOUTHERN DIVISION

4     _____

                                )

5                                )      Civil Action No.

      In Re FLINT WATER CASES    )      5:16-CV-10444-JEL-MKM

6                                )      (Consolidated)

                                )

7                                )      Hon. Judith E. Levy

                                )      Mag. Mona K. Majzoub

8                                )

      _____)

9

10

11                     HIGHLY CONFIDENTIAL

12        VIDEOTAPED DEPOSITION OF BRENT WRIGHT - VOL 2

13                  Wednesday, December 4, 2019

14                       at 9:05 a.m.

15

16

17

18    Taken at:      Butzel Long

                     41000 Woodward Avenue

19                   Bloomfield Hills, Michigan  48304

20

21    REPORTED BY:   LAURA STEENBERGH, RPR, CRR, RMR, CSR-3707

22

23                  GOLKOW LITIGATION SERVICES

            877.370.3377 ph | 917.591.5672 fax

24                     deps@golkow.com

```
 1                   A P P E A R A N C E S
 2                        - - -
 3   On behalf of the Class Plaintiffs:
 4   JESSICA B. WEINER, ESQUIRE
     COHEN MILSTEIN SELLERS & TOLL PLLC
 5   1100 New York Avenue NW, Fifth Floor
     Washington, DC  20005
 6   202-408-4600
     jweiner@cohenmilstein.com
 7
 8   On behalf of Moore and Rogers and Legionella Plaintiffs:
 9   DONALD H. DAWSON, JR., ESQUIRE
     FIEGER LAW
10   19390 West Ten Mile Road
     Southfield, Michigan  48075-2463
11   214-355-5555
     d.dawson@fiegerlaw.com
12
13   On behalf of the Mason State Court Plaintiffs:
14   ADAM SCHNATZ, ESQUIRE
     MCALPINE PC
15   3201 University Drive, Suite 200
     Auburn Hills, Michigan  48236-2395
16   248-373-3700
     atschnatz@mcalpinepc.com
17
18   On behalf of Individual Plaintiffs:
19   LOUISE R. CARO, ESQUIRE
     NAPOLI SHKOLNIK, PLLC
20   2665 South Bayshore Drive, Suite 220
     Coconut Grove, Florida 33133
21   786-837-5442
     lcaro@napolilaw.com
22
23
24
```

Highly Confidential - Brent Wright

```
 1                A P P E A R A N C E S (CONT'D)
 2                         - - -
 3   On behalf of Defendants Veolia Water North America
     Operating Services, LLC, Veolia North America, LLC,
 4   and Veolia North America, Inc. (via teleconference):
 5   ALAINA N. DEVINE, ESQUIRE
     CAMPBELL CONROY & O'NEIL, P.C.
 6   1 Constitution Wharf, Suite 310
     Boston, Massachusetts  02129
 7   617-241-3037
     adevine@campbell-trial-lawyers.com
 8
 9   On behalf of Defendant City of Flint (via
     teleconference):
10
11   WILLIAM KIM, ESQUIRE
     City of Flint LEGAL DEPARTMENT
12   1101 S. Saginaw St., 3rd Floor, Room 307
     Flint, Michigan  48502
13   810-766-7146
     wkim@cityofflint.com
14
15   On behalf of Defendants Leo A. Daly Company and
     Lockwood, Andrews & Newnam, Inc.:
16
17   PHILIP A. ERICKSON, ESQUIRE
     PLUNKETT COONEY
18   325 E. Grand River, Suite 250
     East Lansing, Michigan 48823-4356
19   517-324-5608
     perickson@plunkettcooney.com
20
21
22
23
24
```

Highly Confidential - Brent Wright

```
 1              A P P E A R A N C E S (CONT'D)
 2                          - - -
 3   On behalf of Defendant Adam Rosenthal (via
     teleconference):
 4
 5   JAMES A. FAJEN, ESQUIRE
     FAJEN & MILLER, PLLC
 6   3646 West Liberty Road
     Ann Arbor, Michigan  48103
 7   734-995-0181
     fajenlaw@fajenmiller.com
 8
 9   On behalf of Defendant for Howard Croft (via
     teleconference):
10
11   ALEXANDER RUSEK, ESQUIRE
     WHITE LAW PLLC
12   2549 Jolly Road, Suite 340
     Okemos, Michigan 48864-3679
13   517-316-1195
     alexrusek@whitelawpllc.com
14
15   On behalf of DEQ Employee Defendants (via
     teleconference):
16
17   CHRISTOPHER B. CLARE, ESQUIRE
     CLARK HILL
18   1001 Pennsylvania Avenue NW
     Suite 1300 South
19   Washington, DC 20004
     202-572-8671
20   cclare@clarkhill.com
21
22
23
24
```

```
 1              A P P E A R A N C E S (CONT'D)
 2                        - - -
 3    On behalf of Rowe Professional (via
      teleconference):
 4
 5    CRAIG S. THOMPSON, ESQUIRE
      SULLIVAN WARD ASHER & PATTON, PC
 6    25800 Northwestern Highway, Suite 1000
      Southfield, Michigan 48075-8412
 7    248-746-2776
      cthompson@swappc.com
 8
 9    On behalf of the State of Michigan:
10    RICHARD KUHL, ESQUIRE
      MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
11    ENVIRONMENT, NATURAL RESOURCES, AND AGRICULTURAL
      DIVISION
12    525 West Ottawa Street, Floor 6
      Lansing, Michigan 48933-1067
13    517-335-0696
      kuhlr@michigan.gov
14
15    On behalf of Defendant Steven Busch (via
      teleconference):
16
17    KRISTA A. JACKSON, ESQUIRE
      SMITH HAUGHEY RICE & ROEGGE
18    100 Monroe Center Street NW
      Grand Rapids, Michigan 49503-2802
19    616-774-8000
      Kjackson@shrr.com
20
21
22
23
24
```

Highly Confidential - Brent Wright

```
 1              A P P E A R A N C E S (CONT'D)

 2                        - - -

 3   On behalf of Defendant Daugherty Johnson

     (via teleconference)

 4

 5   EDWAR A. ZEINEH, ESQUIRE

     LAW OFFICE OF EDWAR A. ZEINEH

 6   800 East Grand River Avenue, Suite B

     Lansing, Michigan  48912-4336

 7   517-292-7000

 8   On behalf of the Witness:

 9   ROBERT J. MORAD, ESQUIRE

     LAW OFFICES OF ROBERT J. MORAD, PLLC

10   355 S. Old Woodward Avenue, Suite 100

     Birmingham, Michigan  48009

11   248-646-2920

     robert@rjmoradlaw.com

12

13   ALSO PRESENT:

14       Jeff Gudme - Videographer

15

16               *       *       *       *

17

18

19

20

21

22

23

24
```

Highly Confidential - Brent Wright

```
 1        concerning to a water quality engineer, even water

 2        treatment plant employees, isn't that right?

 3   A.   Yes.

 4   Q.   Were you concerned when you received the Leanne Walters

 5        test results?

 6   A.   When I seen them, yes.

 7   Q.   Okay.  Is there a reason why those test results weren't

 8        shared with the Veolia staff who were in a conference

 9        room upstairs at the Flint Water Treatment Plant?

10   A.   Not that I know of.

11              MS. WEINER:  Objection, assumes facts in not

12        in evidence, mischaracterizes testimony.

13              THE WITNESS:  Not that I recall, not that I

14        know of.

15   BY MS. DEVINE:

16   Q.   Sure.  Did you share the Leanne Walters test results

17        with the meeting?

18   A.   No, I didn't.  Mike Glasgow mostly dealt with the Leanne

19        Walters.  I had met her a few times at the plant, he

20        brought me into a lab, introduced me to her.  The -- the

21        first time I met Leanne Walters I actually gave her a

22        tour of plant.

23   Q.   Okay.

24   A.   And then she mostly dealt with Mike, Mike Glasgow.  I
```

Highly Confidential - Brent Wright

```
 1        know that there was a lot of testing going on at her

 2        house.

 3   Q.   Would it surprise you that none of those test results or

 4        information were shared with Veolia while they were

 5        on-site?

 6                  MS. WEINER:  Object to form.

 7                  THE WITNESS:  I don't know why they weren't

 8        shared with them.

 9   BY MS. DEVINE:

10   Q.   Do you think that would be an important piece of

11        information to provide to Veolia?

12   A.   The only thing I recall on the Leanne Walters situation

13        was that, for one, it didn't meet EPA's regulations on

14        -- it had a whole-house filter, and we're not supposed

15        to take lead results from homes with whole house

16        filters.

17   Q.   Okay.

18   A.   That's the only -- that's the one thing I do remember

19        that was -- and that may be why it wasn't shared.

20   Q.   Do you recall a conversation with Daugherty Johnson in

21        February of 2015 where he told plant staff to make

22        preparations to switch back to Detroit due to water

23        loss?

24   A.   Due to water loss?
```

Highly Confidential - Brent Wright

```
 1   Q.   Yes.  Out of a fear that the plant may run out of water
 2        at some point.
 3   A.   That was actually me.
 4   Q.   Okay.  And did you contact the Genesee County Drain
 5        Commissioner's office?
 6   A.   Yes, I did.  That was the first call I made, and then
 7        the second call I made was the DEQ.
 8   Q.   And what came of that?
 9   A.   We were able to get the plant running better.  We
10        couldn't keep up with the main breaks.  We had a lot of
11        main breaks going on.  The weather was really cold.  And
12        the plant was maxed out trying to keep up with the main
13        breaks.  Our reserves, clear wells had depleted.
14   Q.   Sure.
15   A.   And so this is going to take -- you don't just hit a
16        switch, you know, or open a valve.  This is going to
17        take some time to put all this in place, so, I mean, we
18        still had time, but time was -- you know, it wasn't
19        looking good.  And so I contacted the drain
20        commissioner, because they had control over the pipeline
21        now, and to let them know that there's a chance that we
22        are going to be switching, that we might need to take
23        Detroit water in.
24   Q.   And it's true, isn't it, that Mr. Ambrose informed you
```

Highly Confidential - Brent Wright

```
 1          and informed Mr. Johnson that the city could not afford

 2          to switch back to Detroit?

 3     A.   It wasn't going to happen is what I was informed.

 4     Q.   Due to financial concerns?

 5     A.   No, it was -- he didn't say anything about financial

 6          concerns.

 7     Q.   This was Mr. Ambrose specifically?

 8     A.   Yes.

 9     Q.   He told you it's not going to happen?

10     A.   It's not going to happen.

11     Q.   And that was in when, February 2015?

12     A.   That's -- that day.  I mean, it happened --

13     Q.   The time day that you contacted the drain commissioner?

14     A.   Yeah.  Everything happened within hours.

15     Q.   Sure.

16     A.   And --

17     Q.   Do you know who Dell Harris is?

18     A.   No, I don't.

19     Q.   Okay.

20               MS. WEINER:  I think we're going over our

21          time.  If you have a just a couple of questions that's

22          fine.

23               MS. DEVINE:  Yep, I just have two or three

24          questions.  Thank you very much.
```