**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

In re FLINT WATER CASES

Civil Action No. 5:16-cv-10444

_____

LeAnn Walters, et al.,

                    **Plaintiffs**          Civil Action No. 5:17-cv-10164

**vs.**                              Hon. Judith Levy

Governor Rick Snyder, et al.,

                    **Defendants**

---

**AMENDED MASTER NOTICE OF NONPARTIES AT FAULT OF DEFENDANTS
LOCKWOOD, ANDREWS AND NEWNAM, P.C. AND LOCKWOOD, ANDREWS AND
NEWNAM, INC.**

NOW COME Defendants Lockwood, Andrews and Newnam, P.C. and Lockwood,

Andrews and Newnam, Inc. (hereinafter sometimes referred to as the "LAN Defendants"),

by and through their undersigned attorneys, and hereby file their amended notice of

nonparties at fault in this matter in compliance with Michigan law governing tort law

claims for money damages arising out of personal injuries and property damages the

various plaintiffs alleged that they have sustained as a consequence of the acts and

omissions of federal, state, county and city officials in changing the source of drinking

water from Lake Huron to the Flint River in 2014. *See* MCR 2.112(K).

Through this Amended Notice of Nonparties at Fault, the LAN Defendants state their

intent (and preserve their right) to have the jury allocate fault on the verdict form (in each

case, including any class proceeding) to each listed party or person who caused or contributed to the harm or damages proven by the Plaintiffs, including, without limitation, each person or entity sued by each and every plaintiff in each lawsuit in state and federal court, collectively referenced as the Flint Water Litigation (or the "Flint Water Cases"). Further, the LAN Defendants state their intent to amend and modify this Notice prior to trial as the litigation develops. Some nonparties at fault, such as the plaintiffs' various governmental, commercial or residential landlords who provided substandard housing contaminated with lead painted surfaces, pipes and soils have yet to be identified.

The LAN Defendants file their Master Notice of Nonparties at Fault in order to preserve their right to argue to the jury that the listed entities or persons are wholly or partially at fault in causing the harm and/or damages alleged by Plaintiffs:

**1.      Michigan Department of Environmental Quality (MDEQ)[1], and all current and former employees of the MDEQ, including, but not limited to, Liane Shekter-Smith, Chief, Office of Drinking Water and Municipal Assistance, Stephen Busch, District Supervisor of Lansing District Office, Patrick Cook, Water Treatment Specialist, Michael Prysby, District Engineer, Adam Rosenthal, Environmental Quality Analyst, Dan Wyant, former Director, Bradley Wurfel, former Communications Director, Richard Benzie, former Assistant Division Director, Jim Sygo, former Deputy Director, and Keith Creagh, former Director of the DNR and Interim Director of MDEQ.**

---

[1] The Agency is now called the Department of Environment, Great Lakes and Energy or EGLE. For consistency and to avoid confusion, the LAN Defendants use the old name and acronym in use at the time the Litigation arose throughout this notice.

During 2015, Governor Snyder commissioned a group he named the Flint Water Advisory Task Force ("Task Force") to investigate the issues surrounding what has become known as the Flint Water Crisis.  On or about March 21, 2016, the Flint Water Advisory Task Force issued its final report.[2]  This final report makes numerous findings regarding the role of the MDEQ in causing the Flint Water Crisis, including finding F-1, "MDEQ bears primary responsibility for the water contamination in Flint."  The LAN Defendants incorporate all of the discussion and findings of the Task Force herein as though set forth word for word.

In addition, in March of 2016, the State of Michigan Auditor General prepared a Performance Audit Report of the Community and Noncommunity Water Supplies function within the Office of Drinking Water and Municipal Assistance or ODWMA at MDEQ.  The Auditor General's Audit makes several findings critical of the performance of ODWMA including that, "DEQ did not require the City of Flint Water Treatment Plant to implement optimal corrosion control treatment when switching to the Flint River water source."  The LAN Defendants incorporate all of the findings of the Auditor General regarding the performance of MDEQ herein as though set forth word for word.

The MDEQ was created in 1995 by Executive Order No. 1995-18, which transferred environmental regulatory functions from the Michigan Department of Natural Resources to the newly created department. In 1996, Executive Order No. 1996-1 transferred oversight of environmental health programs "relating to drinking water and radiological protection" from the Michigan Department of Public Health to the MDEQ. In his first-ever executive

---

[2] Although this report incorrectly states that LAN did not cooperate with the Task Force, LAN did file responses to the questions asked of it by the Task Force prior to the publication of the Report, as has subsequently been acknowledged by members of the Task Force.

order, Executive Order 2011-1, Governor Rick Snyder reversed a prior action by his predecessor, Governor Jennifer Granholm, and split the Department of Natural Resources and Environment that she created, returning the MDEQ  status as a separate department of the executive branch of the state government. Governor Snyder's stated purpose for the reorganization was allowing the MDEQ to focus on its core mission: "promot[ing] wise management of Michigan's air, land, and water resources to support a sustainable environment, healthy communities, and vibrant economy." MDEQ set its "guiding principles" as being a leader in environmental stewardship, a partner in economic development, and a provider of excellent customer service. The MDEQ established as its strategic goals protecting public health, improving the quality of air, land and water resources, and implementing Michigan's water strategy.

The MDEQ was charged with the primary duty to enforce both the state and federal Safe Drinking Water Act and has primary legal authority and responsibility for safe drinking water monitoring and enforcement in Michigan with oversight authority from the EPA. The MDEQ also had a duty to serve as the environmental health agency for the state and was required to advise the governor and other state agencies "on matters of the environment as those matters affect the health of the people of the state." The MDEQ was required to monitor and evaluate conditions which represent potential or actual environmental health hazards.

MDEQ had the duty to maintain power and control over public water supplies and to evaluate the adequacy of proposed waterworks systems and proposed surface water sources to protect the public health. The MDEQ had a duty to notify the supplier of water of necessary changes to the treatment, operations or capacity of a system in compliance with state drinking

water standards. Additionally, the MDEQ had a duty to require proper testing and sampling in accordance with lead and copper standards and was required to determine the appropriate corrosion control treatment methods. If the system is found not to be in compliance with state or federal drinking water standards, the MDEQ has a duty to require that a supplier notify its users.

As early as 2004, the MDEQ was aware of potential concerns about using the Flint River as a source of drinking water. A technical assessment completed that year noted that "the Flint River was a highly sensitive drinking water source that was susceptible to contamination." In an appendix to a 2011 report addressing the Flint River as a potential future water source, LAN detailed approximately $50 million in suggested improvements to operate the Flint Water Treatment Plant on a continuous basis using the Flint River water source. In January 2013, MDEQ officials discussed the feasibility of using the Flint River, acknowledging that they "agree that the city should have concerns of fully using the Flint River..." After the Flint City Council approved the resolution to buy water from the KWA on March 25, 2013, MDEQ officials, including the Director himself, continued to discuss the risks associated with using the Flint River, including that the use of Flint River water would pose increased health risks to the public. As the prospect of the KWA deal and use of the Flint River as an interim water source became apparent, MDEQ Deputy Director Jim Sygo acknowledged that "[a]s you might guess we are in a situation with Emergency Financial Managers so it's entirely possible that they will be making decisions relative to cost."

The MDEQ also played a central role in the development and success of the Karegnondi Water Authority ("KWA"). In August 2009, the MDEQ issued a permit to the Genesee County Drain Commission to withdraw large quantities of water from Lake Huron

for the KWA. The MDEQ was apprised of the efforts to transfer the vote on the KWA back to local governments "to approve the KWA agreement and not be challenged in court." When Flint's financial troubles threatened their ability to join the KWA, the MDEQ also put together  an administrative consent order in order to exempt Flint's portion of the costs from being counted against Flint's statutory debt limits (for bonding) by requiring Flint to fix lagoons at the water treatment plant and tying the project to KWA development.

After the switch to Flint River water, the MDEQ, with knowledge of the growing dangers to the public health, failed to adequately respond and undertook efforts to downplay any correlation between the Flint River and both lead issues and Legionnaires' disease, choosing politics over public health. The MDEQ was aware (or should have been aware) that Flint's sampling protocols did not comply with the regulations, as the City did not know which properties had lead service leads. The MDEQ lied to or misled the EPA regarding the nature of the City corrosion control program in early 2015. MDEQ officials instructed Flint water treatment staff to manipulate test results through targeted flushing and altering of water quality reports. The MDEQ continued to assure residents that the water was safe despite knowledge to the contrary and their duties to protect the public health.

The State of Michigan charged the following MDEQ officials with committing significant crimes in relation to the Flint drinking water crisis: Liane Shekter-Smith (Chief, Office of Drinking Water and Municipal Assistance); Adam Rosenthal (Water Quality Analyst, Lansing District Office); Stephen Busch (District Supervisor, Lansing District Office); Patrick Cook (Water Treatment Specialist, Lansing Community Drinking Water Unit); and Michael Prysby (Engineer, District 11).

The plaintiffs admit that MDEQ and the officials referenced above as well as MDEQ Director of Communications Bradley Wurfel intentionally deceived them, keeping from them critically important information about the hazardous conditions they confronted. The plaintiffs also admit that MDEQ officials Wyant, Wurfel, Shekter-Smith, Rosenthal, Busch, Cook, and Prysby intentionally caused them bodily harm (in the nature of invading their bodily integrity). MDEQ proximately caused further exposure, personal injuries, and damages to the plaintiffs.[3]

a.     Dan Wyant, former Director

Dan Wyant ("Wyant") was the Director of the MDEQ during the relevant time frame. Governor Snyder appointed Mr. Wyant to the position of Director of the MDEQ in 2011. He held the position until December 29, 2015. Director Wyant "resigned," after "reassigning" Liane Shekter-Smith's employment as Chief of the Office of Drinking Water and Municipal Assistance. He appointed his Deputy James Sygo as her replacement. MDEQ Communications Director Bradley Wurfel also "resigned." In conjunction with these personnel changes, Director Wyant issued a formal statement to the effect that the MDEQ failed to enforce the EPA lead and copper rule mandate for corrosion control in its oversight of the Flint Water Treatment Plant's delivery of drinking water to residents of Flint. The federal Environmental Protection Agency delegated to MDEQ "primary" responsibility for enforcement of the Safe Drinking Water Act (the "SDWA") requirements, including its lead and copper regulation.

---

[3] The plaintiffs' admissions made in their complaints are incorporated by reference. The admissions are too voluminous to incorporate into the body of the Notice.

Director Wyant abandoned the MDEQ's "guiding principle" of being a leader in environmental stewardship and a provider of excellent customer service. The MDEQ did not provide any service to its customers in Flint, hiding behind an impenetrable bureaucratic wall when confronted with serious problems regarding the quality of Flint's drinking water. The fundamental core of "stewardship" is the ethical and responsible management of public resources. Under Mr. Wyant, the MDEQ demonstrated a complete lack of ethics and irresponsible management of Flint's drinking water. Public health was secondary to political expediency and self-preservation of the bureaucracy.

Specifically, Mr. Wyant had no experience in providing safe drinking water to residents before taking the position.[4]  He had no familiarity with the SDWA, the statute he was charged with enforcing,[5] and he received no training on the SDWA.[6]  When he took the job, he did "not know what a lead service line was."[7]  He was not aware that in 2013, MDEQ had identified deficiencies in the Flint Distribution system including 80% lead service lines.[8]  He did not know about LeeAnn Walters' February 2015 high water lead test results or the EPA's ensuing investigation until July 2015.[9]  On October 18, 2015, Mr. Wyant admitted to Governor Snyder, "I now believe we made a mistake."[10]

b.    Liane Shekter Smith, former Chief of the Division of Drinking Water

Liane Shekter Smith ("Shekter Smith") was the Chief of the Division of Drinking Water at the MDEQ until October 19, 2015. Ms. Shekter Smith worked in environmental agencies for

---

[4] Deposition of Dan Wyant, Pg. 29, *In Re Flint Water Cases* (July 2, 2020).
[5] *Id*. at 25.
[6] *Id*. at 26.
[7] *Id*. at 88.
[8] *Id.* at 117.
[9] *Id.* at 84.
[10] *Id*. at 141; Exhibit 10.

the State of Michigan for over 30 years. As Chief, Shekter Smith's coordinated drinking water

compliance efforts with state and local agencies (among other tasks), including supervision of

water supply operations for the provision of safe drinking water. In her position at MDEQ,

Ms. Shekter Smith was responsible for having (and developing) knowledge of contaminants

and their impact on public health and for collecting and analyzing environmental data. From

2011 to 2015, Shekter-Smith consistently promoted a practice of minimalist or "technical"

compliance with environmental laws and regulations, choosing politics and self-

preservation over protection of the public health, in direct violation of her duties and the

spirit of the regulations she was responsible for enforcing.

Ms. Shekter-Smith was involved in the discussions and planning between the KWA

and the City of Flint as early as 2011. In December 2012, Ms. Shekter-Smith was involved in

conversations regarding the City of Flint accepting an offer to join the KWA. In January 2013,

Ms. Shekter-Smith became involved in discussions about potential water treatment options

for the City of Flint with the Department of Treasury. By March 2013, Ms. Shekter-Smith was

well aware of potential risks of using the Flint River as a primary water source (having been

so informed of several risks by Mr. Busch), including concerns about public health and

exposure to harmful contaminants. Nonetheless, Ms. Shekter-Smith played an integral role in

securing an Administrative Consent Order for the City of Flint to allow for funding of the

KWA project and the use of the Flint River as an interim water source. Less than one month

prior to the change in drinking water from Lake Huron to the Flint River, Ms. Shekter-Smith

advocated the existence of an ambiguity (a "very grey area") about the LCR requirements for

full time operation of the Flint water treatment plant. Ms.  Shekter-Smith advanced the

assertion that Flint was not required implement corrosion control treatment under the LCR

prior to delivering drinking water to its residents. When Michael Glasgow communicated to the MDEQ on April 17, 2014, a mere eight days before the switch to the Flint River, that the Flint WTP would not be ready to supply water to the City, Shekter-Smith failed to take appropriate action because she apparently felt it was an "informational email that went to staff."[11]

After the switch in water source, Ms. Shekter-Smith repeatedly downplayed water quality issues and resident complaints, including complaints about lead contamination and Legionella, insisting at all times that the water was safe to drink. In October 2014, after Ms. Shekter-Smith was informed of a potential Legionnaires' disease outbreak, she relayed to MDHHS that she was "concerned that [MDHHS] were going to be making some sort of announcement" and warned MDHHS officials that:

> There have been numerous complaints about Flint water, that the Governor's Office had been involved, and that any announcement by public health about the quality of the water would certainly inflame the situation.

As the Genesee County Health Department began closely investigating the Legionnaires' disease outbreak in the spring of 2015, Ms. Shekter-Smith stressed a clear message to MDEQ officials, including spokesman Brad Wurfel:

> While the change in source may have created water quality conditions that could provide additional organic nutrient source to support legionella growth, there is no evidence or confirmation of legionella coming directly from the Water Treatment Plant or in the community water supply distribution system at this time.

---

[11] Deposition of Shekter-Smith, June 18, 2020, pp 64-65.

The next day, Ms. Shekter-Smith approved MDEQ's response to the Genesee County Health

Department asserting that Legionnaires' disease was not regulated under the Safe Drinking

Water Act, adding:

> It is highly unlikely that legionella would be present in treated
> water coming from the City of Flint water treatment plan given
> the treatment plant's use of ozone along with complete
> treatment and chlorine disinfect contact time to comply with
> federal surface water treatment rules for potable water.

When Ms. Shekter-Smith discovered violations of the drinking water regulations she

had a duty to enforce, she failed to take corrective action. Ms. Shekter Smith went to great

lengths repeatedly to downplay concerns regarding corrosion and lead, meanwhile

acknowledging her concerns internally. For example, she stated her concern regarding the

optics of "[t]he decision to provide bottled water [to state employees] when the public

notice was not a 'do not drink'" and the possibility of a "distribution system problem" in

Flint. Nonetheless, on January 21, 2015, Ms. Shekter-Smith reiterated MDEQ's minimalist

position on the Flint drinking water problems to her colleagues:

> Our position has always been that we do not dictate which
> acceptable option(s) a water supply may choose. Our
> responsibility is to see that operations are managed properly,
> regulations are met, and safe water is delivered. For example,
> when Flint decided to leave Detroit and operate using the
> River, our role wasn't to tell them our opinion; only what steps
> would be necessary to make the switch.

Upon reports of high levels of lead in one Flint home, on February 26, 2015,

Ms. Shekter-Smith wrote to MDEQ's Richard Benzie stating that "the city is meeting 90th

11

percentile. Not sure why region 5 [EPA] sees this one sample as such a big deal." A day later, MDEQ officials, with Ms. Shekter-Smith on the distribution list, lied to or misled the EPA informing them that Flint had an "optimized corrosion control program." After it became known to the EPA that Flint was not using a corrosion control additive, Ms. Shekter-Smith worked with EPA officials to disparage and discredit EPA employee Miguel Del Toral's analysis and report addressing concerns about the safety of the Flint River water, explicitly refused to mandate a corrosion control additive and maintained that the water was safe to drink. In August 2015, two months before the switch back to Lake Huron water, Ms. Shekter-Smith met directly with Flint residents, assured them that the water was safe to drink, refused to acknowledge the importance and accuracy of Mr. Del Toral's findings, and further delayed the implementation of a corrosion control additive.

c.      Bradley Wurfel, former Director of Communications

Bradley Wurfel ("Wurfel") was the Director of Communications for MDEQ during the 2014 to 2016 time period. As spokesperson for the state's environmental agency responsible for regulating drinking water, Mr. Wurfel held a position of public trust intended to have the general public and other state and local agencies rely on his statements regarding environmental health matters. Contrary to Mr. Wurfel's duties within the department, he intentionally disseminated deliberately misleading and inaccurate communications and unleashed a campaign to discredit residents and community representatives and to spread false messages about the safety of the drinking water.

By January 2015, Mr. Wurfel was aware of the issues with Flint water quality, including reports of an uptick in Legionnaires' disease. On January 30, 2015, Mr. Wurfel acknowledged to the governor's office that he didn't want MDEQ's Director "to say publicly that the water in Flint is safe until we get the results of some county health department trace back work on 42 cases of Legionellosis in Genesee County since last May." Despite his concerns, on March 13, 2015, Mr. Wurfel assured the governor's office that the local health department's efforts to attribute the increase in Legionnaires' disease to the Flint water system was "beyond irresponsible." That same day, Mr. Wurfel communicated with the governor's office about coordinating communications on Legionnaires' disease, stating: "Political flank cover out of the City of Flint today regarding the spike in Legionnaires' disease cases. See enclosed. Also, area ministers put a shot over the bow last night . . . with a call for Snyder to declare a state of emergency there and somehow 'fix' the water situation."

By February 2015, Mr. Wurfel had been included on communications regarding reports of high lead levels at a home in Flint. On July 9, 2015, Mr. Wurfel emailed a copy of Mr. Del Toral's (EPA) interim memo about violations of the Safe Drinking Water Act and potential widespread lead issues to several MDEQ officials, noting: "Miguel apparently asserts that the DEQ and EPA are at odds on proper protocol. Which seems weird." Four days later, Mr. Wurfel gave a comment to Michigan Radio that "anyone who is concerned about lead in the drinking water in Flint can relax." Mr. Wurfel later referred to Del Toral as a "rogue employee" and consistently reported to the governor's office that "the city is in

13

compliance for lead and copper" and that "Flint residents do not need to worry about lead in their water supply."

Over the course of the next three months, Mr. Wurfel continued on a quest to downplay resident concerns both with the public and with the governor's office in an effort to protect his agency and the Governor. On July 25, 2015, Mr. Wurfel urged his colleagues to produce an update on the January-June lead testing results after Flint Ministers met with the Governor's office producing 80 water tests in Flint that showed high lead levels. Shortly thereafter, Mr. Wurfel went on attack against Dr. Mona Hanna-Attisha and Professor Marc Edwards—Mr. Wurfel referred to Dr. Mona Hanna-Attisha's work as "unfortunate" and a "very emotional approach" and that Professor Edwards' team "specializes in looking for high lead problems... they pull that rabbit out of that hat everywhere they go" and that they were "fanning political flames irresponsibly." The Governor's Task Force report cites the "substance and tone" of the MDEQ's communications as one of the department's key failures. Mr. Wurfel resigned from his position in December 2015, acknowledging a dereliction of his duties, including that "the human element got lost in the press account." Mr. Wurfel confessed that he was "simply wrong" and "had I understood then what I know now, I would definitely have brought a different tone to the conversation."

    d.    Richard Benzie, former Assistant Division Director

Richard Benzie ("Benzie") was the Assistant Division Director, Office of Drinking Water and Municipal Assistance at the MDEQ during the relevant time frame. Benzie

14

continues his employment as an official at the MDEQ and was Stephen Busch's ("Busch")

direct supervisor. By June 12, 2014, Mr. Benzie was aware that some Flint residents were

experiencing significant problems with their drinking water. Nevertheless, he failed to do

anything about the problem.

On February 26, 2015 and February 27, 2015, Mr. Benzie received the

communications constituting discussions among EPA and MDEQ employees regarding the

high lead levels found in some Flint drinking water. While Mr. Benzie knew about the

importance of corrosion control generally, he also observed that Mr. Del Toral stressed its

importance in these February 26, 2015 and February 27, 2015 communications. When

Mr. Del Toral inquired about the nature and type of corrosion control that Flint was using,

Mr. Benzie's subordinate, Mr. Busch, falsely or misleadingly represented that Flint "[h]as an

Optimized Corrosion Control Program." Mr. Benzie did nothing to correct the false or

misleading information given to the EPA or to implement the use of a corrosion control

additive at the Flint Water Treatment Plant.

Months later, on April 24, 2015, MDEQ employee Patrick Cook finally informed

Mr. Del Toral that "Flint is not currently practicing corrosion control at the [Water

Treatment Plant]." After this revelation, on April 25, 2015, Mr. Del Toral expressly warned

Mr. Cook of the dangerous levels of lead exposure that can occur when a city has lead

service lines and does not practice corrosion control.  Yet, Mr. Cook responded to Mr. Del

Toral, with Mr. Benzie's apparent approval as a participant in the communication, with

total disregard for the gravity of the situation. Instead of solving Flint's contaminated

drinking water problems, the MDEQ, including Mr. Benzie, chose to promote the false

narrative that Flint met "all current state and federal [drinking water] requirements even

with a lack of corrosion control" and that controlling the "chronic contaminants" would be

"of little to no value in the long term" because Flint would eventually get its water supply

from KWA. He knew lead was a "chronic contaminant" of Flint's drinking water, and he

failed to take any action.

  e.  Stephen Busch, former District 8 Water Supervisor

  Stephen Busch ("Busch") was the District 8 (Lansing) Water Supervisor at the MDEQ

during 2012-2016 time period. Mr. Busch reported to Ms. Liane Shekter-Smith and

oversaw the work of District Engineer Michael Prysby and Water Treatment Specialist

Patrick Cook. Mr. Busch's duties included advising and consulting with water systems and

state and local agencies regarding regulatory compliance and water quality issues for the

purposes of providing safe drinking water to communities. Mr. Busch was intimately

involved with the decision to use the Flint River as a drinking water source in both 2013

and 2014, assisted water treatment plant staff with treatment and compliance issues, and

met directly with Flint residents to discuss various water quality issues. In violation of his

duties as an employee at the MDEQ and to the citizens of Flint, Mr. Busch made false and

misleading statements regarding water quality and requirements for the Flint Water

Treatment Plant and caused an unnecessary and prolonged exposure to potential public health hazards.

On March 26, 2013, Busch acknowledged the risks associated with using the Flint River as an interim water source. In a communication to MDEQ colleagues, including Director Wyant, Mr. Busch warned that substantial updates would be needed to the treatment plant and that use of the river water would pose increased health risks to the public, including a microbial risk and an increased risk of disinfection by-product ("TTHM") exposure.

Despite these known risks, Mr. Busch actively participated in the series of events from 2013-2014 that resulted in distribution of contaminated water from the treatment plant, including coordinating with Flint attorneys to achieve the Administrative Consent Order in February 2014 and coordinating with treatment plant staff to move the plant into full time use despite operational and staffing issues. On March 24, 2014, just one month prior to the switch, Mr. Busch wrote to MDEQ colleagues acknowledging these operational shortcomings and regulatory issues, stating, "[S]tarting [the plant] up for continuous operation will carry significant changes in the regulatory requirements so there is a very gray area as to what we consider for start up." Mr. Busch also had discussions with the Genesee County Drain Commissioner's Office after formal announcement of the use of the Flint River as a primary water source during which Mr. Busch acknowledged that the plant was not ready but that he nonetheless authorized the city to activate the water plant

"because he was directed to." Mr. Busch provided Mr. Brad Wurfel various talking points in April 2014, including: "While the Department is satisfied with the City's ability to treat water from the Flint River, the Department looks forward to the long term solution of continued operation of the City of Flint Water Treatment Plant using water from the KWA as a more consistent and higher quality source water."

After the water switch, Mr. Busch actively sought to downplay concerns over water quality in direct violation of his duties, including concerns over lead and Legionella. Mr. Busch played an integral role in failing to require a corrosion control additive at the water treatment plant, and on February 27, 2015, after reports of elevated lead levels, Mr. Busch lied to or misled the EPA by stating that the city was, in fact, using optimized corrosion control treatment. Mr. Busch has since admitted under oath that at that point the City "had not been deemed to have optimized corrosion control treatment." [12]  In March 2015, Mr. Busch was aware that the EPA had been "inundated" with citizen complaints over water quality, yet he failed to act. In April 2015, Mr. Busch began the process of denigrating and disparaging Mr. Del Toral by advising his MDEQ colleagues that it may be necessary to alert the EPA to Del Toral's "over-reaches" in investigating elevated lead levels and advising on optimized corrosion control treatment.

Despite knowledge of faulty sampling procedures and other problems, on June 10, 2015, Mr. Busch falsely assured the EPA that "almost all of the lead sample sites are lead

---

[12] Deposition of Busch, January 10, 2020, pp 351-352.

service lines and the State is not seeing large increases in lead levels at the tap." Mr. Busch

vigorously defended a questionable interpretation of the Lead and Copper Rule even after

evidence of elevated lead levels, and he falsely assured Flint residents and activists that the

water was safe at a meeting at the governor's office in August 2015. Mr. Busch also

provided deceptive and misleading advice to the MDEQ and both state and local health

agencies during the Spring and Summer of 2015 that "there is no evidence or confirmation

of legionella coming directly from the Water Treatment Plant or in the community water

supply distribution system" and called these conclusions "premature." Mr. Busch was

criminally charged for his acts and omissions related to the operation and management of

the Flint water treatment plant and for violations of the Safe Drinking Water Act. His

conduct caused the plaintiffs' alleged injuries and damages.

      f.      Adam Rosenthal, former Environmental Quality Analyst

Adam Rosenthal ("Rosenthal") is a former Environmental Quality Analyst at the

MDEQ. Mr. Rosenthal had a duty to ensure that the City of Flint maintained compliance

with the Lead and Copper Rule. As a water quality analyst, it was Mr. Rosenthal's duty to

analyze water quality reports and operation and monitoring reports to determine whether

a violation existed and to recommend courses of action to return the City to compliance.[13]

On April 17, 2014, a week before Flint began using the Flint River as its source for drinking

water, Mr. Rosenthal was made aware that the Flint Water Treatment Plant was not

---

[13] Deposition of Busch, January 9, 2020, pp 18, 46.

prepared to begin processing drinking water for Flint residents. On that date, Mr. Rosenthal received an email from Michael Glasgow, the highest ranking technically qualified employee at the Flint Water Treatment Plant, stating: "If water is distributed from this plant in the next couple weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda."

Mr. Rosenthal also received the February 26, 2015 and February 27, 2015 memoranda setting forth the discussions among MDEQ and EPA employees regarding Flint's drinking water lead problem. At the same time, Flint officials were far behind in their testing responsibilities, and Mr. Del Toral's communications forced Mr. Rosenthal to finally reach out to Mr. Glasgow about the lead and copper certification form that was six weeks delinquent: "I need your lead/copper cert form - it was due by 1/10/15. I also need your WQPs for 2014. EPA is asking due to your 104 hit on lead. If you can, I need them today."

Mr. Rosenthal knew that it was the MDEQ's responsibility to intervene in situations where there were discrepancies in water monitoring data. As early as June 2014, Mr. Rosenthal was aware that Flint had failed to send the MDEQ May 2014 operating report of the list of Tier 1 and Tier 2 lead and copper sites. [14] As of June 30, 2014, the MDEQ still had not approved a list of sampling sites.

---

[14] Rosenthal Deposition, March 5, 2020, p 87.

At the end of the first six month round of lead and copper monitoring in December of 2014, Mr. Rosenthal knew that Flint provided the MDEQ with only twelve sample sites out of 100 that were required. However, when the City once again failed in its water testing duties during the second six month round of lead and copper monitoring, Rosenthal reached out to Mr. Glasgow and Mr. Wright and let them know what he would like them to find: "We hope you have 61 more lead/copper samples collected and sent to the lab by 6/30/15, and that they are will be below the AL for lead. As of now with 39 results, Flint's 90th percentile is over the AL for lead." [15]  Mr. Rosenthal was also personally involved in the decision to omit from the pool of sample results certain high lead results which, if included, would have meant that the City was in violation of the LCR. [16]  Despite the fact that Mr. Rosenthal was aware that Flint had a serious lead problem and that Flint was not capable of adequately performing its water testing responsibility, he took no action to help the residents of Flint. Instead, Mr. Rosenthal chose to "hope" that Mr. Glasgow and Brent Wright would not find actionable levels of lead in Flint's water.

g.      Patrick Cook, Water Treatment Specialist

Patrick Cook ("Cook") was a Water Treatment Specialist with the Division of Drinking Water and Municipal Assistance at the Lansing office of the MDEQ. A professional engineer with extensive experience at the MDEQ, Mr. Cook was extensively trained in the SDWA and EPA rules and regulations; he was considered a specialist in the Safe Drinking Water Act's Lead and Copper Rule at the MDEQ. Mr. Cook regularly consulted on water treatment development and plans and attended training sessions at the EPA regarding

---

[15] *Id,* p 24.
[16] *Id,* p 135.

corrosion control. As part of his duties, Mr. Cook was responsible for the interpretation and implementation of the legal requirements of the Lead and Copper Rule at the Flint Water Treatment Plant. Mr. Cook failed at his essential duties to the plaintiffs by failing to insist on an appropriate corrosion control additive when the City changed its drinking water source from Lake Huron to the Flint River in April 2014, and by acquiescing to department politics and advancing a questionable interpretation of the Lead and Copper Rule resulting in distribution of corrosive water hazardous to the public health.

It was not until approximately one year after the change in water source to the use of the Flint River, on April 23, 2015, that Mr. Cook first inquired of other DEQ staff "what is Flint doing now (post Detroit) for corrosion control treatment?" Mr. Cook, aware of MDEQ's questionable interpretation of the Lead and Copper Rule, forwarded MDEQ's position to Miguel Del Toral in an effort to further mislead the EPA and delay treatment. On May 1, 2015, Mr. Cook, advancing the MDEQ party line and its questionable interpretation of the Rule, informed the EPA that the MDEQ would not require any corrosion control decisions until after June 30, 2015 and that "requiring a [corrosion control] study at the current time will be of little to no value in the long term control of these chronic contaminants." His conduct caused the plaintiffs' alleged injuries and damages.

h.    Michael Prysby, District Engineer

Michael Prysby ("Prysby") was an Engineer in the Office of Drinking Water and Municipal Assistance for District 11 (Genesee County) in the MDEQ's Lansing office. Mr. Prysby's duties included advising and assisting in water treatment plant operations, development, and treatment plans. A professional engineer, Prysby was intimately involved in the decision to use the Flint River as an interim water source. He assisted with placing

the treatment plant into full time operation, and consulted on water quality issues after the switch from Lake Huron water to the Flint River water. Mr. Prysby failed at his duties to Flint residents by approving use of a contaminated water source, manipulating test results to achieve technical compliance with knowledge of potential public health consequences, and falsely assuring state and local agencies and the public about the safety of the Flint River water.

By 2012, Prysby was involved early on in the approval and development of the KWA, including achieving Flint's participation.  Over the course of 2013-2014, Mr. Prysby met regularly with Flint treatment plant staff and had direct knowledge of the plant's operational problems and staffing issues. Mr. Prysby was a recipient of Michael Glasgow's April 17, 2014 email warning: "If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready." Mr. Prysby was aware and approved of the decision to forego use of a corrosion control additive. Mr. Prysby failed to act or provide the requested assistance to Flint treatment plant staff.

Mr. Prysby agreed that corrosion control can be a contributing factor in causing lead and copper to leech into the distribution system.[17]  His sanitary survey of 2013 determined that at least 70% of the pipes in Flint were made of lead.[18]  Mr. Prysby knew that Detroit was using orthophosphate as part of their corrosion control program.[19]  MDEQ did not require any corrosion control to treat Flint River water and, instead, established a

---

[17] Deposition of Michael Prysby, Pgs. 91-92, *In Re Flint Water Cases* (June 16, 2020).
[18] *Id.* at 123.
[19] Deposition of Michael Prysby, Pg. 667, *In Re Flint Water Cases* (June 17, 2020).

monitoring program of two consecutive six month rounds of testing to determine if there

was a corrosion control problem occurring in Flint's distribution system.[20]

One month after the switch, according to EPA notes, Mr. Prysby falsely assured EPA

officials that "Flint River quality is not great, but there is a surface water treatment plan

producing water that is currently meeting SDWA standards." In August of 2014, after

violations of the SDWA were apparent, Mr. Prysby instructed the Flint Water Treatment

Plant staff "off the record" to improve TTHM results through targeted flushing of hydrants

near sampling sites.

In January 2015, Mr. Prysby repeatedly assured local health officials that "the

municipal water system is in compliance with the Safe Drinking Water Act" and declined

the health department's requests to meet to discuss the potential Legionnaires' disease

outbreak. As early as February 2015, Mr. Prysby was informed by Mr. Glasgow that the lead

sampling sites in the City did not comply with the Lead and Copper Rule, rendering the lead

and copper data nonverifiable. Upon receiving reports of a potential lead issue in February

2015, Mr. Prysby took no action and acquiesced to MDEQ's false or misleading statements

to the EPA regarding Flint's corrosion control practices, even after Mr. Cook informed him

that "high levels of iron usually bring high levels of lead." By early 2015, Mr. Prysby was

explicitly informed by Flint water treatment plant officials that the lead sampling protocols

were faulty and that the City wasn't aware of where the lead service lines and Tier 1

sampling sites were located in violation of the Lead and Copper Rule. Mr. Prysby also

played an integral role in "scrubbing" the June 2015 lead and copper reports to achieve

compliance, all the while assuring the public of the water's safety and dismissing reports to

---

[20] *Id.* at 122.

the contrary, prolonging the distribution of contaminated water. His conduct caused the plaintiffs' alleged injuries and damages.

      i.      Jim Sygo, former Deputy Director

Jim Sygo ("Sygo") was the former Deputy Director of the MDEQ during the relevant time frame. Mr. Sygo's duties included oversight and implementation of the state's drinking water program. Prior to the switch to Flint River water, Mr. Sygo was aware of the river water quality issues expressed by his own staff. Mr. Sygo acknowledged internally that "[a]s you might guess we are in a situation with Emergency Financial Managers so it's entirely possible that they will be making decisions relative to cost." In early 2015, Mr. Sygo was aware that the Legionnaires' disease outbreak and its correlation to the Flint River water was a "mounting problem." Despite Director Wyant's admission in the Fall of 2015 that the MDEQ violated the LCR in April 2014, Mr. Sygo vigorously defended the MDEQ's questionable interpretation.

      j.      Keith Creagh, former Interim Director

Keith Creagh ("Creagh") is the former Director of the Department of Natural Resources ("DNR") and served as interim Director of the MDEQ from December 2015 to June 2016. Mr. Creagh has been in state government service since 1974 and has extensive experience in policy development and environmental stewardship.

Creagh has openly admitted that the acts of MDEQ officials during the relevant time period were a "mistake." Specifically, Mr. Creagh has stated that state officials, in applying both state and federal safe drinking water regulations, "relied on technical compliance instead of assuring safe drinking water." Mr. Creagh has also blamed the EPA for lack of urgency and a failure to elevate legitimate concerns over water quality issues.

**2.    Michigan Department of Treasury, and all current and former employees of the Michigan Department of Treasury, including but not limited to, Andy Dillon, Kevin Clinton, Wayne Workman and Thomas Saxton.**

The State Treasurer of Michigan is an unelected officer appointed by the Governor, operates the Department of Treasury within the executive branch, and functions as the chief financial officer for the State. The State Treasurer oversees the collection, investment, and disbursement of all state monies, and also administers major tax laws, safeguards the credit of the state, and distributes revenue sharing monies to local units of government. As part of its responsibility to safeguard the credit of the state, the Department of the Treasury oversees the Emergency Managers appointed by the Governor, including the delivery of services essential to the public health, safety, and welfare of residents.

The Michigan Department of Treasury approved the 2013 decision for Flint to switch to the Karegnondi Water Authority ("KWA"),[21] but abdicated its responsibility to assess the economic implications of entering the KWA. Instead of undertaking that assessment itself, it looked to the Michigan Department of Environmental Quality ("MDEQ") for guidance, even though MDEQ is not an agency equipped to make economic-focused decisions like these. The Department of Treasury also independently approved contracts for the City of Flint that exceeded $50,000, including contracts for treatment upgrades and similar activities. In addition, the Department of Treasury worked with others to secure the Administrative Consent Order ("ACO") that was necessary to secure financing for the KWA, even though the ostensible purpose of the ACO was to clean a lagoon at the Flint Water Treatment Plant's lime-sludge facility. In addition, once it became

---

[21]  March 28, 2013, Flint Resolution to Purchase Capacity from Karegnondi Water Authority.

apparent that water being provided to Flint residents was unsafe, Treasury failed to exercise its power or authority to either require timely changes to the treatment process or effectuate a timely transition to a safe drinking water source, prolonging any adverse effects.

      a.     Andy Dillon, former Treasurer

Governor Snyder appointed Andy Dillon as State Treasurer in 2011. He held that position through October 11, 2013, but after stepping down he continued to be employed at the same salary as "Senior Advisor" to his successor. In his capacity as Treasurer, Mr. Dillon had a duty to oversee the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and welfare of Flint residents.

Mr. Dillon played a pivotal role in the decision-making by Flint's Emergency Managers resulting in the change of the source of Flint's drinking water from Lake Huron to the Flint River. On March 28, 2013, Mr. Dillon communicated to Governor Snyder that "based upon today's presentations to the DEQ by the City of Flint, KWA and the engineering firm (Tucker Young) Treasury hired to vet the options as to whether Flint should stay with DWSD or join KWA. I am recommending we support the City of Flint's decision to join KWA. The City's EM, Mayor and City Council all support this decision. Dan Wyant likewise concurs and will confirm via email."

A few weeks later, on April 11, 2013, in a letter to Flint Emergency Manager Ed Kurtz, Mr. Dillon listed off the reasons that leaving the DWSD and joining the KWA was the right move for Flint:

> First, there is widespread support in the city for this move, including the support of the Mayor, the City Council, and the Emergency Manager. Second, this move will provide a unique opportunity for the City and County to partner on an important

> project, which will hopefully lead to future regional
> collaboration. Third, the Department of Environmental Quality
> is supportive of the City participating in the KWA project.
> Finally, your representations that this deal will lead to
> substantial savings for the City over the coming decades,
> savings that are desperately needed to help with the
> turnaround of the City of Flint.[22]

Continuing, Mr. Dillon acknowledged that regardless of what the DWSD's final best offer was, Flint was joining the KWA: "It is my understanding that the Detroit Water and Sewer Department is making a final best offer to Genesee County and the City of Flint next Monday, April 15, 2013. As such, this approval will be effective at 5 pm on April 16, 2013 after receiving written notice from the City that either no such offer was presented to the county and the City or that an offer was received and was rejected in good faith based upon specified objections."[23] Mr. Dillon admits that his decision was influenced by local politics and rushed to meet Spring construction deadlines.

Despite the statements he made in March and April 2013, Mr. Dillon states that he never actually expected Flint to use the Flint River as an interim source of water: "I assumed they would work something out with Detroit."[24] Joining the KWA was the first move Flint made that led to its public health crisis. Without Mr. Dillon's facilitation at the highest levels of Michigan state government, Flint may have never left the DWSD, and this crisis may have been averted.

---

[22] April 11, 2013 Andy Dillon Letter to Ed Kurtz.

[23] *Id.*

[24] Fonger, Ron, *Former state treasurer assumed Flint wouldn't use river for drinking water*, Mlive (January 21 2016) , available at
https://www.mlive.com/news/flint/index.ssf/2016/01/former_michigan_state_treasure.html
(last visited July 12, 2019).

b.      Kevin Clinton, former Treasurer

Mr. Clinton served as State Treasurer from October 11, 2013 until April 17, 2015 and, as such, was directly responsible for decision-making related to the switch of Flint's drinking water source from Lake Huron to the Flint River. Mr. Clinton was the State Treasurer in April of 2014, when Flint transitioned to the Flint River as a source of drinking water, and in October 2014, when the Governor's control group raised the need to return the City of Flint to Lake Huron as the source of its drinking water.

Despite his predecessor's relatively active involvement in Distressed Cities, and role in decision-making regarding Flint's drinking water source, Clinton (at the direction of Dennis Muchmore) avoided all involvement in the supervision of Distressed Cities.[25] Notwithstanding his statutory duty to supervise Flint's Emergency Managers, Clinton failed to exercise adequate supervision.  Notably, Clinton was unaware that Emergency Managers were required to submit regular reports to his office,[26] and reports to the Governor's Office regarding the Emergency Manager's performance (bearing Clinton's name) were neither authored nor reviewed by Clinton personally.[27]

During Clinton's tenure as State Treasurer: 1) not one, but two boil water advisories were issued in Flint; 2) Flint experienced elevated levels disinfectant byproducts in its drinking water; 3) Professor Rose rendered her advice to the City of Flint that testing for lead should be performed; 4) LeeAnne Walters' home drinking water test results demonstrated extraordinarily high levels of lead; 5) the EPA began investigating the issue of lead in Flint's drinking water; and, 6) Flint DPW's Rob Bincsik voiced concerns that high

---

[25] Deposition of R. Kevin Clinton, Pg 82, *In Re Flint Water Cases* (April 30, 2020).
[26] *Id.* at 114.
[27] *Id.* at 58-59.

lead level test results within Flint's drinking water might be a city-wide problem.[28]  Yet, Clinton failed to take any action to transition Flint to a safe source of drinking water.

Accordingly, Mr. Clinton failed in his duty to oversee the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and welfare of Flint residents.

c.     Wayne Workman

Wayne Workman was Deputy State Treasurer from July 2013 to January 2016.[29]  As Deputy State Treasurer, Workman oversaw the local government division of the Treasury Department.[30]  This responsibility included the direct oversight of the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and welfare of Flint residents.[31]

Although, the City's decision to join KWA was made before Workman became the Deputy Treasurer in July 2013, Workman oversaw Flint Emergency Manager Darnell Earley when Flint actually transitioned the Flint River as its interim water source in April 2014.  Workman also oversaw Earley at the time that Earley misinterpreted DWSD's termination letter as notice of a water cutoff, necessitating an alternate water source. Aside from merely overseeing Flint's Emergency Managers during the transition to the Flint River as a primary water source, Workman went a step further in March 2014 by directing a colleague to "get a call in to," the director of the DEQ, and to "push through" an Administrative Consent Order which would enable the City of Flint to secure its share of

---

[28] *Id.* at 83-85.
[29] Deposition of Wayne Workman, Pg. 18, *In Re Flint Water Cases* (June 15, 2020).
[30] *Id.* at 19.
[31] *Id.* at 136-137.

funding for participation in the KWA.[32]  Notably, this Administrative Consent Order specifically required Flint to use the Flint River as a temporary source of untreated water until KWA water became available, and was prepared under the guise that funds would be used to clean the Bray Road lagoon in order to access the funding.[33]

Once safety concerns regarding the City of Flint's drinking water became apparent, Workman failed to take prompt action to provide safe drinking water to the citizens of Flint.  Instead, Workman continued to prioritize financial concerns regarding a switch back to DWSD and failed to appreciate the severity of the situation.  For example, between October 14 & 15, 2014, Workman responded to Dennis Muchmore's request that Workman and his colleague, Thomas Saxton, step-in to evolving concerns stemming from Valerie Brader's memorandum regarding General Motor's decision to cease use of Flint Water, by stating that they "will escalate their involvement."[34]  Workman later added that with respect to these evolving concerns regarding Flint's water, he planned to "control what people say."[35] Later that day, Gerald Ambrose emailed Workman suggesting the MDEQ sit in on an October 15, 2014 telephone conference regarding Flint's water concerns.[36]  Aside from his pledge to, "control what people say," Workman failed to act with urgency to undertake a substantive investigation of the concerns or exercise Treasury's authority to see that Flint and DWSD returned to the negotiating table in any meaningful way.

---

[32] March 19, 2014, 7:19 AM Wayne Workman Email to Thomas Saxton and Brom Stibitz (Re: FW: order for Flint).
[33] March 21, 2014 Administrative Consent Order at § 3.13.
[34] October 15, 2014, 6:45 AM Wayne Workman Email to Thomas Saxton and Dennis Muchmore (Re: "Flint water").
[35] *Id.*
[36] October 15, 2014, 11:30 AM Gerald Ambrose Email to Wayne Workman, et. al. (Re: "Noon phone call").

On January 16, 2015, Thomas Saxton sent an email to Workman stating: "I spoke to Jerry Ambrose on the water issue. He indicated KWA water will be available in late 2016. They are in the process of hiring water consultant to assist. They don't want to pay and would have difficulty paying DWSD an estimated 1M per month."[37]

On February 22, 2015, Saxton forwarded a memorandum from Workman regarding the increase in water and sewer rates in Flint since 2010 and added that Flint "could be hooked up to DWSD by the end of the calendar year."[38] Saxton continued to note, "Whether you hooked up to DWSD thru county or directly it is an add'l $1M to the budget and 130% increase in rates over existing."[39]

On March 2-3, 2015, Dennis Muchmore forwarded an email to Workman and others entitled "Contaminated Drink Water if [sic] Flint."[40] In that email, Muchmore states:

> "Might want to get Jarrod and Terry Stanton on this as well as Harvey. Otherwise it will get out of hand. It's in the city's long-term interest to make the KWA work and we can make the river water safe, but we need to work with the ministers this week to help them out. It's tough for everyday people to listen to financial issues and water mumbo jumbo when all they see is problems. You can't expect the ministers to hold the tide on this problem. How about cutting a deal with Ice Mountain or Bill Young and buying some water for the people for a time? $250K buys a lot of drinking water and we could distribute it through the churches while we continue to make the water even safer. If we procrastinate much longer in doing something direct, we'll have real trouble."[41]

Workman responded to this email by stating, "If this does happen, we need to figure who would hand out the water. It should not be the City. It would undercut every point

---

[37] January 16, 2015, 2:56 PM Thomas Saxton Email to Wayne Workman, et. al. (Re: "Document for Review").
[38] February 11, 2015, 12:27 PM Thomas Saxton Email to Dennis Muchmore, et. al. (Re: FW: "Flint water").
[39] *Id.*
[40] March 3, 2015, 10:04 PM Dennis Muchmore Email to Wayne Workman, et. al. (Re: FW: "Contaminated Drink Water if Flint").
[41] *Id.*

they are making.  It probably should also be reserved for people who can't afford to buy water."[42]

On July 28, 2015, Eric Cline authored a memorandum to Randall Byrne, in response to several questions regarding the City of Flint's Water System posed by Wayne Workman at a July 23, 2015 meeting.[43]  In the memorandum, Cline noted that on March 3, 2015, Emergency Manager Ambrose advised Workman that Ambrose had been informed by DWSD that a reconnection to DWSD would result in an immediate fixed cost to the City of Flint of $10.1 million per year, a 30% increase in water rates, and that DWSD insisted that Flint enter into a 30-year contract with DWSD.

Despite ongoing concerns regarding the safety of Flint's water supply, on September 3, 2015, Saxton forwarded a description of the costs to reconnect to DWSD to Muchmore and Workman and added, "I assume/hope no one is still seriously considering that option but if you need anything more give us a call."[44]

On October 1, 2015, Saxton forwarded an email to Dennis Muchmore, copying Workman and others outlining the latest estimate of the costs to return to DWSD.[45]  Saxton adds that the estimate seems to be an improvement over DWSD's prior offers but only represents a ballpark and, "While this can be pulled together in less than a week it will not mean that lead concerns will go away in one week."[46]

---

[42] *Id.*
[43] July 28, 2015 Eric Cline Memorandum to Randall Byrne ("Re:  Questions Regarding City of Flint Water System").
[44] September 3, 2015, 5:36 PM Thomas Saxton Email to James Redford, et. a. (Re:  FW: "Flint Water").
[45] October 1, 2015, 8:25 PM Thomas Saxton Email to Dennis Muchmore, et. al. (Re: FW: "follow up").
[46] *Id.*

Subsequently, on October 5, 2015, Workman sent a memorandum addressed to Governor Snyder entitled, "Status of Financially Distressed Local Governments."[47]  In this memorandum, Workman states, "Concerns have been raised about the amount of lead in the city's water system after a study by Virginia Tech University suggests that the amount is much higher than standard testing shows.  The city is in compliance with state and federal lead standards but will be adding a corrosion inhibitor into the treatment process to reduce the amount of lead leaching into the system.  The city is also providing free and independent water quality testing to residents.  Treasury is monitoring this issue closely."[48]

Lastly, on October 9, 2015, Randall Byrne sent an email to Workman forwarding Drew Vandegrift's recommendation that, "the best way forward to [sic] reconnect to DWSD."[49]

Despite Workman and Treasury's growing awareness that safety issues permeated Flint's water supply, it was not until October 16, 2015 that Flint reverted to the DWSD.

Accordingly, Workman's failure to act promptly unreasonably prolonged the Flint Water Crisis and compounded the threat posed to Flint's residents.

d.     Frederick Headen

Frederick Headen ("Headen") served as Legal Adviser to the State Treasurer from November 2012 through 2016.[50]  For the 10 years prior to assuming his role as Legal

---

[47] October 5, 2015 Wayne Workman Memorandum to Rick Snyder ("Re:  Status of Financially Distressed Local Governments").
[48] *Id.*
[49] October 9, 2015, 7:52 AM Randall Byrne Email to Wayne Workman, et. Al. (Re: FW: "Flint Water Issue").
[50] Deposition of Fredrick Headen, Pg. 10-11, *In Re Flint Water Cases* (October 7, 2020).

Advisor to the State Treasurer, Headen served as Director of the Bureau of Local

Government Services within the Department of Treasury.[51]

In his capacity as an employee of the Department of Treasury, Headen had a duty to

oversee the Emergency Manager's activities, including the delivery of services essential to

the public health, safety, and welfare of Flint residents.  Headen reported that he provided

legal advice concerning law and policy matters directly to the Treasurer and Chief Duty

Treasurer.[52]  Notably, Flint's former Emergency Manager, Ed Kurtz, explained in sworn

testimony that Headen was the Emergency Manager's primary point of contact with the

Department of Treasury.[53]  Kurtz testified that he would provide weekly updates to

Headen.[54]  Headen was thus aware of the decision to switch from DWSD water and join the

KWA and supported that decision.  If Flint had not abandoned the DWSD as its drinking

water source, it would never have had to use the Flint River as an interim source of water

and this crisis may have been averted.

Around April of 2015, Headen was named the Chairperson of the FRTAB, which took

over control of Flint's government from Emergency Manager Gerald Ambrose at the end of

April, 2015.[55]  Upon taking over Flint's government, the FRTAB had all the powers that the

Emergency Managers possessed - - the FRTAB had to approve certain contracts and all

resolutions, ordinances, and budget amendments adopted by the City Council before they

could take effect.[56]  The FRTAB accordingly owed a duty to safeguard the public's health,

welfare, and safety.

---

[51] *Id.*
[52] *Id.* at 11-12.
[53] Deposition of Edward Kurtz, Pg. 29, *In Re Flint Water Cases* (November 21, 2019).
[54] *Id.* at 37.
[55] Deposition of Frederick Headen, PG. 100, *In Re Flint Water Cases* (October 7, 2020).
[56] *Id.* at 104-107.

By the time Headen and the FRTAB took over Flint's government, Flint's lead problem was well-established. Despite Treasury's awareness of these various safety concerns, Headen and the FRTAB did not immediately take action to remedy the lead problem or initiate a switch to a safe water source.  Instead, Headen and the FRTAB dithered.  Indeed, it was not until more than six months after the FRTAB took over Flint's government—in mid-October, 2015 – that Flint reconnected to DWSD water.  If Headen and the FRTAB had acted sooner to return Flint to DWSD water, the effects of this crisis may have been mitigated.

e.      Edward Koryzno

Edward Koryzno ("Koryzno") was an Administrator in the Office of Fiscal Responsibility within the Department of Treasury between 2012 and 2014.[57] Subsequently, Koryzno was promoted to Director of Bureau of Local Government.[58] Koryzno recalled that this office "was created as part of, I believe, public act four and – and so the intent was to assemble a team of people to assist local governments that were in financial trouble.  So my first task was to hire a staff and then once that staff was assembled to develop a game plan to – to seek out communicates that were having difficulties financially and offer our assistance."[59]  Additionally, Treasurer Dillon specifically tasked the Office of Fiscal Responsibility with the responsibility of:  1) assessing the different projected construction costs provided by TYJT and by the City of Flint/KWA; 2) explaining why Treasury believes that the projects provided by Flint/KWA are acceptable; and, 3) identifying the construction contingencies included in the TYJT and Flint/KWA

---

[57] Deposition of Edward Koryzno, Pg. 16, *In Re Flint Water Cases* (May 26, 2020).
[58] *Id.* at 18.
[59] *Id.* at 18.

projections, as well as the options Flint will utilize in the event of a construction cost overrun or a delay in construction by KWA.[60]  Therefore, in his capacity as an employee of the Department of Treasury, Koryzno had a duty to oversee the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and welfare of Flint residents, specifically assessing the viability of the KWA as a source of safe drinking water.

According to Treasurer Dillon, Koryzno was Flint's primary point of contact at Treasury.[61]  Once Koryzno and his department were assigned to evaluate the competing proposals between DWSD and the KWA, Koryzno delegated much of this responsibility to his subordinate Eric Cline.[62]  Therefore, Koryzno received Cline's February 21, 2013 memorandum concluding that the KWA proved to be the cheaper option but noting several difficulties in arriving at this conclusion. These difficulties included: 1) the number of proposals involved; 2) differences of opinion regarding the conclusions of various engineering analyses; 3) the comparison between an existing water system and one that has yet to be designed; 4) an inability to identify the City of Flint's true water needs; 5) the short timeframe within which Tucker Young attempted to perform its analysis; and, 6) that all available information may not have been provided to Tucker Young.[63]  Cline emphasized this point by adding, "the only way to verify the accuracy of either estimate would be to utilize a third engineering firm to independently review both TYJT and KWA's estimates."[64]

---

[60] *Id.* at 69.
[61] Deposition of Andrew Dillon, Pg. 12, *In Re Flint Water Cases (July 7, 2020).*
[62] Deposition of Edward Koryzno, Pg. 161-162, *In Re Flint Water Cases* (May 26, 2020).
[63] February 21, 2013 Eric Cline Memorandum to Edward Koryzno ("Re: Updated Flint Water System Assessment").
[64] *Id.*

As Cline's supervisor, Koryzno was in a position to escalate these concerns and object to Treasury basing its approval of Flint joining the KWA on the information available at that time, but failed to do so.  Further, Koryzno stood by while Emergency Manager Ed Kurtz unilaterally withdrew from consideration several potentially more cost-effective alternatives, including those involving a blending of Flint River water with water supplied by the DWSD.[65]

Additionally, Koryzno knew that the KWA would not be able to supply Flint with water until 2016, and that DWSD would stop supplying Flint with water as of April, 2014.[66] Koryzno also knew that the Flint River was under consideration as Flint's interim water source until the KWA came online.[67]  But Koryzno also knew that the Flint Water Treatment Plant was woefully inadequate to supply safe water.[68]  By June, 2013, Koryzno was told that significant upgrades to the Flint Water Treatment Plant would be necessary in order for the Flint River to safely provide drinking water to Flint's residents.[69]  As a result, Koryzno approved Flint's request to contract with LAN to consult regarding necessary upgrades to the Flint Water Treatment Plant.[70]  Koryzno advised then-Emergency Manager Michael Brown to submit a request for an additional $11 million from the State of Michigan to make the Flint Water Treatment Plant operational.  Accordingly, Koryzno knew or should have known that when the Flint Water Treatment Plant became operational in April, 2014, it could not supply safe drinking water.  Had Koryzno not

---

[65] February 15, 2013 Eric Cline Memorandum to Edward Koryzno ("Re: Updated Flint Water System Assessment").
[66] Deposition of Edward Koryzno, Pg. 121, *In Re Flint Water Cases* (May 26, 2020).
[67] June 19, 2013 Edward Kurtz Letter to Edward Koryzno.
[68] Deposition of Edward Koryzno, Pg. 120-121, *In Re Flint Water Cases* (May 26, 2020).
[69] June 26, 2013, 8:22 AM Maxine Murray Email to Edward Koryzno, et. al. (Re: "Electronic Communication – Flint Water Plant").
[70] *Id.*

supported the switch to KWA and had Koryzno not supported the use of an inadequate Flint Water Treatment Plant, this crisis may have been averted.

       f.     Eric Cline

      Eric Cline ("Cline") was a Unit Operations Specialist in the Office of Fiscal Responsibility within the Department of Treasury between 2012 and 2016.[71]  As a Unit Operations Specialist, Cline's responsibilities included assisting local units of government that were experiencing various degrees of operational or financial distress and to, "engage with these local units, try and figure out what issues they were having, advise them on maybe ways to correct the issues, or help them try and figure out sort of a plan of action."[72] By virtue of these responsibilities and Treasury's general duty of superintendence, Cline had a duty to oversee the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and welfare of Flint residents.

      In February, 2013, Edward Koryzno delegated to Cline the responsibility of: 1) assessing the different projected construction costs provided by TYJT (in support of the DWSD option) and by the City of Flint (in support of the KWA option); 2) explaining why Treasury believes that the projects provided by Flint/KWA are acceptable; and, 3) identifying the construction contingencies included in the TYJT and Flint/KWA projections, as well as the options Flint will utilize in the event of a construction cost overrun or a delay in construction by KWA.[73]  Cline's analysis of these issues culminated in two February 2013 memoranda to Koryzno in which Cline concluded:

> KWA presents the best future option to provide potable water
> for the City of Flint in the future.  Long-term, KWA appears to

---

[71] Deposition of Richard E. Cline, Pg. 20, *In Re Flint Water Cases* (April 13, 2020).
[72] *Id.*
[73] Deposition of Edward Koryzno, Pg. 69, *In Re Flint Water Cases* (May 26, 2020).

> be the cheaper option; the quality of water will almost
> certainly improve; Genesee County appears willing to assist the
> City in securing the financial resources for their portion of the
> project; this project could signify the beginning of better
> collaboration between the City of Flint and Genesee County;
> the KWA project has both political and popular support.[74] [75]

However, in his analysis, Cline also noted several difficulties in arriving at this conclusion.[76]

These difficulties included: 1) the number of proposals involved; 2) differences of opinion

regarding the conclusions of various engineering analyses; 3) the comparison between an

existing water system and one that has yet to be designed; 4) an inability to identify the

City of Flint's true water needs; 5) the short timeframe within which Tucker Young

attempted to perform its analysis; and, 6) that all available information may not have been

provided to Tucker Young.[77] Cline emphasized this point by adding, "the only way to verify

the accuracy of either estimate would be to utilize a third engineering firm to

independently review both TYJT and KWA's estimates."[78]

While these difficulties did not stop Cline from rendering an opinion, he also did not

question Flint Emergency Manager Ed Kurtz's decision to withdraw from consideration

several potentially more cost-effective alternatives, including those involving a blending of

Flint River water with water supplied by DWSD.[79]

---

[74] February 21, 2013 Eric Cline Memorandum to Edward Koryzno ("Re:" Updated Flint Water System Assessment").
[75] February 15, 2013 Eric Cline Memorandum to Edward Koryzno ("Re:  Updated Flint Water System Assessment").
[76] Id.
[77] February 21, 2013 Eric Cline Memorandum to Edward Koryzno ("Re: Updated Flint Water System Assessment").
[78] Id.
[79] Id.

Subsequently, in April 2013, Cline was tasked with comparing DWSD's final offer to Flint relative to the costs of joining the KWA.[80] [81]  Cline concluded in his report of April 16, 2013, that the DWSD's final offer "could be cheaper" than the KWA option but that proposal lacked specificity and "without delaying a final decision and conducting more analysis it is difficult to determine."[82]  Cline once again formulated an opinion based on admittedly insufficient information.

Ultimately, Cline's recommendations in support of the KWA option, which were based on incomplete and/or insufficient information, formulated the basis of Treasury's support for Flint joining the KWA as a long-term water source.  If Flint had not committed to using the KWA, it would not have had to use Flint River water a short-term interim water source, and this crisis may have been averted.

d.  Thomas Saxton

Thomas Saxton ("Saxton") was employed as the Deputy Treasurer for Finance within the State Treasury Department between 2008 and June 2013.[83] In June 2013, Saxton was promoted to Chief Deputy Treasurer where he served until his retirement in June 2016.[84] As Deputy Treasurer for Finance, Saxton's duties and responsibilities included assisting local units of government with their debt and bond issuance, as well as education financing.[85] Later, as Chief Deputy, Saxton's duties and responsibilities expanded to include general supervision over many of the department's administrative functions.[86] These

---

[80] April 16, 2013, 12:42 PM Edward Koryzno Email to Richard Cline, et. al. (Re: "KWA and City of Flint").
[81] April 18, 2013, Eric Cline Memorandum to Brom Stibitz ("Re: Flint Water Summary").
[82] April 16, 2013, 12:42 PM Edward Koryzno Email to Richard Cline, et. al. (Re: "KWA and City of Flint").
[83] Deposition of Thomas Saxton, Pg. 23, *In Re Flint Water Cases* (October 1, 2020).
[84] *Id.* at. 19-21.
[85] *Id.* at 24-27.
[86] *Id.* at 21-23.

expanded responsibilities included oversight of local government operations.[87] Saxton acknowledged that Emergency Managers were appointed through a joint effort between the Governor's Office and the Treasury, and that the Emergency Managers generally reported to the State Treasurer through the Office of Local Government.[88] By virtue of these responsibilities and Treasury's general duty of superintendence, Saxton had a duty to oversee the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and welfare of Flint residents.

Saxton was put on notice of Flint's intention to join the KWA as far back as March 18, 2013, when Brom Stibitz forwarded an excerpt of Eric Cline's February 2013 memorandum indicating that Flint officials had withdrawn from consideration all DWSD related options with the exceptions of either joining the KWA or continuing to receive 100% of Flint's drinking water from DWSD.[89]

Subsequently, on April 19, 2013, Saxton was instructed by Treasurer Dillon to review a letter from Detroit's Bond Counsel, Clark Hill, outlining several cost-related concerns regarding Flint's decision to join the KWA.[90] [91] These concerns were purportedly not addressed in Tucker Young's final analyses of the overall cost associated with Flint joining the KWA, and included specific concerns regarding Flint's compliance with the Local Financial Stability and Choice Act's competitive bidding requirement.[92] Notwithstanding these concerns, and/or Saxton's senior position within the Treasury Department, it is not clear that Saxton undertook any substantive review of the issues

---

[87] *Id*. at 21-23.
[88] *Id*. at 42-43.
[89] March 18, 2013, 1:48 PM Brom Stibitz Email to Andy Dillon and Thomas Saxton (Re: "KWA Memo").
[90] April 19, 2013, 1:48 PM Andy Dillon Email to Thomas Saxton (Re: "DWSD / KWA Clark Hill Letter").
[91] April 19, 2013, Clark Hill Letter to James Fausone (Re: "KWA Proposal").
[92] *Id*.

presented. To the contrary, on March 19, 2014, Wayne Workman actually enlisted Saxton's assistance in "get[ting] a call in to" the Director of the DEQ to "push through" an Administrative Consent Order which would enable the City of Flint to secure its share of funding for participation in the KWA.[93] Notably, this Administrative Consent Order was secured within one week of Workman's email, specifically required Flint to use the Flint River as a temporary source of untreated water until KWA water became available and was prepared under the guise that funds would be used to clean the Bray Road lagoon in order to access the funding.[94] Had Saxton exercised his discretion to object to Flint's decision to join the KWA, it is possible that Flint may not have secured the approval's necessary to make the switch and Flint would have continued to receive the same quality Lake Huron water that it had received for decades.

Within six-months of Flint's transition to the Flint River as an interim drinking water source, Saxton became aware of significant health concerns regarding the potability of Flint's drinking water. Specifically, on October 14, 2014, Dennis Muchmore forwarded to Saxton and Wayne Workman an email chain outlining Valerie Brader and Michael Gadola's urgent concerns regarding bacterial contamination in Flint's water and General Motors' decision to leave the Flint Water system.[95] Significantly, both Brader and Gadola advocated for an immediate return to the DWSD at that time.[96] However, Saxton simply responded by exchanging emails with Workman noting that an upcoming conference call regarding the

---

[93]March 19, 2014, 7:19 AM Wayne Workman Email to Thomas Saxton and Brom Stibitz (Re: FW: order for Flint).

[94] March 21, 2014 Administrative Consent Order at § 3.13.

[95] October 14, 2014, 10:56 AM Wayne Workman Email to Thomas Saxton (Re: "Flint water).

[96] Id.

issue, "could get a little crazy depending who is on," to which Workman replied, "I am [on the call] and plan to control what people say."[97]

Rather than heed the advice of Brader and Gadola, Saxton persisted in prioritizing Flint's financial goal of returning to financial solvency by minimizing the extent of the health concerns for an entire year.[98] For example, on January 19, 2015, Dennis Muchmore forwarded to Saxton an email from Flint Mayor, Dayne Walling, wherein Walling pleads for the Governor's assistance in addressing Flint's water issues.[99] In response to Muchmore's query, "now what?", Saxton replied in relevant part, "at this point we are trying to determine whether this [DWSD offer] makes economic sense."

Saxton remained steadfast in his support for KWA's economic benefits throughout the Spring and Summer of 2015, despite numerous warning signs and mounting concerns regarding the safety of Flint's water.[100, 101, 102] By the Summer of 2015, Saxton had not only attended an in-person meeting with the Concerned Pastors regarding Flint water concerns, but also was advised that Flint was not incorporating phosphate optimization into its finished water.[103, 104]

Saxton's unwillingness to take reasonable measures to either connect Flint to a safe drinking water source or adequately investigate concerns regarding Flint's drinking water culminated in a September 3, 2015 email to James Redford, Dennis Muchmore and Wayne

---

[97] Id.
[98] Deposition of Thomas Saxton, Pg. 147-149, *In Re Flint Water Cases* (October 1, 2020).
[99] January 19, 2015, 3:44 PM Dennis Muchmore Email to Thomas Saxton (Re: "Flint Water).
[100] February 4, 2015, 11:35 PM Wayne Workman Email to Dennis Muchmore and Thomas Saxton (Re: "Flint Meeting").
[101] February 11, 2015, 8:01 PM Wayne Workman Email to Thomas Saxton (Re: "Flint water").
[102] February 19, 2015, 5:30 PM Thomas Saxton Email to Dennis Muchmore et. al. (Re: "Flint").
[103] Deposition of Thomas Saxton, Pg. 135, *In Re Flint Water Cases* (October 1, 2020).
[104] July 24, 2015, 4:180 PM Thomas Saxton Email to Nick Lyon (Re: FW: "Need update on lead / copper tests for Flint").

Workman.[105]  Tellingly, Saxton's email read, "Gentlemen...in the attached (which you have likely seen before) is a description of the cost to reconnect to DWSD. I assume/hope no one is still seriously considering that option but if you need anything more give us a call."

Saxton's failure to act, despite his clear duty and ability to intercede, demonstrates his callous prioritization of economic and political goals over the health and safety of Flint's citizens.

e.  Terry Stanton

Between 2001 and April 2016, Terry Stanton ("Stanton") at all times served as either the Press Secretary or Public Information Officer within Treasury's communications department.[106] Stanton recalled that, "the Department of Treasury in its role ... would work with emergency managers after they were appointed. Our Bureau of Local Government Services generally was the main point of contact with emergency managers. From my perspective, I would have been the communication conduit between the department and financially troubled local units."[107] Stanton also understood that Treasury oversaw the actions Emergency Managers were taking in various municipalities, and that he personally was responsible for communicating the message that Treasury would put out in a certain circumstance.[108]

By virtue of these responsibilities and Treasury's general duty of superintendence, Stanton and the Treasury Department had a duty to oversee the Emergency Manager's activities, including the delivery of services essential to the public health, safety, and

---

[105] September 3, 2015, 5:36 PM Thomas Saxton Email to Dennis Muchmore et. al. (Re: "Flint Water").
[106] Deposition of Terry Stanton, Pg. 19-21, *In Re Flint Water Cases* (April 21, 2020).
[107] Id. at 32-34.
[108] Id. at 25, 36.

welfare of Flint residents, and ensure that the public received pertinent, truthful and accurate information related to the provision of such services.

However, Stanton failed to use his platform to inform the public of growing concerns regarding the safety of Flint's water, even though the Treasury had assumed supervision over the provision of necessary services to Flint. For instance, Stanton was unaware until sometime later that, during January to July 2015, state and federal agencies engaged in an ongoing discourse regarding the presence of lead in Flint's water or the need for corrosion control.[109] Additionally, Stanton did not make public any concerns regarding the safety of Flint's water following conversations within State government regarding the possibility of handing out bottled water.[110] Yet again, on February 5, 2015, when informed of Concerned Pastor's request for immediate reconnection to Lake Huron, rather than give a voice to the Pastors or recognize the request as a warning sign Treasury's constituents should be aware of, Stanton participated in an echo chamber amongst his colleagues in State government suggesting that the costs to reconnect to DWSD were simply more than the city could afford.[111]

Finally, Stanton admits that the Treasury Department, among other governmental entities, played a role in the Flint Water Crisis.[112]

**3.      Michigan Department of Health and Human Services (MDHHS), and all current and former employees of MDHHS, including, but not limited to Nancy Peeler, Program Director for Maternal, Infant, and Early Childhood Home Visiting, Corinne**

---

[109] *Id*. at 98.
[110] *Id*. at 109.
[111] *Id*. at 102.
[112] *Id*. at 125-126.

**Miller, State Epidemiologist and Director of Bureau of Epidemiology, Robert Scott,**

**Data Manager for Healthy Homes and Lead Prevention Program, Eden Wells, MD,**

**Chief Medical Executive of MDHHS, Nick Lyon, former Director, Sue Moran, former**

**Deputy Director, Lynda Dykema, former Director of Division of Environmental**

**Health, Dr. Matthew Davis, former Chief Medical Executive, Jim Collins, former**

**Director of Communicable Disease Section, Jay Fiedler, former Section Manager for**

**Infectious Diseases Surveillance Section, Susan Bohn, former Unit Manager for**

**Respiratory Disease Section, Tim Bolen, Epidemiologist, and Jim Rudrik, Ph.D.,**

**former Director, Infectious Diseases Section .**

The Michigan Department of Health and Human Services ("MDHHS") is a principal department of the State of Michigan headquartered in Lansing that provides public assistance, child and family welfare services, and oversees health policy and management. Governor Rick Snyder merged the Department of Human Services ("DHS") and the Department of Community Health in his 2015 State of the State address. MDHHS oversees the Bureau of Epidemiology and Population Health and the Childhood Lead Poisoning Prevention Program, a section responsible for protecting, detecting, and monitoring childhood lead poisoning from a variety of sources, including exposure to lead contamination in dwellings and adjacent surroundings, in compliance with state and federal laws.

Pursuant to Section 51 of Article 4 of the state Constitution of 1963 and state Public Health Code, MDHHS is commanded to "continually and diligently endeavor to prevent disease, prolong life, and promote the public health through organized programs."[113] These

---

[113] M.C.L. 333.2221.

duties include "prevention and control of environmental health hazards, prevention and control of diseases, prevention and control of health problems of particularly vulnerable population groups, development of health care facilities and agencies and health services delivery systems, and regulation of health care facilities and agencies and health services delivery systems to the extent provided by law."[114] MDHHS has broad powers and duties under the public health code, including:

(a) general supervision of the interests of the health and life of the people of the state;

(b) the implementation and enforcement of laws within the area of its vested responsibility;

(c) the collection and utilization of vital and health statistics and the conduct of epidemiological and other research studies for the purpose of protecting the public health;

(d) the conduct of investigations and inquiries as to:
(i) the causes of disease and especially of epidemics;
(ii) the causes of morbidity and mortality; and
(iii) the causes, prevention, and control of environmental health hazards, nuisances, and sources of illness;

(e) planning, implementing, and evaluating health education by the provision of expert technical assistance and financial support;

(f) undertaking appropriate affirmative action to promote equal employment opportunity within the department and local health departments and promoting equal access to governmental financed health services to all individuals in the state in need of service;

(g) exercising the powers necessary or appropriate to perform its duties and which are not otherwise prohibited by law; and

(h) planning, implementing, and evaluating nutrition services by the provision of expert technical assistance and financial support.[115]

Further, MDHHS has a duty to promote local health services through the coordination and integration of public health activities, including effectively cooperating with local health departments so as to provide a unified system of statewide healthcare.[116]

---

[114] *Id.*
[115] *Id.*
[116] MCL 333.224.

MDHHS' broad investigatory powers ensure compliance with the laws and regulations set forth by the department and animate its obligation to report periodically to the governor and the legislature regarding matters of public health.[117]

Lead contamination of Flint's residential dwellings and soils was a longstanding problem dating back several decades. Lead-based paint (banned in 1978) and lead service lines connecting water mains to residential dwellings (initially subjected to mandatory replacement by the 1991 EPA Lead and Copper Rule) were common throughout the City of Flint. According to the Genesee County Community Action Resource Department, 82.9% of the housing structures in Flint were built before 1969 (91.8% before 1980).[118] Soils, long contaminated by combustion of leaded gasoline, were made worse by the use of lead coated wood construction debris as fuel by the Genesee Power Station in Flint's North End.[119] MDHHS, through its officials and employees and in accordance with such funded programs as the Childhood Lead Poisoning Prevention Program, failed to carry out its duties to prevent and minimize residential lead exposure in the Flint community, including from paint, lead service lines, soil, and dust. MDHHS, through its officials and employees, did not meet its most basic duties in failing effectively to respond either to spikes in elevated blood lead levels among Flint children or to the Legionnaires' disease outbreak in the Flint area following on the heels of the change in the source of Flint's drinking water from Lake Huron to the Flint River. Worse yet, MDHHS engaged in efforts to conceal the

---

[117] MCL 333.2231,2241.

[118] The number of vacant hommes (most of which are undoubtedly encrusted in lead paint) has increased 74% since 2000.

[119] Flint's NAACP, an activist group called United for Action, and Flint residents filed a lawsuit challenging the Genesee Power Station because its plume of lead- laden smoke and ash contaminated the City and exposed residents to physical injuries and diseases associated with lead (*e.g.*, brain injury, premature births, and learning disabilities). Highsmith, A.R., Demolition Means Progress, University of Chicago Press (2015) at 254.

public health problems, to prevent public notification about them, and to coordinate local public health efforts to address them, including taking steps to downplay scientific and public health data.

The State of Michigan charged the following MDHHS officials with committing significant crimes in relation to the Flint drinking water crisis: Nick Lyon (Director); Corinne Miller (Director, Bureau of Epidemiology); Eden Wells (Chief Medical Officer); Nancy Peeler (Director, Maternal, Infant, and Early Childhood Home Visiting Program); and Robert Scott (Data Manager, Healthy Homes and Lead Prevention Program). The plaintiffs admit that MDHHS and the officials referenced above intentionally deceived them, keeping from them critically important information about the hazardous conditions they confronted. The plaintiffs also admit that MDHHS Director Nick Lyon and Nancy Peeler, the MDHHS Director, Maternal, Infant, and Early Childhood Home Visiting Program, intentionally caused them bodily harm (in the nature of invading their bodily integrity).[120] MDHHS proximately caused further exposure, personal injuries, and damages to the plaintiffs.

a.    Nick Lyon

Nicholas Lyon was the Director of the Department of Health and Human Services and held that position since September 2014. Prior to that time, Mr. Lyon served as the agency's Chief Deputy Director since 2011. In his role as Director, Lyon exercised all powers and duties vested in the Department as well as overseeing the daily departmental operations.[121] As Director, Mr. Lyon was required to "continually and diligently endeavor to

---

[120] The plaintiffs' admissions made in their complaints are incorporated by reference. The admissions are too voluminous to incorporate into the body of the Notice.
[121] M.C.L. 333.2205(1).

prevent disease" and to "[c]ollect and utilize vital and health statistics . . . for the purpose of protecting the public health."[122]

As early as September 2014, Mr. Lyon through his subordinates learned that McLaren Hospital experienced a significant outbreak in Legionnaires' disease. On October 13, 2014, an MDHHS epidemiologist identified a potential correlation between the outbreak and Flint's change of its water source from Lake Huron to the Flint River:

> I spoke with Tim [Bolen, MDHHS] late last week about the ongoing Legionnaire's [sic] increase in Genesee County. They've had 30 cases of Legionnaire's [sic] Disease reported into the [Michigan Disease Surveillance System] from June to present this year, where in previous years (2009-2013) they've had a range from 2- 9 cases reported during this same time frame. Genesee initially thought the increase was associated with McLaren Flint Hospital as a source, but after Tim and I both reviewed the preliminary data it was pretty clear that many of the cases did not fit with this hypothesis. In addition, the picture has been clouded by the fact that most cases being reported did not have onset dates recorded. The current hypothesis is that the source of the outbreak may be the Flint municipal water.

Mr. Lyon learned on January 28, 2015, that there was an outbreak of Legionnaires' disease in Genesee County and that the initial outbreak coincided with the change in water source from Lake Huron to the Flint River. State Epidemiologist Corrine Miller met with Mr. Lyon and presented him with data and graphs on the monthly case counts of Legionnaires' disease between January 1, 2009 and January 2015 and pointed out the relationship in time with the Flint water switch. That same day, Deputy Director Sue Moran forwarded Mr. Lyon a summary from a call held between MDHHS, MDEQ and Flint area hospitals. According to Ms. Miller, "MDEQ expressed concern that this issue might reach the

---

[122] M.C.L. 333.2221(2)(c).

Governor's office and I indicated it already had (and that [DHHS] would be assisting the locals in the investigation)."

While cases of Legionnaires' disease continued to be reported, on May 29, 2015, MDHHS officials mailed a letter to McLaren Hospital declaring the outbreak of Legionnaire's Disease over. McLaren Hospital officials "found it very strange that [the outbreak] was declared as over because it was never declared to begin with and we were still seeing cases." On July 22, 2015, Governor Snyder's Chief of Staff Dennis Muchmore sent Mr. Lyon an email requesting that he look into Flint's water issues. With the assistance of his staff, Mr. Lyon falsely responded to Mr. Muchmore's inquiry by stating that 73% of the cases involved individuals who were not consumers of Flint drinking water. MDHHS staff testified in preliminary criminal hearings involving Mr. Lyon that in early January 2016, he was presented with substantially the same information that Corrine Miller had presented Mr. Lyon nearly a year earlier, yet he acted as though he had never seen the information before. Despite his extensive knowledge of the outbreak, Mr. Lyon failed to act or inform the public until January 13, 2016, during a news conference with Governor Snyder and Dr. Eden Wells.

Moreover, Lyon treated reports of elevated blood lead levels among Flint children with a similar "glib and dismissive" approach. In July 2015, MDHHS knew that there was a spike in elevated blood lead levels of Flint children which correlated with the onset of use of the Flint River water as a drinking water source. Despite Mr. Lyon's obligations to investigate public health concerns, in September 28, 2015, after the blood lead level issue had garnered media attention, Mr. Lyon sought assistance from MDHHS staff to disprove any correlation to the Flint water:

> I need an analysis of the Virginia Tech/Hurley data and their conclusions. I would like to make a strong statement with a demonstration of proof that the blood lead levels seen are not out of the ordinary and are attributable to seasonal fluctuations.

Mr. Lyon also actively participated in the political cover-up from the Governor's office. On November 26, 2015, Richard Baird, a top advisor to Governor Snyder, advised the Michigan state police: ". . . boss wants us to work through this without a disaster declaration if possible. Dan [Wyant, MDEQ] and Nick [Lyon] and I are working on it."

Mr. Lyon actively minimized the drinking water problems and their potential effect on public health. MDHHS, with Lyon at the helm, disregarded scientific data and engaged in a scheme to undermine and obscure the truth at the expense of the public.

b.    Sue Moran

Sue Moran ("Moran") was the Deputy Director for Public Health at MDHHS. Ms. Moran reported to Deputy Director, Timothy Becker, who reported directly to MDHHS Director Nick Lyon. Ms. Moran's duties included consulting with the Director's office on public health issues, including communicable disease outbreaks. Ms. Moran failed at her essential duties to investigate and prevent disease and promote the public health, including failing to urgently and properly respond to both reports of elevated blood lead levels and the Legionnaires' disease outbreak.

Ms. Moran became aware of the Legionnaires' disease outbreak in January 2015. Despite this, Ms. Moran failed to adequately respond and assist the local health department in accessing information and informing the public throughout 2015. Notably, eleven months later, in December 2015, Ms. Moran and Dr. Eden Wells criticized the Genesee

County Health Department for "going behind their back" and not being a "team player" in drafting a press release regarding the outbreak.

In September 2015, Director Lyon contacted Ms. Moran directly stating that he wanted to make a "strong statement" that the elevated blood lead levels reported in the media were merely seasonal variation. In line with department politics, that same month, Ms. Moran emailed MDHHS staff informing them that the "front office" was asking about Flint water and stressing that "while this is a public health concern, this is largely DEQ/local jurisdiction." Ms. Moran declined to accept that any issues related to water quality were the responsibility of the MDHHS, in direct contradiction to her duties to protect the public health.

c.      Corrine Miller

Corinne Miller ("Miller") was the Director of the Bureau of Epidemiology at MDHHS. Ms. Miller reported to Sue Moran. Ms. Miller's duties as Director included providing review of data reports and feedback, consultation, and crisis management for public health investigations, including communicable diseases. Ms. Miller's duties also included oversight over the Legionella investigation.

Ms. Miller became aware of the Legionnaires' disease outbreak by January 2015 and had discussions with Linda Dykema about the correlation between the water switch and the increase in the cases of Legionnaires' disease. Ms. Miller has admitted that notice could have been released to the public as early as January 2015, but that there were "political overtones" and that news of a Flint water related disease outbreak could have been "embarrassing" or "cause a difficult situation" for the Governor because that decision had been made under emergency management. By March 2015, Ms. Miller was aware of the

challenges the Genesee County Health Department (GCHD) faced in investigating the Legionnaires' disease outbreak. Ms. Miller had the power and ability to provide additional assistance or request epidemiologic assistance from the CDC, but she failed to do so until after public notification was made, even when the GCHD requested CDC's assistance.

In July 2015, Ms. Miller was aware that one of her epidemiologists, Cristin Larder, had determined that the blood lead levels in Flint children in the summer of 2014 were higher than previous years and that it warranted further investigation. However, Ms. Miller chose to play politics by instructing others not to take action and to delete emails pertaining to Ms. Larder's report. Despite knowledge and access to data evidencing elevated blood lead levels from her own staff, on September 17, 2015, Ms. Miller reminded MDHHS staff that "[p]er the MDEQ, the compliance monitoring for lead within the city has never exceeded the EPA action level for lead." Worse yet, after the blood lead level issues became public, Ms. Miller pressured MDHHS staff to provide false statements to the media regarding reports of elevated blood lead levels.

d.    Linda Dykema

Linda Dykema ("Dykema") was the Director of the Division of Environmental Health at MDHHS from May 2014 to October 2016. Her duties included serving as a liaison to the MDEQ, managing the toxicology and response section, and conducting public health assessments of environmental contamination. Ms. Dykema also oversaw the Lead Hazard Remediation Program, responsible for assessing and cleaning up lead contaminated housing.

Ms. Dykema became aware of the Legionnaires' disease outbreak in January 2015, and she had discussions with Corrine Miller about the correlation between the water

switch and the increase in the cases of Legionnaires' disease. In an effort to protect her department and the Governor from an "embarrassing" and "difficult situation," Ms. Dykema instructed MDHHS employees to refer calls from the public complaining about the water to her attention, warning that "there is a political situation that we don't want to stumble into should we get hotline calls."

Ms. Dykema also worked with the MDEQ beginning in and about July 2015 to downplay the seriousness of the lead issues and other health concerns related to the water and to diminish and disparage Miguel Del Toral. On July 23, 2015, Ms. Dykema reiterated to several MDHHS officials, including Corrine Miller, Nancy Peeler, and the "front office," that the city is in compliance with the Lead and Copper Rule and that Mr. Del Toral's report was "issued as a result of his own research and ...not reviewed or approved by EPA management. He has essentially acted outside his authority." On September 29, 2015, after Dr. Mona Hanna-Attisha's work became public, Ms. Dykema expressed to other MDHHS officials the need for the department to have a unified response: "It's bad enough to have a data war with outside entities, we absolutely cannot engage in competing data analyses within the Department, or, heaven forbid, in public releases." Ms. Dykema has since expressed her frustration that the Department did not share the lead concerns with the public sooner. Ms. Dykema, in her role as the Director of the Division of Environmental Health, failed in her duties to investigate, prevent, and control environmental health hazards. By her conduct, she exacerbated the plaintiffs' injuries and damages.

e.     Eden Wells

Dr. Eden Wells ("Wells") was the Chief Medical Executive for MDHHS and held that position since May 1, 2015. Prior to that, Dr. Wells served as the Associate Chief Medical

Executive from January 1, 2015 to May 1, 2015. Pursuant to M.C.L. 333.2202, if the Director

of MDHHS is not a physician, the director "shall designate a physician as chief medical

executive of the department. The chief medical executive shall be a full-time employee and

shall be responsible to the director for the medical content of policies and programs."

Dr. Wells' duties included assisting with disease outbreak coordination and investigation

and to provide the department with professional medical guidance.

Dr. Wells was aware of the Legionnaires' disease outbreak as early as May 2015. She

was consistently informed and updated on the nature and scope of the outbreak during

2015. However, she and MDHHS did not inform the public about the outbreak until January

16, 2016. Dr. Wells failed to take steps to investigate the source of the outbreak or notify

the public. Moreover, Dr. Wells actively participated in efforts to undermine the Genesee

County Health Department's ("GCHD") attempts to investigate the outbreak and notify the

public, accusing GCHD officials of "going behind [MDHHS'] back" and not being a "team

player." Dr. Wells was aware of the report of elevated blood lead levels as early as August

2015 and took steps to limit scientific access to data and downplay the reports in the

media. Despite her duty to protect the public from health outbreaks and alert the public of

known dangers, Dr. Wells failed to act accordingly.

f.    Nancy Peeler

Nancy Peeler ("Peeler") was Director of the Maternal, Infant and Early Childhood

Home Visiting Program ("MIECHV") at MDHHS during the relevant time frame. The

MIECHV program is designed to promote maternal, infant and early childhood health,

development and safety. This program includes the State's childhood lead poisoning

prevention program, which provides education and outreach regarding lead hazards and

the impact of lead poisoning and maintains a registry of blood lead levels throughout the state. Ms. Peeler was specifically assigned the task of responding to an inquiry from the MDHHS Director's office regarding elevated lead levels and the potential impact on public health.

By July 2015, the MDHHS knew that there was an increase in elevated blood lead levels among Flint's children. Prior to July 2015, MDHHS had the necessary data to analyze the issue of elevated blood lead levels but failed to do so. Ms. Peeler, who is not an epidemiologist herself, assigned MDHHS' epidemiologists to evaluate any increase in child blood lead levels in the summer of 2014 that may be attributable to the change in drinking water from Lake Huron to the Flint River. On July 28, 2015, MDHHS epidemiologist Cristin Larder found and reported to Ms. Peeler that children's blood lead tests conducted in summer 2014 "lie outside the control limit" compared with prior years and that this finding "does warrant further investigation." Despite this, Ms. Peeler falsely reported that there was no significant jump in lead levels other than the normal, seasonal variation. Ms. Peeler's report was brought to the Director and ultimately to the Governor's office. When Ms. Larder again reported that, based on additional data provided to her, there was still "a higher proportion of EBLL last summer than usual," Ms. Peeler took no steps to correct her report to the Director and the Governor or to conduct a further analysis. Ms. Peeler effectively buried Ms. Larder's work, choosing politics over public health. When Ms. Larder learned, months later, of Ms. Peeler's alternative report, Ms. Larder communicated to members of the Governor's Flint Water Advisory Task Force that the results of her 2015 analysis "were actively blocked from reaching Director Lyon."

Further, Ms. Peeler took steps to disparage Dr. Mona Hanna-Attisha's work and further to mislead the public regarding any correlation between elevated blood lead levels and the change in the source of the drinking water. On September 23, 2015 Ms. Peeler sent an email internally to MDHHS staff stressing the "seasonal impact associated with lead poisoning" and insisting that staff hold forth with the talking point that "[w]e do NOT see a different pattern of results for the 2014-2015 year, right after the change in the water source." On September 24, 2015, Ms. Peeler proofread a response drafted by Robert Scott to Professor Marc Edward's request for data on blood lead levels and expressing his frustration about the State's lack of response. Ms. Peeler instructed Mr. Scott to "apologize less" and explicitly warned: "The email you received could be read as an intent to escalate and spin things, and I don't think you need to get caught up in that."

On September 25, 2015, a day before Dr. Mona Hanna-Attisha's work became public, Ms. Peeler communicated with MDHHS leaders stating:

> Based on questions coming through, I do think we need to run our Flint charts for the same population group that the Flint docs ran (as close as we can approximate the sample) but I'd look at it across the five years again. Depending on what our charts show, we may want to consider having (state epidemiologists) help us run an analysis more like the docs ran – but let's look at the revised charts as a starting point.

That same day, Ms. Peeler assigned Mr. Scott to respond to a Detroit Free Press article about lead increases in Flint and expressed her "secret hope . . . that we can work in the fact that this pattern is similar to the recent past." The next day, despite her knowledge of elevated childhood blood lead levels nearly two months prior, Ms. Peeler acquiesced to Director Lyon's mandate to send a strong message of "seasonal variation." Specifically, Ms. Peeler coordinated with Robert Scott and MDHHS's Deputy Director for External

Relations and Communications, Geralyn Lasher, to "put[] together talking points about this 'study' that the physicians will be discussing that claims an increase in elevated blood levels in children since the change to the water system source."

> g.    Robert Scott

Robert Scott ("Scott") was the Data Manager for the Healthy Homes and Lead Prevention and Childhood Lead Prevention Program. Mr. Scott, who is not an epidemiologist, was responsible for tracking and organizing child blood lead level data for the program. In July 2015, Mr. Scott was asked by Nancy Peeler to assist in providing a limited data set to MDHHS epidemiologists to determine whether there was an increase in child blood lead levels in Flint related to the change in the source of drinking water from Lake Huron to the Flint River. After MDHHS epidemiologist Cristin Larder reported on the morning of July 28, 2015 that there was, in fact, an increase in child blood lead levels in the Summer of 2014, Mr. Scott took it upon himself to also analyze state data. Before receiving the final report from Ms. Larder, Scott wrote to Ms. Peeler:

> I said this morning I'd look to see if the distribution of (elevated blood lead levels) in the July-September 2014 'spike' was any different from the typical distribution of (elevated blood lead levels) in Flint. I compared totals by zip code vs. totals by zip code from 2010. The pattern is very similar and is further evidence, I think, that the water was not a major factor here.

Scott chose to ignore the experts in his own department and his obligation to protect the public health by advancing efforts to ignore and to bury Ms. Larder's work.

Upon receipt of a September 11, 2015 email from Professor Marc Edwards describing "severe chemical/biological health risks for Flint residents" related to corrosion of pipes, Mr. Scott forwarded the information to several MDHHS colleagues, including

Nancy Peeler, writing: "[s]ounds like there might be more to this than what we learned previously. Yikes!"

Mr. Scott also participated in efforts to discredit Dr. Mona Hanna-Attisha's work. On September 24, 2015, Mr. Scott attempted to recreate Dr. Hanna-Attisha's work and, ignoring the work of MDHHS epidemiologists and despite a lack expertise in the field, informed Ms. Peeler that he saw a difference between the two years, but not as significant as Dr. Hanna-Attisha's. The following day, Mr. Scott instructed MDHHS staff to inform the Detroit Free Press that "[w]hile the trend for Michigan as a whole has shown a steady decrease in lead poisoning year by year, smaller areas such as the City of Flint have their bumps from year to year while still trending downward overall."

h.     Jim Collins

Jim Collins ("Collins") was the Director of the Communicable Disease Division at MDHHS. As Director, his duties included oversight and responsibility for providing support and consultation to local health departments to closely monitor and track disease outbreaks. Additionally, the Division was responsible for collecting and analyzing data on communicable diseases, assisting in strategies to control disease and, when necessary, partnering with the Centers for Disease Control ("CDC") on issues related to communicable diseases. Mr. Collins' division also includes oversight of the emergency notification network and Michigan Disease Surveillance System ("MDSS"), including "surveillance and control of respiratory infections, such as influenza and legionellosis."

In October 2014, Collins was informed of an "ongoing Legionnaires' increase in Genesee County" including 30 cases reported into the MDSS since June 2014, and a potential correlation with the Flint River water as nearly all of the cases had been mapped

61

in Flint. Collins was aware at that time of conversations between his staff and the MDEQ, including that the Governor's Office had been involved with complaints about the Flint water and that "any announcement by public health about the quality of the water would certainly inflame the situation." MDHHS assured MDEQ staff that they would work with Genesee County to coordinate water testing.

By January 2015, Collins had concerns about GCHD's progress in investigating the Legionaries' disease outbreak, noting that "we believe that this increase warrants additional evaluation on the part of public health" and acknowledging the "pressures on [GCHD] of late from the public and media alike about the water quality questions in Flint." GCHD responded by requesting MDHHS' assistance with additional testing of clinical and environmental samples and obtaining information from MDEQ. Despite this request, from September 2014 to May 2015, MDHHS provided GCHD with no information related to the status of the legionella outbreak, and never sent any staff members to assist GCHD's efforts including obtaining environmental or clinical samples.

After the GCHD requested assistance from the CDC in February and April 2015, Collins subsequently issued a memorandum in June 4, 2015, copying the CDC and declaring the legionella outbreak over despite the fact that two new cases were reported on June 1 and June 2 in MDHHS' surveillance reporting system. Collins also harshly criticized GCHD's efforts to contact the CDC: "Relative to communications around the investigation, I believe that CDC is in agreement that their involvement really should be at the request of the state, rather than the local health department. To be clear, we do value the skills and resources of our CDC colleagues, but we also recognize that their involvement needs to have some

structure. I want to reinforce the necessity that investigation communications from the Genesee County Health Department need to be directed to staff at the MDHHS."

      i.      Dr. Matthew Davis

Matthew M. Davis ("Davis") was the Chief Medical Executive from March 2013 to April 2015. Pursuant to M.C.L. 333.2202, the chief medical executive is responsible to the director of MDHHS for the medical content of policies and programs. Dr. Davis' duties included assisting with disease outbreak coordination and investigation and providing the department with professional medical guidance. Dr. Davis was notified of the Legionnaires' disease outbreak and the potential correlation to the change in water source by January 2015. Dr. Davis failed to investigate or assess the degree of the public health risk, failed to effectively cooperate with other state agencies in the interest of public health, and failed to properly advise his own department or the director of the need to investigate and respond. Dr. Davis' actions resulted in a lack of public notification and harm to the plaintiffs.

      j.      Jay Fiedler

Jay Fiedler ("Fiedler") was the Section Manager for the Infectious Diseases Surveillance Epidemiology Section at MDHHS during the relevant time frame. Fiedler's duties at MDHHS included monitoring disease outbreaks and coordinating with the local health departments. By October 2014, Mr. Fiedler was aware of a potential correlation between an uptick in Legionnaires' disease and the switch to Flint River water. Mr. Fiedler knew of the frustrations by local health officials in investigating the Legionnaires' disease outbreak. Mr. Fiedler failed to provide the necessary information to assist in the effective coordination of data for the protection of public health and was openly critical of the

Genesee County Health Department's efforts. Mr. Fiedler has admitted that public notice of the outbreak should have been provided by MDHHS early in 2015.

k.    Susan Bohn

Susan Bohn ("Bohn") was the Unit Manager for the Respiratory Disease Epidemiology Section at MDHHS during the relevant time frame. Ms. Bohn's duties included monitoring and investigating respiratory disease outbreaks, including Legionnaire's disease. By October 2014, Ms. Bohn was aware of a potential correlation between an uptick in Legionnaires' disease and the switch to Flint River water. Despite her knowledge and duties, Ms. Bohn coordinated with MDEQ officials to downplay any correlation, stating that "the Flint water was at this point just a hypothesis." Ms. Bohn also communicated to other MDHHS staff members MDEQ's concern that "any announcement by public health about the quality of the water would certainly inflame the situation."

l.    Tim Bolen

Tim Bolen ("Bolen") was an epidemiologist at MDHHS during the relevant time frame. Mr. Bolen had direct communications with staff at McLaren Hospital in June and September 2014 about a Legionnaire's disease outbreak. By October 2014, Mr. Bolen knew that the source of the outbreak was likely correlated to the Flint municipal water. Mr. Bolen failed to act accordingly to protect the public health and ensure public notification.

m.    James Rudrik

James Rudrik ("Rudrik") was the Director of the Infectious Disease Division at MDHHS during the relevant time frame. By October 2014, Mr. Rudrik knew that the source of the legionella outbreak was likely correlated to the Flint municipal water. Mr. Rudrik

participated in the lack of urgency displayed by MDHHS in failing to properly investigate or notify the public of a disease outbreak.

**4.      The Governor's Office, former Governor Richard Snyder and all former staff members, including, but not limited to, Dennis Muchmore, Harvey Hollins III, Richard Baird, Valerie Brader, Jarrod Agen, Sara Wurfel and David Murray.**

Mr. Snyder took office as the elected Governor of Michigan on January 1, 2011. As Governor of Michigan, Snyder had executive power and the duty to supervise the faithful execution of laws by state agencies.[123] The Governor has the power and duty to investigate the acts of any public office or public officer, elective, or appointee and may remove or suspend a public official from office.[124] Moreover, the Governor is "responsible for coping with dangers to [the] state or the people of [the] state presented by a disaster or emergency" including natural or human-made water contamination, and may issue an emergency declaration accordingly.[125]

Through his first executive order, Governor Snyder divided the Department of Natural Resources and Environment into two distinct departments as they were configured a few years beforehand: the Department of Natural Resources and the Department of Environmental Quality. Governor Snyder appointed Andy Dillon as the State Treasurer, Nick Lyon as Director of MDHHS and Dan Wyant as Director of MDEQ and had duty to supervise their execution of law. On March 16, 2011 (and again in December, 2012), he signed bills into law that increased the powers of Emergency Managers of local municipalities to resolve financial matters. Governor Snyder also appointed the Emergency

---

[123] Mich. Const. Article V, §§ 1, 8.
[124] Mich. Const. Article V, § 10.
[125] M.C.L. § 30.403; 30.402(h)

Managers who ran the City of Flint during the time periods relevant to the City of Flint's

water contamination. Flint's Emergency Managers reported to Governor Snyder through

the Department of the Treasury and its executive, the State Treasurer. Simply put,

Governor Snyder and his subordinate, the State Treasurer, had complete power and

authority to direct the Flint Emergency Managers to undertake actions that were necessary

and proper to protect the health and safety of Flint residents.

Governor Snyder was informed of the Flint water switch in April, 2014. In October,

2014, after reports of water quality concerns and violation notices, the MDEQ sent

Governor Snyder a "briefing paper" discussing various water quality issues and

infrastructure problem in the City of Flint affecting their ability to distribute safe water.

That same month, Governor Snyder's senior staff referred to the water contamination

situation as an "urgent matter to fix," yet the Governor took no action.

By July 2015, Governor Snyder knew of reports of elevated lead levels found in

homes throughout the city. On September 5, 2015, Governor Snyder knew that 1,500

kitchen water filters had been distributed to Flint residents in 4 hours "as a way of

providing added comfort amid concerns about Flint's water quality." Lacking urgency and

concerned about public perception, Governor Snyder stated his main concern as, "How did

it go over with the residents?" On September 25, 2015, in a written communication to

Governor Snyder, his Chief of Staff reported: "I can't figure out why the state is responsible

except that Dillon did make the ultimate decision so we're not able to avoid the subject"

and warned that Governor Snyder should not "fan the narrative that the state is ducking

responsibility." On October 8, 2015, a full year after his staff made the recommendation,

Governor Snyder ordered the return to Lake Huron for drinking water by reconnecting to the Detroit Water and Sewer Department.

Governor Snyder had complete authority over the key state agencies responsible for implementing state and federal safe drinking water regulations, including the power to intervene, demand additional information or action, or reorganize resources or departments to ensure the public health. Governor Snyder failed adequately to supervise the acts of his state agencies and their department directors, including Nick Lyon and Dan Wyant. Governor Snyder failed to intervene appropriately or to take emergency action to prevent further harm to the general public caused by contaminated drinking water. Governor Snyder has admitted that the Flint Water Crisis was a failure at all levels of government, including his own administration, and has stated that he takes responsibility for the State's role in the crisis.[126]

Members of the Governor's Office Senior Staff had direct supervisory duties and authority over the Emergency Managers in Flint. Prior to the switch to the Flint River water as an interim drinking water source, Harvey Hollins III, Director of Urban Initiatives in Governor Snyder's administration and the point person for the State's response to the Flint water issues, served as a liaison between the City, Detroit Water and Sewage Department ("DWSD"), Department of Treasury, and consultants working for the City regarding the potential cost implications of the various drinking water sources. After the switch, Mr. Hollins was intimately involved in coordinating the water quality concerns of Flint residents and activists, including communicating water quality concerns to the emergency

---

[126] Deposition of Richard Snyder, June 25, 2020, pp 64-69.

manager. Mr. Hollins was aware early on of the lack of response from city officials and state agencies over growing health concerns.

In October 2014, nearly six months after Flint had begun using the Flint River water to save money, Valerie Brader, Governor Snyder's senior policy adviser and deputy legal counsel, and his chief legal counsel, Michael Gadola, raised concerns to him about Flint's drinking water. Ms. Brader had considerable education, training, and experience in environmental matters. A Rhodes Scholar, Ms. Brader received her undergraduate degree, magna cum laude, from Harvard, a master's degree from the University of Oxford (environmental change and historical studies), and a law degree, magna cum laude, from Georgetown University. She clerked for a federal judge in the Eastern District of Michigan and served as a special master in the federal court overseeing environmental compliance of a large public utility. She was a partner at Bodman, PLC, practicing environmental law, and had been an environmental and business process consultant for the EPA and the Department of Defense. Through her past work experience, she was familiar with the environmental issues of communities (like Flint) serviced the by DWSD.

On October 14, 2014, Ms. Brader, in her capacity as a Senior Advisor to Governor Snyder, sent a communication to "the members of the senior staff team" in which she recommended that Flint reconnect to or blend with DWSD (*i.e.*, Lake Huron) water: "I am not sure who is the best person to initiate that conversation with the EM, but I see this as an urgent matter to fix."

Ms. Brader testified that a few days later, Richard Baird, Transformation Manager in Governor Snyder's Executive Office, contacted her about setting up a call with the Flint Emergency Manager to discuss the concerns expressed in her October 14 email. She recalls

68

that she went down to Mr. Baird's office yet a few days later still and that together they called Flint's Emergency Manager, Darnell Earley, from Baird's office. Ms. Brader testified that Emergency Manager Earley told them that he had recently spoken with MDEQ staff about the health violations, but that the problems could be fixed and that the switch back to Lake Huron water would be too expensive. Despite Flint Emergency Manager Earley's statements, Ms. Brader did not change her recommendation to switch back to Lake Huron water to or blend water with DWSD. The switch back to Lake Huron did not take place until one year later in October, 2015.

Early in 2015, Governor Snyder's staff knew of a potential Legionnaires' disease outbreak.  In March 2015, members of the Governor's Office began looking into purchasing bottled water for Flint residents.  Members of Governor Snyder's senior staff, including Dennis Muchmore, became aware of serious issues with Flint's water, including potential lead issues, sometime in the May, June, or July 2015 time frame.[127]  In July 22, 2015, Governor Snyder's Chief of Staff Dennis Muchmore met with the Concerned Pastors in Flint and learned that, according to the group, lead was a serious issue in the City of Flint. Mr. Muchmore sent MDHHS Director Nick Lyon a written communication requesting that he look into Flint's water issues, but public notification was not made until over a year later, in January 2016.  By July 2015, Governor Snyder knew of reports of high levels of lead in the water supply, yet Governor Snyder and members of his senior staff worked to appease residents and dispel concerns over drinking water quality.

In a September 2015 effort to dodge responsibility, the Governor's office attempted to place blame for the problem on others: "[t]he real responsibility rests with the county,

---

[127] Deposition of Dennis Muchmore, Pg. 162-164, *In Re Flint Water Cases* (June 8, 2020).

city and KWA" and that "it's really the city's water system that needs to deal with it."  On

November 26, 2015, Richard Baird, a senior advisor to Governor Snyder, instructed the

Michigan State Police:  "...boss [Snyder] wants us to work through this without a disaster

declaration if possible.  Dan [Wyant, MDEQ] and Nick [Lyon] and I are working on it."  The

Governor, directly and through his senior staff, failed properly to advise or to take action to

protect the general public from health hazards caused by contaminated water.

**5.      The City of Flint, and all current and former employees, elected officials
and emergency managers, including, but not limited to, Dayne Walling, former
Mayor, Michael Brown, former Emergency Manager, Edward Kurtz, former
Emergency Manager, Darnell Earley, former Emergency Manager, Gerald Ambrose,
former Emergency Manager, Howard Croft, former Public Works Director, Daugherty
Johnson, Deputy Director of Public Works, Michael Glasgow, former Water
Treatment Plant Operator, Natasha Henderson, former City Administrator and all
members of the Flint Receivership Transition Advisory Board.**

The City of Flint is a body politic incorporated in 1855. Like the State of Michigan,

the City of Flint is a body politic that acts through its executive branch (including

specifically the various Emergency Managers appointed by the Governor), departments and

boards, officers, and employees. The City of Flint operates the Department of Public Works

and has a duty to provide drinking water to its residents and property owners as part of its

responsibilities and services. This duty includes operating, maintaining, and managing

Flint's water supply on a daily basis in compliance with federal and state drinking water

standards to assure the safety of public drinking water. The City also has a duty to provide

for competent and sufficient personnel certified to operate Flint's water treatment plant

and distribution system to provide safe drinking water to Flint's residents. The City of Flint, in conjunction with the MDEQ, has a duty to determine appropriate treatment, including for lead and copper, and to establish and implement monitoring plans for its water system necessary for protection of public health. When the City of Flint's water quality monitoring revealed elevated lead levels, the presence of other contaminants, or evidence indicating a water borne disease, the City of Flint had a legal obligation to notify the public.

Although Flint's Emergency Managers were appointed by, and accountable to, the Governor and the State of Michigan,[128] the Emergency Manager law authorized Flint's Emergency Managers to act in the place of local government to "rectify the financial emergency and to assure the fiscal accountability of the local government" through complete control of the municipality.[129]  From 2013 to 2015, Flint's Emergency Managers, including Darnell Earley, Ed Kurtz, Gerald Ambrose, and Michael Brown actively controlled and participated in decision making on behalf of the City of Flint, specifically regarding Flint's public drinking water system.[130]  Because the sale and delivery of drinking water is deemed a municipal business activity under Michigan decisional law, the City of Flint is responsible for the Emergency Manager's acts and omissions related to drinking water.[131]  Consequently, the acts and omissions of its Emergency Managers, departments and boards, officers, and employees undertaken within the scope of their employment, constitute the acts and omissions of the City.  Likewise, knowledge acquired by its Emergency Managers,

---

[128] Mich. Admin. Code. R 325.10401-10402.
[129] Mich. Comp. Laws § 141.1549(1).
[130] It was EM Kurtz who made the ultimate decision to rely upon the Flint River and put the Flint Water Treatment Plant into operation.  *See* Flint Water Advisory Task Force Report (March 2016) at 17.  Later, it was EM Ambrose who decided that Flint would not enter into a new contract with DWSD.  See Deposition of Gerald Ambrose, Pages 122, 595-96, *In Re Flint Water Case* (June 10-11, 2020).
[131] Mich. Comp. Laws § 141.1550(10).

departments and boards, officers, and employees acquired within the scope of their employment is imputed to the City.  In consequence, the City cannot plead innocence by asserting that the information obtained by different Emergency Managers, several departments and boards, officers, and employees was not acquired by any one individual employee who then would have comprehended its full import. Rather, the City is considered to have acquired the collective knowledge of its Emergency Managers, departments and boards, officers, and employees and is held responsible for their failure to act accordingly.[132]

The City of Flint (acting through its Emergency Managers, departments and boards, officers, and employees) failed in its duties to Flint Residents and to the named plaintiffs by approving, participating in, and enacting the switch to the Karegnondi Water Authority and the use of the Flint River as an interim drinking water source, thereby both creating and prolonging the water crisis in Flint.  The City of Flint also failed to properly maintain and upgrade the Flint Water Treatment Plant and distribution system sufficient to provide safe drinking water to Flint residents.  The City of Flint failed to comply with its legal obligations under the state and federal Safe Drinking Water act, including employing insufficient untrained staff, failing to maintain an accurate inventory of lead services lines, failing to properly treat Flint River water, utilizing improper monitoring and sampling techniques, and falsifying water quality data.  The City of Flint failed to keep Flint residents adequately informed of water quality issues and refused, even despite warnings by its own employees, to return to the Detroit Water and Sewerage Department as Flint's drinking water source.

---

[132] In re NM Holdings Co., LLC, 622 F.3d 613, 620 (6th Cir. 2010) (citing *Upjohn Co. v. N.H. Ins. Co.,* 438 Mich. 197, 76 N.W.2d 392 (1991)).

Flint is the largest city in, and the seat of, Genesee County and currently has a population of approximately 102,000. From the late 19th century to the mid-20th century, the City was the site for leading manufacturers of carriages and later automobiles. General Motors Corporation was founded in Flint in 1908 and grew into the largest automobile manufacturer in the world. General Motors Corporation housed its Buick and Chevrolet divisions in Flint until the 1970s. General Motors Corporation significantly downsized its workforce in the Flint area from a 1978 high of 80,000 to under 8,000 by 2010. Flint's population declined dramatically from 196,940 in 1960 to 102,434 in 2010.

According to the 2010 census, the racial makeup of the City was 56.6% African American, 37.4% White, Hispanic or Latino of any race 3.9%, Native American, 0.5% Asian, 1.1% from other races, and 3.9% from two or more races.  Non-Hispanic Whites were 35.7% of the population in 2010, compared to 70.1% in 1970.

Flint's various neighborhoods historically have been divided along racial lines with the population density and the quality of housing stock following suit.[133]  Many (if not most) of Flint's neighborhoods were comprised of poorly constructed wood frame structures sealed or coated in lead paint.[134]  According to Realty Trac, a real estate information company and an online marketplace for foreclosed and defaulted properties, by January 2016, 9,800 homes were empty in Flint, constituting 16.5 percent of all residential properties.  By the mid-2000s, Flint became known for its high crime rates and has repeatedly been ranked among the most dangerous cities in the United States.  Danielle Lewinski, Vice President and Director of Michigan Initiatives at the Center for Community

---

[133] Indeed, Flint was one of the first "red-lined" cities in the nation.
[134] Highsmith, A.R., *Demolition Means Progress*, University of Chicago Press (2015).

73

Progress, explained the implications of industrial disinvestment, declining population, and

property abandonment on cities like Flint:

> Distressed cities like Flint struggle to generate enough revenue locally to reinvest back into critical infrastructure, such as water systems.  Decades of disinvestment and job and population loss have led to a phenomenal erosion of the tax base, both in terms of the number of taxpayers and in terms of the value of the land.  As a result, cities with high levels of abandonment, like Flint, are faced with the financial challenge of needing to maintain and reinvest in a scale of infrastructure that once supported by a tax base more than twice its current size.[135]

As part of its responsibility to safeguard the credit of the State, the Department of

the Treasury oversaw the Emergency Managers appointed by the Governor for the City of

Flint. The Emergency Manager law, promulgated by the Legislature through Public Act 72

of 1990,[136] authorized the State to intervene in units of local government that experience

financial emergencies. According to a public communication by the Governor, State

Treasurer Andy Dillon was charged with "leading the administration's effort to ensure

emergency managers that may be necessary in the future are properly trained."[137] In the

same communication, the Governor declared that "Emergency managers are accountable to

both the governor and the Legislature. …"[138] An Emergency Manager stands in the place of

---

[135] Kate Abbey-Lambertz, *These are the American Cities With The Most Abandoned Homes*, Huffington Post (February 13, 2016), available at https://www.huffingtonpost.com/entry/cities-with-most-abandoned-houses-flint_us_56be4e9ae4b0c3c5505171e7 (last visited July 12, 2019).
[136] The financial emergency status, along with the Emergency Financial Manager (EFM) position, was first created in Public Act 101 of 1988 for the specific emergency in Hamtramck. Public Act 101 was amended by Public Act 72 of 1990, allowing an Emergency Financial Manager to be appointed for any local governmental unit. PA 72 in turn was replaced by Public Act 4 of 2011, which renamed the position to Emergency Manager (EM) and gave the Manager additional authority. The state legislature, in the Local Financial Stability and Choice Act of 2012, Mich. Comp. Laws § 141.1541 et seq. created and further defined the position of "emergency manager."
[137] State of Michigan, Emergency Manager Fact Sheet, https://www.michigan.gov/documents/snyder/EMF_Fact_Sheet2_347889_7.pdf (last visited April 2, 2020).
[138] *Id.*

74

the governing body, chief executive officer, or chief administrative officer of the local government and has the authority to remove any of the unit's elected officials should they refuse to provide any information or assistance. The Flint Emergency Managers had complete control over the municipality with the ability to reduce pay, outsource work, reorganize departments, modify employee contracts, and determine municipal business activities, including the sale and delivery of drinking water to Flint residents and operation of the Flint Water Treatment Plant.[139]

Emergency managers have broad authority and powers to "rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare."[140] Because the Emergency Managers were appointed by, and accountable to, the Governor and Legislature and because they were trained by and reported directly to the State Treasurer, the State of Michigan is charged with knowledge of all facts and circumstances known by them and with responsibility for their acts and omissions. In addition, because the sale and delivery of drinking water is deemed a municipal business activity under Michigan decisional law, the City of Flint is responsible for their acts and omissions related to drinking water as well.

The identity of each of Flint's Emergency Managers, his time in office, and the Governor who appointed him is set forth in this below:

Jul 2002 - Jun 2004 Ed Kurtz, John Engler

---

[139] 5 Longley, Kristin, Other emergency managers provide glimpse of what Flint can expect under state takeover, Flint Journal (November 18, 2011), available at http://www.mlive.com/news/flint/index.ssf/2011/11/other_emergency_managers_p rovi.html (last visited July 12, 2019).
[140] Act No. 4, Public Acts of 2011, State of Michigan, Enrolled House Bill No. 4214.

Dec 2011 - Aug 2012 Michael Brown, Rick Snyder

Aug 2012 - July 2013 Ed Kurtz, Rick Snyder

July 2013 - October 2013 Michael Brown, Rick Snyder

October 2013 - January 2015 Darnell Earley, Rick Snyder

January 2015–April 30, 2015 Jerry Ambrose, Rick Snyder

The State of Michigan charged Darnell Earley and Gerald Ambrose with serious crimes arising from their acts and omissions while serving as Emergency Managers for the City of Flint. The plaintiffs admit that Darnell Earley, Gerald Ambrose, and Ed Kurtz intentionally caused them bodily harm (in the form of invasion of their bodily integrity).[141]

According to sworn testimony taken in connection with the Flint Water Cases, MDEQ staff actively opposed full-time operation of the Flint Water Treatment Plant, as both the Plant and the distribution system were not ready for full time operation. MDEQ informed the City of Flint that it could not use the Flint River as a primary water source but the emergency managers, controlled by treasury and the governor's office, "overrode" their decision in a "set up" engineered by the emergency managers, for the benefit of saving money and at the expense of the health and safety of the residents of Flint.[142]

As the owner and operator of the public water supply, the City of Flint is responsible for ensuring proper design, construction, operations, and maintenance of the public water supply.  In 2012 and early 2013, representatives of the City of Flint participated in a series of meetings with representatives from the MDEQ, the Department of Treasury, the Governor's office, the Karegnondi Water Authority, Rowe Engineering and possibly others

---

[141] The plaintiffs' admissions made in their complaints are incorporated by reference. The admissions are too voluminous to incorporate into the body of the Notice.
[142] Deposition of Adam Rosenthal, Pages 41-45, In Re Flint Water Cases (March 5, 2020).

to discuss transitioning from the DWSD water source to the KWA water source and possibly using the Flint River as an interim water source.  Ultimately, the decisions to stop using the DWSD water source, to transition to the KWA water source, and to use the Flint River as an interim water source were made by the City of Flint and its emergency managers.  Although Defendant LAN was retained to consult with the City, Defendant LAN was given a limited scope of work focused on certain specific components of the Flint Water Treatment Plant.  Defendant LAN did not operate the plant, and it was not responsible for water quality or treatment decisions.

Prior to the change over to the use of the Flint River water source, representatives of LAN communicated to the City of Flint at different times and in different ways that the City should implement a plant test run for 60-90 days before going on-line to allow the City to evaluate the need for full softening, phosphate or other chemical additives and overall water quality.  Based on information and belief, the City did not follow the recommendations of LAN because they were not required to do so by the MDEQ and because the Emergency Managers and others were focused on reducing costs.

Moreover, Defendant LAN was repeatedly assured in 2014 and 2015 by representatives of the City of Flint that the sampling and testing which was required by the MDEQ under the Lead and Copper Rule demonstrated that the City's water supply was in compliance with applicable state and federal guidelines.  More recently, the sampling by the City and the testing done by the MDEQ has been called into question in numerous ways. Defendant LAN had no role in the collection of samples or the testing of the samples.

a.   Darnell Earley

Darnell Earley ("Earley") was appointed Emergency Manager for the City of Flint from October 2013 to January 2015. Earley readily admits that he was responsible for ensuring that the City of Flint was in compliance with state and federal laws regarding safe drinking water. Mr. Earley played an integral role in authorizing and coordinating full-time operation of the Flint Water Treatment Plant and the use of the Flint River as its drinking water source. In March 2014, one month prior to the change from Lake Huron to the Flint River, Mr. Earley was aware that the Flint Water Treatment Plant did not have the appropriate resources, upgrades, or regulatory requirements to distribute drinking water safely. In a letter to the Detroit Water and Sewer Department, Mr. Earley acknowledged: "in the very unlikely event that the City of Flint is not able to draw water from the Flint River no later than April 17, 2014, then the City would like the option of continuing to purchase water from the DWSD, for a period of time, up to the time water is available from KWA." Mr. Earley intentionally misled the public by falsely stating that the plant was capable of producing safe drinking water and by authorizing its distribution.

After the change in the source of drinking water from Lake Huron to the Flint River, Mr. Earley consistently refused to acknowledge water quality issues. In October 2014, after learning of a spike in cases of Legionnaires' disease, Mr. Earley obstructed and hindered the local health department's investigation into the disease outbreak. Specifically, Mr. Earley insisted that the City's "message" should be that the outbreak was "an internal issue at McLaren [Hospital] that they are working on with our assistance, not a Flint water problem that we are trying to resolve." After boil-water advisories and TTHM violations were issued by the City and General Motors Corporation's exit from the Flint water distribution system,

Mr. Earley was contacted by the Governor's office regarding public health concerns and a request to return to the DWSD "as an interim solution to both the quality, and now the financial, problems that the current solution is causing." However, Mr. Earley refused, placing financial obligations over public health.

On January 9, 2015, after the University of Michigan-Flint water tests revealed high lead levels in two separate campus locations elevating water quality concerns, Mr. Earley again refused the opportunity to return to DWSD. In a press release, Mr. Early stated:

> Suggestions have been made that the City of Flint should return to using water purchased through the Detroit Water and Sewerage Department. For many reasons financial and otherwise, the City of Flint can ill-afford to switch courses at this point. Thus, we will continue following the guidelines and directives of the Michigan DEQ in the implementation of our water quality plan and operational report until the KWA water source is available. The estimated cost to go back to the water provided by DWSD is approximately $1 million per month and the City expects to be using the [KWA] Lake Huron water within the next eighteen months. It is not financially prudent to spent $18 million to purchase water that meets the same DEQ standards as the water now available from the Flint River.

Mr. Earley refused overtures of the DWSD for a third time on January 12, 2015 when DWSD Director offered Mr. Earley immediate reconnection "to the DWSD system at no additional charge to the City and at the same 'expired contract' rate that the City was paying in April, 2014." Mr. Earley violated his duties by failing to provide necessary governmental services essential to the public health, safety, and welfare through his deliberate indifference to state and federal safe drinking water regulations, water quality, and the public health.

b.  Gerald Ambrose

Gerald Ambrose ("Ambrose") was the Emergency Manager for the City of Flint from

January 2015 to April 2015. Mr. Ambrose previously served as a financial advisor to the

City, responsible for analyzing the cost benefit to the City of participating in the KWA as

compared to continuing to purchase water from the DWSD. Prior to his tenure as

Emergency Manager, Mr. Ambrose played an integral role in assuring the success of the

KWA through Flint's participation, including involvement in the Administrative Consent

Order and use of the Flint River as an interim water source.

In October 2014, Ambrose expressed frustration with the "instant connection"

between the uptick in Legionnaires' disease and Flint Water, criticizing Michael Glasgow's

assistance in testing for bacteria. In January 2015, Mr. Ambrose assisted Mr. Earley in

crafting a response to the DWSD, rejecting the offer to return despite water quality

concerns. In February 2015, city councilman Joshua Freeman requested that Mr. Ambrose

revisit DWSD's invitation to rejoin, however, Mr. Ambrose responded by stressing the

importance of cost over public health, stating "[n]o [matter] how many times you send it to

me, it doesn't change the cost (or my mind)."

In his role as Emergency Manager, Mr. Ambrose knew of increasing public health

concerns and water quality problems. Despite his knowledge, on March 25, 2015, after the

Flint City Council voted to reconnect to DWSD, Mr. Ambrose rejected the decision and

stated: "[i]t is incomprehensible to me that . . . Flint City Council would want to send more

than $12 million a year to the system serving Southeast Michigan, even if Flint rate payers

could afford it. (Lake Huron) water from Detroit is no safer than water from Flint." Despite

his duty to provide services necessary for the public health, Mr. Ambrose consistently

placed financial concerns over the health of the citizens and, despite his power to do so, repeatedly declined officers to reconnect to DWSD. Mr. Ambrose's conduct caused the plaintiffs' alleged injuries and damages.

c.   Ed Kurtz

Ed Kurtz ("Kurtz") served as Flint's Emergency Manager from August 2012 to July 2013. Mr. Kurtz was instrumental in Flint's decision to leave the DWSD and join the KWA and ignored arguments from both an engineering and economics standpoint that Flint should reject the pressures to join the KWA. When the option was being considered, on January 7, 2013, Mr. Kurtz received an Assessment and Cost Analysis from Rowe Professional Services.[143] That engineering study was one of the key first steps in switching to the Flint River as a drinking water source. Mr. Kurtz knew that "[w]ater from the river will require greater effort to treat than water from Lake Huron (more chemicals, power, and residuals)."[144]  At this time, one of the main considerations was a blending of Flint River water with DWSD water, and even then it was acknowledged that "there is a potential for challenges with chemistry and treatment."[145] With this knowledge, Mr. Kurtz signed off on the March 28, 2013 Resolution to Purchase Capacity from the KWA that described it as being "in the long term best interests of the City of Flint to enter into a contract with the KWA."

At its initial meeting with City representatives, Defendant LAN was informed that the City planned to save approximately $10,000,000 by using Flint River as a water source

---

[143] January 7, 2013 Rowe Professional Services Company Letter to Ed Kurtz ("Review of TYJT December 21, 2012 Presentation – City of Flint Water Supply Assessment").
[144] Id.
[145] Id.

during the interim period between the shut off of the DWSD water source and the availability of the KWA water source.  Upon information and belief, Mr. Kurtz was a lead participant in formulating this plan.   At subsequent meetings with LAN personnel, Mr. Kurtz stated very clearly in response to suggestions by LAN that the City was not going to do anything which was not required by the MDEQ.  Upon information and belief, Mr. Kurtz was acting pursuant to understandings reached during meetings in late 2012 and early 2013 with representatives from the City, the MDEQ, the Governor's office, the Department of Treasury and others.  LAN was not invited to and did not attend these meetings in late 2012 and early 2013.

Mr. Kurtz' conduct caused or contributed to the plaintiffs' alleged injuries and damages.

d.   Michael Brown

Michael Brown ("Brown") served as the Emergency Manager for the City of Flint from December 1, 2011 to August 5, 2012 and again from July 2013 to October 2013. Moreover, he remained as an advisor to Mr. Kurtz during the intervening period.  At a February 10, 2011 meeting, Mr. Brown participated in discussions regarding the options for Flint's future water supply sources. At that time, the discussion included "continued service from Detroit, establishing a new surface water source from Lake Huron – Karegnondi project (as a joint venture with other communities), or utilization of Flint's existing resources."

In September 2013, Mr. Brown "approved an order for a contract among Flint, Genesee County and the KWA." This contract was a precipitating event of the Flint water

crisis. Mr. Brown, in his role as Emergency Manager, was a key factor in these early decisions that ultimately led to Flint leaving the DWSD and joining the KWA.

e.   Dayne Walling

Dayne Walling ("Walling") is the former Mayor of the City of Flint and Chairman of the KWA Board. He was in office from August 6, 2009 through November 3, 2015. In part for his own personal political gain, Mayor Walling was a strong proponent of the KWA, actively participating in the success of the project and the development and use of the Flint River as an interim drinking water source. Despite emergency management, Walling was a critical public advisor during the time period of the change in the source of drinking water from Lake Huron to the Flint River and was an important advocate in communications with residents, the city council, and local agencies on matters related to the Flint River and implications on the city's finances and public health.

Prior to the change in the source of drinking water from Lake Huron to the Flint River in April 2014, Mayor Walling was aware of the required upgrades to the Flint Water Treatment Plant to service the residents of Flint, the lack of financial resources to do the work properly, and the potential dangers of using the Flint River as an interim drinking water source. After the change in the source of drinking water from Lake Huron to the Flint River, Mayor Walling repeatedly sought to reassure the public that the water was safe, even though he knew of reports of Legionnaires' disease and lead contamination. Indeed, Mayor Walling publicly declared that the Flint River water was "regular, good, pure drinking water, and it's right in our backyard." In response to complaints about the water two months after the change in the source of drinking water from Lake Huron to the Flint River,

Mayor Walling remarked that he thought "people [were] wasting their precious money buying bottled water."

In April 2015, after the City's financial emergency was declared over, Mayor Walling regained control of his elected office. That same month, he assured the public that his family "drink and use the Flint water every day, at home, work and schools" and stated that the water was comparable to Lake Huron water. Mayor Walling communicated with EPA Region 5 Director Susan Hedman regarding Miguel Del Toral's interim report, advising her that Mr. Del Toral was speaking publicly about a potential crisis. With knowledge of the interim report and a potential widespread lead contamination, Mayor Walling boastfully drank Flint water in a television broadcast in July 2015, for the specific purpose of giving Flint residents a sense of safety.

      f.   Daugherty Johnson

Daugherty Johnson ("Johnson") served as the Utilities Administrator for the City of Flint and had held that position since 2012. Johnson worked for the City of Flint for over 30 years and answered to Howard Croft during 2012 – 2015 time period. As Utilities Administrator, he had a duty to oversee the operations of the Flint Water Treatment Plant, including its compliance with state and federal standards.

Mr. Johnson actively participated in the decision to join the KWA and use the Flint River as an interim water source. Mr. Johnson was present and participated in discussions on May 1, 2012, when Flint's future drinking water options were being decided. Mr. Johnson knew from these discussions (as memorialized by MDEQ's Mike Prysby) that changing the source of drinking water from Lake Huron to the Flint River would necessarily mean its lead and copper monitoring program would change. From 2013-2014, Mr. Johnson worked with

Flint Water Treatment Plant staff and the MDEQ to determine the necessary upgrades, drinking water treatment requirements, and additional staffing needed to bring the plant into full time operation. Throughout the process of transitioning the change in the source of drinking water from Lake Huron to the Flint River, Mr. Johnson actively took steps to discourage a return to Lake Huron water while pressuring employees to get the Flint Water Treatment Plant operational at any cost, stating that they would be "heroes" if they changed the source of drinking water from Lake Huron to the Flint River and saved the City money.

Mr. Johnson knew in March 2014 that the Flint Water Treatment Plant was not ready to distribute drinking water, because it had not completed the necessary upgrades and was not adequately staffed with qualified, competent personnel. In April 2014, in callous defiance of the warnings from the Flint Water Treatment Plant employees, Mr. Johnson gave his "administrative stamp of approval" permitting and pressuring the Flint Water Treatment Plant employees to release contaminated water to the public. Mr. Johnson falsely praised the system after the change in the source of drinking water from Lake Huron to the Flint River, calling it a "great system" and a "great asset" for the City. Mr. Johnson dug in and refused to acknowledge that Flint had a serious health problem. Mr. Johnson worked with Emergency Manager Ambrose to draft a "thanks...but no thanks" response to DWSD's January 21, 2015 offer to reconnect to Lake Huron drinking water.

Mr. Johnson undertook other efforts to minimize and conceal the public health risks, including GCHD's investigation into the Legionnaires' disease outbreak. After the city refused to respond to the health department's FOIA request for water test results, on February 5, 2015, Mr. Johnson responded the he would "fulfill [the] request as soon as possible" but took

no action to provide the results or to cooperate with the investigation. The plaintiffs admit that Mr. Johnson intentionally caused them bodily harm (in the nature of interference with their bodily integrity).[146]

g.  Howard Croft

Howard Croft ("Croft") was the Director of the Flint Department of Public Works during the relevant period, including from 2012 through November 2015. As Director of the DPW, Mr. Croft was responsible for overseeing the Utilities Department for the City of Flint, including the provision of safe drinking water to residents. Mr. Croft was involved in the decision to use the Flint River as an interim drinking water source and a strong advocate of the KWA. By February 2012, Mr. Croft had met with KWA representatives to discuss Flint's involvement in it and the use of the Flint River as an interim source for drinking water, reporting to then Emergency Manager Michael Brown his belief that under a "best case scenario" Flint River could be used as a temporary solution with the approval of the MDEQ.

Several city and county individuals, including Robert Bincsik, Water Distribution Supervisor, and Michael Glasgow, Flint's Laboratory and Water Quality Supervisor, repeatedly warned Mr. Croft about the Flint Water Treatment Plant's lack of staffing and resources and its inability to produce safe water. Despite these explicit warnings, Mr. Croft participated with Mr. Johnson to pressure the Flint Water Treatment Plant employees to distribute drinking water to City residents.

---

[146] The plaintiffs' admissions made in their complaints are incorporated by reference. The admissions are too voluminous to incorporate into the body of the Notice.

In October 2014, after the change in the source of drinking water from Lake Huron to the Flint River, Mr. Bincsik brought Mr. Croft a pipe from the City's distribution system that was bare inside, having lost all of its inner diameter protection from the corrosivity of the water.[147]  Despite knowledge of the water's corrosivity and the destruction of protective scale on pipes' inner surfaces, Mr. Croft failed to act and continued to falsely assure the public that the water was "high quality" and in compliance with all state and federal standards.

In January 2015, Michigan State Professor Joan Rose advised Mr. Croft and others in the City of Flint that "I definitely think more testing for hardness, iron, TDS, E.coli maybe lead from people who are having aesthetic issues is needed."[148]  In February 2015, Mr. Croft was informed by both Mr. Glasgow and Mr. Bincsik of high lead levels in Flint's distribution system and the potential for more widespread lead issues but failed to act to investigate further and informed his staff to "move quickly" to isolate the issue to a single home, if possible.[149]

By March 2015, Mr. Croft knew that Legionnaires' disease had increased in the City of Flint and that the City's employees were not cooperating with County health officials. Mr. Croft participated in Flint's Technical Advisory Committee and worked directly with residents regarding water quality concerns. Mr. Croft knew that residents and professionals were concerned about health issues regarding TTHMs in the water supply and that the public believed that he was "in charge not just of the water but of the public trust."

Mr. Croft consistently responded to resident concerns dismissively, on one occasion by rolling his eyes and stating, "[N]ow we are going to hear more complaints from residents about their rashes." During this time period, Mr. Croft falsely assured the public of the safety

---

[147] Deposition of Howard Croft, Pages 770-71, *In Re Flint Water Cases* (September 11, 2020).
[148] Deposition of Howard Croft, Page 794, *In Re Flint Water Cases* (September 11, 2020).
[149] February 24, 2015 e-mail from Howard Croft to Robert Bincsik ("LeeAnne Walters – 212 Browning"

of the drinking water distributed from the Flint Water Treatment Plant. The plaintiffs admit that Mr. Croft intentionally caused them bodily harm (in the nature of interference with their bodily integrity).[150]

### h.   Michael Glasgow

Michael Glasgow ("Glasgow") was the Laboratory and Water Quality Specialist at the Flint Water Treatment Plant during the 2012–2016 time period. Mr. Glasgow had an F1 Operator's License, making him the highest technically qualified individual at the plant. Mr. Glasgow was responsible for overseeing the operations of the plant, including water quality monitoring, reporting, and collection of compliance samples under the state and federal safe drinking water regulations.  During 2013-2014, Mr. Glasgow met with MDEQ officials regarding necessary improvements and regulatory requirements to the Flint Water Treatment Plant before distributing water. Prior to the change in the drinking water source, Mr. Glasgow knew that the Flint Water Treatment Plant did not have the necessary, qualified, and competent staff, the time, or the procedures to produce safe drinking water.  On April 18, 2014, Mr. Glasgow contacted the MDEQ to voice his concerns.

> I have people above me making plans to distribute water ASAP. I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda.

---

[150] The plaintiffs' admissions made in their complaints are incorporated by reference. The admissions are too voluminous to incorporate into the body of the Notice.

Nonetheless, Glasgow permitted drinking water to be distributed to Flint residents in violation of his duties.

After the change in the source of drinking water from Lake Huron to the Flint River, Mr. Glasgow actively distorted the City's water test results. Mr. Glasgow was involved in lead testing at the Walters home in February 2015 and, as a result, knew that very high lead levels were found. Mr. Glasgow knew that Flint's sampling procedures were not capturing the highest lead levels from the higher risk "Tier 1" locations, admitting that "we threw out bottles everywhere just to collect as many as we can, just to hit our number, and we just turn in every result we get in" despite the fact that Glasgow had no knowledge of whether the testing locations were actually Tier 1 locations in the first place.  Further, Mr. Glasgow agreed to MDEQ's instructions to alter the June 2015 water quality reports and remove the highest lead levels. The plaintiffs admit that Mr. Glasgow intentionally caused them bodily harm (in the nature of interference with their bodily integrity).[151]

i.   Natasha Henderson

Natasha Henderson ("Henderson") was appointed City Administrator for the City of Flint in December 2014 by Emergency Manager Darnell Earley. Ms. Henderson began serving in her position in February 2015 and was actively involved in the Flint water quality concerns, including early knowledge of research regarding elevated blood lead levels. During 2015, Ms. Henderson, along with other city officials, downplayed the seriousness of growing public

---

[151] The plaintiffs' admissions made in their complaints are incorporated by reference. The admissions are too voluminous to incorporate into the body of the Notice.

health concerns, expressing her hesitancy over declaring a state of emergency in the city given the potential impact on the State and the Governor.

j.   Members of the Flint Receivership Transition Advisory Board: Michael A. Townsend, David McGhee, Michael A. Finney, and Beverly Walker-Griffea

Michael A. Townsend, David McGhee, Michael A. Finney, and Beverly Walker-Griffea were all members of the Flint Receivership Transition Advisory Board ("FRTAB"). The FRTAB took over control of Flint's government from Emergency Manager Gerald Ambrose at the end of April, 2015. Upon taking over Flint's government, the FRTAB had all the powers that the Emergency Managers possessed—the FRTAB had to approve contracts and all resolutions, ordinances, and budget amendments adopted by the City Council before they could take effect. The FRTAB owed a duty to the public to safeguard the public's health, welfare, and safety. By the time the FRTAB took over Flint's government, the lead problem was already well-established. Despite this, the FRTAB did not immediately take action to remedy the lead problem. Instead, the FRTAB dithered. Indeed, it was not until more than six months after the FRTAB took over Flint's government—in mid-October, 2015—that Flint reconnected to DWSD water. If the FRTAB had acted sooner to return Flint to DWSD water, the effects of this crisis may have been mitigated.

**6.   United States Environmental Protection Agency (EPA), and all current and former employees of the EPA, including, but not limited to, Susan Hedman, Former EPA Region 5 Administrator, Tinka Hyde, Director of Water Division, Thomas Poy, Chief of Ground Water/Drinking Water Branch, Jennifer Crooks, Program Manager for Ground Water/Drinking Water, Andrea Porter, Miguel Del Toral, Rita Bair, Michael Schock, and Darren Lytle.**

90

The Environmental Protection Agency ("EPA") is an independent agency of the federal government charged with the establishment and enforcement of environmental protection standards and providing support and technical assistance to the states for the protection of human health and the environment.[152] The EPA is charged by Congress with implementing and enforcing drinking water standards under the Safe Drinking Water Act ("SDWA"), including standards applicable to lead. The SDWA was established to protect the quality of drinking water in the United States, including in Flint, Michigan.

Under the SDWA, the EPA granted the State of Michigan the authority to implement and enforce SDWA regulations in an arrangement referred to as "primacy." Where states are granted primacy, the EPA retains the duty to ensure that public drinking water systems comply with health-based federal standards for contaminants.[153] The EPA has the duty to monitor and oversee state primacy for compliance with the SDWA.[154]

EPA's headquarters in Washington D.C. maintains overall planning, coordination and control of EPA programs.[155] EPA Regional Offices have a duty to execute EPA's programs within the boundaries of their regions.[156] EPA Region 5 Office of Drinking Water program staff and managers have a duty to oversee SDWA implementation in regional primacy states, including Michigan, through enforcement actions and by providing guidance and technical information to state agencies and local utilities within its region.[157] EPA has a duty to notify state officials and a public water system if it determines that a

---

[152] 40 C.F.R. § 1.1; Reorganization Plan No. 3 of 1970.
[153] 42 U.S.C. § 300g-3(a); 300j-4.
[154] *Id.*
[155] 40 C.F.R. § 1.5.
[156] *Id.*
[157] 40 C.F.R. § 1.49(d).

water system is out of compliance with the SDWA, including the Lead and Copper Rule

("LCR"). In such situations, the EPA has a duty to provide technical assistance to the state

and public water system to bring the system into compliance "by the earliest feasible time."

[158]  If compliance is not achieved and the State has not commenced an enforcement action

after thirty days, the EPA has a duty to issue a compliance order or commence a civil action.

[159]  Additionally, treatment technique violations, including a failure to utilize appropriate

corrosion control treatment, require public notification. [160]

The EPA is empowered and required to intervene when states do not fulfill their

responsibilities to protect the public's health. The SDWA authorizes the EPA to request

information, take independent enforcement actions, and revoke state primacy when states

do not implement the SDWA with the stringency required by federal law. Additionally, the

EPA may override state decisions regarding issues such as corrosion control treatment.[161]

If states fail to take enforcement action within applicable frames, EPA may issue

administrative orders or commence civil actions.[162]  EPA can also issue emergency orders

when state of local authorities fail to respond adequately to imminent and substantial

public health threats.[163]

EPA's authority under the SDWA allow it to exercise preemptory jurisdiction. Under

the LCR, an EPA regional administrator can override a state determination about corrosion

control treatment if the state determination is not defensible under federal law.[164]  The

---

[158] 42 U.S.C. §300g-3 (a)(1)(A).
[159] 42 U.S.C. §300g-3 (a)(1)(B).
[160] 42 U.S.C. §300g-3(c).
[161] 40 C.F.R. §42.18-19.
[162] 42 U.S.C. §300g-3, commonly referred to by its section number within the SDWA, section 1414.
[163] 42 U.S.C. §300i(a), commonly referred to by its section number within the SDWA, section 1431.
[164] 40 C.F.R. §141.82(h)(i).

Regional Administrator can then issue a federal treatment determination in its place. EPA's enforcement authority can also be understood to retain general preemptory jurisdiction since EPA is able to bring an enforcement action against a public water supply if the state fails to do so. EPA must first notify the state of a public water supply's noncompliance and give the state 30 days to address it; EPA can then issue an administrative order or commence a civil action if the state doesn't take appropriate action within that timeframe.[165] If it determines an emergency exists and that state and local authorities have not taken appropriate action, EPA has broad authority to issue emergency orders necessary to protect the public, including ordering those who caused the endangerment to provide an alternative water supply.[166]  There are two sections of the SDWA that give the EPA authorization to act. They are Sections 1414 (42 USC §300g-3) and 1431 (42 USC § 300i(a)).

**Section 1414**. When the EPA finds a public water system out of compliance, the EPA must notify the state and public water system of the violation. If after 30 days the state has not commenced enforcement action, then the EPA *must* issue an order to comply. In the case of Flint, EPA did not use this authority as required by the SDWA.

**Section 1431**. The SDWA provides the EPA with emergency authority to address imminent and substantial endangerment to human health from drinking water contamination. Specifically, Sec. 1431 grants emergency powers to the EPA when the regional administrator is aware of a contaminant or threat "*which may present an imminent and substantial endangerment to the health of persons, and that appropriate state and local authorities have not acted to protect the health of such persons, the EPA Administrator may*

---

[165] 42 U.S.C. §300g-3(a).
[166] 42 U.S.C. §3001(a).

*take such actions as he or she may deem necessary in order to protect the health of such persons.*" The EPA can use this discretionary authority whenever: (1) contamination is in or likely to enter a drinking water source which may present an imminent and substantial endangerment to the health of persons; and (2) the appropriate state and local authorities have not acted to protect human health.

The EPA's authorized actions include issuing administrative orders requiring specific actions that are necessary to protect human health or commencing a civil judicial action. In 1994, the EPA Administrator delegated the authority to issue administrative emergency orders under Section 1431 to EPA regional administrators and, in multi-regional cases or cases of national significance, to the Assistant Administrator for OECA. The authority to make a Section 1431 judicial referral, however, remains with headquarters. The EPA's *Final Guidance on Emergency Authority under Section 1431 of the Safe Drinking Water Act (1991)* is designed to encourage more widespread use of the EPA's Section 1431 authority by more fully explaining situations where this authority may be applied. The EPA's 1991 guidance describes how and when the EPA can use its emergency authority even if a state or local agency acts: "*The Regions should not view this standard - whether a State or local authority has acted to protect the health of persons - as an issue of whether these authorities have "failed" to protect public health. Instead, these authorities intentionally may defer action to EPA because the Section 1431 authority may be more powerful or expeditious.... Further, State or local authorities may decide to take action jointly with EPA. In such cases, EPA would determine that State and local authorities have not acted (on their own) to protect the health of persons. Therefore, EPA may proceed with Section 1431 actions when State and local authorities are working jointly with EPA.*"

The guidance clarifies that the EPA may use its emergency authority even when a state is acting or is going to act. Regarding whether the state action is in fact protecting the public from the contaminants in a timely fashion, the guidance provides: *If EPA has information that State/local agencies are going to act, EPA must decide whether the action is timely and protective of public health. If EPA determines that the action is insufficient and State and local agencies do not plan to take stronger or additional actions to ensure public health protection, in a timely way, EPA should proceed with an action under Section 1431*. The EPA invoked this authority when it issued its emergency administrative order relating to Flint on January 21, 2016.

The EPA possesses emergency powers if a contaminant in drinking water poses an imminent threat or danger to the public health. [167]   Though the EPA ultimately found exactly such circumstances to exist in Flint, it did not take action to address them until late January 2016, when it issued an emergency administrative order. Although the EPA was aware of the City's noncompliance with relevant standards at least as early as April 2015, it did nothing until January 21, 2016.

Appearing before Congress, EPA Administrator Gina McCarthy acknowledged that her agency should have been more assertive in testing the water and requiring changes, stating that she "wished we had yelled from the tree tops." Instead, the EPA remained silent. Without EPA intervention, "the conditions in Flint persisted, and the state continued to delay taking action to require corrosion control or provide alternative drinking water supplies."

---

[167] 42 U.S.C. § 300j-1.

**EPA's Office of Inspector General**

The EPA's Office of Inspector General is a part of the EPA, although Congress separately funds it from the Agency so as to ensure its independence. The EPA's Office of Inspector General was created pursuant to the Inspector General Act of 1978, as amended. In its capacity as an independent office within the EPA, the Office of Inspector General helps the Agency protect the environment, in part, through its audits and investigations of the EPA to promote economy and efficiency and to prevent and detect fraud, waste and abuse.[168]

Pursuant to its statutory and regulatory authority, the Office of the Inspector General conducted a comprehensive "performance" audit of the Flint Water Crisis from February 2016 through April 2018 in accordance with generally accepted government auditing standards. Those standards require that it plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for its findings and conclusions based on its audit objectives. In its performance audit, the Office of Inspector General concluded that the evidence obtained provided it with a reasonable basis for its findings and conclusions based on its audit objectives.

Prior to reaching its conclusions, the Office of the Inspector General reviewed the laws, regulations, policies, procedures and guidance related to the SDWA program. At EPA headquarters, it interviewed the former EPA Administrator (Gina McCarthy); the former EPA Deputy Administrator (Susan Hedman); and staff and officials from the EPA's Office of General Counsel, the Office of Water, and the Office of Enforcement and Compliance

---

[168] EPA OIG, *Management Weaknesses Delayed Response to Flint Water Crisis*, Report No. 18-P-0221 (July 19, 2018) ("OIG Report").

Assurance.  It also interviewed EPA Region 5 staff and officials, including the former

Regional Administrator (who served until January 2016), and the former acting Regional

Administrator (who served from January 2016 through January 2018).  Further, it

interviewed MDEQ's Office of Drinking Water and Municipal Assistance personnel, former

and current employees of the City of Flint, residents of Flint, and external experts.  It also

reviewed documents from the EPA and the MDEQ.[169]

The Office of the Inspector General issued its official report No. 18-P-0221 entitled

"Management Weaknesses Delayed Response to Flint Water Crisis on July 19, 2018 ("OIG

Report").[170]  In the OIG Report the Office of the Inspector General established the EPA's

duties, failures to meet those duties, and causal relationship to the injuries and damages

that Plaintiffs allege they have sustained.[171]

Although the EPA chose to assign "primary" enforcement responsibility under the

SDWA to the State of Michigan, the EPA remained at all times the governmental agency

with ultimate authority for compliance with the SDWA. The EPA duties were non-delegable

as a matter of law.[172]  EPA Region 5 drinking water program staff and managers primarily

oversee SDWA implementation in regional primacy states, including Michigan. Two

headquarters offices help EPA regions implement the SDWA: the Office of Water ("OW")

provides programmatic and implementation guidance and the Office of Enforcement and

Compliance Assurance ("OECA") advises EPA regions about enforcing SDWA provisions.[173]

---

[169] OIG Report at pp. 11-12.
[170] The OIG report is admissible evidence under federal and state law.
[171] The OIG findings, including the enumeration of duties and responsibilities under the LCR, are definitive and put to rest any purported "disagreement" between the State of Michigan (MDEQ) and the EPA over the proper "interpretation" of the regulations.
[172] See OIG Report at 2.
[173] See OIG Report at 11.

The Office of Drinking Water ("ODW"), a program within the Office of Water and under the supervision of the Director, has a duty to develop regulations and guidelines to protect drinking water quality, evaluate compliance with regulations and provide program policy direction for technical assistance and training activities in the water supply area. [174]

In the OIG Report, the Office of the Inspector General definitively relates the obligations imparted by the Lead and Copper Rule ("LCR").[175]

> ...[T]he LCR established the treatment technique requirements to minimize exposure. These requirements compel drinking water systems to conduct tap sampling for lead and copper to determine the treatment techniques and other steps systems must take to reduce exposure. To adhere to the LCR, utilities must conduct monitoring for lead and copper in water systems, and demonstrate that they comply with monitoring and treatment technique requirements.
> ***
> Some LCR requirements vary based on the water system size and type. ... Flint is a large community system ... serving more than 50,000.
>
> In 1986, Congress amended the SDWA to prohibit the use of pipes, solder or flux that are not 'lead free' in public water systems, or in plumbing where facilities provide water for human consumption. In 1996, Congress further amended the SDWA by prohibiting the sale of any pipe or plumbing fixture that was not lead free, except for a pipe used in manufacturing or industrial processing. In 2000, the EPA published revisions to the LCR to address implementation issues arising from legal challenges to the 1991 rule. The revisions also streamlined and reduced the monitoring and reporting burden. In 2007, the EPA revised the LCR to enhance implementation in the areas of monitoring, treatment, customer awareness and lead service line replacement.
> ***
> The LCR requires community water systems to optimize corrosion control. Utilities have optimized corrosion control when the treatment method that they use has minimized the potential for corrosion in the distribution system, thus minimizing lead contamination.

---

[174] 40 C.F.R. § 1.49(d).
[175] In 1991, the EPA issued the LCR, 40 CFR § 141.8, et. seq., to minimize lead and copper in drinking water.

\*\*\*

The LCR required large water systems to install optimal corrosion control treatment by January 1, 1997, unless they qualified for certain exemptions.[176]

\*\*\*

According to the LCR, if a water system has optimized its corrosion control treatment and plans to change water sources or drinking water treatment methods, the state must review and approve plans before the change can be implemented.

The LCR requires states to review and approve the optimized corrosion control treatment for all systems. The LCR also requires states to designate optimal water quality parameters intended to represent the conditions under which systems must operate their corrosion control treatment. The rule requires that water systems measure against those parameters, which are typically set as ranges or minimums. Without set water quality parameters, a state does not have a reliable method for gauging the adequacy of corrosion control treatment or determining compliance.

\*\*\*

After a system has optimized corrosion control, the LCR requires water systems to monitor for changes in lead concentration on a regular basis. These tests verify that when drinking water reaches the consumer, lead concentrations do not exceed the federal action level of 15 ppb in more than 10 percent of homes.

To conduct the monitoring, the LCR requires utilities to identify the highest- priority sampling sites, such as single-family homes served by lead service lines. The highest-priority sampling sites are identified as "tier 1" locations and, for Flint, constitute the entire sampling pool for regular testing.

The LCR instructs water systems to regularly report tap water sample results from tier 1 sites. Water systems monitor tap water on a semiannual, annual or triennial basis to verify lead contamination does not exceed the federal action level. When a large water system exceeds that level in more than 10 percent of home tap water samples, the water system must provide public education on lead, remove a percentage of lead service lines, and conduct source water monitoring. The LCR requires systemwide public education when tap-monitoring results show that a system exceeds the federal action level for lead.

---

[176] None of the exemptions applied to Flint.

There are also supplemental lead-monitoring requirements for all water systems to provide consumer notices to those whose taps were tested. The purpose of public education is to inform consumers about lead results, the health effects of lead, and steps the public can take to reduce exposure.

Water systems must submit all written public education materials to the state prior to releasing the information to the public.

In the event of a lead action level exceedance, the LCR requires water systems to identify the number of lead service lines present in the distribution system, and requires water systems to meet the minimum 7 percent replacement rate through either physically replacing lead service lines or individually testing them to demonstrate their lead concentrations are below 15 ppb. ... In addition, if a system is in violation of 40 CFR § 141.81 for failure to install corrosion control treatment, the state can require the system to commence lead service line replacement until the system is below the lead action level for two consecutive monitoring periods.[177]

OIG Findings: The Office of the Inspector General determined the facts and circumstances causing the contamination of Flint's drinking water. With regard to the MDEQ and the City of Flint, the OIG found:

- Under the MDEQ's oversight, the Flint Water Treatment Plant did not adhere to two LCR requirements: (1) identify and maintain a pool of tier 1 sampling sites, and (2) install and maintain corrosion control treatment throughout the system. State and local decisions to not adhere to these LCR requirements led to the corrosion of the Flint distribution system, which exposed residents to lead in their drinking water.

- The City of Flint did not develop or maintain accurate records of lead service line locations to identify tier 1 sampling sites. Primacy states like Michigan must require water systems to collect and maintain lead service line information, in accordance with the LCR. Without this information, Flint could not prioritize its sampling efforts to collect water samples

---

[177] Lead Contamination and SDWA, OIG Report at pp. 3-7, n. 4-5.

where higher levels of lead contamination were most likely to occur, as required by the LCR.

- Corrosion control treatment was not maintained.

- The MDEQ did not require Flint's water system to maintain corrosion control treatment when Flint changed water sources in April 2014. According to EPA Region 5, the MDEQ concluded that Flint's change in source water would require Flint to revert to the LCR provision that required the water system to conduct tests to determine whether corrosion control treatment was necessary. To do this, MDEQ personnel instructed Flint system staff to conduct monitoring during two consecutive 6-month periods to determine whether corrosion control treatment was necessary.

- EPA Region 5 disagreed with the MDEQ's interpretation. The LCR treats systems (such as Flint's) that change their source water or treatment as an existing system. As a result, Region 5 concluded that Flint's system was an existing system with a new source. Therefore, under the LCR, the City needed to maintain continuous corrosion control treatment.

- In January 2015, results from Flint's first round of testing found a 90th percentile lead concentration of 6 ppb. However, the MDEQ did not instruct Flint to install corrosion control treatment (per the LCR) but instead required an additional 6-month round of sampling. In July 2015, results from the second round of 6-month tests showed 90th percentile lead concentrations had increased to 11 ppb.

- In October 2015, instead of installing corrosion control treatment, Flint's water system returned to purchasing drinking water from the Great Lakes Water Authority (formerly called the Detroit Water and Sewerage Department), which already included corrosion control treatment. At the time of this change, almost a year-and-a-half of exposure to improperly treated water had damaged the city's drinking water infrastructure, and lead concentrations continued to rise. In December 2015, the MDEQ reported that Flint began

supplementing Detroit water with additional corrosion control treatment. However, due to the damage done to the Flint distribution system, the lead levels in drinking water did not fall below the federal action level until late 2016.

- The MDEQ did not enforce LCR provisions that require Flint's water system to keep an accurate and complete inventory of tier 1 sample site locations, or maintain corrosion control treatment. As a primacy agency, the MDEQ bore responsibility for advising Flint's water system staff about the drinking water source change and meeting SDWA standards. However, MDEQ personnel misinterpreted the law, which led them to provide incorrect advice to Flint on corrosion control treatment requirements. This resulted in infrastructure damage and the prolonged exposure of Flint residents to lead in their drinking water.[178]

With regard to the EPA, the OIG found:

- Despite its authority and responsibility to oversee states with primacy over their drinking water programs, the EPA Region 5 staff and managers did not establish clear roles and responsibilities needed to foster a constructive federal-state relationship with the MDEQ's drinking water program staff. ... [T]he EPA's National Program Manager Guidance directs EPA regions to "ensure that primacy agencies fulfill the enforcement conditions of their primacy agreements" under the SDWA.

- As early as 2010, the EPA reviewed the MDEQ's drinking water program and identified MDEQ implementation deficiencies. The EPA knew that the MDEQ disinvested from 10 SDWA requirements, which Michigan designated as "temporary and non-health related."

- The EPA knew that the MDEQ continued these disinvestments through 2015, and the OIG concluded that the disinvestments

---

[178]Circumstances Leading to Flint Drinking Water Contamination and EPA Emergency Administrative Order, OIG Report, Chapter 2 at 13 -15.

did in fact have potential public health effects. However, EPA
Region 5 did not intervene to ensure that the MDEQ's drinking
water program met minimum federal standards. It was not
until 2016, while under the emergency order, that the MDEQ
discontinued the majority of the disinvestments.

- MDEQ personnel falsely informed Region 5 regarding corrosion
  control treatment in Flint. In February 2015, when EPA Region 5
  staff asked about corrosion control, MDEQ personnel told them
  that Flint had an optimized corrosion control program in place,
  that the city conducted quarterly water quality parameter
  monitoring and did not have any unusual results, and that Flint
  continued to meet all applicable plant tap standards and
  treatment technique requirements. However, no later than April
  2015, the EPA knew that Flint was not using corrosion control
  treatment.

- In April 2015, EPA Region 5 managers instructed the MDEQ
  that the LCR required Flint to maintain consistent corrosion
  control treatment but nonetheless did not advise them to
  initiate corrosion control at that point.

- In 2016, EPA Region 5 knew that MDEQ personnel did not
  establish water quality parameters required by the LCR.

- Despite known economic challenges in the city, EPA Region 5
  staff did not identify Flint's source water switch as an event
  that could impact the city's ability to comply with the SDWA.
  As early as May 2014, problems emerged that informed the
  EPA about the risk.

- Between May 2014 and the issuance of the EPA Emergency
  Administrative Order in January 2016, EPA Region 5 staff
  received 87 citizen complaints about drinking water conditions
  in Flint. The complaints described distress about water quality
  (color and odor), more specific concerns about total
  trihalomethanes, total coliform and *E. coli*, *Legionella* and,
  ultimately, lead. Of the complaints received before the order,
  30 (34.5 percent) included concerns about lead. EPA Region 5

ignored the volume of complaints and responded with form letters that recommended citizens resolve their concerns by contacting the MDEQ or Flint's water system staff. In six cases, Region 5's response came more than a year after the citizen made the complaint. In 11 cases, EPA Region 5 did not respond at all.

- Staff and managers in Region 5 did not have a system for cataloguing and responding to citizen complaints, nor did they use citizen complaints or the volume of calls as indicators of problems with Flint's water system. As a result, Region 5 did not assess the severity of the situation, and did not alert management to an emerging incident.

- [T]he volume of complaints should have alerted Region 5 to a developing drinking water risk in Flint. A more proactive approach would have enabled the Region to respond more swiftly to the contamination incident.

- [T]he EPA ... regional staff knew of the source switch soon after it happened. When the region was informed—a year after the switch—that Flint did not have corrosion control treatment, the Region should have intervened earlier to verify the changes occurred in accordance with SDWA regulations.

- Sampling results from two 6-month tests indicated the 90th percentile of the results exceeded the 5 ppb limit at which optimized corrosion control treatment is required, and lead concentrations increased over the course of testing. According to Region 5 officials, these results did not alert the Region to widespread problems in Flint's water system. However, if the results of these tests were combined with other issues identified in Flint, this could have signaled problems in Flint's water system and the Region could have intervened more forcefully. For example, Region 5 could have done the following: Taken enforcement action under SDWA § 1414, which would have required Flint to install corrosion control treatment after notifying the state; Issued an order under SDWA § 1431 when the Region had evidence there was "imminent and substantial

endangerment" to human health, and when the region knew the state did not act; Alerted Flint residents about the potential harm to public health (although not required under the SDWA).

- The Flint water crisis demonstrates that public health is not protected when EPA regional staff—with multiple warning signs—do not use the agency's SDWA authorities in conjunction with EPA oversight tools.

- Conclusion. During the Flint water crisis, Region 5 leadership did not employ many of its SDWA authorities, as the state continued to debate LCR requirements and residents continued to drink potentially contaminated water. Flint drinking water contamination continued, in part, because the public health protection authorities of the SDWA were not used effectively.[179]

a.    Miguel Del Tora

Miguel Del Toral ("Del Toral") has been employed by the EPA since 1987. For the past 29 years, he has worked exclusively for Region 5's Groundwater and Drinking Water Program. Mr. Del Toral was employed in the Ground and Drinking Water Program in 1991 when the Lead and Copper Rule ("LCR") was promulgated; he worked directly on the 2007 revisions to the Rule. Mr. Del Toral was responsible for providing education, training, technical assistance, and guidance to EPA officials and to the State of Michigan (among Region 5 states) regarding LCR compliance for public water systems. Mr. Del Toral was the most knowledgeable individual within Region 5 on issues relating to lead in drinking water.

On or before February 26, 2015, Mr. Del Toral, Jennifer Crooks, and Thomas Poy (and therefore the EPA) knew that extraordinary levels of iron were found in black sediment in drinking water in the home of a Flint resident with two minor children. Mr. Del

---

[179] OIG Report, Chapter 3 at 17 -27.

Toral, Jennifer Crooks, and Thomas Poy (and therefore the EPA) knew that high levels of iron may mean high levels of lead and the black sediment likely meant lead particulate. Mr. Del Toral, Jennifer Crooks, and Thomas Poy (and therefore the EPA) knew that pinpointing the root cause and scope of the problem required an immediate investigation and that the nature of the City of Flint's use or non-use of phosphates for corrosion control was an important part of the inquiry. Mr. Del Toral personally interviewed the Flint resident and inspected her home in Flint and had discussions directly with MDEQ officials regarding LCR compliance issues, including corrosion control and sampling and treatment requirements.

By April 2015, Mr. Del Toral (and therefore the EPA) learned that the Flint Water Treatment Plant's monthly operating reports demonstrated that Flint was not using phosphates for corrosion control. As a consequence of learning that information, Mr. Del Toral made direct inquiry of Patrick Cook, whom Mr. Del Toral knew to be "the LCR contact in the central office of the MDEQ," regarding the method and materials used in Flint for corrosion control. On April 24, 2015, Mr. Del Toral (and therefore the EPA) were told unequivocally by Mr. Cook and the MDEQ that Flint was not using a corrosion control additive.

On April 29, 2015, Mr. Del Toral and Thomas Poy, Chief of the Region 5 Ground and Drinking Water Program, specifically directed MDEQ's Drinking Water Director, Liane Shekter-Smith, that the LCR mandated the use of corrosion control at the Flint system. But, Ms. Shekter-Smith (and therefore the MDEQ) stated that it was MDEQ "policy" to forego corrosion control until two 6-month monitoring periods were completed. In a June 10, 2015 a conference call, the MDEQ repeated its refusal to perform corrosion control treatment.

Four months after learning about the problem, Mr. Del Toral memorialized the LCR violations in a June 24, 2015 memorandum entitled "High Lead Levels in Flint, Michigan." Mr. Del Toral reported: "In accordance with the Lead and Copper Rule (LCR), all large systems (serving greater than 50,000 persons) are required to install and maintain corrosion control treatment for lead and copper." Mr. Del Toral recommended that "U.S. EPA should review the compliance status of the City of Flint with respect to whether the system is in violation of the LCR requirement to install and maintain optimal corrosion control and whether the MDEQ is properly implementing the LCR provisions regarding optimal corrosion control treatment requirements for large systems." Further, Mr. Del Toral recommended that the EPA review whether relevant resident-requested samples were being included by the City of Flint in calculating the 90th percentile compliance value for lead.

On June 26, 2015, Mr. Del Toral wrote to Rita Bair, the EPA Section Chief of Ground Water and Drinking Water, describing the situation in Flint and MDEQ's actions as "bordering on criminal neglect" and informing her that the state was "complicit" and that "public has a right to know what they [MDEQ] are doing because it is their children that are being harmed."

Restated, no later than the end of June 2015, Mr. Del Toral and the EPA knew the following facts:

- The Flint Water Treatment Plant was not using corrosion control despite the requirements of the LCR ;
- The high lead levels from the Flint residence likely evidenced a system-wide problem with lead in drinking water;

- The "primacy" agency in Michigan responsible in the first instance to comply with the LCR law had no intention of doing so; and

- The residents of Flint confronted a significant health hazard from drinking water that was very probably contaminated with lead.

Despite this, the EPA did nothing to carry forth its non-delegable duty to protect the residents of Flint and enforce the SDWA until January 21, 2016, when it issued its first Emergency Administrative Order to the State of Michigan and City of Flint.

b.     Susan Hedman

Susan Hedman ("Hedman") is a career environmentalist from Illinois who joined the EPA in 2010 and occupied the highest position within EPA Region 5, Administrator, directing EPA operations in the six-state Great Lakes region until she resigned in January 2016. Ms. Hedman is a licensed attorney who also holds a PhD. in environmental studies. Prior to taking a position with the EPA, Ms. Hedman served as an environmental lawyer and policy adviser to state agencies and non-governmental organizations.

As Region 5 Administrator, she held herself out as a leader among those working in the environmental field, highlighted common environmental dangers that threaten women's health, and discussed EPA efforts to protect women and children from unnecessary chemical poisoning. Ms. Hedman issued numerous written and oral statements after June 2015 and gave testimony on the Flint drinking water problem before Congress. She also responded to an interview by the EPA's Office of the Inspector General.

As the Region 5 Administrator, Ms. Hedman was directly responsible for the execution of the EPA's programs within the boundaries of her region (40 C.F.R. § 1.5),

including conducting effective regional enforcement and compliance programs, exercising approval authority for proposed state standards and implementation plans, and providing for overall and specific evaluations of regional programs and state activities. [180]  Under the SDWA and the LCR, the Regional Administrator is duty bound to determine if a state's corrosion control activities are appropriate. [181]  As Regional Administrator, Ms. Hedman had the statutory and regulatory power to issue corrosion control treatment orders to the state to meet LCR requirements.[182]

Ms. Hedman claimed in her testimony before Congress and in her deposition testimony that she learned of Flint's lack of corrosion control treatment on June 30, 2015.[183] At that time, she was also aware that high lead levels had been discovered in some Flint residents' tap water. But, despite her April 2012 professed commitment to protecting women and children from environmental dangers (and specifically from unnecessary chemical poisoning), Region 5 was slow to address what Dr. Hedman admitted was a known public health threat in Flint from lead release. By early July 2015, she had before her Mr. Del Toral's June 24, 2015 memorandum entitled "High Lead Levels in Flint, Michigan." She knew that her Region 5 expert on the LCR reported unequivocally that "[i]n accordance with the Lead and Copper Rule (LCR), all large systems (serving greater than 50,000 persons) are required to install and maintain corrosion control treatment for lead and copper" and that MDEQ was

---

[180] 40 C.F.R. §1.61(d), (f)-(g).
[181] 40 C.F.R. § 142.19(a).
[182] 40 C.F.R. § 142.82(i).
[183] Ms. Hedman certainly knew long before June 30, 2015 that Flint had changed the source of its drinking water from Lake Huron to the Flint River, that the change brought about discolored and foul smelling water, that boil water advisories had been issued as a result of fecal contamination of the water, that chlorination of the water led to TTHM exceedances, and that Flint residents were vehemently protesting against these conditions.

misinterpreting the LCR.[184] She knew that Mr. Del Toral recommended that "U.S. EPA should review the compliance status of the City of Flint with respect to whether the system is in violation of the LCR requirement to install and maintain optimal corrosion control and whether the MDEQ is properly implementing the LCR provisions regarding optimal corrosion control treatment requirements for large systems."[185] She knew that on June 26, 2015, Mr. Del Toral described the situation in Flint and MDEQ's actions in the most dire terms as "bordering on criminal neglect" and that the "public has a right to know what they [MDEQ] are doing because it is their children that are being harmed."

Dr. Hedman claims she was "immediately concerned" when she heard Flint lacked corrosion control treatment and that EPA needed to act "as quickly as possible" and was "alarmed" by MDEQ's inaction and that some of her staff were pushing for a treatment technical violation for Flint, but she was unwilling to confront MDEQ about its misinterpretation of the LCR even as EPA obtained more information about high lead levels at Flint residences.

Instead of issuing an emergency order under Section 1431, EPA issued a press release about the situation in Flint on July 10, 2015. Dr. Hedman acknowledged that the press release did not include warnings about possible widespread lead contamination, nor did it warn Flint parents that they should use filtered water or premixed formula for their children. Dr. Hedman also chose to ignore Mr. Del Toral's warnings, shun him because he had the audacity to speak out, and downplay the seriousness of his work and findings.[186] On July 2, 2015, she

---

[184] Del Toral Memo at 2.
[185] *Id*. at 5.
[186] Mr. Del Toral properly described the policy and practice of EPA Region 5: "At every stage of this process, it seems that we spend more time trying to maintain state/local relationships than we do trying to protect the children." Del Toral email to Thomas Poy, Rita Bair, Nicholas Damato with copies to Joanna Glowacki, Andrea Porter, and Heather Shoven, sent on September 22, 2015 at 7:06:37.

wrote to Flint Mayor Dayne Walling that Del Toral's report was "a preliminary draft and that

it would be premature to draw any conclusions based on that draft." On September 27, 2015,

while now acknowledging a potential health crisis, she chose the path of least resistance by

offering technical assistance to the MDEQ on corrosion control optimization and water

quality testing protocols. On September 29, 2015, Ms. Hedman circulated a "ten point plan"

which included a proposed start date for corrosion control treatment of January 16, 2016.

Ms. Hedman failed to enforce LCR requirements until an emergency order was issued by the

Agency in January 2016, downplayed concerns about the safety of the Flint drinking water

and failed to protect the health of Flint residents when she knew that some of them were in

serious danger. Ms. Hedman's attitude toward the Flint drinking water problems was

characterized by Professor Marc Edwards in his testimony before Congress as "willful

blindness." Professor Edwards also accused the EPA of silencing Del Toral following the

publication of his memo. "Even before Del Toral wrote that memo, he told me he had to

protect Flint's children while minimizing the possibility that he would be retaliated against."

Professor Edwards also testified that "I don't think Ms. Hedman understands the climate she

created." The Hedman climate at Region 5 is perhaps best exemplified by Debbie Baltazar,

Chief of the Region 5 Water Division's State and Tribal Programs Branch, in a September 24,

2015 internal memo regarding funding for residential drinking water devices: "We've

included information on Flint's financial practices, as we think Susan needs to be aware. ...

Perhaps she already knows all this, but I'm not so sure Flint is the community we want to go

out on a limb for."[187]

---

[187] EPA-R5-2015-01129900007197-00002, disclosed by the EPA as "an Internal Deliberative Document" to the Congress only for use in its oversight.

c.   Tinka Hyde

Tinka Hyde ("Hyde") was the EPA Region 5 Director of the Water Division overseeing approximately 180-200 staff members. Ms. Hyde previously served as EPA Region 5's Director of the Office of Enforcement and Compliance Assurance for approximately 10-12 years. She had substantial education, training, and experience with the SDWA in the years leading up to the Flint drinking water crisis. In 2014–2016, Ms. Hyde reported directly to the EPA Region 5 Administrator, Susan Hedman. In Region 5's management hierarchy with regard to the SDWA, she was second in command. Ms. Hyde met weekly with Ms. Hedman and was directly responsible for bringing matters of consequence within her department to Ms. Hedman's attention. Ms. Hyde also had ultimate responsibility within Region 5 for responding directly to citizen complaints, including complaints directed to Region 5 from Members of Congress or the White House, and had authority to elevate issues relating to drinking water to EPA headquarters

On or before May 15, 2014 (*i.e.,* less than one month after Flint changed its drinking water source from Lake Huron to the Flint River), Ms. Hyde knew that drinking water quality and Flint residents' physical health was a matter of concern when a resident complained of a rash as a result of drinking the Flint water.[188]  At that time, Jennifer Crooks told her bosses, Ms. Hyde and Tom Poy, and other EPA employees that "Flint River quality is not great . . . ." On February 26, 2015, Ms. Hyde received an email from her direct subordinate Tom Poy regarding the high levels of lead that were found in a Flint resident's drinking water: "One resident in Flint had sediment in her water and the water plant tested it and found high iron

---

[188] May 15, 2014 Jennifer Crooks/EPA e-mails colleagues Mindy Eisenberg, Thomas Poy and Tinka Hyde/EPA re: concerns about Flint drinking water expressed by resident Lathan Jefferson.

and lead."[189] Mr. Poy was relating Mr. Del Toral's report that extraordinary high levels of iron were found in black sediment in drinking water in the home of a Flint resident with two minor children, that high levels of iron meant high levels of lead and that the black sediment likely meant particulate lead (with lead concentrations reaching 95%), that that pinpointing the root cause and scope of the problem required an immediate investigation, and the City of Flint's use or non-use of phosphates for corrosion control was an essential part of the inquiry. On and after June 24, 2015, Ms. Hyde knew that there was no corrosion control being utilized for the water in Flint, that lead service lines were ubiquitous throughout the City, and that the City was improperly pre-flushing pipes so that samples would minimize the levels of lead in the water. On June 30, Ms. Hyde communicated that Region 5 was "concerned about the lead situation in Flint" to MDEQ officials.

On and before February 2015, Ms. Hyde oversaw the response to Flint citizens' expressed concerns over water quality issues, including requests to return to Detroit water. From March 2015 through January 2016, Ms. Hyde chose to respond to Flint residents with evasion and jargon, falsely asserting that she had no power to help them. The OIG spoke directly to Ms. Hyde's incompetence in its findings on Region 5's myriad failures to listen to Flint residents and to use the information learned from doing so to resolve serious problems related to their health and safety.

Ms. Hyde, under the direction of her superior Ms. Hedman, actively denigrated Mr. Del Toral and the seriousness of his findings and recommendations to Region 5. On June 30, after Mr. Del Toral's report was made public, Ms. Hyde told the MDEQ that Region

---

[189] February 26, 2015, 4:25 PM Tom Poy Email to Tinka Hyde and Timothy Henry ("FW: HIGH LEAD: FLINT Water testing Results")

5 was "still being briefed on the lead issues" and that Mr. Del Toral's report would not be shared with the MDEQ until "Miguel addresses our comments." On July 21, 2015, Ms. Hyde managed a conference call between Region 5 and the MDEQ regarding LCR compliance. In that conference call, Ms. Hyde effectively disparaged Mr. Del Toral, calling his report "his own research" that was "not reviewed by management." Ms. Hyde has now confirmed in her deposition that that Mr. Del Toral was acting on behalf of the EPA and that the direction of his supervisor, Mr. Poy.

Despite the fact the she knew Flint was not utilizing corrosion control in April 2015, that lead service lines were prevalent in the City, that Flint was pre-flushing as part of its compliance sampling and that high lead levels had been detected at Walters' residence in June 2015, Ms. Hyde failed to act or elevate the need for Flint to utilize corrosion control to the highest authorities within EPA despite the fact that she was "concerned' about the lead situation in Flint. As the former Director of EPA's OECA, Ms. Hyde was aware of EPA's enforcement authority under Sections 1414 and 1431 of the SDWA. Consequently, she knew EPA had the statutory authority to mandate corrosion control treatment so her (and EPA's) decision to delay corrosion control treatment resulted in the prolonged exposure of Flint residents to lead in their drinking water.

d.   Thomas Poy

Thomas Poy ("Poy") was the Chief of EPA Region 5's Ground Water and Drinking Water Branch.[190] He had worked for Region 5 for over 30 years and served as Chief of the Ground Water and Drinking Water Branch for 12 years. In 2014–2016, Mr. Poy reported

---

[190] The Ground Water and Drinking Water Branch is a department within the Water Division (which is one of eight divisions in Region 5).

directly to Tinka Hyde, then the Director of the Water Division. Mr. Poy also served as a member of the EPA's "Flint Safe Drinking Water Task Force" and the Chair of the "Flint Drinking Water Technical Support Team." The Ground Water and Drinking Water Branch is responsible for implementing the drinking water program in Region 5. As Chief of the Branch, Mr. Poy was responsible for overseeing primacy states, including Michigan, and their compliance with the SDWA and LCR. Jennifer Crooks and Rita Bair report directly to Mr. Poy. Miguel Del Toral is the Region 5 Ground Water and Drinking Water Branch Regulations Manager and also reported directly to Mr. Poy.  Mr. Poy recognized Mr. Del Toral as the Region 5 expert in drinking water regulations and the "go to" person on LCR implementation.

At least as early as 2012-2013, Mr. Poy (in a report co-authored by the MDEQ) recognized the need to "plan for circumstances where [financial] resources are inadequate to implement the entire drinking water protection program." By September 2014 (and with knowledge of Flint's fiscal problems), Mr. Poy expressed concern about the quality of the Flint River as a source of drinking water. Mr. Poy knew that Flint was experiencing significant problems with the quality of its drinking water, including public health problems (like rashes). He knew that his subordinate, Jennifer Crooks, had been "inundated" with complaints related to the water, including health concerns. But Mr. Poy had no idea how many complaints she had received and failed to take any steps to implement a system to track and evaluate these complaints. On September 14, 2014, Mr. Poy knew that Savannah Young, a concerned Flint resident, had complained of tap water that was "disgusting" and not "possibly safe to drink." Mr. Poy knew that Ms. Young explicitly complained that the EPA, City and State were not adequately addressing the problem: "[No] person is available to discuss this issue with me... This has not been addressed or even acknowledged by the city... [T]hey are not even

informing the citizens that it is happening." Mr. Poy did not assign any staff or scientists at the EPA to investigate the drinking water problems at that time.

On February 26, 2015 and February 27, 2015, Mr. Poy knew that high concentrations of lead were found in a Flint resident's home. Mr. Poy knew that lead was entering the water as part of the corrosion process. Mr. Del Toral told him that "where you find pB values that high, it is usually due to particulate lead. Not always, but generally. Particulate lead is released sporadically from lead service lines, leaded solder and leaded brass in a number of ways and folks tend to discount these values as anomalies, but particulate lead is a normal part of the corrosion process and it is universal (common) in all systems." Mr. Del Toral expressed concern about Flint's optimized corrosion control treatment: "I was wondering what their OCCT was. They are required to have OCCT in place which is why I was asking what they are using." Mr. Poy has since testified that he should have recommended to citizens of Flint with lead in their water, such as Ms. Walters, that they use a filter or alternative water; but that he never made that recommendation (or any other health and safety warning) to the Flint community.

Mr. Poy learned that Flint was not using any corrosion control treatment in late April 2015. Between that time and June 2015, he also became aware of lead test result from two more homes, one of which exceeded the LCR action limit. By June 2015, Mr. Poy was concerned about the potential health effects from lead release. Mr. Del Toral's interim report only served to heighten his concern. He participated in discussions with MDEQ in June and July 2015 regarding the need for corrosion control and offered certain technical support, but EPA took no direct corrective actions regarding Flint's water treatment and undertook no studies to determine the extent or severity of the lead release issue in Flint.

By June 2015, Mr. Poy knew that Flint was not practicing corrosion control, that lead service lines were prevalent in Flint and that Mr. Del Toral was concerned that the high lead levels found at Ms. Walters' home potentially indicated a systemwide problem in Flint's water system, but he failed to take any action to correct the problem. In response to Mr. Del Toral's request for additional sampling to determine whether a systemwide problem with lead existed in Flint, Mr. Poy denied the request, stating that he was "comfortable" waiting for the results of the City's second round of 6-month compliance monitoring. Mr. Poy's reluctance to act is emblematic of the EPA's lack of urgency in responding to the water crisis in Flint and delayed enforcement of the SDWA and LCR, which only served to prolong the crisis and residents' exposure to high lead levels. Mr. Poy's malfeasance or nonfeasance (or both) despite his concern regarding the potential harmful impact of Flint's drinking water and despite Region 5's belief that state and local authorities were not acting quickly to protect human health is quintessential make-nice politics and consistent with the non-confrontational or "cooperative federalism" approach promoted by Administrator McCarthy: "Region 5 was going through its process of working with the State to deal with the issue.

As of July 2015, despite internal EPA discussion (including discussion at EPA headquarters) about whether a LCR violation under the Safe Drinking Water Act and public notice should be issued, Mr. Poy (and the EPA) decided to "work with the state, stressing the need to have Flint implement corrosion control." When no action had been taken by August 2015, rather than act to protect the public, Mr. Poy chose a path of least resistance with the MDEQ asking Liane Shekter-Smith: "[a]ny news on Flint since our call a couple of weeks ago? Has the letter been sent to inform them that they are not optimized for lead based on their

monitoring? Have they been approached about starting corrosion control sooner rather than later?"

Mr. Poy actively participated in the Region 5 disparagement of Miguel Del Toral (after disclosure of his report on system-wide lead release in Flint). Mr. Poy called Mr. Del Toral's recommendations "personal opinions" and rejected Mr. Del Toral's statement that the EPA was obligated to review Flint's corrosion control compliance status in June 2015. Mr. Poy did not order additional testing as Mr. Del Toral requested until 2016. Mr. Poy breached his duty of care to the residents of Flint.

e.    Jennifer Crooks

Jennifer Crooks ("Crooks") was employed by the EPA Region 5 Water Division, Ground Water and Drinking Water Branch as its Michigan Program Manager. She has held that position for more than twenty years. She reports to Mr. Poy, the Chief of the Ground Water and Drinking Water Branch. As the Michigan Program Manager, she was responsible for communicating directly with the residents of Flint through the EPA's State Drinking Water Hotline and otherwise. The flow of communications and consequent information ran between her, Mr. Poy, and ultimately Ms. Hyde. In carrying out her assigned duties to investigate complaints about Michigan's public water supplies, Ms. Crooks was supposed to interact with state officials at the MDEQ. As a result, Ms. Crooks communicated directly with MDEQ officers and employees regarding Flint's drinking water quality, including Michael Prysby, Stephen Busch, and Richard Benzie. In testimony and statements pertaining to the Flint drinking water crisis, Ms. Crooks admitted that she was required to do a thorough investigation in response to residents 'complaints and to provide residents with accurate and truthful information. In her 20 years as Program Manager, she never

confronted more resident complaints from an affected community than she did over the quality of Flint's drinking water.

By May 15, 2014, less than one month after the water switch, Crooks informed Ms. Hyde and other EPA employees that, with regard to SDWA standards "Flint River quality is not great . . . ." By September 17, 2014, Crooks was already dismissive about resident complaints over Flint's drinking water quality; when she was charged with investigating a Flint resident's concern about her brown tap water, Crooks informed MDEQ officials by stating: "Yep, have another Flint complaint."

On or before February 26, 2015, Mr. Del Toral, Ms. Crooks, and Mr. Poy (and therefore the EPA) knew that extraordinarily high levels of iron were found in black sediment in drinking water in the home of a Flint resident with two minor children. Ms. Crooks inquired of MDEQ officials whether Flint was practicing corrosion control treatment and expressed her belief at that time that such treatment was required. On March 10, 2015, Ms. Crooks told the MDEQ that she was being "inundated" with controlled correspondence emails referred to her by the White House. Nonetheless, Ms. Crooks testified that she did not consider tracking these communications and complaints, despite the fact that many of them explicitly questioned the health effects of the water.

Through Mr. Del Toral's report, Ms. Crooks knew by July 2015 that blood lead levels in Flint children were elevated since the Flint River became the source of the City's drinking water and that exposure to the Flint River drinking water was causing skin rashes. Ms. Crooks had also heard from residents that the drinking water was causing hair to fall out in clumps. Ms. Crooks testified that despite assuring numerous Flint residents about the

safety of their drinking water, she never followed up with any of the residents about their health concerns.

While Ms. Crooks testified that she was "shocked" by the actions of the MDEQ in lying about having corrosion control treatment in place, and despite her knowledge of the health concerns raised by Flint residents and her duty to properly investigate and respond to residents' complaints, Ms. Crooks chose to follow the path set by Region 5 Administrator Hedman and Water Division Director Hyde by downplaying the significance of Del Toral's report and the potential health effects of Flint Residents. On July 9, 2015, Ms. Crooks told her colleagues Rita Bair and Andrea Porter that it was "apparent that Flint may have violated the LCR by not maintaining corrosion control" but added her belief that the MDEQ officials would "take this personally" and "they may get VERY defensive." Ms. Crooks proffered the perfect bureaucratic solution that the EPA and State move forward together "holistically" to correct the problem and that Region 5 avoid "rubbing their [MDEQ] nose" in EPA's LCR interpretations. In their July 10, 2015 conference, Region 5 and the MDEQ agreed to a lack of urgency to MDEQ's LCR violations and to the MDEQ contention that "the source of drinking water will be changing again in 2016, so to start a Corrosion Control Study now doesn't make sense." On July 15, 2015, Miguel Del Toral sent an email to EPA officials, including Ms. Crooks, Ms. Bair, and Ms. Porter, urging Region 5 to issue a treatment technique violation and synchronous public notice. Ms. Crooks, however "did not see what the benefit would be" from such actions despite acknowledging the utility of informing the citizens that there was a likelihood that lead was leaching into lead service lines. State and federal appeasement politics trumped human health concerns.

As the Flint drinking water problems became more fraught and nationally significant, Ms. Crooks took steps to protect the bureaucracies at Region 5 and the MDEQ by denigrating Mr. Del Toral and plausibly denying receipt of his critical report.[191] Throughout all of the relevant time period, Ms. Crooks knew that Flint had significant numbers of lead service lines, that it was not performing optimized corrosion control, and the lead was leaching into the drinking water. In her callous disregard of her duties and the ongoing public health problems, Ms. Crooks exacerbated the injuries and damages sustained by Flint residents.

f.    Rita Bair

Rita Bair ("Bair") is a 30-year employee at Region 5's Groundwater and Drinking Water Branch who served as Mr. Del Toral's supervisor from 2014 to 2016. From mid-June to mid-July 2015, Ms. Bair served as the acting Chief of the Ground Water and Drinking Branch. Ms. Bair is responsible for supervising the implementation, regulation, and enforcement of the SDWA by her staff members. While disclaiming knowledge of the correlation between exposure to lead contaminated water and adverse health effects, Ms. Bair admittedly knew that a drinking water containing lead was a concern for a city.

While serving as the acting Chief of EPA Region 5's Groundwater and Drinking Water Branch, Ms. Bair orchestrated Region 5's public disparagement and denigration of Mr. Del Toral following his publication of his report of MDEQ's failure to meet the requirements of the SDWA and LCR. Ms. Bair dismissed Mr. Del Toral's report as "his opinions" and merely

---

[191] On September 11, 2015, in an email to Mr. Poy and MDEQ officials, Ms. Crooks proposed her orchestration plan: "I wanted to remind you that Miguel's report has DEQ cc'd. So if the Legislature or whoever might say you all were cc'd, you can truthfully respond that it was EPA's request that the report not be sent to the cc's. Consequently, you all never received the report from Miguel."

"scientific statements." She professed a lack of concern or, indeed, having any reaction to his reports of high lead levels in Flint's drinking water. On June 25, 2015, Ms. Bair challenged Mr. Del Toral's characterization of Flint's drinking water lead problem as "widespread." In response, Mr. Del Toral asked that a team be sent out to collect samples to prove that the problem was widespread. Mr. Del Toral accused the state of being "complicit," highlighted that children were being harmed, and championed the public's right to know the facts and the truth. Ms. Bair ignored Mr. Del Toral's requests and adjudged "his opinions" as outside the requirements of the regulations. Ms. Bair characterized Mr. Del Toral in jaundiced terms, stating that he was not presenting "logical, clear statements" and was being overly "dramatic."

When Ms. Crooks sent an email to EPA leaders including Andrea Porter and Rita Bair on July 9, 2015 stating that it was "apparent that Flint may have violated the LCR by not maintaining corrosion control" and that the state would "take this personally" and "they may get VERY defensive," Ms. Bair instructed Ms. Crooks not to contact any of the MDEQ engineers directly about Mr. Del Toral's report. Ms. Bair participated in the "management level" conference call on July 10, 2015 among EPA and MDEQ officials, where Mr. Del Toral's findings were again downplayed and dismissed. Ms. Bair repeated her disparagement of Mr. Del Toral, calling his opinions on corrosion control "above and beyond their regulatory process." She falsely asserted that LCR compliance for a large city like Flint was based on the 90th percentile range of the samples collected.

g.     Andrea Porter

Andrea Porter ("Porter") is a long term employee of EPA Region 5 Ground Water and Drinking Water Branch with extensive education, training, and experience with the

LCR.[192] In July 2013, Ms. Porter published a field study with Miguel Del Toral (EPA) and

Michael Schock (EPA) regarding elevated lead release from lead service lines and assessing

lead levels in the Chicago public water supply.[193] Ms. Porter reported that "the existing

regulatory sampling protocol under the U.S. Lead and Copper Rule systematically misses the

high lead levels and potential human exposure." Ms. Porter knew that "[m]ost lead in drinking

water comes from premise plumbing materials and lead service lines. She knew that lead

service lines are generally the largest source of lead in drinking water when they are present in

public water systems."[194] She knew that "a legacy of millions of partial or whole LSLs remains

in many public water systems.[195] She knew that "lead corrosion" referred to the corrosion of

lead plumbing materials and "result[ed] in the transfer of dissolved or particulate lead into the

drinking water."

Ms. Porter was a party to the many communications exchanged between MDEQ and

EPA on February 26, 2015 and February 27, 2015.  Ms. Porter participated in discussions on

April 24, 2015 when it became inarguable that Flint was not maintaining optimized corrosion

control. On June 25, 2015, after the release of Mr. Del Toral's report which harkened back to his

previous field studies with Porter and Schock, Mr. Del Toral responded by email to questions

by other EPA officials about his work in part by seeking Ms. Porter's support. Mr. Del Toral

---

[192] *See, e.g.,* Porter, A., *Handy Tools for the Lead and Copper Rule*, 15th Annual EPA Drinking Water Workshop, September 28, 2018.

[193] Del Toral M. A., Porter A., Schock M. R., *Detection and Evaluation of Elevated Lead Release from Service Lines: A Field Study, Environmental Science & Technology, July, 2013, 47, 9300–9307.*

[194] Sandvig, A.; Kwan, P.; Kirmeyer, G.; Maynard, B.; Mast, D.; Trussell, R. R.; Trussell, S.; Cantor, A. F.; Prescott, A. *Contribution of Service Line and Plumbing Fixtures to Lead and Copper Rule Compliance Issues*; Research Report 91229; American Water Works Association Research Foundation: Denver, CO, 2008.

[195] Triantafyllidou, S.; Edwards, M., *Lead (Pb) in tap water and in blood: Implications for lead exposure in the United States*, Crit. Rev. Environ. Sci. Technol. 2012, 42, *1297–1352.*

stated that "the fact that their sampling is designed not to capture lead (everything is fine) does not negate our scientific understanding of what is going on." Del Toral goes on to state:

> "I am really tired of the bad actors being defended, the bad actions being ignored, and people trying to do the right thing are constantly being subjected to intense scrutiny as if we were doing something wrong. It's all of this 'don't find anything bad' crap at EPA that is the reason I desperately want to leave. I am not happy to find bad things. It is completely stressful because it means children are being damaged and I have to put up with all of the political crap, but where these problems exist I will not ignore them."

Porter chose to join the road block and never responded to Mr. Del Toral's email.

On July 15, 2015, Miguel Del Toral sent an email to EPA officials, including Crooks, Bair, and Porter, acknowledging that it was a "tough situation" but urging officials to take action by issuing a treatment technique violation which would have provided for public notice. Porter sat idly, refusing to defend or concur with Del Toral while EPA officials dismissed his work and recommendations.

When the MDEQ and EPA finally decided to act on the information they had in February, Porter was present at a meeting on August 31, 2015, where it was acknowledged "that to delay installation of corrosion control treatment in Flint would likely cause even higher levels of lead over time as Flint's approximately 15,000 lead service lines are continuously in contact with corrosive water."

Just like other MDEQ and EPA employees, Porter was aware that Flint was not maintaining optimized corrosion control, which exposed some of its citizens to dangerous levels of lead, and she failed to act. Because of her lack of action, Flint residents were

subjected to high levels of lead in their drinking water for much longer than they would have if not for the unreasonable delay.

h.   Michael R. Schock

Mr. Schock is a chemist with the EPA's Office of Research and Development (ORD), which is a scientific research arm of the EPA. He worked in a laboratory within the Drinking Water Treatment and Distribution Branch, Water Systems Division, at ORD known as the National Risk Management Research Laboratory, primarily on drinking water corrosion issues. Researchers in the EPA's lab in Cincinnati, Ohio provide technical support to state agencies and their communities to address environmental problems and related public health challenges.

i.   Darren Lytle

Dr. Lytle is an environmental engineer with the EPA's Office of Research and Development, National Risk Management Research Laboratory, in Cincinnati, Ohio. Since beginning work at the EPA in 1990, Dr. Lytle's work has been focused on drinking water quality issues. He has conducted drinking water research as an engineer in the areas of corrosion, microbial contaminants, distribution issues, and inorganic contaminants. Over the years, he has investigated and published works on drinking water systems, focusing on distribution system corrosion control and water quality, including lead and copper corrosion control. He has extensive experience in corrosion and corrosion control treatment so is familiar with the Safe Drinking Water Act and Lead and Copper Rule requirements for corrosion control.

Dr. Lytle joined the City's Technical Advisory Committee in late September 2015 along with Michael Schock. He also become involved with the EPA's Flint Task Force and

provided corrosion control recommendations to MDEQ. As an expert in drinking water distribution systems and corrosion, Dr. Lytle knew that in the absence of corrosion control treatment, drinking water leaving the Flint plant could corrode the City's lead pipes and domestic plumbing in homes releasing lead into the drinking system. Dr. Lytle was copied on Miguel Del Toral's June 2015 memo regarding the City's water source change to the more corrosive Flint River in April 2014 and his concerns with respect to the City's elevated lead issues, sampling methodology and lack of corrosion control treatment.

Dr. Lytle learned of Dr. Marc Edwards/VT's water sampling test results and Dr. Mona Hanna-Attisha's blood lead test results in August and September 2015.

While EPA offered Dr. Lytle's technical assistance to Stephen Busch and Mike Prysby at MDEQ in June 2015, they never followed up with him and he never followed up with them until September 2015, when Dr. Lytle and Mr. Schock were both asked to join the City's Technical Advisory Committee. Despite the fact that he's an expert on corrosion and knew that the City was no longer practicing corrosion control treatment so was aware of the potential for lead release and also learned from Mr. Edwards about the broader scope of lead contamination in the City and elevated blood lead levels in Flint children, Dr. Lytle did not recommend that corrosion control be implemented immediately. As a result of Dr. Lytle's failure to take immediate action, Flint residents were exposed to lead contaminated water for much longer than they would have if prompt action had been taken. Accordingly, Dr. Lytle breached his duty of care to the residents of Flint.

j.   Gina McCarthy

Gina McCarthy ("McCarthy") served as the EPA's Administrator from July 2013 to January 2017. Prior to that, she held the position of Assistant Administrator for the EPA's Office

of Air and Radiation from 2009-2013. Despite learning in June 2015 that three homes in Flint had lead-contaminated water and expressing her concern over the situation in a September 2015 email to EPA staff, Ms. McCarthy did not use her emergency powers until late January 2016 to force the MDEQ to install corrosion control treatment to protect Flint's residents from consuming lead-tainted water. While she served as Administrator, the EPA failed in its oversight role and its obligation to warn the public. The EPA had sufficient authority and information to issue an emergency order to protect Flint residents from lead-contaminated water as early as June 2015, but didn't act until nearly 7 months later when it declared an emergency. Without such EPA intervention, the conditions in Flint persisted, and the State continued to delay taking any action to require corrosion control treatment or provide an alternative drinking water supply. Michigan officials declared a public emergency in October 2015; however, the EPA's emergency order was not issued until three months later in January 2016. Accordingly, Ms. McCarthy breached her duty of care to the residents of Flint.

### 7.    Genesee County Health Department

The Genesee County Health Department ("GCHD") is responsible for all government public health functions for residents of Genesee County, including the City of Flint. GCHD's duties include the prevention, investigation, and control of environmental health hazards. GCHD has broad authority to investigate potential public health threats and has the power to take emergency actions (including public health notices). GCHD, in conjunction with MDHHS, had a duty to conduct in-home assessments to determine sources of contamination for those with elevated blood lead levels.

Here, however, GCHD did not satisfy its duties and obligations. As of January 2016, only about 20% of these in-home assessments had been completed. Further, although

GCHD was aware of outbreaks of legionella related illness in the City of Flint, it did not advise the public about it. GCHD's failure to undertake expeditious, affirmative emergency actions to protect public health exacerbated the plaintiffs' alleged injuries and damages

**8.     All other engineering and water consultants who have performed services for the Flint Water Supply from the beginning of the existence of the Flint Water Plant and the Flint water distribution system until the present, including but not limited to, Rowe Professional Services Company, Ayers, Lewis, Norris and May, Inc., Snell Environmental Group, Alvord, Burdick and Howson, LLC, Prein & Newhof, and Gould Engineering, and any of their current and former employees.**

During the performance of its work for the City of Flint, these Defendants or non-parties requested and were provided a copy of prior reports prepared by Snell Environmental Group, Alvord, Burdick and Howson, LLC, Prein and Newhof, and Gould Engineering.  In addition, Snell Environmental Group, DLZ Corporation and others submitted numerous permit applications for the construction of components of the Flint Water Treatment Plant and the Flint water distribution system to the MDEQ.  The LAN Defendants are being sued for professional negligence, and they relied in part in the performance of the work on the prior reports and other work prepared by these entities. In addition, Defendant LAN was given a limited scope of work by the City of Flint, and Defendant LAN was not responsible for water quality or water treatment decisions. Defendant LAN believes that it is not responsible for causing the harm alleged by Plaintiffs and that the claims against it should be dismissed.  However, Defendant LAN reserves the right to assert to the jury that the work of other consulting engineers and/or water

consultants was a cause of the alleged harm to Plaintiffs in the event that the claims of the Plaintiffs are allowed to go to a jury.

### 9.      McLaren Regional Medical Center

McLaren Hospital ("McLaren"), a major hospital in Genesee County, was a common source of exposure for the Legionnaires' disease outbreak, including 51 cases in the 2014-2015 timeframe. McLaren had a duty to prevent legionella from growing and spreading, including through an effective water management program. By January 2015, McLaren Hospital knew of the potential legionella risks associated with the Flint River water. McLaren failed to inform its patients of the risks associated with exposure to legionella and failed to properly address or investigate the increased number of cases within the hospital itself.

### 10.     Business Entities and Individuals that Caused or Contributed to the Presence of Lead in Flint Soils, Water and Other Materials

The plaintiffs claim that they are (or were) residents of the City of Flint or regular visitors to the City as workers, students or faculty members, or consumers. A common assertion among the various plaintiffs is exposure to lead after the governmental officials brought about the change in the source of drinking water from Lake Huron to the Flint River. The incontrovertible fact, however, is that residents and visitors to the City of Flint have been exposed to lead for decades in quantities measurably greater than any lead found in Flint drinking water after the change in water source. Lead exposure in the City of Flint came about "from many sources, such as older housing containing lead-contaminated paint, water, dust, or soil."  "Flint is a 'rust-belt' community with a high percentage of

Medicaid recipients matching the socioeconomic profile of a city with children at greater risk for lead exposure from multiple sources."

Flint soils are primarily contaminated by lead deposits over decades from internal combustion engines fueled by tetraethyl lead gasoline (TEL), a product manufactured by the now defunct Ethyl Corporation, in order to address engine knock. Flint housing stock is also contaminated by lead paint applied to its historically wood frame residential structures.

Contamination of Flint soils from lead paint came about, in part, by degradation of wood frame residential structures over decades but also, in part, by the Genesee Power Station Limited Partnership's (owner and licensee of the Genesee Power Station) use of combustible wood frame housing construction debris as fuel for its power plant. The Genesee Power Station is located within the Dort-Carpenter Industrial Center on Flint's northeast side and near I-475. Describing the "irony and indignity" of Flint residents sequentially enduring foundry pollution, the City's disinvestment program and loss of homes to urban renewal "only to be poisoned by the burning of some of those same toxic structures," University of California Irvine Professor Andrew R. Highsmith documented the Genesee Power Station's contribution to Flint's contaminated soils.

> The freeway and urban renewal projects did enable several new business openings in and around the North End, but the resulting job creation was minimal. ... One such venture was the Genesee Power Station, an eighty-million-dollar waste incinerator and electric power-generating facility that opened in 1992 in an area just north of the demolished St. John neighborhood. Hoping to make a profit from the mountains of demolition waste created annually by urban renewal and other activities in the Flint region, the operators of the facility designed it to run entirely on wood fuel. The burning of the demolition wood also created a substantial amount of electric power, which the operators sold to Consumers Power Company, the Flint area's primary energy provider. Much of the wood burned at the Genesee Power Station was

> coated in lead-based paint, however, which resulted in the release of
> dangerous toxins into the air. Although local residents and activists
> were quick to point out the many dangers associated with lead exposure
> – which include high blood pressure, kidney and brain damage,
> premature birth, and learning disabilities – officials from the Michigan
> Department of Environmental Quality, unwilling to block a job-creating
> venture in the midst of a long-term economic slump, ultimately
> approved the plant's operations.

As Genesee Power Limited Partnership deposited substantial quantities of lead on the Flint community and its soils, it bears substantial responsibility for any personal injuries or damages caused by lead exposure.

In a comprehensive study of Flint blood lead levels by a team of physicians, public health professionals, and toxicologists from the University of Michigan, Michigan State University (Hurley Medical Center), and Rutgers New Jersey Medical School, "annual [blood lead level] changes in children in Flint, Michigan, over the last decade [2006 to 2016], including the months of exposure to Flint River water [were analyzed and placed in historical context... thus, [providing] a complete assessment of their lead exposure."  The researchers established that blood lead levels "during the Flint River water exposure did not exceed values found before 2013." Indeed, the data published by the researchers ... show that children living in Flint during the calendar years 2006, 2007, 2008, 2009, 2010, 2011, and 2012 had higher blood lead levels (and, therefore, exposure to greater concentrations of lead) than children living in Flint when the Flint River was the City's source for drinking water.

Children born before the April 2014 were exposed throughout their lives to lead from sources unconnected to the Flint Water Treatment Plant and the switch from Lake

Huron to the Flint River for Flint's drinking water. Restated, lead exposure attributable to the switch was at best a fractional addition to the background lead exposure already present in their lives and to the lead physically in their bodies. Similarly, children born after the April 2014 switch from Lake Huron to the Flint River for Flint's drinking water were likewise exposed to Flint's background lead levels from sources other than Flint Water Treatment Plant. That is to say, these newborns were bought into an existing lead contaminated environment.

The problems with Flint's drinking water were manifest after the April 2014 change in source to the Flint River, and the public discord over it was continuous, robust, and dominant in Flint (if not the State of Michigan and the nation). By late Spring or early Summer 2015, the general public was aware that a significant health hazard was tied to the presence of lead present in Flint's drinking water. Public awareness of the presence of lead in Flint soils, in wood frame houses, and in the plume of ash and smoke from the Genesee Power Station, however, dates back to at least 1992. Flint's property owners (whether government owned or sponsored entities, commercial businesses, or individuals) knew of the presence of lead on their properties and the public health hazards attributed lead. Property owners had legal duties to remediate those hazards, arising by statute, regulation, and the common law.

In 1991, the EPA Lead and Copper Rule mandated utility companies to replace a percentage of all service lines containing lead, and after revising the Rule in 1993, made

homeowners responsible for replacing service lines containing lead from their property line to the discharge tap within the dwelling. Lead-based paint was outlawed in 1978. Since 82.9% of the residential housing structures in Flint were built before 1969, most homes in Flint are contaminated with lead paint. Congress enacted the Residential Lead-Based Paint Hazard Reduction Act in 1992. EPA regulations implementing Title X of the Act apply to rental property built before 1978 and require that before the sale or lease of a home, a landlord or homeowner must execute a written disclosure identifying any known lead-based paint or hazards.

U.S. Housing and Urban Development associated housing (including housing vouchers) have heightened duties under the Lead Safe Housing Rule, 24 CFR 35. The Lead Safe Housing Rule applies to all "target housing" (generally meaning any housing constructed before 1978) that is federally owned or receiving federal assistance. Similarly, under the Michigan Lead Abatement Act, owners of "target housing" offered for rent or lease (again meaning generally any housing constructed before 1978) must register the property with the MDCH (now MDHHS). Michigan landlord-tenant law imposes a duty on landlords to provide safe, habitable, and fit premises in compliance with state health and safety codes. The Michigan state building code makes it unlawful for any owner or agent to maintain a dwelling which qualifies as a "dangerous building." A dangerous building includes the grounds and the buildings, or portions thereof, that are "unsanitary or unfit for human habitation" or in a condition that is likely "to injure the health, safety, or general welfare of people living in the

dwelling." The common law imparts premises liability for failure to give notice of the presence

of lead in a dwelling or for leasing a unit with known lead hazards. Thus, liability exists for

landlords who leased or rented dwellings (1) contaminated by lead paint or by lead laden

soils and dust or (2) connected to water mains by lead service lines and this caused the

plaintiffs alleged injuries and damages. The LAN Defendants identify non-parties at fault to

include government, commercial, and residential landlords, including, but not limited to, FG&S

Investments, and other potential landlords who provided substandard housing contaminated

with lead painted surfaces, pipes, and soils who have yet to be identified in discovery.

### 11.    Genesee County Drain Commissioner's Office

The Genesee County Drain Commissioner's Office ("GCDC"), through its elected

Commissioner, is the County Agency for water supply, wastewater collection, and

treatment.[196] The GCDC has a duty to administer the state's Drain Code. The GCDC has

broad duties and powers to sue and be sued, contract, levy taxes, borrow money, acquire

interests in real or personal properly, acquire and grant easements, condemn or dispose of

property, and may locate, establish, and alter existing drains, creeks, rivers and

watercourses "whenever the same shall be conducive to the public health, convenience,

and welfare."[197] The GCDC through its commissioner and agents, were deeply involved in

the development and funding of the KWA, including Flint's participation and the use of the

---

[196] Act 342 Michigan P.A. of 1939.
[197] M.C.L.A. § 280.2.

Flint River as an interim source of drinking water to achieve and finalize KWA's

development. In June 2013, GCDC staff met with state and local officials to discuss the

evaluation of the River as a drinking water source and necessary upgrades to the water

treatment plant. In April 2014, GCDC officials with extensive experience in water treatment

toured the Flint Water Treatment Plant spoke directly to MDEQ officials about the Plant's

preparedness and operation and had direct knowledge that the Plant was incapable of

producing safe water. The GCDC office, in the interest of preserving the KWA deal,

neglected its duties and broad authority by permitting contaminated water to be

distributed to the citizens of Flint.

     a.     Jeffrey Wright

Jeffery Wright ("Wright") was the Genesee County Drain Commissioner during the

2012-2016 time period. The Commissioner has a duty to cooperate with state and federal

agencies to enforce pollution laws, and assist in coordinating federal, state, and regional

flood control and water quality plans. The duties of the Drain Commissioner include the

construction and maintenance of drains, apportioning costs of drains among property

owners, and awarding contracts for drain construction. As Commissioner, Mr. Wright had

broad authority and power to impose his plans for the KWA upon a municipality such as

the City of Flint. Using his political prowess as County Drain Commissioner, Mr. Wright

engaged and funded private consultants and local and state officials to orchestrate,

manipulate, and carry out the development and funding for the KWA, of which Mr. Wright

was the CEO. In 2013, Mr. Wright, in his role with the GCDC, twice spoke directly to Flint

citizens and city councilman providing false advice on the advantages of the KWA for the

City of Flint and misleading both citizens and officials about the required upgrades to the
Flint Water Treatment Plant. Mr. Wright recklessly disregarded the public's health and
wellbeing by placing money and politics over the provision of safe drinking water.

Mr. Wright and his office knew that Flint did not have the resources or capabilities of
making the necessary upgrades to the Plant and was aware at the time of the switch from
Lake Huron as the source of drinking water that the Plant was not prepared to go into full
time operation. Nonetheless, using his political power both through the Drain
Commissioner's Office and through the KWA, Mr. Wright took advantage of Flint's lack of
options and resources at the expense of the public health. The plaintiffs admit that Jeff
Wright intentionally caused them bodily harm (in the form of invasion of their bodily
integrity) because, like Treasurer Dillon, he knowingly exposed all Flint water users to the
contaminated water from the Flint River.[198]

### 12.    Caretel Inns

Caretel Inns is an assisted living facility located in Linden, Michigan. Caretel Inns
treated patient John Snyder, father of named plaintiff Michael Snyder, prior to his death.
Caretel Inns failed to properly monitor and assess the seriousness of Mr. Snyder's health
conditions leading to his death.

### 13.   BANKS AND UNDERWRITERS

#### a.  J.P. Morgan Chase & Co., Wells Fargo Bank National Association and Stifel, Nicolaus & Company, Incorporated

Under the tutelage of Genesee County Drain Commissioner Jeffrey Wright, the
communities of Flint, Genesee County, Sanilac County, Lapeer County, and the City of

---

[198] The plaintiffs' admissions made in their complaints are incorporated by reference. The admissions are too voluminous to incorporate into the body of the Notice.

Lapeer formed the KWA as an alternative to water delivered by the DWSD. The projected

cost of the project was approximately $300 million. By the spring of 2013, Wright had

secured 30-year commitments from all of the KWA member communities to purchase

millions of gallons of water, except for Flint. Flint's contribution to the KWA was necessary

for the project to move forward.

In the Spring 2013, officials from the State of Michigan, Genesee County, Lapeer

County, Sanilac County, and the City of Flint reached out to J.P. Morgan Chase & Co.

("J.P. Morgan"), Wells Fargo Bank National Association ("Wells Fargo"), and Stifel, Nicolaus

& Company, Incorporated ("Stifel") to secure financing through a bond sale of the KWA

construction. On August 1, 2013, Flint executed a financing contract with the KWA, which

required the City of Flint to pay its pro rata share of the $300 million KWA contract. The

City of Flint's share was approximately $85 million; however, the City already had

significant debt obligations that it had difficulty meeting and had been under emergency

management since 2011.

In the Spring 2014, J.P. Morgan, Wells Fargo, and Stifel underwrote a municipal bond

sale, which financed and enabled the City of Flint's participation in the KWA. Without this

bond financing, the City of Flint would not have been able to bear its share of the costs in

constructing the KWA pipeline, and thus the KWA would not have been able to commence

construction, to the likely detriment of the other entities participating in the KWA.

Moreover, it was anticipated that if the financing for the KWA project was secured by April

2014, then the project could be completed by the end of 2016.

J.P. Morgan, Wells Fargo, and Stifel all knew that the City of Flint would use the Flint

River as an interim drinking water source from April 2014 through the completion of the

137

KWA. The three underwriting entities all knew that if the City of Flint stayed with the DWSD as its water source, then the Flint Water Treatment Plant would not need to be upgraded. However, if Flint joined the KWA, the Flint Water Treatment Plant would have to be upgraded to treat the raw water coming from Lake Huron.

To help achieve its $85 million share of the financing, the Government Defendants used a March 21, 2014 Administrative Consent Order (ACO) under the guise of responding to and remediating unresolved allegations of an open dump site created at the Bray Road lime sludge lagoon, which had not been used for its intended purpose for decades. Moreover, the City's bond counsel required the MDEQ to include the following language in the ACO for the City to move forward with the ACO:

> The respondent plans to use the Flint River as its temporary source of untreated water supply until KWA water is available. The respondent must undertake the KWA public improvement project or undertake other public improvement projects to continue to use the Flint River, such as additional water treatment plant public improvements, source water protection public improvements and public improvements to obtain back-up water supply, in order to comply with Act 399.

Pursuant to the terms of the April 4, 2014 Bond Financing Agreement, Flint was required to "make an estimated $8,000,000 in improvements to convert the plant from stand-by to fully operational and to accommodate the flow of water from the System (KWA)." However, this was not being financed through the municipal bond sale, and there was not enough time to complete $8 million worth of upgrades by April 25, 2014. Despite knowing that the City of Flint had been under emergency management since 2011 and that private engineering firms had cautioned against the use of the Flint River and the Flint Water Treatment Plant without substantial upgrades which could not reasonably be completed in one month, the underwriting entities still agreed to underwrite the KWA

bond financing. The three underwriting entities also knew that the entire KWA project and their revenue would fall through if Flint did not obtain sufficient financing in an expedited fashion.

**14.    Additional Parties**

The LAN Defendants have herein named all the nonparties at fault that, at this time, they can ascertain with the exercise of reasonable diligence. The LAN Defendants reserve the right as new facts present themselves to amend this notice to include additional parties that, at this time, were not and could not have been known to the LAN Defendants through the exercise of reasonable diligence.

Respectfully submitted,

/s/ Wayne B. Mason
Wayne B. Mason (SBOT 13158950)
Travis S. Gamble (SBOT 00798195)
S. Vance Wittie (SBOT 21832980)
David C. Kent (SBOT 11316400)
FAEGRE DRINKER BIDDLE & REATH
1717 Main St., Suite 5400
Dallas TX 75201
(469) 227-8200
wayne.mason@faegredrinker.com
travis.gamble@faegredrinker.com
vance.wittie@faegredrinker.com
david.kent@faegredrinker.com

ATTORNEYS FOR DEFENDANT
LOCKWOOD ANDREWS & NEWNAM INC.,
LOCKWOOD ANDREWS & NEWNAM PC
and LEO A. DALY COMPANY

/s/ Philip A. Erickson
Philip A. Erickson (P37081)
Robert G. Kamenec (P35283)
Saulius K. Mikalonis (P39486)
PLUNKETT COONEY
101 North Washington Sq., Suite 1200
Lansing, MI 48933
(517) 324-5608
perickson@plunkettcooney.com
rkamenec@plunkettcooney.com
smikalonis@plunkettcooney.com

ATTORNEYS FOR DEFENDANT
LOCKWOOD ANDREWS & NEWNAM INC.,
LOCKWOOD ANDREWS & NEWNAM PC
and LEO A. DALY COMPANY

Dated:  August 10, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2021, I electronically filed LAN Defendants' Amended Master Notice of Nonparty at Fault In Re FWC with the Clerk of the Court using the ECF system and via email submission of such filing to all attorneys of record.

By:   /s/ Philip A. Erickson
Philip A. Erickson (P37081)
Attorney for LAN Defendants
101 S. Washington Square, Ste 1200
Lansing, MI  48933
(517) 324-5608
perickson@plunkettcooney.com

Open.25633.60817.26958835-1