```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3     LEE-ANNE WALTERS, et al

 4                     Plaintiffs,
         -v-                              Case No. 17-10164
 5
       CITY OF FLINT, et al
 6
                       Defendants.
 7     _____/

 8                         MOTION HEARING

 9
                    BEFORE THE HONORABLE JUDITH E. LEVY
10                    UNITED STATES DISTRICT JUDGE

11                         NOVEMBER 3, 2021

12
       APPEARANCES:
13
       For the            Corey M. Stern
14     Plaintiffs:        Levy Konigsberg, LLP
                          605 Third Avenue, Suite 33rd Floor
15                        New York, New York 10158

16                        Renner Kincaid Walker
                          Levy Konigsberg, LLP
17                        800 Third Avenue, 11th Floor
                          New York, New York 10022
18
                          Madeleine Layla Skaller
19                        Levy Konigsberg, LLP
                          605 Third Avenue, Suite 33rd Floor
20                        New York, New York 10158

21
                      (Appearances Continued On Next Page)
22

23     To Obtain a       Jeseca C. Eddington, RDR, RMR, CRR, FCRR
       Certified         Federal Official Court Reporter
24     Transcript        United States District Court
       Contact:          200 East Liberty Street
25                       Ann Arbor, Michigan 48104
```

```
 1                         Moshe Maimon
                           Levy Konigsberg, LLP
 2                         605 Third Avenue, 33rd Floor
                           New York, New York 10158
 3
      For the Defendant    James M. Campbell
 4    Veolia:              Campbell Conroy & O'Neil, P.C.
                           1 Constitution Wharf, Suite 310
 5                         Boston, Massachusetts 02129

 6                         Mark R. Ter Molen
                           Mayer Brown LLP
 7                         71 South Wacker Drive
                           Chicago, Illinois 60606
 8
                           Andreas Ringstad
 9                         Campbell Conroy & O'Neil, P.C.
                           1205 Westlakes Drive, Suite 330
10                         Berwyn, Pennsylvania 19312

11                         Kristin Michele Dupre
                           Campbell Conroy & O'Neil, P.C.
12                         1 Constitution Wharf, Suite 310
                           Boston, Massachusetts 02129
13
      For the Defendant    Wayne Brian Mason
14    LAN:                 Faegre Drinker Biddle & Reath LLP
                           1717 Main Street, Suite 5400
15                         Dallas, Texas 75201

16                         David C. Kent
                           Faegre Drinker Biddle Reath LLP
17                         1717 Main Street, Suite 5400
                           Dallas, Texas 75201
18

19

20

21

22

23           To Obtain a Certified Transcript Contact:
              Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24                 Federal Official Court Reporter
                    United States District Court
25         200 East Liberty Street - Ann Arbor, Michigan 48104
```

November 3, 2021

1                     **I N D E X**

2    **PROCEEDINGS**                              **PAGE**

3         KRISHNAN ARGUMENT                    5
          BY:  Mr. Campbell
4              Mr. Walker

5         BITHONEY ARGUMENT                   32
          BY:  Mr. Campbell
6              Mr. Stern

7         MICHAELS ARGUMENT                   79
          BY:  Mr. Ringstad
8              Mr. Walker

9         CRAKES ARGUMENT                  94
          BY:  Mr. Campbell
10             Mr. Stern
               Mr. Walker

11

12

13   MISCELLANY

14        Proceedings.................................4
          Certificate................................116

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1
2          THE CLERK:  Calling the Flint Water Cases.

3          THE COURT:  Thank you.  Please be seated.

4          And it's going to take me just a minute to get my

5    computer hooked up.

6          Okay.  I'd like to suggest something today.  I found

7    it very difficult to spend the time that I was talking

8    yesterday with the mask on.  It caused a real challenge to me,

9    and I notice that it did to all of you as well -- or some of

10   you.

11         And so I'd like to offer you the opportunity when

12   you're speaking only to remove your mask if you wish to.  And

13   if anybody has any concern about that, please let me know.

14         There's an absolute veto if any of you have a concern

15   about it.

16         MR. CAMPBELL:  Your Honor, I would like to take that

17   opportunity.  But if anyone in the courtroom has an issue with

18   me doing that, I'm happy to keep the mask on as well.

19         THE COURT:  Okay.  Anyone else want to speak on that?

20         Okay.  Well, then I think that's what we'll do when

21   individuals are speaking.  You're not required to take the

22   mask off.  But you may take it off during the time period that

23   you're speaking.

24         For those who are not here in person, we do have

25   Plexiglas surrounding everyone, and it's a pretty big room,

November 3, 2021

```
1    and there is room for social distancing as well.
2         Okay.  So we are ready to get started with VNA and
3    LAN's motions to exclude Dr. Krishnan.
4         MR. CAMPBELL:  Thank you, Your Honor.  Good morning.
5    I'll be handling this motion, so I'll remove my mask.
6         THE COURT:  Okay.  Thank you.
7         MR. CAMPBELL:  First of all, Dr. Krishnan, just to
8    focus us and to follow on some of the comments you had
9    yesterday about experts and really any witness, but these
10   particular experts fitting a role.
11        And Dr. Krishnan's role is to diagnose these four
12   bellwether plaintiffs with particular conditions in her
13   opinion.  And I raise it because Dr. Krishnan does not offer
14   causation opinions and the like, and we're not going to
15   address those, because they were with -- Dr. Krishnan offering
16   those opinions was withdrawn formally.  And in our briefing,
17   we make reference to that.
18        And significantly, I think she does not offer a
19   differential diagnosis on causation issues regarding these
20   four conditions.  She has diagnosed the four children with
21   them, but there's no differential diagnosis.
22        And with that, Your Honor, I'd like to start with
23   Your Honor's questions.  You had three of them for the
24   parties.
25        THE COURT:  Yes.
```

```
 1            MR. CAMPBELL:  I'll start with the first one.  And
 2   essentially the question is whether an expert like
 3   Dr. Krishnan can offer opinions based upon clinical
 4   experience, not anecdotal data or stories, but clinical
 5   experience.
 6            And the four cases do establish that, that if an
 7   expert has extensive relevant experience in their -- his or
 8   her clinical experience, that is a basis of or can be a basis
 9   for expert opinion.
10            I think that the issue for us on that really relates
11   to Dr. Krishnan's predictions.  And it melds I think all three
12   of your questions but particularly the last one.  Whether
13   Dr. Krishnan or any expert can offer a prediction of the
14   future.
15            And the answer to that is it needs to be based upon
16   extensive relevant experience.  And I think the record is
17   clear as to what -- how Dr. Krishnan offers her opinions
18   regarding percentage chances of these four bellwethers to
19   graduate from high school or to be in need of an
20   individualized education plan or even a percentage chances of
21   dropping out of graduate school.
22            And her statements are -- they are what they are and
23   they're for the parties and the Court to consider.  For
24   instance, she describes those -- well, before I get to that, I
25   don't believe there's any dispute that there's no data,
```

1    there's no studies, there's no literature that Dr. Krishnan

2    draws upon to make these future estimations.  What we're

3    dealing --

4            THE COURT:  In one instance with respect to ADHD, she

5    cites a study that people with ADHD have a 15 percent chance

6    of high school dropout instead of a 5 percent chance, which is

7    apparently the standard.

8            MR. CAMPBELL:  So, Your Honor, you predicted my next

9    statement --

10           THE COURT:  Oh, okay.

11           MR. CAMPBELL:  -- with one exception.  That's the

12   Hendrickson study (phonetic).  And the study doesn't support

13   Dr. Krishnan's opinion for this reason.  She diagnosed, and I

14   believe I can use names of the plaintiffs based upon our --

15           THE COURT:  Yes.

16           MR. CAMPBELL:  She diagnosed the Sherrod plaintiff

17   with mild ADHD, and there's no dispute.  That's what she

18   diagnosed the child with, mild ADHD.  The Hendrickson study

19   found an association between, I believe the phrase is high

20   load ADHD.  And there is none, no support for mild ADHD in

21   that paper.

22           So they're two different things, and that's, again, a

23   reason for our challenge to Dr. Krishnan's statements about

24   the future here.

25           Beyond the ADHD, the other diagnosis for three of the

November 3, 2021

1    plaintiffs are ultimately became a combination of a

2    neurocognitive and neurodevelopmental condition, mild

3    neurocognitive and developmental mixed diagnosis and a mood

4    disorder and the mild ADHD.

5         Those are the things she diagnosed the four children

6    with.  And in connection with her efforts to predict the

7    future, she described them in different ways, all basically

8    giving us the same picture.  Quote, "broad range

9    approximation."  Quote, "approximate representation of the

10   number."  She called it "anecdotal data" on one occasion.  She

11   added, quote, "very rough approximation and then estimations."

12        That's how she describes this prediction as to the

13   future.  And it just -- in the context --

14        THE COURT:  Which goes to the strength of her

15   testimony but not to whether she used the scientific method to

16   arrive at that conclusion.  And that's what Daubert requires

17   of an expert.

18        MR. CAMPBELL:  Absolutely, Your Honor.  But we

19   disagree with your characterization, the characterization that

20   you just made.  In the absence of the supporting data, we're

21   talking about her practice or her experience, and she doesn't

22   have it.

23        She said quite clearly she doesn't follow the

24   children or her patients from childhood through, and she just

25   doesn't have that experience.  So she doesn't have the

1    extensive, relevant experience called for by the cases.

2            Beyond that, Your Honor, in this population, whatever

3    it is that she's talking about, her own experience, there's

4    no --

5            THE COURT:  I think she said that she doesn't -- in

6    her practice, she doesn't collect information on the patient

7    success in school ultimately.  But she treats children at a

8    variety of ages and for a lengthy period of time in her

9    career.

10           So you're suggesting even with that experience,

11   that's inadequate to use her experience to make predictions.

12           MR. CAMPBELL:  For this one, absolutely, Your Honor.

13   We do not know and the plaintiff hasn't offered and

14   Dr. Krishnan hasn't offered.  You know, this is a percentage,

15   therefore, it's a ratio.  So what is the denominator of that

16   ratio?  What is the numerator of that ratio?  But most

17   importantly, what is the collection of data that she's talking

18   about to arrive at this?

19           And specifically using ADHD or a mood disorder or

20   reasons why children don't graduate from high school, don't

21   succeed in college or drop out, common sense tells us that the

22   reasons for those things happening are myriad.  They could be

23   literally anything.

24           And to take Dr. Krishnan's, you know, rough -- use

25   one of her words.  "Rough approximations" or "broad

1    approximations," where is it coming from and where is the

2    analysis of the, let's call them, confounding factors?

3           You know, I think it would be a fair statement, Your

4    Honor, to just say somebody that has mild ADHD and doesn't

5    succeed in college, that's not a fair data point to say,

6    "Well, you know, there's a 25 to 50 percent chance there,"

7    because of the confounding factors.

8           If this was a study, a published study, those are the

9    things that peer review would go after.  How do you -- how do

10   you do this?

11          THE COURT:  Yeah.  And that's a question I'll have

12   for plaintiffs to understand better what their perspective is

13   on how Dr. Krishnan made these predictions.

14          MR. CAMPBELL:  So in our view, Your Honor, as we've

15   put forth in the brief and the support we have them, this is

16   -- it doesn't rise to the level of Daubert -- or Rule 702

17   interpreted by Daubert and Kumho and the rest of the cases.

18          It doesn't rise to that level of methodology.  It

19   can't be discovered.  It can't be tested by us.  It is simply

20   her rough approximations or her anecdotal information about

21   this that is undefined otherwise.

22          THE COURT:  But let me ask if you would distinguish

23   between her findings in her report of ADHD, mild

24   neurocognitive disorder and mood disorder?  Those are

25   certainly testable.  Those -- you disagree.  You have your own

November 3, 2021

1    expert, and that's what a trial is all about.  So that's one

2    thing that she concludes.

3         And from my perspective, I didn't see in your

4    briefing or hear in your argument yet today anything that

5    would say that shouldn't go to the jury.

6         MR. CAMPBELL:  So, Your Honor, we're switching to the

7    second point I wanted to make, but I anticipated that it would

8    come together.

9         THE COURT:  Okay.

10        MR. CAMPBELL:  So here's the issue there.  We

11   briefed, and there's extensive discussion in the briefing

12   about Dr. Krishnan's diagnosis using the DSM, which is the

13   gold standard for these types of diagnoses.

14        And that was Dr. Krishnan's choice to use the DSM and

15   to -- just to state what it is, it's a diagnostic manual that

16   identifies certain conditions.  And the hallmark of the DSM is

17   the identification of diagnostic criteria.  Dr. Krishnan did

18   not --

19        THE COURT:  But the DSM itself lists a variety of

20   criteria that could lead to a diagnosis.  But it is not, as

21   the cases say, a cookbook.  You don't have to have one of each

22   ingredient to reach this diagnosis.  And it's not the only way

23   to make a diagnosis.

24        MR. CAMPBELL:  Well, to tag these -- to say that I

25   use the DSM to make these diagnosis and to put the -- you

```
 1    know, the strength of the DSM manual as the gold standard in
 2    this field on these diagnosis without meeting the criteria of
 3    these diagnoses is -- adds something to it that it isn't.
 4            And, you know, I -- the plaintiff cited or plaintiffs
 5    cited a number of cases.  But I would distinguish those cases
 6    on the cookbook issue, because there's some other way that
 7    they are tied.  Some objective standard with the one exception
 8    of the New York case in a criminal setting.
 9            But the others are distinguishable from what we're
10    dealing with here.  So the way I would say it is this, Your
11    Honor:  Dr. Krishnan, with her experience, clearly qualified
12    in this field, she could make a diagnosis of what the children
13    have.  However, she chose to bolster that by hanging the tag
14    of a DSM diagnosis on it, and those don't fit.
15            I was trying to think of an analogy here.  And the
16    best I can do -- and forgive me to Mr. Stern, but yesterday he
17    made reference to Rule 4.  He knows that you need to serve a
18    complaint after you file it.
19            And I guess the analogy that I would say is someone
20    might say, "Well, I followed the Rule 4 criteria for service.
21    I served it."  But if you don't do the criteria, it's not
22    Rule 4 service.
23            And the same thing pertains here.  Demonstrably, it
24    is shown as set forth in our briefing that the criteria wasn't
25    met, and we have Dr. Krishnan bolstering this by saying it's a
```

1    DSM diagnosis when it isn't.

2           If I can return just for a moment to the future

3    issues.  Dr. Krishnan does not give us any baseline, if you

4    will.  In the absence of the Flint water issues or in the

5    absence of this or these diagnoses to stay focused on what

6    Dr. Krishnan did to diagnose conditions, what would be the

7    baseline for somebody -- for children in this circumstance?

8           We don't have that from Dr. Krishnan.

9           So then again to give the ratio, if you will, to a

10   percentage chance of what, you need the baseline to say that

11   there's some difference.  You need the --

12          THE COURT:  She does have a baseline.  She seems to

13   think that 5 percent, I believe, of people don't graduate from

14   high school.

15          MR. CAMPBELL:  I think she drew that -- Your Honor, I

16   don't mean to interrupt but --

17          THE COURT:  Did she --

18          MR. CAMPBELL:  I think that's drawn from the

19   Hendrickson paper, and that's not pervasive across the board,

20   and it certainly isn't relevant to the Flint children and what

21   the experience might be in Flint.

22          And that's relevant -- perhaps we'll take that up

23   with Dr. Crakes as well.  But it's relevant because that's the

24   only data that we have for these children.  So you have to

25   start from somewhere.

November 3, 2021                                                     14

```
 1              But to say these four children have these percentage
 2    broad range approximations or however she describes it, you
 3    need to say from what.  And she doesn't do that.
 4              THE COURT:  What about her statements that
 5    individuals with similar IQs are generally successful in two
 6    to four year colleges?  Would that be a baseline?
 7              MR. CAMPBELL:  I think it brings in other issues that
 8    -- to restate what Dr. Krishnan found, these four children are
 9    generally doing well in school.  They are within the normal
10    range of IQ.  There's no issues there.  She doesn't raise any
11    issues there.  They're doing well in school.
12              And to say that she identifies a percentage of how
13    children do or people do generally, I do believe you need to
14    tie it to Flint because of who you're dealing with.
15              THE COURT:  What do you mean "who you're dealing
16    with"?
17              MR. CAMPBELL:  I'm sorry.  We are dealing with
18    children from Flint that are starting from that point --
19              THE COURT:  But children in Flint are not inherently
20    different from children anywhere else such as Ann Arbor or
21    Boston.
22              MR. CAMPBELL:  That is true, Your Honor.  But when
23    you're talking about educational issues and predicting the
24    future, the starting point would be Ann Arbor or Boston or
25    Flint.  And those -- that starting point is available.  And it
```

1    would be a reasonable methodology to use for a starting point.

2         THE COURT:  I'm not following you.  You're suggesting

3    that a child -- let's take the Flint water crisis out of this

4    altogether.  A child starts life in Flint.  And are you

5    suggesting that that child starts behind the starting line

6    because they're in Flint?

7         MR. CAMPBELL:  I'm not suggesting -- I'm saying that

8    there are -- there's data available from the government, the

9    census data that will describe what educational futures are on

10   a population-based analysis in any given community including

11   Flint.

12        THE COURT:  And our job in the justice system is in

13   many ways to level the playing field, to look at each

14   individual as just that, an individual with strengths and

15   weaknesses.  And to see, to ensure that they have

16   opportunities that every other child in this country has.

17        MR. CAMPBELL:  I agree with that, Your Honor.  And

18   that should be our view, but when we're dealing with issues

19   like this one, you know, what is the percentage chance of

20   somebody from a given area to do anything?

21        And that information is available.  It's not casting

22   aspersions on anyone, and I certainly don't mean to do that,

23   and our briefing doesn't mean to do that.  It is simply that

24   that data is available, and it is of the type of data that

25   experts who do this rely upon.

```
 1          THE COURT:  Why does the area matter as opposed to
 2   looking at the individual's home environment and their own
 3   testing and their own personal situation?  Why don't -- why
 4   does the area they're from matter?
 5          MR. CAMPBELL:  Because it is the type of data relied
 6   upon by people who do this.  And the other factors that you
 7   identify are certainly part of the mix as well.
 8          You know, when I think that experts in the field,
 9   when they consider what an educational future will be, among
10   the first places they will look is family history and how
11   parents, what that is.
12          And, you know, that's individualized, but that's what
13   these professionals do in order to approximate a future while
14   giving the same -- not saying anyone starts ahead or behind.
15   That is how this is analyzed by experts in the field.  It's
16   not something that I'm overlaying on it.
17          If I could --
18          THE COURT:  Okay.
19          MR. CAMPBELL:  -- move for a second, Your Honor.
20   Just, the cases that we talked about yesterday or that came up
21   yesterday regarding -- excuse me -- Dr. Graziano.  You know,
22   what do you need in Michigan in order to predict the future?
23   And I think most of those go to damages, if you will.
24          But this is a damage issue.  And I think they're
25   instructive of what is required.  And I would just to throw
```

```
 1    out the case names Henry, the Court mentioned Larson, Stites

 2    citing King.  And even the Rupersberg case that was cited

 3    yesterday by the plaintiffs, that -- it has to do with medical

 4    bills but requires a reasonable certainty into the future.

 5    That's the phrase for the medical bills.

 6              In any case, the clear implication of these cases is

 7    that whatever this is, it has to be reasonable certainty.  And

 8    I believe the Stites case, if I have my cite correct,

 9    described that as, quote, "in all likelihood."

10              And that's not what we have here.

11              THE COURT:  But here we have a diagnosis, and we have

12    Dr. Krishnan -- well, let me ask you if the cases you're

13    citing apply to someone who has a diagnosis of lead poisoning

14    and ADHD, mood disorder, etcetera, and what we're talking

15    about is the likelihood of that progressing?

16              MR. CAMPBELL:  Right.  Clearly and obviously they

17    don't apply.  They're not about lead.

18              THE COURT:  Right.

19              MR. CAMPBELL:  But do they apply?  Yes, they do.  And

20    they apply, because they require a present injury.  These

21    children on these issues do not have a present injury.  At

22    best, what Dr. Krishnan is doing is trying to assess a risk

23    factor that may currently exist.  It's not a present injury.

24              THE COURT:  Well, what if the present injury is the

25    ADHD or mild neurocognitive disorder?
```

```
 1              MR. CAMPBELL:  So according to Dr. Krishnan, that's
 2     exactly what the injury is.  And that's what they have, and
 3     that's what Dr. Krishnan would like to testify about.  But
 4     that doesn't mean that you can then say, "Well, in the future,
 5     this is what's going to happen."
 6              Michigan law is clear that future damages need to be
 7     -- are not recoverable unless they are reasonably certain or
 8     happen in all likelihood.  And that's what we're talking about
 9     here.
10              THE COURT:  But that goes to how did she come up with
11     the 15 to 20 percent likelihood of not graduating from high
12     school as a result of these conditions.  Which to me is
13     different from whether these known conditions that she
14     diagnoses them -- you know, the jury will decide.
15              If her evidence is weak, if her presentation is weak,
16     your expert is stronger, that the children don't have these
17     disorders, well, then it's not an issue.
18              But assuming she testifies that they have these
19     conditions, what are the cases that say that if she can
20     support with her experience or with her experience, I guess is
21     what it has to be, that her predictions are accurate.
22              What are your cases to say she can't do that?
23              Now, I don't know that her report shows where she
24     drew those numbers from.  So that's a question the percentage
25     is from.  So that's a question for plaintiffs.
```

November 3, 2021

1    MR. CAMPBELL:  So we've talked about why we don't
2    think those percentages and that analysis meets the Daubert
3    standard.  But beyond that -- and I would stand corrected.
4    But I believe that the report simply placed these percentages
5    without describing any more of a basis than what we've already
6    talked about.
7            THE COURT:  I agree with that.
8            MR. CAMPBELL:  And as to the case law, the best I can
9    do right here, Your Honor, subject to, you know, coming up
10   with a case that we could submit later is the ones we've cited
11   go to this issue.
12           And there is -- in fact, there's -- it's not probable
13   that these conditions -- that these results will pertain even
14   according to Dr. Krishnan since they're all below 50 percent.
15           That's -- it's not reasonably likely.  It's not
16   reasonably probable.  It's not more probable than not, because
17   the percentages are less than 50 percent.
18           So by her own analysis, it is not probable.  It's not
19   reasonably certain.  And it is a speculative analysis based
20   upon her experience that doesn't support it for the reasons
21   that I've already articulated.
22           THE COURT:  Okay.  Well, thank you.
23           MR. CAMPBELL:  Thank you, Your Honor.
24           THE COURT:  Who will be responding for plaintiffs?
25           MR. WALKER:  I will, Your Honor.

```
1              THE COURT:  Okay.
2              MR. WALKER:  Renner Walker for the plaintiffs.
3              And I'd like to also do my best to answer the Court's
4    questions that were provided in the communications to the
5    parties.  For the most part, I think our brief covers outside
6    of the future damages issues, which I think were a lot of the
7    discussion.
8              And the question was directed, you know, just to say
9    briefly maybe ahead of the questions, or as I said, part and
10   parcel of the first point, you know, the DSM as cookbook.  And
11   I think there's something that --
12             THE COURT:  Well, why don't you start out -- what I'm
13   actually most concerned about is the basis for Dr. Krishnan's
14   estimates about the future, her predictions for the decreased
15   likelihood of high school graduation, for example.
16             Where does she get that?
17             MR. WALKER:  She mentions it in her deposition, I
18   think.  And what she says is this is clinical experience, that
19   she's treated a lot of children, and, no, she doesn't have a
20   database.  She does not follow every child.
21             But they are, you know, based on her experience
22   working with children over the years, that these are the kinds
23   of consequences she has seen.  She does call them -- she calls
24   it an approximation or an estimate.
25             And, in part, that is -- I think that follows in some
```

```
 1    ways from the weakness of literature generally in this field.
 2    I think the Fredriksen study is a benchmark.  I think she
 3    draws -- she draws on it and makes her own inferences about
 4    it.
 5            There's certainly a dispute.  VNA disputes the
 6    strength of the study in supporting her conclusions.  But I
 7    think that's a better question for cross-examination.
 8            THE COURT:  Does she treat any adults or in college
 9    or anyone in masters programs?  Because she draws on these
10    percentages saying you're only X percent likely -- these
11    bellwether plaintiffs are only X percent likely to graduate
12    from college with these conditions.
13            Does she treat people in college?
14            MR. WALKER:  Yes, Your Honor.  I think it's adults at
15    large discussed in her deposition.  About 30 to 40 percent of
16    her patient base are adults.  So she is seeing, obviously, the
17    majority, 60 to 70 percent are children.  And of those, she
18    specifies that the bulk of them are kind of in the, I don't
19    know what you call that, the preadolescence 2 to 12 or 13 or
20    so.  But about 30 to 40 percent are adults.
21            And so, you know, what -- she explained certainly to
22    me when I tried to get some more clarity on it, but I think
23    it's in the deposition, as well, is that literature, it may
24    lag behind.  Current conditions, it may deal with children
25    that do have other confounding factors.
```

November 3, 2021

```
 1            And to the point of localized conditions, that, if
 2   anything, bolsters clinical judgment.  Because Dr. Krishnan
 3   has an office in Grand Rapids, treats children in Michigan.
 4   She's familiar with conditions like schools.  And, if
 5   anything, that strengthens her ability to assess how children
 6   are going to perform over time.
 7            THE COURT:  Does she rely on the Fredriksen study for
 8   anyone other than Sherrod?
 9            MR. WALKER:  Yes, Your Honor.  And let me -- I have
10   the report in front of me.  It is also in the D.W. report.
11   Yeah.  She mentions it with respect to D.W. as well.  And I
12   think that, you know, she's trying to synthesize data as well
13   as she can, knowing that there are -- you know, and she is
14   doing batteries of tests with these children.
15            It's not -- you know it's not purely -- you know I
16   think she's with them for seven hours.  She interviews them,
17   interviews the parents.  So she certainly is trying to draw as
18   much data as possible.
19            I think the Fredriksen study is one data point that
20   she relies on.  It provides one baseline, which is the, sort
21   of, the 5 percent number.  And so she's able to say, "Well, if
22   it's a two to three times likelihood, that might be a 10 to 15
23   percent chance that they're going to not complete high
24   school."
25            THE COURT:  Mr. Walker, you talked about the
```

 1    literature maybe lagging behind in this particular area.  Do

 2    you have cases that would suggest that when the literature

 3    lags behind, courts should not follow the literature and lag

 4    behind as well?

 5           MR. WALKER:  I don't know of a case that speaks of,

 6    say, you know, literature not -- of lagging.  Not off of the

 7    top of my head, in all candor, Your Honor.  What --

 8           THE COURT:  And I'm not suggesting that anyone should

 9    lag behind reality.  And that maybe that's where experience of

10    an expert permits a particular finding to be admissible.

11           But I'd be interested if there simply are not studies

12    that can support these predictions, what is the basis for the

13    Court accepting that testimony?

14           MR. WALKER:  So and I think it's an important point

15    that is mentioned, and I believe it is the Best case, if I'm

16    trying to do my best to remember -- sorry.

17           THE COURT:  Best.

18           MR. WALKER:  My best to remember the discussion in

19    that case.  There's an argument that there's not a single

20    piece.  I'm looking at page 181 of the opinion.  You know, not

21    a single piece of medical literature that supports the

22    expert's opinion.

23           And, you know, what the court does say, I think the

24    court thinks it's not dispositive.

25           Sorry if that's me creating the rumble, Your Honor.

1            THE COURT:  Right.  And that's an interesting thing

2    where the Best versus Lowe's Home Center, Inc., case says that

3    an expert must, quote, "Employ in the courtroom the same level

4    of intellectual rigor that characterizes the practice of an

5    expert in the relevant field."

6            And so you're telling me that Dr. Krishnan exercised

7    professional techniques in these interviews, administration of

8    the testing, evaluation of the records to reach these

9    predictions.  And what's left is for Mr. Campbell to

10   cross-examine her.

11           MR. WALKER:  Yes, Your Honor.  If I --

12           THE COURT:  What if -- because from my reading of the

13   material, it appears that -- it is difficult for me to track

14   where she gets the specific percentages for each of the

15   bellwether plaintiffs.  But she certainly says they have a

16   decreased, somewhat decreased chance.

17           Because she even has a range of -- like for R.V., she

18   says that that individual has mild neurocognitive disorder and

19   a 25 to 50 percent chance of needing tutoring.  So that's --

20   and that's more immediate.  She knows what the math scores

21   are.  She knows what's going on there.

22           But in terms of these, "30 to 50 percent chance that

23   A.T. will not graduate from college," what if I permitted her

24   to say that the plaintiffs have a somewhat decreased

25   likelihood of graduating from high school and college as a

```
 1   consequence of these diagnostic outcomes?
 2          MR. WALKER:  I think that would be -- and to be
 3   honest, obviously, I don't believe to speak for Dr. Krishnan,
 4   of course.  I think that she would think that would be -- I
 5   know that it doesn't have a number, but in some ways a more
 6   accurate way to put it.
 7          And I think to go back to what Joiner and what Best
 8   talk about, right, it's ensuring that an expert employs the
 9   same level of intellectual rigor in the courtroom that they
10   apply in their ordinary practice.
11          And so, you know, it's certainly a clinical
12   neuropsychologist is not always trying to come up with a
13   precise number.  They're not gamblers.  What they're trying to
14   do is establish risks and hopefully courses of treatment that
15   can help the child.  Or obviously she treats adults too.
16          But so I think when the 25 to 50 percent number comes
17   along, I think she says this about A.T. in her likelihood of
18   success in college or perhaps lack thereof.
19          There are not specific numbers about college success
20   or lack thereof for children who have neurodevelopmental
21   disorder.  And so she's basing it on experience.  She's trying
22   to synthesize when she can, and I think the decreased chance
23   is accurate or maybe in some ways better than the number, to
24   be honest.
25          THE COURT:  Let me ask you what do you think of
```

```
 1    Mr. Campbell's use of the cases, the Michigan cases that there
 2    has to be a reasonable certainty for damages to be collected,
 3    reasonable certainty of the harm?
 4            MR. WALKER:  So I looked at cases as well, and I saw
 5    Henry, and I saw Larson, although I think Larson is of course
 6    -- Henry articulates very well there's like a distinction
 7    between a present injury that might have future consequences
 8    versus a present exposure without a present injury that might
 9    result in a future injury.
10            I think that was asbestos in Larson.
11            THE COURT:  It was.
12            MR. WALKER:  So I looked at it, a case, and it was
13    informative.  Of course, the injury itself is somewhat
14    different.  But it was Berrios versus Miles, Inc.  That's 226
15    Michigan Appeals 470.  It was obviously a tragic story.  A
16    young man, hemophiliac had contracted HIV.
17            And it presents as a statute of limitations case.
18    But, you know, the court has a, I think, very enlightening
19    discussion about damages on page -- is it bridges page 478 and
20    479 that, you know, damages may inherently have some
21    speculative component to it.  But, you know, they just --
22    because they can't be ascertained with mathematical precision
23    doesn't include recovery.
24            And I think one of the things that, you know,
25    influences this on some level is that if it's a damages
```

```
 1   question, you know, I think -- I suppose the alternative would
 2   be that we would have to wait and see if any of these children
 3   doesn't finish high school.
 4          And so I think that being able to present that
 5   information to the jury, I know that, you know, Dr. Krishnan
 6   did not use the magic words "reasonable certainty."  I think
 7   that that's what she's trying to gesture at.  I think
 8   reasonable certainty is like any of those sort of probable
 9   cause or whatever.  I think it's difficult to say precisely
10   what it means.
11          But I think what the court is getting at is that, you
12   know, although you might not have a precise number or
13   whatever, that those are ordinarily jury questions.
14          THE COURT:  So you're suggesting that these are
15   present injuries with future consequences that this expert can
16   describe for us as opposed to the Larson situation of is there
17   a likelihood of future injury?  This is a present and known
18   injury according to her diagnosis that will have a future
19   consequence.  And in her professional experience she knows
20   what that looks like.
21          Do psychologists, neuropsychologists make predictions
22   about -- is this the ordinary course of their professional
23   work to make a prediction about graduation rates?
24          MR. WALKER:  You know, the answer that I was getting
25   at earlier, Your Honor, I think that they are less, you know,
```

1    making precise predictions trying to come up with a 25 or 50

2    percent, rather than, you know, trying to assess is that a

3    risk and it does the course of care.

4            THE COURT:  And if we're looking at the future

5    predictions as a damages issue, is the fact that her

6    predictions are under 50 percent mean that they are -- that

7    there's not a reasonable certainty because it's not more

8    likely than not?

9            MR. WALKER:  I don't think so, Your Honor.  I mean, I

10   think, you know, if a person -- if a bricklayer falls off a

11   building and breaks their back, the damages expert is going to

12   have to come in and try to make a prediction as well.  You

13   know, I think that's always -- there's going to be uncertainty

14   built into that.

15           THE COURT:  But there you have a known injury, which

16   we have a known injury here of ADHD, etcetera.  But the

17   bricklayer, we also know, we're going to have the vocational

18   expert testify about what she can do.  Can she stand, stoop?

19   Believe me, I've heard a lot of vocational experts.  How much

20   can she lift?  How much can she twist, you know, all of those

21   things.

22           And then so it's -- so there is sort of very clear

23   certainty, or at least experts can battle it out, which is

24   what trials are for.  One expert's going to say the person --

25   the injury's nothing at all.  They can climb and lay more

```
1   bricks.  And another is going to say they're virtually bed

2   ridden.

3           MR. WALKER:  And I think that that will happen here.

4   I mean, certainly VNA makes an argument based on its expert's

5   report with respect to at least one of the children in its

6   motion to exclude Dr. Krishnan.

7           Certainly VNA makes -- and, you know, Mr. Campbell

8   made a point to say that there currently appear, you know,

9   some of them are within average ranges of IQ, that kind of

10  thing.

11          We think that that does not pick up on all of the

12  symptoms.  You know, to say that one child is within average

13  IQ range may obscure the fact that the problem is that they're

14  lagging a grade behind or more in reading scores or something

15  along those lines.

16          What I would add, by the way, is not only is it a

17  capable battle of the experts here, but that Dr. Bithoney can

18  also speak to, you know, in his experience as well, treating

19  5,000 children.

20          One of the issues that's going to come up in his

21  motion is the lag effect.  Right?  That they perform well

22  maybe or better comparatively than when they are younger, and

23  that it over time, you know, when they get to be 15, 16, 17.

24  And he's seen those things as well.

25          So I think that he -- you know, Dr. Krishnan is not
```

1   the only expert that can speak to this.

2          THE COURT:  Okay.  The Berrios case is interesting,

3   because it tells us that in Michigan, although damages based

4   on speculation or conjecture are not recoverable, because they

5   cannot be ascertained with -- damages are not speculative

6   merely because they cannot be ascertained with mathematical

7   precision.

8          It is sufficient if a reasonable basis for

9   computation exists, although the result be only approximate.

10  But we have to square that with the remainder of the cases

11  that talk about a reasonable certainty that these negative

12  consequences will take place.

13         And in that case, as I'm seeing now, the individual

14  had an infection with HIV and did not yet have the onset of

15  symptoms.  So the cause of action was when there was HIV and

16  not yet the symptoms.  But it sure seems to me that the

17  scientists can give us a reasonable degree of certainty about

18  what that progression could be at that time, which was 1997,

19  prior to some of the treatments that are now available.

20         So okay.  I'll take a closer look at Berrios.

21         Mr. -- oh, did you have anything further?

22         MR. WALKER:  I was about to say unless the Court has

23  further questions for me.

24         THE COURT:  Not at this time.

25         Yeah, Mr. Campbell.

1       MR. CAMPBELL:  May I follow-up?  Thank you, Your

2   Honor.  I have not read the Berrios case.  I'm not sure

3   whether I should have.  I didn't recognize it as one that was

4   in the briefing.

5       THE COURT:  I didn't either.

6       MR. CAMPBELL:  But just listening to Your Honor as to

7   what it said, that seems to me to be relative black letter law

8   type of comments about, I don't know, maybe economic-type

9   damages where the challenge is not -- well, you don't know

10  exactly what it is.  Of course not.  It's presented based upon

11  a reasonable methodology, accepted in the field, and that's, I

12  believe, probably what the case is addressing.

13      But the bottom line is the -- every case in Michigan

14  that I've seen on this issue is quite clear that plaintiffs

15  may not recover for something they may suffer in the future

16  unless it's founded in reasonable certainty.  We don't have

17  that here.  Your Honor used the phrase that we have a "present

18  condition with future consequences."

19      Using the example that you had of somebody, you know,

20  I believe it was a bricklayer that has an injury on the job

21  that does something physically to himself or herself that

22  takes the person out of that occupation, that's a different

23  story than what we have here.

24      We have a situation here where there are no known

25  future consequences other than this prediction of a percentage

```
 1   that's under 50 percent with children that are doing well with
 2   normal IQ scores and based upon the challenged methodology
 3   that Dr. Krishnan is using to get to those percentages.
 4          I think it's a very, very different circumstance.
 5   That's the position we have.  And I would close, Your Honor,
 6   with one of the cases you cited was Brown.  And I had the
 7   quote from the Brown case is on this issue of future
 8   testimony.
 9          Quote, "Experience without reliable, testable
10   methodology is insufficient."  And that's -- I think,
11   describes what we're dealing with here with Dr. Krishnan.
12   She's referenced her patients.  But, again, we don't know the
13   numerator, the denominator.  We don't now the compounding
14   factors in a circumstance where so many things can affect
15   educational success.
16          THE COURT:  Okay.  Thank you.
17          All right.  So I will take that -- all of your
18   remarks along with the briefing into consideration and issue a
19   written opinion.
20          We are now up to Dr. Bithoney.  Want to say anything
21   on Dr. Krishnan, Mr. Mason?
22          MR. MASON:  I apologize, Your Honor.  I believe it's
23   been covered.
24          THE COURT:  Okay.  Thank you.
25          Let me start.  Who's going to argue for plaintiff?
```

1    Yeah, I see you, Mr. Campbell.

2            Mr. Stern, let me just ask a couple of questions that

3    I think will help me focus on this.

4            Dr. Bithoney, let me ask you if you intend to illicit

5    testimony about the specific diagnoses that the plaintiffs

6    have or their symptoms.  Because in his report, I saw a

7    connection between plaintiffs' symptoms and lead, but I didn't

8    see the diagnosis in lead.

9            MR. STERN:  Thank you, Your Honor.

10           Dr. Bithoney relies upon the diagnoses of

11   Dr. Krishnan.  And with 50 years of experience as not just

12   someone who specializes in lead poisoning but clinical

13   practice dealing with children, he is familiar with, based on

14   his practice and experience, those diagnoses, even though he,

15   himself did not formulate the diagnoses.

16           Meaning that Dr. Krishnan spent hours and performed a

17   battery of tests and did certain things to come to the

18   conclusions that she did, and Dr. Bithoney did not.  So to --

19           THE COURT:  Oh, I know that.  I know that.  I was

20   just interested in whether you were going to have him testify

21   about the various symptoms that your clients have experienced

22   as opposed to their diagnosis being caused by lead.

23           MR. STERN:  He's going to talk about the symptoms

24   that they've experienced and his experience in dealing with

25   those symptoms and what those symptoms mean to him in terms of

1   his analysis as to whether, A, they're lead poisoned and then,

2   B, causation associated with the lead poisoning.

3         But his testimony is essentially all about the

4   symptoms.  But to say that he wouldn't be able to speak on the

5   actual diagnoses, I think would be disingenuous of me to say

6   that to the Court.

7         I don't think he needs to.  I think that he can take

8   -- make assumptions based on Dr. Krishnan's diagnoses, and

9   based on the symptoms reported to him both in medical records

10  from the parents potentially from teachers or schools, he can

11  then give his opinions based on the symptoms.

12        THE COURT:  Right.  And you're talking about specific

13  causation.  And I think I was clear.  I'm looking at his

14  testimony on general causation.  And for example with mood

15  disorder, is he going to testify that mood disorder is caused

16  by lead poisoning?

17        MR. STERN:  Yes.

18        THE COURT:  Okay.  Well, let me let Mr. Campbell

19  speak first, and then we'll go from there.

20        MR. CAMPBELL:  Thank you, Your Honor.

21        I've debated where to start on this one.

22        THE COURT:  There's a lot here.  I debated where to

23  start.

24        MR. CAMPBELL:  And if it's okay with Your Honor, I

25  know the one question that you asked of us was the one that

```
 1    you just put to Mr. Stern.  But, typically, I would start with
 2    that, because obviously it's top of mind for you.  But I'd
 3    like to start at another point if that's okay.
 4              THE COURT:  That's just fine.
 5              MR. CAMPBELL:  So the point that I wrote down first
 6    to start with is the one that was discussed just now.  I took
 7    the time when we started with Dr. Krishnan to say that she was
 8    withdrawn as a causation expert, and there is no causation
 9    source from her.
10              So one of the things that's fundamental under
11    Michigan law or Sixth Circuit law is that the plaintiffs'
12    burden here is to rule out or to do a differential diagnosis
13    to use a phrase that's better for the medical part of it as to
14    these conditions.
15              And I think again, common sense tells us as well as
16    the DSM and testimony that mood disorders, the alleged mix of
17    neurocognitive and newer developmental diagnosis by
18    Dr. Krishnan and certainly ADHD can have multiple, multiple
19    causes.
20              Now, the plaintiffs' proof here fails, because there
21    is no one that has been offered to do that differential
22    diagnosis.
23              THE COURT:  Well, Dr. Bithoney took into
24    consideration a great deal of information.  And in his
25    deposition, it becomes clear that he looked at things like
```

1    fetal alcohol.  He looked at family history.  His deposition

2    implies a differential diagnosis.  His report does not

3    specifically provide that.

4         I agree with you that his report -- it is not clear

5    in the report what he did to rule out these other conditions.

6    He certainly has support for why he ruled in lead as the

7    course of the problem.

8         But it is difficult in the report itself, but it

9    seems to me that his deposition touches upon the differential

10   diagnosis.

11   MR. CAMPBELL:  I'd have to disagree with you, first

12   of all, at least as to the deposition.  On the report, there

13   is none.  I read them, and for this point, I read them again.

14   And as far as I can tell, there's nothing in the report.

15        And the report defines the disclosure and what we're

16   dealing with.  And that defines what you need to inquire about

17   at a deposition.  In the deposition, Dr. Krishnan no doubt

18   talked about the things that you did, but it didn't apply it

19   to the four plaintiffs.

20        And I stand on the statement that there is no

21   differential diagnosis for these children with these

22   conditions that are clearly and obviously, and I would say

23   concededly, could be caused by other things other than

24   exposure to lead.

25        And that is a fundamental failure of the plaintiffs'

1   burden here with respect to Dr. Krishnan and -- well, I'll

2   leave it at Krishnan.

3            THE COURT:  Well, he goes through the family history

4   for each individual plaintiff.

5            MR. CAMPBELL:  He does that, but that's not a

6   different -- that does not address, to be specific, let's just

7   pick one.  ADHD.  ADHD can be caused by multiple things.  And

8   among the criticisms that we raised for Dr. Krishnan is that

9   although he looked at a couple of blood lead studies, not bone

10  lead.  We'll get to that.

11           For ADHD, you know, that arguably create a situation,

12  not a causal basis.  But he ignored the major burden or major

13  body of literature that would not create that and addresses

14  other things.

15           So, yes, he did a family history, but that's not a

16  differential diagnosis.  That's not stated anywhere that I

17  have considered these other potential areas for these

18  conditions --

19           THE COURT:  With respect to ADHD, he asked the

20  parents whether they drank alcohol, or the mothers whether

21  they drank alcohol during their pregnancies.  He asked whether

22  there was a family history of ADHD.  And those are certainly

23  ways to rule -- to come up with a differential diagnosis.

24           MR. CAMPBELL:  I have no doubt that it's a start ,

25  Your Honor.  But I also have equally no doubt that that's not

1    the end point.  You have to do more.  And I would say that if

2    that was the key issue in this case or some other case, the

3    litigants would be in here arguing to you that that is an

4    insufficient basis of methodology to do the differential

5    diagnosis.

6             THE COURT:  If we know, in fact, that he did it based

7    on some of his responses during his deposition but he didn't

8    know that it's a requirement for specific causation in

9    Michigan, and so it, therefore, was not spelled out in his

10   report for each of the bellwether plaintiffs, is there any

11   prejudice to the defendants for allowing him to simply say

12   what he did.  He either did it or he didn't.

13            And he is somebody with -- you said 50.  I thought it

14   was 40 years of experience in this area.  And it's clear to me

15   that there's -- that he did -- he was looking for other

16   sources for these problems, but he never states it clearly in

17   his written report.

18            It comes out through the deposition but not in the

19   report, and he never summarizes it in a neat, tidy package for

20   us.

21            MR. CAMPBELL:  So, Your Honor, what I would say to

22   that is first of all, I disagree for the reasons I already

23   said, that the deposition addresses it.  Leaving that aside --

24            THE COURT:  Okay.

25            MR. CAMPBELL:  -- we are, you know, a few months to

```
 1    trial.  We are at a Rule 702 hearing.  We have followed the
 2    requirements of an extensive CMO.  And this is the time for
 3    the challenge to these experts.
 4          And I don't know that Dr. Krishnan -- I'm sorry.
 5    Dr. Bithoney would know or not know about what the
 6    requirements are.  But that's the role of the litigants.  And
 7    we are at a time now where this is the Rule 702 challenge to
 8    what has been put forth and this is a fatal flaw in his
 9    opinions.
10          And to then say, "Well, we're going to rescind the
11    CMO and, you know, the Daubert issues and Rule 702 and allow,
12    you know, further expert reports," that's going to lead to
13    further expert reports or responsive reports, further
14    depositions.
15          And what I would say, Your Honor, is, yes, we are
16    prejudiced, because we're here.  And if the rules are now
17    changed as to where we're at, then that's the prejudice.
18          THE COURT:  No.  We are at the Daubert hearing.
19          In the deposition, he says that he looked at family,
20    medical, and social histories, medical records for the
21    plaintiffs, including lab results, maternal alcohol and drug
22    use, and genetic factors.
23          Is that accurate?
24          MR. CAMPBELL:  Your Honor, without doing the
25    differential diagnoses, this is what I did, these are my
```

```
1    findings.  We can read comments in his deposition testimony,
2    but it's not a differential diagnosis.  It's not stated.  It's
3    not -- it wasn't subject to disclosure in his report, and the
4    report defines the disclosure and the level of inquiry.  It's
5    not there.
6          THE COURT:  Okay.  Yeah.  It's certainly not in the
7    report.
8          So what is the response from plaintiffs just so we
9    don't lose some of these.
10         MR. STERN:  Sure.  Your Honor, there's no requirement
11   that a expert says magic words when it comes to a differential
12   diagnoses.
13         THE COURT:  No.  But under Michigan law, for a
14   specific causation expert, they have to have ruled out other
15   causes.
16         MR. STERN:  There's not -- I don't know of a single
17   question that Dr. Bithoney didn't answer that would lead
18   anybody to believe that he did not come up with a differential
19   diagnosis.
20         He looked at literally every piece of family history.
21   He looked at every medical record that was available.  He did
22   look at blood levels.  Did look at bone levels.  But
23   ultimately, there was nothing else for him to attribute the
24   causation to based on his differential diagnoses.
25         THE COURT:  So show me in the report where he makes a
```

 1    differential diagnosis.  Let's take Sherrod.

 2              MR. STERN:  Hang on one second.

 3              THE COURT:  That's just who I have first.

 4              MR. STERN:  First and foremost, he says, "Emir was

 5    born after an uncomplicated pregnancy, labor, and delivery."

 6              One of the hallmarks of the type of neuro -- this is

 7    not -- I'm now commenting on that sentence in his report, so

 8    I'm not quoting the report.

 9              THE COURT:  Okay.

10              MR. STERN:  But one of the things in cases like this

11    that a defendant might argue is an actual cause of the same

12    injuries that Emir Sherrod has here is that a child had a low

13    Apgar score at birth, or there were complications where a

14    child was stuck in utero during the birth and delivery and

15    there could have been brain damage.

16              So he's not mentioning this sentence simply because

17    it's commonplace.  He's saying that Emir was born after an

18    uncomplicated pregnancy, labor, and delivery, meaning that

19    there's nothing from the labor and delivery that would have

20    caused any of these issues.  That goes into a differential

21    diagnosis.

22              Mother did not ingest alcohol during her pregnancy.

23    Again, fetal alcohol syndrome could very much lead, and he

24    touches upon this in his deposition as well, could lead to the

25    same type of injuries that have been diagnosed by Dr. Krishnan

1    here.

2              However, before she knew she was pregnant, she ate

3    half of a marijuana cookie purchased legally every few days.

4    So he is now recognizing that there might be some connection

5    during a birth and delivery to illegality, whether it was

6    alcohol or drugs, but there's no testimony from anybody else,

7    and clearly he does not believe that the ingestion of a

8    marriage cookie every few days would have had any impact on a

9    different cause for the same diagnosis.

10             He talked about the birth weight.  Again, children

11   with lower birth weights typically indicates premature birth,

12   and a premature birth may lead to complications that involve

13   brain issues and brain development.

14             But he's now recognizing that during the course of

15   labor, delivery, and even post-delivery that this is a normal

16   child.

17             If we skip down to --

18             THE COURT:  Okay.  So what you're telling me is that

19   the magic words "differential diagnosis" are not needed or the

20   magic words of I ruled out X, Y, and Z as the source of the

21   ADHD.

22             MR. STERN:  Correct.

23             THE COURT:  But, in fact, that's what's implied in

24   this report.

25             MR. STERN:  Correct.  I mean, the paragraph that

```
 1    begins with, "Emir has no chronic -- Emir has no chronic
 2    medical issues except for skin rashes, which seem to improve.
 3    And extensive review of system within normal limits except as
 4    described herein."
 5         That's a ruling out of chronic issues.  What if he
 6    had chronic migraines or if he had chronic sleep disorder or
 7    he had chronic fainting spells related to low blood flow to
 8    the brain?  He is taking us through his investigation into his
 9    opinion as to why these injuries were caused by the lead.
10         So I don't see the prejudice to the defendants for
11    him not using the magic words.  It's not as though anything
12    would change if Dr. Bithoney today submitted an affidavit or
13    at the very end of his deposition or at the very end of each
14    of his reports, he said, "Based on the foregoing, I have
15    undertaken to provide a differential diagnosis.  I have ruled
16    out most other factors, and I believe that the cause of these
17    injuries is the exposure to lead."
18         It's in there.
19         THE COURT:  Okay.  So, Mr. Campbell, what the cases
20    suggest is you must do a differential diagnosis.  You must
21    undertake that, otherwise it's hog wash, we don't know what
22    caused this harm.  But here, Mr. Stern is arguing that
23    Dr. Bithoney did that by rule -- there was the normal
24    pregnancy, the normal birth weight, there was X, Y, Z that
25    he's aware of.  He considered.
```

```
 1              And why is that not sufficient under the cases?  What
 2   cases say it must be spelled out in the report what was ruled
 3   out?  He's clearly ruled out fetal alcohol.  He's ruled out
 4   birth trauma.  He's ruled out some traumatic event or
 5   something in early childhood.  It says, "Medically, Emir is a
 6   well child.  He had a number of the usual childhood illnesses,
 7   pink eye, and so on.
 8              "His growth and development are within normal limits,
 9   and his growth charts evidence normal weight and height."  And
10   so -- and Dr. Bithoney is somebody with significant experience
11   in this area.  So why is that not enough?  Why can't you say
12   to him -- cross-examine him of -- you're going to know at
13   trial everything that causes ADHD besides lead.
14              And you're going to say, "Did you rule out -- isn't
15   it true you never ruled out this, this, and this?"
16         MR. CAMPBELL:  It's not sufficient, Your Honor,
17   number one, because the cases require it.  Number two, we just
18   heard a legal argument that that's what these things mean.
19   Dr. Bithoney didn't say what these things mean.  This sounds
20   to me like a medical history and not a review of issues for a
21   differential -- a diagnoses of anything.
22              We don't know from Dr. Bithoney in either his report
23   or any place else why he did this.  He doesn't say it.  And
24   it's not just magic words, Your Honor.  This is a process
25   that's important enough to make its way into Michigan case
```

```
 1  law, Sixth Circuit case law that requires this to be done.
 2  And it wasn't.
 3          You know, we can sit here and parse his words, what
 4  he actually did say, but there's no doubt that he did not say,
 5  "This is my differential diagnosis and why I can say that
 6  there are no other causes of which there are numerous known
 7  other causes for -- in the case of young Mr. Sherrod, ADHD,
 8  not neurocognitive or behavioral disorder."
 9          And there are numerous ones.  He doesn't go through
10  that and he doesn't do it.
11          THE COURT:  Okay.  I hear you.
12          MR. CAMPBELL:  Thank you, Your Honor.  May I move on
13  off of that one?
14          THE COURT:  Yes.
15          MR. CAMPBELL:  So and then trying to unwind some of
16  this and the arguments made in the briefing, the next one that
17  I wrote down was ruling out other sources of lead.
18          And I heard you yesterday, Your Honor, make reference
19  to Dr. Bithoney and his experience and his interview of the
20  mothers of these four bellwether plaintiffs as the source of
21  -- or the source of ruling out other sources of lead.
22          And, you know, we recite the cases, the Pluck case,
23  Paul Murphy (phonetic).  I don't think there's any dispute
24  that the law requires other -- in an exposure case like this
25  one that the plaintiffs burden and the expert's burden include
```

November 3, 2021

1    ruling out other sources of lead.

2              There's no doubt, Your Honor, and the testimony is

3    what it is.  He spoke to the mothers of each of these

4    plaintiffs.  The knowledge base of each of those mothers

5    cannot include things that are relevant here and that there's

6    no indication that they do.

7              And to use as a specific example, in each of the

8    reports by Dr. Bithoney he cites, you know, citywide reference

9    to lead service lines.  And you know as we know, the lead

10   isn't in the Flint River water, the lead isn't introduced in

11   the distribution plant.  The lead isn't in the main lines.

12   The lead comes from after that.  And generally regarded as the

13   service lines.

14             So Dr. Bithoney took the time in the reports to cite

15   to a study saying that -- I believe it's 40 percent -- I stand

16   corrected.  Some percentage less than a hundred percent,

17   substantially less than a hundred percent of the homes in

18   Flint have lead service lines.

19             Exactly that number is not relevant here.  What is

20   relevant is lead service lines are important to this ruling

21   out.  Not all homes in Flint have lead service homes -- lead

22   service lines.  And the undisputed evidence is that the four

23   homes at issue for these children do not have lead service

24   lines.

25             THE COURT:  But he specifically addresses that, and

1    he talks about the lead quantities for those individuals who

2    were in school or daycare.  He talks about what the lead

3    levels were there.

4           He also makes the point that children are not always

5    in their parent's care.  They're at other people's homes.

6    They're at restaurants.  They're out.  They do more than just

7    sit at home and follow their parents' directions.

8           MR. CAMPBELL:  My children do, Your Honor.

9           THE COURT:  Mine did.

10          MR. CAMPBELL:  I believe I understood, Your Honor.

11          THE COURT:  Oh, and I think it's Michaels who lists

12   the lead levels at the schools.

13          MR. CAMPBELL:  So I believe those issues that will

14   come up in the argument.  But those primarily have to do with

15   issues regarding VNA, when our work started, and whether the

16   notion that the plaintiff stopped drinking the water or being

17   exposed to the water.

18          Leaving that aside --

19          THE COURT:  But doesn't Bithoney talk about even if

20   these four bellwether plaintiffs had copper service lines that

21   the water passed through lead service lines to get to their

22   homes?

23          MR. CAMPBELL:  If he says that, I believe he's wrong.

24   But he says what he says.  The lead service lines are kind of

25   the last in the fingers that go out to each of the homes.

November 3, 2021

```
 1              THE COURT:  Okay.

 2              MR. CAMPBELL:  So my understanding of it, a service

 3    line wouldn't have a connection to some other house unless

 4    it's a very unusual circumstance.

 5              THE COURT:  Okay.

 6              MR. CAMPBELL:  But beyond that, a couple of things.

 7    So the basis of the ruling out of other sources is -- the only

 8    thing is the interview with the parent.  Parent can't know

 9    some of these things like lead in soil, lead in paint, lead in

10    dust, lead in food.

11              THE COURT:  But he asks about paint or is it Bithoney

12    who asks about paint -- Krishnan.

13              MR. CAMPBELL:  My understanding of what Dr. Bithoney

14    asks was essentially, "Are you aware of other sources of

15    lead?"

16              I'd stand corrected if the questions were more

17    particularized than that.  But that is my understanding of the

18    question asked, and the answers apparently were no from the

19    parents.  But it's not --

20              THE COURT:  In the deposition at page 285 to 86, he

21    says, quote, "I've done a lot of evaluations of epidemiology

22    of lead in families' homes, and we typically ask about lead

23    paint and soil and all that, the age of the housing.  We did

24    all that."

25              MR. CAMPBELL:  Okay.  The people can't know that.
```

1   It's like asking --

2           THE COURT:  But he can know when he says did you have

3   -- well, he had somebody assess the likely age of the homes

4   for a connection presumably to the paint.

5           MR. CAMPBELL:  Your Honor, if I may?

6           THE COURT:  Yeah.  Go ahead.

7           MR. CAMPBELL:  Given the Rule 702 hearing here, we're

8   dealing with the methodology, if you will.

9           THE COURT:  Correct.

10          MR. CAMPBELL:  And he did what he did with his

11  questionnaire with a single parent that that has a

12  limitation --

13          THE COURT:  Wait.  I can't hear you.

14          MR. CAMPBELL:  -- that has a limitation as to the

15  knowledge base of that parent.  So the methodology that would

16  be employed, whether it's Dr. Bithoney's practice or not is

17  there are homes.  You can test it.  There is a way to go about

18  doing that.

19          And it is unreasonable to rely upon the statement of

20  an involved party, a plaintiff, to say, "Well, no, I don't

21  know about those things."  And in fact -- in fact, there is

22  lead in these homes.  And there is, in fact --

23          THE COURT:  And so that goes to the accuracy but not

24  the methodology.  And so you can cross-examine him with, "Have

25  you had an opportunity to read our expert's report showing

1  that there's lead in these homes?"

2          Because you went into each of them to evaluate it,

3  and would that impact your diagnoses?  If you now know that

4  there's X percent lead in the air, dust, and so on.

5          MR. CAMPBELL:  We can certainly do that, Your Honor.

6  But in this context of a 702 hearing and what an appropriate

7  methodology is, all I can say to you is the method of simply

8  ruling out by asking a question of an interested party without

9  doing more to investigate when those things are reasonable,

10  accepted, and available and just blind to other available

11  information, that's not cross-examination.

12          That goes to the methodology and the admissibility of

13  it.  That's --

14          THE COURT:  So does your expert have a different

15  standardized process?  Because he testifies in his deposition

16  on page 221 --

17          MR. CAMPBELL:  I'm sorry.  Which expert, Your Honor?

18          THE COURT:  Dr. Bithoney testifies that he used a

19  standard clinical exposure assessment during each parent

20  interview.

21          MR. CAMPBELL:  That's -- as Mr. Ringstad said

22  yesterday, that's the testimony, and that's what he says.  But

23  it may be a standard interview of somebody.  But as long as

24  we're talking about a interview of somebody, that is limited

25  to what that person knows or can know.

```
 1            THE COURT:  Of course.  But he also -- I mean, these
 2   four bellwether plaintiffs had the very good fortune of being
 3   raised by a parent.  And so who would know more about that
 4   child's exposure from birth to the date of the evaluation or
 5   interview than the parent who knows -- I mean, we've got one
 6   parent says there was some chipped paint in the kitchen.
 7            They're answering these questions for these
 8   evaluations that are apparently standard in this field.  This
 9   is his only field.  40 years of experience evaluating lead
10   poisoning and treating it.
11            MR. CAMPBELL:  Understood.  But can you imagine, Your
12   Honor, if we had one of the parents involved, and we asked a
13   question, "Well, do you know whether there's lead in your
14   paint?  Do you know whether there's lead in your soil?"  And
15   they say, "I don't know," or "no."  That is an uninformed --
16   they cannot know that.  They cannot reasonably know that.  It
17   is something for an expert analysis or a specialized field
18   analysis.
19            And in the context of this exposure case as it
20   relates to the other cases on this issue, you know, we have --
21   their cases cited about PCBs and other carbon issues that were
22   the subjects of the various cases.  And you can't just say to
23   the involved party, "Did you have any other exposure?"
24            That's not reasonable.  It's not a proper method.
25   And I have no doubt -- I don't take issue with the
```

1    questionnaire that -- and the questions that Dr. Bithoney may

2    have asked of the plaintiffs.  But that's not an appropriate

3    ruling out of other sources of lead in the context of what we

4    have here.

5           THE COURT:  Okay.  So why don't we get a response on

6    that.

7           MR. STERN:  Your Honor, I just want to know first and

8    foremost that VNA's own reports did not find lead in the soil.

9    And so, I guess, at least in the instance when the parents

10   answered that question, they were answering it truthfully and

11   honesty, because the experts who came in for the defendants

12   who have every right to come in, found that there was no lead

13   in the soil.

14          THE COURT:  But apparently they found that there was

15   lead in the homes.

16          MR. STERN:  There's a difference between -- and

17   that's cross-examination fodder for Dr. Bithoney, and

18   Dr. Bithoney shouldn't be required to go into homes and use

19   the XRF machine that Mr. Campbell and his team say is

20   unreliable anyway in order to make a determination about

21   whether there's lead in the paint.

22          But it's one thing to have lead in paint.  It's

23   another thing to have exposure to lead in paint.  The very

24   fact that there's lead paint in a cupboard or lead paint in a

25   closet or lead paint by a -- you know, a panel on a wall

 1   doesn't necessarily mean that the child's been exposed.

 2          And I take issue with the fact that Mr. Campbell says

 3   that a parent would never know if there's been alternate

 4   exposures.  That's untrue.  Kids are supposed to be tested for

 5   lead as part of their basic -- as part of their basic visits

 6   with doctors up until a point when they're 5 and 6 years old.

 7          And if a doctor, if a pediatrician who drew blood

 8   from one of these kids found that there was lead in the blood

 9   prior to, during, subsequent to the Flint water crisis, there

10   would have been a home assessment that would have been done by

11   the Department of Health, not just in Flint, but in any city

12   to determine what the source of lead is.

13          And so to say that a parent just would not know that

14   there were alternative exposures is completely -- is not

15   accurate.  It's inaccurate.  With regard to Dr. Bithoney's

16   testimony, this is from his deposition.  They ask --

17          THE COURT:  When you're reading, be sure not to go

18   too fast.

19          MR. STERN:  I'm so sorry.

20          And then go on to say, "The basis of this opinion is

21   the fact that a mere drank leaded water from the Flint River

22   in 2014 and 2015."

23          So on page 285 they finally get to it.  And he says

24   -- and they say, "That's the only source of lead that you

25   believe resulted in him having that level of lead in his bones

1     during the entire course of his life; is that right?"

2          Dr. Bithoney says, "That's the only source I was able

3     to identify.  You know, I've done a lot of evaluation of the

4     epidemiology of lead in a family's home, and so we typically

5     ask about lead paint and soil and all of that, the age of

6     housing.  We did all that."

7          These reports could be -- instead of 14 pages, they

8     could be 50 pages if we got into all of that.  But I assure

9     you that we did look for other sources in the parental

10    interview.  Didn't find that.  Didn't find anything in the

11    depositions.  Didn't find anything other than source other

12    than the lead in the water.  There may be other sources.

13         Perhaps Mr. Campbell and his team found lead in a

14    home in paint.  Perhaps they found lead in soil.  Perhaps they

15    have found that a baby formula that one of these kids was fed

16    early on in life, 40 years later or 10 years later or five

17    years later contains lead.

18         But to say that Dr. Bithoney didn't actually

19    undertake to make that determination is inaccurate.  And it's

20    -- I don't know if "irony" is the right word.  But

21    Dr. Bithoney didn't use magic words to describe a differential

22    diagnosis even though I think it's clear that he did.

23         But VNA and I guess LAN by association takes issue

24    with the fact that he didn't.  Conversely, here he actually

25    says exactly what's required of him to say, but now VNA and

1    LAN don't think he did it right or did it well enough.

2           And so if anybody thinks that had Dr. Bithoney

3    actually used the words "differential diagnosis," that we

4    still wouldn't have spent 20 minutes discussing that the

5    differential diagnosis wasn't appropriate based on how VNA

6    reads the case law, then they would be fooling themselves,

7    Your Honor.

8           THE COURT:  Okay.  Thank you.

9           MR. CAMPBELL:  If I could just respond to that.

10          MR. STERN:  I had one more point that I --

11          THE COURT:  Okay.

12          MR. STERN:  I think -- I let it go kind of the first

13    time earlier today when there was a discussion about kids in

14    Flint.  You know, well, we've got to look at kids in Flint

15    pretty much different than anywhere else.

16          There's now been an insinuation that these are

17    plaintiffs.  You can't rely on them.  You can't trust them

18    when -- Mr. Campbell said when Dr. Bithoney asked of the

19    plaintiffs, well, these are plaintiffs, insinuating they have

20    an interest in this, and they would be disingenuous --

21          THE COURT:  I didn't -- what I heard in this latter

22    was simply that if Dr. Bithoney said, "Were there any other

23    sources of lead," and the parents said, "no," they wouldn't

24    know what the sources of lead are necessarily.

25          MR. STERN:  I always try and be respectful and I am.

1    But in this instance, I respectfully disagree, because he

2    actually said, "These are plaintiffs."  If he said, "These are

3    parents," totally understood.  You know, these are folks who

4    don't have an environmental degree, and they can't articulate

5    or even know what it means to have lead in soil.

6         But the insinuation that because these are

7    plaintiffs, they're going to make a comment that might not be

8    wholly truthful or inaccurate struck me in a way that's

9    different than in a way that it struck the Court.

10        THE COURT:  Okay.  Mr. Campbell.

11        MR. CAMPBELL:  Your Honor, I clearly meant the

12   comment in the way you interpret it.  Thank you.

13        THE COURT:  Okay.

14        MR. CAMPBELL:  A couple of things.  I forgot to

15   mention that lead is, I think, admittedly everywhere in the

16   environment and probably in every body.  So that no other

17   sources, it just doesn't square with reality.

18        But also on the issue of the questionnaire and other

19   sources, the highest blood lead level that was ever obtained

20   on any of these children was for young Plaintiff Ware.  And it

21   was, I believe, in 2009 long before the water switch.

22        And that establishes, I believe, without any doubt

23   that there had to be another source somewhere.

24        THE COURT:  Well, Dr. Bithoney agrees that he's asked

25   in his deposition, he agrees that lead is quote/unquote

```
 1    "everywhere."  But he says that no other source would have

 2    caused, and he says, "Thousands of micrograms of lead in these

 3    children's bones."

 4            And the blood lead levels, I think we know about the

 5    half-life issue with blood lead levels.  So if a particular

 6    plaintiff on a particular day didn't have an extremely

 7    elevated blood lead level, it doesn't mean they exposed.

 8            MR. CAMPBELL:  Again, Your Honor, this blood test

 9    that I referenced was long before the water switch, and

10    therefore cannot be related to the water.  It is something

11    that the parent obviously knew about, because he had to take

12    the child to -- for the testing.  And it was not reported in

13    the parental interview from what I gathered, because there

14    were no other sources.

15            So it's an important point not only because it

16    establishes, one, there has to be another source.  And number

17    two --

18            THE COURT:  But how did you learn about the blood

19    lead test?  Because it's listed in the medical review in the

20    report.

21            MR. CAMPBELL:  I learned about this blood test just

22    from discovery that we all have.  It's referenced in the reply

23    brief at some point.

24            THE COURT:  I think it's in the report.

25            MR. CAMPBELL:  In the -- I think it's a blood lead
```

```
1    level of young Mr. Ware -- I'm sorry, Ms. Ware.
2             THE COURT:  Daylaana Ware.  Is Daylaana a boy or a
3    girl?
4             MR. CAMPBELL:  Girl.
5             THE COURT:  Okay.  That's what I thought.
6             Okay.  I'll look for it, but thank you.
7             MR. CAMPBELL:  My point is that it shows prior
8    exposure, and it shows the limitations of simply using the
9    parental interview.
10            And just one point about the home inspections that
11   were done.  It isn't just because lead is found that there was
12   -- I'm sorry -- that there is a blood test that shows an
13   elevated lead level like Daylaana Ware's blood test in 2009.
14   It has to be over 5 to initiate -- I believe it's over 5 to
15   initiate an assessment of the home.
16            THE COURT:  Okay.
17            MR. STERN:  Your Honor, with regard to the previous
18   blood lead level, one of the reasons why we have these cases
19   is because there's going to be a population of children in
20   Flint who had prior elevated levels before the water switch.
21            And to take Mr. Campbell's argument at face value
22   would essentially say, "Well, someone was hit by a car in
23   2009, so any damage that occurs to them from being hit by a
24   car again in 2014 doesn't count, because they were already
25   damaged once by being hit by a car."
```

```
 1              Dr. Bithoney talks about lead eloquently,

 2   effectively, and at great length being a dose response

 3   disease.  And so the fact that a child may have had an

 4   elevated lead level prior to the water switch or prior to what

 5   is being alleged in terms of liability on behalf of a

 6   defendant doesn't change the fact that there could still be

 7   damage.

 8              That's just something that has to be addressed at

 9   trial by an expert to quantify on some level why the previous

10   exposure either meant nothing to the second exposure or how

11   the second exposure enhanced what had previously occurred.

12              THE COURT:  I think Mr. Campbell based on his

13   briefing is going to get to that, about whether any -- well, I

14   guess that might be later, whether any additional molecules of

15   lead will harm these individuals.  So I think we are

16   definitely going to get to that.

17              MR. CAMPBELL:  Your Honor, I just -- the point about

18   the prior lead test is not damages and certainly not car

19   accidents and two different years.  It has to do with it's

20   proof positive that there was some other source before the

21   Flint water.

22              THE COURT:  Yeah.  But what I hear Mr. Stern saying

23   is even if there was a car accident in '09, if there's another

24   one in 2014 that caused harm, we don't disregard it, because

25   there had been a previous car accident in '09.
```

```
 1              MR. CAMPBELL:  No doubt, but --

 2              THE COURT:  And I think page 2 of the Ware report,

 3   Dr. Bithoney indicates that he saw information about a third

 4   blood test of 2 micrograms per deciliter but didn't see it in

 5   the medical records.  So he's aware that there was an earlier

 6   blood test that showed some lead.

 7              MR. CAMPBELL:  And, again, we're not dealing with

 8   traumatic injuries in a car crash that are separate.  We're

 9   dealing with exposures over time.  And this prior exposure on

10   the issue of the ability to rule out other exposures on the

11   one basis of a questionnaire from the parent is relevant to

12   this inquiry.

13              I'm not saying that there couldn't be --

14              THE COURT:  Oh, it's certainly relevant.  But it

15   doesn't rule out a conclusion that the bone lead level that

16   Ware had was impacted significantly by the exposure from the

17   water.

18              MR. CAMPBELL:  We don't know that, Your Honor,

19   because Dr. Bithoney didn't take it into account, because he

20   doesn't talk about it.  He says specifically, "There's no

21   other exposures."

22              THE COURT:  Okay.  Okay.

23              MR. CAMPBELL:  So he doesn't account for it.  And it

24   calls to question on a method logical basis why would you rely

25   upon a questionnaire from a person who knew about this but,
```

1    you know, forgot about the prior test?  And it goes to the

2    unreliability of relying upon the single data point of the

3    questionnaire.

4            So that's the point I'm trying to make.

5            MR. STERN:  If I may just respond briefly.  He does

6    account for it.  It's actually in his report.  And because he

7    didn't see it in the medical records, the actual only way that

8    he would have been able to obtain that information would have

9    been from the parent interview.

10           And a parent can still say, "I am unaware of any

11   sources of lead," while simultaneously telling Dr. Bithoney

12   that the child had an elevated lead level at a different time.

13   So those two things --

14           THE COURT:  I think he got it from Ware's mother's

15   deposition is where he got it.  So he looked at those

16   depositions.  He did his own interviews.  But I think he --

17   the point he makes is that there are everyday exposures that

18   all of us have been supposed to lead, but they wouldn't cause

19   the level of elevation that these plaintiffs have.  That's

20   what I got out of his report.

21           And I understand what you're saying is that he just

22   simply didn't do the math.  He didn't subtract it, and he

23   didn't acknowledge it that there are other sources for each of

24   these plaintiffs.  But that doesn't attack the methodology.

25           He used standard methodology in his questioning, in

```
 1    his evaluation.  He looked at the depositions, the medical
 2    records, etcetera.  Dr. Krishnan's evaluations.
 3              And it goes to the weight the jury would give to this
 4    testimony.
 5              MR. CAMPBELL:  Your Honor, I understand what is
 6    likely to be your ruling.
 7              THE COURT:  Okay.
 8              MR. CAMPBELL:  But just --
 9              THE COURT:  And I'm not saying it's without concern
10    about the differential diagnosis.  I mean, there may be some
11    things that ultimately come in, and some things that don't.
12    But I'm just --
13              MR. CAMPBELL:  To be clear, we disagree and for the
14    reasons in the briefing and this argument.
15              So with that, Your Honor, I'd like to move on.
16              THE COURT:  All right.  We'll keep going until about
17    noon.  Oh, yes to a break now.  Okay.  Let's take a
18    five-minute break, and then we'll come back and work a little
19    longer.
20                        (Brief Recess)
21              THE COURT:  Please be seated.  Thank you.
22              Okay.  Mr. Campbell.
23              MR. CAMPBELL:  Thank you, Your Honor.  I just wanted
24    to raise one point probably apprised to all of this but to
25    just raise for Your Honor's attention, a case Sardis, I think
```

```
1    I have that right, S-A-R-D-I-S.  That's a Daubert case that
2    advises that the Court's gatekeeping role can't be abandoned
3    to cross-examination when given -- if there's issues that 702
4    would address.
5              THE COURT:  No.  I don't know if I've looked at the
6    Sardis case, to be honest.  I might have in all of this.  But
7    I certainly know that we have got -- the expert has to be
8    qualified under 702 and the Daubert standard and the specific
9    requirements narrowing it even further that the Sixth Circuit
10   has set forth.
11             So what my intention is to ultimately at the
12   conclusion of this two days of oral argument is to go back and
13   go through all of the arguments yet again on my own and make a
14   determination as to whether they meet the Daubert standard or
15   whether the argument is just going to what the weight of that
16   testimony should be.
17             Are you actually able to say that the testimony is
18   not scientifically sound?  That it's junk science?  I'm
19   required to keep out junk science and all of that.
20             So it's not my intention to say, "Never mind.  I'm
21   not going to do that part of my job, and instead, what I'm
22   going to do is just let you all go at it on
23   cross-examination."
24             So thank you for that reminder.  But -- you know, the
25   other thing about Daubert that is emphasized in the In
```

1    Re Scrap Metal case is that not every factor of the Daubert

2    analysis, the five general factors, will apply in every

3    instance.

4            So I'll figure out what applies in a person like

5    Dr. Hoaglund versus someone who's doing something very

6    different, like Mr. Crakes.  So but thank you.

7            MR. CAMPBELL:  Your Honor, thank you for that.

8            I'd like to turn to a couple of points that I heard

9    from -- we all heard yesterday the arguments.  But I wanted to

10   raise them just to put them on the record and, you know, for

11   to make the position that we've identified in the briefing

12   clear.

13           And that is because of the argument that we believe

14   to be true that the bone lead testing offered by Dr. Specht is

15   not reliable, and that's the only basis on which Dr. Krishnan

16   rules in lead here.  That because the foundation of

17   Dr. Specht's bone lead testing is unreliable for the reasons

18   we argued yesterday, that Dr. Krishnan can't rule in lead.

19           THE COURT:  Okay.  And one of the reasons that I set

20   up this argument with Dr. Specht's -- with the motion with

21   respect to Dr. Specht before this, before Dr. Krishnan and

22   Dr. Bithoney is because I wanted to hear every possible

23   argument about Dr. Specht.

24           And there's -- of all of these experts, there's one

25   who I can tell you now that having evaluated everything I

1  heard yesterday as well as everything I read in this briefing

2  as well as everything I heard in the form of an objection to

3  the partial settlement, I think he's qualified to testify as

4  an expert.

5          And you will have an -- and this is where the

6  opportunity for cross-examination comes in.  Because there are

7  some weaknesses in -- I think there may be some weaknesses in

8  his testimony.  But that, I think, is safely in the realm of

9  my gatekeeper function to permit in and then to allow

10  cross-examination and a contrary expert to testify about the

11  accuracy of his testing.

12          MR. CAMPBELL:  Understood, Your Honor.  And again,

13  I'm raising this just for the --

14          THE COURT:  For the record.

15          MR. CAMPBELL:  -- for the record, because it is

16  foundational to what Dr. Bithoney has to say.

17          THE COURT:  It is.

18          MR. CAMPBELL:  And secondly as a --

19          THE COURT:  But it's not just Dr. Bithoney who

20  suggests that boasting for lead is in some ways the gold

21  standard.  I think it's in the toxicology profile that -- so I

22  just offer that.

23          MR. CAMPBELL:  I think you -- when you said

24  Dr. Bithoney you meant Dr. Specht?

25          THE COURT:  No.  For doctor -- I think Dr. Bithoney

1    -- in looking at his report and his reliance on the bone lead

2    and his sort of reverse engineering of what that might be

3    equivalent to in terms of a blood lead level, I think that

4    it's clear that because the -- a good deal of the literature

5    talks about blood lead levels, he needs to try to figure out

6    what do these bone levels tell us.

7            But also the toxicology profile suggests that bone

8    testing is an important way to figure out what the lead load

9    is in any given person.

10           MR. CAMPBELL:  I'm going to get to that issue.  I

11   think, Your Honor, just one more of the foundation points I

12   wanted to make.

13           Bone lead testing doesn't give us or anybody, even

14   Dr. Specht a -- doesn't go to timing --

15           THE COURT:  No.

16           MR. CAMPBELL:  -- and this is the issue we talked

17   about yesterday that was deferred until Dr. Krishnan.  And

18   because the same reason.  We challenge the reliability of the

19   bone lead testing, so it's not proper foundation.  Understand

20   Your Honor disagrees.  But that's the position that we

21   maintain.

22           So without a bone lead testing, there's no way to --

23   I'm sorry.  I'll start again.

24           This goes to the need to rule out other sources of

25   lead and why the argument regarding ruling out other lead is

```
 1   so important given Dr. Krishnan's reliance on bone lead
 2   testing.  The house of cards goes from the bone lead testing
 3   to ruling out, because bone lead testing doesn't tell us
 4   anything about timing.  You need to rule it out.
 5          So in the context of these particular facts, that
 6   requirement of Michigan law is prominent and very important.
 7          Having said that, Your Honor, heard your ruling, and
 8   I understand that.  But I just wanted to make that clear that
 9   we think on a couple of grounds, the reliance on bone lead
10   testing is fatal to Dr. Krishnan.
11          Moving to the --
12          THE COURT:  Dr. Bithoney.
13          MR. CAMPBELL:  Dr. Bithoney.
14          THE COURT:  Okay.
15          MR. CAMPBELL:  I tend to do that generally, Your
16   Honor.
17          THE COURT:  I notice that.
18          MR. CAMPBELL:  I can't believe I haven't done it up
19   to this point.
20          THE COURT:  No, you have.  You have.
21          MR. CAMPBELL:  One of my partners is always on me.
22          THE COURT:  Consistency is good.
23          MR. STERN:  I'd just like to note that since we've
24   returned from the break that all the references that were just
25   made to Dr. Krishnan I think were intended to be Dr. Bithoney.
```

```
 1              THE COURT:  Yes.
 2              MR. STERN:  I didn't want to interrupt, but I think
 3      that's true.
 4              MR. CAMPBELL:  Thank you.  I did.
 5              THE COURT:  Okay.  All right.
 6              MR. CAMPBELL:  I'd like to move, Your Honor, to the
 7      question you posed to the lawyers about Dr. Bithoney and
 8      whether his specific -- whether the specific injuries
 9      identified by Dr. Krishnan need to be correlated.
10              And as we described at length in the briefing, we
11      strongly believe that they do and that the specific injuries
12      of the combined neurocognitive neurodevelopmental issue that
13      Dr. Krishnan sees for three of the plaintiffs; the mood
14      disorder she sees for young Ms. Teed and the ADHD that she
15      sees for young Mr. Sherrod.
16              There is no support, reasonable support in the
17      literature that correlates those issues to lead.  The studies
18      that Dr. Bithoney relies upon have to do with blood lead
19      levels, not bone lead studies.
20              The CDC and I believe -- well, there is evidence,
21      there is evidence in the literature that there is not enough
22      to correlate the two or to draw information and reasoning from
23      studies regarding blood lead levels -- a phrase that has to be
24      spoken very carefully -- blood lead levels and bone lead
25      testing.
```

```
 1              There is insufficient support to correlate the two.
 2    And Dr. Bithoney's efforts to do so is as we've explained in
 3    the briefing and for those reasons, unreliable in this
 4    circumstance.
 5              THE COURT:  Okay.
 6              MR. CAMPBELL:  I would add that not ruling lead in,
 7    again I've heard Your Honor --
 8              THE COURT:  And that's why he attempts this reverse
 9    engineering from bone to blood.
10              MR. CAMPBELL:  Right.  And that is for the reasons
11    we've explained in the briefing, it's unreliable in the
12    circumstance.  There's no support for that.  And the two are
13    different.
14              And you can't convert reasonably blood lead levels to
15    bone lead levels, and there's nothing to suggest that any bone
16    lead levels by any of these plaintiffs correlates to a blood
17    lead.
18              THE COURT:  Well, he explains how he made that
19    calculation and what he based it on.
20              MR. CAMPBELL:  That is true.
21              THE COURT:  Okay.
22              MR. CAMPBELL:  But there is nothing to support that
23    novel opinion other than Dr. Bithoney.  And, in fact, there is
24    statements, I believe the CDC cited in our brief, whatever the
25    citation is in the brief, that the two don't correlate, and
```

1    you can't draw conclusions one to the other.

2          But in any case, it's another foundational issue

3    related to bone lead testing that -- for all the reasons that

4    we've stated and I've now stated it again, that it shouldn't

5    be considered by the Court because of the reasons we put

6    forth.

7          The next issue that I would take up, Your Honor, is

8    the absence of a fit, if you will, between Dr. Bithoney's

9    opinions and VNA and the start of our work in Flint in

10   February 2015.

11         There is evidence before Your Honor that from the

12   parents who testified at deposition that either stopped

13   drinking the water or substantially reduced ingestion of water

14   by that time.

15         THE COURT:  Correct.  And Dr. Bithoney, I think,

16   combined with Dr. Michaels talks about alternative sources of

17   water, I think we talked about that earlier this morning, that

18   these children could have ingested outside of parental

19   supervision.

20         MR. CAMPBELL:  Your Honor, the operative phrase there

21   is "could have."  And this is -- what is the evidence of that?

22   We all know that children can and do things that no one

23   expects.  But that doesn't change the fact that in the context

24   of this case and this litigation, facts have to be proven,

25   even fundamental facts need to be proven, and those are rank

 1    speculations -- I'm sorry.

 2          THE COURT:  Are these the sorts of things that an

 3    expert testifies about?  I mean, you have children.  You know

 4    your children don't always act in rational, anticipated ways.

 5    Jurors will have children or were once children.

 6          And that, to me, doesn't seem like the type of thing

 7    we need an expert to testify to.  That's where I always tell

 8    the jurors, "Don't leave your common sense at the door of the

 9    courthouse.  Bring it in here.  We want your life experience

10    to inform your understanding of the facts in the case."

11          And what jurors don't have, generally speaking or we

12    exclude them if we think they do, is an understanding of

13    complex, specialized areas of science and medicine and

14    engineering.  So that's where we bring the experts in to

15    inform them.

16          But simply the idea that Dr. Bithoney assumes that

17    children are going to have exposure to water outside of

18    drinking in front of their parents, he knows the ages of these

19    children.  It seems unremarkable to me, and it seems like a

20    common sense sort of thing.

21          And you can certainly cross-examine him on this for

22    sure.

23          MR. CAMPBELL:  You've hit on a couple of things.  And

24    I would say that an expert testifying that children may do

25    something that they don't -- may do something is something not

```
 1    for expert testimony.  It doesn't -- for the reasons you
 2    articulated; it doesn't help the jury.
 3            But most importantly on this point, however
 4    fundamental it is, it is a key fact that needs to be proven in
 5    this case.  So perhaps at a later time, motion in limine time,
 6    the issue of not speculating what children may have done.
 7            The best analogy I can think of, Your Honor, is in a
 8    red-light-green-light case, someone needs to prove that
 9    someone else ran a read light.  We know that people run red
10    lights -- not that I've ever done it.
11            THE COURT:  Right.
12            MR. CAMPBELL:  But it happens.  Right?  But in those
13    cases, someone has to prove it.  This is what I saw and
14    observed.  The same would pertain here.  It would be rank
15    speculation on such a key point that, "Hey, children do a lot
16    of things, and they may have drank water that was
17    contaminated."
18            And remember, just because there's water, doesn't
19    mean that it's tainted with lead, even in Flint.  I mean,
20    there has to be evidence that there was lead in that water.
21    So I think we're a couple of steps beyond where we need to be.
22    But the point that I want to make is there's no fit between
23    Dr. Krishnan and VNA in February 2014 and exposure to --
24            THE COURT:  2015.
25            MR. CAMPBELL:  -- '15, Your Honor.  Sorry.  There I
```

1    go again.

2            THE COURT:  But Dr. Bithoney, if I understand his

3    reports, he's not making an assessment with respect to VNA or

4    LAN or both.  He's a general causation expert and specific

5    about lead.  And the plaintiffs, if I understand it, have

6    other testimony from parents.

7            At least, I started trying to get prepared for the

8    summary judgment portion of this, at which point I could no

9    longer do that, because this took over my life.

10           But there's testimony from parents about bathing,

11   like D.W. stopped drinking the water in mid-2013, but

12   occasionally bathed in tap water and was exposed at school and

13   elsewhere in 2015.

14           I mean, so that's -- I don't see Bithoney as the

15   person who's pinning this on VNA or LAN.  I see Bithoney as

16   talking about general causation, specific causation with

17   respect to lead in the water.  And there's going to be other

18   witnesses that say what the timing was for the exposure for

19   these individuals.

20           MR. CAMPBELL:  So I agree with that, Your Honor, but

21   I would add that for VNA and our circumstances where we came

22   to Flint in February of 2015, I understand that there's an

23   issue from the plaintiff.

24           THE COURT:  Well, there is the 2014 issue that we

25   talked about yesterday too.

1          MR. CAMPBELL:  And that's part of the summary

2    judgment.  And I'm sure we're going to resolve all of those

3    issues before trial.

4          But for this moment on the issue of exposure be --

5    after February 2015 there is -- Dr. Bithoney agrees that there

6    would be an alternative exposure before the time when we are

7    responsible.

8          So in order to say that we are responsible, VNA is

9    responsible for the alleged specific exposure, he would need

10   to identify and quantify that exposure from February 2015

11   onward, and that is absent in this.

12         THE COURT:  You know, what occurs to me about that

13   argument, which I saw, is that there are certain things that

14   cannot be done.  If these children were not being tested on a

15   monthly basis from April 2014 to January 2016 or something,

16   it's going to be very difficult for anyone to parse exactly

17   how much exposure happened on what date.

18         We have bone lead levels.  We have some blood lead

19   levels to look at.  And then we're going to have testimony,

20   and I think the jury will have a very challenging job to

21   figure there out.  But --

22         MR. CAMPBELL:  Again, Your Honor, perhaps for a

23   different day, but perhaps how it relates to Dr. Krishnan, the

24   burden of proof is on the plaintiffs.  The burden of proof is

25   on the plaintiffs to establish exposure as to VNA.

1           On this particular issue it is undisputed that there

2   is a prior exposure for which, you know, resolving the Detroit

3   issue would not apply to VNA.  That's the plaintiffs' burden.

4   And if there's an absence of proof there, it remains the

5   plaintiffs' burden.

6           THE COURT:  Correct.  But I don't think Bithoney has

7   to make their whole case.

8           MR. CAMPBELL:  He certainly does not.  But if this

9   doesn't -- well, I agree, Your Honor.

10          THE COURT:  Okay.  Anything further?

11          MR. CAMPBELL:  What's that?

12          THE COURT:  Anything further?

13          MR. CAMPBELL:  Yes, Your Honor.  I would like to

14  address -- we talked yesterday about the no-safe level of

15  lead.  I don't think that is necessary for anything more.

16          It's the no -- known safe level of lead here.  It's

17  in our briefing.  In this, we cite the cases Nelson, Lawry

18  (phonetic), Condra (phonetic), simple presence in the

19  environment isn't enough.  And I'll rely upon the arguments in

20  the briefing.

21          The final thing, Your Honor, is more of the future

22  injuries.  Dr. Bithoney includes two; one would be the

23  so-called lag effect, his phrase, I believe, in his report.

24  And the second would be a myriad of injuries that, quote, "May

25  be suffered in the future," I believe.

```
 1        Speaking of the lag effect, Dr. Bithoney has
 2   identified some research regarding traumatic brain injuries.
 3   That's obviously not what we have here.  They are
 4   substantially different than the claimed injuries here; mild
 5   neurocognitive/neurodevelopmental injury, ADHD, and mood
 6   disorder.
 7        It's not traumatic brain injury.  That's his only
 8   source for this.  These children at this point in time, by all
 9   accounts, are doing well in school.  They're well adjusted.
10   They -- the comments from the various observations about them
11   are that they're doing well at this point.
12        And to suggest that there's some un-manifested injury
13   that doesn't exist now is in violation of the law that we've
14   talked about in the previous argument, and I would stand on
15   those cases.
16        The same is true -- and this issue as to other
17   physical injuries, I believe Dr. Bithoney might have
18   referenced cardiovascular disease or some other things.  These
19   are identical to the issues that were raised in the Graziano
20   argument.  And they're simply not manifested.  These are
21   conditions that these plaintiffs do not have, and they should
22   be excluded.
23        THE COURT:  And from my perspective, I think there
24   are two different things, which I think you acknowledged; one
25   is the so-called lag effect that refers to known symptoms
```

```
 1   worsening over time that he discusses or appearing manifesting
 2   in more severely in the future than they are in the present.
 3          And the other is the separate diagnosis or diagnoses
 4   that these plaintiffs at the present do not have, which I
 5   think is similar to the issue we discussed yesterday.
 6          MR. CAMPBELL:  Yes, Your Honor.  The reasoning and
 7   the basis would be as we set forth in our briefing.  The case
 8   law I think pertains, and I would emphasize that the lag
 9   effect in a brain injury is not something that refers to the
10   DSM diagnoses or the diagnoses that Dr. Krishnan has
11   identified.
12          It's not these injuries and the gap between the paper
13   cited by Dr. Bithoney and what we have is too great here.  And
14   that's why it's a Rule 702 Daubert issue.
15          THE COURT:  Okay.  Okay.  Thank you.
16          MR. CAMPBELL:  Thank you, Your Honor.
17          Mr. Stern.
18          MR. STERN:  Unless Your Honor has any questions, I'm
19   happy to stand on the briefs at this point.  I would agree,
20   Your Honor, with regard to the types of injuries being
21   described.  I think the discussion yesterday related to
22   Dr. Graziano is equally applicable to Dr. Bithoney today.
23          There's a significant difference between being
24   diagnosed with ADHD or another neurocognitive deficit and the
25   manifestation of that injury than there is with Dr. Bithoney
```

1    predicting the child's going to come down with colitis or some

2    other injury that has not yet manifested itself.

3            It doesn't mean he's not qualified to discuss the

4    various effects potentially of what lead poisoning does.  But

5    if he can't apply those -- if he can't, based on his own

6    review of the records and scientific research -- he can't

7    predict it for these kids without some more evidence.

8            And then in terms of the lag effect, if you want me

9    to address it, I'm happy to, but I think our brief is pretty

10   sufficient on that point.

11           THE COURT:  Okay.  No.  I think I'm okay.  All right.

12   Well, we're doing well time wise.  So what we'll do is take a

13   break, and we have left to go Michaels and Crakes.  And so why

14   don't we return at 1:00 o'clock.

15           Does that give you enough time, or do you need a full

16   hour?

17           MR. CAMPBELL:  That's fine, Your Honor.

18           MR. STERN:  1:00 o'clock's great.

19           THE COURT:  All right.  Thank you, very much.  And

20   I'll see you at 1:00 o'clock.

21                         (Brief Recess)

22           THE COURT:  Please be seated.  Okay.  We are now up

23   to VNA's motion to exclude Dr. Michaels.  But I'm not sure --

24   did I check in with LAN about whether there was anything you

25   wanted to add on our last motion?

```
 1              MR. KENT:  No, Your Honor.  By the way, Mr. Mason has
 2   left this in my capable hands for the rest of the afternoon.
 3   I told him he didn't need to stay around.
 4              THE COURT:  All right.  Well, thank you.
 5              MR. KENT:  Thank you, Judge.
 6              THE COURT:  Thank you.
 7              Okay.  So do we have Mr. Ringstad on this?
 8              MR. RINGSTAD:  Thank you, Your Honor.  And good
 9   afternoon.  So Dr. Michaels is a toxicologist.  And he has a
10   lot of different opinions.  Those have been thoroughly briefed
11   in the Daubert papers that we filed.  I did want to highlight
12   for the Court a couple of areas of particular concern if I
13   can.
14              And the first area of concern is the exposure
15   opinions that Dr. Michaels proposes to offer to the jury down
16   the line.
17              He characterizes the exposures for these individual
18   children as -- well, not in quantitative terms but in
19   qualitative terms, and he describes them as I think
20   incremental exposures or as persistent exposures, and I'm not
21   nitpicking with that labeling.
22              What has my concern, Your Honor, is how Dr. Michaels
23   arrives at those conclusions of persistent and incremental
24   exposure.
25              Dr. Michaels has a -- he has a problem with these
```

1    individual children, and that is a lack of data.  And he's

2    pretty forthright about it.  You can see it in the report.

3            THE COURT:  Yeah.  And then he speaks about

4    probabilities instead of absolute certainties.  And we know

5    from In Re Heparin Product Liability Litigation, which is

6    admittedly a district court case, but it's here in the Sixth

7    Circuit, that, "To be considered appropriately scientific, the

8    expert need not testify to what is known to a certainty, but

9    must only state an inference or assertion derived by a

10    scientific method."

11           MR. RINGSTAD:  Precisely.  My concern is not about

12    the precision.  It is about the inference that is made in the

13    first place and how it's made.  And so I just wanted to

14    highlight for the Court to make sure that came through

15    clearly.

16           THE COURT:  Okay.  It did.

17           MR. RINGSTAD:  The deficiencies in the data, let's

18    just say, from the defense perspective deficiencies, there

19    just isn't data about blood lead levels from any of these

20    children, the four children that we're dealing with here

21    today.

22           And there's also a lack of data about water lead

23    levels in the homes.  There is also a lack of data, generally

24    speaking, about water lead levels in the schools.  And I don't

25    think I need to go through that with Your Honor.

1           What I do want to point out is the way that

2     Dr. Michaels addresses that problem is he goes and looks to

3     aggregate level data.  So he looks at data that's in the

4     Pieper, Kelsey Pieper 2018 article.  That's data collected by,

5     I believe, Dr. Pieper and Dr. Edwards and others in August of

6     2015 in Flint.

7           And the way I read Dr. Michaels's report and his

8     deposition is that he works backwards from that data down to

9     the individual level to say that there was exposure.  He

10    doesn't have the individual level data.  He has an aggregate

11    level data, and that is not a reliable inference.

12          If I can give the Court, you know, an example of why

13    that's wrong, I tried to think of one.  The best I could come

14    up with was I could ask everyone in this room how many

15    bicycles they own.  Some people own zero.  Some people might

16    own two or three.

17          I will get an average from that data.  I cannot

18    reliably say that Mr. Campbell owns one-and-a-half bicycles or

19    Mr. Stern owns half a bicycle.  The inference cannot be made

20    backwards down.  And that's what's happening here.

21          THE COURT:  I understand that.  But Dr. Michaels

22    talks about where he -- how he makes this inference.  And I

23    think one of the strengths of his report and testimony is that

24    what we were just saying is he's not saying I know with an

25    absolute certainty how many bicycles Levy owns, but I can tell

```
 1   you how I'm going to figure it out.
 2          And it's not just an average of how many everyone in
 3   the room owns, because he looks at measurements of lead
 4   contents in the plaintiffs' ZIP Codes, in their schools, on
 5   Dr. Hanna-Attisha's a citywide analysis, and data of that
 6   nature.  And then makes a determination that it's more
 7   probable than not that these individuals were exposed to lead
 8   as a result of the water crisis.
 9          MR. RINGSTAD:  Your Honor, the ZIP Code level data, I
10   believe that's not available through the Pieper article.  I
11   believe the Pieper article notes that there were -- in the
12   data that was collected, elevated -- I'm going to call them
13   P90 levels, 90 percentile lead levels in all the ZIP Codes of
14   Flint.
15          Again, the same problem applies to neighborhood level
16   data and working down from that to an individual residence.
17          Your Honor, if you look at the data that is actually
18   in the Pieper article, there's -- I think it's Table 1.
19   That's a little off the top, so I may be not quite right about
20   that --
21          THE COURT:  Slow down.  Slow down.
22          MR. RINGSTAD:  Sorry.
23          It's attached to one of our briefs.  I believe it may
24   be attached to the Graziano brief.  Anyway, if you look in
25   that article, the data that's reported by Pieper has
```

1    15 percent of homes in the sample.  I'm not even quibbling

2    with the sampling methodology, but 15 percent of the homes in

3    the sample with less than the 1 microgram per liter detection

4    limit.

5           So zero.  15 percent of the homes per the testing had

6    zero lead.

7           The median value for lead in those homes in the

8    Pieper data was 3 point -- I think it was 3.

9    3-point-something.  So half of the homes in that sample have

10   less than 3-point-whatever parts per billion lead in the

11   sampling.

12          So there's a real question there of the accuracy of

13   any inference that's made from that data, especially any

14   inference that says there was incremental lead or increased

15   exposure to lead in these particular homes.

16          That's the problem that I have with what's going on

17   with Michaels.  I realize he has limited data.  I think the

18   plaintiffs point to a couple of cases; one from the Southern

19   District of Ohio and one from the Ninth Circuit, I think.

20          The Southern District of Ohio case is the Sunnycalb

21   case.  We can add alongside our horse case the exploding

22   freight train toilet case.  And that's the Sunnycalb case, and

23   then I think that the 9th Circuit case is the Motor Vessel

24   Carissa.  If I've got that correct from memory.

25          And that's about filing of oyster beds off the coast

1    of Oregon.  Neither of those are on point here.

2         Those -- let me talk about the Sunnycalb case first.

3    That's the exploding toilet case.  That case involved a

4    one-time limited duration chemical exposure that was alleged

5    for a very unfortunate freight engineer.

6         And there was no data available.  And there was no

7    way to reconstruct that event.  And there was probably no need

8    to reconstruct that event reasonably, because there was

9    physical evidence of what had happened.

10        So very different situation than we have in Flint.

11   There is a lack of data, perhaps, and particularly on the

12   individual level as I'm noting.  But there is -- there are

13   ways in which Dr. Michaels or others could have tried to come

14   to the exposure -- an exposure conclusion that is generally

15   accepted and reliable.  He chose not to do that.

16        And instead, we have incremental exposure and excess

17   exposure, whatever the verbiage is, based on our position is a

18   fundamentally flawed reasoning.

19        And then in terms of the Motor Vessel Carissa case,

20   that focused on specific causation.  And there was -- there's

21   noted in the opinion extensive oyster pathology that was done

22   by the expert in question who really took a hard look at what

23   had happened to those oysters.

24        So it's a different case.  It's a different situation

25   than we have for Michaels here.

```
 1              THE COURT:  Okay.  Well, the Pieper study,
 2    P-I-E-P-E-R, reported results of sampling from 268 homes in
 3    August 2015 in the five primary ZIP Codes in Flint.  And
 4    Dr. Michaels -- or the Pieper report reveals that all of the
 5    bellwether plaintiffs' homes were in one of those ZIP Codes.
 6              So that at least places their homes in a ZIP Code
 7    with the elevated lead.  And then he ends up concluding that a
 8    systemwide lead in the water contamination problem existed in
 9    the location where these homes were.
10              And another thing that I saw in your brief was this
11    notation again that the four homes had the copper piping.  And
12    I think he takes that into consideration in reaching his
13    conclusions.  So it's not something he just said, "Oh, let's
14    not worry about that."  He acknowledges that and took it into
15    consideration.
16              MR. RINGSTAD:  Your Honor, I agree that was
17    apparently considered by Dr. Michaels.  If he has ZIP Code
18    level data -- and I don't think that the Pieper data set
19    includes the ZIP Code level data, at least not that
20    Dr. Michaels considered.
21              Then the same problem applies.  It's referred to in
22    statistics as the ecological fallacy.  It can't work backwards
23    from -- the population level statistic back down to an
24    individual reliably.  We don't name it as such in the briefs
25    but the gist of the argument is there.  And I think it needs
```

November 3, 2021

1    to be noted by the Court and looking at the reliability of

2    Dr. Michaels's opinions.

3           As for the reference by Pieper to systemwide lead in

4    water contamination, the way I read that is that it was a

5    reference to exceedances of what I call the P90 level, the 90

6    percentile level.

7           So if you go for either for the full 268 homes in the

8    data set or if you go ZIP Code by ZIP Code, if you're looking

9    at that P90 level, you would in accordance with the LCR.  You

10   would -- you would conclude that there was a potential for

11   systemwide corrosion issues.

12          So that's how we would view that.

13          Your Honor, there's a further issue on the exposure.

14   I think it was eluded to by Mr. Campbell in some of his

15   comments earlier about, I think, Dr. Bithoney.  It's that

16   there is no -- there's no way for Dr. Michaels to say whether

17   there was this incremental exposure or excess exposure,

18   whatever, after February 2015.

19          He cannot pinpoint a date.  He cannot break apart the

20   timeline.  And so as to VNA, that's a significant issue as to

21   a shortcoming of the Michaels report.

22          THE COURT:  I think that Dr. Michaels is being

23   presented as a general causation expert.  So I don't think

24   that he's trying to discern exactly when the exposure took

25   place for each individual plaintiff.  And I don't think he

```
 1    draws a conclusion specifically of about VNA.
 2            MR. RINGSTAD:  He doesn't, and he can't, and he
 3    admitted that in deposition.  As to whether, Your Honor, he is
 4    being offered as a general causation or specific causation
 5    expert, I struggled with that.  I think I picked up the
 6    Court's sense on that from the questions that were passed
 7    along.
 8            But he is offering opinions specific to these
 9    plaintiffs about exposure and about the -- he can't say the
10    amounts, but whether there was, he calls it the excess
11    exposure or increment exposure to these plaintiffs.
12            So he is somewhere -- he is somewhere between general
13    and specific causation is how I would categorize him.
14            THE COURT:  I think we'll find out more in just a
15    moment.
16            MR. RINGSTAD:  One other point, and I'll be brief
17    about this.  Dr. -- this is on general causation for sure.
18    And many of the things that we talked about with Dr. Graziano,
19    many of those problems apply to Dr. Michaels as well, and what
20    we tread that ground.
21            But Dr. Michaels goes a step further, and he offers
22    this single molecule one-hit theory.  It's a page in his
23    report --
24            THE COURT:  Yeah.  I saw that, and I'll have a
25    question about whether that's based upon a peer-reviewed
```

```
 1    study.  So I'll ask the plaintiffs that question.
 2              MR. RINGSTAD:  That was my question, Your Honor -- my
 3    point.  Thank you, Your Honor.
 4              THE COURT:  Because see, it's one thing to say that
 5    additional exposure causes additional harm and another to say
 6    one molecule causes ADHD or something could lead to the
 7    conditions that the plaintiffs have, so.
 8              MR. RINGSTAD:  So, Your Honor, those were the points
 9    I wanted to highlight for the Court.  The rest is in our
10    briefing.  And thank you.
11              THE COURT:  Okay.  Okay.  So who will be --
12    Mr. Walker?
13              MR. WALKER:  Yes, Your Honor.
14              THE COURT:  Okay.  So can you tell me what you --
15    what your purpose is with Dr. Michaels's testimony?  Is it
16    general causation, or is it a combination of general and
17    specific causation?
18              MR. WALKER:  Somewhere between the two.  We identify
19    him as a general causation expert.  I think the standard under
20    Pluck and other cases that talk about the general and specific
21    causation dichotomy, the first step is usually exposure.
22              And so part of what Dr. Michaels offers is a basis
23    for showing exposure.  Now, obviously once exposure gets
24    considered, that goes into specific causation.  He's not
25    offering the ultimate specific causation opinion.  But his
```

1    exposure insofar as it fits in I think is reliable.

2         THE COURT:  So he's going to be a general causation

3    expert and an expert who say these individuals were exposed.

4         MR. WALKER:  Yes.

5         THE COURT:  But he's not going -- you've got Krishnan

6    and Bithoney to take it to the next step of the specific

7    causation analysis.

8         MR. WALKER:  Correct, Your Honor.  Dr. Krishnan

9    offers a diagnosis of each plaintiff, and Dr. Bithoney makes

10   the ultimate specific causation opinion.

11        THE COURT:  Okay.  Tell me about the one molecule

12   theory.

13        MR. WALKER:  So I read that as being contained in a

14   peer-review article.

15        THE COURT:  What peer-review article?

16        MR. WALKER:  In this Mason article, the thing that I

17   was going to say beyond that is, you know, I think that

18   substantive law.  We're not offering him -- since we're not

19   offering him as a specific causation expert, the places that

20   the single molecule theory becomes problematic are in the

21   specific causation arena.

22        But when an expert says it's a single molecule or no

23   safe lead level or whatever, that any exposure period

24   necessarily equates to specific causation.  Those are the

25   cases that VNA cites for example.  He is not offering a

1    specific causation opinion.

2           So I believe that is contained in the article.  But

3    to, you know, certainly, I think the thing that we want to be

4    careful with is avoiding that issue.  Because what he's really

5    there for is to talk about exposure and tracing, you know, and

6    providing it under oath.  Right?

7           He ultimately does not say that there's a single

8    molecule that these children have been exposed to.  He says

9    there's, you know, 539 days of exposure at home.  There's

10   hundreds of days of exposure at schools.  He relies on a

11   constellation of data points that created, as the Court noted,

12   a probability of fairly substantial exposure --

13          THE COURT:  So on specific causation, he's going to

14   testify as you propose him on exposure that the four

15   bellwether plaintiffs were supposed to increased levels of

16   lead that were second element sufficient to cause harm.

17          But so that's his area.  He will not testify that, in

18   fact, the harm took place.  Because you've got Krishnan who's

19   got the diagnosis and Bithoney as well.

20          MR. WALKER:  That's correct, Your Honor.

21          THE COURT:  So where does the one molecule come in?

22   That comes in on sufficient to -- where does it come in?

23          MR. WALKER:  I think it's comparable as, you know, to

24   the issue that came up with Dr. Graziano.  So it's a similar

25   point.  I think --

 1          THE COURT:  It is a similar point.  But what I have
 2   to also look at is Rule 403 and the duty under Rule 702 that
 3   the evidence be relevant and not be more prejudicial than
 4   probative.
 5          MR. WALKER:  Correct, Your Honor.
 6          THE COURT:  And the single molecule theory seems to
 7   go into that territory that if someone's conduct caused a
 8   single molecule of additional lead, that seems very -- like a
 9   very different calculation than what Dr. Graziano and others
10   are suggesting.
11          Did you say the Mason report supports that?
12          MR. WALKER:  I was trying to find it quickly, Your
13   Honor, and I believe it was contained in there.  But --
14          THE COURT:  The Mason report instructs that studies
15   have failed to find evidence of a threshold for neurological
16   effects and that recent large scale prospective studies
17   suggest that blood lead levels below 10 micrograms per
18   deciliter significantly worsen intellectual functioning.
19          So it's definitely a report to rely upon.  But I
20   don't see the one molecule concept in there.
21          MR. WALKER:  Understood, Your Honor.  And in candor,
22   I think that you mentioned -- the Court mentioned 403 a moment
23   ago.  And I think what I had wanted to say about that is that,
24   you know, going back to Judge Sutton's opinion in Gissantaner,
25   to the extent that Dr. Michaels's opinion or information about

1   a single molecule could be helpful, and I think the Court will

2   consider it's probative value, the Court also has the power to

3   require that it be presented in a way that is not confusing or

4   prejudicial.

5            THE COURT:  Let me ask you something on a different

6   subject, which is that it looks like Dr. Michaels relies on

7   some of Dr. Specht's now retracted reference values.  So does

8   that need to be corrected or deleted from his report?

9            MR. WALKER:  I want to be clear about it.  I think

10  that the reference value in question, I had understood that

11  was a Dr. Bithoney.

12           THE COURT:  I think it's both.

13           MR. WALKER:  It may be both.  So what happened in

14  Dr. Specht's deposition was he identified a reference value of

15  10.

16           THE COURT:  Exactly.

17           MR. WALKER:  And that reference value is, as I

18  mentioned yesterday, derived from testing that Dr. Specht was

19  aware of -- about persons who were supposed to leaded

20  gasoline.  And what happened --

21           THE COURT:  That was an adult study.

22           MR. WALKER:  They were adults who had chronic

23  exposure to lead gasoline.

24           THE COURT:  Right.

25           MR. WALKER:  So what happened -- and I know this

1    happened in the Bithoney deposition, for example, is that he

2    was given a question that was -- well, you know Dr. Specht

3    recanted that opinion.  And so what Dr. Bithoney said is, "Oh,

4    well, if he recanted that opinion, then I need to withdraw my

5    opinion on that score as well."

6         But what Dr. Specht did not do, at least I as read

7    Dr. Specht at his deposition, is that he did not recant that

8    opinion.  What he says is, "Oh, the exposure scenario there

9    just isn't very relevant to kids."  Now, I guess I would

10   disagree, because I think the comparison seems relevant.

11        But what he's saying is, you know, "We don't need to

12   talk about people getting exposed to gasoline, because I guess

13   the point is it's leaded gasoline.  These kids were not

14   exposed to leaded gasoline."

15        I don't think that he -- he does not withdraw that

16   opinion.  And so --

17             THE COURT:  Okay.

18             MR. WALKER:  -- there's no basis for Dr. Michaels to

19   withdraw either.

20             THE COURT:  Okay.  Any response that you wish to

21   make?

22             MR. RINGSTAD:  Just one comment.  And that is that

23   the Sixth Circuit Tamraz court, you know, speaks about

24   untested hypothesis not being admissible.  And this page 103

25   of the report outlines an untested hypothesis.  It's a theory.

```
 1   Dr. Michaels says it might or might not be the most accurate.
 2   Whatever that means.
 3           This is something I think that in Daubert clearly
 4   ends up in the cutting room floor.  This is the kind of
 5   opinion that a jury does not need to hear, will not benefit
 6   from.  It will be prejudicial, unduly prejudicial to VNA and
 7   to LAN, if I may speak for them as well.
 8           THE COURT:  Okay.  Mr. Mason took off, but I'm sure
 9   Mr. Kent will tell him.
10           MR. RINGSTAD:  Getting a nod from brother Kent in the
11   gallery, and that will suffice.
12           THE COURT:  Okay.
13           MR. RINGSTAD:  But that's all I have to say, Your
14   Honor, on Dr. Michaels.  Thank you.
15           THE COURT:  Thank you.  And that leaves us with
16   Dr. Crakes.  Professor Crakes.  Or was there anything further,
17   Mr. Walker?
18           MR. WALKER:  No, Your Honor.  Sorry about that.
19           THE COURT:  Okay.
20           MR. CAMPBELL:  Proceed?
21           THE COURT:  Yes.
22           MR. CAMPBELL:  Thank you, Your Honor.
23           Okay.  Dr. Crakes, he's an economist, and we
24   challenge on Rule 702 grounds his opinions for the reasons
25   that we set forth in the briefing.  And I'll address a couple
```

1    of those points.

2           The first one I'd like to address, again, is Your

3    Honor's question to us in advance of the hearing.  And what is

4    the support for the statement that Dr. Crakes should use local

5    as opposed to national wage data in terms of coming to his

6    conclusion.

7           And the basis for that is as we state in the brief,

8    it's the Tenier case (phonetic), which is a case here from the

9    Southern District, Judge Drain, I believe along with the

10   Andler case (phonetic).  It's not precisely national versus

11   local.  There is not a citation that I have for you on that

12   one.

13          But those cases pertain because in the Tenier case,

14   the concept was to use precise and contrary data that then

15   what was used by the expert doing the analysis there.  The

16   expert --

17          THE COURT:  Aren't those cases about undue

18   speculation must be -- conclusions based on undue speculation

19   must be excluded?

20          MR. CAMPBELL:  They may also hold that, Your Honor.

21   I know them for the proposition that I'm speaking about --

22          THE COURT:  Okay.

23          MR. CAMPBELL:  -- which is that in doing this type of

24   work, the expert has to use the realistic assumptions and the

25   most appropriate data that would go to the to the particular

November 3, 2021

 1    circumstance.

 2          So I -- without calling to mind the actual case, I

 3    could see where the extension of that notion would lead to

 4    what you said, that it's unsupported.

 5          But here's the issue.  By using national wage data as

 6    opposed to local wage data, Dr. Crakes multiplied by a factor

 7    of 100 percent or two times what would be the result if local

 8    wage data was in use.

 9          And the best analogy that I could come up with in

10    dealing with children -- obviously, there's not a wage history

11    to look at.  And I believe in the Tenier case that was the

12    particular issue; the expert had disregarded the particular

13    plaintiffs' wage history and opted for some other metric.

14          But in any case, given that we're dealing with

15    children, there clearly and obviously isn't a wage history.

16    But the best wage history that should at least be considered

17    for somebody in doing a reasonable methodology and in choosing

18    making realistic assumptions as was stated in the Andler case

19    should consider the local wage data from which it would be

20    reasonable to conclude what the analysis would be.

21          So that was the basis --

22          THE COURT:  Mr. Campbell, did you take a look at

23    Greyhound Lines, Inc. versus Sutton?  It's a Mississippi

24    Supreme Court case, so it's not applying Michigan law.  And

25    it's from the year 2000.

 1          And I found that very instructive on your argument

 2    that we should be looking at local wages in Flint or

 3    educational achievement in Flint or even as narrow as from a

 4    particular school.

 5          And what that case says is that it starts with the

 6    conclusion by the Court of Appeals that income from the

 7    children should be based on some sort of average income for

 8    persons of the community in which they lived.  And I think

 9    that's what you're saying here.  "As far as we can find, has

10    no basis in our law."  Of course, that's Mississippi law.

11          But then they say, "It is both unfair and prejudicial

12    to ground the projected future income of a deceased child" --

13    which was the issue in that case -- "on either basis.  Both

14    methods result in potentially disparate recoveries for

15    children from affluent communities or with affluent parents as

16    opposed to children from less affluent areas with less

17    affluent parents."

18          And then the court goes on and says, "Today's society

19    is much more mobile than in the past.  Additionally, there are

20    many more educational and job training opportunities available

21    for children as a whole today."

22          But then they say something very important.  "We must

23    not assume that the individuals forever remain shackled by the

24    bounds of community or class.  The law loves certainty and

25    economy of effort.  But the law also respects individual

1   aptitudes and differences."

2          And that's what I see in your argument that we should

3   be looking at wage accomplishments of children on a local

4   level.  And I think the Mississippi Supreme Court reached the

5   conclusion that Dr. Crakes reaches, which is that we should do

6   what every other -- I think he's done some 3,000 prior

7   reports.

8          MR. CAMPBELL:  At least.

9          THE COURT:  At least.  And it's good to have

10   something you can do, you know.  At least he could do it 3,000

11   times.  I don't know if I can do anything that often.

12          But he does what is done in this field, which is to

13   use national labor data.  We live in a mobile society.  We

14   want people to accomplish their highest level that they are

15   capable of accomplishing.

16          And there is nothing to say that the children in

17   Flint are limited by where they were born or what school they

18   go to.

19          So I don't see any support in the law that local data

20   has to be -- is required or even used by any courts.

21          MR. CAMPBELL:  Your Honor, I'm unfamiliar with the

22   Mississippi case.  I hadn't reviewed it.  I don't know

23   whether it's --

24          THE COURT:  Understandably.  That's fair.

25          MR. CAMPBELL:  So what I would request is an

1    opportunity to review it, and if appropriate, submit a filing

2    for you about it.  But beyond that, I would say that the case

3    law that I did identify is closer to Michigan.

4           I understand the point, and I'm unaware of a case

5    that requires local versus national wage data other than as I

6    said for the basis for the reasoning.

7           I think that I wanted to start with that, because

8    that was the question you posed to us.

9           THE COURT:  Yes.

10          MR. CAMPBELL:  But the bigger issue with Dr. Crakes

11   is this:  He is -- he can only -- he's an economist,

12   obviously.  He has to make assumptions about what it is he's

13   asked to provide his economic opinion about.

14          And he has to do that in a way that passes Daubert

15   and Rule 702 muster as well as complies with Michigan law.

16   And he fails at least on the second prong of that for this

17   reason.

18          He can't assume anything about the health or the

19   diagnoses of what the issues are medically for these children.

20   He has to build off of what Dr. Krishnan has identified.

21          THE COURT:  Yes.

22          MR. CAMPBELL:  -- and he says that.  He also says

23   that he agrees -- this is page 59, lines 12 through 19,

24   page 58, 4 through 7, that he didn't exactly follow what

25   Dr. Krishnan put forth, and he changed that in consultation

1    with Mr. Stern.

2          Leaving that aside, we are not dealing with that iron

3    worker that has a orthopedic or some injury that takes him or

4    her off the job, and there's a calculation to be made.  What

5    we are dealing with at best -- which we've challenged by the

6    way.  This is another one of those issues that builds upon the

7    others -- we've challenged Dr. Krishnan's percentages.

8          And what Dr. Crakes has done here is assume that

9    they're not going to graduate from high school or they're not

10   going to graduate from college or they're not going to get a

11   degree.  And the fact of the matter is there is no basis for

12   that.  And what he is calculating is damages that have not

13   occurred, but according to the foundational witness, will not

14   occur.

15         THE COURT:  Well, they may occur.

16         MR. CAMPBELL:  But that's not good enough.

17         THE COURT:  Twenty-five percent.  Well, I hear you on

18   this point.  I hear you.

19         MR. CAMPBELL:  This witness if permitted to do this,

20   will tell the jury about damages that according to the

21   foundational witness will not occur.  That is improper.

22         Because he's putting forth 100 percent of the alleged

23   loss wage, and we don't know that that's even going to occur.

24   We've challenged Dr. Krishnan's basis for doing it.  But if

25   you were to take the low bound of 25 percent for plaintiffs,

November 3, 2021

1    three of the four aren't going to have this damage at all.

2         If you take the high bound, 50 percent, two of the

3    four are not going to have this damage.  This witness is

4    asking the jury necessarily to award damages for which there's

5    no foundation.  And as should be agreed that there's no

6    foundation.

7         THE COURT:  Well, I think what he does is he takes

8    the scenarios that Dr. Krishnan says are possible and then he

9    attaches a number and then he walks away.  He's done.  So he

10   doesn't say it will occur, it's 25 percent likely to occur.

11   He just says high school, college, masters.  If these aren't

12   achieved, that becomes the impaired versus if they are

13   achieved.

14        And it's for other witnesses to tell the jury whether

15   these things are going to occur.

16        MR. CAMPBELL:  The only witness who can do that is

17   Dr. Krishnan, and we've been over that.

18        THE COURT:  We have.

19        MR. CAMPBELL:  Your Honor, it's now in your hands --

20        THE COURT:  Yeah.

21        MR. CAMPBELL:  -- on that issue.  But the fact is

22   that even, I believe Dr. Krishnan, if she were here, would

23   say, "No.  This is just my broad based assumptions," to use

24   one of her phrases, to put a ballpark on this.

25        It would be improper to give a jury an opportunity to

```
 1    award damages that even the proof is would not occur.  And to
 2    award damages on a percentage like this.  Or more -- this is
 3    the kind of case and the kind of situation for which Rule 702
 4    Daubert and the other cases are meant for.  This is the kind
 5    of thing that will prejudice --
 6         THE COURT:  Well, yeah.  I think we're in a Rule 403
 7    territory potentially that we have to figure out whether we
 8    are or aren't.
 9         MR. CAMPBELL:  And I would agree with that.  And it's
10    coupled with the Rule 702 challenge, because this is
11    unfounded, and there is no assumption to be made that goes
12    with this conclusion.
13         And the importance of this, Your Honor, to cut right
14    to it is these are the numbers.  And this is an issue that
15    would clearly confuse the jury.  This is not a piece of damage
16    that exists now.
17         This is an effort to predict the future with
18    something that for each of these children has less than a
19    50 percent chance of happening and is not reasonably likely
20    and doesn't fit, most importantly, the Michigan law on the
21    issue.
22         That's my argument.
23         THE COURT:  Okay.  Thank you.
24         MR. STERN:  Your Honor, I was not prepared to discuss
25    Dr. Crakes.  Mr. Walker will.  But I just want to note that
```

```
 1   all of these expert's opinions in so many ways are
 2   interrelated.
 3          And while there may be issues that Your Honor takes
 4   with Dr. Krishnan, you have not yet ruled on Dr. Krishnan, and
 5   you've made it clear that you're going to look again at all of
 6   the materials and the law and consider the arguments.
 7          What I don't hear is that if -- there's -- Dr. Crakes
 8   is making assumptions.  His methodology and the manner in --
 9   his qualifications to do so are pristine.  The methodology
10   that he uses is pristine.
11          And if, in fact, there's testimony at trial from
12   another expert that a child is unlikely to or whatever Your
13   Honor comes to or the case comes to in terms of what a child
14   may or may not accomplish going forward, if it's part of the
15   same injury or if it's permitted, then that would be helpful
16   for a jury.
17          What Mr. Campbell is arguing now is that because he's
18   assuming that Your Honor's not going to permit Dr. Krishnan in
19   the same way that they assume that Your Honor will not permit
20   Dr. Specht, that Bithoney's assumptions should not be part of
21   his scientific methodology, because those assumptions are
22   based on a false pretense.
23          Dr. Crakes's assumption, because they're based on a
24   false pretense.
25          THE COURT:  Let me ask you, and then we'll turn to
```

1    Mr. Walker, something that I didn't discuss with Mr. Campbell

2    but that I'm interested in, in light of some of the discussion

3    yesterday and this morning.

4         Dr. Crakes makes no prediction about damages for

5    somebody who has schizophrenia, Parkinson's, high blood

6    pressure.  So it occurs to me reviewing his report that those

7    are not damages that you're -- you're not seeking money

8    damages for those possible outcomes for lead exposure.

9         You don't have an expert who's going to quantify what

10   schizophrenia would cost to the person in lost wages.

11        MR. STERN:  So in the context of your question, the

12   answer is you're correct.  We would not.

13        I could envision a scenario where part of a pain and

14   suffering argument for a child could be as they grow older to

15   the extent that they're aware of what's happening to them, and

16   they're unsure of what might happen to them in the future.

17        There could potentially be a pain and suffering

18   argument that has nothing to do with any of Dr. Crakes's

19   calculations and potentially could be the subject to motion

20   practice prior to making that argument at a closing, depending

21   on how the evidence comes in.

22        But to your specific point, there's not a calculation

23   made by Dr. Crakes that Sherrod -- Mr. Sherrod -- sorry.

24   Amele Sherrod is going to suffer from schizophrenia.  So based

25   on the calculations I've come up with, that that is quantified

```
 1    as lost earnings of X to Y amount of dollars.
 2           That is not part of his calculation, nor will it be
 3    or part of anybody's calculation.
 4           THE COURT:  Okay.  So then what we have to do is be
 5    careful that that's not what the jury is awarding damages for.
 6           MR. STERN:  Absolutely.  I mean, we would be -- if
 7    the evidence presented by experts on lost future earnings
 8    doesn't include projections or an analysis associated with an
 9    injury that hasn't been presented, but the jury ultimately
10    awards damages for an injury that wasn't presented, it would
11    be reverse I believe on appeal, so --
12           THE COURT:  Correct.
13           MR. STERN:  -- we are not in any way attempting to
14    nor do we intend to try to convince you, defendants, or the
15    jury that Emir Sherrod will suffer from schizophrenia.
16           That's never been a part of any of the expert
17    reports.  And I think that what's --
18           THE COURT:  Well, I'm not sure that's true.  Because
19    the expert -- we do have testimony that those are some of the
20    outcomes of lead poisoning for some people --
21           MR. STERN:  Absolutely.
22           THE COURT:  -- but we don't know what percent, and we
23    don't know what likelihood it is.
24           MR. STERN:  Sure.  And you could -- absolutely.  And
25    the -- there are -- there is some education that has to be in
```

```
 1   a trial like this be imparted upon a jury in general terms
 2   that has nothing to do with the actual damages that are going
 3   to be sought or awarded.
 4          So, for instance, if the jury is able to hear about
 5   the composition of the -- the chemical composition of the
 6   river water prior to the switch, prior to the switch and with
 7   or without corrosion control.  Taking away the sampling and
 8   the comparison to DWSD, that's an educational component.
 9   That's not going to prove that Veolia did something wrong or
10   didn't.
11          And so in that instance, there should be an analysis
12   about whether this educational information is more probative
13   than it is prejudicial to the extent someone doesn't want it
14   to come in.
15          But to simply say that, you know, out of hand, the
16   jury should never know all of the potential consequences
17   associated with lead poisoning, I think it's a little
18   premature to say that.
19          And I don't think Dr. Crakes, in particular, or any
20   of our experts are positing that that outcome is either
21   probable or even has occurred.
22          THE COURT:  Okay.  But at some point in the next --
23   in the days after today, I will have to decide whether those
24   expert opinions can come in or not.  And I have a challenge by
25   defendants that it's more probative -- more prejudicial than
```

1   probative.

2           And so I look to Dr. Crakes just to see, "Well, is he

3   opining on that?"  And he's not.  So it looks to me and now

4   you've confirmed that you won't be seeking money damages for

5   conditions that the plaintiffs don't currently have, and we

6   don't have a reasonable medical expectation in the record that

7   they will have.

8           And so I have to figure out what point is the jury

9   getting -- what is an element that's in controversy, a fact in

10  controversy that that would -- that information would satisfy?

11          MR. STERN:  So the only caveat -- I agree with what

12  Your Honor just said.  And I don't envy you for the task

13  ahead.  I understand that it's a lot that you have to do.

14          THE COURT:  Thank you.

15          MR. STERN:  No, thank you.

16          But what I would say is that I don't concede that a

17  manifestation of the injury that's been diagnosed is the same

18  thing as schizophrenia.  So, for instance, a child who today

19  has been diagnosed with and is suffering from ADHD, there's a

20  difference between any expert, whether it's Dr. Bithoney,

21  Dr. Krishnan discussing the future manifestations based on

22  their own experience of what's likely to occur to that child

23  based on the injury that's already been diagnosed versus

24  Dr. Bithoney coming in and saying, "Well, Emir Sherrod's going

25  to be schizophrenic, and that's -- you know, that's not based

1   on anything I've seen in the records.  It's just in my

2   experience, kids who are lead poisoned sometimes suffer from

3   schizophrenia in life, and you should award damages to that."

4          And so, Your Honor, I think earlier today even

5   delineated between the -- when we were discussing Dr. Bithoney

6   between those future manifestations of the present diagnosis

7   versus the manifestation of a diagnosis that has not yet been

8   made.

9          THE COURT:  Yes.  Okay.  So does Mr. Walker have

10  anything to add?

11         MR. WALKER:  I'd be happy to try to answer any

12  questions, Your Honor.  But if Your Honor doesn't have any,

13  then --

14         THE COURT:  I do have a question --

15         MR. WALKER:  Sure.

16         THE COURT:  -- which is, okay, Dr. Crakes gives us

17  these scenarios of not graduating from college.  And here are

18  the lost wages or the wage potential that's not achieved.

19         Is there -- can you tell me how he picked these

20  scenarios in that he doesn't give us some college.  Maybe two

21  years of college but not graduation gives you an edge in the

22  job market.  Or some high school but not all of high school.

23  Or some part of a masters but not all.

24         So how does he pick this, the scenarios that he uses?

25         MR. WALKER:  To be sure I understand the question

November 3, 2021

1   accurately, you know, why is -- he doesn't say ninth grade
2   versus tenth grade or one year of college versus two or three
3   years of college and not finishing.
4           THE COURT:  Correct.
5           MR. WALKER:  I don't think that it is spelled out in
6   the report.  I don't know that the question was asked at his
7   deposition.  I think that he provided one number.  To the
8   extent that there are questions that VNA would ask about those
9   assumptions, those are the kinds of assumptions that are
10  fodder for cross-examination but not exclusion.
11          THE COURT:  So A.T. has a 30 to 50 percent chance of
12  not going to college.  And Dr. Crakes tells us the outcome of
13  no college.  So you're saying he just took Dr. Krishnan's
14  general cutoffs looking at graduation from high school,
15  college, and some graduate school, and then put those into the
16  national databases and got these outcomes.
17          MR. WALKER:  Yes, Your Honor.
18          MR. STERN:  Your Honor, I don't want to tag team, but
19  I have to jump in for a second.  The fact that Dr. Crakes has
20  a number in his report does not necessarily mean that counsel
21  for plaintiffs is going to ask a jury to award that number.
22          It's very possible at a trial to juxtapose what one
23  expert says.  And let's assume for a minute that
24  Dr. Krishnan's opinions are permitted with regard to the 30 to
25  50 percent related to not going to college.

November 3, 2021

```
 1          Just because Dr. Crakes says that has -- not going to
 2   college has a value of a million dollars doesn't mean that we
 3   would present to a jury, "Hey, jury, you have to award or we
 4   suggest you award or we'd like for you to award a million
 5   dollars, because there's a 30 to 50 percent chance that the
 6   child's not going to go to college."
 7          It's very possible and very likely that, based on the
 8   testimony as it comes in, that a plaintiff's lawyer like us
 9   would say to a jury, "Take into account the fact that there's
10   a 30 to 50 percent chance that the child doesn't go to
11   college, and take into account that Dr. Crakes has opined that
12   if a child doesn't go to college, it's worth a million
13   dollars, and use your judgment as a jury whether you want to
14   award that job a million dollars or whether you want to
15   discount it by 50 percent or whether you want to discount it
16   by 30 percent."
17          And so just because he's created numbers using a
18   sound methodology in his experience -- sorry.  That's -- put
19   me in time out.
20          My point is that these reports -- there are
21   assumptions being made that what's in these reports is what's
22   going to be what plaintiffs' counsel asks of the jury.  And if
23   we get to a point in a trial where we are overreaching or
24   where the testimony that we're trying to elicit is
25   unsupported, there's motion practice and issues that can be
```

 1    resolved then.

 2           But to say, based on his report, that Dr. Crakes is

 3    not qualified, didn't use a sound methodology, and this would

 4    not assist the jury is just unfounded.

 5           THE COURT:  Okay.  Then I have one final question,

 6    which is:  What is the source of the 3.5 percent wage growth

 7    assumption that Dr. Crakes puts into his analysis?  I didn't

 8    see where he told us which national databases he used for

 9    that.

10           MR. STERN:  If you're looking at me, I don't have

11    anything.

12           THE COURT:  He said he used historical data, but we

13    don't know what that -- historical from what database?

14           MR. WALKER:  I don't think it's set forth in his

15    report, and I don't recall the question in the deposition,

16    Your Honor.

17           THE COURT:  Okay.  All right.  Mr. Campbell,

18    anything --

19           MR. CAMPBELL:  I would say that the argument that

20    Mr. Stern just made about how this could be used is exactly

21    why it must be excluded.  By throwing out a number that is not

22    -- doesn't have a factual or evidentiary basis that it will

23    occur, particularly as to a number that the jury could use or

24    grab onto, and if it doesn't have a basis, it's irrelevant.

25           And in this case at this point in the litigation with

1    the Daubert 702 hearing, the reason why you should exclude it

2    is because it's absent a foundation that would be helpful to

3    the jury.

4              And that is this outcome that he's putting millions

5    and millions of dollars on is hypothetical, and it doesn't

6    belong in front of the jury.  That's what the Michigan law is,

7    that it needs to be a -- I forget the words even know -- but

8    the cases that I've cited, that's why that law exists.

9              THE COURT:  A reasonable certainty.

10             MR. CAMPBELL:  Yes.

11             THE COURT:  Yes.  Okay.  Well, thank you, all, very

12   much for your arguments yesterday and today and for the

13   extensive briefing that was filed some time ago.

14             Let me say this.  A couple of things.  We discussed

15   yesterday a couple of issues that might have some additional

16   briefing, and I want to make sure.

17             One of them was on Mr. Humann, and I think I offered

18   the opportunity for defendants to file a brief by November 9

19   regarding new areas you may want to depose him on.  Plaintiffs

20   to respond by November 16.

21             Is that what you have in your records?  Okay.

22             I think we also talked about whether additional

23   briefing was being requested regarding Dr. Graziano, and that

24   was related to -- was that related to the items for future

25   damages?  General causation regarding physical illnesses.

November 3, 2021

```
1              MR. WALKER:  That's correct, Your Honor.
2              THE COURT:  Yeah.  And when -- we can use the same
3    schedule of November 9 and 16th, or tell me if you need an
4    additional time.
5              MR. WALKER:  That timeline works for us, Your Honor.
6              THE COURT:  Okay.  And was there any request for
7    further briefing on Dr. Hoaglund?
8              MR. TERMOLEN:  Yes, Your Honor.
9              THE COURT:  Mr. Termolen.
10             MR. TERMOLEN:  Thank you, Your Honor.  I believe you
11   set a briefing schedule and part of that was the plaintiffs
12   are to identify exactly what opinions they intend to use.
13             THE COURT:  That's right.
14             MR. TERMOLEN:  With Dr. Hoaglund.  And I think it was
15   a week from yesterday and then a week from that, Your Honor.
16             THE COURT:  Okay.  That's right.  Thank you.
17             MR. CAMPBELL:  And the last issue was the taking a
18   look at this Greyhound Lines case from Mississippi.
19             THE COURT:  Sure.  You can take a look at that, but
20   it's not going to be helpful for me to know that it's a
21   Mississippi Supreme Court case and I'm to apply Michigan law
22   and that we're in the Eastern District of Michigan in federal
23   court and not in Mississippi in the state court.
24             I just offer the text of that opinion, because I
25   think it said in a more eloquent way than I could say why
```

1    courts look at national data and not local data when looking

2    at the potential of a human being in our country.

3              We may be diluting ourselves about potential.  But

4    every court does it, uses this technique of looking at

5    national wage data, national life expectancies, national

6    educational accomplishments.

7              And so I don't -- you can certainly write to me --

8              MR. CAMPBELL:  Your Honor, I promise you that we

9    won't go on a Michigan-Mississippi route --

10             THE COURT:  Okay.

11             MR. CAMPBELL:  -- but given that -- I just -- given

12   that I hadn't seen it, I would just like the opportunity.  If

13   there's something that it prompts, I'd that opportunity, and I

14   represent to you that we won't re-plow old ground or discusses

15   Mississippi versus Michigan.

16             THE COURT:  And the citation is 765 Southern Second

17   1269.  And it's Mississippi in the year 2000.

18             MR. STERN:  765 Southern Second 1269, Your Honor?

19             THE COURT:  Let me look again.  I think so.  1269.

20             MR. STERN:  Thank you.

21             THE COURT:  And the quote was from 1276 to 77.

22             MR. RINGSTAD:  Your Honor.  On the Graziano

23   supplemental briefing, will the plaintiffs go first for the

24   9th then?

25             THE COURT:  I think that makes sense.

November 3, 2021

115

```
 1              MR. RINGSTAD:  Thank you, Your Honor.
 2              THE COURT:  Okay.  Then I have one other thing that
 3    came up, and I've got all the right people here, because
 4    Mr. Kent is here.
 5              I would like -- hold on, and I'll tell you what I'd
 6    like.
 7              I would like the full deposition of J. Braider.  And
 8    the sooner I can get that, the better.  I'm looking at LAN's
 9    motion for summary judgment.
10              MR. CAMPBELL:  Oh.
11              MR. KENT:  Oh, sure.
12              THE COURT:  And so if you could file it, that will be
13    great.
14              MR. KENT:  Will do.
15              THE COURT:  If there's something that needs to be
16    redacted, if you can submit it to my law clerk, that's fine
17    too.
18              And then hold on one more minute.
19              Okay.  I'm still following up on the number of
20    potential jurors to be summonsed, so I wanted to be sure I
21    didn't need to ask you.  I'm looking for a response from our
22    jury department, but I don't have it yet.  Okay.
23              Anything further from any of you?
24              MR. CAMPBELL:  Thank you for your time.  And from me
25    and my perspective, the last time I was live in court was, I
```

1    think, March 11 with Your Honor.  And so you book ended the

2    COVID.

3              THE COURT:  My goodness, me, too.  Happily I've been

4    in court since then.  But not for a very long time, I wasn't.

5    So I was very concerned about all of us following that day.

6    So I'm glad that there were no ramifications for having

7    gathered then.

8              So I ask that you all take good care and stay

9    healthy.  Good a booster shot if you haven't gotten one, and

10   I'll see you soon I'm sure.

11             MR. CAMPBELL:  Thank you, Your Honor.

12                        (Proceedings Concluded)

13                  -           -           -

14

15            <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

16        I, Jeseca C. Eddington, Federal Official Court

17   Reporter, do hereby certify the foregoing 116 pages are a true

18   and correct transcript of the above entitled proceedings.

19   <u>/s/ JESECA C. EDDINGTON</u>                    <u>11/12/2021</u>
     Jeseca C. Eddington, RDR, RMR, CRR, FCRR        Date
20

21

22

23

24

25