Highly Confidential - Mira Krishnan, Ph.D.

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4

     ----------------------------)
5                                 ) Civil Action No.:
     IN RE:  FLINT WATER CASES    ) 5:16-cv-10444-JEL-MKM
6                                 ) (consolidated)
                                  )
7                                 ) Hon. Judith E. Levy
     ----------------------------) Mag. Mona K. Majzoub
8                                 )
     Elnora Carthan et al. v.     )
9    Governor Rick Snyder et al.  )
                                  )
10   ----------------------------)

11

12                 HIGHLY CONFIDENTIAL

13       VIDEOTAPED DEPOSITION OF MIRA KRISHNAN, Ph.D.

14

15                MONDAY, OCTOBER 5, 2020

16                      Volume 1

17

18       Remote oral videotaped deposition of MIRA

19   KRISHNAN, Ph.D., conducted at the location of the witness

20   in Grand Rapid, Michigan, commencing at approximately

21   9:04 a.m., on the above date, before JULIANA F.

22   ZAJICEK, a Registered Professional Reporter, Certified

23   Shorthand Reporter, Certified Realtime Reporter and

24   Notary Public.

```
 1    APPEARANCES:
 2    ON BEHALF OF INDIVIDUAL PLAINTIFFS:
 3          NAPOLI SHKOLNIK PLLC
             360 Lexington Avenue, 11th Floor
 4          New York, New York 10017
             212-397-1000
 5          BY:  PATRICK J. LANCIOTTI, ESQ.
                  planciotti@napolilaw.com
 6
                       -and-
 7
             NAPOLI SHKOLNIK PLLC
 8          2665 South Bayshore Drive, Suite 220
             Coconut Grove, Florida 33133
 9          212-397-1000
             BY:  LOUISE R. CARO, ESQ.
10                 lcaro@napolilaw.com
11                      -and-
12          LEVY KONIGSBERG, LLP
             800 Third Avenue, 11th Floor
13          New York, New York 10022
             212-605-6200
14          BY:  COREY M. STERN, ESQ.
                  cstern@levylaw.com
15
16    ON BEHALF OF DEFENDANT CITY OF FLINT:
17          BUTZEL LONG
             41000 Woodward Avenue
18          Stoneridge West
             Bloomfield Hills, Michigan 48304
19          248-258-1616
             BY:  WILLIAM J. KLIFFEL, ESQ.
20                 kliffel@butzel.com
21
22
23
24
```

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    APPEARANCES: (Continued)
 2    ON BEHALF OF DEFENDANTS LEO A. DALY COMPANY, LOCKWOOD
      ANDREWS & NEWNAM, INC. AND LOCKWOOD, ANDREWS & NEWNAM,
 3    P.C.:
 4         FAEGRE DRINKER BIDDLE & REATH, LLP
           1717 Main Street, Suite 5400
 5         Dallas, Texas 75201
           469-356-2535
 6         BY:  TRAVIS S. GAMBLE, ESQ.
                travis.gamble@dbr.com
 7
 8    ON BEHALF OF DEFENDANTS VEOLIA WATER NORTH AMERICA
      OPERATING SERVICES, LLC, VEOLIA NORTH AMERICA, LLC AND
 9    VEOLIA NORTH AMERICA, INC.:
10         CAMPBELL CONROY & O'NEIL, P.C.
           1 Constitution Wharf, Suite 310
11         Boston, Massachusetts 02129
           617-241-3063
12         BY:  DAVID M. ROGERS, ESQ
                drogers@campbell-trial-lawyers.com;
13              ALAINA N. DEVINE, ESQ.
                adevine@campbell-trial-lawyers.com;
14              KRISTIN M. DUPRE, ESQ.
                kdupre@campbell-trial-lawyers.com
15
                     -and-
16
           MAYER BROWN LLP
17         71 South Wacker Drive
           Chicago, Illinois 60606
18         312-782-0600
           BY:  SARAH E. REYNOLDS, ESQ.
19              sreynolds@mayerbrown.com
20
21
      THE VIDEOGRAPHER:
22
           MR. DAVID LANE,
23         Golkow Litigation Services.
24
```

Highly Confidential - Mira Krishnan, Ph.D.

```
 1                    I N D E X

 2   WITNESS:                            PAGE:

 3    MIRA KRISHNAN, Ph.D.

 4         EXAM BY MR. ROGERS...................    7

 5

 6                    * * * * *

 7

 8                 E X H I B I T S

 9   MIRA KRISHNAN EXHIBIT              MARKED FOR ID

10    No. 1     Hearing transcript dated        12

11              10/02/2020

12    No. 2     CV                               44

13    No. 3     Invoice for services, 6/15/20    48

14    No. 4     Invoice for services, 6/27/20    51

15    No. 5     Fourth National Report on Human  128

16              Exposure to Environmental

17              Chemicals, Updated Tables, January

18              2019, Volume One

19    No. 6     Forensic Neuropsychological      141

20              Evaluation - E▓▓ S▓▓

21    No. 7     Pages 59 - 66 from the DSM-V     148

22    No. 8     Review Article: "Pb Neurotoxity:  166

23              Neuropsychological Effects of Lead

24              Toxicity," by Mason, Harp and Han
```

Highly Confidential - Mira Krishnan, Ph.D.

```
 1                  E X H I B I T S (Continued)

 2    MIRA KRISHNAN EXHIBIT                    MARKED FOR ID

 3    No. 9      Review Article: "Lead             167

 4               neurotoxicity in children: Basic

 5               mechanisms and clinical

 6               correlates," by Lidsky and

 7               Schneider

 8    No. 10     Forensic Neuropsychological       203

 9               Evaluation - E███ S███

10    No. 11     Forensic Neuropsychological       247

11               Evaluation - A████ T███

12    No. 12     DSM-V criteria for Mild           256

13               Neurocognitive Disorder, pages 605

14               - 612

15    No. 13     DSM-V criteria for Unspecified    281

16               Depressive Disorder, Page 184

17    No. 14     Forensic Neuropsychological       284

18               Evaluation - A████   T███

19

20

21

22

23

24
```

Highly Confidential - Mira Krishnan, Ph.D.

```
1        THE VIDEOGRAPHER:  We are now on the record.  My

2   name is David Lane, the videographer for Golkow

3   Litigation Services.  Today's date is October 5th,

4   2020, and the time is 9:04 a.m. Eastern Standard Time.

5             This remote video deposition is being held

6   in the matter of Flint Water Cases, restricted

7   distribution, bellwether depositions.

8             Our deponent today is Dr. Mira Krishnan,

9   Ph.D.

10            All parties to this deposition are

11  appearing remotely and have agreed to the witness

12  being sworn in remotely.

13            Due to the nature of remote reporting,

14  please pause briefly before speaking to ensure all

15  parties are heard completely.

16            Counsel will be noted on the stenographic

17  record.

18            The court reporter today is Juliana

19  Zajicek, who will now swear in our witness.

20            (WHEREUPON, the witness was duly

21             sworn.)

22      THE VIDEOGRAPHER:  Please begin.

23            MIRA KRISHNAN, Ph.D.,

24  called as a witness herein, having been first duly
```

1    sworn, was examined and testified as follows:

2                        EXAMINATION

3    BY MR. ROGERS:

4        Q.    Okay.  Dr. Krishnan, good morning.  I

5    introduced myself to you.  We introduced each other, I

6    guess, to each other.  My name is Dave Rogers.  I

7    represent the VNA Defendants.  We did an audio test

8    earlier.

9              Can you still hear me all right?

10       A.    Yes, Mr. Rogers, I can.

11       Q.    And that's good.  If you could please keep

12   your voice up at that volume and stay as close to your

13   screen where the microphone is, that would be good.

14             I would remind you that given that we are

15   doing this via Zoom, it's really even more important

16   that we both not speak at the same time.  So if you

17   wouldn't mind, I found it useful if the witness, in

18   this case you, you have a little pause in between the

19   end of my question and when you begin your answer so

20   that the court reporter, Juliana, can get everything

21   down correctly and also that allows other people to

22   interject objections, if necessary, to any of the

23   questions that I ask you.

24             Okay?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.    Yes, I understand.

2      Q.    See what -- you just did it, you just had

3   a little pause in there before the answer, so that --

4   that will make everybody's life easier today.  Thank

5   you.

6            The first thing I want to clarify or I

7   guess confirm, you -- you heard our off-the-record

8   discussion that I had with Mr. Luc -- Lanciotti about

9   what I would describe as a narrowing of the focus of

10  your testimony.

11           You -- you heard what we talked about off

12  the record before we get started, right?

13     A.    Yes, I did.

14     MR. ROGERS:  And, Louise, I don't know if you

15  were on.

16  BY MR. ROGERS:

17     Q.    But we talked about the issue of whether

18  or not, Dr. Krishnan, you were going to be offering

19  opinions at trial in this case with respect to the

20  issue of causation, and specifically whether or not

21  you were going to be offering any opinions about

22  whether or not any of the neuropsychological deficits

23  or impairments that you found in your testing for the

24  four bellwether plaintiffs were caused by or whether

Highly Confidential - Mira Krishnan, Ph.D.

1    or not lead contributed to causing those conditions.

2            And I understand that you are not going to

3    be providing that type of causation opinion testimony.

4            Is that right, everything I've said?

5        A.    Yes, that's my understanding as well.

6    Sorry.

7        Q.    The reason I ask is because in your

8    reports, there appear to be causation opinions

9    expressed.

10           Are -- is -- is it correct that you are

11   withdrawing those or at least that the bellwether

12   plaintiffs are withdrawing Dr. Krishnan as an expert

13   in causation at this time?

14       MS. CARO:  Well --

15   BY THE WITNESS:

16       A.    That is my under -- sorry.

17       MR. STERN:  Hello?

18       THE WITNESS:  Hello, who is -- who is on the

19   phone?

20       MR. STERN:  This is Corey.

21       THE WITNESS:  Okay.

22       MR. STERN:  Hey, Louise.

23       MS. CARO:  Hey.  Go, Corey.

24           So -- so, she is not offering opinion as

Highly Confidential - Mira Krishnan, Ph.D.

1    to causation.  She is offering opin -- opinion as to

2    her testing of each of the individual bellwethers and

3    the results that she found there, but not as to

4    causation.

5        MR. ROGERS:  Yeah, so, Corey, I'm glad you

6    joined.  We -- we had an off-the-record discussion

7    about the statements that you made at the hearing on

8    Friday; namely, that Dr. Krishnan was not going to be

9    providing testimony -- opinion testimony about

10   causation, so we are just trying to clarify that so

11   that we can streamline the deposition.

12              So, is that, in fact, correct, Corey, that

13   Dr. Krishnan will not be offering opinions about

14   causation with respect to any of the

15   neuropsychological deficits or impairments that she

16   has found in the bellwether plaintiffs?

17       MR. STERN:  I -- I think it's fair to say that

18   it's not our intention to offer her as a causation

19   expert at trial.  I think that her expertise is in the

20   testing and evaluation for neuropsychological

21   deficits.  To the extent that she references in her

22   reports anything that she -- any conclusions that she

23   has made regarding those deficits, I mean, I think I

24   know where you are going, there are some things that

Highly Confidential - Mira Krishnan, Ph.D.

1   she says in her reports that could go to causation.

2   I'm not invalidating by agreement the things that she

3   said in her reports.  I'm just telling you that the

4   reason that Dr. Bithoney was hired as an expert for

5   these four individuals is to take what Dr. Mira has --

6   has done and the conclusions that she has made and

7   opine about cause.

8        So, you know, she will not be offered at

9   trial as the -- as the causation expert for these

10   cases.  However, it doesn't mean that anything she may

11   have said in her reports is no longer valid or true.

12   It is just that, you know, Dr. Bithoney may offer

13   testimony about a neuropsychological exam.  That

14   doesn't mean he is an expert in performing that

15   testing or has the credentials to -- to opine on that.

16        So, there may be a little bit of

17   crossover, but she is not the causation expert that

18   will be offered for these four bellwether plaintiffs

19   at trial.

20     MR. ROGERS:  Okay.  Well, I -- I think I have an

21   understanding, but just to make sure, let me just pull

22   up the transcript here and we'll -- we'll see if we

23   can get this clarified.  So I'm going to share my

24   screen.

Highly Confidential - Mira Krishnan, Ph.D.

1   BY MR. ROGERS:

2       Q.    And, Dr. Krishnan, can you see the screen

3   that I am sharing with you now?

4       A.    Yes, I see your -- your file browser.

5       Q.    Okay.  I'm going to open up a document

6   entitled "Hearing Transcript," and Juliana, can we

7   mark this Exhibit 1.

8               (WHEREUPON, a certain document was

9                marked Mira Krishnan, Ph.D.

10               Deposition Exhibit No. 1, for

11               identification, as of 10/05/2020.)

12  BY MR. ROGERS:

13      Q.    This is the hearing transcript from Friday

14  afternoon's hearing in which I participated as well as

15  Mr. Stern.

16           And on Page 5 of the transcript, I've

17  highlighted a section here.

18           Can you see that okay, Doctor, now?

19      A.    Yes.

20      Q.    It says -- Mr. Stern says:  "Okay.  No

21  problem, your Honor.

22           "Dr. Krishnan is a neuropsychologist who

23  evaluated each of the four bellwether trial plaintiffs

24  for cognitive deficits and will be testifying about

Highly Confidential - Mira Krishnan, Ph.D.

1  her perceptions, her conclusions, her testing and the

2  cognitive deficits that she may have found through her

3  testing and evaluations."

4          Is that a correct statement, Doctor?

5      A.    Yes, I think so.  To my understanding that

6  is correct.

7      Q.    Thank you.

8          The next section that I'd like to show

9  you --

10     MR. STERN:  Are we on the -- are we on the

11  record, Dave?

12     MR. ROGERS:  Yes.

13     MR. STERN:  Okay.

14  BY MR. ROGERS:

15     Q.    The next section on Page 6 is the Court,

16  that is the Judge, asks:

17          "Now, is his testimony -- it sounds like

18  Dr. Krishnan's testimony goes to damages.  Does it

19  also go to causation in general?"

20          And Mr. Stern says:  "Neither of them go

21  to causation."

22          The neither of them, Dr. Krishnan, is

23  reference to, there was also some reference to

24  Dr. Aaron Specht at this point during the -- the

Highly Confidential - Mira Krishnan, Ph.D.

1    hearing.

2              But then Mr. Stern -- the Court says:

3    "Okay."

4              And Mr. Stern goes on to say:

5    "Dr. Krishnan will testify:  'I did testing and these

6    were the results.'"

7              And the Court says:  "Okay."

8              And then Mr. Stern says:  "'I can't tell

9    you why.  That's not my expertise.  I could just tell

10   you what I found.'"

11             Is that correct?

12       A.    So, this hearing, to my understanding,

13   happened after these evaluations were completed and

14   after these reports were written.  I am able to do

15   what Mr. Stern asks in the transcript.

16       Q.    Yeah, but, I mean, does it mean that you

17   are not intending to offer opinions at the trial of

18   the case about causation, that is to say, for the four

19   bellwether plaintiffs where you have found various

20   impairments, that you are not going to testify about

21   the cause of those impairments; namely, whether or not

22   lead caused them or was a contributing factor in

23   causing them?

24       A.    So my understanding from this conversation

Highly Confidential - Mira Krishnan, Ph.D.

1    is that -- that plaintiff counsels are going to

2    present other experts for that purpose.

3         Q.    Not you?

4         A.    That is what I understand.

5         Q.    So do you hold professional opinions as an

6    expert in this case that you intend to testify about

7    at trial concerning causation, that is, what caused

8    the neurological deficits or impairments that you

9    found in your testing?

10        A.    So, in general, what I can tell you is

11   that neuropsychologists who consider individuals with

12   claims of injury or impairment routinely consider the

13   type of injury they sustained in evaluating the

14   impairment.  The example -- an example that I

15   sometimes give is that if I tap you on the arm, you

16   may sustain a range of injuries from me tapping you on

17   the arm.  Most people would be uninjured by that.  If

18   you had some kind of pain condition, me tapping you on

19   the arm might be painful, but there would be other

20   kinds of injuries that would be very rare, you know,

21   maybe there is somebody who has some kind of bone

22   disorder and I break your arm just by tapping it.

23   That would be very rare.  There also would be

24   impaired -- impairments that would be entirely

Highly Confidential - Mira Krishnan, Ph.D.

1    unlikely to occur, like if I tapped you on the arm and

2    you alleged that you went blind.

3           So in general, neuropsychologists who deal

4    with injuries consider the -- the type or source of

5    the injury to look for impairments that may be

6    plausible or consistent with that kind of injury.

7           I don't know if that's the same thing as

8    causation as you are defining it, but when I evaluated

9    the children, I considered whether -- for each of

10   these bellwethers -- the kinds of impairments they had

11   were within the realm of the impairments that are seen

12   as the result of the type of alleged injury in this

13   case, that exposure to lead.

14       Q.   Well, I guess I'm still not -- not clear.

15       MR. ROGERS:  Perhaps, Corey, you could help me

16   out or -- or Louise or whoever.

17           If the Doctor is not going to present

18   testimony, opinion testimony at trial about what

19   caused the children's deficits that she has found, and

20   particularly she is not going to testify that lead was

21   a contributing factor in causing those deficits, the

22   deposition will be different than what it would be if,

23   in fact, she is doing that.

24           So I'm -- I'm just not clear.  Can you

Highly Confidential - Mira Krishnan, Ph.D.

1   elaborate?

2       MR. STERN:  Well, Dave, Dave, Dave, to be clear,

3   what I said on the record was that we will not be

4   offering her to testify to certain things at trial.

5   There are plenty of experts who have overlapping

6   opinions, and I think you are entitled to ask her

7   whatever you want based on the reports that she has

8   written, but I've represented to the Court that at

9   trial Dr. Krishnan is not intended to be put forth to

10  a jury for the purpose of testifying about causation

11  and I also represented to the Court that Dr. Krishnan

12  is talking about four individual children, not the

13  entire community of children who allege that they were

14  poisoned.

15          So I'm not -- I'm not going to limit her

16  testimony for this deposition.  If you have questions

17  you want to ask her based on her report, I mean, you

18  are -- you are entitled to ask her whatever you want,

19  and her report speaks for itself.  I'm just -- I --

20  I -- I informed the Court that the structure of our

21  case as we envision it for trial is that Dr. Krishnan

22  is an expert and will be qualified as an expert to

23  testify about cognitive deficits and the testing that

24  was performed and is typically performed to determine

Highly Confidential - Mira Krishnan, Ph.D.

 1   if -- to determine cognitive deficits.

 2           Dr. Bithoney, based on his experience and

 3   evaluating over 5,000 children with lead poisoning,

 4   including the pathology and the mechanisms in which

 5   lead poisoning occurs, will testify about whether

 6   the -- the deficits seen by Dr. Krishnan, observed by

 7   Dr. Krishnan, and reported on by Dr. Krishnan were

 8   caused by exposure to lead.

 9           And Dr. Crates (phonetic) will testify

10   that what the value of all of those claims are,

11   assuming that the reports of Krishnan and Bithoney are

12   true.

13           Does that mean that Dr. Bithoney doesn't

14   have some understanding that kids who were lead

15   poisoned typically earn less money over the course of

16   their life, no.  Does that mean that he can't say that

17   on the record, no.  But he is not going to be

18   qualified as an economist to talk about lost earnings

19   for children who are lead poisoned.

20           Dr. Krishnan is not going to be attempted

21   by us to be qualified as an expert who could talk

22   about why her observations were caused, what caused

23   them.  She -- I'm sure she is able to talk about in

24   her experience and her expertise in evaluating lead

Highly Confidential - Mira Krishnan, Ph.D.

1    poisoned children that what she saw in these children

2    is common for kids who were exposed to lead.  That

3    doesn't require expertise.  That's just a

4    neuropsychologist who has seen other kids.

5            So, I'm not going to -- I'm not going to

6    agree to limit her testimony in this deposition to

7    this narrow scope where it is just the testing, but I

8    am being candid with you, as I was with the Court,

9    that it is not our intention to offer her as an expert

10   in causation because her expertise is -- is limited in

11   this case to her observations and testing of these

12   children.

13   BY MR. ROGERS:

14       Q.    Dr. Krishnan, let's start with some basic

15   background questions and then we'll move on into some

16   of the documents.

17       MR. STERN:  Can I ask one more question before

18   we start, Dave?

19            I'm not defending this deposition, Louise

20   is, because I cannot be on the deposition the entire

21   time.  For the record, I have issues with my children

22   today that require me to -- to be away from this

23   deposition for an extended period of time, but I want

24   to make sure, and I'm sure it has already happened,

Highly Confidential - Mira Krishnan, Ph.D.

1   that there is no one on this deposition who would

2   violate the order that was entered by the Court on

3   Friday, meaning everyone on this deposition is either

4   Dr. Krishnan, the attorneys representing the

5   individuals whom hired Dr. Krishnan, or defendants who

6   have been sued by the individuals, the four bellwether

7   individuals, and who will be at the trial of this

8   case, as well as the court reporter and the

9   videographer.

10          Is that true?

11      MR. LANCIOTTI:  Yeah, hey, Corey, this is

12  Patrick.  We are -- we are good there.

13      MR. STERN:  So there is not a single person for

14  the putative class that's on this -- that's on this

15  deposition or attempted to be; is that correct?

16      MR. LANCIOTTI:  No, I don't believe so.  I

17  see -- I see one individual with the name "Documents."

18  I believe Dave is using that account, if I'm not

19  mistaken.  Dave can clarify.

20      THE VIDEOGRAPHER:  That's David.  David the

21  videographer.

22      MR. LANCIOTTI:  Okay.  So, then, yes, so then we

23  are -- we are all good, Corey.

24      MR. STERN:  All right.  Sorry, everybody, I'm

1  going to shut up now.

2            Louise, Dr. Krishnan, it is your show.

3            Dave, do your best and forget the rest.

4      MS. CARO:  Well, thanks for that clarification,

5  Corey.  That was really helpful.

6  BY MR. ROGERS:

7      Q.    Yes, so, Dr. Krishnan, I'm -- I'm going to

8  proceed on the understanding that you, as we confirmed

9  earlier, I think, that you will not be providing

10  causation opinions at the trial of the case; namely,

11  as to what caused -- what was the cause of the

12  deficits that you found in the testing based on the

13  statements of counsel.

14            So, but anyway, let's -- let's proceed.

15  So basic questions, when were you first retained as an

16  expert in the case?

17      A.    I reviewed my records and I believe that I

18  was retained on the 1st of May.

19      Q.    By whom?

20      A.    I was originally retained by -- by Napoli

21  through Paul Napoli and Patrick Lanciotti and Hunter

22  Shkolnik.

23      Q.    When you were retained or shortly

24  thereafter, did you learn as to whether or not, and

Highly Confidential - Mira Krishnan, Ph.D.

1    I'm going to just restrict my questions now to the

2    four bellwether plaintiffs who have been chosen for

3    trial, that is to say, and I'm -- if you don't mind,

4    I'm going to refer to them by their last names just

5    because it is easier for me to keep track of, but the

6    child S██████, T███, V█████████ and W████.

7            You have an understanding that those are

8    the four bellwether plaintiffs that the deposition is

9    going to be limited to and those are the four

10   bellwether plaintiffs who will be in the first trial

11   of the case, right?

12       A.    Yes, that was communicated to me prior to

13   this deposition.

14       Q.    Okay.  So, with respect to those four,

15   at -- at the point in time that you were retained, was

16   there any discussion about whether or not any

17   neuropsychological testing had been done on those

18   children before you were retained?

19       A.    So, as a matter of course, I -- I asked

20   about what kinds of background information were

21   available.  As I believe you may know, I was

22   ultimately retained by both the Napoli and Levy

23   Konigsberg, and to the best of my understanding these

24   children were represented by Levy Konigsberg, although

Highly Confidential - Mira Krishnan, Ph.D.

1    I understand that the two law firms are working

2    together, and I have been working at the direction

3    of -- of lawyers from both law firms.

4              So in that original discussion, as it

5    happens, these four bellwethers were not a part of

6    that discussion.  I was asked to see them slightly

7    later.  But I did ask if prior testing had been done

8    for the bellwethers, both in the original case with

9    the original ones that I was asked to see and then

10   also when these ten were added from Levy Konigsberg.

11       Q.   Right.  So what's the answer, was

12   neuropsychological testing done, evaluations of these

13   four before you?

14       A.   To the best of my knowledge, the only --

15   only one bellwether that I saw had prior

16   neuropsychological testing.  That child is not one of

17   these four.

18       Q.   Which one was that?

19       A.   That was, I believe -- sorry?

20       MS. CARO:  I was going to say, objection,

21   outside the scope of this deposition.

22              You can answer.

23   BY THE WITNESS:

24       A.   I believe that was S██████ B██████

Highly Confidential - Mira Krishnan, Ph.D.

1    G██PPI████.

2    BY MR. ROGERS:

3        Q.    Okay.  So just to confirm then, you are

4    not aware of any previous neuropsychological testing

5    of the type that you did on the plaintiffs S██PPI████,

6    T██PPI██, V██PPI████████ or W██PPI██, correct?

7        A.    Correct.

8        Q.    What was your assignment in the case as an

9    expert?

10       A.    I was asked to complete neuropsychological

11   evaluations of the bellwethers, consisting of

12   interviewing them and their parents and completing

13   cognitive and emotional tests and drawing conclusions

14   about impairment on the basis of that testing.

15       Q.    And what did you do to carry out that

16   assignment with respect to the bellwether plaintiffs,

17   the four, and I'll just refer to them as the four to

18   keep it simple?

19       A.    So I received a package of records to

20   review in each cases -- each of the cases and I

21   reviewed records prior to meeting with the families.

22   In the case of these four bellwethers, I met the

23   families in person in Flint and completed interviews

24   of the families and then I tested the children in

Highly Confidential - Mira Krishnan, Ph.D.

1    person and completed reports.

2        Q.    Since the time that you've -- or when you

3    did the testing, I noted on your reports that there is

4    a date, DOE, date of evaluation, is that right?

5        A.    I believe that's correct.

6        Q.    So, basically what you did is received

7    records and you reviewed them, you interviewed the

8    parents and/or the individual children, and then you

9    did your neuropsychological testing, is that correct?

10       A.    Correct.

11       Q.    And after you did your evaluations and

12   your testing for each, when is it that you wrote the

13   reports that were generated and provide -- produced to

14   us as an expert disclosure in the case?

15       A.    In general I wrote the reports over the

16   following few days.  The -- I believe that there is a

17   date indicated by the physical signature on the report

18   and that was the date on which the report was

19   finalized.

20       Q.    I see.  Okay.

21             You mentioned interviewing the plaintiffs

22   and the parents.  In the materials that I have

23   received, I haven't seen any interview notes.

24             Did you take notes?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.    These evaluations were all completed

2    during the COVID -- COVID-19 pandemic and in general I

3    took measures to reduce risk, including minimizing

4    materials.  I took notes directly on my computer in

5    these cases.

6      Q.    Yes, so --

7      A.    It is something that I have been doing in

8    my clinical practice during that time as well.

9      Q.    Do you have those notes?

10     A.    Meaning that I wrote the notes directly

11   into the report Word documents.  I don't have any

12   other notes from the examinees other than the ones

13   that -- all -- other than the information that's in

14   the report.

15     Q.    So the procedure that you followed when

16   you interviewed the parents and the children was that

17   you would have -- you had your laptop or computer with

18   you at that time and you were transcribing or typing

19   in the information that they provided to you, is that

20   right?

21     A.    Correct.

22     Q.    And that those notes, of course, would

23   have been being taken by you contemporaneous or during

24   the interview process, is that right?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.    Yes, that's correct.

2      Q.    And then so was that in an Word document

3   or something like that format?

4      A.    So, if you look at the reports that I

5   wrote, there is an interview section and it begins

6   with something like:  I eval -- reviewed early

7   development in detail with the family, I typed that

8   portion of the report contemporaneously with

9   interviewing the families.

10      Q.    So that's what I'm saying.

11           So, apart from that section of your

12   reports where it says -- it's entitled "Interview,"

13   you do not have or maintain any separate documents,

14   computer-generated documents or handwritten notes or

15   anything other than what's contained in your report,

16   is that right?

17      A.    With respect to the interview, that --

18   that is correct.

19           Prior to COVID-19, I would use paper forms

20   to write interview notes down, but at the time I

21   believe that this was a move that would reduce the

22   level of risk involved, and so I eliminated using

23   those paper notes around this time.

24      Q.    Just to be clear then, so apart from

Highly Confidential - Mira Krishnan, Ph.D.

1    the -- what is recorded in your reports under the

2    section Interview, there are no other

3    computer-retained documents or handwritten documents

4    concerning your interviews of the -- of the parents

5    and the children, right?

6         A.    That's correct.

7         Q.    I want to ask you some questions to make

8    sure that I know what are in your file materials.

9              I had requested of Patrick and Corey

10   that -- we had a -- let me just explain, Doctor.  We

11   had in a -- in a court order there is a requirement

12   that the expert files be turned over seven days in

13   advance of the deposition.  And I did some follow-up

14   to get your CV and list of publications and things

15   like that, but I didn't receive your whole file,

16   meaning I didn't receive the education records or

17   medical records that you would have received for each

18   of these patients.

19             So, I had asked for whether there was an

20   index that could be provided so that I could check to

21   make sure that what you had and reviewed for each

22   child is information that I also possess.

23             So, is there some way that we could do

24   that?  How -- how -- do you have an index of the

Highly Confidential - Mira Krishnan, Ph.D.

1   materials that were provided to you when you were

2   first retained with respect to these four children,

3   and I'm not talking about the work that you did, I

4   mean education records, medical records and things of

5   that type?

6        A.    I don't -- I did not prepare an index of

7   them.  I reviewed them and summarized them in my

8   reports and that's the only document that I produced

9   in relation to them.

10       Q.    Okay.  So somewhere in your file materials

11  you do have those materials, right?

12       A.    Yes.

13       Q.    So I'm going to request that we do that.

14  Is there -- would that be a relatively easy thing for

15  you to do, to just create an index of what the

16  materials are that you were provided?

17       A.    Would you -- are you asking me to produce

18  an index of the materials or are you asking me to

19  produce the materials themselves?

20       Q.    No, I don't -- I don't need the materials

21  themselves, just a list, so that with respect to, for

22  example, let's take the plaintiff S PPI , you

23  received medical records, employment records -- I'm

24  sorry, not employment -- education records, fact

Highly Confidential - Mira Krishnan, Ph.D.

1    sheets, discovery responses, stuff like that, right?

2        A.    Correct.

3        Q.    So I'm asking you if you could prepare a

4    list of those materials so that I know what's in your

5    complete file?

6        A.    Yes, I -- I believe I -- sorry.

7        MS. CARO:  She can -- she can provide a -- a

8    verbal list right now in deposition of what she went

9    through.  Why don't we do that?

10   BY MR. ROGERS:

11       Q.    Well, do you have the file materials with

12   you?

13       A.    I was asked not -- my understanding

14   generally of depositions is I don't have any materials

15   in front of me at the moment.

16       Q.    So how --

17       A.    I do have them on my computer.

18       Q.    Yeah, I -- I don't -- that would be fine,

19   if you -- I -- I would like to have a list, a written

20   list, but if you have access to what you were provided

21   on your computer and you read them off, I guess that

22   would constitute the list.

23       MS. CARO:  So you are saying you want a list

24   provided at some point during the deposition or after

Highly Confidential - Mira Krishnan, Ph.D.

 1  the deposition?  What are you requesting exactly?

 2       MR. ROGERS:  Well, actually, Louise, I requested

 3  from Patrick and Corey a list about a week or so ago.

 4  I never received a response to it, so I'm following

 5  up.  I mean, I -- I don't know what the issue is.

 6       MR. STERN:  Yes, since -- I mean, since -- since

 7  we are on the record, I mean, you asked for her

 8  records and she gave you the records.  Why does she

 9  need to make you a list when you have all of the

10  records.  Why can't you make the list?

11       MR. ROGERS:  That's incorrect, Corey.  Excuse

12  me.  That's not correct.  What I have is her testing

13  and her reports.  I don't have the materials, I don't

14  know what's in her file with respect to the materials

15  that she received from you and/or Patrick about these

16  plaintiffs.  That's what I'm referring to.

17       MS. CARO:  So it was my understanding that you

18  were provided the filings, so now you are saying that

19  you were not provided her files?

20       MR. ROGERS:  I just said I was -- correct, I was

21  not provided her files, meaning the files that she

22  received from the plaintiffs' lawyers about the

23  individual plaintiffs, including education records,

24  any fact sheets or discovery responses, medical

Highly Confidential - Mira Krishnan, Ph.D.

1    records, blood test reports, et cetera.

2        MS. CARO:  So you don't have any of those

3    materials?

4        MR. ROGERS:  I don't have them from her file.

5    That is the point of the question.  I want to be able

6    to make sure that, in fact, I know what she has had

7    and reviewed and that we have those things, Louise.

8        MS. CARO:  Well, you could always show her what

9    you have and -- and ask her questions about that

10   material.

11       MR. ROGERS:  No, look, the court order required

12   that the expert provide her file seven days in advance

13   of the deposition.  I don't have it.  I don't have

14   those materials from her file.  That's the point.

15       It's a -- it's a very simple thing.  If

16   she would just provide me a list of what's in the file

17   that she received for these four plaintiffs, we can

18   confirm that we have that material, being -- having

19   been produced separately to us.  I don't know what the

20   problem is.

21       MS. CARO:  It's not a problem.  It's just that

22   my understanding is that we did provide her files, so

23   we're -- we seem to have a -- some sort of

24   miscommunication here.  I don't know if Corey or

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   Patrick could chime in on that, but I'm told that you
 2   have been provided her files.  So...
 3       MR. STERN:  I didn't provide anything to the
 4   defendants.  Patrick, I think, has been the person who
 5   has communicated with them of actual documents.  So if
 6   you don't have -- you know, I don't have the order
 7   from the Court in front of me.  I don't know what you
 8   are entitled to, but I have no problem with her
 9   telling you exactly what she was provided in order to
10   interview these folks and -- and begin the process of
11   creating an opinion about it.
12       MR. ROGERS:  Well, what about a list?  I
13   don't -- why can't --
14       MR. STERN:  Are you asking for, like, to suspend
15   the deposition so she can provide you a list or do you
16   want a list at some subsequent time or do you want to
17   go through each individual plaintiff and say:  For
18   Mr. V▓PPI▓▓▓▓, what were you provided, for Ms. W▓PPI▓,
19   what were you -- like what are you -- you are entitled
20   to it, you are going to get it.  Are you -- how are --
21   how are you wanting this information to be
22   disseminated to you and at what point in time?
23   BY MR. ROGERS:
24       Q.   I was entitled to the information seven
```

Highly Confidential - Mira Krishnan, Ph.D.

1   days ago, but be that as it may, I would like to have

2   a written list of the materials, Dr. Krishnan, that

3   were provided to you for each of these four

4   plaintiffs, and as of right now, if you have access to

5   your computer where you could describe on the record

6   what those materials are, that would be great.  Let's

7   do that.

8        A.   Okay.  I -- I have -- if that is fine with

9   it.

10       MS. CARO:  Do you want to take a break to get

11  prepared to do that?

12       THE WITNESS:  We can do that.  I just -- before

13  we take a break, I would just like to make sure I

14  understand.

15  BY THE WITNESS:

16       Q.   Forgive me.  I have been asked to provide

17  reports in cases that are similar to this before.  I

18  want to make sure that I understand what you are

19  asking of me.

20            You are asking me to tell you what

21  documents the two law firms provided me for each of

22  these four children, meaning you want -- does that

23  mean that you want file names for these documents?

24  BY MR. ROGERS:

Highly Confidential - Mira Krishnan, Ph.D.

1    Q.    I just want to know what materials were

2    provided to you.  I don't know how to explain it any

3    better.  It doesn't seem to be that hard.

4    MS. CARO:  So I would say make a list -- make a

5    list of the files you have -- were given for each of

6    the clients, like what -- what was it contained in

7    there, was it a doctor record, was it a school record,

8    that for each of the four, if you could just make a

9    list, we'll take a little break and you can make a

10   list so that way you can go through that list for him

11   when we come back.

12   MR. ROGERS:  No, Louise, I would like a written

13   list to be produced at some point.  For purposes of

14   now, if you could just get access to your computer,

15   Doctor, open up your files on these plaintiffs and

16   describe on the record what the materials are that you

17   received on each plaintiff starting with plaintiff

18   S██████.

19   BY MR. ROGERS:

20   Q.    Am I pronounced that right, is it S██████

21   or S██████?

22   A.    I believe it is S██████.

23   Q.    S██████.  Okay.  So that's -- that's what

24   I'm asking you to do.

Highly Confidential - Mira Krishnan, Ph.D.

1              So do you want to take a couple minute

2    break to get your computer and then you can open up

3    the files and you can tell me what's in there for the

4    plaintiff S▉PPI▉▉▉?

5        MS. CARO:  Right, and Counsel, of course we need

6    to see her list before she would provide it.  So we

7    definitely need a little break and let her do that

8    and -- and then we can get on the record and get

9    moving.

10       MR. ROGERS:  Yeah, but Louise, I'm not asking

11   for her to write a list now.  To be clear, I'm asking

12   her to open up her computer where she has these files

13   and on the record describe what's in there, okay.  So

14   let's take a couple minute break.

15       MS. CARO:  Let's take a break.

16       MR. ROGERS:  Listen, I'm not -- I'm not -- under

17   the Federal Rules, you know, draft reports and/or

18   communications between counsel are not discoverable.

19   I'm not asking for that kind of stuff.  I'm talking

20   about the materials, Doctor, like education records,

21   medical records, fact sheets, discovery responses or

22   other things about these plaintiffs that were provided

23   to you, okay.

24       MR. STERN:  Great.  Let's come back at 9 --

Highly Confidential - Mira Krishnan, Ph.D.

1   9:55.

2        THE VIDEOGRAPHER:  Off the record, 9:41 a.m.

3               (WHEREUPON, a recess was had

4                from 9:41 to 9:54 a.m.)

5        THE VIDEOGRAPHER:  Back on the record, 9:54 a.m.

6   BY MR. ROGERS:

7        Q.    Okay.  Dr. Krishnan, thanks for making the

8   effort to get another computer that you can access and

9   so that we can get this done.

10              So, let's just start with the plaintiff

11   S█PPI████, E█PPI██  S█PPI████.

12              Would you just tell me what are the

13   materials that you received concerning him?

14        A.    So I'm going to describe the files that I

15   have, they are PDF files on my computer, and the dates

16   of specific care were records that are within these

17   documents are -- are reviewed and in my reports.

18              For E█PPI██ S█PPI████, I received a file with a

19   long file name, but it is a set of records from

20   Brownell K-2 STEM, S-T-E-M, Academy.  I received

21   records from Integrated Providers, Medical Records

22   Department.  I received a document containing bone

23   lead results.  I received a document from Dolven

24   Pediatrics, D-o-l-v-e-n.  I received the Plaintiff

Highly Confidential - Mira Krishnan, Ph.D.

1    Fact Sheet.  I believe that's what PFS stands for.  I

2    received a document entitled "GCHD," I believe that's

3    Genesee County Health Department, "Lead Level."  And

4    then I received a deposition transcript from I believe

5    Mr. Wheeler.  And those are all of the documents that

6    I have for E██ S██ .

7         Q.    Thanks.

8               Can you go on to -- let's do this in

9    alphabetical order.  The plaintiff T██ , please.

10        A.    Okay.  Let me find the correct file.  I

11   have these all up in front of me.  Okay.  Sorry.

12              For A██     T██ , the documents that I

13   have are a set of records from Genesee County Health

14   Department, another set of records also from Genesee

15   County Health Department, a set of records from

16   Genesys Interactive -- Integrated Group Practice,

17   Genesys is G-e-n-e-s-y-s.  I received records from

18   Grand Blanc Academy registrar, G-r-a-n-d B-l-a-n-c.  I

19   received records from Freeman Elementary School.  I

20   received two sets of extra records after the initial

21   set of records.  These are both blank.  They only

22   consist of a request form to the referral source.

23   Then I received a Plaintiff Fact Sheet, bone lead

24   results, a deposition of Apricot T██ and records from

1  Genesys Peds, again, G-e-n-e-s-y-s, and records from

2  WIC, W-I-C.

3      Q.    What's that?

4      A.    Women, Infant and Children.

5      Q.    Okay.  Thank you.

6            Does that -- that complete it for T██?

7      A.    Correct.

8      Q.    Okay.  Can we move to V███████, please?

9      A.    For R███ V███████, I received records

10  from Mott Children's Health Center; from Weston

11  Elementary School, W-e-s-t-o-n; I received a set of

12  records that are from Warde Med Lab, W-a-r-d-e; I

13  received bone lead results; I received GCHD Lead

14  Level; I received records from Mott Hospital, M-o-t-t,

15  that are entitled "Peds, Lead Level"; I received the

16  Plaintiff Fact Sheet; and I received V███████

17  deposition transcripts.

18      Q.    Thanks.

19            And then for W███, would you complete it?

20      A.    For D███████ W███, I received records from

21  Warde Med Lab, W-a-r-d-e; I received records from

22  Hurley Medical Center, H-u-r-l-e-y, Records

23  Department; and Hurley Medical Center Pathology

24  Department.  I received records from Hamilton

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   Community Health Network, Main Clinic.  I received

 2   records from Colonel Donald McMonagle Elementary

 3   School, M-c-M-o-n-a-g-l-e.  I received records from

 4   Doyle Ryder Elementary School, D-o-y-l-e R-y-d-e-r.  I

 5   received a set of extra records that, again, contained

 6   only a request for information but no actual records.

 7   And then I received bone lead results; a Plaintiff

 8   Fact Sheet; records from Hamilton Peds, Lead Level;

 9   records from Hurley Birth, Peds, P-e-d-s; and then I

10   received a Martin deposition transcript.

11       Q.    Those documents that you said were blank

12   or were just record request forms, were those forms

13   for entities or institutions different from the

14   records that you did receive, that is, some other

15   place?

16       A.    I -- I would have to check that.  I -- I

17   generally don't report on records that I don't have to

18   review.

19       Q.    Well, could you -- can you open up the

20   file that has the request form and then see if it's a

21   request for records that you already had or if it's a

22   different place?

23       A.    Just one moment, please.

24             So, for D PPI      W PPI , there is a request
```

Highly Confidential - Mira Krishnan, Ph.D.

1  from a -- to an Aaron Specht, A-a-r-o-n, S-p-e-c-h-t,

2  and that is -- that appears to be all that is in here.

3       Q.   Is that a request from you to Dr. Specht

4  or someone else to Dr. Specht or what?

5       A.   It -- the document is generated by the

6  Marker Group.

7       Q.   Did you -- do you know whether you

8  received anything from Dr. Specht besides the bone

9  lead -- the bone scan lead report printout sheet?

10      A.   I did not receive anything that is not

11  reviewed in my report.

12      Q.   Well, I -- what we have received for the

13  bone lead scans is -- so far, anyway, from Dr. Specht

14  was just a one-page sheet.

15           Is that what you got?

16      A.   Yeah, I believe so.  I -- I actually am

17  not clear on who Dr. Specht is.

18      Q.   Well, he is another consultant that --

19  expert that the plaintiffs have retained who did the

20  bone lead scans or at least, if he didn't do them, you

21  know, he was in charge of having them done.  So that's

22  who he is.

23           So I'm just trying to clarify, did you

24  receive anything from anything that Dr. Specht did

Highly Confidential - Mira Krishnan, Ph.D.

1    with respect to these plaintiffs besides just the one

2    page sheet reporting the results?

3         A.    I received the documents that I just read

4    to you.

5         Q.    All right.  Well, let's -- we are going to

6    have to open it up.  Would you open up the bone lead

7    scan for that file for WPPI and just tell me what's in

8    it?

9         A.    The bone lead file is a one-page document

10   that has a bone lead results.

11        Q.    Okay.  So then is it your memory with

12   respect to the bone lead results for each of these

13   plaintiffs, that's the record you received, just that

14   one page?

15        A.    That's correct.

16        Q.    Okay.  Does that complete your description

17   of the file materials that you received concerning

18   each of these plaintiffs from the plaintiff's lawyers

19   at some point in time after you were retained in the

20   case?

21        A.    Yes, it does.

22        Q.    And you didn't receive any other materials

23   besides those, right?

24        A.    To the best of my knowledge, I did not

Highly Confidential - Mira Krishnan, Ph.D.

1    receive any medical records to review other than the

2    ones that I have read to you.  I did not receive any

3    other educational records other than the ones that I

4    have read to you, either, for these four bellwethers.

5         Q.   I haven't heard you refer to any

6    deposition transcripts yet except the depositions of

7    the parent representatives of these four bellwether

8    plaintiffs.

9              Did you receive any other deposition

10   transcripts that have been taken in the case of anyone

11   besides the parents of the four bellwethers?

12        A.   I did not receive any depositions related

13   to these four bellwethers, other than the ones I

14   listed in the list of documents I just provided to

15   you.  And I didn't review any depositions other than

16   the ones that are in my reports, to the best of my

17   knowledge.

18        Q.   So -- yeah, did -- as part of your work on

19   the case, whether it's for these four bellwethers or

20   not, did you receive and review any other deposition

21   transcripts besides those of the parents?

22        A.   To the best of my knowledge, no.  They

23   were all depositions of parents.

24        Q.   All right.  I wanted to just get marked

Highly Confidential - Mira Krishnan, Ph.D.

1   and find out what else is in your file or other

2   materials that you have produced and make sure that we

3   have everything complete.

4           So I'm going to mark as Exhibit No. 2, and

5   I'll share my screen, your CV.

6                   (WHEREUPON, a certain document was

7                    marked Mira Krishnan, Ph.D.

8                    Deposition Exhibit No. 2, for

9                    identification, as of 10/05/2020.)

10  BY MR. ROGERS:

11      Q.    Okay.  This is what I was provided by

12  Mr. Lanciotti, I think, on Friday or Saturday.

13          Can you see that all right, Dr. Krishnan?

14      A.    Yes, I can.

15      Q.    Is that big enough?  I have it at

16  100 percent.  Is that big enough on your screen?

17      A.    That's fine.  Thank you.

18      Q.    Okay.  So this has been marked as

19  Exhibit 2.

20          Is this a complete and current CV.  I'm

21  going through it pretty fast, but does that look like

22  your complete and up-to-date CV?

23      A.    I -- I update my CV from time to time.  I

24  was asked to produce a CV for my adjunct position at

Highly Confidential - Mira Krishnan, Ph.D.

1    Michigan State a few days ago, and I added maybe one

2    thing to it, but it was current at the time that I

3    sent it to you.

4         Q.    Okay.  What -- do you have different CVs?

5         A.    No.  In general I just have the one.

6         Q.    Well, I -- you mentioned that it was a CV

7    that you updated for purposes of your adjunct

8    professor work at Michigan State.  That's why I asked.

9              Is there -- are there other CVs besides

10   this one?

11        A.    It is just a newer version of the same CV.

12        Q.    That's what I'm asking.  So you don't have

13   any other CVs besides this one, that's the other one?

14        A.    Correct.

15        Q.    Okay.  There are -- there were other CVs,

16   but they are prior versions of this one, right?

17        A.    In the course of my lifetime, I've had a

18   different CV than this one, but at any given time I

19   only maintain one CV.

20        Q.    Okay.  I'm going to come back to this

21   because there are some things that I have to ask you

22   about, but let's just get things marked first and

23   we'll make sure we have everything.

24              I want to ask you about a testimony list.

1   You know in the Federal Court under the Federal Rules,

2   you are required to produce deposition -- a list of

3   your depositions or trial testimony for the previous

4   four years.

5           Do you -- have you testified in a

6   deposition or in a trial at any point in time in the

7   last four years, whether it be a civil or a criminal

8   case?

9       A.    To the best of my knowledge, I have not.

10      Q.    Why do you say to the best of your

11  knowledge?

12      A.    I have testified several years ago in

13  matters such as guardianship, but I believe that was

14  more than four years ago.

15      Q.    Okay.  Have you ever provided expert

16  reports or disclosures for civil cases pending in

17  federal courts before this one?

18      A.    To the best of my knowledge, again, all of

19  the other evaluations that I have done are for civil

20  matters in State Court.

21      Q.    In the State Court in which you've

22  provided those report, would that be Michigan State

23  Courts?

24      A.    Generally, yes.

Highly Confidential - Mira Krishnan, Ph.D.

1    Q.    In any of the state courts where you've

2  provided expert disclosures, is it correct, then, that

3  you don't remember testifying in any of those cases?

4    A.    A portion of my practice involves

5  independent medical examinations.  They are mostly in

6  the context of auto no fault.  I have been scheduled

7  for a number of depositions in the last four years,

8  but they have all been cancelled prior to being

9  completed.

10    Q.    Okay.  And is -- in the disclosures that

11  you wrote or reports in the State Court -- Courts of

12  Michigan or elsewhere, do you ever remember being

13  required to provide a testimony list of depositions

14  and trial testimony?

15    A.    I have been asked before if I have been

16  deposed in the last four years and I have not, and so

17  I -- that's the response that I provided there as

18  well.

19    Q.    So just to be clear, you don't -- you are

20  not sure if you were required to produce a testimony

21  list in the state courts in which you have testified

22  or have been retained?

23    A.    I have -- I was asked once or twice to

24  produce a list, but there is no list because I did not

Highly Confidential - Mira Krishnan, Ph.D.

1   testify.

2       Q.    Okay.  Gotcha.  Thank you.

3             So, then there is no testimony list.

4   Let's look at your invoices.  I was provided two

5   invoices.

6       MR. ROGERS:  I'll open this first one up and

7   let's mark this one, Juliana, as Exhibit 3.

8                      (WHEREUPON, a certain document was

9                       marked Mira Krishnan, Ph.D.

10                      Deposition Exhibit No. 3, for

11                      identification, as of 10/05/2020.)

12  BY MR. ROGERS:

13      Q.    Can you see that all right, Doctor?

14      A.    Yes.

15      Q.    So it's an invoice to Mr. Stern dated

16  June 15th, 2020.

17            There is an amount, flat rate, it looks

18  like $30,000 for ten neuropsychological evaluations in

19  Flint per contract sent for review on 6/14/20.

20            What -- what is the reference to a

21  contract sent for review?

22      A.    I -- I provided -- so I generated a

23  contract.  In both of the cases I asked the firms if

24  they have a standard contract that they wanted to use

Highly Confidential - Mira Krishnan, Ph.D.

1    and they agreed to use my contract and so I sent them

2    a contract between my LLC and their LLP.

3         Q.    Was that contract executed, signed?

4         A.    I believe so.

5         Q.    So, do you have it?

6         A.    Yes.

7         Q.    So will you produce it?

8         A.    Yes.  I thought it was already produced to

9    you.

10        Q.    Yeah, no, I haven't seen it.  Is that

11   something that you could maybe at some point during

12   today e-mail to Louise and she could provide it to me,

13   the -- the contracts with -- was there only one or was

14   there -- well, let's put it this way.

15             If you had a contract with Mr. Stern's

16   firm and you had a contract with Mr. Lanciotti's firm,

17   are they the same, the same standard -- your standard

18   agreement?

19        A.    The only difference is that when I was

20   first asked to serve Mr. Lanciotti's firm, the -- the

21   scope of the work was slightly unclear.  That contract

22   was executed in early May and Michigan was under a

23   stay home court -- pandemic order.

24             The order -- the contract for Napoli, as a

Highly Confidential - Mira Krishnan, Ph.D.

1   result, was on an hourly basis because I was not sure

2   what I would be able to do at the time that it was

3   executed, whereas the contract for Levy Konigsberg is

4   on a flat rate fee basis.

5       Q.   Okay.  Well, I think we better get the two

6   contracts then.  Would you, please, at some point send

7   to Lee wheeze the contract that has been executed for

8   both firms, contracts for both firms, and then

9   we'll -- I'll go ahead and mark those.

10      MR. ROGERS:  That's no problem, Louise, is that

11  right?

12      MS. CARO:  That's right.

13      MR. ROGERS:  Okay.  Thank you.

14  BY MR. ROGERS:

15      Q.   So, looking at this invoice, Exhibit 3,

16  does that mean basically that your flat rate for

17  during a neuropsychological exam of each individual

18  plaintiff is $3,000 per plaintiff?

19      A.   Correct.

20      Q.   All right.  And then so that -- and that

21  first one for Mr. Stern was for ten total plaintiffs,

22  and I'm going to show you now, I'll open up the second

23  invoice that I received.

24      MR. ROGERS:  We'll mark this as Exhibit 4,

Highly Confidential - Mira Krishnan, Ph.D.

1  please, Juliana, this is dated a couple of days later,

2  the 27th.

3              (WHEREUPON, a certain document was

4               marked Mira Krishnan, Ph.D.

5               Deposition Exhibit No. 4, for

6               identification, as of 10/05/2020.)

7  BY MR. ROGERS:

8      Q.    So that was an additional 2500.  Was that

9  for one more plaintiff?

10     A.    No.  What happened was that there were

11 several missed appointments by the plaintiffs and I

12 had to change my schedule significantly and stay in

13 Flint for an extra day and so I requested extra

14 compensation for that.

15     Q.    Okay.  Were those two invoices paid, the

16 30 and then 2500?

17     A.    Yes.

18     Q.    Okay.  So I see now.  The -- so you did --

19 for Mr. -- Mr. Stern you invoiced him for a total of

20 ten neuropsychological evaluations of his ten clients

21 essentially, right?

22           Okay.

23     A.    That's correct.

24     Q.    Now, have you issued any invoices for work

Highly Confidential - Mira Krishnan, Ph.D.

1    that you have done since the last one here, which is

2    June 27th, 2020?

3        A.    To Levy Konigsberg?

4        Q.    Sure.

5        A.    No, I don't think I have.

6        Q.    Have you issued invoices to the Napoli law

7    firm?

8        A.    I believe I issued one invoice to the

9    Napoli firm for follow-up phone conversations or

10   meetings.

11       Q.    Okay.  Well, with respect to these four

12   bellwether plaintiffs that we are referring to,

13   S███, T███, V███ and W███, they are all

14   Mr. Stern's clients, and since the neuropsychological

15   testing that was done and the dates that you issued

16   your reports and the reports were produced to us,

17   you -- you did more work after the invoices were

18   issued, right?

19       A.    Will you explain what you mean by "did

20   more work"?

21       Q.    Yes.  So you -- you -- by the end of June,

22   which was the last invoice, June 27th, the work that

23   you had done up until that time was to do -- review

24   the materials and do the neuropsychological testing

Highly Confidential - Mira Krishnan, Ph.D.

1    and evaluations, right?

2         A.    Correct.

3         Q.    But then you had to write -- write up the

4    reports, right?

5         A.    Oh, I'm sorry.  The reports are also

6    included -- the reports are part of the evaluations.

7         Q.    That was my question.  Okay.

8               So, do you have -- since you charged the

9    flat fee for these, did you record anywhere else the

10   time that you spent actually doing the evaluations,

11   reviewing the materials that had been provided, and

12   then going and -- ahead and writing up the reports, is

13   that itemized or separated out anywhere?

14        A.    No, I don't think it is.

15        Q.    Would you check, because that would be of

16   interest to me, that is, whether or not you kept any

17   separate time records or calendars or entries that

18   would show how much time you spent reviewing records,

19   how much time you spent doing the evaluations, and

20   then how much time you spent actually writing up the

21   reports?

22        A.    I can describe that to you.

23        Q.    All right.  Why don't you do that.

24   Let's -- let's pick one.

Highly Confidential - Mira Krishnan, Ph.D.

```
1              Let's pick S███ ██ and tell me about that,

2    you know, how much time did you spend reviewing the

3    materials, how much time did you spend doing the

4    actual evaluations and testing, and then how much time

5    you spent doing -- writing up the report?

6         A.    For each of these bellwethers, generally

7    speaking, the interview of the parents lasted between

8    one and one and a half hours, the direct

9    neuropsychological evaluation of the child lasted

10   about three hours to four hours, and then the balance

11   of time was approximately five or six hours.  That

12   included the records review and the writing of the

13   report.

14        Q.    Okay.  So all of that work that you just

15   described per plaintiff you billed $3,000 and then you

16   had to bill an extra 2500 because of just scheduling

17   and missed appointments, right?

18        A.    That's correct.

19        Q.    So, what is your hourly rate for work that

20   you are being asked to do going forward including for

21   your deposition today?

22        A.    $300 an hour.

23        Q.    Did you do any work to prepare for

24   providing deposition testimony today?
```

Highly Confidential - Mira Krishnan, Ph.D.

1    A.    Over the course of Friday and the weekend,

2  I reread the reports that I wrote and I re-reviewed

3  some of the journal articles that are in my reference

4  list.

5    Q.    Anything else?

6    A.    I had a brief meeting with the law -- law

7  firms Napoli and Levy Konigsberg on Friday.

8    Q.    Telephone or Zoom?

9    A.    Zoom.

10   Q.    How many hours total do you think you

11 spent doing all of that work that you just described?

12   A.    Approximately four.

13   Q.    In between the time that you finished

14 writing your reports and the time that you spent

15 starting Friday preparing for the deposition, did you

16 do any other work on the case?

17   A.    I believe that Mr. Lanciotti called me on

18 two or three occasions and -- and Mr. Stern called me

19 on two or three occasions.

20   Q.    And what was the purpose of those phone

21 calls?  I don't want you to tell me exactly what was

22 said, but, you know, the basic subject matter or

23 purpose.

24   A.    Generally speaking, they provided me an

Highly Confidential - Mira Krishnan, Ph.D.

1    update on the state of the case.  I wanted to know

2    when this deposition would happen so that I could make

3    sure that it was blocked off on my calendar and I

4    think we did briefly discuss this issue that was an

5    earlier focus of the deposition with respect to

6    whether I was rendering an opinion on causation.

7         Q.    I see.  When did the conversation take

8    place about whether you would be rendering opinions on

9    causation, when -- when was that?

10        A.    I don't remember exactly.  It was sometime

11   in August, I believe.

12        Q.    Did that conversation --

13        A.    At that time there was no conclusion on

14   the topic.

15        Q.    Yeah.  Was that -- was there any

16   conversation with the lawyers on that subject on this

17   past Friday?

18        A.    I don't think that it was a significant

19   topic of conversation on Friday.

20        Q.    Insignificant?

21        A.    We met before the -- the hearing that we

22   discussed earlier, the one that you showed me the

23   deposition -- the transcript of, but that hearing I

24   believe had not yet been scheduled or I was not aware

Highly Confidential - Mira Krishnan, Ph.D.

1    that it was going to happen at that time on the

2    morning of Friday.

3         Q.    So, but at least part of the subject

4    matter that was discussed on Friday was this issue of

5    whether you would be offering opinions about causation

6    in the case or not, is that right?

7         A.    I don't recall, actually, that it came up

8    on Friday.  I -- I am not sure.

9         Q.    All right.  The reason I asked is because

10   you said it wasn't a significant part of the call, so

11   your best memory is now that you're not sure if it

12   came up on Friday or not, is that right?

13        A.    Correct.

14        Q.    Those materials that we dis -- that you

15   described that were in your files, did you make any

16   separate notes or write up any separate memos of any

17   type concerning the information that was contained in

18   those materials besides your actual report?

19        A.    No.

20        Q.    Did you -- are those records the way that

21   you have them, are they in electronic form?

22        A.    Yes.

23        Q.    Did you highlight them or mark them up or

24   edit them or annotate them in any way electronically?

Highly Confidential - Mira Krishnan, Ph.D.

1     A.    No.

2     Q.    Did you print them out into paper form and

3   make any notes on them or highlight any important

4   sections or anything like that?

5     A.    No.  In general when I review records, I

6   have the PDF document in one window and the Word

7   document in another and I type directly into my

8   report.

9     Q.    Is that what you did with respect to these

10  four reports?

11    A.    Yes.

12    Q.    The same question, I want to make sure I

13  include this, the deposition transcripts.

14          Is your answer the same with respect to

15  those, that you don't have any separate notes or the

16  transcripts highlighted in any fashion, whether

17  electronic or in paper form?

18    A.    I do -- I do not.

19    Q.    So, to the extent that you would do any

20  more work on the case after your deposition and then

21  moving toward the trial date, would your rate for

22  those services be $300 an hour?

23    A.    Yes.  I believe this is in the contract.

24  I apologize that you have not seen it.  The -- my rate

Highly Confidential - Mira Krishnan, Ph.D.

1    for all services up and to and including the

2    evaluation is $250 an hour and my rate for all

3    services during this -- this day is, up to and

4    including trial, is $300 an hour.

5        Q.    Okay.  The next question I have for you is

6    about the scientific literature that you reviewed and

7    relied upon in support of your opinions.  Excuse me.

8             You -- you had prepared and attached to

9    your report -- reports a document entitled

10   "Bibliography" or "List of References."  I'll just

11   pull that up from one and make sure we know what it

12   is.

13            Okay.  I haven't shared my screen yet,

14   have I?  You don't see that, do you?

15       MS. CARO:  Nope.

16   BY THE WITNESS:

17       A.    I do not.

18       Q.    How is that, do you see that now?

19       A.    Yes.

20       Q.    Okay.  So this is a -- it's a

21   two-page document.  I -- this is the one from the

22   S██PPI██  report.

23            Is this, in fact, the List of References

24   or a Bibliography of the scientific literature that

Highly Confidential - Mira Krishnan, Ph.D.

1    you reviewed and relied upon to some extent in forming

2    the opinions that you hold in the case, Doctor?

3        A.    Yes, it is.

4        Q.    Okay.  And I -- I think it's the same for

5    all four plaintiffs.

6              Did -- is that right, is the -- is this

7    Bibliography basically the same for all four?

8        A.    What I did was I had pulled all of the

9    references that are in all of the reports and made one

10   list of references.  If the reference was used in the

11   report, it is cited in the report using the APA style.

12       Q.    Okay.  Gotcha.

13             So there is -- there aren't any additional

14   scientific papers or literature that you reviewed and

15   rely -- relied upon other than what's in this

16   bibliography, right?

17       A.    Outside of my general expertise, there

18   isn't that I -- there are no other articles I used in

19   formulating these opinions specifically.

20       Q.    So we have the reports and we have the --

21   what I would call the underlying data or the

22   neuropsychological evaluations and test report forms

23   for each of the plaintiffs.

24             Are -- have you reviewed or do you have in

Highly Confidential - Mira Krishnan, Ph.D.

1    your possession, in your files, anything else that we

2    haven't talked about relating to these four bellwether

3    plaintiffs?

4        A.    I don't think I do.

5        Q.    I didn't see in the underlying data

6    materials, at least in some cases, and we can get into

7    this in a little bit more detail later, any examinee

8    or informant response sheets, and I have an

9    understanding that for some of the evaluations you did

10   you're interviewing the parents and for others you

11   were interviewing the plaintiffs.

12            Do I have that right so far?

13       A.    So, in general I interviewed the parents

14   together with their children.

15       Q.    So are there -- did you have separate

16   response sheets that the parents or the child filled

17   out versus response sheets that you filled out as you

18   were interviewing them?

19       A.    Would you explain what you mean by

20   "response sheet," please?

21       Q.    Well, I guess I have in mind -- let's do

22   it this way:

23            So when you conducted the interviews of

24   the -- of the parents and the plaintiffs, you had

Highly Confidential - Mira Krishnan, Ph.D.

1    already described that to me where you had your Word

2    document open -- open and you had your computer and as

3    you were asking them questions and they provided

4    responses, you were summarizing that information right

5    in the Word document, right?

6         A.    That's correct.

7         Q.    So, were there any of the tests or

8    evaluations that you did in which you were asking the

9    parents questions and they were providing answers to

10   you where you were the person completing the sheets

11   with their responses or summarizing what their

12   responses were versus them filling it out?

13        A.    There is a test that is used for most of

14   these bellwethers called the Vineland, V-i-i-n-e --

15   V-i-n-e-l-a-n-d dash 3.  The Vineland is an adaptive

16   behavior scale.  I think this may be what you were

17   referencing.

18             The format of the Vineland is that it is

19   an interview, it is a portion of the interview.

20   General questions are asked by the psychologist of the

21   parent related to their child's abilities.  The -- the

22   psychologists make the ultimate determination of the

23   ratings and fills those out.  That is done via a

24   web-based interface and it generates the document that

Highly Confidential - Mira Krishnan, Ph.D.

1   you were provided, I believe, which is the report from

2   the Vineland assessment.

3        Q.    All right.  So, are there any other

4   assessments that you conducted on the bellwether

5   plaintiffs that are of that type like the Vineland

6   where you are asking the respondents, the examinees

7   questions and you are inputting the information or the

8   scaling that goes into the report?  Besides the

9   Vineland is what I meant.

10       A.    In general, all of the neuropsychological

11  tests involve me asking questions or asking the

12  patients to do things and then writing down responses,

13  and I believe that you were provided those protocol

14  summaries.

15       Q.    All right.  So, I'm not sure about all --

16  we have the protocol summaries, but I don't think we

17  have the protocols and I don't think we have the --

18  the normative scaling that you used, but we'll get

19  into that in a little bit when we -- when we go

20  through the first one.

21            So I'm just trying to get at this, though.

22  Have -- have you provided to us in the underlying

23  neuropsychological data materials everything that was

24  generated as a result of your interviews and the

Highly Confidential - Mira Krishnan, Ph.D.

1    testing that you actually did?

2            Is there anything else out there that you

3    did not provide?

4        A.    I provided Mr. Stern and Mr. Lanciotti

5    everything that I generated.

6        Q.    Okay.

7        MR. ROGERS:  All right.  Why don't we take just

8    a short, short break.  I'm going to turn to some

9    different questions about some of these documents now,

10   so let's take a five-minute break.  I need a short

11   water and bathroom break.

12           Is that okay with everybody?  We'll

13   start --

14       THE WITNESS:  Yes.

15       MR. ROGERS:  -- start up again 10:35.

16       MS. CARO:  Sure.

17       MR. ROGERS:  Okay.  Let's do that.  Off the

18   record.

19       THE VIDEOGRAPHER:  Going off the record at

20   10:32 a.m.

21               (WHEREUPON, a recess was had

22                from 10:32 to 10:38 a.m.)

23       THE VIDEOGRAPHER:  Back on the record at

24   10:38 a.m.

Highly Confidential - Mira Krishnan, Ph.D.

1   BY MR. ROGERS:

2       Q.    Okay.  Dr. Krishnan, I wanted to ask you

3   some background questions about your education,

4   employment, experience, that sort of thing.

5             Where did you go to high school?

6       A.    I went to high school at West Ottawa High

7   School, O-t-t-a-w-a, in Holland, Michigan.

8       Q.    Okay.  And what year did you graduate?

9       A.    This is a memory test.  I graduated in

10  1993.

11      Q.    And did you go to college directly out of

12  high school?

13      A.    Yes.  I went to the University of Michigan

14  and -- for my undergraduate education from 1993 to

15  1997.

16      Q.    And what degree did you receive?

17      A.    I received a Bachelor of Science and

18  Engineering in engineering physics.

19      Q.    Okay.  What did you do after that?

20      A.    I remained at the University of Michigan

21  for two more years, I worked in a ultrafast optics

22  lab, and I received a master's of science in

23  engineering in nuke -- nuclear engineering.

24      Q.    In what year?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.    And that was 1999.

2      Q.    Okay.  So, from 1999 forward, what did you

3  do?

4      A.    From 1999 to 2004 I -- 2004, I worked in

5  several capacities as an engineer and consultant.  I

6  worked for an organization called Visteon,

7  V-i-s-t-e-o-n, that was at the time part of Ford Motor

8  Company, I worked for Deloitte Consulting,

9  D-e-l-o-i-t-t-e, and I worked for Textron,

10  T-e-x-t-r-o-n, and then during the tail end of that

11  time I also took undergraduate courses and graduate

12  courses in psychology at Wayne State University.

13      Q.    So from '99 through 2004, you are basing

14  do -- basically doing engineering work for these

15  companies that you described?

16      A.    Correct.

17      Q.    And when did you start taking psychology,

18  undergraduate and/or graduate psychology courses?

19      A.    I believe that was in 2002.

20      Q.    Why did you start doing that?

21      A.    I enjoyed problem solving as an engineer,

22  but I wanted something with a more human connection

23  and so I evaluated different kinds of career paths.  I

24  thought about going to law school, I was accepted to

Highly Confidential - Mira Krishnan, Ph.D.

1    business school at University of Michigan.  I didn't

2    think that those things would make me happy, and so I

3    took some courses to initially, basically, to stay

4    sharp because I knew I wanted to do something else and

5    I really enjoyed psychology and so I took more courses

6    and during that period of time I decided to go back to

7    graduate school.

8         Q.    All right.  When did you stop working in

9    the engineering field?

10        A.    About two months before I started graduate

11   school at the University of Florida.

12        Q.    And what year was that?

13        A.    That was, I believe, 2004.

14        Q.    Were -- were any changes that you made in

15   your employment during that '99 through 2004

16   timeframe, were -- were those all voluntary, that is

17   to say, if you moved from one job to another, a

18   different company, it was all voluntary on your part?

19        A.    I was -- my pos -- I was a -- I was laid

20   off on one occasion also.

21        Q.    All right.  You weren't terminated for

22   cause or fired at any of these jobs, were you?

23        A.    No.

24        Q.    Okay.  So, starting in about 2002 -- I'm

Highly Confidential - Mira Krishnan, Ph.D.

1  sorry.  What -- what year did you -- I didn't write it

2  down quickly.

3          What -- what year did you start taking

4  graduate courses in psychology?

5      A.    I believe that was 2002.

6      Q.    Okay.  So, and that was at Wayne -- in

7  Florida, right?

8      A.    So, I'm sorry.  Let me say that again.

9          I -- while I was working as an engineer, I

10  took courses at Wayne State University, which is in

11  Detroit, Michigan, as evening courses, generally

12  speaking.  I began graduate school in Florida in 2004.

13      Q.    All right.  So you -- did you get an

14  undergraduate degree in psychology at some point?

15      A.    No.

16      Q.    How was it that you were able to start

17  taking graduate courses in Florida?

18      A.    In general the entrance requirements for

19  psychology grad school do not include an undergraduate

20  degree in psychology, but they include foundational

21  material and various areas of psychology and I met all

22  of the requirements in terms of coursework.

23      Q.    Okay.  What type of -- what was the name

24  of the university in Florida that you attended --

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    attended for your graduate work in psychology?

 2         A.    The University of Florida.

 3         Q.    And how long did that program last?

 4         A.    This requires a small explanation of how

 5    psychology graduate school works, but I was enrolled

 6    at University of Florida from 2004 to 2009.  During

 7    the timeframe 2008 to 2009, I was at the University of

 8    Chicago doing my internship, but the way that

 9    psychology graduate school works, you remain

10    enrolled -- one remains enrolled in their psychology

11    graduate program during their internship.  So

12    that's -- that's a normal part of the way that

13    training works.

14         Q.    So, did you then receive your graduate

15    degree in psychology in 2009 from the University of

16    Florida?

17         A.    Yes, that's correct.

18         Q.    And what -- what is that --

19         MR. STERN:  Hey, Dave?

20         MR. ROGERS:  Yeah.

21         MR. STERN:  Dave?  This is Corey.  I just wanted

22    to interject as a University of Georgia graduate from

23    both undergrad and law school, I'm not sure that we'd

24    be having this deposition if I was fully aware of
```

Highly Confidential - Mira Krishnan, Ph.D.

1   Dr. Krishnan's educational experience and the fact

2   that she attended Florida.

3       MR. ROGERS:  I think --

4       THE WITNESS:  Please don't hold that against me.

5   I'm also a Michigan State adjunct and I...

6       MR. ROGERS:  I think that Doctor --

7       MR. STERN:  I just wanted to put it -- I just

8   wanted to put it -- Dave, I had to put it on the

9   record, and I didn't mean to interrupt you, I know you

10  are in a flow, but my heart is breaking right now and

11  I feel like I had to interject.

12      MR. ROGERS:  Well, I -- I think that would be

13  suggestive of a desire, Dr. Krishnan, on Mr. Stern's

14  part to confirm your withdrawal as an expert in the

15  case entirely at this stage.

16      MR. STERN:  We are too far along, Dave.  We are

17  already -- we are already in the hole.

18      MR. ROGERS:  Yeah, okay.  Well...

19      MR. STERN:  Sorry to interrupt.

20      MR. ROGERS:  I thought that might be in the

21  offing with that statement, but I guess we'll proceed

22  along.

23  BY MR. ROGERS:

24      Q.    Okay.  So just I think I was asking you

Highly Confidential - Mira Krishnan, Ph.D.

1   what -- what was the degree that you received from the

2   University of Florida in 2009?

3        A.    That is a Ph.D., a Doctor of Philosophy in

4   clinical psychology.

5        Q.    Was -- was there any interim degree, like

6   a master's in psychology, or did you just go right to

7   the Ph.D.?

8        A.    I believe I did receive a master's in

9   2006.  I did receive a master's in 2006.  The reason I

10  say that is because those -- those masters' degrees,

11  you have the option -- one has the option of electing

12  or not electing to receive one, and it is really not

13  something that matters after the doctoral degree is

14  conferred.  But I believe that I received one.  I

15  didn't attend a graduation, but I did receive the

16  certificate.

17       Q.    Okay.  So then in 2000 -- let me go back

18  to your training, your -- your internship training in

19  Chicago.  Can you describe what -- what that involved?

20            What were you doing?

21       A.    So, in general with clinical psychology,

22  clinical psychologists have a large amount of clinical

23  training throughout their graduate education and so I

24  did, I think, on the order of 3 or 4,000 hours of

Highly Confidential - Mira Krishnan, Ph.D.

1  clinical service in Florida.  We complete a

2  pre-doctoral internship which is a one-year clinical

3  training experience specializing typically in our

4  practice area.  And so I completed a one-year

5  pre-doctoral psychology internship at the University

6  of Chicago in Chicago, Illinois, where I primarily

7  completed adult and child neuropsychological

8  evaluations.

9            I also did child psychotherapy and I was

10  involved in treatment teams as part of that training

11  as well.  That training also includes seminars and

12  didactic training and giving presentations and those

13  kinds of things as well.

14       Q.    All right.  What did you do after you

15  received your Ph.D., what work did you do?

16       A.    I completed -- sorry?

17       Q.    Go ahead.

18       A.    I -- I completed a two-year postdoctoral

19  fellowship in clinical neuropsychology at Mary Free

20  Bed Rehabilitation Hospital in Grand Rapids, Michigan.

21       Q.    What type of patients were you involved

22  with there?

23       A.    This is a subacute rehabilitation hospital

24  that also offers outpatient services.  The primary

Highly Confidential - Mira Krishnan, Ph.D.

1    group of patients I work with there were people who

2    had traumatic brain injuries, but I saw a variety of

3    other people as well.

4         Q.    Okay.  How long did you do that?

5         A.    Two years.

6         Q.    So does that bring us up to 2011?

7         A.    Correct.

8         Q.    What did you do then?

9         A.    I accepted a position with a large

10   non-profit, Hope Network, and I was at Hope Network

11   from 2011 into the -- until the beginning of 2016.

12        Q.    And what was that?

13        A.    Initially I was a staff neuropsychologist

14   at an autism center.  From, I believe, 2012 to the end

15   of 2015 I also directed that center.

16        Q.    Did you work with exclusively patients who

17   had autism during that time?

18        A.    No.  So, in general, in my experience when

19   one has a neurodevelopmental clinic, whatever the area

20   of emphasis is, there are a variety of patients in

21   that stream, so I saw children with a variety of

22   neurodevelopmental problems, autism, ADHD, learning

23   disabilities, intellectual disabilities, toxic

24   exposure and so on.

Highly Confidential - Mira Krishnan, Ph.D.

1      Q.    Okay.  What -- what percent of your work

2  at the center for autism involved working with

3  children who had exposure to toxic chemicals?

4      A.    I routinely asked about this for

5  100 percent of my patients.  This is not a clinic that

6  sought out children in this area, although a number of

7  them were referred.  I would estimate that it would be

8  about 1 to 3 percent over the course of those five

9  years.

10     Q.    When you said, I wanted to make sure I

11 heard you correctly, did you say when you are

12 typically asked about this or did you mean that you

13 typically -- typically ask about toxic chemical

14 exposure when you are evaluating patients, which --

15 which was it?

16     A.    I typically ask about toxic exposure.

17     Q.    I see.  So that's a, sort of a general

18 standard history that you take when you are working

19 with the patient and doing a neuropsychological

20 evaluation, you ask about that.

21           Is that what you are saying?

22     A.    For children, yes.

23     Q.    Okay.  All right.  And then from 2000 -- I

24 think you said 2016, but this -- your CV says that it

Highly Confidential - Mira Krishnan, Ph.D.

1   was in 2015, but be that as it may, you started a

2   business called Mira Krishnan LLC.

3           What's that?

4       A.   So that is my private practice.  My

5   private practice consists of clinical services and I

6   also do some consulting services as well.

7       Q.   Clinical services, describe what kind of

8   clinical services you have performed since 2015.

9       A.   All -- essentially all of my clinical

10  services -- well, since 2015, I did some clinical

11  services that involved psychological evaluations.  I

12  have done a little behavior planning and then

13  primarily the -- the bulk of my clinical services are

14  neuropsychological evaluations.

15      Q.   Do you -- do you, as part of your clinical

16  practice perform what I would describe as treatment as

17  opposed to evaluations only?

18      A.   I am involved in settings where I don't

19  provide direct treatment, but I oversee treatment or I

20  make treatment recommendations or I follow up on the

21  benefit or lack of benefit of treatment.  I have

22  performed psychotherapy in the past, but it has been a

23  number of years since I have been a psychotherapist.

24      Q.   All right.  In terms of your practice at

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    Mira Krishnan LLC, I think you mentioned consulting

 2    work.

 3              What -- what's the percentage of clinical

 4    work that you do with patients versus consulting work?

 5        A.    It's approximately two-thirds to

 6    three-quarters clinical work.  I typically see

 7    patients three or four days a week.

 8        Q.    And -- and so for the one-third to

 9    25 percent consulting work, tell me about that, what

10    does -- what does that involve?

11        A.    I am a psychological consultant in -- for

12    Disability Determination Services, which is the state

13    agency that evaluates Social Security claims, and then

14    I do some clinical work -- I do some consulting work

15    in the form of working with organizations trying to

16    increase their services for minority populations, and

17    I do some public speaking.

18        Q.    What percentage of your consulting work

19    involves consulting with lawyers and litigation?

20        A.    So, I do -- maybe I'm characterizing

21    things or classifying things in a different way than

22    you.  I see -- as a routine part of my work I see

23    evaluations at the direction of lawyers.  Some of them

24    are independent medical examinations and sometimes
```

Highly Confidential - Mira Krishnan, Ph.D.

1    that's not exactly the right term to use.

2    Psychologists tend to call this forensic psychology,

3    and that's a minority of my work.  I probably see on

4    the order of four to six cases a month in that area.

5         Q.   Yeah, I -- I hesitated to use that term

6    "forensic psychology," but since you used it, would

7    you define what that means to you?

8              Is that -- well, I'll define it.  Is

9    that -- forensic psychology is where you are doing

10   work evaluating patients for purposes of some type of

11   litigation, whether it be criminal or civil or

12   disability evaluation, that type of thing?

13        A.   Yeah.  So I -- I generally use the term if

14   a -- if an attorney asks me to do the work rather than

15   it being a medical referral.

16        Q.   Okay.  So what percentage of your work

17   involves that, evaluating patients or individuals at

18   the request of lawyers?

19        A.   It is probably about 25 to 30 percent.

20        Q.   So is that --

21        A.   It is a minority of my work.

22        Q.   Is that 25 to 30 percent of your

23   consulting work or 25 to 30 percent of your overall

24   work?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.      Of my overall work.

2      Q.      Including your clinical practice?

3      A.      Correct.

4      Q.      And for that forensic work that you do the

5   25 to 30 percent, does that include the four to six

6   individuals or evaluations that you do per month that

7   you had told me about earlier?

8      A.      That is essentially the -- that's the

9   forensic work that I do.

10     Q.      Okay.  And is your rate for that work that

11  you do the same as it is here, $300 an hour?

12     A.      I had mentioned previously that it is $250

13  an hour for evaluations and so that is typically the

14  rate.  I do also -- I am sometimes asked to do that

15  work on a flat rate basis, and so I have flat rate

16  fees as well that are similar to the rates that I

17  charge here.

18     Q.      Do you know -- or do you have a breakdown

19  of how much of that 25 to 30 percent forensic work

20  that you do for lawyers, how much is for lawyers

21  representing plaintiffs versus lawyers representing

22  defendants?

23     A.      That's a little complicated for me as a

24  psychologist because the majority of the work that I

Highly Confidential - Mira Krishnan, Ph.D.

1    do is civil and so typically the -- the injured party

2    is the -- the plaintiff, but in the -- obviously in

3    the criminal side oftentimes the injured party is

4    actually the defendant.

5           When it comes to civil work, I don't track

6    that directly, but the majority -- more than

7    50 percent of the civil work that I do is at the

8    request of defendants.  But I -- I work for defendants

9    and plaintiffs.

10     Q.    Going back to your retention in this case,

11   do you -- did you learn from the Napoli law firm how

12   they came to retain you, that is, was it a referral,

13   did they -- how did that happen?  Did they explain how

14   they came to you?

15     A.    Prior to being contacted by Napoli, I was

16   contacted by an organization called the Expert

17   Institute, with which I had not had prior dealings,

18   and they asked me if I was willing to speak to an

19   attorney looking to retain a psychologist for this

20   purpose, and they arranged the phone -- the first

21   phone conversation I had with the Napoli law firm.

22     Q.    Tell me about that, what is the Expert

23   Institute?

24     A.    I am not very familiar with that.  I -- I

Highly Confidential - Mira Krishnan, Ph.D.

1    had -- I looked it up online when they reached out to

2    me, but they appeared to be an organization that

3    identifies experts and connects them to attorneys.

4         Q.    Did -- is -- was there any fees exchanged,

5    that is, you know, when they contacted you, did -- did

6    they pay you a fee or anything like that, did any fees

7    exchange hands there?

8         A.    I do not have a financial relationship

9    with the Expert Institute.

10        Q.    Well --

11        A.    I am not sure what the relationship is

12   between Napoli and the Expert Institute.

13        Q.    Right.  Okay.

14              So, the phone call that you received from

15   the Expert Institute, they would have explained in

16   that phone call that they had a lawyer who was seeking

17   expert -- an expert with expertise in a certain area

18   and they asked you if you'd be willing to serve in

19   that capacity, essentially?

20        A.    Correct.

21        Q.    Okay.  But no money exchanged hands

22   between you and the Expert Institute for your having

23   agreed to work with the lawyers, right?

24        A.    That's correct.

Highly Confidential - Mira Krishnan, Ph.D.

1      Q.     Has the Expert Institute, since the -- you

2    were retained in this case, referred you to -- or

3    referred other lawyers to you?

4      A.     No.

5      Q.     Zero?

6      A.     Yes, I haven't -- I don't believe that

7    I've had any further contact with the Expert

8    Institute.

9      Q.     Do you -- are there any other expert

10   refer -- referral organizations of that type that you

11   have a relationship with?

12     A.     So, when I evaluate -- so, a significant

13   portion of my forensic psychology or independent

14   medical examinations are in relation to auto accident

15   injuries, and the -- most of that work is done through

16   companies that maintain referral networks for

17   independent medical examinations.  In those cases

18   typically the -- the financial relationship is between

19   myself and that -- that company that does the

20   scheduling of the IMEs.

21     Q.     I see.

22            Are those insurance companies or some

23   other entities?

24     A.     They are -- they are not insurance

Highly Confidential - Mira Krishnan, Ph.D.

1    companies.  So typically these companies maintain

2    ex -- maintain independent medical examination experts

3    in different areas, physical medicine and neurosurgery

4    and pain medicine and psychology and so on.  They

5    handle referrals.  These referrals come from a mixture

6    of attorneys and insurance agencies.

7       Q.    I see that you have on your CV, you are

8    listed as a Clinical Assistant Professor at the

9    Department of Psychiatry in Michigan State University

10   2014.

11          Does that continue, you are still an

12   assistant professor?

13      A.    I am currently an assistant professor at

14   Michigan State.  Earlier this year my assistant

15   professorship was terminated, I believe, because a

16   form was not submitted in a timely basis and it -- so

17   it ended on 6/30/20 and then it was reinstated I think

18   in late September.

19      Q.    Do you teach any classes presently for

20   Michigan State?

21      A.    I am involved in medical resident

22   education.  I practice in a clinic that has Michigan

23   State interns and residents in it.

24      Q.    I see.  What -- what clinic is that?

Highly Confidential - Mira Krishnan, Ph.D.

1       A.      It's an autism evaluation center that is

2   operated by Hope Network in East Lansing.

3       Q.      All right.  And I see in your CV here that

4   you have an address listed as 2626 Brooklyn Ave.,

5   Southeast in Grand Rapids, Michigan.

6               Is that the office that you are in now?

7       A.      Yes.  That's my home, actually.

8       Q.      Oh, okay.  I -- I meant -- when I said

9   now, I meant actually during the deposition today, are

10  you in your home office now?

11      A.      I am in my home office.

12      Q.      All right.  Is that where you see your

13  patients, your clinic -- in your clinical practice at

14  your home?

15      A.      No.  So, I have -- I have an office in --

16  in the Grand Rapids area and then I also see patients

17  at -- at sites of -- I -- I maintain contracts with --

18  with Hope Network and I see Hope Network's patients at

19  their sites.

20      Q.      Where did you conduct your evaluations and

21  interviews of the bellwether plaintiffs in this case?

22      A.      With respect to the four bellwethers that

23  we are currently discussing, I conducted all of those

24  evaluations at a Napoli law office that is in Flint,

Highly Confidential - Mira Krishnan, Ph.D.

1    Michigan.

2         Q.    I see.  And so if 2626 Brooklyn Ave.

3    is -- in Grand Rapids is your home address, you

4    mentioned an office.

5              Where do you maintain a professional

6    office?

7         A.    That address is 4320 44th Street

8    Southwest, Grand Rapids, Michigan 49418.

9         Q.    And is there any particular reason why you

10   conducted your interviews of the bellwether plaintiffs

11   and their parents and the evaluations and testing at

12   the Nap -- Napoli law firm office as opposed to your

13   professional office?

14        A.    Yes.  My professional office is about

15   120 miles away from the patients.

16        Q.    I see.

17        A.    The -- the bellwethers.

18        Q.    Okay.  So you -- remind me.  I -- I don't

19   know if you said this.  Where was the Napoli law firm

20   office located, what city?

21        A.    Flint, Michigan.

22        Q.    I see.  So you traveled 120 miles between

23   where you live and -- and Flint in order to do the --

24   all of the evaluations of the four bellwethers, is

Highly Confidential - Mira Krishnan, Ph.D.

1    that right?

2         A.    Yes, that's correct.

3         Q.    I'm trying to get some background or a

4    description from you about the extent to which your

5    practice involves evaluating children versus adults,

6    and let's pick an age.

7               What would you consider it to be, you

8    know, the end of childhood age and then moving into

9    adulthood so that we can classify this?

10        A.    It's a sliding scale because there is a

11   lot of overlap between adult and child neuropsychology

12   for young adults, but typically neuropsychologists and

13   I typically consider people under 18 to be children

14   and people above 18 to be adults.

15        Q.    Okay.  So do you -- in your clinical

16   practice, do you see children ages, you know, 0

17   through -- well, more than 0 through 18?

18        A.    I typically don't see children younger

19   than one year old, but I see children from age 1 to

20   18.

21        Q.    Yeah.  Okay.  And, so, what percentage of

22   your practice involves -- your clinical practice

23   involves children 1 through 18 versus adults?

24        A.    I would estimate that about 60 percent of

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   my practice, 60 to 70 percent of my practice is

 2   children and then 30 to 40 percent of my practice is

 3   adults.

 4        Q.    I think the oldest child in this case, the

 5   bellwethers, is 11, if I'm not mistaken, one I think

 6   shortly to be 12.

 7              What percentage of your practice

 8   involves -- clinical practice, that is, involves

 9   children ages 2 to 11?

10        A.    So I -- I'm not sure I have an exact

11   estimate, but I can -- I don't have an exact number,

12   but I can estimate.  So I -- I believe I just said

13   that 60 to 70 percent of my child population is -- or

14   my patient population is children.  The majority of

15   those children are between about 2 and 12 or 13 years

16   of age.

17        Q.    Okay.  So how many of those -- or how

18   often, I'll ask it this way:  How often is it that you

19   evaluate children who for neuropsychological

20   impairment or -- or disabilities, what's the right

21   word, let's get our definitions straight.

22              So when you are talking about the work

23   that you do, if I were to refer to impairments or

24   deficits, is that a correct term that when you do your
```

Highly Confidential - Mira Krishnan, Ph.D.

1    testing and evaluation you are trying to evaluate

2    whether or not a certain child, in this case patient,

3    has neurological deficits or impairments?

4              Is that the right way to describe it?

5         A.    Yeah, I think -- I think that use of

6    either of those terms is fine.

7         Q.    Okay.  So when is it that you -- do you

8    have a specialty in neuropsychology as opposed to

9    psychology in general?

10        A.    Yes.  I am board certified in clinical

11   neuropsychology.

12        Q.    Yeah, I don't think I asked you about

13   that.

14              When did you get your board certification

15   in neuropsychology?

16        A.    I believe that was 2013.

17        Q.    So what's the difference between

18   psychology and the specialty of neuropsychology?

19        A.    So, psychology, broadly speaking, is the

20   science that deals with the behavior of humans.

21   Clinical psychology is a subset of psychology that

22   applies psychological concepts for healthcare purposes

23   or -- or clinical purposes that may include assessment

24   and treatment.

Highly Confidential - Mira Krishnan, Ph.D.

1          Clinical neuropsychology is a

2    subspecial -- or is a subspecialty of clinical

3    psychology.  The expertise, the way that I described

4    this to patients is that neuropsychologists are a type

5    of doctor who use tests of thinking skills to

6    understand how, in the case of children, how

7    children's brains are developing, to understand

8    reasons why they are having problems, whether that be

9    a developmental basis or an injury basis, and to help

10   with things like treatment planning and, in general,

11   how to make life better or easier for them.

12          So neuropsychologists are -- are

13   psychologists who use tests of cognitive and emotional

14   functioning, based on understanding of brain

15   structures and locations, and how different skills are

16   mediated by different parts or different systems in

17   the brain.

18     Q.    To what extent does your practice involve

19   conducting neuropsychological evaluations and testing

20   on children who have been exposed or are thought to

21   have been exposed to lead?

22     A.    It is a minority of my evaluations, but as

23   I mentioned, approximately 1 to 3 percent of the

24   children that I see in my developmental clinics have

Highly Confidential - Mira Krishnan, Ph.D.

1    had exposure.

2         Q.    I see.  And when you say 1 to 3 percent of

3    the children that you see in your clinics have had

4    exposure, how do you -- how do you quantify that?

5              What do you mean by "have had exposure"?

6         A.    Meaning they have positive lead levels in

7    their medical records, typically, or their parents

8    report it.

9         Q.    And -- and would that be in the medical

10   records the evidence that there had been -- they had

11   been exposed to lead, in what form would that evidence

12   be in the medical records for the -- for the patients

13   that you see?

14        A.    So in general terms, I -- we are not

15   talking about a specific patient here, but typically

16   the same kinds of evidence that are in these cases,

17   most commonly capillary and venous blood draws.

18        Q.    Have you ever seen patients in your

19   clinical practice who've had bone scans done for the

20   evaluation of lead in the bones before?

21        A.    I -- I can say that I don't commonly

22   receive bone scan information.  I have -- I've seen it

23   before.

24        Q.    All right.  From -- without naming the

Highly Confidential - Mira Krishnan, Ph.D.

1    patients, I don't want to know about that, but from

2    what sources have you received bone scan lead

3    information before this case, from what entities or

4    what places or people?

5        A.    So in clinical practice, generally this

6    information would come from a primary care physician

7    or pediatrician.

8        Q.    Okay.  So, pediatricians or general

9    practitioners, to my understanding, don't conduct

10   scans of bone for lead, is -- am I right about that?

11       A.    I probably -- I'm not an expert who can

12   testify to the scope of practice of pediatricians.

13       Q.    Okay.  So what I'm saying, though, is that

14   when you -- you said that you did receive information

15   sometimes for some of your patients, occasionally that

16   would be bone scans for lead, and that you would

17   receive that information from general practitioners or

18   pediatricians.

19            Am I right so far?

20       A.    I don't -- I don't have specific memories.

21   In the scientific literature there is a mixture of

22   report of bone and blood levels.  I -- I think I may

23   have received a bone level from a pediatrician.  If

24   I -- if I would have received one, it would probably

Highly Confidential - Mira Krishnan, Ph.D.

1   have been from a pediatrician.

2       Q.    Okay.  But the -- the -- leaving aside

3   from whom it was received, your experience, can you

4   describe your experience with any entities who

5   actually did the bone scans for lead content besides

6   the person who did them in this case, Dr. Specht?

7       A.    I don't have experience in testing

8   directly for lead.

9       Q.    No, but, I mean, did -- do you know the --

10  the -- if you have received reports of bone scans for

11  lead before, do you remember the names of the entities

12  or the people who actually did the bone scans besides

13  Dr. Specht?

14      A.    I do not.

15      Q.    Okay.  I think you said -- I may have

16  heard you correct -- mis -- incorrectly.

17            You don't consider yourself to be an

18  expert or have expertise in the field of bone scanning

19  for lead, right?

20      A.    That's not generally something that

21  neuropsychologists do, and -- and, no, I don't -- I --

22  I would not know how to complete a bone lead scan.

23      Q.    And -- and you don't have any expertise in

24  interpreting the results of bone scans for lead, do

Highly Confidential - Mira Krishnan, Ph.D.

1    you?

2         A.    So, in general, assuming that the

3    information from any kind of lead test is accurate,

4    neuropsychologists base their work on field data.  And

5    field data of children in the references that I have

6    provided to you, I believe that one of those

7    references uses blood -- bone lead levels as a marker

8    for -- for -- as a marker for in considering children

9    who have cognitive changes.

10        Q.    Would you point out which one to me that

11   is, please, because I would like to make sure I don't

12   forget to have you tell me which one.  So I have

13   your -- do you have your Bibliography reference chart

14   handy that you could point out which one you are

15   referring to?

16        A.    I don't, and I would have to review to

17   make sure I know which one it is.  But what I can say

18   in a general way is that the literature, the

19   scientific literature that talks about lead talks

20   about bone and blood levels.

21        Q.    Okay.  I -- I can share my screen and I'll

22   show you the -- the Bibliography references here and

23   see if you can identify which one you are referring

24   to.

Highly Confidential - Mira Krishnan, Ph.D.

1              Can you see that screen?

2        A.    Yes.

3        Q.    Okay.  So, I think I have included all of

4    them here by date.  Actually, the -- the way I have

5    them is basically I think the way that you labeled

6    them, but do you recognize which one you are referring

7    to?

8        A.    So I -- I don't have all of these articles

9    open in front of me, but I believe that the Hou, et

10   al. article talks about bone lead levels, but, again,

11   I -- I'm not looking at it right now, so I'm not sure.

12       Q.    This is the one I've highlighted here,

13   2013 Hou?

14       A.    Correct.

15       Q.    Okay.  Any others?

16       A.    I -- I am not sure.

17       Q.    All right.  But I guess to close this out,

18   the, the -- the evaluation or interpretation about

19   what a particular result from a bone scan for lead

20   content means, you don't have expertise in that, do

21   you?

22       A.    My expertise would really run up to the

23   point that in prior studies of cognitive functioning

24   researchers may categorize children based on high or

Highly Confidential - Mira Krishnan, Ph.D.

1    low levels of lead or medium levels of lead.  And so

2    we know -- we know -- we use those categorizations,

3    you know, in considering, like, for instance, are --

4    are there children with these kinds of levels of lead

5    that have cognitive impairments.

6           So there is all kinds of things that I

7    don't know how to do myself, but I use that data in

8    making my evaluation, much like pediatricians refer

9    people to neuropsychologists, they don't know how to

10   do neuropsychological evaluations, but they use the

11   results that the neuropsychologist provides, so that

12   goes the other way as well.

13       Q.    Okay.  With respect to the blood lead

14   levels that you talked about for the patients that you

15   see, the minority of about 1 to 3 percent of your

16   patients who may have had some lead exposure, what are

17   the -- to what extent do you have a baseline level for

18   blood lead levels for making an evaluation of lead

19   exposure as being a cause of any of the

20   neuropsychological impairments that you are seeing?

21       A.    I'm sorry.  I'm not sure I understand your

22   question.

23       Q.    Well, what -- do you in the patients that

24   you see when you -- what is the purpose of you

Highly Confidential - Mira Krishnan, Ph.D.

1  receiving information about blood lead levels from

2  those patients or about those patients?

3       A.   So, generally, these children are referred

4  by pediatrics for evaluation and the goal of the

5  evaluation is typically differential diagnosis,

6  meaning explaining, first of all, if there is a

7  problem and -- and what of multiple causes might

8  explain the problem.  You know, like do they have

9  ADHD, do they have a problem that might have been

10  caused by lead, do they have autism, do they have

11  something else.

12      Q.   So the purpose of receiving the blood lead

13  levels is in part -- is part of the process of

14  arriving at a differential diagnosis, is that right?

15      A.   Correct.

16      Q.   And what -- what do you mean by the term

17  "differential diagnosis"?

18      A.   When I say "diagnosis," I mean providing

19  medical explanation for a problem.  When I say

20  "differential diagnosis," I mean that the problem --

21  the presence of a problem has been established and the

22  question is not if there is a diagnosis but what the

23  diagnosis is.

24           So like if --

Highly Confidential - Mira Krishnan, Ph.D.

1    Q.    So is -- is part of -- go ahead.

2    A.    Sorry.

3          So, like, if -- if a doctor sent you to me

4    and they wanted to know are you depressed, that is a

5    diagnosis.  If they want to know are you depressed or

6    do you have problems because you had a concussion,

7    that is a differential diagnosis.

8    Q.    Did you perform differential diagnoses on

9    the four bellwether children in this case?

10   A.    In practice it's always differential

11   diagnosis in my experience, but what's different about

12   an examination like this is that these children are

13   part of a lawsuit, I guess, that, based on the nature

14   of -- of their having been referred, they are alleging

15   that something is wrong, but I am also trying to ask

16   whether anything is wrong at all.  So I really am

17   doing both things.

18   Q.    Okay.  So this -- this goes to the issue

19   of the causation that we I think talked about some two

20   plus hours ago now.

21         So, does arriving at a diagnosis require

22   consideration of differential diagnoses and then

23   ruling some out and then arriving at a final

24   diagnosis?

Highly Confidential - Mira Krishnan, Ph.D.

```
 1      A.    In general, yes.

 2      Q.    And so did you reach a diagnosis of the

 3  four bellwether children in this case that includes

 4  not only what is the psychological --

 5  neuropsychological impairment or deficits that the

 6  children have, but also what was the cause -- what is

 7  the cause of the deficits?

 8      MS. CARO:  Object to form.

 9  BY THE WITNESS:

10      A.    I believe that question is answered in my

11  reports.

12  BY MR. ROGERS:

13      Q.    Well, what is it?  What's the answer?

14      A.    So, there is a Diagnosis section in each

15  of the reports that contains the diagnosis.

16      Q.    Right.  So let me just read one of them to

17  you.  It's for E████ S████.

18            The -- do you have the reports handy so

19  you can check to make sure I have it right?

20      A.    I would be glad to look at it on screen if

21  you'd like to put it on screen.

22      Q.    Okay.  Maybe when we take our lunch break

23  it might be useful if you have -- do you have that

24  separate computer with your reports handy so that you
```

Highly Confidential - Mira Krishnan, Ph.D.

1  could have it up on screen too because I have a paper

2  copy and it might be -- it is just going to be more

3  time-consuming for me to keep bringing them up on

4  screen.

5           Is that something that you could do when

6  we take our lunch break?

7      MS. CARO:  Well, wouldn't it be easier for

8  everybody in the depo if we could get up on screen

9  what we are talking about, are you going -- especially

10  since you are probably going to want to mark some of

11  these?

12      MR. ROGERS:  Maybe, but I'm just asking if the

13  doctor has them handy.

14  BY THE WITNESS:

15      A.    Typically in my prior experience in

16  depositions I'm asked not to bring things with me.

17  This is obviously an unusual circumstance.  I -- I

18  agree that it would be easier if you put the same

19  document on screen so that we were all talking about

20  the same thing.

21  BY MR. ROGERS:

22      Q.    It is on the screen now.  We won't mark it

23  as an exhibit yet because I want to go through these

24  in a -- in a particular order.

Highly Confidential - Mira Krishnan, Ph.D.

1          Can you see what's on my screen now?

2     A.    I cannot.

3     Q.    Hmm.

4     THE VIDEOGRAPHER:  You just need to share,

5  David.

6     MR. ROGERS:  Yeah, I -- I thought I did.  How is

7  that?

8  BY THE WITNESS:

9     A.    It appears to be starting to share now.

10          Okay.  Yes, I do.

11  BY MR. ROGERS:

12     Q.    So this is your report on E███ S███ and

13  it says under Diagnoses:  "Overall, my primary

14  diagnostic impression is ADHD," and you have a code

15  there.  So let's stop there.

16          Is that code from the DSM-V?

17     A.    It's from the ICD-10.

18     Q.    Okay.  Is the --

19     A.    It is -- the codes in the DSM-V and the

20  ICD-10 are the same.

21     Q.    So, but the ICD-10, the coding that is

22  used, does that have the diagnostic criteria or does

23  the DSM-V have the diagnostic criteria?

24     A.    The DSM-V has the diagnostic criteria

Highly Confidential - Mira Krishnan, Ph.D.

1    generally speaking.

2        Q.    Okay.  So with respect to a diagnosis that

3    you made for the S███ patient of ADHD -- well, let

4    me ask you.

5              You say here:  "My primary diagnostic

6    impression is ADHD."

7              Is that different than a diagnosis?

8        A.    No.

9        Q.    So you made, based on your testing, a

10   diagnosis that E███ S███ has ADHD, right?

11       A.    Yes.

12       Q.    And do you hold that diagnosis as an

13   opinion to a reasonable degree of probability in the

14   field of neuropsychology?

15       A.    I am not sure I understand the question.

16       Q.    Hmm.  Well, what --

17       A.    ADHD is the diagnosis that I made in the

18   report and -- and I stand by the report.

19       Q.    Yeah.  So that's an opinion -- a diagnosis

20   is an opinion, right?

21       A.    Correct.

22       Q.    So in your opinion, E███ S███ has ADHD,

23   right?

24       A.    He has -- yes, he has signs and symptoms

Highly Confidential - Mira Krishnan, Ph.D.

1    that are consistent with ADHD.

2        Q.    So I guess my question is:  Do you hold

3    that diagnosis or that opinion that he has ADHD to a

4    reasonable degree of probability in the field of

5    neuropsychology?

6        A.    Yes, I do.

7        Q.    All right.  Now, and then with respect to

8    the diagnostic criteria that would form the basis for

9    the diagnosis of ADHD, that comes from the DSM-V,

10   right?

11       A.    So, in general the DSM-V is considered

12   the -- the diagnostic standard in the United States.

13   We look at a variety of sources of evidence.  The

14   field -- the fields of medicine and psychology

15   don't -- are not static and so development of

16   psychological knowledge didn't stop in, I believe,

17   2013 when the DSM-V was published.  I generally follow

18   the literature on ADHD, but the symptoms are

19   consistent with those described in -- in the DSM-V.

20       Q.    Did you use the DSM-V as the diagnostic

21   criteria to formulate this diagnosis for S███PPI███?

22       A.    I -- so, this is also -- this has been a

23   sticky issue in the field of psychology and psychiatry

24   since the DSM-V.  Prior to the DSM-V there was fairly

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   broad agreement on using the exact diagnostic

 2   standards in the DSM with the DSM-IV.  There was a

 3   significant departure from that with the publication

 4   of the DSM-V.  Generally speaking I make ICD

 5   diagnoses.  I use the DSM-V as a guide -- as a

 6   guidance.

 7        Q.    But what's the difference between the

 8   ICD-10 F90 diagnostic criteria versus the DSM-V

 9   diagnostic criteria for ADHD, if there is any?

10        A.    So, in general, I consider what the DSM

11   says, but I also consider what the general scientific

12   literature since then has said.

13        Q.    Okay.  I -- I think I understand what you

14   are saying, but let's just be clear.

15              So the ICD-10 does not contain diagnostic

16   criteria, correct?

17        A.    No, that -- I believe that's correct.

18        Q.    So now this next part of your diagnosis

19   for S PPI    here that's up on the screen:  "...ADHD,

20   which is more likely than not a result of

21   developmental lead exposure."

22              Is that an opinion that you hold to a

23   reasonable degree of probability in this case?

24        A.    Yes, it is.
```

Highly Confidential - Mira Krishnan, Ph.D.

1      Q.    So hence, the questions that I had at the

2   beginning of the deposition about causation, isn't

3   that a causation opinion?

4      MS. CARO:  Well, let me interrupt.  We discussed

5   our use of the testimony in this case at trial.  That

6   doesn't mean that she did not have an opinion about

7   the -- a diagnosis.  We are not using that -- or not

8   offering that at trial.  So, I mean, that's why Corey

9   said you can ask all of the questions you want about

10  all of this, but that doesn't mean that we are

11  offering it at trial.

12     MR. ROGERS:  Well, I just -- I just want it to

13  be clear on the record then that -- you know, so, the

14  plaintiffs are not going to at the trial of this case

15  have Dr. Krishnan offer an opinion that E███ S███

16  ADHD is more likely than not the result of

17  developmental lead exposure, is that right?

18     MS. CARO:  That's correct.

19     MR. STERN:  Dave -- Dave, I'm not sure why you

20  are trying to lock us into this.  It is -- it is not

21  appropriate.  The conversation with the Court on

22  Friday about causation was in response to Michael

23  Pitt's claim that the doctors in this case may be

24  talking about general causation for all people in

Highly Confidential - Mira Krishnan, Ph.D.

1    Flint and they needed to be able to protect their

2    clients' interests and everything I said was in

3    response to that.

4              Earlier today I said that she can testify

5    to everything that's in her report, but as of now it's

6    not our intention to offer her as an expert on

7    causation.  I don't know what's going to happen

8    between now and then.  It is in her report.  Just ask

9    her about it.  Pretend that she is going to.  I'm

10   telling you more than I need to or more than I should,

11   a strategy for plaintiff's counsel is that she is not

12   being offered for causation at trial.  There is

13   another expert for that.  But that in and of itself

14   doesn't invalidate the opinions that she has in her

15   report, and when you ask a question, like, Well, isn't

16   that causation, which we talked about earlier you

17   weren't going to testify to, she also said that on

18   Friday was the first time that she even had a

19   conversation about this issue which came before the

20   hearing.

21             So it feels a little bit like you are

22   trying to lock her and lock us into things and no one

23   is preventing you from asking these questions.  You

24   have her for two days.  And many of the defendants who

Highly Confidential - Mira Krishnan, Ph.D.

1    may have been on this deposition have fallen by the

2    wayside in some form or fashion because they've done

3    the right thing and -- and they've -- they are paying

4    $600 million to settle the case.

5            So, you have all of the time in the world

6    with her.  I'm not going to permit you to lock us or

7    lock her in.  I stand by the comments that I made this

8    morning.  I stand by the comments I made to the Court.

9    But you've done enough of these cases to know that

10   things change.  It's in her report.  And I don't think

11   it's right for you to -- to either try and beat her up

12   now about not being a causation expert or at trial by,

13   you know, if she -- if she -- if she reads from her

14   report and it gets into something that has to do with

15   causation, you saying, You are not a causation expert,

16   your layer said you are not a causation expert.

17   You've got her.  It is an expert deposition.  Ask her

18   all of the causation questions you want.

19   BY MR. ROGERS:

20       Q.   Dr. Krishnan, I'm going to ask you some

21   general questions now instead of going to any

22   particular documents.

23       MR. ROGERS:  And then I think what we should do,

24   it is about 11:30, let's go -- how -- how does

Highly Confidential - Mira Krishnan, Ph.D.

1    everyone feel about a lunch break?  Do you want to

2    press ahead until 12:30 and then we can take a break

3    from 12:30 to 1:00?  How does that sound?

4         MS. CARO:  I'm fine with whatever the doctor

5    wants to do.

6         THE WITNESS:  That's fine by me also.

7         MR. ROGERS:  Yeah.  That's what we'll do.  So

8    we'll go to 12:30.

9    BY MR. ROGERS:

10        Q.    I'm going to ask you some general

11   questions first.

12             What are the major sources of lead

13   exposure leading to ingestion of -- in children in

14   urban environment such as Flint?

15        A.    The urban environment of Flint or urban

16   environments in general?

17        Q.    I was using Flint as an example because

18   that's where these plaintiffs reside or resided at the

19   relevant time, but urban environment is fine.

20        A.    So, the reason I ask is because as is

21   discussed in one of the references I provided from

22   Dr. Hanna-Attisha's work, there were significant

23   increases in the number of children testing positive

24   for lead in the Flint area that are attributed to

Highly Confidential - Mira Krishnan, Ph.D.

1    water, but a few of the major causes of lead exposure

2    include a water-based lead exposure and lead-based

3    paint, either lead-based paint in the home or

4    sometimes lead-based paint in -- in other home goods,

5    like toys.

6        Q.    How about soil?

7        A.    Soil can also contain lead.  In a clinical

8    setting, you know, with younger children we ask about

9    things like pica or in -- p-i-c-a -- ingesting

10   non-food objects, typically we ask, like, we ask these

11   questions with preschoolers.

12       Q.    Right.  So do you agree that the primary

13   sources of lead exposure leading to ingestion in

14   children in urban environments would be paint, soil,

15   dust and water?

16       A.    I don't know if that order is correct, but

17   I think that those are common sources of in -- of lead

18   exposure.

19       Q.    So how do you measure the contributions of

20   each one of those to any particular child?

21       A.    I -- I think I have already established

22   that I am not in -- in the profession or business of

23   measuring lead.  If you are asking how, as a

24   neuropsychologist, I consider exposure, I look at time

Highly Confidential - Mira Krishnan, Ph.D.

1    course and levels.  So if there has been a change in

2    lead level, I look -- I look at things that fit the

3    time in which that change occurred.

4         Q.    Hmm.  Okay.  So have you undertaken an

5    analysis yourself to determine the extent to which

6    paint, soil, dust or water contributed to the lead

7    levels in each of these individual bellwether

8    children?

9         A.    I haven't completed any evaluation other

10   than the ones that I have complete -- that I -- the

11   reports that you have received.  With respect to those

12   reports, I believe in most of these cases one of

13   your -- one of the attorneys -- one or more of the

14   attorneys questioned the families with respect to

15   things like the paint in their homes.  That was in

16   most if not all of these cases.  I -- I looked at the

17   blood lead levels that were available to me and/or

18   bone lead levels that were available to me.  I used

19   the data that I was provided.

20        Q.    Right.  But what I'm saying is:  Did you

21   do an analysis to determine the extent to which paint,

22   soil, dust or water contributed to the blood lead

23   levels that were recorded in these individual

24   plaintiffs?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.    I'm not aware of any of these cases in

2   which there is -- was any evidence of paint or soil or

3   dust exposure to lead.

4      Q.    Have you seen the house inspection report

5   for the S███ family residence?

6      A.    I don't believe I have seen a house -- any

7   house inspection rec -- re -- reports.

8      Q.    Did you, as part of your evaluation in the

9   case, determine the period of time during which these

10  individual plaintiffs were drinking water after the

11  switchover to the Flint River in April 2014?

12     A.    I primarily referenced the information

13  that was in the deposition transcripts.

14     Q.    Right.  So, with respect -- I want to ask

15  you a few questions about these in particular.

16         So, with respect to Mr. -- or E███

17  S███, you have an understanding and you have as a

18  fact that you have evaluated the fact that E███

19  S███ stopped drinking the water sometime in 2014.

20         That's on Page 3 of your report, is that

21  right?

22     A.    I -- I don't have the -- the document --

23  source documents in front of me, but I stand by what

24  is in my report.

Highly Confidential - Mira Krishnan, Ph.D.

1     Q.    Okay.  So on Page 3 of your report for

2     S[PPI]    , you report that the family indicated that

3     they stopped drinking the water when they received the

4     letter sometime in 2014, is that right?

5     A.    I -- I am going -- I am taking your word

6     for it.

7     MS. CARO:  Do you want to put the report up on

8     the screen?

9     MR. ROGERS:  Not at this time.

10    BY MR. ROGERS:

11    Q.    With respect to the plaintiff T[PPI], what

12    is your assumption about whether -- at what point in

13    time, if any, the T[PPI] family stopped drinking the

14    water after the switchover?

15    A.    I would have to go back and look at the

16    specifics in the report.  I -- I have not memorized

17    that information.

18    Q.    Okay.  Yeah, we are going to need to have

19    your reports.  And, you know, I think the best

20    procedure is for you to have them with you.  You are

21    required to have your file materials with you during

22    the deposition.

23         So, is there a way, like I described

24    earlier, that you could have your reports on your

Highly Confidential - Mira Krishnan, Ph.D.

1    laptop and you can look at them while we go through

2    this?

3         MS. CARO:  It seems unusual to me.  In every

4    dep -- Zoom deposition I have been in the documents

5    have been placed on the screen for sharing by the

6    attorney and that's what I expected would be happening

7    today.

8         MR. ROGERS:  Yeah, but we've already been

9    through this where, you know, the doctor has access to

10   a computer where she can just bring up the report and

11   it will just be easier to do it that way.

12   BY MR. ROGERS:

13        Q.    So, can you go ahead and do that, Doctor,

14   get the report for T██PPI██?

15        MS. CARO:  But to re -- to create a clean

16   record, how are we going to do that if we don't know

17   what's -- what you are using in -- in evidence and

18   what everybody is looking at?  Why couldn't we all --

19   we need to all be looking at the same thing in order

20   to create a clean record?

21        MR. ROGERS:  We could and we may do that, but

22   I -- I want to go through just some background

23   information first.

24   BY MR. ROGERS:

Highly Confidential - Mira Krishnan, Ph.D.

1    Q.    So, Doctor, could you pull up your report

2    on T███, please.

3    A.    One moment.

4    Q.    Actually, why don't we start with -- with

5    S███ , because that -- I'll just point you to the

6    section that I was referring to before.

7    A.    You would like to start with E███ S███ ?

8    Q.    Yes, please.

9    A.    Okay.

10    Q.    So on Page 3 of 9 for S███ , the

11    paragraph at the top of the page before you get to

12    interview, midway through -- about midway through that

13    paragraph you say:

14         "They did continue drinking it until they

15    received a letter at some point in 2014, advising that

16    the water was not safe.  They then began purchasing

17    bottled water until bottled water began being provided

18    to them for free.  At that point they began to drink,

19    cook and wash with it or they used baby wipes to clean

20    themselves instead of using tap water."

21         Right?

22    A.    That is what the report says, yes.

23    Q.    So for -- for E███ S███ , the

24    information that you have that was provided to you by

1    the family and/or through the deposition is that E███

2    S███     stopped drinking the water as of sometime in

3    2014, right?

4         A.    That -- in my -- my memory of these

5    deposition transcripts, the families were often unsure

6    of the specific dates that these things happened at.

7    I believe that if I put at some point in 2014, it was

8    because the family was not clear about when this

9    occurred.

10        Q.    Well --

11        A.    But I -- that paragraph is attempting to

12   represent what is in the deposition in abbreviated

13   format as it is relevant to this evaluation.

14        Q.    What is your -- what is your assumption,

15   Doctor, or what -- what is your information that you

16   have in making diagnoses or causation -- having

17   causation opinions as to when E███ S███     stopped

18   drinking water from the Flint River?

19        A.    I don't diagnose people with whether or

20   not they drink water from a certain source.  That's

21   not a diagnosis.

22        Q.    No, no, but I mean, in order to make a

23   diagnosis about the extent to which water was a

24   contributing factor in the blood lead levels that the

1  patient had, you would need to know when they stopped

2  drinking the water, right?

3      A.    I -- that -- that information is certainly

4  helpful.

5      Q.    So, again, your understanding is, as you

6  wrote in your report, based upon what the S█PPI█

7  family told you or what is written in their

8  deposition, what they testified to in the deposition

9  is that E█PPI█ S█PPI██  stopped drinking the water in

10  2014, right?

11      A.    Correct.

12      Q.    And since you raised it on this page of

13  the report, 3 of 9, it goes onto the section Interview

14  after the section that I just referred you to, did you

15  ask the S█PPI██  family to provide any further

16  clarification or information about when they stopped

17  drinking the water?

18      A.    If it's not in my interview, I did not.

19      Q.    Okay.  I -- I didn't see it in your

20  interview.

21          Do you have a memory as to whether you did

22  or you didn't?

23      A.    In general, I -- I didn't focus on their

24  water consumption.  I focused on the symptoms and --

Highly Confidential - Mira Krishnan, Ph.D.

1   that are relevant to evaluate -- to the

2   neuropsychological evaluation.

3       Q.    Okay.  Isn't it important for you to know

4   if you were making a diagnosis with respect to what

5   caused the lead exposure to the children, to know the

6   period of time during which they were drinking the

7   water?

8       A.    In this case, I -- as I think I mentioned

9   earlier, I am not aware of any other sources of

10  exposure, so the only ex -- source of exposure that I

11  was -- was identified for me was the water exposure.

12      Q.    Do you -- are you aware of any evidence

13  that the S███ boy drank water from the -- from the

14  Flint water supply from January 1st, 2015, forward?

15      A.    I -- I don't.  I'm not aware of any

16  specific evidence outside of what is reported in my

17  report.

18      Q.    And with respect to that information, the

19  information that you did receive, is that the family

20  and, therefore, S███, the child, stopped drinking

21  the water sometime in 2014, right?

22      A.    Correct.

23      Q.    Okay.  With respect to A███ T███, can

24  you open that one up for me, please, your report?

Highly Confidential - Mira Krishnan, Ph.D.

1       A.      Yes.

2               Please proceed.

3       Q.      Yes, just a second.

4               I didn't see in your report in the either

5    background section or the -- or, actually, now that --

6    now that I'm looking at it, it doesn't appear that you

7    had a separate interview section for the T██PPI

8    plaintiff, am I right?

9               Oh, I do.  I see it.  No, I stand

10   corrected.  I see that now.  It is at the bottom of

11   Page 2, right?

12      A.      The -- the header didn't carry over to the

13   next page, that's correct.

14      Q.      Yeah, my -- my bad.

15              So, do you have -- I didn't see a

16   reference in the T██PPI report in back -- the Background

17   section or the Interview section as to any information

18   that you received about when the T██PPI plaintiff

19   stopped drinking the water after the switchover.

20              Am I right about that?

21      A.      If you read the paragraph directly above

22   the word "Interview" at the bottom of Page 2 --

23      Q.      Yes.

24      A.      -- there is a discussion of several

Highly Confidential - Mira Krishnan, Ph.D.

1    instances on which Ms. T█████ -- Ms. T████ tried to

2    restrict A█████████ consumption of water from the

3    public water system without success.

4         Q.    I see.

5             Okay.  So, is the -- is the extent of

6    information that you had when you wrote your report or

7    that you have today about the T████ child's consumption

8    of water contained in that paragraph, the last

9    paragraph of the Background section?

10        A.    Yes.

11        Q.    I see.  And in the interview process, you

12   did not ask for any further clarification on that

13   subject, is that right, for T████?

14        A.    I did not ask for -- so, in my review of

15   these reports, there -- in my review and writing these

16   reports, there was extensive discussion of this topic

17   in the depositions, and so I focused on other topics

18   that were not covered in the depositions rather than

19   repeating that ground with them.

20        Q.    Is that true for all of them?  These four

21   I mean?

22        A.    Yes.

23        Q.    Okay.

24        A.    Unless they are -- yeah.  I don't think

Highly Confidential - Mira Krishnan, Ph.D.

1    that there is any comment in my interviews about any

2    of these children -- four children about the water

3    consumption, and I -- I went off of their comments in

4    deposition.

5        Q.    Thank you.  I'm just going to finish up

6    with V███ PPI        and W PPI  on this subject of the

7    stoppage of drinking the water, but before I do that,

8    I've got to take a two-minute break for bathroom

9    purposes.  So let's go off the record for two minutes,

10   and let's try to keep it short.  We'll get right back

11   into it, okay.  Thank you.

12       THE VIDEOGRAPHER:  We are going off the record

13   at 11:47 a.m.

14              (WHEREUPON, a recess was had

15              from 11:47 to 11:50 a.m.)

16       THE VIDEOGRAPHER:  Back on record at 11:50 a.m.

17   BY MR. ROGERS:

18       Q.    Okay.  Doctor, just finishing this up, do

19   you -- could you pull up the V PPI       report,

20   please?

21       A.    I have that ready.

22       Q.    Thank you very much.

23              On Page 3 you report up at the top of that

24   page that -- and this is in the Background section, so

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    I take it this was -- this is your summary of

 2    information that you got from the deposition, is that

 3    right?

 4         A.    The paragraph that begins:  "Finally,

 5    Ms. Michelle V[PPI]     , R[PPI]    mother, was deposed

 6    on 2/12/20" is a summary of the deposition --

 7         Q.    Great.

 8         A.    -- of 2/12/20.

 9         Q.    Great.

10               So it says there:  "Ms. V[PPI]

11    reported moving to their home in Flint, Michigan in

12    9/2014."

13               So that's the information you had about

14    when R[PPI] V[PPI]     moved to Flint, September

15    of 2014, right?

16         A.    Yeah, that's correct.

17         Q.    And then a little bit further down it

18    says, about midway through that paragraph:  "She," I

19    take it to mean Mrs. V[PPI]    , "She reported that

20    the family stopped using tap water for drinking and

21    cooking in 12/2014 but continued using it for bathing,

22    dishes, and laundry."

23               Right?

24         A.    That is what the report says, yes.
```

Highly Confidential - Mira Krishnan, Ph.D.

```
1         Q.     And further on, the next sentence:  "In

2    2014, also, a filter was installed in the kitchen

3    sink, which was in place for approximately a year

4    thereafter."

5               Right?

6         A.     Correct.

7         Q.     So, the information that you had as to the

8    time period that R▇▇  V▇▇▇▇▇was consuming water

9    from the Flint water supply for drinking was

10   September 2014 through December of 2014, right?

11        A.     No.  If I understand correctly, it was

12   from April of 2014 to December of 2014.

13        Q.     But -- but they didn't move to Flint until

14   September?

15        A.     Oh, I'm sorry.

16               I have to -- I would -- I would have to

17   review that deposition.  I forget if they lived in

18   more than one place in Flint.  That may be correct.

19        Q.     Well, just to see what you wrote here, at

20   the -- at the top of the page:  "Finally, Ms. Michelle

21   V▇▇▇▇▇▇▇, R▇▇▇ mother, was deposed.  She

22   reported living in an older, rented home in Tampa,

23   Florida from the time of R▇▇▇ birth through

24   relocating to Flint."  And then, the next sentence:
```

Highly Confidential - Mira Krishnan, Ph.D.

1    "She reported moving to their home in Flint in

2    September of 2014."

3           So as -- as far as you reported, that's

4    what happened, right?

5        A.    Correct.

6        Q.    And then could you open up your report for

7    W██PPI██, please.

8           This --

9        A.    Yes, I have it in front of me.

10       Q.    Thank you.

11          This is going to be Page 3 of the report

12   as well.

13          Again, under the Background section,

14   right, on page 3, middle of the page, it is reported:

15   "Ms. Martin reported that she" -- I'll go back, sorry,

16   one sentence before that.

17          "Ms. Martin noted that in 4/2014 when the

18   Flint, Michigan water system was converted to the

19   Flint River, she noted abnormal smell and taste of the

20   water, with yellow discoloration, at times.

21   Ms. Martin reported that, following this, she

22   contacted her physician and her landlord, but she was

23   ultimately informed by the latter that it was outside

24   of the landlord's control."

Highly Confidential - Mira Krishnan, Ph.D.

1          Then this is the significant part here, I

2    think, if you could focus on this.

3          "Her pediatrician advised her to

4    discontinue drinking tap water.  Ms. Martin reported

5    that she did so 'in the late spring, early summer

6    of 2014.'"

7          Right?

8     A.    That -- that is how I understood the

9    deposition.

10    Q.    So the information that you had about the

11   plaintiff W██PPI██ is that she stopped drinking the water

12   as of late spring or early summer 2014, right?

13    A.    That was used in the home.  If my memory

14   serves, these -- these transcripts are unclear about

15   any consumption at school or elsewhere.

16    Q.    I think -- I think you've probably

17   answered these questions, but just to make sure and

18   close out this particular section here of my

19   questions, is it correct that you did not analyze the

20   extent to which drinking the water led to the blood

21   lead levels of these children versus other sources?

22    A.    I considered all of the sources of lead

23   exposure that were known to me based on the medical

24   records and -- and other records that were provided

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    for me to review, the ones that are summarized in the

 2    reports, and that I also read to you earlier in this

 3    deposition, and so I considered any source of lead

 4    exposure that was revealed to me by reviewing those

 5    and whether that timeframe potentially correlated with

 6    the problems that were involved.  But I did not

 7    conduct any kind of analysis to determine the

 8    percentage of lead that was consumed via these other

 9    sources because, to the best of my knowledge, there

10    was no evidence that I reviewed that suggested that

11    lead was consumed via these other sources.

12         Q.    And is that true also with respect to the

13    bone lead amounts, that is, you didn't analyze

14    scientifically the extent to which different sources

15    besides the water for lead could have contributed to

16    the amount of lead in their bones, is that right?

17         A.    It is correct that I am not aware of any

18    other sources of lead exposure.

19         Q.    Did you undertake any analysis of the

20    blood lead levels for children in the United States

21    in -- during the period of time that the blood lead

22    tests were done for these children?

23         A.    I reviewed information about this in --

24    that is in the references that I provided to you.
```

Highly Confidential - Mira Krishnan, Ph.D.

1    There are children in various communities that have

2    positive lead values and those are generally tracked.

3         Q.    What's the average nationally?

4         A.    And as --

5         Q.    Sorry.

6         A.    The average of what?

7         Q.    Blood lead levels.

8         A.    So the -- the question is unfortunately

9    complicated by variable practice.  This -- this is

10   just something that is a limitation in the information

11   that's available.

12            If you look at these bellwethers, for

13   instance, the numbers of lead assays that they

14   underwent is quite variable.  If I remember correctly,

15   of the children that I evaluated, one of them had as

16   many as seven or eight lead assays during the period

17   of interest, and I think there was at least one that

18   didn't have any.  And so, there are some limitations

19   in where information is available, but -- but there is

20   general information about -- usually in the form of

21   the percentage of children that have elevated lead

22   levels.

23        Q.    Yeah, so what is that information?

24        A.    I'd have to review the literature.  The

Highly Confidential - Mira Krishnan, Ph.D.

1    focus with Flint has been that that number increased

2    as described in the Hanna-Attisha article.

3         Q.    I understand, but I'm -- I'm trying to get

4    at this point, Doctor.  You -- there, as you just

5    described, with respect to these four bellwethers now

6    that we are focusing on, they -- some had blood lead

7    levels tests done at various points in time and at

8    least one did not have any.

9              Is that your memory, basically?

10        A.    I think that the one that did not is not

11   one of these four.

12        Q.    Okay.  All right.  Fair enough.

13             But -- but there are blood lead level

14   tests that were done on these four children, right?

15        A.    They are reported in the -- the ones that

16   I had access to were reported in the background of

17   these reports.

18        Q.    Right.  And you -- you actually received

19   copies of the blood lead level tests, right?

20        A.    I -- I believe that it was a mixture of

21   reporting the lab as part of a pediatrician encounter

22   summary and the actual lab report was in the medical

23   records, one or both.

24        Q.    So -- so my question is did you compare

Highly Confidential - Mira Krishnan, Ph.D.

1    the blood lead levels in the test reports or the

2    pediatrician's reports or for whatever medical reports

3    and information you had to blood lead levels for

4    children of the same age group nationally during the

5    same period of time?

6         A.    I primarily compared them to their

7    reference ranges.

8         Q.    What do you mean "reference ranges"?

9         A.    Meaning that we expect blood lead levels

10   to be negative and a positive result is considered

11   abnormal.

12        Q.    So is the answer to the question that you

13   did not compare the blood lead levels of these four

14   plaintiffs, as the test reports indicate, to any type

15   of database for what the national average or average

16   would be, averages across the country would be for

17   children in their age group at the same time?

18        MS. CARO:  Objection; asked and answered.

19             You can answer.

20   BY THE WITNESS:

21        A.    I -- I believe I -- I've already answered

22   that question, but I -- I considered the lead levels

23   that were provided in the medical records with the

24   expectation that -- that venous or capillary assays of

Highly Confidential - Mira Krishnan, Ph.D.

1    blood lead should be negative and in these cases they

2    were not.

3         Q.    So I'm going to share my screen and ask

4    you about a particular document at this time.  I think

5    it should be up on screen.

6              Can you see my screen now, Doctor?

7         A.    I see a website, it looks like a Fourth

8    National Report on Human Exposure to Environmental

9    Chemicals.

10        Q.    It is.  It's a -- it is a -- in a PDF

11   form, but you are right.

12             So this is -- are you familiar with this

13   report, the Fourth National Report on Human Exposure

14   to Environmental Chemicals, Tables, January 2019,

15   Volume One, from the US Department of Health and Human

16   Services, Centers for Disease Control and Prevention?

17        A.    I -- I'm not sure if I have reviewed this

18   specific report, but I'm -- I'm aware that the CDC

19   catalogs this information.

20        Q.    Do you consider the information cataloged

21   by the CDC with respect to this information in this

22   report to be accurate and reliable?

23        A.    I would have to review the report.

24        Q.    I want to direct your attention to a

Highly Confidential - Mira Krishnan, Ph.D.

1   particular page.  And let me just make sure I get that

2   right.

3          This is page --

4      MR. ROGERS:  Oh, can we mark this as, Juliana,

5   as -- is this Exhibit 4 now?

6      THE COURT REPORTER:  Yes.

7      MR. ROGERS:  Thank you.  So Exhibit 4.

8                  (WHEREUPON, a certain document was

9                   marked Mira Krishnan, Ph.D.

10                  Deposition Exhibit No. 5, for

11                  identification, as of 10/05/2020.)

12  BY MR. ROGERS:

13     Q.   So I have turned to Page 311, Doctor, and

14  you can see that this is the page that has the table

15  with summaries of blood lead 2011 through 2016.

16         And you can see at the top here it says:

17  "Geometric mean and selected percentiles of blood

18  concentrations as measured," it says here, "in

19  micrograms per deciliter."

20         You're familiar with that measurement,

21  micrograms per deciliter, right?

22     A.   Yeah, that's -- that's the typical way

23  that blood lead is -- is described.

24     Q.   Right.

Highly Confidential - Mira Krishnan, Ph.D.

 1              And it says:  "For the US population from

 2    the National Health and Nutrition Examination Survey."

 3              What's that?

 4      A.     To the best of my knowledge, NHANES is a

 5    national survey of -- of a variety of health factors

 6    in Americans.

 7      Q.     So you used the acronym NHANES,

 8    N-H-A-N-E-S.

 9              You're familiar with that?

10      A.     Yes.

11      Q.     And -- and in the field of epidemiology

12    and measuring various levels of certain chemicals in

13    the population, that this information is relied upon

14    by people in your field regularly, is that right?

15      A.     It's a common source of data for analyses

16    that is -- that are published in the scientific

17    literature.

18      Q.     Do you consider it to be reliable?

19      A.     I generally consider the CDC to be a

20    trustworthy source.

21      Q.     Well, that's good, because, you know, in

22    today's day and age, right, there's some folks out

23    there who don't, but that's a discussion for another

24    day, I guess.

Highly Confidential - Mira Krishnan, Ph.D.

```
 1              So, I want to direct --

 2       A.    I -- I am not, in any event, one of them.

 3       Q.    Yeah.

 4       MR. STERN:  Like the entire University of

 5  Florida academic staff.  Sorry.

 6       MR. ROGERS:  Not -- never mind.

 7  BY MR. ROGERS:

 8       Q.    So we -- we digress.  Let's get -- let's

 9  all get back to some questions here.

10              So, Doctor, do you see the -- I wanted to

11  direct your attention to this -- can you see my cursor

12  moving around here, this section here, which is the,

13  you know, Ages 1 through 5 and then up through Age 6

14  to 11?

15       A.    Um-hum.

16       Q.    During years 2011 through 2016, right?

17       A.    I see that.

18       Q.    And up above, as we discussed earlier, it

19  says, these are the numbers in micrograms per

20  deciliter.  And the first column here is the geometric

21  mean with the 95 percent confidence interval.

22              What -- what does that mean, 95 percent --

23  I'm sorry -- geometric mean, that's the average,

24  right?
```

Highly Confidential - Mira Krishnan, Ph.D.

1    A.    It is, correct.

2    Q.    So, for example, if we just take this

3 first -- or this last line here, Age 6 through 11,

4 2015-16 and you go across the column here, there

5 was -- the sample size, there were a total in this

6 database of 1,023 blood lead levels in the database,

7 right?

8    A.    My understanding is that there are -- that

9 that means that there are 1,023 samples that were

10 children who were between 6 and 11 who had data

11 between 2015 and 2016.

12    Q.    Exactly.

13    A.    Although, again, I am -- I'm just

14 reviewing this now.

15    Q.    Exactly.  You said is it better than I --

16 I did in my question.

17         But this column here means that of that

18 group of tests that were done, Ages 6 through 11

19 during that timeframe, the average blood lead level in

20 micrograms per deciliter was .571, right?

21    A.    Correct.

22    Q.    And if you go up to the other columns,

23 Ages 1 through 5, 2011-12, .970 and so forth, so if

24 you focus on the period of time when these blood lead

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   levels were being measured on children ages 1 through

 2   5 during 2015 and '16, the average is, as listed here,

 3   .758, right?

 4       A.    I -- I don't believe that any -- oh, yes,

 5   that's correct.

 6       Q.    And then you have .681 for ages 6 through

 7   11 in earlier years and so forth.  But this -- this

 8   block here that I'm basically trying to outline, Ages

 9   1 through 5 through Ages 6 through 11, that would be

10   the relevant comparison group for children like these

11   four wether -- four bellwether plaintiffs, right,

12   during these ages these periods of time, right?

13       A.    That's correct.

14       Q.    And did you, in your work in the case,

15   undertake an analysis of how the four bellwether

16   plaintiffs, S▉▉▉▉, T▉▉, Va▉▉▉▉ and W▉▉, how

17   their measured blood lead levels compared to these

18   averages, these national averages in this database?

19       A.    I completed neuropsychological

20   evaluations.  My scope of work was not to do a

21   statistical analysis of their blood lead in comparison

22   to the general population.  My scope of work was to

23   determine if they had cognitive or emotional

24   impairments.
```

Highly Confidential - Mira Krishnan, Ph.D.

1       Q.    Okay.  So the answer then is no, am I

2  right, you did not as part of your work in the case

3  compare the blood lead levels for these four children

4  with what was being found nationally for the same age

5  level kids throughout the country during these years,

6  right?

7       A.    Correct.

8       Q.    Just to make sure that -- so you don't see

9  that on the screen anymore, do you, that -- that has

10  stopped?

11       A.    It has stopped.

12       Q.    Thank you.

13             Similar questions with respect to bone

14  lead scans.

15             So you received -- and I'm just focusing

16  on the four plaintiffs we have now in the case, these

17  four.

18             You received reports with references to

19  the amount of lead in their bones, right?

20       A.    Correct.

21       Q.    Do you have an understanding that the

22  bones that were tested were the children's tibias?

23       A.    I -- I understand that that is common, but

24  I -- I only reviewed the one-page documents that --

Highly Confidential - Mira Krishnan, Ph.D.

1     that we were talking about earlier.

2          Q.    Okay.  So you don't know which bone was

3     scanned based on that report itself?

4          A.    I'm not able to testify to the specifics

5     of -- of bone lead measurement.  That's outside of my

6     area of expertise.

7          Q.    So if I were to tell you that these were

8     done on tibias using a portable XRF machine, that's

9     x-ray fluoroscopy machine, you -- you wouldn't know

10    one way or the other whether that was accurate?

11         A.    That sounds correct to me, but I -- I

12    don't know for sure.

13         Q.    Do you know -- do you know and/or did you

14    do any analysis or investigation into what the

15    averages for bone lead in tibias recorded by portable

16    XRF equipment in children of comparable ages to these

17    four plaintiffs from any database?

18         A.    I -- I really only looked at, as I -- as

19    earlier in this deposition we discussed it, that I

20    believe that one of the articles I referenced

21    discusses bone lead levels in relation to cognitive

22    functioning and that was the extent of -- of what I

23    looked at.

24         Q.    Okay.  So is the answer then that you

Highly Confidential - Mira Krishnan, Ph.D.

1   don't know what databases are out there which would

2   show what the average amount of bone lead measurements

3   would be for children of -- in this age group from

4   around the country?

5       A.    I have -- have not looked into that.

6       Q.    Did -- did -- have you ever had any

7   conversations with Dr. Specht in the case at all?

8       A.    I have not.

9       Q.    Did you ever receive any information from

10  anyone about whether -- what databases Dr. Specht has

11  or used for making determinations about these bone

12  lead scans and what they mean or don't mean?

13      A.    You would have to ask Dr. Specht that

14  question.

15      Q.    Yeah.  I'm just asking if you have had any

16  conversations with him or know anything about that?

17            Is the answer no?

18      A.    I have not had any interactions.  Yeah,

19  no.

20      Q.    Have you read his report?

21      A.    I -- the -- the documents that I reviewed

22  are the ones that I listed to you earlier and that are

23  reviewed in the reports.  I -- I didn't review

24  anything that is not -- that we have not already

Highly Confidential - Mira Krishnan, Ph.D.

1    discussed.

2         Q.    Yeah, sorry.  I was referring to his

3    expert report.  So besides the reports of the blood --

4    I'm sorry -- of the bone scans, you haven't read

5    Dr. Specht's report that was provided in the case,

6    right?

7         A.    That's correct.

8         Q.    Do you -- do you have an understanding of

9    what the difference is between what these measures

10   tell you about the -- the period of time of exposure,

11   that is to say, what does -- when you are looking at a

12   blood lead test, what does that tell you about the

13   period of time, if anything, as to which that

14   particular child would have been exposed to and

15   consumed or ingested lead?

16        A.    So, in a general way, what I can -- my

17   understanding is that when lead is in the bloodstream

18   it is gradually renally excreted, meaning that it

19   is -- is passed out in the urine.

20             What complicates this is that lead in the

21   body, to the best of my understanding, once it is

22   consumed it enters various other kinds of tissue,

23   including the bones.  Its presence in these other

24   tissues is relatively more stable, but it also

Highly Confidential - Mira Krishnan, Ph.D.

1   recirculates between these other tissues and the

2   bloodstream, and so -- so if you -- if you were to go

3   and ingest lead, then in general what would happen, if

4   you ingested lead just once is that you would have a

5   peak in your blood lead level and you would excrete

6   the lead out over a relatively short period of time,

7   primarily through your urine.

8            If you had continuous exposure to lead or

9   sufficient exposure to lead, some of that lead would

10  also make its way into other tissue.  It can

11  recirculate back out into the blood and remain in the

12  blood lead level.

13           But then in general the tissue

14  measurements, like bone lead density, I understand

15  them to be suggestive of longer term or cumulative

16  exposure to lead because my understanding is that lead

17  remains in bone significantly longer than in blood.

18       Q.   Thank you.

19           So your understanding is then that the

20  bone lead levels that were recorded by these bone

21  scans represent the cumulative amount of lead that

22  this child -- these children were exposed to over the

23  course of their whole lifetime, right?

24       MS. CARO:  Objection; asked and answered.

Highly Confidential - Mira Krishnan, Ph.D.

1    BY THE WITNESS:

2         A.    My understanding is that -- that -- sorry?

3         MS. CARO:  No.  I said:  "Objection; asked and

4    answered."

5              Go ahead.

6    BY THE WITNESS:

7         A.    My understanding is that lead levels do

8    gradually dissipate in bones, but it is a much slower

9    process.  There -- I am not an expert in bone

10   pathophysiology.  I'm a clinical neuropsychologist,

11   but my understanding is that there are multiple

12   variables that affect this, but it is typically over a

13   period of years that bone lead levels dissipate.  And

14   so it's a long-term average in the case of these

15   children.

16        MR. ROGERS:  Okay.  So it's about 12:15.  I'm

17   going to get into your specific reports for each of

18   the bellwethers, and I will bring up and mark the

19   reports and we'll go through them in quite some detail

20   along with the backup information, so why don't we

21   take our lunch break now.  It is 12:15.  Half an hour.

22   12:45 we'll come back, and I'll -- I'll get the

23   reports lined up and we'll mark those as exhibits and

24   start going through them, okay.

Highly Confidential - Mira Krishnan, Ph.D.

 1      THE VIDEOGRAPHER:  Going off the record, 12:17.

 2            (WHEREUPON, a recess was had

 3             from 12:17 to 12:50 p.m.)

 4      THE VIDEOGRAPHER:  Back on the record.  The time

 5  is 12:50 p.m.

 6  BY MR. ROGERS:

 7      Q.    Okay.  Doctor, I want to get into the --

 8  your reports for these specific four bellwether

 9  plaintiffs, so I'm going to share my screen and we'll

10  mark this as -- this is going to be Exhibit 6,

11  because --

12      A.    Can I clarify something before your

13  question, please?

14      Q.    Do you mean in re -- clarify a response to

15  a prior question or --

16      A.    Yes, please.

17      Q.    Sure.  Go ahead.

18      A.    You had asked for which of the references

19  discussed bone lead, and I just wanted to clarify that

20  it is -- I was wrong.  It was Lidsky and Schneider,

21  L-i-d-s-k-y, S-c-h-n-e-i-d-e-r, and Mason, Harp & Han.

22  Those two references are the ones that I should have

23  selected.

24      Q.    Okay.  When you say "references to lead,"

Highly Confidential - Mira Krishnan, Ph.D.

1    do you mean with respect to the -- the averages or

2    the -- or the bone lead or which?  I'm not sure which

3    it was?

4         A.    You had asked about bone lead.

5         Q.    Okay.  So those are the two that reference

6    bone lead?

7         A.    I believe that's correct.

8         Q.    When you did your review, did you note in

9    either of those two papers whether they had numbers

10   for average lead that they found in any databases of

11   anybody who was reporting it?

12        A.    They focused on lower exposure levels that

13   caused cognitive impairment.

14        Q.    I know, but you -- see, you didn't answer

15   my question.

16             What -- what -- did -- did either of those

17   two papers that you referenced for bone lead describe

18   any averages based on any databases for, you know,

19   lots of bone lead scans that were done?

20        A.    No.

21        Q.    Thank you.

22        MR. ROGERS:  Okay.  So Juliana corrected me that

23   that last exhibit that we looked at, which I believe

24   was the NHANES data from the CDC, that's actually

Highly Confidential - Mira Krishnan, Ph.D.

1    Exhibit 5, so we are going to correct that, and this

2    is now Exhibit 6.

3            Do you have that right, Juliana?

4        THE COURT REPORTER:  That's correct.

5        MR. ROGERS:  Thank you very much.

6    BY MR. ROGERS:

7        Q.    Okay.  Doctor, so it is your report that

8    we'll mark as Exhibit 6, it should be up on the

9    screen, for E▓▓▓ S▓▓▓▓.

10           Is that right?

11       A.    Correct.

12               (WHEREUPON, a certain document was

13                marked Mira Krishnan, Ph.D.

14                Deposition Exhibit No. 6, for

15                identification, as of 10/05/2020.)

16   BY MR. ROGERS:

17       Q.    And it goes through, the end is the

18   bibliography, but it doesn't have the underlying test

19   data which will be a separate exhibit, which will be 7

20   when we get to it, I think in a few minutes.  But just

21   to get oriented here about some specific information

22   for this young boy.

23               So, the date of your evaluation was done

24   on June 28th, 2020, right?

Highly Confidential - Mira Krishnan, Ph.D.

```
 1        A.    Correct.

 2        Q.    And he, at that time, was 9. -- well, is

 3   that nine years, three months?

 4        A.    Correct, that's nine years, three months.

 5        Q.    Thank you.

 6              And then his date of birth was PPI     ,

 7   2011, and he was in the third grade, right?

 8        A.    That's correct.

 9        Q.    With respect to the -- when your report --

10   at least the final report was -- when you signed it,

11   you mentioned that there is a date there on Page 9 of

12   9, August 4th, 2020.

13              That's the date that you finalized the

14   report?

15        A.    That's correct.

16        Q.    A couple of specific questions to start us

17   off here.

18              The only blood lead measurement that you

19   are aware of for E PPI  S PPI   is, as I've highlighted

20   here, on February 16th, 2016:  "E PPI  had a negative

21   capillary blood lead level of less than 3.3 micrograms

22   per deciliter," right?

23        A.    I think that that's correct.

24        Q.    So that would have been in February -- he
```

Highly Confidential - Mira Krishnan, Ph.D.

1   would have been almost five years old at that point?

2       A.    Correct.

3       Q.    And so, as we discussed earlier -- well,

4   let's talk about the level itself.

5             What does it mean when it reports less

6   than 3.3?

7       A.    So, I am not an expert on blood lead

8   measurement.  My understanding as a user of the data

9   clinically is that it means that the lowest detectable

10  level with that test was 3.3 micrograms per deciliter

11  and the value was -- that there was no evidence of

12  lead higher than that level.

13      Q.    So, therefore, you know, based on this,

14  since it is below the level of detection, you don't

15  know what his actual blood lead level was at that

16  time, right?

17      A.    Correct.

18      Q.    It -- it could have been anywhere from

19  zero --

20      A.    That's why it is marked as negative.

21      Q.    Right.  So when -- when we were having a

22  discussion earlier, I think what you were describing

23  is that you were attempting to determine not how blood

24  lead levels measure to any average amount for --

Highly Confidential - Mira Krishnan, Ph.D.

1   nationally for kids this age, but rather you were just

2   evaluating them for purposes of determining whether it

3   was positive or negative, right?

4        A.    That is correct.

5        Q.    And this one -- this one is reported as

6   negative?

7        A.    Correct.

8        Q.    So, are you aware of any other blood lead

9   level test ever performed on the plaintiff E██████

10  S██████?

11       A.    I -- is it a -- may I con -- consult my

12  report briefly?

13       Q.    Yes.  I don't think there is, but if you'd

14  like to consult, please do, yep.

15       A.    My understanding is that the only -- the

16  only lead levels that I had available to review were

17  the negative result in 2016 and then the bone lead

18  measurement which was in 2019.

19       Q.    Right.  So let's take a look at that.  The

20  bone lead measurement here is on the next page,

21  Page 2.  I am highlighting it here.

22             That was measured at 6. -- reported at

23  6.72 micrograms per gram, right?

24       A.    Correct.

Highly Confidential - Mira Krishnan, Ph.D.

1    Q.    But, again, in terms of what that means

2  with respect to averages or the period of time over

3  which there was an exposure besides over his whole

4  life, you -- you don't know what those are, right?

5    A.    I know that the neuropsychological

6  literature shows cognitive impairments in children

7  with positive bone lead measurements of below

8  10 micrograms per gram, but beyond that, no.

9    Q.    So in terms of -- to get back to that

10  point, in terms of what this means, if anything, the

11  bone lead scan, about when, during what period of time

12  this particular child may have been exposed to lead or

13  ingested lead, you don't know, it is just that at some

14  point over the course of his lifetime, right?

15    A.    I am not an expert in bone lead

16  measurement, but my understanding is it is a long-term

17  average, essentially.

18    Q.    So is it correct that you do not know what

19  this means, this measurement and this amount that was

20  recorded on April -- sorry -- August 24, 2019, about

21  the period of time over which he was exposed to and

22  ingested lead, right?

23    MS. CARO:  Objection; asked and answered.

24  BY THE WITNESS:

Highly Confidential - Mira Krishnan, Ph.D.

```
1        A.    It's only -- I only know that it is a long
2   period of time that he would not -- that he would be
3   unlikely to have that bone lead level based on an
4   acute exposure of lead.
5   BY MR. ROGERS:
6        Q.    Okay.  Let's turn to your diagnoses that I
7   think we looked at before.
8              So for E███ S███    here is your
9   diagnoses on Page 8 of 11 of the report.  I'm
10  highlighting it here.
11             You say:  "Overall, my pride" -- "my
12  primary diagnostic impression is ADHD (F90.1), which
13  is more likely than not a result of developmental lead
14  exposure."
15             Right?
16       A.    That -- that is what the report says, yes.
17       Q.    So, I want to ask you some questions about
18  ADHD, and it goes to the diagnostic criteria that we
19  were discussing earlier.
20             I think you said, and correct me if I'm
21  wrong, that the diagnostic criteria that you used for
22  this diagnoses was based on the DSM-V, right?
23       A.    I just said that I used the DSM-V as a
24  guideline, I believe, and I make ICD diagnoses based
```

Highly Confidential - Mira Krishnan, Ph.D.

1   on the overall information and -- and the state of the

2   scientific literature.

3        Q.    Well, why then did you put the code in

4   there which is a code for the DHM -- a DSM-V?

5        A.    As I indicated earlier in the deposition,

6   that is the ICD code for ADHD.

7        Q.    Okay.  Well, let's take a look at it then.

8              So, with respect to -- but the ICD-10, as

9   we talked about earlier, it doesn't have diagnosis --

10  diagnostic criteria, right?

11       A.    If you would like to put the ICD-10 up for

12  me to look at it, I'm happy to look at it.

13       Q.    Well, I'm asking you.  I don't have it

14  handy.  Do you -- do you -- does it or doesn't it?

15       A.    So, in general, as I said previously, we

16  use guidance from sources like the DSM-V as well as

17  the current scientific literature to make accurate

18  diagnoses.  Engaging in -- you identify the diagnosis

19  that best fits the -- the symptoms and signs that we

20  observe.

21       Q.    I know.  But my question was, I thought we

22  had covered this, the ICD-10 does not have, does not

23  contain diagnis -- diagnostic criteria for ADHD,

24  right?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.      I believe I answered that question

2  previously.

3      Q.      Yes.  And am I correct, what I just said?

4      A.      I believe you are.

5      Q.      Okay.  So I've got up on the screen now,

6  and let's make it Exhibit No. --

7      MR. ROGERS:  Are we up to 7, do I have that

8  right, Juliana?

9      THE COURT REPORTER:  Yes.

10             (WHEREUPON, a certain document was

11              marked Mira Krishnan, Ph.D.

12              Deposition Exhibit No. 7, for

13              identification, as of 10/05/2020.)

14  BY MR. ROGERS:

15     Q.      So this is the DSM-V.  It is from Page 59

16  of the DSM-V.

17             Is this the criteria that you applied at

18  least in part as the criteria for making the

19  diagnosis -- the diagnosis of

20  attention-deficit/hyperactivity disorder in young E▓▓▓

21  S▓▓▓ ?

22     A.      Yes.

23     Q.      So which of these -- it says here in order

24  to -- the diagnose -- diagnostic criteria are:

Highly Confidential - Mira Krishnan, Ph.D.

```
 1              "A persistent pattern of inattention

 2    and/or hyperactivity-impulsivity that interferes with

 3    functioning or development, as characterized by (1)

 4    and/or (2)."

 5              Right?

 6        A.    Correct.

 7        Q.    And for (1), it says:  "Inattention:  Six

 8    (or more) of the following symptoms have persisted for

 9    at least 6 months to a degree that is inconsistent

10    with developmental level and that the negative" --

11    "and that it negatively impacts directly on social and

12    academic/occupational activities."

13              Which of these did you find in EPPI

14    SPPI    of these six or these inattention criteria?

15        A.    So if you -- if you'll notice in my report

16    at the end of Page 7 I indicated that the prominent

17    symptoms were hyperactivity and impulsivity.  I can --

18    will review my report briefly, but as far as

19    inattention symptoms go, the family reported

20    intermittent focus, distractability, so they reported

21    symptoms consistent with Items A(1)a, b.

22              They reported issues, I believe,

23    consistent with Item d.  And I would have to look and

24    see if there are any other inattention symptoms that
```

Highly Confidential - Mira Krishnan, Ph.D.

1    they reported.  But I think that those are the primary

2    ones.

3        Q.    So those were -- there were three?

4        A.    I believe I've told you that the primary

5    symptoms were hyperactivity/impulsivity.  They are in

6    the next section of the document.

7        Q.    Okay.  But it says here six -- up at the

8    top, it says:  "Six (or more) of the following

9    symptoms have persisted for at least 6 months," for

10   inattention, and you only listed three, and it ends

11   with Paragraph i, right?

12       A.    Scroll up, please.

13             ADHD is:  "A persistent pattern of

14   inattention and/or hyperactivity-impulsivity that

15   interferes with functioning or development, as

16   characterized by (1) and/or (2)."

17       Q.    Oh, I see what you are saying.

18             So he -- he showed three, according to the

19   parents' report -- and by the way, this diagnosis was

20   made on the basis of the parent reporting, right?

21       A.    On the basis of my overall

22   neuropsychological evaluation.

23       Q.    Which was -- was there something beyond

24   the -- what the parents reported that lead you to this

Highly Confidential - Mira Krishnan, Ph.D.

1   diagnosis?

2       A.    It's described in my report.  Yes.

3       Q.    Tell me what it is, please.

4       A.    So if I -- if you see the Observations

5   section of my report on Page 4, it says there were

6   times when he would respond quizzically or What?  to

7   directions that are within context.  I had to repeat

8   myself.  There were only sometimes when he could work

9   independently.  He required coaxing or redirection to

10  complete cognitive testing.

11           And then if you look at on Page 5, he was

12  impulsive on three separate tests that I describe in

13  the paragraph that begins with:  "I also looked at

14  frontal/executive functions and detail."

15      Q.    Okay.  Is that it?

16      A.    In addition to that, I completed BASC-3,

17  B-A-S-C, assessment of parent reports of symptoms.

18  The difference between that and the interview is that

19  the BASC allows for comparison of parent ratings to

20  those of parents of other children of the same age.

21  And on that hyperactivity is rated as 97 -- worse than

22  97 percent of age peers.

23      Q.    Uh-huh.  Anything else?

24      A.    It is all in the report that you have

Highly Confidential - Mira Krishnan, Ph.D.

1   already been provided.

2       Q.    I know.  But I'm asking you.

3             Is it -- is there anything else besides

4   what you just told me?

5       A.    I conducted an interview, I did behavioral

6   observations, I completed a neuropsychological

7   evaluation and I drew conclusions from those content

8   areas.

9       Q.    So getting to the next page of this ADHD

10  from the Diagnostic Criteria for DSM-V, which of these

11  symptoms of hyperactivity did -- or I'm sorry -- yeah,

12  hyperactivity and impulsivity did he demonstrate?

13      A.    So, I observed -- between my observations

14  and the parent report, he had 2a, 2d, 2e, 2f, 2g, 2h,

15  and 2i.

16      Q.    All right.

17            Is any of that based on testing or

18  evaluations versus parental reporting?

19      A.    It is based on a combination of the two.

20      Q.    Which are parental reporting and which are

21  tests for evaluation?

22      A.    As a standard of practice in

23  neuropsychology in general and in psychological

24  assessment, I correlate the parent report with the

Highly Confidential - Mira Krishnan, Ph.D.

1   symptoms that I'm observing and the test results, but

2   I don't say that Item 2a is because the parent said

3   and Item 2b is because I observed it.  These are

4   things that I observed that were consistent with what

5   parents report of E██PPI██ functioning.

6       Q.    Is there -- did you arrive at a severity

7   level with respect to attention -- his attention

8   deficit hyperactivity disorder, that is to say,

9   mild -- excuse me -- moderate or severe?

10      A.    I characterized it as mild at the bottom

11  of Page 7 of my report.

12      Q.    Thank you.

13            What -- what is the basis for

14  characterizing it as mild?

15      A.    That was my holistic opinion based on the

16  parent report, the -- the symptom report on the BASC

17  and my observations and testing results.

18      Q.    So, to what extent -- or what is the

19  prevalence of ADHD in the general population for

20  children?

21      A.    It is in the order of 2 to 3 percent.

22      Q.    So what are the causes of ADHD?

23      A.    In general, ADHD can occur based on

24  genetic determinants.  ADHD has been associated with a

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   number of environmental determinants as well.

 2            So ADHD can occur in families, but it can

 3   also occurs spontaneously in children in a family in

 4   the absence of -- of a family history.

 5       Q.    So what did you do to rule out genetics or

 6   spontaneously occurring ADHD in a mild severity level

 7   for E▆▆▆ S▆▆▆  ?

 8       A.     In E▆▆▆ case, I -- I -- in general I ask

 9   about family medical history, I believe in this case

10   there was no contributory family medical history.

11   I -- and then I consider whether there are other

12   explanations.

13            In this case the two explanations really

14   that would be available would be exposure to lead that

15   I -- that I know of and -- and spontaneous ADHD.

16       Q.    So what -- what -- tell me the

17   characteristics of spontaneous HDAD -- HD.

18            What does that mean?

19       A.    Meaning ADHD that occurs without any --

20   any other explanation.  We don't always have a good

21   explanation for why these conditions occur.

22       Q.    So how was it that, in terms of a

23   differential diagnoses process that you described to

24   me earlier, that you ruled that out?
```

Highly Confidential - Mira Krishnan, Ph.D.

1    A.    So, I can't talk about everything that is

2  possible.  I can really only talk about the

3  probabilities involved.  In this case there is a

4  known -- there is a known exposure to lead at some

5  time during E███ childhood.  ADHD is associated in

6  significantly increased rates in children who are lead

7  exposed at levels comparable to E███ , and -- and so

8  it is more likely that it was caused by that given

9  that we know that than -- than having been caused by

10  some other unknown cause that we have not identified.

11    Q.    But I thought we established that with

12  respect to his blood lead level lead, it was negative?

13    A.    With a high threshold for detection.

14    Q.    Well, but from a scientific point of view,

15  since it was below the level of detection of that

16  test, all it means is that you don't know anything

17  about his blood lead level except it was lower than

18  that.

19         It could be zero, right?

20    A.    He also had a positive bone lead level.

21    Q.    All right.  We'll -- we'll get to that in

22  a minute.

23         But with respect to the period of time

24  during which E███ was exposed to lead at some point in

Highly Confidential - Mira Krishnan, Ph.D.

 1    his lifetime, what do you know about that?

 2         A.    I'm sorry.  I don't understand the

 3    question.

 4         Q.    Your diagnosis depends upon the fact that

 5    E███ was exposed to lead at some -- at some point

 6    during his lifetime in terms of ingestion, right?

 7         A.    Correct.

 8         Q.    And you describe it as, I think what's the

 9    exact word that you used, "developmental lead

10    exposure," so that means during what period of time,

11    "developmental"?

12         A.    Well, in E███  case, during childhood, in

13    E███  case that would be his whole life.

14         Q.    Okay.  Yeah, so --

15         A.    But during a period of time in which the

16    brain is developing.

17         Q.    So that -- that includes any point in time

18    from his date of birth up through the time that you

19    examined him, right?

20         A.    Again, my understanding of bone lead

21    levels is that it takes time to accumulate a bone lead

22    exposure.  And so an acute exposure shortly before I

23    saw him would be an unlikely explanation for this

24    pattern of results.

Highly Confidential - Mira Krishnan, Ph.D.

```
 1      Q.    I guess what I'm trying to get at, Doctor,
 2   is:  You don't know the period of time over which he
 3   was exposed developmentally to lead through ingestion
 4   apart from the fact that it was at some point in
 5   between when he was born and when you did your
 6   examination, right?
 7      A.    That's -- that is fair, yes.
 8      Q.    So the extent to which E▮▮▮▮ S▮▮▮▮▮ had
 9   exposure and ingestion of lead before April 2014, you
10   don't know the extent to which that happened, right?
11      A.    I only know that I am not aware of any
12   other -- I was not at the time of this evaluation
13   aware of any other source of lead exposure for E▮▮▮▮
14   besides having known that he consumed the water in
15   question.
16      Q.    Do you -- but is it true with respect to
17   E▮▮▮▮ S▮▮▮▮ that as far as you know no tests were
18   done for the water to -- in his residence, in the
19   S▮▮▮▮ residence, to determine at any point in time
20   what the lead concentration or levels were in the
21   water.
22            Is that a fair statement, a correct
23   statement?
24      A.    I reported anything I had for review in --
```

Highly Confidential - Mira Krishnan, Ph.D.

1    in my evaluation report.  I don't see that there, so I

2    am not -- I think that that's correct, that I am not

3    aware of that.

4        Q.    Okay.  And similarly, the extent to which

5    he was exposed to ingestion of lead between April 2014

6    and January 1st, 2015, you don't know the extent of

7    that, do you?

8        A.    Somebody else -- a different kind of

9    expert would have to testify with respect to the water

10   supply at his home.  I know that he was within the

11   catchment area where elevated lead levels were

12   observed, but I don't know any more than that.

13       Q.    Did -- have you ever seen any papers

14   that -- besides Dr. Hanna Mona Attisha (sic) -- never

15   mind, strike that.  We'll -- we'll get to that later

16   on.

17             So, in terms of your differential

18   diagnoses, just to -- just to finish this up now and

19   to clarify, the -- it's understood in the

20   neuropsychological community that ADHD can be caused

21   by genetics, it could be spontaneous ADHD, or it could

22   be attributable to and -- and contributing factors

23   being exposure to some type of toxins, right,

24   including lead?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.    That's correct.  Those -- those categories

2   are not necessarily mutually exclusive, but that's

3   correct.

4      Q.    Okay.  And in terms of your attempting to

5   make a differential diagnoses that it was due to, more

6   likely than not, as you describe it, developmental

7   lead exposure, you ruled out genetics because the

8   family didn't report a history of anyone else in the

9   family being -- having ADHD, right?

10     A.    I would have to look in my report quickly.

11  I'm not aware of any other ADHD in the family.

12     Q.    All right.  So that's -- based on that,

13  your interview with the family, that's how you ruled

14  that out as part of the differ -- differential

15  diagnosis -- or the final diagnoses, right?

16     A.    Yes.

17     Q.    And then with respect to spontaneous ADHD,

18  you ruled that out because why?  I -- I think I

19  understand what you said, but just explain it to me so

20  I make sure we have it.

21     A.    So if, in general, if there is a disease

22  or disorder that we are diagnosing, the -- we don't

23  rule out the sort of spontaneous or idiopathic case

24  first.  That's the last explanation when -- when

Highly Confidential - Mira Krishnan, Ph.D.

1    nothing else applies.

2         Q.    I see.

3              So what you are saying is that you made

4    the determination it was most likely the result of

5    developmental lead exposure because there was evidence

6    of that and, therefore, that's what you would say is

7    more likely than not as opposed to spontaneous, is

8    that right?

9         A.    Given that this is a child where I am not

10   aware of any family medical history of ADHD, there is

11   no clear complaint of issues related to ADHD predating

12   the water and there is known lead exposure and there

13   are no other known exposures that would explain the

14   symptoms, yes.

15        Q.    I want to ask you about your statement in

16   the paragraph preceding the Diagnosis section where

17   you say -- do you see it at the top of Page 8?

18              Let me bring that up for you.

19        A.    Please.

20        Q.    This sentence here:

21              "ADHD is not uncommon in the general

22   population, by it is known to occur with an elevated

23   rate in children exposed developmentally to lead, and

24   it is within the range of impairments established as

Highly Confidential - Mira Krishnan, Ph.D.

1   consequences of lead neurotoxicity, even at low

2   concentration levels."

3          And you cite to the Mason and the Lidsky

4   papers, right?

5      A.    Correct.

6      Q.    And then you go on to say:

7          "In the absence of any evidence supporting

8   any other potential cause of either E███ lead

9   exposure or his ADHD symptoms, it is more likely than

10  not" it is the "direct result of lead exposure through

11  the Flint water system."

12         Right?

13     A.    Correct.

14     Q.    So, with respect to this I am going to say

15  evaluation or analysis:  "It is known to occur with an

16  elevated rate in children exposed developmentally to

17  lead," what is your basis, the scientific literature

18  basis for that?

19     A.    It is cited in the two articles that are

20  referenced.

21     Q.    And is that also true that your -- the

22  second part of that sentence:  "It is within the range

23  of impairments established as consequences of lead

24  neurotoxicity, even at low concentration levels" as

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   well?

 2        A.    Correct.

 3        Q.    Okay.  So I'm going to --

 4        A.    So the -- the --

 5        Q.    Go ahead.

 6        A.    Sorry, sir.

 7        Q.    No, please, go ahead.

 8        A.    No, yes, that's correct.

 9        Q.    So, let's look at those papers, and I want

10   you to show me the sections of the papers that you are

11   relying upon for these statements that you make here,

12   okay.

13             So, I can't have both documents up at

14   once, so this is a situation in which, you know, it

15   would be useful if you could keep your report up on

16   your computer and I'll show you the papers or -- or we

17   could do it the other way around.

18             Which is the most efficient way, given

19   that we are doing this via Zoom, for you to show me

20   the sections of these two papers that you say support

21   these two conclusions that you have drawn here?

22        A.    I -- I think it's probably easier if I

23   look at the paper separately.

24        Q.    So you're going to look at the paper --
```

Highly Confidential - Mira Krishnan, Ph.D.

1      A.    The -- the journal articles.

2      Q.    Yeah, on your computer?

3      A.    Correct.

4      Q.    Okay.  Good.  Why don't you take the time

5    to do that.  Look at the -- look at the Mason, Harp &

6    Han paper first and then I'm going to close this down

7    and then when you find it, you can tell me where it is

8    and I'll bring that up on the screen.  Okay?

9      A.    Okay.

10           So in the Mason paper, I -- I believe here

11   I'm primarily referencing the Section 3.3 which begins

12   at the end of Page 3 and continues onto Page 4.

13     Q.    Okay.  So I have it up on the screen here.

14   Let's take a look at that, Executive Functioning,

15   that's the section, 3.3?

16     A.    Um-hum, that's correct.

17     Q.    So it is:  "Decreased executive

18   functioning abilities on switching and inhibition

19   tasks "(Trail Making Tests,)" et cetera, et cetera,

20   "have also been noted in a group comprised of

21   indiveg" -- "individuals with a peak exposure of

22   20 micrograms per gram" of "(tibia bone lead

23   measurement)."

24           But that's not what we have in EPPI

Highly Confidential - Mira Krishnan, Ph.D.

1    S███████ case, do we?

2        A.    That is a higher level than E████ S████

3    demonstrated.

4        Q.    It is -- it is triple, isn't it?

5        A.    I would have to check that number.

6              Yeah, it's about three times.

7        Q.    So are there any -- is there any

8    scientific literature that support your statement as

9    to developmental lead exposure for E████ S██████

10   besides this paper?

11       A.    In the other paper that's referenced,

12   there is a discussion of attention as well.  There --

13   this one talks about low levels of -- of exposure

14   based on blood levels and not bone, but there is a

15   cognitive discussion about it on Page 11 of the other

16   paper.

17       Q.    Well, wait a sec.  Let's stick with this

18   paper for a minute, if you would.

19              Are you saying that Mason, the Mason paper

20   also talks about cognitive impairments or

21   neuropsychological impairments due to low blood lead

22   levels?

23       A.    It -- it does.

24       Q.    Can you show me that?

Highly Confidential - Mira Krishnan, Ph.D.

```
1        A.    For instance --

2        Q.    Go ahead.

3        A.    The Section 3.1 which begins on the left

4   side of Page 3, you just scrolled past it, and then

5   continues to the top of that page.  It talks about low

6   blood levels.  These are blood levels.  Again, and I

7   think I have already mentioned that those -- that

8   this -- the neuropsychological literature does tend to

9   mix these two up, but it talks about stepwise

10  decrements beginning at 5 micrograms per deciliter.

11       Q.    Right.  So this -- this scientific paper

12  that you are referring to for supporting the opinions

13  that you've expressed reports on children who have

14  blood lead levels at 5 to 20 micrograms per deciliter

15  and then later on 5 to 50, but E███ S███   has -- the

16  only thing we know about his blood lead level is that

17  it was zero, right, negative?

18       A.    It was not necessarily zero.  It was less

19  than 3.3 micrograms per deciliter.

20       Q.    Well, it wasn't 5, was it?

21       A.    I think that that's -- that's -- I am not

22  an expert on blood lead level measure -- measurement,

23  but I think that that is probably within the error

24  rate of that test.
```

Highly Confidential - Mira Krishnan, Ph.D.

1      Q.    Well, you are relying on this paper to

2   establish that some of the symptoms that you

3   ultimately conclude constitute evidence of mild ADHD

4   is based on this paper, but this paper does not study

5   children who have bone lead measurements similar to

6   E█PPI█ S█PPI████  nor does this paper report on findings

7   for children who have bone lead level -- bone --

8   sorry -- blood lead levels less than five, right?

9      A.    I would have to look through the rest of

10   the paper, but I think that that is correct.

11      Q.    All right.  Well, let -- let's, if you

12   wouldn't mind, I want to make sure we close the loop

13   on this, see if you could find anywhere in this paper

14   that it reports on children with blood lead levels

15   less than 5 or bone lead levels in the 6 range that

16   E█PPI█ had reported.

17      MR. ROGERS:  While she is doing that, Juliana,

18   did we mark this as the next exhibit?  If not, I would

19   like to.  What's this number, please?

20      THE COURT REPORTER:  No. 8.

21      MR. ROGERS:  Thank you.

22           (WHEREUPON, a certain document was

23            marked Mira Krishnan, Ph.D.

24            Deposition Exhibit No. 8, for

Highly Confidential - Mira Krishnan, Ph.D.

 1                    identification, as of 10/05/2020.)

 2   BY THE WITNESS:

 3       A.    I think that you are correct, that those

 4   are the lowest levels that are explicitly mentioned in

 5   this paper.

 6   BY MR. ROGERS:

 7       Q.    So let's go to the other paper then,

 8   because I wanted to close the loop on that.

 9            Which was the other paper?  Lidsky?

10       A.    Lidsky and Schneider, yeah.

11                 (WHEREUPON, a certain document was

12                  marked Mira Krishnan Deposition

13                  Exhibit No. 9, for identification, as

14                  of 10/05/2020.)

15   BY MR. ROGERS:

16       Q.    Okay.  Would you mind doing what you did

17   before and look at that and find out where there is

18   support in that paper for your statement that A --

19   mild ADHD and the impairments that you found with E▮PPI▮

20   S▮PPI▮    were within the range of impairments

21   established as the consequences of lead neurotox --

22   toxicity, even at low concentration levels?

23       MR. ROGERS:  And we'll mark this, Juliana, this

24   will be -- the Lidsky paper will be Exhibit 9.

Highly Confidential - Mira Krishnan, Ph.D.

1   BY THE WITNESS:

2        A.    So, one example on this paper is on

3   Page 11.  The paragraph on the right column, the

4   fir -- the last full paragraph that begins with

5   "Winneke and colleagues."  And I'm sorry, Page 11

6   going by the numbers of the document -- of the journal

7   article, not the page numbers.

8   BY MR. ROGERS:

9        Q.    Thank you.  Just give me a second.

10       A.    It is actually Page 7.

11       Q.    Okay.  So I'm on Page 7 of 15 and 11 of

12   the -- of the paper.

13             Whereabouts, please?

14       A.    The last full paragraph on the right side.

15             So here again, they talk about lower

16   levels, this is a -- is a higher level of blood lead

17   than that is reported for E PPI, but the mean is

18   4.3 micrograms per deciliter, meaning the -- the

19   sample had blood level -- lead levels that included

20   the measurement threshold for the test that he took,

21   but, again, the primary finding was impaired

22   attention.  That's the sentence after the first

23   sentence, the second sentence.

24       Q.    But, again, you know, these all -- these

Highly Confidential - Mira Krishnan, Ph.D.

1    are all blood lead levels where the mean is 4.3 and

2    then the mean later on is eight, so how do these --

3    how does this study support your opinion about

4    inattention having been caused by lead exposure in

5    E██PPI -- E██PPI S██PPI██ case since his lead -- blood

6    lead level was negative?

7         MS. CARO:  I'm also going to object here.

8    Excuse me.  I'm going to object because you are

9    assuming that there is no testimony or will be no

10   testimony about the timing of blood lead levels, when

11   they were taken and that sort of thing, so I wanted to

12   interject that.

13   BY MR. ROGERS:

14        Q.    Go ahead, please, Doctor.

15        A.    That -- that issue of the timing of the

16   lead levels is outside of my expertise, but my point

17   with this article is that the lead levels in this

18   sample are very low.  The mean is 4.3 micrograms per

19   deciliter.  The upper 95th percentile value is 8.9

20   micrograms per deciliter.  Half -- about half of the

21   children in this sample had values even lower than

22   4.3 micrograms per deciliter, and they still had

23   impairments in attention.

24        Q.    Okay.  And you --

Highly Confidential - Mira Krishnan, Ph.D.

```
1        A.     So this -- this provides general support

2   for the idea that -- that attention deficits are seen

3   at low levels of blood lead.

4        Q.     What are the -- what are the other causes

5   of attention issues besides exposure to lead?

6        A.     I believe you asked me that question

7   already.

8        Q.     I'm not sure.  I think I asked you about

9   ADHD in general, but not specifically attention.

10       A.     Oh, there are a lot of causes of attention

11  problems.  What kind of category are you interested

12  in?

13       Q.     The ones that E███ S███  experienced.

14       A.     I'm not aware of any besides lead in

15  E███  case.

16       Q.     No, no, but I mean -- I'm sorry.  I'm not

17  talking about causes.  I'm talking about the type

18  of -- I thought you meant that there were different

19  types of inattention?

20       A.     I -- I don't think I said that.

21       Q.     So my -- my question is, I guess, let me

22  see how to phrase it.  What -- what type of

23  inattention is it that E███ experienced that is

24  similar to the type of inattention that is reported
```

Highly Confidential - Mira Krishnan, Ph.D.

1    here as part of his attention ADHD diagnosis that you

2    made?

3        A.    So, when psychologists use the term

4    "attention" neuropsychologically, they do tend to

5    include both what in the diagnostic criteria for ADHD

6    is referred to as inattention and also

7    distractability, impulse -- impulsivity and -- and the

8    other issues that are in the second set of criteria

9    that you looked at in the DSM-V, but, again, I believe

10   I already answered this, but he was distractible, he

11   lost his focus easily, he needed redirection to

12   complete tasks, he was impulsive, he responded without

13   thinking, he had an elevated activity level.  Those

14   are all markers of attentional problems.

15       Q.    So with respect to -- to close the loop on

16   this, this -- these two papers, have you now shown me

17   all of the sections of these two papers that support

18   the statements that you made at the top of Page 8 in

19   your report on E█PPI█ S█PPI█?

20       A.    Let me look at the Lidsky paper briefly,

21   please.

22       Q.    Sure.

23       A.    Let me briefly mention in the Lidsky

24   paper, if I draw your attention to Page 9 by the

Highly Confidential - Mira Krishnan, Ph.D.

1    paper's numbering, which is Page 5 in the document.

2         Q.    Yep.

3         A.    On the right-hand side the second full

4    paragraph begins:  "The effects of lead."

5         Q.    Um-hum.

6         A.    And so there it discusses some of the

7    pathophysiology, the destruction of dopaminergic

8    functioning which is normally involved in not only

9    motor control but also attention, memory and executive

10   functioning, can produce a host of behavior problems

11   including attention deficit, hyperactivity disorder,

12   as well as cognitive impairments, and so -- and -- and

13   then this is all being discussed again in the context

14   of developmental lead exposure.

15        Q.    Okay.  Thank you for that.

16              Anything else?

17        A.    And then there is one other place.

18              So, if you look at Page 12 in the -- in

19   the page numbering which is Page 8 in the document,

20   this is in reference to -- sorry.  I think you are not

21   on the right page.

22        Q.    Which one is it, 10 in the document or --

23        A.    Sorry.  Now I lost it.

24              Page 12 in the document, which is Page 8

Highly Confidential - Mira Krishnan, Ph.D.

1    of the PDF file.  Journal articles are page numbered

2    in a kind of strange way.

3         Q.    I think I have it now, yep.

4               Okay.  So the paragraph that's at the

5    bottom of your screen that begins:  "Long-term

6    follow-up."

7         A.    Yep.

8               So this discusses -- this does discuss

9    children with very high blood lead levels, but the

10   part that I want to draw your attention to is that --

11   so these children had inferred or measured high blood

12   lead levels, but -- and in the author's note in the

13   middle of the paragraph that the blood lead level was

14   actually only known for 25 percent of the exposed

15   cohort, but then at the bottom of the paragraph, at

16   the time of evaluation, blood lead levels of both

17   groups were low, the exposed group was 2.9 micrograms

18   per deciliter and the control group was 1.6.  And the

19   exposed group performed significantly worse on each

20   test of cognitive functioning.

21              And you see, again, executive functioning

22   is the area that would include things like attention,

23   is singled out there.

24              The reason I bring this up is that these

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    groups, at the time of the study, like in -- this is a

 2    follow-up after lead exposure, they demonstrated that

 3    the -- that impact can still be seen with very low

 4    blood lead levels that were lower than would have been

 5    detected by the study that was done in E███ case.

 6         Q.    Yeah, but that was in the -- the control

 7    group as referred to at the time of the testing that

 8    was done, they had those blood lead levels, but they

 9    were -- the cohort had already had blood lead levels,

10    you know, 30, 40, in the 50s, right?  I mean, they

11    were -- they were already --

12         A.    Right, those were -- those that were

13    mentioned.

14         Q.    Yeah, they already had massive lead

15    toxicity beforehand, before the testing was done?

16         A.    That's correct.

17         Q.    Okay.  Anything else in this article?

18         A.    I think that that's it for this article.

19         Q.    Okay.  Thanks.  I'll close that out for

20    now and stop sharing the -- well, I've got to go back

21    to your report here, so let's pull that up for

22    Mr. S███.

23              Oh, not that one.  Sorry.

24              I'm going to ask you some questions about
```

Highly Confidential - Mira Krishnan, Ph.D.

1    your recommendations beginning on Page 8 that I now

2    have up on the screen.

3            You -- you can still see that, my screen?

4        A.    I can, yes.

5        Q.    All right.  So, going back to E PPI

6    S PPI        diagnosis of mild ADHD, is there -- in terms

7    of treatment or recommendations for assisting the

8    child who is diagnosed with mild ADHD and being able

9    to perform in school and other activities, what are

10   those?  I mean, you must -- you must get involved in

11   that in your -- in your clinical practice, what are

12   those things that are either compensating mechanisms

13   or treatment or even medication or describe for a

14   patient who has mild ADHD who is nine years old, what

15   would the treatment plan be?

16       A.    There are -- there are a few options, and

17   oftentimes several of these are used simultaneously.

18           Medications are considered a relatively

19   primary mode of treating ADHD symptoms in the children

20   in this age range.  Those are typically -- I'm not a

21   prescribing physician, but generally speaking, those

22   are options like treating with stimulants, like

23   Adderall or Concerta.

24       Q.    Okay.  That -- that was medications.

Highly Confidential - Mira Krishnan, Ph.D.

1    Anything else?  I asked sort of the broad question

2    there?

3         A.    You did.  So the -- with very young

4    children we recommend psychotherapy as the first line

5    intervention.  Usually we recommend it as a sole or

6    first line intervention for children under five.  It

7    remains relevant for children in this age range.

8    Psychotherapy would be used to treat -- teach children

9    things like monitoring tools, using way -- external

10   references or other kinds of tools or knowledge to

11   better regulate their attention, teaching them

12   planning and organizational skills and other things

13   that they can use to compensate for ADHD.

14        Q.    Anything else?

15        A.    And then if you see in my report, Item 1

16   under Recommendations, I said that there may not be a

17   clear indication for an individualized education in

18   school at present, but there is an increased

19   likelihood that he would require one in the future,

20   and I outline in that first recommendation the kinds

21   of things that that individualized education plan

22   would consist of.

23        Q.    Okay.  Anything else in terms of treatment

24   for someone with mild ADHD?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.     Other than that we generally recommend

2   structured social activities, we -- we talk about --

3   as a psychologist I talk about children's need to

4   coregulate, meaning that we -- we all and children in

5   general and adults in general learn to regulate our

6   activity level, our attention and focus, our emotions

7   based on other people that we are in an environment

8   with.

9           In my experience, children with ADHD

10   symptoms often do well by learning how to function

11   around other children in structured activities, like

12   team sports or Scouts or something like that.

13           Then the other thing, sometimes we

14   recommend parent training.  Oftentimes that is part of

15   psychotherapy.  And then, finally, in the clinic it

16   wouldn't be uncommon for me to make lifestyle

17   recommendations, good diet and nutrition, reducing

18   food that is high in refined carbohydrates or sugars,

19   because those things cause volatility in children's

20   energy that can worsen these symptoms, consistent

21   sleep schedule, like we would make those kinds of

22   recommendations as well.

23      Q.     Do you know if any of E█PPI█ S█PPI█ -- if

24   his pediatrician or any of his treating physicians of

Highly Confidential - Mira Krishnan, Ph.D.

1   any type have ever made a diagnosis of mild ADHD?

2       A.    In reviewing the -- the written -- the

3   pediatrics notes that I reviewed are all of the ones

4   that are discussed in my evaluation.  I am not aware

5   that -- that pediatrics had made that diagnosis for

6   him.

7       Q.    And similarly, with respect to his

8   schooling, as a -- as you mentioned earlier, to date

9   at least or to date -- to the date that you did your

10  evaluation of him, the testing, you are not aware of

11  any IEP plan having been implemented for him.

12          Is that right?

13      A.    I -- I was not aware of that at the time

14  that I saw him.

15      Q.    In terms of these recommendations -- or

16  the -- the regimen or the range of treatments or

17  compensatory type things for someone with mild ADHD

18  who is nine years old like him, do you know whether

19  any of those have been considered or implemented by

20  the parents in consultation with any doctors or

21  educators or others?

22      A.    I'm not aware of them having done any of

23  that.

24      Q.    Do you know the extent to which those

Highly Confidential - Mira Krishnan, Ph.D.

1  treatment modalities or options that you described

2  have success, that is, in what percentage of patients

3  do the -- the treatment modalities that you described

4  result in improvement in the patients with mild ADHD's

5  functioning?

6      A.    So, generally speaking, my understanding

7  is that stimulant therapy is fairly effective.  I -- I

8  don't have exact numbers in front of me, but I want to

9  say that the rate of children responding to a first

10  stimulant trial positively is in the order of 60 to

11  80 percent of children.

12     Q.    Hmm.  What do -- what is a stimulant

13  trial?

14     A.    This is using medications that -- that

15  treat ADHD like Concerta or Adderall.

16     Q.    Are those --

17     A.    Or Vyvanse.

18     Q.    -- you are not a -- you are not a medical

19  doctor.

20          Am I right that that -- that the

21  consideration for whether or not to use medication in

22  a nine-year-old child who has mild ADHD, that's for a

23  doctor to decide, right, a medical doctor?

24     A.    That's for a medical doctor to decide.

Highly Confidential - Mira Krishnan, Ph.D.

```
 1        Q.     And do you know whether that's been
 2   considered or not for E███ S███      ?
 3        A.     To my knowledge it was not considered
 4   before I saw him.
 5        Q.     How about after?
 6        A.     I -- I don't have any information about
 7   his interactions with doctors after I saw him.
 8        Q.     In -- in your experience, is it common,
 9   uncommon, frequent, infrequent for children with mild
10   ADHD of the type that E███ has who are nine years old
11   to receive medication?
12        A.     It is fairly common for them to receive
13   medication.  It's also fairly common for these kinds
14   of symptoms to come to clinical attention around this
15   age.  The reason being that prior to about third
16   grade, in my experience, younger children, they don't
17   have a lot of independent work, so speaking generally,
18   they don't have a lot of homework, they don't -- they
19   are not asked to read long passages by themselves,
20   they don't have a lot of independent work in the
21   classroom.  Oftentimes when those start -- demands
22   start to increase around this age, there is a
23   significant increase in ADHD symptoms.
24               So clinically, probably the two times that
```

Highly Confidential - Mira Krishnan, Ph.D.

1    I see children most commonly referred for ADHD

2    evaluations are around four or five when they are

3    entering preschool and around this age when they are

4    hit -- when they are reaching a grade around third

5    grade.

6         Q.    Okay.  Given what your diagnosis is for

7    E███ S███████, would you expect that to the extent his

8    ADHD was caused by developmental exposure to lead that

9    if he is not exposed to lead anymore, the symptoms

10   would lessen or diminish or go away?

11        A.    So, I think that it's fair to say that, if

12   my diagnosis is correct, which I believe it is, then

13   if he is no longer exposed to lead, I would expect

14   that over time his bone lead levels would very slowly

15   decline, his blood lead levels would remain -- would

16   be negative, and I would expect the contribution of

17   the lead to resolve and for his functioning to

18   improve.

19        Q.    To what extent --

20        A.    I don't -- I'm not sure I'm able to give

21   you a specific degree or a timeframe for that, but I

22   would expect that general course.

23        Q.    So the extent to which he has mild ADHD

24   now and the symptoms that you found through your

Highly Confidential - Mira Krishnan, Ph.D.

1   testing or your evaluation or your interview, as long

2   as he is not exposed to lead going forward, you would

3   expect those symptoms to diminish, right?

4       A.    So, I would expect the severity in general

5   to diminish, although it's common in the context of

6   ADHD for there to be an increased visibility of

7   symptoms in certain kinds of situations.  That, again,

8   is -- is why I previously mentioned that I commonly

9   see referrals around the start of preschool and around

10  this grade level.

11      Q.    Well, but it then -- all right.  I guess

12  we'll leave it at that.

13            Let's turn to your Recommendation section

14  and I'll -- we -- I have that up on the screen now.

15            Can you see it?

16      A.    Yes.

17      Q.    So I want to get to this point here.  You

18  talk about he's -- how he:  "Is functioning

19  intellectually in the normal broad range.  He has the

20  cognitive capacity to succeed...he at present has

21  fairly normal academics in my standardized testing,"

22  such as his math, et cetera, although they do --

23  his -- his impulsivity and lack of attention appear to

24  limit his performance slightly, you say.

Highly Confidential - Mira Krishnan, Ph.D.

1              And you -- there you go on to say you

2     don't think that he at the present is in immediate

3     need for an IEP plan.

4              But this section here where you say:  "But

5     it is common for milder cases of ADHD not to be

6     apparent in school functioning until late elementary

7     school," you already mentioned that, I think, "and

8     there is a 25-50% chance that E**PPI** will need an IEP in

9     the future, to provide accommodations," et cetera, et

10    cetera.

11             What -- what's that number based on?

12    Where do you get that 25 to 50 percent figure from,

13    Doctor?

14        A.   It is a broad-range approximation based on

15    my clinical experience working with children with

16    similar symptoms.

17        Q.   So in the Bibliography that you prepared

18    there are no scientific papers that we could -- you

19    could point me toward to saying that somebody with a

20    mild ADHD would have a 25 to 50 percent chance that

21    he'd need an IEP in the future?

22        A.   I am not aware of one to point you to to

23    provide that specific answer.

24        Q.   Well, I -- I -- that's a -- I just don't

Highly Confidential - Mira Krishnan, Ph.D.

1    understand where you came up with that -- that number.

2              Are you saying that in your practice you

3    have kept records which would establish that for the

4    patients you see with mild ADHD at this age, there is

5    a 25 to 50 percent chance that they will need an IEP

6    in the future?

7         A.    I've followed children at this age with

8    similar symptoms, and that is an approximate

9    representation of the number of them that have gone on

10   to have IEPs.

11        Q.    Well, do you have any, you know, specific

12   databases where you have, you know, a database of here

13   are all of your patients that you've seen for mild

14   ADHD that you've diagnosed and then you've followed

15   them going forward into the future and that you have

16   the data that shows that 25 to 50 percent of them

17   needed IEPs?

18        A.    I do not.

19        Q.    It's a -- it's a guess, isn't it?

20        A.    It is an estimation.

21        Q.    But, I mean, it's an estimation based on

22   what?  You don't -- how many -- how many patients have

23   you treated or -- and diagnosed over the years who

24   have had mild ADHD?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.    I don't have a specific number, but it's

2   in the hundreds, at least.

3      Q.    Okay.  In the hundreds.

4            How many of them have gone on later to

5   have IEPs put in place?

6      A.    A significant number of them that I

7   estimate to be on the order of one out of four to one

8   out of two of them.

9      Q.    But how do you know that if you don't keep

10  the data?  I mean, it's just -- where is the data that

11  would establish that?

12     A.    The number is based on my clinical

13  expert -- experience.

14     Q.    Okay.  To the extent that you've had

15  patients in your clinical practice where IEPs have

16  been put in place to assist, what is the extent to

17  which the IEPs when put in place have helped the

18  patient -- the students perform better?

19     A.    They are usually helpful.

20     Q.    Usually meaning more than half the time?

21     A.    I think that that's very fair.

22     Q.    And then at the -- the next statement is

23  that you make there:  "His appropriate placement is in

24  a mainstream classroom."

Highly Confidential - Mira Krishnan, Ph.D.

1              He is in a mainstream classroom now,

2   right, or at least when you saw him?

3       A.    When I saw him, it was the summer, but I

4   believe he was in a mainstream classroom before that.

5       Q.    Before that.  Thank you.  Okay.  That's

6   right.

7              And your estimate there, there is some

8   chance, probably also 25 to 50 percent, that he will

9   require future tutor support of about one hour a day.

10             What's that based on?

11      A.    That, again, is based on my general

12  experience with these -- with patients with similar

13  symptoms.  I don't have a database to provide you a

14  number for that, but I think that it's reasonably

15  likely.  I don't think that there is a 100 percent

16  chance that he would need that service, but I think

17  that there is a significant chance that he would need

18  that service.

19      Q.    Okay.  I want to ask you about some other

20  statements that you make here in Paragraph 2 about

21  getting a diploma and so on.

22             So you say here:  "While IQ at the current

23  age is not completely predictive of long-term outcome,

24  individuals at this intellectual level are generally

Highly Confidential - Mira Krishnan, Ph.D.

1    able to graduate from high school with a diploma."

2              What does "generally" mean?

3         A.    Meaning that children with this IQ level

4    are well represented among children who graduate with

5    a diploma.

6         Q.    But at what percentages?  I mean, what's

7    "generally" mean?  Is it 50 percent, 90 percent,

8    95 percent, what?

9         A.    I don't have a percentage for that, but

10   E▇PPI▇ full scale IQ was 99.  That is an average

11   score.  What I can say is that his IQ in and of itself

12   would not be a predictor that would raise concern

13   about his failure to graduate from high school.

14        Q.    All right.

15              So then you say:  "However, there is an

16   elevated risk of high school dropout-even mild ADHD

17   increases this risk 2-3 fold (Fredriksen, Dahl,

18   Martinsen, et cetera [sic], 2014), to a risk of about

19   10-15% versus 5% in the general population?"

20              So let me just understand this before

21   we -- we get to the study.

22              In the general population, are you saying

23   that someone with a 99 IQ has -- only about 5 percent

24   of those folks don't go on to graduate from high

Highly Confidential - Mira Krishnan, Ph.D.

1   school and get a diploma?

2       A.   If I remember correctly, that -- that is

3   not based on a specific IQ level, but that's a more

4   general statement.

5       Q.   So, is it that what you are referring to

6   here is that in the general population -- well, I

7   don't know what -- I -- you explain it to me.  I'm

8   not -- I'm not following.

9            For someone with mild ADHD, are you saying

10  that for people who have been diagnosed with that

11  ailment that there is a 10 to 15 percent that they

12  will not graduate from high school?

13      A.   Yeah, it's a -- they graduate -- they

14  graduate from high school -- they -- they drop out of

15  high school or fail to graduate with 2 to 3 times the

16  frequency of the -- of non-ADHD comparisons.

17      Q.   So in the general population of non-ADHD

18  comparisons, 5 percent of kids don't graduate high

19  school, is that right?

20      A.   I think that that's correct.

21      Q.   And -- and what you are saying is these

22  studies that you -- we are going to look at in a

23  minute that you are going to show me, there is an

24  increase to 10 to 15 percent of kids who have mild

Highly Confidential - Mira Krishnan, Ph.D.

1    ADHD of non-graduation, right?

2         A.    Correct.

3         Q.    But that means that with -- there is a 90

4    to -- or an 85 to 90 percent rate for kids with mild

5    ADHD that do graduate from high school, right?

6         A.    Correct.

7         Q.    Okay.  Can you -- can we -- can you find

8    in that study where it is that these numbers are, and

9    also, while we are at it, is that where you get the

10   number above the 25 to 50 percent chance of dropout at

11   the post secondary level?

12        A.    I was not able to find a good specific

13   quantitative statistic for that and so that number is

14   based on my experience.

15        Q.    Well, wait a minute.  So --

16        A.    And is an -- is an approximation.

17        Q.    So there is not any scientific study

18   that -- and database that you can point me to that

19   says that there is a 25 to 50 percent chance of

20   someone with mild ADHD dropping out of college?

21        A.    I have been able -- there are papers that

22   point out the risk, but I'm not aware of a good

23   specific estimate for you, and so this is an estimate

24   based on my expertise.

Highly Confidential - Mira Krishnan, Ph.D.

1      Q.    Well, I'm -- yeah, but on what database?

2   What do you mean your expertise?  What's the -- what's

3   the scientific data for it?

4      A.    Again, I -- whenever I have access to

5   specific scientific results, I use them.  When I don't

6   have access to specific scientific results, I go off

7   my own clinical experience working with this

8   population.

9      Q.    So, again, and I ask you, do you have a

10  database that you could point me to of all of the

11  patients that you've seen who have mild ADHD and

12  you've followed them over the course from when you've

13  treated them up through the time that they go to

14  college and you're able to report statistics that show

15  that 25 to 50 percent of them don't make it through

16  college?

17     A.    I do not have such a database.

18     Q.    So how could you make this estimate?  What

19  is it based on?  It is a guess, isn't it?

20     A.    It is an estimation.

21     Q.    But -- but what's the database that it's

22  based on?  You just said that you don't have the data.

23     A.    I have the experience seeing the patients,

24  but I don't have a database to draw a specific

Highly Confidential - Mira Krishnan, Ph.D.

1   quantitative number from.

2       Q.   All right.  So for that number, 25 to

3   50 percent, as the number reported earlier, 25 to

4   50 percent, those are your estimates based on your

5   clinical experience, not any database or scientific

6   literature that you are aware of in the -- in the

7   field of neuropsychology or others, or things, right?

8       MS. CARO:  Objection; asked and answered

9   argumentative.

10  BY THE WITNESS:

11      A.   That's correct.

12  BY MR. ROGERS:

13      Q.   Okay.  Let's look at the Fredriksen, Dahl,

14  Martinsen paper.  Do you have that handy?  And I'll

15  pull it up on the screen, and you can point me to the

16  section that supports that statement that you made

17  there.

18           It is this one here?  I'm sorry, Doctor.

19  Could you look at the screen.  Is it this one here,

20  Fredriksen?

21      A.   Yes, I think that that's the right

22  article.  It is in the abstract.

23           So they talk about ADHD symptom severity

24  on a continuum and they do refer to high levels of

Highly Confidential - Mira Krishnan, Ph.D.

1    symptom severity.  I did characterize it as clinically

2    mild, but diagnosable ADHD is -- is -- I consider to

3    be significant in and of itself.

4        Q.    But -- but where is the -- where are the

5    numbers that you referred to me that there is a three

6    times higher amount of non-graduation rate?

7        A.    It is at the end of the partial paragraph.

8    It is on -- it is on your screen.

9              "High levels of ADHD symptom severity in

10   childhood were related to dropping out of high school

11   [odds ratio (OR) = 3.0]."  That's what an odds ratio

12   is.

13       Q.    Okay.  Where -- where did you refer to the

14   significant or level of severity of the ADHD patients

15   that are included in this group, this cohort that was

16   studied?

17       A.    Just a moment.

18             So, they used a test, this is in the

19   odds -- this is in the regression analysis that's in

20   Table 3 on Page 95.

21       Q.    Yeah.

22       A.    They used a different measure than I used.

23   They used the WURS-25, which, I believe, is a German

24   measure.  But, and so I attempted to draw an analogy

Highly Confidential - Mira Krishnan, Ph.D.

1    from that to the measurements that we have available.

2          And so if you see the WURS category that

3    is high, the adjusted odds ratio is 3.

4    Q.    So what -- so which test that you

5    administered or which criteria that you evaluated

6    would be comparable to the WURS, W-R-S (sic)?

7    A.    The hyperactivity index in the -- the

8    hyperactivity index in the BASC.

9    Q.    How do you know that they are

10   comparable --

11   A.    B-A-S-C.

12   Q.    How do you know that they are comparable

13   for saying that using this paper that focused on the

14   WURS for a threefold increase versus the BASC

15   information that you used?

16   A.    The -- the -- the WURS scale, The Wender

17   Utah Rating Scale, is described on Page 90 of this

18   report.

19   Q.    Um-hum.

20   A.    And they explain their quartiles and I

21   used the percentile data from the BASC as a comparable

22   index.

23   Q.    Okay.  Are you aware of any studies like

24   this paper that we're referring to now that used the

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    BASC scaling as a -- and use it in an analysis of the

 2    potential for increased rates of dropping out of high

 3    school for kids with ADHD?

 4         A.    I am not.

 5         Q.    The -- the WURS sample, WUR -- The Wender

 6    Utah Rating Scale data that's reported here in this

 7    table, Table 3, is that in the range of mild ADHD,

 8    severe, moderate, what?  It's all what they are

 9    reporting is that the -- the incidence, the threefold

10    increase in dropping out of high school is in the high

11    range, right?

12         A.    Yeah.  My understanding is that all -- all

13    clinically significant ADHD would be in the high

14    range.

15              What complicates answering a question like

16    this is that you can't do a study of whether

17    nine-year-old children have dropped out of high school

18    because nine-year-old children don't drop out of high

19    school.  This is a retrospective study looking at

20    people who had ADHD in their childhood and assessed

21    them when they were adults, which is why they used the

22    Wender scale, which is a retrospective ADHD scale.

23              Neuropsychologists don't have time

24    machines or crystal balls, so we are not able to go
```

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    into the future or into the past in an explicit kind

 2    of way.  In some alternate world where we could travel

 3    through time, we would travel through time and see

 4    what happened to a child like E███.  Because we can't

 5    do that, we have to compile information from a range

 6    of sources, one of which is retrospective analysis of

 7    adults who have ADHD as raised as children.

 8         Q.    So in terms of your estimates that you

 9    made based on your clinical practice, getting to this

10    time machine travel issue that you just correctly

11    pointed out, during what period of time is it that you

12    are referring to that you've had patients in your

13    clinical practice that had ADHD when they were nine

14    years old and then you know what happens to them in

15    high school?

16         A.    I typically -- I do -- do not typically

17    follow children all -- all of the way from nine to

18    their mid adult years, but I have seen a cross-section

19    of -- of youth and young adults and I have worked with

20    a number of young adults who have ADHD histories.

21         Q.    But is that -- I'm -- I'm asking you for

22    the timeframe, is the clinical practice in your

23    experience that you rely upon on which to make your

24    estimates that you described earlier from 2015 through
```

Highly Confidential - Mira Krishnan, Ph.D.

1  now when you've been in your private practice?

2     A.    I -- I am using my experience all

3  throughout my training and -- and my practice at Hope

4  Network and -- and in private practice.

5     Q.    Okay.  Let's see if there is anything else

6  we need to finish up with █PPI S█PPI█ here.

7           Oh, yeah, the last -- let me go back to

8  that report.

9           The last sentence here, do you have it up

10  on your screen?

11     A.    Yes.

12     Q.    "There is an" -- "There is, overall, an

13  increase" -- "also an increased risk of working below

14  █PPI█ potential, such as preventing success in a

15  skilled vocation, (that is, reducing his work to

16  simple, unskilled work below his potential if his

17  attention and impulsivity issues were not a concern)."

18           What's the basis for that statement?

19     A.    That's based on my general experience with

20  this population clinically as well.

21     Q.    So, again, you know, what's the data?  Do

22  you -- do you have data on the amount of your patients

23  that you've seen clinically over the years who have

24  had mild ADHD who then when they get into their

Highly Confidential - Mira Krishnan, Ph.D.

1  working life have a higher percentage of working in

2  unskilled labor versus, you know, the general

3  population?

4       A.    In my experience working with adults with

5  ADHD, it's extremely rare that they work in skilled

6  populations, but -- but there are some that I have

7  seen who have worked in skilled populations -- in

8  skilled settings.

9       Q.    Okay.  But -- so what you are saying

10  though is that that's -- that's at the stage where an

11  adult is in the work -- you know, in his -- in his

12  employment life, not -- let me -- bad question.

13          What you are saying is that people --

14  patients -- people who have ADHD when they are adults

15  and they are working have a higher rate of working in

16  unskilled job -- jobs than peep -- people who don't

17  have ADHD, right?

18       A.    People who have ADHD histories.

19       Q.    Going back to nine years old?

20       A.    Typically that's the age range at which

21  ADHD is diagnosed.

22       Q.    I know.  But you already said that, you

23  know, with treatment and some of these other

24  modalities and since it was caused by, in your

1   opinion, developmental lead exposure, that you would

2   expect the symptoms to diminish over time, right?

3   In -- in E▮▮▮▮ S▮▮▮▮'s case?

4        A.    I would expect some diminishment.  And, in

5   general, ADHD patients also diminish over time.

6              What the Fredriksen paper shows is that

7   although symptoms diminish over time, there is still

8   adverse outcomes.  Although educational interventions

9   are effective, there are still frequently adverse

10  outcomes.

11        MR. ROGERS:  Okay.  Let's take a five-minute

12  break.  We are making decent progress.  I know this

13  is -- you know, it is just painstaking to go through

14  all of the data with you, so why don't we take a, you

15  know, five-minute break, we'll continue on.

16              The next thing I'm going to ask you about,

17  Dr. Krishnan, is -- and we are going to do this in the

18  same order for each of the plaintiffs, I'm going to go

19  through the report and ask you questions about what's

20  in the report and your conclusions and then I'm going

21  to go into the actual underlying test data that we --

22  that you have and I'll ask you some questions about

23  that.

24              So, just as a preview, next thing we are

Highly Confidential - Mira Krishnan, Ph.D.

1    going to look at is E███ S███ test data, okay,

2    and interview forms and all of that stuff.

3        THE VIDEOGRAPHER:  Off the record, 2:16 p.m.

4            (WHEREUPON, a recess was had

5            from 2:16 to 2:23 p.m.)

6        THE VIDEOGRAPHER:  Back on record, 2:23 p.m.

7    BY MR. ROGERS:

8        Q.    Okay.  Doctor, like I said, we are going

9    to go through the underlying test data, the tests that

10   you conducted and the interviews and things, the

11   information you got for E███ S███.

12            What's this page here?  Is this a summary

13   sheet of the testing that was done?

14       A.    So, first of all, you earlier stated that

15   my test results were not in my reports, but that is

16   incorrect.  The tabulated test results are in each of

17   the reports.  That section is called Test Results

18   Comma Tabulated.

19            You requested the -- the raw data, the

20   protocol forms.  This sheet that you are currently

21   looking at is the summary sheet I used during the data

22   track, which tests I'm doing in what order.

23       Q.    I think you misunderstood what I said.

24   What I said is, yes, we have the test results, but we

Highly Confidential - Mira Krishnan, Ph.D.

1   need the normative scoring criteria.  That -- that's

2   what we are looking for.

3       A.   Okay.  The normative scores are also in

4   the report.

5       Q.   I know the normative scores are in the

6   report, but the -- the scoring criteria or sheets that

7   describe, you know, how you got to the -- the scores

8   that you did are not included.  For example, a

9   particular score of this number, what does that mean

10  on the -- the test result.

11          Do you understand what I am saying?

12      A.   I'm not sure I do, but if you can show me

13  an example, I'd be glad to address it.

14      Q.   Well, let's do that when we go through the

15  individual test reports.

16          So this first one is, as you were saying,

17  a summary of all of the tests that were administered,

18  right?

19      A.   Correct.

20      Q.   And so, for example, let's take this WISC,

21  the Wechsler Intelligence Test.  Well, let's go

22  through this a little bit differently.

23          Is this your handwriting on the form?

24      A.   It is my handwriting.

Highly Confidential - Mira Krishnan, Ph.D.

1    Q.    And the order here is the order in which

2  these tests were administered?

3    A.    Correct.

4    Q.    Is there any particular reason for doing

5  it in an order -- in this particular order?

6    A.    There are multiple reasons.  Most

7  neuropsychologists, in my experience, have a

8  preference order of doing testing.  Sometimes there

9  are certain tests that are done early in a battery

10  because they change the test plan for the remainder of

11  the battery, and then there is certain tests that

12  are -- that are separated from other tests in a test

13  battery in order to minimize interference of one test

14  on the results of another test.

15    Q.    Okay.  So that's the why -- those -- in

16  combination, that's the reason you did these tests in

17  this order that you described?

18    A.    Correct.

19    Q.    And then it says down here something that

20  you talked about earlier is the timeframe:  Hours with

21  neurologist face-to-face, 8:45 to 12:00.

22          Does that include the interviews that you

23  did with the parent -- parents or parent?

24    A.    I think it does not in this case.  I think

Highly Confidential - Mira Krishnan, Ph.D.

1   that the interviews started at 8:00 and this is --

2   this is referring to the testing.

3       Q.    All right.  So these -- this sheet here

4   doesn't give the scores, right?  It just gives the

5   order in which they were done and which tests, the

6   boxes that you checked off, right?

7       A.    I am providing that as a courtesy in case

8   the neuropsychologist you retained wants to understand

9   the order in which the tests were administered,

10  correct.

11      Q.    Yeah, no, I'm just asking, they don't

12  retain the results, that's all I'm asking, right?

13      A.    No.  The results are in the report.

14      Q.    Right.

15            So let's go to -- what I'm trying to get

16  at in terms of how you scored these, let's use this

17  WISC as our first example, and I'll explain to you

18  what I'm talking about and hopefully that will help

19  you understand what I'm talking about.

20            So, this first page --

21      MR. ROGERS:  Oh, by the way, Juliana, we'll make

22  this as Exhibit 9, is that right?

23      THE COURT REPORTER:  Exhibit 10.

24      MR. ROGERS:  Ten.  Thanks.

Highly Confidential - Mira Krishnan, Ph.D.

```
 1                 (WHEREUPON, a certain document was

 2                  marked Mira Krishnan, Ph.D.

 3                  Deposition Exhibit No. 10, for

 4                  identification, as of 10/05/2020.)

 5    BY MR. ROGERS:

 6         Q.    Is there any reason why in these forms you

 7    didn't put the child's name, the examiner's name, the

 8    test date, the birth date and all of that kind of

 9    stuff?

10         A.    These forms, in my experience, are

11    intended in some cases to be used individually or in a

12    one-off basis.  What I do in my clinical practice is I

13    have a folder full of all of the tests for a child and

14    I just keep them together and I -- I don't fill out

15    all of that information on the forms because it does

16    not change anything.

17         Q.    So, for this test, there is a standard

18    sort of battery of tests that are contained within the

19    WISC-5, right?

20         A.    Correct.

21         Q.    And they are all listed here on the side

22    in -- in terms of subtests, right?

23         A.    Correct.

24         Q.    So what I was getting at in terms of the
```

Highly Confidential - Mira Krishnan, Ph.D.

1    scaled score is there is, for this subtest, the Block

2    Design, the raw score that was recorded was 22 and

3    then there is a scaled score number, the 10.

4                How did you convert, what normative type

5    scaling conversion did you use to get the score -- the

6    raw score of 22 down to a scaled score of 9?

7         A.    It's the -- in the case of a WISC, this is

8    an age-corrected scaled score.  It is -- it is part of

9    the WISC test kit.

10        Q.    I see.  So when you -- when you then take

11   the scaled scores and you total them all up and you

12   report the end result, what is the normative test

13   scaling that you used for that?

14        A.    So, do you mean -- so, first of all,

15   the -- this -- the terms that -- the numbers that are

16   referred to as scaled scores, I should explain that

17   they have an average of 10 and a standard deviation of

18   3.  So the average -- the 50th percentile of the

19   population approximately scores 10 and the -- one

20   standard deviation on either side scores from 7 to 13.

21   The index scores that are slightly below where you are

22   on this screen at present are -- have an average of

23   100 and a standard deviation of 15.

24                There are historical reasons for why these

Highly Confidential - Mira Krishnan, Ph.D.

1  scores are scored this way.  But, again, the index

2  scores are computed from the sum of scaled scores

3  using the test kit.

4      Q.    Well, that's what I mean.  So where is

5  the -- the information?  Where can I find in these

6  documents the information that you just described

7  about what the scaled scores are and the standard

8  deviation and all of that stuff?

9      A.    The scaled score -- the standard scores

10  are immediately below on the page.  The VCI and FRI

11  and full scale IQ, they are in the boxes marked

12  "composite score."

13      Q.    But, I mean, yeah, I know they are -- I

14  know they are listed there, but I guess I'm not -- for

15  some reason we are having a -- a miscommunication

16  here.

17          The -- what you do on this score sheet is,

18  when you get down to this level, for verbal

19  comprehension, you just add up all of those numbers

20  for verbal comprehension that are reported up above,

21  right?  And then you get the scaled score.  But where

22  are -- where are the -- where are the documents that

23  describe how you convert a full -- the scaled scores

24  and the composite scores to a full scale sum of the

Highly Confidential - Mira Krishnan, Ph.D.

1    scores and then the IQ, the full scale IQ?

2       A.    They are part of the Wechsler Intelligence

3    Scale for Children test kit.

4       Q.    Okay.  So is there a different Wechsler

5    Intelligence Scale test kit for children or is there

6    just one?

7       A.    There are -- if I understand that

8    correction correctly, there is -- there are -- so this

9    is one kind of IQ test.  There is a version of this --

10   there is a variant of this IQ test for preschoolers,

11   there is a variant of this IQ test for school-aged

12   children, which is this one, and then there is a

13   variant of this test for adults.

14      Q.    Okay.  So what I'm -- what I'm trying to

15   get at is that you've given us the scores and you've

16   then done the sum of the scaled scores and the

17   composite score and you end up, for full scale

18   intelligence, of this one of 99 for E███ S███   .

19            But what I don't see, I don't have the

20   test kit that shows, you know, these conversions for

21   how these are done for this particular age group of

22   kids aged nine.

23            So where -- where do we go to find that?

24      A.    You would have to obtain a Ph.D. in

Highly Confidential - Mira Krishnan, Ph.D.

1  psychology and then purchase a WISC test kit from the

2  publisher.

3      Q.    I see.

4            So what you are saying is that if I were

5  to -- if -- let me ask it this way just so we -- I

6  don't want to misunderstand each other.

7            If -- if I were to consult with my expert

8  neuropsychologists and I were to say to them, Okay,

9  help me understand and figure this -- this information

10 out here, they could go to the standard WISC-V test

11 kids for which category, young adults?

12     A.    The WISC-V is the test for children.

13     Q.    Okay.  Thank you.  So this --

14     A.    If --

15     Q.    Go ahead.

16     A.    If you have --

17     Q.    Go ahead.

18     A.    Sorry.

19           If you -- if you consulted a

20 neuropsychologist and they looked at this test

21 protocol, they could add up the raw scores, generate

22 the scaled scores and generate the index scores using

23 the Wechsler test kit themselves, yes.

24     Q.    I see.

Highly Confidential - Mira Krishnan, Ph.D.

1          So these -- the -- the -- they could take

2    these same numbers that you've determined here to be

3    the raw score and then what the scaled score is and

4    then they could input it into the program and it would

5    come out with the -- the final -- the full scale IQ

6    and the full scale down here, right?

7          A.    Yes, I believe so.

8          Q.    All right.  So, at any rate, in terms of

9    the full scale intelligence for E███ S███    , you --

10   you have described that earlier, it was 99, in the

11   average range, right?

12         A.    Correct.

13         Q.    So, in -- in terms of these -- all of the

14   writing on these going to this page that I'm on now,

15   14 of 129, this is all your handwriting here, right?

16         A.    That's my handwriting.

17         Q.    So where -- where is the actual test

18   results for the WISC-V that E███ S███   completed?

19         A.    There is no document that the patient

20   completes excepting, if you scroll down further, there

21   is a test that the -- the child writes on that I will

22   show you.

23         Q.    Okay.  But it is --

24         A.    It is after this section.

Highly Confidential - Mira Krishnan, Ph.D.

1    Q.    It is not in the WISC-V?  Or it is?

2    A.    It is in the WISC-V.

3    Q.    I see.  So I'll just continue to scroll

4    down to it.

5          So all of these tests, basically up until

6    the point we are at here is the child is taking the

7    test but you are recording what the responses are?

8    A.    Correct.

9    Q.    Is it a -- is it a test on paper or is it

10   a computer-generated test?

11   A.    This particular test?

12   Q.    Yeah.

13   A.    It's a -- it uses -- it uses physical

14   stimuli.  It is not on a computer.

15   Q.    Okay.

16   A.    Or at least I did not administer it on a

17   computer.

18   Q.    So where is the one where the -- the child

19   actually filled out some of this?

20   A.    It is a one-page document.  It should be

21   immediately after this one in the file.

22   Q.    The letter-number sequencing tests that

23   are on here, is this -- did -- was this test actually

24   performed or are these just random numbers here?

Highly Confidential - Mira Krishnan, Ph.D.

1    A.    Those are optional tests.  That's what the

2  form looks like when it hasn't been filled out.  I did

3  not administer that test.

4    Q.    Right.  How did you go about determining

5  which portions of the test you administered versus

6  which ones you didn't?

7    A.    So, in general, I make this decision based

8  on my clinical expertise, my review of the broad

9  neuropsychological literature, my prior consultation

10  with other neuro -- with other psychologists.

11          In the case of the WISC, the full scale IQ

12  requires the first seven subtests and those are the

13  ones I typically administer.

14    Q.    I see.  So then after the first seven it

15  would be basically discretionary based on the

16  examiner's, you know, analysis?

17    A.    That's like the WISCs are used by

18  individuals other than neuropsychologists.

19          Stop here, please.

20    Q.    Yeah.

21    A.    Those -- these tests are -- these tests

22  are sometimes used by people who complete no other

23  testing besides the -- the WISC.

24          In the case of neuropsychologists, what we

Highly Confidential - Mira Krishnan, Ph.D.

1   typically do is something called a flexible battery

2   approach.  We compose a battery that is built together

3   from different tests that are validated to answer

4   different kinds of questions.  It's common in my

5   experience for neuropsychologists to not use every

6   subtest of a test like the WISC.  In fact, I don't --

7   I cannot name a neuropsychologist who would administer

8   every subtest of the WISC.

9        Q.    So is this the page you wanted me to stop

10  at, because this is the one that he actually filled

11  out himself?

12       A.    If I understand your correct -- question

13  correctly, and certainly you can consult with a

14  neuropsychologist that you have retained to clarify

15  this as well, but the way that the -- the WISC test

16  works, the only part that requires E PPI, in this case,

17  to write anything on a piece of paper is the test of

18  coding, which is the one that is on the screen right

19  now.

20       Q.    So what does this mean, tell me how this

21  works.

22       A.    This is a test of processing speed, and so

23  just above where you are on this screen, there is a

24  code of special marks that go with different numbers.

Highly Confidential - Mira Krishnan, Ph.D.

1              You have to scroll up a little bit

2    further.  There it is.

3        Q.    I see.

4        A.    So the child is given a set amount of

5    time.  And, again, I -- I want to be clear that I --

6    there are test security issues here and I have

7    concerns about you, being a non-psychologist,

8    reviewing the raw data.  Typically our professional

9    organizations recommend that I would have sent this

10   material to your consulting psychologist and if you

11   wanted an explanation of it, you could get it from

12   them.

13             But this is a test of processing speed.

14   The child is given a set amount of time to rapidly do

15   a simple task, in this case transcribing these codes.

16       Q.    Okay.  It looks like we are at the next

17   one.

18             What is the WRAT-5?

19       A.    That test is a test, it's a WRAT -- WRAT-5

20   stands for Wide Range Achievement Test.  It is a test

21   of academic achievement.

22       Q.    Okay.  And I have the same question for

23   you here.  Where -- where are the -- where can I find

24   the norms, meaning, you know, how do you convert the

Highly Confidential - Mira Krishnan, Ph.D.

```
1    raw score into a standard score and, you know, that it

2    ultimately gets to the grade equivalent?

3         A.    The answer is the same.  The test

4    publisher includes it as part of the test kit.

5         Q.    So --

6         A.    And it is available to any psychologist.

7         Q.    Right.  So the same thing, with respect to

8    this one, if my neuropsychologists have the WRAT test

9    kit, you've provided the information by which they

10   could put these scores in and come up with the same

11   analysis, right, based on the actual results?

12        A.    Correct.

13        Q.    So did you find -- what were the results

14   of the WRAT testing with respect to E███ S███, and

15   I'm looking at Page 7 of your report?

16             Oh, I'm sorry --

17        A.    So, they are --

18        Q.    Doctor, sorry.  Excuse me.  One thing.  I

19   forgot to ask you this question.

20             You know, in terms of the diagnosis that

21   you made of E███ S███ was that he had ADHD.  Is

22   there anything about his test results in the WISC-V

23   that were evidence that formed part of the basis for

24   the diagnosis of mild ADHD in him?
```

Highly Confidential - Mira Krishnan, Ph.D.

1       A.      No.

2       Q.      Because that -- that doesn't test for

3   that, right?

4       A.      Correct.

5       Q.      Okay.  And so basically the -- the overall

6   final or full scale IQ test, he -- he performed at --

7   the score was a 99.

8               Where does that fit in within the range of

9   scores?  You called it average.  Tell me about that,

10  for -- going back to the WISC-V?

11      A.      It's very close to the 50th percentile.

12  I -- I could look that number up for you, but it's

13  like the 48th percentile or something like that.

14  About half of children do worse and half of children

15  do better.

16      Q.      Excellent.  Thank you.

17              Okay.  Same thing with respect to the

18  WRAT-5, WRAT-5 I guess you call it, where did -- what

19  were the results there?

20      A.      They are tabulated on Page 6 of my report.

21      Q.      Yep.

22      A.      And then they are discussed on Page 4 at

23  the bottom.  The -- they were largely normal accepting

24  that when I asked E█PPI█ to do math, he tried a very

Highly Confidential - Mira Krishnan, Ph.D.

1  large number of questions and he got a very small

2  number of them correct.  This is mentioned at the end

3  of Page 4 and the beginning of Page 5.

4      Q.    What does that mean?

5      A.    It can mean a number of things.  Sometimes

6  children who are highly motivated will try tasks

7  outside of their ability even though they are not able

8  to do them.  What I thought was noteworthy in his case

9  was that he made certain kinds of errors that are

10  sometimes seen in children who have nonverbal learning

11  problems, and those errors are the ones that are

12  described on Page 5 of my report.

13      Q.    So in terms of the -- this particular

14  test, what you -- what it arrives at is grade

15  equivalence for the -- for the particular test of the

16  examinee, right?

17      A.    That is one of the -- one of the ways of

18  looking at it, yes.

19      Q.    Because I'm looking at your summary of

20  the -- of the tests here and it says, you know, word

21  reading, 97 is the score and it is a grade equivalent

22  of 3.0, math computation, 86, grade equivalent of 2.5,

23  sentence compilation, 95, grade equivalent 3.1.

24          So those are basically all within the

Highly Confidential - Mira Krishnan, Ph.D.

1   range of where E███ S███  was when you saw him,

2   right, after the third grade?

3       A.    Correct.  The -- the math computation is

4   psychometrically low average.  A scaled score of 86 is

5   about one standard deviation below average, but

6   it's -- it's not a score that we consider impaired.

7       Q.    Okay.  What's the next test, the G -- oh,

8   did any of these -- did any of the results of this

9   test form part of the basis for your opinion that he

10  has mild ADHD?

11      A.    The only thing is the impulsive errors on

12  the math testing.

13      Q.    Okay.  Thank you.

14            What's the GPT?

15      A.    Grooved Pegboard Test.

16      Q.    Hmm.  And tell me --

17      A.    It is a test of motor dexterity.

18      Q.    Okay.  And tell me how that was conducted.

19      A.    It is a -- it's essentially a test that

20  requires a person to manipulate small pegs and place

21  them in a pegboard.  It is done one hand at a time and

22  it is a way of comparing -- it's right here -- it's a

23  way of comparing motor dexterity for the -- the

24  dominant and non-dominant hands.

Highly Confidential - Mira Krishnan, Ph.D.

1      Q.     And how -- what were the results of that?

2      A.     They are on the screen right now and they

3   are also on Page 6 of my report.

4      Q.     Yeah.  What I meant was on the report.

5             So the pegboard test, what is the -- I

6   don't know what this means, R DOM 83, zero drops, et

7   cetera, et cetera.

8             What -- what are the results in terms of

9   whether it shows any impairment of E▮▮▮ S▮▮▮▮?

10     A.     It does not show impairment.

11     Q.     So he was -- you know, how is this one

12  scored?  Normal?  Mean?  You know, percentiles?  What?

13            How does the -- how does the scoring work

14  on this?

15     A.     So the Z score is -- again, this is

16  something that your -- your neuropsychologist would be

17  familiar with, but a Z score has an average of zero

18  and a standard deviation of one.  So, scores that are

19  within one standard deviation of average go from minus

20  one to plus one.

21     Q.     And his was what?

22     A.     Minus 0.6 for his right hand and plus 0.3

23  for his left land.

24     Q.     I see.  Thank you for that.

Highly Confidential - Mira Krishnan, Ph.D.

1           So, again, for the -- the way that --

2    there is -- there is a -- a metric, so to speak, for

3    the Grooved Pegboard test that's put out by the

4    creator or the company that created this test that

5    will describe what the Z scores are and what they

6    mean, right?

7       A.    In the case of three, I think, tests that

8    I used, the Grooved Pegboard, the Trail Making Test,

9    and the Controlled Oral Word Association, which I did

10   not administer to E███, those tests I used norms that

11   are published in a book by Ida Sue Baron that's --

12   that's commonly used for that purpose, and if you'd

13   like, I can -- I can produce that reference.

14      Q.    Yes, see, that -- that's what I need

15   for -- if -- if the tests that were done like the WISC

16   and the -- the -- the others where the, you know, kit

17   package, I think you referred to it as, will -- has

18   the norms and all of the scoring information, if you

19   used some type of reference material that's not of

20   that type, I'd like you to tell me about it.  So,

21   please, yes.

22           So the Grooved Pegboard, the scoring

23   references you got from some other publication or

24   textbook, is that right?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.     Correct.  It's a -- it's a classic child

2  neuropsychology textbook that -- that most

3  neuropsychologists have.

4      Q.     Excellent.  And what's the name of that

5  textbook and -- and the page where I can find this

6  reference, if you have it?

7      A.     I don't have it in front of me, but I -- I

8  can give you the name of the textbook.

9      Q.     Please.

10     A.     I can produce that.

11     Q.     Yeah, do you -- do you know what the name

12  is or do you need to take a look at it?

13     A.     I -- I need to find it.

14     Q.     Okay.  So why don't we do that then.

15     MR. ROGERS:  I -- I don't need it today or

16  anything, but can we have an agreement then, Louise,

17  as well, that the doctor will get this reference so

18  that I can give it to my experts to figure out, you

19  know, how this particular Grooved Pegboard test was

20  scored?

21     MS. CARO:  Sure.

22     MR. ROGERS:  Thank you.

23  BY MR. ROGERS:

24     Q.     Okay.  And what was the other one, Doctor,

Highly Confidential - Mira Krishnan, Ph.D.

1    that you mentioned that is within that same type of

2    category where there was another reference that you'd

3    have to look at to -- to score -- to figure out what

4    these scores mean?

5        A.    I used that same book for the next test,

6    the TMT, and then I use it for a test, Controlled Oral

7    Word Association, COWA.  I did not administer that

8    test to EPPI, but I think I administered it to one of

9    the other bellwethers.

10       Q.    Excellent.  Okay.

11             So just to go back, the Grooved Pegboard

12   test, we already determined he basically fell within

13   the -- the normal range in that, right?

14       A.    Correct.

15       Q.    And then the -- the TMT, the trail mark --

16   trail -- that's the Trail Making Test?

17       A.    Correct.

18       Q.    And that you're going to provide to me the

19   section of that neuropsychology test -- textbook that

20   you used to score this test, is that right?

21       A.    I'm going to give you a reference to that

22   textbook.

23       Q.    Yeah.  I mean, you are going to give me

24   the reference to the textbook, but you are going to

Highly Confidential - Mira Krishnan, Ph.D.

1    refer me in the reference to the section of the

2    textbook where it has the criteria that you used for

3    scoring the trail mark -- Trail Making Test, right?

4         A.    If that's what you wish, I can do that.

5         Q.    Yes, that's what I'm asking for.  I don't

6    know what -- we seem to be having some failure to

7    communicate, probably on my part.

8              I'm just making sure that by the end of

9    this deposition I know and, therefore, my experts will

10   know what you used to score all of these tests that

11   you did.

12             So with respect to -- to just clarify,

13   with respect to this last one, the Grooved Pegboard,

14   there is a section of a textbook in neuropsychology

15   that you used to score this that you are going to

16   provide to me, right?

17        A.    I am going to provide you a reference to

18   it.

19        Q.    Yeah, but when you use the word

20   "reference," you are going to provide me with the name

21   of the textbook and the page or pages where the

22   scoring criteria that you used that applied to this

23   Grooved Pegboard test is found, right?

24        A.    Yes, I can do that.

Highly Confidential - Mira Krishnan, Ph.D.

1        Q.    Okay.  Thank you.  That's all I'm trying

2    to get at.

3             And the same is true with respect to this

4    one, the next one, the trail mark -- Trail Making

5    Test, you are going to do the same thing for that,

6    provide me with the neuropsychology reference textbook

7    and the pages where the scoring criteria are that you

8    used for this test, right?

9        A.    It is the same book for the three tests

10   and I can give you the page numbers for each of the

11   three tests.

12       Q.    Exactly.  Okay.  Now we are -- now we are

13   clear.  Thank you.  That's what I would like.

14       A.    All -- all of the other tests that were

15   administered were scored using the test kits or

16   manuals, and so these are things that your

17   neuropsychologist would have available to them.

18       Q.    Okay.  As long as -- that's true as long

19   as I make sure we know which, you know, is it for the

20   children or which version of it you used, so let's

21   make sure we do that.

22             Okay.  Were there any abnormalities or --

23   in the Trail Making Test results for E███ S███  ?

24       A.    So, this is really not an appropriate way

Highly Confidential - Mira Krishnan, Ph.D.

1    to review neuropsychological test results.  As your

2    neuropsychologist has probably also told you, we never

3    evaluate tests in isolation.  We look for patterns

4    across a battery of tests that sample all of the major

5    test areas.

6              I can tell you the scores that are

7    impaired and I can tell you what I think they mean,

8    but this is not the way that a neuropsychologist would

9    do this.

10        Q.   Well, were any of the scores impaired on

11   this test?

12        A.   Yes, the -- the Trail Making A score was

13   impaired in the test and that's discussed in the

14   report.

15        Q.   Okay.  Show me in the -- your report where

16   that is that -- to what extent it was impaired?

17        A.   In the middle at Page 6 is the tabulated

18   test result.  The Z score is minus 1.3.

19        Q.   And what was --

20        A.   And this is discussed at --

21        Q.   Go ahead.

22        A.   Sorry?

23        Q.   Go ahead.

24        A.   And then this is discussed at the second

Highly Confidential - Mira Krishnan, Ph.D.

1  full paragraph on Page 5, he did relatively more

2  poorly on an esual -- easy visual scanning and

3  sequencing test, TMTA.

4      Q.    But I -- what -- the -- the summary on

5  Page 5 does not match up with the summary under the

6  TMT that you are reporting.

7          Why don't you just explain to me what

8  these numbers mean?  A and B are the two different

9  tests, right?

10     A.    Correct.

11     Q.    And then the next reference is zero --

12 does that mean zero error, zero ERR?

13     A.    Correct.

14     Q.    And then the Z score is 1. -- minus 1.3.

15         So his was that -- he made zero errors in

16 the normative Z score is minus 1.3?

17     A.    The normative Z score is based on the

18 time, not the number of errors.

19     Q.    Oh, I see.

20         So was -- so what was his score?

21     A.    38 seconds with a Z score of minus 1.3.

22     Q.    And -- and where does that fall within

23 the -- you know, the expected scores?

24     A.    That's minus 1.3 standard deviations below

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   average.

 2        Q.    I see.

 3        A.    That's a typically accepted cutoff for

 4   impaired.

 5        Q.    Okay.  And the -- the references to how

 6   that Z score is determined is minus 1.3, that would be

 7   in this reference textbook that you are going to

 8   provide to me?

 9        A.    This is general knowledge to

10   neuropsychologists.

11        Q.    Okay.  And then what's the B scores for

12   the B part of the test?

13        A.    The B score is within normal limit.

14        Q.    Okay.  Thank you.

15              Now let's go on to the next one which is

16   the CVMT.  What's that?

17        A.    It stands for Continuous Visual Memory

18   Test.  It is a test of visual memory.

19        Q.    Okay.  And how did he perform on this one?

20        A.    He had generally a pattern of over

21   responding, so he -- this test requires a child to

22   recognize new visual stimuli and discriminate them

23   from old ones.  He responded to most everything, which

24   is why the hits and false alarm scores are elevated
```

Highly Confidential - Mira Krishnan, Ph.D.

1    and why the total score is relatively low but not

2    impaired.  He did poorly on delayed recognition, below

3    the 10th percentile.

4        Q.    And what does that mean?

5        A.    That means that he was not able to

6    remember the information he initially learned after a

7    delay.

8        Q.    I see.  So is this one of the tests that,

9    because its part -- it would be part of the test kit

10   for this PAR organization, P-A-R?

11       A.    That's the publisher.  This is -- this

12   test is described at the top, any psychologist can

13   order the CVMT test kit and manuals.

14       Q.    So in terms of which -- are there dif --

15   is there only one type of CVMT test that's

16   administered or how is it described so that I can have

17   my guys get the test kit if they don't already have it

18   and figure out how to score this or check the scoring?

19       A.    There is only one version, and this is

20   something your psychologist would be able to do.

21       Q.    Okay.  Thanks.

22             Is there something in the test results for

23   the CVMT that formed part of the basis for your

24   conclusion, the diagnosis of mild ADHD in him?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.     In -- I -- no.

2      Q.     Okay.  Thank you.

3             Let's go to the next one, the CVLT.

4   What's that?

5      A.     CVLT stands for, as you can see on the

6   screen, California Verbal Learning Test.  The C stands

7   for children.

8      Q.     Got it.

9             And so is this one where there is a

10  standard test that's administered for children that

11  you've -- that -- the test that you did?

12     A.     It's -- it's the one that's on the screen,

13  yes.

14     Q.     So, again, the test package for that test

15  would have this information?

16     A.     Correct.

17     Q.     Were there any decrements or impairments

18  that you found on -- based on this test?

19     A.     On this test the -- the major finding was

20  that he had inefficient learning.  He was low average

21  in general on learning trials, but when you add

22  together his ability to learn information over

23  multiple trials, it was impaired compared to other

24  children his age.

Highly Confidential - Mira Krishnan, Ph.D.

1     Q.    Where is that reported on the test report

2  form here -- I mean in your report?

3     A.    It's tabulated on Page 6 under CVLT-C.

4     Q.    Yeah, I know that, but, I mean, which one?

5     A.    T 1-5, that T score of 31.

6     Q.    I see.

7     Were any of the others besides that one

8  impaired?

9     A.    The -- the others were generally low

10  average.  My -- we don't consider minus 1.0 to be

11  impaired.

12     Q.    All right.  The next one is the -- I think

13  the NEPSY.

14     What's that test all about?

15     A.    The NEPSY is a neuropsychological battery

16  for children.  In principle, you can administer the

17  whole thing and it -- it tests a variety of cognitive

18  domains.  In my experience people don't generally do

19  that, but it has a test of a -- sustained attention,

20  auditory attention response, which I administered.

21     Q.    So, is that, the NEPSY test that you

22  administered up on the screen now, it begins with this

23  page, Auditory Attention and Response Set?

24     A.    That's correct.

Highly Confidential - Mira Krishnan, Ph.D.

 1      Q.    I see.  And is this one also where my

 2   neuropsychologist could go and, you know, have -- find

 3   the test kit to score this?

 4      A.    Yes, they could.

 5      Q.    Okay.  So what were the results of this as

 6   reported on Page 6 of 9 of your report?

 7      A.    There was some impulsive responding in the

 8   first subtest, but generally speaking, this was within

 9   normal limits.

10      Q.    Okay.  Thank you.

11            The next one is the TOL, Tower of London.

12            Is that different from the NEPSY?

13      A.    Yes.  It's the Tower of London.

14      Q.    I see.

15            So the same thing here.  The 2nd Edition -

16   Child Record Form, for 7 to 15-year-olds, there is a

17   test kit where my folks could go and find it and do

18   the same scoring you did, right?

19      A.    That's correct, but also in this case the

20   scoring is on the next page.

21      Q.    All right.  Oh, I see.

22      A.    You actually don't really need the test

23   kit.

24      Q.    I see.  Yeah.

Highly Confidential - Mira Krishnan, Ph.D.

1        Okay.  So what were the results of this

2   test?

3        A.    That test was also within normal limits.

4   The only observation that was significant for that one

5   was the one that is mentioned in Page 5 of my report,

6   mid paragraph in that paragraph discussing frontal

7   executive functions where he seemed to be stuck on

8   doing a very simple example and then he thought that I

9   had presented the example to him incorrectly and --

10   and I thought that that was more likely to have been

11   intentional lapse.

12        Q.    Hmm.  Okay.

13        And what -- I'm seeing here on your test

14   scores the underlying data sheet.  We are now at the

15   green nonverbal MSVT, but on your test report were --

16   I mean, in your report itself, we are at the Vineland.

17   What's the -- explain to me what's going on here.

18        Is this -- is the Green Non-Verbal test

19   different or part of another test?

20        A.    It is the first test that's at the end of

21   Page 5 in the report.

22        Q.    Oh, I see.  Okay.  This just got mixed up

23   in the whole -- thank you.  This just got mixed up in

24   the order in which you did them.

Highly Confidential - Mira Krishnan, Ph.D.

1           Okay.  What's this test all about, what's

2   it measure?

3       A.   It is a measure of effort or validity in

4   testing.

5       Q.   And what were the results?

6       A.   It did not raise concerns.

7       Q.   Thank you.

8           All right.  And then let's see if I can

9   find, move on.  Oops.

10          Yeah, the Vineland-3.  Okay.  Is this one

11  where -- tell me how this test is administered,

12  please?

13      A.   This test is ad -- administered as an

14  interview, as it says on the screen, so what I -- what

15  the psychologist does is I ask in general and -- and

16  as necessary a more specific questions about a child's

17  independent skills and I make ratings that an --

18  that -- in a --a web-based form.

19      Q.   I see.

20          So you have a series of questions or

21  inquiries that you asked of the parents.  Is that the

22  way -- or the parent in this case?

23      A.   Correct.

24      Q.   And those questions or those subject

Highly Confidential - Mira Krishnan, Ph.D.

```
1   matters that you address with them, where is that

2   found within the Vineland-3 materials?

3       A.    In this case it's administered on a

4   computer, and so there is no document I have.  It is

5   something that would be available to your -- your

6   testing -- your -- your evaluating -- your consulting

7   psychologist.

8       Q.    Yes.  So I think what I'm trying to get at

9   here is that there is -- if I'm not mistaken, there is

10  a -- for this one, isn't there at the end of it a

11  section of actual your scores that you -- yeah, okay.

12          Is this it where you -- can you see this

13  now, we are on Page 88 of 129 of this exhibit?

14      A.    Yes.

15      Q.    So it says here:  "Names at least three

16  actions," and your score for that is "2".  That --

17  that score that you entered here is 2 based upon the

18  parent's description of what they told you in response

19  to this item that is "names at least three actions,"

20  right?

21      A.    So, the way that the Vineland works, the

22  psychologist avoids asking really specific questions,

23  like can your child name three actions.  In general we

24  ask more general questions that elicit that
```

Highly Confidential - Mira Krishnan, Ph.D.

1    information and if that doesn't work, then we ask a

2    more specific question.

3        Q.    Okay.  So what does a score 2 mean?

4    What -- what's the range of scores that you can put in

5    here?

6        A.    This is, again, something that your

7    consulting psychologist would be familiar with, but a

8    2 is a -- is a score that means the person is able to

9    do the task independently.

10       Q.    What is the range of scores though, would

11   it be 0, 1, 2, 3, 4?  What -- what are the potential

12   scores that you can get here?

13       A.    This is, again, a question that your

14   neuropsychologist would know the answer to, but the --

15   the way that these items on the Vineland are scored

16   are 0, 1, or 2 and 0 means that the child is usually

17   not able to do the task.  1 means they are able to do

18   it sometimes or partially and then 2 means that they

19   are able to do it fully.

20       Q.    Got it.  Okay.

21            So, let's take an example.  For No. 44 you

22   were attempting to determine whether E███ S███

23   could write reports or papers, essays of at least one

24   page and you scored a zero because the parents told

1    you he couldn't do that essentially, that is what you

2    learned?

3         A.    Correct.

4         Q.    I see.

5              So is it -- am I correct that for each of

6    these items what you're -- the way that you go about

7    gaining the information by which you scored, is there

8    isn't a specific list of questions that you asked, but

9    you -- you inquire of the -- of the parent or the

10   parents and then you get a sense of what the score

11   should be based on what they tell you?

12        A.    There -- there are different ways to

13   administer this test.  That is the way that I

14   administer it.  There is an alternative where you

15   actually just have the parent fill this questionnaire

16   out and provide the answers directly, but in my

17   experience it is not very accurate.

18        Q.    I see.

19              So the way you did it is, for example,

20   let's pick another one, this one about the phone, 24,

21   "Talks with a familiar person using a phone, etc."

22              You just inquire of them if E▮PPI S▮PPI▮

23   could talk on a phone, you know, and he is familiar

24   with the person using it, so on and so forth, and you

Highly Confidential - Mira Krishnan, Ph.D.

1    rated that as a 2, he could do that?

2         A.    Correct.

3         Q.    I see.

4               Okay.  So in terms of -- if -- if my -- my

5    folks could take all of these scores and I thought you

6    had a -- yeah, here it is.  This -- is this the sheet,

7    Page 15, where all the scores correspond to those

8    items that we just started to look at?

9         A.    Yes, I believe so.

10        Q.    All right.  And so then down at the end,

11   how -- how do these -- how were these total scores

12   calculated or generated to come up with any specific

13   conclusions?

14        A.    The answer is the same as the last several

15   times that you've asked this type of question.  To

16   give you a detailed answer, you would have to complete

17   a Ph.D. in psychology and become trained to do what we

18   do, but the brief version is that if your psychologist

19   wanted to recreate the scores, they would use the test

20   material, the test manual or kit from the publisher of

21   the Vineland.

22        Q.    I see.

23              And there aren't -- there aren't different

24   variations of this, there is just one test kit for

Highly Confidential - Mira Krishnan, Ph.D.

1   these particular items?

2       A.    There -- there are variations, but the

3   variation used is identified on the first page of the

4   report, of the -- of this printout.

5       Q.    Okay.  Can you show me that, please, just

6   to make sure, is it right up here on this page here?

7       A.    Yeah, if you see where it says:

8   "Domain-Level Interview Form Report," any psychologist

9   would know exactly what that means.

10      Q.    "Domain-Level" -- so the -- the report

11  form, "Domain-Level Interview Form Report," that's a

12  specific type of format within Vineland-3, 3rd

13  Edition, is that what you are telling me?

14      A.    Correct.

15      Q.    Okay.  And what were the overall results

16  of this or any -- and -- and any conclusions that you

17  drew from the -- from this test?

18      A.    This test was normal.

19      Q.    Oh, okay.  Thank you very much.  Let's

20  move onto the BASC-3.

21            I think I just went past it too fast, am I

22  right, this is part of it here?  I see.

23      A.    I think you are at the -- you are about 18

24  pages into it.

Highly Confidential - Mira Krishnan, Ph.D.

```
 1      Q.     Okay.  Thank you.

 2             While I'm getting to it, why don't you

 3      describe what the BASC-3 is intended to get, you know,

 4      information about?

 5      A.     This -- so BASC test or Behavior

 6      Assessment System for Children, it is a parent report

 7      measure.  There are also other forms, like teacher or

 8      self report versions, but what it allows for is -- it

 9      asks parents about a number of different things that

10      they may or may not see for their children and they

11      rate those things based on how often they see them,

12      like never, sometimes, often or almost always, and

13      then they -- those -- those responses are aggregated

14      into -- I'm sorry.  Those responses are aggregated

15      into domain areas, like hyperactivity, or inattention,

16      or depression, and their responses are compared to

17      other parents of children of the same age and then

18      they can also be compared to disorder populations,

19      like children with emotional disorders or children

20      with social disorders.

21      Q.     Um-hum.  I see.  Okay.

22             And so this -- this was a -- a test that

23      you administered to the mom and you did the same type

24      of thing that you did with the Vineland where you
```

Highly Confidential - Mira Krishnan, Ph.D.

1    raised these subject matters with her or asked

2    questions and then, based on her response, you put in

3    a particular score.

4              Do I have that right?

5        A.    No.  This is a -- this is actually a

6    parent questionnaire.  They use a computer tablet to

7    select the answers.

8        Q.    I see.  Thank you very much for that.

9              So, there would be -- for this particular

10   BASC-3, where is the information that I could show to

11   my experts where they would know which of these, you

12   know, forms came up on the screen that the mom filled

13   out.

14             Is this one --

15       A.    It should be on the last page.

16       Q.    Okay.  It is not on the first page here at

17   all?

18       A.    I'm sorry.  Can you say the question

19   again?

20       Q.    Yeah, I'm trying to get -- you said so the

21   way this test is administered to the mom, she sits in

22   front of a computer and there is a -- there is a

23   template or a form that comes up and she looks at the

24   questions or the -- the subject matters and then she

Highly Confidential - Mira Krishnan, Ph.D.

1   actually inputs the information into it, it's not

2   something that you do by way of interview.

3           Do I have that right so far?

4       A.   That's correct.

5       Q.   So what I'm looking for is where is the

6   information about which particular series of subject

7   matters or questions would be presented to the parent

8   that she filled out, where is that reported on this?

9           Are you saying it's right at the end of

10  the document?

11      A.   The -- the -- the responses that she gave

12  are on the last page of the document.

13      Q.   I -- I get that.  So it looks like I'm on

14  it now.  There is 175 responses with the scaled

15  scoring, but where -- where do I find reference to the

16  items numbers, like Item 1, what is Item 1?

17      A.   You would get that from the publisher.

18      Q.   I know, but which -- which version of this

19  BASC-3 parent rating scale would we want to look at to

20  make sure that we have the right items?

21      A.   This, again, is a question that your

22  psychologist wouldn't ask, and I apologize, because it

23  would be more obvious to them than to you, because of

24  the nature of their training, but the BASC-3 parent

Highly Confidential - Mira Krishnan, Ph.D.

1    rating scale is the form type and then they would

2    choose the right form based on E███ age at the time

3    that it was administered, and so there is a version

4    for, in this case for children from age 6 to 11 which

5    is the only version of the BASC-3 parent rating scale

6    that would be an applicable to E███.

7         Q.    Okay.  So I appreciate your patience with

8    me.  You don't have to keep saying that my

9    neuropsychologist would know the answers to questions

10   I'm asking you.  I -- I assume that to be true, but

11   I'm the one asking you the questions and I need to

12   have an understanding of it despite your earlier

13   comments about, you know, normally you only give this

14   information to neuropsychologists.

15            So I appreciate your patience.  I think

16   we've now covered it.  I just wanted to make sure that

17   we had a record at the end of the day of what tests

18   you administered, how you administered them, how the

19   parents filled them out or -- or whatever that we can

20   use to evaluate your overall opinions.

21            So it's clear that if I were asking you

22   questions about the law, you know, you would probably

23   not know the responses as well as Louise would, so

24   enough -- enough commentary.

Highly Confidential - Mira Krishnan, Ph.D.

1            The -- what -- what was your overall

2    conclusion for the test results for the BASC-3 with

3    respect to E▓PPI▓ S▓PPI▓   and the diagnosis of ADHD

4    mild?

5       A.    So, I will draw your attention to the

6    beginning of the report.   If you go back up to the,

7    let's see, the Page 9, which may be Page 106 in the

8    document.

9       Q.    Okay.   Thank you.

10      A.    I'm sorry.   Actually, that's not right.

11   It's further up than that.   It's Page 3.

12      Q.    Okay.   Got it.

13      A.     This one.

14      Q.    Yep.   I'll make a little -- sorry.   Bear

15   with me a second.   Sorry.   There we go.   Okay.

16      A.    Okay.   So this is a -- basically what this

17   does is it takes the questions that the parent has

18   asked and decomposes them into different content

19   areas, and the -- as indicated on the screen, we

20   consider scores about the threshold in the dark gray

21   to be clinically significant, we pay attention to

22   scores that are in the light gray as being at risk,

23   meaning that they're maybe are not clinically

24   significant but they are concerning, and then the

Highly Confidential - Mira Krishnan, Ph.D.

1    scores in white are normal.

2            And so, as you see and in the report also,

3    the hyperactivity index is in the dark gray and at the

4    bottom of the page you see a percentile in the general

5    population indicating that hyperactivity is described

6    as worse than 97 percent of the general population.

7        Q.    Okay.  Thank you.  That's very helpful.

8            So where the black dots appearing on this

9    graph going across from left to right, if you go up,

10   I'll just demonstrate so you know what I'm talking

11   about, I think I do.

12           So for hyperactivity I'm moving the cursor

13   up and the T score, the way this was rated based on

14   the parent's response, that's up in the gray area

15   above 70 and his score, E██ S██       score based on

16   the parent's completion of this test was 72, and what

17   you are saying, that's in the 97th percentile for

18   hyperactivity, right?

19       A.    Correct.

20       Q.    I see.  And then so going across,

21   aggression, the score was 65, T score, that's the 92nd

22   percentile, so that's why it is at risk.  I see.

23           At what -- is the 50 -- is this line, the

24   50 going across, is that the 50th percentile,

Highly Confidential - Mira Krishnan, Ph.D.

1    basically?

2         A.    Are you still able to hear me?

3         Q.    Yes.

4         A.    Okay.  Sorry about that.  My headset went

5    dead.

6         Q.    Oh.

7         A.    The -- so unfortunately we use a lot of

8    different scoring metrics and I know you don't want me

9    to repeat it, but, again, this is something that your

10   neuropsychologist would be familiar with, but these

11   scores have been --

12        Q.    Hold it.  Hold it.  Is this something that

13   my neuropsychologist would be familiar with?

14        A.    It is.

15        Q.    Okay.  That's what I -- I get it.  You

16   don't have to tell me that again.  Go ahead.

17        A.    The T -- a T score of 50 is -- is average

18   and so, yes, it is at the 50th percentile, but a --

19   the standard deviation is 10 and so a T score of 60 is

20   one standard deviation above average, a T score of 70

21   is two standard deviations above average.

22        Q.    So the -- the sections of -- or the -- the

23   components of this test where he was -- E███ S███

24   was at risk would -- would be hyperactivity,

Highly Confidential - Mira Krishnan, Ph.D.

1    aggression, externalizing problems and somatization,

2    right?

3         A.    The -- the externalizing problems is a

4    summary index and so it's computed from the first

5    three items to the left of it.

6         Q.    Okay.

7         A.    But, so, yes, he -- he was elevated for

8    hyperactivity and then he had borderline levels of

9    aggression and somatize -- somatization.  Somatization

10   means a tendency to experience distress via physical

11   symptoms.

12        Q.    I see.  Okay.

13              Okay.  I think that's been very helpful.

14   Thank you.  I don't think there is any other data,

15   right, that we see?

16              What does this section of the report here

17   mean where, let's just pick this one, Emotional

18   Control Index, 44, is that Item 44 on the -- on the

19   test materials?

20        A.    Correct.  So I think that the report that

21   the -- that the system generates gives you items that

22   you might be particularly interested in as a

23   psychologist just so that you can look at them.

24        Q.    I see.

Highly Confidential - Mira Krishnan, Ph.D.

1          But, for example, the parents when they

2    were entering in -- in a score for overall executive

3    function here on "Pays Attention," does this mean --

4    does this "Sometimes" mean that's what they wrote or

5    that's what they input?

6          A.    Correct.

7          Q.    And then from that, if it's "sometimes"

8    there would be a numerical score that's associated

9    with that?

10         A.    Correct.

11         Q.    Okay.  I see.  And they are here, yeah.

12         MR. ROGERS:  Okay.  That's good.  Let's take

13   another five-minute break -- actually, no, let's

14   finish this up first.

15   BY MR. ROGERS:

16         Q.    Would you -- would you -- because we are

17   pretty much done with E███ S███  and we can now turn

18   to our next one, T███, but have you -- have you now

19   explained the basis for your opinion that E███

20   S███ , based on your evaluation and the testing and

21   the interviews with the parents, has a mild -- mild

22   ADHD?

23         A.    I believe I explained the basis for that

24   already in my report and I stand by my original

Highly Confidential - Mira Krishnan, Ph.D.

1    statement.

2         Q.    Yeah, would you just summarize it for me

3    to make sure we have it before we leave E███ S███ ?

4              Basically tell me what's -- what's the

5    basis for your opinion based on all of the work and

6    evaluation that you've done that he suffers from mild

7    ADHD?

8         A.    His parents reported symptoms that were

9    consistent with ADHD.  When they filled out a

10   questionnaire that is validated by comparing them to

11   parents of other similarly aged children, they

12   endorsed very high levels of hyperactivity.

13   Hyperactivity and impulsivity were also evident in my

14   testing of E███ and they are seen in multiple settings

15   as the ADHD criteria generally require, and so, based

16   on the core -- the consistency between the parent

17   report, the questionnaire report and the testing

18   results, I made a conclusion of ADHD.

19        Q.    Thanks.

20        MR. ROGERS:  Let's go off the record for five

21   minutes and we'll turn to T███ next.  Thank you.

22        THE VIDEOGRAPHER:  Off the record at 3:24 p.m.

23              (WHEREUPON, a recess was had

24              from 3:24 to 3:33 p.m.)

Highly Confidential - Mira Krishnan, Ph.D.

```
 1        THE VIDEOGRAPHER:  Back on record.  3:33 p.m.

 2   BY MR. ROGERS:

 3        Q.    Okay.  Dr. Krishnan, turning to the

 4   plaintiff A████ T██, am I saying it right, is it

 5   A████ T██?

 6        A.    Yes, I believe that's correct.

 7        Q.    Okay.  So just to get some basic stats

 8   like we did with E██ S███, let me bring up her

 9   report -- your report on her, I mean, and here it is.

10   Here is the first page.

11        MR. ROGERS:  Juliana, let's just make sure, I --

12   I did ask that the underlying data test report for

13   E██ S███ be marked as the next exhibit, right?

14        THE COURT REPORTER:  Yes, you did.

15        MR. ROGERS:  And so let's mark this report by

16   Dr. Krishnan for A████ T██ as exhibit, what would

17   this one be now?

18        THE COURT REPORTER:  Eleven.

19        MR. ROGERS:  Eleven.  Thank you.

20                (WHEREUPON, a certain document was

21                 marked Mira Krishnan, Ph.D.

22                 Deposition Exhibit No. 11, for

23                 identification, as of 10/05/2020.)

24   BY MR. ROGERS:
```

Highly Confidential - Mira Krishnan, Ph.D.

1      Q.    At the time you did your evaluation, she

2  was 11 years old, she had just completed the fifth

3  grade, right?

4      A.    Correct.

5      Q.    And she's -- her date -- the date of the

6  evaluation was June 21st, 2020, right?

7      A.    Correct.

8      Q.    Her date of birth was or is PPI,

9  2009, right?

10     A.    That's correct.

11     Q.    I want to direct your attention to Page 1

12  down at the bottom here in terms of the blood lead

13  level that was measured.  Similar to what we saw with

14  the S PPI boy, for the T PPI girl, as far as you

15  know, the only blood lead level measurement for her

16  that was ever taken was on January 12th of 2016 and it

17  was reported as less than 3.3 micrograms per

18  deciliter, right?

19     A.    To the best of my knowledge.  That's the

20  only result I saw.

21     Q.    And then for the bone lead scan, that was

22  reported here on the next line, April -- sorry --

23  August 15th, 2019, bone lead assessment

24  9.65 micrograms per gram, right?

Highly Confidential - Mira Krishnan, Ph.D.

```
 1       A.    Correct.

 2       Q.    And as I asked you before -- well, would

 3   you -- you would consider A█████ T███ s blood lead

 4   level test to be negative, right?

 5       A.    Correct.

 6       Q.    Just as you did with S███  , right?

 7       A.    Yes.  I didn't say negative in this case,

 8   but yes.

 9       Q.    Yeah, that --

10       A.    I believe that that's negative.

11       Q.    Thank you.  That's why I asked, yeah.

12             And then for the bone lead -- or actually,

13   for each of these, either the bone lead -- sorry --

14   the blood lead level or the bone lead level, you don't

15   know what the averages are for someone who is age 11

16   at these times when these tests were done, right,

17   nationally?

18       A.    You -- you showed the blood lead levels on

19   the screen earlier in the deposition, but, no, I -- in

20   general I only considered them against

21   neuropsychological evidence of impairment based on

22   levels.  So the answer is the same.

23       Q.    Yeah.

24             For the period of time that the T███ girl
```

Highly Confidential - Mira Krishnan, Ph.D.

```
1    was drinking the water or not drinking the water, I

2    think we covered this before, that's -- whatever

3    information you have about that is contained in your

4    report based on a dis -- a summary of what is in the

5    mother's deposition testimony, correct?

6         A.    Correct, unless it was in one of the other

7    report documents, in which case I mention it there,

8    but I don't think that it was.

9         Q.    Right.  So, am I correct that there --

10   there isn't, at least from your evaluation and your

11   summary of the information provided by Ms. T▉PPI▉, that

12   there wasn't a definite stop date for when she stopped

13   drinking the water?

14        A.    That was my understanding in reviewing the

15   deposition.

16        Q.    And you had mentioned that that was

17   because Ms. T▉PPI▉ reported in her deposition that, you

18   know, that her daughter continued to drink tap water

19   or hose water, stuff like that, out of the spigot

20   outside, right?

21        A.    Correct, and I believe she also reported

22   that they attempted to get a filter but it was not

23   compatible, I believe, with their home.

24        Q.    Yep.  So, but in terms of the amount of
```

Highly Confidential - Mira Krishnan, Ph.D.

1    lead that the T███ girl had in her bones, same with

2    respect to S███, what that means is that that's a

3    cumulative -- it is a measurement of the cumulative

4    lifetime lead exposure of her up until the point in

5    time at which the test was done, right?

6         A.    Yes, that's correct.

7         Q.    Okay.  So let's -- let's go to the

8    report -- your report at the end where you have your

9    diagnosis and we'll do the same.  What we'll do is try

10   to go through this in the same order that we did with

11   S███, and I think it will move more quickly now

12   that I understand the test documents better and now

13   that you won't have to tell me that I don't understand

14   them as well as you or the expert -- my experts, so

15   hopefully this will go quickly now, a little more

16   quickly anyway.

17             So your diagnosis for A███  T███ is, as

18   I've highlighted here:  "Overall, my diagnostic" --

19   "primary diagnostic impression is neurocognitive

20   disorder (G31.84) -- .84 -- "and mood disorder (F39)

21   resulting from lead exposure."

22             Right?

23        A.    I believe if you are intending to share

24   your screen you are not currently sharing your screen.

Highly Confidential - Mira Krishnan, Ph.D.

1    Q.    I'm -- I'm sorry.  I will do that, yeah.

2          Actually, I -- I had intended to share my

3    screen before when I highlighted other sections of

4    your report.  So let -- let me just go back and do

5    that so I can show it.

6          So when I was referring to the blood lead

7    levels and the bone lead levels, that -- that wasn't

8    on the screen before?

9    A.    Correct.

10   Q.    All right.  Well, I'm going dough go back

11   and do that then just so we have it.

12   A.    Sorry.

13   Q.    There they are -- thank you.  No, that's

14   all right.

15         There they are on the first page, these

16   two highlighted sections.  There is the negative blood

17   lead level and then the 9.65 for the bone lead, right?

18   A.    Correct.

19   MS. CARO:  And I'm just going to point out again

20   the same as I did as the other one, that are you

21   assuming that there is going to be no other testimony

22   or there has been no other testimony about lead

23   levels.  I just want to get that on the record.

24   BY MR. ROGERS:

Highly Confidential - Mira Krishnan, Ph.D.

1    Q.    So, with respect to the diagnosis that you

2    have of neurocognitive disorder, I noted that in some

3    of the other plaintiffs you rated it as either, I

4    think, mild for both, when we get to them for

5    V**PPI** and W**PPI**, but with respect to T**PPI**, is

6    it -- did you not rank the severity level for some

7    reason or -- or explain that to me?  You just have

8    neurocognitive disorder.

9    A.    I apologize.  I -- that was an oversight,

10   but it would be a mild neurocognitive disorder.

11   Q.    Okay.  Thanks.

12         Yep, and I think that the G31.84 code from

13   the DSM is actually mild, right?

14   A.    I -- I think that that is correct.

15   There -- if I also will admit to my flaw, there is an

16   alternate DSM diagnosis, neurodevelopmental disorder.

17   The two are overlapping.  In prior editions there was

18   no neurodevelopmental disorder.  It might have been

19   better to use that diagnostic code, but the meaning is

20   the same in this case.

21   Q.    What -- what edition of the DSM-V -- DSM-V

22   has the developmental diagnoses?

23   A.    It -- the DSM-V does.  The -- the -- the

24   DSM-IV, I believe, did not.

Highly Confidential - Mira Krishnan, Ph.D.

1    Q.    Oh, I see.  Okay.

2          So you are saying that there -- there is

3    another -- in retrospect looking back on it, you could

4    have selected mild neurocognitive developmental

5    disorder as the diagnosis based on the DSM-V?

6    A.    The term is a "neurodevelopmental

7    disorder."

8    Q.    I'm sorry.

9    A.    And I would have to look up the ICD code

10   for that.  The distinction is neurocognitive disorder

11   is typically used when a person has a acquired injury

12   that causes a loss of thinking skills, and -- and that

13   applies to this case, in -- in my opinion, but the

14   term "neurodevelopmental disorder" is also often used

15   even when the source is acquired, if it happens during

16   child development, and so sometimes the -- in this

17   kind of case the neurodevelopmental will all -- always

18   be used instead of neurocognitive, but otherwise the

19   meaning is the same.

20   Q.    Is the diagnostic criteria the same?

21   A.    It is.

22   Q.    Okay.

23   A.    Excepting that -- excepting that

24   development is in question.  So if -- if -- I'm not

Highly Confidential - Mira Krishnan, Ph.D.

1   going to assume your age, but if you went out and had

2   an acquired injury that caused a loss of your

3   thinking, it would always be diagnosed as a

4   neurocognitive disorder, but if you had that loss when

5   you were younger, when you were a child, then it might

6   of -- it would be -- it could also be called a

7   neurodevelopmental disorder instead.

8       Q.   I wasn't able to find this Code F39 for

9   mood disorder in the DSM-V or anywhere else.

10          Where -- where does that come from?

11      A.   It may be a mistake.  I can -- I can look

12  in the DSM-V.  The -- the -- I was attempting to use

13  the -- the general category for mood disorders, but it

14  may be that that code is wrong.

15      Q.   Yeah, I would like you to do that because

16  I need to -- I want to know what, you know, your

17  intentions were in terms of this coding in the mood

18  disorder for the diagnostic criteria.

19          So could you -- do you have one handy, do

20  you have your DSM-V book handy or do you --

21      A.   I do.

22      Q.   Do you have it electronically or -- I -- I

23  happen to have the hardcover book in my hand here.

24          Do you have it -- the book or do you have

1    it electronically?

2         A.    I have it electronically.  So I will

3    search.

4         Q.    Well, why don't you do that --

5         A.    And I can get it probably --

6         Q.    Go ahead, you -- you search for that, and

7    while you are doing that, I'm going to bring up the

8    DSM-V diagnostic criteria for mild neurocognitive

9    disorder and we'll look at that.

10        A.    Okay.

11        Q.    Let's -- so you are looking for mood

12   disorder, F39 is the code.

13        MR. ROGERS:  And Juliana, we'll make this the

14   next exhibit which -- boy, I don't know why I can't

15   remember the numbers.  Is this 13?

16        THE COURT REPORTER:  It's 12.

17        MR. ROGERS:  Okay.  Thank you.

18             So this is the DSM-V criteria for Mild

19   Neurocognitive Disorder.

20                  (WHEREUPON, a certain document was

21                   marked Mira Krishnan, Ph.D.

22                   Deposition Exhibit No. 12, for

23                   identification, as of 10/05/2020.)

24   BY THE WITNESS:

Highly Confidential - Mira Krishnan, Ph.D.

1       A.    To answer your earlier question, I believe

2   the code should have been F32.9, which is Unspecified

3   Depressive Disorder.

4       Q.    And you don't happen to have a -- a

5   reference to a page number in the DSM-V that I can

6   find that, do you?

7       A.    In the version that I have, it's on

8   Page 184.

9       Q.    Okay.  That's where I have it.

10           Unspecified Depressive Disorder F32.9, I

11   see.  Okay.  Well, we'll -- I'll see if I can get that

12   scanned and marked when we get to it, but let's --

13   let's start with Mild Neurocognitive Disorder first.

14           Okay.  Do you see that up on the screen?

15   This is now Exhibit 12.

16       A.    I do.

17       Q.    So, it says here, and I want to understand

18   this carefully or correctly with you.  In order for a

19   diagnosis of mild neurocognitive disorder to be made

20   under the DSM-V criteria, which is what you did,

21   Section A here says:

22           "Evidence of modest cognitive decline from

23   a previous level of performance in one or more

24   cognitive domains," and it lists them, and then it

1    says:  "Based on concern of the individual, a

2    knowledgeable informant, or the clinician that there

3    has been a mild decline in cognitive function; and a

4    modest impairment in cognitive performance, preferably

5    documented by standardized neuropsychological testing

6    or, in its absence, another quant" -- "quantified

7    clinical assessment."

8            So, explain to me how you used this

9    criteria to make the diagnosis of mild neurocognitive

10   disorder in A▓▓▓▓▓ T▓▓▓, please?

11       A.   So, I have already discussed how I used

12   the DSM-V as a guideline.

13           The difference, again, between a

14   neurodevelopmental disorder and a neurocognitive

15   disorder has to do, and I apologize if I -- I used the

16   wrong term, although I think that my meaning is clear,

17   has to do with the fact that children's brains are

18   developing.  So the classical definition of a

19   cognitive disorder, and you see the examples that are

20   listed in your exhibit, are adult examples.  So you

21   are an older adult and you develop Alzheimer's disease

22   and you have a loss of cognitive function.

23           It is trickier in children to -- to

24   understand decline because these skills are improving

Highly Confidential - Mira Krishnan, Ph.D.

 1  or developing as children age, and so the general

 2  understanding of psychologists and neuropsychologists

 3  and neurologists and others who work in this area is

 4  that we are looking at a failure to achieve gains or a

 5  deficit from a likely functioning in the absence of --

 6  of the problem.

 7          In general, a bare -- a limitation with

 8  neuropsychology is that we don't evaluate people who

 9  don't think that they have problems very often.

10  People don't file lawsuits if they don't think that

11  they were injured, people don't come to clinical

12  attention if they don't think that they have a problem

13  either.  And so, in general, neuropsychologists use a

14  variety of ways of estimating the likelihood of

15  decline from expected functioning.

16          And so the primary way for children is the

17  use of age-corrected scaled scores and -- and

18  sometimes also gender-corrected scaled scores or

19  occasionally grade-corrected scaled scores.  And as

20  for the A2 criteria, I did standardized

21  neuropsychological testing that demonstrates modest

22  impairment.

23     Q.    Okay.  But as we established earlier,

24  right, there -- there was not any cognitive --

Highly Confidential - Mira Krishnan, Ph.D.

1  neuropsychological cognitive impairment-type testing

2  that was done on any of these children before you did

3  yours, right?

4       A.    With respect to these four children,

5  that's correct.

6       Q.    So how was it that you were able to

7  determine that there was a decline from some point in

8  time to another point in time -- well, the other point

9  in time being when you did your test, testing and

10  evaluation?

11      A.    So, the alternatives that we use are

12  things like looking at the general intellectual level

13  as an estimation of where a child should be and

14  comparisons to other children who are like the child

15  in question, so other children who are of the same age

16  and so on.

17      Q.    So when did you come to the real --

18  realization that your diagnosis of mild neurocognitive

19  disorder was not the correct one or not the most

20  appropriate one for T██PPI██, in particular, and does that

21  also apply to the other children that we'll get to,

22  V██PPI██████████  and W██PPI██?

23      A.    It apply -- it would apply to -- so -- so

24  what I can tell you first is that psychologists -- in

Highly Confidential - Mira Krishnan, Ph.D.

1    my experience psychologists and psychiatrists in

2    clinical practice don't view the DSM-V as a purely

3    authoritative source, meaning it is not the be all and

4    end all of these diagnoses, but we use them in the way

5    that they are commonly used in the scientific and

6    treatment literatures.

7            Beyond that, I -- I -- to answer your

8    question, I came up -- I came on the realization in

9    the last couple of weeks as we've been having

10   interdisciplinary conversations about diagnosis in --

11   in a clinic that I participate in.

12        Q.    Okay.  So, where would I find the

13   diagnostic criteria for mild developmental cognitive

14   disorder?  And am I -- am I saying it right?  I want

15   to make sure I get it right.

16        A.    I think you are not.  Let me -- let me see

17   if I can find it.

18        Q.    Is it in the DSM-V?

19        A.    Yes.  It...

20        Q.    It looks like there is neurodevelopmental

21   disorders with F codes 70 through 89.

22        A.    Yeah.  Yeah.  That -- that would be the --

23   the area.  The -- the -- probably the appropriate one

24   would be the one that used to be ICD-9, 315.9, and I

Highly Confidential - Mira Krishnan, Ph.D.

1    can find you the -- the F -- the ICD-10 code is F88.

2        Q.    So that says here Global Developmental

3    Delay, is that right?

4        A.    Let me -- let me see if I can find it.

5            It's used in more than one place, and so

6    it -- it's also used as an Other Specified

7    Neurodevelopmental Disorder.  It's the same code as

8    used for Global Developmental Delay and also Other

9    Specified Neurodevelopmental Disorder.

10       Q.    Yeah, but I'm not really interested in the

11   code necessarily.  I -- I'd like to find the

12   diagnostic criteria, because I understand that you are

13   saying that DSM-V is more of a guideline or a guide

14   than, you know, the be all and end all, but up until,

15   you know, a half an hour ago, we were working on the

16   assumption that your diagnosis was mild neurocognitive

17   disorder for these remaining three plaintiffs, and now

18   you are telling me that some other diagnosis would be

19   more appropriate, I guess.

20           If so, I -- I need to know whether or not

21   there is any diagnostic criteria that you employed so

22   as to now determine if that's the better, more

23   appropriate diagnosis?

24       A.    As I'm looking at the DSM, I think that

Highly Confidential - Mira Krishnan, Ph.D.

1    that diagnostic -- that diagnosis is in the ICD-10 and

2    it is not in the DSM-V, but in essence, the -- the

3    idea is the same, except that because children have

4    developmental cognition, the -- it's not an,

5    necessarily an issue of decline from previous

6    functioning.

7             In my experience, neuropsychologists use

8    the code that I used commonly to describe this kind of

9    problem.  When the ICD-9 was being used, the code that

10   they used was 294.9, which I understand to be

11   substantially equivalent.

12        Q.   Well --

13        A.   So the previous term that we used was a

14   cognitive disorder.

15        Q.   Well, let's go through this carefully

16   here.

17             So, are you now saying that your diagnosis

18   for A█████  T███ is mild neuro -- or mild

19   developmental disorder?

20        A.   I had never said that.

21        Q.   What is it?

22        A.   I -- so, it can be diagnosed -- it -- the

23   condition that I characterized can be diagnosed using

24   either the code that I provided in my report or

Highly Confidential - Mira Krishnan, Ph.D.

1   neurodevelopmental disorder which is -- which is noted

2   in the DSM-V as -- under that F88 code.  And the two

3   are used interchangeably in my experience in this kind

4   of situation.

5       Q.    But -- but then you added in the further

6   explanation that, with respect to a diagnosis of mild

7   neurocognitive disorder under the DSM-V, that is, this

8   exhibit, there is the requirement that there be, under

9   that diagnostic criteria at least, a modest decline

10  from a previous level performance, right?

11      A.    And so, as I explained what

12  neuropsychologists do in this area and what other

13  practitioners in my experience do in this area, is we

14  look at the person's likely trajectory in the absence

15  of the impairment using factors such as their overall

16  IQ in comparison to their domain specific

17  neuropsychological performance or their comparison to

18  age peers who are similar to them.

19      Q.    And so what is this ICD-10 diagnostic

20  criteria?

21      A.    I believe that we covered this in great

22  detail with EPPI already, but the --

23      Q.    No, we didn't.  Excuse me.  Not for mild

24  neurocognitive disorder we didn't.

Highly Confidential - Mira Krishnan, Ph.D.

1     A.    To the best of my knowledge, the ICD

2   doesn't specify specific criteria.

3     Q.    Okay.  So that's what I'm trying to get

4   at.  Where -- where is it that I could find a

5   description of neurodevelopmental disorder which is

6   different than mild neurocognitive disorder in the

7   particular aspect that in neurodevelopmental disorder

8   there is no requirement that there be a modest decline

9   from a previous level of performance?

10     A.    It is on -- sorry, it finally just showed

11   up.  It is on Page 86 of the DSM-V.

12     Q.    Bear with me a second.

13          Do -- do you have an opinion that the

14   plaintiff T▮PPI did have a modest cognitive decline

15   from a previous level of performance?

16     A.    I have an opinion that she has a modest

17   impairment in cognitive performance.

18     Q.    But not a decline from a previous level?

19     A.    I think that that criteria is irrelevant

20   in this age group because the exposure was

21   developmental while these abilities were becoming

22   present.  If I -- however, if I return to my report,

23   her emotional functioning was more clearly a change

24   from prior functioning.  It was less clear in the case

Highly Confidential - Mira Krishnan, Ph.D.

1    of her thinking -- cognitive skills.

2         Q.    So the emotional functioning part of it,

3    that goes to the diagnosis of the mood disorder, not

4    the neurocognitive disorder, right?

5         A.    That's correct.

6         Q.    Okay.  So, if I understand correctly, what

7    you are saying is, as you sit here today as you are

8    testifying under oath, that your diagnosis for

9    A█████ T████ with respect to her neurocognitive

10   situation is that the most appropriate diagnosis in

11   your opinion is Other Specified Neurodevelopmental

12   Disorder code, or as described on Page 86 of the

13   DSM-V, as opposed to Mild Neurocognitive Disorder,

14   which is now up on the screen as Exhibit 12.

15             Do I have that right?

16        A.    I -- I think that both of these diagnoses

17   are in common use in terms of ICD billing codes for

18   this kind of disorder.  I don't think in clinical

19   practice there is a clear preference among

20   practitioners to use one or the other, but if your

21   expectation is that I follow the letter of the DSM-V,

22   which is not in general what psychologists or

23   psychiatrists do, then the F88 code may be more

24   appropriate.

1      Q.    Well, I'm not asking, you know, what I

2    expect or anything else.  I -- I want to know what

3    your opinion is?  So is it --

4      A.    My --

5      Q.    Let me just try to clarify.

6            Do you -- do you have an opinion that

7    A▮PPI▮▮▮▮ T▮PPI▮ sustained a -- a decline, a modest

8    cognitive decline from a previous level of experience

9    performance or not?

10     A.    I have an opinion that A▮PPI▮▮▮ T▮PPI▮

11   experienced a modest impairment in cognitive

12   performance that would not be present had she not been

13   exposed to lead.

14     Q.    Okay.  And what you are saying is that

15   that diagnosis that you just described doesn't fit

16   squarely within the diagnostic criteria of the DSM-V

17   for Mild Neurocognitive Disorder or Other Specified

18   Neurodevelopmental Disorders, right?

19     A.    Yes.

20     Q.    So, therefore, is it also true that

21   since -- let me think about that one a little bit

22   more.  Maybe I'll ask you a better question about that

23   tomorrow.

24            Okay.  Let's get into the bases for your

Highly Confidential - Mira Krishnan, Ph.D.

1    diagnosis that you just described.

2           Can you show me in the report -- or

3    just -- you know what we did at the end of the last

4    one where I asked you to just summarize what your --

5    what the bases were for your opinion about this

6    diagnosis, and I'm not talking about the mood disorder

7    now, we'll -- we'll leave that aside, but the

8    developmental disorder, neurodevelopmental disorder

9    that you are describing.

10          Explain to me, what is the basis for that

11   diagnosis, summarize that, please?

12   A.    So, going back to A▉PPI▉▉▉▉

13   neuropsychological results, which are in the report,

14   she had a normal IQ, although she had a substantial

15   discrepancy between her verbal and her visual

16   reasoning abilities, including the impaired

17   performance on a test of verbal reasoning.  She had a

18   different pattern in her academic test results where

19   she had much weaker math than other areas.  This was,

20   again, low average and not impaired, but it is an

21   unusual discrepancy between domains.

22          Turning to the remainder of her testing,

23   she had impairments in tests that look at skills like

24   speeded processing, like TMTA, and she had impairment

Highly Confidential - Mira Krishnan, Ph.D.

1    in sustained attention as seen in the NEPSY 2,

2    N-E-P-S-Y, Auditory Attention Response Set test.

3            In talking to her parents, these were

4    consistent with cognitive things that were seen in her

5    real world functioning.  And I did make a cognitive

6    disorder on that basis.  And I didn't see any of it

7    in -- in the record that problems that correlate with

8    my -- with my cognitive testing findings were in any

9    of the records I had to review from prior to my --

10   from prior to the time period in question.

11       Q.    Okay.  Is what you are saying, then, you

12   didn't see evidence in her education records or other

13   information that was available to you that would be

14   indicative of any neurocognitive impairments that you

15   found in your testing?

16       A.    That's correct.

17       Q.    Okay.  Now let's turn to the -- and we are

18   going to go through all these tests just like the

19   one -- the last one we did.

20            Let's look at the mood disorder diagnosis.

21   Why don't you describe to me what did you mean by

22   "mood disorder" before we get into the actual DSM-V

23   criteria that you pointed me to.

24            What -- what did -- did you do?

Highly Confidential - Mira Krishnan, Ph.D.

1    A.    So --

2    Q.    Yeah.

3    A.    -- the DSM and the ICD both have disorder

4    diagnoses that have terms like "unspecified" or "not

5    elsewhere classified" in their diagnostic title.

6    These are broadly used and commonly used by clinicians

7    to designate problems that don't fit tightly within

8    the definition of a specific mood disorder.

9          So this would be used, for instance, in

10   cases where a child has mood symptoms that are unusual

11   in the general population, but they don't meet the

12   criteria for major depressive disorder or bipolar

13   disorder or disruptive mood dysregulation disorder.

14   Q.    So what are the symptoms that you found in

15   your evaluation of T███ that led you to make that

16   diagnosis of mood disorder?

17   A.    So, when I spoke to A███       mother, she

18   indicated a change in personality after the water

19   crisis.  Shy noted that in the time prior to the water

20   crisis her daughter was friendly, maybe even

21   excessively friendly, and after the crisis she wanted

22   to be left alone, she disengaged from other people,

23   which is something that A███   also endorsed.  She

24   is moody and volatile, this is on Page 3 of my report,

Highly Confidential - Mira Krishnan, Ph.D.

1    and lacks motivation, even for relatively simple

2    things.  Her mother also noticed some defiance or back

3    talking as a problem as well.

4              And then when I had -- when I had her

5    complete the BASC-3 responses, those were consistent

6    and suggested social withdrawal as well as lack of

7    adaptability and some problems with aggression and

8    mood, as well.

9              And she was -- she was cheerful when I saw

10   her, but she is also endorsing some of these problems,

11   you know, based on my understanding from talking to

12   the two of them, and so I did feel that there was also

13   a mood disorder.

14        Q.   What type of treatment is available for

15   someone like her who is -- is she -- is she 11, did I

16   remember that right?

17        A.   That's correct.

18        Q.   So -- yeah, so she just -- had just turned

19   11.  She is now, it looks like she would be in the

20   sixth grade now.

21             What type of treatment is available for

22   kids who were her age that have the type of mood

23   disorder issues that you have found in her?

24        A.   If she were my patient clinically, I

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    probably would recommend psychotherapy as a mainline
 2    intervention.  The reason I would make that choice is
 3    because she has these symptoms that don't really
 4    clearly fit into one of the more common mood disorder
 5    diagnoses, like depression or bipolar disorder, and
 6    that would generally reduce my confidence level in
 7    psychotropic intervention, medication intervention,
 8    because medication interventions are often designed
 9    based on these really specific definitions of things
10    like depression or bipolar disorder.
11              However, depending on how she did in
12    psychotherapy, it is also common for individuals with
13    these kinds of problems to see a psychiatrist and to
14    do -- to use medications as well.
15         Q.    So, to your knowledge, has any of her
16    medical care providers, pediatricians or anyone made a
17    diagnosis of mood disorder before you?
18         A.    In looking at my records, I believe the
19    last medical appointment that I was able to review for
20    A PPI         was six years before I saw her.  I -- I am
21    not aware of any evaluation or treatment for it.
22         Q.    Did you -- did you learn of any
23    information from her mother that indicated that any
24    medical professional had made this diagnosis of mood
```

Highly Confidential - Mira Krishnan, Ph.D.

1  disorder before your evaluation of her?

2      A.    I -- I did not.

3      Q.    Why -- why is it that the various symptoms

4  that you described to us that -- that you read from

5  your report are not within the normal range of mood

6  variations that an 11-year-old child would have?

7      A.    That's a good question.

8            So some degree of -- when it comes to mood

9  systems, some degree of all of what I described is

10  common for children in a variety of ages and even for

11  adults.  What we look at are a few things.

12            First, as you were looking at the DSM-V,

13  what you will see in general across diagnostic

14  criteria is that typically each diagnostic criteria in

15  the DSM has an item towards the end of the definition

16  that says that it has to cause clinically significant

17  distress or impairment, or something similar to that.

18            So, in general, psychologists ask if there

19  is a problem that bothers somebody, you know, when we

20  see them.  So if you tell me that you have been

21  feeling sad but you think that that's normal and you

22  don't think that it's causing you any problems, I

23  would be unlikely -- and -- and I didn't have any,

24  like, contradicting information, you know, you weren't

Highly Confidential - Mira Krishnan, Ph.D.

1   also failing school or getting kicked out of your

2   social clubs or something like that, then I would be

3   disinclined to diagnosis that as a disorder.

4           In this case, A██PPI█████ mother did

5   complain about problems for A██PPI██.  Both of them

6   endorsed that her social, emotional approach was

7   different than it had been prior to the onset of -- of

8   this mood disturbance.  And -- and then I -- the

9   BASC-3 data also corroborated their report.

10      Q.    Do you have a cat loose in the house or

11  something in your office, is that that noise?

12      A.    I do.  If you want to take a quick break,

13  I can move him out of the room.  I apologize.

14      Q.    No, it's not bothering me.  I just noticed

15  you looking around.  So I -- it doesn't bother me.

16  Let's -- let's press ahead unless you want to remove

17  the cat from the room on your own.

18      A.    I think he'll be fine.

19      Q.    All right.

20      A.    Sorry about that.

21      Q.    So -- so, with respect to the mood

22  disorder diagnosis, do you have your DSM-V handy, and

23  I think you mentioned it appears on Page 184, and

24  that's the same version of it that I have, and I'm

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   wondering if you could point me toward the -- the

 2   exact criteria that you applied as a guide, or

 3   whatever way you want to describe it, for this

 4   particular mood disorder that she has?

 5              Because it's got different things in here

 6   with, you know, melancholy, anxious, distress, you

 7   know, seasonal pattern, psychotic features, and a lot

 8   of other things.  What -- what is it that you point to

 9   for her mood disorder that means that she has this

10   particular unspecified depressive disorder?

11        A.   So, as the -- the definition of

12   unspecified dis -- depressive disorder in the DSM-V

13   states, it's a category that is used for individuals

14   who have clinically significant distress or impairment

15   but do not meet the full criteria of the other

16   disorders in the section.

17              And so I -- I have already described to

18   you the emotional mood changes that were of a concern

19   for A███PPI████ , and those are the ones that I'm talking

20   about here as well, and they do not meet the criteria

21   for depressive disorder or bipolar disorder or the

22   other specified mood disorders.

23        Q.   I see.

24              So the -- the only -- the only section of
```

Highly Confidential - Mira Krishnan, Ph.D.

1    this DSM-V that you are referring to here is the one

2    under Unspecified Depressive Disorder 311, Code F32.9,

3    that one paragraph that's there, and not anything that

4    starts under the heading Specifiers for Depressive

5    Disorders, right?

6         A.    That's correct.

7         Q.    Okay.  I'm going to take -- let's stay on

8    the record.  I'm going to just walk out and see if I

9    can get someone to help me copy and scan this so that

10   we can mark it as the next exhibit.  Bear with me.  It

11   will only take a minute.  Maybe you get -- you can

12   kick the cat out, if you want, during this -- this

13   time.

14        A.    Okay.

15        THE VIDEOGRAPHER:  Are we going off the record?

16        MS. CARO:  No.  He said he is just going to step

17   out for a second.

18        MR. ROGERS:  No, let's just stay on so we don't

19   lose everybody.  I'll be right back.

20        THE VIDEOGRAPHER:  Okay.

21             (Short pause.)

22        MR. ROGERS:  Okay.  So that's being done.  Let's

23   continue on here as long as everybody is here still.

24             Do we have Juliana?

Highly Confidential - Mira Krishnan, Ph.D.

```
 1          THE COURT REPORTER:  I am here.

 2          MR. ROGERS:  All right.  Great.

 3     BY MR. ROGERS:

 4          Q.    Okay.  Turning, Doctor, to the -- the

 5     paragraph in your report entitled Conclusions, I'll

 6     try to bring this up on the screen here.

 7               Okay.  Can you see that all right?

 8          A.    Yes, I can.

 9          Q.    So:  "A▮▮▮▮▮ presents with the complex

10     pattern of discrepant skills across cognitive domains,

11     which are masked by an overall normal intellectual

12     level."

13               What -- what is her IQ?

14          A.    It is on Page 5 of the report.  It's 103.

15          Q.    And is that generally within the 50th

16     percentile area, just like for E▮▮▮ S▮▮▮▮▮?

17          A.    Yes, it is just generally higher.

18          Q.    I see.  Okay.  What is -- this is the

19     first time we've talked about this, the Hanna-Attisha

20     and other authors' paper from 2016.

21               You say:  "There is no evidence of these

22     issues prior to the change in the Flint, Michigan

23     water system to the Flint River, and her exposure is

24     consistent with known distributions of lead exposure
```

Highly Confidential - Mira Krishnan, Ph.D.

1    resulting from the water system change."

2              Explain what you -- and then you refer to

3    the Hanna-Attisha paper.

4              What do you mean by that?

5         A.   All I -- I mean in this case is that to

6    the best of my understanding she lived within the

7    locations in which elevated lead levels were reported

8    in the drinking water.

9         Q.   I see.

10             Is that -- that's the only thing you meant

11   by referring to that paper?

12        A.   In this case, yes.

13        Q.   Do you know what -- what the composition

14   of the service line going into the T███ house was?

15        A.   I am not an expert in service lines.  I --

16   if I commented on -- I believe that that was a

17   question that was commonly asked in your depositions

18   where -- or whichever attorney performed the

19   depositions.  I do not recall if they knew the answer

20   to that question or what the answer was.

21        Q.   And is it correct that you're not aware of

22   any actual water lead tests for the -- the T███

23   residence where A███  was living at this point in

24   time or the relevant point in time?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.    I have not -- I have not reviewed any.

2      Q.    And as we just reviewed earlier, you are

3  not aware of any blood lead level tests other than the

4  one that was reported as negative, right?

5      A.    That's correct.

6      Q.    Okay.  So let's go to the next section

7  here which says:  "Her impairments in mood and

8  cognition are consistent with the range of impairment

9  seen in exposure to lead."

10         The Lidsky and Schneider paper that we

11  already looked at, and the Mason, Harp & Yan paper,

12  right?

13      A.    Correct.

14      Q.    So, is there anything in the Lidsky paper

15  that you wanted to point out as the scientific basis

16  for this statement that is in any way different than

17  what you showed me before?

18      MR. ROGERS:  Bear -- I'm sorry.  Bear with me

19  one second here.

20              (WHEREUPON, discussion was had off

21               the stenographic record.)

22      MR. ROGERS:  I want to mark this exhibit that

23  just came in, so bear with me a second here.  I have

24  to stop sharing my screen and then we'll do this.

Highly Confidential - Mira Krishnan, Ph.D.

 1            So I just want to make sure, somebody tell

 2   me, nobody is seeing my screen with my e-mails on it

 3   right now, right, I hope?

 4       MS. CARO:  Nope.

 5       THE WITNESS:  No.

 6       MR. ROGERS:  Okay.  So I'm going to bring up --

 7   I'll re-share my screen and hopefully bring this up.

 8            Doctor, just for the record, and is

 9   this -- Juliana, what's this going to be, 14?

10       THE COURT REPORTER:  Thirteen.

11       MR. ROGERS:  Thirteen.  Was -- was 12 the TPPI

12   report that we were just looking at, Dr. Krishnan's

13   report?

14       THE COURT REPORTER:  Let me look.

15       MR. ROGERS:  Thanks.  Sorry.  I just want to

16   make sure we marked it.

17       MS. CARO:  I don't think you did.

18       MR. ROGERS:  I'm sorry, Louise.  Did -- did you

19   say something?

20       MS. CARO:  I don't -- I don't think you did.  I

21   don't think you marked it.

22       MR. ROGERS:  Okay.  Well, then, let's make --

23       THE COURT REPORTER:  Twelve -- twelve is the

24   DSM-5 criteria for Mild Neurocognitive Disorder.

Highly Confidential - Mira Krishnan, Ph.D.

```
 1          MR. ROGERS:  Okay.  Thank you very much.

 2   BY MR. ROGERS:

 3       Q.    Okay.  This one will be 13, and it is the

 4   DSM-V criteria that you referred me to for Unspecified

 5   Depressive Disorder which is on the screen now, right?

 6       A.    Correct.

 7       Q.    Doctor?

 8               (WHEREUPON, a certain document was

 9                marked Mira Krishnan, Ph.D.

10                Deposition Exhibit No. 13, for

11                identification, as of 10/05/2020.)

12   BY MR. ROGERS:

13       Q.    I see.

14             So, in the second part of it here, we

15   didn't discuss yet:  "The unspecified depressive

16   disorder category is used in situations in which the

17   clinician chooses not to specify the reason that the

18   criteria are not met for a specific depressive

19   disorder, and includes presentations for which there

20   is insufficient information to make a more specific

21   diagnosis (e.g., emergency room settings)."

22             Right?

23       A.    That is what it says, yes.

24       Q.    I see.
```

Highly Confidential - Mira Krishnan, Ph.D.

1          So what you are saying is, if I have this

2    correct and can just summarize it, you are saying that

3    A■PPI■■■ T■PPI■ her -- through the BASC testing that

4    you did and the reports of her parent or mom in this

5    case, there was evidence of a mood disorder that was

6    causing distress to her or impairment in social or

7    other important areas of functioning, but that it did

8    not meet the full criteria for any of the other

9    disorders basically, right?

10       A.    Correct.

11       Q.    I see.

12          And what specifically would a social

13   settings or the things about the way she was

14   functioning socially that were impaired?

15       A.    I described it as in response to a

16   previous question, but, again, she withdraw --

17   withdrew socially, she was not engaged with other

18   people as much as she used to be, she kept to

19   herself -- let me go back to that part of my report --

20   where as she had previously been much more friendly to

21   others.

22       Q.    Now, let me ask you, though, the period of

23   time that she was reported as having these issues and

24   when you did your examination of her, I mean, they --

Highly Confidential - Mira Krishnan, Ph.D.

1    they obviously to some extent overlapped with the

2    period of time from March when the pandemic started up

3    through, you know, the time that you examined her,

4    right?

5         A.    Yes, but they -- the parents told me that

6    they noticed these problems after the water crisis.

7         Q.    I know, but to what extent did you take

8    into consideration that the mood disorder and the

9    symptoms that she was experiencing could be explained

10   by, you know, what was going on in the country and her

11   community as of the time that COVID-19 and the

12   pandemic caused all of these major disruptions to our

13   society and her?

14        A.    That was not what they reported.

15        Q.    Well, was she experiencing the symptoms of

16   mood disorder that you were describing in your report

17   from March of 2020 through the period of time that you

18   examined her?

19        A.    Per the family report, she was

20   experiencing them both during that time period and

21   before that time period.

22        Q.    Okay.  But during the time period from

23   March to -- to June, what did you do to evaluate

24   whether those symptoms were being caused by things

Highly Confidential - Mira Krishnan, Ph.D.

1    that were going on then as opposed to something from

2    before?

3        A.    I'm not aware of any psychological tests

4    for a mood disorder due to COVID.  COVID has become

5    such a large problem that maybe someone will develop

6    such a test in the future.

7             But first, they were clear to me that

8    there was no fear in engaging with other people, which

9    in -- in my clinical experience since March is one of

10   the primary issues that people have in the context of

11   COVID-19, they -- they told me that in general anxiety

12   and fear were not concerns for A▮PPI▮▮    at all.  They

13   reported that -- rather that for several years she had

14   been less socially engaged.

15            It doesn't make clinical sense for her to

16   have become socially disengaged over the several years

17   preceding COVID in response to the global pandemic.

18       Q.    Okay.

19       MR. ROGERS:  Then let's now go ahead and mark

20   the next exhibit, which would be 14, the T▮PPI▮ report,

21   your T▮PPI▮ report that we are looking at.

22                    (WHEREUPON, a certain document was

23                     marked Mira Krishnan, Ph.D.

24                     Deposition Exhibit No. 14, for

Highly Confidential - Mira Krishnan, Ph.D.

1                      identification, as of 10/05/2020.)

2    BY MR. ROGERS:

3         Q.    Whoops.  Can you see that all right?

4         A.    I can now, yes.  It was a little difficult

5    for a moment.

6         Q.    Yeah, that's for sure.  It went down to

7    miniature level.

8              So, I -- I think before we took the break

9    when we -- when I got that document scanned, I was

10   asking you about the Lidsky and Schneider and Mason,

11   Harp papers, right?  And I was asking you if there was

12   any additional information in either of those two that

13   we didn't already talk about that would support -- or

14   actually, you know, we need to do this, you know why,

15   because when we were discussing B██ S█████, that was

16   for ADHD, not cognitive impairment of the type that

17   you found in T███.

18             So I guess I'm going to have to ask you to

19   show me in the Lidsky paper first where there is a

20   description of evidence that support your opinion or

21   conclusion that you're expressing here that her

22   impairments in mood and cognition are consistent with

23   the range of impairment seen in exposure to lead?

24        A.    All right.  Bear with me, please.

Highly Confidential - Mira Krishnan, Ph.D.

1      Q.    And what I'll do is we'll do the same

2  thing we did before, I'll bring that one up and you

3  can tell me where to find it and we'll put it up on

4  the screen.

5      MR. ROGERS:  Juliana, can you help me out, did

6  we -- did -- or somebody -- did we mark this paper,

7  the Lidsky paper before as an exhibit, and if so, what

8  number was it?

9      THE COURT REPORTER:  Let me check.

10      MR. ROGERS:  Thank you.

11          You know what we need, we need Adam

12  Schnatz on the Zoom conference.  He keeps track of all

13  of the exhibits very carefully.

14      THE COURT REPORTER:  Sorry.  It's taking me a

15  minute.

16      MR. ROGERS:  Yeah, my bad, I should have written

17  it down.

18      THE COURT REPORTER:  The Lidsky paper is No. 9.

19      MR. ROGERS:  Thank you very much.

20  BY THE WITNESS:

21      A.    So if you are ready, I wish to draw your

22  attention to Page 11 using the paging number -- the

23  page numbering in the article.

24      Q.    Yep, Page 11 in the article, yep.

Highly Confidential - Mira Krishnan, Ph.D.

1    A.    So, I previously mentioned the paragraph,

2  the Winneke and colleagues paragraph in response to an

3  earlier question.

4         So, there again, they did talk about

5  attention, but they also talked about other cognitive

6  impacts of lead exposure.  And so those also include

7  things like visual perception, visual memory, reaction

8  times.  Those were the things that were not affected

9  and attention was affected and -- and we can talk

10  about attention for A█████ and why I thought that

11  was a neurocognitive disorder and not an attention

12  deficit disorder -- or attention deficit hyperactivity

13  disorder.

14         But that paragraph discusses the cognitive

15  impacts of lead more broadly, and there is continuing

16  discussion of the cognitive impacts of lead over the

17  next several paragraphs.

18    Q.    I guess what I'm trying to get at is

19  which -- where in this study does it refer to

20  neurocognitive impairment of the type that you found

21  in A█████ that is caused by exposure to low level

22  lead?

23    A.    So, first of all, A█████ had impaired

24  performance on Auditory Attention and Response Set,

Highly Confidential - Mira Krishnan, Ph.D.

1   which is a test of sustained attention and response

2   vigilance, and that's one of the areas that is

3   explicitly mentioned in the paragraph I just

4   indicated.

5        Q.    Okay.  Anything else?

6        A.    The Trail Making Test A is also an

7   attentionally modulated measure, and that, you know,

8   again, is already discussed here.  The -- the -- --

9   and the Lidsky paper also talks about emotional

10   changes in response to lead exposure.

11        Q.    Where is that?

12        A.    That is on Page 12, right-hand side,

13   second complete paragraph beginning:  "In addition to

14   the evaluation."

15        Q.    Okay.  So the -- the authors here are

16   reporting that there is an increased incidence of a

17   variety of behavior problems, depression, somatic

18   complaints in lead-exposed children and that increases

19   in aggression were observed at a blood lead level of

20   15 micrograms per deciliter, right?

21        A.    I note that is a higher level.  Well,

22   there is no blood lead level for A␡PPI␡ that was

23   positive.

24        Q.    Right.  So, are you aware of any

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    scientific studies that support the proposition that

 2    there are increased incidents of behavior problems of

 3    this type that were found in A██PPI      T██PPI at lower

 4    blood lead levels than 15 micrograms per deciliter?

 5         A.    If I draw your attention to the other

 6    paper that we were talking about, the Mason paper.

 7         Q.    Okay.  I guess we could get to that one in

 8    a sec.  I just want to make sure that there is nothing

 9    else in this paper that supports that before we move

10    on to the other one.

11         A.    I think that it is -- there is a

12    discussion also of -- the -- the end of that paragraph

13    that we were reading just now, the sentence that

14    begins:  "The first prospective longitudinal

15    investigation," that talks about low lead level

16    exposure.

17         Q.    But how much?  I mean, it says "low lead

18    level exposure" but it doesn't tell you what that is.

19         A.    I don't have that in front of me.

20         Q.    So you'd have to look at that paper in

21    order to determine what that low lead level exposure

22    was, right?

23         A.    Yes.

24         Q.    Okay.  So does that complete your
```

Highly Confidential - Mira Krishnan, Ph.D.

1   description of where there is support for your opinion

2   that a mood disorder and the neurocognitive

3   impairments that you've described as having been

4   caused by low lead levels?

5       A.    In this paper?

6       Q.    Yes, in this paper.

7       A.    Yes.

8       Q.    Okay.  So now we can go to the next paper.

9   So that's what we'll do.

10            I have a -- a series of papers here.

11  Which one was it, the Mason paper or Hou?

12      A.    Mason.

13      Q.    Okay.  So here we have an issue.  I don't

14  know why that did that.  Ma -- Lidsky came up again.

15  Let me get read of that.  Here is Mason.

16      MR. ROGERS:  Okay.  Now, we haven't marked this

17  one before or have we?  I'm sorry, Juliana.  I'm a --

18  I'm a mess today on the numbering.  I can't remember

19  if we marked this one or not.

20      THE COURT REPORTER:  Let me check.

21      MR. ROGERS:  I think we did.

22      THE COURT REPORTER:  You have not marked --  do

23  you think you did?  I think the -- let's see.

24      MR. ROGERS:  Yeah, because --

Highly Confidential - Mira Krishnan, Ph.D.

1      THE COURT REPORTER:  The Mason, Han paper is

2   Exhibit 8.  The Lidsky paper is Exhibit 9.

3      MR. ROGERS:  Yeah, so thank you.  This is the --

4   this is the Mason paper which is Exhibit 8.  I thought

5   we had marked it before.  Okay.  Great.

6   BY MR. ROGERS:

7      Q.    So, Doctor, point me to sections in this

8   paper that support the opinions that you are

9   expressing?

10     A.    So, if you look at Page 4, please, there

11   is a Section 3.8 in the lower right.

12     Q.    Yep.

13     A.    And so here there is discussion of a

14   various -- various emotional changes that occur in

15   response to lead exposure, the second paragraph

16   describes antisocial behavior, aggression and -- and

17   other antisocial behaviors, including a study of

18   resilient adolescents with dental enamel related

19   exposure.

20     Q.    But what is the -- what are the numbers

21   with respect to the blood lead levels in these

22   studies?

23     A.    I am not sure.

24     Q.    Okay.  Are you aware of anything in this

Highly Confidential - Mira Krishnan, Ph.D.

1    study that describes these effects at low blood lead

2    levels?

3         A.    The -- the end -- at the end -- as noted

4    in the end of the first paragraph, low lead level

5    exposure conclude -- studies of low lead level

6    exposure -- studies of low lead level lead exposure

7    concluded that lead related interpersonal problems may

8    be mediated by irritability and fatigue.

9         Q.    Okay.  So you'd have to look at the

10   reference footnoted as number -- or Reference No. 74

11   to find out what those low lead level exposures are,

12   right?

13        A.    Correct.

14        Q.    Well, those -- it seems to me that the --

15   the authors there are reporting on studies of adults.

16             Is there any indication that this

17   paragraph relates to children?

18        A.    That is an adult study.

19        Q.    Hmm.  Okay.

20             Is there anything else in this paper that

21   you wanted to refer me to that supports your opinions?

22        A.    We already talked about some portions of

23   this paper, but if I draw your attention to 3.5

24   language, which is on Page 4 on the left, it is in the

Highly Confidential - Mira Krishnan, Ph.D.

1    same place as you just were, it discusses

2    vocabulary -- it discusses similarities between adults

3    and children who had problems with language-based

4    skills, including reasoning difficulty, which is one

5    of the problems seen for A███████.

6         Q.    Okay.  So in order to determine what the

7    lead levels are, you'd have to go to each one of these

8    studies because this paragraph is basically a summary

9    of various other studies, right?

10        A.    Correct.  This is a review article.

11        Q.    Right.  And some of them are for adults

12   and some of them are for children, right?

13        A.    Yes, that's correct.

14        Q.    Okay.  Anything else in this paper that

15   support your opinions?

16        A.    I think that we have spoken about

17   everything else already.

18        Q.    Okay.

19              Going back to your report for T███,

20   A███████ T███.  Whoops.  Going to the Recommendation

21   section.

22        A.    Would you please share that again?

23        Q.    I'm sorry?

24        A.    Would you please re-share it on the

Highly Confidential - Mira Krishnan, Ph.D.

1  screen?

2      Q.    Yeah.  Thanks.  Sorry about that.

3            Have you got it now?

4      A.    Yes.

5      Q.    You say in your Recommendations:

6  "Intellectually, A███ generally has the cognitive

7  capacity to succeed.  She does present with a pattern

8  of scattered, mild cognitive deficits.  With sub" --

9  "deficits.  With substantial discrepancy between her

10  strong reading skills and her mathematics ability,

11  which is nearly two grades behind her actual grade

12  placement, as well as problems with activity level and

13  attention, she requires special education supports

14  under an individe" -- "individualized education plan,

15  consisting of resource room support/tutoring for

16  mathematics."

17            Are you saying that that is what she

18  should have or that that is what she already has in

19  terms of the IEP?

20      A.    That is what she should have.

21      Q.    Okay.  So as far as you know, was A███

22  ever on an IEP before the time that you saw her?

23      A.    I am not aware that she was on an IEP.  It

24  seems like she may have been in some less formal

Highly Confidential - Mira Krishnan, Ph.D.

1   interventions, but it's not clear.  I -- I -- she --

2   to my knowledge, she did not have an IEP.

3        Q.    Do you -- do you know whether -- I think

4   there is someone in here -- somewhere in here in your

5   report you say something to the effect of, you know,

6   you're -- you're conducting this examination in a

7   lis -- litigation setting and there is not a

8   patient/psychologist relationship or something to that

9   effect.

10           Is -- is -- is there any means by which

11  these recommendations, to your knowledge, were

12  provided to the parents of the bellwether children in

13  order to determine whether, you know, your

14  recommendations could be followed and implemented?

15       A.    So, my general practice and when I

16  complete evaluations at the request of attorneys is

17  that I return the work product back to the attorney.

18  I'm not aware of anyone sharing the information with

19  the family.  And I did explain to them, as noted, that

20  I wouldn't -- that I was not giving them feedback when

21  I saw them.

22       Q.    Gotcha.

23           So what happens is you complete the

24  report, you give it to the -- Mr. Stern in this case

Highly Confidential - Mira Krishnan, Ph.D.

1    and whether or not anything is done with respect to

2    these recommendations for the -- for the plaintiff,

3    you don't know at this point, right?

4          A.    That's correct.

5          Q.    Okay.

6                And you also say:  "She should also

7    receive accommodations in the form of a private

8    testing environment and extended time on tests."

9                Do you know whether that has been

10   implemented?

11         A.    I do not.

12         Q.    Okay.

13               Now, the next recommendation is similar to

14   the one that you did for S███████:  "While IQ at the

15   current age is not completely predictive of long-term

16   outcome, A███████ attention and learning problems do

17   increase her risk for negative outcomes such as

18   dropout or performing below her potential.  Overall, I

19   would estimate her likelihood of not graduating high

20   school to be low (less than 25%)."

21               What's that based on?

22         A.    So in this case there is no well-defined

23   clinical population to compare A███████ to because

24   both her cognitive profile and her emotional profile

Highly Confidential - Mira Krishnan, Ph.D.

1    don't fit a well characterized disorder, so this is

2    based on my clinical judgment.

3        Q.    Okay.  So, the same questions that I asked

4    about S███████  I'll ask you now.

5            You don't have statistics or data with

6    respect to your patients who have the clinical picture

7    and diagnoses that A████    T███ has to determine the

8    percentage of them who are not able to graduate high

9    school, correct?

10       A.    I -- I would only be able to use the same

11   process I described in -- in E████  case.

12       Q.    So it's a correct statement, right, you do

13   not have the statistics or data for patients that you

14   have had that have experienced -- that have the same

15   diagnosis as A████   in order to determine, once they

16   get to the age where they could be graduates of high

17   school, whether they have or they haven't graduated

18   from high school, right, you don't have those

19   statistics and data based on your patient group,

20   right?

21       A.    I -- I have anecdotal data but I don't

22   have data that would allow me to make a specific

23   quantitative.

24       Q.    Well, what -- what do you mean by

Highly Confidential - Mira Krishnan, Ph.D.

```
1    anecdotal data, that, you know, some of the patients
2    that you have treated over the years who have reached
3    high school age who have these same symptoms don't
4    graduate from high school, basically, is that it?
5         A.    Correct.
6         Q.    By you don't know what the percentages
7    are, you don't know what the totals are, you don't
8    know -- you don't have the statistics, right, the
9    data?
10        A.    We may be using the term "data"
11   differently, but anecdotal information is, I consider
12   that data.  I don't have quantitative data that allows
13   me to make a numerical statement that's more specific
14   than this.
15        Q.    So you're not -- you're not saying to a
16   reasonable degree of medical neuropsychological
17   probability that she faces an increased risk of not
18   graduating from high school because of this, do you?
19        A.    I am not able to quantify that risk
20   specifically, but I think that there is an increased
21   risk.
22        Q.    I see.  But you can't quantify it.  Okay.
23              So is it correct that you estimate, based
24   on your anecdotal data and her condition, that she has
```

Highly Confidential - Mira Krishnan, Ph.D.

1    a 75 percent chance of graduating from high school?

2         A.    That's -- that's my very rough

3    approximation, yes.

4         Q.    And then the next part of it:  "There is a

5    moderate possibility that these issues may prevent

6    completion of college or graduate training (30-50%)."

7              Where did that approximation come from,

8    estimate?

9         A.    So, again, that is also based on I have

10   anecdotal but not quantitative information to make a

11   specific statement.  In her case she had more

12   significant impairments, like her sustained attention

13   performance was psychometrically impaired, and that

14   concerns me for her performance.

15             If I may refresh my memory on her.  I --

16   I'm not sure if she had -- if she has any specific

17   vocational aspirations.  I don't remember what they

18   are.  Oh, if -- yeah, she -- she told me that she

19   didn't know when I asked her.  But -- but I would also

20   be concerned about her big academic swings, like

21   between her math and her other abilities.

22        Q.    Okay.  Are there -- the purpose of IEPs

23   and some special -- individualized ed -- education

24   plans in general is to help the students address

Highly Confidential - Mira Krishnan, Ph.D.

1   certain impairments or learning difficulties that they

2   have, right?

3        A.   So I -- I am not a teacher, but to the

4   best of my understanding, IEPs function in multiple

5   roles.  In general they allow for students to receive

6   specialized services that allow them to receive a

7   maximally free and appropriate education that allow

8   them to learn as much as they are able to learn by

9   adjusting the instructional method or content.  I

10  don't mean to be evasive with that answer, but IEPs

11  vary.  For some children with relatively milder

12  problems, the goal of an IEP is generally to help them

13  be able to learn age and grade appropriate information

14  along with their peers, but for other children who are

15  more significantly impaired, the goal of an IEP is --

16  is not for them to maintain grade level.

17       Q.   Okay.  And the final sentence of this

18  Recommendation section is, you say:  "And may prevent

19  her from success in a skilled vocation (that is,

20  reducing her work to simple unskilled work below her

21  potential if her learning and attention issues were

22  not a concern)."

23            What's the scientific support for that

24  statement?

Highly Confidential - Mira Krishnan, Ph.D.

```
1        A.    Well, first of all, at present she is

2   already showing problems with following multi-step

3   directions.  And in my experience most skilled work

4   is -- involves following relatively complex

5   instruction and most semiskilled work involves

6   following relatively detailed instructions.  That is

7   also corroborated by her psychometric performance and

8   sustained attention testing.

9        Q.    But what kind of -- besides the findings

10   that you have just described, where -- where is the

11   scientific support or literature that says that

12   people -- kids at her age who are 11 who have these

13   impairments are going to have an increased risk of not

14   being able to have a skilled vocation?

15        A.    So, earlier I -- I -- we discussed the

16   findings in the context of ADHD.  As I mentioned

17   already, in A█PPI███████ case, the cognitive and

18   emotional impairments both don't fit a

19   well-established profile that is seen in a large

20   number of patients, and so I don't think that there is

21   a scientific literature that looks at a large number

22   of people who -- who have the thinking and emotional

23   challenges that A█PPI██████ has.

24        Q.    So there isn't any scientific literature
```

Highly Confidential - Mira Krishnan, Ph.D.

1    that you can point me to to support this, is that

2    correct?

3         A.    I used, by extension, information from

4    other areas and so I don't think that A███████ has

5    diagnosable ADHD but she does have attention problems

6    and so I consider the -- the one that I already showed

7    you, and so I -- I do consider what we generally know

8    about people with cognitive -- with the kinds of

9    cognitive impairments and the kinds of emotional

10   problems, but, no, I don't think that there is a

11   scientific literature that assesses a large number of

12   people who are just like A██████ and follows their

13   outcomes.

14        Q.    Okay.  To wrap this up for today, I'm

15   going to ask you some questions about the issue of

16   differential diagnoses like we did with E███ S█████.

17             What are the other -- and I want to use

18   terms that -- that, you know, you are comfortable

19   with.

20             With respect to the cognitive impairment

21   that A███████ T███ has that -- that you found and

22   diagnosed, where do you come down on what -- how are

23   you going to describe what your diagnosis is?  I want

24   to use your words and then ask you a question about

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   differential diagnoses.

 2        A.    So, I think that APPI        has cognitive

 3   deficits in things -- in verbal reasoning and higher

 4   attention skills that would be unlikely to be

 5   present -- that are unusual for her in comparison to

 6   her other skills.

 7        Q.    Okay.  So that impairment that you just

 8   described, in your opinion that was caused by her

 9   exposure to developmentally -- developmental lead

10   exposure, right?

11        A.    That is the only potential source,

12   explanatory source that I'm aware of.

13        Q.    So what -- what were the differential

14   diagnoses as to causation that you went through in

15   order to come to that conclusion?

16        A.    So, I considered ADHD as described in the

17   report, but I don't think that she has symptoms that

18   meet the criteria for ADHD fully.

19        Q.    I'm sorry.  I think I -- I probably --

20   that was a poorly phrased question.

21             I'm referring to the -- the opinion that

22   you have that it's caused by exposure to lead as

23   opposed to something else.

24             What are the other things that can cause
```

Highly Confidential - Mira Krishnan, Ph.D.

1    these cognitive impairments besides exposure to lead?

2        A.    So, they -- well, the -- the other things

3    would include things like other neurodevelopmental

4    disorders like ADHD, and that's why I mentioned that.

5    This is an unusual pattern and I'm not sure that I

6    have a specific list of other conditions that would

7    cause this.  There are conditions -- there are a

8    number of conditions that cause scattered cognitive

9    deficits that are just not a consideration for

10   A▉▉▉▉▉, like epilepsy or other toxic exposures, but

11   I'm not aware of any other toxic exposures.

12       Q.    Yeah, but I'm not referring to just toxic

13   exposures.  I'm talking about other things like

14   genetics or, you know, anything else?

15       A.    I -- I'm not aware of any -- the only

16   relevant -- there -- the only -- there is some

17   relevant family history in -- in A▉▉▉▉▉▉case,

18   there are actually siblings with ADHD.  I am not sure

19   about their ages, although at least one of her

20   siblings is a twin, and -- and then her mother had

21   anxiety, but she reported no history of anxiety prior

22   to the water crisis.

23       Q.    So how did you rule out those as the

24   potential causes in your diagnosis as opposed to

Highly Confidential - Mira Krishnan, Ph.D.

 1  developmental lead exposure?

 2      A.    With respect to the attention problems the

 3  siblings have, that is a consideration, although I did

 4  not diagnose ADHD for A\[PPI\], and so I would not

 5  have a reason to expect that a family history of ADHD

 6  would cause the different pattern of cognitive

 7  problems that A\[PPI\] has.  She doesn't have anxiety

 8  and so likewise I wouldn't expect a family medical

 9  history of anxiety to cause her other kinds of

10  problems outside of anxiety.

11      Q.    All right.

12      MR. ROGERS:  So it's five o'clock.  Let's wrap

13  it up for this evening.

14          Let's get started promptly at nine o'clock

15  tomorrow.  You know, we basically have quite a bit of

16  work left to do on Ms. T\[PPI\] to go through the tests,

17  but I think it will be much faster this time, now that

18  I know what you told me about for S\[PPI\], and then we

19  have to finish up on the other two.

20          So, it's kind of hard to predict an

21  endpoint, but let's just get started right away in the

22  morning and move through as fast as we can and

23  hopefully get this done by, you know, one or clock or

24  so.  Okay?

Highly Confidential - Mira Krishnan, Ph.D.

```
 1        THE WITNESS:  Will you provide a list of the

 2   things that you asked me to provide you off line that

 3   I haven't yet provided you, please.

 4        MR. ROGERS:  If I can --

 5        MR. STERN:  He will provide -- this is -- this

 6   is Corey.  He can send them to -- to me and to Patrick

 7   and to Louise and we'll get them to you.

 8        MR. ROGERS:  Yeah, absolutely.  You know,

 9   Juliana will give us a rough transcript.  I didn't

10   write all of those things down, so I would have to go

11   by memory, but absolutely, I mean, within a day or two

12   we'll -- we'll have those to Corey and he can tell you

13   what they are.

14            But definitely I need that textbook with

15   the, you know, page references to the scoring criteria

16   for the things that aren't in the test packages, so to

17   speak.

18        THE WITNESS:  Okay.

19        THE VIDEOGRAPHER:  This is the end of today's

20   deposition.  We are going off the record at 5:02 p.m.

21                    ---

22            Thereupon, at 5:02 p.m., on Monday,

23   October 5, 2020, the deposition was concluded.

24                    ---
```

Highly Confidential - Mira Krishnan, Ph.D.

1                    REPORTER'S CERTIFICATE

2

3           I, JULIANA F. ZAJICEK, a Registered

4    Professional Reporter and Certified Shorthand

5    Reporter, do hereby certify that prior to the

6    commencement of the examination of the witness herein,

7    the witness was duly remotely sworn by me to testify

8    to the truth, the whole truth and nothing but the

9    truth.

10          I DO FURTHER CERTIFY that the foregoing is

11   a verbatim transcript of the testimony as taken

12   stenographically by me at the time, place and on the

13   date hereinbefore set forth, to the best of my

14   availability.

15          I DO FURTHER CERTIFY that I am neither a

16   relative nor employee nor attorney nor counsel of any

17   of the parties to this action, and that I am neither a

18   relative nor employee of such attorney or counsel, and

19   that I am not interested directly or indirectly in the

20   outcome of this action.

21          IN WITNESS WHEREOF, I do hereunto set my

22   hand on this 22nd day of October, 2020.

23          *Juliana F. Zajicek*

24          JULIANA F. ZAJICEK, Certified Reporter

Highly Confidential - Mira Krishnan, Ph.D.

```
 1                    DEPOSITION ERRATA SHEET

 2

 3

 4    Case Caption:  Flint Water Cases

 5

 6             DECLARATION UNDER PENALTY OF PERJURY

 7

 8             I declare under penalty of perjury that I

 9    have read the entire transcript of my Deposition taken

10    in the captioned matter or the same has been read to

11    me, and the same is true and accurate, save and except

12    for changes and/or corrections, if any, as indicated

13    by me on the DEPOSITION ERRATA SHEET hereof, with the

14    understanding that I offer these changes as if still

15    under oath.

16

17                              MIRA KRISHNAN, Ph.D.

18

19

20    SUBSCRIBED AND SWORN TO

21    before me this       day

22    of                , A.D. 20__.

23

24             Notary Public
```

Highly Confidential - Mira Krishnan, Ph.D.

```
 1                    DEPOSITION ERRATA SHEET

 2      Page No._____Line No._____Change to:_____

 3      _____

 4      Reason for change:_____

 5      Page No._____Line No._____Change to:_____

 6      _____

 7      Reason for change:_____

 8      Page No._____Line No._____Change to:_____

 9      _____

10      Reason for change:_____

11      Page No._____Line No._____Change to:_____

12      _____

13      Reason for change:_____

14      Page No._____Line No._____Change to:_____

15      _____

16      Reason for change:_____

17      Page No._____Line No._____Change to:_____

18      _____

19      Reason for change:_____

20      Page No._____Line No._____Change to:_____

21      _____

22      Reason for change:_____

23      SIGNATURE:_____DATE:_____

24                      MIRA KRISHNAN, Ph.D.
```