Highly Confidential - Mira Krishnan, Ph.D.

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF MICHIGAN

3                 SOUTHERN DIVISION

4

    -----------------------------)
5                                 ) Civil Action No.:
    IN RE:  FLINT WATER CASES     ) 5:16-cv-10444-JEL-MKM
6                                 ) (consolidated)
                                  )
7                                 ) Hon. Judith E. Levy
    -----------------------------) Mag. Mona K. Majzoub
8                                 )
    Elnora Carthan et al. v.      )
9   Governor Rick Snyder et al.   )
                                  )
10  -----------------------------)

11

12              HIGHLY CONFIDENTIAL

13      VIDEOTAPED DEPOSITION OF MIRA KRISHNAN, Ph.D.

14

15           TUESDAY, OCTOBER 6, 2020

16                  Volume 2

17

18      Remote oral deposition of MIRA KRISHNAN, Ph.D.,

19   conducted at the location of the witness in Grand

20   Rapids, Michigan, commencing at approximately 9:03

21   a.m., on the above date, before JULIANA F. ZAJICEK, a

22   Registered Professional Reporter, Certified Shorthand

23   Reporter, Certified Realtime Reporter and Notary

24   Public.

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   APPEARANCES:
 2   ON BEHALF OF INDIVIDUAL PLAINTIFFS:
 3        NAPOLI SHKOLNIK PLLC
          360 Lexington Avenue, 11th Floor
 4        New York, New York 10017
          212-397-1000
 5        BY:  PATRICK J. LANCIOTTI, ESQ.
               planciotti@napolilaw.com
 6
                    -and-
 7
          NAPOLI SHKOLNIK PLLC
 8        2665 South Bayshore Drive, Suite 220
          Coconut Grove, Florida 33133
 9        212-397-1000
          BY:  LOUISE R. CARO, ESQ.
10             lcaro@napolilaw.com
11
     ON BEHALF OF INDIVIDUAL PLAINTIFFS:
12
          LEVY KONIGSBERG, LLP
13        800 Third Avenue, 11th Floor
          New York, New York 10022
14        212-605-6200
          BY:  COREY M. STERN, ESQ.
15             cstern@levylaw.com
16
     ON BEHALF OF DEFENDANT CITY OF FLINT:
17
          BUTZEL LONG
18        41000 Woodward Avenue
          Stoneridge West
19        Bloomfield Hills, Michigan 48304
          248-258-1616
20        BY:  WILLIAM J. KLIFFEL, ESQ.
               kliffel@butzel.com
21
22
23
24
```

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    APPEARANCES: (Continued)
 2    ON BEHALF OF DEFENDANTS LEO A. DALY COMPANY, LOCKWOOD
      ANDREWS & NEWNAM, INC. AND LOCKWOOD, ANDREWS & NEWNAM,
 3    P.C.:
 4         FAEGRE DRINKER BIDDLE & REATH, LLP
           1717 Main Street, Suite 5400
 5         Dallas, Texas 75201
           469-356-2535
 6         BY:  TRAVIS S. GAMBLE, ESQ.
                travis.gamble@dbr.com
 7
 8    ON BEHALF OF DEFENDANTS VEOLIA WATER NORTH AMERICA
      OPERATING SERVICES, LLC, VEOLIA NORTH AMERICA, LLC AND
 9    VEOLIA NORTH AMERICA, INC.:
10         CAMPBELL CONROY & O'NEIL, P.C.
           1 Constitution Wharf, Suite 310
11         Boston, Massachusetts 02129
           617-241-3063
12         BY:  DAVID M. ROGERS, ESQ
                drogers@campbell-trial-lawyers.com;
13              ALAINA N. DEVINE, ESQ.
                adevine@campbell-trial-lawyers.com;
14              KRISTIN M. DUPRE, ESQ.
                kdupre@campbell-trial-lawyers.com
15
                     -and-
16
           MAYER BROWN LLP
17         71 South Wacker Drive
           Chicago, Illinois 60606
18         312-782-0600
           BY:  SARAH E. REYNOLDS, ESQ.
19              sreynolds@mayerbrown.com
20
      THE VIDEOGRAPHER:
21
           MR. DAVID LANE,
22         Golkow Litigation Services.
23
24
```

Highly Confidential - Mira Krishnan, Ph.D.

```
 1                    I N D E X

 2   WITNESS:                                PAGE:

 3    MIRA KRISHNAN, Ph.D.

 4         EXAM BY MR. ROGERS (Resumed).........  315

 5         EXAM BY MR. KLIFFEL..................  434

 6         EXAM BY MS. CARO.....................  460

 7         FURTHER EXAM BY MR. ROGERS...........  464

 8

 9                      * * * * *

10                  E X H I B I T S

11   MIRA KRISHNAN EXHIBIT              MARKED FOR ID
```

```
12    No. 15   Article: "Elevated Blood Lead      323

13             Levels in Children Associated With

14             the Flint Drinking Water Crisis: A

15             Spatial Analysis of Risk and

16             Public Health Response," by

17             Hanna-Attisha etc.

18    No. 16   DSM-V - Other Specified           331

19             Neurodevelopmental Disorder, Page

20             86

21    No. 17   Forensic Neuropsychological       336

22             Evaluation - A▇PPI▇  T▇PPI

23    No. 18   Forensic Neuropsychological       347

24             Evaluation - R▇PPI▇ V▇PPI▇
```

Highly Confidential - Mira Krishnan, Ph.D.

```
 1                E X H I B I T S (Continued)

 2    MIRA KRISHNAN EXHIBIT                  MARKED FOR ID

 3    No. 19    Forensic Neuropsychological          371

 4              Evaluation - D███PPI███   W██PPI

 5    No. 20    Wade Medical Laboratory re:          376

 6              D██PPI███   ██PPI██   W█PPI█,  █PPI██09;

 7              Restricted

 8              Distribution-Confidential-DW██PPI-

 9              WardeMedLab-MD-540097-000003

10    No. 21    Research Review Article: "Recent     405

11              Developments in Low-Level Lead

12              Exposure and Intellectual

13              Impairment in Children," by Koller

14              etc.

15    No. 22    Science Direct Water Research        415

16              article: "Lead release to potable

17              water during the Flint, Michigan

18              water crisis as revealed by

19              routine biosolids monitoring

20              data," by Roy etc.

21    No. 23    Notice of Taking Audio-Visual        420

22              Deposition

23

24
```

Highly Confidential - Mira Krishnan, Ph.D.

1       THE VIDEOGRAPHER:  We are now on the record.  My

2  name is David Lane, the videographer for Golkow

3  Litigation Services.

4             Today's date is October 6th, 2020.  The

5  time is 9:03 a.m.

6             This deposition is taking place remotely

7  in the matter of Flint Water Cases, restricted

8  distribution, bellwether dis -- depositions.

9             Our deponent today is Dr. Mira Krishnan,

10  Ph.D.

11             Our court reporter today is Juliana

12  Zajicek.  Counsel will be noted on the stenographic

13  record.

14       Dr. Krishnan, I just want to remind you

15  you are still under oath from yesterday.

16       THE WITNESS:  Thank you.

17       THE VIDEOGRAPHER:  Please begin.

18       MR. ROGERS:  Thanks, Dave.

19             MIRA KRISHNAN, Ph.D.,

20  called as a witness herein, having been previously

21  duly sworn and having testified, was examined and

22  testified further as follows:

23             EXAMINATION (Resumed)

24  BY MR. ROGERS:

Highly Confidential - Mira Krishnan, Ph.D.

1    Q.    Good morning, Doctor.

2    A.    Good morning.

3    Q.    As I mentioned off the record before we

4    got started, Mr. Lanciotti sent me an e-mail this

5    morning which contains reference -- reference norms

6    for the TMT and GPT tests that you administered to

7    these bellwether plaintiffs, and I wanted to just get

8    that on the record to make sure it's accurate and that

9    we have it.

10         So remember -- you remember that

11   discussion, of course, yesterday, right?

12   A.    I do.

13   Q.    So, the reference that I was provided is

14   to a textbook by a Baron, I.S. from 2018 entitled

15   "Neuropsychological Evaluation of the Child:  Domains,

16   Methods and Case Studies," Second Edition, Oxford

17   University Press, is that correct?

18   A.    That's correct.

19   Q.    And that's the reference book that you

20   referred to that has the normative values for the

21   tests that we discussed, right?

22   A.    Yeah, the -- the first and second editions

23   of that book have the same references, but the table

24   numbers are -- that were provided are for the second

Highly Confidential - Mira Krishnan, Ph.D.

1   edition.

2       Q.    Okay.  Thanks.

3           And what -- did you use the table numbers

4   in your test normative scoring from the second

5   edition?

6       A.    That's correct.  They are the same, it's

7   the same data.

8       Q.    Okay.  And the further information is that

9   for the TMT norms, they are at Table 10.08, Green --

10  I'm sorry, the names in parentheses -- "(Spreen and

11  Gaddes)", G-a-d-d-e-s.  The Kindle location that you

12  have is near 18903 and you -- and the page reference

13  in a, I guess, would be the hard cover book would be

14  524.

15          Is that all right?

16      A.    To the best of my knowledge.

17  Unfortunately the way that the Kindle book works, I'm

18  not 100 percent sure the page number is correct, but

19  the table number should be the same irrespective of

20  version.

21      Q.    Okay.  And for the GPT test norms, that is

22  Table 12.16, the author appears to be a Mr. Knight or

23  Ms. Knights, K-n-i-g-h-t-s, and the Kindle location

24  you referenced is 25675, the page number may be 710 in

Highly Confidential - Mira Krishnan, Ph.D.

1   the physical edition, right?

2       A.    To the best of my knowledge, that's

3   correct.

4       Q.    Okay.  And then there is a reference to

5   the CW -- oh, sorry -- COWAT test, and a reference to

6   a Table 9.21 in that same book.  I don't recall our

7   discussion yesterday of the COWA test.  It says here

8   on it e-mail that you mentioned it yesterday that you

9   used it in similar evaluations but you don't believe

10  you administered this particular test to any of the

11  four bellwethers.

12          Tell me about that, what -- what's the

13  story with that?

14      A.    It's a test that I -- I am -- it is a test

15  that I commonly use in this population.  I -- I would

16  have to go back and look at all of the reports, but I

17  think it's possible that I used it in one of the 14

18  children that I evaluated, but I went -- I went back

19  and looked at these four reports.  I didn't use them

20  in these four.  I provided it as a courtesy.  It is

21  the other norm that I might have used in one of these

22  evaluations that's in that book.

23      Q.    Okay.  Thank you very much.

24          So having said that now and provided --

Highly Confidential - Mira Krishnan, Ph.D.

1    provided me with this information, you believe -- you

2    have provided either in the test data reports

3    themselves and/or with this information, the normative

4    data for the other two tests as to which the test kits

5    don't have the normative data, all of the information

6    that would be related to the scoring and the norms for

7    all of the tests and evaluations that you did, is that

8    right?

9        A.    I believe that's correct.

10       Q.    Okay.  So let's turn now to some other

11   areas.  I have sort of some general questions before

12   we get into some of the specifics that I think would

13   bear upon all of the plaintiffs, and it has to do with

14   your diagnoses and -- and your opinion about --

15   opinions about causation.

16            So, as I understand it, and correct me if

17   I'm wrong, for all of these plaintiffs you hold the

18   opinion and you've testified to the opinion and you've

19   included it in your report that each of the

20   plaintiffs -- as to each of the plaintiffs, that their

21   impairments or the deficits that -- that you found in

22   your testing were more likely than not the

23   developmental lead exposure and that the source of the

24   exposure was lead in the water.

Highly Confidential - Mira Krishnan, Ph.D.

1              Is that a fair and accurate statement of

2    what your opinions are?

3        A.    I stand by the opinions as they are

4    originally written in the reports, but I believe that

5    that's a fair summary.

6        Q.    Well, the reason I said it this way is

7    that, you know, over the course of the day yesterday

8    we delved into, you know, the language that you used

9    in the reports and I'm sort of synthesizing it down to

10   an opinion.

11             So I'm going to say it again and then ask

12   you some questions about it.  And just tell me if this

13   is -- you know, these are your opinions or not.

14             So you hold the opinion -- opinions that

15   for each of the plaintiffs the impairments or deficits

16   that you found in your testing and evaluation of them

17   were more likely than not the result of developmental

18   lead exposure, is that right?

19       MS. CARO:  Objection; the reports speak for

20   themselves.

21             You can answer.

22   BY THE WITNESS:

23       A.    Are you -- first, can you clarify, please,

24   if you are referring to the four bellwethers that we

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   are currently discussing or some other group of

 2   bellwethers?

 3         Q.    Only these four.

 4         A.    Okay.  I -- again, I stand by the reports,

 5   but I believe that in these four cases I did state

 6   that I believe -- I -- I believe that that is correct.

 7         Q.    And do you also hold the opinion with

 8   respect to these four plaintiffs that the source of

 9   the exposure to lead developmentally was lead in the

10   water?

11         MS. CARO:  Same objection.

12   BY THE WITNESS:

13         A.    The -- I discussed this in detail with

14   each of the reports.  I am not aware of any other

15   sources of lead exposure for these children.

16         Q.    So, therefore, as I said, you hold the

17   opinion that the source of lead exposure for these

18   four bellwether plaintiffs was water, right?

19         A.    Correct.

20         Q.    So, I'm going to ask you some follow-up

21   questions based on that opinion:

22               What evidence do you have that there were

23   elevated levels of lead in the water that each of

24   these plaintiffs consumed?  And, again, it is the four
```

Highly Confidential - Mira Krishnan, Ph.D.

1    bellwethers that we are talking about here.

2         MS. CARO:  Objection; asked and answered.

3    BY THE WITNESS:

4         A.    We discussed this in great detail

5    yesterday.  I have stated repeatedly to you that the

6    re -- the evidence that I reviewed is the evidence

7    that is presented in each of the reports.  I have -- I

8    have summarized everything that I reviewed.  I did not

9    review anything that is not reported in any of the

10   reports.

11   BY MR. ROGERS:

12        Q.    No, but what specifically, what specific

13   evidence do you have that the water that these

14   individual plaintiffs drank had elevated lead levels

15   in the water that they consumed?

16        MS. CARO:  Objection; asked and answered.

17   BY THE WITNESS:

18        A.    I am not an expert in water delivery.

19   I -- I know that there are many experts -- I believe

20   that there are many experts involved in this case that

21   would know that area better than I do.

22             My basis is that these children have

23   evidence of lead exposure and they are within the

24   known distribution of lead exposure based on water in

Highly Confidential - Mira Krishnan, Ph.D.

1    the Flint, Michigan water system.  I -- all other

2    evidence is the evidence that I reviewed in the

3    reports.

4    BY MR. ROGERS:

5        Q.    Okay.  When you referred yesterday to that

6    same evidence, I think you were referring to, and

7    correct me if I'm wrong, as to the -- them being in

8    the areas where there was reported lead in the water,

9    you referred -- or your basis for saying that or the

10   evidence that you had of that was the

11   Dr. Hanna-Attisha report from 2016.

12            Am -- am I right about that?

13       A.    That's correct.

14       Q.    Okay.  So just -- I don't think we marked

15   that yesterday.  I'd like to mark this as our next

16   exhibit.

17       MR. ROGERS:  As I said off the record before we

18   got started with Juliana, I -- we -- I marked your

19   A PPI         T PPI  report as Exhibit 11 and then again as

20   14.  So this morning we are going to start with 15,

21   just to make sure we have a clear record on it.

22                (WHEREUPON, a certain document was

23                 marked Mira Krishnan, Ph.D.

24                 Deposition Exhibit No. 15, for

Highly Confidential - Mira Krishnan, Ph.D.

1                    identification, as of 10/06/2020.)

2    BY MR. ROGERS:

3        Q.    So I'm going to -- I do have the screen

4    shared, is that right, can you see this coming up now?

5        A.    I can see it, yes.

6        Q.    Okay.  So this is the Dr. Hanna-Attisha

7    and other authors study that we just referred to that

8    is now Exhibit 15.

9              This is the evidence that you have for

10   there having been elevated lead levels in the water

11   that the plaintiffs consumed, is that right?

12       A.    In the case of these four children, to the

13   best of my memory, I did not review any direct

14   evidence of water samples from their homes, and so

15   this is the only basis that I would have.

16   BY MR. ROGERS:

17       Q.    Thank you.  I'll close that out.  I'm

18   going to stop sharing at this time.

19             What evidence do you have that the amount

20   of lead in the water that was consumed by these

21   plaintiffs was to -- was sufficient in terms of amount

22   and duration of its consumption to cause the types of

23   disabilities and impairments or deficits that you have

24   diagnosed them as having?

Highly Confidential - Mira Krishnan, Ph.D.

```
 1        MS. CARO:  Objection; beyond the scope of the

 2    expertise.

 3    BY THE WITNESS:

 4        A.    I am not an expert in water, and my

 5    expertise, I -- I think I have been quite clear, is in

 6    clinical neuropsychology.  I am using the lab data

 7    available in each -- in the case of each children --

 8    child, consisting of blood and bone lead levels.

 9    BY MR. ROGERS:

10        Q.    Okay.  Ms. Caro, or Louise, I think when

11    we discussed this subject yesterday, I asked you

12    questions about the blood lead levels at least for the

13    first two plaintiffs, that being S▇▇PPI▇▇ and T▇PPI▇ as

14    having been negative, and I -- I think Louise's

15    objection was something to the effect of, Well, that

16    there isn't other evidence of blood lead levels for

17    these children, so I wanted to follow up on that with

18    you.

19              Are you aware of any evidence that these

20    four bellwethers lead -- besides the blood lead level

21    reports -- strike that.  I'll start again.  Sorry.

22              Are you aware of any other evidence

23    besides the blood lead level test reports with respect

24    to what were the actual or calculated or estimated
```

Highly Confidential - Mira Krishnan, Ph.D.

1  blood lead levels for these children?

2      A.     I am not aware of any evidence that is not

3  reviewed in my reports.

4      Q.     And the evidence reviewed in your reports

5  are the actual blood lead level test reports that were

6  conducted on these children, correct, and nothing

7  else?

8      MS. CARO:  Objection; mischaracterization of

9  testimony.

10  BY THE WITNESS:

11      A.     They are the ones that -- they are the

12  ones that I received for review.

13  BY MR. ROGERS:

14      Q.     Right.  So, therefore, the only evidence

15  that you are aware of that you are -- have knowledge

16  of as you sit here today as to what the blood lead

17  levels were in these four children are contained in

18  the test reports that you received and reviewed,

19  correct?

20      A.     Once again, I am not privy to any records

21  that were reports or data that I didn't review in my

22  reports.  So the ones that are represented in the

23  reports are the only ones to which I am privy.

24      Q.     I understand that, but it's a simple

Highly Confidential - Mira Krishnan, Ph.D.

1    question.

2           The only evidence or information that you

3    have, Doctor, as you sit here today, as to what the

4    blood lead levels were in these four bellwether

5    children at any time are the blood lead level test

6    reports that you received and that you reviewed and

7    that you've testified about so far, right?

8    A.    I believe I've answered that question

9    repeatedly, both yesterday and today.  Yes.

10   Q.    I want to talk briefly about your

11   methodology.  I think we covered this to some extent

12   yesterday, but I just want to make sure we -- I'm

13   clear on some things here.

14          Would you describe the methodology that

15   you employed, that you used or carried out to

16   determine whether the plaintiffs' impairments or

17   deficits that you found in your testing and evaluation

18   were causally linked or connected to their exposure to

19   wat- -- the lead in the water?

20   A.    I first interviewed the families and

21   determined what their concerns or complaints about

22   their children were.  Then I completed behavioral

23   observations and neuropsychological testing of the

24   children.  That included evaluation of their cognitive

Highly Confidential - Mira Krishnan, Ph.D.

1    and emotional skills.  I used the data that I -- we

2    discussed yesterday to obtain a general idea of the

3    kinds of impairments that are commonly seen in this

4    population, in addition to my own clinical experience

5    and my general understanding of the human brain and

6    neuropsychology, and I compared the impairments

7    observed in the testing to the family complaints and

8    to the range of impairments that are seen in lead

9    exposure, and I also considered by way of differential

10   diagnosis any other potential explanations for the

11   phenomena that I was seeing as described in each of

12   the individual reports.

13        Q.    Okay.  And how did you go about ruling out

14   the other potential causes or sources of their

15   impairments?

16        A.    This is described in detail in the

17   Conclusion section of each of the reports.

18        Q.    Okay.  So your methodology that you used

19   to rule out other potential causes of the disabilities

20   are as you described in the Conclusion section of your

21   report and there is nothing else except what you

22   reported there, is that right?

23        A.    In general -- and neuropsychological

24   reports can be hundreds of pages long if I write down

Highly Confidential - Mira Krishnan, Ph.D.

1    everything that I am thinking, but the high points are

2    represented in the Conclusions.

3        Q.    Do you recall having done anything other

4    than what's in the Conclusions to rule out other

5    potential causes of the disabilities or deficits that

6    these children experience?

7        A.    That is a fairly broad question.  If there

8    are specific alternate causes, I'm happy to discuss

9    them with you.

10       Q.    Well, you know, I -- it is a broad

11   question, but what is your answer?  I don't -- do you

12   have an answer for me?

13       A.    Generally speaking, neuropsychologists

14   consider a range of possible options.  I don't discuss

15   ones that seem overly implausible or have no evidence

16   or basis in any data, and so when I discuss the

17   conclusions, I don't discuss the possibility that the

18   children were tox -- were exposed to some other

19   substances that I don't know about and that there is

20   no suggestion that they were exposed to and I don't

21   consider other things that are implausible based on

22   their presentation.  I considered the ones that are

23   the most high likelihood alternative explanations in

24   the Conclusion sections.

Highly Confidential - Mira Krishnan, Ph.D.

1      Q.      In terms of A█████ T███, I have a few

2   more questions following up on the end of our

3   discussion yesterday, and that is, and I think you

4   made mention of this, you noted in your interview or

5   your report of the family history that there was a

6   history of ADHD and anxiety for some of the members of

7   her family.

8           Is that right, do I have that right so

9   far?

10     A.      The ADHD was in siblings and the anxiety,

11   per my understanding, was in the plaintiff's mother

12   after the water crisis began.

13     Q.      Okay.  How -- how did you rule out, if at

14   all, genetic predisposition as the cause of Ms. T███

15   alleged -- or her neurocognitive and mood disorders

16   that you diagnosed?

17     A.      We discussed this yesterday, but to

18   reiterate what I said yesterday, first of all, I did

19   not think that she had ADHD, and so the genetic

20   inheritance of ADHD would not be relevant.

21           I also did not think she had an anxiety

22   disorder and so the genetic inheritance of anxiety

23   would also not be relevant.

24     Q.      Did you -- you also noted in your report

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    that Ms. T███  mother has bipolar disorder.

 2             Is that relevant in any way to any of the

 3    diagnoses for A████   T███

 4        A.    I do not see a mention of bipolar disorder

 5    in my report.  Can you point out to me what you are

 6    looking at, please?

 7        Q.    Yeah, let -- I will.

 8             That's not coming out clearly in my

 9    highlighting here on the report.  Let's come back to

10    that.  During a break I'll find that reference for you

11    and we'll come back to that one.

12             Okay.  Now let's do what we -- I had

13    mentioned we were going to do earlier, and that is

14    mark as Exhibit 16, and I'll share my screen so you

15    can see it here, the section of the DSM-V that has to

16    do with Other Specified Neurodevelopment --

17    Neurodevelopmental Disorder.

18                   (WHEREUPON, a certain document was

19                    marked Mira Krishnan, Ph.D.

20                    Deposition Exhibit No. 16, for

21                    identification, as of 10/06/2020.)

22    BY MR. ROGERS:

23        Q.    Is this -- take a look at this, and is

24    this the diagnostic criteria that -- from the DSM-V
```

Highly Confidential - Mira Krishnan, Ph.D.

1   that you were referring to yesterday when you

2   mentioned that you thought -- you felt that perhaps a

3   more appropriate diagnosis would be other specified

4   neurodevelopmental disorder versus mild cognitive

5   disorder?

6        A.    I discussed that in common clinical use

7   these two terms are used somewhat interchangeably when

8   the question is the impairment of cognitive functions

9   in young children because they are in the

10  developmental period, but this is the -- the

11  alternative -- this is the other diagnostic material

12  that I made reference to, yes.

13       Q.    So just to be -- yeah.

14             So just to be clear, I think in three out

15  of the four bellwether plaintiffs, that would be T PPI,

16  V PPI        and W PPI, in your reports you have a

17  diagnosis of mild neurocognitive disorder, right?

18       A.    I think that that is correct.

19       Q.    And do you -- are you also -- and then

20  because of our discussion, you said you had some

21  clinical experience recently in discussions with

22  colleagues or something to that effect that you had

23  considered potential other appropriate diagnoses or

24  terms for the diagnoses because they don't fit

Highly Confidential - Mira Krishnan, Ph.D.

1  squarely within that particular definition or

2  diagnostic criteria.

3          Do I have that right?

4      A.    As we discussed yesterday, the fundamental

5  problem is that the DSM-V criteria for a

6  neurocognitive disorder talks about decline from prior

7  functioning, but in young children when there is a

8  loss of functioning, it may not present as a decline

9  because the skills are also developing during the time

10  period in question.  But, correct --

11     Q.    So --

12     A.    -- yes, this is something that we have

13  discussed in the clinic recently.

14     Q.    So, what I'm trying to get to here is with

15  respect to the three children in which you have in

16  your report made a diagnosis of mild neurocognitive

17  disorder, is there evidence that there was a decline

18  from a pre -- in their functioning in that respect, a

19  modest decline?

20     A.    There is evidence of a modest impairment

21  in their functioning.

22     Q.    And -- but the modest impairment in their

23  functioning, does that -- is there evidence that it

24  declined from a previous level that they were

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   functioning at before?

 2       A.    There is evidence that it is statistically

 3   unlikely that it -- that their general skill level

 4   would have predicted those skills that are impaired.

 5   There is no prior neuropsychological testing that I'm

 6   aware of in these specific cases.  And so, because

 7   these children are developing and because there isn't

 8   prior cognitive data, I cannot explicitly point you to

 9   a quantitative basis for a prior level versus the

10   current level.

11           Many of these children were also very

12   young during the times in question.  And so, for

13   instance, you don't talk about a decline in the

14   reading skills of an eight-year-old who was exposed to

15   lead at five because they were not expected to read at

16   age five.

17       Q.    So when we go through the testing, which

18   we'll do in a moment for A PPI      T PPI  what you are

19   saying is that, for some of the tests, anyway, there

20   is evidence of an impairment of certain neurocognitive

21   functions but that you are not able to say whether

22   there was an actual decline from a preexisting level

23   with respect to that particular skill, is that right?

24       A.    I'm saying that in most of these cases the
```

Highly Confidential - Mira Krishnan, Ph.D.

1    question of decline from a preexisting skill is

2    irrelevant.

3         Q.    Well, isn't it relevant to the issue of

4    timing and causation, that is to say, what actually

5    explains or accounts for that deficit?

6         MS. CARO:  Objection; asked and answered.

7    BY THE WITNESS:

8         A.    As I've explained several times both

9    yesterday and today, when children are developing,

10   these cognitive or other skills become available to

11   them as very develop over time.  These children were

12   young at the time in question, ranging approximately,

13   I believe, from age two or three with respect to the

14   14 patients I examined, up to, I think, about age

15   seven at the end of the crisis for the oldest children

16   by just doing that math in my head.

17              But these children were all young when

18   these things happened.  So, generally speaking,

19   neuropsychologists are interested not necessarily in

20   loss of prior functioning, because the functions in

21   question were generally developing over the course of

22   time in question, but we are concerned with alteration

23   of the trajectory of that development.

24              (WHEREUPON, a certain document was

Highly Confidential - Mira Krishnan, Ph.D.

```
 1                    marked Mira Krishnan, Ph.D.

 2                    Deposition Exhibit No. 17, for

 3                    identification, as of 10/06/2020.)

 4    BY MR. ROGERS:

 5        Q.    Okay.  Let's go to Exhibit 17, which I

 6    should be sharing.

 7              Can you see this on your screen?

 8              Doctor, I -- I just want to make sure you

 9    can see it?

10        A.    I'm sorry.  Who is Sharon?

11        Q.    I am right now.  Can you -- can you see

12    it?

13        A.    Oh, I can see it, yes.

14        Q.    Yeah.  Yeah.  So --

15        A.    I thought you were directing that question

16    to someone other than me.

17        Q.    Nope.  I'm only -- only asking you

18    questions today.

19              So, what I mentioned before was that I'm

20    not going to mark your report separately.  Actually,

21    yeah, this one is.  Okay.  I stand corrected.

22              This Exhibit 17 contains both your full

23    report on A██PPI██ T█PPI█, but it also has all of the

24    data from the testing with it.  What I mentioned was
```

Highly Confidential - Mira Krishnan, Ph.D.

1    when we get to the next two reports, I'm not going to

2    re -- mark your report separately because it's

3    contained in the report or the document with the raw

4    data.

5             So let me just get this view oriented

6    correctly and we'll take a look at this.

7             So, all of these raw data compilations,

8    and they are all approximately 120 pages like this one

9    is, they follow the same basic format, right, you have

10   the raw data, the test reports, the scores and

11   everything, and they all start out with this sort of

12   cover sheet that describes what tests you

13   administered, right?

14        A.    That's correct.

15        Q.    And show me on here, point out to me which

16   of these would the -- would the norms for the scoring

17   be contained in that textbook that we talked about?

18             Is it this one right here that I'm

19   highlighting, the -- can you see my cursor, the TMT?

20   Oops.

21        A.    Yes, that's correct.  That one and then in

22   the third column at the top, GPT, the same two tests

23   that we previously discussed.

24        Q.    I see.

Highly Confidential - Mira Krishnan, Ph.D.

1          So, my cursor is going -- I'm not able to

2    get my cursor over to the shared screen right now.

3          A.    I'm not an expert in IT either.  Sorry.

4          Q.    No, I wouldn't -- okay.  There is one

5    where I'm not asking you the question.  I need help

6    from Dave on this one.

7          MR. ROGERS:  Something happened, Dave, where I

8    now can't get my cursor over to my shared screen.

9    Let's go off the record for a second.  Sorry about

10   that.

11         THE VIDEOGRAPHER:  Off the record, 9:33 a.m.

12               (WHEREUPON, discussion was had

13                off the record.)

14         THE VIDEOGRAPHER:  Back on record, 9:35 a.m.

15   BY MR. ROGERS:

16         Q.    Okay.  Sorry about that snafu there.  We

17   are -- we are back in business here.

18         So, with respect to the remainder of the

19   tests, Doctor, besides the TMT and the GPT, the norms

20   for scoring are all contained, as we discussed before,

21   in the actual scoring kits for the individual tests

22   that you described yesterday for -- for this

23   particular plaintiff as well, right?

24         A.    In looking at the tests that were

Highly Confidential - Mira Krishnan, Ph.D.

1  administered, the tests are the same tests and the

2  answers are the same answers as provided yesterday.

3      Q.    Yeah.  So, I mean, but with respect to the

4  scoring and the answers, my question was:  The same

5  norms for scoring those are contained within the test

6  kits themselves for each of the individual tests,

7  right, the publishers of the test?

8      A.    As we discussed yesterday, there was one

9  of the tests where the norms are actually on the

10  second page of the test and are so included in the

11  document that I gave you, but for all of the others,

12  yes, the norms are in the test kits or manuals.

13     Q.    I -- I appreciate that.  Thank you.

14            Remind me which one of those tests

15  contains the norms for the scoring on the form itself,

16  which one?

17     A.    That's the Tower of London, Drexel

18  Edition, it is indicated as TOL-DX in the left column.

19     Q.    Got it.  Thank you.

20            So, having looked at that, I want to go

21  back to -- and this -- this should be a -- a little

22  bit more efficient than the way we did it yesterday.

23  I'm going to go to your report where it has all of

24  these tests, and I know that you've summarized them in

Highly Confidential - Mira Krishnan, Ph.D.

1    a different section of the report, but if you wouldn't

2    mind, just tell me for all of these tests in the

3    section here on your report, Pages 5 through -- 5 and

4    6, I guess, which ones did you find any abnormalities

5    or deficits in your testing of A████PPI █████ T█PPI?

6         A.    So, I believe we discussed some of this

7    already yesterday, but starting with the WISC-V --

8         Q.    Uh-huh.

9         A.    -- on the first page, the score SI = 5 is

10   a similarities.  It is a test of verbal reasoning that

11   is impaired.

12        Q.    Okay.  If it's an SI 5 level, to what

13   extent is that impaired?

14        A.    Psychometrically it is considered mildly

15   impaired.

16        Q.    What would be the score that would be

17   required for it to be not mildly impaired?

18        A.    Are you asking for a score that would be

19   considered normal or are you asking for a score that

20   would be considered more than mildly impaired?

21        Q.    No.  You said it's -- she said -- you said

22   that this score, 5, represents mildly impaired, right?

23        A.    I did, yes.

24        Q.    What would the score have to be in order

Highly Confidential - Mira Krishnan, Ph.D.

1  for it to be more normal than mildly impaired, the

2  next level up?

3      A.    Okay.  That's -- that's the question that

4  I just asked you.  Seven or higher.

5      Q.    Okay.  Thank you.

6            Okay.  Any others?

7      A.    I discuss in the report some of the

8  pattern differences, like the -- the pattern

9  difference between word reading and math computation,

10  but those scores are not considered impaired as

11  discussed in the report.

12            The next impaired score is --

13      Q.    I'm sorry --

14      A.    -- is TMT-A which is --

15      Q.    I'm sorry.  Excuse me.

16            The word reading and the math computation,

17  that's from the WRAT5, right?

18      A.    That's correct.

19      Q.    I -- I just wanted to make sure we aren't

20  still in the WISC-V.  Okay.  So I understand what you

21  are saying there.  Yes.

22            Please go on.  I -- were you on the TMT

23  now?

24      A.    Yes.  So the TMT-A Z score of minus 1.8 is

Highly Confidential - Mira Krishnan, Ph.D.

1    impaired.

2         Q.    And what does that refer to?

3         A.    What do you mean, what does that refer to?

4         Q.    What -- what's the TMT-A?

5         A.    So this is a question I answered

6    yesterday, but this is a test of --

7         Q.    Doctor, Doctor, Doctor, Doctor, Doctor,

8    excuse me.

9              So, when you -- when you keep interjecting

10   this is an answer that I -- a question that I answered

11   yesterday or you make comments to the effect like you

12   did yesterday that any neuropsychologist would know

13   the answer to this question, I'm going to ask you not

14   to do that, okay, because it's -- it's causing delays

15   and it's just not helpful.

16             So I'm asking you the questions, I would

17   like you to please answer my questions and not have

18   the commentary about whether you've answered it before

19   or whether anyone else would know the answer to the

20   question, okay.

21             Would you do me that favor going forward.

22             So, please explain what is the TMT-A test

23   about?

24        A.    It is a test of visual scanning and rapid

Highly Confidential - Mira Krishnan, Ph.D.

1    information processing.

2         Q.    All right.  And what -- is there other --

3    any other test that reveals any other deficits for

4    Ms. T███?

5         A.    The next test is on the next page at the

6    top.

7         Q.    Okay.

8         A.    So, this test has a number of different

9    scores.  If you scroll up a little bit so that you can

10   see the top of the prior page, it begins where it says

11   "NEPSY-2."

12        Q.    Um-hum.

13        A.    All of those scores are part of the same

14   test and are discussed together in the preceding

15   section, but the -- the test is called Auditory

16   Attention and Response Set.  It is a test of sustained

17   attention and response vigilance.  A███ did

18   adequately with the easier component, which is

19   auditory attention, that those are the scaled scores

20   that are at the bottom of that page, but she was

21   impaired with the more difficult condition response

22   set which is at the top of Page 6.

23        Q.    On all of those or just some of those that

24   are listed there?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.     The scores are considered -- I know that

2    you don't want me to point out that I've -- we

3    discussed this yesterday, but as I previously

4    mentioned, neuropsychologists don't go through scores

5    line by line and say this is impaired, this is intact,

6    this is impaired, this is intact.  I am answering your

7    questions at your request, but this is not typically

8    the way that people in my field consider the data.

9             The correct total score in the first line

10   and the combined total score in the last line are

11   impaired.  The overall result is one that I consider

12   impaired.

13     Q.     Okay.  Any others, meaning any other

14   evidence of any deficits or impairments based on your

15   testing?

16     A.     For the cognitive skills, no.

17     Q.     Are there some test results here that are

18   supportive of or evidence of the mood disorder that

19   you diagnosed in A█PPI█████ T█PPI██?

20     A.     That is primarily the BASC-3.  The index

21   scores are indicated here.  If you would like to go

22   through the line-by-line impairment, I would direct

23   you to the BASC score report form which is much

24   further down in the document.  I believe it is on

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    Page 92 of the overall PDF file.

 2         Q.    Thank you.  Let's do that.

 3               Okay.  I remember we looked at this

 4    similar type of form for Mr. S████, right.  So,

 5    okay, yeah, explain this to me, please.

 6         A.    The general way that these scores are

 7    interpreted is the same.  There are -- questions asked

 8    may vary slightly from child to child, although I

 9    believe that in the case of E███ and A███, the

10    ages are -- are close enough to the same that the same

11    questions are being asked.

12               The -- the questions, again, decompose

13    into different content areas of behavioral and

14    emotional functioning and are adjusted based on the

15    child's age at the time of report.  And, again, as you

16    see on the screen, the dark gray areas are considered

17    clinically significant by the test publisher, the

18    light gray areas are considered at risk, and

19    percentiles are also included just below the bottom of

20    where you are currently on the screen.

21               But so, as described in the report, the

22    primary area that was impaired was the social skills

23    area where A███s social skills were described as

24    worse than 97 percent of comparison population.  There
```

Highly Confidential - Mira Krishnan, Ph.D.

1    are -- because these publishers use different

2    standards for what is considered clinically

3    significant, and we also consider the base rates of

4    different kinds of disorders, it is common for

5    psychologists and neuropsychologists to also look at

6    some of the items that are in the light gray area,

7    particularly to note if they fit a pattern, and so in

8    A PPI        s case, her mother is also reporting fairly

9    low levels of adaptability, fairly high levels of

10   social withdrawal, and some other problems that are

11   relatively more minimal.

12        Q.    So remind me, that the BASC-3, is that a

13   test that's administered by interviewing the parent?

14        A.    It is a test that is a questionnaire that

15   the parent fills out directly.

16        Q.    That's right, okay.  You told me that.

17   You did tell me that yesterday, that's right.

18             Okay.  And that's how you performed it or

19   you had the mom do that in this case for Ms. T PPI ,

20   right?

21        A.    That's correct.

22        Q.    Okay.  I think that concludes the

23   questions for Ms. T PPI .  Let's move on to R PPI

24   V PPI        .

Highly Confidential - Mira Krishnan, Ph.D.

1          MR. ROGERS:  Let's mark as Exhibit 17 --

2          THE COURT REPORTER:  Exhibit 18.

3          MR. ROGERS:  Right.  Thank you.  Exhibit 18,

4     this is the full record for your -- which includes

5     your report, the forensic neuropsychological

6     evaluation, and all of the underlying test data and

7     reports for R███ V███         .  And as I did with the

8     other plaintiffs, I'm going to ask you some background

9     first.

10                    (WHEREUPON, a certain document was

11                     marked Mira Krishnan, Ph.D.

12                     Deposition Exhibit No. 18, for

13                     identification, as of 10/06/2020.)

14    BY MR. ROGERS:

15         Q.    So, as of the time of the evaluation which

16    you did, and the evaluation was June 27th of this

17    year, 2020, right?

18         A.    Correct.

19         Q.    And so that meant that R███  Va███      ,

20    she was 6.8 years old or six years, eight months old,

21    right?

22         A.    Are you intending to share the screen at

23    this point?

24         Q.    I am.  Sorry.  You are right.  I haven't

Highly Confidential - Mira Krishnan, Ph.D.

1    done that yet.  Thanks.

2            Got it?

3        A.    Yes.

4        Q.    So she is six years, nine -- eight months

5    old as of that time, and she had just finished the

6    first grade, right?

7        A.    Correct.

8        Q.    I'm going to ask you some questions about

9    what you know about her reported blood lead levels

10   based on the reports that you reviewed and that you

11   reported on in your report for R████  V█████████

12           The first reference to a blood lead level

13   is on Page 1, which I'm highlighting here, and similar

14   to some of the reports that we saw yesterday, on

15   November 3rd, 2014, there was a negative blood lead

16   level assay test that was done, right?

17       A.    That is my understanding, yes.

18       Q.    And then the next one appears on Page 2.

19   I'm highlighting it here.  On the -- sorry -- I missed

20   one up top here.

21           On September 2nd, 2015, the blood lead

22   level was reported as .7, right?

23       A.    That's my understanding based on reviewing

24   the records.

Highly Confidential - Mira Krishnan, Ph.D.

1    Q.    And then on January 14th, 2016, another

2    blood lead level test was done and the amount was --

3    the measurement was 1.3 micrograms per deciliter,

4    right?

5    A.    Again, that -- that is my understanding

6    based on reviewing the records.  I did not perform

7    these blood assays.

8    Q.    And then based on the records, the last

9    one that you are aware of is this blood lead level

10   that was done on May 22nd, 2017, .5 micrograms per

11   deciliter, right?

12   A.    To the best of my knowledge, the only

13   other test after that was the bone lead test that is

14   lower on that page.

15   Q.    Right.  But I -- I'm just -- based upon

16   the information that you have, she was tested on

17   May 22nd, 2017, and the blood lead level was .5,

18   right?

19   A.    Correct.

20   Q.    And as we also discussed yesterday, is it

21   also true that with respect to R███ V███████

22   blood lead levels that were measured and based on

23   these test, you have not looked to do a -- or done an

24   analysis of how that compares to averages for children

Highly Confidential - Mira Krishnan, Ph.D.

1    who at this point would have been between age one and

2    three, right, national averages?

3        A.    My answers to that questions -- that

4    question are the same as they were yesterday, yes.

5        Q.    Yes, meaning you haven't done that

6    analysis, correct?

7        A.    Correct.

8        Q.    Okay.

9              Let's go to page -- the page that has your

10   diagnosis, just as we did the other day for R██PPI██.  Or

11   just as we did yesterday with the other plaintiffs.

12             Okay.  In your diagnosis, your diagnosis

13   is:  "...mild neurocognitive disorder...which is more

14   likely than not a result of developmental lead

15   exposure," right?

16       A.    That is what the page says, yes.

17       Q.    And I just wanted to make sure for R██PPI██

18   that your testimony is the same concerning the Other

19   Specified Neurodevelopmental Disorder from the DSM-V

20   that we marked now I think as Exhibit 15.

21             Is there -- having considered it more, do

22   you think that that's the more appropriate diagnosis

23   than the one you have in your report?

24       A.    I -- all -- all of my prior answers are --

Highly Confidential - Mira Krishnan, Ph.D.

1    apply to the same issues and the same issues are

2    present with R███. There is a cognitive -- there is

3    a cognitive problem that has the same issues of

4    developmental nature that we discussed in the prior

5    case with A████.

6         Q.    So where do you come down on this, is it a

7    blend of the two DSM criteria or is it the Mild

8    Neurocognitive Disorder or is it the Other Specified

9    Neurodevelopmental Disorder?

10        A.    I come down in believing that the DSM-V is

11   not purely authoritative in defining the diagnostic

12   criteria for disorders and that rather

13   neuropsychologists should consider all of the

14   available scientific evidence. But the way that the

15   DSM-V describes the two disorders, the condition is

16   really a blend of the two.

17        Q.    In what respect is it a blend?

18        A.    There is a mild impairment -- there is a

19   modest impairment in cognitive functioning as

20   described in the neurocognitive definition in the

21   DSM-V and there is a developmental aspect to the

22   disorder as described in the other condition.

23        Q.    I see.

24              So with respect to R███, is your answer

Highly Confidential - Mira Krishnan, Ph.D.

1    the same as it has been with -- with the other two

2    plaintiffs, that in terms of determining whether there

3    has been a decrease or a decrement in a prior level of

4    cognitive performance, you are not aware or you don't

5    have any evidence to support that for R███ ?

6         A.    Again, as with the prior case of A███████ ,

7    it's my opinion that that question is irrelevant

8    because in R███████  case R███████  was 6-1/2 years old,

9    approximately, when I saw her in 2020, and so during

10   the time period in question, she was very young.  In

11   2015 she would have been 1-1/2 years old, and so, for

12   instance, a child would not be expected to lose

13   reading abilities that they had at 1-1/2 or attention

14   abilities that they had at 1-1/2 because those

15   abilities had not yet been developed.

16        Q.    Okay.  Let's go to your recommendations

17   here, just as we did with the others yesterday.

18             You say with respect to R███████  that you

19   estimate, do you see this section here?

20        A.    Yes.

21        Q.    Just like similar to what we looked at

22   yesterday for one.

23             "I would estimate a 25-50% likelihood that

24   R███████  may require future tutoring services (up to one

Highly Confidential - Mira Krishnan, Ph.D.

1    hour per day) or a future individualized education

2    plan, although she is appropriate for placement in a

3    mainstream classroom."

4             What is that based on?

5        A.    The answer to that is -- is substantially

6    the same as the answer I gave to the similar question

7    previously, meaning that I do not have a direct source

8    to provide you a quantitative specific estimate, but

9    this is the best approximation I can make based on my

10   clinical experience with this population.

11       Q.    I think you described the evidence or the

12   basis for that is your anecdotal experience with your

13   clinical patients.

14             Is that true with respect to your estimate

15   here for R██PPI██?

16       A.    Yes, similar to A██PPI██████ case, I'm not

17   aware of a large sample of children who have exactly

18   the same cognitive profile from which I could draw an

19   answer to that question, and I do not have a

20   quantitative database of my own that I could use to

21   answer that question.

22       Q.    The second recommendation that you have

23   here says, that I've highlighted now:  "While IQ at

24   the current age is not a completely predictive" --

1    "completely predictive of long-term outcome," what was

2    her IQ measured in the FISQ (sic), actually, what was

3    that?

4         A.    It was 92.

5         Q.    And where does that fit within the average

6    or normal range or where does that fit?

7         A.    It is average.  It is a little lower than

8    the other IQs that we discussed yesterday.  I don't

9    have a percentile in front of me, but it is somewhere

10   around, I believe, the 35th percentile and so roughly

11   two-thirds of children her age perform better than her

12   and roughly one-third perform worse than her.  That's

13   my estimation without getting out a calculator.

14        Q.    And so you say here that with -- "While IQ

15   at the current age is not completely predictive of

16   long-term outcome, individuals at this intellectual

17   level are generally able to graduate from high school

18   with a diploma."

19             What -- what's the "generally" refer to?

20        A.    I did not see in R████PPI████ case factors that

21   would cause me to think that she has a substantially

22   statistically elevated likelihood of dropout.

23        Q.    Okay.  Thanks.

24             Is that true for college as well as high

Highly Confidential - Mira Krishnan, Ph.D.

1    school?

2        A.    Based on my general knowledge, I think

3    that it is -- it is not -- it is difficult to make a

4    quantitative statement because R PPI  is very young.

5    She would go to college approximately 12 years from

6    now, and I don't think that there is enough stability

7    in testing at age six to make a strong statement about

8    that.

9        Q.    Is that also true with respect to her

10   potential for success in a skilled vocation versus

11   unskilled vocation?

12       A.    So, the -- when I was a child my mom

13   listened to a lot of financial television and they

14   would say that the best predictor of future returns is

15   past performance.

16            Given the data that I have available, the

17   most reasonable assumption is that the deficits seen

18   today would be deficits that would continue in the

19   future.  There is no assumption that is more justified

20   by the evidence than that.

21            I think that there is probably some

22   reduction in her functioning, but I am not able to

23   provide a quantitative degree of that reduction.  And

24   I do think that some of the skills that she struggled

Highly Confidential - Mira Krishnan, Ph.D.

1   with would be important for many skilled vocations,

2   but I am not able to quantify that.

3       Q.   There was some information in some of the

4   scientific literature that we looked at yesterday with

5   respect to, some statistical data anyway, on increased

6   risk for children diagnosed with ADHD that we talked

7   about for E▆▆▆ S▆▆▆

8           Do you have any scientific literature or

9   data with respect to the potential for R▆▆▆

10  V▆▆▆    to complete either high school, college or

11  engage in skilled or unskilled vocations?

12      A.   So, in R▆▆▆  case I did not think that

13  she had a current pattern that was consistent with

14  ADHD.  I also didn't see a clear pattern that was

15  consistent with nonverbal learning disorder.  That's

16  discussed on the top of Page 8 of the report.

17          The reason I mention that is I believe

18  that I also provided you references that discuss

19  long-term outcomes from nonverbal learning disorder.

20  I don't think that that is something that we discussed

21  yesterday, but -- but that's the other closest source

22  of information that I have available.

23      Q.   Well, let me make sure I understand.

24          Do you or do you not think that based on

1   the evidence you can opine as to whether or not R⬛PPI⬛,

2   based on her testing and her -- the evaluation that

3   you did, has an increased risk of graduating from high

4   school or not?

5        A.    I'm not able to quantify that.

6        Q.    The same question with respect to college?

7        A.    I'm not able to quantify that either.

8        Q.    The same question with respect to engaging

9   in a skilled vocation versus an unskilled vocation?

10       A.    I am not able to quantify that either.

11       Q.    What is the literature that you are

12  referring to that has some analysis of the future

13  potential for kids with, what was it, the deficit that

14  she had that you just described?

15       A.    There -- there -- I believe -- I have to

16  look more closely at this literature, but I believe it

17  is the Margolis reference that's in the -- the

18  reference list I provided you.

19       Q.    What -- what -- which specific deficit

20  does that literature refer to or describe?

21       A.    Nonverbal learning disorder.

22       Q.    Okay.  Let me just take a quick look at

23  that.

24             So is that the 2020 paper, Margolis, et

Highly Confidential - Mira Krishnan, Ph.D.

1   al. "Estimated prevalence," et cetera?

2        A.    Correct.

3        Q.    I see.

4              Okay.  Well, what I'm going to do, then,

5   is I've already got all of the exhibits lined up and

6   marked in order, so let me mark this one as -- I'll

7   bring it up -- I'll share the screen so you can see

8   it.  And then we'll mark that one as -- let's see,

9   I'll figure that out in a minute.

10       A.    The -- but as I'm looking at that paper,

11  it doesn't really provide any quantitative information

12  about long-term outcomes, and so I think that the --

13  the issue is really limited in terms of what we know

14  or that what we have in the scientific literature to

15  make statements, which I believe is what I had already

16  said in answer to the prior question.

17       Q.    All right.  Well, we have the paper, so

18  that's good.  We don't need to mark it based on

19  that -- that answer.  Thank you.

20             Let's go back to the V██PPI██████ child in

21  terms of recommendations and -- and what the future

22  might hold.

23             Do you remember yesterday that we

24  discussed, at least for the ADHD diagnosis for

Highly Confidential - Mira Krishnan, Ph.D.

```
1    S█████, and I think also for the -- some of the

2    deficits that T█████ A█████ T████ exhibited, for any

3    of the deficits that you found in R█████ V█████████

4    that you've gone through in detail, are -- are there

5    any specific coping mechanisms or teaching skills or

6    treatment that would help her to enhance her

7    performance in those areas in which she has deficits?

8         A.    In R████████ case, it -- well, in R███████

9    case some of those deficits fell in areas that have to

10   do visual processing and visual reasoning.  What I had

11   noted in my report was that while she had those

12   deficits or lower scores in those areas, she had

13   normal academic functioning, which is why I

14   recommended that she may need an IEP in the future but

15   that I wouldn't be able to recommend one at present.

16              So, in terms of treatments that are used

17   for this kind of -- these kinds of thinking or

18   learning problems, it is -- there -- so at the -- the

19   Margolis paper that we started discussing talks about

20   the issue that the condition is only now coming to a

21   point where there is a clear prevalence estimate.  And

22   so in my experience, the -- the treatment is not as

23   standardized as some other conditions for these

24   nonverbal learning problems.
```

Highly Confidential - Mira Krishnan, Ph.D.

1                What I recommend to patients that I see

2      with these kinds of thinking problems are sometimes

3      occupational therapy is helpful, occupational

4      therapists have some skills in remediating visual

5      kinds of tasks, functioning, sometimes I recommend

6      that youth with these kinds of problems have extra

7      emphasis in things like structured training in the

8      arts, like drawing or painting, because that tends to

9      enhance visual functioning.

10               And then, if the child starts to show

11     these problems in core academic areas in the future,

12     which is typically they are seen in math, in the

13     second to fourth grade kind of range, then -- then

14     the -- the IEP recommendations would be for special

15     education services or a response to intervention

16     services is another term that teachers use that would

17     remediate those skills at that time.

18          Q.   Are those treatment or compensa- -- go

19     ahead, sorry.  Are you going to say something else?

20          A.   Correct.

21               Unlike ADHD, this is a condition that

22     would not typically be treated with medications.

23          Q.   Yeah.  Thank you.

24               Are -- are those treatment modalities or

Highly Confidential - Mira Krishnan, Ph.D.

1    compensatory skills and extra tutoring and stuff of

2    the type that you described generally successful?

3         A.    In my experience, when children do these

4    things, they do help.  They -- they -- I don't know

5    that I can make a quantitative statement about that,

6    again, because of the lack of standardization of care

7    in this area and because I don't have a database to

8    make a quantitative statement based on myself, but,

9    yes, they are generally beneficial.

10        Q.    Are there any other deficits or

11   impairments that you found in R███ that would be

12   susceptible of treatment, compensatory-type approaches

13   or anything, skilled teaching that you described for

14   any of your -- her other deficits?

15        A.    I am just looking at my report myself.

16              So the -- I did not see in her case a

17   strong pattern of the frontal executive deficits that

18   are seen in conditions like ADHD.  There were some

19   problems with aspects of learning that -- that, yes,

20   would generally be amenable to interventions that have

21   to do with teaching children meta -- meta cognition

22   or -- or meta learning, meaning learning how to think

23   or learning how to learn.

24        Q.    Okay.  Anything else?  The question being:

Highly Confidential - Mira Krishnan, Ph.D.

1    Are there -- are there any --

2         A.    That's it.

3         Q.    Okay.  Thank you.

4               Yesterday I asked you a question about

5    since it's -- and I'll ask you about R█PPI█ now the

6    same question.

7               Since it's your view that these deficits

8    that you found were caused by developmental lead

9    exposure, is it true that if there is no continuing

10   exposure to lead for R█PPI█ v█PPI█ that the

11   symptoms will diminish over time?

12        A.    So, we had a -- we had a discussion about

13   neuropsychologists lacking crystal balls yesterday and

14   that certainly applies here as well.

15              In R█PPI█ case, there is -- was already

16   evidence of peaking and reducing blood lead levels, as

17   discussed in the Conclusion section of my report.  If

18   her levels continued to normalize, then, yes, I would

19   suspect that there would be mitigation as a result of

20   that, of any of these deficits.

21        Q.    Okay.  When you say that her results would

22   normalize, I'm -- I want to make sure I understand.

23              What -- what do you mean by "normalize"?

24        A.    I mean that if she continued to have blood

Highly Confidential - Mira Krishnan, Ph.D.

1  lead levels that trended in the direction of negative

2  and stayed there, then I would expect that that means

3  that her cumulative lead exposure period has now

4  closed and that I would expect that gradually the lead

5  that has accumulated in her body would circulate back

6  into the blood and excrete and -- and as that happens

7  I would expect that there may be some attenuation of

8  any deficits that are being caused by lead.

9      Q.   Let's do what we did for -- with the other

10  plaintiffs, looking at the actual scoring information

11  for her.  So I'll bring her record back up.

12      THE VIDEOGRAPHER:  Don't forget to share your

13  screen, David.

14      MR. ROGERS:  Yeah, I got it.  That should be up

15  now.  Thank you.

16  BY THE WITNESS:

17      A.   He's doing it right now.

18  BY MR. ROGERS:

19      Q.   It takes two clicks, so bear with me.  It

20  takes just a couple minutes here.

21      A.   Sure.

22      Q.   So I want to look at the raw test data for

23  a minute and do what we did before.  And I -- I know,

24  listen, Doctor, to some extent this is somewhat

Highly Confidential - Mira Krishnan, Ph.D.

1    repetitive, but, please, just bear with me.  I just

2    want to do this in a certain pattern so that the

3    record is clear.

4           So, I am now on the page of your report

5    which summarizes the test results that are tabulated,

6    and I'm just going to ask you if you would please tell

7    me for which of these test results, point out to me

8    the ones that report abnormalities or deficits that I

9    know you've already described, but I want you -- want

10   you to show me where they are on these tabulations of

11   the results here, okay.

12          So would you please do that?

13   A.     Could you please clarify?  We were talking

14   about R███ V███████, but this is, I believe,

15   D████████ W█████ report.

16   Q.     You are right.

17   A.     Have we changed topics?

18   Q.     No, I didn't intend to, so that was a

19   bad -- bad share.  So let me get back to R███

20   V███████, thank you, which is Exhibit 18.  We'll

21   get to W███ in a minute, but you are 100 percent

22   correct.  Thank you.

23   A.     I just saw numbers I didn't recognize

24   because I was looking at a different report than you.

Highly Confidential - Mira Krishnan, Ph.D.

```
 1      Q.     Yep, you are right.

 2             Okay.  So here we are with R███

 3   V███     .  So go through these test scores and

 4   results here, the tabulations, and tell me which ones

 5   are the ones where you found evidence of some deficits

 6   or decrements?

 7      A.     Okay.  You are not yet sharing your

 8   screen.

 9      Q.     Oh, here we go again.  Sorry.

10      A.     Sorry.

11      Q.     No.  Thank you.

12      A.     I hate to keep calling you out on that.

13      Q.     No, no, please.  Thank you for telling me.

14             Now can you see it?

15      A.     Yes.

16             So, I mentioned with discussing A███

17   that, when we were talking about the BASC a moment

18   ago, I mentioned that we pay attention to scores that

19   are -- that cluster lower than other scores, in

20   addition to psychometrically impaired scores, and I'll

21   tell you briefly about both kinds of issues.

22             If you look at the WISC-V which is the

23   second test in the Tabulated Results section, Figure

24   Weight -- Figure Weights, FW, which is under -- so I
```

Highly Confidential - Mira Krishnan, Ph.D.

1    apologize for the abbreviations, but the third line

2    under WISC-V, Fl Reas stands for Fluid Reasoning.

3    These -- these are tests that have to do with novel

4    problem solving using visual information.  Figure

5    Weights is the second one of those, FW, and that is

6    psychometrically impaired.

7              The -- another visual spatial test was low

8    average but not impaired, and that was BD on the line

9    above, which is block design which is a task that

10   requires construction based on visual stimuli.

11        Q.   Okay.  Thank you.

12             Is that -- what's the next one?

13        A.   The next one is under CVLT-C, further down

14   the page.

15             Neuropsychologists, again, just to

16   clarify, I'm not attempting to insult your

17   intelligence, but when you go to the doctor and you

18   get a complete metabolic panel or a complete blood

19   count, you get a lab result sheet that has 20

20   indicators on them and most of them are normal.  The

21   way that a flexible battery works, we test a wide

22   variety of areas, not necessarily expecting all of

23   them to be impaired, and so I'm just skipping the ones

24   that are -- that are not impaired, which is normal in

Highly Confidential - Mira Krishnan, Ph.D.

1    most populations.

2              Under the CVLT-C, the -- the score that

3    was impaired is the Trial B score, which is in the

4    second column, the second row.  The Z score is minus

5    2, which is two standard deviations below the mean.

6    And -- and that is worse than about 95 percent of age

7    peers.  That is described in the report in the third

8    paragraph under Testing -- under Test Results on the

9    prior page.  It is a test of memory interference.

10             So essentially when -- the format of the

11   CVLT-C, which, again, stands for California Verbal

12   Learning Test for Children, the format of the test is

13   that a child is asked to remember a list of

14   information, it's presented several times so that they

15   can learn successively over the trials.  There after

16   that is a distraction test where a different set of

17   information is provided.

18             Generally speaking, we are able to look at

19   two things with this.  One of them is something that

20   psychologists call single trial learning, which means

21   what it sounds like, can you learn information if I

22   just tell you once.  And you can imagine how that

23   would be important in a variety of settings.

24             The other thing that this potentially

Highly Confidential - Mira Krishnan, Ph.D.

1    indicates is a kind of frontal executive functioning

2    that we call interference, and so interference means

3    that you -- in order to pay attention to things, your

4    brain has structures and functions that allow you to

5    select whether you need to pay attention, what you

6    need to pay attention to.  If you think about your own

7    life and if you are having a problem, you are stuck in

8    a certain sort of thinking path and you need to --

9    people will say something like, I need to do a reset,

10   that's a frontal executive kind of function.

11           And in this case, because R̲PPI̲ had normal

12   Trial 1 performance but impaired Trial B performance,

13   it is this latter type of problem that this

14   represents, in my opinion.

15       Q.    Okay.  Thank you.

16             Anything else?

17       A.    The scores for the Wisconsin Card Sorting

18   Test, this is the WCST-64 that's immediately below

19   that.  I apologize.  That equal sign in the first line

20   should be a hyphen.  So that's the name of the test.

21   WCST stand for Wisconsin Card Sorting Test.

22             The -- those scores are right on the edge

23   of psychometric impairment.  If a standard for

24   psychometric impairment of 1.3 standard deviations is

Highly Confidential - Mira Krishnan, Ph.D.

1    used, then a T score of 37 is considered impaired, but

2    a -- it is more than one standard deviation below

3    average and there are multiple variables on that test

4    that are abnormal or subtly abnormal, and because I

5    had already seen another kind of executive deficit in

6    the CVLT-C as described in the report, I did consider

7    the -- the performance in the Wisconsin Card Sorting

8    Test as potentially correlating with that earlier

9    finding.

10        Q.    All right.  Anything else?

11        A.    The -- the remainder of the cognitive

12   testing I read as normal.  And I also read the measure

13   of adaptive functioning, the Vineland, and the measure

14   of behavior functioning, the BASC, as normal as well.

15        Q.    Okay.  Thank you.

16        A.    If I go -- if you bear with me for one

17   second, I can talk to you about -- sorry.  One moment,

18   please.

19             The -- the BASC score form that we looked

20   at for the previous children is on Page 96 of this PDF

21   file, and if you would like, you can quickly look at

22   that, but it is normal.

23        Q.    I see.  That -- I have this up on the

24   screen now.

Highly Confidential - Mira Krishnan, Ph.D.

```
 1      A.    And see -- yeah, here you see that,
 2   correct, and so you can see that on the screen that
 3   all of the dots are in the white area and so we
 4   consider this -- this is totally normal.
 5      Q.    Okay.  Thank you.
 6            Does that complete a description of the
 7   test reports in which you saw some findings that
 8   represented evidence of any deficits or impairments in
 9   R███  V███
10      A.    Yes.
11      MR. ROGERS:  All right.  I think we are ready to
12   move on to D███    W███, so it's about 10:20 or so.
13   Let's take a five-minute break.  And we are making
14   good progress here.  I -- I'm optimistic that we can
15   finish, you know, around lunchtime depending on the
16   other attorneys questioning.
17            So we are making good progress here.  We
18   are moving right along efficiently.  Let's take a
19   five-minute break, please.
20      THE VIDEOGRAPHER:  Going off the record,
21   10:23 a.m.
22              (WHEREUPON, a recess was had
23               from 10:23 to 10:31 a.m.)
24      THE VIDEOGRAPHER:  Back on record, 10:31 a.m.
```

Highly Confidential - Mira Krishnan, Ph.D.

```
1                    (WHEREUPON, a certain document was

2                     marked Mira Krishnan, Ph.D.

3                     Deposition Exhibit No. 19, for

4                     identification, as of 10/06/2020.)

5    BY MR. ROGERS:

6         Q.    Okay.  Dr. Krishnan, what I have up on the

7    screen now, I hope you can see it, is Exhibit 19,

8    which is the full record including your report and all

9    the underlying test data records for D███PPI████ W██PPI██.

10             So just to go over the basics here again

11   like we did before, the date of the evaluation for her

12   that you did was June 26th, 2020, right?

13        A.    Correct.

14        Q.    And she, at that time, was 11 years and 1

15   month old -- or sorry -- 10 years -- 11 years and 10

16   months old, right?

17        A.    Correct.

18        Q.    And she had just finished the sixth grade,

19   right?

20        A.    Correct.

21        Q.    In terms of the information that you had

22   about her blood lead levels, I want to show you this

23   first one.

24             Okay.  The ones that you had in your
```

Highly Confidential - Mira Krishnan, Ph.D.

1    records, the first one that you had was reported here

2    on Page 2 on March 28th, 2016, she had a negative

3    blood lead study because it was less than the

4    3.3 micrograms per deciliter, right?

5         A.    Correct.

6         Q.    And then on the --

7         A.    There is another one that's in that same

8    paragraph.  The -- the date is not right next to it,

9    but on 7/5 -- 15/16 she saw her primary care physician

10   and she had, based on my understanding of the records,

11   a venous blood lab on the same day and that's that

12   0.6 micrograms per deciliter.

13        Q.    Thank you.  That is the one that I was

14   looking for.  So the other one is -- was measured at

15   .6.

16             And just not to belabor the point, but

17   with respect to D██PPI██ W██PPI██, similar to the other

18   plaintiffs, you haven't compared these -- or this

19   report of .6 to the average of kids her age at that

20   time nationally, right?

21        A.    Correct.

22        Q.    Now, you did mention in your report that

23   you had seen from the deposition transcript that there

24   was a -- another blood lead level measurement that --

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    for D██████ W███ from September 25th, 2009, that was

 2    measured at 2 micrograms per deciliter when she would

 3    have been one year old.

 4             Do you recall that?

 5    A.    Yes.

 6    Q.    Did you actually see that blood test

 7    report in -- in your records that you reviewed?

 8    A.    No.  That -- that's the reason it's only

 9    described in the Deposition Review.

10    Q.    Okay.  Let me see if I can find that for

11    you so that we can show that to you.

12             Okay.  Can you see what I have up on the

13    screen now?

14    A.    Yes, I can.

15    Q.    So here is the record that I believe was

16    marked in -- as an exhibit in the -- in the deposition

17    that you described in the -- the -- your report.  You

18    can see that it's for the play -- patient D██████

19    W███, date of birth ███ 2008.

20             It's for a sample received September 25th,

21    date collected, 2009, and it has a recording here:

22    "Lead interpretation:  Blood lead in children,

23    9/25/09."

24             And here is the number right over here,
```

Highly Confidential - Mira Krishnan, Ph.D.

1    and the reference range you can see is the same as the

2    other reference ranges, micrograms per deciliter, and

3    it has got a -- a measurement or a test result of 2.0.

4            Do you see that?

5        A.    Yes, I do.

6        Q.    Is -- what significance does -- assuming

7    that it's accurate, what significance does this have

8    to any of the opinions with respect to her that you --

9    that you hold?

10       A.    So, the -- this lead level is the highest

11   blood lead level that I am aware of for D████████.  It

12   was clearly collected long before the -- the Flint

13   water crisis happened, if it's okay if I call it that.

14   It occurred before the change in the water system to

15   the Detroit -- from the Detroit River or back to the

16   Detroit River.

17           What is challenging with these blood labs

18   in general is that some of them are -- again, I'm not

19   a blood -- a cap -- a blood lab expert, I'm not a

20   phlebotomist or a -- I'm not -- I'm not the

21   appropriate expert for that, but to the best of my

22   knowledge, the -- some of these blood labs are

23   capillary draws and some of them are venous draws.

24           Based on my understanding, the relevance

Highly Confidential - Mira Krishnan, Ph.D.

1    of that is that the capillary draws have a high

2    threshold for minimal detection.  That's the -- I

3    think that -- I've -- I -- I believe, although I am

4    not sure, that in the case of all of the labs that are

5    resulted -- reported as negative, below

6    3.3 micrograms, that those are probably capillary

7    draws, whereas, like, in this case this is presumably

8    a venous draw because the level is only 2 and the --

9    the other one that we just discussed is presumably

10   also venous.  I -- I think, actually, that one was

11   reported as venous.

12          The reason I say that is that because it

13   is plausible that she had high lead level continuously

14   during this time.  I just -- I don't have any

15   information about her lead exposure or lead levels

16   between 2009 when she had a positive draw and 2017

17   when she had the -- or I'm sorry -- 2016 when she had

18   the next positive draw.

19        Q.    Okay.  That's interesting.  So --

20        A.    So that it --

21        Q.    Go ahead.

22        A.    No, I'm sorry.

23              So, it's hard to make a conclusive

24   statement about that, but it does certainly raise the

Highly Confidential - Mira Krishnan, Ph.D.

1    possibility that -- that she had some -- I'm sorry,

2    let me rephrase that.

3              She has evidence of lead exposure prior to

4    the water crisis.

5        Q.    And I think you said just a moment ago,

6    correct me if I'm wrong, that it's plausible that she

7    had an elevated lead level from 2009 up until 2016.

8              Did I mishear you?

9        A.    It -- it's within the realm of possibility

10   but I can't comment on whether it's probable or not.

11       MR. ROGERS:  Let's mark this as an exhibit.

12             Would this be -- this is going to mess up

13   my numbering system, Juliana, but so be it.  Is this

14   one now going to be 20 or 19?

15       THE COURT REPORTER:  Twenty.

16       MR. ROGERS:  Thanks.

17                  (WHEREUPON, a certain document was

18                   marked Mira Krishnan, Ph.D.

19                   Deposition Exhibit No. 20, for

20                   identification, as of 10/06/2020.)

21       MR. ROGERS:  Okay.  That won't mess it up too

22   much, Juliana, because we only have three more, so

23   we'll just revise those on the fly here.

24   BY MR. ROGERS:

Highly Confidential - Mira Krishnan, Ph.D.

1        Q.    So I brought -- excuse me -- I brought

2    back up Exhibit 19, which is the full record for

3    D▉PPI▉    W▉PPI▉, where we had highlighted those blood

4    lead levels that you can see on Page 2 of the report.

5              So I want to do what we did with the other

6    plaintiffs, we'll go to your Diagnostic section, which

7    is at the end of your report here on Page 9 in this

8    case.

9              Without, you know, having to go off --

10   over this all again like we did before, but just see

11   if we can move through this efficiently, your -- your

12   diagnosis based on your evaluation and your -- the

13   history that you took, et cetera, et cetera, for

14   D▉PPI▉    W▉PPI▉ is:  "...mild neurocognitive

15   disorder...which is more likely than not a result of

16   developmental lead exposure," correct?

17       A.    Correct.

18       Q.    And is it also true that in thinking about

19   it some more, as you did with the other two plaintiffs

20   whom you diagnosed with this condition, that you

21   believe it's more -- a more appropriate diagnosis at

22   least using the DSM criteria would be for the Other

23   Unspecified Neurodevelopmental Disorder?

24       A.    So, the -- my answer is the same, but as I

Highly Confidential - Mira Krishnan, Ph.D.

```
1    have said previously, I believe that if the DSM-V is
2    used as a strict source of criteria, then the
3    condition is somewhere in between this and the DSM
4    Unspecified Neur- -- the Neurodevelopmental Disorder
5    that we previously discussed.
6         Q.    Okay.  Now, you know, D█████ is older
7    than R████ right, and she -- she was quite a bit
8    younger.  D█████ when you saw her was almost 12, I
9    guess.
10         Do you have an opinion as to whether or
11   not there is evidence of a decline in D██████ W████
12   cognitive performance in any particular areas, or is
13   it that what you -- your opinion is that the -- she
14   simply has deficits but you can't specify as to
15   whether there has been a decline from a previous
16   functioning level or not?
17        A.    I do not believe that I can make a
18   quantitative statement about that.  In -- in
19   D█████ case, there is more detailed school record
20   information than there were for some of the other
21   bellwethers, but in my review of that school
22   information, the pattern is inconsistent from report
23   to report, and so I do not think that that is clear
24   enough to be able to infer declines in functioning.
```

Highly Confidential - Mira Krishnan, Ph.D.

```
 1    And I'm not aware of any prior neuropsychological

 2    testing.

 3         Q.    Right.  Okay.  Let -- let's just be clear

 4    about that too.

 5              In -- in any of the education records that

 6    you've seen, I think I'm correct that -- and -- and

 7    tell me if this is right -- that there were no

 8    neurological psych -- psych -- sorrow -- sorry, let me

 9    restart -- no neuropsychological testing of the

10    batteries of tests that you performed on these

11    plaintiffs had been done in any of the records that

12    you've seen before, right?

13         A.    With respect to the four bellwethers that

14    we are currently discussing, that's correct.

15         Q.    Right.  Okay.

16              So, to the extent that you saw

17    inconsistencies or reports in the education records,

18    what -- what types of -- with D███████ , that is, what

19    types of reports are you referring to in terms of

20    these inconsistencies that you've described?

21         A.    That is in -- on Page 2 of my report at

22    the bottom, the full paragraph -- the paragraph that

23    begins at the -- about halfway through the page and

24    then continues to the top of Page 3.
```

Highly Confidential - Mira Krishnan, Ph.D.

```
 1              During this time period there were
 2   generally satisfactory ratings for D PPI       up until
 3   around 2016.  After 2016 she was noted to, I'm quoting
 4   myself:  Have fair to poor citizenship, needing
 5   supervision, disregarding suggestions and being
 6   frequently disruptive.  She had a decrement in grades
 7   at that time.  In 2017 and '18 similar reports were
 8   made by the school, although not in every marking
 9   period.  And she had a non-proficient language score
10   in the M-Step in 2018, I believe, and -- and then in
11   2018 to 2019, similar issues were noted that were not
12   noted in prior notes from the school.
13        Q.    I see.
14              On Page 3 of 9 of the -- of your report
15   there is a reference to her having been disruptive
16   during MAP, M-A-P, testing, and then you note
17   parenthetically that:  "(As an aside, I did not
18   receive that MAP testing to review.)"
19              What did you mean -- what's MAP testing
20   and why did you make that statement?
21        A.    MAP, M-Step and NWEA are various
22   standardized -- more or less standardized assessment
23   tools for -- that schools use.  I'm not a teacher and
24   I'm not an expert in these particular tools, but they
```

Highly Confidential - Mira Krishnan, Ph.D.

1    produce psychometric scores, typically including

2    things like percentile scores in academics that are

3    reasonably comparable to the percentile scores in

4    academic tests that I use like WRAT5.

5        Q.    I see.

6            So, having noticed that in your report --

7        MR. ROGERS:  Patrick or Louise or Corey, is

8    there some reason why that hasn't been received from

9    the school or is there a way that we can get that,

10   what -- what's the story on that, does anyone know?

11       MS. CARO:  I'm not sure.  I'll have to get with

12   Corey and Patrick to find out, unless they have an

13   answer for you now.

14       MR. ROGERS:  Yeah, okay.  Let's do that.  And

15   I'll -- I -- I had offered to make sure that I'll

16   circulate a list of a couple of additional things that

17   we are looking for, so let -- that will be on the list

18   because we don't have that testing either, so let's

19   see if we can get that.

20   BY MR. ROGERS:

21       Q.    Okay.  Thanks for that, Doctor.

22           The -- would you explain -- and, again, I

23   know it's in your report, but explain to me the basis

24   for your diagnotice -- diagnosis of D PPI     W PPI as

Highly Confidential - Mira Krishnan, Ph.D.

1   having a mild neurocognitive disorder or sort of a

2   blend of that and in between other unspecified

3   neurodevelopmental disorder?

4        A.    So, the easiest way to do that would be to

5   look at the test results, as -- as you requested for

6   the previous bellwethers.  Excuse me.  So I found

7   impairments in visual and spatial processing with a

8   significant discrepancy between verbal and fluid

9   reasoning skills.  And so if you want to look at the

10  scores, which we have done previously, the WISC-V, if

11  you look at the -- the third line below that for fluid

12  reasoning, here the Matrix Reasoning and Figure

13  Weights are both measures of -- of fluid reasoning or

14  visual reasoning, and they are both impaired.

15            If I use the staid -- same standard of

16  impairment of 1.3 standard deviations below the mean

17  in the measurement metric that's used for IQs, that's

18  a measurement of 80 or low -- or lower.  And so the

19  FRI, which is in the line that's marked Indices, which

20  is 74, that index is composed of those two fluid

21  reasoning measures, and so you see that that is also

22  impaired.

23            Moreover, you -- as a -- as -- as

24  described above in the report, there is a large

1    discrepancy between the verbal reasoning and the fluid

2    reasoning.  Quantitatively that is the difference

3    between that VCI score of 100, which is composed of

4    the first two tests in the verbal -- or the -- the --

5    the line marked "verbal" and the FRI, which is the

6    Fluid Reasoning Index.  Sorry.  VCI stands for Verbal

7    Comprehension Index, FRI stands for Fluid Reasoning

8    Index.  And so the difference between those two is

9    26 points, which is close to two standard deviations

10   of difference and is relatively rare in the general

11   population.

12        Q.    Okay.  And the -- the Full Scale

13   Intelligent Quotient, FSIQ, that's a 91.

14             Does that put her in the basically 50th

15   percentile for her age group?

16        A.    I would have to look at a percentile

17   calculator, but it is more like the -- somewhere

18   around the 30th percentile.

19        Q.    Okay.

20        A.    But it is considered normal.

21        Q.    Yep.  Okay.  Let's -- let's do that.

22             So I -- I had asked you to -- to explain

23   the basis for your diagnosis based on your evaluation

24   and testing, and you were beginning to do that, and

Highly Confidential - Mira Krishnan, Ph.D.

1    you've told me about this first one, the tests for the

2    WISC-V.

3              Are there others that you can refer me to

4    that form part of the basis for that opinion?

5        A.    So, I looked at frontal and executive

6    functioning -- functioning in detail and there were

7    impaired scores in some of those tests as well.  If

8    you look at TMT, that test that we've discussed a few

9    times now, this test was also, again, impaired in

10   D███ -- in D█████    .

11             The difference between her impairment and

12   the impairment to the other children, there are two

13   noticeable differences.  So this is a test that --

14   that the A component of this test is a visual scanning

15   and rapid sequencing test.  It is very easy for

16   children of this age, and so they complete it very,

17   very quickly.  So although the -- the raw score of

18   37 seconds is fairly similar to what was seen in some

19   of the younger children, it is much worse at

20   D█████    age.  It was almost three standard

21   deviations below the mean, which is -- is a -- a very

22   unlikely score in the general population.

23             The B index, which we haven't discussed in

24   this deposition, the difference between A and B is

Highly Confidential - Mira Krishnan, Ph.D.

1    that the B component involves something that

2    psychologists call dual tasking or set shifting.  It

3    involves essentially requiring children to maintain

4    two flows of information at the same time and switch

5    back and forth between them in order to correctly

6    solve the problem, and that was also impaired.  That's

7    that Z score of minus 1.7.

8            In addition to that, the other area where

9    the impairment was seen was the Tower of London, which

10   is further down the page, TOL-DX.  And there the --

11   this is a test of multistep problem solving.  So what

12   a child has to do is solve a problem that gets

13   increasingly more difficult, that requires them to

14   think multiple steps in advance.  So if they don't

15   think multiple steps in advance, they do something

16   that looks like it might solve the problem but it

17   actually makes the situation worse, if you can imagine

18   that, and that's the kind of test that this is.

19           And I am -- I -- I have this up on my

20   computer as we did yesterday, but on the previous

21   page, Page 6, I describe this in text, but what

22   happened is that when these problems were relatively

23   easy, and easy in this case was five steps, she did

24   very well.  She became more inefficient and then she

Highly Confidential - Mira Krishnan, Ph.D.

1    also broke the test rules later in the test when it

2    became more challenging.  That's that RVS score of 72

3    which is psychometrically impaired.  It was actually,

4    I think, I'd have to look at the test form, but I

5    think it was actually only one error, but those errors

6    are uncommon enough in children this age, especially

7    once they've learned the rules and made it halfway

8    through the test that I consider that remarkable and

9    it -- it is psychometrically impaired as well.

10           So, to summarize, she showed problems with

11   visual reasoning as well as problems with rapid

12   information processing, divided attention, or set

13   shifting, and -- and also with flexibility in problem

14   solving.

15       Q.    Show me where that is, please.

16       A.    The flexibility and problem solving is

17   a -- the Tower of London.

18       Q.    Oh, okay.

19       A.    Sorry.  I -- I think I used a different

20   term, but that -- that's a general kind of category

21   that we would put this in.

22       Q.    I don't see that on the report in scores

23   on this summary sheet here.

24              Is that -- am I missing that?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.    I'm sorry.  The -- the -- the -- this

2  Tower of London, TOL-DX is the one that you just

3  circled with your cursor.

4      Q.    Yeah, but you said -- I don't see the

5  reference to the problem solving issues that you just

6  described.

7            What -- which of these numerical scores

8  represent that?

9      A.    RVS of 72, that's the second row, first

10 column.

11     Q.    All right.  Thank you.

12           Okay.  Continue on.  Is there any other

13 evidence in the testing as to her -- relevant to her

14 diagnosis that you made?

15     A.    Those were the -- excuse me -- only

16 cognitive deficits.  I -- I rated -- I considered the

17 Vineland Adaptive Behavior Scale to be normal in her

18 case, and then, again, there is a description of the

19 BASC in the report, and then I will give you the page

20 number for the detailed score sheet for that, and that

21 is -- oops -- 98 in this case.

22     Q.    Yep.

23     A.    And so here the Atypicality Index is one

24 that we haven't talked about before.  That is the one

Highly Confidential - Mira Krishnan, Ph.D.

1    that is in the dark gray area.  It is at the

2    95 percentile, meaning that only one out of 20

3    children this age have as many behaviors in this area.

4    Atypical behaviors are strange -- essentially, I

5    apologize for the use of non very -- not very

6    psychological language, but they are strange or weird

7    behaviors, children who do things that seem odd or off

8    to their parents or other people.  That one was the

9    most elevated in A█PPI█████ case.

10            And then there were some milder elevations

11   with a lack of social el -- engagement, attention

12   problems and adaptability.

13      Q.   What were the weird behaviors that the

14   parents described?  Would we have to look at the --

15   their -- their answers to that?

16      A.   One moment, please.

17      MR. ROGERS:  Hey, Corey, if you wouldn't mind,

18   can you go on mute.  I think I'm hearing some

19   fuzziness sound coming from your phone.

20      MR. STERN:  I'm on mute.

21      MR. ROGERS:  Oh, okay.

22      THE WITNESS:  I'm not sure who that is.  I hear

23   it also.

24      MR. ROGERS:  Yeah.

Highly Confidential - Mira Krishnan, Ph.D.

1      THE WITNESS:  I don't think it is me because

2  it's quiet here.

3      MR. ROGERS:  Yeah, my -- it's quiet here too.

4  BY THE WITNESS:

5      A.    The -- the items with my concern that --

6  that I do what I am supposed to to protect test

7  security, meaning that we generally -- these kinds of

8  tests work better if the general public don't know

9  about the content of these, but those items are in the

10 documents that we have provided to you and they are on

11 Page 117 and 118.

12          And so in her case, these were things like

13 acting confuse -- confused, having staring spells, and

14 then there was a wide variety of things like saying

15 things that don't make any sense or being unaware of

16 others that were marked as sometimes --

17          It's a -- it's up from here.  It is on a

18 prior page.

19 BY MR. ROGERS:

20     Q.    Oh, I see.  Okay.

21     A.    It is right there, yeah.

22     Q.    Yeah.

23     A.    I also describe this in the interview,

24 sorry to make you flip around through a very large

Highly Confidential - Mira Krishnan, Ph.D.

 1    document, but on Page 4 of the report, which is also

 2    Page 4 of the PDF file, I --

 3         Q.    Can I -- I'm sorry --

 4         A.    I noted in the --

 5         Q.    Sorry, Doctor.  Just let me stop you for

 6    now.  I'm still looking at this one here.  Give --

 7    bear with me a minute.

 8         A.    Please.

 9         Q.    So the -- the -- I asked you the question,

10    you know, what -- what did the parents describe as her

11    behavior that was weird, as you -- the word you used,

12    and then so it's under this Atypicality section on the

13    bottom of Page 117 and then down to 171, right?  Okay.

14         A.    Down to -- yeah, yes, correct.

15         Q.    Yeah, the next page?

16         A.    Those two pages.

17         Q.    Item -- Item 171.

18               And, you know, you made a comment about

19    not disclosing -- disclosing these -- this information

20    to the general public.  I -- I hope you've been

21    informed or that you're -- you're aware, I didn't mark

22    this court order, but there is a court order in the

23    case that called for production of this material that

24    allowed you to produce it after consultation with the

Highly Confidential - Mira Krishnan, Ph.D.

1    judge and the attorneys, it was an agreed upon order,

2    that the information is confidential under the court's

3    protective order and it's to be used only by the

4    neuropsychologist consultants in the case or other

5    medical professionals, as well as the lawyers would

6    have to have access to it for, you know, use in the

7    litigation and the evaluation.

8              So, something to the effect you said, you

9    know, they are not -- it is not supposed to go to the

10   general public, it isn't, you know.  You understand

11   that, right?

12        A.    That's the reason I produced the

13   information to you, yes.

14        Q.    Exactly, okay.  So you were just

15   explaining something about, you know, this information

16   generally as to why it's not disclosed, but you

17   understand it's not being disclosed in this case

18   except for as purposes that are allowed under the

19   court order.

20              Okay.  So, that -- did -- did you want to

21   direct me to, what was it, Page 4 of your report for

22   her to describe this?

23        A.    Yes, please.

24        Q.    Yeah.

1     A.    So, the -- the correlating things that the

2   parents reported on Page 4 are primarily in the

3   paragraph that says:  "They started noticing," it's

4   the bottom paragraph on the screen, where you are

5   currently.

6           There they noted that she is foggy, she

7   will have unusual lack of detail in things that she

8   explains.  Those are the things that she was noted to

9   have that fit with Atap -- Atypicality Index that came

10  up in the interview.  They did also mention things

11  that fit with some of the other more mildly elevated

12  index -- indices, and so in the next paragraph

13  D▮▮▮▮ mentioned that she -- she said, I don't let

14  people get too close to me.  For what it's worth in my

15  experience, that's an unusual statement by an

16  11-year-old.

17    Q.    Okay.

18    A.    But it correlates with the Social

19  Withdrawal Scale on the BASC.

20    Q.    Okay.  Thank you.

21          Anything else on that?

22    A.    I don't think so.

23    Q.    Does that complete a description of the

24  evidence that you found in your tests and evaluations

Highly Confidential - Mira Krishnan, Ph.D.

1    that form the basis for your diagnosis of her?

2         A.    Yes, it does.

3         Q.    I want to turn to the Recommendation

4    section then, like we did with the others.

5              I was curious, too, why did you call them

6    recommendations versus, you know, prognosis?  Some of

7    them seem to be, you know, sort of prognosis type

8    things as opposed to recommendations?  Why do you

9    entitle this section Recommendations?

10        A.    I could -- I think that's good advice.

11   Perhaps I will do that in the future.

12             Typically the -- in my clinical reports,

13   that's what this section is called.  So like in the

14   template documents that I use, the -- when I change it

15   in a medical-legal kind of setting, typically I change

16   it to questions for the examiner.

17             If I was given explicit questions to

18   answer in a -- oftentimes in these kind of evaluations

19   there is a list of questions that an attorney provides

20   and I put them in the report verbatim and then I

21   answer them one by one.  Because that wasn't done in

22   this case, I used what I usually use in my clinical

23   reports.

24        Q.    Let's see.

Highly Confidential - Mira Krishnan, Ph.D.

1           For the first recommendation here, you

2   say:  "There is not a clear basis for her to need a

3   current individualized education plan, but she should

4   receive accommodations to complete testing in a

5   private environment as part of a 504 plan."

6           Do you know if that -- or up until the

7   point in time that you examined her, she didn't have

8   an IEP and she didn't have that component of a 504

9   plan as far as you knew or know?

10      A.    I -- let me review my -- my notes, my

11   report.

12           I am not aware that she has had either an

13   IEP or a 504 plan.

14      Q.    So in terms of accommodations for testing

15   in a private environment, what does that mean?  Does

16   that mean, you know, testing, if she does academic

17   tests in school, to have her be separate from others

18   when she does that?

19           Is that what that means?

20      A.    Correct.  And so typically this -- the

21   students with attention problems were -- the kinds

22   of -- the kinds of issues that I described in the

23   cognitive profile are offered the opportunity to take

24   tests in something like a resource room or a library

Highly Confidential - Mira Krishnan, Ph.D.

 1    that's a low stimulation environment that doesn't have

 2    as many distractions.

 3         Q.    Okay.  And then turning to the second

 4    paragraph, this -- this one, you know, the language

 5    that you use here, I think you would admit, is a

 6    little bit different than the sections that address

 7    these same subject matters in the -- in the prior

 8    children because you talk about, you know, her

 9    intellectual ability and the -- her FSIQ, but then you

10    say on the other hand it doesn't match exactly ADHD,

11    but they -- you talk about the ADHD statistics that we

12    talked about in that Fredriksen paper.

13              So, when you come to the conclusion here

14    where you say that there is an increasing risk of her

15    dropping out of high school to 15 percent from

16    5 percent versus the general population.

17              Explain to me how it is that you come to

18    that conclusion for her.

19         A.    So, in her case that is my estimation

20    based on my opinion that the -- although I did not

21    diagnose ADHD, that the -- the cognitive symptoms are

22    substantially similar to ADHD and so I believe that

23    the rate would be similar to the -- the threefold odds

24    ratio that we discussed in the ADHD context yesterday.

Highly Confidential - Mira Krishnan, Ph.D.

1    That's from the reference that we discussed yesterday.

2         Q.    Right.

3         A.    That's provided here.

4         Q.    So -- yes.  Thank you.

5              So the -- the Fredriksen, Dahl paper, that

6    is the only scientific literature or paper that you

7    have cited to or referenced that provides the basis

8    for your opinion about this increased risk that she

9    would drop out of high school, is that correct?

10        A.    That's correct.

11        Q.    Okay.  Then we -- you go on to say:  "This

12   is true even though, in a clinical sense, symptoms are

13   'mild.'"

14             Why did you add that last sentence in

15   there, what did you mean by that?

16        A.    Well, I think that yesterday we discussed

17   this issue that -- that clinicians use terms like

18   "mild."  Typically we use these terms relative to the

19   disorder itself, and so sometimes the term "mild," you

20   know, in my experience is misunderstood by people

21   outside of the profession.

22             If I use an example that is maybe more

23   accessible, unrelated to these children, clinicians

24   have a diag -- have a diagnostic criteria and use the

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   term "mild" to refer to mild Alzheimer's disease, but

 2   nobody wants to have Alzheimer's disease and even mild

 3   Alzheimer's disease is very disabling.

 4           And so my point is that although these --

 5   these cognitive symptoms are mild, they are

 6   significant in a real world sense.  That -- that's all

 7   I mean by that.

 8       Q.    Okay.

 9       A.    The other difference -- the other thing

10   that you had mentioned earlier and -- and that is in

11   my report is that differentiates D████PPI████  situation

12   from the other children is that she had this FRI,

13   Fluid Reasoning Index on the WISC that was in the --

14   that was impaired, the score was 74 or more than about

15   1-1/2 standard deviations below average.

16           The reason I mention that is because that

17   was -- in these four bellwethers, I believe this is

18   the only time when that happened.  The significance of

19   that is that, based on my clinical experience, IQ

20   scores -- well, let me back up a step.

21           IQ scores have a long history of

22   predictive validity in a variety of settings, although

23   I think that they are commonly misunderstood by the

24   general public.  And so I'm saying this not so much
```

Highly Confidential - Mira Krishnan, Ph.D.

1    for your benefit, but anybody who reads this

2    deposition, because I think that you probably already

3    know these things.

4            So people often in the general public will

5    talk about very high IQ scores, like my IQ is 186 or a

6    hundred -- 204.  When you actually look at these

7    tests, they often don't even go that high.  It's not

8    possible on this particular test to have an IQ of 200.

9            They also misunderstand and say that, you

10   know, if -- it's common in -- in general pol --

11   parlance to make the assumption that people who have

12   advanced degrees, like yourself or me, have very high

13   IQs.  We might and some of us certainly do, but the

14   idea that every doctor has an IQ of 130, you know, or

15   every attorney has an IQ of 130 is -- is not likely to

16   be true.

17           With that being said, in general, if the

18   Fluid Reasoning Index is an index of general thinking

19   abilities, that score is lower in D▬PPI▬▬▬ case than

20   IQ scores that are generally considered competitive in

21   collegiate settings.  And so that is something that is

22   unique for her that didn't come up in the other three

23   bellwethers that we've been discussing because I

24   didn't have that kind of finding.

Highly Confidential - Mira Krishnan, Ph.D.

1    Q.    So with respect to the assessment that you

2  have about collegiate success for D███PPI█████, you have

3  an estimate of a likely 25 to 50 percent chance of her

4  dropping out in secondary education.

5         Is that percentage estimate also based on

6  the -- as it was with the others, based on your

7  anecdotal experience with patients that you've

8  treated?

9    A.    Yes, it is.

10   Q.    And just to confirm then, there is no

11  other scientific literature or studies or data that

12  you can point to that would quantify that for persons

13  who have the deficits that D███PPI████ has?

14   A.    I am not aware of any.

15   Q.    Is that also true -- would that be the

16  same answer with respect to your statements here that

17  this results in an overall increased risk that

18  D██PPI█████ will work below her potential, that she would

19  not succeed in a skilled vocation, and would be sort

20  of relegated to simple unskilled work?

21   A.    Correct.

22   Q.    With respect to these deficits that you've

23  identified for D███PPI████ W██PPI██, are their treatment or

24  coping mechanisms or -- or skills, skill-type training

Highly Confidential - Mira Krishnan, Ph.D.

1    that could help to assist her in overcoming these

2    deficits, like we talked about with the other

3    children?

4         A.     In D▮▮▮▮ case, because she shows a

5    mixture of some of these nonverbal learning problems

6    and issues that look a little bit like ADHD but not

7    very clearly like ADHD, but that are psycho -- that do

8    correlate with psychometric impairments and attention

9    functions, it would be a mixture of the two.

10            The -- I'm sorry.  It would be a mixture

11   of some of the things that we talked about earlier.

12   For her visual reasoning, increased exposure to art,

13   like drawing or painting would be very helpful,

14   occupational therapy might also be helpful.  And then

15   for her attention problems -- I'm sorry.  And for --

16   for her visual problems, so far I don't see a basis

17   for her needing an IEP on that basis, and I'm not sure

18   that she would, but the accommodative approaches like

19   the 504 plan would probably be sufficient to mitigate

20   that.

21            With respect to her attention, it would be

22   reasonable for her to see a psychiatrist.  It's

23   possible that medications would -- would be beneficial

24   for that as well.

Highly Confidential - Mira Krishnan, Ph.D.

1      Q.     Would you expect those types of treatments

2   or accommodations that -- or skill set learning that

3   you describe to be successful?

4      A.     I -- it depends, I think, on how you

5   define successful.  What I could say is that when it

6   comes to IQ scores, there is no good evidence that IQ

7   scores can be -- that -- that the -- let me -- let me

8   rephrase that.

9          There is no good evidence that the

10  underlying cognitive abilities that I -- IQ scores

11  measure can be meaningfully changed by interventions,

12  and so that FRI, for instance, being in an impaired

13  score would be unlikely to change from interventions,

14  but it may be that -- that through a mixture of

15  learning, learning techniques and compensatory tools,

16  and possibly emphasizing work that can be done in a

17  way that does not highly leverage those kinds of

18  skills, that -- that somebody like D███████ could

19  mitigate.

20     Q.     All right.  Since you are of the opinion

21  that these deficits that she has experienced were

22  caused by developmental lead exposure, if going

23  forward she doesn't have any additional exposure to

24  lead, would these symptoms and deficits diminish over

Highly Confidential - Mira Krishnan, Ph.D.

1    time?

2        A.    In general my answer to that question is

3    the same as before.  The only difference I would offer

4    is, as you noted, D█PPI███ is one of the oldest

5    bellwethers -- I think she is the oldest of these four

6    bellwethers.  I think that, if I remember correctly,

7    she is also either the oldest or close to the oldest

8    of the 14 children that I evaluated.

9            The only caveat I would really offer is

10   that in D█PPI█████ case I am not the expert on bone

11   lead measurement and -- and I -- I believe that there

12   may be others who will testify in more detail about

13   that, but D█PPI█████ was 11 already, almost 12 when she

14   had her bone lead measurement.  And in general what I

15   would say is that the -- the amelioration possibility

16   that arises from the cessation of lead exposure is

17   going to be higher when the lead exposure period is

18   briefer and when there is more time during the

19   developmental period to recover.

20       Q.    What is that based on?  Where do you

21   derive that information?

22       A.    That's based on my general understanding

23   of brain development.

24       Q.    Okay.  Can you see what's up on the screen

Highly Confidential - Mira Krishnan, Ph.D.

1    now?  This is -- this is the summary sheet, initial

2    summary sheet page for her testing, D▮PPI▮  W▮PPI▮, and

3    I -- can you see that all right?

4         A.    I can, yes.

5         Q.    Each of these sheets, and I didn't ask you

6    about all of them, but I -- I think I asked you about

7    one, and I just want to clarify here, where it says:

8    "Hours of neuro" -- "neuropsychologist face-to-face,"

9    in this case you have it as 9 to 12:15, does that

10   include the time for the interviews with the parents

11   and the testing, or parent?

12        A.    I believe in this case that that's the

13   testing.

14        Q.    All right.  Is -- would that be true with

15   each of them, that is to say, this period of time that

16   you recorded there would only be the actual

17   face-to-face with you when the testing was being done?

18        A.    I believe that's correct.  Generally

19   speaking the testing component for each of these

20   children took about three hours.

21        Q.    All right.  And what -- what would you say

22   the approximated time was that you spent with the

23   parents doing the interviews and getting the history

24   and that sort of thing?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.    I believe in general most of the

2   interviews were about an hour long.

3      Q.    And then you say over here:  "Hours

4   interpretation," I can't rean your -- read your

5   handwriting here.

6           What does that say?

7      A.    I -- I may not have even finished writing

8   that.  These are just notes that I was taking during

9   the evaluation, but it says that I spent an hour

10  reviewing records before I saw D███PPI███.

11     Q.    Well, what -- read to me what these

12  notes -- what the words are or the numbers that you

13  have written here.  I can't make them out.

14     A.    It says:  "Plus one pre, plus one lunch

15  hour."

16     Q.    Okay.  So for these sections of the

17  reports under "hours interpretation," your notations

18  there would mean the amount of time that you spent

19  reviewing the records and then, either before the

20  interview or after, and then additional time, if you

21  did spend it, on interpretation of the test results,

22  is that right?

23     A.    I apologize.  It's -- so this is not a

24  complete accounting of the time that I spent on this

Highly Confidential - Mira Krishnan, Ph.D.

1   report.  I -- I did not finish writing this report

2   over lunch after I saw her, but -- but these are times

3   that I spent interpreting.  So what this means in this

4   case is that I spent the lunch hour scoring tests.

5        Q.   Right.  Okay.  I get it.  So you had told

6   me that before, if -- if there is any time in these

7   summary sheets under "hours of interpretation," that

8   does not include the time that you spent actually

9   writing up the reports.

10            You did that later, right?

11       A.   Correct.

12       Q.   Okay.

13            I want to ask you some questions about --

14   and I think this will now be a paper that we're going

15   to mark as Exhibit 21, just to make sure.

16       MR. ROGERS:  Is that -- are we right on that,

17   Juliana, this would be 21?

18       THE COURT REPORTER:  Yes.

19                 (WHEREUPON, a certain document was

20                  marked Mira Krishnan, Ph.D.

21                  Deposition Exhibit No. 21, for

22                  identification, as of 10/06/2020.)

23   BY MR. ROGERS:

24       Q.   Do you recognize this Ko -- paper, Doctor,

Highly Confidential - Mira Krishnan, Ph.D.

1    from the lead author Karin Koller, I believe it's

2    mentioned or listed in the Bibliography of references

3    that you prepared for your report, is that right?

4         A.    Yes, I -- I believe that I have read this

5    paper.

6         Q.    So you're -- you're fam --

7         A.    I think this is one that I cited.

8         Q.    Yeah.  I don't recall that you -- correct

9    me if I'm wrong -- I don't recall that you referred to

10   or cited this paper for any specific parts of your

11   report or any of your diagnoses or conclusions.

12             Am I right on that?

13        A.    I believe that -- it may be that I cited

14   it explicitly in another one of the -- the reports

15   from the 14 children that I saw.

16        Q.    I see.

17             With respect to these bellwether

18   plaintiffs, nevertheless, this was one of the papers

19   that for these four you included in your overall

20   Bibliography, right?

21        A.    That's correct.

22        Q.    Okay.  And this -- this study says in the

23   abstract, I guess that's what you would call this.

24             What would you call this first section

Highly Confidential - Mira Krishnan, Ph.D.

1    here highlighted in blue?  Is that the abstract or

2    basically the summary of the article?

3        A.    That's the abstract, you are correct.

4        Q.    Okay.  Thank you.

5              It says here -- and this is a paper from

6    2002, I believe -- I'm sorry, 2004.

7              And it says:  "In the last decade

8    children's blood lead levels have fallen significantly

9    in a number of countries, and current mean levels in

10   developed countries are in the region of 3 micrograms

11   per deciliter."

12             Do you have any reason to disagree with

13   the author's statement as to the current mean levels

14   in developed countries for blood lead levels?

15       A.    If I recall correctly, you showed me CDC

16   data -- you showed me CDC data yesterday and when you

17   were asking me if I had considered normative bases for

18   lead levels, and the data that I recall you showing me

19   was more like 0.6 micrograms per deciliter as a mean

20   level.

21       Q.    Right.  But those were in late -- right,

22   but as you recall, those were in later years.  This --

23   this study is reporting on, you know, data prior to

24   2004.  That information that I showed you yesterday

Highly Confidential - Mira Krishnan, Ph.D.

1    was based upon data sampling that began in 2011

2    through 2016.  So what I'm asking you is that do you

3    have any reason to disagree with the author's

4    statements about the mean blood lead levels that they

5    are reporting as of 2004?

6         A.    No.

7         Q.    Then the authors go on to state in the

8    abstract here:

9              "However, from a public health

10   perspective, exposure to lead should be seen within

11   the many other risk factors impacting on normal

12   childhood development, in particular the influence of

13   the learning environment itself.  Current lead

14   exposure accounts for a very small amount of variance

15   in cognitive ability (1 to 4%), whereas social and

16   parenting factors account for 40% or more."

17             You're familiar with the author's

18   conclusion as it's expressed here?

19        A.    Yes.

20        Q.    Do you have any reason to disagree with

21   it?

22        A.    In the context that the authors are

23   speaking in, no.

24        Q.    What do you mean by that, what context?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.    This is a cross-sectional -- these --

2  these -- this is based on cross-sectional data about

3  large populations in which there is much more

4  variability in factors like social and parenting

5  factors than there is in factors like lead.

6            So, the authors, to the best of my

7  understanding -- and I didn't write this paper -- but

8  the authors, to the best of my understanding, are

9  saying that when you look at the general population,

10  lead is not a driving factor of cognition in the

11  general population of children who don't have known

12  lead exposures.  But that's not the population that we

13  are talking about here.

14      Q.    What is your basis for saying that this

15  study involves the general population and not children

16  who have had lead exposure?

17      A.    So, I would be happy to run through this

18  article in more detail if you want me to take a break

19  to do that, but it looks like they are using NHANES

20  data again.

21      Q.    Well, I'm not following, because if -- if,

22  in fact, as we looked at the statistics yesterday, the

23  blood lead levels for these four bellwether plaintiffs

24  are within the range, the measured levels are within

Highly Confidential - Mira Krishnan, Ph.D.

1    the range of what has been reported as average, that

2    would mean they are not exposed to lead more than, you

3    know, the average across the nation, right?

4         A.    That -- that's your statement, not mine.

5         Q.    Is it correct?

6         A.    Can you say it again, please?

7         Q.    Yeah.  Remember the data that we looked at

8    yesterday with the mean blood lead levels for a period

9    of time for these in this age group of children, 2011

10   through 2016, right, we just talked about that.  And

11   if the -- if -- if -- if it's true that the average

12   blood lead levels reported in that document that I

13   showed you from NHANES data from the CDC, if the

14   averages for these children, these four bellwethers

15   are within that range of average, then there -- it

16   doesn't indicate that they have been exposed to lead

17   more than the average of kids across the country,

18   right?

19        A.    If the -- if -- if a child has a

20   lead val -- has lead values that are only within the

21   average range that are reported in the NHANES data,

22   then I would agree that that child has a level of lead

23   exposure that is comparable to the general population

24   based on that data assuming that there is no other

Highly Confidential - Mira Krishnan, Ph.D.

1    source of information that contradicts it.

2        Q.    Okay.  So, what is your -- getting back to

3    the point about this article, I think I would like you

4    to take the time.  Why don't we -- we are very -- we

5    are on -- we are doing very well on timing, so I would

6    estimate that I probably only have about another half

7    hour left, so here is what I suggest.

8            Let's take a -- do you think maybe ten

9    minutes would be enough for you to just peruse this

10   article, Doctor, and -- and make yourself familiar

11   with it so that you can answer that question that I

12   asked you previously, or how much time would you like,

13   you tell me?

14       A.    I -- I think ten minutes is probably

15   reasonable.  Can you please repeat the question?

16       Q.    I hope so.

17            You -- your statement, I think, was

18   something to the effect of that your understanding of

19   what the authors were reporting on was an analysis of

20   a -- of the general population, including a cohort

21   which had children that were not exposed to high

22   levels of lead or lead exposure, something to that

23   effect, and I think you said -- I said what's the

24   basis for that or you said something about the

Highly Confidential - Mira Krishnan, Ph.D.

1    context, right, and I asked you, Okay, what's your

2    basis for saying that, and you said, I'd like to have

3    more time to peruse the article.  So I -- I think

4    that's the thrust of the question.

5        A.    Okay.

6        Q.    Okay.  So I -- I'm looking at --

7        A.    So --

8        Q.    I'm looking at the basis for your saying

9    that, you know, what is the context in which the

10   authors are reporting these findings with respect to,

11   you know, the lead exposure for the children involved

12   in the -- in the survey or the study that they did.

13           So let's take -- you know what, we're --

14   we have plenty of time.  It is almost 11:30.  Let's

15   take 15 minutes.  I'll give you the time to do that.

16   And then I'll -- I'll be able to finish up I think my

17   questioning by, if that's 11:45, I should be done by

18   12:15 and then I can turn it over to the other

19   defendants and see how much they have, okay?

20       A.    All right.  Thank you.

21       THE VIDEOGRAPHER:  Off the record, 11:28 a.m.

22              (WHEREUPON, a recess was had

23               from 11:28 to 11:47 a.m.)

24       THE VIDEOGRAPHER:  Back on the record,

Highly Confidential - Mira Krishnan, Ph.D.

1    11:47 a.m.

2    BY MR. ROGERS:

3        Q.    Okay.  Doctor, we've taken a 15-minute

4    break, and to turn to the subject, I -- I do -- I do

5    still have up on the screen, hopefully, this paper we

6    are referring to, and I think the -- the question

7    before you was what -- what you wanted to do to put it

8    in context based on the findings that I reported from

9    the abstract.  So go ahead, please.

10       A.    So I just wanted to state for the record

11   that I -- I didn't write this paper and I'm not an

12   expert on this paper and you may have to direct some

13   of the questions that you have to the author of the

14   actual paper.

15            With respect to this 1 to 4 percent

16   statement that you had previously discussed and

17   highlighted, I am not able to determine what the basis

18   for that statement is.  The only place that I see it

19   made -- referenced, again, in the article is in the

20   very last sentence where it is a reference to another

21   paper, and so I'm not sure -- I'm not sure what that

22   statement -- what the basis for making that statement

23   is by the authors.

24       Q.    Why did you include this -- oh, and just

Highly Confidential - Mira Krishnan, Ph.D.

1    for the record, so I went to that last page of the

2    article and it -- it says there, as is highlighted:

3    "Current lead exposure accounts," et cetera, et

4    cetera, and then it cites to the Weiss paper from

5    2007, right -- I'm sorry -- 2000.

6              Is that what you meant?

7         A.    Yes, correct.

8         Q.    Okay.  So why did you include this paper

9    in your Bibliography?

10        A.    I don't generally review journal articles

11   with the expectation that I agree with every sentence

12   in them or understand the basis for every sentence in

13   them, but this paper reviewed lead exposure in

14   children, it discussed a number of studies that had

15   attempted to determine exposure, it reviewed at least

16   some findings that children who had lead exposures

17   below the 10 micrograms per deciliter level that is

18   typically used to define lead poisoning had decrements

19   in intellectual funding.

20        Q.    Hmm.  Okay.

21             Have you ever seen this data, that is,

22   that:  "Current lead exposure accounts for a very

23   small amount of variance in cognitive ability (1 to

24   4%), whereas social and parenting factors account for

Highly Confidential - Mira Krishnan, Ph.D.

1    40% or more," have you ever seen that cited by or

2    referenced by any other authors in your research on

3    this case?

4         A.    I haven't seen that specific statistic

5    cited elsewhere.

6         Q.    Have you ever reviewed any studies or

7    literature from the CDC in which this statement and

8    these findings are reported and repeated?

9         A.    The -- the highlighted statement?

10        Q.    Yep, the one I just read, yeah.

11        A.    I am not aware -- I am not personally

12    aware of another source where that statement is made.

13    I'm -- I'm -- CDC or otherwise.

14        Q.    Okay.

15        A.    If you'd like to show me, I'm happy to

16    look at it.

17        Q.    No.  We can move on at this point.

18              I'm going to show you another paper.  That

19    one was 21.  I'm going to show you a paper now that

20    will be marked as Exhibit 22.

21                    (WHEREUPON, a certain document was

22                     marked Mira Krishnan, Ph.D.

23                     Deposition Exhibit No. 22, for

24                     identification, as of 10/06/2020.)

Highly Confidential - Mira Krishnan, Ph.D.

1   BY MR. ROGERS:

2       Q.    And it's a paper by several authors, but

3   it's the 2019 Roy and Edwards paper.

4             Do you know who Dr. -- do you see his --

5   I'm -- my cur -- where my cursor is here, do you know

6   who Dr. Marc Edwards is?

7       A.    That name is familiar.  I believe that

8   I've met Dr. Edwards.

9       Q.    Did -- have you had any conversations with

10  Dr. Edwards about the work that he did analyzing the

11  water in Flint and the water lead levels and so forth,

12  the work that he did?

13      A.    I -- I have not.  If I had met him, it

14  would have been before this crisis.

15      Q.    Okay.  Did you --

16      A.    I am not sure if I've met him.  The name

17  sounds familiar.  There -- but it may also be that

18  there is a different Marc Edwards.

19      Q.    Well, I'm referring -- this Marc Edwards

20  is the Virginia Tech professor who, you know, came out

21  and did all of -- all of the water sampling and the

22  water lead testing for the people of Flint, you know,

23  after the water crisis had occurred.

24            So is that the person that you believe you

Highly Confidential - Mira Krishnan, Ph.D.

1    met?

2         A.    I -- I think, actually, I -- I met a

3    different Marc Edwards.

4         Q.    Oh, okay.  Well, so be it.

5         A.    My apologies.

6         Q.    So -- no, no, that's all right.

7               So, Dr. Edwards has given a deposition in

8    the case, and just to confirm, this was, I don't know,

9    maybe a month ago, a few weeks ago.

10              You have not reviewed Dr. Edwards'

11   deposition testimony in the case, is that right?

12        A.    That's correct.

13        Q.    In fact, other than the depositions of the

14   parent plaintiff representatives, you haven't reviewed

15   any depositions in the case, right?

16        A.    I believe that's correct.  I believe all

17   of the depositions I reviewed were of parents.

18        Q.    So Dr. Edwards is reporting in this paper,

19   and he also testified about it in his deposition, that

20   based on his analysis and the highlighted section that

21   I have -- have presented to you here, he says:

22              "Although total biosolids lead increased

23   just 14% during the 18 months of the FWC," meaning the

24   Flint water crisis, "versus the comparable time

Highly Confidential - Mira Krishnan, Ph.D.

1   pre-FWC, 76 percent of that increase occurred in

2   July through September of 2014."

3           Do you have any basis or reason to

4   disagree with that statement by Dr. Edwards?

5       A.   I -- I am unable to evaluate that

6   critically.

7       Q.   Is that because you lack the expertise in

8   that particular field to do so?

9       A.   Yes, I don't know very much about biosolid

10  lead --

11      Q.   Okay.

12      A.   -- increments.

13      Q.   And then he said -- and then he says:

14          "In" -- "And the corresponding percentage

15  of Flint children under 6 years with elevated blood

16  lead," and he describes that as greater than or equal

17  to 5 micrograms per deciliter, "doubling from 3.45% to

18  6.61% in those same three months versus 2013," and

19  then he goes on to say here, "was not statistically

20  higher during the remaining months of the FWC compared

21  to pre-FWC or post-FWC."

22          Do you see that, up through here?

23      A.   I do.

24      Q.   Do you have any reason to disagree with

Highly Confidential - Mira Krishnan, Ph.D.

1    that statement?

2         A.    I -- I don't.  But, again, I didn't write

3    this paper and -- and I am -- am just seeing it now.

4         Q.    Okay.  I won't go into the rest of the

5    paper then, but I can -- I'll just try to summarize it

6    and report to you.

7              Dr. Edwards reported that there was a

8    significant spike in lead levels in the biosolids that

9    he believes indicates a significant spike in the lead

10   content of the water system during 2011.

11             Are you familiar with that finding that he

12   has made at all?

13        A.    I am not.

14        Q.    Have you ever seen any scientific papers

15   or studies or other references to that that there was

16   a spike in the lead content of the Flint water in 2011

17   before the switchover to the Flint River?

18        A.    I -- I am not familiar with that, no.

19        Q.    Okay.

20        MR. ROGERS:  Then the last -- this one we marked

21   as Exhibit -- is this -- would this be 23, Juliana?

22        THE COURT REPORTER:  Yes (sic).

23        MR. ROGERS:  Thank you very much.

24                  (WHEREUPON, a certain document was

Highly Confidential - Mira Krishnan, Ph.D.

1                    marked Mira Krishnan, Ph.D.

2                    Deposition Exhibit No. 23, for

3                    identification, as of 10/06/2020.)

4    BY MR. ROGERS:

5        Q.    I want to get to your Notice of

6    Deposition, which would be No. 20 -- Exhibit No. 24

7    (sic).

8            So I'm going to ask you some questions,

9    Dr. Krishnan, just to make sure that you don't have

10   anything in your files that have -- hasn't been

11   described or produced yet.  This was a -- if you can

12   see it on the screen, it's what's called the

13   deposition notice, it sets forth the date when you are

14   going to be deposed, and it also has a document

15   request which is called a Schedule A which I'll show

16   it to you now.

17           I just want to go through --

18       A.    You haven't shared your screen yet, sir.

19       Q.    Thank you.  My bad.

20           There it is.  Can you see it now?

21       A.    Yes.

22       Q.    Okay.  So I'll just size it down a little

23   bit.  So as I was saying, this is a Schedule A

24   document request.  There is language in here about

Highly Confidential - Mira Krishnan, Ph.D.

1    the -- producing the file material seven days before

2    your deposition.

3              But in any event, have you now summarized

4    for me and/or produced your complete expert file in

5    the cases involving the bellwether plaintiffs, T█PPI█,

6    V█PPI████, W█PPI█and -- and S█PPI███?

7         A.    To the best of my knowledge, yes.

8         Q.    And you've produced -- Paragraph 2, asks

9    for the complete time and billing records, you've

10   provided me with two billing invoices and that's all

11   you have, right?

12        A.    So I -- I provided -- I provided invoices

13   to the attorneys, and so I am -- the attorneys on the

14   other side, and so I am not completely sure if there

15   may have been a -- something missing there.

16              There is an invoice -- sorry.  I -- I -- I

17   didn't submit an invoice that covered the usage of the

18   retainer for Napoli law until September.  That invoice

19   I provided to -- I had provided it to Napoli.  If you

20   only have the one from Levy Konigsberg, then I believe

21   the Napoli attorneys are in possession of that and

22   they can provide that to you.

23        Q.    Okay.  I think, though, that for -- for

24   T█PPI█, V█PPI████, W█PPI█ and S█PPI███ those are all

Highly Confidential - Mira Krishnan, Ph.D.

1    Corey Stern's clients who would be the Levy Konigsberg

2    firm, but we can look into that.  So thank you for

3    telling me.

4              You -- you have a separate invoice that

5    you issued to the Napoli firm for those other

6    bellwether plaintiffs?

7         A.    Correct.

8         Q.    But with respect to any work that you've

9    done on T▮PPI▮, V▮PPI▮, W▮PPI▮ and S▮PPI▮, those

10   bellwether plaintiffs, you don't have any other

11   invoices because the reports that you wrote were work

12   that you did that was included within the billing or

13   invoicing that you did originally for the case, right,

14   for these cases?

15        A.    That's correct.

16        Q.    We have your most current CV, you've told

17   me that you don't have a testimony list.

18              Is it correct that you don't have any

19   witness statements, Paragraph 5 here asks for witness

20   statements obtained by you or reviewed by you in

21   connection with this case, apart from what's described

22   in your reports?

23        A.    That's correct.

24        Q.    The only thing by way of deposition

Highly Confidential - Mira Krishnan, Ph.D.

1    transcripts that you have, Paragraph 6, is the

2    transcripts -- did you get the exhibits along with the

3    deposition transcripts for the parent representatives

4    of these plaintiffs?

5         A.    I -- I don't think I did.

6         Q.    Did -- there is a typo in this one,

7    Paragraph 7, but it says:  "All facts or data that you

8    considered in forming your opinions, including, but

9    not limited to."  So let's leave out the "including

10   but not limited to" because there is nothing after

11   that.

12              Did you -- have you provided all of the

13   facts and data that you considered in forming the

14   opinions that you have in the case concerning these

15   four bellwether plaintiffs?

16        A.    I believe I have.

17        Q.    The Federal Rules of Civil Procedure call

18   for experts to provide information concerning any

19   assumptions that were provided to experts, and in this

20   case provided to you and relied upon you in forming

21   your opinions.  I just want to make sure we cover

22   that.

23              Did you receive any facts that you assumed

24   to be true from the plaintiffs' lawyers that you

1    relied upon in forming your opinions that you haven't

2    already told us about?

3         A.    Forgive me for being a little new to these

4    rules.  Can you give me an example of something that

5    would be -- that would fall in that category?

6         Q.    Sure.  I am in an excellent position now

7    because for the past two days you have been telling me

8    how any neuropsychologist would know this, and I'm

9    pleased to be able to explain something to you

10   concerning the law.

11            So, that would --

12        A.    The tables have certainly turned on me at

13   this point.

14        Q.    Yep.

15            So, the -- an example would be if a lawyer

16   in an e-mail or a letter, or even in a conversation

17   said to you, Dr. Krishnan, for purposes of the

18   opinions that you are going to come up with or

19   generate in the case, I want you to assume that there

20   will be evidence that the lead content in the water of

21   these children was X, and I'm not going to give you

22   any documents or anything that support that, but I'm

23   just going to tell you that.  I want you to assume

24   that and have your opinions be based in part on that.

Highly Confidential - Mira Krishnan, Ph.D.

1    That would be an example.  So they didn't provide you

2    with actual data of test reports or something, but

3    they said I want you to assume that.

4             Is -- is it correct that no such

5    assumptions -- you have -- you have not asked or been

6    provided with any assumptions on certain facts that

7    you relied upon in forming any of your opinions in the

8    case?

9        A.    I don't believe that I have.

10       Q.    Have you engaged in any correspondence,

11   whether e-mail or letters, between you and other

12   consultants retained for the plaintiffs in the case?

13       A.    To the best of my knowledge, only the ones

14   that I had provided to the law firm to -- to Patrick

15   Lanciotti in this matter.

16       Q.    I think you might have misunderstood.

17   The -- the -- let me explain.  It's not clear.

18             Have you corresponded with any other

19   expert consultants retained by the plaintiffs in the

20   case, not with the lawyers but with other expert

21   consultants?

22       A.    I provided Pat -- Mr. Lanciotti copies of

23   e-mails exchanged between myself and Dr. William

24   Bithoney.

Highly Confidential - Mira Krishnan, Ph.D.

1     Q.    I see.  Okay.  Thank you.

2           Is there any other such correspondence

3  with any experts in the case?

4     A.    I'm not aware of any.

5     Q.    Okay.  So whatever correspondence by way

6  of e-mail that you had with Dr. Bithoney, you still

7  retain those e-mails and you provided them to

8  Mr. Lanciotti, is that right?

9     A.    That's correct.

10    Q.    What subject -- without telling me what's

11  in the e-mails, what are the basic subject matters of

12  the correspondence, e-mail correspondence between you

13  and Dr. Bithoney?

14    A.    Most of the e-mails asked me when I would

15  have reports ready for him to review, and then there

16  were also, I believe, there was a question about the

17  date on which I -- the date range in which I had

18  completed the evaluations.  If I remember correctly,

19  he wanted to know if I had seen the children in May or

20  June.

21    Q.    Okay.  Anything else that you can

22  remember?

23    A.    No.  Oh, I think --

24    Q.    Did --

Highly Confidential - Mira Krishnan, Ph.D.

1      A.    -- I think he also asked me for a

2   clarification about a demographic factor for one of

3   the children.  I'm sorry.

4      Q.    Was it one of these four?

5      A.    I -- I would have to review those e-mails,

6   but I -- I think at one point he asked me if one of

7   the children was a boy or a girl.

8      Q.    Okay.  Thanks.

9            So with respect -- did -- did you have any

10  communications with Dr. Bithoney that were not

11  e-mails, that is, telephone conversations, Zoom

12  conferences or anything like that?

13     A.    He -- if I -- to the best of my memory, he

14  called me by telephone also on the topic of when I

15  would have reports available to review.

16     Q.    He really wanted those reports, huh?

17     A.    It is a somewhat long story, but as you

18  may already know, I -- my involvement in the case

19  began at a relatively late date and so there were

20  significant time pressures at that time.

21     Q.    Well, I certainly understand the

22  sequencing, you know, that's common, right, where

23  experts sometimes need information and reports from

24  other experts, so.

Highly Confidential - Mira Krishnan, Ph.D.

1              Okay.  That being said, I want to make

2   sure, you've never -- you -- before you wrote your

3   reports, did you -- were you provided with any reports

4   or information from other consulting experts before

5   you wrote -- with respect to these four plaintiffs

6   before you wrote -- you wrote your reports for them?

7       A.   I would like to ask a question of the

8   attorneys from -- from Napoli and Levy Konigsberg

9   before I answer that, if that's okay?

10      Q.   Sure.

11      A.   May we go off the record?

12      Q.   Sure.

13      THE VIDEOGRAPHER:  Going off the record,

14   12:06 p.m.

15              (WHEREUPON, a recess was had

16               from 12:06 to 12:15 p.m.)

17      THE VIDEOGRAPHER:  Back on record, 12:15 p.m.

18      MR. STERN:  This is Corey Stern.  Mr. Rogers for

19   VNA and I just had an off-the-record conversation.

20              I wanted to note for the record that prior

21   to Dr. Krishnan agreeing to serve as an expert for the

22   four bellwether plaintiffs who are the subject of this

23   deposition, plaintiffs counsel had retained another

24   expert for the same purpose.  Because of the COVID-19

Highly Confidential - Mira Krishnan, Ph.D.

```
 1   pandemic, roughly two to three weeks before that
 2   expert was scheduled to travel to Flint, Michigan to
 3   evaluate the children who are subject of this -- the
 4   subjects of this deposition, that expert informed my
 5   law firm that he was unable to travel or participate
 6   in the litigation in the way in which we had requested
 7   his participation, meaning to physically evaluate and
 8   meet with the children and their families.
 9              At that point in time we -- or -- or
10   somewhere around that point in time we requested an
11   extension of time from the Court with regard to
12   provision of expert reports and we hired Dr. Krishnan
13   to perform the same evaluations and provide her
14   expertise with regard to those evaluations.
15              Any -- there may have been documents or
16   communications that were between my office and the
17   original expert that was retained which we may have
18   forwarded to Dr. Krishnan before she got started on
19   her in-person evaluations with the families of --
20   and -- and the actual plaintiffs for our cases.
21              The -- the original expert did not ever
22   evaluate the children.  He was unable to perform the
23   tasks that we had asked because of the COVID-19
24   pandemic and ultimately we are here today for the
```

Highly Confidential - Mira Krishnan, Ph.D.

1    deposition of the expert that was retained.  There was

2    no reason for that expert to cease working with my

3    firm other than the pandemic.  It is an expert that

4    I've worked with for close to a decade in lead

5    poisoning cases who I highly respect and it was

6    regrettable that he was unable to perform the tasks

7    that we had hired him to perform.

8             Notwithstanding that, we are extremely

9    happy with the work that Dr. Krishnan has done on

10   behalf of these individual plaintiffs and we are

11   excited, you know, to have her as part of our -- our

12   expert team.

13        MR. ROGERS:  Okay.  Thanks, Corey.

14   BY MR. ROGERS:

15        Q.    So, Dr. Krishnan, is it -- is what

16   Mr. Stern said accurate in the sense that some

17   information was provided by him to you about some

18   information or materials that the previous consulting

19   expert had authored or had input in?

20        A.    Yes, it is.

21        Q.    And do you have those materials sort of

22   segregated out or stored or -- or in your files or in

23   your possession in some form?

24        A.    I haven't checked during this break, but

Highly Confidential - Mira Krishnan, Ph.D.

1    if they were provided to me, I believe I still have

2    them.

3         Q.    Okay.  I'd just ask you to maintain those,

4    please, and we'll have to consider what, if anything,

5    to do about this at another time.

6              I just want to clarify, the -- the

7    materials that you did receive, it wasn't a report or

8    evaluation or data of any type that that other

9    consulting expert provided on the plaintiffs, was it?

10        A.    To the best of my knowledge, it was an

11   un-finalized document and I essentially was not able

12   to -- I did not use it to draw any con -- conclusions,

13   I did not use it to make any assumptions, and I

14   started over and completed completely independent

15   evaluations.  And the reason I don't mention it in my

16   reports as well is because I didn't reference it.

17        Q.    Okay.  So I'll just ask you to hold on to

18   that and segregate out whatever those materials are,

19   and, you know, so that we have -- we know what they

20   are for a future time.  And with that, I just want to

21   finish up the questioning on this document that I hope

22   is still on the screen.

23             Is this the -- the -- well, let's make

24   sure there is nothing else.  So we were on Paragraph 9

Highly Confidential - Mira Krishnan, Ph.D.

1    and I was asking about, and this is what caused --

2    prompted the break for the separate communications

3    with the counsel there, correspondence between you and

4    other consultants retained for the plaintiffs.

5              Apart from what you just told us about

6    this one consulting expert, did you have any

7    correspondence or communications or receive any

8    information from any other consultants for the four

9    bellwether plaintiffs?

10    A.    I am not aware of having received any

11    other correspondence or communication.

12    Q.    Okay.  And then the last paragraph asks

13    for, this is actually language, I think, right from

14    the court order that we worked out on this, and it

15    says:

16              "The complete and unredacted raw data,

17    test forms, test protocols, test reports, computer

18    printouts and examinee and informant response sheets

19    for the tests and evaluations administered concerning

20    the bellwether plaintiffs T██PPI, V██PPI████████, W██PPI and

21    S██PPI████."

22              And have you produced all of that

23    information to us and we've marked those as exhibits

24    during the deposition?

Highly Confidential - Mira Krishnan, Ph.D.

1        A.    To the best of my knowledge, yes.

2        MR. ROGERS:  Okay.  That -- those are all of the

3    questions that I have for you.  Thank you very much

4    for your cooperation and patience over the last day

5    and a half, and I'm wondering if the other defense

6    counsel have questions and maybe if we could just go

7    ahead and finish at this time.

8        MR. GAMBLE:  This is Travis Gamble on behalf of

9    the LAN defendants.  In light of your completely

10   thorough examination of the witness, LAN has no

11   additional questions for Dr. Krishnan at this time.

12       MR. ROGERS:  Okay.  Thanks, Travis.

13             I -- I noted that Bill Kliffel was on the

14   Zoom conference yesterday.  I don't know if he is on

15   today.

16             Is there -- are there any other defense

17   counsel, City of Flint or otherwise, who -- who want

18   to ask questions?

19       MR. KLIFFEL:  Hey, David, can you hear me?

20       MR. ROGERS:  Oh, there you are.  Okay, Bill.

21   Yep.

22       MR. KLIFFEL:  I do have some questions.  I

23   wouldn't be too long.

24       MR. ROGERS:  I'm going to go off and mute.

Highly Confidential - Mira Krishnan, Ph.D.

1    Thanks, Bill.

2        MR. KLIFFEL:  And, David, could you take down

3    your document, the deposition notice.  That seems to

4    be -- having trouble seeing the full screen.

5            Great.  Perfect.

6                    EXAMINATION

7    BY MR. KLIFFEL:

8        Q.    Dr. Krishnan, my name is Bill Kliffel.  I

9    represent the City of Flint.

10           Can you hear me okay?

11       A.    I can, yes.

12       Q.    Okay.  If at any time you can't, let me

13   know.  I've tried to strike from my notes anything

14   that's been covered, so I'll try not to cover anything

15   twice.

16           Just some questions about the four

17   bellwethers that we've been talking about that came to

18   my mind as we've been, you know, discussing the last

19   two days.

20           Can -- can a death of a close loved one in

21   a family affect a child's performance at school or

22   affect their behavior?

23       A.    Are you asking that question with respect

24   to these four children or as a general question?

Highly Confidential - Mira Krishnan, Ph.D.

1      Q.    Generically for the moment.

2      A.    Yes, it can.

3      Q.    Okay.  Were you aware that E███ S███ ████████

4 great grandmother, who was only 69 years of age, died

5 in May of 2019?

6      A.    I would have to go back to my report.

7 I -- I'm not sure if I was aware of that or not.

8      Q.    Okay.  Would that have had any impact on

9 your assessment of his behavior or of the condition

10 that you diagnosed him with?

11      A.    If you -- is it all right if I take a

12 quick look at my report?

13      Q.    Yes.

14      A.    I believe -- to the best of my knowledge,

15 that's not something I was aware of.  When did you say

16 this happened?

17      Q.    May 22nd, 2019.

18      A.    So this is not something that -- that came

19 up in the discussion I had with this family.  I --

20 I -- I have a hard time saying, you know, therefore,

21 how much of an impact it makes.  They did not really

22 describe significant emotional changes or problems for

23 E███ and I did not primarily base my finding based on

24 school problems for E███.  I would generally not

Highly Confidential - Mira Krishnan, Ph.D.

1    expect a death in the family to have a significant

2    effect on neurocognitive testing.

3        Q.    Okay.  Fine.

4            Now, with respect to A█PPI█████ T█PPI█ there

5    is a reference in her mother's deposition transcript

6    to her being diagnosed with bipolar disorder, but my

7    question is more generic.

8            Would a parent having been diagnosed with

9    bipolar disorder impact your opinions about the

10   conditions you diagnosed in A█PPI█████ T█PPI█ or not?

11           In other words, you said ADHD among the

12   siblings didn't impact your opinion because you didn't

13   find that she had classic ADHD.  So, what would a

14   bipolar diagnosis in a parent do to impact your

15   opinions, if anything?

16       A.    So, again, bear with me a moment, please.

17           In A█PPI█████ T█PPI█ case, if I remember

18   correctly from the -- not changing any previous

19   answers that I gave, but if I remember correctly from

20   the discussion, there was this -- this -- there was a

21   discussion of the family history that I understood and

22   anxiety and that I didn't think that that was a

23   relevant factor in the mood disorder diagnosis that I

24   gave, but I do think that a mood disorder would

Highly Confidential - Mira Krishnan, Ph.D.

1  have -- there is a potential for heritability on the

2  basis of a parental diagnosis of bipolar disorder,

3  assuming that that diagnosis is accurate.

4      Q.    Okay.  And then could the behaviors that

5  could be manifested in a parent as a result of having

6  bipolar disorder, in other words, that condition in

7  addition to being a possible heredit- -- hereditary

8  link for the child, could that parent's behavior and

9  the environment created by that behavior also have an

10  impact on the development of the child from a

11  neuropsychological standpoint?

12      A.    I can say that that is possible.  I am not

13  able to comment on the probability of that.  I did not

14  evaluate A▇PPI▇▇▇▇ mother, of course, but I was not

15  aware in interacting with A▇PPI▇▇▇ and her mother --

16  I -- I did not -- did not come across significant mood

17  instability for the parent that would raise a concern

18  of that kind.

19      Q.    Okay.

20      A.    But I do think that that is possible.

21      Q.    Okay.  I'm sorry for interrupting you.

22            And your interaction with the mother took

23  place again over about an hour, hour and a half and

24  then you had the benefit of her completing the

Highly Confidential - Mira Krishnan, Ph.D.

1    Vineland and the BASC-3, correct?

2         A.    That's correct.

3         Q.    Okay.  All right.  Moving now onto R███

4    V███          .

5              I was interested to know -- in your report

6    you mentioned that R███ had actual eye or visual

7    issues.

8              Do you know how back her diagnosis of

9    visual issues went, based on your report?

10        A.    Just a moment, please.

11             I -- I am not aware.  If I read you the --

12   the sentence from my report:  "R███ has just been

13   referred to see an eye doctor, so this is pending.

14   Her pediatrician was not actually concerned, but she

15   did fail a school test."

16             I -- if I understood what it -- what I was

17   privy to, if I understood it correctly, she had

18   relatively recently failed a school test and so the

19   family was planning on obtaining an eye -- an

20   optometrist or ophthalmologist evaluation, but I don't

21   know the history of her, any visual problems.

22        Q.    Okay.

23        A.    I don't actually know, in fact, if she had

24   any visual problems.

Highly Confidential - Mira Krishnan, Ph.D.

1      Q.    Okay.  Can visual problems or visual

2  acuity problems have an impact on academic performance

3  as a general question?

4      A.     In general there are situations where that

5  happens.  That is part of the reason, to my

6  understanding, that schools complete vision screens.

7  It is really common for a child to need eyeglasses or

8  contact lenses when they are sitting in the back of

9  the classroom and they realize they can't read the

10  school board and everybody else can.  That is, in

11  fact, how I started wearing glasses myself.

12          It would generally not be expected to have

13  a sustained impact just because schools are doing

14  vision screening and giving parents the feedback, as

15  in this case the parents were planning on doing an

16  evaluation.

17      Q.    Okay.  Can vision issues impact or affect

18  the outcome of tests like the WISC-V or other testing

19  that you did in R▮PPI▮ situation, because -- and the

20  reason I'm asking is you note that she has a visual --

21  she had visual issues that were manifested through

22  your testing.

23          Am I correct on that, she had visual

24  spatial issues?

Highly Confidential - Mira Krishnan, Ph.D.

```
1        A.    Oh, I see.  So these are visual reasoning

2    issues.  They are -- they are based on interpreting

3    visual information, but the -- these are information

4    processing problems.  They happen in the brain and not

5    in the eyes.

6        Q.    Okay.  So the eyes -- excuse me.  The eyes

7    cannot affect the way that you take in and then

8    process information, if your eyes are very poor?

9        A.    If your eyes are very poor, yes, but I

10   didn't see any evidence that was suggestive of that

11   when I evaluated her.

12       Q.    Okay.  Okay.  Now, moving on to D▮PPI▮

13   W▮PPI▮.  Can a move of a family residence have an impact

14   on a child's behavior in school and performance in

15   school?

16       A.    Yes, that is possible.

17       Q.    Okay.  Do you know that her family moved

18   in October of 2018, which is, you know, a good portion

19   of the way through the first semester of that year?

20       A.    That came up in the deposition transcript

21   that I reviewed for her family.

22       Q.    Okay.  And another thing, excuse me, wow,

23   I'm glad we are not in the room together, I guess,

24   today.
```

Highly Confidential - Mira Krishnan, Ph.D.

```
1              I also noticed in D▪▪▪      W▪▪▪
```

2    deposition transcript that I asked her about screen

3    time and her mother told me she had two to three hours

4    of screen time on devices during the school year and

5    six to eight hours in the summer months.

6              Is screen time a significant thing in your

7    mind as a neuropsychologist in terms of the way people

8    act or the way that they interact with people or not?

9         A.    So, it is a topic of -- it is a hot topic

10   or a topic that psychologists are discussing.  I'm not

11   aware of any high quality study that a -- that

12   associates -- that provides, like, a dose response

13   kind of relationship between screen time and cognitive

14   or emotional functioning.  In D▪▪▪      case, there

15   was a question of -- excuse me.  I -- I -- I'm

16   thinking of somebody else.

17             I -- I -- I would not recommend that

18   children have that much screen time, particularly the

19   higher number that you said, but I -- I don't recall

20   any information that I reviewed with the family that

21   suggested that that contributed to what I was seeing.

22        Q.    Okay.  And -- and did her parent or

23   parents express any concern to you about the amount of

24   screen time that she had?  I didn't see that in your

Highly Confidential - Mira Krishnan, Ph.D.

1    report specifically, but do you remember that?

2         A.    No, I don't, I do not remember that.

3         Q.    Okay.  All right.

4               I'm going to switch gears a little bit,

5    and some of these questions are kind of basic, but I'm

6    going to try and pare out the ones that may not be

7    necessary, so just bear with me.

8               In your clinical practice when a child

9    comes to you and there is a -- you know, a

10   doctor/patient relationship and when you administer a

11   complete neuropsychological examination, how long

12   face-to-face do you spend with the child that you

13   are -- in your clinical practice for that sort of an

14   evaluation?

15              Here you said two to three hours give or

16   take.  How long does it take in your practice?

17        A.    If -- so these -- these evaluations, aside

18   from the -- the nature of the records review are

19   largely similar to what I would do for a similar

20   clinical situation.  The reason I'm answering that way

21   is I do participate in different kinds of clinics.  I

22   participate in some team care clinics where I have a

23   relatively tight constrained amount of time.  In that

24   setting I only have about an hour and a half with each

Highly Confidential - Mira Krishnan, Ph.D.

1   patient, but in general what I would say is that my

2   evaluations here are fairly comparable to what I would

3   do in a clinical setting for children of this age.  I

4   would shoot for around three or maybe four hours of

5   cognitive testing.  I would spend about an hour to an

6   hour and a half with the parents.  And I would

7   typically give a same-day feedback that would consist

8   of an hour or two or so as well.

9        Q.    Okay.  Now, the battery of tests that you

10   selected for these bellwether, these four bellwether

11   children we are discussing, they are pretty similar,

12   and there are a couple where you added one or took one

13   away.

14            My question is in your clinical settings,

15   are the batteries that you are using there pretty

16   similar to these or were these varied and changed up

17   compared to what you normally do?

18        A.    So in general these are all tests I use in

19   my clinical setting.  And -- and so, again, if I saw a

20   child similar to these four children, I may well give

21   exactly the same battery, depending on the time

22   constraints, it might be slightly longer or shorter.

23            The only exception I would give is, again,

24   in some of those settings where I'm working with

Highly Confidential - Mira Krishnan, Ph.D.

1    children and I have a very short amount of time, I --

2    so we didn't discuss effort testing in great detail,

3    but I did include effort testing in all of these

4    evaluations.  I -- I always in -- incorporate some

5    kind of measure or validity or effort in medical/legal

6    evaluations.  I almost always do that in clinical

7    settings, as well, unless the appointment is very

8    short and there -- and the time is precious.

9         Q.    Okay.  Now, under the WISC-V, are there

10   five cognitive domains?

11        A.    That's not the reason it's a "V," but,

12   yes, that's correct.

13        Q.    Okay.  So what does the "V" pertain to?  I

14   probably have it wrong.

15        A.    No.  No, sir.  It's the fifth edition of

16   the test.

17        Q.    Okay.  Well, no, my -- my question is how

18   many cognitive domains are tested for under the

19   WISC-V?

20        A.    As it happens, the answer is also five.

21   So, I don't want the -- I don't want to get too far in

22   the weeds unless you really want me to.

23             The WISC-V is a measure of general

24   intellect.  In psychological literature that construct

Highly Confidential - Mira Krishnan, Ph.D.

1    is sometimes just referred to as G, and IQ is a

2    measurement of G.  G is a measure of -- it is

3    something like a measure of overall thinking health.

4    If you had to pick one number that characterized a

5    person's cognitive abilities, then -- then this G or

6    IQ is the number you would choose.

7            The way that -- I'm not an expert in -- in

8    designing IQ tests, but the way that IQ tests are

9    designed, generally speaking, is that all of the

10   subtests administered are highly correlated with each

11   other, meaning that the performance is very similar on

12   one to another.  The reason many subtests are

13   administered is because by administering many corl- --

14   highly correlated tests you derive a more accurate

15   estimate of IQ, intelligence quotient or this

16   quantitative measurement of this G factor.

17           However, although these tests are highly

18   correlated, if you do something that statisticians

19   call factor analysis, then these tests that are highly

20   correlated fall into slightly different sets of

21   thinking skills.  In the case of the WISC-V, it breaks

22   into five skills, older versions of this test broke

23   into a smaller number of these domains.  Briefly those

24   domains are verbal comprehension, visual and spatial

Highly Confidential - Mira Krishnan, Ph.D.

1    construction, fluid reasoning, working memory, and

2    processing speed, and so those are the reasons that

3    the subtests are listed in five rows in my score

4    summary.

5        Q.    Okay.  Okay.

6             Now, can you make a comment based on a

7    single subtest of one of the domains of the WISC-V in

8    terms of the performance and that domain or should you

9    do more than one subtest from that domain to make a

10   comment on performance?

11       A.    So, I obviously cannot speak for all

12   neuropsychologists, but in general in my experience

13   neuropsychologists view IQ tests as being a small

14   subset of their arsenal.  If anything, I'm usually

15   trying to spend less time measuring IQ and more time

16   measuring other things.  The reason for that is that

17   IQ is a measure of general cognitive health, but in

18   general we are asked to see people because they have

19   specific kinds of problems.

20            With that being said, these tests vary a

21   little bit in duration and complexity, but as a

22   general practice, I look for overlapping corroborating

23   information from multiple tests, and I think that I

24   mentioned this several times to Mr. Rogers, to his

Highly Confidential - Mira Krishnan, Ph.D.

1   chagrin, to some extent, but I avoid reading

2   individual tests in isolation as a general matter of

3   practice.

4        Q.    What is the range of normal IQs in

5   children?

6        A.    That depends a little bit on how you

7   define normal.  IQs are distributed on a Gaussian,

8   G-a-u-s-s-i-a-n, or normal or bell curve distribution,

9   meaning that there is no sharp distinction between an

10  IQ that is normal and abnormal.  Neuropsychologists

11  typically consider 1.3 standard deviations below the

12  mean to be -- as a -- as a common level that is

13  inferred to be impairment.  That's -- in the IQ metric

14  that's 80, and so using that standard 80 to 120 would

15  be normal.

16       Q.    Okay.  Now, does IQ testing and the

17  results for that testing, does that get more accurate

18  as children get older or conversely is it less

19  accurate when the children are younger?

20       A.    That's an excellent question.

21             Generally speaking, IQ becomes more stable

22  over time.  IQs for young children, and by "young" I

23  mean probably less than about six years of age, are

24  not as effective as long-term predictors.

Highly Confidential - Mira Krishnan, Ph.D.

1      Q.    Okay.  And then if you took one child and

2  you tested them in year one and they were let's say

3  like eight years old and you tested them a year down

4  the line, how much variability is there in IQ testing

5  of the same student or the same subject across two

6  tests?

7      A.    That's a good question.  I have to

8  decompose that into two slightly different questions,

9  if you -- if you'll bear with me.

10          So, neuropsych -- I apologize, too, the

11  sun is shining just now and I want you to be able to

12  see me.

13          Neuropsychological tests, generally many

14  of them have susceptibility to something called

15  practice effects.  It just varies from test to test,

16  but what a practice effect means is that if you do a

17  test and then you take the test again, then you do

18  better the second time than you did the first time.

19  For reasons that I think are apparent.

20          In general, IQ tests have known practice

21  effects.  I don't have those statistics right in front

22  of me, but those -- the practice effect size is on the

23  order of a third to half of a standard deviation.  And

24  that diminishes over time, and so the further away the

Highly Confidential - Mira Krishnan, Ph.D.

1    less the size of that is.

2              But then the second question is how -- how

3    accurate are the IQ measures to begin with and -- and

4    so scientists if they use kind of like this artificial

5    reality in that kind of question if I -- if I consider

6    one of these children I imagine that I have ten clones

7    of the same child, right, and -- and ten clones of

8    myself and the ten of me evaluate the ten of them so

9    that each of them only do the IQ test once.  If that's

10   not too absurd to imagine.

11             Then the question is, like, how similar

12   would their IQs be, right?  In a perfect world we

13   would imagine that their IQs would be the same.

14   Generally speaking, that range is relatively small.

15   It's probably on the order of a third of a standard

16   deviation, to my recollection.

17        Q.   Okay.  All right.

18             Switching gears just a little bit, to what

19   extent, if any, do you believe that this COVID

20   pandemic has impacted your ability or any -- any

21   neuropsychologist's ability to test for IQ?  Did it

22   have any effect on the testing of these four, for

23   instance, that you can tell us about or not?

24        A.   So, as -- as Mr. Stern alluded to earlier

Highly Confidential - Mira Krishnan, Ph.D.

1    in the deposition, the time that I was retained was

2    during the acute pandemic.  Michigan was at a

3    stay-at-home order, as you know, at that time, and

4    there was a period of time in which

5    neuropsychologists, most neuropsychologists were not

6    completing evaluations at all, and, in fact, the

7    evaluations that were done were close in time to the

8    earliest timeframe that it was safe to do these kinds

9    of evaluations again.

10           In my clinical practice, I did make

11   adaptations to my battery to reduce the amount of

12   paper that children came physically into contact with

13   or other physical stimuli that the children came into

14   contact with, but in terms of administering an IQ

15   test, I did not observe any major barriers.  We looked

16   for things like increased close mishearing, right, and

17   so if -- if I say blood and you think I said flood or

18   vice versa, I'm just picking random words that sound

19   similar to each other, that would be my cue to think

20   maybe like this would be something that was caused,

21   for instance, by the fact that I'm wearing a mask.

22   And I didn't really see any significant issues in that

23   regard.  They would pop up less in the WISC and more

24   in tests like this California Verbal Learning Test,

Highly Confidential - Mira Krishnan, Ph.D.

1    and I really didn't see anything that was unusual, and

2    so I'm not sure that there have been careful

3    scientific studies on neuropsychologists administering

4    tests during COVID, but I don't believe that COVID had

5    a significant impact on the test outcomes.

6         Q.    Okay.  Doctor, does the literature say

7    what component of IQ is hereditary?

8         A.    Generally speaking, IQ is fairly

9    hereditary in most individuals, and so there -- there

10   are -- you know, there is significant literature about

11   the inheritability of IQ and it is moderate in nature.

12         The -- the -- typically moderate means

13   there is still a significant amount of variance that

14   remains for other factors.

15        Q.    Okay.  Does the literature land at -- at

16   any level does it say 30 to 80 percent or 50 percent

17   or anything like that that you can tell us about right

18   now or not?

19        A.    I would have to review the literature.

20        Q.    Okay.  All right.

21         The -- the article that Mr. Rogers put on

22   that we talked about a little bit talked about some

23   factors that can impact IQ.

24         Does a supportive home environment impact

Highly Confidential - Mira Krishnan, Ph.D.

1    IQ and IQ-related performance?

2         A.    I think in general factors such as the

3    level of environmental stimulation have a substantial

4    effect on IQ.

5         Q.    Okay.

6         A.    The research on that has gone back and

7    forth, but so an enriched environment is generally

8    conducive to higher levels of IQ.  The complication

9    for psychologists in answering that question has been

10   that traditionally enriched environments are also more

11   often provided by high SES individuals who are high

12   S -- socioeconomic status -- because they are also

13   high IQ to begin with, and so the -- the nature and

14   nurture kind of tease out is difficult in that case.

15        Q.    Okay.  So I guess a corresponding question

16   would be:  Are you suggesting that things like reading

17   aloud with your children, playing math games, maybe

18   watching different sorts of more educational higher

19   quality TV, are those the sorts of things that would

20   be a good home environment that would foster IQ or the

21   development of IQ?

22        A.    They generally foster the development of

23   positive cognitive skills.  I -- I am not sure how

24   large of an effect they have on IQ, but they are

Highly Confidential - Mira Krishnan, Ph.D.

1    certainly -- I -- I would -- if I -- for my own child,

2    you know, my approach would be to talk to them a lot,

3    read to them and -- and minimize television, yes.

4         Q.    Okay.  Switching gears again a little bit,

5    when you look at attention disorders or ADHD, I think

6    that -- and tell me if I'm wrong, but I think the

7    Vineland and the BASC-3 are very useful tools that you

8    used to try to find out if there are those sorts of

9    issues with the child.

10             Did I get that right or did I -- did I get

11   that wrong?

12        A.    No, I think you got that correct.

13        Q.    Okay.  Now, typically in your clinical

14   practice, if you had a parent come in and you were

15   testing a child and you did the Vineland and the --

16   and the BASC-3 with the parent, would there typically

17   be a corresponding test that you might send to a

18   teacher or an educator or a counselor at school to get

19   a corroborating opinion that might or might not

20   dovetail into the parents' opinions?

21        A.    That is very helpful.  By tradition the

22   expectation for ADHD is that it presents in multiple

23   settings.  The -- in a -- in a clinical setting the

24   biggest challenge is modern expectations for

Highly Confidential - Mira Krishnan, Ph.D.

1    turnaround time.  I -- I -- I generally give parents

2    feedback on the date of the evaluation.  I -- the

3    physicians as well as the parents are expecting

4    relatively rapid turnaround and oftentimes getting

5    teacher reports is somewhat unpredictable.  What we do

6    in the clinical setting to manage that is, one,

7    oftentimes pediatrics before they refer children to

8    neuropsychology has already done that, and so

9    certainly we take that into account.

10           If we can't get the psychometric data,

11   then we look at, you know, anything else that the

12   school is able to provide, but certainly, yes, I do

13   think that that is a good practice when it is

14   possible.

15      Q.    And for these four bellwethers that we are

16   talking about, the closest you came to that, I would

17   imagine, would have been whatever the school records

18   divulged or the report cards.

19           Is that a fair statement?

20      A.    Correct.

21      Q.    Okay.

22      A.    Of anything that came up.  Yeah, the --

23   the only direct testimony from the school was the

24   educational records that I reviewed in my reports.

Highly Confidential - Mira Krishnan, Ph.D.

1      Q.    Now, with respect to these four

2   bellwethers we are talking about, you don't have any

3   IQ information on their biological parents, do you?

4      A.    I do not, to my -- the best of my

5   knowledge.

6      Q.    Now, A█████ T██, she had, I believe, a

7   fraternal twin.

8            You don't have any IQ data on her

9   fraternal twin, do you?

10     A.    I do not.

11     Q.    Okay.  I saw that you -- you talked about

12  the TMT a little bit earlier over the last two days.

13           That's quite an old test, isn't it,

14  developed for the Army?  Wasn't that developed in the

15  1940s?

16     A.    I think that that's correct.  There are

17  some neuropsychological tests that go all of the way

18  back to the -- even the 1910s or 1920s.  Some of these

19  tests began before -- before there were even measures

20  like CTs or MRIs that would allow for visual imaging

21  of the brain, and so some of the early history of

22  neuropsychology was identifying brain injuries when

23  there were no other available corroborating tools.

24     Q.    Okay.  And I think you told us that the --

Highly Confidential - Mira Krishnan, Ph.D.

1    the TMT has been normed and you gave us that

2    information today, where to find that?

3         A.    Correct.

4         Q.    When was that normed?

5         A.    Yeah, it is -- it is -- oh, I'm sorry.

6               I would have to look back in that report.

7    It would have been within the last 20 or 30 years.

8    Many of these tests are re-normed over time and so the

9    norms that are being used are not norms from the 1920s

10   or 1940s.

11        Q.    Okay.  All right.

12              And then you also used the Tower of

13   London.  The question I had was:  You are familiar

14   with the D-KEFS, the Dallas Kaplan Executive Function

15   System?  I think that's referenced in your summary --

16        A.    I am, yes.

17        Q.    You didn't -- you didn't administer that

18   to any of these four children, did you, the D-KEFS?

19        A.    I did not use the D-KEFS, no.

20        Q.    Okay.  Are the -- the TMT and the Tower of

21   London, are those preferable to you than some of the

22   subcomponents of the D-KEFS?

23        A.    So, I -- I want to be respectful of other

24   neuropsychologists, both Dean Dallas and -- and Edith

Highly Confidential - Mira Krishnan, Ph.D.

1    Kaplan are incredibly well respected in our field.

2    Every test has pros and cons.  If I talk shop a little

3    bit, the difference tends to be between the D-KEFS and

4    some of these other options that the D-KEFS tests tend

5    to have many different conditions that lengthen the

6    tests in a way that I don't find very useful.  That's,

7    for instance, with respect to the trail making test.

8    The -- the standard trail making test has two

9    conditions and the D-KEFS, I believe, has five.

10            With respect to the Tower of London versus

11   the -- the Tower of Hanoi that is in the D-KEFS, I

12   have -- I have used the D-KEFS extensively in my own

13   training and -- and I use it still sometimes in my

14   clinical practice.  My experience with the D-KEFS

15   tower is that it provides less useful information than

16   the Tower of London.  And so if I use the term "like,"

17   I -- I like or find the Tower of London Drexel Edition

18   to be more useful than the one that's in the D-KEFS.

19       Q.    Okay.  All right.

20            When you are administering a test like

21   the -- like the WISC-V, and tell me if I get this

22   wrong, but I think what you do is you -- you are

23   testing the child on a certain subcomponent of that

24   test and if they get two or three wrong, do you then

Highly Confidential - Mira Krishnan, Ph.D.

1    stop and move on or do you prompt the child and try to

2    get them back and see if they can complete it

3    successfully?

4              How does that work?  Do you do it one way

5    or the other or is there a mixture?

6        A.    So that -- the -- the manual for the

7    D-KEFS standardizes both of those things, and so,

8    without getting too deeply into the test security

9    itself, there are standards for both of them, and

10   so -- and I follow those and so I provide cues when

11   there are certain situations where children provide

12   ambiguous answers and I provide cues to determine if

13   the -- if -- to make sure I understand how to score

14   the answer.

15             All of the subtests on the D-KEFS are --

16   sorry -- all of the subjects on the WISC-V have

17   discontinuation rules where -- which is the second

18   thing that you referred to, where when a child gets

19   items repeatedly wrong, they stop.  The exception is

20   the coding subtest does not have a discontinuation

21   rule, but -- and I follow those rules as -- as they

22   are published.

23       Q.    Okay.

24       A.    In addition to that, you know, informally

Highly Confidential - Mira Krishnan, Ph.D.

1    with children as a standard of care, if children are

2    responding very quickly or impulsively, I -- I also

3    provide more informal cues that I understand to be

4    within the standardization of the WISC and so, for

5    instance, if there is a series of items where a child

6    is picking from five options and they keep picking one

7    immediately, I'll say something like, make sure you

8    look at all of the options before deciding.

9         Q.    Okay.  And -- and, again, for the reports

10   for these four bellwether children, did you overtly

11   state in your reports whether you were giving them the

12   cues or is that just understood because it's your

13   protocol that you would normally follow?

14        A.    I -- I believe that it's understood, but

15   it -- so the cues and the discontinuation rules are

16   not my protocol.  They are the -- the standardization

17   for the WISC or -- or the test in question.

18        Q.    Have you followed those protocols for --

19   for these tests across these four children?

20        A.    I did, yes, to the best of my knowledge.

21        MR. KLIFFEL:  All right.  Doctor, I believe that

22   those are all of my questions.  So I appreciate your

23   time and patience.  Thank you.

24        THE WITNESS:  Thank you.

Highly Confidential - Mira Krishnan, Ph.D.

1        MS. CARO:  Are there any other defendants that

2   have anything that they'd like to ask?  Dave?

3        MR. ROGERS:  No, I don't have any follow-up.

4   Thanks.

5        MS. CARO:  Okay.  I just have a few follow-up

6   questions.

7                        EXAMINATION

8   BY MS. CARO:

9        Q.    Doctor, are you aware of any literature

10   that concludes that bone lead levels are not reliable?

11        A.    I am not.

12        Q.    And what is your understanding of the

13   reliability of the bone lead level test?

14        A.    My understanding is that they have a

15   measurement error and if I remember correctly the bone

16   lead levels that I was provided for these children

17   included the measurement error and so they would say

18   something like, this child had 1.5 micrograms per gram

19   with a measurement error of 1.1, meaning that -- that

20   the possibility of a zero level could be excluded.

21            My understanding is that the -- all of

22   the -- all of the bone lead levels were above the

23   measurement error in these four children.

24            And then, in general, I understand that

Highly Confidential - Mira Krishnan, Ph.D.

1    bone lead levels act as an integrator or aggregator,

2    meaning that they provide a -- a more long-term stable

3    level with less fluctuation than blood.

4        Q.    Can you remind us and state on the record

5    what the bone lead levels were for each of the four?

6        A.    If you bear with me, yes, I would be happy

7    to.

8              These are -- these are to the best of my

9    knowledge from my review of the records that I was

10   provided.

11             For E▮PPI▮ S▮PPI▮, I understand that there

12   was an 8/24/19 bone lead density assessment with the

13   result of 6.72 micrograms per gram.

14             For A▮PPI▮ T▮PPI▮, I understand that there

15   was an 8/15/19 bone lead assessment with a result of

16   9.65 micrograms per gram.

17             For R▮PPI▮ V▮PPI▮, I understand that

18   there was an 8/15/19 bone lead density of

19   5.58 micrograms per gram.

20             For D▮PPI▮ W▮PPI▮, I understand that there

21   was a 2/14/20 bone lead density of 5.46 micrograms per

22   gram.

23       Q.    Thank you.

24             Were all of the bone lead level tests

Highly Confidential - Mira Krishnan, Ph.D.

1   consistent with the impairments you found in the

2   testing, in your testing?

3       A.   All of these children I read as having

4   abnormal neuropsychological results.  Those results

5   are, I believe, within the range of the kinds of

6   impairments that are seen in children with this level

7   of lead exposure.

8       Q.   And you testified that lead leaves the

9   body through urine excretion and that you expect over

10  time attenuation of deficits.

11           That's not the same as to say that there

12  may not be permanent damage, is that correct?

13      A.   That is correct.

14      Q.   Or that there could be long-term negative

15  outcomes, is that also correct?

16      A.   That is also correct.

17      Q.   Could you elaborate on what kinds of

18  permanent damage may be caused by the lead levels

19  that -- that we experienced here and some of the

20  long-term health outcomes that -- that could occur?

21      A.   So, within my area of expertise having to

22  do with cognitive and emotional functioning, there is

23  a really broad range of impairments seen, although

24  among the more common impairments are impairments in

Highly Confidential - Mira Krishnan, Ph.D.

1    things like attention and executive functioning,

2    impairments in visual and spatial skills and mood and

3    learning problems.

4          Q.    And are these things --

5          A.    And so if I understand your --

6          Q.    Go ahead.  I'm sorry.

7          A.    Sorry.

8                And so the -- the -- the concern is that

9    these would generally maintain over time and continue

10   to -- to limit the children.  It's possible that they

11   would improve, but there are also situations where

12   they get worse in the form, not of getting worse in an

13   overall sense, but as discussed in the reports in the

14   case of something like nonverbal learning disorder,

15   oftentimes that becomes evident once a child is at a

16   certain academic level and it's not impaired -- not as

17   apparent in testing at this age.

18         Q.    And could that be something that's --

19   could those kinds of types of outcomes, can they be

20   permanent in nature?

21         MR. GAMBLE:  Object to form, foundation.

22   BY THE WITNESS:

23         A.    Yes, they can.

24         MS. CARO:  Okay.  Thank you very much.  I have

Highly Confidential - Mira Krishnan, Ph.D.

1    nothing further.

2        THE WITNESS:  Thank you.

3        MR. KLIFFEL:  Dr. Krishnan -- oh, go ahead,

4    David.

5                    FURTHER EXAMINATION

6    BY MR. ROGERS:

7        Q.    Yeah, I do have a -- sorry.  Let me start

8    the video.  I do have a couple of follow-up questions

9    on the blood lead tests, Dr. Krishnan.  And it

10   involves the date on which the tests were conducted.

11           So, let me share -- so in your report you

12   have described or identified the dates on which the

13   bone lead tests -- bone scans were done, right?

14       A.    Correct.

15       Q.    Do you know where you received that

16   information, because I'm going to share my screen with

17   you now, and I will show you as an example the bone

18   lead result report that we were provided for E▮PPI▮

19   S▮PPI▮   and you can see here this is the whole

20   report, and it has a date of birth and it has the

21   results and so forth, but it doesn't have the date it

22   was performed.

23           So, where did you obtain -- do you -- do

24   you have bone lead result reports that are different

Highly Confidential - Mira Krishnan, Ph.D.

1   than this or where did you obtain the information

2   about the date on which they were done, the dates on

3   which they were done?

4        A.    No, I think you are correct, and I

5   apologize if I misspoke earlier unintentionally.  I

6   believe that that was provided via separate -- that

7   may have been provided via a separate communication,

8   and I would be happy to -- to provide that back to the

9   attorneys to provide to you.

10       Q.    Well, what I'm really interested in is

11  if -- if you wouldn't mind checking with respect to

12  these four plaintiffs in your file materials, I think

13  we covered this yesterday, but I just want to make

14  sure, do you have something in addition to this

15  concerning the bone lead testing that was done on E███

16  S████, for example?  I want to make sure that there

17  is nothing else there related to these bone lead tests

18  that -- that we don't have that you have.

19            So if you wouldn't mind, can you -- can

20  you open up your file on S████ and go to the section

21  where you have the bone lead results and just see if

22  there is anything else in there besides this document

23  that's on the screen?

24       A.    Again, I apologize.  My memory is actually

Highly Confidential - Mira Krishnan, Ph.D.

1    that I was provided, now that you mention this issue,

2    I was provided a spreadsheet by the counsel and so

3    this requires me to amend an answer that I previously

4    provided you.

5            I was provided a spreadsheet by counsel

6    that clarified the dates of the bone lead results

7    because I -- I asked the same question myself.

8        Q.   Okay.  But let's -- let's just be clear.

9            So, do you have in your file this document

10   that's up on the screen now, the bone lead result

11   report for E████ S████

12       A.   Well, let me look.

13            Yes, I do.

14       Q.   And in addition to that, you mentioned a

15   spreadsheet.

16            Is that a spreadsheet that has -- well,

17   tell me what the information is on the spreadsheet

18   that you received?  Can you pull that up and just tell

19   me what's on it?

20       A.   To the best of my recollection, the

21   spreadsheet had a list of the dates and -- and values

22   for these bone lead results.

23       Q.   Do you have it that you can open -- find

24   it and -- and confirm that?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.    Would you like to take a short recess for

2    that?

3      Q.    Well, we could do that, yes, but with

4    respect -- would you also at the same time check to

5    make sure that for the other three plaintiffs, T███,

6    V███      and W███, in addition to the spreadsheet

7    that you are looking for you don't have anything other

8    than these bone lead results for those plaintiffs as

9    well?

10          Do you understand my question?

11     A.    I -- I am not sure I do.  I'm sorry.

12     Q.    Okay.  So here we have a bone lead result

13   report for E███ S███ and you just checked and you

14   said that you have it in your file, right?

15     A.    Correct.

16     Q.    I'm asking you, if you would, please,

17   check your file materials for the other three

18   plaintiffs, T███, V███    and W███, and confirm

19   that you have the bone lead test results reports like

20   this one that's on the screen for S███, for them,

21   and also determine whether there is anything else that

22   you have by way of records about the bone lead scans

23   and test results for any of the plaintiffs besides the

24   spreadsheet that you just described.  Okay?

Highly Confidential - Mira Krishnan, Ph.D.

1      A.     Okay.

2      Q.     Okay.  So yeah, you want to -- we'll take

3   a couple of minute break.  And let's just stay on the

4   record, we might as well.  I don't care how we -- how

5   we want to do it.

6      A.     Please give me five minutes to look for

7   it.

8      Q.     Yeah.  So basically what I'm asking you to

9   do is see if you can find in your files any

10  information that you have about the bone lead results

11  because of what we just discussed, okay.

12      MR. ROGERS:  So let's go off the record for five

13  minutes.

14      THE VIDEOGRAPHER:  Going off the record,

15  1:09 p.m.

16              (WHEREUPON, a recess was had

17               from 1:09 to 1:14 p.m.)

18      THE VIDEOGRAPHER:  We are back on record at

19  1:14 p.m.

20              All set.

21  BY THE WITNESS:

22      A.     So, thank you for the -- the time to check

23  my records.

24              So you asked two questions.  The first one

Highly Confidential - Mira Krishnan, Ph.D.

1   of the questions was whether there were any other

2   documents in my full records for the -- the children,

3   these four children that I didn't already mention to

4   you.  I read those documents directly from my folders

5   and there are not.

6            However, there was a document that was

7   provided to me by Levy Konigsberg that I didn't put in

8   my records because it was not about one child but

9   about all of their clients, and so I apologize for not

10  mentioning that earlier.  The document contains the

11  bone lead testing dates and I have forwarded that back

12  to them and they will -- they will be making sure that

13  there is nothing that they need to redact that isn't

14  relevant and -- and sending that to you.

15       MR. ROGERS:  Okay.  Thanks a lot.  That's all I

16  have.

17       MS. CARO:  Okay.  I have nothing further.

18       THE VIDEOGRAPHER:  One moment.

19            This ends today's deposition.  We are

20  going off the record at 1:16 p.m.

21                      ---

22            Thereupon, at 1:16 p.m., on Tuesday,

23  October 6, 2020, the deposition was concluded.

24                      ---

Highly Confidential - Mira Krishnan, Ph.D.

1                  REPORTER'S CERTIFICATE

2

3            I, JULIANA F. ZAJICEK, a Registered

4    Professional Reporter and Certified Shorthand

5    Reporter, do hereby certify that prior to the

6    commencement of the examination of the witness herein,

7    the witness was duly remotely sworn by me to testify

8    to the truth, the whole truth and nothing but the

9    truth.

10           I DO FURTHER CERTIFY that the foregoing is

11   a verbatim transcript of the testimony as taken

12   stenographically by me at the time, place and on the

13   date hereinbefore set forth, to the best of my

14   availability.

15           I DO FURTHER CERTIFY that I am neither a

16   relative nor employee nor attorney nor counsel of any

17   of the parties to this action, and that I am neither a

18   relative nor employee of such attorney or counsel, and

19   that I am not interested directly or indirectly in the

20   outcome of this action.

21           IN WITNESS WHEREOF, I do hereunto set my

22   hand on this 22nd day of October, 2020.

23           *Juliana F. Zajicek*

24           JULIANA F. ZAJICEK, Certified Reporter

Highly Confidential - Mira Krishnan, Ph.D.

1                    DEPOSITION ERRATA SHEET

2

3

4    Case Caption:  Flint Water Cases

5

6            DECLARATION UNDER PENALTY OF PERJURY

7

8            I declare under penalty of perjury that I

9    have read the entire transcript of my Deposition taken

10   in the captioned matter or the same has been read to

11   me, and the same is true and accurate, save and except

12   for changes and/or corrections, if any, as indicated

13   by me on the DEPOSITION ERRATA SHEET hereof, with the

14   understanding that I offer these changes as if still

15   under oath.

16

17                          MIRA KRISHNAN, Ph.D.

18

19

20   SUBSCRIBED AND SWORN TO

21   before me this       day

22   of                , A.D. 20__.

23

24           Notary Public

Highly Confidential - Mira Krishnan, Ph.D.

1                        DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24                        MIRA KRISHNAN, Ph.D.

Highly Confidential - Mira Krishnan, Ph.D.

1              DEPOSITION ERRATA SHEET

2     Page No._____Line No._____Change to:_____

3     _____

4     Reason for change:_____

5     Page No._____Line No._____Change to:_____

6     _____

7     Reason for change:_____

8     Page No._____Line No._____Change to:_____

9     _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                         MIRA KRISHNAN, Ph.D.