```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF MICHIGAN
 3                     SOUTHERN DIVISION
 4   _____
                                     )
 5                                   ) Civil Action No.
                                     ) 5:16-cv-10444-JEL-MKM
 6   In re:  FLINT WATER CASES       ) (consolidated)
                                     )
 7                                   ) Hon. Judith E. Levy
                                     ) Mag. Mona K. Majzoub
 8   _____)
                                     )
 9   Elnora Carthan, et al.,         )
                                     )
10       Plaintiffs,                 )
                                     )
11       vs.                         ) Civil Action No.
                                     ) 5:16-cv-10444-JEL-MKM
12   Governor Rick Snyder,           )
     et al.,                         )
13                                   )
         Defendants.                 )
14   _____)
15                   HIGHLY CONFIDENTIAL
             REMOTE VIDEOTAPED DEPOSITION OF
16               JOSEPH GRAZIANO, PH.D.
                        VOLUME II
17
                  Friday, October 30, 2020
18                    at 9:01 a.m.
19
20   Taken at:  Residence of Joseph Graziano, Ph.D.
                   Mount Kisco, New York
21
22   REPORTED BY:  SARA S. CLARK, RMR/CRR
23          GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
24              deps@golkow.com
```

Highly Confidential - Joseph Graziano, Ph.D.

```
 1                  A P P E A R A N C E S
 2                      (via Zoom)
 3                        - - -
 4   On behalf of Individual Plaintiffs:
 5        COREY M. STERN, ESQUIRE
          LEVY KONIGSBERG LLP
 6        800 3rd Avenue, 11th Floor
          New York, New York  10022
 7        212-605-6200
          cstern@levylaw.com
 8
 9   On behalf of Individual Plaintiffs:
10        PATRICK LANCIOTTI, ESQUIRE
          NAPOLI SHKOLNIK PLLC
11        400 Broadhollow Road, Suite 305
          Melville, New York  11747
12        631-224-1133
          planciotti@napolilaw.com
13
14   On behalf of Defendants Veolia Water North America
     Operating Services, LLC, Veolia North America, LLC,
15   and Veolia North America, Inc.:
16        MARK R. TER MOLEN, ESQUIRE
          SAMUEL P. MYLER, ESQUIRE
17        MAYER BROWN LLP
          71 South Whacker Drive
18        Chicago, Illinois  60606
          312-701-7307
19        mtermolen@mayerbrown.com
          smyler@mayerbrown.com
20
21
22
23
24
```

Highly Confidential - Joseph Graziano, Ph.D.

```
 1                  A P P E A R A N C E S
 2                      (via Zoom)
 3   On behalf of Defendants Veolia Water North America
     Operating Services, LLC, Veolia North America, LLC,
 4   and Veolia North America, Inc.:
 5          BRYAN D. MCELVAINE, ESQUIRE
            JOHN R. PENHALLEGON, ESQUIRE
 6          CAMPBELL CONROY & O'NEIL, P.C.
            1205 Westlakes Drive, Suite 330
 7          Berwyn, Pennsylvania  19312
            610-964-1900
 8          bmcelvaine@campbell-trial-lawyers.com
            JPenhallegon@Campbell-Trial-Lawyers.com
 9
10   On behalf of Defendant City of Flint:
11          FREDERICK A. BERG, ESQUIRE
            BUTZEL LONG
12          150 West Jefferson Avenue, Suite 100
            Detroit, Michigan  48226
13          313-225-7000
            berg@butzel.com
14
15   On behalf of Defendants Leo A. Daly Company and
     Lockwood, Andrews & Newnam, Inc.:
16
            DAVID C. KENT, ESQUIRE
17          FAEGRE DRINKER BIDDLE & REATH, LLP
            1717 Main Street, Suite 5400
18          Dallas, Texas  75201
            469-357-2535
19          david.kent@faegredrinker.com
20
21
22
23
24
```

Highly Confidential - Joseph Graziano, Ph.D.

```
 1                A P P E A R A N C E S

 2                    (via Zoom)

 3   On behalf of Defendant Edward Kurtz:

 4         CHRIS STRITMATTER, ESQUIRE
           SIMEN, FIGURA & PARKER

 5         5206 Gateway Centre, Suite 200
           Flint, Michigan  48507

 6         810.235.9000
           cstritmatter@sfplaw.com

 7

 8   Also Present:

 9         Robert Martignetti, Videographer

10

11                     - - -

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Joseph Graziano, Ph.D.

```
 1                    I N D E X

 2                       - - -

 3   WITNESS                                    PAGE

 4   JOSEPH GRAZIANO, PH.D.

 5   Continued Examination By Mr. Ter Molen     297

     Examination By Mr. Stern:                  323

 6

 7                       - - -

 8              (No exhibits marked.)

 9                       - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Joseph Graziano, Ph.D.

```
 1                    - - -

 2              P R O C E E D I N G S

 3                    - - -

 4          VIDEOGRAPHER:  We are now on the record.

 5          My name is Robert Martignetti.  I'm a

 6  videographer for Golkow Litigation Services.

 7          Today's date is October 30th, 2020, and

 8  the time is 9:01 a.m.

 9          This continued remote video deposition

10  is being held In Re: Flint Water Cases.

11          The deponent is Joseph Graziano, Ph.D.

12          All parties to this deposition are

13  appearing remotely.  Due to the nature of remote

14  reporting, please pause briefly before speaking to

15  ensure all parties are heard completely.

16          Counsel will be noted on the

17  stenographic record.

18          The court reporter is Sara Clark.

19          Dr. Graziano, do you understand that

20  you're still under oath?

21          THE WITNESS:  Yes, I do.

22          VIDEOGRAPHER:  Thank you.

23

24
```

Highly Confidential - Joseph Graziano, Ph.D.

```
 1                  - - -

 2              JOSEPH GRAZIANO, PH.D.

 3  being by me previously duly sworn, as hereinafter

 4      certified, testifies and says as follows:

 5              CONTINUED EXAMINATION

 6  BY MR. TER MOLEN:

 7      Q.   Good morning, Dr. Graziano.

 8      A.   Good morning.

 9      Q.   And I think on the positive side,

10  Doctor, after going through the materials, I

11  expect to have less than an hour of questioning

12  for you today, just for your information, and then

13  we'll turn it over to other counsel who may or may

14  not have questions of their own.

15          So we looked yesterday briefly at a

16  study by Taylor.  I think we marked that as

17  Exhibit 7.  But we didn't get into the substance,

18  and I'd like to talk a little bit about the

19  substance today.

20          MR. TER MOLEN:  Sam, if you don't mind

21  putting that Taylor study back up, please.

22      Q.   Doctor, I know we talked about a number

23  of studies yesterday that you hadn't seen before.

24          Did you get a chance to look at anything
```

Highly Confidential - Joseph Graziano, Ph.D.

1    last night?

2        A.   I did not.

3        Q.   Okay.

4        A.   As I said, we lost power at some point

5    in the evening last night, so...

6        Q.   Wow.

7            MR. MYLER:  Sorry, Mark.  Just give me

8    one second --

9            MR. TER MOLEN:  That's okay.

10            MR. MYLER:  -- to pull up the version we

11    sent last night with the exhibits.

12            MR. TER MOLEN:  Great.  Thank you.

13    BY MR. TER MOLEN:

14        Q.   And just as a refresher, Doctor, this is

15    a study that was looking at the effects of

16    low-level prenatal lead exposure, meaning that the

17    mother was exposed while pregnant with the child,

18    to lead, and then testing the child's IQ at ages 4

19    and 8, right?

20        A.   Yes.

21        Q.   I'm sorry.  I couldn't quite hear that.

22        A.   Yes.

23        Q.   Okay.  Thank you.

24            MR. TER MOLEN:  And then, Sam, if we can

Highly Confidential - Joseph Graziano, Ph.D.

1  go to Page 165.

2          Here.  Thank you.  Can we -- perfect.

3      Q.   So this is the -- if you can see this,

4  Doctor, looking on the left side, under

5  Section 3.2, looking at the mean prenatal blood

6  lead was 3.67 micrograms per deciliter, right?

7      A.   Yes.

8      Q.   Okay.  And then noting that the mean

9  child blood lead was 4.2 micrograms per deciliter.

10          Do you see that?

11      A.   Yes.

12      Q.   Okay.  And then noting in the next

13  phrase of that same sentence that 26.6 percent of

14  the children had levels greater than 5 micrograms

15  per deciliter, right?

16      A.   Right.

17      Q.   Okay.  And then going down to the next

18  section, Section 3.3, "Associations between blood

19  lead and IQ," right?

20      A.   Yes.

21      Q.   And then the first sentence reads,

22  "There was no evidence for any differences in

23  4-year IQ scores by prenatal lead category,"

24  meaning whether the mother was less than 5 or

Highly Confidential - Joseph Graziano, Ph.D.

1    greater than 5, correct?

2         A.   Yes.

3         Q.   Okay.  And then at age 8 years, there

4    was the discovery that verbal IQ was actually

5    higher for children whose mothers had been exposed

6    to higher lead levels than children whose mothers

7    had been exposed to lower lead levels, right?

8         A.   I see that.

9         Q.   Okay.  And then going to the next page,

10   Section 3.4 --

11            MR. TER MOLEN:  I'm sorry.  Same page,

12   Sam.  I'm sorry.  I'm just shifting over the

13   column there on the right side.

14        Q.   Under Section 3.4, "There was no

15   evidence for an effect of early pregnancy

16   Hb concentration" -- I'm sorry.  We can skip that.

17            MR. TER MOLEN:  Let's move down, if you

18   don't mind, Sam, to the --

19        A.   Can I just -- so there was no evidence

20   for an early pregnancy hemoglobin concentration.

21        Q.   Thank you.  Thank you.  I appreciate

22   your --

23        A.   Sure.

24        Q.   -- explaining that, Doctor.

Highly Confidential - Joseph Graziano, Ph.D.

```
 1              MR. TER MOLEN:  Let's scroll down there
 2    toward the end, then, Sam.
 3         Q.   Okay.  Under "Discussion" -- I'm
 4    sorry -- just reading the first sentence -- couple
 5    sentences there, "We found no evidence for an
 6    adverse association of prenatal blood lead levels
 7    measured in the first trimester with child IQ at
 8    either 4 or 8 years of age."
 9              Right?
10         A.   That's what it says.
11         Q.   Okay.  And then it noted that "Maternal
12    education was the strongest variable" for IQ,
13    right?
14         A.   It always is.
15         Q.   It always is, yeah.  Exactly.
16              Okay.  Do the results of this study
17    surprise you, Doctor?
18              MR. LANCIOTTI:  Objection; form;
19    foundation.
20         A.   The results of this study are discordant
21    with a large body of literature.
22         Q.   Well, okay.  Has, in fact, there been
23    extensive study of prenatal lead exposure and IQ,
24    Doctor?
```

Highly Confidential - Joseph Graziano, Ph.D.

```
 1          A.   Yes, there has.  There has been some.
 2          Q.   Okay.  Sitting here today, Doctor, can
 3   you name another study that focuses specifically
 4   on prenatal exposure and child IQ?
 5          A.   My own work.
 6          Q.   Okay.
 7          A.   My own work --
 8          Q.   Is -- I'm sorry.
 9          A.   -- we actually had blood lead
10   measurements at mid-pregnancy --
11          Q.   Okay.
12          A.   -- at birth, at 6, 12, 18, and 24 months
13   of age.
14          Q.   Uh-huh.
15          A.   And we actually asked the question,
16   which is more important?  Is it prenatal exposure,
17   i.e., blood lead measurements in mid-pregnancy, or
18   is it early postnatal exposure, when the child's
19   brain development is, as you know, exploding
20   during the first two years of life.  And, in fact,
21   we demonstrated very clearly that it's postnatal
22   exposure, the area under the curve of the blood
23   lead measurements in the first two years of life,
24   that is much more important than prenatal -- than
```

Highly Confidential - Joseph Graziano, Ph.D.

1    prenatal exposure.

2         So we specifically were asking this

3    question, which is more important, prenatal or

4    early postnatal?  And it turned out to be early

5    postnatal.

6    Q.   Okay.  Well, that's very interesting,

7    Doctor.  Thank you for -- for highlighting that.

8         And with respect to the work that you

9    did in prenatal exposure, that's work that you did

10   in Yugoslavia, right?

11   A.   That is correct.

12   Q.   Okay.  And we're talking, in Yugoslavia,

13   about blood lead levels that were much higher than

14   the blood lead levels involved here, right?

15        MR. LANCIOTTI:  Objection; form.

16   A.   We're talking about a range.  Recall,

17   please, that we worked in two towns in Yugoslavia.

18   One, Pristina, the capital city of Kosovo, where

19   there wasn't a lead mine and a lead smelter, and

20   the other, a mining town.

21        But, yeah, without question, the

22   majority of children in the study had blood leads

23   that were higher than those we're talking about

24   here.

Highly Confidential - Joseph Graziano, Ph.D.

1      Q.   Yeah, exactly.  Thank you, Doctor.

2      A.   Sure.

3      Q.   Looking at this column on the right

4  side -- actually, before we get there, Doctor,

5  just -- you're familiar with the World Health

6  Organization, right?

7      A.   I certainly am.

8      Q.   Okay.  And are they, from your

9  standpoint, a respected international body?

10     A.   Yes, they are, despite what our

11  president says.

12     Q.   And you're aware that the World Health

13  Organization has looked at the concerns associated

14  with exposure to lead, right?

15     A.   Right.

16          MR. LANCIOTTI:  Objection; form.

17     Q.   Okay.  And in 2010, do you recall that

18  the World Health Organization came out with an

19  estimate of what effect blood lead levels had on

20  IQ?

21          MR. LANCIOTTI:  Objection; form;

22  foundation.

23     A.   I do not specifically recall.

24     Q.   Okay.

Highly Confidential - Joseph Graziano, Ph.D.

1           MR. TER MOLEN:  Sam, if you don't mind

2     highlighting that language there on the right side

3     there.

4           Q.   And I'll represent to you, Doctor, as

5     reflected in this -- whoops -- in this study, the

6     Taylor study that in 2010 -- that's okay -- who

7     estimated that each 1 microgram per deciliter

8     increase in blood lead resulted in a decrement of

9     0.25 IQ points.

10          Do you see that?

11          A.   I do.

12          Q.   Okay.  Have you specifically looked at

13    that WHO estimate?

14          A.   No.

15          Q.   Okay.

16          A.   It is what it is.  They base that on --

17    they don't conduct their own original research.

18    They're trying to sum up --

19          Q.   Sum up the research that other people

20    have done, right?

21          A.   Yes.

22          Q.   And, obviously, in -- 2010 was after the

23    2005 publication of the study by Dr. Lanphear and

24    yourself that was the pooled analysis of the seven

Highly Confidential – Joseph Graziano, Ph.D.

1    different cohorts, right?

2        A.    Right.

3        Q.    And you would expect that WHO had looked

4    at that pooled analysis and included that data in

5    the overall set of data that they looked at for

6    purposes of determining this estimate, right?

7              MR. LANCIOTTI:  Objection; form;

8    foundation.

9        A.    Right.

10       Q.    Okay.  Would you, Doctor, then, defer to

11   the estimate that WHO made after looking at all of

12   the data available?

13             MR. LANCIOTTI:  Objection; form.

14       A.    Not necessarily.

15       Q.    Okay.

16       A.    You know, when one conducts original

17   research with a group of colleagues who no one

18   feels are a distinguished group of scientists, one

19   cannot help but be maybe more powerfully

20   influenced by one's own work than by an

21   organization that is summing up works that are of

22   mixed quality.

23       Q.    Okay.  So I understand what you're

24   saying, Doctor.  And fair to say that you think

Highly Confidential – Joseph Graziano, Ph.D.

1   your work is better?

2        A.   Well, I believe in what we did.

3        Q.   Okay.

4        A.   And it does stand alone as a piece of

5   work that involves children, as I said yesterday,

6   from several countries and from multiple cities in

7   the United States.  And it's powerful.

8        Q.   And sitting here today, you don't know

9   what additional studies WHO evaluated for purposes

10  of reaching their estimate, correct?

11       A.   Correct.

12            MR. LANCIOTTI:  Objection; foundation.

13       Q.   Okay.

14       A.   You know, yesterday, Mark, I used a word

15  that, on reflection in the powerless darkness here

16  last night, in looking at the low end of the

17  dose-response curve in the Lanphear analysis --

18  and you were talking about the wide confidence in

19  intervals, I used the word it's a matter of

20  opinion.  It's -- "opinion" was the wrong word.

21            Opinion, when you listen to opinions in

22  a political sense, opinions, it's a matter of

23  scientific judgment rather than opinion.  And my

24  feelings about that low end of the dose-response

Highly Confidential – Joseph Graziano, Ph.D.

1    curve, it's not my opinion.  It's my scientific

2    judgment about that.

3         Q.   Okay.  Thank you, Doctor.  I appreciate

4    that.

5              MR. TER MOLEN:  I'd move to strike that

6    as nonresponsive.

7         Q.   But appreciate that.

8              Doctor, we talked yesterday about the

9    Bradford Hill criteria, right?

10        A.   Yes.

11        Q.   And I'd like to talk about the

12   Bradford Hill criteria in the context of the 2005

13   Lanphear estimate -- I'm sorry -- the 2005

14   Lanphear study, the pooled study that we were just

15   talking about.  Okay?

16        A.   Sure.

17        Q.   Okay.  So with respect to temporality --

18   I'm just going to walk through the nine criteria,

19   Doctor.  If I recall correctly, you've got those

20   criteria written down there on some notes that I'm

21   sure you have handy.

22             But with respect to temporality, Doctor,

23   I understand that the seven longitudinal studies

24   involved certainly satisfy that criteria.

Highly Confidential - Joseph Graziano, Ph.D.

1          Would you agree with that?

2          MR. LANCIOTTI:  Objection; form;

3    foundation.

4      A.   Yes.

5      Q.   Okay.  With respect to strength, I'd

6    appreciate your thoughts on how the 2005 Lanphear

7    pooled study satisfies the strength criteria.

8      A.   Well, the strength of the association

9    between the various lead measurements and child

10   IQ is small in comparison to, as we just

11   mentioned, the other predictors of child

12   intelligence.  And no one -- no one has ever

13   debated that.  Mother's education, mother's

14   intelligence have larger impacts on a child's IQ

15   than does lead.  But it's there.  It's there in

16   each of the seven studies individually, and it is

17   there in the pooled analysis.

18          And so strength of association is not

19   huge, certainly, but it's consistent across each

20   of the studies and in the pooled analysis.

21     Q.   Okay.  And what about consistency,

22   Doctor?  Can you explain, in your view, how the

23   2005 Lanphear study meets the Bradford Hill

24   consistency criterion?

Highly Confidential - Joseph Graziano, Ph.D.

1      A.   Well, the pooled analysis cannot address

2  consistency in and of itself.  I think the power

3  of the term "consistency" relates to the fact that

4  each of the seven studies, which were largely

5  going on at the same point in time, each of us

6  come down with the same conclusion.  Each of us

7  comes down with having found an association

8  between lead exposure and child IQ.  That's where

9  the term "consistency" comes into play.

10     Q.   And focusing -- so in your view, Doctor,

11 is the consistency criterion simply an internal

12 criterion?  What you're describing, as I hear you

13 say it, is internal consistency among the studies

14 that were included in the study.

15          Is that your understanding of the focus?

16     A.   It's consistency across studies.  That's

17 what Bradford Hill -- Sir Bradford Hill was

18 alluding to --

19     Q.   Yeah.

20     A.   -- when he gave his now-famous lecture.

21     Q.   Right.  Exactly.

22          And so we're -- this criterion looks

23 outside of the studies that were included in the

24 Lanphear pooled analysis, and when you look

Highly Confidential – Joseph Graziano, Ph.D.

1   outside of the studies, we've -- and focusing on

2   what we're calling low-level lead exposures,

3   Doctor -- and for purposes of this discussion,

4   we'll define low-level lead exposures as below

5   5 micrograms per deciliter blood lead level.

6   Okay?

7           MR. LANCIOTTI:  Objection; form;

8   foundation.

9       A.   Sure.

10      Q.   Okay.  And so looking at that, Doctor, I

11  mean, we've certainly looked at a number of

12  studies where -- that have not found the IQ

13  association with blood lead level at that

14  low-level exposure; would you agree?

15          MR. LANCIOTTI:  Objection; foundation.

16      A.   I would like to go back to the ATSDR

17  toxicologic profile of lead in which they reviewed

18  40 epidemiologic studies that focused on blood

19  leads of less than 10, not less than 5.  But that

20  was their -- that was -- and as a result of their

21  analysis of 40 epidemiologic studies, not just

22  these seven, looking at blood leads less than 10,

23  they concluded that there was a causal

24  relationship between blood lead and child IQ.

Highly Confidential - Joseph Graziano, Ph.D.

1  They didn't dissect it down to below 5.  Okay?  Is

2  that helpful?

3       Q.   Well, I understand what you're saying,

4  Doctor, is you acknowledge they did not dissect

5  down below 5, and we're focusing on -- for

6  purposes of the questioning here this morning,

7  we're focusing on low level, as we've defined it,

8  which is below 5 micrograms per deciliter.  And

9  certainly you have seen yesterday, and again this

10  morning, studies demonstrating that -- or there is

11  not, in fact, a relationship between IQ loss and

12  blood lead levels that are below 5, right?

13            MR. STERN:  Object to form.

14       A.   Let me say this.  This dichotomizing the

15  range of leads to less than 5 and more than 5 is a

16  much less powerful approach than looking at blood

17  lead as a continuous variable.

18            So in statistical terms, you know, you

19  can just set a cut point and say I'm going to

20  compare less than 5 or more than 5, or the more

21  powerful approach is to look at blood lead as a

22  continuum.  And, you know, I don't want to get

23  lost in the weeds, but it is more powerful to look

24  at it as a continuous variable.

Highly Confidential – Joseph Graziano, Ph.D.

1            And the -- this Taylor paper looks at it

2    in a dichotomous fashion.  I don't know why they

3    didn't look at it as a continuous variable.

4    Perhaps the sample size is not sufficient, but...

5        Q.   Well, Doctor, when you say "look at it

6    as a continuous variable," what you're really

7    saying, isn't it true, Doctor, that you're

8    assuming that effects that you see at higher blood

9    levels are occurring at lower blood lead levels,

10   right?

11           MR. LANCIOTTI:  Objection.

12           MR. STERN:  Object to form.

13       A.   We're not assuming anything.  We're not

14   assuming anything.  We let the data speak for

15   itself.

16       Q.   Well, okay.  But the Taylor study is

17   actual data, right?

18       A.   That's right.

19           MR. STERN:  Object to form.

20       Q.   Okay.  And that data speaks for itself,

21   right?

22       A.   It is what it is, Mark.

23       Q.   Sure.

24       A.   You know, they have a prenatal blood

Highly Confidential - Joseph Graziano, Ph.D.

1    lead, and they looked later in life at child

2    performance -- at child intelligence.

3         Q.   And also --

4         A.   I don't know what more to say on this

5    point.  I'm sorry.

6         Q.   Okay.  That may be true.

7              Okay.  If you could walk us through the

8    rest of the Bradford Hill criteria, Doctor, I'd

9    appreciate it.  We've looked at temporality and

10   consistency and strength.  Would you mind walking

11   us through the other six?

12        A.   Sure.  Biological gradient, in other

13   words, a dose-response relationship.  And we

14   certainly see that.  Each of the seven

15   longitudinal studies see a dose-response

16   relationship.

17        Q.   And let's just stick with that for a

18   minute, Doctor.  I think you mentioned yesterday

19   that collectively, that pooled analysis includes

20   approximately 1300 individuals, right?

21        A.   Correct.

22        Q.   Okay.  And I think I suggested to you

23   yesterday that of those 1300, there were only

24   approximately 103 that had blood lead levels that

Highly Confidential - Joseph Graziano, Ph.D.

1    were tested that were at the level of

2    7.5 micrograms per deciliter or lower.

3              Do you recall that?

4        A.   I do, yes.

5        Q.   Okay.  Sitting here today, do you

6    disagree with that number?

7        A.   No, I don't.

8        Q.   Okay.  And with respect to that number,

9    Doctor, it's fair to say, is it not, that for that

10   103, that they may well have had blood lead levels

11   higher than 7.5 micrograms per deciliter at other

12   times, right?

13             MR. LANCIOTTI:  Object to form.

14       A.   That's plausible.

15       Q.   Okay.  Go ahead, please, Doctor, with --

16   you were talking about the biological gradients,

17   and if you've finished that, feel free to move on.

18       A.   Sure.  The next criterion is coherence.

19   Are findings coherent one to the next to the next.

20   And, of course, there's never 100 percent

21   coherence.  The quality of studies varies.  But

22   there is powerful coherence across the seven quite

23   unique longitudinal studies that looked at blood

24   lead levels from prenatal period of time across

Highly Confidential - Joseph Graziano, Ph.D.

1    through, in our case, through age 12, in other

2    case, actually on through later in adolescence.

3              So there's powerful coherence.

4              I have to say, you know, we -- many of

5    these groups, the United States group, the

6    Australia group, the Mexico group, met under the

7    auspices of the US EPA during the course of the

8    studies to -- and it was a gentleman named

9    Lester Grant at EPA who really wanted us to do

10   things in a manner so that we could eventually do

11   this pooled analysis, you know.  Let's all use the

12   same assessment of intelligence, the WISC.  Let's

13   all use the same assessment of the quality home --

14   quality of the home-rearing environment and so on

15   and so forth.

16             So the powerful thing here is these

17   studies were essentially going on at the same

18   point in time.  And we were all seeing -- it's

19   like developing a piece of film.  We -- you know,

20   you see it start to come to life.  We were all

21   seeing the same thing as -- over the years as this

22   was done.

23             So the coherence here is powerful.  And

24   we saw it in real time.

Highly Confidential - Joseph Graziano, Ph.D.

1      Q.   I appreciate that, Doctor.  Thank you.

2      A.   The next criterion?

3      Q.   And I do understand the film analogy.

4  I'm not sure you can use that much longer.  I do

5  understand that.

6      A.   I used to love working in the darkroom.

7      Q.   Sure.

8           Next criterion.  Thank you.

9      A.   The next is biological plausibility.

10  And here, we're basically talking about mechanism.

11  Is there evidence in experimental model, animal

12  systems, or cellular systems, that demonstrates an

13  adverse impact of lead on the underlying biology.

14  And we touched on this yesterday, that the

15  literature there is totally vast.  And so there

16  are many, many, many mechanisms.

17           Now, I don't think anyone agrees that

18  there's just one mechanism, but it's a

19  constellation of mechanisms.

20           One of the powerful observations in this

21  regard, I talked yesterday about how the

22  1-year-old brain has the most neuronal

23  connections, and then there's this pruning back.

24  Some of the powerful observations in terms of

Highly Confidential – Joseph Graziano, Ph.D.

1  biology is that lead actually leads to a

2  disordered pruning back of neuronal connections.

3  And so I won't belabor it, but the biology -- the

4  biological plausibility is certainly there.

5          Next?

6      Q.   Yes.  Thank you.

7      A.   Experiment.  Can you do an experiment

8  that tests the association.  Here, quite honestly,

9  the only experiment that I can cite was a large

10  clinical trial run by NIEHS, National Institute of

11  Environmental Health Sciences, that asked the

12  question, is the impact of lead on child IQ

13  reversible?  And they actually did a trial with

14  the drug that I developed, with succimer.  And I

15  was not a member of that study team.  I was

16  actually a monitor, if you will, somebody who

17  audited the sites.

18          And there, the answer was no, that if

19  you take children, I believe the eligibility

20  criteria was that child had to have a blood lead

21  of 25 micrograms per deciliter.  I could be wrong.

22  Maybe it was -- maybe it was 30 or thereabouts.

23  But they did a trial, very carefully controlled

24  trial, to see, can we reverse the adverse

Highly Confidential - Joseph Graziano, Ph.D.

1    association?

2            And the answer was no, sadly.  So that

3    was an experiment, if you will, that sadly proved

4    that the consequences of lead on child

5    intelligence are not reversible when you give a

6    drug to lower the blood lead concentration.

7        Q.   Thank you, Doctor.

8            And, Doctor, one of the hallmarks of the

9    scientific method is that the results should be

10   reproducible, right?

11       A.   Yes.

12       Q.   That other scientists conducting the

13   same analysis should reach the same results,

14   right?

15       A.   Say that again, Mark?

16       Q.   Sure.

17            Other scientists conducting the same

18   analysis should reach the same results, right?

19       A.   Same analysis of what?

20       Q.   Well, other scientists conducting the

21   same analysis of the --

22       A.   Do you mean the same experiment?

23       Q.   Yes.  Other scientists conducting the

24   same experiment should reach the same results.

Highly Confidential - Joseph Graziano, Ph.D.

1      A.    Hopefully.

2      Q.    Okay.  Well, that's one of the hallmarks

3  of the scientific method, right?

4            MR. LANCIOTTI:  Objection; form.

5      A.    Well, it's one of the hallmarks of

6  reaching causal inferences.

7      Q.    Okay.  And certainly here, looking at

8  others who look at the same data, the obvious

9  example is Crump, right?

10     A.    Right.

11     Q.    Okay.  And as we've noted yesterday,

12  when Crump looked at the low-level area that we're

13  focusing on today, meaning blood lead levels of

14  5 or less, Crump reached a different conclusion

15  than Lanphear and you reached in the 2005 paper,

16  right?

17           MR. LANCIOTTI:  Objection; form.

18     A.    Well, this is where I come to the point

19  I made earlier.  At some point, there's judgment

20  involved, you know.  Sir Bradford Hill, I

21  mentioned yesterday, at the end of his lecture

22  pointed out that we should not live and die by

23  statistical significance.  We need to look at the

24  larger picture, the larger body of evidence across

Highly Confidential – Joseph Graziano, Ph.D.

1   these many criteria that we're talking about

2   today, in order to reach causal inferences.  And I

3   respect Crump.  I respect -- you know, I didn't

4   mean to in any way -- what's the term -- I respect

5   that group of scientists.  I know some of them.  I

6   know the Gradient Corporation.  Yes, they're a

7   consulting firm, but they do great -- they do

8   great work.  I know Barbara Beck quite well.

9   She's a very distinguished scientist.  It's -- but

10  it comes down to a matter of scientific judgment

11  when it comes down to that very low range.

12          I don't know how else to say it.

13      Q.   Okay.

14      A.   Now, the group who did the pooled

15  analysis -- the original Lanphear pooled analysis,

16  we've worked our whole lives on lead, and we know

17  the broad picture, all of the criteria we've gone

18  through here this morning.  A consulting firm

19  comes in and looks at a dataset, and their

20  scientific judgment when it comes down to that low

21  range is based on a single dataset, which they

22  analyze very nicely.

23          What I'm saying is my scientific

24  judgment about that low range is based on the

Highly Confidential - Joseph Graziano, Ph.D.

1    constellation of things that we've talked about.

2         Q.    I understand, Doctor.  Thank you.

3         A.    People can differ.

4         Q.    Appreciate that.  Thank you.

5         A.    Most of the scientists can differ.

6         Q.    Ready for the next criterion, Doctor, if

7    you are.

8         A.    The last one, quite frankly, is analogy.

9    And I don't know -- I'm at a loss -- I need to go

10   back and look at Bradford Hill's lecture to

11   discern exactly what he was referring to there.

12   So I -- I have no answer for that one.

13        Q.    Okay.  That's fine.  I appreciate that.

14             MR. TER MOLEN:  Why don't we, Doctor,

15   take a break for 10 minutes and I'm going to go

16   through my materials and we'll look to see if we

17   can wrap this up.  Okay?

18             THE WITNESS:  Terrific.

19             VIDEOGRAPHER:  The time is 9:36 a.m.,

20   and we're off the record.

21             (Recess taken.)

22             VIDEOGRAPHER:  The time is 9:56 a.m.,

23   and we're on the record.

24             MR. TER MOLEN:  Doctor, thank you for

Highly Confidential - Joseph Graziano, Ph.D.

1   your time.  We've determined we have no further

2   questions on our end.

3          We're happy to pass the witness to

4   anybody else who does.

5          THE WITNESS:  Thank you.

6          MR. KENT:  Dr. Graziano, this is --

7   where am I -- David Kent for the LAN defendants.

8          And I want to thank you for your time

9   and thoughtful answers, but we have no further --

10  no questions ourselves.

11         THE WITNESS:  Thank you very much,

12  David.

13         MR. BERG:  This is Rick Berg.  No

14  questions for the City.

15         THE WITNESS:  Thank you, Rick.

16         MR. TER MOLEN:  Doctor, I think that

17  means that we're done.  And thank you for --

18         MR. STERN:  No, no.  This is

19  Corey Stern.  I have one question for the doctor.

20         THE WITNESS:  Sure.

21                    EXAMINATION

22  BY MR. STERN:

23     Q.   Dr. Graziano, this is Corey Stern.  I

24  represent a number of plaintiffs in this

Highly Confidential - Joseph Graziano, Ph.D.

1   litigation.  I was appointed as lead counsel for

2   all individual plaintiffs in state court.  I was

3   appointed as co-liaison counsel for individual

4   plaintiffs in federal court, though I'm not sure

5   how long that appointment is going to last.

6           Notwithstanding that, Mr. Ter Molen

7   asked you a number of questions related to the

8   significance of particular lead levels.

9           Do you recall questions of that manner?

10   A.   Yes, I do.

11   Q.   You would agree with me, sir, that any

12   particular lead level that shows up on a blood

13   lead test is dependent on when the child or

14   individual was actually exposed to lead, correct?

15           MR. TER MOLEN:  Objection; form;

16   foundation; vague.

17   A.   To some extent, yes.

18   Q.   Well, let me ask you this.  If a child

19   was exposed to high levels of lead on January 1st,

20   2015 and no lead level was taken at that time but

21   was taken -- a blood lead test was taken, say, on

22   April 1st, 2015, and that child had a lead level

23   of 2 on April 1st, 2015, would you agree that the

24   child's highest lead level would not be indicated

Highly Confidential - Joseph Graziano, Ph.D.

1    on the April 1st test?

2              MR. TER MOLEN:  Objection; form;

3    foundation; vague; incomplete hypothetical.

4         A.   It would depend, of course -- you

5    mentioned a January 1st exposure.  It would depend

6    when the exposure stopped.

7         Q.   Okay.  Let's assume for a minute that

8    the exposure stopped on January 1st --

9         A.   Then a measurement --

10        Q.   -- in that hypothetical.

11             MR. TER MOLEN:  Same objections.

12        A.   Sure.

13             Then a measurement in April would be --

14   the blood lead would be a fraction of what it was

15   back in January.

16             I mentioned, I believe, yesterday, that

17   the half-life of lead in blood is approximately

18   one month.  So one could backtrack using that

19   parameter and say, well, if it was -- if it was

20   blood lead of 2 in April, well, in March it was 4,

21   in February it was 8, and in January it was 16.

22        Q.   So for all of the questions that

23   Mr. Ter Molen asked you that involved static blood

24   levels, and in particular, when he asked you would

Highly Confidential - Joseph Graziano, Ph.D.

1  you expect something -- something to the effect of

2  would you expect for there to be significant

3  cognitive deficits for a child with a lead level

4  of 2, your assumption in answering each of those

5  questions was that the exposure that led to the

6  lead level of 2 or lead level of 4, or whatever

7  hypothetical Mr. Ter Molen gave you, was a recent

8  exposure and not an exposure that may have ended

9  3, 4, 5, 7, 12, 18 months earlier, correct?

10      A.  That is correct.

11          MR. TER MOLEN:  Objection; form;

12  foundation; vague; misstating the record.

13      Q.  Your answer, sir?

14      A.  That is correct.

15      Q.  So for a child, for instance, who had a

16  lead level of 2, which I believe yesterday you had

17  a long conversation with Mr. Ter Molen about,

18  where you indicated, using your fingers very

19  slightly, you put them very closely together so

20  you could barely see the space between the fingers

21  when you were describing the amount of cognitive

22  deficits you might expect to see for a child who

23  had a lead level of 2.  You would agree with me,

24  sir, that if that lead level was taken, say, on

Highly Confidential - Joseph Graziano, Ph.D.

1    April 1st, 2015, but the exposure for that child

2    actually ended, say, on January 1st, 2014, 15 or

3    16 or 17 months earlier, your answer and the space

4    between your two fingers would have changed

5    dramatically depending on what you knew about when

6    that exposure ended, correct?

7              MR. TER MOLEN:  Objection; form;

8    foundation; misstating the record.

9         A.   That is very correct.  The space between

10   my fingers would have been much larger.  As I

11   said, one can backtrack since we know the

12   half-life of lead in blood.

13        Q.   Right.

14        A.   And I won't repeat --

15        Q.   Sure.

16        A.   -- but in March it was 4 and so forth.

17        Q.   And so if Mr. Ter Molen or one of the

18   20-or-so lawyers who represent Veolia were to show

19   a video at trial of you squinting and putting your

20   two fingers together ever so slightly to express

21   on video how little cognitive deficits you would

22   expect for a child with a lead level of 2, it

23   would be most appropriate for them to explain to

24   the jury when the exposure actually ended for that

Highly Confidential - Joseph Graziano, Ph.D.

1   particular child for whom they're showing the

2   video, correct?

3           MR. TER MOLEN:  Objection; form;

4   foundation; improper question; move to strike.

5       A.   Absolutely correct.

6           MR. STERN:  Okay.  I have no further

7   questions at this time.

8           Oh, go ahead.  Sorry.  Please, finish

9   your answer.

10      A.   And it's a very important point that you

11  bring up.

12          MR. STERN:  Thank you.

13          I have no further questions for the

14  witness at this time.

15          MR. TER MOLEN:  No further questions

16  here.

17          MR. STERN:  Now I think we're probably

18  done.

19          VIDEOGRAPHER:  The time is 10:03 a.m.

20  This deposition has concluded, and we're off the

21  record.

22          (Signature not waived.)

23          Thereupon, the deposition was concluded

24  at 10:03 a.m.

Highly Confidential – Joseph Graziano, Ph.D.

1   STATE OF NEW YORK:

              SS:

2   COUNTY OF _____:

3            I, JOSEPH GRAZIANO, PH.D., do hereby

4   certify that I have read the foregoing transcript

5   of my deposition given on October 30, 2020; that

6   together with the correction page attached hereto

7   noting changes to form or substance, if any, it is

8   true and correct.

9

                        _____

10                       JOSEPH GRAZIANO, PH.D.

11           I do hereby certify that the foregoing

12  transcript of the deposition of JOSEPH GRAZIANO,

13  PH.D. was submitted to the witness for reading and

14  signing; that after he had stated to the

15  undersigned Notary Public that he had read and

16  examined his deposition, he signed the same in my

17  presence on this _____ day of _____, 2020.

18

19                       _____

20                       NOTARY PUBLIC, NEW YORK

21  My commission expires: _____

22                  – – –

23

24

Highly Confidential - Joseph Graziano, Ph.D.

1                          CERTIFICATE
2
3
4           I, Sara S. Clark, Registered Merit
    Reporter, Certified Realtime Reporter,
5   Certified Realtime Captioner, a Notary Public,
    duly commissioned and qualified, do hereby
6   certify that the within-named JOSEPH GRAZIANO,
    PH.D. was duly remotely sworn to testify to the
7   truth, the whole truth, and nothing but the
    truth.
8
            I DO FURTHER CERTIFY that the
9   foregoing is a verbatim transcript of the
    testimony as taken stenographically by me at the
10  time, place, and on the date hereinbefore set
    forth, to the best of my ability.
11
            I DO FURTHER CERTIFY that I am neither
12  a relative nor employee nor attorney nor counsel
    of any of the parties to this action, and that I
13  am neither a relative nor employee of such
    attorney or counsel, and that I am not
14  financially interested in the action.
15          IN WITNESS WHEREOF, I have hereunto set
    my hand and affixed my seal on this 13th day of
16  November, 2020.
17
18
19
20  _____
            Sara S. Clark, RPR/RMR/CRR/CRC
21          Notary Public
            Registered Merit Reporter
22          Certified Realtime Reporter
            Certified Realtime Captioner
23
24  My commission expires:  March 10, 2023