```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

    _____
 3                                 )
                                   )  Civil Action No.
 4                                 ) 5:16-cv-10444-JEL-MKM
    In Re:  FLINT WATER CASES  )  (consolidated)
 5                                 )
                                   )  Hon. Judith E. Levy
 6                                 )  Mag. Mona K. Majzoub
    _____)
 7                                 )
    Elnora Carthan, et al.,        )
 8                                 )
         Plaintiffs,               )
 9                                 )
         vs.                       )  Civil Action No.
10                                 ) 5:16-cv-10444-JEL-MKM
    Governor Rick Snyder,          )
11  et al.,                        )
                                   )
12       Defendants.               )
13  _____)
14              HIGHLY CONFIDENTIAL
           REMOTE VIDEOTAPED DEPOSITION OF
15             ROBERT MICHAELS, PH.D.
                    VOLUME I
16
17         Thursday, November 12, 2020
18               at 9:04 a.m.
19   Taken at:  Residence of Robert Michaels, Ph.D.
                Schenectady, New York
20
21     REPORTED BY:  SARA S. CLARK, RMR/CRR
22         GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
23              deps@golkow.com
24
```

```
 1              A P P E A R A N C E S
 2                   VIA ZOOM
 3                    - - -
 4  On behalf of Individual Plaintiffs:
 5         COREY M. STERN, ESQUIRE
           LEVY KONIGSBERG LLP
 6         800 3rd Avenue, 11th Floor
           New York, New York  10022
 7         212-605-6200
           cstern@levylaw.com
 8
 9  On behalf of Individual Plaintiffs:
10         PATRICK LANCIOTTI, ESQUIRE
           NAPOLI SHKOLNIK PLLC
11         400 Broadhollow Road, Suite 305
           Melville, New York  11747
12         631-224-1133
           planciotti@napolilaw.com
13
14  On behalf of Defendants Veolia Water North America
    Operating Services, LLC, Veolia North America,
15  LLC, and Veolia North America, Inc.:
16         DAVID M. ROGERS, ESQUIRE
           CHRISTOPHER D. FLETCHER, ESQUIRE
17         CAMPBELL CONROY & O'NEIL, P.C.
           1 Constitution Wharf, Suite 310
18         Boston, Massachusetts  02129
           617-241-3000
19         drogers@campbell-trial-lawyers.com
           cfletcher@campbell-trial-lawyers.com
20
21
22
23
24
```

Highly Confidential - Robert Michaels, Ph.D.

```
 1                A P P E A R A N C E S

 2                     VIA ZOOM

 3                        - - -

 4   On behalf of Defendants Leo A. Daly Company and

     Lockwood, Andrews & Newnam, Inc.:

 5

         TRAVIS S. GAMBLE, ESQUIRE

 6       FAEGRE DRINKER BIDDLE & REATH, LLP

         1717 Main Street, Suite 5400

 7       Dallas, Texas  75201

         469-357-2534

 8       travis.gamble@dbr.com

 9   Also Present:

10       Robert Martignetti, Videographer

11                        - - -

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Robert Michaels, Ph.D.

```
 1                    I N D E X
 2                      - - -
 3    WITNESS                                  PAGE
 4    ROBERT MICHAELS, PH.D.
 5    Examination By Mr. Rogers:                 8
 6                      - - -
 7    EXHIBIT           DESCRIPTION            PAGE
 8    Exhibit 1    Notice of Deposition          29
 9    Exhibit 2    Michaels CV                   30
10    Exhibit 3    7/1/20 Invoice                31
11    Exhibit 4    8/6/20 Report of Michaels     36
12    Exhibit 5    2/16/16 Progress Note re:     87
                   S▓PPI▓  , Bates
13                 CHD-MD-540099-000001
14    Exhibit 6    1/12/16 Progress Note re:     96
                   T▓PPI▓ , Bates
15                 GCHD-MD-540141-000001-2
16    Exhibit 7    2/6/18 Progress Note  re:    111
                   V▓PPI▓▓
17
      Exhibit 8    9/2/15 Report re:            112
18                 V▓PPI▓ , Bates
                   MCHC-MD-540069-000026
19
      Exhibit 9    1/14/16 Report re:           114
20                 V▓PPI▓ , Bates
                   MCHC-MD-540069-000024
21
      Exhibit 10   5/22/17 Report re:           115
22                 V▓PPI▓ , Bates
                   MCHC-MD-540069-000020
23
24
```

| | EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | Exhibit 11 | 9/25/09 Report re: WPPI, Bates WardeMedLab-MD-540097-000003 | 116 |
| 3 | | | |
| 4 | | | |
| 5 | Exhibit 12 | 3/24/16 Progress Note re: WPPI, Bates GCHD-MD-540097-000001 | 119 |
| 6 | | | |
| 7 | Exhibit 13 | 7/15/16 Report re: WPPI, Bates WardeMedLab-MD-540097-000004 | 121 |
| 8 | | | |
| 9 | Exhibit 14 | Document titled, "Fourth National Report on Human Exposure to Environmental Chemicals, Updated Tables, January 2019, Volume One" | 138 |
| 10 | | | |
| 11 | | | |
| 12 | Exhibit 19 | Graziano Deposition Excerpts | 141 |
| 13 | | | |
| 14 | Exhibit 20 | Article titled, "Analysis of blood lead levels of young children in Flint, Michigan before and during the 18-month switch to the Flint River water" | 144 |
| 15 | | | |
| 16 | | | |
| 17 | Exhibit 18 | Article titled, "Analysis of blood lead levels of young children in Flint, Michigan before and during the 18-month switch over to the Flint River water" | 147 |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | Exhibit 22 | Article titled, "Elevated Blood Lead Levels in Children Associated with the Flint Drinking Water Crisis: A Spatial Analysis of Risk and Public Health Response" | 165 |
| 22 | | | |
| 23 | | | |
| 24 | | | |

| | EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | Exhibit 23 | Article titled, "Chronic | 166 |
| | | Lead Intoxication in | |
| 3 | | Children" | |
| 4 | Exhibit 24 | Article titled, "Lead | 168 |
| | | release to potable water | |
| 5 | | during the Flint, Michigan | |
| | | water crisis as revealed | |
| 6 | | by routine biosolids | |
| | | monitoring data" | |
| 7 | | | |
| | Exhibit 25 | Article titled, "Efficacy | 170 |
| 8 | | of Corrosion Control and | |
| | | Pipe Replacement in | |
| 9 | | Reducing Citywide Lead | |
| | | Exposure During the Flint, | |
| 10 | | Michigan Water System | |
| | | Recovery" | |
| 11 | | | |
| | Exhibit 26 | Article titled, "Low-level | 170 |
| 12 | | Environmental Lead | |
| | | Exposure and Children's | |
| 13 | | Intellectual Function:  An | |
| | | International Pooled | |
| 14 | | Analysis" | |
| 15 | Exhibit 27 | Article titled, "A | 171 |
| | | Statistical Re-evaluation | |
| 16 | | of the Data Used in the | |
| | | Lanphear Pooled Analysis" | |
| 17 | | | |
| | Exhibit 28 | Article titled, "Erratum: | 172 |
| 18 | | Low-Level Environmental | |
| | | Lead Exposure and | |
| 19 | | Children's Intellectual | |
| | | Function: An International | |
| 20 | | Pooled Analysis" | |
| 21 | Exhibit 29 | ATSDR Toxicological | 175 |
| | | Profile for Lead | |
| 22 | | | |
| 23 | | (Exhibits 15 - 17 not marked.) | |
| 24 | | - - - | |

```
 1                    - - -

 2             P R O C E E D I N G S

 3                    - - -

 4        VIDEOGRAPHER:  We are now on the record.

 5        My name is Robert Martignetti.  I'm a

 6   videographer for Golkow Litigation Services.

 7        Today's date is November 12th, 2020, and

 8   the time is 9:04 a.m.

 9        This remote video deposition is being

10   held In Re: Flint Water Cases.

11        The deponent is Robert Michaels, Ph.D.

12        All parties to this deposition are

13   appearing remotely and have agreed to the witness

14   being sworn in remotely.  Due to the nature of

15   remote reporting, please pause briefly before

16   speaking to ensure all parties are heard

17   completely.

18        Counsel will be noted on the

19   stenographic record.

20        The court reporter is Sara Clark, and

21   will now swear in the witness.

22

23

24
```

```
 1                    -  -  -

 2              ROBERT MICHAELS, PH.D.

 3      being by me first duly sworn, as hereinafter

 4        certified, testifies and says as follows:

 5                    EXAMINATION

 6  BY MR. ROGERS:

 7      Q.   Okay.  Good morning, Dr. Michaels.  I

 8  introduced myself to us while we were off the

 9  record.  My name is David Rogers.  I represent the

10  VNA defendants.

11          So good morning to you, sir.

12      A.   Good morning.

13      Q.   And as we also discussed, any time that

14  you need to take a break, you just let us know.

15  The only thing I would ask is that you just answer

16  the question that's pending, and then we'll decide

17  and go ahead and take a break.

18          Okay?

19      A.   Very good.

20      Q.   All right.  I want to start by asking

21  you when you were retained in the case.

22          Do you have a memory of when it was that

23  you were retained to be a consulting expert in the

24  case?
```

```
 1        A.   No, I don't.  No, I'd rather not guess.
 2   I'm sure I have records of that, but I don't
 3   remember.
 4        Q.   There was a --
 5             MR. STERN:  Dave Rogers?
 6             MR. ROGERS:  Hi, Corey.
 7             MR. STERN:  Hey.  This is Corey.
 8             I just wanted to note for the record my
 9   appearance by phone for now.  I'll be jumping on
10   the computer shortly at some point.  But the
11   404-number is mine.
12             MR. ROGERS:  Yep.  And I sent you an
13   e-mail earlier today, Corey, about a matter I
14   mentioned to Patrick.  When we have a break,
15   there's another issue, if we have a chance, I
16   would like to discuss with you.
17             MR. STERN:  Sure.
18             MR. ROGERS:  So we'll do that during a
19   break or lunchtime, I guess.
20             MR. STERN:  Sure.
21             MR. ROGERS:  We just got started.  You
22   didn't miss anything.
23   BY MR. ROGERS:
24        Q.   All right.  Do you go by doctor or
```

Highly Confidential    Robert Michaels, Ph.D.

1  mister?  I'll probably refer to you as

2  Dr. Michaels.  Is that fine with you?

3      A.   Doctor is fine.

4      Q.   Okay.  We had asked that you provide to

5  us invoices, and what was produced was an e-mail

6  to Mr. Stern, I believe, from July of 2020 with an

7  amount of, I think, $12,000 for an invoice.

8          Do you have any other documents or

9  records that would show the amount of time that

10  you worked on the case, when you did the work, and

11  what you did when you were working for however --

12  whatever period of time on a daily or weekly basis

13  or anything?

14      A.   That invoice is --

15          MR. LANCIOTTI:  Objection; form.

16          Go ahead, Doctor.

17      A.   That invoice, we have a lump sum

18  agreement, so I was not required to write down

19  specific hours.

20      Q.   Yeah.  But did you?  I mean, do you have

21  any other records in your possession that you

22  maintain that would describe the work that you did

23  on the case and when you did it, whether it's an

24  invoice or not?

Highly Confidential Robert Michaels, PhD.

```
1        A.   I'm sure that there are pieces of paper
2   around that I could scrounge up that might remind
3   me of when I did things, but I don't have a
4   specific document that -- that I can provide to
5   you right now.
6        Q.   When I asked about when you were
7   retained in the case, you said you didn't want to
8   guess and you didn't know, but that you might be
9   able to find out, I think, paraphrasing what you
10  said.
11            How would you find out the date on which
12  you were retained?
13       A.   I have a calendar --
14            MR. STERN:  Object to form.
15            Object to form.
16            Dave, I'm not sure if you're referring
17  to the cases that he began working on for
18  Levy Konigsberg, my firm, or when he was retained
19  initially for the other bellwether cases which
20  came before he was retained by my firm.
21            MR. ROGERS:  Yeah.  I had asked earlier
22  about when he was retained, quote, in the case.
23  BY MR. ROGERS:
24       Q.   So I guess I'm referring to,
```

Highly Confidential          Robert Michaels, Ph.D.

1   Dr. Michaels, the first time at which you were

2   retained as an expert consultant in any capacity

3   to work on the Flint water cases.

4       A.   You know, I'm pretty good at keeping

5   records for -- I have a calendar that is on iCal

6   and I could look that up.  And I suspect that if I

7   went into my computer, I would find a date, you

8   know, that -- probably an e-mail or something like

9   that.  But I don't recall the actual -- I don't

10  recall.

11      Q.   Would you be willing to do that?  It

12  is -- excuse me -- there's something in my throat

13  here.  Excuse me.

14          Later on today or before tomorrow, would

15  it be possible for you to look into your records

16  and determine the first date on which you were

17  retained to do -- as a consultant to do any work

18  on the case?

19      A.   Yes, I could do that.

20      Q.   All right.  I would appreciate it.

21  Thank you.  I'll check in with you about that

22  tomorrow.

23          What did you understand your assignment

24  to be when you were retained?

Highly Confidential    Robert Michaels, Ph.D.

1          A.    To address the issues for, at first four

2     bellwether plaintiffs, and later, 10 bellwether

3     plaintiffs, for a total of 14.

4                And -- excuse me.  That's more of a

5     morning problem for me.

6          Q.    We both -- we must have the -- we both

7     need some cough drops or something today, I think.

8          A.    Yeah.

9                I also recall that part of the rationale

10    for the rest of my report comes from the fact that

11    it is also a document for use by other plaintiffs

12    that we -- who might be recruited into the case.

13    And so it has that as well as a purpose.

14         Q.    I see.

15               So the way that you answered the

16    question leads me to ask this question, which is:

17    Was there a sequence of when you were retained in

18    the assignments that you were given, namely, that

19    at first, you were retained by the Napoli law firm

20    to investigate issues surrounding toxicology for

21    the four bellwether plaintiffs, and then at some

22    point after that, you were asked to also address

23    the 10 bellwether plaintiffs that Mr. Stern

24    represented?

Highly Confidential             Robert C. Michaels, Ph.D.

```
1        A.   Yes.  That's exactly what happened.

2        Q.   Okay.  Beyond what you just said, that

3   is, I think, paraphrasing toxicology, you were

4   retained to -- your assignment was to investigate

5   and do an analysis regarding toxicology issues for

6   the bellwether plaintiffs -- and we'll just call

7   them that for now.

8             What else were you asked to do, if

9   anything?

10       A.   Well, I think as I said, I created a

11  report that had sufficient breadth to be useful

12  for the plaintiffs that might come into the place

13  later on who were not considered bellwether

14  plaintiffs at the time when I was retained.

15       Q.   Okay.  So you know at this point in

16  time, there's been a selection process in the four

17  bellwether plaintiffs who have been chosen to be

18  the first trial plaintiffs, so to speak, in our

19  trial that we have scheduled for June.  I'll just

20  refer to them by their last names -- I don't mean

21  any disrespect but just to simplify things --

22  S▮PPI▮▮, T▮PPI▮ V▮PPI▮▮▮, and W▮PPI▮.

23            Are you familiar with that?

24       A.   Yes, of course.
```

```
1        Q.   Okay.  So we had an agreement among

2   counsel that we're going to basically focus on,

3   you know, those four plaintiffs, the four

4   bellwethers that are the first trial candidates.

5   And while your report addresses, you know, the

6   14 that were in the group at the time, I'm going

7   to focus on the four.  So when I say going

8   forward, "the bellwethers," that's who I'm

9   referring to, these four.  Okay?

10       A.   Okay.

11       Q.   What -- can you describe for me in

12  chronological order as best you remember the work

13  that you did to carry out the assignment in the

14  case that you just described?

15       A.   Well, I was provided with a lot of

16  information by the attorneys, and I looked at that

17  information.  The information included the

18  depositions of the bellwether parents, and they

19  included some attorney records of information that

20  had been summarized for each bellwether

21  plaintiffs.  And so that was another source of

22  information.

23            I also saw some physician summary of

24  medical cases.  And as the -- that was very
```

1  useful.

2       And I believe that, to be precise, the

3  more definitive answer is in the literature that

4  I've explicitly cited in my report -- in both

5  reports, but, of course, one of the reports is not

6  relevant today.

7       Q.  Okay.  So you described a couple of

8  things.  Reviewing records.

9       In addition to reviewing the records,

10  what did you do?

11       A.  Well, I looked at a lot of literature as

12  well to form -- to create the report that you see.

13  I'm not sure how to answer this except that I did

14  an investigation, basically literature

15  investigation involving the literature -- the

16  general literature, the scientific literature, as

17  well as the case-related literature that was

18  provided to me.

19       Q.  Okay.  Then you wrote the report based

20  on that work that you did?

21       A.  Yes.

22       Q.  Have you done anything else -- up until

23  the point in time in which you wrote your report,

24  had you done anything else?

1    A.    You mean relative to writing the report,

2  something that I didn't mention to you?

3    Q.    No, my question is broader than that.

4  I'm asking about the work that you did to carry

5  out the assignment that was given to you in the

6  case.

7        So thus far, you've described to me you

8  reviewed lawyer summaries of information,

9  physicians' summaries of information, other

10  records related to the plaintiffs, including the

11  parents' depositions, you did a literature review,

12  and then you wrote your report.

13        So up until the point in time at which

14  you wrote your report, I'm just asking if you did

15  anything else other than what you've just

16  described to me?

17    A.    Nothing that comes to mind right now.  I

18  mean, I -- as I said already, I looked at very

19  specific literature, and I'm referring to

20  case-related literature right now --

21  plaintiffs-related literature right now, and those

22  are all cited in great detail.

23        But as a general statement, I'm just

24  saying that that's what I did.  I've not mentioned

1   every piece of literature that I -- that I looked

2   at.  And I did receive literature that I did not

3   look at as well.

4        Q.   Okay.  In terms of the lawyers'

5   summaries, we had asked that the file materials

6   that you had be produced to us.  I don't believe I

7   received any lawyers' summaries.

8             Tell me about those.  What are those?

9        A.   This is --

10            MR. STERN:  Object to form.

11            Object to form.

12            You can answer.

13            MR. LANCIOTTI:  Doctor, if you hear

14  either Corey or myself objecting, you can answer

15  the question unless we specifically instruct you

16  not to answer it.  So if you hear us say

17  "objection," you know, you can go ahead and answer

18  the question after our objection.

19            THE WITNESS:  Okay.

20            MR. STERN:  I just want to be very

21  careful not to get into work product issues.

22            THE WITNESS:  I'm seeing a green

23  telephone on the screen and I'm not sure that

24  you -- that I have the floor at this point.  Can

Highly Confidential - Robert Michaels, PhuD.

1   you hear me?

2           MR. ROGERS:  Yeah, we do.

3           MR. STERN:  Yeah.  You always have the

4   floor once the objections are lodged.

5           THE WITNESS:  Okay.

6       A.   There were some forms that I gather were

7   standard questionnaires that the lawyers

8   administered to each of the plaintiffs, or maybe

9   they filled them out themselves based on

10  interviews with the plaintiffs.  In any case, I

11  was provided with those, and I thought that I had

12  provided them to you, but I may not have, if

13  you're telling me I didn't.

14          THE WITNESS:  Or, Patrick, did you

15  receive them and discover that those were not

16  appropriate?

17      Q.   Well, let me just clarify.  I think

18  maybe you're referring to the fact sheets --

19      A.   Yes.

20      Q.   -- with the information?  That's what

21  you're referring to?

22      A.   Yeah.

23      Q.   Okay.  So I know what those are.  Thank

24  you.

Highly Confidential - Robert Michaels, PhD.

1      A.   Okay.

2      Q.   Other than the fact sheets, you know,

3  containing information about certain subject

4  matters for each individual plaintiff -- that's

5  why I asked about lawyers' summaries.

6           Did you receive any written memoranda or

7  summaries of information that you relied upon for

8  purposes of writing your report and expressing

9  opinions in the case besides the fact sheets and

10 these other things that you described earlier?

11     A.   I don't believe I did.  So I will amend

12 my answer if I come across something like that,

13 but I don't think so.

14     Q.   Okay.  And then with respect to

15 physicians' summaries, I think you said, are

16 there -- did you review any summaries written by

17 physicians other than actual medical records?  I

18 don't know what you're referring to when you

19 describe them as "physicians' summaries."  What do

20 you mean?

21     A.   Again, I believe I provided those to you

22 in the drop of information that I had received.  I

23 was not very selective.  I just sent them off.

24 And I believe they're in there.  I don't -- and

Highly Confidential    Robert Michaels, Ph.D.

1    actually, you invited me to have a copy of my

2    report.  I can be more precise.

3        Q.    That's okay.  I think I understand.

4            So you are -- when you use the words

5    "physicians' summaries," you're referring to

6    medical records from various physicians for each

7    of the individual plaintiffs, right?

8        A.    Yes.  And I will tell you that my

9    understanding -- you know, I looked at some

10   medical records.  And if you've ever tried to read

11   a physician's handwriting or if you've ever tried

12   to look at all of the painful detail, those are

13   extensive documents.  And sometimes I did delve

14   into those documents.  But there was a physician

15   who was engaged to summarize them, and I looked at

16   his summaries of those medical records and relied

17   on the summaries.

18           And so if you are using the word

19   "medical records" to mean original medical

20   records, these are different.  If you're using the

21   word "medical records" to refer to records

22   prepared by a physician, these are medical

23   records.  That's your semantic choice.

24       Q.    Gotcha.  Thank you very much for that.

1    I appreciate it.

2              The report that you wrote was dated --

3    let me just make sure I have the date here.

4    Actually, I don't see a date on it.

5              It was at the end of July 2020 sometime,

6    right?  I'll tell you what, whenever the date of

7    the report is -- leave that aside for a minute --

8    can you tell me what work you've done on the case

9    since you completed and finalized your report?

10        A.   I believe I've been told not to talk

11   about that.

12        Q.   Well, I'm going to need you to answer

13   the question unless Patrick or Corey tell you not

14   to.  I'm just asking what work have you done on

15   the case between the end of your report and the --

16   today, as we sit here, concerning the Flint water

17   litigation and the bellwether plaintiffs?

18             MR. STERN:  Dave, this is Corey.  He can

19   answer the question.  I just want to interject.

20             In our preparation -- our brief

21   preparation with the doctor about the deposition,

22   what we told him that he should not discuss is our

23   communications, is our --

24             MR. ROGERS:  Yeah.

1         MR. STERN:  -- communications.  So he

2    can tell you anything he wants.

3         And, Doc, it's okay to answer the

4    question.  I just -- you know, if you're going to

5    tell him that we met yesterday via Zoom for an

6    hour, it's okay to say that, but it's not okay to

7    say, you know, "Corey told me that I should tell

8    Dave Rogers that he's a fabulous human being."

9    Like, nothing about our conversation is able to be

10   discussed.

11        A.   Well, we had a phase of the selection of

12   plaintiffs, and my opinion was requested on how to

13   select plaintiffs, and so I did some work on that.

14        Q.   Okay.  Understood.  And, again, yeah,

15   I'm not asking you to describe the substance of

16   communications between you and the lawyers, but

17   just the subject matters of the work that you did.

18        Okay.  So that's one thing that you did.

19   You were asked to help or, you know, provide some

20   information as part of the selection process.

21        Anything else between -- any other work

22   that you did on the case between the time that you

23   finished your report and today, sir?

24        A.   Well, I reviewed my work.  I actually

1    read through my report.  I don't know if you --

2    again, it's a semantic issue.  Does that count as

3    work?  I was preparing for my deposition which I

4    knew was coming, so I looked at my report.  And I

5    don't think I was asked to do anything else.

6         Q.   I'm just trying to know what you did.

7    So I'm -- does that complete your description of

8    any work that you've done on the case since you

9    finished your report and today?

10        A.   I believe so.

11        Q.   All right.  Do you have an estimate of

12   how much time you spent working on the case from

13   when you were first retained through the time that

14   you completed your written report, sir?

15        A.   What I have is actually a record of the

16   time that I spent preparing for my deposition.

17   That includes phone calls that have been made;

18   that includes reading my report; that includes the

19   work I described on the selection of plaintiffs;

20   it includes the Zoom conversation that we had to

21   prepare me.  That is incorporated in time sheets,

22   but that all post-dated the report.

23        Q.   Yeah.  So I believe you might have --

24   thank you for that.  I think you might have

```
 1   misheard me or misunderstood.  I was asking for an

 2   estimate, if you have one, of how much time you

 3   spent from the date that you were first retained

 4   to work on the case through the time at which you

 5   completed your written report.

 6              How much time did you spend during that

 7   period of time?

 8        A.   I don't know.  I don't know.

 9        Q.   And since the --

10        A.   A lot.

11        Q.   Do you have --

12        A.   It's a lot.

13        Q.   -- do you have an estimate for me?

14        A.   No, I do not.

15        Q.   Since you completed your report, you're

16   saying that you've kept time sheets.

17        A.   Correct, yes.

18        Q.   And do those time sheets basically

19   itemize the work that you were doing and how much

20   time you spent doing it?

21        A.   Yes.

22        Q.   All right.  And what is the total amount

23   of time that you've spent as recorded on those

24   time sheets?
```

1       A.   Well, I haven't added it up, but...

2       Q.   I'll tell you what we can do, Doctor.

3   If during a break at some point --

4       A.   I can add it up.  I'm sorry.

5       Q.   No, maybe -- I'm going to ask you to

6   provide them to Patrick and Corey, copies of them,

7   if they don't already have them, and then provide

8   them to me so I can just take a look at them and

9   maybe mark them as an exhibit and that way we'll

10  have the time.

11           MR. ROGERS:  Is that doable, Patrick or

12  Corey and Dr. Michaels?

13           MR. LANCIOTTI:  Yeah, that's fine.

14  Either today, or we can do it tomorrow.

15           MR. ROGERS:  Yeah.  If you get it to me

16  at the end of today, we'll cover it tomorrow

17  morning.  Okay. Thank you.

18           MR. LANCIOTTI:  Yeah.

19  BY MR. ROGERS:

20      Q.   So, Doctor, just hold on to those time

21  sheets and we'll deal with that at another time,

22  or probably tomorrow.

23           Let's see.  Why don't we mark some

24  exhibits just to get some paperwork out of the

1   way -- no, no.  Before we do that, let me ask you

2   this.  Sorry.  I've got a massive outline for you,

3   Doctor, and I'm trying to figure out what's the

4   best and most efficient way to go about this.

5           Your report, as you know, is quite long,

6   120-plus pages or thereabouts, and then post -- or

7   appendices with lists of references and things

8   like that.  And I didn't see anything in the

9   written report identified as opinions or summary

10  of opinions or anything like that.

11          Can you give me a basic description of

12  what your opinions are with respect to the four

13  bellwethers that we have at issue in the case

14  right now?

15      A.   I believe I've given you that --

16          MR. LANCIOTTI:  Objection; form.

17      A.   I believe I've given you that, and the

18  report is -- I'll have to look at this in more

19  detail, but the report is divided up into

20  traditional scientific sections.  There is a

21  summary at the beginning, and those summarize

22  everything.  There is a "Conclusions" section and

23  a "Discussion" section, and those give my

24  opinions.

1          So if you -- if you use that as a guide,

2     those are my opinions.

3          Q.   All right.  Let's take a look at the

4     "Summary" section, then.  It looks like that

5     appears on Pages 2 -- well, it's all contained on

6     Page 2 of your report.

7          Are -- the third and fourth paragraphs

8     on Page 2, are those the opinions that you hold

9     that you intend to testify about at the trial of

10    this case?

11         MR. LANCIOTTI:  Dave, I think if you're

12    going to be asking him questions about the report,

13    it might make sense to enter it as an exhibit so

14    we can all see it on the Zoom.

15         MR. ROGERS:  Yeah, let's do that.  Let's

16    mark a few documents just to get some paperwork

17    out of the way and then, Doctor, we'll come back

18    to it.

19         All I'm going to do is put up on the

20    screen these exhibits and then we'll mark them and

21    get back to those questions.

22         MR. LANCIOTTI:  Thank you.

23         MR. ROGERS:  Yep.

24                        - - -

Highly Confidential    Robert Michaels, PhD.

```
 1              (Michaels Exhibit 1 marked.)

 2                        - - -

 3   BY MR. ROGERS:

 4        Q.   Dr. Michaels, I'm putting up on the

 5   screen what we'll mark as Exhibit 1, the notice of

 6   taking deposition.

 7              Do you see that?

 8        A.   I do.

 9        Q.   And did you receive that notice of

10   deposition and the document requests that

11   accompany it that are listed here as Schedule A?

12        A.   Yes.

13        Q.   And did you undertake to search through

14   your records and your files and produce the

15   documents that were requested and to provide them

16   to Mr. Stern or Mr. Lanciotti so that they could

17   provide them to me?

18        A.   I did.

19        Q.   All right.  So at the end of the

20   deposition, I'm going to come back to this and

21   we'll just go through it in more detail and make

22   sure.  But that's Exhibit 1, the notice of

23   deposition.

24                        - - -
```

```
 1                (Michaels Exhibit 2 marked.)

 2                       - - -

 3   BY MR. ROGERS:

 4        Q.   Exhibit 2 is your CV.  And I will get to

 5   some questions about that.  This was a CV that I

 6   believe was provided with your report, and I've

 7   got some highlights on it.

 8                But do you basically recognize that as

 9   your CV in the case?

10        A.   I do.

11        Q.   And did you provide a CV that was up to

12   date as of the, you know, time that you wrote your

13   report?

14        A.   I believe I must have updated that CV.

15   You say it was included in the report?

16        Q.   I think -- not included in the report

17   maybe but was provided with the report or at some

18   time thereafter.

19                So is that basically current as of, you

20   know, summertime 2020?

21        A.   When somebody asks me for a CV, I

22   normally would update it at the time that I

23   provide it.  But I also am aware that I provided a

24   CV as part of the process of getting retained.
```

Highly Confidential    Robert Michaels, PhD.

```
 1            Are there two different versions, one
 2    updated, I don't recall.
 3        Q.   All right.  When we get to it and I ask
 4    you specific questions, we'll maybe be able to
 5    figure that out.
 6                        - - -
 7            (Michaels Exhibit 3 marked.)
 8                        - - -
 9    BY MR. ROGERS:
10        Q.   But in terms of housekeeping, let's take
11    a look at this Exhibit 3 that I marked, which is
12    that e-mail dated July 1st to Mr. Stern that I
13    described earlier.  And you say here that you're
14    providing this invoice for the work that you did,
15    6,000 -- you can see it on the screen -- 6,000 for
16    initiation -- or upon initiation of work, 6,000
17    upon report submittal, $12,000.  Right?
18        A.   Correct.
19        Q.   So that leads me to believe that you may
20    have been retained, at least for the 14 -- well,
21    for the 14 bellwethers, sometime around July 1st,
22    2020 because of the way that you wrote this.
23            Does that refresh your memory of when
24    you were retained?
```

```
1         A.   Well, it was considerably before
2    July 1st because we -- I was retained to do a
3    report on four bellwether plaintiffs.  This
4    Number 14 that's in here includes that, that
5    initial four.  So I probably was retained a couple
6    of months before that July 1st e-mail.
7         Q.   Okay.
8         A.   Maybe two, three months before that.  I
9    don't really remember.
10        Q.   Well, the reason I ask is because it
11   says here invoice, due, 6,000 upon initiation of
12   work.  What does that mean?
13        A.   Well, it means probably that as a
14   businessperson, I am somewhat trusting, and I did
15   start work before receiving that.
16        Q.   Okay.  So your best memory is that you
17   would have been retained to -- as an expert to do
18   work on the case several months before July 1st,
19   and as of July 1st, that's when you submitted your
20   first invoice; is that fair?
21        A.   No, no, that is not correct.  I believe
22   that the sequence was that there was an initial
23   report that I did involving four bellwether
24   plaintiffs and a subsequent report that I did
```

1    involving the additional 10 bellwether plaintiffs.

2         The initial report had been submitted

3    earlier, and there was an invoice for that as

4    well.  I might not have provided that invoice.  I

5    don't remember if I did, because it did not

6    involve these four bellwether plaintiffs.

7         Q.   I see.

8         A.   The additional 10 bellwether plaintiffs.

9    But -- but there were two different invoices.

10        Q.   Okay.  That's helpful information.

11   Thank you.  I'll talk to Corey and Patrick about

12   that later.

13        So as I understand, this invoice relates

14   to the work that you did involving the Corey Stern

15   10 bellwether plaintiffs after you had already

16   done some work for the four bellwether plaintiffs

17   who Mr. Lanciotti represented; is that the way it

18   worked?

19        A.   Exactly, yes, that's right.

20        Q.   Okay.  So the $12,000 here that you

21   invoiced for the work that you did, that would be

22   for the 10 bellwether plaintiffs in Mr. Stern's

23   group of clients, right?

24        A.   Basically yes, but I will have to amend

1    that and say that the reports -- the two groups of

2    bellwether plaintiffs substantially overlap.  And

3    so in some sense, this is an incremental amount

4    because I was able to make use of information in

5    the prior report that was generic, in other words,

6    information that did not relate only to each of

7    the four bellwether plaintiffs that were addressed

8    by that report.

9            So -- well, that's the way I wanted to

10   amend what you've suggested.

11       Q.   Yeah, that's helpful.  Thank you.  And,

12   of course, we were provided with the report.  You

13   divided the reports up into the four bellwethers

14   from the Napoli group and then the four from

15   Mr. Stern's group.

16           So do you remember what amount you

17   invoiced for the four in the original invoice for

18   the work that you did?

19       A.   I believe that was $15,000.

20       Q.   Okay.

21           MR. ROGERS:  So, Patrick, can you get

22   that and produce that?  Because I think, as he

23   just said, you know, some of that would have been

24   devoted to work that's generic and was carried

Highly Confidential    Robert Michaels, Ph.D.

```
1    over into the second report.
2              MR. LANCIOTTI:  Yes, that's fine.  And
3    that's the reason why it wasn't produced in the
4    first place, because I had thought it was just for
5    our four bellwether plaintiffs so it wouldn't have
6    been pertinent to our conversation to the four.
7    But, yeah, we'll get that to you and -- probably
8    at the end of today.  That's fine.
9              MR. ROGERS:  Yeah, great.
10   BY MR. ROGERS:
11        Q.   And that might also -- Dr. Michaels, if
12   you looked at that invoice, potentially that could
13   assist in trying to nail down the date on when you
14   were first retained, right?
15        A.   Well, I'm sure it will help.  Again, as
16   a businessperson, I'm not animated by money as
17   much as other people are, and there was a
18   significant lag between the time I first submitted
19   the report and later submitted the invoice.  So,
20   yes, it will help certainly, but I have more exact
21   information, I'm sure that I can find, pretty
22   exact information about when I was retained.
23        Q.   Okay.  Thanks.  And we've talked about
24   that.
```

Highly Confidential - Robert Michaels, Ph.D.

```
 1                     - - -

 2              (Michaels Exhibit 4 marked.)

 3                     - - -

 4   BY MR. ROGERS:

 5       Q.   The next exhibit I'm going to show you

 6   is the actual report; it's Exhibit 4.  It says

 7   here there's 143 pages total.

 8            But, basically, do you recognize this is

 9   the report for the -- that includes the four

10   bellwethers that we have here which is dated

11   August 6, 2020?

12       A.   This includes the 10 additional

13   bellwether plaintiffs.  It does not include the

14   four bellwether plaintiffs that were done in a

15   separate initial report.

16       Q.   Yeah, I'm sorry.  I recognize that.  I

17   meant the four bellwether plaintiffs that are the

18   trial plaintiffs that we're concerned about,

19   S▮PPI▮  , T▮PPI▮, V▮PPI▮      , and W▮PPI▮.

20            They're in this report, right?

21       A.   They're in this report, correct.

22       Q.   Okay.  So now to get to the point that

23   we were on before, which is your opinions, I was

24   asking you to describe what your opinions were,
```

Highly Confidential - Robert Michaels, Ph.D.

1    and I focused you on Page 2, which is the summary.

2    And if you see, if we go to Page 3, the summary

3    portion ends and it moves into an introduction.

4            Is this summary that's on Page 2 of your

5    report a basic summary of the opinions that you

6    hold in the case?

7            MR. LANCIOTTI:  Objection; form.

8        A.   The summary is a brief explication of

9    the scope of the report, the activities that I

10   conducted, the findings that I made, and the

11   conclusions that I drew.  You can count them as

12   opinions if you like.  They certainly are -- I

13   guess I refer to the conclusions mostly as

14   opinions and the other things as kind of the raw

15   material that went into forming my opinions.

16           The other thing I would say about your

17   question is that there is a -- there are sections

18   that describe each of these areas in great detail,

19   and I would say that the scope of those sections

20   represent the raw material that went into forming

21   my opinions and the opinions themselves.  They're

22   much more extensive and much more detailed than

23   what is represented here in the summary.

24       Q.   Where are your conclusions in your

1   report?

2       A.   Well, they're in a section called

3   "Conclusions," but let me find it.

4            Page 120 is the beginning of the

5   "Conclusions" section.

6       Q.   I see.  Okay.  Thanks.  Let me put a

7   sticker on that so I can get to that later.

8            All right.  And so the "Conclusions"

9   section beginning on 120, it seems to be related

10  to your conclusions or opinions with respect to

11  each of the individual bellwether plaintiffs,

12  including the four that we have now in the case,

13  right?

14      A.   Correct.

15           MR. LANCIOTTI:  Objection; form.

16      Q.   And then -- would you then describe --

17  would it be a correct statement for me to say

18  that -- or would it be an accurate statement that

19  the opinions that you hold in the case that you

20  intend to testify about are summarized or briefly

21  described in your summary that appears on Page 2

22  of your report, and then the "Conclusions" section

23  that goes from Page 120 through Page 126?

24      A.   No, I would not --

Highly Confidential       Robert Michaels, Ph.D.

```
 1              MR. LANCIOTTI:  Object to form.
 2         A.    -- consider that an accurate statement
 3    at all.
 4         Q.    Why is that not accurate?
 5         A.    Because what I intend -- what I believe
 6    I will be asked to testify about is the full scope
 7    of my report, which does not begin on Page 120
 8    with a summary on Page 2.  There is an
 9    "Introduction" section that places the report in
10    context; there is a "Method" section that
11    describes what I did; there is a "Findings"
12    section which describes the findings that I made
13    and the information sources that I made them from
14    and the conclusions that I drew from those
15    findings; and there's a "References" section which
16    describes everything in great detail that are
17    cited in text in each of those sections.
18              The report is a holistic unit.  That
19    represents what I will testify about.
20         Q.    Okay.  Take a look at Page 2 that I have
21    up on the screen here.  You can either look at the
22    screen -- I don't care what you do -- as opposed
23    to looking at your actual paper report, whatever
24    is easier for you, but I want to ask you about the
```

Highly Confidential    Robert Michaels, Ph.D.

1    third and fourth paragraphs to get started here.

2              So you describe in Paragraph 3 the

3    general causation issue concerning lead in the

4    water supply for Flint, and you say at the

5    conclusion here, "The salient issue, therefore, is

6    not whether incremental exposure via drinking

7    water can cause particular adverse health effects,

8    but whether such exposure can cause and/or

9    exacerbate, or contribute to causing and/or

10   exacerbating, these effects."

11             Would you explain that to me?  What do

12   you mean by that?

13        A.   Well, I think if you want an explanation

14   of that, the best place for that is in the

15   "Discussion" section.  So if you're asking me for

16   an ad-lib kind of a thing, I'm happy to provide

17   that, but the report is the report.  It explains

18   these things.  These statements in the summary are

19   derived from a full explication of those issues in

20   the report.

21             What I'm basically saying is that there

22   are -- in the report there are -- and I don't

23   remember specifically with respect to the four

24   bellwether plaintiffs that are included in this

1    deposition -- but there are cases where the blood

2    lead levels predated the onset of Flint water use.

3    And so one has to ask the question, does Flint

4    water use cause something if the prior existence

5    of lead also is documented?  And so, therefore,

6    you have to consider the question of whether it

7    makes it worse or it contributes to causing

8    something.  And, therefore, that is basically what

9    that is all about.

10        Q.   Okay.

11        A.   And it is described in great detail.  I

12   mean, I believe I was careful in describing that.

13        Q.   So what is your opinion about whether

14   incremental exposure via drinking water can cause

15   adverse health effects or cause or exacerbate or

16   contribute to causing those health effects?

17             MR. LANCIOTTI:  Objection; form.

18        A.   Well, I will again preface my answer to

19   your question by saying that that is explicated in

20   the report in great detail, but I'm also happy to

21   also do a kind of an ad-lib approach to that.

22             If a person has some kind of learning

23   disability that predates the onset of Flint water

24   use or has some other condition that predates the

1  onset of Flint water use, and then you add to that

2  the Flint water use, it's very difficult to say

3  that the Flint water use caused something that

4  already existed.  In that case, you can say,

5  perhaps, that the Flint water use exacerbated a

6  condition that was already there.

7           It also may have contributed to causing

8  a condition that has not yet appeared.  Let's say

9  that a person has been exposed to lead and it's

10  documented in their lead levels in the blood, but

11  they don't have learning disability or some kind

12  of neurobehavioral consequence, but they might

13  eventually get one.  And so the role of the

14  exposure to Flint water is to contribute to

15  causing, not uniquely to cause.

16      Q.   Okay.  Thanks for that.

17           I didn't mean to interrupt you.  It

18  looked like you had stopped and completed your

19  answer.  Is that true?

20      A.   Yes.  Yes, it is true.

21      Q.   Okay.  Then down at the end of

22  Paragraph 4, I want to ask you about this.  And

23  I'm just trying to make sure that we know from the

24  outset of the deposition what you will -- what you

1  do not hold opinions about and what you will not

2  be testifying to at the trial, and I think it's

3  summarized here, at least in one area, so let's go

4  through this.

5        You say "I conclude further that lead

6  exposure can cause and/or exacerbate, or

7  contribute to causing and/or exacerbating,

8  numerous adverse health effects, for example,

9  cognitive, behavioral, and other neurological

10  effects.  In view of the general causation of such

11  effects by lead, I leave to the personal

12  physicians of bellwether plaintiffs and of

13  potentially other plaintiffs the determination of

14  Pb, lead, causation/exacerbation via drinking

15  water in their specific cases."

16        What did you mean by that in terms of

17  what opinions you do not hold about specific

18  causation?

19      A.   There is no -- there is no -- first of

20  all, let me preface again by saying this is a

21  summary of subjects that are explicated in great

22  detail later in the report.  And so what I intend

23  or hope -- or assume that I will be asked to

24  testify about is the full scope of that which is

Highly Confidential - Robert Michaels, Ph.D.

1    included in the report, not just in this

2    particular paragraph.  That's just a preface.

3            What I think I'm getting at here is the

4    general causation issue is critical for a

5    physician to conclude that his or her patient has

6    a lead effect.  If lead can't cause those effects,

7    then the patient doesn't have a lead effect.  And

8    so I'm not a clinician, I'm not a physician, and,

9    therefore, the scope of my expertise involves that

10   question of general causation.  I did not examine

11   these plaintiffs, and I would not be qualified to

12   do so, and, therefore, the specific causation is

13   out of the realm of what I can testify about.

14       Q.   Great.  That's what I was trying to get

15   at.

16       A.   Okay.

17       Q.   So, yeah.  Is it correct, therefore,

18   that you do not hold any professional opinions in

19   the subject -- on the subject matter of specific

20   causation with respect to any of the four

21   individual bellwether plaintiffs; is that correct?

22       A.   I think it's --

23            MR. LANCIOTTI:  Objection; form.

24       A.   I think it's more correct to say that

Highly Confidential    Robert Michaels, Ph.D.

1   the focus of my activities in this report is on

2   general causation.  It does not mean that I have

3   opinions on specific causation or that I don't

4   have opinions on specific causation.  These are

5   issues that are beyond the scope of my expertise,

6   and so I exclude from the opinions in my report

7   anything that's beyond the scope of my expertise.

8       Q.    Excellent.

9       A.    Do I have some opinions?  Well, maybe I

10  do and maybe I don't.

11      Q.    I think you're referring to personal

12  opinions.  I'm trying to get to your professional

13  opinions.

14          So just to make sure, you do not hold

15  any professional opinions within the area of your

16  expertise concerning specific causation, that is

17  to say, with respect to the four bellwether

18  plaintiffs, whether any of them -- any of those

19  plaintiffs have sustained any specific injuries or

20  ailments or adverse health effects because of

21  exposure to lead, correct?

22          MR. LANCIOTTI:  Objection; form.

23      A.    Yeah.  I'm -- we're in the realm of an

24  area beyond my expertise, and that area is

1    semantics.  You're making a distinction between

2    personal and professional opinions.  My opinions

3    in this case are all professional opinions.  Some

4    of them are expressed, some of them aren't

5    expressed, and some areas I have more experience

6    and more expertise, and in other areas I have

7    less, and those have been excluded from this

8    report.  I think that's pretty clear.

9         Q.   Right.

10             So you do not hold any professional

11   opinions because they're beyond your expertise

12   concerning specific causation, that is to say,

13   whether any of the individual four bellwether

14   plaintiffs have sustained any particular injury,

15   ailment, or adverse health effect because of lead

16   exposure, right?

17             MR. LANCIOTTI:  Objection; form; asked

18   and answered.

19        A.   Yes.  Asked and answered is a perfect

20   phrase for that.

21             I believe that I have emphasized that my

22   report is silent on that issue because my

23   expertise is -- I'm not able to make professional

24   opinions, as you would call them, on that issue.

```
 1              Do I have opinions?  If I do, those are
 2     professional opinions.  If I don't, that's fine,
 3     too.  But they're not in the report.  They're not
 4     the focus of my activities.  They're not the focus
 5     of my activities because they're not within the
 6     realm of my expertise.
 7         Q.   Okay.  We'll close out of the report for
 8     now.
 9              MR. ROGERS:  And why don't we go ahead
10     and take that first break.  I think this might be
11     a real good time for a quick break.  And I'll
12     figure out what I'm going to turn to next.  So
13     let's take, you know, a short, short break, no
14     more than five minutes.  Okay?
15              VIDEOGRAPHER:  The time is 9:51 a.m.,
16     and we're off the record.
17              (Recess taken.)
18              VIDEOGRAPHER:  The time is 10:00 a.m.,
19     and we're on the record.
20     BY MR. ROGERS:
21         Q.   Okay.  Dr. Michaels, I put up on the
22     screen Exhibit 2, which is your CV, and I want to
23     ask you about the description here in the middle
24     of the page, professional experience, April 1986
```

1    to the present.

2           I note that before -- or you graduated

3    from Stony Brook -- sorry.  Start over again.

4           You got your BS from City College of

5    New York, then you went to University of Georgia

6    for your master's, then you got your Ph.D. at

7    Stony Brook in August of '79.

8           What kind of work did you do in between

9    August 1979 and April 1986 when you started your

10   company, RAM TRAC?

11       A.   When I first graduated from Stony Brook,

12   I had a job as a high school biology teacher in

13   the school that had a premedical program.  And I

14   did that for -- I don't know, I did that for one

15   full year and part of another year.

16          And then I got a job in a consulting

17   firm down in Washington -- well, it was the

18   Beltway -- Rockville, Maryland.  And that was

19   EnviroControl.  It was a consulting firm in

20   Rockville.  I only worked there for about -- under

21   a year because at that time, Anne Gorsuch was the

22   EPA administrator and had gutted all of the

23   projects that I was hired to work on.  And so I

24   think 10 of us were laid off.  I was there less

1    than a year.

2              And then I went to work for the governor

3    of the State of California who had an office

4    called the Office of Appropriate Technology.  That

5    was Jerry Brown.  And I worked there also for

6    under a year.  Jerry Brown, I guess, lost an

7    election, and, anyway, that office was being

8    eliminated.  And so I can't remember the

9    exact years.  I have documentation of the dates if

10   you need it.

11             And then I got a job working for a

12   consulting firm in Long Island called

13   Henderson & Bodwell.  I had a six-month contract

14   with them.  And there, I guess I was trying to get

15   work for them and bring their qualifications up to

16   date, and I also worked on certain projects.  They

17   worked mostly for -- well, it doesn't matter.

18             So then after that -- after that, I got

19   a job for the U.S. Congress, Office of Technology

20   Assessment, working on the decision-making process

21   for the evacuation, later repopulation of

22   Love Canal in New York.

23             And then -- then I had a job in Maine

24   for Envirologic Data, another consulting firm in

Highly Confidential          Robert Michaels, PhD.

1   Portland, Maine.  And I was their chief toxicology

2   consultant.

3        And after that, I had a job with the

4   Natural Resources Defense Council, or NRDC, in

5   New York City as their toxicologist.  And that

6   job -- that job was -- I believe, if I recall

7   correctly, that job was four days a week.  And the

8   extra day -- five days a week -- in that extra

9   day, I was allowed to do private consulting.  And

10  that is how my career as a private consultant got

11  started.  People magically called me up and I got

12  jobs, and I eventually went off on my own.

13       And during this period of time, I had

14  not yet incorporated RAM TRAC.  So that was

15  actually -- the RAM TRAC Corporation activity

16  actually predates April of 1986.  That was the

17  incorporation date.  I don't remember exactly how

18  long I was doing that before the incorporation of

19  RAM TRAC, but I do have those records as well if

20  you need them.

21     Q.   So as of April 1986, at least as of that

22  date, going forward to the present, your

23  employment has been exclusively for RAM TRAC -- or

24  with RAM TRAC?

Highly Confidential - Robert Michaels, Ph.D.

1      A.    Yes.

2      Q.    And tell me the type of consulting work

3    that RAM TRAC has done since 1986, just in general

4    terms.

5      A.    Well, it's been very diverse.

6    Essentially toxicology and health risk assessment,

7    the assessment and the management of risks.  I

8    have worked for a number of public interest

9    organizations, a number of state and federal and

10   local agencies, and I've worked for a good number

11   of Fortune 500 companies.  Those companies have

12   included General Electric, FMC, Monsanto.  The

13   Zinsser; it's a national paint company.  There was

14   the National Coal Association.  Inter-Power of

15   New York.  Lots of hospitals.  The Rhode Island

16   Department of Environmental Management.  Many,

17   many different roles.

18     Q.    At what point in time did you start

19   doing any consulting with lawyers?

20     A.    You know, there were always lawyers

21   involved.  I don't know.  I would say from day one

22   probably.  I was not primarily asked to be an

23   expert witness, but I was increasingly asked to be

24   an expert witness as time went on and my

1    reputation was probably expanded.  I've always

2    worked with lawyers, I guess.

3         Q.   Do you work with both plaintiffs' and

4    defendants' lawyers?

5         A.   Absolutely.  That's a big part of my

6    practice, to work on either side.  The only thing

7    I require is to be allowed to do an objective

8    analysis.

9         Q.   Do you have any estimates in terms of

10   the breakdown over, let's say, like, the last

11   five years, plaintiffs versus defendants?

12        A.   I don't have a breakdown of revenue, and

13   I don't have a breakdown of time.  I don't have a

14   breakdown of the number of clients.  But I will

15   say that I have adequately represented both sides

16   during the last five years and during my entire

17   career.  And, you know, during the last

18   five years, for example, I've had the Anschutz,

19   international oil exploration company, as a client

20   in a case in western New York.  That was a big

21   case, a billion-dollar case.  And that, I believe,

22   was the last time I had a deposition.  That was in

23   Washington, D.C.

24             But, no, I've worked on both sides.

Highly Confidential          Robert Michaels, Ph.D.

```
 1        Q.    Have you worked with Mr. Lanciotti's
 2   firm, the Napoli law firm, before?
 3        A.    No.
 4        Q.    Have you ever worked with Mr. Stern's
 5   firm, the Levy Konigsberg firm, before?
 6        A.    No.
 7        Q.    Do you know how it is that they came to
 8   ask you to work with them on the case, if it was a
 9   referral or anything like that, do you know?
10              MR. LANCIOTTI:  Objection; form.
11        A.    I don't know the answer to that.  I have
12   a suspicion that it had something to do with being
13   invited by the New York State Bar Association to
14   make a presentation in New York City at the end of
15   January in 2020.  I was told it was a good
16   presentation, and there were a number of people
17   interested in me as a result.
18        Q.    What was that presentation about?
19        A.    Emerging issues in toxic substances that
20   might be of interest to lawyers.
21        Q.    Did it include lead?
22        A.    It included lead, yes, absolutely.  Yes.
23        Q.    Is there -- do you have a written --
24   written materials that were -- that you used or a
```

1    PowerPoint presentation or anything like that

2    concerning that presentation?

3         A.   I do.  It is on ResearchGate.  You can

4    gain access at no charge to anything of mine --

5    almost anything of mine on ResearchGate.  And that

6    presentation is among those.

7         Q.   Okay.  I honestly haven't heard of that

8    entity or that thing before, ResearchGate.

9              What is that?

10        A.   Well, I guess it's a social media kind

11   of a thing, but it's for researchers.  It's for

12   people who are in academia and for people who are

13   in research of various kinds, consulting or

14   whatever.  I think it is heavily weighted toward

15   academia.  It's an international organization.

16   You can see that on the page that you're

17   displaying, there are ResearchGate statistics as

18   of the 6th of August in 2020.  Those reflect the

19   ratings that I've received by ResearchGate.  And I

20   put them on there because, number one, they're

21   good, and, number two, they're widely accepted.

22   I'm actually a little surprised that there are any

23   lawyers who haven't heard of it.

24              But in any case, that is -- it's

1    ResearchGate.org, I think.

2         Q.    Okay.  So you're saying anybody could go

3    on ResearchGate.org and just input your name and

4    there's a bunch of papers and presentations and

5    stuff on that site that you've authored?

6         A.    Yes.  As of the 6th, you can see there

7    were 96 research items.

8         Q.    I see.

9              Okay.  Is this something that you submit

10   your papers to this website, or do they solicit

11   them, or how does that work?

12        A.    My papers are generally published in

13   journals, but I can submit anything I want to

14   ResearchGate.  And I have submitted some newspaper

15   letters to the editor to ResearchGate on the --

16   one case, on the COVID-19 epidemic.  I think I

17   might have submitted one or two.  On PCB dredging

18   in the Hudson River, there I had -- in addition to

19   a good publication record in journals, I've had

20   some letters published because my opinions locally

21   are very influential on PCB dredging.

22              If you publish something in a way that

23   you might call self-publishing, you can put it on

24   ResearchGate, anything you want.

```
1        Q.   Is there any type of screening or, you

2    know, review process before ResearchGate actually

3    accepts and puts the publications or the papers on

4    the website, do you know?

5        A.   I don't believe there's anything like

6    that.  I know they ask you if you're the author,

7    or they ask other people if you are the author, if

8    they know.  So there are some minor controls on

9    that, but it's really not controlled very well.

10       Q.   Well, I would hope so, that they know

11   who the author is.

12       A.   Right.  This is -- this is a repository

13   of information that generally comes from other

14   sources where those kinds of controls are

15   stringent.

16       Q.   Can you describe to me any work that

17   you've done in the past -- and I'll take the CV

18   down now and stop the screen share -- on issues --

19   similar issues as you've worked on in this case,

20   that is to say, studying populations for lead

21   exposure and suspected lead poisoning from

22   whatever source during your career since 1986?

23       A.   Well, I've had a lot of experience with

24   lead.  And one reason for that experience is, as I
```

1    said, I worked a lot of hospitals, and some of

2    them have hospital incinerators.  And one of the

3    issues always is what's coming out of the stack,

4    and lead is one of the things that has a low

5    melting and evaporation point and comes out of the

6    stack.

7              And so the question of exposure to lead

8    and toxic effects potentially caused by lead is

9    something that I've dealt with for a very long

10   time.

11             When I was at NRDC, I guess I had dealt

12   with it even before I had my own personal

13   consulting firm.  And one of the first experiences

14   I had, actually, was on the news --

15   Peter Jennings' news when the EPA changed its

16   standard from 25 to 15 parts per billion in water

17   and they interviewed me about that.

18             So this was something that began very

19   early in my career dealing with lead and

20   continue -- continued all the time.  I guess I had

21   another one the last several years involving

22   remediation of apartments, you know, hazards and

23   so on, where the lead is in the paint, and so

24   there are guidelines for workers doing that work.

1    And so I had one or two jobs in that area.

2            I had another job, which was

3    interesting, for the Army.  The Plattsburgh

4    Air Force base had on it an Army firing range, and

5    somehow, often these things when they're closed

6    down, they -- I can't explain it, but they go to

7    elementary schools.  And so there was a berm where

8    the kids were playing outside of their elementary

9    school, and every so often, one of the kids would

10   find a bullet, which contains lead, and some of

11   them would put it in their mouths.  So I did an

12   analysis for the Army -- well, I mean, I was

13   subcontracting, but I did the analysis for the

14   Army of what were the risks associated with the

15   lead bullets that were found.

16           So I've had a lot of experience with

17   this substance -- with this group of substances.

18   That's enough said for now.  That's what comes to

19   mind.

20           Oh, well, as I -- I mentioned also --

21   yes, I mentioned also this international oil

22   exploration oil company called Anschutz.  The job

23   I had for them out in western New York involved

24   lead as well because people were experiencing foul

1    water in their homes, and the lead was one of the

2    substances in their water.  And so again I dealt

3    with lead in that context as well.

4            So I'm sure I could come up with more

5    than that, but that's what comes to mind now.

6        Q.   Okay.  Thanks.

7            I think you were describing your

8    experience with lead issues in general.  Let me

9    focus on water.

10           Have you done work in the past, before

11   this case, involving issues surrounding lead in

12   water and exposure to populations due to water

13   being the source of lead?

14       A.   Well, as I said, the Anschutz case

15   involved people's water because it had lead in it.

16   And when I do an assessment of an incinerator, for

17   example, let's say a hospital incinerator, there

18   are several sources of lead.  It comes out of the

19   stack, but it comes down to the ground and it runs

20   off into bodies of water.  And so that becomes an

21   issue as well in those contexts.

22           And so in my reports, I generally dealt

23   with the question of lead in water as well.

24       Q.   Okay.  So besides the Anschutz -- well,

1    tell me a little bit more about that Anschutz

2    evaluation that you did.  What were the

3    circumstances and what was your actual work?

4         A.   Well, out in western New York -- and I

5    can't remember the name of the town -- there were

6    a group of homes that were in an area where the

7    Anschutz company was exploring for oil.  We're not

8    allowed to do fracking, but they were allowed to

9    do drilling downward and horizontally.  And there

10   were a couple of wells where they did that.  And

11   there were -- there was an association made by

12   these residents of the activities of Anschutz and

13   the quality of their home drinking water.  And I

14   evaluated that evidence and was -- I wrote a

15   report about it and was deposed on it.  And that's

16   the context.

17        Q.   Okay.  Have you ever worked on a

18   project, whether it be in litigation or not

19   litigation, involving the evaluation of a town or

20   municipality's or a city's water supply for lead

21   and the potential for its -- people who drink the

22   water to be exposed to lead?

23        A.   Well, if you're suggesting a case

24   involving -- or a project involving the water

Highly Confidential      Robert Michaels, Ph.D.

1   supply without some kind of contributing factor, I

2   don't remember right now one that just involves

3   the question of lead in the water.  But, of

4   course, in all of these cases where there were

5   incinerators involved, the water supply is exactly

6   what is at issue -- one of the things that is at

7   issue.

8           So, again, we're getting into the

9   semantic realm where, yes, I have dealt with it,

10  but usually in the context of some kind of an

11  industrial facility being located there.  And

12  sometimes I've involved myself -- landfills, I've

13  been involved in a number of landfills, including,

14  as you know, Love Canal, and lead has been an

15  issue in many of those cases.  And, again, with

16  runoff from the land, water supplies, whether in

17  wells or public water supplies, public wells or

18  public nonwell water supplies, those are issues as

19  well.

20          So lead is a pretty pervasive issue.

21  I've been involved with it for a long time, and in

22  the context that you've asked me about, I believe.

23      Q.   Okay.  Have you ever worked on any

24  projects or any lawsuits in the past, involving

1  issues of lead exposure in water supplies of

2  municipalities or towns or whatever, where the

3  source of the lead was suspected to be or turned

4  out to be from the system itself, that is, lead

5  pipes in the system?

6          MR. LANCIOTTI:  Objection; form.

7     A.   Well, I don't have any control over who

8  suspects what.  When I answered the question, I am

9  sure that, you know, all kinds of things were

10 suspected.  I'm generally involved in a particular

11 source, landfill or incinerator or some kind of

12 industrial facility.

13          I don't recall offhand somebody calling

14 me up and saying, "Well, you know, somebody's

15 complaining about the lead in the pipes."  So I --

16 I don't recall something like that right now.

17    Q.   So other than the -- your work on this

18 case, the Flint water litigation and the Flint

19 cases, you don't have a memory of ever having

20 worked on a project, whether it be litigation

21 related or not, involving lead getting into the

22 water supply due to some components of the water

23 supply system?

24          MR. LANCIOTTI:  Objection; form.

1      A.   Again, I find it very hard to

2    categorically rule out what you're suggesting

3    because there is an interaction between the water

4    and the water supply pipes and so on, and so there

5    is always the concern that that's a contributor.

6    But if you're asking about what I think you were

7    asking about before and the way I answered it was

8    adequate, I think, that I don't remember a town

9    calling me up and saying, "Gee, we have people

10   worried about the lead in the water pipes right

11   now."

12     Q.   Yeah, I don't -- I don't know why it is

13   that you're having trouble understanding my

14   questions.  Perhaps I'm not being specific enough.

15        But I'm simply asking whether you've

16   ever worked on a project, whether it be a private

17   project or you've worked on a case -- a litigation

18   case -- involving -- where your work involved an

19   analysis of whether components of the water

20   distribution system, the pipes, essentially, were

21   contributing lead into the water supply.  That's

22   as simple as I can make it.

23        MR. LANCIOTTI:  Objection; form.

24     A.   I don't recall such a case right now

Highly Confidential     Robert Michaels, Ph.D.

1  except insofar as I've parsed your question in

2  ways that you aren't happy with, but I -- other

3  than that, I believe I don't remember a case like

4  that --

5       Q.   Can you --

6       A.   -- or a project.

7       Q.   Yeah, thank you.

8            So the question did include projects, so

9  I wasn't referring to just litigation, but your

10 answer included projects or work that you did and

11 litigation cases, right?

12      A.   Yes.  To the best of my recollection

13 now.

14      Q.   All right.  What are the primary sources

15 of lead in children in the United States?

16           MR. LANCIOTTI:  Objection; form;

17 foundation.

18      A.   Well, there are lots of different

19 sources.  And the importance of those sources

20 probably varies geographically and also culturally

21 by the age of the kids and by the economic -- the

22 socioeconomic status of the kids.  I believe I

23 cited an article like that.

24           But one can talk about water; one can

1    talk about air; one can talk about, you know,

2    hunting and fishing with lead bullets and lead

3    sinkers and so on; one can talk about lead in the

4    flesh of fish or hunted birds who might be eating

5    fish that had swallowed some of these lead

6    sinkers, for example.  There are many different

7    sources.

8         Q.   How about dust?

9         A.   Dust, of course, yes.

10        Q.   Paint?

11        A.   Paint.  And that was one of the projects

12   that I did mention to you about the Zinsser paint

13   company that was -- I did a couple of projects for

14   them.  And lead, of course, was an issue in their

15   paint.

16        Q.   Soil?

17        A.   Soil, sure.

18        Q.   And you mentioned air.  What did you

19   mean by air as being a source for lead?

20        A.   Well, I don't mean that it's the primary

21   source.  What I mean is it's the vehicle, that if

22   you have a stack that is emitting combustion

23   products, that can include lead and it goes into

24   the water.  Then you have the question of how much

1  is in the air, how long does it stay in the air,

2  and if it's raining, then it comes down to the

3  ground very quickly.  And where does it go?  It

4  goes into the water systems; it goes into the

5  soil.

6          All of that -- all of those are sources

7  of lead.

8      Q.   You mentioned it varies depending upon

9  location.  I think you mentioned urban versus

10  other environments, socioeconomic status.

11          Could you explain what you meant by

12  those references?

13          MR. LANCIOTTI:  Objection; form.

14      A.   Well, if you don't live near an

15  incinerator, you're less likely to get exposed

16  through that source.  That's the kind of thing I

17  mean.

18      Q.   What did you mean by "socioeconomic

19  status"?

20      A.   Well, if your community is in a place

21  that has a lot of industrial facilities, you're

22  more likely to get exposed in such contexts than

23  if you live in Scarsdale, New York, for example,

24  where there aren't any facilities like that.

1          So socioeconomic status is very

2    important.

3          Q.   Yep.

4          Okay.  Before I forget, I believe that

5    you have in your report a disclosure that you have

6    not testified in any deposition or any trial in

7    the last four years.

8          Is that accurate?

9          A.   I believe it's accurate.  I checked my

10   records, and I don't think there was anything.

11   The Anschutz one, I believe, was the most recent

12   one.  It must have been more than four years ago,

13   though.

14         Q.   Yeah.  Where was that case pending?  You

15   said western New York.  Was that where the case

16   was pending?

17         A.   I -- again, if you need that, I can look

18   it up, but I don't know.  I mean, I was deposed in

19   Washington by a Washington D.C. law firm.

20         Q.   Okay.  Do you know if it was in the

21   federal or the state court?

22         A.   Again, I could look it up, but I don't

23   recall.

24         Q.   You did not personally do any

Highly Confidential - Robert Michaels, Ph.D.

1    inspections of the bellwethers' homes?  And for

2    purposes of -- well, let me ask about all of them.

3              You haven't done any inspections

4    yourself of any of the bellwethers' homes that

5    would include all 14?

6              MR. LANCIOTTI:  Objection; form.

7         A.   No.  I believe I'm supposed to testify

8    about the four selected bellwether plaintiffs, and

9    I will say that I have not.

10        Q.   Same for all 14?

11        A.   If it's okay to say that, yes, the same

12   for all 14.

13        Q.   Have you reviewed -- have you been

14   provided with any information related to

15   inspections of any of the bellwethers' homes or

16   residences or houses for lead content in the dust,

17   paint, soil, et cetera?

18        A.   I would have to look it up and see what

19   I have, but I got a lot of information about some

20   water testing, some -- some pipe replacements.

21   Inspections of pipes followed, in some cases, by

22   replacement of pipes.  Again, I'd have to look it

23   up.  I don't recall.

24        Q.   I didn't see -- yeah, I didn't see in

Highly Confidential - Robert Michaels, Ph.D.

 1    your report.  What I'm referring to is actually

 2    there were some house inspections done, and some

 3    data was provided about samples that were tested

 4    for dust and sample paint chips and things like

 5    that, and dust -- I'm sorry -- lead content of the

 6    soil.

 7          You haven't seen anything like that with

 8    respect to any of the bellwethers' houses; is that

 9    right?

10    A.    Well, I know that this may seem like

11    quibbling, but I don't know what I've seen.  I

12    know that if I haven't cited it, my report did not

13    rely on it.  And maybe I did see such reports,

14    maybe I didn't.  I don't remember.

15    Q.    For purposes of analyzing or evaluating

16    the sources of lead for any individual person such

17    as the four bellwethers, wouldn't that be

18    information that would be important as part of

19    that analysis, that is, lead that exists in the

20    environment of the homes in which they live?

21          MR. LANCIOTTI:  Objection; form.

22          Dave, you're trying to limit this

23    expert's testimony on home inspections that were

24    performed after his report was submitted.

1     Q.   Go ahead, sir.

2     A.   I don't understand your question.  Can

3  you repeat it.

4     Q.   Isn't it important when doing an

5  evaluation or analysis of the sources for lead for

6  any individual person that information about lead

7  in the individual's residence and the environment

8  in which they live, that is, dust, soil, paint,

9  and things like that, important to conduct such an

10  analysis?

11         MR. LANCIOTTI:  Same objection.

12     A.   Well, I was doing an analysis of the

13  impact of lead in the drinking water.  I was not

14  doing an analysis on, you know, breaking down the

15  various sources.

16         As I've said before and acknowledged

17  before, some of those lead levels appeared even

18  before the use of Flint River.  So I am aware that

19  exposure to lead occurs, and I've said

20  unambiguously that everyone has exposure to lead.

21  But I've tried to be very clear about the fact

22  that I'm looking at water in people's homes.  I'm

23  looking at water in people's schools.  I'm looking

24  at -- you know, if they go visiting to their

1   friends or they go visiting to their relatives, if

2   they have exposure to lead in Flint water.  I know

3   for sure that they have other exposure, even

4   though I haven't analyzed each one of them.

5       Q.   Is it correct that up until the present

6   time, you have not undertaken an analysis to

7   determine the extent to which lead in the dust,

8   paint, or soil of any of the bellwethers' homes

9   contributed to any of the lead that they were

10   exposed to?  Is that right?

11          MR. LANCIOTTI:  Objection; form;

12   foundation.

13       A.   I believe that there is a grain of truth

14   to what you say, but if you look at one of the

15   tables that I provided -- one of the figures that

16   I provided by Hanna-Attisha, et al., there was a

17   distinct spike in blood lead levels that was

18   documented after the Flint water supply was

19   changed to the Flint River, and that does strongly

20   imply that the source of lead predominantly was

21   the Flint River.  And so to that extent, I

22   certainly have ruled out everything else as

23   being -- that's the only thing that would change,

24   as far as I know.  And so to that extent, I have

1  examined that issue.  But if you're asking have I

2  listed the sources and written down what percent

3  of total exposure comes from that source, no, I

4  have not.

5      Q.   Okay.  You said that there was a grain

6  of truth in what I said.  I'm just trying to ask

7  the question in a way that I could get a pretty

8  straightforward answer from you, and I'll -- so

9  I'll try it again.

10          The question is:  Have you done an

11 evaluation or an analysis with respect to the four

12 bellwethers to determine the extent to which lead

13 in the dust, in the soil, or in the paint of the

14 homes in which they live contributed to their lead

15 exposure?

16      A.   And I believe I've answered that

17 question --

18          MR. LANCIOTTI:  Object to form.

19      A.   -- exactly, which is that I have made

20 inferences about, you know, basically putting

21 limits on that by showing that before and after

22 the Flint River began to be used as a water

23 supply, the fraction of children who had elevated

24 lead levels increased.  And it increased

Highly Confidential - Robert Michaels, Ph.D.

1  geographically in relation to the specific water

2  content of lead, and, therefore, there are limits

3  to which you can attribute such exposure to other

4  sources.

5          Have I -- and as I also said, have I

6  added each one up and written down a percent of

7  how much is in that source?  No, I have not done

8  that.  And that's the grain of truth, I have not

9  done that.

10      Q.   You mentioned limits.

11          What are the limits?

12      A.   They're not quantitative limits.

13  Perhaps I misspoke in calling it limits.

14          What I'm saying is that when kids' blood

15  lead levels respond after a switch of water

16  supply, it's very difficult to attribute that

17  spike to something else.  So there are limits to

18  which you can do that scientifically.  It's not

19  reasonable.

20          As I've also said, there are other

21  sources of lead.  Every kid, four bellwether

22  plaintiffs, every kid in Flint, every adult, has

23  exposure to lead from these other sources.  I've

24  said that, and I've acknowledged that.  Have I

Highly Confidential       Robert Michaels, Ph.D.

1  written down what are those sources and what is

2  the percent contribution of each of those sources?

3  No, I have not.  And I think that my answer has

4  been very clear as well, at least as clear as you

5  think your question was.

6      Q.   Let me ask you some questions about

7  blood lead levels.

8           What constitutes a blood lead level that

9  would be significant from a toxicological

10  perspective?

11      A.   Any elevation --

12           MR. STERN:  Object to form.

13      A.   Any amount of lead can be potentially

14  significant.

15      Q.   How so?  Can you explain?

16      A.   Well, in toxicology, we use something

17  called a dose-response curve, and I've depicted

18  one in one of the figures in my report.  And as

19  the concentration or exposure to lead declines,

20  the response declines, both in terms of the

21  severity of the response, the amount of time it

22  takes for the response to occur, all kinds of

23  characteristics of the response change and decline

24  with declining lead content.

1              Now, with most substances, possibly
2    including lead, there is a point called the
3    threshold below which nothing happens.  And so the
4    dose-response curve cannot always be assumed to be
5    smooth and to gradually decline.  But in the case
6    of lead, no such threshold has been discerned, and
7    multiple studies of high credibility that I have
8    cited have reported that, and that effectively --
9    I believe the word was "effectively" -- no
10   threshold has been observed.  And in that
11   situation, we have a gradual decline, not -- so
12   you don't have a bright yellow line or a bright
13   line point when lead becomes significant or when
14   it does not.

15              I will tell you that we had a case in
16   New York decades ago where a toxicologically
17   insignificant amount of plutonium was found in the
18   New York City water supply.  Is that
19   toxicologically significant?  Well, one molecule
20   can't produce any effect, but is it significant?
21   Well, how the hell did it get there?  I think
22   that's very significant.  And the city took it
23   very seriously and so did the EPA and beyond.
24              And so, again, if you're talking about

1    toxicological significance, you have a wide range

2    of things to be talking about.

3        Q.   Where did -- I'm just curious.  Was it

4    ever discovered where the plutonium came from?

5        A.   I don't know.  I believe it was in one

6    of the upstate reservoirs.  How did it get there?

7    I don't know.  All I know now is if you feel like

8    going fishing at one of those reservoirs, don't,

9    because you'll be shot, probably with a bullet

10   containing lead.

11          So, yeah, I -- I don't know what the

12   answer to that is, but it was a historic event.

13   And it's the kind of thing that you don't find a

14   lot of plutonium in nature.

15          I'm raising this only because of its

16   relevance to Flint.  Kids who have exposure to

17   lead at a particular level that's measured in

18   their blood have a marker of exposure.  But how

19   quantitatively important is that marker?

20          Well, it could be very important.  It

21   could be of no importance.  It could be a

22   transitory thing that, you know, the kid licked

23   something that had lead on it and then it produced

24   a transitory response.

1           We have reasons to believe that that's

2    not the case.  I have reasons to believe that

3    that's not the case.  But the testing for lead in

4    these kids has been very sparse, and some of it

5    has come after the period of Flint water use.

6        Q.    Okay.  Thanks for that.

7           In terms of your field of toxicology,

8    has the scientific community of toxicologists or

9    within the field of toxicology established any

10   standards with respect to blood lead levels for

11   lead?

12          MR. LANCIOTTI:  Object to form.

13       A.    There are some standards or recommended

14   points, 5 microgram per deciliter does tend to be

15   a marker, after which the kids are thought to be

16   impacted by lead, possibly in clinically

17   significant ways requiring treatment.

18          If you -- I've published in my report a

19   distribution of lead levels in kids.  I believe

20   that the 5 microgram per deciliter number

21   corresponds to something like the 97.5 percentile.

22   And the kids' lead levels that we see

23   predominantly have been falling a little lower

24   than that into some higher percentile as well.

Highly Confidential - Robert Michaels, Ph.D.

1    But as I say, there's been very little testing for

2    lead.

3         Q.   You used the term "marker" a couple of

4    times.

5              What does that term mean in the field of

6    toxicology with respect to lead levels?

7         A.   An indicator.  Indicator of exposure.

8    There are markers of effect, markers of exposure,

9    all kinds of markers.

10        Q.   Okay.  So what's the source of the

11   standard of 5 micrograms per deciliter in the

12   field of toxicology for blood lead level?

13        A.   I believe that's the Centers for Disease

14   Control.

15        Q.   And what -- do you -- why do you

16   consider it to be 5 micrograms per deciliter as a

17   significant standard for blood lead levels in the

18   field of toxicology?

19             MR. LANCIOTTI:  Object to form.

20        A.   I don't think that I do.  I said that I

21   don't.  I said there are significance of any

22   elevation of lead or any lead, actually, at all in

23   kids, that you have a gradual decline of effect in

24   accordance with the dose-response curve.  And so

Highly Confidential   Robert Michaels, PhD.

```
 1    these are -- these standards, as you call them --
 2    and I don't know if that's the technical legal
 3    term for it, but these benchmarks, is I would call
 4    it, are, in part, based on practicality.  You have
 5    the testing program, and if kids turn out in a
 6    certain way, you may want to test them again, and
 7    if they turn out that way again, you may want to
 8    treat them, that sort of thing.  And I guess if
 9    you spoke with a physician, they would know more
10    about that particular procedure than I would know.
11            From a toxicology point of view, the
12    appearance of lead is a marker of concern at the
13    very least, and the kids who have such markers and
14    become plaintiffs in a case like this are not your
15    average kid.  You don't just take an average kid
16    with a net and pull them in and say, "All right,
17    what's your lead level?"  The people who become
18    plaintiffs are a nonrandom selection of the
19    population, and typically they also have some kind
20    of elevation of lead.
21            I think what's more significant and more
22    probative is this -- is the elevation of lead that
23    they have found in their bone tissue, which
24    indicates very significant exposure to lead.  That
```

Highly Confidential - Robert Michaels, Ph.D.

1    is more indicative of long-term exposure.  The

2    blood tests have been very far between and very

3    sparse.

4         Q.   That's my next series of questions you

5    anticipated, bone lead scans.

6              Prior to your work as a consultant in

7    these cases, the Flint water cases, have you ever

8    in any of your other lead work reviewed bone lead

9    scan test reports?

10        A.   I don't recall doing so.  Probably not.

11        Q.   To your knowledge, is there any standard

12   in the field of toxicology about a bone lead

13   measurement or amount or content that would be

14   significant from a toxicological perspective?

15             MR. LANCIOTTI:  Object to form.

16        A.   Well, I have stated the standards or

17   benchmarks in my report, anything over 10 being

18   significant and anything, I believe, over 20 was

19   very intense exposure over a chronic period of

20   time.  That is not the same as your question of

21   what is significant.  In my view, what is

22   significant is when these numbers are elevated,

23   and if you have lead in somebody's bone, that is a

24   matter of some concern, especially if they're

Highly Confidential - Robert Michaels, Ph.D.

1    young children.

2              Now, these bone scans were done in 2019,

3    and in one case, in 2020, years after the

4    experience of Flint River use.  And so there was a

5    lot of time after that for these numbers to

6    decline.

7              And so the numbers we see extrapolated

8    back to what they might have been during 2014 to

9    '15, that would suggest to me very significant

10   exposure to lead.

11        Q.   Okay.  I haven't seen any calculations

12   or anything in your report where you did any

13   analysis or extrapolation back, as you just

14   described.  Am I right, that you have not done any

15   such work for bone --

16        A.   Yes, I --

17              MR. LANCIOTTI:  Object to form.

18              Go ahead.

19        A.   No, you are correct, that I did not.  I

20   did not try to infer what those numbers were in

21   the past.

22        Q.   Okay.  And the references to

23   10 micrograms per gram and 20 micrograms per gram

24   of bone lead as having some significance from a

1    toxicological perspective, from where did you

2    derive those numbers?

3              MR. LANCIOTTI:  Object to form.

4         A.   I believe I was just quoting the

5    information source that I received giving the

6    result of the bone scan with a reference range.

7         Q.   Right.

8              Have you read Dr. Aaron Specht's

9    deposition transcript?

10        A.   No.

11        Q.   Are you aware of the fact that he

12   withdrew -- or in his testimony, he said that

13   those reference values were not supposed to be

14   included on the reports and that they had no

15   relevance for purposes of his analysis?

16             MR. LANCIOTTI:  Object to form;

17   foundation.

18        A.   No.  I'm certainly unaware of that.

19        Q.   So apart from those reference values

20   that you derived from Dr. -- the bone lead scan

21   test reports themselves, you were not aware of any

22   other recognized standards for significance of

23   bone lead measurements, correct?

24        A.   Only to the extent that I've cited them

1    in the report.  I don't recall what I cited in

2    there.  I'd have to look.

3        Q.   All right.  In terms of your work on the

4    case or your preparation, I don't remember asking

5    you this question directly so I'll ask it now, but

6    I don't think you mentioned it.

7             Have you ever had any conversations, not

8    with the lawyers but with other experts retained

9    for the plaintiffs in the cases as part of your

10   work in the case?

11       A.   No.

12       Q.   Have you received any of the other

13   expert reports from the plaintiffs' team or group

14   of experts in your work on the case?

15       A.   No, I have not, but I did receive four

16   reports yesterday.

17       Q.   What were they?  Which ones were they?

18       A.   Those were the -- how do you pronounce

19   that doctor who you're going to depose -- I don't

20   remember how you pronounce it.

21       Q.   Bithoney?

22       A.   Yes.  I received four reports relating

23   to each of the four plaintiffs -- bellwether

24   plaintiffs.

Highly Confidential - Robert Michaels, Ph.D.

```
 1       Q.   I see.

 2            Okay.  So apart from the reports from

 3  Dr. Bithoney, you have not received any other

 4  expert reports from any of the other plaintiffs'

 5  experts; is that correct?

 6       A.   Well, no, it's not really correct.  I've

 7  talked to you about the reports that I've received

 8  and have cited here, including physicians'

 9  reports, medical records, and summaries of medical

10  records.  Everything that I've received and looked

11  at has been cited in here.  I believe that's the

12  best source of information.  My memory is not the

13  best source.

14       Q.   Okay.  We're going to go through that in

15  a little bit.

16            So other than the Dr. Bithoney reports,

17  you don't recall having received any other reports

18  or, for that matter -- sorry.  Bad question.

19  Strike the question.

20            Have you reviewed any deposition

21  transcripts of any expert depositions that have

22  been taken in the case?

23       A.   No.

24       Q.   And apart from the deposition
```

Highly Confidential - Robert Michaels, Ph.D.

1    transcripts for the parents of the bellwether

2    plaintiffs, have you reviewed any other deposition

3    transcripts of any other witnesses in the case at

4    all?

5         A.   Anything that I've reviewed is in here.

6    I don't believe there was anything like that.  I

7    don't remember anything else like that.  But, as I

8    said, the definitive answer is in the "Literature

9    Cited" section.

10        Q.   You didn't do any independent interviews

11   of any of the bellwether plaintiffs or their

12   parents, did you?

13        A.   No.

14        Q.   Were you provided with all of the

15   bellwether plaintiffs' blood lead level testing,

16   to your knowledge?

17        A.   I believe that I have not.  There was

18   one reference to a blood lead value that was not

19   provided that I recall.  I don't have any way of

20   knowing about the word "all" other than that.

21   I've received what I believe to be all of the

22   available tests.

23        Q.   Just to make sure, you have not received

24   Dr. Krisztian's deposition, right?

```
1        A.    I believe not.  If it's not in the -- in
2   the literature cited, I would say that I have not.
3        Q.    Yeah.  And it took place after your
4   report, so it would be later.
5              Dr. Specht's deposition, you already
6   said you haven't received or reviewed that, right?
7        A.    Right.
8        Q.    There's another expert.  I believe I'm
9   pronouncing his name correctly, Dr. Graziano, for
10  the plaintiffs.  He's an epidemiologist.
11             Have you reviewed his deposition
12  transcript in the case?
13       A.    No.
14       Q.    All right.
15             MR. ROGERS:  So it's about 11:00 -- a
16  little before 11:00.  Probably a good time for a
17  quick break because I'm going to go into a
18  different line of questioning right now.  It's,
19  you know, 10:53 or so.  Why don't we break until
20  11:05, if that's okay with everybody, and we'll
21  pick up then.  Is that good?
22             VIDEOGRAPHER:  The time is 10:53 a.m.,
23  and we're off the record.
24             (Recess taken.)
```

Highly Confidential - Robert Michaels, Ph.D.

```
1              VIDEOGRAPHER:  The time is 11:06 a.m.,
2    and we're on the record.
3    BY MR. ROGERS:
4        Q.   Okay.  Dr. Michaels, I want to ask you
5    some questions about some information specific to
6    the four bellwether plaintiffs, S█PPI███, T█PPI█,
7    V█PPI█████, and W█PPI█.  And I'm going to share my
8    screen and show you some things so that you can
9    see them.  Let me start with that.
10                       - - -
11             (Michaels Exhibit 5 marked.)
12                       - - -
13   BY MR. ROGERS:
14       Q.   Okay.  The first is with respect to
15   blood lead levels for E█PPI█ S█PPI███.  And this is
16   now Exhibit 5.  It's a blood lead level test
17   from -- let's see -- see in the upper right-hand
18   corner here where my cursor is -- I'll highlight
19   it for you -- February 16, 2016, and it has blood
20   lead measurements of less than 3 micrograms per
21   deciliter, right?
22       A.   Yes, I see that.
23       Q.   I think you mentioned this in your
24   report, but this is obviously after the switchover
```

Highly Confidential       Robert Michaels, Ph.D.

1    back to Detroit water which occurred in

2    October 2015 or so, right?

3           MR. LANCIOTTI:  Object to form and

4    foundation.

5       Q.   Did you answer my question, Doctor?  I

6    don't know if I heard an answer.

7       A.   Let me turn the air conditioner off.  I

8    don't think I heard your question.

9       Q.   I was just trying to establish that this

10   blood lead level test that you see here as

11   Exhibit 5 of less than 3 micrograms per

12   deciliter -- less than 3.3, I should say -- the

13   date being February 16, 2016, that was after the

14   Flint water supply was changed back to the Detroit

15   Lake Huron water, right?

16      A.   Correct.

17          MR. LANCIOTTI:  Object to form and

18   foundation.

19      Q.   So did -- as part of your work, did you

20   ever undertake an analysis to determine what the

21   mean or average blood lead levels were for

22   children in E PPI  S PPI      s age group as of this

23   period of time?

24      A.   I believe I published something like

1    that in the report, and I also believe that the

2    average number that I've read in the past -- and I

3    can't remember where I've read this -- would be

4    about 1 microgram per deciliter.  And I think it's

5    fair to say that in this type of a test -- can you

6    scroll down on that so I can see?

7              This was a capillary blood draw.  These

8    are these quick tests that have a very high limit

9    of detection.  So 3.3, in my mind, is not really a

10   probative nondetect, because the state-of-the-art

11   technology would be more like 0.1 microgram per

12   deciliter.  And if you look at the bellwether

13   plaintiff blood lead levels that have been

14   positive, they tend to be less than 3 or 3.3.  So

15   if those quick tests were undertaken for those

16   children who had a positive result, they also

17   would be reported as negative even though, in

18   reality, they're not negative, meaning not found.

19             And so I don't consider that a probative

20   test in any case.

21        Q.   Are you aware of any water lead level

22   testing done on any of the homes that E▇PPI▇ S▇PPI▇▇

23   lived in?

24        A.   Well, if I am, it's in the report.  I

1    don't recall.  I'd have to look it up.

2         Q.   You don't have anything in the report

3    about it; I can tell you that.

4              So as you're testifying, though, you're

5    not aware of any, right?

6         A.   As I'm testifying --

7              MR. LANCIOTTI:  Object to form and

8    foundation.

9         Q.   Do you know what the service lines were

10   into any -- comprised of, composed of, as to any

11   of the residences where E███ S███   lived?

12        A.   You know, I don't recall, and so I have

13   reported on that issue in the report, and that's

14   where I would refer you to that.

15        Q.   Well, let's go over a few basics.

16             So you have the -- as of the time of the

17   switchover from Detroit Lake Huron water to

18   Flint River water, which occurred in April 2014 --

19   April 25th or thereabouts, right?

20        A.   Correct.

21        Q.   So you have the water treatment plant,

22   and then the water after leaving the plant flows

23   through pipes.  And then from those pipes, there

24   are service lines leading into individual

Highly Confidential     Robert Michaels, Ph.D.

1    residences throughout the city, right?

2         A.   I assume so.  I did not look into the

3    actual flow pattern.

4         Q.   And are you aware that the City of Flint

5    through something called the FAST program, or the

6    FAST Start program, undertook inspections,

7    excavations, and replacement of some pipes

8    throughout the city, of service lines?

9         A.   Yes, I am aware of that.

10        Q.   So did you review as part of your work

11   in the case the FAST Start data to determine if

12   any of the bellwether plaintiffs' residences were

13   inspected, and if so, what the composition of the

14   service lines for those houses were?

15        A.   I believe that I --

16             MR. LANCIOTTI:  Object to form.

17        A.   I believe I did look at each one of

18   those reports, although I don't -- I mean, each

19   plaintiff's addresses to see if they were

20   represented in that very long list of reports.

21        Q.   And what did you find?

22        A.   I don't recall the results of that.

23        Q.   Do you remember any of the bellwether

24   plaintiffs' residences, the four that I'm talking

1   about now -- that we're talking about here,

2   S███PPI███, T██PPI██, V██PPI███████, and W███PPI███, having lead

3   service lines?

4        A.   I don't recall.

5             MR. LANCIOTTI:  Object to form.

6        A.   I don't recall.

7        Q.   What do you know about when the

8   E██PPI██ S███PPI███ and his family stopped drinking

9   Flint River water after the switchover?

10       A.   As far as I know, it's in the report.  I

11  don't have a memory of each one of those.  As you

12  know, there are 14 plaintiffs that I've examined

13  and -- whose cases I've examined, and I don't

14  remember.

15       Q.   You don't remember the S███PPI███ family

16  stopped drinking the water sometime in the summer

17  of 2014 or at the latest, the end of 2014?

18       A.   No, I don't remember.

19            MR. LANCIOTTI:  Object to form.

20            Hold on --

21       A.   As I said --

22            MR. LANCIOTTI:  Dr. Michaels, hold on.

23            Object to form and foundation.

24            Go ahead.

Highly Confidential - Robert Michaels, Ph.D.

```
 1        A.    As I said, I don't remember.  Whatever I
 2   found is in the report.
 3        Q.    In the report -- I'll pull it up for you
 4   for S██████ -- and you can look at it.  It is on
 5   Page 123 if you have your paper copy handy.
 6              You say -- I'll highlight this section
 7   here -- under the heading -- oops.  That didn't
 8   take.
 9              VIDEOGRAPHER:  It isn't currently being
10   shared.
11              MR. ROGERS:  Oh.  Sorry about that.
12   Thanks, Bob.
13   BY MR. ROGERS:
14        Q.    Okay.  Can you see that now,
15   Dr. Michaels, up on the screen?
16        A.    Yes.
17        Q.    So this is in the "Conclusions" section
18   of your report that we talked about earlier that
19   you said began on Page 120 and includes these
20   pages here.  But you have -- you see it's
21   E███ S██████, exposure.  Under "Causation of
22   Health Effects," you say, quote, "In view of the
23   general caution of such effects by lead, Pb, I
24   leave to E█████ personal physicians the
```

1    determination of lead causation/exacerbation via

2    drinking water in his specific case," right?

3         A.   Correct, yes.

4         Q.   And that's consistent with our

5    discussion early on about the difference between

6    general and specific causation and how you were --

7    you didn't have the expertise to opine about

8    specific causation for any particular health

9    effects for these children, right?

10        A.   Yes, that's correct.

11             MR. LANCIOTTI:  Object to --

12        Q.   Okay.

13             MR. LANCIOTTI:  Object to form.

14        Q.   And while we're at it, I just want to

15   show you that you say the same thing with respect

16   to all four of these children, so why don't we

17   just cover that now.

18             The next plaintiff here in alphabetical

19   order is A██████ T██, and you have the same

20   statement at the bottom of -- or at the end of the

21   "Causation of Health Effects" paragraph for her,

22   right?

23        A.   Correct.

24        Q.   And then for R███ V█████████,

Highly Confidential - Robert Michaels, Ph.D.

```
1   scrolling down a little bit more, same sentence at

2   the end of the "Causation of Health Effects" for

3   him, right?  Or, I'm sorry --

4        A.   Yes.

5        Q.   -- it's a she.  R███ a she, girl.

6             But same sentence there, right?

7        A.   Correct.

8        Q.   And the same with respect to

9   D███    W███, who is a girl, same sentence there

10  about no opinions that you have about specific

11  causation for health effects for her, right?

12       A.   Well, I think you just stated it a

13  little differently.  I think my statement in the

14  report is very clear, that I leave to the personal

15  physician the determination of specific causation.

16       Q.   Yeah.  And the reason for that is that

17  on that subject, you don't have the expertise to

18  opine about subjects of specific causation for

19  lead exposure for health effects in children,

20  right?

21            MR. LANCIOTTI:  Object to form.

22       A.   Well, as I tried to explain earlier, I

23  have what you call professional opinions that may

24  include opinions about specific causation.  I have
```

Highly Confidential - Robert Michaels, PhD.

1    not opined on specific causation in this report

2    because it's beyond my area of expertise.  Because

3    I am not a physician, I cannot -- I'm not a

4    clinician, I don't examine these plaintiffs, and I

5    did not examine the plaintiffs.  If the physician

6    convinced me that certain aspects of the -- of his

7    examination were clear, I think I might form an

8    opinion on specific causation as well.  It's just

9    something I didn't do in this report.

10                   - - -

11              (Michaels Exhibit 6 marked.)

12                   - - -

13   BY MR. ROGERS:

14        Q.   Let's go to Exhibit 6, which has to do

15   with the TPPI plaintiff, a bone -- I'm sorry --

16   blood lead test that was done on January 12th,

17   2016, and the report is reporting here capillary

18   blood draw less than 3.3 micrograms per deciliter,

19   right?

20        A.   I don't know.  I don't see it, but I

21   assume you're correct.

22              MR. LANCIOTTI:  Yes.

23        Q.   Oh, I'm sorry.  I stopped sharing the

24   screen again.  My bad.

Highly Confidential     Robert Michaels, Ph.D.

```
 1              There we go.  Can you see it now?

 2       A.   Yes, I do.  I don't see the name of

 3   the -- oh, yes, there it is.  Okay.

 4       Q.   Okay.  So other than this blood lead

 5   test report, are you aware of any other blood lead

 6   tests on Ms. T▮▮?

 7       A.   As I said, if I'm aware of them, they're

 8   in the report.

 9       Q.   You keep saying that, Doctor.  Okay?

10   I'm asking you now.  Okay?

11              Are you aware, as you're sitting here

12   testifying today, of any other blood lead tests

13   for A▮▮      T▮▮?

14       A.   All right.  I'm going to take --

15              MR. LANCIOTTI:  Object to form.

16       A.   I'm going to take a minute and look at

17   my report and tell you if I'm aware, because I

18   don't know if I'm aware or not.

19       Q.   Okay.  Where would that be found in your

20   report?

21       A.   In Table 1, and I do see that that's the

22   only report that I have, yes.  I'm not aware of

23   any others.

24       Q.   Okay.  Thank you.
```

1            So let's turn to that -- well, you know

2    what?  Let's go through -- I'll tell you what.

3    Why don't we go through the reports that I'm going

4    to show you first.  And to that point, you do have

5    a table or a figure, chart, whatever you want to

6    call it, of blood lead levels for the four

7    plaintiffs on Page 11 of your report.  So let's

8    get through these actual blood lead tests, and

9    then we'll go to that page of your report when we

10   finish.  Okay?

11       A.   Okay.

12       Q.   In terms of Ms. T▮▮▮, do you have any

13   information about any water lead level tests that

14   were done on any of the homes that she lived in?

15       A.   I believe I would have that in a table

16   if I -- I don't believe I -- no, I don't believe I

17   have specific data about that.

18       Q.   Thank you.

19            Same thing with respect to the service

20   line that I was asking you about E▮▮▮ S▮▮▮ .

21            Do you know what the composition of any

22   of the service lines were in any of the houses

23   where Ms. T▮▮▮ lived?

24       A.   No, I don't believe I have that

1    information about TPPI.

2        Q.   What part of the report were you looking

3    at so I could take a look at those pages that you

4    just referred to to answer that question?

5        A.   Page 53 and up to Page 57.

6        Q.   Okay.  So for each of these plaintiffs,

7    you have a section on each one of them, and one of

8    them is entitled "residential water supply."

9            Is that the area of the reports that you

10   would look at to determine if you had any

11   information about whether the service line was

12   lead or something else?

13       A.   Yeah.  I believe I would also look for

14   that there.

15       Q.   Is there -- can I ask you, is there some

16   reason why you didn't research from the FAST

17   program what the composition of the service lines

18   were for the houses where the bellwether

19   plaintiffs lived?

20       A.   I believe --

21           MR. LANCIOTTI:  Object to form.

22       A.   I believe that I did.  I believe that I

23   looked at each one, at each address, in the FAST

24   database.

Highly Confidential - Robert Michaels, PhD.

```
 1          Q.   Okay.  So where in your report do you
 2     record the information -- or report the
 3     information that you learned about that subject,
 4     whether they had lead service lines or not?
 5          A.   If they had lead service lines, I think
 6     I would have recorded it.  I'm not sure I recorded
 7     the negative.  I mean, I see that I have not.
 8          Q.   Okay.  So that -- but that's an
 9     important point, isn't it?  That as part of the
10     evaluation you were doing on the potential for
11     lead exposure, whether the service lines were
12     comprised of lead or not, that's a really
13     important factor, isn't it?
14               MR. LANCIOTTI:  Object to form;
15     foundation; move to strike the colloquy.
16               You can answer.
17          A.   Yeah, I consider that an important
18     issue.
19          Q.   So you did research the FAST Start data
20     information to determine whether any of these
21     residences where the bellwether plaintiffs lived
22     were comprised of lead, and since you did not
23     report in any of -- for any of them that the
24     service lines were lead, your conclusion was that
```

Highly Confidential - Robert Michaels, PhD.

```
1    they were comprised of something other than lead,
2    right?
3              MR. LANCIOTTI:  Object to form;
4    foundation; mischaracterizes his testimony.
5         A.   Yeah, I don't recall.  This was done a
6    half year ago.  I don't really know at this point
7    in time.  I can't remember specifically.  I know
8    that I had multiple sources of information.  Some
9    of them were the bellwether parent depositions,
10   and I believe some of them mentioned replacements
11   of pipes outside of their homes.
12             I don't recall.  Anything that is not
13   cited, I find very difficult to answer
14   definitively.
15        Q.   Is there anywhere in your report, any
16   references, to what the FAST Start information
17   reported or contained about the composition of the
18   lead service lines in the houses where these four
19   bellwether children lived, sir?
20             MR. LANCIOTTI:  Object to form; asked
21   and answered.
22        A.   I see that for T PPI , I did not cite FAST
23   report.  V PPI        , did not cite that.  S PPI    ,
24   did not cite that.  W PPI  -- it looks like I did
```

```
 1   not cite those reports at this point.  I do

 2   remember looking at those reports.  I don't

 3   remember what I did with them exactly.  I thought

 4   that I recall the series of addresses and, in many

 5   cases if not all cases, the addresses that I saw

 6   did not correspond to the addresses in -- that I

 7   was looking at.  I don't recall the answer

 8   definitively.

 9        Q.   All right.  I asked you -- I'm going to

10   ask you again just to make sure because I think

11   your earlier answer was a little bit different.

12             As you sit here today, do you remember

13   whether or not you researched the FAST Start

14   program data to determine what the composition of

15   the service lines were for any of the residences

16   where the bellwether plaintiffs lived?

17        A.   I believe my answer --

18             MR. LANCIOTTI:  Object to form.

19             Object to form; asked and answered.

20        A.   Yeah, I believe I asked -- that you

21   asked it and I answered it.  I believe that I

22   looked at that data.  I believe that I saw long

23   tables of addresses and tried to compare the

24   addresses that I saw in the table with the
```

Highly Confidential - Robert Michaels, Ph.D.

1    addresses of the bellwether plaintiffs that I had

2    listed in my report.  And as I recall, I -- if I

3    didn't cite it, it's probably because they didn't

4    occur in that database.  Were there other data?  I

5    don't know.  But I believe that I had an enormous

6    database of that kind and that I was not

7    successful at finding this information or I would

8    have cited it.

9           Now, as I also mentioned, there were

10   other sources of that information, specifically

11   the bellwether parent depositions, which sometimes

12   made reference to pipe replacements outside of the

13   home.

14       Q.   Dr. Michaels, the FAST Start program, as

15   we discussed earlier, involved actions undertaken

16   by the City through contractors to excavate

17   service lines leading into homes in making a

18   determination as to whether or not they were made

19   of lead.

20           Is that a true statement?

21       A.   I believe so.

22           MR. LANCIOTTI:  Object to form and

23   foundation.

24       Q.   And what I am asking you, sir, is since

Highly Confidential - Robert Michaels, PhD.

1   that is the case, did you determine through

2   looking at the FAST Start data with respect to the

3   addresses where the bellwether plaintiffs lived

4   whether or not it was determined that those

5   service lines were made of lead or not?

6           MR. LANCIOTTI:  Object to form; asked

7   and answered.

8       A.   I believe that I did, and I believe that

9   I did not find those answers.

10      Q.   So you're saying that you did not find

11  within the FAST Start data reports and evidence

12  that, in fact, the residence where the bellwether

13  plaintiffs lived that you have photographs of in

14  your report were not comprised of lead?

15          MR. STERN:  Objection; asked and

16  answered.

17          I know you're not getting the sound bite

18  you want, but he's answered the question five

19  times.

20      Q.   Your answer, sir?

21      A.   I think I'll stick with those five times

22  I've answered it.

23      Q.   Okay.  So you don't know -- is it

24  correct to say, then, that you don't know whether

Highly Confidential - Robert Michaels, Ph.D.

1    or not the FAST Start data contains information

2    that, in fact, the service lines that were going

3    to the four bellwether plaintiffs' residences were

4    not comprised of lead; is that right?

5          MR. LANCIOTTI:  Object to form; asked

6    and answered.

7          A.   I --

8          MR. LANCIOTTI:  Mischaracterizes his

9    testimony.

10         A.   I believe you are asking me to

11   memorize -- to remember things that I don't

12   remember.  And so I can tell you that if I had

13   positive information that I got from this

14   FAST Start program that said they were composed of

15   lead, I probably would have put it in the report.

16   If I didn't put it in the report, as I said, there

17   were also other sources of information from the

18   bellwether parents.

19         The database that I had was very large.

20   Frankly, the time that I had was not so very

21   large.  And I did the best that I could.  And at

22   this point in time, what's not in the report is

23   certainly not in my memory.

24         Q.   We'll turn to the plaintiff VPPI          ,

Highly Confidential - Robert Michaels, Ph.D.

1  who has some blood lead reports.  And if you want,

2  while we're at it, why don't we do it this way,

3  just to try to be more efficient.

4          For -- let's go back.

5          For E███ -- do you have Page 11 of your

6  report handy that you can look at in paper form?

7          MR. LANCIOTTI:  David, you're still

8  sharing your screen.

9          MR. ROGERS:  Yeah, that's okay.  We're

10  going to get to a report in a minute.  But I'll

11  stop it for now.

12  BY MR. ROGERS:

13     Q.  So the Table 1, it's called, actually,

14  in your report on Page 11 -- we don't need to

15  share the screen for this, I just want to go

16  through this -- you have for E███ S███   a record

17  of a blood lead level from February 17, 2016 that

18  you describe as finger stick that was less than

19  3.3 micrograms per deciliter, right?

20     A.  Yes.

21          MR. LANCIOTTI:  Dave, I'm sorry.  As a

22  courtesy, do you mind putting the report up on the

23  screen so I can follow along for the record?  I

24  don't have the report in front of me.

Highly Confidential - Robert Michaels, PhD.

```
 1              MR. ROGERS:  Okay.  Yeah, I'll do that.

 2              MR. LANCIOTTI:  Thank you.

 3              MR. ROGERS:  You owe me one, Patrick.

 4              As you know, taking the deposition, the

 5    screen sharings are problematic sometimes.

 6              MR. LANCIOTTI:  I appreciate it.

 7              MR. ROGERS:  Yep.  You're welcome.

 8    BY MR. ROGERS:

 9        Q.   We're going to go to the report.  We're

10    going to go to Page 11.

11              MR. ROGERS:  Okay.  Everybody see that

12    all right?  Patrick, you included?

13              MR. LANCIOTTI:  Yes.  Thank you.

14    BY MR. ROGERS:

15        Q.   So for E▮PPI▮ S▮PPI▮ -- you can see my

16    cursor here, it's what I just described --

17    3.3 micrograms per deciliter on February 17, 2016,

18    right?

19        A.   Less than 3.3, yes.

20        Q.   Sorry.  Less than 3.3.

21              So when I showed you the blood lead

22    level test report that is Exhibit 5, that had that

23    information.

24              So just to clarify, then, you're not
```

```
1    aware of any other blood lead levels for
2    E[PPI] S[PPI]      besides that one, correct?
3         A.   Correct.
4         Q.   Okay.
5              MR. LANCIOTTI:  Object to form.
6         Q.   Thank you.
7              And with respect to Ms. T[PPI], I showed
8    you -- which was Exhibit 6 -- the report for her
9    on January 12th, 2016.  Again, the measurement
10   being less than 3.3 micrograms per deciliter.
11             So that's the only blood lead level
12   report you have for her, right?
13        A.   Correct.
14        Q.   It says here "rectal" for her.
15             Why did you record that as rectal?
16        A.   I probably just copied it from a medical
17   record.
18        Q.   Because -- what's the difference between
19   a blood lead test that was obtained rectally
20   versus, you know, either venous or a finger stick?
21        A.   Well, I'm no expert on that particular
22   distinction.  I was just being complete.
23        Q.   Because the blood lead test for that one
24   is similar to the one for S[PPI]    .  It shows a
```

Highly Confidential - Robert Michaels, PhD.

```
1   capillary blood test.  Let's just make sure --
2   I'll go back to that one, which is Exhibit 6.  You
3   see here it says "capillary blood draw, assay of
4   lead," et cetera.
5           Is there anything on here that leads you
6   to believe that it was a rectal exam or test?
7       A.   Well, you're scrolling quickly.  I don't
8   think so, but I --
9       Q.   Yeah.  I don't mean to do that to you.
10  I'll put the whole thing up so you can see it and
11  take a look at it.  If you want me to scroll down
12  more, you let me know.
13      A.   No, I don't see anything like that.  I
14  didn't invent it, but I don't see that in this
15  particular document.
16      Q.   Okay.  Is it possible that is a
17  mistake --
18      A.   It's always possible --
19      Q.   -- in your chart?
20      A.   -- that there's a mistake.
21      Q.   Okay.  So turning -- okay.  So let's get
22  to V PPI ██████, then.
23           So going back to your report, the
24  problem is I can't do both at the same time and
```

1    Patrick has the issue.

2              MR. FLETCHER:  Dave, let me know if you

3    want me to share my screen.

4              MR. ROGERS:  No, that's all right.

5    BY MR. ROGERS:

6        Q.   All right.  Let's go through these and,

7    Doctor, just try to --

8              MR. LANCIOTTI:  Dave, I --

9              MR. ROGERS:  Yeah, what?

10             MR. LANCIOTTI:  I apologize to

11   interrupt.  But I believe in PDF, the format that

12   you have, you can open up multiple tabs,

13   essentially, like a web browser and you can go

14   back and forth to the different PDFs that you have

15   open.

16             MR. ROGERS:  Well, you can do that but

17   I'm not going to be able to figure it out, so

18   let's just go through.

19             So I'm going to mark as Exhibit 7 --

20   BY MR. ROGERS:

21       Q.   Doctor, you keep your table in front of

22   you.  All right?  And even though Patrick can't

23   see it, I think this is the easiest way to do it,

24   and we'll go to the table at the end.  All right?

Highly Confidential - Robert Michaels, PhD.

```
 1                      - - -

 2              (Michaels Exhibit 7 marked.)

 3                      - - -

 4    BY MR. ROGERS:

 5        Q.   So I'm going to show you this document.

 6    And the point is we're just trying to find out

 7    what you know about blood lead level tests for the

 8    plaintiff.  Okay?

 9              So here's Exhibit 7.  It's a blood lead

10    level test of February 6, 2018, and it says here,

11    "low, less than 3.3 micrograms per deciliter

12    blood," right?

13        A.   Did you say 2018?

14        Q.   Yep.  See this up in the upper

15    right-hand corner?

16        A.   Yes.  I have -- V███████?  I have --

17    we talk about mistakes -- I have 2014 and 2015.

18    This one is 2018.  Oh, there it is.  Wait.  I

19    think I found it.  No, I didn't.

20        Q.   No, you're right.  You know what?

21    You're 100 percent correct.  My bad.  That was --

22    that had to be the printout date.  And you are

23    correct.  Let me -- let me get rid of this.

24              Anyway, forget that highlight in the
```

Highly Confidential - Robert Michaels, Ph.D.

```
1    upper right.
2              It says here "order date, 11/3/2014."
3              Do you see my cursor that?
4         A.   Yes, that's what I have on my table.
5         Q.   Right.  And you are right.  And on your
6    table, you have that listed there for
7    R███ V███████   right?
8         A.   Yes.
9         Q.   Okay.  And is there any way for you to
10   tell whether this one was a venous blood draw or a
11   finger prick -- finger stick-type blood draw?
12        A.   I don't see it on that page, but I have
13   it on my table as finger stick.
14        Q.   Okay.  Thanks.
15             And then it says here, "collection date
16   11/3/2014," so we've got that straightened out.
17             All right.  So going to the next one,
18   Exhibit 8 will be for R████ V███████  again.
19                        - - -
20             (Michaels Exhibit 8 marked.)
21                        - - -
22   BY MR. ROGERS:
23        Q.   The blood order date was September 2nd,
24   2015, and the amount here is recorded at
```

Highly Confidential - Robert Michaels, Ph.D.

1    .7 micrograms per deciliter.

2              Do you see that?

3        A.    Yes, I do.

4        Q.    And you have that recorded on your

5    Table 1 on Page 11 of your report as well, right?

6        A.    Correct.

7        Q.    So do you know whether -- do you know

8    when the V████ family moved to Flint?

9        A.    That is in my report.  I don't know

10   offhand.

11       Q.    Okay.  If I were to tell you it's

12   September 2015, that would mean, if I am

13   correct -- and I believe I am correct -- that the

14   prior report for V████ would have been at a

15   point in time before they moved to Flint?

16             MR. LANCIOTTI:  Object to form;

17   foundation.

18       Q.    That is November 3rd, 2014?

19             MR. LANCIOTTI:  Same objection.

20       A.    I don't know when they moved to Flint.

21   I'll have to look.  I can look.  I mean, it's not

22   hard to look.

23       Q.    All right.  We'll come back to that when

24   we get to that.

Highly Confidential - Robert Michaels, PhD.

```
 1              MR. ROGERS:  I'm going to mark as
 2    Exhibit 9 a blood lead level for
 3    R▓▓▓  V▓▓▓▓▓▓.
 4                       - - -
 5              (Michaels Exhibit 9 marked.)
 6                       - - -
 7    BY MR. ROGERS:
 8         Q.   It's a test report.  The order date was
 9    January 14, 2016, and the amount here is
10    1.3 micrograms per deciliter, right?
11         A.   Yes, I see that.  And I don't see that
12    one in my report.
13         Q.   Right.
14         A.   Yeah, I don't see that one in the
15    report.
16         Q.   So this report dated -- for the blood
17    lead -- it was ordered on January 14, 2016.  That
18    was after the switchover back to the Detroit water
19    supply Lake Huron, right?
20              MR. LANCIOTTI:  Object to form;
21    foundation.
22         A.   Yes, that's correct.
23         Q.   What is significant about that to you,
24    if anything, that there was a value recorded of
```

Highly Confidential - Robert Michaels, PhD.

1   1.3 at that time?

2        MR. LANCIOTTI:  Object to form.

3        A.   Well, it's certainly nearly twice as

4   high as what was done in 2015 in September.

5        Q.   That's the .7 that you mentioned, yeah.

6        What -- how does it compare to -- never

7   mind.  We'll get to that later.

8        Let's go to Exhibit 10 and just finish

9   this off.

10                      - - -

11        (Michaels Exhibit 10 marked.)

12                      - - -

13  BY MR. ROGERS:

14       Q.   So that one you didn't have -- and you

15  didn't report in your report at all, that last

16  one, right?

17       A.   Well, I didn't report it on Table 1.  I

18  can check and see if it's in another section of

19  the report.  Hold on.

20       No.  Apparently, I don't have that one

21  in the report.

22       Q.   And here's another one ordered May 22nd,

23  2017, and it's reported at a value of .5 blood

24  lead level and the reference ranges in micrograms

Highly Confidential - Robert Michaels, Ph.D.

1   per deciliters.

2          This one you don't have in your table

3   either, do you?

4      A.   No.

5      Q.   Okay.  I think that's it for her.

6          So you have -- oh, I see.  On your

7   table -- look at your table on Page 11.

8          Do the entries that are for

9   D␣PPI␣␣␣␣␣ W␣PPI of March 24, 2016 and July 15th,

10  2016, those both relate to her, right?

11     A.   Yes, those are for her, yes.

12     Q.   I see.  All right.  That makes sense.  I

13  think it was unclear on my section of that report.

14         I want to show you this one for

15  D␣PPI␣␣␣␣␣ W␣PPI.  It will be Exhibit 11.

16                      - - -

17         (Michaels Exhibit 11 marked.)

18                      - - -

19  BY MR. ROGERS:

20     Q.   So here's a report dated, you see here,

21  9/25/09.

22         Can you see that?

23     A.   Yes.

24     Q.   And the amount that's measured there,

Highly Confidential — Robert Michaels, Ph.D.

```
 1    lead, 2.0, the reference range is in micrograms

 2    per deciliter, right?

 3         A.   2.0 -- can you repeat the question?  I'm

 4    not sure I understood what you're asking me.

 5         Q.   I'm just asking you that this test

 6    report indicates that on September 25th, 2009,

 7    there was a test done on D███PPI       W███PPI s blood at

 8    the Hurley Medical Center and that the measurement

 9    was 2.0 micrograms per deciliter, right?

10         A.   Yes, that's correct.  I see that.

11         Q.   So what significance does that have to

12    you from a toxicological perspective that she had

13    this blood lead level as of September 2009?

14              MR. LANCIOTTI:  Object to form.

15         A.   Well, I believe I've answered that

16    before by saying that everybody is exposed to

17    lead, and before they've moved to Flint, they are

18    also exposed to lead.  Everybody has exposure to

19    lead.  She clearly had exposure to lead.

20         Q.   Yeah.  She did live in Flint at this

21    time.

22         A.   Oh, okay.

23         Q.   But she had --

24         A.   Well, before the exposure to the
```

Highly Confidential - Robert Michaels, Ph.D.

1    Flint River, she also had exposure to lead, yeah.

2         Q.   And if -- I think you testified that

3    when you did your research, you determined that

4    the average blood lead level measurements for

5    children was in the 1 micrograms per deciliter

6    range, right?

7         A.   I believe that's the case, yeah.

8              MR. LANCIOTTI:  Object to form;

9    foundation.

10        Q.   So that would mean that as -- at least

11   as of September 2009, D██████ W████s blood lead

12   level was about twice that average for children

13   that you found?

14             MR. LANCIOTTI:  Object to form;

15   foundation.

16        A.   Right.  I don't know -- I don't know

17   where I got that value of 1.  It's something I

18   read someplace.  But I -- you know, whenever

19   you're dealing with an average, you're dealing,

20   you know, with a geographic area, you're dealing

21   with an age group.  There are all kinds of caveats

22   to what that is.  And so I don't -- I don't have a

23   strong basis of how to compare that.

24        Q.   Let's go to Exhibit 12, which is another

Highly Confidential - Robert Michaels, PhD.

```
1   blood lead measurement for DPPI      WPPI.
2                        - - -
3            (Michaels Exhibit 12 marked.)
4                        - - -
5   BY MR. ROGERS:
6        Q.   And just to confirm -- I'm sorry, I
7   can't remember if I asked you that -- but that
8   2009 blood lead level measurement for DPPI      ,
9   you did not have that in your table on Page 11 of
10  your report, right?
11       A.   No, I did not have it.
12       Q.   So with respect to this next one,
13  Exhibit 12, this is one that I do think you have
14  there.  This is the one from March 24th, 2016, and
15  it's measured as less than 3.3 micrograms per
16  deciliter, right?
17       A.   Yes, I see that one in my table.
18       Q.   Yep.  And it appears to be a capillary
19  blood draw?
20       A.   Yes.
21       Q.   Does that mean -- so if it's described
22  as a capillary blood draw, you record it as a
23  finger stick, and that's basically because there's
24  a little prick on the finger and that's how they
```

Highly Confidential - Robert Michaels, PhD.

1   get the blood, right?

2        A.   No, it's because that's where I read it

3   and the source indicated it was a finger stick.

4        Q.   Oh.

5        A.   The source indicates that it's a

6   capillary blood draw.  Of course, fingers have

7   capillaries and so I don't consider those to

8   conflict with one another, but they are somewhat

9   different information.

10       Q.   I gotcha.  Thank you for that.

11            So you actually -- in your chart, where

12  you indicate finger stick, that's based on another

13  medical record which says the blood was drawn via

14  the finger, right?

15       A.   Yes, that's correct.

16       Q.   I see.

17            And then when you report venous, that

18  means what?

19       A.   That I read it in a medical record.  I

20  didn't --

21       Q.   No, I know -- I'm sorry.  I know that,

22  but what's the difference between a finger stick

23  and a venous blood draw?

24       A.   Again, I don't see that as being a

Highly Confidential - Robert Michaels, PhD.

1    conflict because there are veins in the finger,

2    there are capillaries in the finger.  So it's just

3    how that was recorded.  I don't know the answer to

4    why one terminology was used versus another.

5         Q.   Okay.  So the last one for Ms. WPPI, I

6    believe, that you have as -- from July 15, 2016.

7    This is Exhibit 13 now.

8                   - - -

9              (Michaels Exhibit 13 marked.)

10                  - - -

11   BY MR. ROGERS:

12        Q.   And that result is .6 micrograms per

13   deciliter, right?

14        A.   Yes, that is in my table.

15        Q.   And you describe that one as a venous

16   draw, but as you said, that would be based not on

17   anything in this report, but rather some other

18   medical record; is that right?

19        A.   Yes, I -- yes.

20        Q.   Okay.  So just to make sure, then, I

21   believe that I've shown you all of the blood lead

22   level test reports that we're aware of for the

23   four bellwether plaintiffs, and based upon your

24   looking at your chart, Table 1 on Page 11, you're

Highly Confidential - Robert Michaels, Ph.D.

1    not aware of any other ones in addition to what is

2    on that and what I have shown you, right?

3        A.   Well, as I said, there was one report --

4    and I have a vague memory of this -- it was in a

5    transcript of a parent deposition that mentions a

6    blood test for lead that I don't have.  I don't

7    remember which plaintiff it was, don't remember if

8    it's one of these four.  But relying on my

9    memory -- I mean, that's why I record things in

10   painful detail, because I know that I can't

11   remember them and keep them straight.

12       Q.   Let's go through --

13            MR. ROGERS:  We don't need to share any

14   documents for a while, so maybe we could go for

15   another half an hour or so, take -- well,

16   40 minutes.  We'll take a lunch break about 12:30.

17            Doctor, our standard practice has been

18   to take a lunch break of about half an hour.  Is

19   that okay with you?

20            THE WITNESS:  Sure.

21   BY MR. ROGERS:

22       Q.   Just some background stuff -- and my

23   screen is not being shared now, is it?

24       A.   I don't see your screen.

Highly Confidential - Robert Michaels, PhD.

1     Q.   All right.  Good.  Thank you.

2          So your understanding is that the

3     switchover from the Detroit water, Lake Huron

4     water, to the Flint River was on April 25th, 2014,

5     right?

6     A.   Yes.

7          MR. LANCIOTTI:  Object to form;

8     foundation.

9          MR. ROGERS:  Patrick, what's the

10    wrong -- what -- I don't understand.  Why are you

11    objecting to form and foundation on that one?

12    Isn't that kind of established?

13         MR. LANCIOTTI:  It hasn't been

14    established in this deposition.  I don't believe

15    you've asked that question to him before and you

16    haven't shown him any piece of his report where he

17    speaks about that.

18         MR. ROGERS:  Well, I mean, what -- okay.

19    BY MR. ROGERS:

20    Q.   You tell me, Dr. Michaels.  What is your

21    understanding of when the switchover from Detroit

22    water to the Flint River occurred?

23    A.   Your date of the 25th of April is

24    correct.

Highly Confidential - Robert Michaels, Ph.D.

```
1         Q.   And then when was the switchover back to
2    Lake Huron water from the Detroit water supply
3    from the Flint River?
4         A.   As I recall, 16th of October in 2015.
5         Q.   Thank you.
6              So to the extent that there were periods
7    of time when the plaintiffs -- the four bellwether
8    plaintiffs were not drinking tap water in between
9    April 2014 and October 2015, their exposure to
10   lead from the water would be not -- if there was
11   any, it would not be from the tap water, would it,
12   in their homes?
13        A.   No, it might be.
14        Q.   Okay.  How --
15             MR. LANCIOTTI:  Object to form.
16        Q.   How so?
17        A.   Well, if the plumbing in the house has
18   lead, it can have residues in the water.
19        Q.   I know.  But, I mean, if they're not
20   drinking it, whether there's lead from -- in the
21   water from pipes in the house or anywhere else,
22   you know, they're not exposed to it, right?
23        A.   I'm sorry.  I misunderstood your
24   question.  Yes.  If you're not exposed to it,
```

1    you're not exposed.

2         Q.   All right.  Thank you.

3              In your report, you did a -- you have

4    various sections where you have information about

5    the bellwethers' homes in the terms of -- in the

6    form of, I should say, photographs and you have

7    some parcel data and then you have maps that

8    show -- and sometimes Zoom -- not Zoom but Google

9    Earth-type photos that show where they were.

10             In addition to looking at the parcel

11   data and getting that information, did you do

12   anything else to research anything about the

13   construction of the homes, when they were

14   constructed and things like that?

15        A.   No.  I didn't do specific research

16   seeking that information, but I did read

17   information about some renovations of homes and

18   that sort of thing.

19        Q.   All right.

20        A.   Construction dates, all kinds of things

21   like that.  So if they did appear in my screen of

22   view, I saw them, yes.

23        Q.   So to your knowledge, were the

24   residences of the four bellwether plaintiffs all

Highly Confidential - Robert Michaels, PhD.

1   built before 1986?

2       A.   I'd have to look in the report.  I don't

3   know.

4       Q.   But the -- each of the reports, the

5   parcel data, does not appear to show for each one

6   of these the build date; is that right?

7       A.   Hold on.

8            Well, I'm looking at the G PPI     B PPI ,

9   and I don't see any build dates there.  So I

10  assume that you're correct.  I don't have the

11  build dates.

12      Q.   Is 1986 a date of some significance in

13  the -- in terms of lead exposure and -- from a

14  toxicological perspective?

15      A.   I'd have to look it up.  I don't know.

16      Q.   Oh.  All right.

17           So did you in your work on the case

18  undertake an investigation to determine when the

19  houses were built in which the bellwether

20  plaintiffs lived?

21      A.   No.

22      Q.   From a toxicological -- I never say that

23  word correctly -- a toxicological point of view,

24  or in the science of toxicology, was there a

Highly Confidential - Robert Michaels, Ph.D.

1    period of time in which lead that was in gasoline

2    was a significant contributor toward lead exposure

3    for children?

4         A.   Yes, there was.

5              MR. LANCIOTTI:  Object to form.

6         Q.   And what period of time was that?

7         A.   I don't recall.  I do remember doing a

8    report that addressed that issue, but I don't

9    recall the dates.

10        Q.   Do you remember when leaded gasoline was

11   banned in the United States or prohibited?

12        A.   I remember when it was banned because I

13   was a kid.  I think I remember it, but I don't

14   have any idea what the year was.

15        Q.   Did you undertake any investigation or

16   evaluation to determine the extent to which lead

17   from gasoline contributed to any lead in the soil

18   in the areas where the bellwether children lived

19   so as to potentially be a source of their lead

20   exposure?

21        A.   Did I investigate that?  No.

22        Q.   So in terms of the lead exposure for the

23   four bellwether children, if that -- the source of

24   that exposure was lead in the water, do you agree

Highly Confidential - Robert Michaels, PhD.

1    that the children would have had to either drink

2    the water or eat food that was cooked in the water

3    to have that lead exposure?

4         A.   No.

5              MR. LANCIOTTI:  Object to form.

6         Q.   Why is that not correct?

7         A.   Well, it's not correct for multiple

8    reasons.  It's not correct because they also

9    bathed in it and they breathe the steam in showers

10   with it.  They wash dishes in it.  They brush

11   their teeth with it.  There are all kinds of

12   residential kinds of exposure.  And in addition to

13   that, they could be exposed as well from tap water

14   in school, which is where a lot of the day is

15   spent.  And so for those reasons and perhaps

16   others that I could come up with, it's a very

17   broad generalization that I can't agree with.

18        Q.   Okay.  Are there any scientific studies

19   that you're aware of that attempt to determine the

20   relative extents or the contributors between those

21   different sources for lead that you've just

22   described, that is, drinking water, cooking water,

23   versus the others that you've mentioned?

24        A.   I believe that I've seen studies like

1    that, and I don't recall specifically what they

2    are, although I wouldn't be surprised to find them

3    cited in here.

4            But the issue of the plaintiffs in this

5    case is very specific to particular individuals

6    and where they live and what their lifestyle is.

7    These kinds of population averages are less

8    probative, in my view.

9        Q.   Is the mechanism by which neurological

10   impairment in children who have been exposed to

11   lead that the lead actually gets into their

12   brains?

13           MR. LANCIOTTI:  Object to form.

14       A.   Yes, I would say that they -- that lead

15   can pass through the blood brain barrier.

16       Q.   So can you explain from your perspective

17   as a toxicologist -- explain how someone like

18   these bellwether plaintiffs who, in your view,

19   were exposed to lead in the water and how that

20   ultimately could contribute to or exacerbate any

21   neurological issues that they have?  Explain the

22   process by which that happens, please.

23       A.   I don't think I can delve into the

24   mechanisms of action right now.  I probably have

Highly Confidential - Robert Michaels, Ph.D.

1  some references to it there, but I don't like to

2  shoot from the hip for that.

3      Q.   Would that be, you know, something

4  beyond the level of your expertise as a

5  toxicologist to explain that?  Is that more of an

6  issue for a medical doctor?

7          MR. LANCIOTTI:  Object to form.

8      A.   No, it's a very good issue for a

9  toxicologist.

10     Q.   Okay.  So why is it that you can't

11 explain it now?

12     A.   Because I normally would look into

13 something like that.  I don't have a memory of

14 every mechanism of action.

15     Q.   Do you, as you sit here today

16 testifying, know the extent to which lead, if it

17 does get into someone's body, is excreted in the

18 body's waste products, that being urine or feces?

19     A.   That's in the report.  I believe it

20 differs from children to adults, but I would refer

21 you to the report for that.  I don't have memory

22 of the specific numbers.

23     Q.   Is it correct that about 58 percent,

24 approximately, of lead that gets into the body is

1    excreted and not absorbed?

2           MR. LANCIOTTI:  Object to form;

3    foundation.

4       A.   I would have to refer to the report to

5    make sure that that was the correct number.  If

6    you tell me it's in the report, I would say it's

7    probably correct.

8       Q.   In children, is it true that the large

9    majority of any lead that gets into their bodies

10   is stored in the bones in the order of 85 to

11   90 percent?

12      A.   I don't know what the numbers are.

13          MR. LANCIOTTI:  Object to form and

14   foundation.

15      A.   I don't know what the numbers are, and I

16   actually don't know what you mean by that either.

17   Because being stored in the bones is a very

18   temporary condition, especially with regard to

19   children whose bones are growing and their bones

20   are constantly reforming themselves.  And so

21   substances that are in bones stably for adults

22   are not stable for children, and they can exchange

23   back and forth between the blood and, therefore,

24   to all of the places where lead may exert its

1    activity in the body.

2        Q.   You mentioned that in order to get into

3    the brain, the lead would have to pass through the

4    blood brain barrier.

5             Can you explain that in any further

6    detail at this point?

7        A.   Well, it's an evolutionary adaptation of

8    the brain to exclude toxins from the brain.  And

9    it gets better and better as you grow older.  I

10   don't know how it is in old age, but it certainly

11   gets better as you reach maturity.

12            In children, it's very rudimentary, and,

13   therefore, children can have central nervous

14   system effects of lead, whereas adults might have

15   peripheral nervous system effects of lead with the

16   same level of exposure.  So they are excluding the

17   lead from their brains, whereas the children are

18   not.

19            Now, if you're asking the specific

20   molecular mechanisms, I won't be able to answer

21   that right now.

22       Q.   Okay.  Tell me if this is a correct

23   statement, that in order for lead to accumulate in

24   the brain at sufficient levels to induce or cause

1  some type of neurological effect, the lead must

2  first be absorbed by the gastrointestinal tract,

3  distributed to the central nervous system, and

4  then compete with calcium for uptake across the

5  blood brain barrier.

6          Is that a correct statement?

7          MR. LANCIOTTI:  Object to form;

8  foundation.

9      A.   It might be.  I don't know what your

10  source of that information is.

11     Q.   Is there some minimum amount of lead

12  exposure that's necessary for there to be levels

13  to accumulate in the brain so as to cause

14  neurological effects?

15     A.   No such level has been recognized, as

16  far as I know.

17     Q.   Is there any scientific evidence as to

18  how many molecules of lead the typical child is

19  exposed to every day?

20     A.   It would not surprise me if that number

21  were out there someplace.  I have no idea what it

22  is.  And it would vary geographically and by many

23  other factors.

24     Q.   Could you turn to Page 103 of your

Highly Confidential - Robert Michaels, PhD.

1    report.  And I'll go ahead and put this up on the

2    screen as well, but just to get started, can you

3    go to Page 103?

4        A.   Yes, I have that page.

5        Q.   I think you might have started to talk

6    about this earlier in terms of a dose response in

7    some answers to some of my earlier questions.  But

8    explain to me, please, what is this one-hit model

9    that you are describing?  And if you'd like, take

10   the time to read it to get yourself reacquainted

11   with it.  But explain to me what this one-hit

12   model is that you're referring to on this

13   paragraph that I have some highlights in here.

14            MR. LANCIOTTI:  Dave, I don't believe

15   you're sharing your screen.  I don't know if you

16   were intending on it or not.

17            MR. ROGERS:  I was, of course.  Sorry

18   about that.  Let me do that.  Thanks.

19            How is that?  Do you see it now?

20            MR. LANCIOTTI:  Yes.  Thank you.

21       A.   So your question is what is the meaning

22   of a one-hit model?  It means one molecule being

23   sufficient to cause an adverse effect.

24       Q.   How does it relate to your opinions

1   about lead in this case?

2        A.   Well, as I've discussed it, I've put it

3   in context, but I don't think it particularly

4   influences my opinion.

5        Q.   Well, you say here on this Page 103,

6   "The one-hit model in such extrapolations may

7   produce the highest risk and, therefore, may be

8   the most conservative."  It might or might not be

9   the most accurate, you know.  "In the case of

10  ubiquitous contaminants such as lead, body burden

11  may be assumed to exist already."

12          Why is it that you mention it in your

13  report?  I don't really -- I'm not following it if

14  it's not pertinent to your opinions.

15       A.   I didn't say that it's not pertinent to

16  my opinions.  I think it's very pertinent to my

17  opinion.  In fact, it justifies the opinion that

18  any additional or incremental exposure to lead is

19  significant.

20       Q.   Is -- can you direct me to any

21  scientific studies by any scientist who agrees or

22  has the opinion that one molecule of lead can

23  cause any lead-related disease or ailments?

24       A.   I can't specifically refer you to

Highly Confidential - Robert Michaels, PhD.

1  anybody like that.  I certainly would not say

2  that.  I did not say that, and I don't think that.

3  But, of course, if you're talking about the

4  one-hit model, that's what the one-hit model is

5  about.

6       Q.   Okay.

7       A.   The extremely conservative assumption

8  that one molecule can do it.  It's not something

9  you can find.  In fact, they have a figure of a

10  dose-response curve in which I figuratively call

11  the levels below which you can do experiments on

12  the twilight zone because it's a zone where you

13  can't really discern this kind of information.  If

14  one molecule of lead was causing an effect, you

15  wouldn't know it because you don't do experiments

16  with that.

17       Q.   So that is this graph that is in

18  Figure 15, a generic dose-response curve in

19  toxicological health risk assessment, on the next

20  page of your report, 104, right?

21       A.   Yes, that's correct.

22       Q.   Okay.  So I think I understand now.

23            You don't subscribe to the one-hit

24  molecule theory, at least in terms of a

1  professional scientific opinion.  You were just

2  describing that it exists, right?

3      A.   No, that is not correct.  In fact --

4      Q.   Go ahead.  Explain it to me.

5      A.   -- what I said is that with respect --

6  sorry?

7      Q.   I was just saying, go ahead and explain

8  it to me.

9      A.   With respect to cancer, the one-hit

10  model has a much more firm basis.  Cancer tends to

11  be a little more tenuous that way.  Nobody really

12  knows if one molecule can do it.  And it's a

13  statistical problem because there are -- because

14  if a cancer molecule hits, a DNA -- I'm sorry.  If

15  a carcinogenic substance molecule hits, a DNA

16  molecule, and thereby causes cancer, there are

17  mechanisms of correcting genetic misinformation,

18  mutations.  And so -- so you'd have to have the

19  one hit also followed by the failure of the DNA

20  repair mechanisms to repair the molecule.

21          You also would have to have a situation

22  where the one molecule to which the individual was

23  exposed actually winds up at the DNA molecule and

24  actually hits it with enough force to create that

Highly Confidential - Robert Michaels, PhD.

1    mutation.

2           So as a statistical problem, it's not

3    likely.  As a matter of principle, it can happen.

4    In the case of something like a noncancer effect

5    which does not necessarily involve a specific DNA

6    molecule and mutation, that's a little more

7    difficult to imagine.  But I'm presenting it in

8    the proper context here, and by way of having a

9    balanced view, I'm giving the idea that this is

10   not a critical issue in the case of lead because,

11   as I've said before, we're all exposed to lead.

12   We have those molecules already.  We don't have to

13   have one molecule to do its deed.  We already have

14   molecules that are in our body.

15        Q.   Let me show you -- in order to keep the

16   exhibits in order -- yeah, I better -- let me do

17   this so we can just be clear here.  I just want to

18   ask you if you looked at this particular source as

19   part of your research in the case, and I'll share

20   my screen now.  It's Exhibit 14.

21                    - - -

22           (Michaels Exhibit 14 marked.)

23                    - - -

24

1    BY MR. ROGERS:

2        Q.   This publication, the Fourth National

3    Report on Human Exposure to Environmental

4    Chemicals, Updated Tables, January 2019,

5    Volume One.

6            Did you review this source for

7    information about blood lead levels or lead

8    exposure at all?

9        A.   You are not showing me the source.  I

10   don't know who wrote that.  I don't recall citing

11   it.  But if I did cite it -- okay.  If I looked at

12   it, it would be in the "Literature Cited" section.

13       Q.   Okay.  You can see the citation there,

14   it's the U.S. Department of Health and Human

15   Services, the Centers for Disease Control and

16   Prevention, and it is based on NHANES data.

17           Did you look at that?

18       A.   I'm looking to see if I cited it.  If I

19   didn't cite it, I didn't look at it.

20           It looks to me from a perusal of my

21   citation section that I did not use this as a

22   source.

23           MR. ROGERS:  All right.  It's about

24   12:15.  Why don't I take a look -- let's take our

Highly Confidential - Robert Michaels, PhD.

1    lunch break now and come back at 12:45.  I may

2    reorder my exhibits a little bit here going

3    forward.  So let's do that.

4              Off the record.  We'll come back at

5    12:45.

6              VIDEOGRAPHER:  The time is 12:14 p.m.,

7    and we're off the record.

8                        - - -

9              Thereupon, the luncheon recess

10             was taken at 12:14 p.m.

11                       - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Robert Michaels, PhD.

1                    NOVEMBER 12, 2020

2                    THURSDAY AFTERNOON SESSION

3                    12:47 P.M.

4                         - - -

5          VIDEOGRAPHER:  The time is 12:47 p.m.,

6    and we're on the record.

7    BY MR. ROGERS:

8      Q.   Okay.  Dr. Michaels, let's take a look

9    at the next exhibit that I wanted to show to you.

10   It is some excerpts from a deposition of

11   Dr. Graziano.

12         MR. ROGERS:  We'll make this Exhibit 19.

13         Sara, I'm going to skip over a couple

14   exhibits; we might get back to them.  But in order

15   to keep organized here, I'm going to stick to the

16   numbering system that I already have in place.  So

17   eventually if we don't get to them, that's okay.

18   But we'll just call this one Exhibit 19.  Okay?

19                        - - -

20         (Michaels Exhibit 19 marked.)

21                        - - -

22   BY MR. ROGERS:

23     Q.   So I think you said, Dr. Michaels, you

24   haven't had a chance to review this yet, but I'm

Highly Confidential - Robert Michaels, Ph.D.

1    going to ask you if you agree with some of the

2    testimony here from Dr. Graziano.

3         He was asked, "Doctor, do you agree that

4    every child" -- can you see this okay?

5         A.   I do, yes.

6         Q.   All right.  Thanks.

7         He says -- the question was:  "Doctor,

8    do you agree that every child in America has some

9    lead in their body?"

10        His answer was:  "Yes."

11        You agree with that, right?

12        A.   Yes, I do.

13        Q.   Thank you.

14        And then the question was:  "And you

15   agree the same is true for the children of Flint

16   before the water switchover, right?"

17        And Mr. Lanciotti objected and then

18   there was a repeat of the question just read back,

19   and he says -- Dr. Graziano says:  "I agree."

20        Do you agree with that?

21        A.   Yes.

22        Q.   Thanks.

23        And then the next question was:  "Would

24   the lead that the children in Flint had in their

Highly Confidential - Robert Michaels, Ph.D.

1   bodies before the switch occurred in April of 2014

2   have adverse affected those children?"

3           I think it probably should be "adversely

4   affected."

5           And the answer was:  "Yes."

6           Do you agree with that?

7       A.   Yes, I do.

8       Q.   All right.  Thanks.  We'll close out of

9   that one.

10          The next -- I have some questions about

11  some other papers -- scientific papers and

12  studies.  And during the break, I went to your

13  list of -- let me see exactly what you call it --

14  "Literature Cited" -- on Page 127 of your report

15  going through Page 139.  So if you want to keep

16  that handy, because I will ask you if you have

17  looked at and reviewed or considered these papers

18  that I'm going to show you now.  And I think when

19  I asked you that before, you said, "Well, I'd have

20  to look at my list of the literature."

21          So is it correct that the materials and

22  literature that you reviewed and cited in your

23  report are contained on Pages 127 through 139 of

24  your report?

Highly Confidential - Robert Michaels, PhD.

```
1       A.   Yes, it is.

2       Q.   And the scientific literature you list

3  by the authors -- the principal author's first

4  name and in alphabetical order.  So I just say

5  that because when I ask you the question, if

6  you've reviewed this paper for purposes of your

7  work on the case, you may -- that may be helpful.

8            So the first one I want to ask you about

9  is this Exhibit 20.

10                      - - -

11            (Michaels Exhibit 20 marked.)

12                      - - -

13  BY MR. ROGERS:

14       Q.   The lead author is Dr. Gomez, "Analysis

15  of blood lead levels of young children in Flint,

16  Michigan before and during the 18-month switch to

17  the Flint River water."

18            Is this a study that you reviewed and

19  considered in your work on the case?

20       A.   Apparently not.  I don't see it in the

21  "Literature Cited" section.

22       Q.   I'll shrink it down a little so you can

23  see it.

24            It not being in the list of materials,
```

Highly Confidential - Robert Michaels, PhD.

1  if you are looking at the title and you're looking

2  at the paper here, is that -- do you remember

3  having reviewed this scientific paper and study in

4  "Clinical Toxicology" at all?

5      A.   No, I don't recall.

6      Q.   Would this be a subject matter that's

7  pertinent to any of the opinions that you have in

8  this case, namely, an analysis of blood lead

9  levels of young children in Flint, Michigan before

10 and during the 18-month switch to Flint River

11 water?

12          MR. LANCIOTTI:  Object to the form.

13     A.   If you're asking if it's relevant, yes,

14 I think it is relevant.

15     Q.   Is there some reason that you didn't

16 find this paper and read it as part of your work

17 in the case?

18     A.   I'm sure there are reasons.  I didn't

19 find it.  That's all I can say.

20     Q.   Okay.  Well, the authors here say in the

21 abstract, "The objective of the study is to

22 evaluate whether blood lead levels in Flint

23 children were increased during the entire 18-month

24 Flint River water exposure compared to similar

Highly Confidential - Robert Michaels, PhD.

1    earlier time periods," right?

2           Do you see that?

3      A.    I do, yeah.

4      Q.    And then he says, the methods, "We

5    conducted a retrospective study analyzing blood

6    lead levels from Flint children aged 5 years and

7    under.  The geometric mean and percentages of

8    blood leads greater than 5 were measured in

9    different periods."

10           Do you see that?

11     A.    I do.

12     Q.    Okay.  So do you know Dr. Gomez?  It

13   says that he's associated with the Department of

14   Emergency Medicine at the University of

15   Michigan-Ann Arbor.

16     A.    No, I don't know him.

17     Q.    All right.  I'm going to close this out

18   and ask you the same question about this other

19   Gomez study that is Exhibit 18, "Analysis of blood

20   lead levels of young children in Flint, Michigan

21   before and during the 18-month switch over to the

22   Flint River water" that was published in "Clinical

23   Toxicology" in 2019.

24                        - - -

Highly Confidential - Robert Michaels, PH.D.

1                    (Michaels Exhibit 18 marked.)

2                              - - -

3      BY MR. ROGERS:

4           Q.   Have you reviewed that paper?

5           A.   Apparently not.

6           Q.   The conclusion reached here by the

7      authors was, as I'm showing you now, "Analyses of

8      GM" -- do you understand that to mean geometric

9      mean?

10          A.   Yes.

11          Q.   -- "and percentages of greater than or

12     equal to 5 micrograms per deciliter of BLLs do not

13     support the occurrence of a global increase in

14     BLLs in young children of Flint during the entire

15     18-month period of the Flint River water

16     exposure."

17               Do you see that?

18          A.   I do.

19          Q.   Do you have any reason to disagree with

20     that conclusion of these authors based on their

21     study?

22               MR. LANCIOTTI:  Object to form;

23     foundation.

24          A.   I haven't read the studies, and so,

Highly Confidential - Robert Michaels, Ph.D.

1    therefore, I don't have a strong basis to

2    disagree, except to say that I've been very

3    skeptical of the sporadic testing of blood lead

4    levels of these children.  And in addition to the

5    sporadic aspect, the fact that methods of testing

6    were very crude with levels of detection at

7    3.3 micrograms per deciliter, which is not and was

8    not state of the art during the time, and that as

9    you looked at the positive results that were

10   reported for bellwether plaintiffs, those numbers

11   in the range of, say, 2 or 2.5 micrograms per

12   deciliter would have been basically zero by those

13   crude methods because they didn't reach that level

14   of sensitivity.

15        The other thing that I would say is a

16   lot of these kids have sought treatment, and,

17   therefore, the fact that there is a decline may

18   reflect, to some extent, the success of treatment.

19        So I don't know where to place these

20   studies in my own brain right now.  I have not

21   reviewed the studies, and I can't -- I can't be

22   definitive about what their significance is.

23        Q.  The authors say here on this Page 4 of

24   8 in the report in the discussion that I have

Highly Confidential - Robert Michaels, Ph.D.

1   highlighted, "Contrary to previous investigations

2   focused on examining defined samples of time

3   during the Flint River water switch, we found that

4   geometric mean blood lead levels in young Flint

5   children actually decreased during the 18-month

6   water switch period compared to identical previous

7   time periods when controlling for length of time,

8   seasons, and months."

9          Do you have any reason to disagree with

10  that conclusion?

11         MR. LANCIOTTI:  Object to form;

12  foundation.

13     A.   First of all, that's not represented as

14  a conclusion.  It is represented as a finding.

15  Now, a finding and a conclusion are two different

16  things in scientific studies.  When you find that

17  something is decreased, you don't necessary --

18  necessarily conclude that it has decreased.  It

19  may have not decreased.  It may have increased.

20  But the fact is that as a basis for the question,

21  I don't see that they are concluding that.

22     Q.   Okay.  I'll show you this section which

23  is labeled "Conclusions."  The highlighted section

24  says "The exposure of young children to Flint

Highly Confidential - Robert Michaels, Ph.D.

1  River water from 25 April 2014 to 15 October 2015

2  in Flint coincided with a decrease in BLLs, blood

3  lead levels, in young children when compared to

4  prior time periods controlling for the time-length

5  studied, months, and seasons."

6         That's a conclusion; that's what they

7  call it, right?

8     A.   Yes, they do.

9     Q.   So do you have any reason to disagree

10  with that conclusion of these authors?

11         MR. LANCIOTTI:  Object to form and

12  foundation.

13     A.   I have to read it first.  I don't know

14  anything about what they mean by controlling for

15  time-length studied, months, and seasons.  I don't

16  know what that means.  I don't -- I don't -- I

17  don't know how to interpret this study.

18     Q.   All right.  You did, however -- sorry.

19  Did you want to add something?

20     A.   Well, yeah.  You're showing me two

21  studies.  The first study doesn't say quite the

22  same thing.  It says that the increase that they

23  observed was not statistically significant.  It

24  doesn't mean that it didn't increase.

1        So I don't, again, know how to interpret

2   these studies, and it requires a certain amount of

3   time to look into that.

4        Q.   Isn't the issue of whether or not the

5   blood lead -- measured blood lead levels of

6   children in Flint during the period of time of the

7   water switchover an important fact for you to know

8   and consider in coming to your opinions and

9   conclusions as a toxicologist in the case?

10        MR. LANCIOTTI:  Object to form.

11        A.   I don't think I picked up your meaning

12   there.  Could you repeat that question?

13        Q.   Yeah.

14        Isn't -- isn't the fact of whether or

15   not blood lead levels were decreasing during the

16   period of time when the water switchover occurred

17   for children in Flint -- isn't that an important

18   fact for you to know about in terms of the

19   opinions that you were providing as a toxicologist

20   in the case?

21        MR. LANCIOTTI:  Object to form.

22        A.   Yeah.  Well, if your premise is that the

23   numbers were decreasing, I don't accept that.  I

24   don't know that they've been decreasing.  If you

1    are suggesting that you've substituted one source

2    of lead for another, from a toxicological point of

3    view, the children's bodies don't mind which

4    source.  They will still respond to it.  From a

5    legal point of view, I imagine that the lawyers

6    could work out who is responsible for it when the

7    origin of the lead has changed.  That's not my

8    issue.

9          So if you're asking generically whether

10   something is important, I can imagine ways that it

11   would be important, yes.

12        Q.   What would those ways be?

13        A.   Well, as I've mentioned, the legal

14   aspects might change because there's a different

15   source of the lead, and quantifying the exposure

16   might be -- you know, that the exposure levels may

17   have been different.  I don't know.

18        Q.   But didn't you reach a conclusion and

19   don't you hold an opinion that the children in

20   Flint, including the bellwether plaintiffs,

21   experienced an increase in their exposure to lead

22   during the water switchover?

23        A.   I believe that I reported that finding

24   of Hanna-Attisha, yes.

Highly Confidential - Robert Michaels, PhD.

1      Q.   Okay.

2      A.   And I considered that to be significant

3  and important, yes.

4      Q.   In terms of the lead exposure from the

5  changeover in water as opposed to other sources,

6  right?

7      A.   Well, I think -- I think that, as I've

8  always said, there are multiple sources and

9  exposures that predate the use of the Flint River

10  and that all molecules of lead are potentially

11  significant to children exposed to them.  So I

12  have tried to keep out of the politics of this.

13  If somebody were to show that the Flint River

14  water use was a great thing for the kids, I would

15  have to question why they went back to the old

16  source.  But if somebody were to show that, that's

17  great, and it's maybe like giving them vitamins or

18  something.  I -- as I said, I haven't read these

19  papers; and if you're asking generically, does the

20  source of lead matter, yes, I think that's

21  important.

22      Q.   Right.

23           But what I'm saying is you relied on the

24  Dr. Mona Hanna-Attisha papers, which report

Highly Confidential - Robert Michaels, Ph.D.

1   increases in blood lead levels for periods of time

2   related to the water switchover in terms of, you

3   know, the amounts that are recorded of greater

4   than 5 micrograms per deciliter.  But if, in

5   fact -- or you rely on that for purposes of your

6   opinions to conclude that the water was the source

7   of the increased lead in their blood, right?

8        A.   No, that's not right.  I said that the

9   kids have multiple sources, and that after the

10  switchover, there was a spike related

11  geographically to where the sample was taken and

12  what the water levels were in those areas, a spike

13  in the blood lead levels of the children.

14           What I relied on is much beyond what

15  you're referring to.  Of course, I did talk about

16  those studies, but I primarily relied on the blood

17  lead reports and the bone lead reports and, you

18  know, the information I had that they were exposed

19  at their homes and at their schools.  You're

20  raising a different issue of whether those numbers

21  went up or down, and I can imagine that that's

22  important, yes.

23       Q.   Yes.

24           So if, in fact, the blood lead levels

Highly Confidential - Robert Michaels, PhD.

1    for the children that were measured in Flint went

2    down during the period of time of the water

3    switchover, that would be an important thing for

4    you to consider, wouldn't it?

5            MR. LANCIOTTI:  Object to form.

6        A.   You know something?  The answer to that

7    question is basically no, it would not.  The issue

8    that I'm facing when I evaluate this is what

9    happened to the four kids.  Did their blood levels

10   go up or stay the same, or what has happened to

11   their blood and what has happened to their bone.

12   And I have concluded that they were exposed to

13   lead and that some of that exposure, and perhaps a

14   predominant amount of that exposure, came from the

15   use of Flint River water.

16           Now, if there's a population-level trend

17   that you can point to, these kids could be bucking

18   that trend or not.  I don't know.  And you're

19   asking me a lot of questions about studies that I

20   have not seen.  And so I won't let you put words

21   in my mouth, but I'm answering as completely as I

22   can.

23       Q.   In terms of determining whether these

24   particular four children experienced an increase

Highly Confidential - Robert Michaels, Ph.D.

1    in the amount of lead that they were exposed to

2    from the water as a result of the water

3    switchover, what steps -- what analyses did you go

4    through in order to determine that from a

5    toxicological point of view?

6        A.   Well, my analysis was a qualitative

7    analysis, not a quantitative analysis.  And what I

8    had discovered in that is that these kids were

9    exposed to Flint River water and to the lead

10   produced by Flint River water while flowing

11   through the various types of pipes.

12            The question that you're raising now as

13   a premise of your question of whether that number

14   increased or decreased, which may be a

15   population-level question, I have not primarily

16   addressed that problem.

17       Q.   Similarly, with respect to the four

18   bellwethers, you have not done any calculations or

19   analyses to determine in terms of quantity the

20   additional amount of lead that they are exposed to

21   because of the water switchover, correct?  These

22   four bellwethers, I mean.

23       A.   Have I quantified it?  No.

24       Q.   Because you used the term

Highly Confidential - Robert Michaels, PhD.

```
1    "qualitatively," I wanted to make sure that I

2    understood what you meant.

3              In terms of the quantity, or that is,

4    the amount that each of these children were

5    exposed to during the period of time of the water

6    switchover, you -- just to be clear, you haven't

7    attempted to quantify that, right?

8         A.   Well, I certainly haven't quantified it.

9    I probably started off hoping that I could, but I

10   wasn't able to.

11        Q.   Why not?

12        A.   Well, the data were very sporadic.  I

13   mean, the depositions of bellwether parents, and

14   they don't remember when they stopped drinking the

15   water, or they don't remember when they started

16   drinking bottle water, and they don't remember --

17   they don't know how much kids drank from garden

18   hoses or how much they drank from the tap or

19   whether there was a filter in place and whether

20   the filter was exchanged frequently enough, or how

21   often they were at a grandparent's house, or how

22   often they were at a friend's house, or what was

23   the -- how much water did the kid drink in school.

24              There's a lot of factors that go into a
```

Highly Confidential - Robert Michaels, PhD.

1  quantitative risk assessment that I didn't have to

2  quantify with.

3      Q.   And, similarly, to the extent that their

4  exposure to other sources of lead, that in paint,

5  dust, soil, in terms of a quantitative analysis,

6  you did not undertake that, did you?

7      A.   No, I did not undertake it.  And I've

8  tried -- I've tried to be complete in my

9  understanding -- in conveying my understanding

10 that there are multiple exposure sources.

11     Q.   Yep.  I've got it.

12          In terms of time periods, I just want to

13 direct your attention to this time period, in

14 terms of quantification, that is, the quantity, an

15 attempt to evaluate the quantity of lead exposure

16 from the water at various points in time.

17          You have not attempted to determine the

18 extent to which the amounts of lead that these

19 four bellwethers were exposed to occurred from the

20 time of the switchover through the end of the year

21 2014, and then from that point beyond, have you?

22          MR. LANCIOTTI:  Object to form.

23     A.   You know, it's an interesting question

24 that you ask.  It's a lawyer's question, really.

Highly Confidential - Robert Michaels, PhD.

1    And by that, I mean that when a child is exposed

2    to lead, the child stores a certain amount of that

3    lead.  And the child is exposed to that lead by

4    the circulation of the lead from the places where

5    it's stored to the rest of the body, potentially

6    for years after the exposure has occurred.

7    Exposure to lead isn't something that starts on

8    Monday and ends on Friday.  It's something that

9    goes on for a long period of time and, you know,

10   can be affected by diet, by other health

11   conditions, by, as I've said, socioeconomic status

12   and, basically, habits.  There are all kinds of

13   factors that affect this process.

14           A better indicator might be the bone

15   lead, which indicates very long -- much

16   longer-term exposure, and I would say very

17   significant longer-term exposure.  So if you're

18   just looking at the blood lead levels, I think

19   that's a rather narrow focus, and certainly those

20   two papers where you were referring to that, I'm

21   not saying the investigator shouldn't investigate

22   that, but what I am saying is that there are other

23   factors involved.

24           Q.   Maybe you didn't understand my question.

1    I'm just asking whether you, in your work on the

2    case, attempted to evaluate the quantity -- from a

3    quantitative point of view the amount of

4    additional lead that the children were exposed to

5    because of the water switchover from the time of

6    the water switchover through the end of the

7    calendar year 2014, compared to the amount of lead

8    that they would have been exposed to from a

9    quantitative -- additional amounts that they would

10   have been exposed to from water -- lead in the

11   water from January 1st, 2015 to the time that the

12   water supply was switched back to Lake Huron.

13        A.    I think that you --

14             MR. LANCIOTTI:   Object to form; and

15   asked and answered.

16        A.    I think that you are misunderstanding my

17   answer to that question, which is to say that the

18   question itself is flawed, because the exposure

19   that occurred after that period of time is a

20   continuation of exposure that was initiated during

21   that period of time.

22        Q.    Do you know how much for any of the

23   individual bellwether plaintiffs their exposure to

24   lead from the water increased from January 1st,

Highly Confidential - Robert Michaels, PhD.

```
1    2015 through the period of time when the
2    switchover back to the Lake Huron water occurred?
3            MR. LANCIOTTI:  Object to form.
4        A.   I don't know the specific number.  No, I
5    don't have that number.
6        Q.   Similarly, same question with respect to
7    the quantities.  The additional amount of lead
8    that they were exposed to from the date of the
9    switchover in April 2014 through December 31st,
10   2014?
11       A.   I'm sorry.  What was the difference --
12           MR. LANCIOTTI:  Object to form.
13       A.    -- between the two questions?
14       Q.   The timing, sir.
15       A.   Well, maybe you better review that with
16   me again because I thought that was what we were
17   talking about.
18       Q.   Let's try it again.
19           Do you know the additional amount of
20   lead that the children were exposed to from the
21   water for this period of time, April 25th, 2014
22   through December 31st, 2014?
23           MR. LANCIOTTI:  Object to form.
24       A.   From what dates?
```

Highly Confidential - Robert Michaels, PhD.

1      Q.   Are you having trouble hearing me,

2    Dr. Michaels, or you just forgot the dates?

3      A.   I forgot the dates.  I have no problem

4    hearing you.

5      Q.   Good.

6           The first date is April 25th, 2014.  The

7    second date is December 31st, 2014.

8      A.   I don't know that number.

9      Q.   My next question refers to this time

10   period, January 1st, 2015 until October 16th,

11   2015, when the water supply was switched back to

12   Lake Huron.  Same question:  Did you quantify or

13   do you know the additional amount of lead that

14   these four bellwether children were exposed to

15   during that time frame?

16     A.   No.

17          MR. LANCIOTTI:  Object to form; asked

18   and answered.

19     Q.   Did you undertake to determine in terms

20   of a quantitative analysis the amount of lead --

21   the additional amount of lead from the water that

22   occurred from the point in time when the water

23   switchover took place to the Flint River up until

24   the time that these individual families and the

Highly Confidential - Robert Michaels, PhD.

1   children for the four bellwethers stopped drinking

2   the water?

3       A.   I did not quantify that, no.

4       Q.   And did you then attempt to quantify the

5   amount of lead that they were exposed to from the

6   point in time in which they stopped drinking the

7   water from their taps in their homes through the

8   period of time when the water switchover back to

9   Lake Huron occurred in October of 2015?

10      A.   I'm sorry.  I have to ask you to repeat

11  the question.

12      Q.   The question is:  Did you attempt to

13  quantify the additional amount of lead that these

14  children were exposed to from the point in time at

15  which they stopped drinking the tap water,

16  whenever that date was for the individual families

17  and their children, through October of 2015, when

18  the water was switched -- the source of the water

19  was switched back to Lake Huron?

20          MR. LANCIOTTI:  Object to form.

21      A.   I did not quantify the number of -- that

22  particular number.  I did try to take that into

23  account by looking at the number of days that

24  might have been involved of exposure residentially

1  and of exposure in school.  And so, you know,

2  there was -- to some extent, I did try to consider

3  that, but I didn't have the data to quantify it.

4      Q.    In what sense did you consider it, and

5  what were your conclusions?

6      A.    Well, my findings were that there were a

7  certain number of days that they were potentially

8  exposed residentially, and that that number of

9  days was reduced, based on the depositions of the

10  parents, when they stopped using the water.  And

11  then there were certain kinds of exposure that

12  stopped at different points in time, if they

13  stopped drinking the water, or they started to

14  filter the water, or they stopped showering or

15  washing dishes or brushing their teeth.  I tried

16  to look into all of those factors.  It just got

17  too complex.

18      Q.    Okay.  I see.

19          So you -- in your analysis, you have a

20  start time of the water switchover of April 25th,

21  2014, and you did attempt to determine the period

22  of exposure, at least through drinking the tap

23  water in their residences, up until the point in

24  time at which they stopped doing so, right?

```
1        A.   Yeah.   To the extent that that's
2   reported in there, yes, that is correct.
3        Q.   Okay.   I think we'll get to that when we
4   get into the specifics of some of your reports.
5             You do recognize or you do acknowledge
6   that, you know, that period of time -- or never
7   mind.  Strike that.
8             I'm going to show you the
9   Dr. Hanna-Attisha study.
10            MR. ROGERS:  This is now exhibit -- will
11  be Exhibit 22.
12                      - - -
13            (Michaels Exhibit 22 marked.)
14                      - - -
15  BY MR. ROGERS:
16       Q.   Is this the study that you referred to
17  and that you reviewed?  I'll shrink it down a
18  little bit so you can see it -- as part of the
19  scientific research that you did for the case?
20       A.   Yes.
21       Q.   So this is the one that you have listed
22  on Page 133 of your list of papers that you
23  reviewed.  Just making sure that that's the
24  correct one.
```

1             Okay.  Did you -- yeah.  Did you -- you

2    didn't review or rely upon any other papers by

3    Dr. Hanna-Attisha besides this one, right?

4         A.   Not where she was the first author.  I

5    don't know if she was in corporate-authored papers

6    that I did cite, but I don't recall her being.

7         Q.   All right.  Thank you.

8             And you didn't review her deposition

9    transcript in the case, right?

10        A.   Right.

11                    - - -

12             (Michaels Exhibit 23 marked.)

13                    - - -

14   BY MR. ROGERS:

15        Q.   I'm going to show you Exhibit 23, a

16   paper from some time ago, 1965, by an author named

17   Julian Chisolm, Jr.  I don't believe that this is

18   listed as one of the papers that you reviewed in

19   the case; is that right?

20        A.   Yes.

21        Q.   And in this paper, Dr. Chisolm found

22   that in terms of blood lead levels, in terms of

23   micrograms per -- wait a minute.  Let me just

24   check this.  Hold on.

1          That the median levels here during this

2    period of time from age 0 to 6 months up through

3    adults had a median value -- can you see that all

4    right -- from 15 up to 27.

5          Do you see that?

6    A.    Yes, I do.

7    Q.    So is -- that would be higher -- these

8    numbers would be higher than the median levels --

9    median blood lead levels that you would expect for

10   children in Flint during the period of time we're

11   concerned about, 2014-15, right?

12         MR. LANCIOTTI:  Object to form.

13   A.    It does look like they're higher.

14   Q.    All right.  Did you by any chance ever

15   have any -- do you mind if I ask, how old are you,

16   sir?  Are you about 75 or so?

17   A.    74.

18   Q.    74.  Okay.  I was very close.

19         Have you ever reviewed studies like this

20   one -- or have you reviewed as part of your work

21   in this case studies like this one, or similar to

22   this one, for periods of time in the 1960s or the

23   1970s to determine how the mean or average blood

24   lead levels of various populations of children

Highly Confidential - Robert Michaels, Ph.D.

1    compared to the levels that were reported in Flint

2    during 2014-15?

3         A.   I don't recall citing -- or reviewing

4    any of those types of studies, no.

5         Q.   If, in fact, though, studies exist that

6    show in the 1960s and '70s, and even early '80s --

7    or the '80s and '90s, that the mean blood lead

8    levels were higher in young children in various

9    populations, what does that mean from a

10   toxicological perspective about whether they had

11   sustained any damage or impairments due to

12   exposure to lead?

13        A.   Well, it means that they probably did

14   experience damage as a result of that exposure.

15        Q.   Okay.  Let's go to the next one, which

16   is Exhibit 24.

17                        - - -

18             (Michaels Exhibit 24 marked.)

19                        - - -

20   BY MR. ROGERS:

21        Q.   I don't believe that you have referred

22   to this paper in your list, but you can check if

23   you'd like just to be sure.

24             There were two papers from Roy and

Highly Confidential - Robert Michaels, PhD.

1    Edwards as the coauthors.  You certainly know who

2    Dr. Marc Edwards is, right?

3        A.   Not offhand, no.

4        Q.   Oh, okay.  So Dr. Marc Edwards is a

5    professor from Virginia Tech, as is Professor Roy,

6    the coauthors of this report, who did water lead

7    level testing in Flint at various points in time

8    during the Flint water situation.

9             Have you not read any of the studies or

10   reports by Dr. Edwards concerning those subject

11   matters?

12       A.   I believe not.

13       Q.   Well, I guess, then I won't ask you a

14   lot of questions about them.

15            So you -- this paper -- you're not

16   familiar with Dr. Edwards' paper and any of the

17   conclusions or opinions that he relates in it, or

18   findings that he relates in it, lead released to

19   potable water during the Flint, Michigan water

20   crisis as revealed by routine biosolids monitoring

21   data?  You just don't know anything about it,

22   right?

23       A.   That's correct.

24       Q.   I'll show you the next one, Exhibit 25.

Highly Confidential - Robert Michaels, PhD.

```
 1                      - - -

 2              (Michaels Exhibit 25 marked.)

 3                      - - -

 4   BY MR. ROGERS:

 5       Q.   Another paper by Edwards entitled

 6   "Efficacy of Corrosion Control and Pipe

 7   Replacement in Reducing Citywide Lead Exposure

 8   During the Flint, Michigan Water System Recovery."

 9            You have not read this paper either,

10   Doctor?

11       A.   No, I have not.

12            MR. ROGERS:  Next exhibit I would like

13   to mark is Exhibit 26.

14                      - - -

15              (Michaels Exhibit 26 marked.)

16                      - - -

17   BY MR. ROGERS:

18       Q.   This is a paper that I believe you have

19   cited in your work and that you have reviewed by

20   Dr. Lanphear.  It's entitled "Low-level

21   Environmental Lead Exposure and Children's

22   Intellectual Function:  An International Pooled

23   Analysis."

24            You've reviewed this one, right?
```

```
 1        A.   I did, yes.

 2        Q.   Let's just make sure that's the one that

 3   you've cited here in your paper because

 4   Dr. Lanphear has a couple of different

 5   publications.

 6             Yeah, this is the one that you cite from

 7   Environmental Health Perspectives 2005.  Right.

 8   That is the one that appears on Page 134 of your

 9   report.

10             So what -- what is important to you in

11   terms of your opinions from this Lanphear report?

12        A.   I reviewed a lot of reports.  I can't

13   keep them straight offhand.  I'd have to review it

14   again and look again at the -- you can see what

15   the citation -- the in-text citation says, and

16   that's what I relied on for the information there.

17        Q.   Well, as you sit here today, you can't

18   remember what it is that's important about this

19   paper to any of the opinions that you hold in the

20   case?

21        A.   Right here, I can't remember, no.

22                        - - -

23             (Michaels Exhibit 27 marked.)

24                        - - -
```

Highly Confidential - Robert Michaels, PhD.

```
 1   BY MR. ROGERS:
 2       Q.   I'm going to show you Exhibit 27.  It's
 3   a paper by -- lead author is Crump, "A Statistical
 4   Re-evaluation of the Data Used in the Lanphear
 5   Pooled Analysis."
 6            And I don't believe you have read or
 7   referred to this scientific paper; is that
 8   correct?
 9       A.   Right, yes.
10       Q.   So to the extent to which the author
11   here, Crump, did an evaluation of Dr. Lanphear's
12   earlier study that is described in this paper,
13   you're just not familiar with that, are you?
14       A.   Not familiar with the paper, no.
15                    - - -
16        (Michaels Exhibit 28 marked.)
17                    - - -
18   BY MR. ROGERS:
19       Q.   Marked as Exhibit 28, the paper by
20   Dr. Lanphear that is an erratum, or -- I don't
21   know what erratum technically means -- but a
22   correction to some information in his previous
23   paper.
24            I don't believe you've referenced this
```

Highly Confidential -- Robert Michaels, PhD.

1   in your scientific literature papers that you

2   relied upon; is that right?

3       A.   Yes, that's correct.

4       Q.   So whatever Dr. Lanphear says where he's

5   correcting some of the information from his prior

6   report, you don't know what that is, do you?

7       A.   Not offhand, no.

8       Q.   You have a number of citations in your

9   report to something called the ATSDR.

10          What does that -- what's the acronym

11  stand for, and what is that all about?

12      A.   The Agency for Toxic Substances and

13  Disease Registry.  It's part of the CDC, Centers

14  for Disease Control.  And it is a very important

15  source of information and analyses that are

16  synthetic analyses of large databases, such as the

17  database of lead toxicology, in which these kinds

18  of details that you've referred to by Lanphear and

19  by Kenny Crump are incorporated into the full

20  documents.  And so those kinds of factors tend to

21  be corrected for in major reviews that are

22  undertaken by large organizations like ATSDR.

23      Q.   Okay.  And you consider information in

24  the ATSDR to be reliable, scientific, and you've

Highly Confidential - Robert Michaels, PhD.

1    relied on them, in part, in your report, right?

2         A.   Yes, that's correct.  And I have also

3    consulted for ATSDR.

4         Q.   Okay.  You just said something, I think

5    you said Kenny Crum.  Do you know --

6         A.   Crump.

7         Q.   Crump.

8              Do you know him?

9         A.   He's just a very famous guy.

10        Q.   Oh, okay.  So -- you referred to him by

11   Kenny.  I thought that meant that you knew him.

12             You don't know him personally, do you?

13        A.   No, I don't.  But I think that's the

14   name he uses on his papers.

15        Q.   Okay.  So I don't believe that you refer

16   to the ATSDR on the toxicological profile for lead

17   from August 2020, although you do make reference

18   to that same thing for 2019.  But I want to use

19   the 2021 and ask you some questions -- whoops, I

20   had stopped share and that was a mistake -- the

21   2021, if I may.

22             MR. ROGERS:  So this will be, Sara,

23   Exhibit 29.

24                           - - -

```
 1                 (Michaels Exhibit 29 marked.)

 2                         - - -

 3   BY MR. ROGERS:

 4        Q.   So you're familiar with the document

 5   that I'm showing to you sort of in the form,

 6   right, or the way it appears, that this is, in

 7   fact, the ATSDR from the Department of Health and

 8   Human Services, right?

 9        A.   Yes.

10        Q.   Did you -- am I right that you didn't

11   look at anything in the ATSDR for 2020 for

12   purposes of your report?

13        A.   Apparently not.  I think the most recent

14   one I have is this 2019.  I don't recall seeing

15   the 2020.

16        Q.   Okay.  So I just want to ask you if you

17   agree with some of the statements that are made

18   here as -- within your background and experience

19   and your expertise as a toxicologist.  And the

20   first one is on this page here that I'm showing

21   you now, which is Page 329.

22             You can see that we don't have the whole

23   August 2020 report.  We just have a few selected

24   pages here.  And it's -- we're now on Page 329 of
```

Highly Confidential - Robert Michaels, PhD.

1    that.

2          It says "Standard methods for bone lead

3    XRF measurements have not been universally

4    accepted, in part, because the technology

5    continues to be improved, and this needs to be

6    considered in comparisons of measurements reported

7    by different laboratories and at different times

8    in developing the methodology used."

9          Do you agree with that?

10     A.   I have no reason to disagree with it,

11    but I'm not familiar with the statement.

12     Q.   And in terms of the work that Dr. Specht

13    did in his -- the bone lead scan reports that were

14    provided to you, you know, you haven't read his

15    deposition transcript or any of his studies -- or

16    have you?  I forgot.

17     A.   No.

18     Q.   Have you read his papers or studies on

19    his technique for portable XRF machines?

20     A.   No.

21     Q.   So you don't know anything about, you

22    know, the extent of which and how Mr. Specht --

23    Dr. Specht went about calibrating and validating

24    his PXRF machine that he used for bone lead

Highly Confidential - Robert Michaels, PhD.

1    measurements, right?

2              MR. LANCIOTTI:  Object to form.

3         A.   I don't have that information.

4         Q.   The next statement here that I want to

5    ask you about is this one highlighted.

6              "Methodological factors can contribute

7    substantially to observed variability in bone lead

8    measurements in populations."

9              Do you agree with that?

10        A.   I imagine it's true.  I don't have

11   specific knowledge of it.

12        Q.   "These factors include bone, lead

13   target, radioactive source, measurement, time and

14   data reduction methods approach to handling

15   negative values," right?  Do you agree with that?

16        A.   I have no reason to disagree with that.

17        Q.   "Measurement uncertainty also appears to

18   contribute by biological factors such as BMI."

19             That's the body mass index, right?

20        A.   Yes, I imagine so.

21        Q.   And bone mineral content, right?  Do you

22   disagree with that?

23        A.   I have no reason to disagree with it.

24        Q.   Basically you're not an expert or you

Highly Confidential - Robert Michaels, Ph.D.

1    don't have expertise in bone scanning for purposes

2    of determining actual amounts of lead in bones, do

3    you?

4         A.   No, I don't.

5         Q.   And as I think we described earlier, in

6    your prior work up until your work on this case,

7    you had never had occasion to review and rely upon

8    or analyze bone lead content from bone lead scans

9    at any point in time in your career, right?

10        A.   Correct.

11             MR. LANCIOTTI:  Object to form.

12             MR. ROGERS:  Okay.  Let's take a

13   five-minute break here.  Let me get reoriented

14   here.  I'm going to change it up a little bit in

15   my order of questioning.

16             Just to let you know, Doctor, if you

17   have your report handy, I'm going to spend a lot

18   of time, probably the next couple of hours, going

19   through your report in some detail, so if you can

20   have that handy.  And I will put it up on the

21   screen when we need to so Patrick can see it, but

22   let's take a five-minute break and let me get

23   organized here.

24             VIDEOGRAPHER:  The time is 1:37 p.m.,

Highly Confidential - Robert Michaels, Ph.D.

1    and we're off the record.

2            (Recess taken.)

3            VIDEOGRAPHER:  The time is 1:48 p.m.,

4    and we're on the record.

5    BY MR. ROGERS:

6        Q.   All right.  Dr. Michaels, like I said

7    before we went off the record, I'm going to spend

8    a lot of time over the next couple hours here,

9    probably the rest of the day, on your report.  And

10   we're going to start -- I'll start my questioning

11   back at the beginning where we were before, with

12   respect to this highlighted section of the first

13   Page 2 here of the -- sorry -- second paragraph --

14   no, I'm sorry.  Bad question.  Start at the

15   beginning.

16           I noted that you cite to the amended

17   master complaint at great length in your report.

18   Why is that?  Why did you spend so much time

19   referring to the amended master complaint which

20   contains the allegations of the plaintiffs in the

21   case?

22       A.   Well, I found that it was a useful

23   source of general information that I could rely

24   on.  I didn't think there was anything

Highly Confidential - Robert Michaels, PhD.

1    controversial that I did rely on, but if there

2    was, I could be wrong.

3         Q.   Okay.  So to the extent that there were

4    allegations in the complaint that you referred to

5    or factual statements in the complaint, you didn't

6    do any, like, quality control checks to find out

7    if they were accurate or not?

8              MR. LANCIOTTI:  Object to form.

9         A.   No, I didn't.  I -- if there was

10   something in there that I felt was controversial,

11   I certainly would not have cited to it.

12        Q.   I see.

13             So you basically relied upon the master

14   complaint for your report to, you know, just sort

15   of lay the groundwork, the foundation, the

16   background story in the case, but anything

17   controversial, you wouldn't have cited to it for,

18   right?

19        A.   In fact, there was a particular

20   statement that I explicitly did not endorse, which

21   was the fact that the -- if I recall, that there

22   was some under-reporting of the water levels or

23   something like that.  I can't recall.  But I

24   explicitly stated that allegation is beyond the

Highly Confidential - Robert Michaels, PhD.

1    scope of my consideration.  And I felt that way

2    generally speaking, that I was not trying to pick

3    up any particular viewpoint from this document.

4         Q.   Gotcha.

5              And while we're on that subject, as you

6    know, I represent the Veolia defendants -- Veolia

7    North America defendants in the case.  And in

8    your -- you don't have any opinions in the case

9    directed specifically to Veolia or any of its

10   employees or any of the work that they did in the

11   case, right?

12        A.   Yeah, I don't recall using that word,

13   "Veolia."

14        Q.   So it's correct, then, that you don't

15   hold any professional opinions that you intend to

16   testify about, at least at this time, with respect

17   to the work that Veolia did for the City of Flint

18   and whether it met any accepted standards of care

19   or anything like that, right?

20        A.   No.  I haven't precluded any judgments

21   to be made about the standards of care or anything

22   else that you might refer to.  I simply haven't

23   looked at the term "Veolia."  If Veolia was

24   responsible for an allegation of mine, then Veolia

Highly Confidential - Robert Michaels, PhD.

1    would be included.  I really have no idea.

2        Q.   Okay.  So that leads me to have to ask

3    you a series of follow-up questions because of the

4    way you answered the question.

5            You said you haven't precluded.  You

6    know, Doctor, here we are.  You've written a

7    report; we're now taking your deposition.  You

8    haven't said one word in your report about any

9    specific opinions that you hold with respect to

10   anything that Veolia did or did not do, but then

11   you just said, "Well, I haven't precluded that."

12   So, you know, I get one chance to take your

13   deposition here and I've got to know.

14           As of today, is it correct that you

15   don't have and have not formed any professional

16   opinions about whether or not -- about anything

17   having to do with Veolia and the work that it did

18   for the City of Flint in this case?

19       A.   Well, I'm going to answer your question

20   to the best of my ability.  And, apparently, it's

21   not a style of answer that you like.

22           The fact is, I don't know what Veolia

23   did.  But I do know that there are questions about

24   what kind of pipes were put in and whether they

Highly Confidential - Robert Michaels, Ph.D.

1    were all taken out and which ones were taken out,

2    all kinds of questions that might or might not

3    have to do with the role that Veolia played.  If

4    I'm critical of something, the fact that I'm

5    unaware of a role that Veolia played in bringing

6    that aspect about does not preclude my including

7    Veolia in my opinions if subsequently I find out

8    that they did have something to do with it.  I

9    just have not focused on Veolia as an entity.  But

10   I have focused on issues, and if Veolia had

11   something to do with it, well, I don't have any

12   problem bringing Veolia in based on that.

13        Q.   You don't know what Veolia did?

14        A.   No, I don't know what Veolia does.

15        Q.   You don't know what Veolia does, but you

16   also don't know what Veolia did or did not do with

17   respect to the work that it did for the City of

18   Flint as a consultant, right?

19        A.   Right.  I don't recall.  I probably -- I

20   know that I came across the name before, but I

21   don't remember in what context.

22        Q.   So this statement here in the second

23   paragraph where you say "In short, this report

24   evaluates general causation.  General causation is

Highly Confidential - Robert Michaels, PhD.

1    necessary to justify a physician's finding of

2    specific causation, that is, attribution of a

3    specific patient's condition to the patient's

4    exposure."

5              What is the source of that statement?

6    Where did this come from?

7        A.   Comes from the rest of the report.  This

8    is a summary of the report.

9        Q.   No, but I mean your formulation of it

10   that general causation is necessary to justify a

11   physician's finding of specific causation, where

12   does that -- what's the source of that statement?

13       A.   My general understanding over many years

14   of practice.

15       Q.   Is that an understanding as to some type

16   of legal requirement or evidentiary foundational

17   requirement?

18       A.   I believe that there probably is some

19   basis like that, but I only make the distinction

20   between general causation and specific causation,

21   as I've explained.

22       Q.   So the way in which you're using these

23   terms, general causation and specific causation --

24   and you have "specific" and "general" both in

Highly Confidential -- Robert Michaels, PhD.

```
 1    quotation marks -- that's the reason I asked --

 2    those are scientific principles that you apply in

 3    your expertise as a toxicologist, right?

 4        A.   Yes.  That's the way I would put it.  I

 5    think that's correct.

 6        Q.   Okay.  Well, finally I got one right.

 7    You finally agreed with one of my formulations of

 8    your statements here.

 9             So -- and then, again, the attribution

10    of a specific patient's condition to the patient's

11    exposure as a matter of specific causation, you

12    know, you -- you're deferring to physicians to

13    make that specific causation connection, right?

14        A.   Yes, that's correct.

15             MR. STERN:  Object to form.

16        Q.   Okay.  You go on in the next paragraph

17    to say "The general causation issue for lead in

18    City of Flint municipal water is complicated by

19    the ubiquity of exposure from other sources."

20             Explain what you meant by that, please.

21        A.   I believe I've explained that before.

22    We all know that people are exposed to lead from

23    many, many different sources, and those include

24    sources that were active before the City of Flint
```

1    switched to its Flint River source.  So it's

2    complicated by the fact that it's hard to

3    attribute.  You don't know which lead molecule was

4    associated with the river and which one was

5    associated with a can of peas, you know,

6    five years ago.

7         Q.   Gotcha.  And we did discuss this a

8    little bit earlier on.

9              In terms of the other sources of lead

10   for the bellwethers and the, you know, children in

11   Flint during this period of time, what would those

12   be?

13        A.   What would the other sources be?

14        Q.   Yes.

15        A.   Well, I think I've listed some.  You

16   know, kids go fishing.  They used lead fishing

17   sinkers.  Kids go hunting for squirrels and they

18   use lead bullets.  Kids eat canned -- eat food out

19   of cans that may have solder that has lead in it.

20   Kids, you know -- they get exposed to dust that

21   has lead in it from an incinerator, for example.

22   We've talked about a lot of these kinds of

23   sources.

24        Q.   I know.  But, Doctor, you specifically

Highly Confidential - Robert Michaels, PhD.

1  are referring in your statement here to "the

2  ubiquity of exposure from other sources," so I'm

3  asking you specifically, what are those other

4  sources of lead exposure that are ubiquitous that

5  I am -- that you are referring to in this

6  sentence?

7      A.   I didn't say any particular source was

8  ubiquitous.  I said there is ubiquity of exposure.

9  Everyone is exposed to lead --

10     Q.   Okay.

11     A.   -- from a mix of sources.

12     Q.   From other sources.

13     A.   Yes.

14     Q.   So I'm asking, then, what are the other

15  sources that the children in Flint were exposed to

16  besides lead from the water?

17     A.   And I've tried to answer that.  I don't

18  have a particular kid's name with a list of the

19  sources.  I have a list of sources that I've given

20  you.  Some kids go fishing with sinkers that are

21  made of lead; some kids go shooting squirrels with

22  bullets that are made of lead; some kids eat food

23  from cans that are soldered closed with lead

24  solder; some kids may have a hand-to-mouth or pica

Highly Confidential -- Robert Michaels, PhD.

```
1    problem where they actually eat nonfood items and
2    that could include soil that has lead in it; you
3    know, some kids may help their parents with
4    gardening and the gardening may have, you know,
5    fall -- particles falling out of the air that have
6    lead in them.
7              There are a lot of different sources of
8    lead.
9         Q.   And I don't think you mentioned but you
10   said before, dust, right?  Dust in the home.
11        A.   In the home, yeah.  My -- yes, dust in
12   the home, dust in paint chips that can fall out
13   of, you know, the windowsill, or -- you know, kids
14   can rub their fingers along it and then in their
15   face.  There's a lot of different sources of lead,
16   and I've tried to acknowledge that with complete
17   candor and complete understanding that there's not
18   just one source of lead.
19        Q.   And are you familiar with the IBEUK
20   [sic] model for attempting to evaluate the various
21   sources of lead exposure in modeling predicted
22   blood lead levels from the EPA?
23        A.   Yes, I am familiar with that.
24        Q.   Have you used that model in any of your
```

1  work in the past?

2      A.   I have not used the model.  If you're

3  referring to a product that's for sale, it's

4  really not anything unique.  It's just what we do

5  normally by hand.  It just integrates it into a

6  computer program that puts that -- those

7  parameters in and attributes fractions of the

8  exposure to each source.  You know, in the old

9  days, we try to do that individually without the

10  IEUBK model.  But, you know, our people find that

11  useful.

12      Q.   Yeah, I didn't mean a particular brand

13  or anything or a particular computer model.  I

14  meant the modeling that's available to do that

15  type of thing.

16          You have done that type of modeling and

17  evaluation in the past, is that right, in your

18  work?

19      A.    No, I have not used any computer model

20  to synthesize those exposure pathways.  I've

21  always done it by the information I have

22  specifically about an exposure pathway.

23      Q.   So if you don't use a computer modeling,

24  you would use mathematical calculations, right?

1      A.   Yeah.  We call them spreadsheets.  We

2  use a lot of spreadsheets.

3      Q.   All right.  Spreadsheets.

4           So you have used spreadsheets using

5  mathematical formulas or calculations --

6      A.   Oh, yes.

7      Q.   -- to attempt to determine the extent to

8  which lead from dust and soil and water and other

9  things contribute to the overall load of lead that

10  would result in predicted blood lead levels,

11  right?

12      A.   Yeah, I've done that, sure.

13      Q.   Okay.  Did you do it in this case for

14  any of the bellwether plaintiffs?

15      A.   No, I did not.  As I mentioned, the data

16  were not conducive to that.

17      Q.   Explain why.  Why wasn't the data

18  conducive to doing that?

19      A.   Well, we don't really have exposure

20  levels.  We don't really have the kinds of

21  detailed information that would be required to

22  fill in a model like that.

23      Q.   What type of information would you need?

24      A.   You know, I've been through this with

Highly Confidential - Robert Michaels, PhD.

1    you before.  For example, we don't know how often

2    the kids drink water; how much the water -- how

3    much water they drink; what the concentrations of

4    lead are in the water.  We don't know when they

5    stopped drinking the water.  We don't know when

6    they started using filters.  We don't know how

7    much of their water intake came from schools.  We

8    don't know how much may have come from garden

9    hoses.  I think one of the kids drank directly

10   from a garden hose when outside.

11          There are many different parameters that

12   we don't know.  And when those kinds of parameters

13   are addressed in the parent depositions, the

14   information is very vague and very approximate.

15   And so we don't really have the kind of

16   information that would be conducive to producing a

17   quantitative estimate.  Or if we did use it, you

18   know, people like you might be attempted to say,

19   "Well, garbage in, garbage out," and I'd be

20   attempted to agree.

21       Q.   Did you say "you," meaning me, why --

22       A.   You.

23       Q.   Oh.  There's an expert in the case

24   called Dr. Yu, but I think he pronounces it Woo.

Highly Confidential - Robert Michaels, Ph.D.

1   So you weren't referring to him, you were

2   referring to me?

3       A.   No.  I was referring to just your role

4   as a defense attorney, that you would probably

5   cast aspersions on such an analysis, and I

6   wouldn't blame you.

7       Q.   What did you mean in this next section

8   of the sentence here, "And the consequent presence

9   of pre-existing lead body burdens and possibility

10  of pre-existing lead health effects"?  What did

11  you mean by that?

12      A.   Well, as I said, people are exposed to

13  lead, and they were definitely exposed before the

14  Flint River episode, and, therefore, they had

15  levels of lead in their body.  And if they had

16  levels of lead in their body, they also could have

17  pre-existing conditions produced by that lead in

18  the body, so we can't preclude that.

19      Q.   I see.

20           Did you do any evaluation to determine

21  what the pre-existing lead body burdens were for

22  the individual bellwether plaintiffs, the four

23  that we're concerned about now?

24      A.   No, I did not quantify that.

Highly Confidential - Robert Michaels, PhD.

1    Q.   Did you do any evaluation of the

2  possibility of pre-existing lead health effects in

3  the four bellwether children?

4    A.   Well, there were definite -- there were

5  summaries of medical records, and some of the

6  medical records dealt with conditions that

7  predated the exposure by the Flint River.  And so

8  those things were not necessarily attributed

9  specifically to lead, but they were there before.

10  So if there was a neurobehavioral effect that

11  predated the Flint River, one has to consider the

12  Flint River didn't produce this effect.  It may

13  have made things worse.  We don't know.

14    Q.   And when you're referring to these

15  summaries, you're referring to these summaries

16  done by a physician that were provided to you for

17  the bellwethers?

18    A.   Yes, that's correct.

19    Q.   I'm going to ask you a question about

20  these next couple of statements.

21       "It is simplified, however, by the

22  absence of a discernible Pb toxicity threshold.

23  That is, no safe blood Pb or lead level is known."

24       So the question is really, what do you

1    mean by that there is no -- there's an absence of

2    a discernible lead toxicity threshold from a

3    scientific point of view as a toxicologist?

4         A.   That the dose-response curve goes down

5    smoothly and not abruptly at a certain threshold

6    exposure.

7         Q.   I'm sorry.  I don't understand that

8    exactly.  What does that have to do with a

9    discernible toxicity threshold?

10        A.   Well, a threshold is where the --

11   anything below that threshold would not produce a

12   toxic effect.  There is no such threshold that

13   anyone can stand or --

14        Q.   Okay.  So there's no -- what you're

15   saying here is that the -- in your opinion, the

16   science as it exists today does not -- the science

17   has not been able to establish the threshold

18   amount of lead in terms of molecules or anything

19   else that would be necessary to cause a toxic

20   effect in human beings; is that what you're

21   saying?

22        A.   Not exactly, no.

23             MR. LANCIOTTI:  Object to form.

24        Q.   Okay.  Then explain it to me.

Highly Confidential - Robert Michaels, PhD.

1      A.    You are presuming that there is a

2  threshold, and I don't know what the threshold is,

3  or science doesn't know what the threshold is.

4           What this statement is saying is that

5  there is an absence of a discernible toxicity

6  threshold.  It's not only that we don't know the

7  number.  We don't know that there is a threshold

8  like that.

9      Q.    Okay.  I see what you're --

10     A.    Now, let's go a little further than

11  that, because I think it's very significant.

12  Let's say that there was a threshold, as there is

13  for most substances.  That threshold is not a

14  universal constant number that applies to

15  everyone.  People have thresholds that are based

16  on their genetics, their nutritional state, their

17  age, all kinds of other factors that make the

18  threshold idiosyncratic for the individual.  So

19  it's not a bright line even when there's a

20  threshold.

21           But what I'm saying here, which I think

22  is very clear, is that there is not, as far as I

23  know, a discernible Pb toxicity threshold.

24     Q.    So then following that, the statement

Highly Confidential - Robert Michaels, PhD.

1    that there is no safe blood Pb or lead level is

2    known, is that essentially the same thing, that

3    it's just not known whether or not there is one,

4    that is to say, you know, a certain amount of lead

5    will not result in any toxicity or harm?

6        A.    Yeah, that's right.  It is pretty much

7    the same thing.

8        Q.    So in your opinion, are there any -- or

9    strike that.

10            So if there's no discernible or known

11   toxicity threshold level, how is it, then, that

12   you can say in your next -- or hold the opinion

13   that -- or do you hold the opinion that any

14   exposure to lead does cause or exacerbate or

15   contribute to causing or exacerbating health

16   effects?

17       A.    I think you're misreading the sentence.

18   It says whether such exposure can cause, not does

19   cause.

20       Q.    Well, that's what I'm --

21       A.    We're talking about the risk.  The

22   potential for such a thing to happen.  We're not

23   specifically saying that in a particular

24   individual, it will happen.

 1        Q.   Right.  Right.  That's what I'm asking

 2   you.

 3            The fact that you say it can cause,

 4   given what we've just talked about, does not mean

 5   that it does, right?

 6        A.   No.  I'm not sure that that's correct

 7   either.  I think that if it can cause something,

 8   you know, they say anything that can happen, will

 9   happen in the universe.  And when you have a large

10   population, things that can happen tend to happen

11   sometimes.

12            And so when you're talking about risk,

13   you're talking about the real thing.  Does it

14   happen?  Yes, it happens.  Sometimes you lose in

15   Russian roulette.  Sometimes you're lucky.  So if

16   you have a six-shooter, one in six times you're

17   going to lose.

18            In this particular example, the

19   presumption is that, yes, it does happen.  Not

20   often, but it does happen.

21        Q.   I guess I was trying to get to more of a

22   specific and not in a general sense.  But in a

23   particular individual, whether or not a specific

24   additional amount of lead does cause additional

Highly Confidential - Robert Michaels, PhD.

1   harm.

2          You're not saying it does or it doesn't;

3   you just say it might?

4       A.   Yes.  I guess you could kind of put it

5   that way.  But if it might, it does.  I don't

6   think it's very distinguishable.  If it might be a

7   problem, then it is a problem.  These are random

8   people.  These are people who are exposed to

9   something, and you have to ask the question, is

10  that a risk for those people?  And the answer is

11  that if there is a statistical risk for the

12  population, there is a statistical risk for the

13  individual as far as we know.

14      Q.   I see.

15          And the issue -- the next step, the

16  issue of whether or not in a specific case with a

17  specific child, based upon that particular

18  child's, you know, medical makeup and background

19  and medical history and so forth and so on,

20  whether or not an additional amount of lead --

21  that person being exposed to additional amount of

22  lead actually caused any harm to that child,

23  you're leaving that to the physicians in the case

24  for those analyses and opinions, right?

Highly Confidential - Robert Michaels, PhD.

```
 1        A.   For a particular child, yes.  The
 2   specific causation issue is what I leave to the
 3   physician.  Absolutely.
 4        Q.   Okay.  All right.  I got it.  Thanks.
 5             We're making progress.  We're through
 6   Page 5.  That's good.
 7             Okay.  On Page 8, I do have some
 8   questions about this paragraph that's highlighted
 9   here starting at the top of the page.
10             "Indeed, homes served by private wells
11   may have lead residues, and these originate not
12   from the municipal source but from corrosion of
13   household plumbing and their well components."
14             You're not aware that any of the
15   bellwether plaintiffs had their water serviced by
16   private wells, right?
17        A.   Right.  In fact, I specifically said
18   that I didn't find any.
19        Q.   Right.
20             And in the next paragraph, "In the case
21   of the City of Flint, the preponderance of
22   potential exposure via drinking water appears to
23   originate from lead in service lines."
24             And you have a citation to -- in your
```

1   Footnote 7, "Most of Flint's 550 miles of water

2   mains are now 75 years old and constructed of cast

3   iron piping."

4           And then you reference 35, Page 91.

5           35 is the master amended complaint in

6   your citation reference numbering system, right?

7       A.   Yes, that's correct.

8       Q.   So -- and then it says a little bit

9   further, again, citing to 35, the master

10  complaint, "An estimated 15,000 of Flint's 30,000

11  residential service lines are composed, at least

12  partially, of lead.  The exact number is presently

13  unknown."

14          Since the time at -- or before the time

15  at which you wrote your report, did you do

16  anything on your own to evaluate the numbers or

17  percentages of service lines that were comprised

18  of lead versus some other material in the City of

19  Flint?

20      A.   No, I did not.  Well, I may have tried,

21  but I didn't find anything.  I did not think this

22  was a controversial statement and, therefore, I

23  cited it because it gave the general idea that

24  there was a pretty good chance that there would be

Highly Confidential - Robert Michaels, Ph.D.

1 lead in the service lines. The actual numbers are

2 not that significant one way or the other.

3     Q. Well, they're certainly significant when

4 evaluating the lead exposure of individual

5 plaintiffs, that is to say, whether the service

6 lines were lead or not, right?

7     A. Yeah, that's why --

8     MR. LANCIOTTI: Object to form.

9     A. -- the statistic is not that

10 particularly important. I just thought it was

11 worth pointing out that not all of them were made

12 of lead and that there was some risk that they

13 were.

14     Q. Why was it important to know when

15 evaluating an individual plaintiff's, in this

16 case, exposure to lead to know whether or not the

17 service lines providing water to their houses were

18 made of lead or not?

19     A. Because these are exposure pathways.

20 And we try to identify the various exposure

21 pathways that can produce the blood lead levels

22 that the people have. And so whether it's lead or

23 not lead is a very important issue.

24     Q. Okay. And not to belabor the point, but

Highly Confidential - Robert Michaels, PhD.

```
1    we had this discussion earlier.

2              As you sit here today in your

3    deposition, you don't know whether the lead -- the

4    service lines for these four bellwether

5    plaintiffs' houses were made of lead or not,

6    right?

7              MR. LANCIOTTI:  Object to form.

8         A.   Well, to the extent that I know, it's in

9    the report.  And if you're telling me it's not in

10   the report and I haven't verified, then I didn't

11   know, right.

12        Q.   Would this statement be true with

13   respect to the individual bellwether's homes, that

14   the preponderance of potential exposure via

15   drinking water would originate from lead in the

16   service lines if, in fact, they were lead service

17   lines?

18        A.   If they were -- if they were not lead

19   service lines?

20        Q.   No.  You say here, "The preponderance of

21   potential exposure via drinking water appears to

22   originate from lead in service lines."

23             That statement is true, right?

24        A.   I believe so.  That's -- yes.
```

Highly Confidential - Robert Michaels, PhD.

1    Q.   So does that also mean that if the

2 service lines were not made of lead, that the

3 exposure would not be from drinking -- the lead

4 exposure would not be from the service lines?

5    A.   Yeah.  It would be something else.  Of

6 course.

7    Q.   What other sources would there be?

8    A.   Well, there's the water mains, number

9 one.  And then there's the water -- the pipes

10 inside the house and the soldering of those pipes.

11 So there are internal kinds of sources.  And there

12 are the schools.

13    Q.   When you say "the water mains," are you

14 aware of any of the Flint water -- or have you

15 undertaken a study to determine what the water

16 mains were comprised of?

17    A.   I thought that I might have cited

18 something like that.

19         MR. LANCIOTTI:  Object to form.

20    A.   I thought I might have cited something

21 like that.  My own personal opinion is that the

22 water mains are larger diameter and they might

23 have less influence on the water.  The service

24 lines are smaller diameter, and there is a more

1    intimate association of the service of the pipe

2    with the water that passes through the pipe.  So

3    that may be another source of increased influence

4    of the service line compared to the water main.

5         Q.   Okay.  But with respect to the water

6    mains, are you aware of any evidence that any of

7    the water mains in the City of Flint were made of

8    lead?

9         A.   No, I'm not -- right now, I'm not.  If I

10   didn't cite it, then I probably was not when I

11   wrote the report.

12        Q.   To the extent to which water -- this

13   next sentence here, "Water delivered via service

14   lines then enters the homes and is circulated

15   within homes via pipes often made of plastic or

16   copper, the latter possibly joined with

17   Pb containing solder."

18             If the pipes in somebody's homes had

19   been replaced and were made of plastic, the

20   plumbing throughout the system, and the lead --

21   the service lines leading into the house were not

22   lead, would there be any sources of lead that

23   could get into the water in that home?

24        A.   Were there any?  I don't know.  But

Highly Confidential - Robert Michaels, PhD.

```
1   certainly not those sources.
2      Q.   Can you think of any that would be -- if
3   the plumbing was all plastic in the home and the
4   service lines were not made of lead, what would
5   the potential source of lead in the water be in
6   that home?
7      A.   Well, we've talked about one in
8   particular, which is wells.
9      Q.   Okay.  Leave out the wells.  Sorry.
10         Assuming there was service by the Flint
11  water distribution system, if you had service
12  lines which were not lead and you had plastic
13  plumbing throughout the house, then there wouldn't
14  be any source of lead to get into the water for
15  that particular house, right?
16         MR. LANCIOTTI:  Object to form.
17     A.   You know, I think that the answer to
18  that question is that if you make the assumption
19  that the water is getting the lead from the pipe,
20  you're right.  That is exactly what you could
21  conclude.
22         Does some form of water treatment plant
23  equipment have lead in it?  I don't know.  I have
24  not looked into the water system in that level of
```

1    detail.  But if you're asking me conceptually

2    could it come from someplace else, well, upstream

3    is the water treatment plant, and that's the next

4    place where it could come.

5        Q.   Okay.  We're on Page 10 now.  No, I'm

6    sorry.  We're still on Page 9.  Sorry.  Let's see.

7             You mention a Pieper study from 2018

8    reporting sampling of homes, and then on the next

9    page, you also refer to the Pieper paper.  That's

10   on page -- I'm sorry.  Forgive me.  I guess -- I

11   guess the only -- the section that you refer to

12   the Pieper paper of 2018 right here is on this

13   page.

14            And I'm going to ask you some questions

15   about that later on, so let's just hold that.  I

16   just wanted to note that you did refer to the

17   Pieper paper to some extent here, and you're

18   talking about -- you're using it here for purposes

19   of information about the water lead levels that

20   were measured and as reported in that paper,

21   right?

22       A.   Yes.  I think that the tenor of those

23   remarks is that there were numbers associated with

24   the study, and that the authors concluded that

1    that indicated a generic problem in Flint, and,

2    therefore, it goes beyond just the numbers.  It's

3    a -- it's a judgment about the problem of lead in

4    water in Flint.

5        Q.   Okay.  I'm highlighting an additional

6    section here on Page 10 where the introduction to

7    this part of it is here, "After the change in the

8    City of Flint water source, the incidence of

9    elevated blood lead levels in Flint rose from

10   2.4 percent to 4.9 percent, compared with no

11   significant change outside of Flint."

12           And that's the Hanna-Attisha study from

13   2016, right?

14       A.   Right.

15       Q.   And what this means is that what she

16   reported was that the -- by elevated blood lead

17   levels, she was reporting that the percentage of

18   blood lead levels above a certain amount rose from

19   2.4 to 4.9 percent, right?

20       A.   They reported that, yes, not she.

21       Q.   Okay.  The authors, yeah.

22           And, then, my question is about the next

23   one, "Concurrent tests for lead in drinking water

24   at bellwether plaintiffs' homes apparently were

1    not undertaken."

2            So that just confirms what we talked

3    about earlier.  You were saying here in your

4    report that you're not aware of any water lead

5    levels taken at any of the bellwether plaintiffs'

6    home during the switchover period, right?

7        A.   Yes, that's correct.

8        Q.   Okay.  Thanks.

9            All right.  So these -- we talked about

10   all of the blood lead level tests.

11           Yeah, in terms of the level of

12   detection, you know, if the -- in terms of

13   interpreting the test reports, okay, for those

14   test reports that we looked at for the bellwether

15   plaintiffs that had a report that said less than

16   3.3 micrograms per deciliter, what that means is

17   that the particular equipment that was used to

18   measure the content of lead in that blood sample

19   was -- had a level of detection that was at least

20   3.3 micrograms per deciliter; is that right?

21       A.   Yes, that's correct.

22           MR. STERN:  Object to form.  Sorry.

23       Q.   Okay.  So in terms of what is known

24   about the actual blood lead content of that

Highly Confidential - Robert Michaels, PhD.

1    particular sample that was taken, if it's reported

2    that way, you just don't know what it is.  It

3    could be zero or it could be, you know, up to 3.2,

4    right?

5              MR. STERN:  Object to form.

6         Q.   Is that right?

7         A.   Yeah, that's correct.

8         Q.   Okay.  And you mentioned, and some other

9    witnesses have testified that depending upon the

10   type of equipment used to test the content of

11   blood -- sorry -- the content of lead in blood,

12   there is equipment -- state of the art type of

13   equipment that can have a -- that have a much

14   lower detection limit than, you know, 3.2 or 3.3,

15   right?

16        A.   Yes, that's correct.

17        Q.   So that if one of the blood lead levels

18   that we looked at was a 2.0, you would assume by

19   reading that report that the level of detection

20   was capable of measuring that amount and that that

21   represents an actual amount, 2.0, right?

22        A.   Yes, that's correct.

23        Q.   So explain to me -- I didn't really

24   understand what the point was that you're trying

1   to make here in this section.  Eight of the

2   15 blood lead tests were reported as nondetects,

3   along with the applicable limit of detection,

4   values 3.3 -- one result 3.3, et cetera,

5   et cetera, 3.4.  All eight for nondetects are

6   higher than blood lead concentrations reported

7   among the seven positive results.

8          Honestly, I just wasn't following what

9   you meant by this.  Can you explain it to me?

10      A.   Well, for the kids who had

11  state-of-the-art equipment used in detecting their

12  blood lead levels, most of those values were lower

13  than the level of detection for this crude

14  equipment.  And so these values, eight of them,

15  all may have had, you know, positive numbers in

16  there, but you wouldn't know that because the

17  equipment was so crude.

18      Q.   But why does that -- explain the logic

19  to me.  The fact that eight -- for nondetects are

20  higher than the concentrations reported among the

21  seven positive results, why does that logically

22  mean anything about, you know, what the actual

23  amounts were in the ones reported as nondetects?

24      A.   I think I will refer you to Page 12

Highly Confidential - Robert Michaels, PhD.

1   where this issue was explained.

2       Q.   That would be good.  Thanks.  Yeah,

3   let's look at that.

4       A.   You know, just use of methods less

5   sensitive than state of the art raises the

6   possibility that some or all of the tabulated

7   nondetects actually would have been reported as

8   detects if state-of-the-art methods had been

9   applied.

10      Q.   Okay.  Can I stop you there?  Please,

11  let me stop you there.  Thank you.

12           I just want to ask you -- you're saying

13  that it raises the possibility, but you -- there's

14  no way of knowing, right?

15      A.   Right.  That's correct.

16      Q.   Okay.  Please continue on.  Thanks.

17      A.   It's part of credibility and

18  probative -- probativeness of the source of

19  evidence.  And if you look at the conversely

20  statement, all seven of the tabulated detects

21  probably would have been reported as nondetects

22  had the relatively insensitive tests been applied.

23      Q.   Oh, I see.

24      A.   So if you had two but the test only

Highly Confidential - Robert Michaels, PhD.

```
1    could detect 3.3, then it would be less than 3.3

2    and not detect.

3         Q.   I gotcha.

4              So you had in there, for example, there

5    was a .7, as I recall -- actually, I'm looking at

6    the chart right here, so --

7         A.   Yes, there is a .7.

8         Q.   Let me tell you what this is.  There's

9    a .6.  There's a .7.  There was a 2.0 that we

10   looked at.  There's a .8 -- sorry.  I'm not

11   referring to just the bellwether plaintiffs, the

12   four.  I'm looking at your whole chart.

13        A.   Yeah, that's fine.

14        Q.   Okay.  So just to illustrate the point,

15   there's a .3., there's a .7., there's a .6, and we

16   talked about a 2.0 that's not on your chart but

17   that we looked at.

18             What you're saying is here if the level

19   of detection of the test that was used at that

20   time on those plaintiffs was 3.3, those would have

21   been reported as less than 3.3, right?

22        A.   Yeah.  They would have been nondetects.

23        Q.   All right.

24        A.   And the paragraph ends with the idea
```

1    that the more general issue is raised of whether

2    Pb tests commonly used or commonly used methods

3    less sensitive than the contemporary state of the

4    art, and, therefore, whether the fraction of

5    children with elevated blood levels -- blood

6    Pb levels might have been underestimated and,

7    therefore, under-reported.

8         Q.   Okay.  But, sir, with respect to

9    whatever type of equipment was used, is it correct

10   that with respect to these four bellwethers,

11   you're not aware of any blood lead level

12   measurements that were ever done that were

13   reported as higher than 3.3 micrograms per

14   deciliter, right?

15        A.   I will have to go back.

16             No, it looks like they were all within

17   that range.

18        Q.   And when you say here it raises the

19   general issue, and the last part of the sentence

20   is "and whether the fraction of children with

21   elevated blood Pb might have been underestimated

22   and under-reported," what is the elevated blood

23   lead level that you were referring to?  What's the

24   number?

Highly Confidential - Robert Michaels, PhD.

```
 1        A.   Well, as I said, I recall reading that
 2   an average number might have been 1.  Again, we're
 3   getting into this realm of semantics.  Anything
 4   above zero could be considered elevated.  But if
 5   you look at 1 as a kind of average number, the
 6   numbers that we're seeing did exceed 1, and so
 7   they could be elevated blood levels in those
 8   children relative to the average blood levels.
 9        Q.   Okay.  But in the plaintiffs that we
10   have -- the four bellwethers we have here, the
11   only measurement that exceeded 1 was the 2.0 that
12   was from -- sorry -- 2009 for -- I think it was
13   for A█████ T██, but let me just make sure.
14             Is that right?
15        A.   Well, I have --
16        Q.   I'm sorry.  It was D█████ W██.  That
17   was the 2.0 from September 2009.
18        A.   Right.  But we also have three values
19   for G█████    B██
20        Q.   Okay.  I'm --
21        A.   2.5, 3.1, all above 2, all above 1.  So
22   those are elevated blood levels for the four
23   plaintiffs that we're referring to today.
24             Now, of course, this statement in my
```

Highly Confidential - Robert Michaels, Ph.D.

```
1    report goes beyond those four plaintiffs.  But,

2    yes, we do have it with respect to the four as

3    well.

4         Q.   Well, we don't -- the one that we have

5    for the four that's the 2.0 was from 2009 for

6    D███PPI███ W█PPI█.  The rest of them were below 1 for

7    the remaining bellwether plaintiffs, right?

8         A.   As I said, G████PPI████ B██PPI██ has three --

9         Q.   I know.  Sorry.  Dr. Michaels, I'm just

10   referring to our four now.  I understand the

11   confusion.  I'm talking about our four:  S███PPI███,

12   T█PPI█, V███PPI████ and W█PPI█.

13        A.   Yeah.  I see those are lower.  Yes,

14   that's correct.

15        Q.   Okay.  So you didn't -- when you were

16   using the term here, whether the fraction of

17   children with elevated blood lead might have been

18   underestimated and under-reported, did you have --

19   did you mean to define -- did you have a number in

20   mind that you meant as elevated blood lead?

21        A.   No, I did not.

22        Q.   Well, you used the word -- I mean, you

23   described -- you chose to use the word "elevated"

24   blood lead.  You can't describe to me what you
```

1    meant by that in terms of --

2         A.    I think I did describe that.  I just

3    wasn't thinking of a particular number.  I thought

4    that's what your question was.

5         Q.    Well, then what was it?  Elevated from

6    what to what?

7         A.    Well, that's what I was saying, that

8    depending on what you mean by "elevated," you

9    know, a normal level ought to be zero.  Nobody

10   should have any lead in their body.  So,

11   unfortunately, we don't live in a world like that.

12   But we all have elevated blood levels.

13         You know, there are other pollutants in

14   the world that we shouldn't have in our bodies,

15   things that are entirely synthetic such as

16   plutonium, as I've mentioned earlier, and the

17   PFOA-type contaminants that are only a product of

18   technology.  Those should be zero.  In our world,

19   they aren't zero.  We all have levels of those.

20   Are they elevated?  That depends on your

21   definition of elevated.  They are elevated

22   relative to zero, which is what we ought to have.

23   They're certainly elevated in this case relative

24   to 1, which is what I think is the average for

1    kids.

2           So whatever your definition is of

3    elevated, if you are under-reporting or

4    underestimating, that skews your data in the wrong

5    direction.

6        Q.   But I'm just trying to get at what you

7    use -- what your definition of elevated was here

8    in this sentence.  Was it zero or was it 1?

9        A.   Neither.  I told you right now that it

10   depends on your definition of elevated.  I said

11   that it is elevated relative to zero, which is

12   what it ought to be; it's elevated relative to 1,

13   which is what it actually is.  And using any

14   number in between or even close to 1 or 2, you

15   still have an underestimating bias in your process

16   there by using crude technology.  I think that's

17   pretty clear.

18       Q.   What was your definition of the word

19   "elevated" when you used it in that sentence?

20       A.   I believe I just --

21           MR. LANCIOTTI:  Objection; asked and

22   answered.

23       A.   I believe I'm finished answering that

24   question.

Highly Confidential - Robert Michaels, PhD.

1      Q.   Is it zero or 1?

2      A.   Yes.

3           MR. LANCIOTTI:  Object to form; asked

4      and answered.

5      Q.   Okay.

6           MR. ROGERS:  All right.  So let's take a

7      five-minute break or so.  It's about 2:40 right

8      now.  Let's take a stretch break.  We have a lot

9      more to get through in your report here.  So let's

10     just keep plugging away.

11          I'm going to next get to, Doctor,

12     starting on Page 47, if you want to turn to that,

13     when we get to the particular four bellwethers

14     that we're concerned about here starting with

15     S█████.

16          Let's take five minutes.

17          VIDEOGRAPHER:  The time is 2:40 p.m.,

18     and we're off the record.

19          (Recess taken.)

20          VIDEOGRAPHER:  The time is 2:50 p.m.,

21     and we're on the record.

22     BY MR. ROGERS:

23     Q.   All right.  Dr. Michaels, we're up to

24     Page 47 of your report now, and I do -- you can

Highly Confidential - Robert Michaels, Ph.D.

```
1    see that right on your screen?

2         A.    I do.

3         Q.    So this is referring to EPPI SPPI ,

4    the bellwether whose parent is Danielle Wheeler.

5               And just on the next page, it appears

6    that -- we talked about this earlier -- that you

7    did some research and got some information about

8    the particular house.

9               Is that a -- where did you get this

10   photo of the house?

11        A.    Well, let's see.

12        Q.    It says the "The Flint Property Portal."

13              Is that it or ...

14        A.    Yeah.  The attorneys provided me with

15   pictures of the houses and the lots, I believe,

16   from the source.  There was one missing, and I

17   looked it up myself and found -- there were a

18   couple missing that I found in some other sources.

19   But these were provided to me for the most part.

20        Q.    I'm sorry.  Are you saying that all of

21   this information from the Flint Property Portal

22   was provided to you, or just the photos?

23        A.    I don't recall.  I imagine that -- I

24   don't know.  Maybe I looked it up.  I don't know.
```

Highly Confidential - Robert Michaels, PhD.

```
1        Q.   Yeah, I'm just trying to probe your

2   memory here.

3             This information that you have from the

4   Flint Property Portal, including the

5   photographs -- oh, I see.  Wait a minute.  It does

6   say here -- and this might be a hint.  It says

7   "Figure 10, Lincoln Avenue, Flint," et cetera,

8   et cetera, and there's an asterisk, and then at

9   the bottom of the page, if you look down at the

10  bottom, it says "Source:  Levy Konigsberg."

11            So does that refresh your memory and

12  does that mean that this information was provided

13  to you by the law firm?

14       A.   Yes, that's what it means.

15       Q.   Okay.  Now, this summary of the

16  information about E███ S███    that is contained

17  in your report, was that also provided by the law

18  firm, or is this your summary of the information

19  that you wrote?

20       A.   This is my summary.  I wrote it.

21       Q.   Okay.  I meant to ask you and I don't

22  think I did, for the depositions of the bellwether

23  parents that you read and the medical records that

24  you looked at and water records, if any, or, for
```

1    that matter, any of the literature that you

2    reviewed, did you take any notes or do any

3    highlighting or anything like that of any

4    important information?

5        A.    I don't recall, but I might have.

6        Q.    So to the extent that there are

7    deposition transcripts of the bellwether

8    plaintiffs, do you happen to have any handy, right

9    in your office where you're at now?

10       A.    Those were very big documents, and I

11   don't believe I printed them out.  I probably

12   looked at them online.

13       Q.    I was just trying to figure out if maybe

14   you had highlighted any of them.

15            If you would have done that, it would

16   have been just on the electronic copies?  Is that

17   what you're saying?

18       A.    No, I wouldn't have done it on the

19   electronic copies at all.  I don't think I have

20   those -- I don't think I printed any of those out.

21   If I did, I don't remember.

22       Q.    Okay.  So getting to E▮PPI S▮PPI▮, your

23   information is that he was living in this house

24   that is depicted here, 1313 Lincoln Avenue, as of

1    the water switchover in April 2014, because you

2    say so right up here in the first sentence, right?

3         A.   Okay, yeah.

4         Q.   And the next one is -- and I think this

5    has been confirmed -- he lived at that -- E▊PPI▊

6    lived at that address from 2011 right up to the

7    present.

8              That's the information you have as of

9    the time you wrote your report, right?

10        A.   Correct.

11        Q.   It says here, "The service lines were

12   inspected and found to be made of copper; no work

13   was needed."

14             Where -- what is the source of that

15   information?

16        A.   I don't recall because I don't see a

17   citation there.  It could have been a parent

18   deposition or it could have been -- it probably

19   was a parent deposition, but I don't really know.

20        Q.   And then it says here, "The internal

21   plumbing of the house was also inspected and,

22   although found to be copper, was also found to

23   have lead-containing solder in the joints."  And

24   there is a reference to pages.

Highly Confidential - Robert Michaels, Ph.D.

```
 1          Would that be pages from the deposition
 2   of the mom?
 3       A.   I believe "20" would be the deposition
 4   of the mom, yes.
 5       Q.   Okay.  And then it says "Ms. Wheeler was
 6   advised not to use the drinking water."  Again,
 7   Page 221.
 8          Do you know when that was, the timing of
 9   that?
10       A.   No, I don't know the timing of that.
11   And in most cases, the parent did not know the
12   timing of that.
13       Q.   All right.  Then going a little bit
14   further down here, you have some descriptions of
15   what they used the water for, bathing, showering,
16   washing, brushing teeth, et cetera.  I want to
17   direct your attention to this part, though.
18          "They stopped drinking the unfiltered
19   water, however, sometime in 2014, after receiving
20   an official warning letter.  These facts seem also
21   to have applied to Ms. Wheeler's mother nearby,
22   where the kids would go frequently."
23          And you cite to Pages 161 through 163 of
24   that deposition testimony, correct?
```

Highly Confidential - Robert Michaels, Ph.D.

1      A.   Yes.

2      Q.   So the information that you have with

3  respect to E███ S███   from her mother --

4  sorry -- from his mother was that the family

5  stopped drinking the unfiltered water in 2014

6  after receiving a warning letter, right?

7      A.   Yes.

8      Q.   And Ms. Wheeler also testified that that

9  also applied to her mother's house, who lived

10  nearby, where her children would go frequently,

11  namely, that they stopped drinking the water

12  there, right?

13      A.   Yes.

14      Q.   So in the middle of Page 49 -- remember

15  we -- I asked you a few questions which led you to

16  answer something to the effect that you had done

17  some quantification or analysis about the period

18  of time for exposure, that each of these

19  bellwether plaintiffs had and their families to

20  the water.

21          Is this for -- at least with respect to

22  E███ S███   , is -- this paragraph in the middle

23  of the page here, does that contain your analysis

24  about the period of exposure for E███ S███   ?

```
1        A.    No.  I would say that's an example of
2   such analysis.  For example, just the paragraph
3   above it has an additional component to that
4   analysis.
5        Q.    Oh, I see.  I'm sorry.  This is his
6   potential exposure from drinking water at school.
7   I see.
8             But with respect to -- did you do an
9   analysis of the potential exposure period for the
10  period of time that EPPI SPPI      was drinking
11  water at the home of -- either his own home or his
12  grandmother's?
13       A.    Well, at the bottom of Page 47, it says
14  that this amounts to approximately 539 days or
15  1.48 years of Flint water Flint River use, where
16  that 1.48 years of potential exposure in his
17  residential drinking water.  And then I go into
18  the transcript indicating that the family used
19  water for multiple purposes.  And so that period
20  of time would refer -- during that period of time,
21  there were a number of sources.  And then it says
22  they stopped drinking the unfiltered water
23  sometime in 2014.  So that would knock out the
24  drinking component but not the other components.
```

1              And so you can see it's a very difficult

2    and complex analysis.  I engaged in it because I

3    am an objective observer.  That's my intent here.

4    But I can't say that this is simple.

5        Q.  So the maximum amount of exposure time

6    would be 539 days from April 25th, 2014 to

7    October 16, 2015, right?

8        A.  Yeah.  For some kind of exposure, yes.

9        Q.  Okay.

10       A.  And there are multiple kinds that are

11   mentioned.

12       Q.  So exposure -- but that's exposure to

13   water coming out of the taps in their house?

14       A.  Yeah.  And then there's the additional

15   exposure from school, which is the next page, I

16   think, or the page after.

17       Q.  Well, that would be the same, wouldn't

18   it?  I mean, the potential maximum exposure at

19   school would be the amount of time they were at

20   school within that 539-day period, right?

21       A.  I believe so.  I would think so.  I have

22   that described as well.  You see here I talk about

23   some discrepancies about the information, and so

24   I've tried to fix that up to the extent that I

Highly Confidential - Robert Michaels, PhD.

```
 1   can.
 2        Q.   Well, going back to Page 47 with respect
 3   to E████ S████ and the mom, Danielle Wheeler, she
 4   indicated that the family used water for multiple
 5   purposes.  And you list it here:  Drinking, making
 6   Kool-Aid, cooking, bathing, showering, clothes
 7   washing, and brushing teeth.
 8             When she testified that she stopped
 9   drinking the unfiltered water sometime in 2014
10   after receiving an official warning, did you
11   interpret that to mean that she also stopped
12   making Kool-Aid with it?
13             MR. LANCIOTTI:  Object to form.
14        A.   I assume she stopped making Kool-Aid
15   with it, yeah.
16        Q.   I'm sorry.  You and Patrick were
17   speaking at the same time.
18             Did you say yes, that that was your
19   assumption?
20        A.   I would assume that they stopped making
21   Kool-Aid --
22        Q.   Yeah.
23        A.   -- because you drink Kool-Aid.
24        Q.   Gotcha.
```

Highly Confidential - Robert Michaels, Ph.D.

```
 1              I can't remember right now whether this

 2     is true or not, but are part of the documents --

 3     were part of the documents that you reviewed in

 4     your work on the case in preparing the report,

 5     records related to the -- any water tests that

 6     were done at any of the schools that the

 7     bellwether plaintiffs attended?

 8         A.    Those are cited in the document, yes.

 9         Q.    Yeah, I see.  Okay.  Thanks.

10              Because they're not listed separately in

11     your list of literature or information cited.

12              So did you personally -- the source of

13     this information on Page 49 for SPPI       schools

14     and the school water supply -- let's start at the

15     beginning.

16              There's a first reference to the

17     plaintiff's fact sheet.  Then there's the

18     deposition transcript.  Then it says here under

19     Pb lead concentrations in school drinking water,

20     the State of Michigan, et cetera, reports drinking

21     water sampling, blah, blah, blah -- oh, I see.  We

22     would be able to find it under 34E.  I gotcha.

23         A.    Yeah, that's under -- that's on

24     Page 129.
```

Highly Confidential - Robert Michaels, Ph.D.

1    Q.   I see it now.  Thank you.

2         So you did review the MDEQ reports

3    reporting information for these various schools.

4    I see that.  Okay.  Thanks.

5    A.   Every single one of them.

6    Q.   Yeah.  Thanks.

7         All right.  So just to be clear about

8    the drinking water, on this section for bottled

9    water, she received a -- she stopped drinking the

10   unfiltered water sometime in 2014 but did not

11   receive water filters until mid to late 2015.

12   However, during that period of time, during the

13   interval, the family did drink bottled water until

14   they got the filters later, right?

15   A.   Yes, that's correct.

16   Q.   And they also used the bottled water for

17   cooking and bathing during that period of time,

18   right?

19   A.   Yes.

20   Q.   So in terms of the S███ plaintiff, as

21   of the point in 2014 when they received the

22   warning and they stopped drinking the water and

23   they stopped using the water for Kool-Aid, they

24   also stopped using the water -- tap water for

1    cooking and bathing, right?

2         A.   No, it doesn't say that.

3         Q.   It says "During this interval, the

4    family drank bottled water.  They also used the

5    bottled water for cooking and bathing."

6         A.   Right.

7         Q.   What's wrong with what I said?

8         A.   It doesn't mean that they also didn't

9    use the shower or -- you know, it's hard to

10   imagine that they did everything with bottled

11   water.  They didn't get so much bottled water that

12   it was enough for a family to use.  That was one

13   of the complaints in the various parent

14   depositions, that, you know, sometimes the water

15   was free.  Sometimes they would have to buy it.

16   Sometimes it wasn't that much.  Sometimes it

17   was -- you know, how would you carry it.  There

18   were all kinds of issues that were raised.  And,

19   again, you'll be challenging my memory too much if

20   you ask me to explicate in particular examples

21   except to the extent that I've recorded it.

22        Q.   No, I get you.  And that's a fair point.

23   You'd have to -- either you or I would have to

24   look at the exact deposition testimony to clarify

Highly Confidential - Robert Michaels, PhD.

1    that issue there, right?

2            Okay.  Here's the reference that I

3    wanted to make sure we covered, on the bottom of

4    Page 50.  EPPI bone lead level was reported to

5    be 6.2 micrograms per gram.  And then you have

6    these reference ranges here, greater than

7    10 equals persistent exposure, greater than

8    20 equals persistent intense exposure.  I reported

9    to you that Dr. Specht said that that was a

10   mistake.  Those reference ranges weren't supposed

11   to be on the report.

12           And so would you accept my report that

13   that's what he said for purposes of this question?

14   I want you to assume that to be true.  Okay?

15   A.   No, I don't assume that.  Right now,

16   from what I understand, the mistake that you --

17   that you explicated was whether that was supposed

18   to be included.  You did not say that it was a

19   mistake with respect to whether it is accurate.

20   Q.   Okay.  I'm going to ask you to assume

21   that it was a mistake and the reference ranges

22   there were not included and were not intended to

23   be included and were not accurate.

24           My question to you is:  Independent of

Highly Confidential - Robert Michaels, PhD.

1    the reference ranges that were reported by

2    Dr. Specht, you have no independent, separate

3    knowledge as to what reference ranges would be so

4    as to indicate persistent exposure or persistent

5    intense exposure for bone lead, do you?

6        A.   No, I don't have --

7             MR. LANCIOTTI:  Object to form.

8        A.    -- have the specific source of that

9    information.

10            On the other hand, let me just point out

11   that you did show me one or two papers on this

12   subject relating to the variability of these

13   numbers.  And since we only have one sample, we

14   are not dealing with the reference -- with the

15   papers -- with the issue dealt with in the papers,

16   which is resolving the source of the variability.

17   We only have one number.  We don't have a

18   variance.  We don't have a variability.  We only

19   have the number.  And so that, I think, is an

20   important concept to bring in.

21        Q.   Okay.  Let's move on to Plaintiff

22   A▮PPI▮     T▮PPI▮.  The summary of the information

23   about her begins on Page 53.  "Residential water

24   supply," first subject.

```
 1              So from the time at which the water --
 2    the water was switched over to the Flint River on
 3    April 25th, 2014, Ms. TPPI was living at
 4    3314 Cherokee Avenue.
 5              That's the information that you have,
 6    right?
 7        A.    Correct.
 8        Q.    And she lived there, APPI    TPPI did,
 9    up until some point in 2018, right?
10        A.    Okay.  Yes.
11        Q.    But, I mean, that's what you're
12    reporting here, right?
13        A.    Yes.
14        Q.    And the deposition transcript of the mom
15    indicates on Page 74 that the service line to the
16    Cherokee Avenue house was replaced in 2018, right?
17        A.    Right.
18        Q.    Did you do any separate research to
19    determine whether or not that particular house at
20    Cherokee Avenue where APPI    TPPI lived during
21    that period of time was part of the FAST Start
22    program?
23        A.    As I said, I believe that I looked at a
24    very extensive table and did not find the
```

Highly Confidential - Robert Michaels, PhD.

1    addresses of any of these plaintiffs in that

2    table.  And so the answer is I tried and did not

3    find the information, as far as I can recall.

4        Q.   So in this section concerning water

5    usage, you report Ms. T▮PPI▮ as having --

6    Apricott T▮PPI▮ as having testified as follows, that

7    she indicated that in the spring of 2014, the

8    family began to notice that their tap water was

9    discolored and odorous.  Next sentence, "Even so,

10   when bottled water was unavailable, the family

11   continued to drink the tap water about 50/50, and

12   they also used it for cooking.  'We tried to get

13   bottled water, but cooking purposes, I didn't have

14   a choice.  We had to use that water.'"

15            So is it your interpretation of what

16   Ms. T▮PPI▮ was saying here that as of April -- as of

17   the spring of 2014, after they noticed -- she

18   noticed -- the family did -- that the water was

19   discolored and odorous, that even when bottled

20   water was unavailable, the family continued to

21   drink the tap water about 50 percent of the time?

22       A.   Yeah, I guess that's about right.

23       Q.   Same for cooking purposes.  She tried to

24   get the bottled water, but when they couldn't,

Highly Confidential - Robert Michaels, PhD.

1    about 50 percent of the time, they would have to

2    use the tap water; is that right?

3         A.    Well, I don't know that the 50/50 refers

4    to the cooking or not.  It looks like it refers to

5    the drinking.  But I don't know.

6         Q.    Well, if it --

7         A.    They had to use it.  They had to use it,

8    yes.  The fraction, I don't know.  And how

9    reliable is that fraction, I don't know.

10        Q.    You're just reporting what was written

11   there as 50/50 on the deposition transcript,

12   right?

13        A.    Yes, that's correct.

14        Q.    I see.

15              And again here for this page that you're

16   looking at, Page 54, there's an asterisk; this

17   information about the house and where it was

18   located within Flint and the photos there, that

19   was provided by the Levy Konigsberg firm, right?

20        A.    Yes, correct.

21              MR. ROGERS:  Corey, am I saying that

22   right?  Is it Levy Konigsberg?

23              MR. STERN:  Sure.  You say tomato; I say

24   tomato.

Highly Confidential - Robert Michaels, PhD.

```
 1              MR. ROGERS:  Well, I just -- it just
 2    occurred to me, you know --
 3              MR. STERN:  Konigsberg is how I say it.
 4    Some people say Konigsberg, but I say --
 5              MR. ROGERS:  It just occurred to me, the
 6    Levy connection.  There's no connection, is there,
 7    with the judge?
 8              MR. STERN:  I mean, none that I'm
 9    willing to talk about right now.
10              No, there's no connection.
11    BY MR. ROGERS:
12       Q.   Okay.  On Page 55, you go on to describe
13    some information about A▮PPI▮▮▮▮▮ drinking -- or
14    water consumption, three or four glasses of water
15    per day, not counting school.  And you describe
16    her potential exposure here from drinking water at
17    school, et cetera.  Okay.  I think that's pretty
18    self-explanatory.
19              Let's move on to, in your report, the
20    information about the MDEQ tests on the faucets at
21    the school.
22              Just curious, when you -- on Page 56,
23    when you're referring to blood lead measurements
24    amount, you refer to it as tissue blood lead
```

```
 1   levels.  Why do you refer to it as tissue versus
 2   blood?
 3        A.   Because I started out with blood and
 4   then I got the bone and I figured I better broaden
 5   it to tissue, because both are tissues but only
 6   one of them is blood.
 7        Q.   I see.  So you just changed the
 8   terminology to include tissue as being the -- you
 9   reported the blood lead levels and the bone, I
10   see.  All right.
11        A.   Yes.  In the same section, yes.
12        Q.   Yes.
13             Okay.  I want to direct your attention
14   up here to something I missed.  The section here,
15   "Bottled Water."
16             "The transcript of the deposition of
17   A▉PPI▉▉▉▉   mother indicates that the family had a
18   long-standing practice of using bottled water for
19   specific purposes, most notably to mix baby
20   formula, even predating the Flint water crisis.
21   They only gradually began to substitute bottled
22   water for tap water, subject to price and
23   availability, sometime after the water crisis came
24   to their awareness."
```

1          No specific date was evident.  The

2   bottled was used for drinking and cooking, for

3   example, cooking pasta.  I'm not really sure what

4   that means in terms of timing.

5          Are you saying here that the bottled

6   water was used for drinking and for cooking, for

7   example, cooking pasta, even before the switchover

8   to the Flint River water, in this family?

9       A.   I think it's clear that it was a gradual

10  process and that that gradual process included

11  drinking and cooking.

12      Q.   Before the water crisis?

13      A.   That there was a gradual process of

14  substituting bottled water for tap bottled.

15      Q.   Even before the switchover?

16      A.   No.  They started using some bottled

17  water for specific purposes, such as mixing baby

18  food, before the water crisis, but then they

19  gradually started to expand the use of bottles for

20  other purposes such as cooking and drinking.

21      Q.   We'll have to look at the transcript for

22  that.  All right.

23      A.   I do want you to appreciate that if I

24  had an IEUBK model, it would be very difficult to

Highly Confidential - Robert Michaels, PhD.

1    fill in the parameters that are demanded in that

2    model.  I have tried painstakingly to come up with

3    fair statements regarding these issues, and I

4    believe that I have succeeded in this regard.

5        Q.   If -- why is it that for each of the

6    plaintiffs, you are describing information about

7    their health issues if you are not opining on

8    specific causation, that is to say, whether any of

9    the individual plaintiffs' health issues were

10   caused by lead exposure?

11       A.   Yeah.  That was one of the initial

12   questions that I posed to the attorneys about the

13   scope of the report.  The kids -- the kids' health

14   issues are critical for general causation, because

15   if you don't know what the health issues are, you

16   don't know what you're evaluating the causation

17   of.  You have to know this.

18            And so this is a definition of what

19   those are.

20            In addition to that, through discussion,

21   we also understood -- and this is why I quoted

22   the -- I cited the complaint and the procedure --

23   that there could be other plaintiffs brought into

24   the process, and, therefore, the scope had to be

Highly Confidential — Robert Michaels, PhD.

1    broader than just the health issues that were

2    represented among the bellwether plaintiffs.  And

3    so that -- that is how I proceeded with the scope

4    of my work.

5        Q.   I see.

6             So you're saying for purposes of the

7    evaluation that you did for general causation

8    purposes, you wanted to know whether there were

9    any health effects that potentially could be part

10   of the general causation evaluation due to lead

11   exposure, because if there weren't any health

12   effects at all that were noticed, it wouldn't even

13   be worthwhile doing the general causation

14   analysis; is that what you're saying?

15       A.   That's right.

16            MR. LANCIOTTI:  Object to form.

17       Q.   All right.  So I got another one right.

18   I actually --

19       A.   You got a lot of them right.  Come on.

20   No, you're doing good.

21       Q.   So you're saying that these summaries

22   here of the health effects that were reported

23   potentially could be attributed from a specific

24   causation point of view to lead exposure based on,

Highly Confidential - Robert Michaels, Ph.D.

```
1    you know, the opinions of the physicians about
2    that subject, right?
3         A.    Exactly, yes.  That's right.
4         Q.    Okay.  Let's move on to the next
5    plaintiff here, R███ V███        .  I had asked
6    you questions about when the V███        family
7    first arrived in Flint, and you said you thought
8    you had reported it, and here it is.
9              So according to the information you
10   have, it's that R███ V███        was born in
11   Florida and moved to Flint in September of 2014,
12   right?
13        A.    Correct.
14        Q.    So clearly by definition, right, that
15   would affect the exposure period of time for
16   R███ V███         It wouldn't start until
17   sometime in September of 2014 when the family
18   moved to Flint by definition, right?
19        A.    That's correct, yes.
20              MR. STERN:  Dave?
21              MR. ROGERS:  Yeah.
22              MR. STERN:  This is Corey Stern.  I just
23   want to interject for a moment.
24              Earlier in the deposition, I took some
```

Highly Confidential - Robert Michaels, Ph.D.

1    notes that I was going to go back and clarify with

2    him tomorrow.  But since you just raised the issue

3    of Mr. V█PPI█████████ residence, earlier in the

4    deposition you had asked a series of questions and

5    indicated that V█PPI█████ did not move to Flint

6    until September of 2015.  That's what you -- you

7    asked a series of questions of Dr. Michaels with

8    that date in mind.  I went back and looked during

9    the break and found what you just found.

10           So just for the record, I just want to

11   clarify that any questions that had previously

12   been asked when the date of residence began in

13   2015, Mr. Michaels' report and the questions that

14   were asked should have indicated it was 2014, not

15   2015.

16           MR. ROGERS:  Yeah.  If the transcript

17   reflects that, that would have been a misstatement

18   on my part as to the year.  I certainly did not

19   mean to confuse the issue or state something that

20   was inaccurate.  But I guess the transcript will

21   remain what it is.

22   BY MR. ROGERS:

23       Q.   But the fact is, right, Dr. Michaels,

24   that according to the deposition that you

```
1    reviewed -- and I believe that is accurate -- that
2    the V PPI     moved to Flint in September 2014,
3    not '15, right?
4        A.   Correct.
5        Q.   So the way that this affects the
6    exposure period is that it could not -- their
7    exposure obviously to lead in the water in their
8    house could not have started until the time that
9    they arrived in Flint, obviously?
10       A.   Yes, that's correct.  And if you look at
11   Page 58 on the bottom, you can see that there is
12   396 days, or 1.08 years, assuming
13   mid-September 2014.
14       Q.   Right.
15       A.   So, again, I can only emphasize the
16   attempts I've made to be objective about these --
17   complete and objective about these issues.
18       Q.   Okay.  And then the paragraph that's
19   highlighted here, the section in terms of water
20   usage, it begins, "Ms. V PPI     indicated that,
21   to the best of her knowledge, no water testing was
22   done at the Woodrow Avenue house."
23            And as far as you know, you haven't seen
24   any water lead level test for that residence,
```

Highly Confidential - Robert Michaels, PhD.

```
 1   right?

 2        A.   If I didn't report it, I didn't see it.

 3        Q.   Then you report here, "Indeed, she said

 4   she heard nothing about the Flint water crisis

 5   until," quote, "'maybe three or four months,'" end

 6   quote, "after moving to Flint in September 2014.

 7   Given this timing, the family would have consumed

 8   untreated tap water until close to the end of 2014

 9   and also used untreated tap water for other

10   purposes, such as cooking, bathing/showering, and

11   washing clothes.  This changed around the end of

12   2014."

13             What do you mean by that?

14        A.   Well, I guess they got aware of the

15   problem and they took steps to mitigate their

16   exposure.

17        Q.   So the information that you have for the

18   V[PPI]       is that they stopped drinking the tap

19   water by the end of 2014, right?

20        A.   I don't know.  Could you find that for

21   me?  I don't recall.

22             Yeah, I don't see that specifically,

23   but -- you're moving around, so I don't know.

24        Q.   Yeah.  I don't know that it's in your
```

```
 1   report.  I guess we'd have to look at the

 2   transcript.

 3            But the statement that you made here is

 4   by saying "This changed around the end of 2014,"

 5   it's your understanding that they -- the

 6   V███████ family stopped drinking the tap water

 7   as of the end of 2014 when they became aware of

 8   the issue, right?

 9        A.   No, that is not correct at all.  The

10   above sentence says right there that she had heard

11   nothing about the water crisis until maybe three

12   or four months after moving to Flint, and,

13   therefore, she heard about it around the end of

14   2014, at which time, I assume that she must have

15   done something about it.  But I don't have

16   information that she stopped drinking the water or

17   anything else.  If it's not reported there, I

18   don't have that information.

19        Q.   Well, what did you mean by "This changed

20   around the end of 2014"?

21        A.   That she became aware of it.

22        Q.   Oh.  All right.  Well, we'll find --

23   I'll see if I can find tonight an exact reference

24   to this and show it to you by tomorrow.
```

```
 1              MR. ROGERS:  Chris Fletcher, are you

 2    still on?

 3              MR. FLETCHER:  Yeah, I'm here.

 4              MR. ROGERS:  Okay.  So would you just

 5    make a note of that and when we talk later, let's

 6    get the exact testimony from Ms. V[PPI]        on

 7    that subject so we can clarify that.  Okay?

 8    BY MR. ROGERS:

 9         Q.   Okay.  So here's an important one for

10    water exposure issues, the school water supply.

11    This is now on Page 60 of the report concerning

12    R[PPI]  Va[PPI]      .

13              It says "R[PPI] has attended Weston

14    Elementary School in Burton, Michigan from 2018 to

15    the present.  No other school or preschool

16    experiences are reported.  R[PPI]  exposure to

17    lead in the City of Flint municipal water supply

18    does not extend to exposure via school."

19              That's because she's so young, right?

20    That she didn't start going to school until after

21    the whole thing was over, right?

22         A.   Right.  She started school in 2018, it

23    looks like.

24         Q.   Right.
```

Highly Confidential - Robert Michaels, PhD.

1          So by definition, from April 2014 to

2    October 16, 2015, she could not have had any

3    exposure to any lead in the water via school

4    because she didn't go to school then.  She was too

5    young, right?

6        A.    That's correct.  Except to the extent --

7    and I just have to be formal about this -- kids do

8    visit schools sometimes, and to that extent, it's

9    possible.  But I think by and large, that is the

10   correct conclusion.

11          MR. FLETCHER:  Dave, if you want, I can

12   pull up that -- those depo excerpts if you want it

13   now.

14          MR. ROGERS:  Let's wait, Chris.  Let's

15   wait.  I just want to see them.  We'll do that

16   later, but thanks.

17   BY MR. ROGERS:

18       Q.    In terms of bottled water here, the next

19   category, you say "At her deposition,

20   Mrs. V█████ was asked about typical meals in

21   2015.  She indicated that much of R█████ liquid

22   intake was derived from milk or pre-mixed juice

23   purchased from a store."  Right?

24       A.    Correct.

Highly Confidential - Robert Michaels, PhD.

```
 1        Q.   And she also indicated that R███ drank
 2   water, and that she's saying here, "I don't know
 3   when we started with the bottled water," at least
 4   in that reference to the deposition, right?
 5        A.   Correct.
 6        Q.   She says here about filtered water,
 7   according to Ms. V███████     deposition, "The
 8   family was given a faucet filter, which was
 9   installed in the kitchen at some point during
10   2014."
11             Do you know whether or not -- or what
12   type of filter that was and whether it was a
13   filter that would filter out the lead?
14        A.   Well, I don't have the answer to that
15   except that I certainly make the inference or the
16   assumption that they wouldn't have given her that
17   filter if they couldn't filter out the lead for at
18   least some period of time.
19        Q.   Yeah, you would think --
20        A.   Of course, the filter doesn't work
21   forever, but it does probably start off doing
22   that.
23        Q.   Yeah, so the filters in the faucet
24   filter have to be replaced periodically to do
```

Highly Confidential - Robert Michaels, PhD.

1    their job, basically, right?

2        A.   Yes.

3        Q.   So she's saying here -- reported that

4    the filter remained on the kitchen sink for about

5    a year.  Eventually she removed the filter as the

6    family was not using tap water from the kitchen

7    faucet.

8             Does that mean, then, that if the faucet

9    was in place for about a year from some point in

10   2014 through 2000 -- some other point in 2015, the

11   water that they would use for cooking would have

12   been filtered water during that period of time?

13       A.   Well, that depends on how long you think

14   that filter might have lasted.  I would assume it

15   didn't last that long.

16       Q.   So with respect to the blood lead

17   levels, the two that you report here anyway, in

18   November 2014, there was a measurement of less

19   than 3.3, so that, you know, given what we talked

20   about earlier, we know what that means.  And then

21   there's a .7 micrograms per deciliter on

22   September 2nd, 2015.

23            So the measurement of .7 is actually

24   below the average that you were aware of that you

Highly Confidential - Robert Michaels, PhD.

```
 1    referred to earlier as being 1, right?

 2         A.    Correct, yes.

 3         Q.    Okay.  So the reference values here to

 4    the bone lead, we've already been over that.  Your

 5    answers to my questions about the reference ranges

 6    for bone lead is the same for all plaintiffs, not

 7    just any of these individual ones, right?

 8         A.    Yes.

 9         Q.    Same thing with respect to V███████.

10    To the extent that you're reporting some type of

11    health issues in this section of your report, you

12    did that because it relates to, in your view, some

13    form of the general causation issue that you

14    addressed, right?

15         A.    Absolutely, yes.

16         Q.    Okay.  I have a bunch of questions on

17    the next section related to D█████  W████.  And

18    what I would suggest, if you guys don't mind --

19    and then I have a lot more questions left at the

20    end of the report concerning the discussion and

21    the final conclusions, and then we've got to go

22    over some other literature and stuff tomorrow.

23              MR. ROGERS:  But would you mind -- why

24    don't I just finish up this next section.  It will
```

Highly Confidential - Robert Michaels, PhD.

1  probably take another half hour or so, and then

2  would you guys mind breaking for the day at 4:00,

3  and then we'll pick up at 8:30 tomorrow?  How does

4  that sound?

5          MR. STERN:  This is Corey.  I'm fine

6  with that.

7          MR. ROGERS:  Okay.  Thank you.

8  BY MR. ROGERS:

9      Q.   Honestly, Doctor, I'm kind of running

10  out of gas myself tonight here, so that would be a

11  good idea, I think, if you don't mind, and we'll

12  definitely finish tomorrow.  So let's get through

13  this next section --

14          MR. STERN:  When you're consistently a

15  Ferrari and you've always got your foot on the

16  gas, sometimes you've got to stop for a refill.

17  And that's Dave Rogers in a nutshell.

18          MR. ROGERS:  Well, you know, I'd like to

19  say I understood what that was, but I didn't hear

20  the first part of it.

21          What -- when you've always got your foot

22  on the gas, you said?

23          MR. STERN:  I said when you're a

24  Ferrari, like Dave Rogers is.  It was a

Highly Confidential - Robert Michaels, PhD.

```
1    compliment.  It was a gigantic compliment.
2           MR. ROGERS:  I actually drive a Toyota
3    Tacoma pickup truck that I switched to a couple
4    years ago, so I'm a pickup truck kind of guy.  But
5    I do have to say I keep the pedal to the metal
6    quite a bit on that truck.
7           MR. STERN:  Dave, I am not joking with
8    you -- and I know we're on the record -- but I in
9    my life have had six Toyota Tacomas.
10          MR. ROGERS:  Wow.  That's great.  I had
11   SUVs before, but I do like the Tacoma.
12          MR. STERN:  I switched to the SUV most
13   recently from the Tacoma, but that's because the
14   kids who play baseball and not because -- yeah.
15          MR. ROGERS:  I've got to ask you, then.
16   With your Tacomas, did you get the extended bed,
17   the 6-foot bed, or were you wimpy and get the
18   5-footer?
19          MR. STERN:  I had -- my most recent one
20   was a 6-foot bed, and it was a TRD Sport, V6,
21   extended cab, four doors.
22          MR. ROGERS:  Yep.
23          MR. STERN:  I loved it.
24          MR. ROGERS:  The passenger --
```

Highly Confidential - Robert Michaels, PhD.

```
 1              MR. STERN:  Anyway, we digress.

 2              MR. ROGERS:  The passenger space in the

 3    Toyota Tacoma four-door extended cab that I

 4    have -- it's a 2016 -- is comparable to the three

 5    SUVs that I had before.  So it's --

 6              MR. STERN:  It is.  It's identical to

 7    the 4Runner, I think, in terms of space, other

 8    than the trunk.

 9              MR. ROGERS:  Okay.  Let's move on and

10    we'll finish up for the day.

11    BY MR. ROGERS:

12        Q.   So now we're on to D PPI   W PPI  some

13    information about residential water supply and

14    other things.

15              Okay.  In terms of water supply for

16    D PPI     W PPI , on the second paragraph on Page 63,

17    you clearly state about her testimony from the

18    mom, Ms. Martin, she "indicates that the family,

19    in the late spring or early summer of 2014,

20    stopped drinking their tap water at the advice of

21    one of the children's pediatricians," right?

22        A.   Right.

23        Q.   And also, "Around midsummer of 2014, the

24    family also stopped using the tap water for
```

Highly Confidential - Robert Michaels, PhD.

```
 1   cooking," right?

 2       A.   Correct.

 3       Q.   "They continued using the water for

 4   bathing but, in maybe summer of 2014, switched to

 5   bathing the children using bottled water," right?

 6       A.   Correct.

 7       Q.   However, the children occasionally

 8   bathed using tap water even after the summer,

 9   right?

10       A.   Correct.

11       Q.   So in terms of leaving aside school, the

12   exposure of D█████ W███ to lead in the water for

13   the most part would have stopped as of --

14   completely stopped as of the summer of 2014,

15   right?

16       A.   Yes.

17            MR. LANCIOTTI:  Object to form.

18       Q.   I'm sorry?

19       A.   For the most part stopped, yes.  Not

20   completely stopped, but for the most part stopped,

21   yeah.

22       Q.   Okay.  What other sources potentially

23   would there be from the tap water -- or from the

24   water from the home that didn't stop?  Bathing
```

1    sometimes?

2        A.    Around that time, they stopped for

3    cooking.  They continued using it for bathing for

4    a while.  And then I guess brushing your teeth

5    and -- I don't know what else they used it for.

6        Q.    About the service lines, Ms. Martin's

7    deposition transcript notes that inspection of the

8    private and public portions of the service line to

9    the home at Burlington Road reveals copper

10   composition, not lead, correct?

11       A.    Correct.

12       Q.    Oh, I see.  I've got to make sure that's

13   the right house.  Hold on.

14             So, yeah, she moved there later.  That

15   was the Burlington Drive in Flint.  Moved there

16   later.

17             Do you know whether she reported if

18   there were any inspections of the service lines at

19   the Rollingwood Apartments at 5108 East Boulevard

20   Drive?

21       A.    Well, if it's not reported here, I don't

22   know.

23       Q.    Again, just like the other ones, you

24   didn't --

Highly Confidential - Robert Michaels, Ph.D.

1           MR. ROGERS:  Okay.  I think Corey might

2   have muted.  I think one of his children was

3   asking him some questions there.

4       Q.   So same as the other plaintiffs that we

5   talked about earlier, Dr. Michaels.  You did not

6   do an independent -- or you don't have any

7   information about whether or not the service lines

8   for the residences at East Boulevard Drive or the

9   Rolling- -- sorry -- I'm sorry.  Let me get this

10  straight.  Give me a minute.  Sorry.  So I've got

11  it now.

12          You don't know what the composition of

13  the service lines were at either the

14  5108 East Boulevard Drive home in Flint, Michigan

15  or the 3375 West Sherman Avenue home in Michigan

16  were, do you?

17      A.   If it's not there, I don't know, no.

18          Now, you can see -- if you scroll back

19  up for one.

20          I mentioned to you that I did look

21  myself at one of the houses at least.  Here the

22  map source is a Google source.  It is not the law

23  firm.

24      Q.   All right.  I see the asterisk there.

1    So this is the one that you were telling me about,

2    right.

3              So for WPPI, you did your own

4    evaluation -- research?

5         A.   My search.  I looked it up myself, yes.

6         Q.   Okay.  So in terms of the school

7    exposure for drinking water for DPPI      WPPI,

8    there's no data relating to the McMonagle

9    Elementary School, right?

10        A.   Correct, yeah.

11        Q.   And there is some data for the

12   Doyle-Ryder Elementary School.  Okay.

13             MR. ROGERS:  Well, I think that's it.

14   That looks like all the questions, because the

15   rest of these things, you know, we've either

16   covered for the other plaintiffs or they're

17   self-explanatory, so I think that's good.  We

18   could stop for today if that works for everybody.

19   We'll pick up at 8:30 tomorrow.

20             And I can pretty much guarantee that

21   we'll be done before lunch, and that will work out

22   well.

23             THE WITNESS:  Are we looking at the same

24   URL link for the meeting?

Highly Confidential - Robert Michaels, PhD.

1          VIDEOGRAPHER:  The time is 3:44 p.m.,

2   and we're off the record.

3          (Signature not waived.)

4                    - - -

5       Thereupon, the deposition was adjourned

6   at 3:44 p.m.

7                    - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Robert Michaels, Ph.D.

1

2

3           I, ROBERT MICHAELS, PH.D., do hereby

4    certify that I have read the foregoing transcript

5    of my deposition given on November 12, 2020; that

6    together with the correction page attached hereto

7    noting changes to form or substance, if any, it is

8    true and correct.

9

                    _____

10                    ROBERT MICHAELS, PH.D.

11           I do hereby certify that the foregoing

12   transcript of the deposition of ROBERT MICHAELS,

13   PH.D. was submitted to the witness for reading and

14   signing; that after he had stated to the

15   undersigned Notary Public that he had read and

16   examined his deposition, he signed the same in my

17   presence on this ____ day of _____, 2020.

18

19                    _____

20                    NOTARY PUBLIC

21   My commission expires: _____

22                      - - -

23

24

```
 1                      CERTIFICATE
 2
 3
 4          I, Sara S. Clark, Registered Merit
    Reporter, Certified Realtime Reporter, Certified
 5  Realtime Captioner, a Notary Public, duly
    commissioned and qualified, do hereby certify
 6  that the within-named ROBERT MICHAELS, PH.D.
    was duly remotely sworn to testify to the
 7  truth, the whole truth, and nothing but the
    truth.
 8
            I DO FURTHER CERTIFY that the
 9  foregoing is a verbatim transcript of the
    testimony as taken stenographically by me at the
10  time, place, and on the date hereinbefore set
    forth, to the best of my ability.
11
            I DO FURTHER CERTIFY that I am neither
12  a relative nor employee nor attorney nor counsel
    of any of the parties to this action, and that I
13  am neither a relative nor employee of such
    attorney or counsel, and that I am not
14  financially interested in the action.
15          IN WITNESS WHEREOF, I have hereunto
    set my hand and affixed my seal on this 3rd day
16  of December, 2020.
17
18
19
20          _____
            Sara S. Clark, RPR/RMR/CRR/CRC
21          Notary Public
            Registered Merit Reporter
22          Certified Realtime Reporter
            Certified Realtime Captioner
23
24  My commission expires:  March 10, 2023
```