```
 1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF MICHIGAN
 2                     SOUTHERN DIVISION
    _____
 3                                  )
                                    )  Civil Action No.
 4                                  ) 5:16-cv-10444-JEL-MKM
    In Re:  FLINT WATER CASES   )  (consolidated)
 5                                  )
                                    )  Hon. Judith E. Levy
 6                                  )  Mag. Mona K. Majzoub
    _____)
 7                                  )
    Elnora Carthan, et al.,      )
 8                                  )
        Plaintiffs,                 )
 9                                  )
        vs.                         )  Civil Action No.
10                                  ) 5:16-cv-10444-JEL-MKM
    Governor Rick Snyder,        )
11  et al.,                         )
                                    )
12      Defendants.                 )
13  _____)
14                HIGHLY CONFIDENTIAL
             REMOTE VIDEOTAPED DEPOSITION OF
15               ROBERT MICHAELS, PH.D.
                      VOLUME II
16
17            Friday, November 13, 2020
18                  at 8:32 a.m.
19    Taken at:  Residence of Robert Michaels, Ph.D.
                  Schenectady, New York
20
21        REPORTED BY:  SARA S. CLARK, RMR/CRR
22            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
23                deps@golkow.com
24
```

```
 1              A P P E A R A N C E S
 2                   VIA ZOOM
 3                    - - -
 4  On behalf of Individual Plaintiffs:
 5        COREY M. STERN, ESQUIRE
          LEVY KONIGSBERG LLP
 6        800 3rd Avenue, 11th Floor
          New York, New York  10022
 7        212-605-6200
          cstern@levylaw.com
 8
 9  On behalf of Individual Plaintiffs:
10        PATRICK LANCIOTTI, ESQUIRE
          NAPOLI SHKOLNIK PLLC
11        400 Broadhollow Road, Suite 305
          Melville, New York  11747
12        631-224-1133
          planciotti@napolilaw.com
13
14  On behalf of Defendants Veolia Water North America
    Operating Services, LLC, Veolia North America,
15  LLC, and Veolia North America, Inc.:
16        DAVID M. ROGERS, ESQUIRE
          CHRISTOPHER D. FLETCHER, ESQUIRE
17        KRISTIN M. DUPRE, ESQUIRE
          CAMPBELL CONROY & O'NEIL, P.C.
18        1 Constitution Wharf, Suite 310
          Boston, Massachusetts  02129
19        617-241-3000
          drogers@campbell-trial-lawyers.com
20        cfletcher@campbell-trial-lawyers.com
          kdupre@campbell-trial-lawyers.com
21
22
23
24
```

Highly Confidential - Robert Michaels, Ph.D.

```
 1              A P P E A R A N C E S
 2                 VIA ZOOM
 3                   - - -
 4   On behalf of Defendants Leo A. Daly Company and
     Lockwood, Andrews & Newnam, Inc.:
 5
          TRAVIS S. GAMBLE, ESQUIRE
 6        FAEGRE DRINKER BIDDLE & REATH, LLP
          1717 Main Street, Suite 5400
 7        Dallas, Texas  75201
          469-357-2534
 8        travis.gamble@dbr.com
 9   Also Present:
10        Robert Martignetti, Videographer
11                   - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                  I N D E X
 2                   - - -
 3   WITNESS                               PAGE
 4   ROBERT MICHAELS, PH.D.
 5   Continued Examination By Mr. Rogers:   266
     Examination By Mr. Gamble:            332
 6   Further Examination By Mr. Rogers:    339
     Examination By Mr. Stern:             341
 7                   - - -
 8   EXHIBIT          DESCRIPTION          PAGE
 9   Exhibit 30A  4/27/20 Michaels         268
                  Retention E-mail
10
     Exhibit 30B  Michaels Invoice         273
11
     Exhibit 30C  Michaels Time Sheets     274
12
     Exhibit 31   V PPI        Deposition  279
13                Excerpts
14   Exhibit 32   Excel Spreadsheet        282
15   Exhibit 33   Article titled, "Legacy  291
                  Contaminants of Emerging
16                Concern:  Lead, Flint,
                  Michigan, and Human Health"
17
     Exhibit 34   Article titled, "Evaluating  307
18                Water Lead Levels During
                  the Flint Water Crisis"
19
20                   - - -
21
22
23
24
```

```
  1                    - - -

  2             P R O C E E D I N G S

  3                    - - -

  4           VIDEOGRAPHER:  We are now on the record.

  5           My name is Robert Martignetti.  I am a

  6  videographer for Golkow Litigation Services.

  7           Today's date is November 13th, 2020, and

  8  the time is 8:32 a.m.

  9           This continued remote video deposition

 10  is being held In Re: Flint Water Cases.

 11           The deponent is Robert Michaels, Ph.D.

 12           All parties to this deposition are

 13  appearing remotely.  Due to the nature of remote

 14  reporting, please pause briefly to avoid speaking

 15  over someone else.

 16           Counsel will be noted on the

 17  stenographic record.

 18           The court reporter is Sara Clark.

 19           Dr. Michaels, do you understand that

 20  you're still under oath?

 21           THE WITNESS:  I do.

 22           VIDEOGRAPHER:  Thank you.

 23

 24
```

```
 1                      -  -  -

 2                ROBERT MICHAELS, PH.D.

 3    being by me previously duly sworn, as hereinafter

 4      certified, continues his testimony and says as

 5                       follows:

 6                CONTINUED EXAMINATION

 7    BY MR. ROGERS:

 8        Q.   All right.  Good morning, Doctor.

 9        A.   Good morning.

10        Q.   We had an e-mail exchange and some

11    conversation between Patrick and I before we went

12    on the record, and it has to do with the issue of

13    these summaries, what you described as the

14    physicians' summaries concerning some of the

15    bellwether plaintiffs.

16             And Mr. Lanciotti stated that you were

17    provided with physician summaries -- a physician's

18    summary -- summaries for the Napoli bellwethers.

19    But what I'm trying to determine, if you were also

20    provided with any physicians' summaries concerning

21    medical records for the 10 Levy Konigsberg,

22    Corey Stern represented plaintiffs, which would

23    include the four that we're concerned with

24    S▮PPI▮   , T▮PPI▮, V▮PPI▮      , and W▮PPI▮.
```

1    So can you look at your file materials

2  and determine whether you received any such

3  summaries concerning those bellwethers?

4      A.   I -- I don't think I have to.  I think

5  you're exciting a memory of mine that I did not

6  receive those for that group of bellwether

7  plaintiffs.  There was not a physician's summary

8  section, so I had to rely on the actual medical

9  records.

10     Q.   Okay.  I'm going to ask you to go

11  ahead -- not right now -- but please confirm that,

12  because, you know, memory is one thing but

13  actually checking the file materials is another.

14  So I'm going to request that you do that just to

15  confirm.

16     A.   Sure.

17          MR. STERN:  Dave, this is Corey Stern.

18          We did not send him any physicians'

19  summaries.

20          MR. ROGERS:  Okay.

21  BY MR. ROGERS:

22     Q.   So, Doctor, we were provided some

23  additional information about invoices and an

24  e-mail when you were retained, so I'm going to

1    share my screen now and show you those.

2            MR. ROGERS:  And, Sara, the first three

3    exhibits I marked as 30 will be marked as 30A, B,

4    and C, because they're all related to each other.

5                        - - -

6            (Michaels Exhibit 30A marked.)

7                        - - -

8    BY MR. ROGERS:

9        Q.   So, Doctor, you should be able to see my

10   screen.  Can you see this?

11       A.   Yes, I can.

12       Q.   Okay.  So this is the Exhibit 30A, which

13   I was sent last night or this morning -- I

14   forget -- I guess last night.  This appears to be

15   an e-mail that you sent to Mr. Lanciotti and

16   Mr. Napoli and Mr. Shkolnik about, you know, when

17   you were first retained in the case.

18           So does this indicate the approximate

19   date on which you were retained, April 27th, 2020?

20       A.   Yes.

21       Q.   And it describes the work that you're

22   doing and the price and the evaluation that you're

23   going to do, right?

24       A.   Correct.

Highly Confidential - Robert Michaels, Ph.D.

1    Q.   Did you send this e-mail to them on the

2  same day that you first spoke to them, or -- do

3  you remember?

4    A.   Within a very short time, I think

5  probably within a day or two, but I can't recall.

6    Q.   All right.  And there's a -- there was a

7  deadline here -- not a deadline but an expectation

8  that you would provide your report on the matter

9  on May 29th, right?

10    A.   By the 29th of May, yes.

11    Q.   Yeah, right.

12         So Mr. Lanciotti sent me another e-mail

13  last night that forwarded this e-mail that is

14  marked as Exhibit 30A in which he reported some

15  estimates of the hours that you spent working on

16  the case up through the time of your report.  And,

17  you know, I am not able to mark it because I

18  didn't have it as a PDF version, but in any event,

19  I'll report what is described.  I think this

20  information came from you, and you can just tell

21  me whether it's accurate.

22         So what it says here is that the

23  estimate of hours spent on reports, Report 1,

24  submitted May 29 -- May 2020, 50 to 100 hours,

Highly Confidential - Robert Michaels, PhyD.

1   assuming two to three hours per day over 33 days.

2          Was that your estimate of the amount of

3   time you spent working on the case through the

4   first report?

5      A.   Yes, it is.

6      Q.   That's a pretty wide range, 50 to

7   100 hours.

8          Did you maintain any time records or

9   anything like the handwritten notes that you

10  provided about the time spent that we're going to

11  get to in a minute that would -- for later work

12  that you did to narrow that down or make that a

13  little more accurate?

14     A.   I don't know that I could make it more

15  accurate except to say that if you want it to be a

16  little more accurate, you probably could make it

17  66 to 100 hours, because -- what did I say -- I

18  don't remember even what I estimated there, but I

19  just rounded it to 50 to 100.  It could be 66 to

20  99 or something like that.  It's an estimate.

21  That's all it is.

22     Q.   Okay.  So the answer to my question, I

23  guess, is that you didn't write down the time that

24  you spent working on the case during that period

Highly Confidential – Robert Michaels, Ph.D.

1  of time?

2       A.   No, I did not.  But what I did do was,

3  you know, I have an iCal thing and I usually write

4  down on my iCal what I've been working on, but not

5  necessarily the time that I've spent working on

6  it.  Sometimes, if I'm out doing something like

7  walking the dog, I put a box in and I know when it

8  started and when it ended.  But if I'm doing

9  things sporadically all day long, you know, I -- I

10  don't have that on my calendar.  But I usually

11  know what I've been working on on a particular

12  day.

13       Q.   Okay.  So iCal, is that some kind of

14  personal calendar?  Is that what that means?

15       A.   Yes.  It's my online -- my computer --

16  the calendar that resides on my computer, yes.

17       Q.   Okay.  I don't think I asked you this

18  because, you know, since you did your work on the

19  case on a flat-fee basis, I assume that it's

20  correct that you weren't charging any hourly rate

21  for the work that you did; is that correct?

22       A.   Yes, that's correct.

23       Q.   What is your rate for providing

24  deposition testimony?

Highly Confidential    Robert Michaels, Ph.D.

1      A.    I've declared that $600 per hour.

2      Q.    And then the e-mail that Mr. Lanciotti

3   sent includes another line item about the amount

4   of time that you estimated that you worked to

5   prepare the report -- the second report concerning

6   the 10 bellwethers, Mr. Stern's clients that, of

7   course, would include the four bellwethers that

8   we're concerned about now since they're part of

9   that group.  And it says here on the e-mail,

10  Report 2, submitted 6 August 2020, 50 to 100 hours

11  assuming two to three hours per day times 33 days.

12  So it's essentially the same.

13         And that's your best estimate of the

14  amount of time that you spent reviewing the

15  materials and writing up the report through the

16  completion date of the report; is that right?

17     A.    Well, it's the best estimate that I

18  could come up with last night.  If you -- if you

19  assign me and I'm allowed to spend hours of my

20  time going through my calendar and looking at

21  which days I might not have worked on it at all, I

22  might be able to narrow things down a little.  But

23  I -- that's what I was able to come up with last

24  night, yes.

1    Q.   Yeah.  I'm not trying to argue with you

2    about it.  I'm just trying to get the information.

3    So this is what I was provided.

4         As of today, this is your best estimate,

5    having looked at your iCal or calendar entries

6    last night, as to the amount of time that you

7    spent doing the work on the case, right?

8    A.   Well, close to being right.  I did not

9    look at my entries on my iCal.  I looked at the

10   date that I started work on each one, and I looked

11   at the date that I submitted it.  Both of them

12   were 33 days.  So that's how I figured it out.

13   Q.   All right.  So what you're saying is

14   that -- I understand now -- that if you did look

15   at your iCal, it's possible that you could provide

16   a more accurate estimate between the 50 and

17   100 hours, right?

18   A.   Yes.  I could remove some days when I,

19   you know, did something else.

20                    - - -

21        (Michaels Exhibit 30B marked.)

22                    - - -

23   BY MR. ROGERS:

24   Q.   All right.  Let's go to Exhibit 30B.

1          Can you see that now?

2     A.   Yes.

3     Q.   I see.

4          So what this indicates is that this

5     relates to the work that you did for the first

6     group of plaintiffs, the four bellwethers from the

7     Napoli law firm, because it says here "Retainer,

8     April 30th, per agreement, 7,500."  And then the

9     lump sum, per agreement, was 15,000 total, right?

10    A.   Correct.

11    Q.   I see.

12         So the total amount that you billed for

13    the work that you did through retention -- the

14    date that you were retained through the completion

15    of that first report was $15,000, right?

16    A.   Yes.

17                    - - -

18         (Michaels Exhibit 30C marked.)

19                    - - -

20    BY MR. ROGERS:

21    Q.   All right.  And then the third item that

22    I wanted to mark is now Exhibit 30C.  And as I

23    think we discussed yesterday at some point during

24    your deposition, there was an indication that you

```
1    had some handwritten notes concerning time spent

2    in between the completion of your report -- your

3    last report and up until the present.

4              Is that what these are?

5         A.   Yes, that's correct.

6         Q.   All right.  Just so I make sure I

7    understand what these columns mean, I see on the

8    left side here is the date, and then the times,

9    right?

10        A.   The date is on the top and the times on

11   that date are below start and finish, and then I

12   add them up, the numbers of minutes, in an hourly

13   rate.

14        Q.   Yep.

15             What does the "300" mean in the

16   Column 2?

17        A.   That's the hourly rate.

18        Q.   Oh.  But you didn't -- is that what you

19   are -- the agreement was that for this amount of

20   time after the reports, you would charge an hourly

21   rate?

22        A.   I don't recall what we -- maybe.  I

23   don't know.  I mean, if my clients don't want to

24   pay that, well, we'll -- I don't know what to say
```

1   about that.  I -- I don't recall what we said

2   about my hourly rate, although I think we probably

3   specified it.

4       Q.   Well, they're on the deposition now.

5   You might as well try to nail it down with them.

6   Get an agreement right now that that's what

7   they're going to pay.

8       A.   I'm not concerned about it.

9       Q.   All right.  So the -- I see.  And then

10  you see down -- for the entry for yesterday,

11  Thursday, November 12th, you did record the

12  $600 hourly rate for the deposition.

13           Okay.  Now, what do these entries

14  mean -- let's go across Column 3.

15           What does this mean, "bellwether"?

16      A.   These are the plaintiffs that -- there's

17  14 bellwether plaintiffs.  That was the

18  terminology we were using.  Ten that were the

19  subject of the second report, including the four

20  that were selected for our subject today.  But

21  this is before those four were selected.  So there

22  were 14.  And this is -- I was asked to look into

23  how to select them, and that's what I did.

24      Q.   Well, it seems like you have an entry

Highly Confidential - Robert Michaels, Ph.D.

```
 1   across Columns 4 and 5 that says plaintiffs --

 2   "P," I guess.

 3            Does "P" stand for plaintiff?

 4   A.    Yes, right.

 5   Q.    I see.  Oh, I get it.  I think what this

 6   means is bellwether plaintiff selection criteria,

 7   and your entries for -- in Column 3 for these

 8   dates, the work that you were doing on all of

 9   these dates for all of these time entries involved

10   bellwether plaintiff selection criteria.

11            Do I have that right?

12   A.    All the way down to the 10th of

13   September, until you see an entry for calling

14   Patrick Lanciotti.

15   Q.    Okay.  Thank you for that.

16   A.    And then I see there was some more of

17   that, yes.  Okay.  Yeah.

18   Q.    All right.  So then you have entries

19   here for a call with Mr. Lanciotti, and then you

20   continue with more entries for bellwether

21   plaintiff selection criteria, right?

22   A.    Correct.

23   Q.    Okay.  And then I see here you have

24   deposition prep, call with Mr. Lanciotti, another
```

Highly Confidential - Robert Michaels, Ph.D.

```
1    call with Mr. Lanciotti, and deposition prep, it

2    looks like, on Friday, October 30th, right?

3         A.   Yes.

4         Q.   Then we go to November 10th, the entry

5    says here "Depo Self-Prep:  Review Report."  I

6    think you described that yesterday.  Okay.

7              And then there's another entry for the

8    11th, this week, Wednesday the 11th, Zoom meeting

9    with Mr. Lanciotti and Mr. Stern and examine

10   documents.

11             What documents were you examining during

12   that Zoom call -- conference?

13        A.   I don't recall.  I'm sure -- I don't

14   recall.

15        Q.   All right.  So this looks like, then,

16   from the date that you completed your report up

17   till Monday, September 7th, is it correct that you

18   didn't do any work on the case during that period

19   of time?

20        A.   I don't know.  I certainly didn't charge

21   for it.  That's the only thing I can say.

22        Q.   All right.  Let's move on to some issues

23   that came up yesterday having to do with the

24   V██████████ -- Mrs. V████████ testimony about
```

Highly Confidential - Robert Michaels, Ph.D.

```
 1    when the family stopped drinking water and other

 2    things.

 3            Do you recall that basic subject matter

 4    of testimony yesterday?

 5       A.  Yes, I do.

 6            MR. ROGERS:  So let's mark this, please.

 7    The next one will be -- this will be Exhibit 31.

 8    It's selected pages from Mrs. V███████

 9    deposition.

10                      - - -

11             (Michaels Exhibit 31 marked.)

12                      - - -

13    BY MR. ROGERS:

14       Q.  And I want to show you this series of

15    questions and answers, okay, on Page 60, and

16    then -- 60 and following.

17            The question is, first one:  "Now, these

18    news reports in late 2014 are the reports that you

19    referenced a few moments ago that the water was

20    bad, right?"

21            And she says -- her answer is:  "Yes."

22            And then the question is:  "And so when

23    you heard those news reports in late 2014, you and

24    your family stopped drinking the water?"
```

Highly Confidential - Robert Michaels, PhyD.

```
 1                And her answer is:  "Correct."
 2                The next question is:  "And when I say
 3     'you and your family,' you personally stopped
 4     drinking the water in December 2014 or by
 5     December of 2014?"
 6                And her answer was:  "Yes."
 7                Then a couple more questions and answers
 8     here.
 9                "And you've got four children in the
10     home.  They also stopped drinking the water at
11     that time?"
12                Her answer was:  "Yes."
13                "And did you also at the same time, late
14     2014, stop using the water out of the faucets or
15     taps for cooking?"
16                And her answer was:  "Yes."
17                So is this the information that you
18     believe to be the best source of the facts as to
19     when the V▋PPI▋▋▋▋▋ stopped using tap water for
20     drinking and cooking?
21         A.   I believe that that's what I cited.  I'm
22     not sure -- I don't remember exactly what I cited.
23     But as I say, I've gone through these depositions,
24     and I sometimes have found conflicting
```

1   information, or vague information, and I -- I'm

2   not able to compare this with other parts of the

3   deposition, but this is probably what I cited.

4         Q.   Is there anything vague about this in

5   your view?

6         A.   Well, yeah.  I don't know exactly when

7   it occurred, but sure.

8         Q.   I'm sorry.  What do you mean you don't

9   know when it occurred?  She said here clearly the

10  family stopped drinking the water and stopped

11  using the water for cooking by December of 2014.

12  What's unclear about that?

13        A.   Well, I believe what it says is not by

14  December of 2014, but in December 2014 or by

15  December, and there's 31 days in there.  That's

16  unclear when the thing occurred, whether it

17  cleared abruptly, and whether it was absolute, you

18  know.  Whether -- whether the compliance with that

19  policy in the family was 100 percent effective.

20             So I -- so I don't -- I don't consider

21  that definitive -- it was definitive enough for my

22  report to state my assumptions, but in terms of

23  what we raised earlier in terms of how many days

24  of exposure, what could you put into a model, you

Highly Confidential — Robert Michaels, PhyD

1  would -- to do a quantitative risk assessment

2  here, you would have to look at other kinds of

3  information that is not included here, such as

4  whether they brushed their teeth and so on, washed

5  dishes.  I don't know -- I'm looking at this kind

6  of halfway, but it's vague, as I said.  But it is

7  generally -- gives the idea that they stopped.

8       Q.   Are you aware of any evidence that the

9  V███PPI███████ used tap water for drinking or for

10  cooking at any point in time from January 1st,

11  2015 forward?

12       A.   My memory does not contain such

13  evidence, no.

14       Q.   Okay.  There were some questions I asked

15  you yesterday in which you said -- paraphrasing

16  here -- that you had reviewed some FAST Start

17  service line information and data concerning the

18  composition of the service lines of the bellwether

19  plaintiffs, these four bellwether plaintiffs.

20                    - - -

21            (Michaels Exhibit 32 marked.)

22                    - - -

23  BY MR. ROGERS:

24       Q.   And what I'm showing to you here is

Highly Confidential - Robert Michaels, PhyD.

1    Exhibit 32, which is a spreadsheet that contains

2    the addresses for the four bellwethers from the

3    FAST Start data.

4            Do you recognize this spreadsheet as the

5    type of information that you were referring to

6    yesterday when you reviewed spreadsheets

7    concerning the service line composition for the

8    bellwethers' residences?

9    A.    I don't have a very specific memory of

10   the spreadsheet, except to say that it was huge.

11   And what I did was a search on the addresses, and

12   I didn't find them.  I don't know if it was the

13   spreadsheet in which this was contained or

14   something else, but it is the kind of information

15   I was looking for, yes.

16   Q.    Okay.  So what we did was we did select

17   these addresses and, you know, it's not the full

18   spreadsheet that I think is clear, but we selected

19   and just excerpted out the addresses that we're

20   concerned about.

21           And you can see here that the addresses

22   are in Column A.  The B column is "SLE/SLR."  And

23   what that means from the spreadsheet is service

24   line excavation, slash, service line repair date.

Highly Confidential - Robert Michaels, PhD

```
 1   And then it says -- it lists information for the
 2   service lines, both the public and private, as to
 3   what the composition was.  And then in Column E
 4   here, whether it was replaced or not.  And then
 5   the last column is the phase.  There were -- as
 6   you know in the FAST Start program, there were
 7   different phases to the whole thing.
 8              You're familiar with that?
 9        A.   I don't recall it, no, but maybe I was
10   looking at a different phase.  I really don't --
11   you know, that's -- that is interesting.  I may
12   have been looking at a database that did not
13   include those addresses.  That's possible.
14        Q.   So I'll just report to you that the
15   Montana Avenue house is the residence for the T▮▮▮
16   family; the Cherokee Avenue, the second one, is
17   for the T▮▮▮ family; the Burlington address is for
18   W▮▮▮ family; the S▮▮▮ address is the
19   Lincoln Avenue address; and the last one here,
20   V▮▮▮ is the Woodrow Avenue address.
21              So according to these records, at least,
22   both the public service line and the private
23   service line when they were excavated and
24   evaluated, were all copper, is that right,
```

Highly Confidential - Robert Michaels, Ph.D.

```
1    according to this anyway?

2         A.   Yes, on those dates.  That's correct.

3         Q.   And it says for all of them that no

4    portion of the service line was replaced, right?

5         A.   Well, it says that no portion of the

6    service line was replaced on the date that is

7    listed in Column B.  I don't know that they were

8    not replaced earlier.  I do recall that in at

9    least one, and I -- perhaps more than one

10   deposition of the bellwether parent, there was

11   some discussion of replacement that they observed

12   out of -- out of their house.  And I don't know

13   that -- I don't recall what the dates were.

14        Q.   Wasn't the testimony that the -- there

15   was an excavation in the front yard that would be

16   consistent with an inspection of the pipe but not

17   a replacement?

18        A.   I don't know.

19             MR. LANCIOTTI:  Object to form.

20        Q.   Do you know of any way to determine what

21   the composition of a service line is except for

22   excavating it and actually, you know, examining

23   it?

24             MR. LANCIOTTI:  Object to form.
```

Highly Confidential - Robert Michaels, PhD

1       A.   Well, I don't -- I don't have that kind

2  of information.  I imagine that somebody -- there

3  must have been records of when it was put in place

4  and what the material was at that time.  So there

5  could be documentary records.  I'm just

6  speculating about that.  But if you're asking if I

7  can imagine other ways of finding out, yes, I can

8  imagine --

9       Q.   I don't want you to imagine.  I'm asking

10  you if you know.

11           Are you aware, sir, do you know, if

12  there are any other ways to determine what the

13  composition of the service line is besides or

14  separate from excavating it and inspecting it?

15      A.   Well, let me tell you what I do know.

16  When people hire contractors, they usually get a

17  description of the work that they're about to pay

18  for.  And that work would include the materials.

19  Do such documents still exist or can they easily

20  be accessed?  That, I don't know.  But if you're

21  asking me if I know of other ways, yes, that is

22  what I answered before.  I know of one other way.

23      Q.   And that other way would be to review

24  records to determine if they describe the

1    composition of the lead service lines at some

2    point in time when they were originally installed?

3        A.   Yes.  Those would include two kinds of

4    documents.  One is the design document, and the

5    other is the as-built document when there are

6    variations from the way the thing was designed.

7    So those two classes of documents would be

8    potential ways of finding out how the service --

9    what these service lines contained.

10            It's a hypothetical question.  I don't

11   know that these documents exist.  I can hardly

12   remember these lines being in my -- I don't -- I

13   think if I saw these, I would have reported them.

14   I certainly didn't report the contrary.

15       Q.   All right.  So just to close this out,

16   then, it's correct, right, that you have not seen

17   and are not aware of any actual as-built or design

18   information as to the content of the composition

19   of the service lines for these addresses, right?

20       A.   Right.

21       Q.   So assuming that these records are

22   correct and that during the period of time that

23   there was the water switchover, the public portion

24   of the service lines for these residences where

Highly Confidential — Robert Michaels, PhD

1    the bellwether plaintiffs lived and the private

2    portion of the service line were copper and not

3    lead, what effect would that have, if any, on your

4    evaluation of the extent to which there was an

5    increased lead exposure for these families?

6         A.    Yeah, I don't think what you -- the

7    premise of your question was correct.  As I

8    pointed out before, that no portion of the service

9    line was replaced on the date when it was

10   inspected in 2018 or 2019.  I don't know what

11   preceded that.  I don't know if somebody replaced

12   service lines before that.

13            This was a program in which service

14   lines were looked at.  The prior history is opaque

15   to me.  So just putting that on the record, I

16   don't know that the service lines were copper

17   during the period of Flint River water use.

18            Now, assuming that that's the case, I

19   don't believe that I reported the contrary in my

20   report.

21        Q.    Can you answer this question, Doctor:

22   Assuming that the service lines for the residences

23   in which the bellwethers lived were copper and not

24   lead, what impact does -- during the time of the

1    water switchover, from April 2014 to October 2015,

2    what effect or impact does that have on your

3    evaluation and your opinion as to whether there

4    was increased lead exposure for these families and

5    these bellwether plaintiffs because of the water?

6           MR. LANCIOTTI:  Object to form.

7      A.    Yeah, the report that I wrote addressed

8    the question of the children's exposure to lead,

9    not specifically whether it was increased or

10   decreased.

11           That said, I would say that I also made

12   clear in my report that there are other sources of

13   lead that could explain why the kids have body

14   burdens of lead that were measured.  And the

15   specific one that I emphasized was that the

16   internal plumbing in the house and the fixtures in

17   the house could have lead or solder that contains

18   lead.  I think that was made very clear in my

19   report.

20     Q.    So your opinion is that to the extent

21   water during the water switchover period was the

22   source of any lead exposure for the families is

23   that there would -- it would have had to have come

24   from lead in the plumbing fixtures in the house

Highly Confidential - Robert Michaels, PhD

1  if, in fact, the service lines were made of

2  copper; is that right?

3          MR. LANCIOTTI:  Object to form.

4      A.  As I pointed out before in an earlier

5  part of our discussion, the upstream portion also

6  was something that conceptually could have lead.

7  I don't know.  And the upstream portion being the

8  water mains and the water treatment plant.

9          So, you know, I think the most likely

10  place is probably inside the plumbing of the

11  house.  If there's no lead in the plumbing of the

12  house, then you could exclude that as well.  And I

13  think all of that is clear in my report.

14          But the other thing that's clear in my

15  report is that you do have to account for the fact

16  that these kids have lead in their bodies.  I

17  think that's pretty uncontroverted --

18  incontrovertible.

19      Q.  Let's go to the next exhibit, which it

20  looks like I messed up on the numbering here.

21  That's okay, though.  We can go back to it.

22          MR. ROGERS:  So what I'm going to show

23  you now, Sara, we're going to mark this as

24  Exhibit 33 just to keep my numbering system

Highly Confidential - Robert Michaels, Ph.D.

1    consistent here and we'll go back to 32 in a

2    little bit.

3                        - - -

4              (Michaels Exhibit 33 marked.)

5                        - - -

6    BY MR. ROGERS:

7        Q.   Can you see what's up on the screen now,

8    Doctor?

9        A.   I do.

10       Q.   So this is a paper from the

11   "Environmental Claims Journal" that you were the

12   author of entitled "Legacy Contaminants of

13   Emerging Concern:  Lead, Flint, Michigan, and

14   Human Health," right?

15       A.   Yes.  They left off the colon somehow.

16   I don't know if they corrected that.

17       Q.   Where would the colon go?

18       A.   After "concern."

19       Q.   I see.

20            Okay.  Now, I want to ask you about the

21   timing of this.  It appears -- there's some

22   numbers up here -- can you see this right here

23   where my cursor is?

24       A.   Yes.

1    Q.   And I don't know what these numbers

2  mean.  Do you know when -- when did you write this

3  paper?  Put it that way.  When did you write it?

4    A.   You know, it says 2019 in there.  I

5  probably wrote it in -- I don't know, maybe in

6  2019 or 2018.  But I -- let me check on that, you

7  know.  It's in the "References" section, I'm sure,

8  so let me --

9    Q.   Yeah, it is.  I'd like to know when you

10  wrote it as opposed to the publication date.

11  Because if you look at the bottom of the first

12  page here, it says "copyright 2019" for the

13  publication.  But I'd like to know if you can tell

14  me when you wrote it as opposed to when it was

15  published.

16    A.   I can guarantee you that it was before

17  the publication date, but other than that, I don't

18  know.  If I look at the -- part of the year, as

19  I've said, it most probably was in 2019, but I --

20  I don't know.

21       And let's put it this way.  As I've

22  said, I've had a lot of projects on lead.  And so

23  some of the components of the paper include text

24  that I'm sure I drew from previous years' work.  I

Highly Confidential - Robert Michaels, PhD

```
 1   don't know specifically because I don't -- I

 2   don't -- I don't keep track of all of that.  But,

 3   you know, this is -- this is the manuscript I came

 4   up with in 2019, I think.

 5       Q.   Okay.  You raised the issue that I --

 6   you just said about, you know, building off of, I

 7   think, you know, prior work that you had done on

 8   lead and including it in this paper.

 9            It's true, isn't it, that you basically

10   excerpted or took from this paper the text and

11   some of the diagrams and figures and you put it --

12   placed it directly into your reports in this case,

13   right?

14       A.   Yes, I did do some of that, yes.

15       Q.   Okay.  And in particular, I'm going to

16   show you -- just bear with me -- the dose-response

17   chart that is in your report that we talked about

18   yesterday.  I'm sorry.  Bear with me a second here

19   while I scroll to that.

20            Okay.  Here it is.  So on Page, it looks

21   like, 29 of this article, this information here,

22   the dose-response chart, that's the same chart

23   that's in your report -- reports in this case,

24   right?
```

Highly Confidential    Robert Michaels, PhD

```
1        A.    Correct.

2        Q.    And this is not something that you

3   created.  This actually came from the American

4   Thoracic Society from a report that was published

5   back in 2000, right?

6        A.    No, that is not right.  I created this

7   myself.

8        Q.    Oh.  So is this -- is this dose-response

9   chart based on this 1985 ATS statement from the

10  American Thoracic Society?

11       A.    No.  No.  I think you have to look at

12  the text and see where it first references

13  Figure 1 up ahead -- up higher, usually on the

14  page before.  You know, the editor takes some

15  liberties about where he or she put the figures

16  and tables.

17       Q.    Okay.  Yeah, I didn't see that, so let's

18  scroll through and see if we can find it.  We're

19  on Page 28.

20            I don't see any references to Figure 1.

21  It says here, "The figure on Page 6" -- do you see

22  where my cursor is?

23       A.    Yes.

24       Q.    -- "The figure on Page 667 of American
```

1  Thoracic Society (1985) illustrates," et cetera.

2          Doesn't that mean that this figure that

3  you have in here came from there?

4      A.   No.  I did not copy that figure.  That

5  was my figure.  But let me -- if I -- maybe they

6  put it below.  I don't know.

7      Q.   All right.  But it doesn't -- when you

8  say "they," I mean, it's your manuscript.  You

9  don't have any attribution here for this Figure 1

10  that I can find or see other than this reference

11  to the American Thoracic Society work.

12      A.   Well, I will look through my copy of the

13  manuscript and see if I find it.

14      Q.   And, actually, can I point you to this

15  right here?  I'll highlight it for you.

16          This section, "The EPA has portrayed

17  this pollution burden, Figure 1."

18          But that's not this Figure 1, though, is

19  it?

20      A.   No.  That's a quote from probably the

21  American Thoracic Society.

22      Q.   All right.  Well, be that as it may, as

23  we've established, a not-insignificant amount of

24  this paper, the exact language that you have in

Highly Confidential - Robert Michaels, PhyD

1    this paper, made its way into your reports in this

2    case; is that right?

3              MR. LANCIOTTI:  Object to form.

4         A.   Yeah.  I would say that "made its way"

5    is somehow like the rebel force intruding on

6    something.  This is my work, and I used it for my

7    report.

8         Q.   That's fair.  I didn't mean to imply any

9    mysterious force.  I was just using a sort of

10   lay-handed -- or I don't know what you call it.

11             So the point is that a lot of the actual

12   language from this paper based upon your work, you

13   thought relevant, and, therefore, included it in

14   your reports on this case, right?

15        A.   Yes.

16             MR. LANCIOTTI:  Object to form.

17        A.   The toxicological issues, I did, yes.

18        Q.   All right.  Let's stop the share screen

19   at this point.

20             Actually, we'll have to go back to the

21   share screen because I want to ask you some

22   questions about your report.

23             Do you still have a copy -- paper copy

24   of your report handy?

1          A.    Yes, I do.

2          Q.    Thanks.

3                Okay.  I'm going to show you some

4     information on Page 6 right down at the bottom,

5     and it carries over to Page 7.

6                "Use of Flint River water began on

7     25 April 2014 and ended in mid-October 2015 when

8     the system reconnected to the DWSD supply."

9                On the top of Page 7, "Thus, the period

10    of potential exposure exceeded one year.

11    Exposure, therefore, was potentially chronic in

12    toxicology terms as distinguished from acute

13    (roughly up to a day, 24 hours) and subchronic (in

14    between acute and chronic, variously defined,

15    approximately three months)."

16                I think I understand what you're

17    defining these terms to mean, but I just want to

18    make sure.  So can you explain what you are

19    referring to here in terms of the exposure period,

20    what would be chronic, what would be acute, and

21    what would be subchronic?

22          A.    Well, a chronic exposure is a long-term

23    exposure.  That's the general meaning of it.  In

24    actual terms, a lot of studies on which chronic

Highly Confidential    Robert Michaels, PhD

1    exposure is evaluated are one-year studies or

2    longer.  And so one year is the definition --

3    pretty common definition of chronic exposure.

4              And, again, there are no bright lines.

5    The subchronic is not defined uniformly, and

6    that's why I say that between acute and chronic, I

7    believe that the CDC uses three months.  I'm not

8    sure.  I think the EPA may use one month.  I'm not

9    sure about that either.  They may use two weeks

10   and perhaps use both in different contexts.

11             But acute usually is within one day.

12   Acute is something that is often very sudden

13   exposure, such as you might encounter in a poison

14   control center where people, you know, might come

15   sick because they swallowed a bottle of pills.  So

16   that occurred at a very quick period of time.  But

17   roughly speaking, acute exposure can be up to

18   about a day, and that is pretty uniform

19   definition.

20        Q.   So just to make sure I've got this now,

21   the term -- you have it in quotes here --

22   "chronic" in toxicology terms, what you are saying

23   is that your definition of that term means a

24   period of at least one year; is that fair to say?

Highly Confidential - Robert Michaels, Ph.D.

1      A.    Roughly one year, yes, that time frame.

2      Q.    Roughly one year.

3            And your definition of, quote, "acute"

4  is roughly up to a day or 24 hours, right?

5      A.    Correct.

6      Q.    I see.

7            And then subchronic would be somewhere

8  in between one day and one year, but you're also

9  sort of limiting it to approximately three months,

10  right?

11      A.    I'm suggesting that that's pretty common

12  in the way people think about it, yes.

13      Q.    All right.  Did you attempt in your

14  work -- or strike that.  Not attempt.

15            Did you in your work on this case

16  determine for each of the four bellwethers that

17  we're concerned about here, S████, T███,

18  V██████, and W███, which of these definitions

19  for the exposure period they fell into or they

20  should be characterized as, chronic or subchronic?

21      A.    To the extent that it is reported, I

22  have done that.  I believe we looked at some of

23  the sections regarding the number of days of

24  residential exposure potentially, the number of

Highly Confidential - Robert Michaels, PhD

1  days of exposure at school as well.  And, you

2  know, if they overlapped, of course, you would use

3  the same time periods.  You wouldn't add them up.

4         And so there was some addressing of that

5  issue.  I did not probably specifically conclude

6  that the exposure was chronic or subchronic or

7  acute.  And one reason for that is something else

8  that I've mentioned to you earlier in our

9  discussions, which is that exposure to lead, once

10  it occurs and results in storage of the lead,

11  continues beyond the day you turn off the spigot.

12  It continues potentially for years after that,

13  and, therefore, exposure to lead is one of those

14  sorts of things that is difficult to fit into

15  this -- into this paradigm.

16         Now, exposure externally is one thing,

17  and you can fit it into that.  Obviously, you turn

18  off the spigot and the exposure may stop soon

19  after that.  But internal exposure continues.

20  That's made quite clear, I think, in my report.

21         So, again, it's one of those kinds of

22  questions where in this case, it's a distinction

23  made without much of a difference.

24         Q.   With respect to your description of

1  turning off the spigot, if -- with respect to the

2  bellwether plaintiffs' exposure to water from

3  drinking the water, the exposure period would end

4  as of the point in time at which they stopped

5  drinking the water in their residences.

6          I'm referring to residences only at this

7  point in time, not schools, right?

8      A.   The drinking exposure --

9          MR. LANCIOTTI:  Object to form.

10     A.   -- would stop, yes.  It would stop

11 except to the degree that it occurs incidentally

12 in brushing one's teeth or washing dishes and that

13 sort of thing, yes.

14     Q.   Okay.  Thank you.

15          And to the extent that the families

16 stopped using the tap water for cooking, the

17 bellwether plaintiffs, the children's exposure to

18 lead by ingestion of water that would be used in

19 cooking would also have ended as of the point in

20 time that they stopped using the water for

21 cooking, right?

22     A.   Well, it would stop from cooking, yes.

23 It would continue to the extent that brushing

24 one's teeth produces exposure or bathing produces

Highly Confidential - Robert Michaels, PhD

1    exposure.  And as I've said before, internal

2    exposure continues from past exposure.

3         Q.  And with respect to the water in their

4    homes, if there is no lead in the main pipes, or,

5    that is to say, the main pipes are not made of

6    lead, and the service lines going into their homes

7    are not made of lead, in your opinion, the only

8    source of the lead that could be going into the

9    water as -- before it comes out of the tap in

10   those homes is due to solder, potentially lead

11   solder, in the fittings in the plumbing; is that

12   right?

13         MR. STERN:  Object to form; outside the

14   scope of his expertise.

15         A.  As I've also mentioned, we talked about

16   the upstream places where it could come from, such

17   as the water treatment plant.  We've also talked

18   about internal plumbing of the house, having lead

19   pipes or components and fixtures that contain

20   lead, and we've talked about the one that you

21   included, which was solder that contains lead.

22         Q.  Right.  And I think we covered this

23   yesterday, and, you know, I don't have a clear

24   memory of it.  Just to close it out -- I'm not

Highly Confidential -- Robert Michaels, PhD

1    trying to be repetitive -- but you personally, as

2    of today, don't know what the plumbing -- the

3    composition of the plumbing within these

4    bellwether residences during the switchover is or

5    was, right?

6        A.   Right.

7        Q.   All right.  I'd like to return to an

8    exhibit that we marked yesterday.  It's the -- one

9    of the Edwards' papers.  It's Exhibit 24, the

10   biosolids study.  I want to go back to this for a

11   minute.  And, again, I don't mean to repeat.  I

12   didn't have a chance to read your transcript --

13   the rough transcript that Sara prepared very

14   efficiently, as usual, and got out last night for

15   us, but I think I'm correct that you have not read

16   this paper before, right?

17       A.   I believe that this is not one that I

18   cited, yes.

19       Q.   And, in fact, I think you said yesterday

20   that you didn't even know who Dr. Marc Edwards

21   was, right?

22       A.   If I said that, that's true.  I don't

23   recall a Marc Edwards.

24       Q.   Okay.  So I want to ask you if some of

Highly Confidential - Robert Michaels, PhD.

1  the findings that are reported in this article, if

2  they are true and accurate and factual, have any

3  impact on any of the opinions that you hold in the

4  case.

5           So what he says here -- what the authors

6  say here is "Although total biosolids lead

7  increased just 14 percent during the 18 months of

8  the Flint water crisis versus the comparable time

9  pre-Flint water crisis, 76 percent of that

10  increase occurred in July through September 2014,

11  and the corresponding percentage of Flint children

12  under six years of age with elevated blood lead

13  greater than or equal to 5 micrograms per

14  deciliter doubled from 3.45 percent to

15  6.61 percent in those same three months versus

16  2013."

17           So if that is correct and accurate, does

18  that impact your opinions concerning lead exposure

19  for these bellwether children in any way?

20           MR. LANCIOTTI:  Object to form and

21  foundation.  He's already testified that he hasn't

22  had a chance to review this report in its

23  entirety.

24      A.    Exactly.  And I must say that you're

1    showing me a part of the abstract of a report that

2    has a much larger context, and I need to look at

3    that report and have time to evaluate it to

4    understand what it's trying to say.  Well, I think

5    that's enough.

6        Q.   Well, but I want you to assume that what

7    is said here is true.  I understand you haven't

8    read it and you may at some point in time do that,

9    but assuming that this report is true, that it's

10    accurate, that 70 percent of the increase occurred

11    during the summer months of 2014, does that -- if

12    that fact is true, would that influence any of

13    your opinions that you hold in the case as to the

14    lead exposure for the four bellwether plaintiffs?

15        A.   As I said --

16        MR. LANCIOTTI:  Objection; form and

17    foundation.

18        A.   As I said, I have not read this paper

19    and, therefore, I don't know what it says, and,

20    therefore, if it's true or not true, I don't know

21    what it would imply for my opinions.

22        This does refer specifically to

23    biosolids, and so right there, I have to say that

24    that excludes some sources of lead.  And so I

1  don't really know what this paper is trying to

2  say.  Biosolids is a very specific subcategory of

3  solids, and solids are a specific subcategory of

4  lead content, which includes some soluble forms of

5  lead although they're not usually soluble.

6          So all I can say is that you are showing

7  me something from which, had I opined on it, you

8  might have criticized that I had looked at the

9  paper.  I've only looked at that sentence.  And so

10 I can only tell you that I don't know what this

11 would imply, if true, for my opinion.

12     Q.   Have you in any of your past work,

13 either for litigation cases or in your regular

14 business consulting work, done any analyses of

15 lead content in biosolids?

16     A.   I don't recall doing that, no.

17     Q.   What do -- you described something about

18 what biosolids are.  What's your understanding of

19 what biosolids are?

20     A.   Again, you've not let me see this entire

21 paper.  The authors have the definition, I'm sure,

22 of what biosolids are.  I don't know what that

23 definition is.  I only know that, you know, an

24 organic molecule must be implied by that, but I

1    don't really know.

2        Q.   All right.  I want to go to the Pieper

3    study, which you do cite in your report at various

4    locations.

5            MR. ROGERS:  And, Sara, this is now

6    Exhibit 32.  We went backwards in the exhibit

7    marking.

8        Q.   Dr. Michaels, you recognize this paper

9    as one of the scientific papers that you cite in

10   your report and rely on to some extent?

11           MR. LANCIOTTI:  I'm sorry, Dave.  I

12   think for clarity of the record, we've already

13   marked an Exhibit 32.

14           MR. ROGERS:  Oh.  Well, let's check that

15   out.  If we did, that's a mistake.

16           Thank you for that, Patrick.  So what

17   we're going to do is -- that's right.  So 32 is

18   the lead service line spreadsheet.  So 33, the

19   Michaels paper that we just looked at, is correct.

20           And let's make this one now 34.

21           Thank you for that.

22           MR. LANCIOTTI:  Yep.

23                      - - -

24           (Michaels Exhibit 34 marked.)

Highly Confidential - Robert Michaels, PhD

```
 1                      - - -
 2           MR. ROGERS:  Okay.  All clear, Sara?
 3  You got that?  This is 34.
 4           You know what?  And, Sara, if I send you
 5  this later today and it's got a 32 number on it,
 6  that's my bad.  I just didn't change it.  So just,
 7  you know, make sure -- please check that out and
 8  make sure I didn't make a mistake when I send you
 9  these.  Okay?  Thank you.
10  BY MR. ROGERS:
11      Q.   All right.  I don't know if we got an
12  answer, Doctor, while we were having this
13  conversation.
14           This is the paper that you cite in your
15  report for various things, right?
16      A.   Correct.  I don't know about various
17  things but, yes, I cite it in the report.
18      Q.   Okay.  That's what I'm really going to
19  ask you to explain for -- to me or for us.
20           In your view, what is the important
21  information in this paper that informs and that
22  you rely on for any of the opinions or findings
23  that you have in your report?
24      A.   Yes.  I recall that we brought up this
```

Highly Confidential - Robert Michaels, Ph.D.

1  subject -- or you brought up this subject

2  yesterday, and I see that on Page 109, we do see

3  some discussion of the Pieper, or however you

4  pronounce his name, paper.

5      Q.  I'm sorry.  I had to take my earphones

6  out to get to your report, which was on my floor.

7          Did you say Page 109?

8      A.  Yes.

9      Q.  Okay.  So let me just take a look at

10  that.  Bear with me.

11         Okay.  So on Page 109, you have a quote

12  from this Pieper paper, right?

13     A.  Yes.

14     Q.  All right.  So let's -- I don't know.

15  Let me see if I can find where in the report it

16  is, that quote, so that we don't have to go back

17  to the report.  Oh, there you say it.  It says

18  Pieper 2018, Page 8126.  So let's see if we can

19  find it.  Yeah, I think it's right over here.

20  Yeah, this is it.

21         So would you agree with me that on your

22  report on Page 109, you have quoted this section

23  of the Pieper paper?

24     A.  Yes.

1    Q.   And what I wanted to ask you about here

2  is, so what is important -- you quoted, but in

3  reading the report, I'm not really understanding

4  what the significance of it is.

5       Would you explain, what is the

6  significance of this information to the opinions

7  that you hold in the case?

8    A.   I believe that it was the idea that it

9  was a system -- the conclusion of the paper was

10 that this was a system-wide problem and that the

11 ZIP codes, that include the ZIP codes where the

12 four plaintiffs live, are heavily impacted and

13 that this is a systemic problem for those ZIP

14 codes.

15   Q.   Do you know whether the authors in their

16 work of this paper attempted to determine what the

17 composition of the service lines in the houses

18 where the samples were taken?  Do you know if they

19 did that?

20   A.   I don't recall.  It may be in the paper.

21   Q.   I want to ask you about this entry right

22 here.  Can you see where my cursor is?

23   A.   Yes.

24   Q.   It says "The median water lead level was

1    3.5 micrograms per liter and 85 percent of the

2    samples contained lead above the minimum reporting

3    level of greater than or equal to 1 microgram per

4    liter."  Right?

5         A.   Correct.

6         Q.   So what does that tell you, if anything,

7    important to any of the opinions that you hold,

8    that the median water lead level for the samples

9    that these authors are reporting on was

10   3.5 micrograms per liter?

11        A.   I don't know.  A median is just a point,

12   so it was just one study.  I don't know what it

13   would imply.  I'd have to look at my text and see

14   if there's any use of that information.

15        Q.   So -- but the way that you were -- as

16   you just described, using this information from

17   this paper was to explain or support your position

18   that there was a system-wide problem within the

19   water supply?

20        A.   I'm sorry.  Could you repeat that?

21        Q.   Yeah.

22             The way that you were using this

23   information was to support your opinion or

24   statement that there was a system-wide problem

1    with lead contamination in the water?

2        A.   No, I wouldn't characterize it that way.

3    I would say that if I have that opinion, it's

4    because of the information I use.  I didn't pull

5    it out because the information supports my

6    opinion.

7        Q.   Well, I -- again, I think we're engaging

8    in semantics again here.

9            So this information is supportive of

10   your opinion that you have and hold that there was

11   a system-wide problem with lead contamination in

12   the water; is that what you're saying?

13       A.   I'm saying that the quotation that I

14   used supports that, yes.  Not particularly the

15   mean number, but, yes, the quotation does.

16       Q.   Why do you say "not particularly the

17   mean number"?

18       A.   Because the entire quotation was quoted,

19   and the conclusion drawn by the authors is based

20   on their database and on their -- the information

21   they condensed from their studies.  They did tell

22   us the median value, but that doesn't constitute

23   the full basis for the authors' conclusion, or

24   mine.

Highly Confidential - Robert Michaels, PhD

```
 1        Q.   Do you use or cite this paper or any
 2   language from the paper for any other purposes in
 3   your report, do you know?
 4        A.   I don't recall.  If I used that paper in
 5   more than one place, I probably would have cited
 6   it in more than one place.  And you can check to
 7   see if I did.
 8             I did use it -- I'm looking at my paper
 9   right now, and I can see that I used that quote in
10   respect to conclusion -- in respect to findings
11   made with respect to some of the plaintiffs.  So
12   I've brought that out in more than one place.
13        Q.   Let's go to your report again.  I'm
14   going to direct your attention to Pages 77 through
15   78 and then continuing after that.
16             Just to get oriented here, I think the
17   way this is structured -- and correct me if I'm
18   wrong -- is you have a section here beginning on
19   Page 75 entitled "Pharmacodynamics."  And then
20   you're saying here -- you are identifying certain
21   nervous system effects that could be exerted by
22   lead during embryonic development, and you list
23   them out here, right?
24        A.   No, that's not correct.
```

1    Q.   Okay.  Tell me what's wrong with that.

2    A.   The nervous system effects are an

3    example, but the "Pharmacodynamics" section, or

4    subsection, whatever you want to call it, has

5    sections within it or subsections within it which

6    are listed here and continuing on to Page 76.

7    Q.   Right.  But I mean -- all right.  You

8    explain to me.  Why did you list out these

9    subheadings that you have here, beginning with

10   "Acute Toxicity" down through, you know, "Toxic

11   Effects"?

12   A.   Well, just a preliminary or an

13   introduction to the sections that you will see

14   following.  The first one listed there is "Acute

15   Toxicity," and now the first subsection after that

16   list is "Acute Toxicity."

17        The second one -- I don't -- whatever it

18   is, it is, but it's just the order of

19   presentation.

20   Q.   I get it.

21        But what are you saying about whether or

22   not any of these effects that are listed here

23   are -- can be caused by lead exposure?

24   A.   Each of the sections that -- or

1   subsections that follows that list evaluates that

2   issue.

3        Q.   I see.  Okay.  So I get it, then.

4             So to the extent that there are

5   scientific sources or references listed here,

6   those are the ones, for example, on this acute

7   toxicity issue, the Klassen, Amdur, and Doull 1986

8   study, that is the paper that you rely upon for

9   your statement concerning acute toxicity, right?

10       A.   Well, first of all, that's a chapter in

11  a book.  And, secondly, that is one of the

12  sources, yes.  I don't know what other sources are

13  there.

14            You're going up and down, and I don't --

15  I don't know what else is there.  It looks like a

16  lot of it does come from Klassen, but I don't

17  recall.

18       Q.   Yeah, I'm just trying to get the

19  structure down.

20            So for each of these effects that you're

21  listing here, you included scientific literature

22  that supports the statements that you have made

23  with respect to each of these particular effects;

24  is that right?

Highly Confidential - Robert Michaels, PhD

```
1        A.    Yeah, absolutely.

2        Q.    Okay.  Now, I think we covered this

3   yesterday, but with respect to the issue of

4   specific causation, and that is to say, when it --

5   whether any of these effects exist in any of the

6   individual bellwether plaintiffs, the four that we

7   have, you defer to physicians with respect to

8   that.  You did not hold any opinions in that

9   regard; am I right?

10       A.    We talked about that at pretty great

11  length.  And I did make the distinction from what

12  you've just said that I have not addressed that in

13  the report.  And my report is based on the concept

14  of general causation, and I do defer to physicians

15  for conclusions about specific causation with

16  respect to their specific patients.

17       Q.    I want to ask you about this Table 3 on

18  Page 92.  I have it highlighted here, Table 3,

19  "Distribution of Blood Lead Levels Among Children

20  Less Than 6 Years Old, 2009 through '15, in HHS."

21            I think that means Department of Health

22  and Human Services from the United States

23  Government, right?

24       A.    Yes.
```

Highly Confidential - Robert Michaels, PhD

1      Q.   And it describes Region 5 with these
2  various states:  Illinois; Indiana; Michigan;
3  Minnesota; Ohio; Wisconsin; including Flint,
4  Michigan.  And you have a source here, asterisk.
5  The source is McClure, Leland; Justin Niles paper
6  from "The Journal of Pediatrics," right?
7      A.   Correct.
8      Q.   So why did you include this Table 3 in
9  your report?  What is it that you're trying to get
10  across here?
11      A.   I would have to look at the text.  I
12  don't recall.
13      Q.   Why don't you take a look at your report
14  and the text preceding and/or after it and see if
15  you can do that for me.
16      A.   Sure.
17           (Witness reviews document.)
18           Yes.  I believe that you can find that
19  explanation on Page 91 at the bottom.  And it's
20  interesting that we're looking at that right now
21  because I did talk to you yesterday about my
22  reading -- my recollection of an average of about
23  1 microgram per deciliter as an average blood
24  level for young children.  And here I see that

Highly Confidential - Robert Michaels, PhD

1    that comes from this period of 2009 to 2015 where

2    it was actually 1.3 micrograms per deciliter.  And

3    that year is a geometric mean.  But in any case,

4    it's approximately -- you know, assuming some

5    statistical assumptions, that's where I got that

6    number from.

7         And the purpose of citing the McClure

8    study was to narrow down the numbers for the

9    U.S. -- and you can see this is an average for

10   young children in the U.S. -- to the region in

11   which Flint, Michigan -- the Health and Human

12   Services region in which Flint, Michigan falls.

13   And that is why I highlighted that information.

14        Q.   So I -- while you were speaking, I just

15   highlighted this section here.  Maybe I'll do the

16   whole thing just so it's clear.

17        So when you were describing yesterday

18   what you just said about the mean or average being

19   around 1 micrograms per deciliter, this reports it

20   as 1.3.  But you're remembering now that this is

21   the source from which you derived that estimate

22   yesterday; is that right?

23        A.   Well, I think it's more confirmatory

24   because I don't know where I found that number.  I

1    don't remember where I found that number.  I'm

2    sure it appears in more than one place.  But here

3    it is, so that's a good thing.

4         Q.   All right.  So did you compare the

5    bellwether plaintiffs in terms of where they --

6    their blood lead levels fall within this range

7    that is reported in Table 3?

8         A.   I don't recall specifically whether I

9    compared it with Table 3.  I do recall comparing

10   it with the 5 microgram per deciliter number, and

11   I believe I did that with respect to each -- I

12   think I did that with respect to each plaintiff.

13   I'd have to look back into my report to confirm

14   that.  But I don't think I went back to look at

15   this particular information.

16        Q.   Did you do -- aside from this Table 3,

17   did you look at the actual numbers to determine

18   where the bellwethers' blood lead levels would

19   fall to the extent that there were any actual

20   measurements that were reported as not less than a

21   certain number but actual numbers?  Did you do

22   that?

23        A.   Well, we'd have to look at the report

24   for each of the plaintiffs to see what I did

Highly Confidential - Robert Michaels, PhD

1  because I don't remember the specific comparisons

2  that I made.  I do seem to recall making that

3  comparison with respect to the action level of

4  5 micrograms per deciliter.

5      Q.   Okay.  So I don't believe you did, and

6  you don't remember.

7           Do you have any memory of doing any

8  additional investigation as to the actual numbers

9  that the authors found from this survey of the HHS

10 region for the blood lead levels for children less

11 than 6 years old during that time period?

12     A.   I'm sorry.  Can you repeat that

13 question?

14     Q.   Yeah.

15          Did you do anything to investigate the

16 actual data, the numbers that are reported in this

17 HHS Region 5 study for blood lead levels of

18 children less than 6 years old during that period,

19 2009 to 2015?

20     A.   I think the extent of my investigation

21 is presented here, and I think this table makes it

22 possible for anyone to look at the actual results

23 for bellwether plaintiffs in the context of what

24 is typical for their region.  I don't know whether

Highly Confidential - Robert Michaels, PhD

```
1   you're -- we're getting into the semantic issue
2   again.  You're asking if I did additional
3   research.  Well, additional on top of this?  No,
4   of course not.
5        Q.   Yeah, that's --
6        A.   I did my research.
7        Q.   I'm trying to make my questions as
8   direct and simple and clear as I can, Doctor, so
9   let me try it again.
10            This table that you have that you're
11  including in your report contains information
12  about the percentage of children reported from
13  this study with a blood lead level of less than or
14  equal to 3, and it reports it as a percentage of
15  93.0 percent.
16            Is that right so far?
17       A.   Yes, of course.
18       Q.   So my question is:  Did you do any
19  investigation or research into not what is
20  reported in Table 3 here, but the actual blood
21  lead measurements that are reported in this paper
22  or reported by the HHS to do any additional
23  evaluation to see where the blood lead levels of
24  the bellwether plaintiffs fell within that
```

1  database?

2  A.   Well, I think your question is becoming

3  more clear to me.

4  Q.   Good.

5  A.   I think that I relied on the data that

6  was presented and put into my report in the

7  source, which was McClure.  I believe that those

8  do capture the data that you're talking about.

9  That's why it's here.  And it's also here because

10  anybody looking at a plaintiff's result can

11  compare it to that number.  And that number is

12  precisely what you're talking about, what the

13  numbers were found to be, but they would be an

14  unwieldy, large table of numbers and this seems to

15  capture it.

16  Q.   I guess my question wasn't clear enough,

17  because I recognize that you have the table here.

18  We've established that.

19      What I'm asking you, sir, is:  Did you

20  do any investigation further into the numbers that

21  resulted in this table, that is to say, that there

22  would have been a total number of blood lead level

23  tests that went into this paper from the HHS data,

24  right?

1       A.    Yes.

2       Q.    And the blood lead levels that are being

3  reported are for children between the ages of --

4  or less than 6 years old during the years 2009

5  through 2015, right?

6       A.    Right.

7       Q.    Did you look at that data, look at the

8  numbers, and investigate where the bellwether

9  plaintiffs fell within that data as opposed to

10  what is reported here on Table 3?

11       A.    No, I don't think I did anything to

12  confirm that these numbers are accurate with

13  respect to the data that they were based on.

14       Q.    I'm not asking you that.  I'm asking

15  you --

16       A.    I'm completely unclear about what you're

17  asking me.

18       Q.    This has a report that 93 percent of the

19  kids in this database had a blood lead level of

20  less than or equal to 3, right?

21       A.    Correct.

22       Q.    I'm asking you if you did any further

23  investigation of the numbers to match up or

24  determine and evaluate for the blood lead levels

Highly Confidential    Robert Michaels, PhD

1  that are known for these bellwether plaintiffs,

2  where they fell within the geometric mean or

3  averages for all of the blood lead levels that

4  were recorded.

5        MR. LANCIOTTI:  Objection; asked and

6  answered.

7     A.   Are you referring to other age groups

8  beyond the less than 6 years of age?

9     Q.   No.  Why -- no.  Why would I be saying

10  that?  No.  I'm talking about this age group.

11     A.   Well, to the extent that I understood

12  your question, which apparently is not to your

13  satisfaction, I think I've answered that question.

14  And I've invited you more than once to clarify

15  your question, and I don't believe that it has

16  become clear to me.

17        As I said before, this less than

18  3 percent -- less than 3 microgram per deciliter

19  is the value that they found when they looked at

20  those numbers and is the value that I would find

21  if I looked at those numbers of 93.08 percent of

22  the kids whose blood levels were recorded in that

23  age range during that period of time.

24        So it's presented there so that you or

1  any reader could compare the report of a kid's

2  blood lead level with this table.  Did I do it?

3  Apparently not.  I did it with respect to the

4  5 microgram per deciliter action level.  I did not

5  do it in text with respect to these numbers.

6       Q.   Take a look at Page 11 of your report,

7  please.

8       A.   Right.

9       Q.   Let's just take R██████ V██████ .

10      On September 2nd, 2015, there's a report

11 of .7 micrograms per deciliter for her blood lead

12 level, right?

13      A.   Correct.

14      Q.   Did you -- this is my question that I'm

15 trying to get at -- did you undertake an

16 evaluation to see where that number, the blood

17 lead level reported for her of .7, would fall

18 within the database of information that was

19 provided by these authors from the HHS

20 distribution for these kids that are reported?

21      A.    I assume that it's within the less than

22 3 microgram per deciliter, characterized as

23 93.08 percent.  Did I actually do a distribution

24 of the data in that group?

Highly Confidential - Robert Michaels, PhyD

```
 1        Q.   Right.

 2        A.   No, I did not.

 3        Q.   Okay.  Then the distribution of the data

 4   within the group, that's what I'm asking you

 5   about.  Did you -- did you analyze the actual

 6   numbers for any reported blood lead levels for the

 7   bellwether plaintiffs to fall where they fell

 8   within that distribution data?

 9        A.   No, I did not.

10             I believe I understand your question

11   now, and I did not do that.

12        Q.   Okay.  That was my question.  If I

13   wasn't clear about it, I'm sorry.  That's what I

14   was trying to get to, and --

15        A.   Well, if I was obtuse about it, I'm very

16   sorry about that as well.

17             MR. LANCIOTTI:  David, is this a good

18   time for a break?  We've been going for an hour

19   and a half.  I know we want to try to finish

20   before lunch, but...

21             MR. ROGERS:  Oh, you know, I was looking

22   at the clock and thinking we started at 9:00.

23             So, yeah, that's fine, Patrick.  I don't

24   think I have a lot more.  I think I just have some
```

Highly Confidential - Robert Michaels, PhD

1    questions about the end of the report and the

2    conclusions.  So that's fine.  Let take a

3    five-minute break and we'll come back around

4    10:00.

5              MR. LANCIOTTI:  Thank you.

6              VIDEOGRAPHER:  The time is 9:55 a.m.,

7    and we're off the record.

8              (Recess taken.)

9              VIDEOGRAPHER:  The time is 10:03 a.m.,

10   and we're on the record.

11   BY MR. ROGERS:

12      Q.   All right.  Dr. Michaels, I want to

13   direct your attention back to your report again to

14   the "Conclusions" section and focus only on the

15   four bellwether plaintiffs that we've been

16   discussing here.  And let me just make sure I get

17   to it.

18              Okay.  So they're in alphabetical order.

19   They start with -- or you start in your report

20   with E███ S███     , and then it goes forward.

21              I just have a couple of simple remaining

22   questions for you about your conclusions as you've

23   expressed here because I think we've covered most

24   of these yesterday, but I don't think I asked you

Highly Confidential - Robert Michaels, PhD

```
 1   about this for each one.  And, Doctor, I'm not --
 2   I don't -- I'm not going to go through each
 3   plaintiff.  I'm just going to ask you about the
 4   first one and whether or not, you know, the
 5   answers are the same for each one of them with
 6   respect to the language because you use the same
 7   language here.
 8              So in terms of exposure for
 9   E███ S███, you say here in this section that
10   I'm highlighting now, "Details of his incremental
11   lead exposure via drinking water are" -- I'm
12   sorry.  You know what?  I did the wrong one.
13   Scratch that.  Let me start over again.  It's the
14   first sentence.
15              "Exposure.  Transition by the City of
16   Flint from Lake Huron to the Flint River as the
17   primary source of municipal water, along with the
18   decision not to treat the water to protect against
19   leaching of lead from lead-containing pipes and
20   plumbing fixtures, together more probably than not
21   caused incremental exposure of bellwether
22   plaintiff E███ S███ to lead in the drinking
23   water."
24              Right?
```

1        You're mute- -- Dr. Michaels, you're

2    muted.  We can't hear you.

3        A.    Correct.

4        Q.    Thanks.

5            What I want to ask you about is this

6    incremental exposure.

7            Am I correct that you haven't, in your

8    work on the case, attempted to quantify the amount

9    of additional exposure from the water; is that

10   right?

11       A.    No, it's not exactly right.  It is

12   probably more right to say that I wasn't

13   successful with doing it because there was a lot

14   of vague information, and I didn't feel that the

15   information was adequate for coming forth with a

16   quantified number that would represent that

17   increment.  I certainly would have liked to do

18   that if I had better data.

19       Q.    All right.  That's a fair answer.  I

20   understand what you're saying.

21           And then you go on to say "Details of

22   the incremental exposure via drinking water are

23   explicated in the 'Findings' section, including,

24   to the extent possible, the relevant lead sources,

Highly Confidential - Robert Michaels, PhD.

```
 1    the exposure concentrations, and exposure

 2    periods."

 3              Right?

 4        A.    Yes.

 5        Q.    All right.  So this paragraph -- I will

 6    report to you and you can check -- but it's

 7    essentially the same for each of the plaintiffs,

 8    and, therefore, your answer about not being able

 9    to quantify the incremental exposure for each of

10    the plaintiffs is the same, right?  You were not

11    able to do that?

12        A.    That's correct.

13              Let's put it this way.  I was not able

14    to do it to my own satisfaction.  I -- you can

15    always come up with numbers, but the question of

16    whether they're good numbers is very important,

17    and I was not happy with the precision with which

18    I could come up -- or the accuracy with which I

19    could come up with numbers.

20        Q.    You know, I -- when we took the

21    five-minute break, I looked over the rest of my

22    planned examination here, and I think we've

23    covered it.

24              MR. ROGERS:  What I'd like to do is --
```

Highly Confidential - Robert Michaels, PhD

```
1   I'm sorry for not doing this earlier, but I didn't
2   have a chance.  Why don't we take -- let's take a
3   10- or, let's say, a 15-minute break.  I'd really
4   like to talk to my colleague, Mr. Fletcher, and
5   just make sure that I didn't miss anything,
6   because we have plenty of time here.  And then
7   we'll -- Mr. Gamble probably has some questions.
8           Travis, do you have some questions?
9           MR. GAMBLE:  Dave, I just -- have just a
10  few questions relating specifically to my client.
11          MR. ROGERS:  Well, would you -- would
12  your preference be, Travis, to go ahead and do
13  those now, and then I could maybe finish up?
14          Corey and Patrick, you don't care about
15  the order, right?  If we let Travis go and then I
16  take a break and talk to Chris, that's fine with
17  you guys?
18          MR. STERN:  Whatever you want.
19          MR. ROGERS:  All right.
20          MR. LANCIOTTI:  Yeah, that's fine with
21  me.  I think that makes the most sense.
22          MR. ROGERS:  Why don't we do that, then.
23  I'll defer to Travis at this time, but I do want
24  to take a break, as I said, and talk to
```

Highly Confidential - Robert Michaels, PhyD.

1    Mr. Fletcher and then we'll see if I have any

2    more.  Thank you.

3              Go ahead.

4              I'll stop sharing my screen.  Do you

5    want me to leave it on, Travis, or not?

6              MR. GAMBLE:  No.  You can take it down,

7    Dave.

8              MR. ROGERS:  Okay.

9              MR. GAMBLE:  Are we still on the record

10   right now?

11             MR. LANCIOTTI:  Yes.

12             MR. GAMBLE:  Okay.  Great.

13                     EXAMINATION

14   BY MR. GAMBLE:

15        Q.   Mr. Michaels, I just have very brief

16   questions for you.  Mr. Rogers has been very

17   thorough going through your report and your

18   opinions, so I'm going to leave it at that.

19             But I represent three defendants in this

20   lawsuit:  Lockwood Andrews & Newnam, Incorporated;

21   Lockwood Andrews & Newnam, PC; and Leo A. Daly

22   Company.

23             You understand that?

24        A.   Well, you said it pretty quickly, and

 1    I'm not familiar with the names.

 2         Q.   Okay.

 3         A.   I understand that you represent three

 4    clients.

 5         Q.   And for the sake of brevity, I'm just

 6    going to refer to them as L-A-N, or LAN.  Okay?

 7         A.   Could you spell those out or say them

 8    slowly so that I can --

 9         Q.   Yeah.  Let me say it slower for you.

10              It's Lockwood Andrews & Newnam, PC, is

11    one entity.

12         A.   Andrews?

13         Q.   Andrews & Newnam.

14         A.   N-O-O-N-A-N?

15         Q.   N-E-U-N-A-M [sic].

16         A.   N-E-U --

17         Q.   N-A-M.

18         A.   -- N-A-M?

19         Q.   Correct.

20         A.   PC?

21         Q.   PC.  And then Lockwood Andrews & Newnam,

22    Incorporated.

23         A.   Okay.

24         Q.   And then the Leo A. Daly Company.

```
 1        A.    Okay.

 2        Q.    Okay.  And I'm going to collectively

 3   refer to those three entities as L-A-N, or LAN.

 4              Is that fair?

 5        A.    Have a good time.

 6        Q.    Do you have any understanding or any

 7   familiarity with any of those LAN entities?

 8        A.    No.

 9        Q.    Okay.  And I'm asking you these

10   questions because yesterday, Mr. Rogers asked you

11   certain questions about his client, which was

12   Veolia North America and other Veolia entities.

13              Do you recall those questions yesterday?

14        A.    Yes.

15        Q.    And I think when he was asking you

16   questions, he was specifically focusing on whether

17   you had any opinions whatsoever -- any

18   professional opinions in this case about his

19   client and what they did or did not do with regard

20   to work in the City of Flint.

21              Do you recall that?

22        A.    I do.

23        Q.    Okay.  I just want to ask you the same

24   questions with regard to my client, LAN.
```

Highly Confidential    Robert Michaels, PhD

```
 1            Do you have any professional opinions as
 2   you sit here today about what LAN did or should
 3   have done with regards to work in the City of
 4   Flint?
 5       A.   As you understood from my answer
 6   yesterday, I don't have specific information that
 7   would include those names of your three clients.
 8   I do have opinions that have been expressed in my
 9   report.  And if somehow those opinions were linked
10   to your client, then there would be a nexus there
11   that I have not established at this point, but I
12   wouldn't preclude it -- not that I have any
13   suspicion of there being such a nexus.
14       Q.   Fair enough.
15            You don't have any understanding of what
16   LAN did or didn't do as far as the scope of work
17   in the City of Flint from 2013 to 2015, correct?
18       A.   Correct.
19       Q.   Okay.  And I just want to kind of
20   establish, we went through your CV a little bit
21   yesterday, but we didn't specifically discuss what
22   degrees you have specifically and from what
23   university or college.
24            So can you briefly tell me where you did
```

Highly Confidential — Robert Michaels, PhyD

```
 1    your undergraduate work?

 2         A.   I was an undergraduate at the City

 3    College of New York, more formally, the City

 4    College of the City University of New York.  CCNY

 5    is the main acronym that's used for that.

 6              And I went to school there from 1963 to

 7    '67 and received a bachelor of science degree.

 8         Q.   And what was your BS degree in

 9    specifically?  What area?

10         A.   Well, I don't think there was a

11    specialty.  I majored in -- oh, yeah, I guess I --

12    you could say that I majored in biology.  Yes,

13    that's what it was.

14         Q.   Okay.  So you had a BS -- you graduated

15    with a biology degree from City College of

16    New York, correct?

17         A.   Yes, that's correct.

18              I'm sorry.  It was a long time ago.

19         Q.   Fair enough.

20              So after you completed your

21    undergraduate degree, where did you -- or what

22    program or what studies -- master's program did

23    you go into?

24         A.   I went to the University of Georgia in
```

1    Athens, Georgia.  And I was studying in their

2    department of zoology with a specialization in

3    environmental ecology, you could call it, or

4    environmental toxicology.  I don't know how you

5    would call it.  There's no formal name for it.

6              I was working in the institute of

7    ecology; that was where my office was.  And the

8    major professor that I had was an associate of

9    Eugene Odum, who is considered the father of

10   ecology.  He was also on my master's degree

11   committee.

12             So that gives you an idea of what I

13   studied within zoology.

14        Q.   Okay.  And I just want to confirm.

15   We've talked about your toxicology background and

16   degree as well yesterday, but I just want to

17   confirm that you have no education, training, or

18   experience in engineering, do you?

19        A.   I have not been formally trained in

20   engineering.  Of course, the nexus of my work

21   always is with respect to engineering work, so,

22   yes, I have experience.  And if you want to let

23   that count as some education, hopefully I've

24   learned something from it.  But if you're talking

Highly Confidential - Robert Michaels, PhD.

```
 1   about academic programs, absolutely not.
 2        Q.   And you've never worked in the private
 3   sector as an engineer, correct?
 4        A.   Correct.
 5        Q.   You're not a licensed professional
 6   engineer, correct?
 7        A.   Correct.
 8        Q.   And you haven't ever sealed any design
 9   plans on an engineering project, correct?
10        A.   Correct.
11        Q.   Okay.  I just wanted to establish that
12   you wouldn't -- you didn't have some sort of
13   additional training or work experience in those
14   areas.  Fair enough?
15        A.   Yeah.  I can still remember that I
16   don't.
17        Q.   Okay.  Fair enough.
18             MR. GAMBLE:  Dr. Michaels, those are
19   really all of the questions that I have.  I
20   appreciate your time.
21             THE WITNESS:  Okay.  Well, it was a
22   pleasure to meet you.
23             MR. GAMBLE:  You, too.
24             VIDEOGRAPHER:  Shall we go off the
```

Highly Confidential - Robert Michaels, PhyD.

```
 1   record?

 2            MR. GAMBLE:  Sure.

 3            VIDEOGRAPHER:  The time is 10:15 a.m.,

 4   and we're off the record.

 5            (Recess taken.)

 6            VIDEOGRAPHER:  The time is 10:31 a.m.,

 7   and we're on the record.

 8                 FURTHER EXAMINATION

 9   BY MR. ROGERS:

10       Q.   All right, Doctor.  I just do have a

11   couple further questions for you that will

12   probably take about five minutes.  I have my

13   screen sharing again, I hope, up here.

14            And this is Exhibit 30C, the time entry

15   chart that you prepared.  Can you see that all

16   right?

17       A.   Yes, I can.

18       Q.   So I forgot to ask you questions about

19   this when I put it up before, and it has to do

20   with the bellwether plaintiffs' selection

21   criteria, that work that you did that we talked

22   about.  And then there's an entry here that says

23   "Patrick Lanciotti called re: matrix."  You have

24   an arrow and it says, "Bellwether plaintiffs'
```

Highly Confidential - Robert Michaels, PhD.

```
 1    selection criteria matrix."

 2            So my first question is, what was the

 3    selection criteria?

 4            MR. LANCIOTTI:  Objection.

 5            I think we're getting into attorney work

 6    product here, and I'm going to ask Dr. Michaels

 7    not to answer that.

 8            MR. ROGERS:  Okay.  Well, then, to

 9    shorten things up, Patrick, I was going to ask

10    questions about the matrix and the selection

11    criteria.

12            So can we just have an agreement that I

13    was going to follow up and ask questions about

14    that, what the selection criteria was, what his

15    evaluation of the criteria was, that kind of

16    thing?  You're going to instruct him not to answer

17    on privilege for all of those?

18            MR. LANCIOTTI:  That's correct.  Yep.

19            MR. ROGERS:  Okay.  All right.  Well,

20    that was it.

21            That's what I wanted to ask you about.

22    Given that the -- you're being told not to answer

23    those questions, I don't have any further

24    questions at this time, Doctor, except to say --
```

Highly Confidential - Robert Michaels, PhD

```
1    maybe I'll just ask -- and Patrick, you may

2    instruct him not to, but...

3    BY MR. ROGERS:

4        Q.   Did you write any documents that you

5    were the author of that was plaintiffs' selection

6    criteria or matrix, Doctor?

7             MR. LANCIOTTI:  Yes, same objection.

8             MR. ROGERS:  All right.  Okay.  Well,

9    that's it, then.  Appreciate it.

10            MR. STERN:  This is Corey.  I have -- I

11   have a couple of questions.

12                      EXAMINATION

13   BY MR. STERN:

14       Q.   Doctor, this is Corey Stern.

15            Would you agree with me that the

16   accuracy of a blood lead level test is only as

17   good as how close that test was taken in the time

18   that a child was exposed to lead?

19       A.   Yes.  If you take the test before the

20   exposure, you don't capture the exposure.  And if

21   you take the test after the exposure, then there

22   are changes in the lead levels that will precede,

23   depending on the amount of time afterwards, and

24   depending on other factors such as alternative
```

Highly Confidential - Robert Michaels, PhD

```
 1    exposures or if the exposure stops.  And so,
 2    therefore, there are a lot of variables that you
 3    have to take into account.
 4         Q.   And so for any question that you may
 5    have answered over the course of the day and a
 6    third of deposition time that you've spent with
 7    the parties in this case, for any answer you gave
 8    related to a particular lead level associated with
 9    one of the four bellwether children, you would
10    agree that each of those lead levels are only as
11    accurate as they are close time in proximity to
12    when the child was exposed to lead, correct?
13              MR. ROGERS:  Object to --
14         A.   Yes --
15              MR. ROGERS:  Sorry, Doctor.
16              Object to form.  Sorry.
17    BY MR. STERN:
18         Q.   What was your answer, sir?
19         A.   Yes, I agree with that, and I believe
20    that I have made clear in the prior discussions
21    that I felt that the testing for lead was very
22    sporadic and used crude technology, and that some
23    of the tests postdated the actual exposure period.
24              So I believe that we did cover this
```

Highly Confidential - Robert Michaels, Ph.D.

1    issue, and I certainly agree with you about --

2    about the summary that you just created for it.

3    Yes.

4        Q.    Okay.  And just so I'm clear, if,

5    hypothetically, one of the bellwether children had

6    a lead level of 1.3, it's possible, and perhaps

7    even likely, that their peak lead level was much

8    higher if the test that led to the 1.3 had been

9    taken weeks or months after they had last been

10   exposed, correct?

11           MR. ROGERS:  Object to form.

12       A.    Yes, that is correct.  And I believe we

13   also covered that with respect to the bone numbers

14   which were indicative of longer-term exposure and

15   also subject to decline over the ensuing few years

16   after the bone levels were measured.

17       Q.    And when you were asked about means and

18   medians and averages and comparing the four

19   bellwether clients to the means, medians, or

20   averages, again, your answers to those questions

21   and the information you have with regard to those

22   lead levels is only as good as those lead levels

23   are in proximity to the last exposure for the

24   child, correct?

Highly Confidential - Robert Michaels, PhyD.

1       A.    Yes, that is correct.

2             MR. STERN:  Okay.  Those are all of the

3    questions that I have.

4             MR. ROGERS:  Thanks.  I have nothing

5    further.

6             We'll see you all -- I don't know about

7    Sara and Robert -- but maybe next week.

8             Thanks, Doctor.  Good to meet you.

9             THE WITNESS:  Thank you very much.

10            MR. LANCIOTTI:  Thank you, guys.

11            VIDEOGRAPHER:  The time is 10:37 a.m.

12            This deposition has concluded, and we're

13   off the record.

14            (Signature not waived.)

15                      - - -

16            Thereupon, the deposition was concluded

17   at 10:37 a.m.

18                      - - -

19

20

21

22

23

24

Highly Confidential - Robert Michaels, Ph.D.

1

2

3          I, ROBERT MICHAELS, PH.D., do hereby

4  certify that I have read the foregoing transcript

5  of my deposition given on November 13, 2020; that

6  together with the correction page attached hereto

7  noting changes to form or substance, if any, it is

8  true and correct.

9

          _____

10          ROBERT MICHAELS, PH.D.

11          I do hereby certify that the foregoing

12  transcript of the deposition of ROBERT MICHAELS,

13  PH.D. was submitted to the witness for reading and

14  signing; that after he had stated to the

15  undersigned Notary Public that he had read and

16  examined his deposition, he signed the same in my

17  presence on this _____ day of _____, 2020.

18

19          _____

20          NOTARY PUBLIC

21  My commission expires: _____

22                  - - -

23

24

Highly Confidential - Robert Michaels, Ph.D.

```
 1                      CERTIFICATE

 2

 3

 4          I, Sara S. Clark, Registered Merit
       Reporter, Certified Realtime Reporter, Certified
 5     Realtime Captioner, a Notary Public, duly
       commissioned and qualified, do hereby certify
 6     that the within-named ROBERT MICHAELS, PH.D.
       was duly remotely sworn to testify to the
 7     truth, the whole truth, and nothing but the
       truth.

 8
            I DO FURTHER CERTIFY that the
 9     foregoing is a verbatim transcript of the
       testimony as taken stenographically by me at the
10     time, place, and on the date hereinbefore set
       forth, to the best of my ability.

11
            I DO FURTHER CERTIFY that I am neither
12     a relative nor employee nor attorney nor counsel
       of any of the parties to this action, and that I
13     am neither a relative nor employee of such
       attorney or counsel, and that I am not
14     financially interested in the action.

15          IN WITNESS WHEREOF, I have hereunto
       set my hand and affixed my seal on this 3rd day
16     of December, 2020.

17

18

19

20     _____
       Sara S. Clark, RPR/RMR/CRR/CRC
21     Notary Public
       Registered Merit Reporter
22     Certified Realtime Reporter
       Certified Realtime Captioner

23

24     My commission expires:  March 10, 2023
```