Highly Confidential - Gary M. Crakes, Ph.D.

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4

5    In re FLINT WATER CASES

6                                    Civil Action No.

7                                    5:16-cv-10444-JEL-MKM

8    _____   (consolidated)

9

10   Elnora Carthan, et al.,

11   v.

12   Governor Rick Snyder et al.     Civil Action No.

13   _____   5:16-cv-10444-JEL-MKM

14

15

16               HIGHLY CONFIDENTIAL

17       VIDEOTAPED DEPOSITION OF GARY M. CRAKES, Ph.D.

18     Taken via Zoom, Monday, November 16, 2020, at 9:09 a.m.

19

20

21   REPORTED BY:  TRISHA CAMERON, RDR, RMR, CRR, RPR, CSR

22

23

24

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1    APPEARANCES:

 2    MR. COREY M. STERN

 3    Levy Konigsberg, LLP

 4    800 Third Avenue, 11th Floor

 5    New York, New York 10022

 6    (212) 605-6200

 7    cstern@levylaw.com

 8        On behalf of the Individual Plaintiffs.

 9

10    MR. PATRICK LANCIOTTI

11    Napoli Shkolnik, PLLC

12    360 Lexington Avenue, 11th Floor

13    New York, New York  10017

14    (844) 860-0949

15    planciotti@napolilaw.com

16        On behalf of the Individual Plaintiffs.

17

18    MR. FREDERICK A. BERG

19    Butzel Long

20    41000 Woodward Avenue

21    Bloomfield Hills, Michigan 48304-5178

22    (248) 258-1414

23    berg@butzel.com

24        On behalf of the City of Flint.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1    MS. ALAINA DEVINE

 2    MR. MARK J. SPROSS

 3    Campbell Conroy & O'Neil, P.C.

 4    1 Constitution Wharf, Suite 310

 5    Boston, Massachusetts 02129

 6    (617) 241-3037

 7    adevine@Campbell-trial-lawyers.com

 8         On behalf of Defendants Veolia Water North

 9         America Operating Services, LLC, Veolia North

10         America, LLC, and Veolia North America, Inc.

11

12    MR. TRAVIS GAMBLE

13    Faegre, Drinker, Biddle & Reath, LLP

14    1717 Main Street, Suite 5400

15    Dallas, Texas  75201-7367

16    (469) 357-2534

17    travis.gamble@faegredrinker.com

18         On behalf of Defendants Leo A. Daly Company

19         and Lockwood, Andrews & Newnam, Inc.

20

21    ALSO PRESENT:  Nancy Segreve; Malcolm Cohen;

22                   Rob Martignetti, videographer.

23

24
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
1                  INDEX TO EXAMINATIONS

2

3    WITNESS                                    PAGE

4    GARY M. CRAKES, Ph.D.

5     EXAMINATION BY MS. DEVINE                    8

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1                       EXHIBITS

 2   DEPOSITION EXHIBIT                              PAGE

 3   Exhibit No. 1     Curriculum Vitae               10

 4   Exhibit No. 2     Notice of Taking               17

 5                     Audio-Visual Deposition

 6   Exhibit No. 3     Appraisals of Economic Loss    19

 7   Exhibit No. 4     Invoice for A███████ T███       24

 8   Exhibit No. 5     Invoice for D███████ W███       25

 9   Exhibit No. 6     Invoice for E███ S███████       25

10   Exhibit No. 7     Invoice for R███ V██████████    26

11   Exhibit No. 8     Appraisal of Economic Loss,     30

12                     A███████  T███

13   Exhibit No. 9     Appraisal of Economic Loss,     31

14                     D███████  W███

15   Exhibit No. 10    Appraisal of Economic Loss,     32

16                     E███ S███████

17   Exhibit No. 11    Appraisal of Economic Loss,     32

18                     R███  V██████████

19   Exhibit No. 12    Dr. Krishnan report for         34

20                     Ms. T███

21   Exhibit No. 13    Dr. Krishnan's Report for       36

22                     Ms. W███

23

24   (Exhibits continued on page 6.)
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1    Exhibit No. 14    Dr. Krishnan's Report for        37
 2                      Mr. S█████

 3    Exhibit No. 15    Dr. Krishnan's Report for        38
 4                      Ms. V█████

 5    Exhibit No. 16    Statistical tables for women     38

 6    Exhibit No. 17    Statistical tables for men       38

 7    Exhibit No. 18    National Vital Statistics        41
 8                      Reports, United States Life
 9                      Tables, 2014

10    Exhibit No. 19    Outline, notes, and charts       48
11                      regarding Ms. T████

12    Exhibit No. 20    Outline, notes, and charts       89
13                      regarding Ms. W████

14    Exhibit No. 21    Outline, notes, and charts       98
15                      regarding Mr. S█████

16    Exhibit No. 22    Outline, notes, and charts      105
17                      regarding Ms. V██████

18    Exhibit No. 23    The Markov Model of Labor       122
19                      Force Activity 2012-17:
20                      Extended Tables of Central
21                      Tendency, Shape, Percentile
22                      Points, and Bootstrap Standard Errors

23

24    (Exhibits attached.)
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   Monday, November 16, 2020

 2   At 9:09 a.m.

 3                    *   *   *

 4            VIDEOGRAPHER:  We are now on the

 5       record.  My name is Robert Martignetti.  I

 6       am a videographer for Golkow Litigation

 7       Services.  Today's date is November 16th,

 8       2020, and the time is 9:09 a.m.

 9            This remote video deposition is being

10       held In Re: Flint Water Cases.  The

11       deponent is Gary Crakes, Ph.D.

12            All parties for this deposition are

13       appearing remotely and have agreed to the

14       witness being sworn in remotely.  Due to

15       the nature of remote reporting, please

16       pause briefly before speaking to ensure

17       all parties are heard completely.  Counsel

18       will be noted on the stenographic record.

19            The court reporter is Trisha Cameron

20       and will now swear in the witness.

21                    *   *   *

22              GARY M. CRAKES, Ph.D.,

23            having been first duly sworn,

24            was examined and testified as follows:
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1                          *   *   *

 2                       EXAMINATION

 3   BY MS. DEVINE:

 4   Q.   Good morning, Dr. Crakes.

 5   A.   Good morning.

 6   Q.   My name is Alaina Devine and I represent the three

 7        Veolia North America defendants in this case and I'm

 8        going to lead off questioning of you today.  Okay?

 9   A.   That's fine.

10   Q.   I've seen from your CV and prior list of testimony

11        that you have given a few depositions over the last

12        couple of months.  Were those over Zoom?

13   A.   Yes.  I think one of them was on Ring Central.  The

14        rest were via Zoom.

15   Q.   Okay.  So you're obviously familiar with being

16        deposed and it sounds like familiar with the Zoom

17        technology.  But the same basic ground rules apply,

18        that being that you have to give a verbal response to

19        each of the questions that I ask you and that you

20        should pause in between my question and your answer

21        to allow for any delays in technology or for counsel

22        to object.  Okay?

23   A.   That's fine.

24   Q.   Okay.  And same rules as prior depositions.  If you
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1       don't understand a question I'm asking or it can be

 2       clarified, please let me know.  I'd be happy to do

 3       that.

 4  A.   Thank you.

 5              MR. STERN:  Hey, Alaina?

 6              MS. DEVINE:  Yep.

 7              MR. STERN:  Alaina, before you get

 8         started, can I just ask, I'm looking at

 9         the participant list.  I'm sure -- I don't

10         know who they are.  But there's somebody

11         named Nancy and someone named Malcolm

12         Cohen, who I've never seen before.  Do you

13         know who those people are?

14              MS. DEVINE:  Yeah.  They're both

15         consultants that work for VNA.

16              MR. STERN:  Okay.  Thanks.

17  BY MS. DEVINE:

18  Q.   Dr. Crakes, could you please state your full name for

19       the record.

20  A.   Yes.  Gary M. Crakes.

21  Q.   And are you appearing today pursuant to a deposition

22       notice issued in the In Re: Flint Water Cases?

23  A.   Yes.

24  Q.   Okay.  I'm going to share my screen real quick.  I'm
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        going to mark first for you Exhibit 1, which is your

 2        CV.

 3                    (Exhibit No. 1 marked.)

 4   BY MS. DEVINE:

 5   Q.   Can you see that on the screen there?

 6   A.   Yes, I can.

 7   Q.   Okay.  Can you describe for us briefly your

 8        educational background.

 9   A.   As my CV indicates, I received a bachelor's degree in

10        economics from Central Connecticut State College in

11        1975, a master's degree in economics from the

12        University of Connecticut in 1976, and a Ph.D. in

13        economics from the University of Connecticut in 1984.

14   Q.   What is your current job or occupation?

15   A.   I'm a professor emeritus at Southern Connecticut

16        State University where I continue to teach one course

17        on a part-time basis, and the remainder of my

18        employment activities involves performing appraisals

19        of economic loss for matters in litigation.

20   Q.   Was there a period of time where you were employed as

21        a full-time professor at the University of

22        Connecticut?

23   A.   Not at the University of Connecticut.  It's Southern

24        Connecticut State University.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   Q.   Okay.

 2   A.   I was a full-time faculty member there from 1980

 3        until 2011.

 4   Q.   Can you describe for us briefly the amount of time

 5        that your current role as a professor emeritus takes

 6        up?

 7   A.   The majority of my time, vast majority is related to

 8        my consulting activities.  The class that I teach,

 9        normally a large lecture hall class, of course

10        everything is online now, probably is 10 to 15 hours

11        per week.

12   Q.   And what is that class?

13   A.   Principles of macroeconomics.

14   Q.   What percentage would you assign to the amount of

15        time that you take doing litigation verse -- excuse

16        me, doing litigation work versus as professor

17        emeritus?

18   A.   I would approximate that at this point, 80 to 90

19        percent of my time is for my consulting activities.

20   Q.   Okay.  How many hours per week do you work as a

21        consultant?

22   A.   I would approximate, for my consulting activities,

23        perhaps 40, 40 to 50 hours per week.  The balance

24        would be for my class that I teach.
```

Highly Confidential - Gary M. Crakes, Ph.D.

1   Q.   And the consultant work that you do, is that directly

2        related to litigation primarily?

3   A.   Yes.  I believe occasionally there's a matter that is

4        not in suit, but --

5             THE REPORTER:  I'm sorry, excuse me.

6        Can you repeat that, please.

7             THE WITNESS:  Yes.  Occasionally

8             there are matters that are not yet in suit

9             where I am retained to perform an

10            analysis.  But generally, I believe the

11            ultimate objective would be for suit to be

12            filed and litigation to commence.

13  BY MS. DEVINE:

14  Q.   In your CV here, there's a list of publications.

15       Have you contributed to any publications since 2007?

16  A.   No, I've not.

17  Q.   Okay.  And are you a member of any professional

18       associations related to economics?

19  A.   Yes.  I believe they're on the first page of my CV.

20       There's a list of those organizations.

21  Q.   Okay.  And are you a member of the National

22       Association of Forensic Economics?

23  A.   Yes.

24  Q.   Okay.  And how long have you been a member of that

Highly Confidential - Gary M. Crakes, Ph.D.

```
1          association for?

2    A.    I believe I'm a charter member from the first year of

3          its inception, which I don't, as I sit here, recall

4          the exact year.

5    Q.    Have you ever held any leadership positions with that

6          organization?

7    A.    No, I've not.

8    Q.    Have you ever contributed to any publications on

9          behalf of that organization?

10   A.    I had attended some of their conferences in the past.

11         I have served as a reviewer of some articles that

12         have been submitted for publication, but I have held

13         no positions in the organizational structure.

14   Q.    Do you subscribe to the Journal of Forensic

15         Economics?

16   A.    Yes, I do.

17   Q.    Okay.  And are there any other methods that I haven't

18         just gone over with you in which you keep up with the

19         research in your field?

20   A.    Well, other than my activities performing appraisals

21         of economic loss and the National Association of

22         Forensic Economics, I'm also a member of the American

23         Academy of Economic and Financial Experts.  But those

24         would be the two organizations that I have membership
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        in.

 2   Q.   Okay.  And is there anything that you're in the

 3        process of publishing or preparing that is not on

 4        your CV but that you're currently working on?

 5   A.   No.

 6   Q.   As far as the consulting work that you do, what

 7        percentage of that work is for the plaintiffs?

 8   A.   I would approximate that over time, 75 to 80 percent

 9        of the analyses I perform are for attorneys

10        representing plaintiffs.  The balance would be for

11        attorneys representing defendants.

12   Q.   And does the litigation work that you do primarily

13        take place in the personal injury context?

14   A.   Personal injury, wrongful death, employment

15        litigation.  Occasionally, very rarely, a divorce

16        case.

17   Q.   You had indicated that 75 to 80 percent of your work

18        was for plaintiffs.  When's the -- or what's the last

19        defense work that you -- defense case that you worked

20        on?

21   A.   I would say sometime within the last couple of

22        months.

23   Q.   How many evaluations, like the ones that you

24        completed in this case, do you complete a year, would
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1       you say?

 2   A.  I'd approximate somewhere in the range of 120 to 125

 3       per year.

 4   Q.  Do you know how many, since you began writing such

 5       evaluations, you've completed in your career?

 6   A.  Over the last 39-plus years, I would approximate

 7       somewhere between -- again, it's an approximation --

 8       3,300 to 3,500.

 9   Q.  In the cases in which you give deposition testimony,

10       like you are today, or testimony at trial, can you

11       approximate how many of those cases are for the

12       plaintiffs?

13   A.  Well, for cases in which I have provided testimony,

14       deposition or trial, only a handful have been for

15       those representing defendants.

16   Q.  Okay.  Can you assign any percentage to that, as you

17       sit here today?

18   A.  If I had to, I would say certainly something in

19       excess of 90 percent, 95 percent have been -- of my

20       appearances at trial or deposition, have been cases

21       where I've been retained by attorneys representing

22       the plaintiffs.

23   Q.  I want to talk a little bit about the types of cases

24       that you generally handle.  Can you describe for us
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1         the percentage of cases in which you -- it involves

 2         an adult plaintiff versus a child plaintiff, somebody

 3         over the age of 18?

 4    A.   I really don't know that breakdown.

 5    Q.   Okay.  Have you had some experience in handling

 6         asbestos adult cases in your career?

 7    A.   Well, if I understand the question correctly, cases

 8         involving individuals who have had mesothelioma, yes,

 9         I have been involved in cases of that sort.

10    Q.   Can you assign any percentage of the type of work

11         that you've done specific to that type of a case?

12    A.   I really don't know the percentage breakdown on that

13         basis.

14    Q.   Similarly, can you provide an estimate of the number

15         of child plaintiff cases that you consulted on?

16    A.   Again, I have no idea of the percentage breakdown on

17         that basis.

18    Q.   Do you know how many prior lead injury type cases

19         you've consulted on, either adult or child plaintiff?

20    A.   Again, I just don't know.  I've had a number of cases

21         of that sort.  I just don't know the breakdown.

22    Q.   Okay.  Could you approximate about how many cases in

23         your career you've worked on that involve lead

24         injuries?
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   A.   If I had to approximate, I would say somewhere in the

 2        neighborhood of 100.  I don't know, though.  Again,

 3        that's just an approximation.

 4   Q.   Okay.  Are you an expert in reviewing or evaluating

 5        lead injuries and the effects it has on a minor

 6        plaintiff?

 7   A.   No.

 8   Q.   And are you offering any opinions about that today?

 9   A.   No.

10   Q.   I'm going to pull up the deposition notice here.  I'm

11        going to scroll through it.  This will be Exhibit 2.

12              (Exhibit No. 2 marked.)

13   BY MS. DEVINE:

14   Q.   Have you seen this deposition notice before appearing

15        today?

16   A.   Yes, I have.

17   Q.   Okay.  And it looks to me like you just maybe pulled

18        a file folder or something in front of you, or maybe

19        I didn't see that correctly.  Do you have a file in

20        front of you today, Dr. Crakes?

21   A.   I have four files for the cases that are being

22        reviewed today, and what I just reached to pull and

23        put in front of me was the deposition notice.

24   Q.   Okay.  If you review this notice pursuant to which
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        you're appearing here today, did you have a chance to

 2        review the Schedule A that was attached to it?

 3   A.   Yes.

 4   Q.   Okay.  And you understand that within these requests,

 5        it asks you to produce a copy of your file, correct?

 6   A.   Yes.

 7   Q.   Okay.  And it also asks you to produce any facts or

 8        data that you used to form opinions that you've

 9        reached in this case, correct?

10   A.   Yes.

11   Q.   Okay.  And upon receiving this deposition notice, or

12        perhaps in advance of receiving it, did you provide

13        all of those materials to your counsel?

14   A.   Well, to clarify, Attorney Stern is not my counsel.

15        Clarification on that point.  And did I provide

16        materials to them pursuant to your request?  Yes, I

17        did.

18   Q.   Okay.  Thank you.  You, in your work as a litigation

19        consultant, do you have a firm or a shop that you

20        operate out of?

21   A.   It's a sole proprietorship doing business as Maher,

22        M-a-h-e-r, Crakes and Associates.

23   Q.   Okay.  And what type of work does Maher Crakes and

24        Associates do?
```

Highly Confidential - Gary M. Crakes, Ph.D.

 1   A.   As we were discussing earlier, performing appraisals

 2        of economic loss for matters in litigation.

 3   Q.   And are there any other employees at that firm?

 4   A.   I have a few individuals who will provide me with

 5        assistance in some matters.  All of the calculations

 6        of these cases were my own.  My wife does provide

 7        some administrative and clerical assistance.

 8   Q.   Okay.  And did that occur in this case?  Were you the

 9        only person making these calculations and writing

10        these reports?

11   A.   Yes.

12   Q.   And let me pull up another exhibit here.  This will

13        be Exhibit 3.

14             (Exhibit No. 3 marked.)

15   BY MS. DEVINE:

16   Q.   This was a document that was provided to us with your

17        file materials, and it's titled Appraisals of

18        Economic Loss.  Do you see that at the top there?

19   A.   Yes, I do.

20   Q.   Okay.  This was provided to us with a list of your

21        prior appearances, here beginning on page 2.  Do you

22        see that?

23   A.   Yes, I do.  And I do want to indicate that a few days

24        ago, the end of last week, I did provide an update to

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        that list to Attorney Stern's office.

 2   Q.   Okay.  Is this the updated list or is this the

 3        initial list that was provided?

 4   A.   That's the initial list that was provided.  There's a

 5        one-page update showing any appearances that I've had

 6        at depositions or trials since June 30th of 2020.

 7   Q.   Okay.  So there have -- can you explain for us here

 8        on the record what that update was?

 9   A.   Yes.  As I think you were inquiring earlier, I've had

10        a number of depositions via Zoom or some other

11        provider.  And I did have one trial appearance, or I

12        should say a bench trial in federal court in

13        Bridgeport, where I did physically appear at trial,

14        and those are on the updated list.

15   Q.   Okay.  I see here on your list of prior testimony

16        that primarily your work is done in the state of

17        Connecticut.  Is that correct?

18   A.   Yes.  The majority would be in the state of

19        Connecticut.  That's correct.

20   Q.   Okay.  Have you ever been qualified as an expert to

21        give appraisals of economic loss anywhere other than

22        New York or Connecticut?

23   A.   Well, again, if I'm understanding your question

24        correctly, have I provided testimony in states other
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        than Connecticut and New York?  Yes, I have.

 2   Q.   Okay.  And what states are those?

 3   A.   It would include New Hampshire, Vermont, Rhode

 4        Island, Massachusetts, New Jersey, Illinois, Florida,

 5        the District of Columbia, Puerto Rico, Georgia.

 6        Those are the states that are coming to mind as I sit

 7        here.

 8   Q.   Have you ever provided a report like you did in this

 9        case or given testimony, either by deposition or at

10        trial, in the state of Michigan?

11   A.   Not that I recall.

12   Q.   Can you state that again?  I'm sorry.  You broke up a

13        little.

14   A.   Yes.  I said not that I recall.

15   Q.   Thank you.  Have you ever, to your knowledge, been

16        excluded from testifying in any cases in whole or in

17        part?

18   A.   I'm not aware of any exclusions in whole.  There have

19        been some cases where my trial testimony, my

20        appearance at trial was restricted and some values

21        were not permitted to be described.

22   Q.   Can you describe for us, generally, the circumstances

23        that you recall that occurring in?

24   A.   In the state of Connecticut, there often is a value
```

Highly Confidential - Gary M. Crakes, Ph.D.

1           that one estimates in the economic analyses, the

2           value of household services.  In the state of

3           Connecticut, it seems to depend upon the

4           interpretation of the court in each particular case.

5           So in some cases where I have estimated a value for

6           the loss of household services and the judge has

7           indicated that it's not going to be something that

8           can be described to the jury, my testimony has not

9           been permitted on that basis.

10                   There was also a case in US District Court

11          in Connecticut where there had been a value included

12          for an executive associated with stock options, and

13          the court in that case ruled that the testimony on

14          stock options would not be allowed.  Those are the

15          only ones I know of.

16    Q.    Okay.  Are you aware of any specific motions, other

17          than those that you just stated on the record for us,

18          to exclude your testimony?

19    A.    Well, there may be motions of that sort.  Often I'm

20          not informed about them and any discussion of that

21          occurs typically before I appear at trial, but there

22          may be.

23    Q.    When were you first retained in this case?

24    A.    The first contact I had concerning this matter, I

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        believe, was sometime perhaps in April or May of this
 2        year.
 3   Q.   And who contacted you?
 4   A.   Attorney Stern's office.
 5   Q.   Have you ever consulted for Attorney Stern's firm
 6        before?
 7   A.   Yes, I have.
 8   Q.   Okay.  And are you -- how many cases would you say
 9        you've had with Attorney Stern in the past?
10   A.   Once -- well, with Attorney Stern --
11   Q.   We'll start with Attorney Stern, and then we can ask
12        about the firm after that.
13   A.   A general idea about the firm.  I don't really
14        have -- I haven't really thought about how many cases
15        for Mr. Stern.
16   Q.   Okay.  And how many for the firm are you able to
17        recall?
18   A.   Over the last 39 years for Levy and Konigsberg,
19        formerly Levy Phillips & Konigsberg, I would
20        approximate perhaps 75 to 80 cases.
21   Q.   Cases?
22   A.   Yes.
23   Q.   And are those all on behalf of the plaintiff, to the
24        best of your recollection?
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   A.    To the best of my recollection, that's correct.  Yes.

 2   Q.    Okay.  I'm going to mark a few more exhibits.  Bear

 3         with me for just a second.  Okay.  This is going to

 4         be Exhibit 4.

 5               (Exhibit No. 4 marked.)

 6   BY MS. DEVINE:

 7   Q.    This is another item that was produced to us as part

 8         of your file.  This is an invoice dated July 1st,

 9         2020, for Ms. T███.  Do you see that document on your

10         screen?

11   A.    Yes, I do.

12   Q.    Okay.  And is this reflective of what you charged to

13         produce the appraisal of economic loss for Ms. T███

14         in this case?

15   A.    It's the invoice associated with my time and

16         compensation for that time for producing a report in

17         that matter.  Yes.

18   Q.    Okay.  And does that rate, that $3,600, include the

19         review of any materials, your analysis, and then the

20         preparation of your report, including the

21         calculations?

22   A.    Yes, it does, as well as preparation for deposition

23         or trial.

24   Q.    Okay.  And can you give me a rough estimate of the
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1          number of hours that you typically spend on an

 2          analysis such as the ones produced in this case?

 3    A.    I don't keep any time records of that sort.  It's a

 4          flat fee.  I would approximate typically somewhere

 5          between 12 and 15, 16 hours.

 6    Q.    Okay.  And is that consistent with what you did in

 7          this case as well?

 8    A.    Yes.

 9    Q.    Okay.  This will be Exhibit 5.

10               (Exhibit No. 5 marked.)

11    BY MS. DEVINE:

12    Q.    This is another invoice.  This one is dated July 3rd,

13          2020, for Ms. W█PPI█.  Do you see that?

14    A.    Yes, I do.

15    Q.    And this, again, is consistent with the amount of

16          time -- excuse me.  This is consistent with the fee

17          that was charged to Attorney Stern's office for your

18          evaluation with respect to Ms. W█PPI█, correct?

19    A.    Yes.

20    Q.    This will we Exhibit 6.

21               (Exhibit No. 6 marked.)

22    BY MS. DEVINE:

23    Q.    This is for Mr. S█PPI█.  This is dated July 6, 2020.

24          Same question.  Is this reflective of the amount
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        charged to Attorney Stern's firm for the analysis

 2        completed for Mr. E███ S███

 3   A.   For the time for that analysis, yes.

 4   Q.   Okay.  And then Exhibit 7.

 5             (Exhibit No. 7 marked.)

 6   BY MS. DEVINE:

 7   Q.   This is the R███ V███        July 3rd, 2020,

 8        invoice.  And is that reflective of both the time

 9        spent and the amount charged to Attorney Stern for

10        analysis in this case?

11   A.   Yes.

12   Q.   When you were contacted by Attorney Stern, did you

13        sign any sort of a retention, a retainer agreement?

14   A.   No, I had no such agreement.  And I should clarify, I

15        believe my initial contact was from someone at

16        Mr. Stern's office, Ashley Vieux.

17   Q.   Okay.  And you indicated that that was sometime

18        around May of this year; is that accurate?

19   A.   I'm approximating sometime April to May of this year.

20   Q.   Okay.  And were you contacted by telephone?

21   A.   I believe the initial contact may have been via

22        e-mail, and then I spoke with Mr. Vieux on the phone.

23   Q.   Okay.  Who else in Attorney Stern's office did you

24        speak to with respect to the analyses that you
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1         completed in this case?

 2   A.    Mr. Vieux and Mr. Stern.

 3   Q.    Okay.  And do you know when those conversations took

 4         place?

 5   A.    Over the period of time from April to May until just

 6         recently for the scheduling of the deposition.

 7   Q.    What was your specific assignment in this case,

 8         Dr. Crakes?

 9   A.    To perform an appraisal of economic loss, the loss of

10         earning capacity for each of the individuals for

11         which my services were requested.

12   Q.    And at any point, did that specific assignment change

13         before you testified here today?

14   A.    No.

15   Q.    What did you do to prepare for your deposition here

16         today?

17   A.    I reviewed the materials in my files.

18   Q.    Did you meet with anyone, either over Zoom or in

19         person?

20   A.    I had a brief telephone conversation with Mr. Stern

21         yesterday, and I had been discussing with Mr. Vieux

22         the scheduling of the deposition.

23   Q.    Okay.  Do you have any familiarity with what the

24         Flint water crisis is?
```

Highly Confidential - Gary M. Crakes, Ph.D.

1   A.   Just a general observation from what's been covered

2        in the media.

3   Q.   Okay.  And can you tell us what that general sense

4        is?

5   A.   That the public water supply had been contaminated

6        with lead, and that there were people who had had

7        issues associated with their health based upon that

8        contamination.

9   Q.   Have you ever been to Flint, Michigan, before?

10  A.   No.

11  Q.   Have you ever spoken to any of the plaintiffs or

12       individuals who live in Flint?

13  A.   Not to my knowledge.

14  Q.   Okay.  And I know we talked about any prior testimony

15       that you've given in Michigan.  But have you ever

16       done any work in Michigan?

17  A.   No.  Not -- again, not that I recall.

18  Q.   What opinions were you asked to reach in this case?

19  A.   Well, I was provided with the estimates from I

20       believe it's Dr. Krishnan --

21            THE REPORTER:  I'm sorry, you broke

22            up a little.  Can you start your answer

23            again.

24            THE WITNESS:  Yes.  I believe I was

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1               provided with reports from Dr. Krishnan.

 2               And based upon the conclusions in those

 3               reports, I was requested to make

 4               calculations of the future loss of earning

 5               capacity of each of the individuals.

 6   BY MS. DEVINE:

 7   Q.   Other than assessing the earning capacity, lost

 8        earning capacity, were there any other opinions you

 9        were asked to reach in this case?

10   A.   One of the other items that was included in each of

11        the reports was, I believe, a cost of monitoring.

12   Q.   Where was that provided?

13   A.   That was provided to me as a value that should be

14        included in each analysis.

15   Q.   Okay.  And who provided you that value?

16   A.   Attorney Vieux indicated to me what the value was

17        that had been established by another person involved

18        in the matter.

19   Q.   Did they tell you who that person was?

20   A.   I believe there was some reference to Dr. Bithoney.

21   Q.   Okay.  Were you provided with any reports from

22        Dr. Bithoney?

23   A.   No.

24   Q.   Okay.  And did you ask to see any reports from
```

Highly Confidential - Gary M. Crakes, Ph.D.

1       Dr. Bithoney to verify that number that you were

2       given?

3   A.  No, I did not.

4   Q.  Have you reviewed Dr. Bithoney's initial deposition

5       transcript from day one of his deposition?

6   A.  No.

7   Q.  I'm going to mark next your reports.  Just bear with

8       me for one second.

9             Okay.  So we're going to start with

10      Exhibit 8.

11            (Exhibit No. 8 marked.)

12  BY MS. DEVINE:

13  Q.  What I'm going to do is mark these first.  We'll go

14      through the rest of the materials that were provided

15      with your file, and then we're going to go through

16      each of these reports in detail after that.  Okay?

17  A.  That's fine.

18  Q.  Okay.  So it's -- you were provided information for

19      four bellwether plaintiffs; is that correct?

20  A.  Well, yes.  And other cases as well.  But these were

21      the four that were identified for me that would be

22      the subject of today's deposition.

23  Q.  Okay.  Thank you for that clarification.

24            For purposes of your analysis, you complete

Highly Confidential - Gary M. Crakes, Ph.D.

1      one report for each plaintiff, correct?

2  A.  Yes.

3  Q.  There's not one summary report that was provided for

4      all of the plaintiffs in which you consulted,

5      correct?

6  A.  That's correct.

7  Q.  Okay.  And in preparing this report in Exhibit 8, for

8      Ms. T▉PPI, did you prepare any draft reports?

9  A.  No.

10 Q.  Okay.  And with respect to this report for Ms. T▉PPI

11     which is 36 pages in total, have you submitted or

12     drafted any addendums or supplemental reports?

13 A.  Not at this time.

14 Q.  Okay.  And for the record, this report is dated

15     July 1st, 2020, correct?

16 A.  Yes, it is.

17 Q.  Okay.  Next is Exhibit 9.

18             (Exhibit No. 9 marked.)

19 BY MS. DEVINE:

20 Q.  This is the appraisal of economic loss for Ms. W▉PPI

21     dated July 3rd, 2020.  Do you see that?

22 A.  Yes, I do.

23 Q.  Okay.  And in preparing this report, did you prepare

24     any draft reports?

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   A.   No.

 2   Q.   Okay.  And since you produced this report on

 3        July 3rd, 2020, have you drafted any addendums or

 4        supplemental reports?

 5   A.   Not at this time.

 6   Q.   Okay.  Next is the appraisal of economic loss for

 7        E▮▮▮ S▮▮▮▮.  This is Exhibit 10.

 8             (Exhibit No. 10 marked.)

 9   BY MS. DEVINE:

10   Q.   It's dated July 6th, 2020, and it's, again, 36 pages.

11             In preparing this report, did you prepare

12        any draft reports?

13   A.   No.

14   Q.   Okay.  And have you drafted any addendums or

15        supplemental reports to this?

16   A.   Not at this time.

17   Q.   Okay.  And finally, Exhibit 11 is the appraisal of

18        economic loss for Ms. V▮▮▮▮.

19             (Exhibit No. 11 marked.)

20   BY MS. DEVINE:

21   Q.   This is dated July 3rd, 2020.  Again, 36 pages.  And

22        in preparing this report, Dr. Crakes, did you prepare

23        any draft reports?

24   A.   No.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
1    Q.   Okay.  And have you drafted any addendums or

2         supplemental reports?

3    A.   Again, not at this time.

4    Q.   When you say not at this time for all four of those

5         plaintiffs, do you have an intention to prepare any

6         addendums or supplemental reports?

7    A.   I have no plans to make any additional calculations.

8         If I'm requested to do so, I will.

9    Q.   I'm sorry.  You broke up just at the end there.

10   A.   Yes.  I have no plans to make any additional

11        calculations.  If I'm requested to do so, I will.

12   Q.   Okay.  Thank you.  In preparation of each four of

13        these reports, Exhibit 8, 9, 10, and 11, did you

14        consult any treatises, articles, or publications in

15        order to complete your analysis?

16   A.   Well, the data sources that I relied on are

17        identified in my report.

18   Q.   Okay.  Any -- anything other than the data sources

19        specifically listed in your report, Dr. Crakes?

20   A.   And my background and knowledge as an economist.

21   Q.   Okay.  I'm going to mark now the four reports from

22        Dr. Krishnan.  And, again, I'm going to just go

23        through these just for purposes of marking your file,

24        and then we'll get into detail after that.  Okay.
```

Highly Confidential - Gary M. Crakes, Ph.D.

1      This is Exhibit 12.

2              (Exhibit No. 12 marked.)

3  BY MS. DEVINE:

4  Q.   This is the report from Dr. Krishnan with respect to

5       Ms. T▓PPI▓   It's nine pages.  I'm just going to scroll

6       through it.

7              Is this the report that you were provided

8       from counsel with respect to Dr. Krishnan's opinions

9       in this matter?

10 A.   I believe so, yes.

11 Q.   Okay.  And, again, I think I asked you this already.

12      But you've not reviewed Dr. Krishnan's deposition

13      transcript, correct?

14 A.   That's correct.

15 Q.   Okay.  And this report is with respect to Ms. T▓PPI▓?

16 A.   Yes.

17 Q.   Were you provided with any other expert reports for

18      Ms. T▓PPI▓

19 A.   There initially was a report from a Dr. Hoffman, but

20      that was not a report that I relied on in making my

21      calculations.

22 Q.   Did that report -- is that report part of your file

23      in this case?

24 A.   Yes.  It's in my file, and it's a report that did not

Highly Confidential - Gary M. Crakes, Ph.D.

1        provide any evidence in terms of the impact of the

2        contamination on Ms. T██PPI██

3   Q.   What was the -- what was discussed in that report, to

4        the best of your recollection?

5   A.   Again, I don't recall any detail.  But the report was

6        not something that could be used in making any

7        calculations of economic loss.

8   Q.   What is Dr. Hoffman's specialty?

9   A.   I believe he's a Ph.D. in psychology.

10  Q.   And is it your testimony that he just didn't reach

11       conclusions necessary in order for you to do your

12       work, or what is it about his report that caused you

13       not to rely on it?

14  A.   There was -- there were no --

15            MR. STERN:  Object to form.  Alaina,

16         I'm not sure you know, or if you do know,

17         you can ask whatever questions you want,

18         we could not utilize Dr. Hoffman as an

19         expert because of COVID and he was unable

20         to travel to Michigan because of a

21         personal COVID situation that he had, at

22         which point we had to hire another expert,

23         which was Dr. Krishnan.

24            So while Dr. Hoffman began the

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1              process and was paid to consult with us

 2              and to begin the process of evaluating the

 3              children, he was unable to complete his

 4              task in light of COVID, which is why we

 5              need an extension of time for

 6              identification of experts, which is all on

 7              the record in court.  And it's not our

 8              intention to utilize anything that

 9              Dr. Hoffman did or didn't do, not because

10              of the quality of his work, but because of

11              his inability to complete the work in

12              light of the pandemic.

13                   MS. DEVINE:  Okay.  I understand.

14              Thank you for that clarification.

15  BY MS. DEVINE:

16  Q.   Dr. Crakes, other than the report of Dr. Hoffman and

17       Dr. Krishnan, were you provided any other expert

18       reports with respect to Ms. TPPI in this matter?

19  A.   No.

20  Q.   Okay.  Next is Dr. Krishnan's report with respect to

21       Ms. WPPI.  This is Exhibit 13.

22                   (Exhibit No. 13 marked.)

23  BY MS. DEVINE:

24  Q.   Again, it's nine pages.  This was produced as part of
```

Highly Confidential - Gary M. Crakes, Ph.D.

1      your expert file with respect to Ms. W██ and in

2      relation to these cases.  Is this the report from

3      Dr. Krishnan that you received and that you rely upon

4      in reaching your conclusions in your own report?

5  A.  Yes.

6  Q.  Okay.  Other than Dr. Krishnan's report, are there

7      any other expert reports or information provided to

8      you by counsel with respect to Ms. W██?

9  A.  Once again, a report from Dr. Hoffman, which I did

10     not rely on.

11 Q.  Okay.  And that's -- that's the entirety of the

12     expert information provided to you with respect to

13     Ms. W██; is that correct?

14 A.  Yes.

15 Q.  Next is Exhibit 14.

16         (Exhibit No. 14 marked.)

17 BY MS. DEVINE:

18 Q.  This is the Dr. Krishnan report for Mr. E██ S██.

19     This one is 11 pages.  And this was, again, produced

20     as part of your file with respect to Mr. S██.

21 A.  That's correct.

22 Q.  Thank you.  Are there any other experts that you --

23     expert reports or that you relied upon with respect

24     to your analysis that you completed for Mr. S██?

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   A.    No.

 2   Q.    Okay.  Finally, this is Exhibit 15.

 3               (Exhibit No. 15 marked.)

 4   BY MS. DEVINE:

 5   Q.    This is the Dr. Krishnan report for R███

 6         V███          This is 11 pages.  And this was also

 7         produced as part of your file with respect to your

 8         work that you did on Ms. V███      , correct?

 9   A.    That's correct.

10   Q.    And are there any other expert reports that you were

11         provided or that you relied upon in reaching your

12         conclusions with respect to Ms. V███     ?

13   A.    Once again, for Ms. V███     and Mr. S███

14         there was a report from Dr. Hoffman that was

15         provided.  I did not rely on it in my analysis.

16   Q.    Did you speak to Dr. Krishnan at any point in time

17         conducting your analysis in this case?

18   A.    No.

19   Q.    Okay.  The next items that were produced in your

20         file, I'm going to mark as Exhibit 16 and Exhibit 17.

21               (Exhibit No. 16 marked.)

22               (Exhibit No. 17 marked.)

23   BY MS. DEVINE:

24   Q.    But they are several documents.  So I'm going to pull
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
1          up Exhibit 16 first.  Do you see this document on the

2          screen here?

3     A.   Yes, I do.

4     Q.   Okay.  And can you describe for us what this document

5          is?

6     A.   Yes.  I was requested to provide the statistical

7          tables that I relied on published by the U.S.

8          Department of -- U.S. Bureau of the census and in

9          conjunction with the Department of Labor, showing the

10         annual earnings by age, gender, and level of

11         educational attainment.  So I provided copies of

12         those statistical tables to Mr. Stern's office.

13    Q.   Okay.  And you provided two sets.  One set for

14         females and one set for males; is that correct?

15    A.   That's correct.

16    Q.   Okay.  And for the females, I'm going to mark as

17         Exhibit 16 the entirety of the reports that were

18         given, and there were, I think, five that were given.

19         You have -- the one on the screen here, which is

20         females age 25 to 34, correct?

21    A.   That's correct.

22    Q.   Okay.  And then you also provided the age ranges of

23         35 to 44, 45 to 54, 55 to 64, and then 65 and over;

24         is that correct?
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   A.   That's correct.

 2   Q.   Okay.  With respect to the male data that was

 3        provided that we'll mark as Exhibit 17, can you see

 4        that on the screen there?

 5   A.   Yes, I can.

 6   Q.   Can you, again, describe for us what we're looking at

 7        in this table?

 8   A.   Again, I was requested to provide the statistical

 9        tables that I relied on for the calculation of the

10        earning capacity of each of the individuals.  And

11        these are the tables that I did provide concerning

12        the earnings of males by age, gender, and level of

13        education.

14   Q.   Okay.  And once again, you provided, and we'll mark

15        for Exhibit 17, the age ranges of 25 to 34, 35 to 44,

16        45 to 54, 55 to 64, and 65 and over, correct?

17   A.   That's correct.

18   Q.   Okay.  One other dataset that you relied upon was the

19        employer cost for employee compensation information,

20        correct?

21   A.   Well, for the calculation of any loss of fringe

22        benefits, I relied on a table which I provided in my

23        report.  Yes.

24   Q.   Okay.  And those are Exhibit 4 in your report; is
```

Highly Confidential - Gary M. Crakes, Ph.D.

1      that correct?

2  A.   I believe that's correct.  If I could just confirm

3       that.  Yes.

4  Q.   And then the only other data that I can see cited in

5       your report is the National Vital Statistics 2014

6       report from the Department of Health and Human

7       Services.  Is that correct?

8  A.   Life expectancy tables.  Yes.

9  Q.   Okay.  I did not see those produced in your file but

10      was able to pull them up.  So I'm going to make sure

11      we're talking about the same thing.  This is Exhibit

12      18.

13              (Exhibit No. 18 marked.)

14  BY MS. DEVINE:

15  Q.   And is this the document which you reference in your

16       report that you relied upon for life expectancy

17       information?

18  A.   Yes, it is.

19  Q.   Okay.  I have now marked everything that was produced

20       to us as part of your file in this case.  With the

21       exception of the Dr. Hoffman report, have you

22       produced all of the data that you relied upon in

23       reaching your conclusions and opinions in this case?

24  A.   In reaching my conclusions and opinions that resulted

Highly Confidential - Gary M. Crakes, Ph.D.

1        in my report, yes, that is all the material.  I did

2        indicate that I did provide an updated list of my

3        appearances at trial, deposition, and arbitration.

4    Q.  I've had the opportunity to review a few of your

5        prior depositions in unrelated cases.  Do you

6        typically keep notes or spreadsheets of the

7        calculations that you complete that are summarized in

8        your reports?

9    A.  Yes.  And I had provided those to Attorney Stern's

10       office.

11   Q.  Okay.

12            MS. DEVINE:  Corey, I don't think we

13        ever received those.  Corey, are you

14        there?  Okay.

15            MR. STERN:  I'm here.  I'm here.  I

16        was on mute.  Yes.

17            MS. DEVINE:  Sorry.

18            MR. STERN:  If we have them and we

19        haven't sent them to you, I'll send them

20        to you during the break.  I just have to

21        check with the paralegal on the case.

22            MS. DEVINE:  Okay.  I think that

23        would be helpful to have when we go

24        through Dr. Crakes' reports momentarily.

Highly Confidential - Gary M. Crakes, Ph.D.

 1              So we can break in a few minutes, if you

 2              can see if you can track those down.

 3                   MR. STERN:  Okay.

 4    BY MS. DEVINE:

 5    Q.   Are there any other documents or materials that you

 6         received in connection with your work on this case

 7         that were not contained in the file materials that

 8         were produced?

 9    A.   No.

10    Q.   Okay.  Can you describe for me, generally, the work

11         that you've done on this case chronologically, from

12         the first phone call that you received from Attorney

13         Stern's office.

14    A.   Well, generally, the first phone call inquired as to

15         my availability, and then indication that there would

16         be some type of assessment provided of the impact of

17         the contamination on each of the individuals.

18         Ultimately, when I did receive the reports from

19         Dr. Krishnan, I reviewed them.  I communicated my --

20         what I thought would be reasonable assumptions to

21         make concerning the conclusions that had been

22         generated by Dr. Krishnan and the impact on earning

23         capacity, and I then proceeded to make the

24         calculations.

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   Q.   This information in Exhibit 3 that I've put up, which
 2        was produced in your expert file, the section related
 3        to facts or data considered.  Do you see that?
 4   A.   Yes, I do.
 5   Q.   Okay.  And how was this information presented to you?
 6   A.   Some of it was in Dr. Krishnan's report.  Some of it
 7        was provided to me specifically by Mr. Vieux, by
 8        Ashley Vieux.
 9   Q.   In other cases that you've worked on, is that
10        communication of information typical in that you'd
11        receive some sort of under -- excuse me -- some sort
12        of underlying report and then have a communication
13        with counsel that you're working on the case specific
14        to what your opinions may or may not be in that case?
15   A.   Well, the type of assessment that was provided from
16        Dr. Krishnan would certainly be applicable in a case
17        of this sort.  Other matters where, for example, it's
18        a wrongful death matter, such a report would not be
19        necessary because there would be no residual earning
20        capacity for the individual.  So it would depend upon
21        the nature of the case.
22   Q.   Are there cases in which you're provided deposition
23        transcripts, either from the plaintiffs' witnesses or
24        experts?
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   A.   In some cases, yes.  Not in all.

 2   Q.   And that was not provided.  None of those were

 3        provided to you here; is that correct?

 4   A.   That's correct.

 5   Q.   Okay.  And were you provided with any medical records

 6        or educational records for any of these four

 7        plaintiffs in which you were calculating economic

 8        loss for?

 9   A.   No.

10   Q.   Okay.  Did you have any information, other than what

11        was contained within Dr. Krishnan's report, about any

12        preexisting conditions that each of these four

13        bellwether plaintiffs may have had?

14   A.   No.

15   Q.   And did you, other than the information provided in

16        Dr. Krishnan's report, have any information related

17        to how each of these four bellwether plaintiffs was

18        doing in school before the Flint water crisis?

19   A.   No.

20   Q.   And other than Dr. Krishnan's report and the

21        information contained therein, did you consider or

22        have any information about how these four bellwether

23        plaintiffs were doing in school after the Flint water

24        crisis or after April of 2014?
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   A.   Once again, other than what was in Dr. Krishnan's

 2        report, no.

 3   Q.   Okay.

 4             MS. DEVINE:  All right.  Why don't we

 5        take a break now.

 6             Corey, can you see if you can track

 7        down --

 8             MR. STERN:  Yeah.  He's getting them

 9        for me right now.

10             MS. DEVINE:  Okay.  So let's go off

11        the record, if we could, Robert.

12             VIDEOGRAPHER:  The time is 9:57 a.m.,

13        and we're off the record.

14             (Recess taken.)

15             VIDEOGRAPHER:  The time is 10:16 a.m.,

16        and we're on the record.

17   BY MS. DEVINE:

18   Q.   Dr. Crakes, we just took a break, during which

19        counsel has provided me with some additional file

20        materials.  So I'm going to mark those at this time,

21        if you just bear with me for one second.

22   A.   That's fine.

23   Q.   Sorry.  The computer is moving at a snail's pace

24        here.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1                    While that's pulling up, Dr. Crakes, you
 2          had indicated to me before the break that you, in
 3          connection with your work in this case and perhaps
 4          others, make assumptions based on what the
 5          information is that's presented to you; is that
 6          correct?
 7   A.     Yes.
 8   Q.     Okay.  And that's part of your role is to make those
 9          assumptions and then perform your analysis based on
10          those specific assumptions, correct?
11   A.     Yes.  I usually do make them in consultation with the
12          attorney that's retained my services.
13   Q.     Okay.  And those assumptions could vary from
14          plaintiff to plaintiff and from case to case,
15          correct?
16   A.     Yes.
17   Q.     Okay.  And do you believe that there is a standard
18          methodology in terms of calculating lost earning
19          capacity for child plaintiffs with no record of any
20          income?
21   A.     Well, again, what we're measuring is earning
22          capacity.  And certainly a child would not have any
23          record of any earnings, which is why one would rely
24          on the types of statistical data that I have here.
```

Highly Confidential - Gary M. Crakes, Ph.D.

1    Q.    Okay.  And you're also relying, as you just

2          indicated, on information that's provided to you from

3          counsel, correct?

4    A.    That's correct.

5    Q.    Okay.  And in your reports, you indicate that your

6          analyses are completed as scientifically and

7          accurately as the data permits.  Is that standard

8          language that you use in your reports?

9    A.    Yes.  It's basically indicating that I'm relying on

10         the accuracy of the information provided to me by

11         those who have retained my services.

12   Q.    Okay.  And you also use a phrase based on the

13         available data, correct?

14   A.    That's correct.

15   Q.    Okay.  And other than receiving a report from counsel

16         about what your assumptions may or may not be and the

17         reports from Dr. Krishnan, did you independently

18         verify any of the information provided to you with

19         respect to these four bellwether plaintiffs?

20   A.    No.

21   Q.    Okay.  This is going to be Exhibit 19.

22              (Exhibit No. 19 marked.)

23   BY MS. DEVINE:

24   Q.    This was what was just provided with respect to

Highly Confidential - Gary M. Crakes, Ph.D.

```
1          Ms. T PPI    Can you see that document here on the

2          screen?

3   A.     Yes.

4   Q.     Okay.  And this is seven pages.  It appears to be

5          some handwritten notes and some charts as well,

6          correct?

7   A.     That's correct.

8   Q.     Okay.  So I want to start on the first page here with

9          Ms. T PPI , and it indicates here that assume date of

10         present to be September 1st of 2020.  Do you see

11         that?

12  A.     Yes.

13  Q.     And what is the significance of that date with

14         respect to the calculations and the opinions that you

15         reached in this case?

16  A.     Well, just to clarify, what we're looking at is an

17         outline that I prepared before beginning the analysis

18         of economic loss of each of these matters.  The

19         assumed date of present is simply an identification

20         of when the -- usually it's a month or two after the

21         point in which -- at which I'm making the

22         calculations.  So I'm just identifying --

23         calculations were made in July, let's say, so I

24         assumed that September 1st was the date of present.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   Q.   Okay.  And you have a date of exposure of April 24th

 2        of 2014.  Do you see that?

 3   A.   Yes, I do.

 4   Q.   And who provided you with that information?

 5   A.   Attorney Stern's office.

 6   Q.   Okay.  And did you independently verify what the

 7        actual date of exposure was for Ms. T▮▮▮?

 8   A.   No, I did not.

 9   Q.   Okay.  And, again, you're familiarity with the Flint

10        water crisis or lead exposure that may have occurred

11        as a result of the Flint water crisis is based on the

12        information provided to you by Attorney Stern and

13        then some anecdotal information you've gathered from

14        news media; is that correct?

15   A.   Yes.  I would not refer to it as gathering.  Just

16        awareness --

17   Q.   Okay.

18   A.   -- based on what I have read.

19   Q.   Under the date of present, you have Michigan law

20        regarding economic loss.  Do you see that?

21   A.   Yes, I do.

22   Q.   Okay.  What can you tell me about what that note

23        means as reflected in your outline here?

24   A.   The information provided to me was that the
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1          calculations of economic loss should be undiscounted

 2          and no deduction for income tax liability under

 3          the -- under Michigan law with respect to economic

 4          loss.

 5    Q.    Did you yourself, Dr. Crakes, investigate whether

 6          that's actually true in Michigan?

 7    A.    I'm not -- I'm not an attorney.  I did read an

 8          article that appeared in the Journal of Forensic

 9          Economics about eight or nine years ago.  And then I

10          consulted with Attorney Stern, and the information

11          provided to me was that I should calculate the

12          economic loss undiscounted without any deduction for

13          income taxes.

14    Q.    Was that article you're referring to one that was

15          written by Dr. William King?

16    A.    I think that's correct.

17    Q.    Okay.  And you're aware that -- are you aware that

18          Dr. King was retained in connection with the Flint

19          water cases by some other plaintiffs?

20    A.    No, I'm not.

21    Q.    Okay.  Did you speak to him in relation to your work

22          on this case?

23    A.    No, I did not.

24    Q.    Okay.  Are you aware that Michigan has a 5 percent
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        discount rate -- per year applied to economic loss

 2        damages?

 3                THE REPORTER:  I'm sorry, your audio

 4          broke up.  Can you repeat that, please.

 5                MS. DEVINE:  Sure.

 6   BY MS. DEVINE:

 7   Q.   Are you aware that the State of Michigan applies a

 8        5 percent discount rate compounded each year in

 9        calculating economic loss damages?

10   A.   Again, I'm not an attorney.  So I'm not involved in

11        interpreting legal standards.  But the understanding

12        I had was that when the values are ultimately

13        discounted, which often occurs after a trial, that is

14        the discount rate that is used.  My understanding in

15        communication with Attorney Stern, as well as that

16        article, is that typically the values that are

17        presented are undiscounted, no deduction for income

18        taxes.  Any discounting would typically occur after

19        the fact.

20   Q.   So you've not provided any value for what that

21        discounted loss would be, correct?

22   A.   The values in my report are all undiscounted.  That's

23        correct.

24   Q.   Okay.  In this outline here and in your report for
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1          each of the bellwether plaintiffs, the four

 2          bellwether plaintiffs that we're discussing today,

 3          you use four scenarios, correct?

 4     A.   Well, the scenarios did vary depending upon the case.

 5          But yes, there were -- I had two unimpaired earnings

 6          alternatives and two impaired earnings alternatives.

 7          So there were four different estimates of economic

 8          loss.

 9     Q.   Okay.  And for Ms. T███, we have on the screen here,

10          and, again, this is your file materials, your

11          unimpaired earnings alternatives were a female with a

12          bachelor's degree and a female with a master's

13          degree, correct?

14     A.   That's correct.

15     Q.   Okay.  And for a female with a bachelor's degree, you

16          assume that that -- that Ms. T███ would work from age

17          23 to age 67, correct?

18     A.   No.  She would have an earning capacity from age 23

19          to age 67.

20     Q.   Okay.  And then similarly, for a master's degree, her

21          earning capacity would be age 25 to 67, correct?

22     A.   That would be the period of time for her earning

23          capacity.  Yes.

24     Q.   What is the source of determining what the unimpaired
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        earnings would be for Ms. TPPI?

 2   A.   The report from Dr. Krishnan.

 3   Q.   Okay.  We're going to pull that up.

 4             Okay.  Can you direct me where in this

 5        report Dr. Krishnan states that but for lead exposure

 6        as a result of the Flint water crisis, Ms. TPPI would

 7        have attained a bachelor's or master's degree?

 8   A.   Well, it's based on her recommendations at the end of

 9        her report, and I made that determination after

10        reviewing those recommendations in consultation with

11        Attorney Stern.

12   Q.   Okay.  So what specific recommendation leads you to

13        the belief that Ms. TPPI would have a bachelor's or

14        master's degree but for lead exposure?

15   A.   It's based on the statement No. 2, the phrasing that

16        there was a possibility that these issues may prevent

17        completion of college or graduate training.

18   Q.   So you're looking at the sentence that begins with

19        overall; is that correct?

20   A.   That's correct.

21   Q.   Okay.  She indicates here that the -- there is a

22        moderate possibility that these issues may prevent

23        completion of college or graduate training.  Is that

24        the sentence that you're referring to?
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
1   A.   Yes, it is.

2   Q.   Okay.  And she assigns a 30 to 50 percent rate to

3        that.  Do you see that?

4   A.   I do.

5   Q.   Okay.  And that's the possibility outcome that she

6        assigns with respect to failure to complete college

7        or graduate school, correct?

8   A.   That appears to be the case.  Yes.

9   Q.   So you're inferring from Dr. Krishnan's statement

10       here that Ms. T‑PPI would, in fact, have completed

11       college or graduate training?

12  A.   As I've indicated, in consultation with Attorney

13       Stern, I -- we proposed -- or I proposed estimating

14       her unimpaired earning capacity as a female with a

15       bachelor's degree and as a female with a master's

16       degree.

17  Q.   Okay.  But that certainly is not stated explicitly in

18       Dr. Krishnan's report, correct?

19  A.   That's correct.

20  Q.   And are you a vocational expert, Dr. Crakes?

21  A.   No, I am not.

22  Q.   Okay.  And are you qualified to give vocational type

23       opinions?

24  A.   No, I am not, nor have I done so.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   Q.   Okay.  Are you qualified to offer an opinion that

 2        lead exposure would reduce a plaintiff's future

 3        academic potential?

 4   A.   No, I'm not qualified to make that determination.

 5   Q.   Okay.  And have you done that here, Dr. Crakes?

 6   A.   No, I've not.

 7   Q.   Okay.  Other than the statement in Dr. Krishnan's

 8        report that as a result of lead exposure, there may

 9        be a 30 to 50 percent chance that Ms. T████ may not

10        complete college or graduate training, is there

11        anything in Dr. Krishnan's report that reflects her

12        unimpaired academic potential?

13   A.   Again, I'm relying on the conclusions and

14        recommendations from Dr. Krishnan's report, as we

15        just discussed.

16   Q.   Okay.  This paragraph here, though, discusses what

17        her impaired academic potential would be, correct?

18   A.   Well, my understanding is it's assessing both, what

19        she would have been able to do perhaps absent the

20        poisoning and what she now will be capable of doing.

21   Q.   Does it say, though, Dr. Crakes, that but for the

22        lead exposure, Ms. T████ would have graduated college

23        or completed graduate training?  Does it say that in

24        Dr. Krishnan's report?
```

```
 1   A.    I don't know if it says that anywhere else in her
 2         report.  Again, I'm relying on the assessment that
 3         she made in her recommendations section at the
 4         conclusion of her report.
 5   Q.    Okay.  And, again, these recommendations are the
 6         opinions she's reached with respect to their level of
 7         functioning as a result of lead exposure, correct?
 8   A.    Again, I'm not assessing Dr. Krishnan's report or
 9         making any assessment of that sort myself.  I'm
10         relying on the conclusions and recommendations she
11         has identified.
12   Q.    Okay.  With respect to this specific recommendation
13         regarding college or graduate training, she clearly
14         states, if you look at the 30 to 50 percent, that
15         there is a 50 to 70 percent chance that Ms. TPPI
16         would complete college or graduate training, correct?
17   A.    Well, I believe -- again, I can't speak for
18         Dr. Krishnan.  I'm not sure that's exactly what it
19         says.  But again, I'm not speaking for her at this
20         point.
21   Q.    Well, okay.  That's fair.  What I'm trying to get at,
22         Dr. Crakes, is the assumption that you reached in
23         your report that but for the lead exposure, Ms. TPPI
24         would have reached college -- excuse me.  Would have
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        had a bachelor's or master's degree.  So what I'm

 2        trying to gather is where that information came from

 3        specifically.

 4   A.   Again, after reviewing the recommendations and

 5        conclusions of Dr. Krishnan, and in consultation with

 6        Attorney Stern, I calculated the economic loss on the

 7        basis of the assumptions that we've been discussing.

 8   Q.   Okay.  So as far as unimpaired earnings, based on

 9        your review of Dr. Krishnan's report, which is that

10        one section you read to me, you believed it was

11        reasonable to assume that Ms. T PPI  would have

12        obtained a bachelor's or master's degree but for lead

13        exposure; is that correct?

14   A.   I made a calculation of economic loss based on those

15        two alternatives of unimpaired earnings.

16   Q.   Okay.  And you personally have no opinion whether or

17        not Ms. T PPI  would have had the capacity, interest,

18        or ability to complete a bachelor's or master's

19        degree, correct?

20   A.   As I think we've identified, I'm not qualified to

21        make that determination.

22   Q.   Okay.  Do you know if Dr. Krishnan is a vocational

23        expert?

24   A.   I don't know what Dr. Krishnan's training is.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   Q.   Okay.  Do you know if she's qualified to give an

 2        opinion on an individual's future earning capacity?

 3   A.   I'm not making any assessment of Dr. Krishnan's

 4        qualifications.

 5   Q.   Okay.  Do you think it's important to know whether or

 6        not the data that you're relying on is reliable?

 7   A.   Well, I'm relying on the accuracy of the data

 8        provided to me, as we discussed a few moments ago,

 9        and I'm relying on Dr. Krishnan's report.  I'm not

10        qualified to make any assessment of those

11        qualifications.

12   Q.   Well, my question is, do you think it's important

13        that when you're completing your calculations, the

14        data that's provided to you is accurate?  Or are you

15        just asked to look at data and make your

16        calculations?

17             MR. STERN:  Objection.

18             THE WITNESS:  I'm relying on the

19        accuracy --

20             MR. STERN:  Objection.  Asked and

21        answered.

22             THE WITNESS:  I'm sorry.  Yes.  I'm

23        relying on the accuracy of the data that's

24        been provided to me, as I believe I've
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
1              indicated a number of times.

2   BY MS. DEVINE:

3   Q.   So let me go back to your outline here for a second.

4        Okay.  So your impaired earnings values for Ms. TPPI

5        are earnings as a female with 9th to 12th grade

6        education, correct?

7   A.   Yes.

8   Q.   And then earnings as a female with a high school

9        graduate, correct?

10  A.   That's correct.

11  Q.   Okay.  And can you explain for us the source of those

12       impaired earning scenarios?

13  A.   That same paragraph from the report of Dr. Krishnan.

14  Q.   Okay.  Let's pull that up.  So can you explain for me

15       where in Dr. Krishnan's report it states that as a

16       result of lead exposure, Ms. TPPI will only complete

17       either 9th to 12th grade or obtain a high school

18       graduate or GED degree?

19  A.   It's the same sentence that we were referring to

20       earlier.

21  Q.   Okay.  And that's the sentence that says, overall, I

22       would estimate her likelihood of not graduating high

23       school to be low?

24  A.   That's correct.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   Q.   Okay.  So Dr. Krishnan is actually saying that

 2        there's a good chance that Ms. TPPI will graduate

 3        high school, correct?

 4   A.   Well, she provides a percentage.  What I have

 5        calculated is what her impaired earnings would be as

 6        a high school graduate, and then if she did not

 7        finish high school, what those impaired earnings

 8        would be.

 9   Q.   Okay.  Why didn't you calculate something above high

10        school graduate if Dr. Krishnan states here that the

11        chances of her not graduating high school are low?

12   A.   Well, I calculated her earning capacity in her

13        impaired condition as a high school graduate and one

14        of those alternatives.

15   Q.   Okay.  But why didn't you do something more than a

16        high school graduate, like some college or bachelor's

17        degree or an associate's degree or a master's degree?

18   A.   Well, I believe the assessment is that with the

19        impairments that Ms. TPPI is experiencing, she would

20        have a likelihood perhaps of graduating from high

21        school with some percentage potential of not doing

22        so.  And that's what I relied on in discussion with

23        Attorney Stern for the assumptions of her impaired

24        earning capacity.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   Q.   But that's not stated in Dr. Krishnan's report that

 2        she -- that there's a strong likelihood that she

 3        won't complete high school, correct?

 4             MR. STERN:  Objection.  Asked and

 5        answered.

 6   BY MS. DEVINE:

 7   Q.   You can answer, Dr. Crakes.

 8   A.   I said yes, I think that's correct.

 9   Q.   Okay.  And with respect to her ability to complete

10        college or graduate training, she just says that

11        there's a 30 to 50 percent chance that her injuries

12        could prevent her from completing college or graduate

13        training, correct?

14   A.   That's what she states.  Yes.

15   Q.   So said another way, there's a 50 to 70 percent

16        chance that she could complete college or graduate

17        training, correct?

18   A.   As I believe I answered when you asked me that

19        question before, I don't know.

20   Q.   Well, isn't that what it states in the report,

21        Dr. Crakes?

22   A.   No, it does not.

23   Q.   Okay.  So what does it say about her chances of

24        completing college or graduation, as you understand
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1       this section to mean?  Excuse me.  College or

 2       graduate training.

 3   A.  Again, I don't want to speak for Dr. Krishnan.  But I

 4       believe it's indicating that there was a 30 to 50

 5       percent chance that, probability, that she may not

 6       finish college.

 7   Q.  Okay.  Have you provided any calculations for

 8       Ms. T[PPI] for loss of earning capacity that she

 9       complete some college?

10   A.  No, I've not.

11   Q.  And why didn't you do that?

12   A.  As I've indicated to you a number of times, in

13       consultation with Attorney Stern, after reviewing

14       this paragraph, those are the assumptions that were

15       made.

16   Q.  Were you told not to make that calculation?

17   A.  No.

18   Q.  Why didn't you calculate for the possibility that

19       Ms. T[PPI] complete college?

20   A.  Well, the calculation was made for her completing

21       college and her earning capacity as a female with a

22       bachelor's degree.  That calculation was provided.

23   Q.  For someone who's unimpaired, correct?

24   A.  Yes.
```

Highly Confidential - Gary M. Crakes, Ph.D.

1    Q.    Okay.  So my question is, and I apologize, that was

2          not clear, for your impaired values, which we went

3          over are between 9th and 12th grade or graduating

4          high school, you've indicated you did not provide a

5          calculation for her completing some college.  My

6          question is, did you provide a calculation for

7          impaired values for completing college?

8    A.    Well, it would be the same as the unimpaired value

9          that I calculated.  But no, I did not label it as

10         such.

11   Q.    Okay.  And what about for an associate's degree?

12   A.    No, I did not.

13   Q.    Okay.  And what about for a master's degree?

14   A.    I calculated her earning capacity as a female with a

15         master's degree as a portion of the alternatives for

16         someone with unimpaired earnings.

17   Q.    Okay.  But your report with respect to impaired

18         earnings does not include calculation for a master's

19         degree, correct?

20   A.    That's correct.

21   Q.    Okay.  You're not saying that your calculations for

22         bachelor's and master's degree could carry over to

23         your unimpaired conclusions, are you?

24   A.    If I understand the question correctly, I provided

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        the two alternatives for unimpaired earnings and the

 2        two alternatives for impaired earnings, as we've been

 3        discussing.

 4   Q.   Okay.  So you're not saying that we should look at

 5        your calculations for bachelor's and master's degree

 6        in considering what Ms. T███ impaired earnings may

 7        be, are you?

 8   A.   No, I'm not.

 9   Q.   Okay.  I want to look back for a second.  Sorry.  And

10        this was Exhibit 19, I believe.  Exhibit 19.  These

11        are -- this is your -- back to your outline for

12        Ms. T███, correct?

13   A.   Correct.

14   Q.   Okay.  And you indicate here that you've applied an

15        annual rate of growth of 3.5 percent, correct?

16   A.   That's correct.

17   Q.   Okay.  And then for fringe benefits, you've indicated

18        10 percent of the earnings difference, correct?

19   A.   That's correct.

20   Q.   And then for future cost of care, you indicate $5,000

21        per year for medical monitoring for the remaining

22        life expectancy, correct?

23   A.   Yes.

24   Q.   And you apply 3.5 percent annual rate of growth to
```

Highly Confidential - Gary M. Crakes, Ph.D.

1      the cost of future care, correct?

2  A.  Yes.

3  Q.  Okay.  Is this all of the information that you used

4      to make your calculations that are reflected in your

5      report and in these spreadsheets we've been provided?

6  A.  Well, to clarify, it's not all the information.  It's

7      an outline that I produced for my own use in going

8      through the calculations of economic loss.

9  Q.  And, again, this was information that was provided to

10     you primarily by Attorney Stern's office in

11     consultation with Dr. Krishnan's report and then some

12     of the data and statistics that we've gone over,

13     correct?

14 A.  Yes.  And my discussion with Attorney Stern as to the

15     assumptions regarding unimpaired and impaired

16     earnings.

17 Q.  Okay.  And did you ask any follow-up questions with

18     respect to specifics on these individual plaintiffs,

19     other than what's reflected in your report here?

20          MR. STERN:  Objection.  Work product.

21          I don't think it's appropriate for

22          Dr. Crakes to testify about what he and I

23          discussed with regard to his consulting

24          with our firm.  So I'd ask him not to

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1              answer that question.

 2                   MS. DEVINE:  I'll ask it a different

 3              way without getting into that.

 4  BY MS. DEVINE:

 5  Q.  If you look at -- give me one second -- Exhibit 3.

 6       This was one of the data sheets provided to us in

 7       your expert file.  It has your list of testimony on

 8       here, and it says facts or data considered.  Do you

 9       see that?

10  A.  Yes, I do.

11  Q.  Okay.  And this follows generally what's included in

12       your report and in your outline in terms of the date

13       of birth of each plaintiff, correct?

14  A.  Yes.

15  Q.  And the date of exposure of each plaintiff, correct?

16  A.  That's correct.

17  Q.  And the gender of each plaintiff, correct?

18  A.  Yes.

19  Q.  Okay.  And then we just discussed the reports from

20       Dr. Krishnan, the cost of care of $5,000, and then

21       the government statistics.  Do you see that?

22  A.  Yes, I do.

23  Q.  Okay.  In your work as an economist and in completing

24       these analyses, are there other datasets that you
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        will look to or rely upon in reaching your opinions?

 2   A.   Depends upon the nature of --

 3   Q.   I'm sorry.  I didn't hear your answer.

 4   A.   It would depend upon the nature of the case at hand.

 5   Q.   Okay.  Well, in a case such as the one before you,

 6        where you're dealing with a child plaintiff, no

 7        earnings record, what other information or data have

 8        you taken into account in the past?

 9   A.   Well, these would be the data sources that I would

10        rely on.  As I think I indicated earlier, if this,

11        for example, were a wrongful death matter, then there

12        would be no necessity for an assessment of what the

13        child would be able to do in their impaired state.

14        But in a personal injury matter, if a child is not

15        totally disabled, then there would have to be some

16        type of assessment of impaired earnings.

17   Q.   Does the geographical area in which a plaintiff

18        lives, does that ever factor into your calculations?

19   A.   Well, it certainly affects the legal standards that

20        are applied.  That would certainly be one of the

21        things that would depend upon geographic location, if

22        you're referring to what state they're living in.

23        And, again, it would depend upon the circumstances of

24        the case at hand.  If we had someone who -- if we had
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1          someone who was older and had an established

 2          occupation, one could look at earnings for where they

 3          were residing for that occupation, but that's not the

 4          case here.

 5   Q.     It's true, though, that vocational experts, even if

 6          there isn't a record of earnings, will look to such

 7          factors such as geographical areas and job prospects

 8          in that area in reaching a conclusion about earning

 9          potential of a particular plaintiff, correct?

10   A.     Some may do that.  Again, I'm not a vocational

11          analyst, and I'm not speaking for vocational

12          analysts.

13   Q.     In your work as an economist and in completing these

14          analyses, you've been provided with vocational

15          reports, correct, in other cases?

16   A.     Yes, I have.

17   Q.     Okay.  And in your career of consulting on litigation

18          matters, how many vocational reports would you say

19          you've reviewed?

20   A.     I really don't know.

21   Q.     Okay.  Can you assign a percentage in which cases

22          that you work on provide some sort of vocational

23          report to you?

24   A.     I really don't know.
```

Highly Confidential - Gary M. Crakes, Ph.D.

1    Q.    Okay.  Is it more common in a case with a child

2          plaintiff to be provided with a vocational report

3          because without any record of earnings, it can be

4          more difficult to determine what educational

5          attainment or profession that individual may go into?

6                MR. STERN:  Object to form.

7                THE WITNESS:  It would depend.  In

8                some cases, I'm provided with assumptions

9                of that sort that have been made, and I

10               make calculations based on those

11               assumptions.  In other matters, a

12               vocational assessment may be provided.  It

13               depends upon the circumstances of the

14               case.

15   BY MS. DEVINE:

16   Q.    Okay.  I want to go through the actual calculations

17         that you've completed, starting with Ms. TPPI.  So

18         this is Exhibit 8.  Can you take us through here, on

19         page 3, the summary of your opinions as you reflected

20         in your report?  I know we've spoken about them

21         briefly.  But can you just explain for the record the

22         scenarios that you've put forth and the numbers that

23         you reached for each of the scenarios?

24   A.    Yes.  I think it might be more straightforward if we

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1            were to look at pages 6 and 7, Exhibit I and IA.  The

 2            page 6 -- should I continue or would --

 3    Q.      Yes, please.  Thank you.

 4    A.      Page 6 provides the estimate of economic loss with

 5            unimpaired earnings as a female with a bachelor's

 6            degree, and then the two alternative impaired

 7            earnings assumptions, female with a 9th to 12th grade

 8            education and female high school graduate.

 9                     As we move down the two columns, the value

10            for unimpaired earnings as a female with a bachelor's

11            degree, the undiscounted value is provided.  From

12            that, we subtract the impaired earnings for the two

13            different alternatives.  We then add the fringe

14            benefits and the future cost of care for the

15            remaining life expectancy and arrive at the net

16            undiscounted economic loss values at the bottom of

17            each of those columns.

18    Q.      Okay.  And this is the first scenario where you have

19            unimpaired earnings for a bachelor's degree, correct?

20    A.      That's correct.  And if we turn to page 7, the same

21            format is provided, but this time the unimpaired

22            earnings are as a female with a master's degree.  And

23            the same procedure is followed.  Arriving at the

24            total net of undiscounted economic loss, after
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1          subtracting the impaired earnings for 9th to 12th
 2          grade education and high school graduate, and adding
 3          fringe benefits and the cost of care for the
 4          remaining future life expectancy, the total net
 5          undiscounted economic loss is at the bottom of the
 6          two columns.
 7     Q.   Okay.  I want to start with how you -- or what values
 8          you're using for each year for earning capacity, both
 9          impaired and unimpaired.  And I think that
10          information is more accurately reflected in the
11          charts that you provided; is that correct?
12     A.   Yes.
13     Q.   Okay.  And to be clear, we went through some of the
14          data earlier with the Exhibit 16, which is these
15          charts that you've produced to us, correct?
16     A.   That's correct.
17     Q.   Okay.  So can you -- for Ms. TPPI, in the first
18          scenario, which is unimpaired bachelor's degree,
19          inform us as to what values you're using for each
20          year to calculate the unimpaired earnings.
21     A.   You have to turn to the spreadsheets that you
22          referred to.  If you go to the next page, right
23          there, the values are provided for the female with a
24          bachelor's degree and impaired earnings with a 9th to
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1          12th grade education, and then in the lower portion

 2          of the table, with the impaired earnings as female

 3          high school graduate.  The unimpaired earnings and

 4          impaired earnings in column C and D are arrived at

 5          using the data source that you referred to a moment

 6          ago with that 3 and a half percent rate of increase

 7          year to year.  So the undiscounted values for those

 8          earnings levels by education are provided in columns

 9          C and D by the ten-year age increments that we

10          referred to earlier.

11   Q.     Okay.  So for each year, you applied that median

12          earnings, depending on the age in which Ms. TPPI was

13          for the year that you're calculating; is that

14          correct?

15   A.     That's correct.

16   Q.     Okay.  And these are national statistics, correct?

17   A.     Yes, they are.

18   Q.     And these statistics begin at age 25, correct?

19   A.     Yes, they do.

20   Q.     Okay.  So for the calculations you're making for

21          earning capacity under the age of 25, such as the

22          scenario 1 where you have a bachelor's degree,

23          starting work at age 23, and then impaired earnings

24          with a 9th to 12th grade education at age 18, what
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1           values are you using for computing lost income where

 2           your tables start at age 25?

 3    A.     So about ten years ago, it may be longer than that or

 4           shorter than that, but the Census Bureau published

 5           those values for less than 25 years of age.  They

 6           stopped doing so.  What I have done is gone back and

 7           looked at the years when those values were provided

 8           and recognized that typically the earnings for

 9           someone under 25 with each level of educational

10           attainment and each gender was approximately 70

11           percent of what the earnings were between 25 and 34,

12           and I continued to use that 70 percent approximation

13           for ages less than 25.

14    Q.     Okay.  Thank you for that explanation.

15                 Why do you use, Dr. Crakes, average income

16           data in your calculations?

17    A.     I'm not using average income data.  I'm using median

18           value -- --

19    Q.     Median.

20    A.     -- and earnings values, not total income.

21    Q.     Okay.

22    A.     Only the earnings that an individual would receive

23           from employment.

24    Q.     Okay.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1    A.    I don't use the mean because mean values are more

 2          subject to the effect of extreme values.  Median

 3          values are taking all the values in the series,

 4          ranking them from highest to lowest, and selecting

 5          that value which is at the midpoint of that ranking.

 6          Typically, median values are less than the mean

 7          because median values are less subject to skewness or

 8          the impact of extreme values.  And in all of the

 9          earnings data that I've employed in these reports

10          that we're discussing today, the mean values were

11          higher than the median.  I used the median, not the

12          mean.

13    Q.    Okay.  And you do that for the reasons you just

14          explained; is that correct?

15    A.    Yes.

16    Q.    Okay.  You'd agree that for someone with a bachelor's

17          degree or college graduate, there would obviously be

18          a range of income depending on what that individual

19          may have majored in, correct?

20    A.    It's a range of earnings.  And yes, the data are by

21          educational level, but are not occupation specific.

22    Q.    Same question for someone with a master's degree.

23          That could vary based on what they received their

24          master's degree in, correct?
```

Highly Confidential – Gary M. Crakes, Ph.D.

1   A.   It can, yes.

2   Q.   Okay.  And there'd be also differences in earnings

3       based on the actual occupation that that individual

4       goes into, whether it be engineering, economics, or

5       the like, correct?

6   A.   That's correct.

7   Q.   Okay.  With respect to the $5,000 future medical --

8       per year medical monitoring costs that you used for

9       each of these four bellwether plaintiffs, you

10      indicated the source of that was somebody in Attorney

11      Stern's office; is that correct?

12  A.   That's correct.

13  Q.   Okay.  And other than that conversation with respect

14      to that value, there's no other dataset or report

15      that you're relying on to reach that $5,000, correct?

16  A.   Correct.

17  Q.   And what is that?  What does the $5,000 represent?

18      What type of care does it represent?

19  A.   It's been referred to me as medical monitoring.  I

20      don't know anything beyond that.

21  Q.   Do you know whether or not any of these four

22      plaintiffs are currently receiving the type of care

23      for which your $5,000 a year would cover?

24  A.   I don't know.

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1  Q.  And you assumed that the cost of care, $5,000 a year,
 2      is the same for all four plaintiffs; is that correct?
 3  A.  Yes, I did.
 4  Q.  Okay.
 5  A.  Well, I should say I did not assume that.  That's the
 6      information that was provided to me.
 7  Q.  And what -- when does that $5,000 per year start?  Is
 8      that the September 1st, 2020, date?
 9  A.  That's correct.
10  Q.  Okay.  And did you ask any questions, again, about
11      the source that Attorney Stern's office had for the
12      $5,000 a year?
13  A.  No.
14  Q.  Okay.  You had mentioned earlier something about a
15      report from Dr. Bithoney; is that correct?
16  A.  I did not see any reports from Dr. Bithoney.  It was
17      my understanding that perhaps Dr. Bithoney -- I don't
18      know this with certainly -- but perhaps Dr. Bithoney
19      was the source of that value of $5,000 per year, but
20      I don't know.
21  Q.  When we look in your report, the $5,000 a year, when
22      you calculate your totals, that's about $1,473,900,
23      correct?
24  A.  Undiscounted.  Yes.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   Q.   Okay.  And that's the same no matter what because

 2        you're applying the same $5,000 per year no matter

 3        the scenario, correct?

 4   A.   And the same remaining life expectancy.  Yes.

 5   Q.   Okay.  If it turned out that that plaintiff only

 6        required $1,000 per year for future medical

 7        monitoring, your calculations would be off, right?

 8   A.   Alternative assumptions would generate an alternative

 9        result.  Yes.

10   Q.   Okay.  If Attorney Stern's office had told you that

11        the cost of medical monitoring for each of these

12        plaintiffs -- and obviously we're looking at the TPPI

13        report but I would apply this to all four of the

14        plaintiffs -- was $10,000 a year, would you have

15        calculated that?

16   A.   If the information provided to me was that the cost

17        per year was that value, yes, that's what I would

18        have used.

19   Q.   Okay.  And what about if it was $20,000 per year?

20   A.   Again, I'm not qualified to make a determination of

21        what those costs of care would be.  So I would rely

22        on the information that was provided to me.

23   Q.   Okay.  So whatever the number is that you were given

24        from Attorney Stern's office, that's what you would
```

Highly Confidential - Gary M. Crakes, Ph.D.

1       plug in and calculate, correct?

2   A.  I would rely on that information.  Yes, I would.

3   Q.  Okay.  Have you done any independent investigation

4       about the cost associated with lead poisoning or

5       medical conditions as a result of lead poisoning?

6   A.  No, that's not my area of expertise.

7   Q.  Okay.  And did you have an understanding that the

8       $5,000 a year would be for injuries that may develop

9       in the future?

10  A.  I don't know.

11  Q.  Okay.  You weren't provided any sort of life care

12      plan for any of these plaintiffs, correct?

13  A.  That's correct.

14  Q.  Okay.  And in other cases where you have child

15      plaintiffs and you're computing cost of care, you

16      have been provided with life care plans, correct?

17  A.  In some cases, I have.  Yes.

18  Q.  With respect to the fringe benefits calculation,

19      which is line III here on page 6 of your report -- do

20      you see that?

21  A.  Roman numeral III, yes.

22  Q.  Okay.  How did you calculate the fringe benefits?

23  A.  I calculated the loss of fringe benefits based on the

24      earnings differential between the unimpaired earnings

Highly Confidential - Gary M. Crakes, Ph.D.

1        and the impaired earnings.  I calculated fringe

2        benefits at 10 percent of that earnings difference.

3        When we think about fringe benefits in the United

4        States for workers on average, we typically think of

5        something much greater than 10 percent.  But I'm not

6        including any of the employment-based, legally

7        mandated benefits, only the discretionary benefits

8        that employers provide on average for health and

9        pension-related benefits.  That's an average for

10       workers in the neighborhood of 12 to 15 percent.  I'm

11       using 10 percent of that earnings difference in my

12       analysis.

13   Q.  Okay.  And are there occupations out there in which

14       fringe benefits would not be provided to an employee?

15   A.  Yes.  These are statistical averages.

16   Q.  Okay.  And you provide that same statistical average

17       for all four bellwether plaintiffs here, correct?

18   A.  I use the same 10 percent of the earnings difference.

19       That's correct.

20   Q.  Okay.  With respect to work life calculations and

21       life expectancy, can you tell us the assumptions that

22       you have with respect to work life and life

23       expectancy?

24   A.  Life expectancy is based upon the table that you

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        referred to earlier, the U.S. life.  I typically use

 2        the year of the incident.  There are life tables that

 3        are more current than 2014.  But since 2014 was the

 4        date of first exposure, those are the life expectancy

 5        tables that I employed with respect to the period of

 6        time over which earning capacity would be

 7        experienced.  I'm sorry.  Did you want me to refer to

 8        these?

 9   Q.   Yeah.  Could you point me here in Exhibit -- let me

10        see.  What did I do -- 18 the values that you

11        assigned specific to Ms. T██ on life expectancy.

12   A.   You would have to scroll down to the detailed tables.

13   Q.   Which tables specifically?

14   A.   Keep going.  I could --

15   Q.   Okay.

16   A.   All right.  Scroll down to the life tables for total

17        population for females.

18   Q.   Okay.

19   A.   I can indicate when you can -- that's males.  If we

20        -- one more page.  So if we stop there, at four years

21        of age, the life expectancy is 77.7 years.  At five

22        years of age, life expectancy is 76.8 years.  At the

23        age of exposure, A███  T██ was 4.9 years of age.

24        So I interpolated between 77.7 and 76.8 and arrived
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        at 76.89 years of life expectancy at 4.9 years of

 2        age.

 3   Q.   And, again, these are national statistics, correct?

 4   A.   Yes.

 5   Q.   Okay.  And are there fact -- individualized factors

 6        that would affect someone's life expectancy?

 7   A.   There can be.  But it's -- life expectancy tables are

 8        for everyone.  It's not just for people in perfect

 9        health.  It's people on average.  So people with a

10        variety of different characteristics, behaviors.  So

11        it's a statistical average.  It's an average life

12        expectancy.

13   Q.   And things such as geography, perhaps income, and the

14        like, could affect life expectancy, correct?

15   A.   Again, it's a statistical average with all of those

16        factors involved in influencing what that average is.

17   Q.   But as it relates to these four bellwether

18        plaintiffs, those individualized type factors were

19        not considered.  You were relying on national

20        statistics, correct?

21   A.   Well, national statistics are one thing.  The

22        averages of all people with a variety of different

23        characteristics would be another.  But yes, they

24        are -- the data are national and it's -- it's all
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        females.

 2   Q.   Okay.  Can you explain to us now how you reached your

 3        work life calculations?

 4   A.   Yes.  I calculated the earning capacity of A▮PPI▮

 5        T▮PPI▮ to age 67 with different starting points,

 6        depending upon her level of education.  So I would --

 7        it's not the same starting point for each of the four

 8        alternatives, the two impaired, the two unimpaired.

 9             I calculated to the age 67 for a variety of

10        reasons.  I consulted tables on work life expectancy,

11        tables on years to final separation from the labor

12        force.  Also currently the age of attainment under

13        current law of the standard social security benefit

14        is age 67.  The maximum benefit is age 70.  Based on

15        all of those inputs, I felt it was reasonable in all

16        scenarios to calculate the earning capacity to age

17        67.

18   Q.   Okay.  You would agree with me that there's

19        circumstances in which an individual either may

20        become ill or may choose to remove themselves from

21        the workforce before the age of 67, correct?

22   A.   Yes.  But keeping in mind that if one, for example,

23        as you put it, chooses to remove themselves from the

24        workforce, they may not be working.  But that doesn't
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1         mean they don't have an earning capacity.

 2    Q.   Okay.  And did you take into consideration the

 3         possibility that any of the bellwether plaintiffs

 4         would be out of work, either voluntarily or

 5         involuntarily, prior to age 67?

 6    A.   Well, as I've indicated, if they're out of work

 7         voluntarily, they would still have an earning

 8         capacity.  If they're out of work involuntarily, I

 9         did not include as a fringe benefit any compensation

10         often associated with such experiences.

11    Q.   And there's certain types of professions or

12         employment that may have, say, greater physical

13         demand on a person, such that people retire earlier

14         than 67, correct?

15    A.   Yes.  These are statistical averages, however.  Some

16         work more, some work less.

17    Q.   Okay.  But as far as individualizing those statistics

18         for these four bellwether plaintiffs, you're using

19         the national averages, correct?

20    A.   I'm relying on the inputs that I've already reviewed.

21    Q.   Okay.  And you've also made assumptions for Ms. TPPI

22         and for all of the bellwether plaintiffs based on

23         their level of educational attainment when they would

24         have started working.  I think you have ages 18, ages
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        23, and ages 25, depending on what level of education

 2        they receive, correct?

 3   A.   That's correct.

 4   Q.   But it's true, is it not, Dr. Crakes, that some

 5        people could start working later than that, despite

 6        their educational attainment, correct?

 7   A.   Yes.  But they would still have an earning capacity.

 8   Q.   Okay.  Do you have -- are you assuming then that each

 9        of these bellwether plaintiffs will remain in the

10        workforce until age 67?

11   A.   I'm assuming they would have had an earning capacity

12        or will have an earning capacity to age 67.

13   Q.   So you're not giving an opinion on the likelihood or

14        probability that they would, in fact, remain in the

15        workforce or remain consistently employed until age

16        67, correct?

17   A.   Once again, it's an estimate of earning capacity.

18   Q.   Okay.  And as far as unimpaired earnings and your

19        calculations of those, are you making any assumptions

20        as to the probability that but for the Flint water

21        crisis, Ms. T PPI or any of these bellwether

22        plaintiffs would have been consistently employed

23        until age 67?

24   A.   Well, I think there are a few parts to that question.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        I'm not assuming that they would be consistently

 2        employed.  I'm assuming they would have had an

 3        earning capacity.

 4              And I think the other part of your question

 5        related to the issues with respect to the degree of

 6        impairment and the injuries that they've suffered.

 7        I'm not qualified to make any assessment of that.

 8        I'm relying on the report from Dr. Krishnan.

 9  Q.    Okay.  With respect to your 3.5 annual rate of

10        growth, can you tell us specifically -- that was

11        applied to all four bellwether plaintiffs, correct,

12        on all four possible outcomes for each bellwether

13        plaintiff?

14  A.    That's correct.

15  Q.    Okay.  And can you tell us how you reached that

16        number and what it represents?

17  A.    I've looked at earnings trends for workers in the

18        United States historically, and certainly it does

19        vary over time.  We are going quite a few years out

20        into the future.  And what I would be more inclined

21        to do is look at the longer term historical record.

22        If we go back 50 years, 60 years at the trends of

23        earnings of workers in the United States, the annual

24        growth rate has been above 4 percent.  I would not
```

Highly Confidential - Gary M. Crakes, Ph.D.

1    rely on just current rates.  In the last -- in 2019,

2    the rate of growth in earnings for workers on average

3    was 3.57 percent.  I'm not relying on just one year.

4    But when I go back and look at the historical record

5    over 50 to 60 years in the past, earnings growth has

6    been above on average 4 percent per year for workers

7    in the United States.  I felt going forward in these

8    analyses that using 3 and a half percent per year was

9    a reasonable assumption.

10   Q.   Thank you.  Would you agree with me that wage

11        increases would depend on where an individual may be

12        geographically located in the U.S.?

13   A.   It can vary.  It varies over time.  What I'm

14        referring to is what it has been on average over that

15        50 to 60-year period historically.  And yes, it

16        varies by -- it varies by occupation.  It varies by

17        geographic region.  But it's an average over time.

18   Q.   Would you agree with me that it varies depending on

19        what type of occupation or educational attainment a

20        person reaches as well?

21   A.   I just indicated that.  Yes.

22   Q.   Okay.  But that was not reflected in your

23        calculations, correct?  You just used a 3.5 percent

24        no matter what the earnings were or either impaired

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1          or unimpaired, correct?

 2   A.     I just indicated it's a statistical average, taking

 3          into consideration that all of those different

 4          factors that you're referring to enter into that

 5          average.  The average over that last 50 to 60 years

 6          is 4.1 to 4.2 percent.  I'm using 3 and a half

 7          percent.

 8   Q.     With respect to Ms. TPPI, your unimpaired earnings

 9          calculations assume either a bachelor's or master's

10          degree, correct?

11   A.     As we've discussed.  Yes.

12   Q.     And your impaired, the highest level of educational

13          attainment would be high school graduate or GED,

14          correct?

15   A.     Yes.

16   Q.     In making these calculations for your unimpaired, did

17          you factor in the cost of higher education, that

18          being for a bachelor's or master's degree?

19   A.     No.

20   Q.     And why did you not do that?

21   A.     I'm calculating the loss of earning capacity to the

22          individuals.

23   Q.     Okay.  That would be a cost that Ms. TPPI would have

24          to undertake, if you assume the unimpaired scenario
```

Highly Confidential - Gary M. Crakes, Ph.D.

1       for a bachelor's or master's degree, would be the

2       cost of obtaining that degree, correct?

3   A.  There may be a cost of attaining it, there may not

4       be.  It would depend upon circumstances.

5   Q.  Okay.  But that's not something you factored into

6       your calculations, correct?

7   A.  Not for the loss of earning capacity.  No.

8   Q.  All right.  I want to go next to Ms. W███, if we

9       could.  And, Dr. Crakes, is Ms. W███ file in front

10      of you?

11  A.  Yes, I have my file for D███ W███ in front of me.

12      Yes.

13  Q.  Okay.  And I'm looking first at Exhibit 9, which is

14      your report.  And I'm also going to mark as

15      exhibit -- I think I'm at 19.

16              THE REPORTER:  I believe it's 20.

17              MS. DEVINE:  20?  Okay.  Thank you.

18              (Exhibit No. 20 marked.)

19  BY MS. DEVINE:

20  Q.  -- the report that we received this morning, which

21      are your calculations and handwritten notes with

22      respect to Ms. W███.  Do you see that?

23  A.  Yes, I do.

24  Q.  Okay.  Can you take us through the opinions that you

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1          reached with respect to Ms. W█PPI█, as reflected in

 2          your report and your outline?

 3   A.     Well, if you want me to look at -- you have the

 4          outline up in front of us at this point.  Should I

 5          refer to it, or would you like me to look at the

 6          summaries that were provided in the report?

 7   Q.     Let's go with the outline first.

 8   A.     Well, as I indicated, I prepared an outline for each

 9          of these cases before beginning the calculations.

10          The information, most of it is as we discussed

11          before.

12                  In this case, based upon the vocational

13          assessment, the calculation of unimpaired earnings is

14          based on earnings as a female with an associate's

15          degree and earnings as a female with a bachelor's

16          degree, the impaired earnings as a female with a 9th

17          to 12th grade education and as a female high school

18          graduate.

19   Q.     And with respect to the assumptions made on

20          unimpaired and impaired earnings, where did you --

21          what is the source of those assumptions?

22   A.     The report from Dr. Krishnan.

23   Q.     Okay.  So we'll look at Exhibit 13, which is

24          Dr. Krishnan's report.  Can you direct me here where
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        Dr. Krishnan explains Ms. W████ unimpaired earning

 2        potential?

 3   A.   On page 9, recommendation No. 2.

 4   Q.   Okay.  And can you point me where, in recommendation

 5        2, Dr. Krishnan states that Ms. W████ unimpaired

 6        earning potential is either an associate's or

 7        bachelor's degree?

 8   A.   She makes reference to two or four-year college

 9        degrees.

10   Q.   Okay.  Is that in the second sentence here?

11   A.   Yes.  And it goes on where I think there's some

12        discussion of magnitude of risk.

13   Q.   Okay.  And is Dr. Krishnan talking about Ms. W████

14        current health status in recommendation No. 2 or her

15        pre Flint water crisis health status?

16   A.   I don't know.  I can't speak for Dr. Krishnan.

17   Q.   Okay.  So if Dr. Krishnan here is referring to

18        Ms. W████ current level of functioning as someone

19        who's able to obtain a two or four-year college

20        degree, did you present calculations for Ms. W████

21        based on impaired values for a two or four-year

22        college degree?

23   A.   No, because I think she goes on to discuss the risk

24        of not achieving those degrees.
```

Highly Confidential - Gary M. Crakes, Ph.D.

 1   Q.   Okay.  Looking now down further in the paragraph.

 2        Can you point directly where you're referring to,

 3        Dr. Crakes?

 4   A.   Well, Dr. Krishnan has a phrasing about two-thirds of

 5        the way down the paragraph, increasing the risk of

 6        dropout, she refers to.  And then she goes on and

 7        refers to the dropout rate would be higher for

 8        someone in a collegiate training center -- setting.

 9        Excuse me.

10   Q.   Okay.  So can you point, Dr. Crakes, where in this

11        report Dr. Krishnan gives an assessment of Ms. W▉PPI▉

12        unimpaired earning capacity?

13   A.   Well, as I think we indicated in the previous report,

14        I consulted with Mr. Stern after reviewing this

15        report, as he did as well.  And where there is

16        reference to the two and four-year college degree

17        potential, it is then referred to in the lower

18        portion of that paragraph that this rate of dropout

19        would be even higher in a collegiate setting.  And

20        for that reason, because of the dropout in

21        post-secondary education situations, the assumptions

22        were made that absent injury, her unimpaired earnings

23        would have been those of a female with an associate's

24        degree or a bachelor's degree.

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   Q.   So you've taken the risk of dropout to assume that

 2        she would, in fact, drop out and not receive a two or

 3        four-year college degree; is that correct?

 4   A.   Well, to clarify, as I've indicated before, the

 5        assumptions that were made were based upon the

 6        description from Dr. Krishnan.  And based upon that

 7        description in consultation with Attorney Stern, the

 8        calculation was determined to be made for unimpaired

 9        earnings as a female with an associate's degree and

10        with a bachelor's degree.

11   Q.   Okay.  And you, again, are not yourself giving an

12        opinion on whether or not Ms. W█PPI█ would have

13        obtained an associate's or bachelor's degree but for

14        the Flint water crisis, correct?

15   A.   That's correct.

16   Q.   And you yourself are not opining that as a result of

17        the Flint water crisis, Ms. W█PPI█ will only obtain

18        a high school education or graduate high school,

19        correct?

20   A.   That's correct.

21   Q.   Okay.  You were not provided any vocational reports

22        for Ms. W█PPI█, correct?

23   A.   I was provided with the report from Dr. Krishnan and

24        the -- as I've indicated earlier, the report that was
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1         not used from Dr. Hoffman.

 2   Q.    But you didn't rely on Dr. Hoffman's report, correct?

 3   A.    No, I did not.

 4   Q.    Can you explain for us the differences between

 5         Ms. T███ and Ms. W███, such that you believe Ms. T███

 6         would be capable of obtaining a bachelor's or

 7         master's degree, whereas Ms. W███ would be only

 8         capable of obtaining an associate's or bachelor's

 9         degree but for the Flint water crisis?

10   A.    I made no assessment or comparative evaluation

11         between these two individuals.  I'm not qualified to

12         do so.  I'm relying on the reports from Dr. Krishnan.

13   Q.    Okay.  And you don't know what data or information

14         Dr. Krishnan based any of the conclusions in her

15         report on, correct?

16   A.    No, I don't.  I'm not qualified in her field.

17   Q.    Okay.  So despite the fact that we have two different

18         unimpaired earning values for Ms. T███ and Ms. W███,

19         you have them both at the same impaired earning

20         capacity, that being either a high school education

21         or GED, correct?

22   A.    Based on the evaluation of Dr. Krishnan, that's

23         correct.

24   Q.    Okay.  So was there some sort of assumption made that
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1          Ms. W███ s lead exposure or cognitive deficits were

 2          more significant than Ms. T███

 3   A.     I don't know.

 4   Q.     Was that an assumption you made in making your

 5          calculations?

 6   A.     Ma'am, I'm not qualified to make that determination.

 7   Q.     Okay.  If we look back at Exhibit 9, can you take us

 8          through the values and calculations that you made

 9          with respect to Ms. W███

10   A.     Yes.  If we go to Exhibits I and IA.

11                  Page 6, Exhibit Roman numeral I is the

12          calculation of the loss of earning capacity with

13          unimpaired earnings as a female with an associate's

14          degree.  That's the first entry in the summary.

15          Impaired earnings are then subtracted as a female

16          with a 9th to 12th grade education and as a female

17          high school graduate.  The discussion of fringe

18          benefits, again, that's included.  And then the

19          continuing cost of care for the remaining future life

20          expectancy based on that $5,000 per year.  And with

21          those values, we arrive at the total net undiscounted

22          economic loss.

23                  If we turn to page 7, Exhibit Roman numeral

24          IA, the same format is provided, this time with
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        unimpaired earnings as a female with a bachelor's

 2        degree.

 3   Q.   And for Ms. W▉▉▉, you're using the median income

 4        values for each year in which you estimate or

 5        calculate earning capacity, correct?

 6   A.   Clarify.  Median earnings values.  Yes.

 7   Q.   And those were the same values that we looked at in

 8        Exhibit 16 for females beginning at age 25, correct?

 9   A.   Median annual earnings values currently would be the

10        same.  The application of those values would result

11        in a different value ultimately because of the period

12        of time over which the 3 and a half percent per year

13        growth would have occurred.  Ms. W▉▉▉ and Ms. T▉▉▉

14        are not the same age.  So that would explain the

15        difference in values.  That percent would be applied

16        for differing numbers of years to the point at which

17        the earning capacity would commence at ages 20 -- 18,

18        20, or 23.

19   Q.   And with respect to Ms. W▉▉▉, you used the same

20        fringe benefit, 10 percent, correct?

21   A.   Yes, I did.

22   Q.   And you used the same future cost of care, $5,000 per

23        year, correct?

24   A.   Same current annual cost of $5,000 applied for a
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1         different remaining future life expectancy.  Yes.

 2    Q.   Okay.  And in determining Ms. W███ life expectancy,

 3         you went through the same process that you did for

 4         Ms. T███; is that correct?

 5    A.   I did.

 6    Q.   Okay.  And that was to take her age and use the

 7         tables that we displayed I think in Exhibit 18 on

 8         life expectancy, correct?

 9    A.   Yes.  She was 5.68 years of age at the time of

10         exposure.  So the calculation would be from -- at

11         five years and at six years, and then interpolating

12         between those two values and arriving at a future

13         life -- at a life expectancy from the date of

14         exposure of 76.12 years.

15    Q.   Did you reach any other opinions with respect to

16         Ms. W███  loss of earning capacity not reflected in

17         the report in Exhibit 9?

18    A.   No.  This is the report of the undiscounted economic

19         loss for D███████  W███.

20    Q.   Okay.  And, again, you did not calculate the

21         unimpaired earning values for Ms. W███ on anything

22         above a bachelor's degree, correct?

23    A.   That's correct.

24    Q.   And you did not calculate any impaired earning
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
1          capacity above a high school graduate, correct?

2   A.     That's correct.

3   Q.     Okay.  And that's based on a decision made in reading

4          Dr. Krishnan's report and in consultation with

5          Attorney Stern?

6   A.     Yes.

7   Q.     And next we're going to look at S███████ report.  So

8          this is Exhibit -- no.  Hold on one second.

9                 So I now have up on the screen Exhibit 10,

10         which is your report for E███ S███████; Exhibit 14,

11         which is Dr. Krishnan's report for E███ S███████; and

12         then what we'll mark as Exhibit 21, which are your

13         file materials produced this morning for E███

14         S██████.

15                (Exhibit No. 21 marked.)

16  BY MS. DEVINE:

17  Q.     And can you explain for us, Dr. Crakes, generally,

18         starting with the outline that I have on the screen

19         here, the opinions that you reached with respect to

20         Mr. E███ S██████.

21  A.     I just want to clarify.  I don't know if it's true

22         for everybody else, but I don't have the outline up

23         on the screen.

24  Q.     Oh, okay.  Thank you.  Can you see that now?
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   A.   Yes.

 2   Q.   Okay.  So this will be Exhibit 21.  This is seven

 3        pages of materials that were provided for E███

 4        S███ .  Okay.  So could you take us through,

 5        Dr. Crakes, the opinions that you reached with

 6        respect to E███ S███

 7   A.   Yes.  The information is provided at the top of the

 8        page, the date of birth of Mr. S███ , as well as

 9        the date of exposure.  The unimpaired earnings were

10        calculated based upon the report from Dr. Krishnan,

11        both as a male with a bachelor's degree and a male

12        with a master's degree; the impaired earnings as a

13        male with a 9th to 12th grade education and a male

14        high school graduate; fringe benefits and the future

15        cost of care similar to as we've been discussing.

16   Q.   Okay.  So in determining the unimpaired earnings for

17        Mr. S███ , is it fair to say, similar to other

18        bellwether plaintiffs, that you relied on

19        Dr. Krishnan's report and your conversations with

20        Attorney Stern?

21   A.   That's correct.

22   Q.   Okay.  So if we look at Exhibit 14, which is

23        Dr. Krishnan's report, can you point to me where in

24        Dr. Krishnan's report she opines that but for the
```

Highly Confidential - Gary M. Crakes, Ph.D.

1       Flint water crisis, Mr. S███PPI███ would have obtained a

2       bachelor's or master's degree?

3   A.  Toward the -- item No. 2 under recommendations is

4       reference to the possibility that his issues may

5       prevent him from completing college or graduate

6       training.

7   Q.  So in recommendation 2, Dr. Krishnan states while an

8       IQ at the current age is not completely predictive of

9       long-term outcome, individuals at this intellectual

10      level are generally able to graduate from high school

11      with a diploma, correct?

12  A.  Yes.

13  Q.  Okay.  So with respect to your impaired values for

14      Mr. S██PPI██, you have him at a 9th to 12th grade

15      education and a GED, correct, as your two different

16      scenarios?

17  A.  The high school graduate and 9th to 12th grade

18      education, based upon the reference made to the

19      potential for high school dropout, elevated risk of

20      high school dropout.

21  Q.  Okay.  Do you know what the risk is, as reflected in

22      Dr. Krishnan's report, for the record?

23  A.  Only what it says in that paragraph.  I don't know

24      anything else, nor am I qualified to make that

Highly Confidential - Gary M. Crakes, Ph.D.

```
1         determination.

2    Q.   Okay.  And she goes on to say that individuals at

3         this intellectual level can, likewise, succeed at a

4         two or a four-year college, correct?

5    A.   Yes.  But then refers to the possibility --

6    Q.   Yes.

7    A.   -- of dropout.

8    Q.   So she goes on to say that there's a moderate

9         possibility that his issues may prevent him from

10        completing college or graduate training, right?

11   A.   That's correct.

12   Q.   Okay.  So she raises issue with his ability to

13        complete college, correct?

14   A.   Well, she refers to a dropout possibility.

15   Q.   Okay.  But you didn't provide any calculations for

16        the fact that E███ would complete some college,

17        correct?

18   A.   No, I did not.  That's correct.

19   Q.   Okay.  And does it say anywhere in Dr. Krishnan's

20        report that E███ would not complete some college?

21   A.   Well, only to the extent, as we were just discussing,

22        about the possibility of dropout.

23   Q.   Dropout of college, correct?

24   A.   Or graduate school.  Yes.
```

Highly Confidential - Gary M. Crakes, Ph.D.

1    Q.    Okay.  But she doesn't reach an opinion in her report

2          that he would not complete some college, only that

3          there's a risk of dropout, correct?

4    A.    She identifies a risk of dropout.  That's correct.

5    Q.    And that risk is 25 to 50 percent, correct?

6    A.    That's the indication.  Yes.

7    Q.    And that's from either college or graduate training,

8          correct?

9    A.    Yes.

10   Q.    Okay.  So fair to say that she estimates a 50 to 75

11         percent chance that EPPI could complete college or

12         graduate training?

13   A.    I don't know.

14   Q.    Okay.  You don't read her report to indicate that?

15   A.    That's not what she's stated, so I'm -- I'm not

16         qualified to -- or speak -- qualified to assess

17         Dr. Krishnan's analysis, nor am I speaking for her.

18   Q.    Okay.  And it was based on your reading of this

19         report and consultation with Attorney Stern that you

20         chose not to present any calculations for the

21         potential that EPPI might complete some college,

22         might complete college or might complete some

23         graduate school or complete graduate school, correct?

24   A.    That's correct.

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   Q.   Okay.  When we look at the report that you have for

 2        Mr. S████, and this is true with respect to the

 3        other bellwether plaintiffs as well, the four

 4        scenarios that you give, that being the impaired

 5        versus unimpaired for a bachelor's degree versus a

 6        master's degree with respect to Mr. S████, the

 7        range in values for your total net undiscounted

 8        economic loss is pretty significant, correct?

 9   A.   Well, depending upon the assumptions made, yes.

10   Q.   Okay.  So, for example, with Mr. S████, the lowest

11        undiscounted economic loss that you assign would be

12        $6,720,000, correct?

13   A.   That is the lowest of the four values.  Yes.

14   Q.   Okay.  And then the highest of the four values that

15        you assign in 11,906,000, correct?

16   A.   Yes.

17   Q.   So that's over a $5 million difference, correct?

18   A.   Yes, it is.

19   Q.   Okay.  And with respect to Mr. S████, and as it

20        applies to all four bellwether plaintiffs, can you

21        assign any degree of certainty which of the four

22        possible scenarios are likely to come to fruition?

23   A.   No.

24   Q.   Were you asked to assign any type of percentage
```

Highly Confidential - Gary M. Crakes, Ph.D.

1       likelihood that one of the four scenarios would

2       occur?

3    A.  No.

4    Q.  What type of information would you need in order to

5       do so?

6    A.  I would not.  These are four alternative scenarios

7       based on alternative assumptions.

8    Q.  And, again, with Mr. S█PPI█ and with all four

9       bellwether plaintiffs, none of these values represent

10      the current -- or the present value, correct?

11   A.  That's correct.  All the values in the report are

12      undiscounted.

13   Q.  So we'll look at Ms. V█PPI██ next.  Actually, I

14      wanted to just clarify one thing on Mr. S█PPI█.

15      With respect to life expectancy, did you use the same

16      methodology that you applied to the previous two

17      plaintiffs, W█PPI█ and T█PPI█

18   A.  Yes.

19   Q.  Okay.  And with respect to calculating work life, did

20      you use the same methodology applied to T█PPI█ and

21      W█PPI█

22   A.  Yes.

23   Q.  Okay.  And here, because Mr. S█PPI██ is a male, you

24      used slightly different values in determining what

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        the impaired and unimpaired earnings would be over

 2        Mr. S████ lifetime, correct?

 3   A.   Yes.  The median annual earnings values, as I've

 4        indicated, vary by age, race, and gender.  So there

 5        would be a different set of median annual earnings

 6        values for men than there would be for women.

 7   Q.   Okay.  And here you applied the different median

 8        values based on age and gender, correct?

 9   A.   And education.  Yes.

10   Q.   Okay.  And the values for Mr. S████ would be

11        slightly higher based on the statistics provided in

12        Exhibit 17 going all the way -- this is 35 to 44.

13        But it begins at 25 and goes up to 67, correct?

14   A.   That's correct.

15   Q.   Okay.  And those values are reflected in the charts

16        that you've produced in Exhibit 21; is that correct?

17   A.   Yes.

18   Q.   Okay.  And, again, you used a 3.5 rate of growth for

19        Mr. S████, correct?

20   A.   Yes, I did.

21   Q.   Okay.  Okay.  Now we can turn to Ms. V████.  So

22        what I have on the screen here will be Exhibit 22.

23             (Exhibit No. 22 marked.)

24
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   BY MS. DEVINE:

 2   Q.   These are your notes and spreadsheets that were

 3        produced this morning with respect to

 4        Ms. V███████.  Do you see that on the screen?

 5   A.   Yes, I do.

 6   Q.   Okay.  And then I also have before you Exhibit 11,

 7        which is your appraisal of economic loss for R███

 8        V███████ and then Exhibit 15, which is

 9        Dr. Krishnan's report for Ms. Va███████.  Do you

10        see that?

11   A.   Yes.

12   Q.   Okay.  Starting with your outline for

13        Ms. V███████ can you summarize the opinions that

14        you reach as reflected in this outline and then in

15        your report.

16   A.   Yes.  So the outline I prepared prior to beginning

17        the calculations of economic loss have R███

18        V███████s name, gender, and her date of birth, as

19        well as the date of exposure.  The unimpaired

20        earnings values are calculated based upon the report

21        of Dr. Krishnan, are as a female with an associate's

22        degree and a female with a bachelor's degree.  The

23        impaired earnings are calculated based on the report

24        of Dr. Krishnan as a female with a 9th to 12th grade
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1           education and as a female high school graduate.  The

 2           fringe benefits and future cost of care assumptions

 3           are the same as in the prior reports.

 4    Q.     Okay.  And you have, as you stated, Ms. V████████

 5           as obtaining an associate's or a bachelor's degree,

 6           correct?

 7    A.     Yes, I do.

 8    Q.     And that's the same degree that you used in your

 9           calculations for Ms. W████, right?

10    A.     That's correct.

11    Q.     Okay.  And are you opining that Ms. V████████ --

12           excuse me.  Your impaired values, however, are the

13           same for Ms. V████████ as it is for all four

14           bellwether plaintiffs, that being as a result of the

15           lead exposure, she'll only either have some high

16           school education or obtain a GED or high school

17           graduate, correct?

18    A.     A 9th to 12th grade and high school graduate, of

19           course, for Mr. S█████, those values are applied as

20           a male, whereas for the other three cases, they're as

21           a female.

22    Q.     Are you giving any opinion on the -- on

23           Ms. V████████ lead exposure, that being that it

24           only dropped her from an associate's or bachelor's to
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        a 9th grade education or GED, versus Mr. S[PPI]   or

 2        Ms. T[PPI] who went from bachelor's or master's down

 3        to the same values of 9th to 12th grade or GED?

 4   A.   If I understand the question correctly, I'm not

 5        qualified to make that determination.  I'm relying on

 6        the report of Dr. Krishnan.

 7   Q.   Okay.  So let's take a look at Dr. Krishnan's report

 8        for Ms. V[PPI]       Can you point to me where in

 9        Ms. -- in Dr. Krishnan's report she speaks to

10        Ms. V[PPI]        unimpaired earning potential?

11   A.   It would be under recommendations, No. 2.

12   Q.   Okay.  So No. 2 states, while IQ at the current age

13        is not completely predictive of long-term outcome,

14        individuals at this intellectual level are generally

15        able to graduate from high school with a diploma,

16        correct?

17   A.   As stated, yes.

18   Q.   She also says they can also succeed at two or

19        four-year college education, although her cognitive

20        deficits do likely increase the likelihood of failure

21        to complete college level training and increase the

22        risk of R[PPI] working below her potential, such as

23        preventing success in a skilled vocation.  Do you see

24        that?
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
1   A.   Yes, I do.

2   Q.   Okay.  So which sentence in this recommendation 2

3        sets Ms. V[PPI]          unimpaired earning capacity to

4        be that of someone with an associate's or bachelor's

5        degree?

6   A.   Dr. Krishnan identified two-year or four-year college

7        education, but then indicated there's an increased

8        likelihood of failure to complete college level

9        training.  So based on that statement and my

10       consultation with Attorney Stern, I calculated her

11       unimpaired earnings with an associate's degree and

12       with a bachelor's degree.

13  Q.   Okay.  So you understand this sentence to be speaking

14       to her health condition before or after the Flint

15       water crisis?

16  A.   I don't know.

17  Q.   Okay.  And Dr. Krishnan opines, at least in this

18       recommendation, does she not, that individuals at

19       this level are generally able to graduate from high

20       school with a diploma, correct?

21  A.   Yes, that is indicated.

22  Q.   Unlike the other reports, Dr. Krishnan does not speak

23       to cognitive deficits that would impact

24       Ms. V[PPI]          ability to complete high school,
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1       does she?

 2   A.  No.  Other than her indication at the conclusion of

 3       that paragraph, that there's an increased risk of her

 4       working below her potential.

 5   Q.  Okay.  But she doesn't say anything about an impaired

 6       inability to complete high school, correct?

 7   A.  No.  But other than indicating that she has a risk of

 8       working below potential.

 9   Q.  Okay.  Well, she's stated in other reports when she

10       sees that risk, right?

11   A.  She has different ways of describing these things in

12       the circumstances of each case.  So I'm not looking

13       for any similarity between the reports.  Based on

14       what her conclusions and recommendations were and my

15       consultation with Attorney Stern, the determination

16       was made to estimate her impaired earnings, both with

17       a 9th to 12th grade education and as a high school

18       graduate.

19   Q.  But it's fair to say, Dr. Crakes, that she doesn't

20       call in to question, specifically in this

21       recommendation, a risk of dropout from high school,

22       correct?

23   A.  Not specifically.  That's correct.

24   Q.  Okay.  Nonetheless, you did provide a calculation,
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        and as one of your four outcomes the -- or two of the

 2        four outcomes, that she would only obtain some high

 3        school education, correct?

 4   A.   A 9th to 12th grade education.  That's correct.

 5   Q.   Okay.  And that was made based on your review of this

 6        report, as well as your consultation with Attorney

 7        Stern?

 8   A.   Yes.

 9   Q.   Okay.  And you indicated that the last sentence of

10        this section discussing her working below her

11        potential had some sort of significance to you.

12   A.   I just indicated that there was -- that that was a

13        statement that Dr. Krishnan had made.

14   Q.   Okay.  And what -- how did that play into your

15        calculations or your assumptions in making your

16        calculations?

17   A.   As I think I've indicated, based upon my review and

18        my consultation with Attorney Stern, we decided to

19        provide not only the earnings as a female high school

20        graduate in her impaired condition but also earnings

21        as a female with a 9th to 12th grade education.

22   Q.   Okay.  With respect to your unimpaired

23        calculations -- excuse me.  With respect to your

24        impaired calculations, Dr. Krishnan also says in her
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        report that individuals such as Ms. V█████can

 2        also succeed at a two or four-year college education,

 3        correct?

 4   A.   Yes.

 5   Q.   And she goes on to say that her cognitive deficits do

 6        increase the likelihood of failure to complete

 7        college level training, correct?

 8   A.   Yes.

 9   Q.   But she's not saying here that Ms. V████████

10        wouldn't complete some college, correct?

11   A.   Not that I'm aware of.  But that's why the two

12        alternatives were provided.

13   Q.   Okay.  Well, you didn't provide any calculations that

14        Ms. V██████ would complete some college.

15   A.   No, I did not.

16   Q.   Okay.  And as I just stated, or just asked you,

17        nowhere in Dr. Krishnan's report does she say that

18        Ms. V██████ wouldn't complete some college,

19        correct?

20   A.   That's correct.

21   Q.   Okay.  In fact, she says that individuals at

22        Ms. V███████ level of cognition can complete a

23        two or four-year college education, correct?

24   A.   Yes.  And then goes on to say the effect of her
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1       cognitive deficits.

 2   Q.  Would affect her ability to complete college,

 3       correct?

 4   A.  Yes.

 5   Q.  But it doesn't say it would affect her ability to

 6       attend some college, correct?

 7   A.  That's correct.

 8   Q.  Okay.  And if we looked at those charts that we had

 9       in Exhibit 16, there are values you could have used

10       for Ms. V█PPI█████ and for each of the four

11       bellwether plaintiffs for impaired earnings with some

12       college, correct?

13   A.  There's a category of some college.  That's correct.

14   Q.  Okay.  And that's not a category that you used or

15       presented in any four of your reports, correct?

16   A.  That's correct.

17   Q.  All right.  With respect to Ms. V█PPI█████, you used

18       the same methodology in determining work life,

19       correct?

20   A.  The period of time of her earning capacity.  Yes, I

21       did.

22   Q.  Okay.  And you used the same methodology in

23       determining life expectancy, correct?

24   A.  Yes, I did.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   Q.    You used the same value in determining fringe

 2         benefits, correct?

 3   A.    The same methodology, yes.

 4   Q.    Okay.  And you used the same methodology in applying

 5         future cost of care, correct?

 6   A.    That's correct.

 7   Q.    And if we look at your calculations for

 8         Ms. V███PPI████, can you take us through here your

 9         methodology and the values you ascribed to these four

10         scenarios.

11   A.    Yes.  As I indicated in the other cases, the

12         spreadsheets are provided on pages 2 and 3.  The

13         unimpaired and impaired earnings are based upon the

14         median annual earnings values for each age increment,

15         with the adjustment every year by 3 and a half

16         percent as we move out into the future.  And those

17         values are then presented in the report, Exhibits

18         Roman numeral I and IA.

19   Q.    So if we look at Roman numeral I, the lowest value

20         for impaired earnings that you've calculated for

21         Ms. V███PPI████ is $3,487,323, correct?

22   A.    Yes.  I believe you said the lowest value for

23         impaired earnings.  Actually, that's the lowest value

24         for the undiscounted economic loss.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   Q.   Thank you.  And the highest value for undiscounted

 2        economic loss that you computed for Ms. V███████

 3        was $8,217,806, correct?

 4   A.   That's correct.

 5   Q.   And, again, there's a gap between the low and high

 6        range of calculations you've presented of nearly

 7        $5 million?

 8   A.   That's correct.

 9   Q.   And are you able to assign any percentage of

10        certainty to any of these four outcomes?

11   A.   No.  There are four alternative scenarios presented

12        as such.

13   Q.   Okay.  And, again, they're based on the assumptions

14        that you are provided, correct?

15   A.   The information that was provided to me and the

16        assumptions made, some of those in consultation with

17        Attorney Stern.

18   Q.   Okay.  And you weren't asked to assign any percentage

19        of likelihood for Ms. V███████ for any of these

20        four scenarios, correct?

21   A.   That's correct.

22   Q.   And with respect to these four values, you have not

23        calculated their present value, correct?

24   A.   The values in my report are all undiscounted.
```

Highly Confidential - Gary M. Crakes, Ph.D.

1  Q.  And I neglected to ask you similar questions for

2      Ms. T█PPI█ and Ms. W█PPI█  But the -- I'll pull them up

3      real quick, just for the record here.

4            If you look at Exhibit 8, which is your

5      report for Ms. T█PPI█ the lowest value that you've

6      assigned for her undiscounted economic loss is

7      $5,522,513, correct?

8  A.  Yes.

9  Q.  Okay.  And the highest that you've calculated is

10     $8,493,798, correct?

11 A.  Yes.

12 Q.  Okay.  And that's a difference of almost $3 million,

13     right?

14 A.  Yes, it is.

15 Q.  Okay.  And you did not -- you cannot here today

16     assign any percentage of certainty to the outcome of

17     one of any four scenarios that you've provided,

18     correct?

19 A.  Correct.  There are four alternative scenarios that

20     are being presented.

21 Q.  And you weren't asked to do that, correct?

22 A.  That's correct.

23 Q.  And similarly, Ms. T█PPI█ losses have not been

24     calculated to present value, correct?

Highly Confidential - Gary M. Crakes, Ph.D.

1  A.  All the values in my report are undiscounted.  That's

2      correct.

3  Q.  Okay.  And just briefly, Ms. W███, which is

4      Exhibit 9 -- and I apologize for not doing this

5      before -- you have your net undiscounted loss.  The

6      lowest value you have for her is $2,910,953, correct?

7  A.  That's correct.

8  Q.  Okay.  And then the highest that you have for her is

9      $6,869,306, correct?

10 A.  That's correct.

11 Q.  Okay.  And that's a difference of about $4 million,

12     correct?

13 A.  Approximately, yes.

14 Q.  Okay.  And, again, you were not -- you cannot, as you

15     sit here today, assign any percentage of certainty to

16     any of these four outcomes, correct?

17 A.  That's correct.  There are four alternative scenarios

18     presented as such.

19 Q.  Okay.  And these four values are not calculated to

20     their present value, correct?

21 A.  That's correct.  The values in the report are all

22     undiscounted.

23          MS. DEVINE:  All right.  Let's go off

24          the record for a minute, Robert.

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1                    VIDEOGRAPHER:  The time is 11:54 a.m.,

 2            and we're off the record.

 3                 (Recess taken.)

 4                    VIDEOGRAPHER:  The time is 1:02 p.m.,

 5            and we're on the record.

 6   BY MS. DEVINE:

 7   Q.   Good afternoon, Dr. Crakes.

 8   A.   Good afternoon.

 9   Q.   I wanted to follow up on a little bit of your

10        testimony this morning, beginning with the age at

11        which you estimate each of the bellwether plaintiffs

12        will stop working, which is age 67, correct?

13   A.   The age to which they will have an earning capacity.

14        Yes.

15   Q.   Correct.  And you used that for each of the

16        bellwether plaintiffs across the board, correct?

17   A.   Yes.

18   Q.   Okay.  And can you explain for us again, and I

19        apologize if you did already, why you used age 67 for

20        each of these four bellwether plaintiffs and where

21        that value comes from.

22   A.   Well, I indicated that I have looked at tables for

23        work life expectancy, tables for years to final

24        separation from the labor force.  In addition to
```

Highly Confidential - Gary M. Crakes, Ph.D.

1          that, the current law and the age of attainment of

2          standard social security benefit is 67, maximum

3          benefit of 70.  I felt based on all of those inputs,

4          I would calculate the economic loss of earning

5          capacity to age 67.

6    Q.    Okay.  And when you do work in the smaller percentage

7          of cases that you do for defendants, do you always

8          use age 67 as the date at which the plaintiffs will

9          cease having an earning capacity?

10   A.    I'm sorry.  When I do work for defendants?

11   Q.    Yes.

12   A.    My methodologies are comparable across plaintiffs'

13         and defendants' cases.  I will say that in recent

14         years, I have been adjusting up from age 65 to age

15         67, because the tables are showing that people are

16         working longer and the age of the standard benefit

17         for social security has increased to age 67.  So in

18         some prior cases have I used 65?  Yes.  Am I

19         adjusting that upward in recent, the last year and a

20         half or so to 67?  Yes, I have.

21   Q.    Okay.  And when you say to age 67, how do you factor

22         in breaks from the workforce that any of these

23         bellwether plaintiffs may take, whether it be for a

24         week or a month?  How does that factor into your

Highly Confidential - Gary M. Crakes, Ph.D.

1        analysis.

2   A.   Well, when we're talking about any type of separation

3        from the labor force, where one decides for a period

4        of time, for example, not to work, to care for a

5        family member of some sort, if one makes that choice

6        as a personal choice, it doesn't mean they still

7        don't have an earning capacity.

8   Q.   But they wouldn't -- go ahead.  Sorry.

9              (Reporter clarification.)

10             THE WITNESS:  Some situations where

11          there is an involuntary separation from

12          the labor force, the forms of compensation

13          that are available to people during those

14          periods of time are not something that I

15          include as a fringe benefit.

16  BY MS. DEVINE:

17  Q.   Okay.  Have you -- you indicated you looked at some

18       work life expectancy tables; is that correct?

19  A.   Yes.

20  Q.   Were those provided or cited at all in your report?

21  A.   No, they were not.  If you would like copies of those

22       tables, I can provide them to Attorney Stern, with

23       his approval.

24             MS. DEVINE:  Okay.  I'm going to

Highly Confidential - Gary M. Crakes, Ph.D.

1           mark -- Trisha, could you tell us what

2           exhibit we're at?

3                THE REPORTER:  23.

4                MS. DEVINE:  Okay.

5                THE WITNESS:  I'm sorry to say, can I

6           have a break for just three minutes?

7                MS. DEVINE:  Absolutely.  Let's go

8           off the record.

9                THE WITNESS:  Thank you.

10               VIDEOGRAPHER:  The time is 1:06 p.m.,

11          and we're off the record.

12               (Recess taken.)

13               VIDEOGRAPHER:  The time is 1:11 p.m.,

14          and we're on the record.

15               THE WITNESS:  I apologize, by the

16          way, my -- for the intermission.

17               MR. STERN:  Not a problem.

18   BY MS. DEVINE:

19   Q.   Sorry about that.  I had to step away from the

20        computer for a second.

21   A.   You missed my apology.

22               MS. DEVINE:  Okay.  All right.  We

23          can go back on, Robert, if we aren't

24          already.

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1                   VIDEOGRAPHER:  Sorry.  I just put us

 2           on the record a moment ago.

 3                   MS. DEVINE:  Okay.  Thank you.

 4    BY MS. DEVINE:

 5    Q.   Dr. Crakes, before we broke, I had asked you if you

 6         reviewed work life expectancy tables in connection

 7         with your report, and you indicated that you did,

 8         correct?

 9    A.   Oh, yes, I did.  These were the tables that I

10         reviewed.

11    Q.   The ones that I have up on the screen here?

12    A.   Yes.

13    Q.   Okay.  And this will be Exhibit 23.

14                   (Exhibit No. 23 marked.)

15    BY MS. DEVINE:

16    Q.   These, Dr. Crakes, are not cited in your report,

17         correct?

18    A.   That's correct.

19    Q.   Okay.  And they were not provided as part of your

20         file, correct?

21    A.   That's correct.

22    Q.   Okay.  And can you tell me in Exhibit 23 here what

23         this article and these tables are?

24    A.   Well, they're the most current tables for work life
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        expectancy.  They were published in the Journal of

 2        Forensic Economics.  And there's an article and then

 3        there are tables at the end of the article that

 4        distinguish between men and women by age and level of

 5        educational attainment, the years of remaining

 6        activity in the labor force over one's lifetime.

 7   Q.   And what type of factors does work life expectancy,

 8        maybe you just said that, take into account when

 9        computing lost earnings?  Yep.  Go ahead.

10   A.   The tables differentiate by gender, age, and level of

11        education.

12   Q.   Okay.  And can you explain to what degree your review

13        of these tables factored into your assumption that

14        each of these four bellwether plaintiffs would work

15        until age 67?

16   A.   I want to repeat again, I'm assuming they would have

17        had an earning capacity to age 67, not that they

18        necessarily would have worked until age 67.  Work

19        life expectancy tables show the number of years that

20        one will remain in the labor force over one's

21        lifetime.  They are not additive to age, which is a

22        mistake that sometimes will be made.  So that when

23        you see a work life expectancy value for someone of a

24        particular age and you then add it to their age,
```

Highly Confidential - Gary M. Crakes, Ph.D.

1          that's really not what they're reflecting.  They're

2          reflecting over the remainder of one's lifetime, the

3          number of years of activity in the labor force.

4                    So that some people may exit the labor

5          force for a period of time and reenter.  That would

6          not necessarily mean that we would take that period

7          of time and suggest that they didn't have an earning

8          capacity.  So that we can't really add the work life

9          expectancy values to a person's age.

10                   But in addition to that, if I had relied

11         just on these tables, comparing the work life

12         expectancy of a male or female with less than a high

13         school -- or a 9th to 12th grade education, would

14         mean there would be more years when there would be no

15         impaired earnings.  And for some of these

16         alternatives, the loss might actually be greater.

17    Q.   You would agree with me that using these work life

18         expectancy tables is common in your profession,

19         correct?

20    A.   Some use them.  Yes.  And some misinterpret them as

21         well.

22    Q.   Okay.  And am I correct to take away from your

23         testimony that these tables are just one factor that

24         you use to determine earning capacity, age of earning

Highly Confidential - Gary M. Crakes, Ph.D.

1       capacity?

2  A.   Yes.  The years to final separation article, which

3       appears in the same journal, by the way, and the same

4       edition of the journal in this particular volume, the

5       years to final separation from the labor force is the

6       number of years that someone will go and leave the

7       labor force and never return.  Those numbers are

8       additive to age, but not to work life expectancy

9       numbers.

10              But nonetheless, just as an illustration,

11      the work life expectancy of a male, like ▮PPI

12      S▮PPI   , with a bachelor's degree would be about 40

13      years from age 23.  The years from age 18 to -- with

14      the 9th to 12th grade education would be about 29.7

15      years.  So that just as an illustration, you would

16      have over ten years of complete and total earnings

17      loss, if one had made the assumption of using those

18      tables, rather than what I've done, which is

19      calculate the impaired earnings to age 67 as well.

20  Q.   We spoke earlier about departures from the workforce,

21      whether it's voluntary or involuntary.  And am I

22      correct to assume from your testimony that that

23      really has no effect on your calculations because

24      you're calculating the capacity, not whether or not

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        someone actually did or did not leave the workforce?
 2   A.   Well, I'm not calculating actual earnings.  We're
 3        calculating earning capacity.
 4   Q.   Correct.
 5   A.   The capacity of an individual to experience earnings.
 6        With that qualification, yes.
 7   Q.   Okay.  So if someone goes out on a leave or maternity
 8        or paternity or anything like that, that's not really
 9        factored into the capacity calculations that you're
10        making, correct?
11   A.   Well, if someone takes time out of the labor force
12        for child raising, it doesn't mean they didn't have
13        an earning capacity.  They just chose not to exercise
14        it.
15   Q.   Okay.  But for purposes of your calculations, you're
16        not factoring that in one way or another, correct?
17   A.   Correct.  For earning capacity, that's correct.
18   Q.   Just jumping around a little bit here.  I know we
19        spoke a little bit earlier that you're not offering
20        any vocational opinions in this case, correct?
21   A.   As I think we've indicated on numerous times.  Yes.
22   Q.   Okay.  And you did not speak to any of the four
23        bellwether child plaintiffs, correct?
24   A.   No.
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   Q.   Okay.  And you didn't speak to their parents either,
 2        correct?
 3   A.   I should say not to my knowledge, no.  I have not
 4        spoken to them, to my knowledge.
 5   Q.   Okay.  And were you provided with a copy of their
 6        deposition transcripts?
 7   A.   No.
 8   Q.   Okay.  Were you told by anyone that you were not able
 9        to speak to the plaintiffs in this case?
10   A.   No.
11   Q.   Okay.  And did you speak to any, other than the
12        parents of the four bellwether plaintiffs, any family
13        members, medical providers, or educational providers?
14   A.   Not to my knowledge.
15   Q.   Okay.  And your calculations then, those are based on
16        Dr. Krishnan's report in conjunction with,
17        essentially, nationwide profiles of people with
18        similar age, education, or occupation, correct?
19              MR. STERN:  Objection.  Asked and
20           answered.
21              THE WITNESS:  Yes.
22   BY MS. DEVINE:
23   Q.   Okay.  Other than Dr. Krishnan's report, there are no
24        individualized factors for any of these four
```

Highly Confidential - Gary M. Crakes, Ph.D.

1       bellwether plaintiffs that you took into account,

2       correct?

3   A.  Well, to clarify, certainly age and gender.  But

4       other than that, other than what Dr. Krishnan

5       indicated, no.

6   Q.  Okay.  And we went through Dr. Krishnan's reports for

7       each of the four bellwether plaintiffs, and you

8       directed me to the recommendations section No. 2 as

9       the primary source for your calculations; is that

10      correct?

11  A.  Yes.

12  Q.  Other than those one to two sentences in

13      Dr. Krishnan's recommendations section, is there any

14      other information in that report which you relied

15      upon in reaching your conclusions or calculations?

16  A.  Well, I don't know how many sentences there were in

17      each recommendation.  And I would imagine to some

18      extent, what is in the report is the foundation for

19      those recommendations.  But other than that, no.

20  Q.  Okay.  But in relaying your opinions here today, are

21      there any other sections of the report that you rely

22      upon in reaching your calculations?

23  A.  Only to the extent that they went into determining

24      those recommendations.

Highly Confidential - Gary M. Crakes, Ph.D.

1    Q.    Okay.  In Dr. Krishnan's report, in the sections you

2          were able to point me to, with respect to her

3          statements on the type of educational attainment each

4          bellwether plaintiff may or may not reach, what data

5          did Dr. Krishnan, herself, rely upon?

6    A.    I don't know.

7    Q.    Okay.  And I think I asked you this, if you were

8          provided Dr. Krishnan's deposition transcript.  And

9          you said you were not, correct?

10   A.    That's correct.

11   Q.    Are you aware that Dr. Krishnan gave testimony that

12         her conclusions on educational attainment were rough

13         approximations, not based on any data or statistics?

14   A.    I don't know.

15   Q.    Okay.  And if she was not able to give an opinion on

16         educational attainment on each of those four

17         bellwether plaintiffs, that's not something you can

18         do for us, correct?

19   A.    I think we've established that.  Yes.

20   Q.    Okay.  We spoke a little bit about your familiarity

21         with vocational experts and vocational reports, and I

22         just want to flesh that out a little bit for the

23         record.

24               You would agree with me that customarily,

Highly Confidential - Gary M. Crakes, Ph.D.

1      based on your review of vocational reports in the

2      past, those reports tend to be pretty individual

3      specific in terms of each of the plaintiffs, correct?

4              MR. STERN:  Object to form.

5              THE WITNESS:  I'm not sure what you

6          mean by individual specific.

7    BY MS. DEVINE:

8    Q.  Sure.  So it's not uncommon for vocational reports to

9         include information about a plaintiff's current

10        academic level of achievement?

11   A.  Well, if we're talking about someone who was in the

12        workforce, those would be -- that would be part of

13        the biographical data that would be provided.  That's

14        difficult to do with a child.

15   Q.  What about a child who has an academic record, albeit

16        limited?

17   A.  I don't know.  That's not my -- as I indicated,

18        that's not my area of expertise.

19   Q.  Okay.  Sometimes vocational reports will include

20        information about individual medical history,

21        correct?

22   A.  Some may, some may not.

23   Q.  Some may include information about the geographic

24        area in which that plaintiff resides, correct?

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1   A.   Again, some may, some may not.

 2   Q.   Okay.  And some vocational experts, as well, will

 3        conduct clinical interviews with plaintiffs.  You've

 4        seen that in reports before, correct?

 5   A.   I don't know that I recall that.  I may have.  I'm

 6        not recalling it as I sit here.

 7   Q.   Okay.  And those clinical interviews and information

 8        gathering would include or could include information

 9        about the parents' educational level and their

10        occupations, correct?

11   A.   That's possible.

12   Q.   Okay.  It could include information on a child's

13        report cards or test scores, correct?

14   A.   It's possible.  Again, that's not my area of

15        expertise.

16   Q.   Understood.  I'm just fleshing this out for the

17        record.  I understand, Dr. Crakes.

18             It could include -- vocational reports

19        could include things such as whether or not a child

20        has earned any certificates, is on the honor roll,

21        things like that, correct?

22             MR. STERN:  Objection to form and

23             foundation.  Dr. Crakes has answered

24             repeatedly that this is not his expertise,
```

Highly Confidential - Gary M. Crakes, Ph.D.

```
1              and you continue to ask him questions

2              about a topic that he claims he's not an

3              expert on.

4    BY MS. DEVINE:

5    Q.   All right.  I'll ask it this way, Dr. Crakes.  You

6         didn't consider information about how each of these

7         bellwether children were doing in school, if they

8         received any certificates, were on the honor roll,

9         correct?

10              MR. STERN:  Objection.  Asked and

11         answered.

12              THE WITNESS:  No.

13   BY MS. DEVINE:

14   Q.   Are you familiar with the PEEDS-RAPEL methodology?

15   A.   No.

16   Q.   Okay.  Do you know what that is?

17   A.   No.

18   Q.   Okay.  Would you agree with me, Dr. Crakes, that a

19         parental educational level is an important predictor

20         of the child's educational level and behavioral

21         outcomes?

22              MR. STERN:  Objection to form and

23         foundation.

24              THE WITNESS:  I'm not someone who
```

Highly Confidential - Gary M. Crakes, Ph.D.

1              makes those types of assessments.

2    BY MS. DEVINE:

3    Q.   Okay.  And you didn't consider in your assumptions or

4         calculations what each of these bellwether parents

5         did for work or what their educational levels were,

6         correct?

7    A.   I did not make --

8              MR. STERN:  Object to form.  Object

9         to form, foundation.  Asked and answered.

10             THE REPORTER:  I'm sorry, I didn't

11        hear an answer.

12             MR. STERN:  He said no, I did not,

13        was his answer.

14             THE REPORTER:  Thank you.

15   BY MS. DEVINE:

16   Q.   Do you know if Dr. Krishnan looked at or considered

17        in reaching her conclusions each of these four

18        bellwether parents' educational attainment or

19        occupation?

20   A.   I don't know.

21   Q.   Do you know or did you consider in reaching your

22        opinions and your calculations any statistics about

23        the number of individuals in Flint who receive

24        college degrees or master's degree, either before or

Highly Confidential - Gary M. Crakes, Ph.D.

1        after the Flint water crisis?

2   A.   No.

3   Q.   Okay.  Do you know if Dr. Krishnan relied on any data

4        like that?

5   A.   I don't know.

6   Q.   Okay.  Did you consider or review as part of your

7        opinions or calculations in this case the type of

8        degree programs that were -- are available in Flint

9        for future children?

10  A.   No.

11  Q.   Did you review or consider what percentage of people

12       growing up in Flint will ultimately live or work in

13       Flint or end up leaving the area?

14  A.   No.

15  Q.   We spoke earlier, Dr. Crakes, about Dr. Krishnan's

16       reference to unskilled labor in her report.  Do you

17       recall that?

18  A.   Something to that effect.  Yes.

19  Q.   Okay.  I'm going to pull up one of her reports just

20       so we can have the language here.  So I'm showing you

21       Exhibit 12.  This is page 7 of the report.  Can you

22       see that?

23  A.   Yes, I'm trying to get it -- the copy in my file.

24  Q.   Oh, okay.  This is T PPI  report.

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1    A.    Yes, I have it.

 2    Q.    Okay.  And if we look at the bottom of recommendation

 3          No. 2 --

 4    A.    Yes.

 5    Q.    -- there's some language here about may prevent

 6          completion of college or graduate training.  We

 7          talked about that.  And may prevent her from success

 8          in a skilled vocation, that is, reducing her to

 9          simple, unskilled work below her potential if her

10          learning and attention issues were not a concern.

11                   Do you see that?

12    A.    Yes, I do.

13    Q.    Okay.  How did that -- separate and aside from any

14          statements Dr. Krishnan has made about completion of

15          college or high school, that last three lines, how

16          did that factor into your assumptions or calculations

17          in this case?

18    A.    Well, the assumptions that I made in conjunction with

19          Attorney Stern did not -- were not based on that

20          statement.

21    Q.    Okay.  So the fact that Dr. Krishnan references

22          simple, unskilled work, that didn't go into the

23          assumptions that you made at all?

24    A.    That's correct.
```

Highly Confidential - Gary M. Crakes, Ph.D.

1  Q.   Okay.  Do you know what she's referencing there when

2       she says simple, unskilled work, what types of jobs

3       that could be?

4  A.   No, I don't.

5            MR. STERN:  Object to form and

6         foundation.

7  BY MS. DEVINE:

8  Q.   Do you know what type of income potential there is

9       for someone who is employed in simple, unskilled

10      work?

11 A.   All I would know is that typically it would be less

12      than skilled work.  Otherwise, I don't know.

13 Q.   Do you know the availability of simple unskilled jobs

14      in the United States?

15           MR. STERN:  Object to form and

16        foundation.

17           THE WITNESS:  No, I don't.

18 BY MS. DEVINE:

19 Q.   Do you know any data or statistics that Dr. Krishnan

20      relied upon in making that statement in her report?

21           MR. STERN:  Object to form and

22        foundation.

23           THE WITNESS:  As I think I've

24        indicated a number of times, I don't know

Highly Confidential - Gary M. Crakes, Ph.D.

1            how Dr. Krishnan performed her analysis.

2    BY MS. DEVINE:

3    Q.   Okay.  Let me pull this off the screen for a second.

4         Dr. Crakes, you're not qualified, nor are you stating

5         today whether or not any preexisting conditions

6         played a role in any of these four bellwether

7         plaintiffs' capacity to earn, correct?

8              MR. STERN:  Object to form and

9              foundation.

10             THE WITNESS:  That's correct.

11   BY MS. DEVINE:

12   Q.   And you're not qualified or offering any opinions

13        today about whether or not any alternate lead

14        exposure, that being not from the Flint water crisis,

15        played any role or plays any role in any of these

16        four bellwether plaintiffs' ability or capacity to

17        earn, correct?

18             MR. STERN:  Object to form.

19             THE WITNESS:  That's correct, nor

20             would I be qualified to do so.

21   BY MS. DEVINE:

22   Q.   Okay.  With respect to these four bellwether

23        plaintiffs, did you review or consider, in reaching

24        your opinions or calculations, what the lead levels

Highly Confidential - Gary M. Crakes, Ph.D.

```
1        were in each of these four bellwether plaintiffs'

2        homes or schools or residences?

3                 MR. STERN:  Object to form.  Compound

4            question.  And object to foundation.

5                 THE WITNESS:  I did not investigate

6            that, nor if I did, I wouldn't know how to

7            proceed with it.

8   BY MS. DEVINE:

9   Q.   Okay.  And you --

10  A.   That's not something I'm qualified to do.

11  Q.   Okay.  And you didn't investigate what their actual

12       lead levels were, correct?

13                MR. STERN:  Object to form,

14           foundation, asked and answered.

15                THE WITNESS:  That's correct.

16  BY MS. DEVINE:

17  Q.   And as part of your assumptions and calculations, you

18       didn't compare lead levels of these four bellwether

19       plaintiffs to lead levels nationally of children,

20       correct?

21                MR. STERN:  Same objection.

22                THE WITNESS:  As I've indicated, I

23           have no ability to evaluate blood levels.

24
```

Highly Confidential - Gary M. Crakes, Ph.D.

1  BY MS. DEVINE:

2  Q.   You indicated in your report, one of the assumptions

3       or the datasets given to you was that the date of

4       injury was, I think, April 25th, 2014; is that

5       correct?

6              MR. STERN:  I think his report says

7          April 24th, 2015.

8              THE WITNESS:  April 24th, 2014.

9  BY MS. DEVINE:

10 Q.   Okay.  What does that date represent?

11 A.   It represents what I was told would be the date of

12      the first exposure of -- that was being used for

13      these cases.  And that's what I was told to use as,

14      in essence, a date of incident.

15 Q.   Okay.  Were you given any information on the date on

16      which the exposure ended?

17 A.   No.

18 Q.   Okay.  And as part of your opinions and calculations

19      in this case, are you apportioning any damages to any

20      of the various defendants that may or may not be

21      named in this case?  Sorry.  I didn't hear that.

22 A.   I said no.

23 Q.   Okay.  And --

24 A.   I don't think that's a surprise, but that's okay.

Highly Confidential - Gary M. Crakes, Ph.D.

1  Q.  Okay.  I have to ask some of these questions,

2      Dr. Crakes.

3  A.  Okay.

4  Q.  Do you know anything about my client, Veolia North

5      America?

6  A.  No.

7  Q.  Okay.  Do you believe or do you have any information

8      on when or -- after April 2014, whether or not the

9      lead exposure ended at any point in time in Flint?

10 A.  I don't know.

11 Q.  Okay.  And you don't know if any of these four

12     bellwether plaintiffs continued to be exposed to

13     lead, either in the water or from other environmental

14     sources, correct?

15 A.  That's correct.

16 Q.  What role, Dr. Crakes, does mitigation play in

17     calculating lost earning potential?

18 A.  I'm not sure what you mean by mitigation.

19 Q.  Okay.  So are you assuming for each of these four

20     bellwether plaintiffs that the damages that they

21     sustained are permanent?

22 A.  Well, the calculation is based upon the difference in

23     earning capacity between different levels of

24     educational attainment over the balance of their work

Highly Confidential - Gary M. Crakes, Ph.D.

1          life.  So that would be something that would occur

2          over their lifetime.

3    Q.   Okay.  So has -- do your calculations or opinions

4          consider the potential that one or all four of these

5          bellwether plaintiffs' condition improves over the

6          next few years and they are able to reach their

7          unimpaired educational attainment?

8    A.   No.  And, again, I'm not qualified to make that

9          evaluation.

10   Q.   Okay.  And you don't know whether or not Dr. Krishnan

11         testified that one or all four of these bellwether

12         plaintiffs' cognitive impairments could be improved,

13         mitigated, or resolved, correct?

14   A.   I don't know.

15   Q.   Okay.  And if that's true, that would have an effect

16         on your calculations, that being what level of

17         education they may receive and their income

18         potential, correct?

19              MR. STERN:  Object to form.

20         Foundation.

21              THE WITNESS:  If what is -- if what

22         is true?  I'm sorry.

23   BY MS. DEVINE:

24   Q.   So if the cognitive impairments cited in

Highly Confidential - Gary M. Crakes, Ph.D.

```
 1        Dr. Krishnan's report are resolved and they're able

 2        to -- the bellwether plaintiffs are able to reach

 3        their unimpaired educational attainment, there would

 4        not be any loss of earning capacity, correct?

 5                MR. STERN:  Object to form and

 6             foundation.

 7                THE WITNESS:  Well, it would -- it

 8             would partially -- if that were to occur,

 9             it would depend on when it would happen.

10   BY MS. DEVINE:

11   Q.   Okay.  But it would certainly have an effect on your

12        calculations, correct?

13   A.   Depending upon when it would occur, that

14        hypothetical.

15   Q.   And you didn't provide for any calculations for that

16        instance, that hypothetical, correct?

17   A.   That's correct.

18   Q.   Dr. Crakes, the opinions that are expressed in your

19        four reports that we marked as Exhibits 8, 9, 10, and

20        11 for Ms. TPPI, Ms. WPPI, Mr. SPPI     , and

21        Ms. VPPI        , do those constitute your final

22        opinions in this case?

23   A.   Well, I don't have any -- as I indicated earlier, I

24        don't have any plans to make any additional
```

Highly Confidential - Gary M. Crakes, Ph.D.

1        calculations.  But if I'm requested to do so, I will.

2    Q.  Okay.  And are there any other documents or

3        categories of documents you believe would have been

4        helpful in your analysis that you didn't have the

5        opportunity to see?

6    A.  No.

7    Q.  Okay.  Have you reached any other opinions with

8        respect to these four bellwether plaintiffs that

9        we've not discussed today?

10   A.  No.

11   Q.  Other than the work life expectancy tables, which you

12       indicated you would have Attorney Stern -- that you

13       could provide to Attorney Stern -- but I think we

14       marked those; is that correct?  Those are the ones

15       that you relied upon in Exhibit 23?

16   A.  Yes.

17   Q.  Okay.  Other than that and the materials we marked

18       today as part of your file, are there any other

19       sources of data that you have relied upon in reaching

20       your opinions in this case?

21   A.  Well, I think I did indicate that in that same issue

22       of the Journal of Forensic Economics, there was

23       another article about years to final separation from

24       the labor force by the same authors.

Highly Confidential - Gary M. Crakes, Ph.D.

1    Q.    Okay.  Anything else you can think of, as you sit

2          here today?

3    A.    No.

4    Q.    Okay.  Give me just one moment, and I think I will

5          pass the witness.  I think I covered this, but I'm

6          just going to ask the question.

7                You were not provided with any

8          neuropsychological testing from any of these four

9          bellwether plaintiffs from before the Flint water

10         crisis, correct?

11   A.    That's correct.

12   Q.    Okay.  Okay.  I have no further questions at this

13         time.  Thank you very much, Dr. Crakes.  I appreciate

14         it.

15   A.    Thank you.

16              MR. GAMBLE:  Corey, this is Travis,

17         Travis Gamble on behalf of LAN.  We don't

18         have any questions for Dr. Crakes at this

19         time.

20              MR. STERN:  Okay.

21              MR. BERG:  Nor do I, Corey.  This is

22         Rick.

23              MR. STERN:  Okay.

24              MS. DEVINE:  Corey, one thing.

Highly Confidential - Gary M. Crakes, Ph.D.

1           Sorry.  I would just like the opportunity,

2           because we were provided that information

3           today, the spreadsheets and the notes -- I

4           don't think it's going to change anything,

5           but we haven't had the opportunity to

6           really review that fully.  So if there is

7           anything that comes out of that that I did

8           not ask about today, we may be seeking to

9           ask Dr. Crakes about that.  Again, I don't

10          think that's going to happen.  But we did

11          ask for that material in advance, we

12          weren't given it, and I've tried to do my

13          best with it today.  But I want to reserve

14          that right.

15              MR. STERN:  I understand.

16              MS. DEVINE:  Thank you very much.

17              THE WITNESS:  Thank you.

18              VIDEOGRAPHER:  With that, the time is

19          1:40 p.m.  This deposition has concluded,

20          and we're off the record.

21              (Deposition concluded at 1:40 p.m.)

22                          *   *   *

23

24

Highly Confidential - Gary M. Crakes, Ph.D.

1                    CERTIFICATE OF NOTARY PUBLIC

2        STATE OF MICHIGAN )

3        COUNTY OF LENAWEE )

4             I, Trisha Cameron, Certified Shorthand Reporter

5        and Notary Public in and for the State of Michigan, do

6        hereby certify that the witness whose attached

7        deposition was taken before me in the above cause was

8        first duly sworn or affirmed to testify to the truth,

9        the whole truth, and nothing but the truth; that the

10       testimony contained herein was by me reduced to writing

11       in the presence of the witness by means of Stenography;

12       afterwards transcribed by means of computer-aided

13       transcription; and that the deposition is a true and

14       complete transcript of the testimony given by the

15       witness to the best of my ability.  I further certify I

16       am not connected by blood or marriage with any of the

17       parties, their attorneys or agents; that I am not an

18       employee of either of them; and that I am not

19       interested directly, indirectly, or financially in the

20       matter of controversy.

21

22             Trisha Cameron, RDR, RMR, CRR, RPR, CSR

23             Notary Public, Lenawee County, Michigan

24             My Commission Expires 5-24-24