```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3    LEE-ANNE WALTERS, et al,

 4                       Plaintiffs,
         -v-                                  Case No. 17-10164
 5
      CITY OF FLINT, et al,
 6
                         Defendants.
 7    _____/

 8                          MOTION HEARING

 9
                 BEFORE THE HONORABLE JUDITH E. LEVY
10                  UNITED STATES DISTRICT JUDGE

11                       NOVEMBER 22, 2021

12
      APPEARANCES:
13
      For the             Corey M. Stern
14    Plaintiffs:         Levy Konigsberg, LLP
                          605 Third Avenue, Suite 33rd Floor
15                        New York, New York 10158

16    For the Defendant   James M. Campbell
      Veolia:             Campbell Conroy & O'Neil, P.C.
17                        1 Constitution Wharf, Suite 310
                          Boston, Massachusetts 02129
18
                          Mark R. Ter Molen
19                        Mayer Brown LLP
                          71 South Wacker Drive
20                        Chicago, Illinois 60606

21
                          (Appearances Continued On Next Page)
22

23    To Obtain a         Jeseca C. Eddington, RDR, RMR, CRR, FCRR
      Certified           Federal Official Court Reporter
24    Transcript          United States District Court
      Contact:            200 East Liberty Street
25                        Ann Arbor, Michigan 48104
```

```
 1                          Kristin Michele Dupre
                            Campbell Conroy & O'Neil, P.C.
 2                          1 Constitution Wharf, Suite 310
                            Boston, Massachusetts 02129
 3
                            Alaina N. Devine
 4                          Campbell Conroy & O'Neil, P.C.
                            1 Constitution Wharf, Suite 310
 5                          Boston, Massachusetts 02129

 6                          Timothy S. Bishop
                            Mayer Brown LLP
 7                          71 South Wacker Drive
                            Chicago, Illinois 60606
 8
                            Minh Nguyen-Dang
 9                          Mayer Brown LLP
                            1999 K Street NW
10                          Washington, District of Columbia 20006

11   For the Defendant      Wayne Brian Mason
     LAN:                   Faegre Drinker Biddle & Reath LLP
12                          1717 Main Street, Suite 5400
                            Dallas, Texas 75201
13
                            David C. Kent
14                          Faegre Drinker Biddle Reath LLP
                            1717 Main Street, Suite 5400
15                          Dallas, Texas 75201

16   Also Present:          Deborah E. Greenspan
                            Special Master
17                          Blank Rome LLP
                            1825 Eye Street, Northwest
18                          Washington, District of Columbia 20006

19

20

21

22

23            To Obtain a Certified Transcript Contact:
              Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24                 Federal Official Court Reporter
                    United States District Court
25        200 East Liberty Street - Ann Arbor, Michigan 48104
```

November 22, 2021

3

1                          **I N D E X**

2       MISCELLANY

3       Proceedings..................................4
        Certificate................................144

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

November 22, 2021                                         4

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | THE CLERK:  Calling the Flint Water Cases. |
| 3 | THE COURT:  Thank you, Casey.  And welcome again to |
| 4 | everybody who's here on the screen.  This is the date and time |
| 5 | that we are set to begin oral argument in Veolia North America |
| 6 | or the Veolia defendants' motion for summary judgment related |
| 7 | to the four bellwether plaintiffs. |
| 8 | And for those who are observing this who are not |
| 9 | lawyers or have not been following our cases with the detail |
| 10 | that counsel on the cases might follow it, I want to let you |
| 11 | know that what this means is we are at a point in these cases |
| 12 | where we have identified the first four plaintiffs who are set |
| 13 | to go to trial. |
| 14 | A great deal of discovery has been conducted, which |
| 15 | is the under oath interviews of individuals, exchange of |
| 16 | documents, and things of that nature.  And we, about two weeks |
| 17 | ago, had a couple of days of hearing related to expert witness |
| 18 | testimony.  I've made one decision out of the I think eight |
| 19 | decisions or maybe it was not -- I think it's eight.  And the |
| 20 | rest are a work in progress. |
| 21 | There's enough work in this case to keep all of us |
| 22 | busy all day and all weekend.  And the outcome of those |
| 23 | motions plays into these motions so I'll do my best to let you |
| 24 | know as we're going through this the direction I think I'm |
| 25 | going with those. |

 1            But what these motions are is the Veolia defendants

 2    are saying to the Court, they're saying to me, that now that

 3    they have all of this fact discovery under oath and so on,

 4    they think that no reasonable jury could find that they had

 5    violated the law.

 6            Now the plaintiffs strongly dispute that.  Very

 7    strongly.  So that's what makes for a court case.  And it

 8    makes for a hearing.

 9            So the point here is that the Veolia defendants are

10    seeking to have me dismiss these four bellwether cases and

11    plaintiffs are disputing that and saying we have enough

12    information that the case should go to the jury.

13            So at the current time, the jury trials are scheduled

14    for these cases and there's a rigorous schedule between now

15    and then to get the work done if these motions are denied.

16    And that trial would begin February 15 here in Ann Arbor in

17    person with jury selection set to begin that day.  So we're

18    about to get started with Veolia's argument.

19            I should mention that at the conclusion of this,

20    we'll have a small hearing on a -- I don't know if it's a

21    discovery dispute.  But a case management dispute regarding

22    plaintiffs' counsel's wish to have a replacement expert come

23    in as an expert.

24            So we'll put that off to the end of the day today.

25    And then tomorrow morning we'll start with the LAD, Leo A

1   Daly's motion for summary judgment and then move from there to

2   LAN's motion for summary judgment.  So that's the order that

3   we'll take things in.  And I would -- who will be arguing for

4   VNA?

5           MR. CAMPBELL:  (Technical Difficulties) We will have

6   three people --

7           THE COURT:  Mr. Campbell, we can't hear you -- I

8   can't hear you very well.

9           MR. CAMPBELL:  Your Honor, if I go off video is that

10  --

11          THE COURT:  That's a little better.  But not

12  fantastic.  But give it another try.

13          MR. CAMPBELL:  Okay.  There will be three people

14  arguing different parts of the motion.  We suggest that the

15  duty argument go first.

16          THE COURT:  Yes.

17          MR. CAMPBELL:  And Timothy Bishop would be taking

18  that.  I will be arguing the portion regarding stop drinking

19  water for the three plaintiffs.  And then Minh is going to

20  argue the causation issue.  If that's an acceptable order for

21  Your Honor.

22          THE COURT:  Sure.  That is.  Although I'm -- the one

23  thing -- there's the duty issue but we also have 2014 duty

24  versus 2015.  And I want to make sure that we separate those

25  out clearly.  Because there are different arguments there.  So

November 22, 2021

```
 1   however you want to do that, just feel free to do it.
 2           MR. CAMPBELL:  Mr. Bishop will be taking both of
 3   those issues, Your Honor.
 4           THE COURT:  Oh, okay.  That's good.
 5           So and for plaintiffs, is it you, Mr. Stern?
 6           MR. STERN:  Yes, Your Honor.
 7           THE COURT:  Okay.  Great.  All right.  Well, why
 8   don't we get started.
 9           MR. BISHOP:  Thank you, your Honor.  This is Tim
10   Bishop and I'm going to talk about the duty of care.  Which,
11   as you know, is an essential element to plaintiffs'
12   professional negligence claims.  And Mr. Humann is plaintiffs'
13   expert on duty.  And he identifies two duties that he says VNA
14   owed to the plaintiffs.
15           He says the first duty arose sometime in 2014 when
16   VNA was working for Detroit months before VNA's contract with
17   Flint.  And he says that duty was to insert VNA's expertise
18   into Flint by offering Flint solutions to mitigate lead
19   contamination.  And Humann says that the second duty arose
20   when VNA had a short contract with Flint in 2015 and that was
21   a duty to insist that Flint institute corrosion controls to
22   return to Detroit water.
23           And those are the only duties for which plaintiffs
24   have offered evidence.  And I'd like to come back --
25           THE COURT:  I think that Mr. Humann also says -- but
```

November 22, 2021

```
 1    correct me if I'm wrong -- that with respect to 2015,

 2    defendant failed to insert itself into the -- failed to

 3    prominently indicate that corrosion control was needed.  And

 4    second of all failed to in some way insist that Flint go back

 5    to the DWSD water source.

 6            MR. BISHOP:  Yes.  It didn't insist hard enough that

 7    Flint institute corrosion controls or insist that they return

 8    to Detroit water.  There are those two elements, Judge.  Yes.

 9            So you know, I think the fact that there are only

10    these two duties has implications for the other theories of

11    plaintiffs have posited and I'll come back to that.

12            But VNA's entitled to summary judgment on plaintiffs'

13    professional negligence claims.  Because as a matter of law,

14    it didn't owe plaintiffs the duty that Humann identifies.

15            As this Court recognized in Lee, the Michigan Supreme

16    Court has rejected the view that everyone owes a duty to

17    everyone else to avoid foreseeable harm.  The Court said that

18    in Certified Question, said it in Hill, said it in Bailey.

19    These are all fairly recent cases.

20            It's held that before a common law duty could be

21    imposed, there has to be a relationship between the parties

22    and the harm must be foreseeable.  Both of those are

23    essential, relationship and foreseeability.  But as the

24    Supreme Court said in Certified Question the most important

25    factor is the relationship with the parties.
```

1        And plaintiffs have failed to show the sort of

2   relationship between VNA and plaintiffs that is necessary to

3   ground a duty of care.

4        As to 2014, the plaintiffs have no evidence of any

5   relationship at all between VNA and either Flint or the

6   plaintiffs.  For 2015, VNA's work with Flint does not

7   establish a relationship of the sort that can give rise to a

8   duty of care.  And I'll address 2014 and 2015 separately

9   because --

10       THE COURT:  You know, Mr. Bishop --

11       MR. BISHOP:  -- a different analysis applies.

12       THE COURT:  I appreciate that.  And so what I'd like

13  to do is start with 2014.  And then I think I'll turn to Mr.

14  Stern.

15       MR. BISHOP:  Yes.

16       THE COURT:  Get his response on 2014.  And then go to

17  '15.  Because otherwise --

18       MR. BISHOP:  Right.

19       THE COURT:  We'll lose track.

20       MR. BISHOP:  Yes.  Makes perfect sense, Your Honor.

21       So on 2014, so this Court held in the class case that

22  VNA cannot be responsible for harms that occur before it

23  arrived in Flint in 2015.

24       THE COURT:  And let me just be clear about that.  I

25  absolutely said that.  That intuitively made sense to me.  I

```
 1    was completely unaware of this theory of relief.  I just need
 2    to clarify that.
 3           MR. BISHOP:  Right.  Understood, Your Honor.  But I
 4    think plaintiffs' arguments here show the wisdom of your
 5    ruling in that case, in the class case.  Because VNA's work
 6    with Detroit in 2014 created no relationship of any kind with
 7    the plaintiffs or with Flint.
 8           Now plaintiffs' theory is that through its work for
 9    Detroit, VNA knew that Flint needed to but was not using
10    corrosion control.  And so let's assume that that's true.
11    Let's assume for the moment that that's correct.  Let's assume
12    VNA's knowledge of Flint's problems in 2014.  We don't think
13    that's correct, but let's assume it.
14           Now even if Humann's assumptions about that are true
15    or if they created factual disputes, knowledge -- knowledge
16    that VNA might have acquired working with Detroit doesn't give
17    rise to any relationship with plaintiffs or with Flint.
18           As the Michigan Supreme Court said in Bailey, no duty
19    obligates one person to aid or protect another.  A duty arises
20    from a relationship.  And in 2014 there was no relationship of
21    any kind.  Humann doesn't even claim a relationship.  What he
22    claims is knowledge.
23           THE COURT:  He doesn't claim a relationship.  But he
24    claims that VNA would have known that Flint needed corrosion
25    control and would have known that the Flint water treatment
```

1    plant could not accommodate that.

2            MR. BISHOP:  Right, Your Honor.  And --

3            THE COURT:  And then he goes to, combined with his

4    supplemental affidavit, he seems to generally suggest that an

5    engineer has a duty -- once an engineer goes to an undertaking

6    -- and let's say the undertaking started in May 2014 with the

7    peer review of DWSD.  Once an undertaking has been started,

8    there's a duty to those who could be foreseeably harmed.  And

9    the ethical requirements for engineers are so broad that it

10   doesn't have to be the entity that's involved with the

11   undertaking.

12           Is that -- I think that's the argument.

13           MR. BISHOP:  Well as to ethical standards, plaintiffs

14   don't say that the ethical standards relate to whether VNA

15   owed a duty of care.  They now say it's about the standard of

16   care.

17           THE COURT:  Right.

18           MR. BISHOP:  And we agree with that, of course.  The

19   filing that we made last week we've explained that the

20   engineering ethical standards do not give rise to a duty.

21           And so we think that being the case, Humann still has

22   offered no basis for his view that VNA owe plaintiffs a duty

23   as a result of its work for Detroit or Flint.  There was a

24   contract.  There was an undertaking.  But the undertaking was

25   with Detroit, not with Flint.

```
 1              THE COURT:  Can I ask you a question?  Was that
 2    contract -- I keep reading that the results of that contract
 3    was a detailed report that was to be provided to the governor
 4    of Michigan.  So at whose behest was the undertaking started
 5    or performed for?
 6              MR. BISHOP:  Well, Detroit put out a request for
 7    proposals.  And it may make sense, Your Honor, just to go
 8    through the steps here of VNA's interaction with Detroit,
 9    which really has four stages.
10              So in 2014 Detroit was bankrupt and it was looking
11    for ways to save money on its water and sewerage operations,
12    including potentially outsourcing them.  So VNA submitted an
13    expression of interest to Detroit in April 2014 in response to
14    an RFP from Detroit.
15              Humann seems to think that that starts -- that's the
16    beginning of when VNA owed a duty to the plaintiffs because of
17    the due diligence that VNA would have done for that document.
18    But an expression of interest in entering into a contract in
19    the future is not a contract.  VNA's interest in responding to
20    Detroit's RFP was VNA's own interest in pitching for the work.
21              And as you said in Lee, page 11 footnote 3, no duties
22    rise out of isolated conduct like that of an insurer who
23    inspects the property of its customers purely for its own
24    benefits because it does not act out of an existing
25    relationship with either the customer or a third party.
```

1    That's a quotation from your footnote there.  And that's the

2    exact position that VNA was in when it expressed interest in

3    working for Detroit in April.

4         Now it followed that up.  VNA followed that up with a

5    more detailed proposal to Detroit water in May of 2014.  And

6    that proposal was for VNA to take over Detroit's water

7    operations and it's sewerage operations to deliver cost

8    savings.

9         Again, it was just a proposal.  It was subject to a

10   later agreement and terms.  And ultimately Detroit never

11   agreed to outsource water operations to VNA.  So as were the

12   initial indications of interest, the proposal was just

13   isolated conduct prepared in VNA's own interest and not out of

14   an existing relationship with Detroit let alone with Flint or

15   the plaintiffs.

16        And it's notable that in opining that VNA owed to

17   plaintiffs a duty to in 2014, Humann really did not address

18   the difference between those two proposals and the contract.

19   The contract came in August of 2014.  And that was a much more

20   -- for a much more limited project to study Detroit's

21   operations and suggest cost savings.

22        So there was no agreement that we would take over the

23   operations, but we would look at them and come up with cost

24   savings.  And we delivered that final report.  We began the

25   work in August.  We delivered the final report in December of

```
 1  2014.
 2              THE COURT:  Mr. Bishop, do you have a copy of the
 3  scope of work for that?  Was that attached?  I can't recall.
 4              MR. BISHOP:  The Detroit final report is --
 5              THE COURT:  Not the final report, but the request for
 6  proposals or the contract itself I guess is what I'm curious
 7  about.  We have the final report.
 8              MR. BISHOP:  Yeah.  Now I don't think that anyone's
 9  been able to turn up the RFP.
10              THE COURT:  Okay.  How about VNA's proposal in
11  response to the RFP.
12              MR. BISHOP:  Yes.  The expression of interest is --
13  actually plaintiffs filed it last week as an exhibit to their
14  response to our supplemental brief.
15              THE COURT:  Okay.
16              MR. BISHOP:  It's Exhibit 6 to that.  So that's ECF
17  4487.
18              THE COURT:  Okay.  I'll see it there.
19              MR. BISHOP:  And then the proposal, the May proposal
20  was Exhibit 5 to plaintiffs' response.  And that's 4486.
21              THE COURT:  Okay.
22              MR. BISHOP:  And then the final report is Exhibit 115
23  to our MSJ.  And that's ECF 4425.
24              THE COURT:  Okay.  I have that.  But thank you.
25              MR. BISHOP:  So we started work in August and we
```

1    issued the report in December.  And none of those documents,

2    none of them -- the expression of interest, the May proposal,

3    the August contract, the December report, none of them mention

4    Flint.  And that's not a surprise.  Because the goal of

5    Detroit and VNA was to cut operational costs.  And Flint was

6    no longer a Detroit customer.

7         Eight months before the final report, Flint had

8    switched to Flint River water.  So our goals in working

9    together had nothing to do at that point with Flint.  It long

10   since declared its intent to leave and then it left.

11        So Flint had nothing to do with Detroit entering the

12   RFP, hiring VNA, looking into Flint's post Detroit plans was

13   no part of VNA's work.  So the sorts of things that we

14   suggested were closing a plant.  All of the plants were

15   overcapacity.  So you'll see the final report goes through a

16   lot of very detailed cost cutting suggestions.  Probably the

17   most significant being closing a plant.

18        So we don't think in those circumstances that there's

19   any relationship of the sort that courts in Michigan have

20   looked to because Flint and the plaintiffs suggest not part of

21   the equation when we're doing work for Detroit.  VNA -- Flint

22   was not on our radar in our issue for -- in our work for

23   Detroit.

24        THE COURT:  Okay.

25        MR. BISHOP:  And in fact, the idea that it was is

1    contradicted by all of the record facts in those four

2    documents.

3              THE COURT:  Let me turn to Mr. Stern now unless you

4    have something more on duty --

5              MR. BISHOP:  No, I think that's -- I think that's it

6    for 2014, Your Honor.

7              THE COURT:  Okay.  So Mr. Stern, in terms of the

8    argument you're making that VNA had a duty to your clients in

9    2014, tell me how you get past some of the core Michigan

10   Supreme Court cases.  And here this is a state court or a

11   state professional negligence claim against VNA.

12             How do you get past Dyer and Hill and the other key

13   cases that talk about a very limited scope in Dyer liability

14   for in that case it was an independent medical exam that

15   created a very limited duty between a plaintiff and an IME

16   doctor who was contracted by the defendant in that case?

17             But there in Dyer the IME doctor had a hands on

18   experience, so to speak, with this plaintiff, and is alleged

19   to have whacked her shoulder or his shoulder -- I don't know

20   which -- out of alignment such that it needed surgery.  So

21   there the third party is the plaintiff and there was direct

22   contact.

23             So I don't know how Dyer can be read to support your

24   theory here.  And Hill, of course, is the case where with the

25   dryer and the home fire where no duty to warn was the holding.

```
 1              And generally speaking, the restatement of tort says
 2    that no matter how serious or grave the danger to the other
 3    and the insignificance of the trouble, effort, or expense of
 4    giving him aid or protection, we still don't have a duty to
 5    warn of dangers to others if it's not a part of the
 6    undertaking.  So tell me.
 7              MR. STERN:  Sure.  So that was a long question, Your
 8    Honor.  And if you don't mind, I'm going to start at the end
 9    with the 324 analysis and why it's different here than the
10    cases that you describe.
11              First off 324(a) requires a couple of things.  It
12    requires an undertaking of services necessary for the
13    protection of the plaintiffs and then to do so negligently.
14    And I think that's the point that Your Honor was just making
15    here.  VNA's arguing they didn't undertake to do anything.
16              Your Honor, in Walters, the case that involved the
17    EPA which is still ongoing, Your Honor held that the EPA
18    undertook to provide services by going to citizen's homes, to
19    conduct independent water testing, e-mailing back and forth
20    with MDEQ staff regarding Flint's worrisome lack of corrosion
21    control, offering the DEQ additional technical instance.
22              When it comes to -- and I'm going to speak about 2015
23    and 2014 at the same time just to answer Your Honor's
24    question.  When it comes to 2015, the undertaking that VNA
25    talks about is nothing to do with lead.  It claims that it's
```

1   limited by the scope of its work.  And essentially it did not

2   have any type of undertaking.

3          But the reality is is that we have emails between VNA

4   employees talking about lead seems to be a problem.  We have

5   emails from VNA engineers, which indicate that the safest and

6   perhaps fastest fix would be for Flint to go back to DWSD.

7   And in 2014 we have the undertaking -- the undertaking that

8   VNA became a part of was agreeing to perform work for the

9   State of Michigan.

10          And so at the time of the contract that VNA keeps

11   referring to as the Detroit contract or the DWSD contract,

12   DWSD and Detroit were actually under emergency management.

13          And so if you look at this like a pedestrian who's

14   driving or a driver who's driving down the road and sees a car

15   off the side of the road that needs help, obviously there's no

16   duty to stop.  Somebody is not required to stop as they're

17   going down the road.

18          Notwithstanding that, once someone stops they have

19   undertaken the duty.  And I think where VNA is trying to push

20   the Court is that it's not so much stopping that matters.

21   It's stopping for a particular task.

22          And so here VNA's saying, yeah, we undertook to do

23   something for what they say is DWSD.  We say it's Detroit.  We

24   say it's the State of Michigan.  That undertaking, once it was

25   done, if there was foreseeable harm to one of the plaintiffs,

```
 1    to anybody in Flint, or to Benton Harbor, or to any other city
 2    for that matter, once the undertaking occurs, there's a bright
 3    line.
 4           What is the undertaking?  VNA says that there was no
 5    undertaking.  We say there was.  We say --
 6           THE COURT:  Well, let me stop you for just a minute.
 7    Do you argue that VNA completed its work for this -- let's
 8    call it the State of Michigan.
 9           MR. STERN:  Sure.
10           THE COURT:  Detroit was in bankruptcy.  We'll just
11    call it the State of Michigan for the 2014 work.  The
12    undertaking was the report they did related to DWSD for the
13    State of Michigan.
14           Do you argue that they completed that report
15    negligently?  And if so, where?  Where is the --
16           MR. STERN:  No.
17           THE COURT:  -- the negligence?
18           MR. STERN:  No, Your Honor.  It has nothing to do
19    with the report.
20           THE COURT:  Okay.  So what my understanding of this
21    body of law is that in order to get to your clients, you would
22    need to tell me or point to me how VNA completed its work in a
23    negligent manner, the work that it undertook, which was the
24    top to bottom peer review of DWSD to be submitted to the State
25    of Michigan.
```

1        MR. STERN:  Yes, Your Honor.  DWSD in the course of

2    its work for the State of Michigan, it had special knowledge.

3    It's not like an engineer that's just hanging out in Detroit

4    or in Benton Harbor or in Flint or in Cleveland Ohio or in New

5    York City and they're reading about the Flint situation and

6    they realize as they're Googling Flint because they've got

7    some interest on a Sunday morning that something bad is

8    happening in Flint and they'd like to get to the bottom of it.

9        They actually undertook a project that included, if

10   you look at their final peer review report, numerous

11   references to corrosion control.  VNA's own pleadings talk

12   about the comprehensive nature of their work in -- with the

13   State of Michigan with regard to the DWSD.

14       Once VNA knew or should have known that there was a

15   danger -- this has nothing to do with the report that they

16   produced.  I guess I can retract my answer that the answer is,

17   no, they weren't negligent.  It's not so much that they should

18   have put it in a report.  They could have put it in a report.

19       They could have also gone to the governor.  They

20   could have also gone to the mayor.  They could have also gone

21   to the EPA.  Humann doesn't specify exactly who they should

22   have gone to, but we know they ultimately submitted their

23   report to the governor.  Once --

24       THE COURT:  Let me ask you this.  Do you have a case,

25   preferably a Sixth Circuit case but I'll take any case, for

```
 1   the proposition that a defendant with special knowledge --
 2   that having special knowledge can give rise to a duty in the
 3   absence of negligence in the undertaking?
 4          MR. STERN:  I don't think --
 5          THE COURT:  Is there any case that says that special
 6   knowledge gives --
 7          MR. STERN:  The answer is no without the absence of
 8   negligence.  But here there is negligence in the undertaking.
 9   VNA wants you to believe there's no negligence in the
10   undertaking because the undertaking doesn't specifically,
11   based on a contract, have anything to do with Flint.  In the
12   same way that VNA wants you to believe that the negligence
13   alleged in 2015 has nothing to do with lead.
14          They're actually making the exact same argument for
15   both --
16          THE COURT:  I see it as different arguments.  Because
17   in 2015 VNA had a contract with the City of Flint.  And by
18   engaging in that contract, the water drinkers or users in the
19   City of Flint are clearly the people who their work will
20   immediately impact.  Whereas the undertaking with the DWSD,
21   it's not clear to me what they knew about Flint.
22          I understand you say that they knew that DWSD water
23   had corrosion inhibitors or control agents, but I'm just
24   looking for a case anywhere.  District court, state court,
25   anywhere.
```

```
 1              MR. STERN:  Your Honor, there is not a case that's
 2    going to say that because the principle that we are positing
 3    to Your Honor includes the negligence component of it.
 4              And so for instance, if -- let's say in 2015 Flint
 5    had this contract that Your Honor seems to be referencing in
 6    terms of, well, we knew specifically this was for the people
 7    of Flint.  We knew specifically it was for water drinkers.
 8    And so there's some difference in Your Honor's eyes between
 9    the 2015 situation and '14 because that directly related to
10    the people of Flint.
11              The reality is is that if in 2015 based on the
12    contract that VNA had with Flint, during the course and scope
13    of its work on TTHM's for Flint, VNA found out or realized or
14    through its work for Flint realized that somewhere else in
15    Michigan in Genesee County not on the Flint River water,
16    somewhere in Benton Harbor or somewhere in southeast Michigan
17    somewhere else besides Flint, VNA realized that, oh, my God.
18    The folks in Oakland are based -- again, just based on the
19    work, based on their research, based on their due diligence,
20    based on what they were doing on the ground, they recognized
21    that there is a danger to the health and safety of another
22    community.
23              They would have been equally obligated in that
24    situation to those folks in that community based on their
25    undertaking in Flint to actually say something to someone to
```

November 22, 2021

1   prevent harm. And so --

2          THE COURT: Okay. So let me ask you, are you saying

3   that the failure to warn constitutes the negligence in the

4   undertaking?

5          MR. STERN: It's not so much to warn -- it's not to

6   warn the people of Flint as much as it is according to the

7   expert testimony in the case, to warn the folks who could do

8   something about it.

9          THE COURT: I know. But still, the failure to warn

10  is the negligence you're pointing to?

11         MR. STERN: Absolutely.

12         THE COURT: And the restatement requires reasonable

13  care in the undertaking.

14         MR. STERN: Yes.

15         THE COURT: And so that's what brought my focus to

16  are you alleging negligence in the report, you know, the

17  ultimate report? Which I could not -- I did not see in your

18  pleading.

19         You have only one sentence on this actually, which is

20  because VNA had a relationship with DWSD in 2014 and

21  plaintiffs had been receiving DWSD water up until April 25,

22  2014, there is more than a sufficient relationship between the

23  parties. That's all you've told me.

24         MR. STERN: So Your Honor, to go back to your

25  question about the report. The reason the negligence isn't --

November 22, 2021

1    the reason that the negligence is not the report is because by

2    the time the report came out, VNA had been negligence for six

3    months.  The report -- the report is not the end all be all.

4    The report is not the line.

5            The time in which VNA became negligence was the

6    moment in time where it was foreseeable to VNA that the

7    individuals in Flint were going to be poisoned.  VNA only had

8    that knowledge because of its undertaking for the State of

9    Michigan.

10           Again, VNA was not some drive by trucker that was

11   coming through from Cleveland on their way to Mississippi and

12   just stopped to do a little bit of research and then went on

13   its way.

14           VNA actually undertook a project for the State of

15   Michigan.  As part of that project, VNA gained special

16   knowledge about what was happening in Flint.  In no small part

17   because DWSD had serviced Flint for decades upon decades upon

18   decades upon decades.

19           Once VNA knew that Flint was in danger in the same

20   way that once the EPA knew that Flint was in danger in the

21   same way that once in -- yes, ma'am.

22           THE COURT:  The EPA had a direct role in Flint.  I

23   think that's a very different thing.

24           MR. STERN:  Actually respectfully, Your Honor, the

25   EPA did not have a direct role in Flint until Miguel Del Toral

November 22, 2021

```
 1   undertook to go to Flint.
 2           THE COURT:  Right.
 3           MR. STERN:  Until citizen complaints started being
 4   made.  There is no fundamental difference between Miguel Del
 5   Toral undertaking to visit Lee-Ann Walters' home on his own
 6   dime, being actually put in the EPA jail by the EPA for doing
 7   so, as VNA undertaking an obligation to the State of Michigan
 8   to actually look at issues like corrosion control.
 9           I mean just because the City of Flint's name doesn't
10   appear in their scope or doesn't appear in their contract or
11   doesn't appear in their report, it doesn't mean that when VNA
12   became aware that there was a ticking time bomb that was going
13   to go off in Flint they didn't have an obligation to do
14   something about it.
15           And so whereas in the EPA situation you have emails
16   and you have reports by Miguel Del Toral referencing Flint.
17   You have emails from the EPA talking about Flint.  And even in
18   the 2015 situation, you've got emails between VNA employees
19   referencing Flint, referencing lead.  And here you don't.
20           THE COURT:  Okay.
21           MR. STERN:  I understand here you don't.  And that's
22   where the disconnect is.  But our expert says whereas over
23   there we know they knew because it's in the emails and it's in
24   the reports, here our expert says they knew or should have
25   known.  And so -- go ahead.  I keep --
```

1           THE COURT:  Tell me about this.  The Michigan Supreme

2    Court cases say that knowledge is not enough to give rise to

3    duty.

4           MR. STERN:  Right.

5           THE COURT:  So distinguish your situation here from,

6    for example, the Hill case.  Where knowledge was right there

7    and that there was a gas leak and the Supreme Court found no

8    duty.

9           MR. STERN:  So Hill was distinguished and limited in

10   Abraham v Farmers.  There was like 12 minutes in a plaintiff's

11   house.  The person at issue didn't even discover an uncovered

12   gas pipe and four years later the house exploded.

13          Here we are talking about -- even though VNA's claim

14   is that its scope doesn't include Flint, VNA's scope surely

15   includes issues like the health and safety of the citizenry of

16   Michigan despite how VNA couches it because of the numerous,

17   numerous, numerous references to corrosion control throughout

18   it's peer review report, throughout it's proposal.

19          The reason that engineering companies like Veolia

20   talk about corrosion control, make changes to corrosion

21   control, part of it is cost savings, part of it is you want to

22   have the cheapest but most effective corrosion control

23   treatment as you possibly can to run efficiently.  But it's

24   also for the health and safety of folks.

25          And so here VNA actually undertook a project that

1    directly relates to the issues associated with Flint

2    irrespective of the fact that Flint wasn't part of its scope

3    of work.

4         When you layer that with the fact that VNA undertook

5    this for the State of Michigan, every citizen of the State of

6    Michigan is part of that undertaking.  I mean -- go ahead.

7         THE COURT:  There's nothing in the record that

8    overtly suggests that health and safety of the entire State of

9    Michigan or the midwest or some area was part of the

10   undertaking, you then go back to Humann and he says, well, for

11   an engineer it is actually part of the undertaking for every

12   engineer?

13        MR. STERN:  Not just is it part of the undertaking,

14   it is the primary requirement of any water engineering

15   undertaking.  And it's not just Humann who says it.

16        I mean, Your Honor asked for the definition of Marvin

17   Gnagy.  I mean, Marvin Gnagy's deposition is replete with

18   references to health and safety warnings, health and safety

19   warnings.  I mean, he doesn't say anywhere in his deposition,

20   nor does Depin Chen, nor does Humann, nor does any of VNA's

21   experts that the only time health and safety is a prominent

22   part of what we do as engineers is when that's within the

23   scope of our contract.

24        Nowhere in anybody's testimony do they say that, yes,

25   but, comma, only when.  You could substitute the testimony of

1  Marvin Gnagy and the testimony of Depin Chen for our expert

2  Humann and you would not know who said what.

3          And so yes, Your Honor, the difference is when it

4  comes to a water engineering consultant who's part of their

5  consulting has to do with corrosion control which necessarily

6  affects the health and safety of individuals, of children, of

7  adults, absolutely there's a heightened duty there, Judge.

8          THE COURT:  Okay.  How do you get past -- I mean, we

9  learn In Re Certified Question that the Michigan Supreme Court

10 says they are, quote, the ultimate inquiry in determining

11 whether a legal duty should be imposed is whether the social

12 benefits of imposing a duty outweigh the social costs of

13 imposing a duty.  And further a duty cannot be imposed where

14 there is no relationship to give rise to it or where the harm

15 is not foreseeable.

16         MR. STERN:  Judge, I would --

17         THE COURT:  Yeah.  Go ahead.

18         MR. STERN:  I would argue that so there's two sides

19 of the scale.  There's the health and safety part versus the

20 public policy part about imposing too much effectively is what

21 I think that question asked.

22         I would argue that you put kids getting lead poisoned

23 on one side of the scale, the possibility of a child getting

24 lead poisoned, you could pile all of the other considerations

25 that you want on the other side of the scale, no matter what

1   the policy considerations are, and not all of them combined or

2   one of them individually would outweigh the considerations of

3   preventing an entire population let alone one child from being

4   brain damaged from lead poison.

5         THE COURT:  Of course that's a very appealing

6   argument.  And what I have to find is case law that supports

7   that.  Because we do not have a good samaritan situation.  We

8   don't -- I could find no cases that stood for that.  And in

9   fact the other portion of the restatement 324A says quite the

10  contrary, that no matter how serious the harm, we want people

11  to warn, we want people to take the initiative to do it.  But

12  I'm having a very hard time finding support for that in the

13  law.

14        So but you're telling me I can distinguish Dyer.  I

15  can distinguish Hill.  And that there is a duty here based on

16  the professional ethics that Humann has -- I'm sorry.  314(c)

17  of the restatement, not 324.

18        MR. STERN:  Your Honor, I want to just make a point

19  that I think needs making.  I'm not saying that you can

20  distinguish it because Humann cites the professional codes.

21  The professional codes inform the standard of care.  They are

22  not the standard of care.

23        And despite VNA's late filing of a supplemental

24  brief, we were glad they did because it gave us the

25  opportunity to respond or if Your Honor actually permits the

1    response to be part of the record.  We actually move the Court

2    for permission to file the response.

3            There's a fundamental difference here because here

4    there is actually an expert that says that the standard of

5    care for a professional engineer is different than what the

6    standard was for those other individuals as part of those

7    other cases.

8            None of those cases deal with an engineer that's

9    specializing in water treatment, corrosion control, who's

10   duty, who's responsibility, who's standard of care is informed

11   first and foremost by the health and safety of the citizenry.

12   These are completely different contexts.

13           Those cases are not on point because we're not

14   talking about engineers who have a standard of care that

15   includes a duty to the health and safety of everyone that is a

16   foreseeable person who could be harmed by their decisions.

17           Again, I go back to 324A, Judge.  I know that -- I

18   know that -- I think part of the reason that this conversation

19   is so dense is because for years, for years not only Your

20   Honor but all of the litigants in this case believed and Your

21   Honor even went on record as saying it numerous times, that

22   VNA's liability starts in February of 2015.  I understand

23   that.

24           And so now here we are in 2021, almost 2022, and

25   within the last year there's an expert engineer who says not

```
1    so fast.  Not because a lawyer fed it to him or because
2    somebody told him to.  But he looked at all of the documents
3    or many of the documents that VNA looked at and based on his
4    professional expertise has opined that the standard of care
5    governing their profession, governing VNA required VNA once
6    they undertook a duty to the State of Michigan by doing work
7    to assess the DWSD to warn somebody that a bomb was about to
8    go off.
9            And there is actually not much of a difference
10   between both what VNA argues for '15, for '14, and what the
11   EPA argues for its role.  There's not a significant difference
12   between those arguments and what's happening in 2014.
13           To the extent that the EPA undertook something that
14   was not contractually based -- it wasn't even statutorily
15   based.  It was some guy in an office in Chicago who decided to
16   take a drive on a weekend to Michigan.
17           In 2015, fast forwarding, VNA has argued tooth and
18   nail upon years upon years upon years upon years that it had
19   no duty whatsoever regarding lead because it was limited to
20   TTHM's.  And here --
21           THE COURT:  Let's keep that -- I want to focus in on
22   where we are.
23           So let's say I agree with you about the standard of
24   care for a professional engineer.
25           MR. STERN:  Yep.
```

```
 1              THE COURT:  And let's say I agree that VNA knew or
 2    should have known or would have known about the fact that DWSD
 3    was using corrosion control in Flint, and furthermore they
 4    knew or should have known that Flint either was not using it
 5    or couldn't use it.  Somehow they knew that and there's
 6    evidence let's say.
 7              Tell me about the relationship required -- or the
 8    element in In Re Certified Question that required a
 9    relationship between VNA and the injured.
10              MR. STERN:  Yeah.  So this is one of the Miller
11    factors as well, the relationship.  And when it comes to
12    relationship, VNA had a relationship with the state through
13    DWSD.
14              Let's for a minute recognize who their report
15    actually went to and who was under emergency management at the
16    time.  Your Honor has held repeatedly that the emergency
17    managers were state actors, you know, throughout this
18    litigation.  Okay.  Well let's --
19              THE COURT:  Well we've got Monell liability here.
20              MR. STERN:  That's fine.
21              THE COURT:  Okay.
22              MR. STERN:  VNA submitted its report to the state
23    when it submitted its report for DWSD.  So clearly there was
24    some relationship with the state or else the report would not
25    have gone to the governor.  The state is a joint tortfeasor as
```

```
1   part of this case.  And so there is a relationship with a
2   joint tortfeasor in this case.
3         The harm was foreseeable.  At least that's a question
4   of fact because Humann, now our expert, says that the harm was
5   foreseeable based on the relationship that VNA had with the
6   state, based on the work that it undertook with the state.
7   The injuries -- the injuries --
8         THE COURT:  So was the relationship because the
9   report was going to the state then VNA had a duty to all water
10  users in the State of Michigan?
11        MR. STERN:  VNA's duty was not because of necessarily
12  the relationship with the state.  Although, yes, that causes a
13  duty to arise.  But VNA -- the answer is yes, Your Honor.
14  Yes, Your Honor.  Because of the relationship with the state,
15  VNA had a duty to all water users.  But all foreseeable water
16  users who could have been in danger.
17        And so again, we're -- you know, if someone in -- if
18  someone in Grand Rapids had made it -- had made a claim
19  against VNA based on this same theory of liability that their
20  water bills were too high and VNA's responsible because it did
21  a comprehensive analysis of the DWSD on behalf of the state,
22  that is a different -- that is a different analysis.
23        Because there I'm not sure the harm was foreseeable,
24  but even if it was, the injuries are arguably not serious.
25  And the seriousness of the injuries is part of the
```

```
 1    determination.  Based on the Miller factors and based on the
 2    progeny of cases that followed those that Your Honor cited.
 3    Based on the 324A analysis.
 4          And so yes.  Yes, Your Honor, the relationship with
 5    the state caused an obligation on behalf -- caused a duty to
 6    arise for VNA to all water users for foreseeable harm if the
 7    injuries were serious.  And that is exactly what happened
 8    here.
 9          THE COURT:  Okay.  Tell me if you have any law or can
10    locate any law that suggests that a professional standard of
11    care can be an exception to the general rule that there's no
12    duty to help or recuse.
13          MR. STERN:  Sure.  Murdock v Higgins, Your Honor.
14    454 Mich. 46 at 54.
15          THE COURT:  Hold on.  Hold on.
16          MR. STERN:  Yeah.
17          THE COURT:  Murdock 4 -- say it again.
18          MR. STERN:  Sorry.  That's the New York in me.  454.
19    Here's the Georgia in me.  Mich. 46 at 54.  And this talks
20    about the special relationship.  And it says that a special
21    relationship can be with either plaintiffs or someone who
22    causes the harm to plaintiffs.
23          And so again even if the relationship that VNA had
24    was with the State of Michigan -- and we know for certain that
25    VNA is not going to dispute that the State of Michigan caused
```

```
 1    harm to plaintiffs because there's a 254-page notice of
 2    nonparty at fault.  There's about 55 deposition transcripts
 3    where VNA cross-examines effectively all State of Michigan
 4    employees outright blaming the State of Michigan for
 5    everything that happened.
 6              This case is directly on point because it talks about
 7    the special relationship that an entity like VNA has not only
 8    potentially with the individuals who are harmed, but with
 9    someone who causes the harm to plaintiffs.  And here VNA
10    claims that the state caused the harm to the extent there was
11    any.
12              MR. BISHOP:  Your Honor, can I just tell you about
13    Murdock?
14              THE COURT:  Yes.
15              MR. BISHOP:  So Murdock is a case where a state
16    agency employed someone who they suspected was a sex offender.
17    He moved on to another stated agency and the first employer
18    did not tell the second agency of their suspicions about him.
19    And he committed sexual offenses.  And the court there held
20    that there was no duty on behalf of the first agency to
21    disclose their suspicions to the second.
22              I have a lot of trouble seeing how that helps Mr.
23    Stern.
24              THE COURT:  Let's find out.
25              MR. STERN:  It's a general standard, Your Honor.  It
```

```
 1    stands for the principle that a special relationship can exist
 2    not -- Your Honor asked for a case that describes how
 3    essentially VNA could have an obligation to a bunch of folks
 4    like the folks in Flint without being obligated to them
 5    directly.
 6              We think they are obligated directly based on the
 7    foreseeability, based on the standard of care, and based on
 8    the contract that they had with the State of Michigan.
 9              But notwithstanding any of that, because I'm not sure
10    that Your Honor is getting on that train, although I hope you
11    do --
12              THE COURT:  I'm just trying to learn right now.
13    That's the purpose of an argument or we wouldn't have it.  I'd
14    just be sitting in my office by myself typing up --
15              MR. STERN:  Even if -- even if that's true, even if
16    the proposition that because VNA doesn't have the word Flint
17    in any of its reports, just because VNA, the word Flint wasn't
18    in the request to bid or wasn't in their proposal or wasn't in
19    their peer review report, they had no relationship whatsoever
20    with the folks in Flint.  We fundamentally disagree.
21              But having a relationship with the State of Michigan,
22    which is a joint tortfeasor who VNA claims effectively is at
23    fault for anything and everything that happened or at least
24    very much at fault for anything and everything that happened
25    in Flint, that in and of itself creates a special relationship
```

```
 1    if it causes harm to the plaintiffs.  So it's a general
 2    proposition case.  It's --
 3            THE COURT:  Okay.  This has been helpful for me to
 4    understand both sides' arguments.  And so let me see if
 5    Mr. Bishop has any response --
 6            MR. STERN:  Your Honor, but before he responds, so he
 7    only needs to respond once -- or he can respond as much as he
 8    wants -- I just want to point out that pursuant to the 320A
 9    analysis, just to be clear for the record, depending on how
10    Your Honor goes, so I can be clear and make the record, VNA
11    undertook to provide services.
12            VNA contracted with the state to do a top to bottom
13    analysis of the DWSD's operations.  If not earlier, we know
14    definitely that by October 2014 there are corrosion problems
15    with Flint's water.  We know that because Mr. Gnagy testified
16    that -- I'm sorry, Mr. Chen testified that General Motors had
17    told VNA that they were having corrosion issues with the
18    water.
19            The other criteria of the analysis are also
20    satisfied.  By not doing anything, VNA increased the risk of
21    harm by prolonging the crisis.  Your Honor said the same thing
22    in Walters about the EPA.  We know VNA undertook duties that
23    the state owed plaintiffs.
24            And what I mean by that is that the state had a
25    responsibility.  The DEQ had a responsibility to make sure
```

1    that there was proper corrosion control, that all of the

2    efficiencies in terms of health and safety of DWSD were

3    actually in place.  But when VNA came on to do that analysis,

4    in some small way they were undertaking that role and the

5    state and DWSD relied on VNA's recommendations.  We know that

6    because of the peer review report and the things that happened

7    subsequent to that.

8            And so when you divine the 324 factors with Humann's

9    standard of care, while it may seem like a reach to Your

10   Honor, it's not.  It's just not.  Because ultimately they

11   undertook a duty and in the scope and course of their duty

12   they recognized that there was a foreseeable harm to the

13   health and welfare of at least one community and they stayed

14   silent.

15           THE COURT:  Okay.

16           MR. BISHOP:  Your Honor, it's more than a reach.

17   It's a huge leap.  And you know what I hear is that if you do

18   confined work for a city that's under state control and you do

19   a report on how that city can save money on its water system,

20   which is vastly underused, the mere fact that because it's

21   under state control creates a duty to the entire population of

22   the state deriving from your knowledge.

23           I know of no case that comes anywhere close to that.

24           Michigan is very clear Bailey, for example, no duty

25   obligates one person to aid or protect another.  And I simply

```
 1    haven't heard anything here that creates a duty.  The Walters'
 2    case is entirely different because under the SDWA and under
 3    the clean water act, EPA has ultimate control over the safety
 4    of water in Michigan.  It has a statutory duty --
 5              THE COURT:  Right.
 6              MR. BISHOP:  -- to act when the state fails.  And VNA
 7    is not in that situation.  We had a --
 8              THE COURT:  Yeah.  VNA -- I mean EPA I think is in a
 9    different situation.
10              MR. STERN:  Actually, Your Honor, in that situation
11    the EPA gave away that responsibility to the MDEQ.
12              THE COURT:  Right.
13              MR. BISHOP:  No.  Under the statute, under the clean
14    water act, and under the SDWA, even when the power is
15    delegated to the state, EPA is ultimately responsibile for the
16    safety of water in that state.  It's a delegated authority of
17    EPA.  It's not a pass off of all responsibility from EPA to
18    the state.
19              MR. STERN:  And Your Honor, if I may respond for one
20    moment.  I mean, VNA's own proposal, as we pointed out in our
21    responsive brief to their supplemental brief, their report
22    refers to the revival of the DWSD and throughout the report
23    talks about additional customers and capacity.
24              They are arguably talking about Flint.  I mean, just
25    because they don't mention Flint by name doesn't mean that
```

1   Flint is not part of their analysis.

2          THE COURT:  Okay.  This has been very helpful to me

3   and I appreciate it.  And I'd like to move on to the duty in

4   2015.

5          MR. BISHOP:  So on 2015, Your Honor, this Court in

6   Lee -- obviously the groundwork has changed since we filed our

7   summary judgment brief because of your opinion in Lee.

8          THE COURT:  Right.

9          MR. BISHOP:  So I'll be talking quite a lot about

10  that opinion.  And Lee recognizes that foreseeability alone is

11  not enough to establish a duty.  That a relationship is also

12  required.  But the Court went on to hold that Lee had

13  adequately alleged that VNA had a relationship with Flint

14  through the February 2015 contract sufficient to give rise to

15  a duty.

16         Now Lee arose at the motion to dismiss stage.  It did

17  not address the specific duties that Humann asserts here.  But

18  more generally we respectfully suggest that the Lee opinion

19  does not accurately reflect how Michigan law treats cases like

20  this one.

21         And you know you talked about Dyer as being a case

22  with a hands on experience direct contact.  And that I think

23  is really the key here.  Relationships that give rise to a

24  duty to third parties in Michigan are marked by the active

25  role of the defendant in the operations that cause the harm.

1    Or the defendant's control over an activity or a condition

2    that causes the harm.  Operational activity that causes harm

3    or control over that activity.

4           And when you look at statements in Loweke and Murdock

5    about duties arising from a relationship between the defendant

6    and a third party who caused the injury, they are to be read

7    in light of this operations control test.

8           And the Michigan Supreme Court has focused on control

9    in Bailey against shaft in 2013 after it reiterated there that

10   the common law imposes a duty of care only when a relationship

11   exists.  The court said that relationships are predicated on

12   control.  And this is a quote.  The element of control is of

13   prime importance when determining the existence of a duty.

14          I'd refer to Court to the Williams against Cunningham

15   Drug Stores, which is another control case.  And Hill.  Hill

16   talks a lot about the control over the gas line in the

17   plaintiff's house.  That the defendant install a lat control

18   over it was an important factor in the discussion.

19          Now the Sixth Circuit in Bennett v MIS Corp.  This is

20   a case not cited in our briefs.  We sent it to Mr. Stern

21   yesterday.

22          THE COURT:  Okay.

23          MR. BISHOP:  This is 607 F.3d 1076.  It's a 2010 case

24   from the Sixth Circuit.

25          It recognizes that under Michigan common law, there's

1    a difference between giving advice as a consultant and

2    exercising control over or actually performing the activity

3    that causes the harm and that that's critical to the existence

4    of a duty.

5         Now Bennett involved toxic mold at the Detroit

6    airport.  The Sixth Circuit observed that, quote, defendants

7    fell into two performance categories.  Consultation or

8    removal.  Some defendants provided professional consultation

9    services to the FAA by producing reports that recommended mold

10   remediation strategies.  Other defendants performed the actual

11   mold remediation work.

12        And the Sixth Circuit held that the advice giving

13   consultants owed no common law duty or care to the airport

14   workers.  Now the plaintiffs going to say that Bennett is an

15   application of faults and is no longer good law.  And

16   certainly part of the opinion, the part of the opinion that

17   relates to those who actually perform the mold remediation

18   work is mired in the Fultz contract issue.  And in Loweke the

19   court disapproved that part of -- disapproved Bennett because

20   of that.

21        But the part of the opinion that I'm focused on here,

22   1096, is a -- is about the rule that survives Loweke and

23   that's the principle that you don't look at the contract as a

24   limit on common law liability.  You look at whether the common

25   law supplies a duty.  And the court held there is no common

 1     law duty for those who simply give advice as a consultant.

 2             Now the same is obviously true of VNA.

 3             THE COURT:  But looking at the Bennett case, how much

 4     does that decision rely on the fact that there was no new

 5     hazard created in that situation?  And we have expert

 6     testimony here that lead poisoning is cumulative and even if

 7     the four plaintiffs have lead poisoning prior to 2015, it

 8     would -- their continued exposure -- and we'll get to that.  I

 9     think Mr. Campbell is going to talk about that.  But their

10     continued exposure would create additional harm to them.

11             MR. BISHOP:  Well, I don't think it turns on that,

12     Your Honor.  To us it seems to turn on the difference between

13     giving it advice and -- giving advice and actually operating.

14     And let me talk about the case -- some of the cases that you

15     addressed in Lee --

16             THE COURT:  Okay.

17             MR. BISHOP:  -- as an illustration of this.  You said

18     in Lee the Michigan courts routinely find liability in cases

19     just like this one.  But when you look at those cases, none of

20     them are like this one because they all involve the defendant

21     carrying out or controlling the activity that harm the

22     plaintiffs.

23             They involve contractors who undertook building or

24     repair activity.  We say carried out in a way that harmed the

25     plaintiffs.  So they're like Dyer.  They're like Dyer.  You're

1    on the premises.  You do something that actually harms the

2    plaintiff.

3          The analogy with those cases is if VNA had control

4    over operating Flint's treatment plant, which we didn't.  And

5    there are other Michigan cases on the other side of this coin

6    where there is no control.  And there is no activity,

7    plaintiff directed activity.

8          Sabbaugh is one of those.  You'll remember that's the

9    case where the plaintiffs applied for jobs with the

10   municipality.  The municipal agency contracted with Sabbaugh

11   to give the applicants psyche evaluations and Sabbaugh

12   selected those examiners.  And the plaintiffs alleged that

13   they were negligent in selecting the examiners.

14         And the Court of Appeals held there's no duty of care

15   there.  The client was the agency.  There was no direct

16   interaction with the plaintiffs.  There was no control over

17   the examination.  They just chose the examiners.

18         Now if Flint's relationship were bootstrapped into a

19   relationship between VNA and the plaintiff through the

20   contract, there would have been a relationship in Sabbaugh.

21         And the other case we'd ask you to think about, Your

22   Honor, the consulting physicians.  When a treating physician

23   obtains advice from a consulting physician, that doesn't give

24   rise to a duty of care from the consulting doctor to the

25   patient.  And as the Michigan Court of Appeals said in NDB

1    Bank, that's because the doctor is free to accept or reject

2    the advice and the consultant has no direct interaction with

3    the plaintiff.

4          And that's the situation here.  The contract makes

5    absolutely clear that Flint is in charge.  That it doesn't

6    have to take any of the advice.  And in fact, it didn't take

7    most of the advice.  This is a short-term contract in which

8    Flint was in charge.  We were not.  We had no operational

9    control over the treatment plants.  All we were doing was

10   giving it advice that it could take or leave.

11         And we don't think that under Michigan law that gives

12   rise to a duty.

13         THE COURT:  Okay.

14         MR. BISHOP:  And you know, I would -- that is not an

15   argument that was made in those terms in our brief because it

16   comes out of our study of Lee.

17         THE COURT:  Of Lee, okay.

18         MR. BISHOP:  You know, we have made in our brief

19   arguments about control.  And we've always maintained that

20   there -- we said repeatedly in there that Flint did not take

21   our advice and did not have to take our advice and we had no

22   operational control.

23         THE COURT:  But is there a question of fact about the

24   extent the City of Detroit -- or City of Flint relied on VNA's

25   expertise in making its decisions?

1          MR. BISHOP:  No.  No, Your Honor.  I mean, the

2    contract says that the city will rely on the advice that we

3    give them.  But it also says that they ultimately have control

4    over what to do.  And the fact is, you know, what we -- their

5    ability to rely on us is not the determining factor.

6          The factor is whether they had to rely on this or not

7    or whether we were just giving advice.  We weren't doing

8    anything that directly impacted the plaintiffs.  It was the

9    city that made the decision what to do, what advice to take,

10   and what not to do.  And that we believe under those cases is

11   the critical factor.

12         THE COURT:  Okay.  All right.  Well let me turn to

13   Mr. Stern and ask him a couple of questions on this.

14         And Mr. Stern, let me start with a slightly bigger

15   picture question for you that I may know the answer to but I'm

16   not entirely sure.

17         You had a number of theories of negligence related to

18   2015 primarily I think.  But maybe -- well, I guess 2015.

19   That I don't know that Mr. Humann testified to.  So I just

20   wanted to know if you're still pursuing those theories.  The

21   first being that VNA improper said that the water was safe.

22   The second, that VNA failed to conduct a root cause analysis.

23   And third, should have recommended an increase in ferric

24   chloride.

25         Are you still pursuing those as theories of

1    negligence?

2              MR. STERN:  Yes, Your Honor.

3              THE COURT:  And tell me how you're going to support

4    those arguments.  Because as we know from a while back where I

5    needed to learn this carefully that this is a professional

6    negligence case that will rely on expert testimony unless the

7    lack of due care is so obvious as to be within the common

8    knowledge and experience of an ordinary person.

9              Now arguably the first one VNA improperly said the

10   water was safe might be in the common knowledge domain.  But

11   ferric chloride and root cause analysis and the way a

12   professional engineer would undertake this, I'm less certain

13   about.  So --

14             MR. STERN:  Judge, when I said yes, the only one I

15   was referring to was the properly -- is standing up in a town

16   hall meeting, which there's an audio recording of and a

17   PowerPoint presentation --

18             THE COURT:  Right.

19             MR. STERN:  -- and a transcript where VNA says that

20   the water was safe.

21             Not only is that something that would be in the

22   purview of a jury beyond or without an expert because it's so

23   obvious, but I think that fundamentally our expert does

24   discuss that by discussing the standard of care as do VNA's

25   own employees by discussing health and safety.

```
 1              And when you've got a report and a -- I'm sorry.
 2    When you've got an email on day one that says that, you know,
 3    the quickest and safest option for the City of Flint is to go
 4    back to Detroit, we with need to get this in front of business
 5    development right away, they may not be happy about it but
 6    we've got to tell them.
 7              And then within 24 hours, business development stands
 8    up at a town hall meeting and says, guys, your water is safe.
 9    And I'm paraphrasing all of that.  But that happened.  We know
10    that that happened.  That is absolutely part of our case.
11              The technical components that Your Honor asked about,
12    those are not mentioned by Humann.  And without proper
13    testimony from an expert, we would not be able to present that
14    to a jury.  And so no, those are not part of our case.
15              THE COURT:  Okay.  I just needed to know that.
16              MR. BISHOP:  That is a gross misrepresentation of
17    that email, Your Honor.  But --
18              MR. STERN:  Am I going to get to -- do I get -- I
19    mean, what are we doing?
20              THE COURT:  Just a minute, Mr. Stern.  I'll give you
21    an opportunity to respond, Mr. Bishop.  So this will be Mr.
22    Stern's opportunity.
23              So let's go back to the arguments related to 2015.
24              MR. STERN:  So if I might just start with this,
25    Judge.
```

```
 1              THE COURT:  Sure.
 2              MR. STERN:  I find it -- I don't know what -- I'm
 3    shocked that I got a case that was sent to me at 5:00 PM
 4    yesterday that wasn't in any of the briefing.  And that's
 5    fine.  They gave me notice of it.
 6              And then not only did Mr. Bishop discuss the case in
 7    terms that he wants the Court to see it through, but he also
 8    told the Court what I was going to say about the case so that
 9    I got the case, I got to see the case.  Mr. Bishop got to talk
10    about the case in his terms and then told the Court what I
11    would say about the case and why it matters.
12              I think the case speaks for itself, Your Honor, but I
13    would say this.  In 2012, the Supreme Court in Fultz -- sorry.
14    In 2012, the Supreme Court in Loweke clarifies Fultz and
15    actually cites Bennett as an example of an erroneous
16    interpretation of the law.
17              I mean, the fact that anyone is relying on this for
18    even a sliver of principle to support the position, it's like
19    -- you know, there's 99 things about this case that are
20    probably really bad for VNA.  I mean really bad for VNA.  But
21    there may be one sentence in there that they'd like Your Honor
22    to extract.  And it just does not make any sense whatsoever to
23    rely on this case.
24              And we're glad they're citing it.  I hope Your Honor
25    reads the entire case so that you can see how the progeny of
```

1    cases is changed in how Loweke explains this progeny of cases

2    and actually distinguishes Bennett as being a terrible

3    misrepresentation of the law.

4              THE COURT:  Okay.  No, I certainly will.

5              MR. STERN:  When Mr. Bishop is talking about the

6    doctor cases, you know, in Sabbaugh, for instance, there's no

7    foreseeable harm in that case where there is here.  And that

8    case only asked for economic damages.

9              THE COURT:  Right.

10             MR. STERN:  Which is clearly not the case here.

11             THE COURT:  I think that's key in Sabbaugh,

12   S-A-B-B-A-U-G-H.  I think that's key.

13             MR. STERN:  And I think there's specific policy.  You

14   know, obviously I'm not the legal want that, you know, some

15   others are.  But I go to public policy questions and issues of

16   public policy.  And in doctor cases there's a specific policy

17   basis in not discouraging doctors from consulting with each

18   other, you know, when they're performing their work.

19             There is -- the policy here for an engineer is

20   completely different as evidenced by not just the standard of

21   care as articulated by Engineer Chen, as articulated by

22   Engineer Gnagy, as articulated by Engineer Humann, but by the

23   codes, but the public codes.

24             And so to try to hang a hat on the policy

25   considerations in a medical malpractice case or in policies

1    that affect doctors, when it comes to a completely different

2    profession is not rooted in anything of substance.

3            THE COURT:  I agree that those are very difficult

4    cases to apply in a situation like this.  Those cases are

5    about the doctor/patient relationship or lawyer/client

6    relationship and not the general duty to take due care in an

7    undertaking that affect people beyond the contracting parties

8    or the immediate relationship.

9            And if you will, Mr. Stern, I want to go back to

10   Mr. Bishop for a minute.

11           MR. STERN:  Sure.

12           THE COURT:  And ask you, Mr. Bishop, what is your

13   view of a duty to take due care in an undertaking and what

14   does that mean for people in a consulting role?  Because in a

15   consulting role, the contracting entity will always have the

16   ultimate control.  They're the ones who are seeking the advice

17   of in this instance VNA.

18           So do you think that means consultants never have a

19   duty because they can't ever actually turn the lever on and

20   off at the Flint water treatment plant, for example.

21           MR. BISHOP:  Yes.  It may depend on the terms of the

22   contract.  If the contract makes clear that the advice is

23   going to be implemented, that may be a different case.  But I

24   think the teaching of Bennett is that there is a distinction

25   between giving advice and actually carrying out operations or

```
 1    having control.
 2            And you know what the court said in Bennett is these
 3    defendants did not assume the FAA's duty to provide a
 4    reasonably safe working environment when the FAA hired them to
 5    provide consulting services.  And that's exactly the same with
 6    VNA.
 7            And I think, you know, as to Mr. Stern's policy,
 8    there is a strong policy reason for this sort of distinction.
 9    Extending duty to an advice giving consultant is going to
10    chill the provision of professional services.  And we know
11    that in Lee that you rejected that position.  But we'd ask you
12    to look at that again.  Because, you know, I think in Lee you
13    pointed at the specific facts alleged.
14            But if this Court recognizes a duty to exercise due
15    care in a situation like this, anyone foreseeably harmed
16    through the provision of consulting services, that isn't going
17    to be limited to the facts of this case.  That's going to
18    apply to any service provider in Michigan.  Even though they
19    have no control over what the -- over the party that actually
20    causes the harm --
21            THE COURT:  Well, it might just apply in Eastern
22    District of Michigan at the most at this point.  But go ahead.
23            MR. BISHOP:  You're an influential judge, Judge Levy.
24    Consultants are going to have to deal with that risk.  They're
25    going to have to withhold services and especially from the
```

1   public sector.  So government clients owe duties to large

2   populations, right.  And either consultants are going to

3   withdraw from that of a fear of liability to big populations

4   or they --

5            THE COURT:  But tell me about this chilling

6   influence.  Because we have -- there is already a duty not to

7   perform an undertaking in a negligent way.

8            Let's look at a construction worker.  There's a

9   construction services contractor giving advice on how to build

10  something to a builder.  And I'm not aware of any chilling.

11  We have lots of construction in Michigan.  And I don't see

12  those entities having been chilled.

13           MR. BISHOP:  I think the difference is those are

14  being -- those are operational activities.  If you think about

15  the architect.  I don't remember the name of the architect

16  case but I think it's the swimming pool case.

17           MR. STERN:  Francisco.

18           MR. BISHOP:  Francisco.  The architect is doing an

19  intricate set of drawings, the purpose of which is to be

20  diverted into the building.  That's -- it's a blueprint for

21  what occurs.  That's very different from a consultant saying

22  here are our ideas.

23           And that's what the -- that's what the contract

24  refers to.  Ideas.  Ideas that we know that you'll have to

25  think about some more and uses that term ideas.  And you know

```
 1    here's -- we've looked at this.  Here's what we think.  You,
 2    Flint, are the decisionmaker here.
 3              MR. STERN:  Your Honor?
 4              THE COURT:  Yes.
 5              MR. STERN:  If I may.  And I mean if I haven't shown
 6    it over six years, I mean it in this moment.  I have the
 7    absolute utmost respect for the Court and Your Honor.  That
 8    said, it's not Your Honor that says that there's a duty here.
 9    I'm looking at Marvin Gnagy's testimony.
10              I mean, this comes directly from Mr. Gnagy when it
11    comes to a duty.  And it's on page 437 of his deposition
12    transcript.  Question --
13              THE COURT:  But is Mr. Gnagy talking -- I mean, I
14    think you've got the better argument here.  But is Mr. Gnagy
15    or Gnagy testifying about actually performing the engineering
16    services or is it only about consulting advice when he
17    testifies?
18              MR. STERN:  I don't think he draws a distinction one
19    way or another.  But according to Humann, according to Gnagy,
20    according to Chen, no one, even though given numerous
21    opportunities to draw a distinction between the actual
22    engineering versus consulting services, they all fail to draw
23    any type of distinction, which seems to indicate that it's
24    applicable to both consulting as well as engineering.
25              And in fact, in fact, Your Honor, I think the record
```

1   -- the record in this case lends itself more to consulting

2   than it even does engineering because there are emails which

3   have been attached to our briefs wherein the engineering folks

4   at VNA, whether it's Mr. Chen, Mr. Gnagy, or anyone else they

5   say, business development is doing a PowerPoint tonight.

6         So they're selling, okay.  Business development is

7   selling this job, which is a consulting job.  We must let them

8   know, we have to let them know that the quickest and perhaps

9   the safest remedy for Flint is to switch back to Detroit.  To

10  turn the spigot on.

11        That's not an engineering comment.  That is a

12  consulting comment.  No engineering needed.  No engineering

13  involved.  And even though it's coming from engineers, it's in

14  the context of consulting.

15        So it's not Your Honor who would extend some crazy

16  duty that would impact the policies associated with engineers

17  coming into states and performing services, it's the standard

18  of care that every engineer in this case has discussed in the

19  same way.

20        THE COURT:  Okay.  Thank you.  Mr. Bishop, anything

21  else on this subject?

22        MR. BISHOP:  Yes, yes.  We're not talking about the

23  standard of care.  We're talking about the existence of a

24  duty.  The contract here was for 160 hours of work.  It called

25  for the -- on what the city had done and proposed.  And it

```
 1    asked us to recommend other things to try, understanding that
 2    more study might be needed to, quote, "investigate ideas."
 3    And the contract says that VNA, VNA services, quote, "would be
 4    utilized solely as determined by the city."
 5            I don't know how you get from that to a duty that we
 6    insist that the city do anything.  We were consultants asked
 7    to advise.  Nothing that we did was translated into actions by
 8    the city except through the city's own decisions.
 9            MR. STERN:  Yeah.  There's two ways.  There's --
10            THE COURT:  Let me tell you about a case that's based
11    on Tennessee law.  So I'll make sure that it fits with
12    Michigan law.
13            But it's Merill, M-E-R-I-L-L, Estate of Merill -- you
14    can see what happens here -- versus Arch Cole.  And there the
15    court held that McCoy's actions went beyond mere oversight or
16    consultation.  McCoy visited the mine, went underground to
17    look at the roof, and offered advice about roof control.
18            He also admitted to concluding that Lone Mountain's
19    passive roof system was adequate, the water is safe, you know,
20    here.  And he expressed his conclusion to the mine manager.
21    Viewing these facts in the light most favorable to plaintiffs,
22    a reasonable trier of fact could find that McCoy voluntarily
23    undertook to advise Lone Mountain on its specific roof control
24    problems and that such an undertaking was for the benefit of
25    miners like Merill.
```

```
 1              Therefore, summary judgment was inappropriate and I
 2    have no idea what happened after that in the case.
 3              But I'll be looking at other cases where there was a
 4    consulting role and also I'll make sure -- I'll see how that
 5    fits with Michigan law.
 6              MR. STERN:  Your Honor?
 7              THE COURT:  Yes.
 8              MR. STERN:  Sorry.  So first off, just addressing,
 9    VNA keeps going back to the scope of the contract argument.
10    And tomorrow you're going to hear similar arguments from the
11    LAN defendants.
12              Loweke is clear that a contracting party's assumption
13    of contractual obligations does not extinguish or limit
14    separately existing common law or statutory tort duties owed
15    to non contracting third parties.  And there's a whole
16    analysis.
17              But in addition to that, there's a -- there's an
18    email that was attached to one of our briefs.  And it's from
19    Rob Nicholas to a number of folks where he says don't pass
20    this on.  And while that's -- you know, while that in and of
21    itself should give everyone pause that he's saying don't pass
22    this information on, he goes on to say this begins to prove
23    our concern that with lots of different people doing tests, it
24    is a problem unless clear information is provided.
25              Flow of water in different parts of the building is
```

 1    the school's responsibility.  The city, however, needs to be

 2    aware of this problem with lead and operate the system to

 3    minimize this as much as possible.  And consider the impact in

 4    future plans.  We had already identified that as something to

 5    be reviewed.

 6          And so on the one hand there's the contract,

 7    contract, contract.  Everything is the contract argument.  The

 8    four corners of the contract.  Number one, the law doesn't

 9    support that Your Honor is limited in doing an analysis of

10    responsibility based on what's contained in the contract.  And

11    the contract itself is suspect by the testimony of VNA's own

12    employees who were describing to each other as well as to

13    consultants to the city.

14          On that email there's a woman named Kelly

15    Rossman-McKinney who is a consultant to the City of Flint at

16    the time that she's being emailed that information that says

17    lead could be a problem and this was something we were going

18    to look at.

19          And so these contract arguments -- and they're

20    different tomorrow for LAN than they are today for VNA.  But

21    clearly under Loweke as well as the applicability of the facts

22    of this case, they are not persuasive whatsoever.

23          MR. BISHOP:  Your Honor, if I may?  Not one of the

24    cases that I have cited is a contract case.  They're all about

25    the common law.  The common law of Michigan makes a

1   distinction between consultants and operative or controlling

2   contractors who actually cause the harm.  And we fall on the

3   consulting side of that line.  That's our position.

4           MR. STERN:  Is that argument --

5           MR. BISHOP:  Not that the contract --

6           THE COURT:  But I just think we would have to look at

7   the public policy implications of a consultant not having a

8   duty to undertake their efforts with due care.  That would

9   have a public policy implication as well.  But...

10          MR. STERN:  And Your Honor, we would argue that that

11  applies to both the 2014 and the 2015 questions before Your

12  Honor.

13          THE COURT:  Okay.  So let's move on.  And what are we

14  doing next?

15          MR. CAMPBELL:  Your Honor, this is James Campbell.  I

16  switched to a different service.  So I hope you can hear me

17  now.

18          THE COURT:  Who is covering the intervening criminal

19  conduct theory?  I know it's in your briefs and if you want me

20  to rely on the briefs I'm happy to do that.  You don't waive

21  anything by not arguing it.  Just know that.

22          MR. NGUYEN-DANG:  Your Honor, I'm happy to answer

23  your questions about that, if you have any.

24          THE COURT:  Well, in this instance, let me look,

25  because I did have a question.  Hold on.  I guess -- oh, here

1    you are.  Okay.

2         In this instance, VNA doesn't say we didn't know

3    there was lead in the water, right?

4         MR. NGUYEN-DANG:  Your Honor, I think that we do say

5    that, Your Honor.  I mean, I know Mr. Stern refers to an email

6    about that I guess it was a news article or was going to be a

7    news article about testing at the University of Michigan Flint

8    campus which occurred before VNA started its engagement in

9    Flint.

10        And then when VNA came to Flint though, it looked at

11   the lead testing from -- that the city had conducted in I

12   think it was December of 2014.  And those testing results

13   showed that the city's water was in compliance with the lead

14   and copper rule.

15        Now at the same time that was happening, the city was

16   also testing the water of Lee-Anne Walters home finding

17   elevated lead levels there.  But I think it's undisputed that

18   those results were not shared with VNA.

19        So no, during it's time in Flint and of the work it

20   actually did in Flint, VNA was not aware of an actual lead

21   problem or elevated lead issues in the city.

22        THE COURT:  But isn't there testimony that it's clear

23   that generally it was widely known that there were a great

24   many lead pipes in Flint and that it's clear that you need

25   corrosion control to prevent lead leaching when you have lead

1    pipes?

2              MR. NGUYEN-DANG:  Well, we would --

3              THE COURT:  It doesn't take a criminal withholding

4    information for VNA to know that.

5              MR. NGUYEN-DANG:  Well, Your Honor, with respect it's

6    disputed whether or not that would be enough.  But I think,

7    you know, on the one hand you have the supposition or the

8    possibility that there might be a problem.  And at the time

9    VNA did not know -- I don't think anyone knew -- exactly how

10   many lead service lines were in Flint.

11             But what it did know, the actual data that it did

12   have, the testing by the city that VNA at the time reasonably

13   thought that the city conducted in accordance with the

14   requirements of the lead and copper rule show that there

15   wasn't a problem.

16             So the possibility on the problem on a one hand but

17   the actual testing data on the other, which is the only

18   testing data that VNA had access to, that showed -- that did

19   not show a problem.

20             THE COURT:  I thought that Gnagy's testimony said

21   that he knew the Flint water infrastructure had lead from the

22   first day of his work there.

23             MR. NGUYEN-DANG:  I'd have to look at that testimony

24   again, Your Honor.  I don't want to mischaracterize it.

25             THE COURT:  Okay.  Mr. Stern?

November 22, 2021

```
 1              MR. STERN:  I need to make two points right at this
 2    juncture.  First and foremost, is VNA withdrawing then its
 3    defense that it actually told the City of Flint that there
 4    were issues with lead when in its final report it mentions
 5    corrosion control?  And when Mr. Gnagy was at the Flint water
 6    treatment plant he made a handwritten note that says, "I
 7    informed the folks at the plant that there may be a need for
 8    corrosion control?"
 9              Because one of their largest defenses in this entire
10    case is we did -- even though we weren't required to do it, we
11    told everybody there was a problem with lead.
12              If you look at our final report, we say talk to your
13    engineering about the implementation of corrosion control.
14    And we have a handwritten note from Marvin Gnagy that says
15    that he was down at the water treatment plant and informed
16    somebody.
17              And so it's not just a matter of Marvin Gnagy's
18    testimony saying, you know, during his deposition we knew that
19    there was significant lead pipes in the infrastructure, but
20    VNA has actually posited a defense that despite not being
21    obligated to tell anybody anything because they had no
22    obligations beyond the scope of their work, we actually did
23    tell people.  We told people in our final report and we told
24    people on the ground.
25              And so to say now that there's no evidence that VNA
```

1     knew anything about lead, that is contrary to the defenses

2     that have been raised in this case.  And I don't think you can

3     take multiple positions on that.

4               MR. NGUYEN-DANG:  May I respond to that, Your Honor?

5               THE COURT:  Yes.

6               MR. NGUYEN-DANG:  Of course not is the answer.  That

7     advice is consistent with what we have been saying all along,

8     which is what the actual advice was, was that there was a

9     potential for a lead problem, there could be a lead problem,

10    and that's why you should take those steps.

11              And yes, it's not -- to be clear, it's not merely a

12    handwritten note.  We have an email from a CTM employee

13    memorializing the fact that he was told this by Marvin Gnagy

14    and of course it's in the final report.

15              But the question was, did VNA have actual knowledge

16    of an problem in specific people's homes?  And the answer to

17    that is no.

18              THE COURT:  And so what we're talking about, of

19    course, is the general concept that in Michigan, criminal

20    conduct is ordinarily held to be unforeseeable as a matter of

21    law.  And so just to telegraph what we're talking about.

22              Tell me whether -- it's not obvious to me that the

23    city's failure to turn over the reporting data considered

24    separately from the city's other conduct is a crime under

25    Michigan law.  Is that --

 1            MR. NGUYEN-DANG:  You mean the test results of

 2   Lee-Anne Walters' home?

 3            THE COURT:  Yes.

 4            MR. NGUYEN-DANG:  I don't know that that would be a

 5   crime, but --

 6            THE COURT:  But is that the crime that you're saying

 7   was an intervening unforeseeable event?

 8            MR. NGUYEN-DANG:  I think we would still say that

 9   it's unforeseeable.  I don't think we would expect that the

10   city would withhold information that clearly might have been

11   relevant to the scope of -- might have been relevant to what

12   we were doing.

13            I don't think that -- no.  To your point, I don't

14   think that's necessarily a crime.  I think other criminal

15   actions the city has taken, obviously there was the ones that

16   came before it even entered into the -- it even switched to

17   the Flint River.  And then the subsequent ones when in

18   connection with the June 2015 lead and copper testing.

19            It didn't quite falsify them.  What it did was it

20   removed two of the sampling results so that the overall result

21   would appear to be in compliance with the lead and copper

22   rule.  And I believe there is a theory of criminal liability

23   attached to that.  But...

24            THE COURT:  Okay.  All right.  Is there anything

25   further on this?

1          MR. NGUYEN-DANG:  Not from us, Your Honor.

2          THE COURT:  Okay.  Great.  Mr. Stern?

3          MR. STERN:  Well, actual knowledge is not the

4   standard.  So you know, Mr. Nguyen-Dang mentioned actually

5   knowledge.  I'm not sure there's a case on point that says

6   that actual knowledge is the standard.

7          In terms of knowing versus not knowing, there's

8   testimony from Depin Chen that says they knew at least in

9   October of 2020 -- I'm sorry, 2014 that General Motors, which

10  they were consulting with, had corrosion problems and that

11  they were turning off the spigot to Flint.

12         And you know, not to editorialize too much, but it's

13  incredible that the conduct being alleged against the city of

14  not informing VNA of testing that was taking place on Lee-Anne

15  Walters' home, that that matters so much that it's in all of

16  their briefing and it's a defense to this.

17         But them not informing anybody of the fact that, yes,

18  lead seems to be a problem.  And don't share this with anyone.

19  And GM shut off, you know, because of lead.  You know,

20  everything is like will just want to have it both ways.

21         You know, the city's bad for not telling us anything

22  but we're not bad for not telling anybody anything.  And

23  again, just the heads/tails thing that Your Honor -- it's not

24  a cute thing, but it's just the reality.  It's just they

25  always win no matter which side of the coin that it gets

1    flipped on and you just can't have it both ways.

2              THE COURT:  Okay.  Thank you.  What we're going to do

3    is take about a 10-minute break and then we'll return.  So I

4    just ask that -- don't log off because then -- but just you

5    can turn your cameras off and your mics off and we'll be back

6    in 10 minutes.  Thank you.

7              THE CLERK:  Court is now in recess.

8                        (Brief Recess)

9              THE COURT:  We'll get starred.

10             MR. CAMPBELL:  Your Honor, this is James Campbell.  I

11   think if it's okay with you, the next thing that we would take

12   up is the issue regarding three of the four bellwether

13   plaintiffs not drinking the water.

14             THE COURT:  Yes.

15             MR. CAMPBELL:  After VNA got to Flint.

16             THE COURT:  Hold on while I get to that.  Okay.

17             MR. CAMPBELL:  Thank you, your Honor.

18             So this argument does not apply to Plaintiff Teed.

19   It applies to the remaining three plaintiffs Ware,

20   Vanderhagen, and Sherrod.  And the testimony from each of the

21   parents who testified in the case on behalf of their child is

22   that each of them stopped drinking the water before February

23   2015 when VNA arrived in Flint and was engaged with the

24   consulting contract.

25             THE COURT:  Okay.  So here, just to frame where we

```
 1   are in this argument, if the Court determines that the 2014
 2   conduct does not constitute negligence, then this is where
 3   this argument kicks in.  Because then VNA's conduct begins in
 4   February of 2015.
 5         MR. CAMPBELL:  That would be correct, Your Honor.
 6   But it's not an on and off issue and it's not, you know, if
 7   you find 2014 versus 2015.  And here's the reason.
 8         As far as we can determine, Your Honor, there's no
 9   definition of when in 2014 this alleged duty would be created
10   during that time period.  There's the response or the request
11   for proposal in Detroit.  There's the response to the request
12   for proposal in Detroit.  And there's the final report that
13   VNA issued on Detroit which I believe is November 2014.
14         In any case, there's no definition about when in that
15   -- those several months, the duty -- this alleged duty would
16   arise.  And there's no proof as to when in that time -- well
17   there's some issue for at least some of the three plaintiffs
18   as to when they stopped drinking the water.
19         THE COURT:  I think Mr. Humann testified or it may
20   have been in his deposition, but certainly his report, that at
21   the latest there was a duty in November of 2014 as the report
22   was finalized.
23         MR. CAMPBELL:  Okay.  If we were to assume that date,
24   Your Honor, then the Ware plaintiff, it's fairly clear that
25   that family and that plaintiff stopped being exposed to the
```

 1   water in the spring shortly after the water switch or in the

 2   summer of 2014.  So that if Your Honor were to go with that

 3   analysis, then the Ware plaintiff would be out.

 4            The Vanderhagen plaintiff didn't --

 5            THE COURT:  Well, let's go back to Ware.  So I'm just

 6   going to refer to Ware as D.W.  And Dr. Michaels, in his

 7   expert report and testimony, concludes that D.W. was likely

 8   exposed at her elementary school through 2015 and that the

 9   school she attended was tested in November of 2015 and those

10   tests revealed lead levels up to 23 times the regulatory

11   action level.

12            And so what is your response to that testimony?

13   There's no evidence that she was told not to drink water at

14   school.  And I know that I'm not -- testimony is not

15   admissible if it is based 100 percent on speculation.  But

16   there are exceptions to that where it is absolutely without

17   question that children need water in the course of a day and

18   drink water from water fountains and sinks and wash their --

19   wash things and so on.

20            So what's your response to that?

21            MR. CAMPBELL:  The response is, Your Honor, it's pure

22   speculation.  And it's not one of those situations where --

23   certainly we all need water.  But simply because we all need

24   water doesn't mean that this child drank water at the school.

25   Ms. Martin, D.W.'s mother --

1          THE COURT:  Yes.

2          MR. CAMPBELL:  -- told D.W. not to drink the water

3   outside the home.  And that they stopped drinking the water

4   outside the home.  And I would say that Mr. or Dr. Michaels, I

5   forget which, testimony is just speculation, you know, that

6   anything can happen.  And this is not one of the things that

7   can be put forth by just saying, well, I think it happened.

8   There's no -- there's literally no evidence of it.  Zero.

9          And also there's no evidence of -- and we'll get into

10  this in the causation type arguments.  But there's no evidence

11  that there was lead in that water that she may have taken.

12  There's no evidence that she drank it.  There's no evidence

13  that it was anything substantial.  And there's, you know, a

14  continuous and substantial exposure to the water.

15         THE COURT:  Where is the testimony in the Martin

16  deposition that she told D.W. not to drink water outside the

17  home?

18         MR. CAMPBELL:  Page 109 lines 9 through 12.

19         THE COURT:  Okay.  Thank you.

20         MR. CAMPBELL:  And there's no evidence that the child

21  disregarded that.  You know, there's just simply no evidence,

22  Your Honor, that this child ingested water, unfiltered water

23  from Flint after VNA arrived in February of 2014.

24         And as Dr. Bithoney, one of the plaintiffs' experts

25  said, if they're not -- quote, "If they weren't drinking it,

1    they weren't exposed."  And that's on his deposition at page

2    231.

3              So that's what I'd say about D.W.  There's simply no

4    evidence post VNA's arrival that she drank the water.  Or

5    yeah.

6              THE COURT:  Okay.  So we've got about a 6 to

7    7-year-old at this time who goes to school at a school where

8    the lead levels are 23 times the regulatory action level

9    throughout this period in 2015.  And you're suggesting that it

10   would be speculation to assume she drank some water at school?

11             MR. CAMPBELL:  Absolutely, Your Honor.

12             MR. STERN:  Your Honor, may I respond to that?

13             THE COURT:  Sure.

14             MR. STERN:  Okay.  Your Honor, thank you.

15             Yes, Ms. Martin testified that she told D.W. to stop

16   drinking the water in the summer of 2014.  Mr. Campbell

17   properly cites the page and lines of that deposition.  Martin

18   does not have any personal knowledge as to whether D.W.

19   followed her instructions.  And at page 110 lines 3 to 6, D.W.

20   was often unable to focus and required frequent redirection.

21             Ms. Martin was never questioned about other locations

22   about which D.W. may have consumed tap water, only at her

23   home.  And it's not clear D.W. would have even understood that

24   mixed water in other products carries the same risk as plain

25   tap water.

1           You can see Bithoney's testimony -- sorry,

2    Dr. Bithoney's testimony that the plaintiff each mixed their

3    water for certain food and drank items such that the kids

4    drank water not only as plain water but as Kool-Aid or mixed

5    with Jello or in soups or in cooking, tea, whatever.  And for

6    infants, they mixed Enfamil with tap water.  That's from

7    Bithoney's deposition.

8           So when you combine the questions that weren't asked,

9    when you combine the testimony that she -- sorry, that D.W.

10   was unable to focus, both by Dr. Krishnan, Dr. Bithoney, and

11   by the mother's own testimony in conjunction with

12   Dr. Michaels' report, it is not mere speculation that this

13   child would have drank the water at school.

14          It is certainly a question of fact that VNA will have

15   every opportunity to cross-examine about.  And frankly,

16   there's a common sense argument that a 6-year-old child in a

17   public school for a course of eight or nine months is going to

18   have some interaction with the water.  And I think Bithoney

19   says in his deposition testimony that it's common sense that a

20   child would consume water at school.

21          THE COURT:  Okay.

22          MR. CAMPBELL:  Your Honor, if I may?

23          THE COURT:  Thank you.  Let me turn back to Mr.

24   Campbell.

25          MR. CAMPBELL:  Dr. Bithoney's opinions about what is

```
 1    or isn't common sense are simply not admissible.  If he has to

 2    say something about it, it speaks to whether it's common sense

 3    or not.

 4              So as to the issues of questions not asked --

 5              THE COURT:  Oh, I mean, we could easily say it's --

 6    that it's speculation that a child wouldn't drink water at

 7    school or in Kool-Aid or Jello or whatever it's being mixed

 8    with.

 9              All I want to say is this is hard material.  It's not

10    hard legally but factually I think it's very challenging.

11    So...

12              MR. CAMPBELL:  Your Honor, this is the plaintiffs'

13    burden.  It's a simple fundamental burden --

14              THE COURT:  Yes.

15              MR. CAMPBELL:  -- that is expressed in Michigan law

16    up and down in every one of the cases.

17              THE COURT:  No, you're absolutely right.

18              MR. CAMPBELL:  Their burden to establish that these

19    children ingested these water -- this water unfiltered.  As

20    Dr. Bithoney says, if they weren't drinking it, they weren't

21    exposed.  It's a fundamental simple fact but it is the

22    plaintiffs' burden.

23              And suggesting that we didn't ask questions that may

24    have produced some answer, that's not the standard here.  It's

25    the plaintiffs' burden to come forth and they haven't.
```

1      THE COURT:  Yeah.  I understand that.  So should we

2  move on to one of the other three you're questioning regarding

3  the water?

4      MR. CAMPBELL:  Sure.

5      THE COURT:  R.V. is an interesting one.  Because

6  there's testimony that R.V.'s mother clearly remembered -- she

7  had said originally that R.V. stopped drinking Flint tap water

8  at home in 2014.  And but then she, later in her testimony,

9  corrects it and says she remembered that she stopped drinking

10  the water after discussing an elevated blood lead level --

11  blood lead measurement with R.V.'s doctor.

12      And in the deposition it becomes clear that the high

13  blood lead test did not occur until January 14 of 2016.  So

14  we've got R.V. drinking, according to this testimony, until a

15  year -- close to a year after VNA's contract at Flint.

16      MR. CAMPBELL:  Your Honor, I understand what you are

17  saying about that testimony.  But that's not the fair reading

18  of it.  Ms. Vanderhagen was asked about R.V.'s ingestion and

19  their use of the water through the deposition.

20      And number one, R.V. was about one-year-old when they

21  stopped using the water.  And that's 2014, not '15 or '16.  It

22  was within a couple of months of them moving to Flint, which

23  is 2014, not '15 or '16.

24      And none of these blood tests were elevated for R.V.

25  They were all low.  And so none -- bless you, Your Honor.

```
1    None of them are elevated.  So the fair reading of the
2    testimony is that she was speaking about December 2014 when
3    that first blood lead test after moving to Flint was provided
4    by the doctor.  And that's a fair reading, you know, of it.
5              THE COURT:  Okay.
6              MR. STERN:  I mean, that's Mr. Campbell's fair
7    reading of it, Your Honor.  You know, she said I messed up the
8    dates because I know that we were drinking water then at that
9    time.  Whenever she got a high result is when we stopped
10   drinking water.
11             She went on to say, I just know that she told me one
12   of the tests, that it was high, that her lead level was high.
13   And from whenever the lead level was high, that's when we
14   stopped drinking.
15             Obviously, obviously there is a ton of testimony here
16   that's ripe for cross-examination that goes to the witness's
17   credibility.  But to just blanket say that a fair reading of
18   the testimony, that this testimony is that the child didn't
19   drink the water, that wouldn't be my reading of this
20   testimony.
21             And additionally, the same issues that existed for
22   the Ware plaintiff exist here.  I mean, simply because mom
23   says whatever mom says doesn't mean that the child stopped
24   drinking the water.  And yes, it's our burden at trial.  But
25   I'm also a little bit enamored by the new argument that
```

 1   without a contemporaneous lead level during the period of time

 2   of drinking, that there is no exposure.

 3           You know, Your Honor has ruled on one Daubert

 4   challenge and that was to Dr. Crakes -- I'm sorry to -- I

 5   imagine Dr. Crakes is forthcoming at some point.  To

 6   Dr. Specht.  And I think it's clear to everybody at least

 7   that's a part of this hearing that the damages and exposure

 8   component of proof associated with plaintiffs' claims at least

 9   for these bellwether plaintiffs deals in some part with the

10   bone scans.

11           And so to say that, you know, the contemporaneous

12   lead level, was -- there wasn't even a lead level, or whatever

13   Mr. Campbell said in conjunction with his reading of mom's

14   testimony, is a blanket that this child's case must be thrown

15   out on summary judgment just doesn't comport with what the

16   testimony actually is.

17           It mistakes the purpose of a summary judgment moment

18   for what I think cross-examination and credibility arguments

19   are for trial.  But if you showed this testimony to more than

20   --

21           THE COURT:  I think Mr. Campbell was referring to the

22   blood lead test because that's what the mother mentioned in

23   her deposition.  So I --

24           MR. STERN:  That's fine.  Then I misheard -- I didn't

25   mishear him.  I misunderstood what the point of raising that

1    was.

2            But the underlying point is that, yeah, reading this

3    mom's testimony, it's a bit all over the place.  But there is

4    certainly enough in this testimony that indicates that the

5    child did not stop drinking the water until 2016.  And in fact

6    it was a January 2016 blood lead level which was higher than a

7    previous blood lead level.  And Vanderhagen immediately

8    realized her earlier testimony was incorrect at page 84 line

9    22 through 85 line 6.

10           THE COURT:  Okay.  And -- thank you, Mr. Stern.

11           And Mr. Campbell, Mr. Stern raises sort of we are at

12   the summary judgment stage.  I'm required to view the evidence

13   in the light most favorable to the plaintiff at this stage of

14   the case.  And presumably that includes inferences from

15   inconsistent or difficult to understand or difficult to follow

16   testimony.

17           Would you agree with that?

18           MR. CAMPBELL:  I certainly agree with the standard

19   for summary judgment, Your Honor, and what Your Honor's

20   obligated to do.  But I disagree that the testimony from

21   Ms. Vanderhagen is subject to that interpretation.  I just --

22   I don't agree with that.

23           I think if you look at page 77 lines 10 through 13

24   followed by page 81, 1 through 7, it is really quite clear

25   that this child was one year old.  It was her annual visit.

```
 1    It was just after they moved to Flint.  The child is an
 2    infant.  She was only one year old in 2014.
 3            And the suggestion may pertain to, you know, an older
 4    child that you don't know where the child is or what have you.
 5    That simply doesn't pertain to R.V. because of the child's age
 6    and was with the parents.
 7            THE COURT:  Okay.
 8            MR. CAMPBELL:  So that just -- that argument, which
 9    is speculation, as I've argued already, doesn't pertain here.
10            So as to the summary judgment standard, I believe it
11    is met when you read this testimony together.  It is -- there
12    is no high blood lead level.  And if that were the case --
13    well, there is no high blood lead level.  The one in 2016 I
14    believe is 1.6 or some such thing.  So it is not elevated, not
15    high.  As with every other blood test for these children, it's
16    low.
17            MR. STERN:  Your Honor, if I can just point the Court
18    to one case, O'Brien v Ed Donnelly Enterprises.  It's 575 F.3d
19    567 at 595.  It's a Sixth Circuit case from 2009.  It states,
20    "The conflicting testimony within the depositions raises a
21    genuine issue of material fact which precludes summary
22    judgment."
23            I understand that Mr. Campbell believes that there is
24    no conflicting testimony in the deposition.  However, if Your
25    Honor finds that there is any conflicting testimony within the
```

 1    mother's deposition or for any other reasons like those that
 2    exist for the Ware child and children drinking water beyond --
 3    out of the tap, I think Your Honor is well within your ability
 4    to find genuine issues of material fact exist such that
 5    summary judgment on this plaintiff should be denied.
 6              THE COURT:  Okay.  Thank you.
 7              Let's look at E.S.  Did we discuss E.S.?  I don't
 8    think so.
 9              MR. CAMPBELL:  We have not, Your Honor.
10              THE COURT:  Okay.
11              MR. CAMPBELL:  So the argument here is the same as
12    the others, that the testimony is that Danielle wheeler,
13    E.S.'s mother, testified that they stopped drinking the water,
14    quote, shortly after the April 2014 switchover.  And you can
15    find that at page 158 line 10 through 159 line 1.  And they
16    never stopped -- they never resumed drinking the water.
17              Just like the other two, even when these depositions
18    were taken in 2020 I believe, but whenever the depositions
19    were taken, these families and these children were not using
20    the Flint tap water even at that point in time.
21              THE COURT:  Well, what about her testimony on page
22    158 of her deposition where the mother testifies but still yet
23    when they go to other people's houses and they don't quite
24    believe, you know, oh, the water is not this.  And I think
25    she's talking about the adults there.  To where they still

1    practice however they practice at their own location where

2    they stayed at.

3            So what I understood her to be saying is that

4    different people viewed the water situation differently.  We

5    are nationally familiar with that at this point.  We all think

6    we understand one thing about COVID and it turns out that we

7    have vastly different views of what we're learning about it.

8            So E.S. was three years old at the time, would be

9    very difficult to have a, you know, a conversation with her

10   about what to do outside the home.  But Ms. Wheeler also says

11   that she continued to wash dishes with tap water.  That her

12   grandmother, E.S.'s grandmother still cooked with the water.

13   And that E.S. may have drank tap water at her grandmother's

14   house.

15           And Bithoney says that the washing of dishes and

16   cooking with the water obviously he says is enough to cause

17   lead poisoning.

18           MR. CAMPBELL:  If I can take that one at a time.

19           THE COURT:  Okay.

20           MR. CAMPBELL:  Page 158 where Ms. Wheeler referenced

21   some other place.  There's no time reference there.  So we

22   don't know when that may or may not have taken place.  And

23   there's also nothing specific about it about that this

24   actually took place.

25           But if you go to the very next question.  Okay.  So

 1    it's a follow on to the question.  So then did you stop

 2    drinking the water shortly after April 25, 2014?  Answer,

 3    correct.  Because they told us not to drink the water.

 4         It was further follow-up on that.  So it's really

 5    quite clear that this family and this child stopped drinking

 6    the water at that point in time.

 7         The issue regarding washing the dishes and the like,

 8    I believe that -- let me just check my notes.  Well, I'll go

 9    to the grandmother's house next, Your Honor.

10         THE COURT:  Okay.

11         MR. CAMPBELL:  On that one, again, it's hearsay.

12    It's not that Ms. Wheeler observed that or heard that or could

13    testify about it.  It was reported hearsay from another one of

14    her children.  And there's also no timeframe associated

15    whether that took place before or after February 2015.

16         And further, there's also testimony about the

17    grandmother's house that there were filters available.  So

18    that's simply not enough.

19         As to washing the dishes, Your Honor, I would cite

20    Dr. Bithoney's testimony that if they didn't drink it, they're

21    not exposed to it.  And that washing of dishes in this

22    circumstance -- and I know that one of the plaintiffs

23    testified that they used bottled water to wash the dishes.

24    And I just can't find my reference to whether that's E.S. or

25    not.

November 22, 2021

```
1              THE COURT:  Okay.

2              MR. CAMPBELL:  But this wasn't argued in the brief

3    and in order to get enough lead, enough into the child, to

4    anybody, you need more than washing the dishes.  There's no

5    testimony before Your Honor that that's going to cause the

6    type of issues that we're talking about here.  I would stand

7    on Dr. Bithoney's --

8              THE COURT:  What about E.S.'s grandmother cooking

9    with the water?  Because we also know that cooking with tap

10   water with lead is especially dangerous because you boil water

11   or heat it, the lead in the water concentrates so that it's

12   more toxic.

13             MR. CAMPBELL:  So Your Honor, again, we just don't

14   know whether that happened or not.  There's no evidence before

15   you that that occurred.  And that there was this one reference

16   that Ms. Wheeler's older I believe son reported that the

17   grandmother provided food that was cooked with Flint water.

18             That's not enough.  It has to be unfiltered water.

19   We don't know that.  We don't know when it took place.  And it

20   seems like as reported in the testimony this reported hearsay

21   was a one off issue.  And that Ms. Wheeler didn't want that to

22   happen at the grandmother's house.

23             So I just -- that's not enough here for Your Honor.

24   There's nothing here, admissible evidence, to get over the

25   summary judgment issue on the consumption at the grandmother's
```

 1    house.

 2              THE COURT:  Okay.  Let me turn to Mr. Stern.  And I

 3    have two questions to you.

 4              How do we get over that hurdle that we need to have

 5    evidence that is admissible?  But second of all -- so hang on

 6    to that for a second.  But I'm interested in where you have --

 7    where I can look in the record of your experts, in particular,

 8    for evidence of this incremental exposure after February of

 9    2015 and whether that exposure is enough to cause -- enough --

10    well, where do you have evidence of specific causation that

11    would be enough to lead to the diagnoses that Dr. Krishnan or

12    others have found or discussed?

13              MR. STERN:  It's all from Dr. Bithoney, Your Honor.

14    Dr. Bithoney describes it in every one of his reports.  He

15    talks about dose response.  He discusses in his deposition

16    about how each instance of exposure to lead causes a new

17    injury.

18              And in terms of the specifics, I mean, each one of

19    these children is different.  But the testimony from -- I was

20    actually surprised that they even raised Emir Sherrod here.  I

21    mean, the mom says the family continued to drink unfiltered

22    tap water from other people's home.  That's at page 158, 1

23    through 9.

24              She says there was sometimes a filter at grandma's

25    house but it wasn't installed until the end of 2015 and may

```
1    not have been installed properly.  That's at 162, line 15
2    through 163 line 10.  As well as 165, line 13 through 17.
3              The combination of Dr. Bithoney's testimony,
4    Dr. Michaels' testimony, the testimony of the parents, it all
5    -- it all comes together in a way that certainly is enough to
6    withstand summary judgment at this sage.
7              I mean, Dr. Michaels counts the days from after April
8    25, 2014, that each kid would have been exposed to lead in the
9    water.  I mean, this is not speculation.  This is a
10   combination of Dr. Michaels, Dr. Bithoney, the parents' own
11   testimony, and common sense.
12             THE COURT:  Okay.
13             MR. CAMPBELL:  Your Honor, I would just add -- and
14   this will flow into the next argument.  But there is also no
15   evidence of any lead levels as to any of these homes.  I
16   remind you that none of these homes for the four bellwethers
17   or the three we're talking about had lead service lines and
18   there's nothing to suggest that they had elevated lead levels.
19   And the same thing goes for the grandmother's house, whether
20   there was any lead in that water.
21             THE COURT:  Okay.  Thank you.  All right.  Who is up
22   next?
23             MR. NGUYEN-DANG:  I am, Your Honor.
24             THE COURT:  Okay.  There you are.
25             MR. NGUYEN-DANG:  So good morning again, Your Honor.
```

November 22, 2021

```
 1    So I'm going to discuss the remaining aspects of causation.
 2    So assuming that plaintiffs can prove that they drank some
 3    water after VNA arrived in Flint, they still have to prove
 4    three more things to establish causation in this case.
 5              First, as Mr. Campbell sort of eluded to, they have
 6    to prove that they consumed enough lead from Flint water to
 7    cause or aggravate their conditions, which means both that the
 8    water contained enough lead and that they drank enough of that
 9    water.
10              Second, they have to --
11              THE COURT:  Well, let's assume we just covered that
12    in Mr. Stern's response that between the parent's testimony,
13    Dr. Bithoney, Michaels, that there's enough there.
14              MR. NGUYEN-DANG:  I don't -- I mean, I want to make
15    something clear on this point, Your Honor, is that both
16    Dr. Bithoney and Dr. Michaels acknowledged that they don't
17    actually estimate the amount of lead in anyone's water.  Not
18    in these plaintiffs, at their homes, or in any other location.
19              So we may be able -- and Dr. Michaels, as Mr. Stern
20    points out, he counts the number of days in which they were in
21    Flint.  But that assumes that there was water in the lead --
22    sorry, that there was lead in the water.
23              THE COURT:  Lead.
24              MR. NGUYEN-DANG:  And that they drank that water.
25    And we just don't have water lead levels at any location.
```

1   Either their homes or their grandmother's home or anything

2   like that.

3          And so just saying that, well, between that we might

4   be able to assume that they drank some water at some point in

5   Flint, that doesn't get to the question of was there was lead

6   in that water.  And in fact, both Dr. Bithoney and

7   Dr. Michaels expressly say that they do not attempt to

8   quantify any lead levels in that water.  And frankly they

9   would not be qualified to do so.  Right.

10         They are not water treatment engineers.  They don't

11  know about how water interacts with pipes and the like.  So

12  there's just an absence of evidence on this point.

13         THE COURT:  What about Dr. Bithoney who says there is

14  literally no other explanation for the high level of lead in

15  their bones.

16         MR. NGUYEN-DANG:  Well, I think that's -- we were

17  talking about two separate issues, Your Honor.  They have one

18  the obligation to prove that there was lead in water.  And

19  second, they have the obligation to rule out other causes.

20  And so those are two independent obligations that are put on

21  them.  We would put to you that you can't bootstrap the second

22  one to come back as affirmative evidence that there was lead

23  in the water.

24         I mean, he is quite clear that he doesn't know that

25  as a fact.  He assumes it because he -- I think he testifies

November 22, 2021                                              86

 1    he isn't aware of any other source.  But that assumption isn't
 2    affirmative evidence that there was lead in the water that
 3    these plaintiffs drank.  I also --
 4              THE COURT:  But what we do know -- I mean, it's not
 5    disputed that the general fact that there was a lead crisis in
 6    Flint following the switch to the Flint River in April of
 7    2014.  Are you disputing that also?
 8              MR. NGUYEN-DANG:  I suppose it depends on what you
 9    mean by a general lead crisis.
10              Dr. Bithoney cites Dr. Edwards' --
11              THE COURT:  Yeah.
12              MR. NGUYEN-DANG:  -- in his Virginia tech team
13    study -- sampling, I should say, in 2015.  And that sampling
14    found that 17, one seven, percent of the homes in that sample
15    had water lead levels above the -- above 15 parts were
16    billion, which is the regulatory limit.  And that a further 40
17    percent, so still less than half, was above 5 parts per
18    billion.
19              So from that evidence it is not a reasonable
20    inference to say that every single home, every single location
21    in Flint had elevated or significant quantities of lead.  In
22    fact, it says just the opposite.
23              So I do think that it's still plaintiffs' burden to
24    show that they drank water from the locations that are in the
25    minority that actually had elevated water lead levels and they

1    just haven't presented any of that evidence.

2              THE COURT:  Okay.

3              MR. NGUYEN-DANG:  And so I think that covers -- I

4    think Your Honor you mentioned earlier in relation to I

5    believe it was D.W.'s schools --

6              THE COURT:  Um-hum.  I did.

7              MR. NGUYEN-DANG:  Just to follow-up on that point,

8    which was the city -- we have this in one of our expert

9    reports but I don't think it's disputed.  Of the city's

10   sampling in that school, 85 percent of the samples were below

11   the 15 parts were billion limit.  So even though there were

12   locations in that school that detected -- just to be clear,

13   this was after the Flint water crisis was over, that detected

14   elevated lead levels, it was still the minority of the

15   locations in that school.

16             So it would still be, we would submit, speculation to

17   conclude that D.W. happen to drink at that small minority of

18   locations from that small minority of locations that later

19   were determined to have elevated lead levels.

20             Our point is just that at no point has any

21   plaintiff -- have plaintiffs put on any evidence from anyone

22   that attempts to quantify or even in a qualitative way say

23   that the water that these plaintiffs drank had enough lead and

24   that then they drank enough of that water to cause or

25   aggravate their injuries.

 1           And that's true both as a general matter but also

 2   specifically to the time period relevant to VNA.  Again,

 3   assuming Your Honor rules a certain way on the 2014 issue.

 4           THE COURT:  Okay.

 5           MR. NGUYEN-DANG:  But if VNA's duty started in 2015,

 6   they have made -- they have shown absolutely nothing about

 7   water lead levels at any point in time.

 8           THE COURT:  Okay.

 9           MR. STERN:  May I respond, Your Honor?

10           THE COURT:  Sure.

11           MR. STERN:  Okay.  I just want to start a little bit

12   toward the end and then work my way back and I won't go into

13   much detail.  But Mr. Nguyen talks about the 15 parts per

14   billion and it being less than that and he concedes that was

15   after the water crisis.

16           We are not arguing and I don't think it's anyone's

17   burden to show that the level of lead in anybody's water was

18   necessarily above the actionable level in order for a child to

19   have been poisoned.  We're now talking about something

20   different.

21           I mean, Dr. Bithoney makes clear that there is no

22   safe level of lead.  And so if it was 14 parts per billion

23   rather than 16 parts per billion, A, it's after the water

24   crisis and we know that once Flint switched back to the DWSD

25   and the water that was being received had been treated by DWSD

1    that the lead levels necessarily would go down because the

2    pipes were now being coated by water that had been treated.

3    And so you would have an expectation that post Flint water

4    crisis, the lead levels in the water would go down.

5          Mr. Nguyen said it's the plaintiffs' job to rule out

6    other causes.  I'm not sure this is a medical malpractice

7    case.  But if what he's insinuating is that there may be other

8    causes and VNA intends to raise at trial alternative theories

9    of causation, the burden for that is on the alternative theory

10   of causation razor, not the plaintiffs who are posturing their

11   case a certain way.

12         And if they want to cross-examine Dr. Bithoney on

13   alternative theories of causation, obviously that's something

14   that could be done at trial.  But it's not plaintiffs --

15         THE COURT:  I think what I'm understanding is he's

16   talking about specific causation, which does require a

17   differential diagnosis.  I think that's all that I'm hearing

18   so far.

19         MR. STERN:  And Dr. Bithoney testifies to that for

20   each plaintiff.  He says I see no other plausible explanation

21   for why their levels of lead were so high in conjunction with

22   his study of Michaels.  In conjunction with his study of

23   Edwards.  In conjunction with his study of Dr. Mona.  And so

24   he didn't just pull that out of thin air.

25         Dr. Bithoney's testimony is based on reliance on a

1    number of studies that have been sort of discussed at nauseam

2    in his Daubert.  Now listen, respectfully if Your Honor were

3    to determine that Dr. Bithoney doesn't meet the Daubert

4    standard and cannot testify, there's no issue here.  You know,

5    there would be no issue here.

6         The other thing I'd like to say is that Dr. Michaels

7    testified -- and I pulled the cite.  He says elevated lead

8    exposure evidently has occurred in multiple places, most

9    notably at homes and in the schools and/or daycare centers.

10   That's from his deposition at page 12.

11        Again, does that mean that he's right and everyone

12   should take it as the gospel?  Not necessarily.  It means that

13   he has given a statement now that might be widely criticized

14   and ripe for cross-examination at trial, just like Bithoney's

15   statements, and his reliance on certain things.

16        But again, we're at the summary judgment stage here.

17   To say that there is no question of fact to support the

18   exposure and the causation issues at this stage, it's just not

19   accurate and it's premature.

20        I'd also like to note one other pointed.  Dr. Finley

21   -- I think he's a doctor.  He's one of VNA's own experts.  You

22   know, Mr. Campbell and I believe now Mr. Nguyen, they keep

23   raising this issue about there's no lead pipes in the families

24   homes.

25        Their own expert testified that copper service lines

1    and cast iron water mains leach lead into the water.  And so

2    there's this gigantic red herring that has been put out there

3    both in their initial briefing and the reply brief and the

4    supplemental brief and today during oral argument that no lead

5    lines in the home equals no lead to the kid.

6           And defendants' own expert takes a different position

7    on that.  And when you juxtapose Dr. Finley's testimony with

8    Dr. Bithoney's testimony with Dr. Michaels' testimony with the

9    parents' testimony, not only are there questions of fact,

10   there's just no way to find that there aren't questions of

11   fact with regard to both exposure and causation, Your Honor.

12          MR. NGUYEN-DANG:  If I may, Your Honor, a couple of

13   points on that?

14          THE COURT:  Yeah.  Just a moment.

15          MR. NGUYEN-DANG:  Okay.

16          THE COURT:  Okay.  Go ahead.

17          MR. NGUYEN-DANG:  So I think I just want to address

18   two things.  The first is that I had -- was planning on

19   talking about the ruling out part later to your point.  I was

20   referring to the differential diagnosis and I hadn't quite

21   gotten to that yet.  I was still just on the point about

22   whether there was lead in this water.

23          You know, Mr. Stern refers to the deposition of

24   Dr. Michaels.  Dr. Michaels was asked specifically, do you

25   know the additional amount of lead that the children were

1    exposed to from the water furthest period of time, you know,

2    April 25, 2014, through December 31, 2014.  Here are the

3    dates.  I don't know that number.  And this is on pages 161,

4    162 of his deposition.

5              My next question refers to the time period January 1,

6    2015, until October 16, 2015.  Same question, did you quantify

7    or do you know the additional amount of lead that these four

8    bellwether children were exposed to during that timeframe?

9    Answer, no.

10             THE COURT:  And he's not the specific causation

11   expert as I understand it.

12             MR. NGUYEN-DANG:  That's right.  He is not

13   Dr. Bithoney --

14             THE COURT:  Right.

15             MR. NGUYEN-DANG:  -- who provides a differential

16   diagnosis.  He is their toxicologist.  And he does, as

17   Mr. Stern pointed out, he does say that he thinks there was

18   lead in the water.  But that still has to be based on some

19   fact.

20             The fact that an expert says it without actual

21   factual support doesn't make it a true fact in this world.

22   And so he makes these assumptions, it's true.  But that's not

23   a factual basis about whether or not there was lead in the

24   specific water that these plaintiffs drank.

25             But I kind of also would like to move on to -- oh,

1    sorry.

2            THE COURT:  No, please.  You can move on.

3            MR. NGUYEN-DANG:  Unless Mr. Stern wants to respond

4    on this point.

5            THE COURT:  Oh.

6            MR. STERN:  Yeah, I would just for a moment, Your

7    Honor.  Michaels' report page 2 to 6 addressing this very

8    issue says apparently none of the lead tests was conducted at

9    the homes of bellwether plaintiffs.  That's a fair point.

10           This absence of empirical data, however, should not

11   imply absence of lead in plaintiffs' residential drinking

12   water.  Indeed, data are available quantifying lead

13   concentrations in Flint residential drinking water during the

14   water crisis.

15           And that's at Piper, et al 2018.  Reported results of

16   sampling 268 homes in August of 2015 in the five primary Flint

17   zip codes.  48503 to 48507.  All 16 residences of the ten

18   bellwether plaintiffs at the time, which includes the four

19   that we're now discussing that are going to trial, are located

20   in one of these five zip codes.  That's his report at page 9

21   -- sorry, that's his report 2 to 6.

22           Then at page 9 he says, as a group of bellwether

23   plaintiffs evidently have experienced protracted exposure to

24   elevated lead concentrations in drinking water using the City

25   of Flint municipal water supply.  Searches of parent or

```
 1    guardian deposition transcripts -- and he lists some
 2    numbers -- reveal no use of private wells for drinking water
 3    during the period of the Flint River use as the City of Flint
 4    primary source of municipal water.
 5            Elevated lead exposure evidently has occurred in
 6    multiple places, most notably at homes and in schools and/or
 7    daycare centers.
 8            Now again he is not testifying specifically about
 9    causation.  But that in conjunction with Bithoney's testimony
10    and the parents' testimony surely is enough to survive summary
11    judgment on this particular issue.
12            MR. NGUYEN-DANG:  Just on that point, Your Honor,
13    that Piper 2018 study is the same Edwards Virginia tech
14    sampling from 2015.  And the results of that, as I mentioned,
15    was that only 17 percent of homes were found with elevated
16    lead levels and only 40 percent of homes were found with lead
17    levels above 5 parts per billion.
18            So again, it is not a reasonable assumption to make
19    that just because these plaintiffs' homes or their daycares
20    were in these locations, they had elevated lead levels in
21    their water.  Because the very data on which Dr. Michaels and
22    Dr. Bithoney relies on this point doesn't make that point.
23            THE COURT:  Okay.
24            MR. NGUYEN-DANG:  And so again, we come back to the
25    fact that there just isn't any evidence that there was
```

1    elevated water lead levels at the specific locations in which

2    these plaintiffs drank water.

3              THE COURT:  Okay.  Thank you.  I think one issue,

4    just to be clear on this particular part of your causation

5    discussion, is that the Michigan Supreme Court and Courts of

6    Appeals have made it clear that circumstantial evidence of

7    causation is generally sufficient to, quote, facilitate

8    reasonable inferences of causation.  They have to be

9    reasonable inferences.

10             And that's the Skinner case and the Genna, G-E-N-N-A,

11   v Jackson case, which is Michigan Court of Appeals.  But thank

12   you.

13             MR. NGUYEN-DANG:  Right, Your Honor.  If I may on

14   that?

15             THE COURT:  Sure.

16             MR. NGUYEN-DANG:  You know, I think it's right that

17   in an ideal world, you know, we would have sort of -- in the

18   best of all possible worlds, we would have the contemporaneous

19   lead water tests from each plaintiffs' homes and all the other

20   locations at all the right times.  You know, and then we'd

21   have contemporaneous evidence about how much they were

22   drinking of that water at all the right times.  And that would

23   be the ideal case.

24             And of course we don't need -- we're not saying that

25   you need the ideal case either to prevail or even to make a

```
 1    summary judgment or make it past summary judgment.  The
 2    question is how far short are we of that?
 3              THE COURT:  Right.
 4              MR. NGUYEN-DANG:  You know, there are reasonable
 5    inferences we can make to get us to the point where these
 6    plaintiffs were drinking enough lead or were exposed to enough
 7    lead from Flint water to cause or aggravate their injuries.
 8    And the gap here is just huge.  Because where we have --
 9              THE COURT:  I hear your argument.
10              MR. NGUYEN-DANG:  I just -- sorry.  One past point is
11    I think Mr. Stern mentioned that copper lead lines -- or
12    copper pipes can be a source of lead.  I think two responses.
13    I think first is that Dr. Finley's testimony is quite clear
14    that lead service lines are the principal source of lead in
15    drinking water and it's undisputed that these four plaintiffs
16    did not have lead service lines.
17              But I'm actually not quite sure what part of the
18    report he's referring to when he talks about copper lines.
19    But that's sort of neither here nor there.  The key is that
20    they did not have lead service lines and it is undisputed from
21    plaintiffs' side that lead service lines typically are the
22    principal source of lead in drinking water.
23              THE COURT:  Okay.
24              MR. STERN:  Your Honor, if I could just point
25    Mr. Nguyen to it's Exhibit 4 to our responsive pleading.  It's
```

 1   the Finley deposition.  It's page 31 lines 24 through 32.  As

 2   well as -- yeah.  Exhibit 4, Finley dep 31, 24 to 32.

 3          And I would say that, you know, additionally the

 4   Environmental Protection Agency on its website says that the

 5   average American family uses more than 300 gallons of water

 6   per day.  300 gallons of water per day.

 7          But VNA does not want anybody to make any assumptions

 8   whatsoever about any consumption of water anywhere besides a

 9   child's home.  And if a child's home doesn't have lead pipes,

10   then there's no way they could have been exposed to water --

11   to lead.

12          I mean, the cases that you cited from Michigan that

13   talk about making reasonable assumptions, it's common sense.

14   When a family is to consume up to 300 gallons of water -- I

15   don't know any families in Flint.

16          And again, this isn't testimony.  But to assume that

17   every family in Flint somehow got a hold of 300 gallons of

18   water per day by way of bottled water and used that instead of

19   the tap, they're calling our assumptions about drinking at

20   schools and daycares and in formula not enough to sustain our

21   claims against them, but it's not an outrageous assumption to

22   assume that a family that needs 300 gallons of water per day

23   were actually using bottled water for all of its needs.

24          THE COURT:  Okay.  Yeah.  Thank you.  There you are.

25          MR. NGUYEN-DANG:  So the next point that we wanted to

1    cover is the second things that plaintiffs have to prove.  And

2    as you mentioned, this is under Powell-Murphy and the specific

3    causation standard is they have to rule out other sources of

4    their injury.  And this is an affirmative obligation on

5    plaintiffs.  And in fact they admit this at page 120 of their

6    opposition brief.

7            So in this case, that has sort of three components.

8    Two, maybe three, depending on how you look at it.

9            The first is that they have to account for all known

10   and likely sources of their injuries including sources of lead

11   other than the water.  And then second specific to VNA, they

12   have to rule out lead in water from before VNA.

13           And again, I understand that might be affected by how

14   Your Honor rules on the 2014 issue.

15           THE COURT:  Right.

16           MR. NGUYEN-DANG:  So if we start about -- if we start

17   with other sources of their injuries, now our experts

18   explained that they are many other potential sources of

19   neurodevelopmental injuries.  Things such as secondhand smoke,

20   pollution, other heavy metals, which as we indicated in our

21   briefs have been found in baby food.  And I don't understand

22   plaintiffs dispute that.

23           They rely entirely on Dr. Bithoney's opinions to rule

24   out other causes.

25           THE COURT:  Correct.

```
 1            MR. NGUYEN-DANG:  Now they've claimed that his
 2   opinions are sufficiently reliable under Daubert because he
 3   follows his clinical practice.  But we would put it that
 4   whether he followed his clinical practice doesn't really
 5   answer the question that Michigan law requires plaintiffs to
 6   answer.  Right.  Whether they have ruled out all other known
 7   and reasonably likely alternative causes.
 8            THE COURT:  Right.  And here I think we looked at
 9   this issue pretty exhaustively at the Daubert hearing.  You're
10   free to add something that wasn't reviewed there if you'd like
11   to.
12            MR. NGUYEN-DANG:  So just a couple of points then.
13            THE COURT:  Okay.
14            MR. NGUYEN-DANG:  Because you're right, we did
15   discuss this at the Daubert hearing.
16            THE COURT:  Yeah.
17            MR. NGUYEN-DANG:  I think the first point is I
18   remember at the Daubert hearing I think it was Mr. Stern said
19   that Dr. Bithoney, even though he didn't say he was ruling out
20   known lead sources, he actually was doing that.
21            But you know, even if that's true, he doesn't say
22   that or he doesn't even mention many of the common sources of
23   injuries.  Things like secondhand smoke or pollution.  He
24   didn't ask, for instance, about -- sorry -- brands of baby
25   food.
```

1          So we're knot asking for magic words, which I believe

2     is what was the arguments at the Daubert.  But at least some

3     recognition from Dr. Bithoney that he considered and ruled out

4     all other non lead sources.  And we just don't have that.

5          And then as to other sources of lead, remember there

6     was the discussion he asked the parents --

7          THE COURT:  He's only required to rule out plausible

8     causes of lead poisoning, not every single brand of baby food.

9          MR. NGUYEN-DANG:  That's true, Your Honor.  But we

10    would put things like secondhand smoke and certainly pollution

11    are more than plausible.  It seems quite probable, in fact,

12    that they were exposed to at least some of it at some point.

13         But let's actually switch over to other sources of

14    lead.  Because here we're not talking about merely

15    possibilities.  We can talk about known other sources of lead

16    because we did home inspections of three of the plaintiffs.  I

17    believe the fourth one has been conducted but we don't have

18    the results yet.

19         We have home inspections and those inspections found

20    lead.  It found lead in soil and dust and paint.

21         And remember Dr. Bithoney's testimony is not that he

22    considered those results, but said that they were inadequate

23    to explain the plaintiffs' claimed injuries.  He just didn't

24    consider them at all.  And maybe that's fine for Daubert

25    purposes because he followed his clinical practices, but

November 22, 2021

1   someone on the plaintiffs side under Michigan law needs to

2   rule out those known other sources of lead.  And if it's not

3   Dr. Bithoney, it has to be someone.

4           THE COURT:  I'm sorry to interrupt.

5           MR. NGUYEN-DANG:  No.  Please.

6           THE COURT:  But were those home inspections conducted

7   before Dr. Bithoney's report?  Were they finalized before

8   Dr. Bithoney's report was written?

9           MR. NGUYEN-DANG:  I'm sorry.  I don't know the answer

10  to that question, Your Honor.  I can follow up with you.

11          THE COURT:  Okay.  Because I thought he considered

12  those reports, but I don't know.

13          MR. NGUYEN-DANG:  No.  I'm quite certain that he did

14  not.

15          THE COURT:  He talked to parents I believe about

16  chipped paint, other sources of lead in their homes.

17          MR. NGUYEN-DANG:  Correct.  He asked the parents if

18  they knew whether there were sources of lead in the homes.

19  And the parents did not.

20          THE COURT:  Yeah.

21          MR. NGUYEN-DANG:  But that's -- you know, that's

22  entirely consistent with their actually being lead sources in

23  the home that their parents just weren't aware of.  And we

24  know from the home inspection reports that that, in fact, was

25  the case.

```
 1          So as I said, I don't want to relitigate
 2  Dr. Bithoney's Daubert.  You know, it might be fine under
 3  Daubert for him to not have considered it.  But I would put to
 4  the Court that someone on the plaintiffs' side needs to
 5  consider those results and rule them out.  And as we stand, no
 6  one has done that.
 7          THE COURT:  Okay.  Anything further?
 8          MR. NGUYEN-DANG:  I was going to move on to lead from
 9  water -- lead from water before VNA.
10          THE COURT:  Okay.
11          MR. NGUYEN-DANG:  So I can just wrap that point up
12  and then move on to the next one.
13          So plaintiffs also have to rule out lead from water
14  either from before the switch or even after the switch before
15  VNA's involvement in Flint.  And on this point, plaintiffs
16  have no evidence at all.  Their experts expressly admit that
17  they do not try to quantify the amounts of lead in the water
18  at any given point or to quantify plaintiffs' exposure at any
19  given time.
20          THE COURT:  But how is that even -- I mean, I hate to
21  say this.  But how would that even be possible?  I mean, I
22  know that certain blood lead tests are done on certain babies.
23  But you're sort of asking for evidence that -- in the ordinary
24  course you're raising your children, you're doing the best you
25  can.  I know that's what I did.
```

1           I was not thinking let me get my child tested for

2    lead every six months in case in five years there's a crisis.

3           MR. NGUYEN-DANG:  No, I understand that, Your Honor.

4    But there are certain things that they could have done and at

5    the very least there's certain evidence that they have to

6    account for.

7           So for instance, Dr. Edwards' biosolid study from

8    2019 and 2020, which that looked at where water samples from

9    sewage, which the city had stored, and it went back and tested

10   those samples to see historically what the water lead levels

11   were in Flint.  And there's two very important findings from

12   that study.

13          The first is that in 2011, there was a major spike in

14   water lead levels in Flint.  And that's at a time when three

15   of the plaintiffs lived in Flint and every except for R.V. who

16   had not yet been born.  And so at the very least, you know,

17   there should be an acknowledgment that that happened in an

18   attempt to rule out that as a possible -- as a contributing

19   source.  Again, that's the obligation under Powell-Murphy.

20          And then as to the second point, you know, from

21   before or after VNA, it's possible.  I mean, again,

22   Dr. Edwards' study shows that the major spike in lead in Flint

23   following or after the start of the crisis was in the summer

24   of 2014.  And that by the fall and winter of 2014, lead levels

25   in the Flint water had returned to their pre crisis levels.

1    So again, I mean, that's not evidence that's good for

2  plaintiffs but it's something that plaintiffs have to account

3  for.

4    THE COURT:  Okay.

5    MR. NGUYEN-DANG:  When were they drinking water?

6  They were drinking water -- certainly they were drinking water

7  right after the switch.  We can dispute how much they drank,

8  you know, at later points.  But they would have been drinking

9  at the time of that spike.  And so they would have to explain

10  how that isn't enough to account for all of their injuries

11  such that there must be something left for VNA to be held

12  liable for.

13    THE COURT:  We do know that by mid 2015 the lead

14  levels went back up again in Flint.  And that's the Edwards

15  study.

16    MR. NGUYEN-DANG:  No, Your Honor.  That's the same

17  Edwards study, the biosolid studies.

18    THE COURT:  Yeah.

19    MR. NGUYEN-DANG:  And there are two charts to that

20  study.  One is water lead levels and one is blood lead levels.

21  And the water lead level one shows a spike as I said first in

22  2011 and then in the summer of 2014.  And it goes back down

23  and it stays down after that.

24    Blood lead levels, it's true, does show a spike in

25  2015.  But that blood lead level is unassociated with the

```
 1    water lead level spike.  And as Dr. Edwards explains in his
 2    deposition is consistent -- actually, I think he explains it
 3    in the study itself.  Is consistent with the seasonal
 4    variation that you've seen from year to year.
 5         Blood lead levels tend to go up in the summer.  I
 6    guess I don't want to speculate, but that's a thing that you
 7    see from year to year.  So it's not evidence that there was a
 8    water lead level spike in 2015.  In fact, it says quite the
 9    opposite.  And Dr. Edwards is very clear about that both in
10    his studies and then subsequently at his deposition.
11         THE COURT:  Okay.  Let's -- Mr. Stern, do you want to
12    respond on this issue?  I think we've gone through a lot of
13    this with the Daubert hearing.  You're muted.
14         MR. STERN:  Your Honor, we'll stand on our pleadings,
15    our briefing, our argument on Daubert when it comes to the
16    rule out portion of this.  And I think Dr. Bithoney's
17    testimony in his deposition squarely addresses the -- I'm not
18    even sure that VNA is correct in what we need to prove at
19    trial in terms of exposure before they got there versus
20    exposure after.
21         But to the extent that's required, Dr. Bithoney does
22    talk about how lead poisoning is a dose response disease and
23    that each instance of exposure is another poisoning, is a new
24    poisoning in his deposition.  And I think the record is
25    replete with evidence that Dr. Bithoney's opinions are valid
```

 1    at this stage.  And therefore the motion for summary judgment

 2    as to causation, both general and specific as well as exposure

 3    should be denied at this point.

 4             THE COURT:  Okay.  Anything further?

 5             MR. NGUYEN-DANG:  Just on this point, Your Honor.

 6    Just one quick point.

 7             THE COURT:  Yes.

 8             MR. NGUYEN-DANG:  I would point the Court to

 9    Dr. Bithoney's report for E.S. on pages 12 and 13 where he

10    states -- and I'm paraphrasing -- that Emir's -- sorry, E.S.'s

11    conditions are consistent with consuming 4 to 6 glasses of

12    water -- sorry.  4 to 6 glasses a day of lead contaminated

13    water for 4 to 6 months.

14             Which, you know, if we assume that that started in

15    October -- or sorry, in April or May of 2014 would be done by

16    the end of 2014.  So even Dr. Bithoney's opinion, and this is

17    how he has characterized it would seem to indicate that

18    nothing more is required to explain E.S.'s --

19             THE COURT:  And that's what you would focus on

20    assuming I admit Dr. Bithoney in cross-examination.  You don't

21    like his conclusions or you say his conclusions don't support

22    plaintiffs' argument here.

23             MR. NGUYEN-DANG:  Well, what we're saying, Your

24    Honor, is that itself, that can't be evidence that there needs

25    to be something left for VNA.  Because his own conclusion gets

```
 1    plaintiffs to all other injuries.  And that's before VNA
 2    arrived in Flint.
 3              THE COURT:  Okay.
 4              MR. NGUYEN-DANG:  That's the only point I wanted to
 5    make here.
 6              THE COURT:  Okay.  Let me turn back for a moment to
 7    Mr. Stern.
 8              If the 2014 period of time is not included in the
 9    case -- and I have not reached a decision on that -- do you
10    have enough specific causation testimony in the record?
11              MR. STERN:  Yes.
12              THE COURT:  Okay.  And that's Dr. Bithoney combined
13    with Dr. Michaels.
14              MR. STERN:  Dr. Bithoney, Dr. Michaels, parents'
15    testimony, and common sense.
16              THE COURT:  Okay.
17              MR. STERN:  Dr. Edwards' documents.  I mean, the
18    record is replete with evidence.
19              THE COURT:  Okay.  All right.  Where are we now?
20              MR. NGUYEN-DANG:  We had one last point on causation,
21    Your Honor.
22              THE COURT:  Oh, please.
23              MR. NGUYEN-DANG:  And the last point is plaintiffs
24    also have to show as part of but for causation is that VNA's
25    negligence caused or contributed to there being lead in the
```

1    water.  And again, this is wrapped up in the 2014, 2015 point.

2    But we will note that it is a particularly difficult task here

3    given that VNA arrived at Flint only 10 months after the

4    switch.

5          THE COURT:  Can I ask you to speak just a little more

6    slowly?

7          MR. NGUYEN-DANG:  I apologize.

8          So this also we think had two aspects.  First

9    plaintiffs have to show that but for -- you know, if VNA had

10   insisted more fervently on our corrosion control chemical or

11   return to Detroit water, that the city would have acted sooner

12   than it did.  And second that acting on that advice sooner

13   would have caused a reduction in lead in Flint water that was

14   more than what was -- that actually happened.

15         So on the first point on whether the city would have

16   done anything differently, again we respectfully posit that

17   the plaintiffs don't have the evidence they need.  Now here

18   plaintiffs rely I think principally on the testimony of

19   various city and state officials who at their depositions

20   stated that they would have considered VNA's advice more than

21   they did if only VNA had been more forceful about it.

22         Two points on this.  The first is that none of this

23   testimony is admissible.  A lay witness must testify to events

24   that he or she perceived.  And by definition a witness who is

25   speculating as to what he or she might have done in some

1    hypothetical scenario is not testifying as to what he or she
2    perceived.  And that is a general rule.
3            THE COURT:  Yes.  That is a general rule and it's
4    Rule 701 of the federal rules of evidence.  But what do we do
5    with the Payne, P-A-Y-N-E, v Novartis case where I think it is
6    Judge Stranch -- and I wrote this quote down last night where
7    she says causation issues in failure to warn cases present
8    particularly naughty problems.
9            And what she -- and that was a case about that -- the
10   woman whose jaw disintegrated after taking a medication.  And
11   she said if her doctor had warned her that she might have that
12   problem, then she would not have taken the drug.
13           The district court granted summary judgment to
14   defendant but that was reversed in this case if I'm not
15   mistaken.  Saying -- and the Court said there are two factual
16   issues that carry the plaintiffs past summary judgment.  And
17   it's similar types of things that you're saying warrant
18   summary judgment.
19           Now, the Payne case didn't discuss Rule 701 openly or
20   it wasn't -- I don't even know if the rule was cited there.
21   But it certainly was the rule at the time the case was
22   decided.
23           MR. NGUYEN-DANG:  So --
24           THE COURT:  Excuse me?
25           MR. NGUYEN-DANG:  I apologize, Your Honor.  I'm not

```
 1    familiar with that case.  I would --
 2              THE COURT:  In Payne, certain medications destroyed
 3    this plaintiffs' jaw.  It's those medications for osteoporosis
 4    I think.  And so she brought suit against the manufacturer for
 5    it's failure to warn her physician of this potential side
 6    effect.
 7              And the Sixth Circuit reversed the district court.
 8    Even though it was speculative, it was self-serving testimony
 9    by the plaintiff.  Oh, if I had -- if my doctor had warned me
10    of this potential jaw side effect, I would never have taken
11    the medicine.  It's 767 F.3d 526.
12              And so it's a self-serving testimony and speculative.
13    And the Sixth Circuit said that's enough to create a question
14    of fact and send this to the jury.
15              MR. NGUYEN-DANG:  Your Honor, I'm sorry.  I'm not
16    familiar with that case.  And I don't believe that it was
17    cited in our briefings.  If you'll permit, we'll go take a
18    look at it and perhaps submit something after the argument on
19    it.
20              THE COURT:  Sure.  It's an interesting question.  The
21    other issue though I don't know that supplemental briefing
22    just on the Payne, P-A-Y-N-E.  Because I think she did have
23    pain, P-A-I-N.  But I think one of the things the Sixth
24    Circuit talks about is that causation questions in failure to
25    warn cases very often need to be presented to a jury.  That's
```

1    set forth in the case.

2            Now this is -- it was a Tennessee case.  But the

3    court says these cases involve a series of counter factual

4    constructs, had you known certain facts what would you have

5    done.

6            When we try to determine cause and fact and that

7    usually these are ordinarily jury questions.  And part of it's

8    because you've got to look at the credibility of the witness

9    to determine whether you believe that they would have done

10   something differently.  And when you've got credibility

11   questions, it's not for me.  It's for the trier of fact.

12           MR. NGUYEN-DANG:  That, I understand, Your Honor.  I

13   guess two responses.  The first is, you know, that assumes

14   that that testimony is admissible such that their credibility

15   would be at issue.

16           And the second is if you look at the totality of the

17   circumstances that we're in, that is another way -- another

18   issue at summary judgment is if you look at the totality of

19   the circumstances, could a reasonable jury from that evidence

20   draw their conclusion that plaintiffs want them to draw?

21           And here you have to remember what the context is.

22   These are city and state officials who I think made

23   unequivocally clear at the time through their contemporaneous

24   actions that they absolutely refused to consider a return to

25   Detroit water under any circumstances.

```
 1              I mean, the city council voted to return to Detroit
 2   water but the emergency manager overruled that vote saying
 3   that the return was incomprehensible.  The treasurer said that
 4   they would switch back to Detroit only if money grew on trees.
 5   But even when Detroit offered Flint a reduced rate to switch
 6   back, Flint still refused.
 7              And that also has to be looked into the context of
 8   the city's other actions.  The city didn't take any of VNA's
 9   other recommendations.  This city didn't listen to any of it's
10   citizens' complaints at any point throughout the crisis.
11              I just think it's strains credibility to think that
12   in the light of all of that evidence a jury would reasonably
13   accept, even if they were allowed to consider it, the
14   self-serving testimony of these officials that, well, maybe we
15   would have considered it more.
16              I mean, to be clear, they don't actually say they
17   would have done it.  No one who was in a position of authority
18   in Flint actually said that, you know, if VNA had only said
19   these things in a different way we actually would have done
20   it.  The most they say is that they would consider it.
21              So in the totality of the circumstances, we would put
22   that as actually not enough to go to a jury.
23              THE COURT:  Okay.
24              MR. NGUYEN-DANG:  I think Mr. Stern wants to respond
25   on that point.
```

November 22, 2021

```
 1              MR. STERN:  Go ahead.  Why don't you -- I don't want
 2    to interrupt you.
 3              MR. NGUYEN-DANG:  The second point I was going to
 4    make here is even assuming that the city or the state would
 5    have acted sooner than it did, plaintiffs also have to show
 6    that that would have led to an additional reduction or an
 7    earlier reduction in lead levels than actually happened.
 8              And on this point, plaintiffs have nothing at all.
 9    As we've mentioned, none of their experts --
10              THE COURT:  On which point?  I missed your last
11    sentence.
12              MR. NGUYEN-DANG:  Sorry.  On the point of whether
13    water lead levels would have been lower than they were if only
14    the city had acted sooner than it did.  Because they have to
15    -- that is, again, an element of but for causation in this
16    case they have to show that if VNA had only given different
17    advice, insisted more forcefully, the city would have done
18    something different.  And that doing that would have mattered.
19    That doing that would have led to a reduction in water lead
20    levels.
21              And here they just don't have that evidence.  None of
22    their experts touch on this topic at all.  None of them
23    address what water lead levels were.
24              THE COURT:  I mean, some things become so obvious.
25    We know that the DWSD water did not have similar lead levels.
```

1    We know that they used corrosion control to prevent lead from

2    leaching.

3           MR. NGUYEN-DANG:  Your Honor, the one piece of

4    evidence we do have is Dr. Edwards' biosolid study.  And that

5    evidence, as I said, shows that the water lead levels returned

6    to pre switch levels after the summer of 2014 and remained

7    there throughout the rest of the crisis.

8           I think this is not a subject that is within the

9    knowledge of the ordinary juror.  This is water treatment and

10   how water and how pipes react, different water -- water

11   chemistry and different chemicals.  It's an extremely

12   complicated subject and experts disagree about it.

13          Our point here is that plaintiffs have no expert

14   evidence on this point.  And simply saying, well, isn't it

15   obvious, we would submit is going to lead plaintiffs or, I'm

16   sorry, is going to lead the jury down the wrong path.  Because

17   this isn't something that can simply be discussed, well, isn't

18   it obvious.

19          It's something that requires expert testimony to

20   support.  As I said, plaintiffs don't have it.  But the one

21   piece of evidence that is in the record from Dr. Edwards shows

22   that the bio -- that the water lead levels had returned by --

23   after the summer of -- after the summer of 2014.

24          THE COURT:  Okay.

25          MR. STERN:  Your Honor, may I respond?

```
 1              THE COURT:  This is the evidence that I -- just one
 2    second.  In terms of the evidence that I've seen in the
 3    record, first there's two issues.  There's whether VNA in the
 4    course of its undertaking with the City of Flint on its
 5    contract to advise the city regarding water quality, whether
 6    they or at all said return to DWSD.  And second, whether they
 7    prominently recommended corrosion control.
 8              And there we have Humann, Hoaglund, and Michaels all
 9    talking about corrosion control preventing leaching of lead.
10              MR. NGUYEN-DANG:  I would disagree on that point,
11    Your Honor.  I don't think that Dr. Hoaglund is qualified to
12    talk about that.  He is not a water treatment expert.  So I'm
13    not sure that his opinion gets there.  And I'm also not sure
14    that Dr. Michaels is qualified to talk about that subject
15    either.
16              I do acknowledge that Mr. Humann who is qualified
17    does say that corrosion controls are required to control lead
18    levels.  But he doesn't go into any specifics as to what
19    happened in Flint.  He doesn't talk about what the lead levels
20    were at any time.  He doesn't look at the actual treatment
21    that Detroit was using or that Flint was using -- or you know,
22    was or should have used.
23              His position simply is that without a lead corrosion
24    -- sorry.  Without a corrosion control chemical, lead could be
25    a problem.  But he doesn't at all talk about the timeline of
```

```
 1   that or how that would have played out in Flint.  And
 2   specifically to this point whether or not a return to Detroit
 3   water earlier would have changed the actually water lead
 4   levels in the city.  And as I said, we do have evidence on
 5   that.  But that evidence shows that it would not have
 6   mattered.
 7            THE COURT:  Okay.  Why don't we do this.  It's 12:35.
 8   And I think it would be a good idea to take a break.
 9            I don't think we have a great deal more on the motion
10   for summary judgment.  But we do need to address the issue of
11   plaintiffs' request to have a replacement expert that's
12   entirely unrelated to this motion itself.
13            MR. STERN:  Your Honor?
14            THE COURT:  Yes.
15            MR. STERN:  Are we taking like a lunch break?
16            THE COURT:  We're going to take like a half hour
17   lunch break.
18            MR. STERN:  Not -- before we break, can I just
19   address this last piece about Dr. Edwards since we're on it,
20   rather --
21            THE COURT:  Yes.
22            MR. STERN:  Thank you, your Honor.  Number one, the
23   line chart that VNA's brief from Edwards that they submitted
24   as part of the record, it actually shows that the lead levels
25   in Flint went back up in the summer of 2015.
```

1        The Edwards' article that they keep referring to

2   notes that water levels promptly began to go down as soon as

3   corrosion control was restarted on December 9, 2015.  That's

4   at 479.

5        Further, his 2020 biosolid's article notes that the

6   biosolids data demonstrated a sustained decline in total lead

7   release to potable water plumbing since the 2014/2015 Flint

8   water crisis due to enhanced corrosion control treatment.

9        At his deposition, Edwards testified corrosivity

10  problem was immediately solved when Flint switched back to the

11  DWSD.  He also stated at his deposition, sure, it took a few

12  months for the lead levels to really start the go down, but it

13  logically follows that if the city had switched back to the

14  Detroit water source sooner that, the corrosivity problem

15  would have been solved sooner, that the lead pipe -- that the

16  lead levels would have gotten under control sooner, and that

17  the pipes would be able to re-passivate sooner.

18        So this is not -- there's not no evidence.  I know

19  that's a double negative and I don't always argue as

20  articulately as Mr. Nguyen-Dang does.  But there's a plethora

21  of evidence in the record that had the switch been done

22  sooner, that the corrosivity problem would have been

23  significantly made better.

24        And again, it's, I guess ironic is the word, that

25  there's a strong reliance on Dr. Edwards for things that are

```
 1   helpful, but there's ignoring Dr. Edwards for things that are
 2   not helpful.
 3          I also -- with regard to Your Honor's citation of the
 4   Tennessee case, I'd also like to cite to U.S. v Ranney, that's
 5   719 F.2d. 1183 at 1187 to 89.  Granted this is, I think, a
 6   First Circuit case.  But that case -- the court permitted
 7   investors to testify that they had been provided full and
 8   complete -- had they been provided full and complete
 9   information, they would not have made a certain choice.
10          Again, you know, there are certain instances where
11   Rule 701 is just not applicable.  Here, as Mr. Nguyen-Dang
12   admits, it's not even these defendants or former defendants or
13   folks who have, as they said, a stake in the litigation, it's
14   not as if they said they would actually have done something.
15          What Dayne Walling says, who was the mayor at the
16   time, if anyone from VNA ever told him that the best technical
17   decision is to go back to the City of Detroit as its supplier,
18   he would have heeded that recommendation.  That's at Exhibit
19   7, Walling dep 474.  Even if VNA had said that before
20   contracted with Flint, he would have definitely considered it.
21          And we have to remember that VNA was hired by
22   somebody to look at these issues.  By their own testimony, by
23   their own emails they say we planned on looking at this.
24          But now even though that was in their scope of work
25   or looking at the water was in their scope of work, they want
```

1    the Court to believe and they want the jury ultimately to

2    believe that, yes, we were hired to do something.  Yes, it

3    dealt with water.  But the testimony that's relevant to what

4    the folks who hired us would have done with that information

5    is actually not relevant because they wouldn't have listened

6    to us anyway.

7              Under VNA's analysis, there is literally no set of

8    facts, none, under which they can be held liable for anything

9    when it comes to the lead in water in the City of Flint.  Not

10   in 2014, not in 2015, not later, not sooner, not ever.

11             THE COURT:  Okay.  Let me just -- I know we're going

12   to take a break.  But I have one question for you,

13   Mr. Nguyen-Dang, which is are you arguing that the city was in

14   fact using adequate corrosion control when you arrived there

15   in 2015?

16             MR. NGUYEN-DANG:  I'm sorry.  I want to be careful

17   with my answer here.

18             MR. STERN:  Yeah.

19             MR. NGUYEN-DANG:  I don't actually think that that is

20   the argument.

21             THE COURT:  Okay.

22             MR. NGUYEN-DANG:  I think the argument is that VNA

23   was not aware of the lead problem, that VNA -- as Mr. Stern

24   has repeatedly pointed out, just before VNA arrived in Flint,

25   there was this article about the lead in the University of

```
 1   Michigan which caused VNA to think, well, maybe this is

 2   something we should look into during our engagement.

 3        And then VNA did look into it during its engagement.

 4   Found, according to the city's lead and copper sampling, that

 5   there was no lead problem, that the waters sampling was in

 6   compliance with the lead and copper rule.

 7        Nonetheless, noted that in the absence of a corrosion

 8   control chemical, lead could become a problem.  And so

 9   appropriately advised the city that it should consider -- and

10   this is in the final report and this is in what the doctor --

11   sorry, what Mr. Gnagy told plant officials that this was

12   something that they should talk to their regulator to

13   institute.

14        THE COURT:  Okay.

15        MR. NGUYEN-DANG:  That is I think the fairest reading

16   of VNA's engagement with respect to lead.

17        THE COURT:  Okay.  I just didn't know when you were

18   saying there was no longer a lead problem in 2015 whether you

19   were saying that there was adequate corrosion control.

20        MR. NGUYEN-DANG:  On this point though, Your Honor, I

21   do want it to be clear, Dr. Edwards, when he's speaking of

22   corrosivity and he's talking about lead, they're related but

23   slightly different issues.

24        Because what the biosolid study that Dr. Edwards

25   found and what his deposition makes very clear is his
```

1    conclusions, is that the water lead levels were able to come

2    down shortly after the summer of 2014 and remained low until

3    they went down even further when Flint moved to enhanced

4    corrosion controls, which is beyond what Detroit was doing.

5           But saying that the water had a corrosion problem

6    doesn't necessarily mean in this context that there have been

7    additional releases of lead.  His view, if I understand

8    correctly, is that once the water sort of recalibrated -- I'm

9    not saying that word correctly.

10          Once it got used the Flint water without a corrosion

11   control chemical, at that point there stopped being additional

12   releases of lead into Flint water.  So the water may have

13   remained slightly corrosive because it didn't have a corrosion

14   control chemical but that does not mean that that led to

15   additional releases of lead.

16          THE COURT:  Okay.

17          MR. STERN:  Your Honor?

18          MR. NGUYEN-DANG:  That was a lot.

19          THE COURT:  No, I think I follow you.

20          MR. STERN:  Just one fine point.

21          THE COURT:  Okay.

22          MR. STERN:  I actually think because I've like lived

23   the depositions in the record, I am fairly certain what

24   Dr. Edwards was referring to was blood lead levels going down.

25   Not lead levels in the water, not lead levels in the pipes,

1    not lead levels just randomly going down without the use of

2    corrosion control.

3           I think that it's important to actually take a hard

4    look at the document that's being cited.  Because it's

5    possible that lead levels went down when people stopped

6    drinking the water.

7           Granted it's unlikely they ever completely stopped.

8    But when you have knowledge that there's poison coming out of

9    your faucet versus not having knowledge when there's poison

10   coming out of your faucets, obviously the actions taken by

11   citizens would probably be different.

12          But I think the point is that it's blood lead levels

13   that may have gone down, not the levels in the water.

14          And there's a quote from him that says -- this is

15   from his deposition.  The caption accompanying figure 1 on

16   page 478 notes a peak in August 2015.  He is referring there

17   to the lead in the water, not the lead in kids' blood.

18          And so those are two very distinct things that need

19   to be noted by the Court to the extent that your Court looks

20   at the record prior to making a decision on the summary

21   judgment.

22          THE COURT:  That's the plan.

23          MR. NGUYEN-DANG:  I will agree there because I think

24   the --

25          THE COURT:  No.  We have to actually stop and take a

1    break.  I have a court reporter taking a verbatim transcript

2    and we all need to take a break.

3            So what we'll do is come back in a half hour at

4    approximately 1:15 and go from there.  So we'll finish this up

5    and then we'll move to the issue of Dr. Hoffman.

6            MR. STERN:  Is there more on the summary judgment

7    that we will be addressing?

8            THE COURT:  Actually maybe not.

9            MR. NGUYEN-DANG:  There is not, Your Honor.  I was

10   going to say that's all that we had on the summary judgment.

11           THE COURT:  Oh, terrific.  Then at 1:15 we'll address

12   Dr. Hoffman.

13           MR. STERN:  Thank you, Judge.

14           THE COURT:  Good.  Thank you.

15                       (Brief Recess)

16           THE COURT:  Okay.  We're back on the record in the

17   bellwether cases.  And this issue that we're discussing now

18   relates to plaintiffs' counsel's request to I believe

19   substitute one of your experts with another expert.

20           It's Dr. Krishnan who did a neuropsychological

21   evaluation of the four bellwether children and you wish to

22   substitute her testimony with Dr. Hoffman, who I understand

23   you originally identified as the neuropsych evaluator for

24   these plaintiffs.  And then as a result of COVID he couldn't

25   travel from out of state so you located a Michigan based

 1    neuropsychologist to do the evaluation.

 2              So Mr. Stern, you're the person who brought this to

 3    my attention, I believe.  So do you want to get started?

 4              MR. STERN:  Sure.  I think first off, Your Honor, to

 5    the extent that -- you know, I felt like when I notified Mr.

 6    Campbell and served his office with the reports in September,

 7    I felt strongly based on the representations he made to me

 8    that they were going to file a motion to strike.

 9              I offered at that time -- I let them know at that

10    time that I'd respond to any motion that they filed.  I can

11    assure you, however, that it was not my intention, despite how

12    it may seem, to be playing any games or be utilizing

13    gamesmanship.

14              This was an expert identified over a year and a half

15    ago.  He's someone who initially undertook to interview

16    parents.  When COVID hit I had no choice honestly but to find

17    another expert.  I did tell Mr. Campbell back in the summer

18    that I intended to substitute.

19              On September 14 I served them with the reports.  I

20    offered Dr. Hoffman, Dr. Bithoney, and Dr. Crakes to be

21    re-deposed to the extent they needed to.

22              In retrospect where this is now, I strongly wish that

23    I had come to the Court earlier on this issue.  But

24    notwithstanding that, there's -- I think there may be a

25    perception based on the arguments that have been made by VNA

1    that we're living in kind of a static litigation where there

2    are bright lines about when things start and when things end.

3            And for better or for worse, the way this particular

4    litigation -- and I mean the bellwether cases -- has gone up

5    to this point is there's nothing that's ended.  I just

6    yesterday received a 70,000-page production from VNA from

7    Kettering University based on a nonparty subpoena or something

8    that went to Kettering University.

9            I don't even know what that is.  We're loading it

10   into our system now.  But we're going to have to spend the

11   time and resources and money to evaluate those documents.

12           There's an outstanding subpoena or notice of the

13   deposition of Thermo Fisher by VNA.  As of Friday, my office

14   provided four new authorizations for the bellwether plaintiffs

15   for medical records associated with the State of Michigan's

16   Michigan Department of Health and Human Services.

17           And so whether I like it or not, there is no line

18   that has been drawn where all of this seems to be ending.  It

19   just seems to be ongoing and --

20           THE COURT:  Well, let me ask you this.  We were in

21   court three weeks ago here in person and in Ann Arbor.  And at

22   that time you had a Daubert challenge to Dr. Krishnan.  And at

23   no point during that hearing three weeks ago did you tell me,

24   well, I told them in September that I'm not using this expert.

25   Instead you defended the use of the expert as well as the two

1    others who relied on Dr. Krishnan.

2           So I can see how VNA would not know as of three weeks

3    ago that you were substituting Dr. Hoffman for Dr. Krishnan.

4           MR. STERN:  So two things I'd like to respond with.

5    The first is in the moments of -- and I'm just going to be

6    completely honest, transparent with you.  It felt -- we

7    discussed repeatedly the day before, the night before, the

8    night of should we say something, should we not say something?

9           We don't know if that's going to indicate some sign

10   of weakness for the expert that we think is eminently

11   qualified, that we think her reports are worthy of surviving a

12   Daubert challenge.  And if we were to say in that moment that,

13   you know, we had a different expert, are we saying to the

14   Court that we don't believe this expert survives Daubert?

15          And for whatever reason, we put our heads together.

16   We felt like in that moment it would not be the right thing to

17   do.  And perhaps strategically we should have come to a

18   different decision.

19          As to the idea of why VNA wouldn't have known, that

20   part I strenuously disagree with.  I was in no uncertain terms

21   told Mr. Campbell we intended to call someone for trial.

22          I think there was a little bit of -- it's not the

23   gamesmanship that they've described in terms of the bait and

24   switch, but I definitely think that I participated in a little

25   bit of game of chicken with Mr. Campbell for better or for

1    worse.  And Mr. Mason for that matter.

2         I mean, he was on the emails that I sent advising the

3    defendants that we'd be using Dr. Hoffman at trial, that they

4    could take his deposition, to get me some deposition dates.

5    But I never once backed off of that intent.

6         Again, I -- you know, after all these years, this is

7    one of the few instances where I wish perhaps I had made a

8    different decision in terms of notifying the Court and

9    bringing it to your attention at multiple times.  Not just at

10   the Daubert hearings.  But notwithstanding that, as we are now

11   preparing for trial, I do not believe that the effect of

12   substituting Dr. Hoffman for Dr. Krishnan is nearly of the

13   magnitude as what VNA describes.

14        Dr. Bithoney submitted a letter essentially saying

15   I've read the reports.  Nothing in Hoffman's reports change my

16   opinions.  He doesn't go into any detail about Dr. Hoffman.

17   Dr. Crakes supplied new reports that essentially just comport

18   with Dr. Hoffman's opinions and not doctor -- and instead of

19   Dr. Krishnan's.  Just for the ease of use in any deposition of

20   him would probably be limited just for the difference in his

21   opinions based on Hoffman to Krishnan.

22        I have no desire to retake the depositions of VNA's

23   experts to extent they want to show the experts the new

24   Hoffman's reports and utilize new reports from their experts

25   or supplemental experts -- supplemental reports from their

1    experts.

2              You know, I'm not asking to take their depositions.

3    I would live with their new reports to the extent they want to

4    give any.

5              But ultimately this is an expert that I have a

6    comfort level -- and I'm the one trying the case.  You know,

7    I've got to come there and try the case.  And whether I should

8    have acted differently or whether I should have done something

9    that I didn't do, I take full responsibility for it.  I always

10   do.  And it doesn't happen often.  And in this case, I am

11   sorry.  I'm sorry to VNA.  I'm sorry to the Court.

12             But at the same time this is the first trial that's

13   going to take place in the Flint water litigation.  And the

14   CMO does not make reference to supplemental experts or --

15             THE COURT:  Well, I don't think you're suggesting

16   that he's -- what the Federal Rules of Civil Procedure provide

17   for is supplemental reports from the same expert.  And we did

18   not address that in the CMO, which is Case Management Order.

19             So I agree that to the extent there's a supplemental

20   report or a rebuttal report that was not accounted for, those

21   are most certainly contemplated by the federal rules of

22   evidence and we need to acknowledge that and address it.

23             So I don't see this as a supplemental report.  It's a

24   substitute.  It's a replacement.  Because you're not going to

25   use Krishnan and Hoffman, correct?

```
 1            MR. STERN:  Correct.  But in fairness, we
 2    contemplated using him as a rebuttal expert to what the two or
 3    three neuropsych experts that criticized Krishnan were.  But
 4    then we thought ahead and thought we would be wasting the
 5    Court's time and VNA's time.  Because ultimately testimony
 6    from two experts on the same kids would be unnecessarily
 7    bolstering or piling on.  And we would never be permitted to
 8    use both.
 9            But there are inherent criticisms about Dr. Hoffman
10    that have -- about Dr. Krishnan that have now come up post us
11    notifying VNA of Hoffman, post me sending the Hoffman reports
12    to VNA.  Post me ever even contacting Dr. Hoffman about doing
13    this.
14            And I actually felt like the idea of utilizing
15    Dr. Hoffman and Dr. Krishnan would be disapproved of honestly
16    by the Court and I thought VNA would have a good argument why
17    not.  And so I thought that it was more sufficient to
18    substitute Dr. Hoffman for Dr. Krishnan.
19            THE COURT:  I'll be very frank with you and I'll let
20    either Mr. Campbell or I'm not sure -- Mr. Campbell, who's
21    arguing for VNA on this?
22            MR. MASON:  Your Honor, I'd like to speak to this
23    too.
24            MR. CAMPBELL:  I will, Your Honor.
25            THE COURT:  Sure.  Mr. Mason for LAN in just a
```

1    moment.  I understand that.

2              MR. CAMPBELL:  I will be doing it, Judge.

3              THE COURT:  Okay.  I'll give you plenty of time.  But

4    I want -- when you address this, I want to make sure that you

5    flag this issue.

6              I don't have a problem with a rebuttal expert.  If

7    that's what you want to use Mr. Hoffman for, that's a

8    litigation strategy that I'm not going to prevent.  That's not

9    my -- my job is to on enforce the Case Management Order in a

10   neutral fair and impartial manner.  And I'm not seeing a path

11   to substituting one expert for another expert.

12             Mr. Campbell points out in his submission to the

13   Court on this issue that Dr. Hoffman and Dr. Krishnan disagree

14   a little about by the severity of the diagnosis.  That's fine.

15   People disagree on issues.

16             So is that a route that you want to follow, Mr.

17   Stern, of having Dr. Krishnan as your expert, Hoffman as your

18   rebuttal, if needed.  You'll have to -- that will be a game

19   day decision whether Mr. Campbell brings in his witnesses and

20   there is actually something to rebut.  I imagine he will,

21   but...

22             MR. STERN:  I mean Your Honor, again, I don't -- I

23   think it's duplicative.  I think that it would be actually be

24   more efficient for Dr. Hoffman to be our underlying expert.

25   And I don't -- I don't -- I just don't --

1            I see why Mr. Campbell and his team argued that it's

2    time intensive for them to deal with this.  But if he's a

3    rebuttal witness, they're going to move to Daubert his

4    opinions anyway.  They're going to want to depose him anyway.

5            They're going to say that he's not qualified.  They

6    say that all my experts aren't qualified.  They're going to

7    say that his opinions aren't based on science.  Because they

8    say all my experts opinions aren't based on science.  And then

9    they will likely argue at trial that his opinions and

10   Krishnan's opinions are duplicative.

11           So I am perfectly willing and happy and I think it's

12   within the federal rules for us to utilize him as a rebuttal

13   witnesses -- as a rebuttal witness.  I am certain that he will

14   be rebutting the testimony of their experts because I've taken

15   the depositions of their experts.

16           But I was trying to be more efficient and practical

17   in this than permitting two of my neuropsych experts to

18   potentially testify about the same thing.  But I agree that

19   that would be a fair and reasonable solution to this issue and

20   I'm happy to go down that road.

21           THE COURT:  Okay.  Let me hear from Mr. Campbell and

22   then Mr. Mason.

23           MR. CAMPBELL:  Thank you, your Honor.  First of all,

24   to my knowledge Dr. Hoffman was never identified formally.

25   Ever.  I know that Mr. Stern intended that and made that clear

1    to Your Honor and the parties.  But he was never -- we never

2    had any reports back a year and a half ago when those reports

3    were due.

4           In fact, Mr. Stern motioned the Court for relief from

5    the Case Management Order as to experts because that's what's

6    required in these circumstances.  And he indicated that he

7    found an even better expert in Dr. Krishnan.

8           The first time that we -- and then we had the

9    deposition of Dr. Crakes.  And Mr. Stern on the record said he

10   had no intention of relying on anything that Dr. Hoffman had

11   done.

12          The next thing that happened was this past June Mr.

13   Stern in an email to myself and Wayne Mason said that he had

14   may have another expert that would not affect Daubert issues

15   or summary judgment issues.  I asked him who that was and he

16   said Dr. Hoffman.  That was the end of it from June.

17          The next thing that happened, Your Honor, is we get

18   reports from Dr. Hoffman the night before we're filing reply

19   briefs in the Daubert motions including those that are

20   affected by this.  The night before.

21          And then this issue of Mr. Stern thought I was going

22   to file a motion to strike.  There's nothing to strike.  I

23   made crystal clear --

24          THE COURT:  No.  I agree there was nothing to strike.

25   There's an email correspondence.  But I don't fault you for

```
 1   not filing a motion.

 2            MR. CAMPBELL:  And I made the position that we

 3   articulated in these papers exactly clear in that October

 4   email.  And then in terms of ongoing discovery for other

 5   stuff, you know, that's specifically contemplated by the CMO.

 6   There's tons of other cases to be addressed.

 7            So discovery from Kettering -- Kettering and other

 8   places, that's ongoing in other matters and it's ongoing in

 9   the litigation.  Experts are specifically controlled by Your

10   Honor's CMO.

11            And as you pointed out I think during the class issue

12   that came up on a rebuttal versus supplemental report, this

13   was a highly negotiated CMO, Case Management Order, from Your

14   Honor as to what to do.  And how we did it and the timing of

15   it.  It's critically important.

16            We spent all of that time deposing people,

17   understanding what the opinions are, the Daubert motion

18   practice that Your Honor, you know, we talked about how we all

19   spent so much time addressing those things.  And nothing was

20   said.  I mean, what were we doing?  And then this is not

21   supplemental.  This is not something else.  This is changing

22   the reports.

23            And as we highlighted I think four differences, major

24   differences between the two experts, Krishnan and Hoffman.

25   This is a different presentation.  And it goes to issues that
```

1    we addressed during those Daubert motions.

2            THE COURT:  Yes.

3            MR. CAMPBELL:  This is substantial change.

4            THE COURT:  What do you think about Mr. Stern's sort

5    of alternative request that Hoffman be a rebuttal witness?

6    Now the CMO does not address rebuttal experts.  He would be

7    held to the -- Krishnan would be his neuropsychologist.  If

8    VNA or LAN come up with their own neuropsychology experts who

9    would challenge those findings, that he be permitted at that

10   time to make a motion that this is an appropriate rebuttal

11   witness.

12           MR. CAMPBELL:  What I would say to that, Your Honor,

13   is the rules and what is and is not rebuttal is a highly

14   understood issue.  Rebuttal is not the last word.  I fought

15   that battle a hundred times.  Rebuttal is not the last word.

16           If we came up and had something new in the defense or

17   the response to Krishnan or others, then there's a proper

18   rebuttal.  And I would agree that if that were to happen, I

19   don't know whether that's going to -- I don't think we do it.

20   But I'm sure Mr. Stern and others may argue that we did do it.

21   And then we present to Your Honor whether there is or is not a

22   proper circumstance for rebuttal as distinct from having the

23   last word in the trial.

24           And the concept that didn't want to be duplicative,

25   that means it's not rebuttal.  This is a new expert with new

```
 1    opinions that has a different take on the issues that are
 2    critical to the case.  And it would be fundamentally unfair to
 3    VNA.  And I'll leave Mr. Mason to speak for LAN.  But to LAN
 4    also to change at this point, at this point in time to a
 5    February trial particularly given the extent to which this
 6    case and this litigation was controlled and managed by a Case
 7    Management Order that addressed this point specifically so
 8    that this very thing would not happen.
 9          So that's what I'd like to say to Your Honor.
10          THE COURT:  Okay.  Thank you.  Mr. Mason.
11          MR. MASON:  Thank you, your Honor.
12          My concern is at a 30,000 foot level at first to the
13    comments that Mr. Stern made deflecting from this issue to the
14    suggestion that VNA recently provided some other type, you
15    know, documents.
16          THE COURT:  That's not dispositive for me.
17          MR. MASON:  No, it's not.  But my point is, Your
18    Honor, the suggestion was that despite having a CMO that the
19    reality is that everything is dynamic.  And I really disagree
20    with that.  We have to have a baseline.  That's why we have a
21    CMO.  And there are requirements and responsibilities and this
22    fits directly within those responsibilities.
23          As Your Honor pointed out, this is not a supplemental
24    report.  This would be new and different because there are
25    differences.  And we are not in a position as LAN to start
```

 1    over and have to take these depositions and have to incur the

 2    costs associated with all of these adjustments when we

 3    prepared for Daubert motions and things.  And it's a major

 4    burden and it is a burden that is unfairly placed merely

 5    because of strategy.

 6           And I really appreciate Mr. Stern's candor to the

 7    Court.  But that candor demonstrated something troubling.  And

 8    that is an intentional decision that was made, a strategic

 9    decision to withhold information from this Court because they

10    were going to see how it played out with this other doctor.

11    And that is not a reason to allow a substitution of an expert.

12           We were willing and worked with him with respect to

13    the COVID issue and doing the right thing professionally.  And

14    when there was a reason to substitute an expert, absolutely.

15    But this is just not liking the position they're in and

16    wanting to utilize someone else and that's not a good reason

17    for a change.

18           The other thing I would say with respect to rebuttal

19    and respectfully it appeared to me that Your Honor was the one

20    that was sort of offering the rebuttal.  And even in response

21    to your offer, if you will, Mr. Stern again, because he's

22    being transparent, which I always appreciate, said to the

23    Court, well, to be honest with you it's just duplicative.  And

24    so that's not really the answer.  And so I think the question

25    has been answered.

```
 1            I agree with Mr. Campbell.  The law is what it is.
 2   If there is genuine rebuttal, the Court can make a decision at
 3   that time.  But not bringing in another expert to rebut with
 4   something different is inappropriate.  And if it is
 5   unanticipated, which is what rebuttal should be for, then I
 6   don't think it fits there.  But we'll see at the time.
 7            The issue before this Court is should there be a
 8   substitution.  And I respectfully believe that it is a clear
 9   call that they made their bed and now they need to sleep in it
10   with respect to the decisions that they made with respect to
11   these experts.  Thank you.
12            THE COURT:  Okay.
13            MR. STERN:  Your Honor, may I respond, please?
14            MR. CAMPBELL:  If I could?
15            THE COURT:  Mr. Campbell, go ahead.
16            MR. CAMPBELL:  Just very briefly.  I would just add
17   on the issue of rebuttal, the federal rules require rebuttal
18   reports to be made within 30 days of the thing that they're
19   rebutting.  I think perhaps Your Honor might be thinking or
20   speaking of something different.  But I just wanted to make
21   that observation about rebuttal reports.  Thank you.
22            THE COURT:  Okay.  That's good to know.  Mr. Stern.
23            MR. STERN:  Judge, I take exception to much of that.
24   Mr. Campbell just got done that before their reply briefs were
25   even due that I served them with reports from Dr. Hoffman.
```

1    But Mr. Mason said that I waited to see how this thing would

2    shake out with Dr. Krishnan.

3            There was no waiting to see how it would shake out

4    with Dr. Krishnan.  I served the reports on both defendants

5    prior to the reply.  I wasn't holding back for a strategic

6    reason.  There was nothing --

7            THE COURT:  Did you identify them as rebuttal

8    reports?

9            MR. STERN:  No.  That's not what I'm referring to.

10           THE COURT:  Oh.

11           MR. STERN:  What I'm referring to is this -- it's not

12   insinuation.  It's direct accusation that I'm playing loose

13   and fast.  Want to see what the Court does with Dr. Krishnan

14   and only after I saw what the Court did with Dr. Krishnan --

15   which the Court hasn't done anything with Dr. Krishnan -- did

16   I ever even inform them or supply them with reports of

17   Dr. Hoffman.  That is fundamentally false.

18           On September 14 I served the reports of Dr. Hoffman

19   and in June I told them I was using Dr. Hoffman.

20           Part 2 is I can feel where this is headed.  I have

21   pretty good intuition and I've always been able to read the

22   Court pretty well.

23           I find it troubling that we're now standing on our

24   laurels about the rules, the hard fast rules that exist in

25   this case when in reality, you know, last week instead of

November 22, 2021

1    preparing for summary judgment arguments, I spent two days

2    responding to a supplemental brief by VNA when no one even

3    sought permission to file it.

4         Your law clerk sent out an email from us asking for a

5    one-page summation of what our issue is here and VNA submitted

6    a three-page single spaced no margin brief that was totally

7    unexpected for me.

8         They're saying that there's no relevance whatsoever

9    to all the discovery that's still taking place, but this

10   litigation is fluid.  And so we can't just stand up and say,

11   oh, Mr. Stern playing hard and fast with the rules.  We've got

12   a CMO.  It says what it says and this is how it's going to be.

13        But then when it comes to things that are beneficial,

14   like submitting a 20-page supplemental brief on the issue of

15   liability, all of a sudden without permission of the Court we

16   just get to file supplemental briefs?

17        I mean, you know, pardon me for being transparent

18   with the Court.

19        THE COURT:  Okay.  No, no.  That's not an error of

20   any sort.

21        MR. STERN:  But I got one more note that I just need

22   -- you know, Mr. Mason's talking about the expense and all the

23   briefing that was done on the Daubert issues.  LAN didn't

24   submit a single brief on Dr. Krishnan, Dr. Bithoney, or

25   Dr. Crakes other than a joinder with VNA.

1           So let's be -- I mean, let's be -- if we're all going

2    to be honest and be commendable to each other about how

3    transparent we're being, I'm happy to foot the bill on

4    whatever concurrence -- I will pay the hourly rate -- I'll say

5    it right here on the record.

6           Whatever the hourly rate is for LAN to file the

7    concurrence with VNA's Daubert motions against Dr. Hoffman

8    because of the fact that there was a delay in identifying

9    Hoffman, I would be happy to pay LAN's bill.

10           THE COURT:  Okay.  Thank you.

11           Here's what I think needs to be done here.  I think

12    Dr. Hoffman may be used as a rebuttal witness at trial and

13    that I understand that it's out of time in terms of the

14    official 30 days from when VNA or LAN identified their

15    neuropsychologist and reports.

16           But in the exercise of my discretion, at that time

17    COVID was rampant.  It still is for that matter.  But

18    Mr. Hoffman, Dr. Hoffman was unable to travel here as a result

19    of COVID issues or at least during the time when he would have

20    been the expert in the first instance and we never would have

21    had Dr. Krishnan.

22           The Sixth Circuit has made clear that the district

23    court can exercise its discretion to limit the scope or to

24    define the scope of rebuttal testimony to that which is

25    directed to rebut new evidence or new theories proffered in

1    the defendant's case in chief.

2           But then there's a case that says however where the

3    evidence is real rebuttal evidence the fact that it might have

4    been offered in chief does not preclude its admission in

5    rebuttal.

6           So furthermore, in the case in chief the plaintiff

7    has no duty to anticipate or negate a defense theory in

8    plaintiffs' case in chief and can see how that testimony comes

9    in and use a rebuttal witness in actual rebuttal testimony.

10          So as far as the effort now, that's actually from

11   Benedict v The United States.  It's a Sixth Circuit 1987 case.

12          And I think what we need to do is because we have not

13   really set forth anything other than the Federal Rules of

14   Civil Procedure for rebuttal witnesses and for supplemental

15   reports, is I should set a timeframe for the parties to meet

16   and confer to amend the fifth amended Case Management Order so

17   that we have a Sixth Amendment order -- amended order that

18   would take this into consideration.

19          And there won't be any reason to pay for the costs of

20   LAN's concurrence as far as I'm concerned.  I'll leave that to

21   the two of you.  But we should look at setting a deadline.

22          Has Dr. Crakes already provided -- he has provided

23   his amended report.  I have that.  Correct?  Yeah.

24          MR. STERN:  Yes.  I don't know --

25          THE COURT:  I think it was an exhibit --

1          MR. STERN:  Okay.

2          THE COURT:  -- to Mr. Campbell's email.  Exhibit 7.

3     So there needs -- I mean, I imagine that you will need to meet

4     and confer to -- the problem is Dr. Crakes has a report.

5          MR. STERN:  So Dr. Crakes's testimony in the case in

6     chief based on what I think Your Honor's ruling is is that

7     it's limited to his assumptions made.  Again, assuming

8     Dr. Krishnan is permitted to testify as an expert, assuming

9     Dr. Crakes is permitted to testify as an expert.  But he's

10    limited in his testimony to that which Dr. Krishnan is

11    testifying to.

12         To the extent that there are issues to rebut and

13    Dr. Hoffman is permitted to testify as a rebuttal witness to

14    the defendants, it very well may be that Dr. Crakes would be

15    offered as, you know, in the form of rebuttal testimony.  To

16    the extent they challenge -- I can see a scenario where he has

17    to testify again as to Hoffman depending on how Hoffman's

18    testimony comes in.

19         But on the front end, it should just be about

20    Dr. Krishnan, Dr. Crakes's testimony unless for some reason

21    VNA or LAN opens the door to additional testimony related to

22    Dr. Hoffman.

23         THE COURT:  Okay.  All right.  So what we'll do is

24    that will conclude's today's hearing and the issues that were

25    set forth for today.  Tomorrow we'll start with the -- it's a

November 22, 2021

```
 1   combination motion.  It's the one where Judge Farah from
 2   Genesee County Circuit Court and I will both be hearing
 3   argument.  And I think we'll start with Judge Farah hearing
 4   argument from LAD.
 5         MR. MASON:  Could I address that, Your Honor?
 6         THE COURT:  Yeah, sure.
 7         MR. MASON:  I think it just makes sense to -- for us
 8   to affirmatively make our motion on that.  I think it will
 9   cover much of Judge Farah.  I'm not trying to undercut Judge
10   Farah.
11         THE COURT:  No.
12         MR. MASON:  But I think it makes the most sense if we
13   could make our motion.  And then certainly we'll address all
14   the issues with Judge Farah that are raised.  But if the Court
15   would consider that, I think it would be make it much more
16   smooth.
17         THE COURT:  I think that makes sense.  So you'll make
18   your motion.  There will be a response from the People of the
19   State of Michigan and a response from plaintiffs.
20         MR. MASON:  That will be fine.  However you want to
21   handle it.
22         THE COURT:  Okay.  And then we'll move on to the LAN
23   motion from there.
24         MR. MASON:  Okay.
25         THE COURT:  And it will be my hope to finish up by
```

November 22, 2021

1    very early afternoon at the latest.  So that's the plan.

2              MR. MASON:  Okay.

3              THE COURT:  Okay.  Take care, everybody.  Take care.

4    Enjoy the holiday.

5              MR. CAMPBELL:  Thank you, your Honor.  I appreciate

6    your time today.

7              MR. MASON:  Thank you, Your Honor.

8              THE COURT:  All right.  And Mr. Mason, will you let

9    counsel for the people know the order we're talking about

10   since I don't think they're on the hearing?

11             MR. MASON:  Yes, Your Honor.  Happy to do that.

12             THE COURT:  Okay.  Thank you.

13                      (Proceedings Concluded)

14                 -         -         -

15

16              CERTIFICATE OF OFFICIAL COURT REPORTER

17        I, Jeseca C. Eddington, Federal Official Court

18   Reporter, do hereby certify the foregoing 144 pages are a true

19   and correct transcript of the above entitled proceedings.

20   /s/ JESECA C. EDDINGTON_____          11/30/2021_
     Jeseca C. Eddington, RDR, RMR, CRR, FCRR        Date
21

22

23

24

25