```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3     LEE-ANNE WALTERS, et al,

 4                    Plaintiffs,
          -v-                              Case No. 17-10164
 5
       CITY OF FLINT, et al,
 6
                      Defendants.
 7     _____/

 8                         MOTION HEARING

 9
                   BEFORE THE HONORABLE JUDITH E. LEVY
10                    UNITED STATES DISTRICT JUDGE

11                        NOVEMBER 23, 2021

12
       APPEARANCES:
13
       For the              Corey M. Stern
14     Plaintiffs:          Levy Konigsberg, LLP
                            605 Third Avenue, Suite 33rd Floor
15                          New York, New York 10158

16     For the Defendant    James M. Campbell
       Veolia:              Campbell Conroy & O'Neil, P.C.
17                          1 Constitution Wharf, Suite 310
                            Boston, Massachusetts 02129
18
                            Kristin Michele Dupre
19                          Campbell Conroy & O'Neil, P.C.
                            1 Constitution Wharf, Suite 310
20                          Boston, Massachusetts 02129

21
                      (Appearances Continued On Next Page)
22

23     To Obtain a          Jeseca C. Eddington, RDR, RMR, CRR, FCRR
       Certified            Federal Official Court Reporter
24     Transcript           United States District Court
       Contact:             200 East Liberty Street
25                          Ann Arbor, Michigan 48104
```

```
 1                             Alaina N. Devine
                               Campbell Conroy & O'Neil, P.C.
 2                             1 Constitution Wharf, Suite 310
                               Boston, Massachusetts 02129
 3
          For the Defendant    Wayne Brian Mason
 4        LAN:                 Faegre Drinker Biddle & Reath LLP
                               1717 Main Street, Suite 5400
 5                             Dallas, Texas 75201

 6                             S. Vance Wittie
                               Faegre Drinker Biddle & Reath LLP
 7                             1717 Main Street, Suite 5400
                               Dallas, Texas 75201
 8
                               David C. Kent
 9                             Faegre Drinker Biddle Reath LLP
                               1717 Main Street, Suite 5400
10                             Dallas, Texas 75201

11        For the People:      Nathan A. Gambill
                               Michigan Department of Attorney General
12                             ENRA Division
                               P.O. Box 30755
13                             Lansing, Michigan 48909

14        Also Present:        Honorable Joseph J. Farah
                               7th Judicial Circuit Court
15                             900 Saginaw Street, Suite 305
                               Flint, Michigan 48502
16
                               Deborah E. Greenspan
17                             Special Master
                               Blank Rome LLP
18                             1825 Eye Street, Northwest
                               Washington, District of Columbia 20006
19

20

21

22

23             To Obtain a Certified Transcript Contact:
                Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24                  Federal Official Court Reporter
                      United States District Court
25        200 East Liberty Street - Ann Arbor, Michigan 48104
```

November 23, 2021

1                              **I N D E X**

2          <u>MISCELLANY</u>

3          Proceedings................................4
           Certificate..............................139
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

November 23, 2021

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  Calling the Flint Water Cases.
 3          THE COURT:  All right.  Well, the first thing I
 4  wanted to do is thank everybody for the argument yesterday,
 5  for those of you who were present.  I thought it was very
 6  productive and very helpful.
 7          And I want to welcome Judge Farah, my colleague, on
 8  these cases.  He was, as I think I mentioned, unable to be
 9  present yesterday.  But we agreed yesterday to begin today's
10  session with the issue of the relationship between LAD, Leo A
11  Daly and LAN.  And it presents itself differently in front of
12  Judge Farah and myself.
13          But what we thought would be most efficient was to
14  have -- in front of the federal court it's LAD's motion for
15  summary judgment.  In front of Judge Farah there's the
16  People's motion.  But we'll start out with Mr. Mason and then
17  go to the People.  So Judge Farah will sort of take the
18  laboring oar for this portion of the hearing.
19          Does that sound -- Judge Farah, is that --
20          HONORABLE JUDGE FARAH:  Yes, that's fine.
21          THE COURT:  Great.
22          HONORABLE JUDGE FARAH:  Thank you, Judge Levy, for
23  welcoming me.  And good morning to everybody.
24          And under that method of proceeding, I think I will
25  turn to Mr. Mason.  And he may present his arguments.  Even
```

```
 1    though in my Court it is Mr. Gambill's motion I believe for
 2    summary disposition as plaintiff in what we call the parens
 3    patriae suit.
 4            And so Mr. Mason, your arguments are being listened
 5    to closely by Judge Levy and myself.  So let's see what you
 6    have to say.  And I will undoubtedly have questions for both
 7    of you.  Okay.
 8            MR. MASON:  Thank you, your Honor.  Actually with
 9    respect to the LAD motions, both of them, Mr. Wittie will take
10    the lead.  And then Mr. Kent is on the call.  When it comes
11    time for the LAN motion for summary judgment, Mr. Kent will
12    take the lead.  So I'll pass to Mr. Wittie to take the lead.
13            HONORABLE JUDGE FARAH:  Probably a good idea since my
14    first question to you is how your Cowboys could look so dismal
15    last Sunday.
16            MR. MASON:  I can answer that one.
17            HONORABLE JUDGE FARAH:  We'll get to that one
18    eventually.
19            THE COURT:  There's no material question of fact on
20    that apparently.
21            HONORABLE JUDGE FARAH:  Summary disposition of the
22    Chiefs.
23            MR. WITTIE:  Good morning, Your Honors.
24            HONORABLE JUDGE FARAH:  Good morning.
25            MR. WITTIE:  I'm Vance Wittie with the Faegre Drinker
```

November 23, 2021

1     firm on behalf of LAD.  And I'll be speaking to the motions

2     related to LAD today.

3          As Your Honors are aware, the specific work performed

4     at the Flint water treatment plant was performed by Lockwood

5     Andrews and Newnam.  That's the company referred to by all of

6     the parties as LAN.  That was the party with which the City of

7     Flint contracted to do its services.  And it is a wholly owned

8     subsidiary of LAD.

9          LAD, Leo A Daly company is a separate corporation

10    which owns the stock of LAN.

11         Now in this suit, plaintiffs and ultimately the --

12    plaintiffs have offered two theories for why LAD could be held

13    liable.  Really the People, in their motion, rely only on a

14    single theory.

15         The plaintiffs' theories are that LAN is the alter

16    ego of LAD and that the corporate veil can be pierced.  And

17    second that the engineers were -- they were performing the

18    actual work were in fact employees of LAD and that LAD is,

19    therefore, vicariously liable for any torts they may have

20    committed in the torts of their performance.

21         LAD will show that both of those contentions were

22    invalid under Michigan law or contrary to that law.  We'll

23    begin with the alter ego position.

24         Now to begin with, it's important to recognize that

25    under Michigan law there is a presumption that parent and

1    subsidiary corporations are separate entities with separate

2    legal responsibilities.  And therefore, this is an issue upon

3    which the plaintiffs and the People ultimately bear the burden

4    of proof.

5           Now, in order to pierce the corporate veil, the

6    claimant must show basically three things.  First, that the

7    subsidiary is a mere instrumentality of the parent

8    corporation.  Second, that the parent corporation committed a

9    fraud, wrong, or illegality through that subsidiary.  And

10   third, that the claimant sustained some kind of unlost or --

11   unjust lost or injury as a result.

12          Now I'd like to go a little bit out of order and talk

13   about those second and third requirements first since they

14   provide such a clear road map for the resolution of this

15   particular issue.  There's been simply no showing under this

16   record that LAD used the corporate form of LAN to commit any

17   wrong in this action.

18          The only wrong that has been alleged or has been

19   identified is harm from the ingestion of water by the

20   plaintiffs to which the plaintiffs allege that LAN is

21   partially to blame through the professional -- alleged

22   professional negligence of the engineering employees.

23          And professional negligence is simply not the kind of

24   wrong that the case law is talking about.  The cases speak of

25   deliberate wrongful conduct.  There's no hint of that in this

1   particular case.

2         And even if negligence alone were sufficient to

3   support a piercing of the corporate veil, there's no

4   suggestion in this record that LAD interfered with the work of

5   the engineers or directed their work in any particular way

6   especially with regard to any acts or omissions that the

7   underlying plaintiffs allege to have been negligent in this

8   case.  Nor is there any suggestion that the corporate form of

9   LAN had any special bearing on this case.

10        LAN is an infrastructure engineering firm that

11  conducts its own line of business and has its own sources of

12  revenue.  It was certainly not formed for the purpose of

13  conducting the Flint water project.  It existed for many

14  decades prior to the inception of any work on the Flint water

15  project.  And LAD was not using it in any ordinary sense of

16  the word let alone using it to commit any kind of a fraud or

17  wrong.

18        And finally, the plaintiffs here have not shown that

19  they have sustained a loss connected with the use of the

20  corporate form by LAD.

21        The case law here is quite clear that the wrong must

22  be something more than just the fact that the plaintiffs have

23  sustained what they may term as an unjust loss.  In other

24  words, the fact that they allege to be tort victims does not

25  in and of itself show the kind of wrong that is necessary to

1    pierce the corporate veil.

2          So it's very clear that those second and third

3    requirements are veil piercing have not been met in this case.

4    And furthermore, it does not appear that the first test, mere

5    instrumentality, has been satisfied either.  Now whether a

6    subsidiary --

7          HONORABLE JUDGE FARAH:  Let me ask you about that,

8    Mr. Wittie, that last point that you just made.  And I

9    appreciate your argument so far.

10         Your brief or at least your client's brief -- I don't

11   remember who wrote it.  But in any event, much was made about

12   calling -- LAN being called a department of LAD.  And if, in

13   fact, they are a department of LAD, then why are we -- why are

14   Judge Levy and I concerned about the intricacies that you have

15   mentioned?  If they're a department, when is it that a

16   department acts on its own?

17         And let me give you an example that may not be apt.

18   But think about Macy's and they have a men's department.  And

19   if, in fact, some of Macy's employees are sent to the men's

20   department to help with a need, okay, in that case heavy

21   demands for men's suits versus handling the Flint Water

22   Crisis.

23         If, in fact, they're sent to the men's department, do

24   they no longer become Macy's employees?  What possible sense

25   would that make?

1    Now you took them to task for using the word

2    department.  But didn't the word department originate with

3    your client's representation to the IRS that LAN was a

4    department of LAD?

5    MR. WITTIE:  First, Your Honor, it's very clear that

6    LAD is not a mere department -- or LAN is not a mere

7    department of LAD.  It is a separately incorporated entity.

8    In fact, they're incorporated under the laws of two separate

9    states.

10    Moreover, unlike the Macy's menswear department, LAN

11    is a standalone business.  It does it's own work.  It does a

12    separate kind of work from the work that LAN -- LAD

13    customarily does.  And while there's certainly corporate

14    synergies between the two companies and there's some shared

15    services which are accounted for separately, there are

16    separate accountings for revenue and profits and losses

17    between those two companies.

18    They're in all respects legally separated.

19    Now the --

20    HONORABLE JUDGE FARAH:  Well, let me interrupt you if

21    I could, sir, just to ask this.  Who gets LAN's money?  LAN?

22    Do they have their own checkbook?  Do they have their own

23    account?  Or does that all go back to LAD's account and

24    checkbook?

25    MR. WITTIE:  There is a joint checking account

1   between LAN and LAD which initially receives monies that are
2   collected by either of the two entities.  But then the money,
3   when it is disbursed, is disbursed through separate -- a
4   disbursement accounts and there are separate accountings for
5   profit or loss between the two companies.
6        So at the end of the day, there's, you know, the
7   profitability and bonuses, for example, that would be earned
8   by the respective employees are paid out according to the
9   profitability of whatever entity --
10       HONORABLE JUDGE FARAH:  Mr. Wittie, why would that
11  need to happen?  Why doesn't LAN just keep the money from the
12  City of Flint and write checks to the employees?  My
13  understanding of the record is is the money gets turned into
14  LAD and LAD is the one that writes the checks.  Why the need
15  then not for the money to stop with LAN?
16       MR. WITTIE:  Well, it's incorrect to state that the
17  money is turned over to LAD.  It's turned into a joint
18  checking account.  Like perhaps you and your spouse might have
19  a joint checking account.  It doesn't merge you as individuals
20  into a single unit.  You maintain it for reasons of
21  convenience and efficiency in running your household.
22       And the evidence in this case indicates that LAD and
23  LAN have the same kind of cash management system.
24       And by the way, we've cited, you know, cases in the
25  record that indicate that the mere use of such a system is not

```
 1    a reason to disregard corporate separateness between the two
 2    companies especially when there's no indication that the
 3    ultimate, you know, profitability or loss from a given project
 4    is just shared out evenly between the entities.  That's not
 5    the case.
 6              You have in the record the actual financial records
 7    from the two companies which show that, you know, profit and
 8    loss is accounted for separately.
 9              HONORABLE JUDGE FARAH:  Okay.  Continue.  Thank you.
10              MR. WITTIE:  Now, as far as the IRS form goes, you
11    know, that is not -- the two companies filed a consolidated
12    tax return as is allowed under generally accepted accounting
13    principles.  In fact, it's encouraged for companies to do
14    that.
15              And in that accounting for things, then, you know,
16    the taxpayer, the person who is filing the consolidated tax
17    returns, you know, is the one who issues the W2s to the
18    particular employees.  And in that case, they have chosen to
19    identify, you know, for every employee the operating company
20    for which each of the employees works for naturally.
21              Now the IRS supplied form does not have a operating
22    company line.  It has a line for department.  And so in making
23    that reporting, the companies have chosen to identify for the
24    IRS which company these people worked for by identifying LAD
25    or LAN in the department blank because that's the blank that
```

1  has been provided for them.

2          HONORABLE JUDGE FARAH:  Are there other company names

3  that are on those IRS forms other than LAN?

4          MR. WITTIE:  Well, there could be -- for a given

5  employee could be a LAD employee or could be a LAN employee.

6  I don't believe there are any other operating company

7  subsidiaries that, you know, would be listed out as

8  departments.

9          And I don't think that the record contains

10 information regarding, for example, what, you know, how it's

11 reported, you know, the salary of the shared services folks

12 who have assignments, you know, for both of the companies.

13         But for the engineers, you know, the W2s were

14 presented in some of the depositions and they would show that

15 the LAN folks are identified as being, you know, as part of

16 the LAN operating company on the line that's demarked by

17 department.  But again, that's, you know, the IRS --

18         HONORABLE JUDGE FARAH:  Let me ask you this.  Let's

19 go back in history a little bit, which is in the record, and

20 about the acquisition by LAD of LAN.

21         It must be that LAD thought LAN could provide a

22 service that LAD was not providing to enhance LAD's

23 profitability and universality of providing services in this

24 domain.

25         And indeed did their emblem that they use on the

November 23, 2021

1    internet or otherwise that I think Mr. Campbell has on the

2    first page of his brief indicates that LAN is right there with

3    LAD.  And combining that with the notion that they wanted

4    engineering services that LAN could do that maybe LAD couldn't

5    do, how is it that they acquired them yet wanted to keep them

6    separate to the point that they could be distinguished from

7    LAD?

8         Practical example, maybe not apt.  Pepsi develops a

9    snack food department or subsidiary, Frito-Lay or what have

10   you, Aquafina, and they do that because they want to improve

11   their profitability.

12        Is that what happened here with the acquisition of

13   LAN?

14        MR. WITTIE:  Well, I'm certain that LAN was acquired

15   to enhance the profitability of both LAN and LAD for their

16   joint benefit.  I mean, that's why subsidiaries are formed.

17   That's why corporations exist.

18        There's nothing surprising about that at all.  Nor is

19   there anything unusual in the fact that LAN would identify

20   itself with LAD when it's holding itself out to the public as

21   an LAD company.  It is an LAD company.  LAD owns its stock.

22   You know, it is an LAD subsidiary.

23        LAN has never made any bones about that.  Nor has

24   LAD.  But that doesn't mean that for the purposes of tort

25   liability or legal responsibility that you can simply shift it

1    from one entity to another.

2         HONORABLE JUDGE FARAH:  Maybe not.  But is it a

3    factor that can be considered, the emblem, the purpose for

4    acquisition, all of these things that have been mentioned.

5    The various examples that have been given.  Are those facts

6    that the Court can consider?

7         MR. WITTIE:  Well, they are facts that the Court

8    should consider for not piercing the corporate veil.  Because

9    they show that there was a legitimate business purpose for the

10   acquisition rather than that it was done to commit any kind of

11   fraud or wrongdoing.

12        HONORABLE JUDGE FARAH:  Well, I don't know that I see

13   anything in the record -- we'll listen to what Mr. Gambill has

14   to say -- that suggests they acquired the company for

15   wrongdoing.  I mean, they didn't acquire them and then put

16   them into bankruptcy and then use that to, you know, as a

17   deduction on their federal tax return.

18        I don't think we have that concern.  I'm more

19   interested in why it is legitimately they were acquired and

20   whether that acquisition along with the other facts suggest

21   that they are one in the same.  Because That's really in the

22   end.  May be what Judge Levy and I are both deciding.

23        Is there really a LAN or do we go straight from

24   Green, Hansen, Matta, and Nakashima I think it is, do they go

25   straight to LAD?  And that's, of course, where the vicarious

November 23, 2021

1    liability part comes in.

2          So I don't think there's any question.  I don't think

3    there was necessarily shown by the record -- we'll listen to

4    Mr. Gambill of course -- anything nefarious about this.

5          At the same time, Mr. Gambill might say so what.

6    When it is vying to get the money.  But when the liability

7    claim came, oops.  If I go Allstate here.  Good hands with

8    Allstate until there's a claim.  Oops.  I guess we dropped.

9          I have no disparagement of Allstate.  It's just that

10   my property teacher used that example way back when I was in

11   law school and I still remember it so I've got to give him

12   credit for it.

13         So what about that?  Everything is rosy until there's

14   a claim.  And then all of a sudden LAN, who are they?  We

15   never heard of LAN.  Who are these employees?  What about

16   that?

17         MR. WITTIE:  Well, there are two separate issues

18   here, Your Honor.  You know as to whose employees they are, I

19   mean, that's the whole borrowed servant issue and that's going

20   to exist regardless of how, you know, alter egos determine.

21         But when you state that there's no evidence in the

22   record that there's anything nefarious, you have essentially

23   decided the issue.  Because without something nefarious,

24   without some kind of wrongdoing with regard to the use of the

25   corporate form, there's no alter ego period.  The Michigan law

1    is very clear on that.

2           It is certainly the case that these subsidiaries are

3    formed for the purpose of enhancing the mutual profitability

4    of the various entities.  I mean, it would be foolish to

5    suggest anything otherwise.

6           But the law has been consistent that those kind of

7    synergies are not sufficient to merge the two companies

8    together for tort liability.  You know, if that were the case,

9    then veil piercing would be routine.  The presumption would be

10   completely the opposite of the way that it is.  You would have

11   a presumption of responsibility for the parent corporation

12   when the subsidiary's accused of the tort.  But we know that

13   that's simply not the case.

14          HONORABLE JUDGE FARAH:  Okay.  Continue if you'd

15   like.

16          MR. WITTIE:  I would also add that as far as the

17   People's motions go, they do not even attempt to argue that

18   there is an alter ego relationship between those two

19   companies.  They rely entirely upon, you know, the fact that

20   LAD is the general employer for these particular engineers in

21   their view.  So it doesn't appear that the People can even

22   rely on that particular argument in support of their motion.

23          Now if there are no further questions on the alter

24   ego portion, I'd like to turn to the vicarious liability, if I

25   might.

1          HONORABLE JUDGE FARAH:  Let me ask Judge Levy did you

2     want to present questions or did you want to keep going?

3          THE COURT:  Good question.  I guess I have just one

4     or two and I may have more.  But I am following your argument,

5     Mr. Wittie.  And I think the big issue is the one that has

6     been identified about whether the formation of LAN was in some

7     way used to perpetrate a fraud or wrongdoing.

8          But let me -- just to make sure I understand the mere

9     instrumentality portion of it, in the event that there's a

10    question of fact that we can become convinced of on the fraud

11    or wrongdoing, the record before me shows that the W2s

12    identified only LAD as the employer and payer of wages for

13    every one of the LAN engineers and employees on the Flint

14    project.

15          Do I have that correct?

16          MR. WITTIE:  That is correct, Your Honor.  LAD was

17    the payroll entity.  The companies had a consolidated payroll

18    system for efficiency reasons.  Had the common benefit plans,

19    etcetera.  For purposes of accounting for profit or loss,

20    you'll see that those direct labor charges were accounted for

21    as to the companies that received the services.

22          So in other words, although LAD was providing the

23    paycheck, the physical paycheck to these employees, it was

24    accounted for through LAN's disbursement accounts.

25          THE COURT:  Okay.  And do I understand correctly that

1    LAN has no employees of their own?  All of the employees are

2    provided by LAD.  And all of them are in one way or another

3    leased or shared between the companies.

4         MR. WITTIE:  Your Honor, for the purposes of this

5    motion, LAD would agree that there is record evidence of that.

6    It's unclear to the extent to which the LAD leasing agreement

7    was actually in effect.

8         THE COURT:  Okay.  That's my next question.  So we

9    have the shared general counsel saying at his deposition that,

10   yes, we leased -- LAD leased all of the employees to LAN yet

11   he didn't know about the lease agreement until this

12   litigation.  So back when the work was done, he didn't know

13   anyone was being leased.

14        And then we have the shared chief financial officer,

15   Brader, saying, no, there was no lease.  We didn't -- that's

16   not how we acted.  And he only heard about the lease

17   arrangement when the litigation arose.

18        Do I understand that correctly?

19        MR. WITTIE:  That's certainly how I read that

20   testimony, Your Honor.

21        THE COURT:  So, so far as the general counsel and the

22   CFO of LAN know, all of these employees are just LAD employees

23   because they didn't know there was a lease agreement.  And

24   also if I understand, LAN never paid a penny of consideration

25   in return for these employees.

1          MR. WITTIE:  Well, they never paid a leasing fee, if

2   you will.

3          THE COURT:  Fee.  Okay.

4          MR. WITTIE:  That's right.  Ultimately, you know, the

5   cost of their labor is accounted against LAN.  So in that

6   sense, you know, they're paying these employees.

7          THE COURT:  LAN is paying LAN employees that they

8   borrowed or something.  If the lease agreement was really not

9   in existence, no one really knew about it and no one paid

10  anything under it, is it fair to say it just didn't really

11  exist at the time?  Or what?

12         MR. WITTIE:  Well, it was certainly executed in 2004

13  by the two companies.

14         THE COURT:  Right.

15         MR. WITTIE:  You know, the employees are assigned to

16  LAN.  They go to LAN.  They have LAN business cards.  LAN

17  email addresses.  They're working for, you know, on LAN

18  projects.  So for all practical purposes, whether it's through

19  this formal leasing agreement or through some kind of

20  arrangement, you know, they're there at LAN doing LAN work.

21         They are lent or borrowed in some way.

22         You know, we were very careful in our motion to give

23  plaintiffs the benefit of the doubt on this.  And to say that

24  we're going to assume for the purposes of the motion that the

25  leasing agreement is in effect and that there was, you know,

1   that they were -- the engineers were LAD employees at one time

2   that were leased.  We're just trying to just align this whole

3   issue since there is some question about doubt on it.

4          But ultimately regardless of how it would come down

5   if it had to be determined, it's not going to make any

6   difference to the vicarious liability in this particular case.

7   Because formally or informally, all of the requirements for

8   the borrowed servant doctrine are in place based upon the

9   facts on the ground.

10          THE COURT:  Okay.  And so when looking at the mere

11  instrumentality factors, I -- we look to whether the

12  corporation is undercapitalized.  Tell me what your response

13  is to my suggestion that it does appear that there is some

14  undercapitalization of LAN.

15          MR. WITTIE:  Well, Your Honor, I don't think that

16  there's any evidence of undercapitalization that's in the

17  record.  The record shows that LAN has been, you know, a

18  profitable corporation for most of the years that are in

19  subject here.  In fact, it's been a more profitable

20  corporation than LAD over a significant period of time.

21          The operating statements are in the record which show

22  that.  There's certainly, you know, no evidence of any kind of

23  unexplained or untoward distribution of money from LAN to LAD.

24  Nothing like that in the record.

25          THE COURT:  Well, I guess there is -- I think

1    undercapitalization can take place where a subsidiary is used

2    as the parent company's bank account.  And is there evidence

3    of that here?

4           MR. WITTIE:  Oh, no, Your Honor.  I don't believe so

5    at all.  I've said that you had a joint bank account, that

6    those kind of cash management systems don't indicate that

7    there's -- you know, for example, there would be no intra

8    corporate loans that weren't paid back or anything like that

9    that appear on the record that you sometimes see in these

10   alter ego cases.

11          THE COURT:  Okay.  And I think one of the things I

12   was looking at is that even if the costs of the labor provided

13   by the employees on the Flint project that were leased to LAN

14   is accounted for on the balance sheet, is there a question

15   about whether LAD's giving these employees to LAN for free is

16   analogous to a situation in which a subsidiary does not pay

17   the parent company for products it purchased?

18          MR. WITTIE:  Well, obviously individuals are not

19   products.

20          THE COURT:  No, they are not.

21          MR. WITTIE:  The expenditure for -- they're not

22   depreciated.  So there's a lot of distinctions, I think.

23   Obviously there are employee leasing companies that are in the

24   business of providing employees and do earn some

25   consideration.

1          But you know, for the borrowed servant doctrine

2     anyway, you know, there's no requirement that the borrowing or

3     lending be done on a pay basis.  I mean, the initial case in

4     Michigan, the Janik was a gratuitous lending of an employee

5     for the limited purpose of, you know, providing a driver for

6     the particular day.

7          So I don't think that the fact that there was no

8     overt consideration for the lending of the employee would be

9     determinative.  Especially since, you know, LAD is not an

10    employee lending firm.

11         THE COURT:  Okay.  Mr. Wittie, I was expecting to see

12    corporate minutes for LAN.  That seems very important in the

13    mere instrumentality assessment, that their be corporate

14    formalities observed.

15         Did you submit those and I missed them?

16         MR. WITTIE:  Well, Your Honor, we submitted the

17    affidavit testimony of Mr. Benes who indicated that they were

18    maintained.  I don't believe that they were ever requested.

19         THE COURT:  Okay.  I'd like to -- I'm interested in

20    requesting those corporate minutes.

21         HONORABLE JUDGE FARAH:  I'd like to see those, too,

22    if I could, counsel.

23         THE COURT:  But I think we still -- and here's why

24    I'm asking.  I may be operating at a much more basic level on

25    all of this.  I'm trying to find out -- I understand that LAN

 1   was incorporated in a different state from LAD.  But I'm
 2   trying to figure out whether aside from that it existed in
 3   anything other than its own mind or something.
 4        And so I am just looking at -- I want to be assured
 5   if I see those corporate formalities, that will probably sort
 6   of end my inquiry on that and I'm going to move to the
 7   vicarious liability.  But...
 8        MR. WITTIE:  Before we leave the question of the
 9   minutes, may I ask, you know, a particular time periods the
10   Court may be interested in on that?
11        THE COURT:  I think perhaps a couple of years prior
12   to the Flint water contract.  I mean, you -- LAN had contracts
13   over a period of time.  But let's do 2012 to 2016.
14        MR. MASON:  And Your Honor, this is a bit of an
15   unusual request it seems in this proceeding.  Can this be
16   provided in camera to the Court?  I'll need to obviously speak
17   to the corporate officers about this.  And I'm not suggesting
18   that I won't make the ask.  I just --
19        THE COURT:  Sure.  I can start by viewing it in
20   camera.  And if I have concern then I'll sort out what the
21   next steps.  And Judge Farah has asked for it as well.
22        Is that okay with you, Judge Farah?
23        HONORABLE JUDGE FARAH:  It is.  And I have another
24   question over either Mr. Wittie or Mr. Mason.  We have it in
25   the record.  When was it -- okay.  1991 is when the

 1   acquisition date is.  I don't know how arduous this is going

 2   to be.  But frankly everything about this case has been

 3   arduous.

 4          I would like to see the corporate minutes from 1991.

 5   Because I want to see what the relationship is prior to things

 6   going amuck in 2012, '13, '14, '15.  I'd like to see what the

 7   relationship was through as bespoken by the corporate minutes

 8   from the time of acquisition.

 9          MR. MASON:  Okay.

10          HONORABLE JUDGE FARAH:  If that's okay with Judge

11   Levy.

12          THE COURT:  Oh, certainly.  And I guess what my next

13   point is I'm just interested in the motion before me to hear

14   from plaintiffs where you think there's an issue regarding

15   whether LAD exercised control over LAN in a manner that

16   amounts to fraud.  I mean, that's where my analysis is getting

17   bollixed up.

18          HONORABLE JUDGE FARAH:  Yeah.  Same.  I'm more than

19   happy to hear that, too.  Because I did say subject to

20   Mr. Gambill's argument.

21          MR. STERN:  Your Honors, do you want me to address

22   that?

23          THE COURT:  Well, I think we're having the People go

24   next.

25          MR. STERN:  Okay.

```
 1           THE COURT:  So it's just a placeholder.

 2           HONORABLE JUDGE FARAH:  So I guess I believe, Judge

 3  Levy, we can go on to vicarious liability at this point unless

 4  there's --

 5           THE COURT:  Yes, yes.  Thank you.

 6           HONORABLE JUDGE FARAH:  Okay.  All right.

 7  Mr. Wittie, vicarious liability.

 8           MR. WITTIE:  Yes.  Thank you, your Honor.

 9           Of course the basic principle of vicarious liability

10  would require showing two things, both the existence of a

11  employment relationship and that the employee was acting in

12  the course and scope of that relationship.

13           LAD's motion is directed purely to that second

14  question.  The question of course and scope.  And it doesn't

15  contest that there is at least the fact issue regarding the

16  employment of these professional engineers under the terms of

17  the leasing agreement.

18           The controlling question, therefore, was whether the

19  engineers were working on behalf of LAD or LAN while providing

20  the services with respect to the Flint water system.  Now for

21  more than a century, Michigan law has provided that an

22  employee may be loaned or borrowed.

23           The employer that is lending the employee is usually

24  termed the general employer.  And while the borrowing employer

25  has control and assumes control over the detailed work of that
```

1    employee, it is the borrowing employer and not the lending

2    employer that is vicariously liable for the negligence of the

3    employee in connection with the work that that employee is

4    doing.

5            There are three particularly important cases in this

6    regard in Michigan.  The first is the Janik case, Michigan

7    Supreme Court case from 1914.  A case where Ford Motor Company

8    loaned one of its employees to a customer who had come to the

9    factory and bought a Ford car and wanted someone to drive the

10   car to the city limits.

11           This purchaser was not comfortable driving in

12   Detroit.  And Ford said, yes, we'll provide you with this

13   driver.  He's under your direction.  You choose the route.

14   You choose the speed and the timing and everything like that.

15   And the employee is to return back to the factory on a street

16   car.

17           And as bad fortune would have it, there was an

18   accident which it was alleged that the Ford general employee

19   was negligent.

20           And ultimately the Supreme Court found that a

21   borrowed servant relationship did exist, that at the time of

22   the accident the employee was under the control and direction

23   of the borrowing employer for that limited purpose.  And

24   therefore, Ford did not have tort liability in that situation.

25           Now I think it's noteworthy that this result occurred

1    despite the fact that Ford never relinquished what we would

2    call even day-to-day control of this particular employee.  The

3    employee was only gone for a short period of time.  Ford

4    certainly continued to pay the employee and would have had the

5    right to fire -- hire or fire the employee, etcetera.

6            But for a limited time and for a limited purpose,

7    this particular employee was under the direction and control

8    of the special or borrowing employer.  And that was the

9    determining factor for purposes of imposing vicarious

10   liability.

11           The Hoffman case, which is a Michigan Court of Appeal

12   case in 1985.  It's a case involving a forklift operator who

13   was leased by Manpower to the borrowing employer.  And there

14   was an accident which there was a serious injury by another

15   one of the borrowing employees -- a borrowing employer's

16   employees.

17           And the liability then turned on which entity

18   controlled the detailed activity.  And that's a phrase that

19   the case uses significantly.  In this case, the operation of a

20   forklift.

21           Now since the evidence showed that the borrowing

22   company had control of the operation, only that company was

23   held to be vicariously liable in this particular case.  Now

24   again it's important to note that there was significant

25   indicia of control that continued to provide in manpower.

```
 1    This person was paid by Manpower.  Manpower provided all the
 2    payroll services just like LAD did in this particular case.
 3           Manpower reserved the right to hire and fire it's
 4    employees.  It had all sorts of general controls.  The
 5    requirement that the employee maintain a working telephone,
 6    for example, the right to conduct drug testing.  It even had
 7    the right to go on the premises of the borrowing or leasing
 8    employers and inspect those premises.
 9           But despite all of those called general areas of
10    control that Manpower retained, it was not directing the
11    employee in its operation of the forklift, which was the thing
12    that caused the injury.  And that was what was determinative
13    as to vicarious liability in that particular case.
14           Another and the third significant case I want to talk
15    about is the May v Harper Hospital case.  That's a 1990
16    Michigan Court of Appeals case where a student perfusionist
17    who was being trained and being paid a stipend by the Henry
18    Ford Hospital was lent -- I'm sorry, by the Harper Hospital
19    was lent to the Henry Ford Hospital where an act of alleged
20    professional negligence occurred which resulted in the death
21    of a patient.
22           And the Court of Appeals in that case found that the
23    trial court had erred in failing to grant summary disposition
24    in favor of the lending employer and erred in failing to grant
25    a directed verdict to that employer.
```

1    Because in the borrowing servant context -- and this

2    is a quotation, we looked to the work the employee was

3    performing when the injury for which suit was brought was

4    sustained.  The retention of a general right of supervision --

5    general right of control does not preclude summary disposition

6    on such a case.

7    Now the evidence upon which the court erroneously

8    relied to say that there was some degree of retained control

9    was, for example, a statement in the agreement between the

10   entities that the general employer undertook to monitor and

11   enforce the borrowing employers protocols.

12   There's a similar provision in the employee leasing

13   agreement, for example, in this case.  And there was also a

14   statement that the perfusionist remained an employee of the

15   lending hospital.  Those generic statements within the

16   agreement between those two entities were insufficient to

17   overcome the undisputed facts about who was controlling the

18   activities of the employee on the ground.

19   And because the perfusionist was working for the

20   borrowing employer when the accident occurred and all of the

21   activities of that employee were controlled by that borrowing

22   employer, that was the entity who had the vicarious liability

23   in that case.

24   Now in reality with regard to the motion brought by

25   the bellwether plaintiffs here, the only evidence that they

1    point to with regard to control in this case is the single

2    statement within the employee leasing agreement to the effect

3    that the employees remain subject to the mutual control and

4    direction of both LAN and LAD.

5            We don't think that that bare statement really

6    answers the question here because it doesn't delineate between

7    the types of control.  It doesn't tell you who has operational

8    control of the detailed activities.

9            Certainly there are some areas in which LAD maintains

10   some general control over the lent employees to LAN.  I mean

11   all of the employees, both corporations, are subject to the

12   LAD handbook which contains some general provisions.  The

13   violation of which can cause discipline or determination by

14   LAD.  There's no question about that.

15           But that was also the case in the Hoffman case

16   involving Manpower.  Those kind of general supervisory high

17   level indicia do not indicate the kind of control or even

18   right of control that's necessary for vicarious liability in

19   cases like this.

20           HONORABLE JUDGE FARAH:  Let me ask you this,

21   Mr. Wittie, and I don't know if this question is going to be

22   as clear as I want it to be.  But is there a possibility that

23   this point you are making -- and I'm just asking -- is so

24   strong that it implodes from its own weight in regards to

25   nefarious behavior?

```
 1            In other words, has LAN constructed -- has LAD
 2    constructed a situation where LAN will be their folks as long
 3    as everything's good?  But if things go amuck then it's LAN's
 4    problem?  Is this an effort by LAD to shield itself from
 5    future potential liability, especially given the experts here
 6    are LAN in engineering?
 7            That's why it was acquired.  And what a wonderful
 8    world it now is that we can get all of the benefits but none
 9    of the burdens by our acquisition and lending of employees to
10    LAN?  Is that point so telling that it works the other
11    direction?
12            MR. WITTIE:  Well no, Your Honor.  Certainly no
13    indication here that these entities were created or employed
14    -- the way they were employed to avoid responsibility.  I
15    mean, you could postulate a tort regime where, you know, any
16    corporate entity that obtains some indirect benefit or some
17    down-the-road benefit from the operation of the employee would
18    be responsible in vicarious liability.
19            I mean, I'm sure the tort claimants and their counsel
20    would love such a law to be in place.  But that's not the law.
21    The question here is who had control over the detailed
22    activities, you know, at the time that the tort was committed.
23    In the absence of showing that there was a mutual right of
24    control with regard to those particular activities, the harm
25    causing activities, then there's no tort responsibility.
```

November 23, 2021

33

```
 1              And you know the shoe could be put on the other foot.
 2   I mean, why should a company that just lends out its employees
 3   even if it's, you know, for the purpose of benefiting itself
 4   bear responsibility for a wrong when it did not contribute to
 5   that wrong in any way itself and there's no direct evidence of
 6   wrongdoing by anybody at LAD itself?
 7              So under those --
 8              HONORABLE JUDGE FARAH:  To follow-up on Judge Levy's
 9   question, a relationship where there is no lease payment where
10   the lease isn't followed.  And but somehow they're lent out?
11              Let me ask you this.  What weight do we put, if any,
12   on the fact of what Green, Hansen, Matta, and Nakashima who
13   they thought were their employers?  Do we put any weight on
14   that or does that not matter?
15              MR. WITTIE:  Oh, I think it has evidentiary weight,
16   Your Honor.  I think it shows that there was such a total lack
17   of control by LAD into their activities that the mantle of LAD
18   rested so lightly upon them that they weren't even aware of
19   it, that that would certainly indicate that there's no, you
20   know, control of the daily activities that would be sufficient
21   to impose tort liability in a case like this.
22              HONORABLE JUDGE FARAH:  Okay.  Continue if you'd
23   like.
24              MR. WITTIE:  The state makes a number of arguments
25   that the bellwether plaintiffs do not make.  So before getting
```

November 23, 2021                                                    34

```
 1    into that -- and they do relate to borrowed servant but I
 2    didn't know whether the respective courts here would prefer to
 3    hear from the state first with regard to those arguments or it
 4    would like me to address them now?
 5         THE COURT:  Judge Farah, I have just one question I
 6    think along the lines of what's being discussed now.
 7         HONORABLE JUDGE FARAH:  Okay.  Certainly.
 8         THE COURT:  So if it's agreeable to you, I'll jump in
 9    with that.
10         HONORABLE JUDGE FARAH:  Yes.  That's fine, Judge
11    Levy.
12         THE COURT:  I saw in the record that Warren Green,
13    who I think was the chief engineer on the City of Flint
14    project, testified that he didn't know that he was a LAD
15    employee loaned to LAN.  But he also testified that he
16    reported to Rafael Ortega who also reported to Dennis Peterson
17    and who is the LAN president and the LAD president.
18         And in the Altobelli, A-L-T-O-B-E-L-L-I v Hartmann
19    case, the Michigan Supreme Court says it's well established
20    that, quote, corporations can only act through their officers
21    and agents.
22         So when Dennis Peterson -- when Warren Green is
23    reporting to Peterson and Ortega, was he reporting to them as
24    LAD or LAN officers?
25         MR. WITTIE:  In this case, it would be as LAN
```

```
 1    officers.  It was a LAN project.
 2               THE COURT:  And how do we know that other than you're
 3    here to tell me that.  But where in the -- how do we know in
 4    the record that the hats -- they took off took off their LAD
 5    hat and put on their LAN hat?  Mr. Peterson and Mr. Ortega put
 6    on these -- changed hats when they spoke to Mr. Green about
 7    the City of Flint.
 8               MR. WITTIE:  I'm glad that the Court has mentioned
 9    the subject of hats in this context.  Because you know, it's
10    interesting that in the U.S. v Best Foods case the Supreme
11    Court itself said it's a common practice in the corporate
12    world for high officers to, you know, be officers above the
13    subsidiary and the parent corporation.  There's nothing
14    particularly untoward about that.
15               Now I understand the Court's question relates back to
16    this context of borrowed servant.  I mean, how does Green know
17    for purposes of reporting up the chain of command who he's
18    working for.  He knows he's working on a LAN project.  He
19    knows he's working out of a LAN office.  He knows who the
20    contracts -- who the contracting counterparties are.
21               I think a person in that position would assume that
22    if he's talking to a higher up who has responsibility within
23    that corporation that that's the hat that officer is wearing
24    even though he may have another hat in the closet as well.
25               You know, unless there's something that would involve
```

```
 1   LAD in the project, then there would be no reason for any
 2   engineer who is aware of those situations to feel that he was
 3   being supervised by LAD just because there's somebody up at
 4   the top of the chain of command who might have
 5   responsibilities to both corporations.
 6              THE COURT:  Okay.  Because I looked at the
 7   Sokolowski v City of Charlevoix case.  And there the fact that
 8   the loaned employee testified that he was working for the
 9   president of the loaning employer, here LAD, when the accident
10   occurred mattered.  So that's why I think -- we need to know
11   what Warren Green, who he thought Ortega and Peterson were
12   when he reported to them.
13              But I think we need to take a short break.  If I'm
14   not mistaken, we've got a request in the chat to take a
15   five-minute break.
16              MR. STERN:  Thank you, Judge.  I'm sorry.  I just
17   need to use the restroom.
18              THE COURT:  That's okay.
19              HONORABLE JUDGE FARAH:  Oh, that's okay.  That's all
20   right.  We've been going pretty good.  Okay.
21              THE COURT:  Okay.  Thank you.
22                        (Brief Recess)
23              THE COURT:  Judge Farah, I think we're now at the
24   point of the People's response, right?
25              HONORABLE JUDGE FARAH:  Yes, yes.
```

November 23, 2021

```
 1            THE COURT:  Okay.

 2            HONORABLE JUDGE FARAH:  Who will be speaking for the

 3   People, Mr. Gambill?

 4            MR. GAMBILL:  Yes.  I'll speak for the People.  Thank

 5   you, Your Honors.

 6            HONORABLE JUDGE FARAH:  Okay.  Let's go on to that.

 7   And this is in a way a response.  But this is the People's

 8   affirmative request as a plaintiff in the state court case.

 9   And so Mr. Gambill, you have the floor in that regard.

10            MR. GAMBILL:  Thank you, very much, Your Honors.

11            I think because the Leo A Daly company's brief raises

12   this as a threshold issue, I think it's worth addressing right

13   now, which is they argue that the Michigan court rules do not

14   allow plaintiffs to file motions under (c)(10).  They only

15   allow plaintiffs to file motions under (c)(9).

16            That is completely incorrect.  The court rules

17   explicitly authorized plaintiffs to attack a defense raised by

18   an opposing party using a motion under (c)(10).  And so I

19   think it just bears emphasizing because that is -- that sort

20   of oversight is really indicative of the entire analysis that

21   the Leo A Daly company uses to discuss the borrowed servant

22   doctrine in Michigan.

23            Now doctrine in respondeat superior is

24   straightforward in Michigan.  It's well established.  It just

25   has the two elements.  The first element is that the
```

```
 1   individual employee was an employee of the employer.  And the
 2   Leo A Daly company has conceded that point.
 3           They have not supplied any significant response to
 4   argue that these individual engineers working in Flint were
 5   not employees.  They've acknowledged that Leo A Daly was the
 6   general employer.  That's what they report to the IRS.  That's
 7   what their corporate designee testified to.  That's what they
 8   concede in their briefing.
 9           And so really the next element is the core issue in
10   dispute regarding respondeat superior liability which is were
11   these individual employees acting within the scope of their
12   employment?  And generally that analysis questions essentially
13   were they doing what they were hired to do?  Did these
14   individuals go rogue somehow?
15           One example is the case law is a chauffeur who uses
16   his employer's car against the employer's direction to take
17   off and go run some personal errands.  That's a good example
18   of an employee going rogue.
19           HONORABLE JUDGE FARAH:  Mr. Gambill, let me interrupt
20   you just for a second because I was certainly intrigued by the
21   argument, especially here in state court.  It's probably the
22   same under a different rule in federal court, that a plaintiff
23   can't bring a motion for summary disposition under (c)(10).
24           I took a look, and correct me if I'm wrong, but in
25   that section on page 6, argument 4A in their brief, I'm
```

1    directed to Chambers v Trettco.  I'm directed to Quinto v

2    Cross and Peters, a huge summary disposition case in our

3    jurisprudence.  Lepp v Cheboygan Area Schools.  And Village of

4    Dimondale v Grable.

5           Did any of those cases involve a plaintiffs' motion

6    for a summary disposition?  And was the legal pronouncement

7    made that under (c)(10) there is no availability for a

8    plaintiff to bring a summary disposition?  I don't remember

9    seeing that in any of those cases.

10          So I guess my inquiry is if the cited cases don't

11   stand for the proposition, why isn't that the end of that

12   issue?

13          MR. GAMBILL:  Well, not only do the cited cases not

14   stand for that proposition, but the plain language of the

15   court rules themselves explicitly say, as I indicate in

16   footnote 2 of our reply brief, that motions under (c)(10) can

17   be used to attack defenses.

18          And if that wasn't enough, the Nobel case, the Court

19   of Appeals case, specifically on the borrowed servant doctrine

20   held that summary disposition in the plaintiffs' favor is

21   appropriate when a contract prohibits the general employer

22   from surrendering complete control of the employee.

23          So it's well established.  And so it's really a non

24   issue.  And really the only reason I'm pointing at it is to

25   just emphasize how little attention has been paid to the

1    details of Michigan law.

2            HONORABLE JUDGE FARAH:  All right.  It was the first

3    thing that I noticed.  It was first in the brief.  So thank

4    you for answering that.  And continue if you like.

5            MR. GAMBILL:  And so there's no argument here that

6    any of these individual employees went broke.  They were all

7    doing engineering work which is exactly what they were hired

8    to do.  It's what everyone expected them to do.

9            Instead what the Leo A Daly company wants to invoke

10   is the borrowed servant doctrine, which is really a variation

11   on arguing that they were not acting in the scope of their

12   employment.  And the Janik case that Mr. Wittie raises is

13   really the leading case on this issue where the Michigan

14   Supreme Court laid out the analytical framework for addressing

15   this doctrine.

16           And another example of the type of oversight

17   committed by the Leo A Daly company is that there are four

18   sentences in the legal test established by Janik.  And to no

19   one's surprise, Leo A Daly only quotes one sentence and builds

20   its entire analysis around one sentence and presented its

21   entire argument in this hearing based on the first sentence

22   without going to the second, third, and fourth sentences.

23           And so it's worth emphasizing if we look at the Janik

24   case that the second sentence explains, quote, it is not so

25   much the actual exercise of control which is regarded as the

1    right to exercise such control.  End quote.

2          So the Leo A Daly company has put all its eggs in the

3    basket that no one from the Leo A Daly company was looking

4    over Warren Green's shoulder and telling him what to write on

5    his notepad or looking over Jeffrey Hansen's shoulder and

6    directing him what to recommend to the City of Flint.

7          But that's not the analysis under the Janik test.

8    The Janik test is not so much the actual exercise.  The test

9    is the right to exercise control.

10          And that brings us to the employee leasing agreement.

11    And I just want to state for the record that I do not find it

12    acceptable for the Leo A Daly company to say that for some

13    purposes the employee leasing agreement is enforce and we're

14    going to assume it's enforce for now.  But maybe later if we

15    need to, we're going to argue that it's not enforce.  Judicial

16    estoppel prevents that type of gamesmanship.  It's either --

17          HONORABLE JUDGE FARAH:  Let me ask you if I could,

18    Mr. Gambill, because I'm still on preclusive arguments, all

19    right.  We're getting to your arguments and I'm listening.

20          Top of page 7, the response says, first, there's

21    simply no rule that related entities cannot lend and borrow

22    employees in such a way to relieve the lending company from

23    liability.  Okay.  We'll talk about that.

24          The state cites no authority for the proposition and

25    cases do not support this notion.  Rather the courts treat the

```
 1    question of whether an employee loaned to a subsidiary or
 2    related company is a borrowed servant as a question of fact.
 3            Now Judge Levy and I both know once you start talking
 4    about questions of fact, okay, it's kind of out of our domain.
 5    But the problem is it says see Weaver v Brush from Vermont and
 6    Mohan v Publicker Industries from Pennsylvania.
 7            Is there a case in your view that says we would be
 8    precluded from deciding this issue because it is clearly an
 9    issue of fact and, therefore, we're out of business on summary
10    disposition?
11            MR. GAMBILL:  No.  No, there's not.  And really the
12    point we wanted to make, Your Honor, in regards to the issue
13    raised on page 7 of the Leo A Daly company's brief is that
14    under Michigan law, there is no precedent.  It has never
15    happened where a general employer has said that, you know, we
16    use the word division or department because that's what the
17    corporate designee for the company used.
18            In any event, whether it's the department or whether
19    it's the even subsidiary, there's no precedent in Michigan for
20    a parent company trying to point the finger at its subsidiary
21    using the borrowed servant doctrine.  It's never happened.
22    And they concede that point by failing to identify any
23    Michigan authority.  This will be a first time.
24            And I think in our briefing we explained why it would
25    be so unusual for example with the hospitals in the May v
```

November 23, 2021

1    Henry Ford case, or Harper Hospital case where it just
2    wouldn't make sense for a company that controls another
3    entity, whether it's department or subsidiary, so closely to
4    rely on the borrowed servant doctrine.
5         That doctrine has always come up in an adversarial
6    context.  When the two entities have their own attorneys, they
7    can point fingers at each other, they can argue about it, and
8    then a judge decides the dispute.
9         Here we have the attorney just pointing fingers to
10   one of their clients who's powerless to defend itself.  So
11   it's unusual.  And they concede that it's unusual by failing
12   to cite any Michigan case where it's happened.
13        So but even if they can invoke the borrowed servant
14   defense, that's where we get to the employee leasing agreement
15   which was in effect, which they've conceded that it was in
16   effect.  It's what they point to to argue that they lent --
17   that they leased their employees to LAN.
18        And so the question under Janik is whether they had
19   surrendered a right to control.  And they clearly have not.
20        As Mr. Wittie explained, paragraph 4 of that
21   agreement explains that in a general sense the LAD company
22   will continue to exercise, quote, "mutual control and
23   direction," end quote, of their employees.  And even more so
24   if you get down into paragraph 5B it says that the Leo A Daly
25   company is contractually obligated to enforce any of the

```
 1   policies that the LAN entity develops.
 2             So they're the ones in charge of their employees.
 3   LAN is not in charge under this contract of enforcing their
 4   own policies in regards to these leased employees.  It's the
 5   Leo A Daly company.
 6             But and so under the rule in Janik, they claim they
 7   have not surrendered complete control.  And then if you go to
 8   the third sentence in Janik, it says, quote, "To escape
 9   liability the original master must resign full control of the
10   servant for the time being.  It not being sufficient that the
11   servant is partially under control of a third person."  End
12   quote.
13             That's really the nub here for the Leo A Daly
14   company's invocation of the borrowed servant doctrine, which
15   is that their own internal documents prove that they did not
16   fully resign control of their employees to a different
17   completely separate business that was doing some other
18   completely separate operation.  That is not what happened.
19   And their own documents show that.
20             But we can go a step further.  I mean, even if the
21   test really is what the Leo A Daly thinks it is, which is that
22   its actual control matters, not the right control.
23             Well, that's where we get to Exhibit 7 attached to
24   our brief, which is the employee business ethics and conduct
25   policy.  And under that policy, any time Warren Green or Jeff
```

1    Hansen wanted to do work for a client, if they wanted to enter

2    into a contract and do engineering services for a client, they

3    have to write up a scope of work explaining what those

4    engineering services are and submit that scope of work for

5    approval by a corporate officer of the Leo A Daly company.

6          And that Leo A Daly company corporate officer will

7    look it over.  And if they approve, they will authorize

8    Mr. Warren Green in this case for each of the five Flint

9    contracts.  They will authorize that -- -- they will authorize

10   Mr. Green to sign the contract as an authorized company

11   designee.

12         So they could not do work without explaining what

13   engineering services they wanted to provide and getting

14   approval from the company to do those specific engineering

15   services.  There's -- no matter how you cut the borrowed

16   servant doctrine, the Leo A Daly cannot invoke it here.

17         And you know Judge Levy's question prior about how we

18   know when, for example, Mr. Brader, the CFO for both of these

19   entities, how do we know when he's the CFO for LAD or the CFO

20   for LAN.

21         I asked a similar question in his deposition and it's

22   attached to our brief where he simultaneously was the

23   corporate designee for both of those entities.  And there's --

24   he didn't have to get permission from anyone to do that.

25         He didn't have to say anything.  He just had to

1    unilaterally decide in his mind, okay, I'm now the corporate

2    designee for both of these entities and I can speak and find

3    each of these entities in a sworn deposition.

4          So that's how it was operated.  It was just whenever

5    they decided that they would be a corporate designee, they

6    just made it so, you know.  You know, there was no

7    authorization needed.

8          And you know, really one of the comments that

9    Mr. Wittie made stood out to me.  Which is he rhetorically

10   asked, why should a company who lends its employees even for

11   its own benefit be responsible if those employees do something

12   wrong?  If they were leased to somebody else, why should they

13   be responsible if they do something wrong?

14         Well, the respondeat superior liability doctrine is

15   the response to that question.  Which is that when employers

16   reap the benefits of their employee's work, they also reap the

17   risks and liabilities.

18         In fact, the employee leasing agreement in great

19   detail explains that the Leo A Daly company in paragraph 4 and

20   in paragraph 6 of that agreement explains that the Leo A Daly

21   company assumes all risks, all liabilities.  And all risks,

22   all liabilities, and all expenses associated with leasing

23   their employees to the LAN entity.  And they also, quote, will

24   enjoy all the benefits thereof.

25         So in exchange for the risks they're taking, they

```
 1    enjoyed those benefits.  That's black letter vicarious
 2    liability law.  But that's also built right into the employee
 3    leasing agreement.  And in paragraph 6 is where the Leo A Daly
 4    company agrees to indemnify the LAN entity for anything,
 5    anything at all related to any of the work that the Leo A Daly
 6    company employees do in the course of providing engineering
 7    services.
 8           So this just seems -- it's not a very close issue to
 9    me.  And Mr. Wittie's right.  We don't try to pierce the
10    corporate veil because we don't have to.  Piercing the
11    corporate veil is not a requirement of imposing vicarious
12    liability under the respondeat superior doctrine.  It never
13    was, never has been.
14           It's not surprising that they devote 75 percent of
15    their argument in their brief to something that doesn't even
16    apply to the issues that we've raised.
17           And so really the Nobel case helps for the specific
18    procedural posture this Court is in, which is that Court held
19    that when a employer is contractually bound, forbidden, from
20    surrendering full control of the employees that it lends to
21    others, then summary disposition is appropriate to dispose of
22    the borrowed servant defense.
23           HONORABLE JUDGE FARAH:  Let me ask you a question,
24    Mr. Gambill, on the control question.  And it is this.  Let's
25    explore the universe of possibilities, okay.  Nobody
```

1   controlled Green, Nakashima, Hansen, and the rest.  Okay.

2   Nobody controlled them.  They were on their own.  Well, we

3   don't have a much of a case of that.  Okay.

4          Only LAN controlled them.  Only LAD controlled them.

5   Or both controlled them.  Is there any meaningful legal

6   distinction between just LAD controlled them and LAD and LAN

7   controlled them?

8          MR. GAMBILL:  There is an important legal

9   distinction.  Because as Mr. Wittie I think conceded that it's

10  possible for concurrent control to exist.  And that's the

11  situation we have here in this case.

12         And the Kenyon Lounge case that we cite explicitly

13  holds that when the general employer has not fully surrendered

14  complete control, when it just has -- when it's just shared

15  concurrent control with a third party, that means the borrowed

16  servant doctrine is not available under Michigan law.

17         HONORABLE JUDGE FARAH:  Okay.  That is significant, I

18  would think arguably significant, because if each could argue,

19  well, wait a second.  We weren't in control of them.  LAN was

20  in control of them.  And then LAN says, well, we weren't in

21  control of them.  LAD was in control of them.

22         Then that leaves almost inexorably the conclusion

23  that nobody's in control of them.  Which would be, frankly, an

24  absurdity that Green and the bunch decided, well, we'll just

25  do this on our own, okay.  Okay.

```
 1              I get your point.  Thank you.
 2         MR. GAMBILL:  And really what we have here is a
 3  company -- and by the way, the company's designee refers to
 4  both LAN and LAD as the company.  He used that term
 5  interchangeably.  I asked him that question specifically.  So
 6  that's why I'm using the word the company.
 7              The company has carefully managed the control it
 8  metes out to these individuals.  It has this business ethics
 9  policy that does not allow them to do -- to enter into
10  agreements unless it's signed off by a corporate officer.
11              And the employee leasing agreement is another example
12  of the company being very careful to ensure that they do
13  retain some level of control over these employees.  At no
14  point do they fully resign their right to control.
15              The question is not whether they exercise that right,
16  even though as I explained they did.  The question is whether
17  they fully resigned their right to control.  And they plainly
18  have not.  Their own documents demonstrate that to be the
19  case.
20         HONORABLE JUDGE FARAH:  Continue.
21         MR. GAMBILL:  Between the briefing, Your Honor, and
22  my comments, unless the courts have -- the judges have any
23  other questions.
24         HONORABLE JUDGE FARAH:  I'll turn it over to Judge
25  Levy then for questions, even though this is sort of my
```

1    situation here.

2            THE COURT:  Yeah.  I think this is, as you said, your

3    situation.  And I'll have questions for Mr. Stern I assume is

4    responding for plaintiffs?

5            MR. STERN:  Yes, Your Honor.

6            THE COURT:  Okay.  Well, I think we'll turn it over

7    to you then.

8            MR. STERN:  Thank you, Judge.  Appreciate being back

9    again today.

10           I think our briefing as well as the arguments that

11   have been made thus far by both Mr. Wittie as well as

12   Mr. Gambill very inclusively lay out a number of facts that

13   don't appear to be in dispute as to leasing agreements as to

14   the numbers of employees employed by both.  And so I don't

15   want to rehash any of that.

16           One of the first things that Mr. Wittie described was

17   the three-prong test in order to show alter ego.  And Your

18   Honor seemed to take distinct interest in the second prong

19   which indicates that, you know, there's an interest in whether

20   the entity or entities committed fraud or some nefarious

21   conduct.  And I'd like to address that initially because

22   that's one part that no one has yet addressed.

23           THE COURT:  Correct.  And so what I need to know is

24   what is the nexus between the wrongful act and the abuse of

25   the corporate form?

```
 1              MR. STERN:  So first, Your Honor, to respond, I'd
 2    like to point Your Honor to People ex rel Potter v Michigan
 3    Bell Telephone Company, 246 Mich 198 at page 204.  That case
 4    stands for the proposition that when a corporation exists as a
 5    device to evade legal obligations, the courts without regard
 6    to actual fraud will disregard the entity theory.
 7              I'd next like to point Your Honor to Herman v Mobile
 8    Homes Corp., that's 317 Mich 233 at 247.  The trial court
 9    notwithstanding the lack of actual fraud properly found that
10    the parent company's domination and control so complete as to
11    make the shorter lived subsidiaries the mere instrumentalities
12    and correctly pierce the veil.
13              I'd like to next point Your Honor to Papo v Aglo
14    Restaurants of San Jose Inc., that's at 149 Mich App 285.
15    Quote, "The Michigan Supreme Court on more than one occasion
16    has acknowledged that the corporate veil can be pierced this
17    the absence of fraud."  And they're citing Herman -- the court
18    cites Herman there for that proposition.
19              Your Honor -- Your Honors -- I apologize, Judge
20    Farah.  The reality is is that despite Mr. Wittie and LAN's
21    and LAD's briefing on this subject which make this fraud and
22    nefarious conduct nexus component to Your Honors' analysis a
23    primary focus of why you should grant their motion for summary
24    judgment, it actually doesn't exist, Judge.
25              There is not a requirement to find what Mr. Wittie is
```

```
 1   claiming the Court needs to find in order for plaintiff to
 2   survive summary judgment.
 3           I'd also like to note that Mr. Wittie cited in his
 4   argument earlier the Janik case.  He cited Hoffman, a forklift
 5   case.  He cited May, which involves a student perfusionist.
 6   And in all of those scenarios, in every one of those scenarios
 7   there was --
 8           THE COURT:  Mr. Stern, let me point to Dutten
 9   Partners LLC which is Michigan Court of Appeals case.  And it
10   says despite some ambiguous prior precedent, the Michigan
11   Court of Appeals says, okay, quote, "A showing of fraud,
12   wrongdoing, or misuse is required under Michigan law in order
13   to prevail on an alter ego theory of liability."
14           And they indicated that the court was unable to
15   locate any binding Michigan case that has held that the
16   corporate veil may be disregarded absent a showing of fraud,
17   wrongdoing, or some misuse of the corporate forum.
18           MR. STERN:  Sure.  And Your Honor, in this case, I
19   think the proposition of the cases that I cited had
20   specifically to do with fraud.  Misuse of the corporate forum
21   I think is self evident based on the facts of this particular
22   case.  In every single case cited by LAN.
23           And I just think it's really important to note this.
24   When company A is loaning an employee to company B,
25   irrespective of controlling, irrespective of joint control,
```

```
 1    sole control, who has control, company B in every single case
 2    is a distinct and separate entity that does not have the same
 3    employees as company A.
 4            So in the case involving -- and I'm going to answer
 5    your question.  I'm just taking sort of the west coast path to
 6    China rather than going east.  In the case of Hoffman, the
 7    forklift case where the entity controlled the detailed
 8    activity, the borrowing company had control, that was a
 9    completely separate group of individuals.  Those were -- the
10    folks in control at the second company were independent of the
11    first company.
12            And so if the first company was the Yankees -- I know
13    Your Honor loves sports analogies.  We're talking baseball.
14    The first company is the Yankees.  The second company is the
15    Red Sox and the Yankees loan one of their pitchers to the Red
16    Sox.
17            It's not that the Red Sox were actually the Yankees
18    but they just changed clothes and put on Red Sox gear.  They
19    were a totally different team that literally borrowed one
20    player.
21            Here in every -- in every case that Mr. Wittie cites,
22    that LAN and LAD cite in their briefs, it's always the Yankees
23    /Red Sox context.  The borrow and the lender are always two
24    very distinct and separate entities beyond the paperwork that
25    says so.
```

```
 1              Here there is not one single LAN employee that is not
 2   also an employee of LAD.  It just doesn't exist.  The Yankees
 3   are the Red Sox.  For all intents and purposes, they've
 4   literally just gone into a closet and put on a different
 5   uniform when it conveniently assists them in skirting what
 6   might be legal responsibilities for the actions of one or the
 7   other.
 8              And so it's not that the conduct necessarily is
 9   nefarious.  It's not that the conduct is necessarily
10   fraudulent.
11              But the fact that this case and the facts of this
12   case are so distinguishable by way of the Yankee/Red Sox
13   analogy, by way of the fact that there is no second entity --
14   it's only a second entity by name -- that that conduct in and
15   of itself rises to the level required where they're utilizing
16   this corporate structure in a way to skirt the rules, in a way
17   to skirt responsibility.
18              THE COURT:  Well, I hear what you're saying and
19   that's in some ways where I started.  Does LAN exist aside
20   from its corporate formation in a different state from LAD?
21   But a great deal of what you just discussed goes to the mere
22   instrumentality analysis and not whether there's some sort of
23   misuse of the corporate forum.
24              MR. STERN:  Sure.
25              THE COURT:  But I think I hear you, that you're
```

1    saying there simply isn't a LAN.

2            MR. STERN:  Well, in addition to that, Your Honor,

3    Herman says -- and everyone has cited Herman thus far.  Again,

4    317 Mich 233.  Notwithstanding the finding of the lower court

5    that there was no actual fraud on the part of the defendant

6    courier company, there is to be found in the record a

7    recurring element of the courier company's recognition and

8    acknowledgment of its own responsibility to the plaintiffs,

9    which was entirely lacking in Gledhill.

10           And then the court goes on to say -- and this is at

11   page 19 -- attempted separation between parent and subsidiary

12   will work a fraud upon the law.

13           And so again, we're not -- we're using the word fraud

14   and I think I'm at least thinking when I see the word fraud

15   of, you know, I've told the folks that are working on my house

16   that if they come and paint it white today I'm going to pay

17   them a thousand dollars tomorrow.

18           But I know inherently I don't have a thousand dollars

19   but they relied on my promise to pay as part of their decision

20   to actually paint the house.  And I very am likely in that

21   hypothetical situation committed fraud.

22           Here's it's enough that the attempted separation

23   between a parent and a subsidiary when there really isn't a

24   parent or subsidiary will work a fraud upon the Court.

25           And so Your Honor, I think the record is replete with

1    facts that the Court could absolutely hang its hat on if we

2    look at the word fraud in a way that may be slightly and

3    subtly different than the way we all perceive it in the

4    context of litigation.  Because here the fraud is way more

5    subtle.

6              THE COURT:  Okay.  Thank you.

7              Mr. Stern, if we leave the piercing the corporate

8    veil for just a moment and go to vicarious liability.

9              MR. STERN:  Yes, Your Honor.

10             THE COURT:  You would agree that the Hoffman test

11   applies and that there has to be actual control over day to

12   day activities --

13             MR. STERN:  Yes, Your Honor.

14             THE COURT:  -- of LAD over LAN.  So point to me in

15   the record where I can see that.

16             MR. STERN:  Sure.  If you give me a second.

17             THE COURT:  Sure.

18             MR. STERN:  I think -- it doesn't matter what I

19   think.  Your Honor, the record is, again, this -- I'm just

20   trying to think how to phrase it best.

21             The control -- the control of day-to-day activities

22   is bedded and wedded in all of the manners in which LAN and

23   LAD are the same thing.  So for instance, the fact that they

24   shared a bank account, the fact that LAD paid all of the

25   employees, the fact that LAD procured and paid for the

```
 1    professional insurance policy, the fact that Leo A Daly --
 2              THE COURT:  Well, the record shows that LAN -- LAD
 3    procured the insurance policy for the City of Flint contracts
 4    but LAN paid for their -- paid for it.
 5              MR. STERN:  Can you ask me that again, Your Honor?
 6    I'm so sorry.
 7              THE COURT:  I believe the record shows that LAD
 8    procured the insurance for the City of Flint contracts.  But
 9    LAN paid for the --
10              MR. STERN:  But we don't know if LAN paid for it.
11    Simply because Mr. Benes says that LAN paid for it, it came
12    from the same checking account.  It goes to the whole question
13    of fraud that you just described.
14              This is -- so there's such a fundamental difference
15    between creating a company -- I mean, we live in a corporate
16    country, in a corporate world businesses oftentimes create
17    subparts of its business and other entities so that they can
18    exist in a way that maximizes their profits and on some level
19    minimizes the amount of money that they'd ultimately have to
20    pay in taxes.
21              That's the country that we live in and people can
22    like it or they cannot like it but that's the world that
23    exists.
24              There's a fundamental between -- fundamental
25    difference between doing that the right way and doing it in
```

1   the way where you can never have liability.

2          So for instance in this instance, Your Honor, if Your

3   Honor's entire decision were to turn on that fact on the

4   question and fact that you just raised and asked being such,

5   well, LAD procured it but LAN paid for it.

6          There is no way based on the structure of these two

7   corporate entities that any plaintiff ever could show that

8   that statement is incorrect or that it's correct because LAN

9   and LAD, despite the fact that there are no LAN employees,

10  despite the fact that there is literally not one single piece

11  of LAN except the paper that is utilizes to form its

12  existence, because there is nothing that separates the two

13  other than the paper, we would never know who actually paid

14  for that.

15         And every LAN employee -- back to your question of

16  control.  Let's imagine for a minute that every LAN employee

17  -- start over.  Let's say you're correct that LAN or your

18  insinuation is correct that it's actually LAN that's

19  controlling all of these employees somehow, how do we know, in

20  the same way we don't know which entity is paying for

21  insurance, which entity is actually controlling the employees

22  because every single LAN employee is a LAD employee?

23         And so if I'm LAD and Your Honor asks me, well, were

24  you in control of this employee or was LAN in control of this

25  employee, my answer would likely be very dependent on how the

1    answer works best for me.

2           In the context of this question, no LAD employees

3    ever, ever once had any control over LAN.  Because in order

4    for there to be vicarious liability or piercing the corporate

5    veil, we have to show that they actually had some level of

6    control, whether it was mutual depending on which case you

7    read, or whether it was exclusive control.

8           But here, in the same way that we can't tell Your

9    Honor or show Your Honor or point to a receipt for Your Honor,

10   that it was LAN that paid for the account -- that paid for the

11   insurance, we can't show you in writing who had control over

12   each of these employees because they're one in the same.

13          It's the construction of an entity that avoids

14   liability which goes back to your first question about where's

15   the fraud.  And again, you know, the fraud -- perfect example

16   of this is the answer to Your Honor's question attempted

17   separation between parent and subsidiary will work a fraud

18   upon the law.

19          THE COURT:  Okay.

20          HONORABLE JUDGE FARAH:  Mr. Stern, if I could just --

21   while I have it in my head, Judge Levy, if I could.  Does the

22   record indicate that LAD or LAN paid for the insurance?

23          MR. STERN:  LAD, I believe.  Time out.  We don't

24   know.  I think what happened is at Mr. Benes' deposition --

25   and I'm sure that one of the LAN/LAD lawyers will correct me.

1   I believe he said that while LAD procured the insurance LAN

2   paid for the insurance.  And I was there and I asked questions

3   and I heard it, but I've been wrong plenty of times.  So I

4   could be wrong.  But I believe that's the testimony.

5          And that gets to Her Honor's point is that it's

6   convenient for in this instance for LAD to procure the

7   insurance but very, very important for them that it's LAN that

8   paid for the insurance, at least for appearances, because in

9   some ways that might shield LAD from liability.

10         THE COURT:  Here's what I have in the record, Judge

11  Farah.  I'm glad you asked that because it's focused me back

12  in.  Which is that LAD procured the professional liability

13  insurance policy required by the City of Flint.  Shared the

14  cost of the premiums and was listed as an insured on that

15  policy.

16         MR. STERN:  And they gave the documentation to LAN

17  and then LAN showed it to the City of Flint.

18         HONORABLE JUDGE FARAH:  Well, it strikes me as at

19  least interesting from the perspective of the rules of

20  evidence in Michigan that Rule 411, even though it bans the

21  use of liability insurance to show negligence or liability

22  does say that it can be introduced for another purpose such as

23  proof of agency, ownership, or control if controverted.

24         MR. STERN:  Your Honors, I really want to point out

25  -- Your Honor, Judge Levy, going back to the deposition and

November 23, 2021

1    what you just saw, this is a perfect example of some of the

2    arguments that have been made and why they should fail.

3            The testimony of Mr. Benes was that LAD procured the

4    insurance policy, gave it to LAN, and LAN showed it to the

5    city.  That testimony is uncontroverted.  In actuality what

6    may have had occurred, okay, this is based on the testimony,

7    based on the arguments that have been made.

8            Warren Green may have purchased the insurance.

9    Warren Green may have gotten in his own car with the insurance

10   policy.  Warren Green may have shifted the policy from his

11   left hand to his right hand.  And Warren Green then may have

12   shown that policy to someone at the City of Flint.

13           And if he did so, we can say honestly based on the

14   evidence in the record, that LAD, by way of Warren Green,

15   procured the insurance policy.

16           Once he was in the car and switched the policy from

17   his left hand to his right hand, Warren Green gave that policy

18   to LAN because Warren Green is also LAN.  And then with his

19   right hand Warren Green showed the City of Flint that they had

20   procured a policy.  And thereby, LAD purchased the policy.

21   They gave it to LAN, and LAN showed it to the city.

22           I mean, that is so fundamentally different in terms

23   of borrower lender of any single case cited by anyone in this

24   entire litigation on this issue including the state and

25   plaintiffs because there does not exist a case where anyone

```
 1   has ever argued that I procured it with my left hand, handed
 2   it to myself with the right hand, showed it to the city, and
 3   all of those actions constitute two separate entities and no
 4   one had control over anything.
 5            THE COURT:  Judge Farah, do you have another question
 6   on that?
 7            HONORABLE JUDGE FARAH:  No.  I just thought it was an
 8   opportune time to bring in the rules of evidence.
 9            THE COURT:  Thank you.
10            HONORABLE JUDGE FARAH:  And Mr. Stern, while we're on
11   the topic, I'm getting my house painted.  Could you send your
12   guy who's going to paint for a thousand dollars out to
13   Michigan?
14            MR. STERN:  It's the doghouse that I constantly live
15   in.
16            HONORABLE JUDGE FARAH:  That's okay then.
17            MR. STERN:  Your Honor, if I could be out of the
18   doghouse for one more moment, I just want to make one more
19   point, or be in the doghouse but make the point.
20            Brader -- Mr. Brader doesn't know about the leasing
21   agreement.  And Benes doesn't know if it was ever followed.  I
22   think we all agree that that's the testimony.
23            This means that when decisions were made about
24   supervision and control, at a minimum there's a question of
25   fact about whether the managers thought they were acting as
```

1   LAD or LAN.

2         Even irrespective of my argument that there is no LAD

3   or LAN, that they're all the same except for paper, the fact

4   that they don't even know there's a leasing agreement and at

5   any point in time specifically they don't know which entity,

6   which hat they're actually wearing, there's got to be a

7   question of fact as to control because the very folks who were

8   exercising the control don't know on whose behalf they were

9   exercised.

10        THE COURT:  Well, they were -- Benes and Brader

11  weren't exercising control.  It was Warren Green exercising

12  control over day-to-day activities.  I hear your point, but it

13  was Warren Green was the hands on engineer supervisor manager.

14        MR. STERN:  Warren Green said something similar that

15  he didn't know that he was a leased employee to anybody.

16        THE COURT:  Right.

17        MR. STERN:  The principle -- irrespective of which

18  individual had the control -- and I apologize for insinuating

19  that it was Brader and Benes when, in fact, it was Green, the

20  same principle applies.

21        If the individuals making the decisions don't even

22  know if they're the Red Sox or the Yankees, because --

23        THE COURT:  No.  Well, he said he -- I believe he

24  said he thought he was a LAN employee.  But I find this

25  interesting and I want to ask Mr. Wittie this question.  In

1    the deposition, Mr. Green said that in 2015, so after -- sort

2    of during/after some of the allegations regarding negligence

3    took place, that he contacted Benes at LAD for legal advice.

4         So how do we have it both ways, that if he only

5    thinks he's part of LAN, why would he go to LAD's lawyer for

6    legal advice?  And he said I went to Benes at LAD for legal

7    advice.  You're muted.

8         MR. WITTIE:  Your Honor, Mr. Benes is the general

9    counsel for both LAD and LAN.  He's part of the shared

10   services arrangement.  He's physically located in Omaha at,

11   you know, where the LAD offices are.

12        MR. MASON:  No.  He's located in Houston where the

13   LAN offices are.

14        THE COURT:  Okay.  Well, wherever he's located, I

15   understood that Mr. Green thought he was calling LAD's lawyer

16   for legal advice.

17        But let me ask you another thing, Mr. Wittie, that I

18   had just turned my attention away for a small second.  And I

19   heard you at the beginning of your remarks on the vicarious

20   liability argument with Judge Farah and the People.  You said

21   there's something about a question of fact.  And was that

22   about the existence of the lease agreement or the use of it?

23   What was -- what did you say there?  I didn't hear what you

24   said.

25        MR. WITTIE:  Yes, Your Honor.  The question of fact

1    would relate solely to the matter of how effective the leasing

2    agreement was and the degree to which the companies continued

3    to follow that agreement over time.

4              THE COURT:  Okay.  Okay.  Judge Farah, do you have

5    anything else?

6              HONORABLE JUDGE FARAH:  Well, only that if

7    Mr. Gambill is happy to hear that the question of fact is so

8    limited.  Because it's certainly ironic, isn't it, that to the

9    extent Mr. Stern says we have a question of fact on control,

10   another aspect to the case, Mr. Gambill cringes since he has a

11   motion for summary disposition that contends there are no

12   questions of fact.  So that certainly --

13             MR. STERN:  Your Honors, if I may?  And I'm not one

14   to take up for the state.  My argument is simply that in

15   applying the summary judgment standard, because that's the

16   phase of the litigation that I'm, you know, advocating with

17   regard to the most -- you know, the lowest level argument that

18   I have is at a minimum there are questions of fact.

19             I actually agree with -- I actually agree with

20   Mr. Gambill that there are no questions of fact on this

21   particular issue.  But for purposes of our summary judgment

22   response, that's why I made reference to the questions.

23             MR. MASON:  Your Honors , may we respond now?

24             THE COURT:  I think Mr. Wittie just answered some

25   questions.  Is there more response?

1            MR. MASON:  Sure.  There was a full argument from

2    Mr. Gambill that we should be able to respond to as well as

3    respond to Mr. Stern.

4            THE COURT:  Oh.  I thought we were starting out with

5    your response to Mr. Gambill and your motion.  But I

6    misunderstood.

7            We're starting to run low on time because -- but feel

8    free if you can -- if there are remarks you want to make.  Is

9    it Mr. Wittie now?

10           MR. MASON:  I'll let Mr. Wittie do it and I'll ask

11   him to be succinct, but we do want to respond.

12           THE COURT:  Excellent.  That's okay.  I'm sorry.

13           HONORABLE JUDGE FARAH:  Okay.  All right.

14           MR. WALKER:  There were some matters that I had, you

15   know, held in reserve because they were unique to the state's

16   motion, which we hadn't heard from yet.  Because there's some

17   arguments that the state makes that Mr. Stern does not make on

18   behalf of his clients.

19           First of all, I think that Mr. Gambill is correct in

20   emphasizing the right of control as opposed to control.  He's

21   incorrect in somehow implicating that we didn't address that

22   in our briefing.  We clearly do quote directly from Janik to

23   the extent that it's the right of control is the important

24   consideration here.

25           But even beyond that, the question that the Court has

1     to answer here is the right to control what?

2          And that's where Hoffman and these other cases are so

3     important because they clearly indicate it's the right to

4     control the detailed activities, the day-to-day activities

5     which give rise to the liability itself, not the right -- the

6     general right to control, for example, this great emphasis

7     that he wants to put on the ability of LAD to sign off on

8     contracts that LAN is entering into.

9          That doesn't have anything to do with the day-to-day

10    activities of the engineers or anything that the engineers

11    were alleged to have done in this case to give rise to the

12    liability.

13         In fact, none of the factors that Mr. Gambill talk

14    about as being so important in the employee leasing agreement

15    are really any different from the kind of contractual

16    provisions which were in effect in Hoffman or the May v Harper

17    Hospital case.

18         And both of those involve the same kind of generic,

19    you know, recitations that these folks were still under the

20    control of the lending employer for some purposes.  You have

21    to get down to, you know, exactly what they were doing at the

22    time and determine control that way.

23         Now -- and this I think is a very important point.

24    The state is attempting to invent an argument out of whole

25    cloth when it suggests that the lending and borrowing

1    employers have to have an adversary relationship or they can't
2    be related.

3           I mean, there is no case authority which they cite
4    from any jurisdiction.  And it's an amazing slight of hand
5    that they try to pull off here when they say, well, you just
6    have out of state cases when they have no cases at all in
7    state, out of state, or, you know, from any planet in the
8    galaxy that indicate that there is some kind of prohibition
9    between unrelated entities lending or borrowing employees and
10   for the general test which relate to borrowed servant from
11   applying to those entities.

12          That is purely an invention.  And what it amounts to
13   is an attempt to apply alter ego principles without meeting
14   the alter ego requirements of the law.

15          Now he wants you to disregard the corporate
16   separateness between these two entities without even
17   attempting to meet the test.  And that's a situation which we
18   think is completely contrary to Michigan law.

19          MR. GAMBILL:  Your Honor, I had just one quick
20   response.  Which is that I think that the engineers on the
21   ground would be very surprised to learn that the scope of the
22   services they're providing to the City of Flint had nothing to
23   do with the services they were providing to the City of Flint.

24          We attached each of the five contracts to our
25   briefing.  It's Exhibits 15 and then 18 through 20.  And -- or

1    17 through 20.  Each of those lay out in great detail what the

2    day-to-day activities of those engineers is going to be.  And

3    they could not do any of those things unless a corporate

4    officer with the company signed off on it.

5         And so it's not correct to say that the Leo A Daly

6    company had nothing to do with what the engineers were doing

7    in the City of Flint.  They had to approve it.  They looked at

8    it and had to approve it first.  And the corporate designee

9    for both of those companies acknowledged that that's the

10   policy they followed.

11        And so it's just not correct to say that they were

12   somehow absent or distant from what was happening on the

13   ground.  They had to approve and watch it and make sure that

14   the engineering services that were being provided satisfied

15   company policies and so forth.  So it's just not correct.

16        THE COURT:  Okay.

17        HONORABLE JUDGE FARAH:  I just have one more

18   question.

19        THE COURT:  Oh, sure.

20        HONORABLE JUDGE FARAH:  We have heard, you know, a

21   lot of names and we heard about Green and Nakashima and Matta

22   and some of those folks that are in positions of control.  Do

23   we have the full universe of people in the briefing?  Is there

24   anybody else that's involved here?  Because it seems like

25   we're hearing the same names.

```
 1              I just want to make sure this is it.  There is no
 2   other person in some other role in some other city that
 3   exercises or retained control.  Do we have all our names on
 4   that?
 5              MR. MASON:  The record is the record, yes.
 6              HONORABLE JUDGE FARAH:  Okay.
 7              MR. GAMBILL:  In terms of briefing, Your Honor, we've
 8   identified the people who are relevant to the legal arguments
 9   we're making.  There were certainly other players in here.  I
10   mean, but the people most relevant to our legal arguments we
11   identify by name in the briefs.
12              HONORABLE JUDGE FARAH:  Okay.  Fair enough.
13              THE COURT:  Good.  Okay.  Well, thank you, very much
14   for the argument and thank you, Judge Farah, too.  What I'd
15   like to do is turn now to LAN's motion for summary judgment.
16   And did I hear that Mr. Kent is arguing that?
17              MR. KENT:  Yes, Your Honor.  Can you hear me?
18              THE COURT:  I can hear you very well.
19              MR. KENT:  Very good.  Thank you.  If I may ask if we
20   can take a five-minute comfort break.  We've been going
21   another hour.
22              THE COURT:  Sure.  Okay.  Let's do that.
23              HONORABLE JUDGE FARAH:  Okay.
24              MR. KENT:  Thank you.
25                          (Brief Recess)
```

```
 1              THE COURT:  If everybody's ready.  That was a good
 2    idea.  Thank you, Mr. Kent.  Sure.  Why don't we get started.
 3              MR. KENT:  Okay.  Thank you, your Honor.
 4              THE COURT:  So this is your motion.  Yes.
 5              MR. KENT:  David Kent arguing for LAN on its motion
 6    for summary judgment.
 7              I think that the Daubert hearing two weeks ago and
 8    yesterday's summary judgment hearing on Veolia's motions have
 9    helped focus today's argument.  We seem to have agreement that
10    the only claim remaining against LAN is one of professional
11    negligence.
12              THE COURT:  Yes.
13              MR. KENT:  We also have agreement that in order to
14    make a claim for professional negligence, you need to support
15    your claim by expert opinion testimony regarding the standard
16    of care and the violation of same and how that violation
17    caused any of the damages claimed or injuries claimed by the
18    plaintiff.  You have to have your expert testimony.
19              The third thing that we had agreement on as of
20    yesterday was that the plaintiffs, the bellwether plaintiffs
21    have no expert testimony on the majority of the claims that
22    they have alleged against LAN for professional negligence.
23              Specifically, they have no testimony on anything that
24    happened after April 2014 when the city went live with the
25    Flint River as its water source.  Even though in their
```

1    petition they have claims about things that happened with the

2    total trihalomethanes, the TTHM work that was done in the fall

3    of 2014 and continuing forward, things about ferric chloride,

4    things about root cause analysis, the operational evaluation

5    report.  Mr. Humann, our expert witness, has no evidence.

6            THE COURT:  Mr. Kent, I don't know -- Mr. Kent, I

7    don't know if we have agreement on this last portion of your

8    argument.  Because the plaintiffs do have testimony from

9    Mr. Humann about what a reasonable engineer would have done.

10   So I think there's at least argument there.

11           But as I understand it, I think the plaintiffs are

12   not pursuing claims with respect to TTHM and ferric chloride.

13   But let's just confirm that now so we don't have to cover that

14   material.

15           MR. STERN:  Your Honor, I can confirm what we are not

16   pursuing.  I can also confirm that we do not have an

17   agreement.  We would have withdrawn our response to the motion

18   for summary judgment and dismissed the cases with prejudice

19   had we had an agreement on LAN's motion for summary judgment.

20           So we respectfully do not agree as to the third point

21   that Mr. Kent so artfully and dramatically indicated was an

22   agreement amongst all of us.

23           THE COURT:  But what about the TTHM --

24           MR. STERN:  Our clients are not seeking any damages

25   and not pursuing any cases related to TTHMs.  And I think

1   Mr. Kent knows that the entire scope of our expert testimony

2   -- our expert's testimony regarding LAN involved what they did

3   or did not do prior to the water switch.

4           So I don't think that that's a mystery or something

5   that, you know -- we discussed this for over an hour and a

6   half during the Humann Daubert hearing regarding what his

7   opinions were or what the standard of care were and all those

8   things.  So I'm wondering if there's going to be a new

9   argument today.

10          THE COURT:  So Mr. Stern, let me understand.  Are you

11  no longer making any allegations about the duty to warn after

12  the switch?

13          MR. STERN:  No.  Sorry.  I'm not suggesting that they

14  didn't have any conduct post switch.  I'm suggesting that it

15  begins prior to the switch.

16          THE COURT:  Right.

17          MR. STERN:  And it has nothing to do with TTHMs.

18          THE COURT:  Okay.  That's what I understood.  So

19  okay.  Let's give the floor back to Mr. Kent.

20          MR. KENT:  Thank you, very much, Judge.  And I think

21  that's largely what I said.  Although it's interesting to hear

22  that they are going to make claims that LAN did something

23  wrong after April 2014 and continuing to fail to make some

24  sort of warning.

25          Because in order for Mr. Humann to have that opinion

```
 1    that he can express, he cannot just say, oh, I think that they
 2    were violating a standard of care.  He has to have some
 3    knowledge.  He has to have some basis.  There has to be a
 4    factual support.  You cannot have a naked opinion.  This is
 5    not ipse dixit of I say it, therefore it is true.
 6          And the fact is that he, by his own admission, knows
 7    nothing, knew nothing about what LAN did after April 2014.
 8    And he knew precious little of what they did before April
 9    2014.  Remember he said -- this is his description, the
10    standard of care --
11          THE COURT:  Doesn't the expert opinion -- Mr. --
12    can -- doesn't the expert opinion have to be about the
13    standard or the duty and not about the facts of LAN's conduct?
14          We're not going to have Mr. Humann come in and
15    testify and tell the jury LAN is liable.  We're going to have
16    him lay out the duty of a professional engineer to warn of
17    foreseeable injury and so on.  The very things that he's got
18    now in his supplemental affidavit.
19          MR. KENT:  Let's talk -- well, let's make two
20    comments.  First is, no, I disagree with Your Honor
21    respectfully.  An expert who simply says, well, here's the
22    standard of care hasn't done enough.  He has got to say here
23    is how they violated.
24          THE COURT:  Well, yes.
25          MR. KENT:  Here is the action they took that violated
```

1   it.  It does not meet the standard of care.  He has to know

2   something in order to give you an assessment of whether they

3   measured up against that.  That is a requirement.  He can't

4   get there by just saying, well, here's what I think they

5   should have done without knowing what actually was done.

6            THE COURT:  Okay.

7            MR. KENT:  And secondly, your comment about the

8   supplemental affidavit is interesting because when you look at

9   it, his affidavit says not one word about what LAN did or

10  didn't do.  He didn't say LAN violated it.  LAN should have

11  done something.  Everything in it focuses on Veolia.

12           That is significant.  Because if you'll remember, in

13  his deposition after he had been shown all of the mistakes in

14  it, all of the information that he had not considered, all of

15  the information that contradicted his opinions, he said, well,

16  you know, I'm going to have to go back and rethink this and

17  look at things.

18           Apparently he did.  He took a year and he wrote a

19  supplemental affidavit undoubtedly with assistance of counsel.

20  And the only thing he addresses is what he calls ethical

21  violations by somebody other than LAN.  He attributes nothing

22  to LAN.

23           So we are still left with no expert opinion evidence

24  about anything LAN did after April 2014.  The only thing we

25  have are his opinions about what happened leading up to April

```
 1    2014.  And on those, we're actually restricted to what
 2    happened between April of 2013 or the summer of 2013 and the
 3    spring of 2014 because that's the year period after the city
 4    makes the decision to go to the Flint River.  And in April
 5    2013 and in April 2014 when they actually turned the tap.
 6          Because remember, this expert who said that he had a
 7    complete and comprehensive review beginning to end to get a
 8    complete understanding of everything that happened then had to
 9    admit that his own analysis was done in a reckless and
10    misleading way because he was completely wrong on everything
11    that happened prior to April 2013.  And we're restricted to a
12    one-year period.
13          THE COURT:  Mr. Kent.  Mr. Kent, this is where I'm
14    tempted to say, "To err is Humann."  But I will try not to say
15    that.
16          MR. KENT:  Judge, I can understand that.  I can
17    certainly understand that, Judge.  Everyone makes mistakes.
18          THE COURT:  No, I'm just --
19          MR. KENT:  But this is not a simple mistake.  We've
20    already gone over that at some length.
21          THE COURT:  Yes.
22          MR. KENT:  The one document he bothered to read that
23    had a historical review, which as Mr. Stern says was an
24    autopsy of what happened, contradicted all the things that he
25    was saying before April 2014.  That's not a casual mistake.
```

```
 1              THE COURT:  Okay.
 2              MR. KENT:  That's not a "to err is human."
 3              THE COURT:  Of course.
 4              MR. KENT:  And that's been withdrawn now.  It's been
 5    withdrawn.
 6              THE COURT:  Yes, it has.
 7              MR. KENT:  So let's look at what his two opinions
 8    are.  His two opinions are, number one, that LAN did not give
 9    the city enough time, warning that they did not have enough
10    time to do the work necessary to get the Flint plant
11    operational by April 2014.
12              And when we drilled down and said don't leave it at
13    generalities, let's get the specifics, it came down to one
14    matter and one matter only, which was they did not use a
15    corrosion control inhibitor chemical, the phosphates.  That
16    wasn't part of what they did.
17              And when we said, well, did they have time to do
18    that?  Was it a function of a lack of time?  He said, well,
19    no, actually it wasn't.  So his first opinion, a scheduling
20    opinion, fell by the wayside.  You can't have a general until
21    you get the specific.  The specific fell by the wayside.
22              THE COURT:  Yes.  Okay.  So Mr. Kent, let me turn to
23    Mr. Stern.  Because I have been able in my thought process to
24    break this down into three duties potentially that I think the
25    plaintiffs are still pursuing with respect to LAN.  And so
```

1    this is the first one.

2           The failure to insist or warn that it would be

3    impossible to upgrade the plant in time for the April 2014

4    switch.  And as I understand the record, LAN knew that there

5    was a plan in May of 2013 to potentially switch.  But it

6    wasn't until June of 2013 that Mr. Ambrose said that was the

7    final decision.  It would be done.

8           And back at that time, LAN was saying it would take

9    two years and so on, which obviously there was not two years

10   from June of '13 to April of '14.

11          So Mr. Stern, where do you have expert testimony or a

12   professional engineer's opinion on that subject?  Because

13   Mr. Humann retracts or recants that and doesn't follow through

14   with it and provides us no testimony on that.  He simply says,

15   as Mr. Kent reiterated, that the phosphates are needed.

16   Corrosion control is needed.  That's it.  Period.

17          MR. STERN:  Your Honor, I don't think that he

18   recants.  I think that he modifies what he said.  And frankly

19   those are questions for cross-examination.  But his report

20   specifically says in June -- and this is on page 19 of 21,

21   five paragraphs or so down.

22          In June of 2013 LAN proposes or enters into an

23   agreement with the City of Flint to place the FWTP in

24   operation.  Again, schedule is a critical issue.  LAN even

25   states that in its proposal.  Regardless, however, the clear

1   lack of time to get the Flint water treatment plant

2   operational by 2014, LAN continues to commit to the city that

3   it can successfully complete the work necessary to place the

4   plant into operation.

5           There's a fundamental difference, Your Honor, between

6   the corrosion control necessary to actually treat the water

7   and the Flint water treatment plant becoming operational.  And

8   so while he may have modified what was required for purposes

9   of corrosion control, he surely didn't modify and no one --

10  did you say something, Mr. Kent?

11          MR. KENT:  No, sorry.  I probably coughed.

12          MR. STERN:  You know there's -- by LAN's own -- by

13  LAN's own -- that threw me off for a second, Your Honor.

14          By LAN's own recommendations and work, we know that

15  the Flint water treatment plant needed and Mr. Humann knows

16  that the Flint water treatment plant needed millions and

17  millions and millions and millions and millions of dollars of

18  upgrades irrespective of the chemical treatment of the water.

19          And so any modification of Mr. Humann's opinion

20  during his deposition did not relate to the timing of upgrades

21  associated with the Flint water treatment plant to become

22  operational.  It had to do with the actual treatment of the

23  water.

24          THE COURT:  But he does say in response to a

25  question, "Is there anything else besides the corrosion

1    inhibitor that was not done by April 2014 related to water

2    quality?"  Answer from Mr. Humann, "I'm not aware specifically

3    of the work that would have been done in terms of the

4    treatment process and things like that.  So I couldn't tell

5    you one way or the other."

6         MR. STERN:  Again, Your Honor, absolutely he said

7    that.  And again, he is referring to the treatment of water,

8    not to the upgrades to the treatment plant.  So for instance,

9    you could be properly treating all of the water.  But if the

10   water can't be distributed in such a way where the treatment

11   would even have an appropriate effect.

12         So for instance, there's some record evidence -- it's

13   not in our brief but it had to do with I think -- I think I

14   examined Duffy -- there's a City of Flint employee, Dougherty

15   Johnson who goes by Duffy Johnson.  And during his deposition

16   I asked him about -- I can't remember what the scientific name

17   of these items are.

18         But there are like tindles [phonetic] or large

19   containers at the Flint water treatment plant that need to be

20   balanced in order for the actual water to flow in a way that

21   allows for the treatment to work successfully.

22         You could be doing everything right treatment wise

23   and still have a plant that without the proper upgrades

24   wouldn't be able to deliver properly treated water in a way

25   where the treatment would have the appropriate effect.

November 23, 2021

```
 1              And so the comments made by Mr. Humann were generally
 2    about treatment and not about the plant.  He said nothing to
 3    contradict what's in his report about the treatment plant
 4    needing extensive upgrades prior to going into use.
 5              THE COURT:  So his -- you're saying look to his
 6    report, not to his testimony.  But we have no affirmative
 7    testimony from Humann to explain what had to be done.  Even if
 8    his report is accurate, it's hearsay.  He's at his deposition
 9    to explain what he means there.  And I couldn't find
10    affirmative testimony from him explaining what needed to be
11    done.
12              Although I hear your point that LAN said it was a $20
13    million upgrade and that's definitely more than it would cost
14    for phosphates alone, so.
15              MR. STERN:  Well, Your Honor, two components to a
16    further answer to this question.  What Humann says needed to
17    be done for LAN was to warn.  We're talking about -- I mean, I
18    don't want to confuse the issue here.
19              I mean, LAN's entire argument is we had nothing to do
20    with the actual treatment.  That wasn't in our scope of work.
21    We're going to stand behind our scope of work in the four
22    corners of our contract.  They go to great lengths explaining
23    how they had nothing to actually do with the treatment of the
24    water.
25              If Humann's opinion -- he's artfully and improperly
```

1    articulated a standard of care.  I don't even think that's an

2    issue anymore based on the argument that's already occurred as

3    well as his affidavit and his report and his deposition

4    testimony when juxtaposed with the testimony of LAN's own

5    engineer as well as VNA's engineer.  I don't think there's a

6    standard of care issue anymore.

7         What Humann says LAN did in violation of the standard

8    of care was not insisting on the proper use of corrosion

9    control.  It doesn't even matter what the timing element is of

10   the corrosion control because there's no dispute that LAN

11   didn't insist upon it.  And if LAN says they did insist upon

12   it, then there's a question of fact because there's city

13   employees that say they didn't.

14        THE COURT:  Okay.  Well, I'm at this point just

15   talking about the duty to warn that it can't be done with or

16   without corrosion control.  And I'm looking for expert

17   testimony on that portion.  Not the use of phosphates, but the

18   upgrades to the plant that could not be done in time for an

19   April 2014 switch.

20        And that's where I don't see expert testimony on what

21   it was that LAN needed to warn the city could not be done.

22        MR. STERN:  Well, Your Honor, in his affidavit, while

23   he might be referring to VNA for purposes of the breaches of

24   the violation -- breaches of the standard of care, he

25   absolutely opines that it would not have been possible for --

1    if I can just pull up his affidavit for a moment and I'll

2    point you to the exact spot.

3           THE COURT:  Does he explain why it can't be done?

4           MR. STERN:  Well, he relies in his affidavit and in

5    his testimony and in his report on the testimony of Miguel Del

6    Toral whose testimony also indicates that there's a

7    significant amount of testing and research that would need to

8    be done in order to make the corrosion control appropriate

9    based on the volatility of the water source.

10           So I don't think Mr. Humann has to give an opinion

11    about why it cannot be done if the materials that he relies

12    upon indicate that it cannot be done.  And if his own

13    professional experience, he says in his affidavit it could not

14    be done.  I don't know -- I don't know why he has to go line

15    item by line item for the things that had to be done and

16    couldn't be done.

17           Those are fact questions for, Mr. Humann, you say

18    that this could not be done.  I understand that your opinion

19    is it cannot be done.  Why could it not be done?  Well, that's

20    not a question for summary dismissal of a case.  That's a

21    question to cross-examine someone's credibility for in a way

22    that they may have made in opposite statements and they have

23    to try to justify to a jury how they can say in their report

24    one thing but potentially retracted part of that argument in

25    another.

```
 1              Again, these are questions of fact.  He's eminently
 2    qualified to both review and understand the documents that he
 3    reviewed and claims to have understood.  He's eminently
 4    qualified to testify about the standard of care.  And his
 5    belief that it couldn't have been done I don't think needs to
 6    be laid out in a way in order for LAN to survive the summary
 7    judgment argument.
 8              THE COURT:  Okay.  Thank you.
 9              Mr. Kent, let me ask you a more fundamental question.
10              MR. KENT:  Sure.
11              THE COURT:  Does LAN agree that it was the switch to
12    the Flint River that ultimately caused the Flint Water Crisis
13    as we've defined it?
14              MR. KENT:  Not the switch per se, no.  There's
15    nothing about the river water itself that could not have been
16    treated.  Mr. Humann, himself, agrees it could have been
17    treated.  It could have -- that as an engineering matter it
18    could have.
19              This is really not to his opinion, but as a general
20    statement.  Our experts say that if the plan had been
21    followed, the recommendations had been followed, probably
22    wouldn't have been any problem at all.  There's no reason why
23    it couldn't -- water couldn't have been safe.  It really was a
24    fundamental problem of the operation of the plant by the plant
25    operators who did not control the PH balance.
```

1          THE COURT:  Okay.

2          MR. KENT:  But the techniques, certainly, were there.

3     It's not an issue of the river itself.

4          MR. STERN:  Again, Your Honor, that goes back to the

5     issue of when Humann's describing the scientific method of

6     actually treating water versus the operational capacity of the

7     Flint water treatment plant.  Those are two very different

8     things.

9          I've got to -- I mean, I haven't laughed at anybody

10    today or yesterday and I think some of the arguments that have

11    been made have been a little bit absurd.  But I've made sure

12    not to laugh.  I would very much appreciate it if you would

13    extend me the same courtesy, Mr. Kent.

14         MR. KENT:  I'll certainly try to do so.

15         THE COURT:  Yeah, yeah.  Okay.  So let's go back,

16    Mr. Kent, to your argument.

17         MR. KENT:  Fine.  And I will say, Judge, that it is a

18    function of depositions and facts.  You do not get to write a

19    sentence and then say I have nothing to support it.  I don't

20    know of anything other than the failure to use corrosion

21    control inhibitor chemicals of phosphates, which I admit could

22    have been done.

23         This is about health issues, Judge.  It's not about

24    anything else.

25         THE COURT:  I hear you.

```
 1              MR. KENT:  He doesn't say one -- yeah.  He doesn't
 2    say one word about this tendrils or anything else.  And the
 3    whole issue -- we talked about it last time of this -- of this
 4    how much money could be spent, should be budgeted for the long
 5    term operation of this plant is totally different from what
 6    had to be done by April 24 to operate the system as it relates
 7    to water quality, health effects, damages.  That's what this
 8    case is about.
 9              Nobody's arguing about how often the lines broke, the
10    water mains broke.  That's not part of the case.
11              THE COURT:  Okay.
12              MR. KENT:  It is -- it's a health effect.  And that's
13    why we drilled down and we got to the specifics.  And if he
14    can't give you any specifics, then he cannot say, oh, well,
15    this is just a matter of credibility, cross-examination.  It's
16    not.  There's got to be a genuine issue of material fact and
17    there is not on that timing issue.
18              THE COURT:  I understand.  So let me ask you this.
19              MR. KENT:  Certainly.
20              THE COURT:  One of the things that LAN recommended,
21    among others, was a 60 to 90-day test run period.
22              MR. KENT:  Correct.
23              THE COURT:  And if I'm not mistaken, that test run
24    was begun but it failed and could not be completed because the
25    plant was in no shape to complete the -- even just a 60 to
```

 1    90-day test run.

 2        MR. KENT:  No, those are two different things.  The

 3    events that took place in the summer of July 2013 was to check

 4    out the plant and see if it was operational enough so that you

 5    could get some preliminary information.

 6        And in fact, they were able to say hydraulics are

 7    fine.  You can push the water, run the water through.  We

 8    could not get the water quality data that we needed.  And

 9    that's what led to the discussions in August 2013 to where LAN

10    said, well, here are recommendations on what you need to do.

11        What do you want to hire us to do?  We're offering to

12    do a lot.  What do you want to hire us to do?  And the city

13    said we'll give you these five items.  Nothing more.  We'll

14    take care of everything else.  The 60 to 90-day test run was

15    contemplated to be later closer to the time that you go

16    operational so that you can, in fact, do some of that fine

17    tuning.

18        Mr. Humann was asked.  He specifically said that's a

19    good recommendation.  And everyone within the city who was

20    involved in the water treatment plant operations -- that's

21    from Michael Glasgow, the F1 operator; to Brent Wright, who

22    was the supervisor; to Robert Bincsik in the water department;

23    to Duffy Johnson in the public works department.

24        They all said, yeah, we knew that was the

25    recommendation.  And the question was, well, why did it not

1   happen?  And the answer was we were told don't spend the

2   money.  The emergency manager said do not spend money on

3   things you are not required to do and MDEQ didn't require us

4   to do it.  We didn't do it.

5          And LAN was not involved in those decisions.  LAN is

6   not involved in those discussions.  LAN is not asked, hey,

7   guess what, Warren, we need your help.  The MDEQ is not

8   letting us do this.  Can you come make the case for us?

9   Warren Green is not on the scene.  LAN is not on the scene.

10          THE COURT:  Mr. Kent?

11          MR. KENT:  LAN is not on the scene.

12          THE COURT:  Mr. Kent?

13          MR. KENT:  Yes.

14          THE COURT:  If LAN knew the testing was needed,

15   further testing was needed and knew it didn't happen, did it

16   have a duty to warn about the consequences?

17          MR. KENT:  Well, let's parse that a little closer.

18   If you're asking if that is an assumption that LAN knew

19   additional testing was needed and knew testing wasn't done,

20   did it have a duty to warn, the question is incomplete because

21   you don't know what they needed -- what the seriousness of it

22   was.  What are the consequences?  What is there to warn about?

23          But if you're suggesting that those are the facts,

24   then the evidence in the record unquestionably shows that is

25   unsupported and contradicted because LAN was not on the scene

1    and was not involved in any of those discussions leading up to

2    the turn on -- the switch of the water sources.

3              No one asked LAN, should we be doing this?  Here's

4    what we are doing.  What do you think?

5              THE COURT:  Mr. Kent --

6              MR. KENT:  That wasn't part of LAN's brief.

7              THE COURT:  Mr. Kent, LAN recommended testing.  I

8    have to assume there was a reason for the testing.  It is --

9    that may not take professional testimony to believe you need

10   testing of a dormant water plant that's going to go into

11   operation for a municipality of 100,000 people, or fewer even.

12   And they knew it didn't happen.

13             Do we have agreement on that?

14             MR. KENT:  No, we do not, Judge.

15             THE COURT:  And they were on site for different

16   purposes though.  So we don't have an agreement that they

17   recommended testing.

18             MR. KENT:  We do have --

19             THE COURT:  Okay.

20             MR. KENT:  Well, on the testing is the 60 to 90-day

21   plant run.  Absolutely.

22             THE COURT:  Yes.

23             MR. KENT:  They absolutely recommended it and the

24   people in charge liked the idea.  And everyone has applauded

25   LAN for making that recommendation.

```
 1            THE COURT:  And they knew that it was not successful.

 2            MR. KENT:  No.  That is where we have complete

 3   disagreement.

 4            THE COURT:  Okay.

 5            MR. KENT:  That's a complete disconnect, Judge.  The

 6   summer July 2013 plant operation analysis is the one that did

 7   not get completed.  That's totally separate from this plant,

 8   the test run, what we've called the shakedown crews right

 9   before the plant goes operational in April of 2014.

10            That's where Warren said and everyone agreed, yeah,

11   we ought to be doing that.  And that's what did not happen

12   because there was no money and the MDEQ said you don't need

13   to.  And Warren Green and LAN was totally uninvolved.  We have

14   on the record -- and there's no evidence to suggest the

15   contrary.

16            The affirmative evidence shows that in March of 2014,

17   Jeffrey Wright, the Genesee County Drain Commissioner, with

18   his engineering deputies went to have a sit down talk with the

19   mayor, with the head of the publics department, with the

20   emergency manager, with all the people.  And he said, look, I

21   don't think you're ready.  And they said thank you, very much.

22   We do think we're ready.

23            We have shown in the record March 26, 2014, that Mike

24   Glasgow tells MDEQ I am going to be using orthophosphates.  He

25   says I'm going to be using 1 milligram per liter.
```

 1            THE COURT:  I understand that.  Okay.  Mr. Kent, when
 2   did LAN realize that the 60 to 90-day run did not happen?
 3            MR. KENT:  They never knew it at the time because
 4   they weren't involved.
 5            THE COURT:  So was it not until -- we have to get an
 6   agreement -- and I know that I'm interrupting you.  But the
 7   purpose is for me to get answers to questions.
 8            MR. KENT:  Yes.
 9            THE COURT:  So it's the one time in my life where I
10   give myself permission to interrupt.  Although perhaps some
11   people wouldn't agree with that.  But so please just allow me
12   to do that, if you will.
13            MR. KENT:  Certainly.
14            THE COURT:  Was it not until the litigation or when
15   did LAN learn this?
16            MR. KENT:  LAN, to this day, does not know for sure
17   what was done but certainly not until people got on the record
18   saying, no, we really didn't do this.
19            THE COURT:  Okay.
20            MR. KENT:  So we can't tell you what happened day to
21   day, if they made any efforts at all.  What we do know based
22   on the record from the deposition testimony is that no one at
23   the city said that they did the 60 to 90 day, that long of a
24   period.
25            THE COURT:  Okay.  Then let me ask Mr. Stern do you

November 23, 2021

1    have evidence in the record to the contrary --

2              MR. STERN:  Yes --

3              THE COURT:  -- that LAN knew earlier?

4              MR. STERN:  Yes, Your Honor.  And I'm not sure if

5    it's the 60/90-day testing that is the crucial part.  But

6    Warren Green testified -- and I'm trying to find it in his

7    deposition.

8              But Warren Green testified that he was present at a

9    meeting on the ground with a number of DEQ and city employees

10   prior to the switch.  And he was shocked to find out that

11   rather than implementing corrosion control, there was going to

12   be a -- two 6-month testing periods.

13             So he left that meeting knowing that there was not

14   going to be the utilization of corrosion control prior to the

15   water switch despite all the recommendations that LAN, itself,

16   had made to the City of Flint.  And yet just continued on his

17   way with whatever their minimal scope of work was.

18             THE COURT:  Right.  That's the corrosion control.

19   We're going to get to that.  But do you have record evidence

20   that LAN knew earlier than say the litigation in the

21   depositions that the 60 to 90-day test run was not going to --

22   did not happen?

23             MR. STERN:  We know for certain that they knew

24   because of Warren Green's testimony.  Because if there was a

25   60 to 90-day test run that did -- if the 60 to 90 -- let me

1   start over.

2          The 60 to 90-day test run is designed to ensure that

3   the water is being treated properly.  That assumes that the

4   water is being treated at all.  It assumes that in order to

5   treat it properly, it must be treated.  Everyone would agree

6   to that, especially a group of water engineers.

7          When Warren Green finds out that there will not be

8   utilization of any corrosion control at all for at least six

9   months, it necessarily means that there was no outcome to the

10  60/90 day testing or else the city would be implementing

11  corrosion control.

12         It goes without saying that everyone knew the 60 to

13  90-day testing had never been completed.  Why else would there

14  not be the utilization of any corrosion control?  It's not as

15  though LAN points to evidence that, well, the testing showed

16  this and we knew that this was the proper cocktail for water

17  treatment for the Flint water treatment plant and the city

18  said, thank you for the cocktail, but we are not going to pay

19  for that cocktail.

20         Instead there were blanket statements that we are not

21  going utilize corrosion control.  And there's no indication

22  that there was ever a completion of the 60 to 90 days and any

23  water engineer would have known that when they found out that

24  there was no corrosion control being utilized at all.

25         One can draw the inference that at that meeting when

1    Mr. Green was informed and he was shocked -- and again, I'll

2    find it.  He was surprised or he was shocked and he just

3    couldn't believe it and still went on his way and did whatever

4    LAN was asked to do.

5           It goes without saying that in that moment in time it

6    necessarily means that the 60 to 90-day testing was never

7    completed or completed in a meaningful way or else there would

8    have been corrosion control.

9           THE COURT:  And is that in the deposition that's

10   attached to the briefing?

11          MR. STERN:  The Warren Green testimony?

12          THE COURT:  Yes, Warren Green.

13          MR. STERN:  Yes, it is, Your Honor.

14          THE COURT:  Okay.  Good.

15          MR. STERN:  The meeting, the part about the meeting I

16   believe is in -- I will check to confirm, but I'm fairly

17   certain that it is.

18          THE COURT:  Okay.  Thank you.  All right.  Let me

19   turn it back to Mr. Kent.

20          MR. KENT:  Thank you, your Honor.

21          Yes, that is in the briefing.  It's part of our

22   narrative of the facts.  The meeting he's talking about

23   happened in June of 2013.  June of 2013 when the MDEQ said

24   here's how we think things should be done.

25          And after the meeting Warren Green pulled aside Duffy

1    Johnson and said, I think you ought to reconsider this.  And

2    all of this is what we cite and put in our briefing.  And

3    that's when Duffy Johnson said I'm doing what the MDEQ

4    requires.  Nothing more.  Nothing less.

5            But that is separate, totally separate from the 60 to

6    90-day test run.  It is completely inaccurate to say that,

7    well, gee, you would have known that there was no corrosion

8    control at all.  That's wrong.  Because the MDEQ said, Warren

9    Green said, we -- our experts say, but for purposes of summary

10   judgment water softening, lime only softening is a form of

11   corrosion control.  With proper PH balancing it is a form.

12           And if they had done a 60 to 90-day test run and

13   figured out we've still got some imbalances here, then

14   something could have happened at that point.  There is

15   absolutely no reason for Warren Green or anyone from LAN to

16   have known of what was happening on that side of the plant

17   because water treatment and water quality was taken out of

18   their scope of work.

19           And in fact as we point out in the brief, the

20   infamous memo, the email that Mike Glasgow wrote the day

21   before the plant went live where he said we're not ready.  If

22   you make me turn on the switch, it's against my direction.

23           The reason, one of the reasons he wrote that as

24   testified to by his coworker and supervisor Robert Bincsik was

25   because he had not been allowed to do the previous test runs.

1    Nothing was ready in his mind.  But that has nothing to do

2    with LAN.  We are not in any of those email chains.  We were

3    not invited to the public ceremony where they turned the tap.

4    That's how far behind the scenes and off the radar we were.

5            And if you remember, Judge, this is what Dr. Humann

6    or Mr. Humann said.  I asked him about this.  I said tell me.

7    Give us your standard of care opinion here.  And he said,

8    clearly -- these are his words, not mine.  Clearly the city

9    was relying on MDEQ.  Clearly the city was looking to and

10   taking direction from MDEQ.  They weren't interested in

11   talking to LAN.

12           THE COURT:  Okay.

13           MR. KENT:  This is not a function of they didn't know

14   better.  This isn't a function of us warning, insisting,

15   telling anyone.  This was a function of the city because of

16   the financial constraints that it was under and because of the

17   direction from its supervisor, the regulatory supervisor, the

18   MDEQ, saying this is how we are going to do corrosion -- this

19   is how we're going to do lead and copper rule compliance.

20           THE COURT:  And is it your position that --

21           MR. KENT:  Go ahead.

22           THE COURT:  Is it your position that the city was

23   aware of the health risks of not using corrosion control, of

24   not using either full softening or phosphates?

25           MR. KENT:  Yes.  I would say that they are by virtue

1    of who they are, the water treatment plant operators, and

2    working with the MDEQ engineers where the whole thing is what

3    do we have to do to comply with the lead and copper rule.

4         That's not some esoteric that means nothing.  The

5    lead and copper rule is designed for health effects.  And they

6    know what they're talking about.  They know whether corrosion

7    control inhibitor chemicals should be used.

8         And keep in mind again, the city was planning to do.

9    Mike Glasgow said we're planning to do it.

10        THE COURT:  I know that.  Yeah.

11        MR. KENT:  The reason they didn't do it was the MDEQ

12   said you don't have to and they didn't want to spend the money

13   and they did not ask LAN.

14        THE COURT:  Mr. Kent, did LAN ever advise the city on

15   what the health risks were if you decide not to do this or

16   even later?  Now that we learned you didn't do it, these are

17   the risks you are posing to the population who drinks this

18   water.

19        MR. KENT:  No, to my knowledge, to make a statement

20   of that sort.  And I would have two comments about that.  Two

21   additional comments.  One is that is telling someone who is an

22   expert in the field, which is the MDEQ engineers and the water

23   treatment plant operator who are talking about lead and copper

24   rule compliance.

25        This is not some secret source of hidden wisdom.

1    This is what the subject matter is.  There is no need to tell

2    someone who is also an expert in that field or trained in that

3    field here's why you have to comply.

4          But I would say secondly on your point of did they

5    say anything after they found out.  The first time that LAN

6    found out that there were Lead and Copper Rule problems or

7    lead problems in the water was when the city contacted them in

8    August 2015 at the direction of the MDEQ to say we have now

9    established after our year that we do have lead issues in the

10   water.

11         You need to help us design a phosphate feed system,

12   which LAN did in rapid time, very, very fast immediately upon

13   request.  But until that time, until that time when all the

14   issues have taken place, they were not informed and they did

15   not have knowledge.  Why?  Because the city wasn't interested

16   in talking with them.

17         And again, this is not simply me talking.  You just

18   look at the record as we laid out as is before the Court of

19   all the events that took place internally, discussions between

20   the city and MDEQ and EPA.  LAN does not appear anywhere in

21   there.  Nowhere in there.  No one ever says what does Warren

22   Green think about this.

23         THE COURT:  But LAN -- didn't LAN put in a bid for

24   the work that ultimately went to VNA in February of 2015?

25   Wouldn't LAN by at least that point have known that there was

1    a water quality problem in Flint?

2         MR. KENT:  Two issues there.  Number one, no, they

3    did not put in a bid as a factual matter.  In fact, they said

4    to the city in the fall of 2014 when the city said we want you

5    to do an OER, Operational Evaluation Report, on the -- excuse

6    me.  You can hear my phone in the background.

7         On the TTHM regulatory violation.  LAN said, hey, how

8    about this -- they said how about this, why don't we do a full

9    water quality analysis and the city said no thank you.  We are

10   going to get somebody else to do it.

11        And when they issued the request for proposals, they

12   didn't invite LAN to submit a proposal.  In fact they took

13   LAN's draft OER report and attached it to the scope of the

14   request for proposal to say this is what we want you to do.

15   That's how VNA got on the scene.

16        And allow me to continue, two other comments about

17   that -- or three other comments.  One is Mr. Humann does not

18   have any critique whatsoever about LAN's behavior in poor

19   conduct in that regard.  He does not say any reasonable

20   engineer would have known that that was a problem indicating a

21   lead problem.  In fact to the contrary.

22        He testified the precursor that lead to the TTHM

23   exceedance report was the fecal coliform exceedances in the

24   summer that caused the boil water advisory.  He said in direct

25   answer to a direct question, no, that would not necessarily

1   indicate any lead problem.  It doesn't even indicate a danger

2   or threat to general public health or safety beyond the

3   specific issue of the boil water advisory.

4          So there is no way to build a case when they have no

5   expert anywhere who says, now this is what a reasonable

6   engineer should have known.  A reasonable engineer should have

7   known when they got into this that there was some problem with

8   lead.

9          And all of the discussions that go on with VNA, all

10  of those internal emails, all of the back and forth with the

11  city, all of the issues with Lee-Anne Walters' testing, what

12  is notably absent is any, any mention of LAN.  We are not on

13  the email strings.

14         No one ever contacted LAN to say we need your advice.

15  Guess what?  You haven't done your job.  What did we pay you

16  for?  That's significant, Judge.  Because we're not talking

17  just about what we say.  It is the absence of any evidence.

18         And I've asked every expert, show me one

19  conversation, show me one email, show me one meeting, show me

20  anything contemporaneous to the events where anyone asked LAN

21  what do you think?  We need your help.  Why have you not done

22  your job?

23         And the reason is just as the plaintiffs' own expert

24  concluded.  This is his testimony, not mine.  His testimony.

25  The city wasn't interested in talking about LAN.  The city was

1    looking to the MDEQ.

2         And you know the autopsy report done by the Flint

3    water advisory task force, they easily, easily could have said

4    this was a problem of a lack of information.  Bad advice.

5    They don't.

6         THE COURT:  Okay.

7         MR. KENT:  They go just the opposite.  They say this

8    was government --

9         THE COURT:  So let me ask Mr. Stern if you can point

10   to anything in the record to show that LAN knew or should have

11   known there was lead in the water despite the fact that, as

12   Mr. Kent says, the city did not reach out to LAN regarding

13   this.

14        MR. STERN:  Sure, Your Honor.  You're not going to

15   find a moment in the record where it says, hey, LAN knew there

16   was lead in the water.  What you're going to find is that

17   absolutely LAN should have known.  From the moment in time

18   that it became apparent -- could we stop for a second?

19        THE COURT:  Certainly.

20        MR. STERN:  I'm trying my absolute best to be as

21   professional as I can be.  And maybe it's a disservice that we

22   have Zoom at this point in time because we can all just look

23   at each other the entire time.  And sometimes we have ticks

24   and things.

25        I -- you know, I would have burst out laughing during

 1    the Leo A Daly/LAN conversation about an hour ago if I thought

 2    it wouldn't have been inappropriate.  But there is this

 3    constant snickering at me every time I say a word.  I just

 4    listened to an entire speech that I completely disagree with

 5    by Mr. Kent and I clenched my jaw.

 6              THE COURT:  I hear you.  I hear you.

 7              MR. KENT:  I think it's just the sound effects of

 8    when -- I don't know what it is.  But there's no snickering.

 9    If he's suggesting I'm doing something that I'm not, I don't

10    know what he's talking about.

11              THE COURT:  Okay.

12              MR. KENT:  You know, microphones pick up a lot of

13    rustling of papers.

14              THE COURT:  Okay.  Stop.  I'll just ask everybody to

15    please do the best you can to preserve the civility principles

16    that are adopted by the bench in the Eastern District of

17    Michigan.

18              MR. STERN:  Okay.  Judge, when it comes to knowing

19    that there was lead in the water, it's not just knowing, it's

20    should have known.  Known or should have known.  The standard

21    isn't known.  It's known or should have known.

22              We know that in 2011 LAN recommends corrosion

23    control.  We know that in 2013 LAN is told that there will not

24    be corrosion control utilized other than some lime softening.

25    Which by LAN's own recommendations prior to 2013, there's a

1    significant amount of testing and upgrades that are required
2    of the Flint water treatment plant to know exactly what type
3    of corrosion control is necessary.
4         Miguel Del Toral in the record testified that all I
5    would need to know is you've got lead pipes.  You've got
6    untreated water.  You've got lead.
7         Humann, in his affidavit, cites Del Toral for that
8    proposition and agrees with it.  Michael Shock in the record
9    during his deposition talks about how he would know -- and
10   he's similarly situated to LAN if not inferior to LAN in terms
11   of his experience as a public water engineering consultant --
12   that it would take one to two years to do the type of testing
13   required in order to utilize proper corrosion control.
14        What LAN is asking the Court to utilize as the prime
15   factor in determining whether they had any responsibility
16   whatsoever is if they knew that there was lead in the water.
17   The record is replete with evidence and testimony that any one
18   in LAN's position would have known.  And if they didn't know
19   should have known.
20        And any -- LAN is the most perfectly situated entity
21   of anyone in this entire litigation to know that lead is a
22   problem because they spent so much time and energy and money
23   for years making recommendations related to the water
24   treatment plant, related to priming the water treatment plant
25   for proper corrosion control and opining about what the

1   necessity of corrosion control was and how hard it would be to

2   get there.

3            To now say, well, we knew there was no corrosion

4   control other than a lime softening agent, but we didn't know

5   it was lead and, therefore, plaintiffs' claims fail is beyond

6   the pail.  It's just beyond the pail.

7            So to answer Your Honor's question succinctly, yes.

8   The Del Toral testimony.  LAN's own admissions about what were

9   recommended.  The reports of LAN that had the --

10           THE COURT:  Mr. Stern, LAN made these

11  recommendations.  And up until at least March of 2014 Flint

12  told -- would have told LAN, yes, we're using corrosion

13  control.  So there's no failure to warn up until then.

14           MR. STERN:  I think it's March of -- I think the

15  meeting occurred in 2013, Your Honor.  Okay.  Sorry.  2014.

16           THE COURT:  I think 2014.

17           MR. STERN:  Okay.

18           THE COURT:  It wasn't until a month before going live

19  that I think there's any possibility that Flint was not going

20  to use corrosion control.  So there's no violations of LAN's

21  duty up until that point, right?  Because they made the

22  recommendation and Flint accepted it.  They said, LAN, you're

23  right.  We've got to use -- we've got to use corrosion

24  control.  We'll use phosphates.

25           MR. STERN:  Your Honor, whether LAN found out about

1   it 30 seconds before the switch or 30 days before the switch,

2   it doesn't remove their obligation pursuant to the standard of

3   care.

4           THE COURT:  Okay.  That's fine.  But I just want to

5   make sure I know when the failure to warn is that you're

6   talking about, because it's not in 2013 because --

7           MR. STERN:  So the -- the failure to warn is whatever

8   time period that Humann says it is.  And he may be wrong.  He

9   may be wrong based on facts of the case that he either didn't

10  consider or assume.  And those are questions for

11  cross-examination.

12          But there's no dispute whatsoever that by the time,

13  by LAN's own admission, Warren Green participated in a meeting

14  and found out that there was going to be two six-month testing

15  periods that at that point in time they knew.  And that was 30

16  days before the Flint water treatment plant went live.

17          And so again, I'm not going to go back on what our

18  expert says their failure to warn period of time was because

19  he is not required to consider every single fact in the case

20  in making his determination.

21          As an officer of the Court, I can tell you that if

22  the only facts that exist are those that have been discussed

23  during this hearing and that LAN genuinely didn't know until

24  30 days before the switch that the switch was going to occur

25  without the utilization of proper corrosion control, then

November 23, 2021

1    perhaps the timing associated with Mr. Humann's opinion needs

2    to be modified or his right for cross-examination.

3          But that in and of itself is not a reason to either

4    exclude his testimony or to grant summary judgment for these

5    defendants.

6          THE COURT:  And here's the situation that I'm faced

7    with.  I don't know if LAN ever learned before the switch that

8    corrosion control was not going to be used.  The last they

9    heard, we're taking your advice, LAN.  We're using corrosion

10   control.

11         And then if I'm not mistaken MDEQ says to City of

12   Flint don't do it.  It's too expensive.  I don't know what the

13   exact reasons were.  So then we have to find out when did LAN

14   learn that corrosion control was not being used?

15         MR. STERN:  So I don't agree, Your Honor, with the

16   proposition that just because MDEQ tells LAN that they're

17   using it that it was actually done.  LAN issued an extensive

18   --

19         THE COURT:  MDEQ said don't use it.

20         MR. STERN:  Yeah, I hear you.  Right, right, right.

21   Exactly.  But no, I'm suggesting that Your Honor said that up

22   until a certain point LAN believed that it was -- that their

23   recommendations were being followed.

24         THE COURT:  Right.

25         MR. STERN:  That is implausible for them to believe

1   their recommendations were being followed.  Because part of

2   their recommendation was doing a significant amount of testing

3   on the water to determine what the proper cocktail of

4   corrosion control would be for a very volatile river source.

5        It's not as though -- the reason why -- I mean, one

6   of the things that Mr. Kent said earlier was that these are

7   the water treatment experts on the ground.  The DEQ and the

8   city.  Well then why the heck do you hire LAN in the first

9   place?

10        If these folks are the experts in how to concoct the

11  proper cocktail in order to treat to Flint River, why did LAN

12  do an extensive report and research project in 2011 and

13  determine that it was going to cost $50 million both for

14  upgrades, testing, and implementations of a corrosion control

15  program?

16        And so if the City of Flint was following LAN's

17  instructions, whether they represented that they were or they

18  didn't, LAN would have absolutely known based on all of the

19  circumstances that it would have been impossible for the state

20  and for the city to follow it's recommendations because its

21  recommendations included a $50 million bill that included

22  upgrades to the plant.

23        And so unless that all happened in the middle of the

24  night in the dead of night with some ninja engineering firm

25  that no one ever heard of or the experts on the ground, the

1    DEQ and Howard Croft, who used to work at McDonald's prior to

2    working at the water treatment plant somehow they were able

3    to, with no one noticing, do $50 million of upgrades including

4    corrosion control.

5            It's implausible that LAN didn't know until the

6    Warren Green meeting in March of 2014.  But even if that was

7    the period of time, there's still a month between that period

8    and when Flint goes online that LAN could have and should have

9    done something.

10           THE COURT:  Okay.  Why don't we take a break at this

11   point.

12           MR. KENT:  Your Honor, can I make one -- just address

13   that last comment --

14           THE COURT:  Sure.  While we're there.

15           MR. KENT:  -- before we take a break while it's still

16   fresh on my mind so that we don't have confusion?

17           You know we've heard so much lengthy diatribe now

18   about what could have happened, what should have happened.

19   Let's get back to the facts, get back to the evidence.

20           You heard an admission from Mr. Stern that he has no

21   actual facts.  And that he then said well if, in fact, it was

22   they only learned March 26 four weeks beforehand that the

23   phosphate was not going to be used then maybe I'd have to

24   change things.  None of that is the timeline.

25           March 26 the city is telling the MDEQ we are going to

1    use phosphates for corrosion control at this amount.  LAN's

2    not involved in that.  The MDEQ responds in April.  This is

3    all in our motion.

4              THE COURT:  I saw it.

5              MR. KENT:  The MDEQ responds in April before the

6    switch and says, look, here's what monitoring you need to do.

7    They don't include orthophosphates.  In July Mike Glasgow

8    writes to Adam Rosenthal at the MDEQ and says I want to make

9    sure we don't have to do any of this.  Rosenthal says, yeah,

10   you don't have to do any of this.

11             None of that has anything to do with LAN.  LAN's not

12   on the record.  Not involved.  The only thing that we know

13   that happened was that after the switch occurred, Warren Green

14   did take the initiative to call Brent Wright, Mike Glasgow,

15   and say how are things going?  How are things going?  And they

16   say, hey, we're making our numbers.

17             He's told they're doing everything right.  So there

18   is no knew or should have known.  There is no expert anywhere.

19   Mr. Humann doesn't comment.  All of these things that you hear

20   Mr. Stern say, that's fine for the lawyer, but that's not what

21   the expert says.

22             THE COURT:  Okay.

23             MR. KENT:  And you cannot say, well, he could be

24   totally wrong.  He could be talking through his hat.  It

25   doesn't matter.  We'll just deal with that on

1    cross-examination.

2              MR. STERN:  That's not --

3              MR. KENT:  You've got to have a genuine issue of

4    material fact.  You've got to have support from your expert

5    witness.  This expert witness doesn't have it.  It gets

6    resolved now, not later.  We don't have to go to trial --

7              THE COURT:  Okay.  Thank you, Mr. Kent.

8              MR. KENT:  Thank you.

9              THE COURT:  Mr. Stern, very briefly.  And then we'll

10   take a break.

11             MR. STERN:  Your Honor, Mr. Humann relies on LAN's

12   recommendations from 2011.  He relies heavily in his report

13   and in his discussion about what LAN did in 2011.  It is --

14   I'm actually shocked that the argument is is that, well, we

15   were told that they were going to be using some phosphates so

16   we were good.

17             I mean, that's $50 million worth of phosphates that

18   had to have been used at the Flint water treatment plant for

19   LAN to in good faith believe that the City of Flint and the

20   DEQ is following its recommendations.

21             LAN has admitted throughout the pendency of the

22   litigation by way of numerous depositions that they never

23   changed their recommendations.  They never went back and did a

24   second analysis and said that 50 million that we described in

25   2011, we're throwing that out the window and don't have to do

1    that anymore.

2          The river water's composition has changed so much and

3    by some miracle the treatment plant has sort of evolved into

4    something that doesn't require upgrades and we no longer

5    require $50 million.  All we require now is phosphates.

6          So the very nature of what they were told was going

7    to happen was so in opposite to what they recommended that any

8    engineer in their situation, as Miguel Del Toral said, as

9    Michael Shock said, and as Richard Humann said, would have

10   absolutely known that, oh my God, this is a bomb that's about

11   to go off.

12         THE COURT:  Okay.  Let's take -- thank you.  Let's

13   take a break.  And if we could, let's be back at one o'clock

14   so we can try to wrap up as early in the afternoon as

15   possible.

16         The other thing I wanted to let people know before

17   you leave is that Judge Farah has had to leave.  His mother

18   passed away in the last day, day and a half.  And so he's --

19   there are some family arrangements that need to be made.

20         I have expressed my sympathy and condolences for his

21   loss of his beloved mother who did live in the City of Flint

22   and experienced some of what we're talking about.  So and I

23   expressed that on behalf of all of us.  So he will continue to

24   do that and I'll bring him up to speed on what we've done

25   today.

```
 1            So with that, we'll take a break until one o'clock.

 2                        (Brief Recess)

 3            THE COURT:  All right.  It's a little bit after one

 4    o'clock.  So why don't we get started.  Thank you, Jeseca,

 5    very much.

 6            And unless, Mr. Kent, you have something else at this

 7    point, I'd like to move on to the issue of causation.  And

 8    what I'm interested in doing, even if we're not -- if you want

 9    to discuss breach or return to duty.  What -- I'm looking at

10    this in three parts.  Just to give you that framework.  So I'm

11    sort of breaking this down in my own view of what I think the

12    theories are here.

13            One was the duty to warn that the plant upgrade was

14    impossible.  Second is the alleged duty to warn preswitch that

15    corrosion control was necessary.  And third was the duty to

16    warn or intervene after the switch and after it's learned that

17    there was no corrosion control.

18            So that's the framework I'm looking at it, if that's

19    from -- if that's helpful to you.  And I'm prepared to move on

20    from where we were if -- unless there's anything else right

21    now other than moving on to causation.

22            MR. KENT:  I think, Your Honor, that we've covered

23    our points of significance.  There, on your third point, duty

24    to warn after it is learned that there is no corrosion

25    control --
```

1    THE COURT:  Knew or should have known.  After LAN

2    knew or should have known.

3    MR. KENT:  And the important thing to comment on

4    there is that there is no expert testimony from Mr. Humann

5    whatsoever on that subject.  He does not say, oh, LAN, this

6    was a warning sign.  LAN should have known.

7    Because we've already established that, in fact, the

8    city was planning to do it as recently as four weeks before.

9    And when we talk about corrosion control, we're restricting it

10   to phosphates as opposed to softening.

11   THE COURT:  Correct.

12   MR. KENT:  And there's nothing to say that LAN had

13   any reason to know anything.  I mean, Humann is ignorant of

14   any of this.  He knows no facts.  He offers no facts.  He has

15   no opinion that can be supported.  So you cannot bootstrap him

16   into an opinion on --

17   THE COURT:  I'm not bootstrapping him.  And I

18   understand your argument.  And I'm prepared to move on from

19   there.

20   MR. KENT:  Fine, fine.  And on causation, if you were

21   talking about the medical causation argument which was part of

22   what VNA talked about yesterday, I'm going to hand that off to

23   Mr. Erickson, if that's all right with you --

24   THE COURT:  Certainly.

25   MR. KENT:  -- because he really is focused more on

1   that.  If there is a different form of causation, it would be
2   intervening acts.
3           THE COURT:  Yeah.  I'm looking at but for and
4   proximate causation, the things we traditionally look at that
5   you've brought to my attention in your briefing.  That's what
6   I was looking for.
7           MR. KENT:  Okay.  And if that is in the area of our
8   intervening acts of the MDEQ, then I can certainly address
9   that.  And if it's more on the medical causation side, the
10  general versus specific, which is related, then that's where
11  I'll hand it off to Mr. Erickson.
12          MR. ERICKSON:  Your Honor, Philip Erickson.
13          You know, Veolia covered their causation arguments in
14  a lot of depth yesterday.  We have joined in both their brief
15  in support and in their reply brief regarding their causation
16  arguments in section 3.  Except to the extent that they're
17  based solely on the timing of Veolia's involvement in February
18  and March of 2015.
19          THE COURT:  I agree.  And I wasn't anticipating that
20  we needed to go through general and specific causation again
21  with respect to the medical impacts --
22          MR. ERICKSON:  I was just going to say that most of
23  the arguments that Veolia makes are equally applicable to LAN.
24          THE COURT:  Okay.
25          MR. ERICKSON:  And I would specifically refer the

```
 1    Court to their arguments in the reply brief at section roman
 2    numeral 3A4 and roman numeral 3BC and D.
 3              Some of the arguments they make do relate to their
 4    timing issue.  But the majority of the arguments they make do
 5    not.  And so we join in everything that would be equally
 6    applicable to LAN.
 7              THE COURT:  Okay.  So I don't think I need more
 8    argument on that.  I think we covered the subject fairly
 9    exhaustively.
10              MR. ERICKSON:  I agree.  We also do make causation
11    arguments in our briefs both in the brief in support and in
12    the reply brief.  And then we have the section 2 that relates
13    to intervening causation.
14              THE COURT:  Yes.
15              MR. ERICKSON:  Then you asked the question yesterday
16    about the, you know, criminal conduct.  And we reference the
17    discussion regarding criminal acts and the general rule in
18    Michigan being that criminal acts are not foreseeable.  But
19    the acts don't have to be criminal in order to be an
20    intervening superseded cause.
21              And so we would just rely on those sections of our
22    briefs.  Section 2 in our brief in support and also in the
23    reply brief.
24              THE COURT:  Okay.  Thank you.
25              MR. KENT:  And Judge, I appreciate Mr. Erickson's
```

1    comments on that.  I would mention, not on the criminal aspect
2    of it, criminal acts, but in general on the but for.
3            It is appropriate to reiterate the point that we had
4    been making that this was as Mr. Humann himself, the
5    plaintiffs' expert himself says, this was actions taken in
6    reliance on and at the direction of the MDEQ not based on what
7    LAN said.
8            We quote numerous people but it encapsulated the very
9    best perhaps by Duffy Johnson who was asked why did you do
10   what you did?  Why didn't you do what LAN said?  And his
11   answer was, because we didn't have to do it.  I simply ask do
12   we have to do these things --
13           THE COURT:  That may be true -- that may be true in
14   March of 2014, that up until then as far as LAN knew corrosion
15   control would be used.  Then MDEQ gets involved and suddenly
16   it's off the table.  But then at some point Mr. Stern has made
17   the argument that LAN knew or should have known that corrosion
18   control was off the table and that a public health disaster
19   was imminent and there was a duty to warn.
20           So at that point, MDEQ has already done what it's
21   doing.  And now we're into the third theory of liability here,
22   a duty to warn after phosphates are removed from the process.
23           So where is the superseded intervening cause of
24   MDEQ's involvement there?
25           MR. KENT:  That's a good point.  Let's change it to

1    the issue there is where is there any evidence that LAN knew

2    or should have known that any of that was happening?  They

3    didn't.  And that is the point that we have made repeatedly

4    and which there is no evidence to the contrary to suggest that

5    they had any idea of what was going on because they were

6    affirmatively told whenever they made inquiry, it's okay.

7         The examples that are in the record, Warren Green in

8    the summer of 2013 -- I mean, 2014 after the switch makes an

9    inquiry.  How are you doing?  And he's told we're making our

10   numbers.  No indication, hey, we've got a problem.  Even

11   though, even though the MDEQ and the City of Flint are

12   directly talking about whether or not they are going to be

13   using or measuring or monitoring phosphates.

14        In the fall of 2014, do you want us to help?  No.  In

15   February of 2015 --

16        THE COURT:  Yes.  And we went through this earlier

17   today.  But for the sake of argument, because I'm trying to

18   make a decision here, I'll be looking back at the depositions

19   and so on.  But for the purpose of our argument, let's assume

20   that LAN knew or should have known after the switch that

21   corrosion control, phosphates in particular, were not being

22   used.  Then do you still dispute proximate causation?

23        MR. KENT:  Oh, absolutely, Your Honor.  And I base

24   that on two things.  One that is part of our defensive case

25   which is our own experts.  As I've said before, own experts

say if they had just done the lime softening and PH balancing, they would having good enough, the orthophosphates not necessarily required.

And in fact, it's part of the summary judgment record because we have that from the MDEQ and from Warren Green and from Mr. Humann himself that says lime only softening --

THE COURT: Let's assume -- okay. Remember the part where if I start talking you'll stop talking that we discussed earlier.

MR. KENT: Yes.

THE COURT: And I don't know if you don't hear me. Because this also happened in the courtroom.

MR. KENT: Correct.

THE COURT: So it's also possible I'm just not speaking loudly enough. And so I'll speak louder.

But let's assume for the sake of our argument that LAN knew or should have known that the lime soda, that the softening, and the phosphate was not being used, then do you -- can you identify a superseded or intervening cause?

MR. KENT: I don't think that comes into effect there because all of the events have already taken place under your assumption, if I follow it correctly.

THE COURT: The events that have taken place -- Okay. Here we are. The event -- I might just do this so that way we're not talking over each other. And I apologize for

1    breaking in.

2          But the events that have taken place is the switch

3    April 25, 2014.  And a decision after March of 2014 not to use

4    softening and not to use corrosion control.  So then if we can

5    pinpoint a point where LAN knew or should have known of that

6    and they had a duty to warn, is there another superseded cause

7    that you can identify?

8          MR. KENT:  Because all the events have taken place --

9    I guess -- because we're hypothesizing about this, it would go

10   back to -- I think it would go back to this.

11         Let's say LAN had a duty to warn and they said --

12   let's say that they did warn.  They did say, hey, you're

13   making a mistake.  The question then becomes is there any

14   evidence to suggest that would have had any effect whatsoever?

15   And the answer is, no.  And the record says just the opposite.

16   The evidence says no --

17         THE COURT:  That's where I'm going to -- that's where

18   I'm going to turn to Mr. Stern.  Because we had this argument

19   yesterday with VNA and we had certain system from Mr. Ambrose

20   that if VNA had insisted on corrosion control, he might have

21   listened in a different manner and so on.

22         So let me turn to Mr. Stern and hear what your

23   response is to that.  Would it have made a difference if LAN

24   had said stop the train, use either soda ash or phosphates?

25         MR. STERN:  Yes, it would have made a difference.

```
 1    And the fact that Dougherty Johnson says that for him it
 2    wouldn't have made a difference is not of any moment.  The
 3    reality is that because LAN didn't do it, we have no idea of
 4    what the effect of them having done it would have been.
 5          The only reason we raised issues with VNA in terms of
 6    would it have made a difference or wouldn't it have made a
 7    difference is because VNA by its own defense in the case says
 8    we came in so late in the game.  We came in so late in 2015.
 9    The ship had already left the shore.
10          That's been their argument since the beginning of
11    time as it relates to the Flint Water Crisis.  And so it makes
12    sense as part of litigation to find out eight months after a
13    water switch what would or would not have happened had that
14    engineer done or said something eight months after the water
15    switch based on VNA's own timing.
16          LAN was the engineer that the city actually went to
17    to get recommendations.  LAN was the engineer that was hired
18    in 2011 to make a determination about what was required in
19    order to safely utilize the Flint water treatment plant by way
20    of the Flint River.
21          So VNA and LAN stand in two very different places in
22    terms of trying to make a determination about what someone
23    would or would not have done.
24          In 2011, LAN's task, their very specific task was to
25    identify water quality issues and make a determination about
```

1    how to best treat the water.  By VNA's admissions, when it

2    came in in 2015, all it was tasked to do was TTHMs.

3              It's a different question to the governor of Michigan

4    to say would you have listened to VNA in light of the fact

5    that their scope of work was only TTHMs, in light of the fact

6    that LAN's -- that VNA's defense is we came in eight months

7    later than it is for LAN who was there three years before the

8    switch, had been there during the process of the actual

9    switch, was on the ground with folks from the DEQ when they

10   found out that there were not going to be utilization of the

11   things that their 2011 report recommended.

12             So to hang their hat on Duffy -- on Dougherty Johnson

13   who says, well, yeah, we did this because it was the DEQ who

14   told us to do this.  We have no idea if they would have

15   listened or not.  But I would put to the Court that LAN was in

16   the best position.

17             They were in the best position.  Better than DEQ.

18   Better than the water managers on the ground who Mr. Kent said

19   were experts.  Better even than VNA at that point in time

20   because they were the only ones ever tasked other than Tucker

21   Young and Jackson that did a supplement report at some point

22   in time.  They were the only ones ever tasked with that actual

23   question.

24             And so while VNA was never tasked with four years

25   before a water switch do an analysis to make a determination

1    if the water switch can be done safely, the very folks who

2    needed to hear in that moment in time whether it was March

3    2014 or March 2013 or May or June or July 2014 after the water

4    switch, the best folks in any position to make that

5    recommendation, to make that statement, was LAN.  And it would

6    be to the folks who actually hired them for that advice.

7              THE COURT:  Okay.

8              MR. ERICKSON:  Your Honor, I'd like to just mention a

9    couple of things in response to that.  The record is full of

10   things where LAN was diligent in approaching the city.  LAN

11   approached the city in the -- they were approached regarding

12   TTHM in the fall of 2014.  They said, hey, we want to do a

13   broad study regarding finished water quality.  And the city

14   said, no, we're sending out an RFP.  We're going to have

15   someone else do that.

16             Then Veolia came in, did its work, issued a report.

17   LAN asked the city, hey, can we help you implement this

18   phosphate recommendation?  The city said, no, we're going to

19   wait.  We're going to do the GAC filtration thing.  And then

20   LAN specifically offered and we have it in the record, the two

21   client additional services authorization forms when LAN even

22   offered to have a water treatment engineer at the water plant

23   on an ongoing basis to help address things.  And the city

24   said, no, we're not going to do that.

25             MR. STERN:  Your Honor, I'm -- sorry, Phil.  I'm

1    happy that Mr. Erickson jumped in.  Because now we know for

2    certain based on his own argument that LAN absolutely knew

3    there was a problem.  I mean, why is LAN asking to do all of

4    those things if there's no issues to address?  I mean --

5              MR. ERICKSON:  Your Honor, LAN --

6              THE COURT:  Mr. Stern, I'm going to let Mr. Erickson

7    just finish this portion of the argument and you can certainly

8    respond.

9              MR. ERICKSON:  Your Honor, LAN was aware that there

10   was an issue -- they became aware in the fall of 2014 that

11   there had been an issue regarding E. Coli.  They were aware

12   that there was a TTHM issue.  They said, hey, let us, you

13   know, take a look at finished water quality.  The city said,

14   no, we're sending out an RFP.  We're going to hire a different

15   water engineer to do that.

16             And then as Mr. Kent said earlier, they attached

17   LAN's report to their RFP.  Then after the Veolia report was

18   issued in March of 2015, LAN asked to assist with

19   implementation of the report.  And specifically as noted in

20   the attachments to our brief, specifically the client

21   additional services authorization forms, LAN offered to have a

22   water treatment engineer at the plant.  And they said, no, you

23   know, we're not going to do that.

24             THE COURT:  Okay.  All right.  So Mr. Kent is muted.

25   I think he --

1    MR. KENT:  I appreciate Mr. Erickson's recitation of

2    what I was going to tell you.  But let me put the capstone on

3    that in two respects and I'll be brief.

4        One is that we did ask.  Going through all of those

5    types of examples, we asked Mr. Humann, now are you going to

6    fault LAN in any way, any breach of the standard of care for

7    not doing anything when the city says no, thank you?  When LAN

8    offers, the city turns him down, can you fault LAN?

9        And the plaintiffs expert witness says, no, I cannot.

10   And the reason is from his own experience as he went through

11   at length.  He works off of contracts.  He works off of change

12   orders.  He works off of when dealing with the government.

13   He's only going to do what they tell him to do.  He's only

14   going to do what he's authorized to do.  He cannot fault them

15   for things that they have been turned down on.

16       And let's put it back once more into the second point

17   is --

18       THE COURT:  But isn't Humann talking about -- isn't

19   Humann talking about doing actual work?  You can't fault LAN

20   for not using phosphate if they weren't hired to use phosphate

21   or to be the ones to do a particular task or a particular

22   investigation.  But here I think the plaintiffs' argument is

23   there was a duty to warn, which is not the same as a duty to

24   perform an affirmative task.  It's a duty to warn.

25       MR. KENT:  Well, respectfully, I don't see the

1   distinction.  I think that's too fine a distinction over his

2   testimony.  He was talking in the broader sense.

3           But it goes further to the point of that you've asked

4   of intervening cause, would it have made any difference?  Mr.

5   Stern admitted there's no way to know.  Mr. Humann says no way

6   to know.  I cannot tell you it would have made any difference

7   beyond that.  He says I can't even tell you that phosphates

8   would have made any difference.

9           The advice I'm so critical of, I have done no study,

10  no nothing to say it would have made a difference.  The record

11  says that to the contrary there is no reason to believe that

12  anything said would have made a difference.  The task force

13  said the MDEQ was entrenched in its interpretation of the lead

14  and copper rule.

15          THE COURT:  Let me stop you right there.

16          MR. KENT:  Yes.

17          THE COURT:  Let me stop you there and ask you about

18  that.  So as I understand this, the City of Flint is saying

19  MDEQ told us we don't need to use phosphates and don't do it.

20  So would LAN have then had an obligation to warn that should

21  have gone to the state at that point?

22          The city's under emergency management.  The city is

23  nonresponsive.  They're saying the state is telling us what to

24  do.  Did the duty to warn --

25          MR. CAMPBELL:  Absolutely not, Your Honor.

```
1              THE COURT:  And why not.

2              MR. KENT:  Because the state is the one who is

3    interpreting and enforcing the rule.  They are the people who

4    are the engineers.

5              Again, the assumption behind all of these arguments

6    is that LAN was somehow the repository of secret wisdom and

7    knowledge that nobody else knew, nobody else could understand,

8    and if only LAN had spoken up, ah, the light bulb would have

9    gone off and everyone would have said, oh, yeah.  Yeah, you're

10   right.  This is a mistake.

11             That discussion had taken place way back in the

12   summer of 2013 when LAN said why are you doing this?  And the

13   MDEQ said, this is the way that you apply this rule.

14             So there is no duty to warn somebody else who is in

15   charge, your boss who is in charge.  And when I say your boss,

16   that's the regulatory boss.

17             And let's follow it to it's logical extreme now.

18   Let's follow this to where the conclusion is.  Remember what

19   this lawsuit is about is liability for physical harm.

20             If the argument is you had a duty to warn, the

21   question is, okay, would you have fulfilled your duty if you

22   had made the warning?  But the MDEQ, just as the task force

23   concluded and as the evidence we put in unquestionably shows,

24   the MDEQ said, no.  Thank you, very much.  And the harm had

25   concurred -- the harm happened.
```

November 23, 2021

```
 1           Would we then have satisfied our duty?  Would we then
 2    have avoided liability?  According to the plaintiffs, their
 3    theory would say, well, yes.  Well, if that were true, then
 4    what's the point of this?  Because this is a lawsuit about
 5    harm to people.
 6           The only way that their theory of warning the
 7    government and controlling government action, the only way it
 8    works is if we are successful and we impose our will on the
 9    government.  If you can't prove that, then there is no
10    liability.  And if you only can control the government, then
11    again there can be no liability.
12           No standard of care can move to controlling the acts
13    of government.  And again, Mr. Humann himself agrees.  This is
14    not a point on which Mr. Humann tried to defend the contrary.
15    He said, well, no, the city is the one who is responsible
16    because it's the operator.  And no, the consultant cannot
17    control the city's actions.  No, the consultant cannot control
18    the state's actions.  Consultants rarely can have any effect
19    whatsoever on those types of decisions.
20           So we get nowhere by trying to impose a duty to warn
21    on other people particularly when the evidence in the
22    record -- unquestioned evidence.  The autopsy report says this
23    was government intransigent.  We quote them.  They said it's
24    persistent delays in the face of, quote, irrefutable evidence.
25    The government refuses to take action.  Irrefutable evidence.
```

 1   Intransigent disregard of compelling evidence, callous, and

 2   dismissive responses to citizens' expressed concerns.

 3          The governor's office has infighting where senior

 4   staff are saying, you need to do something, and nothing

 5   happens.  There is a public meeting in Flint, City of Flint,

 6   in March of 2015 where the city council votes 7 to 1, we need

 7   to return to the City of Detroit.

 8          THE COURT:  I understand that.

 9          MR. KENT:  And the emergency manager says, not going

10   to do it.  It's incomprehensible that you would want to spend

11   $13 million, which is what it would cost.

12          This is not a function of they didn't know better.

13   This is a function of a conscious decision by the people in

14   charge to take action in the face of all of this stuff.  So

15   it's not as if there's anything to suggest either a duty

16   existed or that it could have made a bit of difference.

17          THE COURT:  Okay.

18          MR. KENT:  The evidence goes the opposite.

19          THE COURT:  All right.  Mr. Stern, do you want to

20   respond to that any further?

21          MR. STERN:  I will try very briefly because there's a

22   lot there.

23          First, I would urge the Court to read Mr. Humann's

24   deposition testimony.  The numbers of times that Mr. Kent has

25   respectfully I think misrepresented the context in which

1   Mr. Humann testified is too plentiful for me to address each

2   and every one.  But I feel extremely confident that if Your

3   Honor reads his testimony, the context will become clear about

4   his answer to very specific questions and you might juxtapose

5   that with the arguments that have been made about those

6   answers.

7            THE COURT:  And I have read portions and I will

8   continue to read it.

9            MR. STERN:  When it comes to this issue of

10  superseding intervening facts, the defendants cite to Coy I

11  believe in their brief in support of their position.  And what

12  Coy goes on to say is that generally when there are no policy

13  considerations involved, questions of intervening fact,

14  intervening acts of negligence, whether they're superseding

15  cause are questions for the jury.  Here I think clearly these

16  are questions for the jury.

17           And yesterday VNA brought it up and today LAN brings

18  it up and I find it -- I don't know what I find it.  But it's

19  interesting that they keep relying on this task force report

20  and they talk about the callous indifference to consumer

21  complaints.  And this was a government failure.

22           Nowhere in the report does it says there was a

23  callous indifference to the recommendations of LAN or VNA.

24  Nowhere in the report does it says there was a callous

25  indifference on the part of the government actors for failing

1   to heed the strong warnings of the engineer that four years

2   ago had told them that the water needed to be treated a

3   certain way or else it wouldn't be safe.

4          And so I would posit to the Court that part of the

5   reason why LAN and VNA don't appear in that report is because

6   they didn't fulfill their professional obligations by warning

7   anybody about anything such that the failure of the government

8   to heed those warnings would make its way to a report.

9          So Your Honor, the report is a double edge sword for

10  LAN and VNA.  My guess is LAN and VNA would have been

11  completely exonerated in this litigation had there been a

12  report done by the government task force that said something

13  to the effect of, despite LAN's and VNA's repeated urgency and

14  repeated urging that corrosion control needed to be ordered

15  immediately, that Flint needed to switch back to the DWSD

16  immediately, or children would become brain damaged, and the

17  government failed and the DEQ failed, my guess is they would

18  have made their way into the report.

19         But the very fact that they didn't fulfill the

20  standard of care that our expert says which may have lead them

21  to not appear in the report at all in a government autopsy of

22  the government is in and of itself on its face not indicative

23  of LAN's not being a part of this case post summary judgment.

24         THE COURT:  Is there anything in the record, Mr.

25  Stern, that would suggest that the city or MDEQ did not know

November 23, 2021

1    the health risks of not using corrosion control?

2            MR. STERN:  There's a number of depositions of low

3    level employees -- yes.  I mean, I can find for you Howard

4    Croft's deposition when examined about did you know -- I mean,

5    he almost started crying at one point during his deposition

6    because he has children -- he lives in Flint.  He has children

7    in Flint.

8            And it's clear from Howard Croft's deposition, who

9    was one of the highest ranking folks associated with the water

10   treatment plant at the time, that he had no idea of what was

11   happening.  He had no idea what the effects of the lack of

12   corrosion control was as evidenced by his own reaction to what

13   may have been happening to his children at the time.

14           You know, he goes through -- I really think Howard

15   Croft's deposition, multiple depositions, is somewhat

16   instructive.  He talks about his own -- one of the things that

17   Mr. Kent said earlier is how the experts were the folks at the

18   water treatment plant.  And I made a very subtle reference if

19   maybe not so subtle about Howard Croft.

20           Legitimately prior to Howard Croft gaining the

21   position that he had with the City of Flint, his -- the

22   biggest job that he had ever had was at McDonald's.  He

23   literally went from working at McDonald's to becoming the

24   plant is supervisor or whatever his official position was.

25           Yet somehow VNA and LAN and today it's LAN, they

1   really believe that nobody was in a better position than

2   Howard Croft or, you know, Duffy Johnson, or someone on the

3   ground to know precisely what the right cocktail was for

4   corrosion control and what the effects were.

5           So I don't know if there's a specific question that

6   was asked of a city employee that says, hey, did you know that

7   if there was no corrosion control then kids would be brain

8   damaged or where there was a potential for a child to be

9   injured like that.

10          But it is clear from most of the city employee's

11  testimony that they were very low level folks not all of whom

12  had very much experience when it came to water treatment as

13  evidenced by the fact that they're relying, according to

14  Mr. Kent, on the DEQ.

15          If the folks in the city who had hired LAN to do this

16  analysis four years earlier were so sophisticated that they

17  understood the context of corrosion control, the effects of

18  not having corrosion control, why hire LAN in the first place

19  and why be dependent on the DEQ for marching orders to

20  determine what or would not have to happen for corrosion

21  control.

22          One argument completely blows out of the water the

23  other.  You can't be the experts on the ground and know about

24  corrosion control and it's not our fault it's the city's

25  fault, but simultaneously say that -- you know, I guess you

```
 1    just can't make that argument, Judge, or at least not with a
 2    straight face.
 3              THE COURT:  Okay.  Is there anything further,
 4    Mr. Kent?
 5              MR. STERN:  You're Honor, can I say --
 6              MR. KENT:  Your Honor, I'll just toss in -- oh, I'm
 7    sorry, Corey.  Did you want to add?
 8              MR. STERN:  I just wanted to make one more point that
 9    I think is important.
10              THE COURT:  Okay.
11              MR. STERN:  It's clear -- it's clear, I think to
12    everybody, that in 2015 -- and VNA argues this.  They argue it
13    profusely.
14              The fact that they recommended phosphates and some
15    type of inhibitor on the ground at the plant and then it still
16    didn't happen, it's not that the city necessarily, you know,
17    gave VNA the stiff arm and said we're not going to do it even
18    though we know it should happen, there's a question of fact
19    about why they wouldn't have done that.
20              And there's certainly enough evidence based on their
21    own experience, based on what their pedigree was leading up to
22    and during the water crisis.  They just didn't understand what
23    that meant.  And if they did, there would have never been a
24    reason to hire LAN.  There would have never been a reason to
25    hire VNA.
```

1          At the crux of these arguments, LAN today is

2    essentially saying they didn't need us for anything.  They

3    didn't need us to tell them in 2011 how to fix the plant, how

4    to make the water good.  They didn't need us in 2013.  They

5    didn't need us in 2014.  They really didn't need us after 2014

6    because they knew everything and they didn't know anything

7    more than we did.  And even if we had told them, they wouldn't

8    have done anything about it.

9          Well, they didn't tell them so we don't know what

10   they would have done about it.  And it's clear that they

11   didn't know as much or they wouldn't have hired LAN or VNA for

12   that matter in the first place.

13          THE COURT:  Okay.  Thank you, Mr. Stern.

14          MR. KENT:  You know, Judge, there's a lot that could

15   be said.  I think that the complete illogic of an argument

16   that a government agency hires a specialty firm for specialty

17   purposes means that they know nothing about their jobs and

18   about what the government regulations are that apply to them

19   as a provider of public water just should be apparent on its

20   face.

21          The same holds true for saying if Mr. Croft didn't

22   understand the implications of everything then that's the end

23   of it.  The fact is that the people who were in charge of

24   making these -- implementing these decisions, making these

25   recommendations, doing the work for which they were hired and

November 23, 2021

```
 1   trained and are required by law to do, the operator of the
 2   plant, the plant supervisor, or the deputy director of the
 3   public works department, they all knew and understood there is
 4   nothing in the record to create this suggestion that the
 5   people working for the city in these tasks were empty vessels
 6   who knew nothing.  And that the only source of knowledge they
 7   had --
 8            THE COURT:  That's -- remember.  That's why I was
 9   asking questions of that nature.
10            MR. ERICKSON:  Your Honor, if I could make one point
11   quickly?
12            MR. KENT:  If I may finish?
13            THE COURT:  Mr. Kent is not going to cede the floor
14   to you, Mr. Erickson.
15            MR. KENT:  Yeah.
16            MR. ERICKSON:  Okay.
17            THE COURT:  I can't do anything about that.
18            MR. KENT:  Doesn't make sense to say that and it
19   flies in the face of even the most rudimentary common sense.
20   And cannot fill the vacuum that exists here when their expert
21   says nothing of this.
22            We're trying to fill a vacuum that their expert never
23   discussed and he could not discuss because he did not read,
24   know, study, evaluate.  He has a blank slate on those subjects
25   and therefore offered no opinion.
```

 1          THE COURT:  Okay.

 2          MR. KENT:  And no support for his opinion.  And when

 3    shown facts, when shown the evidence, he always retreated to

 4    say, well, you're right.  That's where this came in the grand

 5    scheme of things of that.  Okay.

 6          I cede the floor to Mr. Erickson.  And I'll be done,

 7    Judge, unless you raise something else.

 8          THE COURT:  No, I don't have any further questions.

 9    Mr. Erickson?  You're muted.

10          MR. MASON:  You're on mute.

11          MR. ERICKSON:  Sorry, Your Honor.

12          The only thing I was going to say is that you asked a

13    question about was there any testimony from anybody at the

14    city or the state that they didn't need to be warned.  And we

15    did include in our reply brief reference to Mr. Glasgow's

16    testimony about his knowledge of the reasons of the lead and

17    copper rule.  And he said that he didn't need anybody --

18    anyone to tell him that lead in the water could cause serious

19    health problems.

20          And it's Exhibit 81 in our -- attached to the reply

21    brief.  And pages 98, 99, and 753, and 754 of his testimony.

22          THE COURT:  Okay.  That's good to know.  Can -- I'd

23    like to get the full Glasgow deposition and not just the

24    excerpts that have been attached.  Who can send that to me?

25          MR. KENT:  We can.  We'll be glad to do so.

1          THE COURT:  So Mr. Kent or Mr. Erickson, someone will

2   get that to Leslie Calhoun.

3          MR. STERN:  So Judge, because Mr. Erickson just

4   jumped in there, I just want to respond for 10 seconds.  For

5   30 seconds.

6          This is another instance where the defendants are

7   relying on one thing when it comes to someone like Glasgow and

8   then saying something completely different about him in

9   another instance.

10          They're hanging their hat on the fact that Glasgow

11   told the state that, you know, if this thing goes forward, if

12   this goes forward it's against my -- it's against my wishes or

13   it's against my will and it's not in the best interest of the

14   community, and the DEQ apparently either didn't get the

15   message, didn't see the message, didn't actually hear the

16   message, and did it anyway.

17          Yet at the same time, LAN wants you to believe that

18   it was the folks in the city on the ground who were the

19   ultimate decisionmakers and were the experts on this and could

20   have done something about it.

21          There's nowhere in the record where LAN goes to DEQ

22   and says even knowing, even knowing that DEQ was the ultimate

23   decisionmaker, even knowing that on the ground the city says

24   to LAN, hey, we're just going to go with the six month

25   testing.  Where in the record does it say that LAN went to DEQ

November 23, 2021

```
 1   and said, guys, kids are going to be brain damaged?  Look at
 2   our 2011 report.  It's about to hit the fan.
 3           And Humann's point is that the duty of care requires
 4   someone in LAN's position to warn someone who could do
 5   something about it.  So they'll actually do something about
 6   it.
 7           So a warning of Glasgow, the guy that they say was a
 8   straw man anyway because nobody would listen to him by way as
 9   evidence of his email, that's nonsensical.
10           THE COURT:  Okay.  All right.  Well thank you, all,
11   for the argument this morning and this afternoon.  And I will
12   take the motions, all three motions, under advisement and I
13   think Judge Farah is doing the same thing with respect to the
14   LAD motion.
15           And we will have some further discussion I believe on
16   Monday regarding jury questionnaires.  And at that point, I'll
17   try to foreshadow or tell you what timing I think I can meet
18   to take a chapter out of Judge Farah practice of trying to let
19   people know when decisions will be made.
20           I think that meeting will be at 10:00 AM on Monday.
21   And that's an informal meeting regarding jury questionnaire
22   issues.  It's not a substantive meeting.  So that's what we'll
23   do.
24           And I hope that everybody is able to enjoy time with
25   family or loved ones or in any way that you enjoy spending
```

```
1    time over the holiday.  And I will see you all very soon.  So     01

2    take good care, get a booster, and stay healthy.  Thank you.      01

3                    (Proceedings Concluded)                           01

4                -              -              -

5

6              CERTIFICATE OF OFFICIAL COURT REPORTER

7         I, Jeseca C. Eddington, Federal Official Court

8    Reporter, do hereby certify the foregoing 139 pages are a true

9    and correct transcript of the above entitled proceedings.

10   /s/ JESECA C. EDDINGTON_____     12/2/2021_
     Jeseca C. Eddington, RDR, RMR, CRR, FCRR         Date
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```