# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

*In re* Flint Water Cases

Judith E. Levy
United States District Judge

_____/

This Order Relates To:

*Bellwether I Cases*
Case No. 17-10164

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS VEOLIA NORTH AMERICA, LLC, VEOLIA NORTH AMERICA, INC., AND VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC'S MOTION TO EXCLUDE THE TESTIMONY AND REPORT OF DR. MIRA KRISHNAN [341]**

This opinion is the third in a series addressing the admissibility of the testimony and reports of eight experts retained by Plaintiffs in anticipation of the first bellwether trial, currently set to begin on February 15, 2022. Defendants argue that none of these experts can meet the standards set by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Currently before the Court is the motion by Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC (collectively "VNA") to exclude the testimony and report of Dr. Mira Krishnan (ECF No. 341.) The LAN and LAD Defendants join VNA's motion. (ECF No. 344.) For the reasons set forth below, VNA's motion to exclude is GRANTED IN PART and DENIED IN PART.

## I.    Background

Dr. Mira Krishnan is a licensed clinical neuropsychologist with advanced degrees in nuclear engineering and clinical psychology. (ECF No. 366-2.) She works as a clinical assistant professor in the Department of Psychiatry at Michigan State University, and also runs a small business which provides neuropsychological evaluations, treatment, and consulting services. *Id.* Her qualifications as an expert are not in dispute.

Dr. Krishnan is Plaintiffs' expert on the element of injury. She was retained to conduct a full neurocognitive evaluation of each of the four bellwether Plaintiffs. Dr. Krishnan examined each child, interviewed one or both parents, and conducted a battery of standardized tests to measure IQ, academic progress, and behavioral functioning.  (ECF No. 330-55, No.

2

330-56, No. 330-57, No. 330-58.) Dr. Krishnan testified that she uses the same tests in her personal clinical practice. (ECF No. 428, PageID.32297-32298.) To write her reports in this case, Dr. Krishan also reviewed each Plaintiff's medical and academic records and read the deposition testimony of their parents. *Id.*

Dr. Krishnan's observations and conclusions for each Plaintiff are summarized below.

**A. D.W.**

D.W. struggles to focus on her work at school, and sometimes exhibits defiant, oppositional, or disrespectful behaviors. (ECF No. 330-58, PageID.15748.) Standardized testing revealed inconsistent performance in tasks involving attention and cognitive efficiency. *Id.* Moreover, testing showed a substantial visual problem-solving deficit as compared to her verbal problem-solving skills. *Id.* Such deficiencies are often correlated with social problems, and D.W.'s parents report that she has some social difficulties. *Id.* Because D.W.'s symptoms resemble, but are not entirely consistent with, nonverbal learning disorder and attention deficit hyperactivity disorder ("ADHD"), Dr.

3

Krishnan ultimately diagnosed D.W. with mild neurocognitive disorder. (*Id.* at PageId.15748.)

Dr. Krishnan recommends that D.W. undergo complete testing to evaluate the need for a 504 plan.[1] *Id.* She further indicates that because of her low visual reasoning index, D.W. may have trouble obtaining a college degree. *Id.* Finally, she estimates that due to her mild neurocognitive disorder, D.W.'s risk of high-school dropout is about 15%, as compared to 5% in the general population; for similar reasons, Dr. Krishnan estimates that her likelihood of dropping out in college is 25-50%. As a result, Dr. Krishan concludes that there is a substantial risk that D.W. will have to accept work below her potential. *Id.*

**B. R.V.**

R.V.'s family reported a history of behavioral problems, which was in part reflected by difficulties at school. Most of R.V.'s standardized testing came back normal or even above average. (ECF No. 330-57, PageID.15732.) She did show signs of executive deficits, however. For instance, while she performed well on memory testing, R.V.'s

---

[1] Children who have a disability under Section 504 of the Rehabilitation Act (29 U.S.C. 794) are entitled to a '504-plan' providing them with appropriate accommodations, to ensure that their access to education is not impeded.

4

performance dropped severely when a distraction was introduced. *Id.* Testing also revealed some deficits in aspects of visual reasoning. *Id.*

Dr. Krishnan concluded that any emotional problems R.V. might have were not clinically significant. (*Id.* at PageID.15734.) Nor did R.V. exhibit signs of ADHD or depression, for which there is a family history. *Id.* Instead, Dr. Krishnan concluded that the mild deficiencies captured by testing were best explained by a diagnosis of mild neurocognitive disorder. *Id.*

Dr. Krishnan notes that the visual reasoning deficits may develop into a nonverbal learning disability as R.V. ages and is subjected to more advanced academic tasks. *Id.* She therefore predicts that there is a 25-50% likelihood R.V. will need tutoring or an individualized education plan ("IEP").[2] Finally, Dr. Krishnan notes that R.V. is likely to graduate from both high school and college, but that her cognitive deficits will make it more challenging for her to complete college. Accordingly, there is some risk that she will end up working below her potential. *Id.*

---

[2] An IEP or Individual Education Program is a plan developed for children with special educational needs, specifying the student's goals and the methods to be used to obtain them. The Individuals with Disabilities Education Act requires the writing and regular updating of IEPs for qualifying children. *See* 34 C.F.R. §§300.320 *et seq* (setting forth IEP requirements).

### C. A.T.

Dr. Krishnan observed mild fidgeting and impulsivity during her examination of A.T. (ECF No. 330-56, PageID.15721.) Standardized testing revealed an unusual imbalance: A.T. performed well above grade level on reading, and well below grade level on mathematics (more than two grades below, *Id.* at PageID.15724). Tests also revealed some deficiencies in higher-level attention and verbal reasoning. *Id.* Finally, A.T. exhibited weaker than expected independence skills, social withdrawal, and some mild aggression and mood problems. *Id.*

According to Dr. Krishnan, the discrepant test results for A.T. do not suggest ADHD. Instead, they are better interpreted as indicative of a mood disorder and a mild neurocognitive disorder. (*Id.* at PageID.15723.)

Dr. Krishnan concludes that A.T. will need an IEP with special education support to resolve her significant deficits in math. (*Id.* at PageID.15724.) She expects that A.T.'s learning and attention problems will increase the risk of negative outcomes but anticipates that A.T. will be able to graduate from high school. *Id.* However, Dr. Krishnan

estimates that it is 30-50% likely A.T. will not be able to complete college training due to her learning and attention problems.

**D. E.S.**

E.S.' parents report that E.S. has a great deal of hyperactivity. (ECF No. 330-55, PageID.15707.) This was reflected in Dr. Krishnan's observations as well: during the interview and testing, E.S. often required instructions to be repeated. (*Id.* at PageID.15709.) Overall intellectual functioning was normal, with the exception of below-grade level math skills. *Id.* E.S.' performance on initial learning testing (i.e., short-term memory) was borderline impaired. *Id.* Throughout his testing, E.S. was capable of sustained focus, but only when he experienced the tests as demanding. This resulted in inconsistent test scores, with poor performance on easier tasks and better performance on more difficult ones. *Id.* E.S.' hyperactivity was rated at 97% worse than his peers, and his medical record includes at least one injury caused by impulsive behavior. (*Id.* at PageId.15712.)

Dr. Krishnan diagnosed E.S. with ADHD. While E.S. does not presently require an IEP, decrements in functioning often do not fully present themselves until later in elementary school. Accordingly, Dr.

Krishnan estimates that there is a 25-50% chance E.S. will require an IEP in the future. There is a similar likelihood that E.S. will need approximately one-hour of tutoring a day. (*Id.* at PageID.15713.) Dr. Krishnan estimates a two- to three-fold increase in the likelihood that E.S. will drop out of high school (a 10-15% probability) and a 25-50% probability that he will drop out of college. Accordingly, there is a risk E.S. will end up working below his potential. *Id.*

## II.   Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which sets forth three requirements: (1) the witness must be qualified, (2) the testimony must be relevant, and (3) the testimony must be reliable. Fed. R. Evid. 702; *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). As the Supreme Court explained in *Daubert*, Rule 702 imposes a "gatekeeping" obligation on the courts to ensure that scientific testimony "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589; *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

*Daubert* provides a non-exclusive list of factors courts may consider when evaluating reliability: (1) whether the theory or technique at the

basis of the opinion is testable or has been tested, (2) whether it has been published and subjected to peer review, (3) what the known error rates are, and (4) whether the theory or technique is generally accepted. *Daubert*, 509 U.S. at 593; *see also In re Scrap Metal*, 527 F.3d at 529 (listing same factors). Not every factor needs to be present in every instance, and courts may adapt them as appropriate for the facts of an individual case. *Kumho* 526 U.S. at 150.

"Rejection of expert testimony is the exception, rather than the rule." *United States v. LaVictor,* 848 F.3d 428, 442 (6th Cir. 2017) (quoting *In re Scrap Metal*, 527 F.3d at 529–30)). Nevertheless, the burden is on Plaintiffs to show by a "preponderance of proof" that the proffered expert meets the standards of Rule 702 as interpreted by *Daubert*. *Pride v. BIC Corp*., 218 F.3d 566, 578 (6th Cir. 2000) (quoting *Daubert*, 509 U.S. at 592).

## III. Analysis

According to VNA, none of Dr. Krishnan's opinions are admissible. VNA objects to all of Dr. Krishnan's diagnoses because, in its view, Dr. Krishnan did not appropriately apply the DSM-V criteria. (ECF No. 330-5, PageID.14337-14351.) In addition, VNA argues that Dr. Krishnan's

predictions regarding the likelihood Plaintiffs will graduate from high school or college are too speculative to be admissible.

Dr. Krishan's diagnoses are plainly admissible. However, her predictive opinions are partly speculative and will therefore be limited as set forth below.

### A. Reliability of Diagnoses

VNA argues that all of Dr. Krishnan's diagnoses must be excluded because (1) she only reached them to help Plaintiffs find a diagnostic "hook" for their lawsuit, (2) she recanted them during her deposition, and (3) she failed in every case to follow the objective guidelines set forth by the DSM-V. None of these arguments are persuasive.

Contrary to VNA's assertions, Dr. Krishnan did not "implicitly acknowledge[]" (ECF No. 330-5, PageID.14341) that she only diagnosed these Plaintiffs with a disorder to provide them with a hook for this lawsuit. VNA's argument rests on a serious mischaracterization of Dr. Krishnan's testimony. VNA claims that Dr. Krishnan "implicitly acknowledged that her job was to find a diagnostic hook to support Plaintiffs' claims, observing that 'people don't file lawsuits if they don't

think they were injured'." (*Id.* at PageID.14344.) But that is a soundbite

taken from the following testimony:

> In general, a bare—a limitation with neuropsychology is that we don't evaluate people who don't think that they have problems very often. People don't file lawsuits if they don't think that they were injured, people don't come to clinical attention if they don't think that they have a problem either. And so, in general, neuropsychologists use a variety of ways of estimating the likelihood of decline from expected functioning.

(ECF No. 427, PageID.32114.) Nothing here as much as suggests that Dr.

Krishnan acted improperly.

VNA's frequent claims that Dr. Krishnan "pivoted" from her initial

diagnoses, only to eventually insist "that the correct diagnosis was not in

the DSM at all," are similarly baseless. (ECF No. 330-5, PageID.14341.)

When VNA's counsel pressed her on the possible weakness in her

diagnoses, Dr. Krishnan testified that an alternative diagnosis,

"neurodevelopmental disorder," would also have been appropriate for

some of the Plaintiffs. She admits that "it might have been better to use

that diagnostic code." (ECF No. 427, PageID.32109.) But context matters

here, too. In the very next sentence, Dr. Krishnan clarifies: "but the

meaning [of both diagnoses] is the same in this case." (*Id.*) And when she

11

is asked whether she meant to recant her earlier diagnosis, she says that she did not:

> Q: So are you now saying that your diagnosis…is mild neuro—or mild neurodevelopmental disorder?
>
> A: I never said that.
>
> Q: What is it?
>
> A: I—so, it can be diagnosed…using either the code that I provided in my report, or neurodevelopmental disorder…And the two are used interchangeably in my experience in this kind of situation.

(*Id.* at PageID.32118-32119.) Dr. Krishnan's testimony speaks for itself.[3]

VNA next challenges Dr. Krishnan's application of the DSM-V criteria. According to VNA, Dr. Krishnan should not have diagnosed any of the Plaintiffs with 'mild neurocognitive disorder,' because the DSM-V symptoms include neurocognitive decline, which VNA believes was not present here. VNA also opines that A.T.'s emotional problems are not clinically significant (ECF No. 330-5, PageID.14347), and that Dr.

---

[3] VNA also points to testimony showing that Dr. Krishnan considered the diagnostic guides included in the ICD-10 (the 10th edition of the International Statistical Classification of Diseases and Related Health Problems). None of that testimony suggests that she now believes her earlier diagnoses to be incorrect. As before, Dr. Krishnan simply explains what other diagnostic classifications could also have fit.

Krishnan based E.S.' ADHD diagnosis on insufficient evidence (*Id.* at PageID.14348-14349.)[4]

Neither *Daubert* nor Rule 702 requires courts to scrutinize the conclusions of experts for the kinds of flaws VNA raises. *See, e.g., Daubert*, 509 U.S. at 595 (the court's "focus, of course, must be solely on principles and methodology, not on the conclusions"); *In re Scrap Metal*, 527 F.3d at 529; *United States v. Bonds*, 12 F.3d 540, 556 (6th Cir. 1993). Nor would this be a viable way of exercising the gatekeeping function envisioned in *Daubert*. Judges are not psychiatrists, and the "DSM-V is not a cookbook." *State v. Charada T.*, 106 N.Y.S.3d 725, at *20 (N.Y. Sup. Ct. 2018).

Dr. Krishnan's work easily meets the standards set forth by *Daubert* and Rule 702. *Daubert* requires only that an expert "employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Best v. Lowe's Home Ctr's, Inc.*, 563 F.3d 171, 181 (6th Cir. 2009) (quoting *Kumho Tire*, 526 U.S. at 152.)

---

[4] VNA also cites to its own expert, who disagrees with Dr. Krishnan. But it is up to a jury to decide which expert is more credible *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (citing *Cadmus v. Aetna Casualty and Surety Co.*, 1996 WL 652796 (6th Cir. Nov. 7, 1996)).

Dr. Krishnan used standard clinical practice to evaluate these Plaintiffs. (ECF No. 428, PageID.32297-32298.) That included a series of widely accepted standardized tests, thorough interviews, and a review of relevant records. Such methods are testable, *cf. Daubert*, 509 U.S. at 593, because any other clinician could run the same standardized tests, conduct the same parent interviews, and review the same records. It is based on standards that are not only published and peer-reviewed, but almost universally accepted to be reliable. *See, e.g., Johnson v. Comm'r of Soc. Sec.*, No. 1:20-CV-01505, 2021 WL 4463924 at *4, n5 (N.D. Oh., Sept. 13, 2021) (Wechsler Intelligence Scale the "traditional gold standard" in intellectual assessment) (citing Benjamin Sadock & Virginia Sadock & Pedro Ruiz, *Kaplan & Sadock's Comprehensive Textbook of Psychiatry*, Chap. 7 (10th Ed., 2014)); *United States v. Montgomery*, 2014 WL 1516147 at *26 (W.D. Tenn. 2014) (same). Nor is there any indication that Dr. Krishnan's work is unusually prone to error. Accordingly, all *Daubert* factors weigh in favor of admitting Dr. Krishnan's testimony. *Daubert*, 509 U.S. at 593; *In re Scrap Metal*, 527 F.3d at 529 (listing testability, peer-review, rate of error, and general acceptance as factors to consider).

This is not to say that so long as a clinician uses reliable methodology, she may testify to *any* diagnostic conclusion. "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citing *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.3d 1349, 1360 (6th Cir. 1992)); *See also Stephen v. Hamamoto*, No. 00-00338, 2009 WL 10676989 (D. Hawai'i, March 20, 2009) (psychologist's PTSD diagnoses unreliable because they bore too little relationship to the limited clinical information). But Dr. Krishnan's conclusions are all reasonable given the evidence.

Begin with the three mild neurocognitive disorder diagnoses. VNA argues that they are unreliable because Dr. Krishnan did not find evidence of neurocognitive decline, one of the symptoms listed in the DSM-V for this diagnosis. But, as Dr. Krishnan explained in her deposition, psychologists use "things like looking at the general intellectual level as an estimation of where a child should be and comparisons to other children who are like the child in question" to estimate whether there has been "decline" from a baseline. (ECF No. 427, PageID.32115.) Such estimations are appropriate for two reasons, Dr.

Krishnan explains. First, there are generally no objective measures of baseline functioning because psychologists "don't evaluate people who don't think that they have problems." (*Id.* at PageID.32114.) That is why "in general, neuropsychologists use a variety of ways of estimating the likelihood of decline from expected functioning." (*Id.*) In children, the primary way to do so is to use "age-corrected scaled scores—and sometimes also gender-corrected…or grade-corrected scaled scores." (*Id.*) As set forth above, Dr. Krishan conducted such standard neuropsychological tests on each Plaintiff, and those tests demonstrated "modest impairment" compared to their expected functioning. (*Id.*) Accordingly, Dr. Krishnan used reasonable measures to estimate Plaintiffs' 'decline' from their expected functioning.

Regarding A.T.'s mood disorder diagnosis, VNA objects that (1) Dr. Krishnan did not identify behavioral impairments that could impact an "important area of functioning," and (2) the documented emotional problems suffered by A.T. are not "clinically significant." (ECF No. 330-5, PageID.14347.) VNA concedes that there is *some* evidence of emotional concerns. *Id.* at PageID.14346 (VNA's brief, citing A.T.'s parent interview and Dr. Krishnan's observation that A.T. "presents with some social and

16

mood problems"). It is clearly not appropriate for a court to determine whether a particular symptom is sufficiently severe to be "clinically significant." And Dr. Krishnan identifies behavioral impairments that are affecting A.T.'s school life, surely an "important area of functioning." To be sure, the problems Dr. Krishnan describes are milder than one might expect given this diagnosis. But that is precisely the kind of "factual weakness" in the expert's conclusions that is *not* at issue in *Daubert* evaluations. *E.g., In re Scrap Metal*, 526 F.3d at 529.

Finally, VNA's position that there is too great an analytical gap between E.S.' test results (rating him 97% more hyperactive than his peers) and his ADHD diagnosis is completely without merit. VNA's primary complaint is that E.S.' parents' responses to the BASC-3 test did not support six or more of the common hyperactivity symptoms listed in the DSM-V. (ECF No. 330-5, PageID.14348-14349.) But Dr. Krishnan personally observed several of the behaviors listed, observations which she could plainly consider while making her diagnosis. In any event, there is no support for VNA's checklist-approach to psychology, which is explicitly rejected by the DSM-V itself. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* (5th

17

Ed. 2013) at 19 ("The symptoms contained in the respective diagnostic criteria sets do not constitute comprehensive definitions of underlying disorders, which encompass cognitive, emotional, behavioral, and physiological processes that are far more complex than can be described in these brief summaries.").

For these reasons, Dr. Krishnan's observations and diagnoses of all four bellwether Plaintiffs meet the standards set forth by *Daubert* and Rule 702.[5]

### A. Reliability of Predictions

VNA next objects to the predictions Dr. Krishnan makes about the educational future of each Plaintiff. Dr. Krishnan's testimony and reports include two types of predictions. First, Dr. Krishnan explains that some of the Plaintiffs may need an IEP or tutoring services in the immediate future. Second, Dr. Krishnan estimates the likelihood that each Plaintiff will be able to graduate from high school, college, or an advanced degree

---

[5] In the final paragraph of its brief, VNA claims that the unreliability of Dr. Krishnan's testimony also renders it irrelevant for purposes of Rule 702. Because Dr. Krishnan's methodology was not unreliable, this argument fails.

program. The Court agrees that Dr. Krishnan's testimony on the second issue must be limited.

The parties do not address the first type of prediction. The Court finds that those predictions are reliable because they are reasonable inferences from the Plaintiffs' test scores and are based on Dr. Krishnan's extensive clinical experience. Clinicians may rely on their professional experience to offer an opinion. After all, it is their experience that sets them apart as experts. *See, e.g., Best*, 563 F.3d at 181 (medical doctor properly based differential diagnosis on his own experience); *Dickenson v. Cardiac and Thoracic Surgery of Eastern Tenn.*, 388 F.3d 976, 980-82 (6th Cir. 2004) (reversing exclusion of medical doctor's opinions, noting that "no one denies" that experts may draw conclusions based on "extensive and specialized experience") (collecting cases).

Dr. Krishnan's estimates of the likelihood that each Plaintiff could drop out of school are significantly further removed from the clinical data she collected during her examinations. In support of her estimates, Dr. Krishnan cites to a single study, which concerned the effect of severe ADHD on the likelihood of high-school drop-out. Mats Fredriksen et al., *Childhood and persistent ADHD symptoms associated with educational*

19

*failure and long-term occupational disability in adult ADHD*, 6 ADHD 2, at 87-99 (2014). This study concluded that "childhood hyperactive-impulsive symptoms and overall severity of childhood ADHD symptoms were associated with high school dropout rates." *Id.* at 87.

As VNA points out, the Fredriksen study does not speak to the effect of mild neurocognitive disorder or mood disorder on drop-out rates. It could therefore support only the predictions regarding Plaintiff E.S. And even with respect to E.S., who was diagnosed with mild ADHD, Dr. Krishnan does not explain why his expected educational outcomes are as negative as those of the ADHD patients in the Fredriksen study.

For Plaintiffs A.T., R.V., and D.W., Dr. Krishnan's conclusions are supported exclusively by her clinical experience.[6] But Dr. Krishnan nowhere explains how she reached the percentages she provides in her report. Indeed, in her deposition she often explains that she was "not able

---

[6] VNA's position that Dr. Krishnan may not rely on such experience at all is meritless. *Dickenson*, 388 F.3d 976, 980-82 (6th Cir. 2004) (collecting cases). *See also Seifert v. Balink*, 372 Wis.2d 525, 566 (2017) ("The case law teaches that Daubert's role of ensuring that the courtroom door remains closed to junk science is not served by excluding medical expert testimony that is supported by extensive medical experience. Such exclusion is rarely justified in cases involving medical experts.") (citing *Dickenson*, 388 F.3d at 980); *Foreman v. Am. Road Lines, Inc.*, 623 F.Supp.2d 1327, 1334-35 (S.D. Ala. 2008) (psychologist properly relied on personal experience).

to quantify" whether any plaintiff "has an increased risk of graduating [*sic*] from high school or not." (ECF No. 428, PageID.32212.)

Because Dr. Krishnan has extensive clinical experience treating patients like Plaintiffs, she may explain at trial why she believes each Plaintiff might have greater difficulty completing high school, college, or an advanced degree than they would have had but for their injuries. In that testimony, Dr. Krishnan may further elaborate upon the reasons why patients with Plaintiffs' diagnoses and symptoms may face difficulties at school now and in the future. *See Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006) (Rule 26 contemplates that experts "will supplement, elaborate upon, [and] explain" the conclusions in their reports at trial). Dr. Krishnan may also testify to the results of the Fredriksen study, which is a peer-reviewed article in an academic journal. *United States v. Gissantaner*, 990 F.3d 457, 468 (6th Cir. 2021) ("Submission to peer-review generally suffices under *Daubert*").

However, because Dr. Krishnan does not explain how her clinical experience, the Fredriksen study, or any other academic work supports the numerical percentages related to educational outcomes she offers, the Plaintiffs cannot carry their burden of showing by a preponderance of the

21

evidence that those estimates are based on a reliable methodology. *Pride*, 218 F.3d at 578 (quoting *Daubert*, 509 U.S. at 592) (explaining burden of non-movant in Rule 702 motion). Dr. Krishnan's numerical estimates regarding the likelihood each Plaintiff will complete high school, college, or an advanced degree are therefore inadmissible.

## IV.   Conclusion

For the reasons set forth above, VNA's motion to exclude Dr. Krishnan's opinions and testimony is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

Dated: December 6, 2021                    s/Judith E. Levy
Ann Arbor, Michigan                        JUDITH E. LEVY
                                           United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 6, 2021.

                                s/William Barkholz
                                WILLIAM BARKHOLZ
                                Case Manager

22