**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

*Walters v. City of Flint* et al.,                    No. 5:17-cv-10164

                                                      Hon. Judith E. Levy

                                                      Mag. Elizabeth A. Stafford

_____

**BELLWETHER PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE
EVIDENCE, TESTIMONY, OR ARGUMENT ABOUT ALTERNATIVE
CAUSES OF THEIR INJURIES NOT SUPPORTED BY EXPERT
TESTIMONY**

Bellwether Plaintiffs respectfully submit this motion in limine to exclude any

evidence, testimony, argument, or reference to potential alternative causes of their

injuries and diagnoses not supported by admissible expert testimony.[1] For the

reasons stated in the accompanying brief, Plaintiffs respectfully request the Court

exclude any evidence or testimony regarding potential alternative causes of their

injuries and diagnoses not supported by valid expert testimony and preclude any

argument or mention of theories about alternative causes in Defendants' opening

statements.

---

[1]      Plaintiffs have submitted a separate motion in limine regarding the
VNA Defendants' and LAN Defendants' speculation as to alternative sources of lead
exposure.

As Local Rule 7.1(a) requires, Plaintiffs conferred with the VNA Defendants and LAN Defendants about this motion. Counsel for both groups of Defendants said they would oppose the motion.

Dated: December 14, 2021

Respectfully submitted,

LEVY KONIGSBERG LLP

/s/ Corey M. Stern
Corey M. Stern
Renner K. Walker
605 Third Ave., 33rd Fl.
New York, New York 10158
(212) 605-6200
cstern@levylaw.com
rwalker@levylaw.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

*Walters v. City of Flint* et al.,                    No. 5:17-cv-10164

Hon. Judith E. Levy

Mag. Elizabeth A. Stafford

_____

**BELLWETHER PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION IN LIMINE TO PRECLUDE EVIDENCE, TESTIMONY, OR ARGUMENT ABOUT ALTERNATIVE CAUSES OF THEIR INJURIES OR DIAGNOSES NOT SUPPORTED BY EXPERT TESTIMONY**

**INTRODUCTION**

Bellwether Plaintiffs A.T., D.W., E.S., and R.V. ("Plaintiffs") each suffer from lead poisoning resulting from exposure to lead-containing Flint water during the Flint Water Crisis. As Plaintiffs' experts have opined in their reports, Plaintiffs' lead poisoning has caused certain neurodevelopmental and neurocognitive disorders.

Both the LAN Defendants and the VNA Defendants (collectively, where appropriate, the "Defendants") deny any responsibility, arguing among other things that the lead-contaminated water did not cause Plaintiffs' injuries. Additionally, throughout their *Daubert* and summary judgment briefing, the Defendants have signaled an intention to argue to the jury that something else *possibly* caused Plaintiffs' injuries.

Alternative causation arguments require valid expert testimony. A defendant who proffers evidence and argument regarding alternative causation without supportive expert testimony cannot connect bits of evidence and argument—about, for example, family history of illness, a child's birth, generalized community or socioeconomic data, or spontaneous and idiopathic causes—with any legally sufficient basis for finding causation. In reality, then, abstract "evidence" and unsubstantiated "theories" of *possible* alternative causation can only invite the jury to impermissibly speculate as to what really caused a plaintiff's injury.

As a result, any discussion of *possible* alternative causation theories is irrelevant, and whatever faint and hypothetical probative value Defendants may claim it could have is substantially outweighed by its undue and inappropriate prejudicial effect and its likelihood of confusing and misleading the jury. If Defendants inject these matters in this case through a party, an attorney, or a witness, they will cause irreparable harm that no jury instruction could cure.

Accordingly, the Court should bar Defendants from offering evidence or testimony concerning *possible* alternative causes that are not supported by expert opinions. Likewise, the Court should also bar defense counsel from mentioning *possible* alternative causes during opening statements.

4

**BACKGROUND**

Plaintiffs have all been lead poisoned and diagnosed with various neurocognitive impairments caused by lead poisoning. As a primary defense, VNA and LAN deny that exposure to lead in Flint's water caused Plaintiffs' injuries. As an alternative to this denial, Defendants have shown an intent to suggest that something else *possibly* caused Plaintiffs' injuries. For example, Plaintiffs' parents were extensively questioned at their depositions as to whether there was any family history of certain illnesses, whether the child had suffered losses of relatives or pets, or whether the Plaintiff's mother had a healthy pregnancy and birth. *See, e.g.*, Ex. 1, Teed Dep., at 60:4–62:5, 209:17–212:6, 226:7–231:3; Ex. 2, Wheeler Dep., at 71:20–74:13, 227:17–228:9; Ex. 3, Martin Dep., at 119:5–120:10, 126:9–127–15; Ex. 4, Vanderhagen Dep., at 123:4–124:17.

Further, some of VNA's experts suggested *possible* alternative causation theories. For example, when criticizing the Lanphear et al. (2005) study (which found a causal connection between blood–lead levels and IQ decrements in children), Dr. Douglas Weed states that "[t]he *prevalence of causal factors and risk factors for adverse neurodevelopmental outcomes other than lead* in women in Flint, Michigan during the years 2008-2015 *is sufficient to explain the occurrence of those outcomes* in children born during these years who were subsequently evaluated (e.g. in the years 2014 to the present)." Ex. 5, Weed Report, at 75 (emphasis added). Weed

summarizes the "factors known to adversely affect neurodevelopmental outcomes in

children"; it includes not just lead and other neurotoxicants but also, for example,

> maternal characteristics such as age, race, education, smoking, alcohol and/or drug use, maternal weight or weight gain (e.g. overweight/obesity), maternal IQ, marital status, income, and other relevant demographic and socioeconomic indicators such as preterm (premature) birth (including late preterm and very preterm birth) and other obstetric complications (e.g. low birth weight, very low birth weight), nutrition, and prenatal care.

*Id.* at 14.

To be sure, Dr. Weed offers such *possible* "general causation" opinions; as

his report is largely limited to attempting to counter Dr. Graziano's and Dr.

Bithoney's opinions on general causation. *See id.* at 8–13. However, he admitted at

his deposition that he did not come to any specific causation opinion with respect to

the any of the four Bellwether Plaintiffs and confirmed that he did not consider their

individual exposure to any lead source whatsoever. *See* Ex. 6, Weed Dep., at 27:18–

28:12. Thus, despite concluding other risk factors are "sufficient to explain the

outcomes" of Flint children who have been evaluated, Weed does not render any

opinion that any of those risk factors he claims affect populations generally **more**

**likely than not** affected any Plaintiff individually. *See* Ex. 5, Weed Report, at 75.

Like Weed, many of Defendants' other experts do not actually render an

opinion that any Plaintiff's injury or diagnosis was caused by any alternative cause,

despite hinting at their *possible* existence. For example, in his report regarding E.S.,

one of VNA's psychologist, Dr. Robert McCaffrey, faults Dr. Krishnan for "not includ[ing] any information regarding family history in her neuropsychological report," adding that "[a] family history isa typical and useful component of a neuropsychological evaluation . . . because it is important to consider the individual's test findings within the context of his/her medical/genetic, social, and behavioral history." Ex. 7, McCaffrey Report (E.S.), at 3–4. Yet, Dr. McCaffrey does not actually think that those factors are responsible for E.S.'s injuries; rather, he simply opines that E.S. is not actually injured. *See id.* at 8–9.

Likewise, another VNA psychologist, Dr. Steven Putnam, emphasizes that one article Dr. Krishnan considers mentions the "*many other risk factors*," including "**social and parenting factors**" that may "*impact*[] . . . *normal childhood development*." *See* Ex. 8, Putnam Report (A.T.), at 12 (varying emphases in original); Ex. 9, Putnam Report (D.W.), at 20 (same). However, despite Dr. Putnam's emphasis on other risk factors, he never mentions them anywhere else in his reports. Rather, he simply concludes that there is "no evidence of significant psychopathology or neuropathology and in general [A.T.] appears to be functioning well within the range of normal expectation relative to her age and social/familial milieu." Ex. 8, Putnam Report (A.T.), at 2–3; *accord* Ex. 9, Putnam Report (D.W.), at 2 (same).

In point of fact, when he was questioned about this aspect of his A.T. report, he conceded that "[t]here is no diagnosis that I'm trying to attach her history to." *See* Ex. 10, Putnam Dep., at 65:23–70:13. Rather, Dr. Putnam seemed more interested in discussing the salaciousness of a "rather unflattering history" of a young girl raised by a "single mother with other children" and a "biological father [who] was in and out of jail, had substance abuse issues, legal issues, repeated probation violations." *See id.* at 68:5–16. But Dr. Putnam couldn't substantiate his claim that this information was (in his words) "extremely relevant": When pressed, he conceded that it wasn't relevant to any diagnosis because he didn't believe there was any diagnosis to make. *See id.* at 68:5–71:1. As Putnam said of a similar family health issue, "there is no need to make a connection that doesn't exist." *Id.* at 70:11–20.

Another VNA psychologist, David Thompson Ph.D., attacks Dr. Krishnan's opinions and notes the same research that Dr. Putnam identifies. *See* Ex. 11, Thompson Report (E.S.), at 5; Ex. 12, Thompson Report (A.T.), at 6; Ex. 13, Thompson Report (D.W.), at 4. Thus, Thompson muses, for example, that "competing considerations" **may** explain E.S.'s neurodevelopmental deficits. Ex. 11, Thompson Report (E.S.), at 5. Thompson also asserts there are "numerous other potential causes" of A.T.'s behavioral challenges. Ex. 12, Thompson Report (A.T.),

at 6. And, finally, Thompson claims that the "records reflect a number of alternative causes for the complaints" of D.W. Ex. 13, Thompson Report (D.W.), at 4.

Yet, "*potential* causes" and "competing *considerations*" are not the same as an opinion that any one of them **more likely than not** actually caused the respective Plaintiff's injuries or diagnoses. *See* Ex. 11, Thompson Report (E.S.), at 5 (emphasis added); Ex. 12, Thompson Report (A.T.), at 6 (emphasis added). When these portions of Dr. Thompson's reports were probed at his deposition, he conceded that his actual opinion is simply that E.S. doesn't "suffer[] from any deficit." Ex. 14, Thompson Dep., at 80:5–19. Similarly, when pressed with respect to A.T., Thompson agreed that his opinion is that "not only are the deficits not resulting from lead exposure – they're not resulting from anything at all because there are not deficits." *Id.* at 93:14–94:10. The same is true of Thompson's throwaway reference to "alternative causes" in his D.W. report (*see* Ex. 13, Thompson Report (D.W.), at 4), Dr. Thompson again conceded that the sum total of his real opinion is simply that D.W. doesn't have "any deficits." Ex. 14, Thompson Dep., at 121:16–122:21.

Thompson's repeated concessions show that his purported *possible* alternative causes are purely speculative and highly prejudicial. Stripped of any causal attribution, Dr. Thompson is simply a credentialed doctor offering inflammatory commentary about irrelevant aspects of Plaintiffs' lives apart from their injuries. For example, though he disclaims any causal relationship, Dr. Thompson goes out of his

9

way to criticize E.S.'s "school attendance record [as] reflect[ing] multiple unexcused absences and tardiness reports . . . ." Ex. 11, Thompson Report (E.S.), at 5.

> Similarly, Thompson comments at length on A.T.'s being
>
> raised in a family that faced significant economic and personal challenges unrelated to the Flint water system. [Her] parents divorced, and the mother and children moved to Montana two weeks after the twins' birth, reportedly related to "domestic issues." These adverse events are known to have a cumulative effect on the physical and emotional health of children.

Ex. 12, Thompson Report (A.T.), at 6. Likewise, with respect to D.W., Thompson waxes about "biological and genetic factors, pre-Flint water change lead exposure from substandard housing, as well as emotional factors related to the unexpected loss of an uncle." Ex. 13, Thompson Report (D.W.), at 4.

The closest any VNA expert comes to seriously identifying an alternative cause is Dr. John Gaitanis. In his report, Dr. Gaitanis mentions that R.V. suffered a febrile seizure in April 2015 and mentions that some of her educational and attention issues "may relate to" the seizure and that the seizure "may therefore account" for them. Ex. 15, Gaitanis Report, at 11. He does not, however, render an opinion on a more likely than not basis that the seizure caused those issues. On the contrary, as VNA's other experts did, Dr. Gaitanis's "medical opinion is that [R.V.] has no evidence for cognitive impairment, no evidence for attention deficit disorder, no evidence for a mood disorder, no evidence for any academic insufficiency like a learning disability." Ex. 16, Gaitanis Dep., at 136:24–137:5.

Nor are these the mere stray comments of VNA's experts. Rather, they are consistent with the theme articulated by VNA during oral argument on its *Daubert* motions, that there is just something different about children from Flint either in terms of learning deficits or lifetime earning potential. *See* Transcript of Nov. 3, 2021 Motion Hearing (ECF No. 425), at 14–15. Just as it did during oral argument, the Court should again reject such unsubtle and unsupported implications that children of Flint are for some reason inherently inferior to children in other communities.

## ARGUMENT

I. **The Court should preclude Defendants from offering any testimony or evidence of alternative causation not supported by admissible expert testimony.**

A. **Motions in limine obviate the risk of prejudicial evidence or arguments being presented to the jury.**

"Motions in limine are meant to 'prepare a smooth path for trial—particularly by casting aside inadmissible evidence that might confuse or prejudice the jury.'" *Verburg v. Weltman, Weignberg & Reis Co., L.P.A.*, 295 F. Supp. 3d 771, 773 (W.D. Mich. 2018) (quoting *Dixon v. Grand Trunk W. R.R. Co.*, No. 2:13-14340, 2017 U.S. Dist. LEXIS 185001, 2017 WL 5166868, at *1 (E.D. Mich. Nov. 8, 2017)). Whether to grant a motion in limine is a matter of discretion for the district court. *Louzon v. Ford Motor Co.*, 718 F.3d 556, 560 (6th Cir. 2013).

Additionally, a motion in limine is a useful way to prevent prejudicial references to potential evidence, which would ultimately be inadmissible, during opening statements. "An opening statement is designed to allow each party to present an objective overview of the evidence intended to be introduced at trial." *United States v. Burns*, 298 F.3d 523, 543 (6th Cir. 2002). "It is not appropriate for a [litigant] to 'use the opening statement to poison the jury's mind . . . or to recite items of highly questionable evidence.'" *Id.* at (quoting *United States v. Brockington*, 849 F.2d 872, 875 (4th Cir. 1988)); *see also United States v. Taren-Palma*, 997 F.2d 525, 532 (9th Cir. 1993) ("Opening argument, like closing, should not refer to matters that are not to be presented as evidence."). Limiting a party's opening statement is a matter of discretion for the district court. *Burns*, 298 F.3d at 543.

**B.   Irrelevant evidence is inadmissible under Rule 402, and a district court should exclude unduly prejudicial evidence under Rule 403.**

Only relevant evidence is admissible. Fed. R. Evid. 402. Even when evidence is admissible, Federal Rule of Evidence 403 permits a court to exclude evidence or testimony "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." "'Unfair prejudice,' as used in Rule 403, . . . refers to evidence which tends to suggest decision on an improper basis." *United States v. Sherrill*, 972 F.3d 752, 765 (6th Cir. 2020).

When evidence's alleged probative value is limited to inviting the jury to engage in speculation about alternative causes or perpetrators, it is properly excluded under Rule 403. *See United States v. Delance*, 694 Fed. Appx. 829, 834 (2d Cir. 2017); *United States v. Frank Iron Hawk*, 612 F.3d 1031, 1040 (8th Cir. 2010); *United States v. Jordan*, 485 F.3d 1214, 1219 (10th Cir. 2007). After all, a jury is not permitted to "speculate." *Howe v. Michigan C. R. Co.*, 236 Mich. 577, 585 (1926). "'Such speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice.'" *Jordan*, 485 F.3d at 1219 (quoting *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998)).

## C.      Medical and scientific causation issues require expert testimony.

Like other states, Michigan courts generally require expert testimony unless the "matter 'is so obvious that it is within the common knowledge and experience of an ordinary layperson.'" *Powell-Murphy v. Revitalizing Auto Cmtys. Envtl. Response Trust*, 333 Mich. App. 234, 251 (2020) (quoting *Lowery v. Enbridge Energy L.P.*, 500 Mich. 1034, 1048 (2017) (Markman, C.J., concurring)). "While factual causation may be established with circumstantial evidence, the evidence must support 'reasonable inferences of causation, not mere speculation.'" *Powell-Murphy*, 333 Mich. App. at 246 (quoting *Skinner v. Square D Co.*, 445 Mich. 153, 164 (1994)). This is as true of "alternative causation" theories as it is of a plaintiff's

13

causation evidence. *See People v. Lemons*, No. 348277, 2021 Mich. App. LEXIS 6516, at *21 (Mich. Ct. App. Nov. 18, 2021) (affirming the trial court's "conclu[sion] that the biomechanical engineering evidence and testimony was inadmissible" and its "exclu[sion] alternative causation theories that lacked scientific or factual support").

**D.      The Court should not permit any evidence or testimony concerning alternative causation theories here.**

Here, the medical causation of Plaintiffs' various injuries—including neurodevelopmental and behavioral disorders—is beyond the "common knowledge and experience of an ordinary layperson." *Powell-Murphy*, 333 Mich. App. at 251. Yet, none of VNA's experts opine on a more likely than not basis that any of their injuries were due to some alternative "cause". Rather, as above, each expert simply opines that Plaintiffs are not injured at all. *See* Ex. 7, McCaffrey Report (E.S.), at 3–4; Ex. 10, Putnam Dep., at 65:23–70:13; Ex. 14, Thompson Dep., at 80:5–19, 93:14–94:10, 121:16–122:21; Ex. 16, Gaitanis Dep., at 136:24–137:5.[2] None of VNA's

---

[2]      As above, Dr. Weed discusses other causal factors only in the context of general causation. *See* Ex. 1, Weed Report, at 8–13; Ex. 2, Weed Deposition, at 27:18–28:12; Ex. 2, Weed Deposition, at 27:18–28:12. Given the absence of any opinion that Plaintiffs' injuries were more likely than not actually brought about by some alternative cause, Weed's testimony and opinions cannot make any fact that "is of consequence in determining the action" any "more or less probable than it would be without the evidence." Fed. R. Evid. 401. His opinions in that regard are irrelevant. Fed. R. Evid. 402; *cf.* Fed. R. Evid. 702(a).

experts opine that (1) any Plaintiff is injured, and (2) something else caused that injury.[3]

In the absence of expert testimony attributing Plaintiffs' injuries to some alternative cause, any evidence, either by way of direct testimony or elicited on cross-examination, should not be admitted. After all, any evidence or testimony pertaining to those theories isn't relevant. It simply doesn't bear on a fact that "is of consequence in determining the action" any "more or less probable than it would be without the evidence." Fed. R. Evid. 401. It is unhelpful and irrelevant. Fed. R. Evid. 402.

Furthermore, even if there was some slight amount of probative value to evidence or testimony pertaining to theoretical alternative causation, it is greatly outweighed by the clear and unjustifiable risk of undue prejudice introducing such

---

[3]    VNA may attempt to defend their experts' non-opinions and argue that the experts—notwithstanding their repeated concessions in depositions that they are not really offering these opinions—are in fact offering them as opinions in the alternative (*i.e.*, the expert is opining that Plaintiff wasn't injured, but if the Plaintiff was injured then something else caused it). If so, these opinions do not pass muster under Michigan law. As Defendants argued in their summary judgment and *Daubert* briefing, testimony that something "may have caused" an injury or that there is a "mere possibility" of causation is insufficient. *Skinner*, 445 Mich. at 165; *Craig v. Oakwood Hosp.*, 471 Mich. 67, 87 (2004). Concomitantly, "for an expert opinion to be helpful to the jury," the expert must "testify that his conclusion is more likely than not true." *Johnson v. Memphis Light Gas & Water Div.*, 695 Fed. Appx. 131, 137 (6th Cir. 2017). Thus, Dr. Gaitanis's statements that any impairment to R.V. "may relate" to a 2015 febrile seizure and that the seizure "may therefore account" for it is categorically insufficient under Michigan and Sixth Circuit law.

evidence—or even any mention of it—would create. Fed. R. Evid. 403. At most, the

evidence of other potential causes would amount to "speculation." *Powell-Murphy*,

333 Mich. App. at 246. That kind of conjecture runs afoul of blackletter Michigan

and Sixth Circuit law on causation and has no real probative value; and whatever

limited probative value it does have is greatly outweighed by the manifest likelihood

of juror confusion, undue prejudice, and the possibility that the case will be decided

on improper grounds. *Cf. Jordan*, 485 F.3d at 1219.

Indeed, VNA's own experts show why this is so. Consider just a couple of the

examples above. Dr. Putnam may have recanted his claim that the "rather

unflattering history" of A.T.'s family was "extremely relevant." *See* Ex. 10, Putnam

Dep., at 68:5–71:1. Yet, the striking overemphasis he paid it, by bolding, italicizing,

and underlining text pertaining to it in his report and continuing to attempt to defend

even after conceding it did not inform any actual opinion, shows that Dr. Putnam

will not shy away from making comments calculated to inflame the jury.

Likewise, Dr. Thompson's attempt to opine about A.T.'s family—including

the innuendo about why Ms. Teed took her children to Montana—displays an

awareness that it may bias jurors even there is no basis for rendering an opinion

about it in the first place. *See* Ex. 12, Thompson Report (A.T.), at 6; Ex. 14,

Thompson Dep., at 80:5–19. Indeed, any testimony on it would invite the jury to

decide weighty and complex issues of causation not on the evidence—but on moral judgments about A.T.'s family.

The same is, if anything, more true of Thompson's blaming of E.S.'s injuries on "multiple unexcused absences and tardiness reports." *See* Ex. 11, Thompson Report (E.S.), at 5. It is an invitation to the jury to blame E.S. for his injuries and determine that he is perhaps lazy and does not deserve damages. As with Thompson's speculation about A.T., his attacks on E.S. create a grave risk of permitting the jury to render a verdict on an "improper basis"—precisely what Rule 403 forbids. *See Sherrill*, 972 F.3d at 765.

Finally, the fact that some of these theories may be presented using experts as a mouthpiece is, in truth, worse. An expert's unfounded speculation has a unique capacity to mislead and confuse the jury. As the Supreme Court recognized in *Daubert*: "'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" *Daubert*, 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)).

As a result, Defendants should not be permitted to argue or offer evidence or testimony regarding any potential alternative causes that is not supported by a valid

expert opinion. Defendants are certainly allowed to deny responsibility, deny that lead in Flint's water caused Plaintiffs' injuries, and make Plaintiffs prove their case at trial. But they must not be permitted to introduce speculative and highly prejudicial evidence and arguments pertaining to theories of alternative causation that lack adequate expert support and, at any rate, can only serve to prejudice and inflame the jury.

## CONCLUSION

Accordingly, Plaintiffs respectfully request that the Court grant this motion in limine and preclude Defendants from offering evidence or testimony speculating as to potential alternative causes where those causes are not supported by valid expert testimony. Further, Plaintiffs respectfully request that the Court preclude Defendants from speculating as to these alternative causes during opening statements.

Dated: December 14, 2021

Respectfully submitted,

/s/ Corey M. Stern
Corey M. Stern
Renner Walker
LEVY KONIGSBERG LLP
605 Third Ave., 33rd Fl.
New York, New York 10158
(212) 605-6200
cstern@levylaw.com
rwalker@levylaw.com

**CERTIFICATE OF SERVICE**

I, Renner K. Walker, hereby certify that on December 14, 2021, the foregoing

motion and brief, as well as the attached exhibits, were served on all counsel of

record via the Court's ECF filing system.

/s/ Renner K. Walker
Renner K. Walker
