## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

*In re* Flint Water Cases

Judith E. Levy
United States District Judge

_____/

This Order Relates To:

*Bellwether I Cases*
Case No. 17-10164

_____/

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO FILE SUPPLEMENT [454]; GRANTING IN PART AND DENYING IN PART DEFENDANTS VEOLIA NORTH AMERICA, LLC, VEOLIA NORTH AMERICA, INC., AND VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC'S MOTION TO EXCLUDE THE TESTIMONY AND REPORT OF MR. RICHARD HUMANN [340]; AND SCHEDULING EVIDENTIARY HEARING ON LOCKWOOD, ANDREWS & NEWNAM, INC.'S MOTION TO EXCLUDE THE TESTIMONY AND REPORT OF MR. RICHARD HUMANN [349]**

This opinion is the sixth in a series addressing the admissibility of the testimony and reports of eight experts retained by Plaintiffs in anticipation of the first bellwether trial, currently set to begin on February 15, 2022. Defendants argue that none of these experts can meet

the standards set by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Currently before the Court are motions by Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC (collectively "VNA") and Lockwood, Andrews and Newnam, Inc., ("LAN") to exclude the testimony and report of Mr. Richard Humann. (ECF No. 340, 349.) Also before the Court is Plaintiffs' motion for leave to file a second supplement to Mr. Humann's report.

For the reasons set forth below: (1) Plaintiffs' motion for leave is GRANTED, (2) VNA's motion to exclude is GRANTED IN PART and DENIED IN PART and (3) an evidentiary *Daubert* hearing is ordered to take place on January 10, 2022, at 2:00PM, by video teleconference to assist the Court in evaluating LAN's motion to exclude.

## I.    Background

Mr. Richard Humann is the President and CEO of H2M Architects and Engineers ("H2M"). H2M provides consulting services and specializes in the supply, treatment, and distribution of water. (ECF No. 330-26, PageID.15187.) Mr. Humann has over two decades of experience in water engineering and is a licensed professional engineer in 10 states,

including Michigan. (ECF No. 365-3, PageID.22696.) Prior to becoming H2M's CEO, Mr. Humann worked as its chief water resources engineer. *Id.*

Plaintiffs offer Mr. Humann as their expert on the standard of care. They retained Mr. Humann to determine whether VNA and LAN breached the standard of care in their work related to Flint's water supply. Mr. Humann concludes that "LAN and [VNA] clearly did not fulfill their obligations as expert water supply consultants and do have responsibility in the crisis." (ECF No. 330-26, PageID.15189.)

To evaluate the conduct of VNA and LAN, Mr. Humann considered a series of nine reports and studies: (1) a 1994 corrosion control study performed for the Detroit Water and Sewage Department ("DWSD"), (2) a 2009 preliminary engineering report prepared by LAN and several other engineers, analyzing whether Flint and several other counties should switch to the Karegnondi Water Authority ("KWA"), (3) a 2011 report prepared by LAN and Rowe Professional Services analyzing the viability of using the Flint River as a water supply, (4) a 2013 report by a third-party engineer analyzing the financial benefits of switching Flint to the KWA, (5) LAN's June 2013 proposal to the City of Flint, (6) the

3

June 2013 executed agreement between LAN and the City of Flint, (7) the Change Order #2 agreement between LAN and the City of Flint, (8) VNA's 2014 Peer Review Report evaluating the DWSD system, and (9) VNA's 2015 Water Quality Report for the City of Flint. Mr. Humann did not rely on any other documents for his evaluation. (ECF No. 432, PageID.33079.)

According to Mr. Humann, it is the professional responsibility of water engineering consultants to act so as to protect public health and safety. Mr. Humann concludes that both VNA and LAN breached that standard of care.

In his initial report, Mr. Humann opines that LAN acted negligently in three ways: (1) in its 2009 and 2011 reports, LAN should have warned the City of Flint that it needed to start upgrades to the Flint Water Treatment Plant ("FWTP") much earlier than planned to make the April 2014 deadline (ECF No. 330-26, PageID.15194.), (2) it did not sufficiently highlight the importance of corrosion control for the protection of public health, and (3) in its 2013 proposal, LAN should have explained to the City of Flint that switching to the Flint River before April 2014 was now no longer possible. (*Id.* at PageID.15197.) In his

4

deposition, however, Mr. Humann qualified his first conclusion by noting that if LAN "wasn't aware of the fact that there was going to be a switch" when it wrote those reports, then "I don't think that they could have been as proactive as I thought they could have been." (ECF No. 438, PageID.34466.)

Mr. Humann concludes that VNA acted negligently in two ways: (1) in light of its expertise and work for DWSD in 2014, VNA "had an obligation as an expert water supply consultant" to warn "decisionmakers" of the dangers of switching to Flint River water by November 2014 at the latest (*Id.* at PageID.15199), and (2) while VNA worked for the City of Flint in 2015, it should either have recommended much more forcefully that a corrosion inhibitor be used, or recommended that the City return to DWSD for its water. According to Mr. Humann, the report VNA submitted to the City of Flint only "weakly suggests" corrosion controls, with a buried reference that does not address the severe health risks involved. (*Id.* at PageID.15204.)

Plaintiffs submitted two supplements in which Mr. Humann further explains his opinions. (ECF No. 414-1, ECF No. 454-1) In the first supplemental affidavit, Mr. Humann cites to several ethical standards

5

supporting his view that reasonable engineers must "hold paramount the safety, health, and welfare of the public," and must warn the authorities they know of a danger to public health. (ECF No. 414-1, PageID.31278-31279.) Mr. Humann also provides additional support for his view that VNA had a duty to warn the authorities of the dangers of switching to Flint River water by November of 2014. (*Id.* at PageID.414-1, PageID.31282-31283.) According to Mr. Humann, VNA's work for DWSD would have put it on notice of the impending Flint River switch, and "any reasonable engineer" would have known that one year (from April 2013 to April 2014) is not sufficient time to "adequately test and monitor a surface water source, like the Flint River, to determine which corrosion control method" to use. (*Id.* at PageID.31283.)

In his second supplement, Mr. Humann reviews four additional documents concerning VNA's work for DWSD and explains that those documents reinforce his view that VNA's work for DWSD was related to the City of Flint's leaving the DWSD system. (ECF No. 454-1).

Both LAN and VNA filed motions to exclude the entirety of Mr. Humann's testimony (ECF No. 340, 349). VNA also filed motions to strike Mr. Humann's first supplemental affidavit, and to deny Plaintiffs' motion

for leave to submit the second supplemental affidavit. (ECF No. 415, No. 520).

The Court heard argument on the motions to exclude and the motion to strike on November 2. On November 4, the Court granted in part and denied in part VNA's motion to strike Mr. Humann's first supplemental affidavit. (ECF No. 421). Now before the court are LAN and VNA's motions to exclude Mr. Humann's testimony, and Plaintiffs' motion for leave to file Mr. Humann's second supplement.

## II.   Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which sets forth three requirements: (1) the witness must be qualified, (2) the testimony must be relevant, and (3) the testimony must be reliable. Fed. R. Evid. 702; *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). As the Supreme Court explained in *Daubert*, Rule 702 imposes a "gatekeeping" obligation on the courts to ensure that scientific testimony "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589; *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

7

*Daubert* provides a non-exclusive list of factors courts may consider when evaluating reliability: (1) whether the theory or technique at the basis of the opinion is testable or has been tested, (2) whether it has been published and subjected to peer review, (3) what the known error rates are, and (4) whether the theory or technique is generally accepted. *Daubert*, 509 U.S. at 593; *see also In re Scrap Metal*, 527 F.3d at 529 (listing same factors). Not every factor needs to be present in every instance, and courts may adapt them as appropriate for the facts of an individual case. *Kumho* 526 U.S. at 150.

"Rejection of expert testimony is the exception, rather than the rule." *United States v. LaVictor,* 848 F.3d 428, 442 (6th Cir. 2017) (quoting *In re Scrap Metal*, 527 F.3d at 529–30)). Nevertheless, the burden is on Plaintiffs to show by a "preponderance of proof" that the proffered expert meets the standards of Rule 702 as interpreted by *Daubert. Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (quoting *Daubert*, 509 U.S. at 592).

District courts have significant "latitude in deciding how to test an expert's reliability." *Kumho*, 526 U.S. at 152; *see also Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir. 2001). Where it is helpful to the

8

investigation of an expert's reliability, the Court may order special proceedings, including an evidentiary *Daubert* hearing. *Id.*

An expert's initial report is required to include "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). When an expert learns of new information, she must file a supplemental report. Fed. R. Civ. P. 26(e)(1). Supplemental reports may not be used "to disclose information that should have been disclosed in the initial expert report." *Moonbeam Capital Invs., LLC, v. Integrated Constr. Sols., Inc.*, No. 2:18-cv-12606, 2020 WL 1502004, at *6 (E.D. Mich., March 30, 2020) (quoting *Moore's Federal Practice* 3d, §26.131[2]).

Evidence in late supplemental filings is excluded unless its admission is harmless, or the delay was justified. *See Howe v. City of Akron*, 801 F.3d 718, 747-48 (6th Cir. 2015). The Sixth Circuit has adopted a five factor test to determine whether a party's "omitted or late disclosure" should be admitted:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4)

9

the importance of the evidence, and (5) the nondisclosing party's

explanation for its failure to disclose the evidence.

*Id.* at 748 (quoting *Russel v. Absolute Collection Serv's*, 763 F.3d 385, 396

(4th Cir. 2014)).

### III.   Analysis

VNA and LAN contest every part of Mr. Humann's testimony. LAN argues that Mr. Humann is not qualified to provide expert testimony under Rule 702, and that all of Mr. Humann's opinions regarding LAN's conduct are based on pure speculation. VNA argues that (1) Mr. Humann's opinions about the standard of care are not reliable because Mr. Humann does not understand what the standard of care is, and (2) his opinions about VNA's conduct are unreliable because they are not supported by the facts of this case. Both parties argue that any opinions Plaintiffs elicited from Mr. Humann during redirect at his deposition constitute an impermissible attempt to amend Mr. Humann's report, and that Mr. Humann's opinions about the ethics of Defendants' conduct are more prejudicial than probative. Finally, VNA asks the Court to exclude Mr. Humann's second supplemental affidavit.

For the reasons set forth below, Plaintiffs' motion for leave to file a second supplement is granted, and Mr. Humann's general testimony about the standard of care applicable to engineers is reliable and admissible. The remainder of Mr. Humann's testimony is subject to the limitations set forth below, with one exception. Mr. Humann's opinion that LAN had a duty to warn the City of Flint in 2013 that the FWTP work could not be completed on schedule cannot be evaluated on the current record. Accordingly, an evidentiary *Daubert* hearing will take place on January 10, at 2:00 PM to address this issue.

## A. Second Supplement

VNA argues that Plaintiffs' motion for leave to file a second supplement should be denied because it contains information Mr. Humann should have considered in his initial report, and because the information it contains could not help Plaintiffs establish that VNA owed a duty to them in 2014.

Because the information on which Mr. Humann relies is not new and was served on Plaintiffs several times, VNA is correct that Plaintiffs' supplemental filing is improper. *See, e.g., Moonbeam*, 2020 WL 1502004, at *6. This does not end the question, however, because the Court must

11

consider the five factor test adopted in *Howe v. City of Akron* to determine
whether Plaintiffs' delay was justified or harmless. *Howe*, 801 F.3d. at
748.

The first two *Howe* factors require consideration of the degree to
which the party against whom the new evidence is offered would be
surprised by that evidence, and whether that surprise could be cured. *Id.*
Mr. Humann's second supplement seeks to provide additional evidence
on a single issue: his opinion that VNA's work for DWSD gave rise to a
duty to the bellwether Plaintiffs. The parties have been litigating that
issue for months, both in these *Daubert* motions and in motions for
summary judgment. Moreover, the only evidence considered in the
supplement concerns meetings attended by VNA or documents generated
by VNA. Accordingly, the contents of this supplemental filing could not
be surprising to VNA. These factors weigh in favor of admission.

Since trial has not yet begun, the third factor is not relevant. The
fourth factor—the importance of the evidence—does not strongly weigh
in either direction. The scope of VNA's work for DWSD in 2014 is a
significant issue in the pending summary judgment motions, because
Plaintiffs argue that this work gave rise to a legal duty to them even

12

before VNA began its work in Flint. While VNA correctly points out that none of these documents establish that it owed such a duty, Mr. Humann's review may provide context helpful to determining what VNA's relationship was to the City of Flint and DWSD in 2014. Under Michigan law, the nature of those relationships must be considered before a duty can be established. *In re Certified Question*, 479 Mich. 498, 505-506 (2007). Accordingly, Mr. Humann's second supplement may be of some relevance to the duty analysis.

The final factor—Plaintiffs' reason for failing to disclose this evidence in a timely manner—weighs in favor of VNA. After all, it is not disputed that Plaintiffs had access to these documents long before filing this motion for leave. But because there is no indication that Plaintiffs' failure to use the evidence earlier was anything other than an "honest mistake," this is not dispositive. *Cf. Moonbeam*, 2020 WL 1502004 at *7.

Because Plaintiffs' second supplement is deficient but harmless under *Howe*, 801 F.3d 748, Plaintiffs' motion for leave is granted.

## B. Qualification

Turning now to the *Daubert* motions, the Court must first consider whether Mr. Humann is qualified to testify as an expert under Federal

Rule of Evidence 702. According to LAN, Mr. Humann is not qualified because (1) "nothing" in his "background, training, or experience imbues him with the qualifications necessary to offer the opinions he does," and (2) his failure to correctly explain the governing standard of care shows that he is not qualified to testify about that standard. (ECF No. 348, PageID.22036.) LAN is incorrect.

An expert witness must "establish his expertise by reference to knowledge, skill, experience, training or education." *Berry v. Crown Equipment Corp.*, 108 F.Supp.2d 743, 749 (E.D. Mich. 2000) (quoting Fed. R. Evid. 702). This requirement "has always been treated liberally." *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (quoting *In re Paoli RR Yard PCB Litig.*, 916 F.3d 829, 855 (3d Cir. 1990)). Nevertheless, the Court must "determine whether the expert's training and qualifications relate to the subject matter of his proposed testimony." *Berry*, 108 F.Supp.3d at 749 (citing *Kumho*, 526 U.S. at 157).

Mr. Humann has over thirty years of experience in water engineering, and over two decades of consulting experience. His testimony concerns the standard of care that applies to professionals who provide water engineering consulting services. Mr. Humann has

14

extensive experience in the precise area of work under consideration in this case. Accordingly, he is qualified to provide expert testimony. *See, e.g., E.I. du Pont de Nemours and Comp C-8 Pers. Injury Litig.*, 345 F.Supp.3d 897, 917 (S.D. Oh. 2015) (finding similarly positioned engineer qualified).

LAN argues that Mr. Humann is not qualified because he incorrectly identified the standard of care. But this conflates the reliability of Mr. Humann's conclusions with his personal qualifications. It is possible for a qualified expert to provide incorrect or deficient testimony. Even if Mr. Humann's testimony were wholly speculative, that would not impugn his qualifications, only his work in this case. *Cf. Sanchez v. Boston Scientific Corp.*, 2014 WL 4851989, at *33 (S.D. W. Va., Sept. 29, 2014) (finding expert qualified but excluding expert's standard of care opinions as speculative).

Accordingly, Mr. Humann is qualified.

## C. General Standard of Care Testimony

Both VNA and LAN object to Mr. Humann's general testimony about the obligations of professional engineers and the applicable standard of care. According to Defendants, this testimony is inadmissible

15

because Mr. Humann (1) only opines about what he himself would have done, not about what any reasonable engineer would have done and (2) he does not know the standard of care because he does not recite it in his deposition.

In support of its view that Mr. Humann only testifies about what he personally would have done, not what a reasonable engineer would have done, VNA cites to passages of Mr. Humann's deposition where he speaks in the first person. Mr. Humann explains that the basis for his opinions is "*my* experience over the years" and that his role in this litigation is "about *my* experience as a consulting engineer." (ECF No. 340, PageID.20465, VNA's emphases). Plaintiffs respond that the mere fact that an expert speaks in the first person does not show that the expert is testifying only about his personal opinions.

Plaintiffs are correct. Even where Mr. Humann casts his opinions in the first person, context shows that he is doing so to describe obligations he believes apply to all engineers. For instance, Mr. Humann testifies in the first person that:

> If I were in [VNA's position in 2014] and I had evaluated and had
> an in-depth understanding of the corrosion inhibitors that were

being utilized by Detroit, knowing what happens when you stop using those corrosion inhibitors…You raise that issue of what you know to people that can use the guidance.

(ECF No. 432, PageID.33176). But when Mr. Humann is pressed to explain the grounds for his opinion, he clearly refers to the obligations of professional engineers generally, not to his personal opinions or preferences:

Q: Okay. And when you say "an ethical professional obligation," can you tell me what the source, in your opinion, is, Mr. Humann, for that ethical professional obligation?

A: So…as a practicing professional engineer…we have an obligation to put the protection of public health and safety above all else…This is an obligation that engineers have as professionals.

(*Id.* at PageID.33176-33177.) Accordingly, it is clear that Mr. Humann does not simply opine about his personal preferences or opinions.

Defendants next point to the requirement that a standard of care expert have "knowledge of the applicable standard of care." *Bahr v.*

*Harper-Grace Hosp's.*, 448 Mich. 135, 151 (1995).[1] The parties agree that in this case, the standard of care is "the care, skill, and diligence ordinarily possessed" by water engineering consultants. *Cox ex rel. Cox v. Board of Hosp. Managers for City of Flint*, 467 Mich. 1, 21 (2002). Because Mr. Humann did not recite the *Cox* standard during his deposition, Defendants argue that he does not "know" the standard of care.

This argument fails for two reasons. First, it is rendered moot by Mr. Humann's supplemental affidavit, in which Mr. Humann does cast his opinions in terms of what any "reasonable engineer" would do. (*See* ECF No. 414-1). Second, it misunderstands the standard set forth in *Bahr*. A standard of care expert must know what level of care is ordinarily possessed by professionals in her field. Such knowledge is demonstrated by referring to the expert's practical experience and relevant education. *Bahr*, 448 Mich. at 142. But there is no reason why an expert would need to know how Michigan courts have *described* this requirement. Knowledge *of* the ordinary care taken by members of one's

---

[1] Plaintiffs do not object to the application of this state law rule in this federal diversity case.

profession is distinct from knowledge that the Michigan courts have defined the standard of care as "the care, skill, and diligence ordinarily possessed" by members of one's profession. Mr. Humann need only demonstrate the former to show that he "knows" the standard of care in the relevant sense. *See Bahr*, 448 Mich. at 151-152. Accordingly, Mr. Humann's failure to recite the *Cox* standard does not show that he lacks the required knowledge.

Mr. Humann explains in his deposition that professional engineers have an obligation "to put the protection of public health and safety above all else." (ECF No. 432, PageID.33177.) Mr. Humann's opinion is informed by his lengthy professional experience and by widely accepted ethical and professional guidelines (ECF No. 414-1, PageID.31278-31279). It therefore meets the standards set forth by Rule 702 and *Daubert*.

### D. Testimony regarding LAN

According to LAN, even if Mr. Humann correctly identifies the standard of care, his application of that standard to LAN's conduct is not reliable because it is based on serious misunderstandings of the facts.

Mr. Humann initially offered three opinions about LAN: (1) it failed to warn the City of Flint in 2009 and 2011 to start its upgrades to the FWTP immediately, so as to be ready for the impending switch in April 2014, (2) it failed to warn the City of Flint throughout 2013 that readying the FWTP in time for the April 2014 switch would be impossible, and (3) it failed to insist that the City of Flint use corrosion control measures to treat Flint River water.

Mr. Humann's first opinion has now been withdrawn. Mr. Humann retracted it during his deposition, (ECF No. 438, PageID.34466), and Plaintiffs' counsel indicated at oral argument that the opinion was retracted. (ECF No. 424, PageID.31673). LAN's motion to exclude this opinion is therefore moot.[2]

Mr. Humann does maintain that, by 2013, LAN should have been warning the City of Flint that upgrades to the FWTP could not be completed in time for the April 2014 switch. The Court cannot fully evaluate the reliability of this opinion on the current record because Mr.

---

[2] LAN also objects to testimony Mr. Humann provides during his redirect examination regarding the contents of LAN's website. That testimony was meant to reinforce Mr. Humann's views regarding LAN's pre-2013 failure to warn. Since this testimony has been withdrawn, these objections are also moot.

Humann does not clearly explain his reasons for it and provides testimony that appears contradictory.

In his report, Mr. Humann opines that there was a "clear lack of time to get the FWTP operational by April 2014," but does not explain either *why* it would have been impossible to conduct the necessary upgrades, or *which* additional upgrades would have had to be conducted for the FWTP to be fully operational. (ECF No. 330-26, PageID.15206.) In his first supplemental affidavit, Mr. Humann suggests that any reasonable engineer would have known that it "would take far more than a year for any municipality…to adequately test and monitor a surface water source, like the Flint River, to determine which corrosion control method would be most appropriate." (ECF No. 414-1, PageID.31283.) It may be that this is why there was no time in 2013 to upgrade the FWTP, but other testimony seems to contradict this. First, Mr. Humann suggests in his report that it had been clear for years that orthophosphates had to be added to Flint River water to ensure proper corrosion inhibition. (ECF No. 330-26, PageID.15205-15206.) Second, Mr. Humann testified in his deposition that there *would* have been time in 2013 to implement corrosion inhibitors:

Q: Okay. Is it your testimony that the corrosion—there was not sufficient time to put in corrosion inhibitors by April 2014 if the decision had been made to use them?

[…]

A. So in the overall schedule, you could always have built in sufficient time to put in a corrosion inhibitor.

(ECF No. 438, PageID.34414.) This testimony suggests that, if a timely upgrade of the FWTP was impossible in 2013, this was *not* because it would have been impossible to ensure proper corrosion control within a year. But Mr. Humann also testified that he did not know of any other work that was not done in 2013, that would have been necessary to ensure that drinking water would be safe:

Q. Okay. Is there anything else besides the corrosion inhibitor that was not done by April 2014 related to water quality?

A. I'm not aware specifically of the work that would have been done in terms of the treatment process and things like that. So I couldn't tell you one way or the other.

22

*Id.* Accordingly, it is not clear from the testimony currently in the record precisely what made it impossible for the City of Flint, in 2013, to upgrade the FWTP in time for the 2014 switch. The Court cannot evaluate whether Mr. Humann's opinions are based on "good grounds," *Daubert*, 509 U.S. at 590, without a proper understanding of the grounds for Humann's opinions.

Accordingly, it is necessary to hold an evidentiary *Daubert* hearing on this portion of Mr. Humann's testimony. At the hearing, the Court will ask Mr. Humann to clarify the apparent inconsistencies in his testimony and to explain the basis for his opinion that LAN should have warned the City of Flint in 2013 that upgrading the FWTP by April 2014 was impossible. This hearing will take place on January 10, 2022, at 2:00 PM. It will be limited exclusively to this issue and may not be used to relitigate any other question decided in this opinion. The parties should not interpret this ruling as an invitation to submit further supplemental briefs or reports prior to the January 10 hearing.

This leaves Mr. Humann's third opinion about LAN: that it should have insisted that the City of Flint use corrosion controls to treat Flint River water. That opinion has two components: (1) a reasonable engineer

in LAN's position would have had a duty to warn its employers that corrosion controls would be necessary to ensure public health, and (2) LAN did not issue this warning.

Mr. Humann clearly explains the basis for (1): engineers have a professional obligation to consider public health and safety as they conduct their work (ECF No. 414-1, PageID.31278-31279), and the use of corrosion inhibitors would have prevented the leaching of lead into Flint's drinking water, creating a public health hazard (*see, e.g.,* ECF No. 438, PageID.34414-34415.) LAN does not argue that corrosion controls were unnecessary. Accordingly, Mr. Humann may testify to his general view that an engineer in LAN's position would have had a duty to warn the City of Flint that proper corrosion controls would be necessary to protect public health and safety.

As LAN points out, however, Mr. Humann did not consider any part of the voluminous record of communications between LAN and the City of Flint. Accordingly, Mr. Humann did not investigate whether LAN in fact did warn the City of Flint, consistent with its obligations. Because Mr. Humann did not consider the underlying record, his opinion that LAN failed to warn the City of Flint does not have a sufficient "basis in

24

established fact." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (citing *Skinner v. Square D. Co.*, 445 Mich. 153, 172-73 (1994)). It is therefore inadmissible. At trial, the parties may elicit testimony from fact witnesses to establish whether LAN issued the requisite warnings.

### E. Testimony regarding VNA

Like LAN, VNA also argues that Mr. Humann's opinions about its conduct are unreliable. According to VNA, Mr. Humann's opinions must be excluded because Mr. Humann did not know nearly enough about VNA's involvement in Flint to offer any reliable opinions about VNA's compliance with the standard of care. VNA also argues that Mr. Humann's opinions about the knowledge of VNA employees in 2015— elicited at redirect during his deposition—are improper, late amendments to his report.

Mr. Humann's first conclusion regarding VNA is that VNA breached its duties as a professional engineer when, in 2014, it failed to warn City of Flint or State of Michigan officials about the dangers of failing to use proper corrosion controls. (ECF No. 330-26, PageID.15207.)

As will be set forth in the Court's forthcoming opinion on VNA's pending motion for summary judgment, Michigan law does not support

imposing a duty to warn on VNA in 2014, even if Mr. Humann reliably opines that engineers have a professional duty to warn. Whether a legal duty exists is a question of law. *Dyer v. Trachtman*, 470 Mich. 45, 49 (2004) (citing *Simko v. Blake*, 448 Mich. 648. 655 (1995)). To determine whether a legal duty can be imposed under Michigan law the Court must apply the framework set forth in *In re Certified Question*, 479 Mich. 498 (2007). Expert testimony does not replace the required legal analysis, and the professional duties of an engineer are not necessarily the same as her legal duties under Michigan law.

It is a longstanding rule of the common law that "the fact that [an] actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Restatement (Second) of Torts, §314.[3] Accordingly, even if all of Mr. Humann's opinions relating to VNA's conduct in 2014 were reliable and accurate, they would not establish that VNA owed a legal duty to the four bellwether Plaintiffs in 2014. These opinions are therefore not relevant, and Mr. Humann will not be permitted to testify

---

[3] In its summary judgment opinion and order the Court will review the exceptions to this rule and explain why they do not apply in this case.

to them at trial for the purpose of establishing that VNA had a legal duty to Plaintiffs in 2014.

Mr. Humann next opines that once VNA became employed by the City of Flint, it should have insisted that the City use proper corrosion controls. Alternatively, if VNA knew that the City of Flint would not use corrosion controls, VNA should have recommended that the City return to DWSD for its drinking water.

Mr. Humann explains that VNA, like any professional engineer with similar expertise, would have known that corrosion controls are required to control lead and copper in drinking water. (ECF No. 330-26, PageID.15204.) Indeed, DWSD—VNA's prior employer—*did* add orthophosphates for precisely that purpose. *Id.* It is undisputed that when VNA wrote its 2015 report to the City of Flint, it knew that orthanophosphates were not being used. Accordingly, Mr. Humann opines that VNA knew of a danger to public health at that time, triggering a duty to warn its employers.

Mr. Humann then reviews VNA's 2015 report. That report contains the following discussion of corrosion control:

> Corrosion Control--The primary focus of this study was to assure compliance with the TTHM limits. That is not the only problem facing the city and its customers though. Many people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes. The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water. Polyphosphate addition will not make discolored water issues go away. The system has been experiencing a tremendous number of water line breaks the last two winters. Just last week there were more than 14 in one day. Any break, work on broken valves or hydrant flushing will change the flow of water and potentially cause temporary discoloration.

(*Id.* at PageID.15204.) It is clear that this passage does not contain a warning about the dangers of lead leaching into the water. VNA does not argue that the report warns about that danger in any other way. Moreover, Mr. Humann has extensive experience both writing and reviewing similar reports in similar contexts. Accordingly, his opinion that VNA's 2015 report failed to warn of an ongoing danger to public health is reliable.

VNA argues that Mr. Humann's opinions should be disregarded in their entirety because of Mr. Humann's lack of knowledge about the facts of this case. It is true that Mr. Humann did not read the depositions of VNA employees or review records of communications between VNA and the City. But while this means that Mr. Humann cannot testify that VNA

*never* issued the required warning, it does not affect the reliability of his evaluation of VNA's 2015 report. That testimony is admissible.

VNA also objects to opinions Plaintiffs' counsel elicited from Mr. Humann during redirect examination, regarding e-mails sent by VNA employees. It is not clear how Mr. Humann's role as an expert witness on engineering is served by testimony about the contents of VNA employee emails. Experts testify in order to clarify issues that are "beyond the ken of ordinary lay persons." *See In re Heparin Prod's Liab. Litig.*, 803 F.Supp.2d 712, 745 (N.D. Oh. 2011). The jury will be capable of determining whether a message implies knowledge without the aid of expert testimony. If Plaintiffs do seek to elicit this testimony at trial, and the purpose is not supported by the Rules of Evidence, VNA can raise its objections at that time. Plaintiffs will be required to inform the Court the day prior to Mr. Humann's testimony if they intend to pursue this line of questioning.

### F. Testimony Regarding Unethical Conduct

Finally, Mr. Humann's report contains some references to ethical violations, as distinct from violations of the applicable standard of care. Both VNA and LAN argue that any testimony regarding ethical

violations on their part should be excluded as more prejudicial than probative.

Although one informs the other, ethical standards are distinct from legal standards and the morality of Defendants' conduct is not at issue in this case. Accordingly, Mr. Humann will not be permitted to testify to his personal views about the ethics of Defendants' conduct. District courts routinely exclude such testimony in similar circumstances. *E.g., In re Welding Fume Prods. Liab. Litig.*, 2010 WL 7699456 at *24 (N.D. Oh., June 3, 2010) (distinguishing ethical from legal standards, holding former to be irrelevant); *In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531, 544 (S.D.N.Y. 2004) (same); *In re Baycol Prods. Litig.,* 532 F.Supp.2d 1029, 1054 (D. Minn. 2007) (expert could testify to standard of care but without reference to his personal views as to whether defendants acted ethically).

This restriction should not be interpreted to extend to general testimony regarding the contents of ethical and professional guidelines. Such testimony is clearly relevant, because ethical and professional guidelines inform the "the care, skill, and diligence ordinarily possessed," by engineers—the core of Mr. Humann's testimony. *Cox*, 467 Mich. at 21.

Mr. Humann may explain and apply those guidelines consistent with this decision. Only testimony regarding Mr. Humann's personal opinions about the morality of Defendants' conduct is prohibited.

## IV.   Conclusion

For the reasons set forth above, Plaintiffs' motion for leave is GRANTED and VNA's motion to exclude Mr. Humann's opinions and testimony is GRANTED IN PART and DENIED IN PART.

A limited *Daubert* evidentiary hearing regarding the single undecided issue in LAN's motion to exclude will be held on January 10, 2022, at 2:00 PM.

IT IS SO ORDERED.

Dated: December 24, 2021          s/Judith E. Levy
Ann Arbor, Michigan               JUDITH E. LEVY
                                  United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 24, 2021.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager

31