# Exhibit 5

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MICHIGAN
 2                  SOUTHERN DIVISION
 3   _____
 4                                    No. 5:16-cv-10444
     IN RE:  FLINT WATER CASES        Hon. Judith E. Levy
 5                                    Mag. Mona K. Majzoub

     _____
 6
 7
 8
                      HIGHLY CONFIDENTIAL
 9      VIDEOTAPED DEPOSITION OF ROBERT T. NICHOLAS
10                       VOLUME I
11              Monday, December 9, 2019
                      at 9:05 a.m.
12
13
14   Taken at:  Weitz & Luxenberg PC
                3011 West Grand Boulevard, Suite 2100
15              Detroit, Michigan  48202
16
17
18
19
20
21   REPORTED BY:  CAROL A. KIRK, RMR/CSR-9139
22             GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
23                 deps@golkow.com
24
```

```
 1                    STATE OF MICHIGAN
        IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE
 2     _____
 3     IN RE:  FLINT WATER LITIGATION     Case No. 17-108646-NO
                                          Hon. Richard B. Yuille
 4     _____
 5     JENNIFER MASON, CARL ROGERS,
       II, TERESA SPRINGER, JEFFREY
 6     DUSHANE, DEBORAH CULVER,
       DR. TRISTIN HASSEL, ADAM DILL
 7     AND DAVID YEOMAN, on behalf of
       themselves and a class of all
 8     others similarly situated,
 9         Plaintiffs,                    Case No. 16-106150-NM
                                          Hon. Richard B. Yuille
10         vs.
11     LOCKWOOD, ANDREWS & NEWNAM, PC,
       a Michigan corporation, and
12     LOCKWOOD, ANDREWS & NEWMAN,
       INC., a Texas corporation, and
13     LEO A. DALY COMPANY, a Nebraska
       corporation, ROWE PROFESSIONAL
14     SERVICES COMPANY f/k/a ROWE
       ENGINEERING, INC., a Michigan
15     corporation, VEOLIA NORTH
       AMERICA, LLC, a Delaware
16     limited liability company,
       VEOLIA NORTH AMERICAN, INC., a
17     Delaware corporation, VEOLIA
       WATER NORTH AMERICA OPERATING
18     SERVICES, LLC, a Delaware
       limited liability company
19     and VEOLIA ENVIRONMENT S.A.,
       a transnational corporation,
20
           Defendants.
21     _____
22
23
24
```

```
 1                A P P E A R A N C E S
 2                      - - -
 3  On behalf of the Class Plaintiffs:
         JORDAN CONNORS, ESQUIRE
 4       SUSMAN GODFREY L.L.P
         1201 Third Avenue, Suite 3800
 5       Seattle, Washington  98101
         206-516-3814
 6       kpeaslee@susmangodfrey.com
 7  On behalf of Individual Plaintiffs:
         COREY M. STERN, ESQUIRE
 8       LEVY KONIGSBERG LLP
         800 3rd Avenue, 11th floor
 9       New York, New York  10022
         212-605-6200
10       cstern@levylaw.com
11  On behalf of Individual Plaintiffs:
         DONALD H. DAWSON, JR., ESQUIRE
12       FIEGER LAW
         19390 West Ten Mile Road
13       Southfield, Michigan  48075-2463
         248-355-5555
14       d.dawson@fiegerlaw.com
15  On behalf of the Mason State Court Plaintiffs:
         JAYSON E. BLAKE, ESQUIRE
16       MCALPINE PC
         3201 University Drive, Suite 200
17       Auburn Hills, Michigan  48326
         248-373-3700
18       jeblake@mcalpinepc.com
19  On behalf of the People of the State of Michigan:
         MARGARET A. BETTENHAUSEN and
20       CHARLES A. CAVANAGH
         ASSISTANT ATTORNEYS GENERAL
21       DANA NESSEL, ATTORNEY GENERAL
         525 West Ottawa Street, 6th Floor
22       Lansing, Michigan  48909
         517-335-7664
23       bettenhausenm@michigan.gov
         cavanaghc2@michigan.gov
24
```

Case 5:17-cv-10164-JEL-KGA ECF No. 553-5, PageID.42200 Filed 12/28/21 Page 5 of 16
Highly Confidential - Robert T. Nicholas

```
 1              A P P E A R A N C E S (CONT'D)
 2                         - - -
 3   On behalf of Defendants Veolia Water North America
     Operating Services, LLC, Veolia North America, LLC, and
 4   Veolia North America, Inc.:
             BRYAN D. MCELVAINE, ESQUIRE
 5           KRISTIN M. DUPRE, ESQUIRE
             CAMPBELL CONROY & O'NEIL, P.C.
 6           1205 Westlakes Drive, Suite 330
             Berwyn, Pennsylvania  19312
 7           610-964-6381
             bmcelvaine@campbelltriallawyers.com
 8           kdupre@campbelltriallawyers.com
 9   On behalf of Defendant City of Flint:
             SHELDON H. KLEIN, ESQUIRE
10           BUTZEL LONG
             41000 Woodward Avenue
11           Bloomfield Hills, Michigan  48304
             248-258-1616
12           klein@butzel.com
13   On behalf of Defendants Leo A. Daly Company and
     Lockwood, Andrews & Newnam, Inc.:
14           PHILIP A. ERICKSON, ESQUIRE
             PLUNKETT COONEY
15           325 East Grand River
             City Center, Suite 250
16           East Lansing, Michigan  48823
             517-333-6598
17           perickson@plunketcooney.com
18   On behalf of Defendant Adam Rosenthal (via
     teleconference):
19           JAMES A. FAJEN, ESQUIRE
             FAJEN & MILLER, PLLC
20           3646 West Liberty Road
             Ann Arbor, Michigan  48103
21           734-995-0181
             fajenlaw@fajenmiller.com
22
23
24
```

```
 1            A P P E A R A N C E S (CONT'D)
 2                      - - -
 3   On behalf of McLaren Regional Medical Center (via
     teleconference):
 4           SUSAN E. SMITH, ESQUIRE
             BEVERIDGE & DIAMOND, P.C.
 5           456 Montgomery Street, Suite 1800
             San Francisco, California  94104
 6           1-415-262-4000
             ssmith@bdlaw.com
 7
     On behalf of Defendants Bradley Wurfel and Daniel Wyant
 8   (via teleconference):
             CHRISTOPHER B. CLARE, ESQUIRE
 9           CLARK HILL PLC
             1001 Pennsylvania Avenue NW, Suite 1300 South
10           Washington, DC  20004
             202-572-8671
11           cclare@clarkhill.com
12   On behalf of Defendant Stephen Busch (via
     teleconference):
13           KRISTA A. JACKSON, ESQUIRE
             SMITH HAUGHEY RICE & ROEGGE
14           100 Monroe Center Street, NW
             Grand Rapids, Michigan  49503
15           616-774-8000
             kjackson@shrr.com
16
     On behalf of Defendant Darnell Earley (via
17   teleconference):
             JOSEPH FURTON, ESQUIRE
18           THE FURTON LAW FIRM
             290 Town Center Drive, Suite 420L
19           Dearborn, Michigan  48126
             313-574-4794
20           j.furton@perkinslawgroup.net
21
22   ALSO PRESENT:
23           Marc Myers, Videographer
24                      - - -
```

Highly Confidential - Robert T. Nicholas

 1   mean by "duty."  We had a responsibility to

 2   write a report and provide our findings to them.

 3          Q.   When you are performing work for a

 4   client at Veolia, do you do your best to provide

 5   candid advice to your clients?

 6          A.   Yes.  We do our best to provide

 7   the best advice possible.

 8          Q.   Do you think it's important to be

 9   candid with your clients?

10          A.   I think it's important to give

11   them good information, yes.

12          Q.   When you are issuing public

13   statements about your work, do you believe you

14   have a duty to be truthful?

15          A.   Yes, I do.

16          Q.   If you were aware of potential

17   issues or risks to a water system and you're

18   making statements to the public, do you agree

19   that it's important to be candid about potential

20   risks?

21              MR. MCELVAINE:  Objection.

22              You can answer.

23          A.   If we knew there was a risk and it

24   was documented, yes.

```
 1   meeting open to the public in which you

 2   presented the findings of the interim water

 3   quality report?

 4           A.    That was a public meeting.

 5           Q.    So the city council public works

 6   committee meeting was a meeting open to the

 7   public?

 8           A.    That's correct.

 9           Q.    Where did it happen?

10           A.    It was in I think the top floor of

11   city hall.  It was outside the council chambers.

12           Q.    Okay.  And about how many people

13   attended?

14           A.    I don't know.  It was probably a

15   room this big, and it was filled.

16           Q.    So dozens of people at least?

17           A.    I would say there were more than a

18   dozen people there, yes.

19           Q.    Were there 100 people there?

20           A.    I don't think there was 100 people

21   there.

22           Q.    Okay.  You understand that the

23   press covered the meeting, right?

24           A.    Yes, I understand they did.
```

Highly Confidential - Robert T. Nicholas

```
 1            Q.    You understand the press provided
 2   coverage of a lot of the work that Veolia did
 3   for the city of Flint, correct?
 4            A.    Yes, I'm aware.  They wanted to
 5   make it a transparent process.
 6            Q.    You know the reports were
 7   published and available to the public?
 8            A.    Yes.
 9            Q.    You know that reporters quoted you
10   and your colleagues at Veolia regarding findings
11   associated with the Flint water supply, correct?
12            A.    They may have.  I certainly didn't
13   read all the news press, but that wouldn't
14   surprise me.
15            Q.    You were sent summary recaps of
16   all the different articles written about
17   Veolia's work in Flint; were you not?
18                  MR. MCELVAINE:  Objection.
19                  You can answer.
20            A.    I don't know that I remember that.
21   I mean, I'm not saying it didn't.  But, yeah, we
22   probably did because we had a news clip service
23   that did that sort of stuff.  It's just not
24   something that pops into my mind.
```

Highly Confidential - Robert T. Nicholas

```
 1          Q.    You remember that the statements
 2   that you made to the public and the reports that
 3   were made public were generally covered by the
 4   press?
 5          A.    Yes.
 6          Q.    So you made statements with the
 7   intent that the public would hear them, correct?
 8                MR. MCELVAINE:  Objection.
 9                You can answer.
10          A.    Yes.
11          Q.    You understood it was important to
12   provide accurate information to the public in
13   Flint about the water quality in Flint, right?
14          A.    Yes.
15          Q.    You knew that statements you made
16   about the water quality in Flint could influence
17   whether the public would actually consume the
18   water, right?
19          A.    Yes.
20          Q.    You understand that it was very
21   important to know if the water was safe to drink
22   or not to the people of Flint at that time in
23   February 2015, correct?
24                MR. MCELVAINE:  Objection.
```

Highly Confidential - Robert T. Nicholas

```
 1                You can answer.
 2        A.      Yes.
 3        Q.      You understand that the public was
 4   relying on you as a water quality expert to let
 5   them know if the water was safe to drink or not,
 6   right?
 7                MR. MCELVAINE:  Objection.
 8                You can answer.
 9        A.      I'm not the water quality expert.
10   They were relying on Veolia to provide that.
11        Q.      Yeah, but you were the one that
12   wrote the report, right?
13        A.      No.  I'm the one that drafted the
14   report.  Multiple people were involved in the
15   report of putting the details in, such as the
16   technical people looking at it and the
17   communications people.
18        Q.      Okay.  I'm handing you what I'd
19   like marked as the next exhibit.
20                        - - -
21      (Nicholas Deposition Exhibit 12 marked.)
22                        - - -
23   BY MR. CONNORS:
24        Q.      Exhibit 12 is Bates-labeled
```

```
 1            Q.    You don't remember who had that
 2   idea?
 3            A.    No.  But I remember the discussion
 4   of "We're in compliance with that.  Do we only
 5   want to show a problem?"
 6            Q.    Okay.  So in January 2015, the
 7   city of Flint issues an RFP asking for a water
 8   quality consultant, correct?
 9            A.    Correct.
10            Q.    Veolia won that work and entered
11   into a contract with the city of Flint to be
12   that consultant, correct?
13            A.    Correct.
14            Q.    During the course of that work,
15   Veolia issued reports to the city of Flint and
16   the public, correct?
17            A.    Correct.
18            Q.    And in those reports, Veolia
19   didn't even mention the term "lead," let alone
20   the potential risks from lead in the Flint water
21   system, correct?
22            A.    Correct.
23            Q.    And during this time, you were
24   aware that lead could be a problem in the Flint
```

```
 1   water system, weren't you?
 2              MR. MCELVAINE:  Objection.
 3              You can answer.
 4        A.    There were some lead tests that
 5   came back from one of the schools that came to
 6   the city.  I passed that on to Mr. Gnagy so that
 7   Mr. Gnagy could give us a technical opinion and
 8   an evaluation of what that meant.
 9        Q.    So the answer is yes?
10              MR. MCELVAINE:  Objection.
11              You can answer.
12        A.    Yes.  We passed on that
13   information for technical review.
14        Q.    Okay.  So if you were aware that
15   lead could be a problem in the Flint water
16   system in February of 2015, why didn't you
17   include a mention of lead in the water quality
18   report that Veolia did for the city of Flint?
19              MR. MCELVAINE:  Objection.
20              You can answer.
21        A.    Again, I don't know that lead was
22   a problem.  What I did is we passed on those
23   test results to the technical team for them to
24   review and make that decision.
```

```
 1   not Mr. Gadis.  And so what I said is I agree
 2   with this transcript, "Well, the water is safe
 3   from the standpoint of all testing and
 4   chemicals."
 5              So I'm referencing the fact that
 6   it passed its compliance and regulatory testing.
 7   And I would agree with that statement in this
 8   transcript.
 9         Q.   Okay.  But to be clear, you used
10   the term "the water is safe," right?
11              MR. MCELVAINE:  Objection.
12              You can answer.
13         A.   The water is safe from the
14   standpoint of the testing and chemicals that are
15   put in there.  So I'm referencing -- I'm
16   referencing this safe relates to the -- it
17   passed the regulatory test.
18         Q.   Okay.  And you understand that the
19   people in Flint as of February 18, 2015 were
20   very eager to know whether their water was safe
21   or not, right?
22         A.   Yes.
23         Q.   And this is in response to a
24   person in the crowd who asked you to put it into
```

```
 1   layman's terms, right?
 2        A.   Yes.
 3        Q.   And you did use the phrase "the
 4   water is safe," right?
 5             MR. MCELVAINE:  Objection.
 6        A.   I'm sorry.  I did it in context of
 7   the water was safe from the standpoint of the
 8   testing and chemicals that are put in there.
 9        Q.   Okay.  So nine days before that,
10   you said, "Lead could be a problem based on the
11   water," right?
12        A.   As a non-technical person, any
13   positive test of the water would be a concern
14   for me, and I sent it to our technical people to
15   review.
16        Q.   Okay.  You're a non-technical
17   person, but you're the person who stood up
18   before the people in Flint and said, "Your water
19   is safe," right?
20             MR. MCELVAINE:  Objection.
21        A.   Again, I said that the water was
22   in compliance with the Safe Drinking Water Act
23   regulations.
24        Q.   And you said, "The water is safe"?
```

```
 1                  MR. MCELVAINE:  Objection.
 2          A.      Safe in accordance with the
 3   testing.
 4          Q.      Okay.
 5          A.      I'm in agreement with the
 6   transcript.
 7          Q.      Okay.  You also say, "Part of what
 8   we will do is look at the water quality testing
 9   and results for lots of different variables" in
10   Exhibit 16, correct?
11          A.      Correct.
12          Q.      But Veolia didn't do that, right?
13                  MR. MCELVAINE:  Objection.
14          A.      No.  As we talked about in the
15   February report and we talked about in the final
16   report, we looked at corrosion.  We looked at
17   bromate.  We looked at different things in the
18   water to make sure, and that's how we came to
19   the conclusion that corrosion control was needed
20   and other changes.
21          Q.      You didn't say in your report that
22   corrosion control was needed, did you?
23                  MR. MCELVAINE:  Objection.
24          A.      We added in the report that they
```