## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

*In re* Flint Water Cases                    Judith E. Levy
                                             United States District Judge

_____/

This Order Relates To:

*Bellwether I Cases*
Case No. 17-10164

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS VEOLIA NORTH AMERICA, LLC, VEOLIA NORTH AMERICA, INC., AND VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC'S MOTION FOR SUMMARY JUDGMENT [331]; AND DENYING MOTION *IN LIMINE* TO EXCLUDE HYPOTHETICAL QUESTIONS [497]

Plaintiffs bring this suit for professional negligence against Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC's (collectively "VNA"), Lockwood, Andrews and Newnam, Inc., Lockwood, Andrews and Newnam, P.C. (collectively "LAN"), and the Leo A. Daly Company ("LAD") for harms arising out of the Flint Water Crisis. Plaintiffs' cases

have been consolidated for the purpose of holding the first bellwether trial in the Flint Water litigation.

Currently before the Court is VNA's motion for summary judgment. For the reasons set forth below, VNA's motion is GRANTED IN PART and DENIED IN PART.

Also before the Court is VNA's motion *in limine* to exclude certain hypothetical testimony offered by City of Flint officials. For the reasons set forth below, that motion is DENIED.

## I. Background

Plaintiffs E.S., A.T., R.V., and D.W. are four children who allege they have suffered neurocognitive harms as a result of their exposure to lead-contaminated drinking water in the City of Flint. They bring this suit for professional negligence against VNA and two other companies, LAD and LAN. VNA is a large corporation which provided Detroit and Flint with water engineering services during the Flint Water Crisis. According to Plaintiffs, VNA's professional negligence contributed to their injuries.

The parties agree on the following basic facts. On April 25, 2014, the City of Flint switched its residential water supply from the Detroit

2

Water and Sewage Department ("DWSD") to the Flint River. Flint River water is more difficult to treat than the Lake Huron water used by DWSD. Prior to the switch, the Flint Water Treatment Plant ("FWTP") was refurbished to treat Flint River water, but that refurbishment was inadequate. Because of inadequate water treatment, lead leached from plumbing into the Flint's drinking water. The City of Flint did not reconnect to the DWSD water system until October 16, 2015. (*See* ECF No. 331, PageID.16762-16769 (VNA's brief describing these basic facts); ECF No. 185-2, PageID.5077-5093) (relevant allegations in Master Complaint)).

According to Plaintiffs, the FWTP water treatment process should have included measures to control or inhibit the corrosive properties of Flint River water. Such measures, Plaintiffs argue, would have prevented lead from leaching into their drinking water.

Shortly after Flint left DWSD in 2014, VNA was hired to conduct a system-wide evaluation of its operations, with an eye toward making DWSD more cost-efficient. VNA's work culminated in a formal report, which it submitted to DWSD, the Governor's Office, and several State of Michigan officials, on December 19, 2014. (ECF No. 442-5.) Because Flint

3

was not part of the DWSD system at any time during VNA's evaluation, the final report did not analyze the safety of Flint's water system or the wisdom of Flint's switch away from DWSD. *Id.*

In January of 2015, the City of Flint published a call for bids seeking a water engineer for the evaluation of "the City's efforts to improve the quality of drinking water provided by the City's utility system." (ECF No. 332-22, PageID.17501.) VNA responded with a bid offering to do a full-scale water quality analysis. On February 10, the City of Flint formally engaged VNA to conduct a more limited water quality analysis. (ECF No. 331-3.) The focus of this analysis was on TTHMs,[1] but VNA also investigated other water quality issues. (ECF No. 332-24.) VNA's report did not warn the City of Flint that its drinking water was unsafe or that immediate corrosion control measures were necessary to prevent the leaching of lead. However, VNA did recommend corrosion control "as a way to minimize the amount of discolored water." (ECF No. 332-24, PageID.17511.) VNA also recommended the addition of corrosion controls at a meeting with City and State of Michigan government

---

[1] Total Trihalomethanes (TTHMs) are disinfection byproducts that form when water is treated with chlorine.

4

officials on May 4, 2015. (ECF No. 332-31, PageID.17682.)[2] Meanwhile, the Michigan Department of Environmental Quality informed the City of Flint that the addition of corrosion controls was unnecessary. Ultimately, no corrosion controls were added to Flint River water.

Although the City of Flint had access to test results showing that Flint's drinking water contained dangerous amounts of lead, officials failed to turn those results over to VNA. (*See* ECF No. 330-1, PageID.14119-14120 (reviewing deposition evidence)). VNA's engagement with the City of Flint ended on March 12, 2015, with the submission of its final report.

According to Plaintiffs' expert engineer, Mr. Humann, a reasonable engineer in VNA's position would have urgently warned the City of Flint of the risk that lead would leach into drinking water and cause a serious danger to public health. Mr. Humann opines that a reasonable engineer would have warned Flint of the impending danger immediately after becoming aware of it, and he indicates that VNA would have known of

---

[2] The PowerPoint presentation cited by VNA shows that corrosion controls were recommended but does not show what reasons (if any) were provided for that recommendation.

the danger to Flint's water users when it worked for DWSD in 2014. (ECF No. 438, PageID.15199.) Mr. Humann also argues that once VNA was working for the City of Flint, it should have recommended immediate implementation of corrosion controls or a switch back to DWSD. (*Id.* at PageID.15204.) It is undisputed that VNA did not recommend that Flint switch back to DWSD for its water supply. (ECF No. 330-1, PageID.14129-14130 (VNA arguing that advocating for a return to DWSD was not within the scope of its agreement)).

Each of the four bellwether Plaintiffs was diagnosed with neurocognitive impairments by Plaintiffs' expert psychologist, Dr. Mira Krishnan. (*See* ECF No. 456 (discussing Dr. Krishnan's findings and observations)). D.W., R.V., and A.T. were diagnosed with mild neurocognitive disorder. (*Id.*, PageID.36654-36656.) E.S. was diagnosed with ADHD. (*Id.* at PageID.36657.) A.T. was also diagnosed with mood disorder. (*Id.* at PageID.36656.) Plaintiffs also each underwent a bone lead scan, which was conducted by Dr. Aaron Specht, another of Plaintiffs' expert witnesses. On the bases of these bone lead scans, Dr. Specht concluded that A.T., R.V., D.W., and E.S. were all subjected to

"substantial" lead exposure. (ECF No. 330-48, PageID.15638, 15640-15641, 15643.)

Plaintiffs further offer three general causation experts—Dr.'s Graziano, Bithoney and Michaels—who opine that lead poisoning can cause neurocognitive harms of the kind experienced by Plaintiffs. (*See* ECF No. 451, No. 487, No. 519 (*Daubert* rulings on each general causation expert)).[3]

VNA and Plaintiffs agree that Plaintiffs each drank Flint tap water in their homes during part of 2014, and that there is a material question of fact as to whether Plaintiff A.T. drank water through 2015. (ECF No. 330-1, PageID.14084.) A.T. is also known to have attended a school with water lead levels far above the regulatory limit. (ECF No. 330-15, PageID.14880). Regarding the other Plaintiffs' exposure to Flint water in 2015, the record contains the following evidence. D.W.'s mother testified that she instructed D.W. to stop drinking tap water in the summer of 2014. (ECF No. 378-5, PageID.27181.) However, D.W. may have drunk

_____

[3] As is noted in those opinions, these experts do not provide a direct link between lead poisoning and the diagnoses of mild neurocognitive disorder or mood disorder.

7

unfiltered tap water at the school she attended in Flint. (ECF No. 330-15, PageID.14887.) R.V.'s mother initially testified that R.V. stopped drinking tap water at home in 2014, (ECF No. 378-4, PageID.27155), but subsequently corrected her testimony to state that R.V. did not stop drinking the water until January of 2016, when her blood tested positive for lead:

> Well…I messed up on the dates, then, because I know that we were drinking water then at that time [in 2016]. Whenever she got a high result is when we stopped drinking the water.

(*Id.* at PageID.27165.) Finally, E.S.' mother (Ms. Wheeler) testified that her family stopped drinking tap water at home two months after April 2014. (ECF No. 378-42, PageID.28418.) However, Ms. Wheeler continued to wash dishes with tap water, and E.S.' grandmother cooked with it. (*Id.*, PageID.28420-28421.) Ms. Wheeler's children regularly visited their grandmother. *Id.* Ms. Wheeler's testimony also suggests that E.S. drank tap water at other people's homes:

> But still yet, when they go to other people houses and they don't quite believe, "Oh, the water is not this" to where they still practice however they practice at their own location where they stayed at.

(*Id.* at PageID.28418.)

8

The record does not contain quantitative analyses of the lead content of the water in Plaintiffs' homes. Accordingly, it is not certain that Plaintiffs were exposed to lead through consumption of tap water at their homes. Nevertheless, Plaintiffs' experts opine that consumption of Flint water, whether at home or elsewhere, was the most likely source of their exposure to lead. (*See, e.g.,* ECF No. 487, PageID.36884-36894.) After attempting to rule out other causes, Dr. Bithoney indicates that this exposure was also the most likely cause of Plaintiffs' neurocognitive injuries. (*See id.*, PageID.36895-36898).

VNA filed this motion for summary judgment on May 11, 2021, and it is fully briefed. The Court heard oral argument on November 3, 2021. (ECF No. 419.)

## II.   **Legal Standard**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all

9

facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## III.   Analysis

Plaintiffs' only claim against VNA is for professional negligence. To establish professional negligence under Michigan law, Plaintiffs must show that (1) VNA owed them a legal duty of care, (2) VNA breached this duty, (3) Plaintiffs were injured, and (4) VNA's breach caused Plaintiffs' injuries. *See, e.g., Henry v. Dow Chem. Co.*, 473 Mich. 63, 71-72 (2005). VNA argues that Plaintiffs have not succeeded in raising a material question of fact as to the duty, breach, or causation elements of their case.

For the reasons set forth below, Plaintiffs cannot establish that VNA owed them a legal duty prior to February 10, 2015. Therefore, summary judgment is appropriate as to claims arising from VNA's conduct in 2014. Once VNA began working for the City of Flint, however, it owed Plaintiffs a legal duty of care. Because a reasonable jury could find that VNA breached that duty and thereby contributed to Plaintiffs'

injuries, summary judgment is denied as to claims arising from VNA's conduct in 2015.

### A. Legal Duty

In Michigan, "the question whether the defendant owes an actionable legal duty to the plaintiff is one of law which the court decides after assessing the competing policy considerations for and against recognizing the asserted duty." *In re Certified Question*, 479 Mich. 498, 505 (quoting *Friedman v. Dozorc*, 412 Mich. 1, 22 (1981)). In considering whether the imposition of a duty is appropriate, courts must consider "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." *Id.* (quoting *Dyer v. Trachtman*, 470 Mich. 45, 49 (2004)). If there is no relationship to ground a duty, no duty may be imposed, and the other factors need not be considered. *Id.* at 508-509. Similarly, if the harm was not foreseeable, no duty may be imposed, and the other factors need not be considered. *Id.*

As this Court has recently explained, the required relationship need not be between the litigating parties. *In re Flint Water Cases*, No. 17-11726, 2021 WL 5237197, at *3-4 (E.D. Mich., Nov. 10, 2021) ("Lee"). Instead, those who undertake to perform a service for a third party

11

thereby take on a duty to use ordinary care to avoid physical harm to all foreseeable persons and property. *Id.* at *3 (collecting cases).

VNA argues that it owed no duties to Plaintiffs at any time, because it never stood in any relationship to Plaintiffs, undertook to perform any duty for Plaintiffs, or increased the risk of harm to Plaintiffs. (ECF No. 331, PageID.16783.) Plaintiffs in turn argue that VNA owed them a duty in both 2014 and 2015 because (1) the ordinary duty to avoid causing foreseeable harms applies, (2) VNA had a duty to Plaintiffs because it stood in a "special relationship" to Flint water users, and (3) the duty to take due care in undertakings set forth in Restatement (Second) of Torts §324(A) applies. (ECF No. 374, PageID.25184.)

## 1. **Duty in 2014**

Plaintiffs claim that VNA owed them a duty while it evaluated DWSD in 2014. They argue that VNA owed this duty because (1) its work for DWSD would have put it on notice of the impending harm to Flint citizens, and (2) any reasonable engineer who was on notice of such harm would have a duty to warn. Plaintiffs do not allege that VNA negligently conducted its work for DWSD or otherwise actively contributed to the Flint Water Crisis in 2014. Instead, Plaintiffs sole argument for liability

12

is that VNA knew of the danger to Flint residents and should have issued an urgent warning to the City of Flint or the State of Michigan. Plaintiffs may succeed on this theory only if they can establish that VNA owed them a legal duty to warn or aid. They cannot do so.

The general principle that there is no legal duty to render assistance to those in need is "[d]eeply rooted in the common law." 33 A.L.R. 3d. 301 §2(a). Courts have long upheld that principle in even the most extreme circumstances. *E.g., Yania v. Bigan,* 397 Pa. 316 (1959) (no duty to rescue drowning visitor on one's property); *Depue v. Flateau*, 100 Minn. 299 (1907) (passers-by have no legal duty to aid the sick, helpless, or injured they encounter on the road); *Prospert v. Rhode Island Suburban Ry. Co.*, 67 A. 522, 522-523 (R.I. 1907) (defendant railroad company had no duty to aid passenger who was stuck in train car at hazardously low temperatures for over 11 hours); *Hurley v. Eddingfield*, 156 Ind. 416 (1901) (no liability for physician who "[w]ithout any reason whatever…refused to render aid" to a dangerously ill patient, knowing that there was no other physician available to render the necessary help); *Baltimore & O.R. v. State to Use of Woodward*, 41 Md. 268, 290 (1875)

("no doubt" that "the law imposes no obligation on railroad companies or other carriers" to assist "sick or disabled" passengers).

Although this rule has frequently been criticized for its harshness and inconsistency with basic moral intuition, it continues to be followed in virtually every U.S. jurisdiction. *See, e.g.,* Restatement (Second) of Torts §314 ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid does not of itself impose upon him a duty to take such action."); *Doe-2 v. McLean County Unit Dist. No. 5 Bd. Of Dir's.*, 593 F.3d 507, 514 (7th Cir. 2010) (ordinarily, there is no duty to rescue or protect) (citing *Iseberg v. Gross,* 277 Ill. 2d 78, 316 (2007)); *Brown v. Commonwealth of Penn.*, 318 F.3d 473 (3d Cir. 2003) (no duty to rescue); *Fried v. Archer*, 139 Md. App. 229, 244n3 (2001) ("although the 'no duty to rescue' rule has been widely discussed and criticized…few states have enacted 'duty-to-aid' legislation"); *Myers v. United States*, 17 F.3d 890, 901 (6th Cir. 1994) (no-duty-to-rescue principle "fundamental rule of American tort law") (citing *Restatement (Second) of Torts*, §314)).

Michigan law is no different. *Bailey v. Schaaf,* 494 Mich. 595, 604 (2013) ("it is a basic principle of negligence law that, as a general rule,

there is no duty that obligates one person to aid or protect another")
(collecting cases); *Hill v. Sears, Roebuck and Co.*, 492 Mich. 651, 660
(2012) ("there is no duty that obligates one person to aid or protect
another"); *Lelito v. Monroe*, 273 Mich. App. 416 (2006) (same); *Smith v.
Jones*, 246 Mich. App. 270 (2001) (same). Because Michigan substantive
law applies to this case, these decisions are binding on this Court. *E.g.*
*Wieczorek v. Volkswagenwerk, A.G.*, 731 F.2d 309, 310 (6th Cir. 1984)
(decisions of Michigan Supreme Court and Michigan intermediate courts
binding on federal courts applying substantive Michigan law) (collecting
cases).

There are three limited exceptions to this general rule, but none
apply to this case. First, a duty of care—including a duty to rescue, warn,
or protect—is imposed where there is a "special relationship" between the
parties. *E.g., Bailey*, 494 Mich. at 604. For purposes of this duty, a special
relationship exists "where one person entrusts himself to the control and
protection of another, with a consequent loss of control to protect
himself." *Id.* (citing *Williams v. Cunningham Drug Stores, Inc.*, 429 Mich.
495, 499 (1988)). For instance, a landlord stands in this relationship to
her tenants, as does an owner to her invitees. *Id.* Plaintiffs did not

entrust themselves to the control or protection of VNA in 2014, however, nor did they rely on VNA. Accordingly, this exception does not apply.[4]

Second, there is a duty to provide affirmative protection from harms (or risks of harm) that a defendant herself has created. *E.g.* Restatement (Second) of Torts, §314, comment (d). In other words, one may not place another in danger and then refuse to assist. Since Plaintiffs do not allege that VNA actively placed them in danger in 2014, this exception does not apply.

Finally, where a defendant has power or control over a third party, there are situations where she may have a duty to prevent that third party from causing harm. Restatement (Second) of Torts §315(a); *Reinert v. Dolezel*, 147 Mich. App. 149, 157 (1985). For instance, parents have a duty to prevent their children from causing harms. Restatement (Second) of Torts §316. Because VNA did not control DWSD or the City of Flint, this exception also does not apply.

---

[4] Plaintiffs do assert that they stood in a special relationship to VNA because "VNA had a relationship with DWSD in 2014, and Plaintiffs had been receiving DWSD water up until April 25, 2014." (ECF No. 374, PageID.25200.) This indirect relationship is insufficient to establish that Plaintiffs entrusted themselves to the protection of VNA *after* April 25, 2014.

16

Plaintiffs argue that VNA's relationship with DWSD and the State of Michigan gave rise to a duty. (ECF No. 374, PageID.25200-25203.) As the Court explained in *Lee,* professionals who agree to undertake a task thereby trigger a duty to avoid foreseeable physical harms arising from that undertaking. *Lee*, at *3-4 (collecting cases). For instance, construction companies that take on a road work contract are liable in negligence to any passer-by who is foreseeably injured by their failure to take reasonable care. *Id.* But this rule shows only that if VNA had negligently advised DWSD in 2014, thereby foreseeably causing physical injury to DWSD customers, VNA could be held liable by those customers. Although that is how Plaintiffs characterize the situation between VNA and the City of Flint in 2015, it is not an accurate description of what happened in 2014.

There are neither allegations nor evidence to suggest that VNA negligently performed its duties for DWSD. Accordingly, the duty to take due care in undertakings cannot help Plaintiffs establish liability in 2014. That duty applies when physical harm foreseeably arises from *negligence* in an undertaking. *Lee,* at *3-4. VNA's relationship with DWSD or the State of Michigan is not enough, because VNA did not

negligently perform any of its tasks for DWSD.[5] *A fortiori*, the Plaintiffs' harms did not arise from any negligence in VNA's undertaking for DWSD. Put another way: VNA's relationship with DWSD does not give rise to a duty to Plaintiffs because VNA non-negligently completed its tasks, and those tasks were unrelated to Plaintiffs, the City of Flint, or the Flint Water Treatment Plant. VNA's work for DWSD relates to Plaintiffs' injuries in only one respect: it may have put VNA on notice of the danger to Plaintiffs. As set forth above, merely knowing about a danger is not sufficient to give rise to a legal duty. Accordingly, VNA's relationship with DWSD did not give rise to a legal duty to Flint water users.

Plaintiffs also maintain that the question of whether VNA owed them a duty in 2014 should be left to the jury. (ECF No. 374, PageID.25198-25199.) But it is well-established that the existence of a legal duty is a "question of law for the court to resolve." *Dyer*, 470 Mich. at 49 (citing *Simko v. Blake*, 448 Mich. 648, 655 (1995)). Plaintiffs cite to

---

[5] Even Plaintiffs' own expert, Mr. Humann, does not opine that VNA negligently performed its tasks for DWSD. Instead, Mr. Humann opines only that "VNA was or should have been aware of the water supply switch in Flint," and "had the opportunity and the obligation to insert its expertise into the growing crisis and offer solutions." (ECF No. 330-26, PageID.15206.)

*Farwell v. Keaton*, but that case holds only that when the duty question depends on a disputed issue of fact, that issue of fact must be determined by the jury. *Farwell v. Keaton*, 396 Mich. 281, 287-288 (1976). As explained above, VNA would not have owed Plaintiffs any duty even if all the facts are as Plaintiffs claim them to be. Accordingly, there is no predicate issue of fact to be decided by a jury.

For these reasons, Plaintiffs cannot establish that VNA owed them a legal duty in 2014, and summary judgment is appropriate on claims arising out of 2014.

## 2. Duty in 2015

VNA maintains that it also did not owe Plaintiffs any duty in 2015, once it began work for the City of Flint. But once VNA undertook to evaluate the quality of Flint's water, it had a duty to avoid foreseeable physical harms arising out of that undertaking. *Lee*, at *3-4; *Hill,* 492 Mich. at 660 ("Every person engaged in the performance of an undertaking has a duty to use due care or to not unreasonably endanger the person or property of others"); *Loweke v. Ann Arbor Ceiling and Partition Co.*, 489 Mich. 157, 166 (2011) (recognizing "preexisting common-law duty to use ordinary care in order to avoid physical harm to

foreseeable persons and property in the execution of its undertakings");
*Bearss v. Fazzini*, 2020 WL 3399571 at *2 (Mich. App., June 18, 2020)
(same).

VNA argues that summary judgment on the element of duty is
nevertheless appropriate because (1) the duty to take due care in one's
undertakings does not apply to professional negligence cases, (2) even if
it owed a duty of due care, it did not owe that duty to these bellwether
Plaintiffs, (3) the harm to Plaintiffs was not foreseeable, (4) public policy
militates against imposing a duty of due care on government contractors,
and (5) even if it owed a duty of due care to Plaintiffs, it did not owe them
the specific duties Plaintiffs argue were breached in this case.[6] None of
these arguments succeed.

It is true that the key to many malpractice claims "is whether…the
negligence occurred within the course of a professional relationship."
*Tierney v. Univ. of Mich. Regents*, 257 Mich. App. 681, 687 (2003); *see also*

---

[6] VNA also repeats a number of arguments to the effect that there is no general
duty to take due care to avoid foreseeable physical harm at all. The Court has already
rejected these arguments in *Lee* and they will not be revisited here. *Lee* at *2-4.
Michigan caselaw makes abundantly clear that those who begin an undertaking
thereby take on a duty to take reasonable care.

*Beaty v. Hertzberg & Golden, P.C.*, 456 Mich. 247, 253 (1997). But Michigan courts have made clear that the duty to take due care in one's undertakings applies to claims for professional as well as ordinary negligence. *See, e.g., Roberts v. Salmi*, 308 Mich. App. 605, 615 (2014) ("even in the absence of a professional-client relationship, Michigan's common law imposes on every person a general obligation to refrain from taking actions that unreasonably endanger others.") (citing *Clark v. Dalman*, 379 Mich. 251, 261 (1967)); *Auburn Hills Tax Increment Fin. Auth. v. Haussman Constr. Co.*, 2018 WL 385057 (Mich. App., Jan. 11, 2018) (recognizing that "the generally recognized common-law duty to use due care in undertakings" could apply to a professional negligence claim) (citing *Loweke v. Ann Arbor Ceiling & Partition Co.*, LLC., 489 Mich. 157, 169 (2011)).

Nor would a contrary rule make sense. It is hardly reasonable to hold the ordinary individual liable for a lapse in due care but immunize professionals from liability to anyone but their employer. The Michigan Supreme Court recognized as much when it rejected "a form of tort immunity that bars negligence claims raised by a noncontracting third party." *Loweke*, 489 Mich. at 168. VNA's status as a professional under

21

contract with the City of Flint does not protect it from liability to Plaintiffs.

VNA's argument that it owed no duty to Plaintiffs because it did not stand in any relationship to them is also without merit. As has been set forth above, Michigan courts routinely apply the duty to take reasonable care in one's undertakings in cases where there is no relationship between the parties, so long as there is a relationship between the defendant and a third party. *See Lee*, *3-4 (collecting cases). VNA's undertaking for the City of Flint is sufficient to establish a duty to Plaintiffs because VNA is alleged to have negligently completed that undertaking, and the undertaking—evaluating Flint water quality—was foreseeably related to Plaintiffs' physical safety. By contrast, VNA's undertaking for DWSD was not sufficient because that undertaking was unrelated to Plaintiffs, nor is there any evidence that VNA completed it negligently.

VNA next argues that the injury to Plaintiffs was not foreseeable because the City of Flint failed to provide VNA with test results showing that there was lead in the water. To be sure, this withholding of information may well have been criminal conduct, which is ordinarily

unforeseeable as a matter of law. *See, e.g., MacDonald v. PKT, Inc.*, 494 Mich. 322, 334-335 (2001). But Plaintiffs' expert witness opines that any reasonable engineer in VNA's position would have known that immediate corrosion control was necessary even without the test results the City withheld:

> VNA's duty did not require that it had positive test results of lead in Flint's drinking water, or that it actually knew there was lead in Flint's drinking water—as the above-mentioned problems sufficed to inform an engineering firm like VNA that corrosion was a significant problem in a water system that was most certainly comprised primarily of lead pipes.

(ECF No. 414-1, PageID.31284) (supplemental affidavit of Mr. Humann). Accordingly, Plaintiffs have raised a material issue of fact as to the foreseeability of the harm.

VNA contends that even if its undertaking for the City of Flint was sufficient to create a duty to Plaintiffs, and even if the harm to Plaintiffs was foreseeable, a duty should nevertheless not be imposed because public policy militates against it. According to VNA, imposing a duty of due care in this case would have "far-reaching effects," greatly burden those who provide professional services in the public sector, and amount

to imposing "a duty of care that extends to every resident of the United States" on federal contractors. (ECF No. 330-1, PageID.14123.)

These are remarkable claims. The only duty being imposed in this case is the duty to take reasonable care to avoid foreseeable physical harms. It is hard to see how a duty to do one's job in a reasonably competent way could amount to the great burden VNA complains of. There is nothing new or extraordinary about this duty—indeed, as the Court explained in *Lee,* most states impose *more* expansive duties to prevent harm. *Lee*, at *2; *Huang v. The Bicycle Casino, Inc.,* 4 Cal.App.5th 329, 341 (Cal. Ct. App. 2016) ("California law establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others.") (collecting cases and quoting Cal. Civ. Code §1714(a)); *Coffey v. City of Milwaukee*, 74 Wis.2d 526, 536 (1976) (everyone owes an obligation of due care to refrain from acts that will cause foreseeable harm) (citing *De Bauche v. Knott,* 69 Wis.2d 119 (1975)); *Turpen v. Granieri*, 133 Idaho 244, 247 (1999) ("every person…has a duty to exercise ordinary care to 'prevent unreasonable, foreseeable risks of harm to others.'") (quoting *Sharp v. W.H. Moore, Inc.*, 118 Idaho 297, 300 (1990)).

24

Nor does this ruling imply that federal contractors owe a newly expansive duty to every United States resident. Like all contractors, federal and state contractors must take reasonable care in their undertakings. The fact that one works for the government does not change this familiar rule. As the Supreme Court long ago recognized, even the United States government itself owes a duty of due care in undertakings. *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955) (once Coast Guard began to operate lighthouse, it had a duty to do so with reasonable care). Accordingly, public policy does not relieve VNA of its basic duty to take due care in its undertakings.

Finally, VNA argues that even if it owed Plaintiffs a duty of due care, it did not owe Plaintiffs the duties identified by Plaintiffs' expert, Mr. Humann, namely (1) to strongly recommend the use of corrosion inhibitors, and (2) in the alternative, to recommend a return to DWSD.

According to VNA, it could not owe the first duty because it could not "force its clients to do anything." (ECF No. 330-1, PageID.14127.) While Mr. Humann opines that VNA should have "insisted" on the use of corrosion inhibitors, it is clear that he does not mean to imply that VNA could force the City of Flint to do so. Instead, Mr. Humann reasonably

25

differentiates between a "weak" and a "strong" recommendation. (ECF No. 330-26, PageID.15204) (faulting VNA for only "weakly" suggesting corrosion controls). There is a difference between the suggestion that one consider using corrosion controls to partially resolve discoloration issues with the water, and the urgent warning that a failure to use corrosion inhibitors immediately would result in the widespread lead poisoning of Flint residents. Mr. Humann opines that the situation warranted the latter, while VNA only issued the former. That opinion does not assume that VNA could have forced the City of Flint to listen.

VNA claims it could not owe the second duty because the City had indicated that it was not willing to consider a return to DWSD. According to VNA, imposing a duty to recommend anything the City was not willing to consider would amount to holding "professionals who enter a limited engagement…retroactively…liable for not going beyond the scope of the engagement." (ECF No. 330-1, PageID.14130.) But Mr. Humann does not claim that VNA should have gone beyond the scope of its agreement. According to Mr. Humann, VNA should have warned the City of Flint that it had only two ways to render its drinking water safe: to immediately implement corrosion inhibitors or to return to DWSD. Mr.

Humann indicates that VNA would have known these were Flint's only options without doing any work outside the scope of its agreement. Accordingly, the duty asserted by Plaintiffs' expert does not involve requiring experts to do work outside the scope of their agreement.

VNA appears to argue that merely *issuing* the recommendation would have constituted work outside of its engagement, but that is not persuasive. The mere fact that a client does not wish to do something does not categorically absolve professionals from the duty to recommend it. An architect whose clients wish to build a foundationless swamp home does not exceed the scope of his engagement when they warn that such a home would quickly collapse. If—as the Court must assume at summary judgment—a switch to DWSD was the only alternative to the immediate implementation of corrosion inhibitors, then VNA would not have exceeded the scope of its engagement by warning the City of that fact.

In sum: because VNA began an undertaking for the City of Flint, it owed Plaintiffs a duty of due care to avoid foreseeable physical harms. A reasonable jury could choose to credit Mr. Humann's explanations of that duty. Accordingly, summary judgment is not appropriate on the element of duty as to claims arising from VNA's 2015 conduct.

27

### 3. Duties Not Supported by Expert Testimony

VNA next asks the Court to grant summary judgment as to theories of duty raised in the Complaint that are not supported by any expert testimony. The bellwether Plaintiffs are no longer pursuing any claims regarding TTHM's or the addition of ferric chloride. (ECF No. 450, PageID.36253) (Plaintiffs' counsel acknowledging that these theories cannot be brought to the jury due to the absence of expert testimony). Accordingly, VNA's motion for summary judgment on those theories is moot.

VNA also reads several other theories in the Complaint as unsupported by expert testimony, namely, Plaintiffs' allegations that VNA (1) should not have declared that Flint's drinking water met federal/state water quality requirements, (2) should not have represented that Flint's drinking water was safe, (3) should have warned the City of Flint about the dangers of lead leaching into Flint's water system, and (4) should have recommended the addition of phosphates to the water. (ECF No. 330-1, PageID.14106.) As should be evident from the above, VNA's argument with respect to theories (3) and (4) is entirely without

28

merit. Far from being unsupported by expert testimony, those theories form the core of Mr. Humann's reports and testimony.

Similarly, Mr. Humann's testimony supports the theory that VNA should have told the City of Flint that its drinking water was unsafe. As is clarified by its pending motion *in limine*, however, (ECF No. 499), VNA's real concern is with the theory that its statements to the general public were also negligent. While Plaintiffs seek to introduce VNA's statements to the public as evidence of VNA's negligence, Plaintiffs do not argue that VNA's statements to the general public caused their injuries. There is no need for summary judgment on claims Plaintiffs do not bring.

## IV.   Breach

VNA argues that summary judgment is appropriate on the element of breach. VNA's only arguments for this proposition repeat the arguments of its *Daubert* motion to exclude Mr. Humann. For the reasons set forth in the Court's opinion resolving that motion, (ECF No. 523), these arguments do not succeed.

There is a material issue of fact as to whether VNA issued a sufficiently urgent warning regarding the need for corrosion inhibitors.

29

Moreover, it is undisputed that VNA did not recommend a return to DWSD. Because a reasonable jury could find that VNA did not issue a sufficiently urgent warning, or that VNA should have recommended a return to DWSD, or both, summary judgment on the issue of breach is not appropriate. *Cf. Glittenberg v. Doughboy Recreational Indus.*, 536 Mich. 673, 799 (1990) ("the adequacy of…warnings is a question for the jury").

## V. Causation

This case presents an unusually complex set of causal questions. As in any negligence case, Plaintiffs must establish but-for cause ("cause-in-fact") and proximate cause ("legal causation"). *E.g. O'Neal v. St. John Hosp. & Medical Ctr.*, 487 Mich. 485, 496-97 (2010) (collecting cases).[7] To show that VNA's conduct was the cause-in-fact of their injuries, Plaintiffs must show that, but for VNA's conduct, those injuries would not have occurred. *Id.* To show that VNA's conduct was also the legal cause of their injuries, Plaintiffs must show that their injuries were a reasonably

---

[7] *O'Neal*, like several older Michigan Supreme Court decisions, characterizes both of these elements as part of the proximate causation analysis. That doctrinal confusion was later corrected in *Ray v. Swager*, 501 Mich. 52 (2017), which explained that proximate cause and cause-in-fact are two separate elements of the broader causation inquiry. *See also* Restatement (Second) of Torts, §430-31.

foreseeable consequence of VNA's negligence. *E.g. Ray v. Swager*, 501 Mich. 52, 66 (2017).

This is also a toxic torts case. Accordingly, Plaintiffs must prove general and specific causation. *See generally Powell-Murphy v. Revitalizing Auto Comm's Env. Response Trust,* 333 Mich. App. 234, 250 (2020) (setting forth causation elements for toxic torts). General causation "pertains to whether a toxin is capable of causing the harm alleged." *Id.* (quoting *Lowery v. Enbridge Limited P'ship.*, 500 Mich. 1034, 1043 (2017) (Markman, C.J., concurring)). Specific causation, in turn, requires "proof that exposure to the toxin more likely than not caused *the plaintiff's* injury." *Id.* (quoting *Lowery*, 500 Mich. at 1044)). In this case, then, Plaintiffs must show that lead poisoning could, and in fact did, cause their injuries.

The fact that VNA did not owe Plaintiffs any legal duties in 2014 intertwines these analyses, because it further restricts the causal inquiry to the effects of VNA's conduct in 2015—close to a year after the beginning of the Flint Water Crisis. To show that *VNA* causally contributed to their injuries, Plaintiffs must show that (1) lead poisoning *in 2015* caused or contributed to their injuries, (2) their lead poisoning

was due to exposure to Flint water, (3) VNA's negligence caused or contributed to the presence of lead in Flint water, and (4) Plaintiffs' lead poisoning was a reasonably foreseeable consequence of VNA's negligence.

Although VNA raises serious concerns as to all four steps in this causal chain, Plaintiffs have put forward sufficient evidence to create a material question of fact as to whether VNA causally contributed to their injuries. Accordingly, summary judgment is inappropriate.

## A. Lead Poisoning and Water Consumption in 2015

VNA first disputes that Plaintiffs were lead poisoned due to their consumption of Flint water in 2015. According to VNA, there is no record evidence that R.V., E.S., or D.W. drank *any* Flint tap water in 2015. Moreover, VNA argues, there is also no evidence that any Flint water Plaintiffs did consume actually contained any lead. And even if Plaintiffs consumed *some* water with *some* lead in 2015, VNA maintains that there is no evidence that the resulting lead exposure would have been sufficiently serious to causally contribute to Plaintiffs' injuries.

Viewing the record in the light most favorable to Plaintiffs, as the Court must at this stage, there is sufficient evidence that all four Plaintiffs drank at least some Flint water after February of 2015.

The testimony of E.S.' mother suggests that E.S. continued to be exposed to Flint tap water into 2015 at the home of her grandmother, who cooked with Flint water,[8] and at other people's homes. (ECF No. 378-42, PageID.28418, 28420-28421.) Ms. Wheeler also continued to wash dishes with Flint tap water. (*Id.* at PageID.28420.) As is set forth above, R.V.'s mother testified that her family did not stop drinking unfiltered Flint water until January of 2016. (ECF No. 378-4, PageID.27165.) The fact that Ms. V. earlier testified that they stopped drinking the water in 2014 does not establish that summary judgment is appropriate. To the contrary, conflicting testimony within depositions ordinarily precludes summary judgment. *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 595 (6th Cir. 2009); *see also Jeffreys v. City of New York,* 426 F.3d 549, 555n2 (2d Cir. 2005) ("if there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because an earlier account was ambiguous [or] confusing").

---

[8] VNA claims that E.S.' grandmother used a water filter, but that is incorrect. Ms. Wheeler's testimony shows that E.S.' grandmother did not receive a water filter until the end of 2015. (ECF No. 378-3, PageID.27137.)

The record is least developed as to Plaintiff D.W., whose mother testified that her family did not drink untreated Flint tap at her home after mid-2014. (ECF No. 378-5, PageID.27181.) As Dr. Michaels notes, however, D.W. was likely exposed to Flint water at her school through 2015. (ECF No. 330-15, PageID.14887.) VNA objects that there is no record evidence that D.W. ever drank any water at school. But at summary judgment, the Court must view "any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech*, 95 F. App'x at 135 (citing *Skousen*, 305 F.3d at 526). It is reasonable to infer that D.W. drank at least some water while attending school in 2015.

VNA next points out that there is no clear evidence that any of the water Plaintiffs did consume in 2015 contained lead. As an initial matter, it bears repeating that substantial amounts of lead were detected in the bones of all four Plaintiffs. There is little question that Plaintiffs were exposed to lead. That exposure did not occur in a vacuum: it broadly coincided with a major, city-wide crisis involving the lead pollution of Flint's drinking water. Moreover, the Court has already held that Dr. Bithoney may testify that Flint water was the most likely source for the

Plaintiffs' exposure to lead. (ECF No. 487, PageID.36895-36898.) Accordingly, Plaintiffs have raised sufficient evidence to survive summary judgment on these issues.

Plaintiffs must still establish that at least part of their exposure to lead in Flint's water occurred in 2015. A.T. attended a Flint school where the water was later found to contain lead far above the regulatory limit of 15ppb (ECF No. 330-15, PageID.14880), and it is reasonable to infer that she drank at least some of that water. Accordingly, there is an issue of material fact as to whether A.T. was exposed to Flint water containing lead in 2015.

The evidence is not as unambiguous as to D.W., E.S., and R.V., but direct evidence is not necessary. To survive summary judgment Plaintiffs need only show sufficient evidence to "facilitate reasonable *inferences* of causation." *Genna v. Jackson*, 286 Mich. App. 413, 421 (2009) (emphasis added) (quoting *Skinner v. Square D Co.*, 445 Mich. 153, 164 (1994)). There is admissible testimony in the record suggesting that the water in E.S.' home contained lead due to the presence of lead solder in his home. (ECF No. 519, PageID.39910.) Since E.S.' mother continued to wash dishes with that water, this accounts for at least some exposure. (*See* ECF

35

No. 435, PageID.33760) (expert explaining that lead exposure can occur through dishwashing). Moreover, although E.S. was instructed not to drink any tap water at his home, he was only three at the time. A jury could surely infer that a three-year-old does not invariably follow parental instructions. And E.S. visited other people's homes, where he was exposed to untreated water. Given the widespread nature of the Flint Water Crisis, it is not improbable that the water in some of those homes also contained lead. Viewing all of this evidence in the light most favorable to Plaintiffs, it is not unreasonable to infer that E.S. was exposed to at least some Flint water containing lead in 2015.

The evidence suggests that R.V. drank the same tap water, at her home and elsewhere, in 2014 and 2015. Accordingly, the evidence suggests that R.V. was either exposed to water containing lead in both years—or not at all. Dr. Bithoney opines that consumption of Flint water is the most likely source of the lead that was detected in R.V.'s bones. A jury could choose to credit that testimony. If it does, it could reasonably infer that because R.V. drank the same water in 2015 as in 2014, the exposure to lead occurred during both years.

Finally, D.W. was 6 years old at the time her mother instructed her to stop drinking Flint water at home. (ECF No. 330-15, PageID.14887.) As Plaintiffs' experts note, it would be unreasonable to expect that D.W. followed this instruction to the letter. Moreover, D.W. continued bathing in unfiltered Flint water at home even after the summer of 2014, (*Id.*), and was also likely exposed to unfiltered tap water at her Flint school. (*Id.* at PageID.14887-14888.) The Court is not convinced that no reasonable juror could infer from this evidence that D.W. was exposed to at least some lead contaminated Flint water through 2015.

VNA next argues that even if Plaintiffs were exposed to lead in 2015, they have not shown that they were exposed to *enough* lead to cause or contribute to their injuries. Michigan law requires toxic torts plaintiffs to present evidence of "the level of the toxi[n]…to which they were exposed." *Powell-Murphy*, 333 Mich. App. at 251.

While Plaintiffs have offered bone lead scans showing their overall exposure to lead, no expert has determined precisely how much of that exposure occurred after February 18, 2015—i.e., after VNA arrived in Flint. As VNA points out, Plaintiffs also do not offer evidence showing

precisely how much water they drank between February and October of 2015, and how much lead that water contained.

Plaintiffs' record on this issue is, therefore, limited. But while Michigan law requires that evidence of causation is not "mere speculation," it permits "reasonable inferences of causation" based on "circumstantial evidence." *Powell-Murphy*, 333 Mich. App. at 246 (citing *Skinner*, 445 Mich. at 162-63). Here, as in every other case, the Court must consider whether there is enough evidence to permit a reasonable jury to find in favor of Plaintiff—not whether Plaintiffs have brought an open-and-shut claim.

VNA would require Plaintiffs to show not only how often each child drank water, but also "what the concentrations of lead [were] in the water," and "how much of their water intake came from [their] schools." (ECF No. 330-1, PageID.14161.) Such draconian evidentiary requirements are plainly inconsistent with the well-established rule that causation may be established through circumstantial evidence. *Skinner,* 445 Mich. at 162-63. They would also make toxic torts unwinnable claims. Individuals do not ordinarily scan their environment proactively for toxins, nor do they keep detailed records of their exposure to anything

that might later be found to have contained something dangerous. The law does not require such constant vigilance. As the Sixth Circuit has explained:

> Michigan law…requires only that a plaintiff claiming negligence prove his or her case by a preponderance of the evidence, and does not require that a plaintiff alleging exposure to a harmful substance prove with certainty that he or she was exposed to a particular chemical. Therefore, Plaintiffs may survive summary judgment if a reasonable jury could find that it is more likely than not that Defendants caused Plaintiffs to be exposed to a sufficient quantity of a hazardous substance capable of causing their injuries.

*Gass v. Mariott Hotel Serv.'s, Inc.*, 558 F.3d 419, 431 (6th Cir. 2009) (citing *Liberty Mut. Ins. Co. v. Bay City, Water Dept.,* 367 Mich. 8, 116 (1962)). The plaintiffs in *Gass* not only lacked precise proof of the degree of their exposure—they could not even prove with any degree of certainty *which* chemical had caused their injuries. *Id.* Nevertheless, the Sixth Circuit reversed the summary judgment in favor of defendants, because there was evidence that defendants sprayed plaintiffs' hotel room with

pesticides, and soon after, plaintiffs experienced symptoms consistent with pesticide poisoning. *Id.*[9]

Accordingly, Plaintiffs' inability to prove exactly how much lead they consumed after February 18, 2015, is not fatal to their case. Several expert witnesses testified that blood lead levels of as little as 1 µg/dl are sufficient to cause intellectual harms.[10] (*See, e.g.,* ECF No. 487, PageID.36866-36869) (reviewing Dr. Bithoney's general causation testimony). As Dr. Bithoney explained, a child who drinks approximately four glasses of water containing 10 ppb would consume 10 µg of lead in a single day, 50-100% of which would be absorbed in the bloodstream. (ECF No. 330-18, PageID.15025.) After only ten days of consecutive exposure,

---

[9] *Powell-Murphy* arguably represents a shift in the direction of more stringent evidentiary requirements, but even in that case the parties had far less evidence regarding the degree of their toxic exposures than present Plaintiffs do. In *Powell-Murphy*, unlike here, the plaintiffs could not even establish that they had been exposed to a toxin at all. *Powell-Murphy*, 333 Mich. at 251-53.

[10] VNA argues that Plaintiffs inappropriately rely on the theory that *any* exposure to lead is harmful. The Court has addressed this argument at length in several *Daubert* opinions (e.g. ECF No. 451, ECF No. 487) and will not repeat that analysis here. For the reasons set forth in the *Daubert* opinions, Plaintiffs experts are permitted to testify that 1 microgram / dl of lead causes neurocognitive harms, but not that *any* amount causes such harms.

the same toddler's blood lead levels could be as high as 0.67 µg/dl, approaching the 1 µg/dl toxicity threshold.[11]

In this case, there is evidence that lead levels at the Plaintiffs' schools—as measured in 2015, after VNA's arrival—sometimes far exceeded 10 ppb. For instance, 13 out of 31 sampled water fountains or faucets at A.T.'s elementary school showed lead levels over 15ppb, the highest of which was a shocking 326 ppb. (ECF No. 330-15, PageID.14880.) A toddler who drank the equivalent of two cups of water from the worst faucet at A.T.'s school could reach a blood lead level of over 1 µg/dl in just one day. Similarly, while there are no lead measurements of the water in Plaintiffs' residences or the homes they visited, there is record evidence that at least 40% of homes in Flint had water with a lead content of over 5 ppb, and at least 10% of homes had water with a lead content of over 25 ppb. *Id.* (ECF No. 330-34,

---

[11] As Dr. Bithoney explains, the average toddler has 1.5 liters (= 150 deciliters) of blood. ECF No. 330-18, PageID.15025. Thus, if 100% of 10 micrograms is absorbed into the bloodstream, this would result in a blood lead level of 10/150=0.067 micrograms per deciliter. If only 50% of 10 micrograms is absorbed, this would result in a blood lead level of 0.033 micrograms per deciliter. Over the course of 10 days, this results in blood lead levels of between 0.3 and 0.67 microgram/dl. (The half-life of blood lead is approximately 10 days in children and accordingly need not be accounted for in this example, *see* ECF No. 447, PageID.35622.)

PageID.15509.) As Dr. Bithoney explained, that study likely underrepresented the true percentage of homes with dangerous lead concentrations in their tap water. *Id*. And as has been set forth above, each Plaintiff likely consumed tap water both in their own home and elsewhere.

All of this suggests that a reasonable jury could find that in the eight-month period between VNA's arrival in Flint and Flint's return to DWSD, each Plaintiff consumed sufficient lead to cause or contribute to their neurocognitive injuries. *Cf. Gass*, 558 F.3d at 431. Accordingly, summary judgment is not appropriate on the element of specific causation.

## B. VNA's Causal Responsibility

Plaintiffs' case against VNA requires more than a showing that Flint's water caused their injuries. To survive summary judgment, Plaintiffs must also show that VNA was at least partially causally responsible for the lead in Flint's water. VNA argues that Plaintiffs cannot do so because the City of Flint would not have listened to VNA even if it had issued exactly the warnings prescribed by Mr. Humann.

As VNA points out, there is a great deal of evidence suggesting that city officials disregarded the health and safety of Flint residents when they considered whether to add proper corrosion controls to the Flint River water. (ECF No. 330-1, PageID.14137-14139.) Indeed, Flint officials were instructed to falsify lead test results to avoid disclosing the dangerously high lead levels of Flint drinking water. (*See* ECF No. 332-10, PageID.17418). Moreover, there is record evidence that the Michigan Department of Environmental Quality told City of Flint officials *not* to add corrosion inhibitors to the water, and that City officials relied on that instruction. *Id.*

Although this evidence of negligent conduct by government officials is disturbing, it does not prove that nobody would have listened to an urgent warning from VNA. Several government officials—including Gerald Ambrose, City Manager at the relevant time—testified that after reading VNA's report, they did not understand "corrosion control [to be] anything but an aesthetic issue."   (ECF No. 374-5, PageID.25428.) According to Ambrose, VNA never informed him that corrosion control was necessary to ensure public safety. *Id.* Ambrose testified that he would have considered a return to DWSD or the addition of proper

43

corrosion inhibitors, had VNA warned him that such measures were necessary to protect public health. (*Id.*, PageID.25429-25430.) Plaintiffs point to similar testimony from other Flint government officials, including Howard Croft, the City's public works manager. (ECF No. 374, PageID.25143-25144) (reviewing city officials' testimony).

VNA objects to all of this testimony, arguing that it is inadmissible under Federal Rule of Evidence 701(a) as self-serving, after-the-fact speculation. It is true that some courts have held that a party's self-serving testimony about what she would have done in a hypothetical situation is inadmissible. *See, e.g., Wash v. Dept. of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993) (plaintiff's testimony "as to what he would have done, had he seen the warning label…would not have been based upon [his] perception, but upon his self-serving speculation); *Kloepfer v. Honda Motor Co. Ltd.*, 898 F.2d 1452, 1459 (10th Cir. 1990) (same). Such rulings are based on the requirement that a witness' testimony be "rationally based on the witness' perception." Fed. R. Evid. 701(a). As the Advisory Committee Notes to this rule explain, this rule is equivalent to the familiar requirement that testimony be based on "first-hand knowledge or observation." *Id.*, *see* Advisory Committee Note (1972).

In the unique factual circumstances of this failure to warn case, the Court is not persuaded that Rule 701 requires the exclusion of testimony as to what City of Flint officials would have done with a proper warning. First, while such testimony is not based on observations, it is arguably based on the witness' "first-hand knowledge" of their own decision-making process. *Id.* More importantly, the Sixth Circuit recently relied on very similar hypothetical, self-serving testimony to reverse a grant of summary judgment in a failure to warn case. In *Payne v. Novartis Pharmaceuticals Co.*, 767 F.3d 526 (6th Cir. 2014), the plaintiff alleged that certain medications destroyed her jaw bones. Plaintiff brought suit against the manufacturer for its failure to warn her physician of this potential side-effect. *Id.* at 527. The Sixth Circuit held that: "two factual issues carry the plaintiffs past summary judgment: Payne's doctor made clear that he would have warned Payne had he known that [these medications] can destroy a patient's jaw bones, and Payne testified that she would not have taken the drugs had she been aware of the risk of this side effect." *Id.* at 528. This testimony is at least as hypothetical and self-serving as the testimony at issue here.

45

As the Sixth Circuit explained in *Payne*, causation issues in failure to warn cases should be presented to a jury unless the "uncontroverted facts…make [the issue] so clear that all reasonable persons must agree on the proper outcome." *Payne*, 767 F.3d at 527-28 (cleaned up) (citing *Haynes v. Hamilton Cnty.*, 883 S.W.2d 606, 612 (Tenn. 1994)). That rule makes sense. The causation inquiry in a failure to warn case relies on answers to "essentially unknowable" hypotheticals. *Id.* at 528. Accordingly, it is "especially suitable for the jury." *Id.*[12]

The Sixth Circuit has long trusted juries to "cull the truth out of…seeming contradictions." *Bathory v. Proctor & Gamble Distrib. Co.*, 306 F.2d 22, 25 (6th Cir. 1962) (citing *O'Donnell v. Geneva Metal Wheel Co.*, 183 F.2d 733 (6th Cir. 1950) and *Dickerson v. Shepard Warner Elevator Co.*, 287 F.2d 255, 259 (6th Cir. 1961)); *accord United States v. Persaud*, 866 F.3d 371, 381 (6th Cir. 2017). In this case, weighing the conduct of city officials against their testimony is a task properly left for the jury. Accordingly, Plaintiffs may present the testimony of City

---

[12] The Court in *Payne* applied federal procedural law and Tennessee substantive law. As has been set forth above, however, circumstantial evidence of causation is also sufficient under Michigan law. *E.g. Genna v. Jackson*, 286 Mich. App. 413, 421 (2009) (quoting *Skinner v. Square D Co.*, 445 Mich. 153, 164 (1994)).

officials about what they would have done, had VNA issued the urgent recommendation to implement corrosion inhibitors or return to DWSD. With that testimony, they have raised a material question of fact as to whether the City of Flint would have heeded a sufficiently urgent warning from VNA. Accordingly, summary judgment on the issue of VNA's causal responsibility for the Plaintiffs' injuries is inappropriate.

VNA recently filed a separate motion *in limine* repeating the above arguments and seeking to exclude the same testimony from city officials about what they would have done with a warning from VNA. (ECF No. 497). For the reasons set forth above, that motion is also denied.

VNA briefly argues that even if it *had* warned the City of Flint of the danger to Plaintiffs, and even if City officials *had* listened to that warning, the harm to Plaintiffs still would not have been prevented. First, VNA claims that by February 18, 2015, the water lead levels had already returned to pre-crisis levels, and that implementing corrosion controls or returning to DWSD was therefore no longer necessary by the time VNA arrived on the scene. This argument is without merit. Not only do tests of Flint water—including those of Plaintiffs' schools, taken in 2015—demonstrate that the water contained lead levels far above the

47

regulatory limit, even the graph provided by VNA shows that lead levels increased in 2015 after a brief decrease in the winter. (*See* ECF No. 330-1, PageID.14150).

Second, VNA argues that Plaintiffs cannot show causation because they have not offered expert testimony on "whether a corrosion-control chemical would have reduced water lead levels." (ECF No. 330-1, PageID.14147.) This argument places VNA in the unenviable position of arguing not only that it recommended corrosion controls with sufficient urgency, but also that those warnings were futile because corrosion controls would not have solved the problem. To the extent that VNA now contends that corrosion controls would not have controlled corrosion, Plaintiffs have plainly presented sufficient expert testimony to the contrary. (*See, e.g.,* ECF No. 432, PageID.33138) (Mr. Humann explaining that adding a corrosion inhibitor would have prevented lead from leaching into the water); ECF No. 330-15, PageID.14950 (Dr. Michaels opining the same); ECF No. 330-30, PageID.15289-15290 (Dr. Hoaglund, Plaintiffs' expert on water chemistry, discussing published, peer-reviewed work offering the same opinion)).

48

For these reasons, there is sufficient evidence in this record to permit a reasonable jury to find that VNA causally contributed to Plaintiffs' injuries by negligently failing to issue an urgent warning to the City of Flint about the impending danger to the health of Flint residents. Hence, Plaintiffs' have established a material question of fact as to but-for causation. Moreover, as has been set forth above, harm to Plaintiffs—residents of Flint and foreseeable users of Flint's drinking water—was a reasonably foreseeable consequence of VNA's alleged negligence. Accordingly, Plaintiffs can establish proximate causation as well. *Ray*, 501 Mich. at 66.

## VI.   Conclusion

Plaintiffs cannot establish that VNA owed them a duty in 2014, but they have put forward sufficient evidence to survive summary judgment on all the elements of their professional negligence claims arising out of VNA's 2015 conduct. Accordingly, VNA's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

VNA's motion *in limine* to exclude hypothetical testimony is DENIED.

IT IS SO ORDERED.

49

Dated: January 10, 2022         s/Judith E. Levy
Ann Arbor, Michigan           JUDITH E. LEVY
                                  United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 10, 2022.

                                  s/William Barkholz
                                  WILLIAM BARKHOLZ
                                  Case Manager