EXHIBIT 7

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS                                              SUPERIOR COURT
                                                         DOCKET NO. 1683-CV-00113

TOWN OF PLYMOUTH,
        Plaintiff,

v.

VEOLIA WATER NORTH AMERICA -
NORTHEAST LLC, et al.,
        Defendants.

**– CONSOLIDATED WITH –**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                             SUPERIOR COURT
                                                        DOCKET NO. 1684-CV-01282

COMMONWEALTH OF
MASSACHUSETTS,
        Plaintiff,

v.

VEOLIA WATER NORTH AMERICA -
NORTHEAST LLC, et al.
        Defendants.

## FOURTH AMENDED COMPLAINT

## PARTIES

    1.     The Town of Plymouth ("Town") is a municipal corporation and political

subdivision of the Commonwealth of Massachusetts with a principal office located at 11

Lincoln Street, Plymouth, Massachusetts.

1

2.      Veolia Water North America – Northeast LLC is a foreign limited liability company with a Massachusetts office located at 120 Water Street, Suite 212, North Andover, Massachusetts.

3.      Veolia Water North America Operating Services LLC is a foreign limited liability company with a Massachusetts office located at 120 Water Street, Suite 212, North Andover, Massachusetts.

4.      Veolia North America, Inc. is a foreign corporation with a principal place of business located at E. 12th Street and Hay Road, Wilmington, DE 19809.

5.      American Home Assurance Company ("AHAC") is a foreign corporation with a principal place of business located at 175 Water Street, 18th Floor, New York, NY 10038.

6.      Insurance Company of the State of Pennsylvania ("ICSP") is a foreign corporation with a principal place of business located at 175 Water Street, 18th Floor, New York, NY 10038.

7.      American International Group, Inc. ("AIG") is a foreign corporation with a principal place of business located at 175 Water Street, 18th Floor, New York, NY 10038.

8.      CDM Smith, Inc. ("CDM") is a domestic (Massachusetts) corporation with a principal place of business located at 75 State Street, Boston, MA 02110.

9.      P. Gioioso & Sons, Inc. ("Gioioso") is a domestic (Massachusetts) corporation with a principal place of business located at 50 Sprague Street, Hyde Park, MA 02136.

10.    Stantec Consulting Services, Inc. ("Stantec") is a foreign corporation with a principal place of business located at 5 Burlington Woods, Burlington, MA 01803.

## FACTS

11.    In 1987, the Commonwealth of Massachusetts commenced an action against the Town for alleged violations of the Massachusetts Clean Waters Act, G.L. c. 21, §§ 26-53, entitled, Commonwealth of Massachusetts v. Town of Plymouth, Suffolk Superior Court, C.A. No. 87-2185.

12.    In 1992, the Town and the Commonwealth agreed to the entry of final judgment, which (as initially filed and subsequently modified) required the Town to prepare a wastewater facilities plan, and to plan, design and construct a new wastewater treatment facility, among other infrastructure.

13.    In connection with the final judgment, the Town and Camp, Dresser & McKee, Inc. entered into a contract dated March 1992 and entitled, "Agreement for the Preparation of a Facilities Plan and Environmental Impact Report for Municipal Wastewater Treatment." Under that contract, Camp, Dresser & McKee, Inc. was required to, among other things, prepare, and did prepare, a wastewater facilities plan for the Town.

## THE CDM CONTRACT AND THE PRELIMINARY DESIGN

14.    Subsequently, the Town and Camp, Dresser & McKee, Inc. entered into another contract dated July 31, 1997 and entitled, "Standard Form of Agreement Between Owner and Engineer for Professional Design, Bidding and Construction Services" ("CDM Contract").

3

15.     Under the CDM Contract, Camp, Dresser & McKee, Inc. was required to, among other things, prepare, and did prepare, a preliminary design for a wastewater treatment facility and a preliminary design for a pump station and dual force mains (the "Preliminary Design").

16.     CDM is the successor of Camp, Dresser & McKee, Inc.

17.     CDM is responsible for all of the duties and obligations of Camp, Dresser & McKee, Inc. under the CDM Contract.

18.     The CDM Contract included an Addendum.  Section 8.13 of the Addendum to the CDM Contract states in part as follows:  "The Engineer shall be responsible for the professional and technical accuracy and the coordination of all designs, drawings, specifications, estimates and other work furnished by him."

19.     Section 8.14 of the Addendum to the CDM Contract states in part as follows:  "The Engineer shall furnish appropriate competent professional services for each of the phases to the point where detailed checking and reviewing by the owner will not be necessary."

20.     Section 8.18 of the Addendum to the CDM Contract states in part as follows:  "The Engineer shall exercise its best efforts to work effectively with . . . the Town . . . to ensure compliance with the final judgment," in Suffolk Superior Court, C.A. No. 87-2185.

21.     The CDM Contract also includes an Exhibit D, which, in turn, includes then extant Massachusetts regulation 310 CMR 41.64.

22.     Section 41.64(4) of 310 CMR states in part as follows:  "The contractor [i.e., CDM] shall be responsible for the professional quality, technical accuracy, timely

4

completion, and the coordination of all designs, drawings, specifications, reports, and other services furnished by the contractor under this agreement."

### TOWN OF PLYMOUTH'S REQUESTS FOR PROPOSALS AND THE PRELIMINARY DESIGN OF THE FORCE MAIN

23.     On August 6, 1997, Chapter 138 of the Acts of 1997 was enacted, authorizing the Town to solicit proposals and to enter into contracts for the design, construction, operation and maintenance of a wastewater treatment facility, collection system and appurtenant facilities in accordance with the procurement process set forth in G.L. c. 30B, § 6.

24.     On April 15, 1998, the Town published a Request for Proposals to "Design, Build, Operate and Maintain a Wastewater Treatment Facility Including Sludge Processing and Disposal with an Option to Operate and Maintain an Existing Wastewater Collection and Conveyance System" ("WWTF RFP"), which required the design and construction of a new wastewater treatment facility and, at the option of the Town, the operation and maintenance of that facility and the other parts of the Town's wastewater collection system.

25.     On February 24, 1999, the Town published a Request for Proposals to "Design and Build a Wastewater Pumping Station and Dual Force Mains" ("Pump Station RFP"), which required the design and construction of a pump station ("Water Street Pump Station"), and dual force mains, i.e., an influent force main (the "Force Main"), which carried raw wastewater to the wastewater treatment facility, and an effluent force main, which carried the treated wastewater to an outfall located on Plymouth harbor.

26.     The Pump Station RFP and WWTF RFP included the Preliminary Design.

27.     The Preliminary Design specified that the Force Main should be (i) either a ductile iron pipe or a pre-stressed concrete cylinder pipe, (ii) 30 inches in diameter, and (iii) approximately 4.5 miles in length.

28.     In the Preliminary Design, CDM assumed an average future wastewater flow in the Force Main of 3.0 million gallons per day (the "Design Flow").

29.     According to the Preliminary Design, at the Design Flow, the wastewater flow velocity in the Force Main was expected to be less than two feet per second.

30.     Section 2.1.5 of the Pump Station RFP, entitled "Force Main Odor and Corrosion Control," states:  "The length and large size of the force main are expected to contribute to the formation and release of hydrogen sulfide within the force main. . . . Hydrogen sulfide is produced by bacteria in the wastewater under anaerobic conditions. . . .  [A]naerobic conditions will occur within the force main because of the long transit time to the new wastewater treatment plant."

31.     Hydrogen sulfide has a corrosive effect on iron piping.

32.     The design of the Force Main is deficient because the diameter of the Force Main is too large for the Design Flow.

33.     The design of the Force Main is deficient because the pipe material prescribed by the design is highly susceptible to internal corrosion.

34.     The deficiencies in the design contributed directly to the corrosion and premature failure of the Force Main, because they resulted directly in the production of more hydrogen sulfide than would have occurred in the absence of such deficiencies.

35.     The Pump Station RFP (Vol. I, § 2.3) and WWTF RFP (Vol. 3, Appx. F, § F.2) stated that no major sewer system expansion was envisioned in the future.

6

36.     The Pump Station RFP and WWTF RFP provided proposers the opportunity to take, and to note in their proposals, exceptions to the Preliminary Design.

**VEOLIA'S AND GIOIOSO'S PROPOSALS FOR DESIGN-BUILD SERVICES**

37.     U.S. Filter Operating Services, Inc. ("USFOS") submitted proposals in response to both the WWTF RFP and the Pump Station RFP.

38.     USFOS's engineering subsidiary, Chester Engineers, assisted with the preparation of USFOS's proposals in response to both the WWTF RFP and the Pump Station RFP.

39.     Chester Engineers was, at the time, owned by USFOS, and was represented as USFOS's engineering subsidiary in USFOS's proposals to the Town.

40.     The USFOS proposal in response to the WWTF RFP is dated April 18, 1998 (the "WWTF Proposal").

41.     In the WWTF Proposal, USFOS proposed to design and construct the WWTF, and to operate and maintain the Town's wastewater collection and treatment system, including but not limited to the yet-to-be designed and constructed Force Main and Pump Station ("Contract System").

42.     At the time it submitted the WWTF Proposal, USFOS knew that the Force Main and Water Street Pump Station had not yet been fully designed or constructed.

43.     The WWTF Proposal included USFOS's price proposal ("O&M Price Proposal") setting forth USFOS's annual service fee for the operation and maintenance of the Contract System.

44.     USFOS's annual service fee included $100,000 to be used for capital repairs and improvements to the Town's wastewater collection system, including the Force Main and Water Street Pump Station.

45.     In its August 18, 1998 letter transmitting the O&M Price Proposal, USFOS stated: "Our operations and maintenance proposal is based on 25 years of experience in the municipal wastewater treatment industry. The Town of Plymouth will not have to be concerned with capital improvements and environmental compliance for at least 20 years, and beyond."

46.     In its August 18, 1998 letter, USFOS asserted that it had assumed, in the O&M Price Proposal, a labor cost for only seven fulltime staff to operate and maintain the Contract System despite knowing that the Town then employed no less than 12 individuals for that work.

47.     In the O&M Price Proposal, USFOS significantly underestimated the cost to operate and maintain the Contract System, including the costs of labor, electricity and chemicals.

48.     In 1999, after submission of the WWTF Proposal, USFOS's Vice President, Dick Johnson, delivered letters to members of the Town's Board of Selectmen, Finance Committee and Town Meeting, promising that, except for a change in law or significantly increased wastewater flows in the Contract System, if USFOS mistakenly underestimated the labor, electricity, chemicals, maintenance and repair costs necessary to operate and maintain that system, USFOS—not the Town—would be solely responsible for that mistake.

8

49.     USFOS submitted Mr. Johnson's letters to the Town to induce the Town to sign and appropriate funds for contracts with USFOS for the design, construction and operation of the Contract System.

50.     In a memorandum dated February 3, 1999 and delivered to USFOS's employees and agents charged with preparing USFOS's proposals to the Town (the "Rosenbaum Memo"), Bill Rosenbaum, a senior engineer at Chester Engineers, referring to the Force Main and the ductile iron (or DCI) of which it was made, stated: "Retention times in the 30" line would be so high that the wastewater will certainly go anaerobic and will generate large amounts of hydrogen sulfide.  Odor control stations along the way won't be adequate to solve the problem.  The hydrogen sulfide will corrode the DCI very quickly."

51.     Mr. Rosenbaum's reference to "retention times" being high in the Force Main was a reference to the low velocity with which the wastewater was expected to be conveyed through the Force Main to the WWTF.

52.     USFOS never provided a copy of the Rosenbaum Memo to the Town before the failure of the Force Main.

53.     Before the Force Main failure, USFOS never disclosed to the Town its opinion, reflected in the Rosenbaum Memo, that absent affirmative measures to treat hydrogen sulfide generated in the Force Main, the hydrogen sulfide would corrode the Force Main "very quickly."

54.     The USFOS proposal in response to the Pump Station RFP is dated April 8, 1999 (the "Pump Station Proposal").

55.    Presumably as a result of the Rosenbaum Memo, the Pump Station Proposal included a proposal to design and construct the Water Street Pump Station, but excluded the Force Main.

56.    In the Pump Station Proposal's Executive Summary, USFOS stated that it had "performed a detailed evaluation of the RFP and conditions that exist in Plymouth, and understands the key issues and challenges facing Plymouth regarding its wastewater treatment system.  We have assembled the best team available to respond to these issues and challenges. . . ."

57.    In Section 7 of the Pump Station Proposal, USFOS stated as follows:

a.   "The design criteria . . . include . . . Chemical addition for force main odor and corrosion control."  (p. 7.1)

b.   "Because of its length, the force main has been sized for low flow velocities, resulting in low head losses.  The reduced velocity will allow settling of heavy solids and the lack of high velocities will preclude their re-suspension.  Thus, grit removal at the pumping station is essential." (p. 7.3)

c.   "The high rate of solids deposition that will occur in the force main will require frequent cleaning." (p. 7.4)

d.   "[T]he operation of the pump station and force main will produce large amounts of Hydrogen Sulfide in the force main.  The Hydrogen Sulfide will have a tendency to weaken and corrode the concrete lining of the Ductile Iron Pipe." (p. 7.4)

e.   "However, the pumping station will be equipped with means to launch a pipeline cleaning 'pig' to clean the force main." (p. 7.4)

58.   In Section 10 of the Pump Station Proposal, USFOS proposed a "Force Main Odor/Corrosion Control System."

59.   In the Pump Station Proposal, USFOS proposed the installation of chemical tanks for odor and corrosion control.

60.   In Section 6 of its proposal in response to the WWTF RFP, USFOS stated that "it is expected that the force main will require periodic cleaning due to the proposed large diameter force main from the pumping station to the treatment plant and the resulting low scouring velocity."

61.   In its proposals, USFOS did not express any opinion, concern or belief that the Preliminary Design was deficient.

62.   In the Pump Station Proposal, USFOS did not take any exceptions to the Preliminary Design.

63.   USFOS was not awarded a contract under the Pump Station RFP.

64.   Gioioso also submitted a proposal in response to the Pump Station RFP.

**THE DESIGN CONTRACTS – CDM, GIOIOSO AND STANTEC**

65.   The Town awarded a contract to Gioioso pursuant to the Pump Station RFP for the design and construction of, among other things, the Water Street Pump Station and Force Main.

66.   In its proposal in response to the Pump Station RFP, Gioioso did not take any exceptions to the Preliminary Design.

67.     The Town and Gioioso entered into a contract dated November 10, 1999 and entitled, "Contract for Design, Permitting, Construction, Start-Up Testing, and Acceptance Relating to Town of Plymouth, Massachusetts, Modified Pumping Station and Force Mains" ("Gioioso Contract").

68.     The Gioioso Contract is under seal.

69.     Under the Gioioso Contract, Gioioso was required to design and construct, among other things, the Force Main and Water Street Pump Station.

70.     Gioioso incorporated into its design of the Force Main the Preliminary Design prepared by CDM.

71.     Under the Gioioso Contract, Gioioso is responsible to the Town for its design of the Force Main, including all aspects of the Preliminary Design incorporated into Gioioso's design.

72.     Gioioso's design of the Force Main is deficient because the diameter of the Force Main is too large for the Design Flow, and the pipe material specified for the Force Main is highly susceptible to internal corrosion.

73.     As a direct result of the deficiencies in Gioioso's design, once use of the Force Main commenced, significantly more hydrogen sulfide developed within the Force Main than would have occurred in the absence of such design deficiencies.

74.     The deficiencies in Gioioso's design contributed to the corrosion and premature failure of the Force Main.

75.     Section 302 of the Gioioso Contract required Gioioso to perform its design services in accordance with the Design Requirements, which term is defined in Section

101 of the Gioioso Contract as "the Design Standard of Care, the Design Criteria and all regulatory requirements."

76.     Gioioso thus agreed to comply with a standard of care that is higher than the standard implied by law for engineering design professionals.

77.     Section 101 of the Gioioso Contract defines the term Design Criteria as including the following criteria and standards of performance:

a.   reliability criteria for the appropriate treatment class as defined in "Design Criteria for Mechanical, Electrical and Fluid System and Component Reliability," published by the EPA in 1974, or any revisions to the criteria;

b.   performance standards listed in the 1998 edition of the "Guide for the Design of Wastewater Treatment Works" prepared by the New England Interstate Water Pollution Control Commission (also known as TR-16), or any revisions thereto;

c.   performance standards as listed in the latest edition of "Design of Municipal Wastewater Treatment Plants," published jointly by the American Society of Civil Engineers and the Water Environment Federation (also known as "MOP-8");

d.   guidelines listed in the latest edition of "Design of Wastewater and Stormwater Pumping Stations" published by the Water Environment Federation (also known as MOP FD-4);

e.   standards and conditions found in the Code of Massachusetts Regulations related to municipal and industrial wastewater collection and treatment;

f.   the requirements of the RFP and the Contractor's Proposal;

    g.   Design requirements and criteria set forth in the Preliminary

         Design Report for the Pump Station (Volume 2 of the RFP) and in

         the Preliminary Design Report for the Force Mains (Volume 3 of

         the RFP); and

    h.   design criteria as set forth in Exhibit 301.

78.    The publications and the respective performance standards and guidelines of the publications referenced in the definition of the term Design Criteria set forth above, including TR-16, were incorporated by reference in, and thus are a part of, the Gioioso Contract.

79.    Section 2.2.2 of TR-16 requires that "wastewater collection systems should be designed for a life span of 50 years."

80.    Section 2.3.7 of TR-16 states: "Materials for sewer construction should be appropriate for local conditions, including . . . problems such as abrasion and corrosion."

81.    Gioioso thus made express warranties to the Town, including that the Force Main would be designed for a life-span of 50 years, and that the materials used in the construction of the Force Main would be appropriate for local conditions, including the problem of corrosion.

82.    The Force Main had a life-span of less than fifteen (15) years.

83.    Gioioso failed to design and construct the Force Main for a life-span of fifty (50) years.

84.    Gioioso also failed to use appropriate materials in the construction of the Force Main.

85.     In addition, Gioioso was required by the Gioioso Contract to install and operate certain temporary systems and facilities necessary to maintain uninterrupted wastewater treatment operations during construction of the Water Street Pump Station, Force Main and WWTF.

86.     Among the temporary systems installed by Gioioso was a temporary chemical feed system at the Water Street Pump Station to treat hydrogen sulfide and prevent odors and corrosion in the Force Main.

87.     Gioioso, along with Stantec, was required to operate the temporary chemical feed system starting no later than January 28, 2002, when the Water Street Pump Station commenced operations, until (i) construction of the Water Street Pump Station was completed and (ii) the Water Street Pump Station was accepted by the Town following successful completion of an acceptance test or, if earlier, Veolia commenced operation of the permanent chemical feed system, also installed by Gioioso.

88.     Gioioso failed to operate the temporary chemical feed system.

89.     Gioioso's failures contributed directly to the corrosion and premature failure of the Force Main.

90.     The Gioioso Contract included Exhibit 301, which, in turn, included, among other things, Volume 3 of the Water Street Pump Station RFP.

91.     Section 2.2(d) of Volume 3 of the Water Street Pump Station RFP required that "[a]ll ductile iron and PCCP pipe shall be provided with internal corrosion control protection consistent with the transport of untreated wastewater."

92.     Gioioso retained Fay, Spofford & Thorndike, Inc. ("FST") to perform design services required of Gioioso in the Gioioso Contract.

15

93.     Gioioso and FST entered into a contract for that purpose dated December 8, 1999 and entitled, "Contract for Design, Permitting, Construction, Start-Up Testing, and Acceptance Relating to Town of Plymouth, Massachusetts, Modified Pumping Station and Force Mains (MPS/FM)" ("Gioioso-FST Contract").

94.     The Gioioso-FST Contract is under seal.

95.     FST was subsequently acquired by Stantec.

96.     Stantec is responsible for all of the duties and obligations of FST under the Gioioso-FST Contract.

97.     The Gioioso-FST Contract expressly incorporates the Gioioso Contract into the Gioioso-FST Contract.

98.     In the Gioioso-FST Contract, Stantec expressly agreed to be bound to Gioioso to the same extent that Gioioso is bound to the Town under the Gioioso Contract.

99.     In the Gioioso-FST Contract, Stantec also expressly agreed to be bound to the Town by the terms and conditions of the Gioioso Contract.

100.    Therefore, in the Gioioso-FST Contract, Stantec made the very same indemnification promises and express warranties to the Town and Gioioso that Gioioso made to the Town in the Gioioso Contract (as those promises and warranties are described herein).

101.    Gioioso and Stantec failed to provide the ductile iron Force Main with adequate internal corrosion protection as required by the Gioioso Contract and Gioioso-FST Contract.

102.    The failure to provide the ductile iron Force Main with adequate internal corrosion protection is not only a design deficiency by Gioioso and Stantec, but also a construction defect by Gioioso.

103.    The failure to provide the ductile iron Force Main with adequate internal corrosion protection contributed directly to the corrosion and premature failure of the Force Main.

104.    Gioioso and Stantec were required to notify the Town that the design of the Force Main was deficient, but they never provided such notification.

105.    Under the Gioioso-FST Contract, Stantec is responsible to the Town for all of the deficiencies in the design of the Force Main.

106.    Under the Gioioso Contract, Gioioso expressly assigned to the Town any and all of Gioioso's claims and causes of action against Stantec arising out of any errors, omissions, or negligence in Stantec's performance of design services or related to the design and construction of the Force Main.

107.    Since the Gioioso Contract was expressly incorporated into the Gioioso-FST Contract, as aforesaid, Stantec agreed to Gioioso's assignment to the Town of Gioioso's claims against Stantec.

108.    Under the CDM Contract, CDM was required to perform a technical review of the design of the Force Main and Water Street Pump Station prepared by Gioioso and Stantec.

109.    Under the CDM Contract, CDM was required to provide construction monitoring services for the construction of the Force Main and Water Street Pump Station.

17

110.    CDM was required to notify the Town that Gioioso and Stantec had failed to provide the ductile iron Force Main with adequate internal corrosion protection, but CDM failed to provide such notification.

111.    CDM was required to ensure that Gioioso and Stantec provided, and to cause them to provide, the ductile iron Force Main with adequate internal corrosion protection, but CDM failed to do so.

## VEOLIA'S FAILURE TO MAINTAIN THE FORCE MAIN

112.    The Town awarded two contracts to USFOS pursuant to the WWTF RFP: (i) a contract to design and construct a new wastewater treatment facility and (ii) a contract to operate and maintain the Town's wastewater collection system, including the wastewater treatment facility to be designed and constructed by USFOS, and the Water Street Pump Station and Force Main.

113.    On November 10, 1999, after USFOS had submitted proposals in response to both the WWTF RFP and Pump Station RFP, the Town and USFOS simultaneously entered into two contracts, entitled:  (1) "Contract to Permit, Design and Construct a Wastewater Treatment Facility" (the "USFOS Construction Contract"); and (2) "Contract for Operation and Maintenance Relating to Town of Plymouth, Massachusetts Wastewater Treatment Plant and Contract System" (the "O&M Contract"; and both contracts together, the "WWTF Contracts").

114.    In entering into the WWTF Contracts and accepting responsibility for the operation and maintenance of the Contract System, Veolia knew, acknowledged and agreed that it was accepting responsibility for a system that was essential to the protection

18

of the environment and public health and safety, and that it was being given charge of a "public trust."

115.     The WWTF Contracts are under seal.

116.     Before it signed the WWTF Contracts, USFOS never expressed any opinion, concern or belief that the Preliminary Design was deficient.

117.     Before it signed the WWTF Contracts, USFOS knew that the operation of the Water Street Pump Station and Force Main would produce in the Force Main large amounts of hydrogen sulfide, which if left untreated would weaken and corrode the Force Main.

118.     Pursuant to Section 311 of the USFOS Construction Contract, USFOS was required to coordinate its design and construction services with the design and construction services to be performed by Gioioso and FST for the Force Main and Water Street Pump Station.

119.     After signing the WWTF Contracts, the Town and USFOS entered into the "First Amendment to Contract for Design, Permitting, Construction, Start-Up, Testing and Acceptance, Providing for Interim Operation and Maintenance of Town of Plymouth, Massachusetts Wastewater Treatment Plant and Contract System" (the "First Amendment"), dated February 12, 2001.

120.     Pursuant to Section 13.0(B) of the First Amendment, "USFOS shall provide oversight services relative to the design and construction of the Modified Pump Station and dual force mains. . . ."

121.     Pursuant to the USFOS Construction Contract, as amended by the First Amendment, USFOS was required to notify the Town during the design and construction

of the Force Main that the design of the Force Main was deficient, but USFOS failed to provide such notification.

122.   Pursuant to the USFOS Construction Contract, as amended by the First Amendment, USFOS was required to notify the Town during the design and construction of the Force Main that the design of the Force Main was deficient, but USFOS failed to provide such notification.

123.   Pursuant to the USFOS Construction Contract, as amended by the First Amendment, USFOS was required to notify the Town during the design and construction of the Force Main that CDM, Gioioso and/or Stantec had failed to provide the ductile iron Force Main with adequate internal corrosion control protection, but USFOS failed to provide such notification.

124.   Pursuant to the USFOS Construction Contract, as amended by the First Amendment, USFOS bears responsibility for any and all deficiencies in the design of the Force Main and Water Street Pump Station.

125.   In 1999, USFOS was acquired by Vivendi S.A., and subsequently, USFOS's name was changed either to (i) Veolia Water North America Operating Services LLC ("Veolia OPS"), or (ii) Veolia Water North America – Northeast LLC (together with Veolia OPS, collectively, "Veolia"), and all of the rights, duties and obligations of USFOS under the O&M Contract were fully assumed by Veolia.

126.   During the term of the O&M Contract, Veolia OPS and Veolia Water North America – Northeast LLC each purported to act as, and held itself out to the Town to be, the counterparty to the Town under the O&M Contract, including by corresponding with, submitting invoices to, and accepting payments from the Town.

20

127.    In 2009, the Town and Veolia entered into an agreement entitled, "Settlement Agreement" and dated June 24, 2009.

128.    In the Settlement Agreement, Veolia "reaffirms its obligations, and represents and warrants that it shall fulfill its obligations, to comply with all terms of the O&M Contract, Applicable Law and Legal Requirements, including, but not limited to, the obligation to comply with the Staffing Plan and any and all groundwater discharge permits issued by the Massachusetts Department of Environmental Protection in connection with the Contract System and New WWTP," as those terms are defined in the O&M Contract.

129.    In the Settlement Agreement, Veolia released and forever discharged the Town from "any and all claims, actions, liability, causes of action, grievances, suits, demands, liens, controversies and proceedings for damage, compensation, benefits, costs, losses, whether known or unknown, claims under G.L. c.93A, expenses, attorneys' fees, declaratory relief and relief arising out of economic injury, property damage and injury, violation of federal or state civil rights, breach of contract, negligence and liabilities in law and equity (collectively, "claims") existing as of the date of the execution of this Agreement, including, but not limited to, claims arising out of, resulting from or relating to the O & M Contract and the operation of the Contract System and New WWTP," as those terms are defined in the O&M Contract.

130.    Pursuant to the Settlement Agreement, the Town and Veolia entered into Amendment No. 2 to the O&M Contract.

131.    In Amendment No. 2 to the O&M Contract, the words appearing in the O&M Contract "U.S. Filter Operating Services Inc." and "USFOS" were replaced with "Veolia Water North America" and "Veolia," respectively.

132.    Veolia was required by the O&M Contract to procure a third-party "unconditional guaranty" in favor of the Town, guaranteeing Veolia's performance of the O&M Contract (the "Guaranty").

133.    The Guaranty was provided by Vivendi North America Inc. ("Vivendi"), and was included as an exhibit to the O&M Contract.

134.    By its terms, the Guaranty is binding on Vivendi's successors.

135.    Veolia North America, Inc. is the successor of Vivendi North America Inc.

136.    Veolia North America, Inc. is responsible for all of the duties and obligations of the guarantor under the Guaranty.

137.    AHAC, ICSP, and AIG (collectively, "Veolia's Surety") issued a performance bond and/or extensions thereto (collectively, the "Bond") in favor of the Town ensuring the performance of Veolia's obligations under the O&M Contract.

138.    By letter dated January 29, 2016, addressed to AHAC, the Town made a claim on the Bond.

139.    By letters dated February 10 and 11 and March 31, 2016, AIG responded to the Town's claim on the Bond.  The letters listed ICSP as the "surety" on the Bond.

140.    Veolia obtained a commercial general liability policy in connection with the O&M Contract.  The policy was issued by ACE.  The Town is an additional insured on said policy.

141.    By letter dated February 25, 2016, the Town made a claim on the insurance policy issued by ACE.

142.    Section 301(a) of the O&M Contract requires Veolia to, among other things, "provide O&M Services to operate and maintain the Contract System . . . in accordance with Applicable Law and the Legal Requirements and in accordance with Good Industry Practices. . . .  USFOS will perform all Services described in the O&M Scope of Work, attached hereto as Exhibit 302, and will perform all Services as specified in the O&M Manual."

143.    Veolia failed to comply with Section 301(a) of the O&M Contract by, among other things, failing to develop and implement an effective corrosion-control program for the Force Main and failing to inject chemicals into the Force Main to reduce hydrogen sulfide and prevent corrosion in the Force Main.

144.    Section 3.0 of Exhibit 302 of the O&M Contract requires Veolia to perform "Preventive Maintenance," defined in that contract as "those maintenance activities that are routine or repetitive [and] . . . necessary or desirable in accordance with Good Industry Practice."

145.    Veolia failed to perform Preventive Maintenance with respect to the Water Street Pump Station and Force Main.

146.    Section 3.0 of Exhibit 302 of the O&M Contract requires Veolia to, among other things:  "Be responsible for the cleaning of approximately 20,000-30,000 feet of sewer mains annually, making necessary repairs and/or replacement of lines as required" (¶ 31); and, "Replace annually approximately 1,000 feet of sewer main for the purpose of upgrading the sewer system. . . ." (¶ 33).

23

147.     Veolia failed to clean 20,000-30,000 feet of Town sewer mains annually, and failed to replace annually approximately 1,000 feet of Town sewer mains.

148.     Veolia never cleaned the full length of the Force Main during the term of the O&M Contract.

149.     Veolia never launched a certain cleaning device known as a "pig" from the Water Street Pump Station into the Force Main to clean the Force Main.

150.     Section 101 of the O&M Contract defines the term, "Contract System" as including, among other things, the wastewater treatment facility designed and constructed by Veolia, the Force Main, and the Water Street Pump Station.

151.     Section 101 of the O&M Contract defines the term "O&M Manual" (referred to as such herein) as "the manual containing detailed standard operating procedures and other specific instructions, policies, directives, routines, schedules and other matters relating to O&M and maintained as required by Exhibit 302."

152.     Paragraph 1 of Section 3.0 of Exhibit 302 of the O&M Contract required Veolia to, among other things, prepare the O&M Manual.  That paragraph states that the "portion of the new O&M Manual addressing the operations of the Modified Pump Station and Force Mains shall be provided by the Town of [sic] USFOS and shall have been prepared by the Town's contractor responsible for the design and construction of the Modified Pump Station and Force Mains," which "contractor" was Gioioso.

153.     The portion of the O&M Manual prepared by Gioioso for the Water Street Pump Station and Force Main (such portion, the "Force Main O&M Manual"), dated January 2004, states as follows:

a. "The length and large size of the raw wastewater force main are expected to contribute to the formation and release of hydrogen sulfide within the force main. . . .  In addition, the hydrogen sulfide can be biologically converted to sulfuric acid, which will attack the lining of the cement-lined ductile iron pipe used to construct the force main.  By reducing the generation of hydrogen sulfide within the force main, odor and corrosion problems can be diminished.  This goal can be accomplished by using a ferrous sulfate solution.  Chemical storage tanks and feed pumps have been provided at the WSPS [i.e., the pump station] for this purpose." (§ I, ¶ 3.7)

b. "To assist in maintaining the raw wastewater force main sewer, a pig launching station has been included and is located in front of the WSPS building." (§ I, ¶ 3.15)

c. "It is imperative that the force mains and pressure sewers operate as designed to insure dependable transport of the raw wastewater to the treatment plant and final effluent to the outfall.  High and low points in the system have air & vacuum relief valves and blowoffs, respectively on both piping systems.  These important appurtenances must be maintained on a regular basis.  This would include inspection and flushing of each location on a regular basis." (§ II, ¶ 3.4)

154.    Veolia received a copy of the Force Main O&M Manual no later than January 2004.

155.    Veolia failed to adequately maintain the Water Street Pump Station, including the grit-removal system contained therein, and the air release valves (and similar appurtenances) on the Force Main.

156.    Veolia's maintenance failures were a direct cause of the corrosion and premature failure of the Force Main.

157.    The Water Street Pump Station included a chemical feed system ("Chemical Feed System") capable of injecting chemicals such as ferrous sulfate or bioxide into the Force Main to treat hydrogen sulfide and prevent odor and corrosion in the Force Main (such chemicals, "Corrosion Control Chemicals").

158.    In the summer of 2003, the Water Street Pump Station underwent final testing.

159.    During the final testing of the Water Street Pump Station, the Chemical Feed System was also tested, which involved the temporary operation of that system and the injection of Corrosion Control Chemicals into the Force Main.

160.    The final testing of the Water Street Pump Station occurred during the term of the O&M Contract.

161.    Veolia was contemporaneously aware of the injection of Corrosion Control Chemicals into the Force Main during the final testing of the Water Street Pump Station.

162.    Veolia was required by the O&M Contract to continuously inject Corrosion Control Chemicals into the Force Main to reduce hydrogen sulfide and prevent corrosion and odors in the Force Main.

163.    Veolia did not inject any Corrosion Control Chemicals into the Force Main in 2002, 2003, 2004 and 2006.

164.    Veolia did not commence operating the Chemical Feed System until the spring of 2007.

165.    Veolia did not operate the Chemical Feed System before 2007 in order to avoid having to pay for Corrosion Control Chemicals, and it did so despite knowing that, absent injection of such chemicals into the Force Main, hydrogen sulfide generated within the Force Main would cause the Force Main to corrode very quickly, as reflected in the Rosenbaum Memo.

166.    After it began operating the Chemical Feed System, in order to keep its costs down, Veolia did not inject a sufficient quantity of Corrosion Control Chemicals into the Force Main.

167.    During the period when Veolia failed to inject Corrosion Control Chemicals into the Force Main, Veolia did not inform the Town that it was not injecting such chemicals into the Force Main.

168.    During the period when Veolia failed to inject Corrosion Control Chemicals into the Force Main, Veolia knew that such failure would likely have a catastrophic effect on the integrity of the Force Main, but Veolia did not disclose such knowledge to the Town.

169.    Veolia's failures to inject Corrosion Control Chemicals into the Force Main and to inform the Town of the same were knowing, intentional, willful and wanton. On December 19, 2015, the Town learned of a failure in the Force Main at or near Route 30, Plymouth.

170.     On January 27, 2016, the Town learned of second failure in the Force Main at or near Braley Road, Plymouth.

171.     On January 31, 2016, the Town learned of a third failure in the Force Main at or near Westerly Road, Plymouth.

172.     The Force Main failed prematurely due to internal corrosion arising from the development of hydrogen sulfide within the Force Main.

173.     The failures of the Force Main resulted in a discharge of raw sewage in violation of applicable laws, regulations and/or governmental permits and approvals, and caused damage to property, as well as significant economic loss to the Town of Plymouth.

174.     Veolia's failure to develop and implement an adequate corrosion-control program for the Force Main was a direct cause of the corrosion and premature failure of the Force Main.

175.     Veolia's failure to operate and maintain the Contract System (including the Force Main and Water Street Pump Station) in accordance with the terms and conditions of the O&M Contract was a direct cause of the corrosion and premature failure of the Force Main.

176.     By letter dated January 29, 2016, the Town notified Veolia that said failure of the Force Main constituted a default by Veolia under Article X of the O&M Contract.

177.     For said default, pursuant to Section 1002(f) of the O&M Contract, the Town is entitled to recover from Veolia "any and all actual damages suffered by the Town . . . plus attorneys' fees."

## VEOLIA ENGAGED IN A DECADES-LONG PATTERN OF BAD FAITH
## AND UNSCRUPULOUS CONDUCT IN VIOLATION OF G.L. c. 93A

178.   Before or soon after it commenced operation of the Contract System, Veolia realized that it had significantly underestimated the cost to operate and maintain the Contract System.

179.   Before or soon after it commenced operation of the Contract System, Veolia realized that it would suffer a significant financial loss in the first year of operations.

180.   Before or soon after Veolia commenced operation of the Contract System, Veolia realized that it would likely continue to operate that system at a financial loss for the foreseeable future.

181.   Veolia's financial loss under the O&M Contract was the result of its having underestimated, in the O&M Price Proposal, the costs to operate and maintain the Contract System.

182.   Soon after it started operating the Contract System, Veolia began devising ways to shift its self-inflicted financial losses to the Town, including by intentionally not injecting a sufficient quantity of Corrosion Control Chemicals into the Force Main to keep its operating costs down, and by submitting false claims for payment to the Town for Corrosion Control Chemicals.

183.   Veolia also engaged in a decades-long pattern of bad faith and unscrupulous conduct, with the intent to obtain unbargained-for benefits from the Town while depriving the Town of its benefits under the O&M Contract, as set forth in the following paragraphs.

29

184.   In 2004, approximately two years after Veolia commenced operation of the WWTF, Veolia prepared a "recovery plan" dated November 2004 (the "2004 Recovery Plan").

185.   Veolia never provided a copy of the 2004 Recovery Plan to the Town until it was obtained in discovery in this action.

186.   The 2004 Recovery Plan was devised to shift Veolia's self-inflicted financial losses under the O&M Contract to the Town.

187.   Pursuant to the 2004 Recovery Plan, Veolia requested that the Town eliminate the 10 percent fee paid by Veolia to compensate the Town for administering the wages and benefits of the Town employees leased to Veolia for operation and maintenance of the Contract System under the O&M Contract, and to support Veolia's proposed effort to seek the approval of the Department of Environmental Protection ("DEP") to reduce the number of employees required to staff the Contract System to 7.5 (full-time equivalents).

188.   At the time it prepared the 2004 Recovery Plan, Veolia knew that a staff of 7.5 (full-time equivalents) would have been insufficient to safely and adequately operate and maintain the Contract System.

189.   The 2004 Recovery Plan indicated that if the Town did not agree to eliminate the 10 percent administrative fee, Veolia would consider terminating the O&M Contract.

190.   The 2004 Recovery Plan included a request that the Town increase out-of-town septage deliveries to the WWTF, and share, with Veolia, the revenues generated from septage deliveries to the WWTF.

191.    In a May 19, 2007 e-mail to other senior Veolia employees, Veolia's president, Philip Ashcroft, conceived a plan to profit from septage delivered for treatment to the WWTF by diverting that septage to another wastewater treatment plant operated by Veolia in Cranston, RI, because Veolia received a portion of the revenue generated by such deliveries to such other plant.

192.    At the time of Mr. Ashcroft's e-mail, the Town received all revenues generated by septage deliveries to the WWTF.

193.    At the time of Mr. Ashcroft's e-mail, Veolia knew that diverting septage from the WWTF to another treatment plant would reduce the Town's revenues by shifting those revenues to Veolia.

194.    Veolia fraudulently concealed, and did not disclose to the Town, Mr. Ashcroft's e-mail, or the plan conceived therein.

195.    In a September 11, 2007 letter to the Plymouth Town Manager, Veolia alleged that it had not known that low wastewater-flow velocities in the Force Main could result in corrosion caused by hydrogen sulfide.

196.    Veolia knew that the foregoing statement, which is contradicted by the Rosenbaum Memo, was false when it made the statement in its September 11, 2007 letter.

197.    In its September 11, 2007 letter, Veolia requested that the Town pay for corrosion damage caused to the inlet tanks at the WWTF despite knowing that the damage was caused by Veolia's failure to inject Corrosion Control Chemicals into the Force Main before 2007.

198.    In its September 11, 2007 letter, Veolia requested that the Town pay for the evaluation of the condition of the Force Main conducted by Veolia despite knowing that it was required to pay for such evaluation under section 302 and associated exhibit 302 to the O&M Contract.

199.    On November 1, 2007, Veolia discontinued receiving septage at the WWTF.

200.    Veolia represented to the Town that it had discontinued receiving septage at the WWTF because trucks delivering septage to the WWTF were not fitted with a screen that would prevent sand from entering the septage receiving facility, that damage to such facility was caused by the absence of that screen, and that it was acting pursuant to the O&M Contract.

201.    The aforesaid representation regarding the reason Veolia discontinued the receipt of septage was a fraudulent pretext.

202.    Veolia discontinued receiving septage at the WWTF in order to force the Town to agree to amend the O&M Contract to reduce Veolia's self-inflicted financial losses, and to obtain unbargained-for benefits under that contract.

203.    Veolia fraudulently concealed, and intentionally failed to disclose to the Town, that the reason represented to the Town for discontinuing the receipt of septage was a fraudulent pretext.

204.    Contrary to Veolia's fraudulent representation, the damage to the septage receiving facility resulted from defects in Veolia's design and installation of the facility, including Veolia's failure to design and install a rock trap, and the capability to permit septage trucks to dump septage by gravity.

205.     Veolia's fraudulent representation regarding the reason it discontinued the receipt of septage was contained in its letter to the Plymouth Town Manager dated September 11, 2007.

206.     The aforesaid representation was false, and Veolia knew it was false when it made the allegation in its September 11, 2007 letter.

207.     Veolia fraudulently concealed, and intentionally failed to disclose to the Town, the fact that the aforesaid representation was a fraudulent pretext, and that the damages to the septage receiving facility resulted from defects in Veolia's design and installation of that facility.

208.     At a January 16, 2008 meeting attended by Veolia's President and Area Manager, Philip Ashcroft and Donald Benz, respectively, Veolia represented to the Plymouth Town Manager that Veolia was not aware of the potential for corrosion in the Force Main until December 2006.

209.     Veolia's aforesaid representation to the Plymouth Town Manager, which is contradicted by the Rosenbaum Memo, was false, and Veolia knew it was false when it made that representation during its January 16, 2008 meeting with the Plymouth Town Manager.

210.     In a March 27, 2008 presentation to the Plymouth Town Manager, as part of its effort to induce the Town to agree to amend the O&M Contract to reduce Veolia's self-inflicted financial losses, Veolia falsely stated that it had not been aware that low wastewater-flow velocities in the Force Main would result in the generation of hydrogen sulfide and corrosion in the Force Main.

211.   The aforesaid statement, which is contradicted by the Rosenbaum Memo, was false, and Veolia knew it was false when it made the statement during its March 27, 2008 presentation.

212.   By letter dated September 5, 2008 to the Plymouth Town Manager, Veolia again requested that the Town take responsibility for Veolia's self-inflicted financial losses by agreeing to amend the O&M Contract to, among other things, eliminate or reduce the 10 percent administrative fee paid to the Town and share septage revenues with Veolia.

213.   In a September 21, 2009 letter to the Town, Veolia stated that it did not become aware of the potential for corrosion in the Force Main until 2004.

214.   The aforesaid statement, which is contradicted by the Rosenbaum Memo, was false, and Veolia knew it was false when it made the statement in its September 21, 2009 letter.

215.   In its September 21, 2009 letter to the Town, Veolia requested that the Town amend the O&M Contract to relieve Veolia of responsibility to pay for Corrosion Control Chemicals.

216.   Despite knowing that it was responsible to pay for Corrosion Control Chemicals, as reflected in its September 21, 2009 letter, Veolia repeatedly and continuously demanded that the Town pay for those chemicals.

217.   In a November 11, 2010 letter to the Director of the Town's Department of Public Works, Veolia stated that it did not discover the need to inject Corrosion Control Chemicals into the Force Main until 2007.

218.    The aforesaid statement, which is contradicted by the Rosenbaum Memo, was false, and Veolia knew it was false when it made the statement in its November 11, 2010 letter.

219.    In its November 11, 2010 letter, Veolia also stated that it was not obligated to pay for Corrosion Control Chemicals.

220.    The aforesaid statement, which is contradicted by Veolia's September 21, 2009 letter, was false, and Veolia knew it was false when it made the statement in its November 11, 2010 letter.

221.    In the November 11, 2010 letter, Veolia requested that the Town pay for Corrosion Control Chemicals and enclosed chemical invoices in support of that request despite knowing that Veolia was obligated to pay for those chemicals, as reflected in Veolia's September 21, 2009 letter.

222.    In a May 27, 2011 e-mail to the Director of the Town's Department of Public Works, Veolia stated that it <u>had known</u> of the potential for corrosion in the Force Main since 1997.

223.    In a July 11, 2011 letter to the Plymouth Town Manager, Veolia asserted that it neither knew nor could have known of the magnitude of corrosion that might occur in the Force Main.

224.    The aforesaid assertion by Veolia, which is contradicted by the Rosenbaum Memo, was false, and Veolia knew it was false when it made the assertion in its July 11, 2011 letter.

225.    In a January 31, 2012 letter to the Plymouth Wastewater Superintendent, Veolia requested payment for Corrosion Control Chemicals despite knowing that Veolia

35

was responsible to pay for such chemicals, as reflected in Veolia's September 21, 2009 letter.

226.   In a March 23, 2012 letter to the Plymouth Town Manager, Veolia stated that, at the time it signed the O&M Contract, it neither knew nor could have known that certain design characteristics of the Force Main made it susceptible to corrosion caused by hydrogen sulfide.

227.   The aforesaid statement, which is contradicted by the Rosenbaum Memo, was false, and Veolia knew it was false when it made the statement in its March 23, 2012 letter.

228.   In its March 23, 2012 letter, Veolia threatened to discontinue using Corrosion Control Chemicals if the Town refused to pay for the cost of those chemicals.

229.   Veolia made the aforesaid threat despite knowing that it was responsible to pay for Corrosion Control Chemicals under the O&M Contract, as reflected in its September 21, 2009 letter, and that discontinuing the use of those chemicals would result in irreversible damage to the Force Main.

230.   With its March 23, 2012 letter, Veolia enclosed copies of its aforesaid September 11, 2007, November 11, 2010, and January 31, 2012 letters to the Town.

231.   By enclosing copies of its September 11, 2007, November 11, 2010, and January 31, 2012 letters with its March 23, 2012 letter to the Town, Veolia restated, to the Town, all of the false and fraudulent statements, assertions, and payment demands contained in those letters.

232.   Veolia's delivery of its March 23, 2012 letter to the Town constitutes an unfair and deceptive act or practice under G.L. c. 93A.

36

233.     In an April 25, 2012 letter to the Plymouth Town Manager, Veolia again threatened to discontinue using Corrosion Control Chemicals if the Town refused to pay for those chemicals.

234.     Veolia made the aforesaid threat despite knowing that it was responsible to pay for Corrosion Control Chemicals under the O&M Contract, as reflected in its September 21, 2009 letter, and that discontinuing the use of those chemicals would result in irreversible damage to the Force Main.

235.     With its April 25, 2012 letter, Veolia enclosed a copy of its March 23, 2012 letter to the Town, which, in turn, included copies of Veolia's September 11, 2007, November 11, 2010, and January 31, 2012 letters.

236.     By enclosing a copy of its March 23, 2012 letter (together with all of its enclosures) with its April 25, 2012 letter to the Town, Veolia restated, to the Town, all of the false and fraudulent statements, assertions and payment demands contained in that letter, and in Veolia's September 11, 2007, November 11, 2010, and January 31, 2012 letters.

237.     Veolia's delivery of its April 25, 2012 letter to the Town constitutes an unfair and deceptive act or practice under G.L. c. 93A.

238.     During a telephone call with other senior Veolia employees in 2013, Donald Benz, a Veolia Vice President at the time, made the following entry in his notebook reflecting his discussions during that call: "Plymouth – need to pin the corrosion issue onto."

37

239. The aforesaid entry reflects a scheme by Veolia to blame the Town for Veolia's failure to properly maintain the Force Main, and for the resulting corrosion of the Force Main.

240. Veolia fraudulently concealed, and did not disclose to the Town, its scheme to blame the Town for Veolia's failures to properly maintain the Force Main and the resulting corrosion of the Force Main.

241. Veolia's scheme to blame the Town for Veolia's failure to properly maintain the Force Main, and for the resulting corrosion of the Force Main, is an unfair and deceptive act or practice under G.L. c. 93A.

242. Veolia intentionally charged, and sought to charge, the Town for services that Veolia knew were supposed to be performed at no cost to the Town under the O&M Contract, including, but not limited to, improvements to the WWTF, and inspections and evaluations of the condition of the Town's wastewater collection system (including the Force Main), as set forth in, among other documents, Veolia's September 11, 2007 letter to the Town and several capital repair plans delivered to the Town from and including 2012-2014.

243. By submitting capital repair plans to the Town in 2012-2014, and by enclosing a copy of its September 11, 2007 letter with its March 23 and April 25, 2012 letters to the Town—which contained charges for services that Veolia know it was supposed to perform at no cost to the Town—Veolia committed unfair and deceptive acts or practices under G.L. c. 93A.

244. At various times, Veolia also blamed the Town for certain "permit violations" at the WWTF caused by defective decanter valves installed by Veolia by

38

falsely alleging that all such violations were the result of a "bar screen" installed at the

Water Street Pump Station by Gioioso.

245. The aforesaid allegation was included in letters from Veolia to the Town,

including Veolia's letter dated September 11, 2007.

246. Contrary to Veolia's allegation, most if not all of the permit violations

were the result of the defective decanter valves, not the bar screen at the Water Street

Pump Station.

247. Veolia fraudulently concealed, and did not disclose to the Town, that it

had falsely attributed the permit violations to the bar screen installed at the Water Street

Pump Station.

248. Veolia eventually replaced the defective decanter valves at no cost to the

Town.

249. In addition, the bar screen installed by Gioioso in the Water Street Pump

Station was manufactured and sold to Gioioso by Veolia, with full knowledge that it

would be installed at the Water Street Pump Station.

250. Veolia's fraudulent representation to the Town regarding the cause of the

aforesaid permit violations is an unfair and deceptive act or practice under G.L. c. 93A.

251. By enclosing a copy of its September 11, 2007 letter with copies of its

March 23 and April 25, 2012 letters to the Town, Veolia restated, to the Town, all of its

fraudulent representations regarding the cause of the permit violations, and committed an

unfair and deceptive act or practice under G.L. c. 93A.

252.    In 2012 and 2013, as a result of one or more discharges of untreated or improperly treated wastewater into Plymouth Harbor, the Massachusetts Division of Marine Fisheries closed waters in Plymouth Harbor and/or Kingston Bay to shell-fishing.

253.    The closing of waters in Plymouth Harbor and/or Kingston Bay to shell-fishing resulted in the assertion of one or more claims against Veolia by various shell-fishermen.

254.    Veolia settled some or all of the claims of the shell-fishermen by paying money to the claimants.

255.    In a May 31, 2013 letter to the Town Veolia demanded additional compensation relating to the existence and operation of shellfish beds in Plymouth Harbor.

256.    In its May 31, 2013 letter to the Town, in support of its demand for additional compensation, Veolia asserted that the WWTF had not been designed by Veolia to create an effluent that would be adequate for safe discharge to shellfish beds in Plymouth Harbor.

257.    The aforesaid assertion was false, and Veolia knew it was false when it made the assertion in its May 31, 2013 letter.

258.    Contrary to Veolia's May 31, 2013 letter, (i) the WWTF RFP and the USFOS Construction Contract required that the WWTF be designed to create an effluent adequate for safe discharge to shellfish beds, and (ii) Veolia's very own operation-and-maintenance manual for the WWTF represented that Veolia had designed the WWTF to create such an effluent.

259.    Veolia delivered its May 31, 2013 letter to the Town despite knowing that it was required to design the WWTF to create an effluent adequate for safe discharge to shellfish beds, and that it had represented, in its WWTF operation and maintenance manual, that it had done so.

260.    In its May 31, 2013 letter, Veolia also attributed corrosion of the Force Main to salt water intrusion into the Contract System.

261.    Veolia's attribution of corrosion of the Force Main to salt water intrusion was part of Veolia's scheme, reflected in Mr. Benz's aforementioned 2013 handwritten note, to blame the Town for Veolia's failure to maintain the Force Main and the resulting corrosion of the Force Main.

262.    The delivery of Veolia's May 31, 2013 letter to the Town is an unfair and deceptive act or practice under G.L. c. 93A.

**COUNT I**
**BREACH OF CONTRACT**
**(O&M CONTRACT)**
**VEOLIA WATER NORTH AMERICA – NORTHEAST LLC &**
**VEOLIA WATER NORTH AMERICA OPERATING SERVICES LLC**

263.    The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

264.    Veolia materially breached the O&M Contract by failing to operate and maintain the Force Main and Water Street Pump Station in accordance with the O&M Contract.

265.    Veolia's failure to operate and maintain the Force Main and Water Street Pump Station was motivated to improve Veolia's profitability, and was, therefore, willful and wanton.

266.     Veolia also materially breached the O&M Contract by failing to provide oversight services for the design and construction of the Force Main and Water Street Pump Station.

267.     Veolia's breach of the O&M Contract was a direct cause of the corrosion and premature failure of the Force Main.

268.     As a direct result of Veolia's breach of the O&M Contract, the Town has incurred and is incurring significant damages.

WHEREFORE, the Town hereby demands judgment against Veolia for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

## COUNT II
## BREACH OF IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING
### (O&M CONTRACT)
### VEOLIA WATER NORTH AMERICA – NORTHEAST LLC &
### VEOLIA WATER NORTH AMERICA OPERATING SERVICES LLC

269.     The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

270.     The O&M Contract includes an implied covenant of good faith and fair dealing.

271.     Veolia's failure to develop and implement an effective corrosion control program was intentional and motivated by a desire to improve Veolia's profitability.

272.     As set forth in the preceding paragraphs, Veolia engaged in a decades-long pattern of bad faith and unscrupulous conduct with the intent to obtain unbargained-for benefits while depriving the Town of its benefits under the O&M Contract.

273.   Veolia knew that said conduct would deny to the Town the benefits of the O&M Contract.

274.   Veolia's conduct was willful and wanton.

275.   Veolia's conduct constitutes a breach of the implied covenant of good faith and fair dealing.

276.   As a result of Veolia's breach of the implied covenant, the Town has incurred and is incurring significant damages.

WHEREFORE, the Town hereby demands judgment against Veolia for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

## COUNT III
### UNFAIR AND DECEPTIVE ACTS/PRACTICES – G.L. c. 93A
### VEOLIA WATER NORTH AMERICA – NORTHEAST LLC,
### VEOLIA WATER NORTH AMERICA OPERATING SERVICES LLC,
### AND VEOLIA NORTH AMERICA, INC.

277.   The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

278.   As set forth in preceding paragraphs of this Fourth Amended Complaint, Veolia engaged in a decades-long pattern of bad faith and unscrupulous conduct with the intent to obtain unbargained-for benefits while depriving the Town of its benefits under the O&M Contract.

279.   Veolia fraudulently concealed, and intentionally failed to disclose to the Town, its pattern of conduct.

280.   Veolia's pattern of bad faith and unscrupulous conduct constitutes an unfair and deceptive act or practice under G.L. c. 93A.

281. Veolia fraudulently concealed, and intentionally failed to disclose to the Town, its plan to divert septage from the WWTF.

282. Veolia's plan to divert septage deliveries from the WWTF to increase its revenue at the expense of the Town, reflected in Mr. Ashcroft's May 19, 2007 e-mail to Veolia employees, aforementioned, is an unfair and deceptive act or practice under G.L. c. 93A.

283. Veolia fraudulently concealed, and intentionally failed to disclose to the Town, its fraudulent representation regarding the reasons it discontinued receiving septage at the WWTF.

284. Veolia's fraudulent representation about the reasons it discontinued receiving septage at the WWTF is an unfair and deceptive act or practice under G.L. c. 93A.

285. The delivery to the Town of Veolia's March 23, 2012 letter—which contains false statements and fraudulent payment demands, as set forth in the preceding paragraphs of this Fourth Amended Complaint—constitutes an unfair and deceptive act or practice under G.L. c. 93A.

286. The delivery to the Town of Veolia's April 25, 2012 letter—which contains false statements and fraudulent payment demands, as set forth in the preceding paragraphs of this Fourth Amended Complaint—constitutes an unfair and deceptive act or practice under G.L. c. 93A.

287. Veolia's threats to discontinue the use of Corrosion Control Chemicals contained in its March 23 and April 25, 2012 letters to the Town constitute unfair and deceptive acts or practices under G.L. c. 93A.

288. Veolia's delivery to the Town in 2012-2014 of various capital repair plans—which contain charges for services that Veolia knew it was supposed to perform at no cost to the Town, including charges for evaluating the condition of the Town's collection system and for improvements to the WWTF—is an unfair and deceptive act or practice under G.L. c. 93A.

289. The delivery to the Town of Veolia's May 31, 2013 letter—which contains false statements and fraudulent payment demands—constitutes an unfair and deceptive act or practice under G.L. c. 93A.

290. Veolia's scheme to blame the Town for its failure to maintain the Force Main and for the resulting corrosion of the Force Main, reflected in Mr. Benz's 2013 handwritten note, aforementioned, is an unfair and deceptive act or practice under G.L. c. 93A.

291. Veolia's Answer and Veolia OPS's Counterclaim in this action falsely alleged that the Town was responsible to pay for Corrosion Control Chemicals, that the Town breached the O&M Contract by not paying for such chemicals, and that Veolia neither knew nor could have known of the potential for hydrogen sulfide to corrode, and cause the failure of, the Force Main.

292. The aforesaid allegations are false, and Veolia knew they were false when it filed its Answer and Veolia OPS filed its Counterclaim.

293. Veolia's filing of its Answer and Veolia OPS' filing of its Counterclaim against the Town in this action is a continuation of Veolia's pre-litigation bad faith conduct, and constitutes an unfair and deceptive act or practice under G.L. c. 93A.

294. Veolia's unfair and deceptive acts or practices were knowing and willful.

295.    By letter dated November 22, 2017, the Town delivered a 30-day demand letter to Veolia pursuant to G.L. c. 93A, § 9.

296.    In its response to the demand letter, Veolia refused to grant relief to the Town.

297.    As guarantor under the Guaranty, Veolia North America, Inc. is responsible for Veolia's violations of G.L. c. 93A.

298.    As guarantor under the Guaranty, Veolia North America, Inc. knew or should have known of Veolia's unfair and deceptive acts or practices, and had, and breached, a duty to the Town under the Guaranty to cause Veolia to cease such conduct and to notify the Town of such conduct.

299.    Veolia North America, Inc.'s failure and refusal to grant the Town's claim on the Guaranty constitutes an unfair and deceptive act or practice under G.L. c. 93A.

300.    As a direct result of Veolia's unfair and deceptive acts and practices, the Town sustained significant damages, including, but not limited to, lost revenue from septage that was diverted by Veolia to another treatment plant in Rhode Island, and costs incurred by the Town to contest Veolia's false claims, including, but not limited to, the cost to participate in the formal mediation of Veolia's claim that the Town pay for the cost of Corrosion Control Chemicals, and to answer and defend against Veolia's claims before and during this litigation.

WHEREFORE, the Town hereby demands judgment against Veolia and Veolia North America, Inc. for three times the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

## COUNT IV
## NEGLIGENCE
## VEOLIA WATER NORTH AMERICA – NORTHEAST LLC &
## <u>VEOLIA WATER NORTH AMERICA OPERATING SERVICES LLC</u>

301.    The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

302.    Veolia owed the Town a duty to exercise reasonable care in the operation and maintenance of the Contract System.

303.    Veolia owed the Town a duty to exercise reasonable care in providing oversight services for the design and construction of the Force Main and Water Street Pump Station.

304.    Veolia breached its duty to exercise reasonable care in the operation and maintenance of the Contract System, and in the provision of oversight services for the design and construction of the Force Main and Water Street Pump Station.

305.    Veolia's breach of its duty of reasonable care was a proximate cause of the corrosion and premature failure of the Force Main.

306.    As a direct result of Veolia's breach of duty, the Town has incurred and is incurring significant damages.

WHEREFORE, the Town hereby demands judgment against Veolia for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

## COUNT V
## INDEMNIFICATION
## (O&M CONTRACT)
## VEOLIA WATER NORTH AMERICA – NORTHEAST LLC &
## VEOLIA WATER NORTH AMERICA OPERATING SERVICES LLC

307.    The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

308.    Under Section 1201(a) of the O&M Contract, Veolia is required to "defend, indemnify, and hold harmless the Town . . . from (i) any costs, expenses or liabilities, (including costs, expenses or liabilities to third parties) for bodily injury (including death), damage to tangible property, or regulatory non-compliance, or (ii) any fines or penalties for violations of Applicable Law to the extent that they are directly caused by or arise from USFOS's breach of this O&M Contract or the negligent or wrongful intentional acts or omissions of USFOS or its agents, servants, employees or subcontractors."

309.    Pursuant to Section 1201(a), Veolia is required to indemnify the Town from all costs, expenses and liabilities arising from the failure of the Force Main, including, but not limited to, damage to real property and any governmental fines and penalties.

WHEREFORE, the Town hereby demands judgment against Veolia for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

48

## COUNT VI
## BREACH OF CONTRACT
## (SETTLEMENT AGREEMENT)
## VEOLIA WATER NORTH AMERICA – NORTHEAST LLC &
## VEOLIA WATER NORTH AMERICA OPERATING SERVICES LLC

310.     The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

311.     Veolia materially breached the Settlement Agreement by failing to fulfill its obligation to comply with all terms of the O&M Contract, Applicable Law and Legal Requirements.

312.     As a result of Veolia's breach of the Settlement Agreement, the Town has incurred and is incurring significant damages.

WHEREFORE, the Town hereby demands judgment against Veolia for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

## COUNT VII
## BREACH OF WARRANTY
## (SETTLEMENT AGREEMENT)
## VEOLIA WATER NORTH AMERICA – NORTHEAST LLC &
## VEOLIA WATER NORTH AMERICA OPERATING SERVICES LLC

313.     The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

314.     In the Settlement Agreement, Veolia warranted that it would fulfill its obligation to comply with all terms of the O&M Contract, Applicable Law and Legal Requirements.

315.     Veolia breached its warranty contained in the Settlement Agreement.

316.    As a result of Veolia's breach of warranty, the Town has incurred and is incurring significant damages.

WHEREFORE, the Town hereby demands judgment against Veolia for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

## COUNT VIII
## BREACH OF FIDUCIARY DUTY
## VEOLIA WATER NORTH AMERICA – NORTHEAST LLC &
## VEOLIA WATER NORTH AMERICA OPERATING SERVICES LLC

317.    The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

318.    Before and during the term of the O&M Contract, Veolia represented itself to the town as an expert in the design, construction, operation and maintenance of wastewater collection systems and facilities.

319.    The Town relied upon Veolia's representations, and reposed faith, confidence and trust in the self-proclaimed experience, expertise, judgment and advice of Veolia.

320.    Veolia knew of, and accepted, the Town's faith, confidence and trust in Veolia's self-proclaimed experience, expertise, judgment and advice.

321.    In entering into the WWTF Contracts and accepting responsibility for the operation and maintenance of the Contract System, Veolia knew, acknowledged and agreed that it was accepting responsibility for a system that was essential to the protection of the environment and public health and safety, and that it was being given charge of a "public trust."

322.    In a letter to CDM dated September 8, 1999, a copy of which Veolia delivered to the Town, Veolia acknowledged its fiduciary relationship with the Town when it stated that it shared a relationship of "trust and confidence" with the Town.

323.    Veolia owed a fiduciary duty to the Town in the operation and maintenance of the Contract System, and in the performance of its obligations under the O&M Contract.

324.    Veolia had a fiduciary obligation to disclose to the Town the facts and information relating to Veolia's bad faith and unscrupulous conduct, as set forth in the preceding paragraphs of this Fourth Amended Complaint.

325.    Veolia had a fiduciary obligation to disclose to the Town the Rosenbaum Memo.

326.    Veolia breached its fiduciary duty to the Town by failing to disclose the aforesaid facts, information and Rosenbaum Memo and by engaging in a decades-long pattern of bad faith conduct, as set forth in the preceding paragraphs of this Fourth Amended Complaint.

327.    Veolia's failure to disclose the aforesaid facts, information, and Rosenbaum Memo constitutes fraudulent concealment under G.L. c. 260, § 12.

328.    As a result of Veolia's breach of fiduciary duty, the Town has incurred and is incurring significant damages.

WHEREFORE, the Town hereby demands judgment against Veolia for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

## COUNT IX
## BREACH OF CONTRACT
## <u>VEOLIA NORTH AMERICA INC.</u>

329.     The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

330.     Under the Guaranty, Veolia North America, Inc. "guarantees to the Town timely and proper performance and observance of all the payment obligations of [Veolia], whether arising from covenants contained in the Contract or from the breach of such covenants."

331.     Under the Guaranty, Veolia North America, Inc. is required to pay to the Town all of the damages, costs and expenses arising from Veolia's default under the O&M Contract.

332.     The Town has made a claim on the Guaranty.

333.     Veolia North America, Inc. has failed and refused to grant the Town's claim.

334.     Veolia North America, Inc.'s failure and refusal to grant the Town's claim constitutes a breach of the Guaranty.

335.     As a result of Veolia North America Inc.'s failure and refusal, the Town has incurred and is incurring significant damages.

WHEREFORE, the Town hereby demands judgment against Veolia North America Inc. for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

## COUNT X
### BREACH OF CONTRACT
### AMERICAN HOME ASSURANCE COMPANY,
### INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,
### & AMERICAN INTERNATIONAL GROUP, INC.

336.    The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

337.    The Town made a claim on the Bond.

338.    Veolia's Surety has failed and refused to grant the Town's claim on the Bond.

339.    The failure and refusal of Veolia's Surety to grant the Town's claim constitutes a breach of the Bond.

340.    As a result of the breach of the Bond, the Town has incurred and is incurring significant damages.

WHEREFORE, the Town hereby demands judgment against American Home Assurance Company, Insurance Company of the State of Pennsylvania, and American International Group, Inc. under the Bond for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

## COUNT XI
### UNFAIR AND DECEPTIVE ACTS/PRACTICES – G.L. c. 93A
### AMERICAN HOME ASSURANCE COMPANY,
### INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,
### & AMERICAN INTERNATIONAL GROUP, INC.

341.    The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

342.     As of November 2017, if not earlier, Veolia's Surety was aware of Veolia's pattern of bad faith and unscrupulous conduct, as set forth in the preceding paragraphs of this Fourth Amended Complaint.

343.     In addition, as of November 2017, if not earlier, Veolia's liability in this action and the Town's damages have become reasonably clear.  Yet Veolia's Surety has failed to communicate with the Town, other than its initial denial of the Town's Bond claim.

344.     Veolia's Surety has failed to acknowledge and act reasonably promptly upon communications from the Town with respect to the Town's claim on the Bond; has failed to adopt and/or implement reasonable standards for the prompt investigation of the Town's claim; has failed to conduct a reasonable investigation of the Town's claim based upon all available information; and has failed to effectuate prompt, fair and equitable settlement of the Town's claim in which liability has become reasonably clear.

345.     The foregoing failures of Veolia's Surety constitute violations of G.L. c. 176D, § 9, which also constitute violations of G.L. c. 93A.

346.     By letter dated November 22, 2017, the Town delivered a 30-day demand letter to Veolia's Surety pursuant to G.L. c. 93A, § 9.  In its response to the demand letter, Veolia's Surety refused to grant relief to the Town.

347.     As a direct result of such unfair and deceptive acts and practices, the Town sustained significant damages, including, but not limited to, costs incurred to contest Veolia's false claims, including, but not limited to, the cost to answer and defend against Veolia's claims before and during this litigation.

WHEREFORE, the Town hereby demands judgment against American Home Assurance Company, Insurance Company of the State of Pennsylvania, and American International Group, Inc. for three times the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

## COUNT XII
## INDEMNIFICATION
## CDM SMITH INC.

348.    The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

349.    CDM's Preliminary Design was deficient, because the diameter of the Force Main was too large for the Design Flow, and the pipe material specified for the Force Main was highly susceptible to internal corrosion.

350.    CDM was required to notify the Town that Gioioso and Stantec had failed to provide the ductile iron Force Main with adequate internal corrosion protection, but CDM failed to provide such notification.  This failure constitutes a breach of the CDM Contract.

351.    CDM was required to ensure that Gioioso and Stantec provided, and to cause them to provide, the ductile iron Force Main with adequate internal corrosion protection, but CDM failed to do so.  This failure constitutes a breach of the CDM Contract.

352.    CDM also breached sections 8.13, 8.14 and 8.18 of the Addendum to the CDM Contract and Exhibit D attached to the CDM Contract, as set forth in the preceding paragraphs of this Fourth Amended Complaint.

353.    At law and pursuant to the CDM Contract, CDM owed the Town a duty to perform its design services with reasonable care.

354.    CDM breached that duty for the reasons set forth in this Fourth Amended Complaint.

355.    Consequently, CDM was negligent in performance of its services under the CDM Contract.

356.    The breaches of contract and negligence by CDM were a contributing and proximate cause of the corrosion and premature failure of the Force Main, and have resulted in significant damages to the Town and damage to property.

357.    Section 8.10.1 of Exhibit A to the CDM Contract provides: "ENGINEER agrees to indemnify and hold harmless OWNER and its employees from and against any and all claims, demands, actions, including actions for personal injury or wrongful death, actions for property damages, and any other types of claims asserted by third persons alleging a violation of law or for any other cause, arising from or related to ENGINEER's negligent act, error, or omission in the performance of the work under this Agreement; provided, however, that this obligation to indemnify and hold harmless shall not apply to claims which were caused by the fault of OWNER."

358.    Section 8.17 of the CDM Contract (added by the Addendum attached thereto) also provides: "ENGINEER shall indemnify, defend, and hold OWNER harmless from and against any and all claims, demands, liabilities, actions, causes of actions, costs and expenses arising out of ENGINEER's breach of this Agreement or the negligence or intentional misconduct of ENGINEER, or ENGINEER's agents or employees."

56

359.   CDM is required to indemnify the Town pursuant to the foregoing provisions of the CDM Contract for damages arising from the corrosion and premature failure of the Force Main.

WHEREFORE, the Town hereby demands judgment against CDM for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

## COUNT XIII
## INDEMNIFICATION
## P. GIOIOSO & SONS, INC.

360.   The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

361.   Section 1001 of the Gioioso Contract requires Gioioso to "defend, indemnify, and hold harmless the Town, its elective and appointed officers, and its duly authorized employees and contractors . . . from (i) any costs, expenses or liabilities, (including costs, expenses or liabilities to third parties) for bodily injury (including death), damage to tangible property, or regulatory non-compliance; (ii) any fines or penalties for violations of Applicable Law caused by Gioioso; or (iii) any other costs or expenses arising out of any act or omission of Gioioso or any of its subcontractors, agents and officials for any reason whatsoever relating to the Services under this Construction Contract, to the extent that they are directly caused by or arise from, Gioioso's breach of this Construction Contract or the negligence or wrongful intentional acts or omissions of Gioioso or its agents, servants, employees or subcontractors."

362.   As a result of Gioioso's failures to design and construct the ductile iron Force Main with internal corrosion protection, to design the Force Main with a life-span

of 50 years, and to use materials in the construction of the Force Main that were appropriate for local conditions, including the problem of corrosion, all as noted in the preceding paragraphs of this Fourth Amended Complaint, the Town has incurred and will continue to incur significant damages.

363.    At law and pursuant to the Gioioso Contract, Gioioso owed the Town a duty to perform its design services with reasonable care.

364.    Gioioso breached that duty for the reasons set forth in this Fourth Amended Complaint.

365.    Consequently, Gioioso was negligent in the performance of its services under the Gioioso Contract.

366.    In addition, Gioioso was required by the Gioioso Contract to install and operate certain temporary systems and facilities necessary to maintain uninterrupted wastewater treatment operations during construction of the Water Street Pump Station, Force Main and WWTF.

367.    Among the temporary systems installed by Gioioso was a temporary chemical feed system at the Water Street Pump Station to treat hydrogen sulfide and prevent odors and corrosion in the Force Main.

368.    Gioioso, along with Stantec, was required to operate the temporary chemical feed system starting no later than January 28, 2002, when the Water Street Pump Station commenced operations, until (i) construction of the Water Street Pump Station was completed and (ii) the Water Street Pump Station was accepted by the Town following successful completion of an acceptance test or, if earlier, Veolia commenced operation of the permanent chemical feed system, also installed by Gioioso.

369.   Gioioso failed to operate the temporary chemical feed system.

370.   Gioioso's breaches of the Gioioso Contract and Gioioso's negligence have also caused damage to property.

371.   Gioioso is therefore required to indemnify the Town for such damages pursuant to Section 1001 of the Gioioso Contract.

WHEREFORE, the Town hereby demands judgment against Gioioso for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

## COUNT XIV
## BREACH OF WARRANTY
## P. GIOIOSO & SONS, INC.

372.   The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

373.   In Section 303 of the Gioioso Contract, Gioioso warranted that the materials incorporated into the Force Main would be new and in conformance with the specifications included in Exhibit 301.

374.   Gioioso breached its Section 303 warranty.

375.   In addition, Gioioso's failure to design and construct the ductile iron Force Main with internal corrosion protection, failure to design the Force Main with a life-span of 50 years, and failure to use materials in the construction of the Force Main that were appropriate for local conditions, including the problem of corrosion, all as noted in the preceding paragraphs of this Fourth Amended Complaint, constitute breaches of warranty.

376.    As a result of Gioioso's breaches of warranty, the Town has incurred and will continue to incur significant damages.

WHEREFORE, the Town hereby demands judgment against Gioioso for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

## COUNT XV
## BREACH OF CONTRACT
## P. GIOIOSO & SONS, INC.

377.    The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

378.    Gioioso's failure to design and construct the ductile iron Force Main with internal corrosion protection, failure to design the Force Main with a life-span of 50 years, and failure to use materials in the construction of the Force Main that were appropriate for local conditions, including the problem of corrosion, all as noted in the preceding paragraphs of this Fourth Amended Complaint, constitute breaches of the Gioioso Contract.

379.    Gioioso was required by the Gioioso Contract to install and operate certain temporary systems and facilities necessary to maintain uninterrupted wastewater treatment operations during construction of the Water Street Pump Station, Force Main and WWTF.

380.    Among the temporary systems installed by Gioioso was a temporary chemical feed system at the Water Street Pump Station to treat hydrogen sulfide and prevent odors and corrosion in the Force Main.

381.   Gioioso, along with Stantec, was required to operate the temporary chemical feed system starting no later than January 28, 2002, when the Water Street Pump Station commenced operations, until (i) construction of the Water Street Pump Station was completed and (ii) the Water Street Pump Station was accepted by the Town following successful completion of an acceptance test or, if earlier, Veolia commenced operation of the permanent chemical feed system, also installed by Gioioso.

382.   Gioioso failed to operate the temporary chemical feed system, and that failure constitutes a breach of the Gioioso Contract.

383.   As a result of Gioioso's breach of the Gioioso Contract, the Town has incurred and will continue to incur significant damages.

WHEREFORE, the Town hereby demands judgment against Gioioso for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

### COUNT XVI
### INDEMNIFICATION
### STANTEC CONSULTING SERVICES INC.

384.   The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

385.   As between Stantec and Gioioso, under the Gioioso-FST Contract, Stantec was required to comply with certain requirements of the Gioioso Contract, including the requirements in Exhibit 301, which included the requirement to provide the ductile iron Force Main with internal corrosion protection.  Stantec failed to comply with those requirements, and thus breached the Gioioso-FST Contract.

386.    Under the Gioioso-FST Contract, Stantec is responsible for all of the deficiencies in the design of the Force Main.

387.    The Gioioso-FST Contract expressly states, and Stantec at all relevant times knew, that Stantec's design services would be performed for the direct benefit of the Town.

388.    The Gioioso Contract was incorporated by reference into the Gioioso-FST Contract.

389.    Stantec agreed, in the Gioioso-FST Contract, to be bound to the Town by the terms and conditions of the Gioioso Contract, including indemnification provisions.

390.    The Town is, therefore, an intended third party beneficiary under the Gioioso-FST Contract.

391.    In addition, under the Gioioso Contract, Gioioso expressly assigned to the Town any and all of Gioioso's claims and causes of action against Stantec arising out of any errors, omissions or negligence in Stantec's performance of design services or related to the design and construction of the Force Main.

392.    Stantec's breaches of the Gioioso-FST Contract also constitute a breach of Stantec's obligations to the Town in the Gioioso-FST Contract.

393.    At law and pursuant to the Gioioso-FST Contract, Stantec owed both Gioioso and the Town a duty to perform design services with reasonable care.

394.    Stantec breached that duty for the reasons set forth in this Fourth Amended Complaint.

395.    Consequently, Stantec's conduct, as set forth in this Fourth Amended
Complaint, constitutes negligence in performance of its services under the Gioioso-FST
Contract.

396.    As a proximate result of Stantec's negligence and its breach of the
Gioioso-FST Contract, the Town and, due to the Town's claims against Gioioso in this
action, Gioioso, have suffered damages.

397.    As a result of Stantec's negligence and breaches of the Gioioso-FST
Contract and its consequent breach of its obligations to the Town, in such contract, the
Town has incurred and will continue to incur significant damages.

398.    Stantec breached the Gioioso-FST Contract and was negligent in the
performance of its design services.

399.    Stantec's breaches of the Gioioso-FST Contract and negligent
performance of design services have caused significant damages to the Town, and
property damage.

400.    By virtue of the assignment of the claims of Gioioso under the Gioioso-
FST Contract, Stantec is liable directly to the Town for Stantec's breaches of the
Gioioso-FST Contract and negligent performance of design services.

401.    In addition, in Section 6.6.1.1 of the Gioioso-FST Contract, Stantec agreed
to "defend, indemnify and hold harmless Town and Contractor [i.e., Gioioso] and agents
and employees of any of them, from and against claims, damages, losses and expenses,
including but not limited to attorney's fees, arising out of or resulting from performance
of this Agreement by Design Engineer [i.e., FST, now Stantec] . . . provided that any

such claim, damage, loss or expense is attributable to . . . injury to or destruction of tangible property, caused by the negligent acts or omissions of the Design Engineer. . . ."

402.    The Town is an intended third-party beneficiary under Section 6.6.1.1 of the Gioioso-FST Contract.

403.    Under Section 1001 of the Gioioso Contract and Section 6.6.1.1 of the Gioioso-FST Contract, Stantec is required to indemnify the Town for the Town's damages.

WHEREFORE, the Town hereby demands judgment against Gioioso for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

**COUNT XVII**
**BREACH OF CONTRACT**
**STANTEC CONSULTING SERVICES INC.**

404.    The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

405.    As between Stantec and Gioioso, under the Gioioso-FST Contract, Stantec was required to comply with the requirements of the Gioioso Contract, including the requirements in Exhibit 301, which included the requirement to provide the ductile iron Force Main with internal corrosion protection.

406.    Stantec failed to comply with those requirements, and thus breached the Gioioso-FST Contract.

407.    Under the Gioioso-FST Contract, Stantec is responsible for all of the deficiencies in the design of the Force Main.

408.    The Gioioso-FST Contract expressly states, and Stantec at all relevant times knew, that Stantec's design services would be performed for the direct benefit of the Town.

409.    The Gioioso Contract was incorporated by reference into the Gioioso-FST Contract.

410.    Stantec agreed, in the Gioioso-FST Contract, to be bound to the Town by the terms and conditions of the Gioioso Contract.

411.    The Town is, therefore, an intended third party beneficiary under the Gioioso-FST Contract.

412.    In addition, under the Gioioso Contract, Gioioso expressly assigned to the Town any and all of Gioioso's claims and causes of action against Stantec arising out of any errors, omissions or negligence in Stantec's performance of design services or related to the design and construction of the Force Main.

413.    Stantec's breach of the Gioioso-FST Contract also constitutes a breach of Stantec's obligations to the Town in the Gioioso-FST Contract.

414.    At law and pursuant to the Gioioso-FST Contract, Stantec owed both Gioioso and the Town a duty to perform design services with reasonable care.

415.    Stantec breached that duty for the reasons set forth in this Fourth Amended Complaint.

416.    As a proximate result of Stantec's breach of the Gioioso-FST Contract, the Town and, due to the Town's claims against Gioioso in this action, Gioioso, have suffered damages.

417.     As a result of Stantec's breach of the Gioioso-FST Contract and its consequent breach of its obligations to the Town, in such contract, the Town has incurred and will continue to incur significant damages.

WHEREFORE, the Town hereby demands judgment against Stantec for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

### COUNT XVIII
### BREACH OF WARRANTY
### STANTEC CONSULTING SERVICES INC.

418.     The preceding paragraphs of this Fourth Amended Complaint are incorporated herein by reference.

419.     The Gioioso-FST Contract expressly states, and Stantec at all relevant times knew, that Stantec's design services would be performed for the direct benefit of the Town.

420.     The Gioioso Contract was incorporated by reference into the Gioioso-FST Contract, and Stantec agreed, in the Gioioso-FST Contract, to be bound to the Town by the terms and conditions of the Gioioso Contract.

421.     The Town is, therefore, an intended third party beneficiary under the Gioioso-FST Contract.

422.     All of the express warranties made by Gioioso to the Town in the Gioioso Contract, as set forth in this Fourth Amended Complaint, were also made by Stantec to the Town under the Gioioso-FST Contract, in which Stantec agreed to be bound to the Town by the terms and conditions of the Gioioso Contract and to the incorporation of that contract into the Gioioso-FST Contract.

66

423.    Stantec breached the aforesaid express warranties for the same reasons and in the same manner that Gioioso breached those warranties, as set forth in this Fourth Amended Complaint.

424.    As a result of Stantec's breach of warranty, the Town has suffered significant damages.

WHEREFORE, the Town hereby demands judgment against Gioioso for the Town's damages, plus interest, attorneys' fees, costs of suit, and such other relief as the Court may deem appropriate.

## JURY DEMAND

The Town respectfully requests a trial by jury on all claims so triable.

PLAINTIFF,
TOWN OF PLYMOUTH

By its attorneys,

_____
Richard T. Holland (BBO# 632661)
David J. Doneski (BBO# 546991)
Janelle M. Austin (BBO# 666835)
KP Law, P.C.
  Town Counsel
101 Arch Street, 12th Floor
Boston, MA 02110-1109
(617) 556-0007
rholland@k-plaw.com
ddoneski@k-plaw.com
decker@k-plaw.com
jaustin@k-plaw.com

656919/23903/0016

67