# Exhibit 17

## VNA Defendants' One-Page Memorandum Concerning Its Bellwether Experts

The bellwether plaintiffs served 12 experts' reports on August 10th. As a result of selecting the 4 bellwether plaintiffs for trial, the VNA defendants deposed 8 of those experts over a 60-day period.[1] On November 25th, VNA served reports by 16 experts all of whom will provide testimony relevant to VNA's defenses to the plaintiffs' claims. Each of VNA's experts will either directly rebut the opinions expressed by the plaintiffs' experts or provide testimony in a subject matter of expertise otherwise relevant to VNA's defenses including evidence relevant to the fault of other parties or non-parties. The subject matters addressed by VNA's experts include: Corrosion Science, Economics, Epidemiology, Geospatial Mapping, Governmental Authority, House Inspections, Neuropsychology, Pediatric Neurology, Psychology, Toxicology, Vocational Potential and Employability, Water Chemistry, Water Engineering, and Water Operations, Management and Regulation. See Exhibit A, *The VNA Defendants' Description of Their Experts' Expertise, Opinions and Subject Matters Addressed.* To date the plaintiffs have not confirmed depositions for any of VNA's experts on the dates provided during the deposition period mandated by the current CMO – December 14, 2020 through February 15, 2021.

Because co-liaison counsel requested that the subject matter of VNA's experts' disclosures be placed on the agenda for the status conference without first requesting or convening a meet and confer, the only information VNA received about the factual or legal basis for the plaintiffs' complaint or the remedy they seek is their general statement in correspondence with the court, "Co-Liaison Counsel find these submissions to be excessive, duplicative, and cumulative and will request the Court to limit the number of experts to avoid unfairness, unnecessary delay, and the presentation of cumulative evidence." The court should reject the plaintiffs' request for the following reasons.

First, and most importantly, as described in Exhibit A, the subject matters of VNA's experts' opinion testimony are not excessive, duplicative, or cumulative.

Second, it is pre-mature for the court to make any determination about the scope of expert testimony at trial. See Fed. R. Civ. P. 16(c)(2)(D); *Bowman v. Corrs. Corp. of America*, 350 F.3d 537, 547 (6th Cir. 2003)(rulings about the scope of expert testimony should be made just before trial not during expert discovery before trial preparation is complete); *Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd*., 2008 WL 11357856, at *2 (E.D. Mich. Dec. 10, 2008) (denying a motion to strike duplicative expert reports because, *inter alia*, such motions are inappropriate and "the proper vehicle is a motion in limine" (internal quotation marks omitted)); *Piskura v. Taser Int'l*, 2012 WL 1267990, at *2 (S.D. Ohio Apr. 13, 2012) (holding the "exclusion of [defendant's] designated experts due to purportedly cumulative testimony is premature" because "[d]ispositive motions have only recently been filed, the deadline for filing the Joint Final Pretrial Order is set for . . . approximately three months from now, and no trial date has been set"); *VJ, LLC v. State Auto Prop. & Cas. Ins. Co*., 2016 WL 7497580, at *3 (W.D. Tenn. July 11, 2016) ("Excluding expert testimony as redundant is premature if there are pending dispositive motions and the trial is sufficiently far away that the party proffering the expert has not finalized its decision about who will testify to what information and in what order."); *United States v. Akers*, 2020 WL 1923179, at *7 (E.D. Ky. Apr. 21, 2020) ("[T]he Court cannot say, at this stage, that [the expert's] contemplated testimony would be so cumulative as to outweigh its evidentiary value," and so "denies [the MIL to exclude] but will, at trial, monitor the proof progression to guard against unneeded repetition.").

Wherefore, the VNA defendants request that the court deny the plaintiffs' request to limit the number of VNA's experts or the scope of their testimony.

---

[1] VNA has also completed the depositions of the 14 experts identified by the class plaintiffs without incident.

**EXHIBIT A**

**THE VNA DEFENDANTS' DESCRIPTION OF THEIR EXPERTS' OPINION TESTIMONY – SUBJECT MATTERS ADDRESSED**

**Corrosion science**

David Duquette, Ph.D.

Dr. Duquette is a professor of engineering who researches metallurgy and corrosion processes in water environments.  Dr. Duquette will testify that there is no evidence that the shift from DWSD water to Flint River water affected the corrosion behavior of Flint's distribution system infrastructure.  Dr. Duquette will also testify that available data shows that lead release into Flint drinking water after 2014 was at or below historical rates, and that excess lead came from pipe scale and not directly from metal.

The plaintiffs have not identified an expert in this area of expertise.

**Economics**

Malcolm Cohen Ph.D.

Dr. Cohen is an economist who will testify that the four bellwether plaintiffs have not sustained economic or lost earning capacity damages.

Dr. Cohen will also rebut the opinions expressed by the plaintiffs' expert economist Gary Crakes.

**Epidemiology**

Stacey Benson Ph.D.

Dr. Benson is an epidemiologist who will testify that (a) lead is commonly present in the environment and results in exposures that influence blood lead levels in children, (b) seasonal fluctuations in blood lead levels are common and not unique to Flint, (c) low level lead exposure in children is not causally associated with decrements in cognitive function or behavioral problems and (d) low level lead exposure in children is not causally associated with adverse health effects later in adulthood.

Dr. Benson will also rebut the opinions expressed by the plaintiffs' expert epidemiologist Dr. Joseph Graziano and expert pediatrician Dr. William Bithoney.

Doug Weed M.D.

Dr. Weed is an epidemiologist who will testify that (a) causal association between low level lead exposure in children and neurodevelopmental decrements (whether cognitive or behavioral) have not been scientifically established given the absence of effective adjustment for other well-established causes and risk factors, (b) the prevalence of other causal factors and risk factors for adverse neurodevelopmental outcomes in children is sufficient to explain the occurrence of those adverse outcomes in children in Flint unrelated to lead, (c) an individual's

blood lead level is a result of exposure to all prior and current sources of lead in their environment over the lifespan of the individual including dust, soil, water, food, toys and paint; (d) the four bellwether plaintiffs' blood lead levels were low and are not indicative of sufficient exposure to have caused any alleged neurocognitive or behavioral problems.

Dr. Weed will also rebut the opinions of the plaintiffs' expert epidemiologist Dr. Joseph Graziano and expert toxicologist Dr. William Bithoney.

**Geospatial Mapping**

Jamey Rosen Ph.D.

Dr. Rosen is a geoscientist who will testify about a Geospatial Mapping Tool data program which contains information about the City of Flint relevant to issues in the case including the locations of the bellwether residences, service line locations and composition, water lead tests, soil lead concentration, population density, demolition sites, ages of houses, land usage etc.

The plaintiffs have not identified an expert in this area of expertise.

**Governmental Authority**

Lawrence Friedman J.D.

Mr. Friedman is a law professor who will testify about the constitutional, statutory, regulatory, and other sources of governmental authority by which the various governmental actors engaged in conduct contributing to the Flint Water Crisis.

The plaintiffs have not identified an expert in this area of expertise.

**House Inspections**

David Amir

Mr. Amir is the director of ASTI Environmental's house inspection group which conducted the lead inspections on three of the four bellwether plaintiffs' residences.

The plaintiffs have not identified an expert in this area of expertise.

**Neuropsychology**

Robert McCaffrey Ph.D.

Dr. McCaffrey is a neuropsychologist who will testify that the plaintiffs Sherrod and Vanderhagen do not suffer from any cognitive, academic, or psychological impairment or behavioral disorders.

Dr. McCaffrey will also rebut the opinions expressed by the plaintiffs' expert neuropsychologist Mira Krishnan concerning bellwether plaintiffs Sherrod and Vanderhagen.

Steven Putnam Ph.D.

Dr. Putnam is a neuropsychologist who will testify that the plaintiffs Teed and Ware do not suffer from any cognitive, academic, or psychological impairment or behavioral disorders.

Dr. Putnam will also rebut the opinions expressed by the plaintiffs' expert neuropsychologist Mira Krishnan concerning bellwether plaintiffs Teed and Ware.

**Pediatric Neurology**

John Gaitanis M.D.

Dr. Gaitanis is a pediatric neurologist who will testify that the four bellwether plaintiffs have not sustained any neurological injuries or impairments as a result of alleged lead exposure.

Dr. Gaitanis will also rebut the opinions expressed by the plaintiffs' expert pediatrician Dr. William Bithoney and the bone scan expert Dr. Aaron Specht.

**Psychology**

David Thompson Ph.D.

Dr. Thompson is a psychologist who will testify that the four bellwether plaintiffs have not sustained any psychological impairments as a result of alleged lead exposure.

The plaintiffs have not identified an expert in this area of expertise regarding the four bellwether plaintiffs.

**Toxicology**

Brent Finley Ph.D.

Dr. Finley is a toxicologist who will testify that (a) the blood lead levels of children in Flint were elevated as a result of seasonal exposure to lead in the soil, house-dust and lead based paint, (b) water lead levels in Flint were elevated before and during the switchover period, (c) tap water consumption did not result in an increase to blood lead levels to Flint children in 2015, (d) tap water consumption contributed minimally (if at all) to the four bellwether plaintiffs' blood lead levels in 2015 and did not cause any adverse health effects and (e) the bone lead measurements of the four bellwether plaintiffs are invalid and do not indicate that the four bellwether plaintiffs had elevated levels of bone lead due to tap water consumption in 2015.

Dr. Finley will also rebut the opinions expressed by the plaintiffs' expert toxicologist Dr. Robert Michaels and the bone scan expert Dr. Aaron Specht.

**Vocational Potential and Employability**

Nancy Segreve MA, CRC

Ms. Segreve is a vocational and employment consultant who will testify that the four bellwether plaintiffs have not sustained any impairment to their ability to succeed in their future educational, vocational and employment opportunities.

The plaintiffs have not identified an expert in this area of expertise regarding the four bellwether plaintiffs.

**Water chemistry**

Graham Gagnon, Ph.D., P.Eng.

Dr. Gagnon is a professor of engineering who researches drinking water quality, and particularly mechanisms of metal release and transport in drinking water systems. Dr. Gagnon will testify about lead release in Flint from pipe scale originating from service lines, the dynamics of lead release from scale in Flint, the role of Natural Organic Matter ("NOM") in lead release from scale in Flint, the general importance of NOM control in drinking water systems including Flint's, and scientific and industry support for VNA's chemical corrosion inhibitor recommendations for Flint.

The plaintiffs have not identified an expert in this area of expertise.

**Water engineering/consulting standard of care**

William Bellamy, P.E.

Mr. Bellamy is a water engineer and consultant who will testify that VNA met the standard of care in completing its scope of work for the City of Flint, and that in doing so VNA met its professional ethical obligations.

Mr. Bellamy will rebut opinions expressed by bellwether plaintiffs' experts Richard Humann and John Hoaglund.

**Water operations, management, and regulation**

Steve Hubbs, P.E.

Mr. Hubbs is a water operations consultant who will testify that Flint's water treatment plant was unprepared to begin continuous production and distribution of drinking water from the Flint River, and did not meet the standard of care applicable to a public water utility. Mr. Hubbs will also testify that the City of Flint, its emergency managers, the MDEQ, EPA's Region 5, and other governmental actors ignored warning signs about Flint, and failed to respond adequately and timely to those issues.

The plaintiffs have not identified an expert in this area of expertise.