```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3      LEE-ANNE WALTERS, et al,

 4                      Plaintiffs,
           -v-                              Case No. 17-10164
 5
        CITY OF FLINT, et al,
 6
                       Defendants.
 7      _____/

 8                         MOTION HEARING

 9
               BEFORE THE HONORABLE JUDITH E. LEVY
10                UNITED STATES DISTRICT JUDGE

11                      JANUARY 10, 2022

12
        APPEARANCES:
13
        For the          Corey M. Stern
14      Plaintiffs:      Levy Konigsberg, LLP
                         605 Third Avenue, Suite 33rd Floor
15                       New York, New York 10158

16                       Moshe Maimon
                         Levy Konigsberg, LLP
17                       605 Third Avenue, Suite 33rd Floor
                         New York, New York 10158
18
                         Renner Kincaid Walker
19                       Levy Konigsberg, LLP
                         800 Third Avenue, 11th Floor
20                       New York, New York 10022

21                       (Appearances Continued On Next Page)

22

23      To Obtain a      Jeseca C. Eddington, RDR, RMR, CRR, FCRR
        Certified        Federal Official Court Reporter
24      Transcript       United States District Court
        Contact:         200 East Liberty Street
25                       Ann Arbor, Michigan 48104
```

```
 1                         Hunter Shkolnik
                           Napoli Shkolnik
 2                         270 Munoz Rivera Avenue, Suite 201
                           Hato Rey, Puerto Rico 00918
 3
           For the        Wayne Brian Mason
 4         Defendants:     Faegre Drinker Biddle & Reath LLP
                           1717 Main Street, Suite 5400
 5                         Dallas, Texas 75201

 6                         David C. Kent
                           Faegre Drinker Biddle & Reath LLP
 7                         1717 Main Street, Suite 5400
                           Dallas, Texas 75201
 8
                           Mark R. Ter Molen
 9                         Mayer Brown LLP
                           71 South Wacker Drive
10                         Chicago, Illinois 60606

11

12

13

14

15

16

17

18

19

20

21

22

23              To Obtain a Certified Transcript Contact:
                 Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24                   Federal Official Court Reporter
                      United States District Court
25         200 East Liberty Street - Ann Arbor, Michigan 48104
```

January 10, 2022

# I N D E X

WITNESSES

RICHARD W. HUMANN

Examination by The Court......................7
Examination by Mr. Kent.......................26
Examination by Mr. Maimon....................42
Examination (Continued) by Mr. Kent..........46

MISCELLANY

Proceedings..................................4
Certificate..................................52

January 10, 2022

4

| 1 | **P R O C E E D I N G S** |
|---|---|

1                       **P R O C E E D I N G S**

2         THE CLERK:  Calling the Flint Water cases.

3         THE COURT:  Okay.  Could I have appearances, please,

4 beginning with the plaintiffs?

5         MR. STERN:  Sure.  Corey Stern on behalf of the

6 bellwether plaintiffs, Your Honor.

7         THE COURT:  Thank you.

8         MR. MAIMON:  And also Moshe Maimon together with Mr.

9 Stern on behalf of plaintiffs, Your Honor.

10         THE COURT:  Thank you.

11         MR. WALKER:  Good afternoon, your Honor.  Renner

12 Walker on behalf of the bellwether plaintiffs.

13         THE COURT:  Thank you.  And for the LAN defendants.

14         MR. MASON:  Thank you, your Honor.  Wayne Mason and

15 David Kent on behalf of the LAN defendants.

16         THE COURT:  Thank you.

17         MR. TER MOLEN:  And Mark Ter Molen on behalf of the

18 VNA defendants.

19         THE COURT:  Good.  Thank you.  Okay.

20         Well, this is the date and time that was set for a

21 further or supplemental hearing on the Daubert motion that was

22 filed by the LAN defendants regarding Mr. Humann's report.

23 And what -- I issued an opinion on December 24, 2021.  So on

24 Christmas Eve day.

25         And in that opinion and order, which is docket entry

1  523, I determined that I needed an evidentiary hearing.  That

2  as I read the report, I saw inconsistencies between the report

3  and Mr. Humann's deposition testimony that led me to have some

4  degree of confusion about whether the opinions with respect

5  to -- a portion of the opinions at least with respect to LAN

6  could be deemed to be based on "good grounds" as the Daubert

7  case requires a judge to fine.

8           So what I'm going to do, Mr. Humann, is swear you in

9  to tell the truth.  And then we'll begin with a couple of

10  questions that I have and then if -- is it Mr. Mason?  Will

11  you be doing the questioning for LAN?

12           MR. MASON:  Mr. Kent will.

13           THE COURT:  Okay.  Then we'll follow up -- hello,

14  Mr. Kent -- with Mr. Kent.  And I just want to remind Mr. Kent

15  that if I interrupt you, which I just inevitably am likely to

16  do, I'll ask that you stop speaking when I start speaking.

17           We've had this issue come up a number of times.  And

18  it's just worth repeating.  And I think that that's true for

19  everybody.  If I start speaking, it's because I need to either

20  stop the question or stop the testimony or I have a question

21  and it just wouldn't be helpful if you keep going while I'm

22  speaking.

23           The court reporter can't take two people down and

24  she'll only take me down if I'm speaking and you're speaking.

25  And we, of course, can -- with the beauty of this technology

January 10, 2022

1    is we can hit mute.  But I try to avoid doing that.  So just

2    please try to focus on that.

3           And then of course the plaintiffs can follow up with

4    questions if they have any.  Will that be you, Mr. Stern, or

5    Mr. Maimon?

6           MR. STERN:  It's going to be Mr. Maimon today.

7           THE COURT:  Okay.  Great.  All right.  Well, with

8    that -- and I think there's a message in the chat that I've

9    got to glance at.  Oh.  And Mr. Shkolnik -- oh, there's

10   Mr. Shkolnik.  Okay.

11          MR. SHKOLNIK:  I'm sorry, Judge, to interrupt.  I was

12   just having a hard time getting in.

13          THE COURT:  Okay.  Well, it's good to have you back

14   with us.  I don't think I've seen you in a little while.

15          MR. SHKOLNIK:  A couple of months in trial.  Just

16   finished.

17          THE COURT:  Yeah.  I saw that in the newspaper.

18   Thank you.  Okay.

19          So Mr. Humann, let me -- there you are now.

20   Everybody has moved.  In your report that's on the docket as

21   ECF number 330 -- oh, I guess I was going to swear you in

22   first.  So why don't you raise your right hand.

23          Do you solemnly swear or affirm to tell the truth,

24   the whole truth, and nothing but the truth in the matter here

25   pending.

1           THE WITNESS:  I do.

2               Thereupon,

3           **R I C H A R D   W .   H U M A N N ,**

4    having been called as a witness and having been first duly

5    sworn testified as follows:

6           THE COURT:  Okay.  Thank you.  You can take your hand

7    down.

8                            EXAMINATION

9    BY THE COURT:

10              In your report, which is docket entry 330, you set

11   forth an opinion that there was, quote, "A clear lack of time

12   to get the Flint Water Treatment Plant operational by April of

13   2014."

14              As I read your report, I did not see your explanation

15   for why that would have been impossible and what upgrades

16   needed to be performed to make it fully operational.  So I'd

17   like to ask you now what you were referring to.  Why was it

18   impossible and which upgrades did you think needed to be

19   performed?

20          THE WITNESS:  I appreciate the opportunity to address

21   you today.  And it's okay for me to refer to my report as I

22   have it next to me?

23          THE COURT:  Certainly.

24          THE WITNESS:  Okay.  Thank you.

25              I think to start, I was brought into this case in

1    2020, about six years after the transition in April of 2014.

2    So I didn't have an opportunity in 2013, 2014 to, you know,

3    really understand what work -- what needed to have been done

4    or would have been done in advance of placing the Flint Water

5    Treatment Plant into operation to provide clean drinking water

6    to Flint.

7            So my opinion was based on the scope of work that I

8    had reviewed as LAN's proposals for the City of Flint.  So my

9    opinions are based on my experience and my review of that

10   scope of work.

11           So when you consider all the work that LAN had

12   identified as being required to be implemented as part of the

13   treatment plant upgrades, there was a June -- so there was --

14   the first document I referred to is the proposal that LAN and

15   Rowe had prepared in June of 2013.

16           And in that proposal they had identified three

17   specific tests.  A plant run test, an engineer plan report,

18   and then a design phase report.  And in that had identified a

19   very significant scope of work to evaluate -- basically

20   evaluate the Flint Water Treatment Plant and all the water

21   quality that was going to be necessary to put the plant into

22   operation in April.

23           Also identified a very detailed scope as part of

24   their engineering planning report.  And also provided as part

25   of their design services a listing of all the different water

1    quality parameters that were going to have to be dealt with by

2    the upgrades in order to put the plant into operation.  And

3    they had specifically listed turbidity as a water quality,

4    parameter hardness, cryptosporidium giardia viruses, taste and

5    odor, trihalomethanes and haloacetic acids.

6           So in essence what LAN is presenting is, you know, a

7    whole listing of water quality concerns that need to be

8    addressed as part of upgrading the water treatment plant.  And

9    at the time they had estimated the upgrades at $33 million,

10   which is a very significant water treatment plant upgrade.

11   And that's at a time where, you know, less than a year is

12   available between when the proposal was put together and when

13   the plant would go into service.

14          And I then took a look at what the scope was in

15   trying to deal with all of those water quality parameters and

16   considered, based on my experience, what I know it takes in

17   order to design, construct, do startup testing and compliance

18   testing and get regulatory approval in order to put a

19   treatment facility into service.  And less than a year based

20   on that scope, in my opinion, would have been impossible.

21          When I then looked at the -- then there was a

22   follow-up , you know, document which was the November 18,

23   2013, change order to an existing agreement that LAN had with

24   the city.  And in that, LAN had identified a scope of work to

25   be done.

```
 1            So based on that, my understanding would have been if
 2   LAN had presented a scope of work in November of 2013, that
 3   would have meant that it had not yet been done.  So it then
 4   needed to be done in order to put the treatment plant into
 5   operation.
 6            They had estimated the upgrade work to be between $7
 7   and $10 million.  At this point there was only five months
 8   from the date of this change order to when the plant was going
 9   to be put into service.  Specifically the upgrades that they
10   had indicated in their proposal were a chemical system, an
11   ozone upgrades, electrical upgrades, midpoint chlorination,
12   pump station upgrades, rural water piping connection, and
13   softening residuals disposal which is a significant amount of
14   work for a water treatment plant.
15            And recognizing that the process to upgrade a water
16   treatment plant, you know, which was included in their scope,
17   would have been the engineering work.  So there's an
18   engineering element that is done.  And as part of the
19   engineering element, all the new equipment and systems that go
20   into the plant are sized.
21            Once that work is done, then the way their schedule
22   was laid out, they would have gone through finalizing their
23   bid documents, advertising for bids, conducting a pre-bid
24   meeting.  All of that work was based on their schedule then to
25   be completed by February 17 of 2014.  Then a bid opening to
```

1    occur.

2           So that means, you know, February 2014, contractors

3    have not yet been hired by the city to do the work.  And then

4    recommendation for contract award and contract award.

5           To put some context around the timing, what I did is

6    I -- now there's certain things that are in the control of the

7    engineer and the owner and certain things that are not from a

8    schedule perspective.  And one of the things that is not is

9    the fabrication of new equipment.

10          So things that had to be ordered, delivered, and

11   installed, as much as, you know, people might throw as many

12   resources as possible at trying to get a treatment plant ready

13   for operation, there's always a reliance on equipment vendors.

14          So based on the six items that were in the November

15   18 change order -- and these are construction scope related

16   items -- you know, those systems would have had to have been

17   designed in size.  Once they were sized, that information

18   would have been provided to a contractor or vendor.

19          What then happens is, you know, none of this

20   equipment -- or I shouldn't say that.  In most cases, this

21   equipment is not off the shelf.  So before vendors will ship

22   equipment, they prepare what are called shop drawings.  And

23   shop drawings are basically the vendor's understanding of what

24   the engineer wants in the equipment.

25          So those shop drawings would be prepared, provided

1    back to the engineer.  The engineer would review and approve

2    them.  They would then go back to the vendor after approval.

3    And then the equipment would be fabricated.  Once it was

4    fabricated, it would then be shipped to the plant.  Once it

5    was shipped to the plant, then it could be installed by a

6    contractor or the owner.

7           THE COURT:  Mr. Humann, let me interrupt you and ask

8    you, of the things you identified that would need to be

9    modified or retrofitted to fit at the Flint Water Treatment

10   Plant, which of those items would have any impact on lead in

11   the Flint water?

12          THE WITNESS:  So there's two elements there.  Now

13   clearly the lack of the corrosion inhibitor is separate and

14   apart from this because that wasn't listed specifically in the

15   scope.

16          So as the -- as the Detroit system was adding a

17   corrosion inhibitor for a long time, the discontinuance of

18   that had an effect, had a clear effect on destabilizing the

19   protective systems to prevent the lead from leaching.  So

20   that's above and apart.

21          A lot of these other water quality parameters --

22          THE COURT:  Here's what we'll do.  We'll get to the

23   corrosion inhibitors separately.  Right now I'm interested in

24   the work that had to be done at the plant.  And what work, if

25   any, that had to be done would have an impact on lead content.

1          THE WITNESS: So the all the items that are

2   associated with -- so chemical systems in ozone upgrades as a

3   general topic, you know, these all go into dealing with the

4   aggressiveness of water.

5          And if you go back to the scope that was identified

6   in their June proposal, the water quality elements of it, the

7   turbidity, the hardness, all the various bacteria and viruses,

8   taste and odor. So you can't parse in a water treatment plant

9   specifically, you know, what would go into preventing water

10  from being aggressive or not aggressive. It's a progressive

11  treatment process.

12         So if you're going to go ahead and upgrade in a water

13  treatment facility, you can't select one element or another

14  that would contribute more than another element and whether or

15  not the water would be aggressive.

16         The intention needs to be -- you know, the various

17  upgrades that are in the steps of the plan need to be

18  achieved, then you evaluate the quality of water after that

19  was done. That's going to let you how aggressive is the

20  water. So --

21         THE COURT: When you say aggressive, do you mean

22  corrosive? What do you mean by aggressive?

23         THE WITNESS: Yes. Corrosive. So aggressive --

24  water, by nature, is going to dissolve things that it's in

25  contact with. The aggressiveness of the water or the

1    corrosiveness of the water -- I guess you can use those

2    interchangeably -- would tell you to what extent is water

3    going to dissolve the materials that it's in contact with.

4             THE COURT:  Okay.  And so did you complete your

5    answer?

6             THE WITNESS:  Not yet.

7             THE COURT:  Okay.

8             THE WITNESS:  So what I've wanted to explain, so for

9    a matter of timing, I've been involved in a lot of projects

10   where our clients declare emergencies.  And typically when you

11   declare an emergency it's all hands on deck and you could, you

12   know, have lots of contracts.  There's lots of resources going

13   at trying to solve whatever the problem is.

14            So at this point -- and again I was not there in

15   November of 2013 or April 2014 so I don't know specifically

16   what was done at the time.  What I do know is that based on

17   the scope of the treatment plant upgrade work that LAN had

18   included in that change order coupled with what I was just

19   describing as the timetable that it would reasonably take for

20   -- even an emergency -- take for vendors to go ahead and

21   fabricate and deliver equipment, it's in my opinion on the

22   order of four to five months to get that equipment properly

23   sized, fabricated, and delivered.

24            So if you're talking about a November 18 start,

25   without even including the fact that in their schedule, you

1    know, they had the majority of the time between November 2013

2    and April 2014 was engineering work.  It was design.  And --

3              THE COURT:  Mr. Humann, when you say "in their

4    schedule", you're talking about LAN's schedule?

5              THE WITNESS:  Yes.  The November 18, 2013, change

6    order had --

7              THE COURT:  Right.

8              THE WITNESS:  -- schedule included -- should I walk

9    through the schedule that I'm reviewing for you?

10             THE COURT:  Yes.  If you think it's responsive to the

11   question, yes.

12             THE WITNESS:  Well, I think what it speaks to is the

13   impossible nature of implementing all the upgrades included by

14   April 2014.  They -- you know, from the period they identified

15   a project kickoff meeting on November 6, 2013.  So the

16   assumption would be that that had happened before the November

17   18 change order.

18             So from November 6 of 2013 until February 7 of 2014,

19   which is when they indicate the final bid documents are done,

20   there's a period of three months -- November, December, yeah.

21             THE COURT:  And Mr. Humann, before you continue, are

22   the upgrades you're looking at now and referencing in the

23   documents, were they necessary, in your opinion, before the

24   plant should have been started with Flint River water?

25             THE WITNESS:  Well, that specifically is not

1   something that I was tasked to do.  I did not -- I didn't

2   review the conditions of the plant, you know, prior to April

3   2014.  I got involved in the project six years later.  So I

4   did not evaluate the appropriateness of the actual design or

5   the scope that they had identified as being necessary.

6          What I did is I said, okay, they're an experienced

7   water engineer.  So I wasn't looking to criticize the scope

8   that they had identified.  What I did -- and they know the

9   plant better than I know the plant.  And in their documents

10  they talk about how familiar they are with the plant and I am

11  not.  So I think they would be better suited to be specific on

12  the treatment plant upgrade piece.

13         So you know, my focus was the possibility to actually

14  implement the entire scope of work, one.  Clearly, you know,

15  my opinion is that the absence of the corrosion inhibitor was

16  a major issue which you said we would discuss separately.

17         THE COURT:  Yeah.  Let's move to that for just a

18  second and then we can come back to the structural changes, if

19  that's a good way of referring to them.

20         You make reference to a reasonable engineer would

21  have recommended and taken responsibility for ensuring in some

22  way in their recommendation or so on that corrosion control

23  methods be implemented in this particular situation.

24         And then in your deposition, there was a question

25  asked -- and that's right here in the opinion of December 24.

1    Question, "Is it your testimony that the corrosion, there was

2    not sufficient time to put in corrosion inhibitors by April

3    2014 if the decision had been made to use them?"  And you

4    said, "So in the overall schedule you could always have built

5    in sufficient time to put in a corrosion inhibitor."

6              So in your deposition you're implying that timing was

7    not a problem for corrosion inhibitors for corrosion controls.

8    Do I understand that correctly?

9              THE WITNESS:  So the question was extremely narrow.

10             THE COURT:  Okay.

11             THE WITNESS:  And I probably -- I probably.  I should

12   have expounded on the answer.

13             So the water treatment plant upgrades -- a corrosion

14   inhibitor was one element of many elements that were

15   identified as, you know, needing to be implemented as part of

16   the treatment plant upgrades.

17             So the way that the question was presented, you know,

18   how long would it take to put in a corrosion inhibitor.  It

19   could take three to four months to put in a corrosion

20   inhibitor.  So without considering all the other work that

21   needed to be done, you know, my answer was directed in a way

22   that it isolated corrosion inhibitor.

23             If I would have been more complete with my answer,

24   the corrosion inhibitor was -- if it would have been included,

25   it was truly one element of many elements that were identified

1    as being required to upgrade the treatment plant and to put it

2    into service.

3            So it's not as though you could have abandoned all

4    the other recommended upgrades and just put in a corrosion

5    inhibitor and provided safe drinking water to the community.

6    So that -- I think in isolation of the question is what drove

7    my answer.

8            THE COURT:  Okay.  So then you were also asked, "Is

9    there anything else besides the corrosion inhibitor that was

10   not done by April 2014 related to water quality?"  And you

11   said, "I'm not aware specifically of the work that would have

12   been done in terms of the treatment process and things like

13   that.  So I couldn't tell you one way or the other."

14           But it sounds like earlier today you said that there

15   were too many things that needed to be done in too short of a

16   period of time.  So I'm confused about your testimony.

17           THE WITNESS:  Okay.  So the specific question was,

18   you know, what was I aware of.  Like what part of that scope

19   was I aware was being done.  And again, I got involved six

20   years after the, you know, April 2014, and I wasn't there.

21           So I was not in a position to be able to say this

22   part of the work was done.  This part of the work was not

23   done.  I didn't have any awareness of what work was done

24   between November of 2013 and April of 2014.

25           The question was not posed to me the way you just

1   posed it to me.  You know, all this work had to be done.  How

2   could it have been done in time?  If the question was posed to

3   me that way, I would have said there's no way this entire

4   scope of work would have been able to be done between November

5   of 2013 and April of 2014.

6           THE COURT:  Okay.  So what I'm hearing is that even

7   though you don't know what actually was done, according to the

8   schedule the work could not have gotten done in the timeframe

9   that was available in your opinion?

10          THE WITNESS:  Absolutely.  I mean, again, I'm relying

11  on the scope that LAN had put together in their -- in the

12  change order and the schedule presented.  So by February 17 of

13  2014 based on their schedule, they were going to have a

14  pre-bid meeting.  And then bid opening, recommendation for

15  contractor water and contractor water is to be determined.

16  There's only two months.

17          So before the project was even put out to bid --

18  which tells me contractors have not yet been hired -- you need

19  to now go ahead hire contractors, order equipment, install the

20  equipment, do startup testing, do compliance testing, get

21  regulatory approval.  It is impossible to do that in two

22  months.  It can't be done.

23          THE COURT:  And earlier I asked you which of those

24  upgrades or changes related to water quality.  Can you tell me

25  again what your answer is to that.

```
 1              THE WITNESS:  Sure.  So the way the treatment plant
 2    -- the treatment plant is it's various steps along the way.
 3    So I'm going to talk about the six scope items that were
 4    included in the change order.
 5              Chemical systems in ozone upgrades clearly would have
 6    had to have been done to address water quality.  Electrical
 7    upgrades is very broad.  Now electrical upgrades could include
 8    replacing motor starters and switch gear in order to get pumps
 9    into place in order to transfer water from one treatment step
10    to another.
11              So because I don't know -- the electrical upgrades is
12    a general term.  Based on my experience, there could be
13    control systems that are part of electrical upgrades.  And
14    control systems are going to dictate how the treatment process
15    works.  So clearly some electrical upgrades would have had to
16    have been done in order to address the quality of the water
17    that was going to leave the treatment plant.
18              Midpoint chlorination is something that would have
19    had to have been done to address water quality.  The pump
20    station number 4 upgrades was not specific.  So if the pump
21    station number 4 upgrades -- if there was chemical feed in
22    there, then, yes, it would have been necessary.  Because I
23    don't know specifically what those upgrades were, I can't tell
24    you if those were required to deal with water quality.
25              The rural water piping connection clearly had to have
```

1   been done.  And dealing with the softening residuals, it's a

2   significant issue because you can't operate a water treatment

3   plant if you don't know how to handle disposal of residuals.

4   So the softening residuals disposal would also have had to

5   have been done in order to have a proper and orderly water

6   treatment plant continuing to provide safe drinking water to a

7   community.

8           So out of the six scope items, five for sure.  And

9   I'm not sure about pump station number 4 upgrades.

10          THE COURT:  Okay.  So from January 2014 through April

11  2014, in your opinion as a professional engineer, was there

12  enough time to do enough upgrades to prevent lead poisoning?

13          THE WITNESS:  No.

14          THE COURT:  Okay.  And earlier I think I took us to

15  the corrosion control and so on.

16          Is there anything that you want to say in response to

17  any of my questions at this point?

18          THE WITNESS:  Yeah.  I think that the corrosion

19  inhibitor -- and I'm going to use the term corrosion

20  inhibitor.  Corrosion control is typically about adjusting the

21  pH of the water.  So whether it's basic or acidic.  You know,

22  you can control the pH of the water, make it -- again, I'm

23  going to use the term aggressive.  You can make it less

24  aggressive.

25          A corrosion inhibitor is a chemical that you add in

January 10, 2022                                          22

1    order to prevent the leaching of metals in piping systems.

2    You know, so if you've got water that is going to be sitting

3    in pipes for a long period of time, just adjusting the pH of

4    the water is often not enough.  And adding a corrosion

5    inhibitor actually provides, in essence, a protective coating

6    on the inside of a piping system.

7           And when you've used a certain type of corrosion

8    inhibitor for a long time, a system reaches an equilibrium in

9    a sense.  It stabilizes.  And when you discontinued the use of

10   that and the water that is then going through the same piping

11   system has some aggressiveness to it, it ends up stripping off

12   the interior protective coating that was developed over a long

13   period of time.

14          So you know, the -- there's no doubt in my mind that

15   the corrosion inhibitor should have been a part of the upgrade

16   so that if nothing else, if the water was still to remain some

17   elements of aggressive when all the treatment plant upgrades

18   were done without the corrosion inhibitor, at some point in

19   time the existing interior protective system would have been

20   stripped away and lead would have been leaching into the

21   water.

22          So that, the corrosion inhibitor, in my opinion is

23   above and beyond the treatment plant upgrades that were

24   identified as being required and should have been part of that

25   scope.  Should have been part of the scope.  Should have been

1  well understood and should have been part of the scope really,

2  in my opinion, from the beginning of when the scoping first

3  started to what work was going to be necessary at the

4  treatment plant to prepare it.

5         THE COURT:  Okay.  And let me ask you this.  When

6  you're talking about corrosion inhibition or control, do you

7  mean addition of an inhibitor over and above or in addition to

8  lime softening?

9         THE WITNESS:  Yes.

10        THE COURT:  Or would lime softening be adequate on

11 its own in this situation?

12        THE WITNESS:  Lime softening would not be adequate on

13 its on in this situation.

14        THE COURT:  Okay.  And so based on the '09 and 2011

15 reports that you reviewed, was -- is it your position that it

16 was already clear in 2013 that orthophosphates specifically

17 were needed?  Or could it have been something else?  Testing

18 that would have determined what else could have been --

19        THE WITNESS:  Yes.  Yes.  So typically in compliance

20 with the Lead and Copper Rule, you do also testing to

21 determine what you need to -- how do you condition the water

22 to prevent the leaching of lead and copper into the water.

23        So at some point it was decided that, you know, the

24 orthophosphates would be the feed, would be the mechanism to

25 inhibit corrosion to comply with lead and copper.  And it was

1    like that for decades.

2            And you can always go ahead and do a study to

3    determine whether or not you want to change.  You know, if the

4    water quality in the source water changes, you know you always

5    have the ability to reevaluate your lead and copper

6    compliance.

7            And the things that you need to do to treat to water

8    in order to comply, I didn't -- in anything that I reviewed, I

9    didn't see any of that work done by anybody, that there was an

10   actual study that was performed.  So without the performance

11   of the study, you need to then continue whatever you're using

12   and be consistent with what you're using.

13           THE COURT:  And how long would a study of that nature

14   take?

15           THE WITNESS:  It -- well, this would have been a real

16   challenge because you're changing source water.  So it's --

17   you know, for a large city that you know has a lot of old lead

18   service lines, there's a lot of sampling, a lot of testing

19   that needs to be done in order to determine the effectiveness

20   of a different inhibitor.

21           So what you would have to do is you would have to

22   discontinue the inhibitor that you have.  If you wanted to

23   take a look at different chemical approaches, you may consider

24   basic cutting out coupons, cutting out sections of various

25   pipes in order to do some in laboratory or bench testing to

 1    see, okay, if this chemical is maybe more effective than

 2    another chemical.

 3            From a timing perspective, it could easily take a

 4    year to do that kind of work to conclude that you're going to

 5    use a different type of chemical or you're going to treat the

 6    water in a different way.

 7            THE COURT:  So was a study of that nature required or

 8    would it be optional because orthophosphates had been used in

 9    the DWSD treatment of Lake Huron water?  So could Flint have

10    just added orthophosphates because they were added to the

11    previous water source?

12            THE WITNESS:  That's exactly what they should have

13    done.  They should have added the orthophosphate in a

14    continuance.  If --

15            THE COURT:  So then a year study wouldn't be

16    necessary in your opinion?

17            THE WITNESS:  No.  If they stuck with the

18    orthophosphate, then no, there would have been no study

19    requirement.

20            THE COURT:  Okay.  Okay.  Okay.  Then those are the

21    questions I have at this point.  And I will turn this over to

22    Mr. Kent.

23            And I should have mentioned this at the beginning but

24    I didn't really feel a need to because you asked about looking

25    at your report, that while you're testifying, you should not

 1    be receiving messages from lawyers or anyone else.  And I

 2    doubt that you are, but I just want to make sure that that's

 3    clear.  Okay?

 4            THE WITNESS:  Yes, I understand.

 5            THE COURT:  Good.  Okay.  Mr. Kent.

 6            MR. KENT:  Thank you, your Honor.  I will try my best

 7    to paying close attention to seeing when you're talking so

 8    that I don't continue going on.  And I will tell you I am

 9    recovering from a chest cold.  So if I start coughing, that

10    will be the reason why.

11            THE COURT:  Okay.

12            MR. KENT:  Bear with me on that.

13            THE COURT:  Okay.  Take good care of yourself.

14                            EXAMINATION

15    BY MR. KENT:

16    Q.  Mr. Humann, with regard to the proposals that were made by

17    LAN in the June 2013 proposal to the city and change order

18    number 2, the plan at that point was that the water treatment

19    plant would be put into permanent use starting with the Flint

20    River on a temporary basis until such time as the KWA pipeline

21    could be completed and brought online down to Flint where the

22    water would then be treated.  Correct?

23    A.  Was that in one of those two proposals you just

24    referenced, what you just said?

25    Q.  Do you not understand that?  Do you not know what the

1    plans were that the city was making for the KWA pipeline?

2    A.   No, I do know that.  I didn't know if that was part of the

3    proposals that you had referenced to me.  But yes, I do

4    understand that that was going to happen.

5    Q.   And so the plan that the proposals that Flint -- that LAN

6    was making were never aimed at doing what was necessary to get

7    the plant operational -- just to get the plant operational as

8    of April 2014.  They were always long-term plans for continuous

9    use of the plant long after the Flint River was no longer the

10   water source, correct?

11   A.   But that doesn't mean that you still don't have to achieve

12   the same water quality goals whether it's going to run for a

13   day or for five years.  So you know, any elements that were

14   necessary to have the plant be a longer term operating plant,

15   clearly there could have been elements of the scope that would

16   have been part of that.  But there is also clearly elements of

17   scope that would have had to have been done once you were going

18   to go and put the plant into service.

19   Q.   But you don't know which parts of the scopes that were

20   proposed or actually approved by the city were for short-term

21   preparation of the plant and long-term operation, improvements

22   of the plant.  You don't know those details, do you?

23   A.   Of course I do.  The judge asked me the question.  She

24   asked me what part of the scope was necessary to address water

25   quality.  And water quality, again, from day one of putting the

1   plant into service has nothing to do with how long you're going

2   to run the facility.

3           The scope of work in order to achieve water quality

4   goals has to be done regardless of the duration that you're

5   going to be running the plant.

6   Q.  But if the -- if the facilities were already there and

7   many of the proposals were for improving efficiency, then that

8   does not mean that those proposals were required to make the

9   plant operational, correct?

10  A.  I'm going to refer to my report for a second.  Well

11  this -- so the change order, the scope of the change order says

12  that the design work and construction, construction engineering

13  and necessary regulatory [Inaudible] to operate the Flint Water

14  Treatment Plant used in the Flint River until the KWA water

15  source was complete.

16          So it doesn't speak to the duration.  It speaks to

17   this is the scope of work that's necessary in order for the

18   treatment plant to be used with the Flint River.

19  Q.  If I can, Mr. Humann, let's get real specific on that.

20  The line you are quoting was the line written by the city in

21  its resolution approving the scope of work.  That's not

22  anything that LAN put into its scope of work saying this is

23  what these items are needed for.  Isn't that correct?

24  A.  I don't know.

25  Q.  And point of fact when you say you don't know, you and I

1   spent a long time during your deposition trying to figure out

2   what you actually knew about the work that was done.  And you

3   just told the judge earlier that you really don't know what was

4   approved and wasn't approved, what was done and wasn't done.

5   You don't know the details of that, correct?

6   A.   So again, I was not there when the work would have been

7   done or what work was done.  My --

8   Q.   So the answer to my question -- oh, I'm sorry.  Go ahead.

9   A.   I'm going.  My review of the scope of work that LAN had in

10  its change order was -- was the basis for me rendering my

11  opinion that there was not enough time for the scope of work

12  identified in the proposal to be completed by the time that the

13  treatment plant was going to be put into service in April of

14  2014.

15  Q.   So the answer to my question is, no, you do not know -- or

16  yes, you do not know the details of what was or wasn't done,

17  correct?

18  A.   From November 2013 to April 2014, yes.

19  Q.   In fact from June 2013, when they signed the original

20  contract going forward, you don't know any of the details of

21  what was and wasn't done, correct?

22  A.   What I do know is that --

23  Q.   If you'll answer my question.  Answer my question.  You

24  don't know the details of what was and wasn't done from June

25  2013 forward, correct?

1   A.   In answering your question, what I do know is that there

2   was a scope of work identified that was not yet done in the

3   November 18 change order.  That, I know.  Because LAN had it as

4   part of their change order as work that needed to be done.

5            THE COURT:  And Mr. Humann, in that scope of work

6   that still needed to be done presumably because it's being

7   proposed as what needs to be done, which of those items needed

8   to be done for use of the Flint River as a water source as

9   opposed to preparing for the ultimate decades long operation

10  of the Karegnondi Water Authority?

11           THE WITNESS:  So the first item that was identified

12  were chemical systems and ozone upgrades.  Those would have

13  had to have been done for purposes of delivering water to the

14  community, achieving water quality.

15           And there were not specific -- so the chemical

16  upgrades at the chemical systems and ozone upgrades would have

17  had to have been done.  The rural water piping connection

18  clearly would have had to have been done.  The softening

19  residuals disposal would have had to have been done.  Again,

20  the pump station upgrades, I don't know what the scope was of

21  those.  The midpoint chlorination would have had to have been

22  done in order to achieve water quality.

23           THE COURT:  And those that you just identified, how

24  long in your professional opinion would it take to do those

25  items?

```
 1            THE WITNESS:  So the procurement of equipment
 2    probably would have been four to five months.  They had a --
 3    they had a three-month design duration.  So that's eight
 4    months.  When they hired the contractors.  When they get the
 5    equipment in.  The installation of equipment could take four
 6    months.  So that's 12.
 7            Then they would need to do startup testing of the
 8    system.  And you know, confirming that all the water quality
 9    throughout the treatment process is done.  That's one to two
10    months.  And then there's a compliance testing to achieve
11    regulatory approval to put the system into service, which
12    would probably be another one to two months.  So anywhere from
13    14 to 16 months.
14            THE COURT:  Okay.  Thank you.  Mr. Kent.
15            MR. KENT:  Yes.  Thank you, your Honor.
16    BY MR. KENT:
17    Q.  So Mr. Humann, now you were saying that you came on the
18    scene years after the fact so you were not there to see
19    firsthand what was or wasn't done, right?
20    A.  Correct.
21    Q.  But as an expert witness, one of the things that you do
22    always is come in after the fact.  And then you read all of the
23    evidence that's available to figure out the answers to those
24    questions.  Such as what was and wasn't done, right?  Isn't
25    that what an expert normally does?
```

```
 1    A.   An expert does what an expert is asked to do.  And what I
 2    -- so I think in my report I was clear about the work that I
 3    had done.  And reached my conclusions based on that review.
 4    Q.   And so you never bothered to look to any of the
 5    depositions to find out what was the scope of work, how did
 6    these change orders come about, what was and wasn't done?  You
 7    never looked for any of that information, did you?
 8    A.   I looked at the information I believed was necessary to
 9    render my opinion.
10    Q.   So the answer to my question is you did not look at any of
11    that information, any of the depositions to find out what
12    actually was done, right?
13    A.   I did review some depositions, but I did not review all
14    the depositions.
15    Q.   When you say some depositions, in your deposition, you
16    said you looked at one deposition that you could not remember
17    who it was and you took nothing from it for your report.  Let's
18    be specific.  That's what you actually said, right?
19    A.   I would have to review my deposition.
20    Q.   Do you want to do that?
21              THE COURT:  No, I don't want him to do it.  That
22    wouldn't --
23              MR. KENT:  Okay.
24              THE COURT:  -- be helpful --
25              MR. KENT:  Very good.
```

```
 1              THE COURT:  -- to my evaluation.  Mr. Kent --
 2              MR. KENT:  Very good, Your Honor.  So --
 3              THE COURT:  This is the part where you stop talking
 4   when I I'm talking.  That's the part we're at now.  So it
 5   would not be helpful to my evaluation of the motion.  Go
 6   ahead.
 7              MR. KENT:  Okay.  Thank you, your Honor.
 8   BY MR. KENT:
 9   Q.  One of the other things that certainly you could have
10   found somewhere is if any of these proposals, proposed work had
11   not been done by April 2014 and was determined to be or thought
12   to be the cause of a problem with the water quality, surely
13   someone would have said that somewhere.  Don't you think so?
14   A.  Well, I would have then clearly -- I didn't read anywhere
15   where there was a recommendation to install the corrosion
16   inhibitor.  Clearly the corrosion inhibitor was a vital part of
17   dealing with water quality.  And that, in my opinion, is above
18   and beyond the scope that was identified as needed to be done
19   in November.  So I --
20   Q.  I understand -- I understand your point about corrosion
21   control.  What I'm asking you is about all the other things
22   that you said it was simply impossible to get done.
23              Surely if that were in fact true and if that were
24   anybody thought that that was a cause of the Flint Water crisis
25   problems, it would have been reported somewhere.  Someone would
```

1   have said you did not do the midpoint chlorination.  Someone

2   would have said you didn't do the redundant ozone machine.

3   Someone would have said that if there was any truth to it at

4   all, don't you think?

5          MR. MAIMON:  I'm going to object at this point.  It's

6   argumentative and it's beyond the scope of the Daubert hearing.

7          THE COURT:  Yeah.  I think, Mr. Kent, maybe that's a

8   better argument for trial.  We're just trying to find if

9   there's a good basis for the opinions.  So thinking -- arguing

10  about what somebody else would have done or should have done

11  or could have done isn't going to help me with that.

12         MR. KENT:  Well, it goes to the reliability of this

13  opinion because it is totally made up out of thin air.  There

14  is no evidence from anybody anywhere who supports it or says

15  it happened.  And he has none that he can identify.

16         You have none, do you, Mr. Humann?

17         MR. MAIMON:  Your Honor, I think that the proper

18  procedure is to let the Court rule before Mr. Kent

19  continues --

20         THE COURT:  I think it is, too.  So I'd like you to

21  move on to your next question.

22         MR. KENT:  Okay.

23  BY MR. KENT:

24  Q.  Well, one of the things you said, Mr. Humann, just then

25  was that you saw no indication that there had been a suggestion

1    for a corrosion control inhibitor.  And again, this is

2    something we went through at your deposition at length.  You

3    remember that?

4    A.   I would need to -- it was a long deposition.  So I'm not

5    going to -- if you know that we talked about it, I'm not going

6    to say I didn't talk about it.  I just don't recall it.

7    Q.   You certainly recall the email from Mike Glasgow March 26,

8    2014, less than a month before the plant was going operational,

9    saying that he was planning to use one milligram per liter of

10   phosphates for his corrosion control inhibitor.  You remember

11   that, that we talked about that, right?

12   A.   I apologize.  I didn't review my entire deposition.  So if

13   you said that we talked about that, then I'm going to -- if you

14   want to show me the email just so I can be sure.

15   Q.   I will certainly do so if Your Honor wants to go down --

16   do that -- wants me to do that.

17              THE COURT:  Well, what is your question, Mr. Kent?

18              MR. KENT:  The question is he said that he saw

19   nothing that anyone had ever suggested the use of corrosion

20   control inhibitors.  And I said in point of fact that was the

21   plan as recently as March 26, 2014.  There was evidence from

22   Mike Glasgow telling people that he was going to use -- there

23   will be at least one milligram per liter of total phosphorous.

24              THE COURT:  Correct.

25              MR. KENT:  Because we will be adding phosphates at

1    that level of corrosion control.

2            MR. MAIMON:  Your Honor, I think the question was --

3    or I think the testimony was that LAN didn't do it.  It was a

4    question about LAN's liability.  Not the city's liability.

5    Not anybody else's liability.  And Mr. Humann was clear that

6    in none of the documents that he reviewed did LAN include

7    corrosion inhibitor as required.  And that was his testimony.

8    It wasn't that somebody out there somewhere else didn't do it.

9    That's not the point.

10           THE COURT:  Right.  Okay.  And in any event, we have

11   the email that Mr. Kent is referring to and we have the

12   deposition.  So we know you referenced it in the deposition of

13   Mr. Humann.

14           MR. KENT:  Okay.  All right.

15   BY MR. KENT:

16   Q.  And you do remember, Mr. Humann, our reviewing together

17   the deposition testimony of Duffy Johnson in which he

18   specifically said we were aware in advance of the

19   recommendation from LAN to use orthophosphates, but we did not

20   do it because the MDEQ told us we did not have to?

21           You remember that lengthy review of the deposition

22   testimony.  That ring a bell to you, sir?

23   A.  I just -- I don't recall it specifically the way that you

24   just described it.  I know that there was clearly communication

25   with MDEQ about what needed to be done to comply.  I just don't

 1   recall the specifics.

 2   Q.   And do you recall the email from Mike Glasgow, the email

 3   string June 30 and July 1, 2015, when things are really getting

 4   heated between the MDEQ and the City of Flint, and the EPA in

 5   which he says that we discussed with the MDEQ using

 6   orthophosphates for corrosion control but they told us not to

 7   do so?  You remembered that he said that he was refuting the

 8   accusation that it was an unknown topic?  You remember that

 9   one?

10   A.   Again, I just want to make sure that when you tell me do I

11   remember things and you get very specific, it's very difficult

12   for me to recall things that are very specific.

13        I do know that there was conversations or

14   communication with MDEQ on the topic, I just don't recall

15   specifically the dates of certain emails and, you know, who was

16   communicating with who.  So clearly if I review them again, I

17   would be able to give you an answer.

18   Q.   Or the August 31, 2015, email from Mike Glasgow saying

19   that it would be incorrect to say that no one planned to use

20   phosphates --

21        THE COURT:  Let me --

22        MR. KENT:  Yes, ma'am.

23        THE COURT:  Before you continue, Mr. Kent, we have

24   all of that information.  What I wanted to learn in this

25   hearing today is more about Mr. Humann's opinion that timing

 1   was a problem, that the schedule was a problem.  Because he

 2   includes that in his report and then his deposition implied or

 3   could have been read to understand that maybe it wasn't an

 4   issue.

 5           So that's what I need to learn.  I have the emails.

 6           MR. KENT:  Okay.

 7           THE COURT:  Whether Mr. Humann reads the emails

 8   doesn't matter.  I've read them.  And that will help inform

 9   the basis of my next decision, so.

10           MR. KENT:  Very good, Your Honor.

11           THE COURT:  So what are your questions, if any, for

12   Mr. Humann, on the subject that we're here for?

13           MR. KENT:  All of these relate to that in my opinion,

14   Your Honor, and it gets down to the question of schedule and

15   timing.

16   BY MR. KENT:

17   Q.  Mr. Humann, the fact is that the decision not to use

18   orthophosphates had nothing to do with timing.  It was all

19   because it was done at the direction of the MDEQ.  It was not

20   any other reason.  It was the MDEQ's interpretation of the

21   requirements of the Lead and Copper Rule.  Correct?

22           MR. MAIMON:  I'm going to object again.  Your Honor

23   just, again, tried to narrow as to what we're here for as

24   opposed to what's already in the record.

25           THE COURT:  Okay.  That's overruled.  We're

1   finally -- we're on the issue of timing now.  So you can

2   answer the question, Mr. Humann.

3          THE WITNESS:  So the -- again, the scope of work --

4   or maybe I'll -- the MDEQ conversation that you're referring

5   to is post April 2014 or pre April 2014?

6          MR. KENT:  Must have been before April 2014 because

7   they did not use the orthophosphates after they had said they

8   were going to.

9          MR. MAIMON:  Your Honor, again I'm going to object.

10  The commentary by counsel that must have been, that's not the

11  substitute for evidence.  And this shouldn't be a memory test

12  and shouldn't be -- if there's a document that we want to

13  have, we should have the document.

14         THE COURT:  Yea.

15         MR. MAIMON:  But to have these vague questions and

16  argumentative questions, I object to it.

17         THE COURT:  Mr. Kent, why don't you just put the

18  email up on the screen.  Thank you.  That objection is

19  sustained.

20         MR. KENT:  I can do that.  Are we all looking at the

21  email?  Is that email on the screen?

22         THE COURT:  Yes.

23         MR. KENT:  Okay.  Okay.  Good.

24  BY MR. KENT:

25  Q.  This is Mike Glasgow March 26, 2014.  He's talking.  It's

```
 1   deposition Exhibit 86.  And he says, "There will be at least
 2   one milligram per liter of total phosphorous because we will be
 3   adding phosphate at that level for corrosion control in the
 4   distribution system, and I expect more depending on the river
 5   water quality.
 6           That's March 26, 2014.  The city was planning to use
 7   phosphates as a corrosion control inhibitor, correct?
 8   A.   That's what it reads.
 9   Q.   But we know that the city ultimately did not do so,
10   correct?
11   A.   Correct.  And the reason the city did not do so --
12           THE COURT:  That's not what we're here for, Mr. Kent.
13   That's for your argument.  It's not up to Mr. Humann to
14   address that.
15           MR. KENT:  It gets back to the subject of timing,
16   Your Honor, respectfully.
17           THE COURT:  Okay.  How?
18           MR. KENT:  This decision not to use the phosphates
19   had nothing to do with the failed -- a lack of timing.  It was
20   all because of the MDEQ's interpretation of the Lead and
21   Copper Rule and the need or lack of a need to have any such
22   phosphate control.
23           THE COURT:  I hear you.
24           MR. KENT:  It has nothing to do with timing.
25           THE COURT:  Okay.  Mr. Maimon.
```

```
 1              MR. MAIMON:  It is correct.  It has absolutely
 2    nothing to do with timing or Mr. Humann's testimony.
 3              What Mr. Kent is arguing is a superseded intervening
 4    cause which is separate and apart from the breach of the
 5    standard of care which he has identified for LAN.  Whether or
 6    not that breach proximately caused the injuries or whether
 7    there was an intervening cause, namely MDEQ, and whether or
 8    not either as a matter of law or as a matter of finding of
 9    fact, the jury credits that, is irrelevant to the
10    admissibility of Mr. Humann's testimony.  And I would object
11    to this line of questioning.
12              THE COURT:  Yes.  So sustained.  So is there anything
13    further, Mr. Kent?
14    BY MR. KENT:
15    Q.  Mr. Humann, you never did any water quality study
16    yourself, correct, of the Flint River?
17    A.  Of the Flint River, no.
18    Q.  You never did any study to determine what the actual
19    interaction of the water with the lead was that would have
20    allowed the leaching of the lead.  You did not study that, did
21    you?
22    A.  Again, I got involved in 2020.  I don't know what the
23    relevance would have been of conducting any water quality
24    studies at that point.
25    Q.  You did not evaluate whether the city's plan of using one
```

1  milligram of liter -- per liter of phosphorous -- of phosphates

2  for corrosion control was good, bad, or indifferent.  You

3  didn't study that, did you?

4           MR. MAIMON:  I'm going to object to relevance on the

5  issue here, Your Honor.

6           THE COURT:  Sustained.

7           Mr. Kent, is that it?

8           Mr. Humann, is it fair to say that the scheduling

9  issues that you identified in your report and testified to

10  here related to whether the plant upgrades could be done more

11  than whether corrosion inhibitors could be added?

12           THE WITNESS:  So the majority of my testimony today

13  was about the Flint Water Treatment Plant upgrades.  The

14  corrosion inhibitor or the continuance and utilization of it

15  is separate and apart from the issue of schedule.  And the

16  ability to achieve the scope of work in the timeframe

17  available.

18           THE COURT:  Okay.  Mr. Maimon?

19           MR. MAIMON:  If I may briefly, Your Honor?

20           THE COURT:  Yes.

21                         EXAMINATION

22  BY MR. MAIMON:

23  Q.  Mr. Humann, I'd like to refer to your report and take us

24  first working backwards from the November 2013 change order.

25  And that is -- just so we're all on the same page, that's item

1   2.7 in your report which starts at page 11 of 21.  And that's

2   where you talk about that change order, right?

3   A.   Correct.

4   Q.   And within that change order, within the scope of that

5   work, which is number 2.7 of the report, it has a corrosion

6   inhibitor placed within the scope of work.

7   A.   No.

8   Q.   Should it have been?

9   A.   Yes.

10  Q.   Let's take one step back.  In the contract, which is item

11  number 2.6 and is referenced on page 11 of 21, the executed

12  contract of June 26, 2013, that was a contract for $171,000

13  dollars, correct?

14  A.   Correct.

15  Q.   And part of that was for a plant test run and part of that

16  was for the engineering planning report, each 80 some thousand

17  dollars, correct?

18  A.   Yes.

19  Q.   And when you look at the November of 2013 change order,

20  are the plant test run and the engineering planning report

21  still outstanding?

22  A.   No, it doesn't appear they are.

23  Q.   And what we know is that or we can infer is that those

24  were actually done, right?

25  A.   Yes.

```
 1   Q.   Okay.  Now let's go back one step before that, which is
 2   item 2.5 of your expert report, which is on page 9, which is
 3   the original engineering proposal submitted to the City of
 4   Flint by LAN and Rowe June 10, 2013.  Do you see that?
 5   A.   Yes.
 6   Q.   Was corrosion inhibitor within the scope of that work?
 7   A.   No.
 8   Q.   Should it have been?
 9   A.   Yes.
10   Q.   Is corrosion inhibitor -- when you talk about putting a
11   corrosion inhibitor, is that as simple as simply dumping some
12   chemicals into a vessel, a tub, something like if we would put
13   chlorine into a pool?  Is it that simple or is the process more
14   complex and more time consuming?
15   A.   It's clearly more complex.  There's -- in order to dose a
16   certain amount of phosphate, there's instrumentation that's
17   included.  There's low dose metering pumps that are included.
18   And essentially they have to be dialed in.
19          So as the treatment plant is operating, if you're
20   looking to achieve a certain finished dosage, you need to
21   continue to, in essence, trial and error what the control of
22   the metering mechanism needs to be in order to make sure
23   you're achieving a certain dosage.  So it's very precise.
24   It's a very precise process.
25   Q.   And if you're undergoing what they called plant
```

1    rehabilitation or the upgrades that you've identified, what is
2    the interplay between making sure that those are done and then
3    being able to properly introduce and have a corrosion inhibitor
4    as you've described?
5    A.   Oh, they all have to be -- they all interrelate.  They all
6    have to be done together.  They can't -- if you're looking for
7    a finished water quality goal, you can't -- you can't just
8    focus on one element of the treatment plant and not another.
9           So the upgrades that were recommended all would have
10   had to have been done in order to then make sure you're
11   achieving the right dosage of the corrosion inhibitor.
12   Q.   So there was an earlier document prepared by LAN and Rowe
13   that's referenced in your report.  It's on page 5 of 21.  It's
14   item number 2.3.  And that was -- or I'm sorry.  I'm sorry.
15   2.2, which is on page 4 of 21.  That's the 2009 report through
16   the City of Flint and others about the KWA.  Do you see that?
17   A.   Yes.
18   Q.   And was there a recognition there that corrosion control
19   or corrosion inhibitor had to be part of the process?
20   A.   Yes, it was included.
21   Q.   Okay.
22           MR. MAIMON:  Thank you, your Honor.  Those are all
23   the questions I have.
24           THE COURT:  Mr. Kent, any follow-up?
25           MR. KENT:  Yes.

January 10, 2022                                              46

1          THE COURT:  Go ahead.

2              EXAMINATION (CONTINUED)

3   BY MR. KENT:

4   Q.  Mr. Humann, regardless of what was or was not specifically

5   mentioned in the report, you do not dispute the fact that the

6   city was aware of the recommendation to use orthophosphates as

7   a form of corrosion control inhibition in addition to the lime

8   softening process that LAN recommended?

9          MR. MAIMON:  Your Honor, I'm going to object --

10         MR. KENT:  Prior to April 2014.

11         THE COURT:  Mr. Kent, okay.  Mr. Maimon objects.

12  Then it's my turn to rule on the objection before you

13  continue.  Okay?  So Mr. Maimon, I got distracted by that.

14  You're objecting to what?

15         MR. MAIMON:  So this is the same question that was

16  asked during Mr. Kent's prior examination.  The Court already

17  ruled, I believe, that the city's awareness is really

18  irrelevant to Mr. Humann's testimony about liability and this

19  breach of the standard of care here.  It might be relevant to

20  some other issue.

21         And so I think the Court's comment that this might be

22  are appropriate cross-examination if not with Mr. Humann then

23  with somebody else depending on the scope of direct is proper

24  and it's not any more proper this time than it was the last

25  time.

1          THE COURT:  Correct.  So the objection is sustained.

2    Anything further, Mr. Kent?

3          MR. KENT:  No, Your Honor.

4          THE COURT:  Okay.  All right.  Well, I have found

5    this to be helpful and I appreciate it.  I don't -- you know,

6    ordinarily I would allow some sort of closing statement,

7    closing argument in a hearing of this nature.  But I think

8    we've had all of the -- that done at the earlier oral

9    argument.

10          And I think I heard Mr. Kent's entire argument

11    through his questions.  I would guess that I've heard a lot of

12    it.  But do you wish to make a brief statement as a closing

13    argument?  Either Mr. Maimon or Mr. Kent.

14          MR. KENT:  I certainly will keep it brief, Your

15    Honor.  One point is --

16          THE COURT:  Well, let me ask Mr. Maimon now.  Just a

17    minute.  Mr. Maimon?

18          MR. MAIMON:  I'd only respond to what my adversary

19    says if need be, Your Honor.

20          THE COURT:  Let's keep it to about two to three

21    minutes then, Mr. Kent.

22          MR. KENT:  Sure.  The essence is Mr. Humann's

23    complaint is that the report of the proposals that LAN made

24    could not be accomplished in time for the water switch in

25    April 2014.  That is entirely speculative and not based on any

```
 1    solid facts because he does not know what was done, what
 2    wasn't done.
 3             He has no evidence anywhere of anything that was not
 4    done by April 2014 when the water plant went live that was a
 5    problem other than the lack of orthophosphates as a corrosion
 6    control inhibitor.  That's the only thing he can identify.
 7    And so it does no good whatsoever to talk about, oh, this
 8    report, this proposal in my estimation couldn't be done when
 9    he doesn't really know what was or wasn't done and has no
10    evidence anywhere and no one has ever said it.
11             I mean, this file is so complete.  If that was a
12    problem, that would have been identified a long, long time
13    ago.  It would have been part of the story.  It's not part of
14    the story.  It just isn't.  So his approach to analysis is
15    unreliable.  It is not grounded in fact at all.  It's just
16    not.
17             The second thing about the corrosion control
18    inhibitor, again the argument that because it is not listed in
19    a report here by name but it is listed in other reports --
20    Mr. Maimon brought that out himself and Mr. Humann admitted
21    it -- that it's reported in -- it's included in previous
22    reports.  And the city knew it and the city was planning to do
23    it.  It eliminates any basis for saying that you have a
24    reliable opinion that there was a violation of the standard of
25    care.
```

1          The standard of care is not based on what is

2     contained in one report.  It is based on what is the overall

3     conduct there.  And when you find that there was, in fact,

4     full knowledge and a plan of attack by the city to use the

5     orthophosphates, it eliminates any basis for the complaint.

6          And beyond that it has, again, no relation to reality

7     as to why the orthophosphates were not used.  It was not a

8     scheduling issue in the least.  It wasn't.  Mr. Humann himself

9     said in his deposition that the city turned to look to the

10    MDEQ.  They took their direction from the MDEQ.  And the MDEQ

11    is the one who said you don't need to do it.  And they did

12    that because it was their policy interpretation of the Lead

13    and Copper Rule.

14         This is all about a governmental control and

15    governmental policy.  It has nothing to do with timing,

16    nothing to do with recommendations from LAN.  It just has no

17    relation to what was actually going on.

18         THE COURT:  Okay.  Thank you, Mr. Kent.  Mr. Maimon.

19         MR. MAIMON:  Your Honor, this is not a reargument of

20    the summary judgment motion.  Neither is it a reargument of

21    the other issues subject to Mr. Humann's opinions, which the

22    Court has already ruled upon in its decision.

23         This is a discrete Daubert hearing concerning

24    particular testimony that he gave which the Court said was

25    apparently inconsistent with aspects of his report.  And it

1  was supposed to be limited exclusively to that issue.  When we

2  look at that issue by itself, the apparent inconsistency is

3  gone because Mr. Humann has explained in very clear detail

4  what he meant by the fact that it could not -- the

5  accomplishment of having the Flint Water Treatment Plant

6  operational by April of 2014 was impossible given the time

7  constraint es.

8          He's explained it in great detail and drawn upon his

9  own professional experience, which he's entitled to do.  And

10  the simple fact that it takes a certain amount of time to get

11  something done no matter how many resources the City and/or

12  LAN would have thrown at it.  So he's explained that in

13  particular.

14          He's also explained the two questions at deposition

15  that the Court noted on page 22 of its opinion, namely that,

16  yes, corrosion inhibitors could have been put into place.  But

17  he explained that those -- that question was put in isolation

18  and not within the context of everything that had to be done.

19  And this was an entire plant that had to be rehabilitated or

20  upgraded in order to be put into operation by that deadline.

21  He explained that.

22          And in addition, he explained that while he cannot

23  tell us specifically which of the six items on the list of

24  things to do in November were actually done or were not done,

25  it was an impossibility to get them all done and an

1    impossibility, quite frankly, to do the ones that were

2    required to deliver quality water to the citizens of Flint.

3           I would only refer the Court back -- and I know the

4    Court has the transcript as part of the record in front of it,

5    is that immediately before the testimony the Court included in

6    its opinion, there is a question by counsel to Mr. Humann

7    about -- and this is on page 330 of the transcript at the

8    bottom.

9           Can you identify anything that was not in place that

10   prevented the city from turning on the water and delivering

11   water to the residents?  Mr. Humann made the distinction there

12   and I think it's worth repeating again within the context of

13   this discussion that we've had today.  That there's a

14   difference between simply turning on a spigot and having water

15   physically flow through the pipes.

16          And if you want to know that, yes, they could have

17   done that.  But if you want to know whether they could have

18   done the things that they said were required and the things

19   that he, as an expert, has now identified were required for

20   having water quality, the answer is no.

21          And so it's not enough simply to say could you have

22   had water flowing through there, which was the question.  And

23   he says it's different than delivering water of a certain

24   quality.  So your question about the physical ability to

25   deliver water or is it about the quality of the water being

```
 1    delivered.
 2          That is the subject that we're talking about here.
 3    And I think that Mr. Humann has answered the Court's question.
 4    I don't think that there's any inconsistency.  The Court has
 5    ruled about the other two bases -- other two opinions already
 6    and I won't belabor those except to say that they shouldn't be
 7    reargued.  Thank you, Your Honor.
 8          THE COURT:  Thank you, Mr. Maimon.  Thank you,
 9    Mr. Kent.  And Mr. Humann, thank you, also, for being
10    available.  And that will conclude our hearing today.  And so
11    what we'll do is continue briefly -- this would ordinarily be
12    in chambers just to discuss some logistics related to -- I
13    hate to use this word -- scheduling and similar issues like
14    that.
15          So we'll discontinue the recording at this point.
16                   (Proceedings Concluded)
17              -         -         -
18
19          CERTIFICATE OF OFFICIAL COURT REPORTER
20          I, Jeseca C. Eddington, Federal Official Court
21    Reporter, do hereby certify the foregoing 52 pages are a true
22    and correct transcript of the above entitled proceedings.
23    /s/ JESECA C. EDDINGTON_____        1/18/2022
      Jeseca C. Eddington, RDR, RMR, CRR, FCRR      Date
24
25
```