```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3     LEE-ANNE WALTERS, et al,

 4                    Plaintiffs,
         -v-                              Case No. 17-10164
 5
       CITY OF FLINT, et al,
 6
                      Defendants.
 7     _____/

 8                          MOTION HEARING

 9
                  BEFORE THE HONORABLE JUDITH E. LEVY
10                   UNITED STATES DISTRICT JUDGE

11                        JANUARY 19, 2022

12
       APPEARANCES:
13
       For the          Corey M. Stern
14     Plaintiffs:      Levy Konigsberg, LLP
                        605 Third Avenue, Suite 33rd Floor
15                      New York, New York 10158

16                      Moshe Maimon
                        Levy Konigsberg, LLP
17                      605 Third Avenue, Suite 33rd Floor
                        New York, New York 10158
18
                        Renner Kincaid Walker
19                      Levy Konigsberg, LLP
                        800 Third Avenue, 11th Floor
20                      New York, New York 10022

21                      (Appearances Continued On Next Page)

22

23     To Obtain a     Jeseca C. Eddington, RDR, RMR, CRR, FCRR
       Certified       Federal Official Court Reporter
24     Transcript      United States District Court
       Contact:        200 East Liberty Street
25                      Ann Arbor, Michigan 48104
```

```
 1                         Hunter Shkolnik
                           Napoli Shkolnik
 2                         270 Munoz Rivera Avenue, Suite 201
                           Hato Rey, Puerto Rico 00918
 3
        For the           James M. Campbell
 4      Defendants:        Campbell Conroy & O'Neil, P.C.
                           1 Constitution Wharf, Suite 310
 5                         Boston, Massachusetts 02129

 6                         Alaina N. Devine
                           Campbell Conroy & O'Neil, P.C.
 7                         1 Constitution Wharf, Suite 310
                           Boston, Massachusetts 02129
 8
                           Kristin Michele Dupre
 9                         Campbell Conroy and O'Neil PC
                           1 Constitution Wharf, Suite 310
10                         Boston, Massachusetts 02129

11                         Mark R. Ter Molen
                           Mayer Brown LLP
12                         71 South Wacker Drive
                           Chicago, Illinois 60606
13
                           Marcus Christian
14                         Mayer Brown LLP
                           1999 K Street NW
15                         Washington, District of Columbia 20006

16                         Minh Nguyen-Dang
                           Mayer Brown LLP
17                         1999 K Street NW
                           Washington, District of Columbia 20006
18
                           Philip A. Erickson
19                         Plunkett & Cooney
                           325 E. Grand River Avenue, Suite 250
20                         East Lansing, Michigan 48823

21                         Cheryl A. Bush
                           Bush, Seyferth PLLC
22                         100 W. Big Beaver Road, Suite 400
                           Troy, Michigan 48084
23
                           S. Vance Wittie
24                         1717 Main, Suite 5400
                           Dallas, Texas 75201
25
```

January 19, 2022

3

1          To Obtain a Certified Transcript Contact:
           Jeseca C. Eddington, RDR, RMR, CRR, FCRR
2              Federal Official Court Reporter
                United States District Court
3     200 East Liberty Street - Ann Arbor, Michigan 48104

4

5

6

7

8

9

10

11

12

13

14

15

16                     **I N D E X**

17

18    MISCELLANY

19          Proceedings.................................4
            Certificate...............................139
20

21

22

23

24

25

January 19, 2022

| 1 | **P R O C E E D I N G S** |
| 2 | THE CLERK:  Calling the Flint Water Cases. |
| 3 | THE COURT:  Well, thank you, all, for being here. |
| 4 | And this is the date and time that was set for an initial |
| 5 | hearing on a first group of motions in limine that have been |
| 6 | filed by both plaintiffs and both defendants. |
| 7 | And so let me say something about how these were |
| 8 | selected.  There are well over 25 or something different |
| 9 | motions in limine.  And I have been chipping away at them, |
| 10 | issuing some written decisions on various motions that I |
| 11 | didn't have questions for the parties or it appeared that the |
| 12 | issue was pretty easy to decide in a quick written opinion. |
| 13 | And you've gotten all of those. |
| 14 | What I did next was just pick a handful.  So please |
| 15 | don't read too much into which ones these are.  There's not a |
| 16 | lot of time over here at our side of this case to do all that |
| 17 | I wish I could do to have thoughtfully said, well, we're going |
| 18 | to do 508 and 511 but not this one for a particular reason. |
| 19 | No.  We're just trying to get through this work.  And it's |
| 20 | very -- it's wonderful work.  So I have no complaints about |
| 21 | that. |
| 22 | So what I'd like to do is begin with the first one |
| 23 | that was listed, which is Veolia North America, the VNA |
| 24 | defendants, general motion about improper jury arguments.  And |
| 25 | it's 489.  And what we have is a list of 14 general items that |

1  VNA wants the Court to address at this time.

2          And for anyone who's observing this who's not

3  familiar with a motion in limine, you might have become

4  familiar because there was a little bit of controversy over a

5  candidate who had been nominated to be a federal judge in a

6  previous administration and didn't know what a motion in

7  limine was.  So the whole nation heard that word on the

8  evening news.

9          And what it is is it's a pretrial motion regarding

10  evidence that one side or the other thinks as a matter of law

11  should either be allowed or disallowed before we ever get to

12  the trial.  So we don't even need the context of the trial for

13  these motions the lawyers argue.  They are confident in their

14  position that these evidentiary issues or types of arguments

15  should be prohibited by the Court before the trial ever

16  starts.

17          And they're designed to make the trial run smoothly

18  so that we don't have to stop and send the jury to the jury

19  room or send them home and have all of these issues addressed

20  at that time.  So all right.

21          So we have VNA's general sort of omnibus jury

22  argument motion up first.  And is that Mr. Campbell?

23          MR. CAMPBELL:  Your Honor, I am going to handle this

24  one.  And I alerted Ms. Calhoun and the others that were on

25  the call before you joined, I am having some internet issues.

1   And I'm on a cell service right now I think.  And if I -- if

2   it freezes, I might have to get off the video.  So I hope

3   that's okay.

4          THE COURT:  That's okay.  And I can't tell you I've

5   just been through a handful of those problems at my own house.

6   So I understand.

7          MR. CAMPBELL:  Thank you, very much, Your Honor.

8          So this omnibus motion addresses, as Your Honor said,

9   jury arguments.  And I think that either all or most of them

10  are issues that should not cause any concern.  And I can walk

11  through each one in the order they appear in the motion, if

12  that's okay with you.

13         THE COURT:  Yes.  So the first one is you're asking

14  me to prohibit arguments that insight local or anticorporate

15  bias.

16         MR. CAMPBELL:  Yes, Your Honor.

17         THE COURT:  And if I understand, the plaintiffs have

18  in their response brief -- although they didn't stipulate to

19  this because they don't think an order is necessary.  I think

20  that they agree that they were never intending to do that in

21  the first place.  But maybe we should make sure of that.

22         Is that Mr. Stern arguing?  Mr. Maimon?

23         MR. MAIMON:  Yes, Your Honor.  And we agree that

24  there should not be arguments or statements designed to

25  insight regional, local, or anticorporate bias.  The same way

1   that there shouldn't be other statements to insight anti

2   plaintiff bias.

3         But not only do we believe that there should not be

4   an order, that an order is not necessary, but if we probe and

5   ask VNA what do you mean by that, that's where the danger

6   arises.  And so for instance, they believe that they -- that

7   the corporate status of VNA should not be disclosed to the

8   jury, that the jury should not learn -- Mr. Campbell's shaking

9   his head but I'm reading straight out of his motion or --

10        THE COURT:  Okay.  And Mr. Campbell, tell me if you

11  disagree with Mr. Maimon.  What I understand in plaintiffs'

12  response is that there may be testimony that one of the

13  deciding factors for the City of Flint in selecting VNA to

14  perform a contract regarding water that led to your presence

15  in this case, that one of the factors Flint may have

16  considered was that your client is a prominent water

17  consultant with vast experience and so on.

18        And also the name of the defendant, you've got Veolia

19  North America.  Veolia Water North America Operating Services

20  LLC.  I mean, that -- so the jury will understand this is

21  probably not a Genesee County entity.

22        MR. CAMPBELL:  That's correct, Your Honor.  What the

23  motion addresses -- and I think it's fair to -- when you look

24  at the papers, it addresses the things that were raised in

25  some of the cases that we cited, the Bell case and some of the

1    others that go to, well, this is a billion dollar company or

2    this company's from some other state and we don't tolerate

3    that kind of thing here.  Those are the kinds of arguments

4    that we're talking about.

5           And the one that you raised, Your Honor, really goes

6    to a different motion.  But it's pertinent here, for sure.

7    And for sure the interchanges between the City of Flint and

8    VNA when the contract was signed, you know, we're a

9    corporation.  And we're from a different state.  That's where

10   it's incorporated.

11          But the point of this motion is the improper

12   arguments that frequently flow and have been addressed -- that

13   had been made in courts and wind up on appeal.  And we're

14   trying to prevent that from happening and we're trying to

15   prevent having to stand up and object if we see a question

16   coming or one that's been asked.

17          And you know, the arguments that because we're a

18   corporation or because it's a large corporation or because it

19   has a french parent, none of that has any belonging in the

20   case.  And I think that the -- it is the improper arguments

21   that were --

22          THE COURT:  Right.  So it's the argument and not the

23   mere fact that you are a corporation not housed here in

24   Michigan.

25          So in light of the fact that plaintiffs agree with

January 19, 2022

```
 1    that, I find that it's moot.  They don't plan to make argument
 2    on that.  They may present testimony if it comes out, I don't
 3    know, that what the deciding factors were for Flint or
 4    something like that that could reference VNA's location or
 5    experience or size.  But that's not argument.
 6             So it's -- I think it's denied as moot on point one.
 7    Or just it has been resolved at this point.
 8             MR. CAMPBELL:  Thank you, your Honor.
 9             THE COURT:  Now the next one is references to VNA's
10    size or wealth or plaintiffs' financial condition.  And that
11    one, too, I think plaintiffs have agreed that they don't plan
12    to make those references other than in a factual presentation
13    if those facts are part of the reason that someone would
14    testify about selecting VNA or relying on VNA or something
15    like that.
16             Do I -- let me just find out from Mr. Maimon if I
17    understand that properly.
18             MR. MAIMON:  Yes, Your Honor.  And that really is the
19    point that the case law that addresses this that's cited by
20    the defendant, we agree with that case law.  That the argument
21    that you should find in the plaintiffs' favor because the
22    defendant is wealthy or large or the plaintiffs are poor,
23    those are improper arguments which we're not going to make.
24             But certainly VNA touted its size, its resources to
25    the city.  Certainly the city officials have testified, and we
```

1    expect they'd be consistent, that VNA -- and I'm just looking

2    at Mr. Ambrose -- being an internationally recognized firm in

3    water management was hired.

4            I mean, those are the types of things that if the

5    role of the city is going to be assessed and the

6    reasonableness of their reliance on VNA is going to be part of

7    the case, then all that is factual.  And again, while we would

8    not make improper arguments, I think that we would make proper

9    arguments, that the city was justified in relying on that.

10   That VNA's representations about these things were important

11   to the city.

12           And I think that as long as the fact -- it's a

13   factual basis, that fair argument on the facts is proper.

14   Unfair argument is improper.  And that's part of the problem

15   with motions such as this is that you don't know where it's

16   coming from.

17           So that for instance, I hate to move back, but on

18   page 4 of the motion papers, VNA says neither VNA status as a

19   corporation nor its state of residence are relevant.  But so

20   they were arguing that we can't say that they're a

21   corporation, their status as a corporation.

22           Same thing here.  Their size or their wealth or their

23   resources, it is relevant to certain issues but it would be

24   improper for us to suggest that that is a basis for finding

25   liability.  And therefore, that's the problem that we have in

```
 1   facing motions like this.
 2            THE COURT:  Mr. Campbell.
 3            MR. CAMPBELL:  Your Honor, if I may?
 4            THE COURT:  Yes.
 5            MR. CAMPBELL:  Yes.  Again, these things overlap for
 6   sure.  But that particular issue goes, as Mr. Maimon put it,
 7   that goes to the issue of what the duty is owed by VNA.
 8   Whether VNA is a large corporation or a small corporation or a
 9   small company or whether the city had expectations because it
10   was a large company or not, those don't go to the duty that's
11   owed.  The duty is as to a reasonable company.
12            And I would say this motion or this part of it is,
13   again, this is something that got to the Sixth Circuit.  So
14   this happens.  And it's in the City of Cleveland case where,
15   you know, that what we are addressing at its heart is
16   appealing to the sympathy of jurors who references to
17   financial disparity is improper.  Arguments of counsel
18   contrasting wealth and poverty or strength and weakness of the
19   opposing litigants have been condemned.
20            So that's what we're looking to preclude.  And that,
21   you know, it's reasonable --
22            THE COURT:  Correct.  I heard Mr. Maimon say that
23   they're not making an argument to the jury to inflame their
24   passions or whatever that might be to say look at my
25   relatively economically disadvantaged clients relative to VNA.
```

 1   So you should find in their favor for that reason.

 2           Let me reassure you though that the Mr. Humann

 3   testimony that was related to a corporation the size and

 4   experience of VNA should have been aware in 2014 of certain

 5   things, that won't come in because the 2014 issue has been

 6   addressed in the motion for summary judgment.  So that -- so I

 7   do want to reassure you with respect to that testimony because

 8   it won't be relevant to any fact at issue there.

 9           However, if there's testimony from Ambrose or anyone

10   else that there were certain expectations based on who VNA

11   was, that -- then that would be relevant and it would be

12   permissible.  But not for an unfair argument that their size

13   is the reason to award money damages.  But rather that Flint

14   relied on this report because of the reputation of your

15   client.  Things of --

16           MR. CAMPBELL:  Again, I don't mean to belabor the

17   point.  But what I would say to that, Your Honor, is I think

18   that's an issue that might be subject to additional briefing

19   of Your Honor.  Because I don't think that what the

20   expectation, whatever that may have been by the City of Flint,

21   is relevant to the case.

22           But I understand for this particular motion and part

23   of it, I understand what you're saying, Judge.

24           THE COURT:  But I think it can be common sense.  That

25   if I hire a law clerk who I have 1,000 percent confidence in

```
 1    and they send me a case and say the case stands for A, B, and
 2    C, I'm going to trust that I don't have to read that case if
 3    there's another one that I need my attention -- if there's
 4    another case that I'm not familiar with.
 5            So if Flint can say, look, we didn't check behind the
 6    work of VNA because of its reputation internationally, that
 7    surely seems relevant.  And if they say, well, we would have
 8    -- I don't know if this testimony is out there.  We would have
 9    otherwise done this if it had been some other, you know, ABC
10    engineering services.
11            So but I think the fact is that it's agreed that it
12    can't be referenced.  Your size and status and wealth can't be
13    referenced for an improper purpose.
14            I do note that plaintiffs financial condition you
15    mention that you don't want plaintiffs to bring up.  But I had
16    an opportunity to dip into your four expert psychologists,
17    neuropsych folks, who do reference the plaintiffs' relative
18    challenges, socioeconomic challenges.
19            So I sort of am not sure what you really intend --
20    how that's going to play out.  But that won't -- we'll sort
21    that out.  Because if you're saying the plaintiffs can't bring
22    it up but you're going to bring it up through your neuropsych
23    experts, we'll have to figure --
24            MR. CAMPBELL:  Yeah.  That's not what we're saying.
25    What we're saying in this part of the motion is it's improper
```

```
1    argument as recognized by the Sixth Circuit to say that this
2    is a big company and these are disadvantaged plaintiffs and
3    economically challenged plaintiffs and that that somehow
4    should be a factor for the jury to consider.  It isn't.  And
5    that's what this part of the motion addresses.
6          MR. MAIMON:  And we agree with that, Your Honor.  We
7    said it in our papers that the plaintiffs' financial
8    conditions should not be referenced in order to invoke
9    sympathy and the financial disparity arguments between the
10   parties is improper.  That's not -- it's unremarkable.
11         THE COURT:  Okay.  So that's denied as moot.  But
12   also it's duly noted that there is an agreement on these
13   issues.
14         The third one relates to suggestions that VNA owed a
15   heightened duty because of its size or sophistication.  Here,
16   as I understand it, you're referring to the 2014 testimony
17   from Mr. Humann.  Is that correct, Mr. Campbell?
18         MR. CAMPBELL:  I would say it goes beyond that, Your
19   Honor.  I think that it goes to some of the issues that we've
20   addressed with the first two segments.  Having to do that
21   there is -- because the City of Flint allegedly in its
22   argument had a heightened expectation of VNA that somehow
23   creates a bigger duty or that because of the status of VNA as
24   being a company or a large company or whatever the statement
25   would be, that there is some heightened duty.  There isn't.
```

1          The duty and under Michigan law is as to a reasonable

2     -- the degree of diligence and skill which is ordinarily

3     possessed by the average of the members of the profession in

4     similar localities.  And that's the Cox case.

5          So that's where this motion is about, that an

6     argument that, hey, this is a big company.  And therefore they

7     should have done extra or had some extra burden or, you know,

8     extra burden on them.

9          THE COURT:  Correct.  And I absolutely agree that the

10    city's expectations -- if the city says our expectations were

11    heightened because VNA was an international expert in this

12    area does not matter to the issue of whether VNA was

13    negligent.

14         But it's an interesting thing you raise because you

15    may want to argue that the government -- you have the nonparty

16    at fault cases to make and you're wanting to argue that the

17    government -- if anyone was negligent, it was state actors.

18    And so I could see so I could see that this issue still could

19    come up about whether there's reasonable reliance on VNA.

20    Mr. Maimon.

21         MR. MAIMON:  Yes, Your Honor.  So I think that

22    there's a difference here legally in that it is a -- it is

23    true that the standard of care is the same regardless of

24    whether or not it is a large engineer or a small shop

25    engineer, whether the engineer's been in practice for 30 years

1    as opposed to three years.

2              And by the way, Mr. Humann stated such in his

3    deposition.  So we're not going to argue that -- that there is

4    a different standard of care -- which is a legal issue, by the

5    way.  It's not a factual issue.  It's what is the standard of

6    care.

7              THE COURT:  Right.

8              MR. MAIMON:  That's something that's charged by the

9    Court.  We're not going to argue for a different or a

10   heightened standard of care based on VNA's size or

11   sophistication.

12             However, as a factual matter in determining whether

13   or not VNA met its burden and duty of care, its resources --

14   it's awareness is certainly a matter of fact that the jury can

15   and should take into account.  If VNA because of its resources

16   knew certain things, because of its experience knew certain

17   things and they admit that they knew certain things, well then

18   that is relevant to a jury's determination as to whether or

19   not they acted reasonably in this circumstance.

20             And so you can't divorce that from who the

21   corporation is and how many engineers they have and what

22   Mr. Gnagy's or Mr. Chen's experience was in various jobs.

23             To be sure if somebody who just came out of

24   engineering school were on this job, the standard of care

25   would be the same.  But the evidence with regard to what they

1    knew and when they knew it and what resources were available

2    to them would be different.

3            And therefore, again, it's not a question of a

4    heightened duty of care, but it's a question of what is

5    relevant to determining whether that duty of care was breached

6    or not.  And that's what we say in our motion papers.

7            In addition to the issue of the notice of third party

8    fault and the reasonableness of the City of Flint's reliance

9    including but not limited to the very press release that they

10   issued explaining why they hired Veolia.  And Mr. Nicholas,

11   who was their project manager on the job, his recognition of

12   the reliance about whether or not the water was safe to drink.

13           So these are issues that are going to be fleshed out.

14   But again, we agree it doesn't establish a heightened duty of

15   care.

16           MR. CAMPBELL:  And Your Honor, the argument we're

17   intending to address is not that evidence.  It is okay because

18   they knew that or because they are big company or because of

19   something else that they should have done something extra or

20   some, you know -- for this company in particular or it's the

21   extra that would be put onto to the ordinary -- the standard

22   that would apply under the law.  That's what we're addressing.

23           THE COURT:  I agree -- I think it's fair to say I

24   agree with both of you.  Because Mr. Maimon is saying the size

25   and experience of VNA does not change the jury instruction on

 1   duty.  But facts may come in and won't be excluded if we -- if

 2   there's testimony about 37 years of experience in a global

 3   corporation addressing issues from lead to legionella to these

 4   sorts of things that -- then that would be absolutely relevant

 5   to a jury's consideration of whether an engineer in the

 6   position of VNA with VNA's knowledge would have done certain

 7   things.

 8              So it's not going to increase the duty, not going to

 9   decrease the duty.  But there's going to be -- the story will

10   be told.  And so I -- it's hard to tell whether I'm granting

11   or denying or what.  But I don't think this is an issue.  I

12   think it's moot in the sense that the description from

13   Mr. Maimon of what they intend to do is not prohibited by the

14   law.  And there won't be any improper argument that there's a

15   heightened duty because of your size.  That will be

16   impermissible and prohibited.

17              So now we're on arguments that the jury should send a

18   message to VNA or other corporations.  And I think that's

19   agreed upon, that there was never an intention to do that.

20              Is that correct, Mr. Maimon?

21              MR. MAIMON:  Yes, Your Honor.  The reason that we

22   opposed again is the breadth of the language of the motion

23   that any argument implying this is so broad that -- the last

24   thing you want with an order on an in limine motion is to now

25   have re-litigation at trial as to whether or not that order

1   was violated.  And if that's why in limine orders, our courts

2   tell us, should be narrowly tailored and their scope should be

3   narrow.

4           MR. CAMPBELL:  Your Honor, our point is whether those

5   three words are used to send a messages or whether it's said

6   in four words or six words, it's directly, you know, or

7   indirectly.  And I think that, you know, we don't -- you

8   reference common sense.  I mean, when this argument is being

9   made, it has -- it's obvious and it shouldn't be made.

10          THE COURT:  Correct.

11          MR. MAIMON:  We agree with VNA.

12          THE COURT:  Okay.  So that is either denied as moot.

13  I mean, nobody's going to make that message or make that

14  argument.  And if they do, they'll be shut down immediately.

15          The next one is statements to the effect that the

16  jury is the only entity with the power to regulate or change

17  the conduct of VNA or others.  And I think that's in the same

18  pot with number 4.

19          MR. CAMPBELL:  Yes, Your Honor.

20          THE COURT:  Okay.  Then statements that VNA acted

21  unethically, put profits over safety, or violated some

22  normative criteria other than the standard of care.

23          MR. CAMPBELL:  And Your Honor, this goes to some of

24  the issues that we've -- that you've addressed.  For instance

25  I think it was the Humann order.  But one of the orders that,

1   you know, the -- or maybe it was summary judgment.  I think it

2   was summary judgment.  I'm sorry.

3           THE COURT:  That's okay.

4           MR. CAMPBELL:  You know, whether something is a moral

5   duty or not, it's not what we're talking about.  And that is

6   part of this.  As well as, you know, making reference to what

7   is or isn't ethical is in the same vein.  And then the issue

8   of profits over safety is a punitive damage argument.  And

9   it's one, as I understand it, that in the meet and confer that

10  we had on this that Mr. Maimon doesn't intend to make any

11  punitive damage arguments because punitive damages aren't at

12  issue in our case.

13          But that's the nature of this, that our standard of

14  care is as we've talked about, an engineering issue, and it's

15  not one that's governed by ethics.

16          THE COURT:  Correct.  And in the -- I think it was in

17  the first so far only Daubert opinion on Humann that I have

18  made clear that the ethical nature of VNA's conduct is not

19  what's on trial.  And that opinions regarding morality,

20  they're already excluded.

21          But let's see, Mr. Maimon, anything further?

22          MR. MAIMON:  Sure, Your Honor.  Refer to Mr. Humann

23  as it came out through the Daubert process as well as to the

24  defendant's own engineers.  When their depositions were taken,

25  they all acknowledged that the various ethical codes

1    established the duty of the care of a reasonable engineer.

2    And so they were shown the ethical codes that are applicable

3    wherever they are licensed and they admitted that this

4    establishes the standard of care.

5           And so you can't -- if we're to be able to have a

6    proper cross-examination or an examination of those experts by

7    showing them the code and establishing through their

8    admissions that that is the standard of care, it's not an

9    argument that the ethical violation is what's at issue here.

10   The argument is that the code of ethics that they all swear to

11   uphold establishes a standard of care according to their

12   admissions.  And that it's the standard of care being violated

13   that establishes liability.  That's number one.

14          And then number two, with regard to while

15   Mr. Campbell is correct that I did represent to his colleagues

16   that we would not be making punitive damage arguments because

17   punitive damages are not allowable under Michigan law in a

18   case such as this, that does not mean that the motives of VNA

19   are not at issue here.

20          And the reasons that they did various things is not

21   relevant for a jury's determination as to, number one ,

22   whether or not something was within the scope of their

23   services; number two, the arguments that they've made that

24   being only a $40,000 contract for a very limited period of

25   time limits the scope and therefore abridges any ability for

```
 1    there to be a breach of the duty of care during that period of

 2    time.

 3           All of these issues are relevant to what VNA has put

 4    at issue in this case and --

 5           THE COURT:  And Mr. Maimon, I think we have a

 6    different motion in limine about motive and intent that we'll

 7    get to that argument.  But I think there's agreement that a

 8    judgment by a witness that the conduct was unethical or

 9    immoral does not have any relevance to the duty.

10           MR. MAIMON:  That it's -- first of all, we heard Your

11    Honor loud and clear in the opinion with regard to Mr. Humann

12    and he will not, neither will our other experts, offer any

13    opinions that either anybody acted immorally or unethically in

14    this case.

15           THE COURT:  Okay.

16           MR. MAIMON:  We will not make the argument that

17    they're liable because they were immoral or unethical.  We'll

18    make the argument that they're liable because they violated

19    the standard of care.

20           THE COURT:  Okay.  And I think the only issue -- I'll

21    give you a chance, Mr. Campbell -- is the "put profits over

22    safety."  And I'd like to just hold that over until we discuss

23    the motive and intent.  Because there may be a place for that

24    in a different -- not under duty but breach.

25           So let's -- I don't want to make that decision now.
```

1    But it seems to me that there's agreement that the morality

2    and ethical duties and so on that plaintiffs are not intending

3    to use that testimony for that purpose.  But Mr. Campbell.

4            MR. CAMPBELL:  Yes, Your Honor.  We also heard Your

5    Honor in the previous rulings and certainly don't want to

6    relitigate them at all.  But our position is that the ethical

7    standards that were referenced are not relevant to the

8    standard of care.  Understand Your Honor's rulings in the

9    past.  I want to say that.  That was it.  Thank you.

10           THE COURT:  Okay.

11           MR. ERICKSON:  Your Honor, Philip Erickson.

12           THE COURT:  Yeah.

13           MR. ERICKSON:  We've, of course, joined in all of

14   these motions.

15           THE COURT:  Okay.

16           MR. ERICKSON:  And I want to say that, you know, we

17   object to the assertion by plaintiff that they can establish a

18   standard of care through questioning engineering witnesses

19   about the rules of ethics.

20           A lot of questions were asked about rules of ethics

21   during the depositions.  But we objected to those questions.

22   And we object to Mr. Maimon's assertion that they can somehow

23   establish a standard of care in that way.

24           MR. MAIMON:  Well, I would expect, Your Honor, that

25   if Mr. Erickson's clients' own witness, his own engineer

1    states under oath that this code of ethics, whichever one was

2    put in front of him, establish the standard of care and he

3    felt that they were bound by that standard of care in their

4    working at Flint, that that's relevant.  That's an admission

5    of a party.

6              THE COURT:  I think so, too.  It can be relevant if

7    the rule -- the professional rules that guide engineers, if

8    that's part of what a reasonable engineer would do under these

9    circumstances is to take those requirements into

10   consideration.  I think it could be relevant.

11             So I don't know if I'm granting or denying this.  But

12   I think it's moot because it's the ethical and moral testimony

13   is not going to be used to establish a standard of care

14   separate from what a reasonable engineer would do.  And the

15   professional codes on the rules of ethics may inform that.  So

16   not a general moral duty that but if there are specific codes

17   that inform engineers, I think those are definitely relevant

18   to considering what a reasonable engineer would do.

19             So now we're on the motion of pending -- oh,

20   mentioning of pending claims by other plaintiffs.  And here I

21   think it's very difficult to rule on this now.  I certainly

22   understand that at the beginning of some depositions, some

23   lawyers identified themselves by as here sort of I represent

24   so and so in this case.  And you put your appearance on the

25   record.  And that Mr. Stern may have said and I represent

January 19, 2022

1    2,500 children in the Flint Water Cases.  And he's not going

2    to say that here.

3           But I do think it's likely that the jury will come to

4    understand during jury selection or otherwise that these four

5    children are not the only individuals impacted by this

6    situation.  And so all of us have to figure out what to do

7    about that.  And it's -- because we want to make sure that the

8    jury is not reaching a verdict or if it reaches a liability

9    verdict that the damages represent only the damages of these

10   four children and not thousands of other children.

11          So that's important to me.  It's important to all of

12   us.  But I don't think anyone is going to say, well, there's

13   35 lawsuits -- 86 -- whatever it is.  86 lawsuits.  And

14   they'll be prohibited from saying that.  But there's little

15   chance that the jury is not going to know that there are other

16   cases.

17          So how do you suggest, Mr. Campbell, that that be

18   addressed?

19          MR. CAMPBELL:  The way I see this is it's an issue of

20   staging or grading, if you will.  So at one extreme, you know,

21   someone -- and I'm not suggesting Mr. Maimon or anyone else

22   would do it.  I'm using it as an example.  You know, these

23   four children are just one of 7,000 other lawsuits, right.  So

24   clearly and obviously that's what the type of thing we're

25   trying to prevent here.

January 19, 2022

26

```
 1              And then as you move on the spectrum, it would be
 2    making reference to other lawsuits simply because there are
 3    other lawsuits.  I would say that given the nature of the
 4    litigation where we're dealing with the water system in the
 5    city where, you know, the city residents had access to the
 6    water system, but there's going -- we necessarily are going to
 7    know that other people beyond the four plaintiffs here and
 8    their families consume the water.  I mean, that's going to be
 9    part of it.
10              What we are looking to prevent here is closer to that
11    -- to the extreme that I mentioned.  And that is the fact of
12    other lawsuits should not be the part of an opening.  It
13    shouldn't be the predicate of a question.  The other lawsuits
14    are literally irrelevant to this lawsuit.
15              THE COURT:  Right.
16              MR. CAMPBELL:  These four lawsuits.  So that's in the
17    first instance what we're trying to prevent.  And certainly
18    it's not that there are other people that consumed the water
19    and may or may not be affected by it.  It's the fact of the
20    lawsuits.  That's what this is getting after.
21              THE COURT:  Okay.  Mr. Maimon.  The remarks that
22    Mr. Campbell made about during opening this is one of 2,000 of
23    my clients' cases.  Do you have any intention of doing that?
24              MR. MAIMON:  So in opening statements, that's not
25    something that we would do, Your Honor.  And I agree that
```

```
 1    we're going to learn a lot out of the voir dire process,
 2    especially given the press that's been given not only the
 3    litigation and the crisis but also the settlement.  You don't
 4    settle something that's not a lawsuit.  So they're likely to
 5    be people who know that there were thousands of lawsuits.
 6          People have heard about class actions.  You know,
 7    that's obviously something that we're going to learn about
 8    that's going to inform us.
 9          I would note, Your Honor, that the -- and I always
10    appreciate being the person who just for hypothetical's sake
11    makes the most extreme argument.  But that's fair enough in
12    argument.  But you can't have it both ways.
13          So for instance, one of the issues that Your Honor's
14    going to deal with today is the issue of indictments of state
15    officials and city officials.  And the issues that that
16    relates to bias.  We'll argue against it.
17          But that same bias argument could be used against VNA
18    or LAN officials that here are claims against you.  It's
19    really no different than an indictment.  It's somebody else
20    making a claim that you have responsibility, whether it's
21    criminal or civil, and you may have a bias to testify one way
22    because of that claim.
23          Now we don't intend on doing that with the VNA
24    witnesses or the LAN witnesses when they come into court and
25    impeach them by saying you're only saying this because you've
```

January 19, 2022

```
 1    got 7,000 lawsuits pending against you.  But that's --
 2          THE COURT:  But I think that issue comes up in every
 3    case, that a defendant who chooses to testify, a jury could
 4    think, well, they've got a motive to say they didn't do it.
 5    They're on trial.
 6          MR. MAIMON:  Right.  But I do think that there's no
 7    secret that there are other, you know, many other children.
 8    The medical experts are going to make reference to the studies
 9    that have been done of the blood lead levels and the
10    neurocognitive deficits that have been recognized in the Flint
11    population of children.
12          That's not going to be -- that's going to be
13    something that's going to be the subject of expert testimony.
14    And so it's not only that a lot of people drank the water, but
15    a lot of people were impacted.  And that's going to be part of
16    the expert proofs in this case.
17          And so it seems to me that we're really worrying
18    about something that everybody's going to know is there.  And
19    the question is not to take, you know, artificial and plastic
20    steps to try and hide it from a jury.  But the question is how
21    do you deal with a case or cases of this size, of this
22    notoriety and properly instruct a jury and properly give
23    limiting instructions so that all parties get a fair trial
24    including the defendants.  We're not arguing against that.
25          THE COURT:  Okay.
```

```
 1              MR. CAMPBELL:  Your Honor.

 2              THE COURT:  Yeah.

 3              MR. CAMPBELL:  There is a substantial difference

 4  between, you know, a study that one of the experts might rely

 5  upon in saying, oh, by the way, everybody in that study

 6  brought a lawsuit or some of them brought it.  Those are two

 7  different things.

 8              And the issue of whether or not jurors may or may not

 9  know about anything about this, including that there might be

10  other lawsuits, you know, I can only go on things that I know.

11  In a more simple case, one involving a workplace accident, if

12  everybody knows that there's workers compensation available to

13  that plaintiff, it still is irrelevant.

14              THE COURT:  Right.

15              MR. CAMPBELL:  And it's still something that's not

16  part -- that should be part of the evidence.  It shouldn't be

17  part of the opening.  It shouldn't be part of the predicate of

18  questions about other lawsuits.  That's the point.

19              THE COURT:  And that's correct.  And I hear

20  Mr. Maimon agrees with that.  What I will tell you is I have

21  read only six juror questionnaires.  And of those six jurors,

22  some of them knew that there are other -- there are people who

23  sued.  And so I imagine that a question I would have is you

24  answered question 38 and you told us that you knew that people

25  have filed lawsuits.
```

```
 1            Is there anything about that that would prevent you
 2   from being fair and impartial in our case, in this case.  And
 3   our case is four individuals only.  It's limited to them.  And
 4   so I'll start getting this information, these early
 5   instructions to the jurors about what our case is.  It's four
 6   people.  It's not those people.  Anything about knowing about
 7   other people would make it difficult for you to focus on these
 8   four.
 9            So I think it's going to have to be -- it will come
10   out.  I'm just telling you.  There is no way as you
11   acknowledge.  And so but I will prohibit the plaintiffs from
12   saying they represent all these other people.  All these other
13   people are waiting for their day in court against VNA and LAN.
14   That's not going to be allowed.
15            So I think it's something that ultimately will
16   require a carefully crafted jury instruction.  And I think
17   there are had many out there.  The Sixth Circuit doesn't have
18   pattern civil instructions.  But I'm sure that we can find
19   pattern instructions that will address case -- this issue.  Or
20   we can craft one.
21            So my suggestion here is that the mention of claims
22   by other plaintiffs, to the extent it comes out in looking at
23   studies and things, it's not to say they are plaintiffs.  It's
24   not to say they are litigants against your client.  But it
25   would be relevant to those studies to know how many people
```

1    participated, etcetera.

2              MR. MAIMON:  Your Honor.

3              THE COURT:  Yeah.

4              MR. MAIMON:  The other context in which this is

5    something that generally can be expected to [Inaudible] trial

6    is within specifically cross-examination of adverse experts.

7    It's the typical cross-examination of an expert with regard to

8    his or her bias that you -- you know, you've been retained by

9    the plaintiffs in X number of cases.

10             So you always work for the plaintiff.  In this case

11   you gave testimony for the plaintiff.  In that case you gave

12   testimony for the plaintiff.  And here I follow Mr. Campbell's

13   lead of putting the argument on myself.

14             But again, you know, I've been -- I haven't been in a

15   trial where both plaintiffs and defense experts haven't been

16   cross-examined that way.  That tells you that there are other

17   cases pending.  Again, you don't say I represent them or

18   something like that.  But the fact that there are other

19   lawsuits is not going to be a secret to this jury.

20             And in fact, the experts' involvement in them or

21   other lawsuits is going to be the subject of

22   cross-examination.  And so I agree that what needs to happen

23   here is a carefully crafted instruction and not a broad in

24   limine order.

25             MR. CAMPBELL:  And Your Honor, if I just follow up on

```
 1    my expert issue.  Typically that has to do with other various
 2    and disparate cases wherever.  Here, I can't say whether it
 3    would be in, you know, some other case involved in the
 4    litigation.  But you know certain of the -- there's no need to
 5    cross-examine an expert about other cases in this litigation.
 6    I think it might be something --
 7              THE COURT:  Okay.
 8              MR. CAMPBELL:  -- time.  But I don't see how that is
 9    a need.
10              MR. MAIMON:  Well, we can cross that bridge when we
11    come to it, can't we?
12              THE COURT:  We can what, Mr. Maimon?
13              MR. MAIMON:  Cross that bridge when we come to it.
14              THE COURT:  Yeah.  And it would be Mr. Campbell
15    asking the question.  And he says he doesn't want the jury to
16    know about other cases so I think he's not going to ask the
17    question of your experts.
18              MR. MAIMON:  But I'd like the opportunity to ask them
19    of his, Your Honor.
20              THE COURT:  Oh, about whether his clients are
21    receiving remuneration for -- for instance the neuropsych for
22    evaluating 1,000 other people or something?
23              MR. MAIMON:  Or their water experts or their
24    remediation -- you know, all their experts.  These are not the
25    only four cases in which they're working for these either
```

1    defendants or their firms or so forth.

2            THE COURT:  What's your response to that,

3    Mr. Campbell?

4            MR. CAMPBELL:  I'm not sure that I agree with that.

5    I mean, these four bellwether cases are the only cases that

6    are -- have been worked up, if you will.  And I'm trying to

7    think of the other, you know, the plaintiff specific kind of

8    medical type experts.

9            And I can't say for sure whether they examined other

10   plaintiffs or not.  But if they did, it would be limited to

11   the very handful that were within the first bellwether pool.

12   But it's not a situation where there's thousands of them or

13   whatever.  And it's not a situation -- the water experts are

14   working on this -- these four cases.

15           So I mean, there is the litigation.  But I mean, it's

16   for these four cases.

17           MR. MAIMON:  That's why I said we should cross that

18   bridge when we come to it.

19           THE COURT:  I think that's what we should do is that

20   generally counsel on both sides should not point to their

21   other plaintiffs who are not here and that sort of thing.  But

22   before the first expert, defense expert testifies, we'll

23   revisit this and see whether at that time if Mr. Maimon wants

24   to ask that question.  He'll inform me.  I will count on you

25   all to remind me at the time because that will be months from

1    now I'm afraid.  And I want to be sure not to lose track of

2    that.

3            And so motion in limine number 491, let me see, also

4    addresses this question.  So is there anything else in 491

5    which was not up for today, I think, but I'm pretty sure

6    that's what was in that motion?  So have we resolved that as

7    that motion as well?

8            MR. CAMPBELL:  Your Honor, you are testing my ECF

9    knowledge.  I don't know what 491 is.

10           THE COURT:  I have them all listed in a separate

11   document.  So let me just open that document really quickly to

12   make sure.  Because any efficiencies we can accomplish, we

13   should.  Okay.  I'm almost there.

14           MR. MAIMON:  Was 491 set for argument today, Your

15   Honor?

16           THE COURT:  No.

17           MR. MAIMON:  No.

18           THE COURT:  But I think it's the same argument.  491

19   is VNA's motion to exclude evidence and argument regarding

20   other claims and lawsuits.

21           MR. NGUYEN-DANG:  Your Honor, if I may?

22           THE COURT:  Yes.

23           MR. NGUYEN-DANG:  Nguyen-Dang.  No, Your Honor.  This

24   one is about other lawsuits against VNA not connected to

25   Flint.

```
 1                THE COURT:  Oh, 491 is other lawsuits against VNA not
 2      connected to Flint?
 3                MR. NGUYEN-DANG:  That's right.
 4                THE COURT:  Okay.  All right.  Well, we'll do that --
 5      we'll have that argument when we're up to speed on it.  Thank
 6      you.  But I'm glad to know that.
 7                So let me get us back to where we were.  Good.  Okay.
 8                So now number 8, mention of counsel's representation
 9      of other plaintiffs or appointment as lead or liaison counsel.
10      Mr. Maimon, you don't intend to say the Court appointed us to
11      be the lead counsel?
12                MR. MAIMON:  Correct.
13                THE COURT:  Okay.  Then that one's moot.  Right,
14      Mr. Campbell?
15                MR. CAMPBELL:  Yes, Your Honor.  Well --
16                THE COURT:  Or that I represent -- what?
17                MR. CAMPBELL:  I understand how you're ruling that
18      they're moot based upon the representation that that won't
19      occur and understand that's what you're doing as opposed to
20      entering the order allowing the motions.
21                THE COURT:  Okay.  Understandably.
22                The next one is comments about opposing counsel and
23      other distracting tactics.  I don't think anybody intends to
24      do that.  Correct, Mr. Maimon?
25                MR. MAIMON:  Not us certainly.
```

```
 1            THE COURT:  Okay.  So that's now agreed upon.
 2   References, okay, to defendant's collectively.  Okay.  This is
 3   one where we get into the English language.  But go ahead.
 4            MR. CAMPBELL:  Your Honor, I understand the English
 5   language aspect of it and the reaction to it.  I mean, when
 6   Your Honor charged the -- did the pre-charge for the juror
 7   questionnaires, that's completely reasonable and appropriate
 8   in that circumstance.
 9            But here's the thing, you know, VNA and LAN are in
10   two very distinct places.  And it really has to do with
11   timing.  So I think at the bottom of this concern might be
12   let's say there's an event or something that happened in 2013.
13            THE COURT:  Right.
14            MR. CAMPBELL:  Or 2014.  And then there's a
15   reference, well, the defendants did X, Y, and Z at that time.
16            THE COURT:  Okay.
17            MR. CAMPBELL:  So that, we have to unpack.  Well,
18   when you said that the defendants did it, it can't be VNA
19   because we weren't there until 2015.  I think that's the real
20   concern here, if you will, Your Honor.
21            MR. MAIMON:  Your Honor --
22            THE COURT:  That's fair.  Mr. Maimon.
23            MR. MAIMON:  Yes.  So part of the problem with having
24   motion practice and then when we come to argument to
25   articulate, the, quote, unquote, "real concern" is that what
```

```
 1    are we doing with the motions and what are we doing with the

 2    briefing?  To say that we can't refer to them collectively.

 3          And it's great that Mr. Campbell now says that it's

 4    perfectly reasonable to refer to them collectively in the

 5    pre-charge, but they objected to it.  So he didn't think it

 6    was reasonable when the time came to craft the statement of

 7    the case.

 8          Similarly, the pattern jury instructions refer to

 9    defendants in the plural.  Similarly, there's one standard of

10    care, as he's pointed out, for both LAN and VNA.  So it's not

11    the VNA standard of care and the LAN standard of care.  It's

12    the standard of care that applies to the two defendants.

13          So there's no way not to refer to them as defendants

14    here.  So and that's the way in which the motion was framed.

15    That's the way which we're responding.

16          THE COURT:  I'll give you a chance, Mr. Campbell.

17    But first of all, I think Mr. Campbell is saying that he

18    understands I made a decision about informing the jury of what

19    is the role of a plaintiff, what is the role of a defendant,

20    and who are they.  And so he just -- he accepts that is what I

21    think he's saying.

22          But I do see that there will be times during the

23    trial where the use of the plural defendants makes sense.

24    Because there are two and they are both defendants and they

25    have the same duty and so on.
```

```
 1            But I think -- and also there happen to be three LAN
 2   defendants and three VNA defendants.  So you could easily be
 3   saying defendants in 2013 and thinking in your mind I'm only
 4   talking about LAN because there are three of them.
 5            But I think what we should agree is that VNA is going
 6   to be a singular word and LAN will be a singular word.  And
 7   where you're actually asking did LAN breach a duty in 2013,
 8   just use their name.  Because you actually want to know that.
 9   You don't want to know if VNA breached anything there.
10            MR. MAIMON:  Absolutely, Your Honor.  What I don't
11   want, and that's the way that this motion was phrased, is to
12   be scripted that I can't say the word defendants.
13            THE COURT:  No.
14            MR. MAIMON:  Or that Mr. Stern can't say the word
15   defendants.  Because that's not the law.  There's no case that
16   supports it.  And it would be contrary -- Mr. Campbell's
17   concern, as Your Honor pointed out, would be contrary to our
18   interest where we want to have a -- the only finding we can
19   have with regard to 2013 and 2014 is LAN at this point.  Your
20   Honor has ruled that.  And so it would be foolhardy on us to
21   leave any ambiguity with regard to that.
22            THE COURT:  Mr. Maimon, I agree with you in the sense
23   that, Mr. Campbell, I can't tell Mr. Maimon and his colleagues
24   that they can't ever say defendants.
25            I mean, I think that at the end of his closing
```

```
 1    statement, he'll say I will get a chance to come back at the
 2    end of our case and give you my final argument.  And at that
 3    time I will ask that you find these defendants liable for
 4    professional -- I mean, he'll say -- that's got to be
 5    permitted.
 6              And we'll have a jury instruction that reminds the
 7    jurors that there are two defendants and they can't attribute
 8    one's conduct to the other and they need to be considered
 9    separately.
10              MR. CAMPBELL:  Your Honor, I'm not going to disagree
11    with that.  But again, the point is that the two groups of
12    defendants, the LAN defendants and the VNA defendants are,
13    number one, separate.  But also separate in time and separate
14    in conduct.
15              So the concern -- you know, I appreciate what
16    Mr. Maimon is saying about the use of the word.  But I'm
17    telling, you know, we're trying to find a solution here with
18    this motion.  And what we're getting after is the confusion
19    that could come when questions or arguments are made as to the
20    defendants when it only applies to one.  And it puts and
21    introduces confusion.
22              I can't say whether it would or wouldn't be at the
23    time helpful or unhelpful to the plaintiffs.  But I do know in
24    certain circumstances it would be confusing and then places
25    the burden either on VNA or LAN to unpack that.  Say, well,
```

1    wait a minute.  That wasn't us.

2              THE COURT:  Mr. Maimon.

3              MR. MAIMON:  I think one solution is if -- you know,

4    vagueness, by the way, isn't an objection under the court

5    rules.  If a question is vague, improperly vague so -- then an

6    objection is the appropriate mechanism to deal with it, not an

7    in limine order upfront.

8              THE COURT:  Mr. Campbell, here's the thing, I agree

9    that I can't ban the word of -- the word defendants from the

10   trial.  And so -- and I won't.

11             I do want to tell you a short story which is that I

12   had a three-defendant criminal case where defendant number 3

13   was only involved in one part of tax fraud that was in this

14   amazing scheme.  Amazing scheme.  His lawyer, every witness

15   who came up to testify against all the other two defendants,

16   would say, "And my defendant -- my client wasn't there.  Oh,

17   no, no.  I don't know your client."

18             And so every time they reinforced to this jury that

19   defendant number 3 wasn't a part of counts 1 through 80, it

20   reinforced.  And he was acquited.  And I'm telling you, if I

21   was on the jury, what I saw of his conduct in that one narrow

22   slice was beyond a reasonable doubt.

23             So it was a constant repetition to the jury.  But

24   that wasn't my client, right?  So if you want to stand up and

25   cross-examine witnesses that the plaintiffs are bringing for

1   LAN, have at it and say, "But that's not VNA.  I wasn't there.
2   My client wasn't there."  But if you think there's any
3   confusion, certainly do that.
4          But I'm going to ask the plaintiffs to be as clear as
5   possible.  When using plural, make sure it applies.  So I
6   think the motion is denied with respect to use of the plural
7   defendants.  But I think your point has been made.
8          MR. CAMPBELL:  Thank you, your Honor.
9          THE COURT:  Yeah.  Okay.  The golden rule.  No one is
10  going to talk about the golden rule.  So that's moot.  Okay.
11         And number 12, statements to the effect that
12  compensation that plaintiffs may receive from nonparty
13  defendants is inadequate.
14         Mr. Maimon, you're not going to do that, are you?
15         MR. MAIMON:  So first of all, under Michigan law, the
16  amount that any plaintiff might receive from a settling party
17  is inadmissible.  We're not going -- by the way, we don't even
18  know.  So we can't -- we can't say with regard to that.  And
19  the amount of a settlement is not properly before a jury.  So
20  how could you argue that it's inadequate?
21         Our concern with the way the motion was made is that
22  one of the issues that will come up at trial assuming that the
23  jury finds liability is the allocation of fault among the
24  parties found liable.
25         And to the extent because the defendants have the

```
 1   burden of proof on the nonparty liability, to the extent that
 2   they propose a very large share of liability for a nonparty,
 3   we believe that it's proper argument to say that that would --
 4   that's not an adequate liability finding against VNA.  That
 5   doesn't fairly reflect their liability here.  Because they're
 6   responsible for their share.  So --
 7        THE COURT:  But you'll be arguing -- I mean, I don't
 8   know what percent you think VNA or LAN are responsible for.
 9   But that doesn't have anything to do with references to the
10   compensation that they're getting through the settlement,
11   whether that's adequate or not.
12        MR. MAIMON:  Absolutely correct, Your Honor.
13        THE COURT:  Okay.
14        MR. CAMPBELL:  Your Honor?
15        THE COURT:  Yes.
16        MR. CAMPBELL:  I think this one has another component
17   to it.
18        THE COURT:  Oh.
19        MR. CAMPBELL:  And that would be the argument that
20   while none of these other parties are here and none of these
21   other parties are going to pay the judgment and, therefore,
22   you should increase -- and I'm just suggesting what, you know,
23   what we're trying to get at.  And therefore you should
24   increase the percentage or completely disregard the nonparties
25   at fault because they're not here to pay the bill, if you
```

```
1    will.  That's not proper.

2             THE COURT:  That's not proper.  I agree.

3             MR. CAMPBELL:  Arguing that what the percentages are

4    for sure that's fair game and that's what our trial is going

5    to include.  But it's the argument to say, well, you should

6    have a larger percentage on VNA and a smaller percentage on

7    Governor Snyder or some other nonparty at fault because

8    they're not here or they can't pay the judgment.  That is

9    completely 100 percent improper and shouldn't be allowed.

10            THE COURT:  And I think -- let's find out if

11   Mr. Maimon agrees.

12            MR. MAIMON:  Yes.  We're not going to argue that the

13   -- it is improper to have -- let's say -- it is improper, we

14   agree, to argue for -- to tell a jury that they should find

15   more liability for one over another because one has insurance

16   and one doesn't.  That's improper.  Ability to pay is not a

17   matter of that.

18            I could argue on the facts that one should be held

19   more liable than the other and we will do that.  But we will

20   not make an argument about whether or not to what extent

21   anybody will make any payments here.

22            THE COURT:  Okay.  Then, okay, 13 references to

23   settlements by nonparties for VNA's decision to litigate.

24            Mr. Maimon, do you intend to do that?

25            MR. MAIMON:  So we intend -- so there is a separate
```

```
1    motion with regard to the introduction of evidence about the
2    -- about settlement.  And I'm ready to deal with that either
3    now or later.
4              THE COURT:  Why don't we --
5              MR. MAIMON:  -- or the second portion of that --
6              THE COURT:  Let's deal with the issue of VNA's
7    decision to litigate.
8              MR. MAIMON:  All we intend on reiterating, which I'm
9    sure VNA agrees with and will say is that they have an
10   absolutely right to litigate.
11             THE COURT:  Yeah.  And the jury will know that.
12             MR. MAIMON:  They'll be told they're litigating it,
13   yes.
14             THE COURT:  But the jury's going to bear witness to
15   the defense and to VNA's position that it doesn't have
16   liability.
17             MR. MAIMON:  We are going to argue against their
18   position that they have no responsibility here.
19             THE COURT:  Well, yes.  Otherwise we'd have a
20   resolution right now.
21             MR. CAMPBELL:  And Your Honor, the issue that can
22   come out thus far, you know, VNA's the only party to not
23   accept responsibility.  VNA's the only party that chose to
24   litigate this.  Those types of arguments are what we're trying
25   to get at and they don't belong in the trial.
```

January 19, 2022

```
 1          THE COURT:  They don't and they won't be there.
 2          MR. MAIMON:  Well, so we're not -- first of all, it's
 3    untrue because LAN also has not settled, but --
 4          THE COURT:  Yeah.  And we have the US EPA issue out
 5    there.  We have the underwriters issue to be resolved, so.
 6          MR. MAIMON:  Putting that aside, it is a fact that
 7    VNA and their witnesses and their corporate executives do not
 8    accept responsibility for their role in what happened here.
 9    And we plan on telling the jury that we think that that
10    position is unreasonable and incorrect.
11          THE COURT:  That's what a trial is all about.  So we
12    will have a trial and those issues will be what the trial is
13    about.
14          In terms of comments that VNA conspired with the City
15    of Flint, I don't see that in the complaint at this time so I
16    don't even know where this comes from.  Who's alleging that
17    there was a conspiracy, the claim that survives anywhere here?
18          MR. MAIMON:  So we don't bring a claim for
19    conspiracy, for civil conspiracy, Your Honor.
20          THE COURT:  Right.
21          MR. MAIMON:  However, we do believe that there is
22    evidence that will show that there was a concert of action
23    between both the city and VNA with regard to, you know, the
24    failure to warn to the extent that the city is found liable
25    under the third party fault assertions by VNA that they failed
```

1    to switch back to the Detroit water system.  They failed to

2    implement corrosion control.  We believe that there was a

3    concerted action between the engineering firms and the city in

4    doing so.

5           And so by using the term conspiracy and collusion in

6    the motion, you're charging the motion.  The evidence will be

7    what the evidence will be.  We will not be using the term

8    conspiracy at trial.  For the most part because it has a legal

9    definition and we don't want to get into that.

10          THE COURT:  And do you intend to do that in your

11   opening statement?

12          MR. MAIMON:  No.

13          THE COURT:  Okay.  Mr. Campbell?

14          MR. CAMPBELL:  I think that if we have an agreement

15   that it's not in the opening statement and we can see how the

16   evidence comes in.

17          THE COURT:  Yeah.

18          MR. CAMPBELL:  But Your Honor's correct.  There is no

19   -- the only claim is professional negligence.  And that's not

20   a conspiracy claim nor a corruptness claim between VNA or LAN

21   and the city.  It's a professional negligence.  And whatever

22   evidence comes in has to be relevant to that claim.

23          But with the representation that it's not in the

24   opening, we can see how the evidence goes.

25          THE COURT:  Okay.  So that --

```
 1            MR. ERICKSON:  Your Honor, Philip Erickson.

 2            THE COURT:  Yeah.  Hi, Mr. Erickson.

 3            MR. ERICKSON:  I just want to mention that I don't

 4   believe concert of action is applied anywhere either.

 5            MR. MAIMON:  Again, that's not a legal theory that

 6   we're advancing, Your Honor.  But it is relevant to the issue

 7   of the allocation of fault under the very statute that allows

 8   the defendants to assert nonparty fault.  And that is the

 9   conduct of each, their contribution to the harm caused by the

10   plaintiff.

11            And to the extent that the city or the state together

12   with one or both of the defendants was acting in concert in

13   that way, it might not create an independent basis of

14   liability but it might be relevant to the liability of

15   professional negligence.  That's our point.

16            And I agree with Mr. Campbell that, you know, we can

17   see what the evidence is and then the Court can determine what

18   is the proper use of that evidence after it's come in.

19            MR. ERICKSON:  Your Honor, if I might respond.

20            THE COURT:  Yes.

21            MR. ERICKSON:  The concert of action is a legal

22   theory.  It's a legal claim which hasn't been pled.  And I

23   don't believe that plaintiff should be allowed to assert the

24   theory and the just call it a factual statement when they

25   haven't pled it.
```

| | |
|---|---|
| 1 | THE COURT:  Well, Mr. Maimon -- |
| 2 | MR. ERICKSON:  Perhaps additional briefing on that |
| 3 | point is appropriate. |
| 4 | THE COURT:  Why don't we do this.  If Mr. Maimon asks |
| 5 | a question of a VNA witness and the question is, "Did you |
| 6 | agree with X or Y emergency manager not to publish certain |
| 7 | things in your report that you knew to be true," I think |
| 8 | that's relevant to what happened. |
| 9 | It's not going to make a civil conspiracy claim. |
| 10 | It's not -- it's part of the story, well, that is to be told |
| 11 | here.  So I -- I don't think further briefing would help. |
| 12 | Let's see what the -- how the questions are asked, whether |
| 13 | they draw an objection at the time.  And just deal with it as |
| 14 | we know what the evidence shows. |
| 15 | MR. ERICKSON:  Thank you, your Honor. |
| 16 | THE COURT:  Thank you.  So Mr. Erickson, is there |
| 17 | anything else on -- did LAN file a concurrence in that entire |
| 18 | slew of arguments? |
| 19 | MR. ERICKSON:  Yes, we did, Your Honor.  But I don't |
| 20 | have anything further to add. |
| 21 | THE COURT:  Okay. |
| 22 | MR. ERICKSON:  Thank you. |
| 23 | THE COURT:  Thank you.  So then we're going to move |
| 24 | on to 490, which is VNA's motion to exclude evidence of |
| 25 | Co-defendants' settlement.  We've somewhat discussed this |

 1   already.  And as I think everyone agrees that Michigan law

 2   prohibits admission of evidence regarding a settlement as a

 3   general matter.  So we know that.  There's no doubt about

 4   that.

 5          I think the real question here is how we're going to

 6   address jurors' knowledge of the settlement in -- during jury

 7   selection.  And should it come up somehow through a witness

 8   who we don't expect them to say something?  I've seen that

 9   happen with workers' comp and it's a mistrial.  So we're going

10   to do everything we can not to have it come up.

11          But in light of the degree of press coverage about

12   the settlement and the fact that the claims process is ongoing

13   right now under the settlement and there is media coverage of

14   that here in Michigan, I think they will know that some part

15   of this litigation got resolved.  And the question is can they

16   set that aside and look only at this case in making their

17   decision.

18          But tell me, Mr. Campbell, are you arguing this?

19          MR. CAMPBELL:  I am not, Your Honor.  And I forget

20   who on --

21          MR. NGUYEN-DANG:  I am, Your Honor.

22          THE COURT:  Okay.  Mr. Nguyen-Dang.

23          Well, let me start with -- is it Mr. Maimon, are you

24   responding?  Okay.  Do plaintiffs intend -- did you want to

25   use the settlement as an exhibit?  Let's start there.

1          MR. MAIMON:  No.

2          THE COURT:  Okay.  I didn't think so.  So at least we

3    know that.  And so how do you intend to use the settlement at

4    all?

5          MR. MAIMON:  We don't intend to use the settlement.

6          THE COURT:  Yeah.

7          MR. MAIMON:  So again, I don't think that that's --

8    but Your Honor is correct that plenty of people out there know

9    not only about the litigation, not only about the Flint Water

10   Crisis, but they know about the settlement.  And the question

11   in my mind is not only for those people and in those

12   circumstances can you put it aside, but in the circumstance in

13   which a jury knows about it, I believe that there must be an

14   instruction by the Court that they must put it aside.

15         THE COURT:  Absolutely.

16         MR. MAIMON:  It's not enough just to say, hey, can

17   you put it aside and they say yet.  But there has to be an

18   instruction about that.  And that's why it's not an iron clad

19   rule, especially in circumstances.  And that's why the Estate

20   of Carlsen case is instructive.

21         In that circumstance, where the jury learned about a

22   settlement, what does the court say or where the jury knows

23   about a settlement.  You know, I look at the page and line

24   designations by the defendants with I represent the State of

25   Michigan.  I represent the City of Flint.  I represent

```
 1   Mr. Croft.  I represent this person, that person.
 2               THE COURT:  Exactly.
 3               MR. MAIMON:  Where are all these people who were not
 4   only involved in the issue, but their lawyers involved in the
 5   case that the jury is hearing about?  And you know, it's one
 6   thing if you have all live testimony.  And so you don't have
 7   to have those types of things.  But -- and I'm not saying that
 8   you tell the jury about a settlement.  What I'm saying is that
 9   an in limine motions to absolutely bar dealing with this issue
10   is unwise.
11               THE COURT:  Well, and here's what I'm interested in
12   for both of you.  So Mr. Nguyen-Dang, in the juror
13   questionnaires I've already seen a juror say, you know, the
14   question what do you know about what happened in Flint.  I
15   know the case got settled.  I mean, I think that was written
16   just like that.
17               So we're not going to exclude that person just
18   because they say they know that.  That's not a basis to
19   exclude somebody without further questioning.
20               So what I'm most interested in is have you crafted or
21   will you be crafting a jury instruction to make sure jurors
22   know that whatever happened in that settlement is not a part
23   of this.  Do not consider that.  Etcetera, etcetera.
24               MR. NGUYEN-DANG:  Right, Your Honor.  I mean I agree,
25   of course, as a starting matter that, as you've noted under
```

```
 1    Michigan law, the jury should not be told about a settlement.
 2    But we are, as you say, faced with a situation where it is
 3    likely that some members of the jury may know of the
 4    settlement or know of the existence of the fact that other
 5    nonparties have been sued.
 6              And I think what we would propose that's I think more
 7    consistent certainly with the Barnett and Brewer case that's
 8    from the Michigan Supreme Court is to simply tell the jurors
 9    that they are simply not to speculate as to why any person or
10    any nonparty is not at trial and to decide the case only based
11    on the evidence that they hear at trial.
12              And that has the added -- that has the -- you know,
13    first that respects the Michigan rule that is quite iron clad
14    about not informing jurors of the existence of the settlement,
15    but also has the added benefit of covering other nonparties
16    who haven't settled.  So for instance, as you've noted, the
17    EPA or others.  So to simply say that there has been a
18    settlement might actually be --
19              THE COURT:  Slow down.  Slow down.
20              MR. NGUYEN-DANG:  I apologize.  So to simply say that
21    there was a settlement, you know, that's why somebody is or
22    isn't at trial might actually be incomplete and inaccurate.
23    But on the other hand it would be unnecessary and confusing as
24    to go through every single nonparty and to why they are or are
25    not at trial.
```

```
 1              So we think the simpler, the more consistent approach
 2    would be to say, yes, there are other nonparties.  In fact,
 3    we're going to talk about the fault of those other nonparties.
 4    And the jury is just not to speculate as to why they aren't at
 5    trial and to decide the case solely based on the evidence
 6    presented at trial.
 7              THE COURT:  Any objection to that, Mr. Maimon?
 8              MR. MAIMON:  Yes, Your Honor.  And I don't know --
 9    it's an "I don't know" objection because I think it's
10    premature.
11              Those cases which have crafted instructions like
12    that, you may hear about other parties such as A, B, and C who
13    aren't present here.  You're not to speculate as to why
14    they're not here.  You're to decide the case of this plaintiff
15    against that defendant without thanking about that.
16              Those are cases where the knowledge of a settlement
17    is not within -- the jury doesn't know that there's a
18    settlement.  We're in a peculiar situation here and we're
19    going to learn more about it as we look through the
20    questionnaires and as we conduct voir dire.
21              You may have several jurors who know that there's a
22    settlement.  And by giving them an instruction that doesn't
23    deal with that but rather says don't speculate.  You're
24    inviting them to say, well, I know why they're not here.  As
25    opposed to if they don't know why they're not here.
```

```
 1            And so what I'm suggesting is I think that it's
 2   premature to start crafting instructions to a jury the same
 3   way that it's premature to have an in limine order that the
 4   fact of a settlement is not to be dealt with at trial.
 5            I think that, number one, we need to see what our
 6   jurors know.  And number two, we need to see what the
 7   testimony is going to be like to deal with the other parties
 8   who are represented at various depositions that are introduced
 9   into evidence.  And then we can all make an informed decision
10   and careful decision with a carefully crafted instruction.
11            THE COURT:  And I agree and I don't think
12   Mr. Nguyen-Dang disagrees.  But he's just suggesting what we
13   might use as an instruction.
14            Here's what I'm thinking we need to do is in our
15   conference on February 2 when I'm going to consider and rule
16   on challenges based on the jury questionnaire, I think at that
17   point it would be very helpful for me to have a proposed
18   approach during jury selection for follow-up questions.
19            Once we look at the questionnaires and we see
20   whether -- how many individuals say they're aware of the
21   settlement or they're not or whatever, might be going on, I
22   think I would like the collective work of everyone here to
23   inform me on how I should question them.  What follow-up
24   questions are appropriate for those jurors in the presence of
25   all the other jurors who say that they know about the
```

1   settlement.

2          Because I don't think it would be proper to not

3   address that.  But if you think it is proper just to let that

4   go and it's in the questionnaire for -- you all agreed you

5   wanted to ask about it.  We get an answer.  And then we're

6   going to put it aside.  That's okay if that's what we agree is

7   best.  But I'd like to know what you think should be done.

8          So we'll just add that to our February 2, 11:00 AM

9   hearing to make sure we have an agreement.

10          So I mean, there won't be evidence -- the settlement

11   won't be evidence in our case.  So it may be referenced

12   inadvertently or advertently by an expert or somebody, I don't

13   know.  But it won't be evidence in the case.

14          Are we agreed on that, Mr. Maimon?

15          MR. MAIMON:  Well, the only way I could think of that

16   it might be evidence, Your Honor, and that's again why I think

17   a motion like this is a can of worms, is to the extent that

18   there is a state official or a city official or an EPA

19   official on the stand, I could see a circumstance -- it's not

20   that the plaintiffs will elicit it.  I doubt that we would

21   elicit it.

22          But I can imagine a situation in which somebody is

23   faced with a question about whether or not they accept

24   responsibility for what happened here.  And it may be -- and

25   again, these are not my witnesses and these are not

```
1    Mr. Campbell or Mr. Erickson's witnesses.  They're independent
2    witnesses.  They might say I have.  We settled.
3              THE COURT:  Yeah.
4              MR. MAIMON:  And again, that's the type of a
5    situation that the Carlsen court dealt with.  And both found
6    that and the appellate court found that it was an error and
7    that the court dealt with it properly in giving a subsequent
8    instruction.  And I think that that's the guidance that is
9    proper here.
10             THE COURT:  I think -- I can see the scenario you're
11   talking about.  But I think the Brewer court makes it very
12   clear that mentioning the existence of a settlement is
13   prohibited.  So we would need a corrective instruction if that
14   happened.
15             But Mr. Nguyen-Dang, anything further?
16             MR. NGUYEN-DANG:  No.  Just a little bit, Your Honor.
17   I think really what we're trying to do here is just set the
18   ground rule, which I think everyone agrees as you just
19   mentioned that we should, A, like we should not mention the
20   settlement.  And that is, as you say, Brewer is very clear
21   about that.
22             And so really we're just looking for that ground
23   rule, which I should mention the trial court actually put that
24   ground rule in the Carlsen case that Mr. Maimon refers to.
25   And if, you know, the situation arises where by inadvertence
```

1    we would hope, by inadvertence something happens, then I agree

2    with Your Honor then we can deal with it then to try to craft

3    the appropriate limiting instruction or corrective

4    instruction.  And as I said, we've proposed one.  But again,

5    it's something to address then.

6            THE COURT:  And I can guarantee that a juror is going

7    to put their hand up and say I don't understand.  I thought

8    this case was settled.  So I just think it's going to happen

9    sooner rather than later.  So I'd like to be prepared for

10   that.

11           Looking at the Estate of Carlsen case reminded me to

12   discuss what this -- how this case will be called in court

13   with the jurors.  And I am suggesting that we call it Sherrod,

14   Teed, Vanderhagen, and Ware versus VNA and LAN.  Is that what

15   you're anticipating the case would be called?

16           MR. MAIMON:  That's fine with us, Your Honor.

17           THE COURT:  I just took it in the order of the

18   children that you provided to me in the statement of the case

19   and the order of the defendants you provided me in the

20   statement of the case.

21           Any objection to that as the case caption as it's

22   going to be called, Mr. Campbell, or Mr. Nguyen-Dang?

23           MR. CAMPBELL:  Your Honor, no objection to that.

24           THE COURT:  Okay.

25           Mr. Erickson, you didn't have -- this was -- a motion

```
 1   on this issue.  This was VNA's motion.  Am I correct?
 2            MR. ERICKSON:  Your Honor, we've joined in all of the
 3   motions.
 4            THE COURT:  Oh, okay.
 5            MR. ERICKSON:  But I don't have anything to add.
 6            THE COURT:  Okay.  Okay.  Now what we're going to do
 7   is take a break.  So we'll take about a 5, 10 minute break and
 8   be right back.  Thank you.  So don't log off.  Just turn the
 9   video off and the mute.
10            MR. CAMPBELL:  Thank you, your Honor.
11                      (Pause In Proceedings)
12            THE COURT:  Okay.  So we will now discuss motion in
13   limine number 492, which is VNA's motion to exclude testimony
14   regarding mental states.
15            And is that Mr. Nguyen-Dang?
16            MR. CAMPBELL:  No, I think that's Cheryl Bush.
17   You're on mute.
18            MS. BUSH:  Cheryl Bush has motive and intent.
19            THE COURT:  Oh, you have motive and intent but not
20   mental state.  Guess what, I could discuss it what I'm
21   thinking.  Here's what -- I mean, somebody will come forward
22   and start talking in a minute.
23            But I think it's clear that -- I think this is the
24   motive and intent motion.  But that plaintiffs' experts can't
25   testify about the motives of VNA, the CMI-Trading Inc. v
```

1    Quantum Air case says that the intention of the parties is not

2    an issue for expert testimony.

3              I should not have had a snack.  I'm sorry.

4              And that -- and I don't think plaintiffs have said

5    that they're going to do that.  So let's hear from Mr. Maimon.

6    Are your experts going to testify about the intention of VNA?

7    Did we lose, Mr. Maimon?

8              MR. CAMPBELL:  He's on mute.

9              MR. MAIMON:  I apologize, Your Honor.  My answer is

10   not on direct examination, Your Honor.

11             THE COURT:  Okay.  And then on cross-examination of

12   VNA witnesses?

13             MR. MAIMON:  So the reason that I phrase it that way,

14   Your Honor, is that one of the issues or one of the primary

15   issues that VNA has raised in its defense is the issue of the

16   scope of the services and the scope of their work.  It's not

17   only a matter that they have argument on, but they have an

18   expert, Mr. Bellamy, who is devoted to talking about the scope

19   of the work.

20             And the issue about whether or not the duty is

21   outside the scope of the agreement or not is a matter that

22   Your Honor addressed in the summary judgment opinion.  And so

23   that's obviously an important issue.

24             Mr. Bellamy together with the position of VNA is that

25   you had approximately two months of work with only a few weeks

January 19, 2022

1    at a site evaluation for only $40,000 with a budget in time

2    that are significantly constrained.  And VNA from the outset

3    has been saying it makes no sense that we would have a broader

4    scope of work given the time and the budgetary constraints

5    here.  And therefore we have no duty.  Which at this point the

6    Court has already dealt with.  But we certainly have no breach

7    given that limited scope of work.

8           And so certainly we should be able to argue the

9    contrary with regard to the admissions by VNA itself that its

10   entire intent in taking this job was not to make the $40,000

11   but to, quote, unquote, "upsell" in their own terms the City

12   of Flint in order to get bigger contracts, longer term

13   contracts, and more lucrative contracts.  That rebuts and

14   explains the very defense that they are advocating.

15          It also rebuts the designations that they've put of

16   their former vice president that VNA went into Flint to,

17   quote, unquote, "do the right thing."  That's what their

18   intent was and they've designated that testimony.

19          You can't have it both ways.  You can't say, oh, we

20   were there to do the right thing and then say, but you can't

21   tell the truth that what we were really there to do is to

22   upsell to get a bigger contract and to make a heck of a lot

23   more money than the $40,000, which was a loss leader.

24          THE COURT:  The problem here is that some of that

25   testimony could be relevant regarding breach.  But on duty, if

```
 1    we're trying to figure out whether what the duty is --
 2              MR. MAIMON:  I agree.
 3              THE COURT:  Okay.
 4              MR. MAIMON:  This is not relevant to -- their mental
 5    state is not -- again, this is the same as the argument before
 6    about whether or not there's a heightened duty because of
 7    their size or their sophistication or whatever.  They have the
 8    duty of care and the Court has already articulated that they
 9    had the duty and what that duty is.
10              The question of whether or not they breached that
11    duty of care, their argument by way of their own experts and
12    by way of their arguments is that they didn't.  And look at
13    what the scope of the work was.  And therefore our failure to
14    do this or our failure to do that was not a breach of that
15    duty of care.
16              Now the Court has ruled that it's an issue of fact
17    for the jury to determine.  But that's what it is.  It's an
18    issue of fact.  And all evidence related to those facts should
19    be appropriately put in front of the jury and we shouldn't be
20    constrained in doing that.
21              The reason that I had hesitated before, Your Honor --
22    and I apologize for the long road -- when the Court asked
23    whether or not we're going to have any of our experts give
24    opinions on that and I said not in their direct testimony,
25    what I meant by that is that I could foresee a situation
```

1    either on cross-examination or on redirect examination if the

2    issue gets put forward that, oh, there was this limited scope

3    and, therefore, there was no breach of that duty, the experts

4    know exactly what the situation was.

5        And to curtail the expert when the door has been

6    opened by the defense, I don't think is proper either.  And

7    that's why I didn't want to give a simple no to that answer by

8    the Court.

9        But I think that the evidence of the motive, intent,

10   and mental state of VNA is relevant, number one, to the breach

11   of the duty given the defense that they've put forward.  And

12   number two, it's relevant and it's actually relevant by --

13       THE COURT:  So let me stop you and go back a step.

14   Explain to me how the scope of work opens the door to intent

15   testimony.

16       MR. MAIMON:  Sure.  The argument advocated by VNA and

17   its expert witness is that given the significantly constrained

18   -- and I'm reading.  The budget and time were significantly

19   constrained.  That's the language that their expert on

20   liability Mr. Bellamy, on standard of care by the way, gives

21   testimony, that that's how he defines the scope of the

22   services.

23       That's how he defines whether or not what they did

24   was reasonable in relation to that scope of the services.  And

25   again, you can't look at it abstract.  It's not a question of

```
 1    a heightened duty of care.  It's a question of given the scope
 2    of the services, whether their actions or omissions
 3    constituted a breach of the duty of care given that.
 4          And they want to make that scope of the services so
 5    small that nothing that they did could be a breach of the
 6    standard of care with regard to it.  And our point is that
 7    it's not small like that and it's not small by their own
 8    admissions.  Because what they were doing is they were setting
 9    up something so that they could have -- and I'm not being
10    critical of it.  That's their business model.  Their business
11    model --
12          THE COURT:  The scope of the work is going to be in
13    the contract.  So the scope of the work, everyone will know
14    what it is.  And so I think what you're saying is VNA engaged
15    in misconduct of some sort, malfeasance, misconduct.  They
16    didn't live up to that scope because they had a motive to get
17    another contract later, so they downplayed expenses and
18    expenditures and things that would need to be done.
19          Is that what you're saying?
20          MR. MAIMON:  I'm saying -- I'm saying two things,
21    Your Honor.  I'm saying, number one, is there is no
22    stipulation as to what the scope of the services were.  VNA
23    through its own witnesses has tried to narrow the scope of the
24    services that were due to the city under its engagement in
25    Flint.
```

1    Even when cross-examined with the contract, their

2    witnesses say, oh, yeah, but we had an understanding with the

3    city that the scope was much more narrow.  It was limited to

4    TTHM.  But the documents don't say that.  Yeah, but that was

5    the understanding.

6    And they're entitled to raise that defense.  But you

7    can't be raising a defense which narrows the scope of your

8    services in order to not allow anything that you do to be a

9    violation of the standard of care and not allow the full

10   story.

11   Why did -- why did they do this?  Why did -- you

12   know, one of the issues that we're entitled to show the jury

13   is not only what they did but why they did it.  And the fact

14   that they were from the outset saying that they were only

15   interested in a long term deal, that's the only reason that

16   they were doing this.  That they wanted -- in their words.

17   Not mine.  I'm not putting any spin on this.

18   They wanted to upsell the City of Flint for a longer

19   term and more lucrative contract.  It rebuts the very, defense

20   that's being put forward.  It does other things but I think

21   that answers Your Honor's question.

22   THE COURT:  Okay.  All right.  Ms. Bush.

23   MS. BUSH:  Yes, Your Honor.  What I have heard kind

24   of runs a few things together in my mind.  There is certainly

25   a factual dispute based on the record about what the scope of

1    work is.

2            THE COURT:  Yes.

3            MS. BUSH:  But I don't understand and I just don't

4    follow the logic of how that relates to somebody saying in

5    deposition that they wanted to do the right thing.  I don't

6    understand how that relates to any other motive or intent that

7    they have talked about that they have discussed bringing in.

8    So I'm at a loss.

9            THE COURT:  Okay.  I think what I'm understanding is

10   that for plaintiffs, the motive of upselling for the big

11   contract in the future or the hope that that would be the

12   outcome of this work is part of the story of what went wrong.

13           It's not going to affect what the scope of the work

14   is.  We'll have the contract, which is pretty vague.  We'll

15   have testimony that it's limited to TTHM.  You know, we'll

16   have all of that.  But in the course of this testimony, we may

17   or may not -- I don't know -- learn why certain decisions were

18   made.

19           Plaintiffs allege that VNA did not adequately bring

20   corrosion control to the attention of the City of Flint and

21   those in charge of the water treatment.  And plaintiffs'

22   theory is developing as there's a reason for that.  The city

23   might like them more for the future if they didn't prominently

24   pursue corrosion control advice which is expensive.

25           So from my perspective, intent is not going to impact

January 19, 2022

1    what the definition is of the duty, what the jury is

2    instructed to consider under duty.

3           But to the extent evidence about motive to get the

4    big next contract is brought in, I think that is relevant.

5    And I'm just reminded here that relevance is any tendency to

6    make the existence of any fact that is of consequence to the

7    determination of the action more or less probable than it

8    would be without the evidence.

9           And in the Sixth Circuit, we have a very liberal

10   relevancy standard under United States v Ramer, R-A-M-E-R.

11   And so I don't think that it's substantially more prejudicial

12   than probative or any of the arguments that have been made to

13   be able -- to tell the story of what the witnesses have

14   already testified to in their depositions.

15          MS. BUSH:  May I respond, Your Honor?  May I say

16   something please?

17          THE COURT:  Certainly.  Yes.

18          MS. BUSH:  Just because a witness is testified to

19   something doesn't make it admissible.

20          THE COURT:  No, no.

21          MS. BUSH:  And also just because it's part of a story

22   that someone wants to put forward, that doesn't make the

23   evidence admissible.

24          THE COURT:  No, Ms. Bush.  And what does make the

25   evidence more admissible is if it has any tendency to make the

```
 1    existence of any fact of consequence to the determination more
 2    or less probable.  So that's the standard that will be
 3    applied.  And taking into consideration whether certain
 4    testimony is more prejudicial than probative.
 5              So and I don't see here that the testimony that
 6    Mr. Maimon set forth would not meet the standard of relevance
 7    or would meet the standard of more prejudicial than probative.
 8              MS. BUSH:  Well, it is an objective standard that is
 9    the standard of care.
10              THE COURT:  Yes.
11              MS. BUSH:  So subjective thoughts, whether part of
12    the story or not that one party wants to tell, don't bear on
13    whether or not there's been a violation of the standard of
14    care.  What's relevant is what VNA actually did.
15              MR. MAIMON:  Your Honor, if I can point out?
16              THE COURT:  Sure.
17              MR. MAIMON:  We're not arguing for a different
18    standard of care.
19              THE COURT:  No, I know.
20              MS. BUSH:  Understood.
21              MR. MAIMON:  As an example, within VNA there were
22    disagreements.  There were the technical engineers of VNA who
23    were saying we should not take this job because it's not --
24    the goals of the city are not attainable.
25              We should telling them switch back to Detroit.  We
```

1    should be telling them of the need to do all these things.

2    And we should not let the, quote, unquote, "business

3    development side" whose motive and intent was to upsell, was

4    to have the larger contract, was to have the long-term

5    contract be dictating what is told the client.

6           Ultimately that's who won out.  But if you don't --

7    that's part of the story of what VNA -- in Ms. Bush's words,

8    that's what VNA did.  That's what they were discussing

9    internally.  That's what they said.  Their own engineers said

10   we have to tell them to move back to Detroit.

11          Now it's our contention that the failure to do that

12   was a breach of the standard of care.  But explaining to the

13   jury why they did it is an important part of the story.

14   Because if we simply say it was, that doesn't -- the relevance

15   is that it supports the contention and it makes sense of the

16   whole thing, which we're entitled to do.  We're not

17   constricted to simply saying, well, this is our opinion.

18          THE COURT:  Let me put it this way.  If I -- what I

19   hear from Mr. Maimon and what I understand from what Ms. Bush

20   is objecting to, that if there's testimony that VNA had a

21   motive not to warn the city about corrosion control, that

22   would be evidence that could make it more likely than not that

23   they did not warn.

24          And VNA is saying we did warn.  And plaintiffs are

25   saying you didn't warn.  And so it would be a fact that would

1    make it more likely than not, maybe not very likely.  We'll

2    have to find out what -- how it comes in.  But it's certainly

3    -- if there's a motive not to warn, that could make it more

4    probable and meet the relevancy standard that your client did

5    not warn.

6              So and again the relevancy standard is low.  So this

7    motion is essentially denied.  Although I think -- I will say

8    this, that as the trial unfolds, I think this is one where

9    plaintiffs pointed out that this was a very broad motion in

10   limine and not really what motions in limine are usually used

11   for, which is targeted types of evidence or -- so you can

12   re-raise as you get to certain arguments.  If you think it's

13   inappropriate, I am certain you will object to it and give me

14   the reasons why.

15             So plaintiffs motion number 507 to exclude evidence

16   of indictments and nolo pleas.

17             MR. MAIMON:  That will be me, Your Honor.

18             THE COURT:  Okay.

19             MR. MAIMON:  And then hopefully the Court will have

20   heard enough from me for today.  Mr. Stern will take over.

21             So now looking at the responses of the defendants, it

22   seems that their position is limited in three ways with regard

23   to the admissibility of such evidence.  Number one is they

24   limit themselves to witnesses at trial.  Namely that a witness

25   who testifies at trial puts their credibility at issue and

 1    evidence of indictments may be relevant to the issue of bias

 2    of a witness.  And I'll address that in turn.

 3            But it seems that that is -- that they acknowledge

 4    that there is no independent basis of admissibility of either

 5    convictions or nolo contendere pleas or, of course,

 6    indictments.

 7            The second part is that they, in their arguments,

 8    talk about testimony that it would be relevant with regard to

 9    testimony that's contrary to the indictment.  In other words,

10    that you're giving a different story here and, therefore,

11    talking about the bias.

12            And in talking about bias, they talk about the

13    tendency that a witness might have to, quote, unquote, "alter

14    their testimony" because they -- and again, that goes back to

15    the testimony being inconsistent with something else.  And in

16    that way I'd like to talk about -- talk about that.

17            If one looks at the defendants' papers, if one looks

18    at the defendants' papers and takes a look at the indictments

19    that they seek to put in front of this jury, the first thing

20    that struck me is the indictments for manslaughter.

21            And how inconsistent is the desire by the defendants

22    to put into evidence an indictment for manslaughter by various

23    individuals when the Court has already ruled that the health

24    conditions that our plaintiffs have not experienced can't come

25    into evidence because of the 403 prejudice that's there?  How

```
 1   could it be that the dangers of lead poisoning that are
 2   acknowledged but we can't put into evidence because our
 3   clients don't currently have them, and we don't have an
 4   expert, will say more likely than not that we will have them
 5   can't come into evidence?  But manslaughter, which none of --
 6   thank God none of these kids are dying --
 7           THE COURT:  Let's find out if defendants intend to do
 8   that.
 9           MR. CHRISTIAN:  Good afternoon, Your Honor,
10   Mr. Maimon.  Marcus Christian on behalf of VNA.
11           That is not the purpose of this.  And specifically
12   one thing I want to point out -- and it's not necessarily with
13   respect to what Mr. Maimon is saying directly.  But it's with
14   respect to the whole -- their argument with respect to
15   hearsay.
16           This is not being put forth for the truth of the
17   matter asserted in the indictments.  The purpose here is that
18   these individuals have charges that are pending against them
19   that could have significant impact on their lives.  And the
20   fact that that is the case could affect their testimony.
21           And the idea of altering their testimony could be
22   alteration with respect to the truth to the actual events as
23   they recall and having a biased that would make them want to
24   improve their situation with respect to their indictments.
25           THE COURT:  Yes.  And I'm not sure that's what
```

```
 1   Mr. Maimon addressed.  So thank you for bringing that up.
 2           Mr. Maimon, what I understand is it's not -- VNA is
 3   not concerned about inconsistency.  They're concerned about
 4   the witness who's facing criminal charges, motivation to
 5   minimize their own conduct because of the risk of the criminal
 6   indictment.
 7           MR. MAIMON:  Right.
 8           THE COURT:  But let me ask a predicate question,
 9   which is that have you explored whether these witnesses intend
10   to testify at trial?  I do not recall exactly what we agreed
11   upon with respect to the depositions.  Or do they intend to
12   take the fifth?
13           MR. MAIMON:  So some of the ones that are listed in
14   the defense papers are on our witness list.  Others are on the
15   defense witness lists.  I think it's -- it makes a difference
16   if the defendant calls a witness only to then -- under guise
17   of impeachment offers evidence that would be otherwise
18   inadmissible that is frowned upon by the courts.
19           There are some witnesses who are on our witness list.
20   Mr. Croft, Mr. Ambrose, former Governor Snyder.  I don't
21   remember who else.  But there are some who are on our witness
22   list who have indictments pending against them.
23           The thing that I would say, Your Honor, is that if
24   you look at the caselaw, and especially the case law that the
25   defendant cites -- and let me just get it up a minute.  Yes.
```

1    So one of the cases that they cite -- and this is on page 10

2    of their opposition brief -- is the United States v Maynard

3    case, 476 F.2d 1170 at 1174.  That's a 1993 case out of the DC

4    circuit.

5              If you look at that case, it's instructive in that

6    the circuit court there held that there are circumstances,

7    like the cases say, where indictments may be relevant to bias.

8              However -- and I was surprised that it wasn't in

9    their papers.  What that circuit held was that the indictment

10   evidence against that witness was improper because it was --

11   they said we are persuaded by appellate's argument that the

12   prejudicial effect of the admission of the arrest and charge

13   in this case outweighed its probative substance.  The witness

14   being charged, quote, with a crime was probative of no more

15   than the prosecutor's or grand jury's --

16             THE COURT:  I hear you.  While you're looking at

17   that, let me just ask a quick question of VNA of whether they

18   intend to introduce the actual indictment or the content of

19   the charges?  Or can you agree to limit your questioning to

20   the existence of an indictment?

21             MR. CHRISTIAN:  I think we certainly are willing to

22   explore the existence of the indictment, Your Honor.  I think

23   getting too much until depth with the particular charges,

24   especially given that we're not going -- we don't intend to

25   introduce it for the truth of the matter asserted, is beside

1    the point.

2              THE COURT:  Right.  And are all of those witnesses

3    who are on either side, are they misdemeanor charges that are

4    now pending?

5              MR. CHRISTIAN:  Some are misdemeanor and some are

6    felony.

7              THE COURT:  Okay.  So Mr. Maimon, if VNA limits the

8    question to, are you facing misdemeanor charges; are you

9    facing a felony charge; or just are you facing an indictment,

10   do you have any objection to that?  Because there is -- the

11   issue of bias, I think it's referenced at least in -- once or

12   so in the Sixth Circuit that under appropriate circumstances

13   an indictment may be introduced to show the bias of the

14   witness.

15             MR. MAIMON:  Yes.  And what that was, Your Honor,

16   that is the NLRB.

17             THE COURT:  It is, yes.

18             MR. MAIMON:  Sixth Circuit in 1978.  And that was in

19   a footnote where the footnote simply referred back as a

20   general matter to a DC circuit case and said -- said as

21   follows.  And again, the second sentence was not included in

22   the defendants' brief.  It says, under appropriate

23   circumstances, an arrest or indictment may be introduced to

24   show the bias of the witness.  But it goes on to say, since

25   the company never sought to introduce these convictions for

1    the purpose of showing bias, we have not considered whether

2    they would have been admissible for that purpose in this case.

3    And so that's not a holding in the Sixth Circuit --

4              THE COURT:  Right.

5              MR. MAIMON:  -- that it's admissible testimony.

6    That's the Sixth Circuit saying the DC circuit has allowed it.

7    This issue is not before us.  And so this is -- I mean, I

8    remember back in law school they taught us the difference

9    between a holding and dicta.  This is, by its very definition,

10   dicta.

11             There's another case out of the DC circuit that's

12   quoted by Maynard.  It's the Magill (ph), 106 US APP DC 136.

13   And it's a 1959 case.  And what the court, trial court did,

14   which was affirmed in that case, was it allowed the

15   prosecution -- it allowed the witness to be cross-examined

16   with the previous charge, with another charge, only to the

17   extent with regard to promises of leniency.

18             THE COURT:  Um-hum, yes.

19             MR. MAIMON:  However, the Court upheld the trial

20   Court's ruling saying that bias could not be shown simply by

21   testimony of an arrest where no conviction has resulted and

22   where no showing is made of promises of leniency or the like.

23   That's at 106 US APP DC at 137.  The F.2d cite is 270 F.2d at

24   330.

25             And so here we have no convictions.  We have no

1    promises of leniency.  We have no plea deals of any sort.  And

2    again, we're only talking about indictments and we're only

3    talking about trial witnesses.

4          And so the cases that the defendant cites are in

5    opposite.  And I think that both the Maynard case and quite

6    frankly the Magill case, it's really the 403 analysis as to

7    whether or not the prejudice outweighs the probative value of

8    the potential bias.

9          And I'll tell you one aspect which distinguishes our

10   case from every case cited by the defense and I think is

11   actually dispositive.  In those cases, which are primarily

12   although to a certain extent otherwise, but primarily criminal

13   cases, you're talking about a witness who comes in and gives

14   testimony.

15         Here you have a party whose fault VNA is asserting

16   against it.  And so the risk of the prejudice here is

17   magnified and multiplied exponentially because --

18         THE COURT:  But the risk of that VNA is identifying

19   is that the witness is facing this criminal proceeding in the

20   future after our trial.  There have sworn testimony.  And they

21   might be biased or motivated to downplay their responsibility

22   and up play VNA and LAN's -- LAN's responsibility to shift

23   blame from themselves to the defendants who are at trial.

24         MR. MAIMON:  I understand that that's what it is.

25   But that's not what any of the cases deal with.  All the cases

1   never deal with that -- VNA has a direct claim that let's take

2   Mr. Ambrose.  Mr. Ambrose is liable under its third -- notice

3   of third party at fault.  And the prejudice that results from

4   that indictment testimony is that their claim is more

5   believable because of it.

6          In the standard situation that the circuit courts

7   have dealt with, it has nothing to do with the claims at

8   trial.  It has to do with the bias and credibility of the

9   witness.  Here because VNA maintains the claim against these

10  very people and is going to submit them to the jury, the

11  prejudice -- and this is in some ways what the Magill and the

12  Maynard cases dealt with.

13         The prejudice outside of the slight probative value

14  on bias is that, oh, they were charged with this?  They must

15  be liable and therefore at the end of the case when the jury

16  has to check that box, there's a box for them to check off.

17  That's never been the case where any of these courts have ever

18  dealt with this issue.  And I think that is the most

19  dispositive issue on a 403 analysis.

20         THE COURT:  That's interesting.  I do think that's

21  very interesting.  And so let me ask Mr. Christian how -- so

22  I've got to look at whether it's more probative than

23  prejudicial.  And how probative is it that anyone who's being

24  accused of someone -- something generally wants to make

25  themselves look better rather than worse?

```
 1              MR. CHRISTIAN:  Yes.

 2              THE COURT:  But why doesn't that apply to everybody

 3    has some bias in terms of being accused of misconduct?

 4              MR. CHRISTIAN:  So Your Honor, I can point at -- I

 5    can highlight that a number of ways.  One of them is that when

 6    Mr. Maimon seeks to distinguish the idea of having a lower

 7    sentence from the -- the idea of having a sentence at all gets

 8    beside the point that you're facing criminal consequences.

 9    One of the things that Mr. Maimon said in earlier argument I

10    think underscores this to some extent as well.

11              He said that being a defendant in a civil suit is

12    essentially the same as an indictment.  And you face criminal

13    defendants all the time.  It's not the same.  He doesn't --

14    when someone is indicted, they face loss of liberty.  They

15    face the loss of rights.  Potentially the right to vote, the

16    right to be on a jury, the right to bear firearms.

17              THE COURT:  Right.

18              MR. CHRISTIAN:  A number of rights that they face.

19    It is not the same.  It is -- it has a different penalty.  It

20    has a different threshold.  Beyond a reasonable doubt.  It is

21    very serious.  And each of these potential witnesses have that

22    at stake.

23              And that is a significant fuel for their potential

24    bias.  Because that is -- in the greatest sense that's the

25    most important case to each and every one of them is their
```

1    prosecutions.  And so we say that that is very important and

2    that is what is missed by Mr. Maimon's argument, Your Honor.

3            MR. MAIMON:  Your Honor --

4            THE COURT:  Let me do this.  I think what I should do

5    is take this one under advisement, look at these additional

6    cases that Mr. Maimon has pointed to, take into consideration

7    the argument.  But go ahead, Mr. Maimon.

8            MR. MAIMON:  The only other item I was going to add,

9    Your Honor, is that there is nothing inconsistent with VNA

10   and/or LAN having civil liability to the plaintiffs,

11   especially under our fault sharing statute in Michigan.  And

12   the indictments and the claims in the indictments.  In other

13   words --

14           THE COURT:  Right.

15           MR. MAIMON:  They're not mutually exclusive.

16           THE COURT:  No, they're not.

17           MR. MAIMON:  So Mr. Ambrose can be criminally liable.

18   He can be guilty of the crimes charged in the indictment.  And

19   that has nothing to do with whether or not VNA or LAN is

20   liable under civil liability to the plaintiffs.

21           And so it's not a simple matter, well, they're a

22   witness in this case and they might have liability and,

23   therefore, you tell a jury that they've been indicted and

24   they've been charged with these things.  Those two things can

25   coexist.

 1              And I think that that is number -- also
 2     distinguishing.  But it's also distinguishing as far as the
 3     403 analysis.  Because what this does is it tells the jury
 4     that the criminal justice system, the U.S. Attorney or whoever
 5     it is issued an indictment for this person to be responsible
 6     for the Flint water crisis.  And therefore, when it comes time
 7     to fill in the jury verdict form, you answer yes.
 8              And there's no one doing that prejudice.  There's no
 9     curative instruction that says this is only to determine their
10     bias but you're not to determine whether or not they're
11     responsible with it.  That only underscores the purpose of it.
12     And you know, if you need anything, you take a look at the
13     language that VNA uses to talk about the cloud -- how do they
14     call it?  The cloud of -- the cloud of indictment.
15              MR. CHRISTIAN:  Your Honor.
16              MR. MAIMON:  That's not an issue.  That's straight
17     out of their papers.  That's not an issue of we want to talk
18     about bias.  That's we want to blame them.
19              THE COURT:  Okay.  Mr. Christian.
20              MR. CHRISTIAN:  Your Honor, I think we would
21     stipulate that we won't use the cloud of indictment in the
22     trial.  And I'd like to also add that you can add a limiting
23     instruction so that the jurors understand that they're not
24     supposed to be looking at the fact that these individuals have
25     been indicted to indicate that the indictments are anything

1   beyond charged.

2           As you know, as they all know, they're innocent until

3   proven guilty.  So to the extent that Mr. Maimon is suggesting

4   that there's not necessarily any overlap between the criminal

5   and the civil, I don't think there's any dispute that the

6   testimony that will be given at this trial by these

7   individuals could be relevant to their criminal cases.

8           And so that fact not being in dispute is as the heart

9   of why we think it's important to demonstrate bias and to be

10  able to adequately examine these witnesses at trial, Your

11  Honor.

12          THE COURT:  Okay.  --

13          MR. ERICKSON:  Your Honor, Philip Erickson.

14          THE COURT:  Let me make sure of one think.  Yes,

15  Mr. Erickson, I know you have a whole different argument --

16  angle on this.  So I'll let you discuss that in a minute.

17          MR. ERICKSON:  Thank you.

18          THE COURT:  But I want to make sure, Mr. Maimon,

19  plaintiffs do not agree that to allow defendants to say, and

20  Mr. Ambrose, are you facing an indictment or a criminal charge

21  or a misdemeanor complaint about this.  Related --

22          MR. MAIMON:  Basically that's what the testimony was

23  in the Maynard case.

24          THE COURT:  Okay.

25          MR. MAIMON:  The witness was on the stand.  They said

January 19, 2022

```
 1    you were arrested.  You're charged with obstruction of
 2    justice.  And the Court held that it was error.
 3              THE COURT:  Okay.  All right.  I'm going to take
 4    another look at this argument and I'm going to let
 5    Mr. Erickson make his argument, which --
 6              MR. CHRISTIAN:  May I make just one last point, Your
 7    Honor?
 8              THE COURT:  Sure.
 9              MR. CHRISTIAN:  Just to highlight.  And I know you'll
10    look at it closely.  But Mr. Maimon, one of the things he
11    pointed out in referring to that case over and over again, is
12    that in that particular case, they made reference to the
13    actual charges.  Here, we're talking -- to the nature of the
14    charges.  Here we're talking about the fact of being charged.
15              So to the extent that that's relevant to your
16    consideration, I definitely wanted to point that out.
17              THE COURT:  Okay.  Thank you.  Okay.
18              So Mr. Erickson, you're suggesting that the evidence
19    is admissible under Rule 807 and of an indictment and that
20    nolo pleas are admissible as a statement against interest.
21    Are you still pursuing both of those arguments?
22              MR. ERICKSON:  We're really focusing on 807, Your
23    Honor.
24              THE COURT:  Okay.
25              MR. ERICKSON:  We believe that the existence of some
```

1   of the charges are very relevant to the defenses of LAN.  And

2   in particular, we have focused in the brief on the charges

3   against Mr. Glasgow, Mr. Prysby, and Mr. Bush.

4         Mr. Glasgow is charged with falsely certifying that

5   the samples that were submitted were Tier 1 samples when he

6   had no information about where the samples came from.  Tier 1

7   samples, as I think the Court knows by now in this case, are

8   samples that are from lead service line locations.

9         Mr. Glasgow, Mr. Prysby, and Mr. Bush were all

10  criminally charged with together deciding to eliminate high

11  test results from the test results that were reported under

12  the lead and copper rule.  Thereby causing the testing results

13  to be lower than the action limit when they would otherwise

14  have been probably higher than the action limit.

15        THE COURT:  So you're seeking to admit this evidence

16  for the truth of the matter asserted?

17        MR. ERICKSON:  Yes.

18        THE COURT:  And you're saying, okay, so we look at

19  Rule 807 and these -- a statement that would otherwise be

20  hearsay has to be supported by sufficient guarantees of

21  trustworthiness and may be admissible, even though it would

22  otherwise be hearsay, if it is more probative on the point for

23  which it is offered than any other evidence that the proponent

24  can obtain through reasonable efforts.

25        And you have all the evidence.

January 19, 2022

```
1           MR. ERICKSON:  Your Honor, and I appreciate that.
2           THE COURT:  You have everything you just said to me.
3    You have it.  So I don't see how this possibly reaches that
4    standard.
5           MR. ERICKSON:  Well, Your Honor, the -- you're
6    correct.  Mr. Glasgow has admitted in his deposition that he
7    falsely submitted the information to the MDEQ.
8           THE COURT:  Then why do you need hearsay evidence for
9    that also?
10          MR. ERICKSON:  Well, Your Honor, the Court has cited
11   in its recent decision in the VNA case about, you know, the
12   precedent in Michigan that criminal misconduct of a defendant
13   is superseding intervening conduct as a matter of law.
14          THE COURT:  But this is --
15          MR. ERICKSON:  So the fact of the criminal charges is
16   itself relevant to our defense.
17          THE COURT:  But that's not what -- this is charges.
18          MR. ERICKSON:  But Your Honor --
19          THE COURT:  These are charges.
20          MR. ERICKSON:  But the charges have been verified
21   both by the plea but more importantly by his testimony in the
22   case.
23          THE COURT:  I do not think your argument can win the
24   day on this.  Because you have certain testimony and you are
25   then going to be trying to tell the jury that this testimony
```

```
 1  is a crime and we have shown it beyond a reasonable doubt.
 2  And so I don't know how you can do that.
 3        I think you have the evidence you want to be
 4  admitted.  You've got it in the deposition testimony.  So
 5  you've got a witness who's going to testify to it or have to
 6  be impeached.  And so you don't meet the standard in 807.  So
 7  I don't think you can do this.
 8        MR. ERICKSON:  Right.  I understand the Court's
 9  ruling.  Thank you.
10        THE COURT:  And if you -- if what you're suggesting
11  is that by the end of the case if criminal conduct could be an
12  intervening superseding intervening cause, that the Court has
13  to determine before the end of the trial, whether Mr. Glasgow
14  or whoever we're talking about at the time, has violated a
15  criminal law.  Is that what you're suggesting?
16        MR. ERICKSON:  Well, Your Honor, it is already a
17  subject of a pending motion for summary judgment.  But based
18  on the Court's ruling with respect to VNA's motion for summary
19  judgment, we understand that the Court may find an issue of
20  fact.
21        THE COURT:  Yeah.
22        MR. ERICKSON:  I don't know how a jury makes a
23  determination about whether criminal misconduct constitutes an
24  intervening superseding act if they don't know that the act
25  was, in fact, criminal.
```

```
 1              THE COURT:  Yes.  But the jury -- we're not having a
 2   criminal trial here.  That's the problem.  So I mean we may
 3   need to discuss this further.  I mean, you pose a good
 4   question.  So I don't fault you for the question.
 5              But so we'll cross that bridge either at the summary
 6   judgment stage trying to sort out what has been shown.  But it
 7   won't be a decision for the jury to make.  They won't be
 8   making a decision as to --
 9              MR. ERICKSON:  And I'm not asking that the jury be
10   asked to decide whether the conduct was criminal.  The charges
11   were made.  A plea was entered.  Mr. Glasgow admitted in his
12   plea that he had made misstatements to the MDEQ about the
13   sampling.  And Mr. Glasgow has admitted in his deposition in
14   this case that he falsified the information that he submitted
15   to the MDEQ.  But there's no question that he did what was
16   alleged.
17              THE COURT:  Right.
18              MR. ERICKSON:  And therefore, I think there's a
19   reason -- that it's clear that his conduct was criminal.  He
20   plead no contest to a crime.  But importantly in doing so, he
21   admitted the underlying act which was charged.
22              THE COURT:  I hear you.  Well, I'll take your
23   argument into considered and certainly be looking at it in
24   making the summary judgment decision and sorting out what
25   comes in.  So I appreciate that.  And I don't know if
```

1    Mr. Maimon wanted to say more on this argument.

2          MR. MAIMON:  All I'll say, Your Honor, is that to the

3    extent that he made admissions, those admissions either he

4    will make them again on the stand or he'll be impeached with

5    his prior admissions.  But once the admission is made in the

6    record in this case, the indictment adds nothing to it.

7          All it adds is that a government official is now

8    charging based on that.  It has nothing to do with the truth.

9    The truth of the matter asserted is the admission.  And that's

10   why the Rule 807 says that you can't -- one of the

11   prerequisites is that you don't have testimony or evidence

12   from some other source.

13         THE COURT:  Right.

14         MR. MAIMON:  The very truth of the matter is admitted

15   to, so it can't be admissible under that rule.

16         MR. ERICKSON:  Your Honor, couple of quick points.

17         THE COURT:  Sure.

18         MR. ERICKSON:  One is that the plaintiffs pled all of

19   these charges in their complaint at paragraph 393.  And you

20   know, if the defendants hadn't settled, very likely it would

21   be the plaintiffs seeking to use this information.  Secondly,

22   the plaintiffs have alleged all of the misconduct that I've

23   referred to in my brief and here today in their complaint in

24   paragraphs 194, 195, and 196.

25         So these are averments made by the plaintiffs also.

1         MR. MAIMON:  Yes, Your Honor.  And our fault sharing

2    statute is very clear that to the extent that the defendant

3    wishes to assign fault to anybody else, any nonparty, the

4    defendant has the burden at this point in time.  It's not the

5    plaintiff that has the burden.  And the fact that in a

6    pleading we made an assertion, again, we would be bound by the

7    same rules of evidence.  We're not asking -- we're not saying

8    that the rules of evidence apply differently to us.

9         THE COURT:  Right.  Yeah.

10        MR. MAIMON:  If we had Mr. Glasgow we were

11   prosecuting, again Rule 807 would not be a basis to admit the

12   indictment testimony.  His admission is the evidence.

13        THE COURT:  Okay.

14        MR. ERICKSON:  Your Honor, just one quick final note.

15        THE COURT:  Okay.

16        MR. ERICKSON:  We cited two cases in which the

17   courts, the Sixth Circuit and the Ninth Circuit used Rule 807

18   to admit pleas.  Both of those pleas were guilty pleas.  But

19   we don't believe it would make a difference where there's no

20   question but that Mr. Glasgow has admitted the underlying

21   conduct which was charged.

22        THE COURT:  Okay.  I saw that.  Thank you.

23        MR. ERICKSON:  Thank you.

24        THE COURT:  So I'll take this motion under advisement

25   and issue a written decision.

1           So let's look at 511 which is plaintiffs' motion to

2     exclude investigative reports.  And here we're looking at the

3     Flint Water Advisory Task Force report and the EPA's Office of

4     Inspector General OIG report.

5           And here's what I'd like to suggest.  We're kind of

6     -- this has been quite a long argument.  And as I look at

7     these reports, there are portions of them that I think cannot

8     be admitted for the very -- for reasons that I can articulate

9     more but I'm still interested in your argument.  But what I

10    don't know now is speaking to VNA what portions of these

11    reports you're seeking to have entered.

12          So some portions may meet the reliability standard

13    that's required here and some may not.  But I don't know what

14    portions you're seeking.

15          MR. NGUYEN-DANG:  That's me, Your Honor.

16          I think at this time we don't know exactly which

17    portions.  I think the way that we had envisioned these being

18    used would depend on how the trial unfolds.  I think we

19    envisioned that the parties would use the reports in examining

20    expert witnesses, government officials, other witnesses and

21    would use the specific parts of the reports that are relevant

22    to that witness's testimony.  But as I said, that depends on

23    the progression at trial.

24          I will say that our position -- and I understand what

25    Your Honor just said.  Our position is that all of the report,

1    every part of the reports should be admissible under Rule

2    8078.

3              THE COURT:  Okay.

4              MR. NGUYEN-DANG:  I apologize.  8038.

5              MR. WITTIE:  That's also LAN's position.  And I think

6    that it's important here to bear in mind what procedural stage

7    we're at.  The defendants have not made a tender of these

8    reports for any purpose at this time.  It's basically the

9    plaintiffs' position that they're not admissible for any

10   purpose under any circumstance.

11             And you know, unless they can show that, their motion

12   in limine ought to be denied, you know, without prejudice

13   perhaps with respect to any particular tender that might be

14   made.  But you know, until that time, it's a little premature

15   just to guess exactly for what purpose that these reports

16   might be sought to be admitted by either of the defendants.

17             THE COURT:  Okay.  Who is responding or who is

18   arguing this motion for the plaintiffs?

19             MR. STERN:  Your Honor -- sorry, Your Honor.  That

20   would be me.

21             THE COURT:  Okay.

22             MR. STERN:  I mean, in light of what Your Honor said

23   and in light of the representations made by both defendants,

24   in particular counsel for VNA, that they plan on using the

25   entire report, the two best arguments that I think the Court

1    really ought to focus in on are that the trustworthy factors

2    with regard to the Flint Water Task Force, they're just not

3    met.

4            I mean, there wasn't a single hearing held.  Every

5    finding, to the extent these are findings, was heavily based

6    on hearsay.  The report acknowledges the fact that it's

7    incomplete and was issued in 2016 long before other facts

8    about the corpus of this litigation came to pass.  The task

9    force advisory -- you know, the task force itself were

10   comprised of individuals who had little to no investigative

11   experience.

12           I think that secondly, Rule 403 really comes into

13   play here.  And the In Re 911 litigation is somewhat

14   instructive.  You know, large sections of that report couldn't

15   be admitted in full.  The Court was aware that the jury might

16   unfairly defer to such an authoritative seeming document

17   because it is human nature to rely upon an opinion carrying

18   the imprimatur of an entire state.

19           To the extent that Mr. Wittie, you know, jumped in to

20   talk about how premature it is, it should be noted that LAN,

21   as part of the investigation to the extent there was one,

22   insisted on answering questions to the extent it would answer

23   questions from the committee in writing and wouldn't even

24   appear.

25           And so for all of those reasons -- and frankly,

 1    Judge, not knowing how and in which ways these defendants

 2    intend to utilize the report until now -- and Mr. Nguyen-Dang

 3    actually confirmed our fears that it's their intent to use the

 4    report and it sounds like they'd like to admit the entire

 5    report.  We just don't believe it's an appropriate document.

 6         And you know more than anything, the prejudicial

 7    power of a document that was completed in 2016, that was

 8    focused on the state, that had one of the defendants not even

 9    participate in a way that was initially requested, an

10    investigation done by folks who had never done one before

11    relying primarily on hearsay, I can't envision a scenario

12    under which this document comes in other than to try and

13    convince a jury that the folks named in this document are the

14    ones at fault.  And the folks not named in the document are

15    not at fault.

16         And that's not a permissible use of the document

17    under any circumstances, let alone the ones I've already

18    described.

19         THE COURT:  Here's my thought on this, which is that

20    I think for the rationale that was set forth very clearly in

21    the In Re September 11th case, that the entire entirety of

22    both reports cannot be admitted.

23         If I look at the factors set forth originally in the

24    beach aircraft case, I think that we don't have all of those

25    factors met.  Or I guess I'm looking initially at the Dortch v

1  Fowler that cites Miller v Field timeliness of the
2  investigation, special skill or experience of the official or
3  officials, whether a hearing was held, and the level at which
4  it was conducted, and possible motivation problems.  I think
5  all of those factors do not weigh in favor of admitting the
6  entirety of both reports.

7        And but here's -- plaintiffs note that there's
8  hearsay within hearsay contained in these reports.  There are
9  many reasons why they could be misunderstood or misused by a
10 jury.

11       So I think what I'd need to do at this point is grant
12 the motion to the extent that the full reports will not be
13 admitted.  But I'd like VNA and LAN at a later date to
14 designate the portions that they think they will need.  And I
15 will then determine whether those portions meet the
16 reliability standards set forth so that they can be admitted
17 or not.  I have no pre decision about that at all.

18       I think the issue here is that I don't know when
19 these reports -- are you intending them, starting with VNA, to
20 be used for cross-examination of the plaintiffs' witnesses?

21       MR. NGUYEN-DANG:  I'm not sure at this point, Your
22 Honor.

23       THE COURT:  Okay.  I'm just trying to get a timing.

24       MR. NGUYEN-DANG:  No.  I don't understand Your
25 Honor's ruling.  We disagree with it and I might make a few

```
 1    points if I might.  But I think given Your Honor's ruling,
 2    assuming it doesn't change, then I think what we would do is
 3    we will advise the Court, you know, if a witness comes up and
 4    we think we are going to try to use it then we'll do it at
 5    that point.
 6              THE COURT:  Okay.  And Mr. Wittie?
 7              MR. WITTIE:  Well, like the situation with VNA, we've
 8    not yet made a determination as to exactly when and how the
 9    report would be used.  And we can certainly give advance
10    notice of our intent to do so.  And with respect to what, you
11    know, portions of it that we might attempt to use.
12              THE COURT:  So neither VNA nor LAN intend to use --
13    reference these reports in your opening statements?  Mr.
14    Nguyen-Dang?
15              MR. NGUYEN-DANG:  I'm not sure, Your Honor.
16              THE COURT:  Then we have a problem.
17              MR. ERICKSON:  Your Honor, Mr. Mason is not able to
18    be on the -- in the hearing today and he's the only one who
19    could answer the question from our team at this time.
20              THE COURT:  Okay.
21              MR. ERICKSON:  We'd be happy to follow-up and provide
22    that information to the Court.
23              MR. CAMPBELL:  Your Honor, if I may?  I don't mean to
24    double team.
25              THE COURT:  Sure.
```

1          MR. CAMPBELL:  I would believe that we would want to

2     use some portions of the task force and maybe the OIG reports

3     in our opening so.

4          THE COURT:  Okay.  Then what I need to know is what

5     portions.  When do you want to get that to me?  Starting with

6     Mr. Campbell.

7          MR. CAMPBELL:  So we want to get it to you in time so

8     that you have enough time to get it -- to look at it, which we

9     understand is very difficult given everything that's going on.

10    So I hesitate to throw it back on you, Your Honor.  But given

11    that we're probably going to open some time maybe the Monday

12    after the 14th or something like that in February, if we were

13    to get you something by perhaps February 1, is that enough

14    time for Your Honor?

15         THE COURT:  That's perfect.  That's perfect.

16         MR. STERN:  And obviously, Your Honor, we would like

17    the opportunity after seeing -- you know, perhaps we have no

18    objection.  But perhaps we might depending on what's

19    designated.  And we'd like the opportunity to respond once we

20    have seen it.

21         THE COURT:  Okay.  Of course.

22         MR. STERN:  Since we'll be meeting on I believe it's

23    February 9 in Ann Arbor on the pretrial, perhaps we can get

24    you our response Monday, February 7 to whatever may be

25    provided by Mr. Campbell on February 1.  So a little less than

1    a week.

2              THE COURT:  That's good with me.  And we'll dispense

3    with a reply.  So Mr. Wittie, that's agreeable, the 1st and

4    the 9th?

5              MR. STERN:  1st and the 7th.

6              THE COURT:  1st and the 7th, right.  And the hearing

7    on the 9th, right.

8              MR. STERN:  Sorry, Judge.

9              THE COURT:  No.  Okay.  I think Mr. Wittie said yes.

10   Okay.

11             MR. ERICKSON:  Your Honor, just so it's clear, we'll

12   communicate that to Mr. Mason and we'll meet the February 1

13   deadline.

14             THE COURT:  Good.  Thank you.  Thank you.

15             MR. STERN:  And just for the record, it may be that

16   Mr. Mason determines, unlike Mr. Campbell, that he has no

17   intention on opening on the report and the issue would be

18   deferred until such time as LAN intended to use the report.

19   He's not obligated to send something to the extent he wasn't

20   going to open it.

21             THE COURT:  Right.  We'll, I'd still like to know if

22   he's not going to do it in his opening just tell me and I'll

23   check that off my to do list.  Okay.

24             Let me see if Jeseca is okay.  Jeseca, do you need a

25   break?  We have two more here.

1          MADAM COURT REPORTER:  I'm fine, Judge.

2          THE COURT:  Now we're up to 508 and 513, which are

3    plaintiffs' motion to exclude evidence about alternative lead

4    exposures that are not supported by expert testimony.

5          MR. STERN:  This will be me again, Your Honor.

6          THE COURT:  Okay.

7          MR. STERN:  Your Honor, primarily evidence of other

8    lead exposures and frankly of alternative theories of

9    causations shouldn't be permitted in the trial unless they're

10   supported by expert testimony.

11         The reply briefs made clear that, you know -- our

12   reply brief makes clear that we're taking aim at the

13   information not supported by expert testimony, not the experts

14   themselves.  VNA's and on some level LAN's responsive

15   pleadings insinuated if not outright stated that we're trying

16   the get rid of their experts.  We're not.

17         VNA's experts don't actually opine that there are

18   other lead exposures which are more likely than not to have

19   caused plaintiffs' injuries.  The evidence is speculative.  I

20   mean, generally speaking, VNA's evidence, to the extent it's

21   evidence, of alternate lead exposures and alternative causal

22   theories are speculative.  They're not supported by any expert

23   testimony.

24         The best case that I think the Court should really

25   focus on is United States v Frank Iron Hawk.  The facts

1    involved a child abuse situation and a head injury to a

2    toddler that could have been chronic and thus accidental or it

3    could have been acute and thus intentional and criminal.

4          So this is a criminal case where someone's rights are

5    at stake and it's a very heightened level of scrutiny.  The

6    father of the child was the defendant and he had a doctor who

7    opined that there was a chronic injury involving a hematoma

8    and that a simple accidental fall caused a rebleed and the

9    seriousness of the injury.

10         There, the district court excluded it as to

11   speculative the evidence allegedly in support of the expert's

12   testimony of the steep and dangerous condition of the stairs

13   in the toddler's mother's apartment.  And the Eighth Circuit

14   affirmed stating that the defendant was entitled to prove his

15   theory of a defense, including introducing evidence supporting

16   Dr. Fox's chronic injury theory.

17         However, he was not permitted to provide speculative

18   testimony which could only fit his theory under unreasonable

19   inferences.  A nearby tenant, for instance, who would have

20   testified about the stairs never witnessed the toddler falling

21   down.  Nor was a related injury ever reported to social

22   services.

23         Dr. Weed, who's one of the defendant's experts here,

24   simply discusses the potential for alternative exposure

25   generally.  He's a general causation expert who makes no

1    specific conclusions about plaintiffs' exposure to anything.

2    And Dr. Finley doesn't actually opine that the plaintiffs were

3    exposed to other lead sources or that those exposures caused

4    plaintiffs' injury.

5            There's no presumption of exposure under Michigan law

6    based on the mere fact of a toxin's existence in the

7    environment.  At most, Dr. Finley is reasoning that

8    correlation equals causation.  But that's also not valid under

9    Michigan law.

10           And I point the court to Bloomfield Hills Country

11   Club v Travelers Property Casualty.  It's case number 15-11290

12   2016 US District Lexis 140449.  It's an Eastern District of

13   Michigan case that quotes Craig v Oakwood Hospital, which is

14   471 Mich 67 at 93.  There's just a lack of --

15           THE COURT:  Mr. Stern, just a second.  Are you

16   challenging the admissibility of general causation testimony

17   on relevance grounds?  What is the basis of your challenge?

18           MR. STERN:  Well, there's no specific causation in

19   this case.

20           THE COURT:  Right.

21           MR. STERN:  Because no one's opining that.  In fact,

22   all four of defendants' experts on this point say that the

23   kids aren't hurt at all.

24           So to introduce evidence of general causation or soil

25   , paint, etcetera, would be extremely prejudicial versus

1    probative under Rule 403 in light of the fact that these very
2    same experts who might float the idea of this type of exposure
3    have simultaneously during their deposition testimony stated
4    that not one of them believes the children were actually
5    harmed.
6           So it's a combination of both the admissibility of
7    the evidence mostly based on Rule 403 and the prejudicial
8    effect based on all of the other testimony that each of these
9    witnesses gives.
10          THE COURT:  Okay.  Can you separate your argument out
11   so the psychologists are off to one side and Weed and Finley
12   are separate?  Or are you combining this all?
13          MR. STERN:  They're all combined, Your Honor, because
14   not one of them actually has opined that, you know, Emir
15   Sherrod is, in fact, injured but the cause of his injury is
16   from lead in his home.  Or Daylaana Ware is, in fact, injured
17   but the cause of her injury is from a terrible birth and
18   delivery that occurred with her mom and she got an Apgar score
19   of 3.
20          And so it's one thing for an expert to come in and
21   say, hey, there's a lot of different causes of developmental
22   delays.  There's a lot of different causes of neurocognitive
23   deficits.  And some of those causes are lead poisoning based
24   on an exposure to lead in dirt or lead exposure based on lead
25   in paint or a medical issue that occurred during the birth of

1    the child or autism or some other medical condition.

2          But in this particular case, there is not one opinion

3    provided by a single expert, whether it's a general causation

4    like Dr. Finley or a specific causation expert like Dr. Weed

5    where anyone opines to a reasonable degree of medical

6    certainty, A, this child's injury was caused by blank.  Or B,

7    this child's lead poisoning was caused by something other than

8    the water.

9          THE COURT:  Okay.  Let me ask you, what is the relief

10   you're seeking with respect to Weed and Finley in this motion?

11   Because I understood Weed and Finley to have general testimony

12   that shows that the lead measures in these children are

13   unremarkable.

14         MR. STERN:  Certainly, certainly Dr. Weed and

15   Dr. Finley can provide an opinion that the lead measurements

16   in these children are unremarkable.  We're not trying to

17   exclude their opinions, which are based in science and their

18   own experience.  But to then take it a step further and talk

19   about, well, mama moved to Minnesota for a bunch of years and

20   daddy's a deadbeat and smokes crack and it's noteworthy to me

21   --

22         THE COURT:  Oh, no.  That's a separate issue.  But so

23   the relief -- but that's not what Weed and Finley are

24   testifying.  We've got Putnam -- we've got other people saying

25   all of that.

1          MR. STERN:  Sure, sure.

2          THE COURT:  So let's just focus on -- I don't

3    understand entirely what the relief is you're seeking with

4    respect to Weed and Finley.

5          MR. STERN:  Weed and Finley and any of the other

6    experts should not be able to testify to the extent that if --

7    let me start over.

8          THE COURT:  Okay.

9          MR. STERN:  These -- this child, child A, child B,

10   child C, child D, suffers from cognitive deficits that may

11   have been caused by exposure to soil, that may have been

12   caused by exposure to paint.  Because, A, they don't believe

13   the child is suffering from any cognitive deficits.  It's

14   contrary to their opinions.

15         And B, as we know from defendants' arguments about

16   Dr. Krishnan and Dr. Bithoney, there's magic words that the

17   defendants and Michigan law insist these doctors say and state

18   an opinion to, and none not one has stated --

19         THE COURT:  Okay.  So from your perspective, can Weed

20   and Finley testify that the blood lead levels as opposed to

21   the injuries or poisoning, that these children have could be

22   caused by ordinary background exposure?  That's okay for them

23   -- you have your expert to say , no, that's not how it

24   happened but ...

25         MR. STERN:  They are clearly from a generalist

1   standpoint to say could be.  But not one of them has said to a

2   reasonable degree of medical certainty they have.  And so by

3   permitting them without that testimony to say they could be is

4   prejudicial to the plaintiffs.  It's throwing paint at the

5   wall in a way -- in a way that is far more prejudicial than it

6   is probative.

7           It would be one thing for one of these experts to say

8   it could be caused by blank and based on my review of the

9   records from the school, of the home inspection that VNA done

10  -- did, based on my personal defense medical examination of

11  this child -- which none of the defendants' experts actually

12  took the opportunity to do -- I believe to a reasonable degree

13  of medical certainty that this was, in fact, the cause more

14  likely than not.

15          And because they don't say that, to say the other

16  stuff without actually supporting it with an opinion that

17  that's what happened is far more prejudicial than it is

18  probative --

19          THE COURT:  So if I limit Weed and Finley to

20  testimony that is rebuttal, general rebuttal of Bithoney,

21  Graziano, and Michaels, that's okay.  But they can't take the

22  additional step in your argument of saying and that is exactly

23  what happened to these children.

24          MR. STERN:  I don't even think, Your Honor, that they

25  can rebut with speculative causation.  They can --

1        THE COURT:  Because I think they're saying that the

2   lead in these children is unremarkable and is not lead

3   poisoning because it's just consistent with the background

4   lead that we all get exposed to.

5        MR. STERN:  That is what they've testified to and

6   that is totally fine.

7        THE COURT:  Okay.  All right.  So they can -- okay.

8   That's what I thought, but I wanted to make sure.

9        MR. STERN:  There's a step that they're trying to

10  take it to that goes beyond that.  And it's not only

11  contradictory to their testimony, I think it's unremarkable

12  and this job has -- there's nothing remarkable about this kid

13  because everyday as he walks through the world he is exposed

14  to lead and this is just the baseline amount.

15       Saying that and then saying but, however, if I'm

16  wrong, if the child actually does suffer from lead poisoning,

17  it's because of the soil potentially or it's because of the

18  paint potentially when, in fact, there's not a single opinion

19  in this case from plaintiffs' experts or defendant's experts

20  that indicate that the cause of the potential lead poisoning

21  is anything other than the water.

22       THE COURT:  Okay.  Let me go back.

23       In your brief, I think it's important to note that

24  the plaintiffs have the burden on specific causation and

25  differential diagnoses with respect to your clients.  The

```
 1    defendants don't have those same burdens.  So I think that
 2    needs to be clarified with respect to this motion.
 3              MR. STERN:  Sure.
 4              THE COURT:  So VNA's experts -- and let's just talk
 5    about Weed and Finley right now -- still need to meet the
 6    general evidentiary requirements that all experts face through
 7    Rule 702 and Daubert.  So but they're not required to make a
 8    differential diagnosis.  That's your burden for your
 9    plaintiffs.
10              MR. STERN:  Sure.  But --
11              THE COURT:  Do we agree on that?
12              MR. STERN:  I think what Your Honor is speaking to is
13    sort of a lower standard that would exist for a defendant in
14    this situation than the standard that's required of the
15    plaintiffs.  But while that is true --
16              THE COURT:  Well, it's not a lower standard under 702
17    and Daubert.
18              MR. STERN:  Correct.
19              THE COURT:  It's just that they don't have to meet
20    elements 1 and 2 in a toxic tort case of specific -- they're
21    not the ones proving specific causation and a differential
22    diagnosis.
23              MR. STERN:  Absolutely.  But there still can't be an
24    evidentiary free for all when it comes to just throwing
25    evidence at a jury.  And so alternative cause theories have to
```

 1    be rooted in at least some reliable evidence.

 2             THE COURT:  Exactly.

 3             MR. STERN:  And so where no expert supports an

 4    alternative cause theory, that theory would be entirely

 5    speculative.  And any related evidence is therefore

 6    irrelevant.  That comes from Sowers v R.J. Reynolds Tobacco,

 7    which is a Middle District of Florida case.  It's obviously

 8    not dispositive here, but it's at least instructive.

 9             Secondly the lower threshold, to the extent we're not

10    talking about the standard that's the same, the 702 standard,

11    an expert can speak in terms of possible causes but there has

12    to be some causal opinion.

13             THE COURT:  Okay.

14             MR. STERN:  So for instance, when Dr. Finley says the

15    plaintiffs lead levels are consistent with ambient exposure,

16    I'm just using that as an example, that by definition is not a

17    causal opinion at all.

18             THE COURT:  Okay.

19             MR. STERN:  Whether it's possible or more likely than

20    not or otherwise.

21             THE COURT:  All right.  I get it now.  And so let me

22    hear from defendants.  But let me say this before turning,

23    which is that where I'm coming from is I think Weed and Finley

24    can testify that the blood lead in these children could be

25    caused by ordinary normal exposure.  But they can't testify

```
 1    that these children were, in fact, lead poisoned from sources
 2    of lead that were not water -- not the water.  Because they
 3    don't -- that would be entirely speculative on their parts.
 4    They have no knowledge of that.
 5          So let's start there and hear from VNA.
 6          MR. TER MOLEN:  Thank you, your Honor.  I'll address
 7    these two motions.
 8          So Your Honor I appreciate your efforts to clarify
 9    what these motions are about.  And just quickly I'd like to
10    note, Your Honor, that these motions -- that these two motions
11    each say that they're about one thing with in particular
12    excluding testimony of nonexpert basically testimony.
13    Unsupported nonexpert testimony.  Both in their opening brief
14    and their reply brief.  But then they go on and they focus
15    exactly on expert testimony, which obviously is what we've
16    heard today at argument.  So a bit unusual in that context.
17          But let me take the briefs at face value first, Your
18    Honor, just so we can address this point.  VNA certainly
19    agrees we are not going to offer any nonexpert testimony that
20    doesn't have a credible basis on any of these points, right.
21          THE COURT:  Okay.
22          MR. TER MOLEN:  So to echo plaintiffs' counsel
23    earlier in I guess what's turning into a somewhat long
24    afternoon.  But to echo plaintiffs' counsel earlier, Your
25    Honor, I mean, I don't see a need for this motion.  And I
```

```
 1    think that that if aspect of it is really --
 2             THE COURT:  I see a need for the motion.  So it's
 3    helpful to me.
 4             MR. TER MOLEN:  Sure.  And then let me switch gears
 5    to the expert aspect of it, Your Honor, which what you -- I
 6    wanted --
 7             THE COURT:  Right.
 8             MR. TER MOLEN:  -- which is how the motion is styled.
 9    Now let me turn to the expert part, which I understand and
10    appreciate Your Honor raising.  And first of all, I completely
11    agree with how Your Honor has articulated the -- what the
12    burden of proof here is.  Right.
13             I mean, plaintiffs bear the burden of proving in this
14    case that these plaintiffs were exposed to lead from drinking
15    water in Flint.  And in VNA's case they have to establish that
16    proof after VNA's involvement.  And then they similarly have
17    to show that these plaintiffs were injured by that exposure to
18    the lead in the water that they consumed.  Right.
19             And so it's not defendant's burden here to show that
20    it's more probable than not that plaintiffs did not -- were
21    not exposed or were not injured.  Rather it's our ability is
22    that Your Honor has highlighted I know to highlight the fact
23    that, well, there are other explanations for exposure to lead
24    other than water and other explanations for injury to the
25    extent that the jury concludes injury occurred other than
```

1   exposure to lead.  Right.

2           THE COURT:  Correct.  I agree with you.

3           MR. TER MOLEN:  And so -- yes.  Thank you.

4           And so to hit your point directly, I think your

5   question directly on Dr. Finley, I believe that Your Honor has

6   it correct.  I do want to be clear that in his report,

7   focusing on Dr. Finley, that Dr. Finley walks through for each

8   plaintiff the exposure scenario for each plaintiff and --

9           THE COURT:  He walks through potential exposure

10  scenarios that he knows nothing about in there are actual

11  situation.  So do you agree that he will not testify that

12  plaintiffs were, in fact, exposed to other sources of lead?

13          MR. TER MOLEN:  I agree that he will not testify that

14  they were, in fact, exposed to other sources of lead.  He will

15  testify that there were sources of -- well, let me back up a

16  bit, Your Honor.  I'm sorry.  I have to disagree with that on

17  at least one front, Your Honor.

18          I believe during the Daubert hearings we discussed at

19  least one of the plaintiffs had a blood lead test that came

20  back positive before the water source switch.  So in that

21  context, Your Honor, I believe that it certainly is clear that

22  the plaintiffs were exposed, that that plaintiff -- and I

23  believe it's Teed but I may be mistaken, Your Honor -- was

24  exposed to other sources of lead.

25          And Your Honor, just so we're all clear here, it's

1    the plaintiffs' own expert, Dr. Graziano, testified that every

2    child in Flint had a positive blood lead level before the

3    Flint water source switch.  So I do think it's fair and

4    appropriate to testify and for Dr. Finley to testify that

5    every child in Flint, similar to what plaintiffs testified --

6    plaintiffs' experts testified to --

7            THE COURT:  I think that's Graziano.  I think that's

8    correct.  So and Mr. Stern, do you disagree about Teed that

9    the --

10           MR. STERN:  I do.

11           THE COURT:  -- the record reflects that there was an

12   earlier blood test?

13           MR. STERN:  I do disagree.

14           THE COURT:  Tell me about that.

15           MR. STERN:  I disagree because Dr. Finley states

16   there's nothing wrong with Teed.  And he hasn't stated that to

17   a degree of medical certainty any problems associated with the

18   child Teed were caused by exposure to lead in paint.

19           There could be -- there could be a thousand reasons

20   why someone is exposed.  And obviously they are going to be

21   permitted, the defendants, to present evidence to the jury of

22   a prior lead level.  That's in the medical records.  It was

23   produced by us.  And there's going to have to be an

24   explanation for that by our parents of the child , potentially

25   by Dr. Bithoney who addressed it in his report.

1          But experts can't just come in and suddenly give

2    opinions that they previously didn't give.  I mean, that's --

3    I don't want to get into the Dr. Finley report that is the

4    subject of what we'll discuss at some point after this

5    argument.

6          But just because Dr. Finley recognizes that a child

7    had a blood lead level at some prior time doesn't mean that he

8    has such -- that he has attributed to a reasonable degree of

9    medical certainty that blood lead level to something else.

10   Nor has he said to a reasonable degree of medical certainty

11   that the deficits and the cognitive issues and the

12   neuropsychological issues that Dr. Krishnan unanimous has

13   discussed can be attributed to exposure to lead in paint.

14         And so it's one thing to bring in evidence that the

15   child had a previous exposure and then have the defendants

16   argue that any damage that may have been caused to this child

17   were not the result of a later exposure but an earlier

18   exposure.

19         But they need expert testimony for that.  Just like

20   we need expert testimony.  And that's not because the burden

21   is as high on them as it is on us.  It's because the

22   prejudicial effect of allowing experts to just walk in and

23   make suppositions to a jury about, well, there's some paint

24   that had some lead and there's some soil that had some lead

25   and I saw a record where there was a lead level.  So I'm not

1   saying the child's injured, but you should note, jury, that

2   all those things are true.

3          You need more than that.  The evidence has to be

4   credible.  And Dr. Finley didn't testify to that.  Neither did

5   any of their other experts.

6          THE COURT:  Okay.  So here's -- from -- with respect

7   to this motion, these experts can testify as we discussed that

8   they believe that these blood lead levels are not remarkable

9   and could be caused by ordinary normal exposure.  They cannot

10  testify that these plaintiffs were, in fact, exposed to other

11  sources other than factually somebody can point to the -- if

12  it's Teed then Teed's earlier blood test prior to April of

13  2014.

14         But they will not, yeah, not be allowed to testify

15  about other causes of a poisoning that essentially they don't

16  believe happened and so that's -- so that's with respect to

17  Weed and Finley.  And that's motion in limine 513.

18         So let's move to 508, the psychologists.  And here

19  VNA has four psychologists.

20         And I just at the outset want to understand what the

21  purpose is of four different experts on the same subject

22  matter.  I just want to understand.  I'm the one who's got to

23  manage this trial.  I just want to know what we're doing

24  together and why.

25         So tell me why do we have four different

January 19, 2022

1    psychologists.

2            MR. TER MOLEN:  Yes, Your Honor.  Thank you.  In part

3    it's because of the different ages of these plaintiffs.  And

4    so in part it's because we have specialists in children who

5    are on the -- even though we're talking about younger children

6    here.  We have at this point in time obviously they've gotten

7    older.

8            THE COURT:  Okay.

9            MR. TER MOLEN:  We have experts who are focused on

10   younger versus older I think is largely the explanation for

11   that, Your Honor.

12           THE COURT:  Okay.  That's helpful.  And then here I

13   have to say that this was some difficult material to work

14   through.  Because these experts are testifying -- for

15   instance, Dr. Putnam says there is no diagnosis that I'm

16   trying to attach to her family history.  Yet he wants to

17   testify to events and circumstances of being raised by a

18   single mother that he thinks might lead -- might have led to

19   nothing apparently but maybe something.

20           So then I look at more prejudicial than probative

21   because what could it be probative of if she doesn't have a

22   condition.  But he wants to testify about a biological father

23   who was in and out of jail, had substance abuse issues and

24   legal issues.  And yet he says that the issue is that this

25   plaintiff has no neuropsychological mental health condition

1    that can be diagnosed.  So it can't possibly be relevant that

2    she's raised by a single mother.

3            MR. TER MOLEN:  If I may respond, Your Honor.

4            THE COURT:  And also could be point to articles that

5    say that children raised by single mothers end up with

6    neurocognitive deficits?

7            MR. TER MOLEN:  So Your Honor, what I'll -- again,

8    this motion, Your Honor, like the other motion, is unusual in

9    that it is also styled as being targeting nonexpert issues.

10   But again, you know, here we are.  We're talking about expert

11   issues.  And so it's odd and there's perhaps inadequate

12   briefing on that point.

13           But so, Your Honor, I think part of that may be the

14   disconnect at least with plaintiffs' counsel is that a number

15   of the -- these experts are all taking the well founded view

16   that these plaintiffs are not exhibiting unusual cognitive

17   deficits, right.

18           But in the alternative, they're raising possibilities

19   that in our view the plaintiffs need to address and their

20   experts need to address and Dr. Bithoney need to address in

21   his differential diagnosis as to, look, if plaintiffs are

22   going to contend that these plaintiffs are, in fact, injured,

23   then these are other possible causes of the same kind of issue

24   that plaintiffs are alleging or the plaintiffs' counsel are

25   alleging, plaintiffs' experts are alleging these plaintiffs

1  are suffering from.  So in that -- that's the reason, Your

2  Honor.

3          And again, plaintiffs bear the burden of not only --

4  well, establishing it's more probable than not that they have

5  been injured because of exposure to lead in the drinking water

6  in Flint.

7          And so that includes -- to make that showing, that

8  includes in the cases we've cited including the Wilder, the

9  Allen, and the Acock (ph) cases, Your Honor, make it very

10  clear that to make a finding that something is more probable,

11  that a cause is more probable, that necessarily involves

12  ruling other possible causes out.

13          So these are well established experienced experts.

14  You know, plaintiffs made the decisions not to file Daubert

15  motions against any of them.  So presumably they agree with

16  that.  And these experts are identifying these alternative

17  causes as causes that to the extent that plaintiffs contend an

18  injury occurred, these causes need to be addressed and ruled

19  out.

20          MR. STERN:  Your Honor, may I respond?

21          THE COURT:  Certainly.  But I have a question.

22          Mr. Ter Molen, do you have a case that stands for the

23  premise that an expert can testify to two entirely

24  contradictory theories in the alternative?

25          So we have these expert -- more than just Dr. Putnam.

1    We have others saying that no neurocognitive or other

2    impairment, also family history that they say is -- one of

3    them says is unflattering or something to that effect.

4          And so what is this -- do you have a case that says

5    one expert can testify in the alternative?

6          MR. TER MOLEN:  Your Honor, if I may, what I'd like

7    to suggest is that we submit an additional brief on this.  As

8    I've indicated, the briefing here, again, as plaintiffs styled

9    it as --

10          THE COURT:  Yeah.

11          MR. TER MOLEN:  We're not talking about experts.  And

12    they repeated that in their reply.  But here we are.

13          So if I may.  And again, these are defense experts.

14    As I understand the schedule in this case, they're not going

15    to be taking the stand for some time.  But we would certainly

16    be -- would like the opportunity, Your Honor, to submit a

17    brief on this and those and other issues Your Honor would like

18    us to address.

19          THE COURT:  Well, there's only so much time that

20    everybody has to write and read and decide all these briefs.

21    But let's hold that -- let's just hold on to that.  I

22    appreciate that.  And I do understand that the title of these

23    motions and the content wasn't 100 percent copacetic one with

24    the other but ...

25          MR. STERN:  Your Honor may I respond?

1    THE COURT:  Go ahead.  Sure.

2    MR. STERN:  Two points.  Mr. Ter Molen stated that

3 plaintiffs' counsel had a disconnect.  I don't think there's

4 any disconnect.  I think that the psychological experts that

5 have been proffered by the defendants are perfectly capable of

6 opining about the manner in which Dr. Krishnan performed her

7 test.  Okay.  That is totally fine.

8    I think the real disconnect here is from the

9 defendants who continuously seem to subtly at first and now

10 not so subtly proffer the opinion from experts that there's

11 nothing wrong with these kids other than they're from Flint,

12 other than they've got single parent, other than they've got a

13 dad on crack, other than they're poor, other than all of these

14 socioeconomic -- and frankly I'm the last one that ever raised

15 this -- but racial issues that no expert in this case for them

16 or for us has said is an alternative cause of something that

17 they stay didn't even happen to the kids.

18    Secondly, Mr. Ter Molen mentions, you know, there

19 were Daubert hearings and obviously we agree with their

20 experts because we didn't file, you know, Daubert motions.

21 It's clear to me when the Daubert motions were filed they were

22 filed because the defendants completely disagreed with every

23 single thing that the defendants -- that our experts said.

24    But that's not why you file a Daubert motion.  You

25 file a Daubert motion because you believe that there's not a

1    foundational basis for the person to give the testimony they

2    have not because you don't like their testimony.

3          In this case they're not going to require any more

4    briefing.  There's not a single expert for the defendant who

5    says, A, Ms. Weed [sic] was injured very badly and suffers

6    from terrible cognitive deficits and that's because her dad

7    smoked crack.  That's because her mom was on drugs while she

8    was in the womb.

9          They float these concepts as part of their testimony

10   and then recant them the minute they're cross-examined about

11   whether they actually believe that they caused any damage to

12   the children.

13         It would be had completely inconsistent to permit

14   them to testify this way.  It would have no purpose whatsoever

15   other than to prejudice a jury.  And in some ways it's

16   offensive at this point that they continue to put forward this

17   type of testimony.

18         THE COURT:  Let me say this, which is -- just a

19   minute.  The only reason it may be helpful to have some

20   further briefing is at least with respect to Dr. McCaffrey,

21   I'm not sure what testimony plaintiffs are suggesting is

22   objectionable with respect to that particular witness.

23         But in terms of the argument that some of these

24   arguments are more prejudicial than probative, they don't seem

25   to be probative of anything.  All of the family circumstances

1     don't seem probative of anything that's at issue that your

2     experts are testifying to because they say the -- all four

3     plaintiffs have sorry impairments, zero problems, zero

4     consequences.

5          So it wouldn't be helpful to -- apparently zero

6     consequences also from the situation of the father going to

7     jail.  You know, so it doesn't -- we don't need that

8     testimony.  It just isn't relevant to our case.

9          Dr. Thompson, for example.  Tell me, Mr. Ter Molen,

10    what does he cite to to explain the things he believes are

11    causal factors of something?  That's where he discusses about

12    the uncle dying.  Like one of the plaintiffs, I'm sorry, lost

13    an uncle and then suggests that that might be the cause of not

14    having a problem or maybe having a problem.

15         So tell me about Dr. Thompson and the uncle.

16         MR. TER MOLEN:  Thank you, your Honor.  As an initial

17    matter, Your Honor, it's unfortunate that we talked earlier in

18    the day about a motion in limine that was to stop lawyers from

19    commenting adversely on each other, agree that it was

20    unnecessary to issue an order to that effect, and now we have

21    plaintiffs' counsel who's, for whatever reason, you know,

22    raising this I think irrelevant smear on the arguments that

23    we're making.

24         And I would respectfully submit that that's

25    inappropriate and not needed or helpful here.

1          With respect to the direct question, Your Honor,

2    again Your Honor raised the question which is a fair question.

3    As lawyers, we're used to arguing in the alternative.  Right.

4    We're used to --

5          THE COURT:  Yeah.  But I don't care about a lawyer.

6    Sometimes it's permitted under the law, arguing in the

7    alternative.  Sometimes it's not.  So what I need is a case

8    that tells me an expert can testify that there's no problem at

9    all and that a child has a single mother just to say it

10   because there's no problem.

11         So tell me about how that's permitted.  I need a case

12   to authorize that testimony to come in.

13         MR. TER MOLEN:  I appreciate that, Your Honor.  And

14   what I would -- what I had asked was the opportunity to raise

15   that case with Your Honor and submit a point on that -- on

16   that -- submit a brief, additional, very short.  I promise you

17   it will be very, very short brief on that topic.

18         And again, we had some, as I think Your Honor has

19   recognized, the briefs filed by plaintiffs here were making it

20   very clear on the one hand that they weren't about experts.

21   But then obviously now they are about experts.  And so to the

22   extent that our briefing on that was deficient, I apologize.

23   But we will be happy to submit something on that as very

24   quickly.

25         THE COURT:  Okay.  So with respect to 513 I have

1    ruled on that.  And for example, Dr. Finley mentions only 12

2    percent of adults in Flint possess a bachelor's degree or

3    higher.  And 44.4 percent are living in poverty.  And that

4    they are poor families and poor families tend to live in older

5    homes.

6             It doesn't matter.  That's not relevant to our case.

7    What's relevant to our case is our four plaintiffs and the

8    homes they lived in.  And we don't have testimony about lead

9    paint and so on or lead gasoline in the house or something of

10   that nature.  So he simply can't -- it's not relevant to a

11   fact at issue in our case.

12            MR. TER MOLEN:  I hear Your Honor.  And I just want

13   to highlight and I apologize if I'm misunderstanding your

14   Honor but we do have investigation reports from each of the

15   plaintiffs' home.  And so we are able to testify -- Dr. Finley

16   is able to testify about what was found in each plaintiffs'

17   home.  But I understand what you're saying, Your Honor.

18            THE COURT:  Okay.

19            MR. TER MOLEN:  And again, just to raise this with

20   respect to the timing and the calendar here, we can certainly

21   review this before Dr. Finley takes the stand.  If that's

22   helpful to Your Honor.

23            THE COURT:  Okay.  Okay.  Let me look -- one last

24   thing on 513 is A.T.'s family had moved out of the home by the

25   time of the inspection and the inspection was done after the

1    home had suffered a fire.  And so let me -- I don't know if

2    fire damage can change what -- I mean, if there was lead paint

3    deeply buried under five layers of non lead paint but a fire

4    somehow exposed that.

5         MR. TER MOLEN:  Your Honor, that would be an

6    opportunity for cross-examination by plaintiffs' counsel.

7         MR. STERN:  Respectfully, Your Honor, there's no --

8    there's no expert opinion in this case that A.T.'s injuries

9    were caused by exposure to lead in a home that had lead.

10   Forgetting even the fire.  And so we don't need to brief this.

11   We don't need to -- I mean, there's no expert testimony that

12   attributes it to it.  So the fire is a bit of a red herring.

13        THE COURT:  Okay.  In any event, Mr. Ter Molen, your

14   experts still have to have their conclusions and their sources

15   be reliable.  And I'm not convinced that that inspection is

16   reliable if it took place that after she has moved out and

17   after a fire.

18        But in any event, did the inspection show that there

19   was lead sources in the house?

20        MR. TER MOLEN:  It did, Your Honor.

21        THE COURT:  Okay.  And what were the sources?

22        MR. TER MOLEN:  Your Honor, I believe it was lead

23   paint and some lead dust in the home and some lead in the soil

24   but I don't have that right in front of me, Your Honor.

25        THE COURT:  Okay.  I think the soil I recall, but I

1  don't -- and so I don't -- and there was ongoing remodeling

2  going on in the house at the time.  That seems highly

3  speculative that the remodeling was not going on unless you

4  think that it was when the plaintiff was living there.

5  MR. TER MOLEN:  Well again, Your Honor, we could

6  bring these points out on -- at trial.  We can bring -- we can

7  review specifically this issue later since Dr. Finley won't be

8  taking the stand here for at least I would say three months

9  from now probably the earliest.

10  THE COURT:  Well, let me say on 513 I'm confident

11  that you may not argue that you have evidence that plaintiffs'

12  exposure to lead was caused by soil or lead paint or lead

13  dust.  And so we know that.  There's no further briefings

14  needed because the experts don't tell us.  They don't tell us

15  that.  They don't provide that opinion.

16  And your experts can certainly tell us that

17  plaintiffs, from their perspective, were not exposed to

18  abnormal levels of lead and that their blood lead levels were

19  not abnormally high and are consistent with ordinary

20  background exposure.  That's what the battle of experts is all

21  about.

22  But let me -- with respect to 508 and the various

23  psychologists, I would like to issue a written opinion.  I

24  don't think that further briefing is necessary.  But I think a

25  one to two-page bullet point summary of what you think and

```
 1    what cases I should look at.  That's what I would welcome with
 2    both sides.
 3              MR. STERN:  And we agree -- and I'm not trying to be
 4    a pain in the neck.  But can we agree on font size and
 5    spacing?  Because a lot of times we do single page briefs.
 6    And I do a letter, as the Court requires, and then certain
 7    other parties will submit a no margin single spaced 11 point
 8    brief and it's a little bit -- it's just not equal.  And so
 9    whatever it is is fine, but let's just do it equally so we're
10    all on the same footing.
11              THE COURT:  Okay.  Let's have two pages, 14 point
12    font, single spaced if you wish.
13              MR. STERN:  Thank you.
14              MR. TER MOLEN:  Thank you, your Honor.
15              THE COURT:  And you don't have to have a case caption
16    or a signature.  It can -- well, it does need a signature.
17    Okay.  The signature can be on the last -- on a third page.
18              MR. STERN:  This is with regard to the defense expert
19    neuropsychologists, correct?
20              THE COURT:  Yes.
21              MR. STERN:  Okay.
22              THE COURT:  And what I really want to know is exactly
23    what testimony plaintiffs are objecting to for each.
24              MR. STERN:  No problem.
25              THE COURT:  Or is it all -- or are you suggesting
```

```
 1    that all of it is more prejudicial than probative if they

 2    don't have -- I mean, they obviously can testify that they

 3    don't have any diagnosable condition.  But all of this other

 4    material about single parents and somebody's on crack cocaine,

 5    etcetera.

 6          MR. STERN:  Happy to lay it all out for Your Honor

 7    again, you know, if that's what Your Honor wishes.  We think

 8    that despite the styling of the motion, the relief sought

 9    within it is pretty clear.

10          You know, we've had a number of instances today where

11    we thought we understood what a motion was.  Like defendants,

12    the word "defendants", and then we found out at the oral

13    argument that it was actually a very specific thing about

14    referring in specific moments to defendants.

15          Our motion's clear what we were seeking, although it

16    could have potentially been styled better.  But to the extent

17    there was a disconnect there, I apologize.

18          THE COURT:  Okay.  Okay.  Good.  So I think that

19    concludes the oral arguments on the motions in limine.  And

20    what I'd like to do is take a break and then we have a number

21    of trial scheduling related issues to discuss.

22          I will ask my court reporter to attend that meeting

23    but not to begin by taking down a record.  So that -- just

24    because there are just dates, times, things that just don't

25    require all of that.
```

1     MR. TER MOLEN:  Your Honor, I apologize.  Just so I'm

2     clear.  So we'll have a discussion about trial.  And then

3     later when we talk about issues like the Finley supplemental

4     report and the witnesses, we will have a record for those?

5          THE COURT:  Yes.

6          MR. TER MOLEN:  Thank you.

7          THE COURT:  Okay.  So let's take about a 5-minute

8     break.  And then we'll be -- we'll discontinue the live

9     streaming because that's just not necessary to set dates and

10    discuss when you're submitting jury instructions and so on.

11    So good.

12         So we will be adjourned at this time.  And in recess

13    we'll say, for about 5 minutes to 10 minutes.  When you see me

14    and Jeseca turn our cameras on, you'll know that we're getting

15    ready to have our meeting.  Thank you.

16                    (Recess)

17         THE COURT:  So we're back on the record in -- I guess

18    I can get used to saying this -- in the case of Sherrod, Teed,

19    Vanderhagen, and Ware vs VNA and LAN.

20         And we're on the issue of defendants' request that

21    plaintiffs -- well, that the Court strike witnesses that they

22    were not aware of on a previous witness list or from written

23    responses to interrogatories.

24         And what I have decided is that plaintiffs need to

25    further supplement the response to interrogatory number 5 that

 1   specifically asks whether the witnesses will testify about

 2   plaintiffs' drinking water usage.  And that furthermore

 3   reasonable efforts be undertaken to produce them for

 4   depositions.

 5           Ms. Devine, are you requesting depositions of all of

 6   the witnesses?

 7           MS. DEVINE:  So I believe -- and Mr. Stern can

 8   correct me if I'm wrong -- but the list was reduced to 11

 9   witnesses from 26.

10           THE COURT:  Oh, okay.

11           MS. DEVINE:  And I think four of those are plaintiff,

12   plaintiff representatives themselves who have already been

13   deposed.  So it is seven?  Is that right, Corey?

14           MR. STERN:  I have to check.

15           MS. DEVINE:  Okay.  So we would be seeking

16   depositions of all of those witnesses.  I would ask the Court

17   to put some sort of time limits or deadlines on these just

18   because I feel like we're two weeks from when we last talked

19   about this.  And I know Mr. Stern's making good effort.  But

20   we know not a whole lot more over two weeks.

21           So to the extent he says he's in contact with these

22   people, I would ask that those interrogatories be supplemented

23   by Friday.  And --

24           THE COURT:  Well, I think what he said is that he's

25   having some difficulties contacting some of these witnesses.

1     They're not his clients.

2            MS. DEVINE:  Okay.

3            THE COURT:  So but what were you going to say?  So I

4     think Friday doesn't seem reasonable to me if we're at 5:00 PM

5     eastern time on Wednesday.  But go ahead.

6            MS. DEVINE:  I would just point out, Your Honor, that

7     Mr. Stern said he was already in contact with some of these

8     people because they --

9            THE COURT:  Yes.

10           MR. STERN:  I'm --

11           MS. DEVINE:  So I think those questions can be asked

12     of those witnesses and that information can be provided to us.

13     I understand there may be witnesses that Mr. Stern can't get

14     in contact with or is having more difficulty and we should be

15     just informed of that process.

16            I would ask that the depositions take place no later

17     than February 11.  That's about three weeks.  I know there's

18     seven or eight witnesses that need to be deposed.  Some of

19     these may be in person.  But we need time to be able to

20     process the information and respond to it in opening

21     statements and things like that.

22           THE COURT:  Well, okay.  Let me find out.  Mr. Stern,

23     do you intend to refer to these witnesses' testimony in

24     opening statement?

25           MR. STERN:  No.

1          THE COURT:  I didn't think so because you don't know

2     what they're going to say.

3          MR. STERN:  Your Honor --

4          THE COURT:  So I don't see the urgency of February 11

5     in light of the other deadlines that are continually coming

6     up.

7          MR. CAMPBELL:  Your Honor.

8          THE COURT:  Yeah.

9          MR. CAMPBELL:  I'm sorry to interrupt.  But just on

10     that issue, we're dealing here with, you know, what could be

11     basic fact issues.  And just something out of the blue.  I

12     mean, if the residency of one of the -- or the particular

13     house where a child lived was in question.  It's not.

14          But I mean if it was really important that the child

15     live at 20 Main Street and then we open on 20 Main Street and

16     it turns out that one of these witnesses comes two weeks after

17     we open the case and says, no, no.  The child lived at 19 Main

18     Street, then that's a problem.

19          I mean, we need to have -- these are basic -- that's

20     part of this problem as to why this is so prejudicial to us.

21     This could change some very basic factual assumptions that

22     everyone's had.

23          MR. STERN:  Well, in some instances it might be good.

24     I mean, if a parent certifies that the child lives at a

25     certain place and testified that they drank the water

1    continuously for three years and they never stopped and then

2    it turned out that they lied or misspoke about where their

3    address is, that would probably inure to VNA's benefit for

4    purpose of trial because it would show the credibility of the

5    witness was in question.

6         So it's not just necessarily prejudicial to VNA.  I

7    understand the stakes that we're playing at.  We have every

8    intention of getting it done as quickly as we can.  And there

9    may come a point in time where Your Honor says it's too late.

10   You know, we haven't been able to get in touch with

11   Mr. Vanderhagen and he's not going to appear and it's just too

12   late.  We've past that point.

13        But I'm committed to providing an update on Friday

14   with what we have.  I'm committing -- committed to getting --

15   we are committing to getting the depositions scheduled as soon

16   as we're able to.  I'm not -- I wish I knew what the

17   information was so I could tell everybody.  And it could be

18   equally as bad or good for our side as it is for you or your

19   side.  But we listed them, you know, and we'll provide that

20   information as quickly as we can.

21        THE COURT:  Let's do this.  There are seven

22   individuals.  If by January 28 you can't provide supplemental

23   information about the nature of the testimony, then we'll have

24   to preclude them from trial.  It won't matter what's in their

25   depositions.  If you don't know about the 28th what general

1  areas they're going to testify to and whether it will be

2  related to their drinking of the water, then I think it is too

3  late.

4          So I think you have to supplement the interrogatories

5  by the 28th.

6          And then what I suggest is we're meeting on the 2nd.

7  I would then start to schedule -- I would currently schedule

8  any depositions that you can start to schedule of the

9  remaining seven.  But if by the 28th there are some you've had

10  no contact with or can't provide information with, we'll

11  strike them from the list.

12          But if assuming by the 28th you do have all of that,

13  if there are individuals who are going to testify about water

14  usage or where the plaintiffs lived that would be different

15  from what VNA knows, then their depositions have to be done by

16  the 11th.

17          MR. STERN:  Understood.

18          MS. DEVINE:  Thank you, your Honor.

19          THE COURT:  So now we have the Finley supplement

20  rebuttal issue.  Just a second.  Pardon me.  Okay.  Oh, my

21  God.  You're trying to wear me out.  Okay.  Who's --

22          MR. TER MOLEN:  I'd be happy to start, Your Honor.

23          THE COURT:  Okay.

24          MR. TER MOLEN:  So again, so Dr. Finley, in his

25  initial expert report, is he provided opinions that were

1    responding to and rebutting opinions with respect to how long

2    blood half life -- blood level half life was in children as

3    provided by Dr. Expect and Dr. Bithoney.

4         And then in the context of ongoing studies, we,

5    counsel, VNA counsel, became aware that there was out there an

6    ongoing -- apparently ongoing epidemiological study that

7    related to looking at effects of low level lead exposure on

8    children.  And we --

9         THE COURT:  When did you become aware of that report?

10        MR. TER MOLEN:  So it's not a --

11        THE COURT:  Or that study.  That study.

12        MR. TER MOLEN:  And just -- the study we became aware

13   of I would say maybe eight, nine months ago, Your Honor.  I

14   may be off a little bit there.  And then we initiated efforts

15   to get underlying data from that study.

16        Now interestingly enough, Dr. Lanphear, who, as you

17   may recall, is an expert for the class plaintiffs.  Right.

18        THE COURT:  I do.

19        MR. TER MOLEN:  Had been the lead investigator for

20   that study.  So we contacted class counsel.  We tried to get

21   that information from doctor -- from them and Dr. Lanphear.

22   They declined to do that.

23        We then went to Dr. Yoltin (ph).  Dr. Yoltin is the

24   researcher who took the titular head of the study, if you

25   will, after Dr. Lanphear for whatever reason stepped down from

1    that position.  And she is a researcher at a university.

2          We reached out to her and then began a process of

3    negotiating with her counsel, university counsel, to obtain

4    that data.  That data was just provided to us after back and

5    forth just before Christmas, Your Honor.  I believe it was

6    December 22 or so.

7          So and that data came in the form -- I believe that

8    Mr. Stern provided some spreadsheets to the Court.  The data

9    came to us in that form.  So we then provided that data to

10   Dr. Finley and asked him for his thoughts on it.

11         And he was able, Your Honor, to look at that data.

12   And now for the first time given the underlying individual

13   information, he was able to calculate the half life -- the

14   blood level half life for approximately, Your Honor, 300 plus

15   children who had been followed over the course of years in

16   that -- in this study.

17         And that's information that had not been available

18   before and which therefore we put that together in his

19   supplemental report.

20         Now, there's a bit of a -- there's an add on layer

21   here, Your Honor, in that as time has gone on -- the study

22   that I'm talking about is called a longitudinal study.  It

23   follows a number of children over years.  And it began back in

24   I'm going to say 2010, 2011 thereabout, Your Honor.  So it's

25   been ongoing for a while.

January 19, 2022

1          And over the course of years, different researchers

2    have published some aspects of that study.  But they have not

3    disclosed underlying data.  And so Mr. Stern --

4          THE COURT:  Okay.  Let me focus us in.  Because what

5    I need to decide is whether this is a supplement or a

6    rebuttal.  If it's rebuttal, it's untimely.  And if it's a

7    supplement, I have a test I have to apply.

8          So let me first understand whether it's your position

9    that Dr. Finley's original report or supplemental report was

10   incomplete or inaccurate.

11         MR. TER MOLEN:  So it was not incomplete or

12   inaccurate except in the sense that now we have additional

13   information which --

14         THE COURT:  Right.  And here's exactly what it was

15   looking like to me is that Dr. Finley wasn't incomplete or

16   inaccurate.  So there's no correction needed to his original

17   report.  He's just got more data now that is available to him

18   than he had at that time or more studies that he understands

19   the basis for and the data and so on.

20         And so it certainly sounds like a supplement to his

21   rebuttal report.  So it's a supplement.  And from my

22   perspective it's then untimely, unless you're telling me that

23   the original report was incomplete or inaccurate.  And you're

24   not telling me that.

25         MR. TER MOLEN:  Well, I am telling you, Your Honor,

 1   that based on information we have now that wasn't available

 2   earlier, his report was incomplete in the sense that it didn't

 3   include that -- all of that data that's now available and that

 4   I think is clearly new data.

 5            And I would add, Your Honor, that this is an issue

 6   where clearly, as you pointed out I think in your ruling on

 7   the Richard Humann second supplement, right, that this is an

 8   issue that has been raised.  The blood lead level and the half

 9   life has been an ongoing issue that's been litigated.  And so

10   certainly even if Your Honor were to hold that this is not

11   new, it is -- we would contend and suggest as Your Honor found

12   in the Humann case that it is not prejudicial to allow this

13   now.

14            THE COURT:  Okay.  Hold on one second.  I have a

15   contradictory meeting that I'm currently missing that I just

16   need to ...

17                      (Pause In Proceedings)

18            THE COURT:  I lost track of time.  But I'll fix it.

19   I was to have a meeting.  But I'll have it still.  Okay.

20            So here's the issue is that the class plaintiffs had

21   what I thought was improper, untimely rebuttal.  And I

22   excluded it.  And you're aware of that.  Dr. Humann or

23   Mr. Humann had some portions of his supplement that I

24   permitted and other portions that I did not.

25            And so the cases say you can't just continuously

1    supplement a report.  There has to come a time when that --

2    when we've got a record in the case.  I understand that you're

3    probably going to say, well, you're now letting Mr. Stern

4    bring these seven witnesses that we didn't know about.

5           But I think these are very different issues in that

6    those witnesses were apparently somewhat identified but not

7    through the interrogatories.  But let's just set that aside.

8    Because what we're really on is the experts.

9           And so if it's a supplement saying we have to look at

10   these five Howe factors -- surprise to the party against whom

11   the evidence would be offered; ability of that party to cure

12   the surprise; the extent to which allowing the evidence would

13   disrupt the trial; the importance of the evidence; and the non

14   disclosing parties's explanation for its failure.

15          I totally understand your explanation, Mr. Ter Molen.

16   You have given a thorough and very reasonable explanation that

17   explains exactly why you disclosed it as soon as you had it

18   available.  So I'm not concerned about that.

19          But I've read Mr. Stern's letter.  So instead of

20   turning to him, he says not only -- he's shocked, surprised,

21   to put it mildly.  And it's whether -- and it's not whether he

22   tells me he's surprised or shocked.  But it is a lot of data

23   at 31 days or something before trial.  And the ability of a

24   party to cure is essentially null.

25          I mean, I think this is such extensive data that it

1    would take much longer than between now and the beginning of

2    trial on the 15th to cure.

3           The extent to which allowing the evidence would

4    disrupt the trial.  And it seems that it would absolutely

5    disrupt the trial because this is the material of opening

6    statements.  The importance of the evidence.  And here, that

7    really is an interesting factor here.  Because this -- you

8    have evidence from Dr. Finley that contradicts plaintiffs'

9    evidence on half life as set forth by Bithoney and Specht.

10          So in some ways it seems cumulative so it's sort of

11   unimportant in that regard.  But it takes this evidence to a

12   new level if I understand what the evidence is.  And so it is

13   important.  And I think from my perspective would be

14   disruptive.

15          So I think you've articulated that it's a supplement.

16   And so these Howe, H-O-W-E, factors apply.  If it's rebuttal

17   then it's just -- it's too late under rebuttal.  It's a

18   supplement to a rebuttal.

19          But so I don't know if Mr. Stern thinks there's

20   something more that needs to be said here.

21          MR. STERN:  No, Your Honor.  No, Your Honor.

22          THE COURT:  Yes.  Thank you.  Just a minute.  Okay.

23          So I think what we're going to do is exclude that

24   additional supplement that was 31 days before just under the

25   wire in terms of a supplement because I think it does not meet

1    the Howe factors.

2          And also, I'm not convinced entirely that it is a

3    proper supplement in the sense of correcting or further

4    explaining.  But in any event, it will be excluded for those

5    reasons.

6          So is there anything else for us to discuss today?

7          MS. DEVINE:  Your Honor, can I correct one thing I

8    stated on the new witness issue?

9          THE COURT:  Sure.

10          MS. DEVINE:  I had said there were seven witnesses

11    and I just went back and checked.  It's 11 in total, not

12    seven.  I don't think that changes anything, but I just wanted

13    to make sure that was corrected.

14          THE COURT:  Okay.  Thank you.

15          MS. DEVINE:  Thank you.

16          THE COURT:  The other thing I wanted to discuss --

17    and we can go off the record on this, Jeseca.

18                         (Off The Record)

19                      (Proceedings Concluded)

20                -          -          -

21

22

23

24

25

January 19, 2022

1      <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2           I, Jeseca C. Eddington, Federal Official Court

3    Reporter, do hereby certify the foregoing 138 pages are a true

4    and correct transcript of the above entitled proceedings.

5    <u>/s/ JESECA C. EDDINGTON____</u>                 <u>1/21/2022</u>
     Jeseca C. Eddington, RDR, RMR, CRR, FCRR        Date
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25