## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

*In re* Flint Water Cases

Judith E. Levy
United States District Judge

_____/

This Order Relates To:

*Bellwether I Cases*
Case No. 17-10164

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS LOCKWOOD, ANDREWS & NEWNAM, P.C. AND LOCKWOOD, ANDREWS & NEWNAM, INC'S MOTION FOR SUMMARY JUDGMENT [334]

Plaintiffs bring this suit for professional negligence against Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC's (collectively "VNA"), Lockwood, Andrews and Newnam, Inc., Lockwood, Andrews and Newnam, P.C. (collectively "LAN"), and the Leo A. Daly Company ("LAD") for harms arising out of the Flint Water Crisis. Plaintiffs' cases have been consolidated for the purpose of holding the first bellwether trial in the Flint Water litigation.

Currently before the court is LAN's motion for summary judgment. For the reasons set forth below, LAN's motion is GRANTED IN PART and DENIED IN PART.

## I.    Background

Plaintiffs E.S., A.T., R.V., and D.W. are four children who allege that they have suffered neurocognitive harms because of their exposure to lead contaminated drinking water in the City of Flint.  They bring this suit for professional negligence against LAN and two other companies, VNA and LAD. LAN is a water engineering company which provided the City of Flint with services related to the Flint Water Treatment Plant ("FWTP") before and during the Flint Water Crisis. According to Plaintiffs, LAN's professional negligence contributed to their injuries.

The basic facts of this case are by now familiar. On April 25, 2014, the City of Flint switched its residential water supply from the Detroit Water and Sewage Department ("DWSD") to the Flint River. Flint River water is more difficult to treat than the Lake Huron water used by DWSD. The FWTP was refurbished to treat Flint River water, but that refurbishment was inadequate. Importantly, the FWTP treatment did not include sufficient measures to control or inhibit the corrosive

properties of Flint River water. As a result, lead leached into Flint's drinking water. Flint's drinking water was not reconnected to DWSD until October 16, 2015. (*See* ECF No. 606, PageID.42679) (setting forth this background).

As the Court explained in its opinion resolving VNA's motion for summary judgment, Plaintiffs have presented expert testimony indicating that they suffered neurocognitive injuries and that their exposure to lead in Flint's drinking water was the most likely cause of those injuries. (*See* ECF No. 606, PageID.42683–42686.)

LAN's involvement as a water engineer for the City of Flint runs back to at least 2011, when it cooperated with Rowe Engineering on a report regarding the viability of upgrading the FWTP for the treatment of the City of Flint's drinking water. (ECF No. 327, PageID.13191–13192.) Although the parties disagree about the extent of LAN's involvement in the years leading up to the Flint Water Crisis, it is clear that LAN was involved in discussions with the City of Flint about a possible switch to Flint River water by May of 2013 (ECF No. 327, PageID.13202–13203). Shortly after those discussions, LAN submitted a draft proposal to conduct a variety of upgrades to the FWTP, including

3

providing for corrosion control through a lime and soda ash treatment. (ECF No. 334-33.)

In July of 2013, the City of Flint retained LAN to provide "professional engineering services for assistance in placing the Flint Water Plant into operation using the Flint River as a primary drinking water source for approximately two years and then converting to KWA-delivered lake water when available at a cost of $171,000.00." (ECF No. 371-4, PageID.24086 (City Resolution).) The $171,000 cost estimate reflects the fee for two of the three tasks LAN outlined in its draft proposal, namely, (1) to aid the City in performing a Plant Test Run, and (2) to prepare an Engineering Planning Report. (*See* ECF No. 334-33.)

After a test run of the FWTP failed dramatically because a variety of its components were nonfunctional, the City of Flint hired LAN to perform additional engineering services for the refurbishment of the FWTP. (ECF No. 334-52 (November 19, 2013, change order).) In a memorandum attached to that change order, the City of Flint's Finance Director noted that "LAN's work concluded that using the Flint River on a temporary basis only was feasible," but that "work must begin immediately if the April 2014 deadline [for the switch] is to be met." (*Id.*

4

at PageID.19654.) LAN itself informed the City that "the…proposed improvements are needed to place the WTP into service next spring." (*Id.* at PageID.19657.) These improvements included work on (1) chemical systems and ozone treatment, (2) upgrades of "antiquated" electrical technology, (3) the addition of mid-point chlorination facilities, (4) the rehabilitation of a pump station, (5) the addition of a raw water piping connection relevant for the FWTP's eventual connection to the Karegnondi Water Authority, and (6) the design of a lime residuals disposal plan. (*Id.* at PageID.19657–19661.) It is undisputed that the FWTP was put into service prior to the completion of these upgrades. (ECF No. 327, PageID.13220–13221).

According to Mr. Richard Humann, Plaintiffs' expert engineer, a reasonable engineer in LAN's position would have warned the City of Flint that it would be practically impossible to complete these upgrades prior to April 2014. (*See* ECF No. 643). Such a warning was necessary because, in Mr. Humann's opinion, several of the pending upgrades were necessary to control the corrosivity of water. (*Id.* at PageID.43337; ECF No. 641, PageID.43291; *see also* PageID.43306 (opining that upgrades would have been necessary from "day one" of FWTP's operation).)

5

Moreover, according to Mr. Humann, LAN should have warned the City of Flint that its drinking water would be unsafe if an orthophosphate corrosion inhibitor was not added. (*See, e.g.,* ECF No. 330-26, PageID.15206.) Mr. Humann also testified that the lime and ash softening solution recommended by LAN in 2013 would have been insufficient to control the water's corrosive properties. (ECF No. 641, PageID.43301.)

The parties agree that in the months before the switch, LAN was not hired to complete any further work relevant to water quality, nor was it tasked with implementing any form of corrosion control. Uncontroverted record evidence suggests that Mike Glasgow, the operator of the FWTP, was planning to use orthophosphates as late as March 26, 2014. (ECF No. 334-57, PageID.19688.) LAN asserts that the City of Flint was ultimately dissuaded from this plan by the Michigan Department of Environmental Quality ("MDEQ").

After the switch to Flint River water, the City of Flint received several violation notices alerting it to elevated levels of TTHM's in the

6

drinking water.[1] In September of 2014, LAN was hired to investigate the TTHM problem. LAN responded with several recommendations. According to LAN, it remained unaware at this time that Flint's drinking water also contained lead. (ECF No. 327, PageID.13232.) Hence, LAN did not issue any warnings about corrosion control or the dangers of lead poisoning when it completed its TTHM-related work.

LAN filed this motion for summary judgment on May 11, 2021, and it is fully briefed. The Court heard oral argument on November 4, 2021 (ECF No. 420.)

## II.    Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light

---

[1] Total Trihalomethanes ("TTHM's") are disinfection byproducts that form when water is treated with chlorine.

most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## III.  Analysis

Plaintiffs' only claim against LAN is for professional negligence. To establish professional negligence under Michigan law, Plaintiffs must show that (1) LAN owed them a legal duty of care, (2) LAN breached this duty, (3) Plaintiffs were injured, and (4) LAN's breach caused Plaintiffs' injuries. *See, e.g., Henry v. Dow Chem. Co.*, 473 Mich. 63, 71–72 (2005). LAN argues that summary judgment is appropriate because Plaintiffs have failed to establish a material issue of fact as to the duty, breach and causation elements of their case.

Plaintiffs allege two central failures on LAN's part: (1) it did not inform the City of Flint in 2013 that a timely upgrade of the FWTP was impossible, and (2) it did not recommend the use of orthophosphates or warn about the consequences of a failure to do so. For the reasons set forth below, summary judgment is denied as to both theories. However, with respect to alleged negligence in recommendations regarding

8

orthophosphates, Plaintiffs can establish breach or causation only for conduct that occurred after March 26, 2014.

## A. Legal Duty

The Court has recently explained the framework for determining whether a legal duty exists under Michigan law in two different decisions. *In re Flint Water Cases,* No. 17-11726, 2021 WL 5237197, at *2–4 (E.D. Mich., Nov. 10, 2021) ("Lee"); *In re Flint Water Cases*, No. 17-10164, 2022 WL 94899, at *4–9 (E.D. Mich., Jan. 10, 2022) ("VNA"). For the reasons set forth in those opinions, LAN's work for the City of Flint triggered a duty to avoid foreseeable physical harm to users of Flint's water, including Plaintiffs. *Id.*

LAN argues that even if it owed Plaintiffs a general duty of reasonable care, it did not owe them the specific duties identified by Plaintiffs.[2] According to LAN, there was no need to warn City of Flint officials about the impossibility of upgrading the FWTP, because such upgrades were not, in fact, impossible. Instead, LAN maintains that the

---

[2] LAN also argues that Mr. Humann's testimony regarding these specific duties is inadmissible, but those challenges have been resolved by the Court's orders on LAN and VNA's *Daubert* motions. (*See* ECF No. 523; ECF No. 643.)

upgrades scheduled as part of the November 2013 change order were not related to water quality and not essential to the FWTP's treatment of Flint River water. (ECF No. 641, PageID.44305; ECF No. 326, PageID.13273.)

LAN's position on the necessity of these upgrades has undergone a remarkable evolution. In 2013, LAN told the City of Flint in no uncertain terms that "the … proposed improvements are needed *to place the WTP into service next spring*" (ECF No. 334-52, PageID.19657 (emphasis added).) That message is repeated again and again in LAN's November proposal. For instance, the "segment I" upgrades—which included the chemical and ozone systems, electrical work, mid-point chlorination, pump station maintenance and raw water piping connection that LAN now argues were all unneeded for the treatment of Flint River water— were listed as "to be completed as soon as practical *so that the WTP can be utilized to treat water from the river in the spring of 2014.*" (*Id.* at PageID.19657 (emphasis added).) In contrast, LAN has thus far failed to identify any record evidence supporting its present view that the upgrades were unnecessary. Moreover, Mr. Humann's testimony alone would be sufficient to raise a material question of fact as to whether the

10

upgrades scheduled in November were required to reduce the corrosivity of the water. (*See* ECF No. 641, PageID.43291–43292.)

Accordingly, there is sufficient evidence to permit a reasonable jury to find that the 2013 upgrades were necessary to treat the Flint River water, and that LAN should have warned the City of Flint accordingly.

LAN also argues that it could not have owed a duty to recommend the use of orthophosphates because it was not hired to perform any corrosion control services. But providing corrosion control services is distinct from merely recommending them. On the current record, it is far from clear that LAN's duties for the City of Flint would not have included an obligation to issue such recommendations. In November of 2013, the City of Flint remained under the impression that LAN would "study the feasibility and develop cost estimates for utilizing the Water Plant as a primary drinking water source" and do the "construction engineering" necessary "to operate the Water Plant off the river" (ECF No. 334-52, PageID.19652.)  In any event, LAN's common law duty to take reasonable care was not limited to the four corners of its contract. *Loweke v. Ann Arbor Ceiling & Partition Co.*, 489 Mich. 157, 159 (2011) (citing *Davis v. Venture One Constr. Inc.*, 568 F.3d 570, 575, 577 (6th Cir. 2009)). Instead,

11

LAN owed Plaintiffs a duty to avoid *all* foreseeable physical harms arising out of its work for the City of Flint. *VNA* at \*8–9; citing *Hill v. Sears, Roebuck and Co.*, 492 Mich. 651, 660 ("Every person engaged in the performance of an undertaking has a duty to use due care or not to unreasonably endanger the person or property of others.").

This is not to say that LAN was required to conduct water quality studies or implement corrosion controls on its own initiative. Michigan law does not impose a duty on professionals to provide gratuitous services whenever those might be needed. *Cf. VNA,* \*4–6 (collecting cases); *Bailey v. Schaaf*, 494 Mich. 595, 604 (2013) (no duty to aid or protect) (collecting cases). But Plaintiffs argue only that LAN should have *recommended* the use of orthophosphates and warned about the consequences of a failure to do so. They could prevail on this theory by showing either that issuing such recommendations was within the scope of LAN's work, or through expert testimony that any engineer in LAN's position would have known that orthophosphate corrosion controls were necessary to prevent the leaching of lead into Flint's drinking water. (ECF No. 330-26, PageID.15205–15206.) As set forth above, admissible evidence supports both theories. Accordingly, Plaintiffs have raised a material question of

12

fact as to whether LAN had a duty to warn the City of Flint about the necessity of orthophosphate corrosion control.[3]

## A. Breach and Causation

LAN next argues that Plaintiffs have not raised a material issue of fact as to the elements of breach or causation. Because these elements are closely linked in this case, they are analyzed together below.

In a professional negligence case, the element of breach requires "proof of simple negligence based on a breach of a professional standard of care." *Broz v. Plante & Moran, PLLC*, 331 Mich. App. 39, 52-53 (2020) (citing *Phillips v. Mazda Motor Mfg. (USA) Corp.*, 204 Mich. App. 401, 409 (1994)).

The Court has previously set forth the causation framework that applies to this case. *VNA*, at *10. First, Plaintiffs must establish but-for cause and proximate causation. *Id.* (citing *O'Neal v. St. John Hosp. & Med. Ctr.*, 487 Mich. 485, 496–97 (2010)). To show that LAN's conduct

---

[3] LAN also asks the Court to grant summary judgment as to the theories of duty raised in the Complaint but not supported by Mr. Humann's testimony. For the reasons set forth in *VNA*, LAN's motion for summary judgment on these theories is moot. *VNA* at *9.

13

was the cause-in-fact of their injuries, Plaintiffs must show that but for LAN's negligence, those injuries would not have occurred. *Id.* To show that LAN's negligence was also the legal cause of their injuries, Plaintiffs must show that their injuries were a reasonably foreseeable consequence of LAN's negligence. *Id.* (citing *Ray v. Swager,* 501 Mich. 52, 66 (2017)). Second, Plaintiffs must establish general and specific causation: they must show that lead-poisoning could cause injuries like theirs, and that it did in fact cause their injuries. *Id.* (citing *Powell-Murphy v. Revitalizing Auto Comm's Env. Response Trust,* 333 Mich. App. 234, 250 (2020)).[4]

For purposes of the breach and causation analyses, the Court will consider separately three theories of liability offered by Plaintiffs: (1) LAN negligently and incorrectly told the City of Flint that the FWTP could be timely refurbished, (2) LAN negligently failed to warn the City of Flint that it should use orthophosphates *prior* to March 26, 2014, (3) LAN negligently failed to warn the City of Flint of the consequences of

---

[4] LAN objects to Plaintiffs' case on the elements of general and specific causation by joining in all of VNA's arguments on those elements. (ECF No. 327, PageID.13280.) Because the Court resolved each of those arguments when it resolved VNA's motion for summary judgment, they will not be addressed again here. *See VNA*, *10–16.

its decision not to use orthophosphates *after* it had decided not to use appropriate corrosion controls.[5] For the reasons set forth below, summary judgment is appropriate on the second theory. Plaintiffs have raised sufficient evidence to proceed to trial on their other theories of liability.

## A. Scheduling Failures

Plaintiffs first claim that LAN breached the standard of care by incorrectly informing the City of Flint that it could timely refurbish the FWTP. LAN argues that the refurbishments were not related to water quality and that there was therefore no need to warn the City that they could not be completed prior to April of 2014. Accordingly, LAN disputes breach as well as causation: if there was no immediate need to complete the upgrades, then LAN was not negligent in scheduling them so close to the April 2014, switch, and if the refurbishments were unrelated to water quality, then they bear no causal relation to the injuries in this case.

Material questions of fact prevent the resolution of either of these arguments at summary judgment. Mr. Humann testified that the

---

[5] Plaintiffs consider the second and third theories to be part of a single, continuous failure on LAN's part. However, for the reasons explained below, that theory is not viable.

upgrades scheduled in the November 2013 change order were required to reduce the corrosivity of the water. (*See* ECF No. 641, PageID.43291– 43292.) Moreover, language in the contracts between LAN and the City strongly suggests that the City relied on LAN's representations. (ECF No. 334-52, PageID.19654 (noting that LAN had determined using the FWTP for Flint River water was "feasible" if upgrades started immediately).) A reasonable jury could therefore find that (1) LAN's failure to inform the City of Flint that necessary upgrades could not be completed in time for the switch to Flint River water constituted a breach of LAN's duty to Plaintiffs, and (2) this breach causally contributed to the City of Flint's decision to use the FWTP to treat its municipal water supply before it was safe to do so. And as this Court has previously set forth, there is evidence showing that Plaintiffs' consumption of inadequately treated Flint River water caused their neurocognitive injuries. *VNA*, *10–14. Hence, summary judgment is denied on this theory of liability.

## B. Failure to Recommend Orthophosphates Prior to March 2014

Plaintiffs next argue that LAN failed to recommend the use of orthophosphate corrosion inhibitors in the years leading up to the switch

16

to Flint River water. LAN responds that (1) it did not breach its duty to recommend orthophosphates because it did, in fact, issue the appropriate recommendations, (2) any failure on its part to warn the City of Flint could have had no causal impact on Plaintiffs because the City of Flint was planning to use orthophosphates until March 26, 2014, and (3) negligent decision making and criminal conduct by government officials constitute intervening causes relieving LAN of liability.

LAN's first argument is unconvincing. Although orthophosphates were included in the 2011 Rowe-LAN report, LAN acknowledges that this inclusion amounted to no more than "a placeholder for a possible corrosion control inhibitor" in a cost analysis. (ECF No. 327, PageID.13266.) LAN points to later instances at which it recommended full softening with lime and soda ash, but those recommendations do not suffice. After all, Mr. Humann has opined that only orthophosphate corrosion control would have been sufficient in this case. (ECF No. 641, PageID.43301). LAN also references older reports written by other engineers, but LAN cannot show that *it* lived up to the standard of care by pointing to the work of others.

Importantly, however, there is uncontroverted record evidence showing that the City of Flint was planning to use orthophosphate corrosion control at least up to March 26, 2014. Meeting records suggest that City of Flint officials were considering adding "corrosion control as a precaution" to ensure "lead/copper compliance" as early as 2012. (ECF No. 334-18, PageID.19308.) On March 26, 2014, Mike Glasgow e-mailed an explanation of various water treatment parameters to several City of Flint employees (ECF No. 334-57.) In his e-mail, Mr. Glasgow explains that "there will be at least 1 mg/L of total phosphorous, because we will be adding phosphate at that level for corrosion control in the distribution system, and I expect more depending on the river quality." (*Id.*, PageID.19688.) On August 31, 2015, Mr. Glasgow e-mailed Howard Croft and told him that "we originally had [phosphate] in the design, but the DEQ did not mandate it from the start." (ECF No. 334-43, 19535.) Mr. Glasgow later testified that he had been instructed by the MDEQ that the addition of orthophosphates would not be required. (ECF No. 334-36, PageID.19441.)

Accordingly, the record shows that Mike Glasgow was planning to use orthophosphate corrosion control at least until March 26, 2014.

Hence, prior to March 26, 2014, the FWTP's operators were planning to do precisely what Mr. Humann opines LAN should have recommended. Plaintiffs have not pointed to any evidence suggesting that warnings issued prior to this date could be the but-for cause of their injuries. Indeed, it is difficult to see what such evidence would look like. Plaintiffs would need to show that even though the City of Flint was already planning to use orthophosphates, and even though the City of Flint was broadly aware of recommendations to do so, an additional warning would have prevented them from later changing their minds. *See generally O'Neal v. St. John Hosp. & Med. Ctr.*, 487 Mich. 485, 496–97 (2010) (describing cause-in-fact requirement). There is nothing in the record to support this view.

Moreover, there is no testimony to suggest that reasonable engineers would continue to insist on a corrosion control measure that those in charge were already planning to use. Even when read in the light most favorable to Plaintiffs, Mr. Humann's testimony does not support so expansive a construction of the standard of care. Hence, LAN's failure to insist on corrosion control prior to March 26, 2014, cannot plausibly be construed as a breach of the standard of care under these circumstances.

It is true that Mr. Glasgow's message hardly inspires great confidence in the FWTP's treatment plan. Less than a month away from the planned switch, the FWTP operators evidently still had not completed appropriate testing to determine the quality of the river water. (*See* ECF No. 334-57, PageID.19688 (noting that more phosphates might be needed "depending on the river quality")). But irresponsible conduct on the part of FWTP employees alone is insufficient to make a case against LAN. Plaintiffs have not argued that LAN had a duty to reiterate its recommendation to run appropriate water quality testing after the City of Flint decided not to hire LAN for that purpose. Nor does Mr. Humann's testimony appear to support that view—indeed, Mr. Humann suggested that water quality testing was *not* necessary so long as orthophosphates were used. (ECF No. 641, PageID.43303 ("If they stuck with the orthophosphate, then no, there would have been no study requirement.")).

Accordingly, Plaintiffs have not pointed to any evidence in the record showing that LAN could have usefully intervened prior to March 26, 2014. Because there is no evidence of breach or cause in fact for this period, summary judgment is granted as to this portion of Plaintiffs'

claims. This ruling renders LAN's arguments regarding intervening causation moot insofar as they applied to conduct prior to March 26, 2014.

## C. Failure to Warn About Orthophosphates After March 2014

This leaves Plaintiffs' third theory of liability: that LAN should have warned the City of Flint about the consequences of its failure to use orthophosphates after it made the decision not to use them. As an initial matter, LAN claims to have remained entirely unaware of the City of Flint's decision not to use orthophosphates until August of 2015. According to Mr. Humann, however, any reasonable engineer aware of the problems Flint residents were experiencing with their water (such as discoloration and smell) would have known that "corrosion was a significant problem." (*See, e.g.,* ECF No. 414-1, PageID.31284.) Accordingly, whether LAN knew or should have known of the City of Flint's failure to use appropriate corrosion controls is an issue of fact to be decided at trial.

LAN argues that summary judgment is nevertheless appropriate on this theory because it is not supported by any expert evidence and

because the criminal conduct of governmental actors constitutes an intervening cause.

It is true that Mr. Humann cannot testify about work LAN conducted in 2014 or 2015 because he failed to review any records relevant to that work. LAN claims that this is fatal to Plaintiffs' case, but that is incorrect. To be sure, expert evidence is ordinarily required to establish breach in a professional negligence case. *E.g., Broz v. Plante & Moran, PLLC*, 331 Mich. App. 39, 53 (2020) ("to establish … that the professional breached the standard of care, the plaintiff usually is required to introduce expert testimony.") (citing *Elher v. Misra*, 499 Mich. 11, 21-22 (2016)). But this requirement does not apply to aspects of a case that are within "the common knowledge and experience of an ordinary layperson." *Elher*, 499 Mich. 11 at 21 (citing *Sullivan v. Russel*, 417 Mich. 398, 407 (1988)). After all, the purpose of expert testimony is to clarify issues that are "beyond the ken of ordinary lay persons." *See In re Heparin Prod's Liab. Litig.*, 803 F. Supp. 2d 712, 745 (N.D. Oh. 2011) (citing Fed. R. Evid. 702, Advisory Committee Notes); *see also EQT Prod. Co. v. Phillips*, 767 F. App'x 626, 632 (6th Cir. 2019).

Plaintiffs have offered expert testimony as to all issues outside of common knowledge and experience. Mr. Humann has explained that a reasonable engineer would have warned the City of Flint about the necessity of orthophosphate corrosion controls, and he has explained why such a warning was necessary. LAN claims that Plaintiffs must also provide expert testimony on whether LAN in fact *issued* such a warning, but such testimony would have no added value. Engineers have no special expertise in the reading of meeting records and e-mails. Conversely, juries are perfectly capable of determining whether a party issued a given warning. *Cf. Glittenberg v. Doughboy Recreational Indus.*, 536 Mich. 673, 799 (1990) ("the adequacy of…warnings is a question for the jury").

LAN next argues that the criminal conduct of City of Flint officials constitutes an intervening cause relieving them of any liability. Specifically, Mike Glasgow falsified water tests to suggest, wrongly, that Flint's water was in compliance with the lead and copper rule. (ECF No. 327, PageID.13280).[6] According to LAN, these intervening falsifications

---

[6] LAN cites to *every* criminal charge related to the Flint Water Crisis, but it makes no attempt to argue why and how each of these charges constitute intervening causes as a matter of law. As is explained below, it is not enough to simply point to a criminal act with some relationship to the harms alleged. Instead, a party claiming

show that any negligence by LAN could not have been the proximate cause of Plaintiffs' injuries.

Where an intervening cause has "superseded the defendant's conduct such that the causal link between the defendant's conduct and the victim's injury was broken…the defendant's conduct will not be deemed a proximate cause of the victim's injury." *People v. Schaefer*, 473 Mich. 418, 436-37 (2005). Intervening acts relieve defendants of liability when they are "not reasonably foreseeable." *Id.* Criminal acts are ordinarily not foreseeable as a matter of law. *See, e.g., MacDonald v. PKT, Inc.*, 494 Mich. 322, 334–335 (2001).

LAN appeals to the rule of *MacDonald* to argue that because the falsification of records is a criminal act, it is necessarily an intervening cause as a matter of law. But this argument omits the first step in the intervening cause analysis. After all, it is well established that multiple actors may all be proximate causes of a victim's injury. *E.g. O'Neal*, 487 Mich. at 497 ("it is well-established that the proper standard for

---

intervening causation must explain why the third party's actions *superseded* their own, rather than merely existing alongside them. The Court's opinion focuses on Mike Glasgow's falsification of records because that conduct comes the closest to being an intervening force superseding LAN's conduct.

proximate causation … is that the negligence must be *a* proximate cause, not *the* proximate cause") (cleaned up) (quoting *Kirby v. Larson*, 400 Mich. 585 (1977)). A separate actor's negligence or criminal conduct is an intervening cause only where it *supersedes* an earlier negligent act such that "the causal link between the defendant's conduct and the victim's injury [is] broken." *Schaefer*, 473 Mich. at 436; *see also* Restatement (Second) of Torts §§440–441 (defining superseding and intervening causes). Thus, A and B can both be liable in tort for parallel acts which injure C, even if B's conduct is criminal and A's is not. Criminal conduct is an intervening cause only when it breaks the "natural and continuous sequence…without which [the Plaintiffs'] injury would not have occurred." *Hall v. State, Mich. Dept. of Highways and Transp.*, 109 Mich. App. 592, 603 (1981) (quoting *Weissert v. City of Escanaba*, 298 Mich. 443, 452 (1941) (defining proximate cause)).

In this case, LAN is alleged to have been negligent by failing to warn the City of Flint that its decision not to use orthophosphates would cause the leaching of lead into Flint's public drinking water. Simultaneously, Mike Glasgow, the operator of FWTP, was instructed by his contacts at the MDEQ to falsify his test results. (ECF No. 332-10,

PageID.17419). Neither Mr. Glasgow nor LAN appears to have warned the City of Flint of the impending danger: at least some testimony suggests that several City of Flint employees, including City Manager Gerald Ambrose, remained unaware of the critical necessity of orthophosphate corrosion control. (*See, e.g.,* ECF No. 374-5, PageID.25428 (Mr. Ambrose testifying that he thought corrosion controls were only an "aesthetic issue").)

Whether the falsification of test results constitutes an intervening cause or merely a parallel proximate cause depends on whether LAN should have known of the safety risk to Flint's drinking water *without* having access to accurate test results. If not, then Mr. Glasgow's failure to inform LAN of those results constitutes an intervening force which would break the chain of causation and relieve LAN of liability for its failure to warn. After all, if Mr. Glasgow falsified information that LAN would have needed to issue competent recommendations, Mr. Glasgow in effect sabotaged LAN's work, thereby causally interfering with any potential negligence from LAN.

By contrast, if a reasonable engineer in LAN's position would have warned City of Flint employees even without test results showing

elevated lead levels in the water, then any failure by Mr. Glasgow to publish accurate test results would not break the chain of causation. On this view of the case, the negligent or criminal conduct by Mr. Glasgow, the MDEQ, and LAN would run parallel; each constituting a separate proximate cause of Plaintiffs' injuries.

The ultimate causal inquiry in this case, then, relies on the answers to a series of factual questions. Is Mr. Humann correct in opining that any reasonable engineer would have known of the risk to Flint citizens regardless of any test results? Was LAN aware of the City of Flint's decision in April of 2014 not to use orthophosphates? Proximate causation is often dependent on such factual intricacies, which is why it is a "question…of fact to be decided at the trial level." *Hall*, 109 Mich. App. at 603; *See also Toth v. Yoder Co.*, 749 F.2d 1190, 1196 (6th Cir. 1984) ("Proximate causation, or the lack of it, is generally a question of fact to be decided by a jury") (collecting cases, applying Michigan law). Because it is not clear as a matter of law whether Mr. Glasgow's falsifying of records constituted an intervening cause, this question must be determined by the jury. *Toth*, 749 F.2d at 1196 ("unless it can be said as a matter of law that [the third party's actions] operated as a superseding

27

cause breaking the chain of causation, the issue of proximate causation…should [be] left to the jury.").

LAN separately argues that the decision by Flint officials not to use corrosion control itself constitutes an intervening cause. This is incorrect. First, under the theory of liability now under consideration, LAN's negligent failure to warn did not occur until *after* that decision. *A fortiori*, that prior decision could not be an "intervening" cause. *Cf.* Restatement (Second) of Torts §441. Second, as a professional engineering company LAN had a common law duty to conduct its tasks—including its tasks to advise and recommend—in such a way as to prevent foreseeable physical harms. Accordingly, the fact that Flint officials made incorrect decisions in the absence of competent advice could not possibly relieve LAN from liability for its failure to issue that advice.

For these reasons, summary judgment is denied on Plaintiffs' third and final theory of liability.

## IV.  Conclusion

For the reasons set forth above, LAN's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

28

IT IS SO ORDERED.

Dated: February 7, 2022          s/Judith E. Levy
Ann Arbor, Michigan              JUDITH E. LEVY
                                 United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 7, 2022.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager