```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MICHIGAN
 2                      SOUTHERN DIVISION

 3      LEE-ANNE WALTERS, et al,

 4                      Plaintiffs,
           -v-                             Case No. 17-10164
 5
        CITY OF FLINT, et al,
 6
                        Defendants.
 7      _____/

 8                       STATUS CONFERENCE

 9
                BEFORE THE HONORABLE JUDITH E. LEVY
10                 UNITED STATES DISTRICT JUDGE

11                       FEBRUARY 2, 2022

12
        APPEARANCES:
13
        For the            Corey M. Stern
14      Plaintiffs:        Levy Konigsberg, LLP
                           605 Third Avenue, Suite 33rd Floor
15                         New York, New York 10158

16      For the            James M. Campbell
        Defendants:        Campbell Conroy & O'Neil, P.C.
17                         1 Constitution Wharf, Suite 310
                           Boston, Massachusetts 02129
18
                           Alaina N. Devine
19                         Campbell Conroy & O'Neil, P.C.
                           1 Constitution Wharf, Suite 310
20                         Boston, Massachusetts 02129

21                     (Appearances Continued On Next Page)

22

23      To Obtain a        Jeseca C. Eddington, RDR, RMR, CRR, FCRR
        Certified          Federal Official Court Reporter
24      Transcript:        United States District Court
                           200 East Liberty Street
25                         Ann Arbor, Michigan 48104
```

February 2, 2022

```
 1                        Wayne Brian Mason
                          Faegre Drinker Biddle & Reath LLP
 2                        1717 Main Street, Suite 5400
                          Dallas, Texas 75201
 3
                          Daniel Stein
 4                        Mayer Brown LLP
                          1221 Avenue of the Americas
 5                        New York, New York 10020

 6    Also Present:       Hunter Shkolnik
                          Napoli Shkolnik
 7                        270 Munoz Rivera Avenue
                          Suite 201
 8                        Hato Rey, Puerto Rico 00918

 9                        William Young Kim
                          City of Flint
10                        1101 S. Saginaw Street
                          Third Floor
11                        Flint, MI 48502

12

13

14

15

16

17

18

19

20

21

22

23              To Obtain a Certified Transcript Contact:
                 Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24                     Federal Official Court Reporter
                        United States District Court
25          200 East Liberty Street - Ann Arbor, Michigan 48104
```

February 2, 2022

1                        **I N D E X**

2        MISCELLANY

3        Proceedings..................................4
         Certificate.................................28

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

February 2, 2022

1                    **P R O C E E D I N G S**

2           THE CLERK:  Calling the Flint Water Cases.

3           THE COURT:  Okay.  Well, Jeseca, do we need any

4    appearances to be made on the record?

5           MADAM COURT REPORTER:  No, Judge.  I have everyone.

6           THE COURT:  Okay.  And I want to welcome my two

7    interns for the semester, Ms. Haste and Mr. Stubbs so.

8           Okay.  Well, this is the date and time that we set

9    for an opportunity to go through the first batch of 171

10   questionnaires and identify individuals who we can all agree

11   or at least who I agree should be excused off the top, so to

12   speak, from showing up in court on February 15 or soon

13   thereafter for in-person jury selection.

14          Before we get to that, there are two things I want to

15   review.  And Leslie, if you could put the sidebar setup.  I

16   want to tell you what we have set up for how the trial will

17   take place.

18          THE CLERK:  It will take me just one minute and I'll

19   get it right up.

20          THE COURT:  Take your time.  As you know what we're

21   going to do is have jurors obviously in person in Magistrate

22   Judge Grand's courtroom with counsel and their clients and

23   myself, Jeseca, and the witnesses.  And we will then have

24   closed caption broadcast in the larger courtroom, which oddly

25   seats fewer people socially distanced.

February 2, 2022                                                    5

1          So anyone who wants to be here who's going to be

2     coming up as an expert or whatever and wants to observe

3     directly there and be in the courtroom can observe there.

4     Then we have -- we will be broadcasting, so to speak -- I

5     don't think I'm allowed to use the word broadcasting.  I don't

6     think the judicial conference permits broadcasting.

7          But we will be streaming the trial on Zoom webinar

8     that at least initially will have enough spots for a thousand

9     people.  And I doubt that a thousand people will be interested

10    in observing our time together, as riveting as it might be.

11         But should there be, the Court has promised me that

12    should anywhere near 700 show up on any given day, they would

13    expand it.  They would expand the license or something so more

14    people can attend.  So I'm not concerned about that.  There

15    will be plenty of space on the webinar for observation.  But

16    at least how we have it set up now, no one will testify from

17    the webinar or examine a witness or anything like that.

18         So the question is, what are we going to do for

19    sidebars?  And this is magistrate -- on the screen is

20    Magistrate Judge Grand's jury room.  And Jeseca will -- when

21    it's identified that we need a sidebar while the jury is in

22    the room, that will not be on the webinar.  And the first

23    person to leave the courtroom will be Jeseca with her steno

24    machine.  She will sit at the far end of the room.

25         This picture is one that a real estate agent could

1   have taken.  The room is actually much smaller than this.  I

2   took this picture, so I might go into real estate.

3          And then we have two seats to the right where

4   plaintiffs' counsel can attend and two seats at the table

5   where VNA and LAN could each have a lawyer.  And then two

6   seats behind them if for some reason this requires additional

7   counsel to support whoever the examiner is who requests a

8   sidebar.  And there's space for a law clerk.

9          No one has to sit down obviously.  We want this to be

10  brief.  But I just want you to know that Jeseca will go in

11  first.  Counsel will go in next.  I'll go in last.  And we'll

12  do our best to socially distance and continue wearing masks

13  during the sidebar.

14         Any questions about that?  Okay.

15  MR. MASON:  Your Honor, I do have a question.  Are we

16  talking about a sidebar when we're doing -- when we're picking

17  the jury and we wanted to take a witness out of the presence

18  of the rest of the panel and allow them to ask, you know,

19  private questions or things they don't want to discuss

20  publically?  Or are you talking -- and/or are you talking

21  about during the trial that we would never approach the bench

22  and have a sidebar, we would have to leave the room?

23  THE COURT:  That's it.  There's no space to have any

24  form of social distancing at the side of the bench.  And it

25  would be audible -- I mean, we could mute the webinar.  But I

1   think it would -- there is white noise in the courtroom that

2   we can turn on, but I think it would be very difficult to all

3   crowd around where Jeseca is and have a sidebar in the

4   courtroom.

5           So I think it is both, Mr. Mason.  That's a good

6   question.  So when there's a sidebar during trial, we'll use

7   this technique.  Unless and until we just say we can't bear it

8   anymore.  And then we'll come up with something new.  But I

9   can't think of -- [Crosstalk].

10          We had court services here with -- who could move

11  furniture.  We had IT.  We kept trying different things.  And

12  I don't think there's a way to possibly do it in the

13  courtroom.

14          So what we'll do with objections is you'll -- we

15  won't have so called speaking objections.  You'll just say

16  objection.  Hearsay.  The response can be, not offered for the

17  truth.  I mean just a couple of words.  And if it takes more

18  than that, you'll request a sidebar.  I'll figure out if I

19  think I would benefit from that.  And then we'll have it, if

20  needed.

21          With respect to jurors who have some personal issue,

22  no one so far that I've seen has indicated confidential.  Have

23  any of you seen confidential in response to questions?

24          UNIDENTIFIED PERSON:  No.

25          THE COURT:  So I don't think we're going to have the

1    kind of emotional situations that I've had in the child

2    pornography trials.  So I think this is a pretty

3    straightforward situation for people.

4              Any other questions on the sidebar?  Thank you.

5    Okay.

6              So for the COVID protocols, Leslie is that something

7    you can also put up?  Okay.  So this is proposed.  I'll send

8    this to you.  But the first thing is that anyone coming into

9    the courtroom is required to check their temperature at the

10   station provided at the door just once.  If you go out and

11   come back, once a day is fine.

12             Masks will be required.  Witnesses do not have to

13   wear a mask.  We do have a face shield that witnesses can wear

14   if they -- I'll put that in here.  And jurors and others can

15   remove masks briefly to eat or drink.

16             Then the Court policy is that cloth masks are

17   profoundly discouraged.  So we're requesting that you use N95s

18   or KN94/95s or surgical masks.  This is going to be a problem

19   for jurors.  So I'm going to see if the Court will have a

20   small supply.  If not, I'll have a small supply for jurors who

21   can't afford anything other than a cloth mask.

22             Jurors are the ones most likely not to be vaccinated.

23   So that's something to be aware of.  We are requiring social

24   distancing for jurors.  Lawyers and clients can do as you

25   please.  Then number 5 is the sidebar.  6 -- okay.  I -- in

```
 1   light of the number of people who will be in close proximity
 2   at this trial, I'm going to require either a PCR or a rapid
 3   test twice a week for lawyers and clients who are in the
 4   courtroom regularly.
 5           Washtenaw County has two phenomenal locations with no
 6   lines where you can just make an appointment once a week, spit
 7   in a tube, and your results come back about 24 to 36 hours
 8   later.  Then if either I or a juror tests positive for
 9   COVID-19 and are asymptomatic, we'll adjourn the trial for
10   five days, wait for one negative rapid antigen test.  No need
11   for a PCR because those can remain positive when you're not
12   able to transmit the virus.
13           If counsel or clients test positive, we'll only
14   adjourn if another lawyer cannot proceed.  The client can
15   observe on Zoom webinar.
16           This next portion is the CDC is changing this.  But
17   if an unvaccinated person has been exposure -- an exposure
18   being a term of art -- where it's a sustained contact without
19   a mask under six feet, something like that -- I'll make sure I
20   know -- then I'll sort it out.  So there will be a little bit
21   of a voir dire of the unvaccinated individual to determine
22   whether we can proceed.
23           And if there's a symptomatic case of COVID, the
24   individual will return to the Court when healthy.  And in any
25   event no less than five days and a negative rapid antigen
```

1    test.

2            So that's just a draft.  Does anyone have any

3    questions?  The rapid tests are supposed to become very

4    available very soon.  So it doesn't seem like a huge

5    imposition to either do that or the totally free of charge

6    spit tests.

7            MR. STERN:  Your Honor, I have a couple of questions

8    and comments, if that's okay.

9            THE COURT:  Sure.

10           MR. STERN:  First off, thank you for spending so much

11   time on this and putting it together.

12           You know, I personally have an issue with the

13   testing.  I mean, I'm going to do it obviously.  You know, I'm

14   triple vaxed.  I've gone to great lengths to make sure that

15   I'm safe.  And one of the reasons why I became triple vaxed

16   was to be able to, you know, on a very personal level get on

17   airplanes and be in courtrooms and protect myself and protect

18   other people.

19           I just recently had one of my kids who tested

20   positive cause they had to get tested.  He also was triple

21   vaxed and he tested positive.  Was completely asymptomatic.

22   But it caused ten days of quarantine essentially for our

23   family just because we wouldn't let him go back to anything

24   until he tested negative despite the five-day rule from the

25   CDC.

```
 1              I guess my big issue is I can't change anybody else's
 2   mind and I respect everybody's opinions and what the rules
 3   are.  But I would prefer if I'm going to get tested on a
 4   weekly basis to be able to test on a Saturday before I come to
 5   Michigan so that in the event I test positive, I can be -- not
 6   that I want to be around my wife -- well, I always want to be
 7   around my wife and kids.  I'm not sure they always want to be
 8   around me.
 9              But I'd rather be in a comfortable place where I can
10   at least be cared for in some way rather than being in a hotel
11   in Michigan for five to ten days in light of a positive test.
12              THE COURT:  Oh, of course.  It's just once a week.
13   Once a week.
14              MR. STERN:  Okay.
15              THE COURT:  It can be wherever you are.
16              MR. STERN:  Okay.  And I can tell you on this side,
17   at this point the way we have prepared for trial, our team,
18   and, you know, it's Mr. Maimon and it's me.  And we may
19   have -- you know, we'll have some help from folks.  But in
20   terms of trying the case, it's two of us.
21              If one of us tests positive, I see the part of the
22   order or -- it's not an order.  Who says that unless someone
23   else can't stand in for them or can't proceed.  I can tell you
24   now it would be very difficult for our team if one of us was
25   to test positive to proceed without the other.
```

```
 1              It's not because we're so dependent on each other.
 2     But the way we've divided this up, the way we're preparing our
 3     witnesses, the way we're proceeding with this trial, it would
 4     be very difficult for one of us to proceed without the other.
 5     So I --
 6              THE COURT:  I agree.  I would imagine that's true.
 7     So we would adjourn for five days.  And all of this is subject
 8     to modification, number one if it just doesn't work for some
 9     reason or the CDC changes its view.
10              Are you suggesting that -- the fact is I know that we
11     will have individuals in the courtroom -- I absolutely know we
12     will have individuals in the courtroom who are not vaccinated.
13              MR. STERN:  Right.
14              THE COURT:  And it would break my heart if an
15     individual got sick and had a struggle with this disease so.
16              MR. STERN:  I'm not at all like trying to convince --
17     I've learned over the last three years of this that everyone
18     has a strong opinion or some opinion about all of this.  And
19     no one's wrong.  I mean, I think everyone on this conference
20     knows that I personally have lost someone very close to me as
21     a result of COVID.  I take it very, very serious.
22              I just -- I've gotten to a point where I'm taking
23     every precaution and our team in our office, all of our
24     employees, you know, they're not even allowed to be in our
25     office unless they're triple vaxed at this point.
```

February 2, 2022

1        You know, I think there will be breaks in the trial
2    as a result of this and that's okay.  But I just wanted to --
3    the point of speaking up was I wanted to confirm it's okay
4    that I test before I get to Michigan.
5        And that I didn't want anybody to think on a
6    Wednesday if I test positive and we have had a tough week and
7    we say, hey, we can't proceed without the other, I want
8    everybody to know on the front end that in our preparation of
9    the trial, we are completely interdependent on one another in
10   the way in which we're doing this.
11       It doesn't mean that if it happens on a Thursday that
12   someone may not be able to move forward on a Friday -- or a
13   Wednesday may not be able to move forward on a Thursday, but I
14   wanted to be transparent on the front end that it would be
15   highly likely if one of us tests positive that we would
16   suggest that it be adjourned with the hope obviously that no
17   one does.  And I, of course, don't want that for anybody.
18           THE COURT:  Thank you.
19           MR. STERN:  And with regard to the two rapid tests,
20   the -- as I'm sitting here in realtime thinking about this,
21   coming in on Saturdays or Sunday in preparation for the week
22   ahead, if I were to take a rapid test on a Saturday and then
23   take a rapid test on a Friday based on this protocol, that
24   seems like it would be -- okay.  All right.
25           Well, I appreciate the effort that's put into this.

February 2, 2022                                            14

1   I may be totally on an island the way I feel about this and I

2   apologize if I offended anybody at all because that's not my

3   intent.

4           THE COURT:  Yeah.  And maybe the point is one rapid

5   test.  If the rapid tests are catching this adequately, I

6   think I'm okay with one rapid test per week or a PCR test.

7           MR. MASON:  Your Honor, I do have a couple of

8   comments.

9           THE COURT:  Sure.

10          MR. MASON:  First of all, can we use -- and I've

11  never used them, but I understand they're out there.  If

12  they're available, can we use a home test?

13          THE COURT:  Yeah, that's what I'm talking about.  A

14  rapid test.

15          MR. MASON:  Well you mentioned there were two

16  facilities and I'd rather --

17          THE COURT:  Those are for the PCR.

18          MR. MASON:  Okay.  All right.  So we can use the home

19  tests and we'll buy those for our team.

20          THE COURT:  Yeah.

21          MR. MASON:  And I want to flush out this issue that

22  Mr. Stern said, and I understand in his case there's two of

23  them.  We have -- we may have larger teams, but the client

24  should be able to utilize whomever they deem is appropriate to

25  cross-examine or direct witnesses.  So I would --

1    THE COURT:  Correct.  And so all you have to do is

2  articulate that.

3    MR. MASON:  And that's all I'm saying, is I think

4  lead counsel, it should be in the sole discretion of lead

5  counsel who knows their case and their client to designate

6  that.

7    Because we've had in these cases sometimes where

8  people have said, oh, well they're a big law firm.  They've

9  got other lawyers that can do it.  And that's not appropriate

10  in an important trial that witnesses, as Mr. Stern says, have

11  been, you know, divvied up.  And it may be something that I

12  could pick up and go with, but if I'm doing the examination

13  it's not appropriate just to hand it to somebody else on my

14  team.

15    THE COURT:  Absolutely.  The other good thing about

16  our case is we have a lot of video footage to show these

17  jurors.  And so my thought was if -- and I trust this is not

18  going to happen in light of your experience already with

19  COVID, Mr. Mason, should you test positive with it and be

20  unable to be in the courtroom for a day or something, say it's

21  on a Wednesday, that if there are videos that can be fired up

22  and played --

23    MR. MASON:  Sure.

24    THE COURT:  -- then that seems uncomplicated.

25    MR. MASON:  And we'll work with the Court.  Even if

| | |
|---|---|
| 1 | somebody, a witness has to be taken out of order or something |
| 2 | like that, play a video, we'll work with the Court.  I just |
| 3 | want to make sure that we don't get into the situation where |
| 4 | we're having somebody say, well, there are other lawyers in |
| 5 | the firm that can do that.  And I don't think that's |
| 6 | appropriate at this trial. |
| 7 | THE COURT:  I'm not going to make the decision -- |
| 8 | MR. STERN:  That was not my -- |
| 9 | THE COURT:  I'm not going to make the decision -- |
| 10 | MR. STERN:  That was not my -- |
| 11 | MR. MASON:  I'm not accusing Mr. Stern of anything. |
| 12 | In fact, I agreed with his premise with his partner.  I just |
| 13 | wanted to get that out there. |
| 14 | A couple of other questions about masks.  Is there |
| 15 | enough distance that when, for instance, I stand up to do my |
| 16 | opening that I won't have to wear a mask, if the jurors are |
| 17 | wearing a mask, if I'm far enough away from them to be social |
| 18 | distanced? |
| 19 | It's really difficult to communicate and to be able |
| 20 | to make sure they're hearing us and project.  I just think |
| 21 | it's really important and I'd like to have the ability both |
| 22 | for opening as well as standing at a podium asking questions |
| 23 | of a witness. |
| 24 | THE COURT:  This is a very interesting question |
| 25 | because the way we've got things set up, you'll remain seated |

1    during opening.  The Plexiglass will be down.  I know it's

2    like trying to get in a car and not put a seatbelt on for me.

3    But the only way you'll be heard on the webinar or in the

4    other room is if you're seated at the microphone because the

5    lectern will be removed.

6            MR. MASON:  I need to be standing to make my

7    presentation.  And I'm happy to have our technical people work

8    with yours to bring a lanyard in so that it can tap into --

9    I've done it many times -- to the system.  But I respectfully

10   would ask that we not be tethered to sitting at a desk,

11   particularly for just people watching.

12           I mean, the importance of this case is significant

13   with the jury.  And you know, while the Court -- I understand

14   the Court wants to project it.  There are ways to do that by

15   just hooking up a lanyard.  And I would ask the Court to allow

16   us to try and work that out.

17           THE COURT:  I will look into it.  But at the time

18   being, it's the Court's policy.  It's the Eastern District of

19   Michigan's COVID policy that counsel remain seated for their

20   presentation.  I'll look into it though.

21           MR. CAMPBELL:  Your Honor, does that apply also to

22   questioning witnesses?

23           THE COURT:  That's true for questioning witnesses,

24   yes.  And I've had several evidentiary hearings in court

25   during COVID already.  And it's really quite effective because

 1  you actually are not dropping binders and exhibits and things
 2  like that so.  Okay.
 3           MR. MASON:  I do have strong feelings about this,
 4  Your Honor.  If the Court wouldn't mind seeing if the
 5  technology is available and considering it.
 6           THE COURT:  I will.
 7           MR. MASON:  And I'll pay for the technology if we --
 8  we have lanyards.  We have technical people that have the
 9  ability to do this.  So we're happy to not put the burden on
10  the court.
11           THE COURT:  Mr. Mason, would you be willing to wear a
12  face shield during your opening?
13           MR. MASON:  Sure, Your Honor.  I mean, if that -- a
14  clear shield I think is different than what I call the muzzle.
15           THE COURT:  Yeah.
16           MR. MASON:  And I think it would be -- it would
17  benefit the jurors and I think it's appropriate to make
18  certain that the jury can see our expressions, can also hear
19  us and make sure that we can project well.
20           THE COURT:  Okay.  I'll look into it and let you
21  know.
22           MR. STERN:  Your Honor, I would just ask that we keep
23  this whole thing open for further discussion.  I mean, I could
24  see a scenario where I may be more comfortable seated without
25  a mask and without a face shield, but Mr. Mason may be more

 1    comfortable standing in front of the jury with a face shield.
 2            And you know, I just think this is unchartered
 3    territory on some level and it's stuff that I'd like to just
 4    keep talking about and considering because no one should have
 5    an unfair advantage based on someone else's comfort level
 6    directly related to the requirements of the pandemic.
 7            So again, not trying to throw cold water on any of
 8    this.  I'd probably prefer to stand up as well.  But I've
 9    never worn a face shield.  I've never felt one on my head.
10    I've never put one on.  And it's something I'd have to see how
11    I can do it, you know, before I talk to 10 jurors, you know,
12    about something of this import.
13            THE COURT:  Yeah, I agree.  I naturalized a few
14    hundred citizens with a face shield for hours for two days.
15    And you feel like a coal miner.  But you kind of get used to
16    it.
17            MR. STERN:  May I ask one more -- may I just ask one
18    technical question about this hearing.
19            THE COURT:  Sure.
20            MR. STERN:  I don't want to put anybody on the spot.
21    But when Mr. Mason's talking, there's somebody that keeps
22    popping up in the corner of the screen that looks like they're
23    seed.  I don't know if it's someone in his office or if
24    there's a glitch on my Zoom.  But I keep seeing a gentleman's
25    head that comes up in my right corner of Mr. Mason's box.

```
 1            MR. MASON:  Mr. Gamble who's my partner and who's
 2   appeared in many things in this case is here with me when we
 3   get to the jury questionnaire to assist me.  So we didn't have
 4   introductions or I certainly would have mentioned it, but
 5   that's who it is.
 6            THE COURT:  Oh, that's all right.
 7            MR. MASON:  I can take my blur off if you'd like to
 8   actually see him.
 9            THE COURT:  That's all right.  If we were -- if you
10   were the witness and we were asking questions I'd want to know
11   who's in the room with you but ...
12            MR. MASON:  Sure.
13            THE COURT:  Okay.  So I'm going to look into this
14   issue of opening.  I just don't at this point know exactly how
15   much authority I have to deviate from the Eastern District of
16   Michigan's overall policies.  So I'm going to look into that.
17   We'll see.  Okay.
18            So the other issue that I wanted to know in light of
19   what I'm trying to get done is I don't think we ever set a
20   deadline for counsel letting me know which objected testimony
21   from depositions you plan to use in opening so that I can get
22   that done by the time of the opening.  Did we set a deadline?
23   Does anybody recall that?
24            MR. CAMPBELL:  We did not, Your Honor.  That's the
25   first of the issue that I --
```

```
 1            THE COURT:  Okay.  All right.  I would really benefit
 2   from knowing what testimony from the video deps you plan to
 3   use or quote in your opening so that I can get through all of
 4   that and then go back to the sequential order that I've been
 5   given so far.
 6            MR. MASON:  Could we deal with that on the 14th?  I
 7   mean we're picking a jury -- this is a -- for me it's a work
 8   in progress and it will continue to be a work in progress.
 9   And so I want to be respectful of the judge -- Your Honor in
10   terms of how long you need.  But openings, I think we can
11   probably all agree, are not going to happen until the next
12   week likely from the 14th.
13            If we're going 15th, 16th, 17th, I don't think it's
14   realistic to think we're going to do openings that week.  So
15   depending on how long Your Honor needs --
16            MR. STERN:  I would also add -- and this is just part
17   of the process -- but there's a number of motions that are
18   still outstanding that haven't yet been ruled on.  Which is
19   obviously the Court's super busy with other matters and this.
20   But it would be hard to give a complete list without knowing
21   if some of the stuff that we would include are even going to
22   be permitted.
23            THE COURT:  Absolutely.  And I have not yet ruled on
24   LAN's motion.  LAN and LAD's motion for summary judgment and
25   that will, of course, shape both openings.
```

1          MR. STERN:  Right.

2          THE COURT:  So the 14th is good.

3          MR. STERN:  Okay.

4          THE COURT:  And it's my intention to have the LAN and

5     LAD decisions by the end of this week so.  And then I'll be

6     going back to Hoagland, Crakes, and any remaining motions in

7     limine.  Okay.  So the 14th is great if you can get that to

8     me.  And I'll just keep working my way through these things.

9     But if I need to take them out of order to make sure I get

10    everything that is related to an opening, I'll do that.  Okay.

11          So moving to the jurors, before the Court closed

12    today, we were supposed to have our last batch of juror

13    questionnaires scanned by tomorrow or Friday at the latest.  I

14    don't know if that's going to change as a result of the

15    closure today.

16          But the jury department said they need to know by

17    February 9 who our automatic recusals are.  And we can

18    certainly the minute they show up if we just can't -- if we

19    don't get the second batch until Friday, I have time on

20    Tuesday the 8th.

21          Can we go off the record.

22                         (Off The Record)

23          THE COURT:  Mr. Stern is now going to list the

24    individuals who all three parties identified as having a

25    hardship.  Go ahead.

February 2, 2022                                                    23

 1            MR. STERN:  May I just ask one question, Your Honor?

 2            THE COURT:  Sure.

 3            MR. STERN:  For instance Aaron Felcaris, who's number

 4   4, we listed him as having a hardship but both LAN and VNA

 5   listed him for cause.  I don't see a reason to not exclude

 6   him.  And he may be included in your list because we think

 7   it's a hardship, they think it's cause.  I don't really think

 8   it matters.

 9            THE COURT:  Right.  It doesn't matter.

10            MR. STERN:  Is it okay if I include those?

11            THE COURT:  Correct.

12            MR. STERN:  Juror number 4 -- do I need to say their

13   names?

14            THE COURT:  No.  Please don't say their names.

15            MR. STERN:  Sorry, Jeseca.  Juror number 4.  Juror

16   number 11A.  Juror 18A.  Juror 20A.  Juror 39A.  Juror 107A.

17   Juror 126A.

18            THE COURT:  Do you have 125A?

19            MR. STERN:  I do not have LAN as having listed that

20   as a hardship.

21            MR. MASON:  We'll agree to 125.

22            THE COURT:  Okay.  125A.

23            MR. STERN:  Okay.  Hang on one second.

24            THE COURT:  You're right.  You didn't have 125A.

25            MR. STERN:  Shall I keep going?

1              THE COURT:  Yes.

2              MR. STERN:  126A.  128A.  142A.  145.  146.  152.

3    157.  172A.  173A.  179A.  180A.  190A.  191.  197A.  Sorry.

4    197A.  I already said that one.  214.  231.  305.

5              THE COURT:  Excuse me.

6              MR. STERN:  Go ahead.

7              THE COURT:  305.  Did you have 294, the full time

8    student?

9              MR. STERN:  VNA did not list that person for

10   hardship.

11             THE COURT:  Okay.

12             MR. STEIN:  I actually think we did according to my

13   list, 294.

14             MR. STERN:  Okay.  Hold on.  So then 294 with VNA's

15   comment.  305.  321.  324.  328.  342.  386.  403.  425.  441.

16             THE COURT:  I didn't have 441 on your list.  But let

17   me check again.

18             MR. STERN:  No, they're not on our list.  That should

19   not be included actually.  I apologize.

20             THE COURT:  The next one I have is 462.

21             MR. STERN:  Hang on one sec.

22             MR. MASON:  Is there an issue with 441?  It was

23   listed as 434 maybe --

24             MR. STERN:  Hang on.

25             MR. MASON:  -- on Mr. Stern's list.

February 2, 2022

```
1           MR. STEIN:  Yeah, I think that's right.
2           THE COURT:  What is the first letter of the -- oh
3    that's the M-A-C-K?
4           MR. MASON:  Right.
5           MR. STERN:  Okay.  Is there another -- is there a
6    Jerimie Tackett?  Because we've got that person listed at 434.
7           MR. MASON:  That's correct.
8           THE COURT:  Oh, I see.  Okay.  So we -- I lost track.
9           MR. STERN:  All right.  I think I understand what
10   happened.  It looks like Mack Taylor, we all agree there's a
11   hardship.  But we have in our submission to the Court Mack
12   Taylor as 434.  And for some reason on my composite list I've
13   got him as 441.  And then I have another person named Jerimie
14   Tackett that's listed on my composite list as 434.  My first
15   question is is there a Jerimie Tackett that has a different
16   random number?
17          MR. MASON:  He's 434, I believe.
18          THE COURT:  Exactly.  I think you just have them
19   switched.
20          MR. STERN:  Okay.
21          THE COURT:  Tackett is 434.  So is 434 agreed upon?
22          MR. STERN:  No.  I think it's 441 -- it's 43 -- so
23   who is the proper 434, Mack Taylor?
24          THE COURT:  Tackett is 434.
25          MR. STERN:  And then the proper Mack Taylor is 441?
```

1          THE COURT:  Yes.

2          MR. STERN:  Okay.  So on our list we have Mack Taylor

3     listed as 434 incorrectly but there's a financial hardship so

4     we agree.

5          THE COURT:  And is there agreement on 441 also?  Oh,

6     441 is Mack Taylor.

7          MR. STERN:  Yeah.  I don't think -- I don't think

8     there's anybody who listed as a hardship 434.

9          MR. STEIN:  But I think we all agree on 441.

10         THE COURT:  Okay.  And there is not agreement on 434.

11         MR. STERN:  Correct.

12         THE COURT:  Okay.

13         MR. MASON:  And 434 is the initials J.T.

14         THE COURT:  Okay.

15         MR. STERN:  Yep, yep, yep.

16         THE COURT:  Got it.

17         MR. STERN:  Next would be 462.  481.  484.  And 491.

18         THE COURT:  Okay.  Let's go off the record while I do

19    some math.

20                      (Off The Record)

21         THE COURT:  So a conversation has been had about

22    whether jury selection will be streamed on Zoom webinar.  And

23    it has been agreed upon by the parties and the Court that jury

24    selection will be on the Zoom webinar but the webinar will

25    only be open to lawyers and clients in this case.

```
 1              And by lawyers, the lawyers need to file an
 2   appearance on the docket.  But it will be open to the public
 3   in the overflow courtroom so that anyone who would ordinarily
 4   fit in the courtroom can sit there and watch it on the closed
 5   circuit television.
 6              And I don't know how many spaces we have there.  I
 7   think it's only 10 spaces in the overflow courtroom.  So there
 8   will be some public nature to the jury selection process but
 9   not as wide as the trial itself.
10              And so I understand, Mr. Mason, that LAN agrees to
11   that?
12              MR. MASON:  I do with one qualification.
13              THE COURT:  Sure.
14              MR. MASON:  And I think the Court intended to include
15   this, but it said lawyers, but that would include our staff
16   including the trial consultants that any of the parties might
17   use.
18              THE COURT:  Yes.
19              MR. MASON:  Thank you.
20              THE COURT:  Yeah, it does include that.  Mr. Campbell
21   for -- or Mr. Stein, whoever wants --
22              MR. CAMPBELL:  I'll let Mr. Stein go.
23              MR. STEIN:  Yes, we agree.
24              THE COURT:  Okay.  And Mr. Stern?
25              MR. STERN:  Yes, Your Honor, we agree.  And just a
```

```
 1    question on that.  And this -- when you say lawyers, it's the
 2    lawyers for the parties, correct, and their staff and
 3    consultants and all of that, not just lawyers who were
 4    involved in the litigation generally.
 5              THE COURT:  Right.  So if Mr. Kim wants to be there
 6    -- actually, good question.  So lawyers on the case.  So I
 7    suppose if Mr. Kim, for example, who attended, he represents
 8    the City of Flint, wants to watch jury selection I'm not going
 9    to prohibit that.  He's made an appearance on the docket.
10    Okay.
11              Okay.  I'm going to look into this.  Our jury
12    department is suggesting that all jury trials must be open to
13    the public, including jury selection.  But I think that really
14    comes up in criminal cases and not in civil cases.  So I'll
15    confirm this for you.  But this is the plan, the one we just
16    articulated is the plan for our trial and I'll make sure that
17    I haven't missed something.  Okay.  We can go off the record.
18                           (Off The Record)
19                         (Proceedings Concluded)
20                   -          -          -
21              CERTIFICATE OF OFFICIAL COURT REPORTER
22         I, Jeseca C. Eddington, Federal Official Court
23    Reporter, do hereby certify the foregoing 28 pages are a true
24    and correct transcript of the above entitled proceedings.
25    /s/ JESECA C. EDDINGTON_____        2/7/2022
      Jeseca C. Eddington, RDR, RMR, CRR, FCRR         Date
```