# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

*In re* Flint Water Cases.

Judith E. Levy
United States District Judge

_____/

This Order Relates To:

*Bellwether I Cases*
Case No. 17-10164

_____/

### STATE OF MICHIGAN

### IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

IN RE FLINT WATER LITIGATION

CASE NO. 17-108646-NO
JUDGE JOSEPH J. FARAH

JOINT ORDER RE THE
PEOPLE'S MOTION FOR
PARTIAL SUMMARY
JUDGMENT

_____

# JOINT OPINION AND ORDER GRANTING IN PART, DENYING IN PART DEFENDANT LEO A. DALY COMPANY'S MOTION FOR SUMMARY JUDGMENT [CASE No. 17-10164, ECF NO. 345] AND DENYING THE PEOPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER MCR 2.116(C)(10) [CASE No. 16-107576]

This Opinion and Order considers two motions, each separately before the Federal Court and the Genesee County Circuit Court in the State of Michigan (hereinafter, jointly "the Courts") in two of the pending Flint Water Cases[1]: (1) Defendant Leo A. Daly Company's ("LAD")[2] motion for summary judgment in the Federal Court (ECF No. 345)[3]; and (2) the People of the State of Michigan's motion for partial summary disposition pursuant to M.C.R. 2.116(C)(10) in the State Court (Case No. 16-107576, People's Br.). These motions are two of several motions for summary judgment filed as part of the Bellwether cases. On November 23, 2021, the Courts held a hearing on this matter, with both the Hon.

---

[1] The Flint Water Cases include many separate lawsuits pending in the Genesee County Circuit Court, the Michigan Court of Claims, and the United States District Court for the Eastern District of Michigan.

[2] Among the Defendants in these cases are Lockwood, Andrews & Newman, PC ("LAN PC"); Lockwood, Andrews & Newman, Inc. ("LAN"); and LAD. While the three entities have collectively been referred to as the "LAN Defendants" at various points throughout the litigation (see, e.g., ECF No. 346, PageID.21826), for the sake of clarity, this opinion will consider LAN PC and LAN, only, as the "LAN Defendants."

[3] All citation references without a preceding indicator refer to the ECF entries on the docket for the Federal Court Case No. 17-10164 (e.g., "ECF No. [X]"). In the few instances in which docket entries are referenced from other Federal Flint Water Cases, the citation is preceded by "Case No." and the relevant case number (e.g., "Case No. [XX-XXXXX], ECF No. [X], PageID.[X]"). For instances in which the case before the State Court is referenced, the citation format mirrors that adopted by the parties in the relevant briefing concerning the People's motion for partial summary judgment (e.g., "Case No. 16-107576, People's Br., pp [X]–[X]").

Judith E. Levy and the Hon. Joseph J. Farah presiding. (ECF No. 452.) Because the two motions concern overlapping determinations regarding the relationship between LAD and Defendant Lockwood, Andrews & Newman, Inc. ("LAN"), the Courts considered them in tandem during the November 23, 2021 hearing and in the opinion set forth below.

In LAD's motion for summary judgment, LAD seeks summary judgment on three separate grounds: (1) LAN is not the alter ego of LAD such that the corporate veil cannot be pierced to hold LAD responsible for any actions of LAN as LAD's subsidiary; (2) LAD is not vicariously liable for professional negligence committed by the engineers who performed work for the Flint water project; and (3) Plaintiffs have failed to establish a viable professional negligence claim of any kind. (ECF No. 346, PageID.21825–21826.) However, because LAD relies on the arguments set forth in the separate motion for summary judgment brought by the LAN Defendants (ECF No. 334) in support of their third basis for relief, which this Court has granted in part and denied in part (ECF No. 662), the Courts need not address LAD's third basis for relief proffered in this motion.

3

For the reasons set forth below, LAD's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The People's motion for summary disposition is DENIED.

## I.   Background – The relationship between LAD and LAN

### A. General Corporate Structures

LAN, a Texas corporation with its principal place of business in Texas, has one shareholder: LAD. (ECF No. 346, PageID.21827.) The City of Flint solely contracted with LAN (and not LAD) regarding the provision of engineering services related to the Flint Water Treatment Plant ("FWTP"). (*Id.*; ECF No. 346-1, PageID.21843.) However, LAN's proposal to the City of Flint to do work on the FWTP included reference to its relationship with LAD and LAN's access to LAD's resources. (*See* ECF No. 372-2, PageID.24607.)

LAD, a Nebraska corporation with its principal place of business in Nebraska, is the parent company of LAN. (ECF No. 346, PageID.21826.) LAD also only has one shareholder: Leo A. Daly III. (Brader deposition, pages 51, 130.)[4] LAD describes itself as "an architectural firm" that

---

[4] Jay Brader's deposition is only included on the record as Exhibit 2 to LAD's motion for summary judgment. (ECF No. 346-2.) However, because Exhibit 2 included only certain portions of the deposition transcript, the Courts ordered LAD to submit

4

"derives its revenue from its own activities separate and apart from the activities of LAN[;]" LAD also asserts that it "does not perform infrastructure engineering projects such as those performed in connection with the [FWTP]." (ECF No. 346, PageID.21826; ECF No. 346-2, PageID.21858) This is proposed in direct contrast to LAN, which does perform such projects, and which also has revenue from its own activities. (ECF No. 346, PageID.21827.)

The parties agree that the two corporations have commonalities, although LAD nevertheless argues that the two maintain separate corporate formalities. LAD has two directors (i.e., Leo A. Daly III and Grega G. Daly), while Leo A. Daly III is also among LAN's group of directors. (ECF No. 346, PageID.21827; Brader deposition, page 101.) Leo A. Daly III is the chairman of the board for both LAD and LAN. (Brader deposition, page 57.) LAD and LAN are both insureds under the same policy in addition to (at various points) sharing both the same general counsel (Edward Benes), chief financial officer (Jay Brader), controller,

---

the entirety of the transcript separately for the Courts' consideration. (*See* Case No. 16-10444, ECF No. 1255; Case No. 17-10164, ECF No. 425, PageID.31852.) Because that full transcript was submitted *in camera* to the Courts and not filed, this opinion will use the following citation style for citations to Brader's deposition for clarity: "(Brader deposition, page [X].)"

human resources, IT, and the director of project accounting. (ECF No. 346, PageID.21827; ECF No. 346-2, PageID.21855; ECF No. 372-2, PageID.24579–24580, PageID.24585.) During the relevant time period of the events underlying this action, at least a majority of the directors of LAN also had roles at LAD. (ECF No. 372-2, PageID.24586.) LAD occasionally refers to LAD and LAN as two separate "brands." (Brader deposition, page 30; ECF No. 346-6, PageID.21958.)

## B. Financial Organization and Profits

In 2004, the accounting structures for both LAD and LAN were consolidated for efficiency purposes. (*See* ECF No. 372-2, ECF No. 372-2, PageID.24572.) As a result, LAD and LAN share a joint bank account, with a shared accounting system that tracks two different balance sheets for each company. (*Id.* at PageID.24573.) For example, even though LAN and LAD both put money into this joint account, the accounting system separately keeps track of LAN's own revenue, in addition to its separate costs and expenses, to obtain a balance sheet with related profits and losses for LAN, specifically. (*Id.* at PageID.24583, 24590–24591.) Relatedly, any debit that comes out of the shared account is allocated to either LAD or LAN. (*Id.* at PageID.24600.) This shared bank account

issued paychecks for employees who work for LAN. (ECF No. 346-2, PageID.21863; ECF No. 372-2, PageID.24606.) With regard to the work done for the City of Flint, LAD procured the professional liability insurance policy as required by the City of Flint, shared the cost of these premiums with LAN, and was listed as an insured on that policy. (ECF No. 372, PageID.24553; ECF No. 372-2, PageID.24588, 24594.)

Nevertheless, the two corporations also engage in at least some distinct operations. Since 2005, expenses for shared services (such as those offered by the shared general counsel and CFO) are allocated based on the ratio of their labor between the two companies. (ECF No. 346, PageID.21827; ECF No. 346-2, PageID.21862; ECF No. 372-2, PageID.24582; Brader deposition, pages 47–48.) LAN pays its share of the overhead for the shared insurance policy and is solely responsible for the workers' compensation claims filed by LAN employees. (ECF No. 346, PageID.21827.) LAD and LAN maintain separate disbursement accounts for expenses (including bonuses and profit-sharing benefits), and run separate bonus structures (i.e., if LAD had no profits in a particular year, its employees did not receive a bonus regardless of LAN's profitability). (ECF No. 346, PageID.21827–21828; ECF No. 346-2, PageID.21863,

21868–21869; ECF No. 372-2, PageID.24599; Brader deposition, pages 70, 117.) The two produce separate earnings statements. (ECF No. 346-2, PageID.21861.) LAN holds assets in its own name (although it is unclear if that is entirely separate and apart from LAD). (*See id.* at PageID.21867, 21888; Brader deposition, page 90.) LAN was responsible for the costs and expenses of the FWTP project, and all the revenue from that project is accounted for by LAN. (ECF No. 372-2, PageID.24584, 24600.)

Additionally, LAN is allegedly more profitable than LAD: Brader, VP and CFO of LAD/LAN since April of 2013, testified that LAD has had negative annual profits in most years over the last decade, and that in certain years LAD made no profit when LAN did make a profit. (*See* ECF No. 346-2, PageID.21865, 21870; Brader deposition, pages 24, 122.) In contrast, over the course of 2010 to 2020, LAN's profits exceeded $22 million. (Brader deposition, page 91.) In support of its assertion that the two corporations have different revenue streams (*see* ECF No. 346, PageID.21831), LAD cites office earnings reports for both LAN and LAD, separately, spanning approximately 10 years, as well as asset lists. (Brader deposition, pages 17, 26, 42.) LAN's figures are not included as a

subset of LAD figures, but rather, are kept separate in a distinct set of earnings reports. (*Id.*, pages 33, 42; ECF No. 346-2, PageID.21876–21886.)

## C. Employee Leasing Agreement ("the Agreement")

The relationship between the engineers who performed work on behalf of LAN for the City of Flint and LAD is crucial to the Courts' consideration of this motion. Specifically, there is a question of whether LAD and LAN effectively share employees through a formal Employee Leasing Agreement effective as of March of 2004 (hereinafter, the "Agreement").[5] (ECF No. 346, PageID.21828.) Corporate designee deponents Benes and Brader offer different testimony on this issue. According to Benes, since 2004, every employee who performed work for LAN is a LAD employee, leased to LAN subject to the Agreement— including all employees who performed work for the City of Flint under the contract with LAN. (ECF No. 372, PageID.24552; ECF No. 372-2, PageID.24581.) Through the Agreement, "the workforce of LAN is

---

[5] LAD's motion for summary judgment suggests that there is some debate as to whether the Agreement was ever operational, but LAD nevertheless "assumes [for the purposes of this motion] that the Agreement remained in force at all relevant times." (ECF No. 346, PageID.21828.)

seconded to LAN by LAD" (ECF No. 346, PageID.21828) for purposes of efficiencies in accounting, benefits, and insurance. (ECF No. 372-2, PageID.24582.)

However, Brader disputes this: according to Brader, none of the employees are leased and the agreement was "never used[,]" not "ever truly implemented[,]" and "not how we acted or functioned." (Brader deposition, pages 72, 74, 134.) Specifically, "[Brader] and most other people [he] would say were not even aware of the [Agreement]." (*Id.*, page 75.) Yet, Brader agreed that the Agreement had never been modified or terminated, nor did he believe any aspect of Benes' testimony needed to be corrected. (*Id.*, page 133.)

There are some nuances to this Agreement and how it is treated by LAD and LAN that are of note. First, Benes (LAD and LAN's shared general counsel) and Brader (LAD and LAN's shared CFO) did not know of the existence of this Agreement before the Flint litigation commenced. (ECF No. 372-2, PageID.24591.) Brader further stated that he had "never seen or heard of such a thing" as an employee leasing agreement before, despite having been with LAD when the Agreement was signed. (Brader deposition, pages 142–145, 150.) Benes also indicated that the two

companies have not made any changes to follow this Agreement since it was brought to Benes' attention, because "the way we account for the companies wouldn't allow us to follow this [A]greement." (ECF No. 372-2, PageID.24592.)

Additionally, not all of the provisions of the Agreement have been followed by LAN and LAD. At least during the relevant time period in this case (starting in 2011 and up until as recently as early 2021), LAD performed the necessary payroll and employee benefits services for all the employees. (ECF No. 346, PageID.21828; ECF No. 372-2, PageID.24581; Brader deposition, page 151.) The Agreement outlined the expected consideration for this arrangement:

> 2. <u>Payment.</u> As consideration for the Staff leased to [LAN] by [LAD], all fees, payments, proceeds and other consideration of any nature whatsoever received by [LAN] from clients, owners and any third parties for the Services performed by the Staff, and by any independent contractor, employee leasing companies and other parties of a similar nature, shall as soon as practicable be transmitted to [LAD] by [LAN].

(Case No. 16-10444, ECF No. 278-3, PageID.10232.) Despite this provision, there were no payments made between the two companies. (ECF No. 372-2, PageID.24573.) LAD did not receive any specific revenue from leasing its employees to LAN, and the payment structure outlined

11

in subsection 2 as set forth above was not followed. (*Id*. at PageID.24590–24591.) However, Benes notes that "LAD does not receive revenue from LAN, Inc. for this work, per se, but time charges for LAD employees who work for LAN under the [Agreement] . . . [r]eport showing employee time charges." (*Id*. at PageID.24602.) Other provisions—including subsections 5(h) & 5(g) (i.e., indicating only LAD is to be responsible for workers compensation claims) and subsection 6 (i.e., outlining how LAD was to indemnify LAN)—are also not followed. (Case No. 16-10444, ECF No. 278-3, PageID.10233–10234; ECF No. 372-2, PageID.24591, 24594; Brader deposition, page 152–153.)

The parties also disagree as to whether the employees who worked in Flint are to be considered LAD or LAN employees. The Agreement indicates the following:

> 4. <u>Employment Relationship.</u> **[LAD] and its employees are not employees of [LAN].** [LAD] shall, at its own expense, comply with all state, local and federal laws, regulations, ordinances, requirements and codes which are applicable to the performance of services by [LAD] pursuant to this Agreement. [LAD] shall be responsible for all risks incurred in the operation of its business and shall enjoy all the benefits thereof. **The Staff shall be under the mutual control and direction of [LAD] and [LAN].** [LAD] shall be solely responsible for all liabilities and expenses arising out of or from this Agreement, including but not limited to the compensation

of Staff and the other obligations defined in Section 5 of this Agreement.

(Case No. 16-10444, ECF No. 278-3, PageID.10232) (emphasis added.) Yet according to LAD, "[t]he day-to-day work of providing engineering services for LAN projects was directed by LAN." (ECF No. 346, PageID.21828.) Benes asserted that "[LAD] did not have the ability to tell LAN not to do the work or services and did not actually exercise control of the detailed activities." (ECF No. 372-2, PageID.24593, 24596.) Employees had LAN business cards and email addresses, were hired by LAN employees, and worked out of LAN offices; indeed, many engineering employees working on the FWTP were not even aware of the Agreement. (*See* ECF No. 346, PageID.21828; ECF No. 372-2, PageID.24589.) LAN had a policy that employees of LAN are not to hold themselves out as LAD employees, although this policy was distinct from any policies regarding use of a LAD company logo. (ECF No. 372-2, PageID.24589.) However, the employees who provided work for the City of Flint had W-2 documents that listed LAD as their employer. (Brader deposition, page 148–149; ECF No. 452, PageID.36393.)

Additionally, the corporate designees offered differing testimony on this issue. Benes (testifying in 2018), referred to the employees as "LAN employees" but also admitted he did not know whether that particular provision of the Agreement was being followed. (ECF No. 372-2, PageID.24606.) Similarly, Brader testified in 2021 that the employees who worked on the Flint project were LAN employees. (Brader deposition, page 143.) Yet Brader did not offer a clear, unambiguous answer on the question of whether these employees were leased or not. He stated that "[b]y the strictest reading of [the Agreement]," the employees who performed work on behalf of LAN were leased to LAN by LAD, but that in terms of how these employees were "actually treated[,]" they were not leased. (*Id.*, pages 144–145, 150.) Nor has LAD been consistent in this regard during this litigation – it appears that at least in one of LAD's responses to a request for production of documents, LAD indicates that it provided as part of the documents responsive to the request "time charges for *LAD employees* who work for LAN under the [Agreement]." (ECF No. 372-2, PageID.24605) (emphasis added.)

## II.   Legal Standard

14

LAD's motion for summary judgment in the Federal Court is governed by Federal Rule of Civil Procedure 56. Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Courts may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Courts "view[] the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

Additionally, the parties agree that this is to be decided by Michigan law. Because this is a diversity action, the Courts will apply Michigan substantive law as determined by the Michigan Supreme Court as well as federal procedural law. *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2007). "If the Michigan Supreme Court has not spoken to a particular issue, [the Courts] must

15

predict how the Michigan Supreme Court would rule if confronted with that issue." *Id.*

The People's motion for partial summary disposition is governed by M.C.R. 2.116(C)(10).[6] "A motion under M.C.R. 2.116(C)(10) tests the

---

[6] LAD argues in its response to the People's motion for summary disposition that the People, as a plaintiff, cannot be entitled to summary disposition under M.C.R. 2.116(C)(10). (Case No. 16-107576, Response, p. 6.) According to LAD, the People's motion could not possibly "negate an essential element of the claim" or "show that LAD's evidence is insufficient to establish an essential element of any claim" because LAD has not actually made a claim. (*Id.*) Under this logic, the People's motion should have been brought under M.C.R. 2.116(C)(9)—with its related separate burden of proof standard required to attain summary disposition—because the People's motion tests defenses against the adequacy of the pleadings. (*Id.*) LAD offers no precedential support for its interpretation of M.C.R. 2.116(C)(10) or for any categorical limitation on a plaintiff's ability to file such a dispositive motion. In reply, the People cite the language of M.C.R. 2.116(B) and (C) for the contention that "the Court Rules expressly authorize the People to attack [LAD's] 'borrowed servant' defense with a motion under M.C.R. 2.116(C)(10)." (Case No. 16-107576, Reply, p. 3.)

The People are correct in noting that M.C.R. 2.116(B)'s plain text authorizes a party to "move for dismissal of or judgment on all or part of a claim in accordance with [M.C.R. 2.116]" and to "move under this rule for summary disposition of the defense [asserted against them,]" and that the "motion may be based on one or more of" the grounds outlined in M.C.R. 2.116(C). M.C.R. 2.116(B), (C). The People's motion for summary disposition seeks a ruling that "there is no genuine issue of material fact that [the engineers] were [LAD] employees and were acting within the scope of their employment with [LAD] when they worked on the Flint Project." (Case No. 16-107576, People's Br., p 20.) This is a claim upon which the People bears the burden of proof. *See Al-Shimmari v. Detroit Med. Ctr.*, 477 Mich. 280, 294–95 (2007) ("Vicarious liability thus rests on the imputation of the negligence of an agent to a principal. . . . [T]o succeed on a vicarious liability claim, a plaintiff need only prove that an agent has acted negligently."). Furthermore, the Michigan Court of Appeals has previously affirmed a trial court's grant of summary disposition to a plaintiff on the plaintiff's own claims pursuant to a plaintiff's motion brought under M.C.R.

factual sufficiency of the complaint" and requires the movant to "specifically identify the issues as to which the moving party believes there is no genuine issue as to any material fact." *Maiden v. Rozwood*, 461 Mich. 109, 120–21 (1999) (citing M.C.R. 2.116(C)(10), (G)(4)). Evaluation of a motion under M.C.R. 2.116(C)(10) requires a trial court to consider "affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, M.C.R. 2.116(G)(5), in the light most favorable to the party opposing the motion." *Id*. "In presenting a motion for summary disposition, the moving party has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence." *Quinto v. Cross & Peters Co.*, 451 Mich. 358, 362 (1996). "The burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists." *Id*. "Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law." *Maiden*, 461 Mich. at 120–21 (citing M.C.R. 2.116(C)(10), (G)(4)). "A genuine issue of material

---

2.116(C)(10). *See, e.g.*, *Barnard Mfg. Co. v. Gates Performance Eng'g, Inc.*, 285 Mich. App. 362, 372–75 (2009). Barring any precedential support to the contrary of M.C.R. 2.116(B)'s plan text, the Courts decline to find that the People as a plaintiff are categorically barred from seeking summary disposition under this subrule.

17

fact exists when the record leaves open an issue upon which reasonable minds might differ." *Johnson v. VanderKooi*, 502 Mich. 751, 761 (2018) (quotation marks, citation, and brackets omitted).

## III.   Analysis

LAD's motion for summary judgment argues that LAN is not the alter ego of LAD such that the corporate veil cannot be pierced to hold LAD responsible for any actions of LAN as LAD's subsidiary. Both LAD's motion for summary judgment and the People's motion for summary disposition concern the question of whether LAD is vicariously liable for professional negligence committed by the engineers who performed work for the Flint water project.

For the reasons set forth below, the Courts find that Plaintiffs have failed to allege sufficient facts to establish alter ego liability for LAD stemming from its parent-subsidiary relationship with LAN. However, there is a genuine dispute of material fact as to whether LAD may be vicariously liable for the actions of the engineers.

### A. Plaintiffs have failed to allege sufficient facts to establish tort liability based on an alleged parent-subsidiary relationship between LAD and LAN.

A plaintiff's attempt to pierce the corporate veil (alternatively called an "alter ego" claim under Michigan law) is not, in itself, a cause of action. *See In re RCS Engineered Prod. Co., Inc.*, 102 F.3d 223, 226 (6th Cir. 1996). It is better understood as a doctrine of liability: "[C]ourts apply the alter ego theory and disregard a company's separate corporate identity for the benefit of third parties, e.g., creditors of the corporation, who would suffer an unjust loss or injury unless the shareholders or the parent corporation were held liable for the subsidiary's debts." *Id.*; *see also Gallagher v. Persha*, 315 Mich. App. 647, 664–66 (2016) (noting that piercing the veil of a corporate entity is a remedy imposing liability on an underlying cause of action). Accordingly, Plaintiffs' alter ego claim is relevant to the Courts here as a means of providing Plaintiffs a remedy for recovery against LAD for the underlying cause of action in Federal Court (i.e., professional negligence by LAN).

Traditionally, piercing the corporate veil refers to holding a corporation's individual corporate executives or shareholders liable. *See Rymal v. Baergen*, 262 Mich. App. 274, 293 (2004) ("The traditional basis for piercing the corporate veil has been to protect a corporation's creditors where there is a unity of interest of the stockholders and the corporation

and where the stockholders have used the corporate structure in an attempt to avoid legal obligations.") (citation and quotation marks omitted). Yet, as here, a plaintiff may nevertheless seek to pierce the corporate veil to hold the defendant parent company liable for the actions of its subsidiary. *See, e.g., Dutton Partners, LLC v. CMS Energy Corp.*, 290 Mich. App. 635, 642 (2010).

"[I]n order to state a claim for tort liability based on an alleged parent-subsidiary relationship, a plaintiff would have to allege: (1) the existence of a parent-subsidiary relationship, and (2) facts that justify piercing the corporate veil." *Seasword v. Hilti, Inc. (After Remand)*, 449 Mich. 542, 548 (1995). Here, there is no dispute that LAD and LAN are parent and subsidiary, respectively. Accordingly, the remaining question for the Courts is whether Plaintiffs have alleged sufficient facts to justify piercing the corporate veil in this instance.

As a preliminary matter, "[t]he doctrine of piercing the corporate veil, . . . is the rare exception, applied in the case of fraud or certain other exceptional circumstances, . . . and usually determined on a case-by-case basis." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). "Piercing the corporate veil is an equitable remedy 'sparingly invoked to cure

20

certain injustices that would otherwise go unredressed.'" *EPLET, LLC v. DTE Pontiac N., LLC*, 984 F.3d 493, 499 (6th Cir. 2021) (quoting *Gallagher*, 315 Mich. App. at 654. Furthermore, the decision of whether to consider a subsidiary as a parent company's alter ego is "highly dependent on the equities of the situation, and the inquiry tends to be intensively fact-driven." *Ypsilanti Cmty. Utilities Auth. v. Meadwestvaco Air Sys., LLC*, 678 F. Supp. 2d 553, 572 (E.D. Mich. 2009) (internal quotation marks and citation omitted). "While there is no single rule delineating when the corporate entity may be disregarded, the entire spectrum of relevant fact forms the background for such an inquiry, and the facts are to be assessed in light of the corporation's economic justification to determine if the corporate form has been abused." *Florence Cement Co. v. Vettraino*, 292 Mich. App. 461, 469 (2011) (internal quotation marks, brackets, and citations omitted). This necessarily informs the nature of the Courts' inquiry here: it is generally rare that a court pierces the corporate veil, and the determination of whether to do so relies on a fact-intensive analysis of the particular circumstances present.

In *Dutton Partners*, the Michigan Court of Appeals outlined the relevant analysis regarding whether it is appropriate to pierce the corporate veil in a parent-subsidiary corporate relationship:

> It is well settled under Michigan law that "absent some abuse of corporate form, parent and subsidiary corporations are separate and distinct entities." [*Seasword (After Remand)*, 449 Mich.] at 547[]. However, the courts may ignore this presumption and the corporate veil may be pierced if, under the circumstances, respecting an otherwise separate corporate existence will "subvert justice or cause a result that would be contrary to some other clearly overriding public policy." *Wells v. Firestone Tire & Rubber Co.*, 421 Mich. 641, 650[] (1984). For the corporate veil to be pierced, the plaintiff must aver facts that show (1) that the corporate entity is a mere instrumentality of another entity or individual, (2) that the corporate entity was used to commit fraud or a wrong, and (3) that, as a result, the plaintiff suffered an unjust injury or loss. *RDM Holdings, Ltd. v. Continental Plastics Co.*, 281 Mich. App. 678, 715[] (2008).

*Dutton Partners*, 290 Mich. App. at 643; *see also Tredit Tire & Wheel Co., Inc. v. Regency Conversions, LLC, et al.*, 636 F. Supp. 2d 598, 601 (E.D. Mich. 2009) (citing *Servo Kinetics*, 475 F.3d at 798). Here, LAD does not appear to contest the unjust loss element for the purposes of the alter ego analysis.[7] Accordingly, to determine whether Plaintiffs have overcome the presumption that LAD and LAN are separate entities, the Courts

---

[7] As set forth above, LAD does incorporate the LAN Defendants' motion for summary judgment (ECF No. 334) to argue that Plaintiffs have failed to establish a viable professional negligence claim of any kind. (ECF No. 346, PageID.21825–21826.)

22

must analyze (1) whether LAN is a mere instrumentality of LAD, and (2) whether LAN was used to commit fraud or a wrong. *See Dutton Partners*, 290 Mich. App. at 643.

### a. There is a genuine dispute of fact as to whether LAN is a mere instrumentality of LAD.

Viewing the evidence and making inferences from the facts in the light most favorable to Plaintiffs, *see Pure Tech Sys., Inc.*, 95 F. App'x at 135, there is a genuine dispute of fact as to whether LAN is a mere instrumentality of LAD.[8] However, because the Court also finds that Plaintiffs have failed to demonstrate the second element required to establish alter ego liability (i.e., whether LAN was used to commit fraud or a wrong), the Court declines to examine this first element in detail.

"[A] court must first examine the totality of the evidence surrounding the owner's use of an artificial entity and, in particular, the manner in which the entity was employed in the manner at issue." *Green v. Ziegelman*, 310 Mich. App. 436, 458 (2015). "From this evidence, the

---

[8] The People in the Genesee County Circuit Court do not contend that summary disposition is appropriate based on alter ego liability; LAD's motion for summary judgment in the Federal Court argues that summary judgment is proper on this ground. (*See* ECF No. 346; Case No. 16-107576, People's Br.) Accordingly, only the Federal Court addresses this argument.

trial court must determine whether the evidence establishes that the owner operated the entity as his or her alter ego—that is, as a sham or mere agent or instrumentality of his or her will." *Id.*

In considering whether an entity is the mere instrumentality of another, factors to be evaluated include: "(1) whether the corporation is undercapitalized, (2) whether separate books are kept, (3) whether there are separate finances for the corporation, (4) whether the corporation is used for fraud or illegality, (5) whether corporate formalities have been followed, and (6) whether the corporation is a sham." *Glob. Consulting DM Fenton Assocs., LLC v. DHTE Grp., LLC*, No. 353133, 2021 WL 941066, at *4 (Mich. Ct. App. Mar. 11, 2021) (citing *Glenn*, 305 Mich. App. at 716). "Michigan courts have also considered the commingling of funds and the extent to which the shareholder controlled the decisions of the entity." *Think Operations, LLC v. Top Shelf Barber Supplies, LLC*, No. 1:19-CV-752, 2021 WL 21597, at *8 (W.D. Mich. Jan. 4, 2021) (citing *Foodland Distribs. v. Al-Naimi*, 559 N.W.2d 379, 381 (Mich. Ct. App. 1996).

The existence of one of these factors, alone, is not necessarily dispositive, nor are the listed factors exhaustive. *See, e.g., Lyngaas v. Ag*,

992 F.3d 412, 421 (6th Cir. 2021) ("[T]he district court did not err in finding that [the subsidiary's] 'undercapitalization' was outweighed by the other five factors, none of which supported the finding of an alter-ego relationship."); *see also Police & Fire Ret. Sys. of the City of Detroit v. Leibowitz*, No. 329048, 2017 WL 603551, at *8 (Mich. Ct. App. Feb. 14, 2017) (quoting *Glenn*, 305 Mich. App. at 716) (noting that a court is not required to explicitly address the *Glenn* factors but that they are instead included in the analysis).

LAD asserts that the entities are entirely separate in all respects with the exception of some combined business functions for purposes of efficiency. Plaintiffs argue that LAN "does little more than exist on paper." (ECF No. 372, PageID.24560.) Ultimately, the corporate structures are more complicated than either side depicts.

Some of the above listed factors are not in dispute and suggest that LAN is not a mere instrumentality. For instance, LAN is not a sham: there is no real dispute that LAN generates its own revenues and holds some assets (although it is unclear if these assets are entirely separate and apart from LAD). (*See* ECF No. 346-2, PageID.21867, 21888; ECF No. 372-2, PageID.24584, 24600.) For similar reasons, it appears that

25

LAN has separate finances, and it keeps track of these finances on separate books in order to produce separate earnings statements. (ECF No. 346-2, PageID.21861; Brader deposition, pages 17, 26, 42.)

Yet other factors possibly suggest that LAN is a mere instrumentality. Plaintiffs' arguments bring up the distinct point of whether details of LAD and LAN's financial relationship with themselves and with other entities (such as the City of Flint) could support the finding that there was undercapitalization of LAN. It is true that in most instances, the "bank account" indicator of undercapitalization refers to the instance in which the subsidiary is used as the parent company's bank account. *See*, *e.g.*, *Lyngaas*, 992 F.3d at 421. Yet when analyzing undercapitalization, courts have also looked at other aspects of the financial relationship between parent and subsidiary and how the two entities split money. For example, LAD was not a signatory to the contract with the City of Flint. Yet, LAD procured the professional liability insurance policy as required by the City of Flint, shared the cost of these premiums, and was listed as an insured on that policy. (ECF No. 372, PageID.24553; ECF No. 372-2, PageID.24588, 24594.) There is no indication in the record as to why LAD would incur this debt were LAD

and LAN to have kept expenses for their own distinct work projects separately. *See*, *e.g.*, *Florence Cement Co.*, 292 Mich. App. at 470 (noting that a corporation was an instrumentality of individuals when the individuals treated their personal liabilities as those of the corporate entity, borrowed money on behalf of the corporate entity when the entity needed capital, and allowed the corporate entity to make payments on behalf of its members when it had no duty to do so); *see also Indusource, Inc. v. Sandvik Tooling France S.A.S.*, No. 16-10056, 2016 WL 6216003, at *4 (E.D. Mich. Oct. 25, 2016) (a finding that "the parent regards the subsidiary's business as its own project" supports the determination that the subsidiary is a mere instrumentality) (citing *Herman v. Mobile Homes Corp.*, 317 Mich. 233, 239–41 (1947)).

Additionally, there is evidence supporting the finding that LAD and LAN failed to maintain corporate formalities. As set forth in greater detail in the sections evaluating vicarious liability, all of the employees who worked on behalf of LAN were leased from LAD. A subsidiary's lack of distinct employees, including through a lease arrangement with a parent company, has been found to demonstrate an absence of corporate formalities. *See, e.g., City of Dearborn v. Burton-Katzman Dev. Co.*, No.

309758, 2014 WL 7212895, at *12 (Mich. Ct. App. Dec. 18, 2014) (the fact that a subsidiary was entirely staffed by employees leased by the parent company could support a finding of mere instrumentality); *Green*, 310 Mich. App. at 459 (finding "a very close correspondence of identity" suggesting company was mere instrumentality where shareholder was "sole owner, director, and officer" of subsidiary and "when the [subsidiary] acted, it acted through [the shareholder]").

So, too, is the failure to formalize transactions between parent and subsidiary a factor leaning in favor of finding a lack of corporate formalities. *See id.* at 461. To the extent LAD claims that the Agreement's existence and the two companies' efforts to formalize the arrangement "in itself demonstrates that corporate separateness was maintained[,]" this is unavailing. (ECF No. 400, PageID.31170.) This act of formalizing the arrangement must be understood in conjunction with the fact that the long-time shared general counsel and shared CFO of LAD and LAN both *did not know of the existence of this Agreement* before the Flint litigation commenced. (ECF No. 372-2, PageID.24591; Brader deposition, pages 142–145, 150.) Furthermore, there has been evidence presented that LAD and LAN did not follow (and perhaps never did follow)

28

particular provisions of the Agreement, including subsections 2,[9]

5(g)/5(h), and 6. (Case No. 16-10444, ECF No. 278-3, PageID.10233–

10234; ECF No. 372-2, PageID.24591, 24594; Brader deposition, page

152–153.) Regardless of whether this sort of an employee leasing

arrangement is common, as argued by LAD (ECF No. 400,

PageID.31170),[10] there remains the sticking point that the Agreement

was not followed in at least some ways, and mutual officers of LAD and

LAN could not even agree on the basic facets of how the employee leasing

---

[9] The failure to follow subsection 2, in particular, possibly supports the contention that LAN is a mere instrumentality: if LAN did not pay LAD the specified revenue payments as arranged under the Agreement for the benefit of LAD's leased employees, then this could be said to be analogous to the failure to pay loans. *See Green*, 310 Mich. App. at 461; *see also Servo*, 475 F.3d at 799.

[10] LAD claims employee leasing arrangements are a common practice, citing *Hoffman v. JDM Assoc. Inc.*, 213 Mich. App. 466 (1995). It is unclear why LAD cites to this case. First, *Hoffman* concerned the possible liability for an employer of *one* employee *temporarily* leased to another entity—there is no discussion of an employee arrangement similar to that in between LAD and LAN, in which *all* employees (possibly) were in effect *permanently* leased. While at least one Michigan Court of Appeals decision has briefly touched on the issue of an entity claiming to be a centralized manager or paymaster that leased employees for an organization, *see City of Dearborn v. Burton-Katzman Dev. Co.*, No. 309758, 2014 WL 7212895, at *11 (Mich. Ct. App. Dec. 18, 2014), the Michigan Court of Appeals found that the facts in that case could theoretically support a question of fact as to whether the "centralized manager" or the other subsidiary organizations were mere instrumentalities in the context of a multi-part organizational structure. Furthermore, other cases in the vicarious liability context have suggested that the typical labor broker situation involves temporary employment needs being fulfilled by temporarily loaned workers, in *direct contrast* to those in which a defendant undertakes a broader coordination of loaned employees to reduce costs/improve performance. *See Ross v. L.B. Knight, Inc.*, No. 217073, 2001 WL 629650, at *2 (Mich. Ct. App. May 29, 2001).

arrangement impacted employment relationships. LAD cannot both assert that the Agreement was not followed and yet rely on the existence of the Agreement in support of the contention that it maintained corporate formalities: LAD cannot have its cake and eat it, too. Ultimately, "[t]he lack of formality in [LAD's] dealings with [LAN]" could "suggest[] that [LAD] disregarded [LAN's] separate existence whenever it was convenient or suited [LAD's] needs, but asserted its separate existence when it benefited [LAD] personally[.]" *Green*, 310 Mich. App. at 461. Such a finding supports a genuine issue of material fact as to whether LAN was a mere instrumentality.

Accordingly, the Court finds that evaluation of the mere instrumentality factors present a genuine issue of material fact as to whether LAN was a mere instrumentality. However, as set forth below, summary judgment in favor of LAD is nevertheless appropriate on the issue of the alter ego theory of liability.

### b. Plaintiffs have failed to demonstrate misuse of the corporate form, as required to establish the alter-ego theory of liability.

After evaluating whether the subsidiary is a mere instrumentality of the parent corporation, "[t]he court then must determine whether the

manner of use effected a fraud or wrong on the complainant." *Green*, 310 Mich. App. at 458. Despite some ambiguous prior precedent, the Michigan Court of Appeals has clarified that "a showing of fraud, wrongdoing, or misuse is *required* under Michigan law in order to prevail on an alter-ego theory of liability[.]" *Dutton Partners, LLC*, 290 Mich. App. at 645 n. 5 (emphasis added). Indeed, the court indicated it was "unable to locate any binding Michigan case that has held that the corporate veil may be disregarded absent a showing of fraud, wrongdoing, or some misuse of the corporate form." *Id.*; *see also Est. of Burd by Burd v. Thompson Block Partners, Inc.*, No. 352894, 2021 WL 1941739, at *7 (Mich. Ct. App. May 13, 2021) (finding that the plaintiff cannot prevail on an alter ego theory even if there was a material question of fact regarding instrumentality when there was no showing of fraud, wrongdoing, or misuse of the corporate form, making summary disposition appropriate).

"In considering this element, it is not necessary to prove that the owner caused the entity to directly harm the complainant; it is sufficient that the owner exercised his or her control over the entity in such a manner as to wrong the complainant." *Green*, 310 Mich. App. at 458. "But

it bears repeating that establishing an entity for the purpose of avoiding personal responsibility is not by itself a wrong that would warrant disregarding the entity's separate existence." *Id*. at 459. Furthermore, "Michigan law does not require a showing of fraud or illegality before the corporate form will be disregarded. Rather, the corporate veil may be pierced as long as, the injustice sought to be prevented is in some manner related to a misuse of the corporate form short of fraud or illegality." *Grand Rapids Assocs. Ltd. P'ship v. Coop Properties, LLC*, 495 F. App'x 598, 601 (6th Cir. 2012) (internal quotation marks, brackets, and citations omitted); *see also Gallagher*, 315 Mich. App. at 664 (looking favorably on *Estate of Hurst v. Moorehead I, LLC*, 228 N.C. App. 571, 579–80 (2013), which noted that wrongful acts include "the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of [the] plaintiffs' legal rights" (internal citations and quotation marks omitted)).

Most often, this element is satisfied by showing of a breach of contract by the subsidiary. *See, e.g., Tredit*, 636 F. Supp. 2d at 602 (the plaintiff's allegations satisfied the fraud or wrong element because breach of the defendants' contract with the plaintiff was sufficient to

establish a sufficient wrong against the plaintiff); *1st State Title v. LP Recordings LLC*, No. 322964, 2015 WL 7750297, at *5 (Mich. Ct. App. Dec. 1, 2015) ("A breach of contract has been held to be the kind of wrong that would justify piercing a corporate veil if the corporate form had been abused."); *see also Servo Kinetics*, 475 F.3d at 799-800 (6th Cir. 2007) (breach of contract constitutes a fraud or wrong for purposes of veil-piercing liability). However, other types of wrongful acts have been found sufficient to meet the fraud or wrong element. *See*, *e.g.*, *Green*, 310 Mich. App. at 462–65 (principal of corporate judgment debtor misrepresented financial condition of debtor, causing debtor to breach agreement with knowledge that principal could abandon debtor at any time and render the debtor uncollectible); *Grand Rapids Assocs. Ltd. P'ship*, 495 F. App'x at 601 (abused the subsidiary's corporate form to exact an unjust benefit in the form of below-market rental rates without the commitment of a long-term lease); *S&S Innovations Corp. v. UUSI, LLC*, No. 1:18-CV-1377, 2021 WL 2070064, at *6 (W.D. Mich. May 24, 2021) (inherent purpose of subsidiary is to manufacture and sell reusable canning lids in ways that infringe the plaintiff's intellectual property); *Bodenhamer Bldg. Corp. v. Architectural Rsch. Corp.*, 873 F.2d 109 (6th Cir. 1989) (the

33

corporate parent received the money from liquidating its subsidiary when that money should have been used to pay the subsidiary's liabilities); *Police & Fire Ret. Sys. of the City of Detroit*, No. 329048, 2017 WL 603551, at *5 ("Evidence that defendant [parent company] manipulated [subsidiary] in such a manner that [subsidiary] was left without sufficient assets to meet its obligations to plaintiff would support a conclusion that the entity, [subsidiary], was used to commit a wrong."); *DAGS II, LLC v. Huntington Nat. Bank*, 616 F. App'x 830, 840 (6th Cir. 2015) (finding a wrong committed when the parent bank used a subsidiary to engage in a foreclosure proceeding maneuver that allowed parent bank to subvert Michigan law prohibiting "double recovery"). As such, the majority of case law on this topic appears to consider types of wrong suggesting that the corporate form has been abused that are inapplicable to the circumstances of this case.

LAD argues that there is "no evidence that would suggest that LAD has misused LAN in any way to commit a fraud or any other wrong." (ECF No. 346, PageID.21833.) First, LAD notes that all revenue from the work performed for the City of Flint appears to have been accounted for in the same manner as other LAN revenue. (*Id*.) Second, LAD asserts

that there is no suggestion that LAD interfered with or otherwise influenced LAN's work on the Flint project. (*Id.*) In support, LAD points to the allegedly distinct management structures that had the engineers report within the LAN chain of command. (*Id.*; ECF No. 346-6, PageID.21959.) Because there was "no connection between whatever control that LAD could theoretically assert over LAN and the injuries that Plaintiffs sustained[,]" LAD had not engaged in any culpable conduct that would suffice to meet the fraud or wrong element. (ECF No. 346, PageID.21833.)

Plaintiffs' response brief does not address this part of LAD's argument. (*See* ECF No. 372, PageID.24560–24561.) Plaintiffs do not appear to disagree with LAD's contention that all revenue from the Flint project was properly accounted for under the two entities' accounting system. Instead, Plaintiffs assert that LAD's actions created a wrong because it was LAD employees who were responsible for poisoning the residents of Flint; furthermore, "LAD provided LAN the money and manpower to poison an entire community." (*Id.*)

LAD replies to Plaintiffs' argument on this element with the following: It is necessary to demonstrate more than the bare fact that the

subsidiary is potentially liable to the plaintiff in tort or that the plaintiff suffered an unjust loss. (*See* ECF No. 400, PageID.31172–31174.) "In order to prove the 'fraud or wrong' element, the plaintiff must establish that a controlling entity engaged in deliberate wrongful conduct that either was designed to or actually did produce injury to obligees of the instrumental entity. And the proof of 'fraud or wrong' must comprise something other than a mere showing of an unjust loss to the plaintiff." *Lim v. Miller Parking Co.*, 560 B.R. 688, 704–05 (E.D. Mich. 2016). In other words, there must be some connection or nexus between the wrongful act and the abuse of the corporate form, separate from the unjust loss suffered by the plaintiff. *See S&S Innovations Corp*, No. 1:18-CV-1377, 2021 WL 2070064, at *4. Plaintiffs' argument does not frame the actions committed by LAD and LAN in terms of how LAD *employed LAN's corporate form* in a way that ultimately constituted misuse.

Yet, as set forth above, the Michigan Supreme Court "has never held that a complainant must prove that the owner of an entity used the entity to commit a *specific* fraud or wrong." *Green*, 310 Mich. App. at 456 (citing *Gledhill v. Fisher & Co.*, 272 Mich. 353, 358 (1935)) (emphasis added). Rather, the question is whether "the owner exercised its control

36

over the entity in a *manner* amounting to a fraud or wrong under such circumstances that a court 'would aid in the consummation of a wrong' if it were to honor the separate existence of the entity." *Id.* (quoting *Gledhill*, 272 Mich. at 358) (emphasis in original). Plaintiffs have not offered evidence indicating that LAN was formed for any improper purpose, or that LAN was engaging in an unlawful activity through the performance of professional engineering services. (ECF No. 400, PageID.31173.) Plaintiffs must come forward with evidence of LAD misusing the corporate form—such as by showing that LAD exercised control over LAN in a *manner* amounting to a fraud or wrong (*see* ECF No. 400, PageID.31173)—for their alter ego theory of liability to survive summary judgment.

Perhaps the most analogous case to the situation before the Courts is presented in the Michigan Court of Appeals' decision in *Dutton Partners*. Plaintiff Dutton Partners, LLC, was the owner of a development in Michigan that contained (via easement) an underground pipeline for natural gas. *Dutton Partners, LLC*, 290 Mich. App. at 636. During the plaintiff's development of the property, an issue with the pipeline caused natural gas to be released into the atmosphere, forcing

37

the plaintiff to cease construction. *Id*. at 637. The plaintiff sought recovery under theories of negligence and nuisance/trespass against the defendant CMS Energy Corp., whose subsidiary, Consumers Energy Company ("Consumers"), owned, operated, and maintained the pipeline involved in the underlying incident. *Id*. The plaintiff sought to pierce the corporate veil to hold the defendant liable for Consumers' negligence. *Id*. at 643. Despite the existence of a question of fact regarding whether Consumers was a mere instrumentality of the defendant, the Michigan Court of Appeals denied the plaintiff's attempt to pierce the corporate veil based on the plaintiffs' failure to demonstrate any evidence of fraud, wrongdoing, or misuse of the corporate form. *Id*. at 644. Specifically, "[n]othing in the record demonstrate[d] that Consumers was so controlled or manipulated by defendant in relation to Consumers' maintenance, ownership, and repair of the pipeline that defendant was somehow abusing its corporate shield for its own purposes." *Id*. However, because the plaintiff's argument in favor of piercing the corporate veil was to simply argue that Michigan law does not require a showing of fraud, wrongdoing, or misuse, the Michigan Court of Appeals did not address the question of what sort of evidence regarding the parent company's

control or manipulation of Consumers in relation to the pipeline would support the conclusion that the parent company abused the corporate form.

Because this theory of wrongdoing has not been expanded upon in previous case law,[11] it is unclear exactly what evidence would demonstrate control or manipulation of LAN in relation to the Flint water project supporting the conclusion that LAD abused the corporate form. While Plaintiffs show that LAD employees were responsible for the professional negligence (ECF No. 372, PageID.24560–24561), while working for LAN, there is no indication that LAD exercised control over LAN that resulted in improper influence with respect to engineering

---

[11] Subsequent cases involving allegations related to negligent acts by a subsidiary have similarly involved procedural postures in which the plaintiffs failed to address or offer any evidence regarding what constitutes fraud, wrongdoing, or misuse in such a context. *See, e.g., Est. of Burd by Burd*, No. 352894, 2021 WL 1941739, at *6 (the plaintiff failed to successfully demonstrate through an alter ego analysis that the defendant had possession of a building under construction at which the decedent died, where no argument was advanced regarding whether the parent defendants used the subsidiary to commit fraud or wrong); *Glenn*, 305 Mich. App. at 717 (there was no evidence of the parent company's engaging in a wrongful act in situation where underground storage tanks on gas station property leaked onto the plaintiff's properties because it was "undisputed that [the parent company] never owned or operated the subject property or gasoline station situated on it[.]").

services provided by LAN, or otherwise constituting a manner amounting to a fraud or wrong. (*See* ECF No. 400, PageID.31173.)

At the hearing on these motions, Plaintiffs framed their argument in a different light, suggesting that the situation before the Court evidences a misuse of the corporate form because LAD is asserting a separate identity between a parent and subsidiary corporation where the second entity only exists in name, and such a structure is "utilize[ed] . . . in a way to skirt the rules, in a way to skirt responsibility." (ECF No. 452, PageID.36429–36430, 36434; *see also id.* at PageID.36426–36434.) Plaintiffs relied heavily on language pulled from *Herman v. Mobile Homes Corp. See, e.g.*, 317 Mich. at 247 ("The trial court, notwithstanding the lack of actual fraud, properly found the parent company's domination and control so complete as to make the short-lived subsidiaries the mere instrumentalities and adjuncts of the Currier Company and correctly held the latter responsible for their contractual obligations to plaintiffs.").

However, while Plaintiffs are correct that *Herman* stands for the proposition that a classic fraud, in itself, is not required to meet the misuse of the corporate form element, Plaintiffs stretch *Herman*'s

40

language to hold more than it can bear. Herman *did* find that there was a wrong constituting abuse of the corporate form beyond the mere fact of subsidiaries as instrumentalities: *Herman* was precedent-setting in that the Michigan Supreme Court found that a *breach of contract* could be the kind of wrong that would justify piercing a corporate veil if the corporate form had been abused. *See Herman*, 26 N.W.2d at 762 ("If a corporation is owned and controlled by another and is manipulated by the owner for its own purposes and in its own interests to the prejudice of innocent third parties . . . it may be necessary to limit such abuse of the corporate capacity or shield." (quoting Henry W. Ballantine, Separate Entity of Parent and Subsidiary Corporations, 14 Cal. L. Rev. 12, 18 (1925))). Furthermore, subsequent cases have acknowledged that *Herman* is unique because the parent company in *Herman* acknowledged its own responsibility to the plaintiffs separate from the subsidiary, despite the lack of a contract between them. *See City of Dearborn v. Burton-Katzman Dev. Co.*, No. 309758, 2014 WL 7212895, at *8 (Mich. Ct. App. Dec. 18, 2014) ("The city cites [*Herman*] for the proposition that only an alter-ego relationship is necessary, but *Herman* is distinguishable from this case and other cases requiring actual fraud because the parent company in

*Herman* repeatedly recognized and acknowledged its responsibility to the plaintiffs (who had contracted with a subsidiary, not the parent company).”); *see also Herman*, 317 Mich. at 244.

Additionally, at the hearing Plaintiffs referenced *People ex rel Potter v. Mich. Bell Telephone Co.*, 246 Mich. 198 (1929), to suggest that abuse of the corporate form occurs when a corporation exists as a device to evade legal obligations, but *Mich. Bell* does not support this position. (ECF No. 452, PageID.36426.) As further explained in the seminal Michigan case *Green*, which tracked the development of the fraud or wrong element in Michigan law:

> In an early case, our Supreme Court stated that it would disregard an artificial entity’s separate existence when it “is so organized and controlled and its affairs so conducted as to make it a mere instrumentality or agent or adjunct of another” person or entity. *See* [*Mich. Bell*, 246 Mich. at 204]. But even when an entity is operated as a mere instrumentality by its owner, courts will only intervene to prevent an injustice: “When a corporation exists as a device to evade legal obligations, the courts, without regard to actual fraud, will disregard the entity theory.” *Id*. Because the evidence in *Mich. Bell* showed that American Telephone and Telegraph operated Michigan Bell as a mere instrumentality and did so “to avoid full investigation and control by the public utilities commission of the State to the injury of the public,” the Court disregarded the separate existence of Michigan Bell and voided the contract between Michigan Bell and American Telephone and Telegraph. *Id*. at 204–205, 224 N.W. 438. It was unnecessary to show that the owners used the entity directly to commit a fraud or

other wrong; it was sufficient to show that the continued recognition of the entity's separate existence under the circumstances would amount to a wrong or be contrary to public policy. *See id.*

310 Mich. App. at 452–456. Ultimately, the parent company *used the subsidiary to justify rates that were not based on the real costs of the public utility*; piercing the veil of the subsidiary was appropriate because the parent misused the corporate form and continued recognition of the subsidiary's separate existence would amount to a public wrong by allowing the parent to evade regulation of its prices. There are no allegations of this nature here in which LAD is alleged to have used LAN to evade a public law or other regulatory requirement.

Furthermore, it is important to note that after its consideration of the development of the fraud or wrong element from *Mich. Bell*, the Michigan Court of Appeals in *Green* clarified the possibly distinct proof requirements in different recitations of the element and further emphasized that "establishing an entity *for the purpose of avoiding personal responsibility* is not by itself a wrong that would warrant disregarding the entity's separate existence." 310 Mich. App. at 459. (emphasis added). LAD and LAN's arrangement here, if established to

43

avoid personal responsibility by LAD, does not in itself justify piercing the corporate veil under Michigan law.

The interrelatedness between LAD and LAN does give the Courts pause. The fact that an agreement between the two entities as important as one that facilitated the leasing arrangement such that all of LAN's employees were leased from LAD was unbeknownst to the General Counsel and CFO appears, at least, unusual. Yet, Michigan will not impose alter ego liability on a parent corporation for having a separate corporation as its mere instrumentality when that parent corporation has not exercised control over the subsidiary in a manner amounting to a fraud or wrong. Accordingly, the Court finds that there is no genuine dispute of fact that there was no showing of fraud, wrongdoing, or misuse of the corporate form, making summary judgment in favor of LAN in the Federal case appropriate.

### B. Vicarious Liability

LAD also contends that summary judgment in its favor is appropriate because LAD cannot be found to be vicariously liable for professional negligence committed by the engineers who performed work for the Flint water project. The People's motion for summary disposition

contends the opposite is true, mandating summary disposition on this issue against LAD. For the reasons set forth below, the Courts find that there is a genuine dispute of material fact precluding summary judgment for either side.

### a. Michigan's theory of respondeat superior liability attaches liability to employees of an employer acting within the scope of their employment.

"[T]he courts have imposed liability on those who were not the actors, but merely the masters of the actors, . . . [because] 'a master is responsible for the wrongful acts of his servant committed while performing some duty within the scope of his employment.'" *Rogers v. J.B. Hunt Transp., Inc.*, 466 Mich. 645, 650–51 (2002) (quoting *Murphy v. Kuhartz*, 244 Mich. 54, 56 (1928)). "The doctrine of respondeat superior is well established in [Michigan]: An employer is generally liable for the torts its employees commit within the scope of their employment." *Hamed v. Wayne Cty.*, 490 Mich. 1, 10–11 (2011). Accordingly, it is necessary to demonstrate that (1) the tortfeasor was an employee of the employer and (2) the torts were committed within the scope of the employee's employment in order to attach liability to the employee. *Id.* The burden rests on Plaintiffs and the People to demonstrate these

elements. *See Al-Shimmari v. Detroit Med. Ctr.*, 477 Mich. 280, 294–95 (2007) ("Vicarious liability thus rests on the imputation of the negligence of an agent to a principal. . . . [T]o succeed on a vicarious liability claim, a plaintiff need only prove that an agent has acted negligently.").

### b. There is no genuine dispute of fact that the engineers were LAD employees that were not acting rogue when committing the allegedly tortious acts.

As a preliminary—but crucial—matter, whether Warren Green, Samir Matta, Jeffrey Hansen, and Jeremy Nakashima were LAN or LAD employees frames the relevant vicarious liability analysis. Despite occasional references to these engineers as "LAN employees" (*see*, *e.g.*, ECF No. 346, PageID.21827–21829), LAD admits in its briefing and reiterated at the hearing on these motions that these engineers were all LAD employees. (*Id*. at PageID.21828, 21833; ECF No. 452, PageID.36394–36395.) Indeed, there is no genuine dispute of fact otherwise. Corporate designee Benes testified that since 2004, all LAN employees were leased from LAD pursuant to the Agreement. (ECF No. 372-2, PageID.24581.) The Agreement itself states that "[LAD] and its employees are not employees of [LAN]." (Case No. 16-10444, ECF No. 278-3, PageID.10232.) This is supported by the designation on the W-2

46

forms for all the engineers who worked on the Flint project, which lists LAD as their employer. (Brader deposition, page 148–149; ECF No. 452, PageID.36393.)

To the extent Brader, also acting as corporate deponent for LAD and LAN, suggests at various instances that *none* of the employees who worked for LAN were leased from LAD, this testimony must be taken into consideration alongside his conclusive statements that the Agreement had not been modified or terminated since its execution, nor did he believe any aspect of Benes' testimony needed to be corrected. (Brader deposition, page 133.) Because Benes and Brader were deposed as LAD and LAN's corporate representatives pursuant to Federal Rule of Civil Procedure 30(b)(6), their testimony is binding on both LAD and LAN and can be considered by the Courts at the motion for summary judgment stage. *See Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 867 (6th Cir. 2017). Accordingly, there is no genuine dispute of fact that the engineers were LAD employees.

Nor do the parties dispute that at least part of the traditional bases for analyzing whether the allegedly tortious acts were committed within the scope of the employees' employment are satisfied here. An employee

47

acts "within the scope of employment" when they are "engaged in the service of [their] master, or while about [their] master's business." *Hamed*, 490 Mich. at 11. Acts in service of their master are contrasted to "[i]ndependent action, intended solely to further the employee's individual interests" and "beyond the scope of the employer's business" which "cannot be fairly characterized as falling within the scope of employment." *Id.* "[T]he issue of whether the employee was acting within the scope of his employment is generally for the trier of fact[.]" *Mueller v. Brannigan Bros. Restaurants & Taverns LLC*, 323 Mich. App. 566, 572 (2018) (quoting *Bryant v. Brannen*, 180 Mich. App. 87, 98 (1989)).

Here, LAD does not assert—and Plaintiffs and the People do not otherwise dispute—that the engineers' actions were independent or in service of their individual interests. Rather, LAD argues that the engineers "were not performing any duties in the scope of their employment *with LAD*" but, instead, did so for LAN as loaned servants. (ECF No. 346; Case No. 16-107576, Response) (emphasis added). LAD again points to the Agreement and Benes' testimony to assert that these engineers were leased to LAN. (ECF No. 452, PageID.36395.) As loaned employees, the engineers may be subject to Michigan's borrowed servant

48

doctrine, an "exception" to respondeat superior liability that delineates liability based on an employer's degree of control over the loaned employee. *See Tucker v. Teller Excavating, Inc.*, No. 220794, 2001 WL 738423, at *1 (Mich. Ct. App. June 29, 2001).

According to LAD, because LAD loaned these employees to LAN, Michigan's borrowed servant doctrine applies; analysis of this doctrine allegedly compels the determination that LAD cannot be held vicariously liable as a matter of law. (*Id.*)  Plaintiffs argue that there is a question of fact regarding the determinative factor of the borrowed servant doctrine analysis. (ECF No. 372, PageID.24561.) The People's motion, in contrast, rests on the assertion that the borrowed servant doctrine does not apply under the circumstances presented here between LAD and LAN; in the alternative, the People argue that the borrowed servant doctrine nevertheless compels a finding that LAD was vicariously liable as a matter of law. (Case No. 16-107576, People's Br.; Reply.) Whether the borrowed servant doctrine applies, and the resultant conclusion of the borrowed servant analysis, is ultimately dispositive here.

**c. The Courts decline to extend Michigan precedent to hold that non-adversarial entities cannot invoke the**

**borrowed servant doctrine as a defense to respondeat superior liability.**

The People make two distinct, but related, arguments to support their claim that the borrowed servant doctrine cannot be invoked by LAD.[12] First, the People argue that LAD cannot invoke the borrowed servant doctrine because "the Company" (i.e., LAD and LAN jointly, as phrased by the entities' shared corporate designee Benes) "effectively operates as a single business that simply uses its 'LAN' brand to deliver some its services to clients[.]" (Case No. 16-107576, People's Br., p. 14.) Specifically, the People contend—by reference to many of the facts about LAN and LAD set forth in the alter ego section above, as well as how the Company reports LAN as a department to the Internal Revenue Service—that the Company integrated LAN and considers LAN to be a sub-department of the Company. (*Id.*, pp. 2–5, 14–17.) They recognize that, in the alternative, there is no dispute that LAD and LAN are at least parent and subsidiary companies, respectively. (ECF No. 452, PageID.36417–36418.) Because the borrowed servant doctrine has only

---

[12] Plaintiffs in the Federal Court do not raise this line of argument raised by the People. (*See* ECF No. 372; Case No. 16-107576, People's Br.) Accordingly, only the Genesee County Circuit Court addresses this argument.

been discussed—let alone applied—in the context of one company lending its employees to an entirely separate company, the doctrine requires circumstances where the corporate entities are entirely distinct and thus cannot be invoked by LAD. (Case No. 16-107576, People's Br., pp. 14–17.) Thus, according to the People, the engineers were LAD employees working in the course and scope of their employment for LAD, making LAD vicariously liable for negligence the engineers may have committed. (*Id.*)

Second, the People note this lack of precedent over a one-hundred-year span regarding the borrowed servant doctrine to urge the Courts to consider what the Michigan appellate courts would find if faced with the novel circumstances present here: non-adversarial related corporate entities, represented by the same attorneys and offering the same corporate designees, who jointly litigated the claims against them. (*Id.*) The People suggest that "it is highly unlikely that the courts would have accepted" the contention that only one corporate entity could be held vicariously liable or "found that [the borrowed servant doctrine] even applied" (*id.*, p. 16) were these same circumstances present in the seminal cases outlining the development of this doctrine. (*Id.*, pp. 15–16;

Reply, p. 3–4.) Considered in the context of the judicial system that is at its heart adversarial, applying the borrowed servant doctrine when LAN is a separate company that "does not have its own attorney or any ability to defend itself against the Company's argument" would not only be unprecedented but also contrary to the adversarial process. (Reply, p. 4.) Accordingly, the argument goes, the question of whether non-adversarial companies generally (and parent-subsidiary companies specifically) can invoke the borrowed servant doctrine is one of first impression. (ECF No. 452, PageID.36417.)

In essence, the two arguments presented by the People suggest that either it is an existing requirement that the borrowed servant doctrine be applied solely for adversarial parties or that, were this question presented to the Michigan Supreme Court, such a requirement would be added henceforth. LAD disagrees with both contentions. In response, LAD challenges the People's assertion that LAN is a department of LAD in light of LAD's separate corporate status, emphasizing that "[i]t is incumbent upon the State, therefore, to demonstrate some legal doctrine can be applied to disregard the corporate separateness." (*Id.*, p. 8.) Because the People failed to address (nor establish as a matter of law) an

alter ego theory of liability, LAD cannot be treated as a single employer and summary disposition on this ground is improper. (*Id.*, pp. 7–11.) Furthermore, LAD argues that "there is simply no rule that related entities cannot lend and borrow employees in such a way as to relieve the lending employer from liability" and similarly "no requirement . . . that the lending and borrowing employers be adverse in the litigation." (Case No. 16-107576, Response, p. 7.) LAD cites two decisions from other state supreme courts for the contention that whether a loaned employee is a borrowed servant remains a question of fact regardless of whether the companies are parent and subsidiary. (*Id.*) Thus, according to LAD, "this case presents a clear application of the borrowed servant doctrine" and does not present any novel question. (*Id.*, p. 14.)

Because the People's two arguments present different questions for the Court, each will be considered in turn. First, to the extent the People's brief asserts that LAD cannot invoke the borrowed servant doctrine because LAD and LAN are effectively the same corporate entity, this is unavailing. The Court agrees with LAD's assessment that such a maneuver would fall afoul of the presumption in favor of corporate separateness. *See Servo Kinetics, Inc.*, 475 F.3d at 798 ("Under Michigan

law, there is a presumption that the corporate form will be respected."). While the People are correct that piercing a company's corporate veil is not *generally* an element of imposing respondeat superior liability on that company (Case No. 16-107576, Reply, p. 2), the People's framing of LAN as a department of LAD would require the Court to ignore LAN and LAD's status as separately incorporated. The People do not provide evidence challenging LAN and LAD's status as formally separately incorporated entities. Furthermore, as set forth above, the Courts have determined that there is insufficient evidence of misuse of the corporate form that would allow piercing the corporate veil in this instance. LAD is ultimately correct that "[i]t is incumbent upon the [People] . . . to demonstrate some legal doctrine" that would allow or require the Court "to disregard corporate separateness" here (Case No. 16-107576, Response, p. 8); the People have not done so.

Nor does the Court find that there is an existing requirement in the borrowed servant doctrine as it has been developed under Michigan law that requires the companies be unrelated or adversarial. Neither the parties, nor the Court independently, have found precedent involving the doctrine being invoked for parent and subsidiary companies or the sort

of non-adversarial arrangement at issue here. (ECF No. 452, PageID.36417–36418.)

Here, the People are correct that the circumstances present in this case are novel and the question at issue has not yet been resolved by the Michigan Supreme Court, requiring the Court to predict what the Michigan Supreme Court would do if confronted with this same issue. *See Servo Kinetics, Inc.*, 475 F.3d at 798. This prediction must be based on "all relevant data[,]" including "decisions of the [Michigan] appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [Michigan Supreme Court] would decide otherwise." *Kingsley Associates, Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995) (citing *FL Aerospace v. Aetna Casualty and Surety Co.*, 897 F.2d 214, 218–19 (6th Cir. 1990)).

Examination of the underlying rationale behind the borrowed servant doctrine informs the Court's conclusion here. As all parties correctly note, Michigan law recognizes that there are different situations presenting multiple possible employers for a single employee. The Michigan courts do not treat all of those situations equally. Michigan law distinguishes between circumstances in which a court evaluates

55

whether a particular defendant employer is vicariously liable in tort for an employee (i.e., respondeat superior liability) versus whether an employer-employee relationship exists for the purposes of remedial social legislation (e.g., workers compensation cases). *See Chilingirian v. City of Fraser*, 194 Mich. App. 65, 69 (1992); *see also Ashker ex rel. Est. of Ashker v. Ford Motor Co.*, 245 Mich. App. 9, 15 (2001) (hereinafter, "*Ashker II*"). In situations of tort liability, the Michigan Supreme Court has long recognized that an employee of one employer[13] may, through a loaning arrangement between that employer and another employer, be considered to have a servant-master relationship with the other employer:

> The rule is long settled that a servant in the general employment of one person may also become the special servant of another, with all the mutual rights and obligations of master and servant between them for the time of, and in relation to, the special service in which the servant is temporarily engaged. If an employer loans a servant to another for some special service, the latter with respect to that service may become liable as a master for the acts of the servant without any actual contract of employment between them or payment for service.

---

[13] While the terminology used differs throughout Michigan precedent, the employer loaning the employee to another employer (i.e., LAD) is often referred to as the general employer, the loaning employer, or the original master; in contrast, the employer borrowing the employee (i.e., LAN) is referred to as the special employer or the borrowing employer.

*Janik v. Ford Motor Co.*, 180 Mich. 557, 561–62 (1914). Yet, in so doing, the Michigan Supreme Court made clear that both the general employer and the special employer could *not* be simultaneously liable for the tortious acts of that employee. Instead, a court evaluates whether to impose respondeat superior liability on a general or special employer for a particular tortious act by employing what is now called the "control test." *See Ashker ex rel. Est. of Ashker v. Ford Motor Co.*, 245 Mich. App. 9, 16 (2001) (hereinafter, "*Ashker II*") (stating that the purpose of the control test "is to define and delimit the circumstances under which a master should be held liable for the acts committed by a servant that injure a third party."). The Michigan Supreme Court has articulated the control test as follows:

> The test is whether in the particular service which he is engaged or requested to perform he continues liable to the direction and control of his original master or becomes subject to that of the person to whom he is lent or hired, or who requests his services. It is not so much the actual exercise of control which is regarded, as the right to exercise such control. To escape liability the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under control of a third person. Subject to these rules the original master is not liable for injuries resulting from acts of the servant while under the control of a third person.

*Janik v. Ford Motor Co.*, 180 Mich. 557, 562 (1914); *see also Hoffman v. JDM Assocs., Inc.*, 213 Mich. App. 466, 468–69 (1995) (clarifying that the articulation of the control test in *Janik*, and not the separate economic reality test, was the appropriate test by which to decide the scope of respondeat superior liability for the actions of a loaned servant). In other words, unless the general employer *entirely relinquished its right to control the employee* while the employee was under control of the special employer, the employee's negligence will be imputed to the general employer. Accordingly, the underlying dispositive principle is that it is relinquishing the right to control that releases the general employer from respondeat superior liability.

Allowing the borrowed servant doctrine in the context of parent-subsidiary relationships or otherwise non-adversarial defendant corporate parties would not impugn these governing principles. Application in those circumstances does not absolve all employers of liability or impose liability on both the general and special employers, such that it would contravene Michigan's imposition of vicarious liability only on employers who have the right to control their employees. Furthermore, the crucial relationship behind attachment of respondeat

58

superior liability is not the relationship between the general and special employers, but rather, that between those employers *and the employee*. A close relationship or non-adversarial relationship between the general and special employers does not, by definition, impact the relationship between the employee and their general and special employers. Situations where the special and general employers are related or non-adversarial may raise questions worth exploring regarding the degree to which the general employer controlled the special employer. The Court can envision a line of inquiry into whether the general employer's right of control over the actors of the special corporation (or vice versa) could, by extension, impact the control test analysis for an employee leased between the employers. Yet this would not lean in favor of foreclosing the borrowed servant doctrine entirely; instead, this would impact a court's analysis into the control test itself. In sum, to the extent the People request to impose a requirement that the general and special employers be adversarial or non-related, this does not comport with the purpose or reasoning animating prior decisions in this area. Accordingly, the Court will decline to do so.

Additionally, the People's arguments concerning the importance of the adversarial system generally (Case No. 16-107576, Reply, p. 4) do not apply to the question of whether to impose a requirement on the borrowed servant doctrine that the general and special employers be adversarial. To be sure, the People correctly note that the adversarial process is not ancillary to the state judicial system. (*Id.*) Yet the People's citations to Michigan Supreme Court precedent reference the fundamental principle under the adversarial system that it is each litigant's responsibility to ensure its positions are framed and presented to the trial court. *See Napier v. Jacobs*, 429 Mich. 222, 228 (1987) (noting that, within this adversarial system, the parties frame the issues and present them to the court); *see also Mack v. Detroit*, 467 Mich. 186, 223, 649 N.W.2d 47 (2002) (Cavanagh, J., dissenting) (stating that, under our adversarial system the "parties frame the issues and arguments" for the trial court, which ensures "the best presentation of arguments and theories because each party is motivated to succeed"); *see also United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[A]s a general rule, our system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts

60

and argument entitling them to relief.'") (alteration in original), quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment). Imposing a so-called adversarial requirement on the borrowed servant doctrine does not impact the parties' responsibility to advance the issues to the Courts. LAN, acting as it must through its officers and agents, *see Altobelli v. Hartmann*, 499 Mich. 284, 296 (2016), can choose to retain the same counsel as a fellow defendant or to not respond separately to a motion before the Courts even if those same officers and agents are also responsible for the actions of its fellow defendant, LAD. To the extent the People suggest that having dual representation of both LAD and LAN is not to LAN's interest or presents a conflict of interest, that is a separate line of inquiry not impacting the borrowed servant doctrine generally.

The Courts find no existing requirement that the borrowed servant doctrine be imposed in situations without a parent-subsidiary or non-adversarial relationship between the general and special employers. Nor do the Courts find that imposing one would be the approach taken by the Michigan Supreme Court were it presented with this context. Accordingly, the borrowed servant doctrine applies.

### d. There is a question of fact as to whether LAD would be liable under the borrowed servant doctrine.

Having determined that the borrowed servant doctrine applies to determine LAD's vicarious liability for the actions of its engineers, the Courts must consider the control test.

In order to determine whether a defendant "exercise[d] or possess[ed] the requisite control to make it vicariously liable for the actions of its loaned servant[,]" a court must evaluate whether a defendant "exercise[d] or retain[ed] *any* day-to-day control or supervision of [the loaned employee's] specific work activities" or had the right to control "detailed activities" of the employee. *Hoffman*, 213 Mich. App. at 473 (emphasis added). This requires an inquiry into "whether there was evidence that the [loaned] employees were under the general control of [the general employer] at the time of the relevant work [] and whether any work performed could be considered part of their job duties for [that loaning employer]." *Sokolowski v. City of Charlevoix*, No. 241037, 2003 WL 22736580, at *2 (Mich. Ct. App. Nov. 20, 2003).

This concept of day-to-day control is contrasted to other aspects of control which are insufficient to establish vicarious liability, such as: paying the employee or providing benefits and withholdings; possessing

62

the right to terminate employment based on cause or no cause; retaining the ability to discipline based on workplace conduct; and retaining final authority on all employment related matters. *Hoffman*, 213 Mich. App. at 471–73. Furthermore, "[t]he extent to which the borrowing employer actually or adequately exercised control is immaterial." *Castell v. Peckover Metal, Copper & Brass Sales*, No. 305648, 2013 WL 4487504, at *6 (Mich. Ct. App. Aug. 22, 2013). In other words, issues regarding supervision of the worksite and uncertainty concerning who was in charge do not, in themselves, suggest that the general employer retained control over the loaned employees. *Id*. In situations where the facts regarding the scope of an employer's control create genuine issues of material fact, summary disposition is generally improper. *Hoffman*, 213 Mich. App. at 469–70.

As a preliminary matter, Plaintiffs' response misstates the applicable law. While Plaintiffs identify the control test as the proper test to employ here, Plaintiffs reference *Ashker II* to argue that this test "looks to factors including hiring and firing and maintenance of discipline as factors." (ECF No. 372, PageID.24561.) This is incorrect. Plaintiffs cite to a portion of *Ashker II* outlining the Michigan Court of Appeal's previous

decision on appeal,[14] *Ashker I*, and specifically, the portion of the *Ashker I* opinion outlining the confines of the economic reality test. (*See id.*) *Ashker II* considered whether the law-of-the-case doctrine applied and thus whether the trial court was precluded from reconsidering whether there was a genuine issue of fact regarding whether there was an employee-employer relationship following *Norris v. State Farm Fire & Casualty Co.*, 229 Mich. App. 231 (1998). *Ashker II,* 245 Mich. App. at 13. Ultimately, the *Ashker II* court concluded that *Norris* did not constitute an intervening change in law, but rather, affirmed the principle as set forth above: "*Norris* concluded that for all but worker's compensation cases it is well established that the correct standard to assess respondeat superior liability is the control test, not the economic reality test." *Ashker II*, 245 Mich. App. at 14. Accordingly, whether LAD had the power to hire, fire, or maintain discipline does not factor into the Courts' determination of whether LAD exercises sufficient control over LAN employees in this regard. *See Hoffman*, 213 Mich. App. at 471–73.

---

[14] *Ashker v. Ford Motor Co.*, No. 188647, 1997 WL 33354478, at *1 (Mich. Ct. App. Jan. 21, 1997) (hereinafter, "*Ashker I*").

Ultimately, the fundamental question before the Courts is "whether there is any evidence from which a trier of fact could conclude that [the general employer] had not resigned full control over its employee[.]" *Noble v. Roadway Exp., Inc.*, 153 Mich. App. 12, 19 (1986).

There is some evidence before the Courts that suggests that in some ways, LAD did not actually exercise control over the daily activities of the engineers. Benes testified that the day-to-day work of providing engineering services relating to the FWTP was overseen by John Warren Green, a LAN employee leased by LAD (*id.*)—although Green testified that he did not know he was a LAD employee and did not know who he would reach out to at either LAD or LAN to determine who was his employer. (ECF No. 346-3, PageID.21934–21936.) Other engineers who worked on site—Jeffrey Hansen (ECF No. 346-4, PageID.21942–21943), and Samir Matta (ECF No. 346-5, PageID.21946, 21952–21953)—similarly testified that they had no idea they were possibly LAD employees or that Green was a LAD employee.

Nevertheless, Plaintiffs point to LAD's organizational chart, and the fact that Peterson, the President of LAN, was also a Senior Vice President of LAD, to support their contention that LAD executives

65

controlled LAN during the relevant time period. (ECF No. 372, PageID.24561.) Courts have previously looked to organizational roles to evaluate whether loaned employees who testified that they were working for employees of a parent company at the time of the relevant incident could give rise to vicarious liability. *See Sokolowski*, No. 241037, 2003 WL 22736580, at *2 (noting that loaned employee testified he was working for the president of the loaning employer when working on the trailer where the accident at issue occurred). But LAD is correct (ECF No. 346, PageID.21836–21837) that the simple fact that a LAD executive is at the top of the organizational hierarchy does not in itself support the contention that LAD retained control in some manner "relative to the specific work activity underlying [the] plaintiffs' negligence action." *Ross*, No. 217073, 2001 WL 629650, at *3. Here, the evidence points to the contention that the testifying engineers only reported to a LAN employee: Green (ECF No. 372-2, PageID.24596), who himself believed he was a LAN employee. There is no evidence that the engineers believed they were commanded by LAD superiors or that they otherwise believed they were working for LAD at the time of the alleged negligence to support finding LAD vicariously liable.

66

However, evidence of the control actually *exerted* on the ground does not preclude the finding that LAD maintained the *partial right* to control its engineers while they performed work on behalf of LAN. Analysis of the terms of the Agreement[15] effectuating the lease arrangement between LAN and LAD is essential to understanding whether there is a genuine dispute of fact that LAD maintained such a right to control. Plaintiffs and the People highlight the aforementioned Section 4 of the Agreement, which states: "The Staff shall be under the mutual control and direction of [LAD] and [LAN]."[16] (Case No. 16-10444, ECF No. 278-3,

---

[15] The Courts note that "for the purposes of this motion, LAD . . . agree[s] that there is record evidence of" the fact that all employees working for LAN are leased from LAD but LAD also suggests "[i]t's unclear to the extent to which the [Agreement] was actually in effect" and that there is a "question of fact . . . relat[ing] solely to the matter of how effective the leasing arrangement was and the degree to which the companies continued to follow [the Agreement] over time." (ECF No. 452, PageID.36394, 36439–36440.) Nevertheless, LAD does not dispute that Section 4 of the Agreement, in particular, was in force during the relevant time period to the professional negligence claims.

[16] The People also highlight a different portion of Section 4 of the Agreement, which indicates that LAD "shall be responsible for all risks incurred in the operation of its business and shall enjoy all the benefits thereof" and "shall be solely responsible for all liability and expenses arising out of or from" the Agreement. (Case No. 17-108646, People's Br., p. 19; *see also* Case No. 16-10444, ECF No. 278-3, PageID.10232.) Additionally, the People point to Section 6, which includes a provision regarding indemnification. (*Id*.) The People argue that these provisions would preclude LAD from denying liability for its employees' actions, but that these contractual provisions are not being raised by LAN because of the extreme overlap between the two entities and their non-adversarial nature for this litigation. (*Id*.)

67

PageID.10232.) The parties argue that this provision confirms that LAD retained the right to exert mutual control and direction over the day-to-day work activities of the engineers. (ECF No. 372, PageID.24561; Case No. 16-107576, People's Br., pp. 19–20; Reply, p. 7.) The People, in particular, point to *Noble*, 153 Mich. App. at 18–19, which considered the impact of contractual terms imposed under Interstate Commerce Commission regulations that regulated unloading of freight by consignees and carriers. The Michigan Court of Appeals held that a provision contained in the contract between the two entities binding the general employer carrier to not resign its right to control an employee's activities during unloading could give rise to a genuine issue of material fact in the borrowed servant context.[17] (Case No. 16-107576, Reply, pp.

---

Because the Courts find that there is a genuine dispute of fact regarding whether LAD is vicariously liable under the control test, the Courts need not evaluate the separate implications of these contractual provisions. Nevertheless, these subsections raise questions regarding the extent to which LAD is otherwise contractually bound to incur liability resulting from the actions of employees leased pursuant to the Agreement.

[17] The People also suggest that "the [borrowed servant] test only applies in the absence of 'any actual contract of employment.' *Janik*, 180 Mich. at 652." (Case No. 17-108646, Reply, pp. 9-10.) The People reference *Janik* and *May*, 185 Mich. App. at 553, to suggest that the existence of *any* contract establishing whether the general employer had fully relinquished the right to control the employee, forecloses application of the borrowed servant doctrine. (*Id*.) This is clearly incorrect. The language cited by the People refers to the absence of a contract between the special

10 – 11.) *See also Ross v. L.B. Knight, Inc.*, No. 217073, 2001 WL 629650, at *3 (Mich. Ct. App. May 29, 2001).

LAD disputes the importance of this contractual language in addition to Plaintiffs' and the People's interpretation. First, LAD notes (ECF No. 400, PageID.31176; Case No. 16-107576, Response, p. 15) that there is precedent suggesting that language of such a nature in employee manuals "does not negate the realities of [the employee]'s daily working environment" and that similar language in a contract "'should not be regarded as dispositive in and of itself' because it may be self-serving and not necessarily a true reflection of the relationship." *Hool v. William A. Kibbe & Assocs., Inc.*, No. 255371, 2005 WL 3115816, at *4 (Mich. Ct. App. Nov. 22, 2005) (quoting *Mantei v. Michigan Pub. School Employees Retirement Sys.*, 256 Mich. App 64, 85–86 (2003)).

---

employer and the loaned employee, not the absence of a contract between the general and special employers, as is the situation here. Indeed, *Noble*, 153 Mich. App. at 18–19, confirms this. The *Noble* court found that the provisions incorporated by reference in the contract between the general and special employers provided "evidence from which a trier of fact could conclude that [the general employer] had not resigned full control over its employee," precluding summary judgment for the general employer under the control test. *Id.* at 19. The Michigan Court of Appeals did not forego application of the borrowed servant doctrine in those circumstances; it was the analysis under the control test that led to its conclusion.

However, a closer analysis of the background in *Hool* and *Mantei* casts doubt on the importance of the highlighted language to the case before the Courts. In *Mantei*, the plaintiff retired from working as a public-school principal but acted as an administrator in a public elementary school pursuant to a contractual arrangement with a private-sector personnel-services company. 256 Mich. App. at 66–67. The plaintiff sought to challenge a determination that he was subject to the earnings limitation of Section 61 of The Public School Employees Retirement Act of 1979 (the "retirement act"), M.C.L. § 38.1361, which limited earnings and retirement allowance for individuals "employed by a reporting unit" within the meaning of the retirement act. *Id*. *Mantei* evaluated the existence of an employment relationship as covered by the retirement act under the economic reality test, which, as set forth above, is used under Michigan law to determine an employment relationship in situations where the claim does not allege vicarious liability of a master. *Id*. at 77–79. Control of a worker's duties is a factor considered under this test, but it is one factor amid a list of nonexclusive and noncontrolling factors evaluated to consider the totality of the circumstances surrounding the work performed. *Id*. In *Mantei*, the Michigan Court of

70

Appeals recognized that contractual language purporting to designate roles and responsibilities of the employment relationship is a "relevant factor to be considered in examining the totality of the circumstances" but "should not be regarded as dispositive in and of itself[.]" *Id.* at 85–86.

*Hool*, in turn, involved allegations of direct negligence and vicarious liability against a defendant employee, Darwin Eagle, as well as defendants William A. Kibbe & Associates, Inc. ("Kibbe") and General Motors Corporation ("GM"). No. 255371, 2005 WL 3115816, at *1. The plaintiff Gary Hool, as well as the personal representative of Gary Hool's estate, sought to recover for Eagle's alleged negligence at a metal casting plant owned by GM, which resulted in Hool's death. *Id.* At the time of the incident, Eagle was working as a contractor supervisor pursuant to an agreement between Kibbe and GM, whereas Hool was employed by GM. *Id.* The nature of the case required the Michigan Court of Appeals to determine both (1) whether Eagle could be considered Hool's co-employee such that Eagle was protected under the exclusive remedy provision of the Worker's Disability Compensation Act (WDCA), MCL 418.101 et seq.; and (2) whether Kibbe retained sufficient control over Eagle to be held

vicariously liable. *Id.* at *2–4. The two questions required consideration of both the economic realities test and the control test.

In so doing, the Michigan Court of Appeals analyzed the impact of GM's Manual for Contract Employees (the "manual") and Eagle's contract with Kibbe ("the agreement"). *Id.* at *4. However, the language of the *Hool* opinion cited by LAD was contained in the context of the Michigan Court of Appeals' consideration of the manual and the agreement in terms of evaluating the plaintiff and GM's "assertion that Eagle was Kibbe's employee," as opposed to whether Kibbe retained sufficient control over Eagle's day-to-day activities. *Id.* Specifically, the Michigan Court of Appeals noted that the manual's language "does not negate the realities of Eagle's daily working environment[,]" which is the crux of the economic realities test. *Id.* Thus, the Michigan Court of Appeals cited *Mantei* for the same principle that the economic realities test requires consideration of the manual and the agreement between the employers, but that such contractual language is not dispositive in itself. *Id.* Accordingly, *Hool* noted *Mantei*'s reasoning for its consideration under the *economic realities test*, only.

72

Furthermore, the People recognize (Case No. 16-107576, Reply, p. 11) that in Michigan law, an unpublished opinion has no precedential value. MCR 7.215(C)(1); *Charles Reinhart Co. v. Winiemko*, 444 Mich. 579, 588 n. 19 (1994). Nevertheless, the Courts "may follow that decision if it finds the reasoning persuasive." *Dep't of Env't Quality v. Waterous Co.*, 279 Mich. App. 346, 383–84 (2008). Here, to the extent *Hool* might suggest that contractual language is subservient to an employee's daily working realities under the control test, the Courts do not find the reasoning of *Hool v. William A. Kibbe & Assocs., Inc.* to be persuasive. This is particularly so when *Hool* is considered in the context of published cases such as *Noble*, 153 Mich. App. at 19, that find contractual language capable of creating a genuine dispute of fact on the issue of right to control.

LAD next disputes the Plaintiffs' and the People's interpretation of Section 4 of the Agreement. (ECF No. 400, PageID.31176; Case No. 16-107576, Response, p. 15.) Some of LAD's contentions regarding textual interpretation and the dispositive facets of the borrowed servant doctrine

73

are clearly unavailing.[18] LAD contends that "[t]he phrase 'mutual control' does not suggest equal and coextensive control with regard to every aspect of the employee's work." (ECF No. 400, PageID.31176.) Yet under the control test, LAD's right to control need not be equal and coextensive with LAN, nor must it cover to every aspect of the employee's work; the relevant inquiry is whether LAD "exercise[d] or retain[ed] *any* day-to-day control or supervision of [the loaned employee's] specific work activities"

---

[18] LAD also separately contends that neither LAD nor Leo A. Daly III had the right to direct the professional work of LAN by reference to Benes' deposition testimony on the issue. (ECF No. 346, PageID.21837.) Despite some back-and-forth on the matter (*see* ECF No. 372-2, PageID.24596–24598), Benes ultimately asserted that "[LAD] did not have the ability to tell LAN not to do the work or services and did not actually exercise control of the detailed activities." (*Id*. at PageID.24593, 24596.) In his affidavit and again in his deposition, Benes states that LAD did not have the right to control any of the activities of the employees working on the Flint project. (*See* ECF No. 372-2, PageID.24596.) Yet this constitutes Benes' opinion of the meaning of the Agreement generally, and in particular, Section 4. The Michigan Court of Appeals has previously held that "the contract language itself, and not the conclusions [the general employer's president] drew from the contract language, is the relevant consideration in determining if a genuine issue of a material fact was shown with regard to whether defendant [general employer] resigned full control of [the employee] to [the special employer] relative to the detailed supervisory activities that he was to perform." *Ross v. L.B. Knight, Inc.*, No. 217073, 2001 WL 629650, at *3 (Mich. Ct. App. May 29, 2001).

Additionally, while Benes asserted that this provision of Section 4 was not followed (ECF No. 372-2, PageID.24593), he and Brader both agreed that the Agreement was in force. (Brader deposition, page 133.) Furthermore, failure to follow a contractual provision does not in itself suggest that the provision is no longer legally binding on the parties.

or had the right to control "detailed activities" of the employee. *Hoffman*, 213 Mich. App. at 473 (emphasis added). If LAD retained at least *some* right to control the engineers' specific work activities related to the Flint water project, LAD may be found liable for the engineers' negligence under the control test.

Additionally, to the extent LAD argues that its right to terminate the employees precludes a finding that LAD exercised any control over the employee's daily work activities on LAN projects (ECF No. 400, PageID.31176–31177), this conclusion does not follow from the premise. LAD has offered no explanation for why the right to terminate the employees would be mutually exclusive from the right to control detailed activities.

Finally, LAD's argument implies that the provision at issue is unambiguous, suggesting that "even if the statement is taken at face value, it does not relate to control of the 'detailed activities' of the employee—the factor that matters for determining whether vicarious liability may be applied." (*Id*.)

Although no party addresses the issue, further evaluation of this contractual provision requires the Courts to decide a threshold matter:

what state's laws apply in light of the Agreement's choice-of-law provision in Section 11 ("This Agreement shall be governed by and construed in accordance with the laws of the State of Nebraska without regard to conflict of laws rules."). (Case No. 16-10444, ECF No. 278-3, PageID.10235.) "When we sit in diversity, we apply the choice of law rules of the forum state." *S2 Yachts, Inc. v. ERH Marine Corp.*, 855 F. App'x 273, 277 (6th Cir. 2021). Michigan, the forum state here, applies the Restatement (Second) of Conflicts of Laws § 187, which will apply a choice-of-law clause unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental public policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Id*. With regard to the substantial relationship factor, Nebraska has a substantial relationship to the parties here: LAD is a Nebraska corporation with its principal place of business in Nebraska. (ECF No. 346, PageID.21826.) With regard to the fundamental public policy factor, "[i]n order for the chosen state's law to violate the fundamental policy of

[the other locale], it must be shown that there are significant differences between the application of the law of the two states." *Id.* (quoting *Tele-Save Merch. Co. v. Consumers Distrib. Co., Ltd.*, 814 F.2d 1120, 1123 (6th Cir. 1987)). Both Michigan and Nebraska follow substantially similar methods of contract interpretation, first determining as a matter of law whether a contract is ambiguous, defining an ambiguous contract as one susceptible to at least two reasonable but conflicting meanings, and finding ambiguous contracts to present a question of fact. *Compare Bierman v. Benjamin*, 305 Neb. 860, 865 (2020); *to Universal Underwriters Ins. Co. v. Kneeland*, 464 Mich. 491, 496 (2001). Accordingly, the Courts will enforce the choice-of-law clause and apply Nebraska law to this dispute.

The Nebraska Supreme Court outlined the following guidance for the process of contract interpretation generally:

> In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them. The fact that the parties have suggested opposing meanings of a disputed instrument does not necessarily compel the conclusion that the instrument is

> ambiguous. A contract found to be ambiguous presents a question of fact and permits the consideration of extrinsic evidence to determine the meaning of the contract.

*Bierman*, 305 Neb. at 865. Furthermore,

> A contract must receive a reasonable construction and must be construed as a whole. And, if possible, effect must be given to every part of a contract.
>
> A court is not free to rewrite a contract or to speculate as to terms of the contract which the parties have not seen fit to include. A court should avoid interpreting contract provisions in a manner that leads to unreasonable or absurd results that are obviously inconsistent with the parties' intent.

*Equestrian Ridge Homeowners Ass'n v. Equestrian Ridge Ests. II Homeowners Ass'n*, 308 Neb. 128, 155 (2021).

Accordingly, the Courts must begin by determining whether the meaning of the relevant phrase of Section 4 ("The Staff shall be under the mutual control and direction of [LAD] and [LAN]") is ambiguous. The People and Plaintiffs argue that the relevant language gives LAD the right to mutual control and direction over the engineers' activities. In contrast, LAD asserts that the phrase "mutual control" as used in the Agreement does not necessarily suggest that LAD exercised control over the employee's daily work activities, but rather, could refer to other

aspects of control irrelevant to the control test (e.g., ability to fire). (ECF No. 400, PageID.31176–31177.)

The Courts find that the Agreement is ambiguous with regard to the means of control retained by LAD pursuant to the relevant phrasing of Section 4. Merriam-Webster's Dictionary defines "direction"[19] as (1) "guidance or supervision of action or conduct[;]" (2) "an explicit instruction[;]" and (3) "a channel or direct course of thought or action[.]" *Direction*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/direction (last visited Jan. 18, 2022). Black's Law Dictionary defines "direction" as (1) "[a]n act of guidance"; (2) "[a]n order; an instruction on how to proceed"; and (3) "[a] board of directors; a board of managers." *Direction*, Black's Law Dictionary 556 (11th ed. 2019), *available at* Westlaw. Additionally, Merriam-Webster's Dictionary defines "control (noun)" as "an act or instance of controlling[,]" and "power or authority to guide or manage[.]" *Control*, Merriam-Webster's

---

[19] Clearly irrelevant definitions from Merriam-Webster's Dictionary and Black's Law Dictionary are not listed here. *See Equestrian Ridge Homeowners Ass'n*, 308 Neb. at 155 ("A court should avoid interpreting contract provisions in a manner that leads to unreasonable or absurd results that are obviously inconsistent with the parties' intent.").

Dictionary, https://www.merriam-webster.com/dictionary/control (last visited Jan. 18, 2022). Black's Law Dictionary defines "control" as "[t]he direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to manage, direct, or oversee[.]" *Control*, Black's Law Dictionary (11th ed. 2019), *available at* Westlaw. In sum, consideration of the plain meaning of "direction" and "control" suggests that LAD holds the right to exert, guide, and supervise the actions and conduct of the loaned employees, in addition to rights of management of the employees generally. Whether this right to exert guidance and supervision of the actions and conduct of the loaned employees extends to control over the ability to terminate the employees only, or could extend to control over day-to-day activities, is unclear from the plain text of this sentence in isolation.

Examination of the greater context of this phrase does not offer further clarity. Section 1 outlines the confines of the arrangement from a broader perspective: "[LAD] will lease certain of its employees ("Staff"), to be designated by [LAN], to [LAN] to perform such work and for such periods of time as are specified by [LAN] from time to time to meet

[LAN's] staffing needs (the "Services")." However, this subsection—and no other subsection besides it—does not include any language that would purport to designate the degree of control that LAN and LAD would respectively be able to exert over the Staff and their performance of the Services. Additionally, while the Agreement offers extensive detail regarding the applicable procedure to follow for aspects of the employment relationship such as compliance with applicable law related to compensation, taxes, employee benefits, and workers compensation claims in Section 5, there is no explicit provision outlining LAD and LAN's respective rights to promote or terminate employees. Without additional reference to either the right to supervise or order Staff while engaged in Services, or to the ability to terminate Staff, the relevant Section 4 sentence is a "phrase, or provision in the contract [that] . . . is susceptible of, at least two reasonable but conflicting interpretations or meanings." *Bierman*, 305 Neb. at 865.

Accordingly, both interpretations proffered by the parties are plausible constructions of the contractual language, rendering the contract ambiguous on its face. "The interpretation of an ambiguous

81

contract presents an issue of fact not appropriate for determination on summary judgment." *Bierman*, 305 Neb. at 866.

The People wish for the Courts to go further and to grant summary disposition in their favor based upon the language in the Agreement. Michigan courts have suggested that it may be appropriate to grant summary judgment in favor of a plaintiff seeking to hold the general employer liable when a contract prohibits the general employer from surrendering complete control over the employee. *See Noble*, 153 Mich. App. at 20. The People point to this precedent in support of their contention that summary disposition in their favor under the borrowed servant doctrine is appropriate. (Case No. 16-107576, Reply, p. 4.) However, *Nobel* presents a slightly different circumstance: the ICC regulations constituted *unambiguous contractual language* that indicated that the carrier retained the right to control the acts of its employees at the point of unloading. *Id*. Because the Courts find that the language of the Agreement suggesting LAD may have retained a right to control the activities of its employees is ambiguous, creating a question

of fact, summary disposition is inappropriate.[20] Furthermore, *Nobel*'s language indicates that summary disposition on this ground may be appropriate, but left the question open for consideration by the trial court on remand. Accordingly, in the absence of controlling Michigan precedent finding that summary judgment is warranted in such circumstances, the Courts declines to grant summary judgment in favor of the People or Plaintiffs at this time. Nevertheless, the Courts find that there is a genuine issue of material fact as to whether that ultimately precludes granting summary judgment to LAD.

## IV.   Conclusion

---

[20] The People make two additional arguments in support of their assertion that summary disposition in their favor is appropriate. The People point to Section 5(d) of the Agreement, which indicates that LAD "shall insure that all [employees] assigned" to LAN "will comply with any applicable policies and procedures" of LAN. (Case No. 16-10757617, People's Br., pp. 14–17.) The People argue that this language is another example of a contractual provision that gives LAD the right to mutual control and direction over the engineers' activities, by requiring LAD to ensure that LAN's policies and procedures are followed by LAD employees working for LAN. (*Id.*) Additionally, the People argue that LAD actually exercised the right to control and direct its employees leased to LAN through a policy that required contracts regarding the Flint project (which outlined the proposed engineering activities) to be approved by corporate officers of LAD. (Case No. 16-10757617, Reply, pp. 7–9.) Because the Courts find that summary disposition is inappropriate based on the ambiguous contractual language more directly related to the right to control the engineers' detailed activities, the Courts will not consider these additional arguments at this time.

For the reasons set forth above, the Courts GRANT IN PART and DENY IN PART LAD's motion for summary judgment. (ECF No. 345.) Additionally, the Courts DENY the People of the State of Michigan's motion for partial summary disposition pursuant to M.C.R. 2.116(C)(10) in the State Court (Case No. 16-107576, People's Br.).

IT IS SO ORDERED.

Dated: February 9, 2022
Ann Arbor, Michigan

s/Judith E. Levy
JUDITH E. LEVY
United States District Judge

/s Joseph J. Farah
JOSEPH J. FARAH
Circuit Judge
Genesee County Circuit Court

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 9, 2022.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager