# EXHIBIT A

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF MICHIGAN

3               SOUTHERN DIVISION

4     _____

                                 )

5                                )   Civil Action No.

                                 )   5:16-cv-10444-JEL-MKM

6     In re:  FLINT WATER CASES   )   (consolidated)

                                 )

7                                )   Hon. Judith E. Levy

                                 )   Mag. Mona K. Majzoub

8     _____)

9

10              HIGHLY CONFIDENTIAL

11    VIDEOTAPED DEPOSITION OF MICHAEL B. GLASGOW

12                  VOLUME I

13

14          Monday, February 24, 2020

15               at 9:05 a.m.

16

17    Taken at:  Butzel Long

               41000 Woodward Avenue

18             Bloomfield Hills, Michigan  48304

19

20

21

22    REPORTED BY:  CAROL A. KIRK, RMR/CSR-9139

23          GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com

Highly Confidential - Michael B. Glasgow

```
 1                A P P E A R A N C E S
 2                     - - -
 3  On behalf of the Class Plaintiffs:
            STEPHEN E. MORRISSEY, ESQUIRE
 4          BENJAMIN MANNE, ESQUIRE
            SUSMAN GODFREY L.L.P
 5          1201 Third Avenue, Suite 3800
            Seattle, Washington  98101
 6          206-516-3880
            smorrissey@susmangodfrey.com
 7          bmanne@susmangodfrey.com
 8
    On behalf of Individual Plaintiffs:
 9          DONALD H. DAWSON, JR., ESQUIRE
            FIEGER LAW
10          19390 West Ten Mile Road
            Southfield, Michigan  48075-2463
11          248-355-5555
            d.dawson@fiegerlaw.com
12
13  On behalf of Individual Plaintiffs (via
    teleconference):
14          ALASTAIR J.M. FINDEIS, ESQUIRE
            NAPOLI SHKOLNIK PLLC
15          400 Broadhollow Road, Suite 305
            Melville, New York  11747
16          631-224-1133
            afindeis@napolilaw.com
17
18  On behalf of the Mason State Court Plaintiffs:
            ADAM T. SCHNATZ, ESQUIRE
19          MCALPINE PC
            3201 University Drive, Suite 200
20          Auburn Hills, Michigan  48326
            248-373-3700
21          atschnatz@mcalpinepc.com
22
23
24
```

Highly Confidential - Michael B. Glasgow

```
 1           A P P E A R A N C E S (CONT'D)
 2                      - - -
 3   On behalf of the People of the State of Michigan:
             RICHARD KUHL, ASSISTANT ATTORNEY GENERAL
 4           DANA NESSEL, ATTORNEY GENERAL
             525 West Ottawa Street, 6th Floor
 5           Lansing, Michigan  48909
             517-335-7664
 6           kuhlr@michigan.gov
 7
     On behalf of Defendants Veolia Water North America
 8   Operating Services, LLC, Veolia North America, LLC,
     and Veolia North America, Inc.:
 9           RICHARD P. CAMPBELL, ESQUIRE
             ALAINA N. DEVINE, ESQUIRE
10           CAMPBELL CONROY & O'NEIL, P.C.
             1205 Westlakes Drive, Suite 330
11           Berwyn, Pennsylvania  19312
             adevine@campbell-trial-lawyers.com
12           rpcampbell@Campbell-trial-lawyers.com
13
     On behalf of Defendant Rowe Professional Services
14   Company:
             CRAIG S. THOMPSON, ESQUIRE
15           SULLIVAN, WARD, ASHER & PATTON, PC
             25800 Northwestern Highway, Suite 1000
16           Southfield, Michigan  48075
             248-746-0700
17           cthompson@swappc.com
18
     On behalf of Defendant City of Flint:
19           WILLIAM KIM, ASSISTANT CITY ATTORNEY
             CITY OF FLINT LEGAL DEPARTMENT
20           1101 South Saginaw Street, 3rd Floor
             Flint, Michigan  48502
21           810-766-7146
             wkim@cityofflint.com
22
23
24
```

Highly Confidential - Michael B. Glasgow

```
 1            A P P E A R A N C E S (CONT'D)
 2                      - - -
 3  On behalf of Defendants Leo A. Daly Company and
    Lockwood, Andrews & Newnam, Inc.:
 4          TRAVIS S. GAMBLE, ESQUIRE
            FAEGRE DRINKER BIDDLE & REATH LLP
 5          1717 Main Street, Suite 5400
            Dallas, Texas  75201
 6          469-357-2534
            travis.gamble@dbr.com
 7
 8  On behalf of McLaren Regional Medical Center:
            SUSAN E. SMITH, ESQUIRE
 9          BEVERIDGE & DIAMOND, P.C.
            456 Montgomery Street, Suite 1800
10          San Francisco, California  94104
            1-415-262-4000
11          ssmith@bdlaw.com
12
    On behalf of Defendant Adam Rosenthal (via
13  teleconference):
            JAMES A. FAJEN, ESQUIRE
14          FAJEN & MILLER, PLLC
            3646 West Liberty Road
15          Ann Arbor, Michigan  48103
            734-995-0181
16          fajenlaw@fajenmiller.com
17
    On behalf of Defendants Bradley Wurfel and Daniel
18  Wyant (via teleconference):
            CHRISTOPHER B. CLARE, ESQUIRE
19          CLARK HILL PLC
            1001 Pennsylvania Avenue NW, Suite 1300 South
20          Washington, DC  20004
            202-572-8671
21          cclare@clarkhill.com
22
23
24
```

Highly Confidential - Michael B. Glasgow

```
 1           A P P E A R A N C E S (CONT'D)
 2                      - - -
 3   On behalf of Defendants Patrick Cook and Michael
     Prysby:
 4           ALLISON M. COLLINS, ESQUIRE
             FOSTER SWIFT COLLINS & SMITH PC
 5           313 South Washington Square
             Lansing, Michigan  48933
 6           517-371-8124
             acollins@fosterswift.com
 7
 8   On behalf of Defendant Jeffrey Wright (via
     teleconference):
 9           MATTHEW T. WISE, ESQUIRE
             FOLEY MANSFIELD PLLP
10           130 East 9 Mile Road
             Ferndale, Michigan  48220
11           248-721-4200
             mwise@foleymansfield.com
12
13   On behalf of the MDEQ Employee Defendants (via
     teleconference):
14           JARED A. ROBERTS, ESQUIRE
             FRASER TREBILCOCK DAVIS & DUNLAP, P.C.
15           124 West Allegan Street, Suite 1000
             Lansing, Michigan  48933
16           517-482-5800
             jroberts@fraserlawfirm.com
17
18   On behalf of Defendant Michael Glasgow:
             CHRISTOPHER J. MARKER, ESQUIRE
19           O'NEILL, WALLACE & DOYLE P.C.
             300 St. Andrews Road, Suite 302
20           Saginaw, Michigan  48638
             989-790-0960
21           cmarker@owdpc.com
22
23
24
```

Highly Confidential - Michael B. Glasgow

```
 1            A P P E A R A N C E S (CONT'D)
 2                    - - -
 3   On behalf of Defendant Stephen Busch:
             KRISTA A. JACKSON, ESQUIRE
 4           SMITH HAUGHEY RICE & ROEGGE
             100 Monroe Center Street, NW
 5           Grand Rapids, Michigan  49503
             616-774-8000
 6           kjackson@shrr.com
 7
     On behalf of Defendant Darnell Earley:
 8           JOSEPH R. FURTON, ESQUIRE
             THE PERKINS LAW GROUP PLLC
 9           615 Griswold Street,  Suite 400
             Detroit, Michigan  48826
10           313-964-1702
             j.furton@perkinslawgroup.net
11
12
13
14   ALSO PRESENT:
15           Neal Rogers, Videographer
16
17                    - - -
18
19
20
21
22
23
24
```

Highly Confidential - Michael B. Glasgow

1          VIDEOTAPED DEPOSITION OF MICHAEL B. GLASGOW

2                     INDEX TO EXAMINATION

3    WITNESS                                          PAGE

4    MICHAEL B. GLASGOW

5          EXAMINATION BY MR. CAMPBELL                 12

           EXAMINATION BY MR. GAMBLE                  187

6          EXAMINATION BY MR. THOMPSON                256

           EXAMINATION BY MR. KIM                     262

7          EXAMINATION BY MS. SMITH                   330

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Michael B. Glasgow

```
 1        VIDEOTAPED DEPOSITION OF MICHAEL B. GLASGOW
 2                     INDEX TO EXHIBITS
 3    GLASGOW          DESCRIPTION                      PAGE
 4    Exhibit 1        Collection of transcripts         16
 5    Exhibit 2        E-mail to Mr. Johnson from         41
                       Mr. Bincsik, dated 8/12/2013,
 6                     Bates-stamped COF_FED_0081618
 7    Exhibit 3        E-mail string ending with an       55
                       e-mail to Mr. Wyant and others
 8                     from Mr. Busch, dated
                       3/26/2013, Bates-stamped
 9                     04-15-2016 SOM0024966 and 24968
10    Exhibit 4        E-mail to Mr. Ashford and          63
                       others from Mr. Wright, dated
11                     6/25/2013, with attachment,
                       Bates-stamped COF_FED_0244662
12                     and LAN_GCPO_00036351 through
                       36353
13
      Exhibit 5        Office of Drinking Water and       66
14                     Municipal Assistance Policy and
                       Procedure, Subject:  Lead and
15                     Copper Rule Implementation,
                       Bates-stamped LAN_USAO_00035359
16                     through 35367
17    Exhibit 6        E-mail to Mr. Wright from          76
                       Mr. Green, dated 8/20/2013,
18                     with attachment, Bates-stamped
                       COF_FED_0202655 through 202660
19
      Exhibit 7        E-mail to Mr. Johnson from         81
20                     Mr. Glasgow, dated 10/31/2013,
                       Bates-stamped COF_FED_0114742
21    Exhibit 8        Document titled, "Synergistic      85
                       Impacts of Corrosive Water and
22                     Interrupted Corrosion Control
                       on Chemical/Microbiological
23                     Water Quality:  The Flint, MI
                       Water Crises," Bates-stamped
24                     LAN_GCPO_00026370
```

Highly Confidential - Michael B. Glasgow

```
 1              INDEX TO EXHIBITS (CONT'D)
 2    GLASGOW          DESCRIPTION                   PAGE
 3    Exhibit 9     Handwritten document titled,      89
                    "Corrosion Control Checking,
 4                  2/18/15"
 5    Exhibit 10    E-mail string ending with an      92
                    e-mail to Mr. Croft and others
 6                  from Mr. Glasgow, dated
                    2/24/2015, Bates-stamped CROFT
 7                  - 0000000125
 8    Exhibit 11    Document titled, "Consumer        95
                    Notice of Lead & Copper Results
 9                  in Drinking Water,"
                    Bates-stamped COF_FED_0109591
10                  and 109592
11    Exhibit 12    Letter to Mr. Wright from DEQ,    95
                    dated 10/7/2014, Bates-stamped
12                  03-21-2016 SOM0000183 through
                    185
13
      Exhibit 13    Document titled, "City of Flint  100
14                  Water Reliability Study,
                    Distribution System, December
15                  2013, Bates-stamped
                    COF_FED_0542925 through 542958
16
      Exhibit 14    E-mail to Mr. Johnson from       104
17                  Mr. Glasgow, dated 4/14/2014,
                    Bates-stamped COF_FED_0107003
18
      Exhibit 15    Water Quality Report,            135
19                  Bates-stamped COF_FED_0628049
                    through 0628062
20
      Exhibit 16    Document titled, "City of Flint  139
21                  Will Hold Public Water
                    Presentation Wednesday, January
22                  21, 2015 at 7:00 p.m. in the
                    City Hall Dome, Bates-stamped
23                  COF_FED_0391706
24
```

Highly Confidential - Michael B. Glasgow

| | GLASGOW | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | INDEX TO EXHIBITS | |
| 2 | GLASGOW | DESCRIPTION | PAGE |
| 3 | Exhibit 17 | E-mail to Mr. Prysby from Mr. Croft, dated 1/20/2015, Bates-stamped COF_FED_0028974 | 141 |
| 5 | Exhibit 18 | E-mail string ending with an e-mail to Mr. Croft from Ms. Rose, dated 1/22/2015, Bates-stamped COF_FED_0175479 and 175480 | 142 |
| 8 | Exhibit 19 | Letter to Congressman Kildee from Ms. Rose, dated 10/1/2015 | 145 |
| | Exhibit 20 | E-mail string ending with an e-mail to Mr. Prysby from Ms. Crooks, dated 2/26/2015, Bates-stamped 04-15-2016 SOM0007015 through 7017 | 162 |
| | Exhibit 21 | E-mail ending string ending with an e-mail to Ms. Crooks and others from Mr. Del Toral, dated 2/27/2015, Bates-stamped VATECH_00064173 through 64177 | 167 |
| | Exhibit 22 | E-mail string ending with an e-mail to Messrs. Busch and Del Toral from Ms. Crooks, dated 3/3/2015, Oct-7-2019 EGLE0126915 | 170 |
| | Exhibit 23 | Memorandum to Mr. Poy from Mr. Del Toral, dated 6/24/2015, five pages | 172 |
| | Exhibit 24 | E-mail string ending with an e-mail to Mr. Rosenthal from Mr. Glasgow, Bates-stamped 03-21-2016 SOM0000054 | 237 |
| | Exhibit 25 | E-mail string ending with an e-mail to Mr. Johnson from Mr. Glasgow, dated 10/31/2013, Bates-stamped COF_FED_0240028 | 263 |

Highly Confidential - Michael B. Glasgow

```
 1              INDEX TO EXHIBITS (CONT'D)
 2     GLASGOW          DESCRIPTION                    PAGE
 3     Exhibit 26       E-mail string ending with an   269
                        e-mail to Mr. Johnson from
 4                      Mr. Glasgow, dated 4/14/2014,
                        Bates-stamped COF_FED_0107003
 5
       Exhibit 27       E-mail to Mr. Johnson from     270
 6                      Mr. Glasgow, dated 4/15/2014,
                        with attachment, Bates-stamped
 7                      COF_FED_0107013
 8     Exhibit 28       E-mail string ending with an   287
                        e-mail to Mr. Lorenz, dated
 9                      9/2/2015, Bates-stamped
                        COF_FED_0112441 through 0112443
10
       Exhibit 29       E-mail string ending with an   291
11                      e-mail to Mr. Croft from
                        Mr. Glasgow, dated 9/21/2015,
12                      Bates-stamped COF_FED_0073298
                        through 73299
13
       Exhibit 30       E-mail string ending with an   294
14                      e-mail to Mr. Glasgow from
                        Mr. Bincsik, dated 2/24/2015,
15                      Bates-stamped COF_FED_023232
16     Exhibit 31       E-mail string ending with an   305
                        e-mail to Ms. Murphy and others
17                      from Mr. Glasgow, dated
                        11/3/2014, Bates-stamped
18                      CROFT - 0000001324 through 1326
19     Exhibit 32       E-mail to Mr. Croft from       310
                        Mr. Busch, dated 3/17/2015,
20                      Bates-stamped CROFT - 0000001504
                        and 1505
21
       Exhibit 33       E-mail to Mr. Glasgow from     379
22                      Ms. Miskowski, dated 3/20/2015,
                        with attachment, Bates-stamped
23                      COF_FED_0103438 through 103443
24
```

```
 1              P R O C E E D I N G S
 2                   - - -
 3              THE VIDEOGRAPHER:  We are now on
 4         the record.  My name is Neal Rogers.
 5         I'm a videographer for Golkow Litigation
 6         Services.  Today's date is February 24,
 7         2020, and the time is approximately
 8         9:05 a.m.
 9              This video deposition is being
10         held in Bloomfield Hills, Michigan, in
11         re:  Flint water cases, Civil Action No.
12         5-16-cv-10444-JEL-MKM, for the US
13         District Court, Eastern Division of
14         Michigan, Southern Division.  The phone
15         is Michael Glasgow.  Counsel will be
16         noted on the stenographic record.
17              The court reporter is Carol Kirk
18         who will now swear in the witness.
19                   - - -
20              MICHAEL B. GLASGOW,
21    being by me first duly sworn, as hereinafter
22    certified, deposes and says as follows:
23                   EXAMINATION
24
```

Highly Confidential - Michael B. Glasgow

1    BY MR. CAMPBELL:

2          Q.    Could you state your full name and

3    residential residence on the record, please.

4          A.    Yes.  Michael Brian Glasgow.

5    Residential address is 9363 Kristen Drive.  And

6    that's Otisville, Michigan  48463.

7          Q.    How long have you lived there?

8          A.    About 12 years.

9          Q.    Is it a fair conclusion for the

10   lawyers around the table to draw that you're

11   likely to be living at that address for the

12   foreseeable future?

13         A.    Yes.

14         Q.    So if we need to serve a subpoena

15   on you, that you would be an appropriate place

16   to do so?

17         A.    Absolutely, yeah.

18         Q.    Who employs you at this stage of

19   the game, Mr. Glasgow?

20         A.    The village of Mayville.

21         Q.    In what capacity?

22         A.    I am their DPW director.

23         Q.    What are your duties?

24         A.    Oversee the water, sewage system,

Highly Confidential - Michael B. Glasgow

```
 1   roads, parks, everything for the small village.

 2          Q.    How long have you been employed by

 3   the village of Mayville, please?

 4          A.    Just over three years.

 5          Q.    And what was your start date,

 6   roughly?

 7          A.    I believe it was January 2nd of

 8   '17.

 9          Q.    January 2 of 2017.  Where did you

10   work before that?

11          A.    The city of Flint.

12          Q.    Okay.  When did you start with the

13   city of Flint?

14          A.    I believe it was April of '16 I

15   was put on administrative leave from the city.

16          Q.    I think you misheard that.  Let me

17   try it again.

18                When did you start with the city?

19          A.    Oh, when did I start with the

20   city?  Oh, I'm sorry.  I started with the city

21   in August of 2001.

22          Q.    So you were with the city for 15

23   years?

24          A.    Yes.
```

Highly Confidential - Michael B. Glasgow

1        Q.    And you're saying in April of

2    2016, you were put on administrative leave?

3        A.    Correct.

4        Q.    Why?

5        A.    To do with the Flint water cases.

6        Q.    Okay.  What about the Flint water

7    cases resulted in an administrative leave?

8        A.    Oh, I believe it was criminal

9    charges that were originally filed.

10       Q.    Okay.  So the Attorney General or

11   the Attorney General's delegate filed criminal

12   charges against you and that lead to the

13   administrative suspension?

14       A.    From my understanding, yes.

15       Q.    Okay.  And what were the charges

16   that were filed, please?

17       A.    Oh, goodness.  Misconduct in

18   office, and there two charges.

19       Q.    Was one of them a felony?

20       A.    Seems like one was, yes.

21       Q.    Okay.  And the person or entity

22   bringing the criminal charges against you was

23   the delegate of the Attorney General of the

24   State of Michigan?

Highly Confidential - Michael B. Glasgow

1        A.    Correct.  Yes.

2        Q.    And what was Mr. Flood?

3        A.    Yes.

4                    - - -

5    (Glasgow Deposition Exhibit 1 marked.)

6                    - - -

7  BY MR. CAMPBELL:

8        Q.    I previously marked before we

9  started, Mr. Glasgow, a set of transcripts as

10 Exhibit 1.  We're starting up again with that

11 number for this deposition.  It is before you

12 there.

13            Exhibit 1 is a collection of

14 transcripts from February 22, 2018, February 23,

15 2018, March 22, 2018, April 16, 2018, and

16 April 20, 2018.

17            Do you remember appearing in the

18 criminal court in Flint, Michigan on those days?

19       A.    I do, yes.

20       Q.    Okay.  So you gave testimony over

21 the course of five full or partial days in the

22 criminal court involving criminal charges

23 against let's call them colleagues from the

24 Michigan Department of Environmental Quality;

Highly Confidential - Michael B. Glasgow

1    Mr. Busch, Mr. Prysby, Mr. Cook, and

2    Ms. Shekter-Smith?

3            A.    Yes.

4            Q.    Is that right?

5            A.    Yes.

6            Q.    I marked that testimony -- or the

7    transcripts as Exhibit 1 so that you could have

8    it before you in the event anybody questions you

9    about it.

10                 But is it fair for us to conclude

11   that over the course of those five full or

12   partial days, you gave a substantial recounting

13   of your knowledge of the facts and circumstances

14   related to the Flint water crisis?

15           A.    Yes.

16           Q.    That's not the only time you gave

17   either testimony or a statement related to the

18   Flint water crisis, correct?

19           A.    Correct.

20           Q.    Can you tell us what the other

21   occasions were when you gave testimony or

22   statements?

23           A.    Okay.  I think I originally gave

24   statements to the Attorney General.  I was

Highly Confidential - Michael B. Glasgow

1    subpoenaed and gave a deposition to Todd Flood,

2    the Attorney General.

3              I also had an interview with the

4    FBI out of Flint.  And I also testified in front

5    of a state senate committee.  I'm not even sure

6    what it was called, but in public with some of

7    the representatives of the state.  I believe

8    that's all.

9         Q.    Did you appear before the Congress

10   of the United States or any of its committees --

11        A.    No.

12        Q.    -- to give testimony.

13             I'll get to this at some point in

14   time, but you did give a statement to the

15   governor's task force on the Flint water crisis;

16   did you not?

17        A.    Okay.  Yes.  Task force I did,

18   yes.

19        Q.    In sum, on all of those occasions

20   where you either gave testimony, sworn testimony

21   under oath or you gave a statement, were the

22   facts and circumstances that you related to the

23   people who were questioning you true and

24   accurate, to the best of your knowledge?

Highly Confidential - Michael B. Glasgow

1        A.    Yes, absolutely.

2        Q.    And all of the testimony that you

3   gave in the criminal court in Flint that's now

4   marked as Exhibit 1, the collection of

5   transcripts, that was true and accurate to the

6   best of your ability, correct?

7        A.    Yes.

8        Q.    You didn't try to deceive anyone

9   as you gave testimony in the court in front of

10  Judge Manley, did you?

11       A.    No.

12       Q.    Okay.  You tried to be as full and

13  complete and comprehensive in answering any of

14  the questions that were presented to you; is

15  that correct?

16       A.    Yes.

17       Q.    All right.  So let me start with

18  this:  When you began at the city of Flint, what

19  department were you working in?

20       A.    I was in water pollution control.

21  So I was hired in over at the wastewater

22  treatment plant.

23       Q.    How long were you in the

24  wastewater treatment plant?

Highly Confidential – Michael B. Glasgow

1          A.    I believe roughly four years.

2          Q.    So from 2001 to 2005?

3          A.    Yes.

4          Q.    What were your duties there?

5          A.    I worked in the lab.  I believe it

6    was part of the environmental compliance unit,

7    but basically it was lab testing and industry

8    inspections.

9          Q.    Okay.  Who was your supervisor?

10         A.    At that time his name was Brad

11   Hill.

12         Q.    Okay.  And what did you next do

13   for the city of Flint?

14         A.    After four years at the wastewater

15   plant, a job come up over at the water treatment

16   plant as lab supervisor.  So I made that jump I

17   think in November of '05.

18         Q.    And how long were you at the water

19   treatment plant as lab supervisor?

20         A.    I was there until, I'm going to

21   say, 2015.

22         Q.    What happened in 2015?

23         A.    2015, early 2015 -- I can't

24   remember the month.

Highly Confidential – Michael B. Glasgow

1      Q.    Did you say early?

2      A.    Early 2015, yes, February, March

3    time frame.  I interviewed for the job of

4    utilities director for the city of Flint.

5      Q.    And was that the position that was

6    held by Duffy Johnson?

7      A.    Correct.  Yes.

8      Q.    And you were promoted into that

9    position; is that right?

10     A.    Correct.  Yes.

11     Q.    So from early 2015 until the

12   administrative leave in April of 2016, you were

13   the utilities director for the city of Flint?

14     A.    Correct.

15     Q.    What were the nature of your

16   duties as utilities director?

17     A.    Oh, well, the utilities for the

18   city of Flint had to do with the wastewater

19   plant, the water treatment plant, and then the

20   distribution system for the water side, and also

21   the collection system for the wastewater side.

22     Q.    Who was your supervisor when you

23   were utilities director?

24     A.    Howard Croft.  And he was the DPW

Highly Confidential - Michael B. Glasgow

 1   director.

 2            Q.    When did Mr. Croft leave that

 3   position, to your knowledge?

 4            A.    To be honest, I don't remember.

 5            Q.    Were you on administrative leave

 6   when he left that position?

 7            A.    I believe I was.

 8            Q.    Was he the person who delivered to

 9   you the information that you were going on

10   administrative leave?

11            A.    No, he did not deliver that to me.

12            Q.    Who gave you that information?

13            A.    I received a letter from the human

14   resources department with the city of Flint.

15            Q.    No personal contact?  Just a

16   letter?

17            A.    Just a letter.

18            Q.    All right.  When you were the lab

19   supervisor at the water treatment plant, who was

20   your direct supervisor?

21            A.    Oh, I went through a few

22   supervisors when I was there.  I think when I

23   originally took the job, it was Jeff Bryson was

24   the water plant supervisor at that time.

Highly Confidential - Michael B. Glasgow

1      Q.    Okay.

2      A.    And he didn't seem to be around

3   there very long.  And then the next supervisor

4   was a William Daniels.

5      Q.    Daniels?

6      A.    Daniels, yep.  D-a-n-i-e-l-s.

7      Q.    How long was he there?

8      A.    Oh, he was there for a few years

9   until he retired.

10     Q.    Okay.

11     A.    And then it was Brent Wright who

12  was the water plant supervisor there.

13     Q.    He was initially appointed as

14  acting water treatment plant supervisor,

15  correct?

16     A.    Correct.  Yep.

17     Q.    And did he become the permanent --

18     A.    I don't know that he ever became

19  the permanent supervisor.

20     Q.    Was Mr. Wright your direct

21  supervisor?

22     A.    Yes.

23     Q.    At some point in time when you

24  went to the water treatment plant, you received

Highly Confidential - Michael B. Glasgow

1    some type of licensure from the state; did you

2    not?

3           A.    Yes.

4           Q.    Can you trace for us your

5    licensure with the state?

6           A.    Oh, goodness.  I would have

7    started not long after 2005 when I went to the

8    water treatment plant.  I believe probably in

9    the next year, 2016, I took a state license for

10   treatment plant operation.  I believe it was the

11   F-4.  And the dates are going to get blurry in

12   my head, but --

13          Q.    Well, just give us your best

14   memory.

15          A.    -- long story short -- yeah, long

16   story short, I took the F-4 in 2016.

17          Q.    2006?

18          A.    Or I'm sorry.  2006, yes.  And a

19   year or two later, took the next license, which

20   was an F-3.  And sometime, I believe 2010 or

21   2011, I believe able to take the F-2 and F-1

22   licenses as well for operation of a municipal

23   drinking water plant.

24          Q.    Okay.  Did you take the F-2 and

Highly Confidential - Michael B. Glasgow

1    F-1 license examination or evaluation at the

2    same time?

3          A.    I did, yes.

4          Q.    Can you explain why that is so?

5          A.    Well, I had qualified based on

6    experience to take the F-2.  There was -- I

7    don't know if I want to say disagreements or

8    people with the state had a feeling I didn't

9    really qualify to take the F-1 due to the nature

10   of the city of Flint's water treatment plant at

11   that time, which was a backup plant, a standby

12   plant, if you will.  So we weren't in operation

13   all the time.

14             So I had to go in front of a

15   committee of the state for them to decide

16   whether I could take the F-1 as well.  So I was

17   already signed up to take the F-2.  And a few

18   weeks before the test, they gave me permission

19   to write the F-1 as well.

20         Q.    Okay.  Was Mr. Daniels your

21   supervisor at the time?

22         A.    Yes.

23         Q.    Do you remember Mr. Daniels making

24   an application or request to the Michigan

Highly Confidential - Michael B. Glasgow

1    Department of Environmental Quality for an

2    exception to be made so that you could get an

3    F-1 license?

4          A.    Vaguely.

5          Q.    Okay.  Does that square with your

6    memory --

7          A.    Yes.

8          Q.    -- that that happened?

9          A.    Uh-huh.

10         Q.    And the issue or problem with the

11   F-1 license was that you didn't have the

12   requisite experience operating a full-time water

13   treatment plant that otherwise would be

14   necessary to get that license; is that right?

15               MR. MARKER:  I'm going to object

16         to form and foundation.

17               Go ahead and answer if you can.

18         A.    Can you restate that?  I'm sorry.

19         Q.    I'll try it a different way.

20               When you sit for these exams, an

21   F-2 or F-1, there's sort of an academic exam,

22   questions and answers, like a test, right?

23         A.    Correct.  Yes.

24         Q.    And part of it is filling out an

Highly Confidential - Michael B. Glasgow

1   application that demonstrates your experience,

2   correct?

3          A.    Correct.

4          Q.    And the issue that you had in

5   getting an F-1 license was that your experience

6   was tethered to a part-time backup water

7   treatment plant rather than a full-time water

8   treatment plant, correct?

9          A.    Correct.

10         Q.    If the decision was to be made on

11  whether you would get an F-1 license based upon

12  the criteria that was established at that time

13  applicable to people who work in full-time water

14  treatment plants, you would not have been able

15  to get the F-1 license, correct?

16              MR. MARKER:  Objection; form and

17         foundation.

18         A.    I will say there was -- from my

19  memory, it seemed like there was a question of

20  hours.  So it was kind of like you earned time

21  to qualify for that license based on the number

22  of hours you were in a plant that was operating.

23              So I thought, to my understanding,

24  it was a question of how many hours I had, I

Highly Confidential - Michael B. Glasgow

1    guess, been overseeing the operation of that

2    plant.

3            Q.    Fair enough.  We'll use hours

4    rather than experience.

5            Because the water treatment plant

6    was a backup, part-time water treatment plant,

7    you were not able to generate sufficient hours

8    operating the plant in order to qualify for an

9    F-1 license; is that right?

10           A.    Correct.  Yes.

11           Q.    Okay.  And so the Michigan

12   Department of Environmental Quality made an

13   exception in your case and allowed you to secure

14   the F-1 license despite that limitation on

15   hours; is that right?

16           MR. MARKER:  Objection; form,

17           foundation.

18           Go ahead and answer, if you can.

19           A.    I would say yes, there was a --

20   there was an issue with the number of hours,

21   because it took -- like I said, I started at the

22   water treatment plant in '05, late '05.  It took

23   almost seven or eight years, I think, to get

24   that F-1 license, when if I would have worked in

Highly Confidential - Michael B. Glasgow

1    a full-time plant, within a year or two, I would

2    have qualified --

3            Q.    Sure.

4            A.    -- if that makes sense.

5            Q.    Sure.  And I get it.  The

6    difference was you were working in a part-time

7    backup plant as opposed to a full-time plant?

8            A.    Correct.

9            Q.    But in order to get the F-1

10   license, the State of Michigan, Department of

11   Environmental Quality, had to make an exception

12   in your case, correct?

13           A.    Correct, yes.

14           Q.    Okay.  With respect to the water

15   treatment plant, can you describe its operation

16   between 2005 and 2015?  Describe the nature of

17   its operation.

18           A.    Yeah.  The nature of the

19   operation --

20           Q.    And let me change the dates.

21           A.    Okay.

22           Q.    From when you started in 2005 up

23   until April of 2014, can you describe the

24   operation for us?

Highly Confidential - Michael B. Glasgow

1          A.    I understand.  Yep.  The

2    operation -- like I said, we were a standby

3    plant, backup plant.  We would run on a

4    quarterly basis and run for a week to two weeks

5    straight to test all the equipment, keep all the

6    operators up to speed on all the equipment, how

7    things operated.  So, yeah, usually up to

8    roughly four times a year, we would run the

9    plant for a week to two weeks at a time.

10         Q.    Okay.

11         A.    And that was kind of the standard.

12   Every once in a while, we'd have a little longer

13   extended test run.  And as we got closer to '14,

14   we had a few -- a few more extended test runs.

15         Q.    I'll get to that.

16               Up until April of 2014, according

17   to your testimony on April 16, 2018 in the

18   criminal court, you had zero experience, that's

19   your words, zero experience in producing

20   drinking water from rivers; is that accurate?

21               MR. MORRISSEY:  Object to form.

22         A.    Other than our test runs that we

23   did, I would say that's accurate.

24         Q.    In your test runs, you would take

1    water from the Flint River, correct?

2          A.    Correct.

3          Q.    You would run it through whatever

4    equipment you had at the water treatment plant

5    that was operable at the time, correct?

6          A.    Correct, yes.

7          Q.    And then you would discharge it

8    right back into the river, correct?

9          A.    Correct.  Yeah.

10         Q.    So with respect to drinking water,

11   water that would be consumed by human beings, up

12   until April of 2014, you had zero experience in

13   producing drinking water to be consumed by human

14   beings through that plant, correct?

15               MR. MARKER:  Objection to form.

16               MR. KIM:  Object to form.

17         A.    Actually, there was two occasions

18   prior to '14 where there was an issue on the

19   pipeline from Detroit that carried our drinking

20   water to the city to where there was two

21   different occasions.  I believe one was in '09.

22   One might have been 2011.  My dates could be

23   off.  Don't hold me to them.  But there was work

24   on the pipeline from Detroit to where we ran

Highly Confidential - Michael B. Glasgow

1    water through that treatment plant and sent it

2    out to the city.

3         Q.   Okay.  So, actually, your

4    testimony at pages 167 and 168 of that volume of

5    your -- of the transcript -- again, that was

6    April 16, 2018.

7              Your testimony was that your

8    experience in producing water for consumers was

9    limited to two occasions for a day or two when

10   the Detroit Water & Sewer Department was having

11   issues; is that right?

12        A.   That sounds correct, yes.

13        Q.   And your experience totaled no

14   more than 48 to 72 hours over the course of ten

15   years; is that right?

16        A.   That sounds ...

17             MR. MARKER:  Objection to form.

18        Q.   Okay.  So I was a little bit

19   confused about the testimony, but maybe you can

20   expand upon it.

21             On those two occasions when you

22   distributed water from the water treatment plant

23   into the distribution system -- and by

24   "distribution system," I mean the pipes

Highly Confidential - Michael B. Glasgow

1    throughout the city of Flint that ultimately led

2    to homes and businesses and allowed them to

3    consumer water, okay?  That's what I mean by

4    "distribution system."

5                On those occasions, would you draw

6    down water first from the water treatment plant

7    reservoirs?

8          A.    No.

9          Q.    Did the water treatment plant have

10   reservoirs?

11         A.    Yes.

12         Q.    What was the purpose of the

13   reservoirs?

14         A.    The purpose -- the main purpose

15   was storage.

16         Q.    Storing what?

17         A.    Storing finished water.

18         Q.    Treated water?

19         A.    Yep.  To be delivered, yep.

20         Q.    Okay.  And prior to those

21   occasions, those two occasions in '09 or

22   thereabouts when the Detroit Water & Sewer

23   Department were having problems with their

24   pipes, so their system, the water that was in

Highly Confidential - Michael B. Glasgow

1    the reservoirs was treated water from the city

2    of Detroit, correct?

3           A.    Correct, yes.

4           Q.    When would you use the water in

5    the reservoirs?

6           A.    Oh, it depends.  I mean, roughly

7    we'd like to turn over reservoirs every two to

8    four days.  I mean, so the water was constantly

9    being used and refreshed.

10          Q.    So I'm trying to get a sense of

11   what happened to the treated Detroit water in

12   the reservoirs on those two occasions when you

13   actually distributed water through the water

14   treatment plant to the citizens of Flint.  What

15   happened to that reservoir?

16          A.    Yep.  We would slowly waste

17   through that reservoir until the time when we

18   needed to -- when we would get worried that we

19   were going to run out of water.  So that's when

20   we would switch from our treatment plant to fill

21   the -- fill the reservoirs from treated river

22   water.

23          Q.    Okay.  So would the sequence of

24   events then be draw down of the reservoirs and

Highly Confidential - Michael B. Glasgow

1    then replenish water in the reservoirs with

2    treated Flint River water?

3              MR. KIM:  Objection as to form.

4         A.    Yeah, along the usage.  I mean, we

5    would try to use our storage somewhat -- I don't

6    know if I want to call it a scheduled draw down,

7    but you're going to use the water from your

8    reservoirs and your storage until the last

9    possible moment when you needed to add more

10   water.

11        Q.    Okay.  Should we conclude that at

12   least some portion of the drinking water that

13   was distributed on those two occasions to the

14   citizens of Flint came from the reservoirs?

15        A.    Yes.

16        Q.    We shouldn't -- we shouldn't

17   assume that all of the water came out of the

18   Flint River?

19        A.    Right.  Correct.  Yeah.

20        Q.    Was there any evaluation done

21   prior to those two occasions of what the

22   ramifications would be for the distribution

23   system for taking water out of the Flint River

24   and either passing it through the reservoirs or

Highly Confidential - Michael B. Glasgow

1    directly into the distribution system?

2         A.    Not to my knowledge.

3         Q.    Okay.  So it was just done?

4         A.    Right.

5         Q.    And was that done with the

6    knowledge of the DEQ?

7         A.    Yes.

8         Q.    Was it done with the approval of

9    the DEQ?

10        A.    Yes.

11        Q.    After that was done, was there any

12   evaluation of the impact that those two

13   occasions had on the distribution system, if

14   any?

15        A.    Not that I'm aware of.

16        Q.    Okay.  So aside from those two

17   occasions and then after April of 2014, is it

18   true that you had no experience in treating

19   river water for human consumption over the

20   course of your lifetime?

21             MR. KUHL:  Objection to form.

22        A.    I would say that's a fair

23   statement.

24        Q.    Okay.  So can you describe your

1    relationship with the MDEQ?

2         A.    Yeah.  It was a working

3    relationship.  It seemed to get most involved

4    after 2005 when I was on the drinking water

5    side.

6              Most of my interactions were with

7    our district engineer for the city, or that was

8    assigned to the city, which was Mr. Michael

9    Prysby.  I felt we had a good working

10   relationship.  He was -- he was always available

11   if I had questions or anything, and we had a

12   good rapport.

13             Most of the time yearly, he would

14   send me -- him and Mr. Rosenthal would send me

15   my yearly monitoring schedule to keep us on

16   track for what we needed to monitor in the

17   drinking water.  And roughly I probably visited

18   with him three or four times a year.

19        Q.    Okay.  Mr. Prysby was with the

20   DEQ's Office of Drinking Water & Municipal

21   Assistance?

22        A.    Correct.  Yeah.

23        Q.    And you've seen that acronym,

24   ODWMA?

Highly Confidential - Michael B. Glasgow

1     A.    Yes.

2           Q.    What did you understand the Office

3     of Drinking Water & Municipal Assistance to be?

4           A.    Well, in a sense they kind of had

5     a dual role as kind of a coach, but also kind of

6     the police in my eyes.  You know, they were

7     there to guide us along but make sure we were

8     doing things correctly.

9           Q.    Okay.  The title of the office was

10    Office of Drinking Water & Municipal Assistance.

11    It wasn't office of drinking water and

12    manipulations and avoidance, was it?

13                MS. COLLINS:  Objection; form.

14    A.    No.

15          Q.    Okay.  Mr. Prysby was a

16    professional engineer; was he not?

17    A.    Correct.

18          Q.    You were not?

19    A.    Correct.

20          Q.    And you are not today?

21    A.    Correct.

22          Q.    You've met Mr. Busch?

23    A.    Yes, I have.

24          Q.    He was a professional engineer,

Highly Confidential – Michael B. Glasgow

```
 1   too?

 2           A.    Yes.

 3           Q.    Have you met Mr. Cook?

 4           A.    Yes.

 5           Q.    He's a professional engineer, too,

 6   isn't he?

 7           A.    Correct.  Yes.

 8           Q.    Have you met Ms. Shekter-Smith?

 9           A.    Yes, I have.

10           Q.    She's a professional engineer,

11   too, isn't she?

12           A.    Correct.

13           Q.    And they were all at the time with

14   the Office of Drinking Water & Municipal

15   Assistance, correct?

16           A.    Yes.

17           Q.    Did you understand that as

18   professional engineers, they had a duty and

19   responsibility to the public at large to make

20   sure that they acted in a way to assure or to

21   help assure the public health of the citizens of

22   Michigan?

23                 MS. COLLINS:  Objection; form,

24           foundation.
```

Highly Confidential – Michael B. Glasgow

1          A.    Yes.

2          Q.    And that's something you would

3    come to know over the course of your lifetime,

4    that professional engineers have this duty and

5    responsibility to the general public for safety,

6    correct?

7                MS. COLLINS:  Objection; form.

8          A.    Yes.

9          Q.    And I don't mean to diminish your

10   knowledge and experience at all, Mr. Glasgow,

11   but when it came to your communications with

12   Prysby, Busch, Cook, and Shekter-Smith, the

13   Office of Drinking Water & Municipal Assistance,

14   they were the experts; were they not?

15               MS. COLLINS:  Objection to form.

16               MR. KUHL:  Object to form.

17         A.    In my eyes, they were, yes.

18         Q.    They were the people who knew or

19   should have known what the rules of the game

20   were?

21               MR. KUHL:  Objection; form.

22         Q.    Right?

23         A.    Yes.

24         Q.    They were the people that you and

Highly Confidential - Michael B. Glasgow

1    the city of Flint would have relied upon in

2    order to deliver appropriate, truthful, and

3    accurate information about how you were supposed

4    to run the water treatment plant, correct?

5              MR. KUHL:  Objection to form.

6              MR. MORRISSEY:  Objection.

7                   - - -

8         (Glasgow Deposition Exhibit 2 marked.)

9                   - - -

10   BY MR. CAMPBELL:

11        Q.    I'm giving you Exhibit 2, a

12   document I've marked as Exhibit 2.  It's been

13   marked in Mr. Bincsik's deposition, if not other

14   depositions as well.

15              It's a memorandum by Mr. Bincsik

16   dated August 12, 2013.  It's to Duffy Johnson.

17   And it relates to a water main on Pasadena.

18              Do you see that?

19        A.    Yes.

20        Q.    Who is Mr. Bincsik?

21        A.    I believe at the time he was the

22   supervisor of our distribution system.

23              MR. KIM:  Could you give us the

24              Bates number for that document.

Highly Confidential - Michael B. Glasgow

```
1                    MR. CAMPBELL:  Yeah, I sure can,

2          Bill.  It's city of Flint 0081618.

3    BY MR. CAMPBELL:

4          Q.    So Mr. Bincsik back in August of

5    2013 was the person probably with the most

6    knowledge at the city of Flint about the

7    distribution system, correct?

8          A.    Yes, I would have relied on him

9    for his information.

10         Q.    You came to know Rob Bincsik as a

11   knowledgeable, hard working, intelligent

12   employee of the city of Flint, correct?

13         A.    Yes, I would say that.

14         Q.    And you would rely and did rely on

15   his information with respect to matters

16   pertaining to the distribution system?

17         A.    Yes.

18         Q.    So in this particular memorandum,

19   which is in August 2013, this would have come --

20   oh, I don't know -- six or seven months before

21   the switch over to the Flint River as the raw

22   water source for the city of Flint, correct?

23         A.    Correct.

24         Q.    And it would have come about a
```

Highly Confidential - Michael B. Glasgow

1    month after a meeting among you, Mr. Wright,

2    representatives of the MDEQ -- I believe LAN's

3    Warren Green was present -- at the water

4    treatment plant in July of 2013.

5              Do you remember that meeting?

6        A.   Vaguely, yes.  There's a few

7    meetings, yep.

8        Q.   I will show you the documents in a

9    moment when we get to it.

10             But in 2013, in anticipation of a

11   change in the raw water source from Detroit and

12   Lake Huron to the Flint River, one of the things

13   that occurred was a meeting at the water

14   treatment plant by people who were involved in

15   order to evaluate the water treatment plant for

16   that role, correct?

17       A.   Correct, yes.

18       Q.   And, in fact, there was a -- there

19   was a test run done of 30 days; is that right?

20       A.   That is correct, yes.

21       Q.   And that was done about July of

22   2013, correct?

23       A.   Yes.

24       Q.   That test run was evaluating the

Highly Confidential - Michael B. Glasgow

1    circumstances pertinent to the processes and

2    equipment within the water treatment plant,

3    correct?

4         A.    Correct, yes.

5         Q.    It was not evaluating the

6    implications of utilizing the Flint River as a

7    raw water source on Mr. Bincsik's distribution

8    system, was it?

9         A.    No.

10        Q.    Okay.  That 30-day test run, was

11   that the longest test run that the water

12   treatment plant was ever put to prior to April

13   of 2014, to your knowledge?

14        A.    Yeah.  To my knowledge and my time

15   there, that was the longest.

16        Q.    You came to know LAN and Rowe; did

17   you not?

18        A.    Correct.  Yes.

19        Q.    And at LAN, the head guy, the lead

20   engineer, was Warren Green?

21        A.    Yes.

22        Q.    You came to know Warren Green?

23        A.    Absolutely, yep.

24        Q.    You came to respect him as an

Highly Confidential - Michael B. Glasgow

1    engineer?

2          A.    Yes.

3          Q.    You came to trust his -- both his

4    knowledge and his advice and opinions?

5          A.    Yes.

6          Q.    Mr. Green advocated vehemently for

7    at least a 90-day run of the water treatment

8    plant before it was put in full operation,

9    didn't he?

10         A.    Yes.

11               MS. COLLINS:  Objection; form.

12         Q.    Mr. Green advocated vehemently for

13   the utilization of corrosion control treatment,

14   and specifically orthophosphate, prior to

15   implementation of the water treatment plant as a

16   full-time facility?

17               MS. COLLINS:  Objection to form.

18               (Reporter admonishment.)

19               MR. CAMPBELL:  They don't like my

20         form.

21               MR. KIM:  Objection as to

22         foundation.

23   BY MR. CAMPBELL:

24         Q.    Do you have the question?

Highly Confidential - Michael B. Glasgow

1        A.    Yes, whether Warren Green was

2    stipulating the addition of corrosion control.

3    And that, I do not remember.

4        Q.    Okay.  You're clear that Mr. Green

5    wanted at least a 90-day operation of that plant

6    before it was put into full-time operation,

7    though?

8        A.    Yes, yes, because I was in

9    agreeance with him.  Yes.

10        Q.    Okay.  So you -- you were the only

11    F-1 licensed operator at the plant, right?

12        A.    Correct.  Yes.

13        Q.    And while Mr. Wright may have been

14    your titular supervisor, you really were the

15    decision-maker at the plant at that time; isn't

16    that so?

17            MR. MARKER:  Objection; form,

18        foundation.

19        A.    Yeah.  When it come to operation

20    of the treatment plant, I would say yes.

21        Q.    Mr. Wright actually had to defer

22    to you on those issues; did he not?

23        A.    Usually he would, yes.

24        Q.    So you, as the F-1 licensed

Highly Confidential - Michael B. Glasgow

1    operator, and Warren Green, the outside engineer

2    hired to use his knowledge and advice and give

3    advice, together you both wanted to run that

4    plant for at least 90 days?

5         A.    Yes.

6         Q.    What happened?

7         A.    Well, usually, number one -- and

8    it's one of the things in some of my other

9    testimony -- we were always a standby plant.  We

10   didn't have the staffing that we needed to.

11             I mean, to run that 30 day test

12   run in July or August of '13 there, I basically

13   had to institute all my employees to work

14   16-hour days for 30 days.

15        Q.    Okay.

16        A.    So and after that, that was about

17   all we could do, and, yes -- I stressed numerous

18   times that we needed more staff and we needed

19   them in there earlier if we were going to --

20        Q.    To whom?

21        A.    To my superiors, Mr. Johnson,

22   Mr. Croft.

23        Q.    What was their response?

24        A.    "We're working on it.  We're

Highly Confidential - Michael B. Glasgow

1    working on it."

2           Q.    When did they actually work on it?

3           A.    I don't remember getting any new

4    employees until about a month before the plant

5    went into operation.

6           Q.    All right.  Well, let's go back to

7    Bincsik's memorandum of middle of August 2013.

8                 If you look at the second

9    paragraph, he reports, "Our underground

10   infrastructure in the city of Flint is terrible,

11   and any number of tragedies caused from its

12   failures are also lurking around the corner."

13                Did I read that correctly?

14          A.    Yes.

15          Q.    Do you remember getting a copy of

16   this or seeing a copy of this memo?

17          A.    I don't recall seeing a copy, but

18   it was no -- it was no secret to me that the --

19   there's a lot of water main breaks every year,

20   talking with Mr. Bincsik, prior to any of this.

21   So I knew there was questions about the

22   distribution system.

23          Q.    He goes on in that paragraph about

24   halfway down to complain about the city of

Highly Confidential - Michael B. Glasgow

1    Flint's support sources.

2              Do you see that about halfway down

3    the same paragraph?

4         A.    Yes.

5         Q.    And his complaint is that he

6    really wanted the support services group at the

7    city of Flint actually to support him.

8              Do you see that?

9         A.    Yes.

10        Q.    Was that a problem at the time?

11        A.    I could say yes.

12        Q.    Okay.  So by August of 2013 after

13   a 30-day test run of the plant, and in the

14   presence of known complaints from the head of

15   the distribution system about its terrible

16   condition and repetitive failures, what was done

17   in order to evaluate the likely impact of

18   utilizing raw Flint River water on Mr. Bincsik's

19   system?

20             MR. MARKER:  Objection; form,

21        foundation.

22        A.    I'm not aware of anything.

23        Q.    Nothing was done?

24        A.    Not that I'm aware of.

Highly Confidential - Michael B. Glasgow

1          Q.    We can agree with this, can we

2    not, Mr. Glasgow, that you knew and presumably

3    all of the persons with responsibility at the

4    city of Flint knew that the chemistry of the

5    Flint River would be markedly different from the

6    chemistry of lake -- treated Lake Huron water

7    from the city of Flint Detroit?

8                    MS. COLLINS:  Objection to form.

9                    MR. KUHL:  Objection to form,

10          foundation.

11          A.    I said we knew there would be some

12    differences.

13          Q.    What was done to evaluate those

14    differences on Mr. Bincsik's distribution

15    system --

16                    MR. KIM:  Objection as to form.

17          Q.    -- before implementation of the

18    Flint River as a water source?

19          A.    Yeah, nothing to my knowledge.

20          Q.    Okay.  So as you come up to April

21    of 2014, the city of Flint -- strike the

22    question.

23                    To your knowledge, was the DEQ

24    aware of the decrepit condition of the city of

Highly Confidential - Michael B. Glasgow

1    Flint's distribution system before April of

2    2014?

3            MR. MARKER:  Objection; form.

4            MS. COLLINS:  Objection; form and

5        foundation.

6        A.    Yeah, I can't report on that.  I

7    know that the city was required to do

8    reliability studies every so many years.  So

9    that would contain information of main breaks

10   and issues.

11       Q.    Okay.

12       A.    So I would say they would have

13   some type of recording of it.

14       Q.    Mr. Prysby and his group did

15   sanitary surveys; did they not?

16       A.    Correct.  Yes.

17       Q.    And in the sanitary surveys, they

18   evaluated and reported on the condition of the

19   distribution system; didn't they?

20           MS. COLLINS:  Objection; form,

21       foundation.

22       A.    As far as I know, yes.

23       Q.    Do you remember that in the 2013

24   sanitary survey, Mr. Prysby as the author of

Highly Confidential - Michael B. Glasgow

1    that survey reported that the distribution

2    system was in terrible shape?

3              MS. COLLINS:  Objection; form.

4         A.    I don't know that I ever truly

5    read that.

6         Q.    Okay.

7         A.    I would have a separate sanitary

8    survey for my water treatment plant.  So that's

9    the one I would be more familiar with.

10        Q.    Oh, I see.  There would be a

11   sanitary survey for the water treatment plant

12   and a sanitary survey for the distribution

13   system?

14        A.    Correct.  Yes.  So sometimes when

15   they're talking distribution system, I wouldn't

16   always be privy to that.

17        Q.    By the way, I used the term a

18   little while ago "the Flint water crisis."

19   You've heard that term many, many times?

20        A.    Yes, many, many times.

21        Q.    What was the Flint water crisis?

22              MR. MARKER:  Objection; form.

23        A.    Yeah, in my opinion, a series of

24   mistakes in a short amount of time.  I think the

Highly Confidential – Michael B. Glasgow

1    crisis was a rush to put the treatment plant in

2    operation.

3         Q.    Well, you maybe not predicted the

4    problem, but you raised an alarm about rushing

5    the water treatment plant into operation in

6    April of 2014 before the trigger was actually

7    pulled, correct?

8         A.    Correct.

9              MS. COLLINS:  Objection; form.

10             MR. KUHL:  Objection, form.

11        Q.    Ultimately wasn't the Flint water

12   treatment crisis one that was intimately

13   involved with the distribution system?

14             MR. KIM:  Objection as to form.

15        A.    Yes.

16        Q.    There were many, many questions

17   presented to you in the transcripts that now are

18   marked as Exhibit 1 here about the water that

19   was being treated at the water treatment plant

20   and how it was evaluated.

21             Do you remember those questions?

22        A.    Vaguely.

23        Q.    Okay.  So I don't mean to be

24   obtuse about it.  But you were asked -- and I

1    think you testified that the water at the

2    treatment plant before distribution met all of

3    the criteria set by the Safe Water Drinking Act?

4          A.    Yes.

5          Q.    So the Flint water crisis was

6    really one that related to the passing of that

7    treated water into Mr. Bincsik's distribution

8    system, correct?

9                MR. KIM:  Objection to form and

10               foundation.

11               MR. MARKER:  Objection.

12         A.    I could agree with that, yes.

13         Q.    And the problem there was the

14   water now treated Flint water reacted -- my

15   term -- reacted with Mr. Bincsik's distribution

16   system in an adverse way, correct?

17               MR. KUHL:  Objection to form.

18         A.    Yes.

19         Q.    And one of the adverse ways that

20   it reacted was in leaching of lead from lead

21   service lines, correct?

22               MR. KUHL:  Objection; form.

23         A.    Yep, that was one of the ways.

24         Q.    Prior to April of 2014, what was

Highly Confidential - Michael B. Glasgow

1    done by the city of Flint or by the MDEQ, the

2    experts, in order to evaluate the impact that

3    the Flint River water after treatment would have

4    on the distribution system with respect to

5    leaching of lead from the service lines?

6                MS. COLLINS:  Objection to form,

7           foundation.

8                MR. KUHL:  Objection to form.

9        A.    Yeah, I'm not aware of anything.

10       Q.    Nothing?  Zero?  Zip-a-Dee-Doo-Dah

11   was done, right?

12                MR. KUHL:  Objection to form.

13                MR. KIM:  Objection to form.

14       A.    I'm not aware of anything.

15                MR. CAMPBELL:  What's wrong with a

16           little color.

17                     - - -

18       (Glasgow Deposition Exhibit 3 marked.)

19                     - - -

20   BY MR. CAMPBELL:

21       Q.    You have before you now Exhibit 3.

22                MR. MARKER:  Hold on, counsel.  I

23           think he needs to read it, if you don't

24           mind.

Highly Confidential - Michael B. Glasgow

```
 1              MR. CAMPBELL:  No, I don't mind at

 2         all.  Take your time.

 3              MS. COLLINS:  Could we get the

 4         Bates number?

 5              MR. MORRISSEY:  Did you all bring

 6         copies of any exhibits?

 7              MR. CAMPBELL:  No.

 8              MR. MORRISSEY:  We've done the

 9         courtesy of that for the depositions

10         we've taken.  And if you don't want us

11         to do that anymore -- because your

12         colleagues appreciated that.  So if

13         you'd like us not to do that anymore,

14         fine.

15              MR. CAMPBELL:  Well, you have to

16         understand who I am, okay?

17              MR. MORRISSEY:  I understand who

18         you are.

19              MR. CAMPBELL:  I'm a retired

20         lawyer that's been brought in here to

21         take a deposition.  I have zero to do

22         with the day-to-day operation of this

23         litigation.

24              So if you have a problem with the
```

Highly Confidential - Michael B. Glasgow

1           way my colleagues at the Campbell law

2           firm operate, take it up with them.

3           Don't take it up with me, because I

4           don't work for them.  I'm not employed

5           by that law firm.

6                   MR. MORRISSEY:  I don't have any

7           problem with how your colleagues have

8           handled the depositions that we provided

9           a courtesy -- where we provide the

10          courtesy of giving them copies of

11          exhibits.  That's not my problem.  My

12          problem is that you and your colleagues

13          didn't bring copies today.

14                  MS. DEVINE:  We're not required

15          to.  We disclosed the exhibits.

16                  MR. CAMPBELL:  I thought the whole

17          idea --

18                  MR. MORRISSEY:  Fine.  If you

19          don't want me to bring a copy going

20          forward, we won't.

21                  MR. CAMPBELL:  I thought the whole

22          idea of disclosing the documents by

23          Bates number was so that everybody could

24          get them and have them handy.  I thought

Highly Confidential - Michael B. Glasgow

```
 1          that was the rule.

 2              But take it up with Alaina and Jim

 3          Campbell.  Don't take it up with me.

 4   BY MR. CAMPBELL:

 5          Q.    Have you had a chance yet,

 6   Mr. Glasgow, to take a look at this?

 7              MS. COLLINS:  I apologize.  The

 8          Bates number?

 9              MR. CAMPBELL:  Yeah.  I'm sorry.

10          It's 24966.  It's a State of Michigan

11          0024966.

12              MS. COLLINS:  Thank you.

13   BY MR. CAMPBELL:

14          Q.    If you turn to page 2 of that

15   document.

16          A.    That's where I'm at.

17          Q.    Do you remember being asked

18   questions about this at the -- in the criminal

19   court by Mr. Flood?

20          A.    I do not recall, but I was asked a

21   lot of questions, so I apologize.

22          Q.    Yes, you were, over multiple days.

23              So in paragraph 4, Mr. Busch in an

24   e-mail dated March 26, 2013 states, "The
```

1    continuous use of the Flint River at such demand

2    rates would pose an increased microbial risk to

3    public health (Flint River vs. Lake Huron source

4    water)."

5                   Do you see that?

6         A.    Yes.

7         Q.    Do you agree with that?

8         A.    Yes.

9         Q.    The second point was, "Pose an

10   increased risk of disinfection byproduct, a

11   (carcinogen) exposure to public health (Flint

12   River vs. Lake Huron source water)."

13                  Did I read that correctly?

14        A.    Yes.

15        Q.    You agree with that, too?

16        A.    Yes.

17        Q.    Point 3, "Trigger additional

18   regulatory requirements under the Michigan Safe

19   Drinking Water Act."

20                  Do you see that?

21        A.    Yes.

22        Q.    You agree with that, too?

23        A.    Yes.

24        Q.    Point 4, "Require significant

Highly Confidential - Michael B. Glasgow

1    enhancements to treatment at the water treatment

2    plant beyond those identified in the TYJT

3    report."

4              Do you see that?

5         A.   Yes.

6         Q.   Do you know what that report is?

7         A.   Vaguely.  The Tucker Young I think

8    was a consultant that the city had hired.

9         Q.   Right.  If you look on the prior

10   page, you'll see it identified as Tucker, Young,

11   Jackson & Tull.

12        A.   Yes.

13        Q.   Did you review that report?

14        A.   I don't recall reviewing that

15   report.

16        Q.   Can you tell me what was done

17   prior to April of 2014 in order to address the

18   increased microbial risk to public health by

19   switching to the Flint River?

20        A.   Other than -- yeah, the only thing

21   I recall in regards to that would be an issue

22   with our ozone generator equipment at the city

23   of Flint treatment plant.

24        Q.   The ozone treatment equipment was

Highly Confidential - Michael B. Glasgow

1    not actually operating in April of 2014, was it?

2          A.    It was operating.

3          Q.    It was not operating properly, was

4    it?

5          A.    Not operating up to par, I'll say,

6    yeah.

7          Q.    What was done by the city of Flint

8    to address the increased risk of disinfection

9    byproducts, a carcinogen, with respect to public

10   health?  What was done?

11               MR. KUHL:  Objection to form.

12               Do you have a time frame, Dick?

13         A.    I will say -- I'll refer that to

14   the same.  The ozone generation equipment was

15   supposed to break up the precursors to

16   disinfection byproducts.

17               So until we kind of upgraded

18   that -- or not upgraded, repaired some of the

19   issues of it, I'll say nothing was done.

20         Q.    The third item references

21   additional regulatory requirements under the

22   Safe Drinking Water Act.

23               What was done -- what were those

24   additional requirements?

Highly Confidential - Michael B. Glasgow

```
 1              MR. MARKER:  Objection; form,

 2         foundation.

 3         Q.    Do you know what he's referencing?

 4         A.    Well, in parentheses there, it's

 5    the LT2.  It's the long-term enhanced surface

 6    water treatment rule.  There was a number of

 7    things, I guess, that would fall under that for

 8    regulatory requirements.  I can't state them all

 9    to you here, but ...

10         Q.    What was done to comply with those

11    requirements?

12         A.    Nothing that I'm aware of.

13         Q.    And point D, he references

14    "Significant enhancements to treatment at the

15    water treatment plant beyond those identified in

16    the TYJT report."

17              What was done to comply with that?

18         A.    Well, there was significant

19    enhancements.  I know design, we had changed out

20    our switch gear, all our electrical switch gear.

21    There were some piping configurations

22    underground that were updated.

23              We had -- I know there was some

24    corrections to be made to our softening
```

Highly Confidential - Michael B. Glasgow

 1   clarifiers in the treatment process.

 2              And these were all ongoing.  I

 3   can't -- without looking at other data, I

 4   couldn't tell you when it was completed or when

 5   it was started.

 6              MR. CAMPBELL:  Let's mark this as

 7         the next exhibit.

 8              - - -

 9      (Glasgow Deposition Exhibit 4 marked.)

10              - - -

11   BY MR. CAMPBELL:

12         Q.   So I've given you Exhibit 4, and

13   I've made mention of it earlier.  This is a memo

14   by Brent Wright.  You are listed as a recipient

15   along with a bunch of other people, including

16   Mr. Busch, Mr. Prysby, Jeff Hansen, Warren

17   Green, Samir Matta.  Those three are all with

18   LAN, correct?

19         A.   Correct.  Yep.

20              MR. KIM:  Richard, what's the

21         Bates number?

22              MR. CAMPBELL:  Sure.  It's city of

23         Flint 0244662.  That's the cover letter.

24         The next three documents have a

Highly Confidential - Michael B. Glasgow

```
 1            different Bates number, an LAN Bates

 2            number, 00036 -- I'm sorry.  0003651,

 3            352, 353.

 4    BY MR. CAMPBELL:

 5            Q.    Have you had a chance to look at

 6    that?

 7            A.    Yes.

 8            Q.    Okay.  I gather this is sort of a

 9    notice of a meeting to take place on June 26,

10    2013 at the water treatment plant.  And then

11    there's a sign-in sheet that shows people who

12    signed in on June 26, 2013, correct?

13            A.    Correct, yes.

14            Q.    And among the people who signed in

15    were the three individuals from -- well, maybe

16    not.  Maybe two individuals from LAN, and it

17    looks like at least three individuals from the

18    Department of Environmental Quality, including

19    Busch, Prysby, and somebody by the name of

20    Bloemker.  Do you know him?

21            A.    Yeah.

22            Q.    Who is he?

23            A.    Jon Bloemker.  Yeah, he was just a

24    field operations guy.  I think operations
```

Highly Confidential - Michael B. Glasgow

1    specialist, so to speak.  It seemed like he had

2    been with the DEQ for a significant amount of

3    time.

4         Q.   Okay.  So at this meeting, this is

5    when the discussion and decision was made to run

6    the plant for 30 days?

7         A.   Sounds right, yeah, because that

8    would have happened in July.

9         Q.   Tell us about the discussion.

10   What was said?

11        A.   Oh, I'd have to dust off some

12   cobwebs to try to remember this.  I don't know

13   that I can really -- I'm trying to read notes to

14   see if it will stimulate anything here, but --

15        Q.   Well, if you take a look at the

16   last page of handwritten notes on the LAN

17   document.  This one is Bates number 00036353.

18             Do you see that?  It's the last

19   page.  Very short.

20        A.   Yep.

21        Q.   Okay.  The next to last line, the

22   penultimate line makes reference to lead and

23   copper.

24             Do you see that?

Highly Confidential - Michael B. Glasgow

```
 1          A.    Yes.

 2          Q.    So lead and copper was discussed

 3   at this meeting; was it not?

 4          A.    Must have been with the notes

 5   there.  I do not personally recall.

 6                     - - -

 7      (Glasgow Deposition Exhibit 5 marked.)

 8                     - - -

 9          MS. DEVINE:  LAN_USAO_00035359

10      marked at the Busch deposition.

11          MR. SCHNATZ:  What number are we

12      giving that here?

13          MR. CAMPBELL:  I think City of

14      Flint.  It's 5.

15   BY MR. CAMPBELL:

16          Q.    Take a moment and look at that.

17                Have you had a chance to look at

18   it?

19          A.    Yes.

20          Q.    Okay.  This is an official policy

21   of the Office of Drinking Water & Municipal

22   Assistance related to the Lead and Copper Rule,

23   correct?

24          A.    Correct, yes.
```

Highly Confidential - Michael B. Glasgow

1    Q.    It's dated -- it has two dates, an

2    original date of August 4, 2003 and a

3    reformatted date of January 17, 2013.

4           Do you see that?

5    A.    Yes.

6    Q.    So first question:  When you sat

7    with people at the June 26, 2013 meeting at the

8    water treatment plant, including the three

9    representatives from the DEQ, was this policy

10   put down in front of you and discussed with you?

11   A.    Not that I recall, no.

12   Q.    Prior to April of 2014, did you

13   have this policy?

14          MR. MARKER:  Objection to form.

15   A.    Not that I recall having this

16   policy.

17   Q.    Do you remember at the June 26,

18   2013 meeting at the water treatment plant the

19   representatives of the Michigan Department of

20   Environmental Quality explaining the details of

21   the policy even if they didn't put it down in

22   front of you?

23   A.    I cannot recall.

24   Q.    Is this the first time you've seen

Highly Confidential - Michael B. Glasgow

1    this policy?

2         A.    In paper format, yes.  This is the

3    first time it's been in front of me like this.

4         Q.    Okay.  If you look right on the

5    first page of the policy under the heading

6    "Introduction, Purpose, or Issue," the policy

7    references -- or states that "The Lead and

8    Copper Rule of the National Primary Drinking

9    Water Regulations was promulgated by the United

10   States Environmental Protection Agency under the

11   Federal Safe Drinking Water Act."

12         Do you see that?

13        A.    Yes.

14        Q.    Did you understand that the

15   Michigan Department of Environmental Quality was

16   the primary agency, meaning it had the first

17   line responsibility for enforcing federal law

18   under the Safe Drinking Water Act?

19        A.    Yes.

20        Q.    You understood that the ultimate

21   arbitor was the EPA on the Safe Drinking Water

22   Act, right?

23        A.    Yes.

24        Q.    That the Michigan Drinking Water

Highly Confidential - Michael B. Glasgow

1   Act could impose greater standards, but couldn't

2   undercut the federal act?

3          A.    Correct.

4          Q.    You understood that?

5          A.    Yes.

6          Q.    All right.  After reference to the

7   Safe Drinking Water Act, the policy has these

8   two sentences:  "The complexity of the rule

9   necessitates guidance to maintain consistent

10  implementation of the rule by field staff.

11  Field staff includes the Department of

12  Environmental Quality, public water supply

13  staff, and local health department staff."

14          Did I read that correctly?

15         A.    Yes.

16         Q.    Was the local health department

17  brought into the consideration of the change

18  from Lake Huron and Detroit Water & Sewer

19  Department water to the Flint River water in

20  order to evaluate the health risks that would be

21  presented by that change?

22         A.    Not that I was aware of.

23         Q.    And this makes reference -- this

24  uses the terminology "local health department."

Highly Confidential - Michael B. Glasgow

1    There's also the Genesee County Health

2    Department; isn't that right, Mr. Henry?

3         A.    Correct.

4         Q.    Do you know whether Mr. Henry was

5    brought into a consideration of the health

6    impacts for Genesee County of a switch to the

7    Flint River as the raw water source?

8         A.    I don't know when he was brought

9    in.  I know the first time I met him would have

10   been in August or September of '14 after the

11   switch had already taken place.

12        Q.    Did you understand that the city

13   of Flint water treatment plant was considered a

14   large system under the federal law?

15        A.    Yes.

16        Q.    Because it supplied water to more

17   than 50,000 residents?

18        A.    Yes.

19        Q.    If you look at page 6, there's a

20   heading marked "Corrosion Control."

21              Do you see that?

22        A.    Getting there.  Yes.

23        Q.    And if you look at subpart C, it's

24   headed "Change in Treatment or Addition of a New

Highly Confidential – Michael B. Glasgow

1    Source."

2           A.    Yes.

3           Q.    Do you see that?

4           A.    Yes.

5           Q.    And back in June of 2013 --

6    actually, before June of 2013, the city of

7    Flint, the DEQ, Genesee County, were all talking

8    about changes in water source, correct?

9           A.    Correct.

10          Q.    That was going on for some time --

11          A.    Yes.

12          Q.    -- correct?

13          A.    Yes.

14          Q.    In 2013 when you had this meeting

15   at the water treatment plant and discussed the

16   30-day test run, that test run and that meeting

17   was conducted because a change in water source

18   was envisioned, correct?

19          A.    Yeah.  I guess I looked at it as

20   we were going into operations, so ...

21          Q.    But you were going into an

22   operation with a new raw water source?

23          A.    With a new water source, yes.

24          Q.    If you look down at the bottom of

Highly Confidential – Michael B. Glasgow

1    that subparagraph C it says -- it reads, "If the

2    water quality and characteristics of the new

3    source are similar to the supply's existing

4    sources, then field staff may consider the new

5    source as not adversely affecting the supply of

6    corrosion control treatment and no further

7    action is needed."

8              Do you see that?

9         A.   I do, yes.

10        Q.   Who made the evaluation that the

11   new source, the Flint River, had similar

12   characteristics to Lake Huron water being

13   treated by the Detroit Water & Sewer Department?

14             MS. COLLINS:  Objection;

15        foundation.

16             MR. MARKER:  Objection; form and

17        foundation.

18        Q.   Who made that determinations?

19        A.   I'm not sure who made that

20   determination.

21        Q.   The truth is nobody made that

22   determination, right?

23             MR. KIM:  Objection.

24        A.   Like I said, I'm not sure who made

Highly Confidential - Michael B. Glasgow

1    that decision or who determined that.

2           Q.    You understood that as a large

3    system delivering drinking water to more than

4    50,000 residents, the city of Flint had an

5    obligation to have optimal corrosion control

6    treatment, right?

7                 MR. KUHL:  Objection to form.

8           A.    According to the Safe Drinking

9    Water Act, yes, when you read that.

10          Q.    Okay.  And I will get to this as

11   we move along here at a glacial pace.

12                The truth is, that on day one in

13   April of 2014, and not until October, maybe

14   November, of 2015, there was no corrosion

15   control treatment utilized at the plant, right?

16          A.    Correct.

17                MS. COLLINS:  Objection to form.

18          Q.    Who made the decision as to

19   whether or not there would be no optimized

20   corrosion control treatment as required by

21   federal law?  Who made decision?

22                MR. KUHL:  Objection as to form.

23                MR. KIM:  Objection as to

24          foundation.

Highly Confidential - Michael B. Glasgow

1          A.     I recall the meeting with myself,

2    Mr. Prysby, and maybe one or two other

3    gentlemen.  Like I say, all these meetings kind

4    of blend together.  But I remember Mr. Prysby

5    telling us that we didn't need to add any

6    corrosion control, that they were going to wait

7    and do two six-months' rounds of monitoring

8    before it would be decided.

9          Q.     Okay.

10          A.     And it wasn't a specific question.

11    I asked him in regards to some of the testing

12    that my lab was going to have to perform, and I

13    was inquiring about phosphate, if we needed to

14    test for phosphate.  And that's when I was told,

15    "No, because you won't be adding any phosphate."

16          Q.     I'm glad you brought that up.

17               Prior to April of 2014, you knew

18    what orthophosphate was, correct?

19          A.     Correct, yes.

20          Q.     You knew what polyphosphate was;

21    did you not?

22          A.     Correct.  Yes.

23          Q.     Did you know the water treatment

24    plant before 1967 had been run utilizing Flint

Highly Confidential – Michael B. Glasgow

1    River as a raw water source for drinking water

2    in the city of Flint?  Did you know that?

3          A.    Yes, I did know that.

4          Q.    Did you know that the Flint water

5    treatment plant utilized a polyphosphate for

6    corrosion control treatment prior to 1967?

7          A.    To be honest, I wasn't aware of

8    that, no.

9          Q.    Did you or did anybody, to your

10   knowledge, at DEQ evaluate the means and methods

11   by which the water treatment plant actually

12   engaged in corrosion control treatment back when

13   it was running full time prior to 1967?

14         A.    Not --

15               MR. MARKER:  Objection to form.

16         A.    Not that I'm aware of.

17         Q.    Did you come to learn that Warren

18   Green of LAN objected to the city and to DEQ

19   about the failure to use corrosion control

20   treatment?

21               MR. SCHNATZ:  Object to form.

22         A.    No.

23         Q.    Did you learn that Mr. Green

24   explicitly told your boss, Duffy Johnson, that

```
 1    that was a mistake?

 2               MR. SCHNATZ:  Object.

 3               MR. MORRISSEY:  Object to form.

 4         A.    I'm not aware of that, no.

 5               MR. CAMPBELL:  The next Exhibit

 6         city of Flint 0202655 and beyond.

 7                    -  -  -

 8         (Glasgow Deposition Exhibit 6 marked.)

 9                    -  -  -

10    BY MR. CAMPBELL:

11         Q.    So this Exhibit 6 is addressed

12    from Warren Green to Brent Wright.

13               Do you see that?  It's dated

14    August 20, 2013.

15         A.    Yes.

16         Q.    Do you know whether you received

17    this document, whether you reviewed it?

18         A.    I do not recall.

19               MR. MARKER:  Before you ask any

20         questions -- or any further questions,

21         can you allow him a moment to review it?

22               MR. CAMPBELL:  Yeah, sure.

23               MR. KIM:  Richard, what's the

24         Bates number?
```

Highly Confidential - Michael B. Glasgow

1                    MR. CAMPBELL:  I thought I said

2           it, but it's -- I'll say it again.  The

3           first page is 020655, and then it's --

4           it's a multi-page document.

5    BY MR. CAMPBELL:

6           Q.   Have you had a chance to now look

7    at it?

8           A.   Yes.

9           Q.   I understand it's a multi-page

10   document.  I'll try to move through it quickly.

11                This is a document that attaches

12   to it a proposed scope of work for LAN with

13   respect to upgrades to the water treatment

14   plant, correct?

15          A.   Correct, yes.

16          Q.   So in the regular course of

17   business, you would have seen this, right?

18          A.   Yes.  I would have at one time,

19   yep.

20          Q.   On the first page under "Proposed

21   Scope of Upgrades to water treatment plant" in

22   the introduction, after referencing the

23   utilization of the water treatment plant, "until

24   construction of the proposed KWA supply is

Highly Confidential - Michael B. Glasgow

1    complete."

2              Do you see that in the first

3    sentence?

4         A.   Yes.

5         Q.   Is that -- by the way, is that

6    your understanding of what the plan was at that

7    time?

8         A.   Yes.  That is what had been talked

9    about, yeah.

10        Q.   This is sort of a placeholder

11   until KWA was up and running?

12        A.   Yeah.  Kind of buy us some time,

13   yep.

14        Q.   All right.  And then if you follow

15   down that same paragraph, the LAN document

16   reads, "In addition to the different treatment

17   requirements of each source" --

18              Did I read that correctly?

19        A.   Yes.

20        Q.   -- "the water treatment plant has

21   not been operated on a continuous basis for

22   40-plus years.  So facilities are also being

23   evaluated to identify equipment which should be

24   replaced because of its age, condition, or

Highly Confidential – Michael B. Glasgow

1    obsolescence."

2                   Did I read that correctly?

3          A.    Yes.

4          Q.    What were the different treatment

5    requirements of each source that's referenced

6    there; do you know?

7          A.    Well, it's different.  I mean,

8    Lake Huron water is fairly clean water compared

9    to river water.  The river water is a lot

10   harder.  So there are some differences.  It was

11   a little more difficult to treat the river water

12   than it was the Lake Huron water.

13         Q.    The TOC in river water would have

14   been substantially higher, right?

15         A.    Correct.  Yes.

16         Q.    And what does TOC stand for?

17         A.    Yeah.  Total organic carbon, kind

18   of the precursor to our disinfection byproducts.

19         Q.    Okay.  Total organic carbon became

20   a treatment issue and a problem at the water

21   treatment plant, didn't it?

22         A.    It did, yes.

23         Q.    If you go to page -- the last page

24   under item 3.  It's headed "Other Items to

Highly Confidential – Michael B. Glasgow

1    Address to Finalize Scope of Work."

2         A.    Yes.

3         Q.    Do you see that?

4         A.    Yes.

5         Q.    Subpart C reads, "Impacts of using

6    river as continuous supply (quantity, quality

7    monitoring and control reservoir operating

8    levels)."

9              Do you see that?

10        A.    Yes.

11        Q.    So Warren Green and LAN were in

12   the scope of work were identifying as a matter

13   for future discussion and incorporation into the

14   scope of work the impact of using the Flint

15   River as a raw water source on the system?

16             MR. SCHNATZ:  Object to form.

17        A.    Yes.

18        Q.    Was that ever done?

19        A.    Not that I recall.

20             MR. CAMPBELL:  Let me hand you

21        this next exhibit.

22             MS. DEVINE:  City of

23        Flint_FED_0114742.

24             MR. KIM:  Say that again.

Highly Confidential - Michael B. Glasgow

```
 1                  MS. DEVINE:  Yep.  City of

 2          Flint_FED_0114742.

 3                       - - -

 4          (Glasgow Deposition Exhibit 7 marked.)

 5                       - - -

 6    BY MR. CAMPBELL:

 7          Q.    Let me know when you're ready.

 8          A.    Yeah.  Whenever -- I'm good.

 9          Q.    Okay.  Sorry.

10                This is an e-mail string between

11    you and Duffy Johnson in October of 2013,

12    correct?

13          A.    Correct, yes.

14          Q.    And the subject matter of this

15    exchange is the impact of the Flint River on the

16    distribution system, correct?

17          A.    Correct, yes.

18          Q.    And one of the things that came up

19    was softening, what was going to be done about

20    softening, right?

21          A.    Right.

22          Q.    All right.  But in the initial

23    e-mail responding to Mr. Johnson's inquiry to

24    you about the impact of the treated Flint water
```

Highly Confidential - Michael B. Glasgow

```
 1    on the distribution system, you say, "I have

 2    heard different arguments."

 3                    Do you see that?

 4         A.    Uh-huh, yes.

 5         Q.    From whom?

 6         A.    Oh, that would be from people in

 7    the field, things I've read.

 8         Q.    Warren Green?

 9         A.    He's probably -- yeah, he would be

10    included in that, yes.

11         Q.    Okay.  You go on to say that --

12    you make reference to the final water quality.

13                    Do you see that?

14         A.    Yes.

15         Q.    Referencing pH and alkalinity?

16         A.    Yes.

17         Q.    And then you say, "Most likely we

18    will have scale-forming water."

19                    Do you see that?

20         A.    Yes.

21         Q.    I have searched long and hard to

22    find any memorandum demonstrating calculations

23    or the like supporting that statement.

24                    Can you tell us how you derive the
```

Highly Confidential - Michael B. Glasgow

1    conclusion or observation that the water would

2    be scale forming?

3         A.    Oh, that was based on -- at the

4    time it was kind of the industry standard.  It

5    was called the Langelier index.

6         Q.    Okay.

7         A.    It was an index of a number of

8    different parameters to kind of determine, yeah,

9    how -- somewhat the corrosiveness of the water,

10   whether you'll form a calcium scale or whether

11   you're going to be in aggressive water that rips

12   scale off.

13        Q.    So you're referencing the

14   Langelier index?

15        A.    Yes.

16        Q.    I haven't found any calculation,

17   written calculation, by you related to the

18   Langelier index.

19             Would you have done a calculation,

20   or was this a seat-of-the-pants judgment?

21             MR. MARKER:  Objection to the form

22        of the question.

23        A.    Well, this is -- I'll say this is

24   prior to the running, so I -- I understood the

Highly Confidential - Michael B. Glasgow

1    Langelier index, but I wouldn't necessarily be

2    calculating anything here.  That was more in

3    terms of when we were actually operating the

4    plant and softening the water.

5         Q.   Okay.  So that begs the question

6    of how did you derive the observation that the

7    water would most likely be scale forming?  How

8    did you get there without calculating?

9         A.   That's a good question.

10        Q.   That's why I asked it.

11        A.   Most likely, it had to be I

12   probably looked at previous test runs.  I must

13   have done a calculation, whether it was

14   scribbled on a notepad or whatnot.  But we know

15   what final water characteristics we were kind of

16   wanting.  And we would look at pH, alkalinity,

17   hardness, and all those parameters under -- that

18   are utilized in the Langelier index.  That was

19   kind of my assumption.  You'd shoot for a

20   positive Langelier which would be a scale

21   forming.

22        Q.   Okay.  So that comment begs this

23   question:  A Langelier datum that has a plus

24   sign in front of it indicates one thing, and a

Highly Confidential - Michael B. Glasgow

1    Langelier index that has a negative sign in

2    front of it means something else, correct?

3           A.    Correct, yes.

4           Q.    If it has a negative sign in front

5    of the number, that suggests that the water is

6    corrosive?

7           A.    Correct.  Yes.

8           Q.    If it has a positive symbol in

9    front of it, that suggests the opposite?

10          A.    Right.  Scale forming, yeah.

11          Q.    Okay.  In the fall -- I think it's

12   September or October of 2015 -- Marc Edwards

13   from Virginia Tech came onto the scene and

14   communicated with you on a number of occasions,

15   correct?

16          A.    I only communicated with him once

17   or twice via e-mail.

18                MR. CAMPBELL:  Okay.  Could you

19          pass the next exhibit on to the witness,

20          please.

21                MS. DEVINE:  This is

22          LAN_GCPO_00026370.

23                      - - -

24          (Glasgow Deposition Exhibit 8 marked.)

Highly Confidential - Michael B. Glasgow

1                    - - -

2    BY MR. CAMPBELL:

3           Q.    So Exhibit 8 is styled

4    "Synergistic impacts of Corrosive Water and

5    Interrupted Corrosion Control on

6    Chemical/Microbiological Water Quality:  The

7    Flint, Michigan Water Crisis."

8                 Did I read that correctly?

9           A.    Yes.

10          Q.    Do you recognize this as a

11   PowerPoint from Marc Edwards?

12          A.    Yes.

13          Q.    You've seen this before, haven't

14   you?

15          A.    Yeah.  Yes, I have.

16          Q.    If you go to the second page, flip

17   side -- yeah, that one with the chart on it.

18                It reads off to the side -- on the

19   sidebar, it says, "Flint water is very

20   corrosive.  Detroit water is not."

21                Do you see that?

22          A.    Yes.  Yep.

23          Q.    And then in the table, Table 1,

24   Professor Edwards and his crew put together a

Highly Confidential - Michael B. Glasgow

```
1   set of data in three columns; the parameter,

2   before, and after, referencing before and after

3   the April 2014 switch.

4                   Do you see that?

5           A.    Yes.

6           Q.    And if you look down, the

7   parameters include pH, hardness, alkalinity,

8   chloride, sulfate, CSMR.  That's the -- what is

9   it?  Chloride sulfate mass ratio?  Is that what

10  that stands for?

11          A.    Yes, I believe so.

12          Q.    Inhibiter and Larson ratio.

13                  Do you see that?

14          A.    Yes.

15          Q.    And looking at the before and

16  after on the hardness, that was significantly

17  higher than it was before the switch, correct?

18          A.    Correct, yes.

19          Q.    And the chloride content was

20  significantly greater; was it not?

21          A.    Yes.

22          Q.    The sulfate was higher; was it

23  not?

24          A.    Yes.
```

Highly Confidential - Michael B. Glasgow

1          Q.    The CSMR comparison is sort of 3

2    to 1?

3          A.    Yes.  Roughly, yep.

4          Q.    And then he has inhibitor.  You

5    take that to mean a corrosion control chemical?

6          A.    Yes.

7          Q.    And he lists it as inhibitor,

8    milligrams per liter as P.  Is that for

9    phosphate?

10         A.    Yes.

11         Q.    Is that how you would read it?

12         A.    Yeah.  P, that's probably

13   phosphorus in that.

14         Q.    And then he -- Virginia Tech

15   records before the inhibitor was a

16   0.35 milligrams per liter.  And then in caps

17   after it, "None," correct?

18         A.    Correct.

19         Q.    And that's true?  You agree with

20   that, right?

21         A.    Yes.  Yep.

22         Q.    And then he records the Larson

23   ratio.  And the after -- the Larson ratio for

24   the after -- after the switch was four times

Highly Confidential - Michael B. Glasgow

```
 1    greater than before.  More than four times

 2    greater, right?

 3            A.    Yes.

 4            Q.    So does this data add up to what

 5    he says in your view that the water -- the Flint

 6    River water was very corrosive and Detroit was

 7    not?

 8                 MR. KUHL:  Objection to form and

 9            foundation.

10                 MR. MARKER:  I'll join.

11            A.    Yeah.  I'm going to say he was

12    considered an expert in his field, so I would

13    follow what he said.

14            Q.    You don't disagree with it?

15            A.    Right.  Correct.  Yep.

16                      - - -

17        (Glasgow Deposition Exhibit 9 marked.)

18                      - - -

19                 MS. DEVINE:  This is VWNAOS028028.

20                 MR. KUHL:  Alaina, what is the

21            exhibit number for that?

22                 MS. DEVINE:  9.

23    BY MR. CAMPBELL:

24            Q.    Let me know when you're ready.
```

Highly Confidential - Michael B. Glasgow

```
 1          A.    Yep.  Whenever you're ready.

 2          Q.    Okay.  I don't know that you've

 3     ever seen this document.  It's a set of

 4     handwritten notes by Marvin Gnagy of Veolia

 5     North America, my client?

 6          A.    Okay.

 7          Q.    Do you know Mr. Gnagy?

 8          A.    I remember a couple gentlemen from

 9     Veolia around there.  I couldn't tell you a

10     name.

11          Q.    They were on the scene for, what,

12     about 30 days?

13          A.    Yeah, for a little while.  I know

14     they were in my lab doing some testing.

15          Q.    Okay.  If you look -- if you look

16     at this document, the second set of data, he has

17     CCPP, LI, and I think it's D-I-C, but I could be

18     wrong on the reading of that.

19                The LI, Langelier index?

20          A.    Yes.

21          Q.    Do you see where it is listed with

22     negative numbers?

23                MR. MARKER:  I'm going to object

24                to the form and foundation.  I don't
```

Highly Confidential - Michael B. Glasgow

```
 1              know that he has seen this document

 2              before --

 3                   MR. CAMPBELL:  I just asked him.

 4                   MR. MARKER:  -- and whether or not

 5              he has seen the calculations or was

 6              involved in the calculations.  So just

 7              form and foundation on that basis.

 8                   MR. CAMPBELL:  Sure.

 9    BY MR. CAMPBELL:

10         Q.    Do you see the negative number?

11         A.    Yes.

12         Q.    The negative number indicates

13    corrosive water, correct?

14         A.    Correct, yes.

15         Q.    And in the note below, Mr. Gnagy

16    states that corrosive water conditions exist and

17    he discussed it with the plant staff, and he

18    also discussed lead and copper issues.

19              Do you see that?

20         A.    Yes.

21         Q.    Mr. Bincsik actually wrote a

22    memorandum on February 24 -- and I'll get to

23    it -- February 24, 2015, where he actually

24    records that Marvin of Veolia made reference to
```

Highly Confidential - Michael B. Glasgow

1    possible lead issues in the water.

2              Do you remember that?

3              MR. MORRISSEY:  Object to form.

4              MR. MARKER:  I'll join.

5         A.   I don't recall that.  I'm sorry.

6                   - - -

7    (Glasgow Deposition Exhibit 10 marked.)

8                   - - -

9              MR. CAMPBELL:  The Bates number on

10        this is CROFT -- it looks like

11        0000000125 and 126.

12   BY MR. CAMPBELL:

13        Q.   All set?

14        A.   Yep.

15        Q.   I bring this out of sequence only

16   because of the question that I just asked you

17   about Mr. Bincsik referencing the comments by

18   Mr. Gnagy, Marvin, of Veolia in an e-mail.

19              Do you see that now in front of

20   you?

21        A.   Yes, I do.

22        Q.   Do you remember that e-mail now?

23        A.   Yes, vaguely.

24        Q.   So on February 24, 2015 at

Highly Confidential - Michael B. Glasgow

1    2:19 p.m. Mr. Bincsik wrote to you with copies

2    to Croft, Johnson, and Wright informing you that

3    "The majority of service lines in the city of

4    Flint are lead from the main to curb and in some

5    cases from the main to the house."

6              Then he goes on to report that

7    "Marvin from Veolia mentioned to me he thought

8    we needed to add phosphate to our water to help

9    prevent that."

10         A.    Yes.

11         Q.    Do you remember that discussion

12   with Mr. Bincsik?

13         A.    I don't offhand, to be honest with

14   you.  It was in the e-mail string here, though.

15         Q.    And it was to you?

16         A.    Yes.

17         Q.    And it was prompted, was it not,

18   by the result of lead testing that you undertook

19   or commissioned at LeeAnne Walters' house at 212

20   Browning?

21         A.    Correct.  Yep.

22         Q.    And that -- that lead testing

23   resulted in an extraordinarily high number for

24   lead present in the water; did it not?

Highly Confidential - Michael B. Glasgow

```
 1                MS. COLLINS:  Objection to form.

 2         A.    Correct.  Yes.

 3         Q.    It was 104 parts per billion?

 4         A.    Yes.

 5         Q.    And then in subsequent evaluations

 6    of Ms. Walters' drinking water, subsequent lead

 7    and copper tests, that 104 datum increased to

 8    397, then to 707, and at one point, over 13,000

 9    parts per billion.

10                Do you remember that?

11         A.    I do remember the 397.  I think

12    after that, it was EPA pulling testing for her.

13    But, yes, I did understand it was increasing.

14         Q.    And you would have seen those

15    reports from the EPA; would you not?

16         A.    I did not see the reports from the

17    EPA.

18         Q.    Did you learn the level of lead

19    that was found in her water by the EPA?

20         A.    I did learn -- yes, I did learn

21    the level.

22         Q.    It was huge, wasn't it?

23         A.    Uh-huh.

24                MR. MARKER:  Objection to form.
```

Highly Confidential - Michael B. Glasgow

```
 1          Q.   Your answer is yes?

 2          A.   Yes.

 3               MR. KUHL:  When you have a chance,

 4          can we take a break?

 5               MR. CAMPBELL:  You want a break?

 6               MR. KUHL:  Yeah.

 7               MR. CAMPBELL:  Yeah.  Sure.

 8          That's fine.  It's not a fluid retention

 9          test.

10               THE VIDEOGRAPHER:  We are going

11          off the record at 10:33 a.m.

12               (Recess taken.)

13               THE VIDEOGRAPHER:  We are back on

14          the record at 10:43 a.m.

15                    - - -

16     (Glasgow Deposition Exhibits 11 and 12 marked.)

17                    - - -

18     BY MR. CAMPBELL:

19          Q.   Mr. Glasgow, I've put two exhibits

20     before you.  One is, like, a two-page exhibit on

21     DEQ letterhead, dated October 7, 2014.

22               Do you see that?

23          A.   Yes.

24          Q.   Is that 12?
```

Highly Confidential - Michael B. Glasgow

1          A.    Yes, it's Number 12.

2          Q.    And the other is a single-page

3    document entitled "Consumer Notice of Lead &

4    Copper Results in Drinking Water," dated -- or

5    the sample date was November 19, 2014.

6                Do you see that?

7          A.    Yes.

8          Q.    If we could start with Exhibit 12.

9                This is -- the cover letter is

10   written by Mr. Prysby and Mr. Rosenthal of the

11   Office of Drinking Water & Municipal Assistance,

12   correct?

13         A.    Correct, yes.

14         Q.    And they were providing you with

15   the template or disclosure that was to be used

16   in giving notice because of a safe drinking

17   water violation related to total coliform

18   bacteria; is that right?

19         A.    Correct.

20         Q.    All right.  So if you could turn

21   to the template that DEQ sent to you with the

22   October 7, 2014 letter.  It starts at the top by

23   referencing a violation of a drinking water

24   standard, but then goes on to say that as

Highly Confidential – Michael B. Glasgow

1    customers, as the city's customers, "You have a

2    right to know what happened and what we did to

3    correct the situation."

4              Do you see that?

5        A.    Yes.

6        Q.    You agree with me, sir, that the

7    city of Flint had a duty and responsibility to

8    the citizens of Flint to provide them with

9    relevant information bearing upon the safety or

10   quality of their drinking water?

11       A.    Yes.

12       Q.    And did you, sir, also envision

13   that the Department of Environmental Quality had

14   a duty and responsibility as the experts to

15   provide information to the city of Flint

16   residents if they became aware of a problem

17   related to health and safety with drinking

18   water?

19       A.    Yes.

20       Q.    If you go to the Number 11, the

21   "Consumer Notice of Lead & Copper Results in

22   Drinking Water."

23       A.    Yes.

24       Q.    And down about halfway down, about

Highly Confidential - Michael B. Glasgow

1    right in the middle of the page, there's a whole

2    paragraph in italics.

3                Do you see that?

4        A.    Yes.

5        Q.    It reads, "Lead can cause serious

6    health problem if too much enters your body from

7    drinking water or other sources.  It can cause

8    damage to the brain and kidneys, and it can

9    interfere with the production of red blood cells

10   that carry oxygen to all parts of your body.

11               "The greatest risk of lead

12   exposure is to infants, young children, and

13   pregnant women.  Scientists have linked the

14   effects on the brain with lower IQ in children.

15               "Adults with kidney problems and

16   high blood pressure can be affected by low

17   levels of lead more than healthy adults.  Lead

18   is stored in the bones and can be released later

19   in life.

20               "During pregnancy, the child

21   receives lead from the mother's bone's which may

22   affect brain development."

23               Did I read that correctly?

24       A.    Yes.

Highly Confidential - Michael B. Glasgow

1    Q.    That's information that you knew

2    back in 2013; isn't that true?

3    A.    Yes.

4    Q.    You didn't contest that

5    information at all?  You accept that as true,

6    don't you?

7    A.    Yes.

8    Q.    So you and your colleagues at the

9    city of Flint knew that lead in drinking water

10   could present very serious health risks to

11   children, pregnant women, and others, correct?

12   A.    Yes.  Correct.

13   Q.    And if you were aware of lead in

14   the drinking water, you had a duty and

15   responsibility to the citizens of Flint to make

16   it known so they could take action to protect

17   themselves, didn't you?

18   A.    Yes.

19   Q.    And you would agree with the

20   proposition that the experts at the DEQ knowing

21   this information also had a duty and

22   responsibility to alert the citizens of Flint if

23   their drinking water was contaminated with lead

24   that could cause such serious problems, correct?

Highly Confidential - Michael B. Glasgow

```
 1                    MR. KUHL:  Objection to form.

 2                    MS. COLLINS:  Objection to form.

 3          A.    Yes.

 4          Q.    Did the DEQ provide this template

 5   to you for use?

 6          A.    Yes.

 7          Q.    Did the DEQ provide you with the

 8   paragraph that I just read in italics?

 9          A.    Yes.

10          Q.    So that physical causation medical

11   information related to lead and adverse human

12   consequences came from the DEQ to you?

13          A.    Correct.

14          Q.    You didn't undertake an

15   independent research into medicine in order to

16   come up with that information, did you?

17          A.    No.

18                    - - -

19      (Glasgow Deposition Exhibit 13 marked.)

20                    - - -

21                    MR. CAMPBELL:  City of

22          Flint_FED-0542925.  And then it's a

23          multi-page document, so ...

24                    MR. KIM:  05429 --
```

Highly Confidential - Michael B. Glasgow

```
 1                    MR. CAMPBELL:  542925.

 2                    MS. DEVINE:  And the last one was

 3            COF_FED_0109591.

 4   BY MR. CAMPBELL:

 5            Q.   I've placed before you just the

 6   cover page and one attached page of a

 7   December 2013 report entitled "City of Flint

 8   Water Reliability Study Distribution System."

 9                    Do you see that?

10            A.   Yes.

11            Q.   And the attached page is page 29,

12   city of FLINT-FED_0542598.

13                    Do you see that?

14            A.   Yes.

15            Q.   What was -- what was Rowe?  What

16   is Rowe?

17            A.   Just an engineering firm that I

18   knew the city had used on -- on numerous

19   occasions, whether it be for roads or water

20   treatment.

21            Q.   Rowe is an engineering consulting

22   firm with offices in Flint, Michigan?

23            A.   Correct.  Yes.

24            Q.   Has a longstanding relationship
```

Highly Confidential - Michael B. Glasgow

```
 1   with the city of Flint?

 2        A.   Yes.

 3        Q.   And was used in conjunction with

 4   the water treatment plant and drinking water

 5   issues over time, correct?

 6        A.   Yes.  Correct.

 7        Q.   Apparently Rowe Professional

 8   Services Company produced a report on the

 9   distribution system, dated December 2013; is

10   that right?

11        A.   Yes.

12        Q.   I only gave you one page of it,

13   because there was only one paragraph that was of

14   interest to me at this time.  I have the rest of

15   it if you want to see it.

16             But paragraph 4.4 of this report

17   in December of 2013 is entitled "Water

18   Distribution System."

19             Do you see that?

20        A.   I do, yes.

21        Q.   And Rowe reports that "Much of the

22   city's water distribution system is over 70

23   years old and is in need of rehabilitation or

24   replacement.  In addition, there is a
```

1    significant amount of 4-inch water mains in the

2    system that's over 70 years old prone to water

3    main breaks and unable to provide modern

4    pressures and fire flows."

5            Did I read that correctly?

6        A.   Yes.

7        Q.   I had asked you about the

8    distribution system in August of 2013 when

9    Mr. Bincsik wrote his e-mail about that.

10           Do you remember?

11       A.   I do, yes.

12       Q.   So now fast forward.  We're in

13   December of 2013.  We're four months away from

14   the startup of the water treatment plant, and

15   Rowe is identifying a continuing deteriorated

16   status of the distribution system, correct?

17       A.   Correct, yes.

18       Q.   You would have received a copy of

19   this report from Rowe?

20       A.   Possibly or would have talked with

21   Mr. Bincsik about it.

22       Q.   Okay.  But you agree with the

23   proposition that between August and December of

24   2013, now four months short of the startup of

Highly Confidential - Michael B. Glasgow

```
 1    the water treatment plant, the water

 2    distribution system had not been improved?

 3            A.    Correct.  Yes.

 4                       - - -

 5        (Glasgow Deposition Exhibit 14 marked.)

 6                       - - -

 7                MS. DEVINE:  COF_FED_0107003.

 8    BY MR. CAMPBELL:

 9            Q.    Have you had a chance to look at

10    that?

11            A.    Yes, I have.

12            Q.    In Exhibit 14, you and Duffy

13    Johnson, with a copy to Brent Wright, are

14    talking about comparative data between the Lake

15    Huron water from the city of Detroit and the

16    Flint River data.

17                Do you see that?

18            A.    Yes.

19            Q.    And you make reference to

20    comparisons.  Did you ever actually do the

21    comparisons?  Did you ever reduce that to a

22    writing?

23            A.    It seemed like we did.  It seemed

24    like I had made a little chart kind of showing
```

Highly Confidential - Michael B. Glasgow

1    finished water characteristics of both Detroit

2    water and city of Flint water or what I

3    anticipated it would be.

4         Q.    Why are you using that verb?

5         A.    Well, based -- if I made a

6    comparison from when I think I made it, I used

7    information from our previous test runs when we

8    were just a standby plant.

9         Q.    Okay.  What would this report look

10   like?  Because I don't -- I can't bring it to

11   mind.

12        A.    It would have been just a

13   single-page spread -- simple Excel spreadsheet

14   probably.

15        Q.    So Excel spreadsheet?

16        A.    Yep, Detroit water and some

17   parameters and city of Flint water.

18        Q.    What would the title be?

19        A.    I'm guessing it would be

20   comparisons.  It's hard to say.

21        Q.    But you're reasonably confident

22   you did that comparison?

23        A.    Yes.

24        Q.    And if we can find the document,

```
 1    we'll know what the comparative data is?

 2         A.    Yeah.

 3         Q.    Okay.  So in April -- what was the

 4    start date?  April 24?

 5         A.    Yeah, it was towards the end of

 6    April.  I can't remember exact date.

 7         Q.    I'm just going to use April,

 8    because I don't remember the precise date.

 9               In April when you started up, I

10    want to know what processes were operational.

11    Was the ozone system fully functional?

12         A.    It was functional --

13         Q.    Was it fully functional?

14         A.    -- but I won't say fully

15    functional.

16         Q.    What was wrong with it?

17         A.    Part of the internal components of

18    the ozone generator -- dielectrics I believe

19    they're called.  Basically a type of lightbulb

20    almost -- needed to be replaced.  And I can't

21    recall exactly when -- when that occurred.  I

22    don't believe it was prior to operation.  So

23    ozone was running, just not as efficient and as

24    well as it could have been.
```

Highly Confidential - Michael B. Glasgow

1          Q.    When I use the term "dielectric,"

2    I use it to mean a fluid that suppresses

3    electrical charges like in a capacitor.

4          A.    Okay.

5          Q.    Is that how you --

6          A.    Yeah, it would be similar to that

7    as well, yes.

8          Q.    Okay.  Were all polymer systems

9    functional?

10         A.    I cannot recall.  I don't believe

11   so.

12         Q.    The polymer systems would include

13   coagulation, softening, and filtration?

14         A.    Polymer would have been -- what I

15   remember the polymers being used for was really

16   the softening process.

17         Q.    Okay.  Was the ferric chloride

18   system functional?

19         A.    It was functional, yes.

20         Q.    Was the lime system functional?

21         A.    Yes.

22         Q.    Was the soda ash system

23   functional?

24         A.    We had no soda ash.

Highly Confidential - Michael B. Glasgow

1      Q.    Soda ash had been recommended by

2    prior consultants, correct?

3      A.    Correct.  As part of the softening

4    process, yes.

5      Q.    What is the difference between

6    lime softening and soda ash softening?

7      A.    Well, when you do a combination of

8    lime and soda ash, you can reduce the hardness

9    level.  You can -- hardness is broken up in two

10   different types; carbonate hardness and

11   noncarbonate hardness.  Lime will take care of

12   the carbonate hardness.  Soda ash would help

13   alleviate that noncarbonate hardness.

14     Q.    How would the use of a soda ash

15   system have benefited Flint drinking water after

16   the switch?

17     A.    It would have allowed us to get

18   our softening numbers down even lower.  So our

19   final hardness numbers would have been much

20   lower with soda ash.

21     Q.    Should we conclude that the

22   decision not to use the recommended soda ash

23   system for softening was made by people

24   occupying a higher position of authority than

1  you?

2          A.    Yes.

3          Q.    Would that have been the emergency

4  manager?

5          A.    It could have went all the way up

6  there, yes.

7          Q.    It would have at least been Howard

8  Croft?

9          A.    Correct.  Yes.

10          Q.    Okay.  And it was driven by money.

11          MR. KIM:  Objection to form.

12          A.    From my understanding.

13          Q.    Okay.  Was the carbon dioxide

14  system functional?

15          A.    It was functional, but that needed

16  some I'll call it TLC.  It needed a little care

17  to make it better.

18          Q.    What are you saying?  It was

19  barely functional?

20          A.    It was functional.  It didn't work

21  as well as I wanted to, I'll put it that way.

22          Q.    All right.  Was there a

23  functioning phosphate system available?

24          A.    There was no phosphate system

Highly Confidential - Michael B. Glasgow

```
 1    available.
 2         Q.    Regardless of the type of
 3    phosphate to be used, if it were used, one of
 4    its uses would have been for corrosion control?
 5         A.    Correct.  Yes.
 6         Q.    And corrosion control was not
 7    implemented in any shape by the water treatment
 8    plant, correct?
 9         A.    Correct.
10         MR. KUHL:  Objection to form.
11         Q.    And I read in the transcripts -- I
12    think I read this -- that you did not have the
13    capacity to feed phosphate into the system?
14         A.    Correct.  Yes.
15         Q.    What does that mean?
16         A.    Well, we had no storage area for
17    the chemicals.  We had no feed pumps in order to
18    pump it into the treatment process.  So, yeah,
19    there was no -- no equipment ready to go to be
20    able to add that treatment chemical.
21         Q.    Had phosphate been used at the
22    water treatment plant in the past?
23         A.    Not in my time there.
24         Q.    Okay.  If you had utilized
```

Highly Confidential - Michael B. Glasgow

1    phosphate, either a polyphosphate blend or

2    orthophosphate, as a corrosion control chemical,

3    would you have had to run that past the DEQ,

4    Mr. Busch and Mr. Prysby, and get their

5    approval?

6            A.    Yes.  Any time I would make a

7    change to the treatment process, I would have to

8    have written permission from them.

9            Q.    So at the time of the switch, was

10   the distribution system segregated, or was there

11   a mix of water from the water treatment plant

12   and Detroit?

13           A.    Yeah.  Once we switched, then we

14   introduced that mixture, so there was a mixture

15   in the system for a while after the original

16   switch.

17           Q.    For how long was there a mixture?

18           A.    Oh, I'd have to look back at some

19   data.  It was possibly close to a month that we

20   could see a mixture in there.

21           Q.    So the city of Detroit continued

22   to provide some water to you for a month after

23   the switch?

24           A.    No.  That was based just on what

Highly Confidential - Michael B. Glasgow

1    was in our reservoirs before we started the

2    switch in the water already in the system.

3           Q.    I get it.

4                 So to the extent that there was

5    Detroit treated water in the reservoirs, you

6    would use that mixed with the Flint River?

7           A.    Yes, in a sense.  That was just I

8    guess the causation of switching.  You know,

9    there's already water in all the pipes in the

10   system, little levels in our reservoir, and then

11   we add more water.  So for a while, we seen a

12   mix in the data.

13          Q.    Was there an operational ammonia

14   system?

15          A.    No.

16          Q.    Did you have the capacity to form

17   chloramines?

18          A.    No, we did not have that capacity.

19          Q.    What was the logic for deciding

20   against the formation of chloramines for

21   residual disinfection?

22          A.    Well, chloramines -- that's a

23   whole different ball of worms using chloramines.

24   That balance of the chemicals used needs to be

Highly Confidential - Michael B. Glasgow

1   tightly monitored, a little more costly.  And

2   for years, it seemed like in water treatment,

3   municipalities and stuff had switched to that,

4   and they'd started switching back because of

5   some of the other issues that could be caused

6   with chloramines.

7          Q.    Well, if you weren't going to

8   utilize chloramines for residual disinfection,

9   why wasn't ammonia then used?

10         A.    Ammonia wasn't used.

11         Q.    That's what -- why?

12         A.    Oh, yeah, there's no need for

13  ammonia if you're not using chloramines.

14         Q.    Okay.  That's it.  No need for it.

15  I got it.

16               Did you have a system utilizing

17  potassium permanganate?

18         A.    No.

19         Q.    Sodium chlorite?

20         A.    No.

21         Q.    Powdered activated carbon?

22         A.    No.

23         Q.    How was the ferric chloride dose

24  selected?

Highly Confidential - Michael B. Glasgow

1        A.    Usually based off jar test in the

2   lab and based off history of our test runs.

3        Q.    Okay.  So it would have been

4   decided by you?

5        A.    Yes.

6        Q.    Not in conjunction with anybody

7   else?

8        A.    No, no.  Originally it would be

9   from me.

10        Q.    Okay.  So if we want to go look

11   and see the data that you utilized to select the

12   ferric chloride dose, where would we look?

13        A.    Anywhere in the lab data from the

14   prior test runs prior to the switch.

15        Q.    So prior to April of 2014, you had

16   received recommendations for a ferric chloride

17   dosing both from LAN and SEG; isn't that right?

18        A.    I do not recall.  Possibly.

19        Q.    If I represent to you that LAN and

20   SEG recommended dosing ferric chloride 40 to

21   80 milligrams per liter, does that refresh your

22   memory?

23        A.    It really doesn't.

24        Q.    Okay.  So if I asked you why it

Highly Confidential - Michael B. Glasgow

```
 1   wasn't followed, you don't have anything to say

 2   about that?

 3         A.    Correct.  Yes.

 4         Q.    If we look at the ferric chloride

 5   dosing from your plant data, it changes?

 6         A.    Yes.

 7         Q.    And it changes in conjunction with

 8   chemical reserves, with storage of the chemical.

 9               What was generating those

10   decisions to change the ferric chloride dosing

11   on a day-to-day basis?

12         A.    Usually it was the parameters of

13   the incoming river water that we were attempting

14   to treat.  So our ferric chloride is used to

15   grab ahold of particulate matter in the water

16   and settle it out.

17               So after a heavy storm, the river

18   would get real cloudy, extra particulate matter,

19   we'd increase the ferric dosage to adjust.  And

20   the river changed -- I don't want to say hourly,

21   but it was -- it was a very dynamic water

22   source, so it adjusted.

23         Q.    And by that terminology, "a

24   dynamic water source," you're saying the
```

Highly Confidential - Michael B. Glasgow

```
1   characteristics changed regularly?

2        A.   Yes.

3        Q.   That was different, I guess, from

4   what you were getting out of Detroit?

5        A.   Correct.  Yes.

6        Q.   Substantially different?

7        A.   Yes.

8        Q.   Requiring more people and more

9   time?

10       A.   Yes.  Correct.

11       Q.   Which you didn't have?

12       A.   Correct.

13       Q.   What was the pH for the softening

14  basins?

15       A.   The pH, we would raise up to close

16  to 12 to get the softening reaction to take

17  place.  And then after it left that part of the

18  softening process, that's when we hit it with

19  carbon dioxide to bring that pH back down.

20       Q.   Okay.  What were you shooting for?

21  What did you select as a pH after carbonation?

22       A.   Roughly 7.8.  High 7s.

23       Q.   How was the carbon dioxide dose

24  selected and measured?
```

1        A.     It was measured via controls, but

2    the dose was calculated by that final pH to get

3    that pH to where we wanted it.

4        Q.     Was the carbon dioxide dosage

5    measured in units like pounds per day?

6        A.     Yes.

7        Q.     Is that the unit of measurement

8    you used?

9        A.     Yes, it was actually.  Yes.

10        Q.     And the chlorine dose, how was

11    that selected?

12        A.     That was also something we'd

13    record kind of pounds per day, but we would have

14    a set chlorine residual that we wanted to hit,

15    you know, every day.  So we would adjust

16    accordingly.

17        Q.     How did you measure the chlorine

18    dosage?

19        A.     From what we were putting in -- we

20    had some inline monitors to tell us the dosage,

21    but we would always follow up with hands-on

22    tests from one of my lab staff to verify.

23        Q.     But how much of your water

24    treatment plant was automated?

Highly Confidential - Michael B. Glasgow

     1          A.    Very small portion.  Not much at

     2   all.

     3          Q.    Can you quantify it as a

     4   percentage?

     5          A.    Oh, maybe 20 percent.

     6          Q.    And how much of the -- of that

     7   20 percent of the plant that was automated

     8   involved automation of flow?

     9          A.    A large portion.

    10          Q.    So most of the 20 percent had to

    11   do with flow?

    12          A.    Yes.

    13          Q.    What about chemical dosing?

    14          A.    That was --

    15          Q.    Was that manual?

    16          A.    That was all manual, yep.

    17          Q.    Measuring things like turbidity,

    18   pH, and temperature all manual?

    19          A.    Manual.  We had some inline

    20   meters, but we'd always verify with manual

    21   reads.

    22          Q.    I think I know the answer to this.

    23   But after -- on and after April of 2014, what

    24   training did the staff members have with respect

Highly Confidential - Michael B. Glasgow

1    to operation of these processes?  And I'm

2    referring to ozone, coagulation, softening

3    filtration.  What training did they have?

4              MR. KIM:  Objection as to form.

5         A.    I couldn't tell you, to be honest

6    with you.  Not -- not much more than the

7    hands-on training of actually operating

8    everything.

9         Q.    One of the things that happened is

10   that on and after the change in raw water

11   source, you added a number of employees,

12   correct?

13        A.    Correct, yes.

14        Q.    Most of -- most of them, if not

15   all of them, had no real prior experience in

16   operating a water treatment plant, correct?

17        A.    Correct.

18              MR. KIM:  Objection as to form.

19        Q.    And prior to doing that, you

20   operated what you described in your testimony as

21   a skeletal crew?

22        A.    Correct.  Yes.

23        Q.    That's your terminology, skeletal

24   crew?

Highly Confidential - Michael B. Glasgow

```
 1          A.    Yes, that's mine.

 2          Q.    Define for us what you mean by

 3    "skeletal crew."

 4          A.    Basically the bare bones of what

 5    was need to cover -- cover what needed to be

 6    done.  And that's prior to operation.  So most

 7    of the time --

 8          Q.    Is it one person per eight-hour

 9    shift or 50?

10          A.    Yeah.  Well, most of the time when

11    we're in standby mode, we had about 12 to 15

12    people that were first shift to run the plant.

13    On off shifts, there was just a single

14    individual there.

15          Q.    What is an off shift?

16          A.    Well, it was second and third

17    shift basically prior to full-time operation.

18          Q.    So daytime, evening, and early

19    morning?

20          A.    Yep.  We'd have our normal day

21    shift, and then you'd have your second shift

22    start at 4:00 p.m. to go to midnight roughly.

23    Had to be one individual on hand.  And then from

24    midnight until 8:00 a.m. would be one other
```

Highly Confidential - Michael B. Glasgow

1    individual.

2           Q.    So on and after the switch in

3    April of 2014, this new cohort of employees had

4    to be trained on a -- on-the-job training

5    process, right?

6           A.    Pretty much, yep.

7           Q.    How long did that take?

8                 MR. KIM:  Objection as to form.

9                 MR. MARKER:  I'll join.

10          A.    It was constantly ongoing.

11          Q.    It was a problem, right?

12                MR. KIM:  Objection as to form.

13                MR. MARKER:  I'll join.

14          A.    From my personal view, yes.

15          Q.    That was one of the problems that

16   you raised in your April memorandum to the Grand

17   Poobahs at the city of Flint saying, "I don't

18   want to do this."  Right?

19                MS. COLLINS:  Objection to form.

20                MR. KIM:  Objection to form,

21          foundation.

22          Q.    You made your views known

23   repeatedly, didn't you?

24                MS. COLLINS:  Objection to form.

Highly Confidential - Michael B. Glasgow

```
 1          A.    I attempted to, yes.

 2          Q.    And you made your views known

 3    about the problems that you could envision with

 4    respect to the Flint water treatment plant both

 5    to your supervisors at the city of Flint, but

 6    also to the DEQ, correct?

 7          A.    Correct.

 8          Q.    Can you tell us what a weir is,

 9    w-e-i-r?

10          A.    A weir, yes.  I'd almost rather

11    draw a picture.  But anyways, a weir, you know,

12    say you have a mud tank of water, and what

13    happens a lot of times in the water treatment

14    process, you move water throughout a plant, and

15    a lot of times -- like, for instance, I'll talk

16    about the area where we added ferric chloride to

17    the water.

18                We add ferric chloride to the

19    water, settle heavy particles out.  A weir would

20    be at the top of the tank to allow water to

21    slowly drift over and maybe catch anything else

22    that's going to go on to the next process.  So

23    it's really just -- just a wall with some slits

24    to let water fall out.
```

Highly Confidential - Michael B. Glasgow

```
1          Q.    It's like a dam?

2          A.    Yeah.

3          Q.    Right?

4          A.    Yep, that's a better, easier,

5    quicker explanation.

6          Q.    What was the condition of the

7    weirs in the north and south basin?

8          A.    Yeah, in the -- I have to think a

9    minute.  One of the basins, north or south --

10   I'm trying to remember.  The weirs hadn't been

11   correctly supported.  So when the one softening

12   clarifier was full, the weirs did not operate as

13   intended.

14         Q.    The clarifiers are large pieces of

15   equipment; are they not?

16         A.    Yes, they are.

17         Q.    And the weirs were not level, were

18   they?

19         A.    No.

20         Q.    And that interrupted or interfered

21   with the process, didn't it?

22         A.    Yes, that did disturb the process.

23         Q.    Would you equate a clarifier with

24   a sludge collection mechanism?  Are they one and
```

Highly Confidential - Michael B. Glasgow

```
 1   the same --
 2           A.    Yes.
 3           Q.    -- or are they different?
 4                 One and the same?
 5           A.    No, they could be one and the
 6   same.
 7           Q.    What was the condition of the
 8   clarifiers?
 9           A.    The clarifiers, other than the
10   weirs, I thought were okay.
11           Q.    What was the --
12           A.    Sludge --
13           Q.    I'm sorry.
14           A.    Oh, go ahead.  I'm sorry.
15                 No, I was going to say I don't
16   really recall any issues with the sludge
17   collecting systems, that and the clarifier
18   itself.
19           Q.    What do you remember about the
20   condition of the concrete walls and floors in
21   the north and south basins?
22           A.    I'm trying to picture, and I don't
23   really recall much.
24           Q.    What do you remember about the
```

1    chemical feed systems, the condition of them?

2         A.    Yeah, I know the chemical feed

3    systems that were going into the clarifier and

4    the softening process, they were -- they were

5    not really functional.  I remember running tubes

6    along the floor.  You know, we had some kind of

7    halfway fabbed polymer lines running to the

8    clarifiers when we first started.

9         Q.    I know you didn't utilize soda

10   ash, but did you have the capacity to use soda

11   ash?

12        A.    There was some old equipment

13   around there that we used prior to the '70s I

14   think when they softened and used water that

15   were there.  I had never seen them in operation

16   in my time there.

17        Q.    So you don't know whether they

18   were functional?

19        A.    I don't believe they were

20   functional.  I wouldn't have put any money on

21   it.

22        Q.    Was part of the flow bypassing the

23   coagulation basins?

24        A.    Yes, at times.

Highly Confidential - Michael B. Glasgow

```
1              Q.     And why would that be so?  What
2     was the reason for that?
3              A.     The reason for that is -- well, to
4     be honest, my reasoning is I didn't really want
5     to soften the water.  It was a headache.  And
6     with my untrained staff, topped by such a
7     dynamic process that changes was kind of a pain.
8                     So we would bypass some of the
9     softening just in the event something happened
10    and we were still treating water and getting
11    water out.  But softening was mainly because I
12    didn't want to soften the water.
13             Q.     And you didn't want to soften
14    water why?
15             A.     For numerous reasons.  But number
16    one is my staff and the lime softening process
17    and the way our plant was set up was not -- not
18    ideal in my eyes.  Softening to me -- softening
19    the water is just an aesthetic.  There's no
20    regulations on that.  And I thought it would be
21    better for me and my staff if we didn't soften,
22    because in our prior test runs, we didn't
23    practice softening.  And on top of that, we
24    would send out hard water, which usually
```

Highly Confidential - Michael B. Glasgow

 1    wouldn't cause as much problem in the pipes in

 2    my eyes.

 3         Q.    Okay.  How did you control the

 4    volumes of the flow --

 5         A.    Where?

 6         Q.    -- bypassing or following the

 7    system as designed?

 8         A.    It was a simple valve.  We had

 9    flow meters, and we could adjust valves to try

10    to divert the amount of water we wanted to

11    divert around softening.

12         Q.    Was it a separate physical conduit

13    that passed the water?

14         A.    Yes.

15         Q.    Did that bypass operation impact

16    the pH of the water?

17         A.    Yes, it would.

18         Q.    How?

19         A.    It would actually raise the pH a

20    little.  We would use less carbon dioxide.  The

21    river water was kind of a high pH anyway,

22    usually above 8, and our softening, we'd get the

23    pH up to 12, but then mix it back together and

24    add carbon dioxide to bring that pH down.  It

Highly Confidential - Michael B. Glasgow

1    would -- it would utilize less carbon dioxide to

2    mix like that.

3         Q.    So in the late fall of 2015, early

4    2016, you put in place a phosphate feed for the

5    system?

6         A.    Correct.  Yes.

7         Q.    Can you describe that for us?

8         A.    Yeah, somewhat.  I mean, it was a

9    pretty simple system, a couple feeders.  When we

10   originally installed it, we didn't have the full

11   capacity to hold our 30-day supply of chemical

12   like we would usually be required, but it was

13   kind of get it up and going as fast as we could.

14         We used a garage bay to house the

15   equipment and kind of foam insulated all the way

16   in from what I recall, and then pipe it right

17   into our plumbing.  I don't know --

18         Q.    What was the capital cost for that

19   system?

20         A.    I can't remember.  Maybe a couple

21   hundred thousand dollars, but my memory is kind

22   of jogged from all the years.

23         Q.    Okay.  What was the annual cost

24   for the phosphate chemicals?

Highly Confidential - Michael B. Glasgow

```
 1          A.    It was pretty insignificant to the

 2    rest of the stuff.

 3          Q.    What is that?  Everybody here

 4    wants to know what insignificant is in the

 5    measure of the city of Flint.

 6          A.    Yeah, it's hard to say.  I'm going

 7    to say a couple hundred thousand dollars a year.

 8          Q.    Okay.  So -- and was the phosphate

 9    that was selected orthophosphate?

10          A.    Yes.

11          Q.    So orthophosphate ultimately put

12    in place by the city of Flint late fall of 2015,

13    early 2016, the combined cost of the capital

14    outlay and the annual cost of the chemicals,

15    400,000 bucks?

16          A.    Yeah, roughly.

17          Q.    So if that 400,000 bucks were

18    spent back prior to April of 2014, a lot of the

19    problems we're talking about wouldn't have

20    existed, right?

21               MR. MARKER:  Objection; form

22          foundation.

23               MR. KIM:  Objection.

24          A.    Possibly, yeah.
```

Highly Confidential - Michael B. Glasgow

```
 1              Q.    In one of the days of testimony --
 2    I can find it, if need be.  But you referenced
 3    the EPA coming into your plant -- and I took it
 4    to mean late 2015, but I could be wrong.  And I
 5    will find it if need be.  You reference the EPA
 6    coming into your plant and putting in place a
 7    pipe loop system.
 8              Do you remember testifying to
 9    that?
10         A.    Yes, I do.
11         Q.    When was that?
12         A.    Well, I'm trying to think when
13    that was.  I don't know that I can put a
14    specific date on there or even a month for you.
15    It seemed like it was late in 2015.
16         Q.    Was it right on the cusp of going
17    back to the city of Detroit?
18         A.    It seems like it was.  I don't
19    think they were installed until after the switch
20    had been made back to the Detroit water.
21         Q.    Who from the EPA came into your
22    facility and put in place pipe loops?
23         A.    I don't know if I can remember the
24    name.  Darrell.
```

Highly Confidential - Michael B. Glasgow

```
 1          Q.    Darrell Lytle?

 2          A.    Lytle, yep.

 3          Q.    L-y-t-l-e.

 4          A.    Yep.

 5          Q.    Did you come to know that Darrell

 6   Lytle and Michael Schock were two of the

 7   premiere lead and copper scientists for the EPA?

 8          A.    Yes.  I come to know that as time

 9   went on and was able to gain a lot of knowledge

10   from them.

11          Q.    Okay.  So Michael Schock -- maybe

12   not Darrell Lytle, but Michael Schock was

13   recommended as an EPA consultant to the city of

14   Flint and to the DEQ back in February of 2015.

15                Do you remember that?

16                MR. KIM:  Objection as to

17          foundation.

18          A.    Vaguely, yes.

19          Q.    Okay.  Well, we'll get to it.

20                In any event, can you describe for

21   us what you observed about this pipe loop system

22   that Mr. Lytle put in place?

23          A.    Yes.  It was just a -- I don't

24   want to call it too elaborate, but basically a
```

Highly Confidential - Michael B. Glasgow

1   big wall with just sections of pipe you could

2   put in and run your treated water through, and

3   then you could take the pipe off, observe any

4   effects that happened to the pipe, so ...

5          Q.    Did you come to understand that

6   the pipe loops system was a way to test and

7   evaluate the impact of the water on the

8   distribution system?

9          A.    Yes.

10          Q.    Was the pipe loop system -- was

11   the pipe loop testing discussed prior to April

12   of 2014?

13          A.    No.  My first recollection was

14   talking with Mr. Lytle about it.

15          Q.    Do you remember that LAN and

16   Warren Green recommended pipe loop testing back

17   in 2013?

18          A.    No, I do not recall that.

19          Q.    In any event, you are 100 percent

20   confident that no pipe loop testing was

21   performed prior to Mr. Lytle of the EPA showing

22   up right on the cusp of the change back to

23   Detroit for water?

24               MR. MARKER:  Objection; form.

Highly Confidential - Michael B. Glasgow

```
 1          A.    Yes.

 2          Q.    I referenced powdered activated

 3   carbon at the treatment plant before.

 4                Do you remember that?

 5          A.    Yes.

 6          Q.    When was the decision made to

 7   eliminate that, and who made it?

 8          A.    I don't recall ever discussing it,

 9   to be honest with you.  I think years ago they

10   had an old powdered activated carbon set up

11   there, but it hadn't been touched in 20 or 30

12   years.

13          Q.    So it was before your time?

14          A.    Yes.

15          Q.    Do you know what alternative

16   treatment was put in place to replace the

17   powdered activated carbon?

18          A.    No, I do not.

19          Q.    Prior to ferric chloride, the

20   water treatment plant was using alum, correct?

21          A.    Yeah, I'm unaware.

22          Q.    Is that before your time as well?

23          A.    That was before my time as well.

24          Q.    So you don't know the reasons of
```

Highly Confidential - Michael B. Glasgow

1    why the switch was made from alum to ferric

2    chloride?

3          A.    No, I can't.

4          Q.    And I think I mentioned SEG

5    before.  You never read their report?

6          A.    No.

7          Q.    When VNA -- when Veolia North

8    America came in in February of 2015, one of

9    the -- it made a series of recommendation to the

10   water treatment plant -- or the city of Flint,

11   one of which was to increase the dosage of

12   ferric chloride.

13               Do you remember that?

14         A.    Yes.

15         Q.    And that recommendation was not

16   followed, was it?

17         A.    No, not --

18         Q.    Do you know why?

19         A.    Not apparently -- no, I can't -- I

20   can't say why.

21         Q.    Do you know who made the decision?

22         A.    I can't say.

23         Q.    Would that be the higher-ups?

24         A.    Most likely, yeah.

Highly Confidential - Michael B. Glasgow

```
 1          Q.    Was it done for money?

 2                MR. KIM:  Objection as to form and

 3          foundation.

 4                MR. MARKER:  I'll join.

 5          A.    A lot of things I wasn't privy to

 6    I hate to say.

 7          Q.    One of the --

 8                MR. CAMPBELL:  Mark that as the

 9          next exhibit.

10                      - - -

11      (Glasgow Deposition Exhibit 15 marked.)

12                      - - -

13                MS. DEVINE:  This is

14          COF-FED_0628049.

15                MR. KIM:  This is Number 15?

16                MS. DEVINE:  Yes.

17    BY MR. CAMPBELL:

18          Q.    I'm really going to direct your

19    attention to pages 9 and 10.

20          A.    Okay.

21          Q.    "Conclusions and Next Steps."

22          A.    Okay.

23          Q.    So if you look at the bottom of --

24    in the table that is present there, go from one
```

Highly Confidential - Michael B. Glasgow

1    page to the next.  Really step priority 2 is the

2    one that I'm going to be asking you about.

3                   Have you had chance to see that?

4         A.    Yep, been glancing over it here.

5         Q.    This is the executive summary of

6    the water quality report dated March 12, 2014

7    from Veolia North America to the city of Flint.

8    And it's actually addressed to Emergency Manager

9    Jerry Ambrose.  You see that on page 1, I guess

10   it is.

11                  First question:  Did you get a

12   copy of this?  Did you see a copy of this?

13        A.    Not until months -- excuse me.

14                  Not until months later when I

15   asked Mr. Daugherty Johnson to give me a copy.

16        Q.    Okay.  So eventually you saw it?

17        A.    Eventually, yeah.  I think it was

18   summer of that '15.

19        Q.    Okay.  So in the transactional

20   period, when Veolia North America was delivering

21   this off to Mr. Ambrose, you were not party to

22   it?

23        A.    Correct.

24        Q.    You asked your boss, Duffy

Highly Confidential - Michael B. Glasgow

```
 1    Johnson, for a copy sometime in the summer of

 2    '15?

 3         A.    Yeah, as it got closer to

 4    summertime, yes.

 5         Q.    What motivated you to ask for a

 6    copy of it then?

 7         A.    Just that I would hear certain

 8    recommendations that Veolia had made, but I had

 9    never seen the report.

10         Q.    Okay.

11         A.    Figuring I'm the --

12         Q.    Do you know why your superiors

13    didn't provide you with a copy of this executive

14    summary?

15         A.    I could not tell you.  It was kind

16    of hush hush the whole time Veolia was in town.

17         Q.    If you look at the first

18    priority -- the first sentence of the first

19    priority, number 1, priority number 1, it reads,

20    "Implement operating programs for process

21    control, lab, quality assurance/quality control,

22    maintenance, and training."

23              Do you see that?

24         A.    Yes.
```

1    Q.    That's totally consistent with

2    what you were saying before the switch over to

3    the Flint River, isn't it?

4    A.    Yes.

5    Q.    It's basically saying that you

6    needed to upgrade your staff significantly to

7    run this plant properly, correct?

8    A.    Correct.

9    Q.    But you didn't learn that VNA,

10   Veolia North America, made that its very first

11   recommendation to the city until the summer of

12   2015?

13   A.    Correct.

14   Q.    If you look at the second

15   priority, and go down to -- it's the third

16   paragraph on the top of the next page.

17          It reads, "Contract with your

18   engineer and initiate discussions with the state

19   on the addition of a corrosion control chemical.

20   This action can be submitted and discussed with

21   the state at the same time as the other chemical

22   and filter changes saving time and effort.

23          "Our target dosage of

24   0.5 milligrams per liter phosphate is suggested

Highly Confidential - Michael B. Glasgow

```
 1   for approved corrosion control."

 2              Did I read that correctly?

 3        A.    Yes, you did.

 4        Q.    When did you hear about that

 5   recommendation?

 6        A.    It would have been -- yeah,

 7   probably late summertime of '15 once we started

 8   the design to install.

 9        Q.    Did you ever learn that Warren

10   Green of LAN on learning about that

11   recommendation for engaging the engineer -- the

12   city's engineer and having discussions with the

13   state about corrosion control and which chemical

14   offered to undertake that task?

15        A.    I was not aware.

16        Q.    Who was the primary contact

17   between Warren Green and the city of Flint?

18        A.    I would have to say either

19   Mr. Johnson or Mr. Croft.

20        Q.    Okay.

21                    - - -

22       (Glasgow Deposition Exhibit 16 marked.)

23                    - - -

24              MS. DEVINE:  COF_FED_0391706,
```

1          Exhibit 16.

2     BY MR. CAMPBELL:

3          Q.    Have you seen this press release

4     before?

5          A.    Yes.

6          Q.    Did you come to know that the city

7     of Flint actually created a couple of different

8     committees or task forces related to the

9     drinking water problems that existed at the

10    time?

11         A.    Yes, I was aware.

12         Q.    Were you a member of either one or

13    both of those task forces?

14         A.    I was a member on one of them.

15         Q.    Do you remember which one you were

16    a member of?

17         A.    I couldn't tell you.  To be honest

18    with you offhand, it's been a few years now.

19         Q.    Does this January 16, 2015 press

20    release square with your understanding of the

21    timing of when those task forces were put in

22    place?

23         A.    Yes.

24         Q.    So mid to late January 2015?

Highly Confidential - Michael B. Glasgow

```
 1              A.    Yes.

 2                         - - -

 3       (Glasgow Deposition Exhibit 17 marked.)

 4                         - - -

 5              MS. DEVINE:  COF-FED_0028974.

 6   BY MR. CAMPBELL:

 7              Q.    Have you had a chance now to see

 8   this document?  It's a very short e-mail.

 9              A.    Yes.

10              Q.    And it's from your boss,

11   Mr. Croft.  I don't see you on there, but

12   Mr. Prysby, Mr. Busch, Warren Green, and Joan

13   Rose of Michigan State is on there.

14                   Do you see that?

15              A.    Yes.

16              Q.    Did you come to know that Joan --

17   Professor Joan Rose was one of the participants

18   in one or more of the task forces related to the

19   Flint drinking water problem?

20              A.    Yes, I was.

21              Q.    What did you learn about Joan

22   Rose?

23              A.    Well, I've got to stimulate my

24   memory here.  Not a lot is coming to me.  She
```

Highly Confidential - Michael B. Glasgow

```
 1   just seemed -- it seemed like she was more of a

 2   microbiologist-type and dealing with different

 3   issues that we had related -- it seemed like I

 4   remember Howard bringing her in in regards to

 5   residents' inquiries about rashes and itchy skin

 6   and -- so I do remember her at one of these

 7   meetings.  I didn't have a lot of interaction

 8   with her, but ...

 9          Q.   Did you come to know that

10   Professor Rose is one of the leading authorities

11   in the world on public drinking water?

12          A.   I knew she was -- she come in very

13   high regard, so I will say that.

14               MR. CAMPBELL:  Could you mark this

15          as the next exhibit.

16               MS. DEVINE:  COF_FED_0175479.

17                    - - -

18      (Glasgow Deposition Exhibit 18 marked.)

19                    - - -

20   BY MR. CAMPBELL:

21          Q.   So Exhibit 18 is a copy of an

22   e-mail from Professor Rose to Howard Croft, the

23   mayor of Flint, Jerry Ambrose, Elizabeth Murphy.

24               Who is she?
```

Highly Confidential - Michael B. Glasgow

```
 1            A.    She was an assistant to the

 2    emergency manager or something like that.

 3            Q.    Duffy Johnson, and someone else at

 4    MSU.  I don't recognize the name.

 5            A.    I don't recognize that either.

 6            Q.    All right.

 7            A.    Sorry.

 8            Q.    If you take a look at this e-mail

 9    from Professor Rose to Howard Croft, in the

10    second paragraph she writes, "I definitely think

11    more testing for hardness, iron, TDS, E. coli,

12    maybe lead from people who are having aesthetic

13    issues is needed."

14                  Do you see that?

15            A.    Yes.

16            Q.    Did Mr. Croft or Mr. Ambrose

17    provide this e-mail to you --

18            A.    No.

19            Q.    -- at the time?

20                  Did you learn that Professor Rose

21    was recommending testing for lead in January of

22    2015?

23            A.    No, I never did.  I never was

24    aware of that.
```

 1          Q.    That's something that would have

 2    been of interest to you, right?

 3          A.    Absolutely.

 4          Q.    Because it wasn't -- it wasn't 30

 5    days later that you were generating test results

 6    from LeeAnne Walters' house showing extremely

 7    high lead content, right?

 8                MR. MARKER:  Objection to form.

 9          A.    Right.  Correct.

10          Q.    And one of the things that you

11    observed from early on after the switch to the

12    Flint River as the raw water source in terms of

13    complaints from the customers in Flint was that

14    many of them -- maybe not all, but many of them

15    were complaining about the color of water --

16          A.    Yes.

17          Q.    -- as being yellow or brown?

18          A.    Correct.  Yep.

19          Q.    And some of them complained about

20    sediment in the water, didn't they?

21          A.    Yes.

22          Q.    And you -- when you saw those

23    complaints about miscolored water, yellow or

24    brown, with sediment, you took that to be an

Highly Confidential - Michael B. Glasgow

1    indication that corrosion was underway, correct?

2              MR. MARKER:  Objection to the form

3         of the question.

4         A.    Yeah, I'm going to say over time I

5    took it that way.

6         Q.    Okay.

7         A.    Discolored water and rusty water

8    wasn't out of the ordinary prior to the switch

9    either.

10             MR. CAMPBELL:  I've got -- this

11        one doesn't have a Bates number on it.

12        I don't know why, but I've got a couple

13        extra copies I can pass around.

14             MS. DEVINE:  I can e-mail it to

15        you.

16                  - - -

17        (Glasgow Deposition Exhibit 19 marked.)

18                  - - -

19             MR. CAMPBELL:  What's this number

20        here?

21             MS. DEVINE:  It's 5-09-2016

22        SOM0044352.  It's not a Bates on the

23        actual document.

24             MS. COLLINS:  Can you read that

Highly Confidential - Michael B. Glasgow

1          one more time?

2              MS. DEVINE:  It's 05-09-2016

3          SOM0044352.

4              MR. KIM:  Exhibit 19 or Exhibit

5          20?

6              MR. CAMPBELL:  19.

7     BY MR. CAMPBELL:

8          Q.   You've had a chance to scan that,

9     Mr. Glasgow?

10         A.   Yep.

11         Q.   On the first page of this exhibit,

12    Professor Rose identifies herself as a public

13    health water microbiologist and the Homer Nowlin

14    Chair in water research at Michigan State.

15             Do you see that?

16         A.   Yep.

17         Q.   She makes reference in the second

18    paragraph to Dr. Marc Edwards' proposal and

19    methods and results for lead.

20             Do you see that?

21         A.   Yes.

22         Q.   And Marc Edwards came out with his

23    proposals -- and I think I've shown you his

24    PowerPoint -- sort of at mid to end of

Highly Confidential - Michael B. Glasgow

1    September 2015; is that about right?

2          A.    Yeah, that sounds right.

3          Q.    If you look at the bottom of

4    page 1, Professor Rose reports -- and she puts

5    it in bold.  "It has been well documented that

6    when one changes the source water, one can

7    change the quality of the finished water at the

8    tap due to the chemical, biological, and

9    physical conditions of the distribution system."

10               Do you see that?

11         A.    Yes.

12         Q.    That's something that the city of

13   Flint knew prior to April of 2014, correct?

14               MR. KIM:  Objection as to

15         foundation.

16               MR. MARKER:  I'll join.

17         A.    Yeah.  I don't -- I will say the

18   information is out there.  Whether the city of

19   Flint knew it --

20         Q.    Well, how about you?  You knew

21   that, didn't you?

22         A.    We had an idea.

23         Q.    If you change the raw water

24   source, stuff can happen, right?

Highly Confidential - Michael B. Glasgow

```
 1          A.    Things can change, yep.

 2          Q.    It was not a secret, was it?

 3          A.    No.

 4          Q.    And was it something that was

 5   discussed with Busch, Prysby, Cook,

 6   Shekter-Smith, and professional engineers at DEQ

 7   before the switch in April of 2014?

 8                MS. COLLINS:  Objection; form

 9          foundation.

10          A.    Not that I can recall.

11          Q.    And if you look at the bottom of

12   page 3, she has the numbered paragraph 3, headed

13   "What water quality testing should be done?"

14                Do you see that?  Page 3.  It's

15   not a number.  You have to --

16          A.    Okay.  Yep.

17          Q.    Way down at the bottom.

18          A.    Uh-huh.

19          Q.    "What water quality testing should

20   be done?"

21                Do you see that?

22          A.    Yes.

23          Q.    And then if you look at the bottom

24   paragraph, it reads, "The water testing in Flint
```

 1   needs to be diagnostic, not focused on a

 2   regulatory goal.  This means more extensive

 3   testing is needed to identify the issues and

 4   problems.

 5             "I stated in an e-mail January 22,

 6   2015 to Mr. Howard Croft, the mayor, and other

 7   officials 'I definitely think more testing for

 8   hardness, iron, TDS, E. coli, maybe lead from

 9   people who are having aesthetic issues is

10   needed.'

11             "Added to this list would be

12   corrosivity, heterotopic bacteria, and

13   Legionella."

14             Do you see that?

15        A.   Yes.

16        Q.   Was there ever a discussion of the

17   task forces about Dr. Rose's recommendation for

18   additional testing as she described it in

19   January and then again in October?

20        A.   Not that I can recall.

21        Q.   So that recommendation was just

22   essentially ignored?  It fell through the

23   cracks?

24             MR. MARKER:  Objection; form,

Highly Confidential – Michael B. Glasgow

1          foundation.

2          A.    It never made it to me, I can tell

3     you that.

4          Q.    Did you come to know that by

5     February 9 of 2015, the Environmental Protection

6     Agency had been contacted by the White House

7     about Flint drinking water problems?  Let me

8     restate that.

9               Did you come to know in February

10    of 2015 that the White House, the President of

11    the United States, was expressing concern about

12    the drinking water problem in Flint, Michigan?

13         A.    I do not recall.  I don't recall

14    that.

15         Q.    Do you have the exhibit showing

16    the LeeAnne Walters' analysis, February 24,

17    2015?

18               MR. MARKER:  It's an e-mail; is

19          that right?

20               MR. CAMPBELL:  Yeah, it's an

21          e-mail string.

22               MR. MARKER:  Number 10?

23               MR. CAMPBELL:  That's probably it.

24

Highly Confidential - Michael B. Glasgow

1   BY MR. CAMPBELL:

2          Q.    Can you -- you have Exhibit 10 in

3   front of you, and it references 2128 Browning

4   Avenue.  That's LeeAnne Walters' house?

5          A.    Correct.  Yes.

6          Q.    Okay.  Can you tell us how she

7   came in contact with you?

8          A.    Yeah.  She had been calling -- I

9   believe she had been in contact with Mr. Croft a

10  couple times in regards to discoloration in her

11  water.

12          So Mr. Croft finally called me

13  about that.  So I made myself available to go

14  see Ms. Walters and take samples from her house

15  and try to determine what her issue was.

16          Q.    How many times did you go to her

17  house?

18          A.    Oh, probably a good half dozen at

19  least.  I got to know her and her family pretty

20  well.

21          Q.    She had a couple of young kids?

22          A.    Yes.  Yep, two young boys.

23          Q.    At least one of whom ultimately

24  who suffered some physical injuries that she

Highly Confidential - Michael B. Glasgow

```
 1    alleges were connected to the drinking water?

 2          A.    Correct.

 3          Q.    That's something you came to learn

 4    about through her communications?

 5          A.    Yes.

 6          Q.    But in any event, LeeAnne Walters

 7    was evidently concerned about her drinking water

 8    sufficiently to ask for help from the city of

 9    Flint, right?

10          A.    Correct.  Yep.

11          Q.    Do you know that she also asked

12    for help from the Environmental Protection

13    Agency?

14          A.    Yes, I do know that.

15          Q.    Did you know that she was asking

16    for help from the Environmental Protection

17    Agency at the same time that she was asking for

18    help from the city of Flint?

19          A.    Yes, I did.

20          Q.    That wasn't unreasonable of her to

21    ask for help, was it?

22          A.    No, I don't think so.

23          Q.    It wasn't unreasonable of her to

24    be concerned about the physical well-being of
```

Highly Confidential - Michael B. Glasgow

1    her children and herself from drinking water,

2    was it?

3            A.    No, not at all.

4            Q.    I asked you earlier about the

5    city's and the MDEQ's duty and responsibility to

6    the citizens of Flint about hazards in drinking

7    water.

8                 Do you remember that?

9            A.    Yes, I do.

10           Q.    So when a citizen like LeeAnne

11   Walters expresses concern about the physical

12   well-being of her children and herself from

13   drinking water, is that something that you, the

14   city of Flint, and the MDEQ are duty bound to

15   address; isn't that right?

16                MR. MARKER:  Objection; form.

17                MS. COLLINS:  Objection; form,

18           foundation.

19           A.    And I will say yes.  I personally

20   felt like I had a duty to investigate a little.

21           Q.    And you did?

22           A.    Yes.

23           Q.    And your investigation involved

24   multiple tests of her drinking water, correct?

Highly Confidential - Michael B. Glasgow

```
 1          A.    Correct.  Yep.

 2          Q.    Explain how you performed the

 3    tests.

 4          A.    Well, originally when I went

 5    there, it was kind of like a normal I'll say

 6    standard operating procedures for myself, or lab

 7    staff, that I would send out to a complaint like

 8    this, was to test for chlorine and coliform

 9    bacteria, something we had easy access to, and

10    our lab was certified for.

11              And in any event of discolored

12    water, a lot of times I would make a call to

13    Mr. Bincsik's crew and "Hey, let's flush some

14    fire hydrants to see if we can get this rusty

15    water out of the way."

16              So when I first met Ms. Walters,

17    she was very worried and concerned.  I wanted to

18    try to alleviate that and try to help her as

19    best I could.  So we took a few samples out

20    of -- seemed like a toilet tank for different

21    metals.  And she just wasn't -- she wasn't sure

22    what could be causing issues with one of her

23    children.

24              So my first -- first, I guess,
```

Highly Confidential - Michael B. Glasgow

1  visit there, like I said, it was kind of the

2  standard operating procedure to get a bacteria

3  sample, try to get a chlorine number.  Called

4  Mr. Bincsik to flush the hydrants.  Told her I'd

5  be back a few days later to see if anything has

6  changed.

7           So then a second time I went back,

8  still had the issue of rusty water, and that's

9  when I left her with a lead and copper sample

10  bottle.  This to me was kind of my first inkling

11  that we could have an issue around here.

12           So I left her with a lead and

13  copper sample bottle, DEQ instructions how to

14  collect the sample, and told her to call me the

15  next day when the sample is ready, and I'll send

16  it to the lab.

17           So I did that.  Took a day or two

18  to get the results back.  Might have taken three

19  or four days.  I can't really remember.

20           As soon as I got the results back.

21  I seen that 104 part per billion level.  So I

22  immediately called Ms. Walters.  Told her to

23  make sure the kids aren't drinking any of the

24  water.

Highly Confidential - Michael B. Glasgow

1    Q.    Why did you tell her that?

2    A.    Well, that's a -- that's a high

3    level of lead in the water.

4    Q.    Because you recognized it as a

5    potential cause of serious injury to children?

6    A.    Absolutely, yeah.

7    Q.    So you felt compelled --

8    A.    Absolutely.

9    Q.    -- to inform her of that hazard,

10   right?

11   A.    Yes, right away.  Yep.  So as a

12   follow up, I told her I wanted to take another

13   sample, because I've never seen a level this

14   high in all the samples that had been collected

15   in the city, so -- also, we did a walk-through

16   through her house.

17            You know, usually you do a little

18   bit of investigation to what type of piping they

19   have, if they have filters on their lines.

20   Q.    One of the things you observed

21   about the inspection of her house was that she

22   had all new plumbing fixtures in her house?

23   A.    Yeah, it was all new plumbing

24   fixtures.

Highly Confidential - Michael B. Glasgow

1      Q.    And all of the internal plumbing

2  was PVC, right?

3      A.    It was plastic, correct.  Yes.

4      Q.    So you made reference to the fact

5  that she had a water filter system?

6      A.    Yes.

7      Q.    Where was that connected, and what

8  was it?

9      A.    It was just a simple filter to

10  remove iron.

11      Q.    At the tap?

12      A.    No.  It was in her basement, not

13  far from where the waterline come into her

14  house.  So she had showed me that.

15      Q.    Did she make -- did she tell you

16  that she was continuously finding the need to

17  repair -- replace or clean the filter?

18      A.    Yes.  She was having to clean it

19  very frequently in just a couple of days,

20  sometimes not even a day.

21      Q.    What did you take from that?

22      A.    Well, there's a lot of rust coming

23  in that line from somewhere.  So I'm immediately

24  starting to lean towards her service line as the

Highly Confidential - Michael B. Glasgow

1    issue.

2            Q.    So you took it to mean that the

3    filter was clogging with sediment --

4            A.    Yes.

5            Q.    -- flowing in from raw water --

6    from water?

7            A.    Correct.  Yes.  And it was looking

8    to me like iron, like rust, like we're seen

9    before in parts of the city.  So I knew it

10   wasn't coming from inside her house.

11           Q.    Did you come to learn that

12   eventually she had water samples taken from her

13   house after the filtration system was removed?

14           A.    I'm sorry.  Could you say that

15   again?

16           Q.    Sure.  You took a -- you took a

17   sample from her, found a result of 104 parts per

18   billion.  The system had a filtration system on

19   it at the time that you took the sample, right?

20           A.    Correct.  Yes.

21           Q.    You didn't disassemble that?

22           A.    Well, that was the time -- yeah,

23   because I didn't take the sample.  She had to

24   take the sample herself following with the rules

Highly Confidential - Michael B. Glasgow

```
 1    of taking lead and copper samples, but yeah, she

 2    had --

 3            Q.    So your belief -- your assumption

 4    is that the filtration system was in place when

 5    she took that sample?

 6            A.    When she took that original one,

 7    yeah.

 8            Q.    Okay.  So despite the presence of

 9    the filtration system, the lead result was over

10    the moon?  It was huge?

11            A.    Yes.

12            Q.    Did you ever come to learn that

13    additional tests were taken from her house, from

14    her water without the filtration system in

15    place?

16            A.    Yes.

17            Q.    Did you come to learn that the

18    lead results were even higher?

19            A.    Yes.

20            Q.    So you took another test and got a

21    result of 397 parts per billion?

22            A.    Correct.

23            Q.    Was that with or without a

24    filtration system?
```

Highly Confidential - Michael B. Glasgow

1        A.    I believe I told her to take that

2   without, but it's kind of hard for me to

3   remember now.

4        Q.    And then I think I mentioned to

5   you before that later test results showed lead

6   over 700 part per billion, and one taken by the

7   EPA over 13,000 parts per billion.

8             Do you remember that?  Do you

9   remember learning about that?

10       A.    Yes, I do.

11       Q.    Okay.  So eventually in the summer

12  when you're going to undertake monitoring,

13  you're going to produce results of monitoring

14  for lead and copper at the instruction of the

15  DEQ, you were told by Mr. Busch and Mr. Prysby

16  to remove the LeeAnne Walters' test results,

17  weren't you?

18            MS. COLLINS:  Objection; form and

19            foundation.

20       A.    Yes.  The original one of 104,

21  yes.

22       Q.    Okay.  Did that kind of raise an

23  eyebrow with you?

24       A.    A little bit, it did.  But then,

Highly Confidential - Michael B. Glasgow

1     again, I did know in the Lead and Copper Rules

2     that there's not supposed to be a point of use

3     filter or any filter on the system.

4          Q.   Well, that's what I'm getting to.

5     I can envision a regulator saying, "Don't

6     utilize test results for lead and copper on a

7     system that has a filter, because the lead and

8     copper results might be lower than you otherwise

9     would get if there were no filter."  Right?

10         A.   Correct.

11              MS. COLLINS:  Objection; form.

12              MR. KUHL:  Objection to form and

13         foundation.

14         Q.   Here you've got a filter in place

15    and the lead results are way out of whack.  Why

16    would you not include that in your lead and

17    copper test results or monitoring test results?

18              MR. KUHL:  Objection to form and

19         foundation.

20              MR. MARKER:  I'll join.

21         A.   I included it with my report when

22    I sent it.

23         Q.   Yeah, but Prysby and Busch nixed

24    it, right?

Highly Confidential - Michael B. Glasgow

```
 1              MR. KUHL:  Objection to form.

 2              MS. COLLINS:  Objection to

 3         foundation.

 4         A.   On a conference call a few days

 5    after that report was submitted, they asked me

 6    to remove that and one other number.

 7         Q.   So it doesn't make sense, does it,

 8    Mr. Glasgow, to eliminate a lead and copper test

 9    result that is extremely high despite the

10    presence of a filter?  It suggests a significant

11    problem, doesn't it?

12              MR. KUHL:  Objection to form.

13         A.   It did in my eyes, yes.

14         Q.   Okay.  And you made your views

15    known to Mr. Busch and Mr. Prysby?

16         A.   Yes.

17         Q.   Your views were not followed,

18    correct?

19         A.   I don't believe so.

20                   - - -

21      (Glasgow Deposition Exhibit 20 marked.)

22                   - - -

23              MS. DEVINE:  4-15-2016 SOM0007015.

24
```

Highly Confidential - Michael B. Glasgow

```
 1   BY MR. CAMPBELL:

 2          Q.    Have you had a chance to look at

 3   it?

 4          A.    Yeah, I've glanced at it.

 5          Q.    If you look from the back to the

 6   front, you'll see that the document includes

 7   some e-mails that you sent to LeeAnne Walters.

 8   She then forwarded those e-mails to the

 9   Environmental Protection Agency, Jennifer

10   Crooks.

11                Do you see that?

12          A.    Okay.

13          Q.    And then Jennifer Crooks forwarded

14   that information on to Mr. Busch and Mr. Prysby,

15   with copies to her colleagues, Tom Poy and

16   Miguel Del Toral.

17                Do you see that?

18          A.    Yes.

19          Q.    And eventually you met or spoke

20   with Miguel Del Toral, didn't you?

21          A.    Yes, I did.  I spoke with him

22   early on, not long after meetings Ms. Walters.

23          Q.    Okay.  So it appears from this

24   exchange of information that no later than
```

Highly Confidential - Michael B. Glasgow

1    February of 2015, the EPA, the MDEQ, and the

2    city of Flint were aware of very significant

3    lead findings in LeeAnne Walters' house, no

4    later than that, right?

5         A.    Correct.  Yep.

6         Q.    If you turn to the second page.

7    There's an e-mail from Jennifer Crooks to Busch

8    and Prysby where she's informing Mr. Busch and

9    Mr. Prysby about the lead findings at LeeAnne

10   Walters' house.  She references you and she

11   references black sediment in her water.

12             Do you see that?

13        A.    Yes.

14        Q.    And she states -- well, first of

15   all, she gives you kudos for doing the job that

16   you did.

17             Do you see that?

18        A.    I do.

19        Q.    Then she goes on to say, "The iron

20   levels were so high, they were at the highest

21   levels that the equipment would record."

22             Do you see that?

23        A.    Yes.

24        Q.    And then she says, "Wow.  Did

1  he -- meaning you -- did he find lead.  104

2  parts per billion.  She has two children under

3  the age of three.  Big worries here."

4            Do you see that?

5       A.   Yes.

6       Q.   And then next paragraph, she

7  references a conversation with Steve Busch where

8  they were talking about the different chemistry

9  in the water as leaching out contaminants from

10  inside of the biofilms inside the pipes.

11            Do you see that?

12       A.   Yes.

13       Q.   And then she references in the

14  last paragraph Professor Rose at Michigan State.

15            Do you see that?

16       A.   Yes, I do.

17       Q.   Now, that then leads me to the

18  last e-mail in sequence where Crooks is sending

19  along to Mr. Prysby, Mr. Busch, Mr. Rosenthal

20  with copies to Miguel Del Toral and Tom Poy

21  observations that Mr. Del Toral made in

22  reference to this communication.  And I'm

23  referencing the third paragraph down.

24            Do you see that?  Do you see the

1    reference to his name?

2           A.    Yes.

3           Q.    And she reports that Del Toral

4    told her that "High levels of iron usually bring

5    high levels of lead.  The large amount of black

6    sediment at Mrs. Walters' home is most likely

7    particulate lead that" -- she goes on to say the

8    lead actually bonds to the iron sediment and

9    that that -- those particulates are usually very

10   highly concentrated with lead up to 95 percent

11   lead.

12                Do you see that?

13          A.    I do, yes.

14          Q.    Then he raises the question

15   through Jennifer Crooks of what Flint was doing

16   by way of optimal corrosion control.

17                "Flint must have optimal corrosion

18   control treatment.  Is it phosphates or is it pH

19   alkalinity adjustment?"

20                Do you see that?

21          A.    Yes.

22          Q.    Do you know what the -- do you

23   know what the response to that was?  Did you --

24   strike that question.

Highly Confidential - Michael B. Glasgow

```
 1                    Did you learn that the EPA through

 2    Crooks and Del Toral in February began to

 3    inquire about the city of Flint's use of optimal

 4    corrosion control treatment?

 5         A.    Yes.

 6         Q.    You did?  You learned about it

 7    then?  How did you learn?

 8         A.    A phone call from Miguel Del

 9    Toral.

10         Q.    So he called you directly?

11         A.    Yes.

12         Q.    What did he say to you?

13         A.    He just asked me if we were adding

14    any phosphates to the water.

15         Q.    And you said no?

16         A.    I said no.

17         Q.    And what did he say?

18         A.    He was a little shocked.

19         Q.    Like "Holy Moly" --

20         A.    Yeah.

21         Q.    -- or words to that effect?

22         A.    He told me he was coming in town

23    to do some sampling of his own after that at

24    Ms. Walters' house.
```

Highly Confidential - Michael B. Glasgow

```
 1          Q.    All right.

 2                     - - -

 3      (Glasgow Deposition Exhibit 21 marked.)

 4                     - - -

 5              MS. DEVINE:  This is

 6          VATECH-00064173.

 7   BY MR. CAMPBELL:

 8          Q.    I'm only going to ask you about

 9   the first e-mail by Mr. Del Toral.  It goes over

10   to like the first line on the second page.

11              Have you had a chance to look at

12   it now?

13          A.    Yep.

14          Q.    This is an e-mail from Del Toral

15   to Jennifer Crooks, but also to Mike Prysby,

16   Steve Busch, Adam Rosenthal, and then some of

17   his colleagues, Tom Poy, Michael Schock, and

18   Andrea Porter.

19              Do you see that?

20          A.    Yes.

21          Q.    And he addresses the chemical or

22   mechanical relationship between corrosion or

23   rusting and absorption of lead in the main

24   paragraph.
```

Highly Confidential - Michael B. Glasgow

```
 1                    But if you look down at the bottom
 2    of the first page, Del Toral raises the
 3    question, "If I remember correctly, Detroit is
 4    feeding PO4" -- that's orthophosphate?
 5          A.    Yeah, correct.
 6          Q.    -- "for the Lead and Copper Rule,
 7    but since Flint is no longer part of that
 8    interconnection, I was wondering what their
 9    optimal corrosion control treatment was.
10                    "They are required to have optimal
11    corrosion control treatment in place which is
12    why I was asking what they are using."
13                    And then in the next page, he
14    makes reference to Michael Schock who is the
15    EPA's expert on lead and lead and copper.  And
16    suggests that the people contact Michael Schock.
17                    This is -- we're still in February
18    of 2015.  From this e-mail, he is inquiring
19    about optimal corrosion control treatment, which
20    he says is required by federal law.  And then he
21    suggests, "Let's get an expert in here, Michael
22    Schock, to assist with the evaluation of the
23    lead."
24                    Do you see that?
```

Highly Confidential - Michael B. Glasgow

```
 1          A.    Yes.

 2          Q.    Were you provided a copy of this?

 3   Did you see a copy of this?

 4          A.    No, I did not see a copy of this.

 5          Q.    Is this the first time you've ever

 6   seen this?

 7          A.    First time I've seen it.

 8                      - - -

 9     (Glasgow Deposition Exhibit 22 marked.)

10                      - - -

11          MS. DEVINE:  October 7, 2019

12          EGLE0126915.

13   BY MR. CAMPBELL:

14          Q.    This is another long e-mail string

15   that includes some of the e-mails that I just

16   showed you.

17                So if you could concentrate on

18   just the first two on pages -- the first page

19   and roll over to the top half of the second

20   page, that would be good.

21          A.    Okay.

22          Q.    Had a chance to look at it?

23          A.    Yeah.

24          Q.    The first e-mail from Crooks to
```

1    Busch and -- to Stephen Busch with copies to

2    others, including Prysby and Rosenthal and

3    Mr. Del Toral, contains an explanation again of

4    the chemistry and mechanics of how lead absorbs

5    onto metallic particles.

6              Do you see that?

7         A.   Yes.

8         Q.   But I really want to address the

9    next paragraph down.  Mr. Busch, Stephen Busch,

10   on February 27 responds to Miguel Del Toral and

11   to Jennifer Crooks providing -- purporting to

12   provide the information that they requested.

13             Do you see that?

14        A.   Yes.

15        Q.   In it, he says, "The city of

16   Flint" -- and if you look at the third bullet

17   point down -- "has an optimized corrosion

18   control program."

19             Do you see that?

20        A.   Yes.

21        Q.   You didn't have an optimized

22   corrosion control program at all, did you?

23             MR. KUHL:  Objection to form and

24             foundation.

Highly Confidential - Michael B. Glasgow

```
 1          A.    Not to my understanding.

 2          Q.    Well, you certainly -- you

 3   certainly didn't have optimized corrosion

 4   control treatment?

 5                MR. KUHL:  Objection to form and

 6          foundation.

 7          Q.    Correct?

 8          A.    Correct.

 9          Q.    Do you know -- were you consulted

10   by Mr. Busch about this response?

11          A.    Not that I recall.

12          Q.    Do you have any knowledge as to

13   why Mr. Busch would throw a curve ball at Crooks

14   and Del Toral with this kind of information?

15                MR. KUHL:  Objection to form.

16                MS. COLLINS:  Objection to form

17          and speculation.

18          A.    No, I do not.

19          Q.    You don't know why Mr. Busch would

20   put forth that information which on its face is

21   false, do you?

22                MR. KUHL:  Objection to form.

23          A.    I do not know why.

24          Q.    And this is the first time you've
```

Highly Confidential - Michael B. Glasgow

1    seen this document?

2           A.   Correct.  Yes.

3                - - -

4    (Glasgow Deposition Exhibit 23 marked.)

5                - - -

6           MR. CAMPBELL:  So I'm sorry.  My

7        copy of this document doesn't have a

8        Bates number on it, but it's Miguel

9        Del Toral's June 24, 2015 report.  All

10       of you have it I'm quite certain.

11          MR. KUHL:  State an objection to

12       using this document.  It's a draft

13       document, not a final document.  I'll

14       object.

15          MR. CAMPBELL:  Okey dokey.

16       Whatever you say.

17          MR. KUHL:  All right then.  We all

18       agree.

19          MR. CAMPBELL:  No, I don't agree.

20       Don't take "okey dokey" to mean I agree

21       with anything you say.

22   BY MR. CAMPBELL:

23          Q.   Have you had a chance to look

24   at -- I know it's a lengthy like six-page

Highly Confidential - Michael B. Glasgow

1   letter.

2          A.   Right.  Yeah.  I've kind of

3   glanced through it here.

4          Q.   Did you get a copy of this at some

5   point in time?  Did you have a chance to review

6   this at some point in time?

7          A.   I believe I have.  I don't really

8   remember much.

9          Q.   It was publicized by the American

10  Civil Liberties Union back in July -- back in

11  June of 2015 and ultimately was forwarded to

12  Marc Edwards.

13              Do you know whether you would have

14  come in contact with this report?

15         A.   I don't know that I would have in

16  that chain of events.

17         Q.   All right.  So in this report,

18  Mr. Del Toral lays out all of the activity that

19  was undertaken by the EPA with respect to

20  Ms. Walters' house.  You'll see that on page 3.

21              And because it's -- it was

22  observed that there were nonmetallic plumbing

23  parts in the house, that couldn't have been a

24  cause for the lead.

Highly Confidential - Michael B. Glasgow

```
1                    Do you see that?
2          A.    Yes.
3          Q.    You ultimately agreed with that,
4    didn't you?
5          A.    Yes, I did.  Yep.
6          Q.    If you look on page 3, the third
7    paragraph down, he makes reference to excavating
8    service lines on May 6.
9                    Do you see that?
10         A.    Yes.
11         Q.    And what he determined -- what
12   they determined by a physical inspection of the
13   service line, that the service line on the
14   owner's side of the stop or valve was galvanized
15   iron, but from the water main to that stop was
16   lead.
17                   Do you see that?
18         A.    Yes.  Yep.
19         Q.    And that is consistent with what
20   you later learned to be the case, right?
21         A.    Yes.
22         Q.    And the way it works out there in
23   the field is that the physical objects from the
24   main to the curb stop, from what's called the
```

1    corp stop to the curb stop, are the property of

2    the city of Flint, right?

3           A.    Correct.  Yes.

4           Q.    And from the curb stop into the

5    house of the property of the property owner?

6           A.    Yes.  Correct.

7           Q.    So the component that was leaching

8    lead in the context of Ms. Walters' case was a

9    piece of lead piping owned by the city of Flint?

10          A.    Correct.  Yes.

11          Q.    Do you see on page 1, down at the

12   bottom, that Mr. Del Toral writes about a major

13   concern from a public standpoint is the absence

14   of corrosion control treatment in the city of

15   Flint for mitigating lead and copper levels in

16   the drinking water?

17                Do you see that?

18          A.    Yes.

19          Q.    And that ultimately was confirmed,

20   right?

21                MR. KUHL:  Objection; form and

22          foundation.

23          A.    I would say so, yes.

24          Q.    There's not too much doubt about

Highly Confidential - Michael B. Glasgow

1    it, is there?

2              MR. KUHL:  Objection to form and

3         foundation.

4         Q.    You ended up believing that to be

5    so, correct?

6         A.    Yes.  Correct.

7         Q.    There was a lot of discussion in

8    the criminal court hearing about the Lead and

9    Copper Rule forms that you filled out?

10        A.    Yes.

11        Q.    Sort of a two-, three-, or

12   four-page form on the front -- on the first part

13   of which you were asked a question and had to

14   fill out a question as to whether or not all the

15   sites were Tier 1 sites, and you answered no?

16        A.    Correct.  Yes.

17        Q.    And then on the following pages,

18   you identified addressees of where the lead and

19   copper tests or sampling was done, and as to

20   each, you identified the plumbing as -- or the

21   service line as lead.

22              Do you remember that?

23        A.    Yes.  Yep.

24        Q.    That had -- those responses had no

Highly Confidential - Michael B. Glasgow

```
1    basis in fact, correct?

2              MR. MARKER:  Objection; form,

3         foundation.

4         A.    I did not have the information

5    necessary to verify all that.

6         Q.    And the whole point of that form

7    was to provide verifiable information to the

8    MDEQ, correct?

9              MR. MARKER:  Objection; form,

10        foundation.

11        A.    I would say yes.

12        Q.    Okay.  I gather you assumed that

13   the MDEQ, which was responsible for reviewing

14   those forms, would see the contradiction in

15   terms between page 1 and the back pages, right?

16        A.    Correct.  Yes.

17        Q.    That was your assumption?

18        A.    Correct.  Yes.

19        Q.    Was the first time that anybody

20   from the MDEQ raised with you that contradiction

21   in July of 2000- -- July 10th of 2015?

22        A.    I believe that issue might have

23   been raised earlier than that with Mr. Prysby.

24        Q.    Give me a date.
```

Highly Confidential - Michael B. Glasgow

1          A.    I'm going to say somewhere around

2     the LeeAnne Walters' time frame.

3          Q.    Whoa.  Back in February and March

4     of 2015?

5          A.    Yes.

6          Q.    Tell us -- I haven't seen those

7     documents.  Tell us about how that came about.

8          A.    Yeah, I'm trying to think.  I

9     think that was when I first notified -- or

10    Mr. Prysby asked me a question in regards to our

11    standard list of -- pulled list of samples for

12    lead and copper monitoring, and asked me if

13    Ms. Walters was on that.

14             And I said no, but now after her

15    results, that I was going to go look for the

16    problem areas and take samples from there so I

17    could really get an idea of what's going on.

18         Q.    How did that exchange lead you to

19    believe that Prysby was aware of the

20    contradiction between how you had filled out

21    page 1 of the form and the ultimate -- and the

22    follow-on pages.  Explain that to us.

23         A.    I just think in the midst of

24    conversation, I know I had reiterated to him the

Highly Confidential - Michael B. Glasgow

1    records, and the pulled list was not at my

2    disposal.  I had asked my supervisors for a list

3    back in early '14, knowing that we had to do

4    increased number of samples.

5              So I reiterated that to

6    Mr. Johnson, Mr. Croft, and never received any

7    list of pulled addresses.

8              So that's when I took it upon

9    myself just to collect samples wherever we could

10   get them.  Mr. Bincsik assured me, you know,

11   80 percent of the service lines are lead.  So

12   throw a dart, and you should be able to find

13   your spots.

14        Q.    It turns out that that's not so,

15   though, right?

16        A.    Yep.  Absolutely.

17        Q.    It turns out less than 30 percent

18   of the service lines are lead in Flint, right?

19              MR. KIM:  Objection as to form and

20         foundation.

21        Q.    You've learned that through the

22   Fast program?

23              MR. KIM:  Object to form and

24         foundation.

Highly Confidential - Michael B. Glasgow

```
 1            A.    Well, yeah.  I've been off for a

 2    long time, so I've been not privy to all that

 3    info.

 4            Q.    In any event, the data on Lead and

 5    Copper Rule reporting is unreliable, correct?

 6                  MR. MARKER:  Objection; form and

 7            foundation.

 8                  MR. KUHL:  Objection; form and

 9            foundation.

10            A.    I'll have to say correct.

11            Q.    If you can't identify the source

12    as a Tier 1 source, by definition that report is

13    of no consequence, right?

14                  MR. KUHL:  Objection to form.

15                  MR. MARKER:  I'll join.

16            A.    Correct.

17            Q.    What did Prysby do or say when you

18    confronted him with the fact that the data was

19    non-verifiable?

20            A.    It seems like he said, you know,

21    he'd talk with Busch, and they would discuss

22    this and get back with me.

23            Q.    Okay.  Was it Busch and Prysby in

24    the summer, in July of 2015, who decided that
```

Highly Confidential - Michael B. Glasgow

```
1    the number of samples that you were to collect

2    could be reduced from 100 to something less than

3    100 to 60?

4              A.    Yes, I believe so.

5              Q.    Whose decision was that?

6              A.    I believe it was a combo of

7    Mr. Busch, Mr. Prysby, and Mr. Rosenthal might

8    have been in on that as well.

9              Q.    But not you?

10             A.    No, not me.  No.

11             Q.    And they lowered the number of

12   samples in part because you were having trouble

13   getting samples, right?

14             MS. COLLINS:  Objection; form and

15        foundation.

16             MR. KIM:  Objection; form.

17             A.    Yeah, I'd send them an e-mail

18   saying that I was having problems getting

19   samples.  I assumed the city would be getting a

20   violation for not monitoring, getting the

21   correct number of samples, and I was asking what

22   we do from that point.

23             Q.    And then lickety-split, now you

24   only have to get 60 samples?
```

Highly Confidential - Michael B. Glasgow

```
 1              MS. COLLINS:  Objection to form.

 2              MR. KUHL:  Object to form.

 3         A.    Correct.  The number was reduced.

 4  Instead of 100, it went down to -- it might have

 5  70.  I can't recall if it was 60 or 70.

 6         Q.    I think it was 60.  But it doesn't

 7  matter.  They reduced the number of samples and,

 8  therefore, you were in compliance?

 9         A.    Correct.

10         Q.    By August of 2015, and certainly

11  by September of 2015, the MDEQ had announced to

12  the city of Flint, to you, that lo and behold,

13  you needed optimized corrosion control

14  treatment?

15         A.    Correct.  Yes.

16         Q.    And funny thing, they said it

17  should be orthophosphate, right?

18              MR. KUHL:  Objection; form.

19         A.    Correct.  Yes.

20         Q.    And they said, what, put it in

21  place immediately, right?

22         A.    Yes.  As soon as possible, yep.

23         Q.    Did you have any conversation with

24  them about that?
```

Highly Confidential - Michael B. Glasgow

```
 1            A.    I don't believe I physically had

 2    any conversation with them.

 3            Q.    Do you know whether that change in

 4    view was driven in part by the EPA activity and

 5    questioning that was ongoing from February up

 6    through July?

 7                  MR. KIM:  Objection as to

 8            foundation.

 9            A.    Yeah.  I could make my own

10    assumptions, yes.

11                  MR. MARKER:  We don't want you to

12            make assumptions here today.

13                  THE WITNESS:  Okay.

14    BY MR. CAMPBELL:

15            Q.    Did you -- I think I asked you

16    whether you were interviewed by the governor's

17    task force.  It's called the Flint water

18    advisory task force.

19            A.    Yes.

20            Q.    And you are listed in there as one

21    of the persons who was interviewed.

22            A.    Yes.

23            Q.    You remember being interviewed for

24    that?
```

Highly Confidential - Michael B. Glasgow

1         A.    Yes.

2         Q.    And were you forthright and direct

3    with the members of the task force to tell them

4    what you knew?

5         A.    Yes.

6         Q.    Did you tell them the same kind of

7    information that you testified to in the

8    criminal court against -- in the action against

9    Busch and Prysby and Shekter-Smith?

10        A.    Yes. I believe so, yes.

11        Q.    And you told them the same kind of

12   information you've been telling us here today?

13        A.    Yes.

14        Q.    Have you read the governor's task

15   force report?

16        A.    No, I don't believe I ever did.

17        Q.    Never read it?  Never learned what

18   the findings were?

19        A.    Not that I recall, no.

20              MR. CAMPBELL:  Okay.  I'm going to

21         pass the witness, and I have -- I'm

22         reserving the last half hour of my time.

23              MS. DEVINE:  We can figure out the

24         exact time when we go off the record.

Highly Confidential - Michael B. Glasgow

```
1              MR. CAMPBELL:  Who's up next?

2              MR. MARKER:  We're off the record.

3              THE VIDEOGRAPHER:  We're going off

4         the record at 12:25 p.m.

5                     - - -

6         Thereupon, at 12:25 p.m. a lunch

7          recess was taken until 1:13 p.m.

8                     - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Michael B. Glasgow

```
 1                          Monday Afternoon Session

                            February 24, 2020

 2                          1:13 p.m.

 3                     - - -

 4               THE VIDEOGRAPHER:  We are back on

 5          the record at 1:13 p.m.

 6                     - - -

 7               EXAMINATION

 8    BY MR. GAMBLE:

 9          Q.    Mr. Glasgow, good afternoon.

10          A.    Good afternoon.

11          Q.    My name is Travis Gamble.  I

12    represent one of the other Defendants in this

13    case.

14               You understand that?

15          A.    Yes.

16          Q.    I've got a number of questions for

17    you.  I may jump around a little bit.

18               But you testified earlier that you

19    were employed initially in 2005 as an operator

20    at the Flint water treatment plant, correct?

21          A.    Yes.

22          Q.    And you held that position until

23    2015, correct?

24          A.    Correct.  Yeah.
```

Highly Confidential - Michael B. Glasgow

1          Q.    And were you stationed at the

2    water treatment plant continuously during that

3    ten-year period of time?

4          A.    Yes, I was.

5          Q.    So you weren't working anywhere

6    else with the city of Flint at any other plant?

7          A.    No.

8          Q.    During your tenure, that

9    ten-year -- well, strike that.

10              Between 2005 and 2013, when the

11   decision was made by the city of Flint to

12   actually utilize the Flint River as a potential

13   water source, were you familiar with any studies

14   that had been completed evaluating water

15   treatment options using the Flint River as a

16   water source?

17         A.    No, not that I can recall.

18         Q.    Were you familiar with any studies

19   that evaluated the KWA as a potential water

20   source?

21         A.    No, I wasn't really familiar with

22   any studies.  I had heard, you know, that

23   studies were being done for the KWA pipeline,

24   but I wasn't really involved.

Highly Confidential - Michael B. Glasgow

1     Q.    I'm going to show you what has

2   previously been marked as Brent Wright Exhibit

3   38.  And I'll represent to you that this is a

4   2009 study that was done to evaluate the

5   potential for utilizing the KWA as a new water

6   source for the city of Flint.

7     A.    Okay.

8     Q.    Have you ever seen that report

9   before?

10     A.    I have seen it.  I haven't really

11   looked through it much.

12     Q.    Do you have any recollection as to

13   whether there were recommendations or

14   suggestions as to how to treat the water that

15   would be ultimately or potentially coming from

16   the KWA?

17     A.    No, I can't say I remember

18   discussing any of that.

19     Q.    So you have no understanding of

20   whether there was any inclination or any

21   suggestion or recommendation to utilize

22   orthophosphates as a type of corrosion control?

23     A.    Correct, yeah.

24     Q.    And you have no idea what the

Highly Confidential - Michael B. Glasgow

1    recommendations were, suggestions were, as far

2    as softening?

3              A.    No.

4              Q.    And you don't know whether they

5    were recommending lime softening?

6              A.    Correct.

7              Q.    And you don't know whether they

8    were also recommending soda ash?

9              A.    Correct.

10             Q.    I'm going to show you what has

11   been marked as Defendants' -- this was Exhibit 1

12   to Ed Kurtz's deposition.  And it's another

13   study that was done in July of 2011.

14                  Have you ever seen that study

15   before?

16             A.    I can't say that I have.  Let's

17   see here.

18                  MR. MARKER:  Which exhibit number

19         was it?

20                  MR. GAMBLE:  It's Exhibit 1 for Ed

21         Kurtz.

22                  MR. MARKER:  Okay.  So it's back

23         here.  Right there.

24             Q.    And I'll represent to you this is

Highly Confidential - Michael B. Glasgow

1    a study that was completed by Rowe Engineering

2    as an evaluation or analysis of the Flint River

3    as a potential permanent water supply for the

4    city of Flint.

5              Do you understand that?

6         A.    Yes.

7         Q.    And have you ever seen this study

8    before?

9         A.    I don't believe I have.  I

10   don't -- it doesn't look familiar.

11        Q.    Have you ever heard or talked to

12   anybody who referenced the study and what the

13   ultimate recommendations were if the city of

14   Flint were to utilize the Flint River as a

15   continuous water source?

16        A.    I can't say that I have.

17        Q.    And as you sit here today, you

18   don't know what recommendations were made with

19   regard to what chemicals would be utilized or

20   recommended to treat the Flint River water if it

21   was ever used as a continuous supply?

22        A.    No, I do not.

23        Q.    You don't know anything about

24   recommendations regarding corrosion control that

1  were also contained within the 2011 report, do

2  you?

3          A.    No, I do not.

4          Q.    Before I move on, I mentioned

5  before about the studies and recommendations

6  regarding softening, and I think you testified

7  earlier that softening to you was always an

8  aesthetic.

9          A.    Yes.

10         Q.    Or an aesthetic type of chemical

11  that would deal with the aesthetics of the

12  water, correct?

13         A.    Correct, yes.

14         Q.    Do you have any understanding as

15  to whether lime itself is a form of corrosion

16  control?

17         A.    Not exactly.  You know, I've heard

18  some issues to that, but I can't talk in depth

19  about it at all.

20         Q.    Do you know whether lime in

21  conjunction with soda ash is a form or can be a

22  form of corrosion control?

23         A.    I can say I do not.

24         Q.    But I think you testified earlier,

Highly Confidential - Michael B. Glasgow

```
 1   when you were operating the plant, you were only

 2   operating it utilizing lime --

 3           A.    Correct.

 4           Q.    -- for softening, correct?

 5           A.    Correct, yes.

 6           Q.    You didn't have soda ash feeders

 7   that were up and running, did you?

 8           A.    No, we did not.

 9           Q.    Do you know whether there were

10   recommendations made by LAN or others that the

11   city utilize full softening with both lime and

12   soda ash?

13           A.    I do not recall any.

14           Q.    Did you always believe -- well,

15   strike that.

16                 When did you come to learn that

17   the city of Flint was considering switching

18   water sources to the KWA from Detroit water?

19           A.    I heard -- I don't want to say

20   rumors.  I heard talk, you know, inner-city talk

21   that -- I knew Mr. Wright from the Genesee

22   County Drain Commission was -- they had done a

23   study on the KWA or, you know, they were looking

24   at avenues to bring raw water from Lake Huron
```

1    over, but --

2            Q.    And do you generally recall a

3    date?

4            A.    No.  I'm going to say maybe 2010,

5    2011 time frame.

6            Q.    Okay.  Did you have any

7    discussions or was there any discussions amongst

8    yourself and others with the city of Flint as to

9    how you would potentially treat the Flint River

10   water?  And when I say "treat," I'm referencing

11   what specific --

12           A.    What chemicals.

13           Q.    -- chemicals would be utilized to

14   treat it.

15           A.    Yeah, and I don't recall any at

16   that time.

17           Q.    You don't recall any discussions

18   about corrosion control?

19           A.    No.  No, I do not, not at that

20   time, no.

21           Q.    Were you involved at all in the

22   decision to switch water sources from the KWA --

23   or from DWSD to KWA?

24           A.    No, not whatsoever.

Highly Confidential - Michael B. Glasgow

1          Q.     And by reference, the switchover,

2     the ultimate decision, was made by who?

3          A.     From the switch to Detroit to

4     Flint River water?

5          Q.     Correct.

6          A.     I don't know if it was emergency

7     managers or our DPW director Howard Croft.  I

8     can't say who made that final decision.

9          Q.     You don't know whether Ed Kurtz

10    made that decision or not?

11         A.     No, I can't say.

12         Q.     But you weren't involved in that

13    decision-making process, were you?

14         A.     No, no.  Prior to -- at this time

15    and prior to this, I didn't have my F-1 license.

16    I wasn't kind of the operator in control of the

17    plant, so I wasn't privy to a lot of these

18    talks.

19         Q.     When did you receive your F-1

20    license?

21         A.     I believe it was '11 or '12.

22    Sometime in this time frame, pretty close.

23         Q.     And do you recall specifically

24    when it was announced to you formally that the

1    city of Flint and the Flint water treatment

2    plant were going to switch from Detroit water to

3    KWA with utilization of the Flint River on an

4    interim basis?

5         A.    Yeah.  That would probably be

6    around the '13 -- early 2013 time frame.

7         Q.    When you heard that the city of

8    Flint was going to switch water sources, what

9    was your reaction to that?

10        A.    My initial reaction to the switch

11   to KWA, that didn't really bother me.  I looked

12   at that as a positive for the city.  Now,

13   running out of the river in the interim seemed

14   like a waste to me, to be honest with you.  I

15   would rather use the time to prepare staff and

16   people to be ready for the KWA water.

17        Q.    Why did you think that utilization

18   or switching over to the KWA was a good thing

19   for the city?

20        A.    Just kind of financial

21   independence from -- I had some exposure to the

22   bills we'd get from the city of Detroit, had

23   heard talk from supervisors and others how we

24   could treat water a lot cheaper than we could

1    buy it.

2            Q.   Do you know whether there were

3    ongoing discussions amongst the city of Flint as

4    to how they were going to treat the water from

5    the Flint River in the interim basis between

6    2014 when the startup occurred and ultimate

7    connection to the KWA?

8                 MR. KIM:  Objection to form.

9            A.   I would say a little bit of

10   discussion.  Nothing really seemed set in stone,

11   so to speak.

12           Q.   What discussions do you recall?

13           A.   I just recall basically kind of

14   operating the plant as we had on our standby

15   basis except with softening being involved.

16   Softening wasn't always involved with our test

17   runs prior to full-time operation.  But it

18   didn't seem like there was going to be -- yeah,

19   there wasn't too many in-depth talks about major

20   changes in the treatment compared to what we had

21   done prior for test runs.

22           Q.   Who do you recall having these

23   discussions with?

24           A.   Probably, I will say, Mr. Wright,

Highly Confidential - Michael B. Glasgow

1    Brent Wright, at the water plant there.

2    Possibly Mr. Johnson.  Maybe Mr. Croft as well.

3    And that's all I can really recall.

4            Q.    Do you recall when these

5    discussions occurred?

6            A.    It probably would have been

7    early -- early to mid 2013.

8            Q.    Would that have been after the

9    decision was made to switch water sources?

10           A.    Yeah, I think that was after the

11   fact.

12                 MR. KIM:  Objection as to form and

13           foundation.

14           Q.    Did you have concerns about

15   utilizing the Flint River or treating the Flint

16   River on an interim basis in 2013 when you

17   learned of the proposed switchover?

18           A.    Yes, I did.

19           Q.    And what were your concerns?

20           A.    Main concerns was just the shape

21   of the plant.  Like I said, we were a standby

22   plant.  We'd run quarterly, but to put something

23   in full service 24/7, I didn't have the staff.

24                 And to be honest with you, with

1    the talk of running in the interim until KWA was

2    here, for the longest time I thought that was

3    more of a negotiating plea with DWSD to maybe

4    lower some rates.  Because everything else

5    seemed a little too rushed for me to switch and

6    make a bunch of upgrades just to run in the

7    interim instead of just getting prepared for

8    KWA.

9            Q.    So it sounds like in the back of

10   your mind you thought this was a negotiating

11   tool basically to maintain receiving water from

12   the DWSD but leveraging them into lowering their

13   prices?

14           A.    Right.

15           Q.    And did you agree with this

16   negotiating ploy?

17                 MR. KIM:  Objection as to form.

18           A.    I would say no.

19           Q.    And why not?

20           A.    Well, I didn't get involved in a

21   lot of the politics like that early on or at

22   that time frame.  I looked at it as the city

23   made a decision a year or two prior to go to

24   KWA.  I thought that should be our focus, one

1    thing at a time.

2         Q.    Shifting your attention to once

3    the decision was made to switch water sources in

4    2013, did you have any role in contacting LAN

5    about potentially doing some work on the

6    project?

7         A.    Myself, no.

8         Q.    And when I say "LAN," I'm

9    referring to Lockwood, Andrews & Newnam.

10              Do you understand that?

11        A.    I do understand that.

12        Q.    Okay.  Then I'll just refer to

13   them, for the sake as brevity, as LAN

14   throughout, okay?

15        A.    Yep, that's fine.  I'll know.

16        Q.    Do you know who contacted LAN

17   about potentially doing work on the Flint water

18   treatment plant?

19        A.    I'm not sure.  It would have

20   either been Mr. Wright, Mr. Johnson, or

21   Mr. Croft.  I personally knew LAN had been in

22   the city before and done some upgrades on the

23   plant late '90s, early 2000s.  And that was even

24   before I was hired with the city, but I had

1   heard, you know, just through the grapevine.  I

2   knew they had been around before.

3           Q.    Were you familiar with LAN in 2013

4   when the switchover was announced?

5           A.    Yes.  Yes, I was then.

6           Q.    And did you regularly contact or

7   have contact with LAN or any employees of LAN

8   about the Flint water treatment plant before the

9   switchover was announced in 2013?

10          A.    Yes.  I'll say Mr. Green and --

11  I'm missing the last name.  Jeff was another

12  individual.  I know he's on a list here, but

13  yeah, a couple individuals, and Mr. Samir Matta

14  was around as well.

15          Q.    And that would be Jeff Hansen?

16          A.    Hansen, yes.

17          Q.    And what was your interaction with

18  him prior to 2013?

19          A.    Prior to 2013, I didn't have a lot

20  of interaction with him, not that I can recall.

21          Q.    It's fair to say that your

22  interactions increased in 2013 once the

23  switchover was announced and once there was

24  going to be a project upgrade or basically

Highly Confidential - Michael B. Glasgow

1     retrofit the Flint water treatment plant?

2          A.    Yes, that's a good statement.

3          Q.    Did you attend any meetings with

4     LAN prior to June of 2014 to discuss their

5     potential role and potential scope of work on

6     the Flint water treatment plant?

7          A.    Possibly.  Most likely I was

8     involved in one or two.  I can't say I recollect

9     very well.

10         Q.    Do you have any recollection of

11    what the scope of work was generally going to be

12    for LAN?  And this is prior to June of 2014.

13         A.    Prior to June of 2014.

14         MR. THOMPSON:  You mean 2013?

15         Q.    Oh, 2013, pardon me.

16         A.    Yes, I can't say that I am ...

17         Q.    Do you recall ever meeting with

18    LAN and others with the city of Flint to discuss

19    how the water might be treated from the Flint

20    River when it was being utilized in the interim

21    before the KWA?

22         A.    I possibly was.  Like I said, I

23    can't recollect what the time frames of when I

24    was truly getting more involved.  Like I said, I

1    do remember Mr. Green, Mr. Matta, and Mr. Hansen

2    around a lot.  The dates that I started being

3    familiar with them, I can't say offhand.

4         Q.    It sounds like you don't have a

5    specific recollection of any individual meetings

6    that you would have been present for with LAN or

7    others; is that fair?

8         A.    Not offhand, yeah, that's fair to

9    say.

10        Q.    Well, I'm going to show you what

11   are meeting minutes that were previously marked

12   as Kurtz Exhibit 7 from a May 22, 2013 meeting

13   with LAN and representatives from the city of

14   Flint.

15              Can you take a look at that

16   briefly.

17        A.    Okay.

18        Q.    And if you'll see the fourth

19   bullet point down from the meeting notes, it

20   says, "Flint estimates they could save up to

21   $10 million by running off the Flint River for

22   two years until the KWA system is online versus

23   purchasing water from Detroit."

24        A.    Yes.

Highly Confidential - Michael B. Glasgow

```
1              Q.    Do you see that?

2              A.    Uh-huh.

3              Q.    And that was your understanding as

4     of May of 2013, that the switchover would be a

5     basis or a way for the city of Flint to save a

6     lot of money, correct?

7              A.    Correct, yes.

8              Q.    And, again, I think you said

9     before, you also thought it could have been

10    leverage to try and get Detroit to lower their

11    water prices so you could stay with Detroit

12    water, correct?

13             A.    Correct, yes.

14             Q.    Did you have -- well, strike that.

15                   After -- in May of 2013, did you

16    have any understanding of what LAN's scope of

17    work might be on the Flint water treatment

18    plant?

19             A.    No, I really can't say I did, to

20    be honest with you.  I knew they were going to

21    be involved, but I never seen a statement of

22    scope of work or anything like that.

23             Q.    Did you have any understanding as

24    to whether their work would be with regard to
```

Highly Confidential - Michael B. Glasgow

```
 1    design and retrofitting the Flint water

 2    treatment plant as opposed to water treatment

 3    decisions or recommendations or

 4    responsibilities?

 5              MR. MORRISSEY:  Objection to form.

 6              MR. KIM:  Objection as to form and

 7         foundation.

 8         A.    From my personal, I guess,

 9    viewpoint, I would say it was more from a

10    retrofit and upgrade capacity.

11         Q.    Was it your understanding, just

12    based on the ultimate project, that the city was

13    going to maintain responsibility for water

14    treatment decisions as far as the chemicals, the

15    dosages, and how the water would be treated

16    coming from the Flint River?

17              MR. KIM:  Objection as to form.

18              MR. MORRISSEY:  Objection to form.

19         A.    I would have to answer that yes

20    with, I guess, input from members of LAN and

21    also the state and DEQ.

22         Q.    We talked a little bit before

23    about soda ash feed, and I think you testified

24    before that before the Flint water treatment
```

1   plant was put into full operation during this

2   time period of ramping up or retrofitting it,

3   there were soda ash feeders present in the Flint

4   water treatment plant, correct?

5          A.    There was equipment.  I had never

6   seen them operate it before.

7          Q.    Did you have any understanding of

8   whether LAN's work or recommendations related to

9   the use of full softening?  And when I say "full

10  softening," I mean lime and soda ash.

11         A.    Lime and soda.

12               I can't say that I do.  I don't

13  recall.

14         Q.    Whose decision was it to only do

15  lime softening at the Flint water treatment

16  plant when it started up in April of 2014?

17         A.    I don't know that I can say whose

18  decision it was.

19         Q.    Was that something that was

20  mandated by Steve Busch or Mike Prysby and the

21  DEQ?

22               MR. KUHL:  Objection to form and

23         foundation.

24         A.    It could have been, but I do not

Highly Confidential - Michael B. Glasgow

1    recall who made that decision.  Yeah, I just

2    can't recall where that come from originally.

3           Q.   Do you recall being present at a

4    meeting in June, June 26 specifically, of 2013

5    with the MDEQ, the city of Flint, LAN, and

6    several other persons and entities to discuss

7    the Flint water treatment plant and ultimately

8    what was going to be done on the project?

9           A.   I do believe I was at that

10   meeting, yes.

11          Q.   If you would turn to Wright

12   Exhibit 45.  And I'll represent to you there has

13   been some confusion or some question about when

14   this meeting took place, whether it was

15   June 26th or 29th.

16               But do you see your name on this

17   Exhibit, Exhibit 45?

18          A.   I do, yes.

19          Q.   And what date is out beside that?

20          A.   It looks like the 26th.

21          Q.   So June 26th of 2013?

22          A.   Yes.

23          Q.   Do you have any specific

24   recollection of this particular meeting?

Highly Confidential - Michael B. Glasgow

1          A.    To be honest, I really, really

2   don't.

3          Q.    So other than looking at the a

4   sign-in sheet, you don't know who else would

5   have been present at the meeting?

6          A.    Right, or what fully was

7   discussed, yeah.

8          Q.    So you didn't have any

9   recollection or you don't have any recollection

10  of the substance of what was discussed?

11         A.    I can't say I do, no.

12         Q.    Do you have any recollection as to

13  whether there were discussions about the use of

14  full softening to treat the Flint River water

15  coming out of the Flint water treatment plant?

16         A.    I do not recall.  Sorry.

17         Q.    Do you recall whether there were

18  any conversations about the use of corrosion

19  control and, in particular, phosphates as a form

20  of corrosion control during the June 26th

21  meeting?

22         A.    No, I can't say that I do.

23         Q.    Do you recall who was leading the

24  meeting?

Highly Confidential - Michael B. Glasgow

1        A.    I can't even say I recall who was

2   leading the meeting.  I'm trying to stimulate

3   the memory here but ...

4        Q.    Do you have --

5        A.    But I can't.

6        Q.    Do you have any recollection of

7   LAN making any recommendations during the

8   June 26th meeting?

9        A.    Not offhand.  I'm sorry, I do not.

10       Q.    And you have no recollection if

11  during this meeting the MDEQ said that they were

12  not going to do or require any type of

13  phosphates or corrosion control at the time of

14  the startup in April of 2014 of the Flint water

15  treatment plant?

16              MR. KUHL:  Object to form.

17              MR. MORRISSEY:  Object to form.

18       A.    Yeah, I don't remember that

19  particularly to this meeting, but I think I

20  stated before, as well, I do remember a meeting

21  with Mr. Prysby stating that.  I can't tell you

22  if this was the same meeting or it was a

23  different one.

24       Q.    And do you have any recollection

Highly Confidential - Michael B. Glasgow

1    of whether the MDEQ took the position that

2    instead of applying corrosion control treatments

3    they would do two rounds -- or two six-month

4    rounds of testing before making those decisions?

5           A.    I do recall that, yes.

6           Q.    And do you recall whether that was

7    at this meeting or just that's your general

8    recollection but you can't recall specifically

9    when you learned that?

10          A.    Yeah, I can't recall specifically.

11   I will say when I did learn that, I do remember

12   Mr. Prysby was in the room and also Mr. Green

13   was.  Mr. Green was there from LAN.  I don't

14   remember a room full of people, though.

15          Q.    As an F-1 operator, you have

16   extensive experience about treating water,

17   correct?

18          A.    Correct.

19          Q.    You have experience about

20   corrosion control treatments and the types that

21   can be utilized, right?

22          A.    Correct.  Yes.

23          Q.    And you have extensive experience

24   about what they do or how they affect the water

1    quality, correct?

2         A.    Correct.

3         Q.    Did it cause you any concern when

4    you found out, whether it was at this meeting or

5    some other time, that the MDEQ was not going to

6    require corrosion control treatments when the

7    plant started up in April of 2014?

8         A.    It was surprising to me.  I had

9    been used to -- even on the Detroit water where

10   there was phosphate in the water, which we'd

11   have to monitor for regularly.  So it was a

12   surprise to me that we weren't going to be

13   required to monitor.

14        Q.    Did it cause you concern?

15        A.    Like I said, it was surprising,

16   but I -- from this big switchover, I had a

17   number of concerns, so I wouldn't say it jumped

18   out as compared to others.

19        Q.    Have we already talked about the

20   concerns -- all the concerns you had about the

21   switchover in utilizing Flint River?

22             MR. MARKER:  Objection; form,

23        foundation.

24        A.    It seems like we have touched on

Highly Confidential - Michael B. Glasgow

```
 1    most of what I can remember.

 2            Q.    As an F-1 operator, do you have

 3    familiarity with the Lead and Copper Rule?

 4            A.    Yes.

 5            Q.    And do you know what the Lead and

 6    Copper Rule requires with regard to corrosion

 7    control?

 8            A.    Yes.

 9            Q.    And do you believe the Lead and

10    Copper Rule required that corrosion control be

11    utilized in the finished water design when the

12    Flint River went -- or Flint water treatment

13    plant went online in April of 2014?

14                 MR. KIM:  Objection as to form.

15                 MR. KUHL:  Objection.

16                 MR. MARKER:  I'll join.

17                 MR. MORRISSEY:  Objection.

18            A.    Yeah ...

19                 MR. MORRISSEY:  Stipulate.

20            A.    I will -- I will say -- let me

21    have you ask the question again here so I'm

22    not ...

23                 MR. GAMBLE:  Can you read it back

24         to him.
```

Highly Confidential - Michael B. Glasgow

```
 1              (Record read back as follows:

 2              "Question:  And do you believe the Lead

 3              and Copper Rule required that corrosion

 4              control be utilized in the finished

 5              water design when the Flint River

 6              went -- or Flint water treatment plant

 7              went online in April of 2014?")

 8         A.    No, the Lead and Copper Rule, it's

 9    a pretty -- pretty involved rule.  It stretches

10    a number of pages through the Safe Drinking

11    Water Act.  My initial understanding was I

12    thought it would be required.

13         Q.    So you felt that, based on your

14    understanding of the Lead and Copper Rule, that

15    phosphates would be -- or some sort of corrosion

16    control -- optimized corrosion control would be

17    needed, correct?

18         A.    Correct, yes.

19         Q.    When you found out that the DEQ

20    was not requiring -- it was going to do two

21    rounds of six -- or two six-month rounds of

22    testing, did you agree with that decision?

23              MR. MARKER:  Objection; form,

24              foundation.
```

Highly Confidential - Michael B. Glasgow

1       A.    I wouldn't say I agreed or

2   disagreed.  I kind of was leaving it in the

3   hands of my experts, so to speak.  They would

4   direct me where I needed to go.

5       Q.    Did you engage in any

6   conversations with anybody with LAN immediately

7   after this meeting on June 26th?

8       A.    Not that I can recall.

9       Q.    Do you know whether anyone else

10  with the city of Flint had a conversation with

11  Warren Green or anyone else with LAN following

12  the June 26, 2013 meeting?

13      A.    I cannot say.  I don't recall.

14      Q.    And you don't know whether

15  Mr. Green pushed back with the city of Flint and

16  Duffy Johnson about the need to revisit the

17  issue of corrosion control following the June 26

18  meeting?

19      A.    No, I cannot say.

20            MR. KUHL:  Object to form.

21            MR. KIM:  Object to foundation.

22      Q.    I think you testified before about

23  LAN's scope of work.  Were you involved at all

24  in ultimately deciding what LAN would and would

Highly Confidential - Michael B. Glasgow

1    not be doing for the city of Flint on the Flint

2    water treatment plant?

3              A.    No --

4                    MR. MARKER:  Objection.

5              A.    -- I was not.

6              Q.    Were you involved in any meetings

7    with Duffy Johnson to discuss what LAN would or

8    would not be doing with regard to the project --

9    the Flint water treatment project in 2013?

10             A.    Not that I can recall, no.

11             Q.    Were you engaged in any

12   conversations or did you have any conversations

13   with the MDEQ in 2013 about what LAN's scope of

14   work would be?

15             A.    No, I can't say that I did.

16             Q.    And I think you said before that

17   at least in your mind, LAN's scope of work was

18   primarily related to retrofitting and design of

19   the Flint water treatment plant, correct?

20             A.    Correct.

21                   MR. MORRISSEY:  Object to form.

22             Q.    And it was not necessarily with

23   regard to decisions on water treatment, water

24   quality, or dosages or chemicals that would be

Highly Confidential - Michael B. Glasgow

1    utilized to treat the Flint River water,

2    correct?

3              MR. MORRISSEY:  Object to form.

4         A.    Correct.

5         Q.    A few months back, Brent Wright

6    testified about how the dosages were decided or

7    at least calculated with regard to the chemical

8    treatment process, okay?

9         A.    Okay.

10        Q.    And I believe he deferred some

11   questions to you about how that process took

12   place and how you made the calculations or how

13   you made the decisions regarding what chemicals

14   would be utilized and what dosages of those

15   chemicals would be utilized; is that fair?

16        A.    That's fair to say.

17             MR. MORRISSEY:  Object to form.

18        Q.    Can you describe for me exactly

19   how it was that you would calculate, for

20   instance, lime softening and what dosages would

21   be needed for that?

22        A.    Yeah.  Normally you would try to

23   simulate the plant process in the laboratory.

24   With the softening process, it was always --

Highly Confidential - Michael B. Glasgow

```
 1   you're looking at your final hardness number, I
 2   guess is what you would go by.  In a lot of
 3   other testimony, they talked about trying to
 4   stay as similar to Detroit as possible.  But
 5   usually most of those dosages were determined in
 6   the lab based off what was coming in in our
 7   river water where we would add different doses
 8   of the chemical and see which gave us the best
 9   result.  So a pretty simple, standard jar test
10   in the water treatment field.
11           Q.    Brent Wright testified that there
12   was some sort of computer program that might
13   have been utilized to assist in assessing or
14   evaluating dosages of chemicals to be utilized
15   in the treatment process.
16               Do you have any understanding or
17   recollection of that?
18           A.    I do not, no.
19           Q.    And, again, as you sit here today,
20   you don't have any specific recollection of any
21   recommendations made by LAN or anyone else in
22   June of 2013 about the need for corrosion
23   control assessments or treatments?
24           A.    No, I do not.
```

Highly Confidential - Michael B. Glasgow

```
 1          Q.    Are you familiar with the term

 2   "primacy"?

 3          A.    Yes.

 4          Q.    And what does that mean to you?

 5          A.    Well, let me think how I would

 6   describe it.  If they have -- whoever has

 7   primacy has, in effect, to me, the power to

 8   enforce some rules or dictate power and make

 9   decisions, I guess.  That's kind of a broad

10   definition, but they're the ones to enforce

11   things.

12          Q.    And did you understand that the

13   DEQ was the primacy agent with regard to the

14   water treatment decisions that related to the

15   Flint water treatment plant?

16          A.    Yes.

17                MR. KUHL:  Objection to form.

18                MR. SCHNATZ:  Objection to form.

19                MS. COLLINS:  Objection to form.

20          Q.    I think you previously described

21   in your testimony that the DEQ was kind of like

22   a coach and a cop; is that fair enough?

23          A.    Yeah, that's fair.

24          Q.    What did that exactly mean?
```

Highly Confidential - Michael B. Glasgow

1          A.   Well, they're there to help you

2     when you need it, but if you're not following

3     the procedure, they're there to slap you on the

4     hand if not.

5          Q.   Is it fair to say that the DEQ was

6     your primary resource when you had questions

7     about how to treat the water and the Flint water

8     treatment plant when you went online in April of

9     2014?

10          A.   Yes.

11          Q.   If you had disagreed with

12     something that the DEQ had instructed you to do

13     or not do, did you have any recourse or any

14     ability to appeal that type of a decision?

15               MS. COLLINS:  Objection; form.

16               MR. MORRISSEY:  Object to form.

17          A.   Not to my knowledge.

18          Q.   You just testified previously that

19     you always thought under the Lead and Copper

20     Rule phosphates or some form of corrosion

21     control would need to be included in the

22     finished water treatment process, correct?

23          A.   Correct, yes.

24          Q.   And if you disagreed -- well,

Highly Confidential - Michael B. Glasgow

1    strike that.

2              If the DEQ said that none was

3    going to be required, you couldn't go to anybody

4    else and say, "That decision is just plain

5    wrong," could you?

6              MR. KUHL:  Objection to the form.

7              MR. SCHNATZ:  Objection.

8         A.   No, not to my knowledge, no.

9         Q.   I'm going to turn your attention

10   to test runs.  You testified before about there

11   being test runs or an initial test run that

12   lasted 30 days.

13             Do you recall that?

14        A.   Yes.

15        Q.   And I believe your recollection

16   was that occurred in July of 2013 -- or -- 2013,

17   correct?

18        A.   Correct, yes.

19        Q.   What was the purpose of the

20   initial plant test run?

21        A.   It was just to operate for more

22   than a week, like we usually did, to -- the way

23   our softening process worked, to get it up and

24   running within a week and actually continue to

1   run it, or to learn anything from it, a week

2   wasn't long enough.  So I think that's why we --

3   they wanted to go for a full month so we could

4   get that operation up and running, see if we

5   could get it to stabilize and utilize that time

6   for softening.

7          Q.    Who participated in the initial

8   plant test run?

9          A.    Elaborate by "who."  I don't know

10   where you're getting that.

11          Q.    Were there individuals from LAN

12   that were present during the initial plant test

13   run in July of 2013?

14          A.    I don't recall, but I would

15   assume.  Well, I shouldn't assume.  I would

16   think they would have been there.  I can't

17   recall.  I don't think they were there every day

18   the whole time through the entire plant run, but

19   I imagine they were in a time or two.

20          Q.    Do you recall whether Mike Prysby

21   or Steve Busch were present at any time during

22   the plant test run?

23          A.    I do remember Mr. Prysby stopping

24   by, yeah, on a couple occasions during that run.

Highly Confidential - Michael B. Glasgow

1      Q.    And do you recall why he stopped

2   by?

3      A.    I thought he just wanted to see

4   how things were going.

5      Q.    How long did the initial plant

6   test run?

7      A.    Oh, it was roughly about 30 days.

8      Q.    And what were the results of the

9   initial plant test run?

10      A.    Oh, if we want to look at the

11   results, when I think of results, I think of

12   data and stuff, but without -- I mean, we ran

13   into a few issues with things.  We determined a

14   few mechanical items needed to be corrected.

15      Q.    Is it fair to say that the initial

16   plant test run of 30 days was stopped when it

17   was stopped because the plant wasn't operating

18   the way it was supposed to be operating and you

19   couldn't obtain any meaningful data from the

20   initial test run?

21           MR. MARKER:  Object to form.

22      A.    I'll say that's part of it.  The

23   other part was our staffing levels were

24   dramatically low, and everybody had worked

1    double shifts all month so ...

2         Q.    How many employees did you have in

3    July 2013 that were working during the initial

4    plant test run?

5         A.    Probably somewhere in the number

6    of 12 to 15.

7         Q.    And how many of those were

8    licensed operators?

9         A.    During the test run, the majority

10   of them would have been licensed, at least have

11   the lowest license.

12        Q.    As far as ceasing the initial

13   plant test run because there were problems with

14   the operation of the plant in general, I think

15   you testified before that there were several

16   areas, including the ozone, that weren't working

17   properly; is that correct?

18        A.    Correct, yeah.

19        Q.    And the east side softening

20   clarifier arm had structural issues?

21        A.    Correct.

22        Q.    And the coagulant and polymer

23   systems were gone?

24        A.    Correct.

Highly Confidential - Michael B. Glasgow

1          Q.     And some -- there were issues with

2    filter systems and the SCADA system, correct?

3          A.     Correct, yes.

4          Q.     How many other test runs did the

5    city of Flint run after the July 2013 initial

6    plant test run?

7          A.     I don't know, without seeing the

8    data, exactly how many.  I want to say maybe

9    possibly at least two more after that.

10         Q.     And I think you testified before

11   in response to Mr. Campbell's question, I think,

12   the initial plant test run was the longest test

13   run that you actually ever performed with the

14   Flint water treatment plant before April of

15   2014, correct?

16         A.     Correct, yes.

17         Q.     Do you recall having any

18   discussions with anyone with LAN about the

19   failed test run in July of 2013?

20              MR. MARKER:  Objection; form.

21              MR. KIM:  Object.

22         A.     No, I can't say that I do.

23         Q.     Were you in regular contact with

24   Warren Green or anyone else with LAN in July of

Highly Confidential - Michael B. Glasgow

```
 1   2013 when you were conducting the initial plant

 2   test run?

 3           A.    I can't say that I was.

 4           Q.    If you could turn your attention

 5   to what was previously marked as Brent Wright

 6   Exhibit 49.

 7                 Can you take a look at the

 8   document and the attachment.

 9                 And I think you were shown this by

10   Mr. Campbell.  I think he marked it as a

11   different exhibit number --

12           A.    Yes, okay.

13           Q.    -- in this deposition.

14                 Do you recognize the document

15   that's Exhibit 49 from Brent Wright's

16   deposition?

17           A.    Yes, I do.

18           Q.    And that was an initial scope of

19   upgrades or proposed scope of upgrades to the

20   Flint water treatment plant, correct?

21           A.    Correct, yes.

22           Q.    Do you have an understanding of

23   who created that document or who actually made

24   the proposal?
```

1          A.    Yes.

2          Q.    And who was it?

3          A.    My understanding, LAN.

4          Q.    And that was basically limiting or

5    identifying what it was that was their proposed

6    scope as of August 20 of 2013, correct?

7          A.    Correct.

8                MR. MARKER:  Object to the form.

9                MR. MORRISSEY:  Objection to form.

10         Q.    Do you happen to know or recall

11   whether there was anything in that proposal that

12   related to finished water quality or water

13   treatment processes?

14               MR. MORRISSEY:  Object to form.

15         A.    Not that I was aware of, no.

16         Q.    If I could turn your attention to

17   the last page.  Under Section 3 at the very end,

18   it says, "Other Items to Address to Finalize

19   Scope of Work."

20               Do you see that?

21         A.    Yes.

22         Q.    And it lists four things.

23               Do you see that?

24         A.    I do.

Highly Confidential - Michael B. Glasgow

```
1          Q.    And one of those things, A is
2    "Options for handling the disposal of lime
3    sludge from softening."
4          A.    Uh-huh.
5          Q.    Do you see that?
6          A.    Yes.
7          Q.    B is "Requirements for CT and
8    enhanced treatment."
9                Do you see that?
10         A.    Yes.
11         Q.    Sub C is "Impacts of using the
12   river as a continuous supply (quantity, quality
13   monitoring and control reservoir operating
14   levels)."
15               Do you see that?
16         A.    Yes.
17         Q.    And D is "Chemical storage
18   options," right?
19         A.    Right.
20         Q.    And I think you testified before
21   that it was your understanding these were
22   additional things that the city needed to
23   evaluate moving forward as to completing the
24   design or the retrofit of the Flint water
```

Highly Confidential - Michael B. Glasgow

1    treatment plant, correct?

2         A.    Correct.

3         Q.    And in particular, subsection C,

4    the "Impacts of using the river as a continuous

5    supply," the city of Flint actually took that

6    responsibility on subsequent to this proposed

7    scope of work, correct?

8              MR. KIM:  Objection as to

9         foundation.

10             MR. MORRISSEY:  Object to form.

11        A.    You know, I really can't say.  As

12   a continuous supply, I don't really recall

13   conversations about a continuous supply.

14        Q.    But as far as water quality and

15   treatment, that was something that the city

16   ultimately did, correct?

17        A.    Correct, yes.

18        Q.    Do you recall actually ever seeing

19   this document before today?

20        A.    No, I do not, actually.

21        Q.    And you don't know whether LAN's

22   scope of work was further narrowed from Exhibit

23   49 in subsequent proposed scopes or in the

24   ultimate contract?

Highly Confidential - Michael B. Glasgow

```
 1              A.    No.

 2              Q.    Do you have any understanding of

 3      specifically what the scope of work was that was

 4      set forth in the final change order number 2

 5      when LAN was retained to do work on the Flint

 6      water treatment plant?

 7              A.    I do not.

 8              Q.    I think you were asked this

 9      before, but do you have any recollection of any

10      recommendations made by Warren Green -- well,

11      strike that.

12                   You recall that Warren Green

13      specifically made recommendations that there

14      would need to be additional plant test runs on

15      the Flint water treatment plant before water

16      should be distributed from the Flint water

17      treatment plant.

18                   You recall that?

19              A.    I do, yes.

20              Q.    And, in fact, do you recall when

21      those recommendations were made?

22              A.    I can't really recall when they

23      were made.  I would -- it seems like they would

24      be after our test run in July.
```

Highly Confidential - Michael B. Glasgow

1          Q.    And the city never did a 60- to

2    90-day plant test run, correct?

3          A.    Correct.

4          Q.    They never did any plant test run,

5    prior to distributing water, where they

6    evaluated the specific water characteristics and

7    water quality coming from the plant before April

8    of 2014 when the water went out?

9                MR. MARKER:  Objection to form.

10               MR. KUHL:  Objection to form.

11         A.    I can't say that I do, no.

12         Q.    It would be important to do a

13   60-to-90 plant test run to evaluate the water

14   quality coming out of the plant before it was

15   distributed to the public, correct?

16         A.    Oh, absolutely, yes.

17         Q.    It would be extremely important to

18   understand how you were treating the water and

19   whether it was presenting any type of danger to

20   the public, correct?

21         A.    Correct, yes.

22         Q.    And despite those concerns, the

23   city never did it, correct?

24         A.    Correct.

Highly Confidential - Michael B. Glasgow

1          Q.    Did you ever raise the issue with

2    any of your superiors, saying, "Hey, we've got

3    this recommendation about needing to do a 60- to

4    90-day plant test run to evaluate water quality,

5    and I think we need to do it"?

6          A.    I had stated to my superiors

7    within the city that, yeah, we needed more time,

8    more practice.

9          Q.    And when did you make those

10   suggestions or when did you address that with

11   your supervisors?

12         A.    I will say that was late 2013.

13         Q.    Okay.  And who was it that you

14   would have expressed that to?

15         A.    Mr. Johnson and Mr. Croft,

16   Mr. Wright as well.

17         Q.    And do you recall whether this was

18   one conversation or discussion or multiple

19   discussions?

20         A.    Most likely it was multiple.

21         Q.    Did they tell you -- strike that.

22               Did Mr. Croft or anyone else with

23   the city of Flint tell you that you were not

24   going to be able to do a 60- to 90-day test run

Highly Confidential - Michael B. Glasgow

1    to evaluate water quality before going online?

2         A.    I don't believe anyone ever told

3    me that, but our staffing was showing me that we

4    wouldn't be able to do that.

5         Q.    In 2013, when you had the

6    discussions with your superiors about the 60- to

7    90-day plant test run, did you always anticipate

8    that a test run would take place before you

9    distributed water?

10         A.    Yes, I did.

11         Q.    Did it cause you concern that you

12    and the city of Flint did not do a 60- to 90-day

13    plant test run before the water treatment plant

14    went online in April of 2014?

15              MR. MARKER:  Objection to form.

16         A.    I will say it did cause concern

17    yep.  It did make me worry.

18         Q.    And what were your worries?  Why

19    were you worried?

20         A.    Well, this was a big opportunity

21    for the city of Flint, and I was worried we

22    would fail in one way, shape, or form.

23         Q.    And by failure, what do you mean?

24         A.    My worst fear was that we couldn't

1    treat enough water that the city would need; we

2    would run out of water.

3          Q.    Were you concerned about treating

4    the Flint River water itself and the challenges

5    that proposed to you?

6          A.    Yes --

7                MR. KIM:  Objection to form.

8          A.    -- I do.  I did with the softening

9    aspect.  If we could have treated without

10   softening, I wouldn't have had as many

11   reservations.

12         Q.    I may have asked this before, but

13   do you have an understanding, is lime softening

14   itself alone a form of corrosion control?

15         A.    Not that I'm aware of.

16         Q.    I want you to presume that lime

17   softening can be a form of corrosion control,

18   okay?

19         A.    Okay.

20         Q.    If that's the case and you didn't

21   want to utilize it and you omitted it from the

22   water being distributed from the Flint water

23   treatment plant, there would be no corrosion

24   control at all in the water that was being

1    distributed to the public in April of 2014,

2    correct?

3                 MR. KIM:  Objection to form.

4                 MR. MARKER:  Objection to form --

5         A.    Correct.

6                 MR. MARKER:  -- foundation.

7                 MR. KUHL:  What was the answer?

8         I'm sorry.

9                 MR. KIM:  Correct.

10                THE WITNESS:  I said correct.

11   BY MR. GAMBLE:

12        Q.    I think in 20- -- before the

13   changeover or before the switch actually

14   occurred in April of 2014, right before that,

15   you had concerns about starting up the plant and

16   distributing water, didn't you?

17        A.    Yes.

18        Q.    And specifically what were your

19   concerns at that time?

20        A.    Mainly with staffing and the newer

21   employees and their inexperience with the

22   softening process.

23        Q.    And it sounds like you were

24   concerned that they wouldn't be able to properly

Highly Confidential - Michael B. Glasgow

1    treat the water that was coming out of Flint

2    water treatment plant in April of 2014; is that

3    fair?

4                MR. KUHL:  Objection to form.

5         A.    Yeah.  I'll say the softening

6    process is a dynamic process and there's a

7    number of things to keep your eye on, and it can

8    get out of hand quickly if it's not monitored.

9         Q.    What types of things can get out

10   of hand if they're not monitored properly?

11        A.    Well, on the softening process, we

12   added just a -- we overloaded the water with

13   lime.  The way our softening clarifiers worked,

14   we would keep a -- we would form a lime sludge

15   blanket kind of on the bottom of the clarifier.

16              We'd get disruptions or changes in

17   the incoming water, and it can disrupt our

18   little -- how do I want to say this -- our

19   sludge blanket, as we would call it, of lime.

20   And that could cause that to not stay settled,

21   raise up, come over our weirs, and basically

22   clog our filters in our next step of the

23   process, which would set us back, so we'd have

24   to backwash filters, put them back in service.

Highly Confidential - Michael B. Glasgow

```
 1   And that's where the water service comes into --

 2   with that type of lime softening, there's little

 3   room for error.

 4           Q.    It's fair to say that in April --

 5   mid April 2014, you didn't want to start the

 6   plant up and start distributing water to the

 7   public, correct?

 8           A.    Correct.

 9           Q.    You felt that it was -- it was too

10   soon to be doing so, correct?

11           A.    Correct.

12           Q.    And you said you needed more time

13   with staffing, right?

14           A.    Correct.

15           Q.    And would you need additional time

16   or would you have wanted additional time to have

17   a plant test run so you could actually practice

18   the treatment of water with your staff?

19           A.    Absolutely, yeah.

20           Q.    And so you could ensure that that

21   water that was coming from the plant was safe

22   for the public.

23           A.    Absolutely, yes, and have --

24   instill confidence in myself and in my employees
```

```
 1    to do it.

 2          Q.    I know this has been marked

 3    before.  I'm going to mark it again, whatever

 4    the next exhibit is.

 5                      - - -

 6       (Glasgow Deposition Exhibit 24 marked.)

 7                      - - -

 8                MR. KIM:  What's the Bates number?

 9                MR. GAMBLE:  The Bates number is

10          SOM0000054.

11    BY MR. GAMBLE:

12          Q.    Have you had a chance to review

13    that?

14          A.    Yes.

15          Q.    And that's an e-mail from you to

16    Adam Rosenthal, correct?

17          A.    Correct, yes.

18          Q.    Who is Adam Rosenthal?

19          A.    He's a member of the DEQ, yep.

20          Q.    And what role did he play in the

21    DEQ; do you know?

22          A.    A lot of times he -- his signature

23    was always on our yearly monitoring schedule.

24    So it had be before we were required to test in
```

Highly Confidential - Michael B. Glasgow

1    the water.

2          Q.    And this is basically you sending

3    a note to Adam Rosenthal expressing your

4    concerns that we've discussed about starting up

5    the plant in April of 2014, correct?

6          A.    Correct.

7          Q.    And it says, third sentence, "I

8    have people above me making plans to distribute

9    water ASAP."

10               Do you see that?

11         A.    Yes.

12         Q.    Who were those people that were

13   pressuring you to distribute water out of the

14   Flint water treatment plant in April of --

15               MR. MARKER:  Objection; form,

16         foundation.

17               MR. KIM:  Objection; form,

18         foundation.

19         Q.    -- 2014?

20         A.    Yeah, that was any of them.  Any

21   of my superiors in the city of Flint, which

22   would have been Mr. Johnson, Mr. Croft, and

23   anyone above them.

24         Q.    Did you have any pressure or feel

1    any pressure from the DEQ about starting up the

2    plant in April of 2014?

3         A.   No, I can't say I felt any

4    pressure from the state.

5         Q.   You next state, "I was reluctant

6    before, but after looking at the monitoring

7    schedule and our current staffing, I do not

8    anticipate giving the okay to begin sending

9    water out any time soon."

10              Do you see that?

11        A.   Yes.

12        Q.   Was it ultimately your decision

13   about whether or not you could start the plant

14   up on April -- or in mid April of 2014?

15              MR. KIM:  Objection as to form.

16        A.   I don't believe it was.

17        Q.   Did you have any veto power if

18   they -- if you were receiving pressure to start

19   sending water out of the Flint water treatment

20   plant?

21        A.   No.

22        Q.   Was this your attempt to notify

23   the DEQ and let them know that this was going to

24   start up regardless of whether you were for it

Highly Confidential - Michael B. Glasgow

1    or against it?

2            MS. COLLINS:  Objection; form.

3        A.    Exactly, yes.

4            MR. CAMPBELL:  Maybe you could try

5        to keep your voice up just a little bit,

6        Mr. Glasgow.

7            THE WITNESS:  I'll try.

8        Q.    And you further say, the next

9    sentence, if water is distributed from this

10   plant in the next couple of weeks, it will be

11   against your direction?

12       A.    Correct, yes.

13       Q.    And had you expressed all of these

14   concerns to your superiors in mid April of 2014?

15       A.    Yes.

16       Q.    And this was a last ditch effort

17   to have somebody, the DEQ in particular, step in

18   and perhaps grant you a reprieve as far as

19   starting the plant up, correct?

20            MS. COLLINS:  Objection; form.

21       A.    Correct, yes.

22       Q.    Did you ever receive a response

23   from Adam Rosenthal to this e-mail?

24       A.    No, I don't believe I got any

Highly Confidential - Michael B. Glasgow

1    response to this e-mail.

2         Q.   It sounds like, from the e-mail

3    and your wording, that you were really concerned

4    about starting the plant up, right?

5         A.   Right --

6              MR. KIM:  Objection as to form.

7         A.   -- yes.

8         Q.   If you didn't receive a response

9    to this, did you ever consider calling Adam

10   Rosenthal to discuss this in further detail and

11   to express your concerns to him?

12        A.   Without any response to the

13   e-mail, I didn't figure I'd get a response any

14   other way.

15        Q.   You ultimately deleted this e-mail

16   from your e-mail account, didn't you?

17        A.   I did.

18        Q.   And you ultimately deleted it

19   because it kind of looked bad, right?

20             MR. MARKER:  Objection; form,

21             foundation.

22        A.   I won't say it looked -- well,

23   I -- no, I didn't delete it because I thought it

24   looked bad.  I thought I was barking up the

Highly Confidential - Michael B. Glasgow

1    wrong tree.

2         Q.    Were you concerned that your

3    supervisors were going to see the e-mail and

4    perhaps reprimand you in some way for it?

5         A.    No.  At that point I wasn't really

6    worried about that, to be honest with you.

7         Q.    Well, then why did you delete the

8    e-mail?

9         A.    I just -- no response from

10   anybody.  Like I said, I thought that I was

11   going well above my pay grade even making the

12   suggestion.

13        Q.    Were you concerned at all about

14   the public seeing this e-mail at some point?

15        A.    No, I wouldn't say that.  I don't

16   think that crossed my mind at all.

17        Q.    We previously deposed Duffy

18   Johnson, and it came up as to whether phosphates

19   were always considered and always thought to be

20   a part of the final design.

21             Did you have that understanding as

22   well?

23             MR. KIM:  Objection as to form.

24             MR. SCHNATZ:  Same.

Highly Confidential - Michael B. Glasgow

```
 1              A.    Can you restate that.  Can you

 2    read that back to me.

 3              MR. GAMBLE:  Can you reread it to

 4         him.

 5              (Record read back as follows:

 6         "Question:  We previously deposed Duffy

 7         Johnson, and it came up as to whether

 8         phosphates were always considered and

 9         always thought to be a part of the final

10         design.  Did you have that understanding

11         as well?")

12              MR. KUHL:  Objection to form and

13         foundation.

14              A.    I can't say that I did.

15              Q.    But certainly you knew in April of

16    2014, when you flipped the switch to turn the

17    plant on and start distributing water, that

18    there were no phosphates that were being fed

19    into the water or into the system, correct?

20              MR. MARKER:  Objection; form,

21         foundation.

22              A.    Correct.

23              MR. MARKER:  There has been no

24         testimony to establish he flipped the
```

Highly Confidential - Michael B. Glasgow

1              switch.

2              Q.    In fact, there was no phosphate

3    feed system in place, correct?

4              A.    Correct.

5              Q.    After the switchover and after the

6    water treatment plant started distributing water

7    from the Flint River in April of 2014, did you

8    have any discussions with anyone at LAN about

9    the water treatment process or water quality

10   that you were achieving in the Flint water

11   treatment plant?

12                  MR. KIM:  Objection as to form.

13             A.    I don't recall.  I would imagine I

14   did have a few conversations.  When and where

15   and with who, I can't say offhand here.

16             Q.    Was it fair to say that after the

17   city started distributing water from the Flint

18   River in April of 2014 that LAN's work was

19   complete or virtually complete in your mind at

20   that time?

21                  MR. KIM:  Objection as to form and

22          foundation.

23             A.    I will say, for the most part, I

24   believe it was complete, but I thought we still

Highly Confidential - Michael B. Glasgow

1    had a couple upgrades that pertained to the KWA

2    water coming in that they would maybe be around

3    with later on.

4        Q.    So basically they weren't doing

5    anything, based on your understanding, as to the

6    operation of the plant with the Flint River

7    water, but they were still working on upgrades

8    for the KWA switchover, which was going to occur

9    two years later; is that your understanding?

10       A.    Correct, yeah.

11       Q.    Do you recall ever having

12   discussions with Warren Green about the water

13   quality results and the monthly operating

14   reports coming out of the Flint water treatment

15   plant after April of 2014?

16       A.    Not offhand, I do not.

17       Q.    And LAN didn't have any role

18   whatsoever in evaluating water quality and water

19   treatment after April of 2014, correct?

20            MR. KIM:  Objection as to form and

21       foundation.

22       A.    Not that I recall, no.

23       Q.    Did you ever have any -- well,

24   strike that.

Highly Confidential - Michael B. Glasgow

```
 1                    When did you first become aware
 2  that there was a potential lead problem in the
 3  water?  Was that LeeAnne Walters and what we've
 4  discussed there?
 5        A.    Yes, that's really what stimulated
 6  me to believe there was an issue.
 7        Q.    At that time, did you have any
 8  discussions or did you reach out to LAN to
 9  discuss the lead issues or anything relating to
10  lead in the water?
11        A.    At one point sometime, it would
12  have been late February or early March of '15,
13  after -- when Mr. Green was around from LAN, and
14  I leaned over to him and said, "Start designing
15  our phosphate feed system because I've got a
16  feeling we're going to need this soon."
17        Q.    And when was that discussion or
18  conversation?
19        A.    That would have been -- yeah,
20  February or March of '15, right after the
21  LeeAnne Walters issue.
22        Q.    And what prompted that discussion?
23        A.    That was just me after dealing
24  with Ms. Walters, and I had Warren Green there.
```

1    I forget why he was at the plant, but -- and I

2    knew he was our engineer so I knew they would be

3    part of the design when we would need it.  So I

4    was putting the bug in his ear that we're going

5    to need something here eventually.

6              Q.    And do you specifically recall

7    Warren Green's response to that?

8              A.    I do not.

9              Q.    Do you know when LAN was

10   ultimately charged with designing a phosphate

11   feed system for the Flint water treatment plant?

12             A.    I'm going to say it was probably

13   August or September of '15.

14             Q.    Do you recall why it took so long

15   for LAN to be retained to actually do that work?

16             A.    I believe in August or September

17   of '15 we received a letter from the MDEQ

18   stating that we needed to add phosphate.

19             Q.    So you felt that phosphate -- a

20   phosphate feed system would potentially need to

21   be instituted or implemented in February of

22   2015?

23             A.    Yes.

24             Q.    And did you tell your supervisors

Highly Confidential - Michael B. Glasgow

1    that at all?

2            A.    Yes.

3            Q.    Who did you tell?

4            A.    The same gentlemen I'll rattle off

5    before, Mr. Wright, Mr. Johnson, and Mr. Croft.

6            Q.    And what was their response to

7    your questioning them about the need for a

8    phosphate feed system?

9            A.    It was kind of like we'll cross

10   that bridge when we get to it.  They were

11   waiting for the second round of lead and copper

12   samples to come in.

13           Q.    So between February of 2015 and

14   September of 2015, when LAN was actually

15   retained to design the phosphate feed system,

16   your supervisors were waiting on test results;

17   is that your understanding?

18           A.    That's my understanding, yes.

19           Q.    And all the while, the city of

20   Flint and their residents were being exposed to

21   lead in the water that they were receiving; is

22   that correct?

23                 MR. KIM:  Objection as to form.

24                 MS. COLLINS:  Objection to form.

Highly Confidential - Michael B. Glasgow

```
1              A.    That's correct.

2              Q.    At one point in late 2014, the

3    city had a problem with TTHM levels, correct?

4              A.    Correct, yes.

5              Q.    And what was going on at the time?

6              A.    I think originally we had had some

7    issues with coliform bacteria before then, which

8    led us to keep increasing our chlorine dosage

9    into the water, which then created the TTHM

10   problem.

11             Q.    And you understand LAN was

12   retained to address or at least do the OER to

13   evaluate the TTHM problem?

14             A.    Yes.

15             Q.    Did you have any role whatsoever

16   in that report?

17             A.    Not much of a role, if any.

18             Q.    Do you know what LAN was asked to

19   specifically do and evaluate as part of their

20   OER on the TTHM issue?

21             A.    I can't say I can recall exactly.

22   The state had issued us to do an evaluation.  So

23   that's what I thought we had contracted LAN --

24   an evaluation in regards to the TTHM issue.
```

Highly Confidential - Michael B. Glasgow

1          Q.     And if they were asked to only

2    address the TTHM issue and how to potentially

3    lower it using existing processes in the plant,

4    i.e., no new design, would that be your

5    understanding of what they were charged with?

6          A.     Yes.

7          Q.     Okay.  Do you have a specific

8    understanding of what the cause of the TTHM

9    problem was?

10         A.     Yes, I would say I do.

11         Q.     And what was it?

12         A.     It was a combination of our total

13   organic carbon level in the Flint River water,

14   and then on top of that, the warm weather in the

15   summers and keeping a chlorine residual out in

16   the distribution system as we were supposed to.

17   The precursors for TTHMs were already there, and

18   we just kept adding chlorine to meet our other

19   limits that ultimately created the TTHM issue.

20         Q.     And if there was a sewer leak that

21   was upstream of the water treatment plant, could

22   that contribute to increased TTHM levels?

23              MR. MARKER:  Objection; form,

24         foundation.

1          A.    I can't say that it could.  You

2    know, the precursors were in the river as it

3    was.  So what's coming out of the sewer, I can't

4    say.

5          Q.    Do you recall whether there were

6    any discussions with LAN, when they were

7    evaluating the TTHM issue, as to whether LAN

8    should evaluate other water quality issues

9    coming out of the treated water at the Flint

10   water treatment plant?

11         A.    I can't say that there was, no.

12         Q.    And you don't know whether the

13   city of Flint responded that they were going to

14   retain somebody else to evaluate overall water

15   quality?

16         A.    No, I can't say.

17               MR. KIM:  Objection as to

18         foundation.

19         Q.    Do you have any understanding or

20   recollection of what LAN's recommendation was

21   with regard to addressing the TTHM issue?

22         A.    No, I can't say without reading

23   the report.

24         Q.    Do you recall ever reading the

Highly Confidential - Michael B. Glasgow

1    report?

2          A.    At one time, I do, yes.

3          Q.    And do you have any understanding

4    of whether they recommended increasing the

5    ferric chloride dosage or not?

6          A.    I do recall that coming up.  I

7    can't say if it was LAN that instituted that or

8    not.

9          Q.    Shifting gears to ferric chloride.

10   You're familiar with ferric chloride obviously,

11   right?

12         A.    Correct, yes.

13         Q.    What does ferric chloride do in

14   the treatment process?

15         A.    It's basically a coagulant.  It

16   will grab particulate matter out of the water,

17   grab ahold of it, and then the heavy iron

18   content makes it settle down.

19         Q.    And it's a common coagulant used

20   in the treatment of water, correct?

21         A.    Correct, yes.

22         Q.    In fact, Flint was using ferric

23   chloride in the decades before the water

24   treatment plant and the switchover was

Highly Confidential - Michael B. Glasgow

```
 1    announced, correct?

 2         A.    Correct.

 3         Q.    As a licensed F-1 operator, you're

 4    aware of the potential impact on finished water

 5    quality if the ferric chloride dosage is

 6    increased, correct?

 7         A.    Yes.

 8         Q.    And you're also aware of the

 9    impacts on water quality if it's decreased,

10    right?

11         A.    Yes.

12         Q.    I think we established before, the

13    polymer systems -- did the Flint water treatment

14    have polymer systems in place?

15         A.    Not prior to the start.

16         Q.    So they didn't have them or they

17    weren't functioning?

18         A.    I'll say they weren't functioning,

19    I guess, when you put it that way.

20         Q.    Was it contemplated that you would

21    utilize polymers as part of the treatment

22    process when the Flint water treatment plant

23    went online in April of 2014?

24         A.    There was always that possibility
```

Highly Confidential - Michael B. Glasgow

1  of polymers to aid with the softening process.

2          Q.    Had the polymers been used, that

3  would have impacted your ferric dosage, wouldn't

4  it?

5          A.    Possibly, yes.

6          Q.    In fact, utilization of polymers

7  and effective utilization will decrease the need

8  for ferric chloride, right?

9          A.    Correct, yes.

10         Q.    You didn't increase ferric

11 chloride dosage, did you, when LAN issued its

12 operational report in May of 2015?

13              MR. KUHL:  Objection to form and

14         foundation.

15         A.    No, I can't say that we did.  We

16 would increase dosage as necessary depending on

17 the levels of turbidity coming out of the Flint

18 River.

19         Q.    So if LAN recommended in its

20 reports, the TTHM reports, to slightly increase

21 ferric dosage, you didn't follow those

22 recommendations, did you?

23              MR. KUHL:  Objection to form.

24         A.    I can't recall.

Highly Confidential - Michael B. Glasgow

 1          Q.    Well, you didn't look at the

 2    report and say, "Okay.  They're recommending it

 3    so I'm going to do it."

 4                Right?

 5                MR. KUHL:  Objection to form.

 6          A.    Yeah, I can't say I did.

 7          Q.    With regard to the phosphate feed

 8    system, I think you testified your recollection

 9    was LAN would have been retained to do that in

10    September of 2015?

11          A.    Correct, yes.

12          Q.    And do you recall -- LAN expedited

13    the design of this, didn't they?

14          A.    Yes, they did.

15          Q.    In fact, they had finished the

16    design and actually had the construction up and

17    running in late 2015, right?

18          A.    Right, correct.

19          Q.    And that phosphate feed system was

20    up and operational in December of 2015, wasn't

21    it?

22          A.    Yes.

23          Q.    That's a pretty quick turnaround,

24    wasn't it?

Highly Confidential - Michael B. Glasgow

```
 1              A.    Yes.

 2                    MR. GAMBLE:  I'll tell you what,

 3              Mr. Glasgow, that's all I've for right

 4              now.  I'm going to reserve the remainder

 5              of my time.

 6                    MR. MARKER:  Go off the record and

 7              take a break?

 8                    MR. GAMBLE:  Yeah.

 9                    THE VIDEOGRAPHER:  We are going

10              off the record at 2:19 p.m.

11                    (Recess taken.)

12                    THE VIDEOGRAPHER:  We are back on

13              the record at 2:33 p.m.

14                        - - -

15                        EXAMINATION

16        BY MR. THOMPSON:

17              Q.    Good afternoon, sir.  My name is

18        Craig Thompson.  I represent Rowe Professional

19        Services Company.

20              A.    Okay.

21              Q.    I'm just going to have a few

22        questions for you, okay?

23              A.    Okay.

24              Q.    Are you familiar with Rowe --
```

Highly Confidential - Michael B. Glasgow

```
 1    we'll call it Rowe Engineering?

 2         A.    Yes.

 3         Q.    You're familiar with the fact that

 4    they're, like, a civil engineering and surveying

 5    firm located in Flint, Michigan?

 6         A.    Correct, yes.

 7         Q.    Okay.  In the course of time that

 8    you were at the water treatment plant -- that

 9    was a roughly, what, ten-year period?

10         A.    Ten years, roughly.

11         Q.    -- was there ever an occasion

12    where you would need engineering or surveying or

13    services from Rowe Engineering?

14         A.    I myself?  No.

15         Q.    Okay.  Are you aware that they had

16    a contract with the city of Flint to serve as

17    the acting city engineer for a duration of time?

18         A.    Yes.

19         Q.    I don't think it's necessary to

20    get into the actual period of when they were

21    acting in that capacity.  But you're aware of

22    that?

23         A.    Yes, I was aware they were in that

24    capacity, yep.
```

Highly Confidential - Michael B. Glasgow

1          Q.    Okay.  And do you have a

2    familiarity with how often they would provide

3    services, if any, to the water treatment plant

4    division of the city?

5          A.    Yeah, I can't say I remember any

6    instances that I recall.

7          Q.    Okay.  With regards to the

8    upgrades that were being done at the plant in

9    contemplation of the switch from the DWSD water

10   to the KWA, and in the interim the Flint River,

11   do you know what Rowe's involvement was, if any,

12   in regards to the upgrades that were going to be

13   made to the plant in contemplation of that?

14         A.    Yeah, I can't say.  I can't say

15   that I know they were involved in any of those

16   discussions.

17         Q.    Okay.  Do you know or do you have

18   reason to believe that Rowe had expertise --

19   engineering expertise in the area of water

20   quality or water treatment?

21         A.    No, I can't say that I did.

22         Q.    Okay.  Do you know who the city

23   did hire as their engineer to provide services

24   in relation the upgrades to the plant in

Highly Confidential - Michael B. Glasgow

1    contemplation of the switch?

2         A.    Right.  And from my experience, I

3    only remember LAN.

4         Q.    Okay.  So if you made reference to

5    an engineering firm during that time frame,

6    during the upgrades or the aftermath of that

7    switch, that would have been to LAN --

8         A.    Yes.

9         Q.    -- that you made reference to --

10             MR. GAMBLE:  Objection; form and

11        foundation.

12        Q.    -- an engineering firm?

13        A.    Yes.

14        Q.    If we could go to the book for the

15   Brent Wright deposition and reference back to

16   that Exhibit 45.

17             MR. MARKER:  Is it the sign-in

18        page?

19             MR. THOMPSON:  Yeah.

20   BY MR. THOMPSON:

21        Q.    Thank you.  If you could take a

22   look at that for second, you'll see the name Jim

23   Redding there for Rowe.

24        A.    Yes, I see it.

Highly Confidential - Michael B. Glasgow

1     Q.    Do you know who Jim Redding is?

2     A.    I don't think I could pick his

3     face out of a crowd, I'll say that.

4     Q.    Okay.  And you were already asked

5     by a couple attorneys here today about this

6     meeting, and it seems like we pretty much tapped

7     your memory as to what occurred during that

8     meeting.

9           But I have to ask anyways, do you

10    happen to recall anything that Jim Redding might

11    have said during the course of that meeting on

12    June 26th of 2013?

13          MR. KIM:  Objection to foundation.

14    A.    Yes, I can't say I remember

15    anything from Mr. Redding.

16    Q.    Okay.  Do you know anybody else

17    that works or worked at Rowe Engineering?

18    A.    I can't think of a name offhand.

19    I'm sure I've met one or two other engineers

20    that have worked there, but I can't say what

21    capacity they were under or why I would have met

22    with them.

23    Q.    Okay.  Would you believe that you

24    would have conferred with them at all in regards

Highly Confidential - Michael B. Glasgow

```
 1    to treatment of the water at the water treatment

 2    plant?

 3              MR. KIM:  Objection as to form and

 4         foundation.

 5    A.    No, I can't say that I would have.

 6    Q.    Okay.

 7              Do you have any recall of dealings

 8    with Rowe at all before or after the switch to

 9    utilizing the Flint River, as far as the

10    upgrades to the plant and things like that, in

11    relation to the --

12    A.    Yeah, I don't recall anything

13    after the switch, and if I didn't see a name on

14    this little meeting list, I don't think I would

15    recall anything prior.

16    Q.    Okay.

17              Do you have a recollection of ever

18    discussing any aspect of the Flint water crisis

19    with anybody from Rowe Engineering?

20    A.    No, I don't -- I don't recall any,

21    any conversations.

22              MR. THOMPSON:  Okay.  That's all

23         the questions I have for you.  Thank

24         you.
```

Highly Confidential - Michael B. Glasgow

```
 1                    THE VIDEOGRAPHER:  We're going off

 2          the record at 2:40 p.m.

 3                    (Recess taken.)

 4                    THE VIDEOGRAPHER:  We are back on

 5          the record at 2:44 p.m.

 6                    - - -

 7                    EXAMINATION

 8    BY MR. KIM:

 9          Q.    Okay.  Good afternoon,

10    Mr. Glasgow.  My name is William Kim.  I

11    represent the city of Flint here.

12                    We're familiar with each other; is

13    that correct?

14          A.    Correct, yes.

15          Q.    We knew each other when you worked

16    for the city of Flint; is that correct?

17          A.    That is correct.

18          Q.    Now, for what's going on here

19    today, you understand that you're being asked

20    questions about things that occurred four to

21    seven years ago?

22          A.    I am well aware of that, yes.

23          Q.    Okay.  And -- but you're being --

24    and your answers to the questions that have been
```

Highly Confidential - Michael B. Glasgow

1  posed to you today, have you been answering

2  based on the information that you know now?

3           A.    No, I've been trying to answer on

4  what I knew then.

5           Q.    You say you've been trying to.

6           A.    Yeah, and I will make the

7  attempt -- if I think it's something I've

8  learned after the fact, I will try to stipulate

9  that and point that out.

10          Q.    Okay.  Let's start with this, if I

11  can get the first tab.  This will be 25.

12                      - - -

13      (Glasgow Deposition Exhibit 25 marked.)

14                      - - -

15  BY MR. KIM:

16          Q.    If you could take a look at what's

17  been marked as Exhibit 25.  This is Bates number

18  City of Flint_FED_240028.

19                And is this an e-mail that was --

20  that you sent to Duffy Johnson on October 31,

21  2013?

22          A.    Yes, it is.

23          Q.    And had Daugherty Johnson asked

24  you to essentially predict -- give your best

Highly Confidential - Michael B. Glasgow

1    prediction as to what would be the effects of

2    treated Flint River water on the distribution

3    system?

4              A.    Yes.

5              Q.    And what did you tell him?

6              A.    Well, I'll just -- I'll read some

7    from the e-mail here.  "Sorry" -- well, I'll

8    skip that one.  "About your inquiry of the

9    effect of treated Flint River water on the

10   distribution system, I have heard different

11   arguments.  Personally, I don't believe it will

12   have much effect.  It all depends on our final

13   water quality, mostly pH and alkalinity."

14             Q.    Okay.  Was there more?

15             A.    There's a little bit more but ...

16             Q.    Why don't you read the rest of

17   that.

18             A.    Okay.  "Most likely we will have a

19   scale-forming water, and this may lead to lots

20   of scale buildup in the system.  This may cause

21   reduced flow of piping that is already partially

22   clogged, ultimately affecting pressures and

23   could increase some maintenance on pump station

24   if scale buildup starts to occur in the pumps.

Highly Confidential - Michael B. Glasgow

```
 1                    "As we operate the plant, we will
 2      have to develop some goal for what type of
 3      finished water quality we wish to have.  The
 4      best case is to keep the parameters as close as
 5      we can to Detroit water to have minimal effect
 6      on the distribution system.  But at times, the
 7      process will determine what we 'can' do," "can"
 8      being in quotation marks.
 9            Q.    Okay.  At this time, at the time
10      of this e-mail, had Duffy Johnson or
11      Daugherty -- I'll just refer to him as Duffy if
12      that's okay with you.
13            A.    That's fine, yeah.
14            Q.    Had Duffy Johnson told you
15      definitively that the city of Flint was going to
16      be using the Flint River as a water source?
17            A.    I'll say he told me we were
18      looking at that avenue.  Whether or not he said
19      it was definitive, I don't recall, but ...
20            Q.    Okay.  Now, you're aware that to
21      use the Flint River as a water source, the city
22      of Flint of was going to need to do upgrades to
23      the water treatment plant and increase its
24      personnel and take other steps to be able to
```

Highly Confidential - Michael B. Glasgow

1    successfully use the Flint River, correct?

2        A.    Correct, yes.

3        Q.    And you know that those kinds of

4    upgrades and hiring would take time, correct?

5        A.    Correct, yes.

6        Q.    Is it -- so would it be

7    reasonable, in your ex- -- would it be

8    reasonable to expect that those steps would have

9    to have been done at a -- before the switch

10   itself?

11       A.    Yes.  I will say yes, steps had

12   started to be taken.

13       Q.    Okay.

14              Now, are any of the steps that

15   were -- now, you've testified today as to your

16   recollections as to some of those upgrades and

17   steps that were taken to prepare the Flint water

18   treatment plant to process Flint River water,

19   correct?

20       A.    Correct.

21       Q.    Are any of those steps

22   incompatible with the city continuing to

23   purchase water from Detroit, taking -- or let me

24   rephrase that -- doing any of those upgrades

Highly Confidential - Michael B. Glasgow

1   prevent the city of Flint from staying with

2   the -- staying with the Detroit DWSD and

3   purchasing water from them?

4          A.    No, not to my knowledge.

5          Q.    So just because the city was

6   upgrading its water plant and engaging in

7   upgrades to its water plant, that doesn't mean

8   that the city had committed to using the Flint

9   River and committed to moving away from Detroit

10   by April of 2014; is that correct?

11          A.    I would say that's correct, yes.

12          Q.    Okay.

13                Going back to Exhibit 25 here, the

14   main subject -- or not the subject, but the

15   first part of the e-mail is your response to a

16   follow-up question from Duffy; is that correct?

17          A.    That is correct.

18          Q.    And in that -- in your response,

19   you give him your analysis of what the hardness

20   of the water from Detroit was compared to what

21   you -- what you predicted we could do in Flint;

22   is that correct?

23          A.    That is correct, yes.

24          Q.    And did you inform him that the

Highly Confidential - Michael B. Glasgow

```
 1    water was -- from Detroit was an average of

 2    100 milligrams per liter?

 3           A.    Yes.

 4           Q.    And did you believe that it was

 5    possible to get the city of Flint to

 6    130 milligrams per liter?

 7           A.    Yes.  The 130 was kind of the

 8    theoretical number we could get to in the city.

 9           Q.    Now, I guess in layman terms, what

10    kind -- how -- how closely related are those

11    numbers?

12           A.    The 100 and the 130?

13           Q.    Yes.

14           A.    Is that what we're talking about?

15                 They're reactively close.  I mean,

16    when you talk about hard water versus soft

17    water, you know, you talk about soft water is

18    about 100 milligrams per liter and below, and

19    you don't really start to talk about hard water

20    until you get up to 250 to 300 milligrams per

21    liter of hardness.

22           Q.    Okay.  Now, what is the effect of

23    softening water?

24           A.    Most people look at it -- and
```

Highly Confidential - Michael B. Glasgow

1    myself -- as an aesthetic.  So hard water, we're

2    going to remove some of the calcium and

3    magnesium out of the water.  Residents might

4    notice this scaling on the inside of their sinks

5    or showerheads that may slowly get clogged over

6    time.  But that scale is all mostly -- calcium

7    and magnesium, nothing that's detrimental to a

8    person's health.  But it's mainly an aesthetic

9    thing.  Or maybe they do a load of dishes in the

10   dishwasher and there's spots on it after the

11   fact with hard water as compared to soft water.

12           Q.    Okay.  I'm handing you what has

13   been marked as Exhibit 26.

14                     - - -

15      (Glasgow Deposition Exhibit 26 marked.)

16                     - - -

17   BY MR. KIM:

18           Q.    This is Bates number city of

19   FLINT_FED_0107003.  And is this an e-mail from

20   you to Duffy Johnson dated April 14, 2014?

21           A.    Yes.

22           Q.    And does this represent that you

23   were asked to make a comparison as to the -- as

24   to the water that Detroit was providing compared

Highly Confidential - Michael B. Glasgow

1    to what we -- the water that the city of Flint

2    would be providing?

3          A.    Yes.

4          Q.    And did you -- did you do that

5    comparison?

6          A.    I do recall doing a comparison at

7    one time.  And like I said, before, it was just

8    a -- kind of a standard little Excel

9    spreadsheet, nothing fancy.

10         Q.    Okay.

11         A.    Just with some comparisons.

12                      - - -

13       (Glasgow Deposition Exhibit 27 marked.)

14                      - - -

15   BY MR. KIM:

16         Q.    Okay.  I'm handing you what's been

17   marked as Exhibit 27, city of Flint_FED_0107013.

18               And does this exhibit represent an

19   e-mail that you sent to Duffy Johnson a day or

20   two after the previous e-mail that we

21   referenced?

22         A.    Yes.

23         Q.    And did this -- does this e-mail

24   include -- consist of essentially a cover e-mail

Highly Confidential - Michael B. Glasgow

1    and an attached spreadsheet?

2        A.    Yes.

3        Q.    And is this spreadsheet -- do you

4    have the spreadsheet in front of you?

5        A.    I do.  I do.

6        Q.    Okay.

7            MR. THOMPSON:  What is the Bates

8        number of the spreadsheet?

9            MR. KIM:  I believe the

10       spreadsheet was 014.  It was produced in

11       its native format so the Bates number

12       doesn't appear on the spreadsheet.

13   BY MR. KIM:

14       Q.    Is this the comparison of Flint

15   River water -- processed Flint River water to

16   Detroit water -- Detroit finished water that you

17   provided to Duffy Johnson?

18       A.    Yes.

19       Q.    Okay.  And so we can see that

20   there are a listing of parameters and a

21   comparison between Detroit and Flint; is that

22   correct?

23       A.    That is correct.

24       Q.    What was the source of your

Highly Confidential - Michael B. Glasgow

1    numbers for the Detroit numbers?  In the column

2    that's under -- listed under the heading of

3    "Detroit," what was the source for -- what did

4    you use to calculate those numbers or come up

5    with those numbers?

6         A.    Yes, that was an average of

7    numbers I would get almost monthly from Detroit.

8    They weren't good at sending them every month.

9    But I would get a single-page document e-mailed

10   to me from Detroit with some of their results of

11   their testing for that month.  So I compiled

12   what -- what notifications from Detroit with the

13   numbers I had and kind of took an average of

14   everything.

15        Q.    Okay.  And what was the source of

16   the numbers that you used for Flint?

17        A.    Yeah.  The numbers for Flint were

18   based on previous test runs.  It looks like

19   mainly collected during 2012 and 2013.

20        Q.    Okay.  So would these numbers have

21   been generated based on -- prior to the upgrades

22   that were done to the Flint water plant; is that

23   correct?

24        A.    That is correct, yes.

Highly Confidential - Michael B. Glasgow

1          Q.    So, I guess, let's go down the

2   line -- go down the column here.  What's the

3   significance of the "Barium" line?

4          A.    Barium, that was just one of the

5   results Detroit had.  There's regulations on

6   barium.  But that was one of the numbers I

7   actually had from Detroit, and I actually had

8   some testing results from our test runs as well

9   from Flint, so I included that on here as well.

10         Q.    Okay.  In your experience, is the

11  difference between those numbers -- two numbers

12  a significant difference?

13         A.    Those numbers, no.  They're pretty

14  close.

15         Q.    Okay.  The next line is "Calcium,"

16  where it says 30 milligrams per liter for

17  Detroit and 50 milligrams per liter for Flint.

18         A.    Right, correct.

19         Q.    And you say that will vary

20  depending on the softening process.  Can you

21  explain why?

22         A.    Correct.  Well, depending on how

23  well the softening process is going to work,

24  that number -- the softening process -- the way

1    the city of Flint plant was set up, it's a real

2    dynamic process.  It could change hourly.

3              So I couldn't really put in a

4    number and say that's what we're going to hit

5    every day, 24 hours a day.  It's going to vary,

6    how much lime we're adding, what the

7    characteristics of the Flint River coming into

8    the plant are.  So that was kind of just a good

9    average for me to throw into the spreadsheet

10   there.

11        Q.    Okay.  So in your experience, is

12   the difference between the 30 milligrams a liter

13   and the 50 milligrams a liter a meaningful

14   difference between those two -- between the two

15   sources?

16        A.    You know, in my opinion, no, not

17   with calcium.

18        Q.    Okay.  Chloride, we have a

19   difference between 9 milligrams with Detroit and

20   72 milligrams with Flint.

21        A.    Yes.

22        Q.    And you say -- and is that going

23   to be a significant difference in the finished

24   water product?

Highly Confidential - Michael B. Glasgow

```
 1            A.    It's a significant difference

 2    number-wise, but with the quality -- to my eyes,

 3    chloride is not a regulated contaminant.  And

 4    the whole result of our chloride increasing so

 5    much is due to our coagulant that we used,

 6    ferric chloride.  We were adding that to the

 7    water as a coagulant so there's going to be lots

 8    of residual chloride in the water.  But not too

 9    significant to me.  Ferric chloride is a

10    well-known coagulant.  It's used a lot of places

11    so ...

12            Q.    Okay.  So the chlorine-free

13    residual, the difference between 1 milligram per

14    liter and 1.5 milligrams per liter, is that

15    going to be a significant difference in your --

16            A.    That's not going to be

17    significant, no.

18            Q.    .71 milligrams per liter for

19    fluoride versus .70?

20            A.    No, no.  And we -- we have the

21    control, and that's also a regulation to have

22    the fluoride concentration right around .7 so a

23    little one way or the other won't affect much.

24            Q.    Total hardness, 100 milligrams per
```

1    liter compared to 160 milligrams per liter?

2         A.    Yeah.  I -- somewhat significant

3    on an aesthetic quality to me, but --

4         Q.    So you say that --

5         A.    -- really overall.

6         Q.    Okay.  So as an aesthetic quality,

7    would that, in -- to your mind, does that

8    difference implicate any kind of safety

9    concerns?

10        A.    No, no.

11        Q.    So it's restricted only to

12   aesthetic qualities.  And what would you

13   consider to be aesthetic qualities?

14        A.    Oh, yeah, you know, it could have

15   a little effect on taste.  Like I said, it

16   mainly has to do with scale buildup in sinks,

17   toilets, and showerheads, dishwashers, just

18   calcium magnesium scale building up there, but

19   not a health issue in my eyes.

20        Q.    I guess comparing the remaining

21   ones, the hardness, noncarbonate, magnesium,

22   nitrate, nitrites, sodium sulfate, and your

23   projections for the total trihalomethanes and

24   the haloacetic acids, are anything in those --

Highly Confidential - Michael B. Glasgow

```
 1    any of those projections, to you, significant

 2    differentials?

 3         A.    No, not in my eyes, no.

 4         Q.    Okay.

 5               MR. KIM:  We're on 28?

 6         Q.    Actually, if you can turn to what

 7    was previously admitted as Exhibit 24.

 8               Now, you said this was the

 9    e-mail -- this is the e-mail that you sent on

10    April 17 to Adam Rosenthal; is that correct?

11         A.    Correct.

12         Q.    And in this e-mail, you -- you

13    were communicating your concerns about the

14    current staffing and about the monitoring

15    schedule; is that correct?

16         A.    That is correct.

17         Q.    You say that you needed "time to

18    adequately train additional staff and to update

19    your monitoring plans"; is that correct?

20         A.    Correct, yes.

21         Q.    Now, on the staff issue, this

22    e-mail was sent on April 17, 2014, and so

23    approximately a week later the city switched

24    over to the use of the Flint River; is that
```

Highly Confidential - Michael B. Glasgow

1    correct?

2          A.    That is correct.

3          Q.    Okay.  In that one-week period,

4    did the -- was anything done to address your

5    staffing concerns?

6          A.    At this time, it did seem like we

7    did add additional staff a couple weeks before

8    the switch took place.

9          Q.    Okay.  Specifically, do you

10   remember -- do you remember whether or not

11   authorization for overtime was granted by the

12   personnel who were -- who could authorize such

13   overtime?

14         A.    Yes.  We had an open door for

15   overtime.  There was no questions.

16         Q.    Okay.  Now, if the -- with that

17   essentially unlimited overtime that you had

18   available to you, was it possible to adequately

19   staff the water plant for operation?

20         A.    Yes.  Yes, I could have the amount

21   of guys on shift I wanted with overtime, yes.

22         Q.    Okay.  Were you -- when the water

23   plant went into operation, were you ever denied

24   the ability to have adequate staffing by

Highly Confidential - Michael B. Glasgow

1    limiting the overtime?

2         A.    No.

3         Q.    Okay.  And was additional staff

4    hired to alleviate the overtime concerns in the

5    long run?

6         A.    Yes.  As time went on, more staff

7    was hired.

8         Q.    Okay.  Now, even with the overtime

9    and with the newly hired staff, at any time was

10   the water plant operated -- was there ever a

11   time when the water plant was being -- was there

12   ever a time when there was not a licensed --

13   where there were not licensed operators or

14   personnel at the water plant?

15        A.    Not that I'm aware of.

16        Q.    Okay.  Now, in regards to the

17   monitoring plans, you say that you wanted to

18   update the monitoring plans in your e-mail; is

19   that correct?

20        A.    Yes, that is correct.

21        Q.    What would you have done to update

22   the monitoring plans?

23        A.    Well, there was a couple different

24   monitoring plans we needed.  One was for

Highly Confidential - Michael B. Glasgow

1    disinfection byproducts, so our TTHMs.

2                    We needed more sites.  The other

3    monitoring plan would be the lead and copper

4    monitoring plan, which was changing from 30

5    samples to 100.  So we needed to dig in and get

6    some more information.

7                    It seems like there was one more

8    monitoring plan I was worried about, but it's

9    not coming to mind right now.

10        Q.    Where would these monitoring plans

11   have come from?

12        A.    We would -- the city would develop

13   them and then send them to the -- to the state

14   for approval.

15        Q.    Okay.  And were you waiting for

16   state approval for the monitoring plans?

17        A.    No, not at that time, because I

18   hadn't -- we hadn't prepared them.  I had just

19   got the list of what we needed to do.

20        Q.    And when were those monitoring

21   plans submitted to the state?

22        A.    I can't say.  They were probably

23   all submitted at a different time, but I can't

24   say offhand without my records.

Highly Confidential - Michael B. Glasgow

```
1              Q.    Isn't it true that the -- that --

2     we've discussed corrosion control.  Several of

3     my colleagues have brought this up.  And you

4     testified that the -- that staff from the MDEQ

5     told you that the city was going to be required

6     to complete two rounds -- two six-month

7     monitoring periods before the appropriate level

8     of corrosion control could be determined; is

9     that correct?

10             A.    That is correct.

11             Q.    Now, the city -- when you were in

12    charge of the lab, the city tested the water --

13    finished water that was produced by the water

14    plant; is that correct?

15             A.    That is correct.

16             Q.    And it would test the water for

17    the levels of various chemicals and --

18    essentially to monitor the treatment process; is

19    that correct?

20             A.    Correct, yes.

21             Q.    And the -- the things that you

22    were testing for were specified in a directive

23    from the MDEQ; is that correct?

24             A.    That is correct.  That would be
```

Highly Confidential - Michael B. Glasgow

1    delegated on a yearly monitoring schedule that

2    the state would send to the city.

3            Q.    Okay.  Now, would the addition of

4    orthophosphates be something that would be

5    listed in that yearly monitoring schedule?

6            A.    Yes.  If it was in there, it would

7    be listed and would tell us the frequency of

8    testing, how often to test for it and where to

9    test.

10           Q.    Okay.  Now, if the -- if the -- if

11   the annual monitoring schedule did not include

12   those orthophosphates, could the city have added

13   those phosphates without the approval of the

14   MDEQ?

15           A.    No, not without the approval.  Any

16   change to a treatment process needs written

17   approval.

18           Q.    Okay.

19                 Now, we've discussed

20   orthophosphates as a measure -- as one means to

21   implement corrosion control; is that correct?

22           A.    That is correct.

23           Q.    What happens if you -- now, the --

24   so if corrosion control had been required, the

1    level of orthophosphates would have been

2    specified in the monitoring schedule; is that

3    correct?

4           A.    I don't know if the true level --

5    they would have given us a recommendation on a

6    level to add, but mainly in the monitoring

7    schedule, it would be a frequency of testing and

8    where you test.

9           Q.    Okay.  What happens if you add

10   excessive amounts of orthophosphates to drinking

11   water?

12                MR. KUHL:  Object to form.

13                MR. MORRISSEY:  Object to form.

14          Q.    What is likely to happen if you

15   add excessive amounts of orthophosphates to

16   drinking water?

17                MR. MORRISSEY:  Object to form.

18          A.    Yeah, it's hard for me to predict.

19   I'll say there could be other ramifications of

20   adding phosphates at extreme levels.  When I

21   think about excessive phosphates, I start to

22   think, you know, phosphate is a food source for

23   microorganisms.  So there could be issues in

24   that aspect, but that's, yeah, hard for me to

Highly Confidential - Michael B. Glasgow

1    predict.

2           Q.    Okay.  What kind of issues would

3    you -- what kind of issues are you referring to

4    with it being an organic food source?

5           A.    I would -- you know, it's food for

6    some of the microorganisms in the distribution

7    system.  A lot of people think of water as

8    clean, but there's its own little living --

9    what's the word I'm looking for here?

10                There's a whole nother -- I don't

11   know -- I want to say -- I'm at a loss for a

12   word here.  I apologize, Mr. Kim.  It's like a

13   whole nother little ecosystem inside the pipes I

14   guess is what I'm trying to look for.  So

15   there's living things in there, and the

16   phosphorus would be -- could be a food source

17   potential.

18          Q.    Okay.  I'm going to jump around a

19   little bit here.  You're still -- you're still

20   currently licensed as a -- are you still

21   currently licensed as a water plant operator?

22          A.    Yes, I am.

23          Q.    And what kind of licensure do you

24   currently hold?

Highly Confidential - Michael B. Glasgow

1          A.    I currently hold an F-1

2    certification for treatment and an S-3 for

3    distribution.

4          Q.    Okay.  So an F-1 certification for

5    treatment is the highest level of certification

6    that's offered by the state of Michigan; is that

7    correct?

8          A.    That is correct.

9          Q.    And you've maintained that

10   licensure continuously from the time you were

11   with the city of Flint -- from the time you left

12   the city of Flint until the present day; is that

13   correct?

14         A.    That is correct.

15         Q.    So it's important for you to stay

16   up to date with the regulatory developments in

17   that area; is that correct?

18         A.    Absolutely, yes.

19         Q.    And do you do so?

20         A.    I try my best, yes.

21         Q.    Now, earlier you testified that

22   you were surprised when the MDEQ told you that

23   only -- that before the -- before an optimized

24   corrosion control requirement could be imposed,

1    that they were going to have the city of Flint

2    do two six-month monitoring periods; is that

3    correct?

4          A.    That is correct.

5          Q.    Did you ever question the MDEQ's

6    authority to interpret the regulations in that

7    fashion?

8          A.    No, I did not.

9          Q.    Did the MDEQ's interpretation of

10   the -- interpretation of the applicable

11   regulations seem to fall within their purview as

12   you understood it?

13         A.    I would say yes.

14         Q.    Now, the regulations that were

15   cited by the -- or that were referred to by the

16   MDEQ when they required two six-month monitoring

17   periods before setting an optimized corrosion

18   control level, has there been any clarifications

19   or modifications of those underlying regulations

20   since April 2014?

21         A.    I can't -- I can't say that I -- I

22   believe so.  I'm going to say not that I'm aware

23   of.

24         Q.    Are you aware of any guidance from

Highly Confidential - Michael B. Glasgow

```
 1    the EPA regarding those regulations?

 2          A.    Not specifically I hate to say.

 3          Q.    Okay.

 4                      - - -

 5        (Glasgow Deposition Exhibit 28 marked.)

 6                      - - -

 7    BY MR. KIM:

 8          Q.    I'm handing to you what is marked

 9    as Exhibit 28.  This is city of

10    Flint_FED_0112441.

11                Is this an e-mail that you sent

12    the Jason Lorenz on September 2, 2015?

13          A.    Yes.

14          Q.    And were you -- were you

15    provided -- and who is Mr. Lorenz?

16          A.    He was the -- oh, what do they

17    call him?  Kind of our communications -- I'm

18    trying to think of his title.  He would put

19    out --

20          Q.    Was he the city's public

21    information officer?

22          A.    There you go.  Public information

23    officer sounds right.

24          Q.    Okay.  And were you providing him
```

1    with information about the city's sampling under

2    the Lead and Copper Rule?

3           A.    Yes.

4           Q.    And were you also explaining to

5    him the requirements -- what you understood to

6    be the requirements that were in place requiring

7    the city to deduct two six-month rounds of

8    testing?

9           A.    Yes.

10          Q.    So here we can see that you

11   informed Mr. Lorenz that the city was required

12   to collect samples for a six-month period from

13   July 1, 2014 through December 31, 2014; is that

14   correct?

15          A.    That is correct.

16          Q.    And then you state what the --

17   what was collected and what the testing results

18   were?

19          A.    Yes.

20          Q.    And you refer to a 90th percentile

21   value; is that correct?

22          A.    That is correct.

23          Q.    And then you give that similar

24   information for the second six-month period from

 1    January 1, 2015 through June 30 of 2015; is that

 2    correct?

 3         A.    Yes.

 4         Q.    Why did the -- now, the city

 5    switched over to the Flint River in April of

 6    2014; is that correct?

 7         A.    That is correct.

 8         Q.    So that was in the middle of what

 9    would be a normal six-month sampling period; is

10    that correct?

11         A.    Yes.

12         Q.    So the normal sampling periods run

13    from January to June of every year; is that

14    correct?

15         A.    Yes.

16         Q.    And then from July to December of

17    every year?

18         A.    Yes.  To my knowledge, yes.

19         Q.    And so were you directed to --

20    that the city's sampling period would start in

21    July and end in December?

22         A.    Yes.

23         Q.    And who directed you to do that?

24         A.    The DEQ.

Highly Confidential - Michael B. Glasgow

1          Q.    So it was the DEQ that said that

2    the city's two six-month sampling periods would

3    not start until July of 2014 running through the

4    end of the year and then the first half of 2015?

5          A.    That is correct, yes.

6          Q.    Now, the -- now, were these

7    samples collected using any particular

8    procedures?

9          A.    Yes.  My lab with the water plant

10   was not certified to test for lead and copper so

11   we used the MDEQ lab based in Lansing.  So they

12   would send us the sample bottles, and I could

13   also pull a set of instructions off the DEQ

14   website.  So I could hand a resident the sample

15   bottle and the instructions on how to collect

16   it.

17         Q.    Okay.  So were residents provided

18   with the sample bottles that were provided to

19   you by the MDEQ's lab?

20         A.    Yes.

21         Q.    And were they provided with

22   instructions -- the instructions that you

23   received from the MDEQ?

24         A.    Yes.

Highly Confidential - Michael B. Glasgow

```
 1                    - - -

 2        (Glasgow Deposition Exhibit 29 marked.)

 3                    - - -

 4   BY MR. KIM:

 5        Q.    Okay.  I'm giving you what has

 6   been marked as Exhibit 29.

 7              This is Bates numbers city of

 8   Flint_FED_0073298.

 9              And is this an e-mail from you to

10   Howard Croft dated September 21, 2015?

11        A.    Yes.

12        Q.    Did you intend to send this e-mail

13   to Marc Edwards?

14        A.    No.

15        Q.    Okay.  You see at the top there,

16   at the --

17        A.    Oh, I see it.

18        Q.    -- top of the page, where you

19   addressed it to Marc?

20        A.    Yes.

21        Q.    So did you intend to -- does that

22   make you think that you intended to send this to

23   Marc Edwards as opposed to Howard Croft?

24        A.    Yeah, now that I look at the,
```

Highly Confidential - Michael B. Glasgow

1   yeah, carbon copy there, yeah, I must have.

2        Q.   Okay.  And you see that basically

3   in the e-mail chain here that Howard Croft

4   appears to have forwarded or replied or included

5   you on a reply to a message that he sent to Marc

6   Edwards?

7        A.   Yes.

8        Q.   And you know who Marc Edwards is,

9   correct?

10       A.   Correct, yes.

11       Q.   What's your understanding of Marc

12  Edwards' role in all of this?

13       A.   Well, he come into the picture not

14  long after, I believe, Ms. Walters' episode.

15  And he originally contacted me via e-mail, and I

16  couldn't tell you when, maybe March, April of

17  '15, letting me know that he was conducting lead

18  and copper testing.  I told him we'd help him

19  however we could, that I was having issues

20  getting enough samples back, but he was letting

21  me know that he was doing an investigation of

22  his own.

23       Q.   Okay.  Now, here you stated the --

24  in your e-mail you stated that "the DEQ

Highly Confidential - Michael B. Glasgow

1    calculated the 90th percentile on the last two

2    rounds of sampling."

3              Do you see that?

4    A.    Yes.

5    Q.    And is that a true statement?

6    A.    Yes.

7    Q.    Is that the general practice?  Is

8    that the general practice, that the DEQ would

9    calculate the 90th percentile on samplings?

10   A.    From my experience, yes, over the

11   years.  I would just send them the form -- the

12   LCR form of all the results, and they would

13   usually calculate the 90th percentile and send a

14   letter back to the city stating what our 90th

15   percentile value was.

16   Q.    Okay.  And why is the

17   90th percentile meaningful?

18   A.    It's just meaningful for the Lead

19   and Copper Rule.  That's how the regulations

20   were based, and your reporting is based off the

21   90th percentile.

22   Q.    So if the 90th percentile is

23   meaningful, does having a single result have --

24   require any kind of action under the applicable

Highly Confidential - Michael B. Glasgow

```
 1    laws or regulations?

 2         A.    Not to my understanding, no.

 3         Q.    Okay.

 4               Let me make sure these are in the

 5    correct order here.

 6                    - - -

 7      (Glasgow Deposition Exhibit 30 marked.)

 8                    - - -

 9    BY MR. KIM:

10         Q.    Okay.  I'm handing you what I've

11    marked here as Exhibit 30.  This is city of

12    Flint_FED_0023232.

13               And does this e-mail include a

14    message that you sent describing your

15    interactions with LeeAnne Walters and 212

16    Browning?

17         A.    Yes.

18         Q.    And does this describe the results

19    that you got from testing the water at her

20    house?

21         A.    Yes.

22         Q.    Okay.  And so do you remember when

23    you took those -- when you took those tests or

24    took those water samples from 212 Browning?
```

Highly Confidential - Michael B. Glasgow

```
1              A.    Yes.  It was sometime in February.

2    I can't remember the date.

3              Q.    Okay.  And the result -- the

4    individual results that you got back from

5    LeeAnne Walters were high, as you testified

6    earlier; is that correct?

7              A.    That is correct.

8              Q.    So what did you do after those

9    initial results came back showing that her house

10   had an extreme -- I can't remember the exact

11   words you used, but had high test results come

12   back?

13             A.    Yeah.  So after the initial higher

14   test result, we had her test again.  And then

15   the -- that test come back even higher than the

16   original level of 104.

17             Q.    Okay.  Did you -- did you do any

18   testing at the other homes in her neighborhood?

19             A.    Yes.  After the original 104 part

20   per billion result, the day -- that day or the

21   next day, I went over and took her another

22   sample bottle so she could collect another

23   sample, and I myself walked up and down the

24   street knocking on doors and trying to get ahold
```

Highly Confidential - Michael B. Glasgow

1    of neighbors to see if they would collect

2    samples as well for us, to see if this was a --

3    kind of a singularity problem or something that

4    was affecting the whole street.

5            Q.    Did they -- did they collect

6    samples?

7            A.    Only two residents did here.

8            Q.    And do you remember what the

9    results of those -- of the neighbors to

10   212 Browning was?

11           A.    I don't recall the exact level,

12   but they were underneath the action level of

13   15 parts per billion.

14           Q.    Okay.  Did you conduct any further

15   investigation or analysis as to what the likely

16   cause of the high test results at 212 Browning

17   were?

18           A.    Well, just using a little bit of

19   knowledge I had, I knew her internal plumbing

20   was all plastic.  So that led me to believe it

21   was the service line.

22           Q.    And so was there anything out of

23   the ordinary about the service line at 212

24   Browning?

Highly Confidential - Michael B. Glasgow

1          A.    Yes.  It was -- it seemed like the

2   house Ms. Walters had lived at was one of the

3   first in that neighborhood.  The service line

4   didn't come out the front of her house to the

5   street right in front.  It ran, I want to say,

6   at least 100 feet in another direction to a side

7   street and underneath another house that just

8   had a cement slab, no basement.

9          Q.    And is that unusual for a

10  residential service line?

11         A.    Yes.  It's highly unusual.

12         Q.    Did you draw any conclusions about

13  the age of the service line?

14         A.    Well, just the fact that it was

15  run to a different street told me that it was an

16  older service line put in prior to the street

17  that her driveway was on was put in.  So it

18  reflected something from the time past, I will

19  say, you know, before that neighborhood was

20  fully constructed.

21         Q.    Okay.  So if I can -- tell me if

22  this is an accurate summary:  After determining

23  that the test results at 212 Browning were high,

24  you determined that the neighbors that you could

Highly Confidential - Michael B. Glasgow

1   get samples from did not have -- were not having

2   any -- were not having test results that were

3   even remotely close to those that you were

4   getting from 212 Browning; is that correct?

5          A.    That is correct.

6          Q.    And then you conducted additional

7   investigation and determined that the service

8   line to 212 Browning, where Ms. LeeAnne Walters

9   resided, was an extremely long service line

10  compared to other residential service lines that

11  you're familiar with?

12         A.    That is correct.

13         Q.    And that the line was likely to be

14  of significantly increased age compared to the

15  service lines nearby?

16         A.    Yes, that is correct.

17         Q.    Was that service line replaced?

18         A.    Yes, to my knowledge, it was.

19         Q.    And once it was replaced, were

20  there any -- were there any further negative --

21  well, were there further test results of

22  excessive lead?

23         A.    Not to my knowledge, no.

24         Q.    Okay.  If I can jump around a

Highly Confidential - Michael B. Glasgow

1    little bit more.  Sorry for how I'm jumping

2    around here in time periods.

3          A.    Oh, you're fine.

4          Q.    You were asked earlier in regards

5    to the LAN -- to the contract with LAN whether

6    you authorized them to do certain things or

7    reviewed their various proposals.

8                Do you remember those questions?

9          A.    Vaguely, yes.

10         Q.    Was that ever one of -- was that

11   part of your job duties in 2013?

12         A.    No.

13         Q.    Was that your -- was that part of

14   your job duties in 2014?

15         A.    No.

16         Q.    Did you regularly have any kind of

17   interactions with LAN during that time period?

18               MR. GAMBLE:  Object to form.

19         A.    I wouldn't say regularly.  With

20   going through all our upgrades, usually a member

21   or two from LAN was around the plant here and

22   there, and at times I would bump into them and

23   have discussions but not nothing that really

24   jumps out as being regular.

Highly Confidential - Michael B. Glasgow

1      Q.    Okay.  You described the

2  relationship with the MDEQ and with their staff

3  as being like a coach and like cops.  Is that --

4  was that accurate?

5      A.    Yes.

6      Q.    And you saw them as being coaches

7  because they would provide advice, correct?

8      A.    Correct, yes.

9      Q.    Is there any other reasons why you

10 saw them as coaches?

11     A.    Well, yeah, I guess I could say --

12 when I think about it, I'm still laughing that I

13 used that description of it, but, yeah, they

14 would help, in my eyes, to interpret some of the

15 rules from the Safe Drinking Water Act, you

16 know.  I don't know, probably everybody in this

17 room has now seen the Safe Drinking Water Act.

18 Now it looks like one of these big binders.

19         But as with anything and, I guess,

20 law like you guys practice, there could be

21 different interpretations of items.  So I would

22 rely on them to help clarify things if I had

23 questions.

24     Q.    Okay.  And you also saw them to

Highly Confidential - Michael B. Glasgow

1    have a role as cops.  Can you describe what you

2    meant by that.

3              A.    Yeah.  In that aspect it makes me

4    think of violations or if there's rules we're

5    not following, that they've stipulated to us

6    they can, you know, bring a little discipline

7    down on us in a sense.

8              Q.    Okay.  Did you draw a distinction

9    between those two roles in your view of the

10   MDEQ, or were they occurring simultaneously?

11             MR. MARKER:  Object to the form.

12             Q.    Did you see that their role as --

13   let me rephrase.

14             Did you see that their role as a

15   coach was distinct and separate from their role

16   as cops?

17             A.    Not particularly.  I would think

18   it was almost a combination.

19             Q.    Okay.  So as a combination, did

20   you feel that that -- that their suggestions

21   carried great weight?

22             A.    Yes, you could say that.

23             Q.    Did you view that -- their

24   suggestions as being optional?

Highly Confidential - Michael B. Glasgow

1        A.    No, not whatsoever.  They -- well,

2   when you're saying "suggestions," if something

3   was brought across to me as a suggestion or

4   recommended treatment practices, I took it -- I

5   took it to heart, and I would try my best to

6   institute it.

7        Q.    Okay.  I'd like to address at

8   least one more area here.

9              In the fall of 2014, did you

10  become aware of Legionella issues anywhere in

11  the city of Flint?

12       A.    I did.

13       Q.    And where were those Legionella

14  issues occurring?

15       A.    At McLaren Hospital in Flint.

16       Q.    Okay.  How did you first become

17  aware of those issues?

18       A.    I was contacted by Liz Murphy, who

19  was, I think, an assistant to the emergency

20  manager -- I wasn't sure of her title -- in

21  regards to issues at McLaren Hospital, and

22  McLaren was having a little meeting about it,

23  and the city sent me to attend the meeting.

24       Q.    Okay.  And who was at this

Highly Confidential - Michael B. Glasgow

1    meeting?

2          A.    Oh, there was probably four or

3    five individuals from McLaren Hospital.  The

4    only other person I remember is Jim Henry from

5    the Genesee County Health Department.

6          Q.    Okay.  Do you remember the names

7    of any of the individuals from McLaren?

8          A.    I can't say that I do offhand

9    here.

10         Q.    Okay.  What was discussed at this

11   meeting?  Well, strike that.

12               Let me -- do you remember the

13   positions of any of the persons from McLaren?

14         A.    One of the individuals was like

15   their building or maintenance manager, and the

16   others, I can't say.  They looked a little more

17   professional.

18         Q.    Okay.  Do you remember anything

19   else about the roles that the McLaren personnel

20   played or held or --

21         A.    I do not recall.

22         Q.    Okay.  So I guess back to the

23   question that I interrupted you on.  I apologize

24   for that.

Highly Confidential - Michael B. Glasgow

1        A.    No worries.

2        Q.    What was discussed at this

3   meeting?

4        A.    McLaren had an issue -- they had

5   done some testing in their facility, in their

6   water system, and had found Legionella in a

7   couple different locations throughout the

8   hospital.  So I think this had been maybe after

9   their initial round of testing.  I'm trying to

10  recall.

11             But, yeah, they had found one

12  floor a showerhead, another floor a faucet.  And

13  they were -- it was almost just a little more of

14  a think tank, bring everybody together to see if

15  we can figure out what's happening.  They asked

16  me a few questions.  They knew we had switched

17  water sources.  They notified me that they had

18  the ability to isolate their system and

19  chlorinate their system within the hospital.

20  And that was their next step, was to chlorinate

21  and then take more samples to see if they had

22  taken care of the situation.

23        Q.    Okay.  Was there anything else

24  that you remember being discussed at this

Highly Confidential - Michael B. Glasgow

1   meeting?

2           A.    Yeah, I knew they had -- no,

3   just -- it seemed like they -- I provided them

4   with some information on chlorine residuals in

5   the area.  And they had talked a little more

6   about their testing.  They were testing the

7   water coming into their facility from the city

8   of Flint lines and then testing throughout the

9   facility.  At that time of that meeting, they

10  didn't have any positive hits on what was coming

11  into their facility, but they were just

12  exploring all avenues to try to figure out the

13  cause.

14          Q.    Did you write up a summary of that

15  meeting at that time or shortly thereafter?

16          A.    I did at that time to report back

17  to Ms. Murphy in the EM's office.

18          Q.    And did you do that by e-mail?

19          A.    Yes.

20                    - - -

21     (Glasgow Deposition Exhibit 31 marked.)

22                    - - -

23  BY MR. KIM:

24          Q.    I'm handing you what has been

1    marked as Exhibit 31.  This is CROFT -

2    0000001324.

3              Is this the e-mail that you wrote?

4         A.    Yes, it appears to be, yes.

5         Q.    Okay.

6              And do you see the statement

7    that's underlined in that first paragraph, where

8    it says, "There has been no evidence of

9    Legionella in the water coming into the hospital

10   from the city supply during their sampling

11   events"?

12        A.    Yes.

13        Q.    And is that what you referred to

14   earlier when you were talking about when you --

15   in your last answer as to subjects that were

16   being discussed?

17        A.    Yes.

18        Q.    Okay.  And in the second

19   paragraph, do you see that the first sentence

20   there says, "From the discussions with the

21   health department and the hospital staff, there

22   is still no correlation of data that can link

23   the increased cases of Legionella to the

24   municipal water supply"?

Highly Confidential - Michael B. Glasgow

1      A.    Yes.

2      Q.    And do you recall that being

3   discussed at the meeting at McLaren?

4      A.    Yes.

5      Q.    And so this wasn't just McLaren

6   personnel saying that there was no evidence of

7   Legionella.  This was also the Genesee County

8   Health Department's; is that correct?

9      A.    Yes.

10     Q.    And then you mentioned -- the next

11  underlined sentence there is "The data we

12  collect daily from the water plant will continue

13  to verify that there is no evidence of

14  Legionella in the treated water leaving the

15  water plant."

16        Do you see that sentence?

17     A.    Yes.

18     Q.    So you were collecting data -- you

19  were testing the water that was leaving the

20  water plant on a daily basis; is that correct?

21     A.    That is correct.

22     Q.    And do you recall whether any of

23  the daily testing after that time showed that

24  there was Legionella in the treated water

1    leaving the water plant?

2              MS. SMITH:  Objection; foundation.

3         A.    Yes, there was -- there was no

4    evidence of Legionella, although I have to

5    stipulate that by saying we didn't have a

6    specific test to look for Legionella.

7              Legionella is a -- can be

8    considered under a group of bacteria that we

9    call heterotrophic bacteria.  So we were

10   certified to do HPC, a heterotrophic plate

11   count, but with our levels of chlorine leaving

12   the water plant and clean HPC, or heterotrophic

13   plate count, bacteria testing, that's how I come

14   to that conclusion that no Legionella was

15   leaving the water plant.

16        Q.    Okay.  As a non-scientist, let me

17   attempt to summarize, and please tell me if this

18   is accurate or not.

19             The city had no means for testing

20   specifically for the Legionella -- for

21   Legionella bacteria; is that correct?

22        A.    That is correct.

23        Q.    The city did have the capability

24   to test in general for the class of bacteria

1    that Legionella is a part of.

2           A.    Correct.

3           Q.    And those tests would have

4    revealed that Legionella was there, but they

5    wouldn't have been able to identify it as

6    Legionella.

7                 MS. SMITH:  Objection.

8           A.    Correct.

9                 MS. SMITH:  Form and foundation.

10          Q.    And as the -- at the time you were

11   the lab supervisor; is that correct?

12          A.    That is correct.

13          Q.    And this was testing that you were

14   trained and experienced in doing?

15          A.    Yes.

16          Q.    And if it was not you personally

17   doing these tests, your staff was trained in how

18   to conduct those kinds of tests?

19          A.    Yes.

20          Q.    And so what you're saying is that

21   after this meeting, the daily testing continued

22   and there was no evidence that there was

23   bacteria leaving the plant --

24          A.    That is correct.

Highly Confidential - Michael B. Glasgow

```
 1          Q.    -- that would have captured

 2   Legionella bacteria within that testing?

 3               MS. SMITH:  Objection.

 4          Foundation.

 5               MR. DAWSON:  Where was this

 6          testing being done?

 7          Q.    Where was this testing being done?

 8          A.    At the water plant.  Before the

 9   water left the plant.

10                    - - -

11      (Glasgow Deposition Exhibit 32 marked.)

12                    - - -

13   BY MR. KIM:

14          Q.    I'm handing you what's been marked

15   as Exhibit Number 32.  This is CROFT -

16   0000001504.

17               MR. KIM:  It's six zeros followed

18          by 1504.

19          Q.    Is this an e-mail that's dated

20   March 17, 2015?

21          A.    Yes.

22          Q.    Is this from Stephen Busch at the

23   DEQ?

24          A.    Yes.
```

Highly Confidential - Michael B. Glasgow

1          Q.    And were you a recipient of this

2     e-mail?

3          A.    Yes.

4          Q.    And in this e-mail, does the MDEQ

5     acknowledge that there is no direct evidence of

6     Legionella in the city's public water system?

7          A.    Yes.

8          Q.    And did you have any reason to --

9     had you -- had any test results that you had

10    received since November of 2014 caused you to

11    question that conclusion?

12         A.    No.

13         Q.    Did you regularly have discussions

14    with any of the emergency managers that were

15    appointed to take control of the city of Flint?

16         A.    No, I don't remember one instance.

17         Q.    So you didn't have regular

18    discussions and you're saying that you didn't

19    have any discussions with the -- any of the

20    emergency managers; is that what you're saying?

21         A.    That's what I'm saying, yes.

22         Q.    So you don't recall having any --

23    having any discussions with Darnell Earley?

24         A.    No.

Highly Confidential - Michael B. Glasgow

```
 1           Q.    With Gerald Ambrose?

 2           A.    No.

 3           Q.    Ed Kurtz?

 4           A.    No.

 5           Q.    Michael Brown?

 6           A.    No.  I forgot we had that many.

 7  But anyway, sir.

 8           Q.    And you've stated that you've

 9  reported certain things to Howard Croft --

10           A.    Yes.

11           Q.    -- as the director of public

12  works.  And you said that you've reported things

13  to Duffy Johnson as the utilities administrator

14  when he held that position; is that correct?

15           A.    That is correct.

16           Q.    Do you know whether or not

17  either -- well, let's just do one at a time.

18                 Do you know whether or not Howard

19  Croft was receiving advice from other -- from

20  other individuals?

21           A.    I do not.

22           Q.    Do you know whether or not Duffy

23  Johnson was receiving advice from other

24  individuals?
```

Highly Confidential - Michael B. Glasgow

```
1              A.    I do not.

2              Q.    Would you have expected them to

3       get information from persons besides yourself?

4              A.    Yes.

5              Q.    Would you have expected them to

6       get information -- would you have expected

7       Howard Croft to get information from persons

8       besides yourself?

9              A.    Yes.

10             Q.    And would you have expected Duffy

11      Johnson to get information from persons besides

12      yourself?

13             A.    Yes.

14             Q.    Were they -- did they -- now, you

15      testified earlier that you disagreed with some

16      of the decisions that were made by those

17      individuals; is that correct?

18             A.    That is correct.

19             Q.    Did you ever discuss with them why

20      they made those decisions?

21             A.    No, I can't say that I did.

22             Q.    Were -- was Duffy Johnson in the

23      practice of explaining why he would make

24      decisions to you?
```

Highly Confidential - Michael B. Glasgow

1          A.    No.

2          Q.    I guess for completeness, was

3    Howard Croft in the practice of explaining why

4    he would make various decisions to you?

5          A.    No.

6          Q.    Were they obligated to do so?

7          A.    No.

8          Q.    Did you ever report any of your

9    concerns directly to Dayne Walling?  Do you know

10   who Dayne Walling is, first?

11         A.    Yes, I knew Dayne was our mayor at

12   a time there.

13         Q.    Okay.  Do you recall ever

14   reporting any of your concerns or issues to

15   Dayne Walling directly?

16         A.    I do not.

17         Q.    Now, Brent Wright in his

18   deposition testified as to the kind of basic

19   structure of the utilities division of the

20   department of public works.

21              And you're familiar with that

22   structure; is that correct?

23         A.    Yes.

24         Q.    Because you were the utilities

Highly Confidential - Michael B. Glasgow

1    administrator after Duffy Johnson retired; is

2    that correct?

3            A.    That is correct.

4            Q.    So Brent Wright described the kind

5    of -- and also Duffy Johnson described the

6    structure as having essentially three

7    components.  They described it as the water

8    treatment plant, the distribution system, and

9    the wastewater system; is that correct?

10           A.    That is correct.

11           Q.    Now, when you were in charge of

12   the water treatment plant's laboratory, did you

13   have any responsibilities towards the

14   distribution system?

15           A.    No, none.

16           Q.    Did you have any responsibilities

17   toward the wastewater system?

18           A.    No.

19           Q.    Now, at the time that you were the

20   lab supervisor, you were licensed as an F-1 and

21   were the water plant -- treatment plant's

22   operator of record; is that correct?

23           A.    That is correct.

24           Q.    And the person who was in charge

1    of the water treatment plant was on paper Brent

2    Wright; is that correct?

3           A.    That is correct.

4           Q.    And you understand that Brent

5    Wright did not have an F-1 license?

6           A.    Yes, that is correct.

7           Q.    So how did the two -- how did the

8    two of you split -- how do you recall the two of

9    you splitting the responsibilities for the water

10   treatment plant?

11          A.    Well, we kind of decided -- after

12   I attained my F-1, Brent was already in that

13   position.  I didn't care for the administrative

14   aspect of it as much as the true nitty-gritty

15   and the operation.  So he tended to handle most

16   of the administrative work.  And when it come

17   down to operating the plant, those calls were

18   mine.

19          Q.    What would you consider to be

20   administrative work?

21          A.    That's a good question.  That

22   entails almost anything that didn't have to

23   immediately do with the operation of that plant.

24   So it could be dealing with the unions, setting

Highly Confidential - Michael B. Glasgow

1    up interviews for employees, some correspondence

2    with the state.  I would leave all that to

3    Brent.

4          Q.    Okay.  As the lab supervisor and

5    as the operator in charge, did you review -- did

6    you have the primary responsibility for

7    reviewing contracts with contractors, or was

8    that something that was Brent Wright's

9    responsibility?

10         A.    No, I would have set that on the

11   administrative side.  That would have been

12   Brent's responsibility.

13               MR. KIM:  Can we go off the record

14         for three minutes?  I just want to

15         double-check something.  I may be done

16         here.

17               THE VIDEOGRAPHER:  We're going off

18         the record at 3:45 p.m.

19               (Recess taken.)

20               THE VIDEOGRAPHER:  We are back on

21         the record at 3:57 p.m.

22   BY MR. KIM:

23         Q.    Okay.  Just a few more matters

24   that I wanted to discuss, Mr. Glasgow.

Highly Confidential - Michael B. Glasgow

1           We've discussed the lead and

2   copper reports and sampling that the city

3   conducted and -- from June -- or July to

4   December of 2014 and January to June of 2015.

5           Do you remember that?

6       A.    Yes.

7       Q.    Okay.  Now, the city collected the

8   100 samples required for the June -- July

9   through December 2014 period; is that correct?

10      A.    That is correct.

11      Q.    Do you remember exactly how many

12  samples the city collected at that time?

13      A.    It wasn't much over 100, maybe one

14  or two extra, if any.  I can't -- I don't recall

15  without seeing the report.  I sent every --

16  every result we got I sent to the state, so ...

17      Q.    Okay.  So that was going to be my

18  next question, was every result sent to the

19  state and --

20      A.    Yes.

21      Q.    It was.

22          Now, in the January through June

23  of 2015 time period, it's true -- I believe you

24  said that they reduced the number of samples the

1   city was required to collect; is that correct?

2        A.    Yes.

3        Q.    And why did they do that?

4        A.    I believe that was based on the

5   city's population.  The number of samples that

6   we needed were supposedly based on the

7   population.

8        Q.    Okay.  And I should clarify.  In

9   that -- my question, "they," did you understand

10  that I was referring to the MDEQ?

11       A.    Yes, I did.

12       Q.    Okay.  Or what was then known as

13  the MDEQ?

14       A.    Yes.

15       Q.    And did you ask them to reduce the

16  number of samples that the city was going to be

17  required to collect?

18       A.    No, no.  I'd actually sent an

19  e-mail to Mr. Rosenthal stating that I was

20  worried because we were short on samples.  We

21  weren't going to hit our 100.  I didn't have a

22  lot of takers in the community for that second

23  round of sampling.

24       Q.    Okay.  Now, isn't it true that in

Highly Confidential - Michael B. Glasgow

```
 1    the -- in that second round of sampling, the

 2    MDEQ -- staff from the MDEQ told you to remove

 3    some number of samples?

 4         A.    Yes.

 5         Q.    And did they give you a reason why

 6    they were telling you to do that?

 7         A.    Yes, they did.

 8         Q.    I guess, who at the MDEQ were you

 9    communicating with about that issue?

10         A.    It was Mr. Prysby and Mr. Busch.

11         Q.    Okay.  And what reasons did they

12    give you why certain samples should be

13    disregarded?

14         A.    One sample was due to the fact

15    that there was a filtration system on their

16    plumbing.  The other sample was the fact that it

17    was a business.  It wasn't a residential home.

18         Q.    And based on your understanding of

19    the laws -- applicable laws and regulations, was

20    that a reasonable request?

21         A.    I understood where it was coming

22    from.

23         Q.    Based on your understanding of the

24    laws and regulations, did that -- were those
```

Highly Confidential - Michael B. Glasgow

 1   requests justified by the law -- by those laws

 2   and regulations?

 3            MR. MARKER:  Object to form.

 4       A.    I'll sound like a broken record,

 5   but I understood where it was coming from in the

 6   language of the Lead and Copper Rule.

 7       Q.    Okay.

 8            Did you know exactly what the

 9   result of removing those samples would be?

10       A.    I did not know exactly.  I knew it

11   would have been an effect but ...

12       Q.    What did you know -- what kind of

13   effect did you know that would have on the

14   sampling results for that test period?

15       A.    I knew that that would affect the

16   90th percentile value for lead.

17       Q.    Now, did you know how that would

18   affected the 90th percentile?

19       A.    No, because I never bothered to

20   calculate it.

21       Q.    And was that something that you

22   would normally calculate?

23       A.    No.

24       Q.    So that was something that the

Highly Confidential - Michael B. Glasgow

```
 1    MDEQ -- you would rely upon the MDEQ to

 2    calculate; is that correct?

 3            A.    That is correct.

 4            Q.    Okay.

 5                  Now, do you recall having any

 6    interact- -- in the February 2015 through April

 7    of 2015 time frame, do you recall having any

 8    interactions with personnel from Veolia?

 9            A.    I remember personnel from Veolia

10    being at the water plant using my lab for some

11    testing, but I didn't really have any in-depth

12    conversation with them.

13            Q.    Okay.  Do you remember which

14    personnel that was?

15            A.    No, I couldn't -- I don't think I

16    could come up with a name even if I heard it.

17            Q.    Did those personnel tell you

18    anything about the results that they were

19    seeing?

20            A.    No.

21            Q.    Did they ask you to provide any

22    information?

23            A.    Yes, they did ask for some data.

24            Q.    And what kind of data did they ask
```

Highly Confidential - Michael B. Glasgow

```
 1    you for?
 2         A.   It was kind of our daily
 3    operational data through the plant.  So the
 4    plant process data and -- like in terms of what
 5    our chemical feeds were and, you know, hardness,
 6    softness, incoming data from the river, a bunch
 7    of different things that we would compile daily
 8    anyway.
 9         Q.   Okay.  Now, if I can direct your
10    attention to Exhibit 15 again.  This was Bates
11    number COF_FED_0628049.
12         A.   Okay.
13         Q.   The water quality report.
14         A.   Uh-huh.
15         Q.   Now, do you remember when you -- I
16    believe you said that you saw this report at
17    some point; is that correct?
18         A.   Yes.
19         Q.   Do you remember when you first saw
20    this report?
21         A.   I'm going to say it was sometime
22    in the summer of 2015.  I was getting on
23    Mr. Johnson's case.  I knew Veolia was in here,
24    and I had never seen -- seen a summary of their
```

Highly Confidential - Michael B. Glasgow

```
 1    report, so I kept bothering him to get me a

 2    copy.

 3            Q.    Okay.  So you were not provided

 4    with a copy of this report when it was first --

 5    you don't believe that you were provided with a

 6    copy of this report when it was first

 7    disseminated to the city, do you?

 8            A.    No, I do not.

 9            Q.    Okay.  Did anybody ever ask you to

10    review this report?  Did anybody -- well, let me

11    rephrase that.  In the spring or summer of 2015,

12    did anybody from the city ask you to review this

13    report?

14            A.    Not that I recall.

15            Q.    Did anybody from the -- did Duffy

16    Johnson ask you to review this report?

17            A.    No.

18            Q.    Did Howard Croft ask you to review

19    this report?

20            A.    No.

21            Q.    Did Dayne Walling ask you to

22    review this report?

23            A.    No.

24            Q.    Did Darnell Earley or Gerald
```

Highly Confidential - Michael B. Glasgow

1    Ambrose ever ask you to review this report?

2            A.    No.

3            Q.    Okay.

4                  If I can direct your attention to

5    page 5 of this report under the bullet point

6    labeled "Corrosion Control."

7            A.    Okay.

8            Q.    If you can read that paragraph.

9    Let me know when you're done.

10           A.    Okay.

11                 All set there, Mr. Kim.

12           Q.    Okay.  Do you see anything in

13   there that ties the corrosion control issue to a

14   water safety issue as opposed to a water quality

15   issue?  And, I guess, let me specify.  Do you

16   understand that a water quality issue would

17   essentially be related to aesthetic

18   characteristics of the water, whereas water

19   safety issue would be something related to the

20   health and safety of the consumers of the water?

21           A.    I do, yes.

22           Q.    Okay.  Now, do you see anything in

23   there that ties the corrosion control factors as

24   they're described there to water safety issues?

Highly Confidential - Michael B. Glasgow

```
 1              A.    No, I do not, not in that

 2     paragraph, no.

 3              Q.    Okay.  And, again, just to -- and

 4     nobody asked you to review that?

 5              A.    Correct, no.

 6              Q.    Would you disagree that -- that

 7     corrosion control is only applicable to water

 8     quality issues?

 9                    Does corrosion control have any

10     implications for water safety?

11              A.    Yes, it will.

12              Q.    Okay.  So then, it would be

13     correct to say that you would disagree that it

14     applies only to water quality?

15              A.    Yes.

16              Q.    Okay.

17              A.    Yes.

18              Q.    I believe earlier you looked at

19     the final recommendations or the conclusions and

20     next steps on page 10, the top there.  You can

21     see where it says, "Contract with your engineer

22     and initiate discussions with the state on the

23     addition of a corrosion control chemical."

24              A.    Yes.
```

Highly Confidential - Michael B. Glasgow

```
 1              Q.    Do you see anything in that

 2     paragraph that would implicate water safety

 3     concerns?

 4              A.    I do not.

 5              Q.    Now, when was the first time

 6     that -- when were you first directed to add

 7     that -- to prepare to add corrosion control to

 8     the city's water supply or to the water

 9     treatment process?

10              A.    We were first, I'll say, directed

11     sometime I think August of 2015.

12              Q.    And who were you directed by?

13              A.    That would be the MDEQ.

14              Q.    Okay.  And do you know, was

15     corrosion control implemented by the city of

16     Flint after that?

17              A.    Yes.

18              Q.    When was it implemented?

19              A.    I think mid to late December of

20     2015.

21              Q.    So your recollection is that the

22     city received a directive from the MDEQ in

23     August of 2015 to implement corrosion control?

24              A.    Yes.
```

Highly Confidential - Michael B. Glasgow

```
1        Q.     And was that going to require the
2   city to purchase equipment?
3        A.     Yes.
4        Q.     Would that require the city to
5   purchase chemicals?
6        A.     Yes.
7        Q.     And so -- and this was all
8   completed by December of 2015?
9        A.     Correct, yes.
10        Q.     Okay.  In your -- how long were
11   you with the city of Flint?
12        A.     Roughly 15 years.
13        Q.     Okay.  In that time period, how
14   would you rate the celerity of the city's
15   implementation of corrosion control?
16        A.     Yeah, to implement a new treatment
17   process within a matter of months, it's really
18   unheard of in government work.  It usually --
19   usually it's always at least a year for anything
20   regardless of what you're doing.
21        Q.     Okay.  And I guess just -- you
22   left -- when did you leave the city of Flint?
23   When did you leave the employ of the city of
24   Flint?
```

Highly Confidential - Michael B. Glasgow

1          A.    Sometime in April of 2016.

2          Q.    Okay.  And earlier you testified

3    that you thought it was Howard Croft who placed

4    you on administrative leave.

5                Do you remember that?

6          A.    I don't remember saying that.  If

7    I did, I probably did.  I wasn't sure who put me

8    on administrative leave, to be honest with you.

9    I received a letter in the mail.

10         Q.    Okay.  If I were to represent to

11   you that Howard Croft had resigned from the city

12   in 2015, does that comport with your memory?

13         A.    Yes.

14         Q.    Would you then conclude that you

15   were probably mistaken if you named him as the

16   person who placed you on administrative leave?

17         A.    Yeah, if I did name him, yeah, I

18   would have been mistaken then, yes.

19         Q.    Okay.  So the -- you're sure that

20   you left the city in May of 20- --

21         A.    April of 2016, yes.

22         Q.    April of 2016, but -- and you're

23   not sure who at the city it was that placed you

24   on administrative leave.

Highly Confidential - Michael B. Glasgow

```
 1            A.    No.   Correct.

 2                  MR. KIM:   Okay.   I'm done.   If we

 3            can go off the record, and I'll reserve

 4            the balance of my time for redirect.

 5                  THE VIDEOGRAPHER:   We are going

 6            off the record at 4:10 p.m.

 7                  (Recess taken.)

 8                  THE VIDEOGRAPHER:   We are back on

 9            the record at 4:13 p.m.

10                        - - -

11                  EXAMINATION

12       BY MS. SMITH:

13            Q.    Good afternoon, Mr. Glasgow.   My

14       name is Susan Smith.   I represent McLaren in

15       this matter, and I have some questions for you

16       today.

17                  I, like Mr. Kim, will be jumping

18       around.   Many of the exceptional attorneys that

19       preceded me have covered many of the issues that

20       I felt we needed to dive into.   So I may jump

21       around a bit.

22                  If you don't follow one of my

23       questions, please let me know and I'll try to

24       make sure to rephrase it so you understand.
```

Highly Confidential - Michael B. Glasgow

1          A.     Okay.

2          Q.     But if you do answer my question,

3     I'll presume -- and everyone reading the

4     transcript of this deposition will presume that

5     you understood it, fair?

6          A.     Fair.

7          Q.     Okay.

8                 You've just explained to us, with

9     respect to Mr. Kim's questions, the monitoring

10    schedule that was established by MDEQ.

11                Do you recall that testimony?

12         A.     Yes.

13         Q.     And the -- what are the parameters

14    of that monitoring schedule for the Flint water

15    treatment plant?

16         A.     Let me think here.

17         Q.     Does it include chemicals?

18         A.     Yes, it does include chemicals.

19         Q.     And does it include

20    microbiological material?

21         A.     Yes.

22         Q.     And for the ease of reference

23    today and tomorrow when we're speaking, can we

24    just say "microbio"?

Highly Confidential - Michael B. Glasgow

1         A.    Yes, that's fine.

2         Q.    Wonderful.  Thank you.

3               And so the monitoring schedule

4    includes monitoring levels of chemicals and

5    microbio in the drinking water, correct?

6         A.    That is correct.

7         Q.    And where -- now, focusing on the

8    regulatory monitoring testing, where are those

9    samples collected?

10        A.    A combination.  Most were

11   collected right at the treatment plant.  Some

12   are collected out in the distribution system.

13        Q.    Okay.  And why does the -- if you

14   know, what is your understanding as to why the

15   regulatory monitoring testing is conducted --

16   let's start at the plant.  Do you know the

17   reason for that?

18        A.    Well, I guess some of the -- well,

19   I probably can explain this how I look at it.

20        Q.    Let me suggest that the testing of

21   the moni- -- plant is to evaluate the efficacy

22   of the treatment process.

23              Does that sound about right?

24        A.    I could say that, yeah.

Highly Confidential - Michael B. Glasgow

```
 1          Q.    That's to ensure that the

 2    treatment process did what it was supposed to

 3    do; is that a fair statement?

 4          A.    Yes, that's a fair statement.

 5                MR. KIM:  Objection as to form.

 6          Q.    And if you know, why does the

 7    regulatory monitoring schedule include sampling

 8    in the distribution system?

 9          A.    In a sense --

10                MR. MARKER:  If you know.

11          A.    Yeah.  I guess I would say in some

12    aspect to look at the effects that the

13    distribution system has on the water.

14          Q.    And that's because the water

15    quality and chemistry changes as it travels

16    through the distribution system pipes, correct?

17          A.    Yes.  It has that ability to

18    change, yep.

19          Q.    And when we refer to distribution

20    system pipes today and tomorrow, that's the

21    system of piping that connects the outlet at the

22    Flint water treatment plant to the service lines

23    that then deliver water into people's homes and

24    into businesses that receive Flint treated
```

1    water, correct?

2           A.    Correct.

3           Q.    And that system -- the

4    distribution system piping includes the large

5    water mains, correct?

6           A.    Correct.

7           Q.    And a network of smaller water

8    mains on collateral lines, correct?

9           A.    Correct.

10          Q.    Okay.  And your responsibility as

11   the Flint water treatment supervisor was the

12   quality of the water at the plant, correct?

13          A.    Correct.

14          Q.    And Mr. Bincsik and others had

15   responsibilities with respect to the

16   distribution system, correct?

17          A.    Correct.

18          Q.    And your colleagues that had

19   responsibility for the distribution system did

20   things like check pipes and investigate water

21   main breaks; is that right?

22          A.    Correct, yes.

23          Q.    Okay.

24                And the -- and let me ask you,

Highly Confidential - Michael B. Glasgow

1    where at the plant were these samples collected

2    for the regulatory monitoring testing?

3         A.    Most of them were -- it's dictated

4    in our monitoring schedule that they're taken

5    from the plant tap.  So after we treat the

6    water, it's distributed through our plant

7    through all the faucets and everything, so we

8    had a specific faucet in our laboratory that was

9    everything leaving our filter gallery after a

10   complete treatment.

11        Q.    Okay.  And where were the samples

12   collected to assess the water in the

13   distribution system?

14        A.    Yeah.  That was -- there was a

15   number of different locations.  That was set up

16   under the city of Flint's distribution

17   monitoring plan.  So the city had previously

18   selected, I want to say, 10 to 12 sites

19   throughout the city that were where samples

20   would be collected.

21        Q.    So you referred to a distribution

22   monitoring plan.

23        A.    Yes.

24        Q.    Who set up that plan?

Highly Confidential - Michael B. Glasgow

1          A.    I'm trying to think.  That was

2     already instituted when I started working with

3     the water plant.  So it would have been someone

4     with the city would have originally, I guess,

5     proposed a plan, and we would have sent it to --

6     the city should have sent it to the MDEQ for

7     approval and MDEQ sent it back saying, "Okay.

8     This looks like a good fit for your monitoring."

9          Q.    Okay.

10               And we heard testimony about the

11    distribution sanitary survey.  Would that have

12    included assessment of the distribution

13    monitoring plan, if you know?

14         A.    I don't know offhand.

15         Q.    Okay.  Now, the samples

16    collected -- the 10 to 12 sites in the city, do

17    you know the -- were those taken at taps in

18    people's homes like you described with the Lead

19    and Copper Rule?

20         A.    They were collected from actually

21    businesses, and it was either a -- yeah, kitchen

22    sink or a bathroom sink in a business.

23         Q.    Okay.  And do you know who -- who

24    selected those sites?

Highly Confidential - Michael B. Glasgow

```
 1          A.    Like I said, I don't know

 2    originally.  When I first started working at the

 3    water plant, that plan was already in place.  So

 4    I can't -- I can't elaborate on who, who

 5    originally set that up.

 6          Q.    Okay.  And do you know if the --

 7    well, strike that.

 8                The -- and, of course, when water

 9    sample -- these were all water samples, correct?

10          A.    Correct, yes.

11          Q.    Both at the lab and in the

12    distribution system?

13          A.    Correct.

14          Q.    And I take it that those water

15    samples were analyzed in a laboratory; is that

16    right?

17          A.    That is correct.

18          Q.    So, if you could tell me, what

19    laboratories were involved in analyzing the

20    samples collected as part of the routine

21    monitoring -- regulatory monitoring sampling?

22          A.    Okay.  With all of our routine

23    monitoring, distribution or the plant, most of

24    the parameters, we were -- we could test for
```

 1    right in the lab at the city of Flint water

 2    plant.  Certain parameters we weren't certified

 3    for, so your lead and copper, your disinfection

 4    byproducts, those would be sent out to a

 5    contract lab, but the coliform bacteria testing

 6    and the heterotrophic plate counts, the city of

 7    Flint water plant lab was certified to do that

 8    testing.

 9         Q.    Okay.  And the -- I understand you

10    brought on new staff at around April 2014 before

11    the switch was flipped, if you will.  Were some

12    of the new staff persons laboratory personnel?

13         A.    One gentleman was laboratory

14    personnel after I had another employee leave.

15         Q.    And, now, you were the laboratory

16    supervisor, correct?

17         A.    Correct, yes.

18         Q.    Could you describe for us very

19    briefly what the daily process was for handling

20    the routine monitoring sampling.

21         A.    Well, the routine sampling

22    throughout the plant -- usually the laboratory

23    staff, I should start with that, was myself and

24    usually two other city employees.

Highly Confidential - Michael B. Glasgow

```
 1           Q.    And one of them was one of the new
 2    people?
 3           A.    Yeah, and one was one of the newer
 4    people.
 5           Q.    Okay.
 6           A.    But I stole -- I shouldn't say I
 7    stole.  One of the newer people that I placed in
 8    the lab had come from the Delta College water
 9    and wastewater program.  So I didn't -- I didn't
10    put nobody fresh off the street in the lab.
11                 Daily monitoring there, I'd have
12    to look at our MORs, but it was mainly a group
13    of different parameters, hardness, calcium, pH,
14    chlorine, turbidities.  I'm trying to think if
15    I'm missing anything.  Of course, our coliform
16    bacteria, and also an HPC, heterotrophic plate
17    count, we were required to get daily.
18                 And it depended on my staff.  Like
19    I said, I only had two other staff.  It was
20    either one or the other.  One would be doing the
21    inside, the plant stuff, and the other would get
22    out in the distribution and collect samples to
23    bring them back for testing as well.
24           Q.    Okay.  Now, there was testimony
```

1    previously that the sampling at the plant was

2    daily?

3         A.    Yes.

4         Q.    And the sampling in the

5    distribution system was three times a week?

6         A.    Roughly three times a week.  We

7    were required to collect 100 samples due to our

8    population out in the distribution system.  So

9    with, you know, 10 to 12 sites usually three

10   days a week would do it.

11        Q.    And was that 100 samples daily,

12   weekly, monthly?

13        A.    Monthly, 100 samples monthly.

14        Q.    100 monthly.

15        A.    I'm sorry.

16        Q.    Okay.  And was there any chain of

17   custody maintained for the samples collected in

18   the distribution system?

19             MR. MARKER:  Object to the form.

20        Q.    Are you familiar with the concept

21   of a chain of custody, sir?

22        A.    Yes, I am.

23        Q.    And you understand that that's

24   documentation that tracks the handling of a

1    laboratory specimen?

2         A.    Yes.

3         Q.    And were chain of custody

4    documents maintained for any of the samples

5    collected from the distribution system?

6         A.    Yes.  Usually our individuals out

7    collecting the samples in the distribution

8    system had their data sheet, which was also the

9    chain of custody, and they would -- they never

10   left their possession.  They would collect the

11   samples, bring them back to the lab.  They would

12   also do the testing.  So the chain of custody

13   was included in the daily sheet with all the

14   rest of the data.

15        Q.    And who is the custodian of those

16   data sheets or chain of custody records?

17        A.    It would be the city of Flint.

18        Q.    Where were those data sheets filed

19   after the samples were collected and brought

20   back to the lab?

21        A.    They would have been filed in the

22   laboratory there.

23        Q.    Okay.  And those are city of Flint

24   files?

Highly Confidential - Michael B. Glasgow

```
 1           A.    Yes.

 2           Q.    And the -- okay.  One hundred

 3     weekly.  You mentioned that there were some

 4     external labs involved in connection -- for the

 5     LCR and the DBP testing.

 6           A.    Yes.

 7           Q.    Did you use external labs for any

 8     other purpose?

 9           A.    Not to my knowledge, no.

10           Q.    And what was your process for

11     obtaining the services of a contract lab in

12     2014?

13           A.    Yeah, in 2014, I'm trying to

14     think.  Because prior to 2014, anything our lab

15     couldn't test for or wasn't certified to test

16     for, we always defaulted and used the MDEQ lab

17     in Lansing.

18           Q.    Okay.

19           A.    For pretty much everything we

20     needed, they could handle.

21           Q.    Now, did MDEQ charge a fee for

22     running those tests?

23           A.    Yes.

24           Q.    And what was the fee?
```

Highly Confidential - Michael B. Glasgow

1      A.    Oh, goodness gracious.

2      Q.    If you know.

3            MR. MARKER:  If you don't know,

4      don't guess.

5      A.    Yeah, I can't recall, to be honest

6  with you.

7      Q.    So MDEQ analyzed the samples for

8  the LCR compliance and the disinfection

9  byproducts compliance, right?

10     A.    Correct, yes.

11     Q.    And did you use external labs,

12  contract labs, for any other purpose?

13     A.    There may have been an instance

14  once or twice for a contract lab in regards to

15  TTHM sampling.

16     Q.    Okay.  And, now, the TTHM sampling

17  would be part of the Disinfection Byproducts

18  Rule compliance, right?

19     A.    Correct, yes.

20     Q.    And typically MDEQ's laboratory in

21  Lansing did that testing.

22     A.    Correct, yes.

23     Q.    And if you could explain for me

24  why you then sent samples out to a contract lab

Highly Confidential - Michael B. Glasgow

1    for TTHM sampling.

2              A.    I personally did not send samples

3    out.  I believe it was instituted by either

4    Mr. Croft or Mr. Johnson during an issue we were

5    having with TTHMs when that first come to light.

6              Q.    Do you know when this was that

7    Mr. Croft or Mr. Johnson engaged the services of

8    an external lab?

9              A.    I can't say for sure.  I know if

10   our issues of THMs really become apparent in the

11   fall of '15, I'm going to say it's late '15,

12   early '16.  But if I had to put a date on it, I

13   couldn't tell you.

14             Q.    Sir, let me represent to you that

15   the TTHM violation was issued in late 2014.

16             A.    Okay.  It could have possibly

17   been -- it could have possibly been early '15.

18   I can't recall the dates.  As I said, I

19   didn't -- I wasn't the one that instituted it.

20             Q.    Okay.  So, to your understanding,

21   Mr. Croft or Mr. Johnson engaged an external lab

22   to do some testing for TTHMs?

23             A.    Yes.

24             Q.    How did you learn about them?

Highly Confidential - Michael B. Glasgow

```
 1            A.    One of them told me they were
 2    going to do it and the sample bottles just
 3    showed up one day --
 4            Q.    Do you know --
 5            A.    -- from what I recall.
 6            Q.    Okay.  Pardon me.
 7            A.    Oh, no, you're all right.
 8            Q.    And do you know who collected the
 9    samples for that TTHM testing?
10            A.    I couldn't tell you who collected
11    those samples either.
12            Q.    Okay.  And do you know what
13    laboratory was involved in running those tests?
14            A.    I can't say for certain.
15    Possibility -- but I don't want to --
16    possibility of TestAmerica, but I -- I can't say
17    if that was for sure.  I'm trying to remember a
18    logo on the paper but ...
19            Q.    Okay.  Were there external
20    contract labs that you routinely worked with in
21    your time with the Flint water treatment plant
22    other than MDEQ and TestAmerica?
23            A.    Not at the water treatment plant,
24    no.
```

Highly Confidential - Michael B. Glasgow

1          Q.    Okay.  How about anywhere else in

2    your work experience with the city of Flint?

3    Did you work with any other external labs?

4          A.    When I was with the city of Flint

5    wastewater plant, they utilized external labs

6    for some testing.

7          Q.    Okay.  And the -- do you know of

8    any other occasion when Mr. Croft or Mr. Johnson

9    engaged a contract lab to analyze some samples

10   from the Flint water system?

11         A.    No, I do not.

12         Q.    Okay.

13               Focusing still on the regulatory

14   compliance sampling, the -- some amount of data

15   is generated as a result of the laboratory

16   analysis of these samples, both at the water

17   collected at the plant and in the distribution

18   system.  Is that data then analyzed and

19   summarized in the MORs?

20         A.    Yes.

21         Q.    And when we speak of MORs today

22   and tomorrow, that's the monthly operating

23   reports, correct?

24         A.    Correct, yes.

Highly Confidential - Michael B. Glasgow

1        Q.    And what are the MORs, from your

2   perspective as the lab supervisor for the Flint

3   water treatment plant?

4        A.    Yeah, it's basically -- your

5   monthly operating report or MOR is basically a

6   compilation of all your data for the calendar

7   month of what has been tested and usually what

8   is required to be reported to the regulatory

9   agencies.

10       Q.    So you are the person at the Flint

11  water treatment plant who compiles the data and

12  generates the MOR each month; is that correct --

13       A.    That is correct.

14       Q.    -- in your term as the laboratory

15  supervisor?

16       A.    Yes, that is correct.

17       Q.    And who would then receive those

18  MORs?

19       A.    They would be mailed to Mr. Prysby

20  at the DEQ.

21       Q.    And did you maintain copies of the

22  MORs in the city of Flint files?

23       A.    Yes.

24       Q.    And were those handwritten

1    documents or were they computerized?

2         A.    It was computerized, pretty simple

3    Excel spreadsheets.

4         Q.    And the -- what data did you

5    review to compile the MORs?

6         A.    We would use -- I would compile

7    our daily, I guess, laboratory bench sheets from

8    inside the lab as well as the bench sheet/chain

9    of custody from the distribution sampling.  So I

10   would have to transpose all that into a monthly

11   report.

12        Q.    So you would -- would you review

13   those physical documents and create your Excel

14   spreadsheet?

15        A.    Correct, yes.

16        Q.    And let me ask you.  We've heard

17   some testimony of the SCADA system.  Was any of

18   the data generated from the daily sampling of

19   the water treatment plant generated through the

20   SCADA system?

21        A.    No, not to my knowledge, no.

22        Q.    Could you tell us what role the

23   SCADA system had at the Flint water treatment

24   plant in 2014?

Highly Confidential - Michael B. Glasgow

1            A.    In 2014.  So around the time we

2    switched then.  It was mainly -- most of the

3    information in the SCADA system was mainly --

4    had to do with plant processes.  The SCADA

5    system would show levels of water in our storage

6    reservoirs, which we had one at the water plant,

7    two out in the system.  Also show how much

8    storage was in the elevated water tower we had

9    at the water plant.

10           But as -- and that's about all I

11   can recall at the time.  We were -- we did go

12   through a pretty extensive SCADA upgrade at that

13   time, or a little later, but I can't recall

14   anything else offhand.

15           Q.    So you indicated that, to your

16   knowledge, the SCADA system was only involved in

17   monitoring the levels of water in the

18   reservoirs; is that correct?

19           A.    Yep.  That's a large portion of

20   it, yes, because we could externally -- or we

21   could turn on pumps and pump out our reservoirs

22   when need be.  And one of my operator foremen

23   would have that power to keep balancing the

24   water throughout the town.

Highly Confidential - Michael B. Glasgow

```
 1          Q.    Okay.  Did the SCADA system serve
 2   any other function other than monitoring the
 3   water levels in the tanks?
 4          A.    I'm sure there was a couple other
 5   functions.  I can't tell you offhand exactly
 6   what they were.  I'm trying to picture that.
 7          Q.    Who would know the purpose -- the
 8   other functions of the SCADA system?
 9          A.    Any one of the operator foremen
10   there that controlled the SCADA room.
11          Q.    And do you know the names of any
12   of those individuals?
13          A.    Think back to my time before I
14   left.  There was a Scott Dungee.  There was a
15   Don Echlin.  I believe that's spelled e-c-h.
16   There was a -- I believe a Charles Yanta, and
17   then another gentleman, Matthew McFarland, but
18   he has since passed.
19          Q.    Did you know Mr. McFarland?
20          A.    I did, yes.
21          Q.    And did you hear
22   Mr. McFarland's -- news reported about what
23   Mr. McFarland had said about his concerns about
24   the water at the --
```

Highly Confidential - Michael B. Glasgow

```
 1            A.    I heard that --

 2            Q.    -- distributed from the water

 3    treatment plant?

 4            A.    Yeah, I heard that --

 5                  MR. KIM:  Objection to form and

 6            foundation.

 7            Q.    You heard reports regarding

 8    Mr. McFarland's concerns?

 9            A.    I heard little bits, yeah, bits

10    and pieces here and there.

11            Q.    What did you hear?

12            A.    Just that he had some concerns.

13    Some of the reports I heard from Mr. McFarland

14    wasn't coming from him.  It was coming from a

15    relative of his, and I -- so specifics, it

16    just -- I can't remember any specifics.  I just

17    knew there was bits and pieces of he was a

18    little worried, possible -- you know, public

19    health issues, but I knew Mr. McFarland pretty

20    well.

21            Q.    Did he share these concerns with

22    you?

23            A.    No.  I'm going to say no, he did

24    not.  Not like the concerns I heard with public
```

Highly Confidential - Michael B. Glasgow

```
 1   health.  He had the same issues as I did with

 2   running the plant with staff.  He was one of my

 3   senior operator foremen.  I trusted him to kind

 4   of hold that end of the process together.  And

 5   we didn't have too many in-depth conversations

 6   to where I felt he was that worried.

 7        Q.    But he did share your concerns

 8   about starting operations at the plant in April

 9   of 2014?

10        A.    Oh, yes, yes.

11        Q.    And he shared in your concern that

12   the plant was not ready to operate on a

13   full-time basis to produce drinking water for

14   human consumption?

15             MR. MARKER:  Objection to the

16        form.

17        A.    Yeah.  He -- I will just say my

18   e-mail that I had sent that's been in testimony

19   saying I wasn't ready with this, we need more

20   time, he was happy I sent that.

21        Q.    Okay.  And he shared his views

22   about that e-mail and your sentiments conveyed

23   in that e-mail to Mr. Rosenthal.  He shared

24   those -- his feelings about that with you
```

Highly Confidential - Michael B. Glasgow

1    personally?

2         A.    Yes.

3         Q.    Okay.

4               Now, you said you'd heard reports

5    about what a relative of Mr. McFarland has said.

6    Do you have any reason to dispute the relative's

7    characterizations of Mr. McFarland's concerns?

8               MR. MARKER:  I'll object to the

9         form.

10        A.    I don't know how I would answer

11   that.  I would just reiterate saying me and

12   Mr. McFarland were tight.  If he had concerns, I

13   think I would have heard of them first -- heard

14   from him first.

15              MR. CAMPBELL:  I'm sorry, did you

16        say that you and McFarland were tight?

17              THE WITNESS:  Yeah, we were pretty

18        close.

19              MR. CAMPBELL:  Thank you.

20              THE WITNESS:  Yeah.

21   BY MS. SMITH:

22        Q.    And did you know him to be a

23   competent employee of the Flint water treatment

24   plant?

Highly Confidential - Michael B. Glasgow

1        A.    Absolutely, yes.

2        Q.    And I take it you knew him both

3    personally and professionally?

4        A.    Yes.

5        Q.    And did you know him to be a man

6    of good character?

7        A.    Yes.

8        Q.    And a reliable reporter of

9    information?

10       A.    Yes.  I trusted him with

11   everything, yeah.

12       Q.    We were talking about the SCADA

13   room, and I -- there has been some testimony

14   that the SCADA had some role with respect to

15   monitoring the chlorine residual.

16       A.    Well, we did have inline chlorine

17   monitors, but those weren't numbers that were

18   reported to the state.  We always physically

19   took the samples.  To get certified to use your

20   inline monitors took a lot of maintenance with

21   them and care, which we didn't have the time to

22   do.  And since we had lab staff and operators,

23   it was a lot easier just to grab samples to

24   verify, so ...

1        Q.    Okay.  And where were those

2    samples taken, the inline monitor, chlorine

3    monitor?

4        A.    Seems like we had them in each of

5    the reservoirs that stored water, and we had one

6    just after final treatment after adding chlorine

7    after filtration before water was distributed

8    out to the city.

9        Q.    And why did you check the chlorine

10   residual in the reservoirs if it wasn't

11   something -- a data point reported to the state?

12       A.    Well, I will say our two

13   reservoirs that were out in the city, we

14   considered them part of the distribution system.

15   So those numbers were reported from those

16   reservoirs.

17       Q.    Okay.

18       A.    And we also had the capability to

19   add more chlorine at the reservoirs if

20   necessary.

21       Q.    Okay.  And so why was it important

22   to monitor the chlorine levels in the stored

23   water?

24       A.    Well, the city of Flint, we had

Highly Confidential - Michael B. Glasgow

```
 1   more storage than necessary, I will say.  We had

 2   a 20-million-gallon reservoir and another

 3   12-million-gallon reservoir out in the city.

 4   So, you know, if my operators weren't careful,

 5   it might take four or five days to turn over

 6   that water.  So chlorine residual was a good eye

 7   on it.  We could tell if we needed to turn it

 8   over a little faster.

 9           Q.    And why is maintaining chlorine

10   residual in treated drinking water important?

11           A.    Important for a number of reasons,

12   mainly microbiological, but also, when we --

13   when I look at it from a treatment plant

14   operator standpoint, I mean, it's kind of

15   dictated in the Safe Drinking Water Act that we

16   keep at least a small residual even at the far

17   ends of the system.  So chlorine numbers are

18   always good to look at.

19           Q.    And do you know, is there a number

20   you can assign to that small -- the target range

21   from the Safe Drinking Water Act?

22           A.    Yes.  I'll say it's 0.2 milligrams

23   per liter of total chlorine residual.

24           Q.    And would that translate into a
```

Highly Confidential - Michael B. Glasgow

```
 1    parts per million number for those of us that

 2    think in those terms?

 3          A.    Oh, yeah.  Milligrams per liter

 4    and parts per million are interchangeable so ...

 5          Q.    Okay.  So -- all right.

 6          A.    Yeah.  So .2 parts per million,

 7    you could say.

 8          Q.    .2, okay.  The -- let me just ask

 9    you a quick follow-up question about the

10    monitoring schedule.  I understand that was

11    something that was set for you by MDEQ, right?

12          A.    Correct, yes.

13          Q.    And you were still employed as the

14    laboratory supervisor when the system

15    reconnected to Detroit in October of 2015; is

16    that right?

17          A.    That is correct, yes.

18          Q.    And did you have a change in the

19    monitoring schedule when that switch was made?

20          A.    Wow.  I'm trying to think back.  I

21    imagine we did.  I can't picture receiving the

22    monitoring schedule.

23          Q.    Okay.

24          A.    But it seems like we shifted back
```

1    to what we did prior to the switch to the Flint

2    River.

3         Q.    Okay.  Do you have any

4    recollection, sir, that the monitoring schedule

5    put in place at or around the time of the

6    October 2015 reconnection included requirements

7    above the regulatory minimums?

8              MR. MARKER:  Objection to form,

9         foundation.

10        A.    I believe it did.

11        Q.    So that is certainly something you

12   could have done?

13             MR. MARKER:  Objection to form,

14        foundation.

15        Q.    All right.  We'll revisit that

16   tomorrow.

17             The -- all right.  Just a couple

18   basic questions about water sampling.  Why do

19   you collect samples at the plant on a daily

20   basis?

21        A.    That would be to, I guess, be able

22   to show that the treatment process is doing its

23   job to show that we're going to meet the

24   drinking water standards.

Highly Confidential - Michael B. Glasgow

1    Q.    Well, you're sampling at the

2    distribution side on a weekly basis or a couple

3    times a week.  Why don't you just do the

4    sampling at the plant three times a week?

5    A.    I don't have an answer to that.

6    I'll just say that's what was stipulated with my

7    monitoring schedule.

8    Q.    Now, you've tested a lot of water

9    over your career, fair statement?

10   A.    Fair to say, yes.

11   Q.    And does water quality and

12   chemistry change rapidly?

13   A.    It can, yes.

14   Q.    It can.  And so when you sample

15   water on a daily basis, it might show certain

16   parameters on one day and completely different

17   parameters the next day.  Has that been your

18   experience?

19   A.    Yep, that's fair to say.

20   Q.    And when you analyze samples

21   collected from the distribution system, you've

22   seen the same issue, that samples drawn on

23   Monday could be completely different from what's

24   drawn on Wednesday, fair statement?

Highly Confidential - Michael B. Glasgow

1          A.     That's a fair statement.

2          Q.     And that's because water quality

3     and chemistry is highly variable.  Is that a

4     fair statement?

5          A.     Yes, that's a fair statement.

6          Q.     And would you -- and why is it, if

7     you know, that there are seven to ten sampling

8     locations in the distribution system to monitor

9     water quality?

10         A.     Well --

11                MR. MARKER:  Form and foundation.

12         A.     In my eyes, it's -- you want a

13    good representative sample of the entire city,

14    so you kind of want to spread everything out.

15         Q.     And your -- strike that.

16                Let me now jump to non-regulatory

17    sampling.  We've talked about the regulatory

18    sampling.  The -- you talked about Mr. Croft and

19    Mr. Johnson telling you that they were having an

20    external lab do some TTHM samples.  Were those

21    samples collected as part of the regulatory

22    scheme?

23         A.     No, not to my knowledge.

24         Q.     And do you know of any other --

Highly Confidential - Michael B. Glasgow

1    I'm going to refer to this as non-regulatory

2    sampling, sampling that's not part of the

3    monitoring schedule set by MDEQ.

4              Are you aware of any other

5    non-regulatory sampling conducted on water

6    treated at the city -- water produced at the

7    water treatment plant in 2014 or 2015?

8         A.    The only other testing that I can

9    think would have been when the city installed a

10   THM monitor.  It was an inline monitor.  It

11   would take about an hour to get a test result.

12   And that's the only one I could think of.

13             While I was there, if any testing

14   was done, regulatory or not, that's another

15   reason I preferred to use the state MDEQ lab

16   because then the DEQ, they would have -- my

17   district engineer, Mr. Prysby or Mr. Busch, they

18   would have the results of anything I sent in

19   there.

20        Q.    So if testing was done at your

21   laboratory in 2014 or 2015, you would know about

22   it.

23        A.    Yes.

24        Q.    Is that fair?

Highly Confidential - Michael B. Glasgow

1          A.    Yep, that's a fair statement.

2          Q.    And I'm going to tell you that

3    Mr. Bincsik has testified to some testing out in

4    the distribution system with a -- now I'm going

5    to mess this up -- it's either hatch or hack

6    meter checking for chlorine residual levels in

7    the distribution system.  It was outside of the

8    regulatory program.

9                Do you know anything about that?

10         A.    No, not offhand, but it doesn't --

11   it's refreshing to hear that they had those

12   meters to be able to monitor things.  Now, I'm

13   not an expert on the distribution side, but I

14   know if Mr. Bincsik had a water main break or

15   they had to cut in a section of pipe, they'd

16   have to chlorinate it after the fact, and so I

17   could see them having meters to do that.

18               And if they did do -- you know,

19   sometimes they would bring us the bacteria

20   samples after they put a new water main on

21   service.  They'd bring that to my lab.  But,

22   yeah, for normal chlorine testing I wouldn't

23   have any idea what Mr. Bincsik and his crew was

24   up to.

Highly Confidential - Michael B. Glasgow

```
1          Q.    Okay.  And how about citizen

2    sampling.  You went into residents' homes,

3    Ms. Walters' home.

4          A.    Yes.

5          Q.    Did you go to any other resident's

6    home to do sampling?

7          A.    Over my tenure with the city, I

8    was in a significant number of homes.

9          Q.    And did you ever check chlorine

10   residuals in citizens homes?

11         A.    Yes.

12         Q.    And what were your findings when

13   you did that sampling?

14         A.    It would vary.  Sometimes they

15   were fine.  Sometimes they were a little low.

16         Q.    When you say "a little low," do

17   you mean below the 0.2 PPM target?

18         A.    I'm sorry.  When I say "a little

19   low," the way I used to operate and the way I

20   operate the system I work at now is .5 to me is

21   getting on the low end.  If it starts getting

22   below .5 milligrams per liter or parts per

23   million total chlorine residual that makes me

24   start thinking that I want to bump it up a
```

Highly Confidential - Michael B. Glasgow

1    little bit.

2           Q.    All right.  The -- so in your

3    experience and, again, focusing on 2014 and

4    2015, did you ever sample for chlorine residual

5    in citizens' homes?

6           A.    Yes.

7           Q.    And did you find on occasion

8    results that were below the 0.2 target range

9    that was applicable for the Flint system during

10   that time?

11          A.    I will say yes.

12          Q.    And if you can, tell me

13   approximately how many times you did that type

14   of sampling.

15          A.    I don't feel I can give you -- I'm

16   not confident in an approximation.  I will say

17   after the switch, mostly any water complaint we

18   would get, if I could find the time, myself or

19   my staff would go visit that home.  We had a

20   nice little complaint form we'd fill out with

21   information, name, address, and if we took a

22   chlorine sample, the results would be on there.

23          Q.    Okay.

24          A.    As well as we'd also collect a

```
 1   coliform bacteria sample.

 2          Q.    And did you generate papers when

 3   you did that type of sampling?

 4          A.    Yes.

 5          Q.    And were those papers stored in

 6   the records of the city of Flint?

 7          A.    Yes.

 8          Q.    Okay.  And sir, you were the

 9   laboratory supervisor.  Why were you going out

10   into people's homes?

11          A.    Well, I only had myself and two

12   other lab staff.  We also had to work weekends.

13   So most of the time -- well, gosh.  How do I say

14   this too.  And at one time it was myself and I

15   had two female employees, and to me it wasn't

16   safe to send them out into the city and into

17   city's homes.  So maybe it's a little

18   misogynistic, but I -- if I was going to put

19   somebody in danger, it was going to be myself.

20          Q.    Understood.

21                Now, on those occasions when you

22   did go out into the field and grab samples from

23   people's homes, or even the distribution system,

24   you saw -- did you see results that were
```

Highly Confidential - Michael B. Glasgow

1   different from what you saw at the laboratory?

2              MR. MARKER:  Object to form and

3         foundation.

4         A.    Yeah, I guess I'm not quite

5   understanding "different from the laboratory."

6         Q.    If you --

7         A.    So I'm in the homes --

8         Q.    You testified that the testing you

9   did at the laboratory showed that you were

10  hitting the targets set at the laboratory,

11  correct?

12        A.    I don't know which targets.  Like

13  the targets at my treatment plant that I'm

14  hitting?

15        Q.    Right.  Your testimony, as I

16  understand it, was that the daily testing you

17  did at the plant showed that you were meeting

18  the requirements of the Safe Drinking Water Act.

19        A.    Correct, yes.

20        Q.    And my question is, when you

21  collected samples out in the system, whether in

22  people's homes or at the distribution -- at the

23  sampling sites in the distribution system, those

24  results were different from what you saw at the

Highly Confidential - Michael B. Glasgow

```
1    laboratory, correct?

2              MR. MARKER:  I'll object to form

3         and foundation.

4         A.    I will say yes, because to me

5    it's -- yeah, it's two different types of water.

6    My water at the plant is right there.

7         Q.    Explain to me --

8         A.    The other has traveled through the

9    distribution system.

10        Q.    Why do you say that, that it's --

11   the water is different or the sampling is

12   different?

13        A.    I'm just saying the results are

14   going to be different.  If I have a chlorine

15   residual of 2 parts per million leaving my

16   treatment plant, I know if I go to the far end

17   of the system, I'm not going to see two parts

18   per million of chlorine at the far end of the

19   system.

20        Q.    And why is that, sir?

21        A.    It's a number of factors.

22   Chlorine wants to be a gas.  It don't want to

23   stay in water.  Warm temperatures will make

24   chlorine come out of the water.  Chlorine can
```

1    react with other substances inside the water.

2          Q.    Did you ever learn that there were

3    areas of the city of Flint water distribution

4    system where there was levels of chlorine

5    residual below the regulatory target of 0.2?

6          A.    Yes.

7          Q.    And tell us, what do you know

8    about that?

9          A.    I just remember one -- one of our

10   specific locations was always on the low end

11   of -- which means to me less than .5, but there

12   was times when the chlorine residual was, you

13   know, .2 or .1.

14         Q.    And where were those areas?

15         A.    The only one sticks out in my

16   head, and it was on Martin Luther King Avenue.

17   I believe it was our site number 11, and that

18   was kind of a historic lower place.  That was

19   kind of one we always watched even prior to the

20   switch.

21         Q.    And do you know if anybody from

22   the city of Flint notified the residents and

23   businesses receiving the water in that area of

24   that plant that the chlorine levels -- chlorine

Highly Confidential - Michael B. Glasgow

1    residual tended to be below the target range?

2          A.    I could not tell you that.  I do

3    not know.

4          Q.    Let me ask you a little bit about

5    Legionella testing.  Now, do you consider

6    Legionella a regulated contaminant under the

7    Safe Drinking Water Act?

8                MR. MARKER:  Objection; form,

9          foundation.

10         A.    I do not.  I was not aware of any.

11   I'll put it this way:  In my years of water

12   testing, that has never been a stipulated

13   organism to test for.

14         Q.    What is your understanding as to

15   how Legionella is treated under the -- now, you

16   testified previously that you're familiar with

17   the regulatory requirements of the Safe Drinking

18   Water Act; is that right?

19               MR. MARKER:  Objection to form.

20         A.    That is right.

21         Q.    And you're familiar with both the

22   state Safe Drinking Water Act and the federal

23   Safe Drinking Water Act, correct?

24         A.    Correct.

Highly Confidential - Michael B. Glasgow

1      Q.    And please tell us, to your

2   knowledge, how is Legionella addressed in the

3   Safe Drinking Water Act?

4      A.    In my understanding, from what I

5   recall, it is -- like I said, it's not

6   specifically addressed but it's addressed in the

7   fact of chlorination in your distribution system

8   and chlorine levels.

9      Q.    Do you agree with me that it is

10  addressed by the Safe Drinking Water Act in an

11  indirect manner?

12          MR. MARKER:  Objection to form.

13     A.    I will say prior to 2014 I didn't

14  believe it was regulated in an indirect manner,

15  no.

16     Q.    Has your understanding changed?

17     A.    Since 2014, my understanding has

18  changed on a number of issues.

19     Q.    And how has your understanding --

20  has your understanding regarding Legionella

21  under the Safe Drinking Water Act changed since

22  2014?

23     A.    Well, since 2014 -- prior to 2014,

24  you never heard much about Legionella in

Highly Confidential - Michael B. Glasgow

```
 1   drinking water, almost like it wasn't really a

 2   concern.  You know, any time you heard of that,

 3   you heard of, you know, somebody -- cooling

 4   towers or people all in the same building would

 5   get infected, in that aspect.

 6           Q.    And so you --

 7           A.    After the -- oh, go ahead.

 8           Q.    Go ahead, sorry.

 9           A.    I'm trying to stimulate my memory

10   here for you.  Now, after the fact, in

11   hindsight, you know, you look more at

12   chlorination levels out in the system.  With, I

13   guess, more information that I was -- or

14   knowledge, I should say, I was privy to or over

15   a year or so with gentleman from the EPA and

16   also other members of the MDEQ, you know, you

17   learn a few more other things in regards to

18   Legionella.

19           Q.    And let me ask you, sir, you

20   recall when the EPA came in in January of 2016

21   and issued an emergency order, right?

22           A.    Uh-huh.

23           Q.    And you were still employed by the

24   city during the period of January 2016 to
```

Highly Confidential - Michael B. Glasgow

1    approximately April of 2016; is that your

2    testimony?

3            A.    That is correct, yes.

4            Q.    And were you in contact with

5    people from the EPA during that January to April

6    time frame?

7            A.    Yes.

8            Q.    And did you discuss with them the

9    requirements of the emergency order that the EPA

10   had issued?

11           A.    Yes, I vaguely ...

12           Q.    And one of those requirements

13   related to maintaining a chlorine residual in

14   the distribution system; isn't that right?

15           A.    That is correct.

16           Q.    And do you recall speaking to a

17   gentleman named Robert Kaplan regarding that

18   requirement?

19           A.    Yes.

20           Q.    What do you recall of your

21   communications with Mr. Kaplan?

22           A.    I recall meeting him on a couple

23   different occasions.  But to pull up specifics,

24   I don't think I can come up with any here.

1      Q.    Did Mr. Kaplan impress upon you

2   the importance of maintaining a chlorine

3   residual in order to minimize the risk of

4   Legionella growth?

5                MR. MARKER:  Object to the form.

6      A.    I don't recall that -- that exact

7   statement.  Very well may have been, but I'm

8   sorry, I can't pull it from my memory.

9      Q.    Did Mr. Kaplan ever express

10  concern to you regarding the low level of

11  chlorine residual in the Flint distribution

12  system during that January to April time frame?

13     A.    I don't recall an incident with

14  Mr. Kaplan because -- and I may be confused

15  here, but Mr. Kaplan, I think, come in, and he

16  was a little higher up in the EPA.  I remember a

17  couple other EPA employees, I'll say, that are

18  more the field guys that worked in the

19  laboratory.  So I can recall discussions with

20  some of them in regards to keeping the chlorine

21  up.  I don't -- I cannot remember it ever being

22  associated with Legionella like that, though, I

23  hate to say.

24     Q.    And do you recall that both the

Highly Confidential - Michael B. Glasgow

1    EPA and the MDEQ increased the number of

2    monitoring locations in the distribution when

3    they came in in January of 2016?

4          A.    Yes, I do recall that.

5          Q.    And what do you know about that?

6          A.    It's another one of the field

7    gentlemen.  I apologize.  I don't remember his

8    name.  I'm not good with names at all, let alone

9    four years later.

10                But I remember they come in and

11   looked at our monthly operation reports, seeing

12   how many sites we had.  And they suggested, you

13   know, the shape of our system and the issues we

14   were having, we should increase the number of

15   sites.

16                I also know that they installed a

17   couple -- I don't know if it was hydrant

18   flushers, a contraption you could put on a

19   hydrant that would flush itself every so often

20   to kind of get rid of stagnant water to help

21   keep chlorine residuals up.  I do recall that.

22         Q.    Just so I'm clear, when you said

23   that your understanding about Legionella had

24   changed since 2014, in hindsight, you now

Highly Confidential - Michael B. Glasgow

```
 1    understand you look more at chlorination levels.

 2              Did I hear you correctly?

 3              MR. DAWSON:  Objection; no

 4         foundation.

 5              Go ahead, sir.

 6         A.    Yeah, I believe I said that, yeah.

 7    And, I mean, we looked at chlorine residuals

 8    anyway.  I mean, that was an important aspect of

 9    our monitoring and our regulations.  But I never

10    associated it with Legionella before, I'll say.

11         Q.    And your understanding about that

12    relationship changed after 2014; is that what

13    you're saying?

14         A.    Yeah.  I'm saying after more time

15    with experts in the field, yeah, it increased

16    the knowledge, yes.

17         Q.    And in your reference to looking

18    at chlorination levels, that would have been in

19    relation to the distribution system, correct?

20         A.    Correct, yes.

21         Q.    And just a couple quick questions

22    about this HPC test.  Now, I understand that

23    Legionella -- you didn't -- you would have known

24    of testing done on the city of Flint water
```

Highly Confidential - Michael B. Glasgow

```
 1   because you had a lab supervisor, right?

 2        A.    Correct.

 3        Q.    And to your knowledge, there was

 4   never -- and because of your knowledge with

 5   water testing and laboratory analysis of water

 6   samples, you know that there is a test

 7   specifically for Legionella bacteria, correct?

 8        A.    At the time, I was not aware --

 9        Q.    Okay.

10        A.    -- of anything specific.

11        Q.    And -- but the HPC test was part

12   of the routine Bac-T testing, correct?

13        A.    Correct, yes.

14        Q.    And that is the -- that tests the

15   family level of bacteria --

16        A.    Correct.

17        Q.    -- as you explained to Mr. Kim.

18              Did you at some point in time --

19   now, I believe you told Mr. Kim that if

20   Legionella was there, it would show up on the

21   HPC test?

22        A.    Yes, I -- yeah, we assumed if it's

23   in that family of bacteria, and we're doing HPC

24   tests and them come clear, we should be in the
```

 1    clear, so to speak.

 2          Q.    And what do you mean by "clear"

 3    with the HPC test?

 4          A.    If it was -- if you basically

 5    got -- the lowest number was less than 2 --

 6          Q.    So if it was less than 2 --

 7          A.    -- for that testing.  For the way

 8    the calculations went with their prepackaged

 9    plates, it was a clear plate, no fluorescence,

10    so no bacteria was shown.  But due to the

11    statistics of the test, it would be reported at

12    less than 2.

13          Q.    So if the result was clear, you

14    presumed there was no -- none of this HPC family

15    of bacteria, including Legionella?

16          A.    Correct.

17          Q.    And would the converse be true,

18    that if the HPC was above 2, that this HPC

19    family, including Legionella, was present?

20                MR. MARKER:  Objection to form.

21          A.    If it was above 2, there is a

22    possibility it could be Legionella.

23          Q.    And did you at some point in time

24    learn that there is such a thing as a direct

Highly Confidential - Michael B. Glasgow

1    test for Legionella bacteria that can be run on

2    water samples?

3          A.    Yes.

4          Q.    And how did you learn about that?

5          A.    To be honest with you, I just read

6    about that about two months ago, and it was

7    based off the -- I was looking to order supplies

8    at my new place I work for, and I seen a

9    specific test called Legiolert, you know, and it

10   was similar to the Colilert we used for coliform

11   bacteria.  So that's when I just found out about

12   that specific test.  That's a little more

13   functional and quick to do.

14         Q.    Let me ask you:  Do you have any

15   recollection of any communication with any

16   person at EMSL lab back in 2015?

17         A.    I do not recall.  For some reason,

18   it sounds a little familiar, but I can't pull

19   anything up.

20                MS. SMITH:  If we can go off the

21          record for just a moment.  I need to

22          pick up an exhibit from my pile across

23          the room.

24                THE VIDEOGRAPHER:  We are going

Highly Confidential - Michael B. Glasgow

```
1          off the record at approximately

2          5:04 p.m.

3              (Pause in proceedings.)

4              THE VIDEOGRAPHER:  We are back on

5          the record at 5:05 p.m.

6              - - -

7      (Glasgow Deposition Exhibit 33 marked.)

8              - - -

9  BY MS. SMITH:

10         Q.   For the record, this was

11 previously marked as Johnson Exhibit 147.  And

12 I'll represent that it is an e-mail from a

13 dianemiskowski@emsl.com to

14 mglasgow@cityofflint.com, March 20th of 2015 at

15 11:42 a.m.  The subject line is "Legionella

16 Quote," and the attachment is a city of Flint

17 water plant PDF, Bates range COF_FED_0103438,

18 and the price quote goes to -- ends with

19 COF_103443.

20              Have you had a chance to review

21 the document?

22         A.   Yeah, I was looking at it here,

23 yeah.

24         Q.   Now, I understand, sir, it's been
```

Highly Confidential - Michael B. Glasgow

1    many years since some of these events took

2    place.  Does reviewing this document refresh

3    your recollection of any communications with the

4    folks at EMSL lab about Legionella testing?

5           A.   Yeah, I'm assuming I had just sent

6    out for a quote.

7           Q.   Now, is that the e-mail address

8    that you had assigned to you when you were

9    employed at the city of Flint water treatment

10   plant?

11          A.   Yes, it was, yep.

12          Q.   And do you recall reaching out to

13   EMSL lab about a Legionella quote?

14          A.   I don't recall it, but I obviously

15   did here via this e-mail.

16          Q.   Okay.  So you --

17          A.   March 20, 2015, hmm.

18          Q.   If I were to ask you why you've

19   reached out to EMSL, would you -- let me just

20   ask you that question.  Do you know why you

21   reached out to EMSL?

22          A.   Oh, well, looking at the date of

23   this, figuring it was March 20 of 2015, this

24   would have been a -- you know, roughly six

```
 1   months after the issue with McLaren Hospital.

 2   So I was probably going to get some pricing to

 3   try to put into my budget for the next year for

 4   testing.

 5        Q.   Okay.  Let me hand you -- I know

 6   it's a document that's been previously used

 7   today.  It's marked as Johnson Exhibit 141.  And

 8   I believe that you -- it's in the stack.  It's

 9   the water quality optimization e-mail of

10   March 17 of 2015.

11             MS. SMITH:  And I can't believe I

12        don't have five copies of this because

13        I've used it in every deposition, and I

14        think everyone else has, but -- in fact,

15        here we go.  Speak of the devil, there

16        it is.

17             MR. CAMPBELL:  Exhibit 32?

18             MS. SMITH:  Yes.

19   BY MS. SMITH:

20        Q.   It was marked by Mr. -- one of the

21   gentlemen today as Exhibit 32?

22        A.   Yes.

23        Q.   Okay.  Terrific.  If you could,

24   please review Exhibit 32, which is also marked
```

Highly Confidential - Michael B. Glasgow

```
 1   Johnson Exhibit 141.

 2                Now, I note that you're a

 3   recipient on this March 17, 2015 e-mail from

 4   Mr. Busch.

 5                Do you see that?

 6        A.   Yes.

 7        Q.   And this was March 17, which would

 8   have been three days before your e-mail to

 9   Ms. Miskowski where you're -- the e-mail you

10   received from Ms. Miskowski.  Does that -- it

11   would appear to be that there -- because of the

12   timing, there's a relationship between the two

13   things.  Because if you look on Mr. Busch's

14   e-mail, the fifth item down is "to conduct

15   routine monitoring for Legionella bacteria at

16   the water treatment plant tap and at locations

17   in the distribution system."

18                Do you see that?

19        A.   Uh-huh.

20        Q.   Okay.  Now, do you now recall

21   whether there was -- whether Mr. Busch's e-mail

22   prompted any investigation of direct Legionella

23   testing?

24        A.   With the dates, I would assume
```

1    that it still doesn't stimulate anything, I hate

2    to say, in my memory but --

3          Q.   That's okay.

4          A.   -- I could see that with the

5    dates.  This comes from Mr. Busch.  I could see

6    myself trying to get quotes because, like I

7    said, if I was going to use an outside lab, I

8    need to get quotes and get approval and get the

9    money set aside to be able to do anything.

10          Q.   And who would have approved those

11    expenditures?

12          A.   Mr. Johnson and Mr. Croft.

13          Q.   Okay.  So when we see references

14    in the record to the city of Flint's testing

15    showing no evidence of Legionella, as Mr. Kim

16    asked you about, that would mean the indirect

17    testing from the HPC test; is that correct?

18          A.   That is correct, yes.

19          Q.   And, to your knowledge, there's

20    not a single direct Legionella test that was run

21    by anybody with the city of Flint during your

22    term as the water quality laboratory supervisor;

23    is that correct?

24          A.   Not to my knowledge, that is

Highly Confidential - Michael B. Glasgow

```
1    correct.

2              MS. SMITH:  I'm going to conclude

3         for the day and resume my examination

4         tomorrow.  Thank you very much.

5              THE VIDEOGRAPHER:  This concludes

6         today's testimony.  We are off the

7         record at 5:11 p.m.

8                   - - -

9          Thereupon, at 5:11 p.m., on Monday,

10   February 24, 2020, the deposition was adjourned.

11                  - - -

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Michael B. Glasgow

```
 1                    CERTIFICATE

 2   STATE OF MICHIGAN      :

                                 SS:

 3   COUNTY OF _____:

 4

 5          I, MICHAEL B. GLASGOW, do hereby certify

 6   that I have read the foregoing transcript of my

 7   cross-examination given on February 24, 2020; that

 8   together with the correction page attached hereto

 9   noting changes in form or substance, if any, it is

10   true and correct.

11          _____

                   MICHAEL B. GLASGOW

12

13          I do hereby certify that the foregoing

14   transcript of the cross-examination of MICHAEL B.

15   GLASGOW was submitted to the witness for reading and

16   signing; that after he had stated to the undersigned

17   Notary Public that he had read and examined his

18   cross-examination, he signed the same in my presence

19   on the _____ day of _____, 2020.

20

            _____

21                   NOTARY PUBLIC - STATE OF MICHIGAN

22

23   My Commission Expires:

24   _____, _____.
```

Highly Confidential - Michael B. Glasgow

```
  1                    CERTIFICATE
  2
             I, Carol A. Kirk, a Registered Merit
  3   Reporter and Notary Public in and for the State of
      Michigan, duly commissioned and qualified, do hereby
  4   certify that the within-named MICHAEL B. GLASGOW was
      by me first duly sworn to testify to the truth, the
  5   whole truth, and nothing but the truth in the cause
      aforesaid; that the deposition then given by him was
  6   by me reduced to stenotype in the presence of said
      witness; that the foregoing is a true and correct
  7   transcript of the deposition so given by him; that the
      deposition was taken at the time and place in the
  8   caption specified and was completed without
      adjournment; and that I am in no way related to or
  9   employed by any attorney or party hereto or
      financially interested in the action; and I am not,
 10   nor is the court reporting firm with which I am
      affiliated, under a contract as defined in Civil Rule
 11   28(D).
 12
 13          IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my seal of office at Dexter, Michigan
 14   on this 9th day of March 2020.
 15
 16
 17          _____
             CAROL A. KIRK, RMR, CSR-9139
 18          NOTARY PUBLIC - STATE OF MICHIGAN
 19
 20   My Commission Expires:  August 19, 2022.
 21                    - - -
 22
 23
 24
```

Highly Confidential - Michael B. Glasgow

```
 1              DEPOSITION ERRATA SHEET

 2   I, MICHAEL B. GLASGOW, have read the transcript

     of my deposition taken on the 24th day of February

 3   2020, or the same has been read to me.  I request that

     the following changes be entered upon the record for

 4   the reasons so indicated.  I have signed the signature

     page and authorize you to attach the same to the

 5   original transcript.

 6   Page  Line  Change and Reason:

 7   ____  ____  _____

 8   ____  ____  _____

 9   ____  ____  _____

10   ____  ____  _____

11   ____  ____  _____

12   ____  ____  _____

13   ____  ____  _____

14   ____  ____  _____

15   ____  ____  _____

16   ____  ____  _____

17   ____  ____  _____

18   ____  ____  _____

19   ____  ____  _____

20   ____  ____  _____

21   ____  ____  _____

22   ____  ____  _____

23   ____  ____  _____

24   Date _____  Signature _____
```

1             UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF MICHIGAN

3                  SOUTHERN DIVISION

4     _____

                                    )

5                                   )  Civil Action No.

                                    )  5:16-cv-10444-JEL-MKM

6     In re:  FLINT WATER CASES  )  (consolidated)

                                    )

7                                   )  Hon. Judith E. Levy

                                    )  Mag. Mona K. Majzoub

8     _____)

9

10              HIGHLY CONFIDENTIAL

11    VIDEOTAPED DEPOSITION OF MICHAEL B. GLASGOW

12                   VOLUME II

13

14           Tuesday, February 25, 2020

15                at 8:59 a.m.

16

17    Taken at:  Butzel Long

                 41000 Woodward Avenue

18               Bloomfield Hills, Michigan  48304

19

20

21

22    REPORTED BY:  CAROL A. KIRK, RMR/CSR-9139

23           GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

24               deps@golkow.com

Highly Confidential - Michael B. Glasgow

```
 1            A P P E A R A N C E S
 2                  - - -
 3    On behalf of the Class Plaintiffs:
           STEPHEN E. MORRISSEY, ESQUIRE
 4         BENJAMIN MANNE, ESQUIRE
           SUSMAN GODFREY L.L.P
 5         1201 Third Avenue, Suite 3800
           Seattle, Washington  98101
 6         206-516-3880
           smorrissey@susmangodfrey.com
 7         bmanne@susmangodfrey.com
 8
      On behalf of Individual Plaintiffs:
 9         DONALD H. DAWSON, JR., ESQUIRE
           FIEGER LAW
10         19390 West Ten Mile Road
           Southfield, Michigan  48075-2463
11         248-355-5555
           d.dawson@fiegerlaw.com
12
13    On behalf of Individual Plaintiffs:
           ALASTAIR J.M. FINDEIS, ESQUIRE
14         NAPOLI SHKOLNIK PLLC
           400 Broadhollow Road, Suite 305
15         Melville, New York  11747
           631-224-1133
16         afindeis@napolilaw.com
17
      On behalf of the Mason State Court Plaintiffs:
18         ADAM T. SCHNATZ, ESQUIRE
           MCALPINE PC
19         3201 University Drive, Suite 200
           Auburn Hills, Michigan  48326
20         248-373-3700
           atschnatz@mcalpinepc.com
21
22
23
24
```

Highly Confidential - Michael B. Glasgow

```
 1              A P P E A R A N C E S (CONT'D)
 2                       -  -  -
 3   On behalf of the People of the State of Michigan:
             RICHARD KUHL, ASSISTANT ATTORNEY GENERAL
 4           DANA NESSEL, ATTORNEY GENERAL
             525 West Ottawa Street, 6th Floor
 5           Lansing, Michigan  48909
             517-335-7664
 6           kuhlr@michigan.gov
 7

     On behalf of Defendants Veolia Water North America
 8   Operating Services, LLC, Veolia North America, LLC,
     and Veolia North America, Inc.:
 9           RICHARD P. CAMPBELL, ESQUIRE
             ALAINA N. DEVINE, ESQUIRE
10           CAMPBELL CONROY & O'NEIL, P.C.
             1205 Westlakes Drive, Suite 330
11           Berwyn, Pennsylvania  19312
             adevine@campbell-trial-lawyers.com
12           rpcampbell@Campbell-trial-lawyers.com
13

     On behalf of Defendant Rowe Professional Services
14   Company (via teleconference):
             CRAIG S. THOMPSON, ESQUIRE
15           SULLIVAN, WARD, ASHER & PATTON, PC
             25800 Northwestern Highway, Suite 1000
16           Southfield, Michigan  48075
             248-746-0700
17           cthompson@swappc.com
18

     On behalf of Defendant City of Flint:
19           WILLIAM KIM, ASSISTANT CITY ATTORNEY
             CITY OF FLINT LEGAL DEPARTMENT
20           1101 South Saginaw Street, 3rd Floor
             Flint, Michigan  48502
21           810-766-7146
             wkim@cityofflint.com
22

23

24
```

Highly Confidential - Michael B. Glasgow

```
 1             A P P E A R A N C E S (CONT'D)
 2                      - - -
 3   On behalf of Defendants Leo A. Daly Company and
     Lockwood, Andrews & Newnam, Inc.:
 4          TRAVIS S. GAMBLE, ESQUIRE
            FAEGRE DRINKER BIDDLE & REATH LLP
 5          1717 Main Street, Suite 5400
            Dallas, Texas  75201
 6          469-357-2534
            travis.gamble@dbr.com
 7
 8   On behalf of McLaren Regional Medical Center:
            SUSAN E. SMITH, ESQUIRE
 9          BEVERIDGE & DIAMOND, P.C.
            456 Montgomery Street, Suite 1800
10          San Francisco, California  94104
            1-415-262-4000
11          ssmith@bdlaw.com
12
     On behalf of Defendant Adam Rosenthal (via
13   teleconference):
            JAMES A. FAJEN, ESQUIRE
14          FAJEN & MILLER, PLLC
            3646 West Liberty Road
15          Ann Arbor, Michigan  48103
            734-995-0181
16          fajenlaw@fajenmiller.com
17
     On behalf of Defendants Bradley Wurfel and Daniel
18   Wyant (via teleconference):
            CHRISTOPHER B. CLARE, ESQUIRE
19          CLARK HILL PLC
            1001 Pennsylvania Avenue NW, Suite 1300 South
20          Washington, DC  20004
            202-572-8671
21          cclare@clarkhill.com
22
23
24
```

Highly Confidential - Michael B. Glasgow

```
 1              A P P E A R A N C E S  (CONT'D)
 2                      - - -
 3    On behalf of Defendants Patrick Cook and Michael
      Prysby:
 4            CHARLES E. BARBIERI, ESQUIRE
              FOSTER SWIFT COLLINS & SMITH PC
 5            313 South Washington Square
              Lansing, Michigan  48933
 6            517-371-8124
              cbarbieri@fosterswift.com
 7
 8    On behalf of Defendant Jeffrey Wright (via
      teleconference):
 9            MATTHEW T. WISE, ESQUIRE
              FOLEY MANSFIELD PLLP
10            130 East 9 Mile Road
              Ferndale, Michigan  48220
11            248-721-4200
              mwise@foleymansfield.com
12
13    On behalf of the MDEQ Employee Defendants (via
      teleconference):
14            JARED A. ROBERTS, ESQUIRE
              FRASER TREBILCOCK DAVIS & DUNLAP, P.C.
15            124 West Allegan Street, Suite 1000
              Lansing, Michigan  48933
16            517-482-5800
              jroberts@fraserlawfirm.com
17
18    On behalf of Defendant Gerald Ambrose (via
      teleconference):
19            BARRY A. WOLF, ESQUIRE
              503 Saginaw Street
20            Flint, Michigan  48502
              810-762-1084
21            bwolf718@msn.com
22
23
24
```

Highly Confidential - Michael B. Glasgow

```
 1              A P P E A R A N C E S (CONT'D)
 2                      - - -
 3    On behalf of Defendant Michael Glasgow:
              CHRISTOPHER J. MARKER, ESQUIRE
 4            O'NEILL, WALLACE & DOYLE P.C.
              300 St. Andrews Road, Suite 302
 5            Saginaw, Michigan  48638
              989-790-0960
 6            cmarker@owdpc.com
 7
      On behalf of Defendant Stephen Busch:
 8            KRISTA A. JACKSON, ESQUIRE
              SMITH HAUGHEY RICE & ROEGGE
 9            100 Monroe Center Street, NW
              Grand Rapids, Michigan  49503
10            616-774-8000
              kjackson@shrr.com
11
12    On behalf of Defendant Darnell Earley:
              JOSEPH R. FURTON, ESQUIRE
13            THE PERKINS LAW GROUP PLLC
              615 Griswold Street,  Suite 400
14            Detroit, Michigan  48826
              313-964-1702
15            j.furton@perkinslawgroup.net
                      and
16            T. SANTINO MATEO, ESQUIRE (via teleconference)
              LAW OFFICES OF T. SANTINO MATEO
17            535 Griswold, Suite 1000
              Detroit, Michigan  483226
18            313-962-3500
              tsantinomateo@gmail.com
19
20
21
22
23
24
```

```
 1          A P P E A R A N C E S (CONT'D)

 2                    - - -

 3   On behalf of Defendant Howard Croft (via

     teleconference):

 4          ALEXANDER S. RUSEK, ESQUIRE

            DANIEL STURDEVANT, ESQUIRE

 5          WHITE LAW PLLC

            2549 Jolly Road, Suite 340

 6          Okemos, Michigan  48864

            517-316-1195

 7          alexrusek@whitelawpllc.com

            danielsturdevant@whitelawpllc.com

 8

 9

10   ALSO PRESENT:

11          Neal Rogers, Videographer

12

13                    - - -

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Michael B. Glasgow

```
 1      VIDEOTAPED DEPOSITION OF MICHAEL B. GLASGOW

 2                   INDEX TO EXAMINATION

 3   WITNESS                                        PAGE

 4   MICHAEL B. GLASGOW

 5        EXAMINATION (CONT'D.) BY MS. SMITH          403

          EXAMINATION BY MS. JACKSON                  442

 6        EXAMINATION BY MR. KUHL                     504

          EXAMINATION BY MR. MORRISSEY                566

 7        EXAMINATION BY MR. DAWSON                   658

          FURTHER EXAMINATION BY MS. SMITH            691

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1      VIDEOTAPED DEPOSITION OF MICHAEL B. GLASGOW
 2                      INDEX TO EXHIBITS
 3    GLASGOW           DESCRIPTION                    PAGE
 4    Exhibit 34        E-mail to Mr. Sygo and         402
                        Ms. Henderson from Mr. Kaplan,
 5                      dated 1/20/2016, Bates-stamped
                        EPA-R5-2018-006908_0001194
 6
      Exhibit 35        2014 Monitoring Schedule,      405
 7                      Bates-stamped COF_FED_0107016
                        and 107017
 8
      Exhibit 36        Document titled, "City of Flint 406
 9                      Water Plant Routine
                        Distribution System Sampling
10                      Sites & Additional Water
                        Quality Monitoring Sites"
11
      Exhibit 37        City of Flint Water Treatment  409
12                      Plant Monthly Operation Report,
                        August 2015, Bates-stamped
13                      COF_FED_0112408 through 112416
14    Exhibit 38        E-mail string ending with an   413
                        e-mail to Mr. Bolen from
15                      Mr. Johnson, dated 1/26/2015
16    Exhibit 39        Document titled, "Lead and     495
                        Copper Report and Consumer
17                      Notice of Lead Result
                        Certificate for Community Water
18                      Supply," July 2014 to December
                        2014, Bates-stamped
19                      COF_FED_0107399 through 107404
20    Exhibit 40        Document titled, "Lead and     496
                        Copper Report and Consumer
21                      Notice of Lead Result
                        Certificate for Community Water
22                      Supply," January 2015 to June
                        2015, Bates-stamped
23                      COF_FED_0073495 through 73501
24
```

Highly Confidential - Michael B. Glasgow

```
 1              INDEX TO EXHIBITS (CONT'D)
 2    GLASGOW         DESCRIPTION                    PAGE
 3    Exhibit 41      E-mail string ending in an     498
                      e-mail to Mr. Glasgow from
 4                    Mr. Prysby, dated 6/10/2015,
                      Bates-stamped 04-15-2016
 5                    SOM0020708 and 20709
 6    Exhibit 43      E-mail to Mr. Rosenthal from   506
                      Mr. Glasgow, dated 5/14/2014,
 7                    with attachment, Bates-stamped
                      03-21-2016 SOM0000056 through
 8                    6740
 9    Exhibit 44      Monthly Operating Report,      506
                      May 2014
10
      Exhibit 45      Monthly Operating Report,      506
11                    June 2014
12    Exhibit 46      Monthly Operating Report,      506
                      July 2014
13
      Exhibit 47      Monthly Operating Report,      506
14                    August 2014
15    Exhibit 48      Monthly Operating Report,      506
                      September 2014
16
      Exhibit 49      Monthly Operating Report,      506
17                    October 2014
18    Exhibit 50      Monthly Operating Report,      506
                      November 2014
19
      Exhibit 51      Monthly Operating Report,      506
20                    December 2014
21    Exhibit 52      Monthly Operating Report,      506
                      January 2015
22
      Exhibit 53      Monthly Operating Report,      506
23                    February 2015
      Exhibit 54      Monthly Operating Report,      506
24                    March 2015
```

Highly Confidential - Michael B. Glasgow

```
 1              INDEX TO EXHIBITS (CONT'D)
 2    GLASGOW         DESCRIPTION                     PAGE
 3    Exhibit 55      Monthly Operating Report,       506
                      April 2015
 4
      Exhibit 56      Monthly Operating Report,       506
 5                    May 2015
 6    Exhibit 57      Monthly Operating Report,       506
                      June 2015
 7
      Exhibit 58      Monthly Operating Report,       506
 8                    July 2015
 9    Exhibit 59      Monthly Operating Report,       506
                      August 2015
10
      Exhibit 60      E-mail to Mr. Daugherty from    522
11                    Mr. Glasgow, dated 11/18/2014,
                      Bates-stamped COF_FED_0033610
12                    and 33610
13    Exhibit 61      Letter to Mr. Wright from       531
                      Mr. Prysby, dated 9/10/2014,
14                    Bates-stamped COF_FED_0113932
                      through 113934
15
      Exhibit 62      Document titled "Operational    533
16                    Evaluation Report,
                      Trihalomethane Formation
17                    Concern," November 2014,
                      Bates-stamped COF_FED_0028870
18
      Exhibit 63      Spreadsheet titled "Table 1:    535
19                    Summary of Flint WTP
                      Operational Monitoring Data -
20                    May 2014 to October 16, 2015
21    Exhibit 64      Water Quality Report,           547
                      Bates-stamped COF_FED_0375144
22                    through 375157
23
24
```

Highly Confidential - Michael B. Glasgow

```
 1              INDEX TO EXHIBITS (CONT'D)
 2    GLASGOW         DESCRIPTION                      PAGE
 3    Exhibit 65      E-mail string ending with an     548
                      e-mail to Mr. Case from
 4                    Mr. Johnson, dated 3/31/2015,
                      Bates-stamped COF_FED_0108601
 5                    and 108602
 6    Exhibit 66      E-mail from Mr. Lorenz, dated     556
                      8/18/2014, Bates-stamped
 7                    COF_FED_0422811 and 422812
 8    Exhibit 67      Document titled, "City of Flint   556
                      Boil Water Advisory Lifted,
 9                    Reason for Low Circulation Has
                      Been Identified, Bates-stamped
10                    COF_FED_0036658 and 36659
11    Exhibit 68      2014 Annual Water Quality         563
                      Report, Bates-stamped
12                    COF_FED_0073939 through 73949
13    Exhibit 69      Water System Update with          564
                      Questions & Answers, February
14                    16, 2015, Bates-stamped
                      COF_FED_0380408 through 380413
15
      Exhibit 70      Drawing                           580
16
      Exhibit 71      Letter to Mr. Wright from         586
17                    Mr. Green, dated 6/10/2013,
                      with attachment, Bates-stamped
18                    LAN_FLINT_00185409 through
                      185488
19
      Exhibit 72      Letter to Mr. Lobb from           660
20                    Mr. Westcott, dated 12/23/2014
21    Exhibit 73      E-mail to Mr. Green from          593
                      Mr. Hansen, dated 7/2/2013,
22                    with attachment, Bates-stamped
                      LAN_FLINT_00106464 through
23                    106466
24
```

```
 1              INDEX TO EXHIBITS (CONT'D)
 2    GLASGOW         DESCRIPTION                    PAGE
 3    Exhibit 74   E-mail to Mr. Frechette from      595
                   Mr. Nakashima, dated 2/10/2014,
 4                 with attachment, Bates-stamped
                   LAN_FLINT_00140125 through
 5                 140134
 6    Exhibit 75   E-mail string ending with an      599
                   e-mail to Mr. Luoma from
 7                 Mr. Hansen, dated 3/12/2014,
                   Bates-stamped LAN_FLINT_
 8                 00026111
 9    Exhibit 76   Handwritten document titled,      621
                   "Corrosion Control Checking,
10                 2/18/15," Bates-stamped
                   VWNAOS028028
11
      Exhibit 77   Water Quality Report, March 4,    632
12                 2014, Bates-stamped
                   VWNAOS008493 through 8499
13
      Exhibit 78   Water Quality Report, March 12,   632
14                 2015, Bates-stamped COF_FED_
                   0628049 through 628062
15
      Exhibit 79   E-mail to Mr. Croft from          632
16                 Mr. Nicholas, dated 3/30/2015,
                   with attachment, Bates-stamped
17                 COF_FED_16290 through 16321
18    Exhibit 80   E-mail to Mr. Croft from          653
                   Mr. Hansen, dated 9/8/2015,
19                 with attachment, Bates-stamped
                   LAN_FLINT_00041213 through
20                 41216
21    Exhibit 81   E-mail to Mr. Croft from          657
                   Mr. Hansen, dated 9/8/2015,
22                 with attachment, Bates-stamped
                   LAN_FLINT_00041213 through
23                 41216
24
```

Highly Confidential - Michael B. Glasgow

```
 1            INDEX TO EXHIBITS (CONT'D)

 2    GLASGOW          DESCRIPTION                    PAGE

 3    Exhibit 82    Document titled, "Call with       676
                    Genesee  Co. and MDHHS -
 4                  Community Legionnaire's
                    Outbreak in Flint area -
 5                  4/30/2015"

 6    Exhibit 83    Document titled, "Flint,          682
                    Michigan Legionnaires' Disease
 7                  Key Messages," last updated
                    1/16/2016

 8
      Exhibit 84    Document titled, "Flint,          684
 9                  Michigan Legionnaires' Disease
                    Key Messages," last updated
10                  1/16/2016

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Michael B. Glasgow

```
1              P R O C E E D I N G S

2                        - - -

3              THE VIDEOGRAPHER:  We are now on

4         the record.  My name is Neal Rogers.

5         I'm a videographer for Golkow Litigation

6         Services.  Today's date is February 25,

7         2020 and the time is 8:59 a.m.

8              This video deposition is being

9         held in Bloomfield Hills, Michigan, in

10        re:  Flint water cases, Civil Action

11        5:16-cv-10444-JEL-MKM for the U.S.

12        District Court, Eastern District of

13        Michigan, Southern Division.

14             The deponent is Michael Glasgow.

15        Counsel will be noted on the

16        stenographic record.  The court reporter

17        is Carol Kirk and will now swear in the

18        witness.

19             We are going off the record at

20        9:00 a.m.

21                        - - -

22        (Glasgow Deposition Exhibit 34 marked.)

23                        - - -

24             THE VIDEOGRAPHER:  We are back on
```

```
 1            the record at 9:03 a.m.

 2                      - - -

 3            MICHAEL B. GLASGOW

 4   being by me previously duly sworn, as hereinafter

 5   certified, deposes and says as follows:

 6            EXAMINATION (CONT'D.)

 7   BY MS. SMITH:

 8        Q.   Good morning, Mr. Glasgow.  I'm

 9   Susan Smith.  We met yesterday.  We're

10   continuing the examination that I started

11   yesterday afternoon.

12            If you could, please look at

13   Exhibit 34, sir.

14            Yesterday you testified concerning

15   a discussion with Mr. Kaplan and others from the

16   EPA regarding chlorine in Flint water, chlorine

17   residual.

18            This is a January 20, 2016 e-mail

19   from Mr. Kaplan to Jim Sygo and Natasha

20   Henderson regarding the chlorine residual issue.

21            Now, do you see on the second

22   paragraph regarding "Task force members are

23   scheduled to discuss this matter on a conference

24   call 1/21/2016 with Mike Glasgow."
```

Highly Confidential - Michael B. Glasgow

1          A.    Yes.

2          Q.    Sir, do you recall having a

3     conference call with Mr. Kaplan and others from

4     the EPA and MDEQ regarding a chlorine residual

5     issue in Flint?

6          A.    I recall having a few meetings

7     with Mr. Kaplan and members of the DEQ.  And at

8     one point, yeah, we had weekly conference calls

9     on Friday I know with members of the DEQ staff

10    in regards to this.

11         Q.    Okay.  And the e-mail discusses --

12    it goes on to talk about characteristics of the

13    water in the distribution system that might

14    impact chlorine residuals.

15              Do you recall any discussions with

16    Mr. Kaplan and his team regarding conditions in

17    the distribution system that might be impacting

18    chlorine residuals?

19         A.    I can't say offhand I remember

20    anything in particular.

21         Q.    Okay.

22         A.    As I said, there were a lot of

23    meetings like this and discussions.

24         Q.    Okay.

Highly Confidential - Michael B. Glasgow

```
1                        - - -

2        (Glasgow Deposition Exhibit 35 marked.)

3                        - - -

4   BY MR. KUHL:

5        Q.    Okay.  The next exhibit, sir, is

6   Exhibit 35.  And this is a copy, as I understand

7   it, Bates-numbered COF_FED_0107016, two-page

8   document, titled "2014 Monitoring Schedule."

9        A.    Yes.

10        Q.    And just -- is this what the

11   monitoring schedule you received from MDEQ

12   looked like?

13        A.    Yes.

14        Q.    And is the monitoring schedule

15   that was applicable for the year of 2014?

16        A.    Yes.

17        Q.    Okay.  And could you tell me, sir,

18   where does the HPC test appear on this

19   monitoring schedule?

20        A.    I do not see it listed on this

21   monitoring schedule.

22        Q.    And -- okay.  Are you sure?

23        A.    I'll take another look.  No, I do

24   not see it listed anywhere.
```

Highly Confidential - Michael B. Glasgow

```
 1           Q.    Thank you.

 2                      - - -

 3      (Glasgow Deposition Exhibit 36 marked.)

 4                      - - -

 5  BY MS. SMITH:

 6           Q.    The next document, I'm going to

 7  show this to you -- show it to the camera.  I

 8  only have one copy.  This is not Bates numbered,

 9  but I am certain it came from the document

10  productions.

11               It's the City of Flint Water Plant

12  Routine Distribution System Sampling Sites &

13  Additional Water Quality Monitoring Sites.

14               And it lists eight sites, and I'll

15  hand that to you to take a look at.

16               Just one quick question.  Does

17  that accurately reflect the eight distribution

18  monitoring sites you testified to yesterday?

19           A.    Yes.  To the best of my knowledge,

20  yes.

21           Q.    Okay.  And that's the eight sites

22  where the chlorine residual was tested in the

23  distribution system in 2014 and 2015, correct?

24           A.    Correct.  Yes.
```

Highly Confidential - Michael B. Glasgow

1          Q.    And were those chlorine residual

2    results transmitted into the MOR, the chlorine

3    residual results from the distribution system?

4          A.    Yes.  From those eight sites, they

5    would have been transferred in.

6          Q.    Okay.  And, again, were the HPC

7    tests done at those eight sites?

8          A.    I'm trying to remember.  It seems

9    like after a while, yeah, they were done at

10   those sites.  It may have just been on low --

11   areas of low chlorine, though.  I can't recall.

12         Q.    So was it standard and routine for

13   the water treatment plant staff to test for HPC

14   at these eight distribution sites as part of the

15   regulatory monitoring?

16               MR. MARKER:  Object to form,

17          foundation.

18         A.    Yeah, I don't believe I would call

19   that something that was standard.  I think

20   after, like I said, issues arise where chlorine

21   residuals were really low, then we would perform

22   an HPC test.

23         Q.    And the -- the HPC testing when --

24   in areas of low residual chlorine, that's

Highly Confidential – Michael B. Glasgow

1    something you testified to in the preliminary

2    exam proceedings in 2018.

3              Do you recall that?

4    A.    Yes, vaguely.  Yes.

5    Q.    Okay.  And do you recall

6    testifying in those proceedings at page --

7    approximately 100- -- page 164 that the hydrants

8    were flushed before the HPC testing was done at

9    those locations?

10             MR. MARKER:  Object to form and

11         foundation.

12   A.    I do not recall if the hydrants

13   were flushed prior to taking an HPC sample.

14   Q.    Do you recall testifying in the

15   court proceeding in 2018 that the hydrants were

16   flushed before the chlorine residual tests were

17   taken --

18             MR. MARKER:  Same objections.

19   Q.    -- in the areas where chlorine

20   residuals were found to be low and below the

21   standard?

22   A.    I cannot recall.

23   Q.    Is it fair to say through your

24   memory, that these events would have been

Highly Confidential - Michael B. Glasgow

1    fresher in 2018 than they are today?

2          A.    Oh, yeah.  No doubt, yes.

3          Q.    Okay.  Thank you.

4                And so you wouldn't dispute -- if

5    that is recorded in the transcript of your

6    testimony in 2018, you wouldn't have any reason

7    to dispute that?

8          A.    No.

9                MR. MARKER:  Objection; form

10         foundation.

11         A.    No reason to dispute that.

12         Q.    All right.  And your depo -- the

13   transcript of your testimony was marked as, I

14   believe, Exhibit 2 yesterday.  And if I have

15   time, we'll refer to those specific assertions,

16   but I'm under very tight time limits.  I cannot

17   do that right now.

18                      - - -

19      (Glasgow Deposition Exhibit 37 marked.)

20                      - - -

21   BY MS. SMITH:

22         Q.    The next exhibit is Exhibit 37.

23   And it's my understanding that this is -- starts

24   with COF_FED_0112408.  And it's a multi-page

Highly Confidential - Michael B. Glasgow

1  document ending with 2416.

2          Could you identify this document

3  for us, sir.

4          A.   Yes.  This appears to be a

5  standard monthly operating report for the city

6  of Flint water plant.

7          Q.   Okay.  This has been marked as

8  Exhibit 37.  It covers the time period -- well,

9  strike that.

10          Does the HPC test appear on this

11  MOR?

12          MR. KUHL:  What month is this MOR

13      for?

14          THE WITNESS:  August 2015, my copy

15      is anyway.

16          A.   It appears to me that the HPC or

17  the standard plate count appears on page 6.

18          Q.   And that's page 6 of the results

19  chart, Bates-numbered COF_112413?

20          A.   Yes.  Correct.

21          Q.   Okay.  And I see that that refers

22  to "Total Coliform" in the first large column

23  and then "Standard Plate Count," that's the HPC?

24          A.   Correct.  Yes.

1        Q.    Okay.  And if HPC doesn't show up

2   in the monitoring schedule from MDEQ, how is it

3   that it shows up in the MOR?

4            MR. MARKER:  Objection; form,

5        foundation.

6        A.    I just recall -- I don't recall

7   anything in the monitoring schedule.  Something

8   to do where we were told to do it at least once

9   daily from the plant tap.  I think that was

10   standard with the MOR form that they sent to us.

11       Q.    So just so I'm clear, your

12   testimony is that you were instructed by MDEQ to

13   sample for HPC once daily at the plant tap?

14       A.    Yes.  That was a requirement, yes.

15       Q.    Okay.  And is that something that

16   you did consistently through 2014 and 2015?

17       A.    Yes.  Once the plant went into

18   service, yes, that was something that was done

19   daily.

20       Q.    Okay.  So when we hear testimony

21   concerning the HPC results obtained in 2014 and

22   2015 on Flint water, that would be referring to

23   the samples collected at the plant tap; is that

24   correct?

Highly Confidential - Michael B. Glasgow

```
 1                MR. MARKER:  Objection; form and
 2        foundation.
 3        A.    Yes.  In regards to this report, I
 4   would say yes.
 5        Q.    Sir, are you aware of any HPC
 6   tests that were done of water collected anywhere
 7   in the distribution system?
 8        A.    I do have recollections of
 9   collecting samples out in the distribution
10   system.
11        Q.    Yes.  But my question is whether
12   any of those samples were analyzed for HPC.  Was
13   the HPC test run on any samples collected in the
14   distribution system, to your knowledge?
15        A.    To my knowledge, yes, there was.
16        Q.    And where would those results be
17   recorded?
18        A.    They would be located in the
19   laboratory, on the laboratory daily bench
20   sheets.  I don't recall if they were ever
21   reported with an MOR.
22        Q.    And those daily bench seats are
23   records of the city of Flint?
24        A.    Correct.  Yes.
```

Highly Confidential - Michael B. Glasgow

```
 1            Q.    And those are maintained at the
 2    city of Flint water treatment plant?
 3            A.    Yes.
 4            Q.    And to your recollection, were any
 5    of those HPC results above the 2 target range
 6    that you referred to yesterday?
 7            A.    It seems like that I do recall
 8    some samples that were above -- above the less
 9    than 2.  I actually had a reading.
10            Q.    Okay.  And I'm going to show you
11    the next exhibit, which I believe is 38.
12                        - - -
13        (Glasgow Deposition Exhibit 38 marked.)
14                        - - -
15    BY MS. SMITH:
16            Q.    And, again, I do know that this
17    came from the document production.  It appears
18    that the computer system stripped out the Bates
19    number.  It's a January 26, 2015 e-mail between
20    Shannon Johnson and Tim Bolen of the DCH, and it
21    includes an e-mail chain.
22                  The middle -- and you're not
23    identified on this document, but I want to ask
24    you, Mr. Bolen, in his e-mail, the second e-mail
```

Highly Confidential - Michael B. Glasgow

```
 1    on page 1, refers to -- the third paragraph, it
 2    refers to "heterotrophic plate counts that were
 3    elevated at 8 sites in the city."
 4         A.   Yes, I see that.
 5         Q.   Okay.  And do you have -- is that
 6    accurate information, to your recollection?
 7              MR. MARKER:  Object to the form.
 8         A.   Yeah.  To my recollection, it's
 9    hard to say.  I know there was times -- I mean,
10    elevated at eight sites, that would be every
11    site.  It's hard to say, not being involved in
12    this e-mail string.
13              Like I said previously, I do
14    recall sometimes where they were -- they
15    actually registered, and we had heterotrophic
16    bacteria in the samples, but ...
17         Q.   Okay.  Do you know how Mr. Bolen
18    from the Michigan Department of Community Health
19    would have obtained that information?
20         A.   Yeah, to the best of my knowledge,
21    I don't know how Mr. Bolen got this.  I don't
22    recall his name or having any interaction with
23    him.
24         Q.   Okay.  And let me just be clear.
```

Highly Confidential - Michael B. Glasgow

1              We can move on.

2              Do you know of a company called

3    ERAQC?

4         A.    ERAQC, sounds familiar.  Could

5    have possibly been a company I used for

6    standards in my lab.

7         Q.    And what does that company do?

8    Please tell us what function does ERACQ perform?

9         A.    Well, they perform a variety of

10   functions.  The reason I utilized them was kind

11   of quality control/quality assurance, and also

12   it was stipulated under certification of our

13   laboratory with the MDEQ.

14             So this company, ERA, would send

15   us unknown samples of bacteria basically to test

16   our -- check our test methods and see how we

17   performed the test.

18        Q.    Okay.  And so the documents from

19   ERAQC would not reflect samples of city of Flint

20   of water?  It was samples that they sent you to

21   check the proficiency of your lab technicians?

22        A.    Correct.  Yes.

23        Q.    Okay.  And I'm going to just move

24   through a couple documents we talked about

Highly Confidential - Michael B. Glasgow

1    yesterday.  Johnson Exhibit 141.

2              MR. MARKER:  It's marked in the

3         deposition as Exhibit 32.

4              MS. SMITH:  Okay.

5              MR. BARBIERI:  What was the

6         number?

7              MR. MARKER:  This is Exhibit 32.

8              MR. BARBIERI:  Thank you.

9    BY MS. SMITH:

10             Q.   And I just have one quick

11   follow-up question about this document.

12             Do you know -- we talked about

13   the -- you pursued information from EMSL about

14   Legionella testing.  Do you know if any of the

15   other steps identified in Mr. Busch's list here,

16   the six bullet points -- do you know if any of

17   those were pursued at the city of Flint water

18   treatment plant in 2015?

19             A.   I do not recall the first -- the

20   first item with "water main pigging and

21   flushing."  I don't believe any of that was

22   conducted during my tenure there.

23             The maintenance of the pH levels,

24   I would -- I would say that was something we

Highly Confidential - Michael B. Glasgow

```
 1    could attempt to do --

 2            Q.    Was it done?

 3            A.    -- and are probably undertook.

 4    Yep.

 5                  And that's about all I can attest

 6    for.

 7            Q.    Okay.  Thank you.

 8                  Back to the MORs for a quick

 9    question.  And the MOR was Exhibit 37.

10                  Now, the MOR reflects data from

11    the regulatory monitoring sampling only,

12    correct?

13            A.    Yes.  I would say yes.

14            Q.    Okay.  And so that does not

15    include the inline monitoring, the inline

16    monitor's data?

17            A.    Correct.

18            Q.    And that does not include the

19    field testing done in citizens' homes, correct?

20            A.    Correct.

21            Q.    And that does not include any

22    investigatory sampling in any areas of the city

23    with low chlorine, correct?

24            A.    Correct.
```

Highly Confidential - Michael B. Glasgow

1          Q.    All right.  Thank you, sir.

2                I want to change gears here a

3     little bit and ask you about your meetings with

4     McLaren Flint.  We heard testimony of a meeting

5     in the fall of 2014.  I understand that you were

6     asked to go to McLaren Flint by your supervisor,

7     Mr. Croft; is that correct?

8          A.    Yes.  It seems like I reported

9     back to a Liz Murphy.  It could have been --

10         Q.    Ms. Murphy?

11         A.    -- Ms. Liz Murphy.  Yes.

12         Q.    And McLaren was seeking help from

13    city officials concerning this Legionella issue,

14    correct?

15               MR. MARKER:  Form and foundation.

16         A.    Yes.  When I got to the meeting, I

17    guess, you know, that's what they were -- as I

18    said before, I think it was kind of more of a

19    get-together, think tank, to see what the issues

20    were and what could be possible causes.

21         Q.    Okay.  And did you go to McLaren

22    Flint more than once to talk about this

23    Legionella investigation?

24         A.    I believe I was there a second

Highly Confidential - Michael B. Glasgow

1    time.

2         Q.    And did you ask McLaren to provide

3    you with any information?

4         A.    I believe I inquired about their

5    testing results for Legionella throughout the

6    hospital.  I don't believe I was ever provided a

7    copy from what I recall.

8         Q.    Your e-mail, sir, reflected that

9    you were aware that McLaren was testing their

10   water for Legionella?

11        A.    Correct.

12        Q.    And so they did disclose to you

13   the results of that testing, correct?

14             MR. KIM:  Objection as to

15             foundation and form.

16        A.    Yeah, we discussed them in one of

17   the meetings when I was there.

18        Q.    Okay.  And is there any other

19   information that you asked for from the folks at

20   McLaren Flint concerning this Legionella

21   investigation?

22             MR. MARKER:  Form; foundation.

23        A.    Not that I can recall.

24        Q.    Okay.  And did you provide any

```
 1   instructions to the persons at McLaren Flint

 2   that you spoke to?

 3           A.    I don't believe I provided any

 4   instructions.

 5           Q.    Okay.  Did you provide them with

 6   any recommendations concerning the

 7   investigation?

 8           A.    No, I can't say that I did.

 9           Q.    Okay.  Is there anything that you

10   wanted McLaren Flint to do that they didn't do?

11               MR. MARKER:  Form, foundation.

12           A.    Other than providing me with their

13   test results, I would say no.

14           Q.    Now, did you have any contact with

15   the folks at McLaren Flint after your second

16   meeting?  Which I'll represent, according to

17   your e-mails, was in late October of 2014.

18           A.    After that second meeting, I don't

19   recall having any conversations with anyone from

20   McLaren.

21           Q.    Okay.  Do you know of any person

22   that -- did somebody step into your shoes as the

23   primary point of contact for this investigation?

24               MR. MARKER:  Form, foundation.
```

Highly Confidential - Michael B. Glasgow

1        A.    Not that I'm aware of.

2        Q.    Okay.  Did you -- did you visit

3    any other hospitals in Flint regarding

4    Legionella?

5        A.    No.

6        Q.    Okay.  How about any other

7    facilities?

8        A.    No.

9        Q.    Now, you left the city of Flint's

10   employment in April of 2016.  Do you have any

11   knowledge as to any Legionella investigation,

12   sampling, or testing that occurred after April

13   of 2016?

14            MR. MARKER:  Objection; form,

15        foundation.

16       A.    I do not, no.

17       Q.    Okay.  Now, I'm going to show you

18   what's -- Johnson Exhibit 109, which should be

19   here and everyone should have.  Counsel has it.

20   It's been marked.

21            MR. MARKER:  What has it been

22        marked as?

23            MS. SMITH:  It's Johnson Exhibit

24        Number 109.

```
 1    BY MS. SMITH:

 2          Q.    And this is a November 3rd e-mail

 3    chain between you and Ms. Murphy, correct?

 4                MR. MARKER:  Do you have --

 5                MR. KUHL:  It's Exhibit 31.

 6                MR. MARKER:  Exhibit 31.  Okay.

 7    BY MS. SMITH:

 8          Q.    And just one quick question about

 9    this.

10                "Just wanted to update everyone on

11    the McLaren Legionella investigation.  On

12    Thursday, October 30, I was invited back to

13    McLaren for a meeting."

14                Correct?

15          A.    Correct.

16          Q.    Okay.  And would that reflect the

17    date of your second meeting at McLaren?

18                MR. MARKER:  Form, foundation.

19          A.    To the best of my knowledge, yes.

20          Q.    Okay.  And the -- and you learned

21    in that meeting that McLaren had chlorinated the

22    water system and conducted another round of

23    Legionella testing, and you reported that

24    information to your supervisors, correct?
```

Highly Confidential - Michael B. Glasgow

```
 1              A.    Correct.

 2              Q.    Okay.  And we discussed the

 3       assertion about the no evidence of Legionella in

 4       the water coming into the hospital.

 5                    Now, that was based on the

 6       sampling that McLaren was conducting; is that

 7       right?

 8              A.    Correct.

 9              Q.    Okay.  Because you didn't sample

10       the water that was going into the hospital,

11       right?

12              A.    No.

13              Q.    Okay.  And the -- is it fair to

14       say, sir, in the second paragraph of this

15       e-mail, it reflects that your belief was that

16       McLaren was looking to the city water as a

17       potential source of the Legionella that they had

18       found, correct?

19                    MR. KIM:  Objection to form.

20              A.    I do write in there -- I believe

21       originally that the hospital and the health

22       department were looking to find a simple answer

23       to their problem.

24              Q.    Okay.  And did you ever make a
```

1    determination as to where the Legionella was

2    coming from that was found in McLaren's water?

3          A.    Myself?  No.

4          Q.    And is that something that you're

5    an expert in, the source of Legionella bacteria

6    found in building pipes?

7          A.    No.

8          Q.    And you'd agree, though, sir, that

9    building pipes don't come seeded with Legionella

10   bacteria, right?

11               MR. MARKER:  Form, foundation.

12               MR. KUHL:  Objection to form.

13               MR. KIM:  Objections to form

14         foundation.

15         A.    I am not aware that they do.

16         Q.    Okay.  Are you aware, sir, that

17   other persons suspected -- were looking to the

18   city of Flint water as a source of Legionella

19   and Legionnaires' disease?

20               MR. KUHL:  Objection.  No time

21         frame.

22         A.    Yeah, I don't --

23         Q.    In 2014.

24         A.    I do not recall at that time.

Highly Confidential - Michael B. Glasgow

```
 1          Q.    Okay.  And did you have any

 2   communication with anybody at the Department of

 3   Community Health, also known as the Michigan

 4   Department of Health and Human Services,

 5   regarding the Legionella investigation?

 6                MR. KIM:  Objection as to form.

 7        No time frame.

 8          Q.    In 2014.

 9          A.    I cannot recall.

10          Q.    Okay.  And if you'd look at what

11   has been marked as Gnagy Exhibit 47, which

12   includes an October 13, 2014 e-mail from Shannon

13   Johnson at DCH.

14                MR. KIM:  What's the Bates number?

15                MS. SMITH:  7-5-2016

16        SOM-KIDD-28853, previously marked

17        multiple times.

18   BY MS. SMITH:

19          Q.    If you could, sir, about five

20   lines down in the top paragraph of Ms. Johnson's

21   e-mail that starts, "I spoke with Kim."

22                And it says, "Genesee initially

23   thought the increase was associated with McLaren

24   Flint Hospital as a source, but after Tim and I
```

Highly Confidential - Michael B. Glasgow

```
1    both reviewed the preliminary data, it was

2    pretty clear that many of the cases did not fit

3    with this hypothesis."

4                And the following sentence, "The

5    current hypothesis is that the source of the

6    outbreak may be the Flint municipal water."

7                So did you ever learn any time in

8    2014 that the persons at the Michigan Department

9    of Health and Human Services were also looking

10   to the possibility that the city of Flint water

11   was the source of Legionella and the increase in

12   Legionnaires' disease?

13               MR. KIM:  Objection to form and

14          foundation.

15               MR. MARKER:  I'll join.

16          A.   I was unaware.

17          Q.   And were you aware, sir, in

18   October of 2014 that the Genesee County was

19   seeking testing for Legionella as reflected in

20   Exhibit 47?

21          A.   I was not aware of that, that I

22   can recall.

23          Q.   And were you aware, sir -- Johnson

24   Exhibit 149, October 7, 2019, EGLE0135246, which
```

 1    is a January 23, 2015 e-mail from some of

 2    Ms. Johnson's colleagues at DCH, also known as

 3    DHHS.

 4                   Mr. Collins in his e-mail at the

 5    bottom of the page, January 23, 2015 at 11:08

 6    a.m., "In a nutshell, we have seen a pretty

 7    dramatic increase in the number of cases of

 8    Legionellosis in Genesee County with particular

 9    focus in Flint."

10                   Did I read that correctly?

11         A.    Yes.

12         Q.    Okay.  Were you aware at that time

13    in January of 2015, that the folks at DCH, the

14    state's public health department, recognized

15    that there was a pretty dramatic increase in the

16    number of cases of Legionellosis in Genesee

17    County?

18                   MR. MARKER:  Form, foundation.

19                   MR. KUHL:  Objection.

20         A.    Yeah.  At this time, I don't

21    recall being aware.

22         Q.    Okay.  And further down in

23    Mr. Collins' e-mail, it indicates, "The fact

24    that this increase in diagnosed cases seems to

Highly Confidential - Michael B. Glasgow

```
 1    overlay with the change in Flint water municipal

 2    supply from Detroit to the Flint River is

 3    concerning."

 4                   Are you aware that the state's

 5    public health authorities were concerned that

 6    the increase in Legionellosis cases in Genesee

 7    County correlated in time with the switch to the

 8    Flint River as the source of water?

 9                   MR. MARKER:  Form and foundation.

10                   MR. DAWSON:  Let me object to that

11            question under the optional completeness

12            Rule, 106.  She should read the next

13            sentence that goes with the sentence she

14            just read so it's not taken out of

15            context.

16                   MR. KUHL:  And I'll object to form

17            and foundation.

18    BY MS. SMITH:

19       Q.    Were you aware, sir, that DCH

20    staff were discussing the possibility that the

21    increased in Legionnaires' disease cases that

22    they recognized correlated in time with the

23    switch to the Flint River as the source of

24    water?
```

1          MR. KUHL:  Objection to form.

2          MR. KIM:  Object to form and

3     foundation.

4     Q.    You can answer.

5     A.    At this time, in early January, I

6     was not aware.

7     Q.    Did you ever learn that DCH was

8     discussing that possibility?

9          MR. KIM:  Objection to form and

10         foundation.

11    A.    Eventually I did learn that --

12    well, was it DHS?  Yeah, it had to be DHHS.

13    Eventually I did learn there was some talk in

14    regards to that.  Where -- to be honest, where

15    it was coming from, I don't recall.

16    Q.    Are you aware, sir, that in

17    January 2016 -- in September 2016, an MDHHS

18    official agreed to a statement of facts in court

19    as part of a plea that she recognized in

20    January -- approximately January 13th of 2015

21    that there was a Legionnaires' disease epidemic

22    in Genesee County that correlated in time with

23    the switch to the Flint River as the source of

24    water?

Highly Confidential - Michael B. Glasgow

```
 1              MR. MARKER:  Form, foundation.

 2              MR. KUHL:  Objection as to form

 3         and foundation.

 4         A.    I'm sure sometime after the fact I

 5    heard that.  I can't recall when it would have

 6    been brought to me.

 7         Q.    Did you have any contact with

 8    anybody at -- you had no direct contact with

 9    anybody at the DHHS that you recall, correct?

10         A.    Correct.

11         Q.    And did you have any contact with

12    anybody at the Department of Environmental

13    Quality regarding Legionella or Legionnaires'

14    disease?

15         A.    Not -- not that I can recall.

16    There might have been one time.  I can't -- no.

17    I'm going to be speculating.  I can't remember.

18              MR. MARKER:  I apologize.  Is

19         there a time frame?

20         Q.    Do you have any recollection of a

21    meeting involving DEQ representatives in October

22    of 2014?

23              (Telephone interruption.)

24
```

Highly Confidential - Michael B. Glasgow

```
 1              MS. SMITH:  We can hear

 2         everything, and you're interrupting my

 3         very abbreviated examination, so please

 4         mute your phones.

 5    BY MS. SMITH:

 6         Q.    Did you have any knowledge of an

 7    October 2014 meeting involving representatives

 8    of DEQ?

 9         A.    Not that I can recall.

10              MR. KIM:  Objection as to form.

11         Q.    Did you have any contact with any

12    representatives of the United States Centers for

13    Disease Control and Prevention, otherwise known

14    as the CDC?

15         A.    No.

16              MR. KIM:  Objection as to form.

17         Q.    And do you have any knowledge

18    concerning the CDC's role with respect to Flint

19    water issues?

20              MR. MARKER:  Form, foundation.

21         A.    I do not, no.

22         Q.    Do you have any knowledge

23    of -- strike that.

24              Let me jump back to your testimony
```

1    yesterday.  You mentioned that Veolia

2    representatives were in your laboratory doing

3    testing.

4              Do you recall what testing the

5    representatives from Veolia were doing in your

6    laboratory at the Flint water plant?

7         A.   It was my understanding it was

8    more process testing simulating what was going

9    on in the plant.  So it would have to do with

10   softening and coagulation and ...

11        Q.   Okay.  Did they run any tests to

12   determine water chemistry or water quality?

13              MR. MARKER:  Form.

14        A.   I would -- I would have to look

15   back at that -- their report.  I don't recall.

16        Q.   I'd asked you about your contact

17   with those.  Did you have occasion to speak to

18   Mr. Jim Henry regarding the Legionella

19   investigation in Genesee County?

20              MR. KIM:  Objection as to form.

21        A.   I met him originally at one of the

22   meetings with McLaren.  So I had a conversation

23   or two with him.

24        Q.   Have you worked with Jim Henry in

Highly Confidential - Michael B. Glasgow

1    the past?

2         A.    No.

3         Q.    Okay.  Did you work with him --

4    you mentioned this one meeting at McLaren.  Do

5    you recall any communications with him after

6    that meeting at McLaren?

7         A.    I don't remember any in

8    particular.  There could have been an e-mail or

9    two or a phone call or two, but ...

10        Q.    And you testified yesterday, sir,

11   that the -- you testified about the water

12   quality sampling that's reflected in the MORs,

13   the daily testing in your plant and the three

14   times a week testing at the distribution system,

15   correct?

16        A.    Correct.  Yes.

17        Q.    And would you agree with me -- and

18   you were a laboratory supervisor at the Flint

19   water treatment plant, so you understand water

20   sampling and testing; is that a fair statement?

21             MR. KIM:  Objection as to form.

22        A.    That's a fair statement.

23        Q.    Okay.  And we talked about the

24   variability of water quality and chemistry

Highly Confidential - Michael B. Glasgow

```
 1   yesterday.

 2               Would you agree that the sample

 3   results are a snapshot in time that reflect

 4   conditions in that location at the time the

 5   sample was located?

 6               MR. MARKER:  Form.

 7   A.    Yes, I would.

 8   Q.    Okay.  And you cannot draw

 9   conclusions or inferences about the entire

10   distribution system based on water samples

11   collected in one area at one point in time,

12   correct?

13               MR. MARKER:  Objection to form and

14        foundation.

15               MR. KUHL:  Objection; form,

16        foundation.

17   A.    Correct.

18   Q.    And that's why you do the repeat

19   sampling three times a week?

20               MR. KUHL:  Objection to form,

21        foundation.

22   A.    Yes.

23   Q.    The -- what is tuberculation, sir?

24   A.    That would be -- happens on the
```

1    inside of pipes, a buildup of rust and other

2    debris, I guess, in the pipes.

3            Q.    And can tuberculation in pipes be

4    disturbed when there are low pressure events?

5            A.    Yes.

6            Q.    Okay.  And what are biofilms, if

7    you know?

8            A.    Kind of related to tuberculation.

9    I'll put it in laymen's terms, I guess.  The

10   slimy coating on the insides of pipes.  It can

11   hold its own little ecosystem.

12           Q.    And can biofilms be disturbed in

13   pipes when there are low pressure events?

14           A.    Yes.

15           Q.    And would you agree with the

16   proposition that there were pressure drops in

17   the water distribution system in 2014?

18                 MR. MARKER:  Form, foundation.

19           A.    Yes.

20           Q.    And are water main breaks the type

21   of event that could cause water pressure in a

22   piping system in the Flint distribution system

23   to drop?

24                 MR. MARKER:  Form and foundation.

Highly Confidential - Michael B. Glasgow

1        A.    Yes.

2        Q.    Okay.  Prior to your meetings at

3   McLaren Flint in 2014, did you have any

4   professional experience with Legionella or

5   Legionnaires' disease?

6        A.    No.

7             MS. SMITH:  If we could go off the

8        record for a moment, please.

9             THE VIDEOGRAPHER:  We are going

10       off the record at 9:41 p.m.

11            (Recess taken.)

12            THE VIDEOGRAPHER:  We are back on

13       the record at 9:51 a.m.

14   BY MS. SMITH:

15       Q.    Mr. Glasgow, just to confirm, you

16   did not make a determination as to the source of

17   any Legionella bacteria that was found in water

18   at McLaren Flint Hospital, correct?

19            MR. MARKER:  Form, foundation.

20       A.    Correct.

21       Q.    And you're not going to be

22   offering any opinions in this litigation

23   regarding the source of Legionella bacteria

24   found at McLaren Flint Hospital, correct?

Highly Confidential - Michael B. Glasgow

 1                    MR. MARKER:  Form, foundation.

 2          A.    Correct.

 3          Q.    And you testified concerning the

 4   MOR testing.  I have flagged in your transcript

 5   of your testimony in 2018 page 165 of your

 6   testimony on April 16 of 2018.  And, if you

 7   could, review that testimony.

 8                    MR. CAMPBELL:  Which date are you

 9          on?

10                    MS. SMITH:  April 16 of 2018.

11          First page 165, April 16 of 2018.

12                    MR. KIM:  It's a 180-page

13          document.  Are you looking for anything

14          in particular?

15                    MS. DEVINE:  Page 165.

16   BY MS. SMITH:

17          Q.    Have you had a chance to review

18   that testimony, sir?

19          A.    Yes, ma'am.

20          Q.    And my question is concerning your

21   testimony regarding the hydrant flushing and the

22   chlorine testing.  Do you take issue with -- do

23   you stand by your testimony in April of 2018

24   regarding the chlorine testing as reflected on

Highly Confidential - Michael B. Glasgow

```
 1   that page?

 2          A.    Yes, I do.

 3          Q.    Okay.  And if you could turn to

 4   page -- the transcript from April 20, 2016,

 5   pages 62 to 67.

 6                MR. MARKER:  62 through 67?

 7                MS. SMITH:  Yes.

 8   BY MS. SMITH:

 9          Q.    And I'll represent for the record

10   that your testimony in that section of the

11   April 20, 2018 transcript pertains to chlorine

12   testing and hydrant flushing.

13                Have you had an opportunity to

14   review that testimony?

15                MR. MARKER:  Not yet.  We're

16          working on it.

17                MS. SMITH:  Okay.

18          A.    Okay.  I've had the chance to

19   familiarize myself with it.

20          Q.    Okay.  And my question is, sir, do

21   you stand by your testimony in 2018 as reflected

22   in pages 62 to 67 of the transcript that was

23   marked as Exhibit 1 yesterday?

24          A.    Yes, I do.  My memory was much --
```

Highly Confidential - Michael B. Glasgow

```
 1                    MR. CAMPBELL:  Objection to form.

 2                    MR. MARKER:  I'll join in the

 3           objection.

 4           A.    Yes.  My memory was better in '18,

 5   so I would stick with my testimony.

 6           Q.    Okay.

 7                    MR. CAMPBELL:  Mr. Glasgow, for

 8           those of us who are a little bit

 9           encumbered, can you keep your voice up,

10           please?

11                    THE WITNESS:  Yep.  I'm sorry.

12           I'll try there.

13                    MR. CAMPBELL:  Thank you.

14   BY MS. SMITH:

15           Q.    And so you would agree, sir, that

16   the practice of hydrant flushing would boost the

17   chlorine results that were collected in samples

18   collected after the flushing process was

19   completed, correct?

20           A.    Yes.

21                    MR. MARKER:  Form and foundation.

22           Q.    And would the chlorine residual

23   samples recorded in the MORs collected after the

24   flushing hydrant flushing --
```

Highly Confidential - Michael B. Glasgow

```
 1                   MR. MARKER:  Form, foundation.

 2          Q.     -- or before the hydrant flushing?

 3                   MR. MARKER:  Is there a time

 4          frame?

 5          Q.     In 2014 and 2015.

 6          A.     Usually a low chlorine residual,

 7     which would be reported or recorded, would

 8     institute the hydrant flushing.  So if that

 9     clarifies it.

10          Q.     So when we see the chlorine

11     residual results reported in the MORs, were

12     those collected -- the results obtained in the

13     field, were those results obtained after the

14     hydrants were flushed?

15                   MR. MARKER:  Form, foundation.

16          A.     On that MOR, you're going to have

17     both situations.  Like I said, it's kind of

18     standard practice in the water industry if

19     you've got a low area of chlorine, to open a

20     hydrant or get fresh water there one way, shape,

21     or form.  So I would have to say it could be

22     both ways.  It could be some prior to flushing

23     and some after.

24          Q.     Okay.  Do you have any knowledge
```

Highly Confidential - Michael B. Glasgow

1    as to what occurred within the walls of McLaren

2    Flint Hospital with respect to the Legionella

3    investigation after your second meeting with

4    them in apparently late October of 2014?

5                    MR. MARKER:  Form and foundation.

6            A.    No, I can't contest anything.

7            Q.    No.  My question is, sir, whether

8    you have any personal knowledge of any steps

9    that McLaren Flint was taking within their

10   hospital after your second meeting with them in

11   approximately October of 2014?

12           A.    Yes.  I have no information on any

13   actions they were taking.

14                   MS. SMITH:  That's all I have for

15            now.  Thank you.

16                   If we could have a counting of

17            time.

18                   THE VIDEOGRAPHER:  We're going off

19            the record at 10:00 a.m.

20                   (Recess taken.)

21                   THE VIDEOGRAPHER:  We are back on

22            the record at 10:10 a.m.

23                         - - -

24                   EXAMINATION

Highly Confidential - Michael B. Glasgow

```
 1    BY MS. JACKSON:

 2           Q.    Good morning, Mr. Glasgow.  My

 3    name is Krista Jackson.

 4           A.    Good morning.

 5           Q.    I'm an attorney representing

 6    Stephen Busch, and I'm going to continue asking

 7    you a couple questions.

 8                 I want to sort of start out -- I'm

 9    going to try very hard not to be repetitive to

10    things that have been asked before, but I just

11    wanted to get a little bit more information on

12    your educational background.

13                 Can you tell me how far you went

14    in your education, formal education?

15           A.    I did receive a bachelor's degree

16    in biology and chemistry from Central Michigan

17    University.

18           Q.    And what year was that?

19           A.    I graduated in '98.

20           Q.    And did you go on in school after

21    that?

22           A.    No, I did not.

23           Q.    Okay.  And was that a bachelor's

24    of science?
```

Highly Confidential - Michael B. Glasgow

```
1           A.    Yes.

2           Q.    Since you graduated from college,

3    have you done any technical training, you know,

4    any more formal but not necessarily within a

5    school?

6           A.    Well, I'll say in the water and

7    wastewater industry, there's numerous training

8    classes or seminars I've attended over the

9    years.  Nothing with a formal school.

10          Q.    Do you receive certificates from

11   those seminars or just a record of attendance?

12          A.    Some will have certificates.  And

13   most of the seminars like that are in regards to

14   continuing education credits to keep my water

15   and wastewater licenses current.

16          Q.    And for the majority of the time

17   that you were at the Flint water treatment

18   plant, your role was as laboratory supervisor;

19   is that correct?

20          A.    That is correct, yes.

21          Q.    Okay.  And who was your supervisor

22   when you were within that role?

23          A.    Originally when I was -- left the

24   city of Flint wastewater plant to go to the
```

```
 1    water plant, the water plant supervisor was

 2    Jeffrey Bryson.  So I guess he originally hired

 3    me over in that position.

 4              Not long after Mr. Bryson retired,

 5    then my supervisor was a William Daniels.  He

 6    was there for a couple years before he retired.

 7    And then it was Mr. Brent Wright.

 8         Q.    And did they all hold the same

 9    position?

10         A.    Yes, they did.  Yes.

11         Q.    Okay.  And what position is that?

12         A.    That would be water plant

13    supervisor.

14         Q.    Okay.  And I'm just going to use

15    Mr. Wright as an example.  Who would

16    Mr. Wright's direct supervisor have been then?

17         A.    Then it would have -- he would

18    have -- the chain of command, I guess, would go

19    to the utilities director, which would have been

20    Mr. Daugherty Johnson.

21         Q.    And then who would Mr. Johnson's

22    supervisor have been?

23         A.    And then Mr. Johnson's supervisor

24    would have been department of -- or director of
```

Highly Confidential - Michael B. Glasgow

1    public works, Mr. Howard Croft.

2            Q.    And then who would Mr. Croft's

3    supervisor have been?

4            A.    To be honest, I assumed usually it

5    was the mayor or the emergency manager.

6            Q.    And then in your role as

7    laboratory supervisor, how many people did you

8    supervise at the time that you received that

9    role?

10           A.    Oh, there was two other lab staff,

11   so -- yeah, two individuals.

12           Q.    And then did the amount of people

13   that you supervised in that role increase at the

14   time that the water plant became a full-time

15   water plant, or shortly before?

16           A.    Yeah, I'll say shortly before my

17   departure.  It was greatly increased.  So are we

18   talking while I'm at the water plant or --

19           Q.    So let's say between the time that

20   the decision was made to switch to a full-time

21   plant and use the Flint River water, was there

22   an increase in the number of people you

23   supervised as laboratory supervisor?

24           A.    No, there was not.

1        Q.    Okay.  And then at the time that

2   the water switch occurred in April 2014, for the

3   remainder of 2014, did you receive any

4   additional staff under you at that point?

5        A.    I would have to look back at

6   dates.  I believe just prior to putting the

7   plant in operation, I was given a dual title as

8   laboratory supervisor and assistant water plant

9   supervisor.  So at that time, I would have had

10  the entire water plant staff underneath me.

11       Q.    Okay.  Did that include an

12  increase in lab staff, or was it just because of

13  the change in your role, your umbrella got

14  bigger?

15       A.    My umbrella got bigger.  There was

16  no new or added employees into the laboratory.

17       Q.    And you said you were -- I'm

18  sorry -- co-director?  What did you say?

19       A.    Yeah, it was a combo title.  So

20  originally I was laboratory water quality

21  supervisor.  And then they also gave me the

22  title of assistant water plant supervisor.

23       Q.    And those were internal Flint job

24  titles.  In addition, you also were the operator

Highly Confidential - Michael B. Glasgow

1     in charge under the Safe Drinking Water Act,

2     correct?

3             A.    Correct.

4             Q.    In your role as laboratory

5     supervisor, prior to the water switch, did you

6     have communications with MDEQ employees?

7             A.    Yes.  Most notably that sticks in

8     my memory was Mr. Prysby.  He was our district

9     engineer.  So I had, I'll say, numerous contacts

10    with Mr. Prysby.

11            Q.    And what would the content of

12    those contacts be?

13                  MR. MARKER:  Objection; form,

14            foundation.

15                  Any time before the switch?

16                  MS. JACKSON:  During his time as

17            laboratory supervisor prior to the

18            switch.

19            A.    Yeah, it would be numerous

20    instances.  Mr. Prysby would come around every

21    few years for a sanitary survey.  I would be in

22    contact with him with that.

23                  Any items or questions I had in

24    regards to our monthly operation report would be

Highly Confidential - Michael B. Glasgow

1    directed to him.  Any extra testing or

2    discussing testing results would have been with

3    him.  He was -- he was my main contact.

4          Q.   I believe you testified earlier

5    that you got your monitoring requirements from

6    Mr. Rosenthal; is that correct?

7          A.   That is correct.

8          Q.   And was that true prior to the

9    switch as well?

10          A.   Prior to the switch when we would

11   get -- our monitoring schedule is usually mailed

12   to the city.  And if my memory serves me

13   correct, it was signed by both Mr. Prysby and

14   Mr. Rosenthal.

15          Q.   Okay.  And then after the switch,

16   how did your communications with the employees

17   of the MDEQ change?

18          A.   Well, after the switch, I

19   remember --

20               MR. MARKER:  I'll object to the

21          form and foundation.

22          A.   Yeah, after the switch I remember

23   it just seems like Mr. Busch was around more

24   frequently.  In the past, it had always been

1    just Mr. Prysby either visiting our plant or

2    talking with me.

3              After the switch, Mr. Busch was

4    around more or in discussions more.  And as time

5    went on, I'll say there's a couple other

6    individuals from the DEQ at the time that I

7    would have discussions.  I remember Mr. Jim

8    Sygo.  There was also occasions that I can

9    vaguely recall meeting Mr. Pat Cook, Ms. Liane

10   Shekter-Smith.

11             But the majority of my interaction

12   prior and after the switch were Mr. Prysby and

13   Mr. Busch for the most part that I can recall.

14        Q.   But you continued to get the

15   monitoring schedules from Mr. Rosenthal after

16   the switch?

17        A.   I will -- I will say yes.

18        Q.   When you received those monitoring

19   schedules, did you -- was there a chance to

20   review them and ask questions of the MDEQ?

21        A.   No.  Usually sometime towards the

22   end of January in the calendar year, so let's

23   say it's January of 2010, near the end of

24   January, I would receive a letter in the mail

Highly Confidential - Michael B. Glasgow

1    from Mr. Prysby and Mr. Rosenthal with the

2    monitoring schedule.  But I don't recall any

3    discussions or questions.  It was kind of

4    straightforward there what we -- what we were

5    required to do.

6             Q.    Would you say that you didn't --

7    you would have had the opportunity to ask

8    questions?  You just didn't need to?

9             MR. MARKER:  Form, foundation.

10            A.    I will say that's a fair

11   statement.  If I had issues, I could have

12   discussed them with Mr. Prysby or Mr. Rosenthal.

13            Q.    In your role as laboratory

14   supervisor after the switch in 2014, what

15   reports were you required to provide to the

16   MDEQ?

17            A.    Oh, the one sticks out the most is

18   our monthly operating report.  There would also

19   be a couple annual reports that were required;

20   cross connections, annual pumpage report.  And

21   if necessary, the lead and copper report as

22   well.

23            Q.    Are you aware of whether there

24   were other reports being generated out of the

1   Flint water treatment plant that were not your

2   responsibility?

3              MR. MARKER:  Form, foundation.

4              MR. KIM:  Objection.

5        A.    I'm not aware.  Once I was

6   designated the OIC, the operator in charge, most

7   reports would have had to have my signature.

8        Q.    Did anyone at the MDEQ ever

9   contact you after those reports, the monthly

10  operating reports, were submitted to ask for

11  follow up with any questions regarding the

12  report?

13             MR. MARKER:  Is there a time

14        frame?

15       Q.    Any monthly operating report.

16             MR. MARKER:  Object to form and

17        foundation.

18       A.    I -- I cannot recall an instance

19  where there was questions on a monthly operating

20  report.

21       Q.    What about the annual reports that

22  you submitted, the cross connections and annual

23  pumpage reports?

24             MR. MARKER:  Form, foundation.

Highly Confidential - Michael B. Glasgow

1          A.     Not to my recollection, no.

2          Q.     What was your role, if any, in

3    making the determination as to whether the water

4    treatment plant could handle the transition to a

5    full-time plant and properly treat the Flint

6    River water?

7               MR. KIM:  Objection as to form.

8          A.     Well, prior to the switch, coming

9    up with the decision to switch, I will say I did

10   not have a significant amount of input.

11         Q.     Did you provide any information to

12   either the emergency managers or Mr. Croft or

13   Mr. Johnson that they requested with respect to

14   the analysis of this transition?

15              MR. MARKER:  Objection; form.

16         A.     I possibly passed along data from

17   testing probably from previous test runs.  But,

18   yeah, offhand, nothing is really jumping out at

19   me.

20         Q.     Did you attend any meetings

21   regarding discussions on the transition?

22         A.     There's -- there was at least a

23   couple meetings.  To try to remember what was

24   discussed or what the time frame was is a little

```
1    difficult for me.

2           Q.    And were you at those meetings

3    as -- I'm sorry.  I'm going to rephrase the

4    question.

5                 Were you at those meetings to

6    provide information regarding the plant and its

7    operations?

8                 MR. MARKER:  Objection; form.

9                 MR. KIM:  Objection as to

10          foundation.

11          A.    I will say possibly.

12          Q.    Do you remember speaking during

13   those meetings?

14          A.    I'm sure I had a comment or two.

15   Like I said, unless we had a specific meeting

16   and date I -- there was a lot of meetings over

17   the years leading up to the switch, and then

18   even after the switch.  So I apologize.  A lot

19   of it blends together.

20          Q.    And can you remind me when you

21   obtained your F1 license?

22          A.    I'm going to say either 2011 or

23   2012.

24          Q.    Did you obtain the license in the
```

Highly Confidential - Michael B. Glasgow

1    anticipation of the water treatment plant

2    switching to being a full-time operating plant?

3              MR. MARKER:  Form, foundation.

4         A.    No.  I was going for that license

5    regardless of whether we were going to be full

6    time or not.

7         Q.    What are the testing requirements

8    for getting that license?

9              MR. MARKER:  Form, foundation.

10        A.    Well, there's a number of

11   requirements to even qualify to take the exam.

12   And then when it comes down to it, it's a

13   written exam administered by the DEQ.

14        Q.    You said you took it at the same

15   time as the test for the F2 license; is that

16   correct?

17        A.    That is correct, yes.

18        Q.    But was it two separate tests?

19        A.    Yes, it was.

20        Q.    Are there education requirements

21   to sit for that F1 license test?

22             MR. MARKER:  Form, foundation.

23        A.    Yes.

24        Q.    Is it the type of test that you

Highly Confidential - Michael B. Glasgow

1    studied for, or did you have the knowledge based

2    on your experience at the plant?

3         A.    I'd have to say it's a

4    combination.  You had a lot of the knowledge

5    from your day-to-day work, but you would also

6    have to brush up on regulations and different

7    other things that would be on the exam.

8         Q.    Are there products out there that

9    sort of give you an idea of what to study for

10   that type of test?

11             MR. MARKER:  Form.

12        A.    Yes, there's different exam study

13   guides and different classes you could take.

14        Q.    Did you consult those guides or

15   take any of those classes?

16        A.    Over my history of my career, I

17   took numerous classes in regards to information

18   in the water field that could be used for the

19   testing.  So I'll say yes.

20        Q.    But you didn't take any -- or did

21   you take any specifically to prepare for the F1

22   license?

23        A.    No, I didn't take any.

24             MR. MARKER:  Object to form.

Highly Confidential - Michael B. Glasgow

```
 1              A.    I didn't take any specifically to

 2    prepare.

 3              Q.    And you passed that test on the

 4    first try?

 5              A.    Correct.  Yes.

 6              Q.    And with respect to the F1

 7    license, are there continuing education

 8    requirements?

 9              A.    Yes, there is.

10              Q.    And what are those requirements,

11    to the best of your knowledge?

12              A.    Yeah, to the best of my knowledge,

13    they use the word "CEC," continuing education

14    credits.  So for the F1 license, without looking

15    it up, it seems like every three years, you

16    needed to renew your license once you attained

17    it.

18                    And you needed to acquire 2.4 CECs

19    or continuing education credits through various

20    classes or education and training, some in the

21    technical field, some in the managerial field.

22    I don't remember how that breakdown was set up,

23    but ...

24              Q.    And you still have that license,
```

Highly Confidential - Michael B. Glasgow

```
 1   correct?

 2          A.    Yes, it is current.  It is up to

 3   date.

 4          Q.    And do you need it for your

 5   current position?

 6          A.    I do not need it for my current

 7   position as I work for a smaller town now.

 8          Q.    Is there a particular date on

 9   which you became the operator in charge of the

10   Flint water treatment plant?

11          A.    Not that I can recall.  But I will

12   say it was probably the day I got the results

13   from taking that F1 exam.  Because at that time

14   nobody else in the city had a current F1

15   license.

16          Q.    Did the water treatment plant need

17   an operator in charge when it was just a backup

18   plant?

19                MR. MARKER:  Form, foundation.

20          A.    There was a requirement that we

21   needed an F1 in charge, yes.

22          Q.    What was -- who had that role

23   prior to you getting your F1 license then?

24          A.    Prior to me, the original
```

Highly Confidential - Michael B. Glasgow

1    gentleman that hired me at the water plant,

2    Mr. Jeff Bryson, I know he had his F1.  And then

3    after he retired, we didn't have an F1 in the

4    city.  And I believe we utilized a gentleman

5    from Genesee County who had originally worked

6    for the city of Flint for a couple years.

7              That's to the best of my

8    recollection.

9         Q.   Was there any change to your

10   day-to-day duties after you became the operator

11   in charge?

12        A.   I'm going to say there was.  It

13   wasn't dramatic.  It was mainly certification of

14   a lot of those reports that would have to be

15   sent to the state.

16        Q.   How did -- did your view of your

17   role at the water treatment plant change when

18   you received that title of operator in charge

19   other than the certification of the reports?

20        A.   I will say yes, because just in

21   certifying those reports, yeah, I was signing

22   off on them.  So I would, you know, attempt to

23   understand and ascertain where all the

24   information from them reports were generated.  A

Highly Confidential - Michael B. Glasgow

1   lot of times it was from other employees.  So I

2   will say my role changed slightly.

3         Q.    And did your chain of command

4   change at all?  Did you become either an equal

5   with Mr. Brent Wright or his supervisor in any

6   way?

7         A.    I will say I wasn't really his

8   supervisor in any way.  It was just the way I

9   guess the chain of command was set up prior to

10  me getting the F1.

11              I was -- yeah, never offered a

12  supervisor job there or anything.  We kind of

13  just decided to share duties, so to speak.

14        Q.    Did you do any review of the Safe

15  Drinking Water Act or its regulations to see

16  what the requirements were of being an operator

17  in charge?

18              MR. MARKER:  I'm going to object

19        to form.

20        A.    I can't say that I necessarily

21  reviewed it.  Being in the field for a

22  significant number of years, I'll say I had had

23  some idea of what that entailed.  But I don't

24  recall after getting the license, you know,

1    picking through it to see exactly.

2          Q.    Do you believe you've ever read

3    the definition under the Safe Drinking Water Act

4    regulations of an operator in charge?

5          A.    I'm sure at one time or another, I

6    have.

7          Q.    I'm going to read it to you now.

8    You can just for purposes of this deposition

9    only take my word that I'm reading this

10   correctly, but it says it means "A certified

11   operator who is designated by the owner of a

12   public water supply as the responsible

13   individual in overall charge of a water works

14   system or portion of a water works system who

15   makes decisions regarding the daily operational

16   activities of the system that will directly

17   impact the quality or quantity of drinking

18   water."

19                And that's Michigan Admin Code

20   R32510106.

21                Is that familiar to you?

22         A.    Vaguely, yes.

23         Q.    Okay.  And does it comport with

24   your understanding of what an operator in charge

Highly Confidential - Michael B. Glasgow

1    was responsible for?

2         A.    I would say so, yes.

3         Q.    At the time you became the

4    operator in charge, did you speak with anyone at

5    the MDEQ about what that role meant or what your

6    responsibilities were?

7         A.    I don't recall.  I may have.  I

8    remember getting a call, phone call, from

9    Mr. Prysby congratulating me on passing the

10   exam.

11            So we may have had some

12   discussions, but I do not recall.

13        Q.    You testified yesterday about how

14   you and Mr. Wright divided up the duties.  You

15   made a comment that part of the administrative

16   duties that you guys agreed would fall to

17   Mr. Wright were communications with the state.

18            What specifically did you mean by

19   that?

20        A.    Oh, mainly correspondence.  I

21   believe most correspondence from the state to

22   the city of Flint would still have Mr. Wright's

23   name on them.  A lot of times I would be cc'd.

24        Q.    Other than reports, what kind of

1    correspondence would there be with the state?

2          A.    Well, I don't want to say

3    routinely.  But, you know, there would be

4    correspondence, letters of different issues, or

5    new things coming up or proposed rule changes.

6    In regards to the Safe Drinking Water Act, there

7    would be correspondence in that aspect.

8          Q.    Would this generally be

9    correspondence generated by the state to the

10   water treatment plant or from the water

11   treatment plant back to the state?

12         A.    To my understanding, it went both

13   ways.  I believe Mr. Wright would have also

14   prepared things to send to the state in regards

15   to certain issues.  I can't think of any

16   specifics offhand here.

17         Q.    And by "the state," do you mainly

18   mean the Michigan Department of Environmental

19   Quality, or were there other agencies that you

20   interacted with?

21         A.    No.  I'm sorry.  I mainly mean the

22   Department of Environmental Quality.

23         Q.    How did the requirements for

24   staffing change after the switch from a backup

1    plant to a full-time plant?

2         A.    Well, the requirements from my

3    perspective was that we went from a standby

4    plant which we weren't in operation, so most

5    people were just on first shift.

6              As we went into full-time

7    operations, we needed to staff three shifts

8    around the clock.  So in my eyes, you know, the

9    staff needed to pretty much double.

10        Q.    Were new positions created, or was

11   it just that you needed more people at the same

12   positions?

13        A.    I believe we had to create a new

14   class of people to term -- and they were, I

15   guess, termed the water plant operators.  Prior

16   to standby, we didn't really have operators.  We

17   had operator foremen.

18             But for the most part, it was

19   just -- other than making the new classification

20   of water treatment plant operators, it was just

21   an issue of adding more bodies.

22        Q.    And did you consider having the

23   appropriate staff on site for those three shifts

24   as one of your responsibilities as the operator

Highly Confidential - Michael B. Glasgow

 1    in charge?

 2                    MR. KIM:  Objection as to form.

 3           A.    I would say yes, to an extent.

 4           Q.    Did you create the schedules for

 5    employees?

 6           A.    Like the work schedules and shift

 7    setups?

 8           Q.    Yes.

 9           A.    Yeah.  Usually in conjunction with

10    Mr. Wright, we would sit down and put that

11    together.

12           Q.    And you ensured that there was a

13    person of each required designation or licensure

14    at the plant?

15           A.    At all times, yes.

16           Q.    The monitoring plans and

17    monitoring schedules -- and forgive me if I'm

18    not using those -- stating those correctly.

19                    But were they redone at the time

20    of the switch?  Did you receive revised

21    monitoring schedules?

22           A.    Yes, prior to the switch of

23    full-time operation, I knew our monitoring

24    schedule would change.  And, yeah, that was

Highly Confidential - Michael B. Glasgow

1    probably one of the e-mails I sent to

2    Mr. Rosenthal kind of pleading him, like "I need

3    a monitoring schedule.  We're going to be in

4    operation soon," so ...

5          Q.    In years other than when the

6    switch occurred -- and correct me if I am

7    wrong -- the monitoring schedule would come out

8    in January, and then you would get one annually?

9          A.    Correct.  Yes.

10         Q.    Prior to the switch, did you meet

11   with anyone from the DEQ to discuss what

12   upgrades and construction needed to occur to

13   prepare the plant for full-time use?

14         A.    I'll say yes.  Like I said, it's

15   vague, but I know there was numerous meetings

16   prior with engineering firms and with the state,

17   DEQ, and water plant staff in regards to that,

18   yes.

19         Q.    And by "numerous," can you

20   quantify that at all?

21         A.    Oh, I don't know if I can put a

22   direct number on it.  I would say, for instance,

23   in the year 2013, leading up to the switch,

24   there was probably at least a half dozen

Highly Confidential - Michael B. Glasgow

1    meetings that I can recall.

2              I'm sure there was other

3    correspondence between city of Flint's

4    engineering firm and the state as well.

5         Q.    Do you recall specifically from

6    the MDEQ what individuals you met with to

7    discuss those upgrades or changes to the plant?

8         A.    Most of the time, my memory seems

9    to lead me to Mr. Prysby and Mr. Busch.  As

10   always, Mr. Prysby was always my first contact

11   being our district engineer.  But I do remember

12   Mr. Busch around as well.

13             And I don't recall if it was prior

14   to the switch or just after when I remember a

15   couple other individuals from the DEQ.  As I

16   stated before, maybe Mr. Cook or Mrs. Liane

17   Shekter-Smith.

18        Q.    Are you aware what Mr. Busch's

19   role with the MDEQ was at the time of the

20   switch?

21        A.    You know, to be honest, I will say

22   no.  I just understood that I thought he was

23   next up in the chain of command from Mr. Prysby.

24        Q.    How about Ms. Shekter-Smith?

Highly Confidential - Michael B. Glasgow

1          A.     No, I did not really understand

2     her role, to be honest.

3          Q.     Approximately how many times did

4     you meet Ms. Shekter-Smith?

5          A.     Oh, I want to say just a couple.

6     I don't have a lot of recollection with a lot of

7     discussions, but I do remember her being at our

8     treatment plant a time or two.

9          Q.     But you don't recall if that was

10    before or after the switch?

11         A.     No.  I cannot recall at this time,

12    no.

13         Q.     And do you know what Mr. Sygo's

14    role was at the MDEQ?

15         A.     It seems like -- I didn't know

16    exactly.  It seemed like he was deputy director.

17    He was fairly high up in the organization.  And

18    I never had interaction with him until after the

19    switch.

20         Q.     With respect to meeting with

21    Mr. Busch and Mr. Prysby to discuss changes to

22    the plant to prepare it for the switch, can you

23    explain to me a little bit about how those

24    meetings or interactions would go?

Highly Confidential - Michael B. Glasgow

```
 1                 Would it be that you would propose

 2    what you thought needed to be done, and they

 3    would provide comment, or did they go around and

 4    dictate to you what needed to be done?

 5                 MR. MARKER:  Objection; form,

 6          foundation.

 7          A.    From what I can recall, it seemed

 8    like it was -- it was more of a back and forth.

 9    I don't want to say there was -- from what I can

10    kind of remember, the city was proposing we were

11    going to go into full-time operation.

12                 I believe we had our engineering

13    firm there as well, or items from the

14    engineering firm that they understood we might

15    need to do.  I'd pass that along to Mr. Busch

16    and Mr. Prysby, and they could elaborate.  It

17    was more of a back and forth; you know, this is

18    what we want to do, what do we need to do to get

19    here, and that type.

20          Q.    And then what was the internal

21    process for obtaining funding for these changes?

22          A.    Funding for these changes?

23                 MR. KIM:  Objection to form,

24          foundation.
```

1          A.     Yeah, I will say I wasn't all that

2     familiar with that.

3                 Mr. Wright, sitting in the

4     position as supervisor, developed our budgets

5     every year, put in requests to the city

6     officials.  So I -- I don't personally recall

7     any -- any involvement with the funding issues.

8          Q.     Were you responsible for creating

9     the permits to submit to the DEQ for those

10    upgrades or changes?

11         A.     Most of the time we deferred that

12    to our engineering firms.

13         Q.     Did you sign the permits or

14    permanent applications?

15         A.     I don't recall.  I can't remember

16    signing any permit apps.  I very well could

17    have, but I don't recall any offhand.

18         Q.     And then after the permit

19    applications were submitted to the MDEQ, did you

20    have any correspondence with anyone at the MDEQ

21    regarding those permits prior to their approval?

22         A.     I can't say that I did, no.

23         Q.     Do you know if the permits had

24    to -- permit applications had to be changed in

Highly Confidential - Michael B. Glasgow

```
1    any way to obtain MDEQ approval?

2         A.    Offhand, I can't say I do.

3         Q.    Between 2013 and on the end of

4    your tenure at the Flint water treatment plant,

5    just generally about how often would you go and

6    look at the Safe Drinking Water Act or its

7    regulations?

8              MR. MARKER:  Objection; form,

9         foundation.

10        A.    Oh, that's hard to say.  I would

11   say, you know, a couple times a year I would

12   probably have to peek through it to look, but I

13   can't put a number on hand how many times I

14   would have.

15        Q.    And would you do that in response

16   to a specific issue?

17        A.    Most likely.  It would usually

18   have to be something that I didn't have stored

19   in my knowledge in my head there, so -- or

20   something to refresh or clarify.

21        Q.    Would you agree that under the

22   Safe Drinking Water Act, that the city of Flint

23   was responsible for ensuring that the Flint

24   water treatment plant met the Safe Drinking
```

1    Water Act safe staffing requirements?

2              MR. MARKER:  Objection; form,

3         foundation.

4         A.    I will say yes.

5         Q.    And was the city of Flint

6    responsible for ensuring that the water

7    treatment process met standards?

8              MR. KIM:  Objection; form,

9         foundation.

10        A.    I would say yes.

11        Q.    And the city of Flint was

12   responsible for maintaining the distribution

13   system?

14             MR. MARKER:  Objection.

15             MR. KIM:  Objection.

16        A.    I would say yes.

17        Q.    And the city of Flint was

18   responsible for evaluating the effect of the

19   treated water on that distribution system?

20             MR. KIM:  Objection as to form.

21        Calls for a legal conclusion.

22             MR. MARKER:  Objection; form and

23        foundation.

24        A.    I would say yes.

Highly Confidential - Michael B. Glasgow

1           Q.    You stated in your testimony that

2    a number of things were done and reviewed in

3    preparing for the switch.

4                 You had data from a test run, a

5    30-day test run, correct?

6           A.    Correct.  Yes.

7           Q.    And data from the prior plant

8    operation as a standby plant?

9           A.    Yes.

10          Q.    And data regarding the sort of raw

11   Flint River water?

12          A.    Correct.  Yes.

13          Q.    And did you personally analyze

14   those different pieces of data?

15          A.    Yeah, I'm sure I had glanced

16   through it all.  Most of the data I generated

17   myself in the laboratory.

18          Q.    And did you share any of your

19   conclusions or analysis of that data the MDEQ?

20          A.    Yeah, I shared all data with the

21   MDEQ, even test runs prior to the switch and

22   prior to the long test run in '13.  After every

23   test run, I would send data to Mr. Prysby at the

24   MDEQ.

```
 1             Q.    Did you -- maybe I wasn't clear.

 2                   Did you share your analysis?

 3                   MR. KIM:  Objection as to form.

 4                   MR. MARKER:  I'll join.

 5             A.    My analysis.  I guess in my eyes,

 6      always an analysis of the data wasn't necessary.

 7      The data kind of would speak for itself.

 8             Q.    Did the MDEQ have any role in the

 9      30-day test run?

10                   MR. MARKER:  Objection to form.

11                   MR. CAMPBELL:  Object to form.

12             A.    I don't know if I'd say they had a

13      role.  I do remember a visit from Mr. Prysby

14      during the 30-day test run.

15             Q.    Was that test run required by the

16      MDEQ?

17             A.    I'm going to say no, it wasn't

18      required by the MDEQ.  I think that was more of

19      an internal city -- city-prescribed test run to

20      really shake down our equipment and see what an

21      extended run would look like for us.

22             Q.    Do you recall discussing with the

23      MDEQ prior to the switch differences between

24      Flint River water and Lake Huron water?
```

Highly Confidential - Michael B. Glasgow

```
 1          A.    I don't recall offhand.  I'm sure

 2     there was a couple discussions, just because we

 3     knew treating the Flint River water would be

 4     much more involved than treating Lake Huron

 5     water.

 6          Q.    Do you recall speaking with them

 7     about increased microbial risks from the Flint

 8     River water?

 9          A.    I do not recall.

10          Q.    Any additional regulatory

11     requirements for using Flint River water?

12                MR. MARKER:  Objection; form,

13          foundation.

14          A.    I don't really recall.  I imagine

15     there would be at least a couple items we could

16     have discussed.  But a time frame or what and

17     when and where, I can't pull -- pull from my

18     mind.

19          Q.    Do you recall discussing softening

20     with anyone at the MDEQ in relation to using

21     Flint River water?

22          A.    Yeah.  I'll say I'm sure we had

23     discussions about softening.  I don't recollect

24     what it entailed or how, I guess, involved of a
```

Highly Confidential - Michael B. Glasgow

1    conversation it was, other than the fact that we

2    were -- my understanding that, you know, we

3    were -- it was recommended or almost required

4    that we would soften the water there.

5         Q.    Did you discuss turbidity or the

6    risk of -- increased risk from disinfection

7    byproducts?

8              MR. MARKER:  Objection; form.

9         A.    I do not recall in regards to

10   disinfection byproducts or turbidity, for that

11   matter.  The turbidity issue, that was kind of

12   known.  We had the data from analyzing the river

13   over years.  So we knew it had changed and could

14   be significantly higher than as compared to

15   treating, like, a Lake Huron water.

16        Q.    Do you recall specifically with

17   respect to these topics, who you would have had

18   those conversations with, the ones that you do

19   recall having?

20        A.    Yes.  Most likely, it would have

21   been Mr. Prysby.

22        Q.    Okay.  Do you recall having any of

23   those conversations with Mr. Busch?

24        A.    I don't recall.

Highly Confidential - Michael B. Glasgow

1          Q.    Mr. Cook?

2          A.    No.  The only conversations with

3     Mr. Cook I can recall seem to be after the

4     switch and after the fact, because it was my

5     understanding he was kind of a treatment

6     specialist.

7          Q.    Mr. Rosenthal?

8          A.    No conversations with

9     Mr. Rosenthal.

10         Q.    Okay.  How about

11    Ms. Shekter-Smith?

12         A.    Not that I can recall, no.

13         Q.    Did the MDEQ assist you in

14    obtaining any funding for changes to the water

15    treatment plant that you're aware of?

16         A.    Not that I'm aware of.

17         Q.    Okay.  Did you ever discuss

18    getting loans or anything -- not from the MDEQ,

19    but did you discuss having to obtain loans or

20    options for loans with anyone at the MDEQ to

21    fund different things at the water treatment

22    plant?

23         A.    No, not that I recall.

24         Q.    I'm going to ask you to look at

Highly Confidential - Michael B. Glasgow

```
1    Exhibit 24.  It's an April 17, 2014 e-mail.  And

2    this e-mail has been discussed during this

3    deposition, so I think you would be aware of its

4    content at this point.

5              Were you aware at the time that

6    you sent this e-mail, that Mr. Prysby was on --

7    was out of the office for an extended period of

8    time?  Do you recall that?

9         A.   I did not recall that until

10   reading Mr. Rosenthal's response to my e-mail.

11        Q.   And you -- and correct me if I am

12   wrong, but you testified that this e-mail mostly

13   had to do with concerns regarding the readiness

14   of the staff; is that correct?

15        A.   Yes.  Correct.

16        Q.   And that you didn't speak to

17   anyone at the MDEQ about this e-mail or follow

18   up in person with anyone at the MDEQ about the

19   content of this e-mail?

20             MR. MARKER:  Objection; form.

21        A.   No, I did not.

22        Q.   The e-mail was to Mr. Rosenthal

23   with copies to Mr. Busch and Mr. Prysby,

24   correct?
```

Highly Confidential - Michael B. Glasgow

1     A.    Correct.

2          Q.    Were any of them that you recall

3     at the plant in the days between October 17 and

4     the date that the water switch occurred on --

5     I'm sorry.  April 17 -- the day the water switch

6     occurred on April 24?

7          A.    I don't recall.  For some reason,

8     though, in my memory it seems like Mr. Prysby

9     and Mr. Busch were there on the day of the

10    switch.

11         Q.    And you didn't at that point

12    discuss the e-mail with them at all or the

13    content of the e-mail?

14              MR. MARKER:  Objection; form.

15         A.    No, I did not.

16         Q.    I believe you testified that this

17    e-mail was, you know, essentially a request for

18    some assistance; is that correct?

19              MR. MARKER:  Objection; form.

20         A.    I would say yes.

21         Q.    Okay.  What assistance were you

22    hoping to get?  What did you think the MDEQ

23    could do with respect to staffing?

24         A.    I didn't think the DEQ could

Highly Confidential - Michael B. Glasgow

1    necessarily do anything in particular with

2    staffing.  I was hoping they would just delay

3    our switch.  And showing them my concerns,

4    thought, you know, they could help me with that.

5          Q.    To the best of your knowledge,

6    what authority did the MDEQ have to delay the

7    switch?

8                MR. MARKER:  Objection; form,

9          foundation.

10         A.    I'm going to err on what I said

11   before.  They kind of have a dual role for me, a

12   coach and a cop, and I -- it was under my

13   assumption that they could stop or start us any

14   time they wanted.  They could say yes or no.

15         Q.    But you don't have any specific

16   knowledge of that authority, correct?

17         A.    Correct.

18               MR. MARKER:  Objection; form.

19         A.    Correct.

20         Q.    And I believe you stated that you

21   had expressed your concerns about staffing with

22   Mr. Daugherty -- I'm sorry -- Mr. Johnson or

23   Mr. Croft?

24         A.    Correct.  Yes.

1          Q.    And that essentially those

2    concerns were ignored?

3          A.    I could say they were ignored.  I

4    know they were -- I would hear the thing "We're

5    working on it."  But I felt like they were

6    ignored.

7          Q.    Did you feel as though in your

8    role operator in charge, you could have stopped

9    the water treatment plant from going operational

10   on April 24?

11              MR. KIM:  Objection as to form.

12         A.    No, I did not.

13         Q.    And was that due to politics or a

14   situation unique to Flint, or did you not

15   believe that was your -- that was a role that an

16   operator in charge had under the Safe Drinking

17   Water Act?

18              MR. MARKER:  Objection; form,

19         foundation.

20         A.    I'm going to say in my eyes, it

21   was more of a -- well, I don't want to say

22   political.

23              I don't believe that I had the

24   power in the Safe Drinking Water Act to do that.

Highly Confidential - Michael B. Glasgow

1   But I would just reiterate what was told to me

2   from my supervisors, Mr. Johnson, Mr. Croft, and

3   I'm going to specifically say Mr. Croft, says,

4   "We have approval from the DEQ.  This is going

5   to happen."

6           Q.   And regardless of your concerns at

7   all times, the Flint water treatment plant met

8   those staffing requirements under the Safe

9   Drinking Water Act, correct?

10          A.   Yes.  To the best of my knowledge,

11  yes.

12          Q.   And the MDEQ did not set April 24

13  as a date on which the switch needed to occur;

14  is that correct --

15          MR. MARKER:  Objection; lack of

16          foundation.

17          Q.   -- is that correct?

18          A.   Yeah.  I don't believe they had

19  any -- yeah, any input into what date the switch

20  was going to occur.

21          Q.   Didn't you review or discuss your

22  e-mail that is Exhibit 24 with any of the other

23  employees at the Flint water treatment plant

24  prior to sending it?

1          A.     I did not discuss it prior to

2     sending it.  No.  After I sent it, I talked with

3     a couple of my employees to let them know that I

4     had sent an e-mail.

5          Q.     Okay.  Who did you discuss it with

6     after you sent it?

7          A.     After I sent it -- well, first --

8     I just can't remember -- well, I can't remember

9     the first person I talked to, but I know I

10    informed Mr. Wright that I had sent the letter.

11    And I had also informed one of my operator

12    foremen, Matthew McFarland, that I had sent the

13    letter.

14         Q.     Did you -- to the best of your

15    knowledge, did either of them reach out to the

16    DEQ in any way to also discuss staffing

17    concerns?

18         A.     Not that I'm aware of.

19         Q.     Did you ever consider just

20    directly contacting the MDEQ and saying, "Can

21    you stop this water switch from happening?"

22              MR. MARKER:  Form, foundation.

23         A.     I never made that attempt, but I

24    will say in regards to, I guess, information

Highly Confidential - Michael B. Glasgow

1    from the DEQ, I didn't feel any reluctance from

2    them or any worry from them in the switch.

3            Q.    In your understanding, who was

4    responsible for making decisions regarding the

5    implementation of corrosion control at the Flint

6    water treatment plant at the time of the switch?

7                  MR. KIM:  Objection as to form.

8            A.    I'm going to defer that to -- I

9    would say to the DEQ and the engineering firm

10   working for the city of Flint designing the

11   process and all the upgrades.

12           Q.    Did you consider this part of your

13   role as the operator in charge, as part of your

14   responsibility for ensuring that the water was

15   treated properly?

16                 MR. MARKER:  Objection to form,

17           foundation.

18                 MR. KIM:  Objection as to form.

19           A.    I'm going to say as operator in

20   charge, it is the responsibility to operate the

21   plant according to the Safe Drinking Water Act.

22                 But in regards to the corrosion

23   control and adding new chemicals that we were

24   told we didn't need to design for, that in that

Highly Confidential - Michael B. Glasgow

1    aspect, it wasn't my responsibility.

2         Q.    You testified regarding your

3    understanding or assumption that the Flint River

4    water would be scale forming, correct?

5         A.    Correct.  Yes.

6         Q.    Do you have an understanding of

7    the effect of orthophosphates on scale-forming

8    water?

9         A.    I'm going to say no.

10        Q.    Do you know if it has any effect

11   on scale-forming water?

12             MR. MARKER:  Objection; form,

13             foundation.

14        A.    Well, I will say you're adding

15   phosphate to create a scale-forming -- you know,

16   a phosphate coating on the pipes, so I

17   understand that there's some correlation to

18   forming a phosphate coating along with a

19   scale-forming, you know, hardness scale.

20        Q.    Did you have discussions with the

21   MDEQ prior to the date and meeting in which you

22   were told that corrosion control would not be

23   required at the time of the switch?  Did you

24   have discussions regarding corrosion control or

Highly Confidential - Michael B. Glasgow

1    the Lead and Copper Rule with the MDEQ in, you

2    know, the time leading up to the switch?

3           A.    Not that I recall, no.

4           Q.    And did you -- in the meeting --

5    the meeting in which you were told that

6    corrosion control would not be required, that

7    was an in-person meeting, correct?

8           A.    Correct.  Yes.

9           Q.    And who from the MDEQ was at that

10   meeting?

11          A.    The one I remember is Mr. Prysby.

12          Q.    And do you recall if Mr. Prysby

13   said that corrosion control was prohibited or

14   not required?

15                MR. MARKER:  Objection; form.

16          A.    In my conversation with

17   Mr. Prysby, I was already inquiring about our

18   possible monitoring schedule.  So I asked, you

19   know, what's our frequency, how often are -- are

20   we going to be required to test for phosphate?

21                At that point, Mr. Prysby said,

22   "Well, we're not going to require you to add

23   phosphate, and we will -- in regards to the Lead

24   and Copper Rule, we will, you know, set up two

Highly Confidential - Michael B. Glasgow

1    six-month rounds of sampling and then make a

2    determination."

3           Q.    So the MDEQ did not prohibit the

4    use of corrosion control; is that correct?

5                 MR. MARKER:  Objection; form.

6           A.    I won't say they prohibited it,

7    but in order to install or add that, we would

8    have had written -- we would have had to get

9    written approval from them.

10          Q.    And by "written approval," do you

11   mean a permit to do the construction changes

12   necessary to allow for that -- the corrosion

13   control to be -- system to be constructed?

14          A.    Yeah, I will say that, as well as

15   any change to a treatment process or a change in

16   treatment chemicals needs to be -- needs to have

17   written approval as well.

18          Q.    And did you request -- make a

19   request for a permit application to create a

20   corrosion control system?

21                MR. MARKER:  Objection; form.

22          A.    Not until August or September of

23   2015, after we were required.

24          Q.    And did you make a request for a

Highly Confidential - Michael B. Glasgow

```
 1    change in -- and I'm talking prior to the switch

 2    now.  Did you make a request for a change in

 3    treatment and chemicals to allow for corrosion

 4    control?

 5              MR. MARKER:  Objection; form.

 6         A.   No, we did not.

 7         Q.   Okay.  And in order for the DEQ to

 8    provide that written approval, something has to

 9    be submitted from the plant to the DEQ, right?

10         A.   Correct.

11              MR. MARKER:  Objection; form.

12         Q.   So they don't -- the DEQ doesn't

13    just create a written approval on their own?

14         A.   Correct.

15         Q.   Is it your understanding that as

16    the operator of the treatment plant, the city of

17    Flint can do things or ask to obtain approval to

18    do things that are greater than what are

19    required by the MDEQ?

20         A.   I'll say yes.

21         Q.   In his deposition, Mr. Wright

22    testified that he had been instructed to not do

23    anything beyond what was required by the MDEQ.

24              Did you receive similar
```

Highly Confidential - Michael B. Glasgow

```
1    instructions?

2              MR. MARKER:  Objection; form,

3         foundation.

4         A.    I did not personally, no.

5         Q.    Did you ever discuss the

6    instructions that Mr. Wright was given in that

7    respect with him?

8         A.    I wouldn't say I discussed it with

9    him.  He briefly discussed it with me.

10        Q.    Okay.  Do you know who that

11   instruction came from?

12             MR. KIM:  Objection as to

13        foundation.

14        A.    Yeah, I don't recall exactly where

15   that come from.

16        Q.    After the water switch, the water

17   treatment plant started getting complaints

18   regarding the water; is that correct?

19        A.    Yeah, fairly soon after.  I'd say

20   within a month or two.

21        Q.    And did you -- when these

22   complaints started coming in, did you have

23   contact with the MDEQ with respect to these

24   complaints?
```

Highly Confidential - Michael B. Glasgow

```
1          A.    Not that I recall.  As time went
2    on, I'm sure I had conversations with them.  But
3    right off the start, I don't believe so.
4          Q.    And did the MDEQ contact you with
5    regards to complaints that were coming to the
6    MDEQ?
7          A.    I believe the DEQ notified us.  I
8    can't say it was myself.  I don't know if they
9    were in contact with Mr. Wright.  But as time
10   went on and as we get longer into the switch,
11   almost I'll say six month or longer after the
12   switch, I'm sure there was a few conversations
13   between myself and the DEQ in regards to
14   complaints.
15         Q.    Would you ever tell a customer
16   that called to complain to contact the MDEQ?
17         A.    No.  I don't believe I ever have.
18         Q.    As the operator in charge and
19   laboratory supervisor, you took responsibility
20   for obtaining the samples for the Lead and
21   Copper Rule monitoring; is that correct?
22         A.    Correct.
23         Q.    Did you review prior to -- let me
24   back up.
```

Highly Confidential - Michael B. Glasgow

```
1                    Did you have to take these types
2     of samples during the time that the water
3     treatment plant was a backup facility?
4          A.    Yes, we did.  We were under a
5     reduced monitor schedule for lead and copper, so
6     every three years, we were required to collect
7     30 samples.
8          Q.    What year was the last year that
9     you did that sampling prior to the switch?
10         A.    Oh, goodness.  To be honest, I
11    can't recall.  I'd have to -- yeah, I'd have to
12    see some old data.
13         Q.    And with respect to those sampling
14    events, was the city of Flint within -- within
15    the standards set by the Safe Drinking Water Act
16    for lead and copper?
17         A.    Prior to the switch, yes.
18         Q.    Did you review the Safe Drinking
19    Water Act and its regulations prior to doing the
20    sampling required after the switch?
21                    MR. MARKER:  Objection to form.
22         A.    I possibly could have, but I can't
23    recall.
24         Q.    Is testing under the Lead and
```

1   Copper Rule part of what was tested to get your

2   F1 license?  Is that part of the body of content

3   you were supposed to understand in order to

4   obtain your F1 license?

5           A.    The F1 license, yeah, tests you

6   over a multiple of issues.  And it's very

7   possible there was questions in regards to the

8   Lead and Copper Rule.

9           Q.    Okay.  And you've testified that

10  you didn't have the information available to you

11  to determine which residences had lead service

12  lines; is that correct?

13          A.    That is correct.

14          Q.    Okay.  So when the MDEQ prior to

15  the switch says, "We're not going to require

16  corrosion control, instead we're going to do

17  these two six-month rounds of testings," did you

18  say to anyone at the MDEQ at that time, "We

19  really can't get reliable results from six-month

20  rounds of testing because I don't know where the

21  lead pipes are"?

22               MR. MARKER:  Objection; form

23          foundation.

24          A.    No, I did not.

Highly Confidential - Michael B. Glasgow

1      Q.    Did you ever bring that issue to

2  anyone directly at the MDEQ?

3      A.    On a phone call with Mr. Prysby

4  around the time of the LeeAnne Walters' episode,

5  I discussed with Mr. Prysby that I was never --

6  no one had gone through the records and given me

7  a list of residences.  I was just directed that

8  lead was everywhere.

9      Q.    Okay.  And that was in

10  approximately February 2015?

11      A.    Yeah.  Early '15, yeah.

12      Q.    So two rounds were done, July 1,

13  2014 to December 31, 2014 and January 1, 2015 to

14  June 30, 2015; is that correct?

15      A.    That is correct.

16      Q.    Okay.  And you testified yesterday

17  that someone at the DEQ told you to start in

18  July of 2014, not in April.

19            Do you recall who that was?

20      A.    I don't recall who that was.  That

21  would have shown on our yearly monitoring

22  schedule what dates to collect those samples.

23      Q.    Okay.  What was your process for

24  distributing the bottles and sampling

Highly Confidential - Michael B. Glasgow

```
 1   instructions?  Did you go door to door?  Did you

 2   have, like, a service center where people could

 3   come to get these bottles and sampling

 4   instructions?  How did that work?

 5        A.    It was a combination.  I'll start

 6   years back prior to the switch, I used to send

 7   letters out asking for participants.  A lot of

 8   times you'd send out 100 letters, you might four

 9   or five people to respond.

10             And it seemed like our next

11   monitoring year, I tried to utilize the same

12   people I had before.  But then I would just use

13   a citywide e-mail.  A lot of employees for the

14   city lived in the city, so I knew I could count

15   on them to -- or almost strong arm them to get

16   samples for us in a sense.  So I knew I could

17   hit my numbers, so to speak.

18             So probably prior to 2010, I

19   started using city employees and kind of

20   continued that as time went on even up to the

21   switch.

22             The biggest problem with after the

23   switch is our number of samples required

24   increased from 30 to 100.  So that provided a
```

1   little more difficulty, and can lead me back to

2   another e-mail in one of our exhibits where I

3   say I need more time to develop monitoring plans

4   and figure out where our information is.

5          Q.    With respect to the letters or the

6   citywide e-mails, were those recipients targeted

7   in any way based on location or knowledge of

8   what type of service lines they had?

9                MR. MARKER:  Objection; form,

10               foundation.

11         A.    No.  It was mainly just to try to

12  get some participants in the sampling.

13         Q.    And when someone would respond

14  that they would be willing to participate, did

15  you do any analysis of their location or address

16  to see if you had any information on what type

17  of pipelines they would have?

18               MR. MARKER:  Objection; form.

19         A.    Yeah, I -- at the water plant and

20  under my job scope, I had no ability to observe

21  the records or even knew where the records were

22  kept.

23         Q.    When people started calling in and

24  complaining about the water, did you ever

Highly Confidential - Michael B. Glasgow

1    specifically ask those people to take water

2    samples for the purpose of the Lead and Copper

3    Rule monitoring?

4            A.    Ms. LeeAnne Walters was the first.

5    After responding to her original complaint of

6    discolored water and coming back a week after

7    and had the same issue, we just happened to be

8    in our second round of sampling.  So I asked

9    Ms. Walters.

10           And kind of from then on, I

11   would -- any individual that had an issue

12   similar to Ms. Walters, I would ask if they

13   would be part of our lead and copper sampling.

14                   - - -

15     (Glasgow Deposition Exhibit 39 marked.)

16                   - - -

17   BY MS. JACKSON:

18           Q.    I'm going to hand you a few

19   exhibits.  Okay.  I just wanted to -- the first

20   exhibit is COF_FED_0107399.  And this is the

21   July 2014 to December 2014 lead and copper

22   report; is that correct?

23           A.    That is correct.

24           Q.    Okay.  And you prepared this,

Highly Confidential - Michael B. Glasgow

```
 1   correct?

 2         A.    Correct.

 3         Q.    And you have testified to this

 4   before, that under number 9 on the first page,

 5   you stated that not all samples were Tier 1

 6   sites; is that correct?

 7         A.    That is correct.

 8         Q.    But then you've stated that they

 9   all had lead service lines, correct?

10               MR. MARKER:  Objection to form and

11         foundation.

12         Q.    On the next pages.

13         A.    Correct.  Yes.

14         Q.    Is there a reason that a site

15   could be -- have a lead service line but still

16   not be a Tier 1 site?

17         A.    Not to my knowledge, no.

18         Q.    And did you provide any

19   information as to this discrepancy within the

20   comments sections provided on this form?

21         A.    No, I did not.

22                     - - -

23      (Glasgow Deposition Exhibit 40 marked.)

24                     - - -
```

Highly Confidential - Michael B. Glasgow

```
 1    BY MS. JACKSON:

 2          Q.    And then Exhibit 40 is

 3    COF_FED_0073495.  And this is the second

 4    six-month round, January to June of 2015 report,

 5    correct?

 6          A.    Correct.

 7          Q.    Okay.  And again, you stated that

 8    they're not all Tier 1 sites under number 9,

 9    correct?

10          A.    Correct.

11          Q.    And yet stated they all had lead

12    service lines on the following pages, correct?

13                MR. MARKER:  Objection; form,

14          foundation.

15          A.    Correct.

16          Q.    Okay.  And did you provide

17    anything within the comments to discuss this

18    discrepancy?

19          A.    I did not.

20          Q.    And did anyone from the DEQ

21    contact you with respect to this, the

22    discrepancy between the certification that they

23    all had lead service lines but the statement

24    that there were not Tier 1 sites?
```

Highly Confidential - Michael B. Glasgow

```
 1          A.    I believe Mr. Prysby and myself

 2    discussed that in a phone call early February of

 3    2015.  So it would have been prior to the second

 4    six-month round and after the first six-month

 5    round.

 6                      - - -

 7      (Glasgow Deposition Exhibit 41 marked.)

 8                      - - -

 9    BY MS. JACKSON:

10          Q.    Can you look at Exhibit 41,

11    please.  This is 4-15-2016 SOM0020708.

12                MR. KIM:  Could you repeat that

13          number again, please.

14                MS. JACKSON:  0020708.

15    BY MS. JACKSON:

16          Q.    Do you recall this correspondence,

17    Mr. Glasgow?

18          A.    Yes.

19          Q.    Okay.  And is this where Mr. --

20    your discussion with Mr. Prysby regarding where

21    this discrepancy occurred?

22                MR. MARKER:  Objection; form,

23          foundation.

24          A.    I'm going to say originally in a
```

Highly Confidential - Michael B. Glasgow

1    phone call, like I said, not long after

2    Mr. Walters I think was the first conversation I

3    had in regards to this with Mr. Prysby.

4           Q.    Okay.  On the second page,

5    Mr. Prysby states under paragraph number 2, "The

6    lead and copper reporting form from July 2014 to

7    December 2014 monitoring period states that not

8    all sites were Tier 1.  However, the listing of

9    all 100 locations on the subsequent pages show

10   all locations being Tier 1.  Please clarify."

11                Is that correct?

12          A.    Yes.

13          Q.    Okay.  And then your response is

14   on the first page.  You respond to number 2

15   saying, "There were a couple of apartment

16   residences that were used in the first sampling

17   pool.  These would be Tier 2 sites.  The

18   majority were Tier 1."

19                Is that -- did I read that

20   correctly?

21          A.    Yes.

22          Q.    So is this your explanation for

23   why that discrepancy occurred?

24                MR. MARKER:  Objection; form,

Highly Confidential - Michael B. Glasgow

```
 1              foundation.

 2              A.    I don't believe that is my full

 3    explanation.  Like I said, I recall a phone call

 4    with Mr. Prysby discussing it more in depth.

 5              Q.    Okay.  Would apartment residences

 6    not qualify as Tier 1 sites?

 7              A.    Most likely not because it's

 8    supposed to be single-family residences

 9    according to the rule.

10              Q.    I'm running out of time.  So I'm

11    going to jump ahead a little bit.

12                    You talked a little bit yesterday

13    about the removal -- your discussions with

14    Mr. Busch and Mr. Prysby in which you were --

15    discussed removing two of the sites from the

16    second round of testing.

17              A.    Correct.  Yes.

18              Q.    And that was Ms. Walters' home,

19    correct?

20              A.    Correct.

21              Q.    And then also a business, correct?

22              A.    Correct.

23              Q.    And do you agree that both of

24    those samples do not meet the requirements under
```

Highly Confidential - Michael B. Glasgow

```
 1    the Lead and Copper Rule in order to be included

 2    as Tier 1 sites?

 3              MR. MARKER:  Objection; form,

 4         foundation.

 5         A.    From my understanding, I'll say

 6    yes.

 7         Q.    Okay.  And do you recall that you

 8    had actually removed a few sites prior to

 9    submitting the report that you had determined

10    did not meet the requirements?

11              MR. MARKER:  Objection; form,

12         foundation, and contrary to his prior

13         testimony.

14         A.    I do not recall.

15         Q.    And how would -- do you know how

16    the inclusion of Ms. Walters' home in the second

17    round of sampling would have changed the

18    results?

19              MR. MARKER:  Objection; form,

20         foundation, asked and answered.

21         A.    I will say I -- I understand how

22    it would have an effect on the overall 90th

23    percentile.

24         Q.    You do have an understanding of
```

Highly Confidential - Michael B. Glasgow

1    that?  I'm sorry.  I just didn't understand you.

2             A.    Yes, I will say I do have an

3    understanding.  Yes.

4             Q.    Okay.  And what would that -- what

5    would the effect on the 90th percentile have

6    been?

7                   MR. MARKER:  Objection; form,

8             foundation, asked and answered.

9             A.    In my mind, it would lower the

10   90th percentile value that we would report.

11            Q.    And would it have put the city

12   over the action level?

13                  MR. MARKER:  Objection; form,

14            foundation.

15            A.    Without sitting here and going

16   through the data, I can't -- I can't answer that

17   here.  I never calculated it out exactly.

18            Q.    With respect to Legionella, did

19   you ever ask the MDEQ for assistance in

20   responding to questions regarding Legionella and

21   the Flint water treatment plant?

22            A.    Not that I'm aware of, no.

23            Q.    With respect to the boil water

24   advisories that were issued after the switch,

Highly Confidential - Michael B. Glasgow

1    did you coordinate with the MDEQ in issuing

2    those boil water advisories?

3          A.    Yes.

4          Q.    And did you feel that you got the

5    information you needed and the support that you

6    needed from the MDEQ with respect to the boil

7    water advisories?

8          A.    Yes.

9          Q.    Okay.  And with regard to the TTHM

10   issue, did you coordinate or seek support from

11   the MDEQ with respect to TTHM issues after the

12   water switch?

13         A.    Yes.  As time went on and we

14   realized we were, yep, going to have an issue, I

15   remember conversations with Mr. Prysby.

16         Q.    Okay.  And did you feel that you

17   got the support and advice that you needed to

18   respond to the TTHM issues from the MDEQ?

19               MR. MARKER:  Objection; form,

20               foundation.

21         A.    I'll say yes.

22         Q.    Okay.  Were you involved in the

23   decision to switch back to Detroit water --

24               MR. KIM:  Objection as to form.

Highly Confidential - Michael B. Glasgow

```
 1              Q.    -- in late 2015?

 2                    MR. KIM:  Objection as to form.

 3              A.    I will say I was asked my opinion

 4      on the subject.

 5              Q.    And what was your opinion?

 6              A.    My opinion was to switch back.

 7                    MS. JACKSON:  Okay.  I'm going to

 8              reserve the rest of my time.

 9                    Go off the record.

10                    THE VIDEOGRAPHER:  We are going

11              off the record at 11:26 a.m.

12                    (Recess taken.)

13                    THE VIDEOGRAPHER:  We are back on

14              the record at 11:37 a.m.

15                          - - -

16                        EXAMINATION

17      BY MR. KUHL:

18              Q.    Good morning, Mr. Glasgow.  My

19      name is Richard Kuhl.  I'm Assistant Attorney

20      General with the State of Michigan.  I represent

21      the people of the State of Michigan in this

22      litigation.

23                    Now, as part of your

24      responsibilities as the operator in charge, you
```

Highly Confidential - Michael B. Glasgow

1    oversaw the monitoring that was conducted at the

2    Flint water treatment plant, correct?

3           A.    Correct.

4           Q.    And that monitoring was conducted

5    on a daily basis, wasn't it?

6           A.    Yes.  The majority of it, yes.

7           Q.    Where did you test the water at

8    the Flint water treatment plant?

9           A.    Most of the time it was from -- a

10   plant tap is what we referred to it as.  It was

11   a faucet tap right in the laboratory.

12          Q.    And would that tap represent the

13   water that was treated by the treatment plant

14   prior to it being sent into the distribution

15   system?

16          A.    Correct.  Yes.

17          Q.    And would you use those monitoring

18   results to prepare a monthly report for the

19   state of Michigan?

20          A.    Yes.

21          Q.    And you would submit those

22   reports?

23          A.    Yes.

24          Q.    And who prepared those reports?

Highly Confidential - Michael B. Glasgow

1          A.    Myself.

2                     - - -

3          (Glasgow Deposition Exhibit

4               43 through 59 marked.)

5     BY MR. KUHL:

6          Q.    I've had marked as Exhibits 43

7     through 49 the monthly operating reports

8     submitted by the city to DEQ for the April 2014

9     through August 2015 time period.

10               Can I ask you to take a look at

11    those, sir.

12         A.    Sure.

13               MS. JACKSON:  What was that time

14          frame again?

15               MR. KUHL:  April 2014 through

16          August 2015.

17               MS. JACKSON:  Thank you.

18         A.    So the report would actually be

19    dated May.  So the date of April is due the

20    following month in May, so just to clarify.  So

21    it will run from May until --

22               MS. SMITH:  I'm sorry.  For the

23          record could you clarify your last

24          comment that the report dated August

1          would reflect --

2                 THE WITNESS:  Yes.  I'm sorry.

3          The report -- you wanted to start with

4          reports from April of 2014, but that

5          report is not due until May.  So it will

6          show we're always a month behind on

7          reports in that aspect.  So the report

8          for April of 2014 would be due before

9          May 10th of 2014.

10                 MS. SMITH:  So if the report is

11          dated August 2015, it would reflect the

12          data from the prior month?

13                 THE WITNESS:  Correct.

14                 MS. SMITH:  Thank you.

15                 MR. KUHL:  Why don't we go off the

16          record while Mr. Glasgow is looking at

17          these.

18                 THE VIDEOGRAPHER:  We're going off

19          the record at 11:41 a.m.

20                 (Pause in proceedings.)

21                 THE VIDEOGRAPHER:  We're back on

22          the record at 11:47 a.m.

23                       - - -

24

Highly Confidential - Michael B. Glasgow

```
 1    BY MR. KUHL:

 2          Q.    Mr. Glasgow, I'm going to hand

 3    you -- or ask you first to look at Exhibit 43.

 4                MR. KUHL:  And to clarify for the

 5          record, I've handed him Exhibits 43 to

 6          59.

 7    BY MR. KUHL:

 8          Q.    Now, this was an e-mail that you

 9    sent on May 14, 2014 to Mr. Rosenthal, correct?

10          A.    Correct.

11          Q.    And did this include a partial

12    monthly operating report for the April 2014 time

13    frame?

14          A.    Yes, it did.

15          Q.    And it's a truncated report

16    because the plant didn't operate for the entire

17    month of April; is that correct?

18          A.    Correct.

19          Q.    Are the rest of the reports that

20    we have marked as exhibits complete copies of

21    the monthly reports that you submitted to DEQ?

22          A.    Yes, it appears so.  Yes.

23          Q.    And each of them was signed by you

24    as the operator in charge of the Flint water
```

Highly Confidential - Michael B. Glasgow

1    treatment plant; is that correct?

2          A.    That is correct.

3          Q.    Do you have any reason to believe

4    that the information that you reported in the

5    monthly operating reports was incorrect?

6          A.    Not to my knowledge, no.

7          Q.    Do you know, were these reports

8    made available to the public?

9          A.    Not that I'm aware of.

10          Q.    Do you know if they were posted on

11    any of the city of Flint websites?

12          A.    I do not recall if they were.

13          Q.    I know prior to the switch, you

14    had expressed some concerns about the ability to

15    complete the monitoring that was required.

16                Is there anything in these reports

17    that indicated to you that the city failed to

18    comply with all monitoring requirements on the

19    Safe Drinking Water Act?

20          A.    Not to my knowledge, no.

21          Q.    Did the city receive a violation

22    during the switch for failing to conduct

23    monitoring?

24          A.    Not to my recollection, no.

Highly Confidential - Michael B. Glasgow

1            Q.     And looking at these reports,

2     isn't it correct that Flint reported to the MDEQ

3     for the April 2014 through August 2015 time

4     frame that Flint River water was treated to meet

5     all applicable Safe Drinking Water Act

6     standards?

7                  MR. MARKER:  Objection; form,

8            foundation.

9                  MS. SMITH:  Objection.

10           A.     I will say yes.

11           Q.     At any time between April 2014 and

12    September 2015, did you tell anybody at MDEQ

13    that Flint was unable to treat the Flint River

14    water such that it could not meet all applicable

15    Safe Drinking Water Act standards?

16                 MR. MARKER:  Objection; form.

17           A.     No.  Not to my knowledge, no.

18           Q.     At any time between April 2014 and

19    September 1, 2015, did you believe that the

20    drinking water being produced by the Flint water

21    treatment plant created a substantial risk to

22    the health of the residents of the city of

23    Flint?

24                 MR. KIM:  Objection as to form and

Highly Confidential - Michael B. Glasgow

```
 1          foundation.

 2               MR. CAMPBELL:  Object to the form

 3          of that as well.

 4               MS. SMITH:  Join.  Are we

 5          following the one for all?

 6               MR. KIM:  Yes.

 7     A.    Yeah.  Could you restate that

 8  question for me?  I'm sorry.

 9               MR. KUHL:  Could you read it back,

10          please.

11               (Record read back as follows:

12          "Question:  At any time between

13          April 2014 and September 1, 2015, did

14          you believe that the drinking water

15          being produced by the Flint water

16          treatment plant created a substantial

17          risk to the health of the residents of

18          the city of Flint?")

19               MR. CAMPBELL:  Object to the form.

20               When are you talking about?

21     A.    I'm going to say no.

22     Q.    Did you at any time between

23  April 2014 and September 1, 2015 tell anybody at

24  MDEQ that the drinking water being produced by
```

Highly Confidential - Michael B. Glasgow

1    the Flint water treatment plant was creating a

2    substantial risk to the public health in Flint?

3                MR. MARKER:  Objection; form.

4                MR. CAMPBELL:  Objection.

5         A.    No, I did not.

6         Q.    Now, it's correct after the switch

7    in April 2014 that the city received a fair

8    number of complaints about the drinking water;

9    isn't that correct?

10        A.    That is correct.  Yes.

11        Q.    And some of those residents

12   expressed a belief that the drinking water was

13   responsible for rashes, hair loss, or other

14   physical ailments, correct?

15        A.    Correct.  Yes.

16        Q.    Did you at any time come to the

17   conclusion between April 2014 and September 1,

18   2015 that the drinking water was responsible for

19   those complaints?

20                MR. MARKER:  Objection; form.

21        A.    I did not, no.

22        Q.    Now, when you got these complaints

23   in, did the city have a process or procedure for

24   responding to these complaints?

Highly Confidential - Michael B. Glasgow

```
1              A.    We had an internal procedure, I

2    guess, at the Flint water plant.  If the

3    complaints made it to us, I would try to

4    schedule myself or one of my staff to, you know,

5    go and contact the resident, pull water samples

6    from their house, and have discussions with

7    them.

8              Q.    Do you have any idea of how many

9    times you would do that a month between

10   April 2014 and September 1, 2015?  Just a rough

11   estimate.

12             A.    I would say probably anywhere

13   between 10 to 20 a month.  But it really didn't

14   seem to start for a couple months after the

15   switch.  So I would say more towards summer of

16   '14.

17             Q.    Besides going to the houses and

18   sampling, did you respond to the complaints in

19   any other fashion?

20             A.    Not that I'm aware of, no.

21             Q.    Would the city flush hydrants?

22             A.    If we determined -- if we read a

23   complaint and it was a discolored water,

24   something we had seen prior to the switch as
```

Highly Confidential - Michael B. Glasgow

1    well, I would make a call to our water service

2    center which worked on the distribution system.

3    And at times they would -- they would flush

4    hydrants accordingly to try to see if it was

5    just, you know, discolored water in a small area

6    that we could flush out of the system.

7              Q.   Can you think of any other things

8    that the city attempted to do during the switch

9    to try to resolve the complaints?

10             A.   Possibly increase chlorine dosage.

11   Sometimes taste and odors can be an issue.  A

12   little chlorine -- sometimes, you know, we might

13   try to boost our chlorine input into the water.

14             Q.   Did you change the treatment at

15   all to try to change the quality of the water?

16             A.   Not significantly, no.

17             Q.   Let me ask you:  Isn't it correct

18   that you told the FBI in March of 2016 that you

19   believed when the switch was made, that the

20   water treatment plant would be able to treat the

21   water such that it met the Safe Drinking Water

22   Act standards?

23             A.   Yes.

24             Q.   I think you've testified several

1    times about some of the test runs that took

2    place prior to the switch.

3              Do you recall that?

4        A.   Yes.

5        Q.   Did you test the water during

6    those runs?

7        A.   Yes, we did.

8        Q.   Did those tests indicate that the

9    water being produced during the test run was

10   meeting the Safe Drinking Water Act standards?

11       A.   Yes.  To the best of my knowledge.

12   Yes.

13       Q.   I'm going to ask you to pull

14   out -- it's been marked twice -- Exhibit 7 or

15   Exhibit 25, whichever is easiest.  It's the

16   October 31, 2013 e-mail.

17              MR. MARKER:  For the record, we've

18        got 7 in front of him.

19              MR. KUHL:  Okay.

20   BY MR. KUHL:

21       Q.   All right.  Now, this was an

22   e-mail that you sent to Duffy Johnson on

23   October 31, correct?

24       A.   Correct.

Highly Confidential - Michael B. Glasgow

1          Q.    You had gotten a message from

2     Mr. Johnson asking about the potential effect of

3     the treated Flint River water on the

4     distribution system, correct?

5          A.    Correct.

6          Q.    And this was prior to the switch,

7     right?

8          A.    Yes.

9          Q.    Do you recall specifically what

10    Mr. Johnson asked you?

11         A.    I don't recall specifically.  I

12    imagine it was in regards to kind of what the

13    different characteristics of the water would be

14    after the switch as compared to prior to the

15    switch.

16         Q.    All right.  And your response was

17    that you believed it was most likely you'll have

18    a scale-forming water, right?

19         A.    Correct.  Yes.

20         Q.    What is scale-forming water?

21         A.    Basically water with a particulate

22    calcium in there that will settle out and kind

23    of form a scale on the pipes.

24         Q.    And the scale on the pipes will

Highly Confidential - Michael B. Glasgow

1    reduce the leaching of metals into the drinking

2    water, right?

3          A.    It could possibly have that

4    effect.  In regards to this e-mail, the fact of

5    leaching from the pipes into the water wasn't

6    really what I was getting at.

7          Q.    But that's a correct statement,

8    right?

9          A.    Correct.  Yes.

10          Q.    And so you believed at the time

11    you wrote this e-mail that the most likely

12    result would be that the treated drinking water

13    would produce scale to limit leaching of metals

14    from the pipes into the drinking water?

15          A.    As I stated, I didn't -- I didn't

16    write this e-mail in regards to leaching of

17    metals into pipes.  It was really in regards to

18    the softening process and whether it would be

19    scale forming.  So I guess you could make

20    inferences from it.  But originally --

21          Q.    Sorry.  I didn't mean to

22    interrupt.  I apologize.

23          A.    No.  I was just going to say

24    originally when I'm looking at this e-mail and

1    the data, it's really in regards to how well our

2    softening process is going to work to me.

3          Q.    But you knew at that time if you

4    had scale producing water, that it would have

5    limited the leaching of metals into the drinking

6    water, correct?

7                MR. MARKER:  Objection to form.

8          A.    I'll say correct, yes.

9          Q.    Part of what you were planning to

10   do was to keep the pH, the alkalinity, and the

11   hardness of the treated water similar to what

12   the city had been receiving from Detroit,

13   correct?

14         A.    Correct.  Yes.

15         Q.    Can you use pH, alkalinity and --

16   sorry.  Let me start that over again.

17               Can you use pH and alkalinity as a

18   form of corrosion control?

19               MR. KIM:  Objection as to form.

20         A.    I will say in the effect of

21   causing a calcium scale, yes, you can.

22         Q.    I think there was some testimony

23   yesterday about whether or not that you had done

24   anything prior to the switch to determine the

Highly Confidential - Michael B. Glasgow

```
1    impact of the Flint River water on the

2    distribution system.

3              Do you recall that?

4         A.    I do, yes.

5         Q.    And I think -- at least my

6    recollection was you testified you didn't recall

7    doing anything.

8              Is that your recollection?

9         A.    That is my recollection.

10        Q.    But, in fact, in looking at this

11   e-mail, you were attempting, at least in part,

12   to determine how the treated water would impact

13   the distribution system, correct?

14             MR. MARKER:  Objection; form.

15        A.    No.  Really, with this e-mail,

16   it's leading back to comparisons of finished

17   water between Detroit water that was purchased

18   and Flint River water that was treated.

19             I'm looking more at the

20   parameters, you know, what's your level of

21   hardness going to be, what level of calcium is

22   going to be in there, what's the pH.  It was

23   really just a comparison in my eyes.

24        Q.    All right.  In that e-mail, you
```

```
 1    stated, "At times the process will determine

 2    what we can do."

 3              Do you see that?

 4         A.   Yes.

 5         Q.   What do you mean by that?

 6         A.   I mean the lime softening process

 7    is a very dynamic process.  It changes, you

 8    know, hourly, I'll say.

 9              So depending on the

10    characteristics of the incoming untreated water

11    going into the softening process and the way the

12    operators at the water plant are adding lime or

13    how close they're watching it, the consistency

14    of the untreated water will kind of determine

15    how soft we can get it or what's actually going

16    to be the finished product, so to speak.

17         Q.   Do you recall undertaking any

18    tests or running any models prior to the switch

19    to determine if the treated Flint River water

20    would be scale forming?

21         A.   Other than just a test run with

22    softening to look at your numbers, and use a

23    number of a couple different parameters to

24    determine your Langelier index as just kind of a
```

Highly Confidential - Michael B. Glasgow

1    scale-forming property of the water.

2         Q.    Do you think you attempted to do

3    those calculations prior to the switch?

4         A.    I would -- I would assume I did a

5    time or two based on our long test run in the

6    summer of '13 there.

7         Q.    All right.  So do you recall the

8    conclusions you reached based upon those test

9    results?

10        A.    Well, it's kind of -- in here I

11   believe that our Langelier index was slightly

12   positive.  Should have been a slightly

13   scale-forming finished water.

14        Q.    After the switch, did you attempt

15   to use the Langelier index to calculate whether

16   or not the water would be scale forming?

17        A.    Periodically.  We had a lot of

18   data coming in hourly, so sometimes you'd take

19   averages of the day and just get a peek at what

20   it was for the day.  And the index is something

21   that would also change very dynamic depending on

22   the results of the parameters.

23        Q.    And that's what I'm trying to get

24   at is, how often would you run that test?  Is

Highly Confidential - Michael B. Glasgow

1   that something you did on a daily basis, weekly,

2   monthly?

3                Can you give me an idea?

4        A.    I would say probably -- it would

5   probably depend on how the plant was running.

6   If things were going okay and kind of staying

7   stable for a few days in a row, you wouldn't

8   necessarily run the test, because things were

9   kind of stabilized, so to speak.

10               Once any changes happened, it

11   would be nice to run a calculation.  I can't

12   tell you the number of times I did.  And most of

13   the time if I did, it was on little -- a little

14   scratch pad, you know, just to -- just to take a

15   look.

16       Q.    Would it at least be weekly?

17       A.    Possibly.

18               MR. KUHL:  Can I have that marked

19           as Exhibit 60.

20               - - -

21       (Glasgow Deposition Exhibit 60 marked.)

22               - - -

23               MR. KUHL:  For the record, I've

24           handed you an exhibit with the Bates

Highly Confidential - Michael B. Glasgow

```
 1              number COF_FED_0033610 through 611.

 2   BY MR. KUHL:

 3         Q.    Do you recognize this document,

 4   Mr. Glasgow?

 5         A.    It does appear to be an e-mail

 6   from myself to Mr. Daugherty Johnson.

 7         Q.    And this was sent on November 18,

 8   2014, right?

 9         A.    Yes.  Correct.

10         Q.    So that's after the water switch,

11   correct?

12         A.    Correct.

13         Q.    And in this e-mail, you state,

14   "Our treatment process results in the water

15   being mildly scale forming, so it should not

16   lead to any corrosion of the distribution pipes

17   in household plumbing."

18              Did I read that correctly?

19         A.    Yes.

20         Q.    Where did you get the term "mildly

21   scale forming"?

22         A.    It's based off the results of the

23   Langelier index.

24         Q.    So is it correct that at least as
```

Highly Confidential - Michael B. Glasgow

1    of November 18, 2014 that you believed the water

2    being produced at the Flint water treatment

3    plant would be mildly scale producing?

4           A.    Yes.

5                 MR. KIM:  What's that Bates number

6           again, Richard?  Sorry.

7                 MR. KUHL:  All right.  I am taking

8           a minute from Bill.  COF_FED 0033610

9           through 611.

10                MR. KIM:  Thank you.

11   BY MR. KUHL:

12          Q.    Now, in this e-mail, you indicate

13   that Detroit water was mildly corrosive.

14                Did you see that?

15          A.    Yes.

16          Q.    Why did you believe that?

17          A.    Most likely, I used some of

18   Detroit's results to calculate a Langelier

19   index.

20          Q.    It's correct, isn't it, that you

21   told -- well, let me start that again.  It's

22   correct that you believed prior to the switch,

23   that the water would be scale producing, right?

24          A.    Yep, under the -- yeah.  Under the

Highly Confidential - Michael B. Glasgow

1    correct conditions in the plant, it could be

2    scale forming.

3          Q.    And so at that time, you didn't

4    believe it was going to be necessary to add

5    orthophosphates to the water; isn't that

6    correct?

7                MR. MARKER:  Objection; form,

8          foundation.

9          A.    I can't say that I was thinking

10   about the addition of a phosphate at that time.

11         Q.    Let me ask you, Mr. Glasgow, to

12   look at -- I think it's Exhibit 1, is your

13   testimony at the preliminary exam.  And

14   specifically ask you to look at the testimony

15   from April 16, 2018.  And I'll direct you to

16   page 51 of that testimony.

17               MR. MARKER:  Did you say 51?

18               MR. KUHL:  Yes, sir.

19   BY MR. KUHL:

20         Q.    And specifically, sir, I'll refer

21   you to -- they're numbered -- the lines are

22   numbered on the left-hand side -- lines 11

23   through 23.

24         A.    Okay.

Highly Confidential - Michael B. Glasgow

```
1              Q.   All right.  So you testified at

2    the preliminary exam, sir, that you didn't think

3    the water was going to be corrosive, and,

4    therefore, it wouldn't need phosphates; isn't

5    that correct?

6              MR. MARKER:  Objection; form.

7         A.   That is in my testimony.

8         Q.   And that was the truth at the

9    time, correct, Mr. Glasgow?

10             MR. MORRISSEY:  Objection.

11        A.   Correct.

12        Q.   Can I ask you to pull out

13   Exhibit 10.

14             Do you recognize this e-mail,

15   Mr. Glasgow?

16        A.   I do, yes.

17        Q.   And it's dated February 24, 2015?

18        A.   Correct.

19        Q.   Now, Mr. Bincsik says that Marvin

20   from Veolia told you that -- or told him that

21   Flint should add phosphate to the water to

22   prevent corrosion, correct?

23        A.   Yes.  According to this e-mail,

24   yes.
```

Highly Confidential - Michael B. Glasgow

1        Q.    And you didn't believe that was

2   necessary, right?

3              MR. MARKER:  I'll object to form.

4              Answer if you can.

5        A.    I will say -- I will say yes.

6        Q.    And that's because your tests were

7   still showing that the water was scale

8   producing, right?

9        A.    Yeah.  To the best of my

10  knowledge, yes.

11       Q.    Did you continue to run these

12  tests after February 24, 2015?

13       A.    I do not recall.

14       Q.    But it was your practice to do it

15  weekly or monthly, wasn't it?

16       A.    It was kind of a standard.  Right

17  around 2015 is when I took a promotion to

18  utilities supervisor.  We're getting close to

19  that time frame.  So I can't -- my time in the

20  lab was limited after that.

21       Q.    Well, is it your recollection that

22  you didn't attempt to calculate the Langelier

23  index after your promotion?

24       A.    I'm just saying I don't recall.

```
 1   Like I said, I didn't have a set time frame of

 2   when we did it.  As we get into '15, there was a

 3   lot of issues going on.  So I don't recall, like

 4   I said, the frequency or how often I did it at

 5   that time.

 6          Q.    And that's fine.  My question was,

 7   did you attempt to -- do you recall attempting

 8   to calculate the Langelier index after

 9   February 24, 2015?

10          A.    I can't recall.

11          Q.    Do you believe that you would

12   have?

13          A.    I would think.

14                MR. KIM:  Objection as to form.

15          A.    I would think I would have.

16          Q.    Was there anybody else at the

17   water treatment plant that could run that

18   calculation?

19          A.    Yes, there have been a few other

20   individuals that could have run it.

21          Q.    Did you ever ask them to do it?

22          A.    It wasn't part of our -- I will

23   say it wasn't part of our daily standard

24   operating procedures.
```

Highly Confidential - Michael B. Glasgow

```
1              Q.    Well, let me ask you, sir, prior

2     to September 1, 2015, do you ever recall running

3     the Langelier index and having the result come

4     back indicating that the treated water would not

5     be scale producing?

6              MR. MARKER:  Objection as to form.

7              A.    As I said, that's a very dynamic

8     process, so there's probably times for certain

9     portions of the day where it could have been a

10    negative number.

11             Q.    And that's fine.  My recollection

12    [sic] is do you recall that happening?

13             A.    I can't picture an instance.  But,

14    like I said, it wouldn't -- that number changed

15    dramatically, you know, day to day, hour to

16    hour.  So it's possible there could have been

17    times where there was a negative number, other

18    times positive.

19             Q.    And that's fine.  But I'm just

20    asking if you recall there being a negative

21    number coming back specifically.

22             A.    I don't specifically remember.

23             Q.    All right.  I apologize for

24    jumping around.  We took a lot of questions, so
```

Highly Confidential - Michael B. Glasgow

1    I'm trying not to repeat.  So I'm going to jump

2    topics here.

3              I think you've already testified

4    you know, who Lockwood, Andrews & Newnam is,

5    correct?

6         A.    Correct.

7         Q.    In your responsibilities as the

8    operator in charge, did you rely on advice that

9    you received from them?

10        A.    Yes.

11             MR. GAMBLE:  Objection; form.

12        Q.    Did you have any set meetings

13   with -- I'm going to call them LAN; is that all

14   right?

15        A.    Yep.  That's fine.

16        Q.    Did you have any set meetings with

17   them?

18        A.    Yeah.  I'm going to -- I'm going

19   to say yes.  Like I said, they were around

20   during some upgrades and also around a while

21   after we started running the plant from the

22   Flint River.

23        Q.    Did they have office space in the

24   water treatment plant?

Highly Confidential - Michael B. Glasgow

```
 1              A.    No, they did not have office

 2    space.

 3                        - - -

 4       (Glasgow Deposition Exhibit 61 marked.)

 5                        - - -

 6              MR. CAMPBELL:  What's the number,

 7         please?

 8              MR. KUHL:  Exhibit 61.  It's got a

 9         Bates range of COF_FED_0113932 through

10         34.

11    BY MR. KUHL:

12              Q.    This is a September 10, 2014

13    letter from Mr. Prysby to Mr. Wright, correct?

14              A.    Correct.

15              Q.    And this is a compliance

16    communication about the total trihalomethanes?

17              A.    Correct.

18              Q.    And in this letter, Mr. Prysby

19    asked the city to prepare an operational

20    evaluation, correct?

21              A.    Correct.

22              Q.    Did you ever see this letter, sir?

23              A.    I did, yes.

24              Q.    Do you know, did the city perform
```

Highly Confidential - Michael B. Glasgow

 1   the operational evaluation?

 2        A.   To my knowledge, I thought we

 3   contracted LAN to do that for us.

 4        Q.   On the second page of this letter,

 5   right in the middle under "Examination of

 6   Treatment Operational Practices," do you see

 7   that Mr. Prysby asked the report to address the

 8   treatment problems that contribute to TTHM

 9   formation?

10        A.   Yes.

11        Q.   And would LAN have been

12   responsible for preparing the report on that

13   issue?

14             MR. GAMBLE:  Objection; form,

15        foundation.

16        A.   To the best of my knowledge, I

17   would say yes.

18        Q.   Under that, it states, "The report

19   shall also include steps the city should

20   consider to minimize future exceedances."

21             Do you see that?

22        A.   Yes.

23        Q.   And was LAN tasked with

24   identifying those steps?

Highly Confidential - Michael B. Glasgow

```
 1              MR. GAMBLE:  Objection; form,

 2         foundation.

 3         A.    To the best of my knowledge, like

 4    I said, I thought they were contracted to

 5    develop the OEL, the evaluation.  So I'll say,

 6    yeah, to the best of my knowledge.

 7         Q.    And then that report was supposed

 8    to be submitted to DEQ, correct?

 9         A.    Correct.

10                     - - -

11       (Glasgow Deposition Exhibit 62 marked.)

12                     - - -

13              MR. KUHL:  We're on Exhibit 62,

14         which is the draft November 2014 OEL,

15         operational evaluation report, prepared

16         by LAN.  It has a Bates range

17         COF_FED_0028870 through 889.

18              MR. GAMBLE:  Richard, what's the

19         date on that?

20              MR. KUHL:  November 2014.

21    BY MR. KUHL:

22         Q.    Do you recognize this document,

23    Mr. Glasgow?

24         A.    I do, yes.
```

1          Q.    And this was a draft prepared by

2     LAN?

3          A.    Yes.

4          Q.    And it identified the responsible

5     causes for the TTHM exceedances, correct?

6                MR. GAMBLE:  Objection; form.

7          A.    Correct.

8          Q.    And it sets out an action plan for

9     the city, right?

10         A.    Yes.

11         Q.    Let me ask you to turn to page 2

12    of that report.  About a third of the way down

13    under "Immediate" -- well, let me start that

14    again.

15               Do you see "Immediate Actions"

16    that are listed on page 2?

17         A.    Yes.

18         Q.    And then under the bullet point,

19    "WTP operational changes."

20               Do you see where that section is?

21         A.    Yes.

22         Q.    And then the first immediate

23    action that LAN identifies is "Discontinue

24    softening bypass stream to reduce chlorine

Highly Confidential - Michael B. Glasgow

```
 1    demand."

 2              Do you see that?

 3         A.    Yes.

 4         Q.    What did they mean by that --

 5              MR. GAMBLE:  Objection; form,

 6         foundation.

 7         Q.    -- to your knowledge?

 8         A.    The way the water plant was set

 9    up, it could almost be operated as two separate

10    plants.  So we could go through a couple of our

11    treatment processes before softening.  And then

12    when we got to softening, we could bypass some

13    of the water around softening and only soften a

14    partial amount of the water, so to speak.  And

15    then after the softening process, combine the

16    water back together to go through the last steps

17    of the process.

18                        - - -

19         (Glasgow Deposition Exhibit 63 marked.)

20                        - - -

21    BY MR. KUHL:

22         Q.    Mr. Glasgow, I'm going to hand you

23    a table that we've prepared that summarizes the

24    monthly operating reports in an attempt to move
```

Highly Confidential - Michael B. Glasgow

1  this process along at a little speedier rate.

2  I've handed copies to others.

3         As I indicated, this data is taken

4  from the monthly operating reports.  I tried to

5  input it accurately, but if you have any

6  questions, feel free to look at the actual

7  monthly operating reports.

8         MR. MARKER:  I object to the

9         extent that you just mentioned if there

10        is an inaccuracy.  I guess I'll object

11        to that.

12        Q.   Now, in November -- and you can

13  look at the November monthly operating report --

14  the average lime dosage was 125.1, correct?

15        A.   Yes.  According to this chart,

16  yeah.

17        Q.   And then it's still -- it was

18  123.3 in December, right?

19        A.   Yes.

20        Q.   Then it went up to 153.4 in

21  January?

22        A.   Uh-huh.

23        Q.   And 167.6 in February.

24             Do you see that?

Highly Confidential - Michael B. Glasgow

1     A.    Yes.

2     Q.    Is that because the city was

3 adding more lime to the water?

4     A.    Yeah.  We're obviously adding more

5 lime with the dosage increasing.  Without going

6 through the reports, it's hard to say why.

7     Q.    Well, is it your recollection that

8 the city implemented LAN's proposal to

9 discontinue the softening and bypass during that

10 time frame?

11          MR. GAMBLE:  Objection; form,

12          foundation.

13     A.    I'm going to have to say possibly.

14 Just an increase in lime dosage doesn't --

15 doesn't really refresh my memory for sure if we

16 stopped the bypass, but possibly.  It could have

17 been based on their recommendations.

18     Q.    You would certainly agree that the

19 numbers January, February, April, May, June,

20 July were higher than the prior period --

21     A.    Correct.

22     Q.    -- correct?

23     A.    Correct.  Yes.

24     Q.    Lime has an effect on the

Highly Confidential - Michael B. Glasgow

1    alkalinity of the produced water; is that

2    correct?

3           A.    That is correct.

4           Q.    Generally the more lime added, the

5    lower the alkalinity?

6           A.    Correct.  Yes.

7           Q.    You would also agree that the

8    general downward trend in the alkalinity of the

9    treated water from November of '14 -- let me

10   start that again.  I didn't think that worked at

11   all.

12                You would agree that there was a

13   general downward trend in the alkalinity of the

14   treated water from November 2014 to

15   September 2015?

16          A.    Yes, I would say that's a general

17   trend.

18          Q.    Can I ask you to turn to page 4 of

19   the LAN report.  About -- sorry.

20          A.    I've got it.  We're there now.

21          Q.    About two-thirds of the way down,

22   just above Table 2, it refers to a 2002 report

23   by Alvord, Burdick & Howson.

24                Do you see that?

Highly Confidential - Michael B. Glasgow

1        A.    Yes.

2        Q.    Have you seen that report?

3        A.    I have not.

4        Q.    According to Table 2, that 2002

5    study recommended that Flint add 40 micrograms

6    per liter of ferric chloride for coagulation.

7              Do you see that?

8        A.    I do, yes.

9        Q.    And on page 9, Table 5, it lists

10   the city of Flint's current usage of ferric

11   chloride, correct?

12       A.    Correct.

13       Q.    And it identifies the current

14   usage as only 7.7 micrograms per liter, correct?

15       A.    Correct.

16       Q.    And on top of page 10 of this

17   report from LAN, under the first paragraph, LAN

18   states that the differences between the current

19   usage and the treatability study was "an obvious

20   starting point for optimizing treatment to

21   prevent DBP limit exceedances."

22             Do you see that?

23       A.    Yes.

24       Q.    Was it your understanding that LAN

Highly Confidential - Michael B. Glasgow

1    was proposing that Flint change its treatment to

2    meet the dosages set forth in the 2002 study?

3              MR. GAMBLE:  Objection; form,

4         foundation.

5         A.    I'm sorry.  Could you restate

6    that?

7         Q.    Sure.

8              MR. KUHL:  Can you read it back.

9              (Record read back as follows:

10        "Question:  Was your understanding that

11        LAN was proposing that Flint changed its

12        treatment to meet the dosages set forth

13        in the 2002 study?")

14        A.    Yeah, I don't know if I would say

15   they were trying to change it back to the 2002

16   study.  I guess I'm -- that statement to me just

17   shows that they took into account the study that

18   was done back in 2002.

19        Q.    Well, they state, "an obvious

20   starting point for optimizing treatment" --

21   sorry.

22              They said the difference between

23   the current usage and the recommended was "an

24   obvious starting point," right?

Highly Confidential - Michael B. Glasgow

```
 1            A.    Right.

 2            Q.    They recommended that you add

 3   additional ferric chloride?

 4                 MR. GAMBLE:  Objection; form,

 5            foundation.

 6            A.    Correct.  According to this, yes.

 7            Q.    And if you look at the November

 8   monthly operating report, the average ferric

 9   chloride dosage was, what, 9.6.

10                 Do you see that?

11            A.    Yes.

12            Q.    And that it increased in December

13   to 14.9.

14                 Do you see that?

15            A.    I do, yes.

16            Q.    And 16.8 in January?

17            A.    Yes.

18            Q.    16.3 in February?

19            A.    Yes.

20            Q.    Would you agree that one of the

21   reasons that the dosage increased was the

22   recommendations provided by LAN?

23                 MR. GAMBLE:  Objection; form,

24            foundation.
```

1          A.    I might want to have to say yes.

2          Q.    I mean, that's what you retained

3    LAN for, to provide recommended actions,

4    correct?

5                MR. GAMBLE:  Objection; form,

6          foundation.

7          A.    Yeah.

8          Q.    And they were paid a lot of money

9    to provide those recommendations, weren't they?

10               MR. GAMBLE:  Objection; form,

11         foundation.

12         A.    I'm unaware of what the cost was.

13         Q.    Well, you're aware that LAN was

14   paid a lot of money by the city of Flint over

15   time, right?

16               MR. GAMBLE:  Objection; form.

17         A.    Yes.

18         Q.    In looking through this draft

19   report, I didn't recall seeing anything about

20   adding corrosion control.

21               Do you recall any statements like

22   that?

23         A.    I do not, no.

24         Q.    I didn't see any analysis in this

Highly Confidential - Michael B. Glasgow

1    report on the potential impact of changing the

2    water characterization would have on lead and

3    copper corrosion, did you?

4              MR. GAMBLE:  Objection; form

5         foundation.

6         A.    I did not, no.

7         Q.    Do you recall Warren Green telling

8    the city that he didn't believe it would be

9    necessary to add orthophosphates to the water at

10   the time of the switch?

11             MR. GAMBLE:  Objection; form,

12        foundation.

13        A.    I do not recall.

14        Q.    Do you recall Mr. Green telling

15   the city that he thought the treated Flint River

16   water would be scale producing?

17             MR. GAMBLE:  Objection; form,

18        foundation.

19        A.    I do not recall.

20        Q.    Ferric chloride was used by the

21   city as a coagulant; is that correct?

22        A.    That is correct.  Yes.

23        Q.    Why is it that Flint decided to

24   use ferric chloride as a coagulant; do you know?

```
 1          A.    Based on my knowledge, I'm not

 2   sure when I first started working at the water

 3   plant.  That was a coagulant they had on hand.

 4   So it was determined sometime, yeah, prior to

 5   2005 when I started there.

 6          Q.    Were you aware that Detroit Water

 7   and Sewage Department had used aluminum sulfate

 8   as a coagulant?

 9          A.    Yes.

10          Q.    Did your consultant, LAN, ever

11   advise you that a treatment change from a

12   sulfate-containing coagulant such as aluminum to

13   a chloride-containing coagulant such as ferric

14   chloride would increase the amount of lead

15   leaching into the drinking water?

16                MR. GAMBLE:  Objection; form,

17          foundation.

18          A.    Not that I recall.

19                MR. KUHL:  Do you want to take a

20          lunch break here?

21                THE VIDEOGRAPHER:  We are going

22          off the record at 12:31 p.m.

23                (Recess taken.)

24                        - - -
```

Highly Confidential - Michael B. Glasgow

1          Thereupon, at 12:31 p.m. a lunch

2          recess was taken until 1:07 p.m.

3                    - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Michael B. Glasgow

```
 1                        Tuesday Afternoon Session

                          February 25, 2020

 2                        1:07 p.m.

 3                        - - -

 4                THE VIDEOGRAPHER:  We are back on

 5         the record at 1:07 p.m.

 6  BY MR. KUHL:

 7         Q.   Mr. Glasgow, I want to change

 8  gears and talk about Veolia for a little bit.

 9                Do you recall that Veolia was

10  brought in in early 2015?

11         A.   I do, yes.

12         Q.   Do you know why Veolia was brought

13  in?

14         A.   I did not -- as I say, I was not

15  privy to calling them in.  I think it was

16  requested from our DPW director, as far as I

17  know.

18         Q.   Did he explain to you why he

19  wanted Veolia to come in?

20         A.   Yeah.  In a sense, you know, it

21  was to, you know, take a look at our process and

22  give some report on our efforts and our

23  functions.

24         Q.   He wanted a second pair of eyes on
```

Highly Confidential - Michael B. Glasgow

1    the situation, right?

2         A.    Yep, you could say that.

3              MR. CAMPBELL:  Object to the form.

4         Q.    Was it your understanding that

5    Veolia's a large international drinking water

6    expert?

7              MR. CAMPBELL:  Object to the form.

8         A.    Yes.

9         Q.    And if I understood your

10   testimony -- well, let me strike that again.

11                    - - -

12       (Glasgow Deposition Exhibit 64 marked.)

13                    - - -

14   BY MR. KUHL:

15        Q.    I'm going to hand you Exhibit 64,

16   which is a copy of the March 12, 2015 report.

17              Now, if I recall your testimony

18   from yesterday correctly, you don't believe that

19   you saw a copy of this report immediately?

20        A.    Correct.  Yes.

21        Q.    And your best recollection is it

22   was sometime early summer?

23        A.    Of '15, correct.  Yes.

24        Q.    But you did discuss some of its

Highly Confidential - Michael B. Glasgow

1    conclusions with other people at the city,

2    correct?

3              A.    Yeah.  I would say, yes.

4                        - - -

5        (Glasgow Deposition Exhibit 65 marked.)

6                        - - -

7    BY MR. KUHL:

8              Q.    I'm going to hand you Exhibit 65.

9    It has a Bates range of COF_FED_0108601 through

10   02.

11              Now, Exhibit 65, you're included

12   on this e-mail chain, aren't you, Mr. Glasgow?

13             A.    Yes.

14             Q.    I want you to turn to the second

15   page.  And it starts out with an e-mail from

16   Mr. Brubaker.

17              Do you see that?

18             A.    Yes.

19             Q.    Who is Mr. Brubaker?

20             A.    He worked at the wastewater

21   treatment plant.  He was the -- I believe at the

22   time environmental compliance inspector.

23             Q.    In Mr. Johnson's response to

24   Mr. Brubaker's e-mail, he states "One of the

Highly Confidential - Michael B. Glasgow

1   consultant's recommendations was to quadruple

2   the amount of ferric we are feeding now."

3              Do you see that?

4        A.    Yes.

5        Q.    Do you know who that consultant

6   was?

7        A.    I believe it was Veolia.

8        Q.    And, in fact, if you go over to

9   the first page, right in the middle, he refers

10  to jar testing conducted by Veolia.

11             Do you see that?

12       A.    Yes.

13       Q.    Do you recall discussing with

14  Mr. Johnson or anybody else at the city Veolia's

15  recommendation that Flint significantly add the

16  amount of ferric chloride?

17       A.    I vaguely remember discussing it.

18  It seems like that was in regards -- at least

19  the discussion I can recall -- in regards to

20  increasing the ferric had to do with, you know,

21  the precursors to TTHM formations.  I believe

22  that was some of the discussions I've had.

23             So the thought was increase the

24  ferric, reduce the amount of precursors to form

Highly Confidential – Michael B. Glasgow

```
 1    TTHMs, and that may -- may assist us with the

 2    TTHM issue.

 3            Q.    If you look on page 4 of Exhibit

 4    64, Veolia's recommendation right in the middle

 5    is a recommendation that the ferric chloride

 6    doses be raised up to 100-micrograms per liter.

 7                 Do you see that?

 8            A.    I do, yes.

 9            Q.    And that was significantly higher

10    than you were adding at the time, right?

11            A.    Yes.

12            Q.    Going back to the monthly

13    operating reports, it looks like the average

14    dosage for ferric chloride in March was 15.

15                 Do you see that?

16            A.    Yes.

17            Q.    And then in April, it shot up to

18    16.5.

19                 Do you see that?

20            A.    Yes.

21            Q.    Then it went up to 19.5 for May.

22                 Do you see that?

23            A.    Yes.

24            Q.    And 19.7 for June.
```

Highly Confidential - Michael B. Glasgow

```
 1                 Do you see that?

 2         A.    Yes.

 3         Q.    Is it your recollection that the

 4  city decided, at least in part, to increase the

 5  amount of ferric chloride it was adding to the

 6  water based upon Veolia's recommendations?

 7         A.    Yes.  To my knowledge, yes.

 8         Q.    Going back to Exhibit 64.  Can I

 9  ask you to turn to page 10.  And right up at the

10  very top, these are the recommended actions that

11  Veolia had.

12                 Do you recall those?  I think I

13  looked at these yesterday.

14         A.    Yes.

15         Q.    And at the top, it suggests that

16  the city's engineer initiate discussions with

17  the state on the addition of a corrosion control

18  chemical.

19                 Do you see that?

20         A.    Yes.

21         Q.    Did Veolia advise you that they

22  believed that there was any significant urgency

23  to taking that action?

24                 MR. CAMPBELL:  Object to the form.
```

Highly Confidential - Michael B. Glasgow

```
 1                He never spoke with Veolia.

 2          A.    Yeah.  Not to myself, no.

 3                MR. KUHL:  I appreciate your

 4          objection.

 5                MR. CAMPBELL:  You're welcome.

 6                MR. KUHL:  Next time let's just

 7          maintain it with the rules.

 8                MR. CAMPBELL:  I think that's

 9          consistent with the rules.

10                MR. KUHL:  I'm not so sure about

11          that.

12                MR. CAMPBELL:  Don't try to

13          mislead the witness.

14                MR. KUHL:  That is exactly my

15          point.

16     BY MR. KUHL:

17          Q.    Do you know if Veolia advised

18     anybody else that there was a significant lead

19     problem ongoing in the city?

20          A.    My only recollection had to do

21     with a previous exhibit with an e-mail, and it

22     sounded like Mr. Bincsik had spoke with someone

23     from Veolia.

24          Q.    Did Veolia communicate to anybody
```

1   at the city that you're aware of that they

2   thought there was a substantial risk of lead

3   leaching into the system and impacting the

4   public health?

5        A.   Well, as I said, that --

6   Mr. Bincsik's e-mail was the only thing that

7   lead me to that.

8        Q.   Well, did you go to any of the

9   public meetings that Veolia participated in?

10       A.   I imagine I was at least a couple

11  of them.

12       Q.   Do you recall Veolia telling the

13  public that there was a danger with lead

14  leaching into the water?

15       A.   I do not recall that.

16       Q.   I'm going to switch gears again,

17  Mr. Glasgow.  And I'm going back to your

18  testimony during the preliminary exam.  Can I

19  ask you to -- this is the April 16, 2018

20  testimony again.

21       A.   Okay.

22       Q.   And I'll direct you to pages 49

23  and 50.

24            Starting on page 49, there's a

Highly Confidential - Michael B. Glasgow

1    discussion about how you believed that the water

2    would be scale forming.  And then it goes over

3    onto page 50, and that's really where I want to

4    direct your question, to line 19 through 21,

5    where you state, "This is the same thing he had

6    heard from our engineering firms as well."

7            A.    Yes.

8            Q.    What engineering firms are you

9    referring to?  Take your time.

10           A.    Well, in line 20, my answer is,

11   "This is the same thing he had heard from our

12   engineering firms as well."

13                 When I think of engineering firms,

14   I think of LAN, and I would have to group Veolia

15   in there as well.  Those are -- uh-oh.

16                 (Fire alarm sounds.)

17                 MR. KUHL:  Can we go off the

18          record.)

19                 THE VIDEOGRAPHER:  We are going

20          off the record at 1:18 p.m.

21                 (Recess taken.)

22                 THE VIDEOGRAPHER:  We are back on

23          the record at 1:26 p.m.

24

1    BY MR. KUHL:

2         Q.    Mr. Glasgow, switching topics

3    slightly.

4              Isn't it correct that you told the

5    FBI in March 2016 that nobody pressured you to

6    put the Flint water treatment plant online?

7         A.    Yes, that is in my testimony.

8         Q.    And did you tell the FBI in

9    March 2016 that DEQ's interpretation that Flint

10   was entitled to two six-month testing periods

11   before making a final determination as to its

12   corrosion control treatment was consistent with

13   your own review of the statute?

14             MR. MARKER:  Objection to form and

15        foundation.

16        A.    I will say yes.

17        Q.    And did you testify at the

18   April 16, 2018 preliminary exam that based upon

19   the sampling results from the neighbors around

20   Ms. Walters' home, that you didn't believe that

21   there was a widespread problem in the city?

22        A.    Yes, that is correct.

23                  - - -

24        (Glasgow Deposition Exhibit 66 marked.)

Highly Confidential - Michael B. Glasgow

```
 1                    - - -

 2  BY MR. KUHL:

 3         Q.    I've handed you, Mr. Glasgow,

 4  Exhibit 66 which has a Bates range

 5  COF_FED_0422811 through 12.

 6               Do you know if you've seen this

 7  document before?

 8         A.    I believe I have, yes.

 9         Q.    And this refers to an August boil

10  water advisory in the city of Flint?

11         A.    Correct.  Yes.

12         Q.    And do you recall investigating

13  what the cause was of that test showing fecal

14  coliform bacteria?

15         A.    Yes, I do.

16         Q.    And do you recall reaching the

17  conclusion that an abnormal test result

18  triggered that advisory?

19         A.    Yes.

20                    - - -

21     (Glasgow Deposition Exhibit 67 marked.)

22                    - - -

23  BY MR. KUHL:

24         Q.    And, sir, we've handed you Exhibit
```

1   67 which has a Bates range COF_FED_0036658

2   through 59.

3             Have you seen this document

4   before?

5        A.    I believe so, yes.

6        Q.    And this relates to the second

7   boil water advisory issued to the city of Flint,

8   correct?

9        A.    Correct.

10        Q.    And is it correct that the city's

11   conclusion was that this boil water advisory was

12   due to a broken valve that was found in the

13   system?

14        A.    Yes.

15        Q.    And that broken valve had led to a

16   flow -- or excuse me -- a flow in the system?

17        A.    Correct.  Yes.

18        Q.    And so presuming you had, what, a

19   cross-connection problem?

20             MR. MARKER:  Objection; form,

21             foundation.

22        Q.    Let me ask.  Do you know, was it a

23   cross-connection problem?

24        A.    I do not know if it was a

1    cross-connection problem.

2          Q.     Now, these two boil water

3    advisories, September and August of 2014, were

4    those the only boil water advisories issued

5    during the switch?

6          A.     I do not believe so.

7          Q.     Do you think there was another

8    one?

9          A.     I'm trying to recall.  For some

10   reason, I feel like there was another one, but

11   I'm sure we'd have documentation if there was.

12         Q.     Do you have any recollection as to

13   what that time frame might have been?

14         A.     September, October.  I mean, I may

15   be confusing the following year.  I may be

16   confusing a notice or advisory thinking of the

17   TTHM issue as well.  I apologize.  My memory is

18   just not -- I mean, there's a lot of documents

19   in this case.  I'm not going to suggest that

20   I've reviewed or seen them all.

21         Q.     Outside of at least these two boil

22   water advisories, do you recall there being a

23   widespread problem in the city with coliform

24   bacteria?

Highly Confidential - Michael B. Glasgow

```
 1              MS. SMITH:  Objection.

 2         A.    I would say during the warmer

 3    summer months, there was an issue.

 4         Q.    You would have it, but do you

 5    recall there being any violations of the

 6    standards?

 7         A.    I do not recall.

 8         Q.    You don't recall any violations,

 9    or you just don't recall?

10         A.    I thought we were still

11    discussing -- besides these two violations or

12    boil water notices.

13         Q.    Correct.  I'm sorry.  Let me start

14    over again just to make sure we're not --

15    generally speaking, besides these two water

16    violations, do you recall there being widespread

17    problems with coliform bacteria in the Flint

18    water distribution system?

19         A.    I don't know if I'd characterize

20    it as widespread.  I will say during routine

21    monthly sampling, there was times when we would

22    have positive samples for coliform bacteria.

23         Q.    But that wasn't unusual, correct?

24         A.    Correct.
```

1        Q.    I mean, you had that prior to the

2   switch, right?

3        A.    Correct.

4        Q.    And it's not unusual to have it in

5   any water system, right?

6        A.    Correct.

7        Q.    Do you recall there being any

8   other detections of E. coli in the water

9   distribution system?

10        A.    I do not recall any E. coli.

11        Q.    Do you recall that GM had some

12   concerns about the Flint water, Mr. Glasgow?

13        A.    Yes, I do.

14        Q.    And do you recall what their

15   concern was?

16        A.    Their concern, if my memory serves

17   me correct, it had to do with a rusting of

18   parts.  Yeah, so corrosion --

19        Q.    Were you involved -- I'm sorry.  I

20   apologize.

21        A.    I was just going to say, yeah,

22   they had some corrosion on parts that were

23   sitting -- sitting in the plant there.

24        Q.    Do you recall being involved in

1  the investigation into the cause of the problems

2  at GM?

3          A.    I do recall attending a meeting at

4  GM and taking a little walk through one of their

5  plants in regards to their complaints.

6          Q.    Do you recall reaching the

7  conclusion that the reason GM was experiencing

8  those problems is because they were recycling

9  their water?

10          A.    Vaguely, yes.  It had to do with

11  their CNC machines I believe, yeah, and they

12  would keep recycling water.

13          Q.    And is it correct you didn't

14  believe because the city -- well, let me start

15  that again.

16                Is it correct you believed that

17  just because GM was having a problem didn't mean

18  that there was a larger problem in the Flint

19  water system?

20          A.    Correct.  Yes.

21          Q.    Did the city of Flint issue a TTHM

22  violation notice to its residents?

23          A.    Yes.

24          Q.    And did that notice instruct

1    residents to stop drinking the water?

2         A.    I would have to read the notice.

3    I don't recall if it said to stop drinking or if

4    it was just a precaution to notify them.

5         Q.    Right.  Do you recall that the EPA

6    had guidelines as to the type of notice that

7    would have to be issued when you would have a

8    TTHM violation?

9         A.    I'll say I was aware EPA had, I

10   guess, guidelines, but I would defer to my

11   primacy agent, the MDEQ, for the guidelines of

12   how we would notify.

13        Q.    Do you recall being involved in

14   the issuance of the notices to the residents?

15        A.    Yes.  Somewhat, yes.

16        Q.    Do you recall seeing that notice?

17        A.    Yes.

18        Q.    And do you recall that notice

19   telling the residents not to drink the water?

20        A.    I can't remember the exact

21   language of it.  I'm sure I signed off on the

22   notice.  But without it in front of me and

23   reading it, I can't --

24        Q.    And you can't recall whether or

Highly Confidential - Michael B. Glasgow

```
 1    not the EPA believed that TTHMs were a

 2    substantial risk to public health?

 3              MR. MARKER:  I'll object to form

 4         and foundation.

 5         A.   Yeah, I can -- I can understand

 6    that there was a -- yeah, an issue with public

 7    health with TTHMs.

 8         Q.   Yes.  I mean, there was a concern,

 9    but do you recall how the EPA quantified that

10    risk?

11         A.   I do not recall how they

12    quantified it.

13                   - - -

14      (Glasgow Deposition Exhibit 68 marked.)

15                   - - -

16  BY MR. KUHL:

17         Q.   Exhibit 68 has a Bates range of

18    COF_FED_0073939 through 949.

19              Have you seen this document

20    before, Mr. Glasgow?

21         A.   Yes, I have.

22         Q.   What is it?

23         A.   It is a yearly consumer confidence

24    report that the city would distribute to
```

Highly Confidential - Michael B. Glasgow

```
 1   residents.

 2          Q.    And did the city issue such a

 3   report on an annual basis?

 4          A.    Yes.

 5          Q.    Can I ask you to turn to --

 6   they're not numbered, but it's the third page.

 7   It's got a Bates range of 941 on it.  And in the

 8   second paragraph, there's a discussion about

 9   lead.

10                Do you see that?

11          A.    Yes.

12          Q.    Did the annual report that Flint

13   issued to its residents include that warning

14   each year?

15          A.    Yes.  To the best of my knowledge,

16   yes.

17          Q.    All right.  This is my last

18   exhibit, Mr. Glasgow.

19                      - - -

20      (Glasgow Deposition Exhibit 69 marked.)

21                      - - -

22   BY MR. KUHL:

23          Q.    Exhibit 69 has a Bates range

24   COF_FED_0380408 through 413.
```

Highly Confidential - Michael B. Glasgow

```
 1              Mr. Glasgow, do you recall seeing

 2    this document before?

 3         A.    Offhand here, I don't recall.  I

 4    would think I would have seen that.

 5         Q.    Do you recall that the city had a

 6    series of public meetings in the January, early

 7    February time frame to talk about the water

 8    issues?

 9         A.    Yes, I do.

10         Q.    Can I ask you to turn to the --

11    it's second page, the first page of the

12    memorandum.  And under "City of Flint -

13    Questions and Answers," the first question is,

14    "Is it currently safe to drink City of Flint

15    water?"

16              Do you see that?

17         A.    Yes.

18         Q.    And what's the answer?

19         A.    "Yes.  Water from the City of

20    Flint meets all of the EPA regulatory standards

21    of the Safe Drinking Water Act."

22         Q.    Was that your understanding on

23    February 16, 2015?

24         A.    I will say yes, that was my
```

1    understanding at the time.

2              MR. KUHL:  That's all the

3         questions I have for Mr. Glasgow at this

4         time.  And I'll keep my remaining time

5         for any follow-up.

6              THE VIDEOGRAPHER:  We're going off

7         the record at 1:40 p.m.

8              (Recess taken.)

9              THE VIDEOGRAPHER:  We are back on

10        the record at 1:46 p.m.

11                   - - -

12                   EXAMINATION

13   BY MR. MORRISSEY:

14        Q.   Good afternoon, Mr. Glasgow.

15        A.   Good afternoon.

16        Q.   I know it's been a long couple

17   days.  My name is Steve Morrissey.  I am one of

18   the lawyers for a proposed class of plaintiffs

19   that includes folks in the city of Flint, just

20   so you understand who you're talking to.

21              Now, you began working in Flint in

22   2001; is that right?

23        A.   Correct.  Yes.

24        Q.   And from 2001 through April 2014,

Highly Confidential - Michael B. Glasgow

```
1    did Flint rely on Lake Huron water from Detroit

2    for its drinking water supply?

3            A.    Yes.

4            Q.    Were there any significant lead

5    contamination problems during that time frame?

6            A.    Not that I'm aware of, no.

7            Q.    You understood there were

8    corrosion controls in place during that time

9    frame, correct?

10           A.    I understood -- I was going to say

11   I understood Detroit was adding phosphate as a

12   corrosion inhibiter.

13           Q.    Orthophosphate specifically,

14   correct?

15           A.    Correct.  Yes.

16           Q.    And in the fall of 2015 and after

17   the crisis, you know, came to ahead, did the

18   city again make a switch in its water supply?

19           A.    Yes, it.

20           Q.    And what was the switch that was

21   made then?

22           A.    Back to DWSD and Lake Huron water.

23           Q.    And following the switch back

24   after the fall of 2015, were corrosion controls
```

Highly Confidential - Michael B. Glasgow

1    used again?

2         A.    Yes.

3         Q.    And following the switch back, did

4    the lead problems that you had in the

5    distribution system get better?

6              MR. CAMPBELL:  Objection;

7         foundation.

8         A.    I will say I believe they slowly

9    got better.  It wasn't flip the switch and

10   automatically back to normal.

11        Q.    Right.  Sure.  It certainly

12   stopped getting worse, right?

13        A.    Correct.  Yes.

14             MS. SMITH:  I'm sorry.  Could you

15        speak up?

16             THE WITNESS:  Absolutely.

17        Q.    Yesterday you were asked whether

18   the city had corrosion controls in place between

19   April of 2014 and the fall of 2015.  And it was

20   suggested that what you had in place amounted to

21   zip-a-dee-doo-dah with respect to corrosion

22   control.

23             Do you recall that?

24             MR. MARKER:  I'll object to the

Highly Confidential - Michael B. Glasgow

```
 1          form.

 2                  MR. CAMPBELL:  Object to the form.

 3          A.    I do, yes.

 4          Q.    And, you know, I don't think

 5   zip-a-dee-doo-dah is a technical term.  So just

 6   so it's clear, you had no corrosion control in

 7   place between April 2014 and the fall of 2015,

 8   correct?

 9                  MR. KIM:  Objection to form.

10          A.    Correct.  We were not adding any

11   additional chemicals to account for corrosion.

12          Q.    And you weren't monitoring

13   corrosion on a day-to-day basis?

14          A.    No.

15          Q.    Yesterday you testified it was

16   your belief that the city was supposed to

17   conduct an optimal corrosion control evaluation

18   before making the stitch to the Flint River.

19                  Do you recall that?

20                  MR. MARKER:  I'll object to the

21          form.

22          A.    I recall discussing that.  I don't

23   know -- I don't recall in regards to prior to

24   the switch.
```

1        Q.    Well, at some point, you went to

2    Mr. Prysby and Mr. Busch, right --

3        A.    Correct.

4        Q.    -- before the switch?

5              When you went to them, it was your

6    belief that you should do some kind of corrosion

7    control evaluation before making the switch,

8    right?

9              MR. KUHL:  Objection to form.

10             Misstates his testimony.

11       A.    I was under the assumption we

12   would add orthophosphate, because I inquired

13   about our testing frequency of that chemical.

14       Q.    And at that point, had you heard

15   of something called an optimal corrosion control

16   treatment evaluation or OCCTE?

17       A.    I'll say I heard of it, but I

18   wasn't too familiar with it.

19       Q.    You're not an engineer, right?

20       A.    Correct.

21       Q.    You have an undergraduate degree

22   in chemistry?

23       A.    Chemistry and biology, yes.

24       Q.    But you're not -- you're not an

```
 1    engineer?

 2         A.    Correct.

 3         Q.    The city had engineers working

 4    with it with respect to its water treatment

 5    plant, right?

 6         A.    Correct.  Yes.

 7         Q.    LAN was under a long-term contract

 8    to provide engineering services to the city,

 9    right?

10               MR. GAMBLE:  Objection; form,

11          foundation.

12         A.    Correct.

13         Q.    And you understood the folks who

14    were working with you at LAN were engineers,

15    right?

16         A.    Correct.  Yes.

17         Q.    And you expected the engineers who

18    were advising you to have expertise in their

19    field, right?

20               MR. GAMBLE:  Objection; form,

21          foundation.

22         A.    Correct, I did.

23         Q.    And you relied on these experts in

24    making decisions, right?
```

Highly Confidential - Michael B. Glasgow

```
 1              MR. GAMBLE:  Objection; form.

 2         A.    I did rely on their expertise,

 3    yes.

 4         Q.    Now, from your testimony

 5    yesterday, I understand that Mr. Prysby and

 6    Mr. Busch from the state told you that you

 7    didn't need to do anything further with respect

 8    to corrosion control before making the switch;

 9    is that right?

10         A.    That is correct, yes.

11         Q.    Did anyone from LAN speak up and

12    say, "That's not right"?

13              MR. GAMBLE:  Objection to form.

14         A.    Not that I recall, no.

15         Q.    Did anyone from LAN write a memo

16    and say, "That's just not consistent with the

17    Safe Drinking Water Act.  You actually do need

18    to evaluate corrosion control before making the

19    switch, and if you don't, you'll be putting the

20    health of the people of Flint at risk"?

21              MR. GAMBLE:  Objection; form,

22         foundation.

23         A.    No.

24         Q.    Did anyone from LAN in that time
```

1    before you made the switch speak up in any way

2    about the potential problems that could result

3    from not addressing corrosion control before

4    making the switch?

5              MR. GAMBLE:  Objection to form,

6         foundation.

7         A.    Not that I recall, no.

8         Q.    Moving forward into the February,

9    March 2015 period, you understood that Veolia

10   was doing engineering work for the city, right?

11        A.    Correct.  Yes.

12        Q.    And you understood the folks from

13   Veolia who were working with the city were

14   engineers as well, right?

15        A.    Correct.  Yes.

16        Q.    There were a couple of these folks

17   from Veolia who were working in your lab; is

18   that right?

19        A.    Yes.

20        Q.    And yesterday you testified you

21   saw these folks there.  Do the names Marvin,

22   Depin -- do those ring a bell?

23        A.    The Marvin rings a bell, but I --

24   you know, and the only way that was stimulated

Highly Confidential - Michael B. Glasgow

1    was through some earlier exhibits.

2         Q.    Okay.  And I'm going to show you

3    some other documents in a bit that might refresh

4    your recollection as to any conversations you

5    had with Marvin or Mr. Gnagy, okay?

6              But you don't recall Mr. Gnagy

7    speaking up and saying, "Look, the fact that you

8    didn't do anything about corrosion control

9    before making that switch is a problem," do you?

10        A.    No, I do not.

11        Q.    You didn't get any document from

12   Veolia that said, "The fact you didn't address

13   corrosion control before making the switch is a

14   problem," did you?

15        A.    No, I did not.

16        Q.    Did you ever receive any sort of

17   letter, memo, presentation, or e-mail from

18   anyone at LAN or Veolia that said that the

19   absence of corrosion control was a threat to

20   human health in the city of Flint?

21        A.    No, I did not.

22        Q.    Did you ever receive a letter,

23   memo, presentation, or e-mail from anyone at LAN

24   or Veolia saying that the absence of corrosion

Highly Confidential - Michael B. Glasgow

1    control could cause many millions of dollars in

2    damage to pipes throughout the city of Flint?

3         A.    No, I did not.

4               MR. GAMBLE:  Objection to form.

5         Q.    If someone from LAN or Veolia had

6    spoken up to you and said, "The fact that you

7    haven't addressed corrosion control poses a

8    threat to human health," what do you think you

9    would have done?

10              MR. CAMPBELL:  Object to the form.

11              MR. GAMBLE:  Foundation.

12              MR. MARKER:  I'll join.

13        A.    I would have -- using them as kind

14   of experts above my own abilities, I would take

15   it into account.  I would question it and ask

16   further about it.

17        Q.    These are experts that the city

18   had brought in to help deal with these problems,

19   right?

20        A.    Correct.

21        Q.    You understood that Veolia was a

22   global firm who had brought supposedly their

23   worldwide water experts in to help you, right?

24        A.    Correct.  Yes.

Highly Confidential - Michael B. Glasgow

1          Q.    And you understood that LAN was an

2    engineering firm that had been working with the

3    city for decades and supposedly had engineering

4    expertise to help you, right?

5                MR. GAMBLE:  Objection; form.

6          A.    Correct.  Yes.

7          Q.    So you expected these people to

8    speak up about problems, right?

9          A.    Yes.  And guide our actions, yes.

10         Q.    And that's what an engineer does,

11   isn't it?

12               MR. MARKER:  Objection to form.

13         A.    Yes.  Many times, yes.

14         Q.    During the course of your work

15   with LAN, did they ever make suggestions that

16   you said, "Hey, that's a good idea.  We'll make

17   that switch"?

18         A.    I don't recall.

19         Q.    Well, and just think about the

20   whole design process for the plant --

21         A.    Yeah.

22         Q.    -- when you're making the switch.

23   They were heavily involved in that whole

24   process, correct?

Highly Confidential - Michael B. Glasgow

1          A.    Yeah, when you think about

2     upgrades to equipment and electrical supplies

3     and -- yeah, I hate to say I didn't -- I didn't

4     question their suggestions on that.  We just

5     went through with it.

6          Q.    Right.  Was there ever a

7     suggestion that LAN made where you said, "Nah.

8     That's crazy.  I'm not going to do it"?

9          A.    No, I can't say that there was.

10         Q.    Do you think it would be

11    appropriate for you to second-guess the

12    engineering advice provided by one of your

13    expert engineers?

14         A.    Not particularly, no.

15         Q.    I mean, if you disagreed with it,

16    you'd raise the issue with your boss, wouldn't

17    you?

18         A.    Usually, yes.  Yep.

19         Q.    Now, yesterday you were asked by

20    counsel for Veolia about criminal charges that

21    had been brought against you.  I just want to

22    clear that record up a bit.

23              Counsel said you were charged with

24    a felony.  Do you recall that?

Highly Confidential - Michael B. Glasgow

```
 1          A.    Yes.

 2          Q.    You weren't convicted of a felony,

 3   right?

 4          A.    No.

 5          Q.    And you ultimately plead no

 6   contest to a misdemeanor; is that right?

 7               MR. KIM:  Objection as to form.

 8               MR. MARKER:  Objection; form,

 9          foundation.

10          A.    I pled no contest, but the plea

11   was taken under advisement, so the plea was

12   never entered.

13          Q.    Okay.  And you're still able to

14   work as a water treatment plant operator, right?

15          A.    Correct.  Yes.

16          Q.    And you cooperated in the

17   investigations that were brought by the various

18   government officials, right?

19          A.    Oh, absolutely.  Yes.

20          Q.    And you've provided truthful

21   testimony throughout those investigations,

22   right?

23          A.    Yes, I have.  Yep.

24          Q.    Has anyone ever claimed that your
```

Highly Confidential - Michael B. Glasgow

```
1    testimony was untruthful?

2           A.    Not to my knowledge, no.

3           Q.    Has anyone ever accused you of

4    failing to answer any question that anyone from

5    LAN asked you?

6           A.    No.

7           Q.    Has anyone ever accused you of

8    failing to answer any question that anyone from

9    Veolia asked you?

10          A.    No.

11          Q.    Can you think of any time that

12   anyone from LAN asked you a question where you

13   didn't answer it fully and truthfully?

14          A.    No, not to my knowledge.

15          Q.    And same for Veolia.  During the

16   time that the folks for Veolia were working

17   there, Mr. Gnagy and Mr. Chen, did you ever have

18   a time where they asked you questions and you

19   said, "I'm not going to answer that"?

20                MR. CAMPBELL:  Object to the form.

21          A.    No.

22          Q.    Did you ever have a time where

23   they asked you a question and you gave them

24   false information?
```

Highly Confidential - Michael B. Glasgow

```
1              MR. CAMPBELL:  Object to the form.

2         A.   No.

3         Q.   Anytime you were asked a question

4    by an engineer, you gave them full and truthful

5    answers?

6         A.   Absolutely, yes.

7         Q.   Yesterday you were asked some

8    questions about water quality and water safety.

9              Do you recall that?

10        A.   Yes.

11                   - - -

12       (Glasgow Deposition Exhibit 70 marked.)

13                   - - -

14   BY MR. MORRISSEY:

15        Q.   And I think it was counsel for LAN

16   was trying to draw some distinction between the

17   two concepts.  I did a little drawing that I'm

18   going to hand you.  It's marked as Exhibit 70.

19              MR. MORRISSEY:  I don't have a

20         copy.  I'm sorry.  But it's just two

21         circles.  I'll have copies of everything

22         else.

23   BY MR. MORRISSEY:

24        Q.   It's a simple Venn diagram.  And
```

Highly Confidential - Michael B. Glasgow

 1    I'll do this from memory.  It's a larger circle

 2    that says "Water Quality," right?

 3         A.    Correct.  Yeah.

 4         Q.    And then inside it is a smaller

 5    circle that says "Water Safety."

 6               Do you see that?

 7         A.    Yes.

 8         Q.    Would you agree that water safety

 9    is a subset of the things you're concerned about

10    when you talk about water quality?

11               MR. KIM:  Objection to form.

12         A.    Yes, I would.

13         Q.    I mean, it's impossible to have

14    quality water that is not safe, correct?

15               MR. KIM:  Objection as to form.

16         A.    I would agree with that statement,

17    yes.

18         Q.    I mean, if the water is going to

19    poison people with lead, it is by definition not

20    quality water, right?

21               MR. MARKER:  Objection; form.

22         A.    Yes.

23         Q.    If the water is going to poison

24    people with Legionella, it is by definition not

Highly Confidential - Michael B. Glasgow

```
1    quality water, right?

2              MR. MARKER:  Objection; form.

3         A.   I would agree, yes.

4         Q.   If the water is going to degrade

5    people's pipes such that they sustain millions

6    of dollars in damage, you'd agree it's not

7    quality water, right?

8              MR. MARKER:  Form.

9              MR. KIM:  Objection as to form.

10        A.   I would agree.

11        Q.   Is it your understanding that

12   engineers have a duty to speak up about issues

13   that pose a threat to human health?

14             MR. GAMBLE:  Objection to form.

15             MR. CAMPBELL:  Objection to form.

16        A.   I would say yes.

17        Q.   What is that understanding based

18   on?

19        A.   I believe they have their own code

20   of ethics, which I would hope everybody goes by,

21   including myself.  But, yes, similar to a

22   doctor's code of ethics, I think the engineers

23   have something along the same lines.

24        Q.   And you have decades of experience
```

Highly Confidential - Michael B. Glasgow

```
 1    working directly with engineers, right?

 2         A.    Correct.  Yes.

 3         Q.    So it's based on your experience

 4    you know that engineers speak up about things

 5    when there's an issue that poses a threat to

 6    human health, right?

 7                MR. GAMBLE:  Objection; form.

 8         A.    Yes.

 9         Q.    What was previously marked as

10    Exhibit -- Kurtz Exhibit 7, which came up

11    yesterday, you should have it in the set there.

12                MR. MARKER:  Actually, I don't.

13                Because it's in the big binder that he's

14                got.

15                MR. MORRISSEY:  The binder you

16                gave the witness yesterday, you're not

17                going to let him keep it?

18                MR. GAMBLE:  No.  I took it back.

19                I don't have it with me right now.

20                MR. MORRISSEY:  For the record, if

21                you hand the witnesses a set of

22                documents, leave it with the witness.

23                Do you have it somewhere?

24                MR. GAMBLE:  I can get it on a
```

Highly Confidential - Michael B. Glasgow

 1          break.

 2   BY MR. MORRISSEY:

 3          Q.    All right.  It won't come up again

 4   for a bit.  I'll hand you my copy.

 5                This is a set of meeting notes

 6   from a May 22, 2013 meeting.

 7                Do you see that?

 8          A.    Yes.

 9          Q.    And was that a meeting you were at

10   with the folks from LAN?

11          A.    I believe so, yes.

12          Q.    Can you read the paragraph I

13   highlighted?

14          A.    Okay.  It says, "Brent believes

15   LAN has the most knowledge of the Flint water

16   treatment plant and is most qualified to design

17   improvements to, number one, prepare the plant

18   for full-time interim operation using the Flint

19   River, and, number two, prepare the plant for

20   full-time permanent operation using Lake Huron

21   supply from KWA."

22          Q.    And who's Brent there?

23          A.    That's Brent Wright, the water

24   plant supervisor.

Highly Confidential - Michael B. Glasgow

```
 1            Q.    Got it.  And "prepare the plant

 2    for full-time operations," did that include

 3    being able to supply quality water to the people

 4    of Flint?

 5                  MR. CAMPBELL:  Objection to form,

 6            foundation.

 7            A.    I would believe so, yes.

 8            Q.    You would agree that the plant was

 9    not ready for full-time operation until it was

10    ready to distribute quality water to the people

11    in the city, right?

12            A.    Yeah.  I can agree with that, yes.

13            Q.    I mean, it's a drinking water

14    distribution plant, right?

15            A.    Correct.  Yep.

16            Q.    You can hand that copy back to me.

17                  MR. MORRISSEY:  I brought a few

18            extra copies of some exhibits I'm going

19            to mark, if you want them.

20                  MR. CAMPBELL:  You carried these

21            all that way?

22                  MR. MORRISSEY:  FedEx.

23                          - - -

24        (Glasgow Deposition Exhibit 71 marked.)
```

Highly Confidential - Michael B. Glasgow

```
 1                    - - -

 2   BY MR. MORRISSEY:

 3        Q.   Mr. Glasgow, Exhibit 71 is a copy

 4   of the city's contract with LAN from June 2013.

 5             MR. GAMBLE:  Objection to form.

 6        Q.   Do you know if you've seen this

 7   document before?

 8             MR. GAMBLE:  Objection to form.

 9        A.   I most likely have seen it.

10        Q.   All right.  I'm going to walk you

11   through a few provisions in it.  It's a cover

12   letter with an attached contract and various

13   attachments.

14             First, on the cover letter page,

15   dated June 10, 2013, in the second sentence, it

16   says, "LAN's staff has the knowledge, expertise,

17   and the technical professionals to handle all

18   aspects of the project."

19             Do you see that?

20        A.   Yes, I do.

21        Q.   And then you see on the third

22   page, there's a list of staff names for LAN and

23   Rowe on the page Bates-stamped

24   LAN_FLINT_001851411.
```

Highly Confidential - Michael B. Glasgow

1          Do you see that?

2     A.    Yes, I do see that.

3     Q.    And these folks, Mr. Green,

4 Mr. Matta and Mr. Hansen, in particular, those

5 are people that you'd worked with for a long

6 time, right?

7     A.    Yes.

8     Q.    And this indicates that Mr. Green

9 had been working with the Flint water

10 distribution system for even longer than you

11 had, hadn't he?

12    A.    Yes, that is correct.

13    Q.    Back to 1997, right?

14    A.    Correct.

15    Q.    And that's also true of Mr. Matta

16 and Mr. Hansen, right?

17    A.    Yes.  To the best of my knowledge,

18 yes.

19    Q.    And you understood that these

20 people, unlike you, were all engineers, right?

21    A.    Correct.

22    Q.    If you turn to the page that

23 begins -- there's a heading -- it's the next

24 page -- "City of Flint, Michigan" at the top,

1    page 185412 under the heading "Phase II

2    Rehabilitation and Improvements to the Flint

3    Water Plant."

4              Do you see that?

5      A.    Yes, I do.

6      Q.    And the first sentence there, it

7    says, "The purpose of this agreement is to enter

8    into a contract pertaining to rehabilitation of

9    and improvements to the Flint water plant to

10   provide water supply continuous service."

11             Do you see that?

12     A.    Yes.

13     Q.    What do you understand "water

14   supply continuous service" to mean?

15             MR. GAMBLE:  Objection; form.

16     A.    I understand that to be our

17   full-time operation of the plant.

18     Q.    And this was drinking water,

19   right?

20     A.    Correct.

21     Q.    And so to provide continuous

22   service, you needed to provide safe, quality

23   drinking water, right?

24             MR. GAMBLE:  Object to form.

Highly Confidential - Michael B. Glasgow

```
 1            A.    Yeah.  That would be the point,

 2   yes.

 3            Q.    If you turn to page 2 of this

 4   document.  It's the next page.  Under

 5   "Compensation," it says, "The city shall pay for

 6   such scope of services as have been set forth

 7   herein, a contract price not to exceed

 8   $2,534,640."

 9                  Do you see that?

10            A.    Yes, I do.

11            Q.    You understood that LAN was being

12   paid millions of dollars for their work?

13                  MR. GAMBLE:  Objection; form,

14            foundation.

15            A.    Yes, I did.

16            Q.    Page 6, "Scope of Services,"

17   there's a description of the scope of services

18   that LAN was agreeing to that goes on from page

19   6 to page 9.

20                  Do you see that?

21            A.    Yes, I do.

22            Q.    And there are a number of items

23   listed here, but over the period from the summer

24   of 2013 through when the switch was flipped and
```

1    you started using Flint River water, were you

2    working pretty regularly with folks from LAN on

3    that project?

4           A.    I would say yes.  I remember

5    Mr. Green, Mr. Matta, and Mr. Hansen being

6    around quite a bit.

7           Q.    And were people from LAN involved

8    heavily in that project?

9                 MR. GAMBLE:  Objection; form.

10          A.    I would say yes.

11          Q.    And folks from LAN, they didn't

12   stop working with you after the switch was

13   flipped, did they?  Strike that.

14                They didn't stop working with you

15   after you made the switch, did they?

16          A.    No.  They were under contract to

17   help with implementation for KWA.

18          Q.    Right.  They kept working with you

19   all through the end of 2014 and all through

20   2015, right?

21          A.    That sounds right, yes.

22          Q.    And it was actually LAN who you

23   hired to implement the corrosion controls that

24   you did starting at the end of 2015, right?

 1                 MR. GAMBLE:  Objection; form.

 2         A.    That is correct.

 3         Q.    So these experts from LAN knew how

 4   to do what you needed to do to address corrosion

 5   control, right?

 6         A.    Yes.

 7         Q.    And you don't have any reason to

 8   believe that they didn't know in 2014 what they

 9   knew in 2015 about corrosion control, do you?

10                 MR. GAMBLE:  Objection; form.

11         A.    I don't believe so, no.

12         Q.    "Standard of Performance," page

13   10, it says "Engineer agrees to exercise

14   independent judgment and to perform its duties

15   under this contract in accordance with sound

16   professional practices."

17                 Do you see that?

18         A.    I do, yes.

19         Q.    And was -- it was your

20   understanding that LAN -- they were acting as

21   engineers, right?

22         A.    Correct.  Yes.

23         Q.    And you expected them to perform

24   their duties in a manner consistent with their

Highly Confidential - Michael B. Glasgow

1   professional obligations, didn't you?

2        A.    Yes, I did.

3        Q.    Oh, I forgot one thing there.  If

4   you turn to page LAN_FLINT_00185456 under

5   "Lockwood, Andrews & Newnam Inc. (LAN)."

6              Do you see that?

7        A.    Yes.

8        Q.    Now, you understood LAN was an

9   abbreviation for some longer name?

10       A.    Yes, I did.

11       Q.    And it reads, "LAN is a national

12  engineering firm offering planning, engineering,

13  and program management services.  LAN is

14  consistently rated in the top 100 A/E firms by

15  Engineering News-Record magazine.

16             "As a subsidiary of Leo A. Daly,

17  one of the largest planning, architecture,

18  engineering, and interior design firms in the

19  United States, LAN has access to the expertise

20  of more than 1,100 professionals in 25 offices

21  in 21 cities worldwide."

22             Do you see that?

23       A.    Yes, I do.

24       Q.    Now, that name Leo A. Daly, you

```
 1    saw that on places like LAN's sign and LAN's

 2    letterhead and various other places where you

 3    saw the name LAN, didn't you?

 4              MR. GAMBLE:  Objection; form,

 5          foundation.

 6          A.    I don't recall, I guess.

 7          Q.    All right.  Did the name Leo A.

 8    Daly ever stand out to you?

 9          A.    It does not.

10          Q.    Okay.  But you see here that LAN

11    presented itself as being a part of Leo A. Daly

12    and having access to 1,100 professionals, right?

13              MR. GAMBLE:  Objection to form.

14          A.    Correct.  Yes.

15                    - - -

16      (Glasgow Deposition Exhibit 73 marked.)

17                    - - -

18    BY MR. MORRISSEY:

19          Q.    What I've marked as Exhibit 73 is

20    an expense report from LAN and Leo A. Daly's

21    files.  If you see the names on that, it's from

22    Jeff Hansen at Leo A. Daly to Warren Green at

23    Leo A. Daly.

24              Do you see that?
```

Highly Confidential - Michael B. Glasgow

1      A.    Yes.

2      Q.    And Mr. Hansen and Mr. Green were

3   folks you worked with, right?

4      A.    Correct.  Yes.

5      Q.    And then under -- on the next page

6   on "Detailed Expense Report" to Leo A. Daly/LAN,

7   on June 26, 2013, there's indication that you

8   had lunch with some folks from LAN and

9   Leo A. Daly on that day, right?

10      A.    Yes.

11      Q.    And that was a day that you had

12   this in-person meeting that came up yesterday,

13   June 26th, 2013?

14      A.    Correct.  Yep.  It appears to be.

15      Q.    Did you know that folks at

16   Leo A. Daly in Omaha were approving the expenses

17   for your lunch?

18          MR. GAMBLE:  Objection; form,

19          foundation.

20      A.    No, I did not understand that.

21      Q.    Did you ever know that LAN was

22   actually run out of Leo A. Daly in Omaha?

23          MR. GAMBLE:  Objection; form

24          foundation.

Highly Confidential - Michael B. Glasgow

```
 1          A.    I did not.

 2          Q.    Did you know that they co-mingled

 3   their accounts and they used the same financial

 4   structure, and that people were paid on

 5   Leo A. Daly paychecks?

 6               MR. GAMBLE:  Objection; form

 7          foundation.

 8          A.    I did not.

 9                    - - -

10   (Glasgow Deposition Exhibit 74 marked.)

11                    - - -

12   BY MR. MORRISSEY:

13          Q.    What I've marked as 74,

14   Mr. Glasgow, is a June -- I'm sorry --

15   February 10, 2014 e-mail.  This is from Jeremy

16   Nakashima at Leo A. Daly to Eric Frechette at

17   Leo A. Daly with copies to Warren Green,

18   Sam Lepore.

19               Do you see that?

20          A.    I do, yes.

21          Q.    Now, we talked about Mr. Green.

22   Do you know these other folks?  It says, "Flint

23   WTP - CP design" as the subject.  Do you know

24   these other folks?  Mr. Nakashima?
```

Highly Confidential - Michael B. Glasgow

```
 1          A.    After reading Jeremy Nakashima, I

 2    do remember a couple instances where him and I

 3    were in the same room, or he was in the water

 4    plant.

 5          Q.    And on Mr. Nakashima's signature

 6    line, it says he's a senior project manager with

 7    LAN, Lockwood, Andrews & Newnam, Inc., a Leo A.

 8    Daly Company, right?

 9          A.    Correct.  Yes.

10          Q.    And the document -- this is from

11    June -- February 14.  This is -- what -- you

12    switched end of April 2014?

13          A.    Correct.  Yes.

14          Q.    And these are miscellaneous

15    corrosion control plans from that time; is that

16    right?

17                MR. GAMBLE:  Object to form.

18          A.    That's what it says under

19    attachments, "Miscellaneous Corrosion Control

20    Components."

21          Q.    Did you understand that the folks

22    from LAN and Leo A. Daly were considering

23    corrosion control in this time frame?

24                MR. GAMBLE:  Objection; form,
```

Highly Confidential - Michael B. Glasgow

1              foundation.

2              A.    I did not.

3              Q.    Do you know why they would have

4    been doing that?

5                    MR. GAMBLE:  Objection; form,

6              foundation.

7              A.    I do not.

8              Q.    Were you always -- and they were

9    doing all kinds of things relating to the switch

10   to the new treatment plant, right?

11             A.    Correct.  Yes.

12                   MR. GAMBLE:  Object to form.

13             Q.    Did you know everything they were

14   doing?

15             A.    No.

16             Q.    So they did all kinds of work

17   relating to the engineering of the new treatment

18   plant that you weren't necessarily kept abreast

19   of on a day-to-day basis, right?

20                   MR. GAMBLE:  Object to form.

21             A.    That's correct.  Yes.

22             Q.    But for whatever they were doing

23   on corrosion control, did they ever tell you

24   about it?

Highly Confidential - Michael B. Glasgow

1        A.     No, not that I recall.

2        Q.     Now, there wasn't anything that

3    would have stopped anyone from LAN from speaking

4    up and saying, "You, city of Flint, really need

5    to do more about corrosion control," was there?

6               MR. GAMBLE:  Objection to form.

7        A.     Not to my knowledge, no.

8        Q.     I mean, at any time if someone at

9    LAN had identified an issue, they could have

10   spoken up and said, "You really need to have

11   corrosion control in place before you make the

12   switch," right?

13              MR. GAMBLE:  Objection to form.

14       A.     Yes.

15       Q.     And that's also the case once

16   problems started coming up, once it became clear

17   there was discolored water, once people started

18   getting sick, anyone from LAN could have at any

19   time spoken up and said, "Look, the fact you

20   didn't deal with corrosion control before is a

21   problem," right?

22              MR. GAMBLE:  Objection to form.

23       A.     Yes.

24       Q.     But the fact is the engineering

Highly Confidential - Michael B. Glasgow

 1    firm that you were paying millions of dollars

 2    didn't say anything about corrosion control

 3    until September 2015 when they asked to be paid

 4    more to do more work on corrosion control,

 5    right?

 6              MR. CAMPBELL:  Objection; form and

 7         foundation.

 8         A.    That is correct.

 9                   - - -

10    (Glasgow Deposition Exhibit 75 marked.)

11                   - - -

12    BY MR. MORRISSEY:

13         Q.    Exhibit 75 is an e-mail exchange

14    between Jeff Hansen at Leo A. Daly and Steve

15    Luoma at Leo A. Daly.

16              Do you see that?

17         A.    Yes.

18         Q.    And this is dated March 12, 2014,

19    right?

20         A.    Correct.

21         Q.    And that's, what, six week before

22    you made the switch?

23         A.    Roughly, yeah.

24         Q.    And do you know who Mr. Luoma is?

Highly Confidential - Michael B. Glasgow

```
 1           A.    I do not know who Mr. Luoma is.

 2           Q.    Mr. Hansen writes to Mr. Luoma,

 3    "Steve, one item we still need to look into is

 4    what they want for corrosion control.  I don't

 5    remember exactly what they told us in meetings."

 6                 Do you see that?

 7           A.    Yes.

 8           Q.    Were you aware that LAN was having

 9    internal communications about what you needed to

10    do about corrosion control?

11                 MR. GAMBLE:  Objection; form.

12           A.    I was not aware, no.

13           Q.    Did Mr. Hansen or anyone else come

14    to you in this March 2014 period and say, "We

15    still need to think about what you're going to

16    do about corrosion control"?

17           A.    Not that I recall, no.

18           Q.    And he certainly didn't come to

19    you and say anything like, "Look, Mr. Glasgow,

20    if you don't do anything about corrosion

21    control, there's going to be a big problem," did

22    he?

23           A.    No.

24                 MR. GAMBLE:  Objection; form.
```

Highly Confidential - Michael B. Glasgow

```
 1            Q.    And he certainly didn't say

 2    anything like, "If you don't address corrosion

 3    control, there could be a human health problem

 4    in the city of Flint"?

 5                  MR. GAMBLE:  Object to the form.

 6            A.    No, not that I recall.

 7            Q.    The next exhibit I'm going to get

 8    to is Exhibit 27, which was also brought up

 9    yesterday.  I don't know if you have that.

10                  MR. MORRISSEY:  Or is that in the

11            binder you all took away, too?

12                  MR. GAMBLE:  Objection to the

13            sidebar.

14                  MR. MORRISSEY:  Well, why don't we

15            take a break then, because we've been

16            going a while, and I'm going to spend

17            some time on this exhibit.

18                  THE VIDEOGRAPHER:  We're going off

19            the record at 2:21 p.m.

20                  (Recess taken.)

21                  THE VIDEOGRAPHER:  We are back on

22            the record at 2:23 p.m.

23    BY MR. MORRISSEY:

24            Q.    Mr. Glasgow, we've located Exhibit
```

1   27, so we're going to proceed with it.  This was

2   the Detroit comparisons document that came up

3   yesterday.  I have some questions for you about

4   this.

5              First, the attached Excel file,

6   you understand that it's a printout from an

7   Excel file that you made, right?

8         A.   Correct.  Yes.

9         Q.   And that Excel file was comparing

10  characteristics of Flint River water with

11  Detroit water, right?

12        A.   Correct.  Yes.

13        Q.   And were those figures after

14  treatment or before?

15        A.   Yes.  They are finished water as

16  we would call it, so after treatment.

17        Q.   And this kind of comparison -- is

18  this the only time you did a comparison of the

19  chemical characteristics of the water as between

20  the two sources?

21        A.   To the best of my knowledge, yes,

22  it is the only time.

23        Q.   Did you periodically track the

24  chemical characteristics of Flint water once you

1    made the switch?

2         A.    Yes.

3         Q.    You had these monthly operating

4    reports that came up earlier.

5              Do you recall that?

6         A.    I do, yeah.

7         Q.    Now, those reports don't have a

8    field for total sulfates, do they?

9         A.    No, they do not.

10        Q.    Do you know why?

11        A.    No, I do not.

12        Q.    Is that a form that you created,

13   or did someone from the district create it?

14        A.    It's not a form I created.  The

15   monthly operational reports are developed by the

16   MDEQ or were at that time.

17        Q.    Okay.  Now, this comparison -- to

18   get these figures, what did you need to do?

19        A.    Well, number one, the figures from

20   Detroit treated water was based off records they

21   would send to me periodically.  As for the

22   finished Flint water out of the Flint River --

23        Q.    Well, let me pause you for a

24   second.

Highly Confidential - Michael B. Glasgow

```
 1                    So the Detroit water, you

 2      didn't -- you didn't take a sample of the

 3      Detroit water yourself?

 4             A.    No.  We would.  Prior to the

 5      switch, we would send in monthly operational

 6      reports ourselves.  So we would test the water

 7      that Detroit sent to us.  So some of that data

 8      was from there.  But what we were required to

 9      put on our monthly operational reports for

10      Detroit water prior to the switch was a little

11      less than what I had in my comparison.

12             Q.    Okay.

13             A.    So periodically Detroit would send

14      a one-page summary of other testing results that

15      they had.

16             Q.    So for this comparison that you

17      made -- and did you make this right around this

18      time, April 15, 2014?

19             A.    Yes, I believe so.

20             Q.    So that's about 11 days before the

21      switch; is that right?

22             A.    Roughly, yes.

23             Q.    And that's in a time frame where

24      if anyone sort of rung alarm bells, you could
```

Highly Confidential - Michael B. Glasgow

```
 1   have stopped, right?

 2              MR. MARKER:  Objection to form.

 3         A.    I guess I'm going to ask you to

 4   ask that again.

 5         Q.    There was no physical limit on

 6   continuing to take water from Detroit, was

 7   there?

 8         A.    Not that I am -- that I am aware

 9   of.

10         Q.    If you had been told by anyone to

11   not make the switch on April 26, you could have

12   just continued taking water from Detroit, right?

13         A.    As far as I know, there was

14   discussions of Detroit canceling their contract

15   with us, but I -- I wasn't involved in any of

16   that.  I remember hearing that at one time,

17   though.

18         Q.    And no one from LAN came to you

19   and said, "You can't make the switch in a way

20   that's consistent with looking out for human

21   health, can you?"

22              MR. GAMBLE:  Objection; form.

23         A.    No, I don't recall.

24         Q.    All right.  Now, these
```

Highly Confidential - Michael B. Glasgow

1   calculations in the two columns, for the Detroit

2   column for this comparison, did you use some jar

3   or vial of Detroit water?

4          A.    No.  It would have been past data

5   that we had already acquired over the years.  So

6   I would imagine -- and trying to think back when

7   I did make this comparison, I would have tried

8   to dig up at least four or five years of data to

9   get kind of an average of everything.

10         Q.    Okay.  So in the cover e-mail --

11  this might help refresh your recollection.  In

12  the last sentence of your cover e-mail, you say,

13  "It took a couple days.  I went through the

14  eight years since I've been at the plant."

15             Do you see that?

16         A.    I do see that now, yes.

17         Q.    So did you look back at eight

18  years of monthly operating reports and calculate

19  average figures for Detroit?

20         A.    Yes.

21         Q.    All right.  Now, for the Flint

22  column, what did you do?

23         A.    The Flint column, I utilized data

24  that we had generated during our normal test

Highly Confidential - Michael B. Glasgow

1    runs prior to operation.  I had stipulated

2    before we would run on a quarterly basis usually

3    for seven days, five to seven days.  So I would

4    have went back through all the history I could

5    find of our test run data, compiled that out

6    together and took averages.

7         Q.    So that's an average of the

8    various test runs you had done beforehand?

9         A.    Yes.  To the best of my knowledge,

10   yes.

11        Q.    What equipment do you need to do

12   that analysis?

13        A.    Just the -- what analysis, I

14   guess, are you talking about?

15        Q.    To make these calculations of how

16   much barium, calcium, et cetera, are in Flint

17   River water, just walk me through the process.

18   What did you need to do?  You needed water,

19   right?

20        A.    Correct.

21        Q.    You needed to put it in some kind

22   of jar?

23        A.    Yep, jar or beaker, depending on

24   the test that we were performing.

Highly Confidential - Michael B. Glasgow

```
1           Q.    And then is there some kind of

2    chemistry kit that you use to run a test?

3           A.    Yes.  For each parameter, it would

4    be something different.

5           Q.    Was that something that you had in

6    your own lab?

7           A.    Yes.  The majority of these

8    parameters on the comparison, all except a

9    couple, we had the ability to test right in our

10   lab.

11          Q.    Which ones could you not test in

12   your lab?

13          A.    Oh, I don't believe we could test

14   barium, nitrate or nitrite, or sodium or

15   sulfate.

16          Q.    What did you need to do to get

17   results for those parameters?

18          A.    Usually I would send samples out

19   to a contract lab that could perform the

20   testing.

21          Q.    Is it hard to find one of those

22   contract labs?

23          A.    Not necessarily.  For years with

24   the city of Flint water plant, I utilized the
```

Highly Confidential - Michael B. Glasgow

```
 1   state MDEQ drinking water lab, because

 2   whatever -- it seemed like whatever my lab

 3   couldn't do, they were certified in and could do

 4   it.

 5           Q.    So the state has its own drinking

 6   water lab, right?

 7           A.    Correct.  Yes.

 8           Q.    And they're open every week?

 9           A.    Yes.

10           Q.    And you can ship them a sample of

11   water and ask them to test it for these

12   parameters?

13           A.    Correct.  Yes.

14           Q.    And how much do they charge you

15   for that?

16           A.    Oh, each parameter is a little

17   different.

18           Q.    Is it like millions of dollars or

19   like dollars?

20           A.    I'll say it's more dollars.

21           Q.    Okay.  And so for some fairly

22   modest amount of money, you can send a sample of

23   water to a state lab that's, what, in Lansing?

24           A.    It's in Lansing, yeah.
```

Highly Confidential - Michael B. Glasgow

1          Q.     So you could get it there

2    overnight?

3          A.     Usually, yes.

4          Q.     And this test can then be done

5    within five to seven days?  Is that what you

6    said?

7          A.     Usually, depending on the

8    parameter.  A lot of the parameters need to be

9    tested within a certain time frame, so the lab

10   dictates, you know, what fits their schedule.

11   But they look at when I sent it to make sure

12   they test it within the correct time frame.

13         Q.     And the ability to run this kind

14   of test for, say, the amount of sulfates in

15   drinking water isn't like rocket science, right?

16         A.     No, I would not say it's rocket

17   science.

18         Q.     This is something that labs all

19   over the country can do routinely for fairly

20   modest amounts of money fairly quickly, right?

21         A.     Yes, I would agree with that.

22         Q.     And it's something that as part of

23   your routine work, you were able to do fairly

24   quickly, right?

Highly Confidential - Michael B. Glasgow

1      A.    Correct.  Yes.

2      Q.    Within the budget that the city of

3   Flint had, right?

4      A.    Correct.  Yes.

5      Q.    Did anyone from LAN ever ask for

6   data like this?

7      A.    I don't recall if they asked, but

8   I know they had access to it at any time.

9      Q.    Right.  And if they'd asked you

10  for the data, would you have given it to them?

11     A.    Oh, absolutely, yes.

12     Q.    What about Veolia?  If they'd

13  asked you for this data, would you have given it

14  to them?

15     A.    Yes.

16     Q.    Now, Mr. Gnagy testified that he

17  asked you if you had the data needed to make a

18  chloride sulfate mass ratio calculation, and

19  that you told him you didn't have access to that

20  data; is that true?

21     A.    At that -- well, when I remember

22  Veolia being there, we were running full time,

23  and we weren't testing sulfate or sending it

24  out.  So I don't -- I believe that is true.  I

Highly Confidential - Michael B. Glasgow

1   don't believe I had that data -- some of that

2   data to give him.

3           Q.    You had water.  You had access to

4   a lab, right?

5           A.    Correct.  Yes.

6           Q.    And just as easily as you could,

7   Mr. Gnagy or anyone else from Veolia could have

8   either themselves or asked you to send it over

9   to Lansing overnight and get the results back in

10  a week, right?

11                MR. MARKER:  Object to the form.

12          A.    Yes.  Yeah.  In that scenario,

13  yes.

14          Q.    No one from Veolia ever asked you

15  to calculate a CSMR, did they?

16          A.    No.

17          Q.    No one from Veolia ever asked you

18  for the data needed to calculate a chloride

19  sulfate mass ratio, did they?

20          A.    Not that I recall.

21          Q.    It's not a difficult calculation,

22  is it?

23          A.    No.

24          Q.    It's chloride divided by sulfate,

1    right?

2           A.    Yep, plugging numbers into a

3    formula.

4           Q.    And we're talking sixth, maybe

5    seventh or eighth grade, math, right?

6           A.    I could agree with that.

7           Q.    No one from Veolia ever asked you

8    for your help gathering the data you would need

9    to conduct that kind of analysis; is that right?

10          A.    Not that I recall.

11          Q.    Same for LAN; is that right?

12          A.    Not that I recall.

13          Q.    And you recall yesterday counsel

14   for Veolia asked you about this CSMR, chloride

15   sulfate mass ratio, right?

16          A.    Yes.

17          Q.    You had heard of that term before

18   this time frame, right?

19          A.    I had, yes.

20          Q.    You understood that the CSMR is a

21   standard measure of corrosivity that has existed

22   since the 1970s, right?

23               MR. MARKER:  Objection; form,

24          foundation.

1        A.    I will just say I was aware of the

2   CSMR.

3        Q.    And you would expect your

4   engineering professionals who were supposed to

5   be the worldwide specialists in corrosivity, or

6   water anyway, to know which metric should be

7   used to assess corrosivity, wouldn't you?

8        A.    I would.

9        Q.    Are you aware that dating back to

10  at least the 2000s, if not decades beforehand,

11  it was well recognized that CSMR was the way to

12  measure corrosivity in distribution systems with

13  lead pipes, not the Langelier index?

14              MR. CAMPBELL:  Object to the form.

15              MR. MARKER:  I'll join.

16        A.    Yeah, I -- I was aware of the CSMR

17  terminology.  But to the full extent it was

18  used, I was not that familiar.

19        Q.    And just looking at the data that

20  you had -- you had this data, right?

21        A.    Correct.  Yes.

22        Q.    And no one from any of the

23  engineering firms ever asked you for it, right?

24        A.    No, not that I'm aware of.

Highly Confidential - Michael B. Glasgow

```
 1          Q.    They didn't ask you if you'd ever

 2   done some calculation of what the chlorides and

 3   sulfates were in your water, right?

 4          A.    Right.  No.

 5          Q.    And had you given this to them,

 6   they could have seen that Detroit had

 7   9 milligrams a liter of chlorides, whereas Flint

 8   River had 72, right?

 9          A.    Correct.  Yes.

10          Q.    And they could have seen that

11   Detroit had 22 milligrams a liter of sulfates,

12   whereas Flint River had 20, right?

13          A.    Correct.

14          Q.    Now, you understand that's a

15   significant variance in the CSMR, right?

16                MR. CAMPBELL:  Object to the form.

17          A.    Yes.

18          Q.    It goes from less than 0.5 for

19   Detroit to more than 3.6 for Flint, correct?

20          A.    Correct.

21          Q.    And that's a calculation you can

22   do in your head just looking at this table,

23   right?

24          A.    Correct.
```

1      Q.    In the notation next to chlorides,

2  you wrote, "We use a chloride chemical in

3  treatment which increases end level."

4            Do you see that?

5      A.    Yes.

6      Q.    The chloride chemical you're

7  referring to there is ferric chloride, right?

8      A.    Correct.

9      Q.    And as we saw in the summary of

10  monthly operating reports, you increased your

11  ferric dosages as a result of the advice given

12  by LAN and Veolia, correct?

13            MR. GAMBLE:  Object to form and

14        foundation.

15            MR. CAMPBELL:  Object to form.

16      A.    I will say yes.

17      Q.    And the impact of increasing

18  ferric dosages was to further increase the ratio

19  of chlorides to sulfates, right?

20      A.    Yes.

21      Q.    Were you aware that in 2010 -- you

22  remember Mr. Edwards coming up yesterday?

23      A.    Yes, I do.

24      Q.    Professor Edwards.  Do you

Highly Confidential - Michael B. Glasgow

1    remember Professor Edwards coming up yesterday?

2           A.    I do.

3           Q.    You know who Professor Edwards is,

4    right?

5           A.    Yes, I do.

6           Q.    He's a professor at Virginia

7    Technical University, one of the world's leading

8    experts in water quality?

9           A.    Yes.

10          Q.    Someone that even experts rely on

11   for expertise, right?

12          A.    Correct.  Yes.

13          Q.    Now, Professor Edwards -- were you

14   aware that in 2010, he had published a paper

15   that was reported in the Journal of the American

16   Water Works Association?

17               I'm going to break that down a

18   bit.  Do you know what the American Water Works

19   Association is?

20          A.    I do, yes.

21          Q.    What is it?

22          A.    A conglomeration of a group of

23   individuals that work in the water treatment

24   field.

Highly Confidential - Michael B. Glasgow

1      Q.    Are you a member?

2      A.    I am, yes.

3      Q.    Do you get the journal?

4      A.    I do.

5      Q.    All right.  So were you aware that

6   Professor Edwards' team had reported as of 2010,

7   that increasing the CSMR by anything in a range

8   of 0.1 to 1.0 over what it was before could lead

9   to drastic increases in lead leaching?

10           MR. MARKER:  I'll object to the

11           form.

12     A.    I don't recall seeing his article.

13     Q.    Now, no one from LAN or Veolia

14   ever told you that "Look, if your CSMR goes up

15   by 0.1 to 1.0, you could have a drastic increase

16   in lead leaching, did they?

17     A.    Not that I recall, no.

18     Q.    No one from LAN or Veolia told you

19   that if your CSMR goes up significantly, you

20   could have any increase in lead leaching, did

21   they?

22     A.    Not that I recall, no.

23     Q.    And what we see here is an

24   increase from 0.41 to 3.0, right?

Highly Confidential - Michael B. Glasgow

```
 1             A.     Correct.  Yes.

 2             Q.     And that's an increase by -- to

 3     3.6, so it's an increase of more than 3, right?

 4             A.     Correct.  Yes.

 5             Q.     And if anyone from LAN had asked

 6     you for this data, you would have given it to

 7     them, wouldn't you?

 8             A.     Correct.  Yes.

 9             Q.     If anyone from Veolia had asked

10     you if you had ever done any calculations of

11     this sort, you would given it to them, wouldn't

12     you?

13             A.     Yes.

14             Q.     And apart from oral conversations,

15     you're not aware of any kind of data request

16     where Veolia, when they came on the scene in

17     2015, listed categories of documents and data

18     and said, "To evaluate your water treatment

19     processes, we need these categories of documents

20     and data?"

21                    You never saw anything like that,

22     did you?

23             A.     No, I did not.

24             Q.     And you never saw anything like
```

Highly Confidential - Michael B. Glasgow

1    that from LAN either, did you?

2          A.    Not that I recall, no.

3          Q.    Did anyone from LAN ever tell you

4    that consideration of potential lead leaching in

5    your distribution system was excluded from the

6    scope of their work?

7          A.    No, not that I can recall.

8          Q.    Did you ever see any document that

9    suggested their scope of work wouldn't include

10   consideration of the impacts of lead leaching in

11   your distribution system?

12         A.    Not that I can recall, no.

13         Q.    And same questions from Veolia.

14   Did you ever see any document that said Veolia

15   is supposed to ignore the impacts that lead

16   leaching could have on human health in Flint?

17               MR. CAMPBELL:  Object to the form.

18         A.    No, I do not.

19         Q.    Did you see anything that said

20   that anything related to lead was excluded from

21   the scope of Veolia's work?

22               MR. CAMPBELL:  Object to the form.

23         A.    Not that I recall, no.

24         Q.    Did anybody ever tell you that

```
 1    consideration of those issues was excluded from

 2    the scope of Veolia's work?

 3                    MR. CAMPBELL:  Object to the form.

 4        A.    Not that I can recall, no.

 5        Q.    You understood that Veolia had

 6    been brought in to advise you on how to deal

 7    with water quality issues, right?

 8        A.    Correct.  Yes.

 9                    - - -

10    (Glasgow Deposition Exhibit 76 marked.)

11                    - - -

12    BY MR. MORRISSEY:

13        Q.    I think this exhibit may have been

14    marked yesterday, but at the risk of offending

15    anyone, I'm going to mark it again.

16                    Exhibit 76 is a one-page document.

17    It's a set of handwritten notes which I will

18    represent to you Mr. Gnagy described as his own.

19    It has a heading "Corrosion Control Checking,

20    February 18, 2015."

21                    Do you see that?

22        A.    Yes, I do.

23        Q.    Do you recall meeting with

24    Mr. Gnagy and discussing corrosion control in
```

1    February of 2015?

2            A.    I do not.

3            Q.    Did Mr. Gnagy ever send you any

4    kind of memo or presentation or analysis or

5    e-mail of any sort that summarized his

6    conclusions on corrosion control?

7            A.    Not that I recall, no.

8            Q.    Mr. Gnagy's notes indicate that he

9    wrote, "Corrosive water conditions exist."

10                 It's the first line with the

11    asterisk there.

12                 Do you see that?

13           A.    Yes, I do.

14           Q.    Did Mr. Gnagy tell you that you

15    had corrosive water in Flint as of

16    February 2015?

17                 MR. CAMPBELL:  Object to the form.

18           A.    I do not recall any conversations

19    with Mr. Gnagy.

20           Q.    He says that he flat out told

21    you -- you, Mr. Glasgow.  Mr. Gnagy has

22    testified that he flat out told you that there

23    was corrosive water and that it could cause lead

24    problems in Flint.

Highly Confidential - Michael B. Glasgow

1              Is that true?

2         A.    I do not recall talking with

3    Mr. Gnagy.  I couldn't -- I couldn't pick him

4    out of a room.

5         Q.    So you didn't have any

6    conversation with Mr. Gnagy that stands out,

7    right?

8              MR. CAMPBELL:  Object to the form.

9         A.    Not that I can recall, no.

10        Q.    I mean, can you imagine having a

11   conversation with anyone where they told you

12   that there was corrosive water in your city that

13   could cause lead contamination problems and it

14   wouldn't stand out to you?

15        A.    I would think I could remember

16   that.

17        Q.    I mean, you're the kind of person

18   that if someone had told you something like

19   that, you would have written it down and sent an

20   e-mail to a supervisor, right?

21        A.    Yes.  There would have been

22   discussions.

23        Q.    I mean, that's what you routinely

24   did whenever any problem came up in Flint,

Highly Confidential - Michael B. Glasgow

```
 1   right?

 2        A.   Yes.

 3        Q.   When you got the results from

 4   Ms. Walters' house, you didn't hide them, did

 5   you?

 6        A.   No, not at all.

 7        Q.   You reported them, right?

 8        A.   Correct.  Yes.

 9        Q.   When you identified early on that

10   you thought the city should be dealing with

11   corrosion control, you raised it to your

12   supervisors, right?

13        A.   I did.

14        Q.   Now, Mr. Gnagy, he also accused

15   you, Mr. Glasgow, of deliberately withholding

16   lead results from him.

17             Is that true?

18             MR. CAMPBELL:  Object to the form.

19        A.   That is absolutely not true.

20        Q.   Did he ever ask you for any lead

21   result that you didn't provide to him?

22        A.   As I said before, I don't ever

23   recall conversations with Mr. Gnagy.  Data --

24   our lab was open to them when they were in
```

```
 1    there.  All our data in binders are right on the

 2    computer.  No matter who was working with us

 3    could have access to anything.

 4          Q.    All right.  And you never got any

 5    e-mail where Mr. Gnagy or anyone from Veolia

 6    said, "Mr. Glasgow, I asked you yesterday for

 7    the lead results and you didn't give them to me.

 8    I really need them."

 9                You didn't get anything like that,

10    did you?

11          A.    Nothing like that, no.

12          Q.    Now, Mr. Gnagy's one-page of notes

13    here, he says, "Might need to balance pH and

14    corrosion control with THM compliance issues."

15                Do you see that?

16          A.    I do.

17          Q.    Now, do you understand what that

18    means, "balancing pH and corrosion control"?

19          A.    In a sense, yes.

20          Q.    What does that mean to you?

21          A.    Well, pH is one of the factors of

22    corrosion or a good, I guess, indicator of it.

23    It's one the parameters that was used in the

24    Langelier index calculations.
```

Highly Confidential - Michael B. Glasgow

```
 1              Q.     And THM was a contaminant in the

 2    water you're trying to deal with, right?

 3              A.     Correct.  Yes.

 4              Q.     Now, Mr. Gnagy's notes, they

 5    include various measures of the parameters for

 6    certain chemical elements or compounds as of

 7    December 14 and August 14 for both raw and tap

 8    water.

 9                     Do you see that?

10              A.     I do, yes.

11              Q.     And you see the last two are

12    chlorine -- that's chlorine?  That's not

13    chlorides, is it?

14              A.     That's actually going to be

15    chloride in this context.

16              Q.     Oh, so that's chloride and

17    sulfate?

18              A.     Yes.

19              Q.     So there you have what you need to

20    divide chloride by sulfate, right?

21              A.     Correct.  Yes.

22              Q.     So if you divided 80 by 24 for the

23    tap measure as of December 14, you would see

24    that the ratio is over 3, right?
```

Highly Confidential - Michael B. Glasgow

1          A.    Correct.  Yes.

2          Q.    And you would see that as of

3    August, it was -- if that's a 10, over 6 to 1.

4    It's an 18, it was over 3 to 1, right?

5          A.    Correct.  Yes.

6          Q.    And then there's listed down here

7    three different calculations.  A CCPP.  Do you

8    know some calculation called a CCPP?

9          A.    I'm not familiar with that, no.

10         Q.    And LI, that's a Langelier index,

11   right?

12         A.    That's what I would assume here,

13   yes.

14         Q.    And the Langelier index, that was

15   a metric that you did conduct periodically,

16   right?

17         A.    Correct.  Yes.

18         Q.    And you understand that the EPA

19   has said that the Langelier index has no

20   value -- and that's a direct quote -- no value

21   in measuring corrosivity?

22              MR. MARKER:  Objection.

23              MR. KIM:  Objection to form.

24         A.    I will say I learned that later

1    on.

2            Q.    So you know that now?

3            A.    Correct.

4            Q.    And you would have expected the

5    experts you brought in to know more about it

6    then, right?

7            A.    I would, yes.

8            Q.    And one calculation you do not see

9    on this page is a CSMR calculation, correct?

10           A.    That is correct.

11           Q.    So Mr. Gnagy, he had this data,

12    right?

13           A.    Yes.

14           Q.    Did he ever tell you he had done a

15    CSMR calculation as of February --

16                 MR. CAMPBELL:  Object to the form.

17           Q.    -- '15?

18           A.    No, he did not.

19           Q.    But if he had looked at his data

20    on his own notes, he could have seen that your

21    water was corrosive, right?

22           A.    According to the CSMR, he could

23    have, yes.

24           Q.    I mean, highly corrosive, right?

Highly Confidential - Michael B. Glasgow

```
1              MR. MARKER:  Objection.

2         A.    It was a pretty high number for

3    CSMR.

4         Q.    That is a very high number for

5    CSMR, isn't it?

6         A.    It is.

7         Q.    After this set of notes that

8    Mr. Gnagy put together, Veolia made a series of

9    presentations to the city, right?

10        A.    Correct.  Yes.

11        Q.    Did you attend any in-person

12   meeting when Veolia came and summarized the

13   results to a bunch of folks?

14        A.    I don't recall attending any

15   meeting like that.  If I did, it would have been

16   a public meeting where the public was allowed

17   to, but I don't recall if there was a --

18        Q.    All right.  I was going to ask you

19   about one other public meeting.  The day that

20   the switch was made, April 26, 2014, was anyone

21   from LAN there?

22        A.    I guess I can't really recall a

23   public meeting on that day.

24        Q.    And there was kind of a big
```

1    celebration where the mayor actually pushed the

2    button.

3                    Do you remember that?

4         A.    I do vaguely remember that.

5         Q.    Do you remember if anyone from LAN

6    was there?

7         A.    I couldn't tell you because I

8    really wasn't around myself.

9         Q.    We'll have to ask them when we get

10   a chance.

11                   But sticking with Mr. Gnagy and

12   Veolia.  Veolia never told you, "Your water" --

13   well, let's see.

14                   Right now you're running the water

15   district, right?

16        A.    Yes.

17        Q.    If you got reports like this of

18   corrosion levels in your water, you'd be

19   concerned, right?

20             MR. MARKER:  Objection; form.

21        A.    I would, yes.

22        Q.    Why?

23        A.    Potential problems and issues.

24        Q.    What kind of issues?

Highly Confidential - Michael B. Glasgow

```
 1              MR. MARKER:  Objection; form.

 2         A.    Could be, number one, thinking of

 3    damage to the infrastructure and, number two,

 4    you know, public health in that aspect.

 5         Q.    All right.  Now, you never saw

 6    anything from Veolia where they told you,

 7    "Flint, your water is highly corrosive.  This

 8    could damage your infrastructure and impact

 9    public health."  Did you?

10         A.    No, I did not.

11         Q.    And Veolia could have told you

12    that by dividing one number by another on this

13    single page of notes that Mr. Gnagy had,

14    correct?

15         A.    Yes, they could have told us about

16    the CSMR numbers.

17              MR. MORRISSEY:  Let's take a

18         little break.  I have a few more

19         questions left.

20              THE VIDEOGRAPHER:  We are going

21         off the record at 2:52 p.m.

22              (Recess taken.)

23              THE VIDEOGRAPHER:  We're back on

24         the record at 3:09 p.m.
```

Highly Confidential - Michael B. Glasgow

```
 1                      - - -

 2            (Glasgow Deposition Exhibits 77,

 3                 78, and 79 marked.)

 4                      - - -

 5   BY MR. MORRISSEY:

 6            Q.    Mr. Glasgow, what I've marked as

 7   Exhibits 77, 78, and 79 are three different

 8   reports prepared by Veolia in the spring of

 9   2015.  I think you were asked about one of these

10   yesterday.  You said you first saw one of the

11   Veolia reports, it was approaching summer of

12   2015; is that right?

13            A.    That is correct, yes.

14            Q.    Do you know -- May, June,

15   approaching summer?

16            A.    Yeah, it was probably approaching

17   summer.  Like I said, I had to continually keep

18   asking my supervisors for a copy of their

19   report.

20            Q.    But you knew throughout the spring

21   that Veolia had been there, they'd made a set of

22   recommendations, and that you had made some

23   changes to your operations based on what they

24   advised, right?
```

Highly Confidential - Michael B. Glasgow

```
 1          A.    Correct.  Yes.

 2          Q.    And did you ultimately review the

 3   various reports that Veolia provided?

 4          A.    I'm looking at the ones in front

 5   of me here.  I'll say the one I recall seeing

 6   early summer of '15 was Exhibit Number 78.

 7          Q.    Okay.

 8                MS. COLLINS:  Can you tell us what

 9          that is?

10                MR. MORRISSEY:  That is the

11          March 12, 2015 report, Bates-numbered

12          COF_FED_628049.

13   BY MR. MORRISSEY:

14          Q.    One more question back on

15   Mr. Gnagy and his being there.  We talked about

16   Ms. Walters' lead tests and whether you had

17   withheld any lead results from Mr. Gnagy.

18                Do you recall there being lead

19   tests at the University of Michigan-Flint that

20   were high in the same time frame that Veolia was

21   there?

22          A.    I do recall talking with Mr. Lang.

23   He was from the University of Michigan-Flint,

24   and I do -- I do recall having conversations
```

Highly Confidential - Michael B. Glasgow

1    with him in regards to them doing some of their

2    own testing.  And there was some elevated lead.

3    A time frame, I can't put on that, no.

4           Q.    Okay.  And the university is on

5    the water system, right?

6           A.    Correct.  Yes.

7           Q.    And I asked you Ms. Walters'

8    results.  You didn't hide any results from

9    Veolia regarding the university either, did you?

10          A.    No, I didn't hide results in

11   regards to anything.

12          Q.    Okay.  And do you recall anything

13   about Veolia suggesting to the city that you

14   didn't necessarily need to worry about these

15   results at the University of Michigan-Flint?

16                MR. CAMPBELL:  Object to the form.

17          A.    I do not recall.

18          Q.    Did anyone at Veolia ever suggest

19   to you that these higher results at the

20   University of Flint might be a problem?

21          A.    I do not recall that, no.

22          Q.    Did you ever learn that there was

23   a report up to executives within Veolia that

24   lead might be a problem based on those results?

Highly Confidential - Michael B. Glasgow

1          A.    I did not, no.

2          Q.    Did anyone -- no one from Veolia

3     ever said, "Look, this issue with elevated lead

4     at the University of Michigan-Flint might be an

5     indicator of there being problems.  You should

6     look into this further"?

7                MR. CAMPBELL:  Object to the form.

8          A.    Not that I recall, no.

9          Q.    And you were asked a bit earlier

10     about the corrosivity of the water -- about

11     corrosive water impacting cars at the GM plant;

12     is that right?

13          A.    That is correct, yes.

14          Q.    And what was happening is they

15     used water as part of the process for the -- is

16     it paint plant?

17          A.    It was -- I think it was their

18     metal fab plant, if I recall.  I'm trying to

19     think.  Yeah, one of their plants.  They had a

20     section in Flint there, there's three plants

21     right there; an engine plant, a metal fab plant,

22     and the truck and bus plant.

23          Q.    And GM had concluded that they

24     didn't want to use the water anymore because it

1    was corroding cars?

2         A.    Yeah, it was pitting some of their

3    metal on parts of the cars.

4         Q.    Did anyone from Veolia or LAN,

5    your outside engineering experts, say, "Look, we

6    might want to look further into corrosion in the

7    drinking water because GM's concerned that this

8    water is corroding cars"?

9              MR. CAMPBELL:  Object to the form.

10        A.    Not that I recall, no.

11        Q.    I mean, in hindsight, doesn't it

12   stand to reason that water that's corroding cars

13   is probably not something you want to drink?

14             MR. CAMPBELL:  Object to the form.

15        A.    I would have to agree with that.

16        Q.    But none of these multimillion

17   dollar experts from LAN flagged the issue at the

18   time, right?

19             MR. GAMBLE:  Objection; form.

20        A.    No, not that I can recall.

21        Q.    And none of the world leading

22   water expert gurus like Mr. Gnagy flagged the

23   issue at the time?

24             MR. CAMPBELL:  Object to the form.

Highly Confidential - Michael B. Glasgow

```
1          A.    No.

2          Q.    Now, back to these reports.  The

3    March 4th report, 77, the second paragraph under

4    assignment, it says, "The report will provide

5    the findings requested by the city in regards to

6    the operation of the water plant, distribution

7    system, customer service, and communication,

8    capital plans, and actions, as well as budget."

9                Do you see that?

10         A.    Yes.

11         Q.    Are you aware of anything limiting

12   the scope of Veolia's work such that it was not

13   considering some aspects of your plant or

14   distribution system even though it had said it

15   was in its report?

16               MR. CAMPBELL:  Object to the form.

17         A.    No, I'm not aware.

18         Q.    The next sentence says, "The

19   urgency of the water quality problems and

20   intense public interest make it important to

21   remind the city the scope involved a one week

22   assessment of the situation by four people."

23               Do you see that?

24         A.    Yes.
```

Highly Confidential - Michael B. Glasgow

1        Q.    So these folks were actually

2    physically in your plant for some period of

3    time, about a week, right?

4        A.    Correct.  Yes.

5        Q.    And then they had some period of

6    time to prepare reports based on their work,

7    right?

8        A.    Correct.  Yes.

9        Q.    This urgency of the situation, was

10   there some urgency about the water even by early

11   2015 when Veolia was called in?

12       A.    I would say there was an urgency

13   due to the -- I would think it was kind of the

14   public perception on the issues the public was

15   dealing with.

16       Q.    And people were kind of up in arms

17   generally about the water by this point?

18       A.    Yes, and they were losing trust in

19   their local government I'll say.

20       Q.    Yeah.  And you brought in these

21   outside experts from Veolia, this global firm

22   with expertise in these issues, to help you try

23   to solve the problem, right?

24       A.    Yes.  To my knowledge, yes.

1          Q.     If you turn to page 5 of this

2     March 4th report under "Veolia Recommendations."

3     It's about one, two, three, four, five, six --

4     seven bullet points down from the top set of the

5     recommendations they are making.

6               There's a paragraph on corrosion

7     control.

8               Do you see that?

9          A.     Yes, I do.

10          Q.     And in the third sentence of that

11     paragraph, it reads, "Many people are frustrated

12     and naturally concerned by the discoloration of

13     the water with what primarily appears to be iron

14     from the old unlined cast iron pipes."

15               Do you see that?

16          A.     Yes.

17          Q.     "The water system can add a

18     polyphosphate to the water as a way to minimize

19     the amount of discolored water but not make it

20     go away."

21               Do you see that?

22          A.     I do.

23          Q.     So one benefit of adding

24     polyphosphates is it could make the water

Highly Confidential - Michael B. Glasgow

1    clearer by mitigating the release of iron in the

2    distribution system, right?

3          A.    Correct.  Yes.

4          Q.    And that's one benefit.  Another

5    benefit of having corrosion control is that you

6    could mitigate the release of lead and stop

7    poisoning people, right?

8                MR. MARKER:  Objection; form.

9          A.    I would agree and say yes.

10         Q.    And that benefit of corrosion

11    control in not poisoning people was not

12    mentioned here, right?

13         A.    It was not.

14         Q.    Do you recall anyone from Veolia

15    ever mentioning that one of the benefits of

16    adding a corrosion control was that you would

17    not poison people?

18                MR. CAMPBELL:  Object to the form.

19         A.    I do not, no.

20         Q.    This paragraph suggested that you

21    could add a polyphosphate, right?

22         A.    Correct.  Yes.

23         Q.    And you ultimately added an

24    orthophosphate, not a polyphosphate, right?

Highly Confidential - Michael B. Glasgow

1          A.    Correct.

2          Q.    And the reason you did that is

3    because polyphosphates actually exacerbate

4    corrosion in a water distribution system with

5    lead pipes, doesn't it?

6              MR. MARKER:  Objection; form,

7          foundation.

8          A.    To be honest, I wasn't aware of

9    that.

10          Q.    So to this day, you're not aware

11   that orthophosphates are the preferred corrosion

12   control mechanism for water distribution systems

13   with lead pipes?

14              MR. CAMPBELL:  Objection to form.

15          A.    I will say that was -- that is

16   what I've been familiar with in my tenure in

17   this profession, is the orthophosphate.

18          Q.    Okay.  No one from Veolia ever

19   said there was an urgent need to implement

20   corrosion control to protect public health in

21   Flint, correct?

22          A.    No, not that I can recall.

23              MR. CAMPBELL:  Object to the form.

24          Q.    One idea that came up from time to

1    time of addressing the various problems with the

2    water was switching back to Detroit, right?

3         A.    Correct.  As time went on in '15,

4    that became a topic.

5         Q.    And you ultimately did it, right?

6         A.    Yes, the city did make that

7    decision.

8         Q.    And even early on, February, March

9    time frame, there was, like, a city council

10   meeting and a big public outcry about possibly

11   switching back to Detroit.

12              Do you recall that?

13        A.    I do recall that.

14        Q.    Did anyone from LAN or Veolia ever

15   tell you the best technical way to address these

16   problems right here right now would be a switch

17   back to Detroit?

18              MR. CAMPBELL:  Object to the form.

19        A.    Not that I can recall, no.

20        Q.    Exhibit 78.  This is the report

21   you remember seeing, right?

22        A.    Correct.  Yes.

23        Q.    Under -- in the third -- fourth

24   paragraph down, Veolia indicated, "This report

1    provides recommendations and a roadmap for

2    improvement, though our engagement was limited

3    in scope."

4              Do you see that?

5        A.    Yes.

6        Q.    And, again, you're not aware of

7    anything that excluded lead or public health or

8    impacts on the integrity of pipes from the scope

9    of Veolia's work, are you?

10             MR. CAMPBELL:  Object to the form.

11       A.    No.

12       Q.    And then in the next paragraph, it

13   reads, "Although a review of water quality

14   records for the time period under our study

15   indicates compliance with state and federal

16   water quality regulations ..."

17             Do you see that?

18       A.    Yes.

19       Q.    Now, one thing you know now is

20   that the Safe Drinking Water Act requires an

21   optimal corrosion control treatment evaluation

22   when you're switching from one source to

23   another, right?

24       A.    Correct.  Yes.

Highly Confidential - Michael B. Glasgow

```
 1          Q.    You suspected that was the case

 2   back before the switch, right?

 3               MR. MARKER:  Objection; form.

 4          A.    Yes.  I had an idea.

 5          Q.    That was what you thought the law

 6   was, right?

 7          A.    That's how I understood it at the

 8   time.

 9          Q.    But you went to Mr. Prysby and

10   Mr. Busch, and they said, "Nah, you don't need

11   to do that," right?

12          A.    So to speak, yes.

13          Q.    But no one from LAN said, "Those

14   guys at the state are all wet.  You do need to

15   do this."

16               Right?

17               MR. GAMBLE:  Objection; form.

18          A.    No.

19          Q.    And no one from Veolia when they

20   came in in early 2015 said, "That was a big

21   screw up.  You should have done this evaluation

22   before making the switch, and the fact that you

23   didn't do it is a problem that could cause

24   public health concerns going forward."
```

Highly Confidential - Michael B. Glasgow

1          Right?

2          MR. CAMPBELL:  Object to the form.

3     A.    Right.  No.

4     Q.    If you move forward in this

5  March 12 presentation, there's again on page 5

6  under "Corrosion Control" -- the only reference

7  to corrosion control -- this says "The water

8  system could add a polyphosphate to the water as

9  a way to minimize the amount of discolored

10 water."

11         Again, they didn't tell you that

12 you needed to have corrosion control, did they?

13    A.    No.

14         MR. MARKER:  Object to the form.

15    Q.    They told you you could add a

16 polyphosphate.  They didn't say anything about

17 orthophosphates, did they?

18    A.    No.

19    Q.    And they said it would minimize

20 discolored water.  They didn't say it would have

21 anything to do with lead, did they?

22    A.    They did not, no.

23         MR. CAMPBELL:  Object to the form.

24    Q.    And then Mr. -- or counsel for

Highly Confidential - Michael B. Glasgow

```
1    Veolia yesterday walked through one of these

2    suggested next steps, which was in one of the

3    Tier 2 priority items, the third one down that

4    begins on the second page of "Recommended

5    Actions," on the page Bates-numbered 628060.

6    This says you could "Contract with your engineer

7    and initiate discussions with the state on the

8    addition of a corrosion control chemical."

9              Right?

10       A.    Yes.

11       Q.    And, again, it suggests

12   phosphates, right?

13       A.    Yes.

14       Q.    Doesn't specify ortho?

15       A.    No.  Just says phosphates.

16       Q.    Doesn't say anything about lead,

17   right?

18       A.    Right.

19       Q.    And doesn't say this is something

20   you need to do immediately to protect public

21   health?

22       A.    No, it does not.

23       Q.    Then the next recommendation is to

24   increase ferric, right?
```

Highly Confidential - Michael B. Glasgow

```
 1          A.    Yes.

 2          Q.    And that's something you all did

 3   in the ensuing months, right?

 4                MR. CAMPBELL:  Object to the form.

 5          A.    Yeah, to -- not quite to the level

 6   they were requesting, but yes.

 7          Q.    Right.

 8          A.    It was increased at the plant.

 9          Q.    From the summary that counsel for

10   the state showed you earlier, you could see

11   increasing from March when you got this report

12   to May and June increased by more than four

13   points, which is over 25 percent, right?

14          A.    Correct.  Yes.

15          Q.    And the impact of adding ferric

16   chloride to the water is that it would increase

17   the amount of chlorides in the water, increase

18   the CSMR and increase corrosivity, right?

19                MR. MARKER:  Objection; form.

20          A.    Yes.  It could, yes.

21          Q.    The next Exhibit 79 is the

22   technical memorandum.  This is -- it starts with

23   Bates number COF_FED_0016290.  It's addressed to

24   Mr. Croft with a copy to Mr. Ambrose and others,
```

Highly Confidential - Michael B. Glasgow

 1  the folks from Veolia.  It's dated March 30 of

 2  2015.

 3             The first sentence of the

 4  memorandum begins, "Marvin Gnagy, professional

 5  engineer, and Theping Chen, professional

 6  engineer, conducted comprehensive evaluations of

 7  the Flint water treatment plant operations and

 8  chemical processes in February 2015 under a

 9  consulting contract with Veolia North America."

10             Do you see that?

11      A.    Yes.

12      Q.    Now, did you see this memo?

13      A.    I did not see this memo.

14      Q.    This was -- your supervisors were

15  getting the input from their outside experts at

16  this point, right?

17      A.    Correct.  Yes.

18      Q.    Now, looking back, isn't it clear

19  that Veolia didn't give you anything close to

20  the kind of warning you would have wanted about

21  the potential impacts of not having corrosion

22  controls in place?

23             MR. CAMPBELL:  Object to the form.

24      A.    I'm sorry.  Could you restate

Highly Confidential - Michael B. Glasgow

1    that?

2         Q.    Sitting here today looking back,

3    isn't it clear that Veolia did not give you the

4    kind of warning you would have expected an

5    expert engineer to give about the impact of not

6    having corrosion control?

7              MR. CAMPBELL:  Object to the form.

8         A.    I can agree with that.

9         Q.    And you sure would have

10   appreciated a stark warning that not having

11   corrosion control could cause lead poisoning

12   throughout the city, right?

13             MR. CAMPBELL:  Object to the form.

14        A.    Correct.  I agree.

15        Q.    You would have appreciated a clear

16   warning that not having corrosion control could

17   cause tens of millions of dollars in pipe damage

18   throughout the city, correct?

19             MR. CAMPBELL:  Objection to form.

20        A.    I agree, yes.

21        Q.    If you had gotten that kind of

22   warning in any way, shape, or form, whether

23   orally or by a presentation, would you have done

24   anything with it?

Highly Confidential - Michael B. Glasgow

```
 1                  MR. MARKER:  Object to the form.

 2          A.    Yes, I would have.

 3          Q.    What would your normal practice

 4   have been?

 5          A.    Normal practice would be to grab

 6   my supervisors and have a frank discussion with

 7   them about what needs to be done.

 8          Q.    Do you have Exhibit 19?  Exhibit

 9   19, which was previously marked with you over

10   the last couple days, is an October 1, 2015

11   letter from Joan Rose who's a professor at

12   Michigan State, right?

13          A.    Correct.  Yes.

14          Q.    And you understand that Ms. Rose,

15   Professor Rose, is a professor in water

16   research, right?

17          A.    Yes.

18          Q.    And she was part of something

19   called a technical advisory committee, right?

20          A.    Right.  Correct.

21          Q.    That was established sometime in

22   the spring of '15?

23          A.    Yes.

24          Q.    Now -- and that was like a set of
```

Highly Confidential - Michael B. Glasgow

1    outside advisors that provided input on water

2    quality issues, right?

3         A.    Correct.  Yes.

4         Q.    But they weren't the professional

5    engineers who had been hired by the city, right?

6         A.    No.  Not to my knowledge, no.

7         Q.    And Professor Rose in her

8    letter -- this is October 2015.  By this point,

9    there's obviously a big problem, right?

10               MR. MARKER:  Objection to the

11          form.

12        A.    Yes.  There's definitely some

13   issues.

14        Q.    Issues such that you by then

15   decided you needed to implement corrosion

16   control, right?

17        A.    Correct.

18        Q.    And you were about to tell people

19   to stop drinking the water, right?

20               MR. MARKER:  Objection to the

21          form.

22               MR. CAMPBELL:  Objection to form.

23        A.    We were attempting to notify,

24   yeah, the residents of the issues.

Highly Confidential - Michael B. Glasgow

```
 1          Q.    Okay.  Now, in her letter,
 2   Professor Rose refers to an e-mail that she had
 3   written to Mr. Croft on January 22, 2015 where
 4   she said, "I definitely think" -- this is on the
 5   next to last page of the letter at the top.
 6               "I definitely think more testing
 7   for hardness, iron, TDS, E. coli, maybe lead,
 8   from people who were having aesthetic issues is
 9   needed."
10               Do you see that?
11          A.    Yes.
12          Q.    And this was an e-mail from the
13   professor in this January time frame, right?
14          A.    Yes.
15          Q.    At that time you had LAN sort of
16   on this multimillion dollar retainer, right?
17               MR. GAMBLE:  Objection; form.
18          A.    Correct.  Yes.
19          Q.    You had Veolia who then came on
20   the scene a couple weeks later, right?
21          A.    Yes.
22          Q.    And you were relying on those
23   engineers to tell you what you needed to do to
24   address the problems, not Professor Rose, right?
```

Highly Confidential - Michael B. Glasgow

```
 1                MR. GAMBLE:  Objection; form.

 2           A.   Correct.  Yes.

 3                     - - -

 4      (Glasgow Deposition Exhibit 80 marked.)

 5                     - - -

 6   BY MR. MORRISSEY:

 7           Q.   Exhibit 80 is a September 8, 2015

 8   e-mail with the Bates number LAN_FLINT_0041213.

 9   It's from Jeff Hansen at Leo A. Daly to

10   Mr. Croft, copies to you and others.

11                Do you see that?

12           A.   Yes.

13           Q.   And this is -- it then attaches a

14   status report dated September 4th.  The list

15   says, "New Issues of Concern This Month:

16   Corrosion control."

17                Right?

18           A.   Yes.

19           Q.   And that's the time frame where

20   LAN began working on implementing a corrosion

21   control system, right?

22           A.   Correct.  Yes.

23           Q.   When LAN and y'all started

24   thinking about corrosion control in the fall of
```

Highly Confidential - Michael B. Glasgow

 1    2015, did you come up with some new fangled

 2    approach to the issue?

 3                   MR. GAMBLE:  Objection; form.

 4         A.    No, not in my eyes.

 5         Q.    I mean, you installed an

 6    orthophosphate base corrosion control system,

 7    right?

 8         A.    Correct.  Yes.

 9         Q.    And that's a technology that

10    existed for decades, right?

11         A.    Correct.  Yes.

12         Q.    It's the very technology that your

13    city had been using up until 2014, right?

14                   MR. MARKER:  Objection to form.

15                   MR. KIM:  Objection to form.

16         A.    It was in the water prior to 2014.

17         Q.    And it's not something that costs

18    a ton, right?

19         A.    No, not necessarily.

20         Q.    And within a short period of time,

21    your outside engineers were able to come up with

22    a plan for implementing this new corrosion

23    control approach for the water treatment plant,

24    right?

Highly Confidential - Michael B. Glasgow

```
 1              A.    Correct.

 2                    MR. MORRISSEY:  Why don't we go

 3              off the record, and I'll confer with my

 4              colleagues.

 5                    THE VIDEOGRAPHER:  We're going off

 6              the record at 3:37 p.m.

 7                    (Recess taken.)

 8                    THE VIDEOGRAPHER:  We're back on

 9              the record at 3:45 p.m.

10    BY MR. MORRISSEY:

11              Q.    Mr. Glasgow, yesterday there was

12    quite a bit of discussion about the fact that

13    Mr. Prysby and Mr. Busch had suggested that you

14    didn't need to do anything further about

15    corrosion control before making the switch.

16                    Do you recall that?

17              A.    I do, yes.

18              Q.    And I think -- it even seemed to

19    me that there was an attempt to suggest that you

20    were kind of helpless and couldn't do anything

21    once they told you you didn't need to do

22    corrosion control.

23                    And just so it's clear, you

24    weren't helpless, right?
```

Highly Confidential - Michael B. Glasgow

```
 1                    MR. MARKER:  Objection; form.

 2           Q.    You could have gotten -- you could

 3     have gone to your engineers and said, "Do we

 4     need corrosion control?"  Right?

 5                    MR. CAMPBELL:  Object to the form.

 6           A.    That possibility was there.

 7           Q.    And if your engineers had come to

 8     you and said, "You really need corrosion control

 9     before you flip that switch," you would have

10     listened to them, right?

11                    MR. GAMBLE:  Objection to form.

12           A.    Yes.

13           Q.    If your engineers had come to you

14     and said, "You need corrosion control to protect

15     the public health of this city and can't flip

16     that switch before you have it," you would have

17     not allowed that switch to go forward, would

18     you?

19                    MR. CAMPBELL:  Objection to form.

20                    MR. MARKER:  Objection to form.

21           A.    I would have tried my best to not

22     let it occur or to get something in place.

23           Q.    And you don't have any reason to

24     believe that if your engineers had come to you
```

Highly Confidential - Michael B. Glasgow

1    either in 2014 before you made the switch or in

2    early 2015 when Veolia came on the scene and

3    said, "You really need corrosion control," and

4    you had then gone to the state and said, "We

5    want to implement corrosion control," that they

6    would have said no, do you?

7         A.    No.

8              MR. KIM:  Object to the form.

9              MR. GAMBLE:  Object to the form.

10                  - - -

11    (Glasgow Deposition Exhibit 81 marked.)

12                  - - -

13    BY MR. MORRISSEY:

14         Q.    What I've marked as Exhibit 81 --

15    which is the approval of the permit for the

16    corrosion control system that the city

17    implemented in the fall, right?

18         A.    Yes.

19         Q.    And when LAN and you worked

20    together to put together a corrosion control

21    system in the fall of 2015, you went to the

22    state and sought approval, right?

23         A.    Correct.  Yes.

24         Q.    And that's just part of the

Highly Confidential - Michael B. Glasgow

```
1    process for any corrosion control technology,

2    you need DEQ sign off, correct?

3         A.    Yeah.  Any change to your

4    treatment process you would want their signoff.

5         Q.    And DEQ gave it to you, correct?

6         A.    Correct.

7         Q.    Are you aware of any circumstance

8    in which you asked the state to provide

9    additional corrosion control to protect the

10   people of Flint, and the state said no?

11              MR. MARKER:  Objection; form.

12        A.    No.

13              MR. MORRISSEY:  I have no further

14        questions at this time, but I will

15        reserve the balance of my time for

16        potential recross.

17              THE VIDEOGRAPHER:  We are going

18        off the record at 3:58 p.m.

19              (Pause in proceedings.)

20              THE VIDEOGRAPHER:  We are back on

21        the record at 3:52 p.m.

22                   - - -

23              EXAMINATION

24
```

 1    BY MR. DAWSON:

 2          Q.    Good afternoon, Mr. Glasgow.  My

 3    name is Don Dawson.  I'm an attorney who

 4    represents some plaintiffs in this action, and I

 5    have some questions for you.

 6                If at any time my questions aren't

 7    clear, let me know, and I'll be happy to start

 8    over.

 9                All right, sir?

10          A.    Okay.  Sounds good.

11          Q.    Mr. Glasgow, my main inquiry is

12    going to be in the area of Legionella.  So you

13    can kind of focus in, that's where I'm going

14    with you, okay?

15          A.    Okay.

16          Q.    As I understand your testimony, I

17    believe both yesterday and today, you did have

18    some experience with Legionella as far as

19    discussions with McLaren Hospital; is that

20    correct?

21          A.    That is correct.

22          Q.    You were also shown a series of

23    documents I believe by Ms. Smith who represents

24    McLaren concerning some documents prepared by

Highly Confidential - Michael B. Glasgow

```
 1    Ms. Johnson.

 2              Do you recall those from the --

 3    was it Michigan public health and services?

 4         A.    Yes.

 5         Q.    All right.  Did I understand you

 6    to say that when you went to go have these two

 7    meetings with McLaren, they shared with you

 8    their testing?

 9         A.    Yeah.  They discussed some of

10    their testing that they had done.

11         Q.    And when they shared with you

12    their testing, did they discuss with you the

13    findings of what they found when they tried to

14    do testing on the city water before it came into

15    their premises?

16              MS. SMITH:  Objection; foundation.

17         A.    I do recall an instance I think in

18    the first meeting with discussions of their

19    results, that the incoming water into their

20    hospital from the city was a point of testing.

21         Q.    Sure.

22                   - - -

23    (Glasgow Deposition Exhibit 72 marked.)

24                   - - -
```

Highly Confidential - Michael B. Glasgow

```
 1   BY MR. DAWSON:

 2         Q.   If you need a minute to read

 3   through that, it's not long.  Let me know when

 4   you're ready.  Because we as Plaintiffs have

 5   lots of time left.  We don't have to worry about

 6   going off the record.

 7               MS. COLLINS:  What's the Bates

 8         number?

 9               MR. DAWSON:  There isn't one.  We

10         used it last week with Mayor Walling,

11         too.

12   BY MR. DAWSON:

13         Q.   Did you have a chance to see that

14   document?

15         A.   I have, yes.

16         Q.   First of all, do you remember a

17   fellow that you met with by the name of Henry

18   Lobb --

19               MS. SMITH:  Objection; foundation.

20         Q.   -- at McLaren?

21         A.   I'd say that name is not familiar.

22         Q.   All right.  How about a fellow

23   named Rusty?  Do you remember him as the person

24   as head of maintenance?
```

Highly Confidential - Michael B. Glasgow

```
1            A.    I do remember -- that name does
2    sound familiar, yes.
3            Q.    Okay.  So whoever you met with on
4    those two occasions, did any of those people
5    have this particular report here, Exhibit 72,
6    from December 23, 2014?
7                  MS. SMITH:  Objection; foundation.
8            A.    Not that I'm aware of.  It wasn't
9    presented to me.
10           Q.    Wouldn't you have liked to have
11   had some testing telling you what the hospital
12   had found relative to your water that they
13   tested before it ever got inside their premises?
14                 MS. SMITH:  Objection; foundation.
15           A.    Yes, that would have been nice.
16           Q.    And you can see right here that --
17   "Current Recommendations," it says, "It seems
18   the supply water coming from the city of Flint
19   is not contributing to the Legionella issues at
20   McLaren."
21                 Do you see that?
22           A.    I do.
23                 MS. SMITH:  Objection.  Can I have
24          a standing objection to this line of
```

Highly Confidential - Michael B. Glasgow

```
 1              questions about this document?

 2                   MR. DAWSON:  Sure.

 3                   MS. SMITH:  The witness had no

 4              contact with McLaren after late

 5              October 2014.

 6                   MR. DAWSON:  Absolutely.  Glad to

 7              give it to you.  Or anything else you

 8              can think of later, you can put in.

 9                   MS. SMITH:  Can you note that for

10              the record, please.

11   BY MR. DAWSON:

12         Q.    So what I'm asking you, sir, is

13   you can see this is a testing company from the

14   letter, correct?

15         A.    Correct.  Yet.

16         Q.    You can see that it's directed to

17   McLaren Hospital, correct?

18         A.    Correct.

19         Q.    And it's telling McLaren Hospital

20   that they've hired these people for their

21   opinion, and it's telling them that Legionella

22   wasn't a problem with the city water.

23              Do you see that?

24         A.    I do, yes.
```

1          Q.    But the next sentence does talk

2     about where the problem might be, doesn't it,

3     about within the hospital, internal to the

4     hospital system?

5               Do you see that?

6          A.    I do, yes.

7          Q.    Did you have discussions with

8     anybody at this McLaren facility when you went

9     out there twice to try and see if you could be

10    of assistance -- did you have any discussions

11    with them about where they found the Legionella

12    and what they were doing about it?

13         A.    There was discussions on where

14    they found it.  I don't remember the exact

15    locations.  I know it was sporadic throughout

16    the hospital.  You know, it might have been a

17    shower head on one floor and a sink in a room on

18    a different floor, but no particulars.

19         Q.    Did they tell you they were having

20    patients actually getting sick with Legionella

21    in their facility?

22         A.    I do not recall them telling me

23    that.

24         Q.    They didn't share that with you?

Highly Confidential - Michael B. Glasgow

1              MS. SMITH:  Objection.

2         A.   Not that I recall, no.

3         Q.   Let me ask you this:  When you

4    know that there's a possible safety [sic] to the

5    public in your job, you had to issue some sort

6    of warning, correct?

7         A.   Correct.  Yes.

8         Q.   Do you ever remember, having

9    worked in Flint and so forth, that McLaren

10   Hospital ever issued any sort of warning to the

11   public that "You might not want to come to our

12   hospital because we've got a problem with

13   Legionella here"?

14             MS. SMITH:  Objection; foundation.

15        A.   I do not recall.

16        Q.   And you remember Ms. Smith asked

17   you, "Well, wasn't it being hypothesized that

18   maybe it was the Flint water was the cause, not

19   anything else"?

20             Do you remember that?

21        A.   I do, yes.

22        Q.   Do you recall that there was a

23   press release that says McLaren Flint was the

24   primary source of Legionella outbreak?

Highly Confidential - Michael B. Glasgow

1              Do you remember seeing that one?

2              MS. SMITH:  Objection; foundation.

3         A.    Yes, I do.

4         Q.    And you remember reading that

5    where it blames McLaren as being the primary

6    source of the Legionnaires' outbreak; is that

7    right?

8         A.    That is correct.

9              MS. SMITH:  Objection; foundation.

10        Q.    And you remember a while ago -- do

11   you still have Exhibit 149 there previous

12   from --

13             MR. MARKER:  Was it marked?

14             MR. DAWSON:  Yeah, it had the

15        sticker on it 149, I believe.  Counsel

16        used it.  Ms. Smith used it.  It's the

17        one where I asked her to read the next

18        sentence down, and she didn't, for

19        completeness.  It's talks about --

20             MR. MARKER:  Yes, I do have that.

21             MR. DAWSON:  -- they have no basis

22        to say that the Flint water is, in fact,

23        the cause of Legionella.  She didn't

24        read that sentence.

```
 1    BY MR. DAWSON:

 2         Q.    Do you remember that document,

 3    sir?

 4         A.    Yes, I do.

 5         Q.    Turn to the second page of that

 6    document.  Or is it on the first page?

 7         A.    I don't see it on the first.  It

 8    looks like just --

 9         Q.    Okay.  Is there a statement in

10    there about the issue of whether or not

11    Legionella was, in fact, caused by the city or

12    other people?

13              Is that Exhibit 149?

14         A.    Yes, it is.

15              MR. MARKER:  What he's asking you

16         to read is the portion that you didn't

17         get an opportunity to read earlier --

18              MR. DAWSON:  Yeah.  To put it in

19         context --

20              MR. MARKER:  -- where it starts

21         with "unfortunately."

22    BY MR. DAWSON:

23         Q.    In fairness, read the first

24    sentence above it, and then read the one that
```

Highly Confidential - Michael B. Glasgow

1    you didn't get to read.  And let's see if we can

2    make some sense of this statement.

3              Go ahead, sir.

4         A.    Okay.  The prior sentence there,

5    "Recalling that Legionella bacteria causes

6    disease generally when it is present in water

7    that becomes aerosolized and ultimately inhaled,

8    the fact that this increase in diagnosed cases

9    seems to overlay with the change in Flint water

10   municipal supply (from Detroit to the Flint

11   River) is concerning."

12             The next sentence starts as,

13   "Unfortunately, we really don't have enough

14   information from follow up on these cases at the

15   LHD level to support an association or rule it

16   out."

17        Q.    So that's a fair understanding of

18   what that exhibit is trying to say, not just the

19   one sentence, correct?

20             MS. SMITH:  Objection; foundation.

21        A.    Correct.  That would be my

22   understanding.

23        Q.    And that Exhibit 149, who is it

24   to?  What is it a memo of, sir?

Highly Confidential - Michael B. Glasgow

```
1          A.     It is to Susan Moran, DCH -- oh,
2   I'm sorry.  I'm sorry.  It is still to Susan
3   Moran from Jim Collins.  Both from DCH.
4          Q.     Now, you had never -- had you ever
5   seen this document before you were shown it
6   today?
7          A.     No, I had never seen it before.
8          Q.     But without even seeing it, you
9   were asked to be reading from it by Ms. Smith,
10  correct?
11         A.     Correct.
12         Q.     But you didn't get to read the
13  second sentence, which kind of says that you
14  weren't at fault, right?
15                MS. SMITH:  Objection; foundation.
16         A.     Yes.  In a sense, I will say it
17  didn't have enough information.
18         Q.     Do you understand that McLaren has
19  filed pleadings where they are claiming that the
20  city of Flint was the cause of their Legionella
21  problem rather than their own negligence?
22                Are you aware of that?
23         A.     I am aware of that.
24         Q.     How do you feel about that when
```

Highly Confidential - Michael B. Glasgow

1    you know that they, in fact, had Legionella all

2    through their system?

3              MS. SMITH:  Objection; foundation.

4         A.    To me, it's disheartening being a

5    former employee of the city of Flint water

6    system.

7         Q.    How about would it be more

8    disheartening if you knew that these people that

9    are blaming you actually had engineering

10   controls in place for Legionella since 2004?

11             Did they ever tell you that?

12        A.    No, I was not aware of that.

13        Q.    Did they ever tell you they had

14   chlorinization systems in place at their

15   hospital prior to any of this Legionella

16   outbreak because they knew they needed to have

17   chlorinization to the water that they had come

18   into their hospital to prevent Legionella?

19             MS. SMITH:  Objection; foundation.

20        A.    I was not aware of that.  At one

21   of the meetings, they did make me aware that

22   they had the ability to chlorinate their system.

23   I didn't know what the setup was or how they

24   instituted it.

1    Q.    You were at the facility, correct?

2    A.    Correct.  Yes.

3    Q.    They didn't say, "Well, listen.

4    You're kind of a mechanical guy.  Would you like

5    to come out and see what our system is and how

6    we treat it"?

7    A.    No, they did not.

8    Q.    And there was another person there

9    I believe you said was from another state

10   agency, correct?

11   A.    Correct.  Yes.

12   Q.    Who was that?

13   A.    I believe it was Mr. Jim Henry

14   from Genesee County Health Department.

15   Q.    And did they offer to Mr. Henry

16   for him to go out and look at the system they

17   had in place?

18         MS. SMITH:  Objection; foundation.

19   A.    Not that I recall, no.

20   Q.    Did they tell you that they were

21   going to update and make their equipment better

22   to prevent Legionella from infecting their

23   patients?

24         Did they give you that

Highly Confidential – Michael B. Glasgow

1    information?

2              MS. SMITH:  Objection; foundation.

3         A.    They did not.

4         Q.    Did you know that, in fact, that

5    either after or before they met with you, they,

6    in fact, had gone out and upgraded their system

7    so that they would be less likely to infect

8    their patients with Legionella?

9              MS. SMITH:  Objection; foundation.

10        A.    They did not.

11        Q.    And did they tell you that they

12   had people that would check their water sources

13   and test them weekly?

14             Did they tell you that?

15             MS. SMITH:  Objection.

16             Time frame, please.

17        A.    They did not tell me about the

18   frequency --

19        Q.    During the time that you met with

20   the people, did they tell you that they were

21   doing that?

22        A.    They did not, no.

23             MS. SMITH:  Objection.  Is

24             there -- could you read back the

Highly Confidential - Michael B. Glasgow

```
 1          question, ma'am?

 2              (Record read back as follows:

 3          "Question:  During the time that you

 4          met with the people, did they tell

 5          you that they were doing that?")

 6          A.    No, they did not.

 7              MS. SMITH:  Did they tell you

 8          about what and when?

 9              MR. DAWSON:  You get to ask all

10          that when it's your turn.

11              MS. SMITH:  Well, then I --

12              MR. DAWSON:  You can object.

13              MS. SMITH:  I object to the

14          question.

15    BY MR. DAWSON:

16          Q.    Just for Ms. Smith's edification,

17    did they tell you from McLaren that they, in

18    fact, did weekly tests of their water after they

19    received it from the city to determine if they

20    had any problems with bacteria in their water?

21          A.    They did not, no.

22          Q.    Did they tell you how the

23    chlorinization system was set up such that it

24    would shoot through the water to help guard
```

Highly Confidential - Michael B. Glasgow

1   against any sort of bacterial problems at their

2   hospital?

3         A.    They did not.

4         Q.    And did they lead you to believe

5   that they didn't know anything about Legionella

6   before you met with them?  They were just

7   innocent babes in the woods not knowing that

8   Legionella existed and was a risk at their

9   hospital?

10              MS. SMITH:  Objection to form.

11        A.    With my meeting with them, it

12  appeared that the problem had just -- just

13  arisen.

14        Q.    And that they knew nothing about

15  it, right?

16        A.    In a sense.  It was limited

17  information that I was given.

18        Q.    And did you -- was a person there

19  named Julie -- what's her -- Borowski.  Was

20  Julie Borowski there from their risk management?

21        A.    I can't tell you that I remember

22  the names of who was there.  There was a number

23  of individuals from McLaren there.

24        Q.    And do you recall any of those

 1    individuals that told you that they were aware

 2    that they needed to be safe relative to their

 3    water towers, that they knew about that?

 4                 Did they tell you that?

 5        A.    Not that I recall, no.

 6        Q.    So if we do know of any testing of

 7    Flint water during the time it was from the

 8    Flint River -- we had the two tests I showed you

 9    in Exhibit 72, right?  Is that correct?

10        A.    Correct.

11        Q.    And then we have all the weekly or

12    daily tests you did with the other type of

13    testing mechanism to tell you whether or not you

14    had problems with bacteria that could lead to

15    Legionella, correct?

16        A.    Correct.  Yes.

17        Q.    And for all those tests for as

18    long as they went on, you're aware of nothing

19    that alarmed you into believing that Legionella

20    was a problem; is that correct?

21                 MS. SMITH:  Objection; foundation.

22        A.    Yeah.  All the samples leaving our

23    plant never led me to that issue of Legionella.

24        Q.    And if you got a sample that was

Highly Confidential - Michael B. Glasgow

```
 1    outside the norm, what would you do to address

 2    it, sir?

 3            A.    Usually we would retest the next

 4    day.  If there was an issue with testing, like,

 5    say, chlorine was low, we might flush hydrants

 6    to try to get fresher water with higher chlorine

 7    to the area.

 8            Q.    Okay.  And do you have any recall

 9    that you ever had to do that, sir?

10            A.    On a few occasions, yes.

11            Q.    But you then would do it and you

12    would test it again to make sure the water was

13    safe; is that correct?

14            A.    Correct.  Yes.

15            Q.    You people at Flint weren't just

16    putting water out there and not caring whether

17    or not it had bacterial infection, did you?

18            A.    A lot of the headlines read that

19    way, but that was not the mentality of my staff

20    or myself.

21                           - - -

22        (Glasgow Deposition Exhibit 82 marked.)

23                           - - -

24                    MR. DAWSON:  This is from the CDC.
```

Highly Confidential - Michael B. Glasgow

```
 1            And by the way, I e-mailed all these to
 2       everybody, so you should have them.
 3            MR. CAMPBELL:  You didn't carry
 4       them?
 5            MR. DAWSON:  No, sir.  I just --
 6       as old as I am, I even knew about
 7       e-mail, Dick.  That's pretty scary,
 8       isn't it?
 9            MS. SMITH:  Can I just have a
10       standing objection to the CDC documents.
11       The witness has testified he's never
12       interacted with the CDC in any way about
13       Flint water.
14            MR. DAWSON:  Sure.
15            MS. SMITH:  And never would have
16       seen these documents.
17  BY MR. DAWSON:
18       Q.   Do you want to take a moment and
19  look at that, would you, please, sir.
20       A.   Sure.
21       Q.   And the area where I want to ask
22  you is about the portion that says "Overview of
23  McLaren Hospital outbreak."
24            Do you see that?
```

Highly Confidential - Michael B. Glasgow

1          A.    Yes, I do.  Yep.

2          Q.    Now, this document talks about the

3    McLaren Hospital --

4                MS. SMITH:  Is there a time frame

5           for this document, sir?

6                MR. DAWSON:  What did you say?

7                MS. SMITH:  Is there a time frame

8           for this document?

9                MR. DAWSON:  I don't know.  It's

10          from the CDC, and I e-mailed you these

11          documents.

12               MS. SMITH:  That's not my

13          question.

14               MR. DAWSON:  No, I don't have a

15          date on here.  Sorry.

16               MS. SMITH:  All right.  I'm going

17          to object to foundation.

18               MR. DAWSON:  Very good.

19   BY MR. DAWSON:

20          Q.    In any event, where it says an

21   outbreak -- maybe McLaren had more than one

22   outbreak of Legionella, so maybe this is another

23   time, I guess, counsel is suggesting.

24               But as far as I know, there's only

Highly Confidential - Michael B. Glasgow

```
 1    one major outbreak concerning --

 2                MS. SMITH:  Objection.  That's an

 3          improper question, sir.

 4    BY MR. DAWSON:

 5          Q.   Do you see the part where it says

 6    "Cooling tower tested negative in October"?

 7          A.   I do, yes.

 8          Q.   And October, because they claim

 9    that the outbreak was over in March of '15 --

10                MS. SMITH:  Objection.

11          Q.   -- that logically would be

12    October of '14, correct?

13          A.   That would be my take on it, yes.

14          Q.   Did McLaren tell you that they had

15    done cooling tower testing when you met with

16    them in October and November of 2014?

17          A.   Not that I can recall.

18          Q.   And then you say, "Legionella was

19    found in the potable water in October," and then

20    it puts parens "hyperchlorinated."

21                Do you see that?

22                MS. SMITH:  Objection; vague as to

23          time frame.

24          A.   Yes.
```

Highly Confidential - Michael B. Glasgow

1      Q.    And the hyperchlorinated --

2    remember I told you they had that system?

3      A.    Yes.

4      Q.    The first time you heard of it is

5    today when I told you about it?

6      A.    Yes.

7      Q.    Then it says, "Water sampled

8    coming in from municipal water was found to be

9    negative."  That sounds just like what we heard

10   in Exhibit 72, correct?

11     A.    Correct.

12     Q.    This is something obviously that

13   someone found out that McLaren had done,

14   correct?

15     A.    Correct.

16     Q.    Then it says, "Water circulating

17   the hospital had Legionella."

18           That's inside the hospital, right?

19     A.    That would be my understanding,

20   yes.

21     Q.    Just like what we see in Exhibit

22   72 from their own testing, correct?

23     A.    Correct.

24     Q.    Then it says, "Private lab was

Highly Confidential - Michael B. Glasgow

```
 1    hired for testing - name unknown."  Well, we

 2    know their name now, don't we, from Exhibit 72.

 3    It's called Environmental Testing and

 4    Consulting, Inc.?

 5         A.    Correct.  Yes.

 6         Q.    "No additional treatment after

 7    October is known."

 8              You don't know what that means, do

 9    you, sir?

10         A.    I do not.

11         Q.    All right.  And then it says, "The

12    specific nature of the exposure of the March

13    McLaren case is unknown."

14              Do you know anything about that,

15    sir?

16         A.    I do not.

17         Q.    All right.  But you do see some

18    documents that leads you to believe that McLaren

19    had a problem with Legionella in their water in

20    the hospital; is that correct, sir?

21              MS. SMITH:  Objection;

22         characterized a problem.

23         A.    Yes.  From these documents, yes.

24         Q.    She wants us to define the
```

Highly Confidential - Michael B. Glasgow

1    problem.

2              Would you agree that if you can

3    expose the patient to something as deadly as

4    Legionella, that that's a problem?

5        A.    It would seem to me, yes.

6        Q.    Now, did you learn at any time

7    during your work with Legionella that if you or

8    I drank a glass of Legionella, as long as it's

9    not atomized, it's not going to hurt you?

10       A.    Correct.  Yes, I do understand

11   that.

12       Q.    But you understood that if it

13   became a mist, then if you suck it into your

14   lungs and you're compromised, things can happen

15   to you?

16       A.    Yes.

17             MS. SMITH:  Objection; foundation.

18             The witness has testified he's not an

19             expert on Legionella.

20                   - - -

21      (Glasgow Deposition Exhibit 83 marked.)

22                   - - -

23   BY MR. DAWSON:

24       Q.    Take a moment and look at

Highly Confidential - Michael B. Glasgow

```
1    Exhibit 83.  This has got a last updated date of

2    January 28, 2016.  It's got a big old red note

3    that says "Not for distribution or posting

4    online."

5                Have you seen this document

6    before, sir?

7         A.    I have not.

8         Q.    All right.  Had you -- during the

9    time that you worked at Flint and this

10   Legionella was an issue, did you learn that

11   there was a number of reported cases, as many as

12   87?

13        A.    I didn't remember the exact

14   number.  I knew it was a significant number.

15        Q.    All right.  And did you learn that

16   the hospital, McLaren Hospital, was highly

17   over-involved compared to other facilities in

18   places where Legionella was found in Genesee

19   County?

20        A.    I don't recall fully.  I know in

21   some discussions with members from the Genesee

22   County Health Department, that McLaren was

23   somewhat of a red flag for them.

24        Q.    All right.  And then you see this
```

Highly Confidential - Michael B. Glasgow

1    note right here that I'm pointing to on the

2    Elmo?

3            A.    Okay.  Yes.

4            Q.    It says, "Healthcare facilities

5    associated with cases have since implemented

6    multiple environmental and procedural measures

7    to alleviate the situation."

8                  Do you see that?

9            A.    I do see that.

10           Q.    But you didn't know about any of

11   those; is that correct?

12           A.    That is correct.

13                     - - -

14      (Glasgow Deposition Exhibit 84 marked.)

15                     - - -

16   BY MR. DAWSON:

17           Q.    I'll show you Exhibit 84.  The

18   date is January 16, 2016.  And it says, "CDC's

19   Legionnaires' disease and environmental health

20   experts are aware of and consulting with state

21   and local health departments in Michigan on the

22   increase in cases of Legionnaire's disease in

23   and around Flint."

24                  You knew that activity was

Highly Confidential - Michael B. Glasgow

1     ongoing; did you not?

2              A.    I did.

3              Q.    And it talks about here that of

4     the first 45 cases, the source of water as the

5     primary resident for the city of Flint was

6     47 percent; in other words, less than half,

7     correct?

8              A.    Correct.

9              Q.    And then when it talks about when

10    you're looking at community sources, more than

11    half the individuals had healthcare facility

12    exposure in the two weeks prior to their

13    illness.

14                   Did you know that?

15             A.    I was not aware of that.

16             Q.    In other words, if you go into the

17    hospital, you can get it there.  Did you

18    understand that?

19             A.    I do understand that.

20             Q.    And then it goes on to describe

21    what Legionella is.

22                   Do you see that, sir?

23             A.    Yes.

24             Q.    And it says, "Each year an

1    estimated 8,000 to 18,000 people are

2    hospitalized with Legionnaires' disease in the

3    United States."

4              That's a lot of folks, right?

5         A.    That's a significant number in my

6    eyes.

7         Q.    And you could imagine as large a

8    facility as McLaren being open as long as they

9    had, this wasn't their exposure of Legionnaires,

10   correct?

11             MS. SMITH:  Objection to

12        foundation.

13        Q.    Would you agree with that, sir?

14        A.    I would agree with that.

15        Q.    Now, when you had discussions with

16   McLaren Hospital, did you ask these folks, "What

17   is it we can do for you relative to the problems

18   you are having with Legionella?"

19             Did that ever come up?

20        A.    I believe it did, yes.

21        Q.    And what did they ask or -- ask

22   you to do, if anything, sir?

23        A.    They asked in regards to some of

24   our test results, if we've had any issues in the

```
 1    system.  In a sense, you know, to me it was they

 2    didn't have an idea where their issues were

 3    coming from, so they were attempting to look

 4    everywhere to try to determine their causes.

 5         Q.    Okay.  And did you tell them that

 6    from everything that you had done and everything

 7    that you knew about the water that you had sent

 8    to them, you could not understand how it would

 9    be a source of their Legionella?

10         A.    Yes, I did attempt to explain that

11    and also shared some of my data with them.

12         Q.    But they in turn didn't share the

13    data they had that said that your water wasn't a

14    problem, correct?

15         A.    Correct.

16         Q.    You were also asked a whole bunch

17    of questions -- I can't remember which document

18    it was earlier today.  It's the one from

19    Mr. Kaplan.  Do you still have that thing?  It

20    was Exhibit 34.

21         A.    I'm sure we have it.

22         Q.    First of all, you had never seen

23    this document, but you were asked a bunch of

24    questions about it, correct?
```

1          A.    Correct.

2          Q.    And in this particular document,

3    you see the date is January 20 of 2016.  How

4    long had you been back on Detroit water at that

5    point in time?  About two months?

6          A.    Yeah, two to three months at that

7    time.

8          Q.    And so if there was less

9    chlorinization at the various areas where this

10   document is talking about, it wouldn't be from

11   the Flint River water, it would be from Detroit

12   water, correct?

13         A.    At this time, correct.  Yes.

14         Q.    And this is water that Detroit is

15   sending to you saying, "Hey, it's just dandy,"

16   correct?

17         A.    Correct.

18         Q.    So this document that you were

19   asked a bunch of questions about has nothing to

20   do with the Flint River water; is that correct?

21         A.    That is correct.

22         Q.    Lastly, sir, would you agree that

23   it would be a good thing to have in a hospital

24   an engineering policy that says that when you

Highly Confidential - Michael B. Glasgow

1   have "Environmental services, shall flush all

2   showers and faucets of all plumbing fixtures at

3   the time of routine cleaning.  Faucets shall be

4   wiped with a disinfectant during the daily

5   cleaning.  Aerators containing sediment that has

6   comprised [sic] the output and cannot be

7   properly cleaned shall be reported into

8   engineering for service."

9               Do you agree that's a good thing

10  to do?

11        A.    I would agree, yes.

12        Q.    "Cooling tower water management

13  should be treated for microbial growth using

14  approved chemical disinfectants."

15              Would you agree that's a pretty

16  good thing to do?

17              MS. SMITH:  Objection; foundation.

18        A.    I would agree, yes.

19        Q.    And do you know that the president

20  and CEO of McLaren Hospital, at least at the

21  time of this particular engineering document

22  when it was released to their people, was a

23  fellow named Donald Kooy.

24              Did you ever hear of him?

Highly Confidential - Michael B. Glasgow

1    K-o-o-y.

2            A.    Never heard of him, no.

3            Q.    Was he at any of your meetings,

4    sir?

5            A.    Not that I can recall, no.

6            Q.    And then they have one here, it

7    says, "Water systems shall be flushed with

8    chlorine or mono-chloramine on a minimum of

9    twice-a-year basis."

10                Did you know that they did that?

11           A.    I was not aware of that.

12           Q.    "During system flushing, bottled

13   waters and coolers of ice should be made

14   available to floors for patients and staff to

15   use."

16                Did you know that?

17           A.    I did not.

18           Q.    I just didn't want you to think I

19   was funning you about them having a chlorination

20   system prior to when they met with you, sir.

21                MR. DAWSON:  Those are all the

22           questions I have.  Thank you for putting

23           up with me.

24                THE VIDEOGRAPHER:  We are going

Highly Confidential - Michael B. Glasgow

```
 1            off the record at 4:19 p.m.

 2                 (Recess taken.)

 3                    - - -

 4                 FURTHER EXAMINATION

 5   BY MS. SMITH:

 6        Q.    All right, Mr. Glasgow.  You

 7   remember me.  I'm Susan Smith.  I represent

 8   McLaren Flint Hospital.

 9            Do you remember our conversation

10   yesterday and earlier today?

11        A.    I do.

12        Q.    Okay.  And now I've just listened

13   to your testimony regarding your meetings with

14   McLaren Flint Hospital and what you learned

15   about what was happening at that hospital when

16   Mr. Dawson was questioning you, and I have a

17   couple follow-up questions.

18            First thing I want to do is show

19   you a document that's been previously marked as

20   Johnson Exhibit 142.  And in particular, it's an

21   e-mail from Jerry Ambrose on October 3rd of 2014

22   wherein --

23                 MR. MARKER:  Has this been marked?

24                 MS. SMITH:  It's been marked as
```

Highly Confidential - Michael B. Glasgow

1         Johnson 142.

2               MR. MARKER:  Okay.  Has it been

3         marked in this deposition?

4               MS. SMITH:  No.  We can go ahead

5         and mark it.  I thought we were

6         attempting to not --

7               MR. MARKER:  I don't have a copy

8         is what I'm saying.

9               MS. SMITH:  Okay.  I'm sorry.  I

10         do not have a copy.  I'll hand it over

11         when I read it to the witness.

12    BY MS. SMITH:

13         Q.    And on October 3, 2014,

14    Mr. Ambrose wrote, among other places -- he

15    says, "After talking with Mike Glasgow from our

16    water plant, he confirmed that he was helping

17    the hospital conduct testing for bacteria.  They

18    are flushing their water system with chlorine as

19    part of their routine method of abating these

20    types of issues."

21               If Mr. Ambrose wrote that he had

22    spoke to you on or about October 3, 2014, and

23    obtained that information about McLaren Flint

24    Hospital, was he correct in reporting what you

Highly Confidential - Michael B. Glasgow

1    told him?

2              A.    Yes.  I would say yes.

3              Q.    Okay.  And I want to show you

4    Exhibit 109 from the Johnson deposition, which I

5    believe was previously marked today, which is

6    your November 3, 2014 update.

7                    Now, you were careful when

8    reporting to your superiors to give accurate and

9    truthful information about your findings and

10   observations, correct?

11             A.    Yes.

12             Q.    Okay.  And when you wrote on

13   November 3, 2014 to Ms. Murphy, Mr. Croft --

14   those are the folks that sent you to McLaren,

15   right?

16             A.    Correct.  Yes.

17             Q.    And Mr. Johnson, he was one of

18   your supervisors, right?

19             A.    Correct.  Yes.

20             Q.    As was Mr. Wright, correct?

21             A.    Correct.

22             Q.    Okay.  So you're reporting to your

23   supervisors about an update on the McLaren

24   Legionella investigation.  And you said on

Highly Confidential - Michael B. Glasgow

1    October 30th, "I was invited back to McLaren for

2    a meeting."

3              So McLaren was asking you to come

4    back to their hospital to talk about this

5    Legionella investigation; is that right?

6          A.    Yes.

7          Q.    Okay.  And a representative from

8    Genesee County Health Department was there.  Was

9    that Mr. Henry?

10         A.    From my recollection, yes.

11         Q.    Okay.  And do you have any

12   understanding as to why the Genesee County

13   Health Department was involved in the

14   investigation?

15         A.    The only thing I understood was

16   that there had been an uptake of Legionella

17   infections, and that's why he was involved.  It

18   was countywide, so to speak.

19         Q.    Right.  And so you understood

20   there were cases of infection from this

21   Legionella bacteria that the health department

22   was investigating, correct?

23         A.    Correct.  Yes.

24         Q.    Okay.  And the health department

Highly Confidential - Michael B. Glasgow

1    was brought into this meeting at the hospital to

2    talk with you and others in the hospital about

3    this investigation.

4              What were your -- do you have any

5    understanding as to why Mr. Croft sent you to

6    this meeting?

7         A.    I do not know.  I originally

8    looked at it as kind of like a customer

9    complaint.  In an issue, a lot of times they

10   would get ahold of me in the lab and send myself

11   out there.  I couldn't tell you exactly why.

12        Q.    So that's no different than

13   somebody like Ms. Walters contacting the water

14   department with a complaint and the water

15   department and a person such as yourself

16   responding as a courtesy to customers?

17        A.    Correct.  Yes.

18        Q.    And you did sampling at

19   Ms. Walters' home because she had a concern

20   about her water quality, and you as part of

21   customer service at the water plant agreed to

22   help her investigate that to address her

23   concerns; is that right?

24        A.    That's correct.

Highly Confidential - Michael B. Glasgow

1          Q.    And that's exactly what you were

2     doing at McLaren Flint Hospital, is you were

3     dispatched to help investigate a customer

4     complaint about water quality; isn't that

5     correct?

6          A.    Yes.  I would say that, yes.

7          Q.    Okay.  And you were provided an

8     update at this second meeting on or about

9     October 30th of 2014; is that right?

10         A.    That sounds correct, yes.

11         Q.    And it indicates in this e-mail of

12    November 3, 2014, "Since the original

13    investigation from two weeks ago, McLaren has

14    chlorinated their water system."

15               Does that accurately reflect

16    information you had learned in the second

17    meeting on or about October 30th of 2014?

18         A.    Yes.

19         Q.    And it goes on to indicate that

20    "McLaren conducted another round of Legionella

21    testing."

22               Is that information you obtained

23    from McLaren at the October 30th meeting?

24         A.    Yes.  That is something one of the

Highly Confidential - Michael B. Glasgow

1    employees of McLaren said out loud in the

2    meeting.

3           Q.    Okay.  And as I understand it,

4    your testimony earlier when I was questioning

5    you said there was something McLaren didn't give

6    you, and that was the actual document that

7    reflected the test results from the October

8    testing?

9           A.    Correct.

10          Q.    But they shared the results with

11   you in the meeting?  They told you what they --

12   what they showed?

13          A.    Yes.  They discussed some of the

14   testing results, yes.

15          Q.    Okay.  And after you left the

16   meeting on October 30th of 2014 or thereabouts,

17   did you do any follow-up inquiry to ask for the

18   test results from McLaren?

19          A.    No, I did not.  I assumed -- it

20   kind of sounded like when we left the meeting,

21   there would probably be another one in the

22   future.

23          Q.    But there wasn't, right?

24          A.    Not that I was -- if there was, I

1    wasn't invited, I'll say, I guess.

2         Q.    Did you make any effort to

3    schedule a follow-up meeting with McLaren Flint?

4         A.    I did not, no.

5         Q.    Why not?

6         A.    They originally had invited me --

7    we exchanged information.  I gave them some

8    data.  They discussed some of their data, and we

9    went on.  At this time there was a lot of issues

10   that I was dealing with.

11              So I would say I wasn't really

12   going to be banging on their door every single

13   day to ask them for stuff.  There was enough on

14   my plate, so to speak.

15              But if they -- if they wanted to

16   have another meeting, they said they would, you

17   know, contact everybody again.  But I don't -- I

18   don't recall that ever occurring.

19         Q.    So you didn't pursue any follow-up

20   meetings with the folks at McLaren, right?

21         A.    No.

22         Q.    And is it fair to say -- I

23   understand that you were dispatched to the folks

24   like Ms. Walters' home because you understood

Highly Confidential - Michael B. Glasgow

1    water testing, and that's what she felt needed

2    to be done at her house, right?

3            A.    Correct.  Yes.

4            Q.    And, similar, you were --

5    Mr. Croft sent you out to McLaren Flint because

6    they were talking about water testing.  That's

7    something you know about, right?

8            A.    Correct.  Yes.

9            Q.    And you're not a public health

10   official, and you don't under -- you don't work

11   in the public health department, and you don't

12   investigate infectious disease, fair statement?

13           A.    That's a fair statement.

14           Q.    And so part of your role with this

15   meeting at McLaren was to talk about water

16   testing because that's something you know a lot

17   about, fair?

18           A.    That's fair, yes.

19           Q.    Okay.  And did you propose to

20   McLaren Flint, the folks you met with, that you

21   assist with any testing like you did at

22   Ms. Walters' home?

23           A.    I did tell them that I could

24   assist with doing testing outside the hospital.

```
 1    I said I would, you know, increase some of our

 2    testing around the area.

 3              But I admitted to them I didn't

 4    have any testing to -- that was specific for

 5    Legionella.  And that's where I introduced them

 6    to the HPC, the heterotrophic plate count, that

 7    I did have available to me and what I would

 8    attempt to do within my, I guess, limits or

 9    abilities.

10         Q.    So you explained some of the

11    testing methods that were available to

12    investigate this concern that they shared with

13    you about Legionella that they had found in

14    their hospital water; is that right?

15         A.    Correct.

16         Q.    And did you pursue any of the

17    testing that you described, the HP testing,

18    outside of the hospital?

19         A.    Yes.

20         Q.    And when was that conducted?

21         A.    Oh, it wouldn't have been very

22    long after the meeting.  It was very quick.  I

23    can't remember if it was after the first or

24    after the second meeting.
```

Highly Confidential - Michael B. Glasgow

```
1                    But I do recall testing across the

2   street from the hospital or across Ballenger

3   Highway at St. Paul Lutheran Church and School.

4   They -- I went to them and asked them to allow

5   me to come inside.  I was familiar with them.

6   Both my nieces had attended that school.

7                    So they allowed me in to do

8   testing at their facility.  I can't tell you the

9   exact date.

10          Q.    That's fair.

11          A.    But it wasn't long after the

12  meeting.

13          Q.    Okay.  Would there be a data sheet

14  that reflects the testing at the Saint Paul

15  Lutheran School?

16          A.    Yes.  There should, yes.

17          Q.    Okay.  Do you recall the results

18  offhand?

19          A.    I know coliform bacteria was

20  negative.  I can't remember the HPC or the

21  chlorine.  So we would have taken the chlorine

22  sample, and then collected two separate samples,

23  one for the HPC and one for coliform bacteria.

24          Q.    Now, did you share those results
```

Highly Confidential - Michael B. Glasgow

1    with the folks at McLaren that you had met with?

2         A.    As far as I know, I believe I did,

3    yes, along with some chlorine residuals

4    throughout the city.

5         Q.    And how did you transmit that

6    information to the folks at McLaren?

7         A.    That's what's making me think it

8    was after the first meeting, because I believe I

9    come to the second meeting with data for them.

10        Q.    Okay.  And so you shared

11   information about the testing in the

12   neighborhood.  Did you take any action in

13   response to the test results that you did have?

14        A.    Yeah.  I don't recall taking any

15   action or that any was warranted from the

16   results.

17        Q.    Okay.  And now your area of

18   expertise here in this context is the water

19   testing and sampling that we've talked about and

20   the laboratory analysis of water samples, right?

21        A.    Correct.  Yes.

22        Q.    And that's what you have this

23   license in from the state, the F1 license?

24        A.    Correct.  Yes.

Highly Confidential - Michael B. Glasgow

1          Q.    That focuses on testing water for

2    chemicals and microbiologicals and such,

3    correct?

4          A.    Correct.  Yes.

5          Q.    Now, do you hold yourself out as

6    an expert on hospital water management?

7          A.    I do not.

8          Q.    And do you have any experience

9    implementing -- designing a hospital water

10   management program?

11         A.    I do not.

12         Q.    And do you have any expertise

13   implementing a hospital water management

14   program?

15         A.    I do not.

16         Q.    And do you have any expertise

17   analyzing building water systems to evaluate

18   water quality?

19         A.    I do not, no.

20         Q.    Okay.  And we've established here

21   that Mr. Henry was at the meeting because of his

22   background in public health, and you agreed that

23   you're not a public health expert.

24               Do you have any education or

 1    experience in investigating infectious disease?

 2         A.    I do not.

 3         Q.    And do you consider yourself an

 4    expert on building engineering?

 5         A.    I do not.

 6         Q.    Have you ever been responsible for

 7    the maintenance of a building water plumbing

 8    system?

 9         A.    No, I have not.

10         Q.    Have you ever done any testing of

11    a building water system to investigate

12    Legionella contamination?

13         A.    I have not.

14         Q.    Okay.  So as I understand it, you

15    had this follow-up meeting with the folks at

16    McLaren on or about October 30th of 2014.  I

17    understand around this time, you were a really

18    busy guy.

19              You told us that your employers

20    were sending you out to citizens' homes to do

21    testing because of staffing problems.  You're

22    the laboratory supervisor, and you're being sent

23    out to the field to grab water samples at

24    people's homes, and that was because of the

Highly Confidential - Michael B. Glasgow

```
1    staffing problems?

2           A.    That was part of the issue, yes.

3           Q.    Is it fair to say you had a full

4    plate around this time in October,

5    November 2014?

6           A.    Yes, that is fair to say.

7           Q.    Okay.  So you didn't go back to

8    McLaren Flint Hospital, and you didn't seek a

9    follow-up meeting with them?

10              MR. MARKER:  Objection; form,

11         foundation.

12         A.    I did not.

13         Q.    Okay.  When you left the meeting

14   on or about October 30, 2014, you understood

15   based on your testing that you told us about

16   yesterday that's reflected in the MORs that

17   there was no evidence of Legionella in the water

18   coming into the hospital from the city's supply

19   during their -- strike that.  Let me start

20   again.

21              Your report back to your

22   supervisors on November 3, 2014 indicates that

23   as of October 30th, "There has been no evidence

24   of Legionella in their water coming into the
```

1    hospital from the city supply during their

2    sampling events."

3               Now, that's based on information

4    that they provided to you at McLaren Flint

5    during your meetings there, right?

6          A.    Yep.  That is based on discussions

7    at the meetings.

8          Q.    You'd have no other way of knowing

9    that there was no evidence of Legionella in the

10   water coming into the hospital from the city

11   supply during sampling events?  That was the

12   only source of that information that you had at

13   the time right?

14         A.    Correct.  Yes.

15         Q.    And you understood that the health

16   department and hospital were continuing to

17   investigate and reviewing cases.  So you were

18   aware that there were cases of this infection.

19   You told us that, right?

20         A.    Yes.

21         Q.    And that wasn't kept a secret,

22   that there were people who were infected with

23   this Legionella bacteria?

24         A.    No, I wouldn't say it was a

Highly Confidential - Michael B. Glasgow

1    secret.

2         Q.    And your report back to your

3    supervisors goes on to say that "The health

4    department was going to investigate the

5    locations of and the specific number of cases

6    diagnosed by Hurley Hospital and Genesys

7    Hospital since McLaren has only diagnosed about

8    one-third of the cases countywide."

9              Now, is that information that you

10   obtained from Mr. Henry?

11        A.    I do not recall.  Seeing that it

12   is in regards to the health department, I

13   would -- it would lead me to believe it was from

14   Mr. Henry.

15        Q.    Okay.  And did you have any

16   meetings with the folks at Hurley Hospital about

17   Legionella?

18        A.    No.

19        Q.    And how about the folks at Genesys

20   Hospital?

21        A.    No.

22        Q.    And just to be clear, you left the

23   employment of the city of Flint in April of

24   2016, so you have no knowledge of any test

1    results that might have been generated from

2    those facilities after April 2016, right?

3         A.    Correct.

4         Q.    Okay.  And do you have any reason

5    to dispute the assertion in your report to your

6    supervisors that apparently, according to the

7    health department, Hurley and Genesys were also

8    diagnosing cases of this infection, and McLaren

9    had only diagnosed about a third of the cases

10   countywide?

11              MR. MARKER:  Objection; form and

12         foundation.

13        A.    I'm sorry.  Could you restate

14   that?

15        Q.    The question was simply, sitting

16   here today, do you have any reason to doubt what

17   you reported to your superiors here?

18        A.    Oh, no, I do not.

19        Q.    Okay.  And you go on to explain

20   that based on the available data, there was no

21   correlation -- there was no data available to

22   establish a link between the increased cases of

23   Legionella infection and the municipal water

24   supply; is that about right?

```
 1          A.     That is correct, yes.

 2          Q.     And you then report to your

 3   superiors, "The data we collect daily from the

 4   water plant will continue to verify that there

 5   is no evidence of Legionella in the treated

 6   water leaving the water plant."

 7                 Now, that's based on the testing

 8   that you've told us about that was the chlorine

 9   and HPC testing for the regulatory monitoring

10   purposes; is that right?

11          A.     That is correct, yes.

12          Q.     Okay.  And you go on to talk about

13   not being out of the woods.

14                 Was it your intention here to help

15   McLaren with its investigation the same way you

16   helped Ms. Walters out with her concerns and her

17   investigation?

18          A.     I can't say it's the same, because

19   they were kind of two different issues.  It's

20   similar.  We want to -- it's one of our

21   customers of the city of Flint, so we want to be

22   of help.

23                 But my out-of-the-woods statement,

24   I had the feeling that there was so many
```

1    complaints about our water system at the time,

2    that any issues would be pinpointed to our

3    treatment and the use of utilizing the Flint

4    River as a source.

5          Q.    Sir, is it fair to say that

6    McLaren Flint Hospital wasn't alone in looking

7    to the municipal water supply in October of 2014

8    as the source of health-related concerns?

9          A.    I can agree with that.

10         Q.    By that time, there were lots of

11   citizens in the city of Flint looking to the

12   water flowing through their taps and saying,

13   "This isn't right"?

14               MR. MARKER:  Object to the form.

15         A.    That's a fair statement.

16         Q.    Okay.  And you were very busy at

17   that time dealing with those customer complaints

18   and assisting customers with those

19   investigations, right?

20               MR. MARKER:  Object to the form.

21         A.    Yes.

22         Q.    And the -- and between the last

23   meeting in late October 2014 and the end of your

24   employment with the city of Flint in April of

1    2016, did you speak to anybody at McLaren Flint

2    about Legionella or Legionnaires' disease?

3        A.    I do not recall speaking to

4    anyone.

5        Q.    Okay.  We talked about Mr. Henry

6    at the Genesee County Health Department.

7    Sitting here today, do you recall any e-mail

8    communications with Mr. Henry about water

9    testing data that he was requesting?

10       A.    I vaguely remember e-mail

11   conversations with him in regards to data.  I

12   can't recollect.  It seems like -- yeah, I would

13   be speculating, so I can't -- I think we had a

14   couple conversations via e-mail.  What they were

15   about, I couldn't -- I couldn't tell you.  I'm

16   sorry.

17       Q.    Is it fair to say that Mr. Henry

18   shared the concerns of many citizens of Flint,

19   that the water quality was potentially the

20   source of some health-related issues --

21             MR. MARKER:  Object to the form.

22       Q.    -- in October 2014?

23       A.    Yes, I could agree with that.

24       Q.    Okay.  I'm going to jump around a

1   little bit.  And I'm sorry.  I know it's the end

2   of the day.  If you bear with me.  If you don't

3   understand a question, please let me know.

4                   But Mr. Dawson asked you about

5   warnings that were issued, and you as the water

6   treatment supervisor, the laboratory supervisor,

7   participated in issuing those boil water

8   advisories and other notices from the city of

9   Flint, right?

10          A.    Correct.  Yes.

11          Q.    And you were asked about

12  whether -- and you issued those notices, and

13  those issues went out from the city of Flint

14  water treatment plant, boil water advisories, in

15  August and September of 2014 because they were

16  required by the law; isn't that right?

17          A.    That is correct, yes.

18          Q.    And that law was the Safe Drinking

19  Water Act, and that's the statute that governs

20  the operations of the Flint water treatment

21  plant, right?

22          A.    That is correct, yes.

23          Q.    And those notices were issued

24  because there's something called the Public

Highly Confidential - Michael B. Glasgow

1    Notification Rule.

2              Do you know that rule?

3         A.    Yes.

4         Q.    And you actually -- you know that

5    that rule -- EPA issues a handbook that explains

6    what public water supplies are supposed to do

7    with notifying the public of hazards like those

8    boil water advisories, right?

9         A.    Yes.

10        Q.    And do you know if -- and you

11   issued those notices in conjunction with the

12   MDEQ, right?

13        A.    Yes.

14        Q.    You did them because the MDEQ told

15   you to, right?

16        A.    Yes.  I knew it was a requirement,

17   and we had sent copies to the state.

18        Q.    All right.  And when you went to

19   McLaren Flint and met with those folks at the

20   meetings in October 2014, you didn't participate

21   in any investigation of the history of that

22   facility, did you?

23        A.    No, I did not.

24        Q.    And you didn't engage in any

```
 1    engineering investigation of what was happening

 2    in that building in the pipes behind the walls,

 3    did you?

 4           A.    No, I did not.

 5           Q.    And you didn't participate in any

 6    analysis of past policies or other -- of past

 7    policies that they might have had in place,

 8    right?

 9           A.    Right.

10           Q.    Okay.  And -- just a moment.

11                 And in addition to not

12    investigating the engineering history of McLaren

13    Flint Hospital, you didn't go into the history

14    of their infectious disease practices, did you?

15           A.    No.

16           Q.    And did you review records of past

17    infections that patients might have been

18    diagnosed with?

19           A.    No.

20           Q.    Did you review any medical records

21    of patients that had been at McLaren Flint

22    Hospital?

23           A.    No.

24           Q.    Did you examine any historic data
```

1  about the types of infections McLaren Flint

2  patients had been diagnosed with?

3          A.    No.

4          Q.    Do you have any basis for your

5  testimony that the Legionella cases diagnosed in

6  McLaren Flint patients in 2014 was probably not

7  their first case?

8                MR. MARKER:  Objection to form.

9          A.    Could you repeat that again?  I'm

10  thinking too much.

11          Q.    Let me put it this way, sir:  Do

12  you have any knowledge that any patient in

13  McLaren Flint Hospital before the summer and

14  fall of 2014 had been diagnosed with

15  Legionnaires' disease?

16          A.    I do not, no.

17          Q.    Okay.  So when Mr. Dawson asked

18  you about it probably wasn't their first case,

19  and you said, "Yeah, probably not," that was

20  just a guess, right?

21                MR. MARKER:  Objection to form.

22          A.    Well, in the sense we've known

23  about Legionella a while, but I did not have any

24  hard facts when I made that statement.

Highly Confidential - Michael B. Glasgow

1          Q.     Well, to be fair, Mr. Dawson

2     saying that CDC has reported that there's

3     somewhere between 8 and 18,000 cases of this

4     disease diagnosed each year, and so probably

5     McLaren had had an infection before in a

6     patient, that would apply to every hospital in

7     the country, right?

8          A.     Correct.  Yes.

9          Q.     Okay.  So that wasn't specific to

10    that facility, right?

11         A.     Correct.

12         Q.     Okay.  And you were asked about

13    Mr. Kaplan, and my questions to you about

14    Mr. Kaplan -- and you remember talking to

15    Mr. Kaplan, right?

16         A.     Yes.

17         Q.     And Mr. Kaplan was part of the EPA

18    team that came into Flint in January of 2016

19    after it issued an emergency order addressed to

20    the city of Flint, the Michigan Department of

21    Environmental Quality and the state of Michigan.

22                Do you remember that?

23         A.     I do, yes.

24         Q.     And we talked about that emergency

Highly Confidential - Michael B. Glasgow

```
 1   order, and that emergency order included

 2   specific orders to maintain chlorine residual in

 3   the water system.

 4            Do you remember that?

 5       A.   I do, yes.

 6       Q.   And that order was issued in

 7   January of 2016, right?

 8       A.   Yes.

 9       Q.   And at that time, the city of

10   Flint was on the Detroit water system.  They had

11   reconnected in October of 2015, right?

12       A.   That is correct.

13       Q.   And, nevertheless, the EPA comes

14   in and says, "We're issuing this order and we're

15   going to make you be sure that there's adequate

16   chlorine residual in that water system."

17            Right?

18       A.   That is correct.

19       Q.   Now, in the four months that you

20   were still in the employment of the city of

21   Flint, the January 2016 to April 2016, the four

22   months or so after this order was issued, you

23   were still in your position at the Flint water

24   treatment plant, right?
```

Highly Confidential - Michael B. Glasgow

1          A.    At that time I was the utilities

2    director.

3          Q.    Utilities director?

4          A.    Yeah.  Mr. Johnson had retired and

5    left, and I got promoted, yes.

6          Q.    And so you know that that Flint

7    water -- the water quality flowing through the

8    pipes of the distribution system didn't

9    instantaneously recover once they flipped the

10   switch back to Detroit, right?

11         A.    Yes.  Correct.

12         Q.    And the water quality parameters

13   that existed in that four-month period,

14   January 2016 to April 2016, didn't

15   instantaneously return to the parameters that

16   existed before the switch in April 2014, right?

17               MR. MARKER:  Form, foundation.

18         A.    That is correct.

19         Q.    It took quite a bit of time for

20   the water quality to reach what anyone

21   considered to be acceptable parameters; is that

22   a fair statement?

23               MR. MARKER:  Form; foundation.

24         A.    I hate to say I wasn't around to

Highly Confidential - Michael B. Glasgow

1    see that then.

2            Q.    Okay.  Do you remember the Flush

3    for Flint campaign?

4            A.    Vaguely.

5            Q.    What do you remember about that

6    Flush for Flint campaign?

7            A.    I just remember it was, yeah, get

8    all the remaining -- yeah, Flint River water out

9    of the system, so to speak, and to flush the new

10   water with phosphate all through the system.

11           Q.    Do you remember approximately when

12   that was?

13           A.    I do not.  It had to be close to

14   around the time I departed the city.

15           Q.    Okay.  So that was sometime

16   between January and April of 2016?

17           A.    Okay.

18           Q.    You need to --

19           A.    I'm sorry.  Yes.

20           Q.    And that's because it was

21   understood that the water system needed -- steps

22   needed to be taken to help the water system

23   recover?

24           A.    Correct.  You kind of have to

1    rebuild that phosphate coating on the pipes,

2    yes.

3         Q.    Okay.  So the water flowing

4    through the pipes in January to April of 2016,

5    although it was sourced from the Detroit water

6    system, didn't have the chemistry and

7    characteristics that the Detroit water had

8    flowing through Flint pipes before April 2014;

9    is that a fair statement?

10              MR. KUHL:  Objection; form and

11         foundation.

12         A.    I could say that's a fair

13    statement.

14         Q.    Okay.  And you were asked about

15    that ETC report.  And I just have to ask you,

16    sir, I saw that that report was dated somewhere

17    in late December 2014, and it talked about

18    testing that was done in late December 2014.

19              Were you in touch with anyone at

20    McLaren Flint about their water quality concerns

21    in December 2014?

22         A.    Not that I can recall, no.

23         Q.    And had you requested that they

24    send you results of testing that were generated

Highly Confidential - Michael B. Glasgow

1    in December 2014?

2              MR. MARKER:  Objection to form.

3         A.   No.  I'd only asked that, you

4    know, whatever data they could share would be

5    appreciated, but I didn't specify a month or

6    anything.

7         Q.   Okay.  So you didn't have an open

8    line of communication with the folks at McLaren

9    Flint at that time; that's your recollection,

10   right?

11        A.   Correct.  Yes.

12        Q.   Okay.  Do you have any knowledge

13   as to other -- other persons McLaren Flint may

14   have been communicating with at that time in

15   Michigan State government?

16        A.   I am not aware, no.

17        Q.   Okay.  And the -- and now I'm

18   really going to jump around, and I'm sorry, and

19   it's the end of the day, and I know you're

20   tired.  And, again, if you don't hear me or

21   understand my question, let me know and I'll try

22   again.

23              You've talked -- we talked about

24   the -- when Mr. Kuhl was asking you questions,

Highly Confidential - Michael B. Glasgow

```
 1    you testified, as you have repeatedly before,

 2    that the MORs for the period of April 2014 to

 3    October 2015 show compliance with the Safe

 4    Drinking Water Act regulations, right?

 5         A.    Correct.  Yes.

 6         Q.    And those MORs are what MDEQ looks

 7    to to determine if there's a violation; is that

 8    right?

 9         A.    Yes.

10         Q.    And the -- there was much data

11    that was the non-regulatory sampling that we

12    talked about that was not included in the MORs,

13    right?

14         A.    Correct.  Yes.

15         Q.    And, in fact, MDEQ in connection

16    with the Lead and Copper Rule investigation

17    instructed you to remove results from the

18    regulatory reporting; is that correct?

19         A.    That is correct.

20         Q.    And that was -- you were -- and

21    that occurred and you sensed at that time there

22    was an imminent violation, right?

23              MR. KUHL:  Objection to form,

24              foundation.
```

Highly Confidential - Michael B. Glasgow

1          Q.    And if Ms. Walters' test results

2    for the Lead and Copper Rule had been included

3    in the MORs, what would have happened?

4                    MR. KUHL:  Objection to form

5           foundation.

6          A.    The 90th percentile for lead would

7    have increased.

8          Q.    Okay.  And so your contacts at the

9    MDEQ -- and that was Mr. Busch and Mr. Prysby --

10   instructed you to remove those results from the

11   sampling pool, correct?

12                   MR. KUHL:  Objection to form

13          foundation.  Misstates the testimony.

14         A.    That is correct.

15         Q.    And in a similar vein, you had

16   concerns about the number of samples that you

17   could include in the Lead and Copper Rule

18   sampling pool, correct, that you were supposed

19   to obtain 100 and were having finding customers?

20         A.    Yes.  I was worried about being

21   short on samples, yes.

22         Q.    Okay.  And if -- what would have

23   happened if they were short -- if you were short

24   on samples for that sampling purpose?

Highly Confidential - Michael B. Glasgow

1          A.    To my knowledge, we would have got

2    a monitoring violation and then probably had to

3    start a whole new six-month round of sampling.

4          Q.    So what happened when you fell

5    short of the 100 samples at that time?

6          A.    At that time I remember sending an

7    e-mail I believe to Mr. Rosenthal with the MDEQ

8    inquiring what would happen.  I knew we were

9    only at 70-some odd samples.  And with the time

10   running short, I knew I wasn't going to get to

11   100.  So I was letting him know we were going to

12   continue to try to solicit samples and just to

13   see what was going to happen if we needed to

14   start a new six-month round of sampling.

15         Q.    Okay.  And so the -- but the

16   sampling pool requirement was dropped from 100

17   to 60 or 70?

18         A.    Correct.  Yes.

19         Q.    Okay.  And that enabled you to

20   avoid a violation for not hitting that target,

21   correct?

22         A.    Yeah.  In a sense, yes.  Yep.

23         Q.    Okay.  Well, did I misstate that

24   in any way?  You say, "In a sense."

Highly Confidential - Michael B. Glasgow

```
1           A.    No.  I say "in a sense" because

2    they determined -- they lowered that.  The

3    number of samples is based on population, and

4    supposedly my first report I had used older

5    census data, so they updated census data.

6                 MR. MARKER:  When you say "they,"

7           who are you talking about?

8           A.    When I say "they," I talk about

9    MDEQ.

10          Q.    And you talked about producing

11   drinking water at the plant.  You were asked

12   about producing drinking water for human

13   consumption.

14                Do you remember that questioning?

15          A.    Yes.

16          Q.    And you understood that the water

17   that was being produced at the Flint water

18   treatment plant after April 2014 would be used

19   for human consumption, correct?

20          A.    Yes.

21          Q.    Okay.  And that would include not

22   only -- drinking, right?  Bathing?

23          A.    Correct.

24          Q.    Showering?
```

Highly Confidential - Michael B. Glasgow

1         A.    Yes.

2         Q.    Washing hands?

3         A.    Yes.

4         Q.    Cooking, preparing food?

5         A.    Right.  Yes.

6         Q.    And so that was all expected

7    activity in terms of human consumption of

8    drinking water, right?

9         A.    Correct.  Yes.

10         Q.    Okay.  And you knew that the water

11    that left your plant would eventually make its

12    way through those 600 or so miles of

13    distribution pipe through the service lines and

14    into people's homes at the tap, right?

15         A.    Correct.  Yes.

16         Q.    Okay.  And this is going to seem

17    like it's coming out of left field at this

18    point, but this is the way these things go.

19              We talked yesterday about the

20    ozone system.  To your knowledge, was the ozone

21    system credited as part of the disinfection

22    process at the Flint water treatment plant?

23         A.    It did some give some credit of

24    disinfection, yes.

Highly Confidential - Michael B. Glasgow

```
 1          Q.    Okay.  And how -- and how did that
 2   work?
 3          A.    As in how we got credits or --
 4          Q.    Well, if we were to look at the
 5   regulatory reporting sheets of how you achieved
 6   the disinfection requirements, would ozone be
 7   part of that calculation?
 8          A.    Yes.
 9          Q.    Okay.  And where is the ozone
10   applied?
11          A.    It is the first step in the
12   treatment process.
13          Q.    Okay.  And you testified
14   previously that the ozone system wasn't fully
15   operational in 2014?
16          A.    It wasn't operating as efficient
17   as it should have.
18          Q.    And, to your knowledge, did that
19   impact its ability to disinfect the water?
20          A.    I will say I guess at times it
21   had -- it had a lesser effect than others
22   disinfecting the water.  Although our process --
23   other processes stepped up, and consequently
24   give other forms of disinfection as well.
```

1          Q.    Right.  I understand you said you

2    had the ability to add chlorine at various

3    points in the treatment process.  And, in fact,

4    because of your intervention, there was a second

5    stage of chlorine injection added at the plant,

6    right?

7          A.    Correct.  Yes.

8          Q.    Do you know the approximate time

9    frame of when that second step of chlorination

10   was added?

11         A.    It's an approximate time.  I think

12   it's sometime in summer of 2014, and that was a

13   chlorination prior to filtration.  So what we

14   termed a "midpoint chlorination treatment

15   system."

16         Q.    And why did you do that?

17         A.    That was to keep -- keep our

18   filters cleaner.  We also would get more

19   disinfection credit via the softening process,

20   because we'd raise the pH of the water up to 12.

21   So that had significant disinfection

22   capabilities as well.

23         Q.    Okay.  Was the MDEQ involved in

24   that -- adding that process to your treatment?

Highly Confidential - Michael B. Glasgow

1        A.    Yes.  That was a new step in the

2   process, so we had to get permitted for that,

3   yes.

4        Q.    Okay.  And the -- and this helped

5   you achieve the CT requirements, correct,

6   contact time?

7        A.    That was part of it, yes.

8        Q.    Okay.  And that contact time is

9   measured at the Flint water treatment plant,

10  correct?

11       A.    Correct.  Yes.

12       Q.    So that doesn't account for

13  anything that happens to the water once it

14  leaves the valve at the Flint water treatment

15  plant?

16       A.    That's correct.

17       Q.    Okay.  And the -- I understand in

18  addition to adding a second chlorine step, you

19  had the ability to boost the dose from time to

20  time, boost the dose of chlorine from time to

21  time; is that right?

22       A.    Yes.

23       Q.    And how would you do that?  Was

24  there a port or a point in the treatment system

Highly Confidential - Michael B. Glasgow

1    where you were able to add chlorine?

2          A.    When I think about boosting the

3    chlorine, I think about out in our distribution

4    system at our two reservoirs located within the

5    city.  We had that ability.

6          Q.    So you could physically add

7    chlorine to the reservoirs?

8          A.    Yes, yes.  We had a chlorine

9    feeder we could turn on to boost the chlorine in

10   the reservoir.

11         Q.    And would there be any record of

12   when, if at all, the chlorine was boosted at the

13   reservoirs in 2014 and 2015?

14         A.    Yes.  There should be, yes.

15         Q.    And what were those records

16   called?

17         A.    Oh, they would probably be under

18   reservoir chlorination, something along those

19   lines.

20         Q.    Okay.  And those would be records

21   in the city of Flint's records of the water

22   treatment plant?

23         A.    Yes.  They should be, yes.

24         Q.    And how about, were you able to

Highly Confidential - Michael B. Glasgow

1    add the chlorine -- increase the chlorine dose

2    at the plant during the treatment process?

3          A.    Yes.

4          Q.    And would there be any records of

5    that?

6          A.    Yes.

7          Q.    And is there a form for that?

8          A.    A lot of -- if it was done at the

9    water treatment plant, you could find that on

10   the MOR because we would have to report the

11   pounds per day of chlorine that we used.

12         Q.    And the MOR reports averages,

13   right?  You sit and do that Excel chart and you

14   calculate averages based on the dailies and

15   weeklies?

16         A.    Yeah.  Basically there would be a

17   report of how many pounds per chlorine each day

18   we used throughout the month.

19         Q.    Okay.

20               MR. CAMPBELL:  Susan, it's getting

21         close to --

22               MS. SMITH:  I know.  I'm trying to

23         wrap it up.  Yes, I will.

24               In fact, as a courtesy, we've got

Highly Confidential - Michael B. Glasgow

1           a weather disaster apparently about to

2           happen.  So out of courtesy to

3           Mr. Campbell and his schedule and even

4           weather issues, I'll wrap that up and

5           potentially resume tomorrow, but that

6           may -- that may be the end of it.  But I

7           reserve the right to continue

8           questioning as time allows.

9                   MR. CAMPBELL:  Is that it for the

10          day?

11                  MS. SMITH:  Well, I don't want to

12          keep anyone here against their will.

13                  MR. CAMPBELL:  It's just you've

14          been going for, like, 40 minutes, and

15          it's the end of the day.  We've got to

16          come back tomorrow morning anyway.

17                  MS. SMITH:  Understood.  Yeah.

18          That makes sense.  We'll do that.

19                  MR. CAMPBELL:  Including me is

20          worried about the snow and weather.

21                  MS. SMITH:  I don't want to put

22          anyone in peril.  So we'll wrap it up

23          and resume in the morning.  And if I

24          have any continued questions, I'll do

Highly Confidential - Michael B. Glasgow

```
 1              that first.  I may not have any.

 2                   THE VIDEOGRAPHER:  This concludes

 3              today's testimony.  We are off the

 4              reported at 5:13 p.m.

 5                        - - -

 6              Thereupon, at 5:13 p.m., on Tuesday,

 7      February 25, 2020, the deposition was adjourned.

 8                        - - -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Michael B. Glasgow

```
 1                     CERTIFICATE

 2   STATE OF MICHIGAN      :

                          SS:

 3   COUNTY OF _____:

 4

 5           I, MICHAEL B. GLASGOW, do hereby certify

 6   that I have read the foregoing transcript of my

 7   cross-examination given on February 25, 2020; that

 8   together with the correction page attached hereto

 9   noting changes in form or substance, if any, it is

10   true and correct.

11           _____

                  MICHAEL B. GLASGOW

12

13           I do hereby certify that the foregoing

14   transcript of the cross-examination of MICHAEL B.

15   GLASGOW was submitted to the witness for reading and

16   signing; that after he had stated to the undersigned

17   Notary Public that he had read and examined his

18   cross-examination, he signed the same in my presence

19   on the _____ day of _____, 2020.

20

             _____

21                  NOTARY PUBLIC - STATE OF MICHIGAN

22

23   My Commission Expires:

24   _____, _____.
```

Highly Confidential - Michael B. Glasgow

```
 1                     CERTIFICATE
 2
              I, Carol A. Kirk, a Registered Merit
 3    Reporter and Notary Public in and for the State of
      Michigan, duly commissioned and qualified, do hereby
 4    certify that the within-named MICHAEL B. GLASGOW was
      by me first duly sworn to testify to the truth, the
 5    whole truth, and nothing but the truth in the cause
      aforesaid; that the deposition then given by him was
 6    by me reduced to stenotype in the presence of said
      witness; that the foregoing is a true and correct
 7    transcript of the deposition so given by him; that the
      deposition was taken at the time and place in the
 8    caption specified and was completed without
      adjournment; and that I am in no way related to or
 9    employed by any attorney or party hereto or
      financially interested in the action; and I am not,
10    nor is the court reporting firm with which I am
      affiliated, under a contract as defined in Civil Rule
11    28(D).
12
13            IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my seal of office at Dexter, Michigan
14    on this 9th day of March 2020.
15
16
17            _____
              CAROL A. KIRK, RMR, CSR-9139
18            NOTARY PUBLIC - STATE OF MICHIGAN
19
20    My Commission Expires:  August 19, 2022.
21                     - - -
22
23
24
```

Highly Confidential - Michael B. Glasgow

```
 1              DEPOSITION ERRATA SHEET

 2    I, MICHAEL B. GLASGOW, have read the transcript

      of my deposition taken on the 25th day of February

 3    2020, or the same has been read to me.  I request that

      the following changes be entered upon the record for

 4    the reasons so indicated.  I have signed the signature

      page and authorize you to attach the same to the

 5    original transcript.

 6    Page  Line  Change and Reason:

 7    ____  ____  _____

 8    ____  ____  _____

 9    ____  ____  _____

10    ____  ____  _____

11    ____  ____  _____

12    ____  ____  _____

13    ____  ____  _____

14    ____  ____  _____

15    ____  ____  _____

16    ____  ____  _____

17    ____  ____  _____

18    ____  ____  _____

19    ____  ____  _____

20    ____  ____  _____

21    ____  ____  _____

22    ____  ____  _____

23    ____  ____  _____

24    Date _____  Signature _____
```

Highly Confidential - Michael B. Glasgow

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF MICHIGAN

 3                  SOUTHERN DIVISION

 4     _____

                                )

 5                              )   Civil Action No.

                                )   5:16-cv-10444-JEL-MKM

 6     In re:  FLINT WATER CASES )   (consolidated)

                                )

 7                              )   Hon. Judith E. Levy

                                )   Mag. Mona K. Majzoub

 8     _____)

 9

10                  HIGHLY CONFIDENTIAL

11        VIDEOTAPED DEPOSITION OF MICHAEL B. GLASGOW

12                     VOLUME III

13

14              Wednesday, February 26, 2020

15                   at 8:58 a.m.

16

17     Taken at:  Butzel Long

                   41000 Woodward Avenue

18                 Bloomfield Hills, Michigan  48304

19

20

21

22     REPORTED BY:  CAROL A. KIRK, RMR/CSR-9139

23              GOLKOW LITIGATION SERVICES

            877.370.3377 ph | 917.591.5672 fax

24                 deps@golkow.com
```

Highly Confidential - Michael B. Glasgow

```
 1                    A P P E A R A N C E S
 2                         - - -
 3     On behalf of the Class Plaintiffs:
               STEPHEN E. MORRISSEY, ESQUIRE
 4             BENJAMIN MANNE, ESQUIRE
               SUSMAN GODFREY L.L.P
 5             1201 Third Avenue, Suite 3800
               Seattle, Washington  98101
 6             206-516-3880
               smorrissey@susmangodfrey.com
 7             bmanne@susmangodfrey.com
 8
       On behalf of Individual Plaintiffs:
 9             DONALD H. DAWSON, JR., ESQUIRE
               FIEGER LAW
10             19390 West Ten Mile Road
               Southfield, Michigan  48075-2463
11             248-355-5555
               d.dawson@fiegerlaw.com
12
13     On behalf of Individual Plaintiffs (via
       teleconference):
14             ALASTAIR J.M. FINDEIS, ESQUIRE
               NAPOLI SHKOLNIK PLLC
15             400 Broadhollow Road, Suite 305
               Melville, New York  11747
16             631-224-1133
               afindeis@napolilaw.com
17
18     On behalf of the Mason State Court Plaintiffs:
               ADAM T. SCHNATZ, ESQUIRE
19             MCALPINE PC
               3201 University Drive, Suite 200
20             Auburn Hills, Michigan  48326
               248-373-3700
21             atschnatz@mcalpinepc.com
22
23
24
```

Highly Confidential - Michael B. Glasgow

```
 1            A P P E A R A N C E S (CONT'D)
 2                      - - -
 3   On behalf of the People of the State of Michigan:
          RICHARD KUHL, ASSISTANT ATTORNEY GENERAL
 4        DANA NESSEL, ATTORNEY GENERAL
          525 West Ottawa Street, 6th Floor
 5        Lansing, Michigan  48909
          517-335-7664
 6        kuhlr@michigan.gov
 7
     On behalf of Defendants Veolia Water North America
 8   Operating Services, LLC, Veolia North America, LLC,
     and Veolia North America, Inc.:
 9        ALAINA N. DEVINE, ESQUIRE
          CAMPBELL CONROY & O'NEIL, P.C.
10        1205 Westlakes Drive, Suite 330
          Berwyn, Pennsylvania  19312
11        adevine@campbell-trial-lawyers.com
12
     On behalf of Defendant Rowe Professional Services
13   Company (via teleconference):
          CRAIG S. THOMPSON, ESQUIRE
14        SULLIVAN, WARD, ASHER & PATTON, PC
          25800 Northwestern Highway, Suite 1000
15        Southfield, Michigan  48075
          248-746-0700
16        cthompson@swappc.com
17
     On behalf of Defendant City of Flint:
18        WILLIAM KIM, ASSISTANT CITY ATTORNEY
          CITY OF FLINT LEGAL DEPARTMENT
19        1101 South Saginaw Street, 3rd Floor
          Flint, Michigan  48502
20        810-766-7146
          wkim@cityofflint.com
21
22
23
24
```

Highly Confidential - Michael B. Glasgow

```
1              A P P E A R A N C E S (CONT'D)
2                       - - -
3    On behalf of Defendants Leo A. Daly Company and
     Lockwood, Andrews & Newnam, Inc.:
4            TRAVIS S. GAMBLE, ESQUIRE
             FAEGRE DRINKER BIDDLE & REATH LLP
5            1717 Main Street, Suite 5400
             Dallas, Texas  75201
6            469-357-2534
             travis.gamble@dbr.com
7
8    On behalf of McLaren Regional Medical Center:
             SUSAN E. SMITH, ESQUIRE
9            BEVERIDGE & DIAMOND, P.C.
             456 Montgomery Street, Suite 1800
10           San Francisco, California  94104
             1-415-262-4000
11           ssmith@bdlaw.com
12
     On behalf of Defendant Adam Rosenthal (via
13   teleconference):
             JAMES A. FAJEN, ESQUIRE
14           FAJEN & MILLER, PLLC
             3646 West Liberty Road
15           Ann Arbor, Michigan  48103
             734-995-0181
16           fajenlaw@fajenmiller.com
17
     On behalf of Defendants Bradley Wurfel and Daniel
18   Wyant (via teleconference):
             CHRISTOPHER B. CLARE, ESQUIRE
19           CLARK HILL PLC
             1001 Pennsylvania Avenue NW, Suite 1300 South
20           Washington, DC  20004
             202-572-8671
21           cclare@clarkhill.com
22
23
24
```

Highly Confidential - Michael B. Glasgow

```
 1              A P P E A R A N C E S (CONT'D)
 2                      - - -
 3    On behalf of Defendants Patrick Cook and Michael
      Prysby (via teleconference):
 4            ALLISON M. COLLINS, ESQUIRE
              FOSTER SWIFT COLLINS & SMITH PC
 5            313 South Washington Square
              Lansing, Michigan  48933
 6            517-371-8124
              acollins@fosterswift.com
 7
 8    On behalf of Defendant Jeffrey Wright (via
      teleconference):
 9            MATTHEW T. WISE, ESQUIRE
              FOLEY MANSFIELD PLLP
10            130 East 9 Mile Road
              Ferndale, Michigan  48220
11            248-721-4200
              mwise@foleymansfield.com
12
13    On behalf of the MDEQ Employee Defendants (via
      teleconference):
14            JARED A. ROBERTS, ESQUIRE
              FRASER TREBILCOCK DAVIS & DUNLAP, P.C.
15            124 West Allegan Street, Suite 1000
              Lansing, Michigan  48933
16            517-482-5800
              jroberts@fraserlawfirm.com
17
18    On behalf of Defendant Gerald Ambrose (via
      teleconference):
19            BARRY A. WOLF, ESQUIRE
              503 Saginaw Street
20            Flint, Michigan  48502
              810-762-1084
21            bwolf718@msn.com
22
23
24
```

Highly Confidential - Michael B. Glasgow

```
 1              A P P E A R A N C E S (CONT'D)
 2                        - - -
 3   On behalf of Defendant Michael Glasgow:
            CHRISTOPHER J. MARKER, ESQUIRE
 4          O'NEILL, WALLACE & DOYLE P.C.
            300 St. Andrews Road, Suite 302
 5          Saginaw, Michigan  48638
            989-790-0960
 6          cmarker@owdpc.com
 7
     On behalf of Defendant Stephen Busch (via
 8   teleconference):
            KRISTA A. JACKSON, ESQUIRE
 9          SMITH HAUGHEY RICE & ROEGGE
            100 Monroe Center Street, NW
10          Grand Rapids, Michigan  49503
            616-774-8000
11          kjackson@shrr.com
12
     On behalf of Defendant Darnell Earley:
13          JOSEPH R. FURTON, ESQUIRE
            THE PERKINS LAW GROUP PLLC
14          615 Griswold Street,  Suite 400
            Detroit, Michigan  48826
15          313-964-1702
            j.furton@perkinslawgroup.net
16                  and
            T. SANTINO MATEO, ESQUIRE (via teleconference)
17          LAW OFFICES OF T. SANTINO MATEO
            535 Griswold, Suite 1000
18          Detroit, Michigan  483226
            313-962-3500
19          tsantinomateo@gmail.com
20
21
22
23
24
```

Highly Confidential - Michael B. Glasgow

```
 1           A P P E A R A N C E S (CONT'D)
 2                      - - -
 3   On behalf of Defendant Howard Croft (via
     teleconference):
 4           ALEXANDER S. RUSEK, ESQUIRE
             WHITE LAW PLLC
 5           2549 Jolly Road, Suite 340
             Okemos, Michigan  48864
 6           517-316-1195
             alexrusek@whitelawpllc.com
 7
 8   On behalf of Defendant Daugherty Johnson (via
     teleconference):
 9           LAUREN SAMONA, ESQUIRE
             BAJOKA LAW GROUP PLLC
10           500 Griswold, Suite 2320
             Detroit, Michigan  48226
11           313-462-0537
             laurensamona@bajokalaw.com
12
13
14   ALSO PRESENT:
15           Neal Rogers, Videographer
16
17                      - - -
18
19
20
21
22
23
24
```

```
 1      VIDEOTAPED DEPOSITION OF MICHAEL B. GLASGOW

 2                  INDEX TO EXAMINATION

 3   WITNESS                                      PAGE

 4   MICHAEL B. GLASGOW

 5        FURTHER EXAMINATION (CONT'D) BY MS. SMITH    746

          FURTHER EXAMINATION BY MS. DEVINE          751

 6        FURTHER EXAMINATION BY MR. GAMBLE          774

          FURTHER EXAMINATION BY MS. JACKSON         827

 7        FURTHER EXAMINATION BY MR. KUHL            843

          FURTHER EXAMINATION BY MS. SMITH           852

 8        FURTHER EXAMINATION BY MR. MORRISSEY       857

          FURTHER EXAMINATION BY MR. DAWSON          871

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Michael B. Glasgow

```
 1      VIDEOTAPED DEPOSITION OF MICHAEL B. GLASGOW

 2                     INDEX TO EXHIBITS

 3   GLASGOW            DESCRIPTION                    PAGE

 4   Exhibit 85    Flint Neighborhood United blog     769
                   post titled "Drinking Water
 5                 Testing"

 6   Exhibit 86    E-mail string ending with an       814
                   e-mail to Mr. Wright and others
 7                 from Mr. Croft, dated
                   2/25/2015, Bates-stamped
 8                 CROFT - 000001101 through 1106

 9   Exhibit 87    Document titled, "City of Flint    819
                   Technical Advisory Committee,
10                 5/20/2015 Meeting Summary,"
                   Bates-stamped COF_FED_0012286
11
     Exhibit 88    Document titled, "City of Flint    843
12                 11/7/2014 Meeting Summary,"
                   Bates-stamped COF_FED_0137300
13                 through 137303

14   Exhibit 89    E-mail string to                   880
                   Messrs. Earley, Walling, and
15                 Lorenz from Ms. Murphy, dated
                   11/3/2014, Bates-stamped
16                 COF_FED_0137795

17

18

19

20

21

22

23

24
```

Highly Confidential - Michael B. Glasgow

```
 1              P R O C E E D I N G S

 2                      - - -

 3              THE VIDEOGRAPHER:  We are now on

 4         the record.  My name is Neal Rogers.

 5         I'm the video for Golkow Litigation

 6         Services.  Today's date is February 26,

 7         2020, and the time is 8:58 a.m.

 8              This video deposition is being

 9         held in Bloomfield Hills, Michigan, In

10         Re:  Flint water cases, Civil Action No.

11         5:16-cv-10444-JEL-MKM for the U.S.

12         District Court, Eastern District of

13         Michigan, Southern Division.

14              The deponent is Michael Glasgow.

15         Counsel will be noted on the

16         stenographic record.

17                      - - -

18              MICHAEL B. GLASGOW

19    being by me previously duly sworn, as hereinafter

20    certified, testifies and says as follows:

21         FURTHER EXAMINATION (CONT'D)

22    BY MS. SMITH:

23         Q.   Good morning, Mr. Glasgow.  I'm

24    Susan Smith.
```

Highly Confidential - Michael B. Glasgow

```
 1                We were speaking yesterday when we
 2   decided to wrap up because of the imminent
 3   weather disaster everyone was predicting.
 4                We had a long day yesterday, and
 5   you were asked a lot of questions and were
 6   presented with many documents.  I wanted to ask
 7   you, have you had a chance to think over your
 8   testimony the last two days?
 9        A.    Yes.  Somewhat, yes.
10        Q.    And is there anything that you
11   thought of that you'd like to change in terms of
12   what you said or how it was said?
13        A.    Not that I can recall.  No.
14                MR. FAJEN:  This is Jim Fajen for
15        Adam Rosenthal.
16        Q.    And yesterday you were asked
17   questions about testing around 212 Browning
18   Street, Ms. Walters' home and your assessment
19   that you could not make projections about what
20   was happening in the entire system.  It was a
21   systemwide problem based on that data set.
22                Did I understand you correctly?
23        A.    Yes, you did.
24        Q.    Okay.  And you were asked
```

Highly Confidential - Michael B. Glasgow

```
1   questions concerning sampling conducted in the

2   immediate area around McLaren Flint Hospital

3   yesterday by a company called ETC.

4              Would you have the same view of

5   that data set as you did with respect to the

6   data set at Ms. Walters' home, meaning you

7   couldn't project what was happening in the

8   entire system based on that information?

9              MR. MARKER:  Objection; form,

10        foundation.

11             MR. DAWSON:  Object to foundation.

12             MR. KIM:  Objection to form as

13        well.

14     A.    I will say yes.

15     Q.    And would you agree, sir, that

16   data set gives you information about the

17   localized area in that immediate vicinity of the

18   hospital?

19             MR. MARKER:  Objection; form,

20        foundation.

21     A.    Yes.

22     Q.    And yesterday you were shown

23   Exhibit -- Johnson Exhibit 142, which was marked

24   in this deposition as well.
```

Highly Confidential - Michael B. Glasgow

1           MR. MARKER:  Do you know what it

2      was marked as?

3           MS. SMITH:  I don't.  It's right

4      there (indicating.)

5           THE WITNESS:  This is Johnson 141.

6           MS. SMITH:  It is the October 3rd

7      e-mail -- it begins with the October 3rd

8      e-mail from Mr. Earley.  It's

9      Bates-numbered COF_FED_0140171.

10          MR. DAWSON:  What number is it?

11     147?

12          MS. SMITH:  I have it as Johnson

13     142.

14          MR. DAWSON:  Thank you.

15          MS. SMITH:  Yeah.

16          MR. MARKER:  October 30 or

17     October 31?

18          MS. SMITH:  October 3rd.

19          MR. MARKER:  3rd.

20          MS. SMITH:  I can hand you my

21     copy.  We can do it that way.

22  BY MS. SMITH:

23          Q.   And who is Mr. Earley?

24          A.   At that time I believe he was the

Highly Confidential - Michael B. Glasgow

1    emergency manager for the city of Flint.

2          Q.    And this is Mr. Earley's response

3    to ultimately your report back about your first

4    meeting at McLaren Flint Hospital in

5    October 2014; is that right?

6          A.    Yeah, I could agree with that.

7          Q.    And in that e-mail, Mr. Earley

8    says, "Therein lies our message - an internal

9    problem at Flint that we are helping them with."

10               Correct?

11               MR. MARKER:  Objection to form,

12          foundation.

13         A.    An internal issue at McLaren that

14   we were working with, yes.

15               (Reporter clarification.)

16         A.    I said, to me, it reads an

17   internal issue at McLaren that we were working

18   on.

19         Q.    Okay.  And did you receive this

20   e-mail?

21         A.    I did not.

22         Q.    You did not.  Okay.

23         A.    I don't recall.  I see I'm cc'd on

24   it, but I don't recall.

Highly Confidential - Michael B. Glasgow

```
 1                MS. SMITH:  Okay.  Well, then I

 2          will have no further questions.

 3                THE VIDEOGRAPHER:  Going off the

 4          record at 9:06 a.m.

 5                (Pause in proceedings.)

 6                THE VIDEOGRAPHER:  We are back on

 7          the record at 9:08 a.m.

 8                      - - -

 9                FURTHER EXAMINATION

10     BY MS. DEVINE:

11          Q.   Good morning, Mr. Glasgow.  My

12     name Alaina Devine.  I represent the Veolia

13     North America Defendants.  I work with

14     Mr. Campbell who was here questioning you on

15     Monday.  I just have a few follow-up questions

16     for you based on the testimony you've given over

17     the past two days.

18                You had testified that there was a

19     decision made with respect to corrosion control

20     treatment and specifically phosphates before the

21     switch in April of 2014.

22                Do you recall testifying about

23     that?

24          A.   I do, yes.
```

     1            Q.    And if I recall correctly, you

     2    gave testimony that there was instruction from

     3    the MDEQ, specifically Mr. Prysby, who was the

     4    engineer assigned to the city of Flint, your

     5    engineer, that they were not going to be adding

     6    phosphates to the water; you were not required

     7    to add phosphates to the water; is that correct?

     8                  MR. MORRISSEY:  Objection to form.

     9                  MS. COLLINS:  Object to the form.

    10                  MR. KUHL:  Object to form; assumes

    11          testimony.

    12            A.    That is correct.

    13            Q.    What is your understanding of

    14    Mr. Prysby's role with respect to the city of

    15    Flint?

    16            A.    He was our MDEQ district engineer

    17    assigned to oversee the city.

    18            Q.    Thank you very much.

    19                  With respect to the decision not

    20    to implement corrosion control treatment or add

    21    phosphates to the water, do you know the reason

    22    for that, as you sit here today?

    23            A.    The reason is it was explained to

    24    me their interpretation of the Safe Drinking

1    Water Act was that a change in water source

2    would kind of start us from scratch, so we would

3    have to endure two six-month rounds of lead and

4    copper samples, and then a determination would

5    be made whether phosphate was necessary or not.

6          Q.    Do you know if there were any cost

7    considerations associated with that?

8          A.    Not to my knowledge.

9          Q.    Okay.  Or any wastewater

10   considerations?

11         A.    Not to my knowledge.

12         Q.    Yesterday you were asked to look

13   at a series -- or excuse me -- Monday -- a

14   series of exhibits that the VNA Defendants put

15   in front of you, specifically Exhibits 11 and

16   12.  And I've asked you to pull those out this

17   morning.

18              If you recall, there was some

19   questioning and testimony about whether these

20   were templates created by the MDEQ; is that

21   correct?

22         A.    Yes, that is correct.

23         Q.    And if you look specifically -- I

24   believe it's Exhibit 11.  There is a paragraph

Highly Confidential - Michael B. Glasgow

1    in italics halfway down on that page which

2    discusses lead and the impacts of lead on humans

3    and drinking water; is that correct?

4           A.    That is correct.  Yes.

5           Q.    And your testimony on Monday was

6    that this was information you were aware of as

7    the operator in charge of the Flint water

8    treatment plant in 2013.

9                 Is that still your testimony

10   today?

11          A.    Yes.

12          Q.    And that's true in 2014 and 2015

13   as well, correct?

14          A.    Correct.

15          Q.    And you didn't need anyone to tell

16   you in 2013, 2014, or 2015 that lead can cause

17   serious health problems if too much enters the

18   body from drinking water or other sources; is

19   that correct?

20          A.    That is correct.

21          Q.    And is it fair to say that your

22   colleagues at the city of Flint, specifically

23   Mr. Croft, Mr. Johnson, Mr. Bincsik, or

24   Mr. Wright, also knew that lead in drinking

```
 1   water could present serious health risks --

 2               MR. MARKER:  Form, foundation.

 3               MR. KUHL:  Object to form and

 4        foundation.

 5        Q.    -- as described in this paragraph?

 6               MR. KUHL:  Sorry.  Object to form

 7        and foundation.

 8        A.    I will say I hope they understood

 9   that issue.

10        Q.    Okay.

11        A.    I can't speak for them, though.

12        Q.    And you were asked a series of

13   questions on Monday about the specific duties of

14   the city of Flint, specifically the duty and

15   obligation of the city and its officials to

16   inform its citizens to protect themselves from

17   lead in the drinking water.

18               Do you remember that series of

19   questions?

20        A.    I do, yes.

21        Q.    And that applies not only to you,

22   but also to Mr. Croft who was the director of

23   public works at the time, Mr. Johnson who was

24   the utilities director at the time, Mr. Bincsik
```

Highly Confidential - Michael B. Glasgow

```
 1   who was in charge of the distribution system,

 2   and Mr. Wright who was the water treatment

 3   supervisor; is that correct?

 4              MR. KUHL:  Objection; form and

 5         foundation.

 6         A.   Yes, that's correct.

 7         Q.   I'd ask you to look at Exhibit 10.

 8   We showed you this exhibit on Monday.  And at

 9   that time, we discussed that this was an e-mail

10   chain discussing the context of the LeeAnne

11   Walters' lead testing results in February of

12   2015.

13              Do you remember that?

14         A.   I do, yes.

15         Q.   Okay.  And this first e-mail here

16   that you sent on February 24, 2015 at 1:48 p.m.,

17   that was sent to Mr. Croft; is that correct?

18         A.   Yes.

19         Q.   And he's the director of public

20   works in the city of Flint?

21         A.   Yes.  He was at that time.

22         Q.   And Mr. Johnson who was the

23   utilities director at that time?

24         A.   Yes.
```

Highly Confidential - Michael B. Glasgow

```
 1          Q.    And Mr. Croft was Mr. Johnson's

 2    supervisor; is that fair to say?

 3          A.    That is correct.

 4          Q.    Okay.  Mr. Bincsik who is in

 5    charge of the distribution system, and

 6    Mr. Johnson was Mr. Bincsik's supervisor; is

 7    that fair to say?

 8          A.    That is fair to say, yes.

 9          Q.    And Mr. Wright who at the time was

10    the supervisor, at least on the administrative

11    side of things, at the water treatment plant,

12    correct?

13          A.    Correct.

14          Q.    So you're sending this e-mail to

15    your supervisors and their supervisors; is that

16    right?

17          A.    That is correct, yes.

18          Q.    And in this e-mail, you're

19    specifically discussing the lead testing results

20    at the Walters' residence, specifically the 104

21    parts per billion test result that you

22    discovered at that time; is that right?

23          A.    That is correct.

24          Q.    And you write in this paragraph,
```

Highly Confidential - Michael B. Glasgow

1    "Definitely a pressing issue here."

2              Mr. Glasgow, were you specifically

3    speaking to the high lead content in the water

4    at that time?

5              MR. KUHL:  Objection to form,

6         foundation.

7         A.    Yes.  That is what this e-mail is

8    revolving around.

9         Q.    Okay.  So at that time, you're

10   expressing to your supervisors and their

11   supervisors at the city of Flint that this is a

12   pressing issue, the fact that there's high lead

13   content in the water as evidenced by this test

14   result is a pressing issue; is that correct?

15             MR. KUHL:  Objection to form and

16        foundation, misstating testimony.

17        A.    Yeah, I'll say there's a pressing

18   issue at this residence.  Yes.

19        Q.    Okay.  If you --

20             MR. KIM:  What's the exhibit

21        number?

22             MS. DEVINE:  This is Exhibit 10.

23        It's CROFT-000000125.

24

1    BY MS. DEVINE:

2            Q.    If you look at the next e-mail in

3    the chain, this is Mr. Bincsik.  And as I just

4    asked you, he's in charge of the distribution

5    system; is that correct?

6            A.    That is correct.  Yes.

7            Q.    Okay.  And Mr. Bincsik responds to

8    your e-mail stating that "The majority of the

9    service lines in Flint are lead."  He goes to

10   say that "Marvin from Veolia mentioned to me

11   that he thought we needed to add phosphates to

12   prevent this" -- this being lead.  "Perhaps we

13   need to move on this sooner rather than later."

14           Did I read that correctly?

15           A.    Yes, you did.

16           Q.    And this is Mr. Bincsik who's in

17   charge of the distribution system sending this

18   e-mail to his supervisors and his supervisors'

19   supervisors, again Mr. Croft, correct?

20           A.    Correct.  Yes.

21           Q.    And you received this e-mail as

22   well, correct?

23           A.    Yes.

24           Q.    And this e-mail, again, is made in

Highly Confidential - Michael B. Glasgow

1    the context of a LeeAnne Walters' lead testing

2    result; is that right?

3            A.    That is correct.  Yes.

4            Q.    I'd like you to move to the next

5    e-mail down the chain.

6                  MR. MARKER:  It's not attached to

7            this exhibit?

8                  THE WITNESS:  It's on the back

9            side.

10                 MR. MARKER:  Oh, it's on the flip

11           side.

12   BY MS. DEVINE:

13           Q.    So at the bottom of the first

14   page, it begins with an e-mail from Mr. Croft.

15   This is the same day less than an hour after you

16   sent your first e-mail saying "Definitely a

17   pressing issue," and about less than ten minutes

18   after Mr. Bincsik expresses that phosphates

19   should be added to the water, Mr. Croft then

20   responds, if you turn to the second page, "Move

21   quickly to isolate this to a service line if

22   possible."

23                 Did I read that correctly?

24           A.    Yes.

Highly Confidential - Michael B. Glasgow

```
 1                 MR. MORRISSEY:  Object to form.

 2          Q.    Does Mr. Croft's e-mail here

 3   acknowledge that Mr. Bincsik is making a

 4   recommendation that phosphates should be added

 5   to the water to help prevent lead from leaching?

 6                 MR. MARKER:  Objection; form,

 7          foundation.

 8                 MR. KUHL:  Objection; form,

 9          foundation, calls for speculation.

10          A.    I can't say I get that

11   understanding.

12          Q.    Okay.  So you don't see anything

13   in this e-mail that specifically responds to or

14   discusses the recommendation that Mr. Bincsik is

15   passing on, do you?

16                 MR. KUHL:  Objection; form,

17          foundation.

18                 MR. MORRISSEY:  Objection.

19          A.    I can't say I do, no.

20          Q.    Okay.  Are you aware of any

21   actions other than Mr. Croft's response that the

22   issues should be isolated to the service line if

23   possible, that Mr. Croft specifically took with

24   respect to the recommendation to add phosphate
```

Highly Confidential - Michael B. Glasgow

1    to the water?

2              MR. MORRISSEY:  Object to form.

3         A.    I'm sorry.  Could you restate

4    that?

5         Q.    Sure.  Are you aware of any

6    actions that Mr. Croft took in response to the

7    recommendation passed on by Mr. Bincsik's

8    previous e-mail about adding phosphate to the

9    water other than this e-mail right here?

10             MR. MORRISSEY:  Object to form.

11        A.    I do not, no.

12        Q.    Are you aware of any actions

13   Mr. Johnson took?

14             MR. MORRISSEY:  Object to form.

15        A.    No, I am not.

16        Q.    Are you aware of any actions that

17   Mr. Wright took in response to this e-mail from

18   Mr. Bincsik?

19             MR. MORRISSEY:  Object to form.

20        A.    I do not, no.

21        Q.    Did you take any actions as a

22   result of receiving that e-mail from Mr. Bincsik

23   with respect to the recommendations of adding

24   phosphate to the water?

Highly Confidential - Michael B. Glasgow

```
 1            A.    I did not, no.

 2            Q.    I believe on Monday you had

 3     testified about a discussion that you had with

 4     Mr. Green; is that correct?

 5            A.    Yes.

 6            Q.    And that was somewhere, based on

 7     your testimony, in the late February, early

 8     March time frame; is that accurate?

 9            A.    Yeah.  To the best of my

10     recollection, yes.

11            Q.    And that specific discussion was

12     with respect to adding phosphate to the water;

13     is that right?

14            A.    That is correct.

15            Q.    And I believe you also testified

16     on Monday that you made that same recommendation

17     to the exact same superiors who are listed on

18     this e-mail, Mr. Croft, Mr. Johnson, and

19     Mr. Wright; is that correct?

20                  MR. MORRISSEY:  Object to form.

21            A.    I -- I don't recall if I made that

22     comment.

23            Q.    Okay.  I have your testimony from

24     Monday.
```

Highly Confidential - Michael B. Glasgow

```
 1            A.    Yeah, if it's in my testimony,

 2     then I will stick by my testimony.  When I'm

 3     originally thinking about the time I mentioned

 4     it to Mr. Green, it was after a meeting and just

 5     kind as we were passing in the hallway.

 6            Q.    Sure.  But you had testified that

 7     at the time of the Walters' test results, that's

 8     when you first started to learn that lead could

 9     be a potential in the Flint distribution system;

10     is that correct?

11            A.    That is correct, yes.

12            MR. MORRISSEY:  Object to form.

13            Q.    And the action that you took in

14     speaking to Mr. Green was as a direct response

15     to that discovery on your own?

16            A.    Yes.

17            Q.    If you look down to the next

18     e-mail, in response to Mr. Croft's statement

19     that you should move quickly or the people on

20     the chain should move quickly to isolate this to

21     the service line if possible, Mr. Bincsik

22     responds less than two hours later stating, "I

23     think this indicates a larger potential problem

24     in the system.  If this one service is showing
```

 1    lead issues, the entire system could begin to

 2    show these problems."

 3              And he sends that e-mail to,

 4    again, his supervisors and their supervisor; is

 5    that right?

 6        A.    That is correct.  Yes.

 7        Q.    And you're also included on that

 8    e-mail; is that correct?

 9        A.    Yes.

10        Q.    You respond the next morning to

11    the same e-mail chain indicating, "I'm not sure

12    I would rush to say this will be seen in the

13    entire system."

14        A.    Yes.

15        Q.    Do you stand by that statement

16    here today, Mr. Glasgow?

17        A.    Yes, I do.

18        Q.    Okay.  Is it true that Mr. Bincsik

19    was, in fact, right that it could be a potential

20    problem in the system, a lead problem in the

21    system?

22              MR. KUHL:  Objection to form and

23          foundation.

24        A.    I think hindsight shows us that it

```
 1    was -- he was right.  I based it on

 2    laboratory -- I like to see lots of data before

 3    I make a decision --

 4         Q.    Sure.

 5         A.    -- which is why I respond the way

 6    I do in my response to his e-mail.

 7         Q.    But you were aware of

 8    Mr. Bincsik's prediction at that time in

 9    February of 2015 as the supervisor of the

10    distribution system, that to him this indicates

11    a larger potential problem in the system,

12    correct?

13              MR. MARKER:  Form, foundation.

14              MR. KUHL:  Objection to form,

15         foundation.

16         A.    Correct.

17         Q.    If you look at Exhibit 21, which

18    was shown to you on Monday.  This is a Virginia

19    Tech Bates number.  This is VATECH_00064173.

20              Sir, you're not listed as a

21    recipient or copied on this e-mail; is that

22    correct?

23         A.    That is correct.

24         Q.    But this is two days after you're
```

Highly Confidential - Michael B. Glasgow

```
 1    e-mailing with your supervisor and their

 2    supervisors at the city of Flint with respect to

 3    the Walters' test result; is that correct?

 4           A.    That is correct.

 5           Q.    And that was the exhibit we just

 6    went through.

 7                 If you look at this exhibit, we

 8    discussed how this is Miguel Del Toral who is an

 9    individual at the EPA that I believe you

10    testified you actually spoke to about the

11    Walters' test results; is that right?

12           A.    That is correct, yes.

13           Q.    Okay.  And he is e-mailing Mike

14    Prysby, who you describe as the DEQ engineer

15    assigned to the city of Flint, along with four

16    other EPA officials and two other MDEQ

17    officials; is that -- did I accurately summarize

18    who's in the to and from lines of this e-mail?

19           A.    Yes.  Your statement was accurate.

20           Q.    If you look at the bottom of this

21    e-mail, Miguel Del Toral is stating, "If I

22    remember correctly, Detroit is feeding PO4" --

23    is that phosphates?

24           A.    Yes.
```

Highly Confidential - Michael B. Glasgow

1        Q.     -- "for the LCR, but since Flint

2    is no longer part of that interconnection, I was

3    wondering what their OCCT is.  They're required

4    to have OCTT in place, which is why I was asking

5    what they were using."

6              Were you aware that in February of

7    2015, the EPA was instructing the MDEQ that they

8    were required to have corrosion control

9    treatment in place?

10             MR. KUHL:  Objection; form and

11        foundation.

12        A.     Not at that time, no.

13        Q.     That's not something Mr. Prysby

14   shared with you in 2015?

15        A.     No, not that I can recall.  No.

16        Q.     And did the EPA directly share

17   that information with you?

18        A.     No, they did not.

19        Q.     Did the MDEQ in February of 2015

20   know that the city of Flint was not feeding

21   phosphates?

22             MR. MARKER:  Objection; form and

23        foundation.

24             MS. COLLINS:  Objection;

Highly Confidential - Michael B. Glasgow

```
 1              speculation, form.

 2              A.    Yes, I believe they understood our

 3       treatment process.

 4              Q.    Do you know how many of the Veolia

 5       North America recommendations were implemented

 6       in the city of Flint?

 7                    MR. MORRISSEY:  Object to form.

 8              A.    No.  I cannot say offhand.

 9              Q.    Okay.

10                          - - -

11       (Glasgow Deposition Exhibit 85 marked.)

12                          - - -

13                    MS. DEVINE:  Counsel, this was

14              disclosed on our exhibit list.  It's a

15              city of Flint blog post from June of

16              2015 titled "Drinking Water Testing."

17       BY MS. DEVINE:

18              Q.    Sir, on the second page, it

19       indicates a signature line of Mike Glasgow.

20                    Is that yourself?

21              A.    Yes.

22              Q.    Okay.  And this is a blog post; is

23       that fair to say?

24              A.    Yes, it appears to be.
```

Highly Confidential - Michael B. Glasgow

```
1              Q.    Okay.  And this is from the June

2    of 2015 time frame according to the date on the

3    first page, which is June 18, 2015.

4                    Do you recall writing this letter

5    or blog post?

6              A.    I recall writing this letter.  I

7    don't remember posting it on the blog.  Most

8    likely, it was our city communications --

9              Q.    You had give --

10             A.    -- person.

11             Q.    I apologize.

12             A.    Oh, no.  That's okay.

13             Q.    You had given some testimony

14   yesterday and on Monday that in 2015 and in

15   2014, you did not know where the lead service

16   lines in the city of Flint specifically were,

17   correct?

18                   MR. MARKER:  Form, foundation.

19             A.    That is correct.  I did not have a

20   list with the information.

21             Q.    Okay.  And in June of 2015, I

22   believe you had also testified that you were

23   having difficulty collecting sufficient samples

24   in the city of Flint for the second round of
```

Highly Confidential - Michael B. Glasgow

```
 1   lead and copper testing?

 2          A.    That is correct.  Yes.

 3          Q.    And in this post, you indicate

 4   towards the bottom, "If you live in the city or

 5   have family and friends who live in the city

 6   that would like to be a part of the sampling

 7   group, please contact me via e-mail or call the

 8   water treatment plant," and it includes the

 9   number.

10          A.    Yes.

11          Q.    Is it fair to say that you were

12   actively soliciting lead and copper samples from

13   basically anyone who would allow you to come

14   into their home and test?

15                MR. MARKER:  Form, foundation.

16          A.    Yes.

17          Q.    Okay.  Regardless of whether or

18   not they had a lead service line?

19                MR. KIM:  Objection as to form.

20          A.    Yes.  Without the information, I

21   didn't know that.  So we realized with

22   Ms. Walters early in February of '15, that there

23   was at least an issue out there.

24                So, yeah, a lot of panic was in
```

Highly Confidential - Michael B. Glasgow

1    the city.  So, yeah, we were going to accept

2    from wherever we could get the samples.

3            Q.    Okay.  And that was panic felt by

4    not only you but also your supervisors and their

5    j?

6                  MR. MARKER:  Objection; form,

7            foundation.

8            A.    Yeah.  I don't know if they were

9    as panicked as I was.  I can't say that.  I

10   would hope they were.  But, yeah, I can't say.

11           Q.    Okay.  And the panic specifically

12   was that there was the potential for a

13   widespread lead issue?

14                 MR. MARKER:  Objection; form.

15                 MR. KUHL:  Objection; form,

16           foundation.

17           A.    Yeah, my panic was I was worried

18   there would be more homes like Ms. Walters'

19   around.

20           Q.    On Monday you were asked if you

21   know now how many homes in the city of Flint

22   actually have lead service lines as determined

23   through the Fast Start program.

24                 Do you know what the number is?

1        MR. KIM:  Objection as to form and

2     foundation.

3     A.    I do not.

4     Q.    Have you or anyone at the city of

5  Flint, to your knowledge, gone back and looked

6  at the lead and copper reports from 2014 and

7  2015 and determined if any of those samples were

8  from lead service lines?

9        MR. KIM:  Objection as to form and

10     foundation.

11        MR. MARKER:  Form, foundation.

12     A.    I can't say that I know.

13     Q.    Other than informing Mr. Prysby

14  and perhaps Mr. Rosenthal of the fact that you

15  didn't know where the lead service lines were,

16  did you tell anybody else about that?

17        MS. COLLINS:  Objection; form.

18     A.    I would imagine I told all of my

19  immediate supervisors.  I was pressing them in

20  late October of 2014 to come up with a list for

21  me.

22     Q.    And did they?

23     A.    No.

24     Q.    And the importance of knowing

Highly Confidential - Michael B. Glasgow

```
 1    where the lead service lines are for purposes of

 2    lead and copper testing is to make sure you're

 3    capturing the highest potential homes that have

 4    lead in them; is that correct?

 5          A.    Yes.

 6                MR. MARKER:  Form and foundation.

 7                MR. KUHL:  Objection to form,

 8          misstates the Lead and Copper Rule --

 9          A.    Yes, that would be the more --

10                MR. KUHL:  -- constitutes a

11          Tier 1 --

12          A.    -- more homes at risk for that

13    issue, yes.

14                MS. DEVINE:  Okay.  I have nothing

15          further.

16                THE VIDEOGRAPHER:  We are going

17          off the record at 9:29 a.m.

18                (Pause in proceedings.)

19                THE VIDEOGRAPHER:  We are back on

20          the record at 9:30 a.m.

21                      - - -

22                FURTHER EXAMINATION

23    BY MR. GAMBLE:

24          Q.    Mr. Glasgow, I'm going to be
```

1   jumping around quite a bit, so just bear with me

2   as far as the topics that I'm asking you about.

3   But I want to follow up on some of your prior

4   testimony from yesterday and the day before.

5            I believe yesterday you testified

6   in response to a question about responsibility

7   for implementing corrosion control at the Flint

8   water treatment plant prior to the switchover.

9            Do you recall being asked

10  questions about that?

11       A.   I do, yes.

12       Q.   And I think your response was that

13  you defer to the DEQ and the engineers as to who

14  was responsible for implementing corrosion

15  control.

16            Was that your response?

17       A.   Yeah.  From my recollection, yes.

18       Q.   And when you were talking about

19  engineers, were you referring to LAN?

20       A.   Yes.

21       Q.   You didn't know or don't know what

22  LAN's scope of work was with regard to the work

23  on the Flint water treatment plant, do you?

24       A.   I did not, no.

Highly Confidential - Michael B. Glasgow

1      Q.    That was not part of your job,

2  right?

3      A.    No.  Not at that time, no.

4      Q.    You were not involved in

5  negotiations or meetings with LAN and the city

6  of Flint regarding what it was that LAN would do

7  with regard to retrofitting the Flint water

8  treatment plant?

9      A.    No, I was not.

10     Q.    And you only knew that they were

11  actually retained to do some design work on the

12  Flint water treatment plant equipment, correct?

13     A.    Correct.  I did not know the full

14  scope.

15     Q.    They weren't talking to you about

16  how to chemically treat the water from the Flint

17  River at all, were they?

18     A.    No, not that I can ever recall.

19     Q.    They were not providing any input

20  to you about what dosages or what chemicals to

21  utilize when treating Flint River water when it

22  went online in April of 2014, correct?

23     A.    Yes.

24     Q.    Are you aware of whether LAN made

1    prior recommendations about corrosion control to

2    others at the city of Flint?

3         A.    No, I am not aware.

4         Q.    And you're not aware whether they

5    made recommendations regarding full softening?

6         A.    No, I am not.

7         Q.    But you were aware that they did

8    make a recommendation that the plant operate a

9    60- to 90-day -- 60- to 90-day plant test run to

10   actually evaluate the water quality that was

11   coming out of the Flint water treatment plant

12   using Flint River, correct?

13        A.    Correct.  Yes.  I had a

14   conversation with Mr. Green about that myself,

15   yes.

16        Q.    And you didn't implement any 60-

17   to 90-day test run to evaluate water quality

18   before distributing water in April of 2014, did

19   you?

20        A.    I did not have the ability, no.

21        Q.    And I want to make certain I'm

22   clear on this.  We talked before about the Lead

23   and Copper Rule and what your understanding of

24   it was with regard to corrosion control.

Highly Confidential - Michael B. Glasgow

1           Do you recall that testimony?

2      A.    Yes.

3      Q.    And I think you testified that

4   your understanding of the Lead and Copper Rule

5   was that some sort of corrosion control

6   treatment would need to be utilized in the final

7   water design and the water treatment coming out

8   of the Flint water treatment plant, correct?

9           MR. KUHL:  Objection; form,

10          misstates his prior testimony.

11     A.    Yes.  From knowing that Detroit

12  water had a corrosion control or a corrosion

13  inhibiter in it, I was thinking along those

14  lines that we would need it as well.

15     Q.    You never raised that concern --

16  well, strike that.

17          Was that a concern to you when the

18  MDEQ indicated they weren't going to require

19  some form of corrosion control prior to the

20  switchover?

21          MR. MARKER:  Object to form,

22          foundation.

23     A.    It wasn't a concern for long

24  with -- I don't want to say with their blessing,

Highly Confidential - Michael B. Glasgow

1    but with their interpretation.  That's what I

2    would go by.

3         Q.    And you never took that concern or

4    those beliefs to LAN to discuss what was

5    required by the Lead and Copper Rule, right?

6         A.    Not that I recall, no.

7         Q.    You testified before about the

8    initial test run, is what I'll call it, which

9    was in July of 2013 at the Flint water treatment

10   plant.

11              Do you recall questions about

12   that?

13        A.    I do, yes.

14        Q.    And I think that was the first

15   time you fired up the plant to see if it would

16   actually work, right?

17              MR. MARKER:  Form and foundation.

18        A.    We had fired it up before.  That

19   was the first time in a while we fired up the

20   softening process.

21        Q.    So you were trying to adequately

22   treat the Flint River water during the July 2013

23   initial test run, correct?

24        A.    Correct.  Yes.

Highly Confidential - Michael B. Glasgow

1        Q.    And you were trying to get at

2   least some water data for how to treat the Flint

3   River water at that time, correct?

4        A.    Correct.  Yes.

5        Q.    That test run ended after 30 days,

6   didn't it?

7        A.    Yes.

8        Q.    And, in fact, that test run was

9   shut down because the equipment in the Flint

10  water treatment plant wasn't operating

11  correctly?

12       A.    There was some issues with

13  equipment.  To truly recall why we shut down,

14  I'll have to say that I think some of the

15  employees were a little wore out from 30 days of

16  overtime.

17       Q.    I believe yesterday you testified

18  that you were able to determine that the Flint

19  River water that was treated met the SDWA

20  requirements from the test runs.

21            Do you recall testifying about

22  that?

23       A.    I do, yes.

24       Q.    But you didn't confirm that the

Highly Confidential - Michael B. Glasgow

1    water coming from the Flint River, the treated

2    water, in July of 2013 actually met SDWA

3    requirements, correct?

4                   MR. KUHL:  Objection to form.

5           A.    Could you say that one more time?

6    I'm sorry.

7           Q.    Well, let me rephrase it.

8                 You were not able to gain any type

9    of meaningful data regarding water quality from

10   the initial test run in July of 2013, were you?

11          A.    Well, I wouldn't say no quality

12   data.  I mean, all data can be used for some

13   information, but I don't think -- from my memory

14   that, you know, we sent out extra samples to see

15   if we -- we met every single Safe Drinking Water

16   Act, you know, regulation.  But I will say that

17   the test run still left many questions.

18          Q.    You weren't able to determine

19   whether that water coming out of the Flint water

20   treatment plant in July of 2013 actually met

21   SDWA requirements, right?

22                   MR. MARKER:  Form, foundation.

23                   MR. KIM:  Object to form.

24          A.    I will say I couldn't, no.

Highly Confidential - Michael B. Glasgow

1          Q.   Excuse me for one second.  I need

2     to grab documents.

3               Mr. Glasgow, yesterday you were

4     asked questions about LAN's contract with the

5     city of Flint.

6               Do you recall that?

7          A.   Yes, I do.

8          Q.   And if I could have you turn to

9     Exhibit 72.

10              MR. MARKER:  Certainly.  One

11         moment.  72 --

12         A.   72?  Are you sure this is --

13              MR. MARKER:  -- or 71?

14         Q.   I believe it's 71.  I apologize.

15         A.   No worries.

16         Q.   And you recall being asked

17     questions about that document?

18         A.   Yes, I do.

19         Q.   Had you seen that document before

20     your deposition yesterday?

21         A.   I can't say that I had.

22         Q.   And you didn't know the specific

23     contents of the document, did you?

24         A.   I did not, no.

Highly Confidential - Michael B. Glasgow

```
1       Q.    You were asked certain questions

2  about the scope of work that was contained

3  within that document, right?

4       A.    Yes.  To my recollection, yes.

5       Q.    And that was the first time you

6  had read that, correct?

7       A.    Correct.

8       Q.    You were asked questions about the

9  compensation that was being proposed in that

10 document to be paid to LAN to do work on the

11 Flint water treatment plant.

12             Do you recall that?

13      A.    I do, yes.

14      Q.    And yesterday was the first time

15 you ever came to read that as well, correct?

16      A.    Yes.

17      Q.    Do you know the difference between

18 a proposal and a binding contract?

19      A.    Yes, I do.

20      Q.    And what's the difference?

21      A.    A proposal is just what you're --

22 in a sense, without using the same word -- I

23 don't have my thesaurus.  You're proposing

24 something.  It's not set in stone.  It's not
```

Highly Confidential - Michael B. Glasgow

```
1   been agreed to or signed off on to be put into

2   action.

3           Q.    And that's just common sense,

4   isn't it?

5           A.    In my eyes, yes.

6           Q.    If you would look at Exhibit 71

7   and if you could read the very first sentence of

8   the document.

9           A.    "Lockwood, Andrews & Newnam, Inc.

10  (LAN) is pleased to submit our scope of services

11  and fee proposal for the above-referenced

12  project."

13          Q.    Based on that sentence, do you

14  have an understanding of whether this is a

15  proposal or a contract?

16                MR. MARKER:  Object to form.

17          A.    I would infer that this is a

18  proposal.

19          Q.    And, again, as you sit here today,

20  you have no idea what LAN's scope of work was,

21  correct?

22          A.    Correct.

23          Q.    You have no idea that the city of

24  Flint actually narrowed LAN's scope or proposed
```

 1    scope of work throughout the early parts of

 2    2013, correct?

 3            MR. MARKER:  Objection; form.

 4            MR. KIM:  Objection as to form.

 5            MR. SCHNATZ:  Objection.

 6       A.   Yeah, that is correct.  I was

 7    unaware.

 8       Q.   And you don't specifically know

 9    what LAN was paid for their work on the Flint

10    water treatment plant, do you?

11       A.   No.  I never seen any true

12    figures.

13       Q.   Mr. Glasgow, you were briefly

14    asked questions about LAN and its relationship

15    with the Leo A. Daly Company yesterday.

16            Do you recall that?

17       A.   I do, yes.

18       Q.   And I believe you testified you

19    did not even understand who the Leo A. Daly

20    Company is or was, correct?

21       A.   That is correct.  I had no

22    understanding.

23       Q.   You have no understanding

24    regarding the relationship between LAN and

Highly Confidential - Michael B. Glasgow

1    Leo A. Daly company, do you?

2         A.    No, not whatsoever.

3         Q.    You were asked questions yesterday

4    regarding LAN providing input on corrosion

5    control and water data.  And I think you were

6    asked questions about what you would have liked

7    LAN to have told you, what you would have liked

8    Veolia to have told you about water quality and

9    corrosion control.

10             Do you recall those questions?

11        A.    Vaguely, yes.

12        Q.    Again, you didn't know what LAN's

13   scope of work was and whether they were required

14   contractually to tell you anything about

15   corrosion control or about water quality,

16   correct?

17             MR. MARKER:  Form.

18        A.    That is correct.

19        Q.    If I could turn your attention to

20   Exhibit 75.

21             And you were shown this document

22   yesterday, and it was represented to you that it

23   was an internal LAN e-mail regarding corrosion

24   control.

Highly Confidential - Michael B. Glasgow

1           Do you recall that?

2       A.    I do, yes.

3       Q.    And you had an opportunity to read

4   Exhibit 75, didn't you?

5       A.    Yes, I did.

6       Q.    And specifically they were

7   discussing what the city's decision was

8   regarding corrosion control and needing to

9   understand what it was, correct?

10          MR. MARKER:  Form.

11      A.    That is how I understood it when I

12  read it, yes.

13      Q.    At the time that this was

14  issued -- and I believe it was sent in March of

15  2014 -- LAN's design work was pretty much

16  finished on the Flint water treatment plant,

17  correct?

18          MR. MORRISSEY:  Object to

19          foundation.

20      A.    To the best of my memory, I'll say

21  yes, because within, you know, about six weeks,

22  we went into service.

23      Q.    And about that time, LAN was still

24  doing work, but they were doing work on projects

Highly Confidential - Michael B. Glasgow

```
 1    related to ultimately switching over to the KWA

 2    water source, correct?

 3              MR. SCHNATZ:  Objection; form,

 4         foundation.

 5         A.    That is correct.  To my

 6    understanding, yes.

 7         Q.    And so their work was not

 8    continuing on with the Flint River or how to

 9    deal with the Flint River?  They were dealing

10    with the KWA, correct?

11              MR. SCHNATZ:  Same objection.

12         A.    I would say to the best of my

13    memory, yes.

14         Q.    And would it surprise you that the

15    references to the need to understand corrosion

16    control that are contained in this document

17    actually relate to the KWA water source as

18    opposed to the Flint River?

19              MR. SCHNATZ:  Objection to form

20         and foundation.

21         A.    Well, just reading the e-mail

22    makes it hard to determine that.  But looking at

23    the date, I could -- I could agree with that.

24         Q.    I think you said before you
```

Highly Confidential - Michael B. Glasgow

```
 1    weren't aware of LAN recommendations relating to

 2    the implementation of corrosion control at the

 3    Flint water treatment plant using Flint River

 4    water?

 5          A.    Yes, I believe that's correct.

 6          Q.    Are you aware as to whether LAN

 7    and Warren Green had conversations with

 8    Daugherty -- Duffy Johnson following the June 26

 9    meeting regarding corrosion control?

10          A.    I'm not aware of that.

11          Q.    And do you have any understanding

12    of what was discussed between those two?

13          A.    I do not.

14          Q.    If I could turn your attention to

15    Exhibit 62.

16          A.    This (indicating)?

17          Q.    Yes, that's correct.

18                MR. MARKER:  I've got it as

19          Exhibit 63.

20                MR. GAMBLE:  I'm sorry.  I seem to

21          be one off on everything.  Actually, I

22          needed 63.  I apologize.

23    BY MR. GAMBLE:

24          Q.    You were asked a series of
```

```
 1   questions by Mr. Kuhl yesterday about this

 2   particular table.

 3              Do you recall that?

 4        A.   Yes, I do.

 5        Q.   You were asked questions about the

 6   lime dosages, correct?

 7        A.   Correct.

 8        Q.   And you were asked about the

 9   dosages for ferric chloride, correct?

10        A.   Correct.

11        Q.   Do you know who made this

12   document?

13        A.   I don't recall.  I thought it --

14   it wasn't an internal city document.  I believe

15   whoever was questioning me at the time, I

16   thought they had constructed this document.

17        Q.   So as far as you know, this isn't

18   an official city of Flint document, correct?

19        A.   Correct.

20        Q.   And as you sit here today, you

21   don't know whether the numbers that are

22   represented in this chart are actually accurate,

23   do you?

24        A.   No, I do not.
```

1      Q.    But just taking the numbers for

2   what they are, you were asked about the ferric

3   chloride dosages from November of 2014 through

4   2015.

5           Do you recall that?

6      A.    I do, yes.

7      Q.    And I believe those numbers showed

8   at least a slight increase over the period of

9   time in ferric chloride dosage from

10  November 2014 through October of 2015, correct?

11     A.    Correct.  Yes.

12          MR. MORRISSEY:  Object to form.

13     Q.    You weren't asked about ferric

14  dosages earlier in 2014, were you?

15     A.    No.

16     Q.    And, in fact, they have data from

17  May through October of 2014 showing the ferric

18  chloride dosages, correct?

19     A.    Correct.  Yes.

20     Q.    And when you look at those

21  numbers, in fact, those numbers from May to

22  September of 2014 with regard to the ferric

23  chloride dosages do not differ significantly at

24  all from the November through October 2015

Highly Confidential - Michael B. Glasgow

```
 1    numbers, do they?

 2                    MR. MARKER:  Form.

 3                    MR. KUHL:  Objection to form,

 4            foundation.

 5            A.    As I look through here, it doesn't

 6    appear -- there's minor fluctuations up and

 7    down.

 8            Q.    In fact, in June of 2014, you were

 9    feeding 17.1 --

10            A.    Yes, milligrams per liter.

11            Q.    Right.  And in July, you were

12    feeding 17.9 milligrams per liter as well,

13    correct?

14            A.    Correct.

15            Q.    And those numbers were

16    significantly higher than November of 2014,

17    correct?

18            A.    Correct.  Yes.

19            Q.    And they were higher than December

20    of 2014, correct?

21            A.    Correct.

22            Q.    They were higher than January of

23    2014, correct?

24            A.    Correct.
```

Highly Confidential - Michael B. Glasgow

 1          Q.    They were higher than February of

 2    2014, correct?

 3          A.    Correct.

 4          Q.    They were higher than March of

 5    2014, correct?

 6          A.    Correct.

 7          Q.    They were higher than April of

 8    2015 -- pardon me -- from January through May of

 9    2015, they were higher, correct?

10          A.    Correct.  I'll say January, yeah,

11    through April, they were higher.  Yes.

12          Q.    And when you were feeding the

13    dosages from May to September of 2014, you did

14    not have any recommendations from LAN or anyone

15    else that you needed to increase ferric chloride

16    dosages or feed those dosages, correct?

17                MR. MARKER:  Form, foundation.

18                MR. KUHL:  Can you read that

19          question back, please.

20          A.    Correct.

21                MR. MARKER:  Hang on.

22                (Record read back as follows:

23          "Question:  And when you were feeding

24          the dosages from May to September of

Highly Confidential - Michael B. Glasgow

```
1          2014, you did not have any

2          recommendations from LAN or anyone else

3          that you needed to increase ferric

4          chloride dosages or feed those dosages,

5          correct?")

6     A.    I'll say no, not at that time.

7     Q.    If I could turn your attention to

8  Exhibit 62.  And that's the November 2014 LAN

9  OER report on the TTHM issue.

10    A.    Okay.

11    Q.    You recall seeing that yesterday?

12    A.    Yes, I do.

13    Q.    And you recall being asked

14 questions about it?

15    A.    I do.

16    Q.    When do you first recall ever

17 seeing that document?

18    A.    I will say -- hard to remember.  I

19 would imagine within a month or two after this

20 document was produced.

21    Q.    So if that's November or late

22 November 2014, it would have been late December

23 or January of 2015 when you would have seen the

24 document?
```

Highly Confidential - Michael B. Glasgow

1                    MR. KUHL:  Objection to form.

2           A.    Yes, that would be my best

3    recollection.

4           Q.    Did you read the document when you

5    first recall seeing it?

6           A.    I believe -- I believe I scanned

7    through to kind of read it.  I didn't go word

8    for word through it, but I glanced at it.

9           Q.    Do you have any recollection of

10   when LAN was specifically retained to do the OER

11   with regard to the TTHM issues?

12          A.    I don't recall offhand.  I want to

13   say in possibly July or August of 2014.

14          Q.    Do you know whether they had

15   started their work assessing and evaluating the

16   TTHM issues as of November of 2014?

17          A.    I believe they were, yes.

18          Q.    Okay.  They were in the process of

19   doing jar tests in November of 2014, correct?

20          A.    From what I can recall, yes.

21          Q.    They didn't have any results of

22   those jar tests to tell you about, correct?

23                    MR. KUHL:  Objection; form,

24               foundation.

Highly Confidential - Michael B. Glasgow

1        A.    Not that I can recall.

2        Q.    And you testified that you did

3   read the report.  You don't recall there being

4   any specific recommendation to increase the

5   ferric chloride dosage in that November 2014

6   document, do you?

7              MR. MARKER:  Form, foundation.

8              MR. KUHL:  Objection; form,

9         foundation.

10       A.    Not that I can recall without

11  going back through it here.

12       Q.    In fact, nowhere in that 2014

13  document is there a specific recommendation for

14  increasing ferric chloride at that time?

15             MR. KUHL:  Objection; form and

16        foundation.

17       Q.    Do you understand that?

18       A.    I do.

19       Q.    You had no conversations with LAN

20  or Warren Green or Jeff Hansen about the need to

21  increase ferric chloride dosages in December of

22  2014, correct?

23       A.    Not that I can recall.

24       Q.    What about November of 2014?

Highly Confidential - Michael B. Glasgow

```
 1          A.    Not that I can recall.

 2          Q.    What about January of 2015?

 3          A.    Not that I can recall.

 4          Q.    So if you increased ferric

 5   chloride dosages in December -- December 2014

 6   and into early 2015, that wouldn't have been due

 7   to any recommendation made by LAN, correct?

 8                MR. KUHL:  Objection; form

 9          foundation.  Misstates the prior

10          testimony.

11          A.    Yeah, I cannot recall.

12          Q.    Yesterday you were asked a

13   question by Class Plaintiffs' counsel that LAN

14   never said to you or anyone that the DEQ

15   decision regarding not including corrosion

16   control was wrong and needed to be addressed.

17                Do you recall that question?

18          A.    I do, yeah.

19          Q.    And I think you agreed with that

20   statement?

21          A.    Yes.

22          Q.    You don't have any understanding

23   of LAN's other conversations with employees at

24   the city of Flint, do you?
```

Highly Confidential - Michael B. Glasgow

1          A.    I do not, no.

2          Q.    You don't have any understanding

3     or knowledge of what LAN told Brent Wright about

4     corrosion control, do you?

5          A.    I do not, no.

6          Q.    You don't know what LAN told Duffy

7     Johnson or Howard Croft about corrosion control,

8     correct?

9          A.    Correct, I do not.

10         Q.    And you don't know what LAN told

11    or raised with the MDEQ about water treatment,

12    full softening, or corrosion control, correct?

13         A.    Correct, I do not.

14         Q.    There was some discussion about in

15    February 2015, you may have mention to Warren

16    Green the need for a phosphate feed system.

17               Do you recall that?

18         A.    Yes.

19         Q.    And I think earlier today you said

20    that you caught him and had that conversation in

21    passing; is that correct?

22         A.    That is correct, yes.

23         Q.    Do you recall where that

24    conversation took place?

Highly Confidential - Michael B. Glasgow

1          A.    I believe that was at the city of

2    Flint water plant.

3          Q.    Was there anybody else present

4    when you had that conversation with him?

5          A.    There was a couple other people

6    around.  I don't -- I don't believe they would

7    have heard or seen the discussion that we had.

8          Q.    And the reason you had this

9    conversation was because of the LeeAnne Walters'

10   test results for lead, correct?

11         A.    That is correct, yes.

12         Q.    And this was the first time that

13   you had said anything to anyone at LAN about

14   lead levels being elevated in certain areas of

15   the distribution system, correct?

16               MR. MARKER:  Form and foundation.

17         A.    Yes.  To the best of my memory,

18   yes.

19         Q.    So you never talked with Jeff

20   Hansen or Warren Green at any time prior to

21   February of 2015 about the lead results or lead

22   testing that was being done in the city of

23   Flint?

24               MR. MARKER:  Form, foundation.

Highly Confidential - Michael B. Glasgow

```
1            A.    No, not that I can recall.

2            Q.    And to your knowledge, this was

3    the first time anyone from the city actually

4    informed LAN of any problems or issues with lead

5    in their distribution system, correct?

6                  MR. MARKER:  Form, foundation.

7            A.    To the best of my knowledge,

8    correct.  Yes.

9                  MR. GAMBLE:  Mr. Glasgow, those

10               are all the questions I have.  I

11               appreciate your time.

12                  THE VIDEOGRAPHER:  We are going

13               off the record at 9:53 a.m.

14                  (Recess taken.)

15                  THE VIDEOGRAPHER:  We are back on

16               the record at 10:03 a.m.

17   BY MR. KIM:

18           Q.    Good morning, Mr. Glasgow.

19                 I'm going to try to do this as

20   much as possible in chronological order in my

21   follow-ups here, but I may have to jump around

22   because of the nature of that.

23                 Just a few minutes ago you were

24   discussing -- you were answering some questions
```

Highly Confidential - Michael B. Glasgow

```
 1    about the plant's test run in the summer of

 2    2013.

 3                 Do you recall?

 4         A.    I do, yes.

 5         Q.    And you mentioned that there were

 6    some equipment issues that were identified

 7    through the course of that plant run.

 8                 Do you remember that testimony?

 9         A.    I do, yes.

10         Q.    Can you recall what those

11    equipment issues were?

12         A.    If my memory serves correct, there

13    was issues with one of the softening clarifiers.

14    The weirs weren't level, so that wasn't

15    functioning the way it was designed.  And there

16    was -- the only other issue I can really

17    remember is issues with our ozone generation

18    equipment.

19         Q.    Okay.  And to your knowledge, were

20    those issues fixed after the plant run had

21    occurred?

22         A.    Yes.  They were addressed

23    eventually.

24         Q.    And were those issues addressed by
```

Highly Confidential - Michael B. Glasgow

1    the time that the city switched over to the use

2    of the Flint River in April of 2014?

3                Let's break that down.

4         A.    Yeah.

5         Q.    There was the issues you stated

6    with the clarifiers?

7         A.    Yes.

8         Q.    The leveling of the weirs?

9         A.    Yes.

10        Q.    Were those issues addressed by the

11   time that the city switched to the Flint River

12   in April of 2014?

13        A.    To the best of my knowledge, yes.

14        Q.    Now, you said there were some

15   issues with the ozone clarifiers.

16        A.    Yes.

17        Q.    And I seem to recall that on the

18   first day of your testimony, that you addressed

19   those were not fully resolved by April of 2014;

20   is that correct?

21        A.    To the best of my knowledge, yes.

22        Q.    Was the -- had there been steps

23   taken to address those issues by April of 2014?

24        A.    To the best of my recollection,

Highly Confidential - Michael B. Glasgow

1    yes.

2         Q.    Do you recall what those steps

3    were?

4         A.    In regards to the ozone

5    generators, I believe we were in the process of

6    or had contracted -- I can't remember the name

7    of the company.  They had built the ozone

8    generators.  We had contracted them to come in

9    and switch out some of the dielectrics inside

10   the equipment.

11        Q.    Were those ozone generators

12   essentially functional in April of 2014?

13        A.    Yes.

14        Q.    So they were -- they would work

15   when the city switched over to the Flint River

16   as a water source?  They just would not work at

17   optimal capacity?

18        A.    Yes.  That's a fair statement.

19        Q.    Were they sufficient to handle the

20   city's needs at that time?

21        A.    To my understanding, I will say

22   yes.

23        Q.    Okay.  So essentially, if I can

24   summarize, were there any other -- were there

1    any other plant equipment issues that you

2    remember being identified in the test run of the

3    summer of 2013?

4          A.    Not that I can recall, no.

5          Q.    Okay.  So then all the issues that

6    were identified were addressed or were -- were

7    addressed or -- were either addressed or were

8    not going to prevent the city from being able to

9    successfully treat Flint river water; is that

10   correct?

11              MS. SMITH:  Objection; form.

12         A.    I would say that is correct, yes.

13         Q.    Okay.  Now, yesterday we had some

14   discussion about the Langelier index.  You

15   used -- you used the Langelier index method to

16   determine that the -- to project that the water

17   from the Flint River would be mildly scale

18   forming; is that correct?

19         A.    That is correct.

20         Q.    And that it was also brought out

21   yesterday that the Langelier index is no longer

22   a recommended method for doing so; is that

23   correct?

24         A.    That is correct.

Highly Confidential - Michael B. Glasgow

1          Q.    Do you remember when that was --

2    when that determination was made?

3               MR. MORRISSEY:  Object to form.

4          A.    I do not recall, no.

5          Q.    Okay.  Was the use of the

6    Langelier index an industry practice in 2013?

7               MR. MORRISSEY:  Object to form.

8          A.    I will say -- yeah, I will say

9    yes.  It had been used for years prior to that

10   as well.

11         Q.    How long has the Langelier index

12   been used?

13              MR. MORRISSEY:  Object to form.

14         A.    I don't know.  I can recall

15   mention of it in my entire time in water

16   treatment.  So I'll say at least 15, 20 years.

17         Q.    Okay.  Was the Langelier index

18   still in use in 2014?

19         A.    To the best of my knowledge.

20              MR. MORRISSEY:  Object to form.

21         You can correct it by saying "for what."

22         Q.    Was the Langelier index used in

23   the water treatment industry for the calculation

24   of whether or not water would be scale forming

Highly Confidential - Michael B. Glasgow

```
 1    or not in 2013?

 2            A.    To the best of my knowledge, yes.

 3            Q.    Same question as to the year 2014?

 4            A.    I'll have the same answer.  To the

 5    best of my knowledge, yes.

 6            Q.    Okay.  And was that still the case

 7    in 2015, to the best of your knowledge?

 8            A.    Yes.

 9            Q.    So would it be fair to conclude

10    that, to the best of your knowledge, that the

11    use of the Langelier index was not -- was not --

12    the shortcomings in the Langelier index did not

13    become identified until after 2015?

14            MR. MORRISSEY:  Object to form.

15            A.    I will say that's when I learned

16    that there were shortcomings with the index, in

17    2015 or after.

18            Q.    And by the shortcomings, you

19    understand that I'm talking about the use of the

20    Langelier index to predict whether or not water

21    would be scale forming or not?

22            A.    Correct.  Yes.

23            Q.    Okay.  Now, you testified also

24    yesterday as to communications with Michael
```

Highly Confidential - Michael B. Glasgow

1    Prysby regarding your uncertainty as to the

2    exact composition of lead service lines, and I

3    believe this occurred in February of 2015; is

4    that correct?

5           A.    Yes.

6                 MS. COLLINS:  Objection; form,

7           foundation.

8           Q.    Okay.  Do you recall what Mike

9    Prysby's response was when you raised this

10   issue?

11          A.    Well, when I originally raised the

12   issue, it was in regards to required testing.

13   If we were adding phosphate, we would have to

14   test for it.  So I inquired with Mr. Prysby what

15   the testing frequency might be.  And it was at

16   that point he said that we were not going to be

17   required to add it off the start.  We would wait

18   until the results of two six-month rounds of

19   lead and copper samples were analyzed.

20          Q.    Okay.  I think you might be

21   confused as to what I'm asking, because it

22   seems -- so what I'm asking is, when you -- you

23   talked to Michael Prysby in February of 2015

24   about your uncertainty as to the composition of

Highly Confidential - Michael B. Glasgow

1    the lead service lines from which water samples

2    were being taken; is that correct?

3            A.    Okay.  Yes, that is correct.

4                  MS. COLLINS:  Objection;

5            mischaracterizes the evidence.

6            Q.    And so you spoke to him about

7    the -- your lack of certainty in 2015.  What was

8    his response at that time regarding the issue

9    that you did not have certainty as to the

10   composition of the service lines at the

11   addresses that water samples were being taken

12   from?

13                 MS. COLLINS:  Objection; form.

14           A.    If my memory serves me correct, it

15   seems like he said he would pass that up the

16   line with his superiors and get back with us in

17   regards to that.

18           Q.    Did he ever get back to you in

19   regards to that?

20           A.    I do not recall.

21           Q.    Okay.  Now, at that time, that was

22   also about the same time frame under which the

23   e-mail that you looked at earlier from Rob

24   Bincsik stating that the city's service lines --

Highly Confidential - Michael B. Glasgow

1    that 80 percent of the city's service lines were

2    lead was his belief.

3                    Do you recall that?

4         A.    I do, yes.

5         Q.    Okay.  Did you accept that

6    80 percent number as reasonably accurate?

7         A.    Yes, I did.  I had no reason to

8    doubt Mr. Bincsik.

9         Q.    Okay.  Now, in regards to the

10   addresses from which you submitted or that --

11   from the addresses from which water samples were

12   collected for both -- well, for -- let's start

13   for the July 2014 through December 2014 time

14   frame.

15                   For those addresses, did you have

16   certain knowledge that any of them did not

17   contain a lead service line?

18        A.    Not that I recall, no.

19        Q.    For the addresses for which water

20   samples were collected and submitted for the

21   January 2014 through June 2015 -- or 2014 time

22   frame, did you have certain knowledge that any

23   of those service lines were not lead?

24        A.    I did not, no.

Highly Confidential - Michael B. Glasgow

1          Q.    Okay.  I just want to clarify --

2    go on and clarify some more issues about that

3    212 Browning, Ms. LeeAnne Walters' residence.

4                The e-mails that you -- that you

5    examined earlier, which I believe was admitted

6    as -- or that was listed as Exhibit 10,

7    CROFT000000125.

8          A.    Okay.

9          Q.    What is the date on that e-mail?

10         A.    Tuesday, February 24, 2015.

11         Q.    Okay.  So the information in that

12   e-mail that's being discussed is what was known

13   as of February 25, 2015; is that correct?

14         A.    That is correct.

15         Q.    What do you recall doing about --

16   regarding 212 Browning Street after February 25,

17   2015?

18         A.    Myself, I remember visiting the

19   residence a few more times, at least a couple

20   times, to pick up samples Ms. Walters had

21   collected, and also just to talk with her and

22   let her know what was going on.

23                After that is when I had kind of

24   determined her issue was her service line.  And

```
 1    to my recollection, I suggested that the city

 2    replace her service line to that address.

 3           Q.    Okay.  So after February 25, you

 4    said that you determined that the issue was her

 5    service line.  By that, do you mean that the

 6    issue was isolated to her service line and not

 7    to her neighbors?

 8           A.    I would say yes.

 9           Q.    And how did you determine that the

10    issue was likely related to her service line and

11    not to those of her neighbors?

12           A.    I had solicited samples from some

13    of the neighbors around for lead and copper.

14    Those samples come back below the action level

15    from what I can recall.  Nothing near to where

16    what Ms. Walters had in her house.

17                 So that led me to believe her

18    issue was from her service lines.  Not only

19    that, but also being in Ms. Walters' house on a

20    couple occasions, I had the ability to inspect

21    her plumbing, seen that it was all plastic

22    plumbing and newer fixtures throughout the

23    house.  So my conclusion that lead was coming

24    from the service line.
```

Highly Confidential - Michael B. Glasgow

1        Q.    Okay.  And this all occurred after

2   February 25, 2015 obviously?

3        A.    Yes.

4        Q.    Were your conclusions influenced

5   in any way by Croft's e-mail saying to try to

6   isolate the problem to the address, if possible?

7        A.    I will say I was -- in a sense, I

8   was already attempting to determine the cause of

9   the problem even prior to Mr. Croft's e-mail.

10       Q.    Okay.  Would it be fair to say

11  that since there was evidence that it was

12  restricted -- that the issue was restricted to

13  212 Browning, you could also conclude -- you

14  didn't have information that would allow you to

15  conclude that this was a systemwide problem?

16            MS. DEVINE:  Objection.

17       A.    That is correct.

18       Q.    Now, going a little bit back in

19  time.  When did you become the operator in

20  charge of the Flint Water Plant again?

21       A.    I believe 2011, 2012, somewhere in

22  that time frame.

23       Q.    Okay.  And we've -- you've been

24  asked questions about various personnel from

1    LAN; is that correct?

2         A.    That is correct.

3         Q.    Do you recall ever being

4    introduced to them as the operator in charge of

5    the water plant?

6         A.    I do not recall.

7         Q.    Do you know if they knew that you

8    were the operator in charge of the water plant?

9         A.    I couldn't tell you, no.  I'm not

10   sure.

11        Q.    Okay.  Do you recall ever being

12   introduced to personnel from Veolia as the

13   operator in charge of the water plant?

14        A.    I do not.

15        Q.    Okay.  Now, being an operator in

16   charge is something that has to be listed with

17   the state of Michigan, at the time the MDEQ; is

18   that correct?

19        A.    That is correct.

20        Q.    Okay.  So the MDEQ had been on

21   notice that you were the operator in charge of

22   the water plant; is that correct?

23        A.    Yes.  They were aware.  Yes.

24              MR. KIM:  Okay.  And now we're at

Highly Confidential - Michael B. Glasgow

```
 1            the issue where I need at least one more

 2            exhibit that I'm waiting to be printed.

 3            Can we take five minutes here?

 4                 THE VIDEOGRAPHER:  We are going

 5            off the record at 10:18 a.m.

 6                 (Recess taken.)

 7                 THE VIDEOGRAPHER:  We are back on

 8            the record at 10:36 a.m.

 9                 - - -

10       (Glasgow Deposition Exhibit 86 marked.)

11                 - - -

12  BY MR. KIM:

13            Q.   Okay.  My apologies for the break

14  there to get these exhibits printed.

15                 Mr. Glasgow, can you take a look

16  at what has been marked as Exhibit 86.

17                 And is this an e-mail that was

18  sent from the director of public works, Howard

19  Croft, to a number of individuals?

20            A.   Yes.

21            Q.   And does this --

22                 MS. JACKSON:  Can we have the

23            Bates number, Bill?

24                 MR. KIM:  Yeah.  The Bates number
```

Highly Confidential - Michael B. Glasgow

```
 1              is CROFT - 000000-1011.

 2    BY MR. KIM:

 3         Q.    Okay.  And, Mr. Glasgow, so this

 4    was an e-mail sent by Howard Croft; is that

 5    correct?

 6         A.    That is correct.

 7         Q.    And do you see that you're on the

 8    distribution list for this e-mail?

 9         A.    I do see that, yes.

10         Q.    And did this e-mail -- essentially

11    was an invitation to attend a meeting -- the

12    first meeting of the city's technical advisory

13    committee?

14         A.    Yes, it appears so.  Yes.

15         Q.    Okay.  Do you remember what the

16    technical advisory committee was?

17         A.    From my memory, just a group of

18    people, some scientists, I would say.  It was an

19    eclectic group of people to kind of respond to

20    the water situation.

21         Q.    And by "respond to the water

22    situation," what do you mean?

23         A.    Make recommendations, you know,

24    share information, that type of thing.
```

1          Q.    Okay.  And you see that this --

2    this meeting -- this first meeting was scheduled

3    for Wednesday, March 4, 2015?

4          A.    Yes.

5          Q.    And you see that on the invitation

6    list, it includes the name Michael Prysby?

7          A.    Yes, I do see that.

8          Q.    And you see that it includes

9    Russell Hudson?

10         A.    Yes, I do.

11         Q.    And that's

12   Russell.Hudson@mclaren.org?

13         A.    Yes.

14         Q.    Do you know Russell Hudson?

15         A.    I don't have any memory of the

16   name.

17         Q.    If I was to tell you that Russell

18   is more commonly known as Rusty Hudson, does

19   that spark a memory for you?

20         A.    That sounds a little more familiar

21   as a gentleman I had talked to at McLaren.

22         Q.    Okay.  And you also see that Rob

23   Nicholas from Veolia was on this distribution

24   list?

Highly Confidential - Michael B. Glasgow

1      A.    Yes.

2      Q.    Okay.  If you can turn to the

3  fourth page of this packet.

4      A.    Okay.

5      Q.    You see that there was an e-mail

6  from Russell Hudson that he was asking for

7  clarification about essentially what the meeting

8  was about or what the group was about?

9      A.    Yes, I do.

10     Q.    And then do you see below that

11  Howard Croft's response to that where he's

12  explaining what the technical committee was?

13     A.    Yes, I do.

14     Q.    That stretches over onto the top

15  of page 5 there?

16     A.    Yes.

17     Q.    And you see that this was a --

18  that at least Howard Croft as the director of

19  public works intended this technical committee

20  to be specifically designed for the medical

21  community, the hospitals, and large volume

22  users, such as General Motors?

23     A.    Yes.

24     Q.    And there was a commitment from

1    EPA and MDEQ for participation on the technical

2    committee?

3            A.    Yes.

4            Q.    So with that in mind, would you

5    have considered all the persons who were invited

6    to this technical committee to be knowledgeable

7    in their respective fields?

8            A.    I would say so, yes.

9            Q.    Okay.  Do you recall attending

10   that first meeting of the technical committee?

11           A.    I do vaguely, yes.

12                 (Telephone interruption.)

13                 MR. KIM:  I think somebody needs

14           to mute their -- thank you.

15   BY MR. KIM:

16           Q.    Do you remember what was discussed

17   at the first meeting of the technical committee?

18                 Well, first, do you remember if

19   that first meeting of the technical committee

20   occurred on or about March 4, 2015?

21           A.    I believe so, yes.

22           Q.    Do you remember what was discussed

23   at that meeting?

24           A.    Offhand, I do not recall.

Highly Confidential - Michael B. Glasgow

1          Q.    Okay.  Do you remember if there

2    were further meetings of the technical

3    committee?

4          A.    Yes.  I believe there was almost

5    like a monthly schedule of meetings.

6          Q.    Okay.  And do you remember

7    attending those meetings?

8          A.    I do.

9                    - - -

10     (Glasgow Deposition Exhibit 87 marked.)

11                   - - -

12   BY MR. GAMBLE:

13         Q.    Okay.  Can you take a look at what

14   has been marked as Exhibit Number 87.  This is

15   Bates number City of Flint_FED_0012286.

16              Okay.  And is this the summary of

17   the -- does this document appear to be the

18   summary of the technical advisory committee

19   meeting held on May 20 of 2015?

20         A.    Yes, it does.

21         Q.    Okay.  And do you recall being

22   present at that meeting?

23         A.    I do, vaguely, yes.

24         Q.    Okay.  If you can turn to page of

1     that -- or the second page of that exhibit.

2              A.    Okay.

3              Q.    Do you see at the bottom that

4     there is a list of attendees?

5              A.    Yes, I see that list.

6              Q.    Okay.  Do you have any reason to

7     question the accuracy of that list of attendees?

8              A.    I do not, no.

9              Q.    Okay.  Do you recall if -- do you

10    recall -- well, let's go back to the first page

11    of the summary there.  At the beginning, you see

12    that he was -- that on that summary is listed

13    the introduction of the new utilities

14    administrator Mike Glasgow?  That's yourself,

15    isn't it?

16             A.    Yes.

17             Q.    So you were being introduced as

18    the city's new utilities administrator at that

19    time?

20             A.    Yes.

21             Q.    And you were asked to give an

22    update on the current water status?

23             A.    Yes.

24             Q.    And is that summary what you --

Highly Confidential – Michael B. Glasgow

1    does the summary list what you were -- what

2    update you provided to the advisory committee?

3            A.    To the best of my knowledge, yes.

4            Q.    Okay.  Down in the discussions  --

5    under the "Discussions" heading, you see the

6    number of bullet points listed?

7            A.    Yes.

8            Q.    Okay.  You see that the bullet

9    point listed "Some attention has shifted to lead

10   and copper concerns.  Recent internal testing

11   numbers still show approximately two to three

12   out of 100 with high levels"?

13           A.    I do.

14           Q.    And is that -- does that match

15   with your memory of what was occurring and what

16   the data was showing at that time?

17           A.    Yes.  To my memory, that's showing

18   the data from that first six-month round of

19   testing from July 2014 through December of 2014.

20           Q.    And you see above that, that the

21   health department had listed several items, such

22   as "hard water rash" on the front page of the

23   website with explanations?

24           A.    I do, yes.

Highly Confidential - Michael B. Glasgow

 1          Q.    And did that -- was that meant to

 2    communicate that the Genesee County Health

 3    Department was providing the public with

 4    information about some of the common complaints

 5    that were being received by the -- that had been

 6    received by the city and others since the switch

 7    to the Flint River in April of 2014?

 8          A.    Yes.  To the best of my knowledge,

 9    yes.

10          Q.    And you see that the -- under the

11    "Next Steps," it lists that the next meeting was

12    targeted for late July or early August after the

13    GAC had been installed?

14          A.    Yes, I see that.

15          Q.    And just to make sure that there's

16    not an uncertainty, GAC stands for granulated

17    activated carbon; is that correct?

18          A.    That is correct.

19          Q.    And so that's talking about the

20    granulated activated carbon filters that the

21    city was installing?

22          A.    Yes.

23          Q.    And why was the city installing

24    those filters?

1         A.     The granular -- or the GAC we'll

2    use for short.  That was used to kind of collect

3    and absorb the TTHM issues we were having.

4         Q.     Do you recall why the city chose

5    to go with that method of -- why the city chose

6    to install those?

7         A.     That was at the time in my mind

8    and some of our other, I guess I'll say, experts

9    in water treatment, it was kind of the decision

10   that that would be the quickest way to address

11   the issue with TTHMs.

12        Q.     And by "other experts in water

13   treatment," are you referring to Veolia and the

14   consultants that the city retained?

15        A.     Yeah, I'll refer -- yep, any

16   consultants that the city had at the time.

17        Q.     Okay.  Do you remember when the

18   next meeting occurred?

19        A.     I do not, I hate to say.  No.

20        Q.     Now, have you read through this

21   summary?

22        A.     Yes.

23        Q.     Okay.  Do you recall any topics

24   being discussed or brought up that are not

Highly Confidential - Michael B. Glasgow

1    listed on this summary?

2         A.    Not that I can recall, no.

3         Q.    And would you agree that the

4    topics that are brought up appear to be a fairly

5    wide range of topics all related to the issues

6    related to the use of the Flint River and the

7    city's water supply?

8         A.    I would say so, yes.

9         Q.    And was -- was it understood that

10   the purposes of these meetings were for

11   basically all the participants to pool

12   information, share concerns -- and share their

13   concerns?

14        A.    Yes, that's a fair statement.

15        Q.    And that was so that basically the

16   city could tap into expertise from the community

17   and from other stakeholders in the community?

18        A.    Yes.

19        Q.    And also so the city could be

20   aware of what concerns were being faced by

21   people -- by other stakeholders in the

22   community?

23        A.    Yes, that's a fair statement.

24        Q.    So on the list of attendees there,

Highly Confidential - Michael B. Glasgow

1    you see that -- if I can just go back to that on

2    the second page.  You see that that list

3    included Jim Henry from the Genesee County

4    Health Department?

5         A.    Yes.

6         Q.    And do you see that attendees

7    included Samir Matta and Warren Green from LAN

8    engineering?

9         A.    Yes.

10        Q.    Okay.  Do you recall if those

11   gentlemen were present?

12        A.    I apologize.  I do not recall.  I

13   would believe they were.

14        Q.    Okay.  And you see that the list

15   includes Rusty Hudson for McLaren Hospital?

16        A.    Yes.

17        Q.    Do you recall Rusty Hudson raising

18   any particular issues at this meeting?

19        A.    I do not recall.

20        Q.    Okay.  You also see that Norb

21   Birchmeier from Hurley Hospital is listed?

22        A.    Yes.

23        Q.    And do you remember Norb

24   Birchmeier raising any issues at this meeting?

Highly Confidential - Michael B. Glasgow

1          A.    Not that I can recall.

2          Q.    Gerald Natzke from DO Genesys

3    Regional Medical Center?  Do you see that he was

4    in attendance?

5          A.    I do, yes.

6          Q.    Do you recall him raising any

7    issues at this meeting?

8          A.    I do not recall, no.

9          Q.    Okay.  Kirk Smith from the Greater

10   Flint Health Coalition?

11         A.    I see him listed there, yes.

12         Q.    Do you recall him raising any

13   issues here?

14         A.    I do not, no.

15         Q.    And Pete Levine or Levine from the

16   Genesee County Medical Society?

17         A.    Yes, I see him listed.  And I

18   don't recall any issues he brought up either.

19               MR. KIM:  I think I am finished

20         with my questions.

21               THE VIDEOGRAPHER:  We are going

22         off the record at 10:50 a.m.

23               (Pause in proceedings.)

24               THE VIDEOGRAPHER:  We are back on

1          the record at 10:54 a.m.

2                    - - -

3                 EXAMINATION

4    BY MS. JACKSON:

5          Q.    Good morning, Mr. Glasgow.  My

6    name is Krista Jackson.  I represent Stephen

7    Busch.  I was there in person yesterday and

8    questioned you.  And I just have a few follow-up

9    questions.

10               I'd like to direct your attention

11   to Exhibit 41.  Do you have that available to

12   you?

13         A.    Yes.  One second, please.  Okay.

14   I have it in front of me here.

15         Q.    Okay.  Thanks.

16               And this is a June 10, 2015 e-mail

17   correspondence between you and Michael Prysby;

18   is that correct?

19         A.    That is correct.

20         Q.    Okay.  And so at this time,

21   Mr. Prysby is asking for clarification regarding

22   the Tier 1 sites.  And you had discussed this --

23   I believe you testified in February you started

24   having a discussion with Mr. Prysby regarding

Highly Confidential - Michael B. Glasgow

```
1   your inability to be able to determine the type

2   of lines at the homes in Flint; is that correct?

3       A.    That is correct, yes.

4       Q.    Okay.  But in June, at this time

5   you were certifying -- or stating that at least

6   the majority of the sites were Tier 1 sites,

7   right?

8             MR. MARKER:  Objection as to form.

9       A.    To the best of my knowledge, yes.

10      Q.    Okay.  Do you recall approximately

11  when the MDEQ started trying to get more

12  information from you with respect to how you

13  were putting together the sampling tool?

14      A.    I do not recall.

15      Q.    Do you recall that it was prior to

16  this e-mail correspondence?

17            MR. MARKER:  Object to form.

18      A.    I do not, no.

19      Q.    Under the Safe Drinking Water Act

20  and the Lead and Copper Rule, are you required

21  to submit a sample site pool list?

22            MR. MARKER:  Objection; form,

23        foundation.

24      A.    Yes.  To my knowledge, under the
```

1   rule you are required to submit a sample pool

2   list.

3           Q.    And did you do that in 2014?

4           A.    I did not.

5           Q.    I'm going to direct your attention

6   back to the February 2015 call in which you and

7   Mr. Prysby discussed the sample pool issues that

8   you were having.  Do you have any notes or

9   written summaries of that phone call?

10          A.    I do not, no.

11          Q.    And just to verify, it was just

12  you and Mr. Prysby that were on the phone,

13  correct?

14          A.    To my recollection, that is

15  correct, yes.

16          Q.    Do you recall testifying about

17  this phone call at all during your preliminary

18  examination testimony?

19          A.    I do not recall it offhand, no.

20          Q.    And in that phone call, is it

21  correct that Mr. Prysby asked you for a list of

22  the sampling pool?

23          A.    I'm sorry.  I do not remember.

24          Q.    Okay.  Going back to the second

Highly Confidential - Michael B. Glasgow

```
1    round of testing, there has been some testimony

2    with respect to the issues you were having

3    trying to obtain a sample pool of 100 samples.

4    You recall that, correct?

5         A.    Correct.  I do, yes.

6         Q.    Now, in determining that you

7    needed 100 samples, was it the MDEQ that

8    originally gave you that number, or did you go

9    into the regulations under the Safe Drinking

10   Water Act and determine that yourself?

11        A.    From my recollection, it was

12   determined myself through the Safe Drinking

13   Water Act rules based on the population of the

14   city.

15        Q.    And then I believe you testified

16   yesterday that for the second round of testing,

17   the amount of samples that you needed to collect

18   was reduced because of an updated census; is

19   that correct?

20        A.    That is correct.

21        Q.    Okay.  And, again, did you -- were

22   you the one to determine that there had been a

23   new census and that the population of Flint had

24   gone down?
```

Highly Confidential - Michael B. Glasgow

1        A.    No, I did not.  It was not me.

2        Q.    Okay.  Who did that?

3        A.    To my recollection -- I'm not sure

4    who, but it was someone with the MDEQ.  Whether

5    it was Mr. Busch, Mr. Prysby, or Mr. Rosenthal,

6    I can't testify to.

7        Q.    Okay.  So can you explain to me a

8    little bit about how that went.  You contacted

9    them, said "I'm having trouble getting these

10   samples."  And then was the next thing that you

11   received just a notification that based on the

12   new population of Flint, you only needed a

13   reduced number of samples?

14       A.    I'm trying to recall.  I

15   believe -- my memory is a little fuzzy.  But I

16   believe I had sent in a copy of the report for

17   the second round of sampling.  And I believe it

18   was -- it was sent back, and it may have -- I'm

19   going to say I just -- I don't recall.  I don't

20   want to speculate.

21       Q.    And did you double check the

22   census numbers and the regulations under the

23   Safe Drinking Water Act to ensure that that

24   reduced pool size was appropriate?

Case 5:17-cv-10164-JEL-KGA ECF No. 689-1, PageID.45505 Filed 02/15/22 Page 833 of 892

1           MR. MARKER:  Objection; form,

2      foundation.

3           A.    Based on the population, I did

4   review the Safe Drinking Water Act rules to just

5   confirm what I had been told.

6           Q.    Okay.  And so in your opinion,

7   that reduced sample size was completely in line

8   with the requirements under the Safe Drinking

9   Water Act, correct?

10           MR. MARKER:  Objection; form,

11      foundation.

12           A.    I would say so, yes.

13           Q.    Is there any authority provided to

14   you, either under the Safe Drinking Water Act or

15   otherwise -- if you weren't able to get enough

16   people to volunteer to take samples, is there a

17   authority for you to do that on your own, to

18   enter homes and obtain those samples?

19           MR. MARKER:  To trespass?

20           MR. KIM:  Objection as to form.

21           MR. MARKER:  Foundation.

22           A.    I'm going to say no.

23           Q.    Okay.  And, similarly, with

24   respect to obtaining samples from the neighbors

Highly Confidential - Michael B. Glasgow

1    of LeeAnne Walters', again, you would need

2    people to volunteer to do that, correct, to

3    provide those samples to the city?

4         A.    That is correct, yes.

5         Q.    Do you recall approximately how

6    many of Ms. Walters' neighbors you approached to

7    provide samples?

8         A.    Approximately, I would say, six or

9    eight neighbors right around that residence.

10        Q.    Okay.  And did you do that -- did

11   you approach them in person?  Did you send

12   letters?  How was that communication provided?

13        A.    Communication was provided by me

14   knocking on doors and talking with the

15   residents.

16        Q.    And did you inform them as to the

17   reason that you were asking specifically for

18   samples from their homes?

19        A.    Yes.  To my recollection, I --

20   without naming Ms. Walters, I just said that we

21   had -- I believe I said there was an issue we

22   had at a residence around here and we wanted to

23   make sure, you know, residents around weren't

24   having the same issue.

1        Q.    Okay.  And even with that

2   explanation, only two of the people volunteered;

3   is that correct?

4        A.    That is correct.

5              MR. MARKER:  Objection to form,

6        foundation.

7        Q.    With respect to the others -- and

8   I'm sorry if this should be clearer.  But did

9   you speak to six to eight other neighbors, or

10  did you knock on doors and there was no answer?

11       A.    I did not speak to all six or

12  eight.  From what I can recall, it was three or

13  four I spoke to.  And then I left Ms. Walters

14  with bottles to try to attempt to contact some

15  of them neighbors as well.

16       Q.    Do you know if she did attempt to

17  make that contact?

18       A.    From my recollection, she did

19  attempt to make it, and I don't recall any

20  volunteers or any takers, so to speak.

21       Q.    And the people that did volunteer

22  to provide you those samples, were they given

23  the same type of bottle and sampling

24  instructions as someone would get if they were

```
1   just doing it for the six-month rounds of

2   testing?

3           A.    Yes.

4           Q.    Okay.  And all of those samples

5   were also sent to the DEQ lab for analysis?

6           A.    That is correct, yes.

7           Q.    There was some discussion about

8   this this morning, but who exactly at the city

9   did you discuss either by e-mail or in person

10  the Walters' lead levels with?

11              MR. KIM:  Objection as to form.

12          A.    I would go back to my e-mail in

13  regards to that, which is one of the exhibits.

14              I believe I e-mailed Mr. Croft,

15  Mr. Johnson, Mr. Bincsik, and Mr. Wright, all of

16  my supervisors, and then the supervisor of the

17  distribution system.

18          Q.    Do you recall discussing it with

19  anyone who was not on the e-mail that was --

20  sorry.  I don't have that exhibit number in

21  front of me, but the e-mail that you were just

22  referring to?

23              MR. MARKER:  It's Exhibit 10 for

24          the record.
```

Highly Confidential - Michael B. Glasgow

```
 1              MS. JACKSON:  Thank you.

 2         A.    I -- I do not recall discussing it

 3    with anyone else offhand.

 4         Q.    Okay.  When did you first discuss

 5    the Walters' lead levels with someone at the

 6    MDEQ?

 7         A.    Oh, I believe it was in a phone

 8    call from Mr. Prysby or Mr. Busch.  I don't

 9    recall -- or maybe both of them were on the

10    line.  But someone at the MDEQ had seen those

11    results via utilizing the state drinking water

12    lab there.  And I received a phone call in

13    regards to that.

14         Q.    So you did not contact the MDEQ to

15    notify them of these results, correct?

16              MR. MARKER:  Objection; form,

17              foundation.

18         A.    No, I do not believe so.

19         Q.    And are you aware if Ms. Walters

20    contacted the MDEQ directly?

21         A.    I am not aware, no.

22         Q.    With respect to the technical

23    advisory committee that was put together that

24    you just testified about in response to
```

Highly Confidential - Michael B. Glasgow

1    Mr. Kim's questions, who determined the

2    participants in that advisory committee?

3               MR. KIM:  Objection to foundation.

4          A.    To the best of my knowledge, it

5    was Mr. Croft, the city's DPW director.

6          Q.    And were you the sole

7    representative that worked for the city of

8    Flint?

9          A.    I do not believe so.  I'd have to

10   look at the list of attendees again.

11         Q.    Was participation in this

12   committee voluntary?

13              MR. KIM:  Objection as to form.

14         A.    I don't believe I'd clarify it for

15   myself as voluntary.

16         Q.    And what particularly was your

17   role on the committee?

18         A.    Well, seeing that I was the

19   utilities administrator, I was overseeing the

20   water plant and the distribution system, and

21   also the wastewater treatment plant.  So it

22   seemed kind of a no-brainer that I would be on

23   the committee.

24         Q.    This committee took place after

1    you assumed the role that had been previously

2    held by Mr. Johnson?

3              MR. KIM:   Objection as to form.

4         A.    That is correct, yes.

5         Q.    In late summer and fall of 2015,

6    the city took steps to install an orthophosphate

7    system at the Flint water treatment plant; is

8    that correct?

9         A.    Yes.

10        Q.    Can you tell me what prompted that

11   action, that installation?

12        A.    To my memory, what prompted that

13   installation was a letter from the MDEQ stating

14   that they were going to require the city to

15   install the phosphate system.

16        Q.    And that construction and

17   installation continued even after the decision

18   was made to switch back to Detroit water; is

19   that correct?

20        A.    That is correct, yes.

21        Q.    And what would be the use of that

22   orthophosphate system in conjunction with the

23   use of water from DWSD?

24        A.    It was my understanding we were

 1   utilizing recommendations from Mr. Lytle and

 2   Mr. Schock from the EPA in regards to increased

 3   dosage of phosphate in an attempt to rebuild up

 4   the phosphate scale on the insides of pipes.  So

 5   it would be beneficial to add excess phosphate,

 6   is what was sent to us, in the Detroit water to

 7   help facilitate the formation of that scale.

 8        Q.   And to the best of your knowledge,

 9   was that additional orthophosphate added to the

10   Detroit water at the Flint water treatment plant

11   after the switch back to Detroit water?

12        A.   Yes.

13        Q.   I'm going to switch to a few

14   questions about Legionella for just a second.

15             You stated -- and correct me if I

16   am wrong -- that you attended two meetings at

17   McLaren with respect to their Legionella

18   concerns?

19        A.   That is correct, yes.

20        Q.   Was anyone from the MDEQ at either

21   of those meetings?

22        A.   No, not that I recall.

23        Q.   And did you ever meet with anyone

24   from the MDEQ and representatives of Hurley

Highly Confidential - Michael B. Glasgow

```
1    Hospital?

2          A.    Not that I recall, no.

3          Q.    Did you ever have discussions with

4    anyone at the MDEQ regarding Legionella concerns

5    in the city in the 2014, 2015 time frame?

6          A.    Not that I can recall, no.

7          Q.    Do you recall a phone conversation

8    with Mr. Busch and Mr. Prysby in which they

9    stressed that the city needed to take steps to

10   optimize water quality and limit the potential

11   for Legionella?

12         A.    Vaguely.  I can't put a time frame

13   on that, though.

14         Q.    Okay.  Give me one moment.  I'm

15   just making sure I've covered everything.

16               When you became the utilities

17   director, was there any training or orientation

18   involved in making that switch to a different

19   role?

20         A.    No, not that I can recall.

21         Q.    Did your -- did the amount of

22   information or the amount of understanding you

23   had of the city's financial process on how

24   projects got funded increase when you took that
```

Highly Confidential - Michael B. Glasgow

1    role on?

2              MR. MARKER:  Object to form.

3         A.    I will say, yes, there was a

4    slight learning curve from not being that

5    familiar or that involved with that process.

6         Q.    Were you in that role when the

7    orthophosphate system permit application was

8    submitted in 2015?

9         A.    To the best of my knowledge, I

10   believe so, yes.

11        Q.    And were you involved, then, in

12   determining how that project would be funded?

13        A.    I will say yes, because from my

14   memory, we had LAN on contract in regards to KWA

15   upgrades.  So since they were there, it was just

16   a small addendum to their scope of duties.

17        Q.    And did you negotiate that

18   addendum?

19              MR. MARKER:  Object to form.

20        A.    I do not recall.

21        Q.    And in that role as utilities

22   director, did you have to put together a budget

23   for the Flint water treatment plant?

24              MR. KIM:  Objection as to form.

Highly Confidential - Michael B. Glasgow

1              A.    I would oversee the budget -- or I

2      would say verify it, but not truly setting it

3      up.  That would come from each of my department

4      heads, what they were requesting.  And I would

5      either accept or reject it from what I recall.

6              Q.    And at that time, did you take the

7      time to review different contracts with the

8      city's consultant and determine what they had

9      been asked to do and how much they were being

10     paid for those types of services?

11             A.    I do not recall.

12             Q.    Do you recall, did the budget for

13     LAN's services or Veolia's services at the Flint

14     water treatment plant come directly out of the

15     treatment plant's budget, or was that in a

16     different place within the city's budget?

17             A.    I'm not -- I do not recall,

18     because it seems like both of them contracts

19     were prior to me stepping into the utilities

20     director role.

21             MS. JACKSON:  Okay.  Thank you.  I

22          have no further questions.

23             MR. KUHL:  Anybody else on the

24          phone have questions?

Highly Confidential - Michael B. Glasgow

```
 1              MS. DEVINE:  Do you want to go off

 2         the record?

 3              MR. KUHL:  No.

 4                   - - -

 5      (Glasgow Deposition Exhibit 88 marked.)

 6                   - - -

 7                   EXAMINATION

 8   BY MR. KUHL:

 9         Q.   Again, Mr. Glasgow, my name is

10   Assistant Attorney General Richard Kuhl.  I

11   represent the People of the State of Michigan.

12              I've handed you what has been

13   marked as Exhibit 88.  And the Bates number for

14   that document is COF_FED_0137300.

15              MR. GAMBLE:  Richard, what was

16         that exhibit number again?

17              MR. KUHL:  88.

18   BY MR. KUHL:

19         Q.   So it was 300 through 303.  Can I

20   ask you if you've seen this document before,

21   Mr. Glasgow.

22         A.   I do not recall seeing this

23   document.

24         Q.   Do you know who drafted this
```

Highly Confidential - Michael B. Glasgow

```
 1    document?

 2         A.    I do not know, no.

 3         Q.    If you can look at the third page

 4    at the bottom.  It refers to Howard Croft.

 5               Do you see that?

 6         A.    I do see that, yes.

 7         Q.    Do you know if Mr. Croft drafted

 8    this summary?

 9         A.    I do not know.

10         Q.    This summary relates to a

11    November 7, 2014 meeting in Okemos, Michigan.

12               Do you see that?

13         A.    Yes.

14         Q.    And that was a meeting between the

15    city, LAN, and MDEQ, correct?

16         A.    Correct.  Yes.

17         Q.    And you're identified as being an

18    attendee at that meeting.

19               Do you see that?

20         A.    I do, yes.

21         Q.    Does this refresh your

22    recollection about attending a meeting in Okemos

23    with LAN and MDEQ?

24         A.    Vaguely, yes.
```

```
 1          Q.    And who were the other

 2   participants from the city?

 3          A.    Mr. Brent Wright, Mr. Daugherty

 4   Johnson, and Mr. Howard Croft.

 5          Q.    And who was there from LAN?

 6          A.    Mr. Warren Green and Mr. Samir

 7   Matta.

 8          Q.    Do you recall the purpose of this

 9   meeting being to discuss the TTHM violation

10   notice that was being sent by the state?

11          A.    Yes.

12          Q.    And who was hosting the meeting?

13   Was that LAN?

14          A.    I believe so, since we were at

15   their offices.

16          Q.    There's a section here that talks

17   about the health risks starting at the bottom of

18   page 1 and going over to page 2.

19                Do you see that?

20          A.    I do, yes.

21          Q.    And we had some discussion about

22   that yesterday, and it was a little unclear.

23                But this refers to a Tier 2

24   notification requirement.
```

1          Do you see that at the top of

2   page 2?

3          A.    I do, yes.

4          Q.    And it was a Tier 2 notification

5   requirement for a TTHM violation, right?

6          A.    Correct.  Yes.

7          Q.    And this memo states that under

8   Tier 2, "Tier 2 violations are considered less

9   urgent than Tier 1 violations or situations

10  because there is little immediate risk to

11  consumers."

12          Do you see that?

13          A.    Yes.

14          Q.    Did I read that correctly?

15          A.    Yes.

16          Q.    Does that reflect your

17  understanding as to what a Tier 1 -- or excuse

18  me -- a Tier 2 notification was for?

19          A.    Yes.

20          Q.    This memo also outlines suspected

21  causes of the TTHM violation.

22          Do you see that?

23          A.    Yes, I do.

24          Q.    Who was it that outlined at that

```
 1    meeting the suspected causes of the violation?

 2          A.    I do not recall.

 3          Q.    Do you recall if it was Mr. Green

 4    that presented?

 5                MR. GAMBLE:  Objection; form.

 6          A.    I can't say I recall.

 7          Q.    But you are aware that LAN had

 8    been retained to prepare the evaluation report

 9    for the TTHM violations, right?

10          A.    That is correct.

11          Q.    I think earlier you testified that

12    you thought they had started work earlier than

13    November on the TTHM violation, correct?

14          A.    Correct.  Yes.

15          Q.    Was it LAN, either Mr. Matta or

16    Mr. Green, that outlined the suspected causes of

17    the violation?

18                MR. GAMBLE:  Objection; form,

19          asked and answered.

20          A.    I honestly do not recall.

21          Q.    Is it your best recollection that

22    that's who would have done it?

23                MR. GAMBLE:  Objection; form,

24          asked and answered.
```

Highly Confidential - Michael B. Glasgow

```
1           A.    I would say yes.

2           Q.    Under "Suspected Causes:

3   B.  Water Treatment Plant Operations," the third

4   one is, "Coagulant or flocculent aids not

5   optimized."

6                 Do you see that?

7           A.    I do, yes.

8           Q.    What was the coagulant that the

9   city was using?

10          A.    At that time it was ferric

11  chloride.

12          Q.    Now, here it says it's not

13  optimized.  Do you recall we looked at the

14  November 18 draft report yesterday, and there

15  was a reference to needing to optimize the

16  ferric levels to the amount recommended in the

17  2002 treatability report?

18                MR. GAMBLE:  Objection; form,

19          foundation, mischaracterizes the

20          evidence.

21          A.    I do, yes.

22          Q.    Is it your recollection that at

23  this meeting held on November 7, 2014, LAN was

24  recommending that you add additional ferric
```

Highly Confidential - Michael B. Glasgow

1    chloride to the levels recommended in that 2002

2    treatability study?

3                    MR. GAMBLE:   Objection; form,

4          foundation.

5          A.    Yes.

6          Q.    In this report under "Suspected

7    Causes" under C, they identified distribution

8    problems.

9                    Do you see that?

10         A.    I do, yes.

11         Q.    And they identify three things,

12   correct?

13         A.    Correct.

14         Q.    Number 1, "Low flow," right?

15         A.    Right.

16         Q.    Number 2, "Dead ends," right?

17         A.    Yep.

18         Q.    And number 3, "Too much storage

19   (retention time in the system)."

20                   Do you see that?

21         A.    Yes.

22         Q.    Now, they didn't identify

23   corrosion problems in the distribution system

24   under this section, did they?

```
 1                 MR. GAMBLE:  Objection; form.

 2         A.    They did not.

 3         Q.    They didn't identify lack of

 4   corrosion control in this section as a suspected

 5   cause, did they?

 6                 MR. GAMBLE:  Objection; form.

 7         A.    They did not.

 8         Q.    Now, they also identified possible

 9   solutions, didn't they?

10         A.    Yes, they did.

11         Q.    Now, I think if you look over on

12   the next page under the comments, in the second

13   line, it says, "All of the possible solutions

14   were discussed at length."

15                 Do you see that?

16         A.    Yes.

17         Q.    Do you have any recollection as to

18   how long this meeting took place?

19         A.    I do not recall, no.

20         Q.    Now, on that second page, it also

21   states in the third line that "The above course

22   of action was agreed upon as the best first

23   steps."

24                 Do you see that?
```

Highly Confidential - Michael B. Glasgow

```
1          A.    I'm sorry.  What page are you on?

2          Q.    Back on the third page.  I

3   apologize.  Under "Comments," the third line.

4          A.    Okay.

5          Q.    It says, "The above course of

6   action was agreed upon as the best first steps."

7                Do you see that?

8          A.    I do, yes.

9          Q.    And under "Possible solutions," E,

10  there's a reference to "coagulant and flocculant

11  polymer aids."

12               Do you see that?

13         A.    Yes, I do.

14         Q.    And what again was the coagulant

15  that the city was using?

16         A.    At that time, ferric chloride.

17         Q.    So it seems pretty clear, doesn't

18  it, Mr. Glasgow, that as opposed to some of the

19  earlier suggestions, you knew that LAN was

20  recommending that you add more ferric chloride

21  in early November 2014, didn't you?

22               MR. GAMBLE:  Objection; form,

23          foundation.

24         A.    I will answer yes.
```

Highly Confidential - Michael B. Glasgow

```
 1            Q.    And, oh, by the way, under

 2    "Possible Solutions," there's no mention of

 3    adding orthophosphates, is there?

 4            A.    No, there is not.

 5            Q.    There's no mention of adding any

 6    type of corrosion control under "Possible

 7    Solutions," is there, Mr. Glasgow?

 8            A.    No, there is not.

 9            MR. KUHL:  That's all the

10            questions I have.  If I have any

11            additional time, I'll retain it.

12            THE VIDEOGRAPHER:  We are going

13            off the record at 11:26 a.m.

14            (Pause in proceedings.)

15            THE VIDEOGRAPHER:  We are back on

16            the record at 11:27 a.m.

17                    - - -

18            FURTHER EXAMINATION

19    BY MS. SMITH:

20            Q.    Mr. Glasgow, I just have a few

21    follow-up questions with respect to this

22    document marked Johnson Exhibit 110.

23            Have you had a chance to review

24    this document?
```

Highly Confidential - Michael B. Glasgow

```
1              A.    I have, yes.

2              Q.    And this is an e-mail -- the body

3    of the document is a March 17, 2015 e-mail from

4    Mr. Stephen Busch at the DEQ addressed to Howard

5    Croft.  He was the DPW director at the time for

6    the city of Flint, correct?

7              A.    Correct.  Yes.

8              Q.    And Mr. Brent Wright, he was the

9    water plant supervisor at the time for the city

10   of Flint?

11             A.    Correct.  Yes.

12             Q.    And you are listed as a recipient,

13   and you were at the time the laboratory

14   supervisor for the city of Flint?

15             A.    Correct.  Yes.

16             Q.    And then there's Mr. Daugherty

17   Johnson.  And at the time, Mr. Johnson was the

18   utilities administrator -- or the utilities

19   director for the city of Flint, correct?

20             A.    That is correct.  Yes.

21             Q.    And then Mr. Ambrose is listed.

22   Who is Mr. Ambrose as of March 17 of 2015?

23             A.    I believe he was the city's

24   emergency manager at that time.
```

Highly Confidential - Michael B. Glasgow

```
1        Q.    Okay.  And then there's an
2   N. Henderson.  Do you know who Henderson was?
3        A.    Yes.  Ms. Henderson was the city
4   administrator at the time.
5        Q.    Okay.  And then there's a
6   Mr. Prysby with DEQ.  Who was Mr. Prysby with
7   DEQ at the time, to your understanding?
8        A.    Yeah, at that time he was the
9   district engineer over municipal supplies in
10  Genesee County.
11       Q.    Okay.  And you were in regular
12  communication with Mr. Prysby and Mr. Busch of
13  the DEQ during this time frame of March 2015,
14  correct?
15       A.    Yes, that's a fair statement.
16       Q.    And were you also in regular
17  communication with your colleagues at the city
18  of Flint department of public works listed on
19  this e-mail?
20       A.    Yes.
21       Q.    Okay.  And then it appears from
22  the document that Mr. Johnson forwarded the
23  e-mail to Mr. Green.  And that's Mr. Green at
24  LAN, correct?
```

Highly Confidential - Michael B. Glasgow

```
 1          A.    Yes.

 2          Q.    Okay.  And the body of the e-mail

 3     reads, "As Mike Prysby and I mentioned during

 4     our phone call earlier today" -- now, the

 5     e-mail's primary recipient is Mr. Howard Croft.

 6                But let me ask you if you recall

 7     having a conversation with Mr. Busch and

 8     Mr. Prysby on or about March 17 of 2015

 9     concerning the contents of this e-mail?

10          A.    Vaguely, yes.

11          Q.    You vaguely -- so to your

12     recollection, you participated in the phone

13     conference referenced in Mr. Busch's e-mail?

14          A.    Yes.

15          Q.    Okay.  And so do you have any

16     understanding, then, as to how Mr. Busch --

17     would it be -- what I'm trying to get to is how

18     did Mr. Busch obtain the information that is

19     described in his e-mail concerning the need to

20     optimize water quality in the city's

21     distribution system which will in turn provide

22     the city's water customers with water quality

23     that helps limit the potential for Legionella

24     occurrence in premise plumbing.
```

Highly Confidential - Michael B. Glasgow

```
 1                    MR. MARKER:  Form, foundation.

 2          Q.    Was that information that was

 3    provided to Mr. Busch and Mr. Prysby in that

 4    March 17 -- or that phone call that occurred on

 5    or around March 17 of 2015?

 6                    MR. MARKER:  Same objection.

 7          A.    From what I recall, yes.

 8          Q.    Okay.  To your recollection,

 9    was -- did you have any communication with

10    Mr. Busch and Mr. Prysby about these types of

11    issues prior to March 17 of 2015?

12                    Simply put, was that the first

13    time you talked to your contacts at MDEQ about

14    Legionella concerns in the city of Flint?

15          A.    From what I recall, yes.

16          Q.    Okay.  And did -- do you know of

17    any actions Mr. Croft took in response to

18    receiving this e-mail?

19                    MR. KIM:  Objection as to

20           foundation.

21          A.    I do not, no.

22          Q.    How about Mr. Ambrose?  Do you

23    have any knowledge of any steps Mr. Ambrose took

24    as emergency manager at the time to follow up on
```

Highly Confidential - Michael B. Glasgow

1    the recommendations outlined in this e-mail?

2              MR. KIM:  Objection as to

3         foundation.

4         A.    I'm not aware of Mr. Ambrose's

5    response.

6         Q.    Okay.  And in any of your

7    subsequent -- did you have any interactions with

8    Mr. Green at LAN after March 17 of 2015?

9         A.    I do not recall.  I'm sure I did

10   with the other work LAN was still doing around.

11   But I don't remember any conversation in regards

12   to this e-mail or this phone conference.

13             MS. SMITH:  Thank you.  That was

14        my next question, so I'll let that be my

15        last question.  Thank you very much for

16        the courtesy with the time.

17             THE VIDEOGRAPHER:  We are going

18        off the record at 11:32 a.m.

19             (Pause in proceedings.)

20             THE VIDEOGRAPHER:  We are back on

21        the record at 11:34 a.m.

22                  - - -

23             FURTHER EXAMINATION

24

Highly Confidential - Michael B. Glasgow

```
1    BY MR. MORRISSEY:

2          Q.    Good morning, Mr. Glasgow.

3          A.    Good morning.

4          Q.    This morning counsel for Veolia

5    asked you some questions about the interactions

6    with Mr. Prysby and Mr. Busch before the switch

7    was made.

8                Do you recall that?

9          A.    I do, yes.

10         Q.    And the questioning, I believe,

11   suggested that you were instructed that

12   phosphates weren't required.

13               Do you recall being asked that?

14               MS. DEVINE:  Objection.

15         A.    Yes.

16         Q.    Now, you didn't make any proposal

17   to DEQ for the use of corrosion control before

18   the switch was made, right?

19               MR. KIM:  Objection as to form.

20               MR. MARKER:  Objection.

21         A.    No.

22         Q.    You didn't -- and LAN who was

23   working with you before the switch, they didn't

24   suggest that you use any form of corrosion
```

```
 1    control, any particular form, correct?
 2                  MR. GAMBLE:  Objection to form,
 3           foundation.
 4           A.    Not that I can recall, no.
 5           Q.    LAN did not suggest that you
 6    needed to complete an optimal corrosion control
 7    evaluation before making the switch, correct?
 8                  MR. GAMBLE:  Objection; form,
 9           foundation.
10           A.    Not that I recall, no.
11           Q.    And because you didn't propose any
12    corrosion control and didn't conduct any optimal
13    corrosion control evaluation, DEQ didn't reject
14    any suggestions that you do that, did they?
15                  MR. MARKER:  Objection; form,
16           foundation.
17                  MR. GAMBLE:  Objection.
18           A.    Not that I recall, no.
19           Q.    No one from DEQ suggested it would
20    be a bad idea to have corrosion control, did
21    they?
22                  MR. MARKER:  Objection; form,
23           foundation.
24           A.    No.
```

Highly Confidential - Michael B. Glasgow

```
 1            Q.    And when Veolia came on the scene

 2    in 2015, they didn't advise you that the fact

 3    that you had gone ahead and flipped the switch

 4    without optimizing control corrosion was a bad

 5    idea that posed a risk to the health of the

 6    people of Flint, correct?

 7                  MS. DEVINE:  Objection.

 8            A.    Correct.  Yeah.

 9            Q.    Counsel for Veolia asked you a few

10    questions about Exhibit 10.  If you could get

11    that out.

12                  This is the e-mail exchange

13    regarding Ms. Walters' test result, right?

14            A.    Yes.

15            Q.    And there's an e-mail from

16    Mr. Bincsik reporting he had a discussion with

17    Marvin about the possibility of adding

18    phosphates; is that right?

19            A.    That is correct, yes.

20            Q.    Now, in Veolia's presentations,

21    they didn't tell you anything about when you

22    should be adding phosphates, right?

23            A.    Not that I can recall, no.

24            Q.    They didn't tell you anything
```

Highly Confidential - Michael B. Glasgow

1    about adding orthophosphates, right?

2              MS. DEVINE:  Objection.

3         A.    Right.

4         Q.    They didn't tell you that

5    implementing corrosion control right then and

6    there was urgent, did they?

7         A.    No, not that I can recall.

8         Q.    And they didn't tell you that not

9    implementing corrosion control right then and

10   there could lead to significant damage to your

11   pipe infrastructure and harm to the public

12   health of the people of the Flint --

13             MS. DEVINE:  Objection.

14        Q.    -- correct?

15        A.    No, they did not.

16        Q.    Did anyone from Veolia ask you for

17   individual results like Ms. Walters' test

18   results that were part of your ongoing Lead and

19   Copper Rule compliance?

20        A.    Not that I can recall.

21        Q.    And did anyone from Veolia suggest

22   that an individual elevated result like that at

23   Ms. Walters' home could be indicative of a

24   broader problem in your overall water supply?

Highly Confidential - Michael B. Glasgow

```
 1          A.    Not that I can recall, no.

 2          Q.    Counsel for LAN asked you some

 3   questions about Exhibit 71, which I spent some

 4   time with you yesterday on, which is this

 5   June 10, 2013 document that has the Bates number

 6   LAN_FLINT_00185409.

 7                Do you see that?

 8          A.    Yes.

 9          Q.    And if you turn to page 11 of the

10   attachment, which has the Bates number 185422.

11                Do you see this document is signed

12   by Mr. Green and Mr. Matta, right?

13          A.    Correct.  Yes.

14          Q.    And if you turn back to page

15   185412, there's a section "Applicable Law."  It

16   says, "This contract shall be governed by and

17   interpreted according to the laws of the State

18   of Michigan."

19                Do you see that?

20          A.    Yes, I do.

21          Q.    Now, I understand that as counsel

22   for LAN suggested, this was what LAN was

23   proposing as of June 10, 2013.  And you don't

24   know what the actual contract that was signed
```

Highly Confidential - Michael B. Glasgow

1    looks like, right?

2          A.    That is correct, yes.

3          Q.    But you do know that LAN -- you

4    know this one -- this version is signed by LAN.

5    There may be later versions signed by both

6    parties.

7                But a couple things on this are

8    clearly right, right, like the people that I

9    asked you about yesterday who were described on

10   page 185411?

11         A.    Yes.

12         Q.    And those are the folks from LAN

13   who worked with you, right?

14         A.    That is correct.  Yes.

15         Q.    And these biographies of the LAN

16   employees that began on page 427 with project

17   team, Mr. Green, lists all of his experience

18   with various water plants.  Mr. Matta, it lists

19   all of his experience.  These are the folks you

20   worked with, right?

21                MR. GAMBLE:  Object to form.

22         A.    That is correct.  Yes.

23         Q.    And that work in connection with

24   the switch to the Flint River began within a

1    couple weeks after this, right?

2           A.    To the best of my recollection,

3    yes.

4           Q.    And counsel for LAN suggested that

5    LAN recommended a 60- to 90-day test run before

6    flipping the switch; is that right?

7           A.    Yes.

8           Q.    Did LAN say -- ever say, "You

9    can't do this switch without conducting an

10   optimized corrosion control evaluation"?

11                MR. GAMBLE:  Objection to form.

12          A.    Not that I can recall, no.

13          Q.    Are you aware of LAN or anyone

14   from LAN ever conducting a chloride sulfate mass

15   ratio calculation?

16          A.    Not to my knowledge, no.

17          Q.    Did anyone from LAN ever ask you

18   for the data you would need to conduct the CSMR

19   calculation?

20                MR. GAMBLE:  Objection to form.

21          A.    Not that I can recall.

22          Q.    You're not aware of anything that

23   narrowed LAN's scope of work to exclude

24   consideration of corrosion control, are you?

Highly Confidential - Michael B. Glasgow

```
 1                   MR. GAMBLE:  Object to form.

 2           A.    No, I am not.

 3           Q.    You're not aware of anything that

 4     narrowed LAN's scope of work to exclude any

 5     consideration of public health, are you?

 6                   MR. GAMBLE:  Objection; form.

 7           A.    No, I'm not.

 8           Q.    You're not aware of anything that

 9     purported to limit LAN's duty as an engineer to

10     look out for public health, are you?

11                   MR. GAMBLE:  Objection; form.

12           A.    No.

13           Q.    You're not aware of anything that

14     limited the scope of LAN's work to say they

15     didn't need to consider the impact of your lack

16     of corrosion control on pipe infrastructure in

17     the city, are you?

18                   MR. GAMBLE:  Objection; form.

19           A.    No.

20           Q.    You're not aware of anything that

21     gave LAN some kind of free pass for ignoring

22     public health and property damage problems, are

23     you?

24                   MR. GAMBLE:  Objection; form.
```

Highly Confidential - Michael B. Glasgow

1        A.    No, I am not.

2        Q.    The meeting that counsel for the

3   state just asked you about in November 2014,

4   this was -- that was more than six months after

5   you'd made the switch, right?

6        A.    Correct.  Yes.

7        Q.    And at that point, you started

8   having these TTHM issues; is that right?

9        A.    That is correct.  Yes.

10       Q.    In that time frame, did anyone

11  from LAN say, "Look, let's conduct a CSMR to see

12  if this water is corrosive"?

13       A.    Not that I can recall, no.

14       Q.    Did anyone from LAN say, "Look,

15  the fact that you didn't conduct an optimal

16  corrosion control evaluation before flipping the

17  switch might be part of the problem here?

18             MR. GAMBLE:  Objection; form.

19       A.    No.

20       Q.    Did anyone from LAN say, "Look,

21  you really need to get corrosion control in

22  place now to make sure we don't have problems

23  going forward"?

24             MR. GAMBLE:  Objection to form.

Highly Confidential - Michael B. Glasgow

```
1              A.    No, not that I recall.

2              Q.    Earlier today you were asked a few

3    questions about the Langelier index.

4                    Do you recall that?

5              A.    Yes.

6              Q.    And those questions were framed in

7    the context of whether Langelier -- the

8    Langelier index is an appropriate method to

9    assess whether water is likely to be scale

10   forming.

11                   Do you recall that?

12             A.    Yes.

13             Q.    And the Langelier index can be

14   used to assess whether water is scale forming,

15   right?

16             A.    Correct.  Yes.

17             Q.    The Langelier index is something

18   that has existed for decades, right?

19             A.    That is correct.  Yes.

20             Q.    And it's useful for what it's

21   useful for, right?

22             A.    I agree.  Yes.

23             Q.    The issue here is whether the

24   water in Flint was corrosive, right?
```

Highly Confidential - Michael B. Glasgow

         1          A.    I could agree with that.  Yes.

         2          Q.    And corrosivity can result from

         3    things other than whether the water is scale

         4    forming, right?

         5                MR. MARKER:  Objection; form,

         6          foundation.

         7          A.    I will agree with that.  Yes.

         8          Q.    The fluoride sulfide mass ratio is

         9    a calculation that has been used to measure

        10    corrosion for decades, right?

        11                MR. MARKER:  Form, foundation.

        12          A.    Possibly.  I became more aware of

        13    it in 2015.

        14          Q.    Right.  And during the period from

        15    2013 through 2015, you were working with various

        16    expert engineers who purported to be expert in

        17    water quality, right?

        18          A.    Yes.

        19          Q.    You were working with the folks

        20    from LAN, right?

        21          A.    Correct.

        22          Q.    You were working with the folks

        23    from Veolia later in 2015, right?

        24          A.    Correct.  Yes.

Highly Confidential - Michael B. Glasgow

```
 1            Q.    And none of those people said,

 2    "Mr. Glasgow, you really need to conduct a

 3    chloride sulfate mass ratio calculation to

 4    assess whether this water is corrosive," did

 5    they?

 6                  MS. DEVINE:  Objection.

 7                  MR. GAMBLE:  Objection; form,

 8         foundation.

 9            A.    They did not, no.

10            Q.    None of them made any

11    recommendation at all about conducting a

12    chloride sulfate mass ratio calculation, did

13    they?

14                  MS. DEVINE:  Objection.

15                  MR. GAMBLE:  Object to form.

16            A.    No, not that I recall.

17            Q.    You were asked a few questions

18    about the technical advisory committee.

19                  Do you recall that?

20            A.    Yes, I do.

21            Q.    Now, the folks on the technical

22    advisory committee, apart from the engineers and

23    the DEQ officials, when they started up in late

24    February '15, did any of these outside folks
```

1  have any way to know that you hadn't implemented

2  any corrosion control in your water system?

3              MR. MARKER:  Objection; form.

4              MR. KIM:  Objection as to form and

5        foundation.

6        A.    Not that I'm aware of, no.

7        Q.    Is there any way these outside

8  folks on the technical advisory committee would

9  have known that you hadn't conducted a chloride

10 mass ratio analysis?

11             MR. MARKER:  Form, foundation.

12       A.    No, I do not believe so.

13       Q.    Is there any way that any of those

14 folks would have known that there was a single

15 page of Mr. Gnagy's handwritten notes that would

16 have allowed them to make a single calculation

17 and determine that the water in Flint was highly

18 corrosive?

19             MS. DEVINE:  Objection.

20       A.    No, not that I recall.

21             MR. MORRISSEY:  That's all I have.

22             THE VIDEOGRAPHER:  We are going

23       off the record at 11:48 a.m.

24             (Pause in proceedings.)

Highly Confidential - Michael B. Glasgow

```
 1              THE VIDEOGRAPHER:  We are back on

 2         the record at 11:52 a.m.

 3                   - - -

 4              FURTHER EXAMINATION

 5   BY MR. DAWSON:

 6         Q.    Mr. Glasgow, I just want to make

 7   sure I understand the kind of chronological

 8   events on a few things that happened that I

 9   didn't realize.

10              Yesterday when we talked about you

11   had met with the hospital people in October of

12   2014, did I understand your testimony later on

13   to tell Ms. Smith that after that very first

14   meeting with the hospital folks where they told

15   you they had Legionella in their internal

16   components, that you went across to the closest

17   place you could and measured the city of Flint

18   water to determine if there was any Legionella

19   in that area?

20              Is that what you did?

21              MS. SMITH:  Objection; misstates

22         prior testimony.

23         A.    I did go across the street to a

24   church/school to monitor for what I had the
```

1    ability to monitor for.  So we checked for

2    coliform bacteria, did a heterotrophic plate

3    count, and also took a chlorine residual, yes.

4               (Reporter clarification.)

5          Q.    Chlorine residual level, correct?

6          A.    Correct.  Yes.

7          Q.    And did those tests come back that

8    it was in compliance?

9          A.    To the best of my knowledge, yes.

10         Q.    And the reason why you didn't go

11   and test the water going into McLaren Hospital

12   is because they had already told you they had

13   tested it and found no problem, correct?

14         A.    That is correct.

15               MS. DEVINE:  Objection; misstates

16         testimony.

17         Q.    So I know Ms. Smith criticized

18   yesterday that the only report I showed you was

19   from December 23rd concerning McLaren's testing,

20   which was supposed to cover a 15-day period

21   between December 5 and December 19, 2014, but

22   you had been told about testing that even

23   predated this testing, correct?

24         A.    That is correct.  Yes.

Highly Confidential - Michael B. Glasgow

```
 1           Q.    Have you ever seen the test

 2    results from the McLaren Hospital by their

 3    consultant as to where those reports are and

 4    what they say?

 5           A.    No, I have not.

 6           Q.    So you went over to this church

 7    and school.  You did your testing.  How long did

 8    that take you approximately?  Was it a long

 9    time?

10           A.    No.  A normal bacteria test,

11    results are within 24, 48 hours.

12           Q.    All right.  And you were asked a

13    number of questions about, "Well, because you

14    did a test at that location, you can't tell what

15    something else is at another location.  Then why

16    do you even bother to take testing?"

17                 Can you explain that to us?

18           A.    Well, my time in the field, any

19    time you collect a sample and you test and you

20    get a result, it's really I guess thought of as,

21    you know, you can verify the water at that

22    particular time, but in a sense, you're still

23    getting somewhat of a representation or a

24    representative sample of what's in the system.
```

Highly Confidential - Michael B. Glasgow

```
 1          Q.    And you would think that if you

 2    had problems out there with -- like your HPC

 3    coming back as problematic, you would know about

 4    it, correct?

 5                MS. SMITH:  Objection; foundation.

 6          A.    Correct.  With some of your data,

 7    yes.

 8          Q.    Yes, sir.  And now when you

 9    started understanding that McLaren was telling

10    you they had this problem in October of 2014,

11    that information carried over into the next

12    year, 2015; is that correct?

13                MS. SMITH:  Objection.

14          A.    Yes.

15          Q.    And the reason why I ask that is,

16    is I know you were asked a whole bunch of

17    questions yesterday about Veolia folks and

18    whether or not you had any discussions with

19    them.

20                What I'm asking you is, is -- and

21    Veolia became involved in February and January

22    of 2015.

23                Did you ever mention to any Veolia

24    people about the Legionella problem that McLaren
```

Highly Confidential - Michael B. Glasgow

 1   had brought up, sir?

 2        A.   No.  I do not recall, no.

 3        Q.   It wouldn't make a lot of sense

 4   that you would tell them, would it, because you

 5   already thought that there wasn't a problem with

 6   it at that time based upon the testing that you

 7   had done and McLaren had done?

 8        A.   Yes, that's a fair statement.

 9        Q.   All right, sir.  Now, I just want

10   to go through a few more documents.

11             Oh, I remember what I wanted to

12   ask you.  There's something called a bug fuzz

13   meeting.  Do you know -- did you ever hear that

14   term?

15        A.   I don't believe I have, no.

16        Q.   You never attended any, I take it?

17        A.   No.

18        Q.   Fair enough.  You just cut out a

19   whole bunch of questions for yourself.

20        A.   Hey, all right.

21        Q.   Now, you were shown this

22   document --

23             MR. DAWSON:  I believe it's

24        Exhibit 86, Mr. Kim?  Is this 86?

Highly Confidential - Michael B. Glasgow

```
 1                    MR. KIM:  That would be, yes, 86.

 2                    MR. DAWSON:  Yeah, Exhibit 86 this

 3          morning.

 4   BY MR. DAWSON:

 5          Q.    And Mr. Kim asked you a number of

 6   questions about when you look over at page 4 of

 7   this document and continuing on to page 5,

 8   there's a comment as to what type of

 9   committees -- there's two separate committees --

10   that were being formed.

11                    Do you recall those series of

12   questions?

13          A.    I do, yes.

14          Q.    Do you have a recollection why the

15   second is a technical committee which is

16   specifically designed for the medical community,

17   the hospitals, and large volume users such as

18   GM -- do you know why that was a separate

19   committee?

20          A.    Offhand, I don't.  From my

21   recollection, it was kind of to keep the

22   committees a little smaller and manageable for

23   conversation.

24          Q.    All right, sir.  And there's a
```

Highly Confidential - Michael B. Glasgow

1    number of comments in this exhibit that talks

2    about "Is this going to be an open meeting?"

3              Do you know whether or not the

4    committees for the hospital were an open forum,

5    or were they closed?

6         A.   From my recollection, I believe

7    those were closed.

8         Q.   Was that at the hospital's

9    request, or do you recollect?

10        A.   I do not recall.

11        Q.   All right, sir.  And then we

12   have -- this is Exhibit 87 that you were shown

13   this morning, the technical advisory committee.

14             Do you remember document, sir?

15        A.   Yes, I do.

16        Q.   The very first thing it says was

17   to introduce you as your new job, correct?

18        A.   Correct.  Yes.

19        Q.   And it says, "Upgrade on current

20   water status - Mike Glasgow."

21             What were you presenting, if you

22   can recall, back in May of 2015 concerning

23   upgrades of the water status?

24        A.   I'm going to have to kind of refer

1    to the bullet points here.  I believe I

2    discussed the hardness of the water, as that was

3    being, I'll say, blamed on some of the

4    complaints and the rashes that were being held.

5              And also, according to these

6    bullet points, the TTHM testing and our issues

7    with that, to bring everybody up to speed.

8         Q.   Yes, sir.  And the reason why I

9    ask, you have updates about current problems.

10   There's nothing about Legionella with your

11   water.  Do you see anything in this document

12   about Legionella?

13        A.   I do not, no.

14        Q.   Now, a fellow was at that meeting

15   called Rusty Hudson who's McLaren Hospital's

16   director of engineering and services.  Did he

17   say, "Wait a minute, Mr. Glasgow.  We need to

18   talk about Legionella in this meeting"?

19        A.   No, not that I recall.

20        Q.   He didn't express any problems

21   that he thought existed; is that correct?

22        A.   That is correct.

23        Q.   And then it says under

24   "Discussions" on page 1 of Exhibit 87 that the

Highly Confidential - Michael B. Glasgow

```
 1    Genesee County Health Department hadn't received

 2    any water complaints in over 60 days.

 3              Does that mean that your group

 4    hadn't received them, or just those folks, if

 5    you know?

 6         A.    I would have to say that includes

 7    the Flint water plant.  So I will say that

 8    included all.

 9         Q.    All right, sir.  And then it says,

10    "All independent area testing continues to show

11    water quality to be in line with EPA standards."

12              Do you know whose testing that was

13    referencing, sir?

14         A.    I do not offhand.  I would -- I

15    would think it would include our testing that we

16    have conducted at the city of Flint.

17         Q.    All right.  And then, finally,

18    what is the question about bromite levels in the

19    water?  What was that brought up about, sir?

20         A.    That was in regards to ozone

21    generation.  That can be a byproduct of ozone

22    addition to the water.

23         Q.    All right.  Now, I have a

24    document -- and I can't find one that correlates
```

```
 1    perfectly with it.  It's an e-mail from Liz

 2    Murphy, and I'll just --

 3              MR. DAWSON:  We'll need to mark

 4         that one.  I apologize.

 5              - - -

 6    (Glasgow Deposition Exhibit 89 marked.)

 7              - - -

 8  BY MR. DAWSON:

 9         Q.    I've put before you a document

10    from an e-mail chain that shows Liz Murphy wrote

11    on November 3, 2014 to various people concerning

12    "McLaren Hospital Update."

13              Do you see that, sir?

14         A.    Yes, I do.

15              MR. KIM:  What's the Bates number?

16              MR. DAWSON:  Yes, sir.  It's

17         COF_FED_0137795.

18              MR. KIM:  Thank you.

19              MR. DAWSON:  Yes.

20  BY MR. DAWSON:

21         Q.    It says, "Everyone.  Just wanted

22    to update everyone on the McLaren Legionella

23    investigation.  On Thursday, October 30, I was

24    invited back to McLaren for a meeting with their
```

```
 1    constituents and a representative of the Genesee

 2    County Health Department."

 3              That person who's giving that

 4    update is you; is that correct?

 5        A.    That is correct, yes.

 6        Q.    So I know you told us you had an

 7    early October meeting.  This is a second meeting

 8    on October 30th?

 9        A.    Correct.

10        Q.    All right, sir.  It says, "Since

11    the original investigation from a few weeks ago,

12    McLaren has chlorinated their water system and

13    conducted another round of Legionella testing.

14    The numbers were dramatically lower, but there

15    was still evidence of the contamination, so they

16    are planning another chlorination of their

17    system, and at least two more sampling events."

18              So they told you that they needed

19    to do more work; is that right?

20        A.    Yes.  That was part of our

21    discussion at the meeting.

22        Q.    And then you say, "There has been

23    no evidence of Legionella in the water coming

24    into the hospital from the city supply during
```

Highly Confidential - Michael B. Glasgow

```
1    their sampling events."

2              You're talking about what they

3    reported to you, McLaren, correct?

4         A.   Correct.  Yes.

5         Q.   So wouldn't you think that if

6    someone was having a problem with Legionella and

7    they thought it was from your water source,

8    you'd be getting a lot of written complaints

9    from them?

10             MS. SMITH:  Objection; calls for

11        speculation.

12        A.   Yes, that would be possible.  Yes.

13        Q.   Have you ever seen a single letter

14   or e-mail written from McLaren Hospital to the

15   city of Flint directed to you or anybody else in

16   water saying, "Your lousy water is causing

17   Legionella in our hospital facility"?

18        A.   I have not, no.

19        Q.   Turn to Johnson 142, please, sir.

20             I believe you've got that right

21   there in front of you.  We pulled it out.  Here,

22   I'll just -- here's a couple if you don't have

23   it.

24        A.   I'll double check just to make
```

1    sure.  Oh, yeah, that is the one I had.  Sorry.

2           Q.    That's okay.

3                 I just made a few edifications

4    here.  This is Mr. Earley.  We've already talked

5    about, where it says, "Therein lies our

6    message - an internal issue at McLaren that they

7    are working on with our assistance."

8                 That was true, wasn't it?

9           A.    Yes.  At the time, to the best of

10   my knowledge, yes.

11          Q.    And that was October 3rd.  That

12   was the first time you had a meeting with those

13   folks, correct, early October?

14          A.    Correct.  Yes.

15          Q.    And then he says, "Not a Flint

16   water problem, but they are trying to resolve."

17                Again, that is a true statement,

18   correct?

19          A.    Correct.

20          Q.    And you based that upon your

21   testing, as well as what McLaren told you their

22   testing showed?

23          A.    That is correct, yes.

24          Q.    And then we go down here, and it

1    says -- I think there was some complaints about

2    you here that you hadn't told one of your

3    superiors something about this issue.

4                Do you recall that, getting some

5    unhappiness directed to you about that, sir?

6         A.    Yeah.  It looks that way, yes.

7         Q.    All right.  "Mike's supervisors

8    did know about this.  I got a call from the

9    president of McLaren last week.  I immediately

10   called Howard who was with the mayor and asked

11   him to have my Mike contact McLaren's head of

12   engineering.  They determined that there was no

13   issue with the Flint water coming into the

14   hospital.  They had an internal issue.  Mike

15   attended their internal meeting to offer advice.

16   That is 'Flint working with McLaren.'"

17                You remember that, don't you?

18        A.    I do, yes.

19        Q.    Again, the president of the whole

20   hospital called to report that they found it was

21   their problem, right?

22        A.    Yes.  According to this e-mail,

23   yes.

24        Q.    And then if you turn to the second

Highly Confidential - Michael B. Glasgow

1    page of that document.  Highlighted it says,

2    "After talking with Mike Glasgow from our water

3    plant, he confirmed that he was helping the

4    hospital conduct testing for bacteria."

5              That's true, isn't it?

6         A.    Yes.  Yes, I reported to them that

7    I would do what was in my power to test.

8         Q.    "And they are flushing their

9    system with chlorine as part of their routine

10   method of abating these type of issues."

11             Do you recall them telling you

12   that?

13        A.    Yes.

14        Q.    And then look at this next

15   paragraph.  "I also spoke to McLaren's

16   communications director, Laurie Prochazka, who

17   said that they did not release anything to the

18   public.  Instead, ABC 12 was sent an internal

19   memo meant only for employees to inform them of

20   the cleaning procedures."

21             Did you know that they were only

22   telling their own folks but not the public?

23        A.    I did not, no.

24        Q.    So did you ever meet this --

Highly Confidential – Michael B. Glasgow

1    what's her name -- lower Prochazka is a?

2            A.    Not that I recall.

3            Q.    She wasn't one of the people at

4    the multiple meetings you had, sir, with the

5    McLaren folks?

6            A.    Not that I can recall.

7            Q.    All right.  Now, based upon what

8    you know from your technical position that you

9    held at the city of Flint, do you or do you not

10   believe that you discharged your duties for

11   making sure that there was not bacteria growing

12   in the city of Flint water system such that it

13   would be causing Legionella when it was

14   transmitted to McLaren Hospital?

15                 MS. SMITH:  Objection; form and

16          foundation.

17           A.    I'll answer that and say I did

18   what was within my power to try to verify that.

19           Q.    And you had two ways of doing

20   that; with your own testing and McLaren's; is

21   that correct?

22           A.    That is correct, yes.

23           Q.    And never received a single report

24   from McLaren Hospital people that they found

Highly Confidential - Michael B. Glasgow

1    Legionella in the water that was coming into

2    their system before it got inside it?

3                    MS. SMITH:  Objection.  Time

4         frame?

5         A.    That is correct.

6         Q.    At any time?

7         A.    That is correct.

8         Q.    Now, where McLaren sits relative

9    to your distribution system, do you recall the

10   layout of the distribution system, the water

11   distribution of Flint?

12        A.    Yes, I do.

13        Q.    Is McLaren toward the end of the

14   distribution system on one of the main arteries

15   or not?

16        A.    Yeah.  They're kind of located on

17   the west side of the city.

18        Q.    Yes, sir.  And did they report to

19   you when they were getting Legionella in their

20   internal components, it was also kind of in

21   areas that were toward the end of their

22   distribution, or did you ever have that

23   discussion with them?

24        A.    I don't believe I had that

Highly Confidential - Michael B. Glasgow

1    discussion with them.

2              MR. DAWSON:  That's all the

3         questions I have.  Thank you so much,

4         sir.

5              THE WITNESS:  No problem.

6              THE VIDEOGRAPHER:  We are going

7         off the record at 12:08 p.m.

8              (Pause in proceedings.)

9              THE VIDEOGRAPHER:  On the record

10        at 12:09 p.m.  This concludes the

11        deposition, and we are off the record at

12        12:09 p.m.

13                   - - -

14           Thereupon, at 12:09 p.m., on Wednesday,

15    February 26, 2020, the deposition was concluded.

16                   - - -

17

18

19

20

21

22

23

24

Highly Confidential - Michael B. Glasgow

```
 1                    CERTIFICATE

 2    STATE OF MICHIGAN      :

                                SS:

 3    COUNTY OF _____:

 4

 5          I, MICHAEL B. GLASGOW, do hereby certify

 6    that I have read the foregoing transcript of my

 7    cross-examination given on February 26, 2020; that

 8    together with the correction page attached hereto

 9    noting changes in form or substance, if any, it is

10    true and correct.

11          _____

                    MICHAEL B. GLASGOW

12

13          I do hereby certify that the foregoing

14    transcript of the cross-examination of MICHAEL B.

15    GLASGOW was submitted to the witness for reading and

16    signing; that after he had stated to the undersigned

17    Notary Public that he had read and examined his

18    cross-examination, he signed the same in my presence

19    on the _____ day of _____, 2020.

20

            _____

21                NOTARY PUBLIC - STATE OF MICHIGAN

22

23    My Commission Expires:

24    _____, _____.
```

Highly Confidential - Michael B. Glasgow

```
 1                    CERTIFICATE

 2

              I, Carol A. Kirk, a Registered Merit

 3    Reporter and Notary Public in and for the State of

      Michigan, duly commissioned and qualified, do hereby

 4    certify that the within-named MICHAEL B. GLASGOW was

      by me first duly sworn to testify to the truth, the

 5    whole truth, and nothing but the truth in the cause

      aforesaid; that the deposition then given by him was

 6    by me reduced to stenotype in the presence of said

      witness; that the foregoing is a true and correct

 7    transcript of the deposition so given by him; that the

      deposition was taken at the time and place in the

 8    caption specified and was completed without

      adjournment; and that I am in no way related to or

 9    employed by any attorney or party hereto or

      financially interested in the action; and I am not,

10    nor is the court reporting firm with which I am

      affiliated, under a contract as defined in Civil Rule

11    28(D).

12

13            IN WITNESS WHEREOF, I have hereunto set my

      hand and affixed my seal of office at Dexter, Michigan

14    on this 9th day of March 2020.

15

16

17                       _____

                         CAROL A. KIRK, RMR, CSR-9139

18                       NOTARY PUBLIC - STATE OF MICHIGAN

19

20    My Commission Expires:  August 19, 2022.

21                       - - -

22

23

24
```

Highly Confidential - Michael B. Glasgow

```
 1              DEPOSITION ERRATA SHEET

 2    I, MICHAEL B. GLASGOW, have read the transcript

      of my deposition taken on the 26th day of February

 3    2020, or the same has been read to me.  I request that

      the following changes be entered upon the record for

 4    the reasons so indicated.  I have signed the signature

      page and authorize you to attach the same to the

 5    original transcript.

 6    Page  Line  Change and Reason:

 7    ____  ____  _____

 8    ____  ____  _____

 9    ____  ____  _____

10    ____  ____  _____

11    ____  ____  _____

12    ____  ____  _____

13    ____  ____  _____

14    ____  ____  _____

15    ____  ____  _____

16    ____  ____  _____

17    ____  ____  _____

18    ____  ____  _____

19    ____  ____  _____

20    ____  ____  _____

21    ____  ____  _____

22    ____  ____  _____

23    ____  ____  _____

24    Date _____  Signature _____
```