```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3       SHERROD, TEED, VANDERHAGAN and WARE,

 4                       Plaintiffs,
            -v-                              Case No. 17-10164
 5
         VNA and LAN,
 6
                         Defendant.
 7       _____/

 8                         MOTION HEARING

 9
                  BEFORE THE HONORABLE JUDITH E. LEVY
10                   UNITED STATES DISTRICT JUDGE

11                      FEBRUARY 24, 2022

12
         APPEARANCES:
13
         For the            Corey M. Stern
14       Plaintiffs:        Levy Konigsberg, LLP
                            605 Third Avenue, 33rd Floor
15                          New York, New York 10158

16                          Moshe Maimon
                            Levy Konigsberg, LLP
17                          605 Third Avenue, 33rd Floor
                            New York, New York 10158
18
         For VNA            Marcus Christian
19       Defendants:        Mayer Brown LLP
                            1999 K Street NW
20                          Washington, District of Columbia 20006

21
                            (Appearances Continued on Next Page)
22
```

```
23       TO OBTAIN A        JESECA C. EDDINGTON, RDR, RMR, CRR, FCRR
         CERTIFIED            FEDERAL OFFICIAL COURT REPORTER
24       TRANSCRIPT:           UNITED STATES DISTRICT COURT
                                200 EAST LIBERTY STREET
25                             ANN ARBOR, MICHIGAN 48104
```

February 24, 2022

```
 1                         Mark R. Ter Molen
                           Mayer Brown LLP
 2                         71 South Wacker Drive
                           Chicago, Illinois 60606
 3
          For LAN          Wayne Brian Mason
 4        Defendants:      Faegre Drinker Biddle & Reath LLP
                           1717 Main Street, Suite 5400
 5                         Dallas, Texas 75201

 6                         David C. Kent
                           Faegre Drinker Biddle & Reath LLP
 7                         1717 Main Street, Suite 5400
                           Dallas, Texas 75201
 8
                           Travis S. Gamble
 9                         Faegre Drinker Biddle & Reath LLP
                           1717 Main Street, Suite 5400
10                         Dallas, Texas 75201

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

# I N D E X

MISCELLANY

            Proceedings.................................4
            Certificate...............................59

1                    **P R O C E E D I N G S**

2              THE CLERK:  Calling case 17-10164, Sherrod, Teed,

3      Vanderhagen and Ware vs VNA and LAN.

4              THE COURT:  Thank you.  Please be seated.

5              MR. STERN:  Good morning, Your Honor.  Corey Stern

6      and Moshe Maimon for the four plaintiffs.

7              THE COURT:  Thank you.

8              MR. CHRISTIAN:  Good morning, Your Honor.  Marcus

9      Christian and Mark Ter Molen on behalf of VNA.

10             THE COURT:  Okay.  Thank you, both.

11             And let me do this.  I just want to discuss what

12     we're -- and Mr. Mason and Mr. Kent.

13             MR. MASON:  Good morning, Your Honor.  I tried not to

14     stand up.

15             THE COURT:  I know, I know.  And I'm used to it, too.

16     So would you like to put your appearance on the record?

17             MR. MASON:  I would.  Thank you, Your Honor.  Wayne

18     Mason, David Kent, and Travis Gamble on behalf of LAN today.

19             THE COURT:  Great.  Thank you.  Thank you.  What I'd

20     like to do today is cover the nonparty at fault issue.  The

21     Fifth Amendment issue as far as we can go with it, because we

22     don't have a lot of information about the witnesses who might

23     assert it.

24             A discussion about client representatives at counsel

25     table that Mr. Mason had raised at sidebar yesterday.  I'm

February 24, 2022

```
 1   also interested in just getting an update on where you are
 2   with making -- sorting out the objections in the deposition
 3   transcripts for those witnesses who will appear by video
 4   deposition.
 5              And then I'd just like to know so that I can be
 6   prepared who will be doing the openings and whether you have
 7   any closer estimate of the timeframes just so that we can stay
 8   on schedule on Monday.
 9              So why don't we start with the nonparty at fault
10   issue.  Are there other issues we should talk about?
11              MR. MAIMON:  I don't think there are, Your Honor.
12   This is Moshe Maimon for the plaintiffs.  Although I did
13   advise Mr. Mason this morning that we are withdrawing our
14   objection to Mr. Green being present during openings and the
15   first witnesses until he testifies.
16              So we don't have to cover that.
17              THE COURT:  Okay.  Because I think Rule 615b covers
18   it.  Good.
19              MR. MAIMON:  Just if I can just update the Court on
20   the deposition issue.
21              THE COURT:  Please.
22              MR. MAIMON:  We should be submitting -- we met and
23   conferred with counsel for both VNA and LAN with regard to the
24   next, I think, three depositions that we were going to submit.
25   Those should be submitted to the Court today with regard to
```

February 24, 2022

```
 1   Mr. Gadis, Mr. Nicholas, and Mr. Gnagy, all VNA deponents and
 2   those revised depositions with objections, hopefully seriously
 3   decreased, should be submitted to the Court today.
 4          THE COURT:  Okay.  And when do you anticipate them
 5   testifying so that I can schedule it?
 6          MR. MAIMON:  I don't think they'll -- they certainly
 7   won't testify -- we certainly will not offer their testimony
 8   during the first two weeks of trial of evidence.
 9          THE COURT:  Okay.  Good.
10          So here's what would be very helpful -- okay.  So you
11   just told me -- let me write down who you just told me.  You
12   said Mr. Gadis.
13          MR. MAIMON:  Gadis, Nicholas, and Gnagy or Gnagy.
14          THE COURT:  Yeah.
15          MR. TER MOLEN:  Gnagy.
16          THE COURT:  I've been saying Gnagy.
17          MR. TER MOLEN:  It's kind of a J sound to start, Your
18   Honor.  Gnagy.
19          THE COURT:  Oh, goodness.  I didn't have it right.
20          And this is generally the order I should take them
21   in?
22          MR. MAIMON:  I believe so.
23          THE COURT:  Okay.  More or less.  I'm not going to
24   hold you to it.
25          Okay.  Well, anything else?
```

1          MR. MAIMON:  No.

2          THE COURT:  Great.  Then turning to the question of

3    the nonparty at fault, we had some informal, discussion,

4    conversation about it yesterday.

5          Is that you, Mr. Ter Molen, over here?

6          MR. TER MOLEN:  Yes, Your Honor, yes.

7          THE COURT:  Okay.  And Mr. Maimon.  Okay.  And

8    Mr. Mason, Mr. Kent.

9          MR. MASON:  Gamble.

10          THE COURT:  Mr. Gamble.  Okay.  Yesterday when we

11    were talking about it, it caused me to sort of try to take a

12    step back, figure out why are we discussing this.

13          And the first step in this process is that VNA and

14    LAN, at some point in the last three years or so, filed a very

15    lengthy list of nonparties at fault.  Michigan is a state that

16    permits a defendant in the course of a trial to show that what

17    -- first of all, to defend themselves, of course.

18          But to also show to the jury, prove through evidence

19    to the jury, that other parties are at fault for the conduct

20    they're accused of engaging in.  And for the jury then to make

21    that decision in the course of their deliberations.

22          And after the nonparty at fault filings were made,

23    there was no filing motion to strike.  That's fine.  You're

24    never obligated -- if a complaint is filed, you're never

25    obligated to file a motion to dismiss.

1        There may not be a legal basis.  There may not be --
2    for any number of reasons, it's your reason alone.  It's not
3    for me to question why you didn't file a motion to strike the
4    nonparty at fault filing or a portion of it.

5        But that doesn't mean that at the conclusion of the
6    proofs, plaintiffs can still appeal to the Court for -- with a
7    motion for a directed verdict.

8        Because we took Dougherty Johnson as an example in
9    our informal discussion.  So I'll just continue with that
10   informal example.  If Mr. Johnson ultimately did not
11   participate in an undertaking related to Flint water, well
12   then at the close of the proofs, plaintiffs can say to the
13   Court -- not to the jury because it's a as a matter of law --
14   Dougherty Johnson must be removed as a nonparty at fault.

15       We're seeking a directed verdict on that.  We're
16   seeking a ruling that there is -- that defendants have not
17   shown that he had a duty.

18       But aside from that, if each of the individuals that
19   the defendants seek to -- let me just -- show are actually
20   nonparties at fault, if they do meet the basic criteria in the
21   State of Michigan for having a duty, which we know is
22   relatively broad or we wouldn't be here in this trial at all,
23   then they can proceed to the jury on that.

24       So I guess I'm turning to you, Mr. Maimon, to tell me
25   why am I wrong on that?

February 24, 2022

```
 1          MR. MAIMON:  So I don't believe that Your Honor is
 2    wrong at all.  Because it is the Court that determines whether
 3    there is a duty and what that duty is.  Those are legal
 4    determinations that the Court makes.
 5          However, the law is clear that a party making a claim
 6    must prove duty before the issue of fault or proximate cause
 7    can be considered in the State of Michigan.  That's the Romain
 8    case --
 9          THE COURT:  Right.
10          MR. MAIMON:  -- which had overruled prior splits in
11    Michigan courts as to whether or not that burden falls on the
12    party asserting the claim.
13          So it is the defendant's burden to prove duty.
14          THE COURT:  They'll have to do that in the course of
15    their proofs.  They'll have to show me -- I'll be -- I mean,
16    this is a jury trial.  But that portion will be a legal issue
17    for the Court to decide.
18          MR. MAIMON:  Right.  And --
19          THE COURT:  And what I determined, as I think we were
20    all talking past each other both in the letter briefs and in
21    our discussion yesterday.
22          So you agree it's an issue for the Court that
23    defendants have to show to the Court in the course of the --
24    oops, let me turn my -- in the course of the trial.
25          MR. MAIMON:  Yes.  And I would just say that it's --
```

February 24, 2022

1    there's one more thing that the defendants have to prove to

2    the Court's satisfaction that the prerequisites for the

3    existence of a duty is present just like we had to do that

4    with regard to both VNA and LAN.

5           THE COURT:  Okay.

6           MR. MAIMON:  The Court then determines, number one,

7    whether there is a duty.  But the Court also determines what

8    that duty is.  Because the duty for one entity or person or

9    whatever might be different than what it is for another.

10          THE COURT:  So give me an example of --

11          MR. MAIMON:  So, for instance, if I -- if I get into

12   an accident and I sue Mr. Stern because he knocked me over,

13   and I go to the hospital and a doctor makes things worse, my

14   claim against Mr. Stern is for negligence.

15          THE COURT:  Okay.

16          MR. MAIMON:  My claim against the doctor is for

17   profession -- is for medical malpractice.  And there are

18   different duties that are implicated when you're a

19   professional as opposed to when you're a regular citizen who

20   is negligent and so forth.

21          So my point is that for instance, in this -- in the

22   Flint Water Cases proceedings, the courts have been very clear

23   with regard to potential liability by governmental -- by state

24   and city governmental entities and persons with regard to what

25   is the theory of liability against them.  Because your duty is

1    based on the theory of liability.

2            THE COURT:  Isn't the duty to take reasonable care to

3    avoid foreseeable physical harm in an undertaking unless

4    there's an additional statutory duty that somebody might have?

5            MR. MAIMON:  Right.  But for instance, with regard to

6    VNA and LAN, it was our burden to show that they had a duty as

7    professional engineers.

8            THE COURT:  Correct.

9            MR. MAIMON:  And the Court ruled on that.

10           With regard to the state and city individuals, the

11   courts have already set forth that the theory of liability is

12   a Fourteenth Amendment liability issue.  And that carries with

13   it its own measures of proof.  It might not impact the duty to

14   exercise reasonable care.  But the degree that both Your Honor

15   and other judges who have addressed it and I think the Sixth

16   Circuit --

17           THE COURT:  The Sixth Circuit certainly found that

18   the motion to dismiss was properly denied regarding whether

19   plaintiffs had alleged -- made out an allegation of a

20   violation of their right to bodily integrity --

21           MR. MAIMON:  Right.

22           THE COURT:  -- requiring deliberate indifference and

23   all sorts of things.

24           But I don't think the defendants are bound to that

25   duty in this instance.  I -- what I understand them to be

1    saying is it's the duty to take reasonable care to avoid

2    foreseeable physical harm in an undertaking.

3              They're not bound by the various different

4    allegations or theories that plaintiffs alleged in their

5    complaint.  This is their case of nonparty at fault.  They can

6    fashion it and develop it the way they think it's legally

7    appropriate.

8              MR. MAIMON:  Except it has to -- so for instance, in

9    my accident medical malpractice claim, assume for the moment

10   that the doctor had settled and Mr. Stern wants to assert a

11   nonparty at fault, which is very similar to our circumstance

12   here.

13             He would have to prove that the doctor committed

14   malpractice because the duty of the doctors --

15             THE COURT:  Yes.

16             MR. MAIMON:  -- is the malpractice.  And so we

17   believe that --

18             THE COURT:  But let me just interrupt you.

19             He wouldn't have to prove that you engaged in medical

20   malpractice by bumping into him.  He'd have a different theory

21   of your duty.  Just like --

22             MR. MAIMON:  Well, I sued him, because I'm --

23             THE COURT:  Oh, you're suing him.  You would not have

24   to --

25             MR. MAIMON:  It's for him to assert a nonparty at

 1   fault claim against the doctor who settled --

 2           THE COURT:  Yes.

 3           MR. MAIMON:  -- which is the same as VNA and LAN

 4   asserting against everyone who's properly on a verdict form.

 5           THE COURT:  And so he's not bound by the duty you're

 6   claiming that he's -- that he's claiming that you had.  He's

 7   got a theory against the doctor, and there's a theory about

 8   negligence on this -- the road or however you all --

 9           MR. MAIMON:  Correct.  For Mr. Stern to successfully

10   prosecute a nonparty at fault claim against the doctor, he

11   basically stands in the plaintiffs' shoes and says, "The

12   doctor, the nonparty is actually liable here.  He's at fault.

13   Here was his duty.  Here was his breach.  Here is the

14   proximate cause."

15           And so he -- the defendant in that circumstance

16   stands in the shoes of the plaintiff.  I don't think we have

17   to cover this now.

18           THE COURT:  Okay.

19           MR. MAIMON:  Because I do believe that the

20   prerequisites are exactly as Your Honor indicated, that the

21   Court at the appropriate time will determine, A, whether there

22   is a duty.  And will then say what that duty is.  The same way

23   that the Court did it pretrial with regard to both LAN and

24   VNA.

25           THE COURT:  Correct.  And the thing that I need to

1    correct from our informal discussion yesterday is that I think

2    yesterday I was thinking that somehow a ruling was required

3    before we start trial.  The ruling can't -- there is no ruling

4    because there's no motion.

5           You simply, Mr. Ter Molen and Mr. Gamble, filed these

6    notices of nonparty at fault some three years ago.  They

7    stand.  There's a notice.  It's part of your case.

8           At the close of the proofs, plaintiffs can move to

9    say you failed to show that one or more of these people were

10   involved in an undertaking such that there would be a duty of

11   reasonable care to avoid physical harm -- foreseeable physical

12   harm.

13          Anything that I have wrong about that, Mr. Ter Molen?

14          MR. TER MOLEN:  Your Honor, I think you've stated the

15   duty quite accurately, and we agree with that.  I think some

16   of the comments that we heard, if I heard them correctly,

17   highlight the importance of having this discussion now.

18          THE COURT:  Sure.

19          MR. TER MOLEN:  Because on the defense side, we don't

20   want to be caught, obviously, in a trick bag at the end of the

21   case where plaintiffs all of a sudden come in and says.

22   "Well, no.  You've had to show X, Y, Z.  You know you had to

23   show the elements of a 1983 claim, for example, to establish

24   duty."

25          I think Your Honor has articulated that, in fact,

1     that's not the case and that our obligations to establish duty

2     are much -- we're looking at a broader standard of negligence.

3              And with that understanding, Your Honor, I think that

4     we're okay proceeding here.

5              THE COURT:  Okay.  Let me turn to Mr. Gamble.

6              MR. GAMBLE:  No, we agree with Mr. Ter Molen in his

7     assessment.

8              THE COURT:  Okay.

9              MR. MAIMON:  So we believe, Your Honor, that the

10    Court first articulated it correctly.  That it is -- the issue

11    is not ripe in front of the Court right now.

12             THE COURT:  Right.

13             MR. MAIMON:  And so all I was saying is we believe

14    that the time to raise this issue is really at the close of

15    evidence, because that's when the defendants will finish

16    putting on their proofs with regard to this.

17             And at that point, the Court can determine with

18    regard to anybody who is on the list submitted by -- so for

19    instance, VNA submitted its list on February 11, 2022.  And

20    that's the list that we're operating under whether -- and to

21    what extent any of those persons or entities had a duty.

22             We may make arguments at that time with regard to

23    whether or not, for instance, you could have a duty on behalf

24    of the EPA as well as a person at the EPA.  Whether or not

25    that duty is the agency's duty, the person's duty, what have

1    you.

2          I don't want to -- we don't -- I don't believe it's

3    incumbent upon us at this point to move against those types of

4    things as the Court found.  But we also don't waive them by

5    not raising them now.

6          THE COURT:  Well, if they asserted in their nonparty

7    at fault a certain theory of liability and you think that

8    theory, as a matter of law, is improper because the EPA acts

9    as a governmental entity and it does not act through human

10   beings, I don't understand that theory.  But let's say that's

11   your theory.

12         Wouldn't you have had to say the method in which --

13   the type of duty they have defined is improper as a matter of

14   law?  Is it --

15         MR. MAIMON:  When that issue becomes ripe in front of

16   the Court, we'll make the argument if they still, for

17   instance, is it possible under the law that -- the EPA has a

18   duty, right?

19         THE COURT:  Yeah, yes.

20         MR. MAIMON:  Is it also possible that Ms. Hedman,

21   who's the person who they list also under the EPA heading has

22   an independent duty that can be asserted?  We're going to look

23   into that.

24         We shouldn't have to say now -- and I think that's

25   what the Court said when it came out on to the bench , that

1    the issue is not ripe as to whether or not the defendants'

2    assertion of duties on behalf of both the agency and an

3    individual within the agency --

4         THE COURT:  I think under Michigan law, the

5    individual has the duty if they are engaged in the undertaking

6    that could foreseeably cause physical harm.

7         MR. MAIMON:  It could be.

8         THE COURT:  But we don't know if she's -- you know,

9    perhaps you're going to say Hedman never touched this thing,

10   and then factually they can't make it out.  But we've got to

11   all understand what the theory is that was put in all those

12   nonparty at fault notices.

13        MR. MAIMON:  And the defendants filed once upon a

14   time, and I have it in front of me.  And I have VNA's.  I

15   think it was December 23, 2020, they filed a 231-page notice

16   of nonparty fault wherein they listed all the nonparties who

17   they believed were at fault and pursuant to the rules set

18   forth the basis for their theory of the liability and the

19   basis of fault in there.

20        And we have that.  We now have the revised list of

21   February 11, 2022, reducing that to 36 either persons or

22   entities, parties, whatever you want to call them.

23        THE COURT:  Nonparties.

24        MR. MAIMON:  Nonparties.  And all I'm saying is when

25   we get to that point after -- after the close of evidence, we

```
 1    -- the plaintiffs will avail ourselves of our rights to
 2    challenge whether there was a duty by any of -- whether there
 3    was a duty by any of them or some of them or all of them.
 4            And we'll make argument to the Court as to what that
 5    duty might be.  But the Court will determine both.  I'm sorry.
 6            THE COURT:  The problem I'm having with this is it's
 7    cart before the horse or some conceptional problem about how
 8    the litigation proceeds.
 9            If when you saw that 231-page nonparty at fault
10    notice, you knew then as a matter of law, 200 pages of this
11    needs to be shredded.  There is no legal duty.  Hedman
12    couldn't possibly -- there is no body of law that could hold
13    her liable as an individual.
14            Then I think it's incumbent upon you to bring that to
15    the attention of the Court, because otherwise we're having a
16    trial for no reason at all.  I mean, we're going to have two
17    months of a -- or three months of a five-month trial just for
18    you to raise the motion you could have raised within 30 days
19    or whatever the rule would be of getting that motion.
20            You're saying as a matter of law there's no way LAN
21    and VNA can make out this legal argument.  There's like no set
22    of facts could bring Hedman into this.
23            MR. MAIMON:  So I'm not sure whether or not it's that
24    extreme, which is part of the reason why you wait and see what
25    the evidence is and see what the record is.  But the
```

1   defendants could have waited -- they could have waited and not

2   filed for summary judgment, let us go through the plaintiffs'

3   case at trial and then move for a directed verdict and said,

4   "Your Honor, we do not believe" -- as they did in summary

5   judgment -- "that we have duties to the plaintiffs.  We might

6   have had duties under the contract to the City of Flint, but

7   as they argued in summary judgment, we don't have duties to

8   the plaintiffs."  They could have waited --

9           THE COURT:  They could have --

10          MR. MAIMON:  -- and let us try the case.

11          THE COURT:  Here's what they've done.

12          They said at the motion to dismiss stage, "We don't

13  have a duty."  And I said, "Yes, you do."  Then they said at

14  the summary judgment, which I expected the briefing would be

15  on breach, causation, and damages, they said, "duty, breach,

16  causation and damages."

17          So I said, "See earlier ruling.  Duty is" -- you know

18  we had some areas where duty had not been -- well, I wasn't

19  aware of the various theories.  And so they're preserving

20  their duty -- they're preserving that forever.  They're never

21  going to let go of it, which is fine.  That's the way

22  litigation is.

23          But the fact is if all they had said -- I mean,

24  you're not obligated to file a motion for summary judgment if

25  you think there's a fact question.  But that you have a

1    feeling that once that evidence comes in at trial, it's not

2    going to come in the way plaintiffs thinks it's going to, or

3    some of the deposition testimony is likely to come out

4    differently.  I don't know.  You certainly can go to trial and

5    do that.

6              But if all you're doing at the end of plaintiffs'

7    proof is going back and saying, "duty," and the very same

8    argument that was decided already, you're just going to be

9    shot down for that.

10             MR. MAIMON:  I understand that.  But the defendants

11   didn't have to file a motion to dismiss.  They would not have

12   waived that argument.  Had they never filed a motion to

13   dismiss, never filed a motion for summary judgment, gone to

14   the close of plaintiffs' proofs, they still could have told

15   Your Honor, "We don't believe that we have a duty," and the

16   court would have --

17             THE COURT:  But there -- I'm assuming that there it

18   would be fact based.  Okay, now, "Your Honor, you have seen

19   and the jury has been told that Dougherty Johnson was in

20   Montana throughout this entire time, and the facts don't show

21   that he was involved in an undertaking."

22             MR. MAIMON:  I just don't believe that a defendant --

23   I wish it were so.  I don't believe a defendant has an

24   obligation to move either at the motion to dismiss phase or at

25   the summary judgment phase to retain its rights to argue that

1    there is no duty.

2          THE COURT:  Well, here's what we'll do.  I mean,

3    you're at the close, and I'm -- I'm just suggesting that if

4    they notified you that the duty that they are trying to pin on

5    all of the nonparties is to avoid foreseeable physical harm in

6    an undertaking, and you never said, "Oh, no, that's not the

7    duty.  The duty is to not engage in deliberate indifference,"

8    that's an interesting -- is that the --

9          MR. MAIMON:  Well, we're saying two things.  So let

10    me take it an extreme example.

11          The original non-listed the by VNA listed the Genesee

12    Power Station limited partnership as a potential nonparty at

13    fault.

14          THE COURT:  Let's take an example of somebody who

15    we're actually -- who's actually in the case.

16          MR. MAIMON:  I was taking the extreme example, Your

17    Honor --

18          THE COURT:  Okay.  Just for the --

19          MR. MAIMON:  -- because we do not believe at that

20    point in time that the Genesee Power limited partnership and

21    specifically with the description by LAN -- I'm sorry -- VNA,

22    about what they believe they did wrong, gives rise to a duty.

23          We just don't believe that the Genesee Power Station

24    limited partnership had a duty to our clients.  We just don't

25    believe it.

1          But it was not incumbent upon us to move to strike

2     that element of the defendant's notice.  To the extent they

3     wanted to try to implicate the Genesee Power Station limited

4     partnership at trial, they could have --

5          THE COURT:  They would have to do it through factual

6     material coming in that says that this limited partnership...

7          MR. MAIMON:  Now, they've thought better of it,

8     because it's not on the -- when the Court asked, okay, tell me

9     who you're really asserting nonparty fault against, it's not

10    there.

11         But I don't believe that it was incumbent upon the

12    plaintiffs at that point in time to go one by one out of 231

13    pages and say, "This one we believe that there can be a duty.

14    This one we believe there can't be a duty.  This one, your

15    assertions with regard to it, we don't believe rises to the

16    level of establishing a duty.  This one we think is a question

17    of fact."

18         That wasn't incumbent upon us at that time, and it's

19    not incumbent, I would respectfully assert, until they make

20    their case at trial.

21         THE COURT:  Okay.  And so what we'll do is we'll wait

22    until the close of proofs.  But, I mean, there is a little bit

23    of a moving target problem here, which is that we -- I believe

24    that the duty that I'll be looking for, because it will be a

25    matter of law, is the one I've articulated repeatedly this

```
 1   morning.
 2           I'm not thinking that the duty I'm looking for is
 3   deliberate indifference.
 4           MR. MAIMON:  Well, I don't think -- I don't think
 5   it's a different duty.  I think it might be that it's a
 6   different standard of care.  So, for instance, the defendants
 7   have the duty to act reasonably here, exercise reasonable
 8   care.
 9           The standard of care for -- that's why I gave the
10   medical malpractice example.
11           THE COURT:  Right.
12           MR. MAIMON:  The standard of care for an auto driver
13   is different than the standard of care for a doctor.
14           THE COURT:  Correct.
15           MR. MAIMON:  Both have to exercise reasonable care.
16           THE COURT:  And that's why at the beginning of this I
17   said, "Unless there's a statute or other requirement that
18   would change the standard of care from that general basic
19   Michigan standard of care."
20           MR. MAIMON:  Right.  But I think standard of care is
21   different than the duty.
22           THE COURT:  Okay.
23           MR. MAIMON:  So I have an obligation to exercise
24   reasonable care.  But that reasonable care --
25           THE COURT:  How we --
```

1      MR. MAIMON:  -- subject to different standards,

2   depending on who and what we are.

3      THE COURT:  Okay.

4      MR. MAIMON:  That's all I'm saying.  But, again,

5   that's why I said at an appropriate time, the Court can --

6   will determine, A, whether there was a duty; B, and what that

7   duty is, and what are the elements that any party has to

8   prove.  And that's all I'm saying.

9      I do believe that it's different, depending on --

10   it's different for the EPA than it is for the Genesee Power

11   Station limited partnership.  Because the EPA, it's -- by

12   their own regulations, establishes what their duty is.

13      THE COURT:  Okay.  Well, then that's a statutory

14   definition of "duty" that fits exactly with what I'm --

15      MR. MAIMON:  And I agree with that.  I think that at

16   that point in time, it's not a one size -- all I'm saying is

17   it's not a one-size-fits-all.

18      And, four, I mean, thank goodness we're down to 36.

19   And we'll see what they actually, you know, try and do at

20   trial.  Maybe it will be less.

21      But all I'm saying is we believe we're entitled to

22   reserve our rights to challenge whether there's a duty to any

23   of them.

24      Some of them, we're going to agree, because we

25   believe that as officers of the Court, we must concede that

1    there is a duty.

2              THE COURT:  Okay.

3              MR. MAIMON:  But all we were saying in our letter and

4    all I'm trying to articulate is that we don't believe that we

5    have to stake that position out now.

6              THE COURT:  So let me turn to Mr. Mason.

7              MR. MASON:  Your Honor, I just had a practical

8    question about this.  I'm not trying to infringe on Mr. Gamble

9    in his substantive argument.

10             But as a practical matter, where does this leave us?

11   Because Your Honor said in chambers yesterday there's the

12   obvious duty, let's take the governor, that the constitutional

13   requirement and the employees all.

14             And so we don't want to take up the jury's time.  I

15   mean, right now as counsel in this case, do I have to pull out

16   the constitution with every witness and we're going to have to

17   go through that?

18             It's not a judicial economy issue when, for instance,

19   counsel just admitted, "Okay, the MDEQ is an obvious one."

20   And so --

21             MR. MAIMON:  I didn't mention the MDEQ.

22             MR. MASON:  I'm sorry.  Was it EPA?

23             THE COURT:  I --

24             MR. MAIMON:  Yeah.

25             MR. MASON:  Okay.  I apologize.

```
 1              MR. MAIMON:  No problem.

 2              MR. MASON:  But the point is I'm just trying to say

 3    to the extent that we leave this open, we're -- it just seems

 4    like a futile amount of time to keep the jury involved if

 5    counsel can --

 6              THE COURT:  I think you're going to -- if you --

 7    let's take the governor.

 8              If you've got the governor on the witness stand,

 9    you're going to have to tell the jury and me what are his

10    responsibilities, where do they derive from, how did he fail

11    to take reasonable care in the exercise of his required

12    duties.

13              MR. MASON:  Okay.

14              MR. MAIMON:  And Your Honor --

15              THE COURT:  I don't think that will take all that

16    much time.

17              MR. MASON:  It's a lot of witnesses.

18              MR. MAIMON:  I think the governor is a perfect

19    example.  The governor is a perfect example, Your Honor.

20              I don't know, and I don't think that I have to assert

21    right now whether or not there are separate duties for, A, the

22    governor's office and; B, the governor.  Because they've

23    asserted against both.

24              And all I'm saying is we shouldn't be put to the

25    burden now of saying, "You've proven against the governor, but
```

1    not the governor's office or the duty" --

2           THE COURT:  I'm not asking you to.  At the directed

3    verdict stage.

4           MR. MAIMON:  Right.  So all I'm doing is I'm looking

5    at VNA's list, and they list in their list of nonparties at

6    fault, number four, governor's office.

7           Now, I don't know whether or not we're going to agree

8    that the quote/unquote governor's office has a cognizable duty

9    here.  We may agree that Governor Snyder did.

10          THE COURT:  Okay.  Then you won't file a directed

11   verdict on that; you'll file it on his office.

12          MR. MAIMON:  Correct.

13          THE COURT:  Yeah, that's what I'm anticipating.

14          MR. MAIMON:  Thank you.

15          THE COURT:  Mr. Ter Molen.

16          MR. TER MOLEN:  Thank you, Your Honor.

17          And I am hearing potentially a fundamental

18   disagreement here about what the Michigan nonparty at fault

19   scheme means and what -- as a legal matter, what the burden is

20   on the defendants here for what we have to show.

21          I thought Your Honor articulated well at the outset

22   what the standard is here.  And as Your Honor is well aware

23   and as has been in our briefing, under Michigan law, statutory

24   bars or immunities, etcetera, that apply to the plaintiff's

25   case against the government, for example, don't apply here,

1    don't apply to the nonparty at fault.

2              THE COURT:  I haven't heard that argued.

3              MR. TER MOLEN:  Okay.  And what I am hearing, Your

4    Honor -- and, again, I may not be hearing correctly -- but

5    what I think I'm hearing is an argument that as a legal

6    matter, there are different standards that may come into play

7    for different nonparties.

8              THE COURT:  If there's a statutory duty such as a

9    professional engineer or a medical doctor, then we would look

10   at what their standard of care would be as opposed to just

11   reasonable care and the undertaking to avoid foreseeable

12   physical harm.

13             MR. TER MOLEN:  And, Your Honor, that may be the case

14   under the nonparty at fault process, but if plaintiffs think

15   that that's the case for any of the nonparties that we've

16   identified, we'd request -- and I think Your Honor in the

17   Court's email, February 12, after we made our submission,

18   asked plaintiffs to do this, we'd request that they identify

19   where, for which parties, for which individuals, we haven't

20   identified a legal duty.

21             So that we're all clear on the rules of the game

22   basically going into trial, we all understand, "Okay.  These

23   are the elements you have to establish."

24             THE COURT:  But at a minimum, they have a common law

25   duty.  They may have an elevated duty.  But at the minimum,

```
 1    they have the common law duty to avoid -- to undertake things

 2    with reasonable care to avoid foreseeable physical harm.

 3            So as long as you meet that, that's the minimum

 4    standard of care.  There are some individuals who have an

 5    elevated standard of care.

 6            MR. TER MOLEN:  And, Your Honor, I would just request

 7    if plaintiffs could identify for us who those individuals are.

 8    Because sitting here today, in all honesty, I don't know of

 9    that --

10            THE COURT:  Who --

11            MR. TER MOLEN:  Who they allege have some elevated

12    standard of care.

13            That would be important for us to understand, Your

14    Honor, so that we know what the road map is that we have to

15    meet.

16            THE COURT:  But you're -- if you think you can meet

17    that basic standard of care, you're good to go.

18            MR. TER MOLEN:  Okay.  I may have misheard Your

19    Honor.  I thought Your Honor mentioned that --

20            THE COURT:  Right.

21            MR. TER MOLEN:  -- for some, there might be an

22    additional --

23            THE COURT:  An additional burden to live up to the

24    standard of care for a doctor in this profession with that

25    license and so on.
```

 1          But at a minimum, there's reasonable care in an

 2    undertaking to avoid foreseeable physical harm.

 3          MR. MAIMON:  So, for instance, Your Honor, the last

 4    one on their list is Rowe Professional Services.  Rowe is an

 5    engineering company.  And so the duties, if they establish on

 6    Rowe, will be the same duties that they had.

 7          Because the Court has already defined that you have

 8    to act as a reasonable professional would -- professional

 9    engineer would under the circumstances.

10          That's possible that that's very different than

11    Mayor Walling.

12          THE COURT:  See, my -- I had understood Michigan's

13    regime to say that there may be a statutory duty that's

14    elevated.  That's a higher burden.  But at a minimum -- or

15    that requires more proofs.

16          But as a minimum, we all, once we're engaged in an

17    undertaking, have to avoid foreseeable risk of physical harm.

18          MR. MAIMON:  I don't know that we're saying something

19    different.  All I'm saying is that for a professional

20    engineer, in order for the Court to determine that there's a

21    duty, we have to prove certain things.

22          With all due respect to my colleagues, it's not our

23    job to tell them what they have to prove.  We don't have to

24    tell them, you know, what we think they have to prove or what

25    we believe the necessary proofs will be.

```
 1            If they don't -- if they don't meet them to the
 2    Court's satisfaction at the end, we shouldn't -- it's not a
 3    legitimate argument in our view to say that the plaintiffs had
 4    an obligation up front to tell them that they should've put in
 5    certain proofs that they didn't.
 6            THE COURT:  Okay.
 7            MR. MAIMON:  The same way that if we don't make out
 8    our case at the end of evidence and they move to dismiss, it's
 9    not up to the defendants to say, "Oh, but you needed to prove
10    that," and we complain, "Well, you never told us so."
11            THE COURT:  That won't happen.  Because we know in
12    Michigan, every person has a duty to take reasonable care in
13    their undertakings to avoid foreseeable physical harm.  That's
14    the standard they'll be held to.
15            MR. MAIMON:  And all I'm saying is that the standard
16    of care for -- the Court has already defined what the standard
17    of care is for a professional engineer.  And if the Court
18    determines that they've proven that Rowe Professional Services
19    had a duty, we would expect that that would be the standard of
20    care for Rowe the same way it was for these engineers.
21            It can't be a lower standard of care for an engineer
22    when it's a nonparty than it is for a professional engineer
23    when it's a defendant.
24            How is that possible?
25            THE COURT:  That may be the way Michigan has set it
```

1   up.  But Mr. Ter Molen or --

2             MR. MAIMON:  We don't believe that's the way Michigan

3   has set it up, but we'll -- again, we don't believe this is

4   the time to deal with it.

5             THE COURT:  Well, this would be a good time to deal

6   with it, because we -- they have to get their witnesses in

7   here to show the standard of care then.

8             So my understanding from reading these cases is that

9   it simply is there's someone else responsible for these

10  injuries under this basic Michigan duty of reasonable care and

11  undertakings concept.

12            MR. TER MOLEN:  Right, Your Honor.

13            MR. MAIMON:  So we believe -- we believe that it is

14  different depending on -- because what is reasonable for a

15  professional engineer might not be what is reasonable and

16  expected for a common person.  And so --

17            THE COURT:  The duty is one thing.  But to show

18  breach, you're going to have to show what a professional

19  engineer would have done for breach.  What would -- what would

20  a -- how would a professional engineer have met this

21  reasonable --

22            MR. MAIMON:  I don't think we're saying anything

23  different.

24            THE COURT:  Mr. Ter Molen.

25            MR. TER MOLEN:  Thank you, Your Honor.

1           I think Your Honor has articulated that under the

2   Michigan Nonparty At Fault Act, there is.  And this is

3   certainly in our view, there's basically one-size-fits-all,

4   right?

5           I mean, for all the different entities -- for

6   purposes of Nonparty At Fault Act, it's different than what

7   plaintiffs have to establish, as we've talked already, it's a

8   one-size-fits-all.

9           And I would just suggest, Your Honor, that to pick up

10  the process that the Court had directed in its February 12

11  email here, if plaintiffs have a different view of what the

12  law requires here as Your Honor suggested, this is a perfect

13  time to brief that so that we're all clear on it.  I think

14  that would be a very helpful process.

15          MR. MAIMON:  I just don't see, Your Honor, how --

16  imagine there was never anybody else in this case and nobody

17  else at fault.  Just two engineering companies.  I cannot

18  understand why we have a claim against both of these

19  companies.  The duty is the same.  The standard of care is the

20  same.

21          I do not believe that Michigan law mandates that if

22  one of them settled out, that the remaining defendant could

23  say, "Oh, we don't have to prove professional negligence

24  against the settling party.  We have a lower duty to show to

25  assign fault that the plaintiff had a minute ago."

```
 1              THE COURT:  It's still the duty -- I hear what you're
 2    saying.  The duty is still a duty as a professional engineer.
 3              MR. MAIMON:  We agree.
 4              THE COURT:  So if it was a doctor who did improper
 5    surgery, it would still be what would a doctor who is engaged
 6    in the correct standard of care taking reasonable care have
 7    done.
 8              MR. MAIMON:  Exactly.  And that's the definition of
 9    what the duty is.
10              THE COURT:  Okay.
11              MR. MAIMON:  That's all we're saying.
12              THE COURT:  So --
13              MR. TER MOLEN:  But, again, Your Honor, respectfully
14    the statutory scheme, I think the Nonparty At Fault Act has
15    made it clear that they were basically abrogating the
16    statutory scheme in a number of respects, including with
17    respect to --
18              THE COURT:  Who is abrogating the statutory scheme?
19              MR. TER MOLEN:  The nonparty at fault regime, that
20    whole -- the nonparty at fault process, Your Honor.  It was
21    specifically set up so that statutes that provided immunity,
22    for example, the governmental entities would not apply.  And
23    so to the extent that plaintiffs are asserting now that, well,
24    you know, there are some rules that should apply like a
25    standard of professional negligence, then I'd respectfully
```

1    suggest that we review and brief that question.

2           Since, frankly, one of our purposes in raising this

3    issue was exactly to highlight where -- what's coming down the

4    pike, what the standards are.  And this would be a fine

5    opportunity just to brief that issue, so we're all clear.

6           MR. MAIMON:  Your Honor --

7           THE COURT:  But you understand, Mr. Maimon, that the

8    immunities don't apply.

9           MR. MAIMON:  Of course we understand that, and that's

10   explicit.  But fine opportunities don't infringe upon our

11   rights to assert our claims and our defenses at an appropriate

12   time.

13          So counsel for VNA may want us to say what we believe

14   the standard of care is now.  But we believe that --

15          THE COURT:  Here's where I think we are.  It's the

16   word "reasonable."  So -- what this has all come down to.

17          So what's reasonable for a governor is not going to

18   be what's reasonable for somebody walking down the street who

19   gets involved in helping Flint Water Treatment Plant.

20          There's going to be -- you are going to have to show

21   that the governor with his power -- powers and authority and

22   charge in the constitution did not live up to that as a

23   governor should.

24          You're not going to hold -- the governor can't be

25   held to the standard of an engineer.  An engineer can't be

1    held to be able to do what the governor can do at his level

2    and with his resources and knowledge and constitutional

3    authority.

4         So I think what we've come down to is a discussion of

5    "reasonable."  So the duty is the same, to avoid foreseeable

6    risk of physical harm in an undertaking.  The definition of

7    showing what was reasonable care, the word "reasonable" is

8    what's going to change depending on what the person's

9    statutory, constitutional duties, professional station is.

10        I think that's where we are.

11        MR. MAIMON:  We agree.

12        THE COURT:  Okay.  It took a moment for me to get

13   there.  But I think I understand where we are.  I think we all

14   understand.

15        You're not suggesting, Mr. Ter Molen, that Howard --

16   let's say, Michael Glasgow could declare a state of emergency

17   or had the authority or the statutory authority or any other

18   constitutional authority.  He just couldn't do that.

19        His role was at the water treatment plant.  He has a

20   different -- you're going to hold him to a different standard

21   than the governor who's got constitutional statutory duties to

22   protect the safety and the welfare of the population.

23        MR. TER MOLEN:  I'm not sure it's a different

24   standard in the sense that with respect to what his

25   responsibilities were, he had responsibilities.  And we will

1    show as part of our case that he violated those

2    responsibilities.

3          Similarly, we'll show that the former governor had

4    responsibilities and that he did not follow those

5    responsibilities in a number of ways and so on, Your Honor --

6          THE COURT:  Correct.

7          MR. TER MOLEN:  -- for the 36 different entities that

8    we identified.

9          So in that sense, I agree, Your Honor.  And we'll go

10   back and look at what the Court has -- what the Court has

11   ruled and go from there.

12         THE COURT:  Okay.  All right.  I think we've got it.

13   Pardon me.

14         Let's look at the Fifth Amendment.  And my first

15   question is:  What do any of you know about -- are there nine

16   individuals who have criminal charges outstanding?  Is that

17   Mr. Stern?

18         MR. STERN:  Yes, Your Honor.  There are nine.

19         THE COURT:  Okay.  And have you gotten any

20   communication from either them or their lawyers as to whether

21   they plan to assert the Fifth?

22         MR. STERN:  I mean, I've heard from Mr. Ambrose's

23   attorney both directly and through the Court that his client

24   intends to assert the Fifth.  He also mentioned recently that

25   he intended to file a motion to quash, I believe, the subpoena

 1    that was served by VNA.

 2         We also served a subpoena.  And I would assume that

 3    if counsel is moving to quash the subpoena that VNA served,

 4    they'd also move to quash the one that we served.

 5         I've spoken to counsel for Howard Croft.  And there's

 6    not a definitive -- I've not had anything definitive stated to

 7    me that he will, in fact, assert the Fifth.  But all

 8    indications are that he will.

 9         THE COURT:  Croft?

10         MR. STERN:  Uh-huh.

11         THE COURT:  And with Ambrose, all we got was a

12    telephone call from a lawyer saying, "Does my client need to

13    show up?"  Answer, "Yes.  You've got a valid subpoena.  You

14    absolutely must show up, or you're in violation."

15         Same would be true for Ambrose unless the motion to

16    quash is granted, which that's a whole different matter.

17         But what I still don't know from -- and Mr. Ambrose

18    and Mr. Croft both set for depositions.

19         MR. STERN:  Yes, Your Honor.

20         THE COURT:  Did not assert the Fifth at all during

21    all depositions.

22         MR. STERN:  Correct, Your Honor.

23         THE COURT:  And to the extent you have subpoenaed

24    cross and Ambrose, do you intend to ask questions that go

25    beyond the questions in the deposition?

```
 1                MR. STERN:  No, Your Honor.

 2                THE COURT:  Okay.  Mr. Christian, you're here to

 3       discuss this?

 4                MR. CHRISTIAN:  Yes, Your Honor.

 5                THE COURT:  Okay.  On behalf of VNA, do you intend to

 6       ask questions that go beyond the questions that VNA asked at

 7       those depositions?

 8                MR. CHRISTIAN:  I think we may, Your Honor.

 9                THE COURT:  Okay.  And will you be able to articulate

10       to me what areas you'll go into that are not in the deposition

11       and what that relevance would be to the jury?

12                MR. CHRISTIAN:  Your Honor, I can't -- excuse me --

13       exhaustively state that for the Court at this point in time.

14       I think we can provide more information about that before

15       these witnesses take the stand.

16                THE COURT:  Okay.  Mr. Kent, do you intend to ask

17       questions that go beyond the questions that you asked at the

18       deposition?

19                MR. MASON:  We would anticipate doing so, Your Honor.

20                THE COURT:  Into what areas?

21                Yeah, don't be that close, because then it blasts, I

22       think, into Jeseca's ears.

23                MR. MASON:  Thank you, Your Honor.

24                So, yes, we would intend to expect to do so.  And as

25       with VNA, cannot predict to you right now what the specific
```

1   questions would be or topics would be.  That will depend in

2   part upon how evidence comes in at the time that Mr. Ambrose

3   would be likely to testify.

4           THE COURT:  Okay.  Here's the way -- and then correct

5   me if I don't have this right.  But with respect to the Fifth

6   Amendment in a civil case by a witness who is a nonparty --

7   although you're now suggesting these individuals are

8   nonparties at fault.  So they're still nonparties.

9           Convertino v. United States DOJ teaches that I am to

10  indulge every reasonable presumption against waiver.  But

11  Convertino also says that an ordinary witness -- and so I want

12  you to tell me if these are not ordinary witnesses.

13          An ordinary witness is permitted to, quote, "Pick the

14  point beyond which he will not go and refuse to answer any

15  questions about a matter already discussed, even if the facts

16  revealed are already incriminating."

17          But here's what's important.  "As long as the answers

18  sought may tend to further incriminate him."

19          So what I will need to do is find out what areas you

20  want to go into with these witnesses that might further

21  incriminate them.  And I'll have to make a determination as to

22  whether they can then validly assert the Fifth Amendment

23  privilege against self-incrimination, in which case they

24  become unavailable, and we play their depositions.

25          And then we sort out whether that happens in front of

1    the jury or not and whether there's an adverse inference or

2    not.

3          But I don't even think we need to get to any of this

4    until we know what they're willing to answer and what your

5    questions are that would go beyond the scope of the

6    depositions that would tend to incriminate them in a way that

7    the deposition testimony did not.

8          How do I have that wrong, Mr. Christian?

9          MR. CHRISTIAN:  No, Your Honor.  I just wanted to

10   clarify that, you know -- what you already stated, that we're

11   talking about beyond the -- further incriminating beyond the

12   scope of the deposition.

13         So there could be a question that was unavailability

14   is question by question.  It's not a blanket unavailability.

15   So if we're asking them a question that was covered in the

16   deposition and that they answered, that they're not going to

17   be able to raise the Fifth and not answer that specific

18   question before the jury.

19         THE COURT:  Correct.

20         MR. STERN:  I didn't understand that.

21         THE COURT:  I didn't entirely follow.

22         So what we'll do is for anyone who tries to quash the

23   subpoena, we'll have an ancillary proceeding outside the

24   hearing of the jury where we find out what -- to what extent

25   do they wish to exercise their Fifth Amendment rights.  When

1    we find out that, then I'll have each defendant -- well, I'll

2    have all three parties tell me what areas you want to question

3    them that would potentially go beyond the deposition that may

4    tend to further incriminate them.

5            And then if those questions do not further intimidate

6    them, because it's -- then tell me where you live.  You know,

7    I don't know.  It's just something that doesn't incriminate

8    them, then I'm going to say you don't have the legal right to

9    assert the Fifth, and you're going to answer the questions.

10           But let's say that they can articulate either through

11   counsel that there is some further incrimination, then I would

12   rule that they may assert the Fifth.

13           And in any event, the deposition, I guess, doesn't

14   need to be played if they'll answer -- they'll have to answer

15   all of those questions, unless they can say, "I've lost

16   concentration, and I might incriminate myself," or something

17   that hadn't happened during the deposition.  I can't imagine

18   what that would be.

19           Yeah.  I cannot imagine granting the motion to quash

20   for people who have sat for depositions relevant to this case.

21   And the depositions were in this case, so they're going to

22   really have to bring some strong law to me about quashing a

23   deposition.

24           I mean, there could have been an illness.  There has

25   been a global health crisis.  Maybe somebody has lost

1    cognition since -- as a result of COVID.  You know, something

2    like that.  But I don't know what that would be.

3         MR. STERN:  Your Honor, may I just ask a question for

4    some clarity?

5         THE COURT:  Yes.

6         MR. STERN:  So I understand Your Honor's plan is

7    someone comes in because of a valid subpoena.  Outside the

8    presence of the jury, Your Honor seeks to determine what any

9    of the parties are going to ask of the witness to see if there

10   are questions that go beyond the scope of what was included

11   during the deposition.

12        THE COURT:  And then I'm going to listen to those

13   questions and make sure they're relevant to the proceeding.

14   Because if the idea is to get the witness up there to force

15   them to take the Fifth, that's gamesmanship that we don't want

16   to -- I don't want to be a part of.  I'm not in it for that.

17        But if those additional questions are relevant to the

18   nonparty at fault case or relevant to plaintiff's case in

19   chief or whatever, then I'll certainly figure out whether the

20   answers to those questions would tend to further incriminate

21   the witness.  And if they would, they will be allowed to take

22   the Fifth with respect to that.

23        And then I think what we do at that point is I may

24   need further briefing on this.  Because I'm not -- the problem

25   is that McKinney doesn't tell us that much.  McKinney tells us

```
 1      that in civil cases, parties can comment on a refusal to

 2      testify, including a Fifth Amendment refusal.

 3              But, Mr. Stern, you brought forth a district court

 4      case and otherwise a Second Circuit case that gave me a very

 5      -- you weren't confusing, but the cases are confusing about

 6      how to apply this test.

 7              I don't really understand the test that relates to an

 8      adverse inference witness if the witness does not answer the

 9      questions.  I'm to look at the nature of the relationship

10      between the parties.

11              Okay.  Mr. Stern, which parties am I looking at the

12      relationship between?

13              MR. STERN:  Typically between the person invoking the

14      Fifth Amendment --

15              THE COURT:  Yeah.

16              MR. STERN:  -- and the party that is -- that is

17      causing the invocation of the Fifth Amendment to be raise.

18      And so if VNA's counsel is --

19              THE COURT:  Well, you're now -- you've subpoenaed

20      Croft and Ambrose.

21              MR. STERN:  Correct.

22              THE COURT:  So I'm looking at the relationship

23      between you, your clients, and them.

24              MR. STERN:  Not at this stage.  But at the stage

25      where we'd be seeking an adverse inference.
```

```
 1                  THE COURT:  Right.  That's what -- that's the part
 2       I'm talking about.
 3                  MR. STERN:  Correct.
 4                  THE COURT:  Okay.  And so what is their relationship?
 5       One had a duty to the other?
 6                  MR. STERN:  Correct.
 7                  THE COURT:  Okay.
 8                  MR. STERN:  But I think it's a little premature to
 9       even get to the portion of the adverse inference.
10                  THE COURT:  Yeah.
11                  MR. STERN:  Because it very well may be that there
12       are no new questions that get raised.  Your Honor finds that
13       there's no plausible reason to assert the Fifth Amendment,
14       because all of the examination is the same or similar enough
15       as to what occurred during the deposition, and the person is
16       ordered to take the stand and they're not able to assert their
17       Fifth.
18                  At that point in time, there wouldn't be any adverse
19       inference associated with the assertion of the right to the
20       Fifth Amendment, because there wouldn't be an assertion of
21       Fifth Amendment rights.
22                  THE COURT:  Yes.
23                  MR. STERN:  And so it seems that the only way in
24       which we get to the question about adverse inference --
25                  THE COURT:  Yeah.
```

```
 1              MR. STERN:  -- or even what happens in front of the
 2    jury is if and when the Court determines that there's new
 3    information that will be elicited based on questions that have
 4    been provided by one of the three parties.  That that
 5    information is seeking to elicit new testimony that would
 6    permit the deponent, the witness, to assert his Fifth
 7    Amendment right.
 8              And then at that point in time, we move to, well,
 9    where does that happen, how does that happen, is there an
10    adverse inference.
11              And as of now, there's been nothing presented other
12    than, you know, assertions on the record by counsel that they
13    may, in fact, seek to elicit testimony from the witness.
14              THE COURT:  Okay.  Do you agree?
15              MR. CHRISTIAN:  I agree it's very fact specific, Your
16    Honor.  And even with an adverse inference; right?  There
17    could be someone invoking the Fifth and the conditions are so
18    broad that it's not possible to make an adverse inference
19    based upon the context.
20              Where at some times, it can be very specific
21    context where --
22              THE COURT:  Slow down, Mr. Christian.
23              MR. CHRISTIAN:  Yes, Your Honor.
24              There could be a very specific context where the lack
25    of an answer where the silence, it's very probative.  And so
```

1    we think that until we cross that -- you know, until we get to

2    that point, it's not possible to really make a ruling, a broad

3    based ruling on that, Your Honor.

4              THE COURT:  Okay.  Mr. Kent.

5              MR. KENT:  We agree, agree with that, Your Honor.

6    And I do think that this whole concept of adverse inference,

7    because these are nonparties at fault, it's where are you

8    drawing the inference.  And is it something that would be an

9    instruction, which is part of what some of these cases talk

10   about --

11             THE COURT:  Yeah.

12             MR. KENT:  -- or is it simply an argument.  And the

13   jury is permitted to draw its own conclusion.  There are a lot

14   of different permutations about this that I think go beyond

15   what we can discuss or have discussed so far.

16             THE COURT:  I think so, too.  So I assume that the

17   motion to quash, if any, will be filed on this Docket

18   17-10164.

19             And we'll just sit tight and wait for it.  And we'll

20   set up a hearing at the appropriate time when it's fully

21   briefed and ready for hearing.

22             MR. STERN:  I just -- if I could add, Your Honor,

23   that as we -- during the end of each week during our case

24   provide the names of the witnesses for the following week that

25   we intend to call, it's quite possible that we're going to

1    have to build into that particular week, significant time for

2    this issue.

3           Because it appears as though at least two of the

4    parties to the case have some inclination to ask more

5    questions beyond what was included in those questions during

6    the deposition.

7           And not only do we need to see those questions and to

8    hear how the witness would answer them, but we should be privy

9    to seeing those questions in advance, so we can be well

10   prepared when we come into court to try and keep with

11   efficiency and have the opportunity to view those questions

12   when juxtaposed with those that were asked during the

13   extensive, extensive depositions of each of these individuals.

14          So, for instance, Howard Croft was deposed over four

15   or five days.  There's multiple volumes for Howard Croft.  If

16   we were just to walk in here today and call Mr. Croft to the

17   stand and he were to invoke his Fifth Amendment or indicate to

18   the Court that he was going to.

19          And then LAN and VNA or us come in and say, "Well,

20   Your Honor, we have 60 more questions that we've put

21   together," beyond what was asked in his deposition, I think it

22   would be unreasonable to require the party that may oppose the

23   position to just on the fly make a determination with five

24   volumes of deposition testimonies whether these 60 questions

25   are actually covered by the topics in the deposition.

1              THE COURT:  Yeah, so I've been thinking about that.

2              MR. STERN:  And the criminal defense attorney who was

3       going to come in and zealously advocate for his client is

4       going to have to be able to prepare for that argument.  And

5       all of us should be in the know about what those questions

6       are.

7              It's very difficult to envision a scenario in light

8       of the depth of these depositions -- and Your Honor has seen

9       some of them -- that there are topics beyond the scope of the

10      deposition that actually would come into play here for any

11      reason other than to -- what I believe -- I may be doing the

12      same thing if I were on the other side.  But to get these

13      individuals to invoke the Fifth in front of the jury.

14             THE COURT:  Okay.  Well, I think we will need a

15      process of some sort that you've described.

16             MR. CHRISTIAN:  Your Honor, may I respond to that to

17      some extent?

18             THE COURT:  Sure.

19             MR. CHRISTIAN:  We're not opposing the concept of

20      having some kind of indication of where we're going.  But we

21      don't intend and we don't think it's required or should be

22      required that we provide a blueprint to all of our strategy

23      and what we plan to do.

24             THE COURT:  No, you don't have to -- but you will --

25      you will have to tell me the areas --

```
 1              MR. CHRISTIAN:  Sure.

 2              THE COURT:  -- there's no way to rule.

 3              MR. CHRISTIAN:  Sure.

 4              THE COURT:  I can't rule --

 5              MR. CHRISTIAN:  Absolutely, Your Honor.

 6              THE COURT:  -- in pretend imagine world where I don't

 7     know what you're asking them.  Their lawyers will have to know

 8     what you're going to ask them to know whether to assert the

 9     Fifth.

10              They can't just assert -- I'm not going to permit

11     them to assert the Fifth if I -- if they don't know what the

12     questions are.

13              MR. CHRISTIAN:  Absolutely, Your Honor.  And I think

14     that certainly, based on my experience of that of a federal

15     prosecutor, sometimes there are ways you can use --

16     compartmentalize.

17              For example, with governor -- former Governor Snyder,

18     the charge -- charges from April 25 of 2014.  If he takes the

19     stand, we may be able to say we intend to ask him some

20     questions about his duties and responsibilities before in 2012

21     or 2013, which quite reasonably might not implicate any of

22     that behavior during the charged period.

23              So sometimes there are ways we can do this

24     strategically so that we cannot have to give every specific

25     question.
```

```
 1          THE COURT:  And we'll find out from him and his
 2  lawyer if they need more information on your questions.
 3  Because if they say, "Well, 2012, I was at the 4th of July
 4  parade.  I'm happy to testify about that."
 5          But if it turns out 2012, you're going to say, "Isn't
 6  it true that you knew you were going to be involved in this
 7  situation that would ultimately lead to lead poisoning in the
 8  City of Flint?"  Well then that would be a different answer.
 9          So we're going to have to get a little specific to
10  know if the Fifth is appropriate.
11          MR. CHRISTIAN:  We're not looking to hide any smoking
12  guns, Your Honor.
13          THE COURT:  Okay.  Let me ask Mr. Kent.  Given that
14  the witnesses are only potentially going to be unavailable as
15  to certain questions -- but I think if they've answered those
16  questions at the depositions, they're going to need to answer
17  them from the stand.
18          Are you still seeking -- I've got a motion in limine
19  to decide this afternoon or tomorrow where you're seeking to
20  have the full indictments admitted as an exhibit.  I assume
21  you're no longer seeking that.  Because you've got the witness
22  right here.  They're not unavailable or refusing.
23          I mean, they can't refuse to testify as to things
24  they've already testified unless there's something that tends
25  to make it incriminating against them.
```

```
 1              MR. KENT:  Well, Your Honor, I think the part of the
 2     argument is the fact that they were under indictment is a
 3     relative feature to their credibility, because it would have
 4     impinged on their willingness to protect themselves in the
 5     form of their testimony at the deposition.
 6              And, therefore, that is as part of the justification
 7     for being able to bring that information in.
 8              THE COURT:  Okay.
 9              MR. KENT:  I don't think that answers the question.
10              THE COURT:  I don't think that's the question.  The
11     question is the indictment itself.  Not the fact that there is
12     an indictment.  But the document itself.
13              MR. KENT:  Oh.
14              THE COURT:  Are you still seeking to have the
15     document itself?
16              MR. KENT:  You know, that's a good question.  I
17     haven't thought of that aspect.
18              THE COURT:  Let me know -- let me know --
19              MR. KENT:  Let me discuss that with Mr. Mason and
20     Mr. Erickson.
21              THE COURT:  Can you let me know by about 4:00 o'clock
22     today?
23              MR. KENT:  Absolutely.  Absolutely.
24              MR. STERN:  Your Honor, may I just ask one more
25     question?
```

1          THE COURT:  Just a minute.  You definitely can.  And

2     then I'll tell you an update that my case manager has about

3     the possible motions to be filed.  But go ahead.

4          MR. STERN:  Okay.  If, in fact -- just going to an

5     extreme, imagine a scenario where Howard Croft explains to the

6     Court his intention to invoke the Fifth Amendment, invoke his

7     right to the Fifth.

8          Your Honor makes a legal determination based on the

9     arguments of his counsel and potentially counsel that are here

10    today that he, in fact, must testify and cannot invoke the

11    Fifth as to those topics upon which he's already testified at

12    his deposition.

13         If Mr. Croft gets on the stand, and despite Your

14    Honor's ruling, based on advice of his counsel, still invokes

15    the Fifth Amendment on the stand in front of the jury, how

16    does Your Honor get to that?

17         THE COURT:  It's not going to get to that.  Because

18    he will know if you've been asked this in the civil deposition

19    in this case, you did not invoke the Fifth then.  Asking the

20    same question here, you can't invoke it.

21         So I have in my chambers very important judicial tool

22    that was given to me a couple of years ago, and it's this

23    long.  And the size is about as big as my pinky.  And I've

24    never had to use it.  But I will bring it down here, and I

25    will use the gavel that is as long as my pinky and make sure

1    that that doesn't happen, because it's not permitted.

2            MR. STERN:  Understood.

3            THE COURT:  I don't know what I would have to do to

4    convince them of that, but that gavel will come with me down

5    here that day.

6            MR. MAIMON:  There are circumstances, Your Honor,

7    where people -- people disobey the courts, and the Court has

8    powers of contempt.  I guess we're just going to have to see

9    what their lawyers tell them to do.  Theoretically they might

10   have rights of appeal.  I mean, we'll just have to see, I

11   think.

12           MR. STERN:  Yeah, that's another issue.  If Your

13   Honor makes that ruling, which is perfectly plausible and

14   appears to conform with the law, their lawyers may not agree,

15   and because this is a fundamental right associated with

16   criminal proceedings, they may seek the opportunity to take

17   that to the Sixth Circuit.

18           THE COURT:  They can do that.  But we're going to

19   keep going with our case to the extent we have other witnesses

20   while that happens.

21           MR. STERN:  Understood.

22           THE COURT:  We did hear from an attorney, Bill Swor.

23           MR. STERN:  That's the attorney for Mr. Ambrose.

24           THE COURT:  For Mr. Ambrose.  He contacted the Court

25   -- he's got a case coming up next week for sentencing in a

1    totally different matter.

2           He mentioned regarding our case that a joint motion,

3    perhaps three parties to quash the subpoenas would be filed.

4    But he didn't say when.

5           I find all these ex parte communications --

6           MR. CHRISTIAN:  Did he identify which parties, Your

7    Honor?

8           THE COURT:  No.  We don't ask for further -- once

9    somebody starts an ex parte communication, we don't ask for

10   more information from them.

11          MR. STERN:  Good practice, I think.

12          THE COURT:  Yeah.  And then I love Mr. Swor.  He's a

13   good human being.  I don't mean to say anything there.

14          But okay.  So all we know is we're going to wait for

15   that motion if it's filed -- people often say, "I'm filing a

16   motion," and you never see it.

17          But let's assume that it will be filed.  You'll see

18   it on the docket when I see it.  I can set a briefing

19   schedule, or you can just follow the local rules.  It would be

20   a non-dispositive motion.  I think you have 14 days.

21          But if you need more time or want to expedite it, you

22   can let me know.  I will be seeing you every day for a while

23   except Fridays.  And we'll just sort it out.  And so we'll get

24   to the adverse inference and all of that if we need to later.

25          So I think the other thing I was interested in, just

1    to be ready for Monday.  Can you tell me who will make the

2    opening for plaintiffs?

3             MR. STERN:  That will be me, Judge.

4             THE COURT:  And you're still thinking up to about an

5    hour and a half?

6             MR. STERN:  Yes, Your Honor.

7             THE COURT:  Okay.  For VNA?

8             MR. CHRISTIAN:  Mr. Stein, Your Honor.

9             THE COURT:  And you're thinking still about one hour?

10            MR. CHRISTIAN:  Yes, Your Honor.

11            THE COURT:  Okay.  And for LAN, Mr. Mason will do it?

12            MR. MASON:  Yes, Your Honor.

13            THE COURT:  And you're thinking you'd like to reserve

14   an hour and a half?

15            MR. MASON:  Thank you, Your Honor.

16            THE COURT:  Okay.  And so I think we're all set for

17   that.  The lectern is where it is.  And I'm asking that you

18   not move any closer to the first two jurors than that.

19            And as of today, masks are required.  And the Eastern

20   District suggests that you remain seated, but I'm permitting

21   you to stand.

22            MR. STERN:  And if Your Honor -- if I may ask, if we

23   choose to remain seated for whatever reason, and I'm not

24   suggesting I will, will you at least just tell the jury that

25   these are the rules, and some of the lawyers have made the

1   decision to stand up and others have not?

2          THE COURT:  Well, I'm not going to say some of the

3   lawyers are breaking the rules.  I'm just going to say I have

4   granted some of the lawyers permission to stand up.

5          MR. STERN:  Okay.

6          THE COURT:  Yeah.

7          Mr. Mason?

8          MR. MASON:  Your Honor, I do have one matter for --

9   that I'd like to have it at sidebar before we leave today.

10         THE COURT:  Okay.  What we can do -- if it's going to

11  be at sidebar, we can just turn the -- do you want it outside

12  the hearing of other counsel?

13         MR. MASON:  No.

14         THE COURT:  Okay.  Then what we can do is conduct a

15  sidebar, which would require turning off the Zoom.  And that's

16  all -- then we can stay right here.

17         MR. MASON:  Then we can have it off the record.

18                   (Sidebar Conference)

19         MR. MAIMON:  We have no objection to the request,

20  Your Honor.  And just -- are we done with everything else just

21  so we know where we're at?

22         THE COURT:  Okay.  We're still on the Zoom.  Let's

23  just -- is there anything else today that needs to be on the

24  record?

25         MR. STERN:  I just want to be clear that the only two

1     attorneys that I have communicated with to even raise the

2     potential of invoking the Fifth Amendment are attorneys for

3     Ambrose and Croft.

4              MR. CAMPBELL:  Your Honor.

5              THE COURT:  Okay.  Yeah.

6              Mr. Campbell.

7              MR. CAMPBELL:  Your Honor, I believe that my office,

8     Alaina Devine, has heard from a lawyer representing

9     Governor Snyder.  And he -- there may be -- there was a

10    reference to taking the Fifth.

11             THE COURT:  Okay.  Well, we will just watch the

12    docket.

13             MR. CAMPBELL:  I was just -- I wanted to respond.

14             THE COURT:  No.  Thank you.  Thank you.  Good.  We'll

15    watch the docket see what happens.

16             Okay.  Well, so we will adjourn for today.  We'll

17    begin promptly at 9:00 o'clock with the preliminary

18    instructions that I think all of you have already seen.  And

19    then we'll move on to opening.

20             I will -- the jurors have given -- been given a

21    one-page sheet from the court that just tells them to let us

22    know if there's any exposures to COVID or a positive COVID

23    test that we should know about.  They also have now chambers

24    instead of the jury department's telephone number if there's a

25    car problem or any other issue should come up.

1          And that's all that has happened since I last saw

2     you.

3          MR. MAIMON:  I'm sorry, Your Honor.  I do have a

4     question.

5          Does the Court or the court personnel have contact

6     information, whether it's cellphone, email or whatever for

7     each of the jurors in case we all have an emergency, and they

8     have to be contacted?

9          THE COURT:  Yes.  We don't yet, but we will.

10          MR. MAIMON:  Okay.  Great.  Thank you.

11          THE COURT:  Okay.  So let's go off the Zoom, which we

12     have now done, and we are also off the record.

13                    (Off The Record)

14                  (Proceedings Concluded)

15              -          -          -

16

17              CERTIFICATE OF OFFICIAL COURT REPORTER

18          I, Jeseca C. Eddington, Federal Official Court

19     Reporter, do hereby certify the foregoing 59 pages are a true

20     and correct transcript of the above entitled proceedings.

21     /s/ JESECA C. EDDINGTON____                   3/4/2022
       Jeseca C. Eddington, RDR, RMR, CRR, FCRR        Date
22

23

24

25