# EXHIBIT 2

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3      SHERROD, TEED, VANDERHAGEN and WARE,

 4                         Plaintiffs,
           -v-                                    Case No. 17-10164
 5
        VNA and LAN,
 6
                           Defendants.
 7      _____/

 8                              JURY TRIAL

 9
                      BEFORE THE HONORABLE JUDITH E. LEVY
10                       UNITED STATES DISTRICT JUDGE

11                            MARCH 3, 2022

12
        APPEARANCES:
13
        For the              Corey M. Stern
14      Plaintiffs:          Levy Konigsberg, LLP
                             605 Third Avenue, 33rd Floor
15                           New York, New York 10158

16                           Moshe Maimon
                             Levy Konigsberg, LLP
17                           605 Third Avenue, 33rd Floor
                             New York, New York 10158
18
                             Melanie Daly
19                           Levy Konigsberg, LLP
                             605 Third Avenue, 33rd Floor
20                           New York, New York 10158

21

22                   (Appearances Continued on Next Page)

23
        TO OBTAIN A        JESECA C. EDDINGTON, RDR, RMR, CRR, FCRR
24      CERTIFIED             FEDERAL OFFICIAL COURT REPORTER
        TRANSCRIPT:           UNITED STATES DISTRICT COURT
25                               200 EAST LIBERTY STREET
                              ANN ARBOR, MICHIGAN 48104
```

March 3, 2022

505

```
 1  For the VNA         Daniel Stein
    Defendants:         Mayer Brown LLP
 2                      1221 Avenue of the Americas
                        New York, New York 10020
 3
                        James M. Campbell
 4                      Campbell Conroy & O'Neil, P.C.
                        1 Constitution Wharf, Suite 310
 5                      Boston, Massachusetts 02129

 6                      Marcus Christian
                        Mayer Brown LLP
 7                      1999 K Street NW
                        Washington, District of Columbia 20006
 8
                        Mark R. Ter Molen
 9                      Mayer Brown LLP
                        71 South Wacker Drive
10                      Chicago, Illinois 60606

11  For the LAN         Wayne Brian Mason
    Defendants:         Faegre Drinker Biddle & Reath LLP
12                      1717 Main Street, Suite 5400
                        Dallas, Texas 75201
13
                        David C. Kent
14                      Faegre Drinker Biddle & Reath LLP
                        1717 Main Street, Suite 5400
15                      Dallas, Texas 75201

16                      Jude T. Hickland
                        Faegre Drinker Biddle & Reath LLP
17                      1717 Main Street, Suite 5400
                        Dallas, Texas 75201
18
                        Philip A. Erickson
19                      Plunkett & Cooney
                        325 East Grand River Avenue, Suite 250
20                      East Lansing, Michigan 48823

21

22

23

24

25
```

```
 1                       I N D E X

 2     WITNESSES                                    PAGE

 3     JEFFREY HANSEN
               Direct examination(Cont.)by Mr. Maimon..515
 4             Cross-examination by Mr. Mason..........633
               Cross-examination by Mr. Stein..........659
 5

 6

 7     EXHIBITS                         Marked    Admitted

 8     Plaintiff
               1995.........................583        583
 9             1996.........................592        592
               2005.........................545        545
10             2006.........................596        596
               2117.........................542        542
11             2462.........................532        533
               2854.........................573        573
12             2859.........................620        625
               2882.........................595        595
13             2891.........................580        580
               2892.........................580        580
14             2897.........................627        628
               2898.........................625        625
15             2901.........................551        552
               2906.........................597        597
16             2907.........................581        581
               3673..................previously       514
17                                      marked
               3675.........................601        602
18             3894-019.....................547        548
               3894-020.....................576        576
19             3896-007.....................559        560

20

21     Defendant LAN
               43...........................650        650
22             45...........................650        650
               46..................previously   previously
23                                      marked    admitted
               48...........................650        650
24

25                  (CONTINUED ON NEXT PAGE)
```

```
 1                    (CONTINUED FROM PREVIOUS PAGE)

 2          EXHIBITS                        Marked    Admitted

 3             50............................650        650
               51............................650        650
 4             88............................650        650
               101...........................650        650
 5             108...........................650        650
               148...........................650        650
 6             149...........................650        650
               1734..........................650        650
 7             1754..........................650        650
               1779..........................650        650
 8             1784..........................650        650

 9

10

11


12          MISCELLANY                                PAGE

13          Proceedings................................508
            Certificate................................667
14

15

16

17

18

19

20

21

22

23

24

25
```

Sherrod, Teed, Vanderhagen and Ware v VNA and Ware - Case No. 17-10164

```
 1              Now, if you can turn to Tab 55.  This was an

 2    evaluation, an observation evaluation report by LAN, correct,

 3    for the TTHM issue?  Or it's part of it?

 4    A.   It's -- yeah.  I've got just a single page here.

 5    Q.   Well, you have two pages, because they're double-sided,

 6    right?

 7    A.   Correct.

 8              MR. MAIMON:  And it says -- on the back it says, "2

 9    of 16."  I'm only going to use the front, but I'll supplement

10    the rest of it later, Your Honor.  But we would offer

11    Exhibit 1996 into evidence.

12              MR. MASON:  As long as counsel's going to provide 3

13    through 16, ultimately, we have no objection.

14              MR. MAIMON:  Assuming we have it, I'll put it in.

15              THE COURT:  Okay.  Any objection, Mr. Stein?

16              MR. STEIN:  No objection, Your Honor.

17              THE COURT:  Okay.  Then 1996 is received.

18         (Plaintiff Exhibit No. 1996 Admitted Into Evidence)

19    BY MR. MAIMON:

20    Q.   So remember that in the first draft there was Stage 1 and

21    Stage 2.  Stage 2 is what you would do, and then Stage 2 was

22    contingent if it didn't work, right?

23    A.   Yes.

24    Q.   Okay.  So under Stage 1, one of the immediate actions here

25    from LAN is "Increasing ferric feed has demonstrated improved
```

March 3, 2022

593

1    TOC removal," right?

2    A.   Yes.

3    Q.   And as we saw from the schematic in Exhibit 2012, there

4    was a feed of ferric chloride at the plant, correct?

5    A.   Correct.

6    Q.   And one of the recommendations that LAN made to the City

7    of Flint is to increase the ferric chloride feed -- the amount

8    of ferric chloride, the dose of the ferric chloride, correct?

9    A.   That statement reads that, "Increasing ferric has

10   demonstrated improved TOC removal."

11   Q.   And it's listed under "Immediate Actions," right?

12   A.   Yes.  And the heading immediately above it says,

13   "Potential Modifications" --

14   Q.   Okay.  So it's saying -- right.  We should consider this,

15   right?

16   A.   Correct.

17   Q.   Okay.  Now -- oh, good.  Okay.  Now, if you can turn to

18   Tab 57.  Oh, before we do that.  I told you we'd get back

19   there, but we're going to take one more.  Tab -- we did 55.

20   Okay.  Well, let's go to Tab 57.

21        This was the email from Daugherty Johnson to Warren

22   Green and Samir Matta, correct?

23   A.   Correct.

24   Q.   Now, there came a point in time in 2015, in early 2015,

25   when you learned that the City of Flint had retained another

1    BY MR. MAIMON:

2    Q.   If you look at the Bates page starting 4668, Mr. Hansen?

3    A.   Okay.

4    Q.   Can you confirm for us that this is LAN's final report on

5    the TTHM issue?

6    A.   No.  LAN prepared this report quarterly after each TTHM

7    sampling period.

8    Q.   Okay.

9    A.   So this was -- this was the final report in February of --

10   27th, it appears.

11   Q.   Okay.  So this is the final report for February 27, 2015,

12   correct?

13   A.   Yes.

14            MR. MAIMON:  Okay.  Your Honor, we would offer 3675

15   into evidence.  And I'm only going to be talking about, at

16   this point, the operation evaluation report by LAN.

17            THE COURT:  Okay.  Mr. Mason?

18            MR. MASON:  No objection.

19            MR. STEIN:  No objection, Your Honor.

20            THE COURT:  Okay.  Then it will be received.

21        (Plaintiff Exhibit No. 3675 Admitted Into Evidence)

22   BY MR. MAIMON:

23   Q.   So it does have the stamp final on it, right?

24   A.   Yes.

25   Q.   And unlike the November report from beforehand, this is

```
 1    not marked draft, is it?
 2    A.   Correct.
 3    Q.   And it's dated February 27, 2015, correct?
 4    A.   Yes.
 5    Q.   Again, LAN, in its report in February, identifies the same
 6    possible contributing factors to the high TTHM levels, correct?
 7    A.   Yes.
 8    Q.   And, again, corrosion control or lack of corrosion control
 9    is not identified as a possible contributing factor, true?
10    A.   Right.
11              THE COURT:  Mr. Maimon, what page was that?
12              MR. MAIMON:  That was 4669.
13              THE COURT:  Okay.  Thank you.
14    BY MR. MAIMON:
15    Q.   Now, on page 4671 is, again, that section, "Immediate
16    Actions," right?
17    A.   Yes.
18    Q.   And on the bottom, this time it says, "Increased ferric
19    doses have been implemented at the water treatment plant based
20    on positive jar test results," right?
21    A.   Yes.
22    Q.   And did LAN conduct those jar testing?
23    A.   Yes.
24    Q.   Okay.  So LAN did testing -- withdrawn.
25              In November, LAN said, "Hey, increasing the dose of
```

March 3, 2022

604

```
1    ferric chloride might be something that we should try.  Let's

2    do some testing."  It did some jar testing.  It recommended

3    it.  And it was done.

4              It was implemented, right?

5    A.   The LAN jar testing involved multiple dosages of ferric

6    chloride.

7    Q.   Right.  But this is actually saying that this is beyond

8    the testing phase, that increased ferric doses have been

9    implemented at the treatment plant based on your jar testing,

10   right?

11   A.   Correct.

12   Q.   Okay.  So the city -- you recommended it, the city did it,

13   right?  Increasing the ferric chloride?

14   A.   It was mentioned that it could help with the TTHM removal

15   or reduction.

16   Q.   They followed your recommendation, correct?

17   A.   I'm not sure if they followed a recommendation or if they

18   had already done that.

19   Q.   Well it says, "Increased ferric doses have been

20   implemented at the water treatment plant based on positive jar

21   test results," right?

22   A.   Yes.

23   Q.   LAN did the jar testing, correct?  Correct.

24   A.   Correct.

25   Q.   Based on the -- I'm sorry.
```

605

1           Based on the jar test results, LAN recommended

2    increasing the dose of ferric chloride, correct?

3    A.   That's what it reads there.

4    Q.   Okay.  And this is the LAN report, isn't it?

5    A.   Yes.

6    Q.   In addition here -- withdrawn.

7           We'll get there in a minute.

8           When LAN recommended the increased dosing of ferric

9    chloride, it did nothing to make sure that its recommendations

10   had no negative consequences, correct?

11   A.   This is getting outside my realm of expertise.  But it was

12   my understanding that the dosages were not abnormal.  So there

13   were no evident consequences.

14   Q.   Well, you knew at that time, that very high levels of

15   ferric chloride could be detrimental to water quality and make

16   the water more corrosive.

17          You knew that at that time, correct?

18   A.   Very high dosages, you said?

19   Q.   Yes.  Of ferric chloride?

20   A.   I had a general understanding of that.

21   Q.   Okay.  And you know that -- well, first of all, you

22   yourself did absolutely no testing to make sure that the

23   recommendation of the dosages of ferric chloride that were

24   implemented wouldn't have negative consequences.

25          You didn't do any testing to make sure it wouldn't

March 3, 2022

606

1   adversely affect the system, correct?

2   A.   Correct.  Our testing was limited to the TTHM issue.

3   Q.   Right.  But you didn't -- and you didn't ask Warren Green

4   whether or not the ferric chloride dosages recommended by LAN

5   could create a serious problem with corrosion of the water,

6   correct?

7   A.   I did not ask that question.  But we had discussed it.

8            THE COURT:  But we had the what?

9            THE WITNESS:  We had discussed the levels or dosages

10   of ferric chloride.

11           THE COURT:  Okay.

12   BY MR. MAIMON:

13   Q.   Can you turn to the transcript binder, the first volume

14   from August 19 of 2020.  And in the box, turn to page 204.

15   A.   Okay.

16   Q.   And if you can look at line 16.

17           Question -- well, let's take a look starting at line

18   5.

19           "So you used your quote/unquote sum knowledge to

20   determine that the ferric chloride doses that you were

21   recommending wouldn't have an unintended consequence of making

22   the water so corrosive that there would be significant lead

23   contamination.

24           Is that a judgment that you made?"

25           Answer.  "Ferric chloride dosages are something that

March 3, 2022

1    I would defer to Warren on."

2           Do you see that?

3    A.   Yes.

4    Q.   And that's true, you would defer to Mr. Green about that,

5    correct?

6    A.   Correct.

7    Q.   "Q.   Okay.   Did you ask him that question, whether the

8    ferric chloride dosages recommended by LAN could create a

9    serious problem with corrosive water and lead contamination?"

10          And what was your answer at that time, Mr. Hansen?

11          MR. MASON:   Your Honor, objection.   401.   And we may

12   need to have a sidebar.

13          THE COURT:   Okay.   Let's see.   If we have a sidebar,

14   our jurors have two choices.   You can stretch, stay here.

15   We'll exit to the back and come right back in or go back up to

16   the jury room.

17          Any feedback from our jurors?   You don't mind.   Okay.

18   Why don't -- then we'll just go in the back briefly, talk out

19   of your presence and be right back.

20                      (Sidebar Conference)

21          THE COURT:   What is --

22          MR. MASON:   The issue of ferric chloride and TTHM

23   work has been -- had been withdrawn from their claims in this

24   case.   There is no -- and we went through this with their

25   expert and the like.   And so if they're out of the case, we

1    shouldn't be asking about ferric chloride and what negative

2    impact.

3              They don't have any expert opinion on it, and there's

4    no basis to suggest it was improper.  And so we shouldn't be

5    talking about it.

6              MR. MAIMON:  So this goes to the standard of care and

7    the carefulness of this company, Your Honor, which is at issue

8    that here they're making.  And it didn't have to be ferric

9    chloride.  It could have been something that they recommended

10   in the plant.

11             And the failure, when you make recommendations, when

12   you know that a substance can cause --

13             THE COURT:  I know.  But respond to what Mr. Mason's

14   saying about whether your expert provided any opinion on this.

15             MR. MAIMON:  So, for instance, Dr. Hoaglund testified

16   very clearly on Monday -- was it Monday?  Or Tuesday.  I'm

17   losing track of time -- that the increase in ferric chloride

18   increased the corrosivity of the water.

19             THE COURT:  Okay.

20             MR. MASON:  And from a chemistry standpoint, not in

21   this case --

22             MR. MAIMON:  Excuse me --

23             THE COURT:  Well, this is --

24             MR. MAIMON:  He said that for the water coming out of

25   the plant, the ferric chloride increase in dosage, and he

1  showed it increased the corrosivity.  He did the equation for

2  it.

3          THE COURT:  I know.  But are you now getting back

4  into a TTHM ferric chloride claim?

5          MR. MAIMON:  This has nothing to do with TTHM, Your

6  Honor.

7          THE COURT:  Okay.  Run that by me again then.

8          MR. MAIMON:  Sure.

9          LAN has a duty of care, and they have to act

10  reasonably under the circumstances.  They're making

11  recommendations at the plant to deal with TTHM, which is not

12  lead.

13          We assert that, by the way, the same underlying

14  causes that caused the lead to leach out caused the TTHM.  But

15  that's -- we'll be held to our proofs on that.

16          However, the failure of the company when making

17  recommendations to even test and make sure that their

18  recommendations are not going to make matters worse or to

19  adverse impact shows that this is not a careful company.

20          This is a company -- because the testimony that

21  Mr. Hansen is going to give, because I have it ready, is that

22  they didn't do that, because that was beyond the scope.

23          They could recommend solutions for TTHM, but it was

24  -- outside of their scope to determine whether that would have

25  adverse impacts.  Therefore, they didn't have to test for it.

1    And therefore, he didn't care about it.

2         To us, that is contrary to the careful engineering

3    Mr. Mason advocated was the hallmark of the company.

4         MR. MASON:  You want to address?

5         MR. KENT:  Judge, you will remember this was a big

6    part of the Daubert and the summary judgment motions.  And we

7    put it on the record, and you've written it that they

8    affirmatively stood up and withdrew all claims about the TTHM

9    and the ferric chloride.

10        In the pleading that's a big part of the claim.

11        THE COURT:  I understand that.  He's saying he's

12   using it for a different purpose to show generally.

13        MR. KENT:  Judge, it can't be for a different

14   purpose.

15        MR. MASON:  Hold on.  It's a backdoor way having

16   withdrawn it.  It's improper, Judge.  It's a backdoor way of

17   getting -- trying to suggest that we did something wrong.  And

18   that's the problem here.

19        THE COURT:  So tell me -- tell me where you're going

20   next with this.

21        MR. MAIMON:  Sure.  The reason -- he testifies -- and

22   I have the transcript here.  He testifies that they didn't

23   test to see if what they were recommending for TTHM wasn't

24   going to make the water more dangerously corrosive, because he

25   felt it wasn't defined in the scope of his work.

611

```
 1            THE COURT:  I see.

 2            MR. MAIMON:  That is the basis for the defense here.

 3   Wasn't in our scope.  Wasn't in our scope.

 4            But we believe that this carries through for this

 5   company that they define their scope so narrowly that they

 6   don't have to do what a reasonable professional engineer

 7   should do, and it carries over and it's corroborative of our

 8   theory when it comes to the corrosion control.

 9            THE COURT:  So is this evidence of a prior incident

10   of negligence?

11            MR. MAIMON:  This is not prior.  This is a consistent

12   pattern and practice of the company that they avoid

13   responsibility and avoid doing the right thing by saying, "not

14   within our scope."

15            MR. MASON:  There's no testimony to that effect with

16   respect to this.  And they're just trying to backdoor some

17   other --

18            THE COURT:  I think he just read the testimony.  What

19   page is it on?

20            MR. MAIMON:  Well, on page 201 of his deposition, the

21   question was, "Well, who would have made the decision not to

22   test the recommended solutions to find out if there were other

23   unintended consequences or negative effects from the proposed

24   solutions to the TTHM problem?"

25            "A.  That's me as an item that would be defined in
```

1    the scope.  And I did not prepare the scope for this."

2             MR. MASON:  Nobody -- excuse me.  Excuse me.  I'm

3    sorry.  Go ahead.  Are you done?

4             THE COURT:  But he's just saying, "I didn't prepare

5    the scope."  He's not saying, "It's not within our scope."

6    He's just saying, "I'm not the one who figured out the scope."

7             MR. MAIMON:  Well, he says that -- hold on a second.

8             THE COURT:  It's a confusing answer to the question.

9    Let's find a way -- I mean, you can't bring a negligence claim

10   based on the TTHM.

11            MR. MAIMON:  We're not.

12            THE COURT:  Okay.  So I think you need to find a way

13   to move on from this.  Because it's -- I think it's veering

14   into that area.  And he just says, "I did not prepare the

15   scope" --

16            MR. MAIMON:  Here.  So if I can point the Court

17   page 202, on line 4.

18            "So you're saying that even though LAN came up with

19   those suggestions, LAN wouldn't have had a scope to make sure

20   those suggestions weren't making other problems worse.

21            A.  I'm saying that the scope defined that we were to

22   evaluate issues related to TTHM.  The scope did not say to

23   test other components of the system."

24            THE COURT:  Okay.  So now what he's saying is that as

25   an employee project manager on this project, he says, "We do

```
 1    what's in our scope.  And it just doesn't matter to us what
 2    else happens.
 3            So we're not -- that's no longer saying, "Well,
 4    ferric chloride has this reaction by a chemist.  It's just
 5    simply that's not our job."
 6            MR. MASON:  That's what they're asking -- they set
 7    this whole thing up talking about ferric chloride and
 8    recommendations and making things worse.  That's the problem.
 9            THE COURT:  Okay.
10            MR. MASON:  Because that's why I stopped to ask Your
11    Honor to address it.  And now they want to back off and just
12    say, "Well, it's just a question of scope."
13            THE COURT:  But that's because you've been successful
14    with your objection.  So what we'll do is proceed with this
15    issue of scope.  But we won't get into whether ferric chloride
16    made --
17            MR. MAIMON:  Right.  And the only reason I raised it,
18    Your Honor --
19            THE COURT:  Just let me finish.
20            MR. MAIMON:  I'm sorry.
21            THE COURT:  Made the problem worse with corrosivity.
22            MR. MAIMON:  Right.  But the -- excuse me.  That was
23    the -- it can't be divorced from its context.  That was the
24    context of what he was speaking about.
25            THE COURT:  But just what you'll do is you'll finish
```

1    this portion and then move on.

2           MR. MAIMON:  Correct.

3           THE COURT:  You won't go into the chemistry of ferric

4    chloride's impact.

5           MR. MAIMON:  Correct.  Correct.

6           THE COURT:  Okay.

7           MR. MASON:  And on the record, the objection will be

8    sustained with a qualification to allow a follow-up question?

9           THE COURT:  Correct.  Sustained to the extent that it

10   did start to sound like you were veering into whether there's

11   a separate claim for negligence based on addition of --

12   addition of ferric chloride to address TTHM.

13          MR. MAIMON:  Understood, Your Honor.

14          THE COURT:  And now we understand you're going to

15   limit it to the issues regarding scope.

16          MR. MASON:  Your Honor, are you going to take a break

17   for everyone or should I --

18          THE COURT:  Go right ahead.

19                     (Open Court)

20          THE COURT:  Everybody's back.  Go ahead.

21          MR. STEIN:  Your Honor, could we get a ruling on the

22   record?

23          THE COURT:  You have a ruling.  Jeseca goes back with

24   us.  So the objection was ruled upon and was sustained to a

25   certain extent.  And now we're going to proceed.

March 3, 2022

615

```
 1              MR. MAIMON:  Sure.
 2   BY MR. MAIMON:
 3   Q.  I'd like to draw your attention to page 202 of that
 4   transcript, Mr. Hansen.
 5   A.  Okay.
 6   Q.  Starting on line 4, it says, "So you're saying even though
 7   LAN came up with those suggestions, LAN wouldn't have had a
 8   scope to make sure those suggestions weren't making other
 9   problems worse.
10              A.  I'm saying that the scope defined that we were to
11   evaluate issues related to TTHM.  The scope did not say to test
12   other components of the system.
13              Q.  Okay.  Well, isn't it important to consider the
14   damage that your proposed solutions might do to the water
15   system?
16              A.  Well, it's the city's responsibility to run the
17   plant overall."
18              Those were your answers to those questions, correct?
19   A.  Yes.
20   Q.  Okay.  So let's go back to the February 27, 2015, report.
21   And you see under "Immediate Actions" what the first "Immediate
22   Action" bullet point is hire third-party quality -- I'm
23   sorry -- "hire third-party quality water" -- I'm sorry.  I'm
24   tired.  I apologize.
25              "Hire third-party water quality expert to complete
```

1    deal with the dirt?

2    A.   Yep.  I mean, geotechnical, transportation, hydrology,

3    hydraulics, water treatment, cathodic protection.  There are

4    many categories.

5    Q.   So a doctor who specializes in internal medicine has a

6    medical degree, but it's likely you're not going to have him do

7    brain surgery on you, right?

8             MR. MAIMON:  Objection.

9             THE COURT:  Rephrase that a little bit differently.

10            MR. MASON:  Sure.

11   BY MR. MASON:

12   Q.   The fact that there are doctors that perform internal

13   medicine and see people on a regular basis, correct?

14            MR. MAIMON:  I object, Your Honor.  It's irrelevant

15    about doctors.

16            THE COURT:  Go ahead.  This is his opportunity to

17    discuss this.

18   BY MR. MASON:

19   Q.   Just trying to help understand --

20            MR. MAIMON:  And I object to the explanation, Your

21    Honor.

22            THE COURT:  Okay.  It's overruled.

23   BY MR. MASON:

24   Q.   A doctor who specializes in internal medicine has a

25   medical degree, but it's likely you're not going to have him do

1   brain surgery on you, correct?

2   A.   I would agree.

3   Q.   Your references to laying your expertise talked about

4   design related to and construction related to water treatment.

5         Can you explain what that means versus what Mr. Green

6   does.

7   A.   Yes.  I've had some experience with groundwater treatment

8   plants, which means it's getting its water source from ground

9   -- from groundwater.  Surface water treatment plants are much

10  more complicated, and there's a lot more chemistry involved.

11        Warren's had experience designing and operating water

12   treatment plants.  Frankly, he just knows a lot more about it

13   than I do.

14  Q.   Okay.  So let's move on to your role in the project then.

15  Beginning in May of 2013, did you -- I think counsel's already

16  established that you attended some meetings with Warren,

17  correct?

18  A.   Correct.

19  Q.   And was your role -- tell us what your role was at that

20  meeting, those meetings?

21  A.   Yeah, in general in the project, Warren was the lead

22  engineer and lead water treatment designer at LAN.  I was there

23  to assist him however I could.  My role is minimal in the

24  beginning in particular.

25        Later, my role was next to nothing for late 2013

1  through late 2014.  And then I had a little more involvement

2  later working on the THM report and associated improvements

3  there.

4  Q.  So -- and I mean no disrespect.  But you took a lot of

5  notes in these meetings.

6          Were you the notetaker?

7  A.  I really wouldn't say that.  I was at those meetings, and

8  I always take knows.

9  Q.  Okay.

10  A.  I usually take notes at meetings I go to.  So I did that.

11  Q.  Okay.  And I think you referenced earlier in response to

12  Mr. Maimon's questions that you checked, actually, your number

13  of hours you worked on this project, correct?

14  A.  A little bit, yes.

15  Q.  And so in the timeframe between May and August of 2013 --

16  and just so we have a reference point.  The spigot was opened

17  in April 25 of 2014, right?

18          MR. MASON:  Can you put that up, please, Bobby, the

19   demonstrative?

20          THE WITNESS:  I believe that's about right.

21          MR. MASON:  Can you see that on your screen?

22  BY MR. MASON:

23  Q.  So that red line shows the day that I keep calling the

24  spigot was opened, right?

25  A.  Okay.  Yes.

March 3, 2022

667

```
 1              MR. MAIMON:  So Your Honor has already ruled on
 2   Benes, Lawrence, and Chen also.
 3              THE COURT:  Right.
 4              MR. MAIMON:  And then the next priority is Gadis,
 5   Gnagy --
 6              THE COURT:  Is it Gnagy?  Oh, well.
 7              MR. MAIMON:  Gnagy.  And Nicholas.
 8              THE COURT:  Okay.  So I will get --
 9              MR. MAIMON:  And I think those have been -- the
10   updated versions have been provided to the Court.
11              THE COURT:  I think they have, too.  Okay.
12              Thank you, everybody.  Take care.
13              MR. MAIMON:  Thank you, Your Honor.
14                    (Proceedings Concluded)
15              -          -          -
16
17             CERTIFICATE OF OFFICIAL COURT REPORTER
18         I, Jeseca C. Eddington, Federal Official Court
19   Reporter, do hereby certify the foregoing 164 pages are a true
20   and correct transcript of the above entitled proceedings.
21   /s/ JESECA C. EDDINGTON____                    3/3/2022
     Jeseca C. Eddington, RDR, RMR, CRR, FCRR       Date
22
23
24
25
```