```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3     SHERROD, TEED, VANDERHAGEN and WARE,

 4                    Plaintiffs,
           -v-                                Case No. 17-10164
 5
       VNA and LAN,
 6
                      Defendants.
 7     _____/

 8                          MOTION HEARING

 9
                 BEFORE THE HONORABLE JUDITH E. LEVY
10                  UNITED STATES DISTRICT JUDGE

11                       MARCH 15, 2022

12
       APPEARANCES:
13
                            Corey M. Stern
14                          Levy Konigsberg, LLP
                            605 Third Avenue, 33rd Floor
15                          New York, New York 10158

16                          Moshe Maimon
                            Levy Konigsberg, LLP
17                          605 Third Avenue, 33rd Floor
                            New York, New York 10158
18
                            Melanie Daly
19                          Levy Konigsberg, LLP
                            605 Third Avenue, 33rd Floor
20                          New York, New York 10158

21

22                   (Appearances Continued on Next Page)

23
       TO OBTAIN A        JESECA C. EDDINGTON, RDR, RMR, CRR, FCRR
24     CERTIFIED            FEDERAL OFFICIAL COURT REPORTER
       TRANSCRIPT:          UNITED STATES DISTRICT COURT
25                             200 EAST LIBERTY STREET
                             ANN ARBOR, MICHIGAN 48104
```

```
 1                        Daniel Stein
                          Mayer Brown LLP
 2                        1221 Avenue of the Americas
                          New York, New York 10020
 3
                          James M. Campbell
 4                        Campbell Conroy & O'Neil, P.C.
                          1 Constitution Wharf, Suite 310
 5                        Boston, Massachusetts 02129

 6                        Marcus Christian
                          Mayer Brown LLP
 7                        1999 K Street NW
                          Washington, District of Columbia 20006
 8
                          Mark R. Ter Molen
 9                        Mayer Brown LLP
                          71 South Wacker Drive
10                        Chicago, Illinois 60606

11                        Cheryl A. Bush
                          Bush, Seyferth PLLC
12                        100 West Big Beaver Road, Suite 400
                          Troy, Michigan 48084
13
                          Wayne Brian Mason
14                        Faegre Drinker Biddle & Reath LLP
                          1717 Main Street, Suite 5400
15                        Dallas, Texas 75201

16                        David C. Kent
                          Faegre Drinker Biddle & Reath LLP
17                        1717 Main Street, Suite 5400
                          Dallas, Texas 75201
18
                          Jude T. Hickland
19                        Faegre Drinker Biddle & Reath LLP
                          1717 Main Street, Suite 5400
20                        Dallas, Texas 75201

21                        Philip A. Erickson
                          Plunkett & Cooney
22                        325 East Grand River Avenue, Suite 250
                          East Lansing, Michigan 48823
23

24                        (Appearances Continued on Next Page)

25
```

March 15, 2022

```
 1                    Alexander S. Rusek
                      Whitelaw PLLC
 2                    2549 Jolly Road, Suite 340
                      Okemos, Michigan 48864
 3
                      Juan A. Mateo, Jr.
 4                    Law Offices of Juan Mateo
                      300 River Place, Suite 3000
 5                    Detroit, Michigan 48207

 6                    Randall Levine
                      Levine & Levine Attorneys at Law
 7                    136 East Michigan Ave 14th Floor
                      Kalamazoo, Michigan 49007
 8
                      Charlie Quigg
 9                    Warner Norcross & Judd LLP
                      2715 Woodward Avenue, Suite 300
10                    Detroit, Michigan 48201

11                    William W. Swor
                      William W. Swor & Associates
12                    500 Griswold Street, Suite 2450
                      Detroit, Michigan 48226
13
                      Michael A. Rataj
14                    Michael A. Rataj, PC
                      500 Griswold Street, Suite 2450
15                    Detroit, Michigan 48226

16                    Todd Russell Perkins
                      615 Griswold, Suite 400
17                    Detroit, Michigan 48226

18                    Brian Lennon
                      Warner Norcross & Judd LLP
19                    2715 Woodward Avenue, Suite 300
                      Detroit, Michigan 48201
20

21

22

23

24

25
```

1                              **I N D E X**

2      MISCELLANY                                          PAGE

3      Proceedings..................................5
       Certificate................................108

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | **P R O C E E D I N G S** |
|---|---|
| 1 | |
| 2 | THE CLERK:  Calling Sherrod, Teed, Vanderhagen and |
| 3 | Ware vs. VNA and LAN. |
| 4 | THE COURT:  Thank you, Counsel.  I believe my court |
| 5 | reporter has already taken down your appearances.  So please |
| 6 | be seated.  And give me just a minute to finish logging in. |
| 7 | Thank you for your patience. |
| 8 | Well, let's see.  I know Mr. Mateo.  I know |
| 9 | Mr. Rusek.  I think I know -- and I know Mr. Rataj. |
| 10 | MR. LENNON:  Hi, Your Honor.  Brian Lennon from |
| 11 | Norcross. |
| 12 | THE COURT:  Okay.  All right.  I don't think I know |
| 13 | you yet.  So welcome. |
| 14 | And you're all where you want to be? |
| 15 | Of course, I know bellwether counsel.  Hello. |
| 16 | Welcome back.  Just a second.  All right.  Okay. |
| 17 | Well, thank you, all, for being here.  This is the |
| 18 | date and time that was set for a hearing on various motions. |
| 19 | I think I'm looking at the right side of the room -- that were |
| 20 | filed by Governor Snyder, Mr. Baird, Mr. Ambrose, Mr. Earley, |
| 21 | and Mr. Croft. |
| 22 | Each of those individuals have been issued trial |
| 23 | subpoenas for their testimony in our first bellwether Flint |
| 24 | water trial, which began on February 15, 2022.  And at the |
| 25 | current time, promises to continue for several more months. |

March 15, 2022

1        So today the jury is obviously not here.  But for
2   those who are following on Zoom, they can't see the jury box.
3   So if for any reason you want to be seen during your argument,
4   Mr. Rataj or Mr. Lennon, you may need to move.
5        Actually you will need to move, because you won't
6   have a microphone.  But we'll address that in a minute.  So
7   just be seated and we'll sort that out.  Okay.
8        So we -- one of our jurors had an appointment that
9   conflicted with service today, so we adjourned the trial
10  yesterday and today for that reason.
11       So as I understand the facts of sort of where we are
12  and what we're doing in the hearing today, all of the
13  individuals I just listed have informed the Court by way of
14  their motions that they wish to avail themselves of the Fifth
15  Amendment's protection against self-incrimination, and they
16  want to avoid any appearance at all at our trial.
17       Before hearing your further arguments, I want to set
18  forth a few facts as I understand them and ask that when you
19  make your argument, you correct any assumptions I have made
20  that you believe are incorrect.
21       So I'll begin with where I think we are and what got
22  us here.  And then be sure to tell me where I'm wrong.
23       So this litigation was filed originally in 2016.
24  Though, the bellwether docket for our case has a 2017 number.
25  So let's assume that it was filed that year.

1        When the case was filed, aside from Mr. Baird, all of

2    the witnesses who are represented here today were named

3    defendants in that case.

4        Governor Snyder and the other defendants filed

5    various motions to dismiss the entire litigation.  And

6    although some of the claims were dismissed at various times,

7    plaintiffs' claims for violation of the right to bodily

8    integrity survived those motions before me and on appeal.  So

9    they all continued as parties in this litigation.

10        VNA and LAN were also defendants in 2016 and 2017,

11   and, of course, they are today, as well.  And they filed

12   notices of nonparty at fault naming each of these individuals

13   including Mr. Baird as early as November 13, 2018, in Carthan

14   case, which is 16-10444 and December 10, 2019, on this docket.

15        At a number of points throughout the litigation, the

16   issue of the Fifth Amendment right against self-incrimination

17   was raised by a number of defendants.  It was raised very

18   early on prior to my decision on the motions to dismiss when

19   document discovery was underway.

20        And it was raised again in a motion filed by the

21   individual Flint defendants who are here today, Mr. Ambrose,

22   Mr. Earley, and Mr. Croft on September 27 of 2019.

23        That second pass at the issue involved a motion to

24   stay the depositions that are in large part at issue today of

25   Mr. Ambrose, Mr. Earley, and Mr. Croft who at that time were

March 15, 2022

 1    still defendants in the litigation.

 2         Governor Snyder and Mr. Baird did not request a

 3    protective order related to their depositions or at least not

 4    that I recall.  So certainly correct me if I'm wrong there.

 5         Mr. Baird did not file any sort of motion for a

 6    protective order regarding his deposition.  That much I know

 7    for sure.

 8         I issued a written decision on that motion that had

 9    been filed in September of 2019.  That was issued on

10    November 7 of 2019.  And it granted in part and denied in part

11    the individual Flint defendants' or individual city

12    defendants' motion.

13         And in that motion, I granted -- the motion was for a

14    stay of discovery.  It was saying, "We should not have to or

15    be forced to sit for our depositions in this litigation,

16    because we have full knowledge that we face a risk of

17    prosecution."

18         Certainly a possibility.  Maybe a probability of

19    prosecution for the same facts.

20         And so they wished to have me stay the litigation so

21    that they would not be faced with the question of whether to

22    have an adverse inference, whether to risk an adverse

23    inference of if they took the Fifth Amendment right to remain

24    silent or waive their rights, thus getting us to where we are

25    today.

1        So in my opinion, I specifically focused on the fact

2   that these witnesses could potentially face a choice between

3   invoking or waiving their Fifth Amendment rights.  And so it

4   was set forth in writing, available obviously to the

5   individual city defendants but also to Governor Snyder and

6   Mr. Baird.

7        I noted that the issue of waiver -- I noted that in

8   the opinion.  It specifically set forth, quote, "In general,

9   the ICDs have set forth a plausible fear of prosecution."

10  Everyone was on notice of that.  But most certainly they were,

11  because they brought the motion.

12       But even though there is an overlap between civil and

13  criminal allegations, they cannot assert the Fifth Amendment

14  right in advance of being asked a question.

15       So no one was compelled to answer a single question.

16  As a result, they simply had to assert it on a

17  question-by-question basis.

18       I noted the United States v. U.S. currency decision

19  that counsels against requiring individuals to choose between

20  exercising their Fifth Amendment privilege and the substantial

21  sums of money that were the subject of that case.

22       I then went on to limit attendance at the deposition

23  to only attorneys on the case, and there were no shortage of

24  those.  But that's neither here nor there.

25       But I say all of this just as part of the facts that

1    I understand leading to our hearing today that before any of

2    the witnesses who have brought these motions today ever

3    testified in the summer of 2020, they had my proviso that they

4    faced a plausible fear of prosecution and could most certainly

5    assert their Fifth Amendment rights in the subsequent

6    depositions.

7         Again, another thing I'd like to note in terms of the

8    chronology here is that at the time of at least the first day

9    of everyone's deposition, all but Mr. Baird were still

10   defendants in the case.  They all were represented by counsel

11   and all proceeded to testify and not remain silent as to any

12   questions.

13        The individual city defendants drew my attention to

14   the Judge Lawson case regarding Davontae Sanford.  And that

15   was a single deposition where at a certain point, he received

16   his lawyer's advice not to continue answering questions.

17        It doesn't relate to our issue at all, which is

18   whether there's a single proceeding and a waiver that would

19   apply.

20        But the background during this time, the Solicitor

21   General of Michigan had announced that although certain

22   criminal charges were dismissed, an investigation would be

23   ongoing and could lead to charges against the same individuals

24   plus others who had not ever been criminally charged such as

25   Mr. Baird and Governor Snyder.

1           Now, she did not list them by name, but there was

2    certainly a warning sign there regarding who would be in

3    charge of producing documents.

4           So with all of this knowledge, all five witnesses sat

5    for their depositions between May and July, and I think there

6    was a second day of depositions in September.  They were all

7    represented by counsel.  And I note that Governor Snyder

8    himself is a lawyer.  And I only note that because the -- in

9    RE Mayor Morganroth case noted that Mayor Morganroth is a

10   lawyer.

11          So the next thing I have sort of factually is that

12   plaintiffs and the public officials in this case reached a

13   settlement.  And Governor Snyder, Mr. Croft, Mr. Ambrose, and

14   Mr. Earley became nonparties to the litigation effective at

15   least with the preliminary approval of in November 2021, which

16   was after their depositions.

17          So let me say one thing more.  So those are sort of

18   the general facts as I see them.  So please tell me where I've

19   misunderstood them.

20          But I want to mention an area of argument I think

21   primarily to Mr. Lennon that will not be helpful to me.  Just

22   so that you can consider -- you can still provide it, if you

23   wish to make a record on the issue.

24          But you mention in your reply brief that this wish to

25   potentially go beyond the deposition testimony by VNA and LAN

1    is what you called "gamesmanship" because they are seeking to

2    shift the blame away from theirselves and onto your client and

3    others who are here today.  And I can tell you most certainly

4    they are.

5           And gamesmanship aside, absolutely they are.  And as

6    you know, Michigan is a fair share liability state, and they

7    have the absolute right to do that if the facts support that

8    conclusion.

9           There's nothing untoward about doing what they're

10   doing in this instance which is zealously representing their

11   clients in accordance with Michigan law.  That's just simply

12   how it works.  So but you can certainly emphasize that if you

13   wish to.

14          So here we are at the present with each of these

15   clients having received a trial subpoena from either one or

16   more parties.  And indicating the broad nature of the -- I

17   think that's the fact I left out, which is that your clients

18   were indeed criminally charged in some remarkably broad

19   charges.

20          So I am absolutely aware of that.  And they now wish

21   to assert a blanket Fifth Amendment right against

22   self-incrimination.

23          So I've had an opportunity to read your briefs, to

24   read the earlier sort of letter briefs that the parties in the

25   case filed and submitted before your motions to quash.  So

```
 1    I've read all of that.  Thank you very much for the
 2    submissions.
 3           The way I see the legal question -- but you can make
 4    any legal argument you want -- is my focus at this point is
 5    whether the depositions given in the summer of 2020 before the
 6    criminal charges were filed against Governor Snyder and
 7    Mr. Baird and before the criminal charges were filed again for
 8    Mr. Ambrose, Earley, and Croft, whether these are the same
 9    proceeding.
10           It would be helpful to me if your argument does not
11    rely -- although make the record you want to make -- but it
12    would be helpful to me if you don't rely on cases where an
13    individual testifies at a grand jury and then later wants to
14    invoke their Fifth Amendment trial -- or right at trial.  I
15    clearly see those as two different proceedings.
16           At the time of the grand jury testimony, there is no
17    case other than the prosecutor trying to see whether the grand
18    jury will indict the ham sandwich or whatever they're going to
19    indict.
20           And so the risks, the analysis, all of the things
21    teach me and tell me that those are two different proceedings.
22    A grand jury when there's not yet an indictment and later
23    testimony at trial.
24           So I see those at different proceedings, and what I'd
25    like to focus on is whether deposition in a civil case where
```

```
 1    notices of nonparty at fault cover everybody, including

 2    Mr. Baird.

 3          Defendants are -- the witness were otherwise

 4    defendants in our case.  They are represented by counsel,

 5    which is not true at the grand jury or inside the grand jury

 6    room.

 7          And so please, if you will, focus on that.

 8          So what I'd like to do I think is start with --

 9    unless you all have worked out an order, I would start with

10    Mr. Lennon.

11          But I see Mr. Rusek is sitting right there with the

12    microphone.

13          Do you want to start?

14          MR. RUSEK:  Your Honor.  Good afternoon.

15          THE COURT:  Good afternoon.

16          MR. RUSEK:  Can you hear me okay through the mask and

17    the microphone?

18          THE COURT:  Yeah.  I'll put my mask back on.  We just

19    got -- I should tell everyone for particularly bellwether

20    counsel, our court reconstitution committee just yesterday

21    afternoon issued their updated guidance.  And, sir, you'll

22    need to put your mask on above your nose, sir.

23          And that they issued guidance that no longer do we

24    have to take the temperature coming in.  But masks are still

25    required in all of our buildings.  So I apologize for taking
```

 1    mine down.  But I'm 20, 30 feet from all of you.

 2            So go ahead, Mr. Rusek.

 3            MR. RUSEK:  I have no objection if you want to remove

 4    your mask.  That's fine by me.  Not that I have a say in it.

 5            THE COURT:  Thank you.  No, I know.  But I appreciate

 6    knowing that.

 7            MR. RUSEK:  And I'm just happy to be back here, Your

 8    Honor.

 9            THE COURT:  Oh, I'm very happy to see you.

10            MR. RUSEK:  It has been so long, and I actually have

11    the opportunity to bring my law clerk Alex Tolzman with me

12    today, her first time in federal court.

13            THE COURT:  Welcome.

14            MR. RUSEK:  She's been on Zoom a lot but

15    unfortunately has never sat foot in a federal courthouse

16    before.  And I was looking back on it.  The last time I was

17    here was almost exactly two years ago for a status conference

18    right before we shut down.

19            THE COURT:  Yeah.  It was like March 12, or yeah.

20            MR. RUSEK:  The 11th.

21            THE COURT:  I think it was the 11th.  Exactly.

22            MR. RUSEK:  And as you noted earlier, Your Honor,

23    it's been about 860 days since we really last addressed the

24    Fifth Amendment issues in this case.  And a lot's changed.

25            I think that part of my argument today is going to be

1    providing a little bit of a supplement to the timeline that

2    you already gave.

3            As far as Mr. Croft is concerned, I think that you

4    hit many of the high points.  So I will avoid those and just

5    kind of fill in where I think it's appropriate in regards to

6    our motion today.

7            I then expect Mr. Mateo on behalf of Mr. Earley.  And

8    then Mr. Swor is going to be arguing on behalf of Mr. Ambrose.

9    Mr. Quigg will be arguing on behalf of Governor Snyder.  And

10   then Mr. Levine will be arguing on behalf of Mr. Baird.

11           THE COURT:  Okay.  Mr. Levine for Baird.  Quigg for

12   Snyder.  Okay.  Go ahead.

13           MR. RUSEK:  And I think that we're going to do a hot

14   seat thing and switch if that's okay with the Court, Your

15   Honor.

16           THE COURT:  That's okay.  And just remember to remain

17   seated so you can be heard in the microphone.

18           MR. RUSEK:  To get back to the timeline, Your Honor,

19   you did hit on a lot of the primary points in regards to this

20   litigation.

21           I think it's important to know when you're analyzing

22   both the ability to assert the Fifth Amendment by the ICDs as

23   well as when you're considering whether or not there's been a

24   waiver is that we have to take a look at all these changed

25   circumstances.

```
 1           In the outside world, of course, we've had a
 2   pandemic.  We've had a new president elected.  We're maybe on
 3   the verge of war with Russia over Ukraine.
 4           And then, of course, on a personal level, the
 5   individual city defendants have seen vast amount of change
 6   since we were last here on the Fifth Amendment issues.  To
 7   give a little bit more context as to the criminal charges,
 8   back in June of 2013 -- or excuse me -- June 13 of 2019,
 9   Solicitor General Fadwa Hammoud had taken over the criminal
10   investigations --
11           THE COURT:  You know, and it may work best if the
12   individual speaking only take off their mask if you want to.
13   And if anybody else wants to move further away, feel free.
14           Okay.  But slow down, Mr. Rusek.
15           MR. RUSEK:  Thank you, Your Honor.  It's always
16   difficult trying to yell with the mask on there.
17           So back in June of 2019, we have the solicitor
18   general who has taken over the criminal investigation.  The
19   former office of special counsel had been fired at that point
20   in time.  And all of the pending charges against multiple
21   people in relation to the Flint Water Crisis were dismissed.
22   And dismissed without prejudice.
23           And at that point in time, we were just beginning to
24   really get into discovery in these cases.  And we were
25   focusing on how can we do depositions in a timely, efficient
```

1    manner.  And that brought us before the Court in September

2    through November of 2019 on our motions to stay.

3           Following those, there were multiple days of

4    depositions that occurred in 2020 --

5           THE COURT:  What doesn't this argument that you're

6    providing to me now -- it would be matter if we're looking at

7    these as two different proceedings.

8           So there were one set of risks at the time that they

9    testified in the summer of 2020 and a different set of risks

10   that should be analyzed now.

11          What I'm looking at -- what I'm interested in is your

12   argument for why this is not a single proceeding where they

13   waived their rights with respect to only those questions that

14   were asked at the deposition.

15          And then if I were to find the Fifth Amendment rights

16   were waived under that single proceeding rule, then we would

17   look at whether there is any possibility that additional

18   questions would expose your clients to further risk.

19          And I'll tell you, I'd be very generous in looking --

20   I'm instructed by the Sixth Circuit and the Supreme Court to

21   be very generous in that assessment of whether further

22   questioning could tend to incriminate your client.

23          MR. RUSEK:  Absolutely, Your Honor.

24          THE COURT:  Okay.

25          MR. RUSEK:  To round out a little bit of that

 1    timeline --

 2             THE COURT:  Okay.

 3             MR. RUSEK:  -- before getting into the waiver issue,

 4    because I think it is important, is almost right after your

 5    decision, the November 2019 opinion --

 6             THE COURT:  Yes.

 7             MR. RUSEK:  -- there was a one-man grand juror

 8    substituted in Genesee County.  It was a secret proceeding.

 9    And that began very beginning of January of 2020.  And it went

10    all the way through January of 2021, eventually culminating in

11    the unsealing of the indictments against nine men and women.

12             So while that grand jury proceeding was ongoing, we

13    actually were sitting for depositions.  As you noted earlier,

14    Mr. Croft, he sat for two days of depositions.  Those were in

15    May of 2020.  He then sat for a third day, and that was in

16    September of 2020.

17             Mr. Ambrose sat for depositions in June of 2020 and

18    then Mr. Earley sat for depositions in July of 2020.

19             So in some ways, these cases are kind of analogous to

20    those waiver cases that discuss testimony before grand jury.

21    Because -- and I can't say --

22             THE COURT:  Let me ask you a little bit about that.

23             Why -- when somebody's testifying before a grand

24    jury, they don't have the benefit of counsel present with them

25    for their testimony.  There isn't a case yet.  So I see that

1    as two very different proceedings.

2          So I don't see them as the same proceeding at all.

3    The motivations for testifying before a grand jury as a

4    third-party witness, not the target of the grand jury, are

5    very different from what might potentially -- the witness

6    might be exposed to at trial.

7          Why is this case not like the Moser v. Heffington

8    Maryland Supreme Court case that held that a deposition and

9    trial in one civil case are the same proceeding?

10         MR. RUSEK:  Yes, Your Honor.  I think that there's a

11   smattering of cases that go both ways on that kind of exact

12   issue.  And we have some from the Sixth Circuit.  That would

13   be like the Lavdas case, the Sanford case --

14         THE COURT:  We don't have -- the Sanford case, that

15   was the Lawson case that I mentioned earlier where Davontae

16   Sanford started to answer questions at one single deposition

17   and then said, "Oh, boy, not those questions.  Those could

18   incriminate me."

19         So I don't -- that's just one proceeding, literally,

20   one deposition in one case.

21         So that's not applicable from my perspective.

22         The other cases that you cited -- and thank you for

23   attaching them.  Just made it easier.  So there's the Davontae

24   Sanford case.  And then you cited --

25         MR. RUSEK:  The Lavdas jewelry case.

1          THE COURT:  Yeah, the Lav -- L-a-v, as in Victor,

2    d-a-s Jewelry Limited case.

3          That's in Eastern District of Michigan.  It is

4    Judge Pepe, whose chambers were right next to us almost all of

5    his time on the bench.

6          And that was whether a police interview is the same

7    as a deposition.  And from my perspective, a police interview

8    is generally not done under oath, sometimes not done with a

9    lawyer present, and there's certainly not yet a case.

10          So that to me doesn't fit our circumstance at all.

11   We're not in the ballpark there with this case.  Because our

12   circumstance is a case; known defendants, known nonparty at

13   fault notice for Mr. Baird.

14          And it's absolutely known that there's the

15   possibility of criminal charges if not also the probability.

16   But I think in RE Convertino teaches us that it's not just the

17   probability, the mere possibility of charges that puts people

18   on notice of whether they're going to wish to waive their

19   rights.

20          So the Lavdas case didn't help me.

21          Then we have the Satko -- or Satka, S-a-t-k-a.  And

22   this was again where an individual testified before being

23   added as a defendant was not represented by counsel.  And then

24   it was held that further testimony would be protected by the

25   Fifth Amendment.

```
 1            And here I'm going to look at further testimony very
 2     carefully for your client and all of the other clients.  We're
 3     talking about the known testimony at the deposition in this
 4     case.
 5            Go ahead.  I'm sorry.
 6            MR. RUSEK:  Thank you, Your Honor.  I'll try to
 7     address all of the points.  And I think that it this may be
 8     helpful to talk about the policy behind the single proceeding
 9     rule and what that's meant to prevent.
10            A lot of these cases, I'll say I don't think that
11     there's a Sixth Circuit or a case that I found anywhere in the
12     country that has facts like these.  It's a pretty exceptional
13     case.  And if exceptional relief is ever warranted, this would
14     be the kind of case that I think it comes in.
15            From what I can gather from reading a lot of these
16     single proceeding rule cases, though, is that what we want to
17     avoid is someone using the Fifth Amendment as a shield and a
18     sword in a way that they protect themselves while advancing
19     their interest.
20            And I think in the Sanford case, we see where it's a
21     nonparty witness and Judge Lawson makes that distinction where
22     a nonparty witness has more latitude in asserting the Fifth.
23     So I think that the case is applicable in that sense, even
24     though factually it's quite different from here.
25            But we have five gentlemen who sat for depositions
```

```
 1    above and beyond what normally would be required -- Mr. Croft
 2    for three full days -- and at no point in time did they assert
 3    their Fifth Amendment rights.  A lot of these cases, and why
 4    we have the single proceeding rule, is to avoid someone
 5    saying --
 6              THE COURT:  Well, we don't really have the single
 7    proceeding rule.  We're trying to figure out if we have the
 8    single proceeding -- the Sixth Circuit has not issued clear
 9    guidance on that.
10              So we're trying to figure out what is the appropriate
11    path forward in light of all of the Sixth Circuit's rulings
12    and the Supreme Court, and then we can certainly look to other
13    courts for some guidance.
14              MR. RUSEK:  And you're absolutely correct, Your
15    Honor.  We don't have the majority rule being adopted in the
16    Sixth Circuit explicitly.  But in some of the cases that we
17    cited in our briefs, it has been widely adopted.
18              And what that single proceeding rule seeks to prevent
19    is having a deponent use the Fifth Amendment to avoid
20    answering the tough questions that will put them in a worse
21    spot in the litigation while they can answer questions that
22    favor them.
23              So if you're trying to assert the Fifth in a way that
24    protects you, we don't condone that as single proceeding at a
25    single deposition.  If you're going to sit for that deposition
```

1    and testify, then you need to answer questions about the

2    details that come out.

3            In the Sanford case, that's only one deposition, and

4    that --

5            THE COURT:  Tell me where that -- what case should I

6    look at for that as the explanation?

7            As opposed to -- I mean, some rendition of what

8    you're saying, but primarily that an individual who decides to

9    waive their Fifth Amendment right at a deposition in a civil

10   case with the advice of counsel, with counsel in the room,

11   knows the risks then and knows them at trial and can't avoid

12   the inconvenience, hassle, and so on, of appearing at trial.

13           MR. RUSEK:  Yes, Your Honor.  And I think that -- I

14   think that applies particularly when you have a party witness

15   who is going to try to assert the Fifth at trial.

16           That goes into the gamesmanship sense of this.  And

17   Mitchell v. United States, 526 U.S. 314 discusses some of

18   those concepts.

19           THE COURT:  Slow down.

20           MR. RUSEK:  Absolutely.

21           So Mitchell discusses some of those concepts, and I

22   think that they carry through, I believe, the Sanford court

23   also talked about gamesmanship.  And if I remember correctly,

24   in RE Morganroth also had some discussion there.

25           But where that brings us, Your Honor, is that these

 1    gentlemen did not engage in anything like that.  You know,

 2    they appeared for two or three days of depositions --

 3           THE COURT:  Yeah.

 4           MR. RUSEK:  -- fully answered.  With the knowledge

 5    that, of course, were charges plausible?  Yes.

 6           We also had lost the November 2019 ruling on the EMA

 7    nationwide factors, because there were no pending criminal

 8    charges at that time.

 9           We had many considerations and high stake litigation

10    that we had to take into account.  And we didn't know about

11    these secret grand jury proceedings that sought to charge all

12    these gentlemen, and we wouldn't until they were revealed in

13    January of 2021, shortly before they were arraigned in Genesee

14    County.

15           One of the cases that we haven't talked about yet is

16    the Satka case --

17           THE COURT:  I think I just talked about it.

18           But go ahead if you want to --

19           MR. RUSEK:  Yes, Your Honor.

20           This, I think, has some facts that are pretty close

21    to where we're at.  Nothing that's right on point.  I don't

22    expect there likely ever be a case right on point with these

23    facts.

24           But in Satka, there is a Mr. Pappadakis who was --

25           THE COURT:  P-a-p-p-a-d-a-k-i-s.

```
 1              MR. RUSEK:  Correct.

 2              And he was deposed by a third party subpoena.  And

 3       from the opinion, it also seems like he responded to --

 4              THE COURT:  I think I -- I think just discussed this

 5       case a moment ago.  Because the difference there is that he

 6       testified before he was added as a defendant in the case.  He

 7       wasn't represented by counsel.

 8              And I read the case as relating to further testimony.

 9       And we can protect further testimony in our case.

10              It says, in fact, the court in the Satka case says,

11       "Rather in all likelihood, the government seeks additional" --

12       and it's in italics -- "additional information from

13       Pappadakis.  In fact, the government acknowledges that absent

14       additional testimony, it will have a," quote, "substantially

15       more difficult time proving its case."

16              So I think that case isn't like our case.  That --

17       the holding here relates to additional testimony, and it's

18       clearly two different proceedings when the individual

19       testifies.

20              MR. RUSEK:  Yes, Your Honor.  My memory on that case

21       in my notes is that the government had sought a continuous

22       deposition of Mr. Pappadakis.

23              But I think that it's similar to where we

24       procedurally are because certainly Mr. Pappadakis would known

25       that -- the context of the proceedings.  I believe that he was
```

```
 1    a loan officer or related in some way to the loan process,
 2    that the defendants in that case were being accused of
 3    committing fraudulently.
 4         And he gave his deposition.  And then he receives his
 5    target letter from the U.S. Attorney's Office.
 6         THE COURT:  Right.
 7         MR. RUSEK:  Which is similar to where we stand.  But
 8    our clients were indicted after the depositions.
 9         THE COURT:  They had been indicted before the
10    depositions, temporarily were not indicted, but with a promise
11    that a scorched earth review of every document ever known
12    would be undertaken and that they could be reindicted and
13    others could be indicted, as well.
14         MR. RUSEK:  That's true, Your Honor.
15         THE COURT:  I think that's very different from the
16    Satka case where also he wasn't represented by counsel the
17    first time.  Your clients were.
18         MR. RUSEK:  We also had an additional consideration,
19    Your Honor, and that was your November 2019 order.  At that
20    point in time, I think you were correct.  All we had was press
21    releases to go on saying these charges were dismissed with
22    prejudice.  They have the ability to re -- excuse me.
23         They were dismissed without prejudice.  That the
24    government had the ability to re-file.  That they had said
25    publicly they're investigating.
```

1          But we didn't have really concrete evidence that they

2    would be charged again.  And that's large part, I believe,

3    why --

4          THE COURT:  But why doesn't the Convertino case stand

5    for the risk that you need to assess at the time of waiving is

6    if there's a possibility, not a probability of indictment?

7          MR. RUSEK:  Yes.  I think that the same would apply

8    to all these cases if it's plausible, Your Honor.  Especially

9    like the Satka case.

10         If you're being deposed in connection with a

11   fraudulent loan scheme, surely it's plausible -- possible that

12   you could be charged in the future.

13         THE COURT:  Yeah.  I just see the Satka case as

14   standing for a different thing.  But we can continue if you

15   want with it.

16         MR. RUSEK:  I'll move on, Your Honor.

17         THE COURT:  Okay.

18         MR. RUSEK:  But the Court also said that it didn't

19   even have to get to the majority or minority view in adopting

20   one of those in that case, as well.

21         And, of course, the court declined to rule on whether

22   or not that deposition testimony was even admissible at trial

23   against Mr. Pappadakis.  Because of the Fifth Amendment

24   issues, they weren't raised at that time.

25         When --

1        THE COURT:  Tell me what the additional risk is,

2   Mr. Rusek, for your client in testifying.  Let's start just to

3   the very questions that he already answered at his deposition.

4   What is the risk he -- what's the new risk that he faces?

5        You're not filing a motion to quash the playing of

6   the video of that deposition.  That would be in open court for

7   all to see and all to hear, including the prosecutor on the

8   new criminal charges.

9        What's the new risk?

10       MR. RUSEK:  Absolutely, Your Honor.

11       And I think that you just laid out what would be my

12  preferred method of having this testimony presented to the

13  jury --

14       THE COURT:  I know.  Because you put it in the brief.

15  I didn't have to guess.  I read your brief.

16       MR. RUSEK:  But there's serious risk.  I believe it

17  was the Morganroth case that really established that even a

18  verbatim answer compared to prior testimony can still be

19  further incriminating to someone.

20       In Morganroth, I believe that main concern was

21  perjury charges that could come out of it.  Now, we certainly

22  have Mr. Baird who's been charged with perjury.  So that's not

23  beyond the prosecutors in these cases.

24       So that's a concern.

25       But even repeating their testimony carries that risk

1   of a further establishing the record.

2        The VNA defendants, they put out there that we could

3   ask some questions at trial that would go beyond what's

4   already been out there.  Like what were their positions, their

5   experience, the understanding of the responsibilities and

6   authorities of these gentlemen?  And I can talk to Mr. Croft

7   specifically.  But his charges are willful neglect of duty.

8        And for a prosecutor to prove those charges, one, I

9   mean you just have to prove he's a public official.  Then you

10  get into what duties are enjoined by law, what he was required

11  to do.  So -- and then what he did or did not do in regards to

12  those --

13        THE COURT:  Let's go back a step to in RE Morganroth.

14  There we learned that -- let's just set that aside for a

15  second, because I'm not sure I followed what you were

16  suggesting it stood for.

17        But you -- so you're okay with the video being

18  played?

19        MR. RUSEK:  Correct, Your Honor.

20        THE COURT:  Yeah.  And you put that in your brief.

21  So what is the risk of your client answering the very same

22  questions in open court?  Because some of these cases suggest

23  that it's ideal for a jury to see people and assess their

24  credibility and so on in person as opposed to some other

25  method.

1          So what is the additional risk showing up?

2          MR. RUSEK:  Yes, Your Honor.  I think there's a

3    couple of parts to that.

4          THE COURT:  Okay.

5          MR. RUSEK:  One, if it's just a verbatim recitation

6    of the prior answers, then it is an under oath statement.  And

7    like in Morganroth, that could be a basis for perjury charge.

8    I don't think that --

9          THE COURT:  But Morganroth held that that alone isn't

10   enough.  That every single civil deposition, the person could

11   then take the Fifth and say, "I could be charged with perjury,

12   because I need to be impeached in my deposition."

13          And obviously we don't have that rule.

14          But go ahead.

15          MR. RUSEK:  Yes, Your Honor.  I think the even

16   stronger, bigger concern is that we have to recognize that

17   we're not going to have verbatim answers as they were provided

18   for in the depositions.  There's no way to ensure that other

19   than just to have them up there reading from the depositions

20   at the end of the day.

21          So we're going to have new, different testimony at

22   trial.  And the charges against all five of these gentlemen

23   are so wide ranging that they cover essentially their entire

24   time being employed or having any relation to the City of

25   Flint in the Flint Water Crisis.

1          I don't see a way that we can efficiently and

2    effectively have them testify without subjecting them to a

3    real probable threat of further indictments based on that

4    testimony or stronger support for the charges they're

5    currently facing for the prosecutors.

6          THE COURT:  What if we did this.  What if we played

7    the deposition for the existing questions, hold a hearing

8    outside the presence of the jury for the additional questions

9    that VNA and LAN and potentially plaintiffs -- but I think

10   plaintiffs don't have any additional questions.

11         Hold a hearing outside the presence of the jury to

12   determine whether there's a possibility of further

13   incrimination with those questions knowing full well that I

14   intend to protect their Fifth Amendment rights.

15         What would be wrong with that?

16         MR. RUSEK:  Yes, Your Honor.  I think that's not a

17   very efficient --

18         THE COURT:  I don't care -- I have time.  I have

19   plenty of time.

20         MR. RUSEK:  But beyond that, there's risk associated

21   with any kind of questioning.  Maybe I didn't hear you

22   correctly --

23         THE COURT:  You -- I don't think you heard me.

24         What if we play the deposition -- so there's no

25   further risk of a different twist on an answer or an emphasis

1     or a deemphasis or something to that effect that could put

2     your clients at further risk by answering the same questions.

3            Then before doing that, we hold a hearing outside the

4     presence of the jury where VNA and LAN sets forth the areas

5     that they want to question your client.

6            You're here to represent your client and tell me why

7     that would expose them to a possibility of self-incrimination

8     knowing at that time that I will fiercely protect their

9     constitutional rights.

10           What's -- and then if some questions are deemed by

11    myself that they will not expose them to further liability or

12    incrimination, then and only then will they take the stand to

13    answer those questions.  Only those.  The rest are on the

14    deposition.

15           MR. RUSEK:  If my client did not have to take the

16    stand or provide additional, even off-the-record testimony, I

17    guess I don't see --

18           THE COURT:  Your client would only take the stand if

19    in this little procedure that I'm outlining, I determine that

20    you have not set forth on behalf of your client a general

21    argument that answering those questions would expose them to

22    further liability.

23           MR. RUSEK:  Yes, Your Honor.  I don't think I would

24    have much of an opposition.  I would want to confer, of

25    course.  But without them providing testimony or having to

```
 1    give even a preview of that testimony --
 2            THE COURT:  No.  I wouldn't ask for the testimony.
 3    Because in some ways I think Judge Cleland got a little -- you
 4    know, ended up asking Dave Ashenfelter to put forth his
 5    testimony.  But it was sealed, thank goodness.
 6            But so, no, I'm not asking for the testimony, because
 7    then we've got the -- that's what we don't want.  We don't
 8    want the testimony if it really would incriminate them.  We
 9    only want the testimony if it would not further incriminate
10    them if there's no possibility that it would further
11    incriminate them.
12            MR. RUSEK:  Thinking about it, Your Honor, I think
13    that would be a workable solution with some pitfalls
14    potentially.
15            As to Mr. Croft specifically, he had three days of
16    depositions.  When we take a look at the charges against him,
17    they are so wide ranging that there's probably not much else
18    that he could give as far as information through testimony
19    that would not tend to incriminate him in some way based on
20    the willful neglect of duty charges.
21            And when -- especially when we take a look at what
22    those charges say, verse, say, like the VNA notice of nonparty
23    at fault, there's parts of them that are almost mirror images.
24            So I'm not sure if the defendants could actually put
25    on some kind of foundation for what else we need.
```

```
 1              THE COURT:  I don't know.  I've got no clue.  I
 2    haven't -- I'm busy reading other people's depositions, ruling
 3    on objections.  I haven't -- I don't even think I have his
 4    deposition.  So I haven't read it.  I haven't watched it.
 5              MR. RUSEK:  It's about a thousand pages, Your Honor.
 6    It's a long one.
 7              THE COURT:  Many others are, as well.  I assure you
 8    of that.  So why don't we continue with the argument, and you
 9    continue to think about that as an approach.
10              Because certainly if we -- if you're making the
11    argument that if the very same questions are asked of him as
12    were asked at the -- let's say it's a single proceeding.  He
13    waived his rights against self-incrimination by testifying for
14    three days.  So those questions are fair game here.
15              But you're saying they could potentially expose him
16    to further liability in the way he answers them in his
17    demeanor, in something.  Maybe he'd say "no" when he meant
18    "yes."  Something.
19              And so the only thing that would be left is further
20    questions, areas that go outside the deposition.  If we have a
21    hearing on those areas that go outside the deposition, you
22    disagree with my ruling, you can appeal it.  You'll have --
23    you would have time to do an interlocutory appeal to sort that
24    out.
25              MR. RUSEK:  I think that could be workable, Your
```

1    Honor.  And just to clarify, especially for the record, is

2    that in some of the briefing that we received in response to

3    our motion, it seems to have some conflation between asserting

4    the Fifth for the purposes of deposition and later introducing

5    that deposition testimony at trial.

6              THE COURT:  Wait.  What was that?

7              MR. RUSEK:  There seems to be some confusion.  So the

8    VNA defendants, they cite to United States vs. Vecchiarello --

9    I'm going to butcher it.  It's V-e-c-c-h-i-a-r-e-l-l-o.

10             And also United States vs. White.  And those are

11   cases that the deponent tries to say, "I didn't waive my Fifth

12   Amendment rights at the deposition.  I'm asserting them now.

13   You can't bring that deposition testimony to the trial."

14             We're not making that argument.  The and, of course,

15   I'm not going to opine on any evidentiary ruling.  But 804

16   would allow the Court to have the video recorded depositions

17   played because the five gentlemen would be unavailable

18   witnesses.

19             That would also allow, if the defendants wanted to

20   say "introduced," legislative testimony.  Those five gentlemen

21   would also be unavailable for trial, and then they could bring

22   in that testimony.

23             We're not trying to say, "Keep the video out.

24   Deprive the jury of that information."  We -- at least on me,

25   we admit we waived for the purpose of the deposition, because

1    we didn't assert it.  So that testimony, we're not here today

2    to say, "Keep that from the jury."

3             Rather it's that continued testimony in what you

4    identified as that further threat is our real concern here.

5             THE COURT:  Yeah.

6             MR. RUSEK:  I think that you really identified that,

7    Your Honor.

8             THE COURT:  I think I identified -- I don't know that

9    there's legal support for what I identified, because I think

10   if you waive the Fifth Amendment at the first part of this

11   proceeding -- which I am giving you a little foreshadowing of

12   where I'm coming from -- I think there's every reason to

13   believe that those depositions are part of the same proceeding

14   that the trial is a part of.

15            But setting that aside, I'm not -- I think if you've

16   waived it, you've waived your rights for all purposes

17   regarding those questions.  And even if you answer the

18   questions slightly differently, I think that's what the law

19   says.

20            But I'm still seeing maybe there's just a way forward

21   for us that is a compromise way forward.

22            MR. RUSEK:  And I think there is, Your Honor.  And I

23   think that what you've presented here is one of those ways

24   that we could potentially get there while protecting the

25   constitutional rights of these five gentlemen while also

1   allowing the jury to hear the evidence in this case.

2          And not having them paraded in front of the jury to

3   say, "I assert the Fifth," over and over and over again.

4          THE COURT:  No.  We're not -- we won't need it over

5   and over and over.  We'll sort out what would possibly lead to

6   further incrimination.  Those questions -- those areas won't

7   be asked in front of the jury.

8          But certainly, there may be one or two areas where

9   they assert the Fifth.  I don't know about that but.

10          MR. RUSEK:  And, Your Honor, I do think there is

11   support from Davis B. Straub, U.S. v. Bates and U.S. v.

12   McCallister if the Court did want to go and look at a solution

13   where there's more of a blanket assertion of the Fifth

14   Amendment right.

15          And I'll reserve getting to the nitty-gritty on how

16   the criminal charges really overlap on the defendants'

17   evidence in this case.  But there's almost a complete overlap.

18          THE COURT:  I'm sure.  I don't doubt that.  So I

19   don't think that will be necessary to argue.

20          So, now, Mr. Rusek, do you have further argument, or

21   do you want to yield the floor or whatever they say?

22          MR. RUSEK:  I'm about ready to yield, Your Honor.

23   But just in some summary and closing remarks here.

24          THE COURT:  Okay.

25          MR. RUSEK:  There has been a massive change in

1    circumstances for everyone in this case.  And the risks are

2    certainly much higher now for all of the gentlemen that are

3    charged and, especially the gentlemen who are facing serious

4    felony charges and the potential for prison time if convicted.

5         They have chosen to assert their rights now that

6    there is a pending criminal indictment against all of them.

7         As attorneys for those charged with crimes, I think

8    that we also have a duty under the Sixth Amendment to advocate

9    as much as we possibly can to ensure that they have the

10   effective assistance of counsel for their upcoming trials and

11   in these ancillary proceedings.

12        I don't believe that they have waived their rights

13   outside of the depositions.  And while we don't have a case

14   that's directly on point, I think that overall, the majority

15   view supports that the deposition is not a single proceeding

16   in regards to trial in these cases.

17        And really in conclusion, Your Honor, I'd ask the

18   Court to also take into account the potential impact that the

19   Court's decision can have on the pending criminal cases and

20   their eventual trials themselves.

21        And in that regards, there's a lot of media

22   attention.  One for this trial , this hearing being broadcast.

23   I think I saw over 6,000 people at one point on the webinar

24   stream.

25             THE COURT:  I don't think so.  We have it running.

```
 1    It's usually between -- I think we've gotten 200 or something
 2    for opening.  But -- 200-something.  But under 300 for
 3    opening.
 4           MR. RUSEK:  I may have been looking at a different
 5    counter, Your Honor, just on the side.
 6           But we have intense scrutiny in these cases in
 7    public.  We're going to have intense scrutiny as the criminal
 8    cases march towards trial.
 9           And what I'd ask the Court to consider is that there
10    could be a potential impact on those criminal trials --
11           THE COURT:  Well, that's why you're here.
12           MR. RUSEK:  Well, just in a more general sense of the
13    public, Your Honor, in trying these cases in the public.  And
14    we want to avoid that as much as possible in a case with such
15    -- you know, it's a huge case, and it has wide-ranging
16    implications for all parties involved.
17           I'd ask that the Court just also consider that as we
18    start to fashion procedures that will ensure the rights of all
19    parties to these cases.
20           THE COURT:  Well, thank you.  And I -- thank you.
21           MR. RUSEK:  Thank you, Your Honor.
22           THE COURT:  Sure.  So -- Mr. Mateo?  Okay.
23           MR. MATEO:  Good afternoon, Your Honor.  Juan Mateo
24    appearing on behalf of Mr. Earley assisted here by -- with
25    Todd Perkins.
```

1          Your Honor, in your original timeline, I think one of
2     the things that I want to point out is -- and Mr. Rusek just
3     addressed it.
4          As a representative of Darnell Earley, along with my
5     colleagues Todd Perkins, Gerald Evelyn, and Santino Mateo, we
6     have a duty to Mr. Earley.
7          THE COURT:  Of course.
8          MR. MATEO:  And that duty we need to be effective,
9     provide effective assistance under the Sixth Amendment of the
10    United States Constitution.
11         And one thing that I think I need to stress is when
12    Mr. Earley was deposed on July 30 and July 31, he went through
13    two days of deposition.  He was asked questions by 15 lawyers.
14    They went over 64 exhibits, and he did not assert the Fifth.
15         THE COURT:  Correct.
16         MR. MATEO:  What we did not know at the time -- and
17    this is extremely important for you to understand on the whole
18    issue of whether there's a waiver here and on the issue of if
19    this is a single proceeding problem -- what we didn't know,
20    even though we had been in contact with the prosecution, Fadwa
21    Hammoud's office, we had met with her.  We dealt with Kym
22    Worthy.
23         We exchanged correspondence.  We had an understanding
24    that if we were going to proceed, they would let us know.
25    They never did.  We did not know Mr. Earley had been indicted

1   by a grand juror sitting in Genesee County on March of 2020,

2   months before that.

3          Had we known he had been indicted, had we known he

4   was the subject of a --

5          THE COURT:  But you knew at the time of the

6   possibility of his indictment.

7          MR. MATEO:  But think about what the defense team is

8   doing.  We thought the statute of limitations had run in March

9   of 2020.

10          THE COURT:  But, you know, in RE Convertino, the

11   statute had run with respect to Dave Ashenfelter's potential

12   charges then, as well.  And the court said there's still a

13   possibility of criminal repercussions in that case, even

14   though the statute had run.

15          MR. MATEO:  I understand.

16          THE COURT:  So how is this any different?

17          MR. MATEO:  It is different.  Because to me the only

18   -- and this is an extremely unique factual situation.  I

19   haven't seen any case out there where you have multiple

20   investigations, multiple sets of charges, and then you have

21   this deposition proceeding that occurs in between both

22   investigations.

23          THE COURT:  It's a whole lot like the Moser v.

24   Heffington, Maryland Supreme Court case from 2019, a recent

25   case, too, where there was a deposition.  It was in a civil

```
 1    case.
 2            Later the question was, "Would the testimony be --
 3    had the individual waived their rights by being deposed?"  And
 4    in the intervening time, there were criminal charges filed
 5    against that civil defendant.  It's very similar.
 6            MR. MATEO:  I'm not aware of that case, Your Honor.
 7    I was going to say that the case that I think this is more
 8    consistent with is the --
 9            THE COURT:  Excuse me.  Who are you?  Could you tell
10    me your name?  You.
11            MR. LEVINE:  I'm Randall Levine.  I'm sorry, Judge.
12    I need my glasses, and they keep getting fogged up.
13            THE COURT:  Okay.  The reason I'm asking you is
14    because you keep taking your mask down.  And for better or for
15    worse, we have a mask rule.  And I'll ask that you leave the
16    courtroom if you can't leave it on.
17            Some of us have -- can't do it.  And I don't have
18    mine right on now.  I'm surrounded by Plexiglass.  I'm 20
19    feet, 20 yards -- I'm something from you.
20            And so if you can't keep it on, you can watch on the
21    Zoom.
22            MR. LEVINE:  I'll be more vigilant, Judge.
23            THE COURT:  Okay.  And also, I have my personal stash
24    here that I've purchased.  If yours doesn't stay up, you can
25    just have one.
```

```
 1              Do you want one of mine?

 2              MR. LEVINE:  Oh, no.  I can handle it, Judge.  Thank

 3      you.

 4              THE COURT:  Okay.  Okay.  Mr. Mateo.

 5              MR. MATEO:  Your Honor, I think this is more

 6      consistent with the scenario that is -- that Judge Lawson

 7      wrote about in the Sanford case.

 8              He relied on -- one of the Supreme Court cases he

 9      relied on was the Mitchell case.  In Mitchell, you have a

10      defendant who pleads guilty to the case.  And then at the

11      sentencing hearing, he's being asked questions that him and

12      his lawyer determine would further incriminate him, and he

13      asserts the Fifth Amendment.

14              And in that case, the Supreme Court said he was

15      entitled to assert the Fifth Amendment.  I don't think the

16      analysis was it wasn't the same proceeding.  I mean, I think

17      the analysis --

18              THE COURT:  No.  Because it was one deposition.

19              MR. MATEO:  Right.  But the analysis in the Mitchell

20      case was that, you know, things change.  And, again, when you

21      come down to the issue, is there anything that the witness may

22      be asked that may tend to incriminate him or her.  Then it is

23      logical for the defense to want to assert the Fifth.

24              And it's logical for the witness to assert the Fifth

25      Amendment.  And that's something you should sustain.
```

```
 1          So I do believe two things; that Mr. Earley has not
 2   waived his Fifth Amendment right to remain silent in this
 3   proceeding, because I think we now are in a different year.
 4   This is a bellwether trial.
 5          THE COURT:  I've just got Mitchell up here.  It says,
 6   quote, "It is well established that a witness in a single
 7   proceeding may not testify voluntarily about a subject and
 8   then invoke the privilege against self-incrimination when
 9   questioned about the details."
10          And what I thought Judge Lawson did with Davontae
11   Sanford it said these are -- he lists out the questions that
12   were asked.  And then he analyzes it as these later questions
13   where Sanford asserted the Fifth Amendment were different in
14   nature from the earlier questions.  So it's not a Mitchell
15   problem.  Tell me where I'm wrong.
16          MR. MATEO:  Well, I think our situation, as far as
17   the change in circumstances where we're now in a civil trial
18   -- and I understand this is a bellwether trial where the issue
19   is whether the engineering defendants before you violated
20   their standard of care, right?
21          THE COURT:  Right.
22          MR. MATEO:  The whole Flint Water Crisis litigation
23   involves, I believe, thousands of cases.  And I think the
24   deposition that Mr. Earley was subjected to was to address all
25   of the cases that were out there.
```

 1          THE COURT:  Correct.

 2          MR. MATEO:  My view of how we analyze a single

 3   proceeding is this is not the same proceeding.  We're in a

 4   separate trial.  This is not something that anyone --

 5          THE COURT:  But you just said yourself that he was

 6   being deposed in all of the cases including this one.

 7          MR. MATEO:  But the point is, does that mean that he

 8   waived his right to remain silent in the thousand cases?  I

 9   just don't understand the waiver issue that way.

10          I -- how could Mr. Earley waive his right against

11   self-incrimination when he didn't even know he was under

12   indictment at the time?  How can he waive it now --

13          THE COURT:  Well, that's the -- that's the issue -- I

14   wrote an opinion in 2019, November 7 of 2019, telling him he's

15   got a plausible fear of prosecution.  "Hear me now, you have a

16   plausible fear of prosecution."

17          But why did I write that opinion?  Because his

18   lawyers came forward and told me he had a plausible fear of

19   prosecution and that he wanted to assert -- they wanted me to

20   stay discovery so that they wouldn't be exposed to this choice

21   of whether to testify.

22          MR. MATEO:  And your ruling was in November of 2019.

23   In our mind collectively as defense counsel, we thought --

24   and, again, I know you're going to refer to the Convertino

25   case, but we thought the statute of limitations was over as of

1    March of 2020.

2         So even though there's this potential plausible risk,

3    when Mr. Earley sat down to testify, I had no idea he was

4    still under investigation, let alone a grand jury proceeding

5    where he'd been indicted.

6         THE COURT:  But that might be a matter that you have

7    to take up with your client not -- because I put it right in

8    this opinion that --

9         MR. MATEO:  You did, Your Honor.  But I think --

10   aren't I looking at waiver way too broadly?

11        THE COURT:  Okay.

12        MR. MATEO:  You can do it any way you want, Judge.

13        But I think the challenge -- my notes say the

14   challenge you have is you need to balance these interests, the

15   constitutional interest of Mr. Earley, our obligation under

16   the Sixth Amendment to Mr. Earley, versus managing this trial.

17        What you have proposed --

18        THE COURT:  And I'm not suggest -- it's an idea that

19   I'm throwing out.  I don't know -- the law certainly doesn't

20   require it, because a waiver is a waiver.  So I don't think

21   there's any cases that say if your demeanor changes, that

22   could be further incriminating.

23        I think if anything the cases say you can be

24   questioned in those same areas.

25        But, anyway, let's just say that this could

1    potentially be a way to do this that would --

2          MR. MATEO:  Right.  Right.  And I think from a trial

3    management perspective, it kind of makes some sense.  I do

4    think you do have the discretion on how you want to go

5    forward.

6          Our problem is -- and I have no issue with his

7    testimony being played, the videotape being played, those

8    exhibits being introduced in this trial.  I have no issue with

9    that.

10         If we take the special proceeding and we go off the

11   record outside the presence of the jury and we get to the

12   point where you say, "According to VNA, they want to ask these

13   questions."

14         Now it's -- VNA issued the subpoena.  One of the

15   concerns I have here is what's really going on.  Mr. Earley

16   had already left office by the time they came on board.  So he

17   has no personal knowledge, no direct contact with VNA, no

18   personal knowledge as to what happened after January 12, 2015,

19   when he left that position.

20         So and my fear is that if they -- we go into this

21   sidebar procedure, that they're going to want to ask questions

22   that go beyond the deposition that could implicate the pending

23   case.

24         But I think what you're saying is you would hear us

25   out and then you could make, you know, we would know what the

1    questions are.  We could confer with Mr. Earley.  And then we,

2    as defense counsel, could either, you know, instruct them to

3    testify, instruct them not to testify.

4           But I think that's a major factor for us to deal with

5    as lawyers.  We have the obligation to Mr. Earley.

6           THE COURT:  Slow down a little bit.

7           MR. MATEO:  Sorry?

8           THE COURT:  Slow down a little bit.

9           MR. MATEO:  Sorry.

10          But I think the procedure you're suggesting makes

11   common sense under this very difficult set of circumstances

12   that we have.

13          THE COURT:  Okay.  Thank you.  And could you

14   articulate for me what further risk your client would be

15   exposed to by answering the very same questions that were put

16   forth in the deposition?

17          MR. MATEO:  If he testifies about anything involving

18   his role regarding the Flint Water Crisis in open court, he is

19   charged with three --

20          THE COURT:  Oh, he will be testifying via his

21   deposition --

22          MR. MATEO:  Right.

23          THE COURT:  -- so we know that.

24          MR. MATEO:  And I'm talking about questions beyond

25   the deposition --

1         THE COURT:  And I'm talking about just about the
2    deposition.  Limit yourself now to just the deposition.  What
3    if we just read the deposition but with the real person here.
4         MR. MATEO:  Okay.  If the procedure is you read the
5    questions read, he reads his response?  I don't know how that
6    adds to the management of this trial, because that seems like
7    a robotic process.
8         Our fear regarding anything that he utters in open
9    court in this trial, you know, like the rights say, "Anything
10   you say can and will be used against you."
11        And so what could that be?  Could he say something
12   that I have no idea he's going to say?  And all of a sudden
13   the solicitor general's team thinks he has said something
14   that's incriminating?  I can't predict how that would unfold.
15        But I can't predict that if there's anything that the
16   current investigating team thinks he said that may have tend
17   to incriminate him, that they will certainly try to use it.
18        So that does expose him to a problem, an independent
19   criminal case.  And now -- and I think that's why your
20   procedure makes some sense or makes some sense as I understand
21   it, that we can control this as much as possible so that his
22   rights in the pending criminal case are not impacted.
23        THE COURT:  Okay.  Thank you, Mr. Mateo.
24        Who is going to argue next?
25        MR. RUSEK:  I believe that's Mr. Swor, Your Honor.

```
 1      I'll vacate the table.
 2              MR. SWOR:  This is the first time I've been to the
 3      right of anybody.
 4              THE COURT:  Yeah.
 5              MR. SWOR:  Your Honor, if I may?
 6              THE COURT:  You represent Mr. Ambrose?
 7              MR. SWOR:  I represent Gerald Ambrose.
 8              THE COURT:  And don't feel obligated to -- I mean,
 9      I've got your brief.  If you have something to say that hasn't
10      been said, feel free to focus on that.
11              MR. SWOR:  Okay.  You asked us, "us" being the
12      earlier iteration of us as witnesses, "What new risk does
13      Mr. Ambrose or the other defendants raise by testifying in
14      this case?"
15              Like Mr. Earley, Mr. Ambrose did not know that he had
16      already been indicted when he sat for his deposition.
17              THE COURT:  And the focus for your argument that
18      would be helpful to me is your client for whatever reasons --
19      and I will not ask -- it waived his rights --
20              MR. SWOR:  I.
21              THE COURT:  Let me finish.
22              -- waived his rights at the deposition.  And so I
23      want to know why that's not the same proceeding as the trial
24      in the same civil case where he was then a defendant and now
25      no longer a defendant, because he has settled his claims.
```

1          So if -- waiver is waiver.  So -- and you -- a

2     decision was made.  There was a possibility, even a

3     probability of charges being filed, although Mr. Mateo said

4     for some clients, perhaps there was an incorrect assumption

5     that the statute had run.

6          MR. SWOR:  Well, I don't think it's an incorrect

7     assumption the statute ran.  But that's for Judge Kelly in the

8     Genesee County Circuit Court.

9          But this Court's finding that the defendants -- yeah,

10    I guess they were defendants then -- had a founded fear of

11    prosecution back in November of 2019 was raised as a shield at

12    that time.

13         What the analysis that the Court is applying right

14    now flips that and turns it into a sword to defeat the

15    presumption against a waiver.  Because there is a presumption

16    against a waiver no matter what.

17         And the Court is required to indulge that waiver --

18    or to indulge that interpretation as Klein v. Harris, which is

19    -- underlies all the cases VNA cited.  The Court indulges that

20    if the Court infers a waiver.

21         And I think it is an inference of a waiver, Judge,

22    and I think --

23         THE COURT:  No, there was a waiver at the

24    depositions.  There was absolutely a waiver.  Not one question

25    was the Fifth Amendment right against self-incrimination

1    invoked.

2             MR. SWOR:  I think, Your Honor, you're reading the

3    waiver more broadly than the privilege, not vice versa.  And I

4    think you have to read the privilege more broadly than the

5    waiver.

6             Because there has to be a knowing and intentional

7    waiver, because that's the way the rule works.

8             The Court put them on notice and their counsel --

9             THE COURT:  They put me on notice.  Let me be clear.

10   With -- by filing a motion saying, "Fifth Amendment, Fifth

11   Amendment.  Risk of criminal prosecution.  We're filing a

12   brief asking for relief and protection."

13            MR. SWOR:  Yes.

14            THE COURT:  Okay.

15            MR. SWOR:  All right.  Yeah.

16            And the assessment of that risk, okay, lay in the

17   previous charges.

18            THE COURT:  I don't know what it lay in.  They filed

19   the motion, and they pointed out to me that the solicitor

20   general had announced that she would be undertaking a detailed

21   and lengthy investigation and that additional charges and

22   similar charges could be filed.

23            MR. SWOR:  Could be.  And if they testify -- see,

24   here's the thing.  Mr. Ambrose is charged right now in an

25   indictment in a count that arose as a result of the

1   depositions in this trial.

2          THE COURT:  Oh, you're saying that the one-man secret

3   grand jury looked at the deposition transcript and then

4   indicted him?

5          MR. SWOR:  He didn't look at Mr. Ambrose's

6   deposition.  VNA's principal who was -- I don't know how the

7   -- I don't know how Judge Newblatt -- and I will not use the

8   word, "one judge grand jury," because it's not in the statute.

9   It's a judicial inquiry.  And I prickle -- it's one of those

10  few things I'm fastidious about.

11         These were -- these depositions were marked highly

12  confidential.  The court put limits on who could attend the

13  depositions.  And for whatever reason, Mr. Ambrose's civil

14  attorney did not attend the deposition of Mr. Nicholas.  Okay.

15  That was after this Court's ruling.  It was in December of

16  December 2019 --

17         THE COURT:  Somebody's got a coat -- somebody's

18  trying to get a hold of somebody in that coat.

19         UNIDENTIFIED PERSON:  I'm not going to sell out the

20  person who --

21         THE COURT:  I don't care.  I just -- you know, maybe

22  there's an urgent family need to get a hold of somebody.

23  That's Mr. Perkins?

24         MR. PERKINS:  May I, Your Honor?

25         THE COURT:  Please.  I don't want you to miss the

 1   phone calls.

 2            Okay.  Mr. Swor, focus on anything that has not been

 3   said.  Your Honor, the fact is Mr. Ambrose was criminally

 4   charged after his deposition.  But the deposition -- he's

 5   charged in this -- in the -- now, see, I was all clever.

 6            I had a timeline drawn out, and I was going to

 7   mesmerize you with my --

 8            THE COURT:  Yeah, I threw you off.

 9            MR. SWOR:  Which is not hard to do.

10            THE COURT:  Why don't -- I've got an idea.

11            Do you want to give it some thought and I'll --

12   you're Mr. Quigg?

13            MR. QUIGG:  Charlie Quigg, Your Honor.  Yes.

14            THE COURT:  We'll go to him for now.

15            MR. SWOR:  Yeah.

16            THE COURT:  Would that work?

17            MR. SWOR:  Let me -- go.

18            THE COURT:  Okay.  Great.  Because we've covered a

19   lot of territory already.

20            MR. QUIGG:  Thank you, Your Honor.  I'm Charlie

21   Quigg.  I'm here on behalf of Governor Snyder.

22            THE COURT:  Thank you.

23            MR. QUIGG:  Let me -- let me start at the end and

24   then just hit a couple of points on how we get there.

25            Your Honor outlined an idea for how we might proceed.

1    Play the deposition video for questions at the deposition.

2    Have a hearing outside the presence of the jury where VNA and

3    LAN set out the additional questions they'd like to ask the

4    witnesses, so we can adjudicate the Fifth Amendment issues at

5    that time.

6              And obviously subject to discussion with our client,

7    I think that process is workable.  I'll be up front with

8    you --

9              THE COURT:  I'm not promising that when I hear from

10   them that that's what we'll do.  Because I think there are

11   cases out there that talk about -- I mean, they're within the

12   jurisdiction of the Court.  They can be called live.  If

13   they've waived, they've waived.

14             But still, I think it may be a way to solve the

15   problem.  So we'll hear from VNA and LAN about that.

16             MR. QUIGG:  Right.  And so that's how we get there.

17   And just on your idea, I will just caveat, obviously, we don't

18   know what VNA and LAN will put before you at this point.  But

19   I will say based on their notice of nonparties at fault, what

20   they identified in their response to our motion.

21             And the really breathtakingly broad charges that

22   Governor Snyder is now facing, it's hard for me to imagine

23   that any additional questions that they conceivably might want

24   to ask wouldn't be incriminating.  But --

25             THE COURT:  I hear you.  We'd have to figure out what

1    it is.

2              MR. QUIGG:  Right.  Understood.

3              So then let's talk about how we get there.  Because

4    Your Honor has expressed some hesitation with the concept that

5    there hasn't been a waiver here.

6              THE COURT:  I'm having a hard time with that, yes.

7              MR. QUIGG:  I have heard that.  And I understand.

8    And I think there's a natural inclination among lawyers, at

9    least criminal defense lawyers, they're so sensitive to Fifth

10   Amendment waiver issues that they almost automatically treat

11   them -- treat a waiver of the Fifth Amendment as irrevocable.

12             But if you look at the case law, that's really not

13   the case.  Thing number one is the Sixth Circuit and the

14   Supreme Court have both recognized that courts have to indulge

15   every reasonable presumption against a waiver.  So that's kind

16   of the background --

17             THE COURT:  How could I find that there was not a

18   waiver -- I mean, Mr. Swor suggested that's not -- answering

19   two and sometimes three days of questions and never once

20   saying, "I plead the Fifth," how is that possibly not a waiver

21   knowing full well that there's an investigation underway that

22   could be brought.

23             And specifically that the governor's office wouldn't

24   have control over document production and so on.

25             MR. QUIGG:  Well, certainly, Your Honor, it was a

1    waiver as to the deposition transcript as Mr. Rusek noted.  No

2    one is saying that the deposition transcript or deposition

3    video can't be played before the jury.

4            And, you know, it's kind of interesting.  There

5    really are not a ton of directly on-point cases.  State v.

6    Roberts on the one hand from the Supreme Court of New

7    Hampshire and then Moser versus Heffington from the Maryland

8    Supreme Court, I think --

9            THE COURT:  Yes.

10           MR. QUIGG:  -- is the name of the highest court in

11   Maryland.

12           THE COURT:  Tell me the State v. Roberts Connecticut

13   case, I read that.  It certainly says a deposition --

14   testimony at a deposition and later trial in the same civil

15   case were different proceedings.  But it said because the

16   trial testimony could further implicate the witness.

17           And from my perspective, it seemed that that court

18   was saying the trial testimony could go beyond the questions

19   at the deposition and further implicate.  The word "further"

20   seems important.

21           Because certainly if your -- from my perspective,

22   there certainly was a waiver at the earlier deposition, and

23   all we have to figure out is are we in the same proceeding or

24   not.

25           MR. QUIGG:  Sure.  So -- well, let me answer that a

 1   couple of different ways.

 2          So way number one is I think to figure out the answer

 3   to this problem on which we really don't have a ton of case

 4   law, you have to look at the policies behind the waiver rule.

 5   And the policy, as the Supreme Court in Mitchell told us, is

 6   you can't let a witness control the narrative.

 7          If they testify as to a favorable fact on direct,

 8   they should be able to be cross-examined about --

 9          THE COURT:  -- that fact.

10          MR. QUIGG:  -- the details of that fact on cross.

11          And that policy really has no force here.  Because

12   Governor Snyder, for instance, was deposed for two days.

13   There's 831 pages of deposition transcript.  And the details

14   have already been fully ventilated at his deposition.  No one

15   was prevented from asking any questions.  VNA's counsel --

16          THE COURT:  VNA says they only got an hour and a half

17   or something.

18          MR. QUIGG:  VNA -- VNA ended their questioning before

19   they --

20          THE COURT:  Before the time.

21          MR. QUIGG:  You may recall, Your Honor, there was

22   some dispute among the lawyers --

23          THE COURT:  I do recall.

24          MR. QUIGG:  -- we weren't there -- early on in the

25   deposition that turned out to be moot, because the deposition

 1   ended early.

 2          THE COURT:  Well, I'll certainly ask, "If you have

 3   more questions, why didn't you ask them?"

 4          MR. QUIGG:  Yeah.  And VNA's counsel, I'll just read

 5   from the conclusion of their examination of Governor Snyder.

 6          The lawyer representing VNA was in Pinehurst,

 7   North Carolina, and said to Governor Snyder, quote, "So,

 8   Governor, I'm looking at all of these people playing golf out

 9   of my window, and I'm getting kind of antsy.  So I'm going to

10   suspend my examination of you, reserving whatever time I have

11   left, and pass you on to the next lawyer in line."

12          So the rationale behind the waiver rule, the

13   animating principal for the waiver rule, setting aside

14   separate or successive proceedings, has no force here.

15          So then you couple that with the policy behind the

16   single proceeding rule.  And as the Sixth Circuit recognized

17   in Morganroth, one reason that courts say a waiver applies

18   only within the confines of a single proceeding is that

19   conditions might change between the two proceedings.

20          And as to Governor Snyder, the case presents a

21   textbook illustration for why that might be.  As of -- did you

22   have a question, Your Honor?

23          THE COURT:  No, no, no.  I was just going to go open

24   the case.

25          MR. QUIGG:  Sure.

1          At the time of his deposition in June of 2020, the

2    Flint Water Crisis had been under investigation for more than

3    three years.  He, Governor Snyder, hadn't been charged with a

4    crime.

5          And, in fact, the crimes with which he ultimately was

6    charged, if you were to look at prevailing Michigan law as of

7    June of 2020, you would have said his fear of prosecution was

8    imaginary.  Because they -- the duties he's charged with

9    neglecting are discretionary duties, not the type of duties

10   that are within the scope of the Michigan criminal statute.

11         But here we are a couple of years later.  He now is

12   under indictment for those charges.

13         And on top of that when we're talking about how we

14   work through this practical problem going forward, the

15   indictment is almost completely bare of details.  There are

16   really no facts in the indictment from which to charge what

17   might be incriminating or not.

18         THE COURT:  I can't take any position.  I know

19   nothing about the criminal investigation or what might have

20   lead to that.  I have no contact with it, no knowledge,

21   nothing at all.

22         All I know is that the risks in summer 2020 when the

23   deposition was taken were known risks.  And in light of the

24   broad public relations effort to say, "We are still

25   considering and investigating criminal charges and expanding

1    those charges."

2              So from my perspective, your client had a serious

3    risk, a plausible risk of prosecution at that time.

4              MR. QUIGG:  So let me address that briefly, Your

5    Honor.

6              Certainly was there a possibility of some charge, a

7    narrower charge?  Yes.  But I think it's difficult to judge an

8    invocation of the privilege unless you have an understanding

9    of the scope of the potential charge.

10             THE COURT:  But I think you're creating a rule that

11   would allow people to waive their Fifth Amendment rights.  And

12   then if subsequent charges don't match exactly what their

13   subjective belief was and what they would look like, then they

14   can invoke it at the next stage of the proceeding.

15             MR. QUIGG:  I agree with you, Your Honor.  A

16   subjective belief -- a rule based on subjective belief would

17   be problematic.

18             But I would just point the Court to the Michigan

19   Court of Appeals published decision in People v. Waterstone

20   cited in our brief which objectively would lead a court, as of

21   2020, to conclude that a public official such as the governor,

22   especially the governor, couldn't be charged with willfully

23   neglecting the duties he ultimately was charged with

24   neglecting.

25             So let me -- unless you have a question, Your Honor.

1          THE COURT:  No, I don't.

2          MR. QUIGG:  So let me address the second thing that

3     was embedded in your question.  I think, which is how is it

4     possible that asking him the exact same questions in 2022

5     could further incriminate him?

6          THE COURT:  And I don't even truly know if that's the

7     right question.  Because if he waived his Fifth Amendment

8     rights in the summer of 2020, it's fair game.  He's waived it,

9     and it's fair game to ask him questions, the same questions or

10    very similarly phrased questions on the same areas.

11         But go ahead.  But let's assume that I still am

12    interested in that.

13         MR. QUIGG:  Sure.

14         So a couple of responses.  So thing number one is as

15    the Second Circuit recognized in Miranti and the Sixth Circuit

16    acknowledged in Morganroth following Miranti, reiterating

17    testimony, even if it's the exact same testimony, adds to the

18    credibility of the statement and makes it harder for someone

19    to discount that statement later.

20         So, you know, here hypothetically imagine a future

21    criminal trial, Governor Snyder gives exactly the same

22    testimony in 2022 that he gave in 2020, Your Honor can imagine

23    how that potentially could give the prosecution more ammo.

24         Not only did you testify to this fact in 2020, but

25    you independently testified to it again in 2022.

```
 1          THE COURT:  I have a hard time following how that
 2    would expose -- I mean, I hear your argument.  I understand
 3    your argument.  But I think those are the calculations you
 4    have to take into consideration when you waive your rights in
 5    the first instance.
 6          But go ahead.
 7          MR. QUIGG:  Well, and so then not only that, Your
 8    Honor, but questions don't waive the privilege; answers do.
 9          And there is no way practically for Governor Snyder
10    or me or you on the fly to determine if he's going to give the
11    same answer that he gave --
12          THE COURT:  Well, and he doesn't have to.  In terms
13    of the Mitchell case and others, if he's actually waived his
14    Fifth Amendment rights in the first -- in the deposition, it's
15    part of the same proceeding.  The law says in that -- in the
16    instance of waiver, he can fairly be asked those questions and
17    similar questions on the same topics at a subsequent hearing
18    in the same proceeding.
19          MR. QUIGG:  Well, certainly within the same
20    proceeding.  I guess --
21          THE COURT:  And that's what we're here to figure out.
22    Is this civil deposition the same proceeding.
23          MR. QUIGG:  And just one more point, Your Honor.  The
24    important caveat, at least in this circuit, and I think there
25    is a circuit split on this issue -- is topics -- answering a
```

1    single question on a particular topic in the Sixth Circuit

2    does not open the door to all questions on that topic.

3           Go back to LaRiche, which has been reiterated more

4    recently, I think, including in Convertino.  Even after one

5    answers a question on --

6           THE COURT:  In Convertino, there were no answers on

7    any record.  There was only a confidential affidavit provided

8    to the Court or sealed affidavit.

9           MR. QUIGG:  Right.  But I -- yes, Your Honor.  But I

10   -- and I could be misremembering.  But I believe that

11   Convertino recognized the principle that the Sixth Circuit

12   initially adopted in LaRiche -- or I can't say initially --

13   but adopted in LaRiche that even after answering a question on

14   a topic, the Court still has to determine whether further

15   questions and further answers would be --

16          THE COURT:  Would open the door to incrimination,

17   yes.

18          MR. QUIGG:  Right.  And that -- that also, I think,

19   gets to why asking the same questions today might lead to

20   further incrimination.

21          We don't know -- I mean, it's just impossible to say

22   whether answers will be the same in 2022 as they were in 2020.

23   People's memories change.  They remember different things.

24          And it's conceivable that an answer to the very same

25   question might be different and then we'll have VNA arguing,

1    "Well, they opened the door to" --

2              THE COURT:  Well, the perjury thing we don't have to

3    worry about, because we understand that that's not a basis for

4    refusing to testify.

5              MR. QUIGG:  Yes.  I'm making a slightly different

6    point, Your Honor --

7              THE COURT:  Okay.

8              MR. QUIGG:  -- which is let's say question in 2020,

9    answer is X.  And that opens the door to a certain scope of

10   questioning.

11             THE COURT:  Show me a case that says that let's

12   assume it's a single proceeding that waiving the rights

13   initially that they can be exercised with respect to the same

14   or similar questions on the same topics?

15             MR. QUIGG:  Well, I don't think there -- I don't

16   think there is such a case, Your Honor, because typically in a

17   -- typically you're talking about something that is clearly a

18   single proceeding.  So the same question won't be asked

19   multiple times.

20             THE COURT:  I know.  But now you're just disagreeing

21   on the single proceeding as opposed to on waiver.  Because the

22   Mitchell case tells us if you waive in an area, then that's

23   your waiver.  And the details in a particular area still have

24   to be answered in the subsequent testimony.

25             So I think you're collapsing back into these are two

1    different proceedings.

2            MR. QUIGG:  Perhaps.  I was --

3            THE COURT:  And I think I might be guilty of

4    contributing to that by asking the question of "How would it

5    harm you?"

6            Because I'm just curious in that answer, how would it

7    harm you to answer the same questions in light of the fact

8    that no one's trying to stop us from playing the depositions.

9            MR. QUIGG:  Well, Your Honor, I think the calculus is

10   different.  If we were talking about a trial and a witness

11   were called and he was asked a question on direct and for

12   whatever reason was asked the same question on cross, that's,

13   I would submit, materially different from the scenario that

14   we're looking at where we're dealing with testimony separated

15   by who knows, likely at least two years in our case.

16           I don't know when --

17           THE COURT:  So you're just saying memory issues and

18   so on could impact the answer?

19           MR. QUIGG:  Well, that.  And I really do think there

20   is something to the Second Circuit's recognition in Miranti

21   that reiteration itself, even if it's verbatim the same, adds

22   credibility to a statement and makes it more difficult to

23   discount later.

24           THE COURT:  Okay.  Thank you.  Is there anything

25   further right now?

1            MR. QUIGG:  Nothing further right now, Your Honor.

2            THE COURT:  Okay.  Thank you, very much.  And is

3    there any further argument?  There's Mr. Baird.  That's

4    Mr. Levine.

5            MR. QUIGG:  I believe so, Your Honor.

6            THE COURT:  Yeah.

7            Thank you for wearing the mask, Mr. Levine.

8            MR. LEVINE:  I'm sorry, Judge.  You're welcome.  And

9    I'm sorry for doing it and letting it fall.

10           THE COURT:  That's okay.

11           MR. LEVINE:  May I remove it?

12           THE COURT:  Yes.

13           MR. LEVINE:  Judge, good afternoon.  I'm Randall

14   Levine from Kalamazoo, and Rich Baird's lawyer.

15           THE COURT:  Good.  Thank you.

16           MR. LEVINE:  I've never been before you before.

17           THE COURT:  I don't recall that, so I would agree.

18           MR. LEVINE:  But I've been at this 40 years.  And I

19   can tell you that I've never seen a situation factually that's

20   like this.  And I don't know that the cases that have been

21   spoken about by the counsel who have sat here before are

22   necessarily that helpful.

23           The Court, when it initially spoke to the group

24   today, said, "I'm going to lay out some facts, and tell me if

25   there's anything about those facts that doesn't -- aren't as

1    inaccurate."

2              You're shaking your head, so I presume you know what

3    I'm talking about.

4              THE COURT:  Yes.  I remember that.

5              MR. LEVINE:  Okay.  Well, I'm new to this party.  I

6    don't really know very much about this case at all.  When the

7    Court said that I received a notice of nonparty at fault that

8    includes Mr. Baird, I've never received a notice of nonparty

9    at fault that --

10             THE COURT:  No.  You're not on the docket.  Even as

11   of today, you haven't filed an appearance.  Somebody at your

12   firm did.

13             So go ahead.

14             But no, I didn't mean to imply that you were on the

15   docket receiving the orders.  But they're certainly on Westlaw

16   at any time -- or at least the November 7 order in 2019 was on

17   Westlaw.  The nonparty at fault would be on the ECF docket --

18   public docket.

19             But I don't really think the nonparty at fault

20   matters too much.  I just indicate that, because there was all

21   this talk of so-called gamesmanship in trying to bring these

22   witnesses up here to shift blame away from VNA and LAN.

23             But we're -- all the rest of the parties were

24   notified in 2018 and '19 that they are going to take advantage

25   of Michigan's fair share liability scheme.  And so I only

 1  mentioned that.

 2          MR. LEVINE:  Okay.  Well, I was just --

 3          THE COURT:  It's really not relevant.

 4          MR. LEVINE:  That's fine.  And maybe I should cut to

 5  the chase, because I know we've been here a long time.  So

 6  I'll do as Mr. --  the lawyer who proceeded me said.  I'll

 7  start from the end.

 8          THE COURT:  Okay.

 9          MR. LEVINE:  I don't have a problem on behalf of

10  Mr. Baird with the proposal that's been discussed where the

11  Court plays the deposition testimony and then we deal outside

12  the presence of the jury with potentially other incriminating

13  evidence and whether or not there's an entitlement for the

14  invocation of the privilege.  Okay?

15          THE COURT:  Okay.

16          MR. LEVINE:  So just to get there.

17          I don't dispute that sitting for the deposition

18  constituted a waiver.  The problem that I have, though, is

19  what -- if I had known back then at the deposition what I know

20  now, I certainly would have invoked the privilege.

21          THE COURT:  Well, that's how -- that's life.

22          MR. LEVINE:  I understand, Judge.  But, Judge --

23          THE COURT:  I mean, I can't -- that can't be the

24  standard that if I knew what I knew now, I would not have

25  waived my rights.

```
 1            Because people testify before the grand jury all the
 2    time and later get indicted.  Well, those are criminal cases.
 3    But that just simply be the standard.
 4            MR. LEVINE:  And I understand that.  And I'm not
 5    suggesting.  I'm trying to make a record, and I'll do this,
 6    you know, as expeditiously as I can.
 7            My situation is somewhat different than the other
 8    defendants.  When I say, "my situation," I mean Mr. Baird's
 9    situation --
10            THE COURT:  You know, I think your situation is in
11    some ways less sympathetic than the other defendants for the
12    following reasons.  Which is at the time that the other
13    witnesses, then defendants, sat for their deposition, they had
14    to make a difficult decision.
15            Do they risk an adverse inference in the civil
16    litigation that they're a part of, or do they testify and
17    avoid the adverse inference and waive their Fifth Amendment
18    rights?
19            Your client was not a defendant.  He faced no risk in
20    our litigation when he answered, I assume, a subpoena and a
21    notice of deposition and was sworn in and answered all the
22    questions.
23            MR. LEVINE:  From a civil perspective, I absolutely
24    agree.  He's better off.
25            But, Judge, he's charged with extortion.  He's
```

1    charged with a 20-year felony.  I'm obligated to afford him

2    his Sixth Amendment right to effective representation and

3    zealously advocating his right to claim of privilege at this

4    point.

5             And my position is, and so the record is clear, Your

6    Honor, and I'm not trying to argue with you, but I want my

7    position to be crystal clear on this.  I don't believe even

8    though he waived his privilege and sat for a deposition,

9    that's a waiver in perpetuity.

10            I don't believe because I believe the Fifth

11   Amendment --

12            THE COURT:  But when would the waiver stop?

13            MR. LEVINE:  It stops at the end of the deposition.

14   And this is why, Judge --

15            THE COURT:  But so you're suggesting that all of

16   these cases that talk about, for instance, in a civil case if

17   you testify in your deposition, that you can still get up here

18   and say, "Oh, I'm not going to testify here."

19            Whether or not there are criminal charges in the

20   intervening months, you're -- that's the rule.

21            MR. LEVINE:  In the Sixth Circuit, I don't think

22   that's been established, and I think that the fact that he

23   waived at the deposition is not a waiver in perpetuity.

24            And I think that no one, Your Honor, not a prosecutor

25   or not a civil lawyer in another case can compel a person

```
 1    who's under the indictment that Mr. Baird is under facing
 2    serious criminal charges with serious penalties on absolutely
 3    a vague indictment.
 4           And if the Court would just allow me to be heard on
 5    this.
 6           THE COURT:  Sure.  I did read the indictments.
 7           But go ahead.
 8           MR. LEVINE:  Okay.  Do you have it in front of you?
 9           THE COURT:  I believe I do.
10           MR. LEVINE:  Because I can give it to you.
11           THE COURT:  Oh, no.  I've got it.  And I've got it on
12    the screen if I just do a couple more clicks.
13           But go ahead.
14           MR. LEVINE:  So just by way of background, Your
15    Honor --
16           THE COURT:  Just one second.  I've got it.
17           MR. LEVINE:  Yeah.
18           THE COURT:  Go ahead.
19           MR. LEVINE:  So that you have context, Your Honor,
20    for what I'm about to say concerning the indictment which
21    you've now put in front of you.
22           Mr. Baird was involved from the very beginning.  He
23    was my client in the Flint water investigation.  And he for
24    four days offered testimony under oath relating to matters
25    involving the Flint Water Crisis.
```

1          His first appearance under oath was in February of

2     2017 when he testified a full day at an investigative subpoena

3     hearing --

4          THE COURT:  Yeah.  That's another interesting factor

5     that makes his waiver all the more knowing.  He waived

6     multiple times.  But I'm not suggesting that's the same -- the

7     investigation is the same proceeding as our civil case.

8          MR. LEVINE:  Okay, Your Honor.  Thank you.

9          He sat again on the 1st of March of 2017 for a second

10    full day of investigative subpoena.  And then there were two

11    days of depositions on the 21st and on the 22nd of July.

12         And he did so at that time without invoking a

13    privilege, because he feared nothing, because he had the right

14    to rely on representations that the government made to me when

15    he -- when the investigative subpoenas proceeding was ongoing,

16    that he was not a target, that he was a witness and that the

17    government was not looking to indict him.

18         That -- that informed my decision.  Judge, I've been

19    defending people for 40 years, as I said.  And I didn't mean

20    to say -- I wouldn't -- if I would have known then what I know

21    now, this is kind of what I was getting at.  I was -- had a

22    right to rely on the government representations, and I did.

23         But all of that changed dramatically for Mr. Baird

24    in --

25         THE COURT:  But the Convertino case, there was an

1    argument by Convertino that the Attorney General Eric Holder,

2    I think, at the time had said, "We will not prosecute journal

3    itself for doing their job."

4              And the court said that those guarantees don't -- do

5    not override the Fifth Amendment waiver.  So the fact that you

6    heard from someone -- from the prosecutor that your client

7    wasn't a target at that time, there's a new prosecutor as of

8    the time of these depositions, and you knew that.

9              MR. LEVINE:  I knew it, Judge.  But, Judge, I was one

10   witness of several, I don't know, how many hundreds of people

11   were subpoenaed.  I had no reason ever to believe outside some

12   sensational journalism that appeared to castigate his

13   integrity that he would be criminally charged.

14             THE COURT:  I know.

15             MR. LEVINE:  But he became charged.  He became

16   charged.  And I'm admitting that when he -- I was with him,

17   and I counseled him.  And even though he was represented at

18   the time by the Attorney General in a civil deposition, I was

19   there.

20             And the reason I was there was to make sure that he

21   was -- his rights were protected and that there's a waiver.  I

22   knowledge it.  But when you look at this indictment now, you

23   can understand and appreciate the position I'm in.

24             THE COURT:  Well, this is not so much about you.

25             MR. LEVINE:  Mr. Baird.  I misspoke.

```
 1              THE COURT:  Okay.  But what I'm hearing from a number
 2    of people who have spoken so far is, "My client has the right
 3    to the effective assistance of a lawyer, and these are the
 4    decisions I, as counsel, made."
 5              I appreciate your need to defend your decision or
 6    your interest in defending that.  But what I'm most interested
 7    in is whether this is a single proceeding.  That's what I'm
 8    interested in.
 9              MR. LEVINE:  Well, Judge, I think it's different
10    stages.  And I think he's entitled at the stage that we're at
11    now to assert a Fifth Amendment privilege, and that's why I
12    was going to talk a little bit if you would allow me --
13              THE COURT:  Sure.
14              MR. LEVINE:  -- about the indictment.
15              THE COURT:  Okay.  Well, the indictment's not in our
16    case.  We're not --
17              MR. LEVINE:  It's informing my decision, and it's the
18    basis upon which I am asserting to this Court that he has the
19    right to take the Fifth Amendment at trial on anything beyond
20    his deposition testimony.
21              THE COURT:  Okay.  Thank you.
22              MR. LEVINE:  This is an indictment that charges him
23    over a 37-month period from --
24              THE COURT:  No, I understand that.  I'm interested in
25    waiver.  I'm -- whether the earlier deposition -- I know.  I
```

 1    read the indictment.  Jiminy Cricket, I wouldn't want to be in

 2    his shoes.

 3           So I'm not suggesting -- I don't -- okay.  Go ahead.

 4    We can discuss the indictment.  But the fact is when he

 5    testified earlier, there was a possibility of an indictment.

 6    Why did he ask if he was a target even before that?

 7           MR. LEVINE:  Well, Judge, when you're subpoenaed by a

 8    special prosecutor in an investigative subpoena proceeding,

 9    you determine if you are doing your job, whether or not you

10    are a target of the investigation before you decide to

11    testify.

12           Because if you're a target, you have the opportunity

13    to invoke the Fifth Amendment.  If you're not, you don't.

14           THE COURT:  Okay.  All right.  We may need -- this

15    might be a good time to take a short break.  And what I should

16    tell you is I do have two more criminal cases today -- or not

17    more.  Two criminal cases this afternoon.  So we might start

18    to speed it up a little bit.

19           So let's take about just a five minute break and then

20    come back.

21                          (Brief Recess)

22           THE COURT:  Please be seated.  This might be a good

23    time for me to remind counsel on the bellwether cases that

24    transcripts cannot be shared when they're under the 90 days

25    from when they're docketed.  So otherwise people just pay for

1    the transcript, and we move along.

2              So go ahead.  That didn't relate to you at all.

3              MR. LEVINE:  Thank you.  I think I -- I want to be

4    sensitive to the Court's time.  And so I'm going to be -- I'm

5    going to wrap it up, and I'm going to be brief.

6              THE COURT:  Okay.

7              MR. LEVINE:  I think the Court understands my

8    position.  The bottom line is because of the vague indictment

9    -- and I won't go into the counts and the complete lack of

10   specificity in any of the counts, particularly 2 and 3, which

11   potentially expose Mr. Baird to criminal liability for any

12   discretionary decision he made to use state resources or state

13   personnel or in any way a decision he made that may in Count 3

14   interfere with any legal proceeding.

15             We don't even know which legal proceeding.

16             I mean it is -- this indictment I've never seen an

17   indictment like this in my life.  It is so broad and open

18   ended that the Court -- doesn't take a great stretch of the

19   imagination for the Court to see that I have legitimate

20   concerns that if Mr. Baird were to take a witness stand at

21   this time and ask any question at all, he could potentially be

22   -- incriminate himself.

23             And so for all intents and purposes, he is

24   unavailable, because I believe nobody can force him at this

25   point to testify.  Certainly a civil lawyer can't call him and

1    force him to waive his privilege.  I believe that he waived

2    the privilege in the deposition, but it ends there.

3              THE COURT:  Excuse me.  Excuse me.  Stop.  Stop

4    talking, please.

5              MR. LEVINE:  Yes.

6              THE COURT:  That's what we're here for.

7              MR. LEVINE:  Yes.

8              THE COURT:  Somebody can force him to testify --

9              MR. LEVINE:  Well, that was --

10             THE COURT:  -- and it may not be me.  It may be the

11   Court of Appeals.  I don't know.  I haven't made my decision.

12   But I think it's worth knowing that.

13             MR. LEVINE:  And I apologize, Your Honor.

14             THE COURT:  Okay.

15             MR. LEVINE:  In my zeal, I overstated what I meant to

16   say.

17             THE COURT:  Okay.

18             MR. LEVINE:  Okay.

19             THE COURT:  And you're talking to someone who takes

20   the Fifth Amendment and all of -- anyone in my position should

21   and in all of yours -- who takes this right very seriously.

22             MR. LEVINE:  Thank you.

23             THE COURT:  So I'm not approaching this with a

24   cavalier attitude.

25             MR. LEVINE:  Thank you.

```
 1                THE COURT:  Okay.

 2                MR. LEVINE:  And I appreciate that.  I don't know

 3     you, Judge.  I've never been in front of you, and I'm learning

 4     a little bit about how you operate.

 5                THE COURT:  Okay.

 6                MR. LEVINE:  And I know -- I've already seen and I

 7     don't want to sit here and waste your time.  And so what I'm

 8     going to end with is this, the rules provide a remedy for

 9     what's going on here.

10                If he invokes a privilege, the Court could play -- he

11     could -- he becomes unavailable, and the Court is free to play

12     his deposition testimony for the jury.

13                To the extent that the Court is under the opinion

14     that other questions beyond what was in the deposition may

15     incriminate him, I think a hearing would be appropriate at

16     that point, and I certainly would appear at that time.

17                THE COURT:  Thank you --

18                MR. LEVINE:  Thank you, Judge.

19                THE COURT:  -- very much.  And so now put the mask

20     back on.

21                MR. LEVINE:  Yes, of course.

22                THE COURT:  Is anyone else.  No one else is --

23                MR. RUSEK:  Your Honor, if I may just have rebuttal.

24                THE COURT:  Yes.  Mr. Swor, is there something

25     different from all that's been said that you'd like to offer?
```

1    But you'll have to do it into the microphone.

2            MR. SWOR:  Your Honor, it is our opinion -- it is my

3    opinion, that this is clearly not a single proceeding.  Okay.

4    That these are separate proceedings.

5            THE COURT:  Why?

6            MR. SWOR:  Well, there's case law that says so.

7            THE COURT:  Where?  That's what we're --

8            MR. SWOR:  Let me see.  In our brief -- if I had my

9    glasses --

10           THE COURT:  That's okay.  I read the brief.  No

11   problem.

12           MR. SWOR:  In our brief.  Secondly, you know, under

13   804 -- I think it's 804 -- this is a separate proceeding.

14   This is -- there has been a change of circumstances.

15           Our clients are no longer parties.  They are

16   witnesses.  And their testimony here is not voluntary, whereas

17   their testimony, the Court has said their previous testimony

18   was a voluntary waiver, and that starts and ends there.  And

19   that can be used there.

20           THE COURT:  Okay.

21           MR. SWOR:  But now they're not parties.  They are

22   potential witnesses or they are -- they're subpoenaed

23   witnesses.  They are people in a different situation.  Their

24   testimony is not part and parcel.

25           You know, part of the idea of not allowing to waive

```
 1    at one step and -- or to waive at one step and then not or --
 2    boy, am I doing bad today.
 3               THE COURT:  That's okay.
 4               MR. SWOR:  Is to -- so that the trier of fact is not
 5    left with a half-view of the evidence.  Okay.  They're not
 6    going to be a half-view of the evidence.  I mean, the Court
 7    wants to use their deposition.  That's one thing if they're
 8    unavailable.
 9               But to bring them in here, you know, first of all,
10    you've got to figure out what deposition testimony is
11    relevant?
12               THE COURT:  Okay.
13               MR. SWOR:  Because that's a -- and that's really one
14    of the distinctive parts, why a deposition is a different
15    proceeding.  Because I can guarantee you that if you had read
16    the two days of testimony of Mr. Ambrose's deposition, there
17    was a lot of stuff that would have nothing to do with the
18    trial that in no way would be admissible.
19               So it wouldn't even be a -- I'm going to stop
20    talking.
21               THE COURT:  Okay.
22               MR. SWOR:  But I want to be sure that I preserved our
23    position that this is a separate proceeding.  And if the Court
24    rules, we're going to ask for a stay.
25               THE COURT:  Okay.  That has been well preserved.
```

 1          MR. SWOR:  Thank you.  Well, it's been preserved.  I

 2    don't know how well.

 3          THE COURT:  Well, it's thoroughly preserved.

 4          Okay.  So we'll now move to VNA.

 5          MR. CHRISTIAN:  Good afternoon, Your Honor.  Marcus

 6    Christian on behalf of VNA.  This is a case where the -- as

 7    you've stated, the witnesses took the stand in deposition.

 8    They gave testimony.  They didn't invoke the Fifth.  They have

 9    waived the Fifth Amendment as to their testimony, the topics

10    of the deposition.

11          We further state and argue as we have in our filings

12    that this is the same proceedings.  It's the same claims, same

13    parties, same judge.

14          THE COURT:  Does it matter that in this proceeding

15    the trial or this portion of the proceeding, if it's the same,

16    that it's two years apart?  That a witness could testify -- we

17    heard from their lawyers.  They might testify differently in

18    response to the same question, and that perhaps they didn't

19    waive that in the first deposition?

20          MR. CHRISTIAN:  We argue that it does not, Your

21    Honor.  And it sounds like that's just way to render these

22    individuals unavailable by some possibility that they may say

23    something different in response to a question.

24          That doesn't undo waiver.  There's no case law that

25    suggests that the possibility, the remote possibility that

1    someone may say something different in response to the same

2    question or substantially the same question somehow nullifies

3    the waiver and renders them unavailable to testify.

4         THE COURT:  Yeah, I don't know of any, but I heard

5    the argument made earlier.

6         MR. CHRISTIAN:  And further on that point, Your

7    Honor, we take the position that there's no basis here, given

8    our position of the waiver, as well as the single proceeding

9    that there should be testimony played from the deposition as

10   opposed to having the live witnesses.

11        THE COURT:  What's the benefit to you to having the

12   live witnesses?  If you're allowed to ask live witnesses your

13   additional questions, what's wrong with asking instead of

14   having, like, having the deposition transcript out and reading

15   from it more or less?  What's the benefit of having them here

16   live if they'll be here live for your additional questions

17   where there's not further exposure?

18        MR. CHRISTIAN:  Well, Your Honor, we suggest live

19   testimony is different from recorded testimony.  It gives the

20   jury an opportunity to gauge the credibility of the witnesses,

21   which is a hallmark of our judicial system.

22        And not only is this recorded testimony, this is Zoom

23   testimony.  And so it is also subject to all of the technical

24   glitches and other difficulties that have become common

25   content for jokes --

1          THE COURT:  Were there problems in these witness's

2    depositions?

3          MR. CHRISTIAN:  I can tell you that there must have

4    been people saying, "Oh, sorry.  You're on mute."

5          I'm just giving you example.  But, Your Honor, still

6    even if they were crystal clear, they do not replace the role

7    of the jury to judge the credibility of the witnesses.  And

8    that --

9          THE COURT:  What if the witnesses decide not to take

10   their masks off here?  Their masks were off in the Zoom video

11   deps, so the jury would see their facial expressions.  But

12   here they could say, "I'm concerned about COVID.  That's a

13   legitimate concern, and I'm not going to take my mask off."

14         MR. CHRISTIAN:  Absolutely, Your Honor.  And still

15   even then, they still have body language that can be read by

16   the jury.  Just not the part of their face that is covered and

17   their tone of their voice, the timing.

18         There are so many aspects of live testimony that go

19   beyond what can be seen beyond the mask.

20         THE COURT:  Okay.  And so your main argument is the

21   jury's benefit to seeing live testimony to assess credibility?

22         MR. CHRISTIAN:  That's a part of the argument, Your

23   Honor.  I mean, there have been many people opining since the

24   pandemic began about how judges and juries and courts can save

25   time by having online trials.

1          And courts have rejected that.  And it's because they

2   have a value for the in-person and live trial.

3          And we're saying that there -- that is a part of the

4   law that you're considering in this case.  And we don't see

5   any reason for supplanting that for going to the transcript

6   and providing hearsay as opposed to live testimony with

7   anything we've seen here in this case, Your Honor.

8          THE COURT:  Okay.  Thank you.  Thank you for your

9   argument.

10          Mr. Kent.

11          MR. KENT:  Yes.  Thank you, Your Honor for LAN.  We

12   second VNA's position.  I would add just a couple of small

13   comments.

14          We heard from, I believe, it was Governor Snyder's

15   attorney that the courts carefully considered the fact that

16   the witness should not be allowed to control the narrative.

17          And that sounds to us like what essentially is

18   happening here, that the witness through the guise of claiming

19   the Fifth say, "I do not have to testify at all.  Just play my

20   deposition."

21          That is their attempt to control the narrative.

22          THE COURT:  Have you subpoenaed these witnesses?

23          MR. KENT:  We have not because VNA has.

24          THE COURT:  Oh, okay.

25          MR. KENT:  There's no need to doubly subpoena the

1   same witness.

2           THE COURT:  I saw them on your witness list.

3           MR. KENT:  That's why it is -- VNA's taking the lead

4   on that.  I would say that there is just as there are

5   constitutional rights for the criminal defendants, there are

6   rights under the Seventh Amendment to jury trials.  There are

7   other rights that the parties to this civil litigation has,

8   which the Court, of course, will balance and appropriately so.

9           One does not trump the other necessarily.  There's a

10  way to balance the rights of each.  And the issue that the

11  Court the going face in large part here is not whether there's

12  a waiver, not whether it happened in the same proceeding.

13          The issue is going to the scope of that waiver,

14  because as the Court said in quoting Judge Lawson, "When the

15  subject is disclosed, then it waives the privilege as to the

16  details."

17          And that's why it's not really fair to say, "Well,

18  you had a deposition, and you had questions there."  A

19  discovery deposition, when you have multiple parties, limited

20  amount of time, is going to have a different wording.

21          It's going to have a different emphasis.  It's not

22  going to be exactly the same, and we need to have that

23  opportunity to explore the subject on which there has been a

24  waiver and maybe the details.  We can't just be the exact

25  words.  It cannot be just limited to that, and it ends.

 1          So we think it is appropriate for the witnesses to

 2    come live, to testify live.  If they do have a fear of

 3    additional, somehow different incrimination beyond what has

 4    already been waived, and that's hard to imagine given the

 5    breadth of their depositions, there's a broad waiver, then

 6    that's the time to deal with that.

 7          The question today is do you quash the deposition,

 8    quash the subpoenas entirely.

 9          THE COURT:  Mr. Kent.

10          MR. KENT:  Yes.

11          THE COURT:  As the person who's trying to manage the

12    process, how would we avoid -- I mean, I've got the time, but

13    the jury doesn't.  They have jobs.  They have families.  They

14    have lives.  We can't keep them here forever, and we don't

15    want to.

16          So practically how do you see that happening if what

17    you're telling me is that in a discovery deposition, you frame

18    your questions differently, you so and so, you know, etcetera.

19          And so if the waiver is as to the general subject

20    matter that was asked at the deposition -- and let's say that

21    I make that decision -- then how are we going to actually get

22    through this without going to the sidebar room in the back

23    after every question?

24          MR. KENT:  Well, I think that is determined in large

25    part by your ruling on the breadth of the waiver.  As opposed

1    to saying, "Well, you changed the word.  So that's

2    inappropriate."

3              THE COURT:  Okay.  So I would make a -- so let's say

4    for sake of argument, I make the decision that it's a single

5    proceeding for all the reasons we've discussed that I won't

6    repeat.

7              That there was a broad waiver at the deposition.  And

8    so -- and I learned what the subject matters are that were

9    asked at the deposition that are relevant here to be presented

10   here.

11             And I make a decision that any details on -- directly

12   related to those subject matters are grounds that -- or

13   questions that can be asked and must be answered.

14             We have a separate proceeding for new subject matter

15   that wasn't asked at the discovery deposition, and I make

16   those decisions ahead of time.  Is that?

17             MR. KENT:  I think that was close to what you had

18   presented as a hypothetical to begin with as a potential.  The

19   difference being primarily that it sounded to me like the

20   thought was, "Well, let's just play the deposition and then

21   figure out what else it is" --

22             THE COURT:  Okay.  When I start talking, that's the

23   part you stop talking.  We've been through this.  I know I'm

24   interrupting you, but I'm trying to move it along.

25             Yeah.  That's a proposal for just trying to be

 1   practical.  There are a couple of cases that say that in

 2   Northern District of Illinois, finally live testimony is

 3   preferred over deposition testimony.

 4        And another case also in the Sixth Circuit about a

 5   district court talking about videotape depositions are not the

 6   equivalent of live testimony by these witnesses.

 7        So your colleague, Mr. Mason has -- is your

 8   microphone on, Mr. Mason?

 9        MR. MASON:  I believe it is.

10        THE COURT:  I think it is.

11        MR. MASON:  May I just make one brief comment?

12        THE COURT:  Sure.

13        MR. MASON:  From a procedural standpoint, we'll work

14   with the Court with respect to those headings with citations

15   in the -- so that your Court, Your Honor will know the issues,

16   and we don't need sidebars all the time as a practical matter.

17        The second --

18        THE COURT:  I wasn't thinking so much that you -- I

19   was thinking that the witnesses' lawyers would be objecting

20   nonstop.

21        MR. MASON:  Well, they shouldn't be if they read the

22   transcript for sure.

23        And as officers of the Court, we would have a

24   responsibility to stay within the bounds of what's been asked,

25   so that that would not be an issue.  And I don't anticipate it

 1    will be an issue.

 2            The second thing is, is just the issue of procedural

 3    -- Mr. Kent did say it appropriately.  Justice -- you know,

 4    our clients has rights, as well, and we're not permitted to

 5    use or play depositions in the case under the rules if a

 6    witness is available.  And yet the flip side --

 7            THE COURT:  Well, unless it's just agreed upon --

 8            MR. MASON:  And we don't agree to it.

 9            THE COURT:  I've done it myself frequently, because

10    we don't want to pay the doctor $20,000 to come in at trial,

11    so we fire up --

12            MR. MASON:  I understand.  But the rule -- unless

13    there's an agreement, the rule provides that we cannot.  And

14    yet they want to subvert that and flip it upsidedown.

15            THE COURT:  I hear you.

16            MR. MASON:  That's not fair to our client.  Thank

17    you.

18            THE COURT:  I hear you.

19            One last question, Mr. Christian, is Mr. Quigg

20    brought up that apparently VNA didn't use all of the time at

21    the deposition.

22            What impact, if any, should that have?

23            MR. CHRISTIAN:  Well, Your Honor, I didn't hear he

24    say VNA.  I thought I heard "defendant."

25            THE COURT:  Oh.

1          MR. CHRISTIAN:  Either way, whether we -- I'm not

2     aware, and we're not aware of any requirement that we ask

3     every question that we would like to ask during deposition.

4          THE COURT:  I'm not aware of that rule.  Okay.

5          MR. MAIMON:  May I briefly, Your Honor?

6          THE COURT:  Yes.  Please.

7          MR. MAIMON:  Thank you.  The Court has heard argument

8     today on a whole range of issues.  And I'd like just to

9     address a couple of them.

10         First of all, there is no authority within the

11    Eastern District of Michigan or the Sixth Circuit, as far as

12    I'm aware, that says the constitutional rights of any litigant

13    are curtailed or not upheld if a judge or a circuit or a court

14    decides to hold trials remotely.

15         During the pandemic, there were trials held

16    throughout the country, reviewed on appeal with regard to

17    whether or not cases can proceed.  Some courts decided to do

18    it.  Some courts decided not to do it.  But I don't think that

19    there's a Sixth Circuit controlling authority that says that

20    Zoom trials are not appropriate.

21         The second thing is that the Court gives the members

22    of the jury a clear instruction both before and after the

23    commencement of the evidence on how to judge the credibility

24    of witnesses including judging the credibility of witnesses

25    who appear via prior recording, whether it's by Zoom or

 1   whether it's -- whether it's a -- something that was a

 2   videotape.

 3           In addition, the Court has --

 4           THE COURT:  So your argument, as I understand it, is

 5   that we should just play the depositions and then examine the

 6   witnesses live for any additional areas.

 7           MR. MAIMON:  Well, let me get to that in one minute,

 8   Your Honor --

 9           THE COURT:  Okay.

10           MR. MAIMON:  -- but I think also the Court has

11   considered whether or not under Rule 42 witnesses can be

12   brought to another courthouse and have their testimony be

13   compelled remotely.  Again, juries take that into account, and

14   it's proper, and it's done all the time.

15           So these are not impediments to doing this.  The --

16   one of the things -- and I know that one of the counsel for

17   the subpoenaed witnesses was being facetious.

18           But one of the things that rule 804 does contemplate

19   is a witness refusing to testify despite a court order.

20   That's 804A2.  That makes that witness unavailable --

21           THE COURT:  Right.

22           MR. MAIMON:  -- that's simply part of the rule.

23           What this Court heard was the balancing that is

24   required for 804A1.  And that is the difference between the

25   privilege on one side, which would make the witness

1   unavailable and the issue of waiver on the other, which would

2   mitigate against that unavailability.

3          And the Court heard about it.  And I'm not here to

4   argue that.  What I am here to argue, Your Honor, is that

5   there's another balancing that requires the Court's attention.

6   And that's what nobody talked about and what the defendants

7   want to ignore.

8          And that is Rule 403 balancing.  Because outside of

9   the waiver that certain witnesses might have done, and outside

10  of privileges that they might have, there are the rights of

11  the infant plaintiffs here.  And they have the right not to

12  have their day in court and their Seventh Amendment rights

13  obstructed with a constant barrage of --

14         THE COURT:  Well, that's why we would take precaution

15  that there not be a constant disruption in the trial and

16  distraction in the trial.

17         MR. MAIMON:  I understand that.  But, however, in

18  this trial from its beginning, the Court has introduced both

19  before voir dire and then in the beginning of the trial, the

20  parties and their counsel were now going to introduce with

21  each of these witnesses another attorney who's now going to

22  have the right -- in fact, if you listen to them carefully,

23  and I respect it -- the responsibility when they think

24  something has crossed the line to start invoking privilege in

25  front of a jury and invoking objections in front of the jury.

```
 1              The Court suggested a procedure which we believe
 2    properly balances the interest and all of the rights of all of
 3    the parties and protects the innocent plaintiffs from
 4    prejudice.  That is to show the videotapes, which is the
 5    testimony that was given, which is the questioning chosen by
 6    defense counsel to make the points that they wanted to make.
 7              To the extent that there are additional areas of
 8    testimony, the Court can hold a hearing outside of the
 9    presence of the jury so that we know exactly what it is.
10              The Court suggested maybe, you know, it sounds
11    ridiculous --
12              THE COURT:  Mr. Maimon, what would be wrong
13    procedurally for the rights of your clients or anyone's rights
14    in the case, with having the witness testify one time live
15    with all of these disputes getting taken care of outside the
16    presence of the jury?
17              So we know that if an area was covered in the
18    deposition, it can be covered in some additional detail in the
19    trial testimony?  I won't tolerate an objection to that,
20    because it will already be on the record in the out-of-court
21    hearing.
22              Mr. Mason likes to put things on the record twice.
23    It's not going to happen anymore.
24              MR. MAIMON:  I understand.
25              THE COURT:  And I'm not calling you out for any other
```

1   reason to say I'm not allowing it already, and I won't allow

2   it then.

3         MR. MAIMON:  Right.  And I take defense counsel -- I

4   pay serious attention to what defense counsel say, including

5   the first time that we were here with the Court on this issue

6   where they were insistent that what they -- what they want is

7   they want the jury to see these people take the Fifth

8   Amendment.

9         They want the jury to draw adverse inference.

10        THE COURT:  No.  I don't care if they said that or

11  not.  They have a -- there's motions in limine that have been

12  decided regarding that.  And I believe -- although I don't

13  have it sitting in front of me -- that my ultimate decision

14  was the fact of a criminal indictment could show bias.  It

15  can't be referenced in the opening, because no one's testified

16  in the opening.

17        But it certainly -- lawyers are permitted to find out

18  if the witness's have pending criminal charges on the subject

19  matter.

20        MR. MAIMON:  I understand.  And that was not -- I'm

21  sorry.  I was unclear.  That's not what I was referring to.

22        When we were here talking about these witnesses being

23  subpoenaed and whether or not they would have to come, defense

24  counsel for both VNA and LAN stated explicitly on the record

25  that they want the invocation of the Fifth Amendment privilege

1    in front of the jury.

2              They want the jury to draw an adverse inference based

3    on that invocation of the Fifth Amendment.

4              THE COURT:  Okay.

5              MR. MAIMON:  And we take them at their word that that

6    is something that they want --

7              THE COURT:  No.

8              MR. MAIMON:  -- and if Your Honor is asking me what

9    am I concerned about, I'm concerned about exactly what they

10   told us one of their prime motives was.

11             THE COURT:  I don't know about the prime motive.

12   But Mr. --

13             MR. MAIMON:  One of.

14             THE COURT:  Okay.

15             MR. MAIMON:  But if we go with the plan -- again, I

16   don't know that a word here or a word there makes a

17   difference, but if the Court is concerned and if the case law

18   talks about further incrimination, further than what's had at

19   a deposition, it is -- it's not even a matter of failing

20   memory or different memory.

21             People describe things differently.  When you ask me

22   a question now and perhaps when you ask me a question ten

23   minutes from now, I may use a different analogy.  I may

24   emphasize a different detail.  That's the nature of human

25   discussion and human discourse.

```
 1            What we're concerned about -- and again, we're happy
 2   to live with the Court's ruling.  What we're concerned about
 3   is exactly what the defendants told us they wanted this jury
 4   to have.
 5            And to protect the first -- the Fifth Amendment
 6   rights of people who are under indictment, I don't believe
 7   that the Court would bar their criminal defense attorneys from
 8   being present and being able to raise issues.
 9            And if they felt that their fiduciary duties to their
10   clients required them to do so, that is exactly the -- what we
11   termed "the circus."  But it's the prejudice to the infant
12   plaintiffs that's not necessary here.
13            And that quite frankly, significantly and
14   substantially outweighs the probative value of the different
15   wording of the question as opposed to the deposition where
16   they had a full and fair opportunity to ask these witnesses
17   questions.  That's our position.
18            THE COURT:  Okay.  Mr. Christian.
19            MR. CHRISTIAN:  Sure, Your Honor.  So as terms to
20   adverse inferences, I will say that here now that should we
21   wind up with a factual situation that we wind up with a fact
22   that's probative to our position where someone takes the
23   Fifth, there could be, and we want to preserve that
24   possibility.
25            I think that to state that it's some kind of
```

```
 1    overwhelming motive, one, I think it's irrelevant.  But, two,
 2    I think it's inaccurate.
 3           And just as an aside, I'm not aware of any infant
 4    plaintiffs in this case, given that if the kids were around in
 5    2015, they wouldn't be infants anymore.
 6           MR. STERN:  "Infancy" means under 18 in the law.
 7           THE COURT:  In Michigan -- I know you're not from
 8    Michigan.  But "infancy" is a legal term of art from anyone
 9    from birth to --
10           MR. CHRISTIAN:  Basically a minor.
11           But the point is I don't think motives are relevant
12    here, Your Honor.
13           THE COURT:  Okay.  And that -- I hear you.
14           MR. KENT:  Your Honor?  May I add --
15           THE COURT:  Very briefly.  Because I have an
16    in-custody defendant, and I don't want to keep him there.
17           MR. KENT:  The one comment is that question of
18    whether or not it's played before the jury or informed to the
19    jury is totally separate and can be dealt with at that time as
20    opposed to the procedure for allowing the witnesses here to
21    quash these subpoenas and assert their Fifth Amendment rights.
22           That's a totally separate issue.
23           THE COURT:  Okay.  Thank you.
24           MR. KENT:  It should be dealt with separately.
25           THE COURT:  Okay.  Mr. Rusek, you had said you had
```

1    some rebuttal?

2          MR. RUSEK:  Alexander Rusek on behalf of Croft.  That

3    may be a holdover from our Zoom days.  But I'll be brief, Your

4    Honor.

5          There's just a couple of points that I wanted to hit

6    on that have come up.  We talked briefly in regards to the

7    single proceeding rule about State v. Roberts, and that was a

8    prior deposition case that did not waive for the purposes of

9    trial.

10          And there's a quote there that I think is important

11    for -- to highlight today.  Is that -- this is State v.

12    Roberts.  "The majority rule preserves a witness's right to

13    assert the privilege in subsequent to distinct stages of a

14    single proceeding."

15          And I think that that sentence alone leaves us where

16    there can be distinct stages of an overall civil case.  And

17    that those distinct stages are separate proceedings under this

18    framework of the one proceeding rule.

19          And I think that's supported also by another case

20    that we didn't discuss earlier but was cited in our brief.

21    That's State v. Whiting, and that was from the Wisconsin Court

22    of Appeals, 402 N.W.2d.723.

23          And that was where the Wisconsin Court of Appeals

24    held that just because a nonparty witness testified at the

25    preliminary examination at a criminal case, that that nonparty

```
 1    witness could then assert the Fifth Amendment at that trial in
 2    the same case.
 3           Certainly, a preliminary examination is not the same
 4    as a deposition, but there's certainly a lot of similarities.
 5    You have all parties present.  You have the opportunity for a
 6    full examination.  Some judges may cut you short in a
 7    preliminary examination.
 8           But in our depositions, they went on for days and
 9    days and days.  Mr. Croft was deposed for three days.
10    Everyone in this room on behalf of their respective clients
11    had a full opportunity to depose him, Your Honor, and they did
12    so.  And he answered those questions.
13           Circumstances changed, and now upon advice of
14    counsel, he is asserting his Fifth Amendment rights at trial
15    in this matter.
16           THE COURT:  Okay.  Thank you.
17           MR. RUSEK:  Your Honor --
18           THE COURT:  Oh, you have more.
19           MR. RUSEK:  Yep.  That was just on the single
20    proceeding rule.
21           Just to comment briefly.  I think that the plaintiffs
22    have really laid out here some of our -- my major concerns.
23    And that's what the defendants seemingly want to do based on
24    their prior assertions.
25           And their preference, it seems, would be to create a
```

1    parade of horrors in front of the jury of having these men

2    come out and assert the Fifth over and over again.  The Court

3    can --

4            THE COURT:  That's not going to happen.  I'm not

5    worried about that.

6            MR. RUSEK:  And I agree, Your Honor.  Absolutely

7    should not.  Because that's a horrible outcome, and it's not

8    fair for anyone.

9            What I think the Court proposed earlier, and we --

10   I'm not going to backtrack in my positions in the brief as far

11   as waiving those arguments.

12           THE COURT:  Right.

13           MR. RUSEK:  But I think that the Court has a way to

14   address this that's fair.  And I think that basically what you

15   talked about earlier of having the five gentlemen declared

16   unavailable witnesses, because they intend to assert their

17   Fifth Amendment privileges.

18           Then under Rule 804, their prior testimony, both at

19   their depositions and for those who testified before Congress,

20   can be played or read to the jury.

21           And then we can establish a procedure that occurs

22   outside of the jury that doesn't require the five nonparty

23   witnesses to testify wherein the VNA defendants, the LAN

24   defendants could submit perhaps proposed questions that they

25   believe would not infringe on those Fifth Amendment rights and

1    were not previously asked of those depositions.

2           You would then allow the nonparty witnesses the

3    opportunity to object to those questions.  And then if there's

4    an appeals that need to be made, then we could make those.

5           THE COURT:  Okay.

6           MR. RUSEK:  I think that there's a practical,

7    reasonable solution, Your Honor, that doesn't involve pulling

8    a witness up there, having myself or co-defense counsel sit

9    next to the witness, to have us have to go through hundreds of

10   pages of deposition transcripts almost on the fly and then

11   advise -- which we can't --

12          THE COURT:  Mr. Marcus, where do you think that the

13   criminal defense lawyers would be sitting if I had live

14   testimony for everything?

15          MR. CHRISTIAN:  Your Honor, I think, first of all,

16   the criminal defense attorneys will spend a lot of times

17   sitting next to their clients preparing for it.

18          THE COURT:  Right.  I'm talking about the courtroom.

19          MR. CHRISTIAN:  Your Honor, I haven't worked out

20   those details.  But it is workable.  This isn't the first time

21   that --

22          THE COURT:  It matters to me in terms of the

23   prejudice argument that Mr. Maimon made.  If we have folks

24   with their criminal defense lawyers in that Plexiglass

25   enclosed witness box whispering and consulting on every

1    question, that seems like it would be quite prejudicial.

2          MR. MASON:  They can have my seat, Your Honor.  I'll

3    give up my seat, and they can sit here.

4          THE COURT:  Okay, Mr. Mason.

5          MR. CHRISTIAN:  And Your Honor, I would underscore,

6    Your Honor, that still that doesn't change the waiver issue

7    because --

8          THE COURT:  No, I don't -- I don't think it changes

9    the waiver issue.  But I've got a number of competing issues

10   that I'm trying to think through.

11         MR. CHRISTIAN:  Certainly.

12         MR. RUSEK:  And, Your Honor, normally I think that we

13   could find a workable solution in regards to the stand.  But I

14   know that I would feel extremely uncomfortable having any

15   discussions with my client anywhere near a hot microphone.

16         And not only because it's -- you know, it wouldn't be

17   a part of the transcript, of course, but that stream is going

18   out to the public, and potentially anyone else sitting in here

19   is a huge concern.

20         THE COURT:  Okay.  All right.

21         MR. RUSEK:  And as far as the procedure of consulting

22   at that point and what the Court touched on earlier as far as

23   sidebars, there's quite likely that we'd have to leave the

24   courtroom multiple times, consult on these issues.

25         One story that I heard about in a grand jury

1    proceeding that happened a while during COVID was that the

2    defense attorney wasn't permitted to sit next to their client

3    during that grand jury proceeding.

4              And essentially had to, like, waive them down to say,

5    "No, don't answer that question."  And that's just not

6    practical, and it's prejudicial to everyone.

7              THE COURT:  Okay.  You know, I have a problem, which

8    is another matter, two more that I need to handle.

9              Was there anything that has not been said that anyone

10   wants to say?

11             MR. SWOR:  Two minutes.

12             THE COURT:  Okay.  One minute.

13             MR. SWOR:  Okay.  Mr. Marcus said that this is the

14   same proceeding.  It's the same claims, he said.  That's not

15   true.

16             THE COURT:  His last name is Christian.  But that's

17   his first name, so it's close.

18             MR. SWOR:  I apologize.

19             THE COURT:  That's okay.

20             MR. SWOR:  In the notice of nonparties at fault filed

21   11-13-2018, in Case number 16-10444, Veolia made a substantial

22   claim of fault regarding Mr. Ambrose, which did not include

23   any claim that Mr. Ambrose instructed Veolia not to

24   investigate going back to Detroit.

25             Then in a separate -- that was a year -- almost two

1    years before Mr. Ambrose gave his deposition.  Six months

2    after Mr. Ambrose gave his deposition.  And almost a year

3    after Mr. Nicholas testified at his deposition on 12-23-20, in

4    -- let me see -- the notice for nonparty is ECF number 672 in

5    the 2016 case.

6              THE COURT:  Yes, I know.

7              MR. SWOR:  Then in the 2017 case, ECF number 324

8    between pages 184 and 187.  Veolia changes its claim and

9    claims that Mr. Ambrose -- now after Mr. Ambrose's deposition,

10   after Mr. Nicholas's deposition, they changed their claim to

11   say that Mr. Ambrose instructed Veolia not to review or not to

12   consider going back to Detroit.

13             THE COURT:  Sure.  Isn't that exactly what a lawyer

14   should do?  If they get additional information at a

15   deposition, they should bring it to the party's attention in

16   the appropriate manner.  I don't --

17             MR. SWOR:  Well, you asked me what it changed

18   after --

19             THE COURT:  The change I was looking at was in the

20   risk, the risk for self-incrimination.  But the terrific thing

21   that you've pointed out, but I have to -- I actually have to

22   call a close to this hearing.

23             And the ferric chloride issue for anybody who wants

24   more on ferric chloride, I don't think we can get -- I know we

25   can't get to today.  So what I would ask is that our jury will

1   be here at 9:00 A.M., and if we could start at 8:30 in the

2   morning, then we can address ferric chloride in the morning.

3            I don't think anybody's going to play the Lawrence

4   deposition or any depositions that have ferric chloride in it

5   tomorrow.

6            So -- and Mr. Kent is affirming, and I think

7   Mr. Stern did, too.  So --

8            MR. KENT:  It's our understanding.

9            MR. STERN:  We were, Your Honor.

10           THE COURT:  Oh, you are going to play that

11  deposition?

12           MR. MAIMON:  But we'll have time.  If the Court rules

13  on it between 8:30 and 9:00, we have time to make any

14  adjustments that the Court rules on if any are required.

15           THE COURT:  Okay.  Good.  So thank you, all, for the

16  argument.  And I appreciate meeting the people who I've not

17  met before but also seeing familiar faces like Mr. Rusek and

18  others.

19           MR. STERN:  Just for the record, it's not the

20  Lawrence deposition that we plan to play tomorrow.  It's the

21  Chen deposition that we plan to play tomorrow.

22           THE COURT:  Oh, okay.

23           MR. STERN:  But it does touch on the issue of ferric

24  chloride.

25           THE COURT:  I'll make sure to focus special attention

1   on Chen.  But thank you.

2           Let me just say this on the record.  What I'll do is

3   take the issue under advisement and issue a written decision.

4   I'm sorry.  I forgot to say the main point.  All right.

5                       (Proceedings Concluded)

6                   -         -         -

7

8            CERTIFICATE OF OFFICIAL COURT REPORTER

9        I, Jeseca C. Eddington, Federal Official Court

10  Reporter, do hereby certify the foregoing 108 pages are a true

11  and correct transcript of the above entitled proceedings.

12  /s/ JESECA C. EDDINGTON_____              03/15/2022_
    Jeseca C. Eddington, RDR, RMR, CRR, FCRR      Date
13

14

15

16

17

18

19

20

21

22

23

24

25