```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3      SHERROD, TEED, VANDERHAGEN and WARE,

 4                       Plaintiffs,
          -v-                                Case No. 17-10164
 5
        VNA and LAN,
 6
                         Defendants.
 7      _____/

 8                          JURY TRIAL

 9
                      BEFORE THE HONORABLE JUDITH E. LEVY
10                    UNITED STATES DISTRICT JUDGE

11                         MARCH 28, 2022

12
        APPEARANCES:
13
        For the              Corey M. Stern
14      Plaintiffs:          Levy Konigsberg, LLP
                             605 Third Avenue, 33rd Floor
15                           New York, New York 10158

16                           Moshe Maimon
                             Levy Konigsberg, LLP
17                           605 Third Avenue, 33rd Floor
                             New York, New York 10158
18
                             Melanie Daly
19                           Levy Konigsberg, LLP
                             605 Third Avenue, 33rd Floor
20                           New York, New York 10158

21
                          (Appearances Continued on Next Page)
22

23
        TO OBTAIN A         JESECA C. EDDINGTON, RDR, RMR, CRR, FCRR
24      CERTIFIED             FEDERAL OFFICIAL COURT REPORTER
        TRANSCRIPT:            UNITED STATES DISTRICT COURT
25                                200 EAST LIBERTY STREET
                                ANN ARBOR, MICHIGAN 48104
```

```
 1    For the VNA         Daniel Stein
      Defendants:         Mayer Brown LLP
 2                        1221 Avenue of the Americas
                          New York, New York 10020
 3
                          James M. Campbell
 4                        Campbell Conroy & O'Neil, P.C.
                          1 Constitution Wharf, Suite 310
 5                        Boston, Massachusetts 02129

 6                        Marcus Christian
                          Mayer Brown LLP
 7                        1999 K Street NW
                          Washington, District of Columbia 20006
 8
                          Cheryl A. Bush
 9                        Bush, Seyferth PLLC
                          100 West Big Beaver Road, Suite 400
10                        Troy, Michigan 48084

11    For the LAN         Wayne Brian Mason
      Defendants:         Faegre Drinker Biddle & Reath LLP
12                        1717 Main Street, Suite 5400
                          Dallas, Texas 75201
13
                          David C. Kent
14                        Faegre Drinker Biddle & Reath LLP
                          1717 Main Street, Suite 5400
15                        Dallas, Texas 75201

16                        Tory Finley
                          Faegre Drinker Biddle & Reath LLP
17                        1717 Main Street, Suite 5400
                          Dallas, Texas 75201
18
                          Philip A. Erickson
19                        Plunkett & Cooney
                          325 East Grand River Avenue, Suite 250
20                        East Lansing, Michigan 48823

21

22

23

24

25
```

1

**I N D E X**

2

WITNESSES                                              PAGE

3

Recorded Deposition of David Gadis Played
                              (Continued)..1436
4     DAYNE WALLING
          Direct examination by Mr. Stern.........1446
5         Voir Dire examination by Mr. Christian..1546
          Direct examination(cont.)by Mr. Stern...1546

6

7

8     EXHIBITS                        Marked    Admitted

9     Plaintiff
          458..........................1438        1438
10        459..........................1438        1438
          460..........................1438        ----
11        461..........................1439        1439
          462..........................1439        1439
12        463..........................1439        1439
          463-1........................1439        1440
13        464..........................1440        1440
          465..........................1440        1441
14        466..........................1441        1441
          467..........................1441        1441
15        468..........................1441        1441
          469..........................1441        1441
16        470..........................1441        1441
          471..........................1441        1442
17        472..........................1442        1442
          473..........................1442        1442
18        474..........................1442        1442
          475..........................1442        1442
19        476..........................1442        1442
          477..........................1442        1442
20        478..........................1443        1443
          479..........................1443        1443
21        480..........................1443        1443
          481..........................1443        1443
22        482..........................1443        1443
          483..........................1443        1443
23        489..........................1443        1444
          496..........................1444        1444
24        497..........................1444        1444

25                    (CONTINUED ON NEXT PAGE)

```
 1                (CONTINUED FROM PREVIOUS PAGE)
```

```
 2          498.........................1444      1444
            602-43A.....................1525      1526
 3          602-43B.....................1533      1534
            1097........................1545      1546
 4          1098........................1549      1550
            1099........................1552      1552
 5          1100........................1557      1557
            1101........................1561      1561
 6          1105........................1565      1565
            3601........................1436      1437
 7          3602........................1437      1437
            3603........................1437      1437
 8          3605........................1437      1437
            3606........................1438      1438
```

```
 9



10



11



12          MISCELLANY                            PAGE
```

```
13          Proceedings.................................1430
            Certificate.................................1588
```

```
14



15



16



17



18



19



20



21



22



23



24



25
```

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | THE CLERK:  Calling Sherrod, Teed, Vanderhagen and |
| 3 | Ware vs VNA and LAN. |
| 4 | THE COURT:  Please be seated, and we will have |
| 5 | appearances.  I'm just going to log on here. |
| 6 | MR. CHRISTIAN:  Good morning, Your Honor.  Marcus |
| 7 | Christian, Daniel Stein, and James Campbell on behalf of VNA. |
| 8 | THE COURT:  Okay.  Thank you. |
| 9 | MR. MASON:  Wayne Mason, Philip Erickson, David Kent |
| 10 | for LAN. |
| 11 | THE COURT:  Thank you. |
| 12 | MR. STERN:  Sorry, Your Honor.  I was in the |
| 13 | restroom. |
| 14 | THE COURT:  That's all right. |
| 15 | MR. STERN:  Corey Stern and Moshe Maimon for the |
| 16 | bellwether plaintiffs.  And good morning. |
| 17 | THE COURT:  Good morning. |
| 18 | Oh, yeah.  You're Mr. Maimon. |
| 19 | MR. MAIMON:  If I can hand up, Your Honor, in looking |
| 20 | at the binders that we gave everybody regarding Mr. Gadis's |
| 21 | testimony, Tabs 26 and 27 have the same exhibits in them. |
| 22 | THE COURT:  Oh, okay. |
| 23 | MR. MAIMON:  And so if I can hand up -- I've given |
| 24 | defense counsel the proper document for Tab 27. |
| 25 | THE COURT:  Sure.  So we have, like, 14 minutes or |

```
 1   something left of Mr. Gadis.
 2           MR. STERN:  Yes, Judge.  Something to that effect.
 3           THE COURT:  Okay.
 4           MR. MAIMON:  24 minutes.
 5           THE COURT:  Okay.  I think I just need to still
 6   finish logging in.  I think we're waiting for a juror still.
 7   Let's see.  We are, yeah.
 8           And I have the letter regarding Ms. White's
 9   testimony.  But I need to get the computer to start, so I'll
10   be patient for that.
11           I hope everybody -- I hope there was a good birthday,
12   a successful baseball game.
13           MR. STERN:  Thank you.  Unsuccessful baseball game,
14   but --
15           THE COURT:  Well it's successful, win, lose.
16           MR. STERN:  I successfully got there.
17           THE COURT:  You got there.  That's successful.
18           When my kids were like 3 and 4, you know, tee-ball --
19   they played tee-ball.  And we would tell them you're not -- in
20   Ann Arbor, you're not allowed to keep score.  It's
21   impermissible, it's unlawful to keep score.
22           So we -- but the kids are keeping score immediately.
23   And all they want to do is win.  So it never worked.  Except
24   that I am the proud mother of a daughter who played tee-ball,
25   basketball, and soccer two times a year from pre-K to eighth
```

 1  grade and never scored a point in anything.  So there you go.

 2  Okay.  So we are -- okay.

 3        Oh, our last juror is here.  So what we'll do is make

 4  sure that they come down right at -- oops -- at 9:00.

 5        So I have read your materials regarding Ms. White.

 6  And I don't have it open right now.

 7        MR. CAMPBELL:  We had a discussion, "we" being

 8  myself, Mr. Maimon, and Mr. Mason, just now about this issue.

 9  And if we could table the Ms. White issue until after court or

10  at a convenient time to take it up in chambers, that would be

11  great.

12        THE COURT:  Let's do that.  Okay.  That sounds like a

13  very good approach.  Okay.

14        Well, then I'll -- are you ready for the jury?

15        MR. CHRISTIAN:  Your Honor, there is one other issue

16  that we'd like to raise.  It's with respect to nonparties'

17  testimony during this trial.

18        MR. MAIMON:  I don't think it's appropriate.  If we

19  don't have the defense -- the criminal defense lawyers --

20        MR. CHRISTIAN:  It's not -- it has nothing to do with

21  them, Your Honor.  I just haven't had a chance to talk to

22  Mr. Maimon about it.  It has to do -- or Mr. Mason, for that

23  matter this morning.

24        It has to do with -- as you may recall with similar

25  witnesses, there's been a little confusion about whether

1    cross-examination can include leading questions.

2              THE COURT:  Yes.

3              MR. CHRISTIAN:  And so we're taking the position that

4    with these nonparties, that they're adverse parties, and we

5    should be able to lead.  And we --

6              THE COURT:  I've allowed that.

7              MR. CHRISTIAN:  Sure, Your Honor.  I just wanted to

8    make sure that we understood -- that we had that understanding

9    going forward, so we could proceed --

10             THE COURT:  Well, we have it going backwards.  And so

11   we also have it going forward.  Unless you'd like some -- did

12   something come up or --

13             MR. CHRISTIAN:  No, Your Honor.  Just the fact that

14   there were objections to that, so I wanted to make sure going

15   forward that we're clear.

16             THE COURT:  They were overruled.

17             MR. CHRISTIAN:  Thank you.

18             THE COURT:  I'll deal with objections as they come

19   up.  Of course, if you foreshadow them, you file the motion in

20   limine and so on, if I ruled one way to the extent that I have

21   the presence of mind to continue ruling in that way, I

22   anticipate doing that.

23             MR. STERN:  Your Honor, there's a -- if I may?

24             THE COURT:  Yes.

25             MR. STERN:  There's a fundamental difference between

```
 1    taking the testimony as a defendant of Warren Green who was
 2    not part of a group or individually named as a nonparty at
 3    fault and taking the testimony of someone who has been named a
 4    nonparty at fault.
 5              And so the --
 6              THE COURT:  But so VNA is hoping to shift fault to
 7    LAN, correct, Mr. Christian?
 8              MR. STERN:  No.
 9              THE COURT:  I'm asking Mr. Christian, because he will
10    know if he's --
11              MR. CHRISTIAN:  LAN will be a nonparty at fault.
12              THE COURT:  LAN's a party.
13              MR. CHRISTIAN:  It will be a party on the verdict
14    sheet, Your Honor.  It all adds up to a hundred.  So obviously
15    it's a zero sum, and they would take the same position.
16              MR. STERN:  Yeah.  But there's no cross claims
17    against LAN.  They've filed three different nonparties at
18    fault submissions to a tune of 400 pages and have never once
19    pointed the finger at LAN.
20              THE COURT:  Yeah, but LAN is a party.  So they
21    couldn't file LAN in the nonparty.  So they're just here at
22    trial to say, "Not us.  It's Snyder.  It's Croft.  It's this
23    one.  It's LAN.  It's you.  You know, it's everybody."
24              MR. STERN:  Sure.
25              THE COURT:  And so I permitted cross of Warren Green
```

1   by VNA and cross of -- well, I don't know what live witnesses

2   we've had from Mr. Mason.  But -- and I foresee going forward

3   that way.

4               MR. STERN:  Okay.

5               MR. CHRISTIAN:  Thank you, Your Honor.

6               THE COURT:  And our jurors are on the way.

7               It's a nice, warm day here in Michigan.  I hope you

8   like it.  We're going backwards.

9               MR. STERN:  And, Judge, I assume that because it all

10  adds up to a hundred and because they're all on the jury

11  sheet, that we, too, are able to treat witnesses as though

12  they are adverse witnesses at times where we feel it's

13  appropriate, even if the case is only about LAN and VNA.

14              THE COURT:  If it's a hostile witness, it's a hostile

15  witness.  You've got it.  Yeah.  And you can start with direct

16  and realize the witness has turned hostile, say, "Hey, we've

17  got a hostile witness here."  And I'll say, "Go forward."

18              MR. STERN:  Thank you.

19              THE COURT:  I didn't watch the Oscars.  I don't have

20  a television.  I have to, you know -- but I wish I had.

21              THE CLERK:  All rise for the jury.

22              THE COURT:  Hello.  Happy Monday is right.  Welcome.

23  Hello.  Hello.  Welcome back.

24                              (Jury In)

25              THE COURT:  Okay.  Please be seated.  Welcome back to

1   the jury.  It's very, very good to see you.  I really mean

2   this.  I miss you when you're not here.  It's good to have

3   company.  This can be a very solo kind of job a lot of the

4   time.  So it's just great to have so much company helping me

5   do my job and all of us.

6          So we have about 20 something minutes left of Mr.

7   Gadis.  And then we will move on to the next witness.  So

8   we'll go ahead.

9      (Recorded Deposition of David Gadis Played (continued))

10         THE COURT:  So what we need to do is admit the

11  exhibits so that you all know that -- which exhibits that

12  you've seen on the screen are going to be received in

13  evidence.  And we need to go back to Mr. Benes's, as well.

14         MR. MAIMON:  Yes.

15         THE COURT:  So let me grab my high tech situation

16  here, which is a yellow sticky.  I assure you Jeseca's got the

17  official record, but I like to follow along as well.

18         Okay.  So we'll start with Mr. Benes.

19         MR. MAIMON:  Mr. Benes, that's fine.

20         THE COURT:  Whatever you want.

21         MR. MAIMON:  Mr. Benes is fine.

22         THE COURT:  Okay.

23         MR. MAIMON:  So with Mr. Benes, Your Honor, we would

24  offer Exhibit 3601, which is --

25         THE COURT:  Is it going to be Plaintiffs' Exhibit --

1      MR. MAIMON:  Yes.  Plaintiffs' Exhibit 3601, which

2  was Exhibit 2 to his deposition.

3      THE COURT:  And I guess what I'm going to ask for

4  from defense counsel is if you'll just wave or something --

5  I'll assume there's no objection?

6      MR. ERICKSON:  No objection, Your Honor.

7      THE COURT:  Okay.  So 3601 is received.

8   (Plaintiff Exhibit No. 3601 Admitted Into Evidence.)

9      MR. MAIMON:  3602, which was deposition Exhibit 3.

10     MR. ERICKSON:  No objection.

11     THE COURT:  Okay.  That's received.

12   (Plaintiff Exhibit No. 3602 Admitted Into Evidence.)

13     MR. MAIMON:  Plaintiffs' Exhibit 3603.  With only the

14  leasing agreement, not the pleading that it was attached to.

15  We're offering that into evidence.  That was deposition

16  Exhibit 4.

17     THE COURT:  Okay.

18     MR. ERICKSON:  No objection.

19     THE COURT:  That's received.

20   (Plaintiff Exhibit No. 3603 Admitted Into Evidence.)

21     MR. MAIMON:  Plaintiffs' Exhibit 3605, which was

22  deposition Exhibit 6.

23     MR. ERICKSON:  No objection.

24     THE COURT:  That's received.

25   (Plaintiff Exhibit No. 3605 Admitted Into Evidence.)

```
 1          MR. MAIMON:  And then Plaintiffs' Exhibit 3606, which
 2   was deposition Exhibit 7.  And, again, only the documents
 3   attached to the pleading and not the pleading itself.
 4          THE COURT:  Okay.
 5          MR. ERICKSON:  And no objection.
 6          THE COURT:  And that's received.
 7     (Plaintiff Exhibit No. 3606 Admitted Into Evidence.)
 8          THE COURT:  And then do we move to Mr. Gadis?
 9          MR. MAIMON:  Yes, Your Honor.
10          THE COURT:  Okay.
11          MR. MAIMON:  And so we would offer the following
12   exhibits.  Plaintiffs' Exhibit 458, which was Exhibit 2 to the
13   deposition.
14          THE COURT:  That will be received.
15     (Plaintiff Exhibit No. 458 Admitted Into Evidence.)
16          MR. MAIMON:  Exhibit 459, which was Exhibit 3 to the
17   deposition.
18          THE COURT:  That will be received.
19     (Plaintiff Exhibit No. 459 Admitted Into Evidence.)
20          MR. MAIMON:  Plaintiffs' Exhibit 460, which is
21   Exhibit 4 to his deposition.
22          MR. CAMPBELL:  Your Honor, on that one, I would like
23   an opportunity to review it.  There's a lot of material in
24   that that has nothing to do with Flint.
25          THE COURT:  Oh, it's things that don't relate to our
```

March 28, 2022

1439

1   case are also in there?

2          MR. CAMPBELL:  Yes.

3          THE COURT:  Okay.  So I'll just put a little box

4   around that one and you can let me know if there are just

5   certain pages that we should exclude or use.

6          Mr. Maimon.

7          MR. MAIMON:  Yes.  Next is Exhibit 461, which was

8   Exhibit 5 to the deposition.

9          THE COURT:  That will be received.

10    (Plaintiff Exhibit No. 461 Admitted Into Evidence.)

11          MR. MAIMON:  Plaintiffs' Exhibit 462, which was

12   Exhibit 2 to the deposition.

13          THE COURT:  Did you say 462?

14          MR. MAIMON:  Yes, Your Honor.

15          THE COURT:  But the other was 561?

16          MR. MAIMON:  461.

17          THE COURT:  Oh.  For some reason I put a 5.  Okay.

18   Okay.  That will be received.

19    (Plaintiff Exhibit No. 462 Admitted Into Evidence.)

20          MR. MAIMON:  Then we have Plaintiffs' Exhibit 463,

21   which was Exhibit 7 to the deposition.

22          THE COURT:  Received, as well.

23    (Plaintiff Exhibit No. 463 Admitted Into Evidence.)

24          MR. MAIMON:  And we've marked and would offer 463-1,

25   which is the audio.  We put it on a flash drive -- of what was

```
 1   just played, the full audio.
 2            THE COURT:  Mr. Campbell?
 3            MR. CAMPBELL:  Your Honor, on both of those there,
 4   I'd like an opportunity to review it, because it was an entire
 5   public hearing.  I don't know that everything on either the
 6   transcript or the recording has to do with the Flint issue.
 7            It was a city council meeting, and there might be
 8   other stuff on there.
 9            THE COURT:  Yeah.  If there is, then it's just
10   whatever happened at that council meeting.
11            MR. MAIMON:  I think it's only the public meeting,
12   and it's not the private city council meeting, which is on
13   neither.
14            THE COURT:  Okay.  Well, my inclination is to receive
15   it, and it's the portions that relate to our case that will be
16   of interest.  But I can't imagine that there would be anything
17   that can't be a part of the record.
18     (Plaintiff Exhibit No. 463-1 Admitted Into Evidence.)
19            THE COURT:  Anything else?
20            MR. MAIMON:  Yes.  Plaintiffs' Exhibit 464, which was
21   Exhibit 8 to the deposition.
22            THE COURT:  Okay.  That's received.
23     (Plaintiff Exhibit No. 464 Admitted Into Evidence.)
24            MR. MAIMON:  Plaintiffs' Exhibit 465, which is
25   Exhibit 9 to the deposition.
```

```
 1           THE COURT:  It's received, as well.
 2       (Plaintiff Exhibit No. 465 Admitted Into Evidence.)
 3           MR. MAIMON:  Plaintiffs' Exhibit 466, which was
 4   Exhibit 10 to the deposition.
 5           THE COURT:  Received.
 6       (Plaintiff Exhibit No. 466 Admitted Into Evidence.)
 7           MR. MAIMON:  Plaintiffs' Exhibit 467, which was
 8   Exhibit 11 to the deposition.
 9           THE COURT:  That's received.
10       (Plaintiff Exhibit No. 467 Admitted Into Evidence.)
11           MR. MAIMON:  Plaintiffs' Exhibit 468, which is
12   Exhibit 12 to the deposition.
13           THE COURT:  That's also received.
14       (Plaintiff Exhibit No. 468 Admitted Into Evidence.)
15           MR. MAIMON:  Plaintiffs' Exhibit 469, which was
16   Exhibit 13 to the deposition.
17           THE COURT:  That's received.
18       (Plaintiff Exhibit No. 469 Admitted Into Evidence.)
19           MR. MAIMON:  Plaintiffs' Exhibit 470, which was
20   Exhibit 14 to the deposition.
21           THE COURT:  Also received.
22       (Plaintiff Exhibit No. 470 Admitted Into Evidence.)
23           MR. MAIMON:  Plaintiffs' Exhibit 471, which was
24   Exhibit 15 to the deposition.
25           THE COURT:  That's received.
```

March 28, 2022                                                    1442

```
 1         (Plaintiff Exhibit No. 471 Admitted Into Evidence.)
 2              MR. MAIMON:  Plaintiffs' Exhibit 472, which was
 3    Exhibit 16 to the deposition.
 4              THE COURT:  Received.
 5         (Plaintiff Exhibit No. 472 Admitted Into Evidence.)
 6              MR. MAIMON:  Plaintiffs' Exhibit 473, which was
 7    exhibit 17 to the deposition.
 8              THE COURT:  Also received.
 9         (Plaintiff Exhibit No. 473 Admitted Into Evidence.)
10              MR. MAIMON:  Plaintiffs' Exhibit 474, which was
11    Exhibit 18 to the deposition.
12              THE COURT:  Received.
13         (Plaintiff Exhibit No. 474 Admitted Into Evidence.)
14              MR. MAIMON:  Plaintiffs' Exhibit 475, which was
15    Exhibit 19 to the deposition.
16              THE COURT:  It's received.
17         (Plaintiff Exhibit No. 475 Admitted Into Evidence.)
18              MR. MAIMON:  Plaintiffs' Exhibit 476, which was
19    exhibit 20 to the deposition.
20              THE COURT:  And that's received.
21         (Plaintiff Exhibit No. 476 Admitted Into Evidence.)
22              MR. MAIMON:  Plaintiffs' Exhibit 477, which was
23    Exhibit 21 to the deposition.
24              THE COURT:  Received.
25         (Plaintiff Exhibit No. 477 Admitted Into Evidence.)
```

```
 1              MR. MAIMON:  Plaintiffs' Exhibit 478, which was
 2    Exhibit 22 to the deposition.
 3              THE COURT:  Received.
 4       (Plaintiff Exhibit No. 478 Admitted Into Evidence.)
 5              MR. MAIMON:  Plaintiffs' Exhibit 479, which was
 6    Exhibit 23 to the deposition.
 7              THE COURT:  That's received.
 8       (Plaintiff Exhibit No. 479 Admitted Into Evidence.)
 9              MR. MAIMON:  Plaintiffs' Exhibit 480, which was
10    Exhibit 24 to the deposition.
11              THE COURT:  The same.  It's received.
12       (Plaintiff Exhibit No. 480 Admitted Into Evidence.)
13              MR. MAIMON:  Plaintiffs' Exhibit 481, which was
14    Exhibit 25 to the deposition.
15              THE COURT:  And that's received.
16       (Plaintiff Exhibit No. 481 Admitted Into Evidence.)
17              MR. MAIMON:  Plaintiffs' Exhibit 482, which was
18    Exhibit 26 to the deposition.
19              THE COURT:  Received.
20       (Plaintiff Exhibit No. 482 Admitted Into Evidence.)
21              MR. MAIMON:  Plaintiffs' Exhibit 483, which was
22    Exhibit 27 to the deposition.
23              THE COURT:  Also received.
24       (Plaintiff Exhibit No. 483 Admitted Into Evidence.)
25              MR. MAIMON:  Plaintiffs' Exhibit 489, which was
```

March 28, 2022

1444

 1   Exhibit 33 to the deposition.

 2           THE COURT:  Received.

 3      (Plaintiff Exhibit No. 489 Admitted Into Evidence.)

 4           MR. MAIMON:  Plaintiffs' Exhibit 496, which was

 5   Exhibit 40 to the deposition.

 6           THE COURT:  Received.

 7      (Plaintiff Exhibit No. 496 Admitted Into Evidence.)

 8           MR. MAIMON:  Plaintiffs' Exhibit 497, which was

 9   Exhibit 41 deposition.

10           THE COURT:  Received.

11      (Plaintiff Exhibit No. 497 Admitted Into Evidence.)

12           MR. MAIMON:  And Plaintiffs' Exhibit 498, which was

13   Exhibit 42 to the deposition.

14           THE COURT:  Also received.

15      (Plaintiff Exhibit No. 498 Admitted Into Evidence.)

16           THE COURT:  Mr. Campbell, any of those that you

17   object to?

18           MR. CAMPBELL:  Your Honor, no objection.

19           THE COURT:  Mr. Erickson?

20           MR. CAMPBELL:  Other than what I said.

21           MR. ERICKSON:  No objections.

22           THE COURT:  Okay.  All right.  Other than what you

23   noted.  And I have a box around that one to return to discuss.

24   I better find that box.  Okay.

25           So, Mr. Maimon, do the plaintiffs have another

March 28, 2022

1445

```
 1    witness who you're ready to call?
 2              MR. STERN:  Your Honor, at this time, plaintiffs call
 3    former mayor Dayne Walling to the stand.
 4              THE COURT:  Okay.  Mr. Walling, if you'd stop right
 5    about there and raise your right hand.
 6              Thereupon,
 7                     D A Y N E   W A L L I N G,
 8    having been called as a witness and having been first duly
 9    sworn testified as follows:
10              THE COURT:  Then that's our witness box.  And when
11    you get in there, if you wish, you can take your mask off, but
12    you're not required to.  Yeah.  There you go.  It's a little
13    tight, isn't it.
14              MR. STERN:  Your Honor, may I approach the witness
15    box?
16              THE COURT:  Yeah.
17              THE WITNESS:  Oh, I see.  The other side was easier.
18              THE COURT:  The other side might have been easier,
19    but that's okay.  There you go.
20              MR. STERN:  Your Honor, may I approach?
21              THE COURT:  Yes.
22              MR. STERN:  This is for you, Your Honor.
23              THE COURT:  Is that one for Jeseca?
24              MR. STERN:  I've got another one.
25              THE COURT:  Oh, okay.  Okay.
```

March 28, 2022                                                1446

1        MR. STERN:  Just one second.

2        THE COURT:  Okay.  Well, while we're getting the

3   exhibits ready.  Could you state your first and last name and

4   spell both of them.  Well, there they are.

5        THE WITNESS:  Yes.  My name is Dayne Walling.

6   D-a-y-n-e, W-a-l-l-i-n-g.

7        THE COURT:  Okay.  Thank you.

8                         DIRECT EXAMINATION

9   BY MR. STERN:

10  Q.  Good morning, Mr. Walling.  How are you?

11  A.  Good morning.  I'm fine.  Thank you.

12  Q.  I appreciate you being here with us today.  We've heard

13  some video testimony, so everybody's probably happy to have a

14  live witness sitting in the box.  So thanks for filling that

15  role.

16       Before we even really get started, can you just

17  explain to the jury who you are and what you do today?

18  A.  Yeah.  So today my family and I continue to live in Flint,

19  the same home that we moved back to in 2006.  And I'm doing a

20  few things professionally.  So I'm back to the community

21  development consulting work that I had been doing before I was

22  in office.

23       I've also returned to my academic work.  I had left a

24  Ph.D. in geography -- in urban geography when we had moved back

25  to Flint.  So I've reenrolled to finish my doctorate.  I'm an

1    adjunct professor this semester at Saginaw Valley State

2    University teaching intro to world geography or human geography

3    class.

4            Teaching an urban geography class at Central Michigan

5    University, and I'm teaching sociology civil engagement class

6    for the Baker College system so.

7    Q.   So one thing I'm going to ask you is if you could pull the

8    microphone a little bit, it just might be easier.

9    A.   Yeah, I can't quite tell how loud anything is in this box,

10   so just let me know.

11           THE COURT:   Yeah.

12   BY MR. STERN:

13   Q.   It's okay.

14           Where did you grow up?

15   A.   I grew up in Flint.  I was born -- born in Flint, went to

16   Flint public schools, graduated from Flint Central High School

17   1992.

18   Q.   And when you graduated in 1992, did you attend college?

19   A.   I did.  I went to Michigan State University.  So a proud

20   Spartan.

21   Q.   You mentioned that you also had received advanced degrees

22   and were in the process presently of finishing a degree.  When

23   you graduated from Michigan State, I imagine that was as an

24   undergrad; is that correct?

25   A.   Yes.  And I did -- I had the great fortune of receiving

```
 1   both a Harry Truman scholarship for public service leadership
 2   and then a road scholarship, which allowed me to study
 3   University of Oxford in the United Kingdom.  So I earned a
 4   second bachelor's in modern history.
 5              Modern history for Oxford, by the way, starts with
 6   the Roman occupation of the British Isles in 46AD.  It's a
 7   little different picture than we have here in the United
 8   States.
 9              I continued on while I was there because of my -- on
10   a passion and work around urban affairs.  I took a master's, a
11   one year master's in contemporary urban affairs from the
12   Goldsmith College, which is part of the University of London
13   system.
14              So I was in the UK for three years.  My wife and I
15   were in Washington, D.C., for a couple of years after both of
16   us were out of graduate school.  I worked for DC's Mayor Tony
17   Williams.
18              And then my wife took us up to the University of
19   Minnesota where she actually -- she knew she wanted to have a
20   career in academia.  So I worked for an urban policy coalition
21   there, did some consulting work, and then started my Ph.D.
22   also at the University of Minnesota.
23   Q.   Is your -- your wife, is she a Michigander, as well?  Is
24   she from Flint?  What's her story?
25   A.   My wife's name is Carrie.  So we're still married.  We
```

1    were married in November of 1999.  She was originally from Bay

2    City, so she was at Bay City Central.  We don't think we ever

3    crossed paths while we were in high school, but we were in the

4    same James Madison College of Michigan State.

5         And were kind of together through graduate school.

6    And she's now a full professor of political science at Albion

7    College.

8    Q.  And your wife, you and your wife, y'all have children; is

9    that correct?

10   A.  Yes, we do.  We have two sons.  One who's actually

11   somewhere not too far from here.  He's an undergraduate at the

12   University of Michigan in the history department.  And our

13   younger son is a junior in high school.

14   Q.  So everybody here knows you were the mayor of Flint.

15   There's no surprise.  How did that happen?  How did you come to

16   be the mayor of Flint?

17        Please tell us that story.

18   A.  Okay.  Long story short, right?  Well, I always -- I

19   always had this passion for my community.  My parents were both

20   public school teachers.  My mother was actually in preschool

21   education when I was younger, but earned her teaching

22   certificate.

23        So we were a family that was involved in the

24   community.  Not a political community -- a political family.

25   But my parents voted.  They were engaged with the news.  And

1    obviously a lot of time with the schools.

2            So, you know, I was hitting middle and high school

3    when those most, you know, severe factory closings that most

4    people know about Flint were hitting.  The industrial era.

5    So, you know, friends and family were affected by all of that.

6    Of course, it was on the news.  And movies were being made.

7            And it just -- it was something that deeply affected

8    me.  Any time I had a chance in a college class to, you know,

9    read something about Flint or Flint's history.  Or even when I

10   was at the University of Oxford studying history, as I

11   mentioned, you know, most students are studying things in far

12   flung parts of the world.

13           And I chose to do my honors -- well, we just called

14   it a thesis -- on the sit-down strike in Flint, the 1936, 1937

15   on a series of labor struggles between the nascent UAW and

16   General Motors, which led to General Motors recognizing the

17   UAW's ability to collectively bargain for unions.

18           This was the first time that a major U.S. industrial

19   corporation had agreed to those terms in American history.

20   And I actually studied on what happened subsequent to that

21   with local politics.

22           How did General Motors influence change?  How did the

23   united auto workers, in their growing political power, kind

24   of, exert influence on city decisions on school board

25   decisions.

1    So I just -- I always carried this bit of Flint with

2    me, you know, wherever I went.  And even started a nonprofit

3    organization called Flint Club.

4         And this is hard to imagine today.  But, you know,

5    before we all had Facebook or spent much time on the internet,

6    it was a really need idea for a community organization to

7    actually have a website and to put up stories about what was

8    going on in the community so that people could be connected.

9         There were a lot of us who had the -- you know, the

10   fortune to be able to go to college, had careers that took us

11   to different parts of the country and around the world.  So,

12   you know, I can talk about Flint all day.

13        But that just was always with me.  So I was doing

14   this work professionally.  Urban policy work, had worked for

15   the mayor in D.C.  And keeping an eye, being involved, you

16   know, as much as I could from a distance in Flint.

17        And a lot of my friends and colleagues were starting

18   to become the ones who were involved in community groups.  A

19   friend who was running a community newspaper doing a lot of

20   investigative journalism.  It just, you know, started to be a

21   conversation about what was coming next for the city.

22        Our current mayor at the time was quite advanced in

23   age.  He had this, kind of, rough and tumble sort of approach.

24   And a lot of us thought that that wasn't probably going to be

25   the future for Flint, that we -- we needed something that was

```
 1    different than that.
 2            So that planted a seed in me about how could I be
 3    involved in that, what, you know, maybe there was a candidate,
 4    someone on city council who might want to run for mayor.  Just
 5    one thing led to another in those conversations, and it didn't
 6    really look like anyone who was within my network who I had
 7    been working with or certainly some others, you know, now that
 8    I look back on who also ran in 2007.
 9            But it was something that I reflected on, prayed
10    upon.  And, ultimately -- and so we were living in Minnesota
11    at the time, had actually just bought our first house.  You
12    know, my wife was in her Ph.D. program.  Really felt like
13    that's what I needed to do.
14            That, you know, I was doing this work in other parts
15    of the country.  I was doing it in Minnesota.  I really should
16    go home and do this work.
17    Q.  And when you first ran in 2007, you ran against the mayor
18    that you just described.
19            What was his name?
20    A.  Mayor Don Williamson.
21    Q.  And you lost, right?
22    A.  Yes.
23    Q.  And I don't mean to say that flippantly.  It probably
24    wasn't a fun experience.  But you move back to Flint with your
25    family, decided to run against mayor Williamson.
```

```
 1            And you did not get elected, correct?
 2    A.   I didn't.  So we have this system in Flint where you run a
 3    big open nonpartisan primary.  I mean, many of us have party
 4    affiliations, but that's not on the ballot.  So the top two
 5    vote-getters in the August primary advance to the general
 6    election.
 7            So I was able to come in second in the primary of
 8    August.  So that's 2007.  We had moved back home in May of
 9    2006.  And was very proud of that success.  I felt like as
10    someone whose first time running for office, you know, young
11    person had been able to raise money.
12            And literally knock on thousands and thousands of
13    doors myself.  Not my campaign.  Although they would have done
14    many more.
15            So, you know, the fall was just a blur.  It was a
16    really tough -- politics in Flint are really tough.  Every
17    election is really tough.  So put everything I had into it.  I
18    thought I was going to win.  I think when you ask most first
19    time candidates if they think they're going to win their
20    election, they'll tell you yes.
21            We were in striking distance.  I mean, we knew enough
22    to know that it was going to be close.
23            Over 20,000 people cast their ballots in that
24    election, a pretty big turnout for a Flint mayoral off-year
25    election.  It wasn't with the governor's race or presidential
```

1   election.  Came up 581 votes short.

2   Q.   Still remember that, huh?

3   A.   Oh, yeah.  That's the number.  581.  So that was how many

4   doors I didn't get to.  Or maybe double that number, I would

5   have had to talk to, to convince them to vote for me instead of

6   the other guy, yeah.

7   Q.   And then at some point within the year or two, the mayor

8   who luckily somehow beat you, despite all your door knocking,

9   he resigned; is that correct?

10  A.   He did.  As I said, it's always -- it's always tough in

11  Flint.  But it's really tough in Flint during a Great

12  Recession.  And you know, I never had a chance to talk to the

13  now late -- may he rest in peace, Mayor Williamson about his

14  decision.

15       He publicly said he was retiring.  This was in early

16  2009.  He did also happen to be facing a recall election.  So

17  recall elections in Michigan at that time were structured

18  differently than they are now.

19       Our former mayor before Mayor Williamson had been

20  removed from office by recall.  So it was my belief that he

21  would have lost that recall election.  But about a month or, I

22  don't know, six weeks before that election, he retired from

23  office.

24  Q.   So you run in a special election.

25       Was it 2009?

```
 1    A.   Yes.  And because it was special, we had our -- we had our
 2    primary in May and our general in August.
 3    Q.   So very quick turnaround this time around, right?
 4    A.   Yes.
 5    Q.   And you -- unlike the first time when you ran, this second
 6    time you were elected, correct?
 7    A.   Yes.  I was elected August 2009.
 8    Q.   So everybody in the room for the last four weeks or five
 9    weeks, all we've been talking about is water.  Everything is
10    about water.  But I imagine that when you step in as mayor to a
11    city as big or as small as Flint, your responsibilities are
12    inclusive of issues with water but also pertain to other
13    things; is that true?
14    A.   Yes.
15    Q.   So aside from everything that everyone in here has talked
16    about, what was the day-to-day like?  What were your
17    responsibilities as mayor, and what was it that was essentially
18    required of you in those moments?
19         That was a long question.  I can chop it --
20    A.   No, no.  It's a tough job.  There's a lot to it.  I'll try
21    to be brief valuing the Court and the jury's time.
22         It really has to be one of the most difficult jobs in
23    American government.  I mean, this is a city that has lost
24    population, has lost tax base.  But is also an extremely, you
25    know, proud and tough and beautiful community.  So you don't
```

1    go into that job with low expectations just because it's

2    tough.

3          And I was listening to -- you know, to voters, to

4    citizens throughout these conversations.  I said over and over

5    again that we were going to make Flint into a, you know,

6    sustainable 21st century city with new jobs and safe

7    neighborhoods and good schools.  And went in trying to kind of

8    focus on all those things.

9          So people expected in addition to that, all the basic

10   services.  I mean, that includes water.  We had been receiving

11   water from a long time from Detroit.  But we were no longer

12   under a long-term contract.  So that was an issue that was

13   discussed.

14         We, you know, have to figure out how to mow the

15   parks.  And depending on the communities you all come from,

16   you may take it for granted that someone mows the parks every

17   week.  We in Flint at that time would have a hard time trying

18   to figure out how to mow the parks once a month.

19         And that's not something you're proud of as a mayor.

20   That's not something you want to see when you drive down the

21   street.

22         So we have abandoned houses that need to be

23   demolished that need to be boarded up.  You know, the work to

24   attract new companies, support our existing small businesses.

25   Because people ultimately, you know, want to go to work and be

 1    able to pay bills and raise their family.

 2           And then, you know, at that time because of the

 3    severity of the Great Recession and the kind of desperation

 4    that that was setting in for a lot of families, the challenges

 5    around public safety were really severe in Flint.

 6           You know, you go into it without the resources you

 7    want, but you have to manage them.  I'm thinking like a mayor

 8    here when I say that.

 9           We had in 2010, the still to this day, you know,

10    highest number of homicides that the city has ever recorded in

11    a single year.  And that included an episode with someone who

12    became known as the serial stabber.  We had a series of

13    murders by knife during that summer of 2010.

14           We had a couple of strings of dozens, if not,

15    hundreds of arsons.  It just -- we can have this conversation

16    for a long time.  But I'm trying to just hit on a few -- these

17    were the things that were on, you know, my desk and my

18    department head's desk every day.

19           MR. STERN:  So it sounds like you're talking about

20    parks and recreation, right, when it comes to mowing the lawn;

21    is that fair.

22    A.  Yes.

23    Q.  You're talking about the police department and emergency

24    services, right?

25    A.  Yes.

March 28, 2022

```
 1   Q.   You're talking about the fire department for the -- at
 2   least for the arsons and for other issues that may turn up,
 3   right?
 4   A.   Yes.
 5   Q.   You're dealing with budgets, you're dealing with tax
 6   collection.
 7           All those things, correct?
 8   A.   Yes.
 9   Q.   Now, everybody in the world is from somewhere.  You know,
10   you've already kind of -- it permeates through you about your
11   feelings about Flint.
12           But for people who are not from Flint, whether
13   they're from Ann Arbor or from Saginaw or somewhere else in
14   Michigan or from Georgia or from New York or from Boston,
15   wherever someone's from, if you were to describe to people and
16   to this jury, what does it mean from your perspective as
17   someone who grew up there, who came back there, who became the
18   mayor, what does it mean to be from Flint?
19   A.   Well, we're -- you know we're proud Flintstones.  You'll
20   hear that said.  Just -- it's a place where we've taken a lot
21   of hard knocks, but somehow we -- you know, we find a way.  We
22   pull together.  You know, we stick together we work things out.
23           It's not always a pretty situation.  It's not always
24   a pleasant dialogue.  But you have to be able to have those
25   conversations with people.  So I think it's a place where, you
```

1   know, you can go to the bank, and you'll end up striking up a

2   conversation with somebody about their life story.

3          And you'll end up sharing your life story, even

4   though you didn't intend to have that conversation when you

5   were -- when you were there.

6          So it's a kind of a family.  It's a rough family

7   sometimes.  But people do really care for one another.  We've

8   been through these hard knocks, and I think we're just -- you

9   know, we're really proud of how the community somehow finds a

10  way to beat the odds.

11         That's kind of what you're trying to do in Flint.

12  You're always trying to figure out how you can beat those odds

13  that are stacked against you.

14  Q.   So we're going to get through a lot of history of the

15  river and the water and the KWA stuff that we've been talking

16  about in here.

17         But at some point in time -- and we'll go through it

18  in more detail -- but you finished being mayor around 2015,

19  right after a reelection; is that correct?

20  A.   Finished is a great way to put it.  I lost what would have

21  been my second reelection in November of 2015.  So then

22  Dr. Karen Weaver, Mayor Dr. Karen Weaver took office just a

23  couple of days after that election, so.

24  Q.   And what is interesting or maybe tell the jury is there's

25  a whole water crisis.  You're the mayor in the middle of it.

1    We'll talk about all of that.  But you lose your reelection.

2            You could have left, right?

3    A.   Sure.  I mean, yeah, I could have.  I mean, I -- we

4    weren't going to, but...

5    Q.   Did you and your family make a decision at that time about

6    staying, or was there not even -- what was the decision process

7    like?

8    A.   It wasn't a discussion.  I mean, we weren't ready to go.

9    The work felt unfinished.  I mean, sure, you lose an election.

10   My parents were just down the street.  My grandmother still

11   just lived just literally outside of the city in a senior

12   living facility.

13           So that's where family was.  That's where our friends

14   were.  You know, I was still very connected to the life of the

15   community.  It's certainly a different role when you're the

16   mayor versus not the mayor.  But I was still, you know, a part

17   of the community.

18           And, frankly, to tell the whole truth here on the

19   stand, my father was actually in the hospital with what turned

20   out to be a serious case of pancreatitis.  So he was in ICU

21   those last few days when I was on the campaign trail.  And he

22   passed away in early December just after I was out of office.

23           So it -- we weren't in the mindset of thinking about,

24   you know, going somewhere else.

25   Q.   And to this day, you still live in Flint; is that correct?

March 28, 2022

1461

```
1   A.   Yes, yes.  We're in the house that we purchased when we
2   moved back in 2006.
3   Q.   I skipped over, like, years of stuff, and we'll get to it.
4   But you talk about 2009.  You were elected in a special
5   election.  We just touched on 2015.  You were not reelected.
6            You were reelected in 2011, correct?
7   A.   Yes.  So when you win in a special election, you then have
8   to run in the next regularly scheduled election.  So I came in,
9   in August of 2009 and knew that right around the corner would
10  be a regular primary election in August of 2011.  So that -- so
11  that, you know, was on the calendar.  That was on my schedule
12  from day one.
13  Q.   So you wish that election.  And do you recall anything
14  about that election day or that period of time that stands out
15  to you different than what you experienced in 2009?
16  A.   Yes.  Because on election day -- so I took the day off,
17  because I'm not going to do city business on election day.  I'm
18  going to do Candidate Walling for mayor work.  So I'm out in
19  the neighborhood on the city's south side about 3:00 o'clock in
20  the afternoon.
21           And I realize I'm getting a call from Michigan State
22  Treasurer -- State of Michigan Treasurer Andy Dillon.  And we
23  had been having these conversations and negotiations about
24  Flint's status under this new Public Act 4, which gave the
25  state and the governor additional powers in terms of local
```

March 28, 2022                                                    1462

 1   governments and local school districts.

 2           So usually, you know, when I'm out campaigning, I

 3   don't take phone calls.  The whole purpose is to have

 4   conversations with people who you don't normally talk with.

 5   That's why you take time to go out to a neighborhood.

 6           But because it was Treasurer Dillon and because there

 7   were these ongoing issues in terms of the city status, Public

 8   Act 4, the financial review that had been underway, I took the

 9   call.  So I got back into the car.

10           And Treasurer Dillon told me that at about

11   5:00 o'clock, Governor Snyder would be announcing that the

12   City of Flint would be declared to be in a financial

13   emergency.

14           And at some point subsequent to that, an emergency

15   manager would be appointed.  So that was my, like, you know,

16   three O something on election day.  And this new Public Act 4,

17   of course, which I had followed very closely, said that an

18   appointed emergency manager will act as the mayor and the city

19   council.

20           So it was devastating news to get on election day.  I

21   believed very strongly that I was going to win.  You know,

22   people still have to have their say, votes still have to be

23   counted.

24           But I had to go into a different mode of thinking

25   about what might I say as a person getting elected to an

1  office when I understand the governor is going to appoint

2  someone to take all of that authority.

3          And it's just -- in many different ways as a mayor,

4  you're kind of in this, you know, balancing act or trying to

5  contend with different and conflicting interests.

6          So, yeah, my election night speech ended up being a

7  -- very different kind of remarks.  Because that did hit the

8  news at 5:00 o'clock.  So the governor made this announcement.

9  The community's concerned about losing democracy and what's

10  this going to mean?

11          You may know, but City of Flint tends to be about

12  90-some percent democratic community.  Governor Snyder was

13  elected as a republican.  So you had a republican governor

14  making this announcement about an emergency manager.  You had

15  a local community that has an awful lot of disagreements with

16  that kind of approach.

17          So I ended up coming up with a vision, a statement

18  that was along the lines of, you know, I'm going to work with

19  anyone who's here to cooperate to make Flint a better place.

20          I wanted to -- I didn't want to go into this term

21  with just a pitched battle, you know, right off the bat

22  between democrats and republicans or, you know, what have you.

23  So I wanted to try to create a framework where we could still

24  deal with these problems, still put the community first.

25          It was a value proposition that anyone who wanted to

1  do this work, even if I vehemently disagreed with Public Act
2  4, which people of Michigan repealed about a year later, or
3  disagreed with a certain individual or an individual, a
4  governor who was appointed by that individual, that we had to
5  somehow sort of work through this.
6  Q.  You've mentioned a few times the Great Recession, and you
7  talked about, I think, family members of yours who -- or
8  community that you were aware of that worked in the automotive
9  industry.
10          At some point in time through your education, through
11  your study, through your work, did you become familiar with
12  the history of Flint?
13  A.  Yes.  Especially the social and economic history,
14  political.
15  Q.  So throughout your testimony, I'm going to ask you about a
16  few things.  One is Flint itself, and we've already sort of
17  gone down that road some.  Two is the Flint Water Treatment
18  Plant.
19          Three are some of the players in Flint, some of the
20  names of folks that the jury's heard about that we've talked
21  about.  We're going to talk about Flint's engineering
22  consultants.  And ultimately we're going to talk a little about
23  the crisis; is that fair?
24  A.  Yes.
25          MR. STERN:  Marcus, were you about to say something?

March 28, 2022

1465

```
 1          MR. CHRISTIAN:  Yes.  Your Honor, I understand there
 2   are going to be a number of slides during the -- during this
 3   testimony.  I understand they're not marked for
 4   identification.
 5          THE COURT:  We'll mark them after.  That's what we've
 6   been doing all along.  So we'll continue to do what we've been
 7   doing.  Thank you.
 8          MR. STERN:  Anything else?  May I proceed?
 9          Thanks.
10   BY MR. STERN:
11   Q.   Sorry.
12          So if you don't mind, since you have some working
13   history of Flint, I talked to the jury some in the opening
14   statement about the history of Flint.
15          I'm curious if you have any familiarity with the auto
16   industry when it came to Flint and sort of the story of how
17   that all happened and when it did?
18   A.   Yes.  So I have a long bit of history that maybe hadn't
19   come up yet.  Because you probably know Flint as the vehicle
20   city.  But you may not remember -- of course, we have the motor
21   city in Detroit.  Flint's the Vehicle City.
22          Flint got the moniker "Vehicle City" actually for not
23   producing cars but for producing carriages.  So before we had,
24   you know, automobiles like we think of today we had horse-drawn
25   carriages.
```

March 28, 2022

```
 1              And it was in Flint where early companies that turned
 2    into our auto industry, actually Buick, for instance, started
 3    making carriages and sold more carriages than any other
 4    company in the world in 1905 or 1906.  And that's when we
 5    actually became the Vehicle City.
 6              So it was then from that then, there were, of course,
 7    investments and new technologies and people like Charles
 8    Stewart Mott, which bequeathed later the Charles Stewart Mott
 9    Foundation, moved his axle company from upstate New York to
10    Michigan to be a part of what became General Motors.
11              So companies like, you know, Chevrolet and Buick and
12    later, you know, what Oldsmobile in Lansing and others were
13    part of, you know, what then became the world's largest
14    corporation in the 20th century.
15              So like today, we think about, you know, Amazon or we
16    think about Microsoft, that was General Motors in the 20th
17    century.  And Buick's world headquarters was in Flint.  We
18    had, you know, a couple of handfuls of factories ultimately
19    employing tens of thousands of people.  This really was the
20    life of the community.
21              It was the auto industry and then all of the
22    community institutions that came around that.
23    Q.  So between 1900 and 1920s, do you have any concept or idea
24    of what happened with the population in Flint?
25    A.  Well, it was absolute boom.  This is the first major wave
```

1    of population growth.  People were moving from around the

2    country into Flint.  Some international immigration, as well.

3    But a lot of the people coming to Flint were from different

4    parts of the country.

5           And this picture shows just how crowded everything

6    was.  Because people were rushing to get these, you know, these

7    pretty good paying jobs relatively.

8           So you'll see in Flint's history, this idea of, like,

9    a hotbed which meant that one person slept in the bed and then

10   woke up and went to work.  And before the bed cooled off, the

11   next person coming home from work would be sleeping in that

12   same bed.  And that just, you know, that went on for years.

13          This was, you know, part of our country's great

14   economic boom early in the 20th century, the second Industrial

15   Revolution.

16   Q.   Do you know if -- do you know what Flint's population was

17   by the 1960s?

18   A.   Yeah.  Well, through the '60s, you take a census every ten

19   years, so I think the 1970 census put us 198,000.  We say

20   200,000, you know, the city's peak population was 200,000 on a

21   late '60s, right around that 1970.  So that was our -- that has

22   been our historical peak so far.

23   Q.   And in that period of time, if you know, what was the --

24   what was the perception of and how far reaching were companies

25   like GM, as well as the United Auto Workers Union in Flint?

March 28, 2022

1468

 1    A.   Well, as I said, the community really revolved around the

 2    auto industry.  We had at our peak, I think we had almost, you

 3    know, 11 or 12 production factory facilities, and these are the

 4    big job generators.  These are the thousands and thousands of

 5    people working the line.

 6           The Buick city complex along the river on the

 7    northeast side, it was the largest UAW local in the world.  It

 8    alone -- it alone had like 35,000 members at its peak.  The

 9    largest nonmilitary cafeteria in the world.  I mean, it was

10    just -- at the time, it was just an enormous part of our

11    community.

12           You'll see estimates.  The auto industry can add

13    people and lay people off and change jobs pretty quickly.  But

14    you'll see 75,000, 80,000, maybe even 85,000 workers in

15    Flint's auto plants at its peak.

16           Not all of those would have been Flint's residents.

17    They would be starting to drive in from surrounding

18    communities.  But the property tax base, the -- just all the

19    income and spending that goes with those kinds of jobs.

20           It's -- this is what made Flint such a, you know,

21    prosperous place.  It really put Flint on the map.

22    Q.   So you mentioned that at the -- I think you said in the

23    1970 census looking backwards at the '60s, the --

24           THE COURT:  Mr. Stern.

25           MR. STERN:  Yes, ma'am.

| 1 | THE COURT:  I think we need a break. |

1      THE COURT:  I think we need a break.

2      MR. STERN:  I'm so sorry.

3      THE COURT:  That's all right.  I just got a signal

4  over here from a juror that it would be a good time for a

5  break.

6      MR. STERN:  Okay.  I'll go back to that question.

7      THE COURT:  Okay.  Yeah.

8      THE CLERK:  All rise.

9      THE COURT:  We'll take about 15 minutes.  And,

10  Mr. Walling, you're free to step down or sit there, whatever

11  you wish.

12      THE WITNESS:  Okay.  Thank you, Your Honor.

13      THE COURT:  Mr. Walling, just be sure to stay on the

14  first floor and not.

15      MR. STERN:  Can I ask the.  I have not seen the mayor

16  this morning at the courthouse.  I don't know where he's been.

17  There's a witness room, but I don't -- we don't use it.  I

18  don't know if any of the defendants are using it.

19      But I'm curious if it's possible for him to use that

20  room while we're on a break.

21      THE COURT:  Sure.

22      MR. ERICKSON:  We're not using it today.

23      THE COURT:  Okay.  Yeah.

24      MR. STERN:  So if you go out the hallway,

25  Mayor Walling, on your left-hand side, there should be a room

 1   to go in.  But we're not allowed to talk to.  So I don't want

 2   you to feel compelled to have to.

 3           THE WITNESS:  Thank you.  Otherwise I had just been

 4   in the hallway.

 5           MR. STERN:  No problem.

 6           THE COURT:  Okay.  Good.

 7           MR. CHRISTIAN:  And, Your Honor, before the jury

 8   comes back after break, we'd like to have a moment to discuss

 9   an issue.

10           THE COURT:  Before the --

11           MR. CHRISTIAN:  Before the jury comes back.

12           THE COURT:  Well, what is the issue?

13           MR. CHRISTIAN:  This is fascinating testimony.  I

14   think it's a little bit outside of relevance.

15           THE COURT:  Mr. Christian, you were here during the

16   opening, right?

17           MR. CHRISTIAN:  Yes, Your Honor.

18           THE COURT:  And Mr. Stern went through this

19   history --

20           MR. CHRISTIAN:  Yes, he did.

21           THE COURT:  -- as part.  And so an opening statement

22   foreshadows the testimony that you're going to have to support

23   that opening statement.

24           MR. CHRISTIAN:  I understand, Your Honor.  And that's

25   why I did not object in front of the jury.  I didn't want to

1  be obstructive.  But I just -- you know, given -- some of it

2  seems to be a little bit afield.  But if you disagree, I just

3  wanted to raise the issue, Your Honor.

4        THE COURT:  I disagree only because I listened to the

5  opening statement, and I saw how it was connected to what

6  happened to the City of Flint that landed it where it was.

7  But I think the point of which you would have wanted to object

8  would be earlier.

9        I mean, you saw the PowerPoint from the opening.  It

10 had this progression.

11       So I assume, Mr. Stern, that this is what this

12 testimony is doing, is supporting those statements you made in

13 your opening?

14       MR. STERN:  Of course.  I mean, he hasn't heard the

15 opening.  But even if he had, I wouldn't just ask him, "Hey,

16 did anything I say in opening not ring true?"

17       THE COURT:  Right.

18       MR. STERN:  So I have to get the testimony from

19 somebody.  And he's the person that knows best because of his

20 studies, being the mayor, and he's just somebody that knows

21 it.  He's from there.

22       THE COURT:  Okay.  Yeah.  Well, thank you for your

23 objection, and it's overruled.

24       Mr. Mason wants to make the same one.  But if he

25 makes it, you've got to talk into the microphone.

 1          MR. MASON:  I just --

 2          THE COURT:  Just be seated and speak into the

 3    microphone.

 4          MR. MASON:  The fact that someone says something in

 5    opening does not make it relevant.

 6          THE COURT:  No, it doesn't, Mr. Mason.  But listening

 7    to the opening, it was evident what this testimony was going

 8    to provide.  I didn't know who would provide the testimony.

 9    But I know it couldn't be Mr. Stern testifying.  So it would

10    have had to be a witness.  And it fit into the story that he's

11    telling that led to the Flint Water Crisis so.

12          MR. CHRISTIAN:  And one other thing, Your Honor, I

13    just want to point out.  Although Mr. Walling -- Mayor Walling

14    is very credentialed and has historical credentials.  He's not

15    an expert in this case, and he's testifying as an expert.

16          MR. STERN:  No, he's not.

17          MR. CHRISTIAN:  He wasn't around in the '20s.

18          THE COURT:  He's testifying -- he's not giving

19    opinions.  He told us at one point, there were 85,000 people

20    who worked in Flint water plants at another time, and some

21    lived in Flint and some did not.  I don't see that -- tell me

22    what opinion testimony you've heard.

23          MR. CHRISTIAN:  Well, I mean, he definitely did not

24    experience that, Your Honor.  He's not a witness who can say

25    he was there in 1920.

1    THE COURT:  Well, that's true.

2    MR. CHRISTIAN:  And hotbeds mean this.  And, you

3  know, the history of the unions and all those sorts of things.

4  That's more of a historian as an expert would testify to, Your

5  Honor.

6    THE COURT:  Mr. Stern.

7    MR. STERN:  He was the mayor of Flint.  I mean, he

8  was the mayor for seven or eight years.  He grew up in Flint.

9  He spent his childhood in Flint.  He spent his adulthood in

10  Flint.  Spent his professional career in Flint.

11    You don't have to qualify somebody as an expert for

12  them to talk about intelligently about where they're from and

13  their community.  All of us can do it without being qualified

14  as experts.

15    Totally, totally appropriate for him to give context

16  to the jury about what lead to decisions that were made in

17  2013 and '14.

18    MR. CHRISTIAN:  And he was born in 1974 thereabout,

19  Your Honor.  Not 1920.

20    THE COURT:  Okay.  How much further -- how much more

21  of this material do you have?

22    MR. STERN:  Five minutes, ten minutes.

23    THE COURT:  Okay.  Well, I'll allow that.  I don't --

24  what we try to stay away from with expert testimony is

25  opinions.  And I don't know how much of Ann Arbor's history I

March 28, 2022                                                    1474

```
 1   could give you.  I could -- but probably some.  And just from
 2   living here and so on.
 3            So the objection is overruled, and we have about five
 4   more minutes, and we knew this was coming.  We didn't know
 5   which witness, but we knew it.  And so that will be the
 6   decision there.
 7            So anything else at this time?
 8            MR. CHRISTIAN:  Nothing from me, Your Honor.
 9            THE COURT:  Okay.  Thank you.
10                         (Brief Recess)
11            THE COURT:  Please be seated.  Then we'll get the
12   jury.  Please be seated.  It's now all of 23 degrees.
13            MR. STERN:  Warming up.
14            THE COURT:  Yeah.  It's a heat wave.
15            MR. MAIMON:  Well it's still only March.
16            THE COURT:  Yeah.  There's hope.
17            THE CLERK:  All rise for the jury.
18                          (Jury In)
19            THE COURT:  It got cooler in here.  Yeah.  It was so
20   warm for several weeks, and now there's a little breeze.  So
21   please be seated.
22            Mr. Walling, you're still under oath to tell the
23   truth from when I swore you in earlier.
24            THE WITNESS:  Yes.
25            THE COURT:  Good.
```

1     MR. STERN:  May I proceed?

2     THE COURT:  Yes.

3  BY MR. STERN:

4  Q.  Mr. Walling, you mentioned that at its peak, the city had

5  roughly 190-some-odd-thousand residents.

6     And then at some point in time did that change?

7  A.  Yes.  It declined over time in those coming years.  So,

8  you know, each census would show some decline in population.

9     We did the -- we did the city's long-term

10 comprehensive or master plan while I was in office.  This is

11 something that we took a look at.  The 2010 was also conducted

12 while I was in office.  So we came out 102,000-something in

13 the 2010 census.

14    So we were using that data in our planning, you know,

15 process to look at those changes over time.  I believe the

16 city had some potential where it could grow a bit.  It could

17 also continue to see some population declines as people lived

18 in other parts of, you know, Genesee County so.

19 Q.  You had mentioned earlier when you were talking about the

20 Great Recession, and I think you were talking about in 2007; is

21 that right?

22 A.  Great Recession, 2000 -- 2009 is when it technically

23 started.

24 Q.  Was there -- were there other recessions that affected

25 Flint prior to 2009 that you're aware of?

1   A.   Well, yeah.  I don't know the dates.  But I'm sure, you

2   know, each of those -- any time you have a national economic

3   slowdown that affects the auto industry, which is what we're

4   still heavily dependent on.  And maybe the Great Recession was

5   recorded at the start of -- may have started 2008.

6   Q.   Okay.

7   A.   But right in that time period.

8   Q.   So you just mentioned that, you know, '80s, '90s -- by

9   2010, I think you said the population was around a hundred

10  thousand people, was that accurate, in Flint?

11  A.   Yes.  So approximately half of our peak population.

12  Q.   Do you know in 2014 at the time that the city switched

13  from the Lake Huron water to the Flint River, do you have any

14  idea of what the population was then?

15  A.   Yes.  We were -- we would be using the U.S. census.

16  There's an American community survey that the Census Bureau

17  conducts that uses survey data as opposed to, you know,

18  conducting an actual count of every household.

19           And I believe that had us at 96 or 97,000.  So there

20  had been a loss of a few thousand people since the 2010 census

21  count.

22  Q.   And sitting here today, do you know what the population is

23  of Flint?

24  A.   On the 2020 census, I think shows us at 85,000.  It's in

25  that neighborhood.  I think most large cities believe that the

March 28, 2022

```
 1   pandemic and everything that went along with that, we probably
 2   had an undercount.  So there's probably more than that number
 3   of people actually residing in the City of Flint today.
 4            So somewhere between 85- and 90,000 people.
 5   Q.   And in terms of the demographics of the city, do you have
 6   a familiarity with and know today what the minority population
 7   is in Flint?
 8   A.   Yes.  It's -- and all of this would be in the census to be
 9   more precise.  But approximately 60 percent minority.  For our
10   community, the African American community is the majority.  But
11   in terms of national comparisons.
12   Q.   And was the same true in 2014 in terms of that 60 percent
13   number as it is today?
14   A.   Yes.  It would be the same within a few percentages.
15   Q.   And then if we're going to talk about poverty, you know,
16   there's always poverty lines in discussing communities.
17            Do you have any familiarity with what the percentage
18   of folks in Flint who today live in poverty as well as back in
19   2014?
20   A.   Yes.  Our community is about 40 percent of households are
21   at or below the poverty line.  Again, that would vary a bit,
22   you know, year by year based on conditions.  And that means
23   that about 60 percent of our children are in households that
24   are at or below the poverty line.
25   Q.   We will get into more specifics about the KWA and the
```

1    switch.

2            But as someone who was the mayor for more than half a

3    decade, grew up in Flint, studied the city, do you have a

4    familiarity with, let's just say the last 50 years before 2014,

5    how Flint got its water for its community?  And if so, can you

6    explain it to the jury?

7    A.   Yes.  It's pretty straightforward.  That in the '60s, the

8    city joined the Detroit Water and Sewerage District.  So we

9    were receiving, you know, treated water from that larger

10   Detroit system, which was serving Detroit but also many other

11   communities in the metropolitan area.

12           So that was a long-term contract that we had for many

13   decades.  And then when that -- when the date on that long-term

14   contract expired 2005, 2006, the city effectively went on a

15   year-to-year renewal.

16           So if neither party gave a notice, then the provision

17   of treated water stayed in place.  And there was a bit, I

18   mean, still costly, but a bit of an up-charge for Flint being

19   a water user without being under a long-term contract.

20   Q.   You I believe -- I don't know if this was said in front of

21   the jury or otherwise.

22           But what year were you born, sir?

23   A.   It was accurately stated by the counsel here.  I was born

24   in 1974.

25   Q.   Okay.  And so from the day you were born until 2014, is it

1   -- where was Flint getting its water during that time?

2   A.   Yes.  It was receiving water from Detroit.  So that was

3   coming into the city and distributed through the miles of pipes

4   to our households and businesses.

5            And then there would be a brief -- by that I mean a

6   couple of days at a time, where if the city was unable to

7   receive water from Detroit, then the city's Water Treatment

8   Plant was the approved backup.  And that would kick in and then

9   send water into the distribution system.

10           So that had happened actually while the interim

11  mayor, Mike Brown, who then became later the first emergency

12  manager.  But interim Mayor Mike Brown was in office while I

13  was running in 2009 for mayor.

14           And the city had a major break this the transmission

15  line.  It's like a 6-foot tall pipe that became not

16  operational.  Took some time to get the equipment and

17  contractors in place to fix.

18           So there were a few days where that water from the

19  Water Treatment Plant was flowing into the distribution

20  system.

21  Q.   So when the water came from Detroit, do you have a

22  familiarity with whether it had been treated before it got to

23  Flint or if it had to be treated at the plant?

24  A.   It was treated.  So that was part of the cost that we pay.

25  There would be other costs we would have of, you know,

1  personnel and fixing pipes and things.  But our plant was not

2  treating water on an ongoing basis.

3  Q.  And based on your testimony about the 2009 period when you

4  were running and there was an interim mayor, you said that you

5  remember an instance where you needed -- the city needed to use

6  the Flint River on a very temporary basis.

7          Can you recall any other times from the time you were

8  born until April 2014 when the City of Flint actually utilized

9  the Flint Water Treatment Plant and water from the Flint River

10  to distribute to residents?

11  A.  I'm sure there were some just because of the nature of the

12  system.  But that was the one where I had a specific

13  recollection of them.

14          Because I was running, the interim mayor was keeping

15  the two of us who were general election candidates apprised of

16  some general issues.  So that was one where I heard from the

17  city that, "Okay.  This is what's occurring.  This is how long

18  things might take."

19          It could even maybe have gone on longer.  It ended up

20  being some number a few days.

21  Q.  A few days you said?

22  A.  Yeah.  It may have been a week.  But a few days.

23  Q.  And the cost of the water from Detroit -- I mean, the

24  jury's -- I'll represent to you the jury's already heard a good

25  bit of information about the switch from various witnesses.

1    But when you were mayor both on the interim -- on the

2    -- after the special election and then after you were

3    reelected, do you have a familiarity with and what was the cost

4    of the water coming to Flint on a monthly basis?

5    A.   Yes.  And it would be based on usage.  But we would spend

6    over the course of a year, you know, $11-some million for that

7    water from Detroit for the city's portion of the usage.

8    There's a technicality in how this arrangement was

9    done where the City of Flint actually held the contract with

10   Detroit for water for Genesee County, through the Genesee

11   County Drain Commissioner's distribution, as well as the City

12   of Flint.

13   So that would be another number that would have just

14   been deducted.  Because we would have received that from

15   Detroit and then that would have been paid by the drain

16   commissioner for that amount of water.

17   So the City of Flint's portion of the water that came

18   into our community was around 11 million a year.

19   Q.   So just shy of a million a month or so?

20   A.   Right.  It might be -- it might have been estimated up to

21   a million a month in, you know, conversations with people.  So

22   right about that, that amount of money.

23   Q.   Okay.  The jury has heard a good bit of information about

24   the KWA.

25   When you were elected in 2009, were you aware of any

March 28, 2022

1  conversations that had begun taking place regarding Flint

2  switching to the KWA pipeline?

3  A.   Yes.  This was a conversation occurring in the community,

4  even going back to when I had run in 2007 as a candidate.

5  Because we were no longer -- we weren't under a long-term

6  contract with Detroit, so there was an obvious question of what

7  Flint's long term water source was going to be.

8           Even if it was to resign with the Detroit Water and

9  Sewerage system, then if that was going to be the city's

10  decision, it would be better to get under a long-term contract

11  and actually pay that rate.  So that would be, you know, one

12  option.

13          There were people who were older than me who did know

14  that the city, you know, had used the Flint River as a primary

15  source prior to using the treated water from Detroit.  Our

16  Water Treatment Plant is right kind of on the banks of the

17  river on the city's north side.  So there were people who

18  talked about that.

19          So you had Flint River.  You had Detroit.  And then

20  you have different versions of how those things could be

21  arranged.  Whether you were independent as a city or whether

22  you more cooperated with the Genesee County Drain

23  Commissioner's office.

24          But it was -- yeah, it was an ongoing conversation.

25  And I as a -- you know, a candidate and then as an elected

1  official, I was supportive of this conversation, of seeing

2  what options the city could have on the table.

3  Q.  So when -- I've never been a candidate for anything.  But

4  when people run for office, they usually run on, you know, a

5  platform or some ideas.

6       Did you run in 2009 on the KWA, that this was

7  something that you were, "Let's do the KWA"?

8  A.  No.  But I was in favor when I'd get asked.  People knew I

9  was interested in exploring it.  So that's maybe an answer in

10  the middle.  But sometimes you say to somebody, "No, you know,

11  that's not for me."

12       Sometimes you say, "You know, that's -- yeah, I'm

13  going to make that a big focus."

14       And other times you say, "Yeah, I think this is

15  something that we should definitely look at.  I know Detroit is

16  pretty expensive."

17       It makes sense to try to have cooperation amongst our

18  communities in what we call the I-69 corridor, the east-to-west

19  relationships out to the thumb.  As we had historically been

20  more oriented north and south in the I-75 corridor with, you

21  know, the twin cities -- tri cities to the north and then

22  Pontiac and Detroit to the south.

23  Q.  You went back to Minnesota there for a second.

24  A.  I know I did.  Sorry about that.

25  Q.  That's okay.

1    When you first -- did you ever have an official role

2    when it came to investigating the KWA?

3    A.   Well, I mean, invest in the sense that, yes, in the sense

4    that the city -- when I came into office, there was an

5    opportunity for the city to join a new public authority that

6    would have the ability under state law to provide water to

7    communities.

8    So that was something that the drain commissioner,

9    Drain Commissioner Jeff Wright was especially kind of focused

10   on.  And he clearly had an interest in the City of Flint being

11   a major partner in that.

12   So this was something that I was expecting that the

13   city, you know, could be a part of.  And under a normal, not

14   emergency manager operations, the way the City of Flint takes

15   official action is the mayor sends a resolution to city

16   council.

17   And in our case, the mayor does not vote on city

18   council.  So we have nine members who were elected by wards,

19   and each of them have a vote on those resolutions.

20   So it was always my prerogative, you know, as mayor

21   to send or not send that resolution to join the KWA to the

22   city council.  I believe that was in the city 's best interest

23   and did, you know, work with our legal department for that

24   resolution to go to city council which they then approved.

25   And this is just -- this is the step of the City of

1   Flint incorporating the public authority.  We're not at the

2   point yet of water costs or pipeline designs.  Those things

3   were certainly expected to come in the future.

4         This was just a matter of does the City of Flint want

5   to be an incorporating member of the Karegnondi Water

6   Authority, the KWA.

7   Q.   Was there at some point a committee that was formed with

8   regard to the KWA that you were a part of?

9   A.   Yes.  The articles of incorporation that were attached to

10  that resolution that the city council reviewed laid out the

11  terms that each community would participate in this public

12  authority.  And there was a five-member incorporating body.

13  And that's what each incorporating, you know, municipality

14  would join.

15        So I was -- since we were a city with a strong mayor

16  form of government, the mayor was to serve as the City of

17  Flint's representative on the incorporating body of the KWA

18  authority.  I hope that makes sense.

19  Q.   It's a mouthful.  How many -- and thank you.

20        How many other individuals served on that committee

21  at the time that it was formed in addition to you on behalf of

22  the City of Flint?

23  A.   So four additional.  We were a body of five.  You usually

24  want an even number when you can get it.  So we had five

25  incorporating entities; the City of Flint.  The Genesee County

1  Drain Commissioner, the County of Lapeer, the City of Lapeer.

2            And then one county to the east -- and Lapeer's just

3  to the east of Flint being here in Ann Arbor.  Sanilac County,

4  one county to the east on the thumb also joined.  So we had

5  three counties and two cities.

6  Q.   And were you ever -- I believe you were elected at some

7  point to be the chairperson or the commission -- what was your

8  role on that committee?

9  A.   Yes.  So like any board, we had elections for officers.

10  So I was elected president of the Karegnondi Water Authority.

11  And I believe our first meeting, our incorporating meeting and

12  the Sanilac County drain commissioner was elected vice chair

13  so.

14  Q.   And what kind of power did you wield from being the

15  president or the chair of this committee?

16            What was that experience like and what was required

17  of you?

18  A.   Well our board, one of our first actions was that we

19  authorized a position of a CEO to operate the financial and

20  day-to-day and administrative functions of the authority.

21            So those were designated to the CEO's position, which

22  was occupied by Genesee County commissioner Jeff Wright.  So he

23  became the authority CEO.

24            And our responsibility then was like an oversight

25  board that we needed to see annual financial reports.  We

1    needed to see an audit.  We were doing that level of business.

2          So we had a meeting every -- we had a meeting every

3    couple of months.  We rotated where that meeting was so that

4    we went to different communities for those sessions.

5    Q.  What type -- just for perspective, what time period are we

6    talking about right now when it comes to these meetings and

7    Jeff Wright being appointed CEO and you being the chair?

8    A.  So we -- KWA was incorporated in fall of 2010.  So each of

9    our participating communities had to take, you know, our

10   action.  And then we came together for our first meeting.  And

11   then that was continuing through 2011.

12         I mean, the board meetings then continued through

13   future years in that same arrangement.

14   Q.  Was the decision made -- strike that.

15         You just described the process of the -- these

16   various counties and cities and your role.

17         When that coalition came together and you were

18   elected the chairperson, had the decision been made at that

19   point for Flint to join the KWA?

20   A.  Well, we joined in the sense of we incorporated the

21   authority.  But there was not yet a decision about actually

22   using water that a pipeline that the KWA could build would

23   possibly produce.

24         So first you have to create the entity, which is what

25   the City of Flint agreed to.  And then there was a process of

1    the KWA authority figuring out, "Well, what would it cost for
2    a pipeline to be built?  What kind of terms could communities
3    choose to purchase water from?"
4    Q.   So would it be a fair assessment to say at that point in
5    time y'all were exploring the opportunity to build the KWA
6    rather than were committed to it?
7    A.   Yes, yes.
8    Q.   And early on in your testimony this morning, we talked
9    about in 2011 you're out knocking on doors and you get a call
10   from Treasurer Dillon and now there's an emergency manager.
11        Do you remember who the first emergency manager was
12   that was appointed in 2011?
13   A.   Yes.  It was Mike Brown.
14   Q.   And prior to his appointment, did you know who emergency
15   Financial Manager Brown was?
16   A.   Yes.
17   Q.   And what do you know -- what did you know about him at
18   that time, and what do you know about him today in terms of his
19   experience, education, training?
20        Who is he as a professional?
21   A.   So Mike Brown was in that role of interim mayor in the
22   spring and summer of 2009.  He came to that position by being
23   appointed city administrator by former Mayor Don Williamson.
24        So under our charter, when a mayor's office becomes
25   vacant, the city administrator becomes interim mayor.  So I

1   knew him in that capacity.

2          At the time he was appointed, he had been serving in

3   a facilitator's role for something called the Flint Area

4   Reinvestment Office.  A number of our local foundations

5   created this small team that would hopefully help Flint and

6   Genesee County and communities find, especially federal money

7   that was coming through.

8          If you remember the American Recovery Act and the

9   stimulus programs under President Obama, those offered a lot

10  of different grant opportunities.  And Mike Brown's on-the-job

11  was to see if projects in Flint could match those different

12  opportunities.

13         We had this road map document that, you know, I was

14  aware of, even as a candidate that Mike was facilitating.  His

15  longer professional career, he had been an executive with the

16  Lansing Area United Way.  So his work was really around

17  nonprofit and community work.

18         His very first job with the city, I think, was

19  running the community development department under another

20  former mayor, Mayor Collier.

21         So sorry for all the timeline, but you see these

22  things kind of come back in different ways.

23  Q.  Do you know -- do you know -- and in your -- you

24  interacted with him on a routine basis when he was emergency

25  and previous to is that; is that correct?

1   A.   Yes.

2   Q.   Do you know whether Emergency Manager Brown had any

3   experience that you were aware of then or now regarding water

4   chemistry, geology, or water treatment?

5   A.   Not that I know of.

6   Q.   Okay.  At some point after Emergency Manager Brown was

7   emergency -- Ed Kurtz became emergency; is that right?

8   A.   Yes.

9   Q.   And do you recall roughly the timeframe of when that

10  happened?

11  A.   I think it -- I think the first transition was spring of

12  2012?

13  Q.   I don't know.

14  A.   Yeah.  Well, I'm thinking --

15  Q.   That's fair if --

16  A.   And this may not be relevant.  But Mike Brown then moved

17  to the city administrator's position under appointed manager Ed

18  Kurtz during the various controversies that were statewide

19  around this Public Act 4, which had allowed for the appointment

20  of emergency manager.

21       There were various court cases that were filed.  And

22  one of the decisions from one of those cases or at least

23  interim decisions was that Public Act 4 should be put on hold.

24       And instead the city -- the state's emergency

25  managers would go back to being administered under what had

1    previously been Public Act 72.

2              And because of that, I understand the department of

3    -- the Michigan Department of Treasury didn't believe Mike

4    Brown was eligible as an appointed emergency manager.  So he

5    was then appointed by Mr. Kurtz to be city administrator.

6    Q.  So when Mr. Kurtz comes in, which to the best of your

7    recollection was in the summer of 2012, had you ever worked

8    with Ed Kurtz in any capacity?

9    A.  I hadn't worked with him.  I knew who he was from

10   community meetings.  He had been appointed the City of Flint's

11   emergency financial manager under Public Act 72, like, in 2002.

12             So -- and he had been a long-time executive with the

13   Baker College system.  So he was somebody who was prominent in

14   our business leadership community.

15             And while I didn't live in Flint at the time, you

16   know, I was certainly following when he was the emergency

17   financial manager sometime ago.

18   Q.  I think just so we're not confused, there was an emergency

19   financial manager appointed before you came back to Flint,

20   right?

21   A.  Had been appointed after a prior mayor had been recalled.

22   Q.  Right.  And then that emergency management ended before

23   you came back to Flint , right?

24   A.  Yes, yeah.  Sorry.  It was longer back.

25   Q.  That's okay.

March 28, 2022

1492

1  A.   And I know the history is a bit complicated.

2  Q.   In terms of Mr. Kurtz, did you know -- do you know,

3  sitting here today, if then or now he had any experience in

4  water treatment, water chemistry, or water management prior to

5  becoming emergency manager in 2012?

6  A.   I don't think so.  I mean, he served in that role that he

7  was appointed to.  But, you know, again, that kind of covers

8  everything.

9  Q.   After Emergency Manager Kurtz, Emergency Manager Brown

10  comes back for a short period of time as an emergency manager,

11  right?

12  A.   Yes.  As that legal interpretation changes again,

13  Emergency Manager Mike Brown comes back.

14  Q.   And do you know the timeframe when Mr. Brown came back?  I

15  know it's a long time ago but --

16  A.   I should.  I'm trying to think of whether it was after the

17  election on Public Act 4 in 2000 -- in 2012 or not.  I'm sorry.

18  Within a few months.  It was the end of 2000 --

19  Q.   If I represented to you that Mr. Brown was the emergency

20  manager beginning July of 2013 through October of 2013, do you

21  have any reason to dispute that that's accurate?

22  A.   No.  That sounds -- yeah.  That five, six-month period

23  sounds right.

24  Q.   I know it's been a lot of years.  But just going back to

25  Emergency Manager Kurtz, if I represent to you that he actually

1   became the emergency manager in the summer of 2013 rather than

2   the spring of 2013, any reason to dispute that?

3   A.   No.  And, again, all these things would be clearly

4   documented.

5   Q.   And then after October 2013, I believe Darnell Earley was

6   appointed as emergency manager; is that right?

7   A.   Yes.  So right.  Fall of 2013, yes.

8   Q.   So we've got Mike Brown.  We've got Ed Kurtz.  We've got

9   Mike Brown.  And then we're back to -- now we're at Darnell

10  Earley, right?

11  A.   Yes.

12  Q.   And what did you -- did you know Darnell Earley before he

13  became emergency manager?

14  A.   I had worked with him some.  We had a -- we have a group

15  in Michigan that Michigan State convenes, the Michigan Mayors

16  Association.  And Darnell Earley had been -- was the city

17  manager for the city of Saginaw.

18        And the Mayors Association included Saginaw, Flint,

19  Detroit, Kalamazoo.  And often the mayor in Saginaw, it was a

20  different system, not a full-time job.  Often City Manager

21  Earley would come to those meetings on behalf of the mayor.

22        And at that time, Mayor Greg Branch from Saginaw and

23  the city.  So we had been in meetings together.

24        He had also been interim mayor in Flint years ago,

25   around that same time that Ed Kurtz had been emergency

1    financial manager.  So the now late Mayor Stanley's last city

2    administrator was Mr. Darnell Earley.

3    Q.   And in your interactions with Mr. Earley and in the work

4    that you may have done with him, were you aware in 2014 or are

5    you aware now if Mr. Earley has any experience whatsoever

6    dealing in water chemistry, geology, water management, or water

7    treatment?

8    A.   I don't know about the -- I don't recall any scientific

9    kind of evidence.  He was a city manager for the city of

10   Saginaw.  Saginaw does also provide and supply water to its

11   community.

12          So when you say "management," you know, he would have

13   been someone who in a former role, would have, you know,

14   overseen those operations.

15   Q.   Do you know who Warren Green is?

16   A.   Yes.

17   Q.   Do you see him in the courtroom today?

18   A.   Yes.  I do now.  We had met -- we had seen each other in

19   the hallway when I had stepped out, too.

20   Q.   Could you identify him, just so that we know we're talking

21   about the same person this the courtroom?

22   A.   Yeah.  So Warren has the kind of darker blue mask and a

23   striped tie and a white shirt and a beard underneath the mask.

24   Q.   So I'll represent to you that Mr. Green testified for a

25   few days in this case.  He's an engineer.  He testified about a

1   lot of engineering things.  Okay?

2           Do you know if Mike Brown or Ed Kurtz or Darnell

3   Earley were licensed engineers at any point in time when they

4   were emergency managers or ever for the City of Flint?

5   A.   Not that I know of.

6   Q.   Okay.  And from the science side, from the chemistry side,

7   from the water treatment side, do you know of any

8   qualifications that Mr. Brown, Mr. Kurtz, or Mr. Earley had

9   related to the treatment of water?

10  A.   I don't with Mr. Brown or Mr. Kurtz.  Again, they had been

11  in an appointed role.  And then Mr. Earley, by having been in

12  Saginaw for a longer period of time, his whole career was in

13  city management.

14          He may have had more, you know, knowledge of these

15  things as a manager.  But I don't -- I know he didn't have any

16  -- I'm sure he would have told me.  He didn't have any

17  licenses or training in that area.

18  Q.   And then after Mr. Earley was done being emergency

19  manager, I think it was in January or so of 2015, Jerry Ambrose

20  becomes emergency manager, correct?

21  A.   Yes.

22  Q.   And do you remember what the period of time was that Jerry

23  Ambrose was emergency manager for the City of Flint?

24  A.   It was approximately January to the end of April 2015.

25  Q.   And then just like I asked you about Mr. Brown, Mr. Kurtz,

1   Mr. Earley, when it comes to Mr. Ambrose, do you know whether

2   he had any training, licensures, or experience in water

3   treatment, water management, water chemistry, or geology?

4   A.   I don't believe he did.  He was a professional finance

5   director.  So he had been the City of Lansing's finance

6   director before actually taking the position under the first

7   emergency manager Mike Brown to come and be the finance

8   consultant and then finance director for the City of Flint.

9          So Mr. Ambrose had been in place throughout this time

10  period that we're discussing after my second -- during my

11  second term.  So he was a finance director.  I don't know of

12  anything in terms of water treatment.

13  Q.   And you mentioned we were talking briefly at the beginning

14  of your testimony about all the stuff that the mayor has to do

15  when he's mayor that we've heard about water, and there's more

16  than just water.  You have police and fires and high rate of

17  homicide.

18         Is it fair to say that when one of these individuals,

19  any one of them became emergency manager and undertook the

20  responsibilities of the mayor and the city council, that they,

21  too, had to focus on things besides just water?

22  A.   Well, yes.  The city's operations again were inclusive of

23  all these different departments.  Nearly, you know, I think

24  $175 million budget across on all departments and healthcare

25  benefits and pension liabilities.

```
 1              So as a mayor, as a appointed emergency manager who
 2    was acting as a mayor, in fact, acting as a mayor and city
 3    council, then those duties were very broad.
 4    Q.   Right.  So to the extent that anybody has the perception
 5    that between 2011, the first appointment of emergency manager
 6    and when everything happens with regard to the switch, that all
 7    everybody in Flint is talking about and doing and working on is
 8    this switch is the water --
 9              MR. CHRISTIAN:  Objection, Your Honor.  He's
10     testifying.
11              THE COURT:  Do you want to rephrase your question?
12              MR. STERN:  I probably should.
13              THE COURT:  Okay.
14    BY MR. STERN:
15    Q.   Is it fair to say that each of these emergency managers,
16    when they came into power, were working on things besides
17    water?
18    A.   Yes.  Emergency manager, myself, you know, at the time was
19    working on the whole range.  That did include provision of
20    drinking water.  But also even within the water fund, there's
21    the people, you know, going out and fixing pipes and turning on
22    and off water.
23              And so even within that, there's a whole range of
24    responsibilities.
25    Q.   And when the first emergency manager, Mr. Brown, was
```

1   appointed in 2011, was he appointed because there was a bad

2   water situation, or was he appointed because of a financial

3   situation?

4   A.   The public -- the criterion Public Act 4 is a certain kind

5   of financial emergency.  And that's what allowed the governor

6   to make the declaration in the appointment following the

7   financial review of the city by the treasurer's office.

8   Q.   So it's fair to say it had more to do than just with the

9   water situation in Flint, correct?

10  A.   Well, certainly.  At that point, we were all consuming --

11  you know, Detroit water was coming out of the tap like it had

12  for all the prior years.  And there was a cost issue.  There

13  was a question about long-term supply, so it was something that

14  had to be focused on and analyzed.

15          But the city's financial distress or emergency under

16  this particular law is what enabled the governor to legally

17  make this appointment.  I might disagree with that law or

18  provisions of that law, but that's what occurred.

19  Q.   And in terms of cost savings and cuts that the emergency

20  manager tried to undertake for Flint, were all of those cuts

21  related solely to water, or were they related to other things,

22  as well?

23  A.   They related to a whole host of things, including on a

24  personal note, myself and city council losing our compensation

25  when the emergency manager signed one of its first orders.

1   Staff who I had appointed in various roles were removed from

2   their positions.

3          And there were many, many subsequent changes.

4   Privatizing the city's sanitation service.  Working to

5   renegotiate collectively-bargained agreements.  That was one of

6   the strange powers that these emergency managers had is they

7   could circumvent state laws on collective bargaining.

8          They just had to consult with unions.  They didn't

9   actually have to negotiate the termination of a contract.

10          So all of those things were -- I saw those things

11   occurring at city hall.  I continued to, you know, put on a

12   suit and tie and go into the office and do my job.  And within

13   a period of time -- I don't want to give a false impression --

14   there was approximately half of my compensation was restored.

15          But there's a savings right there.  And the same had

16   occurred with city council.

17   Q.   And were there cuts made to the police department?

18   A.   Ultimately, there were through the various annual budget

19   cycles.

20   Q.   Were there cuts made to the fire department?

21   A.   That was a unique case, because we received a federal

22   grant.  One of the grants called a Safer Grant where you have

23   to preserve a certain level of staffing.  And if you do that,

24   then you can receive additional federally funded staffing.

25          So I believe our fire department numbers actually

1   went up by a few officers, because of the federal funds.

2   Q.   And you were there during the period of time you just

3   described.  You put on your suit every day, and you went to

4   work as you just described.

5          Was it your observation that, at least initially, the

6   emergency manager was looking at cost savings only for water

7   or on a larger scale?

8   A.   I think it was a comprehensive look.  And that does

9   include the city's water fund.  So the emergency manager was

10  taking up this question of what the city's long-term water

11  supply was going to be.

12         That was one of ten or 15 things that would come up,

13  you know, on a regular basis that was being scrutinized.  And I

14  could contribute to some of those conversations, given that I

15  had been looking at that same question with city council prior

16  to Mr. Brown's appointment.

17  Q.   And I believe you talked earlier about the Flint Water

18  Treatment Plant.  You mentioned it was right on the banks.

19         Do you remember that?

20  A.   Yes, sir.

21  Q.   Have you spent time in the course of your time in Flint,

22  either before you were mayor, when you were mayor, or after you

23  were mayor at the Flint Water Treatment Plant?

24  A.   I don't -- I don't think I was ever there before I was in

25  office.  We have Dort Highway, which is a state route, and a

1    bicycling trail goes right by the exterior of the treatment

2    plant.  And I was familiar with it just in that kind of way.

3            As mayor, I was at the facility a handful of times

4    over my time in office.  Maybe not quite once a year.

5    Q.   I'd like for you to look on your screen -- I'm about to

6    show you a picture.  I just want to go through a few images of

7    the Flint Water Treatment Plant.  And tell me if you recognize

8    what you see.

9            First off, what is this photo?

10   A.   Yeah.  So this is the -- this is, like, the front of the

11   building.  A walk-in entrance.  Small.  Small parking lot, so

12   there's steps.  So this would be the place where I would pull

13   up and then go into the plant.

14   Q.   This next picture that I'm going to show you --

15           MR. STERN:  And by the way, that picture, Your Honor,

16   has been previously marked as Plaintiffs' Exhibit 3619.  This

17   next photo that I'm going to show was previously marked as

18   also part of Plaintiffs' 3619.

19   BY MR. STERN:

20   Q.   And Mayor Walling, do you recognize anyone in this photo,

21   as well as where this photo may have been taken?

22   A.   Yes to both.

23   Q.   Okay.  So who do you recognize, and where do you believe

24   this was taken?

25           And if you want to use the pointer --

March 28, 2022                                                1502

1     MR. STERN:  May I approach?

2     THE COURT:  Yes.

3     MR. STERN:  Thanks.

4     THE WITNESS:  Okay.  Right.

5     MR. STERN:  You don't have to.  But if you want to.

6     THE WITNESS:  It's not the kind of thing that I would

7  do if I were teaching one of my classes.  But we'll do the

8  best we can.

9  BY MR. STERN:

10 Q.  All right.  Go ahead.

11 A.  So go left to right, I think if we're trying to identify

12 individuals.

13 Q.  Sure.

14 A.  So on the far left is Jason Lorenz.  So he acted as the

15 city's kind of communication point of contact for most of the

16 time the emergency managers were in place.

17     I don't -- this individual's face looks familiar but

18 I don't remember his name.  A city employee.

19     THE COURT:  And the record will reflect you're

20 pointing to somebody with a maroon --

21     THE WITNESS:  Yes.

22     THE COURT:  -- sweatshirt or top?

23     THE WITNESS:  Yes.  At the wheel.

24     Thank you, Your Honor.

25     Next in the suit in the middle is the city's director

March 28, 2022                                                    1503

 1    of public works, Mr. Howard Croft.

 2              Next in the orange sweater is Brent Wright, who was a

 3    long-time city employee supervisor at the water plant.

 4              I don't have a name on this next individual.  And

 5    then on the far other side here in the foreground is Flint

 6    City Councilperson Josh Freeman.

 7    BY MR. STERN:

 8    Q.   And this next slide was previously marked as part of 3619.

 9    I believe you've already identified this individual.

10              But could you tell the jury who this person is?

11    A.   Yes.  That's the city's director of public works,

12    Mr. Howard Croft.

13    Q.   The next two exhibits were part of 3619.

14              Do you recognize anything in this photo or have any

15    recollection of seeing something like this with your own eyes

16    at some point in time?

17    A.   Yes.  There are a number of these different, you know,

18    tanks where it's showing, like, the water is coming into a

19    stage of the treatment process.  So this is inside of the plant

20    that we saw from the outside.

21    Q.   Okay.  And this picture, as well, is this depicting the

22    same thing just from a different angle?

23    A.   Yeah.  That's a pretty fancy photograph.  But, yeah, I

24    believe that's just the same tank.

25    Q.   Okay.  This next photo was also marked as part of 3619.

Sherrod Teed Vanderhagen and Ware v VNA and LAN - Case No. 17-10164

1    Do you recognize anything in this photo where I may

2  have been taken and if you saw that with your own eyes?

3  A.   Yeah.  So that's around the same photo where we saw with

4  the individuals that I pointed out.  There were a series of

5  these basins for this stage in the process.

6  Q.   So is this also at the Flint Water Treatment Plant?

7  A.   Yes.  At the same Water Treatment Plant.

8  Q.   Do you know generally a timeframe when these photos may

9  have been taken in terms of what you're seeing?

10 A.   I believe it was sometime in 2015.  There were -- I'm

11 thinking of times when maybe the communications director and a

12 council person who have had occasion to be there.  We had done

13 an announcement and discussion when the city was responding to

14 TTHM notice in early of 2015.

15    And then there was also the time when we were at the

16 plant for the actual switch off from Detroit.  That would have

17 been in 2014.  So without more distinguishing information

18 here, it was sometime in 2015 or 2015.

19 Q.   Or 2014 you said?

20 A.   I meant 2014, 2015.

21 Q.   Okay.  And then this next photo, do you recognize this

22 photo as something you had seen at the Water Treatment Plant

23 with your own eyes?

24 A.   Yes.  This is another stage in that -- in the treatment

25 process.

March 28, 2022                                                    1505

```
 1   Q.  And just like the other photos, your best recollection is

 2   this photo would have been taken either in 2014 or 2015; is

 3   that correct?

 4             MR. ERICKSON:  Objection.  Lack of foundation.  He

 5   clearly doesn't know.

 6             MR. STERN:  He actually just testified --

 7             THE COURT:  Overruled.  I mean, we know what he

 8   knows.  We heard his testimony.  He doesn't know for certain

 9   the date, but he has a general time period.

10   BY MR. STERN:

11   Q.  Do you recall seeing what's depicted in this photo during

12   that general time period of 2014 to 2015?

13   A.  Yes.

14   Q.  I'm going to move on to the next photo.  Same question.

15             Does this image depict something that you saw during

16   the same general time period of 2014 to 2015 at the Flint Water

17   Treatment Plant?

18   A.  It looks like a close-up of that last image.  I mean, on

19   its own, I --

20   Q.  Okay.  And then this next picture, does that also appear

21   to be either a close-up of the same image or something that you

22   would have seen with your own eyes during that general

23   timeframe at the Flint Water Treatment Plant?

24   A.  Again, it is pretty close up.  So it's general.  But then

25   that larger tank you showed me, those arms move around, and it
```

```
 1   stirs and mixes the water with whatever this stage of treatment
 2   that's taking place here.
 3   Q.  So you sound like you have some familiarity with the
 4   plant.  I'm going to ask you in a minute about some of the
 5   other folks in Flint.
 6           But do you have a preference for partial or full
 7    softening?
 8           MR. CHRISTIAN:  Objection.  Competence.
 9           MR. STERN:  No, they're blaming him so he --
10           THE COURT:  We'll just find out if he knows what that
11    is.
12           Do you know what "partial" or "full softening" is?
13           THE WITNESS:  I know I've been around discussions of
14    softening.  But I can't sit here today and give you a
15    description.
16   BY MR. STERN:
17   Q.  Did you ever take any classes on softening or anything
18   like that?
19   A.   No.  I did your basic college chemistry classes, yep.
20           THE COURT:  Well, the objection is sustained.  And
21    we'll move on.
22           MR. STERN:  Okay.  Thank you.
23   BY MR. STERN:
24   Q.  Do you have a preference for if you were going to treat
25   water for a polyphosphate, an orthophosphate, or for just a --
```

March 28, 2022

1507

```
 1          MR. CHRISTIAN:  Objection.
 2          THE COURT:  Just a minute.  We'll find out if he has
 3  -- do you know what a polyphosphate, an orthophosphate -- and
 4  what was the third?
 5          MR. STERN:  Any just regular old phosphate.
 6          THE COURT:  Or just a regular phosphate.  Do you know
 7  an understanding of what those are with water treatment?
 8          THE WITNESS:  I only know they're different.  And I
 9  would have to do some additional reading or looking.  I know
10  they've come up at different times --
11          THE COURT:  Okay.
12          THE WITNESS:  -- in this crisis.
13          THE COURT:  That's sustained then.
14          MR. STERN:  I'll move on.
15  BY MR. STERN:
16  Q.  Do you recognize this to be Howard Croft?
17  A.  Yes.  This is Mr. Howard Croft.
18  Q.  And we talked a little bit about what you know about
19  Mr. Brown, about Mr. Kurtz, about Mr. Earley, and about
20  Mr. Ambrose.
21          You interacted with Howard Croft on a regular basis
22  when you were mayor; is that correct?
23  A.  As mayor, yes, yes.  It varied at different times.  We're
24  talking about a six-year time period.
25  Q.  And do you know -- what do you know about Mr. Croft's
```

1    educational, academic, and work history?

2    A.   Well, I got to know Howard Croft when I was first elected.

3    So this is back in 2009.  He actually came into one of my

4    weekly open office visits.  So this was something I committed

5    to as mayor that my office would be open every Wednesday

6    morning from, you know, 10:00 to noon unless I was somehow sick

7    in bed, which I very rarely was as mayor, which I was fortunate

8    of.

9           And he came in and was -- he was interested in my

10   vision of Flint as a more sustainable city.  At the time, he

11   was running a solar panel installation company.  Had moved

12   back up to the area, I think after some time out of Michigan.

13          He had been an electrical engineer for General

14   Motors.  I know we both went to the same high school Flint

15   Central.  He's older than I am.  But we shared a couple of

16   stories about Flint Central.

17          And then, you know, he was involved as a small

18   businessman in the city's work around sustainability.  We

19   ended up convening some sessions with the chamber, talking

20   about chamber of commerce.

21          How could the city and its business be more

22   efficient.  How could we attract new businesses that were in

23   this on a green economy.  So Howard Croft was somebody who

24   would come participate in those.

25          And then he was appointed -- the first position, I

1   believe, was called the director of infrastructure and

2   development.  That's what Emergency Manager Mike Brown

3   appointed him as soon after Mr. Brown became emergency

4   manager.

5   Q.  You said -- I think you said y'all went to high school

6   together; is that right?

7   A.  No.  Just went to the same high school.  So we had some

8   friends of friends.

9   Q.  Do you know if Mr. Croft went to college?

10  A.  I don't recall.

11  Q.  Do you know what, if any, experience Mr. Croft had during

12  the period of time that you were mayor when it came to water

13  chemistry, geology, or water treatment from the science side of

14  things?

15  A.  I don't believe he did.  As someone in that role, it's --

16  I mean, someone could have technical knowledge.  But it's -- he

17  acted more as a facilitator working with other city staff,

18  working with the finance department, the personnel department.

19  Q.  We talked for a good bit about all the different things

20  that the mayor had to do and that EM had to do when he took on

21  that role.

22       Howard Croft's role as director of public works, was

23  it exclusive to the water system or was it inclusive of other

24  things?  And if so, what were they?

25  A.   It was a broad role.  When he was first appointed under

1   the title of infrastructure and development, infrastructure

2   related to what most of us would think of as public works.  So

3   streets, you know, street repairs, street maintenance.  So that

4   was transportation.

5          And then the city had three basic water operations.

6   So we have drinking water.  We have the sewer system, which is

7   both a storm sewer system and then a separate set of pipes for

8   the sanitary.  Kind of things down the sink and in the shower

9   sewer system.

10          And then there are the crews that go out and do the

11   actual, you know, you're moving in, you need somebody to turn

12   on the water.  So each of those things were a unit of city

13   government.

14          So Mr. Croft was responsibile for those.  But then

15   what was called development at the time was the building and

16   safety division, the inspectors who would go out and look at,

17   you know, look at furnaces and look at roofs and look at

18   building plans.

19          It included the zoning board, the planning

20   commission.  And it also included the management of all these

21   different federal grants that were coming like the community

22   development block grant that City of Flint received a few

23   million dollars every year.  It could be used for a variety of

24   purposes.  So it was very broad.

25          Now, later in Mr. Croft's tenure, we had a

1   professional urban planner who became the director of planning

2   and development.

3          And then Mr. Croft was then director of public works

4   and was focused on the utilities, the streets, and initially I

5   think he also had parks actually in infrastructure and

6   development.  So those issues around, kind of, park

7   maintenance and tree maintenance were also part of his brief

8   initially.

9   Q.  Okay.  Do you recognize Mike Glasgow from this picture,

10  and do you know who Mike Glasgow is?

11  A.  Yes.  I know Mike Glasgow.  He was a long-time City of

12  Flint employee.  And when I was -- earlier in my time, he was

13  the -- as mayor -- he was the city's, like, lab tech or lab

14  supervisor.

15  Q.  So what does that mean, and how did you experience that?

16  A.  Well, like, I went on a tour of the waste water treatment

17  plant, which we haven't looked at.  So a different physical

18  location than the water plant.

19          And Mike Glasgow was there in what looked like a

20  really advanced, you know, chemistry lab with test tubes and

21  different kinds of equipment.  And I remember -- that may have

22  been the first time that we actually met at least in the city

23  setting.  Maybe we had bumped into each other in the community.

24          So he was -- that was his role.  So he was in the

25  city's water technicians lab, and that was physically located

```
 1    at the waste water treatment plant.
 2    Q.   And so are you referring to a period of time, I think you
 3    said when you were mayor --
 4    A.   Yeah.  I meant when -- before the emergency managers.  I
 5    would have gone on a tour of the facility either in 2009 or
 6    maybe early 2010.
 7    Q.   Do you know if prior to the water switch in 2014 if Mike
 8    Glasgow had any experience running or operating a full-time
 9    water treatment facility?
10    A.   Not that I know of.  For all of our City of Flint
11    employees and for our long-time employees, the plant, you know,
12    it didn't run as a full-time, full-service plant.  It ran as a
13    backup like I described.  So it had to do certain things
14    throughout a year.
15          And then it would run for a certain period of time
16    for that water to be tested and just dropped, I think, just
17    back into the river actually.
18          So Mike may have had some involvement with that kind
19     of process.
20    Q.   Do you know if at some point in time Mr. Glasgow obtained
21    an F1 license?
22          Are you familiar at all with that?
23    A.   I know the city needed to have an F1 license.  But
24    figuring out who would have it or whether it could be a
25    consultant or an employee, I don't remember the specifics of
```

March 28, 2022

1513

1   Mr. Glasgow in that regard.

2   Q.   Okay.  I want to move on to do you recognize this as Brent

3   Wright?

4   A.   Yes.

5   Q.   And at some point in time when you were the mayor or the

6   city was under emergency management, was Brent Wright the water

7   plant superintendant?

8   A.   Yes.  I think I said "supervisor" earlier when I pointed

9   him out.  But he was the most senior staff at that physical

10  water plant building that you showed me a picture of before.

11           So if I went as a mayor to a walkthrough the Flint

12  Water Plant, then Brent Wright would -- you know, would do most

13  of that tour.  You know, he had an office at the water plant.

14  Q.   Do you know if, sitting here today, if Brent Wright had

15  ever obtained an F1 license?

16           MR. CHRISTIAN:  Objection.  Asked and answered.

17           THE COURT:  I think -- overruled.  I think it was

18   Glasgow.

19           THE WITNESS:  I don't recall specifically about

20   Mr. Wright.  I mean, it would surely be part of the city's

21   personnel records.

22  BY MR. STERN:

23  Q.   Do you know if Mr. Wright, prior to the water switch in

24  April of 2014, had ever operated a Water Treatment Plant that

25  was full-time operational treating water?

March 28, 2022

1   A.   You know, again, I don't know his whole employment history

2   for the time he would have been at the City of Flint, which I

3   know was a good number of years.  That's -- our plant never

4   operated that way.

5   Q.   So no?

6   A.   Not that I know of.

7   Q.   And then I want to move on, if you don't mind, to

8   Daugherty Johnson, who's been affectionately referred to or

9   unaffectionately referred to as "Duffy," I guess, depending on

10   who says his name.

11        At some point in time while under emergency

12   management or while you were the mayor, did Duffy Johnson serve

13   as the utility director for the City of Flint?

14   A.   Yes.  And he generally did go by Duffy.  That's how most

15   people would know him.

16   Q.   Do you know what -- prior to the switch in 2014 to the

17   Flint River, do you know what Mr. Johnson's experience was in

18   water treatment?

19   A.   I don't.  I know he was at the waste water treatment plant

20   when he was elevated to this position.  So this was, again, as

21   I would go to a waste water treatment plant, I would see Duffy.

22        I believe he was a supervisor, not the most senior

23   supervisor at the waste water treatment plan.  He was very

24   familiar with the city's workings.  He had been the president

25   of the city's supervisors's AFSCME union.

1    Q.   And I think it could be confusing, because it is a little

2    bit for me.

3            Is there a difference between the waste water plant

4    and the water treatment facility?

5    A.   Yes.  Those are two different facilities.  They do both

6    involve treatment if there's water going through.  But the

7    physical Flint Water Plant that we saw the picture of with that

8    actually kind of nice stone front, that's on the bank of the

9    Flint River on the city's north side.

10           And then there's a separate waste water facility

11   where all the sanitary sewer water flows to that's actually

12   physically located just outside of the City of Flint's

13   boundaries.

14           It's co-located with the Genesee County Drain

15   Commissioner's waste water treatment plant, even though they're

16   two separate facilities.  Those plants then treat the sanitary

17   water and then they deposit it back in the river once it's

18   treated to that safe standard.

19   Q.   So is it fair to say that before the 2014 water switch,

20   Duffy Johnson's experience, as far as you knew and perceived,

21   was in waste water versus the water that was coming from the

22   Flint Water Treatment Plant?

23   A.   Yeah, I knew he had been waste water when he got elevated.

24   There were certain city employees who over a period of time

25   would work in different facilities.  So, again, we would have

March 28, 2022

1516

1    to look up his record to know.

2    Q.   And do you know -- I assume the answer is going to be the

3    same, but just for the sake of completion.

4            Do you know whether Mr. Johnson ever obtained an F1

5    license to operate the Flint Water Treatment Plant on a

6    full-time basis?

7    A.   I don't believe he did.  With the others, there may have

8    at least been discussions.  But Duffy Johnson, in the

9    director's role, I don't remember him ever, you know,

10   commenting about aspiring to that or planning to do that.

11   That's my memory.

12   Q.   I want to talk to you for a minute about two engineering

13   consultants that have been discussed during this case.

14           Are you familiar with LAN and Rowe?

15   A.   Yes.  I'm familiar.

16   Q.   And if you don't mind, could you tell me what you know or

17   tell the jury what you know about Lockwood, Andrews & Newnam

18   Inc., a Leo A Daly Company?

19   A.   So this is what, yeah, we referred to as LAN.  And LAN had

20   -- LAN had been a long-time engineering contractor for the City

21   of Flint.  So this would have been before my time.

22           But I understood they had been involved in some of

23   the upgrades that had been made when some federal rules changed

24   about what the city needed to do.  Even to be a backup, you

25   have to have certain standards and equipment just to be that.

```
 1              And that LAN had been involved in that.  And had done
 2    other work for the city over the years.
 3    Q.   Did you ever become aware that LAN was playing a role of
 4    any kind when it came to the switch from the DWSD Lake Huron
 5    source to the Flint River?
 6    A.   I learned some specifics about that after the fact in,
 7    like, January of 2015 in some conversations with Mr. Croft.
 8    But I knew that LAN was involved with the city's Water
 9    Treatment Plant.
10              LAN had been either brought on specifically or a
11    contract had been amended for LAN to do some of the technical
12    work on the city's response to the TTHM violation that came up
13    in fall of 2014.
14    Q.   And we've already -- you've already been kind enough to
15    point him out to us in the courtroom.
16              But does this photo -- is this Warren Green?
17    A.   Yes.
18    Q.   And during the period of time when you were mayor, did you
19    ever encounter Warren Green in Flint?
20    A.   I believe so.  I don't think I can name specific times.
21    But he was someone -- you know, he was someone who I was
22    familiar with.
23    Q.   And you've been in -- you know, you sat in a lot of
24    meetings as mayor, right?
25    A.   Yes.
```

March 28, 2022

1518

1   Q.   Meetings that involved a whole host of things that you've

2   already talked about today, right?

3   A.   Yes.

4   Q.   Was there ever a meeting you were in where somebody from

5   the city either whispered or smoke loudly to you and said, "We

6   need to cut Warren Green out of everything about this water

7   stuff"?

8   A.   No.

9   Q.   Was there ever any text messages exchanged or phone calls

10  made where somebody from the city said to you personally, "We'd

11  be better served if there's no Warren Green anywhere to be

12  seen"?

13  A.   No.  I mean, that would have raised a red flag for me,

14  because that's -- that's not how I operated.

15  Q.   Were you -- when you knew that LAN was there or you

16  encountered Warren Green, did you feel good about it?  Bad

17  about it?  How did you feel about them being there?

18  A.   Well look, I mean, everybody has their own approach.  Mine

19  is kind of like I illustrated when I made those comments about

20  the emergency manager when I was just getting reelected is I'm

21  someone who values those scientific opinions.

22          And I don't have any problem with someone having a

23  different view of mine or, you know, we can respectfully

24  disagree.  That happens all the time, especially with the city

25  council.

March 28, 2022

1519

```
 1          So, look, you don't have to be an expert on much of
 2   anything to look at the City of Flint's government and say,
 3   "It has limited capacity."  I mean, this kind of is something
 4   that's widely understood whether it's myself in Flint or, you
 5   know, a mayor in Gary, Indiana, or any municipal governments,
 6   for that sake.
 7          So you're just asking me my view.  I mean, I was
 8   always interested in what did Rowe Engineering have to say in
 9   our role as a city engineer.  What did a planning consulting
10   team have to say?  I can't speak for how others interpreted
11   it.
12          I wouldn't be surprised if there were some people in
13   the city who, you know, felt like that was stepping on toes or
14   who had some issues with that.  But that certainly wasn't my
15   approach, and I don't think anybody who would have worked with
16   me would have had that kind of sense.
17   Q.  Okay.  You just mentioned Rowe.  Tell the jury a little
18   bit about Rowe.  They've heard the name before.  There's been
19   some testimony about Rowe.
20          What's your experience with Rowe?  What do you know
21   about Rowe during the period of time when you were mayor?
22   A.  So Rowe was a -- had a major physical presence in Flint.
23   Actually had offices right downtown.  And had a long -- another
24   company that had a long-time relationship with the City of
25   Flint.
```

March 28, 2022

1520

```
1        While I was in office, even when I came into office,
2   Rowe had a contract with the city to actually act as the city's
3   engineer.
4        In a lot of communities, maybe you would have your
5   own city engineer on the payroll.  We had Rowe Engineering
6   operating as the city engineer.  Most of the time, those
7   services were provided by Mr. Rick Freeman.
8        So Rowe was involved with city in a general sense for
9   public works.  But then, you know, Rowe would also be bidding
10  on individual projects.
11       So if we're redesigning a city -- I mean, redesigning
12  a street intersection or doing a study of one-way to two-way
13  streets, you know, I'm sure Rowe had some other individual
14  contracts with the city during this time as well as serving as
15  the city's engineer.
16  Q.  And when you say Rowe served as the city's engineer, were
17  they -- I think you just answered the question.
18       But for clarity, were they exclusively focused on
19  water engineering, or was there a variety of engineering
20  services that Rowe provided?
21  A.  The city engineer's role was broad across public works.
22  Q.  Were there times when you were mayor or during the period
23  of time where there was an emergency manager and you were mayor
24  in title only, when you were aware that Rowe had either
25  solicited or brought in outside engineering companies to assist
```

1  in engineering services for the City of Flint?

2  A.   I don't know about maybe the specifics beyond, again, the

3  city as a whole would have a lot of different engineering work

4  that would be being done at a time.  So there would be other

5  firms, you know, involved.  But I think that city engineer's

6  contract was not, by engineering contracts, a large one.

7          I'm sorry.  Was that my question?

8  Q.   You answered my question great or as well as you could

9  have, and it was a good answer.

10          You talked a little bit earlier about sitting on the

11  KWA committee and the five -- the group of five and whatever.

12          Was there a point in time after that committee was

13  formed where you personally came to the conclusion that the

14  best option for the City of Flint going forward was to utilize

15  the KWA pipeline?

16  A.   Yes.  And let me just make one clarification, and then

17  I'll give a bit more detail.

18          You're now talking about the City of Flint

19  contracting with the KWA for the provision of water, yeah.

20  Q.   Let me ask it -- let me ask it a different way.

21          It's fair to say that there was a healthy debate

22  beginning as early as when you first became associated with the

23  KWA about Flint's future water receipt, right, where they were

24  going to get water from, right?

25  A.   Yes.

March 28, 2022

1522

```
 1   Q.   You told the jury, I think, that you didn't run on the KWA
 2   as a big part of your campaign, right?
 3   A.   Right.  But people knew I was open to it, that I was
 4   exploring it.
 5   Q.   But did there come a point in time where you went from
 6   open to it to, "This is what I think we should do"?
 7   A.   Yeah.  And there was -- so yes.  And there was a private
 8   part and a public part.  So the private part was summer of 2011
 9   -- I don't know what popped up here.
10   Q.   I'm going to get rid of that.  You go ahead.
11   A.   So in the summer of 2011, so it was pre-emergency manager,
12   myself, city council, we had an opportunity to review a report
13   that had looked at the full cost of the city using the Flint
14   River as now a long-term water supply option.
15        And this would some reservoirs and dams.  So there
16   was a flow of water and actual capital improvement at the
17   physical Flint Water Plant.
18        So myself and city council reviewed that report.
19   And, actually, we were -- myself and city council leadership,
20   including City Council President Scott Kincaid at the time, we
21   were ready to have that resolution considered by city council.
22        I was ready as mayor to send that resolution to city
23   council that we would contract with the KWA for raw water,
24   given these really high costs, $60, $70 million in capital
25   improvements for the Flint River to be an option long-term.
```

1    And council president and I decided that, given that

2  we were right up next to a mayoral election -- because I was

3  literally running door to door in the evenings -- that that

4  was not the appropriate time for the city to make a decision

5  of that consequence.

6    This should really be something that should be done,

7  you know, not in the midst of a campaign.  It shouldn't be a

8  polarizing issue.  So I agreed with that, and I did not send

9  the resolution.

10    And then we got the call about the appointment of the

11  financial emergency and the impending appointment of the

12  emergency manager.  So I was reelected at that point.

13    City Council President Kincaid and I had another

14  conversation about whether we should do this before the

15  emergency manager comes.  Because once the emergency manager

16  comes, that person's going to act as the mayor and the

17  council.

18    And we were of the same mind.  And there were six to

19  seven city council members out of nine who were prepared to

20  vote yes.  And that's a pretty good number in Flint.

21    So we actually decided again that I should not send

22  that resolution.  That it was not the right time.  That this

23  was a very important -- it was a very long-term decision for

24  the community.  It shouldn't be made under cloud of, you know,

25  when's this person going to get appointed.

1   So I did not send that resolution to city council.

2   There's not a record of a resolution in the city clerk's

3   records.

4   So then as you -- as we talked before, it came

5   something that the emergency manager was studying as part of

6   the overall finance and management of the city.

7   Fast forward to March of 2013, after all of that

8   analysis had now been done for, like, the third time -- like,

9   it was done by myself and the city council, it was done by

10  Mike Brown, it was done by Mr. Kurtz, State Department of

11  Treasury.

12  Like, everybody was looking at these numbers, what

13  would the different cost scenarios be, what would be best for

14  the City of Flint.  And the emergency manager I knew was

15  prepared to sign the water contract with KWA.

16  So I went to a city council meeting.  I have no vote

17  at city council.  I have no control over the emergency

18  manager.

19  And I made a public statement that the city should go

20  with KWA as a long-term water source, that it should sign that

21  contract under all that analysis that had been done, that that

22  was the best option for the city.

23  MR. STERN:  Your Honor, I don't know what the signal

24  is.  But would this be an okay time, because I need to use the

25  bathroom.

```
 1              THE COURT:  Sure.  This would be an okay time for our
 2    second break.  So please rise for the jury.  We'll take about
 3    15 minutes.
 4                          (Jury Out)
 5              THE COURT:  Anything at this time?  Okay.  Good.  See
 6    you in about 15 minutes.
 7                          (Brief Recess)
 8              THE CLERK:  All rise for the jury.
 9              THE COURT:  Welcome back.  Please be seated.
10    Mr. Walling is still on the stand and still under oath to tell
11    the truth.  Thank you.
12              THE WITNESS:  Yes, Your Honor.
13              MR. STERN:  May I?
14              THE COURT:  Yes.
15    BY MR. STERN:
16    Q.  Mayor Walling, when we left, you had just testified that
17    at some point, you -- your opinion was that it was in the best
18    interest of the city to transfer over to the KWA pipeline,
19    correct?
20    A.  Yes.  For the long-term water source.
21    Q.  Okay.  I'd like for you and for the Court to know that
22    Tab 4 of your first binder is an exhibit that I have marked as
23    Plaintiffs' 602-43A.  These appear to be some handwritten notes
24    with the date January 9, 2013.
25              THE COURT:  Could you tell me again what exhibit.
```

```
 1              MR. STERN:  No problem.  It's Tab 4.

 2              THE COURT:  Oh, Tab 4.

 3              MR. STERN:  Yes, ma'am.

 4              THE COURT:  Okay.

 5              MR. STERN:  And it's Plaintiffs' Exhibit 602-43A.

 6   BY MR. STERN:

 7   Q.  Mayor Walling, do these appear to be your handwritten

 8   notes?

 9   A.  Yes.

10              MR. STERN:  Your Honor, I seek to admit into evidence

11    602-43A.

12              MR. CHRISTIAN:  No objection.

13              MR. ERICKSON:  No objection.

14              THE COURT:  Okay.  Well, then it's received.

15     (Plaintiff Exhibit No. 602-43A Admitted Into Evidence.)

16   BY MR. STERN:

17   Q.  So I'm going a little old school with the ELMO and hoping

18   that I can manage this.

19              Do you see here, Mayor Walling, that the date is

20    January 9, 2013?

21   A.  Yes.

22   Q.  Okay.  Tell me -- tell the jury -- doesn't matter what you

23   tell me.

24              Tell the jury what was happening based on the title

25   line on the first line of this note in terms of what you were
```

1    taking notes of?

2    A.   This is a meeting that is taking place that I'm present.

3    These are my notes between City of Flint individuals, so that's

4    COF.  And treasury relates to the State Department of Treasury.

5           This is the state body that the emergency manager

6    effectively reports to.  And every City of Flint expenditure

7    over $50,000 needs to be approved by the Michigan Department of

8    Treasury.  That's how the emergency manager operates on a

9    day-to-day basis.

10          And this meeting is taking place around this ongoing

11   analysis of the City of Flint's long-term water supply.  We're

12   still using DWSD every day.  It's coming out of the taps.  But

13   this is a question about what the city will do long-term.

14          THE COURT:  So when it says "treasury," that's the

15    State of Michigan Treasury?

16          THE WITNESS:  Yes.  The State of Michigan Treasury --

17          THE COURT:  Okay.

18          THE WITNESS:  -- and this meeting is actually

19    occurring at the Michigan Department of Treasury in Lansing.

20          THE COURT:  Okay.

21   BY MR. STERN:

22   Q.   And there's a note here that says, "Fraser asked about

23   City of Flint position.  I don't know."

24          Who was Fraser?

25   A.   Fraser, Robert Fraser, I believe his title was deputy

March 28, 2022                                                    1528

 1   treasurer in the Michigan Department of Treasury.  And under

 2   the different functions of the State Department of Treasury,

 3   one of Roger Fraser's duty was local government finance.

 4         And that included the reports and interactions with

 5   the various appointed emergency financial managers.  I think

 6   there were probably 12 or 15 across the state at this time.

 7   Q.   Okay.  These notes, just taking a step back, are these

 8   your perceptions of what other people were saying at this

 9   meeting?

10   A.   It's both.  So I'm a diligent notetaker when I'm in

11   meetings.  I try to use a standard format.  So if you look at a

12   lot of these, you'll see dashes.  Or when there's, like, a new

13   main point, a star is when a point relates to that.

14         Generally, these are -- these are either, like, me

15   paraphrasing key points in the discussions.  And then

16   occasionally, something strikes me as really important.  And

17   that kind of just taking this note as I go.

18         So you have a line I see highlighted in your version.

19   So Mr. Fraser, you know, asked the City of Flint about its

20   position on the long-term water supply.  That photocopy is a

21   bit cut off.  But that's "I don't know" in quotes, which would

22   have been spoken by Mr. Kurtz.

23         And that's supposed to say, "EFM."  So the "M" got

24   cut off of the either -- well, sometimes I ran off the page,

25   too.  So it might be the photocopy or it might be my notes.

March 28, 2022                                                          1529

```
 1            But when asked directly the question on this date,
 2    Mr. Kurtz's response as the city's emergency finance manager
 3    was, "I don't know."
 4            Meaning this was still under discussion.  And I took
 5    that to be a true statement.  He just came right out and said
 6    it, so I thought that was important to note.
 7    Q.  And so at this meeting, is it also fair to say that
 8    somebody said or you took a note that the Flint River as a
 9    primary water source had been eliminated from the discussion?
10    A.  Yes.  So that just to say, these three options of City of
11    Flint could either long-term theoretically, use the Flint River
12    on a permanent basis, could contract with the KWA for water
13    that would come through a pipeline and then be treated in
14    Flint.
15            Or the third option would be to sign, you know, a
16    contract with DWSD just like we had for the last, you know, 40,
17    50 years.
18    Q.  And --
19    A.  And then, yes, so going around a bit here.  So at this
20    point, early 2013, the emergency financial managers -- well, at
21    this point, Mr. Kurtz was saying the Flint River was not being
22    examined as a long-term water supply.
23            I had come to that decision earlier, but this is the
24    emergency manager stating it.
25    Q.  When you mentioned earlier to the jury that you had come
```

March 28, 2022

1530

1   to that conclusion earlier, do you remember why?  Why did you

2   decide?  Why did you come to the conclusion that long-term it

3   shouldn't be the Flint River?

4   A.   Yes.  It was based on this review of costs of what it

5   would actually take that Rowe Engineering had coordinated.  And

6   it just -- especially, the cost of the dams and the reservoirs.

7   In order for the Flint Water Treatment Plant to actually draw

8   water out of the river to then go in to be treated, it has to

9   be at a certain level.  And obviously water, you know,

10  fluctuates in terms of rain fall, and it may be fine for a few

11  years.

12         But if you're signing onto the Flint River in the

13  21st century, not under, you know, the old pre-Environmental

14  Protection Agency era of drinking water, what do you need to

15  do to make sure that water supply is consistent?

16         And that price tag of $65, $70 million, it didn't

17  make sense to me, given our other options.  You know, Detroit

18  was an option.  And we also had incorporated this public

19  authority to actually provide Lake Huron water.

20         Because when you say the KWA pipeline, we're

21  referring to Lake Huron water being brought over about, you

22  know, 70 miles approximately along the I-69 route to Flint and

23  Genesee County.  So one option was off the table.

24  Q.   There's another note here that you'll see in your

25  handwriting, says, "EFM looking at KWA versus DWSD 1."

1    Does that essentially memorialize that Door number 3

2    had been locked, and now we're just looking at two doors?

3    A.   Yes.   Two doors.   But there's multiple other doors through

4    DWSD.   So I don't recall the specifics.   But there were, at

5    that time, a handful of ideas about how Flint and Genesee

6    County could sign with Detroit, but do it in a way that

7    slightly changed the cost structure of the contract.

8    And I believe this idea of something going to Baxter

9    Station was one of these.   We had dozens of these over the

10   course of these years of negotiations.

11   Q.   I'm going to turn the page.   We've printed on two sides.

12   Can you find anywhere on the first page where the

13   bunch holes are on the left, which I just highlighted, and the

14   back page where the punch holes are on the right, can you

15   point to anything in this note that talks about the safety of

16   using the Flint River water as a water source?

17   A.   Give me a minute, since you're asking me the actual

18   document here.

19   Q.   Take your time.

20   A.   No.   This was primarily about the financial analysis.

21   There was an expectation that any drinking water in Flint would

22   be safe.

23   Q.   Okay.

24   A.   This was about, you know, what would it take to choose one

25   option or another, what was being discussed.   This was, like,

March 28, 2022                                                    1532

1    updating the deputy treasurer on the state of affairs.

2    Q.   And it's fair to say that as of January 9, 2013, that no

3    decision had yet been made by the emergency manager or anybody

4    else as to utilizing and moving to the KWA or re-upping with

5    some form of the DWSD, correct?

6    A.   Correct.

7    Q.   There was still ongoing discussions about what the right

8    choice was, right?

9    A.   Yes.  And the interesting thing was, you know, I had

10   stated that I had come to the conclusion that, let's say, much

11   of this would have never happened, and city council and I would

12   have met like usual in the fall of 2011.

13         We may have, at that point, signed a contract with

14   KWA, based on the different negotiations that we had attempted

15   with DWSD.

16         The interesting thing about the discussions with DWSD

17   is there were these different ideas that kept getting put on

18   the table that would change the cost of what Flint would pay

19   to DWSD.

20         So even though I had already, you know, sometime ago,

21   come to the idea that KWA was best, I was still interested in

22   these, because there were versions of the city contracting

23   with DWSD that made a lot of sense.

24         And the City of Detroit at this point is under

25   emergency financial management.  City of Flint is under

```
 1   emergency financial management.  Both of those emergency
 2   financial managers are reporting to the State Department of
 3   Treasury.
 4           So the equation's a little different here in, you
 5   know, winter of 2013 than it would have been previously.
 6   Q.   Than it would have been in 2011 when you said you were on
 7   the verge of sending it to the council, right?
 8   A.   Yeah.  We had spent also time trying to negotiate with
 9   DWSD and didn't come to anything that fundamentally changed the
10   numbers.  But -- but it is possible that something could change
11   the numbers in this scenario.
12   Q.   Okay.  I'd like for you if you would please go to Tab 5 of
13   that same binder.
14           MR. STERN:  And, Your Honor, this is another
15   handwritten note from January 10, 2013.  It has not been
16   previously marked, but we've marked it as Plaintiffs' Exhibit
17   602-43B.  And I would seek to move into evidence this
18   document.
19           THE COURT:  Mr. Christian?
20           MR. CHRISTIAN:  No objection, Your Honor.
21           MR. ERICKSON:  Once the witness identifies that it's
22   his, we have no objection.
23           THE COURT:  Okay.  Thank you, Mr. Erickson.
24           Do you see that exhibit in your binder?
25           THE WITNESS:  Yes, Your Honor.
```

1        THE COURT:  Do you know what it is?

2        THE WITNESS:  Yes.  These are my notes.

3        MR. STERN:  I apologize for not laying the

4    foundation.

5        THE COURT:  From January 10 of 2013?

6        THE WITNESS:  Yes.

7        THE COURT:  Okay.  Any objection, Mr. Erickson?

8        MR. ERICKSON:  No.  No, Your Honor.

9        THE COURT:  Mr. Christian?

10        MR. CHRISTIAN:  No, Your Honor.

11        THE COURT:  Okay.  Then we'll receive it.

12    (Plaintiff Exhibit No. 602-43B Admitted Into Evidence.)

13    BY MR. STERN:

14    Q.  You'll see as was just discussed this is a -- I apologize.

15    New dog old tricks.  I'm trying to use this machine.

16        1-10-2013.  Could you tell us this title on this

17    first line, what type of meeting this is?

18    A.  So -- yeah.  So it's the January 10, 2013, meeting.  The

19    EFM or Emergency Financial Manager Advisory Council -- so that

20    was a formal -- it was a formal body, formal for the emergency

21    financial managers.  Not a part of our normal city operations.

22        And I was appointed to this advisory council.  I

23    believe we had two city council members who were on this

24    advisory council.  And then there were a number of community

25    and business and neighborhood civic leaders who were on this

March 28, 2022                                                    1535

1   body.

2             It met approximately once a month.  And this was, as

3   I understood the emergency financial manager's thinking, this

4   was a way for kind of the key community players, apart from

5   that individual, to be in the same room together to get an

6   update on some major city affairs.

7             It was not conducted under the Open Meetings Act.

8   This was a meeting in what we would call the mayor's conference

9   room right in the mayor's suite at city hall with two city

10  council members present and no decisionmaking authority.  It

11  was able to be conducted in that kind of just private setting.

12  Q.   Do you see I just drew a -- this is the document we were

13  just looking at.  You see the date at the top, and I just drew

14  a black line, three black lines actually, underneath Smith

15  Village and North Franklin.  And then under it says, "water

16  decision."

17            Do you see that?

18  A.   Yes.

19  Q.   Earlier, you testified about all of the different roles

20  and responsibilities that the mayor had besides water.  And I

21  think you also testified about all the different roles and

22  responsibilities that the emergency manager had when he stepped

23  in or they stepped in respectively for the mayor in the city

24  council.

25            Do you recall that?

1    A.   Yes.

2    Q.   I look at everything above this black line.  And is this

3    -- is everything above the black line indicative of a number of

4    different roles that the EM was playing at the time, or is it

5    solely related to water?

6    A.   Yeah.  These are the range of city responsibilities.

7    Q.   And so, again, when you're having these meetings, whether

8    it's on the 9th or the 10th or whatever days y'all are meeting,

9    these meetings were not solely about the utilization of the

10   Flint River or moving to the KWA, correct?

11   A.   Not solely.  Yeah, looks like this one may have been half

12   or a third.

13   Q.   So then we get down to what appears to be the water

14   decision.

15        Do you see that?

16   A.   Yes.

17   Q.   And tell us about this first note, "Tucker Young analysis

18   full of errors."

19        And that's -- it appears you attribute that comment

20   to the emergency financial manager.

21        What is that note, and what does it mean?

22   A.   So as the city, as the emergency financial manager was

23   moving the city towards a decision on its long-term water

24   supply and bringing the Department of Treasury, kind of keeping

25   the Department of Treasury updated with that conversation, the

March 28, 2022

1537

1  State Department of Treasury had arranged for their own review

2  of the review of using kind of Flint River and other options

3  that had been presented over time.

4         So Tucker Young is another engineering company.  And

5  they worked, my understanding, for the State Department of

6  Treasury.

7         And they were independently reviewing both some of

8  the financial, as well as some of the water on a plant planning

9  and analysis documents so that as the Michigan Department of

10 Treasury made a decision on what the emergency financial

11 manager may recommend, this is my understanding, that they

12 would have a picture of the data themselves.

13 Q.  And there's a number of notes here.  I mean, one of them,

14 you know, obviously bias towards Detroit.

15        You see that note?

16 A.  Yes.

17 Q.  And that note, was that something else that was -- came

18 out of the mouth of the emergency financial manager at the

19 time, based on your recollection of these notes?

20 A.  Yes.  Those are -- those are -- they're full of errors and

21 obviously biased towards Detroit were comments that Emergency

22 Financial Manager Ed Kurtz made.

23        Tucker Young had a long-time engineering relationship

24 with the DWSD system.  And at least to my knowledge, they had

25 not done work in the City of Flint.  So this was the emergency

March 28, 2022                                                                 1538

```
 1    financial manager, you know, stating his view, which I was
 2    making note of.
 3    Q.   And it's fair to say or would you agree, sir, that at this
 4    point in time, there's a lot of political considerations that
 5    are being made with regard to Flint's future water supply?
 6    A.   Yes.  All of these decisions we make are political.
 7    Someone serving in elected office, that's part of the job.  I
 8    would say it's just -- it's a high-stakes decision, because
 9    this is a long-term multi-decade financial decision.
10            Whoever the City of Flint is paying for some portion
11    of water, the KWA or Detroit, you're talking about that amount
12    of money over, you know, 30, 40 years.  I mean, this is a very
13    consequential decision.
14            And as I explained, and I certainly don't pretend to
15    speak for him, but according to the laws in place, the State
16    Department of Treasury and the governor are both invested
17    directly in Detroit and directly in the City of Flint in ways
18    that are not usual.
19            Because in usual environments, you have a city
20    council and a mayor, and, yes, there's a state government, but
21    it's not the state government that's approving every
22    expenditure, you know, over some amount of money.
23    Q.   So I look at this below the black line, which is on your
24    screen and in front of you.  And there are one, two, three,
25    four, five, six, seven, eight, nine, ten.  There is 11 lines
```

1    where you made notes underneath those black lines that I drew.

2             Do you see that?

3    A.   Yeah.  I've got ten.

4    Q.   You're probably right.  You're the mayor.  I wasn't.  So

5    we'll just go with ten or 11.

6             Can you point to anything in those ten or 11 lines

7    where one of the considerations that are being made at this

8    January 10 EFM advisory counsel meeting was the safety of the

9    water?

10            Can you point for the jury where you're discussing

11   safety as one of the considerations?

12   A.   These were discussions about the finances, about planning.

13   I mean, there were, as I understand it, you know, other

14   conversations that maybe city staff were having with other

15   state personnel.

16            But treasury had a specific role in terms of

17   approving expenditures.

18   Q.   And at this point in time, we're in January 2013, you've

19   already described the hey stakes that were in play.  You've

20   talked about you came to the conclusion because of the costs.

21            Were you personally, at this point in time,

22   considering anything besides costs when it came to what

23   Flint's future water supply was going to be?

24   A.   I'm focused on cost.  But it's in the context of expecting

25   that drinking water is going to be -- is going to be safe.  So

1    that wasn't the discussion.

2    Q.   Right.

3    A.   And then once you get past costs, there were discussions

4    about, "Well, what might be a tie breaker?"

5         So let's say the Detroit renewal contract and the KWA

6    contract plus the city treatment costs, what if those two costs

7    were exactly the same?  What would be a tie breaker?

8         You know, a tie breaker would be at that time, and

9    certainly in my mind, greater cooperation with the I-69

10   corridor.  That Flint being a place that both kind of

11   connected down to Detroit.  We're going to do that anyway.

12   We're still a big part of the auto industry.

13        But then how do we build some relationships across

14   the growing county of Lapeer.

15        So we did -- I don't know that that was part of this

16   exact meeting that we're talking about, but those were the

17   considerations in my mind.

18   Q.   And I'm going to fast forward a bit.  We'll look some more

19   at your notes.

20        But between January 10, 2013, which is the document

21   note -- the notes that were dated January 10, 2013, which we

22   just looked at, and April 2014, when Flint actually made the

23   switch to the Flint River, were you ever called by any of the

24   engineering companies, whether it was LAN or Rowe or Tucker

25   Young and Jackson or any engineering companies that said,

1   "Mayor Walling, you cannot do this.  You should not do this,

2   it's not safe"?

3   A.   I was not.

4   Q.   Did you ever have any conversations with anybody else at

5   the city whom you were associated with where they told you that

6   someone had made a big issue or any issue of the safety of

7   switching to the Flint River?

8   A.   No, nothing specific.  You're talking about by the time

9   you go up to April of 2014.  That's what you said, right?

10  Q.   Yes, sir.

11  A.   I would be aware that the city needed to do a whole number

12  of things before the Michigan Department of Environmental

13  Quality was going to allow that water to be distributed in the

14  system.  So I would have known that in general.

15  Q.   Right.  But were you ever at the Water Treatment Plant and

16  any meetings with someone from LAN or Warren Green where you

17  overheard someone say, "Man, you can't do this, it's not safe"?

18  A.   No.  And at that particular time -- and this varied over

19  time.  Like, we're looking at these notes from 2013.  Winter

20  2014, I was having very limited interactions with anyone around

21  public works.

22        I might get an update at a staff meeting or an

23  in-the-hallway conversation with Mr. Croft as director of

24  public works.  But no.

25  Q.   In your time as mayor from the time you were first elected

1    during the special election and the end of your second term or

2    the end of your term and a half, you know, however you refer to

3    it in 2015, were there occasions where the city enlisted the

4    help of outside parties to deal with discreet, specific

5    technical issues for the city?

6    A.   Yes.  Yes.  I mean, across a whole range of different

7    areas.  Not just public works.

8    Q.   Well, we went through earlier -- I mean, the judge

9    actually sustained a question I asked you about your own

10   knowledge about chemicals and chemistry.  And that's, you know,

11   okay.

12           We've talked about each of the emergency managers and

13   what you knew about their experience and education --

14           MR. CHRISTIAN:  Objection.  Is there a question?

15           THE COURT:  Go ahead.

16           MR. STERN:  Thank you.  I'm going to start over, if

17    that's okay.

18           THE COURT:  Okay.  Maybe make it a shorter question.

19           MR. STERN:  I'll do my best.

20   BY MR. STERN:

21   Q.   Do you recall our conversation about each of the emergency

22   managers and their experience?

23   A.   Yes.

24   Q.   You recall our conversation about Mr. Croft, Mr. Johnson,

25   and Mr. Wright and their experience?

1  A.  Yes.

2  Q.  I just asked you a series of questions you'll recall about

3  safety coming up in any of these meetings.

4         You recall that?

5  A.  Yes.

6  Q.  We also just discussed very briefly that when you were

7  mayor, at many points in time, the city enlisted outside

8  companies to assist with discreet technical issues, correct?

9  A.  Yes.

10  Q.  When it came to the safety issues associated with

11  switching to the Flint River or utilizing the KWA pipeline, who

12  within city government would you have relied on or who outside

13  of city government would you have relied on for those decisions

14  as of 2013?

15  A.  2013?

16  Q.  Yes, sir.

17  A.  I would have looked to the emergency financial manager.

18  The director of public works both.  So Mr. Howard Croft for the

19  city.  Rowe Engineering was involved in looking at the Tucker

20  Young's review of the review.  So I was paying attention to

21  Rowe Engineering's notes on these various perspectives.

22         At that time, that's who I would have been

23  interacting with and would have been looking to for

24  information for guidance.

25  Q.  And you later came to -- did you later come to find out

March 28, 2022

1544

1    that any other engineering firms during that period of time
2    were also working on issues associated with transitioning the
3    treatment plant to service and treat the Flint River?
4    A.   Yes.   So at a later point, because at this decision time,
5    there may have been others involved beyond Rowe.   But then LAN
6    was involved with the work for the Flint Water Treatment Plant
7    to be ready to be used after that decision was made at a future
8    point in time.
9             And then LAN was involved in the TTHM response after,
10   you know, that water had been in the system for some months and
11   that notice went out to the public the very end of 2014.
12   Q.   Based on your interactions with Mr. Brown, Mr. Kurtz,
13   Mr. Croft, Mr. Johnson, Mr. Glasgow, and Mr. Wright, as well as
14   your interactions with a number of engineering firms that had
15   been doing work for Flint, including Rowe and LAN, who would
16   you have deferred to when it came to the science of water
17   treatment as between the governmental folks on the one hand and
18   the private engineering companies on the other?
19             MR. CHRISTIAN:   Objection.   Compound question.
20             THE COURT:   It's just a long question.
21             Who did you rely on or who did you look to if you
22   wanted technical input?
23             THE WITNESS:   I would have looked to both.   This is
24   part of the reporting structure in the city is you want to
25   hear from your director of public works, even though it's not

1    someone at this point who is reporting to me or that I

2    appointed.  But the --

3            THE COURT:  When you say, "both" --

4            THE WITNESS:  Yeah.  Sorry.

5            THE COURT:  Okay.

6            THE WITNESS:  Both the governmental individuals that

7    were listed, as well as the engineering firms that may have

8    been involved.  That were involved.

9    BY MR. STERN:

10   Q.  I want to move to Tab 7.

11           MR. STERN:  Your Honor, this has been marked as

12   Plaintiffs' Exhibit 1097.  This has not yet been entered into

13   evidence.

14   BY MR. STERN:

15   Q.  Mayor Walling, have you ever seen this document before?

16           You'll notice on the top-right corner, it appears a

17   stamp that says, "Dayne Walling, Mayor?"

18   A.  Yeah.  Yeah.  So I was familiar with this letter.  This is

19   going out of the office, out of the city office to State

20   Treasurer Andy Dillon from Emergency Manager Ed Kurtz.

21           So that top that you referred to, this is the --

22   that's the standard letterhead that the city would use at that

23   time.  Occasionally it was varied.  It was just digitally

24   printed.

25           But, yeah, you have Ed Kurtz as emergency financial

1   manager on the left.  Myself as mayor on the right.

2          MR. STERN:  Your Honor, I seek to admit into evidence

3   Plaintiffs' Exhibit 1097.

4          THE COURT:  Any objection?

5          MR. CHRISTIAN:  May I voir dire the witness briefly,

6   Your Honor?

7          THE COURT:  Certainly.

8          And what that -- "voir dire" is French, which is to

9   see and to hear.  And so what it means is can I quickly have a

10  couple of questions to make sure he knows what this letter is.

11  That's what that means.

12                      VOIR DIRE EXAMINATION

13  BY MR. CHRISTIAN:

14  Q.  Mayor Walling, did you have contemporary awareness of this

15  letter when it was going out in 2013?

16  A.  I believe that I did.  I may have seen a draft or been

17  shared at a meeting.  I knew that emergency manager Kurtz was

18  sending this communication to Treasurer Dillon.

19          MR. CHRISTIAN:  No objection, Your Honor.

20          THE COURT:  Okay.

21          MR. ERICKSON:  No objection.

22          THE COURT:  All right.  Then it's received.

23     (Plaintiff Exhibit No. 1097 Admitted Into Evidence.)

24                    DIRECT EXAMINATION (continued)

25  BY MR. STERN:

```
 1   Q.  Mayor Walling, you've already described on some level what
 2   this letter is.
 3          Do you see the very, very last paragraph of this
 4   letter that starts with "therefore"?
 5   A.  Yes.
 6   Q.  And who wrote this letter?
 7   A.  This is -- it's under the signature of Mr. Kurtz.  I
 8   believe he wrote this letter.  He probably consulted with
 9   Finance Director Ambrose.  Possibly the administrative
10   assistant would have also written a bit of it or added his
11   signature line, for instance.
12   Q.  And is -- what is this letter?  What is Mr. Kurtz asking
13   for here from the treasury department on March 29, 2013?
14   A.  Well, he's putting in writing something that had been
15   verbally communicated, you know, on numerous occasions, which
16   was that he was ready.
17          "He" being Mr. Kurtz as emergency manager, was asking
18   the State Department of Treasury to authorize -- when he says
19   "the EM," he means him -- to adopt a resolution to enter into a
20   contract with KWA, the Karegnondi Water Authority, for up to
21   18 million gallons per day -- maybe that should be MGDS --
22   based on the above terms which were in the above paragraph.
23   Q.  Okay.  So this is the reach out from the emergency manager
24   to treasury saying, "Approve this," right?
25   A.  After all these various discussions, like, would you
```

March 28, 2022                                                          1548

 1   please, you know, take this official step and authorize it.

 2          It lays out the rationale that I had communicated

 3   before, that an emergency manager while acting as the mayor and

 4   counsel, was also under a responsibility to gain State

 5   Department of Treasury approval for any expenditure over

 6   $50,000.

 7   Q.   I'd like for you now to turn, please, to Tab 8 in your

 8   binder.  And this is a letter dated April 11, 2013.

 9          Have you ever seen this letter before?

10   A.   Yes, yes.  I believe I did see this letter.

11   Q.   And was this routine for Mr. Kurtz when he was emergency

12   manager to share correspondence from state government with you

13   despite the fact that he had undertaken the power of the mayor

14   at this time?

15   A.   In many cases he would not have.  But on matters related

16   to this decision about the long-term water supply, Mr. Kurtz

17   seemed to value that I had been engaged with the decision for a

18   long period of time.

19          So these interactions were sort of the exception that

20   proved the rule.  That generally he would not have been

21   consulting with me.

22          But over these few weeks, I was very much aware of

23   what was coming in and out of his office.  So the physical

24   arrangement for us in the -- what we call the "mayor suite," my

25   office, you know, would face kind of forward where a citizen

```
 1   might come in.
 2            And then there was a door, the backdoor that went to
 3   a hallway.  And that went to the backdoor of what usually would
 4   be the city administrator's office.
 5            But while the emergency financial managers were
 6   there, they actually occupied that office, and I stayed in the
 7   larger mayor's office as it were.
 8            So Mr. Kurtz would often, like, you know, just to
 9   make a point, like, he would knock on the door, and he would
10   say, "You know, I just got this letter from Treasurer Dillon
11   that we've been waiting for since I sent him my letter at the
12   end of March."
13   Q.  And is this letter one of those letters that you remember
14   Mr. Kurtz knocking on your door and saying, "I just got this
15   letter from Treasurer Dillon"?
16   A.  Yeah.  And sometimes he was already talking to somebody in
17   the front.  So I don't know whether it was the front door or
18   the backdoor, but...
19   Q.  But you had seen this contemporaneously with when it was
20   sent, right?
21   A.  Yes, yes, right.  It was not addressed to me.  I don't
22   think I was copied by email.  But this is one that I saw when
23   it came in.
24            MR. STERN:  I move to admit into evidence
25   Plaintiffs' 1098.
```

```
 1              MR. CHRISTIAN:  No objection.
 2              MR. ERICKSON:  No objection.
 3              THE COURT:  Okay.  It's received.
 4       (Plaintiff Exhibit No. 1098 Admitted Into Evidence.)
 5     BY MR. STERN:
 6     Q.  You'll see that I highlighted at the top of the letter,
 7     this appears to be addressed to Mr. Kurtz, the emergency
 8     manager.
 9              And then at the very bottom of the letter, you see
10     it's signed by Andy Dillon, correct?
11     A.  Yes.
12     Q.  And the letter is dated April 11, 2013, correct?
13     A.  Yes.
14     Q.  And I highlighted a paragraph that I'd like for you to
15     read.  And then please tell the jury what your understanding
16     was of this letter from Mr. Dillon.
17     A.  All right.  So that paragraph reads -- this is from
18     Treasurer Dillon.
19              "It is my understanding that the Detroit Water and
20     Sewer Department is making a final best offer to Genesee County
21     and the City of Flint next Monday, April 15, 2013.
22              "As such, this approval will be effective at 5:00
23     P.M. on April 16, 2013, after receiving written notice from the
24     City of Flint that either no such offer was presented to the
25     county and the city or that an offer was received and was
```

March 28, 2022

1551

```
1    rejected in good faith based upon specified objections."
2    Q.   Okay.  So as of April 11, 2013, you would agree that the
3    treasury department had not yet authorized officially for the
4    city to move on to the KWA, correct?
5    A.   It had not.  This letter alone would not be that formal
6    legal authorization.
7    Q.   And the expectation was based on the contents of this
8    letter that something was coming from the DWSD, right?
9    A.   Yes, yes.
10   Q.   And what was that something?
11   A.   Oh, it was one more version of, you know, some specific
12   items of what a contract between the City of Flint and Genesee
13   County and Detroit Water and Sewer Department, DWSD, could
14   contain.
15        And that was then presumably something that the
16   emergency manager would then need to review in detail to see
17   how that might change, you know, costs or other factors.
18        So that's where we were on that day.
19   Q.   All right.  So four days later, I'd like for you to --
20   well, you're going to turn to the tab now hopefully.  But
21   you'll see a document from four days later dated April 15,
22   2013.  Please take a look at Tab 9.
23        Do you recognize this letter, sir?
24   A.   Yes.
25   Q.   You were -- were you still, as of April 15, 2013, a part
```

```
 1    of the five-person committee for the KWA?
 2    A.   Yes.
 3    Q.   And you see that at the very top of this letter, there's
 4    an addressee of the Karegnondi Water Authority at 4160 Beecher
 5    Road.
 6              Do you see that?
 7    A.   Yes.
 8    Q.   And it was also addressed to Ed Kurtz, emergency manager,
 9    right?
10    A.   Yes.
11    Q.   So not only may you have seen this letter because
12    Mr. Kurtz would have shown it to you, but you would have
13    received it because of your role with the KWA at the time,
14    right?
15    A.   Yes.  And DWSD and Ms. McCormick knew my role in that
16    regard.  I see I'm actually formally CC'd on this one as mayor.
17    Q.   Okay.
18    A.   On page -- what's marked as page 5.
19              MR. STERN:  Your Honor, I seek to admit into evidence
20     a five-page document that is labeled Plaintiffs' Exhibit 1099.
21              MR. CHRISTIAN:  No objection.
22              MR. ERICKSON:  No objection.
23              THE COURT:  Okay.  Thank you.  Then it's received.
24     (Plaintiff Exhibit No. 1099 Admitted Into Evidence.)
25    BY MR. STERN:
```

March 28, 2022

1553

1   Q.   Tell the jury what is this letter.

2            What does this letter mean to you as of April 15,

3   2013?

4   A.   This is the last best offer after this series of

5   negotiations and discussions that DWSD -- and it's actually

6   technically right in this one as the Detroit Water and

7   Sewerage.  I think the state treasurer shortened it to "sewer."

8   But DWSD.

9            And it's for the consideration of the emergency

10  manager and the City of Flint.  Obviously, myself, you see as

11  CC'd to Kevyn Orr, who is the City of Detroit emergency

12  financial manager.  Andy Dillon, the state treasurer.  I'm on

13  page 5.

14           THE COURT:  Can you put page 5 up, please?

15           THE WITNESS:  Yeah.  I think that's important.  This

16  is just down a little bit.  That this is DWSD's director

17  sharing this proposal with her board share, Mr. Fausone;

18  Genesee County Drain Commissioner, Mr. Orr, myself and

19  Treasurer Dillon.

20           So all of those individuals had been a party to some

21  -- at least some of these discussions over the prior months.

22  And every one understood that DWSD would make, you know, one

23  more effort to see if terms that would make sense for DWSD

24  could also make sense for Flint and Genesee County.

25  Q.   So first and foremost, as of April 15, 2013, based on the

March 28, 2022

1554

1    consents of this letter, no decision had yet been made for

2    Flint to switch officially to the KWA, correct?

3    A.   No.  No decision had been made.

4    Q.   And you'll see here on page 2, the DWSD is actually

5    proposing, and it comes a little later in this letter, a

6    modified rate schedule for the customers of Flint, right?

7    A.   Yes.

8    Q.   And so here, the Detroit Water and Sewerage Department has

9    actually reevaluated the rate schedule and is attempting to

10   negotiate with the City of Flint, correct?

11   A.   Yes.  Insofar as one of these scenarios had to do with KWA

12   becoming a contractor with DWSD in a kind of partnership

13   between the two authorities where Detroit would continue to

14   supply some water to our area.  But as KWA as a new customer.

15   Q.   But in that moment in time, April 15, 2013, were the folks

16   from the City of Flint, meaning the emergency manager and

17   anybody he tasked with working on this issue, were they

18   seriously considering as of that date renegotiating and

19   reentering into a contract with the DWSD?

20   A.   Yes.  I mean, because, you know, cost is at the center of

21   these negotiations.  And maybe if this hasn't come up before,

22   it might -- it might help clarify, well, kind of what would all

23   these discussions be about and why did Flint and Genesee County

24   feel like the water from DWSD was so expensive?

25           There are dozens of communities across Metro Detroit

March 28, 2022

1555

1    who receive their water of DWSD.  But their master contract has

2    a set of provisions about your distance and elevation in where

3    you receive the water and how the Detroit system has to pump

4    it.

5           So Flint and Genesee County were basically at the end

6    of the line.  So the structure of that contract could really

7    make a lot of difference.  If DWSD said, "We're going to sell

8    you water at the same price that we're going to sell the City

9    of Detroit water," we might have been able to sign that

10   agreement very quickly.

11          Because it would have been a radical change in how

12   that cost structure was done.

13          And I know that can be confusing.  Because when most

14   of us, like, pay a consumers bill -- that's what we pay in

15   Flint.  I don't know what electrical company you pay here, you

16   know, the state sets the rate, and everybody pays the same.

17          It doesn't matter whether you're close to the power

18   station or you're far away from the power station, even though

19   technically it costs that utility more money to get you

20   electricity.

21          So without understanding some of that context, it

22   might not make sense, well, why are we continuing to go back

23   and forth, and what makes this so important?

24          It's because if the DWSD board and director were to

25   treat Flint and Genesee County as a wholesale customer instead

1    of a regular or some other version of a partnership, then up

2    until this very last minute, something could have changed.

3            I mean, I was certainly leaning towards KWA.  I don't

4    -- you know, I've told you where my thinking was.  But I was

5    always interested in seeing, "Well, what does DWSD come up

6    with this time?  Is there something that could really benefit

7    our community?"

8            That's why there's so much attention given to this.

9    Q.  And is it fair to say that the primary focus at this time

10   was cost?

11   A.  It was, yeah.  Again, that's in the context of there's

12   probably some -- there's other people having discussions about

13   maybe other things.  But the Detroit water particularly had

14   always been a very safe, stable source for our community.  So

15   that's what we all were expecting, you know, one way or

16   another.

17   Q.  I'd like for you, if you could please turn to Tab 10 in

18   your binder.  This appears to be a letter dated April 16, 2013.

19   And it's from -- it appears to be from Ed Kurtz to Andy Dillon.

20           Have you ever seen this letter before, sir?

21   A.  Yes.

22   Q.  And around April 16, 2013, were you privy to this letter?

23   A.  Yes.  This was another case where Mr. Kurtz would have

24   said, "I'm ready to send this to letter to Mr. Dillon."

25           I've got my notes.  He was very personally involved.

 1   This was a major decision for him.  This wasn't something that

 2   was done by other staff.

 3              MR. STERN:  Your Honor, I seek to admit into evidence

 4    Plaintiffs' Exhibit 1100.

 5              MR. CHRISTIAN:  No objection.

 6              MR. ERICKSON:  No objection.

 7              THE COURT:  Okay.  Thank you.  Then it is received.

 8      (Plaintiff Exhibit No. 1100 Admitted Into Evidence.)

 9   BY MR. STERN:

10   Q.  You'll see at the top that it's on the letterhead of the

11   emergency manager, and it's addressed to Andy Dillon the state

12   treasurer, and it's dated April 16, 2013, correct?

13   A.  Yes.  I'll just point out that's a bit different than the

14   earlier document.  The emergency manager would just, you know,

15   use one letterhead or another.

16   Q.  Understood.

17              The letterhead here is different than the one that

18   had the mayor's stamp on the right-hand corner?

19   A.  Yeah, this is an emergency manager letterhead.

20   Q.  All right.  And here you'll see that Mr. Kurtz appears to

21   be telling Treasurer Dillon that there was a Scenario 1, a

22   Scenario 2, and that these two scenarios were the options that

23   were proposed by DWSD, correct?

24   A.  Yes.

25   Q.  Okay.  And he says that, "After review of the offer" --

1    and I believe -- and correct me if I'm wrong.  He's referring

2    to -- he's referring to the April 15 offer that we just looked

3    at from a day earlier, correct?

4    A.   Yes.  That was the last offer.

5    Q.   He lists a series of reasons as to why the city is going

6    to reject the DWSD's last offer.

7            Do you see that?

8    A.   Yes.

9    Q.   Okay.  And I highlighted a few of them.  Number 3 says,

10   "DWSD's offer does not include a guaranteed rate for Years 2

11   through 30, nor does it provide a maximum annual increase."

12           Do you see that?

13   A.   Yes.

14   Q.   And was that a topic of conversation at the time that DWSD

15   made its last and final offer but before this letter went out

16   within that 24 or 36 hours?

17   A.   Yes.  And this was one of the -- this was one of the

18   differences in the two models between the data the city had

19   from KWA and how its water contract was structured versus how

20   the DWSD water contract was structured.

21           The way DWSD was proposing to operate, how I believe

22   they continue to operate today, is every year, you know, their

23   board looks at their cost as they should, as they're legally

24   required to do.  And they project a budget for what it's going

25   to cost to operate the system, you know, safely and

 1    efficiently.

 2           And then that cost is distributed among all the

 3    different rate payers.

 4           So the emergency manager and the finance director

 5    would, you know, put in the projection, like, an average

 6    annual increase as a way to try to compare different

 7    scenarios.

 8           But you have to remember, this is one emergency

 9    financial manager looking at another city in another public

10    entity understanding that there are real concerns about things

11    like pension costs and rising cost of healthcare.

12           There had been different, you know, regulatory

13    requirements that DWSD might have to meet.

14           So it was always thought to be a bit difficult to

15    project DWSD's actual costs because each of those 29 years,

16    after signing the contract, their board would have to

17    undertake that responsibility of setting the rates.

18    Q.   And so when you look at number 6, the second sentence

19    says, "No indication of what annual rate of increase was used

20    in this projection."

21           Flint can only assume it's 4.4 percent based on the

22    Tucker Young report.  It's also based on 40.6 MGDs.  KWA's

23    proposal is for 649,775,166 based on a different number of

24    MGDs.

25           Do you see that?

March 28, 2022                                                    1560

1  A.   Yes.

2  Q.   And so what does this paragraph say to you in terms of the

3  expense associated with the DWSD proposal versus the expense

4  associated with the KWA proposal?

5  A.   Well, it means that first of all, the emergency manager

6  had all these different spreadsheets of these different

7  projections.  So when he got, like, an offer from DWSD, if I

8  popped into his office sitting there kind of looking at these

9  spreadsheets and he would be saying, well, if the 4.4 percent,

10  which was what I think we were all using as an average annual

11  rate of increase, you know, what would that look like if you go

12  out 30 years?

13        So that was one factor.

14        The other factor in how Ms. McCormick's letter was

15  phrased about how this could reduce cost for Flint and Genesee

16  County was it was proposed to be a lower amount of usage.  And

17  that obviously makes a difference.  And your projections is

18  how much you're actually going to buy each year.

19        So behind this one bullet would be some analysis, and

20  I don't remember all the details.  But I remember those

21  general themes, because they would come up at different times.

22        You needed to make sure that your decision was truly

23  apples to apples.  That you're talking about the same amount

24  of water.  You're talking about the same timeframe.  You're

25  talking about, you know, those -- otherwise, one thing is

1   going to look cheaper or more expensive.

2            But you're not really comparing, you know, like to

3   like.

4   Q.   And that letter that we just looked at from April 16,

5   2013, are you aware of whether that letter was actually sent?

6   A.   Yes.  I'm sure it was.  I don't know what produced this

7   particular version.  It was likely both letter and probably

8   PDF'd to the treasurer's office for expediency is my -- but

9   that's -- I can't say that for sure.

10  Q.   Now, I'd like you to turn if you could, please, to Tab 11

11  in your binder.  It's a letter that appears to be dated

12  April 17, 2013.  And it is from Sue McCormick, director of the

13  DWSD, to a woman named Ms. Inez M. Brown.

14           Do you see that?

15  A.   Yes.  Ms. Inez Brown.  She's our city clerk.

16  Q.   Contemporaneous with the mailing or the transmission of

17  this communication, were you privy to it?

18  A.   Yes.

19           MR. STERN:  Your Honor, I would seek to admit into

20  evidence Plaintiffs' Exhibit 1101.  Let me just make sure it

21  had not yet been -- it has not yet been admitted.

22           MR. CHRISTIAN:  No objection.

23           MR. ERICKSON:  No objection.

24           THE COURT:  Okay.  It's received.

25     (Plaintiff Exhibit No. 1101 Admitted Into Evidence.)

1    BY MR. STERN:

2    Q.   You'll see the date April 17, 2013, right?

3    A.   Yes.

4    Q.   Now, this is one day -- this communication appears to have

5    been drafted one day after the letter we just looked at from

6    Mr. Kurtz, right?

7    A.   Yes.

8    Q.   You just described Ms. Brown as being the city clerk for

9    the City of Flint, right?

10   A.   Yes.  In her role, she's, among other things, the official

11   record-keeper for the City of Flint.  So you can see DWSD wants

12   there to be no mistake about who is aware of this information.

13   Q.   And this is a pretty important letter, right?

14   A.   Yes.

15   Q.   Why is it important?  Why is it important to you what this

16   letter says?

17   A.   Well, at this time, there were both discussions and an

18   understanding within the city, the City of Flint, that we will

19   continue to use Detroit while the new KWA pipeline was being

20   put in place.

21           So in these different spreadsheets that were looked

22   at, that was part of the equation was there would be a few

23   years of costs that would still be paid to DWSD for the water

24   that we had been getting for all these years.

25           And in all the prior years that Flint didn't sign a

 1    contract with DWSD, they never sent us a letter like this, even

 2    though it would have been within their rights to.  They could

 3    have given us notice of termination.

 4         So after paying DWSD for, you know, what, like, 50

 5    years now of water, this seemed like a pretty steep step to

 6    send your customer of 50 years.

 7         Now, at the same time as mayor, I understand that

 8    there's some legal maneuverings that take place.  And when I

 9    saw this letter from DWSD, my thought was, "Okay.  So we're no

10    longer on that every year renewal plan price.  We're now

11    sending you notice that if you want DWSD water, it's a new

12    ball game.  There's a new price that's going to be paid."

13         So I didn't like the form of it.  I thought it was

14    not the way I would have like to seen business conducted.  But

15    at the same time, I understood this is what DWSD is saying.

16         "You're going in a different direction.  You're not

17    going to be a long-term customer.  Okay.  A year from this

18    date as our current contract allows, you're not going to be,

19    you know, a customer.  At least not under this price point."

20    Q.  Did you become aware in April around this time of 2013 of

21    a meeting that took place between Emergency Manager Kurtz, the

22    Governor Rick Snyder, and Treasurer Andy Dillon?

23    A.  Around what timeframe, please?

24    Q.  Around the time of this letter.  Subsequent to the letter,

25    but around April 2014 -- sorry -- 2013.

1   A.   Yeah, to my knowledge, any meeting that the emergency

2   manager would have had with the governor around that time, I

3   was also present.

4   Q.   Okay.  I'm going to show you, if you would please turn to

5   Tab 14 in your binder.  This appears to be an email that was

6   sent to -- well, I'm sorry.

7            It appears to be at the bottom, an email from

8   Mr. Kurtz.  And then you respond to this email at the top.

9            Do you see that?  If you go where it says, "Thanks,

10  Dayne."  The next Saturday April 20, 2013 Ed Kurtz wrote.

11           Do you see that?

12  A.   Okay.  I apologize.  I was looking at the -- at a

13  different --

14  Q.   I promise you it was my fault, not yours.

15  A.   So Tab 14?

16  Q.   Yes, sir.

17  A.   Right.  An email from me on Saturday, April 20, 2013,

18  3:54.  Yes.

19  Q.   But you see down -- you're responding to an email from

20  Mr. Kurtz, right?

21  A.   Yes.  This -- yeah.  I just wrote the one line, said

22  "Thanks Dayne."

23           And then everything from the -- on Saturday,

24  April 20, 10:24 A.M., that was from Mr. Kurtz.

25  Q.   Understood.

```
1    A.   Yeah.

2    Q.   Did you receive this email from Mr. Kurtz?

3    A.   Yes, I did.

4    Q.   And you responded to this email from Mr. Kurtz, correct?

5    A.   Yes.

6              MR. STERN:  I move to admit into evidence Plaintiffs'

7    1105.

8              MR. CHRISTIAN:  No objection.

9              MR. ERICKSON:  No objection.

10             THE COURT:  Okay.  It's received.

11      (Plaintiff Exhibit No. 1105 Admitted Into Evidence.)

12   BY MR. STERN:

13   Q.   All right.  So the jury knows what we were just

14   discussing, you'll see it says on Saturday, April 20, 2013, at

15   10:24 A.M., Ed Kurtz writes, "Very interesting meeting with the

16   governor on DWSD.  The whole cast of characters were there.

17   Tucker Young, DWSD, DEQ, governor, treasurer, and the Detroit

18   EM by phone.

19             "Had a long and sometimes tense change on the same

20   old issues.  Bottom line, the governor has asked us to give the

21   EM one week to review everything.  Following is the schedule."

22             Did I read that correctly?

23   A.   Yes.

24   Q.   Do you remember if you were at that meeting?

25   A.   I was at that meeting, yes.
```

1   Q.  And so would you characterize this email from Mr. Kurtz as

2   a recap of that meeting?

3   A.  I apologize.  I was looking at the document.

4           Would you ask the question again, please?

5   Q.  No problem.

6           Would it be fair to characterize Mr. Kurtz's email at

7   the bottom of this document as a recap of the meeting?

8   A.  Yes.

9   Q.  And he writes that, "DWSD has until Monday morning at

10  8:00 A.M. to request any additional information they need,"

11  right?

12  A.  Yes.

13  Q.  And do you remember that from the meeting?

14  A.  Yes.

15  Q.  And then he says, "We have only until 12:00 noon on Monday

16  to provide such information."

17          Do you recall that from the meeting?

18  A.  Yes.

19  Q.  He then goes on to say that, "The Detroit emergency

20  manager is to respond in writing with his proposal by Wednesday

21  8:00 A.M."

22          Do you remember that from the meeting?

23  A.  Yes.

24  Q.  And then he states that, "Depending on the response, there

25  may or may not be a face-to-face with the EMs."

1     Do you remember that from the meeting?

2   A.   Yes.

3   Q.   And who are the EMs he's referring to here?

4   A.   So this is Emergency Manager Kurtz in Flint and Emergency

5   Manager Kevyn Orr in Detroit.

6   Q.   Then it goes on to say, "The governor is not going to

7   interfere in the decision and has agreed that Friday, April 26

8   is the absolute drop dead date."

9     Did I read that correctly?

10  A.   Yes.

11  Q.   Okay.  So we just saw a letter from April 15, 2013, where

12  the DWSD submits to Mr. Kurtz a new proposal, right?

13  A.   Yes.

14  Q.   And then the next day on April 16, 2013, Mr. Kurtz sends a

15  letter and says, "Thanks but no thanks," right?

16  A.   Correct.

17  Q.   And then on April 17, 2013, Sue McCormick from the DWSD

18  writes to Ms. Brown and says, "Contract over."  You've got a

19  year effectively, right?

20  A.   Yes.  And the stamp on the sides, I think the city clerk's

21  office saw it on April 18.

22  Q.   Okay.

23  A.   Yeah.

24  Q.   But here we are on April 20, discussing a meeting that had

25  taken place apparently at some point between the letter from

March 28, 2022                                                    1568

1   Ms. McCormick and this email.

2              And it appears that there's still the opportunity for

3   the City of Flint to go back to DWSD, right?

4   A.   Yeah.  So this meeting that's being recapped occurred on

5   Friday, April 19.  And this is now the governor's addition of

6   the last best offer.

7              So as the governor -- as he opened the meeting, when

8   we were together, kind of witnessed one city under emergency

9   financial management and another city under financial

10  management sending each other, you know, correspondence that

11  was not collaborative.

12             The governor was appealing in his direct authority

13  for both sides to go through any outstanding questions, share

14  information, see if new proposals could be developed.  And that

15  would all take place within one week.

16             So Governor Rick Snyder had a pause in the meeting,

17  apparently asked Mr. Kurtz if he would join him as an aside.

18  And Mr. Kurtz said, you know, "Mayor, would you go with me?"

19             We were in a side room in the former -- the State of

20  Michigan building in Detroit, the former GM building there.

21             And Governor Snyder said, you know, "Will you" --

22  kind of asking the City of Flint mostly to the emergency

23  manager, "Will you allow DWSD to go over this one more time?

24  I know you've been going over it all these months."

25             And Emergency Manager Ed Kurtz worked with him a bit,

1   knew him by that point.  I could tell he was favorably

2   inclined.  He looked at me.  I said, "The governor's asking.

3   I don't see why not.  Why not take another week to make sure

4   we get this right."

5          And Mr. Kurtz responded to the governor face-to-face,

6   "We'll take the week."

7          And then we went back into the room, and we did this

8   timeline.  So that everybody in the room knew who was going to

9   do what when.  And this very important decision could be made

10  with full information on the table.  The final, final, you

11  know, last best offer.  And any questions could be dealt with.

12  Q.   Two more questions about this document.

13         Number one, do you recall anything in that meeting

14  where anybody in that meeting raised the issue of safety with

15  regard to the Flint River or any other water source for the

16  people of Flint?

17  A.   I don't.

18  Q.   And then you see this in the paragraph below the list

19  where I've highlighted just as a side note, "DWSD did agree to

20  let us opt out if the rates increased by more than 4.7 percent.

21  I indicated that was not acceptable.  We think it's going to

22  happen and would only further delay the project."

23         Did I read that correctly?

24  A.   Yes.

25  Q.   And what's your understanding of that point, that when

March 28, 2022

1570

1  Mr. Kurtz says, "We think it's going to happen and would only

2  further delay the project."

3         Based on your being in that meeting, based on you

4  hearing what happened in that meeting, what's your

5  understanding of what that line means?

6  A.   The projection, I think that's what it was, it was a

7  projection was that the Detroit Water and Sewerage District's

8  kind of older infrastructure, older healthcare and cost

9  benefits just costing all of us more money, that the emergency

10  manager, you know city's finance director which was Gerald

11  Ambrose at the time, they believed that the DWSD rates were

12  going to go up more than that in future years.

13         That was the number being used to try to create a

14  fair comparison.

15         But there was an expectation that it could easily be,

16  you know, 5.5 or 6.5.  That would not have been out of the

17  realm of what the city would have seen in its own water fund,

18  especially with healthcare and pension costs.

19         These pension funds took a huge hit during the

20  recession.  You have a responsibility to try to replenish

21  those as difficult as that is.

22         So I think the emergency manager really felt like

23  this was the time to make the permanent decision about the

24  City of Flint's water supply for the next 30 or 40 years.

25         And doing something, you know, now that would just

1   resolve the issue for 18 months or 24 months, he was saying,

2   you know, that's not what he was interested in.

3          MR. STERN:  Your Honor, this would be a great time to

4   stop.

5          THE COURT:  It sure would.  It's 1:29, and so it's

6   good timing.

7          So members of the jury, thank you for being here, and

8   we'll return tomorrow, begin at 9:00 A.M.

9          So please rise for the jury.

10                         (Jury Out)

11         THE COURT:  Mr. Walling, you are free to step down.

12         And we have one issue, which is the witness.  Is

13  that --

14         MR. STERN:  Yeah.  I'm still focused on Mr. Walling.

15         MR. MASON:  Sidebar.

16         THE COURT:  Oh, you'd like to do that at sidebar?

17         MR. CAMPBELL:  Yes, Your Honor.

18         THE COURT:  Okay.  Then -- this is an issue that may

19  relate to someone's personal life in a way that doesn't need

20  to be aired.

21         So what we'll do is turn off the Zoom feed, and we

22  can do that here in the courtroom.

23         MR. CAMPBELL:  That's fine.

24         THE WITNESS:  Thank you, Your Honor.

25         MR. STERN:  And I apologize.  But we'll see you

March 28, 2022                                                    1572

 1    tomorrow morning at 9:00 A.M.

 2            THE COURT:  So the Zoom is off, and we are here at

 3    sidebar.

 4                      (Sidebar Conference)

 5            MR. CAMPBELL:  Okay.  Your Honor, I'll start.

 6            As to the witness Dietrich White, there are really

 7    two issues to be addressed.

 8            The first is our objection to the newly identified

 9    expert fact -- the newly identified fact witness that we had

10    taken up at a previous conference.  And we submitted to Your

11    Honor a portion of that transcript.

12            And as we discussed on Thursday, it was at least my

13    impression and our impression that the issue was not resolved

14    by Your Honor, and we were looking to get that resolved.

15    That's number one.  And we'd like to resolve that if possible.

16            And then secondly is the issue as to Ms. White.  And

17    we had made some filings and back and forth.  But in talking

18    to Mr. Maimon and Mr. Mason this morning, assuming -- well, we

19    do not believe that Ms. White or the newly identified witness

20    should be permitted to testify.

21            THE COURT:  Understood.

22            MR. CAMPBELL:  But if Your Honor is going to allow

23    that, we would be willing to work with the plaintiff as to a

24    designation of the deposition testimony assuming that Your

25    Honor would find her unavailable.

```
 1              And we understand from the submission that Mr. Stern
 2      made, you know, attaching an email from Ms. White, she's a
 3      daycare provider and has those issues.
 4              But having said that, Your Honor, we have serious
 5      concerns, very great concerns, that this not become a sort of
 6      precedence setting particularly as we're dealing with the
 7      Fifth Amendment issues.
 8              And other witnesses who were seeking to be -- you
 9      know, I know it's not.  But we need it to say that, that this
10      is --
11              THE COURT:  I hear you.  No, I don't fault you for
12      making that argument.  It makes sense to make that argument,
13      because it's the same rule, I think, in a certain sense that
14      Mr. Stern and Mr. Maimon are sort of referencing.
15              But I actually didn't view it that way.  I viewed it
16      as a meaningful personal hardship as opposed to unavailable
17      under the 804 rule.
18              So okay.  Let's go back to whether any of these
19      witnesses who you've identified can testify.  And that's
20      Janeze, J-a-n-e-z-e, Jackson, Melinda Kelly, Philip
21      Vanderhagen, Sherry Vanderhagen, and Ms. White.
22              Is that the whole universe, Mr. Maimon?
23              MR. MAIMON:  Yes, Your Honor.
24              THE COURT:  Okay.  And you're still hoping to call
25      each of these individuals?
```

1    MR. MAIMON:  Yes, Your Honor.

2    THE COURT:  Okay.  And I read your letter.  I read

3  LAN's emails, as well.  And they sign onto your letter or

4  adopt it themselves, as well.

5    And what I understand is that what was learned from

6  these witnesses whose depositions have been taken is that a

7  few of the underlying facts that would be presented to the

8  jury are incorrect.

9    And so these -- of the four plaintiffs, two of them

10  drank water at different sources than had previously been

11  known and that the homes that were inspected thoroughly aren't

12  relevant anymore, because apparently they weren't drinking

13  water at -- they weren't living there.

14    Do I understand that?

15    MR. CAMPBELL:  So, Your Honor, as you were saying

16  those words, I was thinking, "I wonder if that is actually the

17  full extent of it."

18    I'm not sure that it is.  I think that what we're

19  dealing with is other places that where the claim is now these

20  children regularly drank water.  I view it as in addition

21  to --

22    THE COURT:  Okay.

23    MR. CAMPBELL:  -- as opposed to exclusively from the

24  previous spot.  And, of course, it goes to our expert

25  analysis.  It goes to the analysis of the whole case.  It goes

```
 1    to medical issues.  It goes to a lot of things --
 2              THE COURT:  It does --
 3              MR. CAMPBELL:  -- that were fundamental to our
 4    preparation.
 5              THE COURT:  It does.  But fundamental to your
 6    preparation was knowledge of human -- the human condition.
 7              And at least pre-pandemic, which is when this time
 8    period was, we went places.  We went out to eat.  We went to a
 9    friend's house.  We went to a meeting.  We went to a rec
10    center.  Children played at parks with drinking fountains.
11              We did things like that.  And you know that and your
12    experts know that.
13              MR. CAMPBELL:  And that's why we asked for the basis
14    of where these children were drinking.  Because we did know
15    that.  And if we were going to be confronted with these
16    additional places, we asked about that.
17              And, you know, of course, there are the plaintiff
18    fact sheet.  There's initial disclosures.  There's testimony
19    from the -- I think, there were all the mothers of the four
20    children in their depositions.  And there was none of this.
21              So that's why we asked those questions.  And then to
22    be, you know, kind of revealed about pre-pandemic life that,
23    yes, that actually happened for these children.  And even
24    though you asked, now here we're telling you that.
25              And there was an occasion, Your Honor, where we asked
```

March 28, 2022                                                      1576

```
 1   for the deposition of the -- all the depositions of the other
 2   parents of these four children.  And that was opposed.  And
 3   Your Honor said that we couldn't depose those people.
 4         And there's at least one of the people that is in
 5   that --
 6         THE COURT:  Who is that?
 7         MR. CAMPBELL:  I believe it's Philip Vanderhagen, but
 8   I'd stand corrected.
 9         THE COURT:  I'm sorry.  I didn't hear.
10         MR. CAMPBELL:  I believe Philip Vanderhagen is a
11   parent.  But I'd stand corrected if that's wrong.
12         THE COURT:  And that is -- Philip Vanderhagen is
13   somebody who you asked to depose, and I ruled that you could
14   not?
15         MR. CAMPBELL:  Yes.
16         THE COURT:  Okay.  So let's just talk about Philip
17   Vanderhagen.
18         MR. MAIMON:  Sure.  I think that there's a big piece
19   of this missing in the submission that VNA made to the Court
20   on Friday.  And that LAN joined onto.
21         And that is the presentation of the picture as if it
22   was submitted to the Court for the first time on the date that
23   that transcript that they attached in their letter.  And
24   that's not accurate.
25         On January 4, 2022, Ms. Devine, on behalf of VNA,
```

1    wrote to Ms. Calhoun raising the subject and asking for a

2    conference with the Court.

3           She says, "The VNA defendants and LAN defendants wish

4    to raise a dispute with the Court regarding the untimely and

5    improper disclosure of new trial witnesses by bellwether

6    counsel."

7           And they listed the whole list of all of the

8    witnesses that were listed in our pretrial order that had not

9    been in answers to interrogatories before.

10          The Court responded by Ms. Calhoun saying that, "Good

11   afternoon, everyone.  Judge Levy will add this topic to our

12   in-chambers agenda for tomorrow."

13          This is, again, January 4, 2022.

14          "No need to send any more information in advance.

15   We'll discuss the positions of both sides tomorrow."  And she

16   signed off.

17          So we did have a conference with the Court.  It was

18   an in-chambers conference, and, therefore, there's no

19   transcript of it.  But this issue was raised.

20          And the Court's resolution at that time was that,

21   yes, these witnesses can testify; however, number one, they

22   should -- answers to interrogatories need to be amended to

23   identify them.  That's number one.

24          Number two, the defendants are surely entitled to

25   depositions.  And the Court even mentioned at that time,

1    "Listen, we've got a lot to do.  We're doing a lot.  There

2    will likely be depositions in the middle of trial."

3              And that was the resolution, and we were instructed

4    to amend our interrogatories to reflect this.  We sent amended

5    answers to interrogatories.

6              And then it was the dissatisfaction by VNA with the

7    amendments to the interrogatories that led to the conference

8    who's transcript is attached to Mr. Campbell's letter on

9    Friday.

10             And the Court indicated at that time that here is the

11   resolution that, again, if you don't have the full answers to

12   interrogatories for these people by a certain date, they will

13   not be on the witness list.  In other words, they will not

14   testify.

15             However, all of these people who are the subject now,

16   our answers to interrogatories in a timely way according to

17   the Court's rulings then identified them and identified which

18   one of them would speak as to water consumption.  They were

19   all deposed according to the schedule.

20             And now I'll speak about Mr. Vanderhagen.

21             THE COURT:  Okay.

22             MR. MAIMON:  Because with regard Mr. Vanderhagen,

23   there came a time when we reached out to defendants because we

24   had some scheduling problems with his availability and his job

25   and said, "You know what, we won't call Mr. Vanderhagen.  He's

1   not -- he won't -- he's having a hard time scheduling it."

2           And we got an insistent email back by counsel for VNA

3   saying, "No.  We insist on staying Mr. Vanderhagen's

4   deposition."  And so we took the deposition.

5           At the end of the day, Your Honor, this is a matter

6   that's been ruled on twice by the Court.  Once on January 5 in

7   the in-chambers.  And then I don't have the date of the

8   transcript.  I think it was later on in January towards the

9   end of January, the transcript that was appended to the letter

10  last Friday.

11          And, again, for defendants who are defending on the

12  fact that these are not -- these kids are not injured by any

13  lead.  And so they have no lead injuries.  That's the

14  unanimous position of the defense experts.  And the Court

15  noted that in discussing these matters.

16          They've been disclosed.  They've been deposed.

17          THE COURT:  This is my memory, as well, Mr. Campbell,

18  which is that as long as the amended answers were provided in

19  a timely manner within this new timeframe, as long as the

20  depositions could take place.  And apparently

21  Mr. Vanderhagen's deposition did take place.  Okay.

22          So now we're at the -- and then the conclusion to

23  that was that then they could be called to testify.

24          And it's not -- and I just repeat that it's not a

25  surprise that children don't drink water only at home.

 1            But it's also not especially not a surprise, because

 2   you heard about this in December and January from the

 3   plaintiffs that as they were preparing the final pretrial

 4   order and their list of witnesses, you alighted on the fact

 5   that there was not -- you had not previously understood that

 6   or been informed that these witnesses were going to be

 7   involved.

 8            So we took care of that.

 9            So now the question is just whether Ms. White is

10   unavailable.  And I think she's not unavailable in the

11   traditional sense.  It's a personal hardship for her and the

12   people at her -- the families who rely on her for daycare.

13            Oh, Mr. Mason wants to speak.

14            MR. MASON:  Yeah.  I was just going to say I think

15   it's appropriate to handle this that we stipulate.  We want to

16   work with plaintiffs' counsel.  We're not trying to be

17   difficult.

18            But this slippery slope issue is a major concern and

19   cannot, you know, be repeated, if you will, or people think

20   they can repeat it in advance.

21            You're right.  This appears to be a legitimate unique

22   situation.  And so our position is we're willing to stipulate

23   that they can play the videotape in an effort to, you know,

24   work with them.

25            But not have any precedent either with Fifth

1  Amendment witnesses or with the many, many other witnesses in

2  the future.

3         THE COURT:  No.  There won't be any precedent.

4         I think with other witnesses we just have to hear

5  what it is.  If somebody's sick, if somebody's -- unexpectedly

6  a death in the family.  All sorts of things are going to

7  happen between now and the end of the trial.  So we'll take it

8  on a witness-by-witness basis.

9         MR. MASON:  I agree.

10        THE COURT:  Okay.

11        MR. MASON:  But I do not believe she's unavailable.

12 There are many witnesses that have things.  So she is within

13 subpoena range.

14        THE COURT:  She is.

15        MR. MASON:  She is available.  And that's why I think

16 it should be clear that we're stipulating to it.

17        THE COURT:  Of course.

18        MR. MAIMON:  I appreciate that Mr. Campbell is.  But

19 I heard something else from -- I'm sorry.  I appreciate that

20 Mr. Mason is willing to stipulate.  But I heard something

21 different from Mr. Campbell saying he's asking for the Court

22 to determine that she's unavailable.

23        THE COURT:  No, I don't think --

24        MR. CAMPBELL:  I'm fine.  And I agree.  I would

25 prefer to do it by way of stipulation under these particular

 1   circumstances for the reasons that Mr. Mason said.

 2             MR. MAIMON:  That's acceptable to us, Your Honor.

 3             THE COURT:  Okay.  So there's a stipulation.

 4             And my only question is if you wanted to retake the

 5   deposition as a trial deposition.

 6             MR. CAMPBELL:  See that's where we -- we're agreeable

 7   to do this if the existing deposition is used, Your Honor.

 8             THE COURT:  You're agreeable to use the --

 9             MR. CAMPBELL:  The existing deposition.

10             THE COURT:  Okay.  All right.  Great.  Then what I

11   would need is the designations for the existing and the

12   objections.

13             Are there a lot of objections?

14             MR. STERN:  It's a very short deposition.  It's less

15   than 130 pages.  There are some -- there are a number of

16   objections.  But they're all sort of in the same wheelhouse of

17   objections.

18             THE COURT:  Okay.

19             MR. STERN:  It's unlike any of the other depositions

20   Your Honor has ruled on, because the length of the deposition

21   is somewhat shorter.

22             THE COURT:  Okay.

23             MR. MAIMON:  We should be able to have designations

24   to the defendants before the close of today, and hopefully

25   they can turn around quickly.

 1      MR. CAMPBELL:  We can turn that around quickly, Your

 2  Honor.

 3      THE COURT:  Okay.

 4      MR. CAMPBELL:  I just want to finish, if I may, Your

 5  Honor, to make the record as to these witnesses.

 6      THE COURT:  You may, yes.

 7      MR. CAMPBELL:  Your Honor said that we were not

 8  surprised, because we were advised of --

 9      THE COURT:  No, I'm just saying factually it's not

10  shocking factually that a child goes to a playground, goes to

11  a relative's house, goes to a birthday party.

12      MR. CAMPBELL:  But, Your Honor, it is shocking that

13  none of this was disclosed before the exchange of trial

14  witnesses.

15      After this lengthy pretrial process with all of the

16  discovery, all of the efforts to learn where these children

17  had been drinking water and whether or not they were drinking

18  water from places that may or may not have had lead and

19  service lines.

20      And we went through extensive efforts to document

21  that.  And it's all -- it feeds into experts.  These are

22  foundational basic facts.  And they're now different.

23      THE COURT:  I understand that.  Let me ask a quick

24  question.

25      MR. CAMPBELL:  Potentially different.

March 28, 2022                                                    1584

1          THE COURT:  In the fact sheet, is there an area to

2     say, "List every place you were exposed to water or water

3     based food or" --

4          MR. CAMPBELL:  Sitting here, Your Honor, I didn't

5     look at it.

6          I do know is we led up and spoke to Your Honor about

7     this issue.  We were looking at the fact sheets, and there

8     were opportunities to disclose these types of witnesses.  And

9     that's how we learned about it.

10          And if I may say something about Ms. White, just like

11     our efforts to depose the other parent for these children, we

12     made efforts to depose daycare providers and other people

13     that, you know, generally fit into that kind of a category.

14     Teachers.

15          And we -- there was one teacher that we actually took

16     by way of written deposition questions, because Your Honor --

17     again, we wanted to do them.  There was an objection.  And I

18     forget exactly how we got to the one teacher that we did by

19     way of written questions or at least the one that I remember.

20          But certainly if we had known that Ms. White was

21     going to be a trial witness, we would have pursued that.  I

22     mean, there's just no doubt.

23          THE COURT:  I hear you.  I understand what you're

24     saying.

25          The decision has been made two or three times by now

 1    that -- as I recall it, plaintiffs informed me that these

 2    names were identified in depositions as they went along.

 3          They were not specifically put on an earlier witness

 4    list exchange or -- but the decision was made that there are a

 5    finite number of them.  That if the supplements to the answers

 6    to the interrogatories and depositions could be taken, then

 7    they would be trial witnesses.

 8          So I think that's where we are now.

 9          MR. CAMPBELL:  All right, Your Honor.  I certainly

10    understand now you've resolved the issue.  And I thank you

11    very much for taking the time.

12          THE COURT:  Thank you.

13          MR. STERN:  Your Honor, just for the sake of the

14    record, I think it's important to note that at various times

15    during the history of this litigation, there were 150

16    bellwether plaintiffs.

17          And then that got narrowed to 50.  Then it got

18    narrowed to 16 because of COVID.  And so we've used apples and

19    oranges a few times during this trial.

20          But we have not been operating with four individual

21    plaintiffs for the last four years in terms of some of these

22    disputes.

23          And so when you're dealing with the depositions of

24    potentially teachers or second parents for 150 kids or for 50

25    kids, that presents a different issue than what is plaintiffs

 1   you're looking at when you're dealing with getting ready for a
 2   trial for four.
 3            And so to the extent that there's a record, I just
 4   want to note that various points in time when some of these
 5   issues were raised, the picture of children was larger than
 6   the four that are here at trial.
 7            MR. CAMPBELL:  And, Your Honor, just to make the
 8   record clear.  It wasn't 150, and it wasn't 50.  It was 14
 9   when we started taking depositions.
10            THE COURT:  The depositions.
11            MR. CAMPBELL:  So it's simply not fair to suggest
12   150.
13            THE COURT:  Yeah.
14            MR. CAMPBELL:  And it was from those 14 that we
15   wanted to take additional depositions.  And that's when the
16   motions were objected to and Your Honor entered the orders
17   that I referenced.
18            THE COURT:  Okay.  And in the course of litigation,
19   the other thing that goes on and that has happened here, I've
20   presided over all of the discovery disputes.  There's no
21   magistrate or special master doing that.
22            Both sides have needed more time, more pages, more
23   briefs.  And that's the nature of litigation.  And it's within
24   that discretionary authority that I made this decision.
25            Having watched the ups and downs, the ebbs and flows

1  -- I mean, I could have said actually when I expanded the

2  number of pages on one of the motions in limine, I thought

3  that that was going to be the only motion in limine.  I had

4  actually taken a poll in chambers on how many there would be.

5      And then when I got that expand to 35 pages I said,

6  "Okay.  I lose.  I have the wrong number of motions in limine

7  in my poll.  I'm not going to get a free cup of coffee."

8      And but lo and behold, no, that was one of, you know,

9  nearly 20 different motions in limine.

10      So there's ample discretion -- I have exercised my

11  discretion to say, "Yes.  Okay, I will deal with all of the 15

12  to 20 motions in limine regardless of the number of pages that

13  VNA has filed or LAN.  I'll deal with all of the Daubert

14  motions.  There's no limit."

15      Of course, there wouldn't be a limit.  But all of the

16  elements on all of the Daubert motions that have to be

17  addressed.

18      So I just suggest to you that the discretion goes in

19  all different directions.  It's not just being exercised in

20  favor of the plaintiffs, because this singular decision goes

21  in the direction that they're seeking relief.

22      So is there anything else on the record right now?

23      MR. CAMPBELL:  Certainly not your guess as to the

24  motions in limine.

25      THE COURT:  Okay.  No.

```
 1          MR. MASON:  No, Your Honor.  Thank you.
 2          THE COURT:  Okay.  Let's go off the record.
 3                      (Off The Record)
 4                   (Proceedings Concluded)
 5            -            -            -
 6
 7          CERTIFICATE OF OFFICIAL COURT REPORTER
 8      I, Jeseca C. Eddington, Federal Official Court
 9  Reporter, do hereby certify the foregoing 1588 pages are a true
10  and correct transcript of the above entitled proceedings.
11  /s/ JESECA C. EDDINGTON_____        03/28/2022_
    Jeseca C. Eddington, RDR, RMR, CRR, FCRR        Date
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```