```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3    SHERROD, TEED, VANDERHAGEN and WARE,

 4                      Plaintiffs,
         -v-                                    Case No. 17-10164
 5
      VNA and LAN,
 6
                       Defendants.
 7    _____/

 8                          JURY TRIAL

 9
                 BEFORE THE HONORABLE JUDITH E. LEVY
10                    UNITED STATES DISTRICT JUDGE

11                        MARCH 29, 2022

12
      APPEARANCES:
13
      For the           Corey M. Stern
14    Plaintiffs:       Levy Konigsberg, LLP
                        605 Third Avenue, 33rd Floor
15                      New York, New York 10158

16                      Moshe Maimon
                        Levy Konigsberg, LLP
17                      605 Third Avenue, 33rd Floor
                        New York, New York 10158
18
                        Melanie Daly
19                      Levy Konigsberg, LLP
                        605 Third Avenue, 33rd Floor
20                      New York, New York 10158

21

22                      (Appearances Continued on Next Page)

23
      TO OBTAIN A       JESECA C. EDDINGTON, RDR, RMR, CRR, FCRR
24    CERTIFIED           FEDERAL OFFICIAL COURT REPORTER
      TRANSCRIPT:          UNITED STATES DISTRICT COURT
25                            200 EAST LIBERTY STREET
                           ANN ARBOR, MICHIGAN 48104
```

```
 1    For the VNA          Daniel Stein
      Defendants:          Mayer Brown LLP
 2                         1221 Avenue of the Americas
                           New York, New York 10020
 3
                           James M. Campbell
 4                         Campbell Conroy & O'Neil, P.C.
                           1 Constitution Wharf, Suite 310
 5                         Boston, Massachusetts 02129

 6                         Marcus Christian
                           Mayer Brown LLP
 7                         1999 K Street NW
                           Washington, District of Columbia 20006
 8
                           Mark R. Ter Molen
 9                         Mayer Brown LLP
                           71 South Wacker Drive
10                         Chicago, Illinois 60606

11                         Cheryl A. Bush
                           Bush, Seyferth PLLC
12                         100 West Big Beaver Road, Suite 400
                           Troy, Michigan 48084
13
      For the LAN          Wayne Brian Mason
14    Defendants:          Faegre Drinker Biddle & Reath LLP
                           1717 Main Street, Suite 5400
15                         Dallas, Texas 75201

16                         David C. Kent
                           Faegre Drinker Biddle & Reath LLP
17                         1717 Main Street, Suite 5400
                           Dallas, Texas 75201
18
                           Tory Finley
19                         Faegre Drinker Biddle & Reath LLP
                           1717 Main Street, Suite 5400
20                         Dallas, Texas 75201

21                         Philip A. Erickson
                           Plunkett & Cooney
22                         325 East Grand River Avenue, Suite 250
                           East Lansing, Michigan 48823
23

24

25
```

1

## **I N D E X**

2

WITNESSES                                                      PAGE

3

DAYNE WALLING
        Direct examination(cont.)by Mr. Stern...1595
4       Voir Dire examination by Mr. Erickson...1636
        Direct examination(cont.)by Mr. Stern...1636
5       Voir Dire examination by Mr. Christian..1654
        Direct examination(cont.)by Mr. Stern...1656

6

7

8

EXHIBITS                                    Marked    Admitted

9

Plaintiff
        602-18.........................1635       1636
10      602-20.........................1641       1641
        602-27.........................1674       1674
11      602-43C........................1601       1602
        602-43D........................1607       1607
12      602-43E........................1609       1610
        602-43G........................1618       1618
13      602-43I........................1628       1628
        602-43K........................1633       1633
14      602-43L........................1644       1644
        0612...........................1623       1623
15      1108...........................1597       1597
        3618...........................1709       ----
16      3622...........................1648       1649
        3635...........................1702       1702

17

18

19

20

MISCELLANY                                                     PAGE

21

Proceedings...............................1592
Certificate...............................1734

22

23

24

25

1    **P R O C E E D I N G S**

2         THE CLERK:  Calling Sherrod, Teed, Vanderhagen and

3    Ware vs VNA and LAN.

4         THE COURT:  Good morning.  Could we have appearances,

5    please.

6         MR. STERN:  Good morning, Your Honor.  Corey Stern

7    and Moshe Maimon on behalf of the bellwether plaintiffs.

8         THE COURT:  Thank you.

9         MR. CHRISTIAN:  Good morning, Your Honor.  Marcus

10   Christian, Daniel Stein, and James Campbell on behalf of VNA.

11        THE COURT:  Thank you.

12        MR. MASON:  And on behalf of LAN, Your Honor, Wayne

13   Mason, Philip Erickson, and David Kent.

14        THE COURT:  Good.  Please be seated.

15        We have a request from one of our jurors, number 2,

16   to end at 1:00 o'clock today for a family medical appointment

17   that I think is very important.  So we'll wrap up as close to

18   1:00 o'clock as we can.  And we just learned that, or I would

19   have given you a little more warning about that.

20        So is there anything for us so address before we

21   bring the jury in as soon as they're all here?

22        MR. CHRISTIAN:  Nothing for VNA, Your Honor.

23        THE COURT:  Okay.

24        MR. STERN:  Nothing from the plaintiffs.

25        THE COURT:  Okay.  Good.  Thank you.

1    MR. MASON:  Same here.

2    THE COURT:  Okay.  Okay.  The jurors are all here, so

3    we'll bring them down and get eight minutes --

4    MR. MAIMON:  We have to make sure.  Let's make sure

5    our witness is here.

6    THE COURT:  Sure.  That would -- oh, let me ask you

7    about the deposition, Schock.  Will there be any further -- I

8    don't want to get started on the Schock objections if they're

9    going to be trimmed by any chance.  They're not as long as

10   some of them, but I'm not asking you to have me do them all.

11   MR. MAIMON:  We were waiting -- I think Ms. Devine

12   from Mr. Campbell's office was putting the final touches on

13   the revised submission.

14   THE COURT:  Oh, good.  Okay.

15   MR. CAMPBELL:  That's right.

16   THE COURT:  Just trying to pace myself.  We have what

17   we call the Biden report, which is the six-month report on

18   motions pending more than six months.  This case alone has

19   been on that report endlessly.  Okay.

20   Washtenaw County COVID numbers are now up 37 percent.

21   Wayne County is up slightly.  Is our witness --

22   MR. MAIMON:  Just coming through security.

23   THE COURT:  Okay.  Good.  There's supposed to be a

24   weather situation in the morning.  A quarter inch of ice and

25   an inch of snow.

```
 1              MR. MAIMON:  Really?

 2              THE COURT:  Yes.

 3              MR. MAIMON:  Wow.

 4              THE COURT:  It's a winter weather advisory starting

 5    at 8:00 P.M. tonight going until 10:00 A.M.  Maybe on one of

 6    the breaks, I'll just talk to the jurors.  Because it covers

 7    all of the counties that they live in.

 8              One option would be to sort of start at 10 so that

 9    the roads are a little better treated by then.  Or just push

10    through.  So I don't -- does anybody have any preference?

11              MR. STERN:  I mean, I think part of the calculus also

12    has to do with childcare.  I mean, I'm just thinking as a

13    parent of young kids that if -- I don't know what the schools

14    do here, but I could see a scenario where they cancel school.

15              THE COURT:  The school would probably just have a

16    late start, because it's supposed to be 60 degrees by the

17    afternoon.

18              MR. STERN:  Oh, that's great.  We will be here.  So

19    whatever Your Honor wants is fine.

20              THE COURT:  Okay.

21              MR. MAIMON:  Maybe just find out what their

22    preference is.

23              THE COURT:  That's what I'll do.  I'll talk to them

24    on the break.

25              Good morning, Mr. Walling.
```

March 29, 2022

```
 1            THE WITNESS:  Good morning.
 2            THE COURT:  Oh, the jurors have told us that they
 3    would like to begin at 9:00 AM.  That they're good with that
 4    tomorrow.  So the weather won't deter them.
 5            THE CLERK:  All rise for the jury.
 6            THE COURT:  Good morning.  Good morning.
 7                         (Jury In)
 8            THE COURT:  Please be seated.
 9            And Mr. Walling, you're still under oath to tell the
10    truth from when I swore you in yesterday.
11            THE WITNESS:  Yes, Your Honor.
12            THE COURT:  Good.  Okay.  So Mr. Stern, you have
13    further direct?
14            MR. STERN:  Thank you, Judge.
15                DIRECT EXAMINATION (continued)
16    BY MR. STERN:
17    Q.  Good morning, Mayor Walling.  Welcome back.  When we left
18    yesterday, we had just finished talking about if you remember
19    this continued effort to see if there was a deal to be made
20    between the City of Flint and the DWSD.
21            Do you recall that?
22    A.  Yes.
23    Q.  Okay.  If you wouldn't mind going to your binder, Binder
24    number 1, and pulling out number 15.
25            THE COURT:  Do you want him to actually take it out?
```

1   BY MR. STERN:

2   Q.   No, I'm sorry.  Feel free to just look at it.

3          THE COURT:  Okay.

4   BY MR. STERN:

5   Q.   And this appears to be -- actually, you tell me what you

6   see here.  Tell the jury, please.

7   A.   Let me make sure I'm looking at the right tab.  It's a

8   letter dated April 24 at the top?

9   Q.   Yes, sir.  It's a four-page document that appears to be a

10  letter to Ed Kurtz.

11         Do you see that?

12  A.   Yes.

13  Q.   Do you see it's dated April 24, 2013?

14  A.   Yes.  Give me -- if I can have just a moment, since it is

15  four pages.

16  Q.   Take your time.

17  A.   So this letter from Ms. Sue McCormick, who's the director

18  of the Detroit Water and Sewerage Department, April 24, is the

19  city -- the DWSD's very last best offer in that week after

20  Governor Snyder had asked for there to be consideration of one

21  more proposal.

22  Q.   Prior to looking at this document today, had you seen this

23  document before?

24  A.   Yes.

25  Q.   Would you have seen it and do you recall seeing it at the

March 29, 2022                                                    1597

 1   time that it was mailed on or about April 24, 2013?

 2   A.  Yes.  This would have been shared with me by Mr. Kurtz.

 3          MR. STERN:  Your Honor, I seek to admit into evidence

 4   Plaintiffs' Exhibit 1108.

 5          MR. CHRISTIAN:  No objection.

 6          MR. ERICKSON:  No objection.

 7          THE COURT:  Okay.  Then it's received.

 8     (Plaintiff Exhibit No. 1108 Admitted Into Evidence.)

 9   BY MR. STERN:

10   Q.  And you'll note again at the top that this is dated

11   April 24, correct, 2013?

12   A.  Yes.

13   Q.  It's addressed to Mr. Kurtz, correct?

14   A.  Yes.

15   Q.  And you've already described that this was, in fact, the

16   best last -- last, last final offer, correct?

17   A.  Yes.

18   Q.  And you'll see down at the very bottom, I've highlighted a

19   section that says, "In summary, our proposal reflects a

20   public/public partnership approach with Flint that is designed

21   to launch a corporate arrangement toward solving water supply

22   challenges in a Flint Genesee region in a manner that best

23   meets the interests of Flint and is equitable across the DWSD

24   service area."

25          Do you see that, sir?

1   A.   Yes.

2   Q.   And it's your understanding that this was, in fact, the

3   final offer from DWSD Flint to remain on the DWSD water system?

4   A.   This is, yes, for -- to remain as a long-term permanent

5   customer, yes.

6   Q.   Okay.  And when we look at the date, April 24, 2013, is it

7   fair to assume that as of this date, a decision still had not

8   been made regarding whether the City of Flint would remain with

9   DWSD in light of the fact that this is still a proposal for

10   Flint to remain with the DWSD?

11   A.   Yes.  There was -- I remember Mr. Kurtz expressing some

12   optimism that the direct involvement of the governor, for

13   instance, could have prompted a better offer.  Because clearly

14   the governor taking that time showed parties that this was --

15   this was something of interest.

16        And while he said that he was not going to make the

17   decision directly, the state had created a process.  And I

18   think that's what Ms. McCormick refers to a process directed by

19   the state.

20   Q.   And, again, at this time, April 24, 2013, in consideration

21   of what Flint should do next, what was the main consideration

22   from your memory that was being discussed on the City of Flint

23   side about what to do?

24   A.   The city was always looking for a safe, efficient, meaning

25   cost-effective, long-term water supply for the community.  So

1    we had eliminated the Flint River as a long-term supply.  And

2    now it was down to a long-term contract through the DWSD

3    through the City of Flint or the county or KWA.

4            Or continuing or going with KWA for water.

5    Q.   And when you say, "a long-term" -- you just said that by

6    this point, the Flint River had been eliminated as a long-term

7    supply, correct?

8            Is that what you just said?

9    A.   Yes.  That was no longer being discussed in the

10   administration, to my knowledge.  It was down to DWSD or KWA

11   for the city's long-term water supply.  We were still receiving

12   water from DWSD on this date.

13   Q.   So you -- did you know at this point in time what the

14   timeframe would have been for the KWA to actually be utilized

15   by the City of Flint if that was the choice that was made?

16   A.   It was always projected to be approximately a two-year

17   construction time period.  One of the early correspondence

18   mentioned a need to have a decision, so a construction season

19   could be utilized.

20           So if, you know, one made the decision in

21   October/November, then maybe it's two and a half or almost

22   three years.  Whereas if one can start the work during the

23   warmer months just like we see with road construction, then it

24   would fit closer to that two-year timeframe.

25           So it's going to be a two to maybe three-year

1    construction process.

2    Q.   What was your thinking, and if you know, what were the

3    conversations, the substance of the conversations that you

4    would have had at that time in this moment in time about how to

5    fill that two to two-and-a-half year gap between when the

6    decision was made to go to the KWA and when the KWA would

7    actually be operational?

8    A.   Every projection that I saw from the city's finance

9    director who was, at the time, Gerald Ambrose, showed that the

10   City of Flint would continue to use water from DWSD.

11         Those were the financial projections.

12   Q.   So is it fair then to say that, at that point in time,

13   April 24, 2013, the belief was whether we went long-term with

14   Detroit, meaning Flint, or we didn't, that at least the stopgap

15   period of time would still include water from the DWSD?

16   A.   Yes.  That's what all the financial projections showed.

17   There were discussions at different times from Mr. Brown, from

18   Mr. Croft about the idea of blending with the Flint River.

19   Like could the City of Flint reduce costs by receiving a

20   smaller amount of water from DWSD and supplementing that with

21   some water that was treated locally?

22         So those discussions did occur on and off.  But the

23   financial projections -- and this was, I think, the easiest

24   thing for the finance director to do -- would be to say, you

25   know, "We're going to approximately continue to pay DWSD in

1    future months what we have in recent months from a budgeting

2    perspective."

3    Q.   And we just looked at the April 24 letter from Sue

4    McCormick, DWSD, to Mr. Kurtz.

5            Do you have a -- do you know how Mr. Kurtz responded

6    to that letter and what the ultimate decision was at or about

7    that time?

8    A.   I do.  And I remember there being, you know, again, some

9    different spreadsheets that would have been looked at.  But

10   Mr. Kurtz's decision was to reject this offer from DWSD and

11   then to sign the long-term water supply contract with KWA.

12   Q.   Okay.  If you could please look at Tab 16 in your binder.

13           These appear to be some more handwritten notes for

14   the sake of -- could you tell us if these are, in fact, your

15   notes?

16   A.   Yes.

17           And, Counsel, did you note they're not on the screen

18   today?

19   Q.   So far.  I just have to ask the Court first to allow me to

20   admit them.

21   A.   Just wanted to make sure.

22   Q.   No, thank you.

23           MR. STERN:  Your Honor, I seek to admit into evidence

24   Plaintiffs' Exhibit 602-43C.

25           MR. CHRISTIAN:  No objection.

| 1 | MR. ERICKSON:  No objection. |
|---|---|
| 2 | THE COURT:  Okay.  Well that is received. |
| 3 | (Plaintiff Exhibit No. 602-43C Admitted Into Evidence.) |
| 4 | MR. STERN:  Thank you. |
| 5 | BY MR. STERN: |
| 6 | Q.  All right.  Mr. Walling, it appears that these are your |
| 7 | handwritten notes, correct? |
| 8 | A.  Yes. |
| 9 | Q.  It's dated 5-9-2013, correct? |
| 10 | A.  Yes. |
| 11 | Q.  And this is an advisory council meeting; is that right? |
| 12 | A.  Yes.  It's that same EFM advisory counsel that I described |
| 13 | yesterday. |
| 14 | Q.  And, again, I drew a black line you'll see above the |
| 15 | highlighting, and I drew a black line below the highlighting. |
| 16 | Is it fair to say that everything above the black |
| 17 | line and everything below the black line have nothing to do |
| 18 | with water? |
| 19 | A.  There are two items above on income taxes and discussion |
| 20 | from advisory.  There's a long section on blight and budget. |
| 21 | But I want to draw your attention.  There is something at the |
| 22 | bottom that relates back to Ernst & Young. |
| 23 | So it was in the context of the budget, but it did |
| 24 | have to do with water. |
| 25 | Q.  Okay.  And what's that at the bottom?  It's cut off. |

1   A.   It is cut off.

2   Q.   If you remember, what was that?

3   A.   I don't remember.  I just know Ernst & Young was in the

4   context of water-related work.

5   Q.   Okay.  So let's assume for a minute that the three lines

6   above the black line and at the very bottom -- so you see here,

7   I just highlighted, "Why not take DWSD's offer.  Faulty DWSD

8   numbers.  Concerns about inheriting maintenance costs."

9           I just highlighted that in addition to the three

10  lines that were previously highlighted?

11  A.   Yes.

12  Q.   And then I highlighted at the bottom, "Whatever this is

13  from Ernst & Young that may relate to the water."

14          You see that?

15  A.   Yes.

16  Q.   Okay.  Other than what I've highlighted, is it fair to say

17  that the other items on your list of notes do not reference or

18  have anything to do with the water?

19  A.   Correct.

20  Q.   And that's because at this time, despite all the stuff

21  that we've talked about in court, there's still other

22  government business that the city is tending to, right?

23  A.   Oh, yes.  You better believe it.  This is every day.

24  Q.   Right.  And we're talking about income tax, and we're

25  talking about strategies and resources for abandoned cars and

1    businesses, right?

2    A.   Yes.

3    Q.   Now, when it comes to the notes that have been

4    highlighted, do you recall at this meeting a discussion about

5    why or why not the city should take DWSD's offer?

6    A.   I see the two notes there about DWSD's numbers concern

7    about maintenance.  Those were the kinds of things that I was

8    mentioning yesterday that the city was looking at, at an

9    ongoing basis.

10         So I -- this is now after the fact.  I think it's the

11   emergency manager, you know, basically reiterating those

12   points.

13   Q.   And let's just recap for a second.

14         I mean, the emergency manager was appointed why?

15   A.   Well, the authority of the emergency managers came from

16   the governor's declaration of financial emergency, which meant

17   that the city had, you know, financial distress to the point

18   that it could impact the city's welfare.

19   Q.   So in the most basic terms that you can describe, what was

20   the emergency manager's job?

21   A.   It was -- the emergency manager had the authority of the

22   mayor and the council and was charged with kind of a plan for

23   the city to exit a financial emergency.  Which would mean, you

24   know, pretty significantly changing revenues, expenditures, how

25   the budget looks at the end of the year.

1    That's actually, kind of, what you see in the rest

2  here, that first item about income tax adjustment.

3    So this is how could the city's ability to raise

4  local income taxes be changed if the State of Michigan and the

5  legislature actually changed the tax code related to, you

6  know, local income taxes if that makes sense.

7    In the City of Flint, we collect a half percent of

8  income tax from nonresident workers.  We collect 1 percent

9  local income tax from city residents.  And there was an idea

10  of seeking an increase in that percentage, so.

11  Q.   In a number of your notes, were you -- were you -- you

12  referenced the emergency manager.  We've seen yesterday and

13  we'll see some more today.

14    You put in quotes or in parenthesis, "EFM," right?

15  A.   Yes.

16  Q.   And what does "EFM" mean?

17  A.   Well, that's the emergency financial manager which came

18  from the earlier Public Act 72.  And then the emergency manager

19  was from Public Act 4, that newer act.  And then how it got

20  revised.  I tried to be accurate about that.

21  Q.   Now both acronyms, EFM and EM, the individuals that held

22  those roles, their sole focus was on money, right?

23  A.   I would say a primary -- a primary focus.  Because as this

24  individual does have the authority of the mayor and the city

25  council, they are also exercising, you know, these other

1    responsibilities.

2    Q.  But only until when?  They're exercising these

3    responsibilities only until when?

4    A.  Well, individually until the governor replaces them with

5    someone else, which happened multiple times through this

6    process.  And then collectively, when this stage of the

7    financial emergency is concluded.

8           Then under the law, the governor would then move to

9    appoint a transition advisory board, which then became another

10   way of the state maintaining financial oversight.

11          We went through that process in late April-early May

12    of 2015.

13   Q.  And then you see in the middle getting back to the water,

14   there's another three lines that say, "Next steps on water.

15   Addressing DWSD termination, potential river usage for two

16   years."

17          Do you see that, sir?

18   A.  Yes.

19   Q.  And so it said, "potential."

20          Had a decision been made as of May 9, 2013, to

21   utilize the Flint River for two years?

22   A.  No.

23   Q.  Do you recall the substance of this conversation that took

24   place on May 9 at the advisory council meeting?

25   A.  I don't.  This meeting would have taken place over

```
 1   approximately an hour.  You do see there are a lot of different
 2   items.  I think it was more of just an update --
 3   Q.  Okay.
 4   A.  -- from either the emergency manager or the finance
 5   director saying, you know, "These are the things that we're
 6   looking at next."
 7   Q.  I'd like for you to please turn to Tab 17.  This appears
 8   to be a May 20, 2013 -- notes from a May 20, 2013, city council
 9   budget meeting.
10         Do you -- are these your handwritten notes, sir?
11   A.  Yes.
12         MR. STERN:  Your Honor, I seek to move into evidence
13   Plaintiffs' Exhibit 602-43D.
14         MR. CHRISTIAN:  No objection.
15         MR. ERICKSON:  No objection.
16         THE COURT:  Okay.  Thank you.  Then it will be
17   received.
18     (Plaintiff Exhibit No. 602-43D Admitted Into Evidence.)
19   BY MR. STERN:
20   Q.  Mayor Walling, you see that this does appear to be your
21   notes from May 20, 2013, correct?
22   A.  Yes.
23   Q.  And this was a city council budget meeting; is that
24   correct?
25   A.  Yes.
```

1   Q.   And you see in the body of this, I've highlighted two

2   places, three lines.  The first one says, "Water/Sewer rates,

3   future decreases.  Looking at options with river, but not in

4   budget."

5            Then about two lines down, it says, "DWSD

6   termination.  Looking at options, DEQ consultation."

7            Do you see that?

8   A.   Yes.

9   Q.   Of the 20 or 25 lines on this paper, can you see anywhere

10  else in your notes where water or Flint River or DWSD were

11  discussed, at least based on your notes, from this meeting?

12  A.   No.  Those were the items in this budget.

13  Q.   And so, again, like we've seen in a number of your notes,

14  there's city business taking place that goes beyond simply the

15  water issues, correct?

16  A.   Yes.

17  Q.   And, in fact, it appears from these notes, the majority of

18  this meeting was spent on other things besides the water

19  issues, correct?

20  A.   Yes.  The city's overall spending each year would be

21  $170 million.  The water fund is -- you know, was, at the time,

22  35-some million of that.  So this looks pretty representative

23  of a full picture in brief of, you know, city budget highlights

24  going into a new financial year.

25            So the City of Flint adopts a budget by June and then

1  the budget or fiscal year starts July -- July 1.

2  Q.  You see the lowest -- not lowest.

3         The highlighted line that has an asterisk and says,

4  "DWSD termination.  Looking at options.  DEQ consultation."

5         As of May 20, 2013, were you aware that the city

6  would not be using DWSD water in that interim period before the

7  KWA was ready?

8  A.  No.  It continued to be a discussion.  I believe I said

9  this yesterday.  That part of how I understood DWSD's

10  termination letter was to signal that if the city was going to

11  use water beyond that point, it would be under a different --

12  now, we'd be talking about a short-term contractual

13  arrangement.

14         It would not be another one-year continuation of the

15  old contract that had expired.

16  Q.  I'd like for you, if you could, please turn to Tab 19 in

17  your binder.  And this appears to be a June 18, 2013, notes

18  from a June 18, 2013, staff meeting.

19         Do these appear to be your notes?

20  A.  Yes.

21         MR. STERN:  Your Honor, I seek to -- we seek to move

22   into evidence Plaintiffs' Exhibit 602-43E.

23         MR. CHRISTIAN:  No objection.

24         MR. ERICKSON:  No objection.

25         THE COURT:  Okay.  It's received.

March 29, 2022

1       (Plaintiff Exhibit No. 602-43E Admitted Into Evidence.)

2    BY MR. STERN:

3    Q.   Mayor Walling, are these your notes from a staff meeting

4    from June 18, 2013?

5    A.   Yes.

6    Q.   There's two pages here.  On the first page I've

7    highlighted, you'll see the date, the title staff meeting.  And

8    I've highlighted two places on the top-right corner.  It

9    appears to say, "KWA ground breaking."

10            And then in the middle of the page I've highlighted,

11    it says, "KWA reso on capacity contract."

12            Does "reso" mean resolution?

13    A.   Yes.

14    Q.   Okay.  Do you see anything else on page 1 of this document

15    where discussion appears to have been had about the water

16    issues?

17            I missed one.  So before you even get to it, I'm

18    going to tell you.

19            Down near the bottom, it says, "Water plant test run.

20    July.  30 day.  Assess mechanical chemicals, and staffing."

21            Do you see that?

22    A.   Yes.

23    Q.   Other than the three spots I've highlighted on page 1,

24    top-right corner, "KWA reso on capacity contract.  Water plant

25    test run," do you see anywhere else on this page where water is

1    discussed, based on the notes from the meeting that you made?

2    A.   Those are the references to water.  And this staff meeting

3    was a format.  It occurred about once a week, and it was in the

4    mayor's conference room.  There's probably 14 or 16 chairs in

5    that room.  And different staff people -- those are the dashes

6    -- would report out on key items to the group.

7    Q.   And this note down at the bottom, "Water plant test run.

8    July.  30 day.  Assess mechanical, chemicals, and staffing."

9             Do you have an understanding of what that note was

10   about?

11   A.   Not more than what it says.  So this would have been

12   utility, that's under that utilities dash.  So this would be

13   reported out by utility director Duffy Johnson, I believe, at

14   the time.

15   Q.   And you mentioned yesterday that during this period of

16   time, you didn't have a ton of contact with LAN, right?

17   A.   No.  I mean, yeah.  Not that I recall, no.

18   Q.   You weren't involved in -- or were you involved in

19   negotiating any contracts with LAN or scopes of work with LAN

20   about any work related to the Flint Water Treatment Plant?

21   A.   No.  I had a defined set of responsibilities that the

22   emergency manager had ordered that I acted under.  And at this

23   time, my focus was on citizen services, community events,

24   economic development boards.  Those activities.

25             And I was present at this kind of staff meeting, you

1  know, approximately once a week where I would hear updates.

2  Q.  And at any point in time after June 18, 2013, until, say,

3  October 2015.  So between two and a half years or two years and

4  four months, did anybody ever come to you and say, "Hey, we

5  tried to do a water plant test run at the treatment plant, and

6  it failed"?

7  A.  I don't remember hearing that.  I do know there were just

8  ongoing issues.  I mean, there was always some, you know, next

9  step, something else that needed to be done.  Something that

10  needed to be addressed.

11  Q.  But, I mean, we talked about Warren Green yesterday.  You

12  said you knew who he was.  We showed you a picture.  You

13  pointed to him.  You said you had seen him.

14  A.  Yes.

15  Q.  Did Warren Green ever come in that mayor suite and say

16  anything to you about a water plant test run or a failure or

17  anything like that?

18  A.  Not that I recall.

19  Q.  Do you remember anybody from LAN coming in and either

20  talking to you or Mr. Kurtz or both of you or anybody saying,

21  "Test run didn't work.  Cannot move forward if y'all intend to

22  use the Flint Water Treatment Plant"?

23  A.  No.  I can only speak for my own experience.

24  Q.  And then on the back page or the second page for me -- we

25  double sided it -- I highlighted one part of this document that

March 29, 2022

1613

1  says, "Utilities MDEQ review water operation and pumps."

2          Do you see that?

3  A.   Yes.

4  Q.   Then you see at the top -- I just highlighted it, because

5  I hadn't seen it when I was looking at it last night -- but

6  there's a note that says, "KWA."

7          Do you see that?

8  A.   Yes.

9  Q.   And above KWA, it says "SC2."  And under it, it says, "WH

10  youth jobs."

11          Do you see that?

12  A.   Yes.

13  Q.   Do you have any idea what you were referencing in the

14  one-word note KWA there?  I mean, obviously, you're referencing

15  the KWA, but do you have any idea why you wrote that?

16  A.   Yes.  So this is a week later, June 25.  It's pretty -- so

17  it's a second -- a different week.

18          And what I would try to do, I did it on the previous

19  staff meeting notes is in the upper right-hand corner, I would

20  write items that I wanted to mention when the staff kind of

21  round robin came around to me.

22          So that week, I had something about the federal

23  strong city initiative, that's SC2.  Something about KWA, the

24  White House youth jobs, and making a connection with the

25  chamber.  And then RACER, which had to do with the brownfield

1    site at the former Buick City.

2            So there was something that I shared with the group

3     about KWA.  I don't recall what exactly that was.

4    Q.  You see the second highlighted portion blow KWA, it says,

5    "Utilities MDEQ review water operation and pumps."

6            Do you see that?

7    A.  Yes.

8    Q.  Okay.  Do you have a memory about what was discussed that

9    led you to make this note on June 18, 2013?

10   A.  This one is June 25.  The date's just above --

11   Q.  Oh, I apologize.

12           Same exhibit second date?

13   A.  Yes.

14   Q.  Okay.

15   A.  Staff meeting notes.  I don't remember more than that.

16   Again, that would have been something that the utilities

17   director reported.  And I made a note that that was occurring

18   or going to occur.

19           MR. STERN:  Excuse me one second.

20   BY MR. STERN:

21   Q.  My colleague pointed out another spot for me.  Rather than

22   him asking you about it, I'll ask you about it.

23           There's another section that says, "Value of Detroit

24   pipeline section."

25           Do you see that?

1    A.   Yes.

2    Q.   Do you know what that note was in reference to?

3    A.   I have to refresh my memory on the specifics.  But it was

4    a part of -- it was part of the distribution -- well, part of

5    the transmission system from the Detroit water to Flint and

6    Genesee County that the City of Flint owned.

7              And there was a question about if the city was not

8    going to use Detroit water in the future, then might that

9    transmission line be a value to DWSD if they were, for

10   instance, going to supply water to somewhere in, like, Lapeer

11   County.

12             So that was the start of a process.  Or I think at

13   this point, that process was starting to be examined.  How

14   might that transmission line be of value to the city if it

15   could be sold or transferred to another party.

16   Q.   Other than on -- I know there's two different dates.  But

17   other than what we looked at on page 1 and page 2, including

18   what Mr. Christian pointed out for us, were there any places in

19   either of those pages of notes where during those two meetings,

20   you have a recollection of discussing anything about the water?

21   A.   I believe that's it, yeah.

22   Q.   Okay.  So taking a step back now, we're in May-June, 2013,

23   do you recall anybody ever coming to you and telling you, "MDEQ

24   is not going to require corrosion control if we use the Flint

25   River"?

March 29, 2022                                           1616

1    A.   What's the timeframe you asked about, sir?

2    Q.   May -June 2013.

3    A.   No, not at that time.

4    Q.   Did -- and not to be repetitive.  But inclusive of nobody,

5    Mr. Kurtz never came to you, right?

6    A.   Correct.

7    Q.   Mr. Green never came to you, right?

8    A.   Correct.

9    Q.   Mr. Busch, Mr. Prysby, Mr. Glasgow, anybody ever come to

10   you at that period of time and say, "We're not using corrosion

11   control for the Flint Water Treatment Plant"?

12   A.   No.

13   Q.   At that time, you know, we've all -- we're seven, eight

14   years past the time period we're talking about now.

15        If someone had come to you in May-June 2013 and

16   started talking to you about corrosion control, would you have,

17   at that time, had an understanding of what they were talking

18   about?

19   A.   I don't know that I would have.  But I'm a quick study.  I

20   try to, you know, take these notes.  That's why I go through

21   the process.  You want to hear what's important to, you know,

22   someone who's in a position of authority in this area.  Then

23   you try to follow up and learn what you can.

24        But it's not something that -- it's not something

25   that I remember being discussed in the city, you know,

1  throughout these earlier years.  It wasn't -- after the fact, I
2  understand why because of how Detroit water was being treated.
3          But it wasn't something that came to my attention
4  then.
5  Q.  Okay.  So at some point at the end of June or early July
6  2013, you mentioned earlier the budget that included the DWSD
7  as the interim water source.
8          Was there a new budget that began including
9  utilization of the Flint River as that interim water source?
10  A.  There is.  But I want to get my dates right.
11          Do you have something to refresh my memory?
12  Q.  I'm just asking you when do you believe it became apparent
13  to the City of Flint that they would be using the Flint River
14  as the bridge water source between KWA and DWSD.
15  A.  Work -- that's why I want to get my dates right.  So the
16  switch was April of 2014.  So there was in the 20 -- what we
17  call the fiscal year 2013-2014 budget, which was July 2013 to
18  June of 2014, that budget did have authority for there to be
19  additional equipment and personnel.
20          Now, as I mentioned, this was not an area that I was
21  receiving a lot of information on at the time.  So there were,
22  you know, some steps and conversations taking place by the
23  city as a whole.
24  Q.  Okay.  Let's look at Tab 21, please.  I apologize.
25  Tab 22.

```
 1         Do these reflect your notes from a meeting that was
 2   held on October 29, 2013?
 3   A.   Yes.
 4         MR. STERN:  Your Honor, I seek to move into evidence
 5    Plaintiffs' Exhibit 602-43G.
 6         MR. CHRISTIAN:  No objection.
 7         MR. ERICKSON:  No objection.
 8         THE COURT:  Okay.  It's received.
 9     (Plaintiff Exhibit No. 602-43G Admitted Into Evidence.)
10         MR. STERN:  Just give me one sec, Judge.  I
11    apologize.
12   BY MR. STERN:
13   Q.   Do you see the date, sir, 10-29-2013?
14   A.   Yes.
15   Q.   Then if we move down to the middle of the page, do you see
16   the section that says, "Finance.  Planning to draw water from
17   river April 2014"?
18   A.   Yes.
19   Q.   Do you recall making that note at this meeting?
20   A.   Not more than just these are my notes.
21   Q.   Was it clear to you by October 29, 2013 -- or what was
22   your perception as of this date in terms of what the interim
23   water source was going to be for Flint between the KWA and
24   DWSD?
25   A.   Yeah.  So this date is helpful.  So this is -- over that
```

1    summer period, the budget authority was put into place for

2    these modifications.  In the city, that's just one step.  The

3    first step is to have the budget authority for something.  And

4    then there's the actual implementation, the attempt, you know,

5    to implement that budget.

6          So by this time, by fall of 2013, the city was

7    actively, you know, working on and planning for the river to be

8    the city's primary drinking water source for a period of time

9    starting in April of 2014.

10   Q.   So we're now in October 2013.

11         We're six months away from what appears to be a

12   transition to the Flint River, right?

13   A.   Yes.

14   Q.   Was there anything that you recall that was happening in

15   the City of Flint related to water that stands out to you as we

16   sit here today at that point in time?

17         What's the temperature of the city?  What's happening

18   in the city?  What do you remember about that period of time in

19   the city?

20   A.   Well, in 2013, these notes reflect there's always a lot of

21   things to be worked out.  My focus at this time was primarily

22   on the city's long-term master plan that I mentioned yesterday.

23         That was actually adopted in October of 2013 through

24   activity of the planning commission and the city council.

25   That's what I was focused on.

1   Q.   So everybody in this courtroom at this point in time knows

2   that on April 25, 2014, Flint switched to the Flint River as

3   its water source for a temporary basis.  We've just looked at

4   years' worth of notes from you related to the KWA, related to

5   the DWSD.

6            You were the person who flipped the switch to the

7    Flint River, right?

8   A.   Yes.

9   Q.   I mean, you were at the plant, and you flipped the switch.

10           You were physically the person who turned on the

11  water, right?

12  A.   Yes.

13  Q.   The moment in time when you did that, did you have any

14  sense that the water from the Flint River wasn't safe?

15  A.   No.  I had every expectation that it was.

16  Q.   Were you involved at all in the test run, the water plant

17  test run in the summer of 2013?

18  A.   No.

19  Q.   Were you involved in any of the meetings or discussions

20  with LAN about upgrading the Flint Water Treatment Plant prior

21  to 2014?

22  A.   No.

23  Q.   Did anybody from LAN or from the MDEQ or from the

24  utilities department come to you before you flipped that switch

25  and say, "Mayor Walling, let's take a step back.  This isn't

```
 1   safe"?
 2   A.   No.
 3   Q.   And then once the water switches, April 25, 2014, what is
 4   the power structure in the city in terms of you, emergency
 5   manager, city administrator, transition advisory board?
 6   A.   April of 2014?
 7   Q.   Yes, sir.
 8   A.   At that time, Darnell Earley was the emergency manager.
 9   And myself and city council had limited responsibilities under
10   the emergency manager's orders.
11          We did not yet have a transition advisory board.  So
12   it was a fact where, you know, every expenditure that the city
13   made had to be approved by the Department of Treasury which
14   then allowed the emergency manager to proceed with any of those
15   formal actions.
16   Q.   You --
17               THE COURT:  Go ahead.
18               MR. STERN:  You sure?
19               THE COURT:  Yeah.  Go ahead.
20               MR. STERN:  Okay.  I'm sorry.  I lost my train for a
21    second.  Strike that.  I'm just kidding.  All right.
22   BY MR. STERN:
23   Q.   You mentioned your open door policy repeatedly to the
24   jury, right?
25   A.   Yes.  Every Wednesday, two hours for open citizen
```

1    appointments.

2    Q.   And that was true when the emergency manager had the power

3    of the mayor and the city council, as well as before and after

4    that power was with the emergency manager, right?

5    A.   Yes.  Throughout the time I continued to have that open

6    door policy, had the support of the executive administrator in

7    the office, yes.

8    Q.   And when the switch happened and after the switch

9    happened, was there a point in time where you started meeting

10   with citizens about water issues?

11   A.   Yes.  There were issues that came up.  You know, it took

12   just a few days, a few weeks in some cases for the water

13   treated at the Flint plant to make it through the distribution

14   system.

15           But these issues, different complaints or issues

16   started coming up immediately about, you know, the smell, the

17   odor, the taste.

18   Q.   And when you would get a complaint about smell or odor or

19   taste, what was your practice in terms of how you dealt with

20   that?

21   A.   Yeah.  Well, these were things that I would pass on to the

22   director of public works, Mr. Croft.

23   Q.   At any point in time as you were receiving these

24   complaints about taste, odor, smell, did anyone advise you,

25   either from the MDEQ, the city, or Mr. Green that the water was

March 29, 2022                                                                    1623

1   not safe?

2   A.   No.

3   Q.   I want you to, if you could, please, go to Tab 24.

4          Do you recognize this document, sir?

5   A.   Yes.

6   Q.   Could you just tell us what -- very briefly what this

7   document is?

8   A.   Yes.  This is one of the emergency manager's formal or

9   official orders.  And this increased my responsibilities and

10  compensation as described here in this order.

11         MR. STERN:  Your Honor, plaintiffs seek to admit into

12   evidence Exhibit 0612.

13         MR. CHRISTIAN:  No objection.

14         THE COURT:  Okay.

15         MR. ERICKSON:  No objection.

16         THE COURT:  Then it is received.

17    (Plaintiff Exhibit No. 0612 Admitted Into Evidence.)

18  BY MR. STERN:

19  Q.   And so this appears to be an official document on the City

20  of Flint letterhead, right?

21  A.   Yes.

22  Q.   And it's titled, "Mayor Dayne Walling's Increased

23  Responsibilities and Compensation," right?

24  A.   Yes.

25  Q.   And the emergency manager at this point in time had the

1   power to increase your responsibilities based on the emergency

2   manager statute that was in place at the time, right?

3   A.   Yes.

4   Q.   And then if you turn to page 2 of this document, it

5   appears to be signed by Darnell Earley, who you just told the

6   jury was the emergency manager at the time, right?

7   A.   Yes.

8   Q.   It's dated June 20, 2014, correct?

9   A.   Yes.

10   Q.   And it states that, "In correspondence dated June 3, 2014,

11   Emergency Manager Earley advised the Flint council that

12   Mayor Walling would now be responsible for the day-to-day

13   operations of the Department of Planning and Development and

14   the Department of Public Works."

15          Did I read that correctly?

16   A.   Yes.

17   Q.   And it increased your compensation rate to $82,500 at that

18   point in time, correct?

19   A.   Yes.

20   Q.   What did it mean for your day-to-day at that point in time

21   that you were now responsible for the Department of Planning

22   and Development, as well as the Department of Public Works?

23   A.   Right.  So this increased my responsibilities in that

24   these are now two separate departments.  The Department of

25   Planning and Development was directed by Megan Hunter.

```
 1           She had been leading the comprehensive master
 2    planning process.  And as part of that implementation work,
 3    there was now this official city Department of Planning and
 4    Development.
 5           And the Department of Public Works, as we've talked
 6    about, was directed by Mr. Howard Croft.
 7           So I would, you know, meet with each of these
 8    individuals approximately once per month.  They would give me
 9    an update on what was happening in their departments.
10           You know, we would talk about those citizen -- at
11    this point now, I would talk about those citizen issues in
12    those meetings with Mr. Croft.  Issues around planning with
13    Ms. Hunter.
14           But the day-to-day operations is something that, at
15    least for me, is important that people understand.  The
16    emergency manager did not invest me with responsibility on
17    budget for those departments, any personnel decisions within
18    those departments, or legal matters.
19           So I was receiving this, kind of, weekly update on
20    activities from each of those department heads.  But I didn't
21    have the same kind of authority that I would have earlier in
22    my tenure at mayor.
23    Q.   So June 2014, you're now increased your scope of
24    responsibility?
25    A.   Yes.
```

March 29, 2022

1626

1   Q.   At some point in time, did you find out that the city had
2   a TTHM issue?
3   A.   I did.  I learned about that in a group meeting in October
4   of 2013.  That included --
5   Q.   You sure it was 2013?
6   A.   Oh, I'm sorry.  October 2014.
7   Q.   And what did you learn and how?
8   A.   I had a meeting that was placed on my calendar with the
9   Michigan Department of Environmental Quality, the MDEQ.  And at
10  that meeting, it was starting to be discussed, you know, what
11  was the city doing with -- this was in the city.  This was in
12  the mayor's office suite.

13          What had the city been doing around addressing the
14  high levels of TTHMs that had been found in the system.  And I
15  had to ask at the start of that meeting, "What are we talking
16  about?"

17          And I came to understand that these tests had been
18  done, that the city, throughout its distribution system, had
19  this high level of TTHM, a byproduct of chlorine.  So I was
20  both learning about the issue, what the MDEQ was going to order
21  the City of Flint to do, what the Department of Public Works
22  had already started to do in response.

23          And I was reminded that the city was operating under
24  an emergency manager.  And there were things happening
25  including in the Department of Public Works that were not

March 29, 2022

```
1   getting to my desk.  This -- when I was -- in my first term as
2   mayor, I would have never learned about an issue like this in a
3   group meeting with state regulators when I was meeting with the
4   department head on a weekly basis.
5              So this was something that then I had to make extra
6   efforts to try to navigate and to try to understand who was
7   sharing what with me at different times.
8   Q.  Did you come to learn at some point that an outside
9   consultant was retained to address the TTHM issues in the City
10  of Flint?
11  A.  I believe it came up at that -- I believe it was discussed
12  at that meeting.  And I don't -- I don't know if LAN was doing
13  this work as part of an existing contract.
14             Occasionally, we do a contract modification and
15  increase a timeline or a cost of a contract or if this had
16  already been initiated as a new contract.
17             These kind of financial activities while, you know,
18  one would think they would be part of the day-to-day
19  operations, these were not getting to my desk.
20  Q.  But did you come to learn at some point that LAN was the
21  outside consultant that was tasked with addressing the TTHM
22  issues at that time?
23  A.  Yes.  I believe it was discussed at that meeting in
24  October.
25  Q.  And do you remember around that time ever seeing Warren
```

1    Green in meetings or around the plant or anywhere in Flint?

2    A.   It wouldn't have been at the plant.  I don't recall

3    anything specific.

4    Q.   All right.  I'd like to mark as Plaintiffs'

5    Exhibit 602-431 what's contained in Tab 25.  If you can take a

6    look at Tab 25.

7             Do you see that document, sir?

8    A.   Yes.

9    Q.   Dated October 14, 2014.  Is that right?

10   A.   Yes.

11   Q.   Does this appear to be -- do these appear to be your

12   handwritten notes?

13   A.   Yes.

14           MR. STERN:  Your Honor, as previously stated, I seek

15    to move into evidence this document.

16           MR. CHRISTIAN:  No objection.

17           MR. ERICKSON:  No objection.

18           THE COURT:  Okay.  It's received.

19     (Plaintiff Exhibit No. 602-43I Admitted Into Evidence.)

20   BY MR. STERN:

21   Q.   Again dated October 14, 2014, right?

22   A.   Yes.

23   Q.   Other than the last line of what I'll show the jury in a

24   moment, other than the last line of your notes, is there

25   anywhere in this document that you refer to ongoing issues with

1  water?

2  A.   That's the only specific reference.  It may have been

3  mentioned the third line under opening remarks, "City of

4  Flint's Strategic Plan Quarterly Report."

5        That was all inclusive of these different areas of

6  city responsibility.

7  Q.   So other than the line you just pointed out to us and the

8  line we'll talk about in a second, which says, "GM, water,

9  KWA," everything else that's inclusive of your notes on this

10  date are related to other functions that the city had to

11  perform for its citizenry, right?

12  A.   Yes.  And, specifically, this is a group of us, the

13  emergency manager, myself, I believe the finance director at

14  the time Gerald Ambrose, because Darnell Earley was the

15  emergency manager, we met with the editorial board.

16        "FJ" is the Flint Journal.

17  Q.   And it says here, "GM, water, KWA."

18        What did you learn or what did you know at this point

19  in time about -- what is GM?

20  A.   Well, that "GM" is General Motors.  And around that time,

21  there was a General Motors plant that was experiencing some

22  corrosion on their parts at the plant that was being attributed

23  to the new kind of Flint water, the Flint River water.

24  Q.   Did anybody -- did you come to learn that GM stopped using

25  the Flint water for that particular plant for that particular

1    function?

2    A.   They did.  The city -- the city and the county drain

3    commissioner's office worked cooperatively with General Motors

4    for General Motors to connect to the county system, which was,

5    I think, just across the street.  And the county system

6    continued to be served by DWSD.

7    Q.   Did anybody, at that point in time, either at that meeting

8    or after, ever have a conversation with you about GM and say,

9    "This is clearly evidence that the water is not safe"?

10   A.   That's not how it was described.  It was -- there was

11   corrosion or some kind of deterioration taking place on their

12   parts.  And it was confined to that, the relationship to their

13   particular industrial process.

14   Q.   So, again, did Warren Green ever come meet with you at

15   that point in time and say, you know, privately or publicly,

16   "This GM thing's a problem," or anything like, "This GM thing's

17   a problem, and the water's not safe"?

18   A.   It was treated as a -- it was treated as a problem, but it

19   wasn't -- it wasn't described as a human health or public

20   safety problem.

21   Q.   Okay.

22        MR. STERN:  Your Honor, this would be a good time to

23   take our first break if that's okay.

24        THE COURT:  Okay.  Let's do that.  So we'll take a

25   15-minute break.  And be right back.

March 29, 2022                                                      1631

1            THE CLERK:  All rise for the jury.

2                           (Jury Out)

3            THE COURT:  We're adjourned or in recess.

4                          (Brief Recess)

5            THE CLERK:  All rise for the jury.

6                           (Jury In)

7            THE COURT:  Welcome back, and please be seated.

8            MR. STERN:  May I proceed?

9            THE COURT:  Yes.

10           MR. STERN:  Your Honor, right before the break, we

11   admitted Tab 25 into evidence, and I referenced it as

12   Plaintiffs' Exhibit 602-431.  It's an "I" not a one, and I

13   just wanted the record to reflect that.

14           THE COURT:  Thank you.

15           MR. STERN:  I apologize.

16   BY MR. STERN:

17   Q.  So, Mr. Walling, we're now at the end of 2015 -- sorry.

18   2014.

19           You just testified that you understood there was a

20   TTHM issue in the City of Flint, right?

21   A.  Yes.

22   Q.  Based on your open door policy and -- well, first let me

23   ask you this.

24           When the TTHM issue came up, was a notice sent out,

25   based on your recollection, to the city about the violation or

1  about the issue?

2  A.  Yes.  A violation notice was required under Safe Drinking

3  Water Act that the Michigan Department of Environmental Quality

4  was enforcing.  And that notice went out -- it went in the mail

5  at the very end, very end of December of 2014.

6         So households were receiving it right about the new

7  year, right about the start of 2015.

8         So this meeting in October was a discussion of the

9  steps that were going to, you know, lead up to the public

10  notification after the lab results were certified to be over

11  the allowable limit, which the Michigan Department of

12  Environmental Quality.

13         And I understood city staff expected it to come back

14  higher than was allowed.

15  Q.  When the TTHM notice went out to the citizenry of Flint,

16  because of your open door policy and because you still had the

17  title of mayor, did you receive complaints from citizens or

18  questions from citizens about the TTHM issue?

19  A.  Yes.  There were a great deal of questions.  I think all

20  of us can understand, if you're, you know, someone who's using

21  water every day and whenever you see on the news when you get a

22  notice in the mail that says, you know, under the Safe Drinking

23  Water Act, you're being noted identified that this system, you

24  know, has this violation.

25         Then that greatly increased the concern in our

```
 1   community.
 2   Q.   At any point in time during that period of time, did
 3   anybody ever advise you that the TTHM issue could also mean
 4   that there's an issue with lead in the system?
 5   A.   No.
 6   Q.   Did anybody advise you at the time that because of the
 7   TTHM issue or in light of the TTHM issue, there could be
 8   children who would be getting lead poisoned as a result of the
 9   water in the system?
10   A.   No.
11   Q.   I'd like for you to turn to the tab in your second binder,
12   it's Tab 61.  It's Walling Binder 2.
13   A.   What's the number, please?
14   Q.   I'm sorry.  61.  The first tab in that binder.
15        Do these appear to be your notes from January 5,
16   2015, at an executive committee?
17   A.   Yes.
18        MR. STERN:  Your Honor, I seek to admit into evidence
19    Plaintiffs' Exhibit 602-43K.
20        MR. CHRISTIAN:  No objection.
21        MR. ERICKSON:  No objection.
22        THE COURT:  Okay.  It's received.
23    (Plaintiff Exhibit No. 602-43K Admitted Into Evidence.)
24   BY MR. STERN:
25   Q.   Mr. Walling, the date is 1-5-15, correct?
```

1   A.   Yes.

2   Q.   And there's a note here that you made that says, "Water

3   issue.  Can't get a simple message out."

4        And it appears you contribute that to the emergency

5   manager; is that correct?

6   A.   Yes.

7   Q.   And then it goes on to say, "Residents getting letter

8   today or tomorrow.  Amateur response.  Notification in paper

9   Tuesday.  Howard Croft provided letter to Freeman on Friday.

10  Met with Flint Journal.  Fonger.  Friday 6:00 P.M.  TV media

11  focused on water main break."

12       Did I read all of that correctly?

13  A.   Yes.

14  Q.   What's going on here?  What is happening that caused you

15  to make this note on January 5, 2015?

16  A.   As a note -- so this puts a date on what I mentioned a

17  moment ago.  So residents, based on the understanding of the

18  postal delivery system for this kind of mass mailing, residents

19  would be actually receiving it that day, the 5th or maybe the

20  6th.

21       And the emergency manager, Mr. Darnell Earley, I

22  think, was expressing his frustration about, you know, just in

23  Flint, like, how challenging it is as a city to try to

24  communicate a message.

25       You have a lot of different interest.  You have a lot

1   of different questions.

2           I think this was mostly directed at Mr. Croft.  And

3   then that was what Croft was then saying in response.  So I was

4   trying to capture this exchange between the emergency manager

5   and the director of public works.

6   Q.  At this point in time on January 5, 2015, was there any

7   discussion in this meeting or any meeting that you remember

8   where the issue of lead poisoning or lead in the water was

9   raised?

10  A.   No.  This was about TTHMs or Ns.  I see I have "N" in one

11  note later down.  The acronym for this chlorine byproduct.

12  Q.  All right.  If you could please look at that same binder

13  but Tab 84.

14          Do you recall -- have you gotten to the document yet?

15  A.   Yes.

16  Q.  Do you recall this being your notes related to a water

17  system press briefing on January 5, 2015?

18  A.   Yes.  So this was an action that came out of that

19  January 5 executive committee.  Was an effort to provide some

20  further information to the public about what was happening in

21  the city's water system in general and the TTHM notice.

22          MR. STERN:  Your Honor, plaintiffs seek to admit into

23  evidence Plaintiffs' Exhibit 602-18.

24          MR. ERICKSON:  Your Honor, I'd like to voir dire the

25  witness just briefly.

```
 1              THE COURT:  Okay.  Go ahead.
 2                      VOIR DIRE EXAMINATION
 3    BY MR. ERICKSON:
 4    Q.   There are a number of -- Mr. Walling, Philip Erickson
 5    representing the VNA defendants?
 6    A.   Yes.
 7    Q.   There are a number of handwritten comments on the note.
 8              Are those yours also?
 9    A.   Yes.  The handwritten comments were mine.  The typed
10    material was prepared by Jason Lorenz, the city's communication
11    coordinator.
12              MR. ERICKSON:  All right.  Thank you.  I don't have
13     any objection.
14              THE COURT:  Okay.
15              MR. CHRISTIAN:  No objection.
16              THE COURT:  All right.  Then it's received.
17       (Plaintiff Exhibit No. 602-18 Admitted Into Evidence.)
18                   DIRECT EXAMINATION (continued)
19    BY MR. STERN:
20    Q.   Mr. Walling, what is this document?
21    A.   So these were the notes prepared for me.  And then how I
22    change them to reflect, I believe, what very closely what I
23    would have said on that day.
24              We had a press conference, press briefing at the
25    water plant.  The picture that we had seen yesterday.  So it
```

1   was at that facility on January 6.  And I was to -- I was to

2   start the press briefing.

3           This is something that the emergency manager asked

4   that I present at and attend, which I did.  So the city's

5   communication assistant Jason Lorenz or public information

6   officer, I think as he was called at the time, he prepared

7   these notes that were the general points that the city was

8   looking to convey, the emergency manager wanted to convey.

9           And then you'll see a number of places where I made

10  some changes to say, you know, what I believed, you know, I

11  wanted to say.

12  Q.  This document was generated by Jason Lorenz and edited by

13  you.

14          And it relates to the notes that we just saw from a

15  day earlier, right?

16  A.  Right.  The meeting the day earlier.

17  Q.  And the part that I highlighted so far, I'm only going to

18  read to you what it reads like inclusive of your notes?

19  A.  Yes.

20  Q.  Not necessarily the changes or what it used to say before

21  you made your notes.

22          But you state, "This is very important to the City of

23  Flint and represents a significant portion of the city's

24  services"; is that correct?

25  A.  Yes.

1   Q.   And what are you referring to there?

2   A.   I'm referring to the provision of safe drinking water.

3   That as we've said, there are plenty of things to do with the

4   city, but this is an important responsibility, a significant

5   part of our time and resources.

6   Q.   When you wrote this, was it TTHM issue that you were

7   referring to, or was it another issue that you were referring

8   to in terms of, "This is very important to the City of Flint

9   and represents a significant portion"?

10  A.   Well the TTHMs were the most pressing, because the reason

11  the violation notice had to be issued is because it is a safety

12  issue under the Safe Drinking Water Act.

13       So this really raised the level of concern.  But

14  throughout, especially 2013, the city also had a record number

15  of main breaks.  You may remember that was a particularly cold

16  winter, which means there's more stress on our older

17  distribution system.  So there were hundreds of main breaks.

18       We continue to have these kind of financial

19  challenges with the city.  Residents would complain about how

20  costly the water was.

21       So it -- it was prompted by the TTHM notice, but this

22  is really about the city's provision of drinking water in

23  general.

24  Q.   And it appears you added a line that was not included by

25  Mr. Lorenz right below that, which I've also highlighted.

```
 1              "All of our residents and customers deserve clean and
 2   safe water."
 3   A.   Yes.
 4   Q.   That's your addition to this, correct?
 5   A.   Yes.
 6   Q.   And, again, when you wrote that note which wasn't
 7   originally included in this document, what was at the top of
 8   your mind?
 9              What caused you to place this note?
10   A.   Well, it's because sometimes a city -- you'll see, like,
11   it was drafted as a significant portion of the city strategic
12   plan.  You know, residents don't care so much about your
13   strategic plan.  They want to know what services you're
14   providing.
15              So for me, this is about, you know, what the city is
16   doing for its residents.  And it's not just important because
17   it's expensive or it's a big part of our work, but it's
18   important, because, you know, we all want clean water to come
19   out of the tap.  You, of course, expect it to be safe water
20   that comes out of the tap.
21              So that for me was the value commitment that the City
22   of Flint had, even if it was sometimes not spoken by people who
23   are really busy trying to do their jobs.
24   Q.   And you go on to say that, "A lot of work has been done to
25   prepare our system ahead of that connection, including
```

March 29, 2022

1640

1  technology upgrades to the facility, which you can see here

2  today."

3        And it appears that you are referring to a note that

4  you added, which says, "Progress is being made on the plan, and

5  I commend our team.  Many of the objectives within that plan

6  have been met while we are still on track or on track to be

7  met.  We are on track to connect to the new pipeline next

8  year," right?

9  A.   Yes.

10 Q.   And so what was your point of adding the, "We are on track

11 to connect to the new pipeline line," and the changes that you

12 made to the bullet point under it?

13 A.   I was trying to be more clear about my understanding.  I'm

14 interacting with a lot of citizens.  I know what people are

15 questioning, where they may be looking for some clarification.

16       So the plan was about the response to TTHMs, which

17 was underway, as I understood, from that October 2014 meeting,

18 even though it hadn't yet been required that the notice go out

19 to citizens.

20       And that all of this work was kind of in relation to

21 joining and being able to use the water from KWA at a future

22 point.

23 Q.   If you could please turn to Tab 85 in that same binder.

24 A.   Yes.

25 Q.   This appears to be a communication dated January 12, 2015.

 1    And it's addressed to both Mr. Earley and to you.

 2           Do you see that?

 3    A.   Yes.

 4           MR. STERN:  Your Honor, I seek to admit as

 5    Plaintiffs' Exhibit 602-20.

 6           MR. CHRISTIAN:  No objection.

 7           MR. ERICKSON:  No objection.

 8           THE COURT:  Okay.  Then it's received.

 9      (Plaintiff Exhibit No. 602-20 Admitted Into Evidence.)

10    BY MR. STERN:

11    Q.   Mayor Walling, this letter is, in fact, dated January 12,

12    2015, correct?

13    A.   Yes.

14    Q.   And it is addressed to your attention, correct?

15    A.   Yes.

16    Q.   And the RE line is, "Reestablishing Detroit Water and

17    Sewerage Department."

18           Do you see that?

19    A.   Yes.

20    Q.   Do you recall receiving this letter?

21    A.   Yes.

22    Q.   And what is this letter -- what is this letter?

23    A.   Well, this is -- so Director Sue McCormick of the Detroit

24    Water and Sewerage Department reaching out to the city.  As she

25    states, she saw an article in MLive about these kind of

 1    concerns and expressing, says a, "Willingness of DWSD to resume
 2    delivery of the drinking water and its residents."
 3           The customers in Genesee County who were receiving
 4    water through the Genesee County Drain Commissioner's Office
 5    they had continued to stay on DWSD when the city transitioned
 6    to the Flint River as a temporary source.
 7           So DWSD was already serving people, like, literally,
 8    you know, right next door.  And this is the director being
 9    proactive about reaching out.  Seeing the news.  Knowing there
10    were concerns.  Knowing the city had to issue a violation
11    under the Safe Drinking Water Act and putting herself forward
12    and being reminded of what DWSD could do for the City of
13    Flint.
14    Q.  You previously referenced in your testimony aesthetic
15    issues.
16           Do you remember that?
17    A.  Yes.  The color and odor and smell.
18    Q.  You previously referenced some water main breaks in the
19    city.
20           Do you remember that?
21    A.  Yes.
22    Q.  And we just discussed the TTHM issue that you referred to
23    as a safety issue, right?
24    A.  Yes.
25    Q.  You've also testified that you knew LAN was working on the

1   TTHM issue, right?

2   A.   Yes.

3   Q.   Other than the TTHM issue, which LAN, you knew, was

4   working on, the aesthetics issue, which you described, and the

5   water main breaks, did you have any reason to believe as of

6   January 12, 2015, that there were other safety issues

7   associated with the city's drinking water coming from the

8   river?

9   A.   The only other thing that was coming up around TTHMs,

10  since that was a byproduct of chlorine or -- I'm just stating

11  my understanding.  You know, over chlorinating the water, there

12  were also discussions about if there was enough chlorine in the

13  water.

14           Then that could allow, like, viruss or bacteria to

15  exist in the system.  So I do remember that being discussed.

16  The over chlorination and under chlorination.

17  Q.   Any issues about lead discussed with you as of the letter

18  from Ms. McCormick in January of 2015?

19  A.   No.

20  Q.   Anybody discuss issues associated with lead poisoning

21  prior to receiving that letter from Ms. McCormick with you

22  prior to that letter in 2015?

23  A.   No.

24  Q.   I'd like for you to turn to -- you're going to have to go

25  back in time in the binder to Tab 62.  These appear to be your

 1    notes from January 14, 2015, just a few days after the letter
 2    that we just looked at from Ms. McCormick.
 3    A.   Yes.
 4              MR. STERN:  Your Honor, plaintiffs seek to admit into
 5     evidence Exhibit 602-43L.
 6              MR. CHRISTIAN:  No objection.
 7              MR. ERICKSON:  No objection.
 8              THE COURT:  Okay.  It's received.
 9      (Plaintiff Exhibit No. 602-43L Admitted Into Evidence.)
10    BY MR. STERN:
11    Q.   Mayor Walling, this does appear to be some notes that you
12    made on January 14, 2015, correct?
13    A.   Yes.
14    Q.   So at this point in time, just to recap, we've got the
15    TTHM issue LAN is working on, right?
16    A.   Yes.
17    Q.   We've got water main breaks.  We've got citizen complaints
18    about taste, color, smell, right?
19    A.   Yes.
20    Q.   And this appears to say, "RFP."
21              What's an RFP, based on your understanding and
22    experience?
23    A.   That's a request for proposals.  That's the way a city
24    government on a -- asks companies to bid for services or for a
25    contract.

March 29, 2022

1645

1    Q.   You go on to say, "Expert consultant, improving water

2    quality.  Experience with municipal water on river.  Evaluate

3    operations.  Make recommendations."

4            There's some other notes, as well.

5            "Oversee implementation.  Water product.  Due back

6    Monday 1-26 by 12:00 noon.  Out tomorrow by noon."

7            Do you see that?

8    A.   Yes.

9    Q.   Who is that referring to, if you remember?

10   A.   Who -- in which sense?  I'm sorry.

11   Q.   Did you know at this time if there was an expert

12   consultant that was going to come on, or was this just a

13   general statement about the need for one?

14   A.   Right.  This was a step where the emergency manager

15   recognized that the city needed additional technical support.

16           And this was describing what would be in the call for

17   proposals so that companies could then submit their bid to work

18   with the city on these issues.

19   Q.   If you move down just a few lines, it says, "Phase 1."

20           Do you see that?

21   A.   Yes.

22   Q.   Then it goes on to say, "Written evaluation to maintain

23   and improve water quality, report of recommendations, oversee

24   implementation, public presentable report, no less than

25   monthly."

1    Do you see that?

2  A.   Yes.

3  Q.   Because it says, "Phase 1," was it your understanding at

4  this point in time that this would be a single or multiple

5  phase engagement from an expert consultant?

6  A.   The request for proposals would be for that initial list

7  above.  But there were already discussions about the work

8  continuing.  So I don't think it was really set yet what the

9  timeline would be.

10 Q.   Okay.  Was it important to you at this period of time that

11 an expert consultant be brought in to take a look at and

12 address the water system?

13 A.   It was.  This was one of the areas that I agreed with the

14 emergency manager.  I raised my concerns at that point

15 internally about the size and scope of these challenges in the

16 water fund.

17     Because it, to me, already felt that we had spent a

18 lot of 2014 having to deal with these different issues with

19 citizen complaints, the distribution system.  And the community

20 was rightly increasing their concern.

21     After getting this notice, they were increasing their

22 questions of myself, of other city officials.  And it was

23 beyond the capacity of what, you know, the City of Flint could

24 handle.  That was -- that was clear to me.

25 Q.   What do you mean, "it was beyond the capacity of what the

```
 1   City of Flint could handle"?
 2             What are you referring to?
 3   A.   Well, I'm saying that we were -- we were supposedly
 4   working on these issues, you know, month after month, but we
 5   were getting more problems.  You know, we weren't getting
 6   things fixed.  I mean, so here we are, what, eight months after
 7   the switch, and the city's issuing a notice that it violated
 8   the Safe Drinking Water Act with the TTHM.
 9             So that -- you know, that was not acceptable to me.
10   I mean, I'm someone who used the water.  My family, my parents.
11   So I didn't want anyone to have to get that kind of notice.
12   And, you know, we talked earlier about Mr. Croft's role as
13   director of public works more as a facilitator.
14             This was getting, to me, as a mayor, this was above
15   the qualification level of that individual.  Mr. Earley had
16   been a city, you know, manager in Saginaw.  But it was just
17   too big.  It was too complex.  The city needed expert support.
18             And, I mean, why as a mayor you have to give this a
19   lot of thought is because every time you spend money on one
20   thing, you're not spending money on something else, right.
21             So when you go out to a community and you say, "We're
22   going to spend, you know, however much, tens of thousands of
23   dollars on these outside services," you need to really know
24   that that's going to be valuable.
25             Because you know you have workers who are working
```

1   over-time.  You have these other financial liabilities within

2   the water fund.

3            So this was just something that I did give a lot of

4   thought to.  It's also not easy for a mayor to always agree

5   with an emergency manager.  But I felt like this was an area

6   where the city needed that support.  We needed this outside

7   expertise.

8   Q.  If you can please turn to Tab 90 in your binder.

9            Do you recognize this document?

10  A.  Yes.

11  Q.  This appears to be the invitation to bid that we just

12  discussed based on your previous notes, correct?

13  A.  Yes.  This is what the purchasing department actually

14  issued.

15  Q.  And you see at the very top, your name is on the

16  letterhead?

17  A.  Yes.  That was common.

18  Q.  Do you recall seeing this document on or around

19  mid-January 2015?

20  A.  I'm flipping through it to see all that's here.  Yes.

21            MR. STERN:  Your Honor, we seek to move into evidence

22   Plaintiffs' Exhibit 3622.

23            MR. CHRISTIAN:  No objection.

24            MR. ERICKSON:  No objection.

25            THE COURT:  Okay.  It's received.

1     (Plaintiff Exhibit No. 3622 Admitted Into Evidence.)

2    BY MR. STERN:

3    Q.   Mayor Walling, this is, in fact, the invitation to bid,

4    correct?

5    A.   Yes.

6    Q.   You were on the letterhead as we just described, correct?

7    A.   Yes.

8    Q.   And tell us what this document is.

9          What exactly is this document, and why was it sent

10   out?

11   A.   So you'll see on page 3 that this initial letter is signed

12   by Mr. Derrick Jones.  So he's the director of the Department

13   of Purchases and Supplies, the purchasing director, as he was

14   referred to.

15         So this is the city's official formal invitation for

16   companies or entities to provide the services that are

17   described.

18         So the purchasing department has a whole set of kind

19   of regulations and steps that they have to follow in terms of

20   how they handle these bids and allowing for a time period, and

21   each person or company that's bidding to be treated fairly.

22         So that's what the director of purchasing manages.

23   Q.   And if you turn to page 13 and you look at the very top of

24   page 13, what does the section called "Deliverables" address

25   and explain?

1  A.   This tries to lay out in some detail what exactly a
2  company or entity would be providing, would be delivering to
3  the city.
4  Q.   And here it says that, "What the city is looking for is a
5  company to evaluate the city's processes and procedures to
6  maintain and improve water quality," correct?
7  A.   Yes.
8  Q.   Was that your understanding when the request to bid went
9  out?
10  A.   Yes.
11  Q.   Could you -- do you see anywhere on this page where it
12  refers to TTHMs?
13  A.   No.  It's -- and there was significant time put into this
14  request for proposals, as I recall.  It was intentionally
15  broad.  It would include TTHMs.
16  Q.   Right.
17  A.   Because we just sent out a notice to 30-some thousand
18  households and customers.  But it's a general -- you know, "the
19  city" is capitalized.  That means the City of Flint, and so the
20  municipal corporations, the water funds processes and
21  procedures to maintain and improve water quality.
22  Q.   And at this point in time, the city had already engaged
23  LAN to look at TTHMs based on your previous testimony, right?
24  A.   Yes.
25  Q.   And if you could look down at the bottom of page 12, it

1  says, "scope of services," right?

2  A.  Yes.

3  Q.  And it says that, "The city is seeking a consultant -- the

4  city is seeking a consultant to review and evaluate the water

5  treatment process and distribution system, provide

6  recommendations to maintain compliance with both state and

7  federal agencies, and assist in implementing accepted

8  recommendations.

9       "The city will have the selected vendor provide

10 reports to reflect their findings and provide continual

11 oversight in implementing any approved recommended practices to

12 improve the quality of water until implementation of the KWA

13 project."

14      Did I read that correctly?

15 A.  Yes.

16 Q.  So as of mid-January 2015 when this RFP went out, what was

17 your understanding of what the city was looking for?

18 A.  Well, the city was looking for a comprehensive scientific

19 review of the water treatment, but really the entire system.

20 Because it gets treated at a plant, but then it goes through a

21 distribution system and comes out a faucet or a tap or is used

22 in a shower.

23      So those -- it is broad, and it's comprehensive.

24      I'm seeing the background information on that same

25 page.  It actually outlines some of the key points that we've

1    mentioned.  It does specifically cite the operational

2    evaluation report that LAN conducted on TTHM.

3              So that was -- that was provided in the bid, so

4    companies knew where the city was at in its response to that

5    particular issue.

6    Q.  And, in fact, after page 15, you'll see that the actual

7    operational evaluation report for the City of Flint was

8    included in the request to bid, right?

9    A.  Yes.  Because this was one of the, you know, obvious major

10   issues.

11   Q.  Right.  But at the time that a company would have

12   responded to this request, they would have already had an

13   eight- to ten-page document from another engineering company,

14   right?

15             From LAN that addressed the operational and

16   evaluation of TTHMs, correct?

17   A.   Yes.  And I believe part of the reason for that was, as I

18   was describing, I mean, it's really important that the City of

19   Flint with its limited resources get the most that it can out

20   of all of those dollars.

21             So part of the reason for actually providing that

22   right up front in black and white so that a company doesn't

23   propose services that is basically to redo something that's

24   already been done.

25             We wanted a company to come in, you know, as much as

1    they could without having been in the city, to know this is

2    where the City of Flint's at.  This is where we can target and

3    focus our services.  And we didn't want a lot of proposals to

4    do these things that LAN had already -- had already done.

5            They'll be looked at, but you don't just want to

6    replicate the same work.

7    Q.   At some point in time, did Veolia respond to the RFP?

8    A.   Yes.

9    Q.   And, ultimately, do you recall whether anyone else

10   responded to the RFP besides Veolia?

11   A.   Only Veolia responded.  I believe there were some other

12   inquires or questions that came to the purchasing director as

13   the point of contact.  But Veolia was the only company that

14   responded to the formal request for proposals.

15   Q.   I'd like for you to go back to the first binder and look

16   at Tab 27, please.

17   A.   Okay.  Tab 27?

18   Q.   Yes, sir.  If you start halfway down where it begins,

19   "forwarded message," this appears to be an email from John

20   Truscott to Scott Edwards and Mark Sanderson from Veolia and

21   copied is Kelly Rossman-McKinney.

22            Do you see that?

23   A.   Yes.

24   Q.   And then if you go down a little bit further, the -- do

25   you see a reference to you in the second line below the email

 1  subject line?

 2  A.  Yes.

 3        MR. STERN:  Your Honor, we seek to admit into

 4   evidence Plaintiffs' Exhibit 0459.

 5        MR. CHRISTIAN:  Objection, Your Honor.

 6        THE COURT:  And what would be the basis?

 7        MR. CHRISTIAN:  May I inquire of the witness?

 8        THE COURT:  Sure.

 9                   VOIR DIRE EXAMINATION

10  BY MR. CHRISTIAN:

11  Q.  So, Mayor Walling, I see your name listed in here.

12        Did you receive this email or a copy of it

13  approximately January of 2015?

14  A.  No.  This -- I did not -- I did not see it at the time.  I

15  don't recall whether it was presented to me during my

16  deposition just a few months ago.  Or if this is the first time

17  I'm seeing this.  I am aware of Mr. John Truscott.

18  Q.  Sure.  So just to be clear, you're not aware if you've

19  ever seen this before in your life?

20  A.  I don't -- yeah, I don't recall if I was shown this during

21  my deposition or not.  I know I didn't see it at the time.

22        MR. CHRISTIAN:  Okay.  Well, I object, Your Honor.

23        MR. STERN:  Your Honor, Mr. Walling has mentioned in

24   the email this provides context to the whole story.  And Your

25   Honor may remember that they're actually blaming Mr. Walling

March 29, 2022                                          1655

```
 1 │ for the Flint Water Crisis.
 2 │         THE COURT:  No, I remember that.  But he's -- the
 3 │ emails are not either to or from him.  So I don't see a
 4 │ basis --
 5 │         MR. STERN:  These are business records that were
 6 │ produced as part of the case by Veolia.
 7 │         THE COURT:  Right.  They were.
 8 │         Mr. Christian.
 9 │         MR. CHRISTIAN:  Are all emails, Your Honor, business
10 │ records regularly kept in the ordinary course of business and
11 │ therefore admissible?
12 │         THE COURT:  Well, you're asking me a question now.
13 │ I'm asking --
14 │         MR. CHRISTIAN:  I do not believe they are business
15 │ records, Your Honor.
16 │         THE COURT:  All right.  Well, why don't you move on.
17 │ I'm going to take a look at the rule.  I'm going to sort it
18 │ out, but not right now.
19 │         MR. STERN:  Well, I'm about to ask him questions
20 │ about --
21 │         THE COURT:  Why don't you ask him questions about the
22 │ content surely involves him.  And you can just ask him was he
23 │ at this meeting with --
24 │         MR. STERN:  Okay.  Sure.
25 │ BY MR. STERN:
```

Sherrod Teed Vanderhagen and Ware v VNA and LAN - Case No. 17-10164

1  Q.  Mr. Walling --

2            MR. STERN:  Well, Your Honor, I --

3            THE COURT:  You know, it's January 22, 2015.

4            MR. STERN:  But this is a bigger issue.  Because the

5  next dozen documents that I show he's testified to.  There's

6  orders in the case that actually permit him to answer

7  questions about it --

8            THE COURT:  Right.

9            MR. STERN:  -- that he's not copied on that are

10  foundational for --

11            THE COURT:  Well, let's wait until we get to them.

12  So for this one just ask him if he was at a meeting with John

13  Truscott.

14                 DIRECT EXAMINATION (continued)

15  BY MR. STERN:

16  Q.  There's an email from January 22, 2015, that indicates,

17  and it's from someone named John Truscott.

18            Do you know who John Truscott is?

19  A.  Yes.

20  Q.  Who is John Truscott?

21  A.  Mr. Truscott's a principal in a Lansing, Michigan, based

22  public relations firm.  Him and I, at the time, both served on

23  the Michigan Community Service Commission as the -- the board

24  by appointment of the governor that looks at the different

25  AmeriCorps programs and volunteer literacy sorts of programs.

```
 1              So we were on that board together and at an event
 2   around that time.
 3   Q.   Okay.  And this email references the board that you just
 4   described.
 5   A.   Yes.
 6   Q.   And it states that you brought up the water situation with
 7   him at this --
 8              MR. CHRISTIAN:  Your Honor, I object.
 9              THE COURT:  Yeah, don't read the email.  Just ask him
10   -- this is what -- I mean, I can ask him the questions.
11              MR. STERN:  I'm happy to ask.
12              THE COURT:  It says that -- I mean, I'm not going to
13   -- okay.  We're not going to read the document, because we're
14   not admitting it at this time.  We might later.  I'm going to
15   look into it.
16              But do you remember being at a meeting with
17   Mr. Truscott?
18              THE WITNESS:  Yes.  A meeting or event.
19              THE COURT:  And did you bring up the water issue to
20   him?
21              THE WITNESS:  Yes.  I was talking to practically
22   everybody I encountered about Flint's water issues at that
23   time.  You know, he's someone who keeps up on a state affairs
24   and, you know, has asked me about what's happening in Flint
25   before.  So him and I talked about it.
```

```
 1              THE COURT:  Okay.
 2              MR. STERN:  Your Honor, I want to ask him about the
 3    -- I think if the Court would indulge could we have a sidebar.
 4              THE COURT:  Sure.  Why don't we sort this out.  Just
 5    a minute.  I'm going to -- we might just go in the back and
 6    have our jury just stay here and stretch.  But okay.  All
 7    right.  So we will come right back.
 8                        (Sidebar Conference)
 9              MR. MAIMON:  I think we can short circuit that aspect
10    of it, Your Honor.
11              THE COURT:  Okay.
12              MR. MAIMON:  The pretrial rules for the Eastern
13    District of Michigan, the pretrial --
14              THE COURT:  Right.
15              MR. MAIMON:  -- for the pretrial order --
16              THE COURT:  Right.
17              MR. MAIMON:  -- call on the defendants to object
18    specifically to any document listed in the pretrial that they
19    object to either on authenticity or on the foundation for the
20    admissibility of the document.
21              And that's specifically because the court recognizes
22    that if we had to start bringing in a custodian of records or
23    someone who actually sent the document for each an individual
24    document, our trials would last, you know, a lot longer than
25    they're already going to last.
```

1    And says if you're going to make a challenge that a

2    document qualifies foundationally as a business record or as

3    an ancient document or whatever, you have to -- and if you

4    don't, the rule is very clear that objection is waived.

5    So not talking about relevance.  Again, we're not

6    talking about relevance.  We're not talking about 403.

7    THE COURT:  Right.

8    MR. MAIMON:  But as far as laying the foundation,

9    that's already been done by virtue of this having been listed,

10   and the defendants not having objected to it.

11   MR. CHRISTIAN:  If you go -- the logic that

12   Mr. Maimon just advanced means any witness can bring in any

13   document that was on that list basically.

14   And I don't believe that's the way the Court has been

15   ruling, and I certainly don't imagine that's the way you'd

16   like it to happen going forward.

17   THE COURT:  Let me look at -- I mean, it's

18   authenticated, because there was no challenge to the final

19   pretrial -- I don't have a keyboard anymore.

20   MR. MAIMON:  And the foundation -- again, it might be

21   that it's irrelevant, in which case it's not admissible.  It

22   might be that there's a 403 objection --

23   THE COURT:  Right.

24   MR. MAIMON:  -- in which case it would be admissible.

25   All sorts of other objections that might be level.

```
 1   And it might be something that's totally so different or
 2   outside the scope of what a witness could reasonably be called
 3   upon to testify about, that the Court -- that would, in my
 4   view, be a 403 type of an analysis, the Court says, "Not with
 5   this witness."
 6          But it doesn't -- first of all, it doesn't mean that
 7   the document itself is not admissible.  The document is
 8   admissible, because it's an authentic business record of
 9   Veolia, and they didn't -- they waived any objection to it by
10   not objecting to --
11          MR. CHRISTIAN:  Again, I'd say he really didn't
12   respond to my question.  He says, "admissible."  It may be
13   admissible to the --
14          THE COURT:  Slow down.  Slow down.
15          MR. CHRISTIAN:  It may be admissible during the
16   course of this trial, but that doesn't mean it's admissible --
17   should be admitted with this witness.
18          THE COURT:  With this witness.
19          What is your challenge?
20          MR. CHRISTIAN:  My challenge is that this -- the
21   witness does not have any knowledge of this email, and he's
22   not the appropriate witness for the introduction of this
23   email.
24          THE COURT:  I think that's true.  I mean, the email
25   talks about his conversation at a meeting.  But it's not to
```

1   him or from him.  And anyone else could -- it could be

2   admitted through them.

3              MR. STERN:  But, Your Honor, you mentioned in your

4   order in limine, it's ECF number 606.

5              You say this is all with regard to in depositions

6   asking witnesses, you know, "Have you ever seen this email

7   from Rob Nicholas where he says lead seems to be a problem?

8   Have you ever seen this email from Rob Nicholas, which says

9   don't pass this along."

10             You say the Sixth Circuit has long trusted juries to

11  cull the truth out of seeming contradictions.  And you site

12  Bathory v Procter.

13             You go on to say, "In this case, weighing the conduct

14  of city officials against their testimony is a task properly

15  left for the jury.  Accordingly, plaintiffs may present the

16  testimony of city officials about what they would have done,

17  had VNA issued" --

18             THE COURT:  Yeah.  But that's different from an

19  exhibit coming in through a witness who's never seen it before

20  and then gets questioned.

21             Why can't you just question him and say, "Did you

22  attend a meeting with Truscott?  "At that meeting" -- you know

23  what the exhibit says.  "At that meeting, did you tell

24  Truscott you were worried about the water?"

25             MR. STERN:  So --

```
 1              THE COURT:  Now, we're --

 2              MR. STERN:  The -- there are going to be a series of

 3    documents in the next 45 minutes where on February 9, 2015,

 4    VNA is having conversations internally about the safety of the

 5    water.

 6              And then there's notes from Mayor Walling on

 7    February 10, 2015, with Veolia, where they mention nothing of

 8    the sort.

 9              THE COURT:  Okay.

10              MR. STERN:  These documents are documents that he's

11    seen in his deposition, that he's looked at post- the moments

12    in time when they were actually sent and received.

13              And because both VNA and LAN are blaming him, they're

14    putting him on the verdict form, they want to attribute

15    liability to him --

16              THE COURT:  I know that.

17              MR. STERN:  -- he should have the opportunity to talk

18    about what he was thinking at that time, based on the meetings

19    that occurred, and what he would have done differently,

20    because they're blaming his conduct on the Flint Water Crisis,

21    had he known those facts.

22              THE COURT:  But then you can say -- you'll look at

23    the internal VNA document that could come in through any of

24    their witnesses who are on it.  You'll say, "Were you aware

25    that VNA was talking to itself about lead in the water?"
```

1   MR. MAIMON:  So --

2   THE COURT:  So you can still question him about it.

3   MR. MAIMON:  You can do that.  Except the logistics

4   of trial, Your Honor -- and I understand Mr. Christian's

5   point.  The logistics of trial is we've got to put a witness

6   on at a certain point in time.

7   THE COURT:  I know.

8   MR. MAIMON:  And we can't now go back and bring

9   Mayor Walling back and say, "This is now in evidence, because

10  we've had a VNA witness here."

11  That's why the admissibility of the document is so

12  important as a predicate for the Court's --

13  THE COURT:  Okay.  Why don't we do this.  For now,

14  just talk about what's in the document.  I'm going to -- I

15  don't think that's a portion of a motion in limine or an

16  opinion on a motion that would reach this.

17  But I want to look back at the Eastern District's

18  local rule on final pretrial orders.

19  So what I would ask you to do right now is ask him

20  questions based on what the content of those emails and then

21  certainly his own notes.

22  MR. STERN:  May I show him documents that have

23  already been admitted into evidence in this case?

24  THE COURT:  Sure.  Yeah.  Admitted into evidence.

25  Exhibit 603.  Boom.

March 29, 2022

1664

```
 1            MR. STERN:  Okay.

 2            THE COURT:  "Were you ever told about this?"

 3            MR. STERN:  Okay.

 4            THE COURT:  Okay.  Anything else?

 5            MR. CHRISTIAN:  That's it.  Thank you, Your Honor.

 6                         (Open Court)

 7            THE COURT:  Okay.  Go ahead, Mr. Stern.

 8            MR. STERN:  Your Honor, actually the document we were

 9  just discussing was previously admitted as Gadis 459.

10            THE COURT:  Oh, okay.

11            MR. STERN:  Do you want to check that to make sure

12  I'm right before I ask him questions about the jury?

13            MR. CHRISTIAN:  Would you say it again, please.

14            MR. STERN:  Gadis 459.

15            THE COURT:  Okay.  Let's make sure.  As long as it's

16  already admitted, then we can put it on the screen and see if

17  he knew about it.

18            I don't have it as marked in my -- but it would be in

19  a different --

20            MR. STERN:  It's Plaintiffs' Exhibit 459.  It was

21  part of the Gadis deposition, but it was admitted yesterday

22  after the fact.

23            MR. CHRISTIAN:  If the judge says it's been admitted,

24  I'll go with that.

25            THE COURT:  I haven't looked at my list.  But I'm
```

```
 1   going to look at it right now.  Gadis what?
 2            MR. STERN:  459.  It's Plaintiffs' 459.
 3            MR. CHRISTIAN:  We understand it's been admitted,
 4   Your Honor.
 5            THE COURT:  You have it as admitted?
 6            MR. CHRISTIAN:  Yes, Your Honor.
 7            THE COURT:  Okay.  Good.  Then go ahead.
 8   BY MR. STERN:
 9   Q.  Mr. Walling, I'd like to show you what's been previously
10   marked as Plaintiffs' Exhibit 459.
11            Do you see that, sir?
12   A.  Yes.  And would you tell me the tab, please?
13   Q.  I'm so sorry.  It's Tab 27.
14   A.  Yes.
15   Q.  Do you see at the bottom of this -- and this exhibit was
16   admitted through the testimony of David Gadis, who's a Veolia
17   employee, just for context.
18            At the very bottom, there's an email from John
19   Truscott to Scott Edwards.
20            Do you see that?
21   A.  Yes.
22   Q.  And it says, "I serve on a board with Mayor Walling."
23            Do you see that?
24   A.  Yes.
25   Q.  And what's the board that you served on with John
```

1   Truscott?

2   A.   It's the Michigan Community Service Commission.

3   Q.   And it says here, and this is from Mr. Truscott, "As part

4   of our discussion, I mentioned Veolia.  He said he really hopes

5   Veolia responds to the RFP."

6           Do you see that?

7   A.   Yes.

8   Q.   Okay.  Do you recall having that discussion with

9   Mr. Truscott?

10  A.   I remember him and I talking about water in general at

11  that time.

12  Q.   Do you remember -- do you remember him mentioning Veolia?

13  A.   I don't specifically remember that myself, but I was aware

14  of Veolia as a company.  You know, I participate in things like

15  U.S. Conference of Mayors.  We had had other, kind of, somewhat

16  similar companies stress interest in Flint at different times.

17          So I remember knowing a bit about Veolia as a large

18  company.

19  Q.   Do you see at the very bottom of his email, he says, "I

20  know Kelly has talked to Jerry Ambrose.  And now the mayor

21  seems inclined to be pulling for you."

22          Do you see that sentence?

23  A.   Yes.

24  Q.   Okay.  First off, do you know who Kelly is that he's

25  referring to there?

1    A.   Yes, I do.  So Kelly Rossman-McKinney is CC'd on this

2    email.  She's Mr. Truscott's partner in their public relations

3    firm.

4    Q.   And what was the relationship between Truscott Rossman and

5    the City of Flint as of the date of this email, which was

6    roughly -- which was January 22, 2015?

7    A.   So Mr. Darnell Earley, so emergency manager -- well, I

8    don't know.  Did he leave right about that time?  He went to be

9    the emergency manager for Detroit Public Schools.

10          But around that time, Mr. Earley had been using

11   Ms. Rossman-McKinney as a public relations visor.  I believe

12    in an uncompensated way.  I don't believe the city had ever

13    created a contract with her for services.

14          But they had worked together over the years.  As I

15   understood, he -- Mr. Earley would mention, you know, talking

16    to Kelly about something or other.

17   Q.   Were you aware at this point in time whether or not Kelly

18   Rossman-McKinney or John Truscott or anyone from their firm was

19   also consulting with Veolia?

20   A.   I -- I don't -- I don't recall knowing that one way or the

21   other.  I don't think I would have been surprised.  They are a

22   big -- Truscott Rossman are a major company.  I'm sure they

23   have dozens of clients at any given time.

24   Q.   I want to go up a little bit more.  This appears to be a

25   response to Mr. Truscott from Rob Nicholas.

1     Do you know who Rob Nicholas is?

2  A.   Yes.

3  Q.   Who was Rob Nicholas, and what was your experience with

4  him?

5  A.   Rob Nicholas was with Veolia.  And he was at -- because

6  the City of Flint did end up retaining Veolia for that bid

7  scope that we had discussed a few minutes ago.

8     And Rob Nicholas was in most of the meetings, if not

9  all the meetings that I had with Veolia during the time they

10  were under contract with the city.

11  Q.   And you understand or as of January 22, 2015, clearly no

12  one has yet responded to the RFP, because this is a discussion

13  about whether Veolia would respond, right?

14  A.   Yes.  I believe the RFP is still open --

15  Q.   Okay.

16  A.   -- so we're still -- the city is still, you know, waiting,

17  wanting different companies to respond, so we can evaluate

18  those options.

19  Q.   And here Mr. Nicholas says, "We have it.  But it's for an

20  engineering study of the water system regarding how to solve

21  the THM problems.  Marvin can do the work.  But we don't

22  typically pursue these type of projects without hope of

23  something bigger.

24     "At this moment, also we have multiple RFB's to

25  respond to.  Should we use him on a study with no indication of

 1    something bigger or an actual RFP?  Resources are tight."

 2           Did I read that correctly?

 3    A.   Yes.

 4    Q.   Did you -- do you have any recollection of Mr. Truscott,

 5    at that dinner you had with him, mentioning an engineering

 6    company who may or may not be able to do it, because their

 7    resources were tight?

 8    A.   I don't recall.

 9    Q.   Here at the top, you see this is an email from David

10    Gadis, who's also got a Veolia address?

11    A.   Yes.

12    Q.   Mr. Gadis testified previously in this trial, and he says,

13    "Rob, I think we should go after it and let JC upscale it.  My

14    understanding is we can grow this relationship."

15           Do you see that?

16    A.   Yes, sir.

17    Q.   In reading this now in response to the email that you're

18    referenced in at the bottom, do you have any idea what it means

19    when Mr. Gadis says, "and let JC upscale it"?

20           MR. CHRISTIAN:  Objection.  Calls for speculation.

21           THE COURT:  Just if he has a foundation.  So it's

22    overruled.

23           If you know.  Do you know what that means?

24           THE WITNESS:  I know that most companies who come to

25    try to work for the city would like that work to continue and

1   would like it to be more than a one-off.  So I'm thinking it
2   refers to that.  But I --
3           THE COURT:  But if you're guessing, then it's
4   sustained, so.
5           MR. STERN:  Okay.  No problem.  I'll move on.
6           THE COURT:  Okay.  Thank you.
7   BY MR. STERN:
8   Q.  Okay.  I'd like for you to turn to exhibit -- Tab
9   number 29.
10          MR. STERN:  This document, Your Honor, was previously
11   admitted as Plaintiffs' 478 through the testimony of David
12   Gadis.
13          THE COURT:  Okay.
14   BY MR. STERN:
15   Q.  Mr. Walling -- Mayor Walling, do you see this document?
16   A.  Yes.
17   Q.  And you see at the top, it's from Rob Nicholas, Veolia, to
18   Mark Sanderson.  And the subject line is, "Who Wants to Drink
19   Flint's Water?"
20          Do you see that?
21   A.  Yes.
22   Q.  And this appears to be below the email, which we'll talk
23   about in a second.  Someone named Reginald Turner from Clark
24   Hill appears to have forwarded an article to David Gadis, Mark
25   Sanderson, and Kelly Rossman-McKinney, "Who Wants to Drink

March 29, 2022

1671

1    Flint's Water?"

2            Do you see that?

3    A.   Yes.

4    Q.   And in response to being forwarded this article, Rob

5    Nicholas says, "We are debating submitting a letter proposal in

6    response to an RFP for engineering help," right?

7    A.   Yes.

8    Q.   And just stop there.  "We're debating submitting a letter

9    proposal in response to an RFP."

10           As of Friday, January 23, which is the date of this

11   email, a response still hasn't been made by Veolia, correct?

12   A.   It doesn't sound like it.  I think the deadline for

13   proposals was still a few days in advance.

14   Q.   And then Mr. Nicholas says, and this is in January 23,

15   which you just indicated was before the bid process was even

16   closed, "The simple solution is to just buy Detroit water and

17   that solves the problem."

18           Do you see that?

19   A.   Yes.

20   Q.   You've been in a bunch of meetings over the course of this

21   period of time or subsequent to this period of time with

22   Mr. Nicholas, right?

23   A.   Yes.

24   Q.   You were in a number of meetings with a number of folks

25   from Veolia, right?

March 29, 2022                                                    1672

1    A.   Yes.  A few.

2    Q.   I mean, we're going to go down the line, and we're going

3    to see that Veolia responded, and everybody knows the story.

4    They ended up getting the work.  But you interacted with Veolia

5    employees over this period of time, right?

6              MR. CHRISTIAN:  Objection.  I ask for more

7     specificity with respect to timeframe.

8              THE COURT:  Okay.

9              MR. STERN:  Sure.

10   BY MR. STERN:

11   Q.   Once Veolia received the okay to go ahead and do the work,

12   let's say, from early February 2015 through March 12, 2015,

13   when their final report came, you interacted routinely with

14   folks from Veolia, correct?

15   A.   I interacted on a number of occasions, yes.

16   Q.   I mean, we talked earlier how little you interact with

17   LAN.

18              Would you say that your interactions with Veolia

19   during that period of time were greater than your interactions

20   were with LAN prior to that period of time?

21   A.   Yes.  This was work that the emergency manager was

22   directly involved in.  It was treated as an executive staff

23   issue and relationship.  Different than a contract with public

24   works.

25   Q.   Did anybody at any point of time in any of your

```
 1   interactions with Veolia ever say to you, "The simple solution
 2   is to just buy Detroit water, and that solves the problem"?
 3   A.   Not that I recall.
 4   Q.   Okay.  Just out of curiosity, do you have any idea who
 5   that woman is?
 6   A.   Yes.  That's Ms. LeeAnne Walters.
 7   Q.   And we'll get to Ms. Walters in a few minutes.  But I'm
 8   happy to know who she is.
 9          MR. CHRISTIAN:  Objection.  Was that a question?
10          THE COURT:  Not really.
11          MR. STERN:  I'd say strike it, but we've already
12    heard --
13          THE COURT:  Yeah, we already know it's not going to
14    get stricken.  So just move along.
15   BY MR. STERN:
16   Q.   If you can go to Tab 92 of the second binder?
17   A.   Okay.
18   Q.   This appears to be a document -- oh, I apologize.
19          Do you know what this document is, sir?
20   A.   Yes.  These are -- these are my notes from a call on
21   Friday, January 30, 2015, with Governor Snyder and his chief of
22   staff, Dennis Muchmore.
23   Q.   These are your notes, sir?
24   A.   Yes.  In this case, I was sitting at my desk kind of
25   unusually using the landline.  So I had the phone on speaker,
```

 1    and I was typing notes.

 2              MR. STERN:  Your Honor, we seek to admit Plaintiffs'

 3     Exhibit 602-27.

 4              MR. CHRISTIAN:  No objection.

 5              MR. ERICKSON:  No objection.

 6              THE COURT:  Okay.  It's received.

 7      (Plaintiff Exhibit No. 602-27 Admitted Into Evidence.)

 8    BY MR. STERN:

 9    Q.   What are these notes related to, Mayor Walling?

10    A.   So this is a phone call that I initiated and was able to

11    schedule through the governor's chief of staff, Dennis

12    Muchmore, with the governor directly on Friday, January 30.

13              From what the emergency manager and staff discussions

14    had been, it wasn't -- it wasn't clear to me if the governor

15    himself was aware of the level of concern within Flint.

16              So I believed as, you know, one elected official to

17    another, even though he had appointed an emergency manager to,

18    you know, act in my capacity, that I thought, "Well, if I were

19    in his shoes, then I would -- and he were in mine, I would want

20    him to call me."

21              Not to assume that, you know, some other staff people

22    had related things.

23              So I had the chief of staff's cellphone number.  I

24    relayed to Dennis Muchmore my concerns about what we were

25     experiencing in Flint and asked for direct time with the

1    governor to go over those and talk about hopefully some next

2    steps.

3            I wanted to tell him about my ideas and what I had

4    developed as a plan for Flint's water system.

5    Q.   It says here, "Discussion with community health about how

6    they backup local public health and DEQ additional testing."

7            Do you see that?

8    A.   Yes.

9    Q.   At this point in time January 30, 2015, other than the

10   TTHM issues, the aesthetic issues that you previously described

11   and water main breaks, were you aware of any other health

12   issues associated with Flint's water?

13   A.   There were residents who were complaining about, like,

14   skin and hair problems, skin rashes, red irritated skin.  Kind

15   of almost like allergic kind of responses to the water.

16           So I was aware of those complaints along with what

17   you just stated.

18   Q.   Were you aware at that point in time with any complaints

19   related to lead or lead poisoning?

20   A.   I might have to be refreshed with some dates on my notes.

21   Around that time, I was aware of concerns at LeeAnne Walters's

22   residence.  You showed her in a picture earlier.

23   Q.   Yep.

24   A.   Around that time, city staff were looking at some

25   complaints that she had that did involve testing the water for

1  lead.  I believe it was around that time.  I don't know if we

2  had test results by January 30.

3          I don't -- it wasn't something that I brought up with

4  Governor Snyder in that call.

5  Q.   Okay.  We're going to get to the LeeAnne Walters testing

6  in a few minutes.

7          But since you brought it up, tell the jury what your

8  understanding was of the LeeAnne Walters situation related to

9  lead in her home.

10 A.   Well, so the city was -- you know, including myself, we

11 were asking people to contact us with their concerns, with

12 their questions, to have their -- to request to have their

13 water tested.

14         We felt like there was something -- that they wanted

15 to know about what was actually coming out of their tap.  It's

16 a big complicated system across the whole city.

17         And the city ended up being aware of concerns at

18 Ms. LeeAnne Walters's house, I believe skin conditions with

19 one of her children, I think some other issues in the

20 household.

21         And testing of the water coming out of her tap

22 revealed a very high level, an unsafe level of lead under the

23 Safe Drinking Water Act.

24         And Mr. Howard Croft was relaying information to me.

25 Ms. LeeAnne Walters had made one complaint to my office.  And

1    I understood that the city was working with her, trying to

2    understand, you know, what the conditions were at that house.

3           It was reported to me that her house had an unusually

4    long service line.  This is the individual line that goes from

5    the city part of the system to the actual house itself.  So

6    that only serves that one house.

7           I was told it was about 120 foot service line, based

8    on, you know, where that house was built relative to the city

9    main that was underground when it was put up.  And the city

10   would continue to work with her to understand what could be

11   improved at her house.

12          Because those were -- you know, those were very

13   serious issues that were coming up.

14   Q.   During this period of time, say, from January 30, 2015,

15   until March 12, 2015, did anybody ever indicate to you, either

16   from LAN, from the city, from the MDEQ, that the issues with

17   Ms. Walters's home were indicative of a larger problem?

18   A.   No.  It was being treated as a -- you know, as a citizen

19   service.  So this was, you know, how quickly could the lead

20   service line be replaced at that residence.

21          I know there was because of the length of that

22   service line, I think the water department staff was looking

23   at whether there may be a few other houses that also had a

24   very extended service line.

25          As a comparison, when the service line was found to

March 29, 2022

1678

```
1   be lead at my residence, and this was after I was out of

2   office when Dr. Weaver was in place, I think our service line

3   was something like 8 feet, because it just went from the side

4   of the street to the sidewalk.

5           So I understood the city was looking to see, you

6   know, might there be some other cases that were -- that could

7   have that same concern.

8   Q.   And you go on to note, "Going forward.  KWA system."

9           You see that?

10  A.   Yes.

11  Q.   And then you go on to say, "Particular issues on north

12  side.  Two options.  Can't go back to Detroit.  Could help with

13  for 12 or 14 months.  Drinking water resolving fund.  Stretch

14  it or redo terms.  Ananich working hard on it."

15          Do you see that?

16  A.   Yes.

17  Q.   Why did you make that note?

18  A.   I believe these were concerns actually that the -- maybe

19  the chief of staff had heard through other staff in the

20  governor's office who were engaged with community leaders in

21  Flint.

22          So the discussion that came out of that point was

23  that the city wasn't going back to Detroit.  Could help with

24  for 12 or 14 months.  That involved some discussion about

25  money.  I don't remember the exact details.
```

```
 1              The drinking water revolving fund, that was an amount
 2    of money that the city still owed to a fund that the state
 3    administered from capital improvements that were made at the
 4    water plant years ago when we were being upgraded to be a
 5    backup service.  And we still owed money on that.
 6              One of my requests of the governor was that that just
 7    be erased, because that would then give us additional money we
 8    could spend on things we needed to today versus things we had,
 9    you know, already installed years ago.
10              So that's the point about stretch it, you know,
11    meaning give us more time to pay it off, so the payment goes
12    down or just redo the terms.  Maybe say, you know, forgive the
13    rest of the loan.
14              The governor's understanding was that that would
15    require legislative action.  And it was something that our
16    state senator, James Ananich, was working on.
17    Q.  You go on to say, "75 shutoffs per week.  Few less
18    turn-ons.  Safety and quality.  Testing disclosure.  Access
19    reduce turn-on costs and payment plans."
20              What were I referring to in these notes, and why did
21    you make them?
22    A.  These were things that I wanted to mention during the
23    call.  So this was information that I wanted.  I wanted the
24    governor to have about what was happening.
25              So I had started developing what I thought the Flint
```

March 29, 2022

1680

```
 1   community wanted from the Flint, you know, water system.  It
 2   wanted more access to testing.  It didn't want to wait to hear
 3   months later about bad tests.
 4        The community would want to know more quickly about
 5   those tests when they were done.  That we needed to find ways
 6   to cut some costs for people.  And you'll see above that was my
 7   request to him that he personally come and visit Flint.
 8        Because I thought that would be something that a
 9   governor, again, we're different parties.  We disagree on lots
10   of things.  But it seemed to me that he should hear from a
11   mayor that it would be appropriate for him to come and see for
12   himself what's going on in the community.
13   Q.  If you can please turn to tab -- hang on one second --
14   Tab 36 in your binder.  This was previously marked as Gadis 63
15   -- I'm sorry -- as Plaintiffs' 632.
16   A.  Did you say 36?
17   Q.  Yes, sir.
18        THE COURT:  Was this already received?
19        MR. STERN:  It was Exhibit 6 -- sorry -- Exhibit 632,
20    and it was admitted through Mr. Gadis's testimony.
21        THE COURT:  Okay.  Thank you.
22        MR. STERN:  Before I put it up, I mean, I want to
23    make sure that any --
24        THE COURT:  Is that what you have, Mr. Christian?
25        MR. CHRISTIAN:  I don't have a list in front of me,
```

March 29, 2022

1681

```
 1    Your Honor.  We understand that it has been admitted, Your

 2    Honor.

 3            THE COURT:  Okay.  Good.  Because I recall seeing it.

 4    I'm confident now.  Thank you.

 5    BY MR. STERN:

 6    Q.  Mayor Walling, you see this is an email from Depin Chen?

 7    A.  Yes.

 8    Q.  Do you know who Depin Chen is?  I mean, I know you can see

 9    in this email what his email account says.

10            But do you recall ever meeting him or know who he is?

11    A.  I don't think I did.

12    Q.  And we just looked at an email before.  This one from

13    David Gadis.

14            Do you know who David Gadis is?

15    A.  Yes.  Mr. Gadis was in Flint at least once.  Maybe on a

16    couple of occasions during the time that Veolia worked for the

17    city, that February-March timeframe that you referenced.

18    Q.  This is an email from February 2, 2015.  And it appears to

19    be Mr. Chen saying a recap of some investigation that he had

20    done himself.  And he says, "I just want to share with you some

21    of the information that I found out after today's conference

22    call."

23            Do you see that?

24    A.  I do see that.

25    Q.  And it says, "I should correct my original guesses of why
```

1   no other consultants have responded to the RFP.  The consultant

2   may be expected to play a difficult role."

3          Do you see that?

4   A.  Yes.

5   Q.  Mr. Chen goes on to say, "First, the residents are unhappy

6   with many aspects of the water quality mainly judging from

7   aesthetic quality; color, taste, solids, and smell, and some

8   perceived health issues.  Skin rashes.  Even dog death."

9          Do you see that?

10  A.  Yes.

11  Q.  "The city and the mayor are insisting that the water is

12  safe.  The MDEQ won't issue a blanket statement on it" -- sorry

13  -- "won't issue a blanket statement as it only regulates

14  specific water quality parameters such as TTHMs.

15          "But not aesthetic water quality.  The city and MDEQ

16  agree that TTHMs only affects a small population."

17          Do you see that?

18  A.  Yes.

19  Q.  Okay.  First off at this point in time, were you insisting

20  that the water was safe?

21  A.   I probably wouldn't say it quite like that.  But I had

22  stated in that January press conference that I did at the water

23  plant that the water is safe, that my family and I drink it

24  every day.  So I was making that statement.

25  Q.  Okay.  And what led you to believe the water was safe?

1   A.   Well, I was hearing from, you know, the director of public

2   works, the emergency managers who were, you know, communicating

3   with other state officials.  And that's what I understood.

4   Q.   Did you have any doubt when you were making those

5   statements that the water was safe?

6   A.   I didn't.  I'm smart enough to understand that there's

7   regulations, and there's different levels of things.  And there

8   can be a complexity to it.  But at the end of the day, it's do

9   you -- do you have something that you can use that's coming out

10  of your tap that's not going to be bad for your health.

11        Now, with TTHMs, you know, there's some specific

12  populations I believe the violation notice mentioned.

13  Vulnerable populations, particularly people of advanced age or

14  other conditions that may want to consult their own physician

15  about this notice and that information.

16        So that's why I don't think I would have said I

17  insisted it.  I understood it to be safe, and I encouraged

18  people to pay attention to that notice.

19        In that press conference, you'll see in my notes I

20  said things like, you know, "You should be asking questions.

21  You should be examining this information."

22  Q.   You see a little further down, I highlighted Mr. Chen

23  states, according to the news and the following link of NBC

24  news, "DWSD has just offered to reconnect the DWSD supply line

25  to Flint with no strings attached.  No reconnection fee.  No

1    long-term contract."

2           Stopping there, is that true?

3    A.   Yeah.  I think it's close.  There's probably just some

4    minor tweaks in the legal language.  But DWSD was basically

5    offering to have Flint go back to, like, the rate it would have

6    left when the system had been turned off.

7           My understanding is that was pretty close to what had

8    been negotiated with the county to continue to serve people in

9    the larger community.

10   Q.   He goes on to say, "Many residents are asking to have the

11   DWSD water back until the new pipeline is ready, including some

12   of the council members.  City emergency manager and mayor have

13   insisted the approach of using an outside consultant to solve

14   the problem in 30 to 60 days."

15          Do you see that?

16   A.   Yes.

17   Q.   Do you agree with that sentence?

18   A.   You know, again, insisted, it's like, this was the

19   approach we were taking.  I had agreed with the emergency

20   manager on doing this.

21   Q.   And did it make you comfortable knowing that an outside

22   consultant was coming in to look at these issues?

23   A.   Yeah, I mean, this is -- whatever way we were going to go

24   or whatever changes we were going to have to make, you know,

25   for me, it clearly was not going to come out of the current, ou

1    know, team that had been working on this issue.

2         It continued to, in my mind, become more of a crisis

3    instead of less for there to be more questions instead of

4    fewer.  So that's definitely what I wanted to hear from.  I

5    wanted to have individuals who had those kind of qualifications

6    that we went over, look at the system, and say, "This is what

7    the city needs to do."

8    Q.  And you see Mr. Chen goes on to say, "My assessment is

9    that the city's expectation on the consultant is unrealistic.

10   There is no small tweaking will allow the city to comply with

11   the TTHMs regulation or implement any engineering solutions to

12   reduce TTHMs within 30 to 60 days.

13        "Yet TTHMs is not even in most of residents' mind.

14   Their concerns are overall water quality issues comparing to

15   DWSD water."

16        Do you see that?

17   A.  Yes.

18   Q.  Was there ever a point in time where anyone from VNA

19   approached you as the mayor and said, "Your expectations of us

20   is unrealistic"?

21   A.  I don't remember that.  I mean, it's clearly a difficult

22   job.  This is a difficult situation.  And I agree with the

23   characterizations here of residents' concerns.

24        I don't -- I don't know specifically about, you know,

25   fixing this entire problem in 30 to 60 days.  I think -- I

1    recall understanding it's certainly going to take some time to

2    deal with these different issues.

3           The way the Safe Drinking Water Act, as I understood

4    it, even calculates these violations of TTHMs is you average

5    multiple, different testing periods.

6           So I don't know about that exact part.  But it is

7    definitely going to be a difficult job for someone who steps

8    into those shoes.

9    Q.   And we saw in a document earlier that the RFP was

10   associated with a Phase 1.

11          Remember that?

12   A.   Yeah.  I don't know that that language made it into the

13   actual invitation to bid.  But it was something that the city

14   was interested in as a possibility.

15   Q.   And Mr. Chen concludes his email on page 2 by saying, "It

16   seems that reconnecting to the DWSD for the next two years will

17   be the best solution to satisfy the residents and activists.

18          "The emergency manager and mayor may not like it for

19   political mostly and financial reasons.  They should not have

20   unrealistic and false hopes either."

21          Do you see that?

22   A.   I do.

23   Q.   Did anybody from Veolia at any point in time ever come to

24   you and say, "Reconnecting to the DWSD for the next two years

25   will be the best solution"?

```
 1   A.   No.
 2   Q.   Would you have remembered that if someone did?
 3   A.   Yes.  Because that's -- you know, which water source you
 4   use is a highly consequential decision.  This is -- there's
 5   been so much time put into this in different ways.  And, you
 6   know, I'm sorry, but I don't think Veolia and anyone I
 7   interacted with tried to give political advice.
 8            I wasn't looking to Veolia for political advice.  You
 9   know, thank you, very much.  I had been, you know, elected.  I
10   had been reelected.  I was running for reelection at this time.
11   I was beginning the process.
12            So that's not something I looked to outside city
13   consultants for.  You can actually make an argument that the
14   easiest thing to do is just to, you know, politically
15   reconnect to Detroit and just pay the bill.
16            And if that was actually a sound technical approach,
17   then someone with that technical expertise should have said
18   it.  I didn't need the political advice.
19   Q.   And had they, would you have heeded it?  Would you have
20   listened?
21            MR. CHRISTIAN:  Objection.  Calls for speculation.
22            THE COURT:  Well, here's what we have to do.  We need
23   to take a break.
24            MR. STERN:  Sorry.
25            THE COURT:  Yeah.  So we'll take a break, and perhaps
```

March 29, 2022                                                1688

 1  you can reformulate your question.

 2           MR. STERN:  Okay.

 3           THE COURT:  Good.  So please rise for the jury, and

 4  we'll take a 15-minute break.  We'll be back and then we'll

 5  continue until 1:00.

 6                      (Jury Out)

 7                      (Brief Recess)

 8           THE COURT:  Thank you.  Please be seated.

 9           And I just wanted to mention the case Payne,

10  P-a-y-n-e, versus Novartis Pharmaceuticals Company, the Sixth

11  Circuit in 2014.

12           And that's the case that I cited in the -- I think it

13  was the summary judgment opinion regarding whether testimony

14  could be elicited about what somebody would have done if they

15  had received a warning.

16           That's what the Payne versus Novartis Pharmaceuticals

17  case was about.  So I think Mr. Stern's question is consistent

18  with the Sixth Circuit permitting this testimony.

19           THE COURT:  But anything further, Mr. Christian?

20           MR. CHRISTIAN:  Well, I would argue, Your Honor, that

21  the question is contrary to the facts.

22           Mr. Walling has testified extensively that he didn't

23  have power to make that decision.  So to -- if the question is

24  asking him if he would have switched to DWSD, that just is not

25  actually possible.

```
 1              THE COURT:  That's okay.  But that can be made clear.
 2              But he apparently was interacting with the emergency
 3   manager and with the community and so on.  So I don't think
 4   that that's a reason to prohibit this testimony.
 5              Anything else, or should we call the jury?
 6              MR. CHRISTIAN:  I think that Mr. Stern wanted to
 7   correct something for the record with respect to this exhibit.
 8              MR. STERN:  Oh, yeah.  I apologize, Judge.  The last
 9   exhibit -- I could do it in front of the jury.
10              THE COURT:  Just tell me what you're going to do.
11              MR. STERN:  Sure, sure.  Exhibit --
12              THE COURT:  632?
13              MR. STERN:  It's actually -- it was previously
14   admitted as Plaintiffs' Exhibit 34, not 632.
15              THE COURT:  Yeah.  I didn't see 632 so.
16              MR. STERN:  Yeah.  It was Exhibit 34.  I have a
17   different version of it, but it's the same exhibit.
18              THE COURT:  Okay.  Thank you.  I'm glad to know that.
19              MR. STERN:  Sure.
20              THE COURT:  I think I'll just mention it myself when
21   they get here in case --
22              MR. STERN:  They're taking notes, so yeah.
23              THE COURT:  Yeah.  All right.  So let's see if we can
24   get our jury.
25              So it looks like we're not going to be able to finish
```

    1    with Mr. Walling's testimony today.

    2            MR. STERN:  I'm hoping to be done today.

    3            THE COURT:  Yeah.

    4            MR. STERN:  I'm not sure with the 1:00 o'clock, 1:30

    5    change.  But if I'm not, there will be only a few minutes

    6    left.

    7            THE COURT:  Right.  But still we do have

    8    cross-examination to get through.

    9            So, Mr. Walling, I assume you'll be available to

   10    return tomorrow?

   11            THE WITNESS:  Yes, Your Honor.

   12            THE COURT:  And I just ask that you be very careful

   13    on the roads, because there's supposed to be snow and a

   14    quarter inch of ice.

   15            THE WITNESS:  Okay.  Thank you.

   16            THE COURT:  And that goes for everybody.  But most of

   17    you are staying in a nearby location.  So thank you.  And

   18    please leave extra time to get here.

   19            THE WITNESS:  I may decide to stay, as well.  We'll

   20    see.

   21            THE COURT:  Okay.

   22            THE WITNESS:  But I will be here.

   23            THE COURT:  Okay.  Great.  Thank you.

   24            I'm going to look right now, see if there's an update

   25    on the weather.

March 29, 2022                                          1691

```
1          THE CLERK:  All rise for the jury.

2                    (Jury In)

3          THE COURT:  Welcome back to the jury.

4          And please be seated.

5          And I just checked the weather, and it's looking a

6   little better already.  It's going to start raining, sleeting

7   at midnight.  But it's supposed to stop before 8:00 A.M.  So

8   hopefully the drive here in the morning -- and then it'll be

9   34 to 39 degrees during the time we're all trying to get here.

10          So go ahead, Mr. Stern.

11          Oh.  Mr. Stern brought to my attention that the most

12  recent exhibit was actually number 34 and not number 632.  So

13  we've made that correction while you were upstairs.

14  BY MR. STERN:

15  Q.  Mayor Walling, you've already testified that the -- you

16  already testified that the folks that were within government

17  who were working on the water situation, I believe you said

18  were not qualified at this point in time to effectuate any

19  meaningful change.

20          Is that accurate?

21  A.  I'll put it in my words.  I believe the city's capacity to

22  respond was limited.  The scope of what we were facing was

23  larger.  This was as large of a public outcry as I had seen

24  during the height of our public safety challenges in 2010.

25          And around that time, we were engaging additional
```

March 29, 2022

1692

1   expertise in the police department to try to respond to those

2   issues.  So it needed -- we needed additional expertise.  We

3   needed additional capacity.  That was my view of the situation.

4   Q.  And was it your intention to follow the recommendations of

5   someone that was brought in who had more expertise than those

6   folks who were on the ground?

7   A.  Yes.  In the sense -- you go into this expecting you're

8   going to get valuable, useful recommendations.  The city would

9   still, you know, need to be -- would still be making the

10  decisions to implement those, right.

11          So we have our own process as far as budget

12  amendments and procurement and all of the things we would still

13  have to do on the city side.

14  Q.  If someone from Veolia had come to you and said, "It seems

15  that reconnecting to the DWSD for the next two years will be

16  the best solution to satisfy the residents and activists,"

17  would you have taken that seriously?

18  A.  Yes.  Yes, I would have taken it very seriously.  This was

19  the -- this was one of the big questions that I was asked about

20  that I made public statements around.

21          And my statements and understanding were that

22  believing we had water that was, you know, safe under the Safe

23  Drinking Water Act from the Flint River through the Flint Water

24  Treatment Plant, and also then from Detroit, which we had had

25  for many years.

```
 1              If those two things were relatively equal, then the
 2      city would not want to spend the additional money to reconnect,
 3      to pay -- not just the reconnect fee, but to pay the higher
 4      cost that would be coming from purchasing water from Detroit.
 5              But that involves, you know, a factor.  If the water,
 6      as we came to learn later, was not comparable, and, at that
 7      time, I took really strenuous action.  I was actually in
 8      office when we reconnected to DWSD in October of 2015.
 9              We had a transition advisory board, not an emergency
10      manager.  At this time we're speaking of in late January-early
11      February of 2014, there was an emergency manager in place.
12      But it would have greatly affected my thinking, my thought
13      process.
14      Q.  I'd like for you to turn, please, to Exhibit 38.  Sorry.
15      Tab 38.
16              MR. STERN:  Your Honor, this was previously marked as
17      Plaintiffs' Exhibit 0476 through the testimony of David Gadis.
18              THE COURT:  Okay.  Thank you.
19      BY MR. STERN:
20      Q.  Do you have the document in front of you, sir?
21      A.  Yes.
22      Q.  I'd like for you, if you don't mind, to please turn to
23      page 2.
24              Do you see down at the bottom on February 2 , 2015,
25      at 6:35 P.M., Mr. Nicholas sent an email?
```

1   A.   Yes.

2   Q.   Mr. Nicholas states, "Good afternoon.  As you know, Veolia

3   was the only proposer to the RFP in Flint.  The city contacted

4   us late Friday night, and we have since had a call with them

5   today.  The project is moving quickly, and we want to keep you

6   up to date on actions regarding it."

7            Did I read that correctly?

8   A.   Yes.

9   Q.   Does that jive with your memory at this time around

10  February 2, 2015, that Veolia was the only bidder on the RFP?

11  A.   Yes.

12  Q.   The next paragraph from Mr. Nicholas says, "The city has

13  an immediate problem about water quality, and as such needs

14  that fixed as soon as possible.

15           "That being said, the city talked repeatedly about

16  cutting the 50-percent-plus water loss, reducing costs, and

17  getting through the next two years in switching water sources

18  again.

19           "Both us and the city, however, want to get through

20  the immediate problem.  The results of the discussion included

21  the following steps."

22           There's a Week 1 top-down analysis.

23           Do you see that?

24  A.   Yes.

25  Q.   And then it goes into scope.

March 29, 2022                                                    1695

```
 1              "The end result would be a confirmation of where the
 2    city is at now, validation that the current steps are working.
 3    What else could they do regarding treatment or distribution" --
 4    and then we move on to page 3 -- "system operators and how to
 5    improve communications protocol to restore trust from the
 6    public."
 7              Do you see that?
 8    A.   Yes.
 9    Q.   It goes on to talk about, "price, product, staffing,
10    contract, public uproar."
11              Do you see that?
12    A.   Yes.
13    Q.   And then Mr. Nicholas says, "Due diligence.  We see the
14    one-week study as a paid due diligence."
15              Do you see that?
16    A.   Yes.
17    Q.   When Veolia ended up getting this contract from the City
18    of Flint in February 2015, what was your understanding of what
19    they would be doing?
20    A.   The scope that you just read is accurate, as far as my
21    understanding at the time.  And I believed -- I don't know
22    about this part of the one-week study.  I don't know about that
23    phrasing.
24              But the city was expecting this to be, you know, a
25    couple of months of work.
```

March 29, 2022                                              1696

 1  Q.  I want to refer you now back to the first page of this

 2  email.  You'll see here on February 3, 2015, just above the

 3  exhibit number.

 4         Do you see that email from William Fahey?

 5  A.  Yes.

 6  Q.  He writes, "No worries.  I just want to understand the

 7  scope a bit.  If we need to bring in people like Bill Thompson

 8  for compliance issues or JC Davoine for automation and

 9  control."

10         Did I read that correctly?

11  A.  Yes.  I don't know how to pronounce that second person's

12  name but...

13  Q.  I probably messed it up.

14         All right.  And then we move up.  This is how email

15  threads work, where you work bottom up.  But here's

16  Mr. Nicholas again.  And he writes, "That might happen."  And

17  it appears he's referring to bringing in these people.

18         "The current intent is to get paid to do a one week

19  -- sorry -- to do a week onsite investigation to be clear what

20  is going on, is it fixable, and what we would need.

21         "The information would be used for defining the scope

22  going forward."

23         Did I read that correctly?

24  A.  Yes.

25  Q.  In your reading of this email, is it your understanding

1  now and was it then that what Veolia was contracted for would

2  be part 1 of what would ultimately be a different scope going

3  forward?

4  A.   You know, I'm reading that.  I don't have any reason to

5  believe that's not accurate.  How the actual contract was

6  structured with purchasing.  I guess I ultimately don't know.

7  Q.   Then this next line.

8            "The ultimate focus is not on the water problem but

9  fixing the entire utility.  It's a great PPS, delegated

10  management or O and M possibility.  The water loss is

11  50-percent-plus, and there are problems on the waste water

12  side, as well."

13            Did I read that correctly?

14  A.   Yes.

15  Q.   Was it your understanding that VNA was coming in to not

16  focus ultimately on the water problem?

17  A.   The work was for the scope that we went over earlier.  But

18  I would also understand if someone is talking to city staff,

19  they're getting a big picture that there are also issues with

20  that utility, that water fund long-term.

21            So I think anyone who's doing work for the city, even

22  for a couple of months, those kinds of issues are going to come

23  up.  Like I don't know that the water loss was actually 50

24  percent.  But there's water that doesn't -- you know, that goes

25  through the distribution system but never gets to an end user.

```
 1    That's very inefficient.
 2           That was something that was, you know, mentioned as
 3    an area where the city could improve.
 4    Q.  And you would agree that in this description by Rob
 5    Nicholas, there's not a mention of TTHMs, correct?
 6    A.  Correct.
 7           THE COURT:  Mr. Stern, I'd like to ask the witness.
 8           What does "PPS" mean?  Do you know in that email?
 9           THE WITNESS:  So I'm going to --
10           THE COURT:  You don't have to guess --
11           THE WITNESS:  I'm going to think it's public private
12     service or agreement of some kind.
13           THE COURT:  Okay.
14    BY MR. STERN:
15    Q.  And so with that -- in that regard, we saw an email
16    earlier about -- that used the word "upscale," right?
17    A.  Yes.
18    Q.  And in reading this email, is it your understanding that
19    Veolia was hoping to get additional work?
20           MR. CHRISTIAN:  Objection, Your Honor.
21           THE COURT:  It's sustained.  He's already testified
22     as to what he knows.
23           MR. STERN:  Okay.  I'll move on.
24    BY MR. STERN:
25    Q.  If you can go to Tab 65 in the other binder.  Let me know
```

1   when you're there, sir.

2   A.   Yes.

3   Q.   Do these appear to be your notes from February 3, 2015?

4   A.   Yes.

5         MR. STERN:  Your Honor, I seek to admit into evidence

6   Plaintiffs' 602-430.

7         THE COURT:  I think it's an O.

8         MR. STERN:  I'm sorry.  602-43O.

9         MR. CHRISTIAN:  No objection.

10         MR. ERICKSON:  No objection.

11         THE COURT:  All right.  Then it's received.

12   (Plaintiff Exhibit No. 602-43O Admitted Into Evidence.)

13   BY MR. STERN:

14   Q.   Mr. Walling, are these your notes from February 3, 2015?

15   A.   Yes.

16   Q.   And do you see down about six or seven lines down after

17   some information about snow and transportation and sidewalks,

18   there's a note about water quality?

19   A.   Yes.

20   Q.   And it says that, "Internal tests of TTHM below the MCL

21   are below DWSD.  Expect all eight sites to be below MCL for

22   DEQ.  Listening to concerns."

23         Did I read that correctly?

24   A.   Yes.

25   Q.   And what does that mean, and why did you make that note at

1   the time?

2   A.  Yeah.  So I have "Howard" bracketed there to the left.  So

3   this would have been a report at the staff meeting from

4   Mr. Croft.  And the city had to test at different time periods

5   and at different locations in the city for the TTHMs.

6          So at this point, I believe Mr. Crawford was

7   reporting on the -- kind of the unofficial, maybe the results

8   hadn't come back from the state lab or been certified.  But

9   this is what he was -- he was understanding that the levels at

10  the eight different sites where the city tested for TTHMs was

11  below the MCL, the maximum contaminant level.

12  Q.  And then you go on to write, "EM bringing in outside

13  eyes."

14          Do you see that?

15  A.  Yes.

16  Q.  Is that a -- what is that a reference to?

17  A.  Yeah.  So under that discussion of water quality, then the

18  emergency manager talking about bringing in outside eyes.

19  That's the outside water consultants.  Veolia, that we've

20  started talking about.

21          And then you see I do have a semicolon there.  So one

22  thing the emergency manager was talking about was bringing in

23  outside eyes.  Another thing that the city was going to be

24  involved with was testing individual households.

25          And that inevitably, things may end up needing to

```
 1  cost some money and that the city, you know, and partners
 2  should be seeking financial assistance.
 3            So that was, like, the EM's update on water quality
 4   after hearing from the director of public works.
 5  Q.  Sitting here today, do you know if when you wrote, "Will
 6  test individual households," if that was referring in any way
 7  to the outside eyes?
 8  A.  The city was testing a greater number of households than
 9  usual operations.  You know, if you go back a few years.  And
10  my understanding is that that information would have been
11  shared with, you know, consultants who are working with the
12  city.
13  Q.  Okay.  Were you aware of whether the consultants --
14            THE COURT:  And I just want to -- the "MCL,"
15   multi-contaminant level -- no.  Maximum.
16            THE WITNESS:  Maximum.
17            THE COURT:  Maximum contaminant level.  Okay.
18  BY MR. STERN:
19  Q.  If you could please look at Tab 94.
20            Do you know what this document is, sir?
21  A.  Yes.  It's a contract between the City of Flint and
22  Veolia.  At least -- I don't know if it's -- yeah.  And I
23  believe this was signed by the contractor, as well as the City
24  of Flint.
25  Q.  And it's dated February 4, 2015; is that correct?  Do you
```

```
 1   see at the top of page 3, there's an, "EM submission number
 2   presented date, adopted date"?
 3   A.   Yes.  And then it looks like it was executed.  So the
 4   resolution authorizes the city to enter into a contract.  And
 5   then it looks like the dates on the contract with Veolia were
 6   February 10, 2015.
 7           MR. STERN:  Your Honor, plaintiffs seek to admit 3635
 8    into evidence.
 9           MR. CHRISTIAN:  No objection.
10           MR. ERICKSON:  No objection.
11           THE COURT:  Okay.  It's received.
12    (Plaintiff Exhibit No. 3635 Admitted Into Evidence.)
13   BY MR. STERN:
14   Q.   Mr. Walling, what is this document?
15   A.   This exhibit, it's the contract in which was executed by
16   both parties at the end.  There's a compilation of documents.
17   It has the attestation from Brent Wright and Mr. Jones that the
18   vendor's been approved.
19           It has the actual official resolution signed by the
20   emergency manager on February 4.  So this is the legal
21   agreement between Veolia and the City of Flint.
22   Q.   This is the actual document that came from the bid in
23   response to the RFP, correct?
24   A.   Yeah.  This -- with whatever Veolia submitted in those
25   conversations, this is the formal signed contract between
```

March 29, 2022                                                    1703

1    Veolia and the City of Flint.

2    Q.   Okay.  If you don't mind, could you turn to page 9,

3    please?  Do you see at the bottom of the document, it says,

4    "scope of work"?

5    A.   Yes.

6    Q.   And I'm going to read to you the first paragraph.

7              "The city has asked that work be carried out in

8    stages.  This is reflected in the January 29, 2015, Veolia

9    proposal both in text and in graphics.  The initial stages to

10   be carried out are more specifically defined below.

11             "The findings in those stages will be used to further

12   identify future work.  The services to be provided are."

13             Did I read that paragraph correctly?

14   A.   Yes.

15   Q.   Okay.  And was it your -- did you see this contract when

16   it was signed at the time that it was signed or around that

17   time?

18   A.   I did.  But as you see, it is multiple pages.  I don't

19   recall that I read it line by line.

20   Q.   Okay.  Was it your understanding at that point in time

21   that the initial -- there would be a variety of stages

22   associated with Veolia's work?

23   A.   I see that.  So that refreshes my memory of how this was

24   structured.

25   Q.   And it talks about the next paragraph, "One week

1    assessment.  This involves a kickoff meeting with the client

2    and a top-down assessment as defined in the proposal.  Veolia

3    would provide two water and two communication experts for a

4    total of 40 hours each at $225 an hour, plus expenses."

5           Did I read that correctly?

6    A.   Yes.

7    Q.   Is that in line with what you remember was happening at

8    the time?

9    A.   Yes.

10   Q.   "The product from that week would be a letter or

11   PowerPoint presentation reviewing actions taken by the city to

12   date, validating what has been done by the city to date and

13   plans proposed going forward making recommendations for other

14   ideas to try, putting a schedule together for those ideas if

15   more study or other actions is needed to investigate ideas.

16          "The scope of work will involve the water plant,

17   distribution system, and communications with customers.  This

18   would include a presentation of the findings to stakeholders

19   and others upon the city's request.  The city would provide

20   access to staff, consultants, and records to review."

21          Did I read that correctly?

22   A.   Yes.

23   Q.   The next paragraph goes on to say, "Implementation and

24   management assistance.  The RFP asked for additional services

25   over a longer period of time.  At this point, it's not clear if

March 29, 2022                                                1705

```
 1   additional services are needed, what type of service this would

 2   involve, how the services would be provided, and for how long.

 3            "Any such additional services, terms, and conditions

 4   therefore would be negotiated at a later date, whether through

 5   change order, amendment, or otherwise."

 6            Did I read that correctly?

 7   A.  Yes.

 8   Q.  Okay.  Looking at this document and thinking back to that

 9   point in time, is this an accurate reflection of what you

10   believed Veolia's scope of work was on February 4 or

11   February 10, the date that this was actually executed, 2014?

12            MR. CHRISTIAN:  Objection, Your Honor.  He hasn't had

13    a chance to review the entire agreement.

14            THE COURT:  Okay.  Let's see if he wants to look at

15    it further.

16            MR. STERN:  I would love for him to look.  My

17   question was about the scope of work.

18            THE COURT:  Well, maybe there's another paragraph

19   called "scope of work."

20            MR. STERN:  Okay.

21            THE COURT:  He could look for it, see if there is.

22            MR. STERN:  Sure.

23            THE WITNESS:  Yes.  It also establishes that same

24   information in the payment part.  So Veolia will be invoicing

25   after that first week.
```

```
 1   BY MR. STERN:
 2   Q.   Okay.  Does the scope of work that I read and that you
 3   looked at match what you recall the scope of work was for
 4   Veolia at the time this contract was entered?
 5   A.   Yes.  I remember that initial intensive work during that
 6   first, you know, week or so.  And then I just also remember
 7   Veolia working with the city for some time afterwards.
 8   Q.   Okay.  If you can turn to Tab 39, please.
 9            MR. STERN:  Your Honor, this was previously received
10   by the Court as Plaintiffs' Exhibit 461 with the testimony of
11   David Gadis.
12            THE COURT:  Okay.
13   BY MR. STERN:
14   Q.   Do you see this is an email dated February 4, 2015, from
15   Kelly Rossman-McKinney to Scott Edwards, Paul Whitmore, David
16   Gadis, Matt Demo and carbon copying Wendy Larner at Truscott
17   Rossman.
18            Do you see that?
19   A.   Yes.
20   Q.   I'd like for you to turn, if you could, to page 2.  And
21   this appears to be a memo from Scott Edwards, senior vice
22   president communications of Veolia -- sorry -- to Scott Edwards
23   from Kelly Rossman-McKinney.
24            Do you see that?
25   A.   Yes.
```

March 29, 2022                                                      1707

1    Q.   And take a look at this document.  I don't want to read

2    the whole thing to you or to the jury.  But take a look at it.

3    And if you don't mind, please let us know if you recall a

4    meeting that took place, an initial kickoff, that's referenced

5    in this document.

6    A.   Okay.  Give me a minute.

7    Q.   And what I'm referring to is number 2, the media round

8    table.

9    A.   Yes.  I remember that -- that media roundtable.

10   Q.   Okay.  And you participated in that media roundtable,

11   correct?

12   A.   Yes, I did.

13   Q.   And do you see down here at the bottom,

14   Ms. Rossman-McKinney says to Scott Edwards, "Although I'm not

15   sure we mentioned this in our call Monday, Flint is an urban

16   community with a very strong African American presence, and we

17   must be mindful of this as we move forward.

18        "As we have discussed regarding Detroit, having a

19   person of color as Veolia's spokesperson will be helpful."

20        Did I read that correctly?

21   A.   Yes.

22   Q.   And do you recall at that round table meeting whether

23   Veolia sent a person of color to represent the company?

24   A.   I believe that may have been -- I believe that was when I

25   met Mr. David Gadis, African American man.

March 29, 2022                                                    1708

```
 1            MR. STERN:  I'm sorry, Your Honor.  I'm just
 2    switching to the last part of this.  Thanks.
 3   BY MR. STERN:
 4   Q.   On my screen and on your screen is a press release.
 5            Do you recall this press release going out, sir?
 6   A.   Yes.  It was right about that same time, early February.
 7   Q.   And this was to announce that Flint and Veolia had come to
 8   an agreement for Veolia to do some work for the city, right?
 9   A.   Yes.
10   Q.   And is this a photograph that -- I see you smiling.  It's
11   because of your short hair.
12            Do you recall what this photograph -- let me ask it a
13   different way.
14            Do you know what this photograph depicts?
15   A.   This is the media roundtable.  So it's myself, key city
16   personnel, including, I believe, the emergency manager's going
17   to be on the opposite end of the table, and individuals from
18   Veolia.
19            MR. STERN:  Okay.  Your Honor, I'm going to seek to
20   move into evidence the following -- this and the following
21   exhibits.  But I have to get exhibit numbers for the Court, if
22   that's okay.
23            THE COURT:  Okay.
24            MR. STERN:  We may already have them.  I just don't
25   have them on my screen.  I apologize.
```

```
 1              THE COURT:  And is it in the book?
 2              MR. STERN:  It's not in the book.
 3              THE COURT:  Oh, okay.  Thank you.
 4              MR. STERN:  All of these exhibits will be marked as
 5   Plaintiffs' Exhibit 3618.  All of the photos.  Did I just say
 6   all of the exhibits in the book?  I didn't mean to.  So this
 7   will be the first of 3618.
 8   BY MR. STERN:
 9   Q.   Mr. Walling, that's a picture of you at the meeting,
10   correct?
11   A.   Yes.
12   Q.   And we've looked at many of your notes throughout your
13   testimony yesterday and today.
14              These are your handwritten notes from that time,
15   right?
16   A.   Yes.
17   Q.   And here at this table, there are a number of people
18   sitting there, correct?
19   A.   Yes.
20   Q.   Now, the back of someone's head, is that -- whose head is
21   that, that we're looking at?
22   A.   So that's me.  That's my end of the table.  That's where I
23   sat in the mayor's conference office when we had a large group.
24   Q.   And sitting directly across from you at the long end of
25   the table with his hands folded, can you identify who that is?
```

March 29, 2022

1710

1    A.   That's Mr. Gerald Ambrose, who's the city's emergency

2    manager.

3    Q.   And if you go clockwise, so to the right of Mr. Ambrose,

4    can you identify who the gentleman is with the red-striped tie?

5    A.   Yes.   That's public works director Mr. Croft.

6    Q.   And to Mr. Croft's left but continuing to go clockwise at

7    around 3:00 o'clock, could you identify the gentleman with his

8    hands on the table?

9    A.   It's been years.   That's, I believe, Mr. David Gadis.

10   Q.   And then to Mr. Gadis's left in the blue shirt with the

11   blue bracelet, the watch, wedding ring, and a pen in his hand,

12   do you know who that is?

13            And if so can you identify him?

14   A.   Yes.   That's Mr. Ron Fonger from MLive.

15   Q.   We'll skip over you, because we've already talked about

16   you.   To your left at the -- at about 7:00 o'clock on a clock,

17   blue shirt, hands folded, not a great picture of the person in

18   terms of being able to identify him, but can you tell us who

19   that is, if you know?

20   A.   Yes.   That's Mr. Duffy Johnson.

21   Q.   And then to Mr. Johnson's left, continuing clockwise, is a

22   woman with what appears to be a microphone -- a microphone or a

23   boom.

24            Do you know who that is?

25   A.   I don't recognize her.

1    Q.   And then sitting next to her is a gentleman who's leaned

2    back with his hands in his lap.

3              Do you know who that gentleman is?

4    A.   That's Mr. Jason Lorenz, the public information officer,

5    city's public information officer.

6    Q.   And then to Mr. Lorenz's left, do you know who that

7    gentleman is with one hand up and one hand down with a beard

8    and glasses?

9    A.   That's Veolia's Mr. Rob Nicholas.

10   Q.   Do you remember this meeting, sir?

11   A.   Yeah, I do in general.

12   Q.   What was your sense about Veolia after having sat through

13   this meeting?

14             MR. CHRISTIAN:  Objection, Your Honor.

15             THE COURT:  Can you be more -- ask a specific

16    question?

17             MR. STERN:  Happy to.

18   BY MR. STERN:

19   Q.   You talked to a jury a long time today about your

20   concerns, about the folks who were presently working for the

21   city and government and needing an extra set of eyes, an

22   expert's.

23             Were you relieved after this meeting with Veolia?

24   A.   I remember being pleased at how it went.  You know, when

25   you're, like, a participant in a meeting and media's asking

March 29, 2022

1712

1  questions, I don't know how many notes I really took.  There

2  were some there in the photo.  I remember feeling like it was a

3  good meeting, a good event.

4  Q.  Okay.  And once again, this is a close-up of a gentleman

5  you identified.

6          Is this Jerry Ambrose?

7  A.  Yes.

8  Q.  And at the time of that meeting, February -- in February

9  2015, was Mr. Ambrose the emergency manager?

10  A.   Yes.

11  Q.  And this is a close-up of Mr. Nicholas, right?

12  A.   Yes.

13  Q.  And there's Howard Croft, right?

14  A.   Yes.  These photos, you can see the placards for the

15  officials.

16  Q.  Now, the woman who's sitting to Mr. Croft's right in this

17  photo, that was not a woman who was previously identified at

18  the table that y'all were sitting in, correct?

19  A.   Yeah.  I don't think so.  I think the media were moving

20  around.  So that's -- that was a local TV newscaster.

21  Q.   Okay.  And this is Mr. Nicholas and Mr. Lorenz; is that

22  correct?

23  A.   Yes.

24  Q.  That's Mr. Gadis on the left, Mr. Nicholas's back,

25  Mr. Lorenz, and you in the distance, correct?

March 29, 2022

1713

1   A.   Yes.

2   Q.   The gentleman on the far right sitting under that table --

3   sitting under that photograph with his fist by his chin, do you

4   see him?

5   A.   Yes.

6   Q.   Do you know who that is?

7   A.   Yes.  That's Councilman Eric Mays.

8   Q.   And that's a solo photo of Mr. Gadis with some

9   photographers, correct?

10  A.   Yes.

11  Q.   Do you recall at this meeting that Mr. Gadis actually

12  spoke to the group?

13  A.   I don't recall who spoke.

14  Q.   Okay.  I'm just taking you through these photos again.

15  That's one of you --

16  A.   Looks like I was speaking in that one, so yeah.

17  Q.   That's okay.  There's Mr. Gadis being filmed, correct?

18  A.   Yes.

19          MR. STERN:  All right.  If we can go back to the

20   ELMO, please.

21  BY MR. STERN:

22  Q.   I'd like for you to turn to Tab 41, please.

23  A.   Okay.

24          MR. STERN:  Your Honor, this document was previously

25   admitted as Plaintiffs' 467 during the deposition of David

March 29, 2022

1714

```
 1   Gadis.
 2            THE COURT:  Even though it says 462, it was -- 467
 3   was admitted.
 4            MR. STERN:  I said it wrong.  It's Exhibit 462.
 5            THE COURT:  And 462 was, as well.
 6            MR. STERN:  It was admitted with Mr. Gadis, as well,
 7   yeah.
 8            THE COURT:  Okay.  Go ahead.
 9   BY MR. STERN:
10   Q.  You see this is an email, sir, from Paul Whitmore at
11   Veolia to Rob Nicholas, David Gadis, Jonathan Carpenter, Kelly
12   Rossman-McKinney, Matt Demo, and Scott Edwards?
13   A.  Yes.
14   Q.  And do you see here that Mr. Whitmore says, "Team, please
15   see attached revised version of our messaging and FAQ document.
16            "We incorporated the changes and edits discussed this
17   morning, updated the answers to some key questions, added the
18   Indianapolis and Hardinsburg, Kentucky, case studies and
19   reordered some of the messages/FAQ for better flow.  Paul?"
20            Did I read that correctly?
21   A.  Yes.
22   Q.  All right.  Will you take a look at this document and tell
23   me -- tell the jury what this document is?
24   A.  Sorry.  This is a number of pages.
25            So these are -- it says, "Internal only Flint.  Key
```

1    messages.  February 6."  So there's some -- has, "top level key

2    messages, information on case studies."  And then says,

3    "External frequently asked questions and internal."

4    Q.   Do you see the first page after the email that you just

5    referenced the, "Internal only Flint.  Key messages"?

6    A.   Yes.

7    Q.   And do you see the first bullet point, it states, "We

8    understand the frustration and urgency felt by the community of

9    Flint as the need for clean water unites us all.  We're honored

10   to support the community with our technical expertise so that

11   together we can ensure quality water for everyone."

12          Do you see that?

13   A.   Yes.  That's right on.

14   Q.   Was that message in line with what you heard from the

15   folks from Veolia at the meeting that had the photos we just

16   looked at?

17   A.   Yes.  That's what we talked about throughout the time

18   Veolia worked with the city.

19   Q.   And then it states, "The city retained Veolia to conduct

20   an analysis of the water system."

21          Did I read that correctly?

22   A.   Yes.

23   Q.   There's no reference in this bullet point to TTHMs,

24   correct?

25   A.   Correct.

1    Q.   It goes on to say, "We anticipate that the analysis will

2    last less than two weeks, and we will then present our initial

3    findings to the city."

4              Did I read that correctly?

5    A.   Yes.

6    Q.   And at this point in time, LAN and Warren Green had

7    already finished an analysis of TTHMs, correct?

8    A.   Yeah.  Even in the bid proposal, we looked at the TTHM

9    draft evaluation report that LAN had produced.

10   Q.   Okay.  And it goes on to say, "Veolia's analysis will

11   review how the water is treated and distributed.  This will

12   include reviewing water treatment processes and observations,

13   laboratory testing and analysis, and engineering reports that

14   detail the city's treatment and distribution systems."

15             Did I read that correctly?

16   A.   Yes.

17   Q.   And so what was your understanding at this point in time

18   of what Veolia's analysis would include?

19   A.   Well, this is what I had in mind, that it was water

20   treatment --

21             MR. CHRISTIAN:  Objection, Your Honor.  I don't think

22   he laid a foundation for that question.

23             THE COURT:  What was the question?  Let's see.  Did

24   you know what Veolia's analysis would involve?

25             THE WITNESS:  Yes.  I understood it to be these

```
 1    items.

 2              THE COURT:  Okay.  I think there's -- overruled.

 3    BY MR. STERN:

 4    Q.   I mean, you were -- you were at a dinner with Mr. Truscott

 5    where for the first time you discussed with someone bringing an

 6    outside set of eyes, right?

 7    A.   But I think the point here in these different elements --

 8    I mean, I understood all these elements were under review.

 9              There were -- there's a water treatment process,

10    operations, the personnel, who's doing what.  They'd be looking

11    at lab tests and analysis.  And then the engineering reports,

12    that's like the LAN report.  That Veolia would be looking at

13    all of those different aspects.

14    Q.   Okay.  If we can turn to Tab 42, sir.

15              MR. STERN:  Your Honor, this was previously marked in

16     the Gadis -- during Mr. Gadis's testimony as Plaintiffs'

17     Exhibit 467.

18              THE COURT:  Okay.  Go ahead.

19    BY MR. STERN:

20    Q.   Mayor Walling, do you see that in the middle of this page,

21    this is an email from Rob Nicholas to Kelly Rossman-McKinney,

22    Scott Edwards, Paul Whitmore, Matt Demo and David Gadis.

23              Do you see that, sir?

24    A.   Yes.

25    Q.   "Subject.  Water Quality Advisory Committee."
```

```
 1              And it goes on to say, "The water quality committee
 2   is a good idea if properly organized.  But the sampling may not
 3   be.  I suggest the city needs to slow down and think out more
 4   carefully the sampling."
 5              Did I read that correctly?
 6   A.   I'm sorry.  I wasn't yet following you.  Which bullet are
 7   you on?  Oh, okay.  Above the bullets.
 8              Yes.
 9   Q.   Do you know what the water quality committee was?
10   A.   Yes.  I think the "advisory committee" is what we referred
11   to it as.  So this was a broad group of civic and community and
12   faith leaders, active residents.
13              The idea was to create a forum with some structure
14   where people could interact face to face.  There's only so much
15   you can do with websites and emails.  In Flint, we like to get
16   in the same room and talk to each other.
17   Q.   Do you see the first bullet point from Mr. Nicholas?  He
18   says, "Testing needs to be done by qualified water labs.  A
19   reputable entity like the university or a well-known lab would
20   be better.  Testing needs to follow EPA and state collection
21   and analytic requirements."
22              Did I read that correctly?
23   A.   Yes.
24   Q.   Do you know if at this point in time on February 6, 2015,
25   whether VNA had ever mentioned to you or anyone else at the
```

1    city that the testing labs that the city had at the water

2    treatment facility were not qualified to do the testing

3    required?

4    A.   I don't recall that being discussed.

5    Q.   Okay.  This next bullet point says, "Testing locations

6    need to be confirmed in advance with the city and state, which

7    is part of state requirements.

8             "Sampling all over town isn't going to help and might

9    well hurt.  There needs to be coordination with the water

10   company of where, when, and how."

11            Did I read that correctly?

12   A.   Yes.

13   Q.   Okay.  Did anybody at Veolia around this point in time

14   ever come to you or, as far as you know, anyone else at the

15   city and say that, "Sampling all over town isn't going to be

16   helpful and could possibly hurt"?

17   A.   I don't recall that.  I know we needed to find testing

18   locations.  I remember there's some discussion about having

19   places to test, because you need permission of property owners

20   to do that.

21            So I remember that part of it in general.  I don't

22   remember something -- I don't remember anything about, you

23   know, something hurting.

24   Q.   We've talked -- you've talked to the jury at length about

25   your perceived scope of Veolia's work and that they were going

1    to analyze tests, right?

2           Isn't that part of what you testified to?

3    A.   Yes.

4    Q.   Did anybody ever come to you and say, "We can't analyze

5    tests, because the tests can't be done all over town, and that

6    might hurt"?

7    A.   I don't recall that being discussed with me.

8    Q.   Did anybody from Veolia ever come to you and say, "We've

9    got to do this testing from qualified water labs.  And by the

10   way, you don't have any"?

11          Anybody say that to you, that you remember?

12   A.   Not that I recall.

13   Q.   There's another bullet point.

14          "What parameters are being tested?  The discussion

15   this afternoon leads us to believe different testing is needed

16   to help."

17          Do you see that?

18   A.   Yes.

19   Q.   Did anybody ever come to you at or around February 6, from

20   Veolia, 2015, and say, "I know our scope says we got to review

21   this testing, but we believe that different testing is needed

22   to help."

23   A.   I don't recall this.  I know Veolia was doing some of its

24   -- some of its own testing at the actual Water Treatment Plant

25   at some point.  I don't this kind of discussion with me.

March 29, 2022

1721

1    Q.  And did anybody ever come to you and say, "What do you do

2    if a bad sample occurs?  This could cause mass panic with

3    unqualified people saying water isn't safe."

4            Did anybody ever come to you and talk to you about

5    bad samples occurring from Veolia?

6    A.  Not that I recall.

7    Q.  Okay.  The next bullet point says, "Poor sampling

8    techniques cause just as many bad samples as actual problems.

9    There are also holding times and transport requirements on

10   taking samples, which many of these entities may not have."

11           A, did I read that correctly?

12   A.  Yes.

13   Q.  Did anybody from Veolia in early February 2015 ever come

14   to you and say, "These sampling techniques are not going to be

15   helpful in our evaluation"?

16   A.  Not that I recall.

17   Q.  And then finally --

18           MR. CHRISTIAN:  There's one thing.  I want to object,

19   Your Honor, just to be very clear on the timeframe here.

20           THE COURT:  Okay.  The question says:

21           "Did anybody from Veolia in early February 2015 ever

22   come to you and say these sampling techniques are not going to

23   be helpful in our evaluation?"

24           Do you want the specific week?

25           MR. CHRISTIAN:  I think it needs more precision,

1    given what's going on in this time period, Your Honor.

2            THE COURT:  Okay.

3            MR. STERN:  I'm sorry.

4            THE COURT:  Go ahead.

5    BY MR. STERN:

6    Q.  Did anybody from Veolia ever come to you in the history of

7    your life and tell you, "The poor sampling techniques could

8    cause problems"?

9    A.  Not that I recall.  That's something that I was learning

10   about later in the summer of 2015 with Dr. Marc Edwards's

11   independent testing of Flint's water system.

12   Q.  And then finally, "The random water samples already coming

13   in aren't of any value, because they weren't taken properly,

14   are logged by time and location, and the department isn't ready

15   for all the data."

16           Did I read that correctly?

17   A.  Yes.

18   Q.  Did anybody, as of February 6, 2015, from Veolia ever tell

19   you that the random water samples are of no value?

20   A.  No, they did not.

21   Q.  Sitting here today on the 29th of March, 2022, has anybody

22   from Veolia between the date of this email and today ever come

23   to you and said, "The random water samples already coming in

24   aren't of any value, because they weren't taken properly"?

25   A.  Not from Veolia.

```
 1              MR. STERN:  This would be a good place to stop, and
 2      I'm almost done, Judge.
 3              THE COURT:  Okay.  So what we'll do is we'll stop for
 4      the day.  And remember not to talk to each other, to others,
 5      etcetera, about the case.  And we'll start at 9:00 A.M. in the
 6      morning.  I think the weather's going to be okay.  It won't be
 7      great, but it will, I hope be safe for all of us to get here.
 8              So please rise for the jury.
 9                          (Jury Out)
10              THE COURT:  Okay.  Thank you, Mr. Walling.  We'll see
11      you back here at 9:00 A.M.
12              THE WITNESS:  Thank you, Your Honor.
13              THE COURT:  You're welcome.
14              Anything at this time?
15              MR. STERN:  We have one issue that we'd like to raise
16      with the Court.
17              THE COURT:  Okay.  And what is that?
18              You can step down, though.
19              THE WITNESS:  Yes, I am.  Thank you.
20              THE COURT:  And should Mr. Walling leave?
21              MR. STERN:  Yeah, of course.  He should leave before
22      I --
23              THE COURT:  Okay.
24              MR. STERN:  It's not an issue about him, I just don't
25      want to --
```

```
1              THE COURT:  Right.

2              And is this a sidebar or -- no.  Okay.  So.

3              MR. STERN:  Doesn't have to be.

4              THE COURT:  Okay.

5              MR. STERN:  Your Honor, we have a witness who is from

6    out of state who it would be deemed unavailable, based on his

7    -- where he lives.

8              THE COURT:  Okay.

9              MR. STERN:  But he is willing to testify live via

10   Zoom.  In the past, we've conducted a number of depositions.

11   There have been videos made.  The Zoom technology seems to

12   have evolved in a way that could help us with this.

13             And the Court has indicated in the past that the

14   preference is for live testimony.  And so we would like to

15   determine if the Court or how the Court would allow us to

16   proceed in terms of presenting live testimony from an

17   out-of-state witness via Zoom.

18             THE COURT:  Okay.  Well, let me see what your

19   opponents in the case think about that.

20             Mr. Christian.  Mr. Campbell.

21             MR. CAMPBELL:  First question would be who is it.

22             THE COURT:  Well, I'm sort of curious just about the

23   policies.  Because one thing that you've pointed out to me

24   throughout this is just how important it is to be consistent.

25             So I would want to offer the exact same accommodation
```

1    to VNA and LAN as the plaintiffs.

2            But we can certainly ask.  But before -- before we

3    know who it is, do you have a general response to whether live

4    video.

5            MR. CAMPBELL:  Having sat through several occasions

6    where that has happened in trial, it's exceedingly difficult

7    to control the witness.  It's exceedingly difficult to get

8    clear testimony.  To enter objections.

9            Because of the delay in the transmission, the witness

10   keeps talking.  The Court or the counsel are trying to object.

11   So it's difficult.

12           And that's why I asked who it is.

13           THE COURT:  I see.

14           MR. CAMPBELL:  Because that matters.

15           THE COURT:  I think that might be helpful.  If this

16   is somebody who is sort of a skilled testifier, they would

17   know the minute that there's a signal of a question to stop.

18           MR. STERN:  So first off, Your Honor, fundamentally

19   disagree about the issues that have occurred during any of the

20   Zoom depositions.  That has not been my experience.

21           MR. CAMPBELL:  I didn't say depositions.  I said -- I

22   was speaking of my own experience in courtrooms in various

23   places around the country.

24           THE COURT:  Yeah.  In -- I think he was talking about

25   his trial experience probably previous to this case.

```
1          MR. CAMPBELL:  Yes.
2          MR. STERN:  Well, okay.  The individual we're
3   referring to is Miguel Del Toral.
4          THE COURT:  Okay.
5          MR. STERN:  And he would like to be here to testify,
6   but he has significant concerns about COVID.  My understanding
7   is that that's real for him.
8          THE COURT:  Of course it is, yeah.
9          MR. STERN:  And he would like to participate live but
10  cannot be here.
11         THE COURT:  I see.  And you know, the one thing I'll
12  say -- thank you.  The one thing I'll say, Mr. Campbell, is
13  that I take people's liberty away from them by Zoom technology
14  for, in one instance -- a couple of instances recently, the
15  rest of their lives.
16         So it -- I think it has evolved to become more
17  responsive.  And they also have their criminal defense lawyers
18  not by their side, but on a separate panel.
19         And the defendant -- and the defense lawyer are able
20  to say -- you know, the lawyer is able to say stop talking
21  quickly to the defendant if they go into an area the lawyer
22  would ordinarily just elbow them at the table.
23         So let me hear from Mr. Mason.
24         MR. CAMPBELL:  And if I could, Your Honor.
25         THE COURT:  Oh, sure.
```

```
 1              MR. CAMPBELL:  I've heard you say that a couple of
 2    times that about criminal issues and issues regarding
 3    someone's freedom and using Zoom technology in the pandemic
 4    time.  So I clearly understand that.
 5              That is -- doesn't have the particular issues that I
 6    am concerned about, because I've experienced them.  And that
 7    is the witness talking over lawyers, the witness saying things
 8    that are -- they shouldn't say, and having a very difficult
 9    time controlling them.
10              So that's been my experience.  I fortunately have not
11    been engaged in sentencing issues, and so I can't speak to how
12    that goes or who's talking or how that happens.  But I suspect
13    it's different than the adversarial process that we have here
14    in the court.
15              But with that, I'd like to hear what Mr. Mason --
16              MR. CHRISTIAN:  May I ask one quick question, Your
17    Honor, if you don't mind?
18              THE COURT:  Who's speaking?  Okay.  Yes.
19              MR. CHRISTIAN:  Have you had that occur in a criminal
20    trial or we're talking just sentencing hearings?
21              THE COURT:  Guilty pleas, motions to express.  So
22    evidentiary hearings we have done.
23              MR. CHRISTIAN:  But we would argue that's very
24    different than actually a witness in a courtroom trial.
25              THE COURT:  But in the evidentiary hearing, the
```

```
 1    officer or the agent are on the witness stand being shown
 2    exhibits, and -- but you're saying, amplifying what
 3    Mr. Campbell has said, that you think the witness would keep
 4    talking if there's an objection.
 5          MR. CHRISTIAN:  The ability to make eye contact makes
 6    a difference, Your Honor, with a witness.  It doesn't work the
 7    same via Zoom.
 8          THE COURT:  And is the idea, Mr. Stern, that
 9    Mr. Del Toral would be up on the screen and would hear your
10    questions but wouldn't see you or would he -- he'd have access
11    to our -- he'd be on our Zoom.
12          MR. MAIMON:  I think the Zoom trials that I'm aware
13    of where the entire trial took place by Zoom, including direct
14    examination, cross-examination, the Court instructing the
15    jurors who were not in the courthouse but were on their own
16    Zoom, that it's a -- it's like the Zoom hearings that Your
17    Honor has held where there are all the boxes.
18          Obviously, the people who are looking at our Zoom
19    webinar would not be on the boxes.  But basically there would
20    be two; what Mr. Del Toral would see as far as the courthouse,
21    courtroom, and then everybody on the large screen would see
22    him.
23          THE COURT:  And I think what we could do if we decide
24    to do it is we could just have him on the Zoom as a panelist.
25    And what we have is me, all of you, the witness box, which
```

March 29, 2022

1729

```
 1   would become him, and then the exhibit, space for the exhibit.
 2           Would he see the exhibit?
 3           MR. STERN:  Yes.
 4           MR. MAIMON:  Yes.  On a share screen when you share
 5   your screen.
 6           THE COURT:  Okay.  Let me hear from Mr. Mason.
 7           MR. CAMPBELL:  Just one point before Mr. Mason.
 8           THE COURT:  Sure.
 9           MR. CAMPBELL:  With our Zoom depositions that -- and
10   we've done lots of them -- when a document is displayed, it
11   has displaced everyone's picture.  So I don't know how that
12   would work in the trial.
13           But you just mentioned an exhibit box.  But when
14   we've done it within the depositions, as I said generally, as
15   I recall, they take up the whole screen.
16           MR. MAIMON:  When I do Zoom conferences or Zoom
17   depositions, the witness's face is still -- it's a shared
18   screen.  So you see the participants and you see the document
19   that's being shared.
20           THE COURT:  Why don't I look into the technology.  So
21   I won't make a decision today to make sure that the fourth box
22   would be the exhibit.  And it would -- all of it could be
23   projected up on the main screen.  So the witness is in one
24   box.  The courtroom.  So I won't make a decision right now.
25           When were you planning to call this witness?
```

1            MR. STERN:  Next week.

2            MR. MASON:  Your Honor, may I be heard?

3            THE COURT:  Yeah, you may.  Mr. Campbell kept taking

4    your time, yeah.

5            MR. MASON:  I, too, have experience with this in

6    actual trials, and it is cumbersome.  It's problematic often

7    with the documents.  We're not going to ship notebooks to

8    someone and give work product in advance of cross-examination

9    and things like that.

10            So then you're talking about putting something on a

11   screen and taking a significant amount of time for them to

12   potentially review page by page of exhibits.

13            There are those kind of things.  I know technology

14   has moved forward in terms of the Zoom world, but it doesn't

15   change the fact of the dynamics of cross-examination and the

16   like.

17            I also believe that the rules do not provide for

18   this.  This is not -- if a witness is unavailable, if the

19   Federal Rules Committee ultimately wants to make change

20   because the evolution of technology ultimately, that's one

21   thing.

22            This is not a Zoom trial.  It's an in-person trial.

23   We all have COVID concerns.  And this is a witness who is

24   unavailable.  They have the ability to play the videotape.

25   And if parties stipulate to something like this, it's one

1  thing.

2          But respectfully under the rules as the Court rules

3  stand, I don't believe it's appropriate, because it makes

4  virtually any witness available, potentially that is outside

5  the subpoena range.

6          Now, I understand they're voluntarily making

7  themselves --

8          THE COURT:  That's not a bad thing.  I mean, we want

9  more witnesses with relevant information to be able to

10  participate than fewer.

11          MR. MASON:  In-person is, I believe, an important

12  aspect of this.  And so we do oppose the request.  And they

13  have testimony that they can designate.

14          THE COURT:  Okay.

15          MR. MAIMON:  I've looked at the rules.  There is

16  nothing in the rules that prohibits this.  This is not against

17  the rules.

18          If a witness is unavailable, then Rule 804 of the

19  Rules of Evidence allows their prior testimony to be shown.

20  There's nothing that prohibits the Court or even speaks to

21  discouraging courts from taking testimony from witnesses in

22  remote locations.

23          In fact, when we were discussing the subpoenas that

24  we had served on certain of the VNA witnesses, Your Honor,

25  Your Honor will recall there was a discussion that instead of

1    Rule 45 being applicable to those subpoenas, perhaps Rule 42

2    and having those witnesses appear at other courthouses being

3    subpoenaed into those other courthouses and testify remotely,

4    there was a matter that the Court raised as a possibility.

5            If what Mr. Mason suggests is actually the rule, then

6    Your Honor could not have done anything like that.

7            There is -- there is a mechanism available for

8    witnesses to appear remotely.  One way to do it is to go and

9    take trial testimony from them.  Not a discovery deposition,

10   but to take trial deposition --

11           THE COURT:  It's Rule 43A says, "At trial, the

12   witness's testimony must be taken in open court, unless a

13   federal law, federal rules of evidence, these rules or other

14   rules adopted by the Supreme Court provide otherwise."

15           But then it goes on to say, "For good cause and

16   compelling circumstances and with appropriate safeguards, the

17   Court may permit testimony in open court by contemporaneous

18   transmission from a different location," which is what that

19   would be.

20           But, Mr. Mason, is there a different rule that

21   intersects this that I should look at?

22           MR. MASON:  I think the rule's been identified.  The

23   rule you read, Rule 42 --

24           THE COURT:  43.  "Taking testimony."

25           MR. MASON:  Right.

March 29, 2022

1733

1    THE COURT:  Okay.

2    MR. MAIMON:  Just so it's clear, Mr. Del Toral's

3    deposition testimony was by Zoom.  So the same box and box

4    type of issue, documents not available, a full binder of

5    documents up with them, that was a problem that presented

6    itself in the deposition itself.

7    So we're basically the same place.

8    THE COURT:  Okay.  Let me just look at some cases

9    under this rule, see what's going on since COVID.

10   I've taken trial testimony by live video feed from

11   doctors in the past.  And I don't recall there being problems

12   with it.  But I'm going to try to give it some thought and do

13   a little research and let you know in the morning.

14   MR. MAIMON:  Thank you, Your Honor.

15   THE COURT:  Okay.  It seems wrong to have spring

16   allergies when it's about to snow.

17   Anything else?

18   MR. MAIMON:  I'm going to make a suggestion that

19   between now and the end of the week, we start giving thought

20   to just schedule, and Your Honor had mentioned maybe days off

21   here.  I have my own concerns.

22   But maybe -- I'm not suggesting we do it now, but we

23   all give thought, and at some point this week, discuss that.

24   THE COURT:  That would be great.

25   MR. MAIMON:  Thank you, Your Honor.

March 29, 2022

1734

```
 1            THE COURT:  Okay.  Thank you.  Human there for a
 2   minute.  So we'll be adjourned for today.
 3                    (Proceedings Concluded)
 4                 -          -          -
 5
 6              CERTIFICATE OF OFFICIAL COURT REPORTER
 7        I, Jeseca C. Eddington, Federal Official Court
 8   Reporter, do hereby certify the foregoing 146 pages are a true
 9   and correct transcript of the above entitled proceedings.
10   /s/ JESECA C. EDDINGTON_____          03/29/2022
11   Jeseca C. Eddington, RDR, RMR, CRR, FCRR          Date
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```