```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3   SHERROD, TEED, VANDERHAGEN and WARE,

 4                      Plaintiffs,
        -v-                                  Case No. 17-10164
 5
     VNA and LAN,
 6
                       Defendants.
 7   _____/

 8                             JURY TRIAL

 9
                   BEFORE THE HONORABLE JUDITH E. LEVY
10                   UNITED STATES DISTRICT JUDGE

11                         MARCH 30, 2022

12
     APPEARANCES:
13
     For the             Corey M. Stern
14   Plaintiffs:         Levy Konigsberg, LLP
                         605 Third Avenue, 33rd Floor
15                       New York, New York 10158

16                       Moshe Maimon
                         Levy Konigsberg, LLP
17                       605 Third Avenue, 33rd Floor
                         New York, New York 10158
18
                         Melanie Daly
19                       Levy Konigsberg, LLP
                         605 Third Avenue, 33rd Floor
20                       New York, New York 10158

21

22               (Appearances Continued on Next Page)

23
     TO OBTAIN A      JESECA C. EDDINGTON, RDR, RMR, CRR, FCRR
24   CERTIFIED          FEDERAL OFFICIAL COURT REPORTER
     TRANSCRIPT:        UNITED STATES DISTRICT COURT
25                         200 EAST LIBERTY STREET
                         ANN ARBOR, MICHIGAN 48104
```

```
 1    For the VNA        Daniel Stein
      Defendants:        Mayer Brown LLP
 2                       1221 Avenue of the Americas
                         New York, New York 10020
 3
                         James M. Campbell
 4                       Campbell Conroy & O'Neil, P.C.
                         1 Constitution Wharf, Suite 310
 5                       Boston, Massachusetts 02129

 6                       Marcus Christian
                         Mayer Brown LLP
 7                       1999 K Street NW
                         Washington, District of Columbia 20006
 8
                         Mark R. Ter Molen
 9                       Mayer Brown LLP
                         71 South Wacker Drive
10                       Chicago, Illinois 60606

11                       Cheryl A. Bush
                         Bush, Seyferth PLLC
12                       100 West Big Beaver Road, Suite 400
                         Troy, Michigan 48084
13
      For the LAN        Wayne Brian Mason
14    Defendants:        Faegre Drinker Biddle & Reath LLP
                         1717 Main Street, Suite 5400
15                       Dallas, Texas 75201

16                       David C. Kent
                         Faegre Drinker Biddle & Reath LLP
17                       1717 Main Street, Suite 5400
                         Dallas, Texas 75201
18
                         Tory Finley
19                       Faegre Drinker Biddle & Reath LLP
                         1717 Main Street, Suite 5400
20                       Dallas, Texas 75201

21                       Philip A. Erickson
                         Plunkett & Cooney
22                       325 East Grand River Avenue, Suite 250
                         East Lansing, Michigan 48823
23

24

25
```

```
 1                          I N D E X

 2     WITNESSES                                    PAGE

 3     DAYNE WALLING
             Direct examination(cont.)by Mr. Stern...1740
 4           Cross-examination by Mr. Christian......1796

 5


 6
       EXHIBITS                         Marked   Admitted
 7
       Plaintiff
 8           602-43P.....................1750       1750
             602-43R.....................1752       1752
 9           602-43X.....................1781       1782
             0621........................1768       1768
10           1318........................1764       1764
             3618.................Previously        1793
11                                    Marked

12     Defendant VNA
             76..........................1830       1831
13           618.........................1871       1871
             627.........................1874       1874
14           1906........................1880       1880
             2609........................1816       1817
15           2756A.......................1862       1863
             2770........................1852       1852
16           4894........................1804       1804
             5454I.......................1884       1885
17           5454J.......................1888       1889

18

19

20     MISCELLANY                                   PAGE

21     Proceedings...............................1738
       Certificate...............................1905
22

23

24

25
```

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | THE CLERK:  Calling Sherrod, Teed, Vanderhagen and |
| 3 | Ware vs VNA and LAN. |
| 4 | THE COURT:  Thank you.  Please be seated.  Could we |
| 5 | have appearances. |
| 6 | MR. STERN:  Your Honor, Corey Stern and Moshe Maimon |
| 7 | on behalf of the bellwether plaintiffs. |
| 8 | THE COURT:  Thank you. |
| 9 | MR. CHRISTIAN:  Good morning, Your Honor.  Marcus |
| 10 | Christian, Daniel Stein, and James Campbell on behalf of VNA. |
| 11 | THE COURT:  Good morning. |
| 12 | MR. MASON:  And for LAN, Wayne Mason, Philip |
| 13 | Erickson, David Kent. |
| 14 | THE COURT:  Okay.  Great.  Thank you.  Thank you, |
| 15 | Mr. Walling, for being here safely. |
| 16 | The roads weren't bad, but I had about a quarter inch |
| 17 | of ice, maybe an eighth of an inch of ice on my car.  So I |
| 18 | hope you got here safely. |
| 19 | I'm going to see if all of our jurors are here. |
| 20 | Let's see.  The little dots are going.  No, they're not -- oh, |
| 21 | they are.  Wait.  Are we missing any jurors?  No.  Okay.  So |
| 22 | they are all here. |
| 23 | What I'd like to do is address the issue of the video |
| 24 | -- the request by plaintiffs to have live video testimony at a |
| 25 | sidebar or at a break.  So we'll do that later. |

```
 1              So I will let Bill know we're ready.
 2              It's supposed to be 60 degrees this afternoon.
 3              MR. MAIMON:  Isn't that crazy?
 4              THE COURT:  It's crazy.  It's probably -- do you feel
 5     like it's good for the human body?
 6              MR. CAMPBELL:  Good for developing colds, Judge.
 7              THE COURT:  I heard.  Do you have a cold,
 8     Mr. Campbell?
 9              MR. CAMPBELL:  I'm trying to get over it.  I'm hoping
10     not to spread it to anybody.
11              THE COURT:  Well, it's a good thing to have these
12     masks.  Because you went home for a birthday celebration and
13     came back with a cold was my observation.
14              MR. CAMPBELL:  Yeah.  I think that I brought it
15     there, because my wife told me that I did when I spoke to her
16     last night.
17              THE COURT:  Oh, dear.  Oh, I'm sorry.  That's not a
18     good birthday present.
19              MR. CAMPBELL:  No.  But it was a wonderful time.
20              THE COURT:  Well, that's what matters.
21              You know, I've been thinking about how we all used to
22     think, and maybe that's still the mindset in light of this
23     trial, that our culture just tells us to go to work when we're
24     sick.  And I would love to see that turn around.
25              I'm one.  I've done it all my life.  I never used a
```

March 30, 2022                                         1740

```
 1   sick day and blah, blah, blah.  But I think it's -- the people
 2   who take their sick days when they're sick should be rewarded
 3   for protecting the rest of us.
 4           But these will help just with ordinary colds, too.
 5           THE CLERK:  All rise for the jury.
 6                       (Jury In)
 7           THE COURT:  Well, welcome back to the jury.  Thank
 8   you, so much, for being here.  You made the right call about
 9   the weather.  It wasn't too bad on the roads I hope.  So
10   please be seated.  And we will get started right away.
11           And we were, I think, finishing Mr. Stern's
12   examination.
13           So, Mr. Walling, you're still under oath to tell the
14   truth from when you were first sworn in.
15           THE WITNESS:  Yes, Your Honor.
16               DIRECT EXAMINATION (continued)
17   BY MR. STERN:
18   Q.   Mr. Walling, good morning.
19   A.   Good morning.
20   Q.   Could you please turn to Tab 45 in your binder, Walling 1.
21           MR. STERN:  Your Honor, this document was previously
22   admitted as Plaintiffs' 0464.
23           THE COURT:  Okay.
24   BY MR. STERN:
25   Q.   Mr. Walling, if you could please turn to page 2 of this
```

March 30, 2022

1   document.

2   A.   Okay.  Yes.

3   Q.   I've highlighted at the top a section that reads, "Hi,

4   Jason.  I'm working on a story about an email that was sent out

5   to the UM-Flint campus community on Friday about their water

6   quality.

7          "I was hoping to get comment on if any of it seems

8   related to the issues with Flint water or if it's an isolated

9   incident.  They saw high levels of lead in certain locations.

10  I will copy the email below.  Would someone be able to comment

11  on this today?"

12         Do you see that, sir?

13  A.   I do.

14  Q.   If you could turn back to page 1 --

15         THE COURT:  Can you tell us the date that was sent?

16  I'm not --

17         MR. STERN:  Sure, Judge.

18         THE COURT:  It's on page 1.  Is that it what it is?

19         MR. STERN:  Yes, Judge.  It was sent on -- I'll point

20  the Court to it.  It was sent on Monday, February 9, 2015, at

21  12:39 P.M.

22         THE COURT:  Thank you.

23         MR. STERN:  Sure.

24  BY MR. STERN:

25  Q.   And then you can see where I've highlighted that

1    Ms. Rossman-McKinney was forwarded that email from Mr. Lorenz

2    as was Howard Croft, Elizabeth Murphy, and Gerald Ambrose.

3         Do you see that?

4    A.   Yes.

5    Q.   And Mr. Lorenz says, "Hello, everyone.  Here is another

6    water-related story that I believe can be deflected.  It

7    appears UM Flint has done water testing on their campus

8    recently.

9         "The test came back showing TTHM levels were lower

10   than MCL, but have shown in a few places higher than acceptable

11   lead levels.  Is this an internal plumbing issue that is not

12   connected to us?  Please advise."

13        Did I read that correctly?

14   A.   Yes.

15   Q.   And then as we go up, you can see that Rob Nicholas, on

16   February 9 at 3:16 P.M. -- I'm sorry.  I skipped one.

17        And you see on February 9, Ms. Rossman-McKinney says,

18   "Proving what Rob and I were discussing, everyone is testing

19   that darn water"?

20   A.   Yes.

21   Q.   Then Rob Nicholas, at 3:16 P.M., on February 9 responds to

22   Kelly Rossman-McKinney, David Gadis, who we've talked about

23   yesterday, Scott Edwards, Matt Demo, and Paul Whitmore.

24        And Mr. Nicholas says, "No.  Lead could be a problem,

25   based on the water.  Part of what we will do is look at the

1   water quality, testing, and results for lots of different

2   variables."

3           Did I read that correctly?

4   A.   Yes.

5   Q.   At any point in time, on February 9, 2015, until today,

6   did anyone from Veolia ever contact you directly and say, "Lead

7   could be a problem, based on the water"?

8   A.   No.

9   Q.   And the section of the Mr. Nicholas's email that says,

10  "Part of what we will do is look at the water quality, testing,

11  and results for lots of different variables," does that line up

12  with what your expectation was of what VNA was going to do for

13  the City of Flint?

14  A.   Yes.

15  Q.   If you could turn, please, sir, to Tab 46 in your binder.

16          MR. STERN:  Your Honor, this was previously --

17          THE COURT:  It's 634.

18          MR. STERN:  I'm actually going to go to 47 first.

19   No, I'm sorry, Judge.

20          THE COURT:  Okay.

21          MR. STERN:  46, please.

22          THE COURT:  Go to 46.  Okay.

23          MR. STERN:  And this was previously admitted as -- in

24   the Gadis deposition as Exhibit 465.

25          THE COURT:  Okay.  I have that as received.

March 30, 2022

```
 1    BY MR. STERN:
 2    Q.   You can see that this appears to be the same document that
 3    I just showed you that was in Tab 45.
 4           Do you have the highlighted version where someone's
 5    writing to Jason Lorenz, "and I'm working on a story"?
 6           It's on page 2.
 7    A.   Yes.
 8    Q.   And then if I turn back to page 1 and you turn back to
 9    page 1, you'll see again where Mr. Lorenz states, "Hello,
10    everyone.  Here's another water-related story."
11           Do you see that, sir?
12    A.   Yes.  It's the same email.
13    Q.   So far it appears to be an identical document, correct?
14    A.   Right.
15    Q.   And here is the Kelly Rossman-McKinney email that I didn't
16    initially show you before but went back to, "Proving what Rob
17    and I discussed."
18           Do you see that, sir?
19    A.   Yes.
20    Q.   But then on February 9 at 3:34 P.M., just 20 minutes or so
21    after Mr. Nicholas first responded to Ms. Rossman-McKinney, he
22    then again responds to David Gadis, Scott Edwards, Matt Demo,
23    and Paul Whitmore.
24           And in this instance, he writes, "Kelly, do not pass
25    this on.  This begins to prove our concern that with lots of
```

1   different people doing tests, it's a problem unless clear

2   information is provided.

3           "Flow of water in different parts of the building is

4   the school's responsibility.  The city, however, needs to be

5   aware of this problem with lead and operate the system to

6   minimize this as much as possible and consider the impact in

7   future plans.  We had already identified this as something to

8   be reviewed."

9           Did I read that correctly?

10  A.   Yes.

11  Q.   Okay.  Did Ms. Rossman-McKinney or did Mr. Nicholas or

12  anyone else from Veolia ever pass on to you that the city needs

13  to be aware of this problem with lead and operate the system to

14  minimize this as much as possible?

15  A.   No.

16          THE COURT:  Mr. Stern, before you leave this exhibit,

17  have we been told or have we learned who Matt Demo is and the

18  other people on these messages?

19          MR. STERN:  I believe in the Gadis deposition, these

20  were all VNA employees.

21          THE COURT:  Right.  And they're all people with VNA.

22  Okay.  Oh, I see.  Okay.  Thank you.

23  BY MR. STERN:

24  Q.   Mr. Walling, if you could please turn to Tab 47.

25          MR. STERN:  Your Honor, this was previously offered

March 30, 2022

```
 1   and accepted into evidence as Plaintiffs' 466.
 2           THE COURT:  Okay.
 3   BY MR. STERN:
 4   Q.  Are you looking at the document, Mr. Walling --
 5   Mayor Walling?
 6   A.  Tab 47?
 7   Q.  Yes, sir.
 8   A.  Yes.
 9   Q.  And on page 2, this, again, appears to be the exact same
10   email.  "Hi, Jason.  I'm working on a story."
11           Do you see that?
12   A.  Yes.
13   Q.  And then if I turn to page 1, you see again from Jason
14   Lorenz to the same group, "Hello, everyone.  Here's another
15   water-related story."
16           Do you see that?
17   A.  Yes.
18   Q.  Then if I move up a little bit, here's the line from Kelly
19   Rossman-McKinney that I pointed out in the last two documents.
20           Do you see that?
21   A.  Yes.
22   Q.  And then Mr. Nicholas responds -- and this time he
23   responds only to someone by the name of Marvin Gnagy.
24           Do you see that?
25   A.  Yes.
```

March 30, 2022

1747

1  Q.   The last two emails I showed you indicated that the emails

2  had been sent to a number of people.  And then Her Honor asked

3  me who they were, and then we identified them as VNA employees.

4            Here Mr. Nicholas is only sending this to one

5  employee Mr. Gnagy.

6            Do you see that?

7            MR. CHRISTIAN:  Objection, Your Honor.  He seems to

8  be testifying.

9            THE COURT:  Well, and also I'm not sure if the

10  previous email went to Howard Croft and Gerald Ambrose.  Those

11  are the emergency manager and the director of public works.

12            MR. STERN:  It did not.  No --

13            THE COURT:  Oh.

14            MR. STERN:  -- the email from Ms. Rossman-McKinney --

15  let me go back.

16            THE COURT:  Okay.  Yeah.  I'd like that.  Because I'm

17  a little bit confused myself.

18            MR. STERN:  Sure.  So let's -- let me start over.

19            THE COURT:  Sure.

20  BY MR. STERN:

21  Q.   You can see here that Jason Lorenz is sending an email to

22  Kelly Rossman-McKinney, Howard Croft, Elizabeth Murray, Gerald

23  Ambrose.

24            "Hello, everyone.  Here's another water-related

25  story."

March 30, 2022

```
 1              Do you see that?
 2              And then --
 3              THE COURT:  We didn't get an answer.  We have to get
 4  an answer.
 5              MR. STERN:  I'm sorry.
 6  BY MR. STERN:
 7  Q.   Do you see that, sir?
 8  A.   Yes.  And have those individuals been identified?
 9              THE COURT:  Yeah.  I'm not sure that Murphy,
10  Elizabeth Murphy --
11  BY MR. STERN:
12  Q.   Do you know who Elizabeth Murphy is, sir?
13  A.   I do, yes.
14  Q.   Who is she?
15  A.   She's a Flint employee.  She was the assistant to the
16  emergency managers.
17              THE COURT:  Okay.
18  BY MR. STERN:
19  Q.   And then you see here, to answer Her Honor's question,
20  Ms. Rossman-McKinney responds to that email but only includes
21  David Gadis; Robert Nicholas; Scott Edwards, who has a Veolia
22  address; Matt Demo, who has a Veolia address; and Paul Whitmore
23  with a Veolia address.
24              Do you see that, sir?
25  A.   I do.
```

March 30, 2022

1749

1    Q.   So Ms. Rossman-McKinney is commenting on the earlier

2    email, but she's only sending it to the Veolia addressees.

3              Do you see that, sir?

4    A.   Yes.

5    Q.   And then Mr. Nicholas, in his email, only goes to Marvin

6    Gnagy, and he says, "Yep, lead seems to be a problem."

7              Do you see that, sir?

8    A.   Yes.

9    Q.   And at any point in time did David Gadis or Robert

10   Nicholas or Scott Edwards or Matt Demo or Paul Whitmore or

11   Kelly Rossman-McKinney ever come to you on February 9 or any

12   time since and say, "Mayor Walling, lead seems to be a

13   problem"?

14   A.   No.

15   Q.   Did anyone from Veolia ever come to you and say, "Lead

16   seems to be a problem"?

17   A.   Not that I can recall.

18   Q.   Do you think that's something that you would recall if

19   someone from Veolia had ever told you that, sir?

20   A.   Yes.  I can remember the other meetings where the

21   different issues we've talked about with the city's water

22   system came up.  Those are in my notes.  I try to use quotes.

23   Q.   Well, let's take -- let's take a look at one of your

24   notes.  If you can turn to Tab 66, could you identify what you

25   see in Tab 66, sir?

March 30, 2022

1    A.   It's in the other binder.  Give me a moment.

2    Q.   No problem.

3    A.   Okay.  Yes, this is -- these are meeting notes of mine

4    from February 10, 2015, in a meeting with Veolia.

5              MR. STERN:  Your Honor, plaintiffs seek to admit

6     Exhibit 602-43P.

7              MR. CHRISTIAN:  No objection.

8              MR. ERICKSON:  No objection.

9              THE COURT:  Okay.  It's received.

10     (Plaintiff Exhibit No. 602-43P Admitted Into Evidence.)

11    BY MR. STERN:

12    Q.   Mayor Walling, tell the jury about what these notes

13    contain and why you made them at the time this meeting

14    occurred.

15    A.   So this February 10, 2015, meeting was an update from

16    Veolia.  It was one of these meetings in the mayor's office

17    conference table.  I remember the emergency manager's office,

18    my office.  Elizabeth Murphy's office that we just mentioned,

19    we were all in that suite.

20    Q.   We just looked at Plaintiffs' 466 from February 9, 2015,

21    at 3:30 P.M.  this was the third of three documents where

22    Mr. Nicholas commented on lead.

23              Do you remember that?

24    A.   Yes.

25    Q.   Okay.  At any point in time the next day on February 10,

March 30, 2022

1  2015, did anyone from Veolia during that meeting step up and

2  say, "Lead seems to be a problem"?

3  A.   No.

4  Q.   Are you surprised, having looked at three emails that I

5  just showed you from Rob Nicholas where he indicates in various

6  ways at various times all within an hour that lead seems to be

7  a problem, that on February 10, 2015, one day later, no one,

8  not a single person from Veolia --

9           MR. CHRISTIAN:  Objection.  Argumentative.

10          THE COURT:  Overruled.  Just -- but take it down a

11  notch.

12  BY MR. STERN:

13  Q.   Are you surprised that no one from Veolia mentioned it on

14  the 10th?

15  A.   Yes.  This is an internal meeting.  This is not -- this is

16  not something where things would be fully decided.  This wasn't

17  in front of the public.  I mean, that would be the purpose of

18  this kind of meeting where you have discussions.

19          Rob Nicholas was there from Veolia.  There may have

20  been other Veolia staff that I don't recall by name.  These

21  are all important issues that we're covering here.  Talking

22  about equipment, distribution, customer service and public

23  part.

24          I remember discussions on each of these things, you

25  know, the advisory group.  These are all -- we have a whole

March 30, 2022

1752

```
1    set of problems in the water system.  And I don't see any
2    reason why if that was the discussion the day before, why
3    would that have not just been on this agenda, would have been
4    part of this meeting.
5            Even if it's still something that's under review or
6    being tested, it -- I would have wanted to know.
7    Q.   Okay.  Can you please turn to Tab 68 in your binder, sir?
8    A.   Yes.
9    Q.   Could you tell the jury what this document is.
10   A.   This is that same meeting between, you know, myself,
11   executive staff, the emergency manager, and Veolia internally
12   again in the mayor's office suite a week later.
13           So this is dated February 17, 2015.  These are my
14   handwritten meeting notes.
15           MR. STERN:  Your Honor, plaintiffs seek to introduce
16   602-43R.
17           MR. CHRISTIAN:  No objection.
18           MR. ERICKSON:  No objection.
19           THE COURT:  Okay.  It's received.
20      (Plaintiff Exhibit No. 602-43R Admitted Into Evidence.)
21   BY MR. STERN:
22   Q.   Mayor Walling, could you please tell the jury whether
23   anyone from Veolia a week later ever told you, based on what
24   you remember, that lead seems to be a problem?
25   A.   No.
```

March 30, 2022

1753

1   Q.   When it came to red, yellow water is iron and air, and

2   discolored water, higher volume of main breaks, hydrant

3   flushing, did you ever have conversations with anyone from

4   Veolia about why that was happening?

5   A.   The discolored water -- and maybe we'll look at this later

6   in the report, which is what I really paid the most attention

7   to, because that was the public document, that was the final

8   deliverable.

9        The discoloration in the water, you know, which was a

10  problem, we were getting a lot of complaints about, it was

11  described as iron in the water.  And that that was causing the

12  discoloration.

13       And that was coming from corrosion within the

14  distribution system or the service lines or household plumbing.

15  So that discolored water and corrosion was iron getting into

16  the water.

17  Q.   We've talked -- you've mentioned the word "aesthetics" or

18  I've mentioned the word "aesthetics" in questions that I've

19  asked, and you've answered so far today, and it's a word that

20  the jury has heard repeatedly.

21       Could you explain what you believe "aesthetics" to

22  mean in terms of the work that was being done and the

23  conversations that were being had with Veolia around this time?

24  A.   The aesthetics or, you know, the color, odor, smell,

25  appearance, the way the water, you know, looks, smells, tastes.

March 30, 2022

1754

```
 1   That's what I was understanding, you know, the aesthetic
 2   qualities of water.
 3            You want really good, clean, clear water.  That's
 4   what we all want when it comes out of the tap.  Maybe we'll
 5   look at this later in the report.
 6            But there's things that are direct public
 7   health-related.  And then there's things like, you know,
 8   discoloration from iron or maybe some sediment that gets into
 9   the water if there's a main break.  And the higher priority
10   would, of course, would be the health issues.
11   Q.   Okay.  Do you see in the second line you made a note that
12   says, "important topics"?
13   A.   Yes.
14   Q.   Why did you make that note?
15   A.   That note related -- that top purpose related to public
16   communications that were being discussed.  So presentations to
17   city council that are open, they're conducted under the Open
18   Meetings Act.
19            And I don't think that took a lot of the meeting
20   time, but that's what those three comments relate to, that
21   Veolia should be looking to prepare information that was for
22   the layman, you know, for your average kind of person who's
23   concerned about the water.  Comments should be short, and
24   important topics should be covered.
25   Q.   And do you think lead seems to be a problem, or if lead
```

1  was a problem, would you consider that to be an important

2  topic?

3  A.   Yes.

4  Q.   Are you aware that the following day, February 18, 2015,

5  was a public meeting that was attended by a number of people

6  including representatives from Veolia?

7  A.   Okay.  Yeah, that -- you can, refresh my time on the date.

8  But I knew there was one upcoming from this 17th meeting.

9  Q.   I'll represent to you there was a meeting that took place

10  on the 18th, and we're going to get to that in a moment.

11        Do you recall in this meeting on the 17th having a

12  discussion in preparation for the meeting on the 18th?

13  A.   Yes, yeah.  That top line was on a -- here's the general

14  game plan.  Think about your audience.  Keep it short.  Cover

15  important topics.  And then you'll see there's another -- well,

16  there was a dash with a review and then there were some of

17  those topics that were being explored.

18        Many that we've already, you know, touched on.

19  Q.   Could you please turn to Tab 52.  I apologize.  Tab 51.

20  A.   Just give me a moment.

21  Q.   No problem.

22  A.   I'm at 51.

23        MR. STERN:  Your Honor, this was previously marked as

24   Plaintiffs' 477 by way of the Gadis deposition.

25        THE COURT:  Okay.  Thank you.

March 30, 2022

1756

1    BY MR. STERN:

2    Q.   Mr. Walling, you see on page 2, I've highlighted a section

3    that appears to be an email from Joseph Nasuta at Veolia.

4              Do you see that?

5    A.   Page 2?

6    Q.   Yes, sir.  Page 2 of the document.  If you look on your

7    screen, I've highlighted it.

8    A.   Okay.  Yes.

9    Q.   And Mr. Nasuta states, "See the attached comment for Fahey

10   regarding Flint.  I think there are some issues at the corp BD

11   level on this, but he need to look at it from the technical end

12   only as we always do.  Please keep this between us.

13             "On the Flint, Michigan, project that Marvin is

14    working on, if the best technical decision is to go back to

15    the City of Detroit as its supplier, we should not be afraid

16    to make that call.  Just make sure that the politics of this

17    should not get in the way of making the best recommendation."

18             Did I read that correctly?

19   A.   Yes.

20   Q.   Did anybody from Veolia at any point in time on

21   February 13 or after come to you and say, "The best technical

22   decision is to go back to the City of Detroit"?

23   A.   No.

24   Q.   If you turn to page 1 of this document, sir, do you see it

25   says on February 13 at 1:34 P.M., there's an email from Marvin

1    Gnagy, and he states, "Nicholas giving interim PowerPoint

2    report next week on findings thus far.

3            "Later we likely will present findings of treatment

4    investigations.  That's all I've been told.  BD seems to be

5    running the show.  Not sure why?"

6            Did I read that correctly?

7    A.  Yes.

8    Q.  And then finally at the very top of this email thread, do

9    you see there's an email from Joseph Nasuta on February 13,

10   2015, at 6:47 P.M.?

11   A.  Yes.

12   Q.  And he states, "Talked with Fahey, and he made it very

13   clear the technical group needs to point out that the quickest

14   option and maybe the safest option is to return to Detroit

15   water.

16           "We can say we have not evaluated the cost impacts of

17   that option, if we have not, but we need to tell BD that this

18   is an option and quick to implement."

19           Did I read that correctly?

20   A.  Yes.

21   Q.  As of Friday, February 13, 2015, or at any point

22   thereafter, did anyone from Veolia ever make very clear to you

23   that the quickest and maybe the safest option for the people of

24   Flint was to return to the Detroit water?

25   A.  No.  I mean, what's hard for me is this is exactly where

March 30, 2022

1   we ended up in October of 2015.

2           THE COURT:  And, Mr. Stern, "BD," can you just remind

3   us.  It's been a few days.

4           MR. STERN:  I'm very sorry.  I think there's been

5   testimony thus far that the acronym "BD" stands for business

6   development.

7           THE COURT:  Okay.

8   BY MR. STERN:

9   Q.  Second paragraph of this document says, "I'm not sure what

10  documents, emails, or your role in any presentation is, but

11  please in some form, report paragraph or email best, tell BD

12  that returning to Detroit is an option.

13          "If they want to throw that out and not bring it up,

14  that is up to them.  But we need to be sure to tell them the

15  obvious.  There is a quick, easy fix to this, even if it's not

16  in the scope of work BD asked to look at."

17          Did I read that correctly?

18  A.  Yes.

19  Q.  We're going to get to the meeting in a minute with Rob

20  Nicholas and David Gadis from the 18th.

21          Do you remember that meeting?

22  A.  Yes.

23  Q.  Do you remember anybody at that meeting, either

24  Mr. Nicholas, Mr. Gadis, or Mr. Gnagy or anyone else from VNA

25  come to you or say to the public, "The quickest and possibly

March 30, 2022

1759

```
 1   the safest option for these folks in Flint is to go back to
 2   Detroit water"?
 3   A.   No.
 4   Q.   And do you see at the very bottom, Mr. Nasuta says, "Keep
 5   this in the group"?
 6   A.   Yes.
 7   Q.   And, in fact, they did keep it in the group, right?
 8        MR. CHRISTIAN:  Objection, Your Honor.  Misstates the
 9   evidence.
10        THE COURT:  Well, it does say, "Keep in the group,"
11   but I don't know if this witness knows if they kept it in the
12   group or shared it, so.
13        MR. STERN:  I'll ask it a different way.
14        THE COURT:  Okay.
15   BY MR. STERN:
16   Q.   You weren't in the group, right, sir?
17   A.   I was not.
18   Q.   And no one ever shared it with you, correct, sir?
19   A.   Correct.
20        MR. STERN:  I'm going to switch to the PowerPoint, if
21   that's okay.
22        THE COURT:  Sure.
23   BY MR. STERN:
24   Q.   You recall a meeting on February 18, 2015, Mr. Walling?
25   A.   Yes.
```

March 30, 2022                                           1760

```
 1   Q.   Tell the jury what your memory of that meeting is, please.
 2   A.   Well, this was an opportunity for, you know, the public to
 3   get an update on Veolia.  Remember we did the press conference,
 4   we said these experts were coming, they're going to give us
 5   additional information about our water system.
 6            And we had these different ways of interacting with
 7   the public and stakeholder so that this was truly a public open
 8   meeting.  And Veolia personnel were on a walking through
 9   overview, a PowerPoint along the lines of what we said.  You
10   know, keep it focused on the layman, keep it short, cover
11   important topics.
12   Q.   Do you recall whether David Gadis spoke at that meeting?
13   A.   My memory is that Mr. Gadis and Mr. Nicholas were the
14   speakers.
15   Q.   This is an excerpt from the meeting on the 18th.
16            Could you just take a look at the excerpt and then
17   tell the jury if you remember this?
18   A.   You know, I remember that kind of sentiment being
19   expressed.  I don't -- you know, I don't recall this specific
20   quote.
21   Q.   Do you remember David Gadis at some point saying, "The
22   water has come back safe"?
23   A.   Yes.
24   Q.   Do you remember Mr. Gadis at some point saying, "The water
25   is safe"?
```

March 30, 2022

1761

1    A.   Yes.

2    Q.   Do you remember Gadis at some point saying, "And to this

3    day, we can say that the water is safe"?

4    A.   Yes.  That was a theme of that meeting.

5    Q.   Do you remember Rob Nicholas saying it easily could be

6    safe?

7    A.   I remember the safe part.  Again, I don't remember these

8    specific quotes, you know.

9    Q.   We just looked at some notes from yours from the day

10   before, and you had the word "layman" in your notes.

11           Do you remember that?

12   A.   Yes, yes.

13   Q.   Do you see on this next slide, you remember a woman

14   asking, "Excuse me.  In layman's terms, when you say something

15   could be easily safe, what does that mean"?

16   A.   Yes.  Look, I've been to a lot of meetings in Flint by

17   this point.  And I know -- I know what's coming when people ask

18   questions.  So yes.  This is what somebody asks.

19   Q.   And do you remember that in response to that question in

20   laymen's terms Mr. Nicholas saying, "Well, the water's safe

21   from the standpoint of all the testing and chemicals that are

22   put in there"?

23   A.   Yes.  That's what I would have been saying to the, you

24   know, public around that time, too.  That's what I took to be

25   true.

March 30, 2022

1    Q.   Did it give you any confidence that the water was safe

2    hearing it five or six times from Veolia representatives at

3    this meeting?

4    A.   Yes.  And I didn't need to hear it multiple times.  But

5    Veolia's perspective on our water system was incredibly

6    valuable to me.  I've already shared my concerns about the

7    limited capacity that we had at the city, the fact that the

8    scope was bigger than what especially our public works director

9    had any, you know, any experience with.

10          So I was very much paying attention.  I highly valued

11    Veolia's perspective.

12    Q.   Do you remember that meeting being reported on by the

13    press?

14    A.   I'm sure it was.

15          MR. CHRISTIAN:  Objection, Your Honor.  This is

16    argument that the plaintiffs' lawyer has put up.

17          THE COURT:  Oh.

18          MR. CHRISTIAN:  That heading is not evidence.

19          MR. STERN:  I had showed these slides prior --

20          THE COURT:  Was it -- just a minute, Mr. Stern.

21          Was that part of the Gadis examination?

22          MR. STERN:  It was.

23          THE COURT:  Okay.  Well, I'll allow it.

24          MR. CHRISTIAN:  The heading was not part of the

25    examination, Your Honor.

March 30, 2022

1763

```
 1            THE COURT:  Oh, I see.  Okay.

 2            MR. STERN:  Hold on one second.

 3            THE COURT:  If you can do it without the heading.

 4            MR. STERN:  No problem.

 5            MR. CHRISTIAN:  Objection.  Before we go with this, I

 6    want to make sure this was actually in evidence, this text

 7    that's being quoted here that Mr. Stern is publishing.

 8            THE COURT:  Mr. Stern is -- should we move on?

 9            MR. STERN:  That's okay.  We'll move on.

10            THE COURT:  Okay.

11   BY MR. STERN:

12   Q.  Do you recall the press reporting on the meeting, sir?

13   A.  Yes.

14   Q.  Do you recall if the press reported that anyone at that

15   meeting represented that the water was safe?

16   A.  Yes.  I mean, that's the biggest takeaway.

17   Q.  Okay.

18            THE COURT:  Okay.  You have to take it off.

19            MR. STERN:  Apologies.

20            I found a document last evening that I'd like to just

21    share with the parties and then approach the witness with if

22    that's okay.

23            THE COURT:  Sure.

24            MR. STERN:  May I?

25   BY MR. STERN:
```

1    Q.   You recognize this document, sir?

2    A.   Yes.

3    Q.   And at the top, do you see it's addressed from Howard

4    Croft to Jerry Ambrose and then there's a few people CC'd,

5    Elizabeth Murphy who you just explained to the jury who she

6    was, Ms. Natasha Henderson who you've already described as the

7    city manager or administrator, and then it says, "Flint mayor."

8            Is that you, sir?

9    A.   Yes.  That's me in, I think, Howard's contact list.

10           MR. STERN:  Your Honor, we seek to introduce as

11    Plaintiffs' Exhibit 1318, this email.

12           THE COURT:  Any objection, Mr. Christian?

13           MR. CHRISTIAN:  Is this on the exhibit list?

14           MR. STERN:  Yes.

15           MR. CHRISTIAN:  No objection, Your Honor.

16           MR. ERICKSON:  No objection.

17           THE COURT:  Okay.  Then it's received.

18      (Plaintiff Exhibit No. 1318 Admitted Into Evidence.)

19    BY MR. STERN:

20    Q.   And there at the top, you see the email from Mr. Croft, as

21    well as yourself and a number of other people, correct?

22    A.   Yes.

23    Q.   And Mr. Croft says to you -- and this is on the 24th of

24    February, correct, sir?

25    A.   Yes.

```
 1    Q.   This is sometime between the public meeting on the 18th
 2    and the day that the report came out on March 12, correct?
 3    A.   The report came out what date?
 4    Q.   March 12.  We'll get to it.  But I'll represent to you it
 5    was March 12, 2015.
 6    A.   Yes.  This is February 24.  In between those two dates.
 7    Q.   And according to Mr. Croft, he states, "I just spoke with
 8    Rob from Veolia, and his exact statement is that, quote" --
 9    sorry -- "is that the city, quote, 'Does not have a water issue
10    but a political issue.'"
11           Do you see that, sir?
12    A.   Yes.
13    Q.   When you received this email, do you recall what you felt
14    at that time?
15    A.   Yes.  And --
16           MR. CHRISTIAN:  Objection.  Relevance.
17           THE COURT:  Sustained.
18           What did you do --
19           MR. STERN:  I can ask -- I can ask it differently.
20           THE COURT:  Ask a different question, yeah.
21    BY MR. STERN:
22    Q.   When you received this email, did you have even more
23    comfort that safety wasn't an issue with the water?
24           MR. CHRISTIAN:  Objection.  Relevance.
25           THE COURT:  No, that's relevant.  So but just ask a
```

1   direct question.

2          What was your response to this message?

3          THE WITNESS:  Well, I took issue with the political

4   part.  Because that -- for me, again, like I stated, I didn't

5   need political advice from Veolia.  I wasn't surprised that

6   they found Flint politics difficult.  That's pretty obvious to

7   those of us who have experienced it.

8          But then it goes on to cover the kinds of things we

9   had been discussing in those private meetings.  And I was

10  pleased to see that alignment around the technical

11  recommendations.

12         I figured this was just kind of somebody who was a

13  little bit surprised by our politics, and I could bracket

14  that.

15         I really wanted to know Veolia's perspective on the

16  technical water issues.

17         THE COURT:  Okay.

18  BY MR. STERN:

19  Q.  Does it surprise you, sitting here today, that

20  Mr. Nicholas said that it was not a water problem but a

21  political issue in light of --

22         MR. CHRISTIAN:  Objection.  Relevance.

23         MR. STERN:  I didn't even finish my question.

24         THE COURT:  Yeah.  Overruled.

25  BY MR. STERN:

March 30, 2022

1    Q.   Does it surprise you, sitting here today, that

2    Mr. Nicholas said that it was not a water problem but a

3    political issue in light of the three emails that I showed you

4    a few minutes ago where he indicated that lead seems to be a

5    problem?

6    A.   Yes.  And I don't think I exactly took it that way.  I

7    mean, we all knew we had water problems.  I think he was just

8    maybe taken aback by the politics.

9         But that's -- you know, other than the way somebody

10   feels when they're tough -- in a really tough public

11   environment, and maybe they feel like they don't get kind of

12   respected or treated the way that they should, and maybe it

13   shouldn't have gone as far in some cases in terms of the

14   residents' frustration.

15        But residents had a lot of frustrations, and they had

16   a lot of questions.  So this isn't an either or.  I mean, we

17   knew we had water issues.

18        So, again, I certainly can't speak to Mr. Nicholas's

19   mindset, but that's how I took it.  I was focused on the

20   technical content that followed that statement.

21   Q.   Can you turn -- please turn to Tab 91 in your second

22   binder.

23   A.   91?

24   Q.   Yes, sir.

25   A.   Yes.

March 30, 2022

```
 1   Q.   Do you recognize this document, sir?
 2   A.   Yes.  This is a letter that I wrote and submitted to the
 3   director of intergovernmental affairs, the White House
 4   Executive Office of the President.
 5           MR. STERN:  Your Honor, we seek to admit into
 6    evidence Plaintiffs' Exhibit 0621.
 7           MR. CHRISTIAN:  No objection.
 8           MR. ERICKSON:  No objection.
 9           THE COURT:  Okay.  It's received.
10     (Plaintiff Exhibit No. 0621 Admitted Into Evidence.)
11   BY MR. STERN:
12   Q.   Mr. Walling, you'll see at the top left corner is the
13   mayor logo?
14   A.   Yes.  And you can see I left off the emergency manager on
15   this one.
16   Q.   Okay.  This letter is from Jerry Abramson.
17           Who's Jerry Abramson?
18   A.   So Mr. Abramson was the Director of Intergovernmental
19   Affairs.  That's one office within the executive office of the
20   president, President Barack Obama at the time.  And this was an
21   office that I had had, you know, contact with as a mayor of a,
22   you know, important American city.
23   Q.   At the very bottom of this letter, you state, "I welcome
24   any technical assistance you are able to coordinate, including
25   expertise on water quality and public health, best practices
```

March 30, 2022

1769

1    with water treatment, and improving distribution system

2    infrastructure.

3            "Thank you again for the valuable partnership.  I

4    look forward to working with you and federal partners as we

5    transform Flint into a sustainable 21st century city with new

6    jobs, safe neighborhoods, strong infrastructure, and great

7    schools."

8            Do you see that?

9    A.   Yes.

10   Q.   What was the purpose of sending this letter on

11   February 23, 2015?

12   A.   The purpose was to elevate this issue.  So as I described

13   before in my call with Governor Snyder, I felt that, you know,

14   regardless of who reported to who at the city or city

15   administrator or emergency manager, that I had a responsibility

16   as an elected official to communicate with other elected

17   officials as what I saw as the challenges in Flint.

18           This is not the first time I had interaction with

19   this office.  We had it around public safety, around economic

20   development.  So now I'm laying out -- because a letter also

21   serves as a way to, you know, communicate so that people can

22   refer back to it.  I laid out my concerns.  I laid out what was

23   occurring in the city.

24           And I'm specifically in this letter asking for

25   support from the White House and the Environmental Protection

March 30, 2022

1770

```
 1   Agency to serve on the City of Flint's Technical Advisory Water
 2   Committee.
 3           And that had been one committee that was set up to
 4   help us look at these different issues, that Veolia and LAN and
 5   city public work staff and others from Michigan Department of
 6   Environmental Quality, county public health.
 7           So I was now specifically asking for someone to be
 8   assigned to work with that committee.  You know, not just, "We
 9   need you to know about these issues," but there's a specific
10   request for someone to add this to their probably already
11   really long list of responsibilities for the Federal
12   Government.
13   Q.   Could you please turn to Tab 93.
14   A.   Yes.
15   Q.   Do you recognize this document, sir?
16   A.   Yes.
17           MR. STERN:  Your Honor, this was previously admitted
18    as Plaintiffs' 0609.
19           THE COURT:  Thank you.
20   BY MR. STERN:
21   Q.   You see that this is the Veolia water quality report, sir?
22   A.   Yes.
23   Q.   Take a look at the report, if you don't mind.
24           You had seen this report when it was issued, correct?
25   A.   Yes.  And I had also seen a very similar draft.
```

March 30, 2022

```
1    Q.  If you can turn to -- sorry about that.
2             If you could turn to page 5 of the report.
3    A.  Yes.
4    Q.  I've got it on your screen, as well.  You see this is
5    under -- if you look at page 4, actually, it says, "Veolia's
6    recommendations."
7             Do you see that at the very top?
8    A.  Yes.
9    Q.  Then if you turn to page 5, it says, "corrosion control."
10   That is point 1, 2, 3, 4, 5, 6, 7.
11            It's the 8th bullet point under Veolia's
12   recommendations.
13            Do you see that?
14   A.  Yes.
15   Q.  Before we even talk about this paragraph, did you have an
16   understanding during the period of time between February 4,
17   2015, and the date of this report, March 12, 2015, did you
18   understand what corrosion control was, what it was for, and why
19   it might be used?
20   A.  I understood we had a corrosion -- we had corrosion
21   problems or concerns in our city water system.  And that was
22   what was contributing to the discoloration, the odor, the
23   color, the lead that was mentioned -- I'm sorry.  I just
24   misspoke.
25            The iron that was mentioned before.
```

March 30, 2022

1    Q.   Other than the discoloration, the color, the odor, and the

2    iron, did anyone from Veolia when discussing corrosion with you

3    personally ever raise the issue of lead or lead poisoning?

4    A.   No.

5    Q.   What was the context of any conversation you may have had

6    or been a part of when Veolia, if they did ever mention the

7    word "corrosion"?

8    A.   Well, it's exactly what's here.  It's way to minimize the

9    amount of discolored water, that it won't go away, it has the

10   number of water breaks.  I mean, broken valves, hydrant

11   flushing.  Those were all in the notes that we've seen.

12          So those things had been discussed.  So this -- you

13   know, this was what I understood our corrosion problems to be.

14   In this -- summarized in this paragraph.

15   Q.   If you can turn to page 9, sir.

16          You see at the top of page 9, it says, "Conclusions

17   and next steps."

18   A.   Yes.

19   Q.   And you see box 2, which is highlighted on your screen

20   says, "Contract with your engineer and initiate discussions

21   with the state on the addition of a corrosion control chemical.

22          "This action can be submitted and with the state at

23   the same time as the other chemical and filter changes saving

24   time and effort.  A target dosage of .5mgs per L phosphate is

25   suggested for improved corrosion control."

March 30, 2022

1    Did I read that correctly.

2   A.   Yes.

3   Q.   When you read this report in March of 2015, what was your

4   understanding as to why this recommendation was being made?

5   A.   Oh, I understood the corrosion issues were around, you

6   know, the discolored water.  The old, you know, iron pipes.

7   Q.   Anything in this report that you see now or you remember

8   then that ties corrosion, corrosion control issues to lead and

9   lead poisoning issues?

10  A.   I don't recall anything about lead.

11  Q.   I mean, do you remember if the word "lead" even appears in

12  this report?

13  A.   Well, I do know that it doesn't.  Because -- I'm sorry.

14  But I mentioned before when I was reading that email that that

15  was exactly where the Technical Advisory Committee ended up in

16  October of 2015.

17       And during that fall period as these concerns were

18  coming to light because of the independent research of Dr. Marc

19  Edwards and then Dr. Mona Hanna-Attisha, I thought maybe I had

20  missed something in the Veolia report.

21       I went back.  I read it backwards.  I wanted to know,

22  you know, where was lead in here.  How did this get missed?

23  And it's not there.  I thought, "Well, could it have somehow

24  been in the draft report, like was there some -- was there

25  some meddling that took place?"

March 30, 2022

```
 1              I read the draft report the same way.  And lead is
 2    not mentioned.  It wasn't in my notes.  Wasn't in the
 3    PowerPoint.  I had that PowerPoint slide.  So, I mean, this is
 4    a gigantic omission.
 5              MR. CHRISTIAN:  Is there a pending question, Your
 6    Honor?
 7              THE COURT:  There was.  It was whether there was lead
 8    in the report, mentioned in the report, and he provided his
 9    answer.
10              MR. CHRISTIAN:  Okay.
11              MR. STERN:  Thank you.
12    BY MR. STERN:
13    Q.  Mayor Walling, could you turn to page 11, please?  At the
14    top of page 11, it says, "results expected."
15              Do you see that, sir?
16    A.  I see it on the screen.  Let me get to also the tab.
17    Q.  It's not -- it's not a tab.  I'm sorry.
18    A.  Oh, page 11.
19    Q.  I apologize.  I'm sure it was me.
20    A.  Give me a moment to go back.  I'm just thinking about
21    these binders.
22              Which tab is the report, please?
23    Q.  93.
24    A.  93.  Page 11?
25    Q.  Yeah.
```

March 30, 2022

1775

1    A.    Okay.

2    Q.    See it says at the top, "results expected"?

3    A.    Yes.

4    Q.    And then down about three bullet -- in fact, three bullet

5    points down from "results expected," it says, "Discolored

6    water.  The discolored water is caused by the old unlined cast

7    iron pipe.

8          "The water from the plant can have an impact on

9    discolored water.  But a greater concern is the breaks and

10   construction work that can disrupt the flow of water causing

11   discoloration.

12         "A polyphosphate is suggested to help bind the old

13   cast iron pipe reducing instances of discolored water.  This

14   along with improve flow of water and programmed hydrant

15   flushing will help but will not eliminate discolored water

16   occurrences."

17         Did I read that correctly?

18   A.    Yes.

19   Q.    And does this confirm your memory about this report and

20   what the addition of corrosion control was that you believed to

21   be at the time?

22   A.    Yes.  I took what was in this report very, very seriously

23   that, you know, that that informed my understanding.  And then

24   that was the sort of thing that I would explain to citizens

25   when they asked me.

```
 1          You know, you want to be able to -- I mean, I
 2   appreciated what I thought was the honesty here, that you can
 3   make these improvements.  It doesn't mean a problem's going to
 4   totally go away.
 5          You know, but you want to be able to tell people what
 6   you're working on and how it will, at least, make it better.
 7          So that given a lot of our underground pipes were 50,
 8    60, 70, you know, 90 years old, that made since to me.
 9   Q.   You mentioned earlier in one of your answers to one of my
10   questions that in October of 2015, the City of Flint ultimately
11   switched back to the DWSD.
12          Do you recall saying that?
13   A.   Yes.
14   Q.   Between the report on March 12, 2015, and when the city
15   switched back in October 2015, what do you remember about that
16   period of time?
17   A.   Could you be more specific?  That's --
18   Q.   Sure.
19   A.   We'd be here for a long time.
20   Q.   Well, we've got a report -- we've got a report from Veolia
21   that we just looked at.  You were at a public meeting with
22   Veolia a few weeks earlier where they said the water --
23          MR. CHRISTIAN:  Objection, Your Honor.  He's
24    testifying again.
25          MR. STERN:  I'm trying --
```

```
 1              THE COURT:  Well, just see if you can ask a question
 2      that will sort of narrow.
 3      BY MR. STERN:
 4      Q.   What precipitated the change back to the drinking water?
 5              THE COURT:  There you go.
 6              THE WITNESS:  So Dr. Marc Edwards's research that he
 7      was coordinating out of Virginia Tech with people, with
 8      households, you know, citizens, scientists in Flint, he was
 9      challenging the notion that the -- you know, that the water
10      was safe, that the water was being tested properly under the
11      Michigan Department of Environmental Quality and City of Flint
12      standards or protocols.
13              And as I was told by Dr. Mona Hanna-Attisha in our
14      meeting with the Greater Flint Health Coalition, that his
15      research prompted her as a pediatrician to then ask, "Well, if
16      this lead risk in the water is actually affecting Flint's
17      especially, you know, youngest children," you know, being a
18      pediatrician.
19              So Dr. Mark Edwards's work prompted Mona
20      Hanna-Attisha as she told me in that meeting to then spend a
21      few sleepless weeks going through the data that she had access
22      to through our public hospital, Hurley Hospital, to see what
23      the results of blood lead level testing was among, you know,
24      young children, especially those on Medicaid.
25              So it was her research that was presented to me and
```

March 30, 2022                                                    1778

1    others the end of September of 2015 that prompted me to

2    rethink the more incremental approach that we had been taking

3    in Flint to making, you know, this improvement and then that

4    improvement to try to solve these problems.

5            So I'm sorry, but this is very important to me.

6            At the time we did not have an emergency manager.  We

7    had a transition advisory board that had to approve all of the

8    city's expenditures after the city council approved all of

9    those expenditures.

10           And the only way that a resolution could get to the

11   city council at that time under an emergency manager order

12   that remained in effect was for the city administrator to send

13   that resolution.

14           So I appealed to City Administrator Natasha

15   Henderson, as well as Michigan Department of Treasury

16   officials who were ultimately supporting the transition

17   advisory board that the City of Flint, despite the cost, had

18   to go back to the Detroit Water and Sewerage District for its

19   at least short-term water supply.

20           We needed to leave the Flint River and the Flint

21   Water Treatment Plant at that time.

22           And because of the sensitive nature of this issue,

23   the high profile nature of this issue, I knew that

24   Governor Snyder himself would be involved in this decision.

25           And reached out to him also directly through the

1    Michigan Department of Environmental Quality Director Dan

2    Wyant to begin discussing how we could pay what we would need

3    to, money we effectively didn't have but we would find

4    somehow, and started that conversation.

5            And I know that sounds complicated.  But that was the

6    reality of decisionmaking in the City of Flint.  This was not

7    something -- I couldn't go and flip the switch back, you know,

8    by myself.

9            This was going to take a coordinated effort with the

10   city administrator, the city council, the transition advisory

11   board, which is all staffed and directed by the governor,

12   ultimately.

13           And we'd have to find what I believe we determined in

14   negotiations with Detroit would be $9 million.  The city

15   contributed to that.  The state legislature -- so the approved

16   funds.  Because the governor also can't spend that kind of

17   money by himself.

18           And the CS Mott Foundation was a part of those

19   negotiations.

20           And I'll just say this, because I mentioned this

21   before.  The one provision that Governor Snyder had was that

22   the Technical Advisory Committee needed to meet and needed to

23   affirm that direction.

24           That, yes, myself, the city administrator, the city

25   council, we were, you know, significant voices in this.  But

March 30, 2022

1780

1   the governor said in order for the support to be there,

2   effectively meaning for the transition advisory board to

3   legally permit the city to spend this money as it was being

4   negotiated to be available, that the Technical Advisory

5   Committee would need to meet.

6           It would need to affirm this direction of switching

7   to Detroit.  And that is what occurred in October.

8           And before I left office, I was defeated in what

9   would have been my second reelection there in early November,

10  I was able to announce that Detroit water was back and flowing

11  and through the city's -- beginning to go through the city's

12  distribution system.

13  Q.  You just mentioned a lot of things that had to happen

14  between the time the decision was made to go back to DWSD and

15  when that actually happened.

16          If someone would have suggested to the jury at any

17  point in time that it took one day to switch back to the DWSD,

18  would that be accurate?

19          MR. CHRISTIAN:  Objection, Your Honor.

20          THE COURT:  Just did it -- would it have taken just

21  one day?

22          THE WITNESS:  It took a few weeks.  We did both the

23  formal decisionmaking, including the resolutions to take those

24  actions.

25          And there was a technical process which I was, you

March 30, 2022

```
 1   know, I was updated on.  I couldn't tell you the details, but
 2   I believe that took even itself, you know, approximately a
 3   week or so.
 4           So it was a very, very collaborative effort between
 5   the City of Flint, the Genesee County Drain Commissioner's
 6   Office and the Detroit Water and Sewerage District.
 7           Very, very effective collaborative process over what
 8   I think was about a week.  Because that transmission line had
 9   not been -- at least a portion of that transmission line had
10   not been used for a period of time.
11           So it was going to have to be tested in and of itself
12   before it could be released into the -- you know, the public
13   distribution system.
14   BY MR. STERN:
15   Q.   If you would please turn to Tab 74.
16           Do you recognize this document, sir?
17   A.   Yes.  These are my notes that I was making for myself in
18   preparing to go on a weekly radio show, a Saturday morning
19   radio show on the local channel WFLT, a faith-based Christian
20   radio show that did quite a bit of kind of public and community
21   affairs shows, as well.
22           MR. STERN:  Your Honor, plaintiffs seek to admit into
23   evidence Exhibit 602-43X.
24           MR. CHRISTIAN:  No objection.
25           MR. ERICKSON:  No objection.
```

March 30, 2022

1782

```
 1          THE COURT:  Okay.  It's received.
 2      (Plaintiff Exhibit No. 602-43X Admitted Into Evidence.)
 3   BY MR. STERN:
 4   Q.  Mayor Walling, I've made a habit of reading your notes to
 5   you.  In this instance, it's a little bit difficult for me to
 6   read these notes.
 7          Would you mind reading to the jury what you noted
 8   here?
 9          MR. CHRISTIAN:  Your Honor, may I ask -- just want to
10   clarify the timeframe before -- the time of the notes, the
11   date of the notes.
12          THE COURT:  Yeah, I'm not clear exactly when the
13   notes were created.
14          Do you know?
15          THE WITNESS:  This was on the latter half of October
16   2015.
17          THE COURT:  Okay.  So even though it says 9-6 to
18   7-15, is -- that might be a -- I don't know what that is.
19          THE WITNESS:  That was something -- that was
20   something else.  You can see this is -- these are really,
21   like, personal notes in my pocket.  So I've got things going
22   some different ways.  This is not a meeting.
23          THE COURT:  But your testimony is this was October
24   2015?
25          THE WITNESS:  Yes.
```

1    THE COURT:  Does that satisfy you, Mr. Christian?

2    MR. CHRISTIAN:  Yes.  Thank you.

3    THE COURT:  Okay.  Thank you.  So he's reading them

4  to himself.

5  BY MR. STERN:

6  Q.  It's -- I'm going to read it.  I'm going to read it, and

7  you tell me if I read it correctly.

8    THE COURT:  I think he --

9    THE WITNESS:  Yeah, I was just still -- are we

10  proceeding?

11    MR. STERN:  Yes, please.

12    THE COURT:  Do you want to read it out loud, or do

13  you want to read it to yourself?

14    THE WITNESS:  I can read it out loud.

15    THE COURT:  Okay.

16    MR. STERN:  The only reason I ask is it's very

17  difficult to read, and just putting it up -- I'd like for him

18  to be able to tell the jury what it says.

19    THE COURT:  Yeah, me, too.

20    THE WITNESS:  So, again, so these are my notes going

21  into a radio show pretty widely listened to in the Flint

22  community.  And so it's for a Saturday morning.

23    And I think you're not surprised -- it's not so much

24  kind of pertinent here.  But the politics around this and

25  people blaming different people is occurring.  That's what

March 30, 2022

1784

1     happens when there's a great deal of frustration.

2          I was in the mayor's seat.  I was running for

3     reelection.  And maybe you'll agree with me that there are

4     some criticisms of people that were making of me that I would

5     have taken as fair.

6          And there were probably some criticisms that people

7     were making of me that I thought were unfair or

8     mischaracterizing, you know, my life, my choices, the

9     decisions I made, and why I made them.

10         So this was coming at the tail end of that campaign.

11    I very much want to serve another term as mayor.  I want to be

12    able to see, you know, this work get done.  And I want to

13    continue to be a part of it to help fix these problems.

14         So this is what I was writing to myself and very

15    similar then to what I said that morning.

16         "It hurts me, a man of compassion, not putting

17    people's lives at risk but working hard with people who can

18    get it fixed.  The Flint River, lead, costs.  I won't turn my

19    head.  For those who have lived in Flint, we have an old

20    infrastructure.  Need to correct it.

21         "Poisoning people and taking life , it hurts me to

22    think some would think that and depict me.  It is so removed

23    from me as a man, a father, a Christian, and a mayor."

24         And then those other notes were just kind of things I

25    had made for the conversation.  This was like my opening to

1   that show that I knew would then cover, you know, these topics

2    and more.

3   BY MR. STERN:

4   Q.   And who's Donna, sir?

5   A.   Donna Poplar was a friend, an advisor.  She had also

6   served as the city's director of human resources during that

7   first term when I had the authority to appoint individuals to

8   those positions.

9   Q.   And when it says, "Donna - Comes a time when you have to

10  take off mayor hat and put on human hat, that is what will get

11  you through."

12       Were those notes what you made because you thought

13  that, or were those your notes that you made because Donna said

14  that?

15  A.   Well, Donna did say them.  But I wrote them down.  I mean,

16  she probably told me 15 things.  But this was the one that I

17  felt like, "Well, that really puts a finger on it.  That's

18  where the public is at."

19       And you know -- you know, I lost that second

20  reelection.  Dr. -- Mayor Dr. Karen Weaver carried that torch

21  in her vocal advocacy, the kind of position she staked out in

22  the campaign, you know, were what ultimately a majority of

23  Flint voters gravitated towards.

24       But this was -- you know, my thinking.  This was who

25  I was.  This was how I had tried to lead.  And I wanted to put

March 30, 2022

1786

1    that case before the Flint public as they were making this

2    decision about who the next mayor was going to be.

3    Q.   Mayor Walling, I'm going to conclude with this.

4           Do you know that as part of this case that Veolia and

5    LAN are blaming you personally --

6           MR. CHRISTIAN:  Objection, Your Honor.  This is

7     argument and testimony.

8           THE COURT:  Sustained.

9    BY MR. STERN:

10   Q.   Mayor Walling, let me ask you this.

11          You are the former mayor of the City of Flint, and

12   you were the chairman of the KWA board, right?

13   A.   Yes.

14   Q.   You were in office from August 6, 2009, through

15   November 3, 2015, correct?

16   A.   A couple of days after November 3.  In Flint, a regular

17   election, you get elected on a Tuesday.  And the next mayor

18   comes in the following Monday.  So just a couple more days.

19   Q.   What would you -- how would you react if someone claimed

20   that you were a strong proponent of the KWA and chairperson of

21   the KWA for your own personal political gain?

22   A.   I would dispute that.  I worked very hard to make

23   decisions I thought were in the best interest of the Flint

24   community.  There often comes a time as mayor where you do --

25   you pick one side or the other.

```
 1              You say, "I'm supporting this approach," or "I'm not
 2      supporting this approach."  I supported the KWA, you know,
 3      after those analyses.  I still think the KWA was a good
 4      project.  The rest of the county is using that water -- using
 5      that water today.
 6      Q.  What would you say if someone said that, "Prior to the
 7      change in source of drinking water from Lake Huron,
 8      Mayor Walling was aware of the potential dangers of using the
 9      Flint River as an interim water source"?
10      A.  I think it's fair that I knew there were concerns and
11      issues.  That's why there was a process.  I mean, it was months
12      of work that was undertaken.
13              And my understanding from director of public works,
14      from the emergency manager at the time, that the city's water
15      at the treatment plant was meeting all the standards.
16              And, in fact, it would not be allowed to be
17      distributed by the Michigan Department of Environmental Quality
18      until those standards were met.  That's why I said what I said
19      at the time.
20              I mean, the Michigan Department of Environmental
21      Quality is not just regulating the water in Flint.  They're
22      regulating the water across the whole state through these
23      municipal systems.  They're regulating the Detroit Water and
24      Sewerage District.
25              So I -- yeah, of course, there were concerns, and
```

March 30, 2022

1788

```
 1    there were issues.  That's why there was a process.  But the
 2    water doesn't get turned on until it's met those standards.
 3            And then subsequent to that, we've spent this time
 4    talking about the different issues that were identified, the
 5    different steps that were taken.
 6            And I tried my best at whatever authority or
 7    influence or opportunity I had to try to advocate for what I
 8    understood would be the best solution at those -- at those
 9    different times.
10            I mean, that's why I ultimately said to the city
11    administrative before a meeting with treasury officials.  We
12    did a weekly, like, call on key issues.  I said, "We need to
13    go in there and make the case in October of 2015 to switch
14    back to Detroit."
15            And that was a major difference in what I had been
16    saying, what I had been working on for those prior months.
17    But that was my -- that was my conviction at that time.
18            I didn't know, frankly, if it was going to work.  I
19    didn't know who would support that and who wouldn't.  But I
20    just felt like, yeah, look at what we know.  This incremental
21    approach is taking too long.  It's probably been tried for too
22    long.
23            I mean, I very much, you know, practically every day
24    I think about what I could have done differently, you know.
25            What if I had personally sat down with LeeAnne
```

```
 1    Walters?  Would I have somehow figured something out?  There
 2    are these points.  You've shown me emails that I haven't seen.
 3    Some of those, I believe, came up in my deposition.
 4         So I ask myself that every day.  So, I mean, yeah, if
 5    somebody wants to say did I know there were concerns or
 6    issues?  Yeah, I sure did.  That's what I -- that's what I was
 7    working on.  And that's what I continued to reflect on and try
 8    to learn from practically every day since.
 9    Q.  And it was safety of the water that ultimately led to you
10    that conclusion, sir?
11    A.  Yes.  It was the knowledge that we had children in Flint
12    who had lead poisoning.  And that was discovered by a
13    pediatrician who did research that was prompted by someone, by
14    doctor and engineer who was concerned about lead in the water.
15         So, I mean, none of this happened immediately.  You
16    know, Dr. Mona Hanna-Attisha will tell you she wanted me to
17    walk out of that first meeting committed to switching back to
18    Detroit.
19         MR. CHRISTIAN:  Objection, Your Honor.  I believe we
20    have some hearsay here.
21         THE COURT:  Okay.  Sustained.
22    BY MR. STERN:
23    Q.  One last question, Mr. Mayor.
24         If it was safety in September, October 2014 that led
25    you to the conclusion to switch back to Detroit, do you believe
```

March 30, 2022

1790

 1    you would have come to the same conclusion in February or March

 2    of 2015 if you believed that there was a risk to safety of the

 3    community in Flint?

 4            MR. CHRISTIAN:  Objection, Your Honor.

 5            THE COURT:  That's overruled.

 6            THE WITNESS:  Yes.  I know I would have taken it very

 7    seriously.  I've gone through these complexities in

 8    decisionmaking.  Because that was the reality of being a mayor

 9    at this time, a city in this situation.

10            So there would have been a consideration process.

11    But I can guarantee you that if there was lead in the Veolia

12    report, it would have made a difference.  So many other things

13    on that list made a difference.

14            We didn't talk about the carbon filters.  That was

15    more than a million dollar capital investment.  It was on that

16    list, because that was related to public health and TTHMs.  So

17    it would have made a difference.  It certainly would have

18    taken different steps.

19            But that Technical Advisory Committee could have had

20    that discussion in March and not in October.

21            MR. STERN:  Your Honor, this would be a good time for

22    a break, and I'll review my notes and determine if there's

23    anything else.

24            THE COURT:  Okay.  All right.  Good.  Well, we'll

25    take about a 15-minute break.  And thank you.  I just lost my

```
1    mask altogether.  That's bad.  I've got another one.  So
2    please rise for the jury.
3                           (Jury Out)
4            THE COURT:  Please be seated.
5            Oh, you can step down, Mr. Walling, and take a break.
6    And then there will be either a few more questions or
7    cross-examination after the break.
8            I just wanted to draw your attention to two exhibits
9    that I think we need to resolve whether they're admitted.
10   Plaintiffs' Exhibit 460.
11           Mr. Campbell had said you wanted to review some
12   attachments and determine if those should be excluded or
13   admitted.
14           MR. CAMPBELL:  Yes, Your Honor.  I had asked that it
15   be reviewed.  If it was, I forgot to pick it up this morning.
16   And what the issue is, it's a list of capital projects or
17   ongoing projects that I think VNA had.
18           And it was the exhibit that had the prediction of a
19   million dollars of revenue.  But there's all kinds of other --
20   so I will -- I'll get to that.
21           THE COURT:  Okay.
22           MR. CAMPBELL:  I'm sorry.  I should have done it
23   before.
24           MR. STERN:  If you don't mind, which exhibit number
25   is that?
```

March 30, 2022

1792

```
1           THE COURT:  460.

2           MR. STERN:  Thank you.  Sorry.

3           THE COURT:  And then I think that, Mr. Stern, you did

4    not move for the admission of Plaintiffs' Exhibit 3618.  And I

5    don't actually recall what it was.  Oh, it was the photo.

6           MR. MAIMON:  Those were the photos.

7           THE COURT:  The photos, that's right.

8           MR. STERN:  I seek to admit them now.

9           THE COURT:  Mr. Christian?

10          MR. CHRISTIAN:  Just one question I want to ask is.

11   The source of the photos, Your Honor, if we might know.

12          MR. STERN:  Well, he --

13          MR. CHRISTIAN:  I just asked the source of the

14   photos.

15          THE COURT:  Can you take your -- I'm having a hard

16   time.  There you go.

17          MR. CHRISTIAN:  The source of the photos, Your Honor.

18          THE COURT:  Got it.  Okay.

19          MR. STERN:  I believe the source of those photos were

20   from an MLive article.  They were included in our original

21   pretrial order.

22          THE COURT:  Yes.

23          MR. STERN:  So there's no objections that are

24   possible now as to foundation.

25          And Mr. Walling identified everybody in the photos
```

 1  including himself.

 2          MR. CHRISTIAN:  I just needed the answer to where

 3  they were from.

 4          THE COURT:  That would be the answer.

 5          MR. CHRISTIAN:  No objection, Your Honor.

 6          THE COURT:  Okay.  Terrific.

 7          Mr. Erickson.

 8          MR. ERICKSON:  Your Honor, I guess we would -- we

 9  don't object.  But we would reserve the right to admit the

10  MLive article that they came from.

11          THE COURT:  Okay.

12          MR. STERN:  Happy -- happy --

13          MR. MAIMON:  We'll take a look at it and see if it's

14  admissible.

15          THE COURT:  We can't hear you.

16          MR. STERN:  We'll take a look to determine its

17  admissibility.  But that's fine if there was --

18          THE COURT:  Okay.  But for now, the 3618, the photos

19  are admitted.

20    (Plaintiff Exhibit No. 3618 Admitted Into Evidence.)

21          THE COURT:  And we'll wait to hear back from VNA on

22  Plaintiffs' Exhibit 460 and whether there are attachments that

23  aren't relevant to our case.

24          MR. STERN:  I have one other exhibit issue, Judge.

25          THE COURT:  Oh, what is that?

March 30, 2022

1794

```
 1           MR. STERN:  When it came to Tab 93, which was the VNA
 2    report, I had stated that it was previously admitted as
 3    Exhibit 609, but it was actually previously admitted as 46.
 4           THE COURT:  Okay.  Any contradiction to that in your
 5    records?  Mr. Christian?
 6           MR. CHRISTIAN:  We'll check.  We can check during the
 7    break and come back to you.
 8           MR. STERN:  It was certainly admitted.  I just think
 9    it was under 46.
10           THE COURT:  Okay.  Good.  All right.  Then we'll take
11    a break.
12           UNIDENTIFIED PERSON:  15 minutes from now, Your
13    Honor?
14           THE COURT:  Yes.  Thank you for clarifying that.
15                        (Brief Recess)
16           THE COURT:  All right.  Well, we'll get the jury.
17           So the two issues I have that we'll need to discuss
18    later today is I think counsel was going to talk about the
19    schedule going forward in our case.
20           Is there anything to report there?
21           MR. STERN:  I think we were just -- there's a few
22    dates that we would need off based on personal commitments.
23    And I know Your Honor has previously mentioned we should
24    discuss that.
25           THE COURT:  Yeah.
```

March 30, 2022

1795

```
 1            MR. STERN:  So it wasn't in the realm of what
 2    Mr. Mason had talked about last week.
 3            THE COURT:  No, just generally.
 4            MR. STERN:  I'm not sure -- Mr. Maimon normally
 5    communicates directly with the other side.  So I'm not sure if
 6    those conversations occurred.
 7            THE COURT:  We'll find out later.  And then the issue
 8    of the video testimony.
 9            Mr. Walling, are the city council meetings back in
10    person now?
11            THE WITNESS:  Yes.
12            THE COURT:  Oh, good.  Are they there?  There we go.
13            THE CLERK:  All rise for the jury.
14                           (Jury In)
15            THE COURT:  Okay.  Welcome back to the jury.
16            Please be seated.
17            And, Mr. Stern, have you completed your examination?
18            MR. STERN:  Mayor Walling, thank you for your time.
19            And, Your Honor, I pass the witness.
20            THE COURT:  Okay.  Now, what we'll do is go to VNA's
21    opportunity to cross-examine this witness.
22            MR. CHRISTIAN:  And we're just going to distribute
23    some exhibits, Your Honor, for the parties and for Your Honor.
24            THE COURT:  Sure.
25            MR. STERN:  I'm fine.  Thank you.
```

March 30, 2022

```
1              THE COURT:  Did you hit your head?

2              MR. STERN:  They just hit me in the head with the

3   box.

4              MR. MAIMON:  He'll be okay.

5              MR. STERN:  I'm fine.

6              MR. MAIMON:  That, you should strike.

7              MR. CHRISTIAN:  May I approach the witness, Your

8   Honor, and the bench?

9              THE WITNESS:  Counsel, might I also need these?

10             MR. CHRISTIAN:  Not initially.

11             THE WITNESS:  Okay.

12             THE COURT:  Can -- Mr. Christian, can you take

13  those --

14             MR. STERN:  I'll take the two that we --

15             THE WITNESS:  That would be helpful.  It's a lot to

16  manage up here.

17             MR. STERN:  Your Honor, would it be okay here if I

18  left them here for redirect?

19             THE COURT:  Oh, sure.

20             MR. CHRISTIAN:  So first, may I proceed, Your Honor?

21             THE COURT:  Yes.

22                          CROSS-EXAMINATION

23  BY MR. CHRISTIAN:

24  Q.  So good morning, Mr. Walling.

25             So first of all, I'd just like to -- you have a few
```

```
 1    titles that I can call you by.  It could be Mr. Walling, Mayor
 2    Walling, or Professor Walling.
 3              Is there one that you prefer?
 4    A.  I actually would prefer simply Mr. Walling.  I, of course,
 5    did hold that position of mayor.  But we -- you know, we have a
 6    mayor in Flint right now.  So Mr. Walling is fine.
 7    Q.  Okay.  And one of the things I'd like to just begin with
 8    is that stating for the record, I believe we belong to a
 9    networking organization called the Association of American
10    Rhodes Scholars?
11    A.  Yes.
12    Q.  And just want to make clear that we haven't met before in
13    the course of any of their --
14              MR. STERN:  Objection.
15              THE COURT:  Sustained.
16    BY MR. CHRISTIAN:
17    Q.  Have we ever met before, Mr. Walling?
18    A.  No.
19    Q.  And before this trial and taking the witness stand, did
20    you meet with Mr. Stern or Mr. Maimon?
21    A.  Yes.
22    Q.  Okay.  And what did you discuss during that meeting?
23    A.  We discussed a few of the documents that I had seen during
24    my deposition.  A few photos that were in the PowerPoint slide.
25    Q.  Okay.  How many times did you meet?
```

1  A.   I believe we met on three occasions.

2  Q.   And for how much time in total?

3  A.   In total?  Probably -- probably about four hours.

4  Q.   And and could you tell us when you met?

5  A.   Over the last approximately 10 days, I believe.

6  Q.   All right.  And so I'd like to turn to a different topic

7  now.

8          Mr. Maimon and Mr. Stern sued you for your role in

9  the Flint Water Crisis; is that correct?

10          MR. STERN:  Objection.

11          THE COURT:  Overruled.  If he knows.

12          MR. STERN:  I haven't sued anybody.

13          THE COURT:  Right.  Okay.  That's true.  So --

14  BY MR. CHRISTIAN:

15  Q.   Were you sued by the plaintiffs in this litigation,

16  Mr. Walling?

17  A.   I know that I was a plaintiff in the initial filings of a

18  number of different lawsuits.  I don't think I knew from the

19  city attorney's office if this particular case, I was a

20  plaintiff or not.

21  Q.   Okay.  So --

22          THE COURT:  A defendant.

23          THE WITNESS:  I'm sorry, yes.  The plaintiffs, right,

24  filing.  If I was a defendant.

25          Thank you, Judge.

1    BY MR. CHRISTIAN:

2    Q.   So one of the things I'll just -- we're going to be asking

3    a lot of questions.  And sometimes I'll ask questions that are

4    yes or no, and sometimes it will be short answer or essay.

5             And based on your academic credential, I'll assume

6    you're good at answering questions like that?

7             MR. STERN:  Objection.

8             THE COURT:  Just ask questions, and we'll see how it

9    goes.  If there's a problem, you'll appeal to me, and I'll

10   direct the witness.

11            MR. CHRISTIAN:  Okay, Your Honor.

12   BY MR. CHRISTIAN:

13   Q.   So I'd like to direct you to Tab 39 of your book.  And

14   that's VNA Exhibit 3102.  Please let me know when you have it.

15   A.   Yes, I have Tab 39.  Looks like one page.

16   Q.   Okay.  And does this -- does this -- there's a second

17   page, if you flip over to the backside of that page.

18            And do you see your name anywhere on that page?  At

19   the top left-hand corner?

20   A.   Yes, I do.  I was seeing if there was more than one.  Yes.

21   Defendant Dayne Walling.

22   Q.   And do you recall this as being part of the plaintiffs'

23   lawsuit against you in this case?

24            MR. STERN:  Objection, Judge.

25            THE COURT:  What is your objection?  Relevance?

March 30, 2022

1800

```
 1              MR. STERN:  It's three-fold.  Number one, the
 2      document's incomplete --
 3              THE COURT:  And also there's a motion in limine
 4      regarding a lot of this.  So I think you should move on from
 5      this exhibit.
 6              MR. CHRISTIAN:  And just for the record, we object,
 7      Your Honor.
 8              MR. STERN:  You're objecting to --
 9              MR. CHRISTIAN:  Just for the record.
10              THE COURT:  You're objecting to my ruling?
11              MR. CHRISTIAN:  Yes, Your Honor.
12              THE COURT:  That's the nature of -- you know,
13      sustained.
14      BY MR. CHRISTIAN:
15      Q.   So, Mr. Walling, during your direct testimony with
16      Mr. Stern, he asked you a lot of questions about Flint history.
17              Do you recall that?
18      A.   Yes.
19      Q.   And he asked you about where your water as a Flint
20      resident came from -- or Flint residence water came from
21      between 1974 and 2014; is that correct?
22      A.   Yeah.  Approximately --
23      Q.   Your lifetime?
24      A.   Approximately those dates.  My lifetime, yes.
25      Q.   And you answered that it came from Detroit?
```

March 30, 2022

1   A.   Yes.

2   Q.   And that Flint Water Treatment Plant was a backup?

3   A.   Yes.

4   Q.   Are you aware that at a certain point before Flint started

5   getting its water from the DWSD that the Flint River was a

6   source of water?

7   A.   Yes.

8   Q.   You testified to that?

9   A.   Yes.  The location of the plant being at that river bank.

10  Q.   Right.  So I'd like to ask you to turn to tab 57.

11  A.   Yes.

12  Q.   It is -- do you recognize this document at all?

13  A.   It looks familiar.

14  Q.   Okay.  So -- and during the course of your time as mayor

15  of Flint, you've come across a lot of documents related to

16  Flint, correct?

17  A.   Yes, sir.

18  Q.   And I believe you testified that you're sort of a history

19  buff of Flint, as well?

20  A.   Yes.

21  Q.   So is it fair to say that this document may have -- you

22  may have come across it, you know, either in your historical

23  studies or as the mayor of Flint?

24  A.   It looks -- it looks familiar.  I can't recall a specific

25  time when I reviewed this document.

March 30, 2022

1802

```
 1    Q.   Okay.  Would you turn to page 5 of the document, please?
 2    A.   Yes.  And is the page number of the half page of the
 3    original 5?
 4    Q.   Yes.
 5    A.   Okay.
 6    Q.   And you see this talks about -- well, actually, I just
 7    want to make sure I'm giving you -- okay.  Okay.  So, actually,
 8    let's turn to page 10 on the half page.
 9    A.   Yes.
10    Q.   So without reading this document after you get a chance
11    to, you know, familiarize yourself with it a little bit, this
12    is talking about where the water from the Flint River comes
13    from, correct?
14         MR. STERN:  Objection.  Hearsay.  And I asked him
15    some questions about chemicals, and they were objected to.
16         THE COURT:  Can you tell me where you're going with
17    this document?
18         MR. CHRISTIAN:  Your Honor, it's getting to the idea
19    that the Flint River has been used in the past.
20         THE COURT:  Oh.  Well, he's testified to that.
21         MR. CHRISTIAN:  Yes.
22    BY MR. CHRISTIAN:
23    Q.   And your parents are from Flint?  Or grew up in Flint?
24    A.   Yes.  My mother was born in Flint.  She's turning 75 this
25    summer.  And my late father came with his family to Flint in --
```

March 30, 2022

1803

```
1    when he was approximately elementary school, yes.
2    Q.  So is it fair to say that they were in Flint before the
3    switch from Flint to DWSD?
4    A.  Yes.
5    Q.  And I'm not trying to date you in terms of your age, but
6    you remember a time when people didn't buy water in bottles
7    from the store?  In your lifetime?
8              MR. STERN:  Objection.  Relevance.
9              THE COURT:  Yeah.  Sustained.
10             THE WITNESS:  Oh, I'm sorry, Judge.
11             THE COURT:  Let me just ask you --
12             MR. CHRISTIAN:  We were --
13             THE COURT:  Mr. Christian, hold on.
14             MR. CHRISTIAN:  Yes.
15             THE COURT:  This book, the date seems to start in
16   1955 -- stop in 19 -- so this is a book from the 50's?
17             MR. CHRISTIAN:  Yes, Your Honor.  And actually, it's
18   because it's an ancient document more than 20 years old, it's
19   actually admissible.
20             THE COURT:  I'm not worried about that.  I think we
21   should move on.
22             Do you want it admitted?  I just am trying to --
23             MR. CHRISTIAN:  Yes, I will move to admit it, Your
24   Honor.
25             THE COURT:  Okay.
```

```
 1              MR. CHRISTIAN:  I move to admit VNA 4894 into
 2    evidence.
 3              MR. STERN:  Objection.  Hearsay.
 4              THE COURT:  I'll go ahead and accept it.
 5              But -- and could you just describe it for the jury?
 6       (Plaintiff Exhibit No. 4894 Admitted Into Evidence.)
 7              MR. CHRISTIAN:  It is a document entitled, "The Water
 8    Supply of Flint, Michigan."
 9              THE COURT:  Okay.
10              MR. CHRISTIAN:  And it also says, "City of Flint
11    Division of Water Supply, a Municipally Owned Corporation."
12              THE COURT:  Okay.  And it's a book printed in the
13    '50s?
14              MR. CHRISTIAN:  Yes.
15              MR. STERN:  Did he say yes?
16              MR. CHRISTIAN:  It says 1955.
17              THE COURT:  Well, I don't know.  I just saw that it
18    stopped the history at '55.  So I thought, "Well, maybe it was
19    after that."
20              MR. CHRISTIAN:  So after 1955, Your Honor.
21              MR. STERN:  I mean, Judge, we'll stipulate that prior
22    to 1955 --
23              THE COURT:  Right.
24              MR. STERN:  -- the Flint River was used as a water
25    source, and he testified to that.
```

```
 1              THE COURT:  I think we can just do that.  So we've
 2   all agreed.  I think everybody is aware that the Flint River
 3   was a water source in the '60s.  It switched to the Detroit
 4   Water and Sewerage Department supply.  And then in 2014, back
 5   to the Flint River.
 6              MR. CHRISTIAN:  Okay.  And so this has been admitted
 7   into evidence, Your Honor?
 8              THE COURT:  Sure.
 9              MR. STERN:  We object.
10              THE COURT:  Yeah.  It's just -- but we're going to
11   move on from it.
12              MR. CHRISTIAN:  Right.  So there -- on a different
13   topic within this, Your Honor, there is a page that talks
14   about decisions with respect to water sources.
15              THE COURT:  In some point in the '50s?
16              MR. CHRISTIAN:  At the point in time of this
17   document, Your Honor.
18              THE COURT:  Before our witness was born.  Okay.
19              MR. STERN:  Your Honor, just for the sake of clarity
20   in the record, the only date that I see on this document is on
21   page 25.  And it says, "Finished in 1955."
22              THE COURT:  Right.
23              MR. STERN:  There's no date --
24              MR. CHRISTIAN:  Your Honor --
25              THE COURT:  Just let him finish.
```

March 30, 2022

1806

```
 1            MR. CHRISTIAN:  This has been admitted into evidence,
 2    correct?
 3            THE COURT:  Yes.  But I think we need to move on.
 4    Because we're not going to really go back --
 5            MR. CHRISTIAN:  Your Honor, may I ask you --
 6            THE COURT:  Stop.  Stop talking.  We'll get to know
 7    one another.  But if I start talking, you'll have to stop
 8    talking.
 9            And so we need to move on.  Because we know that this
10    is from the '50s and so on.  We don't know the title of the
11    book.  We don't know who authored it.  We don't know anything
12    about it.  But still -- yet and still, it's an ancient
13    document.  So here it is.
14            So let's move on to your next area, I think.
15            MR. CHRISTIAN:  And my next area is in this document.
16    So I'd ask if Your Honor preview page 22, and actually half
17    page 22 in the top left-hand corner.  And if the witness
18    would --
19            THE COURT:  Just a minute.  Okay.
20            MR. CHRISTIAN:  May I publish that portion, Your
21    Honor?
22            THE COURT:  Go ahead.
23            MR. STERN:  Objection.  This is hearsay within
24    hearsay.
25            MR. CHRISTIAN:  One it's admitted, is it hearsay,
```

March 30, 2022

1807

```
 1   Your Honor?
 2           THE COURT:  No.  It can still be hearsay.  But your
 3   objection is noted.  And I'll permit it.
 4           MR. STERN:  Okay.
 5   BY MR. CHRISTIAN:
 6   Q.   Okay.  So would you take a look at page 22, Mr. Walling?
 7   A.   Yes.
 8   Q.   And the top left-hand corner, I'm going to read it, and
 9   I'll ask you if I read it correctly.
10           It says, "The question is often asked, 'Why did not
11   the city go to the Lake Huron for its new water supply instead
12   of building the dam and reservoir on the Flint River?'"
13           Did I read that correctly?
14   A.   I believe it's "raw water."
15   Q.   "Raw water."  Thank you.
16           So assuming that this, given the date of this
17   document before your time as mayor, the question about where to
18   get water for Flint River was something that people asked
19   about, based on this document?
20   A.   Yes.
21   Q.   Okay.  Now, we've already established that you did testify
22   about the history of Flint.  And that your parents spent some
23   time growing up in Flint?
24   A.   Yes.
25   Q.   And based on that knowledge, are you aware of any lead
```

March 30, 2022                                                      1808

```
 1   crisis during the pre-DWSD days back in the '50s and '60s in
 2   Flint?
 3              MR. STERN:  Objection.  Relevance.
 4              THE COURT:  Overruled.
 5              THE WITNESS:  I'm -- I'm not.  I understand in
 6   general, you know, concerns across the country with lead
 7   paint, lead in soils from especially when lead was in
 8   gasoline, before that was banned.  That's why it all says
 9   "unleaded" now at the pump.  So I'm familiar with that in
10   general.
11              I'm not recalling anything specific about Flint.
12   BY MR. CHRISTIAN:
13   Q.  Okay.  And so you said you're familiar with issues with
14   lead.
15              Did those predate your time as mayor, your knowledge
16   of issues arising with respect to lead?
17   A.  Yes.
18   Q.  So I'd now like to direct your attention to your time as
19   mayor.  And I know you've gone over it a bit with Mr. Stern, so
20   I'm not going to belabor it.  But I just want to ask a few
21   questions to make sure I'm clear about some of the answers.
22              So first of all, you were elected in 2009; is that
23   correct?
24   A.  Yes.
25   Q.  And who was the governor at that point in time?
```

1  A.   The governor was Governor Jennifer Granholm.

2  Q.   And then what powers -- I want to make clear what powers

3  you held as governor -- excuse me -- as mayor.  I'm sorry to

4  promote you there -- in 2009 before your reelection?

5  A.   Right.  What powers I held under -- so this would be under

6  the city's charter.

7  Q.   Yes.

8  A.   So the city adopted a charter in actually 1974, so same

9  year that I was born.  It has subsequently been changed.  So if

10  anyone takes a look at this, you'll see it was -- we had a

11  charter commission that changed the charter.

12          But I operated under the 1974 city charter.  It was

13  what's commonly described as a strong mayor system.  So I was a

14  full-time chief executive for the City of Flint Municipal

15  Corporation.

16          It delineates strong responsibilities for our city

17  council, as well.  I've sometimes described it to people as a

18  strong mayor-strong council system.

19          So as mayor, I could appoint a number of -- a handful

20  of executive staff who did not have to be approved by the city

21  council.  That would be, for instance, a director of human

22  resources.  Like I mentioned to Ms. Donna Poplar earlier.

23          That would be an appointment I could make to that

24  position.

25          Then there were a handful of positions that were

 1    called department heads.  And those were positions that had to

 2    be confirmed by a majority vote of the nine-member city

 3    council.

 4           So that would like a director of public works,

 5    director of planning, public safety.  So a chief of police.  A

 6    chief of the fire department.

 7           You know, the titles could change a bit, but the

 8    charter laid out those general authorities.  So the mayor has,

 9    first and foremost, that ability to create a management team

10    for the city.  The mayor has a responsibility to submit a

11    budget to city council each year, each spring, because we have

12    the July 1 to June 30 fiscal year.

13           There's some responsibilities related to that budget.

14    There are responsibilities then to spending that the city

15    council has to approve.

16           So at the time that I was in my first term, I believe

17    it was any expenditure over $2,000 had to be approved

18    individually by the city council.  That's what I meant by a

19    strong council.

20           Because when you're trying to run $170 million

21    operation and you have to go to a nine-member body for any

22    expenditure over, like, $2,000, you're really jointly

23    governing.

24           So there were nine city council members and myself to

25    provide for a state of the city address.

March 30, 2022

```
1              Those would be the main items.  There probably are
2    some others in the charter that relate to, you know, again,
3    swearing into office, when a new mayor comes in, what happens
4    when the position's vacant.
5              Those things would be related to the office of the
6    mayor, as well.
7    Q.   Thank you.
8              So and there came a time when you were reelected in
9    November of 2011?
10   A.   Yes.
11   Q.   And you testified about what that day was like in terms of
12   getting a call.  And then the governor making a statement with
13   respect to emergency manager?
14   A.   Yes.  And the financial -- the statement of financial
15   emergency that then would allow him under the law to appoint an
16   emergency manager.
17   Q.   And just for the record, so -- and then at that point in
18   time, when did that take effect?
19   A.   The financial emergency, I believe we received
20   correspondence maybe even that same day.  The first emergency
21   manager, Mr. Mike Brown, was appointed approximately a month
22   later in early December.
23              So for that month, because we had no directive, the
24   city council and I continued to operate under normal charter
25   provisions.
```

March 30, 2022

1812

```
 1   Q.  And so when you were mayor between 2009 and your
 2   reelection -- and I know -- I hate to ask this question.
 3            What was your compensation of mayor at that point in
 4   time?
 5   A.  It was just over a hundred thousand.  Maybe 102, 103,000.
 6   Somewhere right in there.
 7   Q.  Okay.  And once Mr. Brown was appointed emergency manager,
 8   what happened to your compensation?
 9   A.  So one of his initial orders was to remove authority and
10   compensation from myself and city council.  So for a period of
11   a month or so, I had no compensation from the city.
12            The city attorney believed in terms of compensation
13   it was, you know, it was like a separation, because it zeroed
14   out that compensation.
15            I still came into the office each day.  I met with
16   Mr. Brown and others.  And -- but I did not receive any
17   compensation for that time period.
18   Q.  And a moment ago, you were testifying about the different
19   powers you had as mayor through the charter?
20   A.  Yes.
21   Q.  When Mr. Brown became emergency manager, what happened to
22   those powers?
23   A.  Those powers transferred by the appointment of the
24   governor to an emergency manager.  The broad provision in the
25   law says the emergency manager shall act as the mayor and the
```

1    council.  Something to that effect.

2            When Mr. Brown restored a portion of my compensation,

3    that four or five weeks later, that was accompanied by an

4    order that listed a set of responsibilities that I was then

5    supposed to, you know, focus on as mayor.

6    Q.   Okay.  So four or five weeks later when Mr. Brown

7    reinstated part of your compensation, how much did he

8    reinstate?

9    A.   It was approximately 50-some thousand.

10   Q.   Okay.  And tell us about the responsibilities that he

11   reinstated at that time.

12   A.   So my responsibilities were to citizen services.  So I

13   continued my -- I continued my weekly open office hours, 10:00

14   to noon on every Wednesday.

15           And there were also people who just sent regular

16   letters or emails or called the office.  So I continued to work

17   on citizen services.

18           I would receive those and then distribute them to

19   various staff or bring it to the attention of the emergency

20   manager.

21           I was authorized to continue to serve on a number of

22   boards.  So there are a number of organizations in the city

23   like the city's Downtown Development Authority.  Its by-laws

24   say the mayor shall be the chairperson.

25           Mr. Brown could have assumed that authority under the

March 30, 2022

1814

1    state law in this order.  And we could look at it.  But he

2    detailed those boards that I would continue to serve on.

3              Karegnondi Water Authority, the Downtown Development

4    Authority, the Economic Development Corporation for the City

5    of Flint.  The Flint and Genesee Chamber of Commerce Operating

6    Board.  There were some others.

7              It's a major -- major responsibility of the office

8    was to coordinate with those different entities.  So I

9    continued in that capacity.  I was, through those boards and

10   my own interest, I was very involved in various economic

11   development efforts.

12             I had a Friday morning weekly jobs meeting in my

13   office where I met with the representative of the Flint and

14   Genesee Chamber of Commerce.  Possibly a staff from the

15   Michigan Economic Development Corporation.

16             Brought in different city staff.  So I continued to

17   have that weekly jobs meeting.

18             You know, there could come a time where the city was

19   needing to do something officially that would require some

20   other people's actions.  But citizen services, boards,

21   economic development, and then also planning.

22             I mentioned my work over the years with the city's

23   long-term comprehensive and master plan.  So I had been a very

24   kind of vocal advocate, even within office, for the city

25   starting this comprehensive master planning process,

1    rebuilding a planning department at the city.

2          We were probably about two-thirds of the way through

3    a process to hire a chief planning officer, I believe.  And

4    Mr. Brown had me continue in that role of facilitating that

5    process.

6          We had a major federal grant from one of

7    President Obama's on stainability communities that we were

8    beginning to implement.

9          So those were -- I apologize if that was too much

10   detail.  But that's what my responsibilities were.  I took

11   them very seriously.

12   Q.  And just to be clear.

13         With respect to the economic development efforts or

14   any of these roles, you were not allowed to sign any contracts;

15   is that correct?

16   A.  Yeah.  I would not have been in position to sign

17   contracts.  That was a different process, yeah.  Most of this

18   was external.  It obviously relates to the city, like if

19   there's economic development in businesses and so on.

20         But the orientation was really towards external

21   community work.  And then I would bring, you know, that

22   information or those action items back in to senior staff.

23   Q.  And there came a time that Mr. Kurtz, Edward Kurtz became

24   the emergency manager, correct?

25   A.  Yes.

March 30, 2022

1816

1   Q.  And his term approximately was from August of 2012 to June

2   of 2013; is that correct?

3   A.  Yes, that sounds right.

4   Q.  And then after Mr. Kurtz, Mr. Brown came back in 2013 and

5   served until about October; is that correct?

6   A.  Yes.  And Mr. Brown had been city administrator under

7   Mr. Kurtz.  That's a position in our city charter, the chief

8   operating officer for the city.  The most senior appointed

9   staff.  So that's a position in our charter.

10  Q.  And then Mr. Earley came on after Mr. Brown from about

11  October of 2013 until roughly the middle of January of 2015?

12  A.  Yes.

13  Q.  I'd like to show you what -- ask you to take a look at

14  Tab 52, which is marked as Plaintiffs' Exhibit 2609.

15          Do you recognize this document?

16          After you've had a chance to look at it.

17  A.  I believe I saw this.  This is not a city document.  This

18  is a State of Michigan document.  And it's the emergency

19  manager services for Mr. Darnell Earley.  I believe I did see

20  this at some point.

21  Q.  And that was during the time you were mayor of the City of

22  Flint?

23  A.  Yes.

24  Q.  And was it at the time when Mr. Earley was emergency

25  manager?

March 30, 2022

1817

1    A.   This is dated -- Mr. Earley's signature is October 3,

2    2013.  That's consistent with my understanding.

3              MR. CHRISTIAN:  Your Honor, I move to admit

4     Plaintiffs' Exhibit 2609.

5              MR. STERN:  No objection.

6              MR. ERICKSON:  No objection.

7              THE COURT:  Okay.  It's received.

8      (VNA Exhibit No. 2609 Admitted Into Evidence.)

9    BY MR. CHRISTIAN:

10   Q.   So what I'd like to do if you wouldn't mind is if you look

11   at Section 1.3.  It has the heading "Duties."

12             Would you do me the favor of reading what the duties

13   of the emergency manager are for the jury?

14   A.   Yes.  So 1.3, "Duties.  The emergency manager shall

15   possess all the powers and duties authorized under the act" --

16   sorry -- "noted above Public Act 436 of 2012, including those

17   specifically related to local governments.

18             "In addition, the emergency manager shall work

19   cooperatively with the office of the governor and the state

20   treasurer.  The emergency manager agrees to continue to keep

21   these officials informed of major initiatives to be undertaken

22   in furtherance of this contract before their public

23   announcement."

24   Q.   Thank you.

25             And if you turn to page 2 in Section 3.2, what was

1    the compensation of the emergency manager?

2    A.   Item 3.2, "Salary," reads, "The emergency manager's salary

3    for services rendered under this contract shall be 180,000 per

4    year."

5    Q.   And let's look at Section 4.1, entitled, "Staff."

6              Would you read the first sentence of that, please?

7    A.   Yes.  4.1, "Staff.  The emergency manager may, as provided

8    in the act, appoint additional staff as necessary to fulfill

9    the obligations of the emergency manager's appointment and

10   duties under this contract."

11   Q.   And was this consistent with your understanding of the

12   powers or some of the powers of the emergency manager?

13   A.   Yes.

14   Q.   And during the time that Mr. Earley was emergency manager,

15   did there come a time when he actually appointed staff within

16   the -- to support him?

17   A.   Well, of course, we had senior staff who were appointed.

18   I think most of the senior staff continued.  I believe one

19   appointment that Mr. Earley made was the appointment of a new

20   chief of police.  Chief James Tolbert.

21   Q.   And Section 4.3.  Would you read the first sentence of

22   that?

23   A.   Yes.  First sentence?

24   Q.   Yes, please.

25   A.   4.3, "Security.  The emergency manager will be entitled to

March 30, 2022                                                    1819

1    receive security protection in connection with the emergency

2    manager's duties under this contract."

3    Q.   Do you recall whether Emergency Manager Earley actually

4    appointed security for himself?

5    A.   Not that I recall.

6    Q.   So did there come a time when Mr. Earley left the role of

7    emergency manager approximately January of 2015?

8    A.   Yes.  Mr. Earley -- I wasn't literally in the room when

9    this happened.  I was next door, because my office opens into

10   that conference room where they held the press conference.

11        But state officials came to Flint.  It was announced

12   that Mr. Earley was leaving the emergency manager position in

13   the City of Flint.

14        And he was moving to be the emergency manager for

15   Detroit Public Schools, which was also under emergency

16   management under this same Public Act of 436 of 2012.

17   Q.   And excuse me.

18        Gerald Ambrose succeeded Mr. Earley?

19   A.   Yes.  And then Mr. Ambrose -- I think it was even

20   announced at that same time.  Mr. Ambrose had been serving as

21   the city's finance director, and he was appointed emergency

22   manager for Flint under this same state law.

23   Q.   And his term lasted until April of 2015?

24   A.   Yes.  End of April 2015.

25   Q.   And during the course of these transitions from one

March 30, 2022

1820

```
 1   emergency manager to the next, were you consulted and asked
 2   your opinion on who should be the next emergency manager?
 3   A.   No.
 4   Q.   And is it your understanding that Governor Snyder made the
 5   decision about who should be the emergency manager?
 6   A.   Yes.  It is -- the law says the governor appoints.
 7   Q.   So I'd like to direct you to -- well, just a moment here.
 8            And when Mr. Ambrose left the role, did you come
 9   back --
10            THE COURT:  Left where?
11   BY MR. CHRISTIAN:
12   Q.   -- left the role of emergency manager in April of 2015,
13   did you come back as mayor and resume with your powers to lead
14   the city?
15   A.   In part.
16   Q.   Okay.  Tell us what part you received.
17   A.   All right.  So there were two major changes.  The
18   emergency manager under the state law had the ability to issue
19   orders that stayed in effect, even as that individual -- as
20   there would be no person serving as emergency manager in Flint.
21            So effectively, the governance of the City of Flint
22   became the city of charter in our regular city code, unless
23   modified by an emergency manager order.
24            And there was one -- one major order that affected
25   the operations of the city.  And that was that the city
```

March 30, 2022

1821

1    administrator, whose position I said is in the charter, the
2    chief operating officer normally appointed by the mayor and
3    city council.
4         That that individual would become responsible for
5    department head decisions.
6         So that emergency manager order strengthened the city
7    administrator's role within city governance.  The city was to
8    consult with the mayor under that order, but it was no longer
9    my prerogative to hire or fire someone.
10        I could appeal to the city administrator.  The city
11   administrator could also not be removed by the mayor, the way
12   it normally would be under the charter.
13        The city administrator could only be removed by joint
14   action of the mayor, the city council, and this new transition
15   advisory board.
16        So with the exit of the emergency manager, the state
17   law imposed an appointed, I believe, three-member transition
18   advisory board.  It was headed by Fred Headen, who was an
19   employee of the Michigan Department of Treasury.
20        And that body met, I think, approximately once a
21   month.  So in order for the City of Flint to take official
22   action, to enter into a contract, to pass a new statute, you
23   know, what have you.
24        It would go from a city administrator resolution to a
25   city council vote.  And then whatever made it through city

March 30, 2022

```
 1    council would go onto the docket of the Transition Advisory
 2    Board.
 3              There were some other orders about various matters.
 4    But those were the two major changes to the structure of City
 5    of Flint government.
 6    Q.   So sounds a bit complex?
 7    A.   Yes.  And there were probably court challenges to many of
 8    these things in front of judges across the state as it was
 9    throughout this process.
10              So you always just had to pay attention to, you know,
11    what had been passed, what was in place.  Try to work from that
12    at that particular time.
13    Q.   So you mentioned the city administrator.
14              Who appointed that individual?
15    A.   The city administrator, Natasha Henderson, I believe was
16    appointed near the end of Mr. Earley's time.  And then she -- I
17    don't know if she had actually started her first day while he
18    was still there, but right about that time.
19              And then she served throughout my time in office,
20    continued for some time under Mayor Dr. Karen Weaver.
21    Q.   So just to be clear, Mr. Ambrose appointed the city
22    administrator?
23    A.   I think Mr. Earley did.  But then Mr. Ambrose didn't
24    change it.  You know, it just -- unless you were removed, you
25    just stayed appointed.
```

1   Q.   And you mentioned the Transition Advisory Board.

2   A.   Yes.

3   Q.   Three members?

4   A.   It started as three.  There may have been five at some

5   point.

6   Q.   And Governor Snyder appointed the members of that body?

7   A.   You know, I mean, we should look at the law.  It might --

8   it might say the treasure -- you know, the treasurer's

9   appointed by the governor.  So I thought of it as a governor's

10   appointment.

11   Q.   So is it your testimony that it was either the governor or

12   the treasurer?

13   A.   That's my recollection, yeah.

14   Q.   And the treasurer was appointed by the governor?

15   A.   Yes.

16   Q.   And so you described a fairly complex procedure for

17   getting things done after Mr. Ambrose left.  So what I want to

18   do just to get a little clarity, I'm just going to go through

19   some of the powers you mentioned earlier and see which -- you

20   know, which ones you had at that point in time.

21          So as of Mr. Ambrose's departure, could you appoint

22   executive staff?

23   A.   No.

24   Q.   Could you appoint department heads?

25   A.   No.

March 30, 2022

1824

```
1    Q.   Did you have authority over the management team?
2    A.   No.  I would consult with the city administrator.
3    Q.   And were you able to develop the budget at that point in
4    time?
5    A.   I believe that was also a duty of the city administrator.
6    I certainly continued to have involvement.  And we tried to
7    follow both the orders as well as the charter.
8             So I believe I made the presentation to city council,
9    even though it would have been under the emergency manager's
10   order, technically the city administrator's responsibility to
11   develop the document.
12   Q.   So the city administrator developed the budget, at that
13   point in time?
14   A.   And then I presented it, yes.
15   Q.   And what about spending less than $2,000 at that point in
16   time?
17            Did you have authority to do that?
18   A.   No.  And that had been changed.  Now, the administration
19   through the city administrator, I believe the limit was now
20   $30,000.
21            So the administration could take action, you know, at
22   a higher amount of money than it could under the traditional
23   charter and statutes.
24   Q.   Okay.  So the city administrator could spend up to
25   $30,000?
```

March 30, 2022

1825

```
1    A.   I think that was the number.  And I'm sorry.  All of these
2    things would be in documents, if it makes a difference.
3    Q.   And to go above $30,000, did the city administrator need
4    to seek approval somewhere else?
5    A.   Yeah.  Then it would go through the resolution process, as
6    we called it.  So a senior staff or department head would
7    develop a resolution, could come directly from the city
8    administrator, go through legal and financial review, then to
9    the city clerk, then to the city council.
10         And then whatever the city council passed was then
11   moved to the transition advisory board docket.
12   Q.   And when you left office in November of 2015, the
13   Receivership Transition Advisory Board was still in place; is
14   that correct?
15   A.   Yes.  Yes, it was.
16   Q.   And just want to direct your attention back to the
17   emergency managers really quickly.
18         Is it your understanding that the emergency manager
19   had discretion to approve expenditures up to $50,000?
20   A.   Yes.  That was -- that was what was written into the
21   relationship, the protocols between an emergency manager and
22   the State Department of Treasury.
23   Q.   And above that amount, the emergency manager had to get
24   approval from the State Department of Treasury?
25   A.   Yes.  And it had to be an official approval.  In practice,
```

March 30, 2022                                        1826

```
 1    it seemed to me like the emergency manager was, you know,

 2    consulting with treasury staff on practically everything.

 3            But there was a formal approval process required for

 4    those expenditures over $50,000 on an annual basis.

 5    Q.  And so I'd like to direct your attention, again, to the

 6    authorities you -- and powers you had as governor -- excuse me,

 7    as mayor.  I'm sorry to keep saying that.

 8            If you turn to Tab 2 of the binder, which is VNA

 9    trial exhibit -- as premarked for identification as VNA trial

10    Exhibit 598.

11            Do you recognize this document?

12    A.  Yes.  We looked at it previously in this room.

13    Q.  Sure.  And it is --

14            MR. CHRISTIAN:  Your Honor, I move to admit --

15            THE COURT:  I think it's already admitted, right?

16            MR. STERN:  I admitted it yesterday.

17            THE COURT:  Yeah.  It's already an exhibit.

18    BY MR. CHRISTIAN:

19    Q.  So this is when Emergency Manager Earley made you

20    responsible for day-to-day operations of the public works

21    department?

22    A.  Yes.  This was dated June 20, 2014.

23    Q.  So in terms of the authorities that you laid out as --

24    that you had as the mayor, what, if any, new authorities did

25    you gain by this order?
```

March 30, 2022

1827

1    A.   So the emergency manager looked to me to take the weekly

2    report from these two departments that are mentioned on the top

3    of the second page.  That first page is all just pursuant to

4    436.

5         Department of Planning and Development, that's the

6    new department that is working on the comprehensive master

7    plan and also oversees the city's department of community and

8    economic development, the development block grant funds, the

9    planning commission, and building and safety functions and

10   inspections.

11        So that was one department head.  That was Ms. Megan

12   Hunter.  And I took that same report from Mr. Howard Croft,

13   who was director of the Department of Public Works.

14        That was the department that included utilities,

15   water, sewer, water service center, transportation.  I think

16   parks may have been under planning and development at this

17   time.  Transportation was still doing street, trees, traffic

18   engineering.

19        So I took weekly reports from both of those directors

20   about their operations.  What were they working on.  What was,

21   you know, happening with any issues maybe with staffing.

22        And then I was meeting at that same time

23   approximately weekly with the emergency manager, Mr. Earley,

24   and would go over those notes or those reports.

25   Q.   So just to be clear, you took these reports.

March 30, 2022

1828

```
 1              Were these oral meetings?
 2    A.   Yes.
 3    Q.   So in-person meetings?
 4    A.   In-person meetings, yes, in my office.
 5    Q.   And did they occur religiously every week?
 6    A.   Close.  Yeah.
 7    Q.   And during the course of your meetings with Mr. Croft, did
 8    you get opportunities to ask questions about specific issues
 9    with respect to that department?
10    A.   Yes.
11    Q.   And you could ask specific questions with respect to the
12    Flint Water Treatment Plant?
13    A.   Yes.  Water Treatment Plant, these main breaks we've been
14    talking about.  Different issues that are coming up in
15    transportation.  You know, street sweeping.  Leaf pickup.  Yes,
16    yes, I would certainly ask questions.
17    Q.   And did you get an opportunity to meet with the employees
18    at the Flint Water Treatment Plant?
19    A.   Yes.  I did one meeting at the Flint treatment plant in
20    the fall of 2014.
21    Q.   So one meeting?
22    A.   Yes, one meeting.  I walked through on a couple -- at
23    least one other occasion.  But this was an actual -- this was
24    like an employee meeting where Mr. Croft, you know, made sure
25    those different groups knew that I would be there and that I'd
```

1    be coming and asking questions.

2            And it was -- it was part of, you know, my expanded

3    work under this order.

4    Q.   And did there come a time during your time as mayor where

5    you stopped having these weekly meetings?

6    A.   Yes.  So with the -- with the appointment of the city

7    administrator, there was a new structure than what we had in

8    2014.  So I believe at this time in the second half of 2014,

9    there was no one in the city administrator's position.

10           So I had mentioned Mr. Brown serving as city

11   administrator under Mr. Kurtz.  Mr. Earley, you know,

12   effectively operated as the city administrator.  He was a

13   trained city manager himself.

14           So I took these couple department reports.  He took

15   the other department reports; chief of police, legal, HR,

16   etcetera.

17           With the hiring of Natasha Henderson, there was an

18   emergency manager order that detailed that position's

19   responsibilities.  And at that point, Ms. Henderson took all

20   of these department head reports.

21   Q.   Do you remember when that was?

22   A.   Of course, there would be a document on this.  I mean,

23   this is what January-February 2015, right about in that.

24   Q.   All right.  So if you weren't happy with a report you

25   received from Mr. Croft, what, if any, actions could you take?

1    A.   I could, you know, express my displeasure to Mr. Croft

2    which I would do on occasion when I felt it was warranted.  And

3    then I would take that concern to the emergency manager.  And

4    that was where -- I mean, you saw this is a very short order.

5            And I came to see, you know, what the practical

6    limits of what I had been assigned was.

7            So if -- when employees at the water plant talked

8    about -- were running, you know, low on a particular chemical,

9    I remember there being something about, "We want to make sure

10   we have this chemical," then I couldn't write that resolution

11   to spend more money on that need that I became aware of.

12           I would take that to the emergency manager.  And

13   Mr. Earley would effectively tell me, "Thank you, very much."

14           So whether that involved personnel or legal matters

15   or other kind of HR, that -- I understood what the

16   responsibility was.

17           And I would bring those matters to his attention, and

18   he would be the one who could then act on those.

19   Q.   So you couldn't fire Mr. Croft if you would like to?

20   A.   Correct.

21   Q.   Could you contribute -- did you conduct evaluations of

22   Mr. Croft or any other treatment plant personnel?

23   A.   I did not.

24   Q.   So I'm going to move to a different topic.  And I'd like

25   you to look at Tab 3, which is VNA Exhibit 76.

```
 1            This document's dated November 7 of 2011; is that
 2    correct?
 3    A.   Yes.
 4    Q.   And you've seen this before.
 5            Did you receive a time -- did you receive a copy on
 6    the date -- on or around the date of November 7 of 2011?
 7    A.   Yes.  And I see on the last page myself, city council,
 8    speaker of the -- the Michigan House and Senate majority leader
 9    in the state.  Yes.  So yes, I did see this at that time.
10            MR. CHRISTIAN:  Your Honor, I move to admit VNA
11     Exhibit 76 into evidence.
12            MR. STERN:  No objection.
13            MR. ERICKSON:  No objection.
14            THE COURT:  Okay.  It's received.
15      (VNA Exhibit No. 76 Admitted Into Evidence.)
16    BY MR. CHRISTIAN:
17    Q.   And so this document, Exhibit 76, VNA Exhibit 76, it's
18    titled, "Report of the Flint Financial Review Team"; is that
19    correct?
20    A.   Yes.
21    Q.   And the name of the team members are at the top of the
22    page on the right; is that correct?  Or top of the page; is
23    that correct?
24    A.   Yes.  I'm going through the names.  I understood all of
25    those individuals to be on the financial review them.
```

March 30, 2022

1832

1    Q.   And they were members of the Snyder administration?

2    A.   No.  They were, I think, technically appointed by the

3    state treasurer.  I don't know all of the individuals well,

4    although we may have met.

5             Mr. Earley was serving as the city manager in Saginaw

6    at the time.  Mr. Robert Emerson was, I believe, with a private

7    company.  He had been a long-time state legislature from Flint

8    who had served as Governor Granholm's budgets director for a

9    period of time.

10            Mr. Headen, I did know he was a long-time employee at

11   the State Department of Treasury.  We had a common connection

12   of being Michigan State University James Madison College

13   alumni.

14            Brom Stibitz worked for State Treasurer Dillon.

15            So I was more than familiar with about half of these

16   individuals.  But they -- at least some of them were not part

17   of the Governor Snyder administration in a formal way.

18   Q.   So they worked for the Department of Treasury, as you

19   understand it?

20   A.   I don't know what the conditions of their participation

21   was, if it was compensated or a matter of public service.  I'm

22   sure they had some contract to perform a duty under Public Act

23   -- at this time it would have been Public Act 4.

24   Q.   So let's take a look at the document, specifically the

25   first paragraph.  If you look to the third line from the

March 30, 2022

1833

```
 1    bottom, there is -- starts with "a local government."
 2             Do you see that?
 3    A.   Yes.
 4    Q.   Would you please read the rest of that paragraph from that
 5    point?
 6    A.   Yes.
 7             "A local government financial emergency exists within
 8    the City of Flint and that no satisfactory plan exists to
 9    resolve that emergency.  Therefore, the review team recommends
10    the appointment of an emergency manager."
11    Q.   And so this essentially is a document you received
12    surrounding your -- surrounding the appointment of emergency
13    manager; is that fair to say?
14    A.   Yes.
15    Q.   And this was a financial event; is that correct?
16    A.   Yes.  This -- that language comes from what's required
17    under Public Act 4.
18    Q.   So now I'd like to --
19             MR. CHRISTIAN:  Just for Your Honor's knowledge, I
20    think we're a little early for the break, but I'm getting
21    ready to switch to a different topic, just so you know.
22             THE COURT:  Go ahead.  If everyone's okay, we'll just
23    keep going.
24    BY MR. CHRISTIAN:
25    Q.   So I'd like to turn your attention to the Karegnondi Water
```

March 30, 2022

1    Authority, KWA, I guess, it's commonly known?

2    A.   Yes.

3    Q.   In March of 2013, that was roughly a year before the

4    switch to the Flint River, you recall the city council voting

5    to join the KWA?

6    A.   Yes.

7    Q.   And that vote was what, 7 to 1?

8    A.   Yes.  I think that's right.  Yeah, we had a vacancy at the

9    time.  Um-hum.

10   Q.   And so, you know, you've testified about this.  But that

11   was about switching the water source from the DWSD to the KWA;

12   is that correct?

13   A.   Yes.  The decision on the long-term supply.

14   Q.   And what was the legal meaning of the city council's vote

15   to join the KWA at the time?

16   A.   It was an expression of position in a way that a city body

17   takes a position on a, you know, state law or maybe even an

18   international human rights issue.

19        So the city council was expressing its position on

20   the matter.

21   Q.   Okay.  So it was basically symbolic?

22   A.   That's not how I would say it.  It's an expression of that

23   body's position.

24   Q.   And but at point, in fact, at that time, the emergency

25   manager had the authority to make that decision; is that

March 30, 2022

1835

```
1    correct?
2    A.   Yes, that's correct.  And there was not -- although there
3    could have been, there was not an order that further empowered
4    a city council.  It was a resolution put before them on a
5    properly called meeting, Public Open Meetings Act.
6            And the city council discussed it, I believe, over
7    two meetings, as it turned out and then took a vote on the
8    matter.
9    Q.   And at that point in time, Mr. Kurtz was the emergency
10   manager?
11   A.   Yes.
12   Q.   And for him to approve joining the KWA, did he need to
13   seek any other approvals himself?
14   A.   Yes.  That was on a month's-long back-and-forth with the
15   state Department of Treasury which practically ended up
16   involving Governor Snyder himself.
17   Q.   And so ultimately the decision was made to switch to the
18   KWA?
19   A.   Yes.
20   Q.   And you testified about the contract being terminated,
21   correct?
22            THE COURT:  What contract?
23            MR. CHRISTIAN:  Excuse me.  I'll be more clear.  I
24    apologize.
25   BY MR. CHRISTIAN:
```

March 30, 2022                                    1836

1   Q.   The letter coming from the DWSD indicating that they would

2   terminate the contract, you testified about that, correct?

3   A.   Yes.  That was -- the contract provided the cost structure

4   of what the city was paying for water from DWSD.

5   Q.   And in 2013, the expectation that the KWA would be able to

6   operate, was it 2016?

7            Is that what you testified?

8   A.   It was approximately -- you know, it was two to three

9   years.

10  Q.   But the termination date set by the DWSD was April of

11  2014?

12  A.   Yes.  A year from whenever it was issued.  Either party

13  could terminate that contract with 12 month's notice.

14  Q.   So there was a need for some sort of interim source

15  between the end of the DWSD contract and the beginning of

16  receiving water from the KWA, correct?

17  A.   Yes.  And that's what different levels of this decision,

18  this is now the decision of continue with DWSD in some modified

19  cost structure the way Genesee County did.  Or the discussion

20  that occurred kind of over time about using the Flint River in

21  part or full.

22  Q.   And you've testified a moment ago about the city council

23  voting to join the KWA, correct?

24  A.   Counsel, are you referring to the creation of the

25  authority or using KWA as a long-term water supply?

March 30, 2022

1837

1    Q.   Thank you for asking.

2         Using the KWA as a long-term water supply?

3    A.   Yes.  That was the city council vote in March of 2013.

4    Q.   Now, when there was the issue of the interim water source,

5    the city council did not vote to use the Flint River as an

6    interim water source between the DWSD and the KWA; is that

7    correct?

8    A.   Correct.  The city council did not vote on that specific

9    decision.  It did not ultimately vote on the budget that was

10   put in place for that coming fiscal year.  There was a budget

11   presentation to city council for informational purposes.  I

12   participated in that.

13        But it was the emergency manager's action that put

14   that budget in place with the support of the Department of

15   Treasury.

16   Q.   And there came a time when Mr. Kurtz approved the use of

17   the Flint River as the interim source?

18   A.   That's what I understand.  I don't have -- I don't have

19   knowledge of what many of those conversations were.

20        It was in the budget proposal, and I came to

21   understand later that there had been some discussions with

22   staff and Michigan Department of Environmental Quality about

23   actually proceeding with what was in that budget.

24        But that -- those were things I came to understand

25   later.

```
 1    Q.   Okay.  Thank you for clarifying that.
 2              So put it this way.  At that point in time, you
 3    didn't have authority to choose the KWA as a long-term water
 4    source; is that correct?
 5    A.   Correct.
 6    Q.   And the city council didn't have the authority to do that,
 7    to select the KWA as a long-term water source; is that correct?
 8    A.   That's correct.
 9    Q.   Or an interim water source for Flint?
10              THE COURT:  Well, the KWA wasn't going to be ready
11    until 2016, right?
12              Can you clarify -- did you mean the Flint River?
13              MR. CHRISTIAN:  Well, at first I asked the question
14    about the KWA as a long-term water source --
15              THE COURT:  Okay.
16              MR. CHRISTIAN:  -- and then I asked did the --
17    BY MR. CHRISTIAN:
18    Q.   If the city council had voted, it would not have had
19    authority to vote to use the Flint River as an interim source;
20    is that correct?
21    A.   Correct.  It would not have had the authority of, you
22    know, the legal action of the City of Flint municipal
23    corporation.
24    Q.   And you mentioned a moment ago that other communities in
25    the region decided to use the DWSD as an interim water source
```

March 30, 2022

1839

1    before the KWA water became available?

2    A.   That's correct.  So in some fashion, the county drain

3    commissioner's office made provision for water from DWSD to

4    continue to come, which then, you know, was administered to

5    various communities in Genesee County excluding Flint.

6    Q.   So I'd like to redirect your attention to -- back to March

7    of 2013.

8            Do you recall a city council meeting on March 25 of

9    2013?

10   A.   I believe that was the second of those two city council

11   meetings I referenced.

12   Q.   And at that city council meeting, you had the opportunity

13   to speak; is that correct?

14   A.   Yes.

15   Q.   And you talked about using the Flint River as a permanent

16   water supply and described that as extraordinarily risky,

17   correct?

18   A.   Yes.

19   Q.   And at the same meeting, you described the DWSD water as

20   one of the cleanest sources of fresh water on the planet; is

21   that correct?

22   A.   Yes.  Drawn from -- drawn from, you know, what, a mile and

23   a half or two off the shores of Lake Huron, yes.

24   Q.   Now, going a little bit forward in time to April of 2014.

25   You were at the -- and you testified about it yesterday --

```
 1   physically at the Flint Water Treatment Plant and were the one

 2   who -- you were the person who pushed the button to start the

 3   Flint River flowing into the homes, correct?

 4   A.   Yes.

 5   Q.   So I want to show you what has been marked as VNA trial

 6   Exhibit 539.  It's Tab 59.  And it was admitted -- it's already

 7   been admitted into evidence.  And so --

 8            THE COURT:  What was the exhibit number when it was

 9   admitted?

10            MR. CHRISTIAN:  The exhibit number -- let's see here.

11   It was -- well, VNA Exhibit 539.

12            THE COURT:  Okay.  But you said it was previously

13   exhibited --

14            MR. STERN:  I don't believe this exhibit has been

15   previously marked.

16            THE COURT:  Yeah.  Okay.  I don't know that I've seen

17   it.  Okay.  So this is going to be VNA 539.

18            MR. CHRISTIAN:  Yes, Your Honor.

19            THE COURT:  Is there --

20            MR. STERN:  I object.

21            THE COURT:  Okay.

22            MR. STERN:  He's not a party to this email.  We had

23   an entire --

24            THE COURT:  Let me just hear Mr. Erickson --

25            MR. CHRISTIAN:  It was already been admitted, Your
```

March 30, 2022

1841

1    Honor.  So it's already in evidence.

2              THE COURT:  Okay.  What is the exhibit number?

3              MR. CHRISTIAN:  VNA 539.

4              THE COURT:  I know.  But we have a previously

5    admitted VNA 539.  What is the one that it was admitted under,

6    and I'll look on my list to confirm.

7              MR. CHRISTIAN:  Okay.

8              THE COURT:  Which witness did we get this from?

9              MR. CHRISTIAN:  We admitted it through Warren Green,

10   Your Honor.

11             THE COURT:  Oh, okay.  And what number was it for

12   Mr. Green?  I've got that right here.

13             MR. CHRISTIAN:  We're conferring that right now, Your

14   Honor.  I apologize for the delay.

15             THE COURT:  That's okay.  We're getting close to a

16   break.  So we'll just see if we can figure out that we've

17   already got this exhibit.

18             MR. CHRISTIAN:  Yes, Your Honor.  It looks like it

19   was Exhibit 539.

20             THE COURT:  Oh, okay.

21             MR. CHRISTIAN:  And I can tell you where it was on

22   the transcript, Your Honor.

23             THE COURT:  Just what day?

24             MR. CHRISTIAN:  Admitted.  It was admitted on

25   March 10, Your Honor.

March 30, 2022

```
 1              THE COURT:  Oh, I've gone back too far.  Yeah.  I've
 2    got it as received.  Okay.  So go ahead.  And then we'll try
 3    to take a break around noon.
 4              MR. CHRISTIAN:  Okay.
 5    BY MR. CHRISTIAN:
 6    Q.  So would you please -- you're taking a look at the --
 7    A.  The tab, please?
 8    Q.  The tab, yes.  This is an email dated April 16 --
 9    A.  What number is it?
10    Q.  Oh, I'm sorry.  I apologize.  Tab 59.
11    A.  I can read it better in person.
12    Q.  Yes.  So that will give you a chance to look at it.
13    A.  Yes.
14    Q.  So just looking at the date, this email is dated April 16
15    and 17th of 2014; is that correct?
16    A.  Yes.
17    Q.  And that's about a week roughly before you pressed the
18    button to switch to the Flint River?
19    A.  Yes.  Those dates are correct.
20    Q.  Let's go to the bottom of the email chain.  So this is
21    from Michael Glasgow, and just to refresh everyone's
22    recollection.
23              Who is Michael Glasgow?
24    A.  I do see this just above that.  He's the laboratory and
25    water quality supervisor for the Flint Water Plant.
```

March 30, 2022

1843

1    Q.   Were you aware that he was the F1 licensed operator of the

2    plant?

3    A.   I don't remember that specifically.  I know there were

4    discussions about F1s and the operations of the plant.

5    Q.   And are you familiar -- were you familiar with

6    Mr. Rosenthal, who's in to-line of this email, Adam Rosenthal?

7    A.   I don't know that I was.  I certainly would not have been

8    at the time.

9    Q.   And so if we look at to-line after his name in

10   parentheses, what is that, DEQ?

11   A.   Yes, DEQ.

12   Q.   And when you see DEQ, what entity do you associate that

13   with?

14   A.   This is a state department.  The State Department of

15   Environmental Quality.

16   Q.   So what I'm going to do here is ask you to read here this

17   paragraph of what Mr. Glasgow wrote.

18        MR. STERN:  Which paragraph?

19   BY MR. CHRISTIAN:

20   Q.   The bottom paragraph in the first email.  Begins with,

21   "good afternoon."  If you go to the bottom of the email

22   thread --

23   A.   Oh, the bottom.  I see.

24   Q.   On page 2.

25   A.   I'm sorry.  I was still on page 1.  I couldn't find that

March 30, 2022

1844

```
 1  paragraph.
 2  Q.   Sorry.  About that.
 3          THE COURT:  Flip the page, and it's there.
 4          THE WITNESS:  Yes.  Yes.  "Adam.  Good afternoon."
 5          Would you like me to read this?
 6  BY MR. CHRISTIAN:
 7  Q.   Yes, please.
 8  A.   It doesn't matter -- I'm not on this.  I just want --
 9  okay.
10  Q.   I know.  This is called publishing it to the jury.  It's
11  already in evidence.
12          THE COURT:  Do you want him to read it out loud?
13          MR. CHRISTIAN:  Yes, please.
14  BY MR. CHRISTIAN:
15  Q.   Please read it out loud.
16  A.   "Adam, good afternoon.  I'm contacting you in regards to
17  possible changes in our monitoring of our change to full-time
18  operation out of the Flint River.
19          "I am expecting changes to our water quality
20  monitoring parameters and possibly our DBP and lead and copper
21  monitoring plan.  Also, I am wondering about our MOR-required
22  testing.
23          "I know you have probably been in contact with Howard
24  Croft; however, I have not seen anything except the notes you
25  or Prysby made on the last page of our 2014 monitoring
```

March 30, 2022                                                              1845

```
 1    schedule, quote, that things were subject to change, unquote.
 2            "Any information would be greatly appreciated because
 3    it looks as if we will be starting the plant up tomorrow and
 4    are being pushed to start distributing water as soon as
 5    possible.
 6            "As the acting F-1, I would like to make sure we are
 7    monitoring, reporting, and meeting our requirements before I
 8    give the okay to start distributing water.  Thanks, Mike
 9    Glasgow."
10    Q.   Okay.  So just a couple of terms in there I want to see if
11    you know the meaning of.
12            MOR, are you familiar with that?  Monthly operating
13    report?
14            MR. STERN:  Objection.  He's familiar with it now.  I
15    mean --
16            THE WITNESS:  I don't think I was.
17            THE COURT:  Well, we'll just find out if he was --
18    did you know what that was before Mr. Christian mentioned it?
19            THE WITNESS:  I don't think so.  I mean, now that he
20    said it, I remember later that there were some monthly reports
21    that we were, I think, even publishing at a later point.
22            THE COURT:  Good.
23    BY MR. CHRISTIAN:
24    Q.   The name Prysby, is that familiar to you?
25    A.   That is.  Again, you know, not at the time.  I wasn't in
```

1   these discussions.  But Mike Prysby was one of the individuals

2   who then was coming to Flint, like, in 2015 and was

3   participating in public meetings or advisory meetings.

4           So I do know now, you know, and as of about 2015,

5   Prysby.

6   Q.  So in this text, Mr. Glasgow mentioned being pushed to

7   start distributing water as soon as possible.

8           Based on your experience, who was pushing him?

9           MR. STERN:  Objection.  It assumes facts not in

10   evidence.

11          THE COURT:  If he knows.  He's told us he wasn't --

12          THE WITNESS:  I don't know.

13          THE COURT:  Yeah.

14  BY MR. CHRISTIAN:

15  Q.  Okay.  So let's move to -- move up in the chain --

16          THE COURT:  You know what, I've just remembered we're

17   supposed to be taking a break.  So why don't we do that.

18   We'll take about a 15-minute break.

19          And so please rise for the jury.

20                          (Jury Out)

21          THE COURT:  Mr. Walling, feel free to take a break,

22   and we'll be back in 15 minutes.

23          THE WITNESS:  Thank you, Your Honor.

24                          (Brief Recess)

25          THE COURT:  Please be seated, and we'll get the jury

March 30, 2022

1847

```
 1    back in.
 2         It is turning sunny out, and it is 39 degrees.  We're
 3    headed in the right direction.  So this is good.
 4         UNIDENTIFIED PERSON:  Rain tomorrow.
 5         THE COURT:  I know.  I think it's going to rain
 6    forever after today.
 7         THE CASE MANAGER:  All rise for the jury.
 8              (Jury In)
 9         THE COURT:  Okay.  Please be seated.  Welcome back.
10         And, Mr. Christian, you may proceed.
11         MR. CHRISTIAN:  Thank you, Your Honor.
12    BY MR. CHRISTIAN:
13    Q.  Mr. Walling, before we had the break, I asked you about if
14    you knew who was pushing Mr. Glasgow to distribute the water
15    from the Flint River.
16         And you said you didn't know, correct?
17    A.  Correct.
18    Q.  And so I'd like to direct your attention to that same
19    email at the bottom on the backside on page 2.  In the
20    second-to-last line, it says, "as the acting F1."
21         That term, "F1," what, if any, meaning did it have to
22    you?
23    A.  It's a license.  It has to do with the -- like, an ability
24    to run a Water Treatment Plant.
25    Q.  So based on this email, it appears that Mr. Glasgow is
```

March 30, 2022                                                    1848

1   representing himself to have that license; is that fair to say?

2   A.   That is what it says.

3   Q.   So I'd like to turn back to the first page.  And if you

4   take a look at Mr. Rosenthal's response on Wednesday, April 16,

5   2014, at 2:49 P.M., and I'll summarize.

6        He writes that the MDEQ has been working on a revised

7   monitoring schedule and that it was being sent out on the same

8   day; is that correct?

9   A.   Revised schedule, yes.

10  Q.   And then Mr. Glasgow responds later that day -- or excuse

11  me -- on the next day, April 17, at 11:05 A.M.

12       And would you please read for the jury Mr. Glasgow's

13  response?

14  A.   Yes.

15       "From Mike Glasgow.  Adam, thank you for the quick

16  response.  I assumed there would be dramatic changes to our

17  monitoring.  I have people above me making plans to distribute

18  water ASAP.

19       "I was reluctant before, but after looking at the

20  monitoring schedule and our current staffing, I do not

21  anticipate giving the okay to begin sending water out any time

22  soon.

23       "If water is distributed from this plant in the next

24  couple of weeks, it will be against my direction.  I need time

25  to adequately train additional staff and to update our

March 30, 2022

1    monitoring plans before I will feel we are ready.

2          "I will reiterate this to management above me, but

3    they seem to have their own agenda.  Thank you, Mike Glasgow."

4    Q.   Thank you for reading that.

5          So first I'd like to look at that email.  It's from

6    Michael Glasgow.

7          Who's in the to-line?

8    A.   Adam Rosenthal DEQ.

9    Q.   And what about the copy, the CC line?

10   A.   Mike Prysby, DEQ.  Stephen Busch, DEQ.

11   Q.   Okay.  So Mr. Glasgow talks about time he needs to train

12   staff before he gives the okay to turn on the Flint Water

13   Treatment Plant.

14         That's part of what he wrote, correct?

15   A.   I see that.

16   Q.   Did Mr. Croft or anyone else tell you, ever tell you that

17   Mr. Glasgow needed more time to train staff before turning on

18   the Flint Water Treatment Plant?

19   A.   No.

20   Q.   And at that point in time, how often were you meeting with

21   Mr. Croft?

22   A.   I wasn't meeting with Mr. Croft individually at this time.

23   I would see Mr. Croft in those weekly staff meetings.  We've

24   seen some of the notes from those at different times.

25         And then I believe at this time, Mr. Croft's office,

March 30, 2022

1850

```
 1   I think he was also primarily working out of an office in the
 2   mayor's office suite.  So it was like a horseshoe of different
 3   offices.
 4          So I might, you know, speak with Howard for a few
 5   minutes at some point during a day.  You know, ask him, "How's
 6   it going?"
 7          And he would say -- if it had to do with water around
 8   that time, I would hear something like, "We're working on it.
 9   There's things we still have to do."
10   Q.  So --
11   A.  Very general kinds of statements.  He was not -- he was
12   not reporting to me.  I was not in that chain of command.
13   Q.  And at the time of that email -- so you saw him at least
14   weekly in a regularly scheduled meeting; is that correct?
15   A.  Yeah.  Approximately.  You know, different staff might not
16   be there every week.  But I would be there almost all those
17   weekly staff meetings.
18   Q.  And then you had chance meetings with him around the
19   office?
20   A.  Yes.
21   Q.  Watercooler talk sometimes with him?
22   A.  Yeah.  We didn't have a watercooler, but yes.
23   Q.  And so did anyone tell you that Mr. Glasgow needed more
24   time?
25   A.  No.
```

March 30, 2022

1851

1   Q.   And then just one week later, you actually pressed that
2   button, correct?
3   A.   Yes.
4   Q.   Mr. Glasgow refers to management above him having their
5   own agenda.
6         Who is the management above Mr. Glasgow at that time?
7   A.   So just the structure, there was Brent Wright, the water
8   plant supervisor.  We've seen that individual.  I believe Duffy
9   Johnson was utilities director at that time.
10        And then the next step up would be Mr. Croft as
11   public works.  And then -- April 2014.  And then the emergency
12   manager.
13   Q.   So there were four people above Mr. Glasgow at the time?
14   A.   Yeah.  That's what I would describe just from the
15   organization chart.  Not knowing who was actually talking to
16   who.  But that's what the organization chart would reflect.
17   Q.   Mr. Glasgow refers to an agenda.
18        What agenda was he referring to?
19        THE COURT:  Well, if you know.
20        THE WITNESS:  Yeah.  I don't know, Your Honor.
21   BY MR. CHRISTIAN:
22   Q.   Okay.  So just to be clear, going into the changeover, no
23   one told you anything about this email from Mr. Glasgow or his
24   concerns?
25   A.   Correct.

1    Q.  So I'd like to turn to Tab 4 of VNA Exhibit 2770.  And

2    Mr. Walling, we have a video of the button pressing switchover.

3            MR. CHRISTIAN:  So we'd like to first move to admit

4     the video clip.  It's about 30 seconds long.

5            MR. STERN:  No objection.

6            THE COURT:  Okay.  Just a minute.  I need to write

7     this down.

8            MR. CHRISTIAN:  And it's VNA, if I didn't say it, VNA

9     Exhibit 2770.

10           THE COURT:  Mr. Erickson.

11           MR. ERICKSON:  No objection.

12           THE COURT:  Okay.  Then that's received.

13     (VNA Exhibit No. 2770 Admitted Into Evidence.)

14                        (Recording Played)

15    BY MR. CHRISTIAN:

16    Q.  So you were deposed in this case.  I think you maybe

17    testified about that already.

18    A.  Yes.

19    Q.  And you testified about what changed your mind between

20    when you thought the Flint River was risky and the day when you

21    pressed the button that we just saw?

22    A.  Yes.

23    Q.  You said you relied upon other people's assurances; is

24    that correct?

25    A.  Yes.

March 30, 2022

1853

```
 1   Q.   Whose assurances did you rely upon?
 2   A.   Mr. Howard Croft as director of public works.  The
 3   emergency manager.  And I understood that they were
 4   communicating with Michigan Department of Environmental
 5   Quality.
 6             And that the City of Flint would, you know, plant,
 7   would not be able to distribute water until it had met the
 8   MDEQ's requirements under the Safe Drinking Water Act.
 9   Q.   So it was your understanding at that time -- or your
10   belief that the MDEQ had to provide some sort of approval for
11   the Flint Water Treatment Plant to operate?
12   A.   Yes.  Mr. Croft would tell me things about, you know,
13   "We're working with the Michigan Department of Environmental
14   Quality on," you know, something or other.
15   Q.   When Mr. Croft told you that, was that in these weekly
16   meetings you referred to?
17   A.   It was either in the meetings or in those conversations.
18   Right about that time, I was -- no.  That was a different
19   point.  So it was in either those meetings or the individual
20   conversations.
21   Q.   And at that point in time, what, if any, documentation to
22   backup his representations did Mr. Croft offer you?
23   A.   I don't recall that I had documentation.
24   Q.   And what, if any, documentation did you request from
25   Mr. Croft at that point in time?
```

March 30, 2022                                                    1854

1    A.   I don't recall that I did request any documentation.

2    Q.   And Mr. Croft made reference to the MDEQ providing him

3    assurances, correct?

4    A.   That he was in communication with the MDEQ.

5    Q.   And at that point in time, did you make any inquires of

6    MDEQ directly yourself?

7    A.   No.

8    Q.   And at that point in time, did you inquire with Mr. Earley

9    about the approvals to operate the Flint Water Treatment Plant?

10   A.   We were in communication.  Same kind of thing as with

11   Mr. Croft of knowing that things were being worked on, that

12   there was, you know, a timeline in place.  That's what I

13   understood.

14   Q.   So I've asked you about, you know, what inquires you might

15   have made.  Are there some inquiries of others, of other bodies

16   that you've made that I haven't asked you about so far?

17   A.   Not that I've recalled.

18   Q.   And so I'm just curious.

19        There were many people in the room.  Many smiling

20   faces, correct, when you pressed the button?

21   A.   Oh, in the room.  Yeah, that's a small -- that's an

22   outpost of the big building.  So we haven't seen a picture of

23   that.  But there's a spot where the valve underneath where the

24   Detroit system connects to the city's distribution system.

25        So there were some number of people there.  It wasn't

March 30, 2022

1855

```
 1   -- the front of the video you showed was in the Water Treatment
 2   Plant building that we saw in a picture.
 3            The button was in a smaller kind of one-room building
 4   around back of that complex.
 5   Q.   Now, there were several individuals in the room when you
 6   pressed the button, correct, or in that area?
 7   A.   Yes.
 8   Q.   How is it decided that you would press the button?
 9   A.   It was suggested as a ceremonial function.  I believe
10   Mr. Earley maybe first suggested it.  And I -- that's the kind
11   of thing a mayor does.
12            I mean, I certainly look back on that day with an
13   enormous amount of regret, given what has transpired.  But a
14   mayor performs ceremonial functions.  You cut ribbons, you
15   break ground.
16            You know, in my case, push a button at a water plant
17   and drink a glass of water that has been treated at that plant.
18   Q.   And so you had an understanding at that point in time that
19   MDEQ had made certain assurances as you've testified recently,
20   correct?
21   A.   Yes, yes.
22   Q.   And at that point in time, you had a fair amount of
23   experience working in government, correct?
24   A.   Yes.  I had been in office myself.  I had worked
25   previously for the mayor of Washington, D.C., after graduate
```

March 30, 2022

```
1   school.
2   Q.   And based on that experience and understanding of the
3   Michigan government, you understood that the MDEQ was
4   ultimately in charge of all drinking water systems in the
5   state; is that correct?
6   A.   Yes.  The state has the primary responsibility under the
7   federal law to ensure safe drinking water.
8   Q.   So at that point in time, public works obviously was in
9   charge of the water treatment plant, correct?
10  A.   Yes.  It was part of that organizational structure, yes.
11  Q.   And that also included the distribution system; is that
12  correct?  The Department of Public Works's responsibility.
13  A.   Yeah.  The pipes within the city?
14  Q.   Yes.
15  A.   Yes.
16  Q.   So in your understanding of Mr. Croft's job
17  responsibilities, you understood he had a responsibility to
18  protect the safety and health of the citizens of Flint; is that
19  fair to say?
20  A.   Yes.  That's a basic responsibility.  Health and welfare.
21  Q.   And based on your testimony, is it fair to say that
22  Mr. Croft had more day-to-day interactions with the staff at
23  the water plant than you?
24  A.   I don't really know.  But I can't -- it couldn't be less
25  than me, because I wasn't having any.  But I don't -- I don't
```

March 30, 2022                                                    1857

1   know.

2   Q.   And then just to be clear, you believe the water to be

3   safe when you pressed that button for people to drink?

4   A.   Yes.

5   Q.   Now, at that point in time, and it may seem obvious, VNA

6   didn't have any role or responsibility, correct?

7   A.   Correct.

8   Q.   And just to be -- just to make it clear, their contract

9   wasn't signed, I think you testified until February 10 of 2015,

10  correct?

11  A.   Yes, that sounds about right.

12  Q.   So if I asked you the question:  Did anyone at VNA tell

13  you that it wasn't safe to press the button and switch to the

14  Flint River, that question wouldn't make sense to you, would

15  it?

16  A.   Right.  I certainly would not have been expecting anything

17  from someone with VNA.

18  Q.   So let's -- I'd like to direct your attention now to the

19  period after the switchover.  You've talked about your office

20  hours.  If I remember correctly, Wednesday from 10:00 to 12:00.

21  A.   10:00 to noon, yes.

22  Q.   And it seems like it's something that you looked forward

23  to in your role as mayor?

24  A.   Yes.  Most days.

25  Q.   And you did that fairly religiously every week?

March 30, 2022                                                 1858

1   A.   I did.  I think I was sick maybe once or twice.  And the

2   only other thing I would reschedule for is I think there were

3   -- there were a few occasions where I was asked to be at the

4   White House for a certain purpose.

5           Anyone else who called, I was not available between

6   10:00 and noon.  So if you wanted me somewhere or you wanted me

7   at a meeting, you had to pick a different time.

8   Q.   So roughly four weeks per month?

9   A.   Yes.

10  Q.   So about eight hours per month meeting with citizens?

11  A.   You're doing the math on that one.

12  Q.   I'm trying.  And over ten months, that would be about 80

13  hours of time meeting with the citizens of Flint?

14  A.   Um-hum.

15  Q.   Whatever issues they brought to you?

16  A.   Um-hum.

17  Q.   Did they have to make a reservation to come see you?

18  A.   No.  If you wanted a reservation, which you could do, you

19  know, usually the executive assistant could find time for, you

20  know, a 15 or 30-minute meeting usually within about a month or

21  about four to six weeks.

22          But this was a -- this was a first come, first served

23  walk-in environment.  It was open.

24          There was a sign-in sheet, because it's also not fair

25   to ask somebody to, you know, show up at 9:30 and then just

```
1    sit there for two and a half hours.
2            So someone could come to the complex, sign in.
3    They'd say, "Okay.  I'm number three.  You know, Mayor will
4    probably get to me about 10:30."
5            And as long as they were there when it came their
6    turn, then they came back, and we sat across my desk and got
7    to know each other a bit.  And I heard what was on their mind.
8    Q.  And when they came to you, some of the citizens brought
9    complaints with them, right?  To you?
10   A.  Oh, yes.
11   Q.  And those included complaints about the water; is that
12   fair to say?
13   A.  Yes.
14   Q.  And Mr. Stern asked you about some of those complaints
15   yesterday.  I'd like to get into some of those now.
16           So first of all, after the switchover to the Flint
17   River, when did the complaints start?
18   A.  It seemed like almost immediately.  Certainly, you know,
19   in May, those complaints were coming forward.  These are the
20   things you learn a bit about later.
21           But it takes a certain amount of time for a water
22   that was treated by the plant to circulate through however many
23   hundreds of miles of pipes we have in the city.  So it seemed
24   like immediate.
25   Q.  And did there come a time where you ever stopped having
```

1    those meetings during your second term as mayor?

2    A.   No.  That was something thankfully that I was able to

3    continue.  I mean, if the emergency manager wouldn't have

4    supported it, there might have been an alternative means that I

5    could have used.

6            But I was using my physical office of the mayor, and

7    when a previous emergency administration had taken place, the

8    mayor had actually been removed from that space.

9            So I was in the office the whole time, was able to

10   meet with citizens in that same fashion, even as the emergency

11   managers came and went.

12   Q.   And did there come a time when the citizens ever stopped

13   complaining about the water?

14   A.   No.  There were ups and downs over different times and

15   seasons.  But, no, I would have probably had, you know, at

16   least someone every -- you know, if not every week, every

17   couple of weeks who had some particular issue with water.

18           Something about, you know, a test they hadn't heard

19   back from or a concern they wanted to share.

20   Q.   And just to point out one other thing.  So 2015 was an

21   election year; is that correct?

22   A.   Yes.

23   Q.   And I believe you said that when you first ran for mayor,

24   you knocked on thousands of doors?

25   A.   Yes.

March 30, 2022

```
 1   Q.   And during 2015, did you go door to door and then also
 2   campaign?
 3   A.   Yes, sir.
 4   Q.   And did some of those people also share their complaints
 5   with you when you went door to door?
 6   A.   Yes.  Some did.  One of the challenges at that time in
 7   really trying to understand what was occurring -- and you know,
 8   again, we know a lot about these things, a lot more about them
 9   now.
10        But different even households, you know, right next
11   to each other could actually have had a very different
12   experience with what was coming out of the tap.
13        But, yes, there were through the summer and then in,
14   you know, September and October, it was on everybody's mind,
15   you know, when I knocked on a door.
16   Q.   And so you just testified that you could have two houses
17   next door to each other that would have different experiences
18   with respect to the water?
19   A.   Yes.  As far as someone just turning on a tap.  They might
20   not know exactly what's actually happening in terms of the
21   chemistry, but one tap could look one way another tap a
22   different way.
23   Q.   And because you were talking to a lot of people back then,
24   you knew that at a time back in 2014 and 2015; is that correct?
25   A.   I knew there were a wide variety of experiences, yes.
```

March 30, 2022                                                  1862

1   Q.   Okay.  So let's take a look at Tab number 5, which has

2   been marked as VNA Exhibit 2756A.

3           Does that exhibit -- if you've had a chance to turn

4   to it, does it look familiar to you?

5           Tab 5.

6   A.   Yeah.  These are my handwritten notes.

7   Q.   And it's front and back.

8   A.   It is.

9   Q.   And the page is undated; is that fair to say?

10  A.   That's what I was going to say.  And this -- yeah.  I

11  mean, these are my notes.  These are reflective of citizen

12  frustrations.  It would have either been -- these are multiple

13  people making these comments.

14          It was either at a community advisory meeting at some

15  point or possibly a city council meeting.

16  Q.   So first of all, so this is your handwriting.

17          I believe you said you recognize it?

18  A.   Yes.

19  Q.   And?

20          MR. CHRISTIAN:  And so, Your Honor, we move to admit

21   VNA Exhibit 2756A into evidence.

22          MR. STERN:  No objection.

23          MR. ERICKSON:  No objection.

24          THE COURT:  Just one second while I get another part

25   of my high tech system out.  2756A is received.

```
1        (VNA Exhibit No. 2756A Admitted Into Evidence.)
2    BY MR. CHRISTIAN:
3    Q.  So, Mr. Walling, these -- what you're recording here as
4    best you can recall, these aren't your own thoughts.  These are
5    comments you received from your constituents, correct?
6    A.  Right.  What I do in my notes is if I'm adding my -- I
7    don't think we've seen this.  But if I'm adding my own thought,
8    I put it in brackets.
9            So if I'm -- if you say something that I want to take
10   note of, I'll try to capture that and then I'll put in brackets
11   my own thought.  So that helps me make that distinction for
12   exactly this reason.
13           When I look back at this, these are things I'm
14   hearing from, you know, Flint residents that I'm making note
15   of.
16   Q.  And just to be clear, these notes, as far as you
17   understand, are from one event.  This isn't from a log or
18   anything like that.
19           This is from one event?
20   A.  This is one-event note.
21   Q.  Okay.  So let's talk about a few of these comments.  So
22   the bottom left-hand corner of the page, I see a comment that
23   says, "I pay highest price and can't use the water."
24           Did I read that correctly?
25   A.  Yes.
```

March 30, 2022

1864

```
 1    Q.   And in the second column, the second comment from the top.
 2              "Is the risk to the consumer worth saving a penny?"
 3              Excuse me.  I'm sorry.  I misread that.
 4              "Is the risk to consumer's life worth saving a
 5     penny?"
 6              Did I read that correctly?
 7    A.   Yes.
 8    Q.   Second column, bottom comment.
 9              "I'm losing my hair.  I can't take it."
10              Did I read that correctly?
11    A.   Yes.
12    Q.   Next, let's turn to the second page, which we referred to
13    earlier.  Is it -- let's see here.  So look at this page,
14    second column, three lines down.
15              "Like drinking out of a toilet."
16              Did I read that correctly?
17    A.   Yes.
18    Q.   And a little further down on the page.
19              "Smells like a wet dog."
20              Did I read that correctly?
21    A.   Yes.
22    Q.   And a little further down.
23              "Cat won't drink the Flint water.  Cat smells it and
24    won't drink it."
25              Did I read that correctly?
```

March 30, 2022                                          1865

1   A.   Yes.

2   Q.   These complaints about the smell, price, etcetera, were

3   the types of complaints that you started receiving shortly

4   after the switch to the Flint River; is that correct?

5   A.   Yes.  And, again, I don't remember the dates of this --

6   these particular notes.  But those were the same kinds of

7   things that people were complaining about, yes.

8           MR. CHRISTIAN:  Okay.  So what we're going to do, and

9   I make this just to notify the Court as well as the counsel.

10  We're going to compile a demonstrative based upon the

11  testimony of the witness.

12          We have a -- I believe it's Tab -- let's see here --

13  55 is the completed tab.  But we're only going to add -- we're

14  going to add one piece at a time.

15          So if Bobby would put up --

16          THE COURT:  Just a minute.  So this will be a

17  timeline?

18          MR. CHRISTIAN:  Yes.  Of different items that the

19  witness testifies about.  But we won't put it up until --

20          THE COURT:  And have you shown it to the other

21  lawyers in the case?

22          MR. CHRISTIAN:  It's in the binders.  Tab 55.

23          MR. STERN:  And I'm seeing it for the first time.

24  But I have no issue with timelines.

25          THE COURT:  Okay.  Mr. Erickson, any concern?

```
 1              MR. ERICKSON:  One moment, Your Honor.

 2              THE COURT:  And when we say -- I think we talked

 3       about this.  But it's been a while.  A demonstrative exhibit

 4       is not evidence that can prove a fact in the case.  But it's

 5       used to -- when there's a lot of evidence, it's used to sort

 6       of demonstrate where we are.  What do we have so far.

 7              So it's not something you can take back into the jury

 8       room during your deliberations, but it's a guide to what the

 9       evidence has shown so far.

10              MR. ERICKSON:  No objection.

11              THE COURT:  Okay.  So go ahead.

12              MR. CHRISTIAN:  Starting with a blank slate.

13       BY MR. CHRISTIAN:

14       Q.  So I'd like you to look back to the first page of this

15       exhibit, if you would.

16              MR. CHRISTIAN:  And if we could actually put that up.

17       So what I'm going to say is on the first column, the

18       second-to-last note -- okay.

19              THE COURT:  So what he's looking at is different from

20       what's -- oh, I see.

21              MR. CHRISTIAN:  So it's on the first page.

22              THE COURT:  Give us the number of this.

23              MR. CHRISTIAN:  This was just admitted as VNA trial

24       Exhibit 2756A.

25              THE COURT:  Okay.
```

March 30, 2022                                    1867

```
 1   BY MR. CHRISTIAN:
 2   Q.   And I'd like to you direct you to the second-to-last
 3   comment in the first column.
 4          Would you please read that for the members of the
 5   jury, please?
 6   A.   "Governor put Earley here and Kurtz and Brown."
 7   Q.   Do you know Mr. Ambrose's name there?
 8   A.   No.
 9   Q.   And Mr. Ambrose became emergency manager in January of
10   2015?
11   A.   Yes.
12   Q.   So this document, these notes are from before February of
13   2015 --
14          THE COURT:  I don't think we can go that far.  This
15   -- these are handwritten notes at a community meeting.  I
16   don't think that gives us the date.
17          But let's see if the witness knows the date of these
18   meeting minutes or your handwritten notes of the meeting.
19          THE WITNESS:  Yeah.  And I don't -- I don't know the
20   date.  I agree, Your Honor, that just because a citizen
21   doesn't include something.  What I did see, though, in the top
22   of the left column --
23          THE COURT:  Okay.
24          THE WITNESS:  -- the first from the second item is,
25   "We wouldn't know anything if the DEQ didn't order it."
```

March 30, 2022

1868

```
 1              I'm pretty sure that that was referring to the DEQ's
 2    order to issue the notice of TTHM violation under the Safe
 3    Drinking Water Act.
 4              THE COURT:  There you go.
 5              THE WITNESS:  So I believe -- I believe these notes
 6    were sometime January 2015 or later.
 7              THE COURT:  That's a good way to date these.
 8              THE WITNESS:  I don't know where you put it on your
 9    timeline.
10              MR. CHRISTIAN:  So --
11              THE WITNESS:  But it's after the DEQ notice.  When
12    that DEQ -- when that notice went out, you know, the concern
13    in the community just hit what I thought was a ceiling and
14    then we found out there's more ceilings above that.
15    BY MR. CHRISTIAN:
16    Q.  Sure.  So you mentioned that the -- something about the
17    resident, what the resident put.
18              These notes about -- these notes are in your
19    handwriting, correct?
20    A.  Yes.
21    Q.  So this is what you wrote when you were talking to the
22    residents, correct?
23    A.  I was listening to residents.  This was a group.  This was
24    a meeting of some kind.  And I tend to have better notes in
25    meetings where I'm not a primary person.  If I'm doing a lot
```

1  of, kind of, talking or explaining, I tend to not have a lot of

2  notes.

3        I was taking notes, and it may have even been with

4  Mr. Ambrose.  And the person might have even been -- I'm

5  speculating -- but they might have been expressing themselves

6  to Mr. Ambrose and saying these other names of people who had

7  come before.

8        I was taking notes throughout this meeting.

9  Q.  Sure.  So just to be clear, you mentioned the MDEQ TTHM

10 notice, right?

11 A.  Yes.

12 Q.  As that's kind of a framing point for time?

13 A.  Yes.

14 Q.  That notice went out in October of 2014; is that correct?

15 A.  The first meeting I was at where I became aware of it was

16 at that time.

17 Q.  And when did the --

18 A.  The notice went out, I think the city put it in the mail

19 right before the new year, and the post office said residents

20 are going to be getting it in the first few days of January of

21 2015.

22 Q.  Okay.  So is it fair to say that by May of 2014, you

23 started receiving citizens' complaints about the changeover?

24 A.  Yes.

25 Q.  Okay.  So we're going to add that to our timeline.

1    And is it fair to say you didn't get these type of
2    complaints when Flint was using the DWSD water?
3    A.   There were a lot -- new complaints about the water.  So I
4    would have continued to receive complaints about water costs.
5    People would, you know, be just concerned about the cost in
6    general.  Like, "I don't like my bill being $180 a year."
7         Or someone would come in with a very specific bill
8    like, "Mayor, you know, what can you do to help me?  My bill is
9    now $1,600, because I haven't been able to pay it."
10        So those complaints would have been throughout my
11   entire time in office.  So the cost comments were throughout.
12        But the new complaints were about the discoloration,
13    the smell.  That's what was coming out in May of 2014.
14   Q.   Starting in May of 2014?
15   A.   Yeah.  Starting.  Those were the new kinds of complaints
16   after the switch.
17   Q.   And despite these complaints, in 2014, there was not a
18   switch back to DWSD; is that correct?
19   A.   Collect.
20   Q.   So I'd like to direct your attention to the -- August of
21   2014.  Yeah.  2014.
22   A.   Yes.
23   Q.   On August 15 of 2014, Flint issued a boil water advisory;
24   is that correct?
25   A.   Yes.

March 30, 2022

```
 1    Q.  I'd like you to turn to Tab 6 in your notebook.  You'll
 2    see what has been marked for identification as VNA trial
 3    Exhibit 618.
 4              You've seen this document before; is that correct?
 5    A.  Yes.
 6              MR. CHRISTIAN:  Your Honor, I move to admit VNA 618
 7     into evidence.
 8              MR. STERN:  No objection.
 9              MR. ERICKSON:  No objection.
10              THE COURT:  Okay.  It's received.
11      (VNA Exhibit No. 618 Admitted Into Evidence.)
12    BY MR. CHRISTIAN:
13    Q.  So this is a boil water advisory that Flint issued on
14    August 15 of 2015; is that correct?
15    A.  Yes.
16    Q.  And it's signed at the bottom by whom?
17    A.  That is Brent Wright, plant supervisor.
18    Q.  And let's take a look at what it says.  And let's go here.
19    So the heading says, "Localized Drinking Water Warning."
20              And it says below that, "A localized area of the City
21    of Flint water is contaminated with fecal coliform."
22              What -- you were here -- you were in Flint at the
23    time, correct?
24    A.  Yes.
25    Q.  What, to your knowledge, is fecal coliform bacteria?
```

March 30, 2022

1872

```
1    A.   It's a bacteria that can appear in a water system.  It's
2    something that's routinely tested for at multiple sites
3    throughout the city.
4    Q.   Any -- what is the source of this type of bacteria?
5    A.   I think it has to do with something that may have been in
6    the water, but then due to lack of chlorination, has, like,
7    grown in the water as it's moved through these systems to a
8    point where it can be, you know, can be tested, can be picked
9    up by a test.
10   Q.   Thank you.
11            So let's go a little further down from where we first
12   read.  And it starts -- quotes that starts with, "Fecal
13   coliforms and E. Coli are bacteria whose presence indicates
14   that water may be contaminated with human or animal wastes"; is
15   that correct?
16   A.   Yes.
17   Q.   Did I read that correctly?
18   A.   Yes.
19   Q.   Then it says, "Microbes in these wastes can cause
20   diarrhea, cramps, nausea, headaches, or other symptoms."
21            Did I read that correctly?
22   A.   Yes.
23   Q.   And then it says that, "These microbes may pose a special
24   risk for infants, young children, some of the elderly, and
25   people with severely compromised immune systems."
```

```
 1              Did I read that correctly?
 2   A.   Yes.
 3   Q.   Now, to be sure, this wasn't a boil water advisory for the
 4   whole city, right?
 5   A.   It was not.  These notices would be accompanied by a map
 6   that would show the affected area that would be the kind of
 7   thing that would show up on an evening news, City of Flint's
 8   issue to boil water advisory.  It would show the area.
 9              That's what the "localized" means, I believe.
10   Q.   And how did the City of Flint -- I mean, you say the
11   evening news.
12              How did the City of Flint disseminate this
13   information?
14   A.   This would go out through required media channels.  I see
15   that Brent Wright is attesting that it complies with public
16   notice requirements.
17              I don't think -- at least when these are initially
18   issued, there's not an individual, like, kind of household
19   mailing that was occurring.
20              The area would be, as it says, there would be
21   chlorine, there would be flushing.  Once they get clear tests
22   for either, you know, some period of time, they have to do
23   multiple tests.  They have to be clear.
24              And then the boil water advisory is lifted.  I
25   believe this advisory was in place for, you know, a few days.
```

1      MR. CHRISTIAN:  So we're going to add to our timeline
2   the August 15, 2014, boil water advisory.
3   BY MR. CHRISTIAN:
4   Q.  So I'd like to turn your attention now to Tab 7, which is
5   marked for identification as VNA trial Exhibit 627.
6      Do you recognize this, Mr. Walling?
7   A.  Yes.
8      MR. CHRISTIAN:  And, Your Honor, we move to admit VNA
9   Exhibit 627 into evidence.
10      MR. STERN:  No objection.
11      MR. ERICKSON:  No objection.
12      THE COURT:  Okay.  It's received.
13   (VNA Exhibit No. 627 Admitted Into Evidence.)
14   BY MR. CHRISTIAN:
15   Q.  So what is this, Mr. Walling?
16   A.  It's very similar notice.  I did also note that even
17   though I said a map, that earlier exhibit we looked at did give
18   streets.  Cause that's in bold on this advisory, so that caught
19   my attention.  It provided the area, the streets that were
20   affected.
21   Q.  So this is another boil water advisory, Exhibit 627?
22   A.  Yes.
23   Q.  And what is the date of that boil water advisory?
24   A.  This one is September 6, 2014.
25   Q.  So the next month avenue the previous one we saw?

March 30, 2022                                              1875

1   A.   Yes.

2   Q.   And so like the first boil water advisory, and you just

3   said it's limited to a particular area.

4            I imagine if you look at this, you can tell us kind

5   of the general area it is?

6   A.   Yeah.  The first notice was more west.  This second notice

7   is more north.

8   Q.   Now, the cause of this --

9   A.   It does involve some of the west area.  I think a larger

10  in this second one.  Flushing and Chevrolet.  And then updated

11  to be ML King and Pasadena.

12           The testing would be occurring at these multiple

13  sites.  So if there was a problem in one area, there would be

14  additional testing in those surrounding sites to determine.

15           So it looks like in this second case, there may have

16  been an initial finding and then a second, which is why it had

17  to be updated.

18  Q.   So this second boil water advisory is for total coliform

19  bacteria, right?

20  A.   Yes, that is what it said.  Yes.

21  Q.   And if you look towards the bottom of the document, the

22  document says, "Usually coliforms are a sign that there could

23  be a problem with the treatment or distribution system

24  (pipes)."

25           Did I read that correctly?

March 30, 2022                                          1876

1   A.   Yes.

2   Q.   And at the time of these boil water advisories, the

3   emergency manager of Flint was Darnell Earley; is that correct?

4   A.   Yes.

5   Q.   And based on working with Mr. Earley, this is something

6   that he would be aware of, correct?

7   A.   Yes.  These occurred in a number of times when I was in

8   office.  I believe every time mayor, emergency manager would

9   know about this when -- when that was identified, yes.

10  Q.   And upon -- and after learning about these boil water

11  advisories, Mr. Earley did not try to switch -- or try to

12  switch back to DWSD, did he?

13  A.   Not to my knowledge.

14  Q.   Did you ever hear him say he wanted to switch back to DWSD

15  after this?

16  A.   I did not.

17  Q.   And just to be clear, at this point in time, VNA was not

18  working in Flint; is that correct?

19  A.   Correct.

20  Q.   Now, you mentioned TTHMs before you testified about it

21  yesterday.  I believe you mentioned MDA -- MDEQ issuing

22  something about TTHMs, issuing an alert?

23  A.   Yeah --

24       THE COURT:  Just a minute.  Let him answer the

25  question.

```
1              THE WITNESS:  I was just going to say the city had to
2       issue the notice under the order of the MDEQ.
3              MR. CHRISTIAN:  Thank you for clarifying that.
4       BY MR. CHRISTIAN:
5       Q.  And just for clarity, TTHM stands for total
6       trihalomethane; is that correct?
7       A.  Yes.
8       Q.  You read the alerts and orders that went out, correct?
9       A.  Yes.
10      Q.  And they had it spelled out total trihalomethane; is that
11      correct?
12      A.  Yes.
13      Q.  And if we're going too much further, and I think you may
14      have testified about this.  The fact that a water system has
15      TTHM is not an indication of whether or not it has lead; is
16      that correct?
17             MR. STERN:  Objection.  Foundation.
18             THE COURT:  Overruled.  He either knows or doesn't
19       know.
20             THE WITNESS:  I'm not aware of a connection between
21       those two things.
22      BY MR. CHRISTIAN:
23      Q.  And, in fact, in the notice that went out from the city,
24      do you recall about TTHMs was the word "lead" mentioned?
25      A.  We could look at that -- not that I recall.  There's a lot
```

March 30, 2022

1878

1    of fine print in those notices.  And there's a lot of standard

2    language, I understand, from the Safe Drinking Water Act.  But

3    I don't recall that lead was there.

4    Q.   So in October of 2014 -- and we talked about it a few

5    times -- you learn about the City of Flint being out of

6    compliance with the Safe Drinking Water Act with respect to

7    TTHMs; is that correct?

8    A.   I understood that after some lab results were certified,

9    the city would go out of compliance with the TTHM contaminant

10   level in the Safe Drinking Water Act.

11   Q.   And you first learned about that fact or that there was a

12   potential TTHM problem from the MDEQ; is that correct?

13   A.   Yes.

14   Q.   You didn't hear -- this is in October of 2014.

15          It was months after Mr. Earley's order that you have

16   day-to-day operations or responsibilities with respect to the

17   Department of Public Works; is that correct?

18   A.   Yes.

19   Q.   And you were having weekly meetings with Mr. Croft?

20   A.   Yes.

21   Q.   Mr. Croft did not tell you about the TTHM problem; is that

22   correct?

23   A.   He did not.

24   Q.   Not before the MDEQ at least?

25   A.   Right.  He was there in that meeting.  That was a group

 1    meeting that I was a part of along with Mr. Croft, the

 2    emergency manager, personnel from Michigan Department of

 3    Environmental Quality.  That's where I learned about it.

 4    Q.   So -- and at that meeting -- and it may seem repetitive --

 5    VNA was not at that meeting, correct?

 6    A.   Correct.

 7    Q.   And that time, October -- how many months is that, about

 8    four months before VNA signed its contract on February 10?

 9    A.   Yes.  It might have been the end -- it might have been

10    more the middle or the end of the month, yeah.  I mean, three,

11    three and a half, four months.

12    Q.   So by November of 2014, as you've testified to, LAN had

13    put together at the city's request a document analyzing the

14    TTHM issue; is that correct?

15    A.   Yes.  That was the draft evaluation report I believe is

16    how it was labeled.

17    Q.   So let's just turn to Tab 8, which is Plaintiffs'

18    Exhibit 2012.

19              Does that look familiar to you?

20    A.   Yes.

21    Q.   And is that the LAN document that we just spoke of?

22    A.   Yes.  Although, I believe the earlier one was titled

23    "Draft."  I think this one maybe was just a bit updated from

24    that, but it's from right about that same time.  It says

25    November 2014.

```
 1   Q.  And did there come a time when Flint received an official
 2   letter from the MDEQ that it was in violation of TTHM limits?
 3   A.  Yes.
 4   Q.  Let's turn to Tab 9, please.
 5           You'll see what has been premarked for identification
 6   as VNA trial Exhibit 1906.
 7           You've seen this before; is that correct?
 8   A.  Yes.
 9   Q.  And this is the official MDEQ TTHM violation notice; is
10   that right?
11   A.  Yes.
12           MR. CHRISTIAN:  Your Honor, we move to admit VNA
13    Exhibit 1906 into evidence.
14           MR. STERN:  No objection.
15           MR. ERICKSON:  No objection.
16           THE COURT:  Okay.  It's received.
17      (VNA Exhibit No. 1906 Admitted Into Evidence.)
18   BY MR. CHRISTIAN:
19   Q.  Would you please turn to the last page of this document?
20   A.  The important information about your drinking water?
21   Q.  Yes.
22   A.  I see.
23   Q.  On this page, this is a sample form that is used to notify
24   the public of a TTHM violation; is that correct?
25           MR. STERN:  Objection.  Foundation.
```

```
 1            THE COURT:  Well, if you know.

 2            Do you know this sample forms?

 3            THE WITNESS:  I don't know.  I mean, it looks like

 4   one to me, but I don't think I would maybe know the

 5   difference.

 6   BY MR. CHRISTIAN:

 7   Q.  So let's take a look at the bottom.  There's a line above

 8   certification.

 9            Do you see that?

10   A.  Yes.  And I see.  Maybe this is what's attached actually

11   to the MDEQ.  So maybe the MDEQ is providing this to the city

12   as part of this notice, yep.

13   Q.  Okay.  So let's look to the middle of the page where

14   there's italic text.  It says in quotes -- or it says, "People

15   who drink water containing trihalomethanes in excess of the MCL

16   over many years may experience problems with their liver,

17   kidneys, and central nervous system, and may have an increased

18   risk of getting cancer."

19            Did I read that correctly?

20   A.  Yes.

21            MR. CHRISTIAN:  So we're going to put the December

22   16, 2014, TTHM violation notice on our timeline.

23   BY MR. CHRISTIAN:

24   Q.  Now, you testified about the potential problems associated

25   with TTHMs, and if I recall correctly -- and you correct me if
```

```
 1    I'm wrong -- you thought they were potential serious problems
 2    of health effects that could come from TTHMs, correct?
 3    A.   Yes.  I took this -- I took very, very seriously.
 4    Q.   And despite that, the City of Flint did not reconnect to
 5    DWSD water; is that correct?  At the time.
 6    A.   It didn't.  It was -- I took this very seriously.  And I
 7    also was trying to follow what I understood the guidance and
 8    the science to be.
 9              So I noticed in the second bullet -- you had me read
10    the first bullet or you read it.
11              The second bullet says, "You do not need to boil your
12    water or take other corrective actions.  If a situation arises
13    where the water is no longer safe to drink, you will be
14    notified within 24 hours."
15              So it was a case where there was a very high level of
16    concern.  The guidance was also that residents could, you
17    know, safely continue to use the water unless there was
18    another notification.  That's what I did in my household.
19    That's how I understood it.
20    Q.   So we just heard a bit of information about what happened
21    in 2014 from the time of the switch in April through the end of
22    the year.  Just want to recap a couple of things.
23              The complaints started almost immediately after the
24    switch; is that correct?
25    A.   Yes.
```

March 30, 2022

1  Q.  And the nature of the complaints smell, taste?

2  A.  Yes.

3  Q.  Odor?

4  A.  Yes.

5  Q.  And those complaints persisted through the rest of your

6  time as mayor; is that correct?

7  A.  Yes.  Until that very -- that very end.  I mean, that

8  very, very end --

9  Q.  Very, very end.

10  A.  -- with the switch back to Detroit.

11  Q.  And did they stop immediately after the switch back to

12  Detroit?

13  A.  No.  I don't -- well, I don't remember getting complaints

14  in just those last couple of weeks that I was in office along

15  those lines.

16  Q.  And you had an August boil advisory?

17  A.  Yes.

18  Q.  And a September boil advisory?

19  A.  Yes.

20  Q.  And then there was a TTHM violation notice?

21  A.  Correct.

22  Q.  And at the end -- by the end of 2014, still no switch back

23  to DWSD?

24  A.  That's correct.

25  Q.  And VNA had no role in any of this, correct?

March 30, 2022

1884

```
 1    A.   Correct.  Not at all in 2014.
 2    Q.   So I'd like to direct your attention to another topic now.
 3    Yesterday, I believe it was you -- or earlier, you testified
 4    about General Motors and its use of the water from the Flint
 5    River.
 6              First of all --
 7    A.   Yes.
 8    Q.   -- at the time when you were mayor of Flint in 2014, how
 9    many factories did GM have in Flint?
10    A.   Four or five.
11    Q.   So four or five?
12    A.   Yes.
13    Q.   I'm going to show you a document that's been marked as VNA
14    Exhibit 5454I.  It's Tab 10.
15    A.   Okay.
16    Q.   So this is an email dated October 13 of 2014, correct?
17    A.   Yes.
18    Q.   And you're a recipient of this email?
19    A.   Yes.  I'm CC'd.
20    Q.   So you're copied on it?
21    A.   Yes.
22              MR. CHRISTIAN:  Your Honor, we move to admit VNA
23     Exhibit 5454I into evidence.
24              MR. STERN:  No objection.
25              MR. ERICKSON:  No objection.
```

```
1              THE COURT:  Okay.  It's received.
2         (VNA Exhibit No. 5454I Admitted Into Evidence.)
3    BY MR. CHRISTIAN:
4    Q.  And if we look at the other recipients of this email,
5    would you just please tell the jury who they were, their names,
6    rather?
7              THE COURT:  There are several emails on here.
8              Which one are you talking about?
9    BY MR. CHRISTIAN:
10   Q.   Okay.  So let's start -- let's just start -- I believe,
11   let's start at the earliest email, which would be at the middle
12   of the page roughly.  Slightly above?
13             MR. STERN:  Your Honor, I think the earliest email is
14    actually at the bottom of page 1.  It starts with the words
15    "Pete" and then goes into page 2.
16             MR. CHRISTIAN:  Thank you, Mr. Stern.
17             THE COURT:  Yeah.  That's what I show.
18   BY MR. CHRISTIAN:
19   Q.  So at the furthest -- at the lowest to-line on this page,
20   would you please list the recipients?
21   A.   So we have on the screen you have up there, the Liz Murphy
22   or -- she wasn't CC'd.  Elizabeth or Liz Murphy, assistant to
23   the emergency manager.  And then above that name, Howard Croft,
24   public works director.
25             I was looking at the screen.  Is that where you were
```

 1  asking me about?

 2  Q.   Just -- we're just trying to figure out who received this

 3  -- who was in this email thread.

 4  A.   Right.  So I mentioned Elizabeth Murphy.  I believe every

 5  other name on here is up at the very top of page 1.

 6  Q.   Okay.  So this included Emergency Manager Earley?

 7  A.   Yes.  It was -- at the top, this is the item sent from Tom

 8  Wickham, who's Flint manufacturing communications, so in Flint.

 9  And he's sending this email to Darnell Earley and Elizabeth or

10  Liz Murphy.

11       And then we have a group of people CC'd.  Howard

12  Croft, public works; Pete Bade, city attorney; myself; Jason

13  Lorenz, public information officer; Gerald Ambrose as finance

14  director.  Daugherty Johnson utilities administrator.  Anthony

15  chub was, I believe, a deputy city attorney at that time.

16  Q.   So let's look at the bottom of the screen.  There's a

17  paragraph that says, "The City of Flint has honored" -- begins

18  with, "The City of Flint has honored."

19  A.   Yes.

20  Q.   Would you please read that for the jury?

21  A.   Yes.

22       This is from Elizabeth Murphy.  "I changed a couple

23  of phrases.  The City of Flint has honored a request by General

24  Motors in allowing them to divert a portion of their water

25  supply needs to a different supplier for internal processing

March 30, 2022

1887

1  purposes.

2       "GM is the only company which has made a request to

3  temporarily use a different water source.  General Motors

4  spokesperson Tom Wickham can be reached" -- do you want me to

5  read his number into the record?

6  Q.   Thank you for asking.  No, thank you.

7  A.   That's good enough?

8  Q.   That's fine.  Thank you, so much.

9       And this language you just read, from looking at the

10 email, what was the purpose of that language?

11 A.   This was -- so Tom Wickham was communications for the

12 Flint manufacturing complex.  Three manufacturing complexes on

13 the city's southwest side.  It was an engine company.  They do

14 engines -- I really should know.  Engines, truck assembly.  And

15 there's one other.

16      So Tom worked on those three facilities called Flint

17 manufacturing -- the Flint manufacturing complex.  And this

18 looks like an email chain that were working on a pretrial

19 release.

20      So I think that's why Liz is saying, you know, "I

21 changed a couple of phrases."  Looks like -- there must have

22 been some language that was shared, either in this email chain

23 or in a separate chain about preparing a press release.

24 Q.   And in this language, the first line we see allowing them

25 to divert a portion of their water supply.

March 30, 2022

1888

```
 1              So is it your recollection that GM diverted all of
 2    their water supply away from the Flint River or only some of
 3    it?
 4    A.   It's my recollection that it was one plant in the Flint
 5    manufacturing complex that disconnected from what had been its
 6    water supply, which was the City of Flint maintained portion.
 7    And it connected to a nearby pipe from the Genesee County Drain
 8    Commissioner's purview.
 9              And that water continued to be from DWSD.
10    Q.   So to be clear, only one out of four or five plants
11    switched to --
12    A.   That's my recollection.  The other facility is on a
13    different side of town over by the current Kettering
14    University.  The tool and die plant.  And I believe it was the
15    engine plant that had this issue.
16    Q.   Okay.  So a couple of days later on October of --
17    October 16 of 2014, the City of Flint put out a press release
18    about this.
19              Do you recall?
20    A.   That sounds right.
21    Q.   Okay.  So let's take a look at Tab 11, which is VNA
22    Exhibit 5454J.
23              Do you recognize this?
24    A.   Yes.  Yes, I do.
25    Q.   And did you see this at the time?
```

March 30, 2022

1889

```
 1   A.   Yes.
 2            MR. CHRISTIAN:  Your Honor, we move to admit VNA
 3    Exhibit 5454J into evidence.
 4            MR. STERN:  No objection.
 5            MR. ERICKSON:  No objection.
 6            THE COURT:  Okay.  It's received.
 7     (VNA Exhibit No. 5454J Admitted Into Evidence.)
 8   BY MR. CHRISTIAN:
 9   Q.   So would you please look at the first paragraph of this
10   press release.
11   A.   Yes.
12   Q.   And it describes an agreement with General Motors to allow
13   the company to temporarily use Flint township water for a water
14   source for manufacturing needs.
15            Was there some sort of a process where an agreement
16   was reached?
17   A.   Yes.  I think over a couple week period.
18   Q.   And then let's look at the next paragraph.
19            And were you a part of those negotiations,
20   Mr. Walling?
21   A.   No, not the negotiations.  But I was, as you saw in that
22   last email, I was looped in on what the -- on the developments
23   were.  And then when the public communication was being
24   prepared.
25            I continued to have a lot of those external
```

1    connections, and people would contact me.  So it was easier if

2    I knew in advance.

3         But you do see this -- you look at different

4    letterhead throughout this time.  This letterhead was selected

5    to be City of Flint Office of Emergency Manager.  So this was a

6    statement from Mr. Earley.  I was aware of it.

7    Q.   And so if we look at the paragraph that is now

8    highlighted, the next paragraph from what you just read, would

9    you please just read that for the record?

10   A.   Yes.

11        "The City of Flint uses chloride as an important

12   component in making water safe for drinking.  But that can

13   cause problems for GM's machining work.  The agreement comes

14   after GM raised concerns about chloride levels in Flint's

15   treated water."

16   Q.   Now, what, if any, knowledge do you have about what

17   machining work is?

18   A.   Well, I think they're just meaning that that's a place

19   where they're actually producing parts.  So we're most famous

20   for that big Flint truck assembly plant.  The engine plant is

21   actually doing, I believe, some part machining of those parts.

22        So it's trying to, I think, be specific about GM does

23   lots of things in this community.  This is about what's

24   happening with the machining work in one plant.

25   Q.   So just going to the next paragraph.

1    And let me ask you, did you -- what, if any, role did

2  you have in terms of editing the language in this press

3  release?

4  A.   I don't remember.  I don't recall that I had any edits or

5  revisions to this.  Again, I was in the loop.  But it reflects

6  what I understood was the issue from General Motors.  I had

7  worked with Tom Wickham in other capacities over the years.  I

8  believe I was in maybe one meeting where it was discussed.

9    So this was Mr. Earley's statement.  But from what I

10  knew, this was what the city understood.

11  Q.   So just -- if you read the first sentence of this

12  paragraph?

13  A.   "This temporary switch is needed to allow GM to use water

14  that does not have the same level of treatment provided for

15  high quality drinking water."

16    MR. CHRISTIAN:  So, Your Honor, we're getting ready

17  to switch sections.  So I don't know if this is a point in

18  which you're --

19    THE COURT:  This looks like a good time to take a

20  break.  So -- or to end for the day.  Sorry.  I didn't mean to

21  startle the jury.

22    So we will conclude for the day.  We'll be back at it

23  at 9:00 A.M. in the morning.

24    And so you'll be returning, Mr. Walling.  And we will

25  take it from there.

```
 1              Please rise for the jury.  And you remember
 2    everything I've told you every other day.
 3                        (Jury Out)
 4              THE COURT:  You can step down, Mr. Earley or
 5    Mr. Walling.  There's two L's in there.
 6              Then what I'd like to do is have a sidebar conference
 7    -- please be seated.  Conference.  Well, we can start --
 8              MR. STERN:  I just want to -- if I could just let
 9    Mr. Walling know that it's been the Court's practice we do not
10    have Court on Fridays.
11              THE WITNESS:  No?
12              MR. STERN:  So to the extent he wants to punch me.
13              THE COURT:  We have other work to do on Friday to try
14    to catch up around here, and I'm sure everyone else, too.  So
15    we won't be in session on Friday.
16              I don't know how much longer.
17              Mr. Christian, do you think you have a lot more to
18    go?
19              MR. CHRISTIAN:  Oh, yes.  There's quite a bit more,
20    Your Honor.
21              THE COURT:  And then, Mr. Erickson, will you have a
22    lot of material?
23              MR. ERICKSON:  Your Honor, it's hard to say.  I'm
24    going to be reevaluating this evening.
25              THE COURT:  Okay.  So it would be my guess it would
```

March 30, 2022

1893

1    be possible you would be here all day tomorrow and potentially

2    a little bit on Monday.

3              THE WITNESS:  Next week Monday through Thursday,

4    right?

5              THE COURT:  Yeah.  Okay.  Thank you for your

6    patience.

7              MR. MAIMON:  On that note, Your Honor.

8              THE COURT:  Yes.

9              MR. MAIMON:  And, obviously, we're not looking to

10   interrupt or interfere with counsel's examination.  We had

11   Aundreya Teed's mother scheduled for tomorrow.  If we're not

12   going to get to her, I'm going to call her and tell her, "You

13   know, don't bother coming down."

14             What's that?

15             MS. BUSH:  Oh, I got it.  Aundreya.  April.

16             MR. MAIMON:  Yes.  Apricot.

17             MR. STERN:  Aundreya Teed's one of our plaintiffs.

18             THE COURT:  I can't imagine that if we have

19   Mr. Walling back tomorrow that we'll get to your next witness.

20             MR. MAIMON:  And that's fair enough.  Because, you

21   know, obviously we want to keep things going.  If all of a

22   sudden we're done at 11:00, and I don't -- it doesn't seem so.

23   But that's up to the defendants.  I don't want to be caught

24   short.  That's all.

25             THE COURT:  What do you think, Mr. Christian?

March 30, 2022

1894

```
 1        MR. CHRISTIAN:  If I were telling him based on what
 2   we have left, I would advise him not to call that witness
 3   tomorrow.
 4        THE COURT:  Okay.  All right.  Well, that's
 5   definitive.
 6        MR. MAIMON:  I appreciate it.  Thank you.
 7        THE COURT:  Good.  Okay.  I wanted -- I just wanted
 8   to draw one thing to your attention that I'm curious about.  I
 9   saw a copy of a Tweet from Veolia Flint facts indicating that
10   one of the witnesses in our case is hiding behind lies and
11   hiding behind silence.
12        And I'm not sure if there's a problem.  I mean,
13   that's a Tweet -- I don't know.  Is that a Veolia North
14   America official statement regarding the trial?
15        Are they tweeting the trial?  Or what do you know,
16   Mr. Christian?
17        MR. CHRISTIAN:  I'm not aware of that statement, Your
18   Honor.
19        THE COURT:  Mr. Stein, are you aware?  I can give you
20   the exhibit.  It's the last page of Governor Snyder's request
21   for interlocutory appeal.
22        MR. STEIN:  I saw it attached to Governor Snyder's
23   papers.
24        THE COURT:  Yeah.
25        MR. STEIN:  I hadn't seen it before that.
```

```
 1          THE COURT:  See, model rule of professional conduct
 2    3.6A provides that a lawyer who is participating or has
 3    participated in the investigation of litigation -- or
 4    litigation of a matter shall not make an extra judicial
 5    statement that the lawyer knows or reasonably should know will
 6    be disseminated.
 7          And I'm not suggesting that any of you made this
 8    statement.  It's -- or that, you know, I don't know who made
 9    it.  But -- and the comment to the rule suggests that that
10    applies to making a statement about a witness's identity of a
11    witness or expected testimony of a party or a witness.
12          And this is an expected witness.
13          So I just wanted to know whether counsel was involved
14    in this.
15          MR. STEIN:  I saw it in Governor Snyder's papers for
16    the first time.  And I don't know of any --
17          THE COURT:  My experience thus far in our case is
18    there are many more lawyers than are in court.  There are
19    layers and layers of lawyers, and I think we've got at least
20    two law firms involved for Veolia.
21          It does seem -- I would like to just know that other
22    lawyers on your team are not tweeting about a witness, the
23    identity of witnesses, expected testimony and so on.
24          MR. STEIN:  We'll look into it and get back to the
25    Court.
```

March 30, 2022

1896

```
 1           THE COURT:  Okay.  And then we can sort of sort it
 2    out if that's appropriate.
 3           I'm interested in anything on the schedule for April
 4    that you all have agreed that you need a day off, or are we --
 5           MR. MAIMON:  So I don't think we've -- Mr. Campbell
 6    approached me during the break and asked me what exactly was
 7    it that we were referring to.
 8           And I just told him that for me personally the 18th
 9    of April and the 21st of April, more the 21st than the 18th,
10    but both are somewhat problematic for me.  It's the Passover
11    holiday around then.  And just traveling back and forth would
12    be problematic.
13           THE COURT:  Yeah.
14           MR. MAIMON:  Again, I don't know that a decision has
15    to be made right now, Your Honor.  If, for instance -- and I
16    told Mr. Campbell and I was meaning to speak with Mr. Mason
17    after we concluded court today.
18           If one of those days happens to be a day when we're
19    going to be showing video and there's no other problem, I
20    don't -- I wouldn't want to get in the way of that.  I would
21    like to be here when we have live witnesses.
22           THE COURT:  Okay.
23           MR. MAIMON:  Especially if they're witnesses that I'm
24    going to be putting on.
25           THE COURT:  Okay.  Well, I'll let you talk a little
```

March 30, 2022

1897

```
 1   bit more about it --
 2            MR. MAIMON:  Thank you.
 3            THE COURT:  -- and then I will take a look, too.
 4            And then the last thing for today is the --
 5   Mr. Maimon, are plaintiffs making -- what would be helpful to
 6   me in deciding this issue is if there's a motion before the
 7   Court for the live video feed testimony for your witness,
 8   Mr. Del Toral?
 9            MR. MAIMON:  Yes.  We'll prepare that and submit
10   that.
11            THE COURT:  You can make it orally.  I don't need
12   it --
13            MR. MAIMON:  Okay.
14            THE COURT:  I understand.
15            MR. MAIMON:  So then if I may, Your Honor?
16            THE COURT:  Yes.
17            MR. MAIMON:  Plaintiffs hereby move pursuant to Rule
18   43 of the Federal Rules of Civil Procedure for asking the
19   Court to exercise its discretion to allow Mr. Miguel Del Toral
20   to appear as a witness by videoconferencing, whether it's Zoom
21   or any other mechanism that facilities that and allows it in
22   the most effective way.
23            As indicated yesterday, Mr. Del Toral has personal
24   concerns with regard to the COVID-19 pandemic.
25            THE COURT:  And I don't want argument on the motion
```

1    right now.  I've gotten sort of quasi-briefing in a sense.

2    I've gotten Mr. Kent's article.  I heard some argument

3    yesterday from Mr. Campbell and others.

4              MR. MAIMON:  So that's our motion, Your Honor, to

5    allow us for the reasons stated yesterday and those under the

6    case law to allow us to do that.

7              MR. CAMPBELL:  Your Honor, just to be clear, if you

8    don't mind.

9              THE COURT:  No, I don't mind.

10             MR. CAMPBELL:  My statement was as to my experience

11   doing this in courtrooms, and it was problematic.  And that

12   was not yesterday.  It wasn't this year.  It wasn't in the era

13   of Zoom.  So my concern is that if this happens, we need to

14   make sure that it works.

15             THE COURT:  Well, this is what I want to do, which is

16   that I want to -- you sent me three cases.  There were cases

17   referenced in Mr. Kent's article.  I want to take a chance to

18   review those further.

19             But one thing that struck me, which is why I wanted

20   to do this at sidebar, and I just want to confirm with Bill

21   that it's not being recorded or broadcast.

22             I recall early on, prior to, I think, the motions for

23   summary judgment, that Mr. Del Toral's deposition was -- had

24   some portions redacted related to a health concern.

25             MR. MAIMON:  So I don't think that it actually ended

1    up being redacted.  I know that there was a concern because

2    another EPA official in a deposition that preceded his had

3    disclosed that he had some medical condition and disclosed

4    what it was.

5         But at the deposition itself, I think that when that

6    issue was raised with Mr. Del Toral, his words were, "I'm an

7    open book, and I have nothing to hide."

8         THE COURT:  Okay.

9         MR. MAIMON:  Not that we think that any of that is

10    relevant.  But I don't think --

11         THE COURT:  Well, here's the relevance to me.

12         What was the medical condition?

13         MR. MAIMON:  So he -- I believe, he suffered from a

14    bipolar disorder and took a leave of absence sometime in July

15    of 2015, July and August of 2015.

16         MR. CHRISTIAN:  Your Honor, similar, I think it's

17    schizophrenia.

18         THE COURT:  I think it is, too.  I recall reading

19    that it was schizophrenia.  And yesterday, it just so happened

20    that National Public Radio did a story on four or five studies

21    that have revealed that after age, schizophrenia is the

22    highest risk factor for death from COVID.

23         The study came out of Israel, South Africa, Korea,

24    England, and the United -- it was something like that.  I can

25    send it all to you.

March 30, 2022

1    And that -- I listened with special interest, because

2    I recalled that that's what Mr. Del Toral testified to having

3    a diagnosis for.

4         But in light of that, that seems like a medical

5    condition.

6         So -- but do I understand you correctly that it's

7    COVID is the reason he doesn't want to travel, his concern?

8         MR. MAIMON:  That's exactly right.  We've discussed

9    alternative ways of travel, and he just won't travel here.

10        THE COURT:  Yeah.  Okay.  All right.

11        I think, Mr. Kent, did you have something or

12   Mr. Mason?

13        MR. MASON:  Your Honor, depending on where you come

14   out, we believe that there are -- and the advisory committee

15   has given some guidance with respect to the interpretation of

16   this.

17        But not to argue the motion, I would just say if you

18   do decide to go forward with this, I would respectfully

19   request the opportunity to appear in person with him to take

20   the examination in person.

21        I think that we are getting so far afield of the

22   ability to confront witnesses live in courtrooms that we

23   cannot set a precedent of having to do it Zoom.  The jurors

24   have to be here in person.  Are we going to allow them to Zoom

25   in, in the future, too?  So --

March 30, 2022

1901

```
 1            THE COURT:  Well, no.  Mr. Mason, no, we're not going
 2    to allow the jurors to Zoom in.  That's why we're doing it
 3    here with a COVID protocol in place as an order of the court.
 4            And if I understand, COVID-19, it's a virus that is
 5    transmitted through respiratory droplets or whatever.  And if
 6    Mr. Del Toral doesn't want to drive here from Virginia --
 7            MR. STERN:  Chicago.
 8            MR. MAIMON:  Chicago.
 9            THE COURT:  -- Chicago go to be in person with us, I
10    cannot -- I cannot imagine that he wants to be in a room,
11    small room with you or a large room.
12            MR. MASON:  Well, then I think we should be able to
13    voir dire him over Zoom to find out whether he is out and
14    about, where he lives.  We're taking this presumption that he
15    lives in a bubble because of his concerns.
16            But if, in fact, he does get out on a regular basis
17    and is around people and goes to restaurants and things like
18    that, I think that's valuable information for Your Honor to be
19    able to decide this issue of whether it is indeed
20    extraordinary circumstances.
21            If his schizophrenia and fear of COVID is such that
22    he essentially does not ever get around people, that's
23    certainly relevant.  But if he is not, then at a minimum, you
24    know, I'm fully vaccinated.  We'll wear a mask.  We'll social
25    distance.
```

March 30, 2022

1902

1    But at a minimum, I think that's relevant information

2    for Your Honor to consider.

3    THE COURT:  Well, and also if there's further

4    argument you want to make at this point, what I anticipate

5    doing is issuing a very short written opinion on the subject.

6    So if there is more argument that is to be had, feel free to

7    make it.

8    But what I would do in the event I grant the motion,

9    we would set up a time to test the technology and to make sure

10   that we can hear him.  He can hear us.  He can see you.  And

11   that the exhibit can be easily -- Mr. Campbell, I think or

12   maybe you did, brought up the issue of you don't want to send

13   your exhibits ahead of time to the witness?

14   MR. MASON:  Yeah.

15   THE COURT:  That's a fair -- a fair concern.  So I

16   want to make sure that he can see exhibits that are put in

17   front of him if they're put on either the screen or an ELMO,

18   whatever you prefer.

19   MR. MAIMON:  I've had some experience with this, Your

20   Honor.  And while counsel -- all counsel should be free to do

21   what they wish.

22   In other cases where we've taken testimony by Zoom,

23   we can reach -- I've reached agreements with opposing counsel

24   that people can send a binder to be sealed and not opened up

25   until the examination starts.  And this way --

March 30, 2022

```
 1          THE COURT:  But like Mr. Stern had an exhibit that he
 2   found last night that he thought, "Hey, I'm going to use this.
 3   It wasn't in the binder."
 4          So we just have to make sure that that can work.  I
 5   don't want to limit anyone in here --
 6          MR. MAIMON:  I wouldn't suggest that it's any
 7   limitation.
 8          But to the extent that we think that it could
 9   facilitate and make it easier, those type of safeguards or
10   precautions or ideas can help facilitate the process along so
11   that the one document here, one document there can be shown to
12   the witness and dealt with easier than if we have the binders
13   full.
14          But that's just what I've done in other cases during
15   the COVID pandemic.
16          THE COURT:  And there was a list in the Whitt case
17   from the Eastern District of Tennessee of safeguards that that
18   court ordered, which was that, "The plaintiffs ensured that
19   the witness can be heard and understood by the jury and the
20   parties.
21          "That the witness testifies alone in a closed room,
22   free of any outside influence."
23          The same conditions that we would have in court.
24          And that, "Defendant be allowed a sufficient
25   opportunity to cross-examine the witness and that the
```

March 30, 2022

1904

1   transmission of the video conference be instantaneous."

2          So I would set aside time next week after the jury

3   leaves to try this out, so we'd have to make sure

4   Mr. Del Toral is available.

5          I don't -- I want to finish reading what you've

6   submitted, do a little bit of my own research, and then make a

7   decision.

8          MR. MASON:  And then I'd just request that the Court

9   consider -- I know you haven't ruled yet.  But if the Court is

10  going to test this out, that I be given the opportunity to

11  voir dire the witness on the question of how significant this

12  exposure is so the Court can make the determination at that

13  time.  Even if you're making a judgment subject to that, I'd

14  like to be able to make a record.

15         Because I do think as technology evolves, I would

16  like to make a record on this if I could --

17         THE COURT:  Okay.

18         MR. MASON:  -- with respect to asking the witness

19  about this.

20         THE COURT:  Let me just ask Mr. Maimon or Mr. Stern,

21  you've represented that he doesn't want to travel, that you've

22  explored options.

23         Do you know the answers to --

24         MR. STERN:  I know for certain that he is scared to

25  travel.  I've heard that he has rarely, if ever, left his

March 30, 2022

1905

1    home.  And he is concerned -- he hasn't talked to me about his

2    mental condition other than during the deposition.

3         But I have not asked him, "Is the reason you're

4    scared because of how it would affect your schizophrenia?"  I

5    just don't feel like that's appropriate.

6         He represented to me he wants to be here, but he's

7    scared to travel.  If someone doubts the veracity of the

8    representation I'm making, I have no problem if he asks

9    Mr. Del Toral himself.  Because that's what he's told me, and

10   I'm certain that's what he'll tell them.

11        THE COURT:  That's a good idea.  Okay.  So I'll get

12   busy finalizing a decision on this.  And if the decision is

13   that he can testify remotely, then we'll set a time for 20

14   minutes or so after the jury leaves next week.

15        MR. MAIMON:  Thank you, Your Honor.

16        THE COURT:  Anything else?  Okay.  Good.  Take care.

17             (Proceedings Concluded)

18              -        -        -

19

20        CERTIFICATE OF OFFICIAL COURT REPORTER

21        I, Jeseca C. Eddington, Federal Official Court

22   Reporter, do hereby certify the foregoing 171 pages are a true

23   and correct transcript of the above entitled proceedings.

24   /s/ JESECA C. EDDINGTON_____          03/30/2022___
     Jeseca C. Eddington, RDR, RMR, CRR, FCRR         Date

25

Sherrod Teed Vanderhagen and Ware v VNA and LAN - Case No. 17-10164