```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                       SOUTHERN DIVISION

 3    SHERROD, TEED, VANDERHAGEN and WARE,

 4                    Plaintiffs,
        -v-                                  Case No. 17-10164
 5
      VNA and LAN,
 6
                      Defendants.
 7    _____/

 8                           JURY TRIAL

 9
                  BEFORE THE HONORABLE JUDITH E. LEVY
10                  UNITED STATES DISTRICT JUDGE

11                       MARCH 31, 2022

12
      APPEARANCES:
13
      For the              Corey M. Stern
14    Plaintiffs:          Levy Konigsberg, LLP
                           605 Third Avenue, 33rd Floor
15                         New York, New York 10158

16                         Moshe Maimon
                           Levy Konigsberg, LLP
17                         605 Third Avenue, 33rd Floor
                           New York, New York 10158
18
                           Melanie Daly
19                         Levy Konigsberg, LLP
                           605 Third Avenue, 33rd Floor
20                         New York, New York 10158

21

22                      (Appearances Continued on Next Page)

23
      TO OBTAIN A         JESECA C. EDDINGTON, RDR, RMR, CRR, FCRR
24    CERTIFIED             FEDERAL OFFICIAL COURT REPORTER
      TRANSCRIPT:            UNITED STATES DISTRICT COURT
25                            200 EAST LIBERTY STREET
                            ANN ARBOR, MICHIGAN 48104
```

```
 1     For the VNA        Daniel Stein
       Defendants:        Mayer Brown LLP
 2                        1221 Avenue of the Americas
                          New York, New York 10020
 3
                          James M. Campbell
 4                        Campbell Conroy & O'Neil, P.C.
                          1 Constitution Wharf, Suite 310
 5                        Boston, Massachusetts 02129

 6                        Marcus Christian
                          Mayer Brown LLP
 7                        1999 K Street NW
                          Washington, District of Columbia 20006
 8
                          Mark R. Ter Molen
 9                        Mayer Brown LLP
                          71 South Wacker Drive
10                        Chicago, Illinois 60606

11                        Cheryl A. Bush
                          Bush, Seyferth PLLC
12                        100 West Big Beaver Road, Suite 400
                          Troy, Michigan 48084
13
       For the LAN        Wayne Brian Mason
14     Defendants:        Faegre Drinker Biddle & Reath LLP
                          1717 Main Street, Suite 5400
15                        Dallas, Texas 75201

16                        David C. Kent
                          Faegre Drinker Biddle & Reath LLP
17                        1717 Main Street, Suite 5400
                          Dallas, Texas 75201
18
                          Tory Finley
19                        Faegre Drinker Biddle & Reath LLP
                          1717 Main Street, Suite 5400
20                        Dallas, Texas 75201

21                        Philip A. Erickson
                          Plunkett & Cooney
22                        325 East Grand River Avenue, Suite 250
                          East Lansing, Michigan 48823
23

24

25
```

March 31, 2022

1908

```
 1                      I N D E X

 2    WITNESSES                                      PAGE

 3    DAYNE WALLING
           Cross-examination(cont.)by Mr. Christian.....1930
 4

 5

 6    EXHIBITS                          Marked    Admitted

 7    Defendant VNA
           1027.........................2014       2014
 8         1064.........................1972       1973
           1401.........................2027       2028
 9         1516.........................2041       2041
           1843.........................2051       2051
10         2665.........................2038       ----
           5444.........................1984       1984
11

12

13

14

15

16    MISCELLANY                                   PAGE

      Proceedings................................1909
17    Certificate................................2074

18

19

20

21

22

23

24

25
```

March 31, 2022

|    | **P R O C E E D I N G S** |
|----|---------------------------|
| 1  | |
| 2  | THE CLERK:  Calling Sherrod, Teed, Vanderhagen and |
| 3  | Ware vs VNA and LAN. |
| 4  | THE COURT:  Thank you.  Could we have appearances, |
| 5  | please. |
| 6  | MR. STERN:  Good morning, Your Honor.  Corey Stern |
| 7  | and Moshe Maimon for the bellwether plaintiffs. |
| 8  | THE COURT:  Thank you. |
| 9  | MR. CHRISTIAN:  Good morning, Your Honor.  Marcus |
| 10 | Christian, Cheryl Bush, and Daniel Stein on behalf of VNA. |
| 11 | THE COURT:  Thank you. |
| 12 | MR. MASON:  And Wayne Mason, Phil Erickson, and David |
| 13 | Kent on behalf of LAN, Your Honor. |
| 14 | THE COURT:  Okay.  Thank you.  And please be seated. |
| 15 | And I want to welcome our special guests in the back.  It's so |
| 16 | good to see you. |
| 17 | And, yes, we have Mr. Walling. |
| 18 | And for our guests, this is the former mayor of |
| 19 | Flint.  So he's been on the witness stand since Monday.  Thank |
| 20 | you.  Okay.  I'm just logging in.  I want to see how we're |
| 21 | doing with members of the jury. |
| 22 | Sure was a windy morning, but that shouldn't block |
| 23 | travel.  They're all here. |
| 24 | MR. CHRISTIAN:  Your Honor, before we bring in the |
| 25 | jury, there's a matter we'd like to bring up with you. |

March 31, 2022

```
 1          THE COURT:  Okay.  What is that?
 2          MR. CHRISTIAN:  That's related to the lawsuit by the
 3  plaintiffs against Mr. Walling.  We wanted to raise a few
 4  points that support our position that we should be able to
 5  address that with Mr. Walling.
 6          THE COURT:  Okay.  Let me just say what struck me
 7  yesterday -- and correct me if I'm wrong -- but I thought
 8  there was a motion in limine that you filed that said you
 9  didn't want any mention of the settlement, because it could
10  potentially prejudice you.
11          Because jurors could wonder, "Well, why didn't you
12  settle?"  You know, could get mad at your client.
13          So I do recall that.  Am I mistaken about that, about
14  just that?
15          MR. CHRISTIAN:  That is -- there is a motion in
16  limine with respect to that, Your Honor.
17          THE COURT:  And it was filed by you?
18          MR. CHRISTIAN:  It was filed, yes.
19          THE COURT:  Okay.  And then in that motion, if I'm
20  not mistaken, it also said you were seeking to have no mention
21  of other cases, other than these four cases.
22          Do I have that totally wrong?
23          MR. MAIMON:  That's absolutely correct, Your Honor.
24          THE COURT:  Okay.  Because I just want to tell you
25  I'm not trying to be difficult with these rulings at all.
```

```
 1    Believe me and hear me.  I'm not trying to be difficult.  I'm

 2    trying to follow the previous motion practice, the decisions

 3    made, the efforts undertaken to protect everyone's rights,

 4    including your clients'.

 5              So tell me why you now want to set that aside and

 6    bring in other aspects of the litigation that you previously

 7    filed a written motion seeking to exclude?

 8              MR. CHRISTIAN:  So, Your Honor, the distinction I

 9    would draw, and I appreciate your pointing out that

10    perspective, is that in this instance, we're not talking about

11    what procedurally happened.  We're talking about substantive

12    evidence.  We're talking about --

13              THE COURT:  Well, it's not --

14              MR. CHRISTIAN:  Actually --

15              THE COURT:  If I recall my civil procedure, it's not

16    evidence that he was sued.  It's allegations.

17              MR. CHRISTIAN:  Yes.

18              THE COURT:  Okay.

19              MR. CHRISTIAN:  And that's where we were headed, Your

20    Honor.  The plaintiffs made specific allegations with respect

21    to Mr. Walling.  And where we were headed was to mention some

22    of those -- some language from some of those specific

23    allegations.  That's what we would like to be able to --

24              THE COURT:  And what is that going to -- help me to

25    make sure I understand.  Because I was listening carefully as
```

1  I could yesterday.

2          I believe what you're doing now is cross-examining

3  Mr. Walling in an effort to make your nonparty at fault case

4  against him.  VNA's case of negligence against Mr. Walling.

5          Is that what you were doing?

6          MR. CHRISTIAN:  Your Honor, we are cross-examining

7  Mr. Walling for a number of reasons.  One of them is to

8  address the evidence that was offered during his testimony

9  with the plaintiffs.  So that may be impeachment.  It may be

10  offering additional evidence to complete the picture.

11          It may be talking about -- examining Mr. Walling for

12  evidence with respect to other nonparties at fault.

13          So it is very broad.  And you may recall that during

14  Mr. Stern's testimony -- or excuse me -- not his testimony,

15  but during his examination, he blurted out, "They're trying to

16  blame you."

17          THE COURT:  Right.

18          MR. CHRISTIAN:  Right.  And you can't say strike that

19  and pull it out.  It was here, whether it was sustained or

20  not.

21          THE COURT:  No.  But that was the opening, the

22  colossal failure of government.  All of what's on the VNA

23  Twitter feed that I've now explored in depth tells me -- I

24  mean, it was in the opening.  So the jury heard it.  They

25  didn't first hear it from Mr. Stern.

```
 1              They first heard it from Mr. Stein that VNA has a
 2    case against the government officials who were -- am I
 3    mistaken?
 4              MR. CHRISTIAN:  That is true, Your Honor.
 5              THE COURT:  Okay.
 6              MR. CHRISTIAN:  But government officials are not a
 7    monolith.  Mr. Walling's role, as he testified, and I think
 8    that testimony they tried to elicit, is that he had a very
 9    different role than other people.
10              He says he did not know certain things at certain
11    times.  So his role may be different from Governor Snyder's,
12    which is different from Howard Croft's.
13              THE COURT:  Of course.
14              MR. CHRISTIAN:  So Mr. Stein making that statement
15    does not necessarily mean that for each and every individual
16    who's in the government, they had the same role.
17              THE COURT:  Not the same role.  But what we're
18    talking about is there anything wrong with Mr. Stern reminding
19    the jury of the defendant's opening, theory of the case, which
20    is that it's Mr. Walling and Snyder.
21              But are you still pursuing your nonparty at fault
22    case against Mr. Walling?
23              MR. CHRISTIAN:  We are pursuing our nonparty at fault
24    against city government.  The verdict form hasn't been spelled
25    out.  So we don't know how you'll list it on the verdict form.
```

March 31, 2022

```
 1           THE COURT:  I'll list --
 2           MR. CHRISTIAN:  We're not here to argue that, of
 3   course.
 4           THE COURT:  I don't have an interest in the verdict
 5   form other than that it -- the parties -- I mean, I have a
 6   tremendous interest in it.
 7           But what I will look for first is an agreement
 8   between the parties.  I'll check it against the allegations in
 9   the lawsuit as it stands now.  The filings of nonparty at
10   fault as they stand.
11           I mean, I'll check it.  But I wouldn't know for sure
12   if you're still pursuing your case against Mr. Walling.  But
13   the fact is you are.  You've just told me.  And Ms. Bush is
14   nodding like this.
15           And so --
16           MR. CHRISTIAN:  And what I would say further --
17           THE COURT:  He's talking.
18           MR. CHRISTIAN:  I'm taking the position -- we're
19   taking the position that this is substantive evidence, which
20   the law supports --
21           THE COURT:  But okay.  The lawsuit -- the lawsuit --
22   just a minute.
23           MR. CHRISTIAN:  Okay.
24           THE COURT:  When you're saying, "This is substantive
25   evidence," what you're telling me is the lawsuit that
```

March 31, 2022

1915

```
 1    Mr. Stern and Mr. Maimon filed in 2017 that -- where the
 2    claims against Mr. Walling have been resolved --
 3              MR. CHRISTIAN:  No, Your Honor.  I'm not saying that.
 4    I'm saying the assertions, the allegations are substantive
 5    evidence.  Because admitted against the plaintiff because that
 6    was the offered them.
 7              And so that's what we're saying, Your Honor.  Because
 8    we not only have to introduce evidence or intend to introduce
 9    evidence with respect to the nonparties at fault.  We also
10    have to or plan to introduce with respect to the plaintiff.
11              So the plaintiff is an adverse party who introduced
12    -- who made allegations that are admissible.  And we -- it is
13    our position that we should be able to introduce those to
14    prove our case.
15              MS. BUSH:  May I add something, Your Honor?
16              THE COURT:  Sure.
17              MS. BUSH:  Thank you, so much.
18              The allegations as to Mayor Walling that are in
19    plaintiffs' complaint are judicial admissions by the
20    plaintiff.  And we are entitled to show the jury that it's not
21    just us who blames Mr. Walling, but that the plaintiffs do,
22    too.
23              THE COURT:  What?  I'm sorry.  I didn't really hear
24    you.
25              MS. BUSH:  I will take off my mask.
```

March 31, 2022

1916

```
 1              THE COURT:  Okay.

 2              MS. BUSH:  The admissions that the plaintiffs have

 3    made, the allegations of the complaint where they made

 4    specific allegations as to Mayor Walling, those are judicial

 5    admissions.

 6              THE COURT:  Okay.  So it's a statement of a party

 7    opponent.

 8              MS. BUSH:  And so what those go to show exactly by

 9    the plaintiffs, those particular allegations of the complaint,

10    not the filing of the complaint, but those particular

11    allegations that the plaintiffs made are judicial admissions.

12              And we're entitled to show the jury that not only do

13    we hold Mr. Walling accountable, but so did the plaintiffs and

14    so do the plaintiffs.

15              THE COURT:  And then we'll bring in the settlement to

16    say they're no longer pursuing claims against him.  They've

17    resolved them all to everyone's satisfaction.

18              MS. BUSH:  I believe, Your Honor --

19              THE COURT:  Which is exactly what you told me you

20    didn't want me to do.  And Mr. Ter Molen is saying, "Don't do

21    it."

22              MS. BUSH:  I would say, Your Honor, that some

23    evidence is admissible for particular purposes under, I think,

24    Michigan law governs this question.

25              And the admissibility of a settlement agreement is
```

March 31, 2022

1    just not admissible for any purpose.  But the complaint that

2    they filed where they said all of these terrible things

3    against Mr. Walling, those are judicial admissions that we're

4    entitled to show the jury.

5             THE COURT:  Okay.  All right.  Let me hear a response

6    from Mr. Maimon.

7             MR. MAIMON:  Yes.  Thank you, Your Honor.

8             So first of all, you can't have everything both ways.

9    Because we're going to be sideways and crooked, and that's

10   exactly the path that the defendants are leading us down.

11            The defendants, by their own admission, even though

12   Mr. Christian didn't want to explicitly state it, are pursuing

13   a claim for nonparty fault specifically against Mayor Walling.

14   It's in their notice of nonparty fault.

15            THE COURT:  It is, yeah.

16            MR. MAIMON:  And it was in their amended notice of

17   nonparty fault.  So to try and -- and we are entitled in the

18   presentation of our proofs to rely on that and to address it

19   and not to wait until they finally make a decision at the end

20   of trial, "Oh, we're dropping that.  You couldn't address it

21   beforehand, because we haven't finally decided."

22            We have Mayor Walling on the stand.  We have to be

23   able to address it.

24            THE COURT:  I'm not concerned about Mr. Stern's

25   mentioning what the jury was told in opening and what I've

```
 1    been told in an amended -- in the original nonparty, the

 2    amended nonparty at fault notice.  I'm not concerned about

 3    that.

 4          How are the allegations your clients made against

 5    Mr. Walling not a statement of a party opponent?

 6          MR. MAIMON:  So first of all, there would have to be

 7    a foundation to show that these four plaintiffs, not

 8    plaintiffs in general, not -- and by the way, the question

 9    that was asked is:  "Mr. Stern and Mr. Maimon sued you," which

10    is inaccurate.

11          THE COURT:  Right.

12          MR. MAIMON:  We don't sue anybody.  We represent

13    people in litigation.  But that's part of the coloring that is

14    attempted here.  That that's that.

15          So all we have in the binders is the court and we

16    were provided with was two pages from an amended master

17    long-term -- long-form complaint.  The face page and page 16.

18          If we're going to have a complaint put into

19    evidence --

20          THE COURT:  Let's put the whole thing.

21          MR. MAIMON:  We put the whole thing in evidence,

22    number one.

23          THE COURT:  We've got that rule of completeness.

24          MR. MAIMON:  Yes.  Mr. Mason taught us that.  That's

25    number one.
```

```
 1          Number two is you can't have it both ways.  So you
 2    can't say, "Mayor Walling, isn't it true you were sued in this
 3    case," assuming that Sherrod, Teed, Ware, and Vanderhagen all
 4    were -- had adopted this particular amended complaint, and
 5    therefore they would be judicial admissions.  Without then
 6    saying, yes.
 7          And those claims were settled, and here is the
 8    settlement.  You can't use it as a sword and a shield at the
 9    same time.  And the motion that they filed to shield the
10    settlement, they can't now say, "Oh, you can't say that you
11    settled, but you can say that you -- this."
12          Because that's giving the jury a false and incomplete
13    picture of what's going on here.  And so there are all sorts
14    of things that have to be done before even that could happen.
15          THE COURT:  Okay.  Let me call upon Mr. Mason.
16          MR. MASON:  Thank you, Your Honor.
17          The two are not inextricably intertwined.  The
18    reality is it was a motion in limine with respect to
19    settlement is not inextricably intertwined with the admission
20    of the party opponent that was raised by Mr. Stein.
21          It wasn't a factual basis.  It was an implication
22    that these people are blaming you.  And that's why it's
23    appropriate to have an admission that these plaintiffs adopted
24    the master complaint and sued him himself for that limited
25    purpose.
```

```
 1              That doesn't open the door to have to bring in a
 2    settlement.  Mr. Stern opened the door for a very limited
 3    purpose of just fairness when he -- when Mr. Maimon talks
 4    about that you can't have it both ways.  That's what they're
 5    doing.
 6              They're trying to open the door and force the
 7    settlement in when Mr. Stern, I believe, left the wrong
 8    impression in front of this jury to suggest that we were the
 9    only ones critical of Mayor Walling.
10              THE COURT:  But there is -- the plaintiffs -- do you
11    agree the plaintiffs have no claims against Mayor Walling at
12    this time?
13              Do you agree with that?
14              MR. MASON:  I agree with that.
15              THE COURT:  Okay.
16              MR. MASON:  But that doesn't mean that they didn't,
17    as an admission, that they did at one time do so.
18              THE COURT:  Correct.  So here's my ruling, which is
19    that I think 801D permits this question about, did you at one
20    time -- were you at one -- we probably shouldn't have
21    Mr. Walling here, because I'd rather that he doesn't -- we
22    don't tell him the answers.
23              Mr. Walling, would you mind stepping out?  Thank you.
24              THE WITNESS:  Yes.  Your Honor, may I ask -- just
25    because I have heard a bit of this exchange.
```

```
 1              THE COURT:  Yeah.
 2              THE WITNESS:  The Flint City Attorney's Office has
 3    represented me in these civil cases.
 4              Is there going to be a need for me to consult the
 5    city attorney's office?
 6              THE COURT:  They are aware of -- I think they're
 7    watching on the Zoom, for one thing.  But there are no claims
 8    for damages against you.  They have settled on your behalf
 9    with the plaintiffs.
10              The defendants are trying to have the jury find that
11    you're a nonparty at fault.
12              So even if the jury were to find that, it would not
13    be collectible against you.  So but could I ask -- but if you
14    want to call your lawyer while you're out, you surely can.  I
15    don't want to discourage you from that.
16              And I also am not in a position to give you legal
17    advice.
18              THE WITNESS:  No.  I understand that, Your Honor.
19    But I was asking about who I was consulting with since they
20    weren't physically here present.
21              THE COURT:  Yeah, yeah.  So if you could step out.
22    Because I don't want to waste any more time.  It's not wasting
23    time to have this discussion.
24              But so here's my thought is that you certainly,
25    Mr. Christian, if in your case and your representation, you
```

```
 1    want to bring out that the plaintiffs at one time had claims
 2    against Mr. Walling, certainly do that.
 3            I think it's absolutely fair then that it be clear
 4    what all of the plaintiffs' claims are.  So we would just use
 5    the entire complaint.
 6            That's -- it's going to come out with every single
 7    witness.  So then pretty soon we're going to have pages 38, 39
 8    through Mr. Walling.  We're going to have 40 and 42 against,
 9    you know, Prysby or whoever it is.
10            So I want you to consider that.  But the other is
11    that it absolutely is fair to clarify that they are no longer
12    make -- we don't have to say, "There's a settlement for 600,
13    you know, 26 million."  We don't have to say that.
14            But it must be made clear to the jury that they're
15    not still pursuing a case against Mr. Walling.
16            How do you suggest we do that?
17            MS. BUSH:  I was going to argue the completeness part
18    of it.  And so Marcus has requested that I address the
19    completeness thing.
20            THE COURT:  Okay.
21            MR. MAIMON:  I thought the Court ruled.  Are we going
22    to have reargument now?
23            THE COURT:  No.  I just want to know how do we make
24    sure that the jury understands that you're not still suing
25    Mr. Wurfel --
```

```
1              MR. MAIMON:  Mr. Walling.
2              THE COURT:  -- if we don't mention the settlement.
3    All I want is -- you can just say, "Mr. Christian, and isn't
4    it true that plaintiffs are no longer pursuing claims against
5    you?"
6              You could -- that's what I would suggest.
7              MS. BUSH:  He could say that.  But may I make my
8    record, please?
9              THE COURT:  Yes.
10             MS. BUSH:  All right.  Thank you so much, Your Honor.
11             THE COURT:  You're welcome.
12             MS. BUSH:  The Sixth Circuit has expressly recognized
13   that a plaintiffs' allegations in a complaint are party
14   admissions --
15             THE COURT:  I've ruled that.
16             MS. BUSH:  Please.  I'm sorry.
17             THE COURT:  Okay.  Go ahead.
18             MS. BUSH:  I understand.  I'm sorry if I'm --
19             THE COURT:  You're just going over what I already
20   said.  But go ahead.  Review it again.
21             MS. BUSH:  Okay.  And in the Barnes case, unless
22   those allegations are amended, they are still considered to be
23   judicial admissions.
24             THE COURT:  Correct.  We agree.
25             MS. BUSH:  And that's even later.  And the plaintiffs
```

March 31, 2022

```
 1    never amended to strike --
 2            THE COURT:  I can't agree more with you.
 3            MS. BUSH:  Okay.  And with respect to the rule of
 4    completeness, the rule of completeness does not extend to
 5    everything in a document.  That's why when a party moves for
 6    deposition designations --
 7            THE COURT:  You make a good point.
 8            MS. BUSH:  -- the other party only gets to put
 9    completeness for that topic.  So the rest of the complaint is
10    not admissible with respect to the allegations against VNA,
11    because we're only talking about Mr. Walling.
12            And we intend to introduce into evidence all of the
13    allegations of Mr. Walling against Mr. Walling.  And it is
14    complete.  I haven't left anything out.
15            THE COURT:  I'm just looking up the rule.
16            So, Mr. Maimon, are you -- the thing about -- what
17    are the pages of it?  Where is it in the binder?
18            MR. MAIMON:  It's Tab 39, Your Honor.  And, again, we
19    only have a part of the complaint that they've bothered to
20    show us.  They haven't shown us that these four plaintiffs,
21    that this is their complaint.
22            THE COURT:  But we're pretty sure this was their
23    complaint.
24            MR. MAIMON:  No, we're not.
25            THE COURT:  Oh, we're not.
```

March 31, 2022

1925

```
1       MR. STERN:  We filed 32 complaints in federal court.
2   They're named in one or two of the 32.  And this is a master
3   long-form complaint.
4       MR. MAIMON:  That was amended at some point.
5       MR. STERN:  And that was required for people who had
6   not yet filed to check boxes and to file short forms.  None of
7   these plaintiffs are on short form complaints that I know.
8       But either way, there's 20,000 kids that have either
9   claims or lawsuits in this case through various pleadings.
10  Just pulling out the master complaint with a different caption
11  on it is not the same as showing that these plaintiffs
12  actually filed against him.
13      THE COURT:  The other thing, Ms. Bush, is that
14  there's only paragraph 44 and 45.  And paragraph 45 is cut off
15  mid-sentence.
16      MS. BUSH:  You mean in the binder?
17      THE COURT:  In the binder.
18      MS. BUSH:  Okay.
19      THE COURT:  Is that what we're using as exhibits or
20  no?  This is just --
21      MS. BUSH:  There was obviously a page-copying issue.
22  We intend to use all of the allegations against Mr. Walling
23  that are in the long-form complaint which were expressly
24  adopted by --
25      THE COURT:  And how many pages do you think that
```

Sherrod Teed Vanderhagen and Ware v VNA and LAN - Case No. 17-10164

March 31, 2022

1926

```
1   constitutes?
2         MS. BUSH:  It constitutes paragraph 78 of the Walters
3   complaint, paragraphs 85 to 86, paragraph 27.
4         THE COURT:  Okay.
5         MS. BUSH:  Those paragraphs.
6         THE COURT:  Well, the Federal Rule of Evidence 106.
7         "If a party introduces all or part of a writing, an
8   adverse party may require the introduction at that time of any
9   other part or any other writing or recorded statement that in
10  fairness ought to be considered at the same time."
11        MR. MAIMON:  So I would say two things.  First of
12  all, we can only pose objections, Your Honor.  And in
13  fairness, we only should be expected to pose objections with
14  regard to what we're given at the time of trial.
15        THE COURT:  Yeah.
16        MR. MAIMON:  So telling me abstract paragraphs of a
17  document that I don't have in front of me really doesn't help
18  and puts me in a disadvantage in addressing the issue.
19        MS. BUSH:  I have a copy for him.
20        MR. MAIMON:  Excuse me.
21        THE COURT:  Just a minute.
22        MR. MAIMON:  But the defendants raised this issue
23  yesterday with a paragraph and a half at their disposal.
24  That's number one.
25        Number two, with regard to fairness, these are not --
```

```
 1   these are allegations made in a notice pleading for a group --
 2           THE COURT:  I think they qualify --
 3           MR. MAIMON:  I'm not saying that they don't.  But in
 4   fairness, to put the entire matter in context, you need to
 5   have the whole complaint there.
 6           You need to see what -- and you need -- and you need
 7   an instruction from the Court, quite frankly, as to what a
 8   plaintiff's amended master long-form complaint and jury demand
 9   is.  Because without that, it's meaningless.
10           Because to the extent that a plaintiff, an individual
11   plaintiff, assuming for the moment that our four plaintiffs
12   here adopted this complaint, you have to give the jury a sense
13   of what does it mean to have a master complaint that
14   plaintiffs, individual plaintiffs, are put in the position of
15   either adopting or not adopting.
16           To simply say that this is their judicial admission,
17   which I'm not arguing the basic tenet, but I'm saying in
18   fairness to simply put this out there that Emir Sherrod's
19   mother sued Mayor Walling on his behalf is misleading.
20           THE COURT:  Okay.  Let's get the jury in here.
21           Can you ask this question after the next break when I
22   -- because I want to look at these paragraphs, and I don't
23   have them.  I have the same thing Mr. Maimon has, which is
24   exactly what's in your binder, which is one-and-a-half
25   paragraphs.
```

1       And they're not each the ones you mentioned.

2       MR. CHRISTIAN:  We apologize for the mistake, and we

3  will provide the appropriate language.

4       MS. BUSH:  Yes.  We absolutely will, Your Honor.

5       THE COURT:  Okay.  Thank you.  And then we'll discuss

6  it.  So let's get the jury in here.  Thank you.

7       And in the meantime, I asked yesterday,

8  Mr. Christian, about whether you or your colleagues here in

9  the courtroom were involved in tweeting from the courtroom or

10  from anywhere during the trial.  Making statements.  And

11  whether you were involved in the Twitter account called Veolia

12  -- no -- called VNA Flint facts.

13       And you promised that you would let me know.

14       MR. STEIN:  Yes.  So, Your Honor, I inquired with our

15  team and with all the lawyers working on this case and can

16  confirm that no one is involved with sending out tweets.

17  Certainly from the courtroom but at all.  That other lawyers

18  are involved.

19       MR. MAIMON:  How is the sidebar information then to

20  be relayed?

21       THE COURT:  I looked at that, Mr. Maimon, because I

22  had a lot of concern about sidebars being tweeted.  But that

23  sidebar was on the Zoom account.

24       And it was --

25       MR. MAIMON:  Oh.

```
 1              THE COURT:  Yeah.  So Veolia staff back at Veolia,
 2      they're watching.  I mean, their names are on the Zoom, and
 3      they're watching.
 4              So there's a lot of options, because some of the --
 5      if a lawyer was involved, then it is prohibited by the
 6      Michigan Rules of Professional Conduct to present material,
 7      inflammatory material of the nature that VNA -- oh, the jury
 8      is here.  Let's get --
 9              MR. STERN:  So the slides were also part of the
10      sidebar?  The slides from their opening?
11              THE COURT:  Yes.  This is what I have to get to.  But
12      we'll do that later.
13              Good morning.  Good morning.
14                              (Jury In)
15              THE COURT:  Sorry for the delay for the jury.  I
16      promise you we've been working.  Please be seated.  Oh, we've
17      got to get Mr. Walling back.  He's here.
18              Thank you for being back again, Mr. Walling.  You're
19      still under oath to tell the truth from when I swore you in
20      Monday.
21              THE WITNESS:  Yes.
22              THE COURT:  So we're back on Veolia North America's
23      lawyer cross-examining Mr. Walling.
24              So go ahead, Mr. Christian.
25              MR. CHRISTIAN:  Thank you, Your Honor.
```

```
 1             CROSS-EXAMINATION (continued)
 2   BY MR. CHRISTIAN:
 3   Q.   Good morning, Mr. Walling.
 4   A.   Good morning.
 5   Q.   So before we left yesterday, we were talking about GM and
 6   its decision to divert a portion of its water supply from one
 7   -- from the Flint River to using a DWSD source.
 8             Do you recall that?
 9   A.   Yes.
10   Q.   And during your testimony, you mentioned that there are
11   four or five Flint plants in the City of Flint, GM plants in
12   the City of Flint, correct?
13   A.   Yes.
14   Q.   And when we talked about the specific plant that was used
15   -- going to use DWSD water it said a portion; is that correct?
16             Do you recall that from the exhibit?
17   A.   I don't specifically.
18             Can we look back at that exhibit, please, if it's
19   important?
20   Q.   Absolutely.
21             So let's see.  So VNA Exhibit 5454I, which is Tab 10.
22   And if we look at the text at the paragraph near the bottom of
23   the page that starts with, "The City of Flint has honored,
24   allowing them to divert a portion of their water supply."
25             Do you see that?
```

March 31, 2022

1931

```
 1              And I can read it.

 2    A.   Yes.  I see that now.  This is Elizabeth Murphy's

 3    suggestions.

 4    Q.   Right.

 5    A.   I see "portion," yes.

 6    Q.   Suggested additions.  And you testified yesterday that

 7    this was -- this was only one of the GM plants in the City of

 8    Flint; is that correct?

 9    A.   That was my recollection.

10    Q.   Okay.  So -- and based on your recollection, do you know

11    if in that particular plant if the employees would be

12    continuing to drink the water?

13    A.   I don't know.  My recollection is that with the city

14    system being switched to, you said technically the Flint

15    Township, which was supplied by the county drain commissioner

16    from DWSD.

17              I'm not aware of other, you know, sources of

18    municipal water going into that plant.  I'm also -- I was in

19    the engine plant on a couple of occasions while I was in

20    office.

21              I don't recall how employees or -- I wouldn't have

22    seen kitchens or cafeterias to know if water was supplied

23    differently by the company or not.

24    Q.   Sure.  So it's fair to say that you don't know whether or

25    not employees at that specific plant were drinking Flint River
```

1    water after the change was made in October of 2014; is that

2    fair to say?

3            MR. STERN:  Objection.  Asked and answered.  If they

4    want to bring a plant person who worked here to testify about

5    what they drank, it would be more important than asking a

6    mayor --

7            THE COURT:  Okay, okay.

8            MR. CHRISTIAN:  I was clarifying whether he knew,

9    Your Honor.

10           THE COURT:  And I was looking up something, and I

11   don't recall.  See, he says he doesn't recall.  So we can move

12   on now.

13   BY MR. CHRISTIAN:

14   Q.   Okay.  So with respect to the other three or four plants,

15   there was no switch back to DWSD water for drinking water or

16   otherwise; is that correct?

17   A.   That's my understanding.  That's my recollection, yeah.

18   There are three plants at that -- as we call it, the Flint

19   complex.  So someone else could give you a more technical

20   depiction.  That's my recollection.

21   Q.   Okay.  So you can't give me more technical depiction.

22   Thank you.

23   A.   I remember the engine plant being discussed.

24   Q.   All right.  Thank you.  So I'm going to show you

25   Plaintiffs' Exhibit 3622, which is already in evidence.  It's

March 31, 2022

```
 1   Tab 60 in your book.  That's already in evidence.  So we're
 2   going to put it up on the monitor.
 3             And during your testimony, you spent some time
 4    talking about the invitation to bid in early 2015 --
 5   A.   Yes.
 6   Q.   -- for a contract?
 7   A.   Yes.
 8   Q.   And you mentioned that the city's resources were restrict
 9   -- were restrained, that you needed additional capacity.
10             Do you recall that?
11   A.   Yes.
12   Q.   And do I recall correctly that you are a consultant
13   yourself?
14   A.   I am now.  And I was for a bit over a year before I was in
15   office in 2009, yes.
16   Q.   Okay.  And so you've responded to requests for proposal
17   during your personal business, correct?
18   A.   Yes, I have.  Not -- yes.
19   Q.   And based on your familiarity with this proposal, this is
20   not a contract; is that correct?
21   A.   Correct.
22   Q.   And the date on this -- do you recall the date of this?
23   A.   I recall there was approximately a week or two that
24   allowed companies to bid.  So I do not see a date on this.  I
25   mean, the city records would certainly show when the purchasing
```

1    department released this publicly.

2              That would be a matter of public record.

3    Q.   And attached to the invitation to bid, as I believe you

4    testified, is a LAN operational evaluation report.

5              Do you recall that?

6    A.   Yes.

7    Q.   And that operational evaluation report was about TTHMs; is

8    that correct?

9    A.   Yes.

10   Q.   Okay.  So I would like to take you back for a moment to

11   your testimony yesterday about the MDEQ calling you to a

12   meeting in October of 2014 about TTHMs.

13   A.   Yes.

14   Q.   Was that the first moment you learned about the TTHM

15   problem in Flint?

16   A.   Yes.  That's my recollection.

17   Q.   And at that time, you understood that was a serious

18   problem, correct?

19   A.   Yes.

20   Q.   It could cause, among other things, cancer?

21   A.   Yes.  That language that I believe we read in -- I believe

22   it says "long-term exposure," and then it lists a series of

23   serious health consequences.

24   Q.   Now, during that meeting, you understood that it was

25   serious in October of 2014?

March 31, 2022

```
 1   A.   Yes, I did.

 2   Q.   And you mentioned in your testimony that your family drank

 3   Flint -- drank the water from the Flint River, correct?

 4   A.   Yes, we did.

 5   Q.   And you drank it, as well?

 6   A.   Yes.

 7   Q.   And when you went home, you told your wife about this TTHM

 8   issue?

 9            THE COURT:  We don't have any -- do we have testimony

10   about his wife already?

11            MR. CHRISTIAN:  I'm asking him a question, Your

12   Honor.

13            THE COURT:  I mean whether he has a wife.  Do we have

14   that?

15            MR. CHRISTIAN:  He did testify to that.  Yes, Your

16   Honor.  Yes he did.

17            THE COURT:  All right.

18            MR. CHRISTIAN:  And his sons.  One, I believe, is at

19   the University of Michigan.

20            THE WITNESS:  Yes, yes.

21            THE COURT:  Okay.

22            THE WITNESS:  A wife and two sons.

23            THE COURT:  Good.

24   BY MR. CHRISTIAN:

25   Q.   So you told your wife about the TTHM problem?
```

March 31, 2022

1    A.   You know, on or about that time, she's continued to be a

2    full-time professor at Albion College.  So, you know, I don't

3    recollect that conversation exactly, but yes.

4    Q.   Did you tell your sons about the TTHM problem at the time?

5    A.   I'm not sure if we talked about it with our kids.  We

6    didn't change any -- we didn't change our drinking water habits

7    in the house after that information.  We continued to use the

8    water, you know, on a daily basis.

9    Q.   And when you -- if I recall correctly, was your mother

10   still alive at the time?

11   A.   Yeah.  Both my parents were.

12   Q.   Both our parents.  And they were living in Flint?

13   A.   Yes.

14   Q.   And they were drinking the tap water at the time, as well?

15   A.   Yes.

16   Q.   And did you tell your father about the TTHM problem?

17   A.   I don't -- I don't recall.  I would have at some point.  I

18   know you haven't asked me about specific timelines, but we

19   would have talked about it at some point.

20   Q.   Thank you for pointing out.

21        So in October of 2014, do you recall whether you

22   talked to your father about the TTHM problem?

23   A.   I would have around that time.  I think this meeting may

24   have been in the latter part of October.  So, you know, you've

25   got October, November.

March 31, 2022

1    Q.   Sure.  And you talked to your mother, as well, or -- yes,

2    your mother, as well?

3    A.   I believe I did.  I don't recall specific conversations.

4    Q.   And during that time, you had weekly meetings with weekly

5    office hours on Wednesday from 10:00 to 12:00, correct?

6    October of '14?

7    A.   Yes, yes.

8    Q.   And when citizens came in, did you tell them about the

9    TTHM problem?

10   A.   I don't recall that I did.  We talked a bit about that

11   meeting.  You know, my understanding was the levels of TTHMs

12   were expected to be down by the parties in the room, the city

13   staff and the MDEQ.  LAN may have also been represented in that

14   meeting.  I don't recall.

15        And that there was a plan in place, that there would

16   be notification to the public.  So I was pretty -- I felt like

17   that was a good response from what I knew as a mayor, that

18   those steps -- what I heard in that meeting.

19        I understood this was a long-term concern.  And I

20   didn't have an immediate kind of, you know, motivation around

21   it.  So I guess I'm providing a bit of my thinking at that

22   time.

23        I don't recall when a citizen would have come into

24   the office or, you know, I met them in some other format.  I

25   don't recall talking to citizens about TTHMs before the public

1    notice went out.

2    Q.  But you told your parents and other family members before

3    the notice went out.

4              MR. STERN:  Objection.

5              THE COURT:  I don't think --

6              MR. STERN:  He just testified to it.  So we're just

7    asking the same question.

8              THE COURT:  Yes.

9              MR. CHRISTIAN:  Your Honor, Mr. Stern goes over

10   questions, five, six, seven, eight times.

11             THE COURT:  Okay.  Let's review it one more time.

12             THE WITNESS:  I believe I did.  But I also don't -- I

13   don't recall it being in the context of, you know, changing

14   how we were using the water or anything along those lines.

15             I mean, yes, there are things you share with a family

16   member about what's occurring just in conversations about what

17   you're working on.

18   BY MR. CHRISTIAN:

19   Q.  Thank you.  So let's turn to Tab 61, which is Plaintiffs'

20   Exhibit 51.

21             What you are seeing here has already been admitted

22   into evidence, so we're going to put it up on the monitor.

23   Plaintiffs' Exhibit 51.

24             THE COURT:  It's on Tab 61.

25             MR. CHRISTIAN:  But it's Plaintiffs' Exhibit 51, 5-1.

March 31, 2022

```
 1              THE WITNESS:  Yes.  I have this document in front of
 2   me, as well.  Thank you.
 3   BY MR. CHRISTIAN:
 4   Q.   So before VNA signed the contract to begin work on
 5   February 10 of 2015, are you aware of a kickoff meeting that
 6   occurred via phone with Howard Croft?
 7              Well, let me represent --
 8   A.   Yeah, no.  I'm thinking back.  I don't have a specific
 9   recollection of that.  I know there were discussions about, you
10   know, we're in discussion with VNA or Veolia, as we said.
11   Q.   And so these notes as you see at the top, the date is
12   2-2-15.  February 2, 2015.
13   A.   Okay.
14   Q.   Do you see that?
15   A.   Yes, I do.
16   Q.   And these, I'll represent to you, are the notes of Depin
17   Chen.
18              Do you recall that name?
19   A.   I -- I know I've seen that on emails that we've discussed.
20   I don't recall that name at that time period.
21   Q.   So when you testified earlier with Mr. Stern, you talked
22   about wanting to be efficient with resources, correct?
23   A.   Yes.
24   Q.   And you talked about not wanting to duplicate work.
25              Do you recall that?
```

March 31, 2022

1940

1    A.   Yes.

2    Q.   But you don't have a specific recollection of everything

3    that was included in the engagement with Veolia; is that

4    correct?

5    A.   Correct.

6    Q.   And so during this kickoff call or in Mr. Chen's notes, if

7    you look down the page, you'll see the words -- the letters

8    THM.  For example if you'll go down to a dash that begins with

9    "Next" --

10   A.   Yeah.

11   Q.   -- you see, "Next THM February 2015"?

12   A.   Yes.

13   Q.   And then on the next line, you see, "THM analyzer

14   purchased," correct?

15   A.   Yes.

16   Q.   So during this kickoff call for the work to be done with

17   Flint, THMs, which is another way of stating TTHMs, was

18   included in these notes, correct?

19             MR. STERN:  Objection.

20             THE COURT:  What's your --

21             MR. STERN:  He testified that he doesn't remember the

22   meeting.  He wasn't at the meeting.  So the notes may indicate

23   that, and he can ask do these notes indicate that.  But

24   Mr. Walling has no idea, because he said he doesn't remember

25   the meeting.

March 31, 2022

1941

1    THE COURT:  Do you remember a meeting with Mr. Chen?

2    THE WITNESS:  No.  I'm thinking that I may have

3 known, you know, second- or thirdhand about this type of

4 discussion with Veolia.

5    THE COURT:  Okay.

6    THE WITNESS:  But I'm just looking at these notes

7 right now.

8    THE COURT:  Okay.  And, Mr. Christian, is there

9 anywhere on these notes that indicate that Mr. Walling was

10 present on the conference call?

11    MR. CHRISTIAN:  No, Your Honor.  I'm merely asking

12 Mr. Walling, basically, to use his literacy, which I'm sure is

13 quite advanced, to identify THM in these notes.

14    MR. STERN:  Your Honor, I may not be a road scholar,

15 but his literacy is not at issue here.

16    THE COURT:  Right.  I think you've got to use a

17 different witness to review these notes.  So -- because it's

18 not going to help, because he doesn't know if he was even on

19 this call.

20    MR. CHRISTIAN:  So what I'll do, Your Honor --

21    THE COURT:  I can read them.

22    MR. CHRISTIAN:  Given that they're introduced into

23 evidence, I just want to publish the fact that THM is in these

24 notes that are dated February 2, 2015.

25    THE COURT:  On a call that Mr. Chen had.

March 31, 2022

```
 1               MR. CHRISTIAN:  Yes.

 2               THE COURT:  Okay.  Thank you.

 3               MR. STERN:  We'll stipulate to that.

 4               THE COURT:  Yeah.  Thank you.

 5   BY MR. CHRISTIAN:

 6   Q.  So I'd like to turn to Tab 15, which is Plaintiffs'

 7   Exhibit 3194.

 8               MR. ERICKSON:  I'm sorry.  What tab?

 9               MR. CHRISTIAN:  Tab 15.

10               MR. ERICKSON:  Thank you.

11   BY MR. CHRISTIAN:

12   Q.  Do you see that?  Have you had a chance to turn to it?

13   A.  Yes.  And I recall we looked at this together.

14   Q.  Absolutely.

15   A.  Yes.

16   Q.  And I just want to clarify.

17               Do you recall Mr. Stern referring to this document a

18   couple of times and saying "February 4"?

19   A.  I know I pointed out, because I look at the signature

20   page --

21   Q.  Yes.

22   A.  -- that the signature page says 10th of February --

23   Q.  Yes.

24   A.  -- also.  And it's a few days of back and forth.  But the

25   execution of this contract was February 10.
```

March 31, 2022

1943

1    Q.   Okay.  Thank you.  So what we're going to do, and you may
2    recall the timeline that we started putting together yesterday.
3    We're going to put up the timeline and add to it, "VNA signs
4    contract for Flint work."
5              THE COURT:  Can we see the timeline?
6              MR. CHRISTIAN:  Yes.
7              THE COURT:  You're working on it?
8              MR. CHRISTIAN:  Yes, Your Honor.
9    BY MR. CHRISTIAN:
10   Q.   Okay.  So I next want to go back to something that
11   happened slightly before February 10 of 2015.  It's something
12   that Mr. Stern went over with you.  And it is in our -- in the
13   exhibit book.  I believe it is Tab 62.  And that is Plaintiffs'
14   Exhibit 467.
15   A.   I have that.
16   Q.   Do you see that?  Do you recognize that exhibit from, I
17   believe it was the afternoon of Tuesday?
18   A.   I do recognize that we looked at this exhibit, yes.
19   Q.   Yes.  And so the subject says "Water Quality Advisory
20   Report."  And we're going to get it up on the screen.  Water --
21   excuse me.  "Water Quality Advisory Committee."
22   A.   Yes.
23   Q.   And I believe you testified that you're familiar with the
24   Water Quality Advisory Committee; is that true?
25   A.   Yes.

1  Q.  And do you recall when the Water Quality Advisory

2  Committee came into existence?

3  A.  In -- it was January/February 2015.

4  Q.  Are you sure about that?

5  A.  I remember working on the names of who was to be included

6  in January.  Again, there would be city records that would

7  show.  If you have something to refresh my memory, that would

8  be great --

9  Q.  Sure.  So but first --

10  A.  -- but January/February, that group was considered put

11  together.  And at some point, it had a first meeting.  First

12  meeting -- I mean, it may have even been early March.  It's a

13  process.

14  Q.  Sure.  It takes a while.

15  A.  Yes.

16  Q.  And at this point in time on February 6 of 2015, the

17  committee had never met before based on what you just said,

18  correct?

19  A.  I'm trying to recall when it first met.  It probably

20  hadn't met -- probably hadn't met.  But, again, you know, all

21  of our city emails are public record.  So there would be an

22  email to these individuals inviting them to participate,

23  inviting them to a venue.

24        I just don't recall if any of that communication had

25  occurred at February 6 or not.

1    Q.   Okay.

2    A.   Okay.

3    Q.   So whether it had a first meeting or not, Mr. Stern asked

4    you a number of questions about the bullet points on this

5    sheet.

6              Do you remember that?

7    A.   Yes, I do.

8    Q.   And do you remember the questions taking the form of, "Do

9    you know if anyone at VNA, anybody at VNA had ever talked to

10   you about testing labs that the city had at the water treatment

11   facility," or something of that form, similar form?

12   A.   I remember, yes.

13   Q.   And he started, if you recall correctly, with the top one

14   and went down to the next one.  All the way down.

15             All six bullet points, right?

16   A.   I remember going through these bullet points, yes.  Yes, I

17   do.

18   Q.   It was at the end of the day, right?

19   A.   I know there's a record, so.

20   Q.   Sure.  So and just to be clear, do you remember anybody at

21   VNA on February 6, on February 10, on March 25, telling you

22   about testing?

23             And I'll give you a specific question if you'd like.

24   A.   I think that would be helpful.

25             THE COURT:  Let's let him answer that question before

```
 1    another one comes up.
 2            THE WITNESS:  Oh, I see.
 3            THE COURT:  Go ahead.
 4            MR. CHRISTIAN:  Here's the question --
 5            THE COURT:  Let him answer your question.
 6            Do you remember anybody from VNA on these three
 7    different dates talking to you about testing.
 8            THE WITNESS:  I'm trying to recall my testimony over
 9    now three days.
10            THE COURT:  No, just if you remember now.  Not --
11            THE WITNESS:  So if I was asked if I was contacted by
12    Veolia on February 6 about these bullets?
13    BY MR. CHRISTIAN:
14    Q.  About water testing.
15    A.  I mean, if we're getting into very specific February 6,
16    February 7, my notes might be helpful in describing when I had
17    those interactions.
18            I don't know if -- I mean, before the kickoff
19    meeting, which we looked at where we were all in a room
20    together, I don't think I had direct -- I don't recall direct
21    interaction with Veolia on any matter --
22    Q.  Okay.  So --
23    A.  -- before the kickoff.  That wasn't my -- that wasn't my
24    role or responsibility.
25    Q.  So as of February 6, is it fair to say that you hadn't met
```

March 31, 2022

1947

1    anyone from Veolia?

2    A.   Again, if there was a meeting that I'm not remembering

3    that happened about that same time, I remember meeting

4    individuals at that kickoff meeting that we saw pictures of.

5    Q.   And so if you hadn't met anyone from VNA at that point,

6    they couldn't have told you anything about any of these bullet

7    points; is that correct?

8    A.   On, like, a February 6?

9    Q.   Yes.

10   A.   And if I met them on February 10?

11   Q.   Yes.

12   A.   Then correct, I would have not heard from anyone from

13   Veolia on that date about these items.

14   Q.   And you mentioned when you testified yesterday that prior

15   to coming to testify in this trial, you had some meetings with

16   plaintiffs' counsel.

17        Do you remember that?

18   A.   Yes.

19   Q.   And you testified that during some of those -- during

20   those meetings, you went over some exhibits?

21   A.   Yes.

22   Q.   Did you go over this exhibit with them?

23        THE COURT:  You're looking -- okay.  Because you've

24    got the timeline --

25   BY MR. CHRISTIAN:

```
 1   Q.   Plaintiffs' Exhibit 467.
 2            THE COURT:  While he's thinking about that, it's
 3   worth reminding -- I think I mentioned this before that
 4   there's nothing improper about a witness meeting with lawyers
 5   before they testify.  I think we discussed that a couple of
 6   weeks ago.
 7            But it's also fair to ask him about it.
 8            THE WITNESS:  I believe we did -- I recall looking at
 9   this exhibit.  And I believe I had first seen it during my
10   deposition.
11   BY MR. CHRISTIAN:
12   Q.   You remember seeing this in your deposition?
13   A.   I think I did.  There were a lot of exhibits.
14   Q.   Okay.  So I'm going to ask you about a specific question.
15            You remember Mr. Stern asking you this question:
16            "Did anybody ever come to you at or around February 6
17   from Veolia, 2015, and say, 'I know our scope says we got to
18   review this testing, but we believe that different testing is
19   needed to help?'"
20            Do you recall that question?
21   A.   Yes.
22   Q.   And do you find the contents of that question in this
23   bulleted list that's here?
24            In other words --
25   A.   Which item again, sir?
```

March 31, 2022

1    Q.   If you look at one of the -- one of the -- well, look at

2    the bullets.  Tell me which bullet that question would

3    correspond to.

4    A.   And would you remind me of the item --

5    Q.   Sure.

6    A.   -- that you were asking about?

7    Q.   Sure.  Yes.  Plaintiffs' Exhibit 467.

8           And basically it says, "I know our scope says we got

9    to review this testing."

10          THE COURT:  Wait.  What are you reading from?  You're

11    reading from the exhibit?

12          MR. CHRISTIAN:  I'm reading from the transcript.

13          THE COURT:  Oh, from the transcript.  No wonder.

14          MR. CHRISTIAN:  Yes, yes, yes.

15          THE COURT:  Okay.  And what was the question in the

16    transcript?

17          MR. CHRISTIAN:  "Did anybody ever come to you at or

18    around February 6 from Veolia, 2015, and say, 'I know our

19    scope says we got to review this testing.  But we believe that

20    different testing is needed to help.'"

21          If you don't see it here, that's fine.

22          MR. STERN:  I'm not even sure what the question is.

23          THE COURT:  It's okay.

24          THE WITNESS:  I see in the first bullet -- I mean,

25    we're all looking at the same document.  It says something

```
 1    about, "testing needs to be done, reputable entity."
 2           Second bullet, "testing locations."
 3           So I understand that at around this time, Veolia was
 4    in conversation with various city personnel.  There were
 5    exchanges taking place about the work in the contract.  I
 6    would have understood that like secondhand.
 7    BY MR. CHRISTIAN:
 8    Q.   Okay.
 9    A.   And I do not recall being contacted by Veolia at this
10    time.  I believe -- I recollect that I met Veolia individuals
11    on February 10.  But I understood there were other
12    conversations with city personnel at that time.  It was a
13    process of getting to a kickoff meeting.
14    Q.   Okay.
15    A.   So that was what I was asked to be a part of.
16    Q.   Okay.  Thank you.  So we've talked about -- you've already
17    established that you looked at this email.  But Mr. Stern did
18    not -- flip over -- if you take a look at the backside of that
19    email at the bottom and see what it was really about.
20           MR. STERN:  Objection.  That's --
21           THE COURT:  Yeah, just ask him a question less so
22    about Mr. Stern.  But just ask him --
23           MR. CHRISTIAN:  You'll see what I'm getting at, Your
24    Honor.
25    BY MR. CHRISTIAN:
```

March 31, 2022

```
 1   Q.   So this email here -- and it is from Gerald Ambrose.

 2        Do you see that?

 3   A.   Yes, I do.

 4   Q.   It's at the beginning of the thread.

 5        Do you see that?

 6   A.   Yes.

 7   Q.   And the date is Friday, February 6 of 2015.

 8        Do you see that?

 9   A.   Yes, I do.

10   Q.   And it's to Kelly Rossman-McKinney.

11        Do you see that?

12   A.   Yes.

13   Q.   And you're there, Dayne Walling?

14   A.   Yes.  I now remember this exchange --

15   Q.   Elizabeth Murphy?

16   A.   -- that I was a part of, yes.

17   Q.   Howard Croft?

18   A.   Yes.

19   Q.   And Water Quality Advisory Committee, correct?

20   A.   Yes.

21   Q.   And so it begins, "Kelly," with the opening, correct?

22   A.   Yes, it does.

23   Q.   Then the next line is, "Attached is my idea of the

24   committee's charge."

25   A.   Yes.
```

March 31, 2022

1952

1    Q.   Do you see that?

2    A.   Yes, I do.

3    Q.   So on February 6 of 2015, this committee was still an

4    idea, correct?

5    A.   Yes.  This is really helpful.  This is exactly what I was

6    asking for, a document to refresh my memory.  And the idea of

7    the committee, if my memory is correct, was actually my idea.

8    Q.   Okay.

9    A.   That I came up with, because we had had so much success

10   with our collaborative steering committee on our master

11   planning process.  And that group had continued to meet, had

12   operated under the Public Meetings Act, even though it's not

13   required to.

14          And I was pleased that the emergency manager was in

15   agreement.  So we were working on this over a period of, I

16   believe, a couple of weeks.

17          So this is now becoming more formal.  And as you've

18   stated, this is an email that I'm included on that Jerry is

19   running the idea by Kelly.

20   Q.   Okay.  In talking about this idea, the first sentence

21   says, "I have talked with Liz and Howard about having more

22   independent water testing done."

23          Is that correct?

24   A.   Yes.

25   Q.   And that more independent water testing was referring to

1   that idea with respect to the committee, correct?

2   A.   I mean, it's all related.  But this community committee as

3   we called it, I mean, it would not have been monitoring testing

4   or -- so I think this paragraph is something that was -- this

5   is emergency manager's email.

6           That was on his mind about additional steps the city

7   could be taking.

8   Q.   Could be taking with respect to the committee?

9   A.   With the water problem.

10  Q.   Oh, with the water problem?

11  A.   Not with the committee.  Remember, the committee is still

12  an idea.

13  Q.   Right.  Right.  So at that point in time, this says,

14  "independent water testing"; is that correct?

15  A.   Yes.

16  Q.   Independent water testing would not be conducted by the

17  city; is that correct?

18  A.   That's how I understood it, correct.

19  Q.   And independent water testing, as in this context, would

20  not be conducted by the MDEQ, would it?

21  A.    I can't say for certain on that.  It definitely would -- I

22  mean, Mr. Ambrose is the city's emergency manager.  So

23  independent would definitely be, you know, not through the city

24  lab.

25           Whether that involved MDEQ in some way or they might

March 31, 2022

1954

```
 1   offer to pay for something.  I mean, those were the kind of
 2   discussions that would take place.
 3   Q.   Okay.  So let's go to the next sentence, which says, "For
 4   example, why don't we ask and pay for if necessary the City of
 5   Ann Arbor who draws water from a river to test our water?"
 6            So this was testing that was not being done; is that
 7    correct?
 8   A.   Correct.  Testing not being done.  Right.
 9   Q.   Future testing.  Potential --
10   A.   An idea for future testing, yes.
11   Q.   All right.  So returning to Mr. Stern's questions.
12   A.   Okay.
13   Q.   If the testing did not exist, can you think of any reason
14   why VNA would call you to talk to you about that testing?
15   A.   Can I think of any reason why they might?  Is that your --
16   Q.   Let me rephrase it.  Thank you.
17            So at that time, the committee didn't exist, correct?
18   A.   Right.  There's one community advisory committee was in
19   the works, yes.
20   Q.   VNA had never met you, correct?
21   A.   Not that I recall.
22   Q.   This testing did not exist, correct?
23   A.   This testing that the --
24   Q.   It was --
25   A.   I'm not aware that the city -- that there was any
```

March 31, 2022

1955

1   independent non-City of Flint testing being done at the time.
2   Q.  And, in fact, this very email talked about potential
3   future testing; is that correct?
4           And -- is that correct?
5   A.  Yes.  That first bullet on the other page is, "Testing
6   needs to be done by quality water labs, a reputable entity like
7   the university."  Yes, it does say that.
8   Q.  So it wouldn't make any sense for VNA to contact you, whom
9   they hadn't met, about testing that didn't exist, correct?
10          THE COURT:  Go ahead.
11          THE WITNESS:  There's a first time for everything in
12  this job, right?  I explained to this body the first day
13  Mr. Croft walked into my open office.  I didn't know Mr. Croft
14  before Mr. Croft walked into my office.  I don't feel like I'm
15  in a position to say why or why not Veolia might have -- or
16  someone from Veolia might have contacted me.
17          I mean, I'm on the city's website.  Anybody who wants
18  to contact me can.  I took Mr. Stern's questions to be, you
19  know, did that occur.  So why someone from Veolia would have
20  felt so concerned about something that they would have brought
21  it to my attention or not, I guess that's what we're here to
22  find out.
23  BY MR. CHRISTIAN:
24  Q.  So the contract for services did not include testing that
25  did not even exist, correct?

1    A.   The contract?  What tab is the contract?

2    Q.   Yes.  Let's go back to the contract.  It is Tab 15.

3    A.   I just ask, because I remember there being a lot of

4    discussion about testing.  But I don't recall who was doing

5    what testing.

6              These first pages are just the template contract.

7    Q.   So you're taking a look at the Flint contract.  As you

8    look at it, tell me if you see anything about City of Ann Arbor

9    testing the water.

10   A.   Okay.  I don't see anything about City of Ann Arbor

11   testing.

12   Q.   Do you see anything about UM doing the testing in the

13   contract?

14   A.   No.  And I'm looking on what's page 9, if the jury is

15   following along.  That's the specific scope of work.  This is

16   just template.

17             THE COURT:  See, what you have up there is just what

18   they use for every contract.  That they'll have union people.

19             THE WITNESS:  Yes.  This is the page.  Yeah, so I --

20   so there's nothing on here about U of M.

21   BY MR. CHRISTIAN:

22   Q.   You see anything about hospitals testing in the contract?

23   A.   No.

24   Q.   And you don't need any more time to look at the contract,

25   any other pages to see if those terms are there?

March 31, 2022

1957

1   A.  No.  I had scanned those.  Those other items were just

2   template language.  They weren't specific to VNA other than

3   compensation.  This exhibit was what would be attached.

4         Like with many city contracts, here's the template

5   that we all follow in terms of insurance and workers

6   compensation.  Here's the scope of work.  So this is the

7   one-page scope of work.

8   Q.  Thank you.  So while we're talking about the contract,

9   let's talk about some other aspects of it.

10         You recall testifying that's a one-week assessment in

11   terms of the contract?

12   A.  Yes, I do.

13   Q.  And it was going to provide two water and two

14   communications experts for 40 hours at $225 per hour?

15   A.  Yes.

16   Q.  And the total amount of the contract would be $40,000?

17   A.  Yes.

18   Q.  And that $40,000 was below the $50,000 threshold that the

19   emergency manager had for being able to approve the contract on

20   his own; is that correct?

21   A.  Yes.

22   Q.  And if the emergency manager wanted to approve a larger

23   contract, something more than $50,000, he'd have to get

24   approval from the Department of Treasury; is that correct?

25   A.  Yes.

March 31, 2022

```
 1   Q.   Just to be clear, the contract is VNA, correct?
 2   A.   Yes.
 3   Q.   Okay.  So I want to turn to a section of the contract
 4   entitled, "Compensation."  And hopefully we'll be able to pull
 5   that up, as well, on the monitor.  We're going to zoom in on
 6   it, so everyone can see that section.
 7             It is -- let's see here.
 8             THE COURT:  What are you looking for, Mr. Christian?
 9             MR. CHRISTIAN:  I'm looking for the "Compensation"
10   section of the contract.
11             THE COURT:  For Veolia?
12             MR. CHRISTIAN:  Yes, Your Honor.  Okay.  So we have
13   it here.
14             THE WITNESS:  Page 2.
15   BY MR. CHRISTIAN:
16   Q.   So there's a section.  In this section, it says,
17   "Contractor services will be utilized as needed and as
18   determined solely by the City of Flint"; is that correct?
19   A.   Yes.  The City of Flint's the payee.
20   Q.   The payee.
21   A.   Yes.
22   Q.   So they would pay the money to the contractor?
23   A.   Right.
24   Q.   The city is the payee or the payor?
25   A.   Oh, the payor.  Right, yes.
```

```
1   Q.   So they pay the money to the payee, which is Veolia?
2   A.   That's right.
3   Q.   And you understand this to mean that VNA would do what the
4   city told it to do, correct?
5   A.   VNA would perform the scope of work agreed to with the
6   city.  That's the page we were just looking at.  I mean, a
7   consultant -- you asked me, you know, about my experience with
8   this.
9           You have a scope of work that you perform, and you
10  bring your expertise.  It's not a matter of -- you said "being
11  told by."  This isn't a -- if you're actually being directed to
12  do things that are specific terms of responsibilities and times
13  of day, you actually become an employee.
14  Q.   Are you giving me a legal definition of what an employee
15  is?
16          THE COURT:  No.  He's answering your question.
17          THE WITNESS:  I was just drawing a distinction.  When
18   you said "told."  The scope of work was agreed upon by both
19   parties.
20  BY MR. CHRISTIAN:
21  Q.   Sure.  And there was a scope of work in this contract,
22  correct?
23  A.   Yes.
24  Q.   And in addition to that, there is this clause or this
25  sentence that says, "Contractor services will be utilized as
```

March 31, 2022

1    needed and determined solely by the City of Flint," correct?

2    A.   Yes.

3    Q.   And when the City of Flint determines what the services

4    will be, it will communicate those -- it must communicate

5    those, that determination to VNA; is that correct?

6    A.   This may be beyond my understanding.  The purchasing

7    director maybe could answer that question.

8             I mean, my understanding is when a contractor would,

9    let's say, submit that invoice to the city, the city would be

10   determining, let's say, if all of that was eligible under the

11   scope or not.

12            I don't know about the part you're saying of it being

13   directed up front.  I think it's more of a collaborative

14   process around the scope.  But the city in this kind of

15   template language is protecting its right to go through those

16   voices and determine solely whether those were needed or

17   utilized.

18            But that's my understanding.

19   Q.   So in that sentence that I've read twice now, do you see

20   the word "invoices"?

21   A.   No.  But I believe there's an invoice process related to

22   how you get the compensation.

23   Q.   And as far as you understand, the city paid the

24   compensation, correct?

25   A.   Yeah.  I do believe that.  I do understand that.  And

```
 1    there would be records to that effect.  I don't have a
 2    recollection of when those were disbursed.
 3             I remember almost immediately there were discussions
 4    about, "This isn't going to be a one-week process."  But maybe
 5    there would be some documents to refresh my memory of that.
 6             I'm thinking there wasn't an invoice from Veolia at
 7    the end of seven days.  So that would be February 17.  But I'm
 8    just -- I'm not sure of that.  That's my recollection.
 9    Q.   Sure.  So I apologize.  I thought I asked you the question
10    if the word "invoice" is anywhere in that sentence?
11    A.   No.
12    Q.   Thank you.  So yesterday, you testified with Mr. Stern
13    about -- we just talked about a moment ago about a February 6
14    -- question about February 6.  So let's move to another date
15    before the contract was signed on February 10.
16             So I'm going to talk about -- it would be -- and you
17    may want to grab this.  Mr. Stern's -- let me -- yeah.  So
18    Mr. Stern's notebooks that you have.
19    A.   Yes, I can do that.
20    Q.   Walling 1 and 2.  Just Walling 1.
21    A.   Okay.
22    Q.   So if you turn to Tab 45.  Do you remember looking at --
23             MR. CHRISTIAN:  Tab 45 is Plaintiffs' Exhibit 464, so
24    we can put it up on the monitor.
25    BY MR. CHRISTIAN:
```

1   Q.   Do you recall that?

2   A.   Yes.

3   Q.   And just to give kind of an overview.  So would you take a

4   quick look at Tab 46.  That is, I believe, Plaintiffs' Exhibit

5   634.

6           MR. STERN:  So are we looking at two tabs now?

7           THE WITNESS:  45, sir.

8           THE COURT:  He'll tell us why we're doing this.

9           MR. CHRISTIAN:  Yes, I will.

10  BY MR. CHRISTIAN:

11  Q.   Because in rapid succession, you remember testifying about

12  three different -- an email thread, three different versions of

13  it yesterday where Mr. Stern asked you about did anyone tell

14  you lead could be a problem?

15  A.   Yes.

16  Q.   Okay.  So let's look at Tab 45, Exhibit 464.

17          And do you recall this email?

18  A.   I recall we looked at it.

19  Q.   Yes.

20  A.   I'm not on this email at the time.

21  Q.   Okay.  Sure.  You're not on the email.  So the date on

22  this email at the bottom of the thread is -- what's the date?

23  I'm looking for it here.  February 8 or February 9.

24  A.   It's the 9th.

25  Q.   February 9, 2015.

March 31, 2022

```
 1              When you testified yesterday, you spent -- you know,
 2    you talked a little bit about how important it would have been
 3    for you to know if there was lead found anywhere in Flint; is
 4    that correct?
 5    A.   Yes.
 6    Q.   And if you knew that lead had been found somewhere in
 7    Flint, that would cause you great concern; is that correct?
 8              MR. STERN:  Your Honor, that misstates his testimony
 9     from yesterday.  That's not what he said.
10              THE COURT:  Well, we'll just see what -- overruled.
11              THE WITNESS:  I remember us talking about Ms. LeeAnne
12    Walters --
13    BY MR. CHRISTIAN:
14    Q.   Ms. LeeAnne Walters.
15    A.   -- around this time.  And understanding there was a high
16    level of lead at her house.  And I'm not on this email chain,
17    but I was aware of this same.
18              So there was an MLive story that was done after the U
19     of M Flint notice went out.  So I'm not on this email chain --
20    Q.   Right.
21    A.   -- but I became aware around that same time that U of M
22    Flint had tested a high level of lead and some number of
23    drinking fountains, I believe it was.
24    Q.   On the campus?
25    A.   On the campus, yes.  And so I was aware of those two
```

1    things.

2    Q.   And you became aware through the newspaper?

3    A.   I do believe that's where I first saw it.  It's possible

4    that Jason might have also mentioned it to me around that same

5    time.  But it all happened -- the digital media, it all happens

6    very quickly.  The article was probably up on, you know, the

7    9th or the 10th.

8    Q.   So let's turn to the top of the second page starts with,

9    "Hi, Jason."  And I'm just going to read this to you to help

10   put us in the context.

11          "Hi, Jason.  I'm working on a story about an email

12   that was sent out to UM Flint campus community on Friday about

13   their water quality.  I was hoping to get comment on if any of

14   it seems related to the issues with Flint water or if it's an

15   isolated incident:

16          "They saw high levels of lead in certain locations.

17   I will copy the email below this."

18          You see that?

19   A.   Yes.

20   Q.   And so did Jason tell you about this?

21   A.   I don't have a specific memory of him doing that, but I

22   was knowledgeable of this communication around that time.

23   Q.   So -- and if you go to the top, there's an email -- of the

24   email on the first page.  There is -- it's from Mr. Robert

25   Nicholas.

```
 1            Do you see that?
 2   A.   Yes.
 3   Q.   It's on February 9 at 3:16 P.M., correct?
 4   A.   Yes.
 5   Q.   And let's just -- Mr. Stern asked you -- he read this, I
 6   believe.  Said, "No.  Lead could be a problem based on the
 7   water," correct?
 8   A.   It does say that, yes.
 9   Q.   And you remember him asking you, "Did anybody at VNA tell
10   you that lead could be a problem?"
11            Do you remember that?
12   A.   Yes.
13   Q.   And Mr. Stern then showed you what's in Tab 46 as
14   Plaintiffs' Exhibit 634.
15            Do you recall that?
16            And I'll give you time to turn to it, of course.
17   A.   Yes, I do.  I recall this, as well.
18   Q.   And we'll pull this up on the monitor, as well.  634, yes.
19            And if you look on the second page, there's a section
20   that starts with, "Hi, Jason."
21            Do you see that?
22   A.   Yes.
23   Q.   And I just read it for you, so I won't read it again.  But
24   would you -- is it fair to say that that's the same paragraph
25   starting with, "Hi, Jason," that was in the previous email?
```

March 31, 2022

1    A.   Yes.

2    Q.   So it at least includes some portions of the same thread;

3    is that correct?

4    A.   Yes.

5    Q.   And if you look at the top of the email, it's from

6    Mr. Robert Nicholas.  And I believe Mr. Stern highlighted that

7    it says, "Kelly, do not pass this on," correct?

8    A.   Yes.  I remember we looked at this.

9    Q.   And you received -- you were asked another question about

10   did VNA, anybody at VNA tell you anything about and something

11   related to lead.

12           Do you remember that?

13   A.   Yes.

14   Q.   So let's turn to now Tab 47, Plaintiffs' Exhibit 466.  And

15   let's go to the top of the second page.

16           And you see that, "Hi, Jason," and the paragraph --

17   A.   Yes, yes.

18   Q.   That's February 9, 2015.  And if you go to the first page

19   at the top, there is an email from Robert Nicholas on

20   February 9, 2015, at 3:35.

21           Again, there's a quote -- there is content about

22   lead?

23   A.   Yes.

24   Q.   And Mr. Stern read that to you, correct?

25   A.   He may have, yes.

March 31, 2022

1   Q.   And then he asked you a question, "Did anybody at VNA ever

2   tell you that lead seems to be a problem," correct?

3   A.   Something to that effect.  And my -- I do not recollect

4   anyone from Veolia contacting me or discussing with me the

5   threat of lead in Flint's drinking water.

6   Q.   And Flint's drinking water or about the University of

7   Michigan Flint; is that correct?

8   A.   Well, right.  By drinking water, I mean the whole thing.

9   Whoever's using it, you know, when it comes out of tap, I'm

10  thinking of that as Flint's drinking water.

11  Q.   And that would include University of Michigan Flint?

12  A.   Yes.

13  Q.   So because VNA didn't tell you about this, the issue of

14  lead, you didn't hear anything from them, didn't see any

15  communications from them dealing with lead before February 10

16  of 2015?

17  A.   Correct.

18  Q.   And I believe you testified that you didn't see anything

19  in the report mentioning specifically lead; is that correct?

20  A.   Yes.  We did look at the report.  Because I think you may

21  have said or someone else, I do get lots of emails.  I get lots

22  of meetings.  But I paid quite a good deal of attention to that

23  report itself.

24        MR. CHRISTIAN:  Your Honor, may I approach?  I have

25   an exhibit to distribute.

March 31, 2022

1       THE COURT:  Oh, okay.  Sure.  You know, it's 10:20.

2   So why don't we take a break.  And you can leave the exhibit

3   up there, and so he'll have it when we get back from the

4   break.

5       So for members of the jury, thank you, very much, for

6   your attention.  And we'll be back in about 15 minutes.

7       THE CLERK:  All rise for the jury.

8                   (Jury Out)

9       THE COURT:  Please be seated.  I have just one

10  follow-up question right now on the issue of the VNA Flint

11  facts tweeting.

12      And, Mr. Stein, I think you were responding on that.

13      Did you inquire as to whether anyone on your team,

14  meaning all of the lawyers and paralegals and all of the

15  people involved, but lawyers are the ones bound particularly

16  by the --

17      MR. CHRISTIAN:  Your Honor, may I interject for a

18  moment?  The witness is still in the courtroom.

19      THE COURT:  Yeah, you may step down.  I'm sorry.

20  Thank you.

21      THE WITNESS:  I thought I was waiting on an exhibit.

22  I'm sorry.

23      THE COURT:  This went on to something totally

24  different.  But thank you.  Thank you.

25      Did you inquire, Mr. Stein, as to whether any of

March 31, 2022

1     those lawyers and support staff are providing transcripts or

2     exhibits from the trial to the bloggers?

3           MR. STEIN:  So I did not specifically ask that.  I

4     believe we are providing transcripts to our client.  I don't

5     know -- you know, Veolia is a big company.  I'm not sure

6     exactly how it gets distributed from there.  But we are

7     certainly providing transcripts to the client.

8           THE COURT:  Okay.  Okay.  All right.  Well, I would

9     just want to make sure that you all -- all of the counsel of

10    record -- and Mr. Mason, is the same true for LAN?

11          Did you inquire as to whether any lawyers on your

12    team are participating in the VNA Flint facts blog --

13          MR. MASON:  Absolutely --

14          THE COURT:  -- or Tweet?

15          MR. MASON:  -- we are not.

16          THE COURT:  Okay.  And they're not providing exhibits

17    and transcripts?

18          MR. MASON:  We don't have anything to do with this,

19    Your Honor.

20          THE COURT:  Okay.  All right.  Thank you.

21          MR. STEIN:  Your Honor, sorry.  Very briefly.  As a

22    personal matter, I need to leave court today around our noon

23    break.

24          THE COURT:  Oh, absolutely.

25          MR. STEIN:  I just wanted to let you know.

March 31, 2022

```
 1          THE COURT:  Okay.  Thank you.  Everyone is always
 2   free to come and go as you see fit.  I mean, I think the jury
 3   is really focused on the witness and the examiner, and they
 4   may not even notice, I'm sorry to say.  I would notice, but.
 5          MR. STEIN:  Completely agree.
 6          MR. MAIMON:  We'll notice, too.
 7          THE COURT:  Okay.  Take care of whatever you need to
 8   take care of.
 9                        (Brief Recess)
10          THE COURT:  Please be seated.  And we will get the
11   jury.  And while we're getting the jury, I want to just look
12   at the calendar.  I issued a very short opinion yesterday
13   regarding the oral motion for remote testimony of Mr. Miguel
14   Del Toral.
15          And what I'm interested in knowing is whether we can
16   do a practice run at 2:00 P.M. -- or at the -- when the
17   testimony ends on Wednesday, April 6.
18          MR. MAIMON:  Oh, I thought Your Honor was going to
19   suggest it for Monday, as soon as we're done.  We'll be ready
20   to do it on Monday.  And he'll be ready also.  We asked him to
21   be available on Monday for the voir dire.  And if Your Honor
22   tells us when --
23          THE COURT:  You know, I think we can actually do
24   that.  I have a -- good -- something at 2:30.  Or if that
25   needs to be moved or delayed.
```

March 31, 2022

1971

```
 1            MR. MAIMON:  I can't imagine this is going to take
 2   long.
 3            THE COURT:  Yeah.  It's just that it will need to be
 4   -- the voir dire portion of it will need to be on the record.
 5   And -- all right.  Then that's what we'll do.
 6            We'll do Monday April 4 at the close of the
 7   testimony.
 8            MS. BUSH:  May I ask a question, Your Honor?
 9            THE COURT:  Sure.
10            MS. BUSH:  I'm sorry.  But as the Court -- and I'm
11   sorry I'm asking you this.
12            THE COURT:  Okay.
13            MS. BUSH:  But I'm taking my mom to a doctor
14   appointment this afternoon.
15            THE COURT:  Oh, sure.
16            MS. BUSH:  But if the Court is going to go past
17   1:30 --
18            THE COURT:  I can never go past 1:30, because with
19   the jury -- because one of our jurors has a strict need to be
20   at her place of employment.
21            MS. BUSH:  Understood.  I'm just wondering about
22   argument, about stuff.
23            THE COURT:  I can't predict what anyone will bring.
24            MS. BUSH:  Okay.
25            THE COURT:  Please rise for the jury.
```

March 31, 2022

```
 1                        (Jury In)
 2            THE COURT:  Welcome back.  And you might have noticed
 3    that Bill isn't here today.  We can barely -- please be
 4    seated.  We can barley function without Bill.  But I had to
 5    let him take a brief trip with his family.
 6            And Leslie, too.  So we persevere without them.
 7            So, Mr. Christian, go ahead.
 8            MR. CHRISTIAN:  Okay.  Your Honor, I'm going to
 9    distribute the exhibit.  May I approach, Your Honor?
10            THE COURT:  Yes.  Thank you.  I probably didn't tell
11    you, Mr. Christian, I don't have good eyes.  So I'll have my
12    glasses off oddly.
13            MR. CHRISTIAN:  I apologize, Your Honor.
14            THE COURT:  That's okay.
15            MR. CHRISTIAN:  We will try to get this up on the --
16            THE COURT:  Well, you had no way of knowing that.  My
17    eyes are so bad that with my glasses off I can tell there are
18    people there, but I can't tell features.  I can't tell
19    anything.
20    BY MR. CHRISTIAN:
21    Q.   Okay.  So what we have distributed is what has been
22    premarked for identification as VNA trial Exhibit 1064.
23            And Mr. Walling --
24    A.   Yes.
25    Q.   -- would you please take a look at the exhibit or the
```

March 31, 2022

1973

1  document?

2  A.  Yes.

3  Q.  And about 4 inches down, just above the halfway point on

4  the page, actually at the top of the page, look at who the --

5  to-line is to Jason Lorenz; is that correct?

6  A.  At the very top of the document?

7  Q.  Very top of the document, yes.

8  A.  Yes.

9  Q.  And in the CC line, on the second line, that is your name,

10  Dayne Walling, correct?

11  A.  Yes.

12  Q.  So this email was sent to you?

13  A.  Yes, it was.

14         MR. CHRISTIAN:  Your Honor, I move to admit VNA trial

15  -- VNA Exhibit 1064 into evidence.

16         MR. STERN:  No objection.

17         MR. ERICKSON:  No objection.

18         THE COURT:  Okay.  It's received.

19    (VNA Exhibit No. 1064 Admitted Into Evidence.)

20  BY MR. CHRISTIAN:

21  Q.  So we would like -- we're going to publish this letter on

22  the monitor.

23         THE COURT:  Sure.

24  BY MR. CHRISTIAN:

25  Q.  And we're going to turn to the second page at the bottom.

1      And, Mr. Walling, you recall we were talking not long

2  ago before the break about going through you testifying about a

3  number of emails?

4  A.   Yes.  That we looked at.

5  Q.   Yeah.  That we looked at.

6  A.   Yes.

7  Q.   And you remember going over some -- look at the language

8  at the bottom.  It says, "Hi, Jason.  I'm working on a story

9  about an email that was sent out to the UM Flint community."

10      You remember that language from all three of those

11  other emails?

12  A.   Yes.

13  Q.   And then the next email up is from Jason Lorenz.

14      MR. CHRISTIAN:  And let's highlight.

15  BY MR. CHRISTIAN:

16  Q.   It says, "Hello, everyone."

17      MR. CHRISTIAN:  And then let's highlight the

18   paragraph below that.

19  BY MR. CHRISTIAN:

20  Q.   And I'm going to read it, and I'll ask you afterwards if I

21  read it correctly.

22      "Here is another water-related story that I believe

23  can be deflected.  It appears UM Flint has done water testing

24   on their campus recently."

25      Did I read that correctly?

March 31, 2022

1975

1   A.   Yes.

2   Q.   "The tests came back showing TTHM levels were lower than

3   MCL, but have shown in a few places higher than acceptable lead

4   levels."

5        Did I read that correctly?

6   A.   Yes.

7   Q.   "Is this an internal plumbing issue that is not connected

8   to us?"

9        Did I read that correctly?

10  A.   Yes.

11  Q.   "Please advise."

12       Did I read that correctly?

13  A.   Yes.

14  Q.   Okay.  And so just above that, there is an email from

15  Robert Nicholas at Veolia.

16       Do you see that?

17  A.   Yes.

18  Q.   And that's sent on February 9, 2015, at 3:16 P.M.,

19  correct?

20  A.   Yes.

21  Q.   And it's to Kelly Rossman-McKinney; is that correct?

22  A.   Yes.

23  Q.   And in the CC line is David Gadis, Scott Edwards, Matt

24  Demo, and Paul Whitmore; is that correct?

25  A.   Yes.

1    Q.   And I'm going to read it.  It says, "No.  Lead could be a

2    problem based on the water."

3            Is that correct?

4    A.   Yes.

5    Q.   "Part of what we will do is look at the water quality,

6    testing, and results for lots of different variables."

7            Did I read that correctly?

8    A.   Yes.

9    Q.   So -- and just above that, and I'll just read the line

10   that says on --

11           MR. CHRISTIAN:  Well let's go to the top of that

12    page.  And -- okay.  I'm sorry.  The top of the previous page.

13   BY MR. CHRISTIAN:

14   Q.   And just at the bottom, there's an email address

15   jlorenz@cityofflint.com.  And below that, there is a message on

16   February 9, 2015, at 3:16 PM.

17           Do you see that?

18   A.   Yes.

19   Q.   From Kelly Rossman-McKinney.

20   A.   Yes.

21   Q.   Says, "FYI, from one of the Veolia team members who will

22   be there tomorrow."

23           Do you see that?

24   A.   Yes, I do.

25   Q.   So if we turn to the front page, the next email we see is

March 31, 2022

1977

```
1    from Mr. Jason Lorenz, correct?

2    A.   Yes.

3    Q.   And that's on February 9, 2015, at 3:24 P.M., correct?

4    A.   Yes.

5    Q.   And it says, "Thanks for the heads up, Kelly.  And I

6    thought that was the easy question of the day"; is that

7    correct?

8            Did I read that correctly?

9    A.   Yes.

10   Q.   And then the email before that is on February 9, 2015, at

11   3:37 P.M., correct?

12   A.   Yes.

13   Q.   Kelly Rossman-McKinney?

14   A.   Yes.

15   Q.   Ask it says, "Exactly.  There is no easy question when it

16   comes to water."

17           Did I read that correctly?

18   A.   Yes.

19   Q.   And then immediately above that is a message from Jason

20   Lorenz, correct?

21   A.   Yes.

22   Q.   Sent Monday, February 9, 2015, at 4:28 P.M., correct?

23   A.   Yes.

24   Q.   And it's to Kelly Rossman-McKinney, correct?

25   A.   Yes.
```

March 31, 2022

1978

1    Q.   And it's copied to Gerald Ambrose, the emergency manager?

2    A.   Yes.

3    Q.   Elizabeth Murphy, his assistant?

4    A.   Yes.

5    Q.   Howard Croft, correct?

6    A.   Yes.

7    Q.   Dayne Walling, correct?

8    A.   Yes.

9    Q.   Daugherty Johnson, correct?

10   A.   Yes.

11   Q.   And others.  At least one more.  And this message says,

12   "Our testing has shown no elevated levels of lead in the

13   system.  Would that be fair to say in the response if we can't

14   say outright that it's a plumbing issue?"

15        Did I read that correctly?

16   A.   Yes.

17   Q.   So just above that is a message on February 9, 2015, at

18   4:30 P.M., from Kelly Rossman-McKinney; is that correct?

19   A.   Yes.

20   Q.   And it reads is this -- I'll read it, and you tell me --

21   I'll ask you if it's correct.

22        "If it's true that your own tests have shown no

23   elevated lead levels, it should be A-OK to say.  But is that

24   true in all site testing?"

25        Did I read that correctly?

1    A.   Yes.

2    Q.   And then in the message above that on February -- it's

3    dated February 9, 2015, at 4:31 P.M., correct?

4    A.   Yes.

5    Q.   And it's from Jason Lorenz, correct?

6    A.   Yes.

7    Q.   And he wrote, "According to Duffy and Howard, it is,"

8    correct?

9    A.   Yes.

10   Q.   "Can anyone let me know if I missed something?"

11        Is that correct?

12   A.   Yes.

13   Q.   And then at the top, the very top, there's a message, and

14   we can see "to line."

15        "Jason Lorenz City of Flint," correct?

16   A.   Yes.

17   Q.   And there are a number of names in the CC line, correct?

18   A.   Yes.

19   Q.   And one of those names is Dayne Walling; is that correct?

20   A.   Yes.

21   Q.   So Mr. Stern asked you about three different emails,

22   correct?

23   A.   Yes.  The other emails we looked at in the exhibits.

24   Q.   Right.  And one of the questions was about whether anyone

25   at Veolia ever told you that lead could be a problem, correct?

March 31, 2022

1980

1   A.   Yes.  I remember that question.

2   Q.   And in truth and fact, you receive an email which had that

3   right in the email; is that correct?

4   A.   Yes.  I see in this email string that Kelly

5   Rossman-McKinney included the communication from Robert

6   Nicholas.

7   Q.   And in addition to that, you received additional

8   commentary from people in the Department of Public Works about

9   that lead finding, correct?

10  A.   Yes.  That's what this email reflects.  So this is helpful

11  for refreshing my memory of that email exchange.

12  Q.   And it basically says that there's not a lead problem; is

13  that correct?

14  A.   Well, I think Duffy -- if we're referring to Duffy's

15  response, which is on the screen, I mean, it speaks for itself,

16  right?

17  Q.   Did anybody -- well, did Howard Croft go to the newspapers

18  after this email and say, "We have a lead problem at the

19  University of Michigan Flint"?

20  A.   Not that I recall.  We could look at that coverage.  I

21  don't recall him doing that.

22  Q.   Did you tell Howard Croft to go to any media outlets and

23  tell them that there was a lead problem at the University of

24  Michigan Flint?

25  A.   No.  The communication had already been distributed to the

March 31, 2022

1981

```
 1    U of M Flint campus community.  That's the notice that was in
 2    all of these email strings.
 3    Q.  I'm sorry.  I must not be clear again.  I asked you a
 4    question.
 5              Did you tell Howard Croft --
 6    A.  No, I did not.
 7    Q.  Did you tell Daugherty Johnson to alert the media that
 8    there was a lead problem at the University of Michigan Flint?
 9    A.  No.
10    Q.  Did you tell anyone to alert the media that there was a
11    lead problem at the University of Michigan Flint?
12    A.  No.
13    Q.  You had this email, correct?
14    A.  Yes.
15    Q.  And no one was stopping you from telling the media,
16    correct?
17    A.  Correct.  No one was stopping me.
18    Q.  Did you tell Veolia that there was not a problem with lead
19    at the University of Michigan Flint?
20    A.  Not -- not that I recall.
21    Q.  Did you show them the emails from within the Department of
22    Public Works showing the results of their testing and their
23    conclusions?
24              MR. STERN:  Objection.  Veolia's on -- Veolia's
25    notifying him about the university.
```

March 31, 2022

1982

```
 1              THE COURT:  That's sustained.
 2              MR. CHRISTIAN:  Objection, Your Honor.
 3  BY MR. CHRISTIAN:
 4  Q.  Did you receive this -- this email at the top, it says,
 5  "To Jason Lorenz."
 6              Do you see anywhere that it came from Veolia?
 7  A.  No.  This full string was part of the correspondence from
 8  Jason Lorenz.
 9  Q.  Do you recall receiving any emails directly from Veolia?
10  A.  I don't recall receiving emails directly from Veolia.
11  Q.  But you received the email content from Veolia about lead
12  could be a problem, correct?
13  A.  That's what I'm seeing now.  I don't -- I don't recall
14  recently having seen this email.  But I do see it now.  And I
15  was very diligent about reading my emails.
16              MR. STERN:  Are you done with that document?
17              MR. CHRISTIAN:  Yes, I am.
18              MR. STERN:  Your Honor, for the doctrine of
19  completion, can we have Mr. Walling read the final note from
20  the first email that went out?
21              THE COURT:  Certainly.
22              MR. STERN:  If we could go back and just read the top
23  there.
24              THE WITNESS:  Your Honor, am I to read --
25              THE COURT:  So just that it's to Jason Lorenz from
```

March 31, 2022

1983

1   Daugherty Johnson.  You're copied on it.

2         And what does it say?

3         THE WITNESS:  The subject is "Re-forward Forward Help

4   With the Flint Journal Article.  The lead issue is directly

5   related to the plumbing in the UM system.  Our testing shows

6   no elevated lead issues in our treated or source water.  The

7   sporadic occurrence on site at UM further demonstrates that.

8   Duffy."

9         THE COURT:  Okay.  Thank you.

10        MR. STERN:  Thank you, Judge.

11  BY MR. CHRISTIAN:

12  Q.  So there was no lead problem according to Duffy Johnson?

13  A.  He's stating, "Our testing shows no elevated lead issues

14  in our treated or source water."

15  Q.  And so that was stated on February 9 of 2015?

16  A.  Yes, it was.

17  Q.  And so when you were asked about whether Veolia told you

18  on February 9 that there was lead or lead could be a problem,

19  the answer had already reached you, correct?

20  A.  I see that now, that there was the -- that I was on this

21  email string that included Rob Nicholas's remarks February 9 at

22  3:16.

23  Q.  And when you were preparing for trial and you were shown

24  exhibits, did anyone tell you that you had received an email

25  where Veolia had said that lead could be a problem at UM Flint?

March 31, 2022

1984

```
 1   A.   I don't believe so.  I don't -- I don't recall seeing this
 2   in my deposition either.  But these documents are always
 3   helpful for that purpose.  That was one of the things that
 4   always helps with my testimony.
 5   Q.   One moment, Mr. Walling.  I just want to -- so I'd like to
 6   direct your attention to Tab 17.
 7   A.   Sir, are we back in the Veolia binder?
 8   Q.   Yes, yes.  Thank you for asking.  It is Tab 17.
 9             Have you had a chance to turn to it?
10   A.   Yes.
11   Q.   It's VNA Exhibit 544 [as spoken].
12             And do you recognize this exhibit?
13   A.   Yes.  These are my notes from a Veolia update meeting,
14   February 13, 2015.
15             MR. CHRISTIAN:  Your Honor, we'd move to admit VNA
16    Exhibit 5444 into evidence.
17             MR. STERN:  No objection.
18             MR. ERICKSON:  No objection.
19             THE COURT:  Okay.  It's received.
20      (VNA Exhibit No. 5444 Admitted Into Evidence.)
21   BY MR. CHRISTIAN:
22   Q.   So what's the date of these notes, Mr. Walling?
23   A.   February 13, 2015.
24   Q.   And the title is -- it says, "Veolia update."
25             And is it fair to say that there was a Veolia update
```

1  meeting that day?

2  A.  Yes.  I recall a meeting in the -- that mayor's office

3  conference room.  So not a public meeting, an internal meeting.

4  Q.  And it may seem kind of basic.  But the fact that you are

5  taking notes here, it means that you attended that meeting; is

6  that correct?

7  A.  Yes, I did.  I think I took -- took a lot of notes.

8  Q.  And the first line says, "Veolia Rob perspective."

9       Was that Robert Nicholas, to your recollection?

10  A.  Yes.  Robert Nicholas.

11  Q.  And as we go down to the next line, it says, "Preliminary

12  review."

13       So just for context, the contract was signed on

14  February 10 of 2015, correct?

15  A.  Yes.

16  Q.  And this is three days into it?

17  A.  Yes.

18  Q.  And it's a preliminary review?

19  A.  Yes.

20  Q.  And let's -- we're going to go down further in the email

21  here.  Let's go down to there is a point here where -- do you

22  see the words "corrosive water"?  Turn to the second page at

23  the top.  Sorry.

24  A.  Yes.

25  Q.  It says, "You made corrosive water."

March 31, 2022

1986

```
 1    A.   Yes.
 2    Q.   And you put quotation marks around it?
 3    A.   Yes.
 4    Q.   And if I recall correctly, I think I'm understanding a
 5    little about your approach to making notes is when you put
 6    quotes around something, it means that it's important?
 7    A.   Yes.  It's important.  And someone said those exact words.
 8    You know, I mean, to the best of someone taking notes, yes.
 9    Q.   Right.  So at this point in time, this was February 14,
10    you were still having regular interactions with the staff at
11    the Flint Water Treatment Plant, correct?
12    A.   No, I was not.  The city administrator was in place around
13    this time.
14    Q.   So you testified earlier that you're a quick study, right?
15    A.   Yes.  I'd like to think so.
16    Q.   You do your homework, right?
17    A.   I try.
18    Q.   So this was something that was important enough for you to
19    put quotation marks around, right?
20    A.   Yes.
21    Q.   So you must have followed up on it, correct?
22    A.   The corrosive water?
23    Q.   Yes.
24    A.   Yes.  This was something that I tried to track, you know,
25    throughout our conversations.
```

Sherrod Teed Vanderhagen and Ware v VNA and LAN - Case No. 17-10164

1  Q.  You made efforts to find out what "corrosive water"

2  actually meant, didn't you?

3  A.  I don't remember doing anything -- I don't remember doing

4  anything in this case independent.  I was -- it was coming up

5  in quite a lot of discussions.

6  Q.  "Corrosive water" was coming up in a lot of discussions?

7  A.  Yes, yeah.

8  Q.  And so you're telling me that you did not, despite the

9  fact that "corrosive water" was coming up in a lot of

10 discussions, do any further investigation into what that meant?

11 A.  I don't recall that I did.  There were already

12 conversations about, you know, different treatments, different

13 chemicals in those conversations about corrosive water.

14 Q.  So Mr. Ambrose was in the room at that meeting, correct?

15 A.  Yes.

16 Q.  And Howard Croft was in that room, correct?

17 A.  Yes.  I have a memory of those two, Rob Nicholas, myself.

18 You know, there -- there may have been a couple of others, but

19 I remember those individuals.

20 Q.  And you had the opportunity to speak with Mr. Croft if you

21 wanted to after the meeting; is that correct?

22 A.  Yes.

23 Q.  But you didn't ask him about corrosive water; is that

24 correct?

25 A.  Correct.  I don't remember -- I don't remember anything

March 31, 2022

1988

1    specific at that time.

2    Q.   Now, you personally don't hold a chemistry degree,

3    correct?

4    A.   Correct.

5    Q.   You don't hold a chemical engineer, correct?

6    A.   Correct.

7    Q.   You're not a water engineer, correct?

8    A.   Correct.

9    Q.   And you're not a sworn law enforcement officer, either,

10   for that matter, is that correct?

11   A.   Correct.

12   Q.   And part of the job of a mayor is to be able to get up to

13   speed quickly on areas that may not be in your area of

14   expertise; is that correct?

15   A.   Yes.

16   Q.   And so where you lack expertise, you have to turn to

17   others, don't you?

18   A.   Yes.

19   Q.   So when Mr. Rob Nicholas during that meeting said, "You

20   made corrosive water," you didn't ask him for further

21   information?

22   A.   I don't remember that I did.  It seemed to be being

23   discussed.  That in, like, the preliminary review, changes in

24   chemicals.  Doesn't look like that thought was complete about

25   filters.  But we end up spending a lot of time on carbon

March 31, 2022

1989

 1   filters.

 2            So I was putting those -- I was putting those

 3   comments together.

 4   Q.  So after this meeting, you didn't decide to go down to the

 5   Flint Water Treatment Plant and ask someone there what

 6   corrosive water is, did you?

 7   A.  I did not.

 8   Q.  And how many times did you say you went to the Flint Water

 9   Treatment Plant during the course of your time as mayor?

10   A.  It was about a handful of times.

11   Q.  About a handful of times.

12            And that included the day when you pressed the

13   button, correct?

14   A.  Yes.

15   Q.  So a handful minus one, other than that initial kickoff,

16   correct?

17   A.  Yeah.  That's an estimate.  My calendar would reflect the

18   details.  But so a few times, handful of times.

19   Q.  Sure.  So and how many days have you been here in court?

20   A.  This is my fourth.

21   Q.  So you went during the course of your six years in office?

22   A.  Yes.  Six years and a few months because of that special

23   election.

24   Q.  So six years and a few months, you went to the Flint Water

25   Treatment Plant only a handful of times, correct?

```
 1    A.   Correct.
 2    Q.   And that was during a time when your citizens were coming
 3    to you and saying, "Water smells like a wet dog," correct?
 4    A.   Yes.
 5    Q.   They were coming to you and saying, "My cat takes a sniff
 6    of it and won't drink the water"; is that correct?
 7    A.   Yes.
 8    Q.   So just to be clear, there were people at the Flint Water
 9    Treatment Plant who had some level of water expertise that you
10    did not have, correct?
11    A.   Yes.
12    Q.   And you did not go to any of them and ask them about
13    corrosive water, did you?
14    A.   At around this time, no.  I took these notes at this
15    meeting.
16    Q.   And at the time, outside of the City of Flint, you had
17    contacts in the city of Washington, D.C., government, correct?
18    A.   Yes.
19    Q.   And you could have reached out to the City of D.C.'s
20    government and asked about corrosive water or connected with
21    someone who knows about it, correct?
22    A.   Yes, I could have.  We saw the correspondence, like
23    reaching out to the White House, not the D.C. government.  But,
24    yes, I could have.
25    Q.   But you didn't?
```

March 31, 2022

1991

```
 1   A.   I -- I did not.

 2   Q.   You did not.

 3   A.   I did not.

 4   Q.   Okay.  So I'm going to queue up the timeline a moment

 5   here.  And give some time for it to be pulled up.  I know

 6   there's a lag.

 7            And so we're going to add here that VNA tells

 8   Mayor Walling, Emergency Manager Ambrose, and Howard Croft,

 9   "You made corrosive water."

10            And that's February 13 of 2015.

11            MR. STERN:  Your Honor, I have an objection.  First

12   and foremost, I don't think there was a question about who

13   told you that the water was corrosive.  But we can assume it

14   was Rob Nicholas, based on the question that Mr. Christian

15   asked.

16            THE COURT:  Yeah.

17            MR. STERN:  Number two, this arrow about VNA not yet

18   being in Flint, that's simply not accurate.  It doesn't

19   comport with the testimony in the case or the emails that been

20   exchanged.

21            THE COURT:  I think that's an error.  We can't see

22   the whole thing.  I'm guessing that the contract started on --

23   that arrow ends at February 10.

24            Is that what the idea is, Mr. Christian?

25            MR. CHRISTIAN:  Correct, Your Honor.  VNA was not
```

March 31, 2022

1992

```
 1   under contract to do any work in Flint until February 10 of

 2   2015.

 3            MR. STERN:  I hear you.  But that's argument.

 4            THE COURT:  Right.  So let's just leave the arrows

 5   off and stuff.  We've got the VNA signs the contract.

 6            So that's good.  That's fair.

 7            MR. CHRISTIAN:  So and just to be clear, because I

 8   want to make it clear after Mr. Stern made his point --

 9            THE COURT:  But just -- it's his point is overruled.

10   So now go to your next question.

11            MR. CHRISTIAN:  Thank you.

12            THE COURT:  We've got it resolved.

13            MR. CHRISTIAN:  Thank you, Your Honor.

14   BY MR. CHRISTIAN:

15   Q.   So let's turn to Tab 18, Plaintiffs' Exhibit 53.

16            You've seen this Exhibit 53 before, haven't you?

17   A.   Yes.  Not recent.  Yes, I have seen it.

18   Q.   Okay.  And so this is a deck, a presentation, a PowerPoint

19   presentation from a meeting where Veolia gave a presentation on

20   February 18 of 2015; is that correct?

21   A.   Yes, that sounds right.

22   Q.   And you were there?

23   A.   Yes, yes, I was.

24   Q.   And various employees of Veolia were there?

25   A.   Yes.
```

March 31, 2022

1993

1    Q.   And Jeffrey Wright of the KWA, was he there?

2    A.   I don't -- I don't recall.  I mean, I wouldn't be

3    surprised if he was.

4    Q.   And what business would he have there about a meeting

5    about --

6              THE COURT:  Well --

7              MR. CHRISTIAN:  -- based on your knowledge?

8              THE COURT:  If you -- he wasn't even sure if he was

9    there, so he certainly wouldn't know what his purpose would

10   be.

11   BY MR. CHRISTIAN:

12   Q.   Did you invite Mr. Wright to the meeting, to your

13   recollection?

14   A.   I mean, you put it that way, it makes me wonder if I did.

15   I don't recall one way or the other.  Him and I were certainly

16   in conversation about, you know, these issues.  This was very

17   high profile challenge and presentation so.

18   Q.   So you communicated with Mr. Wright about the Flint Water

19   Crisis?

20   A.   Yeah, yes.  Generally, yes.  That's -- again, if there's

21   an email or something that could refresh my memory.

22   Q.   So yesterday -- so let's first turn to page 3.  And you

23   see at the top, it says -- I'm representing it says, "Everybody

24   is checking the safety of the water."

25              Did I read that correctly?

```
 1   A.   Yes.
 2   Q.   And the next line says, "City, state, news media,
 3   universities, and other groups."
 4            Did I read that correctly?
 5   A.   Yes.
 6   Q.   Based on your experience at the time, is that an accurate
 7   representation of the parties you knew of were looking at the
 8   water or talking about it?
 9   A.   That's what I remember being discussed.
10   Q.   Now, below that, it says, "Safe equals compliance with
11   state and federal standards and required testing."
12            Did I read that correctly?
13   A.   Yes.
14   Q.   And you saw this slide during that meeting of February 18
15   of 2015, correct?
16   A.   Yes, I sure did.
17   Q.   And the next bullet says, "More than 20,000 tests are
18   required annually for the city."
19            Is that a number that you're familiar with, based
20   upon your time as mayor of the City of Flint?
21   A.   You know, I wasn't recalling that number.  But I'm sure
22   that was the case.
23   Q.   So were you aware at the time, did anyone ever tell you
24   that Veolia went to the City of Flint and asked for records of
25   its lead testing results?
```

March 31, 2022

1   A.   Not that I recall.

2   Q.   When you were testifying about going to outside

3   consultants, you mentioned that you wanted to be efficient,

4   right?  We talked about it a little earlier today.

5   A.   Yes.

6   Q.   You didn't want to reinvent the wheel?

7   A.   Right.

8   Q.   So would it have saved money, based on your understanding

9   of how the process worked for VNA, to request existing records

10   about lead testing from the City of Flint?

11   A.   Yes.  That sounds like a reasonable part of this work.

12   Q.   And at the time you were at this meeting, what, if any,

13   understanding did you have about test results in the City of

14   Flint with respect to lead and other contaminants?

15   A.   So I knew we had been out of compliance with the TTHMs.

16   And the public notice went out.  We've talked about that.

17   There was work underway.

18        There would be future testing.  That standard was

19   based on averaging, you know, some number of quarterly tests.

20   And, you know, I knew the city did routine household lead

21   tests.  And had done -- you know, as far as I knew, for many

22   years.

23   Q.   Okay.  And so at this point on February 18 of 2015, as

24   we've talked about earlier, you had read -- you had seen an

25   email about a positive lead test or a lead test result from the

March 31, 2022

1996

```
 1    University of Michigan Flint on February 9, correct?
 2    A.   Yes.  The emails, the news story.
 3    Q.   And between that time on February 9 and this meeting on
 4    February 18, 2015, did you ask Mr. Croft for any results about
 5    lead testing done in Flint?
 6    A.   No, I did not.
 7    Q.   Had you asked Mr. Glasgow for any results of lead testing
 8    done for the City of Flint?
 9    A.   No.
10    Q.   Had you asked Mr. Ambrose for any results from lead
11    testing done in Flint?
12    A.   No.
13    Q.   And when you were at this meeting -- and you testified
14    yesterday that Mr. Gadis said the water was safe, right?
15              Do you remember testifying about that at this
16    meeting?
17    A.   Was that this same date?  I know there were some different
18    meetings.
19    Q.   So if I represent to you that at this meeting, it
20    occurred, would you say that you do recall that?
21    A.   Yes.  If those are the same dates, then yes.
22    Q.   So at that meeting, you heard that the water is safe?
23    A.   Yes.
24    Q.   And then you heard that safe equals compliance with state
25    and federal standards and required testing, correct?
```

March 31, 2022

1997

1    A.   Yes.  And that was my understanding at the time.

2    Q.   So it was -- it wasn't absolute -- it wasn't absolutely

3    safe, to your understanding, correct?

4    A.   No, never absolutely safe --

5    Q.   In fact --

6    A.   -- safe.

7    Q.   In fact, earlier you testified that essentially that

8    you're smart enough to know that things aren't perfect in the

9    world with respect to water and other results, correct?

10   A.   Yeah.  I think I commented about, you know, if you make

11   some changes, and there will be improvements, but something's

12   not -- something's not just going to go away.

13   Q.   So let's turn back one page.  So at the bottom, it says,

14   "Items of note."

15            Do you see that?

16   A.   Yes.

17   Q.   And then the first bullet below that says, "Not in scope."

18            Did I read that correctly?

19   A.   Yes.

20   Q.   And then there's a dash that says, "Studying why the

21   change from DWSD or the history of the utility."

22            Did I read that correctly?

23   A.   Yes.

24   Q.   And this was about one week into Flint's work -- excuse

25   me -- Veolia's work in Flint, correct?

March 31, 2022

1998

```
 1   A.   Yes.
 2   Q.   And Mr. Ambrose was there.
 3             Did he correct VNA when this slide went up?
 4   A.   Not that I recall.
 5   Q.   He didn't say the scope is larger than that, did he?
 6   A.   No.
 7   Q.   And you didn't say the scope is larger than that, did you?
 8             MR. STERN:  Objection.  What scope?
 9             THE COURT:  I don't know.
10   BY MR. CHRISTIAN:
11   Q.   The scope of what VNA is doing in Flint with its $40,000
12   engagement.
13   A.   Yeah, I don't remember any --
14             THE COURT:  Were you aware that -- did you think that
15    somebody had asked Veolia to do a historical review of the
16    utilities in Flint?
17             THE WITNESS:  No.
18             THE COURT:  Okay.
19   BY MR. CHRISTIAN:
20   Q.   Did you ask anyone whether VNA was supposed to study why
21   the change occurred?
22   A.   I don't recall that being discussed or in the scope.  I
23   think I took this to be accurate.
24   Q.   And so looking at Slide 2, looking at Week 1, it says --
25   the first bullet I'm going read, "Provide a review of current
```

1    actions."

2             Did I read that correctly?

3    A.   Yes.

4    Q.   The second bullet says, "Engage staff, visit facilities,

5    and analyze data."

6             Did I read that correctly?

7    A.   Yes.

8    Q.   And the third bullet is, "Make interim report"; is that

9    correct?

10            Did I read that correctly?

11   A.   Yes.

12   Q.   And this was an interim report meeting; is that correct?

13   A.   Yeah.  I think it was on the way to the interim report.

14   This was an agreed upon step was to present it to the Flint

15   Public Works Committee, which is actually the city council's

16   Public Works Committee.  So this was conducted under the Open

17   Meetings Act in the city council chambers.

18   Q.   Okay.  So I'd like to bring up our timeline again to add

19   that on February 18, 2015, VNA gave a presentation to the

20   public.  And it stated, "Not in scope studying why the change

21   from DWSD."

22            Okay.  So yesterday you testified that after this

23   meeting, you saw newspaper articles about the meeting,

24   correct?  It was in the media.

25   A.   Yes.

1    Q.   And I believe you testified that some of the media

2    reported that someone at the meeting said, "The water is safe";

3    is that correct?

4    A.   Yes.

5    Q.   And do you recall if the media said that safe equals

6    compliance with laws and regulations in the newspapers?

7    A.   I don't know if that was included in those articles or

8    not.

9    Q.   Do you recall if you ever contacted any media outlets and

10   said, "Make sure that you say that safe equals compliance with

11   laws and regulations"?

12   A.   I had a lot of conversations with media about matters like

13   that.  I'm sure I would have covered it at different points.

14   At the time of this meeting, I don't have a recollection one

15   way or the other.

16   Q.   Do you remember telling Mr. Lorenz that he needed to reach

17   out to media outlets and tell them that this report said that

18   safe equals compliance with laws and regulations?

19   A.   I don't remember having a conversation like that with

20   Mr. Lorenz, no.

21   Q.   So yesterday -- so let me ask you a couple of questions

22   about your knowledge of testing in general with respect to the

23   City of Flint's water supply.

24           You've testified several times about your family

25   drinking the water, the tap water, correct?

```
 1              THE COURT:  I just want to draw to your attention a
 2    motion in limine on this subject.
 3              But go ahead if you think this question is within --
 4              MR. CHRISTIAN:  He's talked about it several times,
 5    Your Honor.
 6              THE COURT:  Yes, he has.  Okay.
 7    BY MR. CHRISTIAN:
 8    Q.  And you've testified that your parents drank it, drank the
 9    water as well as -- as well?
10    A.  Yes.
11    Q.  And you knew that testing was going on.  Testing was being
12    conducted on the water?
13    A.  Yes.
14    Q.  What was your level of confidence in the water testing?
15    A.  It was good.  I took what was being described to me, you
16    know, as accurate, these statements about meeting standards and
17    being safe.
18    Q.  Okay.  Did there come a time when your faith in the
19    testing decreased?
20    A.  Yes.
21    Q.  And when was that?
22    A.  Well, in August-early September 2015.  You know, I became
23    aware, actually from an ABC12 reporter, that the MDEQ had
24    notified the City of Flint that it was being required to add
25    optimized corrosion control.
```

March 31, 2022

2002

1           I immediately brought together the city administrator

2    and the public works director, so Ms. Natasha Henderson and

3    Mr. Croft, asked when the city had received that notice, what

4    had prompted that notice.

5           Was informed about these two cycles of household lead

6    testing, how those results had come back high.

7           And in response to that, right around that time, made

8    statements of what the city was going to do to get that

9    optimized maximum corrosion control in places, you know, fast

10   as humanly possible.

11          Dr. Marc Edwards from Virginia Tech was also in

12   communication with me.  He was describing, you know, his

13   concerns about different, like, testing methods, how those can

14   lead to different results.

15          So around that time is when I became really

16   concerned.

17          There had been a memo I had become aware of a few

18   months earlier than that from a staff member at the EPA,

19   Miguel Del Toral, and I had --

20   Q.  We'll get to that.

21   A.  Okay.  Well --

22          THE COURT:  Just -- do you want him to finish his

23   answer to your question or should --

24          MR. CHRISTIAN:  I realize that I must have been

25   unclear.  Because I thought I asked him when did his level of

1    confidence in the testing decrease.

2           THE COURT:  I'm hearing that answer.  So I'll permit

3    him to continue answering.  He's telling us what caused a

4    shift in his understanding.

5           THE WITNESS:  So it was in that August-September

6    timeframe.

7    BY MR. CHRISTIAN:

8    Q.   August-September.

9    A.   Of 2015.  And I had also been aware of some -- an EPA

10   staff's concerns about our testing that I had made an effort to

11   follow up on a few months earlier than that.

12   Q.   So I'd like you to turn to Tab 21, which is VNA

13   Exhibit 1647.  And this is already in evidence.  So we're going

14   to put it up on the screen.

15          And so you -- you remember testifying about this

16   earlier in the trial, correct?

17   A.   Yes.

18          THE COURT:  Do you know the exhibit number that's

19   already in evidence?

20          MR. CHRISTIAN:  Yes.  It's VNA -- well, the one in

21   evidence --

22          THE COURT:  Yeah.  That's what I want.  I want to

23   make sure the record reflects the actual exhibit that's been

24   received.  You can let me know later.

25          MR. CHRISTIAN:  Okay.  We'll do that, Your Honor.

March 31, 2022

2004

```
 1   BY MR. CHRISTIAN:

 2   Q.  So let's turn to the page that starts talking about

 3   priorities or conclusions the next steps.  If I get there

 4   before you, I will mention it to you.  Page 9.

 5            THE COURT:  And so for the jury, what this is, is the

 6    Veolia report dated March 12 of 2015.

 7            Now what page?  Page 9.  Okay.

 8   BY MR. CHRISTIAN:

 9   Q.  And let's actually turn -- so there -- left-hand column at

10   the top is the word "priority."

11            Did I read that correctly?

12   A.  Yes.

13   Q.  The center column is "Action."

14            Did I read that correctly?

15   A.  Yes.

16   Q.  The next column, the third column, "Annual operating

17   costs."

18            Did I read that correctly?

19   A.  Yes.

20   Q.  And, "One-time capital costs."

21            Did I read that correctly?

22   A.  Yes.

23   Q.  And so if you turn the page to 10 at the top, and I'm

24   going to -- in the first -- the one that's being highlighted on

25   the monitor.  There's this language.
```

March 31, 2022

2005

```
 1              "Contract with your engineer and initiate discussions
 2   with the state on the addition of a corrosion control
 3   chemical."
 4              Did I read that correctly?
 5   A.   Yes.
 6   Q.   "This action can be submitted and discussed with the state
 7   at the same time as other chemical and filter changes saving
 8   time and effort.  A target dosage of .5 milligrams per liter
 9   phosphate is suggested for improved corrosion control."
10              Did I read that correctly?
11   A.   Yes.
12   Q.   So you testified a lot about what your understanding of
13   that was, correct?
14   A.   Yes.
15   Q.   And you made the point that you did not see "lead," the
16   word "lead" in this report, correctly?
17   A.   Correct.
18   Q.   You read the report forwards, correct?
19   A.   Yes.
20   Q.   And you testified that you read it backwards, correct?
21   A.   Yes.
22   Q.   So -- but you didn't contact your engineer, did you?
23   A.   I don't recall that I did.
24   Q.   You testified earlier today that it is part of the job
25   description, it is part of your required duties of the mayor to
```

March 31, 2022

2006

```
 1   be able to consult with people who have expertise that you
 2   don't, correct?
 3   A.   Yes, yes.
 4   Q.   You have -- so you have been in a water crisis since
 5   April 25 of 2014.
 6              This is -- what day was this report?
 7   A.   March.  March 12.  And there's a very similar draft report
 8   maybe a few weeks earlier.
 9   Q.   So at this point in time after being 11 months into the
10   Flint Water Crisis, you're saying that you did not check with
11   your engineer?
12   A.   I did not.
13   Q.   Did you check with Mr. Glasgow?
14   A.   No.
15   Q.   You identified Mr. Warren Green in the court, correct?
16              So you recognized him?
17   A.   Yes.
18   Q.   Did you tell anyone to contact Mr. Green?
19   A.   I don't -- no, I didn't.
20   Q.   Did you tell anyone to contact the state?
21   A.   Yes.  That would have been -- think about the emergency
22   manager, the public works director, myself, contacting the
23   MDEQ.  That was -- I mean, that was a regular part of our
24   communications.
25              I don't recall anything specific about, you know,
```

 1  this corrosion control.

 2  Q.  So if I recall correctly, you had a notation on

 3  February 13 that you made corrosive water.

 4          Am I recalling that correctly?

 5  A.  Yes.  In that comment from Rob Nicholas.

 6  Q.  Right.

 7  A.  Yes.

 8  Q.  And this was March 12 of 2015, this report?

 9  A.  Yes.

10  Q.  So that's a month, correct?

11  A.  Yes.

12  Q.  And in that month's time between writing a note about

13  corrosive water and getting this priority about corrosion

14  control, did you do any research on your own to understand what

15  corrosion control was for?

16  A.  I don't remember doing independent research.  I understood

17  it had to do with the aesthetics, the color, the odor, the

18  taste.  That's what I was hearing from Mr. Croft.  That's what

19  I recall from Veolia discussions and saw in the report.

20          That was my understanding.

21  Q.  And when you saw this, did you say to anyone at Veolia, "I

22  was on an email on February 9 that mentioned the word 'lead.'

23  What are you going to do to address that?"

24          Did you ask that question?

25  A.  No, no, I didn't.

```
 1   Q.  I'm going to show you -- take a look at Tab 22 of your
 2   binder.  And just tell me if you -- it's VNA -- marked for
 3   identification VNA Exhibit 2126.
 4           Do you recognize that exhibit?
 5           THE COURT:  Is this a demonstrative exhibit or is
 6   it --
 7           MR. CHRISTIAN:  It's actually a document, as I
 8   understand it, that was drafted.  This may not be the best
 9   copy, actually.
10           THE COURT:  Drafted for the trial or at the --
11           MR. CHRISTIAN:  Drafted by someone -- well, I'm not
12    going to testify about this, Your Honor.
13   BY MR. CHRISTIAN:
14   Q.  Do you recognize this at all?
15   A.  I'm familiar with some of this content.  I don't remember
16   this -- I don't remember this document, or I don't remember a
17   date.
18   Q.  So turn to Tab 23 which is marked for identification as
19   VNA trial Exhibit 2127.
20   A.  Okay.
21   Q.  Did there come a time when the treasury department asked
22   questions about VNA's recommendations?
23           Do you recall that?
24   A.  I don't remember anything specific about Veolia.  There
25   were discussions about technical matters reconnecting to -- I
```

March 31, 2022

2009

```
 1    see the date on here.  So I'm thinking this was part of the --
 2    part of the discussions around the possibility of connecting to
 3    DWSD, which Dr. Mona Hanna-Attisha and others were calling for.
 4              I -- that's what I remember.
 5              MR. STERN:  Your Honor, I object just to the use
 6     of --
 7              THE COURT:  I don't think he's offering this.
 8              MR. STERN:  Okay.
 9              THE COURT:  So we'll move on to the next question.
10    BY MR. CHRISTIAN:
11    Q.  So I'd like to direct your attention back -- or keep your
12    attention back in March of 2015.
13              Did there come a time when the city council decided
14    to make a vote with respect to returning to the DWSD?
15    A.  Yes.
16    Q.  And what did they vote?
17    A.  The city council voted to reconnect to DWSD.  I don't
18    recall the number, the for and against, but it was pretty
19    strongly for.
20    Q.  And at that point in time, did you make a statement about
21    returning?
22              THE COURT:  I don't know what point in time that was
23     yet.  I don't --
24    BY MR. CHRISTIAN:
25    Q.  What month -- this was in March of 2015?
```

March 31, 2022                                      2010

1    A.   March of 2015, yes.

2              THE COURT:   Okay.

3    BY MR. CHRISTIAN:

4    Q.   And when the city council voted to return to the DWSD, did

5    you make a statement with respect to that?

6    A.   Yes.

7    Q.   And what was your statement?

8    A.   My statement was that I was not in favor of reconnecting

9    to Detroit.  We had safe water that met the standards.  And it

10   was something that I thought deserved further examination and

11   research.

12             That was -- that last part was where the emergency

13   manager and I differed.  So we agreed on the first two points.

14   The emergency manager's statements were to that same effect.

15             And then my additional part being, responsive to the

16   way city council was looking at this, was that I believed it

17   needed to be further, you know, examined and researched.

18   Q.   Further examined.  So as of that point March of 2015, you

19   were against switching back to the DWSD?

20   A.   That's right.  And I had made my position known publicly.

21   I believe that was important for me.

22   Q.   And in making your position known publicly, did you

23   consult with anyone to see if there's any information, new

24   information with respect to the wisdom of switching back to the

25   DWSD at the time?

March 31, 2022

2011

```
 1   A.   I don't recall that I had anything new at that moment.  I
 2   was at the city council meeting, so I would have heard their,
 3   you know, comments and questions and so on.
 4   Q.   And Mr. Ambrose, you mentioned that he was against it,
 5   correct?
 6   A.   Yes.  Against reconnecting to Detroit.
 7   Q.   Yes.
 8   A.   Yes.
 9   Q.   And, in fact, he said that reconnecting to Detroit would
10   be incomprehensible; is that correct?
11   A.   Yes.  I remember him saying that.
12   Q.   And we're going to pull up the timeline.
13   A.   Okay.  Good.
14   Q.   Fair to say the date was approximately March 24 of 2015.
15        Does that ring a bell?
16   A.   The end of March sounds right, yeah.  There would be
17   official city records on that meeting.
18   Q.   So we're going to add, "EM Ambrose calls going back to
19   DWSD incomprehensible."
20        MR. STERN:  Your Honor, it's already up.  And so it
21   is what it is.  But if we're -- he asked the question, "Does
22   that ring a bell?"
23        And he said, "Yeah, sounds right.  End of March."
24        So we're going to put up March 24.
25        THE COURT:  Let's see if we can -- can you --
```

March 31, 2022

2012

```
1              MR. CHRISTIAN:  We can put late March if Mr. Stern
2    would prefer in the --
3              MR. STERN:  It's already done, and it's fine.  But
4    just going forward --
5              THE COURT:  It still matters to me if it's accurate.
6              Mr. Walling, do you recall if it would have been
7    March 24, 2015?
8              THE WITNESS:  I don't recall.  I'd need to see a
9    document to refresh my memory.
10             THE COURT:  Maybe we have a document.
11             Do we have one, Mr. Christian?
12             MR. CHRISTIAN:  We'll offer one at another time, Your
13   Honor.  We will modify that.
14             THE COURT:  Okay.  For now, we'll say late March.
15   And then later if we know when it was, we can change it.
16   BY MR. CHRISTIAN:
17   Q.  And at the time of the city council's vote to return to
18   the DWSD, that wasn't the first time the idea had come up; is
19   that correct?
20   A.  Correct.
21   Q.  In fact, at the time when you spoke with the governor and
22   his chief of staff, they said -- someone on that phone call
23   said to you that they can't go back to the DWSD; is that
24   correct?
25   A.  Yes.  That was how I took it.  You know, that was without
```

```
1   quotes on those notes.  But that was what I took from the
2   conversation.
3   Q.  And your office wasn't far from Emergency Manager Earley's
4   during the time of his role as emergency manager, correct?
5   A.  Correct.
6   Q.  And during that time, did you ever hear him say that he
7   was ready to go back to the DWSD?
8   A.  I did not ever hear Mr. Earley say that.
9   Q.  And did you ever tell him that you thought you should go
10  back to the DWSD?
11  A.  I did not.
12  Q.  And one of the reasons that you were against going back to
13  the DWSD in March of 2015 was because you trusted the water
14  testing that was going on at the time; is that correct?
15  A.  Yes.
16  Q.  So I'd like to switch to another topic.
17          You mentioned the name a couple of times, LeeAnne
18  Walters; is that correct?
19  A.  Yes.
20  Q.  And there came a time when you learned that she had high
21  lead levels detected in her home, correct?
22  A.  Yes.
23  Q.  But before that, you heard other information about
24  Ms. LeeAnne Walters's family, correct?
25  A.  Yes.  Initial concerns were rashes.
```

1    Q.  So we're going to turn to Tab 25, which has been premarked

2    as VNA Exhibit 1027.

3           This is an email that is from Dayne Walling at the

4    top; is that correct?

5    A.  Yes.

6           MR. CHRISTIAN:  Your Honor, we move to admit VNA

7    Exhibit 1027 into evidence.

8           MR. STERN:  No objection.

9           MR. ERICKSON:  No objection.

10          THE COURT:  Okay.  It's received.

11     (VNA Exhibit No. 1027 Admitted Into Evidence.)

12   BY MR. CHRISTIAN:

13   Q.  And if you go to the second page of this email, it is from

14   Howard Croft, correct?

15   A.  Yes.

16   Q.  On Thursday, February 5, 2015, at 3:44 P.M., correct?

17   A.  Yes.

18   Q.  And that's to Henry -- or James Henry; is that correct?

19   A.  Yes.

20   Q.  Who's James Henry?

21   A.  He's the environmental public health staff person for the

22   Genesee County Health Department.

23   Q.  And let's just go through, and I'm going to read this and

24   ask you if I read it correctly.

25          So it begins with, "Jim, I would like to connect you

March 31, 2022                                              2015

1   with another person who is reporting a rash on their child."

2          Did I read that correctly?

3   A.   Yes.

4   Q.   "LeeAnne Walters has spoken to me several times and also

5   has a notice from a doctor asserting that her son breaks out

6   when he is in a bath with the city water."

7          Did I read that correctly?

8   A.   Yes.

9   Q.   "I am hoping that you can work with her as well in

10  connecting with her doctor and supplying any needed data that I

11  forwarded to you that can help determine the cause."

12         Did I read that correctly?

13  A.   Yes.

14  Q.   "I thought this might be something that Dr. Rose could

15  shed some light on, as well."

16         Do you recognize the name Dr. Rose?

17  A.   Yes.  I don't know if I would have on, like, February 5.

18  But she's a professor at Michigan State University.  I believe

19  she's still there.  Studies water systems.

20  Q.   "I am doing" -- I'm continuing -- "I am including our lab

21  technician Mike Glasgow and plant supervisor Brent Wright on

22  the email in case there is any additional information that is

23  needed.  I would like to keep them in the loop of the

24  situation."

25         Did I read that correctly?

March 31, 2022

2016

1    A.   Yes.

2    Q.   And I mention who it's to.  If you look in the CC line,

3    let's see who else it went to.  So it's copied L. Walters.

4         Do you have any -- it's your understanding that's

5    LeeAnne Walters's email address?

6    A.   That's my understanding.

7    Q.   Michael Glasgow, correct?

8    A.   Yes.

9    Q.   Brent Wright, correct?

10   A.   Yes.

11   Q.   And Daugherty Johnson, who's also known as Duffy Johnson,

12   correct?

13        And so let's turn back to the first page.

14        Mr. Henry writes back; is that correct?

15   A.   Yes.

16   Q.   And so let's -- so it starts maybe just below a third of

17   the page down with, "Howard," correct?

18   A.   Yes.

19   Q.   "I want to make sure there are no misunderstandings.  The

20   Genesee County Health Department has attempted to obtain

21   specific information regarding the water -- Flint water

22   distribution system from your office since November 2014."

23        Did I read that correctly?

24   A.   Yes.

25   Q.   "Your office has not provided a return phone call or

```
 1    response to emails."
 2            Did I read that correctly?
 3    A.  Yes.
 4            THE COURT:  You can go through -- you don't have to
 5    say it after every sentence.  Let's just have the -- this will
 6    be for the rest of our trial.
 7            If you want to read something, do it.  And then we'll
 8    turn -- and that's for everybody.
 9            Then we'll turn to the witness and say, "Did I read
10    that correctly?"
11            MR. CHRISTIAN:  Okay.
12            THE COURT:  We try to speed it up here.  So -- but
13    that's for everybody, not just for Mr. Christian.
14            MR. CHRISTIAN:  Well, okay.
15    BY MR. CHRISTIAN:
16    Q.  "A FOIA request was sent electronically and mailed to your
17    office on January 27 of 2015, in an attempt to obtain
18    information.  The response from your office on February 4 of
19    2015 did not include any of the information that was requested.
20            "I am still hopeful that we can work collaboratively
21    to protect the health of the community and resolve any issues
22    with the Flint water supply.  Respectfully, Jim."
23            Now, did I read that correctly?
24    A.  Yes.
25    Q.  So let's go up to the distribution for this email.  It's
```

March 31, 2022

2018

```
 1    from James Henry rather.
 2              And in to-line, it's Howard Croft?
 3    A.    Yes.
 4    Q.    And other recipients are Michael Glasgow, Brent Wright,
 5    Duffy Johnson, Daugherty Johnson, Dayne Walling, Mark Valacak?
 6    A.    Valacak.
 7    Q.    And Suzanne Cupal?
 8    A.    Yes.
 9    Q.    And so you received this email.
10              Mr. -- is it fair to infer that Mr. Henry added you
11    to this email chain?
12    A.    Yes.  That's how I took it when I received it, yes.
13    Q.    And so at 6:06, so 36 minutes later, you wrote, "Howard, I
14    am stunned by this email from the health department.  What is
15    he referring to?"
16              Did I read that correctly?
17    A.    Yes.
18    Q.    So when you received this email, did you contact Mr. Henry
19    about the rashes?
20    A.    No, I did not.
21    Q.    Did you contact Mr. Croft about the failure to respond to
22    this information request?
23    A.    Yes, I did.  And I raised it with Mr. Ambrose, who you see
24    is on my response.  Because Howard is reporting to the
25    emergency manager at this time.
```

```
1    Q.   And you were seeing Howard, what, weekly in executive
2    meetings at this point?
3    A.   Sometimes he was at executive meetings.  Then we had this
4    larger general staff meetings that would have been, you know,
5    12, 15 people.
6    Q.   And when you saw this email, you didn't contact
7    Ms. Walters, did you?
8    A.   I didn't.  She had -- she inquired in my office, as well.
9    And I think in my testimony yesterday or the day before, I've
10   often thought back to what would have happened if I had
11   followed that up further.  I did not speak with her further at
12   that time.
13   Q.   And at this time, you didn't request records related to
14   rashes in the City of Flint since the switchover to the Flint
15   River; is that correct?
16   A.   I raised those -- I raised those issues with the emergency
17   manager and Mr. Croft.
18   Q.   And after you raised those issues with the emergency
19   manager and Mr. Croft, you didn't do anything else related to
20   this email at that time?
21   A.   At that time, like those maybe couple of days?
22   Q.   Yes.
23   A.   I don't recall I did anything else.
24   Q.   When did you next -- when did you follow up with
25   Mr. Croft?  Well, let me rephrase that.
```

1              Did you follow up with Mr. Croft in the following

2    week about this complaint?

3    A.   Yeah.  I believe approximately once per week for a few

4    weeks Mr. Croft was updating me on what the city personnel were

5    doing and how they were working with Ms. LeeAnne Walters.

6    Q.   So with the Court's permission, we would like to bring up

7    the timeline.

8              THE COURT:  Let's just discuss what we're putting on

9    it.

10             MR. CHRISTIAN:  And to add February 5, 2015, Walters

11   tells Croft her son is breaking out from rashes from bath

12   water.

13             THE COURT:  Any -- go ahead.  Go ahead.

14             MR. STERN:  It's fine.

15             THE COURT:  That's pretty close.

16             MR. CHRISTIAN:  So, Your Honor, at this point, I'm

17   about to shift gears a little bit to another topic.  So if you

18   want to take a break now, this will be a good moment.

19             THE COURT:  Let's do that.  All right.  Please rise

20   for the jury.  We'll take about a 15 minute break.

21                           (Jury Out)

22             THE COURT:  Okay.  We will be in recess.

23                          (Brief Recess)

24             THE COURT:  See our jury's all the way upstairs.  But

25   at least in criminal cases, if we have a defendant in custody

1    with shackles, we have to make sure they're seated.  And so at

2    least we don't have that complication here.  Because we can't

3    allow the jury to see the defendant is in custody.

4           And then inevitably, the defense lawyer says, "But my

5    client's in custody."  And you spent three weeks.  But anyway.

6           THE CLERK:  All rise for the jury.

7                         (Jury In)

8           THE COURT:  Okay.  Please be seated.  Go ahead,

9    Mr. Christian.

10          MR. CHRISTIAN:  Thank you, Your Honor.

11   BY MR. CHRISTIAN:

12   Q.  So I'd now like you to turn to Tab 26 of your binder.  It

13   is -- has been identified, marked for identification as VNA

14   trial Exhibit 1287.

15          You may recall this, Mayor Walling -- Mr. Walling, as

16    Exhibit 70 from your deposition.

17   A.  Okay.

18   Q.  Do you recall reading it during your deposition?

19   A.  It did look familiar.  So that's helpful.  Thank you.

20   Q.  And it's an email chain; is that correct?

21   A.  Yes, it is.

22   Q.  And the earliest date on this email chain is February 24,

23   2015, correct?

24   A.  Yes.

25   Q.  And the first section of the email is from Michael

1    Glasgow; is that correct?

2    A.   Yes.

3    Q.   And as you recall from your deposition, this was an email

4    about a lead finding at a City of Flint resident's home; is

5    that correct?

6            THE COURT:  Mr. Christian, is he on these emails?

7            MR. CHRISTIAN:  He is not, Your Honor.  But he has

8    seen it before during his deposition.

9            THE COURT:  I know.  I know.  You mentioned that,

10   Exhibit 70.  But an exhibit at a deposition is not necessarily

11   admitted at the trial.

12           So I'm trying to understand has this already been

13   admitted in our case?

14           MR. CHRISTIAN:  It has not, Your Honor.

15           THE COURT:  Okay.  So we'll have to lay a foundation

16   for this witness being the one who admits -- through whom it

17   is admitted.

18           MR. CHRISTIAN:  Certainly.

19   BY MR. CHRISTIAN:

20   Q.   So when you -- roughly the time February 24 of 2015, there

21   came a time when Howard Croft informed you that there was a

22   high lead test result at the home of LeeAnne Walters; is that

23   correct?

24   A.   Yes.  Around that time.

25   Q.   And, in fact, he informed you that the high lead reading

March 31, 2022

2023

1    test result was approximately what, 104 parts per billion?

2    A.   Yes.  Very high.

3    Q.   And the maximum contaminant level for lead is 15 parts per

4    billion; is that correct?

5    A.   Yes.  The way it's calculated across multiple households

6    at a percentage, as I understand it.  So I think that's what we

7    always say is -- we always say 15 parts per billion.

8    Q.   And so I'm trying to do the math in my head.  But that

9    would be roughly 104 parts per billion will be roughly seven

10   times the limit; is that correct?

11   A.   Yes.

12   Q.   And Mr. Croft, as you understood it, when he communicated

13   to you had communications with other members at the staff at

14   the Flint Water Treatment Plant, correct?

15   A.   Yes.

16   Q.   He had communicated with Michael Glasgow?

17   A.   I don't know who he would have communicated with person by

18   person.  But I know he was getting his information from city --

19   you know, the city personnel who was working on this.

20   Q.   And there came a time based upon and following up with

21   Mr. Croft's briefing of you about this where he -- where you

22   actually came into contact with this email; is that correct?

23   A.   I don't -- I don't have a recollection of that.  I know we

24   were discussing what you went over, that I was knowledgeable of

25   that information.

March 31, 2022

2024

```
 1    Q.   Okay.  So she had a high lead test result, the family had
 2    a high lead test result that was seven times the limit.
 3              And when you learned that information, VNA was still
 4    working there, right?
 5    A.   Yes.
 6    Q.   And it was two weeks to the day after VNA signed its
 7    contract to do the work, correct?
 8    A.   Yes.
 9    Q.   And you didn't contact VNA to tell them about this result,
10    did you?
11    A.   I did not.
12    Q.   You didn't contact Michael Glasgow after Howard Croft
13    briefed you about this lead result?
14    A.   I recall communicating with just Mr. Howard Croft about
15    it.  So no to Glasgow.
16    Q.   And you didn't go contact Ms. LeeAnne Walters after this,
17    learning of this test result, did you?
18    A.   I did not.
19    Q.   You didn't contact the MDEQ?
20    A.   I did not.
21    Q.   And the gentleman you identified in the courtroom,
22    Mr. Warren Green, you didn't contact him, did you?
23    A.   I did not.
24    Q.   I'm going to refer to Plaintiffs' Exhibit 1318.  It's been
25    admitted into evidence, I believe, yesterday.
```

```
 1            THE COURT:  What tab number?
 2            MR. CHRISTIAN:  It's not a tab.  Mr. Stern passed it
 3   out yesterday, I believe.  As a single piece of paper.  We can
 4   pull it up, too.  So Plaintiffs' Exhibit 1318.
 5   BY MR. CHRISTIAN:
 6   Q.  And so this is an email -- maybe it was admitted prior to
 7   this.
 8            But in any event, this email is from Howard Croft to
 9   Jerry Ambrose, correct?
10   A.  Yes.
11   Q.  And the date on the email is February 24 of 2015, correct?
12   A.  Yes.
13   Q.  That's the same date that Mr. Croft talked to you about
14   Ms. LeeAnne Walters's test results, lead test results, right?
15   A.  I know it was around that time.
16   Q.  Around that time.
17   A.  I don't have an exact day, but yes.
18   Q.  And yesterday, Mr. Stern showed you this email, correct?
19            And I'm just going to read it.  I don't want to read
20   everything.  But it says, "Jerry, I just spoke with Rob from
21   Veolia and his exact statement is that the city does not have a
22   water issue but a political issue."
23            Did Mr. Croft tell you about?
24            MR. STERN:  Objection.  The document speaks for
25   itself.  It's an email from Mr. Croft to the mayor.  So he
```

March 31, 2022                                                    2026

1    clearly told him.
2              THE COURT:  Well, maybe -- is your question:  Did you
3    have a separate conversation about this before the email?
4    BY MR. CHRISTIAN:
5    Q.  Did you have any additional conversations outside of this
6    email with Mr. Croft?
7    A.  I don't know.
8    Q.  And so you're saying that with respect to the email that
9    you looked a moment ago with respect -- talking about
10   Ms. LeeAnne Walters's lead test results, Howard Croft did not
11   email you about that on February 24.
12   A.   Not that I can recall.  I remember us having a
13   conversation around that time.  And all my city emails are
14   public record.  I don't know.
15   Q.  So I remember you testifying that you didn't need
16   political advice from VNA; is that fair to say?
17   A.   Yes.
18   Q.  But you needed water advice from VNA, right?
19   A.   Yes.
20   Q.  But you didn't tell them on the very day you saw this
21   email or in that time period that there was lead found at a
22   resident's home, correct?
23   A.   Correct.
24   Q.  Did you tell Mr. Glasgow to make sure that Veolia was told
25   about this lead test result?

March 31, 2022                                                    2027

```
 1   A.   No.
 2   Q.   Did you tell Mr. Bincsik to make sure that Veolia was told
 3   about this lead test result?
 4   A.   No.
 5   Q.   Did you tell Mr. Croft to make sure that VNA was told?
 6   A.   No.
 7   Q.   Did you tell Mr. Ambrose?
 8   A.   No.  I don't recall asking or, you know, directing anyone
 9   to do that.
10   Q.   So I'm going to now turn to Tab 27, VNA Exhibit 1401.
11            Did you have time to turn there, Mr. Walling?
12            THE COURT:  He has time.  He'll be --
13            MR. ERICKSON:  Which tab?
14            MR. CHRISTIAN:  It's Tab 27.
15            MR. ERICKSON:  Thank you.
16            THE WITNESS:  Yes, I have Tab 27, yes.
17   BY MR. CHRISTIAN:
18   Q.   And do you recognize this email?
19            MR. STERN:  There's about five emails.  I'm not sure
20    which one you're asking him about.
21            MR. CHRISTIAN:  VNA trial Exhibit 1401.
22            MR. STERN:  So I'm just trying to be helpful --
23            MR. CHRISTIAN:  This document, if you look at the
24    top, it says from Elizabeth Beth Murphy.
25   BY MR. CHRISTIAN:
```

March 31, 2022                                                    2028

```
 1   Q.   In to-line, do you see "Flint mayor"?

 2   A.   Yes.

 3   Q.   So this email was to you, among others?

 4   A.   Yes.

 5            MR. CHRISTIAN:  Your Honor, I move to admit VNA

 6   Exhibit 1401 into evidence.

 7            MR. STERN:  No objection to the exhibit.  I just want

 8   to note that the original question said, "Do you recognize

 9   this email?"  And there's one, two, three -- four emails

10   contained in this exhibit.

11            THE COURT:  Okay.

12            MR. CHRISTIAN:  Thank you for the practice point,

13   Mr. Stern.

14            MR. ERICKSON:  No objection.

15            THE COURT:  No objection from LAN.  Okay.  Then it's

16   received.

17      (VNA Exhibit No. 1401 Admitted Into Evidence.)

18   BY MR. CHRISTIAN:

19   Q.   Do you recognize this email chain, Mr. Walling?

20   A.   Yes, I do.

21   Q.   Thank you.  So let's look at the bottom.  It is -- let's

22   look at the bottom of page 3.  And it says it's from a person

23   named Ronald Fonger.

24            Do you recognize that name?

25   A.   I do.
```

1    Q.   And who is Ronald Fonger?

2    A.   Ronald Fonger's a long-time Flint Journal MLive reporter.

3    And he covered, you know, quite a number of different city

4    issues, including this one.  He's probably listening by Zoom

5    today, I imagine.  He's been the one generally covering these

6    cases.

7    Q.   And the date on this email is March 2, 2015?

8    A.   Yes.

9    Q.   At 8:14 A.M.?

10   A.   Yes.

11   Q.   And it reads as follows.  "Hi, Jason.  LeeAnne Walters,

12   one of the residents contacted by the city and offered the

13   chance to have her water tested has received her results.

14        "I have a copy of the official laboratory report and

15   wondered if someone discuss her results and what may be behind

16   what appears to be a high level of lead."

17        Did I read that correctly?

18   A.   Yes.

19   Q.   Even though there was a grammatical problem there,

20   correct?

21   A.   I followed it as you read it.

22   Q.   So on March 2 of 2015, VNA was still working in Flint; is

23   that correct?

24   A.   Yes.

25   Q.   So let's go to the second page.  I apologize.  Yeah.  So

March 31, 2022

2030

1    go to the second page, and there's a message.  At the top, it

2    says, "Elizabeth Murphy sent on Monday March 2, 2015, at

3    8:34 A.M."

4            And it's to Ronald Fonger, correct?

5    A.  Yes.

6    Q.  About LeeAnne Walters.

7            And Ms. Murphy responds, "Ron, I'll call Howard Croft

8    and see who can provide an answer to you.  Liz."

9            Did I read that correctly?

10   A.  Yes.

11   Q.  And we'll go to the first page.  And at the bottom of the

12   page, this message is from Ronald Fonger, Monday, March 2,

13   2015, at 9:53 A.M., correct?

14   A.  Yes.

15   Q.  And the subject is "LeeAnne Walters" to Elizabeth Murphy.

16           "Thank you.  It's up on social media complete with

17    the attached illustration.  So I'm trying to get good

18    information.  Appreciate your help."

19           Did I read that correctly?

20   A.  Yes.

21           MR. CHRISTIAN:  And so let's scroll up to the top of

22    this page.  Or right there.  Let's stop right there.

23   BY MR. CHRISTIAN:

24   Q.  And it's from Elizabeth Murphy on Monday, March 2, 2015,

25    at 11:00 A.M. to Howard Croft.

March 31, 2022

2031

```
 1              "FYI"?
 2    A.   Yes.
 3    Q.   Okay.  So let's go further up.  And this time it's from
 4    Elizabeth Murphy Monday, March 2, 2015, at 11:08 A.M.  And in
 5    to-line, we have Gerald Ambrose, Natasha Henderson -- and to
 6    remind everyone Natasha Henderson was the --
 7    A.   The city administrator.
 8    Q.   Howard Croft and Flint mayor, which is you, correct?
 9              And the first line says, "This is what I would like
10    to send back to Ron Fonger.  In most cases, excessive amounts
11    of lead and copper in water can be contributed to residential
12    service lines and internal plumbing.
13              "The City of Flint water department has not detected
14    lead or copper in the Flint River or leaving the treatment
15    plant.  The water department has just completed testing in
16    December 2014 on 100 residential water samples.  And only two
17    of those samples were above the limit of 15 parts per billion.
18              "In cases where high lead -- high levels are
19    detected, we then attempt to test neighboring locations to
20    help isolate the cause.
21              "We continue to honor all requests for water testing
22    in homes or businesses.  In the specific case of Ms. Walters,
23    the city has contacted her neighbors to ask them to submit
24    samples to have their water tested.  We have not had a
25    response yet."
```

March 31, 2022                                                          2032

1              Did I read that correctly?

2    A.   Yes.

3    Q.   So as of this date, you now have additional information

4    beyond what Mr. Croft told you about Ms. LeeAnne Walters,

5    correct?

6    A.   Yes.

7    Q.   I mean, at the very least, the information is getting out,

8    right?

9    A.   Yes, certainly.

10   Q.   And when you saw this email, did you tell VNA that there

11   was lead found at Ms. Walters's home?

12   A.   No.

13   Q.   Did you tell Mr. Croft to tell VNA that lead was found at

14   Ms. Walters's home?

15   A.   No.

16   Q.   Did you ask Mr. Ambrose to tell VNA about the lead

17   finding?

18   A.   No.

19   Q.   Did you ask Ms. Henderson to tell VNA about the lead

20   finding?

21   A.   No.

22   Q.   Did you tell Mr. Glasgow to tell them?

23   A.   No.

24   Q.   And at this point in time, did you do any research to see

25   what makes -- what corrosive water is?

```
 1   A.   No.  I don't recall I did.  I -- if I may, I -- around
 2   this time, I, you know, learned from Mr. Croft about this
 3   lengthy service line that ran to Ms. Walters's home that I
 4   previously mentioned.
 5           That's what I understood, you know, rightly or
 6   wrongly, to be the problem at that household.
 7   Q.   So I believe you testified yesterday that for each home,
 8   the condition of the water is different; is that correct?
 9           MR. STERN:  Objection.  I'm not sure he's -- I don't
10    know if that was his testimony.  But I don't think he's
11    qualified to talk about water chemistry.
12           THE COURT:  The condition of the water.
13           Why don't you rephrase.
14           What do you mean "condition"?
15   BY MR. CHRISTIAN:
16   Q.   The quality of the water at one home can differ from the
17   quality of the water at the home right next door to it; is that
18   correct?
19           MR. STERN:  Same objection.
20           THE COURT:  If he knows, he can answer.
21           THE WITNESS:  Yes.  That's -- I think when it came
22    up, my observations, when I was out really doing a lot of door
23    knocking, having a high volume of conversations with people,
24    and it was obvious to me that, you know, household by
25    household, people had different, you know, I think I said
```

March 31, 2022                                                    2034

1    experiences.

2           Because you might 23409 necessarily know without a

3    test.  But someone's experiences with the water is very

4    different, even house to house.  Not just neighborhood by

5    neighborhood.  But it could even vary.

6    BY MR. CHRISTIAN:

7    Q.   So at that point, you mentioned a long lead service line,

8    correct?

9           So lead service lines, based on your understanding

10   and knowledge, are buried underground, correct?

11   A.   Yes.

12   Q.   So unless the ground is disturbed and there's a hole, you

13   can't see a lead service line, can you?

14   A.   There's one thing I can add.  Right.  One cannot observe

15   their service line from -- what I'm trying to get to is there's

16   two parts to the service line.  There's a public side and a

17   private side.

18          The public side of the service line, which, you know,

19   usually we say in Flint, like, goes to about the sidewalk,

20   there's no way for a house -- you know, a person in a household

21   to observe the public line.

22          But in most cases, you can -- in the private side,

23   you can see what the pipe is going into your water meter, and

24   you can actually look at that, and, you know, based on what

25   copper looks like, what lead looks like, what other materials

March 31, 2022                                                          2035

1    look like, you may have some information about the private

2    side of the service line.

3           Sometimes those two things just get put together, and

4    it gets talked about as a service line.

5           But my understanding is in most cases for us in

6    Flint, there's these two sides.

7    Q.   Two sides.

8    A.   I just -- you were asking me about that.  I wanted to

9    state what I understood.  So one could not observe the public

10   service line, to my knowledge.

11   Q.   So at that point, you had a resident of Flint who had very

12   high lead level results, and you knew about it?

13   A.   Yes.

14   Q.   When you think back to the February 18 meeting with VNA,

15   they didn't mention any lead service lines or lead test

16   results, high lead test results, correct?

17   A.   Correct.

18   Q.   And that, in addition to the February 9 email you received

19   by the University of Michigan Flint, was the second instance of

20   lead being found at a high level in Flint that you knew of,

21   correct?

22   A.   Yes.

23   Q.   And you knew that this Flint River water had been running

24   through the pipes of Flint, the distribution system, in late

25   April of 2014?

March 31, 2022                                                                    2036

1    A.   Yes.

2    Q.   In May of 2014.  In June of 2014.  July, August,

3    September, October, November, December.

4              All the way up until March of 2014, correct?

5    A.   Yes.

6    Q.   And now lead is cropping up, correct?

7    A.   Yes.

8    Q.   And you didn't do anything on that day to find out whether

9    there was lead at other houses; is that correct?

10   A.   That's what I was asking Mr. Croft about.  I mean, you

11   noted this line here from Elizabeth Murphy.  I understood that

12   the city was, you know, with Ms. Walters looking at doing

13   additional testing.

14             So I understood that from Mr. Croft.  We had talked

15   about that.

16   Q.   And you talked about it on March 2?

17   A.   I don't recall specific date.  But it is right about that

18   same time.

19   Q.   This was a priority to you, correct?

20   A.   Yes.  I was making the point to ask Mr. Croft

21   approximately every week about this case.

22   Q.   About this case.

23   A.   About the case of Ms. Walters, yes.

24   Q.   Did you ask him about the case of all the other citizens

25   of Flint who also were receiving Flint water?

```
 1              MR. STERN:  The cases?  Objection.
 2   BY MR. CHRISTIAN:
 3   Q.  Did you ask him whether there was testing going on for
 4   other Flint residents who might also have a high level of lead
 5   coming in through the taps of their homes?
 6   A.  I remember at that time being told that they were looking,
 7   that this was an unusually long service line.  The water
 8   service center, which maintains those records, I think was
 9   looking.
10              And there were -- you know, they were trying to see
11   if there were a few other houses that had that same kind of
12   exceptionally long service line.
13              That's -- so testing around the house and the length
14    of service line.  That's what I remember us discussing in, you
15    know, probably those couple of weeks.
16   Q.  Okay.  So in your next weekly meeting after learning of
17   this March -- receiving this March 2 email, your next weekly
18   meeting, you talked with Mr. Croft about Ms. LeeAnne Walters's
19   lead test results, correct?
20   A.  The conversation Mr. Croft and I were having were, like,
21   informal.
22   Q.   Informal?
23   A.  Like he -- like he -- I'd grab him for a minute, and we'd
24   sit down in my office.  At this point, he's reporting to the
25   city administrator, Natasha Henderson.
```

March 31, 2022                                                          2038

```
 1              So my primary information about this was coming from
 2    those brief conversations with Mr. Croft that I believe
 3    occurred about once a week.
 4    Q.   Okay.  So at that point in time, you were getting informal
 5    information.
 6              You did not have a more important matter on your desk
 7    than the health and safety of Flint residents at that time; is
 8    that correct?
 9    A.   Ever.  Correct, yes.
10    Q.   And you were content to only have informal meetings with
11    Mr. Croft at that point in time?
12    A.   Well, each week I was hearing the -- you know, the steps
13    and the new information, and I believed the city was making
14    good progress.  I mean, it is something that I look back on.  I
15    question myself about it.  But that's what I was understanding
16    at the time.
17    Q.   So let's look at Tab 28, which has been premarked for
18    identification as VNA trial Exhibit 2665.
19              Do you recognize that as an attachment to the email
20    from -- that was forwarded from Mr. Fonger?
21    A.   I saw that text.  I don't remember seeing that.
22    Q.   Well, let's look at the -- you said, "that text"?
23    A.   I'm sorry.  I meant the text of the email.
24    Q.   Sure.
25    A.   The text of the email said there was an attachment.  I
```

```
 1   didn't -- I didn't remember at the time looking past the email.
 2            MR. CHRISTIAN:  Your Honor, we move to admit
 3    Exhibit 2665 into evidence.
 4            MR. STERN:  We object.
 5            THE COURT:  Yeah.  He's never seen this before, at
 6    least not at the time of the events.  Perhaps you would use a
 7    different witness to have it admitted.
 8   BY MR. CHRISTIAN:
 9   Q.  So a couple more questions about that, about the actual
10   email.
11   A.  Yes.
12            THE COURT:  And which exhibit is the email?
13            MR. CHRISTIAN:  We'll go back to Tab 27.
14            THE COURT:  Okay.  Thank you.
15            MR. CHRISTIAN:  Exhibit 1401.
16   BY MR. CHRISTIAN:
17   Q.  So you've been a manager, you've managed people, at least
18   from 2009 to 2015, correct?
19   A.  Yes.
20   Q.  And when you manage people, you have regularly scheduled
21   meetings with people, some people, correct?
22   A.  Yes.
23   Q.  And have you ever had a time when you have a high priority
24   that causes you to have greater frequency of meetings with
25   someone?
```

March 31, 2022

2040

```
1    A.   Yes.

2    Q.   Did you demand to have more frequent meetings with

3    Mr. Howard Croft when you knew that at least one resident of

4    Flint had lead in the tap water at a high level?

5    A.   So I was making a point to speak with Mr. Croft about once

6    a week like we have described.  I was meeting, at this time,

7    once a week with the executive staff, which would have been

8    individuals on this email chain, and sometimes a few others

9    were invited.  Chief of police, occasionally.

10          I'm just thinking through.  I don't recall feeling

11   like I needed more meetings at that time.  I don't recall

12   requesting a meeting that was, you know, turned down or not

13   scheduled.

14   Q.   So did there come a time when there was something called a

15   Flint's Technical Advisory Committee, came into being?

16   A.   Yes.

17   Q.   And that was early March of 2015?

18   A.   That sounds about right.  I think we had this discussion

19   with the Flint -- the community water quality, as well.  You

20   know, that was something I had been working on for some time

21   for some few weeks.

22          So that sounds like the right date for the first

23   meeting, right around that time.

24   Q.   So I'm showing you -- please turn to Tab 19.

25          Were you a recipient of this email?
```

March 31, 2022                                                2041

1    A.   Yes.

2    Q.   And I may not have stated, but it's marked for VNA trial

3    Exhibit 1516.

4         And the subject -- so did you see your name on that

5    email?

6    A.   Yes.

7         MR. CHRISTIAN:  And so, Your Honor, I move to admit

8    VNA Exhibit 1516 into evidence.

9         MR. STERN:  No objection.

10        MR. ERICKSON:  No objection.

11        THE COURT:  Okay.  It's received.

12    (VNA Exhibit No. 1516 Admitted Into Evidence.)

13   BY MR. CHRISTIAN:

14   Q.   Now, the subject line of this email is "Tech Committee

15   Follow-Up"; is that correct?

16   A.   Yes.

17   Q.   And the date of this email is Thursday, March 5 of 2015;

18   is that correct?

19   A.   Yes.

20   Q.   And let's go through the recipients of this email.

21        So Brent Wright?

22   A.   Flint water plant supervisor.

23   Q.   Daugherty Johnson?

24   A.   City of Flint utilities director.

25   Q.   Donna Cole?

March 31, 2022                                      2042

1   A.   I'm sorry.  That name's just not ringing a bell.

2   Q.   Howard Croft?

3   A.   City public works director.

4   Q.   James Henry?

5   A.   Environmental health for Genesee County Health Department.

6   Q.   Mike Wright?

7   A.   Mike Wright...

8            THE COURT:  It says J. Mike --

9   BY MR. CHRISTIAN:

10  Q.   J. Mike.  Thank you, Your Honor.

11  A.   Maybe there's something else that says who he is.  I know

12  I've heard that name, but I can't recall.

13  Q.   John O'Brien?

14  A.   Senior staff with the Genesee County Drain Commissioner's

15  office.

16  Q.   Kirk Smith?

17  A.   Executive director of the Greater Flint Health Coalition.

18  Q.   Larry Kohler?

19  A.   mcc.edu is Mott Community College.  I believe he was what,

20  you know, they called a plant or facilities manager,

21  supervisor, something along those lines.

22  Q.   Laura Sullivan?

23  A.   Kettering University professor.  Kettering University

24  located in Flint.

25  Q.   Michael Glasgow?

March 31, 2022

2043

```
 1    A.   City of Flint.
 2    Q.   Mike Lane.
 3    A.   I'm drawing a blank on that one, too.  I know the name is
 4    familiar, but I can't place it.
 5    Q.   Mike Prysby.
 6    A.   Michigan Department of Environmental Quality.
 7    Q.   You mentioned Natasha Henry a moment ago?
 8              THE COURT:  Henderson.
 9              MR. CHRISTIAN:  Henderson.  Thank you.
10    A.   City of Flint administrator.
11    Q.   Norbert Birchmeier?
12    A.   That one, I don't remember.
13    Q.   Pete Levine or Levine?
14    A.   Executive director of the Genesee County Medical
15    Association.
16    Q.   Rob Nicholas of Veolia?
17    A.   Yes.
18    Q.   Rosejo -- r-o-s -- Rosejo?
19    A.   Right.  So Dr. Joan Rose, Michigan State University.
20    Q.   Russell Hudson?
21    A.   I'm drawing a blank.
22    Q.   Samir Matta?
23    A.   He's with an engineering firm that did a fair amount of
24    work with the City of Flint.  I'm sure it's a record somewhere.
25    There's a list somewhere of these individuals with titles.
```

March 31, 2022                                    2044

1    Q.   Sure, sure.

2    A.   So with an engineering company.

3    Q.   Warren Green?

4    A.   LAN.

5    Q.   And Elizabeth Murphy?

6    A.   Assistant to the emergency manager.

7    Q.   So at this meeting, you had quite an assembly of water

8    expertise; is that fair to say?

9    A.   Yes.

10   Q.   And was that part of the purpose for this assembly?

11   A.   Yes.  This was one of the steps that we were taking as a

12   city engaging Veolia, creating a broad community water advisory

13   committee and then this technical, kind of, you know, water

14   treatment engineering.

15          So these are people who have technical or work

16   experience or credentials around water.

17   Q.   So we're going to back out a little bit and look at the

18   body of the email.

19          So it begins, "All, I want to thank everyone for

20   attending our first technical committee meeting yesterday.  By

21   all measurements, this was a very successful first gathering.

22          "I am forwarding everyone an electric copy of the

23   materials chaired yesterday, including the presentation by

24   Veolia.

25          "As for next steps, I'm looking for literature form

March 31, 2022                                              2045

1   Dr. Rose and from Michael Wright of the EPA to come within the

2   next day or two.  I also would like to have specific questions

3   that anyone feels should be included in a bullet point list so

4   that we can move quickly to generate the best responses." [As

5   read].

6              Did I read that correctly?

7   A.  Yes.

8   Q.  So if this email sent on March 5 and refers to a meeting

9   the prior day, this is approximately March 4 that the meeting

10  occurred?

11  A.  Yes.  I believe it did.

12  Q.  Okay.  So tell me what you recall about the agenda for

13  that meeting.

14  A.  I was -- I was at that meeting to show that, you know,

15  myself, and others -- I mean, myself, the emergency manager

16  were engaged and valued the contributions that these

17  individuals -- you know, they're taking time.  We had this

18  meeting in this committee room, one of the committee rooms.

19  The larger room for the city council.

20             The door was open.  You asked me about the agenda.

21  Sorry.  I'm trying to prompt my memory.  Well, I know the

22  Veolia presentation that's mentioned there in the attachments

23  was a part of those discussions.

24             I think there were some of the same points that had

25  been shared with the Public Works Committee, as I recall.  I

March 31, 2022

2046

```
 1    don't -- I don't remember more about an agenda.  There
 2    probably were welcome and introductions.  It's the first time
 3    these people were getting to know each other.
 4          I think we had a couple on conference call.  Maybe
 5    there's another document.  But I don't --
 6    Q.  So this meeting occurred two days after that email from
 7    Ron Fonger about the lead, high lead test results?
 8    A.  Yes.
 9    Q.  It occurred two days after a discussion of conducting more
10    tests to see if other homes had high lead content in the tap
11    water, correct?
12    A.  Yes.
13    Q.  This was a good opportunity to talk about high lead test
14    results.
15          Would you agree?
16    A.  In retrospect, I very much agree.
17    Q.  But you didn't bring it up, did you?
18    A.  I did not.
19    Q.  You remember testifying yesterday near the end of your
20    testimony that the technical advisory group was involved with
21    switching back to the DWSD?
22    A.  Yes.
23    Q.  And you remember when you were testifying about VNA, you
24    said that if they would have mentioned lead in their report,
25    maybe this could have gone to the Technical Advisory Committee
```

```
 1   sooner?
 2   A.  Yes.
 3   Q.  If you would have mentioned it in March of 2015, it would
 4   have gone to the Technical Advisory Committee sooner; is that
 5   correct?
 6   A.  Yes.  If I would have mentioned it, there would have at
 7   least been a discussion about it.  You know, if I would have
 8   said, "This is what I've talked about with the public works
 9   director."
10         I think that could have made a difference.
11   Q.  And one of the ways it would have made a difference is
12   that Warren Green could have told you what he thought about it,
13   correct?
14   A.  Yes.
15   Q.  And the representatives of the DEQ could have told you
16   their perspective on it, correct?
17   A.  Yes.
18   Q.  And everyone else in that meeting would have had the
19   opportunity to contribute to the understanding of the mayor of
20   Flint about lead, correct?
21   A.  Yes.  And, you know, whatever was on or not on the agenda,
22   you know, my recollection was there was conversation.  You
23   know, there was free flowing dialogue.  S.
24         O I think what you just asked is fair, is accurate.
25   Q.  So I remember you yesterday read your message from October
```

```
 1    of 2015 from your notes, handwritten notes, about the Flint
 2    River crisis.
 3              Do you recall that?
 4    A.  Yes.
 5    Q.  And you had some advice from a political advisor on there,
 6    correct?
 7    A.  Yes.  And friend, yes.
 8    Q.  And friend.  To communicate not necessarily as the mayor
 9    but as a human, correct?
10    A.  Yes.
11    Q.  When you learned of LeeAnne Walters's high lead test
12    results, you were a mayor and a human, correct?
13    A.  Yes.
14    Q.  And as a human, was that on your heart when you met with
15    these people two days later in March of 2015?
16    A.  I remember that I was interested in hearing what these
17    individuals who were invited to the table had to share from
18    their perspective.  I was in communication with Mr. Croft about
19    that case.
20              And I understood the city was taking, you know, good
21    steps to try to address that case.
22    Q.  Let me make sure I understand.
23              You said they were taking good steps?
24    A.  Yes.
25    Q.  Tell me about those good steps.
```

March 31, 2022

2049

```
 1              How many houses did they test between March 2 and
 2    March 9 of 2015?
 3    A.   I don't know the answer.
 4    Q.   And how many houses did they test between March 9 and
 5    March 16 of 2015?
 6    A.   I don't know the answer.
 7    Q.   And if I continue, will your answer continue to be the
 8    same?
 9    A.   Yes.  I do not know the answers today of how many
10    households were tested around Ms. LeeAnne Walters's house.
11    Q.   And you didn't ask the question either, did you?
12    A.   I don't know.  I don't recall a specific incident of
13    asking for that number.
14    Q.   I'd like to turn to Tab 58, which is VNA's Exhibit 5454M.
15              Do you recognize what has been premarked for --
16    premarked as Exhibit 5454M?
17    A.   I don't remember being familiar with it.  I'm not sure.  I
18    don't know.
19    Q.   So are you familiar with the Coalition for Clean Water?
20    A.   It sounds familiar.
21    Q.   So after you had the knowledge on March 2 of 2015 of
22    Ms. LeeAnne Walters's test results, as well as the Technical
23    Advisory Committee meeting, did there come a time in that month
24    when you went on television to drink water from the Flint
25    River?
```

```
 1   A.   There was the "Ask the Mayor" show with Channel 5.  I'm
 2   not sure the date.
 3            Maybe we can refresh me of the date?
 4   Q.   One moment.  I'll see what we can do here.  And while
 5   we're waiting, I don't want to have everyone sitting watching,
 6   so --
 7   A.   I did that show every week.
 8   Q.   So you did it every week?
 9   A.   Yeah.  I did "Ask the Mayor" every week so.
10   Q.   And do you recall how many times you actually went on the
11   "Ask the Mayor" show and drank the water on television?
12   A.   There was only once.
13   Q.   Only once.
14   A.   Yeah.
15   Q.   Do you remember if it was before or after you learned of
16   Ms. Walters's high led result?
17   A.   I think we should just look up the date.
18            THE COURT:  Well, let's go to a different area.
19            MR. CHRISTIAN:  Sure.
20            THE COURT:  Pressing on the gas pedal here.
21            MR. CHRISTIAN:  We will proceed, Your Honor.
22            THE COURT:  You can always come back to it.  I'm not
23   precluding you from discussing.
24            MR. CHRISTIAN:  Thank you, Your Honor.
25   BY MR. CHRISTIAN:
```

```
 1   Q.   So in late June of 2015, you learned the name Miguel
 2   Del Toral, didn't you?
 3   A.   Yes.  That day sounds about right.
 4   Q.   And I'm going to ask you to look at Tab 31, VNA Exhibit
 5   1843.  It is premarked -- oh, I did say it.
 6            So do you recognize this?
 7   A.   Yes.
 8            MR. CHRISTIAN:  Your Honor, we move to admit VNA
 9   Exhibit 1843 into evidence.
10            MR. STERN:  No objection.
11            MR. ERICKSON:  No objection.
12            THE COURT:  Okay.  It's received.
13     (VNA Exhibit No. 1843 Admitted Into Evidence.)
14            THE COURT:  And could you remind me, did you offer
15   5454M?
16            MR. STERN:  It was not offered, Your Honor.
17            THE COURT:  All right.
18            MR. STERN:  That's the last exhibit we just looked at
19   with the coalition?
20            THE COURT:  That's right.  Okay.
21            MR. STERN:  That was not offered.
22            THE COURT:  Okay.  Go ahead with your question.
23   BY MR. CHRISTIAN:
24   Q.   Now, Exhibit 1843 is a June 24, 2015, memorandum; is that
25   correct?
```

```
 1   A.   Yes.

 2   Q.   And it is from a gentleman named Miguel Del Toral; is that

 3   correct?

 4   A.   Yes.

 5   Q.   And the subject of that email, let's take a look at it.

 6   It says, "High Lead Levels in Flint, Michigan-Interim Report."

 7            Did I read that correctly?

 8   A.   Yes.

 9   Q.   And so at this point in time in June of 2015, Veolia was

10   no longer in Flint; is that correct?

11   A.   Correct.

12   Q.   In fact, they finished their work roughly in March of

13   2015, correct?

14   A.   Correct.

15   Q.   And so let's look at the first paragraph.  And I'm going

16   to read it.

17            "The purpose of this interim report is to summarize

18   the available information regarding activities conducted to

19   date in response to high lead levels in drinking water

20   reported by a resident in the City of Flint, Michigan.

21            "The final report will be submitted once additional

22   analyses have been completed on pipe and water samples."

23            Did there come a time where you understood what

24   prompted Mr. Del Toral to send this memo?

25   A.   I understood that Ms. LeeAnne Walters had reached out
```

March 31, 2022                                      2053

1    directly to the EPA.  Mr. Miguel Del Toral was a staff person

2    for the EPA --

3    Q.   Okay.

4    A.   -- Environmental Protection Agency.

5    Q.   So let's go down to the next paragraph.

6          "Following a change in the water source, the City of

7    Flint has experienced a number of water quality issues

8    resulting in violations of national primary drinking water

9    regulations, including acute and nonacute coliform maximum

10   contaminant level violations and total trihalomethanes.

11         "TTHM, MCL violations as follows?"

12         Now, did I read that with the exception of missing

13   some parentheses there?

14   A.   Yes.

15   Q.   Next group there with the bullet -- with the list.

16         So, "Acute coliform MCL violation in August 2014.

17   Monthly coliform MCL violation in August 2014.  Monthly

18   coliform MCL violation in September 2014.  Average TTHM MCL

19   violation in December 2014.  Average TTHM MCL violation in

20   June 2015."

21         Did I read those correctly?

22   A.   Yes.

23   Q.   In your capacity as mayor, were you aware of each and

24   every one of these violations?

25   A.   Yes.

March 31, 2022

2054

1    Q.   Next paragraph, please.

2              "In addition as of April 30, 2014, when the City of

3    Flint switched from purchasing finished water from the City of

4    Detroit to using the Flint River as their new water source, the

5    City of Flint is no longer providing corrosion control

6    treatment for lead and copper."

7              Did I read that correctly?

8    A.   Yes.

9    Q.   So let's go to the next paragraph.

10             "A major concern from a public health standpoint is

11   the absence of corrosion control treatment in the City of Flint

12   for mitigating lead and copper levels in the drinking water.

13             "Recent drinking water sample results indicate the

14   presence of high lead results in the drinking water, which is

15   to be expected in a public water system that is not providing

16   corrosion control treatment.

17             "The lack of any mitigating treatment for lead is of

18    serious concern for residents that live in homes with lead

19    service lines or partial lead service lines, which are common

20    throughout the City of Flint."

21             Did I read that correctly?

22   A.   Yes.

23   Q.   So I've asked you about whether you conducted any research

24   about corrosion control.

25             And you told me that you didn't, after you saw that

```
 1    word "appears a priority" in Veolia's final report, correct?
 2    A.   Correct.
 3    Q.   And you pointed out that you read it forwards and
 4    backwards and did not see the word "lead," correct?
 5    A.   Correct.
 6    Q.   And in this report, if you go back to the bottom of the
 7    prior page, the previous page, the page before, it mentions
 8    corrosion control.
 9              And then on the next page it mentions lead, correct?
10    A.   Yes.
11    Q.   It connects corrosion control and lead, correct?
12    A.   Yes.
13    Q.   So at this point in time, there was no mistake in your
14    mind that the lack of corrosion control could result in high
15    lead levels in the citizens' of Flint drinking water; is that
16    correct?
17    A.   No.  That's not how I thought about it.
18    Q.   Okay.  So we talked about your being a very literate
19    person.  You're a smart guy.
20              MR. STERN:  Is that a question?
21              MR. CHRISTIAN:  Yes, he said he was smart earlier.
22              MR. STERN:  The question is, "Are you a smart guy"?
23              THE COURT:  We've got that fully understood.
24    BY MR. CHRISTIAN:
25    Q.   So this paragraph -- let's go back -- let's go through it.
```

March 31, 2022                                    2056

1    So presence of high lead results.

2              In the same paragraph corrosion control?

3    A.   Yes.

4    Q.   You read this at the time you received it?

5    A.   Yes.

6    Q.   At that time, you did not understand lead in water to be

7    connected to the lack of corrosion control?

8    A.   Right.  This is when I started to see that connection, and

9    I made an inquiry with the regional administrator for the EPA

10   about this -- what I read and understood was an interim report.

11   Q.   Interim report?

12   A.   Yeah.

13   Q.   So at this point, it wasn't final in your mind, correct?

14   A.   I mean, I read it.  I saw that it was from one staff

15   person.  I took it seriously.  I saw it was interim.  And my

16   personal point of contact that I had at the EPA, from my

17   earlier inquiry that we looked at, was the regional

18   administrator Dr. Susan Hedman.

19              So there's a -- you know, there's an email exchange,

20   and her and I talked on the phone about -- about this when I

21   became aware of it.

22   Q.   So when you became aware of this text connecting or

23   mentioning high lead test results and corrosion control in the

24   same paragraph, did you go to Howard Croft and ask about the

25   results of the additional lead testing that began as a result

1    of LeeAnne Walters's high lead test result that you learned

2    about in February of 2015?

3    A.   No, I don't recall that I did that.

4    Q.   Did you reach out to anyone else in the City of Flint

5    government to inquire about the progress of the lead testing

6    that was occurring in the City of Flint in the aftermath of

7    Ms. LeeAnne Walters's high lead test results?

8    A.   I don't know.  I'm not recalling anything specific.  I

9    know it was -- I know it was discussed between myself, the city

10   administrator.  I'm just not recalling anything specific.

11   Q.   So in your role as mayor and as a manager, can you tell me

12   one action step that you took with respect to the employees of

13   the City of Flint to learn more about the test results that

14   would follow Ms. LeeAnne Walters's high lead test results?

15   A.   I don't remember that I asked or saw specific results

16   until I learned of the order from the MDEQ to the City of Flint

17   for the need to add the corrosion control in early September

18   2015.

19   Q.   So is it fair to say in the -- on the day that you

20   received this report, you didn't do anything in the City of

21   Flint to learn more about it?

22           MR. STERN:  Objection to form.  "In the City of

23    Flint."  He said he called the EPA administrator.

24           MR. CHRISTIAN:  Thank you.  I will be more specific.

25           THE COURT:  Do you mean when he was physically in the

March 31, 2022

2058

```
 1    City of Flint, what did he do reaching out to the White House
 2    and all these things?
 3              MR. CHRISTIAN:  No.  I will be more clear, because
 4    clearly I'm not.
 5              THE COURT:  Okay.  I'm not following.
 6    BY MR. CHRISTIAN:
 7    Q.  So with respect to any City of Flint employee, you took no
 8    actions on the day you received this report in reaction to your
 9    receiving this report?
10    A.  I don't remember if it was this day.  Cause I didn't get
11    this memorandum directly.  This was learning about it from
12    Mr. Ron Fonger that we had discussed earlier.
13              I remember -- I'm just generally remembering a
14    follow-up with the city administrator and director of public
15    works.  And I remember making the phone call to an email to
16    Dr. Hedman.  That's -- so anything else I were asked about, I
17    would say no.
18    Q.  So when you saw this report, you didn't go back to VNA and
19    say, "I read your final report, and now the EPA is telling me
20    that lead and corrosion control are connected," did you?
21    A.  I did not.
22    Q.  You didn't go to Warren Green and say, "You've done work
23    for us.  Is there a connection between corrosion control and
24    lead," did you?
25    A.  No.
```

March 31, 2022

2059

```
1    Q.   You didn't call the DEQ and ask them about the
2    relationship between corrosion control and lead, did you?
3    A.   I did not.
4    Q.   And this was late June-early July, of 2015?
5    A.   Yes.  It was right around that time.  We'd have the email
6    exchange with Dr. Hedman.  That would give a date for that
7    interaction.
8    Q.   Thank you.  So when you testified yesterday, you said that
9    you read the VNA report back and forth.  And you testified that
10   if they had mentioned the word "lead," you would have done
11   something different, correct?
12   A.   Yes.
13   Q.   You said, "I guarantee you," didn't you?
14   A.   Yes.
15   Q.   The EPA, Miguel Del Toral put "lead" in his report,
16   correct?
17   A.   Yes.
18   Q.   "Lead" occurs in this report, the word, more than 20
19   times; is it fair to say?
20   A.   Yes.
21   Q.   And at that time, you did not do anything to switch back
22   to the DWSD, did you?
23   A.   I didn't take any action towards DWSD at the time.
24   Q.   You didn't even start studying whether it was plausible to
25   return to the DWSD, did you?
```

```
1    A.   Not at that time.

2    Q.   Did you write the president at that time?

3    A.   No.

4    Q.   Did you write the governor at that time?

5    A.   No.  The governor came a little bit later.

6    Q.   Months later, correct?

7    A.   Um-hum.

8    Q.   So as of early July, 2015, you had corrosion control, you

9    had lead, you had a report saying that you had danger, correct?

10   A.   Yes.

11   Q.   And you had already seen at least one of your citizens,

12   one of your constituents suffering -- or with a high lead test

13   result coming from the water in their home, correct?

14   A.   Yes.

15   Q.   And you did nothing at that point in time, correct?

16            MR. STERN:  Objection.  That misstates his testimony.

17            THE COURT:  Sustained.

18            MR. STERN:  He named ten things he did.

19            THE COURT:  He listed the things he did.  So it's

20   sustained.

21   BY MR. CHRISTIAN:

22   Q.   You did not start working on changing the water source,

23   did you?

24   A.   I did not.

25   Q.   You did not ask for test results, correct?
```

March 31, 2022                                                   2061

 1   A.   Not at that time.

 2   Q.   And you did not enlist the support or help of any external

 3   party as of July 1, 2015, to deal with lead in water in Flint,

 4   correct?

 5   A.   I had a direct interaction with the EPA regional

 6   administrator, who -- I mean, Mr. Del Toral is in that region.

 7   Q.   Okay.  So you didn't tell Mr. Croft --

 8            MR. STERN:  Asked and answered.  Now, he's just

 9   badgering the witness.  I mean --

10            THE COURT:  Sustained.  Let's go to the next area.

11            Do you have the communication with the EPA

12   administrator?  We could place the date that way.  If that's

13   what you're looking for, Mr. Christian.

14            MR. CHRISTIAN:  What's that, Your Honor?

15            THE COURT:  Do you have the communication from

16   Mr. Walling to the EPA administrator?

17            MR. CHRISTIAN:  I do.  I'm not looking for that, Your

18   Honor.

19            THE COURT:  Okay.

20            MR. CHRISTIAN:  I'm looking for something else.

21            THE COURT:  Okay.

22            MR. CHRISTIAN:  We will get to that, Your Honor.

23            THE COURT:  Okay.

24            MR. CHRISTIAN:  We will get to that.  It's going to

25   take a little while when you get into it --

March 31, 2022                                         2062

1              THE COURT:  Well, let's use our five minutes.

2              MR. CHRISTIAN:  Okay.  We will use it.  We will use

3    it.  So, Your Honor, I can -- I have some additional exhibits.

4              THE COURT:  Okay.

5              MR. CHRISTIAN:  And we're happy to pass them out.

6              May we approach?

7              THE COURT:  Yes.

8              MR. CHRISTIAN:  Okay.

9    BY MR. CHRISTIAN:

10   Q.  So, Mr. Walling, please turn to Tab 19 of the binder I

11   just provided to you.  You mentioned your --

12             MR. STERN:  Objection.

13             MR. CHRISTIAN:  Would you please take a look --

14             THE COURT:  Just a minute.

15             When there's an objection, please wait for the

16   ruling.

17             MR. STERN:  So this is subject to one of the Court's

18   motions in limine.  And I understand there's been testimony

19   that hasn't been elicited that has warranted some responses.

20   But there's a specific motion in limine that addresses.

21             THE COURT:  There is.  So let's move to your next

22   exhibit.  We can discuss this at another time.  Two minutes.

23   They call me "lead foot Levy" for a reason.  Got to keep the

24   gas on here.

25             THE WITNESS:  You might want to rethink that, Judge.

```
 1              THE COURT:  It's not good.  I try not to mention that
 2     when I'm stopped on the side of the road.
 3              Okay.  Well, I think we're at a very good point to
 4     take a break.
 5              So what we'll do is take a break for today.  We will
 6     be back in session on Monday 9:00 A.M.  Pedal to the metal in
 7     our case.
 8              Please remember everything I told you and enjoy the
 9     weekend.  I don't know about the weather.  It's not looking
10     great.
11              But please rise for the jury.
12                           (Jury Out)
13              THE COURT:  Okay.  Mr. Walling, you are free to
14     leave.  And it sounds like we'll need you back on Monday.  I'm
15     sorry.
16              THE WITNESS:  Yes.
17              THE COURT:  Okay.
18              THE WITNESS:  I will be here.
19              THE COURT:  Okay.  Great.  Thank you.  So please be
20     seated.  Okay.
21              And.  Okay.  So, Mr. Christian, I want to ask you
22     about a couple of exhibits.  You were going to tell us --
23              MR. CHRISTIAN:  Right.
24              THE COURT:  -- what VNA Exhibit 1647, what the number
25     is of the previously exhibit -- received rendition of it.
```

```
 1              MR. CHRISTIAN:  And it's my understanding, Your
 2    Honor, that was the previously accepted number for the
 3    exhibit.
 4              THE COURT:  Oh, that's -- it was VNA's exhibit number
 5    through plaintiffs' case.
 6              MR. CHRISTIAN:  That's --
 7              THE COURT:  Okay.  Good.
 8              MR. CHRISTIAN:  1647.  That's what we understand.
 9              THE COURT:  Okay.  It might have been Plaintiffs'
10    1647.
11              MR. ERICKSON:  Your Honor, I think it's actually been
12    admitted twice.  Once under the plaintiffs' number and once
13    under the VNA number.
14              THE COURT:  Okay.  Good.  Then it can be located.
15              I'm just curious, I have lost track.  Kelly
16    Rossman-McKinney, who was she -- who contracted with her?  Was
17    it the --
18              MR. STERN:  She was working for both Veolia and the
19    city separately.
20              THE COURT:  That's what it was looking like, and I
21    was getting confused.  I just wasn't totally -- I'm sure it's
22    crystal clear to the jury, all of this.
23              Okay.  So then we had motion in limine 505, if I'm
24    not mistaken, which related to -- it was plaintiffs' motion in
25    limine that was granted regarding -- well, you're familiar
```

1    with it.

2            MR. CHRISTIAN:  Absolutely, Your Honor.

3            THE COURT:  Yeah.  And so how does this exhibit

4    comport with that, with the Court's ruling?

5            MR. CHRISTIAN:  So, Your Honor, I do believe that

6    Mr. Stern elicited testimony from the witness about drinking

7    water in Flint.

8            And so we will go to the transcript and point that

9    out for Monday.  But we believe he brought up the subject of

10   drinking water and his family drinking water in Flint.

11           MR. MAIMON:  I welcome counsel for VNA to look at the

12   transcript.  Because Mr. Stern did not elicit any such

13   testimony.

14           Mr. Walling volunteered.  That subject was very

15   different than if we would have elicited to have then arguably

16   opened the door.

17           Since Mr. Walling did raise it, we didn't want to

18   object to at a certain point counsel reiterating it, because

19   it was volunteered by the witness.  But we believe that the

20   exhibit that they wanted to put in as well as any testimony on

21   something like that does violate the MIL, and we would object.

22           MR. STERN:  Your Honor, I just want to note that in

23   my examination of him, there was a document I was looking at,

24   and there was some words in the document that referenced him

25   drinking the water.

1        And I specifically avoided asking him about that

2    during the examination to avoid violating the Court's order.

3        THE COURT:  Okay.

4        MR. MAIMON:  The transcript will tell us.

5        MR. CHRISTIAN:  And if, Your Honor -- if we don't

6    find it, we will -- we'll drop this one.  And if we do find

7    it, we'll show it to the Court.

8        THE COURT:  And if you do find it, and it's as

9    Mr. Maimon and Mr. Stern represent it to be, that he offered

10   it without a question of, "Did you and your family drink the

11   water," then do you agree that the motion in limine needs to

12   be -- that plaintiffs have not opened the door such that the

13   Court's order should be set aside?

14       MR. CHRISTIAN:  Well, we'll certainly look into that,

15   Your Honor.  And if we do believe that notwithstanding that,

16   we have a viable and legal and supported reason for

17   introducing it.  We still would like to introduce it.

18       THE COURT:  I'm not sure I'm following.  But it's not

19   important for me to follow that.  That is the least of our

20   concerns, so I won't ask.

21       MR. CAMPBELL:  There is the new Friday, Judge.

22       THE COURT:  What?

23       MR. CAMPBELL:  Thursday is the new Friday.  I'm just

24   feeling like Friday.

25       THE COURT:  Yeah.  We're all tired.

1            MR. CAMPBELL:  I'm not exactly sure what the exhibit

2     is that's being offered.  But I just wanted to offer a comment

3     about the motion in limine.

4            As I recalled that motion, it had to do with people

5     like I think it was specifically as to President Obama --

6            THE COURT:  Well, it was President Obama, certainly.

7     But I'm not sure if it was that one.

8            But it was also government officials.  It was whether

9     VNA and LAN were drinking the water at the drinking fountains

10    at the city hall and whether government officials.

11           But I have all the motion in limine decisions here.

12    But I don't know if I have them all.

13           MR. CAMPBELL:  What I would suggest, Judge, is if we

14    could take an opportunity to review it and comment on Monday.

15    I don't have it with me.

16           THE COURT:  Okay.

17           MR. MAIMON:  Obviously, we should all review it.  But

18    I don't think commentary is necessary.  There's a ruling.

19    We've abided by the ruling.  And I think that the time for

20    reargument or reconsideration is over.

21           MR. CAMPBELL:  But, you know, the witness said it on

22    the witness stand.  And I think it really goes to issues about

23    why somebody was doing it.

24           Mayor Walling was on the TV doing it for basically

25    governmental purposes.  I mean, he was trying to show the

March 31, 2022

2068

 1    people that, "Hey, I do it.  And it's not like President Obama
 2    coming in on a photo op.  This is different."
 3            THE COURT:  Okay.  Well, let me take a look back at
 4    the opinion and order on this issue.
 5            MR. CHRISTIAN:  And, Your Honor, I just want to state
 6    for the record, I believe I showed the witness handwritten
 7    notes from a meeting, I think they may have been introduced
 8    through Depin Chen, but they were, I think, Rob Gnagy's
 9    handwritten notes.
10            I want to clarify that on the record however I need
11    to --
12            THE COURT:  What exhibit number?
13            MR. MAIMON:  I don't think there was any substantive
14    testimony about it, because he said he didn't recognize it.
15            THE COURT:  He didn't recognize it.  It wasn't
16    admitted.  So it doesn't matter.
17            MR. CHRISTIAN:  Okay.
18            THE COURT:  But thank you for the clarification.
19            MR. CHRISTIAN:  Certainly.
20            MR. CAMPBELL:  Your Honor, you had asked me probably
21    at least twice about Plaintiffs' Exhibit 0460, which is a big
22    long list.
23            THE COURT:  Right.
24            MR. CAMPBELL:  I gave Mr. Maimon what I suggested for
25    redactions.  He had wanted to take a look at it.  Might see if

1    there was something else that he might want to include.  I

2    just wanted to let Your Honor know that we're working on it,

3    if that's okay.

4            THE COURT:  Okay.  That's great.  Thank you.

5            Okay.  So Monday we're back at 9:00 A.M.  And I just

6    would encourage everyone to keep your eyes on our jury and on

7    the clock.  Because if we're here together in August, it won't

8    help anyone.  It won't help any of you or your clients or

9    anyone else here.

10           So I just ask that everybody consider, take that into

11   consideration as you prepare your examinations.

12           MR. MAIMON:  So in that regard, can we inquire --

13   because obviously if Mr. Walling is done on Monday before the

14   end of the day, we'll have another witness available.  But I'd

15   hate to bring somebody from out of Ann Arbor to come in only

16   to have them sit and then have to go back home.

17           And I'm not looking to cut short anybody's

18   examination.

19           THE COURT:  How much -- about how much longer do you

20   think --

21           MR. CHRISTIAN:  I would hope to be done by the first

22   break, Your Honor, depending upon when we start.

23           THE COURT:  We will start at 9:00 o'clock, assuming

24   the jurors are here.

25           So you'll be going until 10:15?

```
 1              MR. CHRISTIAN:  That's my estimation, Your Honor.
 2              THE COURT:  Thank you, Mr. Christian.  Thank you.
 3              MR. ERICKSON:  Your Honor, I'm going to guess that I
 4   have, you know, two or three hours.  But, you know, I can't --
 5              MR. MAIMON:  That tells us all we need to know.
 6              THE COURT:  Yeah.  So that will take us through the
 7   full day on Monday.
 8              MR. CAMPBELL:  If I may ask, assuming we have a full
 9   day on Monday with Mr. Walling, the schedule for the remaining
10   three days.  I know we have Mr. Del Toral.
11              MR. MAIMON:  Right.  So I had marked down the
12   possible witnesses for next week.
13              THE COURT:  Oh.  Let me write this down.  Just a
14   minute.  Okay.
15              MR. MAIMON:  Mr. Walling, obviously.  Ms. Teed we had
16   to reschedule from today.  But we're still looking for her.
17   Ms. White, whose deposition is ready to be played.  And we've
18   resolved all differences, so the Court doesn't need to rule on
19   anything.  Mr. Del Toral.  Ms. Wheeler.  And Ms. Kelly.  And
20   then we also have the Gnagy videotape.
21              MR. CAMPBELL:  Thank you.
22              THE COURT:  Okay.
23              MS. BUSH:  Are those in the order at this moment that
24   you anticipate calling them?
25              MR. MAIMON:  No.
```

```
 1            MS. BUSH:  Okay.

 2            THE COURT:  Okay.  Thank you.  All right.  I think

 3   that's it.

 4            MR. MAIMON:  Thank you, Your Honor.

 5            MR. STERN:  Thank you.  Your Honor, is there - will

 6   there be nothing further regarding the Twitter account at this

 7   point?

 8            THE COURT:  Well, let me ask.  Is there anything that

 9   you think the Court should be doing at this time?

10            MR. STERN:  I mean, at a minimum, I think that the

11   defendants should be ordered to preserve the evidence as

12   requested in the email that I sent to them last night.

13            I believe there are clear, clear violations from -- I

14   mean, tweeting about counsel and calling them liars.  It's --

15   whether it's coming from inside the courtroom or outside the

16   courtroom, it's coming from someone's client.

17            I couldn't imagine, I couldn't imagine a scenario

18   where we would hire a PR company to put out tweets about any

19   of these defendants and calling them liars in the tweets.  I

20   think it's unbecoming of this proceeding, and I do think that

21   something needs to be done.

22            THE COURT:  Did you get a response to your email?

23            MR. STERN:  Just Mr. Mason's immediately upon me

24   sending it, saying he had nothing to do with it.  I only

25   included them, because there were a number of tweets about
```

March 31, 2022

2072

1    Warren Green, as well.

2         And so it seemed to me like there could have been

3    collaboration.  But I'll take Mr. Mason at his word.  As to

4    VNA, I got zero response from anyone regarding my email as if

5    it had never been sent.

6         THE COURT:  So, Ms. Bush, do you have any objection

7    to preserving the information that Mr. Stern requested be

8    preserved?

9         MS. BUSH:  No.  We already have.

10         THE COURT:  Okay.  All right.  So it doesn't have to

11    be an order of the Court.

12         MS. BUSH:  Your Honor --

13         THE COURT:  And, I guess, Mr. Stern, in terms of the

14    rules of professional conduct applying to lawyers, we have a

15    representation that no lawyer was involved in this or

16    communicated with the PR firm?

17         MR. STERN:  Well, we'll probably issue a subpoena.

18    This happens sometimes in cases where things like this become

19    part of the case.

20         And it may be that we get documents that allow us to

21    explore that further.  It may be that we're permitted to ask

22    witnesses on the stand about it when they're brought in by

23    VNA.

24         But I'm happy they're going to preserve.  We'll take

25    the steps that we need to actually get our hands on those

March 31, 2022                                              2073

```
 1    documents.  And then we'll assess if there's anything further
 2    that we need from the Court.
 3              THE COURT:  Okay.  I think that would be helpful.
 4              MS. BUSH:  Your Honor, we do have a problem.  Because
 5    Mr. Stern has been quoted in Law360 referring to -- I don't
 6    remember if it was the clients or the employees of VNA or the
 7    lawyers as -- VNA as liars.
 8              And I'm happy -- I mean, I was hoping not to bring
 9    that up.
10              THE COURT:  And was that in response to an
11    interviewer's question.
12              MS. BUSH:  I don't know.
13              MR. STERN:  It was.  I've got the quote here.
14              THE COURT:  Okay.
15              MR. STERN:  And I'd love to see where I called
16    anybody a liar.
17              MS. BUSH:  I'll be happy to submit the Law360
18    article.
19              THE COURT:  I don't know that -- you certainly can.
20    I don't want to --
21              MR. STERN:  "A lawyer for the children, Corey Stern,
22    told Law360 on Friday, 'Our focus is on our clients, four
23    innocent kids who were poisoned by their water.  The criminal
24    proceedings are a side show.  Our only hope that what could
25    easily be a circus stays out of the kids' trial.'"
```

March 31, 2022

2074

```
 1              That's also included in our public filings for the
 2    most part.  There's nothing I said there that implicates --
 3              THE COURT:  I think it's a different quote.
 4              MR. CAMPBELL:  It's a different one.
 5              THE COURT:  Where's the quote then?
 6              MR. CAMPBELL:  It's law -- I don't have it --
 7              THE COURT:  Okay.
 8              MR. CAMPBELL:  -- but I read it.  It was this week.
 9              THE COURT:  Oh.
10              MR. CAMPBELL:  There were, I think, two.
11              THE COURT:  Why don't you submit it to me.
12              MR. CAMPBELL:  Sure.
13              MS. BUSH:  Will do.  Thank you.
14              THE COURT:  Thank you.  And you can do that by
15    sending it to Guus.  Thank you.  All right.  Safe travels,
16    everyone.
17                        (Proceedings Concluded)
18                 -          -          -
19
20              CERTIFICATE OF OFFICIAL COURT REPORTER
21         I, Jeseca C. Eddington, Federal Official Court
22    Reporter, do hereby certify the foregoing 169 pages are a true
23    and correct transcript of the above entitled proceedings.
24    /s/ JESECA C. EDDINGTON_____   03/31/2022_
      Jeseca C. Eddington, RDR, RMR, CRR, FCRR         Date
25
```