```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF MICHIGAN
 2                      SOUTHERN DIVISION

 3   SHERROD, TEED, VANDERHAGEN    )
     and WARE,                     )
 4                                 )
                  Plaintiffs,      )
 5                                 )        Civil Case No.
                                   )
 6            -vs-                 )        5:17-cv-10164-JEL
                                   )
 7   VNA and LAN,                  )
                                   )
 8               Defendants.
     _____

 9
                       STATUS CONFERENCE
10            BEFORE THE HONORABLE JUDITH E. LEVY
                  UNITED STATES DISTRICT JUDGE
11        Ann Arbor, Michigan - Tuesday, May 17, 2022

12   APPEARANCES:

13   FOR THE PLAINTIFFS:    COREY M. STERN, ESQ.,
                            Levy Konigsberg, LLP
14                          605 Third Avenue, 33rd Floor
                            New York, New York 10158
15
                            MOSHE MAIMON, ESQ.
16                          Levy Konigsberg, LLP
                            605 Third Avenue, 33rd Floor
17                          New York, New York 10158

18                          MELANIE DALY, ESQ.
                            Levy Konigsberg, LLP
19                          605 Third Avenue, 33rd Floor
                            New York, New York 10158
20
21   FOR THE VNA            JAMES M. CAMPBELL, ESQ.
     DEFENDANTS:            Campbell Conroy & O'Neil, P.C.
22                          1 Constitution Wharf, Suite 310
                            Boston, Massachusetts 02129
23
                            CHERYL A. BUSH, ESQ.
24                          Bush, Seyferth PLLC
                            100 W. Big Beaver Road, Suite 400
25                          Troy, Michigan 48084
```

```
 1   APPEARANCES (Continued):

 2                        DANIEL STEIN, ESQ.
                          Mayer Brown, LLP
 3                        1221 Avenue of the Americas
                          New York, New York 10020
 4

 5
     FOR THE LAN          WAYNE BRIAN MASON, ESQ.
 6   DEFENDANTS:          Faegre Drinker Biddle & Reath, LLP
                          k Main Street, Suite 5400
 7                        Dallas, Texas 75201

 8                        David C. Kent, Esq.
                          Faegre Drinker Biddle Reath LLP
 9                        1717 Main Street
                          Suite 5400
10                        Dallas, Texas 75201

11   ALSO PRESENT:        Guus Duindam, USDC Law Clerk
                          Timothy B. Walthall
12                        Patrick Lanciotti, Esq.
                          Frederick Berg, Esq.
13

14

15

16

17

18

19

20   REPORTED BY:         Darlene K. May, CSR, RPR, CRR, RMR
                          231 W. Lafayette Boulevard
21                        Detroit, Michigan 48226
                          (313) 234-2605
22

23

24

25
```

1                          TABLE OF CONTENTS

2

3    PROCEEDINGS:                                          PAGE

4      Appearances                                         4

5      Court Addresses Curative Instruction                5

6      Court Addresses Scheduling Issues                  19

7      Court's Ruling

8      Court Reporter's Certificate

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    Tuesday, May 17, 2022

2                    4:01 p.m.

3                              -- --- --

4              THE CLERK OF THE COURT:  The United States District

5    Court of Michigan is now in session.  The Honorable Judith E.

6    Levy presiding.  Calling Sherrod, Teed, Vanderhagen and Ware

7    versus VNA and LAN.

8              THE COURT:  Could I have appearances, please.

9              MR. STERN:  Good afternoon, Your Honor, Corey Stern,

10   Moshe Maimon and Melanie Daly for the plaintiffs.

11             THE COURT:  Thank you.

12             MR. CAMPBELL:  Good afternoon, Your Honor, James

13   Campbell, Daniel Stein and I see Cheryl Bush for VNA.

14             THE COURT:  Okay.  Good.  Thank you.

15             MR. MASON:  Your Honor, Wayne Mason.  I believe David

16   Kent is on and Jude Hickland.  Jude Hickland may not be on, but

17   Wayne Mason and David Kent.

18             THE COURT:  Okay.  I don't see Mr. Hickland, but I do

19   see Mr. Stein and Mr. Kent.

20             MR. MASON:  Mr. Stein is with VNA.

21             THE COURT:  Of course, I know.  But he was right there

22   where I thought Mr. Kent was and they moved places on my screen

23   right as I spoke.  So I just spoke the name that I was looking

24   at.

25             Okay.  All right.  Does anybody else want to make an

1   appearance?

2           We have Mr. Berg for the city of Flint, Mr. Lanciotti

3   also with the Napoli firm, and Ms. Bush.  I see her now.

4           Well, here is what we had set this time so that we

5   could discuss the situation with Juror Number Nine, which we'll

6   do in a moment.  I didn't set up a YouTube feed or a public

7   Webinar just because it would be relating to her personal

8   health information and I didn't see a point in widely

9   broadcasting that, but there's certainly -- this is not sealed.

10  Anyone is welcome to be here and it can be provided immediately

11  to any member of the public or the media who has any interest

12  in it.

13          So why don't we start with the issue of the proposed

14  curative instruction.  And I received an e-mail from Mr. Maimon

15  regarding a proposal and I received -- and, yeah, that's the

16  e-mail I received today.

17          And, of course I have VNA's proposed curative

18  instruction that was handed to me this morning.

19          In light of the fact that Mr. Maimon has written a

20  substantive e-mail and a proposed instruction, I suppose I

21  should -- I would be interested in hearing from Mr. Campbell

22  whether that changes your thought on your proposed curative

23  instruction?

24          MR. CAMPBELL:  Your Honor, it doesn't at all.  And,

25  you know, we still think that the proper remedy given the

1    situation is the mistrial, but we understand that, you know, it

2    was denied and that's the status.  But this proposed

3    instruction really makes matters worse.  It doesn't strike the

4    evidence.  It doesn't tell the jury that they may not consider

5    reduction of present value.  To the contrary, it says that the

6    evidence understanding between the difference of undiscounted

7    versus discounted values when and if you consider an award of

8    future damages.

9         That implies that the jury's award of damages should

10   be based in part on that difference.  Why else is the

11   understanding relevant.  That's the very prejudice that's

12   created.

13        In our view, in VNA's view, Your Honor, the

14   instruction has to -- must tell the jury that it may not

15   consider present value or discount any present value in its

16   deliberations.  Any instruction that doesn't contain that

17   admonition fails to address the prejudice and indeed without

18   that admonition, the instruction would only draw further

19   attention to present value reductions, thereby increasing the

20   prejudice.

21        We believe the evidence that Dr. Crakes permitted was

22   improper and should be stricken.  His report, we cite the

23   statute and I continue to say that the statute says that this

24   is a matter for the Court after the verdict and it speaks in

25   terms of shall be reduced.

1     So we stand on our objection.

2          THE COURT:  You faded out there, Mr. Campbell.

3          MR. CAMPBELL:  I'm sorry.  The instruction that we

4     submitted is the one that given Your Honor's ruling on

5     mistrial, if this is the route that we go, we strongly urge

6     that that's the instruction that we use.

7          THE COURT:  Mr. Mason?

8          MR. MASON:  Thank you, Your Honor.  Again, for the

9     record, we believe that the appropriate remedy is mistrial.

10    But since we're talking about a curative instruction, we

11    believe that the submission by the plaintiffs is wholly

12    inappropriate and does nothing more than draw more attention to

13    the misdeeds that had occurred with respect to this issue.

14         And the case law even that the Court cited, we don't

15    believe supports this in any way.  Their submission -- their

16    submission once again would reward the fact that this was

17    inappropriately demonstrated to the jury already.

18         So the very nature of what they proposed would

19    exacerbate the problem that already exists and, therefore, we

20    respectfully request that the Court adopt VNA's proposed

21    curative instruction and we're fine with the one change that

22    Your Honor mentioned in court earlier today.

23         THE COURT:  And I'll certainly give Mr. Maimon an

24    opportunity to respond.  Would you be the one speaking,

25    Mr. Maimon?

1    MR. MAIMON:  I will be, Your Honor.

2    THE COURT:  Okay.  Here's the situation from my

3    perspective:  First of all, the motion for a mistrial was

4    denied.  And with the benefit of a short period of time today

5    to take another look at this, it is denied with the full force

6    of any of the relevant -- all of the relevant case law that we

7    have been able to determine.  So I have no doubt about that.

8    And I'll be putting that into a very short written order to

9    supplemental what was said on the record.

10    But in addition to the *Hashem*, H-a-s-h-e-m, case that

11    I mentioned this morning and that Mr. Maimon references,

12    there's also *Setterington versus Pontiac General Hospital*.  I'm

13    sure you have looked at that this afternoon.  But there, the

14    trial court instructed the jury to do the discounting and the

15    Court of Appeals said whatever.  That's fine.  As long as it

16    gets done, it doesn't matter.  The point of the Michigan

17    statute is just to ensure that it gets done at some point.

18    So the fact that that jury must have heard about

19    discounted numbers and was then instructed to discount, was not

20    any type of error according to the Michigan Court of Appeals in

21    1997.  So I think that in light of those two cases as well as

22    the Michigan Civil Jury Instruction, pattern instruction,

23    there's simply no error.

24    So then we have to look at, okay, how did we get to --

25    MR. CAMPBELL:  Your Honor?  If I can just address the

1  case, the *Setterington* case?

2         THE COURT:  Sure.

3         MR. CAMPBELL:  It looks like it's Section 10 of the

4  opinion.  The reason why that wasn't an issue in the case is

5  it's because the defense counsel specifically requested that

6  the jury be instructed to reduced future damage to present cash

7  value.  It was the defense that did --

8         THE COURT:  Sure.  But if it was -- if it was

9  Black-letter law in Michigan that a jury may not know anything

10  about present value, then it would be an error one way or

11  another.  But I hear you, that it was the defense request.

12         But the fact that Dr. Crakes did this so that the jury

13  would understand the difference between discounted and

14  undiscounted -- and then they can be instructed and we will

15  instruct them what number to use.  I just think what we're

16  learning from the sparse case law on this is that this type of

17  situation arises and does not pose a problem.

18         MR. CAMPBELL:  And as to that case, Your Honor --

19         THE COURT:  As to the *Hashem*?

20         MR. CAMPBELL:  *Hashem* I think is how you say it, yes.

21         The *Hashem* case is in apposite as well.  Number one,

22  the issue there that seems to be discussed in the case, was the

23  use of what the court called evidence about inflation.  And the

24  best I can correspond to that is the growth rate that would

25  be -- that enables the economist to then say, how in the future

1  exactly what Dr. Crakes did.

2         So best I can equate is this inflation notice is the

3  growth rate.  But beyond that there was some form of curative

4  instruction that was given in *Hashem*.  I cannot tell what it

5  is, but it was specifically referenced.  And further, it has to

6  do -- it's not what we have here.  What we have here is the

7  jury getting both and then being told the difference, and the

8  prejudice that befalls us is that the jury is invited by doing

9  this to gross up their number.  So that --

10        THE COURT:  Well, I don't see that at all because we

11 have not yet instructed the jury at all about damages.  So I

12 don't see how the jury could be deciding to gross up their

13 number in order to take into account any discounting that the

14 Court might do because we simply haven't instructed them at

15 all.

16        But, Mr. Campbell, do you agree, then, that at the end

17 of the case, in the damages jury instruction, we should be very

18 clear that they are to award the nondiscounted amount if they

19 determine that damages are appropriate?

20        MR. CAMPBELL:  Your Honor, I would stand on the

21 instructions that we submitted and that Your Honor is

22 reviewing.  So that's the --

23        THE COURT:  It's not specifically said there.  I mean,

24 I looked at it, not today.  I looked at it yesterday, but it's

25 not ...

1      Well, here's -- okay.  But in terms of the comment

2   about the misdeeds of the witness and so on, it is clear that

3   the law -- the statute itself, the Michigan statute, does not

4   relate to the admissibility of evidence.  There is no rule in

5   Michigan that this is improper evidence.  So at least we -- I

6   think we can agree that there's no rule in Michigan and the

7   statute itself does not relate to evidence.

8      The jury instruction, I believe, says future value.  I

9   don't think it uses discounted and undiscounted.  That's what's

10  missing from it.  And so in light of -- we may want to consider

11  whether we should use the words that have been used in this

12  trial so they know which they're supposed to use.

13     They'll never know that the Court is going to be the

14  one to discount it, if at all.  I mean, they just won't know

15  that.  They won't have any knowledge of that.  They just have

16  an education on what -- when you think about money, some of you

17  think this way, discounted, and you think, nondiscounted when

18  you look in the future.

19     MR. MASON:  That's the reason that it should have

20  never been brought up in the first place and the statutory

21  basis itself doesn't address the admissibility because it's so

22  clear that it is done after the fact.

23     And that's why the dearth of case law with respect to

24  the issue and the fact that the providing both numbers specific

25  as to these plaintiffs was improper.

1          THE COURT:  I'll say just one more thing on this and

2     then we'll get back to the need or lack of need for a curative

3     instruction.  But the standard instruction that you have

4     submitted to me clearly contemplates that a juror would be

5     educated on present and future values because the jury

6     instruction itself uses the word "future."  So how could a jury

7     understand what future is if they don't understand what a

8     present value and a future value is?  So I just cannot fathom a

9     world in which it is a mistrial for a jury to be -- for terms

10    in a jury instruction to be explained.  I just cannot imagine

11    that world.

12          So that much we know is that I'll be denying -- or I

13    have already denied it and I'll do it again in a written order.

14          So the question is now in my mind whether any

15    curative instruction is needed at all or whether we just

16    want -- I'll let you speak, Mr. Maimon.  We just want to be

17    mindful of this and craft the final jury instruction so that it

18    is just a little more clear than the standard instruction might

19    be.  So that's an option.

20          Another option is to use -- I don't see any reason to

21    just strike the testimony.  I think what you're telling me,

22    Mr. Campbell and Mr. Mason, is you're deeply worried about this

23    jury increasing the value of the damages because they're

24    worried that the Court is going to later decrease any amount

25    they might award.  Is that what you're saying?  When you say,

1    "gross up,"  you mean you're afraid they're going to increase

2    damages, if any, because they're worried that I'm going to

3    discount them?  Right, Mr. Campbell?

4         MR. CAMPBELL:  That is about right, Judge.  And in

5    terms of the evidence issue that you raised, the plaintiffs

6    asked for a stipulation because it was their assumption that

7    the evidence had to be in terms of the future damages.

8         Both defendants didn't agree to that.  We didn't agree

9    to whatever the plaintiff was asking us to do and that was

10   either/or and we just thought it to go with what we all agreed

11   at the time was the evidence issue.

12        Beyond that, this expert did not introduce any

13   undiscounted or present value numbers in his report because the

14   undiscounted is what --

15        THE COURT:  We're past that.  That's going back to the

16   motion for a mistrial, right?

17        MR. CAMPBELL:  Well, it does in part, Your Honor, but

18   it also goes to show that you said there was no evidential

19   issue here and it is because the report defines the evidence

20   the expert would give and there was a request for a stipulation

21   to reduce the present value and we didn't agree to that.

22        MR. MAIMON:  If I can be heard, Your Honor?

23        THE COURT:  Yes.

24        MR. MAIMON:  Thank you.  So first of all, that

25   mischaracterizes the offer of stipulation because the offer of

1  stipulation is that the jury would award and be instructed to

2  award damages in present value as opposed to undiscounted

3  values, which is the charge, the current charge.

4        So it wasn't an evidentiary stipulation.  It was a

5  stipulation as to what the jury would award.  That's number

6  one.

7        Number two, once the Court has determined -- and now

8  it's done it about four times -- that the mistrial motion is

9  denied and the foundations for the arguments for a mistrial are

10 not, according to the Court's findings, valid, the continual

11 reference to misdeeds and inappropriate evidence to a jury as a

12 support for an instruction is not correct.  Because the Court

13 by finding that there is no basis for a mistrial, has rejected

14 the argument that this was a misdeed or that it is in opposite

15 to the law.

16       In fact, the Hashem versus Les -- Les Stanford

17 Oldsmobile, the standard Oldsmobile case clearly states that

18 the statute at issue, which is MCL 600.6306 governs only the

19 procedure for entering an order of judgment following a

20 verdict.

21       THE COURT:  Right.

22       MR. MAIMON:  That's a straight quote out of the case.

23       There is no statement in this case that there was a

24 curative instruction.  I don't know where Mr. Campbell or who

25 told Mr. Campbell that, but I have looked at the case several

1   times and it's not in there.

2          And the case law is clear that there is no -- there's

3   no statutory basis.  There's no rule.  There's no case that

4   says that this type of evidence is improper.  In fact, the

5   defendants themselves as proof that this was not improper, had

6   an expert criticize Mr. -- Dr. Crakes for not reducing to

7   present value.  That's their expert, Mr. Cohen or Dr. Cohen.  I

8   don't know what it is and I mean no disrespect.

9          They put forward an expert who criticized Dr. Crakes

10  for not reducing it to present valve, and you can't have it

11  both ways.  You can't say that it's wrong of him not to do it,

12  but to do it would be a violation of court rules.  And what

13  Mr. Mason says is just simple logic that it's absolutely

14  known -- although no commentary has ever said it.  There's

15  no -- the comments of the issues in the pattern jury

16  instructions don't mention anything like this.  There's

17  absolutely no foundation or basis for their argument.

18         So the predicate for their argument that there needs

19  to be a curative instruction is that there were misdeeds, it

20  was inappropriate and both of those are misplaced and

21  unsupported.

22         And so we believe that, A, there is no -- there is no

23  need for a curative instruction because there's nothing to cure

24  here.  To the extent that anything would have to happen, we

25  believe it would only be to clarify the uses of testimony.

1  Because once the Court has already determined that there was

2  nothing wrong with the testimony, it was not a misdeed, it was

3  not inappropriate, perhaps sometimes courts will clarify things

4  for juries, but they certainly won't say that something that

5  they ruled was appropriate or not inappropriate.  They

6  certainly will not strike testimony that they found was

7  appropriate, and they certainly will not tell the jury that

8  when they're at the end of the case -- and this is -- you know,

9  it's telling that when the Court gave counsel for the

10 defendants an opportunity to be heard, none of them spoke about

11 the case law or anything else and it was only after the Court

12 said your motion is denied, let's talk about the curative

13 instruction, and now they have comments about the case law.

14       But none of them discussed the civil jury instruction

15 in Michigan 53.03A which is for future damages in a personal

16 injury action and says as follows:  "If you decide that a

17 plaintiff is entitled to an award of future damages, you should

18 award the full value of future damages as you determined them."

19       That's the language that Your Honor referenced, but

20 there's more language there and I think that it's telling.  It

21 says as follows:  "You should not reduce any award of future

22 damages to present cash value."

23       How can it be that what we're telling the jury not to

24 do is inappropriate for an expert to explain what that means?

25 Otherwise, it would have to be an entire different instruction

1    where the Court became the expert economist and started

2    explaining to the members of the jury what present cash value

3    means.

4            That's not the function of the court.  That's the

5    function of testimony by experts.  And so you can't just -- as

6    I mentioned in my e-mail, you simply cannot square the case

7    law, which is the *Hashem* case, the model jury instruction from

8    the state of Michigan, approved by the Supreme Court of

9    Michigan with the claim of misdeed and inappropriateness.  It

10   just doesn't square.  It's impossible to square.

11           We believe that there's no need to cure because

12   there's been nothing inappropriate done.  To the extent that

13   the Court thinks that there needs to be clarification, we think

14   that clarification can be made.  But clarification has to be

15   made in terms of the actual law and the actual instruction,

16   which is why we cited Michigan Civil Jury Instruction 53.03A in

17   our proposed alternatives.

18           MR. CAMPBELL:  Your Honor, in the *Hashem* case the

19   reference to the curative instruction is Footnote 11.

20           THE COURT:  I know.

21           Here's what I'm going to do -- Mr. Mason, did you have

22   something else?

23           MR. MASON:  Go ahead, Your Honor.

24           THE COURT:  I am going to issue a written decision on

25   the motion for a new trial, which I absolutely promise you is

1    going to remain denied.  But I think in light of the case law

2    that I have been able to review since the oral decision, it's

3    well worth covering that.  And I am glad that Mr. Maimon

4    brought in the Jury Instruction 53.03A to this discussion

5    because I think what it reminds me of is precisely this:  That

6    the jury is going to be looking at the terms "future" and

7    "present" and there's absolutely nothing wrong with defining

8    those terms for them.

9         So -- and right now I'm inclined to look at the

10   instruction that Mr. Maimon submitted, but end it before the

11   citation to the jury instruction and just leave it there at

12   "potentially you should not reduce any award of future damages

13   to present cash valve."

14        And I might add:  "And you need not concern yourself

15   with the discounted numbers that were presented."

16        Something to that effect, but I'll put it in the

17   written decision.

18        MR. MAIMON:  Just one comment?

19        THE COURT:  Yeah.

20        MR. MAIMON:  I apologize.  Mr. Campbell was correct.

21   That it is in Footnote 11.

22        THE COURT:  It is.

23        MR. MAIMON:  But it's clear that what that curative

24   instruction was about was about a closing argument and not

25   about the evidence itself.

1          THE COURT:  Okay.  Thank you.

2          MR. CAMPBELL:  Yes.

3          THE COURT:  So I will work on that and then you will

4     receive it, but I have all of your proposals and I will take

5     them into consideration.

6          My one concern about plaintiff's proposal is that I do

7     have some concern about introducing a jury instruction

8     regarding their duty to -- with respect to damages without all

9     of the jury instructions that say that the fact that I'm

10    talking about damages, doesn't mean I think you should award

11    damages and all of those things that go along with it.

12         So to the extent that I have some concern about giving

13    any sort of damages instruction right now without the benefit

14    of all the instructions at one time.

15         So I'll just be thinking that through.

16         MR. MASON:  Just a final thought.  The misdeed will be

17    decided ultimately by another court apparently what Mr. Maimon

18    discusses, but the reality of the instruction is that the one

19    proposed by the plaintiff makes it worse and brings more

20    attention to it.  And so we would ask the Court as the Court

21    considers both the instructions provided, take that into

22    consideration.  Thank you.

23         THE COURT:  Okay.  Thank you.

24         Let's turn to Juror Number Nine and she did reach back

25    out to us.  She did get a COVID test.  It is positive.  She's

1  very symptomatic.  Although she's okay, but she certainly has

2  all of the classic symptoms of the current variant of COVID-19.

3          And I note that although all of the jurors are masked

4  in the courtroom, in the jury room where they can be six or

5  more feet -- approximately six feet.  Well, they are at least

6  six feet from each other, they take their masks off to eat and

7  to drink.  And that this particular juror has traditionally

8  worn a cloth mask and not a more protective mask.  So I just

9  want to make sure you're aware of that.

10         I looked at the court's, the Eastern District of

11 Michigan Administrative Order on COVID-19, and she is certainly

12 within six feet in the jury box where generally her mask is on,

13 but again it's a cloth mask.

14         The Administrative Order from the Eastern District of

15 Michigan States that:  "A person may not enter the courthouse

16 if he or she, A, has tested positive for COVID-19 within the

17 last ten days."

18         So my trial protocol says that you cannot return until

19 you're healthy and have a negative, rapid antigen test, but in

20 any event, no sooner than five days.

21         I don't know that anybody's tested whether the judge

22 gets to violate an Administrative Order.  I'm not that worried

23 about the Administrative Order.  But in any event, I don't

24 think she's coming back for a week to ten days.

25         I think that's a safe assumption that it will take

1   up -- she is vaccinated and she is boosted.  So that may assist

2   her -- it absolutely will assist her in her recovery.

3            MR. STERN:  Your Honor, do you want us to speak to

4   this?

5            THE COURT:  Please.

6            MR. STERN:  Okay.  So we've discussed since receiving

7   Guus' E-mail and we don't think it's tenable at this point for

8   this juror to remain.  As much as we don't want to lose her,

9   it's not just the COVID test, it's the COVID test plus

10  symptomatic, plus a request for two days off in June, plus what

11  appears to be an issue that we hope is resolved with being

12  paid, but for someone who previously has not made any issues of

13  coming to court being on this jury, it sure seems like over the

14  last week or so a lot of things have happened to cause this

15  juror to have some -- I don't know if skepticism is the right

16  word, but certainly some inability or disenchantment with the

17  process as the case goes on.

18            If we were to continue the case with her as a juror,

19  we are likely going to lose somewhere around two to three weeks

20  of court time because of the two days in June, what could be

21  ten days now, which is another two days -- I'm sorry, two weeks

22  in terms of court time.  It's just not tenable.  Mr. Mason has

23  often and raised the idea of needing to move this case along.

24            As Your Honor knows, we tried to cut our proofs, not

25  our proofs, but our witnesses to help us with our proofs to try

1    and expedite the case.  It was the defendants who initially

2    believed that the case would last roughly 20 weeks.  Our case,

3    short of the jury, has taken roughly ten and a half weeks,

4    which leaves them close to the same amount of time that we've

5    had to meet the 20 weeks that we informed the jury about.

6         It just -- believe me, we do not want to lose a juror.

7    I was the first one to respond this morning.  It's with

8    significant regret that we say that, but we do not believe she

9    should continue and we believe she should be excused.

10        As for the other jurors, we looked at the protocols,

11   there's been nothing that requires testing of them.  I don't

12   believe any of them, from what we've heard or not heard from

13   the court are symptomatic.  We made a -- you know, I requested

14   months ago that we try to determine their vaccination status

15   and that was met with, you know, some heavy disfavor from some

16   folks I think who are parties to the case, whether it was the

17   Court or the other lawyers or just the rules of Eastern

18   District.  We don't see any need for anything to happen at this

19   point with the other jurors unless they become symptomatic or

20   feel that they are needing to, you know, to test for some

21   reason.

22        So if it were our choice, regretfully, Juror Number

23   Nine would no longer serve and we would resume tomorrow morning

24   at nine o'clock with the nine remaining jurors unless something

25   transpires between now and then.

1    MR. CAMPBELL:  Your Honor?

2    THE COURT:  Let me just say -- and, Mr. Stern, you've

3  taken into consideration that other jurors may test positive in

4  light of her being within six feet with a cloth mask and in the

5  jury room without a mask?

6    MR. STERN:  So I trust that the jurors will be

7  informed as to why their colleague is no longer joining them

8  for service in the event Your Honor adopts the proposal where

9  she would be dismissed as a juror.  And I think that in the

10 same way that we're not requesting anyone to be vaccinated or

11 even determining their vaccination status as to the jury, the

12 jurors can determine themselves whether they believe it is

13 appropriate or not to be tested.

14    And that's how the case -- that's how -- the jury has

15 been treated a little differently than the parties in this

16 case, I think to protect their privacy and to protect their own

17 beliefs, which is why there was no issues raised as to

18 vaccination status.  So whereas I may have 12 weeks ago wanted

19 everyone to be vaccinated and all of those type things, that's

20 not how the case has gone.  So I think if we're going to treat

21 them at the beginning through now as though their choices and

22 their status is their decision and it's private, I think they

23 should be informed of Juror Number Nine's positive Covid test.

24 I think if they choose to get tested and they feel they should

25 get tested, they can.  I also know there's a lot of people who

1   don't want to test, who are asymptomatic who feel as though

2   it's not something that they ought to have to do, that it

3   causes significant constraints on them if they test positive.

4         I'm not one of those people.  I'm happy that I've been

5   negative and the Court's been requiring it.  But at the same

6   time, I just don't think at this point to put something on the

7   remaining jurors is consistent with what we have done so far

8   other than to inform them that there was a positive test, they

9   may have been exposed and it's their choice as to how to

10  proceed.  And if they test positive, they need to inform the

11  Court so that we can move accordingly.

12         MR. CAMPBELL:  Your Honor.

13         THE COURT:  Yes.

14         MR. CAMPBELL:  I don't think that you have a -- we

15  have a choice or the Court has a choice here.

16         I'm looking at the order that's entered in the case

17  and that you read to the jury in the opening in paragraph

18  seven:  "If the judge or a juror tests positive for COVID-19

19  and are asymptomatic, the trial will be adjourned for five

20  days --"

21         MR. MAIMON:  You have to read the rest, though.  You

22  have to read the rest.

23         MR. CAMPBELL:  Thank you.  I was trying to do that.

24         MR. MAIMON:  Okay.

25         MR. CAMPBELL:  "But the positive individual will

1  return after five days and one negative rapid antigen test.  If

2  counsel or clients test positive --" that's not what we're

3  talking about.

4       "This decision will be made."

5       The rest really goes to -- I can read it, but it has

6  to do with counsel.

7       MR. MAIMON:  No.  That was the sentence I wanted

8  because the adjournment assumes that the juror is coming back.

9       MR. STERN:  Yeah.  The order that Your Honor entered

10 is under the assumption that Juror Number Nine is returning and

11 so it would be five days if she were asymptomatic, but we're

12 operating under the premise that she will not be returning and

13 thus that part of the order is not applicable.

14      THE COURT:  My -- Mr. Mason, go ahead.

15      MR. MASON:  We've taken off for Juror Number Two with

16 respect to husband issues.  We've giving four days with respect

17 to another juror.  Five days here, if you began with symptoms

18 that occurred yesterday, would hit Sunday.

19      And so we could -- if she tests on Sunday, we could

20 get started again on Monday or Tuesday.  And there is no reason

21 to discharge this juror based on this.  The whole premise of

22 the discussion with respect to we'll stop the trial if somebody

23 gets COVID, we should live up to that in terms of what we said

24 with respect to that.

25      This trial has gone longer than it should so far and

1  I'm not going to go into the specifics of all of the things

2  that I've described before for the Court, of dragging this out

3  so far.  That shouldn't punish this juror who has not asked, as

4  I understand it, off, and who five days can run from yesterday

5  until Sunday.  So it's workable to keep the juror, still

6  respect the CDC guidelines and move forward.

7          MR. CAMPBELL:  And Your Honor --

8          MR. STERN:  And this is -- this is -- the level of

9  flip-floppingness that is occurring here is just -- what was

10  the word that was used to describe our tactics regarding the

11  Crakes' evidence?  I can't remember the word that Mr. Mason

12  keeps using about our conduct and how it's going to be another

13  court that decides it.  I tried to put it out of my head, but

14  whatever that word is is far more applicable now to the this is

15  take too long, we need to speed it up, let's come up with time

16  limits, we're not going to do it.  But now let's wait five or

17  ten days.  Let's see how this juror is doing even though she's

18  not being paid, even though she lives an hour away, something

19  that she -- I mean, what are we doing here?  It's amazing.

20          THE COURT:  Okay.  Here's my concern --

21          MR. CAMPBELL:  Your Honor, I'm concerned about the

22  other jurors myself.  I'm concerned about the other jurors in

23  the jury box that have been clearly exposed to COVID.  And I

24  just --

25          THE COURT:  I am too.

1    MR. CAMPBELL: And I just don't think it's

2 inappropriate to bring them in tomorrow when we know this juror

3 is symptomatic with COVID. I just -- if I was on that jury, I

4 wouldn't want to be here. I mean, I just -- I think that it's

5 not fair to them to bring them in tomorrow.

6    MR. MAIMON: What's the concern about bringing them

7 in? There's no further exposure. I mean, the exposure is gone

8 because she's gone.

9    THE COURT: Here's the concern that I have, which is

10 that the Court issued an Administrative Order that I want

11 to ...

12    That I don't think that I have specifically provided

13 to you. But it says that, "All trial participants, including

14 jurors, must agree to get a COVID-19 test should they develop

15 symptoms or be in close proximity with someone who has COVID-19

16 during trial and deliberations."

17    And so I think we're in a situation where it could be

18 short-sighted to dismiss Juror Number Nine because Number Ten

19 also wears a cloth mask and sits as I am -- I've only been in

20 the jury room five times or four times, and I think they sit

21 next to each other in the jury room, but they certainly sit

22 next to each other in the courtroom and Juror Number Nine was

23 coughing and sneezing yesterday in the jury room and once or

24 twice in the courtroom. And so there's definitely a close

25 proximity.

1            And what I'm afraid of, Mr. Stern and Mr. Maimon, is

2    that we dismiss Number Nine, we come back and we do a day,

3    maybe two days of trial and then Number Ten, Number Eight,

4    those who are sitting beneath -- then we just have a bigger

5    problem.  And so it makes sense to me to adjourn until Monday.

6    I want to talk about Mr. Bithoney, Dr. Bithoney and his

7    availability, but I would like to ask that the jurors get a

8    test on Friday or Saturday, which is consistent with the

9    Court's Administrative Order, not my personal protocol because

10   that is Administrative Order.  I don't even think it existed at

11   the time.

12           But it seem like the only way to make sure we get to

13   the finish line on this case and don't have other jurors who

14   are currently carrying -- have been exposed or carrying the

15   virus and will soon test positive and we'll be right back where

16   we were.

17           Now, from my perspective, Dr. Bithoney is obviously a

18   critical witness for plaintiffs from what has been in the

19   briefing and what I've heard thus far and read in the

20   PowerPoint.  I understand your concern because he has

21   scheduling problems for next week, but I'm willing to do things

22   out of order where we fire Howard Croft's deposition -- we do

23   something to fill time on Monday and then bring in Dr. Bithoney

24   when he's available.

25           So tell me what your thoughts are on that.

1    MR. STERN:  So I have multiple thoughts.  Number one

2    the -- Dr. Bithoney's availability is not yet known and so we

3    need to discuss that with him before alternative arrangements

4    are made.

5         Number two, the request to relieve Juror Number Nine

6    is not simply about her COVID test.  If Your Honor feels based

7    on Your Honor's interactions or your staff's interactions with

8    this juror, irrespective of whether she has asked off, if she

9    is either subtly or indirectly asking off, that's --

10        THE COURT:  Let me address that.  Because I gave that

11   some thought and I don't think she's disenchanted at all.  I

12   think I may have misread the situation with the sneezing

13   happening the same day as she needed two days off.  That, I

14   think I misread entirely.  There's been no sign -- and I did a

15   little thought about this in discussion.  No sign of her being

16   disenchanted in the jury room, the CSO, court security, I

17   mentioned, they think she is delightful with them, enthusiastic

18   every day to be here.  So I think I may have implied that when

19   it was not the case.

20        MR. MAIMON:  Okay.  I think one concern, Your Honor,

21   is not only of Dr. Bithoney's scheduling concern, but it's an

22   overall scheduling concern.  I think the Court had referenced

23   the difference being between symptomatic and asymptomatic and

24   whereas in this Court's COVID-19 trial protocol, it was five

25   days for an asymptomatic juror who tested positive.  That is

1    correct, that it would come due on Sunday, the 22nd on my

2    calculation with a negative test on that date, could be

3    available on the 23rd to come back.  And that assumes that we

4    then go forward on the 23rd.  If it's ten days --

5              THE COURT:  It doesn't need to be ten days.

6              MR. MASON:  Even symptomatic, I think, Your Honor, the

7    CDC is five days that she can test.

8              MR. STERN:  That's fine.  We totally agree with what

9    the CDC.

10             MR. MAIMON:  No.   I'm just saying I thought the Court

11   had referenced a rule from the Eastern District --

12             MR. MASON:  Judge ...

13             MR. MAIMON:  -- which said -- that we haven't seen,

14   that said for symptomatic positive, there's ten days required.

15   Did I mishear?

16             THE COURT:  I think that that is actually an employee

17   order.

18             MR. MAIMON:  I see.

19             THE COURT:  Now that I'm looking at it.

20             MR. MAIMON:  I thought it said any participant in a

21   trial, including the jury or during deliberations.

22             THE COURT:  Hold on.

23             MR. STERN:  Amazing.

24             THE COURT:  I can put the link -- is the Sharepoint

25   for the court available to all of you?

1    MR. STERN:  No.  Maybe the chat room?

2         THE COURT:  I'm going to just put that it in the chat

3    right now.

4         MR. MAIMON:  Assuming that that's a ten day

5    requirement -- and, again, that's a matter of a ruling it

6    either it is or it isn't.  If it's ten days, it knocks out the

7    entirety of next week.

8         THE COURT:  It doesn't have to be ten days.

9         MR. MAIMON:  Okay.

10        MR. MASON:  Your Honor, I'd ask you to take into

11   consideration the passion now with which they're arguing to

12   remove this juror.  She's invested three months of her life in

13   this case with no ask to get off and, you know, we've made

14   accommodations for others and the fact that she's unfortunately

15   caught this virus, we should be willing to make an

16   accommodation here and not lose a juror.  I'm concerned about

17   losing jurors and I think it's important we keep her investment

18   in this case involved as well.

19        MR. STERN:  Your Honor, I should.  Your Honor, I

20   should --

21        THE COURT:  Just a minute.  The other thing I should

22   say that in her voicemail, she said that she wanted direction

23   from me and from us as to what to do and that she would be

24   willing to log on to Zoom and watch the trial, so that she

25   could continue as a juror.

1     MR. MAIMON:  That would be fine by us.

2     MR. STERN:  I just -- if I --

3     MR. MAIMON:  Let me address Mr. Mason's concerns.

4  That would be fine by us, we would love to keep her.  Have her

5  by Zoom and they should be willing to stipulate to that.  Let's

6  not lose time.

7     THE COURT:  Okay.

8     MR. MASON:  I don't think it's appropriate to make her

9  do that.

10    THE COURT:  No.

11    MR. MAIMON:  No, okay.  Right.  Okay.

12    MR. MASON:  I don't want to lose her and it may be

13 that we come to that, but at this point I don't think it's

14 necessary for us to make that decision.

15    MR. STERN:  I just think it's important that the

16 record --

17    THE COURT:  Here's what I need:  Okay.  The record

18 reflects that we've all taken every position imaginable

19 throughout this trial.

20    MR. STERN:  Not all of us.

21    THE COURT:  Okay.  Well, I probably have.

22    But what I think I need to do is look very carefully

23 at the court's Administrative Order and I would like to request

24 that the jurors take a test Friday or Saturday so that we have

25 results by Monday and report any positive tests.

1          But before going any further, I do want to know

2    what -- about the availability of Dr. Bithoney.  So that -- I

3    mean, he is critical -- we can't finish the case until he's

4    available, so we have to know about him.  So can you get back

5    to me, Mr. Stern?

6          MR. STERN:  If you'll hold on right now, I'll go in

7    the other room and I'll call him.

8          MR. MAIMON:  Let's have an opportunity to talk to him.

9          THE COURT:  Yeah.  Okay.  And so I'll get back to you

10   as soon as I hear back, Mr. Stern, and Mr. Maimon will copy

11   everyone on his availability.

12         MR. MAIMON:  So if I understand correctly, Your Honor,

13   our plan going forward is we're going tell the jurors not to

14   come in either tomorrow or Thursday, that they should test

15   Friday or Saturday, but in any event in enough time to know for

16   Sunday afternoon if there's a problem and let us know.  It

17   would be our plan to proceed next week with evidence on Monday

18   and finish Dr. Bithoney when he's available to come back?

19         THE COURT:  Yes.  And I turned immediately to the

20   Howard Croft deposition objections.  And I'm on page 200.  I

21   didn't get very far, but now I will have time to finish that.

22   So that will be available to you.

23         MR. STERN:  So the defendants, just so we know, are

24   okay with Mr. Croft's deposition being the first witness that

25   they call?  Because they indicated previously -- I'm imagining

1  a scenario where Dr. Bithoney is unavailable and so we put our

2  case on pause with no further witnesses, and then we move to

3  the defense case.  They previously said that they do not want

4  to play a video as their first witness.  That was a position

5  that they took late last week.  So now I just want to confirm

6  that we would be moving forward with the Croft deposition if

7  Dr. Bithoney is unavailable as the first witness called; is

8  that right.

9           MR. CAMPBELL:  Am I being asked the question by the

10  counsel?

11           THE COURT:  Yes.

12           MR. STERN:  Yes.

13           MR. CAMPBELL:  Well, first of all, we're in

14  substantially changed circumstances.  So to suggest that, yes,

15  I didn't want to start the case with a video, but since the

16  plaintiff's case is not over and that's fine.  I mean, we've

17  all been in situations where you take things out of order.  But

18  in this sense, I think it probably makes sense to use a video.

19           Croft is available.  We'll think about it this

20  afternoon and if there's another one, Your Honor, we'll get it

21  to you immediately.

22           THE COURT:  Okay.

23           MR. STERN:  May I make a suggestion, then?

24           THE COURT:  Yes.

25           MR. STERN:  If Howard Croft -- if the video is going

1   to be played, why would it be objectionable to allow the jury

2   to watch the Howard Croft video remotely?

3          THE COURT:  Because I would need to set protocols of

4   who can be in the room, what -- I mean, it's just a little more

5   complicated than just saying fire up your iPhone and take a

6   walk and listen to Howard Croft.  So I'm not saying it can't be

7   done and maybe it will be done, but it can't be done this

8   afternoon.

9          MR. STERN:  So I would request -- and then I'll shut

10  up because clearly everyone is tired of hearing my voice.  But

11  I would request that whatever the protocols are that are

12  necessary for that, out of an abundance of caution in light of

13  the fact that there's significant concern from some of the

14  folks on the phone about the health and safety and the COVID

15  issues for the other jurors, in light of that fact, we ought to

16  have that protocol in place in the event that another juror

17  tests positive or if this juror remains symptomatic after

18  Sunday.  Because to lose any more time, as Mr. Mason has

19  repeatedly said, would just be really unfair to the parties to

20  have this drag on -- and to the jurors to have it drag on

21  further than it needs to.

22          MR. CAMPBELL:  And, Your Honor, you know what would

23  really be unfair under these circumstance, these COVID

24  protocols were set forth at the start of the trial.  We talked

25  about them at length.  The plaintiffs were perfectly fine with

1     five days off and ten days off while they were putting their

2     case on.  To now suggest that it's just okay that we have to

3     present our case over Zoom, that is unfair.

4          THE COURT:  Well, no.  There's a lot of scenarios for

5     what happens in the future.  One of our judges, Judge Mark

6     Goldsmith, conducted a civil jury trial over Zoom.  I'll get a

7     hold of his protocols, but we're not at that point at all.  And

8     he selected the jury with that in mind and he selected it over

9     Zoom, and we didn't do that.  And we don't know about what's

10    going on at people's homes and so on, whether they have

11    internet connection and all of that.

12         MR. MASON:  And it would be inappropriate to let the

13    plaintiff put their case on live to the jury and we don't get

14    that benefit.

15         THE COURT:  Understood.

16         MR. CAMPBELL:  A Zoom trial is one thing, but

17    plaintiffs in person and defense on Zoom, that's entirely --

18         THE COURT:  I hear you absolutely.  I think the idea

19    was one juror and not the whole jury for one day of testimony

20    or something like that.  But still, I'm going to look into

21    it to see what it is, but I certainly hear you about

22    shifting -- I'm not anywhere near shifting this whole jury to

23    Zoom.  No, not at all.

24         So, okay.  Anything else today unrelated to these two

25    issues that we've discussed?

1          MR. CAMPBELL:  Thank you, Your Honor.  We'll get back

2     to you as quickly as possible if there is another video that we

3     want to have on Monday.

4          THE COURT:  Okay.

5          MR. CAMPBELL:  Okay.

6          THE COURT:  And I'll keep working on Howard Croft and

7     I may, once I finish one volume, I'll send it to you so you can

8     start working on it instead of waiting.  Is one volume about

9     how many hours?

10          MR. MAIMON:  No way to know.

11          THE COURT:  Bobby knows.

12          MR. STERN:  It's not -- all volumes are not created

13     equally because you're taking testimony from a volume and some

14     volumes may have less testimony, for instance, the McLaren

15     components and the legionella components.  So many of these

16     depositions are not being used and those in certain

17     circumstances take up significant parts of the certain volumes.

18          THE COURT:  Okay.  I'll just keep going.

19          MR. STERN:  Thanks.

20          MR. CAMPBELL:  Thank you.

21          THE COURT:  All right.

22          MR. MAIMON:  I do think, Your Honor, it was helpful to

23     us when Your Honor had made it through a volume to send it.  I

24     think the technicians are able to process that easier and I do

25     think that helps.  So thank you.

1          THE COURT:  Okay.  Good.

2          MR. CAMPBELL:  Your Honor.

3          THE COURT:  Also I feel I have accomplished something

4    as opposed to not.

5          All right.  Thank you.  And so we'll hear you from

6    you, Mr. Stern and Mr. Maimon about Mr. -- Dr. Bithoney's

7    availability?

8          MR. STERN:  Yeah.

9          THE COURT:  And I will communicate this request for

10   the jurors to test and my assumption is that we'll be back in

11   session at 9:00 a.m. on Monday morning.  If there are issues,

12   we need to discuss between now and then, we can have a Zoom

13   hearing, if needed.

14         MR. CAMPBELL:  Thank you very much.

15         (At 4:57 p.m., matter concluded.)

16                         -   -   -

1              C  E  R  T  I  F  I  C  A  T  E

2

3          I, Darlene K. May, Official Court Reporter for the

4    United States District Court, Eastern District of Michigan, do

5    hereby certify that the foregoing is a true and correct

6    transcript, to the best of my ability, from the record of

7    proceedings in the above-entitled matter.  I further certify

8    that the transcript fees and format comply with those

9    prescribed by the Court and the Judicial Conference of the

10   United States.

11

12   May 18, 2022              /s/ Darlene K. May
     Date                      Darlene K. May, CSR, RPR, CRR, RMR
13                             Federal Official Court Reporter
                               Michigan License No. 6479
14

15

16

17

18

19

20

21

22

23

24

25