```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3     SHERROD, TEED, VANDERHAGEN and WARE,

 4                    Plaintiffs,
         -v-                                 Case No. 17-10164
 5
       VNA and LAN,
 6
                      Defendants.
 7     _____/

 8                           JURY TRIAL

 9
                    BEFORE THE HONORABLE JUDITH E. LEVY
10                    UNITED STATES DISTRICT JUDGE

11                         JULY 20, 2022

12
       APPEARANCES:
13
       For the            Corey M. Stern
14     Plaintiffs:        Levy Konigsberg, LLP
                          605 Third Avenue, 33rd Floor
15                        New York, New York 10158

16                        Moshe Maimon
                          Levy Konigsberg, LLP
17                        605 Third Avenue, 33rd Floor
                          New York, New York 10158
18
                          Melanie Daly
19                        Levy Konigsberg, LLP
                          605 Third Avenue, 33rd Floor
20                        New York, New York 10158

21

22                        (Appearances Continued on Next Page)

23
       TO OBTAIN A        JESECA C. EDDINGTON, RDR, RMR, CRR, FCRR
24     CERTIFIED          FEDERAL OFFICIAL COURT REPORTER
       TRANSCRIPT:        UNITED STATES DISTRICT COURT
25                        200 EAST LIBERTY STREET
                          ANN ARBOR, MICHIGAN 48104
```

```
 1    For the VNA          Daniel Stein
      Defendants:          Mayer Brown LLP
 2                         1221 Avenue of the Americas
                           New York, New York 10020
 3
                           Mark R. Ter Molen
 4                         Mayer Brown LLP
                           71 South Wacker Drive
 5                         Chicago, Illinois 60606

 6                         Cheryl A. Bush
                           Bush, Seyferth PLLC
 7                         100 West Big Beaver Road, Suite 400
                           Troy, Michigan 48084
 8
      For the LAN          Wayne Brian Mason
 9    Defendants:          Faegre Drinker Biddle & Reath LLP
                           1717 Main Street, Suite 5400
10                         Dallas, Texas 75201

11                         David C. Kent
                           Faegre Drinker Biddle & Reath LLP
12                         1717 Main Street, Suite 5400
                           Dallas, Texas 75201
13
                           Travis S. Gamble
14                         Faegre Drinker Biddle & Reath LLP
                           1717 Main Street, Suite 5400
15                         Dallas, Texas 75201

16                         Philip A. Erickson
                           Plunkett & Cooney
17                         325 East Grand River Avenue, Suite 250
                           East Lansing, Michigan 48823
18

19

20

21

22

23

24

25
```

**I N D E X**

WITNESSES                                                        PAGE

  (None)


EXHIBITS                                        Marked    Admitted

  (None)



MISCELLANY                                                 PAGE

Proceedings..................................7554
Closing Argument for Plaintiffs..............7562
Closing Argument for Defendant VNA...........7672
Certificate..................................7756

July 20, 2022

7554

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | THE CLERK:  Calling Sherrod, Teed, Vanderhagen, and |
| 3 | Ware vs VNA and LAN. |
| 4 | THE COURT:  Good morning. |
| 5 | MR. STERN:  Good morning, Your Honor. |
| 6 | Corey Stern and Moshe Maimon for the plaintiffs. |
| 7 | THE COURT:  Okay.  Thank you. |
| 8 | MR. STEIN:  And good morning, Your Honor. |
| 9 | Daniel Stein and Mark Ter Molen for VNA. |
| 10 | THE COURT:  Thank you, very much. |
| 11 | MR. MASON:  And Wayne Mason and David Kent for LAN. |
| 12 | THE COURT:  Okay.  Please be seated. |
| 13 | And all of our jury members are here despite the art |
| 14 | fair, which got me going in circles, because even though I had |
| 15 | reviewed with myself that there was an art fair coming |
| 16 | yesterday, I was not ready for it this morning. |
| 17 | So I understand Mr. Mason wants to look at |
| 18 | plaintiffs' PowerPoint slides. |
| 19 | Is that what it is? |
| 20 | MR. MASON:  Yes.  Consistent with what -- I'm sorry. |
| 21 | THE COURT:  Well, let's let Mason talk and tell us |
| 22 | what it is he wants. |
| 23 | MR. MASON:  It's just consistent with what we did in |
| 24 | opening.  Trying to minimize objections.  I prefer not to make |
| 25 | objections during their closing and interrupt them.  And so |

```
 1    what we did in the opening was just briefly showed to make
 2    sure if there were any glaring objections, that we could make
 3    them before, deal with it, and move smoothly through the
 4    closings.
 5            I asked the plaintiffs like we had done before, and
 6    they refused.
 7            THE COURT:  Okay.  Thank you.  Mr. Maimon or -- let's
 8    just -- I'd like to hear from either Mr. Maimon --
 9            MR. MAIMON:  We object to showing the defendants our
10    closing argument.  And opening is not an argument.  It's what
11    you expect to show.  The Court overruled our request to go
12    last.  We're going first.  It's unfair in our view, since
13    Mr. Mason's not going to give his closing until tomorrow, that
14    he has this much knowing what our argument is.
15            If he has an objection that needs to be made at the
16    time, he can make it at the time.  If it's proper to make it
17    after the closing, that a curative instruction, we don't think
18    that there's anything that we're arguing that's not -- we
19    didn't put anything that's not in evidence.  We just object to
20    this request.
21            Closings are fundamentally different than opening
22    statements.
23            THE COURT:  Here's what we'll do, Mr. Mason.  You'll
24    exchange them simultaneously now.  We'll then take a 30-minute
25    break for everybody to -- Stein gives Maimon his.  You give
```

```
1    Maimon yours.  We'll take a 30-minute break.  We'll read them.
2    We'll ask the jury to relax.
3              Is that what you're asking for?
4              MR. MASON:  No, Your Honor.  And I can't do that,
5    because I'm going tomorrow, and I don't have them to exchange
6    today.  So --
7              THE COURT:  Bobby Campbell has them.
8              MR. MASON:  No, he does not have them.  I'm still
9    working on them, because I don't go until tomorrow.  So the
10   way it's been is just before each of the parties go up, we
11   take a look at it.  And I'll be prepared in the morning to
12   show them before I stand up in the morning.  But not today.
13             MR. MAIMON:  That's the fundamental fairness.
14             THE COURT:  All right.  Stop.
15             We'll get started now without the exchange of slides.
16             So anything else before we get the jury?
17             MR. STERN:  Go ahead, Dan.
18             MR. STEIN:  Just briefly sort of following on
19   Mr. Mason's point about not interrupting with objections.  I
20   think, again, practice differs in different courts.
21             Our view would be that any objections would be
22   preserved until after the other side finishes so that you can
23   then ask for a curative instruction.  But we wouldn't want to
24   waive something by not objecting right away.
25             THE COURT:  I don't know about that.  I mean, that's
```

1   your practice where you're from.

2            MR. STEIN:  Yes.

3            THE COURT:  If you think there's about to be some

4   reversible error, something said to this jury, I think you'll

5   need to object.  And we'll take a sidebar in the back and work

6   on it.

7            MR. STEIN:  Okay.  Thank you.

8            THE COURT:  Because I -- if it's something minor that

9   you don't see that won't be a part of your appeal if there is

10  a plaintiffs' verdict, then let it go until afterwards, and

11  you can discuss it at length.

12           But if it's something you think you need to object

13  to, I recommend doing it in realtime.

14           Okay.  Anything else?

15           MR. STERN:  Yes, Your Honor.  In preparing for the

16  closing, we made the determination as a team that I was going

17  to do the first closing and originally Mr. Maimon was going to

18  do the rebuttal.

19           THE COURT:  I remember that.

20           MR. STERN:  Understanding the Court's decision or

21  advice on that, it's become beneficial for us to have me do

22  the main part of the closing.  And Mr. Maimon is going to do

23  the damages portion of our closing today.

24           THE COURT:  Okay.

25           MR. STERN:  And it would be very beneficial, I think,

July 20, 2022                                                    7558

 1   between when I'm finished to when he starts for that to be our

 2   first break.  I would expect that I'm going to be -- I'm

 3   hoping a little less than two hours with my portion.  So if we

 4   could just -- if we could just be mindful of breaks --

 5             THE COURT:  Yes.

 6             MR. STERN:  -- I think it would be beneficial for us

 7   to do it that way.

 8             THE COURT:  That sounds good to me.  But I'm going to

 9   look at -- okay -- the person in charge.

10             MR. STERN:  Thank you.

11             THE COURT:  That sounds like it will work.  All

12   right.  So anything else?

13             Okay.  Great.  Then let's get the jury in here.

14             MR. STERN:  One more thing.

15             THE COURT:  Yes.

16             MR. STERN:  There's an issue, I think, with

17   Question 6 on the verdict form that we still don't have it.

18             THE COURT:  Oh.

19             MR. STERN:  And so part of --

20             THE COURT:  I'm sorry.

21             MR. STERN:  Don't be sorry.  Well, I mean, whatever.

22   I didn't mean to insinuate anyone did anything wrong.

23             But I think it would be beneficial for us if we had

24   that, because part of the closing involves vicarious

25   liability.  And I think there's a -- that verdict question is

1    important.

2              THE COURT:  Okay.  I have it, a draft in my inbox

3    right now.

4                      (Pause In Proceedings)

5              THE COURT:  I'm going to send you an electronic copy.

6    With respect to vicarious liability, we adopted the argument

7    that Mr. Kent -- or I accepted Mr. Kent's argument.  And he

8    had put in the chat the language that he thought was

9    appropriate, and we adopted it.

10             MR. MAIMON:  Yeah.  I just thought that -- I saw a

11   draft with some red lining in it.  We just wanted the final

12   version.

13             THE COURT:  Oh, yes.  We're sending it to you now.

14             MR. MAIMON:  That's great.  Thank you.

15             THE COURT:  And there's still a small red line in

16   this, because there was some concern about "as to."  So we

17   still have to work that out, but I want you to have the last

18   best draft.  But that won't have an impact on your argument, I

19   assume.

20             And, Mr. Stein, I trust that there were negative

21   COVID tests on your team in light of a positive yesterday by

22   an individual who stayed in court after having symptoms.

23             MR. STEIN:  Yes, that's correct.  Personally I tested

24   both rapid antigen last night and this morning and also got a

25   PCR test to confirm.

July 20, 2022                                          7560

```
 1            THE COURT:  Good.  Okay.  I really appreciate that.
 2    We all need -- I care about you.  I care about Mr. Campbell.
 3    But we all need to be safe and healthy.
 4            Okay.  Anything else?  Okay.  Great.  Good.
 5            Then, Leslie, if you'll let Bill know, we'll get
 6    started.
 7            MR. STERN:  I still think we don't --
 8            THE COURT:  What do we need?
 9            Welcome, Jenia.  My intern is back.  We didn't scare
10    her away yesterday.  Right now she says I might want to be a
11    podiatrist.
12            THE CLERK:  Please rise for the jury.
13            THE COURT:  Good morning.  Good morning.  Good
14    morning.
15                          (Jury In)
16            THE COURT:  Welcome back to the jury.
17            Please be seated.
18            And I hope you found your way through the beginning
19    of the art fair today.  I got a little startled by it and had
20    to take a few laps in my car before arriving here.  So okay.
21            So for members of the jury, as I mentioned yesterday,
22    you've now heard me read the jury instructions.  I told you
23    yesterday and I'll remind you again, I'll give you each a
24    copy.  So there won't be any need to have memorized that.
25            But I wanted you to have in mind what the law is that
```

```
 1    applies as you listen to the closing arguments.  And that also
 2    gives the lawyers permission to refer.  They can put them on
 3    the screen.  They can quote them.  And they know for sure this
 4    is it.  These are the jury instructions.
 5            So what will happen now is just like with opening
 6    statements, we start with the plaintiff.  They have the burden
 7    of proof by a preponderance of the evidence.  We will then
 8    move to VNA and to LAN for their closing arguments.  And
 9    you'll notice a difference.
10            Opening statement is where a lawyer tells you what
11    they think the evidence is going to show.  Closing argument,
12    on the other hand, is an opportunity for the lawyer to
13    literally argue their case to you.  No, they won't be like,
14    "Nah-nah-nah-nah," like that.
15            But they'll be allowed to advocate for their client
16    in what they think the evidence that we saw from the witness
17    box and from the exhibits that were displayed and received
18    into evidence.  They'll have an opportunity to tell you what
19    they think that means and what they hope you will find as a
20    result.
21            So because our trial has been, I believe, 23 weeks
22    long, we're in our 23rd week, we're -- I have permitted the
23    lawyers to take more time than -- average closing might be 45
24    minutes, an hour.  They'll have a couple of hours to talk to
25    you.
```

```
1              So I just want you to be ready for that.  But we will
2    take a break.  So don't worry.  And what I want you to do is
3    Mr. Stern will be going first, just like at the beginning.
4    And Mr. Maimon will be also delivering part of the opening --
5    or closing argument today.  The opening closing.
6              And we'll take a break in between them.  But if you
7    need a break before then, if it's just you need a restroom
8    break or you just need a stretch break, just say so.  Okay.
9    Promise me.  I'll do the same.
10             Then after VNA gives their argument, LAN will
11   probably be tomorrow.  Then plaintiffs get a chance at what we
12   call rebuttal, a chance to say, "Wait a minute.  Take a look
13   at this."  That sort of thing.  Okay?
14             Any questions from our jurors about the process?
15             Okay.  Good.  All right.  Mr. Stern.
16                      CLOSING ARGUMENT FOR PLAINTIFFS
17             MR. STERN:  Thank you, Your Honor.
18             Good morning.
19             Before I get started, more than anything I really
20   just want to thank you.  It's kind of hard and weird to stand
21   in front of eight people that you've seen every day for five
22   months who you've not really gotten to know but who've heard
23   you talk and take witnesses and fumble over their words at
24   times and sometimes get emotional and try to advocate.
25             And that's true for all of us.  But it's nothing
```

```
1    compared to the time you've taken away from your families.
2    And I don't say it gratuitously.  I don't mean it like
3    pandering.  I just -- I appreciate it.
4            And I know what a sacrifice it's been for all of you.
5    And genuinely appreciate it.  I also get very emotional, and
6    I'm going to try my best not to.  And I'm going to make
7    mistakes.  I'm -- there's a lot of evidence.  We've been here
8    for five months.
9            And I want you to know that I'm doing the best I can
10   up here.  And I want you to bear with me.  I'm going to go
11   slow.  I'm going to be thorough.  And I'm going to do the best
12   I can.
13           The true story of the Flint Water Crisis is the one
14   that happened before anyone went into crisis management mode.
15   Before anyone realized that they may have failed the people of
16   Flint.  The true story of the Flint Water Crisis is not one of
17   excuses.
18           The true story of the Flint Water Crisis is what
19   happened to a community when no one was watching.  The true
20   story of the Flint Water Crisis is the one that when the folks
21   in charge finally realized that they had no clue of what to do
22   or how to do it or what might happen if they did or didn't do
23   what needed to be done.  They called Warren Green.  They
24   called Jeff Hansen.  They called LAN.  They called David
25   Gadis.  They called Rob Nicholas.  They called Marvin Gnagy.
```

1    They called William Fahey.  They called VNA.  They called the

2    experts.

3           Throughout this trial, you've learned from so many

4    people so many times in so many ways how the folks in charge

5    of Flint's water had no idea what they were doing.  They had

6    no experience doing what they were doing.  They had no concept

7    of the consequences of what they were doing.

8           They had no foresight about what might happen because

9    of what they were or were not doing.

10          And Aundreya Teed, Riley Vanderhagen, Emir Sherrod,

11   and Daylaana Ware were drinking and otherwise using water in

12   all the ways.  And that water was toxic.

13          In all of our communities through every season

14   through all of time, our children are our most precious

15   commodities.  They come with innocence.  They come with

16   kindness.  They come with hope.  And the most common thread,

17   perhaps the only real thread that binds all of us, regardless

18   of race, religion, politics, regardless of our own adult

19   insecurities, our own failures is our love for children.  Kids

20   are our responsibility.

21          In this world and life, true stories are the ones

22   that happen before crisis management.  Before damage control.

23   Before it hits the fan.  Before the spin.  Before the lawyers.

24   Before courthouses.  And before trials.

25          You were told two stories over five months.  Story 1,

1    the true story, is what happened before damage control, before

2    these companies went into crisis management.  Story 1 is what

3    really happened, what people really knew, what people really

4    didn't know.  What people really did.  And what people really

5    said.  And what people really didn't do and really didn't say.

6            Story 1 is the true story about the real differences

7    between the Flint River and the water from Lake Huron.

8    Story 1 is the true story about real corrosion control, about

9    what was really necessary for people's safety.  About the

10   various roles that many people really played in the decision

11   to switch from the DWSD to the KWA.

12           Their real roles in the switch itself and ultimately

13   the real problems that befell the people of Flint.  The real

14   problems that caused real damage to these four children.

15           The second story is one that was developed by VNA and

16   LAN after it hit the fan.  Story 2, the fictional story, is a

17   product of damage control, of crisis management.

18           Story 2, the damage control story is what happens

19   when business development turns to crisis management.  When BD

20   turns into CYA.  Story 2, the crisis management story requires

21   you to believe in the magic of pixie dust.

22           Story 2 requires you to remember certain damage

23   control things while simultaneously forgetting Story 1 things,

24   true things.  Big picture.  Story 2 requires you to believe

25   that while softening, which throughout time and throughout

1   Story 1, the true story was an optional, secondary, and as

2   sworn to by everyone not testifying for LAN during this trial,

3   an unregulated water treatment and not considered control.

4        But suddenly in 2015 when LAN feared it might get

5   sued, softening became corrosion control.  Not because it was

6   but because it had to be when LAN went into damage control.

7        Story 2 requires you to believe that even though LAN

8   knew Flint could not add orthophosphates to the water because

9   there was no orthophosphate feed system, and even though LAN

10  knew that the city was not going to be using real corrosion

11  control, and even though LAN knew that the plant was ill

12  equipped for the switch, and even though LAN knew that the

13  plant didn't have enough personnel and that the personnel they

14  did have wasn't trained, that LAN had no duty whatsoever to

15  warn the City of Flint and the people that would be drinking

16  that water, including our four clients, that they might get

17  poisoned.

18       If you believe that, then perhaps LAN did nothing

19  wrong.

20       Big picture.  Story 2 requires you to believe that

21  the words in a report do not mean what they say but rather

22  what someone else says they say or says they mean seven or

23  eight years later.

24       Story 2 requires you to believe that when Marvin

25  Gnagy told you twice during this trial, first by video from

 1    his deposition in 2019 and the second time when he stood on

 2    that stand that the word "phosphate" in Veolia's final report

 3    meant polyphosphate and not orthophosphate, that he just

 4    didn't mean it.

 5          When he took the stand and told you that twice,

 6    Story 2 requires you to believe that he testified wrong, that

 7    he did not mean it.  Story 2 equally requires you to believe

 8    that both times Marvin Gnagy testified before you during this

 9    trial that the words "corrosion control" in the report meant

10    red and dirty water, that he didn't mean that either.  That he

11    testified wrong.

12          Story 2 requires you to believe that both times he

13    testified he meant something other than what he said.  Not

14    because it's true.  It's because it's what has to be true in

15    order for VNA to not be responsible for what happened to these

16    four kids.  That is Story 2.

17          Story 2 requires you to believe that the words in

18    VNA's own report do not mean what the man who put them there

19    says they mean.  Their guy.  And if you believe that, then

20    perhaps VNA has no responsibility for what happened to those

21    four kids.

22          Big picture.  Story 2 requires you to believe that

23    when Depin Chen told all of his colleagues at VNA before they

24    even took the job that reconnecting to the DWSD for the next

25    two years will be the best solution, that he didn't mean it.

1    He was thinking out loud.  He was spiffballing, because it

2    wasn't in VNA's scope of work, and because they were never

3    going back to the DWSD.

4         Story 2 requires you to believe that when Rob

5    Nicholas said before VNA ever even took the job that the

6    simple solution is to just buy Detroit water and that solves

7    the problem, that he equally didn't mean it.  And he shouldn't

8    have said it.  He was just spiffballing thinking out loud.

9    But it didn't matter, because it wasn't in VNA's scope, and

10   they were never going back to Detroit.

11        Story 2 requires you to believe that when Joseph

12   Nasuta, an engineer for VNA, said during VNA's period in Flint

13   that the quickest option and maybe the safest option is to

14   return to Detroit internally, that he didn't mean it.  He

15   shouldn't have said it.  He was spiffballing.  And it didn't

16   matter.  Because it wasn't in VNA's scope, and they were never

17   going back to Detroit.

18        Story 2 requires you to believe that when William

19   Fahey in 2016 reminded everybody a year after VNA left Flint,

20   "Now, you know why I was so adamant about taking the position

21   that the best alternative was to go back to Detroit water,"

22   that he didn't mean it in 2016 when he was reminiscing about

23   it or reminding everyone.

24        And he certainly didn't mean it in 2015 when he said

25   it for the first time, because he was just thinking out loud

1    twice.  He was just spiffballing twice.  Because it wouldn't

2    have mattered, because no one was ever going back to DWSD.

3            Even William Fahey had the sense enough to insist

4    that business development tell Flint that going back to

5    Detroit was an option and a safe option in realtime.  And then

6    because he's William Fahey, had to remind everybody of what he

7    said a year later.  He just had no idea that any of us were

8    going to see his emails.

9            Because remember, he's a pick-up-the-phone kind of

10   guy.

11           Story 2 requires you to believe that all of the

12   internal emails from VNA that we've shown you during this

13   trial should be ignored.  Because Flint was never going back

14   to DWSD.  And that it wouldn't have mattered one bit what VNA

15   said in its reports about going back to DWSD, because it just

16   wasn't going to happen for Flint.  Even though seven months

17   after VNA left, it did.

18           VNA wants you to believe that there just was no path

19   back to the DWSD.  But when Governor Snyder and Mayor Walling

20   learned in September or October of 2015 that there really was

21   a problem with lead in the water, information that VNA had

22   seven months earlier , they moved heaven and earth to get

23   Flint back on the Detroit water source.

24           But Story 2 requires you to believe that there's no

25   way they would have -- would not have done the same thing in

 1    March of 2015 had Snyder and Walling and others had credible

 2    information.  And if you believe that, then perhaps VNA did

 3    nothing wrong.

 4          Big picture.  Story 2 requires you to believe that

 5    safe does not mean safe.  That lead seems to be a problem does

 6    not actually mean that lead is a problem.

 7          Story 2 requires you to believe that even though

 8    Marvin Gnagy, who sat up on that stand, the second time he

 9    testified before you and apparently realized in realtime for

10    the first time right before your eyes that he made a mistake,

11    that it was someone else's fault.

12          My partner, Mr. Maimon, asked him:

13          "Okay.  And so when you told everybody and when you

14    took the lead and copper out of the final report, based on the

15    University of Michigan Flint data, you did that based on

16    incomplete data, because you never followed up and said, 'Give

17    me the rest of the data,' true?"

18          Answer, right there on the stand, "At this time, it

19    appears to be, yes.  I made a mistake."

20          Calculations that not only allowed VNA to take lead

21    out of its final report but caused them to stand up on

22    February 18 over and over and over and over and over again in

23    a public meeting affirming for the world and the people of

24    Flint that their water was safe.

25          They had lead in a draft report, and it came out.  It

July 20, 2022

7571

 1    came out either because of Marvin Gnagy's miscalculations or

 2    because someone from business development decided that it

 3    wasn't beneficial for it to be in.  But despite all the

 4    internal emails.  Despite everything you've seen.  Despite all

 5    of the information about everyone from VNA who was urging or

 6    arguing or insisting or at least recommending that we tell BD

 7    go back to DWSD is an option for Flint.  Lead seems to be a

 8    problem.

 9             The word "lead" never made it into the report.  But

10    we know at some point it was in a draft.

11             Story 1 is built on truth.  It's built on humility.

12    It's built on regret and responsibility and self-reflection.

13    An ownership of one's own limitations.  Of one's own mistakes,

14    big and small.

15             Story 2 is built on PR and spin.  It's built on

16    what's in the best interest of two companies bracing for

17    litigation and getting ready to put experts on the stand for

18    trial.  Story 2 is a tale weaved so ridiculously, so

19    incredulously that it's insulting that anyone would believe

20    that any of us would actually believe it.

21             Story 1 is a story about a city in financial

22    distress.  Mayor Walling, one of our first witnesses who was

23    on the stand for quite some time, came and testified about the

24    history of Flint.  You heard about the financial struggles

25    that Flint suffered from decade to decade to decade.

1          You heard about the booming economies of the 1970s

2    and the 1980s when General Motors and the auto unions were

3    running Flint.  You heard about the way in which foreign

4    manufacturing and multiple recessions caused the auto industry

5    to leave making the population in Flint much, much smaller and

6    making the economy much more precarious.

7          You heard about a city government in shambles.  You

8    heard about a city council that was dysfunctional.  You heard

9    about the need for an ultimate appointment of emergency

10   managers, financial experts whose sole job was to take the

11   city from the red to the black.

12         It feels like forever ago, probably more for you than

13   for me.  But when I first stood up here on February 28, I

14   showed you the same slide.  I stood here and told you that

15   there was plenty of blame to go around.  I told you that the

16   Flint Water Crisis did not occur in a vacuum.  I told you

17   there was more than one piece to this puzzle.  I was honest

18   with you then, and I'm honest with you now.  That's true and

19   that's Story number 1.

20         You got a big packet yesterday.  When I start talking

21   about jury instructions, we put these in here, so I don't

22   start crying.  That's the philosophy of our team.  So if you

23   see them, it means I'm getting too emotional.  It's a secret

24   button on my clicker.

25         In your packet of jury instructions, you're going to

1   read about preponderance of the evidence.  And what it says

2   is, "Establish by a preponderance of the evidence means to

3   prove that something is more likely so than not.  In other

4   words, a preponderance of the evidence means such evidence as

5   when considered and compared with evidence opposed to it, has

6   more convincing force and produces in your minds belief that

7   what is sought to be proved is more likely true than not."

8           I showed you the scales of justice five months ago,

9   and you've heard various references to it both in openings and

10  throughout the trial.  And what that charge means that I just

11  read to you is that there's a scale.  And plaintiffs' job, our

12  burden is to put as much evidence on this side of the scale as

13  we can.

14          And the defendants have no obligation to put on any

15  evidence to defend themselves, but they have.  And they've

16  also put on some evidence about other folks who they believe

17  were responsible for the Flint Water Crisis or at least bear

18  some responsibility.

19          And ultimately when you put the evidence on one side,

20  our side, versus the evidence on their side, our job, the

21  preponderance of the evidence means we have to tip it in our

22  favor.  We don't have to tip it so that everything on theirs

23  flies off.  We just have to tip it in our favor.

24          And we've all watched TV shows, and we know about

25  reasonable doubt.  "Law & Order."  This is not a criminal

```
 1   trial.  It's just not.  And so the burden in a criminal trial
 2   that most of us are probably more familiar with, at least
 3   those of us who watch TV, it's a much higher burden.  It's a
 4   much different standard.
 5          Nonetheless, we have met our burden in spades.
 6          And when the judge instructed you on nonparties, when
 7   she talked to you about Ambrose and Earley and Kurtz and
 8   Walling and Snyder and the MDHHS and the State of Michigan,
 9   she told you that it's their job to prove liability when it
10   comes to all of those folks and all of those entities.
11          That is their burden.  They had to come forward with
12   real evidence.  And on the whole, they have not.  And frankly,
13   when it comes to the other puzzle pieces, the other folks that
14   they blame for this crisis, it will be fascinating and
15   interesting to hear those proofs when they come up here to
16   argue before you.
17          But despite real evidence, VNA and LAN want you to
18   give them a pass.  I'm not sure you even know who this person
19   is.  This is Ed Kurtz, the first emergency financial manager.
20   VNA wants you to give them a pass, and they want you to blame
21   Ed Kurtz for what happened to Riley and Aundreya and Emir and
22   Daylaana.  They want you to blame Ed Kurtz with no evidence.
23          We've learned only a little bit about Ed Kurtz.  We
24   know he was the emergency manager that made the decision to
25   switch from the DWSD to the KWA.
```

July 20, 2022

7575

```
 1              There's been no evidence about what Ed Kurtz knew or
 2    didn't know about corrosion control.  There's been no evidence
 3    that Ed Kurtz even knew that the water ever was not safe.
 4    There's been no evidence about what motivated Ed Kurtz other
 5    than the fact that he was the emergency financial manager
 6    whose job it was, was to make sure that Flint went from the
 7    red to the black.
 8              And if Ed Kurtz is even partially or a tiny bit or a
 9    huge amount responsible for what happened to those four kids,
10    it was their burden to prove it.  And I submit to you they
11    have not.
12              VNA and LAN want you to give them a pass.  They want
13    you to blame Darnell Earley for what happened to Aundreya and
14    Riley and Emir and Daylaana.  We heard some from and a little
15    bit about Darnell Earley during this trial.  He was the
16    emergency manager right before VNA came on the scene.  We
17    learned he knew little, if anything, about corrosion control,
18    about water treatment, about the plant itself, about how to
19    train staff at the plant, about lead, about what any of it
20    meant.
21              There's been no evidence in this trial about what's
22    motivated Darnell Earley to make whatever decisions that he
23    made or didn't make, other than the fact that he was Flint's
24    emergency financial manager, and his job was to try to save
25    money for the City of Flint.
```

```
 1          There's been no evidence in this case that Darnell
 2    Earley ever knew the water wasn't safe.  And if Darnell Earley
 3    is even a little responsible for what happened to those four
 4    kids, it was their burden to prove it.  And I submit to you
 5    that they have not.
 6          VNA and LAN want you to give them a pass.  They want
 7    you to blame Gerald Ambrose for what happened to Aundreya and
 8    Riley and Emir and Daylaana.  Without any evidence.  We heard
 9    some from and about Gerald Ambrose.  We learned that just like
10    the other emergency managers, he knew little, if anything,
11    about corrosion control.
12          There has been no evidence about what motivated
13    Gerald Ambrose to do or not do the things he did or didn't do.
14    There's been no evidence that he knew anything about the plant
15    or how to treat water.  But these defendants want you to
16    believe that it was because of Gerald Ambrose that nobody
17    would have ever gone back to the DWSD.  He said it was
18    incomprehensible, and that's the end of the story.
19          But don't take their word for it.  Don't take my word
20    for it.  The judge has told you the lawyers's words are not
21    evidence.  Let's hear from Gerald Ambrose himself.
22                    (Recording Played)
23          MR. STERN:  Each of these emergency managers who
24    played any role whatsoever in the decision to switch from the
25    DWSD to the KWA had expertise in nothing but finances.  That
```

 1   is Story number 1.  That is the truth, and that is not in
 2   dispute.
 3           And yet the two water engineering companies who knew
 4   so much about each of these things than most people in the
 5   world, let alone these emergency financial managers from
 6   Flint, expect you to believe that it was the folks with no
 7   experience in water treatment, the financial managers who
 8   failed to proper advise or treat or fix the water issues.
 9   With all of the experience in the world called in as the
10   experts.
11           And worst yet, VNA and LAN's claims against Earley
12   and Ambrose and Kurtz, their claims are against them
13   personally.  They're not against the City of Flint.  They
14   believe and want you to believe that each of those three men
15   caused the damage -- that they say didn't happen, by the way
16   -- caused the damage to Aundreya and Riley and Emir and
17   Daylaana.
18           These engineers who absolutely knew full well in
19   realtime that there was no real corrosion control.  They knew
20   full well in realtime that the city's infrastructure was made
21   of lead pipes and lead fixtures.  They stood by silently while
22   waiting for a bigger KWA payday.  But they bear no
23   responsibility whatsoever.  And it's these three guys who were
24   at fault.  If you believe that, perhaps LAN and VNA did
25   nothing wrong.

1          Story 2, the damage control story, requires you to
2     believe that there was a conspiracy.  There was a coup d'etat.
3     There was a cabal where each of these emergency financial
4     managers one after the other, after the other, after the other
5     nefariously and with some mysterious personal agenda made the
6     tragic but self-serving decision of switching Flint from the
7     DWSD to the KWA.
8          Story 2, the damage control story, requires you to
9     believe that Ed Kurtz, Gerald Ambrose, and Darnell Earley,
10    each of whom had nothing to gain from switching to the KWA was
11    each personally at fault for what happened.  And they bear
12    none.
13         Story 1 is built on the evidence that was presented
14    to you at trial.  Story 2, the damage control story and crisis
15    management story, was built by weaving inconsistencies with
16    false narratives together with self-serving tales of greed and
17    lies and hiding the ball.  And like all good fiction tales, in
18    this one, there's fiction within the fiction.  If after five
19    months of evidence you just don't believe them, if after five
20    months of evidence you actually think they bear some
21    responsibility, they did something wrong, they could have done
22    more, they breached the standard of care, if after five months
23    you believe that, they have created for you what the best
24    fiction stories have.
25         They created a choose-your-own-adventure where you

1    can turn to the fiction within the fiction.  If you don't

2    believe them, if you do think they messed up, if you do think

3    they are responsible, if the evidence is just too much in our

4    favor and you don't buy the tale that LAN and VNA did nothing

5    wrong, how about this?  Maybe this will work.  The kids aren't

6    hurt.  Not at all.

7          For months, the Story 2 storytellers have referred to

8    what happened in Flint as a crisis.  They have vehemently

9    pointed their Story 2 fingers at anyone and everyone who's

10   ever been elected to local government, to state government, at

11   the EPA or hired to work in state or Federal Government,

12   blaming them for the crisis that happened in Flint.

13         It was a manmade disaster when everyone else was

14   responsible.  But in the great pivot, in the failsafe chapter,

15   in the choose-your-own-adventure chapter which only comes in

16   you reject their excuses and you reject their denial of

17   responsibility, well, then there actually was no crisis.  At

18   least not for Aundreya or Riley or Emir or Daylaana.  They

19   weren't hurt.  Nothing to see here.

20         They want you to believe that when they and everyone

21   else was referring to the Flint Water Crisis, they meant the

22   crisis that affected maybe 16 percent of the homes in Flint.

23   And certainly did not affect those four children.

24         And in doing so, in the great pivot, they want you to

25   stare at the sun without drinking blinking.  They want you to

1     forget the Pieper article among other things, which expert

2     after expert after expert relied upon.  The Pieper article

3     that told us that in August of 2015, by August 2015 two or

4     three or four months after Veolia left the City of Flint, that

5     88 percent of the homes in Flint had lead.

6              And if you believe that, then perhaps VNA did nothing

7     wrong.  Perhaps LAN did nothing wrong.

8              Story 1 does not have a backup story.  Story 1

9     doesn't have a pivot story.  Story 1 is not a

10    choose-your-own-adventure.  Story 1 is the story.  Story 1 is

11    true.

12             Story 2 comes with caveat upon caveat upon caveat.

13    Backup story upon backup story upon backup story where science

14    isn't science.  Where safe isn't safe.  Where a crisis is not

15    a crisis.  And where four kids with significantly high lead

16    levels in their bones simply were not hurt.

17             During this trial, Story 1 was built brick by brick

18    by brick with evidence.  Story 2 was a house made out of

19    straw.

20             In Story 1, raw Flint River water is more corrosive

21    and requires more treatment than water from Lake Huron.  For

22    most of this trial, that wasn't even an issue.  Our first

23    witness, Dr. John Hoaglund, he talked to you about scaling,

24    about pH and alkalinity, about corrosivity, about how

25    molecules dance in order to explain to you the water chemistry

1    of the Flint River all in an effort to try to get us to

2    understand what was coming into the plant in its raw form.

3         And throughout this trial, at least until early July,

4    near the end, that testimony was uncontroverted.  It was not

5    questioned.  Even Warren Green, one of the Story 2 authors,

6    agreed that water from the Flint River is more corrosive in

7    its natural form than water from Lake Huron.

8         But in one of the later chapters of Story 2, the

9    crisis management story, VNA's water chemistry expert, Graham

10   Gagnon, came here as the anti-Hoaglund to talk to you about

11   water chemistry.  This is the man they brought to court to

12   tell you everything an expert knows about water chemistry,

13   about corrosivity, about how the corrosivity affects the pipes

14   and the infrastructure and the way the water interacted with

15   those pipes.

16        But unlike Dr. Hoaglund, unlike Warren Green,

17   Dr. Gagnon would not even admit on the stand that water from

18   the Flint River was more corrosive in its natural form than

19   water from Lake Huron.

20        Judge Levy had to ask him directly, "I think we're

21   going to get to that.  But do you -- maybe you don't know if

22   the Flint River is just more corrosive before treatment than

23   Lake Huron was before treatment?"

24        And then she asked Mr. Maimon, "Is that what you want

25   to know?"

1          And Mr. Maimon said, "Yeah, that's exactly what I

2     want.  And if you don't know, just tell me you don't know."

3          And Dr. Gagnon, their water chemistry expert who came

4     here as their expert to talk to you about water chemistry, he

5     didn't even know or testify that he didn't know whether water

6     from the Flint River was more corrosive than water from Lake

7     Huron.

8          During those months when this was not an issue, we

9     saw published articles about this.  We heard testimony about

10    this.  It was clear that Flint River water was more corrosive.

11    The Pieper article told us in no uncertain terms.  Articles

12    with expert upon expert upon expert relied upon.  The Flint

13    River water was a more corrosive and unstable water source.

14         Not only would he not say that the Flint River water

15    was more corrosive, he got on that stand and said he didn't

16    think there was lead in the kids' schools.  He had not seen

17    any documents to that effect.  And more importantly, because

18    of his experience and his expertise, schools just generally

19    don't get as much lead because of the size of their pipes.

20         He didn't look at Exhibit 5085 from Aundreya Teed's

21    school, which shows that on October 24 and 31, lead levels

22    were as high as 326 parts per billion in 2015 in her school.

23         He didn't talk to you about Durant-Tuuri-Mott

24    Elementary School where Emir Sherrod went.  Where in November

25    of 2015, lead levels in some places were as high as

1    2,856 parts per billion.

2           He didn't review or talk about or even know that at

3    Daylaana Ware's school in November of 2015, lead levels were

4    as high as 349 parts per billion.

5           And when it came to the chemistry of the Flint River

6    and whether it was more corrosive, he just couldn't do it.  He

7    wouldn't do it.  And when he got pushed to give a straight

8    answer, he said, "I don't know."  That's their man.  That's

9    their guy.  That's their expert on water chemistry.  And it

10   did not stop there.

11          Dr. Gagnon, one of the final two storytellers who

12   came here to testify, he told you that whether the Flint River

13   was more corrosive didn't even matter.  It didn't even matter.

14   Let that sink in.

15          VNA's water chemistry expert testifying at trial

16   about the Flint Water Crisis, a crisis involving corrosion,

17   corrosion occurring from water from the Flint River, told you

18   that the chemistry and composition and corrosivity of that

19   water just did not matter.  Boldly, blatantly, and

20   unapologetically.  And if you believe that, then perhaps VNA

21   did nothing wrong.

22          In Story 2, VNA's not the only one that brought you

23   some questionable science and experts to talk about that

24   science.  For years, Warren Green and LAN analyzed and made

25   proposals and wrote reports about how to treat and how to make

 1    better Flint's water treatment plan and distribution system.

 2    Report after report after report after report.

 3              And in those reports before damage control, before

 4    crisis management mode, LAN had no problem differentiating,

 5    separating, softening from corrosion control.

 6              In his first report that Warren Green ever wrote on

 7    page 3-11, he's got softening.  And on page 3-12 he's got

 8    corrosion control.  Softening became corrosion control when it

 9    had to.  But don't be mistaken.  Softening is not corrosion

10    control.

11              In Story 1, the true story, y'all have heard about

12    this June 26, 2013, meeting that happened between some folks

13    from the MDEQ, folks from the city, and some folks from LAN.

14    This big meeting on June 26, 2013.

15              In Story 1, when that meeting took place, Warren

16    Green and everyone there were told by Stephen Busch that Flint

17    would be doing two six-month rounds of monitoring.  Then a

18    corrosion-control study.  And then determining what the proper

19    corrosion control would be.

20              In Story 1, the true story, Warren Green absolutely

21    knew and during this trial admitted that engineering best

22    practices were to do a corrosion-control study before the

23    Flint River went online.

24              And I asked him, "You just told us a few minutes ago

25    and you told us yesterday, it would be best practices to

1    perform a corrosion-control study for the Flint River before

2    putting it into use as a water source, right?"

3              His answer, "Correct."

4         In Story 1, when he heard from Steve Busch that they

5    were going to be doing two six-month rounds of monitoring

6    rather than real corrosion control, the first thing Warren

7    Green said to Stephen Busch, by his own admission on the

8    stand, "I don't typically get in anybody's face, you know.

9    But I did talk to him about corrosion control.  When he said

10   that, I said, 'Steve, I don't understand this.'"

11             Well, if softening is corrosion control and the plant

12   was going to be softening, what was there not to understand?

13             Warren Green, who had worked on issues involving the

14   plant for 15 years, whose experience in water engineering, in

15   water treatment, in utility design was touted by LAN

16   throughout this trial.  He never said anything more.

17             In Story 1, the true story, Warren Green never

18   insisted on a corrosion-control study.  Warren Green never

19   warned anybody about what would happen without using proper

20   corrosion controls.

21             In Story 1, the true story, Mike Glasgow told us that

22   Flint's water distribution system was dilapidated.

23             "Did you ever ask your superiors for data and

24   information on the distribution system prior to the spigot

25   being opened?

1          A.  I would say yes.

2          Q.  Is that how you knew it was in a dilapidated

3     condition?

4          A.  Yes."

5          In Story 1, the true story, the Flint Water Treatment

6     Plant where Warren Green spent over 15 years of his career, at

7     least throughout those years at times, it was undermanned, it

8     was understaffed.  The staff was under-trained.

9          And in Story 1, the true story, despite the

10    dilapidated distribution system, despite Flint's dilapidated

11    infrastructure, despite the plant being undermanned with

12    people under-trained, when Warren Green found out that Flint

13    would not be doing a corrosion-control study, when he found

14    out that the test run failed, he didn't tell anyone in Flint

15    that they needed to do one either time.  He didn't light

16    himself on fire.  He didn't write a letter to the governor.

17    He didn't write a letter to the MDEQ.  He didn't write a

18    letter to the EPA.  He didn't write a letter to the President

19    of the United States.  He didn't write a letter to the City of

20    Flint to one of the emergency managers.

21         In Story 1, the true story, Warren Green sat on his

22    hands waiting for a KWA payday.  And when we talk about LAN

23    and we talk about Warren Green, let's not forget as we heard

24    at the very beginning of this trial that Warren Green is LAN,

25    and LAN is Warren Green.  And LAN is LAD.  And LAD is LAN.

1    And Jeff Hansen is LAN.  And LAN is Jeff Hansen.  And Jeff

2    Hansen is LAD and LAD is Jeff Hansen.

3          We heard from Edward Benes.  You probably -- and I

4    don't mean any disrespect to Mr. Benes, but you may not even

5    remember him.  So I'm going to play just a short clip of his

6    testimony when talking about LAN and LAD.  Let's hear from

7    Mr. Benes.

8                    (Recording Played)

9          MR. STERN:  For 15 years, every LAN employee was

10   leased from LAD.  Year after year after year after year after

11   year.  Every single one.  Every single employee.

12         Warren Green's W-2 shows that he was an employee of

13   LAD.  Jeff Hansen's W-2 shows that he was employed by LAD.  In

14   their 2013 proposal to the City of Flint to do work on the

15   treatment plant, they held themselves out as one company with

16   resources across the world.

17         We get to another jury instruction on vicarious

18   liability.  Vicarious liability is fancy legal words.  And

19   what it says is in this case, there is no dispute -- as I just

20   showed you some evidence of -- there is no dispute that Warren

21   Green and Jeffrey Hansen were employed by the Leo A Daly

22   Company , LAD.

23         You must determine whether LAD exercised or retained

24   the right to exercise day-to-day control or supervision of

25   their specific work activities in connection with their work

1   on the Flint Water Treatment Plant.

2          May I use the ELMO for a second?  Is that a problem?

3   It's okay.  May I just walk up for a minute?

4          THE COURT:  I don't want you to go too close without

5   a mask.

6          MR. STERN:  That's okay.  I'm going to hold it right

7   here.  On the verdict form, and it's a long, long verdict

8   form.  There's going to be a question, and it's Question

9   number 6.  Question 6 on your verdict form is about LAN and

10  LAD.

11         "Did LAD exercise or retain the right to exercise

12  day-to-day control or supervision of the specific work

13  activities of Warren Green and Jeff Hansen in connection with

14  their work on the Flint Water Treatment Plant?"

15         The answer is yes.  There's no evidence to the

16  contrary.  LAN is LAD.  LAD is LAN.  They were paid by LAD.

17  They held themselves out as LAD.

18         The reason it says, "Verdict form Question 6," is

19  because we got it this morning, and I couldn't include it in

20  my slides.  I'm sorry.

21         In Story 1, the true story, Warren Green sat in

22  meetings with and got to know Howard Croft, a man who by his

23  own admission knew little, if anything, about corrosion

24  control.

25         In Story 1, the true story, Warren Green sat in

1   meetings with and got to know Mike Glasgow, a man who by his

2   own admission when he sat for his F1 license which everyone

3   talked about is necessary to run a Water Treatment Plant, he

4   told us he wasn't even really qualified to sit through that

5   test and had to jump through hoops in order to take it.

6          But in Story 2, the damage control story, Warren

7   Green was shut out, despite being asked to come train the

8   folks at the Water Treatment Plant on softening.

9          In Story 2, the damage control story, no one would

10  listen to Warren Green except when they asked him to work on

11  the capital improvement program and reprice the upgrades for

12  the Flint Water Treatment Plant and design the phosphate feed

13  system that was actually in an earlier proposal from LAN that

14  they took out.

15         And by the way, if softening is corrosion control,

16  why did no one ever put it in writing?  Not LAN.  Not the

17  city, not the MDEQ.  No one.

18         In Story 1, when Dayne Walling first ran for mayor,

19  he lost.  Dayne Walling, who after finishing his Rhodes

20  Scholarship education, brought his family with his wife to

21  Flint to raise their kids.  In Story 1, the true story,

22  Mayor Walling was elected to serve as mayor only after the guy

23  who beat him resigned.

24         In Story 1, the true story, Mayor Walling then ran

25  for reelection.  And within hours after being reelected to a

1    second term, he was neutered of his power by state statute,

2    because Flint was in an emergency financially.  So much so

3    that for a time, he lost his salary.  So much so that when he

4    went into his office day after day after day, for a long time,

5    he did so with no official duties, with no power, and with no

6    paycheck.  But he still showed up every day.

7           And despite being neutered of all of his power,

8    despite knowing nothing at the time about water treatment or

9    about corrosion control or about how to make the water safe or

10   whether it was safe at all, despite knowing little, if

11   anything at all in realtime about the Flint Water Treatment

12   Plant, he still went to his office and met with citizens of

13   Flint every day to listen to their concerns, to talk to them.

14          And despite his education, which probably would have

15   allowed him to do a ton of other things, he never bailed.  He

16   never pivoted.  He tried his best, as he said, to at least add

17   some comfort to his community.

18          Mayor Walling tried to figure out solutions to

19   problems he didn't even understand.  In Story 1, the true

20   story, Mayor Walling , when it hit the fan, he didn't

21   creatively pivot to damage control or crisis management.  He's

22   a Rhodes scholar, but he didn't write a

23   choose-your-own-adventure book or add more chapters.

24          In Story 1, the true story, when it hit the fan,

25   Mayor Walling wrote to the EPA and insisted that they put

1    somebody on the Flint Technical Advisory Group.  He wrote to

2    Governor Snyder and begged for help.  He wrote to the

3    President of the United States and asked for help.

4         In Story 1, the true story, Mayor Walling is as much

5    haunted by that moment where he flipped the switch, which they

6    showed you time after time after time as he is about what was

7    not included in VNA's report.

8         But in Story 2, the damage control story,

9    Mayor Walling failed in his duties, which he didn't have.  He

10   failed to exert any power over the situation, power which he

11   didn't have.  He failed to use his vast experience and

12   understanding in water chemistry and water treatability, which

13   he didn't have, to fix a solution which he didn't understand.

14        Dayne Walling told us honestly how this haunted him.

15   And his own notes, his own notes are filled with honest

16   questions and earnest prayers and confusion.  It hurts me, a

17   man of compassion not putting people's lives at risk but

18   working hard with people who can get it fixed.  Flint River,

19   lead, costs.  I won't turn my head.

20        But in Story 2, the crisis management story, they lay

21   blame at his feet.  In Story 1, Mayor Walling stayed in Flint

22   even after he lost his reelection bid where he still lives

23   today.  For the Story 2 tellers, he's one of the villains.

24        When it comes to Howard Croft, Story 1 is built on

25   facts.  Story 2, the damage control story, when it comes to

1   Croft, is built on spin and innuendo and tales of deceit where

2   Mr. Croft hid LeeAnne Walters's test results.

3          In Story 1, though, the truth was revealed that

4   everyone, including Miguel Del Toral, looked at the Walters's

5   lead results as a one-off, especially when testing revealed

6   that her neighbors had no lead in their tap water.  Let's hear

7   from Miguel Del Toral.

8                        (Recording Played)

9          MR. STERN:  And if you have any doubts about Miguel

10   Del Toral's testimony, if you have any doubts about Miguel,

11   who on his own dime went to LeeAnne Walters's and did some

12   work to try and find out what the issues were at her house,

13   remember what Mike Glasgow said.

14          Mr. Maimon asked him, "What did Miguel Del Toral tell

15   you about whether or not he needed high lead levels to know

16   there was a problem?

17          A.   Yeah.  He told me he did not need the high lead

18   levels to realize there was an issue."

19          But in Story 2, the damage control story, you need to

20   believe that Croft and other city officials who clearly knew

21   as much about corrosion control as they did about time travel

22   purposefully hid information about the lead levels in

23   Ms. Walters's home.  Despite knowing little if anything about

24   corrosion control or water treatment or what her levels meant

25   or why it mattered.

1    In order to believe Story 2, the damage control

2   story, you have to believe that having nothing to gain

3   personally or professionally, Howard Croft was central to the

4   conspiracy wherein they were going to poison kids no matter

5   what.

6    Story 2, the damage control story, when it comes to

7   Howard Croft is a story of a man who for no particular reason

8   became a subversive, nefarious, highly scheming man.

9   Poisoning a community for some personal gain in ways no one

10  articulated with a knowledge base everyone heard he didn't

11  have, for reasons no one can explain.

12    Story 2, the damage control story, is the one where

13  two very large water engineering companies blames the guys who

14  everyone admits knew absolutely nothing about corrosion

15  control for the corrosion that happened in Flint.  And if you

16  believe that, then perhaps VNA and LAN did nothing wrong.

17    Story 2, the damage control story, was written by the

18  engineers for the engineers to absolve the engineers of all

19  fault whatsoever for the corrosion that occurred on their

20  watch through, at least October of 2015, in the pipes and

21  water system that VNA was committed to looking at from the

22  Water Treatment Plant that LAN was committed to upgrading.

23    In Story 2, the damage control story, if VNA had been

24  told about LeeAnne Walters's high test results, it would have

25  made all the difference in the world.  According to Story 2,

1    that would have been a game changer.

2         But in Story 1, the true story, it wouldn't have

3    mattered at all.  In Story 2, the choose-your-own-adventure,

4    VNA claims that if they had lit themselves on fire, if they

5    had marched into Governor Snyder's office, pounded on his desk

6    and got in face and said, "You have got to go back to DWSD for

7    Flint no matter what," that he would have thrown them out of

8    the office and shut the door.

9         But a few chapters earlier or a few chapters later or

10   perhaps in the same chapter of Story 2, they insist that the

11   LeeAnne Walters's test results would have made all the

12   difference.

13        You need to ask yourself how those two things can

14   coexist at the same time.  If their defense is that no one was

15   ever going back to DWSD, even though they did, and their other

16   defense is that had they known about the Walters's test

17   results, it would have made all the difference, you have to

18   try and look at both things at the same time.  And one is in

19   front of you, one is behind you, and it's simply impossible.

20   VNA cannot have it both ways.  They literally want you to

21   stare at a unicorn while keeping a cyclops in your rearview

22   mirror.  Look at this unless I need to you look at this.  Look

23   at that unless I need you to look at this.

24        In Story 2, everyone in government, the state, the

25   city, the EPA was hiding the Walters information from them.

1    They were hiding it, because -- we never really found out why

2    they were hiding it.  They never explained it in Story 2.

3    There's no evidence of why anyone would have.  There's no

4    evidence of anyone who would have benefited financially from

5    going to the KWA other than perhaps VNA and LAN, who both were

6    hoping to get contracts to do work on the KWA.

7            There's no evidence of any political or personal gain

8    for any of the government folks who were involved.

9            But in Story 1, no one hid anything from anyone.  In

10   Story 1, Mike Glasgow explained that he believed that LeeAnne

11   Walters's home was a one-off.  He said, "After sampling from

12   her residence a second time, I sent letters to immediate

13   neighbors asking to collect water samples.  Both lead and

14   copper were not detected.  Lead was not detected."

15           We've already played for you, I've already played for

16   you the clip from Miguel Del Toral -- I won't play it again --

17   where he says that was not indicative of a larger problem in

18   realtime while he was there on the ground on his own dime.

19           Howard Croft told us that LeeAnne Walters in realtime

20   was a one-off.  Let's hear from Howard Croft.

21                     (Recording Played)

22           MR. STERN:  In Story 1, Mayor Walling told us that

23   what was going on in LeeAnne Walters's house in realtime was

24   believed to be a one-off.

25           "Q.  You already stated during your testimony a

1    minute ago that you believed the Walters's residence was a

2    one-off situation, correct?"

3             And he said, "Yes."

4             Rob Bincsik, who came to court called by VNA to

5    testify about how concerned he was about this large problem in

6    Flint, even he admitted that ultimately:

7             "Q.  And so you were saying here to Mr. Glasgow,

8    Mr. Croft, Mr. Johnson, and Mr. Wright is that you were happy

9    to hear that none of the neighbors had lead in their water --

10   had any lead detected, because if they had, that would point

11   to a much larger problem in the area, and perhaps a systemwide

12   problem.  That's what you told those people?"

13            And he said, "Correct."

14            And I want you to seriously consider this.  I mean, I

15   want you to seriously consider everything.  But I especially

16   want you in this moment to consider this.  Please consider

17   that each of these defendants, each of whom say they didn't

18   warn, because they didn't need to.  These water engineering

19   experts who despite knowing that there was no corrosion

20   control, who despite knowing that the entire infrastructure

21   was comprised primarily of lead pipes and lead fixtures simply

22   stood by while they were waiting to get perhaps a larger

23   payday.

24            These engineers are using Ms. Walters as the

25   foundational piece of their defense.  Ms. Walters, who by all

1    accounts got the EPA to listen, who by all accounts got Miguel

2    Del Toral to listen, who by all accounts got Marc Edwards to

3    listen, who by all accounts got Dr. Mona Hanna-Attisha to

4    listen, who by all accounts got Governor Snyder to listen,

5    because she got all of the others involved.

6         These defendants, water engineers who were hired to

7    solve the problems that the city and the state couldn't, who

8    claimed they had no power to do anything of substance when it

9    came to getting Flint back to the DWSD are using a Flint mom's

10   situation as the foundational piece of their defense, a Flint

11   mom who got everyone to listen.  Everyone the engineers say

12   wouldn't have listened to them.  And if you believe that and

13   you believe them, then perhaps LAN and VNA did nothing wrong.

14        In Story 1, the true story, when Michigan's executive

15   office led by Governor Snyder determined that there was an

16   E. coli problem in Flint, they did what they could to fix it.

17   When they found out that there was a TTHM problem in Flint,

18   they did what they could to fix it.  When they found out there

19   was a Legionella problem in Flint, they did what they could to

20   fix it.  And when ultimately they figured out that there was a

21   lead problem in Flint that would affect the public health and

22   safety, within two weeks, they were back on Detroit water.

23        In Story 1 when Governor Snyder had credible

24   information from Dr. Mona Hanna-Attisha, from Miguel Del

25   Toral, from Marc Edwards, he did everything he could as

1    quickly as he could to get Flint back to Detroit.  He did and

2    Flint did.

3            And despite that, despite having no education in

4    water chemistry and corrosion control, despite being the one

5    who actually found a way to get Flint back to the DWSD, by

6    video, he said here on the stand and he took responsibility

7    for the state's role in the Flint Water Crisis.  He took

8    responsibility for what happened to Aundreya and Riley and

9    Emir and Daylaana.  He didn't beg off.  He didn't pivot.  He

10   didn't create a new chapter.

11           In Story 1, the true story, orthophosphates were

12   needed to make the water safe.  First and foremost, our

13   expert, Richard Humann came and told you that the city should

14   have continued to feed orthophosphates into the water even

15   after the switch from the DWSD to the Flint River.  Plain and

16   simply.

17           In the jury instructions, you're going to read about

18   professional negligence.  This is getting into the heart of

19   proving that LAN and VNA are responsible for what happened to

20   our four clients.  The plaintiffs in this case allege that the

21   two defendants, LAN and VNA each committed professional

22   negligence.

23           The plaintiffs bear the burden of proving each

24   element of their professional negligence claim with respect to

25   each of the two defendants.  For each defendant, each

```
 1    plaintiff has the burden to prove that, A, the defendant
 2    breached the standard of care for a professional engineer.  B,
 3    the plaintiff sustained injury resulting in damages.  And, C,
 4    that the defendant's alleged breach of the standard of care
 5    was a proximate cause of the plaintiff's injury and damages.
 6         Now, when you get the instructions or the verdict
 7    form, A is not going to be highlighted and italicized and made
 8    red and underlined.  I did that for you, because here the
 9    letter A has real meaning.  The defendants alleged breach of
10    the standard of care does not need to be the proximate cause.
11    It needs to be a proximate cause.
12         And we'll talk about that more in a minute.  But for
13    months and months and months, you heard about scope of work.
14    You heard about contracts.  You heard people testify, experts
15    for the defendants get on the stand and say, "I don't know if
16    it was in their contract.  I don't know what was in their
17    scope."  Or, "It wasn't in their contract.  It wasn't in their
18    scope."
19         When you look at the jury instructions, read them
20    closely.  They're dense.  No disrespect.  They're boring.  But
21    a professional engineer's standard of care is not defined by
22    the language of their contract.  And when they stand up, if
23    they talk about scope, if they talk about contracts, somewhere
24    in your minds, store it.  Put it on your hard drive.
25         A professional engineer's standard of care is not
```

1    defined by their contract.

2           We just talked for a minute about the letter A, and I

3    pink-purple A thing for you just to make it stand out.  This

4    is important.  There may be more than one proximate cause of a

5    plaintiff's injury.  A defendant's professional negligence is

6    a cause of a plaintiff's injury if it was a substantial factor

7    in bringing his or her injuries about.  To be a substantial

8    factor, a cause must not merely be -- sorry.  Must not -- must

9    not be merely a slight or trivial cause of a plaintiff's

10   injuries.  You may, however, decide that a defendant's

11   professional negligence is a substantial factor, even if you

12   assigned a relatively small percentage of fault to that

13   defendant.

14          Now, I don't show you that, because I think you

15   should assign a relatively smart percentage of fault to these

16   defendants.  When my partner, Moshe Maimon, gets up here to

17   talk to you about damages, about apportionment, he's going to

18   tell you why.  I show you that to show you that "substantial

19   factor" doesn't mean it has to be a large percentage, but we

20   think it is.

21          Let's talk about standard of care.  If I was allowed

22   to give you, like, one index card, which I'm not.  If I was

23   allowed to take notes for you, which I'm not.  If I was

24   allowed to hand you anything, which I'm not, I would want you

25   to take this with you.  These words.  The exact standard of

```
 1    care as defined by Richard Humann.
 2            "Engineering is an important and learned profession.
 3    As members of this profession, engineers are expected to
 4    exhibit the highest standards of honesty and integrity.
 5    Engineering has a direct and vital impact on the quality of
 6    life for all people.
 7            "Accordingly, the services provided by engineers
 8    require honesty, impartiality, fairness, and equity and must
 9    be dedicated to the protection of public health, safety, and
10    welfare.
11            "Engineers must perform under a standard of
12    professional behavior that requires adherence to the highest
13    principles of ethical conduct."
14            Honesty, integrity, impartiality, fairness, ethical
15    conduct, safety, welfare.
16            30,000 foot view.  I'm going to talk in the next few
17    minutes about what Mr. Humann says that they did -- that these
18    defendants did not do to meet the standard of care.  But
19    30,000 feet.  Just looking at this from 30,000 feet.  You've
20    sat here for five months of testimony every day on time at
21    8:30.  You've heard from close to 50 witnesses during this
22    trial.
23            Before we talk about what Mr. Humann says LAN and VNA
24    did or didn't do, ask yourself based on everything you've
25    heard, did VNA and LAN act honestly?  Did VNA and LAN act with
```

```
 1    integrity?  Did VNA and LAN act to protect the health, safety,
 2    and general welfare of Aundreya, Riley, Emir, and Daylaana?
 3            When it comes to VNA in particular, the jury
 4    instruction that you're going to get says, "Plaintiffs allege
 5    that VNA breached the standard of care by failing to recommend
 6    one or both of the following two options to the City of
 7    Flint."
 8            1, "The immediate implementation of orthophosphate
 9    corrosion inhibitors."  And/or, 2, "A return to receiving
10    water from the DWSD, from the Detroit Water and Sewerage
11    Department."
12            It's actually very simple.  What Richard Humann said
13    is, "Use orthophosphates or go back to Detroit.  Use
14    orthophosphates or turn off the spigot."
15            But it's not just Richard Humann.  Let's hear one
16    more time from Miguel Del Toral.
17                          (Recording Played)
18            MR. STERN:  It's as simple as that.
19            Mr. Humann got into some more detail in his testimony
20    about what the violations were.  And the first thing he says
21    about VNA -- and that's not Mr. Humann.  It's William Fahey
22    who testified, and he was one of the first VNA witnesses.
23            The first thing Mr. Humann said was VNA needed to
24    inform the city that an orthophosphate feed system was
25    necessary.  Mr. Humann said that the honesty, the integrity,
```

1    and the obligation to protect the health, safety, and welfare
2    of the general public required it.  And he says that VNA did
3    not meet that standard of care.
4        And we know that there was no mention of
5    orthophosphates in their report, and we also know -- and this
6    is a quote from Mr. Humann.  "Well, we -- you know, we
7    communicate our recommendations through our reports.  That's a
8    mechanism that we use.  So it's important for our clients to
9    understand our recommendations."
10       There's no recommendation for orthophosphates or for
11   an orthophosphate feed system anywhere in VNA's final report.
12   In fact, we know that the report calls on polyphosphates,
13   polyphosphates over and over again.
14       And, in fact, VNA did the opposite.  Instead of
15   recommending an orthophosphate feed system or any of the other
16   things that Mr. Humann says they needed to do or should have
17   done, over and over and over again in front of people from the
18   community, in front of emergency managers who knew nothing
19   about corrosion control, in a city that was in financial
20   crisis, on February 18, 2015, VNA repeatedly told everyone
21   that their water was safe.
22       The second thing that Mr. Humann says about VNA is
23   that they needed to address corrosion control to deal with the
24   potential for lead leaching out of the pipes.  We know that
25   they didn't address corrosion control for lead.  In fact, they

1    took references to lead out of the final report.  On its face,

2    if you believe Mr. Humann, that's a violation.

3         We know that they didn't recommend corrosion control

4    for lead, because Marvin Gnagy told us that the polyphosphates

5    that they recommended in the report were for red water.

6         "Q.  Well, you were suggesting a polyphosphate feed,

7    right?

8         A.  I was suggesting that for the red water, yes."

9         The third thing that Mr. Humann says that VNA should

10   have done was to insist on an orthophosphate.  He said that

11   the standard of care requires it.  We know that that didn't

12   happen.

13        In fact, Depin Chen recommended a poly and an

14   orthophosphate blend in one of his drafts.  Add corrosion

15   control measures.  Add poly-orthophosphate to finished water.

16   Add corrosion control.  Install poly-orthophosphate and feed

17   systems.  But that never made its way to the report.  On its

18   face, if you believe Mr. Humann, and you should, that's a

19   violation of the standard of care.

20        And if you don't believe the draft, if you think it's

21   something that someone created from trial, let's hear from

22   Mr. Chen, VNA's engineer who wrote it himself.

23                     (Recording Played)

24        MR. STERN:  In Story 1, VNA brought you Dr. Bellamy.

25   He was their $250,000 man.  He was one of their experts.  And

1    he told you that VNA acted appropriately, that they did not

2    breach the standard of care.  And here's why.  Assuming that

3    Mr. Gnagy recommended orthophosphate for lead corrosion to

4    Mr. Bincsik in their oral conversation, by doing so, VNA met

5    the standard of care to meet its duty.  That's what he said,

6    and perhaps he's right.

7           But we know that Mr. Gnagy didn't recommend

8    orthophosphates for anything.  And all of the recommendations

9    that involved any type of phosphate in the report or spoke to

10   corrosion control in the report were all about red and dirty

11   and smelly water.

12          The second thing that Bellamy says -- sorry --

13   Dr. Bellamy says is, "Assuming VNA recommended in its final

14   report orthophosphate for lead corrosion, by doing so, VNA met

15   the standard of care."  He might be right.  But we know with

16   certainty from the horse's mouth that any recommendations in

17   VNA's final report had nothing to do with lead.

18          Their recommendations had to do with red water.  And

19   no matter how many times they try and tell you both ways that

20   the guy that stood up there and said it's red water, really

21   didn't mean it.  Look at the report and look at his testimony.

22   Until trial, all of the recommendations were about red and

23   dirty water.  And none of them had anything to do with lead.

24          And third, Dr. Bellamy, their expert, the quarter of

25   a million dollar man who came and testified before you, said,

1    "Assuming that VNA recommended in its final report that the

2    City of Flint and the MDEQ conduct a corrosion-control study.

3    By doing so, VNA met the standard of care."

4          We've been over the VNA report 20 times during this

5    trial.  It's in evidence.  If y'all can find in that report

6    where VNA recommended a corrosion-control study to anybody and

7    if you can find those words in that report, you will be the

8    first eight people in the history of the world that will have

9    been able to.

10         When he was cross-examined, my partner, Moshe Maimon,

11   asked him, they looked at this part of the report, this part

12   that talked about contracting with your engineer and

13   initiating discussions with the state about the addition of a

14   .5 milligrams per liter phosphate.

15         This was what was in the report, and this is what

16   Dr. Bellamy relied on when he said that VNA met its standard

17   of care, because here they recommended an orthophosphate.

18   Despite the fact that the man who put the words in the record,

19   Marvin Gnagy said no such thing.  And, in fact, said the

20   opposite.

21         "Q.  When you read VNA's final report as you

22   testified to in your deposition, you saw the recommendation to

23   contract with your engineer and initiate discussions with the

24   state on the addition of a corrosion control chemical to be

25   dealing with orthophosphates for lead, true?"

1          And he said --

2          "Q.   That's what you said, right?   This does -- you

3     said under oath this does not relate to the red water

4     problems, right?

5          A.   That was by interpretation of that .5, that's

6     correct."

7          VNA's expert, who says they met the standard of care,

8     that's the testimony.  He says that they recommended something

9     based on a report that the guy who wrote it says means

10    something completely different.  That is Story 2.

11         And finally, when it comes to VNA, Richard Humann

12    said that VNA needed to inform the city that returning to

13    Detroit was the best and safest option.  We know that didn't

14    happen.  Depin Chen, "Seems that reconnecting to the DWSD will

15    be the best solution."  We know that that recommendation

16    wasn't made.

17         Rob Nicholas, before VNA was ever even on the job

18    said in writing internally to nobody but folks from VNA that,

19    "The simple solution is to just buy Detroit water, and that

20    solves the problem."

21         Joseph Nasuta, one of VNA's engineers, sent an email

22    internally to Gnagy and Chen and said, "The quickest and maybe

23    the safest option is to return to Detroit water.  We can say

24    we have not evaluated the cost impacts of that option if we

25    have not, but we need to tell BD that it's an option."  And

1    then at the bottom, he says, "Keep this in the group."

2          And William Fahey, William Fahey in 2016, I guess in

3    a moment of clarity or reminiscence or "I told you so" said,

4    "Now you know why I was so adamant about taking the position

5    that the best available alternative was to go back on Detroit

6    water."

7          And we know that never made it in the report despite

8    all of the internal emails.

9          On your verdict form, you are going to have to answer

10   a question, "Did Veolia North America breach the standard of

11   care for a professional water engineer?"

12         Document after document after document, testimony

13   upon testimony upon testimony, witness after witness after

14   witness with experts on our side that say they did and experts

15   on their side that say they didn't, experts who relied on the

16   meaning of a report that the author says it didn't mean.

17         I submit to you that when you answer that question,

18   it is absolutely yes.  Question number 2 on your verdict form.

19         Now, let's talk about LAN.  This is another one of

20   the jury instructions from the Court.  Plaintiffs allege that

21   LAN breached the standard of care by failing to sufficiently

22   recommend the use of orthophosphate corrosion inhibitors to

23   the City of Flint when it switched its water supply to the

24   Flint River and/or sufficiently or adequately warn against

25   operation of the Flint Water Treatment Plant without use of

```
 1    orthophosphate corrosion inhibitors prior to the switch of
 2    water source to the Flint River.
 3            Again, it's very simple.  Use orthophosphates or
 4    don't turn on the spigot.  I'm not going to play the clip from
 5    Miguel Del Toral again just in the interest of time.  But you
 6    heard him.  I asked him the longest -- well, you've heard a
 7    lot of longwinded questions from me.
 8            But I asked him a very long-winded question.  I asked
 9    him about all the stuff, "And would that indicate to you that
10    there's a problem?"
11            And he looked at me during his deposition and by
12    video looked at you during trial and said, "I didn't need any
13    of that.  You tell me you've got no corrosion control.  You
14    tell me you've got lead pipes.  I don't need anything else.
15    You've got a problem.  And it's as simple as that."
16            The first thing that Mr. Humann said about LAN was
17    that they were required to inform the city that they needed to
18    treat with an orthophosphate and what the risks of not doing
19    so were.  We know they didn't do that.  We know they didn't do
20    it.  They admit they didn't do it.  They brought to you
21    Professor Desmond Lawler, who said it would have been wrong to
22    add an orthophosphate.
23            "Q.  Now, you're aware that Mr. Humann has opined
24    that he felt that orthophosphates should have been used from
25    the start as of April 2014.  You're aware of that?
```

1          A.   I am aware of that, yes.

2          Q.   And do you agree with that opinion?

3          A.   I definitely do not agree with that opinion,

4     sir."

5          That was Desmond Lawler's testimony on the stand

6     despite the fact that everybody knows that once

7     orthophosphates were added back to the water, once Flint went

8     back to the DWSD and then continued adding additional

9     orthophosphates, the problems got better and ultimately ended.

10         And then in some twist of fate or I don't know what

11    happened while he was on the stand.  After an hour and 25

12    minutes or an hour and 30 minutes of telling you over and over

13    and over again that softening was the appropriate thing to do,

14    that softening was the right thing to do, that all the

15    literature supports softening, that softening is corrosion

16    control, at the very, very end of his testimony, my partner

17    asked him, "Agree or disagree, water softening is not at all

18    the same thing as corrosion control?"  And he said, "I agree."

19         Five months of softening is corrosion control.

20    Softening is corrosion control.  Didn't need to do anything.

21    Nothing to see here.  It was the right thing to do.  The

22    proper thing to do.  Their expert who didn't make as much as

23    Dr. Bellamy but still made $80,000 to come to court to tell

24    you that LAN did nothing wrong, a premise based on the fact

25    that softening is corrosion control, at the very end of his

1    testimony looked you all in the eyes and told my partner when

2    it came to water softening, water softening is not at all the

3    same thing as corrosion control.

4          The second thing that Mr. Humann said that LAN needed

5    to do and didn't was inform the city that they needed to

6    include a phosphate feed system in their plant design.  You

7    may not remember Jeff Hansen, either, although his name has

8    been used quite a bit.  I think he was our second witness.  He

9    worked for LAN.  He was paid by LAD.  LAD was Jeff Hansen, LAN

10   was Jeff Hansen.  You heard all of it.

11         We know with certainty that LAN didn't recommend a

12   phosphate feed system.  And you might not remember this,

13   because it happened so early in the trial.  But Jeff Hansen

14   actually had a note in an earlier report when talking about

15   the Flint Water Treatment Plant to add phosphate feed here.

16   And it never made its way into the report.  And we sure as

17   heck know that it never made its way into the plant until

18   after Flint had already switched back to DWSD at the end of

19   2015 and early 2016.

20         Jeff Hansen:

21         "Q.  Okay, but in any event, there's no question in

22   your mind that in 2011, the note said, 'add phosphate feed,'

23   was your handwriting?

24         A.  That looked to be my handwriting."

25         The third thing that Richard Humann came and said

1    that LAN needed to do based on the standard of care, warn the

2    city that because they were not feeding orthophosphates into

3    the water, lead could leach to the water.

4         And they brought you -- I didn't have a photo of him,

5    but he came yesterday.  We saw Brian Ramaley.  We all remember

6    what he looked like.  He's the final witness in Story 2.

7         When asked by my partner, Mr. Maimon, "And there in

8    the summer" -- sorry.  Mr. Maimon didn't ask him this

9    question.

10        When asked by David Kent, lawyers for LAN, "Was there

11   any basis for assuming that orthophosphates were required for

12   the operation of the plant in April 2014?"

13        He said, "No."

14        Mr. Humann says, "Warn the city that because they

15   were not feeding orthophosphates into the water, lead could

16   leach into the water."

17        And the expert they brought to talk to you about that

18   said there was no basis for adding orthophosphates or assuming

19   they were necessary.

20        So if, and you should believe Mr. Humann, you know

21   that they failed in this regard.  It went on.

22        "Q.  Was there any basis for LAN to conclude or for

23   any reasonable engineer to conclude that orthophosphates would

24   be required?"

25        And again, he said, "No."

1          And I submit to you, I submit to you when you get to

2    Question 1 on your verdict form, you ask yourself:  Is

3    softening corrosion control?  Is corrosion control softening?

4    Has LAN acted with the honesty and the integrity and in the

5    best interest of the health, welfare of the general public?

6          The answer to this question is:  Did defendant LAN

7    breach the standard of care for a professional engineer?

8          And the answer is:  Heck yes.

9          And when the defendants get up here, they are going

10   to bang on Mr. Humann.  I promise you.  Wait for it.  They're

11   going to tell you he's an awful expert.  They're going to say,

12   "He didn't review nearly as many depositions as he should

13   have.  He didn't look at all the emails.  He didn't watch the

14   trial for 400 hours or 200 hours or 150 hours.  He just didn't

15   do enough work to be right."

16         Sometimes it's as easy as Miguel Del Toral said it

17   was.  Sometimes 2 plus 2 does equal 4.  You've got lead

18   infrastructure.  You've got no corrosion control.  You've got

19   a problem.  And it cannot be overstated.  It cannot be stated

20   enough when it comes to this trial that the word "crisis" just

21   means different things, depending on whether you're reading

22   Story 1 or Story 2 or the pivot chapter from Story 2, the

23   choose-your-own-adventure chapter.

24         In Story 1, the true story, the Flint Water Crisis

25   was systemwide and affected Aundreya, Riley, Emir, and

1    Daylaana.

2            In the main section of Story 2, the damage control

3    story, the Flint Water Crisis was a tragic event that affected

4    the residents of Flint, but it just wasn't their fault.  The

5    Story 2 pivot chapter, part of the choose-your-own-adventure

6    part of Story 2, the Flint Water Crisis was a bad thing that

7    affected some people but certainly not Aundreya, Riley, Emir,

8    or Daylaana.

9            In Story 1, the true story, the Flint Water Crisis is

10   something that actually affected all four of these kids in a

11   profound way.

12           Story 1, the true story, is about very high bone lead

13   levels.  Dr. Specht told you that these four children have

14   significant levels of lead in their bones.  Dr. Bithoney told

15   you that these children have thousands, thousands of

16   micrograms of lead in their bones.  And when it comes to

17   Dr. Specht, the best these defendants can do is criticize him,

18   because they say his technology is too new.

19           Why is measuring lead in a child's bones so

20   important?  Dr. Specht explained in great detail why this is

21   so.  Number 1, he says blood lead levels linked to turnover of

22   red blood cells.  That means that the cells are changing

23   nonstop, and it's hard to measure the lead in the blood.

24           He talked about how for adults, the half-life of lead

25   is about 30 days but that studies have shown for kids, the

1   half-life can be as short as a week.  This means that in order

2   to get accurate representative levels, blood tests would need

3   to be done to get the right result in realtime at the exact

4   time or as close to the exact time as the exposure.

5          In bones, the half-life is 10 to 30 years.  When the

6   lead leaves the blood, it is stored in the bones.  And so

7   there's not as much variability.  It's not even close to the

8   amount of variability when you measure lead in bones as when

9   you measure it in blood.

10          These defendants are critical of Dr. Specht not

11  because he's wrong.  Not because they presented you any

12  evidence whatsoever, not even an ounce that his measurements

13  are off or that these kids didn't have thousands of micrograms

14  of lead in their bones.  Ask yourself who testified for these

15  defendants that Dr. Specht is wrong.  Again, you'd be the

16  first eight people in this courtroom that can tell us.

17          They're critical, because it's unavailable, because

18  it's too new.  Dr. Specht, who has dedicated his life and his

19  professional career to science, to perfecting new ways to

20  measure old problems, VNA and LAN water engineering companies

21  apparently don't believe that much in science when it comes to

22  Aundreya, Riley, Emir, and Daylaana.

23          In Story 1, science is good.  It's important, it's

24  responsible.  In Story 2, science is the bogeyman.  It's bad.

25  If all of us lived in Story 2, we may never have CT scans or

 1    sonograms.

 2            Two water engineering companies whose businesses rely

 3    on technology and science and innovation, in this case when it

 4    comes to Dr. Specht and the pXRF machine, it's bad.  It's bad

 5    because it doesn't serve their purposes.  And yet not a single

 6    witness took the stand live or by video or in any documents

 7    and told you that Dr. Specht was wrong.  Not one person got up

 8    here and told you that these kids didn't have that lead in

 9    their bones.

10            That evidence which we presented is uncontroverted.

11    You have experts that say, "Yes, there was a violation of the

12    standard of care."

13            "No, there wasn't a violation of the standard of

14    care."

15            But here you have an expert that says there were

16    thousands of micrograms of lead in their bones.  And on this

17    side, you've got nothing, except that it's new technology.

18            But it's not just Dr. Specht who says that this is a

19    good way to measure.  We looked at the ATSDR.  It's a

20    mouthful.  The Agency For Toxic Substances and Disease

21    Registry.  Let's see what they say about the bone scan.

22            Quote, "The development of noninvasive XRF techniques

23    for measuring lead concentrations in bone has enabled the

24    exploration of bone lead as a biomarker of lead exposure in

25    children and in adults.  Lead in bone is considered a

1  biomarker of cumulative exposure to lead."

2          There's nowhere in the ATSDR that says, "Don't do

3  this, can't do it, not a good idea."  In fact, they endorse

4  it.  Regardless of what VNA and LAN want you to believe when

5  it comes to Dr. Specht, regardless of whether you're reading

6  from the main sections of Story 2 or the pivot sections from

7  Story 2, this is a story of high lead levels in these kids's

8  bones.

9          It's a story of acquired brain injury.  It's a story

10  of cognitive deficits.  At its core, it's a story of lost

11  potential.

12          When Mr. Maimon gets up here and talks to you about

13  damages, he's going to go into great detail about Dr. Krishnan

14  and her work with these kids.  But I want to touch on it for a

15  minute.  We brought you Dr. Mira Krishnan, the defendants

16  brought you Dr. David Thompson.

17          Dr. Krishnan, who has extensive clinical experience

18  in neuropsychology, a doctor who spent hours upon days

19  performing tests of these kids, interviewing their parents,

20  looking at their medical records, looking at their school

21  records, watching them while they were being tested by her

22  live in realtime for hours in Flint.

23          She interviewed their families.  She read the

24  depositions of their moms.  She did a thorough and complete

25  assessment of them.  Dr. Krishnan who, when it comes to these

1    kids of all the experts who have testified in this case, were

2    actually the only expert who heard their voices, who looked

3    them in the eyes.

4         Dr. Thompson, who was paid 80 grand by VNA to come

5    here to tell you that as part of the Pivot 2 chapter story

6    choose-your-own-adventure, none of them were her.

7    Dr. Thompson who for 80 grand, as he put it, looked at

8    records, read Krishnan's reports, read some articles, and met

9    with lawyers.

10        Dr. Thompson, who in case you blame VNA and LAN for

11   anything at all, was willing to come here and tell you that

12   there was absolutely nothing wrong with any one of these four

13   kids, so it just doesn't matter what LAN or VNA did wrong.

14        Dr. Thompson who at the time he sat in that chair,

15   had never met a single one of them, who at the time he sat in

16   that chair, had never spoken to a single one of their parents

17   or any members of their families, Dr. Thompson who after every

18   witness that testified referred to what happened in Flint as a

19   crisis, Dr. Thompson came here and told you with a straight

20   face that it was not a crisis, not for these four kids.

21        Four kids who by all accounts have never met each

22   other.  Four kids who by all accounts are just random kids

23   that live in the same city.  These are the four kids who

24   weren't hurt in what has been referred to throughout this

25   trial as the Flint Water Crisis.

1        So here's what Dr. Krishnan did.  She evaluated each

2   of them for cognitive and emotional impacts of lead exposure.

3   She did interviews with their families and with the kids.  She

4   does neuropsychological testing.  She reviewed their medical

5   and school records.  She reviewed the deposition testimony.

6        And when it came to Aundreya -- and Mr. Maimon will

7   talk more about this -- she found that Aundreya suffered an

8   acquired brain injury.  And she found that the result of that

9   brain injury, the deficits that she experiences are

10  disinhibition, impulsivity, problems focusing, relative

11  weakness in mathematics, weakness in verbal reasoning, social

12  and mood problems, greater difficulty completing high school,

13  college, or an advanced degree.

14       When it came to Riley Vanderhagen, also acquired

15  brain injury with neurocognitive deficits that present as a

16  history of learning problems, strong proactive interference,

17  weakness in emotional self-regulation, deficits in visual

18  reasoning, deficits in problem-solving flexibility, greater

19  difficulty completing high school, college, or an advanced

20  education.

21       When it came to Emir Sherrod, hyperactivity and

22  difficulty playing quietly, impulsivity, poor focus, executive

23  deficits, greater difficulty completing high school, college,

24  or an advanced degree.  All the result of his acquired brain

25  injury.

1          Daylaana Ware, acquired brain injury.  Problems

2   focusing and inattention, oppositionality, impulsivity,

3   deficits in visual reading, greater difficulty completing

4   college, high school, or an advanced degree.

5          And if for some reason, VNA felt like you didn't

6   believe Dr. Thompson, they brought you Dr. Gaitanis.

7   Dr. Gaitanis, who was paid $600 an hour and sit in that chair

8   and read for you chapter and verse from Story 2.

9   Dr. Gaitanis, who like Dr. Thompson, did nothing more than

10  look at some records, nothing more than read Dr. Krishnan's

11  reports, cherry-pick parts of cherry-picked articles to try

12  and support his opinion.

13         Dr. Gaitanis who all he did were those things and met

14  with lawyers.  All in an effort for you to believe that what

15  was or wasn't in VNA's report just didn't matter.  Because

16  like Dr. Thompson said, these kids weren't hurt.  You heard

17  Dr. Gaitanis consistently on cross-examination from Mr. Maimon

18  refer to the "real world."  Those were his words over and over

19  and over again.

20         In the real world this.  In the real world that.  As

21  if we were living in some other world with our clients that

22  folks like Dr. Gaitanis do not live in.  Dr. Gaitanis, who in

23  case you blame VNA and LAN for anything, was willing to come

24  in and tell you that the kids weren't hurt.  Dr. Gaitanis, who

25  like Dr. Thompson, had never met a single one of them.

1   Dr. Gaitanis, who like Dr. Thompson, never spoke to a single
2   member of their families.
3           Because in the real world, in the real world, if a
4   kid has a problem and I'm asked a question and I'm
5   Dr. Gaitanis, I don't evaluate that kid.  I don't meet that
6   kid.  I don't talk to his parents.
7           Dr. Gaitanis, who in 25 years has worked with ten
8   lead poisoned kids.  Because in his real world, in that real
9   world, you can be an expert on lead poisoning, even if you
10  only see ten kids over a quarter of a century.
11          Dr. Gaitanis, who isn't even the person at his own
12  institution that someone would call if they had an issue with
13  lead poisoning, because in his real world, in that real world,
14  you don't need to be the person at your institution that
15  somebody calls to be an expert on lead poisoning.
16          Dr. Gaitanis, who's never taught a single class on
17  lead poisoning.  Dr. Gaitanis, who's never published an
18  article on lead poisoning.  Dr. Gaitanis, who over and over
19  and over again referred to this "real world" was referring
20  repeatedly to the real world that exists in Story 2.  And if
21  you believe him and you believe Dr. Thompson, then perhaps VNA
22  and LAN did nothing wrong.
23          Now, let's talk about causation in Story 1.  And I'm
24  almost done.  We're back to a jury instruction.  So thank you
25  for your patience.

1          "If you find that either defendant committed

2     professional negligence and a plaintiff suffered an injury,

3     you must next determine whether that defendant's professional

4     negligence was a proximate cause of the plaintiff's injury."

5          The words "proximate cause" mean first that the

6     negligent conduct must have been a cause in fact of the

7     plaintiff's injury.  And second, that the plaintiff's injury

8     must have been the type that is a natural and probable result

9     of the negligent conduct.

10         There may be more than one proximate cause of

11    plaintiff's injury.  We've already talked about this slide,

12    and this is the one that talks about the relatively small

13    percentage of fault in the last line.  But it goes with the

14    previous slide, and so I put it there for you a second time.

15         And finally, "Plaintiffs may still satisfy their

16    burden of proof on causation, even if defendants's negligence

17    was not the last or only cause of their injuries.  Plaintiffs

18    may also satisfy their burden of proof if defendants's

19    negligence acted in combination with some other causes or at

20    the same time as some other causes."

21         Finally, causation -- I say "finally" -- I may have

22    another slide.

23         Causation by multiple actors.  You may decide that

24    the conduct of neither, one, or both of the defendants was a

25    proximate cause of plaintiffs' injuries.  If you decide that

1   one of the defendants was professionally negligent and that

2   such negligence was a proximate cause of plaintiff's injuries,

3   it is not a defense that the conduct of the other defendant or

4   other persons or entities also may have been a cause of his or

5   her injuries.

6          Meaning that there could be a lot of pieces.  It's a

7   puzzle.  You must give each defendant separate consideration

8   as to whether its conduct was a proximate cause of each of the

9   plaintiff's injuries.

10         I lied.  To find that VNA's breach of the standard of

11  care -- I didn't lie.  I just was mistaken.  I apologize.

12         "To find that VNA's breach of the standard of care

13  was a substantial factor of a plaintiff's injury, you must

14  find that the plaintiff has established by a preponderance of

15  the evidence."  Again, that scale.

16         If VNA had not breached its standard of care -- in

17  other words, if VNA had done what Richard Humann says it

18  needed to do, the city would have started using

19  orthophosphates or returned to Detroit water at some point

20  between February 10, 2015, when they first got to Flint, and

21  October 16, 2015, when Flint switched back to the DWSD.  And

22  that doing so would have lowered the lead level in water the

23  plaintiff may have consumed.

24         2, "The plaintiff consumed enough lead from water

25  after that date to have caused or made worse his or her injury

1    or caused a separate or additional injury.  Remember that.  I

2    underlined it.  We're going to hear what Dr. Bithoney said in

3    a minute.  A separate or additional injury."

4              And, 3, "The lead from water consumed after that date

5    and not some other source caused or made worse plaintiff's

6    injury."

7              Finally, as the LAN, it's the same instruction except

8    with some tweaks.  1, "If LAN had not breached the standard of

9    care, the city would have applied a sufficient amount of

10   orthophosphate corrosion control inhibitor chemicals to avoid

11   excessive levels in the Flint River water or would not have

12   operated the Flint Water Treatment Plant without the use of an

13   orthophosphate corrosion inhibitor."

14             That's the standard that Richard Humann testified

15   about.  That's what he said they needed to do.

16             2, same as the last one, but with different dates.

17   "The plaintiff consumed enough lead from Flint water after

18   April 2014 to have caused or made worse his or her injury or

19   caused a separate or additional injury."

20             And finally, 3, "The lead from Flint water consumed

21   after April 2014 and not some other source caused plaintiff's

22   injury."

23             Y'all remember Dr. Bithoney.  He came over the course

24   of three weeks, I think.  The first time he came, he was a

25   little harder to hear.  And the second time he came, he wore

1    his microphone.

2            Dr. Bithoney has spent the last four decades of his

3    life and career meeting with, treating, evaluating, and

4    working with lead poisoned kids.  Dr. Bithoney has written

5    quite a number of peer-review articles on lead poisoning.

6            Dr. Bithoney told you that he, too, believes what

7    Dr. Krishnan said about these kids, that they suffered from

8    acquired brain injuries and that the deficits that she found

9    in them are true and exist.

10           Dr. Bithoney first spoke to us generally about lead's

11   toxic effect on kids, on their brains.  Dr. Bithoney explained

12   the types of deficits that kids who are lead poisoned

13   generally suffer.  Executive function deficits, decreased

14   academic achievement, decrements in overall intelligence,

15   reduced attention hyperactivity, adverse behavioral effects.

16           Dr. Bithoney also explained that the earlier in life

17   that a kid is exposed to lead, the worse it's going to be for

18   that kid over time.

19           The younger the child, the less the brain is formed,

20   the more damage that will occur if that child is lead

21   poisoned.

22           Dr. Bithoney explained that lead is -- I'm sorry.

23           Dr. Bithoney explained that lead is exquisitely

24   poisonous to kids.  Exquisitely poisonous to kids.  It means

25   it affects kids in ways it doesn't affect anybody else.  And

1    then he explained that there is no known toxicity threshold

2    for led.

3           His testimony when it came to each of these

4    organizations was that all of these prestigious organizations

5    had jumped in and said, "There's no level of lead that's known

6    that does not cause damage to kids."

7           Dr. Bithoney explained the extensive and thorough

8    work that he did in making his evaluations and coming to his

9    conclusions in trying to find what caused Aundreya's and

10   Riley's and Emir's and Daylaana's deficits in their brain

11   injury.  He talked about his differential diagnosis.  He

12   interviewed parents.  He reviewed Dr. Krishnan's reports.  He

13   inspected the kids's medical and school records.  He examined

14   blood and bone results.  He reviewed publications,

15   periodicals.  And then he conducted block by block geomapping.

16          He relied on the Pieper study, which showed

17   systemwide water contamination.  A study that has been

18   referenced over and over and over again during this trial,

19   which some folks have ignored, and some folks have relied

20   upon.

21          In his geomapping, he found -- first off, his

22   geomapping is something that's very rarely if ever done.  He

23   says this is never done in a standard lead poisoning clinic.

24   But because this issue is so very important, we spent hours

25   looking for alternative causes of lead poisoning.  Why did

1  these kids have so much lead in their bodies?  So we went, and

2  we mapped and placed them on a grid, each child's home

3  location.  We also mapped their past residences, where else

4  they lived in the past.

5          He talked to us about zip codes, 48503 through 48507,

6  right out of the Pieper article.  Zip codes, which had some of

7  the highest levels of lead in water in the entire City of

8  Flint.  And each of these addresses Cherokee Ave., South Dort,

9  Lincoln Avenue, Franklin Avenue, Woodrow Ave, Yale Street,

10  East Boulevard Drive, West Sherman Avenue, Father Dukette,

11  Addison Street.  These are where our clients -- this is where

12  Aundreya, Riley, Emir, and Daylaana lived and spent the

13  majority of their time.

14          Dr. Bithoney told us how he tried to find something

15  else.  But he said, "I couldn't find anything else."  And we

16  have a saying probably in all the academic fields.  When you

17  hear hoofbeats, don't think of zebras.  Think of horses.  So

18  we had a cause.  We could not find any other cause of lead

19  elevation in their bones.

20          And yet I had kids with thousands of micrograms in

21  their bones.  So I had to explain it.  And the only source of

22  lead that I'd found, the kids were exposed to was traveling

23  all over the city in multiple zip codes to multiple family

24  members, friends, relatives, parks, water fountains at the

25  park, etcetera.  So -- and those were known to have lead.

1          And he said there was nothing else.  There's so much

2     lead in these kids' bodies, we couldn't find any other reason

3     for it.

4          "And when you described exposure to water from the

5     Flint River, are you including in your opinion to a reasonable

6     degree of medical certainty the years 2014 and 2015?"

7          And he said, "Yes.  Because you couldn't get those

8     high levels of lead in your bones unless there was chronic

9     exposure.  Yes, because you have to have systemwide chronic

10    persistent relatively high level of exposures in order to add

11    up to thousands of micrograms.

12         "I can't understand any other cause for it, and I've

13    spent hours trying to explain this before I wrote my report.

14    I'm sure, because I was really persistent trying to look for

15    another cause."

16         Dr. Bithoney also testified over and over and over

17    again the second day he came in, that each exposure, that each

18    child had, every single day time after time from the minute

19    the crisis started until October 2015 was a separate and

20    individual exposure.

21         When you go back and you look at the jury

22    instructions, remember that.  Each one was separate

23    cumulative, and additional.

24         Dr. Bithoney told us that Aundreya's lead poisoning

25    was caused by exposure to the Flint River in 2014 and 2015.

 1          He told us that Riley's lead poisoning was caused by

 2     exposure to the Flint River water in 2014 and 2015.

 3          He told us that Emir's lead poisoning was caused by

 4     exposure to the Flint River water in 2014 and 2015.

 5          He told us that Daylaana's lead poisoning was caused

 6     by her exposure to water from the Flint River in 2014 and

 7     2015.

 8          Each exposure, separate and additional, each exposure

 9     a separate and additional injury.  These were his words.

10          "Q.  Did their continued exposure during 2015

11     through" -- sorry -- "during 2015 through October 2015,

12     separately and additionally cause them injuries?

13          A.   Yes.  Well, every bit of lead they ingested that

14     was going into the bones would add more lead to the bones and

15     also more lead to the brain."

16          Dr. Bithoney testified, "So we've said that this was

17     systemwide exposure."  You need to have chronic exposure to

18     get to levels of 9,000 micrograms of lead in the bones.  These

19     levels are supernormal.  Supernormal.  That means way above

20     normal.

21          And then for causation Story 2, there's no Story 2

22     for causation.  There's no dispute about what Dr. Bithoney

23     said.  If y'all actually believe Dr. Krishnan, if you actually

24     believe that these kids are injured, there is no other

25     explanation besides what Dr. Bithoney presented to you as to

1    what caused these injuries.

2          Again, we've got experts that say there's a standard

3    of care that was breached and a standard of care that wasn't.

4    We've got an expert neuropsychologist who says the kids are

5    hurt and the Story 2 pivot chapter.  Those experts they

6    they're not hurt.

7          But when it comes to Dr. Specht and his bone scans,

8    there's no expert that says he's wrong.  When it comes to

9    Dr. Bithoney and his opinions, there's no expert that says

10   he's wrong.

11         And on your verdict sheet when you get to Roman

12   numeral II, you're going to be asked a question, "Was

13   plaintiff Emir Sherrod injured?"  And the answer is, "Yes."

14         "Was plaintiff Aundreya Teed injured?"  And the

15   answer is, "Yes."

16         "Was plaintiff Riley Vanderhagen injured?"  And the

17   answer is, "Yes."

18         "Was plaintiff Daylaana Ware injured?"  And the

19   answer is, "Yes."

20         And then you're going to be asked eight more

21   questions about VNA and LAN.

22         "Was VNA's breach of the standard of care a proximate

23   cause of Emir Sherrod's injuries?"  I submit to you that the

24   evidence is overwhelming.  "Yes."

25         "Was VNA's breach of the standard of care a proximate

 1    cause of Aundreya Teed's injuries?"  The evidence is

 2    overwhelming.  "Yes."

 3           "Was VNA's breach of the standard of care a proximate

 4    cause of Riley Vanderhagen's injuries?"  I submit to you the

 5    answer is, "Yes."

 6           "Was VNA's breach of the standard of care a proximate

 7    cause of Daylaana's Ware injuries?"  The answer is, "Yes."

 8           And when it comes to LAN, the same question.  And I'm

 9    going to read it to you one more time.

10           "Was LAN's breach of the standard of care a proximate

11    cause of Emir Sherrod's injuries?"  The answer is, "Yes."

12           "Was LAN's breach a proximate cause of Aundreya

13    Teed's injuries?"

14           "Yes."

15           "Was LAN's breach of the standard of care the

16    proximate cause of Riley Vanderhagen's injuries?"

17           "Yes."

18           "Was LAN's breach of the standard of care a proximate

19    cause of Daylaana Ware's injuries?"  The answer is, "Yes."

20           We're all a product of our communities.  Whether

21    you're from Flint, Michigan or Ann Arbor, New York City,

22    Atlanta, Georgia; Boston, Massachusetts; part of who we are,

23    part of what makes us, part of the way we see the world, part

24    of the way we see ourselves is about how we grew up.

25           It's about our communities.  It's about our siblings.

```
 1   It's about our parents.  It's about our friends.  Part of who
 2   we are is about what it feels like in the dead of winter,
 3   wherever we're from.  What it feels like in the midst of
 4   summer, wherever we're from.
 5           In the same ways that many of us can wake up in the
 6   middle of the night and find our ways to the bathroom without
 7   ever turning on the lights, because we know it so well, the
 8   longer we stay and the more entrenched we become in our
 9   communities, the more our communities become part of who we
10   are, and the more we become a part of what that community is.
11   We become its fabric.  And the tapestry of that fabric, the
12   colors of that quilt, its vibrancy, its dullness, it's
13   contrasts, its transitions, what you see when you look at the
14   fabric is so often defined by its brightest colors.  And all
15   of our communities through all of the seasons through all of
16   time, the brightest colors are our kids.
17           And when you go back to that jury room, you think
18   about those four kids, and you think about all the evidence
19   you heard, and you return a verdict for the plaintiffs.
20           Thank you.
21           THE COURT:  Okay.  Thank you, very much, Mr. Stern.
22           And now we'll take our break, which I think we could
23   all use.  So please rise for the jury.  It will be about a
24   15-minute break.
25                       (Jury Out)
```

```
 1              THE COURT:  We'll take a 15-minute break.  Could
 2    everybody stay off the second and third floor?  The jury's on
 3    the second floor.  So just use the restroom on the first
 4    floor.
 5                          (Brief Recess)
 6              THE COURT:  Please be seated, and we'll bring the
 7    jury in.
 8              MR. STEIN:  Your Honor.
 9              THE COURT:  Yes.
10              MR. STEIN:  I would just ask that after Mr. Maimon
11    finishes, we have a short break --
12              THE COURT:  Sure.
13              MR. STEIN:  -- of a couple of minutes to set up our,
14    whatever we need --
15              THE COURT:  Do you want to give the jury a break to
16    go back up to the jury room?
17              MR. STEIN:  I think it would be a good idea if --
18              THE COURT:  Okay.
19              MR. STEIN:  Again, I think we need about ten minutes
20    to make sure our equipment is set up and all of that.
21              THE COURT:  Okay.  Absolutely.
22              Mr. Mason?
23              MR. MASON:  I'm just stretching, Your Honor.  It's a
24    long day to sit all day.
25              THE COURT:  It is.  I'm sitting on this thing still
```

```
 1    to try to keep me off balance.  Supposedly it's going to help
 2    me with my osteoporosis.  So I don't believe it's helping me
 3    at all.  I'm trying to follow the rules.  That and I chugalug
 4    calcium pills.
 5            The jury's still using the restroom.  I just was
 6    following Mr. Mason's lead.  Thought it would be good to stand
 7    up.  We do have a Zumba instructor on our jury.  And the whole
 8    time I've been thinking maybe she can lead us in a couple of
 9    moves together.  But then our electrician wasn't allowed to
10    help us get the electricity on, so.  He did offer for a small
11    sum.
12            THE CLERK:  All rise for the jury.
13                         (Jury In)
14            THE COURT:  Welcome back.  Welcome back to all of the
15    members of the jury.
16            Please be seated.  And what we'll do now is I think I
17    mentioned this earlier, Mr. Maimon will continue with
18    plaintiffs' closing argument.  And after that, we'll take --
19    it will be shorter than the portion that Mr. Stern did.
20            After that, we'll take another break and then
21    Mr. Stein will get his equipment and materials ready and
22    deliver the closing argument for VNA.
23            MR. MAIMON:  May I, Your Honor?
24            THE COURT:  Yes, you may.
25            MR. MAIMON:  Thank you, Your Honor.  And may it
```

1      please the Court, members of the jury, I'd like to start by

2      talking about one of the major responsibilities that you're

3      going to have.

4            In our system of justice, in our practices, you're

5      going to be given a very long form to fill out.  I'm hopeful

6      that it's on double-sided paper so we can save some of the

7      trees.  But this is your verdict.  You filling this out is

8      your verdict.

9            And the judge talks about verdicts, and we talk about

10     verdicts.  And it always struck me what does the word

11     "verdict" mean?

12               (Stenographer clarification.)

13           MR. MAIMON:  It's made up of two parts.  To "verify"

14     means to make sure that something is true.  And to "dictate"

15     means to speak.  And so what a verdict is you speaking the

16     truth.

17           And in our system of justice that was set up hundreds

18     of years ago, the only people that speak the truth are the

19     members of the community, the citizens, the people.  We have a

20     system that empowers the people to sit as the third branch of

21     government.

22           We stand for Judge Levy when she comes into the

23     courtroom, because she's the judge of the law.  And we've all

24     taken an oath to uphold the law.  And you did that when you

25     swore your oath as jurors.  But we stand when you come into

1  the room, because you and only you are the judges of the

2  facts.

3          And in our system, if you listen to the judge's

4  instructions, you'll hear the values that we have as a

5  society.  Of reasonableness, of care.  And we don't trust the

6  application of those values and those laws to anyone but our

7  citizens.

8          And so you are going to be asked after you answer the

9  questions that Mr. Stern talked about, to answer the questions

10  about the damages that have been caused to these four kids.

11  And I'd like to talk to you about those.

12          The judge will tell you that if you decide that a

13  plaintiff is entitled to damages, it's your duty to determine

14  the amount of money that reasonably, fairly, and adequately

15  compensates him or her for each elements of those damages.

16          We're going to talk about those elements.  The amount

17  of money for certain of these damages, and we'll talk about

18  them, cannot be proved in precise dollar amounts.  When we're

19  going to be talking about the mental anguish that these kids

20  have experienced, that they will experience, the

21  embarrassment, the humiliation, the loss of enjoyment of

22  life's pleasures, those are not things that there's a table

23  that's going to be given to you to say look how hold they are,

24  look how long it's lasted, and here's the right amount.

25          It's not like an economist can come -- and when

```
 1    Dr. Crakes took the stand, he told you he did not evaluate
 2    them.  We trust those to our citizens.  We trust the
 3    evaluation of those things as Judge Levy said, "because the
 4    law knows no better standard than our people."
 5            And so you're going to be asked if you find -- and
 6    I'm not going to go through this for each one of the kids,
 7    because that will take too long.
 8            But if you find that Emir or Aundreya or Daylaana or
 9    Riley sustained damages of mental anguish, denial of social
10    pleasure and enjoyment, embarrassment, humiliation up until
11    today, up until the time that you tell the Court that you have
12    reached a verdict, you're going to give a dollar amount for
13    that.
14            And we'll talk about how we can think about those
15    types of things.  And then separate and apart from that,
16    you're going to be called upon to talk about the disability,
17    the loss or impairment of neurocognitive function and why
18    that's so important to think about, especially when we're
19    talking about kids.
20            And from the time that they experience their first
21    symptoms until the time that you render a verdict, you're
22    going to be asked to put a dollar amount on that.
23            You're also going to be asked and tasked -- and it's
24    an awesome responsibility -- to look into the future for these
25    kids.
```

```
 1            If you find that it's reasonably certain that Emir is
 2    going to suffer from these neurocognitive deficits, the loss
 3    of enjoyment of life's pleasures, the mental anguish, the
 4    embarrassment, the humiliation into the future, you're going
 5    to be given a chart, and you are going to be tasked to fill it
 6    in year by year by year for the time that you believe that
 7    each of these kids are going to suffer.
 8            And the same thing is true with the disability, the
 9    loss or impairment of neurocognitive function.  And we'll talk
10    about how the evidence has shown us that that changes over
11    time and becomes more pronounced and has a more profound
12    effect and will have a more profound effect on these kids as
13    they get older.
14            You'll be asked about economic losses, loss of
15    earning capacity.  We had Dr. Crakes, the only economist to
16    testify in this case, come and talk to us about that.  And,
17    again, you'll be given a chart starting at age 18 for each of
18    the kids and going through the period until age 67, which is
19    the work life expectancy that was provided by Dr. Crakes from
20    the tables for each year.
21            And one of the things that's going to be absolutely
22    crucial for you in order for you to give a fair and adequate
23    amount of money to each of these kids is to listen to the
24    judge's instruction that when you award damages for what's
25    going to happen in the future, you have to do it in
```

1    undiscounted money.  What the money, what the salary is going

2    to be in 2057.  What's the worth of a dollar then.

3            And Dr. Crakes explained to us that money in the

4    future, if you want to put it in present value, is much less.

5    You're not going to discount to future -- to present value,

6    because you're sworn an oath to award in future dollars and

7    not to reduce or discount to present value.

8            And that's so important if you're going to keep your

9    oaths to fairly and adequately compensate these kids.

10           So let's talk a little bit about something that's

11   going to come before -- that's in the jury form after damages.

12   I'm going to reach damages in a minute.  But I'd like to talk

13   to you about what Corey talked about as the burden that the

14   defendants have when it comes to other people who they claim

15   are responsible.

16           And there will be nine entries, nine lines on the

17   verdict form for the people that they blame for the Flint

18   Water Crisis and the injuries that these children have

19   suffered.

20           The defendants bear the burden of proof.  They had to

21   come forward in the same way that we did to prove their claims

22   against these entities and these individuals.  You should

23   consider, I believe, that they failed to call a single expert

24   witness to talk about any of these.  Just absolutely failed.

25           And they have to show not only that somebody acted

1    unreasonably under the circumstances so that they breached

2    their duty of care, but they have to show that that breach of

3    a duty of care proximately caused injury to each of these

4    kids.

5         And so let's talk about the people and the entities

6    that the defendants seek to blame here.  There's former

7    Governor Richard Snyder.  Unlike anybody from the defendants,

8    certainly unlike William Fahey, who got up and said we did

9    absolutely nothing wrong.  Robert Nicholas, David Gadis.

10        Governor Snyder accepted responsibility, because it's

11   the right thing to do.  He's the chief -- he was the chief

12   executive of the state.  He understands that that comes with

13   responsibility.  And he accepted his responsibility for the

14   state's role in the Flint Water Crisis.  What does that have

15   to do with Daylaana, Emir, Riley, and Aundreya particularly?

16   We'll see.  But at least he had the honesty and the integrity,

17   no matter what your politics, to accept responsibility.

18        Gerald Ambrose, as Corey mentioned, this claim is not

19   against the emergency manager's office.  We'll talk about

20   where the claims against the emergency manager's office lie.

21   But this is against Mr. Gerald Ambrose.  And what did Gerald

22   Ambrose do that was so wrong?

23        He relied on VNA.  He was at the public meeting where

24   VNA, based on Marvin Gnagy's mistake, stood up and told the

25   people time and again, "Your water is safe."  And all he said

1    was "If the water is safe, I cannot responsibly say we're

2    going back to Detroit and pay $12 million for the year.  I

3    can't do it."

4         That's what Gerald Ambrose did wrong here.  He relied

5    on VNA.

6         Darnell Earley, he testified that he relied on LAN.

7    LAN was the consultant engineer when he was the emergency

8    manager, and he relied on them to design the plant the way it

9    should be designed.  He didn't know anything about it.  If

10   Darnell Earley is personally at fault, it's because he relied

11   on the people at LAN.

12        Ed Kurtz, all he did was he hired LAN.  He was the

13   emergency manager in June of 2013, which we went over

14   yesterday with Mr. Ramaley, at a time when LAN for every

15   important or crucial thing didn't put it into their reports or

16   their proposals.

17        If pH and alkalinity were so important, they weren't

18   important enough to put in the proposal, the contract, or the

19   change order.  If a 60- to 90-day test run was so crucial as

20   Mr. Ramaley wanted us to believe, it wasn't important enough

21   to make it into a single document.  But that's what Darnell

22   Earley -- that's what Darnell Earley relied on.

23        And Ed Kurtz, he was out of the picture after signing

24   the contract to bring in LAN.  If he's responsible, it's

25   because he hired LAN.

```
 1            The State of Michigan.  The State of Michigan has
 2    different departments in it as we've learned.  Mr. Muchmore
 3    talked about that.  Governor Snyder talked about that.  The
 4    MDEQ, we've heard a lot about them.  The Department of the
 5    Treasury, we've heard a little bit about them.  The Health and
 6    Human Services Department, we've heard virtually nothing
 7    about.
 8            And yet the defendants seek to lay blame at the foot
 9    of the MDHHS.  They seek to lay blame without any evidence
10    that the treasury department did something wrong.
11            Now, it's true, the emergency managers reported to
12    the treasury who reported to the governor.  But what did
13    anyone at the treasury department do to harm any of these
14    kids?  It might be that if you throw enough spaghetti at the
15    wall, something sticks.  But that's not our system of justice.
16            When we took our oaths, lawyers, judges, we swear to
17    uphold the law.  When you took your oath, you swore to truly
18    judge this case according to the law and the evidence.  And
19    spaghetti is not evidence.
20            The MDEQ, they did make a mistake.  Their
21    interpretation of the lead and copper was wrong.  It was a
22    violation of the Lead and Copper Rule to open up this plant
23    without corrosion control and without a corrosion-control
24    study.
25            And that's the basis of their claim against the MDEQ.
```

```
 1    But their own expert yesterday, Mr. Ramaley, refused to agree.

 2    He says, "I don't agree that it was a violation of the LCR."

 3    I'm here to tell you even though it's not in the interest of

 4    my client, Mr. Ramaley was wrong.  The MDEQ was wrong.

 5            They admitted they were wrong in August of 2015 when

 6    they wrote to the city and said, "Put in a corrosion-control

 7    study, and you've got less than six months to do it.  Because

 8    we were wrong.  We made the mistake in how we interpreted the

 9    Lead and Copper Rule."

10            But I guess Mr. Ramaley thought that he's here for

11    LAN.  And if I'm asking a question, it's not really good to

12    agree so much.  Just the way he wouldn't agree with

13    Mr. Del Toral from the EPA who actually wrote the regulations

14    for the LCR.

15            And so we believe that the MDEQ bears a share of

16    responsibility.  And therefore, the State of Michigan of which

17    it's the department for on that line, there should be a share

18    of responsibility.

19            The U.S. EPA, we heard from two witnesses of the EPA,

20    Jennifer Crooks, who there's a document in evidence.  I'm

21    sorry.  I didn't have it.  I just thought of it.  She says,

22    "We've got to work -- let's put aside our differences with

23    MDEQ.  We see it one way.  They see it another.  We've got to

24    put aside our differences and work to help the people of

25    Flint.  That's what we have to do."
```

1              That's what she's to blame for?

2              Mr. Del Toral came in February, stayed in March,

3      April, wrote his report, went out on sick leave, came back.

4      His actions are what we should blame the EPA for?

5              We'll talk about the EPA in a minute.

6              Dayne Walling, again, this is a claim not

7      Mayor Walling.  Because the judge is going to instruct you

8      that if you find any fault for Mr. Ambrose, Mr. Kurtz, or

9      Mr. Earley as the emergency managers, that's fault that lies

10     under the City of Flint.

11             Similarly, if you find that Mayor Walling has

12     responsibility as the mayor, not as Dayne Walling, that's

13     fault that's assigned under the City of Flint.

14             But what did Mayor Walling do?  He called the EPA.

15     "You've got to get here.  You've got to send us somebody right

16     away."  He wrote Governor Snyder.  "You've got to help us.  We

17     need money.  We need help."  He wrote to President Obama.  But

18     he's responsible for the brain damage caused to these four

19     kids.

20             The City of Flint, if you find that any one of these

21     four, Mr. Ambrose, Mr. Earley, Mr. Kurtz, or Mayor Walling in

22     their official capacities breached their duty of care, that

23     falls under the City of Flint.

24             And then finally Rowe Engineering.  We brought an

25     expert to explain exactly where Rowe Engineering breached the

```
 1    standard of care.  We showed you the contracts that each LAN
 2    and VNA had with the City of Flint.  We got their expert,
 3    their own expert to admit that lead and corrosion was within
 4    the scope of VNA's responsibilities to the state.  And the
 5    city.
 6            Where was the expert to talk about what did Rowe do
 7    wrong as a professional engineer?  Because the question with
 8    Rowe is going to be the same as the question with LAN and VNA.
 9            Did they breach the standard of care for a
10    professional engineer, and did that breach of the standard of
11    care for a professional engineer proximately cause these
12    injuries?  And all we knew about Rowe is that sometimes -- and
13    pay attention to the evidence -- sometimes they acted as the
14    city engineer.
15            They weren't hired as the city engineer to look at
16    everything.  And the evidence was for Mr. Glasgow, Mr. Croft,
17    that when it came to the design and the implementation of the
18    design for the Flint Water Treatment Plant, it was LAN, not
19    Rowe.
20            And so let's talk a minute about the EPA.  Yesterday
21    at the close of evidence, at the crescendo of Story number 2,
22    we heard and saw a report by the EPA.  What the United States
23    Environmental Protection Agency did is what responsible people
24    do.  We hope that our government acts like this.  We hope that
25    after a crisis like the Flint Water Crisis, they can sit down,
```

 1   and they can say, "Let's reflect.  Let's be honest.  Let's

 2   have integrity.  And let's admit we could have done better."

 3              And that's what they did.  That's what the EPA did.

 4   And this is the basis of the claims by LAN and VNA.  But

 5   there's one problem.  It's an inconvenient problem for these

 6   defendants.  It's called the law.

 7              Judge Levy instructed you yesterday and will give you

 8   the instructions that in determining whether a defendant or a

 9   nonparty breached its duty, you may not view that defendant's

10   or nonparties' actions through the lens of hindsight.  You

11   can't say, "Oh, now we're sitting here in 2022, and in

12   hindsight, it didn't work out."

13              You have to say with what they knew and what they did

14   in realtime at the time was it reasonable.  So let's look at

15   what the EPA did in realtime.  What did they do?  VNA actually

16   told us.  Because they entered into evidence yesterday

17   Plaintiffs' Exhibit 1602, which was a January 21, 2016, fresh

18   off the switch back to Detroit, this administrative order by

19   the EPA, and they detailed what they had done.

20              April 24.  This is almost two months now when Miguel

21   Del Toral is there on behalf of the EPA working with LeeAnne

22   Walters, testing her water, thinking at first that it was a

23   one-off, and then finally realizing that this is a systemwide

24   problem.  Something that these defendants pretend they could

25   never have figured out.

1              He needed two things to know it.  Lead pipes.  No

2       corrosion control.

3              And when Miguel Del Toral says, "No corrosion

4       control," he didn't say, "No corrosion control.  Oh, except

5       for that water softening."  In realtime, no one considered

6       that.  That's Story number 2.

7              April 24, they're notified by the MDEQ.  May and

8       June, they're expressing concern.  They're working the

9       problem.  They're sending their people to work at

10      Mayor Walling's request to be part of the advisory committee,

11      the Technical Advisory Committee.

12             June 21, they discuss with the MDEQ the city's lead

13      drinking water.  Miguel Del Toral issues his preliminary

14      report.  August -- I mean, July -- June was the report.  July,

15      August.

16             August 31, they had a call with MDEQ to discuss

17      outreach to the citizens to reduce exposure.  This is Jennifer

18      Crooks saying, "Let's put aside our differences.  We don't

19      agree, but we've got to work for the health and welfare and

20      safety of the citizens of Flint."

21             September 3, Mayor Walling invited the EPA to get

22      involved.  Help us.  September 27, Susan Headman calls the

23      MDEQ director Dan Wyant.  October 7, the Technical Advisory

24      Committee with the EPA says, "Go back to Detroit."

25             And on the 16th, less than two weeks later, it's

1   done.  Something VNA says could never have been done with no

2   information greater than what VNA knew in February.  That's

3   when they switched back October 16.

4         April 24, after Del Toral's there for two months.

5   May, June, July, August, September, October.  That's what the

6   EPA did in realtime.  And if you follow the law and apply the

7   instructions of Judge Levy, you can't say, "Oh, we looked at

8   it a year later.  And you know what?  We want to do better.

9   We want to do better for the citizens of this country to make

10  sure they have safe drinking water, and so we could have done

11  better then."

12        We do not believe that the defendants have carried

13  their burden of proof with regard to the EPA.  We believe

14  there is evidence.  As Corey said when he stood up in front of

15  you five and a half months ago, there are other people

16  responsible.  It was their burden to prove it.

17        Governor Snyder accepted responsibility.  The MDEQ

18  made their mistake, and it impacted these kids.  The City of

19  Flint, they didn't run that plant well.  At all.

20        At the end of the verdict form, you're going to be

21  given a chart to fill in with a column for each of the kids --

22        THE COURT:  Mr. Maimon, you have to speak into the

23  microphone, or you won't be heard.

24        MR. MAIMON:  I'm sorry, Your Honor.

25        THE COURT:  I'm sorry.

```
 1              MR. MAIMON:  I thought my loud voice would be enough,
 2    but that's okay.
 3              You're going to be given a chart with columns for
 4    each of the kids to be given that you believe for each
 5    responsible party that they contributed to the injuries.  And
 6    it's not without guidance that you're going to do it.  Because
 7    in the instructions, it tells you that the percentage of fault
 8    you should consider the nature of the conduct.
 9              Was Ed Kurtz just trying to save money?  Was Darnell
10    Earley just trying to do his job and get them out of the red
11    and into the black?  Did the MDEQ make an honest mistake, an
12    honest mistake saying, "This is the way we've interpreted this
13    rule for years.  We think we're right"?
14              Did the City of Flint try their best?  Did Mike
15    Glasgow try his best?  Were they constrained by the amount of
16    money they had to hire staff?  Still responsible but that and
17    the extent to which their conduct caused or contributed to the
18    injury.
19              And I'm going to suggest to you that the evidence
20    suggests and the evidence supports an allocation of fault
21    among the responsible parties at 50 percent for VNA, 25
22    percent for LAN, 5 percent for Governor Snyder, 10 percent for
23    the State of Michigan, and maybe 10 percent for the City of
24    Flint if you add in all the people.
25              Now, why such a difference between LAN and VNA?  VNA
```

1     -- LAN was there first.  LAN designed the plant.  Why do we

2     believe that the evidence, the science actually supports this

3     difference in allocation?

4          These are the experts.  These are the people who were

5     brought in to make sure that the plant was safe.  These are

6     the people who were brought in to say, "Design the plant" --

7     and Jeffrey Hansen admitted that LAN's responsibility was to

8     design upgrade so that it could be used safely.

9          VNA's expert admitted that lead and corrosion were

10    part of the scope of responsibility to the city.  But why such

11    a difference and why such a difference if VNA, "We were only

12    there for a month."

13         Why such a difference?  Put aside the nature of their

14    conduct and the fact that VNA has not been honest.  This whole

15    idea that orthophosphates was in the report where the lie was

16    put to it by Marvin Gnagy's own testimony.  Put aside that

17    they did not recommend a corrosion-control study and the

18    attempts to read a report in such a tortured way only to

19    escape liability.

20         But why does the science support what we suggest?

21    One of our -- our first witness was Dr. John Hoaglund, who's

22    in back there.  And Dr. Hoaglund, in addition to explaining a

23    lot of chemicals to us and explaining why the water was more

24    corrosive in the Flint River than Lake Huron, something

25    evidently was above Dr. Gagnon's $250,000 pay grade, and why

1    the treatment that actually occurred in the plant made the

2    corrosiveness of the water worse, he showed us from the Masten

3    article itself, which talked about the Flint Water Crisis, the

4    changes in the pH and alkalinity starting in May of 2014,

5    which was when it started, and ending in October of 2015,

6    which is when they went back to DWSD.

7            And I think it was Dr. Lawler or Mr. Ramaley, I don't

8    remember which one, we put this up, and we said, "Do you at

9    all disagree with the numbers here?  These reflect what was in

10   the monthly operating reports."

11           He said, "No, that's absolutely accurate."

12           But take a look at what happens when you divide up

13   what happened before VNA and what happened after VNA.

14           Before VNA there was fluctuation in both the pH and

15   the alkalinity, but it was pretty stable.  It was pretty

16   stable at that 7 to 8 range, which, by the way, the Brown

17   article that Dr. Lawler cited as guidance says put in the

18   orthophosphates, and keep it in that range.  It was in that

19   range.

20           After VNA came to town, it went off the cliff.

21   That's the science.  That's the unrebutted proof.  There's no

22   messing with those numbers.  And that's why we believe that

23   VNA holds the primary responsibility for what happened to

24   these kids.

25           They were the second set of eyes.  They were who were

1   brought in to take a look at the system, the distribution

2   system.  They're the ones who said, "We've got it.  We'll take

3   a look at it all, and we'll tell you what's needed."

4          And they're the ones who stood up in public when they

5   knew otherwise and said, "The water's safe."

6          So let's get back to damages.  The damage done.  And

7   you can't divorce the damage that was done from who these kids

8   are.  And so let's talk about the categories of damages and

9   what happened to each of these kids.

10          For damages up through today, you're going to be

11   called to talk about the mental anguish, the loss of enjoyment

12   -- the loss of social pleasures and enjoyments, embarrassment,

13   humiliation.  And separate and apart from that, the loss or

14   impairment of neurocognitive function.

15          And forget about the fact that Dr. Gaitanis chose not

16   to look at these kids.  Forget about the fact that

17   Dr. Thompson didn't bother, didn't take time to talk to these

18   kids.  Don't even think about Dr. Krishnan and Dr. Bithoney

19   for a minute.

20          Who knows these kids better than their moms and dads?

21   Who knows Aundreya Teed better than Apricott Berry?  Apricott

22   came in and told the truth.  And for telling the truth, she

23   was assailed by the lawyers for VNA.  Almost accused of

24   causing the harm herself, because she let her daughter drink

25   the water.  That's so disgustingly ironic that the experts are

1    blaming the moms for this.

2          When Ms. White, the daycare teacher for Aundreya Teed

3    was cross-examined by the lawyers for VNA, "You let the kids

4    drink the water?"  These are the same people who told

5    everybody the water's safe.  I guess the question is:  You

6    actually listened to us?  We were there for a paid due

7    diligence.  We were there to upsell.  Didn't you know that?

8          What did Apricott tell us about her daughter?  She'd

9    seen extreme changes in Aundreya.  Aundreya has shame because

10   of her limitations, a lack of interest.  And I don't how to

11   spell interest, either.  And this is straight out of the

12   transcript.  A butterfly, bubbly kid not herself anymore.  She

13   doesn't socialize.  She feels shame.  She has a lack of

14   interest.

15         All of this, Dr. Krishnan told us, is a result of her

16   acquired brain injury.  And all of this, Dr. Bithoney says,

17   has one cause and one cause only, and that wasn't rebutted by

18   anybody.  And that's the water in Flint.

19         She's judgmental about herself.  She's unsocial.  She

20   has awkwardness.  Now, maybe in Story number 2, in the world

21   that their experts live in, that's just normal, not a problem.

22   But in Story number 1 in the real world when a mom sees it and

23   knows that it's abnormal of their kids, that's evidence.

24         Riley Vanderhagen, her mom came and gave us testimony

25   that Riley is distracted.  That she's angry, that she's easily

1    frustrated.  She told us that she gets distracted, angry.

2    Anywhere and everywhere.  She's angry anywhere, and it doesn't

3    take anything to do it.  It goes instantly.

4          Her grandma, Sherry Vanderhagen, told us that she

5    loses her temper out of nowhere.  She gets frustrated.  She

6    gets angry.  She's forgetful.

7          Her father, Phil, said, "You know what?  We're very

8    worried."  And this was the most ironic part.  Because the

9    cross-examination of all these people by the lawyers for VNA

10   and sometimes LAN was, "Well, look how well they're doing on

11   their report card in this grading period."

12         Who knows the schools that their kids go to.  Who

13   knows that at the end -- or during COVID, all you have to do

14   is show up to get a good grade.  Who knows that in younger

15   grades, the schools are pushing their kids through, that

16   they're helping them through, that they're helping them

17   overcome their challenges.  And that's what our schools should

18   be doing.  And that's what parents should be doing.

19         But that doesn't excuse the damage that's done.  And

20   he said, "What about when she gets to middle school?  What

21   about when she gets to high school, and there's going to be

22   nobody there to say, 'Did you hand in your homework?  Did you

23   forget it'?"

24         The anger.  Her head pops off.  She can't explain

25   something.  She's frustrated.  She's angry.

| | |
|---|---|
| 1 | Emir's mother came in and talked about the fact that |
| 2 | he's become an introvert.  I don't know if you remember. |
| 3 | Every time I look at that corner above the camera, I think of |
| 4 | Emir climbing the walls.  And it's not like some kids who do |
| 5 | it just because it's fun.  It's because he can't help it. |
| 6 | That's that impulsivity that Dr. Krishnan talked about. |
| 7 | That's not something that's normal.  That's not something |
| 8 | that's good.  That's something that was caused by the brain |
| 9 | injury from the water that they were responsible for. |
| 10 | He has an attitude problem.  He's destructive.  He |
| 11 | went from being bubbly to an introvert.  An attitude problem. |
| 12 | He bites his nails down until they're bleeding.  Dr. Gaitanis |
| 13 | is going to tell us that that's normal?  He's destructive. |
| 14 | Daylaana Ware.  Her mother, Dayquichisa, came in and |
| 15 | told us she has a lack of focus.  She lashes out.  She's |
| 16 | forgetful.  She talked about how hard it is for Daylaana to |
| 17 | stay focused.  I'll never forget the story of the towel. |
| 18 | "Daylaana, go upstairs and get a towel."  She goes to |
| 19 | the stairs.  She forgot what she was supposed to get. |
| 20 | "Daylaana, go upstairs and get a towel."  Daylaana goes to the |
| 21 | top of the stairs and can't remember the instruction. |
| 22 | This is the same thing that Dr. Krishnan saw in her |
| 23 | testing and observed.  And it's something that the defense |
| 24 | experts chose to be blind to by choosing -- because |
| 25 | Dr. Gaitanis said, "When a doctor who's referring wants me to |

1    see a patient, I'll see a patient."

2         And I asked him, "You weren't working for another

3    doctor here, were you?  You were working for these lawyers,

4    and these lawyers didn't ask you to see the patients, did

5    they?"  They chose the limitations on their own experts.

6         Her grandma, Janeze Jackson, talked about how this is

7    not the little girl that she knew.  She lashes out.  She has

8    mood problems, attitude problems.  She's become a loner.

9    Sometimes the lashing out is physical.

10        And so one of the hardest things that we ask our

11   jurors to do, it's not -- I'm going to tell you, and I'm going

12   to tell you in a little bit how much respect we have for

13   everything that you've done and the role that you play and the

14   responsibility that you have.

15        But determining right from wrong, that's something we

16   all know about.  We know what's right, and we know what's

17   wrong.  And determining when an expert of the credentials and

18   experience as Bill Bithoney comes in and says, "I've looked.

19   And I'm telling you this is what caused this harm," and they

20   don't bring anybody to say differently, that's not that hard.

21        And when you look at the other entities or people,

22   you know right from wrong.  But the most sacred thing that we

23   entrust to our jurors is to say, "What is the value of the

24   harm done?"  You've done some heroic things showing up.

25   You're not Marvel characters, but you're pretty darn close.

1           But you can't fix their brains.  And unfortunately,

2    nobody can fix their brains.  Lead, once it causes brain

3    damage, it's permanent.  That's the unrebutted testimony.

4           The only thing that our law, that our values allow

5    for are monetary damages.  And so that is the awesome

6    responsibility that you have.  And the first thing that you

7    have to do is you have to take a look for each of these four

8    kids and say from the time that they started having the

9    problems, 2015, 2016, until now, five years, what is the value

10   of that?  Is it $50,000 a year, which would be $250,000 a

11   piece for these kids?  Is it a hundred thousand dollars a

12   year, which would be $500,000 for these damages?  That is

13   sacredly in your province.  Sacredly something we only trust

14   jurors to decide.

15          The same thing is true for the impairment, loss of

16   impairment, and neurocognitive function.  This is very real.

17   A limitation -- if I got in an accident and couldn't raise my

18   arm above this level and was limited, I'd know what it is, and

19   I'd know why it happened, and I'd know what my limitations

20   are.  I submit to you this is so much worse.

21          A, because they're kids.  B, because they don't know

22   why these things are happening.  Why does Emir climb the

23   walls?  Why can't Daylaana remember to go up and get the

24   towel?  Why does Aundreya not want to be friends anymore, even

25   with her twin sister?  Why does Riley have mood problems, have

1    focus problems?  They don't even know.

2           And that impairment in and of itself is compensable.

3    Is five years, is $50,000 a year the appropriate amount?  Is a

4    hundred thousand dollars a year the appropriate amount?

5    That's for you to decide.  It's for you to decide for each of

6    these four kids.

7           But now we're going to talk about the future.  And

8    most of what Dr. Krishnan talked about is implicated for the

9    future.  I put up there all the exhibit numbers.  Please don't

10   try and mark them down.  These are the school records that she

11   looked at.

12          She didn't ignore a good marking period.  She didn't

13   ignore a comment, an encouraging comment by a teacher that

14   Emir is a leader.  She didn't ignore that Riley has made

15   improvement.  She didn't ignore anything.  She looked at all

16   of the records.  She spoke to each one of the kids.  She

17   tested them individually.  She observed them during her

18   testing.

19          And here's what her testing shows, and here I believe

20   is the dishonesty of the defense.  We went over this, but we

21   didn't see this.  When Dr. Krishnan talked about Aundreya's

22   problems with disinhibition and impulsivity, she talked about

23   the teacher report of blurting statements out in school.  Now,

24   Dr. Thompson said, "Yeah, I looked at the records."  But he

25   didn't address this specifically.

```
 1              When she said she showed impulsive behavior during
 2    testing, remember Dr. Thompson chose not to observe Aundreya.
 3    When she said she commissioned -- there were commission errors
 4    under the AARS, Dr. Thompson's slides were silent to it.  He
 5    chose not only not to see these kids, but he cherry-picked
 6    what he would respond to with regard to Dr. Krishnan and say,
 7    "Oh, I think that's normal."
 8              For problems focusing, there was a specific report by
 9    a teacher that Dr. Krishnan outlined.  Dr. Thompson did not
10    address that specifically.  She talked about the AARS test.
11    Dr. Thompson didn't address it.  This difference occurring in
12    2 percent or less in children, Dr. Thompson, in the slides
13    that he showed you, that they put him on the stand to show you
14    didn't address it.
15              Weakness and verbal reasoning.  Yes, Dr. Thompson got
16    up and said, "I looked at the WISC-V test.  Shows normal
17    intelligence."  But he didn't address the impaired performance
18    on the test of analogical reasoning.  That's a subpart.  And
19    so they thought they could say, "Oh, I looked at it.  He's got
20    normal IQ," and not address what Dr. Krishnan did in a
21    thorough and complete evaluation.
22              Not addressed by Dr. Thompson.  Dr. Krishnan talked
23    to Apricott Teed -- Berry.  Dr. Thompson chose not to
24    interview her.
25              The Vineland test, Dr. Krishnan showed you how it was
```

1    abnormal.  Dr. Thompson, "Oh, that's in order with standard

2    deviation.  Not a problem."

3            The BASC-3, 88th percentile of aggression compared to

4    her peers.  That's the data.  That's the result.  He says,

5    "That's normal."

6            Emir, the Montessori report, not addressed.  The

7    parents being afraid of labeling their children, he didn't

8    bother to interview anybody.  The BASC-3, he says that's

9    normal even when 97 percent of kids do better.

10           Impulsivity.  Dr. Krishnan saw it when she was

11   testing Emir.  He chose not to observe Emir.  Poor focus.  He

12   chose not to observe Emir.  He didn't address the CVLT.  It

13   was not interesting testimony, I'm sorry, Corey, to have her

14   go through all the tests and what they're there for.  But it

15   was important.  It was the science.

16           They deserved it.  These kids deserved a thorough

17   analysis of them, not some, "Send me some records, and I'll

18   tell you that they're normal."

19           Dr. Thompson chose not to observe Emir.

20           He didn't address the kindergarten comment.  He

21   didn't address the implementation of the reading intervention

22   plan for Riley.  He didn't address the strong proactive

23   interference in the CVLT-C test.  And with the depressive mood

24   symptoms under the BASC-3 were 82 percent, he says, "That's

25   normal."

1              The impaired visual reasoning on the WISC, he says,

2       "That's normal."  The high error rate on the WCST, he didn't

3       address it.

4              For Daylaana, it's the same thing.  Dr. Thompson

5       either says it's normal or he doesn't address it or it's

6       something that he doesn't have the ability to comment on,

7       because he chose not to look at these kids.

8              The BASC-3, he says, "It's normal," every time.  No

9       matter how badly they perform.  Impaired performance, not

10      addressed.  The discrepancy between the visual and the visual

11      reasoning, almost two standard deviations.  Not addressed.

12             And so when you're going to have to fill out those

13      charts and talk about what's going to happen to these kids, I

14      take back what I said about damages, that it's the hardest job

15      that we could ask you to do.  Talking about the future of a

16      kid is really the hardest part.  And it's thankless for you.

17      Because this is their only day in court.

18             This is not something, well, we'll see if you need it

19      later on and then we'll think about it.  This is the only

20      trial for these kids.  And you are the only jury who will ever

21      award them damages for what they suffered.

22             And so we're going to talk about damages in the

23      future, because you are the only jury that will ever decide

24      their cases.

25             Dr. Bithoney, who has seen thousands of kids and

1    knows about lead poisoning like nobody else, told us that it's

2    a downward spiral.  The problems that a kid has -- and it

3    makes sense.  The judge has told you don't check your common

4    sense at the door.  It makes sense.

5          Brain damage that a kid has at 6, 7, 8, once they get

6    to be a teenager, once they get in their 20s, it's only going

7    to be more profound.

8          Dr. Krishnan says these problems will amplify over

9    the course -- I took a quote for Aundreya -- over the course

10   of her career.  And that saying that over time, there are

11   going to be bumps when these things are more profound for

12   them.  When they have to try to get some skills and train.

13   When they have to enter the employment.  When they have to get

14   into personal relationships and marriages.  When they have to

15   earn a living.  When they have kids.  When they start to grow

16   older.

17         Every step of the way, the challenges, the

18   difficulties will amplify.  They'll bump up.

19         It's harder for people to maintain employment.

20   Social interactions.  The problems continue over time.

21         So let's start with the easiest part of this

22   thankless job.  Because we had a witness on that, Dr. Crakes.

23   He was the only economist who came, and his testimony was

24   unrebutted.

25         And what he said is, "I can't tell you anything about

1    these kids individually and what they will be able to do or
2    not be able to do.  I don't have a crystal ball.  I'm an
3    economist, not a soothsayer.  But I do know the statistics of
4    median values, that's right in the middle.  Some people do
5    better.  Some people do worse.  But for each level of
6    educational attainment, I'm going to give you the median
7    values."

8            And the median values of earnings, he said, for high
9    school is about $4,100 per year.  He was asked, "Oh, but you
10   can't say if it's more difficult to graduate high school, more
11   difficult to graduate college that there will be any damage,
12   any loss."  He says, "I absolutely can."

13           That's because we have the median values.  If you're
14   underperforming in your category, you earn less.  If you
15   over-perform, you earn more.  I'm giving you the median value.
16   And I'm going to talk to you about median values.

17           He says, "There would still be losses, even if it was
18   just more difficult."  And so Dr. Crakes talked about median
19   values.  He talked about how do we compare what will happen to
20   each of these kids if they were unimpaired.  We're going to
21   compare what is the difference between whether they don't
22   graduate -- whether they only graduate high school, whether
23   they don't graduate college, or whether they don't get a
24   master's.  Those are the benchmarks.  No one is here to say
25   anything about, you know, what the future absolutely is with

 1    absolute certainty.  We can't do that.

 2          As Dr. Krishnan says, she's rooting for all of these

 3    kids.  But realistically speaking, they're just not going to

 4    make it.  He talked about the fact that over the last 50

 5    years, earnings have grown in this country at 3.5 percent a

 6    year.  And if you look over the last several years, forget

 7    about with the inflation that we have now, they're rising even

 8    more.  The cost, the future values are even more.

 9          But when he talked about discounting, he talked about

10    a 5 percent discount factor and showed us what the result of

11    that is.

12          For Aundreya, for the different scenarios that he set

13    out compared to if she had gotten a bachelor's degree

14    unimpaired, these are the losses, depending on the scenarios

15    according to Dr. Crakes and according to the statistics.

16    According to what the actual data shows us.  Same way as that

17    data showed us that when VNA came to town, everything fell off

18    the cliff.

19          That's compared to a bachelor's degree.  If you

20    believe that she would have gotten a master's degree, the

21    numbers are higher.  For Riley, compared to a bachelor's

22    degree, it's between $3.5 and $6.1 million undiscounted.  And

23    we'll see how to get there.  For our master's between 5 --

24          (Technical interruption.)

25          MR. MAIMON:  I don't know why Siri thinks --

1           THE COURT:  Siri chimes in every now and then.

2           Strike that.

3           MR. STERN:  I'm sorry, Ms. Siri.

4           Between $5.2 and $7.9 million.

5           For Emir, between $5.9 and $8.5 million or

6  $8.4 million if you round down, a bachelors.  If he would have

7  gotten a master's, $7 million to $10.5 million.

8           And Daylaana, between $3 million and $5.1 million.

9  Just the statistics.  And just the median values.

10          And for a master's, 4.4 to 6.5.

11          And the most important thing that I can impress upon

12  you when you talk about future damages is to do it with that

13  growth factor.  Because as the judge has instructed you, you

14  should not reduce or discount.

15          And so you have to have that growth factor in there.

16  And so here's what I did, not because I'm good at math.  I'm

17  not.  And not because I know have to use an Excel spreadsheet,

18  because I asked Ryan to do it for me.

19          I took Dr. Crakes's numbers, and I said, "What

20  happens if we simply start with this number for 2027 for

21  Aundreya when she's going to be 18?"  The loss in that year of

22  $35,630, the difference, not from master's.  Not from not

23  graduating high school, but the median.  That's the number.

24          And what if we grow that by one -- by 5 percent a

25  year, 1.05.  And this is what happens to undiscounted numbers.

1    They look like big numbers.  But you saw Dr. Crakes explain

2    that those big numbers, when we get out 50 years, 54 years

3    from now are actually small numbers in present value.

4           And as the judge has indicated, this is the way it

5    has to happen.  So I'm going to ask you, please don't be

6    scared by big numbers, because they're undiscounted.

7           For Riley, I started with $40,886, which is his

8    number, because she's not going to be 18 until 2031, and it

9    has more time to grow.  That's what he explained to us.  And

10   if you simply multiply by 1.05 each year, and I apologize you

11   don't have a table like this there.  You're going to have to

12   do some multiplication, 1.05, 1. -- whatever the growth factor

13   that you choose to fill in the form --

14          THE COURT:  Did somebody have a question?

15          MR. MAIMON:  No.

16          THE COURT:  That's an excellent question, though.

17   The PowerPoint -- remember when I told you about demonstrative

18   exhibits versus evidence that's received?  All of the

19   PowerPoints are what we call demonstrative exhibits and are

20   not considered evidence.

21          MR. MAIMON:  But all I did, as I told you, is I

22   started with a number, and I grew it 5 percent a year.  If you

23   think the right number is 4 percent, it grows at 4 percent a

24   year.  If you think the right number is 6 percent, it grows at

25   6 percent a year to be undiscounted.  That's your choice.

July 20, 2022                                                    7667

```
 1              Dr. Crakes talked about 5 percent, but it's your
 2    choice, because you're the jury.  You're the ones who make the
 3    decision.  That responsibility, thankfully, is yours.
 4              For Emir, I started in 2019, when he was going to be
 5    18 with $38,168.  And for Daylaana, we started in 2026,
 6    $34,425.  And this is what happens, and it grows at 5 percent
 7    a year.
 8              Now, I told you that this was the hardest part.
 9    Wrong again.  The really hardest part, the part where we bring
10    our humanity.  The part where we can't feed it into a
11    computer.  There's no Excel spreadsheet.  And that's the
12    damages that are not economic in nature.
13              The mental anguish, the loss of enjoyment, social
14    pleasures, embarrassment, humiliation.  These must also be
15    awarded in future values.  They have to be growing, otherwise
16    the present value is not what you intend.
17              And so for each one of these, I put together just as
18    a demonstrative to show that we start in 2022, because we
19    still have time -- you wouldn't believe it by how long we've
20    been here, but we still have time in 2022.  And to be fair and
21    adequate and full damages, these kids deserve the rest of the
22    year.
23              But whatever it is, even if you start in 2023,
24    whatever the number is, that has to be grown also to account
25    for it being awarded in undiscounted numbers.
```

1           And if you decided that $25,000 a year was the right

2     amount up until this point in time for mental anguish, denial

3     of social pleasures, embarrassment, humiliation, maybe you

4     start there, and you grow it there.  If you decided that

5     $50,000 was the right number for that, maybe you start there,

6     and you start growing it there.

7           But here's why it's really the hardest, hardest part.

8     Because there are bumps.  There are jumps.  There are times

9     and points in life when the impacts of injuries like this

10    become more and more profound.  We talked about what they are.

11    The milestones of life.

12          And as these kids express and experience those

13    milestones, the profundity, how deeply this will impact them

14    will jump.  And so I'm not going to tell you what year it

15    happens in.  I'm going to ask you, though, to consider that

16    along the way, as we move from 2022 to 2032, 2042, 2052,

17    consider the bumps and the jumps along the way.

18          When it is called for to give reasonable

19    compensation, to fully and adequately compensate these kids

20    for what they went through, to say, "No, at this point, a

21    5 percent growth factor is not enough.  It has to be jumped

22    up.  It has to be a quantum leap at that point to a new level

23    to account for what's going to happen in their lives at that

24    time."

25          And then at that point, grow by whatever factor you

1    believe is the right amount to award in undiscounted forms.

2    You decide based on the evidence, Dr. Krishnan and

3    Dr. Bithoney testified and it was uncontroverted that there

4    are big jumps.  It does spiral every step of the way, and it

5    will be more profound along the way.  And so this is the task

6    that you're going to be faced with.

7            And I want to end where we began.  Because this case,

8    if I had to put it in one word, the word I would use is

9    "responsibility."

10           We took on the responsibility to represent these four

11   kids.  And because we did, I want to apologize to each and

12   every one of you for the time that we took that we didn't have

13   to take.  Showing another videotape, asking another question,

14   putting another exhibit in.  Objecting where we felt that it

15   was appropriate.

16           I know we tasked your patience.  I know that there

17   could have always been one less question.  There probably

18   could have been a half hour less of questions a lot of times.

19   And so I apologize for that.  But we were doing that because

20   we had a responsibility.  We thanked you up front for

21   understanding that we're not going to parade Emir and Daylaana

22   and Riley and Aundreya here.  We don't believe they deserve

23   that.  That's not what this is about.  This is not a show.

24           And we thanked you in the beginning.  I want to thank

25   you again for understanding that that's not what we did.  You

1    didn't get to meet them in person.  That's our responsibility.

2          The judge has responsibilities.  The judge is a

3    Federal District Court judge of the Eastern District of

4    Michigan.  She's the judge of the law.  She is responsible for

5    making all the legal rulings.  She talked about that.  She's

6    responsible for giving you the legal instructions that you're

7    to follow and saying, "You have to follow this."  She's

8    responsible for telling the lawyers, "Move on."  And we have

9    to listen to it.

10         You have the awesome-ness of responsibilities, to

11   render a verdict.  To say, "You know what?  Right is right,

12   and wrong is wrong."  And you can do any business you want.

13   You can try and upsell anybody you want.  You can try to put

14   in bids for the KWA if you want.  And that's what this country

15   is all about.

16         But when people get hurt, you can't run away from

17   your responsibility for it.  You have the responsibility to

18   render the verdict.  They've shirked their responsibility.

19   They haven't accepted an ounce of it.

20         And so everybody has acknowledged responsibility

21   except VNA and LAN.  Unlike the experts that VNA chose to

22   bring to talk about these kids, Dr. Krishnan, as Corey said,

23   heard their voice.  I think Dr. Bithoney heard their voice

24   also.  I'm going to ask you, please, when you deliberate, hear

25   their voices.  Hear their voices and then speak the truth.

July 20, 2022                                                    7671

```
 1              I want to thank you for your dedication.  I want to
 2    thank you for your sacrifice.  I want to thank you for your
 3    attention.  I want to thank you for your patience.  And most
 4    of all, I want to thank you for your justice.
 5              THE COURT:  Okay.  Thank you, Mr. Maimon.
 6              And now, as promised, we'll take another short break.
 7    And then we'll turn right to the VNA closing argument.
 8              THE CLERK:  All rise for the jury.
 9                          (Jury Out)
10              THE COURT:  All right.  We'll be in recess.
11                          (Brief Recess)
12              THE CLERK:  Please be seated.
13              THE COURT:  Mr. Stein, I understand that -- Leslie,
14    can you ask Bill to bring the jury -- that your closing may go
15    about a half an hour.
16              MR. STEIN:  I think it's about two hours long.  Again
17    I'm fine stopping at 2:00 and then picking up tomorrow.
18              THE COURT:  I'm going to -- I've asked Bill to ask
19    the jury if today they can stay until 2:30 so that you don't
20    have to be interrupted.  So we'll see what we learn.  I'm just
21    standing for myself.  All of the jurors can stay until 2:30.
22    So I think we can get it done.
23              Dr. Hoaglund.
24              DR. HOAGLUND:  Hi.
25              THE COURT:  We saw you at the beginning.  Welcome
```

```
 1   back.  We've been here the whole time.  Have you had the
 2   tremendously hot weather in Nevada?
 3             DR. HOAGLUND:  That's always.
 4             THE COURT:  Always.  But I thought it was getting
 5   even hotter.
 6             DR. HOAGLUND:  It is, it is.  I think --
 7             THE COURT:  Oh, here we go.
 8             THE CLERK:  All rise for the jury.
 9                        (Jury In)
10             THE COURT:  Welcome back.
11             And please be seated.
12             And thank you to the members of our jury for your
13   willingness -- I think Bill communicated you'd be able to stay
14   until 2:30 today.  Good.  Okay.  We all appreciate it a great
15   deal.
16             So, Mr. Stein.
17                  CLOSING ARGUMENT FOR DEFENDANT VNA
18             MR. STEIN:  Thank you, Your Honor.
19             Good afternoon.  I have to say it feels like another
20   lifetime ago when I stood before you in February in my opening
21   statement and tried to introduce this case to you.  And like I
22   think everyone else in this room, I can't believe that we
23   finally made it.
24             For more than five months, you've listened patiently
25   to all of the testimony.  You've watched hours of deposition
```

```
 1    videos.  You've carefully examined the evidence.  I'll say
 2    what everyone else has said, but you have been a remarkably,
 3    remarkably diligent and attentive jury.
 4          And on behalf of the People of VNA and all of the
 5    lawyers, we thank you deeply for your exemplary service on
 6    this jury.
 7          Now, for all this time so far, your job has been to
 8    listen and to observe while the lawyers got to do all of the
 9    talking.  And you've actually even been instructed not to talk
10    about the case with anyone, not even amongst yourselves.  And
11    in a case this long, that cannot have been easy to sit
12    patiently for more than five months listening and not having a
13    chance to speak.
14          I'm sure you all have questions and opinions and
15    ideas about the events and the people that you've heard about
16    over these past five months.  And the good news is, that it
17    very soon will be your turn.  Most likely as soon as tomorrow.
18    You'll finally be able to take a more active role in this
19    case.
20          It will finally be your chance to express your views
21    and to discuss the issues and debate them with your fellow
22    jurors.
23          Now, I expect at least at the beginning, you probably
24    all are not going to agree about everything.  That's not
25    usually how life works.
```

```
 1              But it's really important to us, to all of us and to
 2    our system of justice that each of you participate fully in
 3    your deliberations.  That you each feel empowered to express
 4    your thoughts and your opinions and exchange views with your
 5    fellow jurors.
 6              And it's through that process, that process of
 7    discussion and debate and deliberations that we all know
 8    you're going to reach a true and just verdict.
 9              Now, as Judge Levy explained yesterday, to reach your
10    verdict, you're going to have to go through a series of
11    questions, and you're going to have to address each element of
12    the plaintiff's claims one by one, step by step and see if
13    these gentlemen have met their burden of bringing you the
14    evidence to prove these claims.
15              And, members of the jury, it's not going to surprise
16    you to hear me say that we think when you go through the
17    evidence in that way, when you answer those questions one at a
18    time, that the answers are going to be clear.  And that is
19    that they have not met their burden.  They haven't proven
20    their case, and that your verdict should be in favor of VNA.
21              Now, what I'm going to do this morning is organize my
22    remarks.  You just heard my introduction.  Organize my remarks
23    around three basic themes.
24              The first one is that VNA did good work in Flint.
25    The second one is to respond to some of what you just heard.
```

1    And show that the evidence doesn't show that these plaintiffs

2    are injured.  And, third, that the government officials are

3    really the ones responsible.

4         So what's the first question?  VNA did -- sorry --

5    VNA did good work in Flint.  On this point, we think the

6    evidence really doesn't leave much doubt that VNA was not

7    negligent.

8         What did they do?  They sent two highly skilled and

9    experienced engineers to Flint to perform a one-week

10   assessment of Flint's water system.  During that week, those

11   engineers analyzed every aspect of Flint's water treatment

12   process, and they offered a set of careful, thoughtful

13   recommendations that if anybody had actually bothered to

14   listen, would have actually done a lot of good for the City of

15   Flint.

16        They had the power to speak, and they spoke.  And if

17   the people in charge of the water plant had actually bothered

18   to listen, it might have helped fix Flint's water problems.

19   Flint did the job it was hired to do, and it did that job

20   well.

21        And as I say, I'm going to walk through the evidence

22   on this in much, much more detail in a moment.

23        But that's only the first question you have to

24   answer.  Because to return a verdict for the plaintiffs, what

25   you have to do is then turn, even if you find that VNA was

1    negligent -- and, again, I don't really think you can --

2    you'll still have to answer a whole second set of questions

3    relating to whether or not any of these children have suffered

4    an injury that was caused by something VNA did or didn't do.

5        And I say it's a set of questions rather than one

6    question, because when you look at Judge Levy's instructions,

7    I think you'll see that it's actually a series of questions

8    that all get kind of consolidated together around the issue of

9    injury.

10        You'll have to examine whether you think any of these

11   children are suffering from an injury.  And here I take it

12   they don't think so.  But We think the testimony of

13   Dr. Gaitanis and Dr. Thompson was convincing and should

14   convince you that they're not.  And make no mistake, that's

15   good news.  That's good news that these children seem to be

16   doing well.

17        But even then, even if you conclude that VNA was

18   negligent and you conclude that these children are injured,

19   you'd still have to reach further questions, because you'd

20   still have to decide whether or not that injury was caused by

21   exposure to lead in Flint's drinking water.

22        And, again, we don't think the evidence supports that

23   at all.

24        And then even then, even if you find that they're

25   injured and you find out that injury was caused by exposure to

1    lead in Flint's drinking water, you'll still need to decide

2    whether that injury was caused because of something that VNA

3    did, which means when you think about the timeline, that

4    you'll have to say the injury was caused because they were

5    exposed to lead after February 10 of 2015 and that that injury

6    would not have occurred if VNA did something different.

7           And, again, I'm going to go through this evidence in

8    detail and explain our view of the evidence to you.  But I

9    have to say on this point, just by way of preview, I think the

10   evidence is really overwhelming.

11          On these injury issues, whether it's the lack of

12   elevated blood lead levels, the use of a bone lead device

13   that's not used by any doctor anywhere in the United States,

14   or even the use of questionable statistics to try and convince

15   you that these children were exposed to lead in their water,

16   Mr. Maimon and Mr. Stern have failed to meet their burden of

17   proof.  And I look forward to going through this evidence with

18   you shortly.

19          Now, finally the third topic, this question of the

20   government officials that are responsible.  Because if you

21   find that VNA was negligent or LAN was negligent and you find

22   that there's an injury, which was caused by that negligence,

23   you then have to turn to the third question of allocating

24   fault.

25          And, you know, I find it interesting that Mr. Stern

1    said we're trying to get a free pass.  We're trying to shift

2    blame to these people.  We're trying to get out of our

3    responsibilities, to use Mr. Maimon's terms.  That's not

4    what's going on here.

5           You heard Judge Levy's instructions yesterday.  It's

6    the law in the State of Michigan that you need to allocate

7    fault among whatever parties you find are responsible for the

8    injuries.  That's what the law requires you to do.

9           So VNA's not looking for a pass.  They're not looking

10   to shift blame.  As you're going to hear from our view,

11   there's no blame to shift.  We're simply offering evidence.

12   And today, our arguments about that evidence so that you can

13   do your duty as jurors and answer that third question about

14   how you allocate fault among all the responsible parties.

15          Now as I said, when VNA took on this job, they did

16   good work.  But, members of the jury, they had no idea they

17   would be dealing with a group of politicians and bureaucrats

18   who would engage in the kind of behavior that you've seen and

19   heard over the course of this trial.

20          You have heard now that many of these people had been

21   charged with crimes for their roles in the Flint Water Crisis.

22   And you heard -- right? -- Mr. Maimon made a big deal that we

23   didn't present these witnesses to you.  You heard why that is.

24          Because many of them invoked their rights under the

25   Fifth Amendment and declined to come to court, because they

1      thought their testimony would further incriminate them.

2              VNA didn't know when it took this job that it would

3      deal with public officials like that.  They could never have

4      guessed that they were dealing with people like the MDEQ

5      officials who lied about corrosion control to the EPA or who

6      instructed Mike Glasgow to falsify the lead and copper

7      results.

8              And they certainly never expected that when they

9      asked the city to provide lead data that the city would

10     provide incomplete data or fail to share important data

11     altogether.

12             VNA is not responsible for this water crisis.  The

13     people running the Flint water plant, names that you've heard

14     about for five months now and are probably household names,

15     names like Mayor Walling, Howard Croft, Duffy Johnson, Brent

16     Wright, Mike Glasgow, those people were there for years

17     operating that plant.  They were there for years.  In some

18     cases, decades.

19             Mike Prysby from the Michigan Department of

20     Environmental Quality, you heard that he'd be supervising the

21     Flint Water Treatment Plant for decades.  Governor Snyder,

22     Governor Snyder was there for the entirety of the Flint Water

23     Crisis.  The MDEQ and the EPA, they were there, as well, along

24     with these emergency managers, Earley, Ambrose, and Walling.

25             The EPA learned about issues in January of 2015 and

1       was there throughout the rest of the crisis.

2               VNA was there for one week, a one-week assessment.

3       And you're supposed to believe that the fault lies with this

4       consultant that was there for a week and offered good

5       recommendations that no one listened to.  When these other

6       people were there for decades running the plant.

7               The MDEQ, the EPA, the governor of Michigan, the

8       people running the plant, they knew everything about the Flint

9       Water Treatment Plant.  They had all the data.

10              It just makes no sense to me to say that, "No, the

11      responsible party is this consultant that came in for one week

12      and tried to help."

13              And I was surprised to hear Mr. Maimon explain that

14      the reason for that, which he says is data, is because the pH

15      and alkalinity dropped after VNA was there?  VNA wasn't

16      running the plant.  VNA offered their recommendations.  No one

17      followed them.  And then they left.  So he can point to that

18      chart.  I really don't know what that means.  And how that

19      gets to 50 percent of the blame is really just a

20      head-scratcher.

21              Now, members of the jury, you saw and I respected

22      that Mr. Stern was very emotional about this case.  He

23      commented on that.  And Mr. Maimon was, as well.  I don't know

24      if I'm going to get as emotional.  I think it's just the type

25      of person I am.

```
 1              But make no mistake.  I want to tell you very clearly
 2    this is a very serious and important case for the people of
 3    VNA.
 4              Because in this courtroom, they have been falsely
 5    accused of poisoning children.  And that is an accusation that
 6    is a very serious accusation.  So, no, it's not damage
 7    control.  It's not spin.  It's not -- I don't know which is
 8    Story 1 or Story 2.  It's not a story.  It's a defense.  A
 9    defense to serious false accusations that have made against
10    the people of VNA, and we're proud to be able to present that
11    defense to you over these past five months and to summarize it
12    here this morning.
13              So let me turn to the first topic.  The question of
14    the work that VNA did in Flint.  As I've said, VNA did good
15    work in Flint.  Now, to evaluate this, what Judge Levy has
16    instructed you is that you need to consider the concept of
17    professional negligence.  And yesterday she gave you detailed
18    instructions on what that means.
19              And for these purposes, as you've heard when you're
20    looking at VNA's work, it means that plaintiffs' counsel have
21    to prove to you that it's more likely true than not that VNA's
22    work in Flint was not consistent with the standard of care.
23    Or in other words, that it was not consistent with what a
24    water engineer of ordinary learning, judgment, and skill would
25    do under similar circumstances.
```

1           And Judge Levy also instructed you that to prevail in

2      this claim, plaintiffs' counsel can't just pick anything they

3      don't like about what VNA did.  They can't just say they

4      weren't honest as if that's what's at issue here.  They have

5      to prove specific claims of negligence.  The specific claims

6      that are set forth in the jury instruction.  And there are two

7      of them.

8           This is not about some 30,000 foot view about what

9      they might think engineers should do.  It's about these

10     specific claims.

11          First, did VNA breach the standard of care by failing

12     to recommend immediate implementation of orthophosphate

13     corrosion inhibitors?

14          And, second, did they breach the standard of care by

15     failing to recommend a return to receiving water from the

16     Detroit Water and Sewerage Department?

17          That's it.  You have to find that they breached one

18     of those two things.  Not something else.

19          In order to do that, as Mr. Maimon talked about with

20     respect to the government officials he's trying to defend, you

21     can't use the benefit of hindsight.  You have to look at what

22     VNA knew at the time, what information was available to them,

23     and what a reasonable engineer would have done under similar

24     circumstances.  That's the first part of the analysis.

25          What were the circumstances?

```
 1              So I want to talk about that.  I want to talk about
 2     the scope of VNA's work.  And, again, no one's looking to hide
 3     behind the contract or evade responsibility by doing that.
 4     But if you're going to evaluate what were the circumstances
 5     that VNA was in, you have to look at what they were hired to
 6     do and what was going on in Flint at the time.
 7              So where do you begin?  Well, when VNA arrived in
 8     Flint in February of 2015, Flint was already ten months in to
 9     a complex and highly charged water crisis.  Months before VNA
10     ever even got there, Flint had to issue multiple boil water
11     advisories due to the presence of fecal coliform in the water.
12              For months, they'd been dealing with an explosion of
13     citizen complaints about undrinkable, dirty water.  And they
14     had recently found, Flint had recently found that their water
15     contained a high level of a dangerous cancer-causing chemical
16     called the TTHM.
17              That was all known.  And so, yes, when VNA arrived in
18     Flint there were real challenges.
19              And on top of that, the city was broke.  Everyone
20     knew that.  And the residents and the politicians were at each
21     other's throats.  People were carrying around jugs of brown
22     water and trying to meet with public officials and get them to
23     pay attention to what was going on with the water.  The people
24     were angry and rightfully so.  They were right to be angry.
25              You heard it was striking to me when Sue McCormick,
```

1    the former director of the DWSD, was here.  She told us that

2    when she was invited to come to a Flint City Council meeting,

3    people told her, "You don't want to get involved in that

4    mess."  It was a highly charged situation.  It was a

5    full-blown crisis.

6            And, you know, I've been struck throughout this trial

7    and I guess Mr. Stern tried to say that we're pivoting,

8    because sometimes we say it's a crisis, and sometimes we say

9    it's not.  But the issue is that this was the Flint Water

10   Crisis.  The Flint Water Crisis.  We've been consistent about

11   that.  It's not the Flint Lead Crisis.  Because every time

12   issues about discolored water or smelly water or all the

13   things we heard about the water, every time that came up, it

14   was sort of dismissed by plaintiffs' counsel as, "Well, that's

15   just aesthetics.  You know, that's just sort of a precursor.

16   Let's get on to the real issue, which is the lead."

17           And of course they're saying that, because that's

18   what their claim is about.  They're seeking injuries for lead

19   poisoning.

20           But when you think about the circumstances in which

21   VNA arrived, when you're evaluating did they do what would be

22   expected of a reasonable engineer, the question is not:  Let's

23   look at everything we know about lead now.  It's:  What was

24   going on with the water then.

25           And this was a full-blown water crisis.

1            And you heard about some of this from Miguel Del

2    Toral.  He explained that it was sort of like a game of

3    Whac-a-Mole.  Every time there was one problem, they would try

4    to fix that problem, and another problem would pop up.

5            You heard something similar from Dr. Bellamy, who

6    explained that when dealing with water treatment, you have to

7    deal with -- his big thing was this concept of simultaneous

8    compliance.  He explained that sometimes you'll add a chemical

9    to address one issue, and that chemical interacts in a way

10   that it causes another problem.  And that's what you were

11   seeing in Flint at the time.

12           They would try to fix one problem; it would cause

13   another problem.  It was a game of Whac-A-Mole.  The city was

14   just totally failing.  Mr. Maimon agreed.  The city was total

15   failing in how they were running that plant.

16           And you saw -- I thought this chart was very telling.

17   You saw this chart during Dr. Gagnon's testimony.  And he

18   explained that one of the most basic tasks of a water

19   engineer, a water operator is to keep pH and alkalinity within

20   a very narrow band so that it doesn't vary much from day to

21   day.

22           And you can see here up until the water switch,

23   that's exactly what happened.  Then the switch happened, and

24   immediately, the pH and alkalinity are all over the place.

25           So what happens?  The city knows they've got this

1    water crisis.  They've got all of these problems.  And they

2    put out a request for proposals for a second set of eyes for a

3    water quality consultant.

4          And, again, I can't resist but, you know, Mr. Maimon

5    said, "Well, they're 50 percent responsible.  The city is 0.

6    They're 50 percent, because they were the second set of eyes."

7          What about the first set of eyes?  Why is the first

8    set of eyes responsible for nothing?  The first set of eyes

9    that was there throughout this entire crisis.

10         But in any event, the city puts out their request for

11   bids, and VNA was the only consultant who responded.

12   Initially, the request called for the consultant to do a

13   broader amount of work.  But given the financial constraints

14   in the city, it was eventually decided that they wouldn't go

15   forward with everything they had initially wanted.  And

16   instead they would just enter into this contract with VNA,

17   which called for a one-week assessment.

18         The contract specified this would involve a kickoff

19   meeting with the client and a top-down assessment as defined

20   in the proposal.  VNA would provide two water and two

21   communication experts for a total of 40 hours each.  The

22   product from that week would be a letter or a PowerPoint

23   presentation reviewing actions taken by the city to date.  And

24   the scope of work will involve the water plant, distribution

25   systems, and communications with customers.

```
 1              THE COURT:  Mr. Stein, can you slow down just a
 2   little bit.  I want to make sure the record --
 3              MR. STEIN:  Sure.  I'm trying to finish by 2:30.
 4              THE COURT:  I know.  But poor Jeseca has to make it
 5   to 2:30, too.
 6              MR. STEIN:  Thank you.  And please let me know if I
 7   speed up again.
 8              THE COURT:  Okay.
 9              MR. STEIN:  A brief word about these contracts,
10   right?  Mr. Stern is absolutely right.  The contract doesn't
11   define the standard of care, and we don't suggest that it
12   does.  But the contract is certainly relevant in understanding
13   the circumstances that VNA was in.  And the scope of what they
14   were hired to do.
15              Now, what else did you hear about how this project
16   developed?  There's a -- specifies in the contract that
17   there's going to be a kickoff meeting.  And you heard from
18   Dr. Bellamy who, again, is as experienced as it comes when it
19   comes to water treatment.  And he said that he had done
20   projects like this.  And the first task is you meet with the
21   people you've contracted with, and you try to find out what's
22   going on in the city and what issues they need your help with.
23              He explained that he would typically have that kind
24   of a meeting and then you would get to specifics.
25              And all the testimony from the plant operators, from
```

1    Mr. Gnagy and Mr. Chen, from everybody who was involved, all

2    the testimony was clear that the initial focus was two things.

3    Red water concerns and TTHMs.

4          Now, that's not to say as a lot of the questions we

5    heard from the plaintiffs' side sort of suggested.  It's not

6    to say that VNA is trying to say, "Well, all we had to look at

7    was red water concerns and TTHMs."  No one on our side is

8    saying that.  We recognize this was a contract to do a

9    one-week assessment of the water system, and that's what VNA

10   did.

11         But if the known issues, when you walk in the door,

12   are that the water is brown and nobody can drink it and, "Hey,

13   we just had this TTHM violation, and by the way, we attached

14   to the request for bids a copy of the TTHM violation," then

15   it's only logical that your consultant would say, "Well, let

16   me start by looking at those known issues."

17         And, you know, this makes sense.  I think we all have

18   this kind of experience in our daily life.  If you went to a

19   doctor for a check-up and you wanted just a general check on

20   your overall health, you might ask the doctor to take a look

21   at your health.

22         But if you also knew when you walked in the door that

23   you had high blood pressure and a sore back, you'd probably

24   mention to the doctor, "I have high blood pressure and a sore

25   back.  Let's start with those issues and then see what else

1   you can figure out."  And that's -- there's no mystery.

2   That's what was going on here with VNA.  They knew about red

3   water.  They knew about TTHMs.  So they started with those

4   issues and then moved on to more broadly evaluate the water

5   system.

6           You have in evidence their notes from this February 2

7   kickoff call where they discussed all these issues.  And

8   you'll see when you look at them that TTHM issues were front

9   and center.

10          And, again, as I said, when asked directly, people

11  like Mike Glasgow, the actual -- the only licensed operator

12  with the plant, "What was VNA there for?"

13          "I think it was in regards to our TTHM violations."

14          Nevertheless, as I said, VNA didn't limit themselves

15  to TTHMs.  They took a broad look at a variety of issues.  And

16  you can see, because it's in evidence, the technical

17  memorandum that VNA put together, which went through all of

18  the issues they looked at.

19          It contained all of their calculations, all of the

20  tests that they ran, covering all of these different issues.

21  Treatment plant operation, THM concentrations,

22  characterizations of the source water, TOC, total organic

23  carbon , oxidative conditioning, bromate formation, coagulant

24  screening, lime/soda softening evaluations, midpoint

25  chlorination and other issues.

1          And what is this document, this technical memorandum?

2     This was a document you heard the cover email made clear.

3     These were Marvin Gnagy's handwritten notes from his work

4     during that one-week assessment that after they left, the city

5     said, "Hey, do you mind typing up your notes and sending them

6     to us so that we can have them in a form that others can look

7     at and use?"

8          And he said, "Sure.  No problem.  Here are my notes."

9     That's what this document is, despite all the questions about

10    what was included in it and what wasn't included in it.

11          And you also saw VNA's final report, and we're going

12    to go through the recommendation on corrosion control.  That's

13    obviously the focus here.  But that's not the only thing in

14    the final report.  They made recommendations about the

15    addition of permanganate, the reduction of the ozone feed, the

16    proper doses of ferric chloride and lime, prechlorination,

17    conversion -- it should say "conversion" not "conversation" --

18    to GAC filters, corrosion control, elimination of storage

19    tanks, valve replacement, flushing in the distribution system.

20          They also made recommendations about changes to

21    process control, proper lab operation, proper maintenance

22    management, proper staff training, and how the water

23    department could communicate better with its customers.

24          The whole report is in evidence, and you'll be able

25    to look at it.

1        And, members of the jury, this was all in one week

2   they did all this work and all this analysis.  A one-week

3   assessment, and they provided this whole host of

4   recommendations that no one on this table wants you to look at

5   or talk about.

6        Again, you heard from Dr. Bellamy.  This is the guy

7   -- I mean, they want to talk about his compensation.  I'll

8   talk about his experience.  This is a guy that for 40-plus

9   years has been one of the go-to water treatment consultants in

10  the world.  He went to Iraq to set up their water treatment as

11  part of the provisional authority there.  He went to Sydney,

12  Australia, to help when there was an issue with the water

13  being provided to Olympic athletes.

14       He has provided water consulting here in Ann Arbor, a

15  city that uses a small river just like Flint.  And what did he

16  tell you?  He said he went through all the documents, and this

17  kind of work is exactly what you would expect from a

18  reasonable, competent engineer, that this was good work.

19       So with that understanding of the context of the

20  circumstances, let's take a look at VNA's recommendations

21  about corrosion control, because that's the first way that

22  Mr. Maimon and Mr. Stern could establish negligence.

23       And when you look at these recommendations about

24  corrosion control, I submit to you that their approach more

25  than met the standard of care.  It was exactly the right

1    response to the situation at the time.

2         VNA made a careful, thoughtful set of recommendations

3    that was fully consistent with all known science about lead

4    corrosion.  They recommended the city conduct a

5    corrosion-control study to get the right inhibitor and the

6    right dose.  And they recommended that it be discussed with

7    the state regulator.

8         So I'm going to go through this in some detail.  But

9    as you can see from the slide, what I'm going to do is give

10   you six reasons, six independent reasons that you know that

11   VNA's recommendation on corrosion control was correct.

12        I'm going to go through them one at a time and

13   explain why the evidence shows on each of those points VNA was

14   right.  And why that means you could have confidence that on

15   the question on your verdict form about whether or not VNA

16   breached the standard of care when it comes to their

17   recommendation on corrosion control, you can confidently check

18   that box in favor of VNA.

19        So what was the recommendation?  Well, we've seen

20   this language many times.  I won't read it again in full, at

21   least.  "Contract with your engineer initiate discussions with

22   the state on the addition of a chemical."

23        Why was this the right recommendation?  First, at the

24   time -- sorry -- at the time, lead in the tap water was not a

25   pressing issue.  Based on the information they knew at the

1    time.  You've heard over the course of this trial dozens of

2    questions, if not more.

3           You've heard arguments from plaintiffs' counsel that

4    what VNA should have been doing is they should have been

5    jumping up and down, raising alarm bells, causing everyone to

6    stop and pay attention to the issue of lead.

7           Well, members of the jury, that is pure hindsight.

8    Nothing else.  Because what was the data that was available at

9    the time?  The lead and copper data, the data that's used by

10   water operators all over the country, it was clear that they

11   were -- that the 90th percentile level for the City of Flint

12   was 6 micrograms per liter or parts per billion.  And you know

13   that the action level is 15.

14          There was no basis to go and alarm everybody about

15   lead.  The data showed they were in compliance.  The evidence

16   didn't support doing anything else.

17          Now, this doesn't mean that VNA ignored the issue of

18   lead.  It doesn't mean that they just said, "Oh, well.  We're

19   done.  Nothing to do here."  No.  They took a measured

20   approach that was consistent with the available information.

21          Again, you can go back to that analogy with your

22   doctor.  You might tell your doctor when you walk in, "You

23   know, I eat a diet that's all sugar."  And a doctor will say,

24   "Maybe you're going to have a problem with diabetes."

25          But if he tests your blood and your sugar levels are

1    not high, what's the doctor going to do?  He's going to tell

2    you, "Okay.  You don't have an issue right now, but this is

3    something you should keep an eye on for the future, and you

4    might be smart to think about this going forward."

5             And that's exactly what VNA did on this issue of

6    lead.  Yeah, they knew there were potential issues with the

7    corrosive water.  They knew there were some amount of lead

8    pipes, and they knew lead could be an issue in the future.

9    They knew it was something the city should keep an eye on and

10   think about.  But at the moment, the data showed that it was

11   6 parts per billion, which is below the action level.

12            And it wasn't just in VNA's report that they said

13   that.  Marvin Gnagy recorded this in his notes.  February 18,

14   2015.  "Corrosive water conditions exist.  Discussed with

15   plant staff and suggested potential issues with lead and

16   copper monitoring in the future."

17            And then thinking back on simultaneous compliance.

18   "Might need to balance pH and corrosion control with THM

19   compliance issues."

20            They say, "Oh, Gnagy, he was only talking about red

21   water.  It's right here in his notes.  "I discussed it with

22   plant staff that they might have an issue with lead and copper

23   in the future."

24            And it wasn't just Gnagy's notes.  You heard from Rob

25   Bincsik.  Remember when the news about LeeAnne Walters first

1   came up, and they first saw they had one home with an elevated

2   lead level?  Rob Bincsik's first thought was, "Hey, this is

3   what Marvin from Veolia mentioned to me, that we needed to add

4   phosphate to our water to help prevent this."

5           So you have Gnagy's testimony to you that he told

6   people about this.  You have his notes that documented it.

7   And you have Mr. Bincsik's email.  And when he was here on the

8   stand, Mr. Bincsik told you that he's confident that

9   conversation occurred.

10          So that's the first reason.  Lead in the water was

11  not a pressing issue.

12          What's the second issue -- second reason?  The second

13  reason is you can't just take orthophosphates and dump them in

14  the water, because that's what was done in Detroit.  What do

15  you need to do?  You need to conduct a study.  This was the

16  consistent testimony of every single water expert in this case

17  other than Mr. Humann, who I'll get to in a few moments.

18          So if that's the case, how can it be negligent for

19  VNA to not recommend orthophosphates and instead recommend a

20  corrosion-control study?  You heard from Dr. Bellamy that when

21  you think about issues of corrosion control , there can be a

22  number of different chemicals that are added.  Orthophosphate

23  is one of them, but there could also be mixtures.  And it's

24  one of the basic techniques for the corrosion control.  It's

25  not the case, as plaintiffs' counsel would have it, that the

 1    only way to do corrosion control is orthophosphate.

 2            You heard from Dr. Gagnon that there were 46 percent

 3    of the utilities in one study that were using some approach to

 4    corrosion control other than adding orthophosphate.

 5            And so the right thing to do, what you have to do is

 6    conduct a study.  That's what Mr. Gnagy recommended.  They

 7    should hire an engineer and coordinate with the state to do a

 8    corrosion-control study.

 9            Mr. Chen, "I did recommend.  I have more information

10    for the future."

11            And Mr. Green testified as well, the best practice

12    would have been that they test for corrosion and everything

13    else.

14            Everyone involved said the same thing.  What you do

15    when you have this potential issue.  You conduct a study and

16    figure out the right chemical.

17            Now, Mr. Stern really went after Dr. Gagnon and his

18    testimony, because he, when pressed on cross-examination about

19    whether the Flint River water was more corrosive, he said he

20    didn't know.  But I think you have to remember what happened

21    on redirect, as well, which is he said he didn't know, because

22    utilities don't take raw water and put it into service lines.

23    It goes through a treatment process first.

24            So if the question is:  Is this water corrosive to

25    service lines, it doesn't matter what the raw water does.

1    That water never comes in contact with a service line.  The

2    treated water does.

3         So he said, "I don't know," because it wasn't a

4    relevant question for him, not because he didn't know the

5    answer or didn't -- it just wasn't a question he'd ever

6    bothered to look at.  Because what matters is the treated

7    water, not the raw water.

8         And I would offer to you -- you saw Dr. Gagnon, did

9    he look like someone who was unprepared or not thorough or not

10   a real expert to you?  He won all those awards, published all

11   those papers.  He was the epitome of a science nerd.  He was

12   the guy -- he's one of the world's leading experts in lead and

13   corrosion who studied this issue and published as many papers

14   as anybody.  And been widely recognized by his peers for his

15   expertise.

16        And what was his view?  That VNA did the right thing

17   by recommending a corrosion-control study.

18        But Dr. Gagnon said more.  And this is really

19   important, as well.  And this is the third reason.  Because he

20   explained, based on his research, that if you added

21   orthophosphate but didn't first address pH and alkalinity and

22   didn't first address all that organic matter in the water, the

23   orthophosphate wouldn't have done anything.

24        Those other water quality issues would have affected

25   the way the orthophosphate works and would have prevented it

 1    from doing anything to inhibit corrosion.

 2         Again, Dr. Gagnon and I have a quote from his

 3    testimony reviewing this study.  He said, "We were surprised

 4    by this, would that -- with the addition of orthophosphate

 5    when organic matter was present, the orthophosphate actually

 6    had very little effect in terms of treatment additive."

 7         And corrosion control is typically the last step that

 8    water would undergo in terms of treatment.  You'd want to make

 9    sure all previous steps are operating properly and addressed

10    before you get to the final step.

11         And so that was the order of VNA's recommendations.

12    It was fully consistent with Dr. Gagnon's research and what

13    science tells you.  You have to get pH and alkalinity under

14    control first.  Remove the organic matter and then study the

15    right corrosion inhibitor.

16         So what do you do?  Implement operating programs for

17    process control.  That's to address pH and alkalinity.  You

18    convert your filters to GAC.  And Dr. Gagnon explained that's

19    how you control for organic matter.  Then once you've done

20    those things, then discuss with the state and figure out the

21    proper corrosion control inhibitor.

22         Fourth reason, you know this was the right

23    recommendation.  You've heard testimony that orthophosphate,

24    if it had just been added to the water might have actually

25    caused more harm than good.  You saw this in an email that

 1    Mike Glasgow sent, again, right after the discovery of this
 2    LeeAnne Walters's test result.
 3           He said, "I wish we could fix our problems with a
 4    corrosion inhibitor, but I'm not sure that is the case.
 5    Although most -- also, most inhibitors are phosphate-based,
 6    which may come to haunt us in the summer months as phosphate
 7    is an energy source for biological growth."
 8           This is why you have to test it.  You can't just take
 9    some one-size-fits-all approach and say, "Well, orthophosphate
10    was there before.  You have to add orthophosphate now."
11           And it wasn't just Mike Glasgow.  We saw the same
12    thing from the EPA, from notes that Jennifer Crooks took from
13    the EPA of a call with Michigan regulators.  First she said,
14    "Let's not do a corrosion-control study yet," in June of 2015.
15    The EPA was still saying, "Let's wait."
16           But then she went to say, "The idea to ask Flint to
17    simply add phosphate may be premature.  There are many other
18    issues and factors that must be taken into account, which
19    would require a comprehensive look at the water quality and
20    the system before any treatment recommendation can or should
21    be made."
22           Jennifer Crooks went on in her testimony to say that,
23    "You have to do a study, because too much phosphate could be
24    just as bad as not enough phosphate."
25           And what's the fifth reason?  The fifth reason is

1    that the city didn't even have authority.  No matter what VNA

2    said, to just pick a chemical, order it up, and add it to the

3    water.  They had to go to the MDEQ and get approval for any

4    chemical change they made to their treatment.  They needed

5    MDEQ approval.

6          Why is this important?  Because that's exactly what

7    VNA recommended.  "Contract with your engineer and initiate

8    discussions with the state on the addition of a corrosion

9    control chemical."

10          So think about this.  If VNA had done exactly what

11   Mr. Humann says they must have done, you know, thou shall add

12   orthophosphate.  The city couldn't even do it.  They would

13   have had to go to the state and seek approval.  And if they

14   did that, they'd be doing the exact same thing VNA

15   recommended.

16          So ask yourselves, how did VNA breach the standard of

17   care by recommending that the city do what it had to do in

18   order to add corrosion control?

19          And in case there's any doubt, I pulled out from the

20   transcript, these are all the witnesses who testified

21   consistently that the city needed MDEQ approval in order to

22   make a change to the treatment chemicals.  Warren Green,

23   Theping Chen, Marvin Gnagy, Gerald Ambrose, Adam Rosenthal,

24   and Miguel Del Toral.

25          And finally, my last reason why I think it's clear

```
 1   why you can have confidence in concluding that VNA's
 2   recommendation on corrosion control was correct is because
 3   Mr. Humann is not a credible witness.
 4         And I don't mean to say -- sometimes people say
 5   "credible" and it means they're suggesting he's lying.  I'm
 6   not saying that.  I'm just saying his testimony is not worthy
 7   of belief by you or worthy of being credited.
 8         And why is that?  Well, some of you may be thinking,
 9   and I think Mr. Maimon set it up this way a couple of times.
10   There's an expert on one side who says this is the standard of
11   care.  There's an expert on the other side who says that it
12   isn't.  We're not experts.  How are we supposed to know who's
13   correct?
14         Well, the answer isn't you just throw up your hands
15   and say, "Well, nobody knows."  You take a look at the
16   information before you, at the evidence that's been presented.
17         And I point first to the breath of Dr. Bellamy's
18   experience compared to Mr. Humann's.  As I said, Dr. Bellamy
19   spent 45 years as one of the world's leading water quality
20   consultants for over a hundred different water utilities,
21   tackling the most challenging problems all over the world.  He
22   set up water systems in Iraq and Australia.  I went through
23   that already.
24         Mr. Humann, there is no evidence that he's ever run a
25   water plant, he's ever done consulting work outside of Long
```

1  Island or maybe New Jersey.  Yeah, he's the CEO of a company.

2  Did he talk to you about his vast experience consulting with

3  water systems in different parts of the world?  I don't think

4  he did.

5          Similarly, I point to the lifetime of research that

6  Dr. Gagnon has done on issues of lead, corrosion, and water

7  treatment.  One of the leading experts in the scientific

8  community.  I'd point you to how credible and detailed both

9  Dr. Bellamy and Dr. Gagnon were.  How they supported all of

10  their opinions with data and with evidence.  How they answered

11  all the questions that were asked of them on

12  cross-examination, even when Mr. Maimon did his best to try

13  and trip them up.

14          And for all those reasons that would be enough of a

15  reason to credit Dr. Bellamy and Dr. Gagnon and not to credit

16  Mr. Humann.

17          But in this case, you don't even have to go through

18  that analysis, because there's another reason that you know

19  Mr. Humann's opinion is just not worthy of belief.  And that's

20  because he didn't look at anything.  He told you he read one

21  document, one document to form his opinion about VNA.  Their

22  final report.  That's it.

23          You've been here for five months and more looking at

24  tons of documents, hearing from lots of witnesses, analyzing

25  everything.  He looked at one thing.

1          He didn't look at Marvin Gnagy's handwritten notes

2     where he indicated that he spoke with plant staff about

3     corrosion control.  He didn't look at Rob Bincsik's email

4     where Mr. Bincsik said, "Yeah, lead corrosion.  This is what

5     Marvin from Veolia was talking to me about."

6          He didn't look at the pH or alkalinity or the organic

7     matter issues and how that played into what VNA was

8     recommending.  He said he wasn't asked to even consider water

9     chemistry.  He didn't review the lead and copper data.

10         He never spoke to or read the depositions of any City

11    of Flint officials.  He never spoke to or read the depositions

12    of any MDEQ officials.

13         When you put that all together with the other experts

14    are telling you, I submit to you, members of the jury, it's

15    clear you should credit Dr. Bellamy and Dr. Gagnon, and you

16    should not credit Mr. Humann.

17         Now, you heard a lot from plaintiffs' counsel today

18    that VNA's recommendation that, you know, how could

19    Dr. Bellamy have thought this was a recommendation about

20    corrosion control for lead when Marvin Gnagy admitted himself

21    that it was about red water and polyphosphates?

22         Well, I have the excerpt from the transcript from

23    page 5245 where Mr. Gnagy said very clearly, "I recommended

24    polyphosphate to deal with red water.  But, you know, I also

25    recommended or talked about a phosphate chemical that could

1    help with future lead and copper levels in the distribution

2    system."

3            The two are not mutually exclusive.  The fact that

4    you're talking about in one section of the report, talking

5    about polyphosphate for red water doesn't mean that you're

6    also not talking about a corrosion-control study to deal with

7    lead and copper.  Two things can be true at the same time.

8    And that's what Mr. Gnagy testified here to you.

9            But even more importantly, even more importantly than

10   what Marvin Gnagy said about what was in his mind when he

11   wrote something down, the evidence is clear that the people he

12   was communicating to understood this to be a recommendation

13   about lead and copper corrosion.

14           We've already talked about Rob Bincsik.  You saw his

15   email, right?  As soon as he hears about the lead result at

16   LeeAnne Walters's house he says, "Wait.  This is what Marvin

17   from Veolia was talking to me about."

18           You also saw for Howard Croft, this is a key document

19   in this case.  In September of 2015 -- right? -- the treasury

20   department asks Mr. Croft, "Why didn't Veolia advise the city

21   about potential for elevated lead levels when using Flint

22   River water?"

23           What does he say?  He says they did.  They did make

24   corrosion control one of their recommendations.  Their

25   commissioned scope of work was to focus on TTHM concerns, but

1    they did make corrosion control one of their recommendations.

2    And he says that in response to a question about lead.

3         He knew that VNA was making a recommendation for a

4    corrosion-control study about lead.  Rob Bincsik knew.  What

5    does it matter what kind of arguments Mr. Maimon can make

6    about what the wording of the report and what that would have

7    communicated?  The people it was being sent to understood what

8    it was saying.

9         So for the first claim of negligence, the immediate

10   implementation of orthophosphate corrosion inhibitors, for all

11   of those six reasons, you can scratch that off your list.

12   There's no basis to conclude VNA was negligent on that.

13        So what about the second point?  What about the

14   return to receiving water from Detroit?  Well, here I submit

15   plaintiffs' counsel doesn't fair any better.  And that's for

16   the simple reason that from all the evidence you've seen --

17   and I'm going to review it -- there's simply nothing anybody

18   could have said in February of 2015 that would have led the

19   City of Flint to return to Detroit.

20        Flint had taken that option off the table.  And it

21   was entirely appropriate for VNA to follow its client's

22   instructions on that issue.  The standard of care is for VNA

23   to answer the question it was asked.  And the question it was

24   asked was do a top-down assessment in your one week of the way

25   we're treating Flint River water.

1           They weren't asked, "Hey, evaluate which one of these

2    water sources is better."  They were asked, "Evaluate our

3    treatment of Flint River water," and that's what they did.

4           Now, here I have three reasons or three arguments.

5    First, as I said, the City of Flint took DWSD off the table.

6    Second, as I said, VNA wasn't engaged to evaluate a return to

7    DWSD.  And, third, that even when VNA tried to suggest a

8    return to DWSD, it was squarely rejected.

9           How do you know that Flint had taken a return to

10   Detroit off the table?  Well, every witness in this case made

11   this clear.  Darnell Earley was the Flint emergency manager at

12   the time, and he testified based on the video deposition about

13   a return to Detroit.  It was not feasible, because the city

14   didn't have any money.

15          Gerald Ambrose, in his video deposition, testified

16   that he stated on -- or he were asked and he stated on many

17   occasions that the $12 million that was being saved by not

18   purchasing the water from Detroit was one of the reasons not

19   to return.

20          And I want to pause for a minute on the logic of

21   that.  Because I think what you see and what you understand

22   when you think about it is why the emergency managers and the

23   City of Flint were so wedded to their decision.  Because as

24   we've said, they knew that they were coming -- in two years,

25   they would be joining the KWA.

1        And to be ready to join the KWA, the plant needed

2   massive upgrades.  And they had no ability to finance those

3   upgrades.  So how did they finance it?  By taking the money

4   that they had been using to pay Detroit for water and saving

5   that money to upgrade the plant while they just got water out

6   of the Flint River.

7        That was the game plan.  That was the decision.  And

8   there's no reason to think that that had changed or that

9   anything was going to get them to come off of that.

10        In fact, I can go through just in the same time

11  period, January and February of 2015, seven different times,

12  there was a suggestion made to return to Detroit, and it was

13  squarely rejected.  This is the month before VNA was arriving

14  in Flint.  You had January 9, 2015, Emergency Manager Earley

15  issued a public statement the City of Flint can ill afford to

16  switch courses at this time.  That's VNA Exhibit 784.

17        You have notes from a January 12, 2015, meeting that

18  Mayor Walling attended.  "The game plan is not changing."  You

19  have a document, an email from Dennis Muchmore from the same

20  period of time January 19, 2015.  "This would be pretty

21  complicated to do now.  A lot of money has been invested to

22  this point."

23        And then you have the testimony of Sue McCormick from

24  Detroit.  She sent this letter in the midst of the crisis when

25  everyone was at each other's throats saying, "Hey, we'll let

1    you come back with no reconnection fee and no long-term

2    contract."

3            One of the city council members invited her to come

4    and present that.  And what happened?  Gerald Ambrose called

5    her on the way to the meeting and said, "You're not coming.

6    You're off the agenda."  She turned around and was about to

7    leave until the city council called her and again and said,

8    "No, come back.  I want people to hear about this option."

9            And she was put at the end of the meeting and was

10   never taken seriously and never got a response.

11           You even saw an email from February 28, 2015, between

12   Emergency Manager Ambrose and a member of the city council

13   discussing this question of a return to Detroit.  And Ambrose

14   made perfectly clear no matter how many times you send it to

15   me, it doesn't change the cost or my mind.  This was taken off

16   the table.

17           You also saw the emergency manager put out a

18   statement, a press release, "Spending an extra $12 million on

19   Detroit water is incomprehensible when Flint water is just as

20   safe."  Incomprehensible.

21           They made no secret of it.  It was reported in the

22   press.  Here's an article that's in evidence.  VNA Exhibit

23   2824.  "Flint Emergency Manager Says There Are Two Big Reasons

24   Not to Reconnect to Detroit Water."

25           And you even heard this testimony from Duffy Johnson,

1    which I have to say was pretty -- it might have come by fast.

2    It was a while ago.  But it was pretty compelling.  He was

3    20-plus year employee of the City of Flint Department of

4    Public Works.

5            And he -- because he was anticipating a return to

6    Detroit might happen, he instructed his staff, "Hey, get

7    ready.  We might have to go back to Detroit."  And what

8    happened when Ambrose heard about it?  He left his job, and he

9    said that was a major reason why he left.  Because it was

10   overturned by Ambrose.

11           And, you know, you heard the same thing from Marvin

12   Gnagy on this question of -- well, I'll get to that about

13   incomprehensible.  It's the same work Marvin Gnagy heard when

14   he tried to raise the question of returning to Detroit to

15   Mr. Ambrose.

16           Now, given this clear evidence that the City of Flint

17   had firmly decided it needed the $12 million to upgrade the

18   plant.  It wasn't interested in returning to Detroit.  Was it

19   -- does it make any sense to think that the city wanted to

20   hear VNA's opinion on this subject?

21           Do you really think the City of Flint was engaging

22   VNA to answer the question of, "Hey, what do you think about

23   returning to Detroit?"  Ambrose made clear this is -- no

24   matter how many times you bring it up, my mind's not changing.

25           And remember the testimony of Bill Bellamy, again, he

1    said as a water quality consultant, there's been plenty of

2    times in his career that he's been asked to evaluate, "Hey,

3    should we use one water source or another?"

4          That's a kind of analysis that water quality

5    consultants do.  And that was not this.  That's not what VNA

6    was hired to do.

7          You also heard from Marvin Gnagy, "They specifically

8    told us returning to Detroit isn't an option.  We don't want

9    you spending time and effort on something we already know."

10         Now, again, the point of this is not to say that they

11   were never going to go back to Detroit.  Obviously, we know

12   that they did six months go.

13         The point of this is to say, "Was VNA negligent?"

14   Did they breach the standard of care when they're told

15   directly by their client, "We don't want your opinion on a

16   return to Detroit."

17         Again, Theping Chen, we were never asked to do that

18   kind of evaluation.  The source comparison.  They had already

19   had another consultant that did the exact same study comparing

20   to the source before.

21         And I put a picture here, because I think it's

22   helpful to think of an analogy.  And I have a picture of a

23   car.  Imagine you were driving a car, and it was working fine.

24   Got you where you needed to go.  And then you decided, "You

25   know what?  I need to save some money, because I have some

1    other things I need to spend money on."

2          So you sell that car and you start using instead an

3    old beat up car that has lots of problems.  What do you do?

4    You take that car to a mechanic and you ask the mechanic,

5    "Hey, are there repairs that we can do to get this car to

6    work?  Can you fix up this car?  Can you repair it?  Can you

7    make it work so that it gets me where I want to go?"

8          Would you expect the mechanic to turn around and say,

9    "You know, you still have an option.  You can go buy your old

10   car back"?  Of course not.  You would know that you could do

11   that.  You had that car, but you needed the money for

12   something else.

13         The question you're asking this mechanic is, "Can I

14   make this car work?"  And that's the question the City of

15   Flint was asking VNA.  "Can we treat the Flint River water?

16   Can you review our processes and give us recommendations to

17   make this work?"

18         Not, "Can you go back and use the water we were using

19   before?"  They already knew that.  Everybody knew that.

20         And so what's remarkable here is not that VNA

21   followed its client's instruction.  What's remarkable here is

22   that even in the face of all of that, even in the face of all

23   that constant rejection of the idea of moving back to Detroit,

24   even when you understand the question VNA was asked, they

25   still made sure they brought the option up to Mr. Ambrose.

```
 1              And you heard, Marvin Gnagy testified.  He mentioned
 2    it to him that, you know, "Going to Detroit is always an
 3    option, and he just told me it was incomprehensible."  He told
 4    me at the end, "Stick to your scope if you want to get paid."
 5              Now, plaintiffs' counsel, with their
 6    cross-examination, I think suggested that maybe this
 7    conversation didn't happen the way Mr. Gnagy remembers it.
 8    And they suggested, "Well, you know, he didn't have it in his
 9    notes.  He didn't write it down, so I guess it didn't happen."
10              But, members of the jury, you saw Mr. Gnagy.  He
11    didn't need notes to remember this conversation.  He
12    remembered it.  And in light of everything else you've seen
13    where Mr. Ambrose, you know, said, "No matter how many times
14    you tell me, it's not going to change my mind," is there any
15    reason to question Mr. Gnagy's credibility on this point, that
16    he raised the option of returning to Detroit and was told,
17    "Stick to your scope"?
18              And finally, if you're comparing who's more credible,
19    Mr. Gnagy or Mr. Ambrose, is it the guy who came and took the
20    stand and testified under oath and answered all of the
21    questions?  Or is it the guy who took the Fifth, Mr. Ambrose,
22    and said that because he's been charged with crimes, he
23    doesn't want to come to answer questions because of fear of
24    self-incrimination?
25              The answer is clear.  You know Mr. Gnagy was telling
```

```
 1    you the truth about this.  You know he identified returning to
 2    Detroit as an option.  And you know the city wasn't
 3    considering it.
 4           So that's so much for their second claim of
 5    negligence that VNA breached the standard of care by failing
 6    to recommend the return to receiving water from the Detroit
 7    water and sewerage department.
 8           Now, when I listened to some of the arguments from
 9    plaintiffs' counsel, the phrase that came in my mind is the
10    phrase "grasping at straws."  And I thought about that the
11    other day, and I wondered where that phrase came from because
12    grasping at straws didn't make sense to me, and I looked it
13    up.
14           It comes from a longer expression from, I think, you
15    know, Medieval England or something where they said, you know,
16    a drowning man will grasp at straws.  And the idea was that
17    someone who's drowning in a river or a lake might reach for
18    whatever straws or reeds are on the side of the river to pull
19    himself up and prevent himself from drowning.
20           And here I submit to you that Mr. Maimon and
21    Mr. Stern, they're not grasping at straws.  They're doing the
22    21st century version.  They're grasping at emails.  They are
23    saying, "We can't engage on these arguments.  There's all
24    these reasons why VNA's recommendations were correct.  We
25    can't engage on that, so let's just put up a bunch of emails
```

1    and try to focus on that.  Let's grasp at those straws."

2         Now, let's start with their greatest hit.  Their

3    absolute favorite.  The apple of their eye.  And this is Rob

4    Nicholas's February 9 email in which he said, "Yep, lead seems

5    to be a problem."

6         They love this email.  How do I know?  Because we

7    went through the transcript, and we counted.  And they

8    presented this email 138 times over the course of this trial.

9    One email.  138 times.  That's how much they wanted you to see

10   that Rob Nicholas said, "Lead seems to be a problem."

11        And you know what?  I don't mind that they showed

12   that email.  I wish they didn't do it 138 times.  Because that

13   email says nothing that undercuts any of our arguments about

14   what VNA did.

15        What was that email?  It was a response to a

16   newspaper article that reported on a high lead result at

17   UM Flint.  A newspaper article.  Not some analysis that VNA

18   did.  Not some test.  It was a newspaper article from which he

19   said, "Huh, lead seems to be a problem."

20        So what did they do?  They investigated, and they

21   concluded that it wasn't a problem.  It was something to keep

22   your eye on that might be a future problem, but it wasn't a

23   problem then.

24        One employee, who by the way was not an engineer,

25   thought this seemed to be a problem.  He passed it on, and the

1    engineers investigated.  This is the email they showed you 138

2    times.

3              And I have to say I thought one of the most revealing

4    in a way moments of this trial came on this point when

5    Governor Snyder was presented by video.  And you've heard,

6    again, Governor Snyder took the Fifth, and that's why he

7    didn't testify.

8              But at some point prior, he sat for a deposition.

9    And he was deposed in this case.  And Mr. Stern, on behalf of

10   his clients, got to ask him questions under oath.  Did

11   Mr. Stern ask him about his oversight of the MDEQ and all of

12   the MDEQ's failures or his interactions with the emergency

13   managers?

14             Did he ask him about his failed effort to broker a

15   deal between Detroit and Flint that might have prevented this

16   whole crisis from happening?  Did he ask him about his meeting

17   with the Flint pastors in July where they were trying to press

18   their concerns about lead in Flint's tap water?

19             Did he ask the governor about all of his inaction

20   over the year and a half of this crisis when he didn't do

21   anything to fix it?  No.  He showed him Rob Nicholas's email.

22   And he said, "Do you see here VNA said, 'Lead seems to be a

23   problem'?  Did anyone from VNA call you."

24             Give me a break, members of the jury.  They had the

25   governor of the state under oath.  And they had the

1    opportunity to ask him questions, to get to the heart of what

2    happened in the Flint Water Crisis.  And they chose to show

3    him Rob Nicholas's email that doesn't really prove anything.

4         What does that tell you?  Does that tell you that

5    plaintiffs' counsel are trying to do a real search and inquiry

6    of what happened in the Flint Water Crisis?  Or are they

7    grasping at straws to try to fix blame where it doesn't belong

8    on VNA?

9         Let's talk about their other greatest hit.  This

10   email where Bill Fahey wrote or Mr. Nasuta wrote, "If the best

11   technical decision is to go back to the City of Detroit, we

12   should not be afraid to make that call."

13        You know this was written by Mr. Nasuta who was

14   saying if it's the best technical decision, not that he

15   concluded that it was.

16        And then you have Theping Chen, who talked about his

17   email -- I'm sorry.  I thought it was here.  His email from

18   February 2, which they talked about in their closing argument

19   where he said, "Returning to Detroit might be the best

20   technical option to satisfy the activists."

21        Again, you've seen that email multiple times.  It was

22   written on February 2, 2015.  VNA's contract wouldn't be

23   signed until ten days later.  In the middle of the night,

24   Mr. Chen was looking at some news articles and said, "Huh,

25   this seems to be what the activists are all asking for.

1    They're asking for a return to Detroit.  That might be the

2    best technical solution."

3            But he learned soon after from the city that that was

4    not going to be an option.  And you see here his testimony

5    where he repeated multiple times that he was given a specific

6    direction that that was outside their scope.

7            And then you have Mr. Gnagy's mistake that they focus

8    on.  Mr. Gnagy's mistake.  What was his mistake?  That same

9    February 9 article about elevated lead at UM Flint.  He asked

10   for the data from the city.  The city sent him data, and he

11   assumed the city had sent him all the data.

12           So he analyzed it.  He did his own calculations.  He

13   didn't go back and check and see that actually if you read

14   down in the article, UM Flint had done three draws of water,

15   and they'd only sent him the results from one.  That was his

16   mistake.  He trusted the City of Flint.

17           Now, I will say to you they want to make a big deal

18   about his mistake, fine.  I would offer to you that testimony

19   shows how credible Mr. Gnagy was.  When he made a mistake, he

20   admitted it.  "I made a simple mistake."  It doesn't undermine

21   any of his recommendations about corrosion control.

22           It doesn't undermine any of the other work he did

23   that met the standard of care.  They pointed out a mistake,

24   and he admitted it.

25           Finally, let's talk about this statement the water is

1    safe.  I honestly -- after this much time, I don't have the

2    patience to go through this again.  I'll just say the slide

3    says right what it says.  "Safe equals compliance with state

4    and federal standards and required testing."

5         They put that right on the slide.  And you know from

6    the earlier testimony that the 90th percentile was 6 parts per

7    billion, which was in compliance with state and federal

8    standards.  So this statement was true at the time.

9         And one last thing, I'll just remind you.  You saw

10   Miguel Del Toral by video, I don't know, a couple of weeks

11   ago, and he was asked about statements like this.  He said,

12   "People say this all the time.  That's how people in this

13   industry work.  If you're at the action level or below, they

14   say the water is safe."

15        The bottom line here is that by looking at these

16   emails, plaintiffs' counsel had not met their burden of proof

17   of showing that VNA failed to meet the standard of care.  And

18   I want to say one other thing, because after all this time, I

19   still don't really understand what Mr. Maimon and Mr. Stern

20   think happened here.

21        You've heard a lot about upsells.  You've heard a lot

22   about, well, VNA knew lead was a problem, but they didn't say

23   something.  I don't really know how that fits into this

24   negligence case.  Because their claim is, you would think it

25   would be, "Well, they didn't know about lead," or, "They

1    overlooked it."  That's what would be a negligence claim.

2    They're not saying that.

3          They're saying no, no, no.  They knew about lead, but

4    they pulled their punches and didn't say it, because they

5    wanted to upsell.

6          Well, members of the jury, use your common sense.  Is

7    that how upsells work?  When you say your car to be repaired

8    at the shop, do you worry about what the repairman's going to

9    tell you?  He's going to tell you that there's -- aren't any

10   problems, or are you worried that there are a lot of problems?

11         Because people who are upselling try to overstate

12   problems.  They don't understate problems.  It's about

13   overstating the problem you can get hired to do more work, not

14   by understating it.

15         So, again, upsell is a -- I guess they found it in

16   some emails, but I just don't understand the logic of it, and

17   I think you should ask yourselves what it is that they are

18   trying to say really happened here.

19         So for all of these reasons, when you turn to that

20   question on your verdict form, did VNA breach the standard of

21   care, the answer clearly is no.  And you can have confidence

22   in reaching that answer.

23         I just have here some slides -- sorry -- that

24   Mr. Fahey also said they were trying to grow their business.

25   No one made any secret about that.

1           I'll skip ahead.

2           The next point.  After you conclude, as I think you

3   should, that VNA was not -- did not breach the standard of

4   care, if you answer that question in favor of VNA, then at

5   that point, at least as it relates to VNA, the case is over.

6           If VNA didn't breach the standard of care, you have

7   nothing left to consider for VNA.  And, again, I don't see how

8   you can conclude otherwise given this evidence.

9           But if you conclude that VNA did breach the standard

10  of care, you then have to turn to the second question of

11  whether these kids are injured.

12          Now, they call this a pivot or

13  choose-your-own-adventure.  I don't know.  Follow the judge's

14  instructions.  It goes down the same order.  First analyze did

15  they breach the standard of care.  If the answer is, "Yes," go

16  on.  If the answer is "No," you're done.  I didn't write the

17  choose-your-own-adventure.  That's what the law requires you

18  to do.

19          So let's talk about the evidence of injury.  And,

20  again, here the burden of proof lies entirely with the

21  plaintiffs.  In this part of plaintiffs' case, I will submit

22  really has one problem after another.  One problem after

23  another that they did their best to try and solve with what I

24  think are really creative arguments, but which ultimately

25  don't hold up.

```
 1              So let's start with the most basic aspect of this
 2      claim.  Were these children, were their clients exposed to
 3      lead in Flint's drinking water?  And as I said, we're not
 4      denying there was a water crisis.  Our claim is there was a
 5      water crisis.  But whether there's evidence it was a lead
 6      crisis is a different story.  We all know by now, I think
 7      every witness this the case has been consistent.  The water
 8      coming out of the treatment plant did not have lead in it.
 9              Lead comes into the equation because of the way that
10      water interacts with lead service lines, which causes the
11      scale to slough off of the service lines, and that's where
12      lead comes from.
13              And we know now that Rob Bincsik, the service center
14      manager, where he previously thought and he had that card
15      catalog that you saw a picture of, you previously thought,
16      "Oh, there's lead lines everywhere."
17              We now know from this FAST Start data that that SWAG
18      that he called it, his scientific wild ass guess that it was
19      way off.
20              We know from the FAST Start Program.  Now, what is
21      this?  You heard from Dr. Gagnon the FAST Start Program is a
22      program that was arraigned by the State of Michigan to replace
23      every single lead service line in the City of Flint.  And they
24      talked about the Pieper study.  The Pieper study was -- you
25      heard the testimony.
```

1          The Pieper study was an estimate based on

2     extrapolations of where -- of how many lead service lines

3     there were that was done before the FAST Start data was

4     available.  The FAST Start data, there's no need to

5     extrapolate.  There's no need for models.  They actually dug a

6     hole in the ground and looked at the pipes and saw which ones

7     were lead.

8          And what did they conclude?  You heard from

9     Dr. Gagnon.  If you just take the number of lead pipes and

10    divide it by the total number of service lines in the city, it

11    comes out to about 16 percent.  16 percent.  That's one out of

12    six.

13         Now, their burden of proof is to prove that it's more

14    likely than not.  More likely than not that their clients

15    consumed water with lead in it.  Ask yourselves, if it's one

16    out of six that had a lead service line, how have they met

17    their burden?  How could they show it's more likely than not

18    when five out of six did not have a lead service line?

19         Well, here's their way to try to solve that problem.

20    They point to the testimony of Dr. Bithoney.  And when you

21    look at Dr. Bithoney's testimony on this point, I submit to

22    you it's really -- when you really get down to it, it's a lot

23    of smoke and mirrors.  It's fancy words like "geomapping."

24         But when you get down to it, what Dr. Bithoney did,

25    he didn't do any testing of the equal homes that these kids

1    lived in.  He can't tell you that any of them lived in a home

2    with a lead service line.

3              Let me pause.

4              They also put up these school reports from the MDEQ

5    about each of the schools.  And you remember these reports

6    came in.  There was no witness to explain them.  They just

7    came into evidence.  Look at those reports.  Yeah, they have

8    some rooms in those schools that had elevated lead levels, but

9    the vast majority, like 80 percent of them did not.

10             So, again, that doesn't prove that any of these kids

11    were exposed to lead in their drinking water.

12             Dr. Bithoney concluded based on his statistical

13    generalizations that in his words, it was very likely that the

14    water consumed by Emir Sherrod, Aundreya Teed, and Daylaana

15    Ware was contaminated with lead, and it was possible that the

16    water consumed by Riley Vanderhagen was contaminated with

17    lead.

18             But other than telling you his conclusion, he really

19    didn't show you how he got there.  He said he did geomapping,

20    looked at zip codes.  How he did it?  A little mysterious.  So

21    let's look at some of the statistics he presented to you.  He

22    said -- I'm picking Daylaana Ware for an example.  But the

23    same analysis can be done for all four of the children.  He

24    said, "Well, she lived in a home" -- or lived in a zone or a

25    ward where 18 percent of the water sampled had -- that was

1    collected exceeded 15 parts per billion of lead.

2          And that was on the slide he showed you.  18 percent

3    exceeded.  He had to admit on cross-examination that that

4    meant that 82 percent did not exceed the action level for

5    lead.  He also said he based it on the estimated percentage of

6    children in the ward who had elevated blood lead levels and

7    that it increased in her ward by 350 percent after the water

8    source switch.  350 percent increase.  Sounds like a lot.

9          But he had to admit on cross-examination that it

10   increased from 1 percent to 4.5 percent.  And don't be

11   confused, that's not the blood lead level.  That's the

12   percentage of children in that ward with elevated blood lead

13   levels.  It went from 1 percent to 4.5 percent, which means

14   95.5 percent did not have elevated blood lead levels.

15         And he tries to tell you, "Well, it went up by

16   350 percent."

17         He said that 42.7 percent of the pipes in this block

18   group were made of lead, galvanized, or unknown materials.

19   Again, not acknowledging, that means that more than half were

20   not.  He also looked at the median year the structure in the

21   block -- the structure in that block group, the homes were

22   built.  And he said that lead-containing pipes were used

23   during that time.  And he had to admit that lead paint was

24   widely used during that time, as well.

25         You know, I loved it when during plaintiffs'

1  counsel's argument, they said, "Oh, Dr. Bithoney, he made

2  clear, when you hear hoofbeats, think of horses.  Don't think

3  of zebras."

4          But, members of the jury, you still have to see the

5  horses.  You still need evidence.  Here it seems like

6  Dr. Bithoney heard some hoofbeats and said, "Stop there.

7  That's enough, because it's not a zebra."

8          So there's no evidence, no direct evidence of lead

9  exposure.  How else did Mr. Maimon and Mr. Stern try to get

10  around this problem?  Well, they tried to say, "Well, they

11  must -- if we can't prove directly that they had lead in their

12  water, we can show that they have lead in their bodies, and

13  that lead must have come from somewhere, and that somewhere

14  must have just been the water."

15          And that's essentially their chain of reasoning, but

16  that doesn't hold up either.

17          To begin with, not one of these four children, not

18  one of them, has ever had an elevated blood lead level.  Not

19  one of them not ever.  This is a chart that Dr. Gaitanis

20  showed you that chartered all the blood lead results that we

21  have for these four children.  And you see Daylaana Ware on

22  the left side, her highest blood lead readings were before the

23  Flint Water Crisis even began in 2009 and 2010.

24          You see Riley Vanderhagen had blood lead readings at

25  the end of 2015 and the beginning of 2016.  The first one was

1    within the national average.  And the second one was slightly

2    above it.  The other two readings are within the national

3    average.  And then these others on the dotted line on top were

4    where it could not be detected.

5           And you can see it's 3.3, because that's the

6    detection limit for the test.  So no one really knows if it's

7    anywhere between 0 and 3.3.  We just know it's less than or

8    equal to 3.3.

9           So not one of these children has ever had an elevated

10    blood lead level.  And make no mistake, every witness in this

11    case, including Dr. Bithoney, including Dr. Specht, they all

12    said the standard way of measuring lead exposure is through

13    blood lead.

14           Not one of these children ever had an elevated blood

15    lead level.  Sounds like a problem for plaintiffs' counsel.

16    Sounds like a problem for their case.

17           Well, they've got a way around that problem.  They

18    say, "No, no, no.  Half-life.  Half-life.  We just didn't get

19    the tests in time, and so there's no way to know what the

20    blood lead levels were, because the blood lead was really

21    there, but it just kind of disappeared like magic."

22           And you heard from Dr. Gaitanis that the medical

23    literature does not support that theory.  He explained that,

24    yeah, there might be some evidence that for an acute exposure

25    if someone has a one-time exposure to lead that there will be

 1   a short half-life where it goes away but that the evidence

 2   shows that for chronic long-term exposures, it lasts for much

 3   longer.

 4          And putting aside the technical literature that

 5   Dr. Gaitanis talked about, again, use your common sense.

 6          Plaintiffs' counsel will have you believe, based on

 7   the testimony, that Riley Vanderhagen was drinking three or

 8   four glasses of water a day throughout the Flint Water Crisis.

 9   Yet in 2015 and early 2016, her blood lead levels were still

10   well below the CDC reference level.

11          When was the time for this magical half-life to take

12   effect?  When did the half-life cause the lead to disappear?

13   She's drinking water that whole time, or so they say, and the

14   blood lead is not elevated.

15          Okay.  So they don't have blood lead.  So what do

16   they do?  They turn to bone lead.  And here this was -- this

17   is obviously a critical issue in the case.  And I want to be

18   very clear about this.  You did hear that there is a KXRF

19   device, a stationary x-ray device used in two hospitals to

20   measure for bone lead and that those measurements have been

21   reliable.

22          But you also heard about Dr. Specht and his pXRF

23   device.  And I want to suggest to you that the evidence is

24   clear the pXRF is not reliable.  Now, they said -- well, they

25   didn't have a witness that said this.  I'll get to that in a

1    moment.

2         But before I even do that, I can't resist again

3    reminding you of one piece of testimony, which is that

4    Dr. Specht, when he was here testifying, I have right from the

5    transcript.  He said, "The pXRF is akin to a Star Trek

6    Tricorder," or something like that.

7         Again, not my words.  This is Dr. Specht who compared

8    it to a Star Trek Tricorder.  And I will admit I'm not really

9    a Star Trek guy.  But I went and tried to look up what a

10   Tricorder was, and it's a device that they used on the show to

11   sort of magically detect medical issues.

12        Members of the jury, that's an apt metaphor, because

13   this device is science fiction.  The pXRF device is not

14   referenced in any lead exposure guidelines written by the NIH,

15   the CDC, or any pediatric medical societies.  It's not

16   mentioned in any major textbooks of pediatrics regarding lead

17   evaluation.

18        It doesn't have proper normative data or control

19   data.  It's never been validated by an outside laboratory.

20   And the results cannot be replicated.

21        I want to go through this in a little more detail,

22   because I think it's really important.  It's really the heart

23   of their case.

24        Why has this device not been replicated by other

25   labs?  Well, you heard from Dr. Gaitanis.  You heard he said

1    lead -- sorry.

2           You heard he said -- he uses some proprietary cast

3    that nobody else has access to, and, therefore, it can't be

4    tested.

5           You heard that Dr. Specht has done four studies to

6    try and validate the measurements he gets from his pXRF

7    device.  He had one study on lead poisoned children I think in

8    China who had very elevated lead levels above 20.  And what he

9    found was that for those children, the device seemed to work

10   and give reliable readings.

11          But for the children who did not have elevated blood

12   lead levels, the device was not reliable.  It didn't correlate

13   with the KXRF.

14          So that one study on the Chinese children.  He also

15   tested it, I think, on a group of adults, I think, in Canada.

16   And there, again, we know adults bones are very different from

17   children's bones, so I think even he didn't think that was

18   full validation.  And he tested it on dead birds.  That's it.

19   It has not been validated.

20          Now, Mr. Stern says, "Oh, it's new, a new

21   technology."  And I remember there was a little back and forth

22   between him and Mr. Kent about, you know, microwaves being

23   invented and Kitty Hawk.  And I stayed out of it as I tried to

24   do throughout the trial on those kind of things.

25          But I thought about it as I was preparing for this

 1   closing statement.  And it said yeah.  There was a day when

 2   there was a first airplane, right?  Everyone -- everything has

 3   to be done for the first time once.  But if you were standing

 4   at Kitty Hawk with the Wright brothers, and they said, "Come

 5   on.  Hop aboard.  I'm sure it will fly," would you jump in?

 6   No.  You'd wait to see that it's validated.  You'd wait to see

 7   that it's reliable.

 8           Here what Mr. Maimon and Mr. Stern are asking you to

 9   do, they're asking you to jump on something that's never been

10   validated and something that isn't reliable.

11           And what else?  We don't each know what these numbers

12   mean.  Because, for example, Dr. Specht put his Tricorder, his

13   pXRF up against one of the plaintiffs legs.  I think it was

14   Riley Vanderhagen, and he said, "Oh, she had a bone lead level

15   of 9."

16           Now, this, again, has no relationship to the blood

17   lead levels.  This is a different number.  Bone lead of 9.

18   And he said, "That's substantial or significant."

19           So the obvious question, "Well, what would a child

20   who wasn't exposed to lead have in their bones?  How do I

21   compare that and know what this number is really telling me?"

22   He doesn't know.  He's never done a control group.  Nobody

23   knows.  Nobody has ever used this device besides Dr. Specht.

24           There's no reference values like you had for the CDC.

25   There's nothing.  There's just Dr. Specht, and we're being

1    asked, essentially, to take his word for it.

2          And finally, the last thing I'll say about

3    Dr. Specht.  Even if you credited his device, even if you

4    thought this device actually showed you something about bone

5    lead, it can tell you nothing about how or when the lead got

6    into those bones.

7          It is reflecting lifetime exposure to lead.  It's not

8    telling you what lead was consumed during the Flint Water

9    Crisis.  It's telling you over the whole life of this person,

10   this is where lead came from.  And it can't tell you when it

11   got there.

12         And this is critically important for VNA, because we

13   only got there in February of 2015, and their burden is to

14   show that there was lead exposure after that.

15         Dr. Specht tells you nothing from nothing about when

16   the lead got into these bodies, and it can't tell you anything

17   to show that it happened after VNA arrived.

18         When did the lead get there?  Hard to say.  Because

19   we know from Dr. Gaitanis that lead is ubiquitous in our

20   environment.  I remember Dennis Muchmore, the governor's

21   former chief of staff.  He said the same thing when he was

22   here just a few weeks ago.  Everyone in this room has lead in

23   their bodies.

24         And we also know from this document that came into

25   evidence, VNA 1829, the notice the city sends out to consumers

1   that the EPA estimates that 10 to 20 percent of human lead

2   exposure may come from drinking water.  10 to 20 percent.

3   Which means that 80 to 90 percent comes from other sources.

4   Like soils and dusts and paints.

5          Dr. Specht tells you nothing about whether the lead

6   he found came from water or whether it came from one of these

7   other sources.

8          So there's no evidence of lead exposure.  There's no

9   evidence of elevated blood lead levels.  The pXRF is not

10  reliable.  We're left with the evidence of impairment.  And

11  you heard a lot about this, this morning from Mr. Maimon and

12  Mr. Stern.

13         And I would offer to you, members of the jury, this

14  is a difficult part of your task to evaluate whether or not

15  these children are impaired, because their parents say that

16  they are.  But you saw their academic records.  You saw that

17  apart from some bumpiness in the school years around COVID,

18  these children are all doing well.

19         On top of that, I would suggest to you keep in mind,

20  not one of these children, there's no evidence that any of

21  them have sought or is seeking any medical treatment for lead

22  poisoning.  Not one of them is seeking any treatment for any

23  of the conditions Dr. Krishnan diagnosed.  They're not seeking

24  educational plans.  They're not seeking educational

25  accommodations.  There's no evidence of any of that.

1          Now, what do we say about Dr. Krishnan's diagnoses?

2     Well, number one, we want to remind you of Dr. Gaitanis,

3     right?  I'll remind you again, Dr. Gaitanis is a treating

4     physician.  He's not a professional expert.  He's not someone

5     who comes to court regularly and testifies in cases.

6          He's a pediatric neurologist who has devoted his life

7     to helping children.  And, yes, he's not an expert on lead

8     poisoning, but he's an expert in the sort of conditions that

9     Dr. Krishnan diagnosed.  And what did he tell you?  He told

10    you that if these kids were referred to him, he would call

11    their parents and say, "Good news.  You can rest easy.  The

12    children are fine.  They're not injured.  And there's no

13    treatment I can do to help them, because they're doing fine."

14         He also said on this notion that there's a downward

15    spiral that, in fact, the opposite is true and that through

16    treatment, some of these conditions can be improved.

17         He also told us that Dr. Krishnan, who, again, is not

18    a medical doctor and who did her tests in a law office, that

19    Dr. Krishnan misdiagnosed these children.  That the cognitive

20    functioning, the decrement in cognitive functioning that she

21    diagnosed is something that has to be measured, according to

22    the manuals, by something that goes beyond the normalcy in

23    aging.

24         It's a diagnosis that's typically applied or really

25    is applied in situations of Alzheimer's or dementia.  It

 1   refers to an aging patient, and it's clearly inappropriately

 2   being applied to these kids, because they're at the wrong

 3   stage of life.

 4        He also told you that the idea that these decrements

 5   came from an acquired brain injury is not correct.  That those

 6   two diagnoses are mutually exclusive.

 7        And here's -- and you heard from Dr. Thompson that

 8   the way this usually works in the real world is that the

 9   person who does the testing is not the same person who does

10   the diagnoses, that the person does the testing and then sends

11   them off to a doctor for diagnoses, a doctor like

12   Dr. Gaitanis.

13        And he would -- and he concluded based on the records

14   he saw, there was no need to evaluate these children in

15   person.  No need to subject them to that, because it was clear

16   from the records he saw that they were not injured.

17        Again, you saw that Dr. Gaitanis made clear he didn't

18   see any evidence of cognitive impairment in any of the

19   children.  And here's really the kicker when you think about

20   this piece of evidence.  Because, again, you have conflicting

21   experts on both sides.

22        But ask yourself this question.  Dr. Krishnan gave

23   these diagnoses in 2020.  That's two years ago, more or less.

24   Is there any evidence that any of these children are seeking

25   any kind of treatment, any educational accommodation, or

1  anything as a result of that diagnosis?  There isn't.  There's

2  no evidence.

3          We would submit to you, members of the jury, that

4  these injuries only seem to exist in this courtroom.  Their

5  teachers haven't identified it.  There's nothing in their

6  academic record that suggests there's an impairment.  And even

7  though Dr. Krishnan testified to an impairment, there's no

8  evidence that anyone's done anything about it.

9          Plaintiffs' counsel are not seeking damages for the

10  cost of medical treatment.  The most they can tell you is that

11  they're suffering shame and embarrassment and humiliation.  I

12  think you heard the testimony was that I think it was Aundreya

13  Teed suffered shame, because she came from Flint, and everyone

14  associates Flint with the water crisis.  Not because of

15  anything that VNA did.

16          And they're saying that this is going to cause a

17  reduction in earnings over the course of their lives.  Members

18  of the jury, there's just no evidence in the record to support

19  any of that.  There's no way to know what these children are

20  going to do now and what they would have done before.

21          In fact, the testimony is that whatever these

22  children were going to be before, they're still going to be

23  able to be now.

24          Dr. Krishnan said it might be more difficult, but

25  that's all she was able to say.

```
 1              Finally -- and I know we're running late on time, and
 2      I appreciate you agreeing to stay with me through 2:30, and
 3      I'm confident I'll get this finished by then.
 4              Finally, before you leave the subject of injury, you
 5      have to consider the concept of causation.  Because, again,
 6      even if you find that these children are injured and even if
 7      you find that injury was caused by exposure to lead, you still
 8      have to -- you still have to conclude to side with the
 9      plaintiffs that this injury was caused by something done by
10      VNA.
11              And to evaluate that, the question is:  Well, what
12      would have happened differently if VNA had made the
13      recommendations that Mr. Humann suggest they should have made?
14      What would have been different?
15              And I think you know the answer to that.  Absolutely
16      nothing.  You know what the MDEQ's plan was.  You heard it
17      from Stephen Busch.  They had this plan to do two six-month
18      monitoring periods, followed by a period of time to do some
19      testing, followed by some time to implement this.  That was
20      the plan that they were on.
21              And they're the MDEQ.  They're the regulator.
22      They're the boss.  They're the law is what Mike Glasgow said
23      about them.  Do you really think if VNA showed up and said,
24      "Ey, we think you should add orthophosphate right now," it
25      would have -- something different would have happened?
```

1          You can speculate about that.  But there's no

2     evidence to suggest that it would have.  Because in addition

3     to the fact that Stephen Busch told you this, you heard that

4     there were lots of people who questioned it.

5          You heard about this June 26, 2013, meeting, a

6     meeting, by the way, that Rowe Engineering attended, according

7     to the documents.  You heard that Warren Green raised

8     questions about corrosion control.

9          And what was he told?  He was told by Stephen Busch,

10    "That's the way we do things in Michigan."  Warren Green

11    raised questions in 2013.  "Do we think it would be different

12    if in 2015 VNA had said something?"

13         You know nothing would have changed.  Mike Glasgow,

14    before they started distributing water from the plant, reached

15    out to his bosses and then to the MDEQ, the regulator.  This

16    is the licensed operator at the plant.  And he's saying, "The

17    plant's not ready.  If water is the distributed from this

18    plant in the next couple of weeks, it would be against my

19    direction."

20         Now, I know we've seen this a couple of times, and

21    you can get kind of desensitized to it.  But, members of the

22    jury, this is the guy standing watch.  This is the lookout on

23    the Titanic yelling, "Hey, iceberg ahead."

24         And what do the people he's saying that to -- what

25    did the captain say?  They shrugged their shoulders.  He heard

 1    Stephen Busch say that he never responded.  Why?  He didn't

 2    know.  He just didn't respond.

 3              You heard from Adam Rosenthal from the MDEQ testified

 4    by video deposition.  He saw this email, too.  He saw -- he

 5    testified he went and wanted to make sure Steve Busch had seen

 6    it.  And then he was asked, "Well, did you say anything to

 7    Glasgow the next day when you were at the plant for the

 8    ceremony where they pushed the button?"

 9              He said, "No.  I didn't it was too loud in there.  I

10    couldn't say anything."

11              You really think when Mike Glasgow was telling the

12    MDEQ, "Hold on.  Don't distribute water."  That if VNA had

13    said something, something would have been different?

14              And I love this, when Dennis Muchmore testified just

15    the other week he was shown some documents in which he and

16    others were questioning Marc Edwards.  And Mr. Campbell asked

17    him, "Do you think they have a responsibility to look into

18    this data rather than to simply call it irresponsible?"

19              And he gave his answer, and he explained that his

20    attitude was, "No way, buddy.  You just showed up in town."

21    Talking about Marc Edwards who came from Virginia Tech.

22              We know what the attitude of the public officials

23    was.  They were committed to their plan.  They had dug in

24    their heels, and they weren't going to do anything different.

25    "No way, buddy.  You just showed up in town."  The same would

1   be true of VNA.

2         There were multiple opportunities, multiple

3   opportunities after VNA left Flint when if anyone wanted to

4   listen, if anyone wanted to do something differently, they had

5   more than enough reason to do something differently.  You have

6   Glasgow's email, which I've talked about.

7         You had Pat Cook's email, April 24, 2015, when he

8   finally told the EPA Flint doesn't have corrosion control,

9   even though the MDEQ had previously lied about that.

10        You have Governor Snyder's meeting with the Flint

11  pastors, July 22, 2015.  And here's the one that is most

12  compelling to me.  This document's in evidence.  August 17,

13  2015.  The MDEQ finally orders Flint to implement corrosion

14  control but gave them until January 1, 2016, to do it.

15        You can check the document.

16        So ask yourselves, "This is the MDEQ, the regulator

17  that has the power to put a stop to this right away, and

18  they're saying, 'Add corrosion control, but you have six

19  months or five months to do it.'"  January 2016.

20        What's the date that if VNA had said, "Add

21  orthophosphate in their report," what's the date that Flint

22  officials would have stood up and said, "Okay.  We're going to

23  do it"?  When all these other people had been saying, "Please

24  do something about the water," and they weren't, what's the

25  date that VNA's recommendation would have made a difference?

1          And then think further.  Even if it had happened

2     right away, even if on February 11, 2015, they immediately

3     decided to switch and add orthophosphate, how long does it

4     take for lead to get out of the water?  There's no evidence in

5     the record about that.

6          Members of the jury, they are asking you entirely to

7     speculate that if just VNA had said something, if VNA had

8     said, "Add orthophosphate," everyone would have changed

9     course, stopped everything they were doing, all the lies would

10    have stopped, all the changing of data, they would have

11    immediately snapped to, change the water treatment, and then

12    the lead would have disappeared overnight.

13         There's just no evidence to support any of that.

14         Now, before I move on to the government officials,

15    you've heard this is a case about four individual children,

16    and you have to consider them individually.  I want to just

17    pause for a moment to review the evidence on each of them, and

18    I promise I'll go through this relatively quickly.

19         First, we have Aundreya Teed.  You met her parents or

20    her mother.  Aundreya was 5 years old at the time of the

21    crisis.  She had two -- on April 19, 2012, nearly two years to

22    the day before the switch to the Flint River water, Aundreya's

23    blood lead level was tested and reported to be 3, the highest

24    of any level that she consumed.

25         She was tested again towards the end of the crisis,

1    and her blood lead level was non-detect.

2          You heard from Aundreya's mom that Aundreya gets A,

3    B, average grades.  No one has ever recommended that Aundreya

4    seek mental health treatment.  Aundreya has never been

5    punished in school.  No time-outs, no detention, no

6    suspension.

7          You heard from Dr. Krishnan.  Aundreya has an overall

8    normal intellectual level.  She generally has the cognitive

9    capacity to succeed.  She has a low average score, not an

10   impaired score.  And you saw from Dr. Thompson, her IQ is

11   right in the middle of the average range.

12         Emir Sherrod, similarly never had an elevated blood

13   lead level.  His teachers describe him as someone who's

14   bright, conscientious, and demonstrates leadership.  He has

15   good team spirit but also the ability to work independently.

16   He has a bright mind and a big heart.

17         Dr. Krishnan said Emir didn't have any significant

18   discrepancies on the WISC-V and did acceptably on much of the

19   remainder of the testing.  His appropriate placement is in a

20   mainstream classroom.  There's no mention of ADHD or

21   hyperactivity in his school records.  And there's no diagnosis

22   of ADHD in his medical records.  His IQ score was right smack

23   in the middle of the average range.

24         Riley Vanderhagen also never had an elevated blood

25   lead level.  She was tested, as I said before, towards the end

1   of the Flint Water Crisis, and her blood lead level was 0.7,

2   within the national average.  She was tested again shortly

3   after, and it was slightly elevated, but still below CDC

4   reference level.

5          According to Riley's family, she had tantrums that

6   started around her first birthday.  Never talked to the doctor

7   about it, because it's a 1-year-old having a tantrum.  They

8   said she has the best personality, she's outgoing, and can

9   make friends anywhere.  She's a happy kid, like a comedian.

10          Dr. Krishnan noted she had difficulty reading in

11   kindergarten, because she started kindergarten early when she

12   was 4 years old, but by the end of the year, she caught up.

13   And Riley's WRAT5 test results, she was reading well above

14   grade level.  Her IQ score was in normal range.

15          Then finally, you have Daylaana Ware whose highest

16   blood lead readings in our whole case were years before the

17   Flint Water Crisis.  She was tested again later towards the

18   end of the crisis or afterwards and did not have an elevated

19   blood lead level.

20          Her teachers describe her as a very eager learner

21   who's always respectful and kind.  She does very well and gets

22   As and Bs and is a joy to have in class.  Dr. Krishnan said on

23   a measure of overall functioning, she's in the normal range,

24   and her IQ score was within the normal range.

25          Members of the jury, again, we don't want to seem

1    callous towards these children.  Everyone cares about

2    children.  As Mr. Stern said, that's what unites all of us.

3    But the question before you is not whether you care about

4    children.  We all care about children.  The question is:  Are

5    these children injured?  Was their injury caused by exposure

6    to lead in Flint's water?  And did anything VNA did cause that

7    injury?

8            And the answers to all of those questions, with all

9    respect to these children, the answer is just, no, they were

10   not injured.

11           Now, finally let me talk about this last subject, the

12   government officials being responsible.  I said at the

13   beginning that we're not here to shift blame.  This is what

14   the law requires.  It's what the judge has instructed you the

15   law requires.

16           And, again, it's your duty to go through this.  And

17   if you find that there's negligence and if you find that

18   there's injury to then allocate fault amongst whatever parties

19   you think are responsible.

20           Now, I thought it was interesting that Mr. Maimon,

21   when he was trying to undercut our case against these

22   government officials, he said, "Well, look.  They didn't have

23   an expert that testified that these government officials were

24   responsible.  They didn't -- we brought experts to satisfy our

25   claims.  They didn't bring any experts to satisfy theirs."

 1          He may have forgotten that Mr. Humann testified that

 2     -- he agreed with the generally accepted conclusion that the

 3     Flint Water Crisis was a failure at all levels of government.

 4     Mr. Humann, their expert, testified to that.

 5          Mr. Humann also testified that if the MDEQ had told

 6     the city that it needed to add a corrosion inhibitor, the

 7     Flint Water Crisis may never have happened.  That's their

 8     expert.  He agreed to that.

 9          Ask yourselves, "If that's true, that if the MDEQ had

10     told the city it needed to add a corrosion inhibitor, how on

11     earth is VNA 50 percent responsible for this crisis?"  If

12     that's the argument they're trying to make to you.

13          He told you that -- or he agreed that ultimately the

14     City of Flint is responsible for the water crisis, and

15     Mr. Humann said the decisionmaking would have been with the

16     City of Flint.  Yes.

17          And finally, he wrote in his report, "The Flint Water

18     Crisis occurred when state appointed emergency managers

19     replaced local representative decisionmaking."

20          And he said, "Yes."

21          So who bears responsibility for the Flint Water

22     Crisis?

23          We're learning it's 2:10.

24          I only -- I promise you I'll be done in 20 minutes,

25     and I'm not going to go through all of the evidence we've

1    heard.  There had be no way to possibly do that on this point.

2         You've heard mountains of evidence about the Flint

3    Water Crisis.

4         What I propose to do to wrap up this part of the

5    closing argument is go through the key decisions that were

6    made and which parties are responsible for those decisions.

7    As a way, again, to help you when you're allocating

8    responsibility, figure out where responsibility lies.

9         Let's begin with the decision -- sorry -- the

10   decision to use the Flint River.

11        Who made that decision?  Well, it's a decision that

12   is hard to understand other than by the fact that everyone

13   involved in governing Flint was trying to save money.  The

14   city had been authorized to use the Flint River as a backup

15   source, but it had no experience treating raw river water as a

16   full-time source and didn't have anywhere near the necessary

17   staff.  The plant was in disrepair.  And everybody knew it.

18        But it was cheap.  It was going to save them

19   12 million a year, so that's what they decided to do.  And,

20   you know, you hear from Mr. Stern, "Well, these people didn't

21   know anything.  Howard Croft didn't know anything about --

22   about water.  How could he be held responsible?"

23        Members of the jury, Howard Croft was the director of

24   public works for the City of Flint.  It was his job to know

25   something about water.  He can't make the excuse of, "Well, I

1    hired Veolia for a week, so I guess my job's done."

2              It was his job to know something about water.  And

3    you saw by their own admission, he didn't know anything about

4    water.

5              You heard that Mayor Walling and the emergency

6    managers try to blame the decision to switch to the Flint

7    River on Detroit, saying that, you know, Detroit cut us off.

8    But you know better.  You saw from Sue McCormick that she

9    offered to reconnect them without any long-term contract or

10   increased fee.

11             So why did they stick to this plan to go to the

12   river?  I think you've seen enough evidence.  It's a

13   combination of arrogance, shortsightedness, and recklessness.

14   Everyone knew the Flint River -- the Flint Water Treatment

15   Plant had been mothballed and only used in a backup capacity.

16             Everyone knew it would require substantial upgrades

17   to be ready to start treating Lake Huron water from the KWA

18   and that the only way to do this would be to stop buying water

19   from Detroit.

20             And you heard that there were lots of people who were

21   raising red flags about this before the decision was made.

22   Adam Rosenthal, from the MDEQ.  When he heard they were going

23   to the river, he said, "I didn't agree with it.  I thought it

24   was a mistake."  He thought going to the river and having them

25   fire up, basically a mothballed plant was a mistake.

```
 1              Again, I went over this before.  You saw
 2      Mr. Glasgow's email.  If you do this, it will be over my
 3      objection.  And you saw that as I said before, Mr. Busch
 4      didn't do anything when he saw that testimony.  Mr. Rosenthal
 5      didn't raise it, because it was loud in there.
 6              So who made the decision to switch to the Flint
 7      River?  Who's responsible for that?  Governor Snyder, who
 8      appointed the emergency managers and who the emergency
 9      managers reported to, who failed to broker a deal between
10      Detroit and Flint to solve this problem.
11              The emergency managers, who pushed forward with the
12      plan, because they wanted to save $12 million a year.  And the
13      City of Flint, which plowed ahead, even though it knew the
14      plant wasn't ready.  State of Michigan, through its MDEQ,
15      which approved this plan, even though their internal people
16      knew it was a mistake, the State of Michigan bears
17      responsibility, as well.
18              What's the next decision we want to talk about?  The
19      lack of corrosion control.  Again, there's really no mystery
20      at this point on this -- on what happened here.  The MDEQ
21      decided from its mistaken interpretation of the Lead and
22      Copper Rule that Flint didn't need corrosion control, because
23      they were going to do two six-month monitoring periods
24      followed by some time to test it.  That was their decision,
25      the MDEQ.
```

1          And you heard that there were people like Warren

2     Green who raised questions about this.  And what happened?

3     You heard in response from several witnesses, from the

4     emergency manager's mandate was we're not doing anything that

5     the MDEQ doesn't require.  No extras.  That's what Emergency

6     Manager Kurtz said.  No extras.  If the MDEQ requires it,

7     we're going to do it.  If they don't require it, we're not.

8     And they weren't requiring corrosion control.

9          And you know now this was a mistake.  The MDEQ

10    director admitted it was a mistake that corrosion control

11    should have been required from the beginning.  Who made this

12    decision?  Clearly the State of Michigan through its MDEQ.

13          You didn't hear very much about the MDEQ when

14    Mr. Maimon was going through the responsible parties.  It was

15    all VNA 50 percent and LAN 25.  The MDEQ, which made the

16    decision not to require corrosion control sort of slipped his

17    mind.

18          The emergency managers, who went along with that

19    decision and the City of Flint.  And Governor Snyder, who

20    ultimately controlled the emergency managers and the MDEQ.

21          What happened after this decision was made to

22    distribute water without corrosion control?  Well, immediately

23    there were water treatment failures.  Immediately.

24          Very soon after the switch, you heard within 30 days,

25    Rob Bincsik told you there was a massive uptick in citizen

```
 1    complaints about water quality.  The water smelled bad.  It
 2    looked bad.  It tasted bad.  You heard from Rob Bincsik that
 3    around this time when he started raising questions about what
 4    the city was doing, he found -- he attended one meeting where
 5    he asked some questions, and he found that all that happened
 6    was he never got invited to another meeting.
 7            The City of Flint and the emergency managers were
 8    committed to this course of action.
 9            Turns out, truly, water wasn't as simple as they had
10    thought.
11            Here you see the statements I referred to from Howard
12    Croft.  "Pretty much right away we got complaints.  30 days
13    after the switch we got complaints."
14            Again, VNA wasn't even there.  Who's responsible for
15    the water treatment failures?  The City of Flint, the
16    emergency managers, the State of Michigan, and
17    Governor Snyder.
18            What was the next key decision?  Well, they had an
19    opportunity to reconnect to Detroit in January of 2015.  That
20    was what Sue McCormick testified about.
21            Sorry.  I skipped one.
22            Well, let me go through.  It's not on my chart.
23            October 2014, Governor Snyder's advisor, Valerie
24    Brader, reached out to the City of Flint emergency manager and
25    said, "We should ask the EM to consider coming back to the
```

```
 1   Detroit system.  This is an urgent matter to fix."  No action
 2   taken by the governor.  Even after Governor Snyder sent his
 3   letter seeking help, no action taken by the governor.
 4          Finally, let me talk about LeeAnne Walters and these
 5   lead test results.  You heard a lot about this.  Mr. Stern
 6   faulted us for trying to use a Flint mom as part of our
 7   defense.  I think we're just talking about the evidence of
 8   what happened in Flint.
 9          And the evidence is clear that everybody, everybody
10   involved, when they got these results, understood that there
11   was a serious issue.  You heard from Mayor Walling when they
12   got these lead test results, they knew there were very serious
13   issues that were coming up.
14          You heard from Mike Glasgow that this is what caused
15   him to connect the dots that there was a lead problem in the
16   City of Flint.  This is when things added up in his mind.
17          You heard from Rob Bincsik that as soon as he saw
18   these lead test results, he was concerned about a potential
19   larger problem in the system.  You heard from Adam Rosenthal
20   from MDEQ, that as soon as he saw this level 104, he said,
21   "Wow.  That's high."
22          But even though all of these city officials -- you
23   heard from Stephen Busch.  He was alarmed, because it was a
24   high lead result.  All these city officials, they saw this
25   result, they knew it was high.  They knew it was a big
```

1     problem.  None of them, not one of them shared that

2     information with VNA.

3           The consultants that were supposedly there to help

4     solve all of these problems and who bear all responsibility

5     for everything that occurred.

6           And you heard from Marvin Gnagy that if he had been

7     told about this, he would have focused on lead and seen it as

8     a more current issue.

9           You heard that the EPA had the opportunity at that

10    point after these test results were found to step in and take

11    action, and they didn't do it.

12          They were delayed in doing that.  Why were they

13    delayed?  Because the MDEQ directly lied to them.  You saw

14    this testimony during the trial.  You saw that after the

15    discovery was made about the high lead results, Jennifer

16    Crooks asked Stephen Busch, "Miguel was wondering if Flint is

17    feeding phosphates.  Flint must have optimal corrosion control

18    treatment?  Is it phosphates?"

19          What did he answer?  He says, "The City of Flint has

20    an optimized corrosion control program."  And he admitted when

21    he was here on the stand that he knew those were not the same

22    things.  He knew they were asking about phosphates, and he was

23    talking about his two six-month monitoring periods.

24          And even when the EPA tried to -- when Miguel Del

25    Toral of the EPA tried to ask questions, did they take his

1    advice?  Did they get help from him?  No.  They tried to reach

2    out to their director to call the EPA and tried to have Miguel

3    Del Toral overreach his address.

4          Think about the testimony from someone like

5    Mayor Walling, who told you that after the crisis ended, he

6    went through Veolia's report, and he just was so disturbed to

7    see that it didn't mention the word "lead."

8          But then had to admit on cross that he got Miguel Del

9    Toral's report from June of that year, which mentions the word

10   "lead" 20 times, and still did nothing.

11         So who's responsible for ignoring the Walters's test

12   results?  Clearly the City of Flint, the emergency managers,

13   State of Michigan, EPA, Governor Snyder.  Not VNA.  They

14   weren't even there.

15         Last two things.  Falsifying the LCR results.  You

16   heard this from Mike Glasgow.  He submitted this was when --

17   towards the middle of 2015, he submits the LCR results to the

18   state, to the MDEQ.  They're above the action level.  What

19   does the state tell him to do?  Take the Walters's home off of

20   your results.  And so he changed the report, submitted a new

21   report, and added a footnote that said he changed it at the

22   request of the MDEQ.

23         State of Michigan, through its MDEQ, the governor who

24   appointed them, City of Flint, Mike Glasgow for going along

25   with it.

```
 1              And finally, you heard about the Flint pastors July
 2      of 2015.  They came to Governor Snyder.  They asked for his
 3      help.  They presented him with evidence of elevated lead in
 4      Flint's water.  You saw Mr. Muchmore's notes from that
 5      meeting.  "Lead is a big problem."  July of 2015.  Veolia
 6      efforts.  "What are we doing with these?"  Still no one did
 7      anything.
 8              Mr. Stern wants to talk about his puzzle from his
 9      opening statement.  And Mr. Maimon suggests that VNA is
10      50 percent responsible for what happened in Flint.  Members of
11      the jury, when you put together all of the evidence, they are
12      pieces of a puzzle.
13              But they're pieces of a puzzle that VNA just doesn't
14      fit into.  You have Governor Snyder, who controlled
15      everything.  You have the DEQ, which made the critical
16      decisions to approve the use of the Flint Water Treatment
17      Plant and then did not require corrosion control and then lied
18      and covered up its mistakes when it was called out.
19              You had the EPA, which had clear evidence of a
20      violation and did nothing about it.  You had the MDHHS, which
21      you heard about, has the ability to test for blood lead
22      levels.  You didn't hear much more, because Nancy Peeler from
23      the MDHHS took the Fifth when we called her to testify.
24              You have the emergency managers who controlled
25      everything.  Plaintiffs' counsel are desperately trying to get
```

```
 1   that VNA puzzle piece to fit into this puzzle, but it just
 2   doesn't belong.
 3         Members of the jury, as I told you in my opening
 4   statement, the people of VNA did not cause the Flint Water
 5   Crisis.  The people of VNA did not prolong the Flint Water
 6   Crisis.  And the people of VNA didn't make the water crisis
 7   worse in any way.
 8         VNA did good work in Flint.  In the space of one
 9   week, it performed a comprehensive analysis of Flint's water
10   and made a series of really good recommendations that had they
11   been followed, would have helped.
12         At the same time, while the people of Flint deserve
13   better in terms of their water, there's just no evidence that
14   any of these children were injured as a result of anything
15   that VNA did.  The Flint Water Crisis was a massive failure of
16   government at all levels.
17         Now, in a moment, on schedule, I'm going to sit down,
18   and you'll be able to leave for the day.  We'll be back
19   tomorrow, and you'll hear from Mr. Mason and then briefly from
20   Mr. Stern.  We're not going to have another opportunity to
21   speak to you.  And you may be glad about that.  I've been
22   going on for a long time now.
23         But I ask you this:  We've been here for five
24   months, more.  You've heard the questions we've asked of our
25   witnesses.  You've heard the questions we've asked of their
```

July 20, 2022

7755

1    witnesses.  You've listened very carefully to my argument

2    today.  When Mr. Stern is speaking tomorrow, remember I'm not

3    going to have a chance to respond.

4         But I think if you pay attention to the arguments I

5    made today to the way that the evidence just doesn't support

6    the way they have to prove, you're going to be able to know

7    what I'm going to say without me having to say it.  And I ask

8    you to think about that when he addresses you tomorrow.

9         Again, members of the jury, you have been a

10   remarkable jury, and we thank you again deeply for your

11   service.  Thank you.

12        THE COURT:  Okay.  Thank you, Mr. Stein.

13        So, members of the jury, it's time for us to wrap up

14   for today.  We'll start again at 8:30 tomorrow.  I ask you to

15   especially remember not to talk about the case among

16   yourselves until you've got the jury instructions, the verdict

17   form, and you're ready to deliberate.  So please rise for the

18   jury.

19                      (Jury Out)

20        THE COURT:  Please be seated.  Leslie has sent the

21   verdict form by email.

22        MR. MAIMON:  I'm sorry.  I didn't --

23        THE COURT:  Leslie sent the verdict form -- no, I was

24   fading out -- by email to counsel.  Do you want to have until

25   5:00 o'clock, 6:00 o'clock, something to let me know if you

```
 1   have any objections to the verdict form?

 2            MR. MAIMON:  Sure.

 3            THE COURT:  Okay.  Will that work, Mr. Stein?

 4            MR. STEIN:  Yes.

 5            THE COURT:  Mason?

 6            MR. MASON:  Yes, Your Honor.

 7            THE COURT:  Kent?  Okay.

 8            And for anyone who's in the courtroom coughing, I

 9   just ask that you try to test before you return in the morning

10   if you plan to return.  Just because we're in pretty tight

11   quarters today.  So I just -- it's a favor to the court and

12   the jury that I would appreciate if you did.

13            So is there anything else at this time?

14            MR. MAIMON:  Not right now.

15            THE COURT:  Okay.  Good.

16                 (Proceedings Concluded)

17            -         -         -

18

19            CERTIFICATE OF OFFICIAL COURT REPORTER

20       I, Jeseca C. Eddington, Federal Official Court

21   Reporter, do hereby certify the foregoing 206 pages are a true

22   and correct transcript of the above entitled proceedings.

23   /s/ JESECA C. EDDINGTON_____      07/20/2022
     Jeseca C. Eddington, RDR, RMR, CRR, FCRR          Date
24

25
```