July 21, 2022

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3    SHERROD, TEED, VANDERHAGEN and WARE,

 4                     Plaintiffs,
         -v-                                  Case No. 17-10164
 5
      VNA and LAN,
 6
                      Defendants.
 7    _____/

 8                           JURY TRIAL

 9
                  BEFORE THE HONORABLE JUDITH E. LEVY
10                    UNITED STATES DISTRICT JUDGE

11                         JULY 21, 2022

12
      APPEARANCES:
13
      For the           Corey M. Stern
14    Plaintiffs:       Levy Konigsberg, LLP
                        605 Third Avenue, 33rd Floor
15                      New York, New York 10158

16                      Melanie Daly
                        Levy Konigsberg, LLP
17                      605 Third Avenue, 33rd Floor
                        New York, New York 10158
18

19

20

21

22                      (Appearances Continued on Next Page)

23
      TO OBTAIN A       JESECA C. EDDINGTON, RDR, RMR, CRR, FCRR
24    CERTIFIED            FEDERAL OFFICIAL COURT REPORTER
      TRANSCRIPT:          UNITED STATES DISTRICT COURT
25                             200 EAST LIBERTY STREET
                            ANN ARBOR, MICHIGAN 48104
```

```
 1    For the VNA          Daniel Stein
      Defendants:          Mayer Brown LLP
 2                         1221 Avenue of the Americas
                           New York, New York 10020
 3
                           Mark R. Ter Molen
 4                         Mayer Brown LLP
                           71 South Wacker Drive
 5                         Chicago, Illinois 60606

 6                         Cheryl A. Bush
                           Bush, Seyferth PLLC
 7                         100 West Big Beaver Road, Suite 400
                           Troy, Michigan 48084
 8
      For the LAN          Wayne Brian Mason
 9    Defendants:          Faegre Drinker Biddle & Reath LLP
                           1717 Main Street, Suite 5400
10                         Dallas, Texas 75201

11                         David C. Kent
                           Faegre Drinker Biddle & Reath LLP
12                         1717 Main Street, Suite 5400
                           Dallas, Texas 75201
13
                           Travis S. Gamble
14                         Faegre Drinker Biddle & Reath LLP
                           1717 Main Street, Suite 5400
15                         Dallas, Texas 75201

16                         Philip A. Erickson
                           Plunkett & Cooney
17                         325 East Grand River Avenue, Suite 250
                           East Lansing, Michigan 48823
18

19

20

21

22

23

24

25
```

1            **I N D E X**

2     WITNESSES                                              PAGE

3        (None)

4

5

6     EXHIBITS                              Marked    Admitted

7        (None)

8

9

10    MISCELLANY                                             PAGE

11    Proceedings..................................7905
      Closing Argument for Defendant LAN..........7764
12    Rebuttal Closing Argument for Plaintiffs.....7840
      Jury Instructions by The Court...............7893
13    Certificate..................................7906

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            THE CLERK:  Calling Sherrod, Teed, Vanderhagen, and

 3   Ware vs VNA and LAN.

 4            THE COURT:  Good morning.

 5            MR. STERN:  Good morning.

 6            THE COURT:  I just have to say they don't make summer

 7   robes.  And I walked in to avoid the art fair traffic.  And

 8   I'm trying not to sweat.

 9            So good morning, Mr. Stern.

10            MR. STERN:  Good morning.

11            Corey Stern and Melanie Daly on behalf of the

12   plaintiffs.

13            THE COURT:  Thank you.

14            MR. MASON:  Wayne Mason and David Kent on behalf of

15   LAN.

16            THE COURT:  Terrific.

17            MR. STEIN:  And Daniel Stein and Mark Ter Molen on

18   behalf of VNA.

19            THE COURT:  Good.  How's Mr. Campbell doing?

20            MR. STEIN:  He's doing okay.  Some mild symptoms

21   still.  Everybody says mild symptoms, but it turns out they're

22   terribly ill.  So I hope for the best for his just speedy

23   recovery.

24            Please be seated.

25            And, Mr. Stern, I would like -- I got your message
```

```
 1    about just letting the jury know that Mr. Maimon had an
 2    important family matter come up and couldn't be here.
 3              Will he be back --
 4              MR. STERN:  Yes.
 5              THE COURT:  -- for the deliberations?
 6              MR. STERN:  Yes.
 7              THE COURT:  Okay.  So I will tell them that as soon
 8    as it's taken care of, he'll be back.  I just don't -- and do
 9    you want me to say -- do you want me to say anything about
10    Mr. Campbell's absence?
11              MR. STEIN:  I wasn't going to.  But if you're going
12    to say something about Mr. Maimon then I think it makes sense.
13              THE COURT:  And do you want me to say that he
14    contracted COVID in -- I won't say it was in the courtroom
15    that he had the symptoms and took the mask.  I won't say that.
16              MR. STEIN:  Maybe you can just say he's ill, and
17    he'll be back.
18              THE COURT:  Okay.  Good.  Thank you.  Anybody missing
19    over here you want me to talk about, Mr. Mason?
20              MR. MASON:  No, Your Honor.  But thank you for the
21    offer.
22              THE COURT:  I'm not trying to discriminate.
23    Similarly situated people should be treated the same.  Okay.
24    Then we'll get the jury here.
25              And we are -- we had a request on the verdict form
```

```
 1   that the content is fine.  The layout would benefit from some
 2   work.  So we are just going to take care of that and
 3   substitute the new one in here.
 4        I have one remaining instruction, duty to deliberate
 5   and reach a verdict that I'll read at the conclusion of
 6   plaintiffs' rebuttal.
 7        Do we have cellphone numbers for the deliberation?
 8   Oh.  Before you leave today, we need a cellphone number or
 9   numbers for each party.  What my expectation, as I think I
10   said the other day, is that you'd be able to get back here in
11   about 15 minutes if there's a jury question or a verdict.
12        And I docket the questions all at the same time at
13   the end of the case, just so you know how that will work.
14        Oh.  One more thing.  I've received -- we've now
15   received the written motions for directed verdict, judgment as
16   a matter of law, whatever we're calling it, from all three
17   parties.  And so I will take those under advisement, await the
18   jury's verdict, and then work my way through them.  So unless
19   I hear otherwise from all of you, the briefing will follow the
20   local rules on a dispositive motion.  Dr. Hoaglund.  Deborah.
21        All of the jurors are here.  They're just gathering
22   themselves.  Oh.  The jurors requested to leave at 1:30 today
23   due to art fair traffic and getting to their jobs on time.
24        THE CLERK:  All rise for the jury.
25        THE COURT:  Good morning.  Good morning.  Good
```

 1    morning.  Good morning.  All right.

 2              Please be seated.

 3              I have a few small announcements.  Welcome back to

 4    the jury.  Thank you for battling your way through art fair

 5    traffic and parking, both of which can be a challenge.

 6              And one of -- there are only a few, sort of, rules in

 7    Ann Arbor.  And one is that if there's an art fair, there will

 8    be a thunder storm, wind storm, and heat beyond human

 9    capacity.  So I think we're already there.  We're already

10    there.  And it's only the first day.

11              So thank you for being here and ready to go.  Okay.

12              So as you know, today we're going to finish with --

13    Mr. Mason will deliver the closing argument for LAN and LAD.

14              And I want to mention that Mr. Maimon is not sitting

15    there.  He's okay.  He had an important family issue come up,

16    had to get home for that.  He will return after that, after

17    today.  So that will be expected.

18              And Mr. Campbell is not here.  He's out sick.  So

19    just want you to know where everybody is in case you're

20    wondering about that.  And, of course, I care about everybody,

21    so I'm always concerned if someone's not here.

22              So with that, we'll get started.

23              MR. MASON:  Thank you, Your Honor.

24              THE COURT:  You're welcome.

25              MR. MASON:  Good morning.  It's nice to be able to

```
 1   actually speak to you --
 2           THE COURT:  Mr. Mason, here's the thing we came up
 3   with Mr. Maimon.  You have to at least stand where you can be
 4   heard through the microphone or it's difficult for Jeseca and
 5   others to hear you.
 6           MR. MASON:  All right.
 7           THE COURT:  Thank you.
 8           MR. MASON:  Happy to do that.  Thank you.
 9                 CLOSING ARGUMENT FOR DEFENDANT LAN
10           MR. MASON:  This document, like a birth certificate,
11   a marriage certificate, or a graduation diploma represents an
12   incredible, incredibly meaningful event.  This verdict form
13   that you will fill out is not just some piece of paper with
14   legal mumbo jumbo on it.
15           You will hold in your hands a decision which will
16   forever impact the reputation and legacy of not just Warren
17   Green but an entire family business lead by Leo A Daly and his
18   father and grandfather before him, created over a hundred
19   years ago.
20           After all these months together, there's really only
21   one, one critical question which you will be asked about.  You
22   hold LAN and Warren's fate in your hands.  So let's look at it
23   together.
24           You saw the question.  It's number 1 in the verdict
25   form.  "Did LAN breach the standard of care for a professional
```

1    water engineer?"

2         Now, the Court read to you an instruction to help you

3    understand what you need to decide when you answer Question

4    number 1.  You saw it briefly yesterday.  And on page 22, 22

5    of the instructions that Your Honor read to you, you were told

6    the following to help you decide the case.  And I've

7    highlighted the bottom line.

8         "The plaintiffs in this case allege that two

9    defendants, LAN and VNA, each committed professional

10   negligence."  You heard Mr. Ramaley tell you yesterday what

11   that means.  Did Warren Green commit malpractice?

12        I suggest when you get your individual copy in the

13   notebook that Your Honor talked about, that you go straight to

14   this paragraph on page 23.  Page 23 is where you need to go on

15   the instructions to answer Question number 1.  Let's look at

16   it together, because this paragraph controls your decision.

17        Counsel yesterday showed you some allegations that

18   they made, but this is the instruction from Your Honor with

19   respect to your decision on Question number 1.  All three of

20   these facts must be proven by plaintiffs, or you must find

21   "no" as to malpractice by Warren.  Let's briefly walk through

22   them.

23        You must find that LAN, to breach it, to breach the

24   standard of care that the Flint water supply required,

25   required the use of orthophosphates for corrosion control.

1          Number 2, "That LAN did not sufficiently make this

2     recommendation or warning or adequately warn against the

3     operation of the plant without the use of orthophosphate,

4     corrosion inhibitors prior to the switch of the water source

5     to the Flint River."

6          So your timeframe, as Your Honor has defined it for

7     you, of LAN's actions is up until that spigot was open, okay.

8          And then number 3 -- and I want you to be sure to

9     recognize the word "and" is there, not "and/or."  All three of

10    these must have been proven by the plaintiffs.

11         The third, "That a water engineer of ordinary

12    learning, judgment, and skill in the community in LAN's

13    position would have made this recommendation or warning."

14         We'll talk about all of these.

15         This last sentence defines what I told you a moment

16    ago.  If you fail to find any one of these three elements, you

17    must not find that LAN breached the standard of care.  You

18    must say, "No."  So I raise it now, as I remind you of the

19    evidence you heard in the case, so you can use that as a

20    backdrop for you, a reference point, if you will, for making

21    your decision.

22         Members of the jury, your decision is huge.  So while

23    I imagine you are exhausted, I've noticed incredible attention

24    that you've provided throughout this trial, and I want to

25    thank you like the others have.  This has been a long slog.

1    I'll not be as long.  I don't plan to be as long as the other

2    lawyers you heard yesterday.

3            But I need you to stay with me, because this is my

4    last chance to speak to you.

5            You know, when I was contemplating what to say to

6    you, I remembered what we were thinking about in the early

7    days of this case.  Frankly, we couldn't figure out why

8    plaintiffs kept us in as defendants.

9            We couldn't see any evidence that Warren and LAN were

10   culpable in any way for the disastrous governmental

11   mismanagement that became the Flint Water Crisis.

12           And as more and more evidence came in, we still

13   weren't seeing anything that had anything to do with Warren

14   and LAN.  The testimony we were hearing was about stuff that

15   he didn't know about, because it pertained to internal

16   interactions between state regulators and the city officials.

17           It was about stuff that happened when he wasn't in

18   Flint.  It was about stuff that the city and the MDEQ kept

19   secret from everybody.  Public, press, anyone who was not an

20   insider, which meant it was kept from Warren, too.

21           We at LAN thought that the plaintiffs would see that

22   also and just let us go home, but they wouldn't do it.  They

23   wanted something from us and you probably figured out exactly

24   what they wanted.  It's the color green.

25           THE COURT:  Let me make one thing clear to the jury

1    that Mr. Mason has referred to.  Warren Green is not sued in

2    his individual capacity, just the company LAN and the company

3    LAD.  Just want to make sure that's clear.

4          Go ahead, Mr. Mason.

5          MR. MASON:  And I want to be sure that we're clear

6    that a company acts through its people.  And so that's why I

7    refer to the fact of Warren committing malpractice.  Because

8    you act through people, and it was Warren who was roughly a

9    hundred percent of the time there.

10          Let me tell you right up front that I think this

11    trial has firmly and clearly demonstrated the truth about my

12    client LAN and specifically Warren.  The evidence presented

13    here was the same stuff we heard in depositions before trial.

14    Hardly anything new.

15          That evidence was basically nothing.  A nonevent.  As

16    far as LAN is concerned, all it did is confirm the truth of

17    our defense of Warren.  It confirmed everything I told you

18    almost six months ago in my opening statement.  It confirmed

19    that Warren did his job right.

20          But since it's been such a long trial, I'm going to

21    summarize the key evidence.  I'm not going to take you through

22    tons of documents or videos of the like.  I'll put up some

23    deposition testimony or trial testimony, I'm sorry, to remind

24    you of what you heard.  We'll look at some documents, a

25    limited number of them.

1           But you know this case.  You know the evidence.  You

2    know that Warren Green and LAN don't belong here.

3           I think it's clear that at all times that he was

4    involved with the Flint Water Treatment Plant project, Warren

5    acted professionally.  Just like as I've learned he always

6    does.  He acted ethically, and he looked out for his clients.

7    The city's best interest at all times.

8           That means he was looking out for the health,

9    welfare, and safety of the people of the city, of the public

10   at all times.  That's who Warren Green is.  That's how he does

11   things.  He does things right.

12          His performance of his duties was not merely up to

13   the standards for his profession, it was exemplary at every

14   turn.  And I'm proud to be associated with him.  I'm proud to

15   be his and LAN's lawyer.  The plaintiffs' case against LAN and

16   Warren is an invention.  It is a kind of slight of hand, a

17   shell game, if you will.

18          You've seen the shell game, right?  Move it around.

19   Where is it?  Where is it?  So you know it's a diversion game,

20   just like this lawsuit.  Tricksters want to divert your

21   attention away from the true facts who caused the Flint water

22   situation.  Those city and state and federal officials who

23   failed to do their job.

24          Instead, the tricksters want to play this game of

25   diverting your attention away from the actual wrongdoers to

```
 1    the engineers.

 2            Some government people have already had to answer for

 3    their conduct in criminal court.  Others may have to face it

 4    soon.  But Warren shouldn't be counted as part of the platoon

 5    of bad actors.  What plaintiffs say of him in this courtroom

 6    is not true.  He doesn't deserve it.  And that's not justice.

 7            There is no apparent consideration of whether Warren

 8    or LAN actually did anything wrong.  In fact, as the Court's

 9    instructions make clear, there is no claim that there was

10    anything wrong with any of the work LAN actually did.

11            Instead, this is one of those you

12    should-have-stopped-them-from-doing-it-type cases.  Grab an

13    engineer who was on the sidelines of the problem and use the

14    evidence already generated against the city and the state and

15    the EPA to pour a big load of sewage on top of that engineer.

16            It's piggybacking on matters that are not for this

17    trial.  And in this case, we've had to defend ourselves for

18    years.  Not just the many months that we've been here in this

19    trial from these claims that are totally woven out of the air.

20    Fluff and puff.  Mirrors and magic wands.  We and you have

21    been here for months, and that's all we get.

22            Here's how they tried to work these illusions.

23    First, there are tricks with lights and mirrors,

24    professionally appropriate actions by Warren got recast as

25    wrongful or inadequate.  Meetings got reinvented as having
```

July 21, 2022

7771

```
 1    purposes they never had.

 2             Other meetings got ignored, essentially hidden from

 3    you if the defendants hadn't made sure you got to hear them

 4    from them in this trial.

 5             You have to keep in mind the simple truth of it.

 6    Warren never ever failed the people of Flint.  He delivered

 7    quality professional engineering services on several specific

 8    assignments he was asked to complete.  He did it right.

 9             And as we walk through together, some specifics now.

10    Let's keep in mind the backdrop of the simple timeline that I

11    used when we had Warren on the stand.

12             You heard in the instructions the only time you need

13    to be concerned about Warren's or LAN's conduct is in 2013 up

14    to the spigot being open in April of 2014.  All those months

15    of testimony about what everyone was doing after the spigot

16    was opened had nothing to do with Warren and LAN in this case.

17             You know this is right, because you heard nothing

18    about LAN for months in this trial.  In all of those 2014, '15

19    discussions, Warren wasn't involved in water quality

20    treatment.  So there's no issue you need to worry about in

21    that timeframe.

22             Let's look at the actual facts of some of the actual

23    assignments Warren performed for Flint and examine his

24    performance.  The simple facts, no stretching, no recasting,

25    and no distortion.  We've been trying to do that for you
```

1    throughout this trial.  So let's begin with the City of Flint.

2         You can take that down.  Thank you.

3         You heard in this testimony, this whole Flint water

4    problem arose because of political bickering and a high stakes

5    poker game played between the City of Flint and the DWSD after

6    months and months of intense negotiating and politicking.

7         At the highest levels of state government, the

8    emergency manager in charge of the City of Flint announced on

9    April 16, 2013, that the city was going to leave the DWSD and

10   join the KWA that you've heard about.

11        Barely 24 hours later, the DWSD, which also was

12   operating under an emergency manager, responded by saying it

13   would cut off the water to Flint in 2014, which they hoped

14   would force Flint back to the bargaining table.  Instead,

15   Flint said, "Oh, yeah?  We'll see you and raise you the stakes

16   by using the Flint River instead."

17        It was at this point the governor himself stepped in

18   and called for a sit-down meeting.  You recall the evidence.

19   But instead of using his authority to bang some heads and tell

20   the two emergency managers to work things out, he washed his

21   hands of the whole affair, saying, "I'll leave it to you two

22   to decide what to do.  I'll not interfere."

23        But instead of working things out, both sides felt

24   like they had to save face.  Neither would give in.  So Flint

25   proceeded to make good on its plan to use the Flint River, and

July 21, 2022

7773

1    it got the blessing of MDEQ to do it.  Only after all this had

2    happened did LAN enter the picture.

3           The city did not ask LAN for its opinion about the

4    plan.  It did not say, "Hey, what do you think we should do,"

5    or, "Is this a good idea?"  Instead the city said, "This is

6    what we're going to do, and we want to hire you to help us do

7    it."

8           Behind all of this was a desperate need to do things

9    on the cheap, to save money at all costs.  The money man at

10   the city knew they would have to spend some money to get the

11   plant ready to operate off the pipeline by 2016.

12          In order to pay for those upgrades to the plant, they

13   hatched this brilliant scheme to pay for the upgrades from the

14   money they would save by using the Flint River for a couple of

15   years.  Flint had been paying DWSD for the water.  But the

16   Flint River was free.

17          We know now that this brilliant scheme may have saved

18   some money on the short-term but only at a horrific cost in

19   the long-term, a cost being paid by the citizens of the City

20   of Flint.

21          Let's just look at a document.  You'll see Emergency

22   Manager Ambrose, one of the money men that I've been talking

23   about.  That decision was made, because it offered an

24   immediate cost-saving opportunity, which translated into the

25   ability to upgrade the plant without having to seek financing.

```
 1              Let's talk about the MDEQ loophole.  In order to get
 2    these cost savings, the city needed to squeeze every penny it
 3    could out of the Water Treatment Plant and the Flint River.
 4    And they found a way thanks to the MDEQ.  It was the MDEQ that
 5    told the city it did not need to spend money on an expensive
 6    full-softening-lime-plus-soda-ash plant.
 7              It could run a lime-softening-only plant, which would
 8    save $10 to $15 million immediately by cutting out the cost of
 9    the soda ash, the soda ash feed equipment, and the sludge
10    removal system.
11              The MDEQ then went one step further and told the city
12    it did not need to spend money up front on corrosion control
13    inhibitors, such as orthophosphates and an orthophosphate feed
14    system.  But instead could wait a year to see if any of this
15    was needed.
16              If it wasn't needed, then it completely eliminated
17    that cost.  Even if it looked like some sort of corrosion
18    inhibitor chemical was needed, the MDEQ said the city could
19    take a year or two to run an optimized corrosion-control study
20    and then take even more time after that to build and start
21    applying whatever additional corrosion control system was
22    needed.
23              Of course by that time, the city would have already
24    been on the KWA pipeline using Lake Huron water.  There would
25    be no need to spend any money on a long-term study or an
```

 1    implementation of a new corrosion control system.  They

 2    thought it was a perfect way for the city to kick the can down

 3    the road on spending money with the political cover of saying

 4    it was all approved and directed by the MDEQ.

 5          So that's what happened.  Doing it cheap became a

 6    guiding principle, not producing safe drinking water.

 7          And it started at the top.  The Department of

 8    Treasury, you saw the conversations and the documents that the

 9    money people, the Department of Treasury, they were

10    communicating with the emergency manager on the left side of

11    this who was running Flint, who said, "We're not doing

12    anything the MDEQ doesn't require."

13          And then the MDEQ saying, "No, you don't need to do

14    this.  No you don't need to do this.  No you don't need to do

15    this."  All the while, those folks there in those houses in

16    Flint were at risk, because these folks were driven by money

17    instead of safety of the public.

18          Doing it cheap became the guiding principle.

19          So where does Warren and LAN fit in on all of this?

20    You learned from the testimony that it started as any

21    potential engineering project would.  Warren got a call from a

22    representative of the City of Flint asking for a proposal for

23    getting the Water Treatment Plant into shape to serve for two

24    years to use the Flint River.

25          Warren's first proposal in mid-May of 2013 was full

```
 1     softening with lime and soda ash, which is what he had
 2     recommended ten years earlier when he was working for that
 3     other engineering firm, AB&H.
 4           And he had done a treatability study of the Flint
 5     River.  He was told, though, point blank by Emergency
 6     Manager Kurtz that the MDEQ said, "Soda ash was unnecessary,
 7     and lime-only softening would be sufficient."
 8           When Warren questioned this, Emergency Manager Kurtz
 9     told him, "We are only doing what the MDEQ requires.  No
10     more."  And Mr. Croft, listen to this, confirmed it.
11                     (Recording Played)
12           MR. MASON:  Fateful words that others in the city
13     would repeat over and over.  So what does Warren say?  He
14     says, "Well, if you're going to do this, you must at least run
15     the plant for 60 to 90 days before going online to make sure
16     everything will work.
17           So what does Kurtz say, Emergency Manager Kurtz?
18     "Yes, I agree.  We will do that.  Meanwhile, go back and come
19     up with a proposal for lime softening."
20           Plaintiffs' counsel said yesterday, "Why would
21     Emergency Manager Kurtz be on that form?  Why would they say
22     anything about Kurtz?"
23           Well, you just heard two reasons, two good reasons.
24     One, he decided to just put money before people.  And then he
25     tells Warren that they would do a 90 -- 60- to 90-day test
```

```
 1    before ever opening the spigot.  And he never made sure that
 2    that happened.
 3            Warren did as he was asked and went back within just
 4    a couple of weeks and submitted a proposal based on lime-only
 5    softening.  That proposal recommended starting out with a
 6    30-day operational test run.
 7            And then the production of a step-by-step action plan
 8    based on what they learned from it.  That would be followed by
 9    an implementation of a fast track plant improvement action
10    plan to be completed in time for the switchover.
11            You know that Mike Glasgow, the plant operator for
12    the City of Flint, and his personnel actually tried running
13    that original 30-day test run recommended by LAN in July of
14    2013.  But they couldn't get it done.  Because there were too
15    many problems with a number of components at the plant.
16            Not being able the run the operational test meant not
17    being able to test the water quality of treated water.  So the
18    city could not provide Warren and LAN with water quality data.
19            Now, I think you could tell that Warren, when he
20    testified about it, he was really disappointed.  But you
21    figured out who wasn't disappointed when the City of Flint
22    couldn't do those quality tests.  The money people, the
23    emergency manager, and their cohorts at the state.
24            No water quality data meant no pressure on them to
25    plan for optimizing prior to switchover.  No expenses.
```

```
 1              You know from the evidence that shortly after the
 2    failed plant test run in July 2013, the city and their own
 3    city engineer Rowe, who was available to them to advise them
 4    24/7, they huddled -- the city and Rowe huddled with the MDEQ
 5    and cut the scope of LAN's proposed work.
 6              Let me recap what the evidence tells us about how and
 7    why that happened.  After the failed test run, Warren proposed
 8    that LAN do certain steps to move forward, getting the plant
 9    safely operational.  He's a skilled engineer and a confident
10    guy.  He thought he was the right choice for the effort.
11              He recommended $20 million in upgrades.  The city was
12    surprised and concerned by this number, because they were
13    expecting a cost figure of 7 to 10 million.  Why?  Because
14    they had made a mistake and were looking at the wrong
15    comparison.  The Wade Trim cost estimate of $7 million for
16    upgrades to the Lake Huron water.  Not upgrades for using
17    Flint River.
18              Remember the apples and oranges we talked about?
19              I showed you this in the email in the opening.  If
20    this is the real cost, then Rowe's credibility and our
21    credibility with the state is in jeopardy.  So you know what I
22    just said is true with respect to this mistake and what in the
23    world are we going to do.
24              Duffy Johnson and Emergency Manager Mike Brown here
25    said the city and Rowe's credibility was in jeopardy.  The
```

```
 1    emergency manager then calls together the treatment plant
 2    people.  The city engineer, Rowe, and the MDEQ figured out how
 3    to deal with this huge cost discrepancy.
 4           They had a meeting to which LAN was not invited.  It
 5    was within that secret meeting in mid-August that the city and
 6    the MDEQ figured out how to solve this gigantic potential cost
 7    overrun.  Cut LAN out of the water quality treatment
 8    decisions.
 9           Put LAN on the sidelines.  Give LAN specific,
10    discreet projects of mechanical, structural, or electrical
11    plumbing.  But don't ask LAN to help with any water quality
12    decisions where it might tell the city they need to spend more
13    money.
14           After that secret meeting in August, Warren got the
15    word that the scope of LAN's work would be significantly cut.
16    The city was cutting Warren and LAN out from all the water
17    quality treatment work.  He was informed that the MDEQ would
18    take leadership on water quality work, including testing and
19    directing the preparation for the plant for the switchover.
20           Warren was out.  The MDEQ engineers, Prysby and Bush
21    were in.  The MDEQ was now fully and completely in charge.
22    Glasgow confirmed this for you when he said, "LAN was not
23    involved in water treatment decisions from the summer of 2013
24    to December of 2015."
25           His testimony is further supported by the lack of any
```

1    correspondence with Warren or LAN on water treatment quality

2    decisions after August 27, 2013.  Eight months before the

3    switchover, Warren was sidelined, sent back out of town back

4    to Chicago.  You saw it.  We walked through it.  And Glasgow

5    confirmed it.

6          Now, let's take a step back to June 26, that meeting

7    that you've heard so much about.  So it was before the 30-day

8    plant run in July where things didn't go well.

9          At that meeting, Warren first heard that the MDEQ

10   believed the city would not be required to implement a

11   specific corrosion control plan during that first year that

12   the Flint River would be the water source.

13         The MDEQ's position was that a lime-only softening

14   program would provide enough corrosion control for the interim

15   period but that they would study water in two six-month

16   periods as required by the Lead and Copper Rule.

17         They said that they thought it was probable that no

18   additional corrosion control materials would be needed.  While

19   Warren knew that balancing the pH and alkalinity with lime,

20   with lime only was a well-known way to treat for corrosion

21   control.

22         You know from Warren's testimony that he questioned

23   that, since he thought they might need a corrosion inhibitor

24   at some point.  The MDEQ assured him that they had done it

25   that way before, and it could work for Flint.

1          Since Warren had been assured that the City of Flint

2    with the MDEQ oversight was going to do a 60- to 90-day

3    commissioning test, he was fine with it.  Perfectly reasonable

4    conclusion as testified by Dr. Lawler, as well as Mr. Ramaley.

5          Was it a good recommendation?  It was an excellent

6    recommendation by Warren.

7          You've heard Warren testify that the MDEQ's direction

8    was not wrong.  He had seen systems where that did work, where

9    lime-only softening had been perfectly acceptable to prevent

10   corrosion problems.

11         And Mr. Ramaley testified that he knew of many

12   softening plants around the country that only used pH and

13   alkalinity control for corrosion control.  And he's not the

14   only one that testified to this.  All of these people in this

15   trial that you see here.

16         Yesterday, plaintiffs' counsel suggested that

17   Dr. Lawler agreed that softening was not corrosion control.

18   But they took the question out of context.  Here's what

19   Dr. Lawler said explaining that slide.  "So softening per se

20   is not corrosion control but an effective softening with

21   recarbonation is corrosion control."

22         That's what they were doing at the plant.  Softening.

23   It should have been affective -- but we'll get to that of what

24   they did or didn't do -- with recarbonation is corrosion

25   control.

 1          He's not alone.  Look at these other people.  This is

 2    plaintiffs' expert.  Whether lime softening alone could work

 3    on certain conditions if you met the pH level without

 4    corrosion control inhibitor chemical, right?  If you did a

 5    study to confirm it, I guess you could.

 6          What did Warren do?  A study is what he recommended.

 7          Who else?  We know that the MDEQ knew that softening

 8    was appropriate.  He was asked about lime softening.  It

 9    provides calcium, hardness adjustment, pH and alkalinity

10    adjustment which are forms of corrosion control treatment.  So

11    it does provide some level of treatment.

12          So the MDEQ -- and here's the City of Flint.  You can

13    treat the water as you did by just lime softening by balancing

14    the pH and alkalinity, correct?  Yeah.  You try to balance a

15    couple of parameters like that.

16          In fact, Warren had proved it himself with the Flint

17    River through the treatability study he had done ten years

18    earlier and the three-month plant run he had conducted the

19    following year way back when.

20          He knew from careful analysis and from his own

21    hands-on experience with Flint Water Treatment Plant that the

22    proper operation of the plant could result in a stable pH of

23    8.8, which according to the EPA corrosion control guidance

24    manual, would provide sufficient corrosion control.

25          What Warren questioned was the MDEQ's decision to

1  wait until the completion of the two six-month testing period

2  before deciding whether anything else was needed.  But he knew

3  the city was going to do the 60- to 90-day test run before

4  starting up the plant, which would provide plenty of time to

5  see if anything else was needed.

6      Besides, these MDEQ people were experienced engineers

7  themselves doing it every day of the week.  That was their

8  job.  They were in charge of water quality compliance in

9  Michigan.  They were the ones who had the final say so.  What

10 Warren didn't know, though, is that after he left, the

11 discussion of water quality treatment in August of 2013, after

12 that time, he didn't know that the MDEQ was never going to

13 require.

14      And you know what that meant.  Therefore the City of

15 Flint was never going to do the 60- to 90-day commissioning

16 run.

17      You probably figured it out, this testimony in this

18 case, that Warren relied on what's called the water treatment

19 engineer's ace in the hole.  If you want to be confident about

20 something, test it.  So Warren recommended the testing of the

21 treated water prior to the switchover.

22      You know it sounds funny when we're talking about

23 water to say, "Do a dry run of a water plant," but that's what

24 he thought they should do.  Water -- I mean, Warren sometimes

25 referred to it as a shakedown cruise -- you heard that term --

1   or a commissioning run.

2          If the MDEQ was right that lime-only softening would

3   be safe for Flint, then that would be confirmed by the

4   testing.  If the MDEQ was not right and lime only wasn't

5   enough, the dry run testing was going to show it.

6          Meanwhile, no untested water would go into the city

7   system.  This systematic approach Warren recommended was doing

8   it right.  And these folks all agreed.  Warren Green was doing

9   it right.  Don't get the cart before the horse.

10          The plaintiffs over here are claiming now nine years

11   later that in June 26 -- at that meeting in June 26, the city

12   and MDEQ that Warren was at was supposed to shout out the

13   words and pound the table.  "Orthophosphates are required."

14          If he had done that, they say the Flint Water Crisis

15   would never have happened.

16          Give me a break.  Anybody who understands water

17   treatment -- and you folks understand it maybe more than you

18   wanted to by now -- knows that you don't know what chemicals

19   you need until you have tested the treated water.  It would

20   have been ridiculous for anyone, let alone someone as

21   knowledgeable as Warren, to say such a thing in that meeting.

22          Warren had the plan that did the job right.  He

23   recommended a 60- to 90-day test run to make sure that the

24   plant was producing safe water in compliance with all of the

25   water quality parameters of the Safe Drinking Water Act.

1          This is something that every treatment plant in the

2     United States needs to do.  And remember, the Lead and Copper

3     Rule is just one of the many rules which water operators need

4     to be sure they're in compliance with.

5          Warren repeated his recommendation for the 60- to

6     90-day final preopening of the spigot test run to Ed Kurtz; to

7     the utility administrator, Duffy Johnson; to the plant

8     supervisor, Brent Wright; and to the plant operator, Mike

9     Glasgow; and to the water distribution supervisor, Rob

10    Bincsik.

11         They all agreed with this recommendation and said

12    they would follow it and told Warren they would follow it.

13    Look at all of them.

14         Testing was in the plan.  Testing in the plant meant,

15    of course, that any potential need for corrosion control

16    inhibitor chemicals like an orthophosphate would be considered

17    up front before any water goes in the city pipes.

18         Testing before distributing water also meant that the

19    corrosion inhibitor like orthophosphate could be considered

20    before distributing the water to the public.  Don't get the

21    cart before the horse.

22         And remember this, the City of Flint plant operator,

23    Mike Glasgow, was fully aware of orthophosphates.  So you

24    remember in that -- what I put up first, that failure to

25    Warren or talk about, listen to this.

1          In August 9 of 2013 -- and I'm not going to put them

2     up.  Those handwritten notes are tough to see, but you saw

3     them in this case.  August 9 from the meeting minutes where in

4     August of 2013, a corrosion inhibitor study was discussed at a

5     meeting between LAN and the city.

6          On March 26 -- you remember this.  This is just like

7     a month before the spigot was opened.  What does Mike Glasgow

8     say?  "There will be total phosphorus, because we will be

9     adding phosphate."  He knew Warren was gone, but the decision

10    with MDEQ and what they were going to do, this was right in

11    the mix.  That's the City of Flint saying that.

12         On August 31, 2015, Mr. Glasgow writes to Croft and

13    says what?  "They recommended the addition of phosphate as

14    corrosion inhibitor and must be implemented by" -- this is

15    after the fact.  Look at the date.  This was way after when

16    the EPA comes in and they finally -- Mr. Del Toral finally

17    ordered it.

18         But look what it says in that second highlighted

19    sentence.  "We originally had this chemical in the design, but

20    the DEQ did not mandate from the start."  Remember that

21    statement, that fateful word?  If the MDEQ doesn't require it,

22    we ain't doing it.  No extras.

23         But we learned during the litigation -- right? --

24    that Mike Glasgow constantly pushed back on orthophosphates

25    without ever once consulting Warren.

```
 1              On November of 2014, here's an email from Mr. Glasgow
 2    to his bosses.  "Our treatment process results in water being
 3    mildly scale forming, so it should not lead to any corrosion
 4    control."
 5              So the pH adjustment with the lime softening, he's
 6    saying that it is scale-forming to protect the inside of those
 7    pipes.  Detroit was corrosive, which forced them to use the
 8    phosphate chemical on the finished water.  They figured that
 9    out later and added it in Detroit.
10              Next, in February of 2015, what did he -- you get a
11    peek behind the curtain here, folks, as to what was going on
12    in realtime.  And isn't that the most powerful?  A peek to see
13    exactly what people were saying at that time.  And I encourage
14    you, as you weigh the evidence, to think about this.
15              Our index, and you see right before it, the Langelier
16    Index.  That was the corrosion control index to make sure that
17    it was being properly treated.  Our index usually runs in the
18    positive.  So the lime softening was working if it's in the
19    positive, which means the water should be scale-forming and
20    not corrosive when you do it right or when you do it at all,
21    which we'll talk about.
22              "I wish we could fix our problems with a corrosion
23    inhibitor, but I'm not sure that's the case.  Most are
24    phosphate based, which may come to haunt us in the summer
25    months as phosphate can be a problem, an energy source for
```

```
 1   biological growth that can cause harm to people by adding
 2   orthophosphates" is what he's saying here.
 3           In June of 2015, even Miguel Del Toral from the
 4   Environmental Protection Agency pushes back on an immediate
 5   use of phosphates.  This is a letter from Jennifer Crooks, who
 6   you heard from.  Remember she referred to Del Toral as the
 7   lead guy, one of the lead experts for the EPA?
 8           And he's asking questions, and she's passing on what
 9   he said.  Del Toral is saying the idea to ask Flint to simply
10   add phosphate may be premature.  There are many other issues
11   and factors that must be taken into account, which would
12   require a comprehensive look at the water quality system
13   before any treatment recommendations can or should be made.
14   You've got to test first.  Just what Warren had recommended.
15           Then Del Toral took months before he -- when he was
16   aware of this and recognized it, it still took him months
17   before he ordered it, because he says -- and she passes on
18   what he says -- "No, you can't do that.  You have to do a
19   study, because too much phosphate could be bad as not enough."
20   And maybe it's the type of phosphate that would need to be
21   changed.  You can't just start throwing chemicals in the
22   water.
23           July and August in 2015, when everyone was asking,
24   "Why aren't you using orthophosphates," what does Glasgow say?
25   Does he blame LAN?  Does he say, "Well, LAN told us to do
```

1    that?"  No, not at all.  He says, "We didn't use it, because

2    the MDEQ told us we didn't need to."

3            And did you notice who was not copied on any of those

4    emails over that 18-month period?  LAN.  No one ever even

5    thought about copying LAN or Warren Green.  Why?  Because they

6    were not involved.

7            Warren never knew that the MDEQ and the city weren't

8    going to do the 60- to 90-day final plant test run.  That

9    never occurred to him.  It's to reckless to imagine.  But

10   apparently, the city management knew the MDEQ was not going to

11   require it.

12           Warren Green and LAN are being sued for doing it

13   right.  Warren is getting sued for giving exactly and

14   precisely the correct advice to people who apparently had no

15   intention of following it.

16           And he's now apparently being criticized for not

17   knowing that all of those folks who promised that they would

18   follow his recommendations and do the testing were lying.

19           You think I'm bothered by that?  You better believe

20   it.

21           It's become obvious in this trial from the City of

22   Flint and the MDEQ witness testimony that they did not want to

23   do any of the pretesting of the water as recommended by

24   Warren.  Why not test?  Here it is again.  Money.

25           They clearly did not want a consulting engineer

1    around who would keep pushing for testing and call them out if

2    they didn't do it.  Warren wasn't the guy who could be

3    silenced.  Warren needed to be sidelined.  That helps you to

4    understand why his contract got changed.

5         Warren Green's principled approach to water treatment

6    engineering would have gotten in the way of their plan.

7    Pretesting might have forced the MDEQ engineers and the city

8    to use a mixture of materials in the treated water that

9    everyone could be confident about.

10        But it also meant there would probably be a need to

11   be some delays, money spent, upgrades, more equipment, perhaps

12   costing tens of millions of dollars.  They absolutely did not

13   want that to happen.  The truth was transparent in the City of

14   Flint and the MDEQ testimony here and the senior officials

15   from the emergency manager down.

16        Let's look at just one of those.  This is Mayor Dayne

17   Walling in testifying to Congress when this was being

18   investigated.  "Michigan's financial manager system focused

19   too much on cutting costs without adequate safeguards and

20   transparency."

21        He goes on to tell Congress, "The state's focus on

22   balancing the city's books and choosing low costs over human

23   consequences created for expensive public problems as state

24   and federal regulators did not fully address the issues along

25   the way."

1            That's the mayor telling Congress that.  They ignored

2    the safety of the citizens of Flint, and they ignored the

3    safety of those kids.

4            Well, let's look at the timeline again.  After August

5    of 2013, Warren is not in Flint except occasionally to check

6    on the KWA design work LAN had been moved out of the way to

7    do.

8            Perhaps he would have been an advocate for

9    Mr. Glasgow, a whistleblower, if you will, as the plaintiffs

10   claimed they wanted him to be.  But he never had the chance.

11   You can't alert people about a problem if you don't even know

12   there is a problem.  Warren didn't know what was happening at

13   the plant.

14           It's clear from the evidence that he thought they

15   were getting ready, doing a final 60- to 90-day test run as

16   promised.  And they were aided and guided by the city engineer

17   Rowe and the engineers at the MDEQ.

18           You've heard him say here he thought highly of both

19   Glasgow and the MDEQ people.  He trusted their integrity as

20   professionals.  He had no reason to worry about the switchover

21   in Flint or so he thought.  But there were big problems

22   coming, folks.

23           Warren wishes today that he had known they were

24   starting that plant up without any testing at all and that

25   they planned to never spend any major upgrade on it unless

1    absolutely forced to do so.  His strength of character tells

2    us that if he saw that, he would have stepped up and said

3    something to somebody.  That's for sure.

4         And he might have been pretty loud, too.  Just the

5    way he was when he learned in the fall of 2014 that the plant

6    was not softening all of the water, because it hadn't fixed or

7    repaired one of the softening tanks.

8         He got in the face of Brent Wright, Duffy Johnson,

9    and Howard Croft and told them all they simply could not do

10   that.  They needed to treat all the water, not just some of

11   it.  And we can bet he would have supported Mr. Glasgow as

12   well as he could, at least when Mr. Glasgow was still trying

13   to do it right.

14        But Mr. Glasgow kept his troubles with bosses and the

15   MDEQ to himself.  He certainly never told Warren.  He could

16   have called him on the phone and emailed him, or texted him

17   and said, "Hey, Warren, I need to talk to you about

18   something."

19        Although Glasgow never reached out to Warren, Warren

20   was always willing to help on a water quality treatment issue,

21   but either was never asked or got turned down every time.

22   Let's look at some examples of over the course of all this

23   mess.

24        In the summer of 2014, Warren asked how the plant was

25   doing.  He was told, "We're making our numbers.  Everything's

1    fine."

2         August and September, they knew there was a boil

3    water advisory.  The city never called Warren to get him

4    involved.

5         In October of 2014, one of the distribution center

6    employees Mark Pavwoski -- you heard about this -- discovers a

7    pipe that had been stripped of its inner coatings.  He thinks

8    it may be due to lack of orthophosphates.  He brings it back

9    to city offices and shows it to Rob Bincsik and places it in

10   the hands of Howard Croft himself.

11        Mr. Croft actually takes the pipe back to his office,

12   and no one ever hears about it again.  Do you recall Croft's

13   testimony about this?  Remember the many sleepless nights he

14   had wondering if he could have prevented everything that was

15   going on in Flint by actually doing something with the pipe

16   rather than forgetting about it.

17        No one ever thought at the time to call Warren or LAN

18   to ask for help.

19        In November of 2014, the city turned Warren -- I

20   mean, the city turned Warren down when he offered to do a

21   systemwide review of water quality when he was back in Flint

22   working on the TTHM issue.

23        In January to March, you heard yesterday Mayor

24   Walling turned to the governor, the White House, the EPA,

25   local healthcare providers, local engineering professors at

1    Kettering and Michigan State Universities.  But never once

2    asked Warren for his advice.  Warren was a mere contractor in

3    former Mayor Walling's mind.

4         In February of 2015 when the LeeAnne Walters problem

5    arose, the city, the MDEQ, the EPA, they're all in on the

6    issue.  But Warren has never once informed or consulted.  He's

7    nowhere in those email strings.

8         In the spring of 2015, the city turns Warren down

9    when he offers to put a person at the Water Treatment Plant

10   either full-time or part-time.

11        Warren Green does it right.  But he was either never

12   asked to help or was turned down when he offered.

13        Now, let's go back to the MDEQ plan.  The

14   MDEQ-recommended plan for the treatment plant wasn't a testing

15   program.  It was a gamble gone bad.  As you heard in this

16   courtroom as well as discussed in the moment, perhaps the

17   biggest reason the gamble went bad is because the plant was

18   never operated properly.  From the moment they turned that

19   spigot on in and around April of 2014 until they reconnected

20   to the DWSD in October of 2015.

21        But that is 100 percent responsibility of the plant

22   operator, the City of Flint.

23        Warren didn't know what was happening.  It is not

24   reasonable to expect an engineer to be a police detective,

25   too.

```
 1            Let's talk about one of the most important pieces of
 2    context information in the whole Flint Water Treatment Plant
 3    story.  If it was a book, it would be called the dark days of
 4    Mike Glasgow.
 5            Putting the whole water crisis story together leads
 6    to the conclusion that Mr. Glasgow, the F1 water treatment
 7    plant operator who actually had to make the changeover happen
 8    allowed himself to be bullied and co-opted.
 9            He fought back at first, then he just tried to
10    survive through the situation by working as hard as he could.
11    Then you heard him admit that he found it all too hard.  "It
12    was a headache"?  That's what he said.  So he just stopped
13    caring.
14            This whole mess might never have happened if the city
15    and the MDEQ hadn't pushed Mike Glasgow until he just quit
16    trying.  It looks like he had started out expecting to be able
17    to get the plant ready in the right way for the water
18    changeover.  It was later when he began to realize how his
19    supervisors were now entirely under the control of the MDEQ.
20            And frankly, the MDEQ actually had a similar problem
21    going all the way up to the governor's mansion.
22            At some point, Glasgow must have gotten it that he
23    was going to be expected to do it the way he was told by the
24    MDEQ.  The people he called -- remember, the law, his coach,
25    and the cops.  The MDEQ.  Not the way he thought was right.
```

1    He was going to be told when and how things were to happen.

2         And it became clear that he had to have the plant

3    ready to go by April of 2014.  If -- even if it wasn't really

4    ready to go.  Oh, and he expected -- he was expected to keep

5    quiet about any problems he was having.  Let's look at that

6    email.  I know you've seen it before.

7         "It will be against my direction."  What's the last

8    statement?  "I will reiterate this to management above me, but

9    they seem to have their own agenda."

10        It seems to me that Glasgow had first tried.  Late in

11   2013 and early 2014, he was working on his staffing, trying to

12   get enough people hired so that the existing group wouldn't

13   have to work around the clock.  But he had only little success

14   with that it seemed.

15        He also arranged for a training day with his staff

16   about some of the fine points of how softening water treatment

17   process would work, among other things, to provide corrosion

18   control through balancing the pH and alkalinity.

19        Did you notice the testimony that the person that he

20   asked to come to Flint and teach alongside him was Warren?

21   Think about that.  Remember, Warren liked and respected

22   Glasgow and vice versa.

23        You could tell from Warren's testimony that he simply

24   never thought Mike would secretly do or allow to be done, the

25   things that were done at that plant.  You can bet Warren was

1    shocked and surprised as the rest of us when he learned

2    literally years later all that had transpired in secret.

3           Much of it he didn't learn about until this

4    litigation.  In fact, there's a lot that he didn't learn until

5    this trial just like you.

6           Mr. Glasgow got no support from his bosses in efforts

7    to do the switchover right.  You heard that Glasgow sought

8    support from his bosses at the city and from the coaches and

9    the cops at the MDEQ.  He got pretty much nothing from them.

10   He didn't want to do just the 60- to 90-day commissioning

11   test.  He wanted four or five months.  But he didn't get to do

12   that.

13          He didn't think April of 2014 was a hard deadline

14   when the water from Detroit would stop flowing.  He thought it

15   could continue past that date if needed.  But the money men

16   wouldn't pay for the additional time that Glasgow wanted.  And

17   his cries of help went unanswered.

18          He got no support from the MDEQ.  The MDEQ didn't

19   even acknowledge his email that we just saw saying the plant

20   wasn't ready.  And that's when Mr. Busch and Mr. Rosenthal

21   were at the plant the very next day.  There's the email about

22   being at the plant the very next day.

23          There wasn't going to be any testing before the

24   switchover.  He told the MDEQ in his email that his staff

25   wasn't ready, and he thought they shouldn't do it in the April

1    schedule.  But his supervisor told him it was going to happen

2    in April, and he had to do it.

3          I'm not going to go into detail about the other

4    painful truths that came from Mike Glasgow in his live

5    testimony.  You know what he ended up doing.  The Flint Water

6    Crisis was caused by an operational failure by the operators

7    of the plant, not some failure to require a particular

8    chemical.

9          Dr. Lawler told you the corrosion control treatment

10   plan of managing corrosion control with softening to balance

11   pH alkalinity was widely accepted in the industry and would

12   have been just fine if they just did the softening.

13         Mr. Glasgow admitted it was a headache to do the

14   softening, and so he quit treating the water.  Up to 75

15   percent of the water was bypassed from the softening basins.

16   Here's the email that confirms it.  I'm not making this stuff

17   up.  Why did we not know they were treating only 25 of the

18   water?  If you only treat 25 percent of the water, you're not

19   doing corrosion control.  You are not doing the softening.

20   And that's a operational issue.

21         By the way, plaintiffs played the same testimony from

22   Mr. Del Toral twice yesterday suggesting all one needs to know

23   was that the City of Flint had lead service lines and no

24   corrosion control.

25         So where's the gotcha moment against us or the

1   defendants?  You saw that it was known here in June that

2   Glasgow was not softening by bypassing 75 percent of the

3   water.  So that means there wasn't corrosion control, not that

4   there wasn't corrosion control available to do it.

5          You just balance the pH.  They just weren't treating

6   it.  They weren't doing the softening.  And that's operator

7   error in addition.  Even when Glasgow did treat the water, he

8   didn't do it right.

9          Instead of a steady straight line at the high pH, the

10  pH levels were too low and totally inconsistent.  Mr. Bellamy

11  testified that -- and I'm going to say this again -- Bellamy

12  testified orthophosphates would have done nothing to prevent

13  corrosion because of the huge variability in the pH levels.

14  Because of the way that plant was being operated.

15         The Flint Water Treatment Plant was not operated

16  properly in 2014 and 2015, and that is why the lead leached.

17  That is the only reason.  Remember the very first witness in

18  the lawsuit?  He's here today.  He came back to say hi, I

19  guess.  Plaintiffs's expert Dr. Hoaglund.  He told us that the

20  plant was not properly operated from Day 1 of this trial.

21         Plaintiffs themselves have said there was operational

22  error.  Every single water expert continuing all the way down

23  to the last two witnesses in this trial, Dr. Lawler and then

24  Mr. Ramaley have agreed the plant was not operated properly.

25         No one has disputed that at any point in this trial.

 1          Let's look at the evidence.  Dr. Hoaglund showed us

 2     this chart taken from the article of Professor Masten where

 3     Masten had looked at the actual records of what the city had

 4     done that show if there's ever an Exhibit A and you only need

 5     one exhibit, this and the one I'm about to show you, that

 6     proves that this was operational error, this is it.

 7          It shows that the plant was never operated at a high

 8     enough pH level or a stable level.  You heard the testimony

 9     from others.  Let's see where the levels should have been.

10     Way up there.  And it was a factor of 10.  Remember the factor

11     we talked about?  That's a huge disparity.  It should have

12     been a more constant.

13          You can see it on the next slide, as well.  Instead

14     of it being this up and down, it should have been up on the

15     high end of that, and it's straight across.

16          By the way, let's go back to that last one for a

17     moment, Casey, please.

18          Mr. Maimon suggested that -- Maimon suggested that

19     the Brown article that he referenced yesterday somehow

20     supported these lower levels of pH down here on the bottom

21     around that 7 range.

22          What he didn't point out, though, that the 7 to 8

23     range is acceptable with the use of orthophosphates.  It's a

24     different comparison.  Without that, the pH has to be up in

25     that 8.8 to 9.1 range.  That's the difference.

1    Dr. Bellamy said orthophosphates, even if used, could

2  not possibly have stopped any corrosion problems because of

3  how hopelessly the plant was operated.  As Dr. Lawler said,

4  it's a simple story of operator error, not a mistake by

5  Warren.

6    I want to make sure I'm clear on this.  First, every

7  single time Warren worked on a project for the city, there was

8  complete satisfaction with his work.  Certainly there were no

9  complaints from anyone.  In fact, he kept getting hired each

10  time the city need to examine a different angle, look at the

11  TTHM, or follow the MDEQ's deal and design, some kind of

12  function at the plant.

13    Things got done right.  And just how right did Warren

14  do it?  Well, he did it so right that in all the years that

15  this case has been investigated and litigated, nobody, nobody

16  who was actually there ever blamed Warren.

17    Doing it cheap by taking advantage of the MDEQ's

18  interpretation of the Lead and Copper Rule became the heart of

19  the city's plan.  Doing it cheap by stretching and

20  manipulating the Lead and Copper Rule was soon going to

21  replace doing it right.

22    Doing it cheap by stretching and manipulating the

23  Lead and Copper Rule was going to cause people to make stupid

24  and dangerous decisions.

25    As we've learned, the money men's plan to save money

1    was threatened pretty quickly when people began to complain

2    about the taste, the odor, and appearance of a new water.

3           It then nearly imploded with LeeAnne Walters's

4    situation when that arose in February of 2015.  But that's

5    when the city was saved by a different form of bureaucratic

6    wrongdoing.

7           This time courtesy of the MDEQ when it became

8    apparent that the MDEQ's plan to study the water one year

9    before making any changes in the treatment plant may not have

10   been the right call.  The MDEQ did not step up and admit it

11   that they might have made a mistake.

12          Instead, the MDEQ decided to double down on its

13   original decision and start to deny that it could have been

14   mistaken at all.  That is why the plaintiffs' expert, Richard

15   Humann, their own expert, described the Flint Water Crisis as

16   a story of government failure, intransigence, unpreparedness,

17   delay, inaction, and environmental injustice.

18          Now, we're going to talk more about Mr. Humann, how

19   little he knew in a bit.  But this much he got right.  These

20   are the words that he said directly from his report.

21          Next slide, please.

22          "Both agencies, but principally the MDEQ, stubbornly

23   discredited and dismissed the others's attempts to bring the

24   unsafe water lead contamination and increased cases workload

25   to issues of Legionnaires' disease to light."

1        The MDEQ stubbornly worked to discredit others.  It

2    was the old game of bureaucratic CYA.  "What do you mean we

3    made a mistake?  We didn't make a mistake.  We were right.

4    It's you who are wrong.  The water's safe.  There's nothing to

5    see here."

6        According to plaintiffs's own expert, Humann, it

7    didn't stop with the MDEQ.  It extended to the Michigan

8    Department of Health and Human Services.  It included the

9    governor's office.  It included the EPA.  Every single

10   governmental agency that touched this problem made it worse.

11       The city, the MDEQ, and the governor's office

12   constantly reassured everyone the water was safe.  Even when

13   Warren made private inquiries to the city, he was told

14   everything's okay.

15       Starting in the summer of 2014 after the switch

16   occurred and continuing all the way up to September of 2015

17   when he finally learned the MDEQ was instructing the city to

18   start using orthophosphates, at no point was Warren told of

19   any lead problems.  Even when he asked point-blank about it,

20   just like every other outsider, he was always told,

21   "Everything was okay.  We're on top of it.  We've got it under

22   control.  We're working with the MDEQ to handle this.  The

23   MDEQ says the water is safe."

24       Here's more Mayor Walling Congressional testimony.

25   "From Day 1 with the river, the state regulatory agency, the

1    MDEQ provided assurance to us that the people of Flint water

2    was safe and met the standards of the Safe Drinking Water

3    Act."

4         Meanwhile, the EPA is a wash in bureaucratic

5    infighting.  Miguel Del Toral was trying to be a whistleblower

6    of sorts, and he got squashed for his efforts.  The EPA

7    leadership failed to take action for months and months after

8    they had information, which would have led any responsible

9    bureaucrat to act.

10        Along the way, people became so entrenched in their

11   positions, so committed to protecting their own reputations

12   that they lied.  They lied to themselves.  They lied to each

13   other.  They lied to the press.  They lied to the public.

14        And all the time, it allowed the money men to keep

15   puffing out their chest and bragging about how much money they

16   were saving.

17        Is it any wonder that five witnesses, former

18   Governor Snyder, former Emergency Manager Ambrose, former

19   Emergency Manager Earley, Howard Croft, and Nancy Peeler have

20   taken the Fifth Amendment in this trial because of the

21   criminal charges they are facing?

22        These people refuse to come into this courtroom and

23   look you in the eye and tell you the truth.  The rest of the

24   story, which we would have gotten out of them on

25   cross-examination if we were given the opportunity.

```
 1            Yet these plaintiffs choose to sue Warren and his
 2    company and drag him through years of litigation and you
 3    through months of trial.  Warren cares what happens here.  He
 4    sat on that uncomfortable bench every single day of this trial
 5    that he could possibly be here.
 6            The guy who does it right got treated wrong.  That
 7    stinks.  And that stench carries well beyond just Warren.
 8    Mr. Leo A. Daly, now in his 80s, has run the family business
 9    for many years, following his father and his grandfather's
10    footsteps.  You heard about the --
11            THE COURT:  Go ahead.
12            MR. MASON:  You heard about their business.  LAN is a
13    relatively -- LAN engineering firm is relatively small for
14    engineering companies.  Imagine for the last six years
15    competitors salivating at the chance to use the allegations of
16    malpractice these plaintiffs have made in this case as an
17    improper marketing tool to dissuade customers from doing
18    business with LAN.  It's hurtful.  It's wrong.  It stinks.
19            Then on top -- to top it off, plaintiffs seek to get
20    money from Leo A Daly Company.  Mr. Daly's architectural firm
21    that had nothing to do with Flint, I don't believe you'll ever
22    get to Question number 6 on the jury question form, the
23    verdict form about whether LAD had anything to do with this
24    mess.
25            But if you need to, the question answers itself.
```

July 21, 2022

7806

1    "Did Leo A Daly, LAD, exercise or retain the right to exercise

2    day-to-day control or supervision of the specific work

3    activities of Warren Green and Jeff Hansen in connection with

4    their work on the Flint Water Treatment Plant?"

5         What did plaintiffs show you yesterday to try to

6    prove this?  A W-2 form?  Nobody disputes the fact that the

7    paycheck came from them.  But that's not the question.  The

8    day-to-day control of Warren and Jeff Hansen.

9         And you heard Warren and Hansen and Mr. Benes tell

10   you the answer.  Absolutely not.  They did not have a right to

11   control.

12        I think Mr. Benes said each if Mr. Daily himself said

13   something that doesn't mean that Warren would have to follow

14   it.  That's the answer.  That's overreaching, too, and so

15   wrong.

16        So what do you do with this case?  How do you handle

17   the challenge of this situation?  Here are plaintiffs who sued

18   lots of people who actually were the cause of the Flint Water

19   Crisis.  And by the way, do you recall the suggestion

20   yesterday that it was somehow unfair to list any person

21   individually?  I guess plaintiffs forgot --

22        MR. STERN:  Objection.

23        THE COURT:  Yeah.

24        MR. MASON:  This came out in the evidence with

25   Mayor Walling.

```
 1              THE COURT:  Just a minute.  Okay.  Go ahead.
 2              MR. MASON:  Thank you.
 3              THE COURT:  I just want to remind the jury that -- of
 4    a couple of things.
 5              Mr. Warren Green -- plaintiffs never sued him.  I
 6    just think that has been said a couple of times.  That's not
 7    in our record just so that you understand that.
 8              Go ahead.
 9              MR. MASON:  And plaintiffs said over and over
10    yesterday Warren is LAN and LAN is Warren.
11              Plaintiffs' counsel may have forgotten yesterday when
12    he came out during the trial with Mayor Walling's testimony
13    that these exact same lawyers sued him individually and many
14    other defendants.
15              And now they decide to take a run at just a couple
16    more parties.  Engineering firms, private companies.  We must
17    have looked like plums on a tree, I guess.  Perhaps it would
18    seem like it would be easy to just knock down a couple of
19    engineering defendants.  That we would be afraid that somehow
20    LAN would be afraid.  Well, Warren Green is not afraid.
21    Because Warren knows he did things right.  And now so do you.
22              There is only one question of fault that applies to
23    LAN.  That is this one that we talked about.
24              Now, let's look at the next one.  You must find --
25    and we went through each of those earlier -- that each and
```

 1    every one of those three must be found by you, or you must

 2    find that Warren and LAN did not commit malpractice.

 3            Keep in mind that you have to judge Warren and LAN's

 4    conduct in context.  The judge's instructions say you have to

 5    consider what a reasonable engineer would have done under the

 6    same or similar circumstances at the time.

 7            At the time is in the summer of 2013 in June before

 8    they even started trying the 30-day operational plant test run

 9    or up to August when they got cut out of the water quality

10    treatment decisions.

11            As Mr. Ramaley said, he's been in those type of

12    situations and meetings.  Both in the roles of LAN and the

13    role of the city.  And he guaranteed that no engineer would

14    have acted any differently than LAN at that time.

15            And why would that be?  They were dealing with a

16    client who was bound and determined to spend as many money as

17    possible, a government regulator who was dictating what would

18    be done, and a treatment plan that LAN knew from analysis and

19    testing would work.

20            What's there to question at that point?  Nothing.

21    Nothing at all.  How in the world can Warren Green or anyone

22    else at LAN have committed malpractice ?  Warren is the person

23    from LAN who had nearly a hundred percent of LAN's direct

24    involvement with Flint plant project.

25            And at that stage of the project before the water

```
 1    started flowing, Warren apparently was the professional most
 2    concerned with doing his job right.  This should be an easy
 3    decision for you.
 4         I want to talk specifics of why the answer to the
 5    question is clearly no of Question number 1.  But first let's
 6    be sure on what the rules are.  The plaintiffs just yesterday
 7    again did what they did in jury selection.  They tried to
 8    suggest that their burden to prove the case against LAN is
 9    light.
10         So once again, I will remind you of a visual.  They
11    use the scales.  But it is more likely than not.  So they've
12    got to get more than 50 percent.
13         Remember the jury selection when we looked at this up
14    to here?  They've got to provide evidence more than a halfway
15    up in order to meet the preponderance of the evidence.  No
16    way.  No way.
17         Now, let's consider the three parts to the paragraph
18    on page 23.  Remember that number again.  Page 23.
19         In order to find against Warren, you must find all
20    three of these things.  Number 1, that orthophosphates were
21    required.  Absolutely not.  You heard Dr. Lawler say that not
22    only was it not necessary, but it was not advisable.
23         One of the world's foremost authorities and experts
24    on water treatment told you, no way.  It would not be
25    advisable under the guidelines that they covered in 2003.  It
```

1    could cause problems.

2         He not only dismissed any criticism of Warren's work,

3    but he applauded him for his advice, that it was not just

4    reasonable.  It was exemplary.  He wasn't alone, either.  The

5    MDEQ's themselves were the ones making water treatment

6    decisions.

7         If anyone should have known whether orthophosphates

8    were required, it was them.  They said the opposite.  "City of

9    Flint, you do not need to use orthophosphates."  Also all of

10   these people said orthophosphates are not always called for.

11   All of these folks said that you don't just add chemicals for

12   water treatment.  You cannot make a decision until you test.

13        Many of these people testified that it can also be

14   harmful.

15        This was exactly the rational and reasonable advice

16   Warren gave.  Test first.  Did Warren Green make sure the

17   audience of decisionmakers were considering orthophosphate if

18   it was determined it might be necessary?  Of course.  He was

19   even vehement in making sure that they knew to do the 60- to

20   90-day testing for what treatment was best.

21        Was his conduct reasonable?  Absolutely.  The

22   evidence is overwhelming that Warren did it right.

23        Number 2, that's the one that talks about failure to

24   warn.  Warn about not using something you might not each need?

25   Warned to use something that may be called for as a powerful

1   product that could actually hurt people for using.  Warn about

2   not using something without testing first?

3        Number 3, Mr. Ramaley and Dr. Lawler answered that

4   question for you firmly and without hesitation.  And I say to

5   you again most importantly, look at the last sentence.  "If

6   you fail to find any one of those three elements, you must not

7   find that LAN breached the standard of care."

8        You must find no malpractice if any one of those

9   three aren't met.  They all, absolutely all three would have

10   to be met.

11        I would remind you again that after this crisis in

12   Flint occurred and all of the many investigations that were

13   completed, not one person involved back then, not one blamed

14   Warren or LAN.  You sat through all the evidence for these

15   months and months, and not one person who was there involved

16   at the time stepped up and said Warren or LAN caused any part

17   of this for his failure to sufficiently recommend

18   orthophosphates.

19        So what evidence of this serious potentially

20   career-ending accusation against Warren and LAN did the

21   plaintiffs bring you?  Richard Humann.  Seriously?  Seriously?

22   To me, it's pretty sad.  They brought this guy, Mr. Humann,

23   their reliable mouthpiece, who has worked for these lawyers on

24   many other cases --

25        MR. STERN:  Objection.

1          THE COURT:  Yeah.

2          MR. MASON:  That's what he said.

3          THE COURT:  Move along.

4          And was there evidence of a career-ending -- was

5     there evidence from a witness, Mr. Mason?

6          MR. MASON:  That is my position here about the impact

7     on this.

8          THE COURT:  But we have to have evidence.  So I just

9     ask that you please move on and focus on the evidence.

10          MR. MASON:  Absolutely.

11          They had Mr. Humann sit in front of you and tell you,

12     without even looking at you, staring at the microphone, how

13     inadequately Warren served the city.  Besides being deadpan,

14     he was dead wrong.

15          Do you remember -- I don't know how you could forget

16     him -- the most unprepared expert in the entire case.  And it

17     wasn't because he didn't have time to prepare.  It was

18     intentional.  Here's how this orchestrated scam happened.  The

19     plaintiffs lawyers sent Humann a large amount of materials to

20     review and supposedly consider.  He didn't review almost all

21     of the materials.  That way he limits what he can be asked

22     about in forming his opinions.

23          Let's be crystal clear about this.  What did you

24     hear?  He claimed that he had done a beginning-to-end study to

25     learn everything that went into the cause of the Flint Water

1    Crisis.  But when asked questions about this, the truth

2    emerged.

3           He did not know who the decisionmakers were regarding

4    corrosion control.  He had no water chemistry knowledge about

5    orthophosphates or softening.  He did not understand that LAN

6    did no direct work for the City of Flint from 2009 through

7    April of 2013 before Warren Green was asked to assist the city

8    in May of 2013.

9           He had no knowledge of the actual work LAN was asked

10   to perform when they got shut out of the water quality

11   treatment discussion.  He did not know what work LAN actually

12   did or did not do.  He reviewed one deposition in the whole

13   case, an EPA person whose name he could not remember and from

14   which he took nothing.

15          He never asked the plaintiff attorneys for any

16   documents he felt he needed to review.  He only reviewed nine

17   documents in the whole case and less than five were related to

18   LAN.  He never reviewed any emails in the case.  He did not

19   know who Busch, Prysby, Rosenthal, Shekter-Smith were from the

20   MDEQ when he put his report together.

21          He did not know that the MDEQ had primacy authority

22   to interpret and enforce the Safe Drinking Water Act and the

23   Lead and Copper Act, even though it was contained on page 3 of

24   his report.

25          He didn't know who Johnson, Bincsik, Wright, Croft,

1   Walling, or Glasgow were from the City of Flint.  He did not

2   know what anyone from the City of Flint said or did not

3   understand about any of Warren's or LAN's recommendations.  He

4   conducted no water chemistry studies.

5        He never looked at Warren's treatability study from

6   the Flint River.  He never looked at any of the monthly

7   operating reports of the Water Treatment Plant.  He did no

8   analysis into the physical mechanisms by which lead leached

9   into the Flint drinking water.

10        And finally, unbelievably, he did not know whether

11   orthophosphate would have even made a difference without

12   studying it and seeing water quality analysis just like Warren

13   suggested.

14        I'm getting close to finishing, so stay with me.

15        But these very skilled lawyers knew that if they

16   wanted to be straight up with you, they would have been all

17   over Humann saying you must do a thorough and complete

18   analysis if we're going to offer you as a credible witness.

19   They didn't want Humann to see the truth.

20        If he did the work like other experts in the case, he

21   likely could never have just mouthed those words saying that

22   Warren and LAN violated the standard of care.

23        Plaintiffs attorneys were complicit in Humann's

24   remaining ignorant to the truth.  Don't reward them for bad

25   behavior.  By testifying in the narrow way that he did

1    referencing only a tiny fraction of evidence in the case,

2    Humann was carrying out the lawsuit version of improper

3    behavior.

4          You can't testify about and can only be

5    cross-examined a little about material you haven't seen or

6    read, put blinders on the whole truth and only look at what

7    you want to come up with an unfounded opinion.

8          Despite all these points of abysmal ignorance,

9    Mr. Humann couldn't ignore a basic indisputable fact that the

10   responsibility for the Flint Water Crisis lay at the feet of

11   the government.

12         He correctly said the Flint Water Crisis has been

13   exhaustively reviewed, assessed, evaluated, reported, and

14   judged with a generally accepted conclusion that the crisis

15   was a failure of all levels of government.  No mention of LAN

16   or engineering companies.  Government.

17         He made another important concession.  He said this

18   was a decision failure, not a system failure or an equipment

19   failure or communication failure.  But a decision failure.

20   And he agreed with Mr. Kent that in order to offer an informed

21   opinion about the decisions that were being made, one had to

22   know the context in which they were made.

23         The five Ws, the who, what, when, where, and why.

24   And guess what?  That's what the Court has instructed you to.

25   In order to determine whether an engineer met the standard of

1    care, you'd have to consider what a reasonable engineer would
2    or would not have done under the same or similar
3    circumstances.
4         How can you consider the same or similar
5    circumstances if you don't know who, what, when, where, and
6    why of how it happened?
7         Mr. Ramaley made this point clearly.  It would be
8    impossible to make those type of judgments in this case
9    without knowing that information.  But Mr. Humann and his
10   lawyers knew that.
11        They knew the only way to get him to say what he
12   wanted them to say was to make sure he knew nothing about the
13   same or similar circumstances.  Stick your head in the ground.
14   Turn a blind eye.
15        Yet despite attempts to avoid learning the truth, he
16   simply couldn't avoid the undeniable fact that this was a
17   problem of government wrongdoing.  He admitted that the MDEQ
18   clearly was involved in the city's decisions about its
19   treatment methods, and the city was relying on the direction
20   of the MDEQ.
21        He concluded that the MDEQ communicated to the city
22   what they wanted, and the city abided by the DEQ's direction.
23   His only knowledge and criticism of LAN's work was based on
24   the content of the 2001 report and July 2013 proposal and
25   initial contract with change order.

1          But those documents standing alone say nothing about

2     the decisions that were made by the city or the MDEQ, any

3     conversations with LAN, or any conversation of why or how the

4     decisions were made.

5          What he didn't admit was that these lawyers gave him

6     many documents to read.  He didn't read them, and the lawyers

7     apparently said, "Okay.  We'll just roll with your opinion

8     without making him study the true facts first."

9          I'm talking about materials, folks, that reveal the

10    facts that has made it possible for us, you and me, to

11    understand what actually happened in Flint nine years ago.

12    Think how little we would know about this case if all we saw

13    was a short list of five documents.  More than 600 exhibits

14    have been admitted into evidence in this case.

15         Common sense tells us that he could have asked the

16    lawyers for any other key documents, but he didn't.  He didn't

17    want anything inconvenient to his theory.  The game was on.

18    Let's stack the case against Warren and LAN.  Despicable?

19    Yes.

20         You know, plaintiffs want to talk about ethics.  You

21    remember all those questions, even recently about the codes of

22    ethics for an engineer and a requirement for -- let's talk

23    about a requirement for an expert witness under those same

24    documents that we looked at.

25         The Society of Civil Engineers Code of Ethics, what

1    does it say?  "When serving as an expert witness, they shall

2    express an engineering opinion only when it is founded upon

3    adequate knowledge of the facts."

4         It goes on to say, "Making any public statements" --

5    and this is certainly a public forum -- "only in an objective

6    and truthful manner they shall include all relevant and

7    pertinent information in such reports, statements, or

8    testimony."

9         You've seen over 600 documents that Mr. Humann never

10   saw.  You've heard testimony from dozens of witnesses that he

11   never ever saw.  You've come to understand a fact fundamental

12   and basic to the story of the Flint Water Crisis.  How this

13   whole switch to the Flint River was precipitated by the high

14   stakes poker game being played between the DWSD and emergency

15   manager.

16        That was -- you understand how Kurtz announced the

17   city was joining the KWA and the DWA and responded as we

18   discussed earlier in this.  Did you catch the part where

19   Mr. Humann admitted that he didn't know this?  That he

20   actually believed that the termination date had been set in

21   stone for years and years before that.  How he had put that

22   into his report.

23        Most importantly, that he only learned of his mistake

24   when confronted with the truth at his deposition.  His

25   complete beginning-to-end review of everything that went into

1    the Flint Water Crisis contained a huge mistake in his report,

2    which he had given to his lawyers, and he carried forward into

3    the day of his deposition.

4         They were hoping he could skate by without it being

5    revealed.  But, of course, it was, under oath.  That was his

6    idea of ethical behavior, expressing opinions as an expert

7    witness without bothering to read the pertinent and relevant

8    evidence, evidence that was right at his finger tips.

9         Members of the jury, the only example of unethical

10   conduct in this trial was played out right here in front of

11   you by Mr. Humann himself who had the gall to offer so-called

12   expert testimony based on such limited information.

13        You should ignore what he said.  Exaggeration,

14   distortion, story out of context.  I told you earlier the ways

15   they've tried to build their case against Warren and LAN

16   exaggerating as one and others completely leaving things out

17   of the story, distorting the picture.  Resenting the story out

18   of context makes it easier to seem to do magic with just a few

19   facts.

20        Finding professional negligence against LAN, Warren

21   would be a huge mistake.  Warren's career and his reputation

22   would be dirtied by the acts of others in a situation where

23   here like others, he was delivering high quality -- like

24   always, he was delivering high quality service.

25        Was it reasonable service that a reasonable water

July 21, 2022

7820

1    treatment engineer of similar experience would have given?
2    Let me give you the answer.  Of course it was reasonable.  It
3    was, in fact, way better than reasonable.  It was the best
4    advice the city and the MDEQ could have gotten.
5           At the critical point in his involvement with the
6    city and the MDEQ just before he was cut out of working on the
7    water treatment planning, he gave the city the professional
8    guidance that would have changed everything for them.
9           If you plan to start with lime-only pH treatment as
10   recommended by the MDEQ, you should test that treated water
11   from the plant for 60 to 90 days before you send it down the
12   pipeline to the public.  Reasonable?  You bet it was
13   reasonable.
14          It also was reasonable for Warren to believe that the
15   city personnel and the MDEQ engineers looking over their
16   shoulders would recognize the wisdom of this advice and follow
17   that advice.  They told him that they would.  It would have
18   been unreasonable for him to doubt them, to be suspicious of
19   them.
20          It is reasonable for him to think that they were
21   acting honestly and ethically as he believed they had acted
22   before.  It is reasonable for him to think that they would
23   operate the plant correctly.
24          It would be completely unreasonable for him to expect
25   that they're going to skip softening or operate the plant in

1    such a haphazard way.  It is unreasonable to expect him to
2    have imagined that they would end up endangering the public.
3            Since we're talking about what's reasonable and
4    what's unreasonable, frankly, I was not addressing plaintiffs'
5    claim for damages at all, since we don't believe you'll need
6    to go past Question number 1 for LAN.
7            But the arguments made yesterday by Mr. Maimon
8    compelled me to make a few comments and then I'll be done.
9            First, as Mr. Stein showed the good news that these
10   four children actually are okay and not showing signs of lead
11   poisoning.  As Dr. Thompson explained -- and by the way,
12   Dr. Bithoney, let's be fair, never saw these kids.  So there
13   were all sorts of references of, you know, they didn't see
14   him.  They didn't see him.  Well, one of their chief experts,
15   Mr. Bithoney, he didn't either.
16           As Dr. Thompson explained, the children's development
17   falls within the broad range of normal and expected.
18   Childhood development cannot be pigeon holed into a single
19   uniformed standard.  Each child has a range of capabilities
20   and characteristics, strengths and weaknesses that combined
21   make all of us individuals.
22           When it comes to childhood development, you have to
23   look at the child as a whole and not label a child based only
24   on those parts of their character that they may rank lower in.
25   But that's exactly what Dr. Krishnan did.  She used the lowest

1    rankings on any individual test to label the whole person.

2    That's just wrong.

3          Dr. Thompson, Dr. Gaitanis were much more reasonable

4    in evaluating the whole child and showing that their range of

5    development was exactly where it ought to be, within the

6    brought category of expected.

7          I think you can draw your own conclusions about the

8    children's actual conditions based on the fact that none of

9    the parents has taken their child to a doctor for treatment or

10   even evaluation since Dr. Krishnan said the child had brain

11   injury.  Not one.

12         As for Mr. Maimon's charts of a lifetime of damages

13   for emotional distress and lost earning capacity with a

14   guaranteed annual 5 percent raise for the next 50, 60, 70

15   years, almost into the next century, I have a couple of

16   comments.

17         First, he just threw out those starting numbers.

18   25,000 per year, 50, a hundred, with a guaranteed annual

19   increase of 5, 6 or more in hopes that you would uncritically

20   accept in order to ramp up the numbers to astronomical figures

21   by the time you get to the 22nd century.

22         But the Court's instructions and verdict form puts

23   the brakes on that tactic.  The law says that you have to be

24   reasonably certain that these children will suffer damages in

25   the future.  Not speculation.  Not conjecture.  Not guess.

1        But reasonably certain when talking about these young

2   pre-adolescent children, there's no reasonable certainty of

3   any future damages.

4        The one thing we can say with some degree of

5   certainty is that the number of homes in the City of Flint

6   that actually have lead service lines and thus possibly may

7   have had lead in their drinking water has turned out to be

8   surprisingly low.  Only about one in six homes.

9        And there was never any proof at all that the homes

10  in which these four children lived, visited, played, or the

11  like were in that small group of one out of six with lead

12  service lines.

13       The blood lead levels for these children, which even

14  Dr. Specht and Dr. Bithoney both testified was the gold

15  standard for determining lead exposure were minimal, below

16  detection limits.  Or at their highest before their switch to

17  the Flint River ever took place.

18       Look, all I'm saying, if you want to, any level of

19  reasonable certainty as the law requires, it would be fair for

20  one to say, "Hey, we would need to cap any award at no more

21  than one sixth of whatever figure you think might otherwise be

22  appropriate."  One out of six.

23       As I said, you should never reach this issue at all,

24  because a no-answer to Question number 1 brings this case to

25  an end for LAN.  But I couldn't let Mr. Maimon's unreasonable

1    pleas for big numbers pass without some comment.

2          So here's what I think the plaintiffs are counting on

3    as it relates to LAN.  They're counting on one of you saying

4    something like this when you get back in the jury room.  "I

5    know Warren Green didn't do anything wrong and that he's being

6    reasonable in his performance of his job, but I still think

7    everybody, even the ones who were just on the sidelines should

8    carry part of the burden of compensating the plaintiffs.

9          "I want to find against LAN on the professional

10   negligence question, so we can put just a little bit of

11   responsibility on them.  Something small like a percent or 2.

12   What's wrong with that."

13         Let me be clear.  If you were to hear such a thing, I

14   hope you would raise your hand high and say everything is

15   wrong with that.  This is a court of law, a place where

16   wrongdoing must be proven before a defendant is penalized.

17         To go at it that other way, wanting to get defendants

18   to share the burden whether they did anything wrong or not is

19   to throw the law out the window.  This is not a game show

20   where the losing contestant gets to go home with a little

21   something.  This is a court of law, and that's not justice.

22         Plaintiffs are also hoping you find just a little on

23   LAN.  They know that you know that these government agencies

24   did this thing and every bit of the fault is on them.  But

25   they're hoping that after running this very long movie, they

 1   can get to you put a tiny percentage on us, despite suggesting

 2   the huge number of 25 percent yesterday.

 3           They know you won't under any circumstance put the

 4   big percentages or grossly exaggerated big dollars on us that

 5   they've asked for.  They're really hoping you put a little

 6   something against LAN or Warren, a percentage or 2, despite

 7   what they told you yesterday.

 8           Don't fall for their game.  If you do that, they'll

 9   be high-fiving in the parking lot, because that's all they

10   want on LAN, a finding of professional negligence.  No matter

11   how small.  Because once malpractice is found, that stain has

12   been indelibly marked on the reputation of Warren Green and

13   LAN.  It's not right.

14           Instead say something very firmly to them about

15   fairness and decency.  Tell them they cannot drag innocent

16   parties into a multi-plaintiff case like this and pummel them

17   for months with ridiculous claims borrowed from actions not

18   even in this trial.

19           Tell them they cannot invent piggyback cases just

20   because they want more money.  Tell them that, "Yes, somebody

21   did wrong here but it wasn't LAN or Warren Green."

22           Let's look at the verdict form.

23           The answer to question of whether LAN breached the

24   standard of care and committed malpractice should be "No."  An

25   emphatic and firm "no."  You don't even have to answer any

1   other questions about LAN or Warren after you do that as

2   stated in the notes after number 2.  You'll see when you see

3   your form.

4        Send them home to work on something legitimate next

5   time to leave out the innocent defendants.  No high fives.

6   Let Warren go home knowing he proved he did the right thing in

7   Flint.  And he got justice here because like him, you did the

8   right thing, too.

9        Thank you for your time.

10       THE COURT:  All right.  Well, members of the jury,

11  and for everyone here, we are going to take a break after this

12  -- it's been about close to two hours.  So it's a perfect time

13  for a break.

14       And what Bill will do is I'll ask the lawyers and so

15  on to sort of stay on that side of the courthouse.  Because

16  the jurors are going to relocate to our jury deliberation

17  room, which is in the back corridor.  So Bill will help you

18  with that.  So this break may be a little bit longer so you

19  can get your things upstairs and get acquainted with the room

20  here.

21       And then we'll be back to hear the rebuttal from

22  plaintiffs.

23       THE CLERK:  All rise for the jury.

24                      (Jury Out)

25       THE COURT:  Please be seated.  Mr. Mason, what was

1    the evidence of Leo A Daly's age?  I just want to know did

2    Mr. Benes testify --

3              MR. STEIN:  Benes.  I believe that's right.

4              THE COURT:  He did testify to that?

5              MR. STEIN:  That's my recollection, Your Honor.

6              MR. STERN:  We need more than recollections.

7              THE COURT:  Yeah.  And also, Mr. Mason, I have been

8    reviewing some treatises on closing arguments.  And abusing or

9    maligning opposing counsel is prohibited.  I have discretion

10   in trying to manage that.

11             But calling the lawyers "tricksters."  And -- you

12   were calling them "tricksters," not Riley, Vanderhagen,

13   Daylaana Ware.

14             MR. MASON:  Of course.

15             THE COURT:  Okay.  That's what I thought.  I thought

16   it was the lawyers.

17             And I just want you to be aware of that.  We have a

18   long path to go from here in our litigation.  That won't be

19   allowed in the next closing argument, because it does violate

20   the sort of rules that guide closing arguments.

21             Where was the career-ending evidence?  Is --

22   Mr. Warren Green, is he retired or continuing to work?

23             MR. MASON:  He's continuing to work.  And in

24   argument, that was my argument to the jury that that kind of

25   finding would have an impact.  I mean, that's not something

1    that's evidence and argument.

2          And I respectfully -- I understand what Your Honor is

3    saying, but I respectfully disagree with respect to -- that

4    there was anything wrong with the comments about -- because

5    the jury needs to understand, and there were comments

6    throughout this trial of defense counsel not providing

7    information to -- throughout this case.

8          "They didn't provide this to you, did they?  They

9    didn't provide this to you?  How long did they talk to you?"

10   And they didn't do that.  So my pointing that out is just

11   consistent with what has gone on in this case.

12         THE COURT:  Okay.  And the idea that there's a

13   conspiracy between plaintiffs' counsel and their expert, were

14   you alleging a criminal conspiracy, a civil conspiracy?  What

15   was your --

16         MR. MASON:  No, Your Honor.  Just the fact that they

17   were aware of the fact that he -- when he did his report, had

18   not reviewed all of this.  And the jury should be able to put

19   weight to that.  In terms of them being aware of it, that as I

20   said in the closing, the reality is that they knew that he

21   hadn't done the work, and they knew that he hadn't reviewed

22   that information.  And they brought him here anyway.

23         THE COURT:  And, of course, the Court made a legal

24   decision in the Daubert opinion and order that he was

25   qualified to testify.

July 21, 2022                                                   7829

```
 1              MR. MASON:  I didn't say -- I mean, they'll make that
 2    decision.
 3              THE COURT:  Okay.  All right.  Just wanted to check
 4    where we were on a couple of these things.
 5              MR. MASON:  Thank you.
 6              MR. STERN:  Your Honor.
 7              THE COURT:  Yes.
 8              MR. STERN:  Well, I'm sorry.  I didn't mean to
 9    interrupt you.
10              THE COURT:  No, go ahead.
11              MR. STERN:  I've been practicing for 20 years.  I
12    mean, in 20 years, I've never -- and I've tried dozens of
13    cases in various contexts.  I know this is a big case.  I know
14    it's a big deal.
15              In 20 years, I've never had an opposing counsel stand
16    up at a lectern in front of a jury in a closing argument and
17    so personally, personally attack the lawyers in this case.
18              Before the trial started, there was a motion in
19    limine about, you know, let's curtail the examinations of
20    plaintiffs' counsel based on examinations that occurred in
21    depositions.
22              I don't think there's been a single time in this
23    trial in front of the jury where we've come close to
24    insinuating or outright saying anything near what Mr. Mason
25    just said to this jury in closing arguments.
```

```
 1              And I move to strike every single reference in
 2    Mr. Mason's closing that makes any reference whatsoever to the
 3    lawyers.  I need some time to look at it.  I need some time to
 4    digest it.
 5              And in fairness to this jury before they deliberate,
 6    it needs to be addressed.  It's one thing to talk about our
 7    expert who Mr. Mason and his client feels is unprepared.
 8              But to just without -- with, like, a reckless abandon
 9    to just make this case about the lawyers, to make this case
10    about us high-fiving, about what's in our minds.  I mean, it
11    violates so many canons of ethics -- I mean, normally I get
12    worked up and hot.
13              This was so pronounced and prevalent, I don't even
14    know which part to be mad at.  I don't even know which part to
15    be offended by.
16              But the sum and substance of the entire closing was
17    this evil, nefarious, made up case with insinuations that LAN
18    and LAD were brought into the case well after the other
19    defendants.  It is just -- it is just --
20              THE COURT:  Yeah.  Let me give it some thought.  One
21    of the areas where I'm coming from, Mr. Mason and Mr. Stern,
22    is that the Eastern District of Michigan has a set of civility
23    principles that guide courts in making legal rulings.
24              And our civility rules prohibit attacks on opposing
25    counsel, incivility.  I think many remarks in your closing
```

```
 1    argument may have violated the local rules here.  And I'll
 2    take a look at them.
 3            I want to make sure they -- when you take an oath to
 4    be sworn in, in the Eastern District of Michigan, what's
 5    always struck me -- and this was decided before I was sworn in
 6    as a judge -- you agree to uphold the civility principles
 7    before the laws and constitution of our country.  That's how
 8    important the bench considers it.
 9            So let me -- I'll take a look at that.  I don't
10    anticipate directing the jury before the rebuttal about
11    disregarding certain portions of Mr. Mason's closing.
12            You also made reference -- I know that the jury
13    became aware during Mayor Walling's testimony that he had been
14    sued.
15            MR. MASON:  Yeah.
16            THE COURT:  But the jury was not made aware that the
17    -- some of the nonparties were sued in this case.
18            MR. MASON:  I didn't say that.  But there were other
19    suits.  And Mr. Stern, we looked at the testimony of
20    Mr. Stern's statement that he wanted them to know, the jury at
21    the time, that there were others.  And so I have that record
22    that I can provide the Court.
23            MR. STERN:  So Mr. Stern doesn't get to testify.
24    That's just one of the rules.  When we come to trial is that
25    the lawyers don't get to testify.
```

```
 1            MR. MASON:  It was a question.
 2            MR. STERN:  The lawyers don't get to testify.
 3            THE COURT:  Okay.  Just a minute.
 4            MR. STERN:  Yeah.  And --
 5            THE COURT:  Just a minute.
 6            MR. STERN:  Yep.  Sorry.
 7            THE COURT:  You said that, "These same exact lawyers
 8       sued him" -- this is Walling -- "individually and many other
 9       defendants.  And now they decide to take a run at more
10       parties."
11            That's just not even true.  You were sued in the same
12       lawsuit as the other defendants.
13            MR. STERN:  We spent months arguing over if this
14       evidence were to come in, what the jury would need to know
15       about those lawsuits.  Whether it included the settlement,
16       whether it included these folks getting dismissed from the
17       case for various other reasons.
18            There were real foundational reasons why Your Honor
19       ultimately decided principles as to why the complaint would
20       not come in, as to why when you ruled in limine that the
21       settlement would not come in.
22            And now before the jury in closing argument wrapped
23       up in ten lines or five lines or whatever it appears is the
24       sum and substance of everything that for months we had been
25       disagreeing about that Your Honor ultimately came down on
```

```
 1      would not be presented to the jury.

 2             And to the extent that Your Honor is inclined to not

 3      do anything before the jury hears the rebuttal, I think it

 4      would be inappropriate not to give a curative instruction to

 5      them the minute they come in about what they just heard.

 6             Because I can't get up there with a straight face

 7      after being accused -- and I don't want to exaggerate.  I'm

 8      known in this courtroom as probably the most colorful speaker

 9      of everybody, because I say crazy stuff, and I make analogies,

10      and sometimes I go a little cowboy.

11             I don't want to have to, in closing, address every

12      single one of these things in the way that I think I need to

13      that can easily be cured by an instruction from the Court

14      before I get up there to speak.

15             THE COURT:  Okay.  Let me give it some thought.

16             MR. MASON:  Can I give some references to the

17      testimony that we looked at?

18             THE COURT:  On what?

19             MR. MASON:  On this issue of that statement about

20      suing others.  If I could just give the statements -- if the

21      Court's going to look at it.

22             THE COURT:  Yes.

23             MR. MASON:  Okay.  On 4-4-22, page 228 [as spoken],

24      lines 23 to 25.  And --

25             THE COURT:  What is the statement?
```

```
 1            MR. MASON:  Well, Mr. Stern makes a statement to give
 2   the jury the complete picture as to this point, they need to
 3   know that he was one of many who were sued.  And then that
 4   came up in the actual questions and examination on page 2411
 5   of the transcript.
 6            So this was not some random comment made.
 7            THE COURT:  Okay.
 8            MR. MASON:  And that was as a result of a sidebar
 9   where Mr. Stern said I want the jury to know that he was not
10   singled out.  Thank you.
11            THE COURT:  Okay.  Thank you.
12            MR. STERN:  Context matters, Your Honor.
13            THE COURT:  It does.
14            MR. STERN:  I would like some extra time if that's
15   okay --
16            THE COURT:  Yes, please.
17            MR. STERN:  Thank you.
18                        (Brief Recess)
19            THE COURT:  Please be seated.  And we'll just take a
20   moment.  I want to make sure our counsel or guest in the back
21   whose been coughing was able to test before coming in today.
22            Were you able to take a COVID test?
23            UNIDENTIFIED PERSON:  Yes.
24            THE COURT:  Oh, good.  And it tested negative?  No
25   exposure or no positive?
```

```
 1              UNIDENTIFIED PERSON:  Yes.

 2              UNIDENTIFIED PERSON:  She said it's just a cold,

 3    Judge.

 4              THE COURT:  Okay.  Thank you.  I'm just trying to

 5    keep all of us safe.  It's nothing personal.  Okay.

 6              So, Mr. Stern, after giving this some expedited

 7    consideration over the break and Mr. Mason, here is the

 8    curative instruction I intend to read that I think is more

 9    than justified based on the practice in the Eastern District

10    of Michigan, the general principles of civility.

11              But more importantly, adherence to the record and to

12    the principles of what a closing argument is.

13              I will read that personal -- members of the jury,

14    we're getting ready to hear plaintiffs' rebuttal argument, and

15    I just want to remind you that personal accusations about

16    plaintiffs' lawyers should be disregarded, as well as the

17    plaintiffs' motives for suing LAN.

18              Also remember only to consider the evidence and

19    documents, the testimony in your deliberations.  And closing

20    arguments are not evidence, including whether Mr. Humann's

21    conduct was ethical or unethical.

22              Something along those lines.

23              Mr. Mason.

24              MR. MASON:  Thank you.  Well, I certainly disagree

25    that anything was improper, and I feel very strongly about
```

```
 1    that having tried cases and saying things similar with respect
 2    to without objection elsewhere.
 3             But let me be very clear in terms of the record here
 4    and why I think the instruction should be bilateral and should
 5    mention all lawyers.
 6             And I say that because if the Court looks at the
 7    record yesterday, Mr. Maimon called Ms. Bush -- it was
 8    "disgusting" what was asked of Ms., I believe, it was
 9    Apricott.
10             You may recall, but it was "disgusting" the way she
11    was questioned and asked.
12             Second of all, Mr. Stern mentioned the defendants in
13    pixie dust that we were -- that's lawyers -- the pixie dust
14    yesterday, which is a similar theme to my magic or reference
15    that he mentioned yesterday himself.
16             And as you recall, his entire examination was Story 1
17    and Story 2, which he alluded to the fact that Story 2 was a
18    fabrication, particularly with respect to our position on this
19    case.
20             And so I think it's appropriate if the Court is going
21    to give an instruction, which I don't believe is necessary, to
22    say that lawyers for both sides that make any kind of, you
23    know, personal statement or things should be disregarded or
24    however you want to phrase it.
25             But it should not be one-sided.  Thank you.
```

 1          THE COURT:  Okay.

 2          Mr. Kent.

 3          MR. KENT:  Your Honor, since I was the one who

 4    cross-examined Mr. Humann, we specifically pulled out those

 5    canons that were used in closing about what an expert witness

 6    has to do and the ethical responsibilities.

 7          Mr. Mason said nothing about Humann in that term

 8    other than what I did in cross-examination with Mr. Humann.

 9    That was directly from the testimony, and it's appropriate --

10          THE COURT:  Did you ask him if he was in a

11    conspiracy?

12          MR. KENT:  I did not do that, Your Honor.  But the

13    question about Humann being ethical, that was part of the

14    examination --

15          THE COURT:  Right.

16          MR. KENT:  -- and it is appropriate for Mr. Mason to

17    point that -- was appropriate for Mr. Mason to point it out

18    again to the jury and let them draw their conclusion as to

19    whether Mr. Humann abided by that requirement of examining all

20    pertinent and relevant data before testifying.

21          THE COURT:  Okay.

22          MR. KENT:  So I don't think you can include him.

23          THE COURT:  I will not include him.

24          MR. STERN:  Your Honor, may I just respond very

25    briefly?

```
 1              THE COURT:  Yes.
 2              MR. STERN:  First off, as to the comment about --
 3     that Mr. Mason just made about Ms. Bush, nobody called
 4     Ms. Bush despicable.  Nobody mentioned Ms. Bush's name.  I
 5     think it was despicable.  But that's besides the point.
 6              But nobody called her out and said, "Cheryl Bush was
 7     despicable."  Any reference that was made by Mr. Mason to
 8     Mr. Stern or Mr. Maimon is the context of his closing is quite
 9     different than saying, "Story 2 requires you to belief in the
10     magic of pixie dust."
11              I didn't say anything about any of the lawyers.
12     That's thematic.  That has nothing to do with whatsoever
13     with --
14              THE COURT:  I agree.
15              MR. STERN:  -- attacking lawyers.  And I would just
16     ask that regardless of what you do with Mr. Humann, I think
17     the jury needs to be instructed that any references to -- any
18     statements made by Mr. Mason about Mr. Stern and Mr. Maimon
19     specifically need to be disregarded.
20              THE COURT:  Okay.
21              MR. STERN:  Thank you.
22              THE COURT:  Thank you.  All right.  So let's get our
23     jury in.
24              Thank you, Bill.  And now they're right in the back,
25     so it's much quicker.
```

```
 1              THE CASE MANAGER:  All rise for the jury.
 2              THE COURT:  This is new.
 3                         (Jury In)
 4              THE COURT:  See, aren't you glad we didn't bring you
 5    into the back -- please be seated -- earlier?  Because you
 6    didn't get experience going up and down and up and down the
 7    stairs.  And we just wanted you to get in good aerobic shape
 8    throughout our trial.
 9              So welcome back to the jury and to everybody.
10              So for members of the jury, what we're going to do
11    now is have a rebuttal, what we call a rebuttal argument from
12    the plaintiffs.  And that will be delivered by Mr. Stern.
13    He's the only one sitting there anymore.
14              So but before we do that, I want to say something
15    following from our last argument to you for your
16    consideration.
17              And that is that personal accusations about
18    plaintiffs' lawyers, Mr. Stern and Mr. Maimon, should be
19    disregarded, as well as the plaintiffs' motives for suing LAN.
20              Also just remember -- and I'm confident that you will
21    -- that you are only to consider the testimony and the
22    documents that have been admitted into evidence in your
23    consideration of what the facts are in this case.
24              And I know I've said this before, but lawyers'
25    comments during closing arguments are not evidence.  So okay.
```

July 21, 2022                                                    7840

```
1              With that, we'll have Mr. Stern deliver our final
2    argument.
3              MR. STERN:  May I?
4              THE COURT:  Yes.
5              MR. STERN:  Thank you.
6                 REBUTTAL CLOSING ARGUMENT FOR PLAINTIFFS
7              MR. STERN:  Good to see you again.  I started the
8    ceremonies back on February 28.  And so I guess on some level
9    it's appropriate that I end it.  I sat by, and I listened to
10   Mr. Stein and Mr. Mason over the last couple of days.
11             And, you know, all of us have been working for a
12   really long time on these cases.  And I don't take anything
13   personally.  And regardless of what the judge just said, for
14   us, this case is about four kids.
15             And, you know, I'm not going to tell you about my own
16   personal life, but I've been called worse.  And, you know, I'm
17   a big boy, and I can take it.
18             It reminded me a little bit of law school for a
19   second.  I don't know why I thought of this.  But when I was a
20   law student a long time ago -- I'm a lot older than y'all
21   think -- I had this professor, Professor Ellington.  And he's
22   a southern guy, great boisterous southern voice.
23             And in law school when you're a first year law
24   student, the way they teach you is through this thing called
25   the Socratic method where you go home and you read and you
```

1    come in the next day, and the teacher teaches through the

2    student.

3            And so they ask you a bunch of questions about what

4    you read in an effort to sort of teach the elements of the

5    cases.  And that's how we start out learning in law school to

6    the extent any of us actually have about what it's like and

7    what it means to be a lawyer.

8            And I went to college and law school at the same

9    place.  Doesn't matter where.  But I was very familiar with

10   the place.

11           So it's safe to say that when I first got to law

12   school, I'm not sure I took it seriously, law school, as some

13   of the others who were with me, because some of them were

14   coming from new places, and they didn't have all of the

15   benefits of knowing where the restaurants were and the bars

16   were and their friends were and where the basketball court

17   was.

18           So sometimes, and you'll probably be shocked in light

19   of all of the work that I've done and how great it's been --

20   I'm joking -- there were times when I didn't go to class.  Or

21   I didn't do the reading.  Because for a minute, I was still

22   enjoying the place where I was and wasn't taking it yet

23   seriously enough the school part itself.

24           And I had this Professor Ron Ellington, he was a

25   professor of Georgia practice.  And he would have these

 1    classes that had, like, 200 students in them.  Huge classes.
 2    So the likelihood of me being called upon in any particular
 3    class is, like, two and a half percent.
 4            You know, one out of 200, so in typical me form,
 5    night before, I didn't do the reading, and I showed up for
 6    class this morning.  And out of nowhere, Professor Ellington
 7    calls on me.  He calls on me about this chapter or this case
 8    that I was supposed to read.
 9            And then he wanted me to be the one to teach the
10    class about it through my reading.  I hadn't read it.  But
11    already in lawyer mode, I started thinking about ways I could
12    answer these questions to make him believe that I had read
13    this case.
14            And I probably went on for ten minutes.
15    Professor Ellington, "Oh, Mr. Stern, tell us a little bit
16    about Stern vs Mason or whatever the case was.  Tell us a
17    little about this case."  And I go off.  I had my best
18    imagery, all of the best I could do to answer these questions.
19            And I could feel my classmates, like, who I think all
20    liked me, you know, kind of, like, moving away from me
21    slightly.  Like, I was sitting there getting ready to ask
22    professor -- answer Professor Ellington's question, and I give
23    this elaborate creative filled with analogies answer.
24            And all Professor Ellington said when I was done was
25    he said, "Aw, Mr. Stern.  That's a good story.  That's the

1     wrong story.  But that's a good story."

2          And as I sat here and listened to candidly both of

3     the closing arguments, it fit very well and nicely and kindly

4     into the themes that I had tried to develop for you in

5     condensing all this evidence into our closing argument.

6          These are good answers.  These are good stories.

7     They're the wrong answer.  They're the wrong story.  But

8     they're good answers.  And they're good stories.

9          I told you yesterday about Story 2, and I'm not going

10    to go over all the evidence with you again.  You've been here

11    for five months.  And, again, I talked yesterday about saying

12    these gratuitously.  You're ready.  You are ready to go back

13    there.  You're ready to deliberate.  You know this case as

14    well or better than any of us.  Okay.

15         So what I'm going to do now is just try and respond

16    to some of the things that were said.  Not the things that

17    were said about me or my partner or our team, but what were

18    said about the facts, what were said about our clients.

19         Okay.  I put this slide up yesterday about the

20    finger-pointing.  I have and we have never ever through any of

21    the examinations that we've done of any witnesses, through any

22    of the evidence that we've shown you from anyone tried to hide

23    the fact that there are plenty of people responsible.

24         Mr. Maimon got up here yesterday and told you about

25    how the MDEQ failed based on the way they interpreted the Lead

```
 1    and Copper Rule.  He got up and said that Governor Snyder is
 2    responsible, and he took responsibility.  He talked about the
 3    city and how the way the city ran the plant, it just wasn't
 4    good.  I mean, these things are not in dispute.
 5            We can't argue every single fact in every single case
 6    to try to get you to believe every single thing that might be
 7    beneficial for us.  We need to present you with all the
 8    evidence, good or bad for us.  Good or bad for our clients.
 9            And when I say "us," that's what I mean.  And let me
10    just respond to one thing.  Lawyers who represent brain
11    damaged kids don't high five each other when they win.  We
12    don't.  I wish I did something else.
13            I'm going to start with VNA, and then we'll get to
14    LAN.  And I'm going to try to run through this in a way that's
15    honorable of your time and that allows you to go back there
16    and start deliberating sooner rather than later.
17            Yesterday, Mr. Stein mentioned to you Mr. Gnagy's
18    mistake.  We all know that he admitted on the stand that he
19    had made a mistake.
20            There was a newspaper article that discussed some
21    high lead levels that were found at the University of Michigan
22    Flint campus.  There were three rounds of testing that showed
23    those results.  And we know that the mistake was when
24    Mr. Gnagy asked for the testing results, he only got one set.
25    He didn't have the other two.
```

1        And he sat there, he sat there, you know, like an

2    honest man, and he said, "I made a mistake.  It seems I made a

3    mistake."

4        I'm not going to read you the entire testimony did I

5    did yesterday.  If there's any doubt he said it, he did.  It's

6    in the transcript.

7        And then when Mr. Maimon cross-examined him about the

8    mistake, just to be clear, because of all the fingers that

9    have been pointed and because of all the blame and because of

10    all the puzzle pieces and all the stuff that so many people

11    did right or wrong to cause and perpetuate the crisis,

12    Mr. Maimon asked him:

13        "Q.  You're not blaming the city for your mistake,

14    are you?"

15        And the answer was:  "I'm not blaming anybody.  It's

16    just a simple mistake."

17        But yesterday -- and Mr. Stein is a very good lawyer.

18    In his closing argument, what Mr. Stein said on behalf of VNA,

19    what he said for his client was, "Mr. Gnagy's mistake, the

20    city sent him data and he assumed the city had sent him all

21    the data.  He trusted the City of Flint."

22        VNA continues, even in an instance where someone

23    stood on the stand and owned his mistake, someone stood on the

24    stand and said, "I didn't do it right.  I didn't get the other

25    two results.  My calculation was wrong.  I made a mistake, and

1    I'm not blaming anybody."

2           Part of the defense is that really wasn't a mistake

3    that Mr. Gnagy made.  It wasn't a mistake, because he trusted

4    that the city gave him all of the information.

5           I want to talk to you for a second about this concept

6    that VNA was only in Flint for one week.  That sounds like

7    such a short period of time -- and I'm not going to argue that

8    it's not a short period of time.

9           I mean, it feels like we've been here for a month

10   just this week.  But a week is not a long period of time.  But

11   VNA was not there for just a week.

12          First of all, on January 22, 2015, all I'm showing

13   you this email for is to show you that as of late January or

14   mid- to late January, VNA's already talking about Flint.

15   VNA's already analyzing whether this is a project that they

16   want to do or not want to do.

17          Mr. Stein told you yesterday about 138 times that I

18   showed you a Rob Nicholas email that said, "lead seems to be a

19   problem."

20          I was actually surprised it was only 138.  But it was

21   138 times.  And there's three e-mails.  So I'm not sure which

22   of the three I showed that many times or if it was all of

23   them.  I'm not going to show you all the emails.  But you've

24   seen them.

25          You've seen that beginning in January, there were

1    conversations internally about upselling.  There were

2    conversations internally about, "Do we want to take on a

3    project for $40,000?"

4         We saw emails about the availability of Depin Chen

5    and Marvin Gnagy and that part of whether we're going to take

6    this job or not take this job depends on whether they're

7    available for it and what the ultimate outcome is for it.

8         "Are we going to be able to get an O&M contract?  Are

9    we going to be able to run or operate or do more than just

10   what this short study was going to be?"

11        On March 30, 2015, Rob Nicholas again writes an email

12   that includes one of the final reports, one of the final

13   pieces that VNA sent to the City of Flint with regard to the

14   work that it had done.  With regard to what Marvin Gnagy had

15   found.  With regard to what VNA came to the conclusions for

16   when it came to their work in Flint.

17        January 22, 2015, to March 30, 2015, while it may

18   only be six or seven weeks, it's more than a week.  And the

19   allegations about what VNA did or didn't do, they're not

20   reliant on a contract.

21        I showed you yesterday either once or twice that your

22   jury instructions, the instructions that are supposed to guide

23   you when you go back to your new jury room as opposed to the

24   old jury room, they say that the contract does not define the

25   standard of care.

```
 1          So even though the contract may have called for a

 2   40-hour study or for one week or whatever it was, we know for

 3   certain, based on all of the internal communications that you

 4   saw, that we showed you, that we asked about, that VNA was

 5   more involved in this than showing up on a Sunday and leaving

 6   on a Saturday.

 7          And on March 25, 2015, you've been asking yourself

 8   why.  Like, what would motivate a company to not provide all

 9   the information?  What would motivate a company who's only

10   there for a week or only there for six weeks to hide the ball,

11   to hide anything, to not be completely forthright, to not

12   warn, to not talk about safety?

13          On March 25, 2015, VNA sent to Jerry Ambrose, the

14   emergency manager at the time, a proposal that would cause VNA

15   to operate the Flint Water Treatment Plant for close to

16   $2 million annually.  $2 million.

17          Now, ask yourself -- and we'll get to the DWSD in a

18   minute.  We'll get to the O&M contracts that did or didn't

19   happen.  And you already know about them.  But if VNA, if VNA

20   had ever said to the city in earnest, if they had ever truly

21   gone to the city and said, "Go back to the DWSD, it's the

22   safest option," and the city had listened and the state had

23   listened, there's no opportunity for a $2 million contract.

24   There's just not.

25          We already know from testimony and evidence in this
```

1    case, you heard Sue McCormick take the stand.  I wasn't

2    exactly sure what she was going to say.  She had never been

3    deposed.

4           But one thing that stood out to me from Sue

5    McCormick, she testified that when VNA was doing work for the

6    DWSD, before Flint ever went online with the Flint River,

7    before VNA was ever even in Flint, she testified that VNA

8    tried to get a larger contract, an O&M contract with the DWSD,

9    and it didn't happen.

10          And so not only if Flint went back to Detroit would

11   Flint going back to Detroit mean that VNA doesn't get this

12   $2 million contract, we know for certain that VNA is never

13   going to get any contract from DWSD, because they tried once

14   already and failed.

15          Mr. Stein yesterday very colorfully and skillfully

16   talked about metaphors.  He talked about cars and sugar, and

17   some of that was fun to listen to.  And I appreciated as

18   someone who speaks in analogies to hear some metaphors from

19   him.  There's a metaphor called "loss leader pricing."

20          Loss leader pricing is when someone or some company

21   wants you to come into the store for a bargain, for a bargain.

22   You can buy a quart of milk for 25 cents.  But the hope is

23   that once you're in store, you're going to buy all the

24   Doritos, all the steaks, all the cheese, all of the expensive

25   stuff.

1          And so you ask yourself, "Why would VNA do this for

2     $40,000?  Why would they come to Flint for seven weeks or one

3     week or six weeks for 40 grand?"  A company that big.  Loss

4     leader pricing.

5          The hope was, the hope was, "Let's just get in the

6     door.  Let's just get in the door.  If we get in the door, if

7     we do enough, there's a bigger contract at the end."

8          This isn't a criminal case.  Motives are not part of

9     what you need to deliberate about in terms putting on the

10    verdict form, "Did someone had the mental culpability.  Did

11    someone mean to kill somebody."

12         This isn't a case about intention.  It's not about

13    crimes.  But you still can consider the motivations of people

14    and companies and the way they conducted themselves throughout

15    this crisis, throughout all of the events that led to the

16    crisis.  Throughout all of the events that perpetuated the

17    crisis.

18         And just ask yourself when you're back there if the

19    question "why" comes up, as Mr. Mason suggested to you, which

20    very well may happen when you go back there, someone's going

21    to stand up and have something to say, and someone's going to

22    disagree with them.  Or maybe it was Mr. Stein yesterday.

23         There's no doubt that after five months, some of you

24    may ask, "Why.  Why?"  I had a partner -- I still have a

25    partner.  He's retired.  One of things he always said to me

1   was if there's an answer -- and it's actually ironic that I'm

2   mentioning him, because he's the person who taught me about

3   lead poisoning cases.

4           But if there's an answer to a question that you don't

5   know, the answer is usually money.  The answer is usually

6   money.  And in this case, VNA stood to make a significant

7   amount of money if Flint did not go back to the DWSD.  Either

8   because they were going to get a larger contract with the KWA

9   or because they were going to get a larger contract with the

10  City of Flint.

11          Yesterday during VNA's closing argument, counsel

12  talked about how this one-week period was just such a short

13  time and the plaintiffs are outrageous in trying to blame VNA

14  for 50 percent of what happened to these kids.  What a huge

15  number for a company that's only there for a short period of

16  time.

17          In opening statements, I don't suggest anybody

18  remembers anything that I said during opening.  I don't

19  suggest y'all remember anything I said from yesterday.  Okay.

20  I'm humble enough to know that you have lives, and you go

21  home, and you probably don't think about this nearly as much

22  as we do.

23          But in my opening statement, I talked to you about a

24  pileup on the highway and how the first driver may be just

25  driving normally, and the driver behind him may be speeding,

July 21, 2022

7852

1   and the driver behind him may be drunk, and the driver behind

2   him may be texting.

3        And I talked about the four-car pileup, and it was a

4   way for me in my simple mind to create for you an image of how

5   multiple people can make mistakes that leads to an injury.

6        There's also sometimes a situation where cars pileup,

7   and all those things happen, and the first car is driving

8   normal, and the second car has been speeding, and the third

9   car is texting, and the fourth car has a drunk driver.  And

10  everybody's there.

11       The person who was hit at the front is on the side of

12  the road.  And they're being tended to with all of the folks

13  from the other cars.  They're trying to make sure that the

14  bleeding stops.  They're there for hours, because it's caused

15  a traffic jam.

16       They're there forever before any emergency folks ever

17  get there.  They're just sitting there, waiting hours after

18  hours after hours.  All the fault there.

19       The speeder, the drinker, the texter.  It all

20  happened.  And then an ambulance, an emergency ambulance comes

21  along and for some reason, either because they were driving

22  too fast or they were texting or they were driving, they run

23  over the person who was being tended to, and they make the

24  injury a ton worse.  Sometimes they kill the person.

25       But just because they arrived five hours after the

1   crash occurred, just because they may not have been the first
2   person who caused that person in the front of the line to get
3   injured doesn't mean that their negligence, that their acts,
4   that their omissions don't cause significant harm.

5        Don't be fooled by timing.  Don't be fooled by
6   timing.  You heard the evidence.

7        You heard about cars yesterday.  I've already alluded
8   to it.  And I took a picture of a mechanic working on a car.
9   And I know that I've played clips from Mr. Del Toral maybe ad
10  nauseam.

11       But I want to play one more for you.  Because I think
12  this metaphor, I think what he says here is the most important
13  metaphor if we're going to be talking about cars.

14                   (Recording Played)

15       MR. STERN:  This goes back to the four-car pileup.
16  These were the experts.  There's no dispute about that.
17  They've touted themselves as that.  You've seen their
18  proposals that cause them to get the business.  These were
19  proposals that were made because the city and the state did
20  not know how to fix their problems.

21       That doesn't mean that the people in the city or the
22  state aren't responsible.  Nobody, regardless of how much I
23  talked about Mayor Walling or Governor Snyder, you never heard
24  me say that Governor Snyder wasn't responsible in some small
25  way or in some large way for what happened to these kids.

```
 1              You never heard Governor Snyder say it.  Regardless
 2   of my politics.  I've never said that before this jury.  None
 3   of us have ever argued that.
 4              And, in fact, when Mr. Maimon got up yesterday to
 5   talk to you about apportioning fault, about apportioning
 6   damages, he took that head-on.  He told you in no uncertain
 7   terms that you should assign some responsibility to certain
 8   folks in this case.
 9              I want to address this concept of the lies about the
10   MDEQ.  You might find the MDEQ responsible.  You might find
11   that when they misinterpreted the Lead and Copper Rule that
12   they bear some responsibility for that.  That's fine.
13              But this, this out right statement that they actually
14   falsified lead and copper results to allow the numbers to be
15   below the 90th percentile is contrary to the evidence that we
16   heard in this case.
17              You heard Mike Prysby by video.  The defendants
18   called him.  Mike Prysby said that those numbers, LeeAnne
19   Walters's house, and a private business were taken out of the
20   lead and copper numbers, because they were not allowed to be
21   included.
22              Because LeeAnne Walters had a filtration system in
23   her basement, which the Lead and Copper Rule said made it not
24   count.  Because those numbers had lead results from a
25   business, from a corporation that wasn't a home, that wouldn't
```

1    have been allowed to count under the Lead and Copper Rule.

2          That doesn't mean I'm standing here and saying you

3    should exonerate the MDEQ.  But let's just be honest.  Let's

4    just be honest about what people did and didn't do.

5          If the MDEQ screwed up, it's because of their

6    interpretation, not because they lied.  Not because they

7    falsified reports.  There's been no evidence of falsification

8    of anything.

9          Yesterday during VNA's closing argument, counsel got

10   up and this -- we've seen this chart a few times.  I think

11   Mr. Mason put it up.  I know we've seen it throughout this

12   trial.

13         This is a chart that deals with alkalinity and pH.

14   PH and alkalinity were out of control after the switch.  That

15   was raised by Mr. Stein yesterday in the closing, and it's

16   without dispute.  Nobody has said anything different.

17         But what counsel for VNA yesterday argued to you was

18   that VNA in its report addressed pH and alkalinity.  And so

19   that was the order of VNA's recommendations.  It was fully

20   consistent with Dr. Gagnon's research and what science tells

21   you.

22         You have to get pH and alkalinity under control

23   first, remove the organic matter and then study the right

24   corrosion inhibitor.  The VNA report -- and you'll have it

25   back there.  I'm not going to go page and line, chapter and

1    verse for you.

2         There's no mention of pH or alkalinity in VNA's

3    report.  This is what they saw when they got there.  The

4    evidence is without dispute that pH and alkalinity were out of

5    control.

6         There was a closing that discussed it yesterday.  And

7    yet in VNA's report, there's no mention of it.  Now, perhaps

8    -- and I don't say this to be cute -- perhaps if someone from

9    VNA took the stand, they might read the report to mean that it

10   includes pH and alkalinity, even though those words don't

11   appear in the same way they somehow read the VNA report to

12   include a corrosion-control study, which doesn't appear in the

13   report.

14        Or in the same way that they read the VNA report to

15   include recommendations about corrosion control for lead, even

16   though their own employee says that all recommendations about

17   corrosion control in the VNA report were about red and dirty

18   water.

19        Yesterday during VNA's closing, counsel talked about

20   Dr. Aaron Specht, and he said, "This is the heart of the

21   case."  Those were his words.  "This is the heart of the

22   case."  I don't disagree.

23        And I want you to remember before I go through

24   Dr. Specht's stuff, before we look at some of what he did,

25   that there is not one witness, not one expert who has stood up

1   in this case and said that these kids do not have thousands of

2   micrograms of lead in their bones.  Not one.

3            There's engineers, and we heard about Mr. Humann this

4   morning, and you heard what Mr. Mason said about him.  I don't

5   need to repeat it.  We've talked about Dr. Gaitanis and

6   Dr. Gagnon and Dr. Bellamy, and you've heard about

7   Dr. Bithoney and Dr. Krishnan.

8            For Dr. Krishnan, they brought Dr. Thompson.  He

9   disagrees.  For Dr. Krishnan, they brought Dr. Gaitanis.  He

10  disagrees.  For Dr. Bithoney, they brought Dr. Gaitanis.  He

11  disagrees.

12           On some level for Dr. Specht, they brought

13  Dr. Gaitanis.  But not to say that Dr. Specht is wrong, not to

14  say that there's not thousands of micrograms of lead in these

15  kids' bones, but to say that the pXRF that he used, we just

16  don't use it in hospitals.  We just don't use it to treat.

17  Those were his words.

18           I want you to remember that as you consider the

19  evidence.  There's no dispute.  There's no evidence that what

20  Dr. Specht found in these kids' bones, that what Dr. Bithoney

21  testified about in terms of the significance of the lead in

22  their bones, there's no dispute about that.  None.

23           And when it comes to Dr. Bithoney, even though he

24  apparently isn't the heart of the case, there's no Thompson,

25  Krishnan, Gaitanis, Krishnan.  Humann, Bellamy.  You've got

1    all these signs.

2            When it comes to Dr. Bithoney, who's the medical

3    doctor, who's the medical doctor that came in and said, "These

4    kids' injuries, these thousands of micrograms in their

5    bone" -- who's the person that came in and said it didn't

6    happen from the Flint River?

7            Who's the person that came in and had some other

8    explanation for why it's in these kids' bones?  I submit to

9    you no one.

10           Let's get back to Dr. Specht.  The word "validation"

11   was used yesterday.  This wasn't validated.  That's just not

12   true.  The pXRF was validated.  These are peer-review article

13   after peer-review article after peer-review article after

14   peer-review article after peer-review article after

15   peer-review article after peer-review article, all of which

16   validate and talk about how Dr. Specht perfected the use of

17   this device.

18           He sat on the stand and talked about how in one of

19   these studies, they only used the device for two minutes and

20   realized that in order to make it more effective, in order to

21   make it most accurate, in order to validate it, they needed to

22   continue to do more studies and that the next study he did,

23   they used it for three minutes, and it fixed any of the issues

24   that the device had in trying to validate it, in trying to

25   match it with that larger XRF device.

July 21, 2022

7859

```
 1              And yesterday in another analogy -- and it's my
 2     fault.  It's my fault, because sometimes in an examination, I
 3     ask questions like, "Have you ever heard of Kitty Hawk," or,
 4     "Let's talk about microwaves."
 5              I say things like that, sometimes to my partner's
 6     chagrin who sits next to me.  He says I'm a little too cowboy
 7     sometimes, because I just ask questions.  I just, whatever.
 8     It pops in my head.  I'm going to ask.
 9              And because I asked a question about Kitty Hawk
10     during this trial, Mr. Stein mentioned would anybody want to
11     get on that airplane?  Would anybody want to jump on the Kitty
12     Hawk airplane the first trip?  Kitty Hawk, the first airplane.
13              But Dr. Specht did more than 500 bone measurements
14     before he ever came and testified in court in China.  He did
15     more than 200 bone measurements in the United States over four
16     years before he came in and testified.  He measured around 150
17     people in India before he ever came in here and testified.
18              That's not Kitty Hawk.  That's not the first flight.
19     I'm not sure what flight number it is, but it's at least 500
20     plus 200 plus 150.
21              And it's a different question.  If after 500 flights
22     and 200 flights and 150 flights the plane is proven to get
23     from where it starts to where it ends through science, the
24     question then is would you get on that plane?  Would you fly
25     on that airplane?
```

July 21, 2022

7860

```
 1              But it's not only my word.  I showed you this
 2   yesterday, and I'm going to show you another slide from the
 3   ATSDR.  Here it says, "The development of noninvasive XRF
 4   techniques for measuring lead concentrations in bone has
 5   enabled the exploration of bone lead as a biomarker of lead
 6   exposure in children."
 7              Goes down to say, "Lead in bone is considered a
 8   biomarker of cumulative exposure to lead."
 9              There's nothing in the ATSDR that says that bone lead
10   is not a biomarker like blood lead.  And let's go a little
11   deeper about what the ATSDR says.
12              "The extensive use of PbB, which is lead blood, as a
13   dose metric reflects mainly the greater feasibility of
14   incorporating blood lead measurements into clinical and
15   epidemiological studies."
16              On this page, it talks about how bone lead is a
17   biomarker.  And on this page of the ATSDR, it talks about the
18   reason blood lead is used is because of its feasibility.  It
19   has nothing to do with the calibration.  It has nothing to do
20   with the validation.  It has nothing to do with normative
21   data, all very science-y words that were thrown at you
22   yesterday.  It has to do with feasibility.
23              And even though Kitty Hawk was the first plane and
24   then after 800 flights they may have perfected how to fly it.
25   If you go to the Atlanta airport today or go to DWSD -- DTW --
```

 1   sorry.  That was a slip of the tongue.

 2          If you go to the Detroit airport, there's hundreds or

 3   thousands of airplanes every day that come and go.  But even

 4   after they perfected the airplane, it didn't mean that

 5   airplanes were available to everyone.

 6          First you develop it.  Then you perfect it.  Then you

 7   multiply it, and you put it in use.  There is absolutely

 8   nothing in evidence, not one sliver of evidence that shows

 9   that what Dr. Specht did and what he found isn't accurate.

10          You heard a little bit about Dr. Gagnon, and even

11   Mr. Mason today alluded to this 16 percent of homes in Flint.

12   Those numbers are totally off.  So let's just go into how we

13   got here.

14          Dr. Gagnon used the FAST Start Program.  The FAST

15   Start Program, you've heard it a few times during trial.  I

16   don't know if anyone ever explained it to you.  But it was a

17   program developed in the City of Flint where they went about

18   digging up pipes, digging up service lines to try and make a

19   determination about what these service lines were made of,

20   because there wasn't, like, a central database that was fully

21   accurate to tell anybody where the service lines were and what

22   they were comprised of.

23          So Dr. Gagnon used this study.  And there were 56,000

24   service lines.  9,095 of which they say were made out of lead.

25   Okay.  Which if you divide 9,000 -- I also, besides the class

1    with Dr. Ellington didn't do great in math.

2              But if you divide 9,095 by 56,000, that's how you get

3    to 16 percent.  That's where his 16 percent came from.

4              But what Mr. Maimon asked him in cross-examination

5    was, "Okay.  Now, again, what you told our jurors is that

6    16 percent of all service lines were lead service lines,

7    right?"

8              He said, "Yes."

9              "And you did that by taking this number here,

10   approximately 91,000 and dividing it by 56,000, correct?

11             Yes.

12             Is it true, Dr. Gagnon, that as of November of 2020,

13   only 26,000 service lines had been excavated?

14             That's true."

15             So when Dr. Gagnon came in and told you that only

16   16 percent of the service lines were made out of lead.  He

17   didn't use 26,000 as the number.  He didn't say that 9,000 out

18   of 26,000 were lead service lines.  He said that 9,000 out of

19   56,000 were lead service lines.

20             He assumed, he extrapolated, he made the scientific

21   decision to say, I guess, that none of the other service

22   lines, if they all would have been extracted, none of them

23   would have been lead service lines.

24             Because unless he did that, there would have been no

25   way to come up with this number of 16 percent.  He assumed

1    that there were no more.  And who's extrapolating?

2          Let's compare that to the Pieper study.  In August of

3    2015, the Pieper study found that 88 percent of homes in Flint

4    had lead.

5          And by the way, if you read a little further where it

6    says 51 percent, what it says is, "The percentage of homes

7    with reportable lead decreased from 88 percent to 51 percent

8    in July of 2016."

9          Just for the record, that was after orthophosphates

10   were added to the Flint treatment plant, and it was after

11   Flint went back to DWSD where they were treating with

12   orthophosphates.

13         I'm not saying that our client's cases are perfect.

14   I'm not saying that we have proven to you beyond a reasonable

15   doubt, beyond a shadow of a doubt, applying a criminal

16   standard to a case.  There are always imperfections in cases.

17         But let's be intellectually honest about the evidence

18   when we evaluate it.

19         How did Pieper get there?  They did water lead

20   sampling in the homes.  And so whereas Dr. Gagnon relied on a

21   FAST Start Program that only looked at a small percentage of

22   pipes and then extrapolated out what all the other pipes that

23   were underground that no one knew what they were would be made

24   of, the Pieper study actually tested and came up with the fact

25   that 88 percent of the homes as of August 2015 did have lead.

July 21, 2022

7864

1    And I'm moving around and shifting, and it may not be

2 as flow-y as yesterday was, but, again, I'm just trying to hit

3 the high parts to get you back in that jury room.

4    The Constitution of the United States, the

5 Constitution of the United States has been brought up during

6 closing arguments in a way that I'm not sure I expected.  But

7 I'm going to address it.

8    You were told by the Court that there's a ton of

9 different reasons why folks who appear by video might appear

10 by video.  Okay.  She told you that some people live outside

11 -- I'm not going to read it to you, but you can look at it.

12    Some people live outside the radius of the Court's

13 jurisdiction.  What that means is that I can't serve a

14 subpoena -- I can't give a document to someone who lives in

15 Honolulu to fly to Michigan to come testify, because there are

16 rules about who can be required to come into court.

17    Who can we force with subpoenas to come in court.  So

18 one of the reasons why people don't come testify live and why

19 we play their deposition is because they are outside of that

20 power of the court.

21    Another reason is people get sick.  People have

22 illnesses.  People just can't show up.  And another reason is

23 some might plead the Fifth Amendment, their constitutional

24 right under the United States of America.

25    Notwithstanding that, notwithstanding how that might

1    feel, "Oh, these folks are all indicted.  They're criminals.

2    They must have done something wrong, because someone indicted

3    them."

4            When it comes to Snyder, when it comes to Croft, when

5    it comes to Earley, when it comes to Ambrose, Mr. Mason said,

6    "We didn't get the chance to cross-examine them."

7            That is simply false.  When they gave their

8    depositions, when they sat and testified for hours upon hours

9    upon hours, these lawyers cross-examined them at great length.

10           You heard hours of testimony from Governor Snyder.

11   And I know you knew when it was my voice.  But there were a

12   lot of voices that weren't my voice.  There were a ton of

13   lawyers that asked them questions.

14           When Mr. Stein yesterday stood up here and said,

15   "Mr. Stern and this Story 2 tale that he's claiming we told,

16   all he asked Governor Snyder about was this VNA email, the one

17   from 138 different times that I showed you," I'm not sure --

18   I'm not sure if you remember, but before you ever heard my

19   voice with Governor Snyder in his deposition, there were a

20   number of other lawyers who asked him all of the questions

21   that Mr. Stein says that I didn't ask him.

22           That's how depositions work.  Lawyers take turns and

23   ask questions.  I'm not obligated to ask the same 75 questions

24   that the person before me asked.  It just so happened that

25   when it came to be my turn that no one asked him about VNA.

July 21, 2022                                                    7866

1    No one had shown him that email yet.  That's my obligation to

2    my clients.

3           And by the way, any insinuation, any insinuation that

4    these clients, that these four kids sued a bunch of other

5    people and then made up an imaginary lawsuit about these

6    folks, it's not true.  They were all sued in the same lawsuit.

7           There was no pivot chapter to our lawsuit.  There was

8    no second story.  You don't need to ask yourselves why other

9    folks aren't here.  But do not be fooled.  This wasn't a new

10   lawsuit.  This wasn't invented.

11          You heard me ask questions about VNA all the way back

12   to what the date said was in some instances 2018.  Two years

13   before COVID.

14          What VNA's counsel said yesterday was that these

15   folks invoked their rights under the Fifth Amendment and

16   declined to come to court, because they thought their

17   testimony would further incriminate them.

18          Further incriminate them from what?  They confidence

19   years earlier under oath for hours upon days.  They didn't

20   invoke their Fifth Amendment rights then.  They gave honest

21   and truthful testimony.

22          And when you go back to that jury room and you look

23   at the Judge's instructions, she says and the instructions say

24   you give video deposition the same level of credit, the same

25   level of credence as you give live testimony.

1    So ask yourselves, "Why?"  Why would anyone insinuate

2    that these four folks who they put pictures up and said, "Oh,

3    they're all indicted," why would anyone insinuate that they're

4    hiding anything when at the time they gave their testimony,

5    they weren't even under indictment.

6         VNA also misstated the law yesterday in their

7    closing.  One of the comments that was made by Attorney Stein

8    was you'll need to decide whether the injury was caused

9    because of something that VNA did, which means when you think

10   about the timeline that you'll have to say the injury was

11   caused, because they were exposed to lead after February 10,

12   2015, and that injury would not have occurred if VNA did

13   something different.

14        What the law says is plaintiffs may still satisfy

15   their burden of proof on causation, even if defendants'

16   negligence was not the last or only cause.  But more

17   importantly down below, if defendant's negligence acted in

18   some combination, in some combination with other causes or at

19   the same time as other causes.  Read the instructions closely.

20        We're lawyers.  We get up here.  We argue the things

21   that are good for us or the things that we think are good for

22   our clients.  Sometimes we ignore or try to leave out the

23   things that are bad for our clients.  That's being an

24   advocate.  That's advocating for your client.

25        But when it comes to these instructions, read them

1    closely.  This is what it really says.  "If defendants's

2    negligence acted in combination with some other causes or at

3    the same time as some other clauses."

4          I implore you, I beg you, please read the

5    instructions.  Then we got to the part about what we need to

6    prove when it comes to VNA.  The immediate implementation of

7    orthophosphate corrosion inhibitors.

8          Plaintiffs allege that VNA breached the standard of

9    care by failing to recommend one or both of the following two

10   options to the City of Flint.  And we'll get to the second one

11   in a minute.  But let's talk about the first one.

12         That VNA breached the standard by failing to

13   recommend the immediate implementation of orthophosphate

14   corrosion inhibitors.

15         I heard Mr. Mason talk this morning about Dr. --

16   about Mr. Humann.  I heard Mr. Stein yesterday talk about

17   Mr. Humann.  All I'll say about Mr. Humann is that sometimes

18   it's a simple question that has a simple answer.  It's not

19   manufactured.

20         Miguel Del Toral wasn't paid by anybody.  He doesn't

21   represent anybody.  Nobody went out as a lawyer and provided

22   with -- Miguel Del Toral with information for him to come to

23   conclusions.

24         No one, as far as I know, retained Miguel Del Toral

25   to serve in this case to come testify before you on behalf of

```
 1     their clients or their clients or their clients.  That didn't
 2     happen.
 3              This is Miguel Del Toral from the EPA who on his own
 4     dime by all accounts came to Flint to help Ms. Walters, to
 5     help her figure out what problems were occurring with her
 6     house.  Here is what he said about all the stuff that
 7     Mr. Humann needed to know, about all of the materials that
 8     Mr. Humann should have reviewed to come to a real expert
 9     conclusion as opposed to the one that he came to.
10                          (Recording Played)
11              MR. STERN:  Sometimes 2 plus 2 just equals 4.  That's
12     not a lawyer trick.  That's not magic.  That's not pixie dust.
13     That's not weaving a tale.  Miguel Del Toral, he's a witness.
14     He's someone who came by video to testify.  He lives outside
15     the jurisdiction of the court.
16              Sometimes 2 plus 2 is 4.
17              Let's talk a little bit about Mr. Humann.  What he
18     said that VNA did wrong -- and I'm not going to go through all
19     their violations -- but he said they did not insist on an
20     orthophosphate.  That's consistent with what the Court
21     instructions tell you we need to prove in order for you to
22     hold VNA liable.
23              Let's talk about Dr. Bellamy.  Let's talk about
24     Dr. Bellamy, VNA's expert who came in here and testified.  He
25     testified that VNA did not breach the standard of care.
```

1    Mr. Humann says they did.  Dr. Bellamy says they didn't.  He

2    was the anti-Humann.  I don't mean "human" like he hates

3    people.  I mean the anti-Richard Humann.  Sorry.

4         He says that assuming -- now just bear with me for a

5    second.  This is the basis for his opinion.  This is what

6    Dr. Bellamy says is the reason that VNA did not violate the

7    standard of care.  This is why.

8         This is why for however much money he was paid, he

9    sat in that chair and said, "I do not believe, in fact I know

10   they did not violate the standard of care."  This is the

11   anti-Humann opinion.

12        Assuming that Gnagy recommended orthophosphate for

13   lead corrosion control to Mr. Bincsik in the oral conversation

14   you referenced by doing so, VNA met the standard of care.  Met

15   its duty.  That Gnagy recommended orthophosphate for lead

16   corrosion.  That Gnagy recommended orthophosphate for lead

17   corrosion.  I'll say it one more time.  That Gnagy recommended

18   orthophosphate for lead corrosion.

19        There has been no evidence, no evidence in this case

20   that Mr. Gnagy recommended orthophosphates at all.  And

21   there's been no evidence in this case that Mr. Gnagy

22   recommended orthophosphates for corrosion control related to

23   lead.  He didn't recommend anything for corrosion control

24   related to lead.

25        His second opinion, assuming, assuming that VNA

1    recommended in its final report orthophosphate for lead

2    corrosion, by doing so, VNA met the standard of care.  Met its

3    duty of care.

4         This is VNA's expert.  This is the anti-Humann.  He

5    says that VNA met their standard of care, because according to

6    Dr. Bellamy, Mr. Gnagy recommended orthophosphate for lead

7    corrosion to Mr. Bincsik in the oral conversation.  He says

8    that VNA recommended in its final report orthophosphate for

9    lead corrosion.

10        His opinions, the man who read all the depositions,

11   the man who read all of the transcripts, the man who looked at

12   thousands of documents, the man who was paid significantly

13   more money than Mr. Humann, who according to these lawyers,

14   looked at nothing, did nothing, said nothing, wrong expert,

15   whatever, the assumptions that Dr. Bellamy made were false

16   assumptions, they're not real.

17        We know from Mr. Gnagy himself that any references to

18   any type of phosphate in the final report had nothing to do

19   with lead.  It had to do with red and dirty water.

20        Do you really think if VNA showed up and said, "Hey,

21   we think you should add orthophosphate right now," it would

22   have?  Something different would have happened?  This is from

23   Mr. Stein's closing yesterday.  They disavowed the fact that

24   they recommended orthophosphates.  They admit there was no

25   recommendation for orthophosphates.

1    And here's what Mr. Gnagy said about his conversation
2    with Mr. Bincsik, the seminal, the foundational piece of
3    Dr. Bellamy's opinion is that VNA did not violate the standard
4    of care.  This is the crux of why he stood here and took their
5    money, to tell you that VNA did not violate the standard of
6    care.
7        "Q.  Okay.  And what did you tell Mr. Bincsik in that
8    conversation, sir?
9        A.  That we noticed that they had no phosphate feed
10   system and that possibly some of the red water occurrences
11   could be reduced by feeding phosphate."
12       The red water occurrences.
13       That's consistent, that's consistent with Mr. Gnagy's
14   testimony.  That's consistent with what's in the report, the
15   words that were actually put this the report when it was
16   drafted, when it was written, when it was submitted in
17   realtime, in realtime.
18       You heard yesterday about the jury instruction about
19   hindsight.  In realtime.  Forget hindsight.  In realtime,
20   every reference in that report, every conversation that
21   Mr. Gnagy had with anyone about anything related to corrosion
22   control or phosphates or polyphosphates had nothing to do with
23   lead and had everything to do with red water.
24       VNA's liability, according to its own expert, the
25   evidence doesn't support Dr. Bellamy's assumptions.  We just

July 21, 2022

7873

```
 1    went through that.  The evidence directly from Marvin Gnagy
 2    contradicts Dr. Bellamy's assumptions.  VNA failed to do what
 3    Dr. Bellamy testified was required.
 4         By saying they didn't violate the standard of care
 5    because they recommended orthophosphates necessarily means
 6    that the recommendation of orthophosphates was required.  I'm
 7    not even sure why this is an issue.
 8         You can take Mr. Humann and you can take his opinions
 9    and you can put them on the shelf.  Use Dr. Bellamy's
10    opinions.  Use their own expert's opinions when you're
11    evaluating whether they breached the standard of care by not
12    recommending an orthophosphate.
13         When it comes to Violation 3, assisting on an
14    orthophosphate, Bellamy and Humann are one in the same.
15    There's no anti-Humann.  They both said it was required.
16         Let's talk about Violation number 4 for VNA.  They
17    needed to inform the city that returning to Detroit was the
18    best and safest option.  We talked about this yesterday.
19    You've seen a bunch of emails.  I apologize to folks that --
20    you may have seen some of these e-mails more than once.  I'm
21    not going to show you the email for the 139th time.
22         And here's what the instruction says from the Court.
23    "Plaintiffs allege that VNA breached the standard of care by
24    failing to recommend a return to receiving water from the
25    DWSD."
```

1    And if you find that an engineer in VNA's position
2  would have made a particular recommendation and that VNA did
3  not make that recommendation, then you must find that VNA
4  breached the standard of care.
5    Mr. Humann says that they breached it by not
6  recommending it.  That was his testimony.  That was his expert
7  testimony.  And VNA argued spending an extra 12 million on
8  Detroit water is incomprehensible when Flint water is just
9  safe.
10    This was a piece of a press release that I'll show
11  you in a minute from Emergency Manager Gerald Ambrose.  And
12  yesterday when VNA was talking to you, they wanted you to
13  focus your attention on the word "incomprehensible."  We've
14  heard it over and over and over again throughout this trial.
15    We've heard that there were conversations where
16  Mr. Ambrose said it was incomprehensible.  Forget the
17  conversations.  He did say it.  He said it in a press release,
18  and they quoted that press release yesterday as part of their
19  closing argument to you.  But the part that was very quickly
20  mentioned and just moved on from was the part where he says
21  "is just as safe."  Is just as safe.
22    The premise, the foundational piece, the crux why
23  they say that these emergency managers claim it was
24  incomprehensible is because they believed it was safe.
25    Here's part of Ambrose's press release from March 24,

```
 1    2015.  This is nine days or ten days after VNA's final report

 2    or 13 days, whatever it was, within two weeks of the final

 3    report after the fact.  These are Mr. Ambrose's words.

 4         "It is incomprehensible to me that seven members of

 5    the Flint City Council want to send more than $12 million a

 6    year to a system serving southeast Michigan, even if Flint

 7    rate payers could afford it.  Water from Detroit is no safer

 8    than water from Flint."

 9         We've already established through evidence, and

10    nobody's contradicting it, that Mr. Ambrose didn't know

11    anything about corrosion control.  Mr. Ambrose was on the job

12    when VNA was there as the experts.  How did Mr. Ambrose figure

13    out that the water was safe?  How did Mr. Ambrose know that

14    the water was safe?  How did Mr. Ambrose come to the

15    conclusion that it was incomprehensible to go back to the

16    DWSD?

17         He was at the meeting when Rob Nicholas and Dave

18    Gadis stood up five or six or seven times and told everyone in

19    the world that their water was safe.  A man who had expertise

20    in finances, who was part of hiring an expert to come in and

21    evaluate the system should be blamed, because he believed them

22    when they told him that the water was safe.  That's their

23    argument.

24         In addition to that -- is everything okay?

25         THE COURT:  Mr. Mason was signaling.
```

```
 1            MR. MASON:  I apologize.  When appropriate.  I
 2   apologize to Mr. Stein.  I need a comfort break once we --
 3            THE COURT:  Let's do that.
 4            MR. MASON:  I apologize, Mr. Stein.
 5            THE COURT:  We're all going to be patient.
 6            MR. STERN:  I need a break, too.  We can go together.
 7            THE COURT:  All worked out.
 8            MR. STERN:  Thank you.
 9            THE COURT:  Okay.  Please rise for Mr. Mason.
10            MR. MASON:  Sorry, Your Honor.
11            THE COURT:  We'll see you when you're back.  If
12   anybody else needs to use the restroom, anything at all.  As
13   you've all learned, I have to put my shoes back on sometimes.
14   So now I have them on.
15                      (Pause In Proceedings)
16            THE COURT:  All right.
17            MR. MASON:  Thank you, Your Honor.
18            THE COURT:  I apologize to Mr. Stern.
19            MR. STERN:  All good.  I got dogs and kids and
20   sisters.  I've been interrupted more than once in my life.  We
21   good?  Oh.  Sorry.
22            All right.  I don't even remember where we were.
23            We were talking about the DWSD.  We were talking
24   about why, why Gerald Ambrose in his press release said it was
25   incomprehensible to go back, because he relied on the experts
```

1       that they hired who told him the water was safe.

2              That was his big mistake.  There's a lot of blame to

3       go around.  Again, no one -- whoa.  You okay?  Sorry.  Take

4       another break.

5              There's a lot of blame to go around.  There's a lot

6       of folks who have either admitted responsibility or may find

7       them responsible.  But when it comes to Gerald Ambrose, you

8       can't put him on the verdict form because his big mistake was

9       listening to VNA.  But then give VNA no liability for giving

10      him information that was wrong.

11             And we know that VNA knew.  We know that VNA knew

12      that the best option was DWSD.  We've seen it over and over

13      again.  Depin Chen, "Reconnecting to the DWSD will be the best

14      solution."  Rob Nicholas, before they got there, "The simple

15      solution is to just buy Detroit water, and that solves the

16      problem."

17             Marvin Gnagy, "The quickest option and maybe the

18      safest option is to return to DWSD."  Bill Fahey, "Now you

19      know why I was so adamant about taking that position."

20             This wasn't something that VNA didn't know was

21      possible.  It wasn't something they didn't know would help.

22      They knew.  They all knew.  They talked about it amongst

23      themselves for weeks.

24             And now I just want to move to LAN, okay.  It's not

25      an easy transition.  There's nothing cute.  Not going to start

July 21, 2022

7878

1    crying.  I'm not going to give you some analogy.  We're going

2    to go now from VNA to LAN.  And LAD.

3           You heard the word over and over and over again in

4    Mr. Mason's closing about malpractice.  I was shocked to hear

5    the word "malpractice."

6           And if y'all had your jury instructions and your

7    verdict form, if you had it online on a computer and you had a

8    search function, if you searched every document that this

9    Court's going to give you that tells you, you need to read,

10   that you need to follow, what you need to say on the verdict

11   form, the boxes you need to check, there is not one mention of

12   the word "malpractice" anywhere in your instructions.  There's

13   no mention of the word malpractice anywhere in the verdict

14   form.

15          Sometimes lawyers use words like "malpractice"

16   because perhaps, perhaps they cause sympathy or perhaps they

17   cause a juror or the public to feel something that if you

18   called it something else, they wouldn't feel.

19          This is not a malpractice case.  There's no

20   malpractice being alleged.  There's no mention of malpractice

21   in the jury instructions.  There's no mention of the word

22   "malpractice" in the verdict form.  It's just not there.

23          Another thing that Mr. Mason says -- and I apologize

24   these slides aren't as flashy.  I was trying to both pay

25   attention and also come up with something to present to you as

1   quickly as I could while he stood and gave LAN's and LAD's

2   closing argument in a way that I could rebut some of the

3   things that he said.

4           This was a quote, this one stuck with me long enough

5   and hard enough that I actually wrote it out.

6           "We know that this brilliant scheme may have saved

7   some money on the short-term, but only at a horrific cost in

8   the long-term, a cost being paid by the citizens of Flint."

9           Those were his words.

10          Why can we not just be honest?  The citizens of

11  Flint, except for Aundreya, Riley, Emir, and Daylaana.  These

12  words, this passion, this conversation, the way we describe

13  this crisis, it is always so different when these defendants

14  describe it in terms of the community versus in terms of these

15  kids.

16          These four kids.  And while I'm not going to parade

17  them into this courtroom to try to get you to feel sympathy

18  for them, this is them.  This is what they look like.  You

19  heard from their parents.  You heard from their teachers.  You

20  heard from Dr. Krishnan.  You heard from Dr. Bithoney.

21          This case isn't about me.  It's not about schemes.

22  It's about these four children.

23          Let's talk for a minute about June 26, 2013.  There's

24  no more slides about this meeting other than June 26, 2013.

25  On that day in that room, wherever the meeting was held in

```
 1   Flint, whoever was there, we know that at least two people
 2   were there.
 3         We know Stephen Busch was there, and we know Warren
 4   Green was there.  There's no dispute about that.
 5         We also know that Warren Green, for 15 years, new
 6   that plant as well as anybody, at least who didn't live there
 7   or work there.  They issued four or five reports, whether it
 8   was with his first firm or with LAN, he knew the Flint Water
 9   Treatment Plant.
10         He knew they didn't have an orthophosphate feed
11   system.  Because it had been in one of the previous
12   recommendations and somehow got taken out.  He's an engineer
13   who by all accounts has experience in managing utilities.
14         We heard about Jackson, Mississippi, for a while
15   during his testimony, how he used to run the plant in Jackson,
16   Mississippi, the same way he said Mike Glasgow was running the
17   plant here.
18         And on June 26, 2013, on that day, in that meeting,
19   when Stephen Busch said to him, said to him and whoever else
20   was there, "We will be doing two six-month rounds of testing
21   and then a corrosion-control study to find out what the right
22   corrosion control would be," he didn't go to Mr. Busch and
23   say, "Dang on it, you've got to did a corrosion-control study.
24   You have to.  It's what best practices is.
25         "We all know that, Steve.  Are you an idiot?  Are you
```

1     a fool?  You're going to poison people.  Y'all don't even have
2     a phosphate feed system at the plant.  You're not going to do
3     a corrosion-control study?  You're just going to put this
4     sucker online."
5          He didn't say that.  He told Steve Busch he was
6     shocked.  And according to even what Mr. Mason said today, he
7     got on an airplane and while there's no evidence of this in
8     the case, I'll take Mr. Mason's word for it.
9          He got on an airplane and went back to Chicago.  He
10    went back to Chicago on an airplane.
11         We've heard about the 60- to 90-day run.  We've heard
12    so much about this 60- to 90-day run that Warren Green was so
13    adamant about, that Warren Green recommended, that Warren
14    Green pounded on his chest 60 to 90 days.  Got to do it.  We
15    have got to do this 60- to 90-day run.  The 60- to 90-day run
16    or the 30 day run or the 45 day run, whatever the run was, it
17    failed.  We know it failed.
18         I'll tell you in a minute how Warren Green knows and
19    knew it failed.  But he was so adamant about this thing.  The
20    crux of the LAN defense is Warren Green made this
21    recommendation, because he knew how important it was.  He knew
22    it mattered, and it failed.
23         And by the way, it's nowhere in writing.  I don't
24    know how many hundreds of documents you're going to get back
25    there with you when you start deliberating.  You will not find

1   one, not one proposal, not one contract that talked about a

2   60- to 90-day run.

3          But let's just assume for a minute that he did.

4   Let's look at the contract that LAN had with the City of

5   Flint.  Task 1, plant test run.  We've heard about this.

6          What was going to happen is there was going to be a

7   plant test run.  Then there was going to be an engineer

8   planning report and then there was going to be a design phase

9   services.

10         Let's break this down.  Test run.  Figure out what

11  the tests show.  Engineering planning report, let's engineer a

12  plan that measures and mirrors what the test run shows us.

13  Task 1 and Task 2.

14         Warren Green knows that the plant test run failed,

15  because they never got to the crux of the engineering planning

16  report.  They weren't able to do it.  Because they didn't have

17  information from the test run.  So how can you get on an

18  airplane back to Chicago when you know that you have to do a

19  corrosion-control study, when you're adamant about a test run,

20  and you know that the test run failed?

21         Nobody was kept in the dark.  They couldn't complete

22  the contract in the way that it was written, because the test

23  run failed.  So any insinuation, any illusion, any commentary

24  that Warren Green didn't know, he didn't find out the test run

25  failed.

1          If I've got a contract that requires me to run

2     4 miles before I get the money and my foot breaks halfway

3     between here and the money, it would be impossible for me not

4     to know that my foot broke, because I'm not getting to the

5     money.  I'm not getting to the next part of my contract.

6          Now, let's talk for a minute about this idea -- and

7     I'm switching gears for a second.  But let's talk about what

8     Mr. Humann says about a corrosion inhibitor.  Okay.  You've

9     heard about, "Oh, you can't just pour chemicals to a feed

10    system.  You can't just throw chemicals into the water.  You

11    can't just add chemicals."

12         Let's be really clear about what Richard Humann said.

13    First paragraph, which I didn't highlight, but as I'm looking

14    at it, because I did this on the fly, it's important for you

15    to see.

16         "So you continue to add orthophosphate just to make

17    sure that, you know, if your water just happened to be

18    corrosive to some degree, even if it's less corrosive, it

19    still, you know, could have a tendency to pull the

20    orthophosphate off of its stabilized system."

21         Next paragraph.  "And then over time, if you're not

22    continuing to feed orthophosphate, you know, you'll eventually

23    break down that established system, and then you won't have

24    that protective system anymore."

25         What Mr. Humann testified about was that when Flint

1    switched from the DWSD to the Flint River, that because the

2    pipes in Flint had been receiving water and having water flow

3    through it for 50 years with orthophosphates, that you had to

4    at a minimum continue to feed orthophosphate just to protect

5    the film.

6          He described the difference between a corrosion

7    inhibitor and corrosion control.  He suggested that they

8    needed to continue to feed orthophosphates, not because of the

9    chemistry of the Flint River or the chemistry of the Lake

10   Huron water.  Because of the pipes.

11         Because for 50 years, the protective coating had

12   built up on the pipes in Flint, because it had been receiving

13   water treated with orthophosphates from the DWSD.

14         And then this idea -- I heard it from I think both

15   closing arguments -- that adding orthophosphates could harm

16   the system.  50 years.  50 years Flint was receiving water

17   from the DWSD with orthophosphate.  And there wasn't a

18   problem.  There was no harm to the system.  What evidence is

19   there other than a professor who stood on the stand to tell

20   you that it would have been a mistake to add orthophosphates?

21         Tell that to decade upon decade upon decade upon

22   decade of Flint residents who all got their water from DWSD

23   safely, because it was treated with orthophosphates.

24         And here's the allegation against LAN.  "Plaintiffs

25   allege that LAN breached the standard of care by failing to,

1        1, sufficiently recommend the use of orthophosphate corrosion

2        inhibitors to the City of Flint when it switched its water

3        supply to the Flint River."

4                That's undisputed.  They didn't recommend

5        orthophosphates.  We've heard for five months how softening

6        was the right corrosion control, apparently, by a number of

7        their experts.  So number one is easy.  That's a given.

8                Number 2, "Sufficiently or adequately warn against

9        operation of the Flint Water Treatment Plant without the use

10       of orthophosphate corrosion inhibitors prior to the switch of

11       the water source this the Flint River."

12               MR. MASON:  Your Honor, I'm sorry.  But I have to

13       object.  This is not the question.  This was the allegation --

14               MR. STERN:  I just got to the question.

15               MR. MASON:  -- that he just went over --

16               MR. STERN:  I just got to the --

17               MR. MASON:  -- suggesting that they met their burden

18       when it was just what they alleged.  This is the question.

19               THE COURT:  Yeah.  This is what they allege.

20               MR. STERN:  I just got to the question next.

21               THE COURT:  Okay.  Let's -- we can continue now.

22       Thank you.

23               MR. STERN:  So this is the allegation, and this is

24       the question.  I didn't just put this in here.  It was coming

25       next.

```
 1              THE COURT:  Okay.
 2              MR. STERN:  You must find that LAN breached the
 3      standard of care if you find, 1, "That the Flint water supply
 4      required the use of orthophosphates for corrosion control."
 5              We've heard from Mr. Humann they do -- that they did.
 6      We also heard from Dr. Bellamy that they did.  Remember the
 7      whole thing I did a few minutes ago how Dr. Bellamy said VNA
 8      met the standard of care, because they recommended
 9      orthophosphates?
10              So if you don't believe Mr. Humann because he's a
11      terrible human because he doesn't read all the stuff that they
12      wish he had read, just move on to Dr. Bellamy.  Okay.  He'll
13      tell you everything you need to know.
14              Number 2, "That LAN did not sufficiently make this
15      recommendation."  We know for certain, we know for certain
16      they didn't make this recommendation, because the only thing
17      they may have recommended was softening.  And 3, "That a water
18      engineer of ordinary learning, judgment, and skill in the
19      community in LAN's position would have made this
20      recommendation or warning."
21              And you've heard about hindsight.  You heard
22      Mr. Stein read the instruction about hindsight in realtime, in
23      real moments in 2013 on June 26, when Stephen Busch and Warren
24      Green and whoever else was there found out that Flint would be
25      doing two six-month monitoring rounds rather than treating
```

1   with orthophosphates, knowing that system, knowing that for

2   50 years, those pipes were protected because of the use of

3   orthophosphates.

4        Absolutely somebody in LAN's position with 15 years

5   of experience at that plant absolutely would have known that

6   the right thing, the technical thing, but most importantly the

7   safe thing was to recommend and make sure that orthophosphates

8   were implemented.

9        And if you don't believe -- I don't know who you

10  don't believe at this point.  But Mr. Chen said it.

11  Mr. Del Toral said it.  Dr. Bellamy said it.  Mr. Humann said

12  it.  They want to bang on Mr. Humann, because he's the expert

13  that they brought.

14       But they're ignoring VNA's own expert, as well as

15  VNA's engineer, as well as the guy from the EPA who came and

16  said, "I didn't need to see anything.  You tell me you got

17  lead pipes, you tell me you got no corrosion control.  I tell

18  you you're in trouble, okay."

19       And by the way, I'm not going to show you a bunch of

20  slides at this point about softening.  I'm just not going to

21  do it.  If you believe that softening is corrosion control at

22  this point in the trial, I don't think there's anything I

23  could show you that's going to get you off that spot.

24       I submit to you that the evidence in this case

25  overwhelmingly is that it's not.

```
 1             Let's talk about this LAN-LAD thing, this LAN-LAD,
 2    you know, retained control.  This feels like an issue that you
 3    haven't really been presented with.
 4             This is what the instruction says and then I'm going
 5    to show you one document.  And it's the only thing you need to
 6    see, and when you get to Question 6, you can check "Yes" and
 7    move on your way.  I promise you when you see it, you'll know
 8    what I mean.
 9             "LAD retained the right to control."  This is an
10    important part of whether it's just LAN or if it's LAN and
11    LAD.  "The test is whether in the particular service the
12    employee is providing, the employee remains under the
13    direction or control of the original employer or becomes
14    subject to the control of the person or entity to whom the
15    employee is lent.
16             "It is not so much the actual exercise of control,
17    which is regarded as the right to exercise such control."
18             So what matters is you've got LAD.  They apparently
19    leased employees to LAN for 15 years based on a leasing
20    agreement that Mr. Benes testified about.  And all that
21    matters is it's not so much that the actual exercise of
22    control, which is regarded as the right to exercise control,
23    the right to exercise such control.
24             Here is the leasing agreement.  "Employment
25    relationship.  The lessor is LAD."  Okay.  This is a legal
```

1    term.  "Lessor."  That's the person or the company that's

2    doing the leasing.  They're the ones that's sending the

3    employee.

4         "Lessor and its employees are not employees of

5    lessee."  What that means is that because LAD is the lessor,

6    that lessee, that LAN are not employees of LAD.  That's what

7    this says.  Fine.  Forget the W-2s.  Forget the testimony.

8    Forget everything.

9         The next line that I've highlighted says, "The staff

10   shall be under the mutual control and direction of the lessor

11   and the lessee.  That's what the leasing agreement says.

12   That's what the relationship was.  It's not so much the actual

13   exercise of control.  The staff shall be under mutual control.

14        MR. MASON:  Your Honor, I'm sorry.  Again, but the

15   Question number 6 does not state the question they're

16   answering of what he's putting up on the board.

17        It's the right to exercise day-to-day control of the

18   specific work activities of Warren Green and Jeff Hansen.

19        THE COURT:  Okay.  Let me just read from --

20        MR. MASON:  Number 6.

21        THE COURT:  -- Question 6.

22        Okay.  "Did LAD exercise or retain the right to

23   exercise day-to-day control or supervision of the specific

24   work activities of Warren Green and Jeff Hansen in connection

25   with their work on the Flint Water Treatment Plant?"  And the

1    options are "yes" or "no."

2             MR. STERN:  Okay.  What Her Honor said.

3             "The staff shall be under the mutual control or

4    direction of both the lessor and the lessee."

5             Whether I said it my way or Judge Levy said it her

6    way, the contract says what it says.  It says what it says.

7    No pixie dust, no smoke and mirrors.  The staff.  That's

8    Warren Green.  He doesn't own the company.  He's a W-2

9    employee.  The staff.  Jeff Hansen.  He doesn't own the

10   company.  He's a W-2 employee.  Both of LAD.

11            But notwithstanding who even paid their salary,

12   notwithstanding the fact that they were not owners of the

13   company.  The staff, Warren Green, Jeff Hansen, and all of the

14   others shall be under the mutual control and direction of LAD

15   and LAN.

16            Sorry.  The red thing for LAD just popped up,

17   because, again, I made this in realtime.  Lessor is LAD.

18   Lessee is LAN.

19            Mr. Mason talked about we've put our heads in the

20   stand, that the plaintiffs have put their heads in the sand,

21   or the lawyers have buried their heads in the sand.  I have no

22   idea about what the claim is about me putting my head in the

23   sand.

24            I have no idea what the claim is about my clients

25   burying their heads in the sand.  But ask yourself over the

1    course of this trial when it comes to responsibility when it

2    comes to accountability, when it comes to doing the right

3    thing, doing the honest thing, when it comes to integrity and

4    public health and safety and all of the things that we talked

5    about yesterday about what's required of an engineer, you ask

6    yourself did two lawyers, who they claim -- the lawyers, not

7    our clients the lawyers.

8           The two lawyers who came in here every day, trying

9    the best we could to present you with the evidence that we had

10   in a way that was persuasive, in a way that was honest, in a

11   way that was real, are we the ones who buried our heads in the

12   sand?

13          Or is it the engineers who blame everybody else for

14   what happened to these four kids?  When you go back to the

15   jury room and you think about these closing arguments, think

16   about that.  Think about that.

17          And I want to leave you with this.  My partner is way

18   more eloquent than me.  He talked to you yesterday about the

19   honor it is to be a juror, the responsibility it is to be a

20   juror.  You've heard for months and months and months about

21   evidence and engineers and experts.

22          You heard during these closing arguments about

23   lawyers and the crazy tricks we pull and the high fives we

24   give each other when we leave and all of the things that are

25   motivating us personally.

```
 1              I am motivated.  My partner is motivated by those
 2     four kids.  By those four kids.  By their futures.  By what
 3     they're going to amount to.  By what they're going to become.
 4     By what they don't even know might have been taken from them.
 5     Because it happened to them at such a young age that even
 6     though they may walk through life and know that something's
 7     wrong, they'll never know what it is.
 8              Because you don't feel it when you get lead poisoned.
 9     There's no treatment for lead poisoning.  There's no fix.  The
10     motivation in this case, the reason we're here, the reason all
11     of us have committed to this trial is to try and do what's
12     right, whatever that means, whatever your verdict is, for
13     those four kids.
14              And when you go back there, don't think of me.  Don't
15     think of Mr. Maimon.  Don't think of Mr. Mason.  Don't think
16     of the lawyers.  Think of those four kids.  Look at their
17     faces.
18              It has been an honor of my career trying this case
19     for you.  Thank you.
20              THE COURT:  Thank you.
21              MR. MASON:  Your Honor, I do need to have a moment
22     with the Court before you excuse the jury.
23              THE COURT:  Well, I was going to direct -- give them
24     one final jury instruction.
25              MR. MASON:  And I'd like to visit about a curative
```

July 21, 2022

7893

1    issue.

2              THE COURT:  Okay.  Let's do that right after this.

3    Because then they'll be -- I'll ask them not to deliberate,

4    not to be0gin their deliberations until we discuss your issue.

5              MR. MASON:  That would be fine.  Thank you.

6              THE COURT:  But then we're not back there and you're

7    here and all of that.

8              MR. MASON:  Thank you, Your Honor.

9                         JURY INSTRUCTIONS

10             THE COURT:  Okay.  So, members of the jury, now I'm

11   going to give you the final jury instruction -- unless we come

12   up -- we always say a short rebuttal or whatever, and it turns

13   out to be long.  So I think this is the final instruction.  I

14   might have one more.

15             But and this relates to your duty to deliberate and

16   reach a verdict.  And here it is.

17             Your verdict must represent the considered judgment

18   of each member of the jury.  In order to return a verdict, it

19   is necessary that all jurors agree on all questions.  It is

20   your duty as jurors to consult with one another and to

21   deliberate with a view to reaching an agreement if you can do

22   so without disregard of individual judgment.

23             It's said a little bit awkwardly.

24             But basically, you must decide the case for yourself

25   but only after an impartial consideration of the evidence in

1   the case with your fellow jurors.  In the course of your

2   deliberations, do not hesitate to reexamine your own views and

3   change your opinion if you're convinced that it's wrong.

4           But do not surrender your honest conviction as to the

5   weight or effect of the evidence solely because of the opinion

6   of your fellow jurors or for the mere purpose of reaching a

7   verdict.

8           Remember at all times that you are not partisans.

9   You are the judges.  Judges of the facts.  Your sole interest

10  is to seek the truth from the evidence in the case.  You must

11  follow these rules while deliberating and returning your

12  verdict.

13          First, when you go to the jury room, you must select

14  a jury foreperson.  That person, the foreperson, will preside

15  over your discussions and speak for you here in court.

16          Second, it's your duty as jurors to discuss this case

17  with one another and try to reach agreement.  Each of you must

18  make your own conscientious decision but only after you've

19  considered all of the evidence, discussed it fully with the

20  other jurors, and listened to the views of the other jurors.

21          Do not be afraid to change your opinions if the

22  discussions persuade you that you should do so.  But do not

23  make a decision simply because other jurors think it is right

24  or simply to reach a verdict.

25          Remember at all times that you are the judges of the

1    facts.  Your sole interest is to seek the truth from the
2    evidence in the case.
3            Third, if you need to communicate with me during your
4    deliberations, you may send a note to me, to Bill -- you know
5    Bill -- or to one of my law clerks signed by one or more
6    juror.  I will respond as soon as possible either in writing
7    or orally in court.
8            So we would have you come in back into court, and I
9    would give you the answer to the question in court or else I
10   would type it up or handwrite it and send it to you, give it
11   to you.
12           Fourth, your verdict must be based solely on the
13   evidence in the law as I have given to you in these
14   instructions.  Nothing I have said or done is intended to
15   suggest what your verdict should be.  That is entirely for you
16   to decide.
17           Fifth, your verdict must be unanimous on every
18   question.
19           And finally, the verdict form is an important
20   document.  It is the written notice of the decision that you
21   reach in this case.  You will take the form -- and it's right
22   here in this binder with the instructions.
23           You will take this all to the jury room, follow the
24   directions on the form for filling it out.  And when each of
25   you has agreed on all of your answers, your jury foreperson

July 21, 2022

7896

1    will fill in the form, sign and date it, and advise Bill or

2    one of my law clerks that you are ready to return to the

3    courtroom.

4           And so in terms of if you find that you have a

5    question, if there's something that's not clear on the verdict

6    form, if there's something that is difficult to understand in

7    the instructions, that's when you would call chambers, let us

8    know that you have a question, and you just write it out on a

9    piece of paper, and we would then get back with you as I just

10   described.

11          The other thing is jurors often ask the judge how

12   long does it take to deliberate?  Everybody wants to know

13   that.  And I've learned from other trials, and there really is

14   no answer to that.  Every jury is different.  Every case is

15   different.

16          So you'll be the ones who will ultimately decide how

17   long it takes.  And you can also set your hours.  I understand

18   you're going to be deliberating 8:30 to 2:00, Monday through

19   Thursday.

20          If something comes up, the only thing I ask you is if

21   you change your hours, we will want to know that just so that

22   we can make sure we're here and available and all of that.

23          The other thing is I did get permission from the

24   Court that we can buy you lunch during your deliberations.  I

25   have to enter a lunch order, which I will do.  It will say

```
 1    lunch order, and it will say that I'm ordering that you be
 2    provided lunch during your deliberations.
 3           So that's just a small way that the Court expresses
 4    its appreciation for your work.  And I told you all of the
 5    other instructions.
 6           So what I would ordinarily -- oh, there is Eva, good,
 7    and Bill.  What I'm going to do is swear in Eva, she's one of
 8    my law clerks.  I think you've met her a couple of times.
 9    Bill and Leslie.  And they will be what we call the court
10    bailiffs for jury deliberations.
11           They take an oath that I administer in front of you
12    and everyone else.  So I'll do that, and I won't give you the
13    verdict form and the instructions until we address the issue
14    here that was just raised.
15           So if Leslie and Bill and Eva would raise your right
16    hand, do you solemnly swear or affirm that you will keep this
17    jury in the jury room provided by the court and that you will
18    not permit anyone to speak with them about this case nor speak
19    with them yourself except to convey any written questions they
20    may have to the Court until a verdict is reached and read in
21    open court?
22           THE CLERK:  I will.
23           THE CASE MANAGER:  I do.
24           THE CLERK:  I will.
25           THE COURT:  Okay.  Thank you.  And then the other
```

```
 1    thing I just want to remind you is when you -- now, once you
 2    start your deliberations -- and we'll tell you when you can do
 3    that -- you should not start deliberating until everyone's in
 4    the courtroom in the morning.
 5          If somebody goes out to take a break, get some fresh
 6    air, use the restroom, you should stop deliberating until they
 7    return.  You all have to be there for all of the
 8    deliberations.  Okay.  So we'll ask you to return to the jury
 9    room for now.  We'll address the issue here and get back with
10    you.
11          THE CLERK:  All rise for the jury.
12                    (Jury Out)
13          THE COURT:  Okay.  Mr. Mason.
14          Please be seated.
15          MR. MASON:  Thank you, Your Honor.
16          Despite the fact that counsel knows full well that
17    the Michigan Model Civil Jury Instructions which are published
18    by the Supreme Court of Michigan, not just some advisory
19    publication or bar committee, under Michigan Model Instruction
20    30.01, the instruction that professional negligence is
21    malpractice.
22          I am well aware of the fact that this Court for the
23    instructions given to this jury took out that reference;
24    however, Mr. Ramaley factually described the fact that
25    professional negligence is the equivalent of malpractice.
```

1          And the Michigan model instruction references that

2     knowing all of that, counsel told this jury that professional

3     negligence was not malpractice and suggested that he was

4     surprised or shocked that I would use that term.

5          And I believe that it is misleading to the jury based

6     on factual record, as well as the law.  And that there should

7     be a curative instruction for the jury that, indeed,

8     professional negligence, is under the Michigan instruction the

9     equivalent or the same as malpractice.

10         THE COURT:  Mr. Stern.

11         MR. STERN:  Your Honor, my response is simply that we

12    have tried the entire case to mirror and be measured with Your

13    Honor's rulings, with Your Honor's orders.  Your Honor found

14    in making determinations about the jury instructions and about

15    the verdict form that these two type of cases are not the

16    same.

17         There should have been -- we objected when

18    Mr. Ramaley mentioned malpractice, because this isn't a

19    malpractice case.

20         The Michigan model rules don't define what

21    professional negligence is.  Her Honor and the law and the law

22    that the jury is provided and the instructions that the jury

23    is provided is what defines what these claims are about.

24         So to raise the issue of malpractice before the jury

25    after months of deliberations about what this verdict form is

July 21, 2022

7900

 1    going to say, what the instructions are going to instruct, all

 2    I was doing was responding to something that was raised in a

 3    closing that was not permitted by the Court to be in the

 4    instructions or in the verdict form.

 5         It would be inappropriate at this point to give an

 6    instruction to the jury.  That would actually go against what

 7    Your Honor has already held in terms of the instructions that

 8    were given and the verdict form that was provided.

 9         THE COURT:  Mr. Mason, here's the situation.  I -- at

10    the time that we finalized the jury instructions or were

11    working on the jury instructions, Mr. Ramaley had not

12    testified about malpractice.

13         But I made a clear decision that professional

14    negligence is what was alleged in the complaint.  It's brought

15    as a professional negligence claim.  And it's what five months

16    of witnesses had talked about and not the word "malpractice."

17         So to the extent Mr. Stern said this is not a

18    malpractice case, I don't think that there is any prejudice to

19    your client whatsoever.

20         So at the time that Mr. Ramaley was testifying, I

21    think there was an objection or there was a dispute about him

22    using the term "malpractice," and I think that I said

23    something to the effect of, "That's the same as professional

24    negligence , right?"  And we all agreed, "right."

25         MR. MASON:  Exactly.

```
 1            THE COURT:  So the jury heard that.  I think they're
 2   in good shape to consider.  They heard the evidence.
 3            MR. MASON:  Okay.
 4            THE COURT:  Thank you.
 5            So I will just go and tell them -- give them their
 6   instructions and tell them that they can begin deliberations.
 7   I know that they will be leaving at 1:30 today because of the
 8   art fair traffic.  And we have copies for each of them.
 9            THE CLERK:  All rise.
10            MR. STERN:  Your Honor, may I just say I think just
11   on behalf of everybody, honestly, there's no -- I don't gain
12   anything from it.
13            Thank you to your whole staff for everything y'all
14   have done during this trial, for staying up late, for working
15   so hard, for Jeseca taking down -- I mean, this has been hard
16   for all of us, but it's been equally hard for all of you.
17            And I think everybody on all sides, regardless of
18   rulings or how you've come down, I think we all sincerely
19   appreciate it.  And at least from our side just could not have
20   been more thankful of how you've treated us throughout this
21   case.
22            I don't mean necessarily in the courtroom.  I just
23   mean just generally in emails and in conversations and in the
24   way your staff and Your Honor has interacted with us.  I just
25   genuinely appreciate all of you.  And it's not -- we're not
```

July 21, 2022

7902

```
 1   naive to how much effort has gone into this from your staff.
 2             THE COURT:  Thank you, very much.
 3             MR. MASON:  We join in that.
 4             MR. STEIN:  Yes.  Thank you, Your Honor.
 5             THE COURT:  Okay.  Yeah.  Thank you, all, very much.
 6             And I also want to acknowledge Jeseca's tremendous
 7   effort, as well as Leslie, Guus, other law clerks, Bill.  It's
 8   -- it just -- it takes a very large village to pull this off.
 9   And all of you are part of that.  So thank you.
10             And I'll just be back out to clean up in a minute.
11             THE CLERK:  Court is in recess.
12                       (Brief Recess)
13             THE COURT:  Mr. Erickson, can you sit in?  This is a
14   minor question.
15             One juror asked me, "What is a bellwether case?"  And
16   I said, "Well, I forget what the word means.  It originates
17   from something."  And then I just said that a bellwether case
18   is for -- in our case it just is four plaintiffs who are
19   bringing their case.
20             I just didn't answer the question.  I did not give
21   them a definition.
22             MR. STERN:  I mean, I would suggest if Your Honor
23   would allow that -- I think you should tell them it's
24   something they should ignore.  It's probably something that we
25   shouldn't --
```

```
 1              THE COURT:  I did.  I said, "Don't worry about it.  I
 2     can't even remember what it means."
 3              And I turned to Bill, and I said, "Bill, do you know
 4     what it means?"  And Bill said, "I don't know what it means."
 5              So that was that.
 6              And then they also would like to know whether they
 7     can -- about getting the exhibits, can they have them.
 8              And I told them, "Well, if we shipped in 600 exhibits
 9     right now, that would be too many.  You don't have to have an
10     exhibit number.  But anything that you want, we will give to
11     you as fast as we can get it together.  Just tell us, 'I want
12     some of those emails,' or, 'I want that contract,' or, 'I want
13     that exhibit to a deposition.'"
14              Is that what you all envisioned?
15              MR. STERN:  Yes.
16              THE COURT:  Now, how are we going to do that?
17              MR. STEIN:  So I would suggest if we get a request
18     like that, if the court staff would email it to us, we will
19     confer -- you know, we'll meet and confer to figure out what
20     we think the right response is and then come to court and
21     present --
22              THE COURT:  Yes.  I know.  But do you have the
23     exhibits?
24              MR. STERN:  We have all of ours here ready.
25              THE COURT:  Okay.  That's all I wanted.  Because I
```

July 21, 2022                                                           7904

  1    have the binders, but I also have stacks of things that were

  2    handed to me, and they're not in order.

  3              MR. STERN:  We have ours.  Any time.

  4              THE COURT:  Can you speak into the microphone?

  5              MR. ERICKSON:  We don't have a set of the LAN

  6    exhibits that were admitted, but we will start preparing the

  7    set.

  8              THE COURT:  Okay.  And I have -- I haven't thrown

  9    anything away, I promise you.  I will tell you I'm not a

 10    hoarder, though, so.

 11              MR. STERN:  I'm also fine, Your Honor, if they want

 12    all the exhibits, I'm happy to let them have it.  I mean, it

 13    may be easier now hearing that, like --

 14              THE COURT:  Let's see how it goes.

 15              MR. STERN:  Okay.  No problem.

 16              THE COURT:  That's a lot to pile in there.  This jury

 17    room is designed as a criminal jury for 12.  But -- and for 14

 18    or 16 during a case.  But it's pretty tight quarters in there.

 19              MR. STERN:  Ours are two boxes.

 20              THE COURT:  Okay.

 21              MR. STEIN:  I don't think we have ours printed out.

 22    I think our -- what we were expecting is that if -- we would

 23    print it out as it were needed, so I don't know --

 24              THE COURT:  Okay.  Well, think about what you want to

 25    do.  They have 28 minutes left.  I don't think during that

July 21, 2022

7905

```
 1    time they'll request the exhibits.
 2              Is that fair?
 3              MR. STEIN:  Yes.
 4              THE COURT:  It might be worth printing them out.
 5              Anything else?
 6              MR. STEIN:  No.  Just to be clear, we're to leave our
 7    contact information with Ms. Calhoun?
 8              THE COURT:  Yes.
 9              MR. STEIN:  Okay.
10              THE COURT:  And then I just ask that you -- I think
11    our -- we'll probably call you from a cellphone.  So it will
12    have a -- either 313, 517 --
13              MR. STERN:  I think Ms. Calhoun has reached out
14    previously to Mr. Mason, Mr. Campbell, and myself by text.
15    And so that's worked, when we had a COVID issue I think --
16              THE COURT:  Right.
17              MR. STERN:  -- there had just been emergencies.
18              THE COURT:  Okay.
19              MR. STERN:  And as far as I know, none of us have
20    ever texted her back.
21              THE COURT:  Okay.  And it wouldn't hurt to have a
22    backup.
23              MR. STEIN:  I'm going to give at least three.
24              THE COURT:  If the phone runs out of a charge.  All
25    right.  Well, thank you, all, very much.
```

1           MR. STERN:  Sure.  Thanks.

2           THE CLERK:  All rise.

3           Court is in recess.

4                          (Brief Recess)

5                       (Proceedings Concluded)

6                -         -         -

7

8           CERTIFICATE OF OFFICIAL COURT REPORTER

9           I, Jeseca C. Eddington, Federal Official Court

10  Reporter, do hereby certify the foregoing 150 pages are a true

11  and correct transcript of the above entitled proceedings.

12  /s/ JESECA C. EDDINGTON_____      07/21/2022
    Jeseca C. Eddington, RDR, RMR, CRR, FCRR          Date
13

14

15

16

17

18

19

20

21

22

23

24

25