```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3    SHERROD, TEED, VANDERHAGEN and WARE,

 4                    Plaintiffs,
         -v-                                Case No. 17-10164
 5
      VNA and LAN,
 6
                      Defendants.
 7    _____/

 8                        STATUS CONFERENCE

 9
                 BEFORE THE HONORABLE JUDITH E. LEVY
10                   UNITED STATES DISTRICT JUDGE

11                        AUGUST 3, 2022

12
      APPEARANCES:
13
      For the              Corey M. Stern
14    Plaintiffs:          Levy Konigsberg, LLP
                           605 Third Avenue, 33rd Floor
15                         New York, New York 10158

16                         Melanie Daly
                           Levy Konigsberg, LLP
17                         605 Third Avenue, 33rd Floor
                           New York, New York 10158
18

19
                       (Appearances Continued on Next Page)
20

21

22

23
      TO OBTAIN A       JESECA C. EDDINGTON, RDR, RMR, CRR, FCRR
24    CERTIFIED            FEDERAL OFFICIAL COURT REPORTER
      TRANSCRIPT:          UNITED STATES DISTRICT COURT
25                            200 EAST LIBERTY STREET
                            ANN ARBOR, MICHIGAN 48104
```

```
 1   For the VNA          Daniel Stein
     Defendants:          Mayer Brown LLP
 2                        1221 Avenue of the Americas
                          New York, New York 10020
 3
                          James M. Campbell
 4                        Campbell Conroy & O'Neil, P.C.
                          1 Constitution Wharf, Suite 310
 5                        Boston, Massachusetts 02129

 6                        Alaina N. Devine
                          Campbell Conroy & O'Neil, P.C.
 7                        1 Constitution Wharf, Suite 310
                          Boston, Massachusetts 02129
 8
                          Kristin Michele Dupre
 9                        Campbell Conroy and O'Neil P.C.
                          1 Constitution Wharf, Suite 310
10                        Boston, Massachuesetts 02129

11                        Mark R. Ter Molen
                          Mayer Brown LLP
12                        71 South Wacker Drive
                          Chicago, Illinois 60606
13
     For the LAN          Wayne Brian Mason
14   Defendants:          Faegre Drinker Biddle & Reath LLP
                          1717 Main Street, Suite 5400
15                        Dallas, Texas 75201

16                        David C. Kent
                          Faegre Drinker Biddle & Reath LLP
17                        1717 Main Street, Suite 5400
                          Dallas, Texas 75201
18

19   Also Present:        Honorable Magistrate David R. Grand
                          United States District Court
20                        Eastern District of Michigan

21

22

23

24

25
```

1                            **I N D E X**

2          WITNESSES                                                PAGE

3            (None)

4

5

6

7

8          EXHIBITS                              Marked     Admitted

9            (None)

10

11

12

13

14         MISCELLANY                                         PAGE

15           Proceedings..................................4
             Certificate.................................63

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2          THE CLERK:  Calling Sherrod, Teed, Vanderhagen, and

3   Ware vs VNA and LAN.

4          THE COURT:  Could I have appearances beginning with

5   the plaintiffs.

6          MR. STERN:  Yes, Your Honor.

7          Corey Stern and Melanie Daly on behalf of the

8   plaintiffs.

9          THE COURT:  Thank you.

10         MR. CAMPBELL:  And James Campbell, Daniel Stein,

11  Kristin Dupre, and Alaina Devine for VNA.

12         THE COURT:  Okay.  Thank you.

13         MR. MASON:  I think Mark Ter Molen's there.

14         THE COURT:  I think Mark Ter Molen's there, too.

15         MR. TER MOLEN:  I don't take offense.  Thank you.

16         MR. CAMPBELL:  There he is.  He's on the second

17  screen.  Sorry about that.  And Mark Ter Molen.

18         MR. MASON:  For LAN, Your Honor, Wayne Mason and

19  David Kent.

20         THE COURT:  Great.  Well, thank you, all, for being

21  here.  I can tell that you had safe travels from your last

22  appearance here in Ann Arbor, and I'm thankful for that, as

23  well as other issues that people are facing that things are

24  going as well as they possibly can.

25         So I have prepared an agenda for our status

August 3, 2022

1   conference today.  But the first thing I'd like to address is

2   I think we should seal this docket entry, the transcript for

3   it in particular for the following reasons.

4            One is that I want to discuss the -- my proposal of

5   having Magistrate Judge Grand here in the Eastern District of

6   Michigan who's present here on the Zoom with us at my

7   invitation.

8            I'd like to discuss him taking over the jury

9   deliberations ███████████████████████████████████████

10  ███████████████████████████████████████████████

11  ██████████████████████████

12            ██████████████████████████████████████

13  █████████████████████████████████████████████████████

14  █████████████████████████████████████████████████████

15  █████████████████████████████████████████████████████

16  █████████████████████

17            So I would propose that we seal this record I think

18  until there's a verdict.

19            But does anyone, starting with Mr. Stern, have an

20  objection to sealing this record until --

21            MR. STERN:  No, Your Honor.  In fact, we would have

22  moved to seal it had Your Honor not raised it.

23            THE COURT:  Okay.  Mr. Campbell?

24            MR. CAMPBELL:  No objection to that until the time of

25  the verdict, Your Honor.  Thank you.

August 3, 2022

```
1              THE COURT:  Okay.  Mr. Mason?

2              MR. MASON:  No objection.  Thank you.

3              THE COURT:  Okay.  And so as we talked about last

4   Thursday and I think I put in an email on Wednesday,

5   Judge Grand is -- his duty station, to use a Federal

6   Government term, is here in Ann Arbor.

7              He is, I think, the most senior of the magistrate

8   judges on our bench right now.  Highly qualified.  And I am

9   recommending that -- or requesting the parties' consent to

10  have Judge Grand preside over the deliberations from the

11  jury's return ███████████████████████████████████

12          ████████████████████████████████████████████

13  ██████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ██████████████████████████████████████████

16          █████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ███████████

20              So starting with plaintiffs, is there any objection

21  to Judge Grand presiding over deliberations?

22              MR. STERN:  We were sold before the golden Lab, and

23  now it's just icing.  So we're good.  I mean, if I knew that,

24  we may have moved for this months ago.

25              THE COURT:  I know.  Josie hasn't been here.
```

 1              So, Mr. Campbell?

 2              MR. STERN:  No objection.

 3              MR. CAMPBELL:  No objection, Your Honor.  Thank you,

 4    Judge Grand.

 5              THE COURT:  Mr. Mason?

 6              MR. MASON:  No objection.  Thank you for being

 7    willing to step in.

 8              THE COURT:  Yeah.  Believe me, as our most senior

 9    magistrate, Judge Grand is -- I think -- is your title

10    Executive Magistrate?

11              HONORABLE JUDGE GRAND:  Yes, as of a number of months

12    ago.

13              THE COURT:  So he has to supervise the staff

14    attorneys and other -- which is a huge docket that they have

15    helping us with habeas corpus cases and other litigation.  And

16    he's got a lot of responsibility.

17              So thank you, Judge Grand.

18              And in anticipation of this, I have given him a copy

19    of the jury instructions, the verdict form, and the -- a

20    little map of who's sitting -- who the jurors are.  And he is

21    aware that on Thursday we had a juror -- or the jury note

22    indicating at that time the jury believed they were

23    deadlocked.

24              And I provided to Judge Grand the modified, sort of,

25    softer gentler Allen charge.  So he knows what has been said

1   to the jury but not much more than that about our case.

2         And it was actually Judge Grand that mentioned --

3   asked me for a list of exhibits so that if one is requested,

4   he can look quickly, see whether it's been admitted and so on.

5   And I think that was a terrific idea, and that prompted my

6   request.

7         So is that Excel spreadsheet now complete, or do we

8   have the most complete copy of it?

9         MR. CAMPBELL:  Your Honor, Ms. Daly and Ms. Devine

10  have been addressing that to get it as cleaned up and as

11  agreeable as possible.  I think they were working with either

12  Mr. -- I don't know who on LAN.  I thought it was Mr. Kent.

13  Maybe not.

14        But anyway, I think it's -- there might be one or two

15  that are still -- exhibits that are in question.  But I should

16  just turn it over to Alaina or Melanie to further address it.

17        THE COURT:  Okay.

18        MS. DEVINE:  Good afternoon, Judge Levy.  We went

19  back and forth this morning.  And I think from our

20  perspective, there are no outstanding issues.  I think there's

21  two exhibits that were referred to by the wrong exhibit number

22  in the transcript.  I think they were both Plaintiffs'

23  Exhibits that they wanted to correct the record on.

24        But otherwise, the list is in agreement.  And

25  Ms. Daly can correct me if that's not correct.

August 3, 2022

1        THE COURT:  Okay.  Is that correct, Ms. Daly?

2        MS. DALY:  Yes, that's exactly correct.  There's just

3   two, as Ms. Devine said, housekeeping matters where the

4   exhibit was referred to on the transcript just with an

5   inverted number as to what it was labeled in the binder.

6        So we can correct that to the jury to the extent they

7   need to know.

8        THE COURT:  And I'm just suggesting only that we

9   provide this Excel spreadsheet to Judge Grand, that all of you

10  have it.  You've done a lot of work to prepare it over the

11  last few days.  And I think it will only pay off as the case

12  goes forward.

13       So I'm not suggesting that we just give it to the

14  jury unless all of you think it would be helpful to the jury

15  to have it.

16       Is there -- are you suggesting we should -- no.

17       MR. STERN:  So, Judge, there's two documents as

18  Ms. Devine and Ms. Daly both mentioned where they were

19  referred to as one thing in front of the jury, but they're

20  labeled something else.

21       We can provide the Excel spreadsheet to Judge Grand

22  that has a column that indicates which of those two documents

23  are so that if the jury asks for, you know, X, Y, Z, but it's

24  really Y, Z, X, Judge Grand can say at that point, if Your

25  Honor is comfortable with it, that, "We have this exhibit for

1    you.  We'd like you to know that it had been referred to

2    during the trial as X, Y, Z.  But it's actually Z, Y, X, and

3    here are the documents."

4            So no need to tell them in advance about those

5    documents.  But we'll have that on the spreadsheet for His

6    Honor to know what we're talking about.  And we can send it to

7    the Court today or tomorrow so that if there's any questions

8    that the judge -- that Judge Grand has, we can answer them in

9    advance of Tuesday.

10           But also having spent time now for five days watching

11   or listening or sitting there while the jury deliberated, I'm

12   sure we'll have some time Tuesday morning, as well, to explain

13   it if need be, if it's helpful to Judge Grand.

14           MS. DALY:  We can provide the updated version, which

15   reflects everything Ms. Devine and I worked out right after

16   this hearing.

17           THE COURT:  Okay.  That will be fantastic.  And let

18   me go back to the appointment of Judge Grand to preside over

19   the deliberations. ████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████

22        ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ██████████████████████

25        ████████████████████████████████████████████████████



17      Here's the situation

18  that I have come up with, which is I've asked Bill and Leslie

19  and Judge Grand          Bill is always there

20  checking in to make sure they're here, and he makes coffee.

21  And then when the last juror comes in, he closes the door, and

22  deliberations can begin.



14      Any objection from plaintiffs

15 ?

16      MR. STERN:  Not at all.

17

18

19      MR. MASON:  Your Honor, I don't have any objection at

20 all to that.

21      I would ask -- I understand it didn't happen last

22 week.  But to be consistent with what we've done with other

23 lawyers when the jury -- if the jury were to come into the

24 courtroom again, I would request that they be

25

1           THE COURT:  Oh.

2           MR. MASON:  -- that there be a similar instruction to

3     the jury that my -- ████████████████████████████████████

4     ███████████████████████████

5           THE COURT:  Absolutely.  And Mr. Kent asked me to do

6     that.  And then we brought the jury in with their hung jury

7     note, and it went right out of my mind.

8           And I apologize to you and to Mr. Kent for that.  And

9     I think that makes good sense, and we will absolutely let them

10    know.

11          MR. MASON:  Thank you, Your Honor.

12          THE COURT:  Or actually Judge Grand will let them

13    know.  Thank you.

14          MR. CAMPBELL:  No objection from VNA, Your Honor.

15    ████████████████████████████████████████████████████████

16          ████████████████████

17          ████████████████████████████████████

18          THE COURT:  ████████████████████████████

19          ████████████████████████████████████████████████

20    ████████████████████████████████████████████████████

21    █████████████████████████████████████████████████████████

22    ████████████████████████████████████████████

23          ████████████████████████████████████████████████████

24    █████████████████████████████████████████████████████████

25    ████████████████████████████████████████████████

1        ███████████        They are working solid from 8:30 to 2:00.  So

2    all right.

3            Well, let's -- Judge Grand, do you have any questions

4    or concerns about anything you've heard so far?

5            HONORABLE JUDGE GRAND:  No.

6            THE COURT:  Okay.  All right.  So I want to look at

7    the proposed modified Allen charge.  And I realize I'm not

8    sure I got that -- I need to send that to Judge Grand right

9    now.

10            Leslie, can you do that?  Oh, you did send it.  Okay.

11    Thank you, Leslie.  Okay.

12            I have been looking at this, and, you know, I think

13    we can anticipate that the jury will get started at 8:30.  And

14    that they'll deliberate in good faith, and we won't need to

15    use this.

16            But in the event that we do, I have on Part 1 where

17    it says, "and sometimes after further discussion, jurors are

18    able to," I just put in, "jurors can work out their

19    differences and agree."

20            On number 2, "Please keep in mind how" -- I just put

21    "important."  I took out "very," because it's obviously

22    important if we're reading this to them in court.

23            And then on paragraph 3, I -- it's my thought that

24    the sentence that begins, "each of you, whether you are in the

25    majority or minority," already that's to me repetitive.  "Each

1    of you" includes everyone.

2         So "ought to seriously reconsider your position in

3    light of the fact that other jurors who are just as

4    conscientious," etcetera.  I think that's already included in

5    paragraph 4.

6         So my inclination is to strike it from that

7    paragraph.  And then go to, "those of you who believe that the

8    plaintiffs" -- I like the modification from the "criminal" to

9    the "civil" in blue.  And, "none of you should hesitate to

10   change your mind if after reconsidering things, you are

11   convinced that other jurors are right and that your original

12   position was wrong."

13        Here's my concern about the plaintiffs' proposed

14   modification that goes into, "Don't slay the messenger," all

15   of the red, is that in our case, I have seen no sign that the

16   jury has anything but respect for one another.

17        Bill or Leslie or other law clerks have been in the

18   jury room checking them in, in the morning, bringing them

19   downstairs, opening the door, lining them up.  Just the kind

20   of casual conversation that goes along with that.  I will say

21   that in virtually every other jury trial that I've had as a

22   judge, I can tell who the problem jurors are.

23        Through that process and through my own observations,

24   I just don't see personality conflicts at all in this group.

25   And, of course, they're behind closed doors.  We have no idea

```
 1   what they're doing.
 2          But my sense is that this red material that
 3   plaintiffs are recommending is really designed for a situation
 4   where the Court perceives that there's a shoot-the-messenger
 5   sort of thing going on.
 6          But, Mr. Kent, were you trying to speak?  You've got
 7   your hand raised on Zoom.
 8          MR. KENT:  Yes, Your Honor.  I just wanted to make
 9   sure I understood.  Were you suggesting you're going to cut
10   all of paragraph 3?
11          THE COURT:  No, no.
12          MR. KENT:  Or that one clause, "whether you are in
13   the majority or the minority"?
14          THE COURT:  Yeah.
15          MR. KENT:  Just that clause, okay.
16          THE COURT:  I wanted to strike the sentence that
17   says, "each of you, whether you are in the majority or
18   minority."  Because I think that's --
19          MR. KENT:  The entire sentence?
20          THE COURT:  That whole sentence.  Because I think the
21   next paragraph addresses that.
22          MR. KENT:  Thank you.  That's all.  I was just
23   uncertain.
24          THE COURT:  And I also think paragraph 5 does, as
25   well.
```

1        So, Mr. Stern, this is obviously plaintiffs'

2   recommendation.  Is there something you've observed about the

3   jury in the courtroom that leads you to believe there's a

4   slay-the-messenger sort of dynamic going on?

5        MR. STERN:  Not until they came in on Thursday.  And

6   there definitely appeared to be some frustration from a number

7   of jurors.  They appeared to be -- you know, I don't know if

8   that frustration is with the process or with each other.  You

9   know, we're not with them.

10        So it's hard to observe looks that they give one

11   another.  But there was a strong sense on Thursday of a

12   different demeanor amongst many if not all of the jurors than

13   we had seen before.

14        And I think that after 20 hours of deliberations in a

15   small room after a five-month trial -- or

16   five-and-a-half-month trial, while we may not be seeing it

17   ourselves and while obviously, Your Honor has spent more time

18   with the jurors and Bill most certainly has spent more time

19   with the jurors and Leslie has spent more -- Ms. Calhoun has

20   spent more time than we have, there felt like a bit of a shift

21   on Thursday.

22        And so we thought it was important to at least

23   acknowledge that at this point, after this many weeks, after

24   this many months, after this many days of deliberations, that

25   those personality issues, they can evolve quickly.  You may

```
 1    have no issues whatsoever for five and a half months.

 2              And then 20 hours in a room together, five lunches

 3    together, and someone just refuses to acknowledge what someone

 4    else is saying or, you know, so we don't know.  But it's

 5    clearly part of a charge that's been given before that's been

 6    approved.

 7              And so we thought it was important to include it.

 8              THE COURT:  Okay.

 9              MR. STERN:  Perhaps the best thing to do would be to,

10    you know, put it on ice and see if it evolves over the course

11    of deliberations next week.  But we felt it was important to

12    include it and still do.

13              THE COURT:  For VNA and LAN, would you object to just

14    the first paragraph of it at this point?

15              "Members of the jury, let me say one other thing

16    about that.  Often after a long period, the message gets lost

17    in the messenger" -- just up to the end of that paragraph?

18              "You have to look at and analyze the position itself

19    and whether it was supported by the evidence"?

20              MR. MASON:  Yes, Your Honor.  We would object to

21    that.  And it is injecting this issue of the messenger issue

22    into the case that is not otherwise identified.  There was no

23    note from the juror -- from the foreperson saying that there's

24    issues.

25              Any time people have a long process and are in
```

1    disagreement, you know, there may be some frustration that

2    they didn't get to a verdict so far.  But that doesn't mean

3    there are messenger issues.

4         And for us to affirmatively inject that into could be

5    offensive to them that they believe we're perceiving that or

6    suggesting it could have a deleterious effect unintended,

7    because we're trying to prognosticate indicate or evaluate

8    what some think is going on.

9         And so I think that all of the remaining red in

10   paragraph 4 should be omitted.

11        THE COURT:  Okay.

12        MR. CAMPBELL:  We agree with that, Your Honor, and we

13   object to the inclusion of this language.  It's just -- it's

14   pure speculation that any of this is going on.  And I think we

15   should assume that the jurors are just having a healthy

16   discussion and debate.

17        There's literally nothing to suggest that any juror

18   has any particular personal issue with any other juror.  I

19   hadn't even thought of the -- you know, the taken aback or

20   insulting part of it that, you know, you kind of -- talking --

21   I just -- there's no basis for it.

22        I think we've all had situations where juries have

23   been out for even short periods of time.  And you can

24   literally hear screaming from the room.

25        THE COURT:  Right.

 1          MR. CAMPBELL:  It's not here.

 2          THE COURT:  No.

 3          MR. CAMPBELL:  I mean, there's nothing to suggest

 4   anything other than a reasonable, healthy debate.  I wasn't

 5   there to observe the jurors obviously all last Thursday.  But

 6   just that they've been discussing the issue.  I think you --

 7   what I've heard about what they looked like was exactly what

 8   you think, so.

 9          THE COURT:  I tend to agree that we should hold this

10   off as something that can be used.  If we -- if it becomes

11   clear that there is a personality conflict arising, we now

12   have an instruction that was used and that the Sixth Circuit

13   didn't find to be coercive or reversible error of some sort.

14          That if something, a dynamic does develop on the

15   jury, we'll be well-served to have this as an option.

16          But I do worry that we've just seen no sign of it.

17   Even when Bill brings in the lunch, there's just no screaming.

18   We always knock.  We wait until they say, "Come in."  We're

19   not interfering.  But there's just, like, nothing like, "Help

20   me," going on that we've seen.

21          We did have the one juror make the comment that I

22   shared with you that she felt very stressed about coming into

23   the courtroom apparently.  It was when they were lining up.

24   Not after the modified charge was given.  But she blurted that

25   out.  And said she felt sick about where things were.

August 3, 2022

 1          But she did not get sick, as far as we know.

 2          MR. CAMPBELL:  Your Honor, just if I may just make

 3   one comment about the source of this language.  Apparently it

 4   comes from a case named Brika.

 5          THE COURT:  Yes.

 6          MR. CAMPBELL:  And as far as we can tell, there was

 7   -- this language was agreed to by the litigants in that case.

 8   There was no objection to it.

 9          THE COURT:  Okay.

10          MR. CAMPBELL:  So different circumstance, and it

11   seems that that was some language that was drafted for

12   circumstances specific to that case.  Maybe that there was

13   personality issues or something.

14          But given that there's an objection from the

15   defendants both, it does change the circumstance of the Brika

16   case.

17          THE COURT:  Okay.  Thank you.  Yeah.  We were looking

18   at the Brika case at the time of the note.  So -- but I think

19   the Sixth Circuit's decision did rest in large part on the

20   agreement of the parties.  So we'll just hold it off until we

21   see that there is an issue.

22          And then you all may agree that this is the right

23   language or tweak it a little bit with Judge Grand, so.

24          And then the next one in paragraph 6, I am not

25   inclined to add the information here about great expense and

1    great emotional harm.

2         What I see in the Sixth Circuit's analysis of judges

3    who go off the path of the model instruction in criminal cases

4    at least is that they're just trying to -- the Court is trying

5    to sort out whether the modification became coercive of

6    members of the jury.

7         And I'm concerned that introducing them to the fact

8    that there are costs of litigation and potential additional

9    harm to the plaintiffs, I'm assuming is what's needed there,

10   would be coercive.  And there isn't necessarily evidence to

11   support -- I mean, there's definitely evidence to support the

12   great expense and personal sacrifice of everybody on this

13   screen and your clients.

14        But I'm not inclined to give it, because I think it

15   could tip things into the coercion area.

16        MR. STERN:  Your Honor, I -- again, we -- the part

17   about the emotional part, perhaps that would be well-served to

18   take out.  But I don't think there's anything in the Sixth

19   Circuit that has ever indicated that explaining to a jury

20   after five and a half months, the great costs that has been

21   incurred by all the parties.  Not the plaintiffs.  All the

22   parties.

23        And that the case would be tried again, that that's

24   coercive.  I mean, that's just the reality.  And it's been a

25   great expense to VNA and LAN and us.  And probably more so to

1  both of them than to us in terms of the numbers of folks that

2  they've had, at least that we've seen in the courtroom.

3         But I think it's perfectly reasonable for the jury to

4  hear that if you have a hung verdict, if you have a hung jury

5  and a mistrial, this case will get tried again to the expense

6  of everybody involved.

7         And I don't know how that's coercing them into

8  anything.  That's just a fact.

9         MR. MASON:  Judge, I think --

10        MR. CAMPBELL:  We really -- we strongly object to

11 this evidence.  It's introducing something that is irrelevant

12 to their consideration.  Whether the case gets tried once,

13 twice, or three times, there's expense involved.  And it's

14 just not something that is an issue for the jurors to

15 consider.

16        Certainly not emotionally how anything will affect

17 anybody.  It's irrelevant.  Both issues are irrelevant to the

18 jury's consideration.  And if they -- if this is given to

19 them, that means that it has some consequence.  And a juror

20 may be moved by it.  So they'd be acting on irrelevant

21 consideration.

22        And you have the whole issue of improper coercion

23 therefore as the result of it.

24        MR. MASON:  I think counsel -- I think Mr. Campbell's

25 right.  It is potentially coercive.  They're -- this is a

```
1    bright jury.  They know how much time and expense is in it,
2    and they can use their common sense with that.  They don't
3    have to be, you know, pushed on the issue.
4              And so respectfully, we would agree that this should
5    come out of number 6.
6              MR. STERN:  Respectfully, if I may, Your Honor, if
7    it's an intelligent jury that already knows about the expense,
8    I don't know how it could be coercive.
9              That is -- you can't say that they're intelligent and
10   they already know, so telling them would be coercive.  If you
11   believe that they're intelligent and they already know, then
12   there's no coercion at all associated with telling them
13   something that's a fact.
14             MR. MASON:  The coercion is elevating the expense to
15   putting pressure on them to get it done as an instruction as
16   opposed to just the reality of the expense.  So those are two
17   different things.
18             THE COURT:  What about this?  Because I'm taking out
19   a portion of paragraph 3, what if it -- the instruction
20   concludes, "But remember, too, that if this case had to be
21   tried again, there is no reason to think that another
22   impartial jury would be able to reach a unanimous verdict"?
23             MR. CAMPBELL:  Your Honor, I think that's already
24   stated in the charge.  And I would just refer to the Brika
25   case at page 5416 F.3d 522, "The court held the judge may not
```

```
 1    ask the jury to consider the external effects of their
 2    inability to reach a verdict delayed to other litigants having
 3    to retry the case."
 4            It's this issue, and it's external.  It's irrelevant.
 5    And it should not be part of the jury charge.
 6            THE COURT:  Okay.  So, Mr. Campbell, you wouldn't
 7    agree to add this one section, "There is no reason to think
 8    another impartial jury would be able to reach a unanimous
 9    verdict"?
10            MR. STERN:  That has nothing --
11            MR. CAMPBELL:  I think generally part of an Allen
12    charge, as I've understood them to be.  So I think that
13    language is okay.  I'd like to see it written out.  But I also
14    think it's somewhat -- it duplicates the general charge
15    anyway.
16            THE COURT:  It duplicates it except that I edited it
17    out of 3.  I edited it out.
18            "Each of you, whether you are in the majority, ought
19    to seriously reconsider your position in light of the fact
20    that other jurors who are just as conscientious and impartial
21    as you are have come to a different conclusion."
22            MR. KENT:  Your Honor, it's in paragraph 2.  You say,
23    "There's no reason to believe that any new evidence will be
24    presented or that the next jury will be any more conscientious
25    and impartial than you are."
```

```
 1            THE COURT:  Correct.

 2            MR. KENT:  So it's already there.  The concept is

 3    already there.

 4            THE COURT:  I think it's already there.  So I

 5    don't --

 6            MR. KENT:  It's reemphasizing and creating a new

 7    emphasis, as Mr. Campbell said.

 8            THE COURT:  Yeah.  Thank you.  I think I'll give

 9    Mr. Stern another chance.  But I think I'll leave it out for

10    now.

11            MR. STERN:  I mean, Your Honor, would you be -- could

12    we move that sentence from paragraph 2 to the end?  I mean, it

13    kind of loses its import when it's embedded in the second

14    paragraph of 6.

15            THE COURT:  What if we do this, Mr. Stern, what if we

16    finalize this, print it.  We'll give it to Judge Grand.  But

17    if this is given, we also send it back to the jury to take

18    with -- I mean, it would be given in open court.

19            But we also send this for them to add to their packet

20    of jury instructions, because then everybody can look at it,

21    hear it, internalize it, read it, do whatever they need to be

22    reminded of it.

23            MR. STERN:  I mean, I think it's a good idea for them

24    to have it back with them.  It doesn't change that we think

25    that the language should be included and that it's permissible
```

1    under Sixth Circuit jurisprudence.

2            So we're not -- it's not in lieu of the language we

3    want.  But as a separate issue, I think it's beneficial for

4    the jury to have the charge back there with them.

5            MR. MASON:  I would just say I've never had an Allen

6    charge sent back to the jury.  And I think -- I would oppose

7    it.  I think it should be read to them.

8            THE COURT:  Oh, it will be read to them, Mr. Mason.

9    I was just thinking that it could also be provided to the jury

10   foreperson.

11           MR. STERN:  I don't know how would it -- how would it

12   prejudice anybody if what they were read was also in their

13   hands for them to refer to?

14           MR. MASON:  I just don't think it's necessary.  And

15   so I would oppose it.  I do have two issues that have now

16   arisen, based on this conversation related to the Allen charge

17   when Your Honor gets to it.

18           THE COURT:  I'm -- we're on the Allen charge.

19           MR. MASON:  I know.  But when we finish this

20   discussion.

21           THE COURT:  Oh, okay.  Okay.  Well, I'll give some

22   thought to the order of this.  But it's -- I think it makes

23   sense to give this to them in writing, read it in open court,

24   and hand it to them to take back.

25           I've written jury notes.  I've written notes to them

1    in response to questions throughout their seven questions or

2    whatever.  I've written maybe three notes now, two or three

3    back to them that we've all discussed.

4         And so I don't think this would be anything different

5    than that.  And it is a part of the jury instructions.  And

6    I've told them at the beginning, "You're going to get jury

7    instructions throughout the case, and then I'll give you a

8    bunch at the end."

9         And so I just don't think it's unusual or could be

10   prejudicial.  I think it's a serious charge, and it should be

11   part of their packet of instructions.  And people learn

12   differently and internalize.  Some people by seeing, some by

13   hearing, some by reading.  Some need it all.  So --

14        MR. MASON:  If it goes out, Your Honor, just a

15   procedural deal, it should likely just -- if it's going to be

16   any heading, it should say, "Additional Jury Charge."  It

17   shouldn't have a numerical "9.04 Deadlock Jury" heading.

18        THE COURT:  Okay.

19        MR. STERN:  Your Honor, I also just found the issue

20   of expenses and the cost of trial.  I just would like to point

21   the Court to the United States v Clinton.  It's 338 F.3d 483.

22   Candidly, it was a criminal case.

23        But it was a case where the court did not use the

24   pattern instruction and instead used a version, which was

25   modeled closely to the instruction set out in Devitt and

```
 1    Blackmar practice manual and repeated in the committee
 2    commentary to the Sixth Circuit pattern jury instruction at
 3    8.04.
 4             And the instruction given included this language.
 5    Quote, "The trial has been expensive and preparation time and
 6    effort are difficult for both the defense and prosecution."
 7             That's, you know, Sixth Circuit case directly on
 8    point.  I would ask that the Court at least review that case.
 9             THE COURT:  Okay.
10             MR. STERN:  In juxtaposition with the conversation
11    and the debate that occurred during this hearing.
12             THE COURT:  Okay.
13             MR. CAMPBELL:  And, Your Honor, I'd point out that
14    the Clinton case also says, quote, "strong presence for the
15    unmodified pattern instruction."
16             THE COURT:  Okay.  All right.  I'll take a look at
17    it.  Okay.  But sitting here right now, I'll change the title.
18             Anybody want to recommend a title for it?
19             MR. CAMPBELL:  How about just "Additional Jury
20    Instruction."
21             MR. MASON:  That's fine.
22             THE COURT:  Okay.  Mr. Stern?
23             MR. STERN:  Sure.
24             THE COURT:  Okay.  So I'll go through this, take into
25    consideration everything you said, and send out -- send it
```

1    back and provide it to Judge Grand.

2              Okay.  Mr. Mason, what else about the charge?

3              MR. MASON:  Thank you, Your Honor.  I was not there

4    Thursday, as you know when you sent them back to deliberate.

5              What I heard you say twice today is that you sent

6    back a softer, gentler Allen charge on Thursday and called it

7    a modified charge.

8              And so my experience -- and unfortunately I tried one

9    case three times.  So I know how that's no fun.

10             But with respect to the Allen charge itself, my

11   experience has been that there are only a few charges that can

12   be given back before there is a presumption of coercion and

13   that a mistrial must be declared.

14             And so my question to you is:  Was the charge that

15   went back Thursday the first Allen charge?  And therefore, if

16   this is read by Judge Grand and given the second time, that

17   would be the end of any instructions.

18             And therefore, Judge Grand would be required to --

19   because of the presumption would be required then to declare a

20   mistrial.  That's my first question.

21             THE COURT:  It was not an Allen charge.

22             Do you have the transcript, Mr. Mason?

23             MR. MASON:  I don't have it in front of me.

24             THE COURT:  I have it.

25             MR. MASON:  I didn't think it was, honestly.  But

```
 1    when -- since you mentioned, you know, "modified," I'm just
 2    trying to understand whether the Court has considered the fact
 3    that one charge has been given back, and there's one left.
 4         MR. STERN:  I think it was specific on the record
 5    that it was not an Allen charge.  We -- the parties discussed
 6    that it wouldn't be an Allen charge.  It was kind of a "go
 7    back there and do your best" thing --
 8         THE COURT:  Yeah.
 9         MR. STERN:  -- and with 20 minutes to go before they
10    were about to leave.
11         So there's no way that any of us, I think, could
12    reasonably consider it to have been the first Allen charge.
13    It just was not.  And it's clear from the record that it was
14    not.
15         MR. MASON:  Okay.
16         THE COURT:  Let me -- I'm going to read it to you,
17    Mr. Mason.  Hold on.
18         MR. MASON:  It's not even necessary, Your Honor.  I
19    take counsel's word.  And frankly, the report that I got from
20    my own counsel was similar to what Mr. Stern said.  I only
21    raised it because of Your Honor's comments --
22         THE COURT:  Oh, I just called it a modified -- a -- I
23    -- because it was in response to a note saying the jury was
24    hung.  That's why I used the word "Allen" in talking about
25    what we asked of them.
```

August 3, 2022

32



```
 1              MR. MASON:  Okay.
 2              THE COURT:  It's one -- it's like four sentences or
 3    three -- it was not much.
 4              MR. MASON:  Okay.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

August 3, 2022

33



August 3, 2022                                                              34



21          THE COURT:  All right.  So let's go -- just another

22    item to briefly mention is that counsel have informed me that

23    you're coming up with a stipulation regarding post-trial

24    motions that would address briefing and handling of the

25    motions for judgment as a matter of law.

August 3, 2022

1    The three motions that are pending right now.  One

2    from plaintiffs to one each from the defendants.  And so I'll

3    be looking forward to that.  That there may be some way to

4    consolidate the briefing on post-trial motions.



22    And the other thing is we got a phone call through

23    Dave Ashenfelter, the public information officer for the

24    Court, that the media had -- a member of the media thought

25    that there was reliable -- he had a reliable source or sources

1   saying that the jury is deadlocked.  And would we confirm

2   that.  And we did not confirm it.

3           I didn't think that would be a helpful think for the

4   -- he said he had three reliable sources.  But that came in on

5   Friday, I think, and there's no article.  So I don't know how

6   reliable it was, because we didn't confirm or deny it and only

7   wrote back and said -- well, Dave Ashenfelter wrote back to

8   say that there would be no further jury notes docketed this

9   week.

10          So that's all we said.

11          MR. STERN:  Your Honor, I received a call from the

12  media about that.  And I actually took great effort to dispel

13  what they said.  I said, "We don't know what's going on in the

14  jury room.  We get notes all the time.  They've been at it for

15  20 hours.  They've been at it for five days."

16          And I don't know -- see, I was confronted with the

17  same question.  "We've got information that the jury's

18  deadlocked, and there's a mistrial."  And I said, "Just slow

19  down.  I have no idea where -- I wish I was back there with

20  them and then I would be able to provide you with real

21  information.  But at this point, if you print anything like

22  that, it would be" -- the word I used was "premature and

23  regrettable" is what I said, so.

24          THE COURT:  Okay.

25          MR. MASON:  I received a similar inquiry and told

```
 1   them we had no comment at all.  All I would say is the jury is
 2   continuing to deliberate on August 9.
 3              THE COURT:  Okay.  Good.
 4              Mr. Campbell, did the Veolia Flint Facts put that out
 5   on Twitter?
 6              MR. CAMPBELL:  I've never seen the Veolia Flint
 7   Facts, Your Honor.
 8              THE COURT:  I have.
 9              MR. CAMPBELL:  I didn't make any comment to any
10   media.  I've never made any comment to any media.
11              THE COURT:  I think this is the one occasion that I
12   would ask that you advise the Veolia Flint Facts that the
13   judge would be very disappointed to see that on the Twitter
14   feed.
15              I mean, there have been extremely inflammatory
16   things.  I know you've never seen it.  Mr. Stein's never seen
17   it.  You all don't know how to log on to Twitter and so on.
18   But I do.  And I've looked at it.  And it's not complimentary
19   to any of us but you all for Veolia.
20              But -- and that's okay.  It's okay.  But I think it
21   would not help the progress of our trial for your client to
22   Tweet the jury notes and so on.
23              MR. CAMPBELL:  Okay.  Understood.
24              THE COURT:  So let's go to supplementing the record.
25   Thank you for the correspondence.  And here is my perspective
```

1    on this.  I have looked at the Federal Rule of Appellate

2    Procedure 10(e) about "Correction Or Modification of the

3    Record."

4           And I don't think this entire list is what's

5    contemplated by that rule of appellate procedure.  But rather

6    there are some things on here that I think should be on the

7    record.

8           And I also see a significant qualitative difference

9    between the clip reports and all of this email correspondence

10   and so on.

11          And that is that the clip reports, I instructed

12   Jeseca that she did not need to take down the video deposition

13   testimony.  And that is because we had the video with the

14   transcript running simultaneously.  And so that would

15   substitute in as the record during all of the many video

16   depositions that were played.

17          And so we -- that's what the clip reports will

18   represent.  They are the transcript of that -- they are the

19   trial record of those -- that testimony.  And so that clearly

20   needs to be in the record and available for all of the appeals

21   that may follow.

22          And so that's not the same as now saying we want

23   correspondence regarding a witness that VNA chose not to call

24   such as Brian Clarke.

25          So here's my perspective.  Let's start with the jury

```
 1    instructions and verdict form.  We will absolutely have the
 2    final jury instructions on the docket.  We can do that now.  I
 3    don't have any problem with that.
 4         And the only reason I haven't docketed the verdict
 5    form at this time is that I didn't want some individual to
 6    print it out, fill it out, and put it on in the public domain
 7    as the verdict form and just have that misinformation out
 8    there.
 9         That's the only reason that the verdict form is not
10    on the docket.
11         Knowing that, do you all want it on the docket now?
12         MR. STERN:  No.
13         THE COURT:  No.  Of course not.
14         Do you, Mr. Campbell?
15         MR. CAMPBELL:  It doesn't have to be on the docket
16    now, Your Honor.
17         THE COURT:  Right.
18         MR. CAMPBELL:  It needs to be on the docket.  And how
19    we got there needs to be on the docket, as well.
20         THE COURT:  And it is.  Let me tell you how.  You
21    filed your proposed jury instructions on the docket.  They are
22    there.  I then modified -- took into consideration LAN's,
23    VNA's, and plaintiffs', and wrote some of my own.
24         And we then had a hearing on July 18 of 2022, that
25    went until 6:00 P.M. at night and started at 10:00.  ████████
```

1  ████████████████████████████████████████████

2  ████████████

3       And literally no one was cut off at any time from

4  placing on the record the objections and counterproposals that

5  you had.  That is the record.  And it is ample and voluminous.

6  And no one was stopped at any point from saying, "I disagree."

7       And believe me, Mr. Nguyen-Dang was terrific, stellar

8  in his capacity to get a high volume of material on the record

9  for VNA that day.  And so was Mr. Wittie, Mr. Mason, Mr. Kent.

10  Mr. Kent had corrected things that we all missed that day and

11  found them and put them on the record.

12       So I will put the final jury instructions on the

13  record.  And if you want that done today, let me know.

14       MR. CAMPBELL:  Again, Your Honor, it's not the today

15  or tomorrow is the issue.  It's the final.  And in our view,

16  how we got there needs to be on there.

17       I know we had a hearing on it.  It was an extensive

18  hearing, and I think you described it accurately.  But still

19  in all, we need to have on the record how we got from the

20  starting point from each of the three parties to the final

21  situation particularly on the jury instructions.

22       THE COURT:  Okay.

23       MR. CAMPBELL:  So we believe admissions are part of

24  the record, and we're hoping that Your Honor will accept them

25  and that we don't have to wait until the appellate process to

1    make that happen.

2            MR. STERN:  Judge, we filed motions in limine at some

3    point in time that Your Honor ruled on.  Some were granted.

4    Some were denied.  The motion itself is on file.  The Court's

5    order on the motion is on file.  And we don't need to

6    subsequently supplement the record to explain to the appellate

7    division how we got there.

8            The record shows how we got there.  There was a

9    motion filed that ECF number blank.  There was a response.

10   There was a reply, and there was an order.

11           Much of what's being contemplated in these

12   supplementing the record are things that are already on the

13   record.  This is -- this is -- we have no problem

14   supplementing the record in an appropriate way.

15           But to supplement a record that's already there is

16   confusing.  It's duplicative.  And if we're going to

17   supplement with email communications and with emails from the

18   court, we need to have an opportunity to actually look at all

19   the emails.

20           Because we found in a number of places at least where

21   the only things that were included in the request to

22   supplement were from VNA and didn't include either responsive

23   emails from us or further emails from the court.

24           And so it's not as though when VNA files this or

25   sends this email that everyone needs to snap to-to and jump to

```
 1    say yes or no.  I mean, there's more to this supplementation
 2    than just an email from Ms. Devine.
 3              So we don't think there needs to be further
 4    supplementation for items that have already been docketed.
 5              And to the extent we're going to supplement or agree
 6    to supplement the record based on various communications that
 7    went back and forth to the Court, we need the opportunity to
 8    actually look at the complete picture of those communications
 9    and not just say, "Yes, let's go ahead and file on the record
10    all the things that VNA thinks are important to file."
11              THE COURT:  Okay.  ECF 893 is the final instructions
12    are on the docket already.  Bill docketed them on July 21.  So
13    it's granted.  That request is granted already.  The final
14    verdict form will go on -- we will redact the name of the jury
15    foreperson to conform to the rules.
16              But otherwise, it will be there, and it will be in
17    its completed form.
18              And in terms of all of the other email
19    correspondence, if you look at the issue of the Fifth
20    Amendment, I'm denying your request for emails from Campbell
21    and Stern and various things the way they're identified here.
22              Because what we had was a robust and fulsome docket
23    on this issue.  And I learned a great deal.  You all briefed
24    the issues.  The five witnesses each had counsel and briefed
25    the issue.  We had two-and-a-half-hour or something oral
```

1    argument on a Friday morning when the jury was not in session.

2          That is the record.  That is the record that you made

3    at the time.  And I would hesitate to say that as those

4    letters he went back and forth and were reviewed, I think VNA

5    sharpened its arguments.

6          Some of the -- so that -- the problem with those is

7    that was not the adversarial process, because the five

8    witnesses weren't sending me letters.

9          And so we don't have their response to those letters.

10   But where we have all of that is on the record.  That's what

11   you want, and that's what you have, and you should have it.

12   You should have all of that for the appeal.  And you also had

13   the opportunity to brief the issue at the Court of Appeals

14   already.

15          It's done at our level, and it's there.

16          I know that the procedure and the process that was

17   followed was not argued at the Court of Appeals.  To my great

18   chagrin it was not raised as something that we need direction

19   from the Court of Appeals.  But that all went to mootness that

20   was being debated so rigorously there.

21          But so I'm just denying your request with respect to

22   the Fifth Amendment.

23          Many of these letters are attached to your briefs

24   already.  They're in the record.  You made choices of what to

25   attach to your briefs.  And often you attached these letters.

1   So -- and emails and so on.

2         Also with respect to the procedure that was followed

3   with the Fifth Amendment witnesses, there was oral argument.

4   And Mr. Campbell in particular was -- you were animated in

5   your opposition to the decision I made, and you were permitted

6   to -- as you should have been for your client.

7         And you put all of that on the record, and it's

8   there.  So I cannot see any way in which this is what Rule

9   10(E) of the Federal Rules of Appellate Procedure require or

10  even suggest is appropriate.  And -- yeah.

11        MR. CAMPBELL:  Your Honor, we simply disagree

12  respectfully with that decision.  And the issues are not just

13  the jury instructions and the final.  It's how we got there.

14  We did certainly have extensive argument.  But not everything

15  that was in the papers makes it into the oral argument.

16        So that's one aspect of things.

17        THE COURT:  I disagree.  Let me just interrupt you.

18        I disagree on that, because we went page by page

19  through the instructions.  Any corrections, changes,

20  deletions, or argument here?  Next page, next page.  And --

21        MR. CAMPBELL:  We did that, and it didn't -- you

22  know, I don't know what more I can say other than there is

23  information and argumentative positions that are set forth

24  that didn't make it into the argument.

25        That it's routine, I think, to have the backing

1    information up to the point of the decisionmaking.  And the

2    jury instructions are kind of one avenue here.  I mean,

3    there's many, many different aspects of this.

4          As to the Fifth Amendment, we -- a lot of it was put

5    into letter briefing and where -- I can't bring to mind

6    anything in particular as to the Fifth Amendment.

7          But on many of these things, we were prohibited and

8    directed not to file them on the docket and on the record so

9    that the record that was being created was in the materials

10   that we now seek to become part of the record that makes it

11   into the decision-making process.

12         I think the one that is most important or among the

13   most important is, yes, the clip reports certainly represent

14   the final testimony that was played to the jury.  And that

15   needs to be part of the record.

16         But the portions of the depositions that were

17   submitted for Your Honor's review and both allowed -- someone

18   -- one of the parties might have an objection to what was

19   allowed over objection.

20         And, you know, using Governor Snyder's examination as

21   something that comes to mind, virtually the entire examination

22   by VNA was excluded by Your Honor.  And the only way we get

23   that on the record is to have the submissions that we made and

24   the matrices that Your Honor ruled on that resulted in the

25   final material that was played to the jury.

1             It's part of the record.  I mean --

2             THE COURT:  I agree.  You can save the energy for the

3     next argument.  Because I agree.  That the matrices -- one of

4     the reasons I took the time to handwrite some of my reasons

5     for rulings on the many thousands of pages was so that that

6     would be in the record.

7             That somebody might be saying hearsay.  Somebody

8     might be saying more prejudicial than probative.  Somebody

9     might be saying beyond the scope of the expert.  And I also

10    thought this is inflammatory and prejudicial.  You know,

11    something like that.

12            So I handwrote all of that just for this purpose so

13    that it would be evident to the Court of Appeals what the

14    basis of my ruling on the objection was.

15            So I agree with you and haven't quite realized that

16    none of that was in the record yet.

17            Does plaintiff have any objection to those matrices

18    being filed so that it's evident.  In court, it would be on

19    the record.  We'd have the live witness.  We'd have the

20    objection, ruling, etcetera.

21            MR. STERN:  Not at all.

22            THE COURT:  Okay.  And then that raises the question

23    Mr. Campbell just brought up is I would -- in the ordinary

24    course, you'd have a question, and you'd have an objection,

25    but you wouldn't have the answer to the question also in the

     1   record.

     2           Because the ruling, if it's going to be excluded,

     3   would be made before the answer is given hopefully.

     4           So what is everyone's position on docketing the full

     5   transcript?

     6           MR. CAMPBELL:  What I would say to that, Your Honor,

     7   I'm not sure that I agree that that's what happens when people

     8   testify live.  But when you have the answer there, you know

     9   what the answer is.

    10           And I believe early on in the process, you actually

    11   made reference to that reality when it comes to deposition

    12   testimony.  So I think to the extent the question is whether

    13   we include the transcripts, I think we have to in order to

    14   understand the matrices what is being -- what was proposed and

    15   what was allowed and excluded.

    16           If I could just go back to the Fifth Amendment issue

    17   just for one moment just to make the statement.  Last week,

    18   the plaintiffs, I believe, filed or sought to have part of the

    19   record, three of the letter briefs that they wrote regarding

    20   Fifth Amendment issues to be part of the docket, so.

    21           MR. STERN:  We -- the only reason that we ever

    22   considered doing that is because there was a point in time

    23   where Your Honor said there were certain things to file on the

    24   docket.

    25           So we took note of each of those instances and were

1    preparing to file on the docket whatever those various things

2    were that Her Honor said.  So we're not taking a contrary

3    position.  We -- we're following the -- as we have done

4    throughout the trial, we're trying to follow the Court's

5    instructions.

6          And there were at least two instances during trial

7    not where the Court said, "Don't file."  I challenge anybody

8    to find me in the record where the Court said, "Do not file

9    this on the docket."  But there was at least one or two

10   instances where Her Honor said to file it.

11         And this was one of those instances.

12         So we can find that part of the transcript and cite

13   to it.  But that's not contrary to our position on the

14   supplementation generally.

15         THE COURT:  So but, Mr. Stern, what's your position

16   on the transcripts being filed --

17         MR. STERN:  It doesn't matter to us.  You know, Your

18   Honor ruled.  I think that whether it's the whole transcript

19   or the portions of the transcript that were designated and

20   ruled upon, obviously if this is going up on appeal, the Court

21   of Appeals needs to understand what the questions were or what

22   the testimony was, what the objections was and what the ruling

23   was.

24         So I can't take a position that they only get part of

25   that story.  How we do that, though, is not necessarily just

1    filing transcripts on the record. There may be some things in

2    transcripts that shouldn't be public.

3            I mean, Miguel Del Toral's transcript and folks

4    leading up to Miguel Del Toral's transcript have significant

5    commentary and information about a serious health issue that

6    he has.

7            And as much as he might not care that that's on the

8    docket at the time that he was deposed, "I'm an open book,

9    whatever. I'm an open book. Nothing to hide," I've

10   interacted with Miguel Del Toral enough to know in the last

11   six months that he's not the same guy that he was when he was

12   deposed.

13           And I don't want to be responsible for putting on the

14   public record a deposition of somebody wherein that deposition

15   there's a health issue that I would never want anybody to know

16   about myself.

17           So it's not as easy as just filing on the docket all

18   the transcripts that go with the objections and the

19   designations and the rulings. I think we need to be

20   thoughtful about it. I think that it might be beneficial to,

21   as we all highlighted the transcripts and sent to Your Honor

22   various highlighted portions, perhaps only the highlighted

23   portions make their way to the record.

24           But I would just be careful of blanket filing

25   depositions on the record that contain things that may not be

1    for the public to see.

2              THE COURT:  Yeah.  There may be some way that that

3    can be filed under seal, because the fact is we now have

4    answers to questions that were ruled inadmissible.  And so --

5    but we need the questions for sure.

6              MR. STERN:  Sure.

7              THE COURT:  And, you know, the Court of Appeals is

8    capable of understanding that these -- you can't read the

9    answer to decide if the question is -- calls for admissible

10   testimony.

11             MR. STERN:  Fundamentally we do not object --

12             THE COURT:  Okay.

13             MR. STERN:  -- to the questions, the answers, the

14   designations and the rulings being part of the record.

15             Whether that means the universe of every deposition

16   needs to go on the record or how it's placed on the record is

17   a different conversation.  But to the main point that

18   Mr. Campbell has made that to file an appeal based on those

19   rulings requires a lot more information than presently is on

20   the record, we do not dispute that.

21             THE COURT:  Okay.  So what we'll do is I'll ask you

22   to come up -- to meet and confer and come up with a way of

23   doing that.

24             MR. STERN:  Sure.

25             MR. CAMPBELL:  We can do that, Your Honor.  And if

1    there was a special circumstance like the situation with

2    Mr. Del Toral, that can be worked out.  I think those are in

3    the distinct minority for what we're dealing with here, but

4    certainly we can address that kind of thing.

5            MR. STERN:  Well, if I may, there's other things like

6    -- listen, I don't love Marc Edwards's testimony.  Everybody

7    knows that.  We did designations.  We fought over it.

8            But there's some inflammatory stuff that's in that

9    deposition that led in part, perhaps, to liable and slander

10   lawsuits being filed in federal court between Flint citizens

11   and Dr. Edwards.

12           I'm trying to protect the integrity of the record and

13   everybody's appeal.  But at the same time, I don't want to

14   answer questions from Mel Jones or from Ron Fonger about the

15   time Dr. Edwards cussed people out during his deposition,

16   because he has a bone to pick with the government or whatever

17   his issue is.

18           So it's not just serious medical health issues.  It's

19   trying to avoid issues that don't need to be raised publicly.

20           THE COURT:  I think the Marc Edwards is a serious

21   situation.  I don't know -- I mean, his -- that slander case

22   that he filed in federal court and got a 90-page decision

23   dismissing it, I don't know if that's on appeal.

24           But what my thought is, is that perhaps the

25   transcripts with the answers should be sealed.

```
 1              MR. STERN:  Yeah.

 2              THE COURT:  It's just not testimony that would be in

 3     the public domain.

 4              MR. STERN:  Yes.

 5              THE COURT:  But the -- definitely the objection --

 6     you know, the Court of Appeals will become very familiar with

 7     my handwriting.

 8              MR. STERN:  As we all are.

 9              THE COURT:  And I got a better pen.  I didn't have to

10     press as hard, and so I wrote more.  So as time went on, you

11     saw a lot more notations from me.

12              Okay.  So that covers all the -- but the transcripts

13     for people who -- the Khadija Walker, I did rule on her.

14     That's right.  It's just that I ruled almost all of it was

15     inadmissible.  Yeah.  Okay.

16              I just -- the one that I think does not -- there's no

17     reason to have anybody who's -- the correspondence about Brian

18     Clarke.  Oh, you're not seeking to have his -- oh, because he

19     was going to be live.  Okay.  Never mind.

20              MR. STERN:  I mean, there's, like, Charles Lawrence.

21     There's a request for -- I mean, his deposition wasn't even

22     played.

23              THE COURT:  Right.  So we will just -- you opted not

24     to call him, Mr. Campbell.

25              MR. CAMPBELL:  I had no intention ever of calling
```

```
 1   Mr. Lawrence.  So I don't know --
 2            THE COURT:  Then why do you want his deposition
 3   transcript in the record?  You're listing it.  What?
 4            MR. CAMPBELL:  I'm sorry, Your Honor.  This was a
 5   letter that Ms. Devine put together.  And I think it's limited
 6   stuff, and I don't know why Mr. Lawrence would be on there or
 7   not.  I do know that he was somebody that was not called.
 8            THE COURT:  Okay.  It was signed by you.  But I
 9   understand.  There's a lot going on.
10            MR. CAMPBELL:  You know, I -- perhaps I made a
11   mistake there.  I don't know.
12            THE COURT:  That's okay.
13            MR. CAMPBELL:  I don't know if everyone else make
14   mistakes.
15            THE COURT:  I make more than the average person.
16   So --
17            MR. STERN:  So will we have an opportunity to go
18   through all of these -- there's an extensive list of things
19   that need -- that VNA requests be supplemented.  And I
20   understand that Your Honor's addressing some of the big ticket
21   items.
22            But we just haven't had an opportunity to really dig
23   into some of these -- I mean, emails.  Like there's the --
24            THE COURT:  Well, I'm not -- we're not docketing
25   emails.
```

```
 1                MR. STERN:  Okay.

 2                THE COURT:  These issues were argued on the record

 3      exhaustively.

 4                MR. STERN:  Okay.

 5                THE COURT:  And in many instances, were attached to

 6      motions in limine and other motions.  So there's just no

 7      reason for this.  So I think I've covered everything.  We

 8      covered the depositions.  We covered the Fifth Amendment, the

 9      jury instructions.  The nonparty at fault, all of that is

10      argued on the record and in the jury instruction.

11                There's very full debate during the jury instructions

12      about jury instruction conference on the record about that

13      issue.  So I don't see any reason to add things after the

14      record was closed other than what we've talked about.

15                Oh, Mr. Kent.

16                MR. KENT:  Your Honor, if I may just add a short

17      comment.  And that is I agree with Mr. Campbell that a lot of

18      the things that -- and this is just in general, not a specific

19      item.

20                But a lot of the things that were submitted by email

21      were done, because we understood that's what we were -- the

22      Court wanted.  Letter briefs submitted to Ms. Calhoun as

23      opposed to things through the ECF PACER.

24                And I don't know if we have, in fact , covered

25      everything on the record that would appear on an appellate
```

1   docket that should be there.  I concur with Mr. Stern there

2   may be things where there were extensive debates through the

3   letter briefs that probably should qualify.

4          I can't identify any in particular for you.  So

5   before you make a final, "Hey, the record's closed, there's

6   nothing else," we may -- either side, either Mr. Stern or we

7   might say, "Wait a minute.  There really is something that was

8   only done through Ms. Calhoun that probably should be part of

9   the record."

10         I know we did an awful lot through PACER.  I know we

11  did an awful lot through oral arguments, through the charge

12  conference, and things like that.

13         MR. STERN:  So the one instance, Your Honor, where

14  Your Honor asked us to docket something, the transcript

15  citation is at transcript page 6381.

16         And the quote from Your Honor was, "The parties in

17  our bellwether trial have submitted letter briefs to the

18  Court, which I now encourage you to file on the docket, so

19  they can be an official part of the record in our case."

20         That's Trial Transcript 6381.  And so last week, what

21  we filed was ECF 694, which was the letter brief that

22  comported to Your Honor's instruction from back in June, I

23  think it was, or -- I think it was June.

24         And so we were merely following those instructions.

25  So if there's something in the transcript from the trial where

```
 1    the Court requested us to file a letter brief on the record, I
 2    think it's totally appropriate to do so, you know, and perhaps
 3    we all should have done it sooner.
 4          But we'll just follow the Court's instruction.  But
 5    short of an instruction from the Court to file something on
 6    the record, I think the process is to seek leave to supplement
 7    and then to have Your Honor rule on each of these things as
 8    you've done.
 9          MR. CAMPBELL:  Your Honor, we were -- as I recall it,
10    you know, multiple times through the course of the trial and
11    perhaps even before the trial, directed not to put things on
12    the ECF filings and directed specifically to do the briefing
13    by way of letter briefing or emails --
14          THE COURT:  And that's why I then said, "If there are
15    significant letter briefs that you want to file, do it now."
16          But a lot of those emails were things like who will
17    be the witness on Monday?  I mean, you don't -- we don't need
18    that on the record.
19          MR. CAMPBELL:  No, we don't need that.  And that's
20    not what I'm talking about.
21          THE COURT:  Okay.
22          MR. CAMPBELL:  I think is significant briefing like
23    the ones just referenced for the Fifth Amendment, significant
24    submissions regarding the OIG report or the task force report.
25          I'm just going through some of the things that were
```

1    evidentiary issues through the course of the trial.  And I

2    just -- when we're instructed not to put it on the ECF filing

3    or do the regular briefing and specifically directed to use

4    this process by which Your Honor makes decisions, the

5    submissions that go into Your Honor's decision-making have to

6    be -- are part of the record.

7            That's where we're at.  Not everything had full

8    argument.  And even when there is a full argument, the

9    briefing in the ordinary course is part of the record, so.

10           MR. STERN:  So what I would suggest is if there's a

11   part of the record that instructs the parties to file

12   something, we ought to file those things.  If there's

13   somewhere in the record where the Court instructed all of us

14   not to file something on the record before I think on a

15   document-by-document basis, I'd love to see that.  I'd love to

16   see where that is in the record.

17           And then a decision can be made about whether it's

18   been either attached to a pleading that's already in the

19   record or was argued or -- you know, there's other ways that

20   it may already be in the record.  But to just blanket

21   supplement because of some blanket statement that many times

22   Your Honor said, "Don't file on the docket," that seems a

23   little loose and not what the federal rules call for.

24           THE COURT:  Okay.  Here's -- we need to wrap this up,

25   because I'm sure Judge Grand is now -- we don't want him to

```
 1    run for the woods right now and say, "Never mind.  I'm not
 2    available next week."
 3              HONORABLE JUDGE GRAND:  I'm okay.  No problem.
 4              THE COURT:  Okay.  Thank you.  But also I have a
 5    sentencing coming up shortly, and I have to be there.
 6              So, Mr. Campbell, if there are -- if there are things
 7    that you think should have been on the record that were not
 8    discussed in court, which I cannot think of a single --
 9    nothing on your July 29 letter qualifies for that, except I
10    absolutely agree about the jury instructions verdict form, the
11    deposition transcripts, and the rulings on the objections.
12              But please go back to the transcript, find out if I
13    prohibited you from doing this or if I permitted it, and let
14    me know based on that.  Or file a motion based on --
15              MR. CAMPBELL:  We preserve -- well, we'll try to
16    refine it so that everyone knows precisely what -- and
17    hopefully eliminate any of my errors in the listing here.
18              And we will be precise as to what exactly letter
19    briefing we're looking to have Your Honor agree to.  And you
20    know, if -- ultimately it's an appellate issue in itself.
21              But at the end of the day, you know, just another one
22    that comes to mind was towards the end of the trial.  And the
23    briefing that we submitted regarding the use of the amended
24    complaint and the admissions contained in it --
25              THE COURT:  That's on here.
```

```
 1          MR. CAMPBELL:  Precluded that evidence.  And that
 2  saved, in our view, a significant legal and potential
 3  appellate issue.  And that's all referenced in letter briefing
 4  that wasn't part of the record.
 5          THE COURT:  It was argued.  It was argued in court.
 6  And I don't think it matters that the -- whether the jury -- I
 7  mean whether the Court of Appeals sees the highlighted
 8  rendition.
 9          They -- it's very evident from the oral argument that
10  you wanted the allegations, all of the allegations read to the
11  jury regarding the nonparties, not the allegations about your
12  client understandably.  Not the suffering alleged by the
13  plaintiffs understandably.
14          But you were seeking all of that.  So it's evident
15  what it is.  And the amended complaint, it's on the docket.
16          MR. CAMPBELL:  I know that --
17          THE COURT:  The Court of Appeals can go right to you.
18          MR. CAMPBELL:  But at your direction, we put together
19  a paragraph-by-paragraph analysis of exactly which ones we
20  wand to use, the reasons for it.  That was not discussed on
21  the record.  And the argument was cut short after a paragraph
22  or two.
23          So in order to make a fulsome record of exactly what
24  we wanted, exactly the reasons why we wanted them, and exactly
25  the statements that we made to the Court about why they were
```

 1   admissible, indeed that piece of paper needs to be part of the

 2   record.

 3            Just like it was a brief.  Because that's how it was

 4   -- that was the procedure that we're on.

 5            THE COURT:  All right.

 6            MR. STERN:  I just want to know when it comes to the

 7   amended complaint that the complaint wasn't highlighted on --

 8   in 2018 when it was amended.  It wasn't submitted and

 9   highlighted form by anybody until July 1, 2022.

10            I just don't understand why we're filing all this

11   stuff on the record when it's been vetted and discussed and

12   briefed, like, over and over and over again.

13            MR. CAMPBELL:  Because we don't believe that it has

14   been and that the additional information and basis for

15   potential appellate issues are contained in the writings.  And

16   the -- certainly the amended complaint is a very specific

17   example of detailed information that was not at all discussed

18   on the record.

19            But you know, the issue was pointed out.

20            THE COURT:  All right.  And that may be -- file -- I

21   think filing the motion at this point is a very good idea.

22   And I can take a look at it and the law in more detail than

23   just, you know, reading one case and --

24            MR. STERN:  But before VNA does that, it's already on

25   the record at ECF 880.  It's on the docket.  Like, I don't

1    understand what's being supplemented.

2           THE COURT:  Oh.  I don't either.  I'm going to look

3    at 880.  Just a minute.  And so many of the letters were

4    exhibits.

5           Oh, Mr. Campbell, it is there.  Notice by VNA.  It

6    was filed by Ms. Devine.  Good.  So it's -- you're set with

7    that.  No need to worry about that one.  A 222-page exhibit is

8    attached.  But I'm -- which is why it's taking me so long.

9           MR. STERN:  That's the amended complaint with the

10   highlighted -- that's what it is.

11          THE COURT:  Yeah.  Statement of issues presented.

12   It's thoroughly briefed with all of the cases.

13          Mr. Campbell, would you agree that that's covered?

14   It's got all of your chart with the argument paragraph by

15   paragraph.  VNA's arguments for admission.  Every -- there's a

16   total of 312 pages of your argument.

17          Would that be satisfactory?

18          MR. CAMPBELL:  Your Honor, I don't have access to the

19   docket.  But you seem like you're describing the piece of

20   paper that I wanted to be part of the record.  And that's a

21   great example of why the rest of this needs to be part of the

22   record.

23          And just because that one is there doesn't preclude

24   the rest of all the letter briefing that we did through five

25   and six months of trial.  And if that one made it on to the

```
 1    record, that's great.
 2              MR. STERN:  I would just suggest before we file any
 3    motions that we have to respond to that anything the
 4    defendants collectively think should be on the record, that we
 5    confirm it's not on the record before we spend any more time
 6    and energy briefing any of these issues.
 7              Because had a motion just been filed and we had 28
 8    days to respond, we would have put hours into responding to a
 9    motion for something that's already on file.  So I know how
10    busy we all are, but I would suggest that anything that needs
11    to be supplemented, we check first to make sure that it's not
12    already there.
13              MR. CAMPBELL:  And you would have immediately just
14    picked up the phone just like you just did and say, "Hey, Jim,
15    it's really number 880, so you don't need to worry about that
16    one."
17              MR. STERN:  I would have if I didn't have somebody
18    here telling me in realtime --
19              THE COURT:  Time out, Mr. Stern.  Stern, time out.
20              Okay.  Thank you, all, for this delightful time
21    together.  I'm looking forward to more.
22    ███████████████████████████████
23              THE COURT:  ████████████████████████████████
24              And you're in fantastic hands with Judge Grand.  ████████
25    █████████████████████████████████████████████████████████████
```



1
2
3
4
5
6
7
8
9
10

11                    (Proceedings Concluded)

12                -         -         -

13

14         CERTIFICATE OF OFFICIAL COURT REPORTER

15     I, Jeseca C. Eddington, Federal Official Court

16 Reporter, do hereby certify the foregoing 63 pages are a true

17 and correct transcript of the above entitled proceedings.

18 /s/ JESECA C. EDDINGTON_____          08/03/2022
   Jeseca C. Eddington, RDR, RMR, CRR, FCRR      Date
19

20

21

22

23

24

25