# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: November 08, 2022

Mr. Timothy S. Bishop
Mayer Brown
71 S. Wacker Drive
Chicago, IL 60606

Mr. Philip A. Erickson
Plunkett Cooney
101 N. Washington Square
Suite 1200
Lansing, MI 48933

Mr. Gerald K. Evelyn
Evelyn Law
300 River Place
Suite 3000
Detroit, MI 48207

Mr. Gaetan E. Gerville-Reache
Warner Norcross & Judd
150 Ottawa Avenue, N.W.
Suite 1500
Grand Rapids, MI 49503

Ms. Stephanie Franxman Kessler
Pinales, Stachler, Young & Burrell
455 Delta Avenue
Suite 105
Cincinnati, OH 45226

Mr. Michael E. Lackey Jr.
Mayer Brown
1999 K Street, N.W.
Washington, DC 20006

Mr. Brian P. Lennon
Warner Norcross & Judd
150 Ottawa Avenue, N.W.
Suite 1500
Grand Rapids, MI 49503

Mr. Anastase Markou
Levine & Levine
136 E. Michigan Avenue
14th Floor
Kalamazoo, MI 49007

Mr. Juan A. Mateo Jr.
Mr. T. Santino Mateo
Mateo Law
300 River Place, Suite 3000
Detroit, MI 48207

Ms. Sarissa Klein Montague
Levine & Levine
136 E. Michigan Avenue
14th Floor
Kalamazoo, MI 49007

Mr. William James Murphy
Zuckerman Spaeder
100 E. Pratt Street, Suite 2440
Baltimore, MD 21202

Mr. Minh Nguyen-Dang
Mayer Brown
1999 K Street, N.W.
Washington, DC 20006

Mr. Charles Robert Quigg
Warner Norcross & Judd
150 Ottawa Avenue, N.W., Suite 1500
Grand Rapids, MI 49503

Mr. Michael A. Rataj
500 Griswold Street, Suite 2450
Detroit, MI 48226

Mr. Bryan M. Reines
Zuckerman Spaeder
1800 M Street, N.W., Suite 1000
Washington, DC 20036-5802

Mr. Alexander Stephen Rusek
Foster, Swift, Collins & Smith
313 S. Washington Square
Lansing, MI 48933

Mr. Corey M. Stern
Levy Konigsberg
605 Third Avenue, 33rd Floor
New York, NY 10158

Mr. William W. Swor
500 Griswold Street, Suite 2450
Detroit, MI 48226

Mr. Sherman Vance Wittie
Faegre Drinker Biddle & Reath
1717 Main Street, Suite 5400
Dallas, TX 75201-7367

> Re:    Case No. 22-1353/1355/1357/1358/1360, *Leanne Walters, et al v. Richard Snyder, et al*
> Originating Case No. : 5:17-cv-10164

Dear Counsel,

The court today announced its decision in the above-styled cases.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

> Yours very truly,
>
> Deborah S. Hunt, Clerk
>
> Cathryn Lovely
> Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0236p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

IN RE:  FLINT WATER CASES.

———————————————————————

LEE-ANNE WALTERS, et al.,

*Plaintiffs*,

E.S.; A.T.; R.V.; D.W.,

*Plaintiffs-Appellees*,

　　　*v.*

RICHARD DALE SNYDER (22-1353); DARNELL EARLEY (22-1355); RICHARD BAIRD (22-1357); HOWARD D. CROFT (22-1358); GERALD AMBROSE (22-1360),

*Defendants-Appellants*,

VEOLIA NORTH AMERICA, LLC; VEOLIA NORTH AMERICA, INC.; VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC; LOCKWOOD, ANDREWS & NEWMAN, P.C.; LOCKWOOD, ANDREWS & NEWMAN, INC.; LEO A. DALY COMPANY,

*Defendants-Appellees*.

Nos. 22-1353/1355/1357/1358/1360

———————————

Appeal from the United States District Court for the Eastern District of Michigan at Ann Arbor.
No. 5:17-cv-10164—Judith E. Levy, District Judge.

Argued:  July 28, 2022

Decided and Filed:  November 8, 2022

Before:  MOORE, GRIFFIN, and THAPAR, Circuit Judges.

Nos. 22-1353/1355/1357/1358/1360     *Walters, et al.  v. Richard Snyder, et al.*          Page 2

—————————

## COUNSEL

**ARGUED:**  Charles R. Quigg, WARNER NORCROSS + JUDD, LLP, Grand Rapids, Michigan, for Appellant Richard Snyder.  Juan A. Mateo, Detroit, Michigan, for Appellant Darnell Earley.   Sarissa K. Montague, LEVINE & LEVINE, Kalamazoo, Michigan, for Appellant Richard Baird.  Alexander S. Rusek, RUSEK LAW PLLC, Lansing, Michigan, for Appellant Howard D. Croft.  William W. Swor, WILLIAM W. SWOR, Detroit, Michigan, for Appellant Gerald Ambrose.  Minh Nguyen-Dang, MAYER BROWN LLP, Washington, D.C., for Veolia Appellees.  S. Vance Wittie, FAEGRE DRINKER BIDDLE & REATH, LLP, Dallas, Texas, for Appellees Lockwood, Andrews and Newman, Inc. and Leo A. Daly Company. **ON BRIEF:**  Charles R. Quigg, Brian P. Lennon, Gaëtan E. Gerville-Réache, WARNER NORCROSS + JUDD, LLP, Grand Rapids, Michigan, for Appellant Richard Snyder.  Juan A. Mateo, Gerald K. Evelyn, T. Santino Mateo, Detroit, Michigan, for Appellant Darnell Earley. Sarissa K. Montague, Anastase Markou, LEVINE & LEVINE, Kalamazoo, Michigan, for Appellant Richard Baird.  Alexander S. Rusek, RUSEK LAW PLLC, Lansing, Michigan, for Appellant Howard D. Croft.  William W. Swor, Michael A. Rataj, WILLIAM W. SWOR, Detroit, Michigan, for Appellant Gerald Ambrose.  Minh Nguyen-Dang, Michael E. Lackey, Jr., MAYER BROWN LLP, Washington, D.C., Timothy S. Bishop, MAYER BROWN LLP, Chicago, Illinois, for Veolia Appellees.  S. Vance Wittie, FAEGRE DRINKER BIDDLE & REATH, LLP, Dallas, Texas, Philip A. Erickson, PLUNKETT COONEY, Lansing, Michigan, for Appellees Lockwood, Andrews and Newman, Inc. and Leo A. Daly Company.  Corey Stern, LEVY KONIGSBERG LLP, New York, New York, for Plaintiff Appellees. Stephanie Franxman Kessler, PINALES, STACHLER, YOUNG & BURRELL, CO., L.P.A., Cincinnati, Ohio, William J. Murphy, ZUCKERMAN SPAEDER LLP, Baltimore, Maryland, Bryan M. Reines, ZUCKERMAN SPAEDER LLP, Washington, D.C., for Amicus Curiae.

GRIFFIN, J., announced the judgment of the court and delivered the opinion of the court with respect to the Introduction and Parts II, III.G., and IV, and delivered an opinion with respect to Parts I, III, III.A, B, C, D, E, and F.  THAPAR, J. (pp. 42–56), delivered a separate opinion concurring in part and in the judgment.  MOORE, J. (pp. 57–76), delivered a separate opinion concurring in part and dissenting in part.

—————————

## OPINION

—————————

GRIFFIN, Circuit Judge.

One of the fundamental liberties enshrined in the Fifth Amendment to our Constitution is the right not to be compelled to bear witness against oneself.  The inquisitorial abuses of the Star

Chambers eventually led to the inclusion of this right in our Bill of Rights.[1]  This bedrock privilege originates from the maxim "*nemo tenetur seipsum accusare*," that "no man is bound to accuse himself."[2]  In the present case, the district court ordered the appellant state officials to testify at trial—to be witnesses against themselves—despite their invocation of their right against self-incrimination.  According to the district court, appellants "waived"[3] their right not to be witnesses against themselves at trial by voluntarily submitting to a discovery deposition.

We disagree.  We conclude that the district court erroneously held that testifying at a pretrial deposition waives invocation of the privilege at a later trial in the same civil case.  In doing so, we hold that a Fifth Amendment waiver does not extend to trial under these circumstances.  Thus, we vacate and remand.

I.

The present case is another dispute stemming from the infamous Flint Water Crisis, the events of which are well known and have been well documented.  *See, e.g.*, *In re Flint Water Cases*, 960 F.3d 303, 311–21 (6th Cir. 2020), and *Mason v. Lockwood, Andrews & Newman, P.C.*, 842 F.3d 383, 387 (6th Cir. 2016).  In short, as a cost-saving measure, public officials switched Flint's municipal water supply from the Detroit Water and Sewage Department to the Flint River, reviving the previously dormant Flint Water Treatment Plant.  Flint residents began receiving water from the Flint River on April 25, 2014, and residents began complaining of water that looked, tasted, and smelled foul within weeks.  Other severe problems emerged, including evidence of E. coli contamination in the water, a localized outbreak of Legionnaires' disease, and a dangerously high lead poisoning rate in children.  Without proper corrosion-control treatment, lead leached from the aging pipes in Flint's water system into the water.  With a public-health disaster mounting, Flint reconnected to its original water sources in October

---

[1]*See generally* 8 J. Wigmore, *Evidence in Trials at Common Law* § 2250, 267–95 (J. McNaughton rev. 1961).

[2]Cong. Rsch. Serv., No. 112-9, *The Constitution of the United States of America: Analysis and Interpretation (Centennial Edition)* 1484–85 (2012).

[3]A "waiver" is generally an "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  More precisely, the district court is relying upon the doctrine of forfeiture.  *See infra* n.16.

Nos. 22-1353/1355/1357/1358/1360    *Walters, et al.  v. Richard Snyder, et al.*        Page 4

2015.  As we have described elsewhere, the crisis was both predictable and preventable.  *See Guertin v. State*, 912 F.3d 907, 915 (6th Cir. 2019).

Both criminal and civil proceedings began shortly thereafter.  On the civil side, a host of litigants filed suit, alleging injury from Flint's contaminated drinking water.  This includes plaintiffs here—four minor children who lived in Flint and suffered lead poisoning, brain damage, and other injuries after being exposed to lead-contaminated water.  The plaintiffs sued two groups of defendants: "governmental defendants," i.e., public officials and entities who they alleged were responsible for the decisions that created the crisis, and "engineering defendants," i.e., those firms who were allegedly responsible for administering the Flint Water Plant, using the river as a source for drinking water, and evaluating the system for public safety.  Among those named as governmental defendants were former Michigan Governor Richard Snyder, former City of Flint Emergency Managers Gerald Ambrose and Darnell Earley, and former Flint Director of Public Works Howard Croft ("appellants" collectively[4]), and named as engineering defendants were Veolia North America ("Veolia"[5]) and Lockwood, Andrews, and Newman, P.C. ("Lockwood"; "appellees" collectively).

The pending cases were largely consolidated in the Eastern District of Michigan.  The district court created a bellwether trial process to manage the litigation—the first was to begin in June 2021 (though it did not actually begin until February 2022), with additional trials following in October 2023 and January 2024.  It also established a coordinated discovery process, the purpose of which was to "limit duplication in the discovery processes."  As it pertained to the coordinated depositions, the district court allowed the plaintiffs to depose witnesses (including the governmental defendants) only once in anticipation of the pending trials.

The criminal process was also underway during this period.  In 2016, Michigan's then-Attorney General, Bill Schuette, appointed a Special Prosecutor for criminal investigations related to the Flint Water Crisis.  *See Sherrod, Teed, Vanderhagen and Ware v. VNA*, No. 5:17-

---

[4]Snyder's former adviser Richard Baird was not named as a defendant, but is an appellant here because he too received a subpoena to testify and now seeks to invoke his privilege against self-incrimination.

[5]Veolia North America consists of Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC.  We refer to it in the singular for ease of reference.

cv-10164-JEL-KGA, 2022 WL 834009, at *1 (E.D. Mich, March 21, 2022).  Ambrose, Earley, and Croft, but not Snyder or Baird, were later indicted on several charges connected to the crisis. But things changed after the 2018 election.  Michigan's new Attorney General, Dana Nessel, appointed a new Solicitor General and assigned lead of the criminal investigations to her. Shortly thereafter, all pending criminal charges, including those against Ambrose, Earley, and Croft, were dismissed without prejudice.  The Solicitor General had "immediate and grave concerns about the investigative approach" taken by the Special Prosecutor and his office, citing alleged links between the investigators and the private law firms representing government agencies and individuals, including Snyder.  She announced that her team would identify and pursue "additional individuals of interest" related to the crisis.

In September 2019, Earley, Ambrose, and Croft moved for a protective order in the civil litigation after their initial criminal charges were dismissed but prior to sitting for any depositions.  They contended that the district court should delay any depositions or written discovery orders pertaining to them until the applicable criminal statute of limitations expired in May 2020 or, alternatively, seal the deposition transcripts and other written discovery.  The district court denied the motion, noting that the three were not currently under indictment and that the plaintiffs, district court, and public at large had an interest in proceeding expeditiously. *See In re Flint Water Cases,* No. 5:16-cv-10444, 2019 WL 5802706, at *2–3 (E.D. Mich. Nov. 7, 2019).

Thereafter, each of the appellants voluntarily sat for a deposition between May and September of 2020.  Each appellant was represented by counsel at his deposition, but none invoked the Fifth Amendment privilege against self-incrimination. *Sherrod, Teed, Vanderhagen & Ware*, 2022 WL 834009, at *2.  Instead, each was examined at great length about his knowledge of and role in the Flint Water Crisis, and each answered the questions posed to him. Ambrose, Earley, and Croft later acknowledged that, at the time of those depositions, they believed that they were likely to face criminal charges again in the future.  Snyder and Baird, though, asserted that they had "no reason to think" that they would face criminal charges, having not previously been indicted.

However, criminal investigations into their conduct were progressing.  In December 2019, the Michigan Attorney General requested the appointment of a one-man grand jury as allowed under Michigan law, and a Genesee County Circuit Court Judge was appointed to act as the jury.  *See People v. Peeler*, ___ N.W.2d ___; 2022 WL 2335397, at *4 (Mich. 2022).  Throughout 2020, the grand jury conducted confidential investigations, and it issued sealed indictments of each appellant.  In March and September of 2020, Earley was indicted on three counts of felony misconduct in office, and Ambrose was indicted on four counts of felony misconduct in office.  On January 8, 2021, indictments were issued against the other three appellants.  Snyder was indicted on two misdemeanor counts of willful neglect of duty.  Baird was indicted on four felony counts:  perjury during an investigative subpoena, misconduct in office, obstruction of justice, and extortion.  Croft was indicted on two misdemeanor counts of willful neglect of duty.  These charges were finally unsealed and announced on January 14, 2021.  *See* Dep't of the Attorney General, Press Release: *Nine Indicted on Criminal Charges in Flint Water Crisis Investigation*, January 14, 2021.[6]

Back on the civil side, the governmental defendants reached a settlement agreement with plaintiffs in November 2020.  That agreement was preliminarily approved by the district court in November 2021.  *In re Flint Water Cases*, 571 F. Supp. 3d 746 (E.D. Mich. 2021).  As a result, Snyder, Ambrose, Earley, and Croft, along with other state and municipal individuals or entities, became non-parties to this civil case.  *Id*. at 757 & n.3.

Veolia and Lockwood, though, continued to actively litigate their liability, seemingly planning to pin much of the blame on appellants and other public officials at trial.  They served notices of non-parties at fault, asserting that various federal, state, and local officials, including appellants, were responsible for plaintiffs' injuries.  Veolia then served subpoenas on appellants, calling them to testify at the forthcoming first bellwether trial.  Appellants moved to quash the subpoenas, contending that they could, and would, invoke their Fifth Amendment privilege against self-incrimination.  They asserted that the act of answering questions at their depositions did not waive the privilege at trial, that they were entitled to a blanket invocation of the privilege,

---

[6]Available at:  https://www.michigan.gov/ag/news/press-releases/2021/01/14/nine-indicted-on-criminal-charges-in-flint-water-crisis-investigation (last visited Nov. 2, 2022).

and that the district court should quash the subpoenas rather than evaluate the privilege on a question-by-question basis.

The district court, however, denied the motions, concluding that appellants had waived the privilege at trial by testifying at their depositions. *Sherrod, Teed, Vanderhagen & Ware*, 2022 WL 834009, at *1. The court initially recognized that, "[b]ecause movants are under criminal indictment for the very conduct at issue in this civil case, there is no question that they would ordinarily be entitled to their silence." *Id*. at *3. However, they were not entitled to that silence here because, when a witness testifies, that person waives the privilege as to the subject matter of their testimony for the remainder of the "proceeding" in which he or she testifies. *Id*. at *3–4. It reasoned that a "proceeding" generally means a lawsuit from its beginning to end; consequently, a deposition is part of the same "proceeding" as the civil trial for which it was taken. *Id*. at *4–5. As appellants were thus not entitled to invoke their privilege, the district court set a hearing to determine the scope of their waivers. *Id*. at *6–7.

But that hearing, held on March 25, 2022, did not resolve the scope of the waiver. Prior to the hearing, Veolia and Lockwood submitted outlines on topics that they intended to ask appellants; those topics largely overlapped with those covered in their depositions. However, appellants informed the district court that they would still invoke their Fifth Amendment privilege at trial and would not testify, notwithstanding the court's order to the contrary. They further noted their desire for "the Sixth Circuit to look at this" before the parties proceeded. Therefore, while the court began the hearing by discussing the scope of the waivers, the hearing soon transformed into, as the district court characterized it, "an oral argument for an interlocutory appeal." Appellants then moved the district court to certify such an appeal under 28 U.S.C. § 1292(b). Neither Veolia nor Lockwood opposed the motion.

The district court granted the motion and certified the issue for appeal. *Sherrod, Teed, Vanderhagen & Ware v. VNA*, No. 5:17-cv-10164-JEL-KGA, 2022 WL 997261, at *2 (E.D. Mich. Apr. 1, 2022). In doing so, it noted that "denying interlocutory appeal and requiring the movants to be held in contempt of court would result in substantial delays in the ongoing bellwether trial, after which the issue would still reach the Sixth Circuit through an appeal as of

right." *Id*. at \*2 n.1.  We took the appeal on an expedited schedule.  *See In re Richard Dale Snyder*, No. 22-0104 (6th Cir. April 26, 2022) (order).

Meanwhile, the civil trial progressed.  As expected, each appellant was called to testify, and each invoked his respective Fifth Amendment privilege.  *See* Ron Fonger, *Snyder can refuse to answer Flint water questions but only in front of jury*, MLive.com, June 14, 2022.[7]  Despite its order to the contrary, the district court allowed each appellant to do so, playing the video of each's deposition instead.  *See* Paul Egan, *Jurors in Flint water trial watch Snyder's 2020 video testimony: What he said*, Detroit Free Press, June 29, 2022.[8]  The case was submitted to the jury on July 21, 2022, before we held oral argument on July 28, 2022.  After deliberating for three weeks, the jury informed the court that it could "not come to a unanimous decision" and that "[f]urther deliberations will only result in stress and anxiety with no unanimous decision without someone having to surrender their honest convictions, solely for the purpose of returning a verdict."  After conferring with the parties, the district court declared a mistrial.  The district court has since rescheduled that trial to begin on February 22, 2023.

In one final twist on the criminal side, the Michigan Supreme Court decided *People v. Peeler* on June 28, 2022.  As part of that case, Nicholas Lyons, another defendant charged in connection to the Flint Water Crisis, challenged Michigan's one-man grand jury statute, Mich. Comp. Laws § 767.4.  *See* 2022 WL 2335397 at \*7 & n.2.  The Michigan Supreme Court held that the statute did not authorize a one-man grand jury to issue indictments.  *See id*. at \*7–10.  After that opinion was released, appellants announced that they would seek dismissal of all criminal charges against them because the same one-man grand jury had charged them.  *See* Beth LeBlanc, *Snyder wants Flint charges dropped after high court nixes one-judge grand jury indictments*, Detroit News, June 28, 2022.[9]  In response, the Solicitor General publicly reiterated her belief that the "charges can and will be proven in court," and that her team was both

---

[7]Available at:      https://www.mlive.com/news/flint/2022/06/snyder-can-refuse-to-answer-flint-water-questions-but-only-in-front-of-jury.html (last visited Nov. 2, 2022).

[8]Available at:  https://www.freep.com/story/news/local/michigan/flint-water-crisis/2022/06/29/rick-snyder-deposition-testimony-flint-water-lead-civil-trial/7764878001/ (last visited Nov. 2, 2022).

[9]Available at:     https://www.detroitnews.com/story/news/local/michigan/2022/06/28/michigan-cant-use-one-judge-grand-jury-indict-flint-water-case-justices-rule/7710896001/ (last visited Nov. 2, 2022).

"prepared to move forward" and "committed to seeing this process through to its conclusion." *SG Hammoud Responds to MSC Ruling in Flint Criminal Cases*, Michigan Department of Attorney General, June 28, 2022.[10]  The Genesee Circuit Court has since dismissed the charges against Baird, Ambrose, and Earley, among others, for the reasons stated in *Peeler*.  Beth LeBlanc, *Judge tosses charges against 7 state officials in Flint water crisis*, Detroit News, October 4, 2022.[11]  The Solicitor General and her prosecution team released a statement shortly thereafter expressing their "anger and disappointment" at the ruling and reaffirming their commitment to "exhaust all available legal options" in their "pursuit of justice for Flint," including appealing that dismissal.  *Flint Criminal Prosecution Issues Statement*, Michigan Department of Attorney General, October 4, 2022.[12]; *Flint Water Prosecution Team Announces Intent to Appeal*, Michigan Department of Attorney General, October 25, 2022.[13]

This brings the case to its current posture.

## II.

Before turning to the merits, we must first assure ourselves of jurisdiction.  We "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).  Given that appellants did not testify at the underlying trial and the case was submitted to the jury, the specter of mootness has arisen.  Indeed, following oral argument, we requested supplemental briefing from the parties on whether the case was moot.  On this discrete issue, appellants and appellees are in accord—the case is not moot.  We agree.

"Article III of the Constitution grants the Judicial Branch authority to adjudicate 'Cases' and 'Controversies.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013).  This actual-case-and-

---

[10]Available at: https://www.michigan.gov/ag/news/press-releases/2022/06/28/sg-hammoud-responds-to-msc-ruling-in-flint-criminal-cases (last visited Nov. 2, 2022).

[11]Available at: https://www.detroitnews.com/story/news/politics/michigan/2022/10/04/judge-tosses-charges-against-7-state-officials-in-flint-water-crisis/69539145007/ (last visited Nov. 2, 2022).

[12]Available at: https://www.michigan.gov/ag/news/press-releases/2022/10/04/flint-criminal-prosecution-issues-statement (last visited Nov. 2, 2022).

[13]Available at: https://www.michigan.gov/ag/news/press-releases/2022/10/25/flint-water-prosecution-team-announces-intent-to-appeal (last visited Nov. 2, 2022).

controversy requirement applies not only at the time the complaint is filed, "but through all stages of the litigation." *Id*. at 90–91 (quotation marks and citation omitted).  A dispute no longer presents a live case or controversy when it becomes moot, i.e., "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id*. at 91 (citation omitted).  "Ultimately, the 'test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties.'" *Sullivan v. Benningfield*, 920 F.3d 401, 410 (6th Cir. 2019) (quoting *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc)).

Neither party contends that the original, underlying controversy is still "live" in its own right.  Indeed, it is impossible for appellants to be called to testify in the underlying trial because that trial has ended.  Yet we recognize an exception to the mootness doctrine for controversies that are "capable of repetition, yet evading review." *See Chirco v. Gateway Oaks, L.L.C.*, 384 F.3d 307, 309 (6th Cir. 2004).  This doctrine applies "only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).  Both appellants and appellees contend that this exception applies because appellants will be called to testify at the forthcoming (and already scheduled) trials and the time frame for appealing any motions to quash in these trials would be too short for an appeal to be fully litigated.

Beginning with the "capable of repetition" requirement, a dispute is so capable if "there is a reasonable expectation that the same complaining party will be subject to the same action again." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735 (2008) (citation omitted). "Recurrence of the issue need not be more probable than not; instead, the controversy must be capable of repetition." *Barry v. Lyon*, 834 F.3d 706, 715 (6th Cir. 2016).  When, as here, the dispute is between two private parties, "the complaining party must show a reasonable expectation that he would again be subjected to the same action by the *same defendant*." *Chirco*, 384 F.3d at 309.  Here, this requirement is comfortably satisfied.  Future trials are already scheduled:  a retrial is scheduled to begin in February 2023, along with a class action trial in October 2023 and another bellwether trial in January 2024.  These trials will involve both Veolia and Lockwood as defendants.  Both have repeatedly affirmed their "almost certain[]" intention to

subpoena appellants to testify again:  they contend that appellants were "key officials" involved in the Flint Water Crisis and "their testimony will be critical to many of the key issues at each trial."  Appellees' Joint Supplemental Brief on Mootness, App. R. 55 at 8.  Thus, it is not only possible but probable that the dispute will recur.  *Cf. Barry*, 834 F.3d at 715.  Such a dispute will also involve the same parties because appellees are the parties calling appellants to testify.  That there will be different plaintiffs in the other trials is immaterial as this dispute is between appellants and appellees, not the plaintiffs.

The "evading review" prong is the crux of our mootness dispute.  A dispute evades review when "the challenged action is in its duration too short to be fully litigated prior to cessation or expiration."  *Davis*, 554 U.S. at 735.  An action is too short if it is impossible "to obtain complete judicial review," including "plenary review" by the Supreme Court.  *First Nat'l Bank of Boston v. Bellotti*, 435 U.S.765, 774 (1978).  *See also Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1287 (9th Cir. 2013) ("An action is 'fully litigated' if it is reviewed by this Court and the Supreme Court.").  As to what time frame is "too short" to obtain full review, the Supreme Court has held that periods of twelve months, *Turner v. Rogers*, 564 U.S. 431, 440 (2011), eighteen months, *First Nat'l Bank*, 435 U.S. at 774, and even two years, *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016), are too short to obtain complete review.

The time frame here—an appeal of a motion to quash trial subpoenas—is far too short for the parties to obtain complete review.  In this case, appellees issued their trial subpoenas in the month before trial began in February 2022.  The case was submitted to the jury on July 21, 2022, and a mistrial was declared on August 11, 2022, about six months after trial began.  Appellees further note the time frame for issuing subpoenas is after the district court determines the genuine issues of material fact for trial, and they assert that this normally occurs in the six months preceding trial.  In either circumstance (subpoenas issued within one month or six months of the beginning of trial), the Supreme Court would not have a full two years to consider the case.  *Cf. Kingdomware*, 579 U.S. at 170.  But even if appellees had issued their trial subpoenas immediately after oral argument in this appeal, as was suggested during argument, that still would not provide enough time.  The retrial is scheduled to begin in February 2023; if it

follows the same time frame as the first trial, it will conclude by August of 2023—less than a year from now.  The next class action trial is then slated to begin in October 2023 and conclude by January 2024 (when the next bellwether must begin)—providing at most eighteen months before that trial would conclude.  Both instances are "'in [their] duration too short to be fully litigated'" and arrive at the Supreme Court "prior to [the subpoena's] 'expiration.'"  *Turner*, 564 U.S. at 440 (quoting *First Nat'l Bank*, 435 U.S. at 774.).  Thus, the dispute would still evade review in those future cases.[14]

But what about diligence?  Though we have not established the exact role diligence plays in the mootness analysis, we have recognized that a case may be moot if the complaining party does not act with diligence or expeditiousness.  *See United States v. Taylor*, 8 F.3d 1074, 1076–77 (6th Cir. 1993) (noting the case did not evade review because the defendants could have "petitioned this court for a stay" or "refused to comply with the [underlying] order"); *United States v. Cleveland Elec. Illuminating Co.*, 689 F.2d 66, 68 (6th Cir. 1982) ("Moreover, [the appellant] could have refused to comply with the order, thereby risking civil contempt but preserving the issues for appellate review.").  Other circuits similarly recognize that a litigant cannot claim a case evades review "when he himself has delayed its disposition." *Armstrong v. F.A.A.*, 515 F.3d 1294, 1296 (D.C. Cir. 2008).  *See also Empower Texans, Inc. v. Geren*, 977 F.3d 367, 371–72 (5th Cir. 2020).  In practice, this means that circuits appear to agree that parties who "could have but did not file for a stay" cannot claim the "evading review" exception. *Armstrong*, 515 F.3d at 1297.  *See also id.* (collecting cases).  On the other hand, the circuits are in less agreement about requests for expedited appeal—some have deemed it relevant, while others have not.  *Compare Empower Texans*, 977 F.3d at 372 ("Crucially, [the appellant] never asked this court to expedite its appeal."), *with Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 321–322 (D.C. Cir. 2014) ("In addressing whether a matter can be fully litigated, we do not consider the availability of expedited review.").

---

[14]Neither *Peeler* nor its aftermath change our conclusion.  While the indictments against Baird, Ambrose, and Earley have been dismissed, the Solicitor General has nonetheless vowed "to exhaust all available legal options" in continuing its prosecution of all appellants.  *Flint Criminal Prosecution Issues Statement*, Michigan Department of Attorney General, October 4, 2022, available at: https://www.michigan.gov/ag/news/press-releases/2022/10/04/flint-criminal-prosecution-issues-statement (last visited Nov. 2, 2022).  The manifest possibility of criminal charges remains, and, indeed, the prosecution team has since announced their intention to appeal the dismissal to the Michigan Court of Appeals.  Therefore, those developments, by themselves, do not moot this case.

We have ample reason to conclude that the parties here acted with diligence.  Appellants received their trial subpoenas shortly before trial began, and they moved to quash those subpoenas shortly thereafter.  When the district court denied those motions, appellants requested an interlocutory appeal and informed the district court that they would risk contempt by not complying with the order.  We view these steps favorably.  *See Taylor*, 8 F.3d at 1076–77; *Cleveland Elec. Illuminating Co.*, 689 F.2d at 68.  Within days of the district court granting leave to appeal, appellants filed their petitions in this Court and requested an expedited briefing schedule.  All in all, briefing concluded less than two months after the district court initially denied the motions to quash.  This is a far cry from cases like *Empower Texans* where the complaining party took months to initiate an action and delayed filing its notice of appeal.  *See* 977 F.3d at 372.  And on appeal, the case was set for the first available argument; appellees then requested an even quicker oral argument schedule or, alternatively, dispensing with argument entirely.  Though we held argument as originally scheduled, that was not due to the parties' lack of diligence.[15]  Regardless of whether appellants needed to seek and obtain expedited review on appeal, *compare Empower Texans,* 977 F.3d at 372, *with Ralls Corp*., 758 F.3d at 321–322, they did so.  In sum, appellants acted diligently, and they have not delayed our disposition of this case.

But what about a stay?  In *Taylor*, we concluded the case was moot because the parties could have but failed to seek a stay of the underlying order.  *See* 8 F.3d at 1076–77.  At least one other circuit has held similarly when a party fails to request a stay.  *See Armstrong*, 515 F.3d at 1297.  It is undisputed that no party sought a stay of the order denying the motions to quash.  But we conclude that, under the unique and extraordinary circumstances presented here, appellants' failure to seek such a stay does not moot this case.  Appellants would have needed to seek a stay of the motion to quash, not the trial.  *See* Fed. R. App. P. 8(a)(1)(A) ("A party must ordinarily move . . . for . . . a stay of the judgment or order of a district court pending appeal.").  But such a course was wholly unnecessary when the district court functionally stayed the order on its own.  The order never went into practical effect because the district court did not require appellants to

---

[15]Given that oral argument was held as scheduled, appellees' motion to expedite the appeal, or alternatively, to dispense with oral argument is denied as moot.

Nos. 22-1353/1355/1357/1358/1360     *Walters, et al.  v. Richard Snyder, et al.*     Page 14

testify at trial.  The purpose of a stay is "to maintain the status quo" pending appellate review of the dispute.  *Gilley v. United States*, 649 F.2d 449, 453 (6th Cir. 1981).  When the district court did not enforce its own order and did not require appellants to testify, it naturally and sua sponte preserved the status quo pending appeal.  Because of this, the district court's actions accomplished the purpose of a stay, rendering a motion for a stay unnecessary.

This conclusion is in accord with both *Taylor* and other circuits' caselaw.  The thrust of the stay requirement is to prevent parties from allowing a challenged order go into effect and complying with it while simultaneously complaining about that order on appeal.  When the complaining party allows the challenged order to run its natural course without complaint, knowing that the dispute will no longer be live once the order expires, that party disregards the need for diligence.  *See Taylor*, 8 F.3d at 1076–77 (noting the parties complied with the district court's order instead of seeking a stay *or* refusing to comply with the order); *Empower Texans*, 977 F.3d at 371 ("Here, there was no order to be stayed, but the relevant point is that a litigant must use the available tools.").  But in this case, appellants contested the order.  At the March 25 hearing, appellants informed the district court they would not comply with the court's ruling and would instead risk contempt proceedings; that the district court did not so hold them in contempt is not their fault.  When the parties continued to contest a particular order, and the district court both functionally stayed that order on its own and permitted an interlocutory appeal, a complaining party's failure to pursue an unnecessary stay does not render the dispute moot.

For those reasons, we hold that this case is not moot because its "exceptional situations" render the dispute "capable of repetition, yet evading review."  *Kingdomware Techs.*, 579 U.S. at 170.

### III.

The merits of this appeal require us to confront an issue of first impression:  whether a witness waives his privilege against self-incrimination for purposes of trial by testifying at a deposition in the same civil case.  Appellants argue that the district court erred in holding that they could not assert their Fifth Amendment privilege at trial.  We agree.

## A.

Our caselaw does not set forth a uniform standard of review when addressing Fifth Amendment privilege cases.  On occasion, we have described the privilege as raising "a mixed question of law and fact;" thus, "we examine the district court's factual determinations for clear error and its conclusions of law and applications of law to facts de novo."  *United States v. B & D Vending, Inc.*, 398 F.3d 728, 733 (6th Cir. 2004) (citing *United States v. Grable*, 98 F.3d 251, 253 (6th Cir. 1996)).  At other times, we have stated that we "review the assertion of a Fifth Amendment privilege against self-incrimination and its grant or denial for abuse of discretion."  *United States v. Boothe*, 335 F.3d 522, 525 (6th Cir. 2003) (citing *United States v. Mack*, 159 F.3d 208, 217 (6th Cir. 1998)).

Nevertheless, these standards of review are not inconsistent.  As recognized in other evidentiary contexts, decisions reviewed under an abuse-of-discretion standard are "not inconsistent with an appellate court's abiding duty to review questions of law de novo or questions of fact for clear error," *United States v. Gibbs*, 797 F.3d 416, 421 (6th Cir. 2015) (citation and brackets omitted), because an error of law necessarily constitutes an abuse of discretion, *Griffith v. Comm'r of Soc. Security*, 987 F.3d 556, 563 (6th Cir. 2021).  This case turns on questions of law:  whether the two events are separate proceedings and, consequently, whether appellants waived their privilege at trial.  Therefore, a de novo standard of review is appropriate here.

## B.

We begin with the guiding principles of the privilege against self-incrimination.  The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  Under this "essential mainstay" of our "accusatorial, not inquisitorial" system of prosecution, the government is "constitutionally compelled to establish guilt by evidence independently and freely secured, and [it] may not by coercion prove a charge against an accused out of his own mouth."  *Malloy v. Hogan*, 378 U.S. 1, 7–8 (1964).  It applies to both civil and criminal proceedings, and it protects parties and non-party witnesses alike.  *McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924).  The privilege against

self-incrimination afforded by the Amendment "must be accorded liberal construction in favor of the right it was intended to secure." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). *See also Estelle v. Smith*, 451 U.S. 454, 467–68 (1981) ("The Fifth Amendment privilege is 'as broad as the mischief against which it seeks to guard,' and the privilege is fulfilled only when a criminal defendant is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence.'" (citations omitted)).

This privilege is not unlimited, for a witness may lose its protection by disclosing information. A witness must claim the privilege to enjoy its protections, *Rogers v. United States*, 340 U.S. 367, 370–71 (1951), and he or she "may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." *Mitchell v. United States*, 526 U.S. 314, 321 (1999). When the witness testifies, "[t]he privilege is waived for the matters to which the witness testifies." *Id.* The reasons for such a "waiver" rule are straightforward: the rule rests primarily "on the need to avoid leaving the trier of fact with the limited version of the relevant information that would be before it if a witness was able to pick at will the point at which to invoke the privilege." 1 McCormick on Evid., § 133 (8th Ed. July 2022 Update).[16] Allowing self-selected testimony would distort the facts of the case, *Rogers*, 340 U.S. at 371, and invite a party to "mutilate the truth" it offers to the court, *Brown v. United States*, 356 U.S. 148, 156 (1958). In other words, if a witness may "pick and choose what aspects of a particular subject to discuss," doing so would inevitably "cast[] doubt on the trustworthiness of the statements and diminish[] the integrity of the factual inquiry." *Mitchell*, 526 U.S. at 322.

---

[16]The term "waiver" here is imprecise as this rule is different from other waiver rules. Generally, a waiver is an intentional relinquishment of a known right. *See Zerbst*, 304 U.S. at 464. But in this context, while a witness must testify voluntarily, that decision need not be "knowing and intelligent." *Garner v. United States*, 424 U.S. 648, 654 n.9 (1976). In other words, the "waiver" rule in this context does not require the witness to "have been aware of or have intended to give up the right to invoke the privilege when questioned about 'the details.'" 1 McCormick on Evid., § 133 (8th Ed.). It would be more precise to assert that we are relying on the doctrine of forfeiture. *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("[F]orfeiture is the failure to make the timely assertion of a right."); *Salinas v. Texas*, 570 U.S. 178, 190 (2013) (plurality opinion) ("[I]t is settled that *forfeiture* of the privilege against self-incrimination need not be knowing." (emphasis added)). Nonetheless, we continue to use the term "waiver" because of its widespread use in the Fifth Amendment context.

When a witness voluntarily waives the privilege by disclosing information, the scope of that waiver is determined both by the witness's testimony and the opposing party's cross-examination.  "The witness himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry."  *Brown*, 356 U.S. at 155.  If a witness testifies and thereby waives the privilege, "he is not permitted to stop, but must go on and make a full disclosure."  *Rogers*, 340 U.S. at 373.  Cross-examination is the vehicle by which the full scope of the waiver is determined—"the breadth of [the witness's] waiver is determined by the scope of relevant cross-examination."  *Brown*, 356 U.S. at 154–55; *see also id*. at 156 ("[The witness] could not take the stand to testify in her own behalf and *also claim the right to be free from cross-examination* on matters raised by her own testimony on direct examination." (emphasis added)).  Permitting full cross-examination after a voluntary disclosure of a fact furthers the need for fair and honest fact-finding, for "[a] witness thus permitted to withdraw from the cross-fire of interrogation before the reliability of his testimony has been fully tested may on occasion have succeeded in putting before the trier of fact a one-sided account of the matters in dispute."  *Id*. at 155.

This waiver is "proceeding" specific, meaning that a waiver applies throughout the proceeding in which the witness testifies: "It is well established that a witness, *in a single proceeding*, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details."  *Mitchell*, 526 U.S. at 321 (emphasis added).[17]  In that proceeding, use of the privilege is "confined to instances where the witness has reasonable cause to apprehend danger from a direct answer," *Hoffman*, 341 U.S. at 486, as witnesses are protected only when they are subject "to a 'real danger' of further crimination."  *Rogers*, 340 U.S. at 374 (citation omitted).  *See also United States v. LaRiche*, 549 F.2d 1088, 1096 (6th Cir. 1977) ("[W]aiver does not occur where further disclosure carries a risk of incrimination beyond that raised by previous testimony.").  In other words, the "hazards of incrimination" facing the claimant must be "substantial and 'real,' and not merely trifling or imaginary."  *United States v. Apfelbaum*, 445 U.S. 115, 128 (1980) (citation omitted).  As for

[17]The Supreme Court's focus on the "proceeding" to which a waiver applies is not just a recent phenomenon.  Rather, it has approached Fifth Amendment questions through a "proceeding" lens for over a century.  *See, e.g.*, *Boyd v. United States*, 116 U.S. 616, 631–35 (1886); *Counselman v. Hitchcock*, 142 U.S. 547, 563–64 (1892), *overruled on other grounds*, *Kastigar v. United States*, 406 U.S. 441 (1972); *McCarthy*, 266 U.S. at 40.

secondary or subsequent proceedings, most circuits have held that a waiver in one proceeding does not constitute a waiver in a second proceeding.  *See In re Morganroth*, 718 F.2d 161, 165 (6th Cir. 1983) (collecting cases).  Courts have provided two reasons for this proceeding-specific rule.  First, "conditions might have changed" in the time between the proceedings, "creating new grounds for apprehension, *e.g.*, the passage of new criminal law."  *Id*.  Second, the "repetition of testimony in an independent proceeding might itself be incriminating, even if it merely repeated or acknowledged the witness' earlier testimony, because it could constitute an independent source of evidence against him or her."  *Id*.

C.

With that background in mind, we turn to the issue of whether a deposition and a trial are separate proceedings for Fifth Amendment purposes.  This issue raises a threshold question: what constitutes a single "proceeding" under the Fifth Amendment?  We have not resolved this specific issue, and plenty of "controversy surrounds the effect of testifying at an early stage of what might be considered a single unit of litigation."  1 McCormick on Evid., § 133 (8th Ed.).  We must wade into this dispute to determine if a deposition and a later trial in the same civil case are part of the same "proceeding."

We begin with *Mitchell*.  There, the defendant pleaded guilty to drug-distribution charges but "reserved the right to contest the drug quantity attributable" under a separate conspiracy to distribute charge.  526 U.S. at 317.  At the plea hearing, after the government explained the factual basis for her charges, the district court asked the defendant, "Did you do that?" to which the defendant responded, "Some of it."  *Id*. at 318.  At the following sentencing hearing, the district court found that her plea testimony constituted a waiver and sentenced her accordingly.  *Id*. at 318–19.  On appeal, the Supreme Court reversed, holding that the defendant "retained the privilege at her sentencing hearing."  *Id*. at 321.  The plea inquiry was not a waiver of her privilege—no cross-examination occurred at the plea hearing and there was little danger that the court would be misled by the selective disclosure of facts agreed to by the parties.  *Id*. at 322–23.  The Court also extended the rule that "where there can be no further incrimination, there is no basis for the assertion of the privilege," to hearings where the conviction has already been fixed.  *Id*. at 326.  Despite the plea, a possibility of further incrimination still existed for the defendant,

including the severity of her punishment. *Id*. at 326–27.  And the Court confirmed that this rule would apply "whether or not the sentencing hearing is deemed a proceeding separate from the [plea] hearing, an issue we need not resolve." *Id*. at 327.

*Mitchell* assists with but does not resolve the question presented here.  It explicitly declined to resolve whether a plea hearing was a separate "proceeding" from a subsequent sentencing hearing.  Instead, it concluded that the defendant's statements at the plea hearing did not constitute a waiver in the first instance.  *Id*. at 325.  It provided several reasons for this, largely related to the purpose of and reason for each hearing.  For one, the court and parties at a plea hearing are not necessarily concerned with fact-finding; rather, as evident from the lack of cross-examination, "[t]he purpose of a plea colloquy is to protect the defendant from an unintelligent or involuntary plea." *Id*. at 322.  This purpose diminishes the risk that a selective disclosure will distort the facts.  Thus, the thrust of *Mitchell*'s holding was that the purposes of and reasons for the defendant's disclosure at the first hearing did not support a waiver of the privilege, regardless of whether plea and sentencing hearings were separate "proceedings."  Such reasoning does not resolve our issue—appellants do not disagree that they waived the privilege at their depositions; rather, they argue that this waiver does not carry over to trial.  But *Mitchell* is still instructive here:  its purpose-based analysis supports assessing whether a deposition and trial have a shared purpose.  And *Mitchell* demonstrates the importance of cross-examination in the waiver process.  The lack of cross-examination at a plea colloquy was a factor that strongly demonstrated no waiver had occurred.  *Id*. at 322–23.

No case from our circuit addresses the exact scenario presented here; the most analogous, *In re Morganroth*, addressed testimony in two clearly separate proceedings.  718 F.2d at 163. There, the witness was charged in federal court with fraud; he was later deposed and testified in a separate state court civil action.  *Id*. at 163–64.  He was acquitted of the criminal charges, but asserted his Fifth Amendment privilege in a later federal civil case to avoid perjuring himself. *Id*.  On appeal, we held that the witness could assert the privilege in the federal civil action but that he must also identify before the district court the nature of the charge for which he feared prosecution.  *Id*. at 166–67.  We declined to reach the issue of whether a waiver in one "proceeding" carries over to another, as we found it inapplicable "where a fifth amendment

privilege is asserted solely because the witness alleges he is apprehensive of providing incriminating evidence in regard to a possible perjury charge stemming from responses in an earlier proceeding under oath." *Id*. at 165.  "Once a witness has testified under oath, he risks the possibility of perjury charges in addition to any risk he may face for prosecution for non-perjury offenses suggested by his testimony." *Id*. at 166.  But we concluded that the witness had not made a sufficient showing to the district court that would establish the foundation for asserting the privilege because his explanations to the court were not enough to demonstrate a "real danger" of prosecution for perjury. *Id*. at 167–70.

*Morganroth* did not address whether a deposition and a trial in the same case are separate proceedings, and it sidestepped the issue of whether a waiver in one proceeding carries over to another.  Consequently, like *Mitchell*, it does not resolve our case.  But its conclusion that perjury constituted an independent basis for asserting a privilege is instructive.  Like the defendant in *Morganroth*, appellants have claimed that they could easily be subjected to criminal prosecution for perjury arising out of potential inconsistencies in testimony.  "When a witness is asked a question in a subsequent proceeding, the answer to which could show that he has already committed the crime of perjury in a prior proceeding, his refusal to answer is permissible almost by the definition of self-incrimination." *Morganroth*, 718 F.2d at 166.  But because *Morganroth* only addressed two separate proceedings, we must still determine whether a deposition and trial are indeed separate.

Because no binding precedent addresses this issue, we move to other sources, turning first to treatises on the subject.  The current version of McCormick on Evidence describes that, though dispute exists about waiver at different stages of one case, "[m]ost courts hold that testimony at a grand jury proceeding or other pretrial event or hearing does not preclude a witness from invoking the privilege at trial."  1 McCormick on Evid., § 133 (8th Ed.) (footnotes omitted).  An earlier edition describes this point in greater detail, explaining:

> In theory, a witness should not ordinarily be subject to additional legal detriment by being required to repeat testimony previously given.  But in the excitement and confusion that may be generated by the second appearance, the witness might make admissions beyond those previously made.  Reaffirming earlier self-incriminating admissions may encourage prosecution as a practical matter. Testimony during the second appearance might . . . increase the risk of liability

for perjury based on the first appearance.  The traditional rule that a witness's loss of the privilege by testifying lasts only during that "proceeding" in which the witness testified is consistent with the spirit of the privilege.

1 McCormick on Evid., § 140, p. 528 (J. Strong 4th Ed. 1992) (footnotes omitted).  Another treatise describes similarly:

The waiver involved is limited to the particular proceeding in which the witness volunteers the testimony or the accused takes the stand. . . .   His voluntary testimony before a coroner's inquest, or a grand jury, or other preliminary and separate proceeding, e. g., in bankruptcy, is therefore not a waiver for the main trial.

8 J. Wigmore, *Evidence in Trials at Common Law* § 2276, 470-72 (J. McNaughton rev. 1961).  *See also* 81 Am. Jur. 2d Witnesses, § 151 (August 2022 Update) ("[T]he waiver of the privilege against self-incrimination at one stage of a proceeding is not a waiver of that right for other stages.").

These treatises strongly support the position that a deposition is a separate "proceeding" from a trial.  They describe that a "proceeding" is the specific hearing in which a witness testifies.  That would support limiting the waiver to a single testimonial event:  in this case, appellants' waiver would cover only their deposition testimony.  As McCormick explains, this is rooted in one of the purposes of the waiver rule:  repetition of testimony may encourage prosecution and increase the risk of perjury.  This, in turn, also supports applying *Morganroth*'s perjury discussion here.[18]

With that background, we turn next to caselaw to examine other scenarios where courts have addressed the Fifth Amendment privilege at different stages of one case.  We begin by

---

[18]Though not a treatise, the district court found Black's Law Dictionary persuasive in outlining the "common meaning" of "proceeding."  *See Sherrod, Teed, Vanderhagen and Ware*, 2022 WL 834009 at *4–5.  Generally, dictionaries are used in determining the "ordinary meaning" of undefined terms in statutes, court rules, sentencing guidelines, and the like.  *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566–69 (2012); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 69–77, 415–24 (Thompson/West 2012).  They are used in interpreting common-law doctrines in limited circumstances, such as understanding the historic context for a particular doctrine.  *See Giles v. California*, 554 U.S. 353, 358–61 (2008).  Nevertheless, Black's does not provide support for the district court's one-sided interpretation.  While it describes that a "proceeding" may be "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment," i.e., a *case*, it also states that "proceeding" may be "[a]n act or step that is part of a larger action," i.e., a *hearing*.  *Proceeding*, Black's Law Dictionary (11th ed. 2019).  In other words, Black's supports both parties' interpretations and, thus, is not useful here.

Nos. 22-1353/1355/1357/1358/1360     *Walters, et al.  v. Richard Snyder, et al.*        Page 22

acknowledging two competing decisions identified by the parties and the district court.  First, in *State v. Roberts*, the New Hampshire Supreme Court held that a deposition and trial were separate proceedings.  622 A.2d 1225, 1235–36 (N.H. 1993).  The deposition testimony did not waive the privilege for purposes of trial—while it is "hornbook law that the waiver . . . is limited to the particular proceeding in which the witness appears," that "majority rule preserves a witness's right to assert the privilege in subsequent, distinct stages of a single proceeding."  *Id*. at 1235 (citing *United States v. Trejo–Zambrano,* 582 F.2d 460, 464 (9th Cir.); *United States v. Johnson*, 488 F.2d 1206, 1210 (1st Cir. 1973); and 1 McCormick on Evid., § 140 (4th Ed.)).  The court reasoned that limiting the waiver to the deposition furthers the "spirit of the privilege" because it "recognizes that a witness's admissions in a second appearance may exceed those previously made."  *Id*.  But in *Moser v. Heffington*, the Court of Appeals of Maryland held that deposition testimony constituted a waiver for trial:  "[f]or Fifth Amendment purposes, a deposition and the trial in the same matter are stages of the same proceeding."  214 A.3d 546, 557–59 (Md. 2019) (citing *United States v. Parcels of Land*, 903 F.2d 36, 43 (1st Cir. 1990), and *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1081 (10th Cir. 2009)).  By testifying at her deposition, the witness waived the privilege "at least to the extent necessary for petitioners to cross-examine her on it."  *Id*. at 558.  She could not invoke the privilege merely because additional testimony would create "new grounds for apprehension;" rather, "[i]t should be clear" to one giving a deposition that "any testimony that she gave might tend to subject her to criminal prosecution, especially since the police investigation had not been closed."  *Id*.

To be sure, *Roberts* and *Moser* offer insight into how two other courts have addressed this exact situation.  One discusses how the purpose or "spirit" of the privilege would best be met by limiting the "proceeding" to the deposition itself, while the other highlights that "any testimony" given while an investigation is ongoing would create a new apprehension.  But their general insight does not resolve the question (and not simply because they are not binding on this court and reached different conclusions).  Both performed a perfunctory analysis of the "proceeding" question, citing—without much explanation—authorities that purportedly support either conclusion.  *Compare Trejo-Zambrano*, 582 F.2d at 464 ("A waiver of the Fifth Amendment privilege at one stage of a proceeding is not a waiver of that right for other stages."), *with Parcels of Land*, 903 F.2d at 43 ("[The witness's] deposition and the filing of his affidavit,

however, were part of the same proceeding, and thus this [proceeding-specific] limitation does not apply.").

More helpful is the substantial body of law involving testimony at other pretrial proceedings. Consider first testimony given to grand juries. Courts generally hold that a grand jury and trial are two separate proceedings, such that grand jury testimony does not necessarily waive the privilege at trial. *See* 1 McCormick on Evid., § 133 (8th Ed.). The Third Circuit explained why in *In re Neff*: "[t]he grand jury is not a judicial tribunal but rather an informing or accusing body." 206 F.2d 149, 152 (3d Cir. 1953). It does not conduct judicial proceedings, but rather "secret ex parte investigation[s]" that returns indictments. *Id.* "It is clear, therefore, that the investigation of a grand jury is a proceeding which is wholly separate and distinct from, and of a different nature than, the subsequent trial of the defendant in the district court." *Id.* It thus followed that a witness "who testified to a matter before the grand jury did not thereby waive her right to claim her constitutional privilege against self-incrimination as to the same subject matter when called as a witness in the subsequent trial of a person indicted by the grand jury." *Id.* One of the cases relied on by *Neff*, the Iowa Supreme Court's opinion in *Duckworth v. Dist. Ct. of Woodbury Cnty.*, 264 N.W. 717 (Iowa 1936), elaborated further, grounding its decision on the purpose of waiver rule. "The reason of this [waiver] rule is that a witness cannot arbitrarily in part waive and in part reserve his privilege, for the purpose of becoming a partisan in the case, revealing only so much of the truth as will benefit one of the parties, and asserting his privilege when interrogated as to facts which would cut the other way." *Id.* at 721 (citation omitted). The privilege still existed at trial—the trial was not "a continuation of the investigation begun in the grand jury room" because of the different purposes of the two proceedings. *Id.* at 722. And the Second Circuit extended this to testifying twice before the same grand jury in *United States v. Miranti*, 253 F.2d 135 (2d Cir. 1958). Conditions may have changed between the proceedings or the witness may be subject to a different interrogation for different purposes; in either event, "reiteration adds to the credibility of the statement." *Id.* at 140. Thus, the two grand jury appearances were separate—"[t]he passage of time and the events occurring between the two appearances render the proceedings separate for the purposes of the waiver rule." *Id.*

Other pretrial events in criminal cases are generally considered separate proceedings. In *State v. Whiting*, the Court of Appeals of Wisconsin held that a witness could invoke the privilege at trial after he had testified at the defendant's preliminary examination.  402 N.W.2d 723, 728 (Wis. Ct. App. 1987).  Analogizing the case to the grand jury proceeding considered in *Neff*, the court noted that "extending waiver from a related proceeding to the subsequent trial creates a danger of increased legal detriment to the witness."  *Id*. at 729.  "Moreover, a contrary rule would discourage witnesses from waiving the privilege at preliminary proceedings, thus depriving the truth-seeking process not only of trial testimony but of whatever investigatory value the preliminary testimony provides."  *Id*.  There was an "essential difference" between the preliminary examination and trial because the exam was "intended to be a summary proceeding to determine basic facts as to probability;" thus, the waiver did not carry over from "one distinct stage of a criminal prosecution to another."  *Id*. at 730.  *See also Overend v. Super. Ct. of City & Cnty. of San Francisco*, 63 P. 372, 374 (Cal. 1900) (concluding that testimony at a preliminary examination did not waive the right to testify at trial); *People v. Williams*, 181 P.3d 1035, 1058 (Cal. 2008) ("[T]he failure of a witness to claim the privilege at a preliminary hearing does not prevent the witness from refusing to testify regarding the same incriminating material at the trial."); *Johnson*, 488 F.2d at 1209–11 (concluding that a codefendant witness who pleaded guilty prior to trial did not waive the privilege at the other defendant's trial by making disclosures at the plea hearing).

Consider too another element of civil discovery:  pretrial affidavits.  Courts largely conclude that these are separate from trial but not from subsequent depositions.  In *Samuel v. People*, the Illinois Supreme Court held that a pretrial affidavit did not waive the privilege for trial.  45 N.E. 728 (Ill. 1896).  While "a witness who voluntarily and understandingly discloses part of a transaction exposing him to a criminal prosecution, without claiming his privilege, is ordinarily obliged to go forward, and complete the narrative, by stating the whole of the transaction," that did not apply "unless the statements made in the affidavit indorsed upon the information and the statements made in the testimony elicited upon the trial may be regarded as parts of one continuous account."  *Id*. at 729.  But the affidavit and trial did not run together— "the doctrine applies only to a case where the witness, while testifying upon the trial, states a fact, and afterwards refuses to give the details, or discloses a part of a transaction in which he

was criminally concerned, without claiming his privilege, and then refuses to go forward, and state the whole; it does not apply to a case where some admission *made long prior to the trial* is sought to be brought forward and joined to the answers given on the trial." *Id.* (emphasis added). The Ninth Circuit has concluded similarly.  *See Trejo-Zambrano*, 582 F.2d at 463–64 (noting that a witness did not "waive his right to refuse to give self-incriminating testimony when he executed the incriminating affidavit" because "[a] waiver of the Fifth Amendment privilege at one stage of a proceeding is not a waiver of that right for other stages"); *Jeffries v. United States*, 215 F.2d 225, 226 (9th Cir. 1954) (commenting that the author of an affidavit used to grant the defendant a new trial "could refuse to testify [at the new trial] by reason of his privilege against self incrimination").  But other courts have concluded that a pretrial affidavit is *not* separate from a pretrial deposition, meaning that a court may strike an affidavit if the witness invokes the privilege at the deposition.  *See Parcels of Land*, 903 F.2d at 42–43 ("[I]t is true that had [the defendant's] affidavit been filed and his deposition taken in separate, distinct proceedings, neither would have affected the treatment of the other, [but the two] were part of the same proceeding, and thus this limitation does not apply."); *In re Edmond*, 934 F.2d 1304, 1308–09 (4th Cir. 1991) (sustaining a district court order striking a witness's affidavit after the witness refused to answer questions at a deposition).

Finally, we would be remiss to leave unacknowledged the cases that address denials of motions to stay proceedings while implying that deposition testimony waives the privilege at a later trial.  In *Creative Consumer Concepts*, the defendant was involved in both civil and criminal cases—she unsuccessfully sought a stay of the civil proceedings while the criminal ones progressed.  563 F.3d at 1080–81.  The Tenth Circuit held that the district court did not abuse its discretion by denying the stay—there was limited overlap between the two cases, the defendant provided no concrete examples of how the denial prejudiced her, and she had already been deposed in the civil case.  *Id.* at 1081.  The defendant "waived her Fifth Amendment privilege with respect to the questions she answered during her deposition," and a stay would not have changed that she had "already provided the evidence used against her" in the civil case.  *Id.*  And in *Microfinancial, Inc. v. Premier Holidays Inter., Inc.*, the First Circuit affirmed a similar denial of a stay because the defendant had already signed an affidavit and given deposition testimony.  385 F.3d 72, 78 (1st Cir. 2004).  "By failing to invoke his Fifth Amendment privilege, he likely

waived the privilege with respect to the subject matter of his deposition testimony for the duration of the proceeding in which that testimony was given." *Id.*  "When all is said and done, a stay cannot preserve what a defendant already has surrendered." *Id*. at 79.  *See also De Lisi v. Crosby*, 402 F.3d 1294, 1301 (11th Cir. 2005) (noting that a witness "waived the privilege [at trial] when he answered the same question" at a deposition but holding that the error was harmless).

Though none of these authorities are binding on this court, they provide a reasonable survey of how other courts have addressed waivers of the Fifth Amendment privilege.  First, a majority of jurisdictions conclude that a waiver at one hearing does not carry over to trial because the two are not part of the same proceeding.  *See, e.g.*, *Miranti*, 253 F.2d at 140 (collecting cases).  In most circumstances, the witnesses were able to claim the privilege at trial.  Second, when addressing pretrial testimonial events, the further the initial testimony is from trial, the more likely it is that a court will conclude that the two proceedings are separate.  *See, e.g.*, *Samuel*, 45 N.E. at 729.  Often, this is because of the purpose of the first hearing is distinct from that of trial.  *See, e.g.*, *Neff*, 206 F.2d at 152.  Third, pretrial discovery affidavits do not necessarily waive the privilege at subsequent hearings, but it depends on the nature of the next hearing.  An affidavit and subsequent deposition may be part of the same proceeding, *see Parcels of Land*, 903 F.2d at 43–44, while an affidavit and trial are not, *see Samuel*, 45 N.E at 729.  Fourth, the cases relied on by *Moser* (and, by extension, the district court and appellees) are less persuasive.  Many of those cases commented without explanation that deposition testimony waived the privilege for the remainder of civil proceeding.  *See, e.g.*, *Creative Consumer Concepts*, 563 F.3d at 1081.  And in *Creative Consumer Concepts* and *Microfinancial*, the Fifth Amendment waiver issue was not necessary to their holdings, rendering the discussion mere dicta.

But the most telling thread evident in this caselaw is that many courts, like *Mitchell*, look to the purpose and logic supporting the Fifth Amendment.  When comparing the two events at issue, courts often determine whether a second waiver is needed by considering whether a waiver best serves the purposes of the Fifth Amendment and, more specifically, the purposes of the "waiver" rule.  *See, e.g.*, *Duckworth*, 264 N.W. at 721–22.  Indeed, we find the opinions that do

this, such as *Neff*, *Samuel*, *Duckworth*, and *Roberts*, far more persuasive than opinions that do not.  For that reason, we now consider whether the logic and purpose of the Fifth Amendment supports concluding that appellants' waivers of the privilege at their depositions carry over to trial because the two are part of the same proceeding.

D.

At the outset, we highlight the general principle that the Fifth Amendment privilege is to be interpreted broadly.  It must be "accorded liberal construction in favor of the right it was intended to secure."  *Hoffman*, 341 U.S. at 486.  While this liberal-construction canon does not, by itself, resolve the waiver issue in this case, we note it is the starting point for our analysis.  Doing so gives full value to the Supreme Court's instruction on the importance and breadth of the privilege while also retaining our independent responsibility to determine whether the purpose and logic of the Fifth Amendment support such a liberal construction in the circumstances before us.  *Cf. Hoffman*, 341 U.S. at 486; *Estelle*, 451 U.S. at 467–68; *see also Convertino v. U.S. Dep't of Justice*, 795 F.3d 587, 596 (6th Cir. 2015) ("Courts must indulge every reasonable presumption against waiver." (quotation marks and citation omitted)).  So, under this canon, absent some justification to the contrary, appellants should be able to invoke it.  But no such justification contrary to the privilege exists here.  Rather, the logic and purpose of the privilege *support* the conclusion that a deposition and trial are separate proceedings.

The "waiver" rule is intended to protect the fact-finding process and prevent witnesses from distorting the truth through providing self-selected testimony or testifying only to the favorable aspects of his or her testimony.  *See Rogers*, 340 U.S. at 371; *Mitchell*, 526 U.S. at 322.  But when a witness testifies, the Fifth Amendment *requires* the witness to submit him- or herself to cross-examination, so that the court and the parties may elicit the particulars of the witness's testimony.  *See Brown*, 356 U.S. at 155–56.  For that reason, cross-examination determines the breadth of the witness's waiver.  *Id*. at 154–55.  Described as the "greatest legal engine ever invented for the discovery of truth," *Maryland v. Craig*, 497 U.S. 836, 846 (1990), it is the key element needed to protect the fact-finding process and to prevent a witness from distorting the truth, *see, e.g.*, *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 401–02 (6th Cir. 2017).  Cross-examination prevents a witness from making only a partial disclosure of the truth by

testifying only on direct examination.  In our adversarial justice system, the parties each have the responsibility to set forth their version of the facts.  *See Malloy*, 378 U.S. at 7–8.  When a witness testifies for one party, they may present testimony in that party's favor; ordinarily, the opposing party may counter that testimony through cross-examination.  Each party has the onus to present their own version of the facts.  By requiring cross-examination, the Fifth Amendment waiver rule protects this fact-finding process.

Consequently, cross-examination is *the* crucial factor in determining what qualifies as a Fifth Amendment proceeding.  A witness cannot set forth certain testimony and then "withdraw from the cross-fire of interrogation before the reliability of his testimony has been fully tested." *Brown*, 356 U.S. at 155.  *See also Duckworth*, 264 N.W. at 721 (describing that a waiver of the privilege compels the witness to disclose the truth "by a rigid cross-examination").  Allowing this process would "mutilate the truth," *Brown*, 356 U.S. at 156, and "cast[] doubt on the trustworthiness of the statements and diminish[] the integrity of the factual inquiry," *Mitchell*, 526 U.S. at 322.  *Mitchell* demonstrates the importance of cross-examination, as the court reasoned that a *lack* of cross-examination supported a finding that no waiver occurred.  *Id*. at 322–23.  In this manner, the Fifth Amendment privilege attaches only to the event where the witness testifies and is then subject to cross-examination, such as at a deposition or trial.  *See Samuel*, 45 N.E. at 729 ("[T]he doctrine applies only to a case where the witness, *while testifying upon the trial*, states a fact, and afterwards refuses to give the details." (emphasis added)); 1 McCormick on Evid., § 140, p. 528 (4th Ed.) ("The traditional rule that a witness's loss of the privilege by testifying lasts *only during that 'proceeding' in which the witness testified* is consistent with the spirit of the privilege." (emphasis added)).  This rationale, therefore, protects the opposing party's right to cross-examination—through that protected cross-examination, that party can still present their facts to the court.  A witness may be able to distort the truth by presenting self-selected testimony without cross-examination, but self-selected testimony is not possible if the opposing party can cross-examine the witness.  For those reasons, this justification *strongly* supports concluding that a Fifth Amendment waiver applies only to a single testimonial event where the witness is subject to both direct and cross-examination.

The depositions that occurred in this case qualify as one of these testimonial events. In a deposition, witnesses do not have an opportunity to "mutilate" the truth because both parties have an opportunity to examine the witness. *See* Fed. R. Civ. P. 30(c). As at trial, a witness has an opportunity to present a side of the story favorable to one party, but the other party is entitled to cross-examine the witness on that testimony. This single testimonial event, so long as cross-examination is allowed and performed, comprises the extent of the Fifth Amendment waiver. If a witness chooses to submit to a deposition, as appellants did here, the entirety of their waiver is determined at the deposition—"the breadth of his waiver is determined by the scope of relevant cross-examination." *Brown*, 356 U.S. at 154–55. Once that cross-examination is finished and the parties each had an opportunity to elicit facts favorable to them, the waiver is finished and the witness may choose to assert a privilege anew at a different testimonial event. Yet the fact-finding process is still intact. If the witness does re-assert the privilege at trial or other event, that new assertion does not affect the availability of the deposition testimony—it may well be admissible at trial regardless. *See* Fed. R. Evid. 804 (providing that a witness who claims a privilege is unavailable and, thus, their prior hearsay testimony is admissible at trial); *United States v. Toney*, 599 F.2d 787, 789–90 (6th Cir. 1979) (concluding that a witness's invocation of the Fifth Amendment privilege rendered him "unavailable" under Rule 804); *Roberts*, 622 A.2d at 1235 (explaining that a deposition "generates a potentially admissible transcript that is available to all parties"). The ultimate decider of fact thereby still has an accurate picture of the case.

The need to protect a witness from further incrimination also supports concluding that the two events are separate. The Fifth Amendment applies when witnesses face a real danger of further incrimination. *See Rogers*, 340 U.S. at 374; *Apfelbaum*, 445 U.S. at 128. And the rule that waivers apply throughout their own proceeding but not beyond (as followed by most circuits) is a logical extension of this, intended to account for changed circumstances that may create new grounds for apprehension and for the possibility that witnesses could further incriminate themselves. *See Morganroth*, 718 F.2d at 165; *Roberts*, 622 A.2d at 1235. When a witness is called upon to repeat his or her testimony, several such hazards exist. If a witness is required to testify anew, that witness may either repeat his or her earlier testimony verbatim or provide information in addition to the earlier testimony. Each situation could further incriminate

the witness.   For one, he or she may make new disclosures that reveal new incriminating information.  *See Roberts*, 622 A.2d at 1235; 1 McCormick on Evid., § 140, p. 528 (4th Ed.) ("[I]n the excitement and confusion that may be generated by the second appearance, the witness might make admissions beyond those previously made.").   But even if he or she merely repeated his or her earlier testimony, that could also further incriminate the witness.   Repetition adds credibility to the earlier testimony, *Miranti*, 253 F.2d at 140, and may "encourage prosecution as a practical matter," 1 McCormick on Evid., § 140, p. 528 (4th Ed.).

But whether the witness makes further disclosures or not, testifying anew brings with it the concrete risk of perjury.   Time and again, perjury has been recognized as a legitimate apprehension justifying invocation of the privilege.  *See Morganroth*, 718 F.2d at 166 ("Once a witness has testified under oath, he risks the possibility of perjury charges in addition to any risk he may face for prosecution for non-perjury offenses suggested by his testimony."); 1 McCormick on Evid., § 140, p. 528 (4th Ed.) ("Testimony during the second appearance might . . . increase the risk of liability for perjury based on the first appearance.").   Appellants have clearly articulated this fear—though appellants maintain the veracity of their prior testimony, appellees seek to show that appellants have lied about what they know.   In other words, appellants face a real and concrete danger that they could, intentionally or not, perjure themselves through subsequent testimony.   This too is enough to require a new invocation of the privilege.   "When a witness is asked a question in a subsequent proceeding, the answer to which could show that he has already committed the crime of perjury in a prior proceeding, his refusal to answer is permissible almost by the definition of self-incrimination."  *Morganroth*, 718 F.2d at 166. *Morganroth*'s admonition makes little sense if separate testimonial events are still part of the same "proceeding" for Fifth Amendment purposes.

This flows into another justification:   changed circumstances leading to greater apprehension.   In this case, appellants were deposed in 2020; their trial testimony was required in 2022 and would be again in 2023 and beyond.   During the intervening time, new risks have indeed presented themselves.   In addition to new apprehensions from repetition of testimony or perjury, appellants are also now facing criminal indictments.   While appellants knew of the criminal investigations into their conduct and they still chose to waive their privilege at their

depositions, they did not *know* if they would face new charges in the future, and, if so, what those charges would be.  Courts have addressed situations where multiple years had passed and an intervening indictment had occurred, noting that this was enough to justify requiring a new waiver of Fifth Amendment privileges.  *See, e.g.*, *Miranti*, 253 F.2d at 140 (concluding that the passage of a year and an intervening indictment and conviction "render[ed] the proceedings separate for the purposes of the waiver rule"); *Samuel*, 45 N.E. at 729 (noting that the privilege did not apply when the waiver was "made long prior to the trial"); *Ellis v. United States*, 416 F.2d 791, 805 (D.C. Cir. 1969) (noting that its holding that a waiver carries forward to a different proceeding does not apply "when the witness is himself accused or under indictment").  So whether appellants should have known new indictments were coming is an immaterial element in this determination—courts focus instead on what actually transpired for the witnesses and how those new events resulted in changed circumstances.[19]

Finally, we consider the purpose of the two events at issue.  In *Neff*, the court reasoned that a grand jury and a trial were separate proceedings because of their different purposes. 206 F.2d at 152.  And in *Mitchell*, the Supreme Court considered the differing purposes of a plea and sentencing hearings, though it declined to decide whether the two were separate proceedings. *See* 526 U.S. at 322–23, 325, 327.  Similarly, the divergent purposes of a deposition and a trial support concluding that the two are not one "proceeding" for Fifth Amendment purposes.  A trial and a deposition serve different evidentiary purposes, even though they may share similar procedures.  A trial is the "judicial investigation and determination of the issues between the parties to an action before a competent tribunal."  75 Am. Jur. 2d *Trial* § 1 (May 2022 Update). Its purpose is to determine conclusively the "validity of the allegations."  *Id*. at § 2.  *See also Trial*, Black's Law Dictionary (11th Ed. 2019) ("A *formal* judicial examination of evidence and determination of legal claims in an adversary proceeding." (emphasis added)).  In other words, the trial is the actual, final determination of questions of fact—it is when issues are conclusively decided.  A deposition is different.  It is questioning performed in anticipation of trial to

---

[19]*Peeler*, again, does not change this because the Solicitor General has vowed to refile (or appeal) any dismissed charges.  But even if those charges are forever dismissed, appellants still face a new fear of perjury for their testimony.  *Cf. Morganroth*, 718 F.2d at 166.  Thus, appellants still face a real possibility of further incrimination, and *Peeler* does not affect their right to claim the privilege at trial.

"produce[] relevant evidence which is useful in determining the merits of the claims asserted by the parties." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975). *See also Deposition*, Black's Law Dictionary (11th Ed. 2019) ("A witness's out-of-court testimony that is reduced to writing . . . for later use in court or for discovery purposes."). A deposition is certainly done to assist with discovery and to produce evidence for trial. But it is not the trial. To that end, the federal rules have different procedures for taking deposition and trial testimony. For example, when taking deposition testimony, a witness must assert an objection to a question, yet the "testimony is taken subject to any objection." Fed. R. Civ. P. 30(c)(2). A witness is permitted not to answer only in limited circumstances, such as "when necessary to preserve a privilege." *Id*. These rules demonstrate an intent to produce as much evidence as possible during discovery. At trial, however, an accurate and trustworthy presentation of evidence is paramount. Parties may object to the admissibility of testimony or other evidence. *See* 75 Am. Jur. 2d *Trial* § 303. The district court is required to rule on those objections, and, unlike depositions, it may exclude evidence if an objection is valid. *Id*. at § 310. Consequently, though there may be some similarities between a deposition and trial, the two share different purposes and, thus, are separate.

For these reasons, we conclude that a deposition and trial are separate proceedings for Fifth Amendment purposes. The logic, justifications, and purpose underlying the Fifth Amendment support concluding that a single testimonial event is its own proceeding for purposes of a waiver. Cross-examination is the mechanism employed by our evidentiary system to protect the fact-finding process and to prevent distortion of the truth. Here, appellants were subject to such cross-examination during their deposition. They may face further incrimination during trial by repetition of their testimony, the possibility of further disclosure, and the threat of perjury. The purposes of a deposition and trial serve different ends. And caselaw and treatises, though not uniform, largely support such a conclusion. Therefore, appellants' waiver of their Fifth Amendment privileges at their depositions did not necessarily waive the privilege for purposes of trial.

E.

Before moving on, we take the opportunity to respond to the dissent.  Unlike the concurrence, our opinions agree that we should examine the logic and purposes of the Fifth Amendment to resolve our "proceeding" inquiry.[20]  However, we diverge on its application, as the dissent would affirm the district court and conclude that a deposition and a trial in the same civil case are part of the same "proceeding."  We find the dissent's examination and application of these purposes unpersuasive.

To begin, the dissent's analysis repeatedly relies on the premise that appellants had "reason to know" that they were waiving the privilege at their deposition; consequently, they should have known the waivers would carry forward to trial, notwithstanding any changed circumstances.  However, this standard has little basis in caselaw.  The dissent divines the "reason to know" standard not from our court or from the Supreme Court, but from a wholly distinguishable and sometimes-questioned Second Circuit opinion, *Klein v. Harris*, 667 F.2d 274 (2d. Cir. 1981).  There, a witness testified for the defendant and was recalled to testify when he stated privately to defense counsel that he had "lied on the stand;" yet when recalled, the witness invoked his Fifth Amendment privilege.  *Id*. at 279–80.  To determine whether a waiver occurred, the Second Circuit invented a two-part test:

> [W]e read the prior decisions of the Supreme Court and the courts of this Circuit to hold that a court should only infer a waiver of the fifth amendment's privilege against self-incrimination from a witness' prior statements if (1) the witness' prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth, and (2) the witness had *reason to know* that his prior statements would be interpreted as a waiver of the fifth amendment's privilege against self-incrimination.

*Id*. at 287 (emphasis added).  Applying that test, the court held that the witness, "by testifying freely about the circumstances of the crime when he first took the stand, waived any fifth amendment privilege he might otherwise have been entitled to invoke to avoid testifying" about

---

[20]There is good reason for this approach, even beyond *Mitchell*.  When addressing constitutional questions of first impression, both the Supreme Court and our court have turned to the purposes or rationales underlying the constitutional provisions.  *See, e.g.*, *United States v. Gillock*, 445 U.S. 360, 369–73 (1980); *United States v. Beckham*, 789 F.2d 401, 413–14 (6th Cir. 1986).

the crime.  *Id*. at 289.  "Where, as here, a witness' prior testimony results in a testimonial waiver of the witness' fifth amendment privilege, the trial judge must, if the witness is subsequently recalled to the stand, direct the witness to testify, if necessary under penalty of contempt."  *Id.*

Application of this "reason to know" standard here is problematic.  For one, *Klein* addressed two instances of testifying during a single trial.  Of course, that factual distinction by itself does not discredit the case; we must consider its reasoning if the Fifth Amendment requires imputing some knowledge to the witnesses.  But it is not clear that the Fifth Amendment does so, and certainly not for our purposes today.  *Klein* did not cite the caselaw upon which it relied for its two-part standard; it merely declared that it "read [those] prior decisions" as supporting its purported "reason to know" standard.  667 F.2d at 287.  This standard has been questioned, *see* 1 McCormick on Evid., § 133 (8th Ed.) ("This approach has been criticized as inconsistent with the Supreme Court's analysis of the privilege . . . ."), and for good reason.  The Supreme Court does not require a "knowing and intelligent" waiver in the Fifth Amendment context, yet *Klein*'s standard explicitly assesses a witness's purported knowledge for waiver purposes.  *Cf. Garner v. United States*, 424 U.S. 648, 654 n.9 (1976).  This has led one court to conclude that *Klein* "improperly adds elements" to the waiver analysis.  *See In re A & L Oil Co., Inc.*, 200 B.R. 21, 25 (Bankr. D.N.J. 1996).  Further, the "reason to know" element is not integral to other courts' determinations of whether two different events are part of the same "proceeding."  Those cases instead focus on individual testimonial events and the ability to prevent distortion of the truth through cross-examination.  *See Brown*, 356 U.S. at 154–56; *Mitchell*, 526 U.S. at 322–23; *Duckworth*, 264 N.W. at 721; *Samuel*, 45 N.E. at 729; *Parcels of Land*, 903 F.2d at 43.  Courts, apart from *Klein* and the few that rely on it, do not undertake a "reason to know" analysis when determining "proceeding" questions under the Fifth Amendment.[21]

---

[21]We acknowledge that some courts have adopted *Klein*'s test.  *See, e.g.*, *State v. Barros*, 148 A.3d 168, 176 (R.I. 2016); 1 McCormick on Evid. § 133 n.18 (8th Ed.).  But we have not found *widespread* adoption of this test, *cf. In re Saunders*, 528 B.R. 860, 867–68 (N.D. Ga. 2015) (describing the test as "widely adopted"), and we note that, perhaps contrary to *Klein*, at least one other court has concluded that a witness did not waive her privilege by previously testifying at the same trial, *see People v. Bagby*, 482 N.E.2d 41, 43–44 (N.Y. 1985).  In sum, the opinions adopting *Klein*'s standard have neither critically examined *Klein* nor evaluated whether its standard is consistent with the Fifth Amendment analysis employed by most courts addressing whether two events are the same "proceeding."  We find their adoption of *Klein*'s test unpersuasive for our purposes.

Nos. 22-1353/1355/1357/1358/1360      *Walters, et al.  v. Richard Snyder, et al.*      Page 35

In any event, even if it is appropriate to consider *Klein*'s "reason to know" element when addressing some Fifth Amendment issues, it does not apply here.  The issue in *Klein*, as in *Mitchell*, was whether a waiver had occurred in the first place.  *See* 667 F.2d at 287.  It was not focused on the scope of a waiver or whether two different testimonial events were part of the same proceeding—indeed, the court presumed without discussion that it was dealing with a single proceeding.  *See id.* at 288 (noting simply that waiver statements must be "voluntarily made under oath in the context of the same judicial proceeding").  This proceeding question was not answered in *Klein*, so we cannot (and should not) rely so heavily on its "reason to know" statement for purposes of our proceeding inquiry.  To derive a rule from a case that did not address the pertinent question is "to build a syllogism upon a conjecture."  *People v. Seewald*, 879 N.W.2d 237, 242 n.26 (Mich. 2016).  *See also Wright v. Spaulding*, 939 F.3d 695, 702 (6th Cir. 2019) ("[Q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (quotation marks and citation omitted)); Bryan A. Garner, et al., *The Law of Judicial Precedent* 87–88 (Thompson Reuters 2016) (explaining that "assumed rules" do not make a "centerpiece" for an argument).  In sum, this "reason to know" element does not assist with our Fifth Amendment analysis; it speaks only to the issue of whether a waiver occurred in the first place.  It has little applicability here where appellants concede—and rightly so—that their deposition testimony constituted a waiver but only for purposes of the deposition itself.[22]

The dissent's other arguments concerning the purposes of the Fifth Amendment are similarly unavailing.  In discussing the need to prevent distortion of the truth, the dissent opines that the need to prevent discovery abuses and to promote fairness "tips in favor of holding a deponent to their waiver come trial."  Dissent, p. 65.  It is "not unfair to require further testimony as to incriminating details once a witness chooses to testify about incriminating facts," because "[a]llowing a witness to testify at a deposition only then to allow them to invoke their privilege against self-incrimination on the same subjects about which they were already deposed would

---

[22]To be sure, we do not criticize the whole of *Klein*, including whether it reached the right conclusion or whether other aspects of its two-part test may assist with Fifth Amendment issues.  Whether two different acts of testifying at one trial are separate proceedings for Fifth Amendment purposes is not before us.  Our criticism is directed solely at reliance on *Klein*'s "reason to know" element for our analysis when that element is not closely entwined with most courts' analysis of "proceeding" questions.

both give a witness insight into the questions that a party might ask at trial as well as let the witness avoid providing follow-up answers based on the ones that they have already given." Dissent, pp. 61, 65.  However, the dissent places a high reliance on fairness interests that are not found in caselaw.  Courts have not held that the Fifth Amendment should always produce the fairest discovery procedures, such as prohibiting insight into the opposing parties' theories or relying on live, not recorded, testimony at trial.  Such concerns, though reasonable, are not part of the logic underlying the Fifth Amendment.  Rather, the Fifth Amendment is expressly concerned with preventing distortion of the truth and self-selected testimony, and we emphasize again that it provides for cross-examination as the mechanism to protect that truth.  *See Brown*, 356 U.S. at 154–56.  But, as a byproduct, the purposes and justifications for the Fifth Amendment still mitigate the possibility of discovery abuse.  A deponent is still subject to examination and cross-examination at a deposition; thus, he or she cannot avoid follow-up examination.  Additionally, while the discovery process often benefits from live testimony, it nonetheless remains that the waived deposition testimony is likely preserved and available for viewing at trial.  *See* Fed. R. Evid. 804; *Toney*, 599 F.2d at 789–90.  A witness who waives his or her privilege only to assert it later at trial will almost certainly not be able to prevent disclosure of those statements, and he or she may even find their testimony subject to an adverse inference in civil cases like this.  *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.") (citation omitted); *Davis v. Mut. Life Ins. Co. of New York*, 6 F.3d 367, 384–85 (6th Cir. 1993) (extending the possible inference to non-party witnesses).  *But see Griffith v. California*, 380 U.S. 609, 613–15 (1965) (forbidding such inference in criminal cases).  The dissent gives short shrift to these points. Consequently, we disagree with its conclusion that the distortion rationale favors extending a waiver not only to the deposition, but also to trial; instead, that purpose of the Fifth Amendment continue to favor limiting the waiver to the deposition itself.

The dissent then opines that the further-incrimination rationale supports its conclusion because deponents generally should know that their statements are made in preparation of trial and, thus, it is not unfair to carry those statements forward.  Again, the dissent relies on unpersuasive fairness concerns and a "reason to know" standard inapplicable here.  But another

point deserves response:  the dissent incorrectly dismisses *Morganroth* and its perjury discussion as further justification that a deposition and trial are separate proceedings.  It concludes that *Morganroth* involved two different civil cases and, thus, did not speak to whether a deposition and trial were separate proceedings.  Though *Morganroth* unquestionably involved two separate proceedings and did not resolve our issue, its reasoning nonetheless supports concluding that a single testimonial event, such as a deposition or trial, is its own proceeding for Fifth Amendment purposes.  The Fifth Amendment is designed to protect a witness's right not to be a witness against himself, and it applies when there is a real danger of incrimination.  *Estelle*, 451 U.S. at 467–68; *Rogers*, 340 U.S. at 374.  When a witness testifies, that always brings with it the possibility of incriminating testimony, including perjury.  Thus, to avoid the possibility of *further* incrimination, a waiver should apply only to a single testimonial event.  Otherwise, a witness will be compelled to give testimony that could be used to incriminate him.  Here, appellants did not face the same risks at their depositions as they did at trial—the likelihood of perjury, increased credibility of their already incriminating testimony, and a greater possibility of prosecution are all new apprehensions.  *See Miranti*, 253 F.2d at 140; *Morganroth*, 718 F.2d at 166; 1 McCormick on Evid., § 140, p. 528 (4th Ed.).  Therefore, forcing a witness to testify anew bring with it new risks of incrimination—meaning a new waiver is required for a new testimonial event in the face of such new apprehensions.

Finally, we disagree with the dissent's characterization of the purposes of a deposition and trial.  We agree that a deposition and trial are more similar than a plea hearing and sentencing, *see Mitchell*, 526 U.S. at 322–23, or a grand jury and criminal trial, *see Neff*, 206 F.2d at 152.  And we acknowledge that many of the procedures governing depositions are similar to, if not the same as, trial.  *See generally* Fed. R. Civ. P. 30(c).  Depositions may indeed be conducted in preparation for trial and help to "sidestep the need for trial altogether;" from a practical perspective, a deponent likely should not "reasonably be surprised when they are called to testify at trial about matters covered in their deposition."  Dissent, pp. 61, 63.  But despite these arguments to the contrary, the dissent cannot overcome the basic, immutable fact that a deposition is not a trial.  No matter how closely entwined they may seem, their purposes are distinct.  *Compare* 75 Am. Jur. 2d *Trial* § 1, *with Blue Chip Stamps*, 421 U.S. at 741.  And the divergent purposes of the two events at issue support concluding that a testimonial event, such as

*a* deposition or *a* trial, is its own proceeding for Fifth Amendment purposes.  Therefore, we reject the dissent's arguments to the contrary.

F.

While our conclusion that the two testimonial events here are separate proceedings does not *necessarily* mean a waiver occurred at trial, it does not conclusively resolve the issue.  Our circuit has not determined whether a waiver at one proceeding carries over to the next.  *Morganroth*, 718 F.2d at 165–166.  However, a large majority of jurisdictions have concluded that a waiver "in one proceeding does not constitute a waiver . . . in a second proceeding."  *Id*. at 165.  *See, e.g.*, *United States v. Licavoli*, 604 F.2d 613, 623 (9th Cir. 1979); *United States v. Cain*, 544 F.2d 1113, 1117 (1st Cir. 1976); *Miranti*, 253 F.2d at 139; *Neff*, 206 F.2d at 152; *Poretto v. United States*, 196 F.2d at 394 (5th Cir. 1952).  As described, this "majority" rule is predicated on certain justifications:  that a change in conditions may "creat[e] new grounds for apprehension" and that repetition of testimony "could constitute an independent source of evidence against" the witness.  *Morganroth*, 718 F.2d at 165.

Only the D.C. Circuit's decision in *Ellis* is discordant.  416 F.2d at 791.  In its view, "[o]nce a witness has voluntarily spoken out, we do not see how his protected interest is jeopardized by testifying in a subsequent proceeding, provided he is not required to disclose matters of substance which are unknown to the Government."  416 F.2d at 801.  Thus, no extra risk of incrimination was present, and a finding of waiver for the second proceeding would not expose the witness to further harm.  *Id*. at 801–02.  But *Ellis* did not extend its holding to "apply when the witness is himself accused or under indictment."  *Id*. at 805.

As our above analysis supports concluding that a deposition and trial are separate proceedings, it similarly requires adopting the majority rule that a waiver in one proceeding does not carry forward to another.  The great weight of authority supports concluding that waivers do not carry over; *Ellis* stands by itself and has been questioned.  *See, e.g.*, 1 McCormick on Evid., § 140, p. 528 (4th Ed.) ("*Ellis* unwisely extends a witness's loss of his privilege beyond the 'proceeding' in which he testifies.").  There is a good reason for this criticism.  For one, *Ellis* goes against the principle that the Fifth Amendment privilege should be interpreted broadly without providing a compelling justification for doing so.  *Cf. Hoffman*, 341 U.S. at 486.  And, as

recognized in other cases, *Ellis* incorrectly assumes that requiring a witness to testify anew would not expose the witness to any additional risk of harm. *See Johnson*, 488 F.2d at 1210–11 (critiquing *Ellis*'s assumption that "the witness' testimony at trial would cover nothing not already disclosed to the grand jury"). But other cases demonstrate that this is false. The risk of perjury alone, such as discussed in *Morganroth*, would give rise to a new risk of harm. Testifying anew subjects the witness to a risk of new, inadvertent disclosure. And even if the witness discloses nothing new, repeating testimony lends credibility to that testimony and encourages prosecution for the disclosed incriminating facts. *See, e.g.*, *Miranti*, 253 F.2d at 140. Thus, new risks necessarily exist when a witness testifies again, and *Ellis* relied on faulty reasoning for suggesting otherwise. In short, cabining a waiver to its own proceeding protects a witness's right to assert the privilege free of new apprehensions and independent sources of evidence against them. Compelling a witness to provide testimony in a second proceeding when facing these risks contravenes the Fifth Amendment. In sum, a waiver of testimony in one proceeding does not waive it for the next. For that reason, appellants' waiver at the first proceeding (their depositions) does not conclusively carry over to the second (the forthcoming trials).

## G.

Given our holding that appellants may assert their privilege at trial, we must now finish with the issue of how they may do so. Appellants argue that they are entitled to a "blanket assertion" of immunity, while appellees assert that they must do so on a question-by-question basis.

Parties are entitled to a blanket assertion of the Fifth Amendment privilege only in limited circumstances. "The longstanding rule of this circuit is that a defendant must take the stand and answer individualized questions in order to invoke his Fifth Amendment privilege." *United States v. Bates*, 552 F.3d 472, 475 (6th Cir. 2009). *See also Morganroth*, 718 F.3d at 167 ("The privilege must be asserted by a witness with respect to particular questions . . . ."). Generally, a blanket assertion, by itself, does not demonstrate the "reasonable fear of danger of prosecution" needed to invoke the privilege. *United States v. Highgate*, 521 F.3d 590, 593–94 (6th Cir. 2008). But we have also recognized that, "in instances where the witness has a clear

entitlement to claim the privilege," such as where a party seeks to blame the witness for the alleged wrongs committed, "forcing the witness to take the stand would be futile and thus unnecessary." *United States v. McAllister*, 693 F.3d 572, 583–84 (6th Cir. 2012) (quotation omitted). "In such a case, the reason behind the rule does not apply because the court already knows that 'reasonable cause' to invoke the privilege exists." *Id*. at 583 (quoting *Bates*, 552 F.3d at 476). But in either instance, the district court must "actually *decide* whether [the] witness' silence is justified." *Highgate*, 521 F.3d at 594 (quotation omitted).

The district court has not made such a decision here. It has neither conducted a question-by-question inquiry nor concluded that appellants would invoke the privilege in response to every question asked. While the district court allowed appellants to invoke the privilege at the now-finished trial, this was merely a practical acknowledgement that appellants were not going to testify, notwithstanding the district court's opinion to the contrary. It did not flow from a determination that appellants are actually eligible to invoke the privilege, as we determine today. And while the district court appears to have recognized the overlap between appellants' testimony and the pending criminal prosecutions, *Sherrod, Teed, Vanderhagen & Ware*, 2022 WL 834009 at *3 ("Because movants are under criminal indictment for the very conduct at issue in this civil case, there is no question that they would ordinarily be entitled to their silence."), this passing comment is no substitute for the decision required. Even if the district court's comment indicates that appellants can and will invoke the privilege as to every question posed to them, that court nonetheless retains its discretion to call appellants to testify and conduct a Fifth Amendment analysis on the stand. Because we are a "a court of review, not first view," *Taylor v. City of Saginaw*, 11 F.4th 483, 489 (6th Cir. 2021) (citation omitted), we remand the issue of whether appellants are entitled to a blanket assertion of the privilege to the district court to decide in the first instance.

## IV.

In our adversarial justice system, a party has the responsibility to "produce the evidence against [another] by its own independent labors." *Miranda v. Arizona*, 384 U.S. 436, 460 (1966). The Fifth Amendment is thus grounded on this "overriding thought:" that a witness "is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his

Nos. 22-1353/1355/1357/1358/1360      *Walters, et al.  v. Richard Snyder, et al.*      Page 41

own will.'"  *Id.* (quoting *Malloy*, 378 U.S. at 8.).  Appellants here voluntarily waived their privilege by sitting for their depositions, and appellees had the opportunity to determine the scope of that waiver through cross-examination.  But once that testimonial event concluded, the Fifth Amendment again protected appellants, absent a further waiver.  We thus hold that appellants' deposition waivers did not waive the privilege at trial because the waiver extended only through the end of cross-examination at their depositions.

Therefore, we vacate the district court's order denying the motions to quash and remand for further proceedings consistent with this opinion.

---

## CONCURRING IN PART AND IN THE JUDGMENT

---

THAPAR, J., concurring in the introduction, section III.G, and section IV of Judge Griffin's opinion and in the judgment.

This appeal presents two questions.  First:  Is this case moot?  For the reasons below, I conclude it is and would hold we lack jurisdiction.  But my colleagues hold we have jurisdiction, so we must proceed to the second question:  Are appellants entitled to invoke their Fifth Amendment right to remain silent at trial, or did they waive that right by testifying at their depositions?  Because appellants' waiver extends only through cross-examination, appellants can invoke the Fifth Amendment when called to testify anew at trial.  Thus, I agree with Judge Griffin on the bottom line.  I write separately, however, to explain my thinking on both mootness and the merits.

### I.

Jurisdiction first.  In my view, this case is moot.  Thus, I would vacate the district court's order denying the motion to quash and remand with instructions to dismiss as moot.  *See United States v. Munsingwear*, 340 U.S. 36, 39–41 (1950).

The procedural history is key to the mootness question here.  Appellants are government officials called to testify as non-party witnesses in the civil litigation concerning the Flint Water Crisis.  Invoking the Fifth Amendment, appellants moved to quash subpoenas compelling their testimony at trial.  The district court denied the motions, but the witnesses still refused to testify.  Rather than holding the witnesses in contempt, the district court certified the Fifth Amendment question underlying the motions to quash for our review.

One problem:  The subpoenas applied to the underlying trial.  *See* Fed. R. Civ. P. 45(a)(ii)–(iii).  And that trial is now over.  That means the subpoenas at issue can no longer be used to compel appellants to testify.  Without subpoenas to quash, "it is impossible for [our] court to grant any effectual relief whatever." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).  Thus,

this case is moot unless saved by an "exception" to mootness doctrine.  On this much, my colleagues and I all agree.

Unlike my colleagues, I do not believe the "capable-of-repetition-yet-evading-review" exception saves the day.  That exception applies only if (1) the challenged action can't be fully litigated before it expires (evading review), and (2) there's a "reasonable expectation that the same complaining party would be subjected to the same action again" (capable of repetition). *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975).[1]  Here, all agree this case is capable of repetition:  Indeed, appellees confirm they plan to subpoena these same government witnesses in future bellwether trials.  So the sole question is whether the Fifth Amendment question evades review.

It does not.  Evading-review analysis is forward looking.  *See* 13C Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 3533.8, 3533.8.2 (3d ed.).  And here, even if the Fifth Amendment question evaded review in *this* case, there are multiple routes for effective review in the future.

For one, the district court could stay the proceedings.  An issue does not "evade review" when the appealing party can seek a stay.  *See United States v. Taylor*, 8 F.3d 1074, 1076–77 (6th Cir. 1993).  In this case, appellants never moved to stay the proceedings pending appeal. But they could have and can in the next case.

For another, the district court could hold appellants in contempt.  If held in contempt, appellants could "obtain full review of [their] claims before undertaking any burden of compliance with the subpoena." *United States v. Ryan*, 402 U.S. 530, 533 (1971) (explaining the proper route to interlocutory appeal of a motion to quash is from a contempt order).  Either of these avenues would suffice for appellate review in the next case.

My colleagues dismiss these possibilities.  They predict that future litigation will proceed too quickly to ensure effective review.  But timing alone is insufficient to satisfy the evading-

---

[1]While some have suggested the evading-review prong is merely prudential, we're bound by circuit precedent to treat both prongs of the exception's test as justified by Article III.  *Compare Honig v. Doe*, 484 U.S. 305, 341 (1988) (Scalia, J., dissenting), *with Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 596 n.3 (6th Cir. 2014).

review prong.  What matters is whether there's something "inherent in the type of injury alleged" that deprives the parties and the district court of an opportunity to preserve the question for review.  *In re Kulp Foundry, Inc.*, 691 F.2d 1125, 1130 (3d Cir. 1982).  In the future bellwether trials in this matter, the district court has the needed tools to allow for effective review before mootness occurs.  It is true this may not be the most efficient route.  But efficiency is not an exception to Article III.

Finally, my colleagues emphasize fairness concerns.  They note appellants acted diligently and suggest appellants deserve a decision on the merits since the mootness problem is not their fault.  But mootness frequently occurs through no fault of either party.  If it occurs while an appeal is pending, the proper remedy is vacatur, which "clears the path for future relitigation of the issues."  *Munsingwear*, 340 U.S. at 40.  And fairness alone does not justify exercising judicial authority when jurisdiction is lacking.

Thus, this case is moot and no exception can rescue it.  But my colleagues conclude otherwise.  They then proceed to part ways on the merits.  That puts me in a curious position. I don't think we should proceed to the merits at all.  But if I say nothing on the merits, the court would (1) hold we have jurisdiction, and then (2) fail to decide the case.  That we cannot do.  *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (Marshall, C.J.) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.").  Another way to think of it is as if we were filing two opinions.  If the panel decided the mootness question in one opinion, I would have dissented.  But losing that issue would not excuse me from participating in the next appeal.  Because we must adjudicate the case in front of us, I assume, "as I must in light of the [majority's] decision, that the Court does have jurisdiction of the appeal." *United States v. Vuitch*, 402 U.S. 62, 98 (1971) (Blackmun, J., concurring in part and concurring in the judgment).

## II.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  Text and history reveal that when answering a question might subject a witness to criminal liability, he may either invoke or waive

his right to remain silent.  But when he waives his right, that waiver doesn't last forever:  It lasts only through cross-examination.  Thus, appellants' waivers at their depositions don't extend to trial.

A.

When analyzing the rights enshrined in our Constitution, we often start with English common law.  Why?  Because that's where many of those rights originated.  In some instances, the American founding fathers sought to protect rights recognized at common law.  *See, e.g.*, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395–96 (2020) (discussing common-law origins of the Sixth Amendment jury-trial right); *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (discussing common-law origins of the Eighth Amendment prohibition on cruel and unusual punishment).  In other instances, the failure to protect certain rights in England revealed the necessity of protecting those rights in our written Constitution.  *See, e.g.*, *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 569–70 (6th Cir. 2018) (Thapar, J., concurring in part and dissenting in part) (discussing "oppressive English search practices that inspired the founding generation to adopt the Fourth Amendment").

The English had good reason to be concerned about compulsory self-incrimination.  Both the English ecclesiastical courts and the Court of the Star Chamber employed the "ex officio oath," requiring an accused to swear to answer truthfully all questions that might be put to him— without knowing what those questions might be.  *See* John H. Langbein, *The Historical Origins of the Privilege Against Self-Incrimination at Common Law*, 92 Mich. L. Rev. 1047, 1073 (1994); *see also Jones v. SEC*, 298 U.S. 1, 28 (1936) (recognizing "compulsory self-accusation" as "among those intolerable abuses of the Star Chamber, which brought that institution to an end").  This was especially problematic for religious dissenters, as they were "typically guilty of the nonconformist religious practices for which they were being investigated."  Langbein, *supra*, at 1073.  Anyone who refused this "inquisitional oath" could be held in contempt, imprisoned, and even tortured.  *See id.* at 1073, 1084–85; *see also* R. Carter Pittman, *The Colonial and Constitutional History of the Privilege Against Self-Incrimination in America*, 21 Va. L. Rev. 763, 773, 778 (1935).

Many English citizens suffered under this oath.  But one English dissenter named John Lilburne—also known as "Freeborn John" for his spirited defenses of the rights of Englishmen—is often credited for drawing the public's focus to the importance of the right against self-incrimination and the injustice of the oath procedure.  *See* E.M. Morgan, *The Privilege Against Self-Incrimination*, 34 Minn. L. Rev. 1, 9 (1949); John H. Wigmore, *Privilege Against Self-Crimination; Its History*, 15 Harv. L. Rev. 610, 624–26 (1902).  In 1637, Lilburne was accused of importing seditious books from Holland.  Brought before the Star Chamber, he refused to answer incriminating questions under oath and decried "the injustice of forcing a man to be the means of his own undoing."  Leonard W. Levy, *Origins of the Fifth Amendment* 271 (2d ed. 1986).[2]  The court found him guilty of contempt.  *See Lilburne's Case*, 3 How. St. Tr. 1315 (Star Chamber 1637).

Lilburne's sentence was severe:  On a two-mile walk from prison to a pillory at Westminster, he was tied to the back of a cart, stripped to the waist, and whipped every few steps.  At Westminster—beaten nearly to death, head clamped in the pillory—he addressed the gathered crowd at length about their freeborn rights.  He explained the Star Chamber oath was "absolutely against the law of God; for that law requires no man to accuse himself."  Levy, *supra*, at 277.  But Lilburne's suffering was not in vain.  Some years later, the House of Lords granted Lilburne reparation and vacated his sentence, declaring it "illegal, and most unjust, against the liberty of the subject and law of the land."  Wigmore, *supra*, at 625.  And for his fellow countrymen, Lilburne's advocacy helped secure the right against compulsory self-incrimination at English common law.

The English legal tradition shaped the founding generation's understanding and appreciation of the right against compulsory self-incrimination.  *See, e.g.*, Federal Farmer No. VI, in 2 *The Complete Anti-Federalist* 262 (Herbert J. Storing ed. 1981) (calling the right

---

[2]Historians debate whether the right against compulsory self-incrimination was an English invention (as Leonard Levy contends) or a European one.  *See* Langbein, *supra*, at 1072 (describing scholarly debate); *see also* Leonard W. Levy, Origins of the Fifth Amendment *and Its Critics*, 19 Cardozo L. Rev. 821 (1997) (responding to criticism).  But wherever the right originated, the English common-law tradition informed the right in America.  *See* R.H. Helmholz, *Origins of the Privilege Against Self-Incrimination: The Role of the European Ius Commune*, 65 N.Y.U. L. Rev. 962, 989–90 (1990) ("The privilege became a part of our law because the common lawyers took up its cause, embraced, and expanded it.  In this sense Levy is of course right to focus on the English common law.").

"unalienable or fundamental"); *see also Brown v. Walker*, 161 U.S. 591, 596–97 (1896) (discussing the influence of English common-law right at the founding).  Indeed, eight of the original states included protections against compulsory self-incrimination in their founding-era constitutions.  *See United States v. Hubbell*, 530 U.S. 27, 52 (2000) (Thomas, J., concurring). The Commonwealth of Virginia led the way in 1776, providing that no man could "be compelled to give evidence against himself."  *Id.* (quoting Virginia Declaration of Rights § 8 (1776)).  The states that followed all likewise framed the right as one against being compelled to "give evidence" or "furnish evidence" against oneself.  *See id.*

Then came time to ratify the federal Constitution.  Many feared that nothing in the new Constitution prevented the use of torture to extract a man's confession—a practice associated with tyranny.  *See, e.g.*, Remarks by Patrick Henry in the Virginia Debates, in 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 447–48 (Jonathan Elliot ed., 1891) (hereinafter "Elliot").  George Mason, who had drafted the Virginian self-incrimination clause, explained that a clause "provid[ing] that no man can give evidence against himself" would protect against such evils.  *Id.* at 452.  Other Anti-Federalists agreed:  Just as it had been necessary to include such protections in the state constitutions, it was "necessary under the general government" to declare that no man shall "be compelled to accuse, or furnish evidence against himself."  Brutus No. 2, in 2 *The Complete Anti-Federalist* 374–75 (Herbert J. Storing ed. 1981).

In response, James Madison drafted the Fifth Amendment's Self-Incrimination Clause. His precise phrasing was a "linguistic innovation."  Richard A. Nagareda, *Compulsion "to Be a Witness" and the Resurrection of* Boyd, 74 N.Y.U. L. Rev. 1575, 1605 (1999).  But Madison's unique formulation was likely "synonymous with" the phrasing in the state constitutions and the states' proposals for the federal Bill of Rights.  *Hubbell*, 530 U.S. at 53 (Thomas, J., concurring). And like its state-constitution forerunners, the Fifth Amendment's Self-Incrimination Clause incorporated its "common-law backdrop."  *Id.* at 52; *see also* 3 Joseph Story, Commentaries on the Constitution of the United States § 1782 (1st ed. 1833).

By including the Self-Incrimination Clause in the Bill of Rights, the framers affirmed that the American system of justice would reject the historic abuses of the Star Chamber and "that

diabolical institution, the *Inquisition*."   Remarks by Abraham Holmes in the Massachusetts Debates, in 2 Elliot, *supra*, at 111.   More than anything, the Self-Incrimination Clause reflects the framers' "judgment that in a free society, based on respect for the individual, the determination of guilt or innocence by just procedures, in which the accused made no unwilling contribution to his conviction, was more important than punishing the guilty."   Levy, *supra*, at 432.

### B.

While the Fifth Amendment's text tells us what right the framers secured, history illuminates how the protection against compulsory self-incrimination was understood to operate in practice.   *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 378 (1995) (Scalia, J., dissenting) ("Where the meaning of a constitutional text . . . is unclear, the widespread and long-accepted practices of the American people are the best indication of what fundamental beliefs it was intended to enshrine.").   In two famous cases, Chief Justice John Marshall understood the right to apply when a witness's answer might subject him to potential criminal liability.   He further understood that witnesses invoke the privilege on a question-by-question basis.

First, in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), a handful of judges nominated by outgoing President John Adams accused the new Jefferson administration of preventing them from taking office by withholding their commissions to the bench.   Before the Supreme Court, Marbury's counsel, Charles Lee, called to the stand Attorney General Levi Lincoln, who had been entrusted with the commissions.   Lincoln objected to answering some of Lee's questions, arguing that he "ought not to be compelled to answer any thing which might tend to criminate himself."   *Id.* at 144.   Chief Justice Marshall agreed that Lincoln was not "obliged to state any thing which would criminate himself."   *Id.*   Lincoln ultimately agreed to answer all but one question—what had been done with the commissions.   The Court concluded "he was not bound to say." *Id.* at 145.   Lincoln may have burned the commissions. *See* Levy, 19 Cardozo L. Rev. at 859.   But the Court recognized Lincoln's right to keep that information to himself.

Second, a few years later, Chief Justice Marshall presided over the trial of Aaron Burr. *See United States v. Burr*, 25 F. Cas. 38 (C.C.D. Va. 1807). After Burr assembled a small army to secede, President Jefferson ordered his arrest for treason. Before the grand jury, the government asked Burr's private secretary, Charles Willie, if he understood a coded letter that might contain evidence of treason. Willie declined to answer on grounds that answering might incriminate himself. *See id.* at 40 ("To know and conceal the treason of another is misprision of treason, and is punishable by law."). Chief Justice Marshall concluded the privilege didn't apply, because the government's particular question "refer[red] only to the present knowledge of the cipher," which alone couldn't be used to prosecute Willie. *Id.*; *see also* Orin S. Kerr, *Decryption Originalism: The Lessons of Burr*, 134 Harv. L. Rev. 905, 944–45 (2021). So Willie had to answer.

While these cases alone are not determinative, they do demonstrate how the privilege against self-incrimination operated at the founding. They show that the right applies if a witness's answer might subject him to potential criminal liability. *See, e.g.*, *Burr*, 25 F. Cas. at 39 ("There may be questions no direct answer to which could, in any degree, affect [the witness]; and there is no case which goes so far as to say that he is not bound to answer such questions."). And they demonstrate that a witness's invocation of the privilege is evaluated on a question-by-question basis—an approach our precedent likewise endorses. *See, e.g., United States v. Mahar*, 801 F.2d 1477, 1495–97 (6th Cir. 1986).

C.

"Like most rights, the right secured by the [Self-Incrimination Clause] is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) (interpreting the right secured by the Second Amendment). The text itself includes a limitation relevant here: The Self-Incrimination Clause "does not prohibit all self-incrimination but only *compelled* self-incrimination." Akhil Reed Amar & Renée B. Lettow, *Fifth Amendment First Principles: The Self-Incrimination Clause*, 93 Mich. L. Rev. 857, 865 (1995). And there's nothing compulsory about a witness volunteering to testify against himself. From this we get the "waiver rule," which provides that

to the extent a witness has waived his right to remain silent, he can be compelled to provide an incriminating answer.[3]

Historical practice reveals the waiver rule's contours.  *See N.Y. State Rifle & Pistol Assoc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (endorsing reliance on "historical understanding of the Amendment to demark the limits on the exercise of th[e] right").  For more than a century, courts repeatedly recited the same basic rule, in only slightly varying formulations:  Voluntary disclosure of a criminal transaction waives the privilege as to the details of that same criminal transaction.  But *only* that transaction—no others.[4]  *See, e.g.*, *Low v. Mitchell*, 18 Me. 372, 374 (1841).  Thus, if the witness "consents to testify to one matter tending to criminate himself, he must testify fully in all respects relative to that matter so far as material to the issue.  If he waives the privilege, he does so fully in relation to that act."  *Id.*  "But he does not thereby waive his privilege of refusing to reveal other unlawful acts, wholly unconnected with the act, of which he has spoken, even though they may be material to the issue."  *Id.*

History reveals a temporal limit, too.  Early cases that faced this question and specified a limit identified cross-examination as the relevant stopping point.  *See, e.g*, *State v. K.*, 4 N.H. 562, 563 (1829) (explaining that once a witness waives his privilege with respect to "a particular fact in favor of the respondent, he will be bound, on his cross examination, to state all the circumstances relating to that fact").[5]  To be sure, some nineteenth-century cases discussing

---

[3]Here, "waiver" is a bit of a misnomer:  So long as he testifies voluntarily, a witness may unintentionally give up his right to remain silent, simply by failing to assert it.  *See* 1 McCormick on Evid. § 133 (8th ed.); *see also Elhady v. Unidentified CBP Agents*, 18 F.4th 880, 884 n.2 (6th Cir. 2021) ("[W]aiver is affirmative and intentional, whereas forfeiture is a more passive failure to make the timely assertion of a right." (quotation omitted)).

[4]I use "transaction" because it tracks the terminology across numerous early sources.  *See, e.g.*, *Dixon v. Vale* (1824) 171 Eng. Rep. 1195, 1195 ("[following waiver, the witness] is bound to answer all questions relative to that transaction"); *Foster v. Pierce*, 65 Mass. (11 Cush.) 437, 437–38 (1853) (similar); *Coburn v. Odell*, 30 N.H. 540 (1855) (similar); 1 Simon Greenleaf, *Treatise on the Law of Evidence* § 451 (Rees Welsh & Co. ed. 1896) (similar).  Some contemporaneous cases used criminal "act" or "matter" seemingly as a substitute for "transaction."  *See, e.g.*, *Chamberlain v. Willson*, 12 Vt. 491, 493 (1840) ("matter"); *Low*, 18 Me. at 374 (using both "matter" and "act"); *Commonwealth v. Price*, 76 Mass. 472 (1858) ("matter"). The terminology raises an additional question: Once there's a waiver, what constitutes the criminal "transaction" over which that waiver extends?  That question is not before us given our conclusion that appellants did not waive their rights for trial.  But it may well arise in future cases.

[5]*See also, e.g.*, *East v. Chapman* (1827) 172 Eng. Rep. 259, 261 ("[O]n his cross-examination . . . [the witness] appealed to the Court to say if he was bound to answer.  [The Court replied:] I think, having given evidence, you must answer the question."); *Chamberlain*, 12 Vt. at 493 (1840) ("[I]f he submit to testify about the

waiver failed to specify for how long that waiver lasted.  But not even those cases extended a witness's waiver beyond cross-examination.

In short, when a witness waives his right to remain silent, that waiver extends (1) only to the details of the specific criminal transactions the witness voluntarily disclosed, and (2) only through the end of cross-examination.

The rule supplied by historical practice makes sense given the Fifth Amendment's background and the context in which it was enacted.  The framers sought to protect individual liberty from tyrannical government.  That liberty included a witness's voluntary choice to risk prosecution by revealing his involvement in a crime.  It would be up to the witness to evaluate the risk and make a choice.  But if a witness's admission of one criminal transaction would allow the government to compel his admission of *other* criminal transactions, perhaps even ones the witness didn't expect to be asked about, by what means could the witness meaningfully evaluate the risk?  *Cf. Coburn v. Odell*, 30 N.H. 540, 566 (1855).  So too if waiver were understood to extend beyond cross-examination—for example, from a deposition on one date to a trial months later.  That's because after a witness has testified once, testifying again almost always exposes a witness to the new risk of "reveal[ing] other unlawful acts, wholly unconnected with the act, of which he has spoken."  *Low*, 18 Me. at 374.  Every time he takes a subsequent oath, a witness "risks the possibility of perjury charges in addition to any risk he may face for prosecution for non-perjury offenses suggested by his testimony."  *In re Morganroth*, 718 F.2d 161, 166 (6th Cir. 1983).  Even if the questions are identical the second time around, the witness faces new

---

very matter tending to criminate himself, without claiming his privilege, he must submit to a full cross-examination."); *Foster*, 65 Mass. at 439 (same); *Price*, 76 Mass. at 476 (similar); *Town of Norfolk v. Gaylord*, 28 Conn. 309, 312–13 (1859) ("[I]f he voluntarily testifies in chief, he waives his privilege, and must submit to the consequent cross-examination."); *Connors v. People*, 50 N.Y. 240, 242 (1872) (similar); *State v. Wentworth*, 65 Me. 234, 240 (1875) ("The defendant . . . waived his constitutional privilege.  He then subjected himself to the peril consequent upon a cross-examination as to all matters pertinent to the issue."); *Lockett v. State*, 63 Ala. 5, 11 (1879) ("It can not be tolerated that a person testifying, after stating material facts bearing upon the case, and favorable to one party, shall, when cross-examined in reference to the same subject, decline answering by reason of his privilege not to incriminate himself."); *People v. Freshour*, 55 Cal. 375 (1880) ("[W]hen a witness voluntarily testifies in chief on a particular subject, he may be cross-examined on that subject, even though his answers may criminate or disgrace him."); *Ex parte Senior*, 37 Fla. 1, 22 (1896) ("[I]f a witness, with full knowledge of his rights, consents to testify about the very matter that may criminate him, without claiming his privilege, he must submit to a full, legitimate cross-examination in reference thereto.").

danger.   The limitations history supplies mitigate that risk, consistent with the founders' understanding of the right.

\*      \*      \*

Applying the foregoing to the instant case, the text and history reveal that the appellants can invoke their right to remain silent at trial because their waivers don't extend beyond cross-examination at their depositions.   On remand, the district court should analyze the questions appellees propose to ask and determine whether appellants' invocation of the Fifth Amendment in response to specific questions is justified.

## III.

There are, of course, other ways to analyze the question presented in this case.   But those analyses are not grounded in text and history.   Nor do they supply sufficient reason to disregard appellants' right to remain silent at trial.

## A.

One way to resolve this case is by employing what I'll call the "proceeding-specific rule," but I would not endorse that rule or rely on it to alter my conclusion.   The rule provides that "[a] witness's loss of the privilege by testifying applies *throughout but not beyond* the 'proceeding' in which the witness gave the incriminating testimony."   McCormick on Evid. § 133 (emphasis added).   And it directs us to inquire:  What counts as a single proceeding?

That question is a red herring.   Having established the waiver extends only through cross-examination, history tells us what questions we have left to ask:  What criminal transactions has the witness voluntarily disclosed, if any?   What risks of prosecution has he assumed as a result?   By answering those questions, we can determine how far a witness's waiver extends.   Focusing instead on the meaning of "proceeding" distorts the Fifth Amendment's protections.

So if figuring out the meaning of "proceeding" is asking the wrong question, why ask it?   Some twentieth-century caselaw is to blame.   Throughout much of the twentieth century, most courts properly understood that a waiver at one time didn't extend to another.   *See, e.g., In re Neff*, 206 F.2d 149, 152 (3d Cir. 1953) ("[W]hether or not [the witness] may claim [the privilege]

is to be determined without reference to what he said when testifying as a witness on some other trial, or on a former trial of the same case, and without reference to his declarations at some other time or place."); John Henry Wigmore, *Wigmore's Code of the Rules of Evidence in Trials at Law* § 2377–78 (3d ed. 1942) ("A waiver by taking the stand (1) at *one trial* is not a waiver for a *later trial*, (2) and a waiver at a *preliminary* and *separate proceeding* is not a waiver for the main trial.").

But as too often occurs, key language lost its context.  Two Supreme Court cases reveal what went wrong.  First came *Rogers v. United States*, 340 U.S. 367 (1951), involving a former Treasurer of the Denver Communist Party.  Before a grand jury, Rogers freely admitted her involvement in the Communist Party—an admission which "tend[ed] to criminate [her] under the Smith Act." *Id.* at 372.  But she refused to name her successor.  Rogers testified twice during the grand jury proceedings:  The first time, she declined to answer because she didn't want to get someone else in trouble. *See id.* at 368.  The second time, she invoked the privilege against self-incrimination to justify her refusal. *Id.* at 370. Both times, she was willing to disclose her own incriminating conduct but unwilling to incriminate another. *See id.* at 381.  The Supreme Court held that the Fifth Amendment "would not justify her refusal" to name her successor. *Id.* at 371. And even assuming the privilege could justify Rogers's silence, the Court concluded she had waived it:  After her "admission that she held the office of Treasurer of the Communist Party of Denver, disclosure of acquaintance with her successor presents no more than a 'mere imaginary possibility' of increasing the danger of prosecution." *Id.* at 374–75 (quotations omitted); *see also id.* at 373 ("Disclosure of a fact waives the privilege as to details.").

Later came *Mitchell v. United States*, 526 U.S. 314 (1999), in which the Supreme Court held that a defendant's waiver of her Fifth Amendment right at a plea hearing did not extend to her sentencing hearing. *See id.* at 321.  That holding is consistent with original understanding and solidifies the long-admitted intuition that a witness needn't testify to the same thing he testified to earlier.  But writing for the Court, Justice Kennedy cited *Rogers* for the "well-established" proposition that "a witness, *in a single proceeding*, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." *Id.* (emphasis added).  That phrasing shifted the inquiry.  Whereas our task used to be

defining the scope of a waiver within one instance of testimony, it's become defining the meaning of "proceeding" to determine whether a waiver at one time extends to another.  *See, e.g.*, McCormick on Evid. § 133.

Neither *Rogers* nor *Mitchell* requires us to endorse this "proceeding-specific rule."  The *Rogers* Court held only that the witness's refusal to name her successor was not covered by the privilege.  *See* 340 U.S. at 371–72.  And the *Mitchell* Court held only that the defendant's waiver at a plea hearing did not extend to her sentencing hearing.  *See* 526 U.S. at 321.  Neither holding extends the waiver from one testimonial event to another.  So I would not accept the "proceeding-specific rule" at face value.  Nor would I apply it to deprive the witnesses here of their right to remain silent at trial.

B.

Policy rationales don't compel a different conclusion either.  Of course, our policy judgments must bow to those enshrined in the Constitution.  And neither policy rationale put forward in this case supplies a reason to disregard the Fifth Amendment's text and history.

1.

One is the "distortion-of-truth" rationale.  Because a witness prevents the factfinder from hearing at least some aspect of the truth after invoking the privilege to remain silent, proponents of this rationale seek to stretch the legal framework by requiring fuller disclosure.  And they have some Supreme Court backing.  Precedent recognizes that the Fifth Amendment shouldn't become a "tool" to manipulate the truth.  *See, e.g.*, *Mitchell*, 526 U.S. at 322; *Rogers*, 340 U.S. at 371; *Brown v. United States*, 356 U.S. 148, 156 (1958).  But here, there are at least three reasons to hesitate before relying on this rationale to conclude appellants' waiver extends from deposition to trial.

First, the distortion-of-truth rationale is a relatively recent invention.  Earlier in our history, witnesses could claim the Fifth Amendment's "protection at any stage of the inquiry whether he has already answered the question in part, or not at all."  1 Simon Greenleaf, *Treatise on the Law of Evidence* § 451 (Rees Welsch & Co. ed. 1896).  A witness who invokes his right

to remain silent halfway through answering a question will surely give the jury a less-than-complete look at the truth. But before the mid-twentieth century, courts seemed less troubled by that possibility. *See McIntyre*, 514 U.S. at 372–74 (Scalia, J., dissenting) (recognizing evidence of historical practice "at the time of adoption" as more probative than "more modern phenomen[a]"). And even when the Supreme Court has expressed concerns about a witness's ability to distort the truth, the Court has never held that a waiver extends from deposition to trial. *See, e.g.*, *Brown*, 356 U.S. at 156.

Second, district courts have various tools to prevent parties from benefitting by distorting the truth. *See id.* at 160 (Black, J., dissenting). For example, a court may strike a witness's testimony and instruct the jury to disregard it. When "prejudice to the opposing party [is] extreme and irremediable the court might even enter judgment in [the opposing party's] favor." *Id.* By such means, the district court can ensure a fair trial without "treat[ing the witness] as having waived his privilege[.]" *Id.* True, even careful case management can't stop parties from gaming the discovery process with the Fifth Amendment.[6] But our job is to apply the rule the Fifth Amendment supplies—even if we find it wanting.

Third, it's true the founders recognized the virtue of getting to the truth. But they also limited the tools our government can use to get there, recognizing other interests at play. The Fifth Amendment itself is just one example of such limitations; the Fourth Amendment is another. Looking to text and history provides a way to uncover the balance the Constitution struck between these competing interests. And this method provides greater stability than any method that relies solely on judicial evaluations of what makes good policy sense.

2.

A second policy justification might be named the "fairness rationale" or "reason-to-know rule." The basic idea: It's fair to hold a witness to an earlier waiver if he made "testimonial, incriminating statements" and "plainly ha[d] reason to know, when he [did] so, that these

---

[6]And here, of course, appellants have not gamed the discovery process. Each of the appellants agreed to be deposed between May and September 2020. At that time, no appellant was under indictment. But by the time they were called to testify at the first bellwether trial, all five appellants had been indicted.

Nos. 22-1353/1355/1357/1358/1360    *Walters, et al.  v. Richard Snyder, et al.*    Page 56

statements may be interpreted as a waiver of his fifth amendment privilege against self-incrimination." *Klein v. Harris*, 667 F.2d 274, 288 (2d Cir. 1981).

There are several problems with this rationale.  For one, it disregards the risk of further incrimination witnesses face each time they testify.  For another, it lacks a clear limiting principle:  If what matters is whether the witness had "reason to know" he was waiving his privilege, why draw the line at "single proceeding," instead of holding the witness to his waiver indefinitely?

Finally, this "fairness rationale" is just another policy judgment incapable of displacing the policy judgment the People enshrined in the Fifth Amendment's text.  It may well be in the interest of fairness to indefinitely hold a witness to a waiver he had "reason to know" he was making.  But we're bound to follow the rules supplied by the Constitution, whether we like them or not.

IV.

The text and history of the Fifth Amendment make clear that witnesses may invoke their right against compulsory self-incrimination when answering might expose them to criminal liability.  And once a witness waives his right to remain silent, that waiver extends (1) only to the details of the specific criminal transactions disclosed, and (2) only through the end of cross-examination.  By focusing on "proceeding" and policy concerns, courts have unjustifiably expanded the scope of waiver and contracted the protection of the right.  Honoring the founders' understanding today compels the conclusion that appellants may invoke the Fifth Amendment at trial.  Such a conclusion would be uncontroversial then, as it should be now.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.

Tens of thousands of residents of Flint, Michigan were impacted by exposure to lead and other contamination in the city's water supply. In the wake of what is now infamously known as the Flint Water Crisis, plaintiffs in this case, four minor children, brought civil suits against a group of public officials and two water engineering firms allegedly involved in the debacle. During discovery, plaintiffs deposed five officials who are the appellants in this case: former Governor Richard Snyder; his advisor, Richard Baird; two former City of Flint Emergency Managers, Darnell Earley and Gerald Ambrose; and the former City of Flint Director of Public Works, Howard D. Croft. All sat and answered questions for hours. None invoked their Fifth Amendment privilege against self-incrimination. After being deposed, however, these five officials were indicted on various charges stemming from the Crisis. That led each official to change their mind and invoke their Fifth Amendment privileges at the civil trial, which has since ended in a mistrial.

This interlocutory appeal raises the question of whether the fact that the appellants testified in their respective depositions resulted in their having waived their Fifth Amendment privileges for the civil trial on the subject matter about which they previously testified. The district court determined that they did. *See Sherrod, Teed, Vanderhagen & Ware v. VNA*, No. 5:17-CV-10164-JEL-KGA, 2022 WL 834009 (E.D. Mich. Mar. 21, 2022). Although I agree with Judge Griffin that the issue is not moot, and concur in section II of his opinion, I write separately because I believe that the district court did not err in determining that the appellants waived their Fifth Amendment privileges. I therefore respectfully dissent.

### A. Fifth Amendment Principles

To understand why the district court did not err requires a wide-ranging tour of Fifth Amendment doctrine. The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "The privilege

afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a . . . crime." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). In accordance with this logic, the privilege extends beyond when a person is "involuntarily called as a witness against himself in a criminal prosecution" and "also privileges him not to answer questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *In re Morganroth*, 718 F.2d 161, 164–65 (6th Cir. 1983).

This privilege, however, can be waived. "It is well established that a witness, in *a single proceeding*, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." *Mitchell v. United States*, 526 U.S. 314, 321 (1999) (emphasis added). (I will return to the significance of the emphasized phrase below.) Instead, "[t]he privilege is waived for the matters to which the witness testifies, and the scope of the 'waiver is determined by the scope of relevant cross-examination.'" *Id*. (quoting *Brown v. United States*, 356 U.S. 148, 154–55 (1958)). Aside from live testimony, courts have also held that discovery and evidentiary materials, such as affidavits, operate "like other testimonial statements to raise the possibility that the witness has waived the Fifth Amendment privilege" for the rest of the civil proceeding. *In re Edmond*, 934 F.2d 1304, 1308 (4th Cir. 1991); *cf. United States v. Parcels of Land*, 903 F.2d 36, 43–44 (1st Cir. 1990).

The justifications for this waiver rule are twofold. *See generally Rogers v. United States*, 340 U.S. 367, 371–75 (1951); *Klein v. Harris*, 667 F.2d 274, 287–88 (2d Cir. 1981); *United States v. Yurasovich*, 580 F.2d 1212, 1218–20 (3d Cir. 1978); Note, *Testimonial Waiver of the Privilege Against Self-Incrimination*, 92 HARV. L. REV. 1752, 1753–54 (1979). First, although the Fifth Amendment's privilege against self-incrimination necessarily limits the amount of evidence that courts receive, it is not a tool that a witness may use to distort the truth. *See Mitchell*, 526 U.S. at 322. By preventing witnesses who present their side of the story from then asserting silence in the face of the opposing party's inquiries into the divulged facts, the waiver rule protects both the "trustworthiness of the statements" and "the integrity of the factual inquiry." *Id.* Without this rule, witnesses could use the Fifth Amendment to shape the truth

rather than shield it.  Thus, courts enforce the waiver rule when necessary to avoid "prejudice to a party to the litigation."  *Klein*, 667 F.2d at 288 (citing *E.F. Hutton & Co. v. Jupiter Dev. Corp.*, 91 F.R.D. 110, 116 (S.D.N.Y. 1981)).

Along with this distortion-of-the-truth rationale, there is a further-incrimination rationale. When a witness's prior statements were both "'testimonial,' meaning that they were voluntarily made under oath in the context of the same judicial proceeding," and "incriminating," meaning that they "directly inculpated the witness on the charges at issue," then those statements are naturally the kind that would "likely influence the finder of fact."  *Id.*  In such circumstances, it is fair to conclude that the witness had "reason to know" that they were giving up the protections of the privilege as to relevant details of their disclosures, and to hold the witness to that knowledge.  *Id.*

In this way, a "waiver" in the context of the Fifth Amendment privilege against self-incrimination signifies something different than the term does in other contexts.  For example, defendants must make a "knowing and intelligent" relinquishment of their *Miranda* rights before a court will deem those rights to be waived.  *Garner v. United States*, 424 U.S. 648, 657 (1976). But whereas waiver for the purposes of *Miranda* operates on the assumption that the right is one that the defendant must renounce to lose its protections, the privilege against self-incrimination is a right that the defendant must assert to gain its protections.  If a witness seeks refuge in the privilege, then "he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment."  *Id*. at 654–55 (quoting *United States v. Monia*, 317 U.S. 424, 427 (1943)).  Despite the need for courts otherwise to "indulge every reasonable presumption against waiver of fundamental constitutional rights," *Emspak v. United States*, 349 U.S. 190, 198 (1955) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)), "an individual may lose the benefit of the [Fifth Amendment] privilege without making a knowing and intelligent waiver."[1]  *Minnesota v. Murphy*, 465 U.S. 420, 428 (1984) (quoting *Garner*, 424 U.S. at 654 n.9).

---

[1]Although the foregoing shows why the use of the term "waiver" is, as the Supreme Court has acknowledged, imprecise in this context, *see Minnesota v. Murphy*, 465 U.S. 420, 427–28 (1984), the term remains prevalent in self-incrimination cases, *see, e.g.*, *Mitchell*, 526 U.S. at 321; *Convertino v. U.S. Dep't of Just.*, 795 F.3d 587, 596 (6th Cir. 2015).  For this reason, I employ the word throughout.

Once lost, however, when can the privilege be recovered?  The Supreme Court has held that the waiver lasts for the course of (here is that phrase again) "a single proceeding."  *Mitchell*, 526 U.S. at 321.  But that raises a new question:  what constitutes a "single proceeding?"  Fifth Amendment doctrine demands a different answer to that question than the lead opinion reaches.

## B.  Extent of a "Single Proceeding"

In ruling that the appellants had waived their Fifth Amendment privileges, the district court reasoned that the Supreme Court had determined in *Mitchell* that a witness waives their Fifth Amendment rights for the entirety of (that phrase returns yet again) "a single proceeding." *Sherrod, Teed, Vanderhagen & Ware*, 2022 WL 834009, at *3 (quoting *Mitchell*, 526 U.S. at 321).  It followed that because depositions "are simply some of the 'events between the time of commencement and the entry of judgment' that together make up this single civil action," the appellants' failure to invoke their Fifth Amendment privileges at the deposition stage also doomed to failure their blanket attempts to assert those privileges at trial.  *Id*. at *5.

Determining whether the district court was correct is not a straightforward task.  Some courts have indicated that a witness who waives their Fifth Amendment privilege during a deposition also waives it for the trial that follows.  *See, e.g.*, *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1081 (10th Cir. 2009); *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 78 (1st Cir. 2004); *United States v. White*, 846 F.2d 678, 690 (11th Cir. 1988); *see also In re Candor Diamond Corp.*, 42 B.R. 916, 920 (Bankr. S.D.N.Y. 1984).  A few courts have directly held this.  *See De Lisi v. Crosby*, 402 F.3d 1294, 1301 (11th Cir. 2005); *Moser v. Heffington*, 214 A.3d 546, 558 (Md. 2019).  One court has reached the opposite conclusion, albeit on analogous state law grounds.  *See State v. Roberts*, 622 A.2d 1225, 1235 (N.H. 1993).  Other courts have suggested that they might come to the same result if pressed.  *See United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978); *People v. Williams*, 181 P.3d 1035, 1059 (Cal. 2008).  The Sixth Circuit has not yet addressed this issue.

Because of the conflicting authorities, a return to basics provides guidance.  In addition to reaffirming the well-established rule "that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when

questioned about the details," the Supreme Court in *Mitchell* also examined how this rule governs the relationship between a plea colloquy and a sentencing hearing. 526 U.S. at 321. The Court held that neither a defendant's guilty plea nor their statements during their plea colloquy functioned as a waiver during their sentencing hearing. *Id*. at 325. How the Court reached this conclusion is instructive.

As *Mitchell* indicated, the purposes of a plea colloquy and a sentencing hearing are distinct. A plea colloquy's purpose "is to protect the defendant from an unintelligent or involuntary plea," thus making the defendant's testimony vital, while a sentencing hearing fixes the severity of the punishment that accompanies guilt. *Id*. at 322. In other words, the Supreme Court contemplated the purposes of each hearing in *Mitchell*, found them to be divergent, and thus concluded that the defendant had not waived her privilege for the sentencing hearing. Although the Court did not conclusively decide whether the two hearings were part of a "single proceeding," its conclusion suggests that they are not.

The Supreme Court's focus on purpose for discerning a proceeding's boundaries makes sense given the waiver rule's nature. Both the distortion-of-truth rationale and the further-incrimination rationale rely on the fairness of requiring a witness to answer further questions once they have provided sworn statements. In the case of the distortion-of-truth rationale, the absurdity of using the Fifth Amendment either to provide only partial, and possibly self-serving, truths or to distort the factfinding process is so obvious that there is nothing unfair about disallowing those practices. *See id.* at 322. The witness instead has "reason to know" that invoking the privilege in such a manner would be unduly prejudicial and will thus not be allowed. *E.F. Hutton & Co.*, 91 F.R.D. at 116; *see also Klein*, 667 F.2d at 288. Likewise, it is not unfair to require further testimony as to incriminating details once a witness chooses to testify about incriminating facts. In that instance, too, the witness had "reason to know" of the risks that their testimony could provide fodder for criminal prosecution. *Klein*, 667 F.2d at 288.

The lead opinion criticizes this reference to *Klein*'s "reason to know" standard, because *Klein* concerns whether a waiver had occurred, and not how to determine the scope of a waiver. *Id.* at 287. But the considerations involved in questions of waiver necessarily inform the scope of a waiver. And these fairness considerations indicate why purpose matters. Holding witnesses

to their waiver is fair when—and only when—they have reason to know of its future applicability.  That is considerably easier in instances when the comparable points in time share similar legal ends than when they do not.  Such similarity ensures that the witness is on notice that their testimony will continue to bear on a case when they initially provide the testimony.

To illustrate the point, consider a witness who is deposed in a civil foreclosure proceeding and then later is deposed in a separate case involving allegations that a fiduciary imprudently managed assets on behalf of a pension fund.  *See In re Morganroth*, 718 F.2d at 163–64.  The witness answers questions freely in the deposition for the foreclosure case.  *See id.* at 163.  But the fiduciary case is different.  When the lawyers in that case want to depose the witness and inquire along similar lines as in the foreclosure case, the witness invokes the Fifth Amendment.  *See id.* at 164.  In that instance, it would be unfair to conclude that the witness had reason to know when they sat for the first deposition that their testimony would constitute a waiver in the second deposition.  Nothing about the discovery in the foreclosure case would necessarily have led the witness to be on notice about discovery in another case that may not have even been filed at the time.

That analysis leads in the opposite direction when the two points in time are a deposition and the trial for which it was prepared.  Why a civil party conducts a deposition is no secret.  Like many other discovery devices, the goal of a deposition is to produce "relevant evidence which is useful in determining the merits of the claims asserted by the parties" in anticipation of trial.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975).  As both the Supreme Court long ago recognized and practitioners have since become well aware, depositions keep federal civil trials from being "carried on in the dark" by allowing "the parties to obtain the fullest possible knowledge of the issues and facts before trial."  *Hickman v. Taylor*, 329 U.S. 495, 501 (1947); *see also, e.g.*, John H. Langbein, *The Disappearance of Civil Trial in the United States*, 122 YALE L.J. 522, 551 (2012) (noting that depositions provide "the litigants a detailed advance view of what the issues and the evidence would be (on both or all sides) were the case to go to trial"); Alexander Holtzoff, *The Elimination of Surprise in Federal Practice*, 7 VAND. L. REV. 576, 578 (1954) (The Federal Rules of Civil Procedure "permit[] the use of discovery not only for the purpose of obtaining evidence, but also of ascertaining where evidence

may be secured."). Questions asked at a deposition may not be asked again at trial, but they are initially posed only because trial loomed on the horizon.

With that in mind, the need for a deponent to preserve their Fifth Amendment privilege during a deposition is not obscure. When conducted by oral examination, as done in the appellants' cases, depositions produce evidence in a form analogous to a civil trial: parties testify under oath, their lawyers are present to conduct examinations and cross-examinations, and the testimony is recorded by an authorized individual. FED. R. CIV. P. 30(c)(1). Also akin to when a witness is examined at trial, attorney-client exchanges are limited during a deposition, though counsel "may instruct a deponent not to answer . . . when necessary to preserve a privilege." FED. R. CIV. P. 30(c)(2). Rule 30's reminder to be watchful of privileges is apt. Once conducted, a deposition takes on a life of its own—"[a]t a hearing or trial, all or part of a deposition may be used against a party" so long as certain conditions are met. FED. R. CIV. P. 32(a)(1).

Among their many uses, depositions can help to sidestep the need for trial altogether. Federal Rule of Civil Procedure 56(c)(1)(A) directs parties to cite depositions in their motions for summary judgment, and parties routinely follow this direction. *See, e.g.*, *Viet v. Le*, 951 F.3d 818, 824–25 (6th Cir. 2020); *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 805 (6th Cir. 2015); *Alexander v. CareSource*, 576 F.3d 551, 560–61 (6th Cir. 2009). If the district court agrees that summary judgment should be granted on any of the claims, then "the movant is entitled to judgment as a matter of law" as to those claims. FED. R. CIV. P. 56(a). Harmful admissions and other testimony given in a deposition can, and often do, settle whether a dispute of material fact exists for this purpose. *See, e.g.*, *Noble v. Time Ins. Co.*, No. CIV. 11-345-GFVT, 2013 WL 1964819, at *3 (E.D. Ky. May 10, 2013); *Home Bank of Tennessee v. Beams*, No. 3:06-CV-191, 2007 WL 3287297, at *4 (E.D. Tenn. Nov. 5, 2007). This possibility combined with the other features of a deposition make it clear that if a deponent has information that the Fifth Amendment can shield, then they should invoke their privilege rather than testify.

All this also makes it clear that a deponent's failure to invoke the privilege will haunt them come trial. Unlike in criminal law where an intuitive line (one clearly marked by a verdict) can be drawn between the purposes of the guilt phase and the purposes of the sentencing phase,

the aims that animate depositions and a trial in civil litigation blur together.  *Cf. Mitchell*, 526 U.S. at 322–25.  Despite the lead opinion's empty protestations that the purposes of a deposition and a civil trial are divergent, both serve to produce evidence relevant to the claims and defenses listed in the complaint and the answer with the aim to determine whether a party will be held liable.  *See* 75 AM. JUR. 2d *Trial* §§ 1–2 (2022).  Either can end up with the court entering an adverse judgment against a party.  Of course, a trial aims to settle the matter of liability definitively whereas a deposition only facilitates this aim.  But a deponent cannot reasonably be surprised when they are called to testify at trial about matters covered in their deposition, especially when the deponent was a party to the suit as four of the five appellants here had been.  That possibility was present the moment the deponent was subpoenaed for the deposition.  Fundamentally, then, the district court was correct to conclude that a deposition and a trial for which it was prepared are part of a single proceeding.

The principles underlying the Fifth Amendment's waiver rule further bolster my conclusion.  On the one hand, the rule recognizes that the privilege is a shield that protects information, not a sword with which to "mutilate" it.  *Brown*, 356 U.S. at 156.  To this end, courts disfavor various strategies used to game the discovery process with the Fifth Amendment. Parties risk having affidavits filed in opposition to summary judgment stricken if they refuse to answer related questions at a subsequent deposition.  *See In re Edmond*, 934 F.2d at 1308–09; *Parcels of Land*, 903 F.2d at 43–44.  Parties also risk being barred from testifying if they invoke their privilege against self-incrimination in response to interrogatories or deposition only to try to testify at trial.  *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 577 (1st Cir. 1989); *see also United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 85 (2d Cir. 1995) (barring party from submitting in evidence "any material previously claimed by him to be within the privilege against self-incrimination"); *Traficant v. Comm'r*, 884 F.2d 258, 265 (6th Cir. 1989) (barring party, after his invocation of the privilege against self-incrimination, "from introducing other evidence on *that matter*").  In any event, the goal is to balance the interests of the party asserting the privilege with the need "to prevent unfair and unnecessary prejudice to the other side."  *S.E.C. v. Graystone Nash, Inc.*, 25 F.3d 187, 192 (3d Cir. 1994).

That balance tips in favor of holding a deponent to their waiver come trial.  Allowing a witness to testify at a deposition only then to allow them in the forthcoming civil trial to invoke their privilege against self-incrimination on the same subjects about which they were already deposed would both give a witness insight into the questions that a party might ask at trial as well as let the witness avoid providing follow-up answers based on the ones that they have already given.  Furthermore, unlike in cases when a court strikes an affidavit because the affiant invoked their Fifth Amendment privilege at trial rather than testify about some subject matter that was divulged in the affidavit, *see, e.g.*, *In re Edmond*, 934 F.2d at 1308–09; *Parcels of Land*, 903 F.2d at 43–44, the same remedy is inadequate when a deponent has already learned substantial information about the other side's trial strategy by sitting for the deposition.  That bell cannot be unrung.

The lead opinion argues that the availability of cross-examination in a deposition is sufficient to guard against these concerns.  But this ignores the key function of the factfinder in judging credibility.  Under the lead opinion's rule, the party who conducted the deposition is left with presenting at trial either a transcript or a recording of the deposition, both being only partial substitutes for live testimony in assessing another critical aspect of the truth—a witness's credibility.  *See, e.g.*, *House v. Players' Dugout, Inc.*, No. 3:16-CV-00594-RGJ, 2021 WL 4898071, at *14 (W.D. Ky. Oct. 20, 2021) (noting that it was "better for the jury to experience these . . . witnesses' testimony live, even if by video, than by pre-recorded trial deposition" in order to judge credibility); FED. R. CIV. P. 32(a)(4)(E) (making unmistakable "the importance of live testimony in open court"); 8A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2142 (3d ed. 2022) ("Although the increasing availability and fidelity of videotaped depositions has provided a better alternative than reading a written transcription, the preference for live testimony is still endorsed by the federal courts." (footnote omitted)); 7 MOORE'S FEDERAL PRACTICE § 32.28 [3] ("The preference for oral testimony by a present witness is of special concern when a case turns on the credibility of testimony that is contradicted by other witnesses."); *see also Stoner v. Sowders*, 997 F.2d 209, 213 (6th Cir. 1993) (noting in context of the Confrontation Clause that videotaped deposition "is still a picture, not a life").  To avoid these problems, a waiver of the Fifth Amendment privilege at a deposition should carry forward to a civil trial.

Although it is true that the purpose of the Fifth Amendment is to prevent a witness from being compelled to provide incriminating information against themselves, once the witness has opened the prosecutorial door by providing an incriminating fact, disclosure of further details related to the disclosed subject "presents no more than a 'mere imaginary possibility' of increasing the danger of prosecution." *Rogers*, 340 U.S. at 374–75 (footnote omitted) (quoting *Mason v. United States*, 244 U.S. 362, 366 (1917)); *see also United States v. LaRiche*, 549 F.2d 1088, 1096 (6th Cir. 1977). "Thus, any witness who makes testimonial, incriminating statements plainly has reason to know, when he does so, that these statements may be interpreted as a waiver of his [F]ifth [A]mendment privilege against self-incrimination." *Klein*, 667 F.2d at 288.

The further-incrimination rationale leads to the same place as the distortion-of-the-truth rationale. "Only the witness knows whether the apparently innocent disclosure sought may incriminate him, and the burden appropriately lies with him to make a timely assertion of the privilege." *Garner*, 424 U.S. at 655. So, too, with deponents who often will be counseled and prepared, will take an oath or affirmation before testifying, and have their testimony recorded. FED. R. CIV. P. 30(c)(1). Although use of a recorded deposition in lieu of live testimony at a trial is not preferred, it is possible in both civil cases as the appellants acknowledge, *see* FED. R. CIV. P. 32(a)(1), and, more importantly, in criminal cases, *see* FED. R. CRIM. P. 15(f). Witnesses who are counseled can be presumed to know the risks that accompany these possibilities, especially given that "the admissibility of [testimony in a prior civil proceeding] in criminal trials is well-settled." *United States v. Cohen*, 946 F.2d 430, 435 (6th Cir. 1991) (collecting cases); *see also United States v. Lay*, 612 F.3d 440, 448 (6th Cir. 2010) (criminal defendant's deposition testimony from previous civil case admissible as an admission of a party-opponent under Federal Rule of Evidence 801(d)(2)); *United States v. Moffie*, 239 F. App'x 150, 156–57 (6th Cir. 2007) (same).

"Such a witness certainly is not treated unfairly, then, if a court ultimately interprets the statements" made in a deposition as a waiver of the Fifth Amendment privilege as to those subjects during the subsequent civil trial. *Klein*, 667 F.2d at 288. This is particularly true when, as I detail further below, the appellants all had abundant indications from the State of Michigan that criminal investigations into the Flint Water Crisis were ongoing into either their specific

conduct, or the conduct of other officials allegedly involved in the Crisis.  Indeed, Ambrose, Croft, and Earley had already been criminally charged for such involvement.  R. 715-3 (Criminal Compl. at 1) (Page ID #45875).  This is not a case in which the realization that a witness's sworn statements were potentially incriminating should strike them like a bolt from the blue.  Instead, these "witness[es] had reason to know that [their] prior statements would be interpreted as a waiver of the [F]ifth [A]mendment's privilege against self-incrimination."  *Klein*, 667 F.2d at 287.

At this point, both the lead opinion and the appellants interject to suggest that *In re Morganroth* is contrary authority.  The *Morganroth* court noted that "once a witness has testified under oath initially, the risk of prosecution which the witness faced in the earlier proceeding is not identical even though the questions may be the same in a subsequent proceeding or the same subject matter covered."  718 F.2d at 166.  That is because "[p]erjury is a separate crime."  *Id*.  For the lead opinion, the fact that the appellants could be subject to perjury charges based on inconsistencies between their depositions and trial testimony suffices to transform the two stages of litigation into separate proceedings.

This is unpersuasive.  *In re Morganroth* dealt with two separate civil cases, which are unquestionably different proceedings.  *Id*. at 163–64.  Neither the facts of that case nor its reminder that perjury is a freestanding offense are of use in discerning what is a single proceeding.  After all, a defendant could not testify on direct examination during a trial about a falsehood only to invoke the Fifth Amendment privilege to a related detail on cross examination out of fear that the response would reveal that they had just perjured themselves.  *See United States v. Charles*, 138 F.3d 257, 267 (6th Cir. 1998) (noting that it is "well-settled" that the Fifth Amendment "does not endow the person who testifies with a license to commit perjury" (quoting *United States v. Wong*, 431 U.S. 174, 178 (1977))).  That perjury is a separate offense does not convert the direct examination and the cross examination of a witness into two separate proceedings.  For the same reason, the possibility of perjury alone does not provide guidance as to whether a deposition and the trial for which it was prepared form the same proceeding.  I thus must look elsewhere to discern what constitutes different proceedings.  I agree with the lead opinion that *Mitchell*'s focus on purpose provides that test.

A return to purpose, however, requires a different conclusion than the lead opinion reaches.  The appellants knew the purpose for which they gave testimony when each was administered the oath at their depositions.  They were counseled; Governor Snyder is himself a lawyer.  *Sherrod, Teed, Vanderhagen & Ware*, 2022 WL 834009, at *2.  The complaint was available.  The possibility of civil liability for those who were parties was clear.  It was so clear that Earley, Ambrose, and Croft believed that they were being forced to trade off either asserting their Fifth Amendment rights or vigorously defending themselves in this lawsuit.  *See* E.D. Mich. No. 5:16-cv-10444, R. 957 (ICDs' Joint Mot. for Protective Order at 8–9) (Page ID #24540–41).  And it was apparent that the appellants' deposition testimony would be used to develop the questions that the parties would ask them at the civil trials that followed.

The appellants, moreover, were all well situated to determine what was or might be incriminating in the answers that they contemplated giving.  The district court even flagged the possibility of invoking the Fifth Amendment for Earley, Ambrose, and Croft.  *In re Flint Water Cases*, No. 5:16-CV-10444, 2019 WL 5802706, at *3, *5 (E.D. Mich Nov. 7, 2019).  Nevertheless, the appellants chose a different course, testifying at their depositions without invoking their privileges against self-incrimination.  Undoubtedly, each had their reasons for doing so.  But these are reasons that come with consequences.  I believe that one of those consequences is that the appellants waived their Fifth Amendment privileges against self-incrimination to some extent regarding the topics about which they were deposed.

## C.  Comparable Proceedings

Both the lead opinion and the appellants rely on several inapposite cases to reach the opposite conclusion regarding waiver.  Those cases largely involve proceedings that are discrete and distinct.  Some cases involve grand juries, *United States v. Miranti*, 253 F.2d 135, 139–41 (2d Cir. 1958); *In re Neff*, 206 F.2d 149, 151–52 (3d Cir. 1953), or a state-law analogue to a grand jury, *State v. Whiting*, 402 N.W.2d 723, 730 (Wis. Ct. App. 1987).  Another case involves coroner inquests.  *Slutzker v. Johnson*, 393 F.3d 373, 389 (3d Cir. 2004).  Further cases involve two different criminal cases, *United States v. Johnson*, 488 F.2d 1206, 1210–11 (1st Cir. 1973), or two different civil cases, *In re Morganroth*, 718 F.2d at 163–64.

Disparate as these cases seem, they are united by a common thread. Each involves proceedings with purposes that distinguish them in ways that are not present when comparing a deposition to the civil trial for which it was prepared. A grand jury, for instance, functions as a stand-alone proceeding that is related to, but separate from, any criminal case that might follow from it. This is because a "grand jury is not a judicial tribunal but rather an informing or accusing body" that meets to determine whether charges may be brought, not whether the accused is guilty of those charges. *In re Neff*, 206 F.2d at 152. Consequently, testimony at a grand jury cannot lead directly to an adverse judgment the way that testimony at a deposition can. *Cf.* FED. R. CIV. P. 56. There are intervening steps such as a trial or plea hearing that must be taken. A coroner's inquest meanwhile functions in a similar manner to a grand jury but regarding the determination of a decedent's cause of death. *See Am. Nat'l Bank v. Cont'l Cas. Co.*, 70 F.2d 97, 99 (6th Cir. 1934). These cases, which deal with threshold proceedings that determine whether a case will be brought, shed little light on the present issue where the purposes of a deposition and the subsequent civil trial are so closely aligned.[2]

The sole case among those cited by the lead opinion and the appellants that squarely holds otherwise is *State v. Roberts*. There, the Supreme Court of New Hampshire held that a witness's waiver of their privilege against self-incrimination during a pretrial deposition does not carry forward to the civil trial. *Roberts*, 622 A.2d at 1235. To reach this conclusion, the court examined the New Hampshire state constitution, not the Fifth Amendment. *See id.* at 1235–36.

I am dubious that *Roberts*'s reasoning extends beyond the decision's confines. How the Supreme Court of New Hampshire characterized a deposition in *Roberts* strongly indicates that a deposition *is* part of the same proceeding as the civil trial for which it was prepared. *See id*. at 1235 ("More similar to an examination of a witness at trial than either a grand jury appearance or a pretrial exchange of affidavits, a deposition subjects a witness to timely, effective cross-examination under oath and generates a potentially admissible transcript that is available to all

---

[2]Neither *United States v. Trejo-Zambrano*, 582 F.2d 460 (9th Cir. 1978), nor *People v. Williams*, 181 P.3d 1035 (Cal. 2008), provide guidance in this case either. *Trejo-Zambrano* held that an incriminating affidavit filed in support of a severance motion does not waive the privilege against self-incrimination at trial. 582 F.2d at 464. *Williams* similarly held that testimony at a motion in limine hearing does not waive the privilege at trial. 181 P.3d at 1059. In both cases, the purpose of the testimony was different at the time of waiver and the time of trial. Thus, those cases comport with my reasoning.

parties."). Instead of taking this position, however, the court in *Roberts* held that the privilege against self-incrimination is specific to the *stages in a proceeding*, not the proceeding itself. *Id.* at 1235.

Inquiring into the *stages* of a proceeding is different from the "well established" rule reaffirmed in *Mitchell* that waiver is a *proceeding*-specific inquiry. 526 U.S. at 321. And *Mitchell*'s focus was on the purpose of the appearance, not the stage of the proceeding. *Id.* at 322–25. Given that the Supreme Court in the intervening years decided *Mitchell* and stressed there the purpose-based approach, I would decline to follow New Hampshire's lead.

## D. Changed Circumstances

The lead opinion also contends that a change in circumstances here—i.e., the fact that the appellants were indicted after being deposed—warrants a different waiver analysis. I disagree. Neither the cases nor the facts support that conclusion.

To start, the primary case on which appellants rely for this point, *United States v. Miranti*, is inapposite. There, the government argued that because a defendant had testified before the same grand jury for one crime, he had waived his Fifth Amendment privilege against self-incrimination for when he testified to the body approximately a year later about another crime. *Miranti*, 253 F.2d at 140. The Second Circuit rejected this argument. Presaging *Mitchell*, the court stressed that, "for all practical purposes, two separate grand juries investigated unrelated crimes," cabining the waiver to the proceeding in which it occurred. *Id.*

That is quite a different scenario than in this case. Unlike in *Miranti* where the purposes of the two appearances before the grand jury were divergent, the purposes between the deposition and the civil trial converge. By the time that the parties are engaged in discovery, the complaint has already been filed and the possibility of liability has increased, even without the matter ever going to trial. *See* FED. R. CIV. P. 56. Those considerations ought to focus the mind, and the witness can assess how much they want to divulge at the deposition with awareness of the types of questions, and risks that accompany them, that will come at trial.

More importantly, the broader context of the appellants' depositions belies the lead opinion's changed-circumstances argument.  By the time that the appellants were deposed, investigations into the Flint Water Crisis had been ongoing for over three years, and fifteen people had been charged.  In 2016, Ambrose, Croft, and Earley were criminally charged on counts of false pretenses and conspiracy to commit false pretenses for their alleged roles in the Crisis.  R. 715-3 (Criminal Compl. at 1) (Page ID #45875).  Notably, Ambrose and Earley were also charged with misconduct in office in violation of Michigan Compiled Laws § 750.505[3] and willful neglect of duty in office in violation of Michigan Compiled Laws § 750.478.[4]  *Id*. at 1–2 (Page ID #45875–76).  Although the conduct that formed the basis for the indictments against Governor Snyder and Baird was distinct from that which formed the basis for the indictments

---

[3]Those charges provide as follows.  For Earley, the misconduct in office count read:

COUNT 3—COMMON LAW OFFENSES—MISCONDUCT IN OFFICE—DEFENDANT (01)

did commit misconduct in office, an indictable offense at common law, during his tenure as the state-appointed emergency manager for the City of Flint, by intentionally misleading the citizens of Flint by falsely stating the Flint Water Treatment Plant was equipped to produce safe water, allowing the Flint Water Treatment plant to produce water to the public despite knowledge that the plant was not ready for use, allowing the City of Flint to enter into a contract that required interim use of the Flint Water treatment plant for 30 months with knowledge that the plant was not ready to produce safe water, authorizing dissemination of information to the general public that was false and misleading in regards to the safety and potability of the Flint River water; contrary to MCL 750.505.  [750.505]

FELONY:  5 Years and/or $10,000.00

R. 715-3 (Criminal Compl. at 1) (Page ID #45875).  For Ambrose, the misconduct in office count read:

COUNT 4—COMMON LAW OFFENSES—MISCONDUCT IN OFFICE—DEFENDANT (02)

did commit misconduct in office, an indictable offense at common law, during his tenure as the state-appointed emergency manager for the City of Flint, by obstructing and hindering a healthcare investigation conducted by the Genesee County Health Department with regard to the Legionnaires' Disease outbreak; contrary to MCL 750.505.  [750.505]

FELONY:  5 Years and/or $10,000.00

*Id*. at 2 (Page ID #45876).

[4]Those charges provided for both as follows:

COUNT 5—WILLFUL NEGLECT OF DUTY IN OFFICE—DEFENDANTS (01) (02)

did willfully neglect to assure the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare pursuant to the powers granted to them by Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1549(2); contrary to MCL 750.478.  [750.478]

MISDEMEANOR:  1 Year and/or $1,000.00

*Id*.

Nos. 22-1353/1355/1357/1358/1360    *Walters, et al.  v. Richard Snyder, et al.*    Page 72

against Ambrose and Earley, Governor Snyder would also be indicted for two misdemeanor counts of willful neglect of duty in violation of Michigan Compiled Laws § 750.478,[5] and Baird would be indicted for one count of misconduct in office in violation of Michigan Compiled Laws § 750.505,[6] in January 2021 for their roles in the Flint Water Crisis.

Those later indictments came after a public shift in the investigations.  In June 2019, Michigan's Department of Attorney General announced that it was taking a fresh look at the investigations and would "aggressively pursue[]" leads against "additional individuals of interest."  R. 715-5 (Press Release) (Page ID #45907).  It stated that the reason for this change in approach was that "all available evidence was not [previously] pursued" because private law firms—including those representing "the Executive Office of former Governor Rick Snyder"— had played "a role in deciding what information would be turned over to law enforcement."  *Id*. (Page ID #45906).  Prosecutors believed that this led to the investigation resting on a "flawed foundation."  *Id*. (Page ID #45907).

---

[5]Those charges against Governor Snyder read:

COUNT 1:  WILLFUL NEGLECT OF DUTY

As Governor of the State of Michigan, a public officer, did willfully neglect his mandatory legal duty under Article V, section 8 and 10, of the Michigan Constitution, by failing to inquire into the performance, condition and administration of the public offices and officers that he appointed and was required to supervise; contrary to MCL 750.478.

MISDEMEANOR:  1 year and/or $1,000.00

COUNT 2:  WILLFUL NEGLECT OF DUTY

As Governor of the State of Michigan, a public officer, did willfully neglect his mandatory legal duty to protect citizens of this state against disaster and/or emergency under Public Act 390 of 1976 (Emergency Management Act) by failing to declare a state of emergency and/or disaster when the Governor had notice of a threat of a disaster and/or emergency in the City of Flint; contrary to MCL 750.478.

MISDEMEANOR:  1 year and/or $1,000.00

R. 712-1 (Snyder Indictment at 2–3) (Page ID #45807–08).

[6]That charge against Baird reads:

COUNT 2:  MISCONDUCT IN OFFICE

Did commit misconduct in office, an indictable offense at common law, during his tenure as a public officer and appointed member of the Executive Office of Governor Snyder, by improperly using state personnel and resources; contrary to MCL 750.505C.  [750.505-C]

FELONY:  5 years and/or $10,000.00

R. 719-1 (Baird Indictment at 2–3) (Page #45955–56).  It is unclear why the indictment reads "MCL 750.505C" as the offense charged is Michigan Compiled Laws § 750.505.  There is no "MCL 750.505C" of which I am aware in the Michigan Compiled Laws.

That foundation, however, could be rebuilt.  As part of the investigative shakeup, the charges against Ambrose, Croft, and Earley were dropped without prejudice.  In reference to those charges, the announcement said:  "It is important to note that this voluntary dismissal by our team is not a determination of any defendant's criminal responsibility.  We are not precluded from refiling charges against the defendants listed below or adding new charges and additional defendants."  *Id*.  Given this public announcement, the appellants should have known that their actions related to the Flint Water Crisis might subject them to criminal liability.  This includes both Governor Snyder and Baird.  After all, the announcement also stated explicitly that an impetus for the change in approach was a concern that the Executive Office of Governor Snyder—an office to which each man was linked—may have previously shielded information from the investigation.

At this juncture it bears repeating that three of the appellants—Ambrose, Croft, and Earley—went so far as to seek a protective order to shield them from being deposed, identifying the risk of incriminating themselves should they do so.  *In re Flint Water Cases*, 2019 WL 5802706, at *1.  The district court denied their motions, issuing an order available to all the appellants.  That order suggested that Ambrose, Croft, and Earley could invoke their privileges against self-incrimination at the deposition to each question that they believed would require an incriminating response.  *Id*. at *3, *5.  Of course, none did.

The appellants therefore had ample notice that they spoke at their own peril when they testified at their depositions.  The State of Michigan was providing multiple indications that public officials involved in the Flint Water Crisis would be prosecuted.  Some of the appellants already had been charged, and those who had not would eventually be similarly charged.  And the investigation was rebooted because of previous investigators' ties to Governor Snyder, to whom Baird was an advisor.  Circumstances might arise in which an intervening criminal indictment will affect the waiver analysis.  Those circumstances are not present in this case.

### E.  Presumption against Waiver

The lead opinion's conclusion that a deposition is a separate proceeding from the trial for which it was prepared is grounded in a presumption against waiving the Fifth Amendment.  For

this proposition, the lead opinion points to the Supreme Court's guidance in *Hoffman v. United States* that the Fifth Amendment "must be accorded liberal construction in favor of the right it was intended to secure."  341 U.S. at 486.  *Hoffman*, however, does less work for the lead opinion's position than is billed for two reasons.

First, *Hoffman* is not a waiver case.  Instead, it involved what a witness needed to show to demonstrate that their testimony tends to incriminate and thus renders the Fifth Amendment's privilege against self-incrimination available to invoke.  The petitioner, Samuel Hoffman, had invoked his Fifth Amendment right not to answer several questions put to him in a special federal grand jury.  *Id.* at 481–82.  After the district court found that Hoffman faced "no real and substantial danger of incrimination," the district court held him in contempt when he continued to refuse to testify.  *Id.* at 482.  The Supreme Court reversed, reasoning that, given what Hoffman had shown, "it was not '*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate."  *Id.* at 488 (alteration in original) (citation omitted).

At its core, *Hoffman* teaches that courts must liberally construe a witness's claim that their testimony will tend to incriminate them in favor of the right's assertion.  That is a non sequitur for this case.  There is no dispute that the appellants *could* have invoked their privilege against self-incrimination at the depositions.  The issue is that they did not, leaving us to sort out how far that waiver reaches.  *Hoffman* does not speak to this problem.

Nor could it.  The line from *Hoffman* that the lead opinion highlights is telling:  the Fifth Amendment should be liberally construed so that "the *right* it was intended to secure" is protected.  *Id.* at 486 (emphasis added).  That right is the right of a witness not to be compelled to give inculpatory testimony against themselves.  Applying this liberal-construction canon in the waiver context is an awkward fit.  A waiver can only occur once a key evil that the Fifth Amendment seeks to ward off has been dispelled:  compulsion.  If a witness voluntarily chooses to testify rather than invoke their right not to provide self-incriminating testimony, then the element of compulsion has been removed for the purposes of the privilege.  *See Garner*, 424 U.S. at 654 ("[I]n the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate

himself."). When the witness waives the privilege, then, the right that the Fifth Amendment was intended to secure has already been secured. The witness has just decided not to exercise that right, and the waiver rule enforces that decision.

On its own terms, thus, *Hoffman*'s liberal-construction canon does not settle the waiver issue in this case. Again, *Mitchell*'s purpose test provides the solution to the puzzle. This test shows that a deposition is part of the same proceeding as the trial for which it was prepared.

## F.  Conclusion

Finally, I suggest how this imbroglio could have been avoided:  by the appellants invoking their Fifth Amendment privileges against self-incrimination at their depositions. In countless civil depositions conducted around the country, such invocations have long been routine, and their nuances have long been routinely addressed by lower courts. *See, e.g.*, *Pursley v. City of Rockford*, No. 18 CV 50040, 2020 WL 4931394, at \*3 (N.D. Ill. Aug. 20, 2020); *Slainte Invs. Ltd. P'ship v. Jeffrey*, No. 3:14-CV-1750 CSH, 2015 WL 1445331, at \*6 (D. Conn. Mar. 30, 2015); *S.E.C. v. ARVCO Cap. Rsch., LLC*, No. 3:12-CV-00221-MMD-WGC, 2014 WL 5106100, at \*3 (D. Nev. Oct. 10, 2014); *C.K. v. Bell Cnty. Bd. of Educ.*, No. 6:11-CV-296-ART-HAI, 2012 WL 13180795, at \*1 (E.D. Ky. Oct. 9, 2012); *Tyson v. Equity Title & Escrow Co. of Memphis, LLC.*, 282 F. Supp. 2d 820, 822 (W.D. Tenn. 2003); *Nunn v. Mich. Dep't of Corr.*, No. 96-CV-71416-DT, 1998 WL 34113236, at \*2 (E.D. Mich. Apr. 8, 1998); *Nutramax Lab'ys, Inc. v. Twin Lab'ys, Inc.*, 32 F. Supp. 2d 331, 333 (D. Md. 1999); *Moll v. U.S. Life Title Ins. Co. of New York*, 113 F.R.D. 625, 628–29 (S.D.N.Y. 1987); *McIntyre's Mini Comput. Sales Grp., Inc. v. Creative Synergy Corp.*, 115 F.R.D. 528, 530 (D. Mass. 1987). A witness waiving their Fifth Amendment privilege against self-incrimination is not a foreordained outcome of being deposed.

Rather, the calculations that go into whether a witness should invoke their Fifth Amendment privilege during civil depositions are themselves complex. If the witness testifies at the civil deposition only later to invoke that privilege in a subsequent criminal trial against them, then the witness runs the risk of being found unavailable and the transcript coming in under Federal Rules of Evidence 804(b)(1) or 804(b)(3), *see United States v. MacCloskey*, 682 F.2d 468, 477 (4th Cir. 1982) ("The law is clear that a witness is unavailable under Rule 804(a)(1)

when he invokes the Fifth Amendment privilege and the claim is sustained by the trial court."); *United States v. Toney*, 599 F.2d 787, 789–90 (6th Cir. 1979) (same), or more simply under Federal Rule of Evidence 801(d)(2), *see Lay*, 612 F.3d at 448.  If instead the witness is a party and invokes their Fifth Amendment privilege during the civil deposition, then they risk an adverse inference being drawn against them in the civil trial that follows.  *See McKinney v. Galvin*, 701 F.2d 584, 589 n.10 (6th Cir. 1983) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refused to testify in response to probative evidence offered against them." (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)) (alteration in original)); *see also Leapers, Inc. v. SMTS, LLC*, 879 F.3d 731, 739 (6th Cir. 2018).

These kinds of decisions are for the witness to make, presumably with advice from counsel.  Once the decisions are made, it is not my prerogative at this stage to reweigh the risks and rewards that attend them.  Rather, "[t]hese choices have consequences."  *Microfinancial, Inc*., 385 F.3d at 78.  This court must discern what the law demands those consequences to be. In the present case, I believe the effects are that the appellants waived their Fifth Amendment privileges in their depositions on the subjects to which they testified, and these waivers apply also for the civil trial for which the appellants were deposed.

At bottom, our choices have consequences.  The appellants decided to waive their privileges against self-incrimination at their depositions despite knowing that their testimony could be self-incriminating and that criminal investigations into the Crisis were ongoing.  They understood the purpose for which they gave their deposition testimony.  And yet still they chose not to invoke the privilege against self-incrimination.  For the foregoing reasons, I would hold the appellants to their choices.  Because the district court did not err in determining that the appellants waived their Fifth Amendment privileges, I would affirm.  I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 22-1353/1355/1357/1358/1360

IN RE: FLINT WATER CASES.

_____

LEE-ANNE WALTERS, et al.,

      Plaintiffs,

E.S.; A.T.; R.V.; D.W.,

      Plaintiffs - Appellees,

      v.

RICHARD DALE SNYDER (22-1353); DARNELL
EARLEY (22-1355); RICHARD BAIRD (22-1357);
HOWARD D. CROFT (22-1358); GERALD
AMBROSE (22-1360),

      Defendants - Appellants,

VEOLIA NORTH AMERICA, LLC; VEOLIA
NORTH AMERICA, INC.; VEOLIA WATER
NORTH AMERICA OPERATING SERVICES, LLC;
LOCKWOOD, ANDREWS & NEWMAN, P.C.;
LOCKWOOD, ANDREWS & NEWMAN, INC.;
LEO A. DALY COMPANY,

      Defendants - Appellees.

**FILED**
Nov 08, 2022
DEBORAH S. HUNT, Clerk

Before: MOORE, GRIFFIN, and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is VACATED and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk