# Exhibit A

## STATEMENT OF FACTS AND BASIS FOR CLAIM

1.     This administrative claim against the EPA arises out of the environmental catastrophe known world-wide as the "Flint Water Crisis."

2.     On April 25, 2014, the MDEQ authorized the City of Flint to distribute to its more than 30,000 customers drinking water pumped from the highly corrosive and toxic Flint River.

3.     For almost 50 years, Flint water users enjoyed plentiful, clean fresh water purchased from the Detroit Water and Sewage Department (DWSD).

4.     Flint Emergency Managers Edward Kurtz and Darnell Early, with the approval of Michigan's Governor and State Treasurer, discontinued Flint's water service from DWSD and approved use of the Flint River as an interim source of water until an alternative water pipeline was completed in late 2016 or 2017.

5.     The Flint River water was toxic and 19 times more corrosive than the DWSD supplied water. The Flint River water required corrosion control treatment in order for it to be safe and useable because many Flint homes and businesses have lead service lines and plumbing making them more susceptible to high levels of corrosion and the leaching of lead.

6.     It is an undisputed fact that the MDEQ and Flint failed or refused to use corrosion control during the entire time that Flint River Water was supplied to Flint water users (April 25, 2014 to October 16, 2015). Flint water users were exposed to the toxic and highly corrosive Flint River water for 539 days or 1 year, 5 months and 21 days.

7.     On October 16, 2015, by order of the Governor, the Flint water system was re-connected to the DWSD system.

8.    Although DWSD water was restored to the Flint water system, the 539 days of exposure to highly corrosive Flint River water ruined the lead service lines, hot water tanks and other plumbing apparatus. As of April 25, 2016, the two-year anniversary of the switch to the Flint River, the water delivered to the people of Flint remains unsafe to drink, use for cooking or use for bathing.

9.    Throughout the spring and summer of 2014, the water supplied to Flint water users was malodorous, tasted bad and appeared to be cloudy with floating dirt or metallic particles.

10.    Flint water users received a notice in August 2014, of an acute coliform Maximum Contaminant Level (MCL), a monthly coliform MCL violation in August 2014, and a monthly coliform MCL violation in September 2014.

11.    Jan Burgess, as a Flint home owner and water user, made numerous complaints to the state and city officials about the poor water quality she was experiencing. Neither the state nor the city gave her satisfactory information about how and when the water quality would be improved.

12.    Jan Burgess determined that she was living in an environmental crisis and turned to the EPA for assistance.

13.    Jan Burgess discovered on the EPA's website a section entitled "Enforcement." The web page gave her instructions on how to report violations of environmental laws and regulations. The Enforcement page stated that if she elected to provide contact information with her report, that information may be "shared by EPA with appropriate administrative, law enforcement, and judicial entities engaged in investigating or adjudicating the tip or complaint."

14.     On October 14, 2014, Jan Burgess presented to the EPA her complaint and

requested an investigation. She wrote:

> Tip or Complaint: Earlier this year, the City of Flint, changed
> its water supply from the City of Detroit (Lake Huron) to the
> Flint River. This river has a very long history of pollution.
> Since this change, our drinking water has tripled in cost and the
> quality varies daily. Some days it smells like an over-
> chlorinated swimming pool; other days, like pond scum. It is
> often brown in color and frequently has visible particles floating
> in it. We've been under several boil water advisories due to e-
> coli contamination. Just this morning our local paper reports
> that General Motors Engine plant has shut off Flint River water
> to the plant due to the over-chlorination and the fears that the
> water will cause corrosion.
> http://www.mlive.com/news/flint/index.ssf/2014/10/general_mo
> tors_wont_use_flint.html#cmpid=nshr_stryheadline
>
> People in Flint have had to resort to buying bottled water or
> having purification systems installed in their homes. Some
> residents have even had private wells dug. The water is not safe
> to drink, cook or wash dishes with, or even give to pets. We
> worry every time we shower. The City of Flint is still very
> economically depressed and most citizens cannot afford to do
> anything other than use the river water. Many of them have NO
> water at all due to the extremely high water bills. There is
> reasonable suspicion that reports have been falsified. Some
> residents have had water tested privately and the results are not
> even close to those reported by the City. Calls to the City and
> State have resulted in no action whatsoever.
>
> Violation Still Occurring? Yes
> State DEP/DEQ/DEM Notified? No

15.     On October 23, 2014, EPA representative Jennifer Crooks (Crooks) responded

to Ms. Burgess' email stating in part that "the Flint River water is a different quality than the

Lake Huron raw water; and requires additional treatment to ensure an acceptable quality

drinking water." She emphasized that the poor quality water was only a temporary problem

because Flint planned to join the Karegnondi Water Authority (KWA) in 2016. She said that

the "MDEQ is aware of the multiple complaints from citizens and is working closely with the Flint Water Department to ensure the distribution system and the water treatment processes work more efficiently and more effectively."

16.     Ms. Burgess heard nothing more from the EPA until April 8, 2016, when investigators of the EPA's Office of Inspector General contacted her for an interview regarding her report. Ms. Burgess met with the EPA investigators on April 9, 2016, for about 1.5 hours.

17.     At the time of interview, the EPA investigator advised Ms. Burgess and her counsel that the EPA had received 120 complaints or notices of environmental violations and most, if not all, had not been investigated.

18.     The duration of time between Ms. Burgess' report of an environmental violation and the opening of an investigation was 543 days or 1 year, 5 months and 26 days.

19.     In January 2015, Flint home owner LeeAnne Walters called the EPA regarding water issues that she was experiencing at her Flint home. She informed the EPA that she and her family members were becoming physically ill from exposure to the water coming from her tap.

20.     On February 26, 2015, Crooks wrote an email to MDEQ and EPA representatives. Crooks noted that Walters complained of "black sediment in her water." She noted that the iron contamination was so high that the testing instrumentation could not measure it. She went on to say:

> But, because the iron levels were so high [Michael Glasgow, Flint Utilities Administrator], suggested testing for lead and copper. WOW!!!! Did he find the LEAD! 104 ppb [parts per billion] She has 2 children under the age of 3....Big worries here ....

I think Lead is a good indication that other contaminants are also present in the tap water that obviously were not present in the compliance samples taken at the plant ....

We also talked about Dr. Joan Rose from Michigan State being on the Flint Tech Advisory committee...would want to dive further into this...she and her family are also exhibiting the rashes when exposed to the water, and her daughter's hair is falling out in clumps.

21.     In a second email on February 26, 2015, Crooks stated that Miguel Del Toral (Del Toral) of the EPA is of the opinion that the "black sediment" in the Walters water was actually lead. She stated that "Miguel is wondering if Flint is feeding phosphates. Flint must have Optimal Corrosion Control Treatment-is it phosphates?"

22.     Crooks continued: "From a public health perspective, can we assume that the high lead levels in Mrs. Walters' neighborhood are isolated to just her area? Or are they more widespread?"

23.     Crooks in an email, dated February 27, 2015, offered to MDEQ representative Stephen Busch (Busch) expert advice through "our expert." Mike Schrock at EPA Cincinnati Research.

24.     On February 27, 2015, MDEQ representative Busch advised Del Toral and Crooks that "[MDEQ] will take the [offer of expert assistance] under consideration." He further stated that Flint has an "Optimized Corrosion Control Program."

25.     Del Toral, on February 27, 2015, advised Crooks that this is a very dangerous situation. He stated that "the particulate can contain very high concentrations of lead (hundreds of thousands of ppb Pb) which is much higher concentration than lead paint, so even small particles can result in high lead values."

26.     By late January 2015, the news media regularly reported the widespread water quality issues and resulting illnesses occurring in Flint. A casual internet search in January, February or March of 2015, would have produced scores of news reports about the environmental crisis developing in Flint. The EPA was monitoring these media reports.

27.     On March 3, 2015, Flint collected a follow-up sample at the Walters home. This time the reading was 397 ppb (more than 20 times the EPA "Action Level" of 15 ppb).

28.     On March 18, 2015, Walters informed Crooks of the March 3rd reading. Crooks asked Walters to fax the report. She stated "any thoughts on how to respond to her? I'm running out of ideas."

29.     Walters also provided the EPA with reports of elevated blood lead levels for her children proving that consuming lead-laced water had poisoned her children.

30.     In early April 2015, Walters called Dr. Marc Edwards (Dr. Edwards), an environmental engineering professor from Virginia Tech University, to Flint. Dr. Edwards, in April 2015, took water samples and shared his test results with the EPA.

31.     On April 23, 2015, Del Toral wrote an email to the MDEQ and asked one question: "What's Flint doing now (post Detroit) for corrosion control treatment?"

32.     On April 24, 2015, the MDEQ wrote back that "Flint is not practicing corrosion control treatment at the Water Treatment Plant (WTP)."

33.     On April 25, 2015, Del Toral prepared an email to the MDEQ and his EPA colleagues stating "given the very high lead levels found at one home and the pre-flushing happening at Flint, I'm worried that the *whole town* may have much higher lead levels than the compliance indicated, since they are using pre-flushing ahead of their compliance sampling" (emphasis added).

34.     On April 27, 2015, Del Toral travelled to the Walters home to investigate the circumstances causing the elevated lead readings. The EPA also tested neighboring homes. Ultimately, testing and investigation determined that the city-owned service line of about 25 feet running from the water main to the external shut off valve was made of lead and a source of the lead contamination In addition, the Walters home had galvanized pipe which became "seeded" with lead due to corrosive water. According to Del Toral, the lack of corrosion control treatment was a major contributing cause for the release of lead into the Walter's water system.

35.     On May 6, 2015, the EPA returned to the Walters home to supervise the service line replacement activities.

36.     On June 10, 2015, the EPA offered additional technical assistance on managing the different water quality issues in Flint, including the presence of lead in the drinking water.

37.     On June 24, 2015, Del Toral prepared a memorandum entitled "High Lead Levels in Flint Michigan-Interim Report ("Del Toral Report")." The Del Toral Report stated that "a major concern from a public health standpoint is the absence of corrosion control treatment in the City of Flint for mitigating lead and copper levels in the drinking water." He added that "the lack of mitigating treatment is especially concerning as the high lead levels will likely not be reflected in the City of Flint's compliance samples due to the sampling procedures used by the City of Flint for collecting compliance samples."

38.     On June 25, 2015, Rita Bair ("Bair"), Branch Chief Region 5, Ground Water and Drinking Branch, Section, responded to Del Toral's Interim Report wanting to know in an email why Del Toral characterized the lead problem in Flint as "widespread."

39.     Del Toral responded to Bair via an email on Thursday June 25, 2015, stating that:

The widespread high lead is my judgement based on a couple of decades of working with lead issues and I stand by it despite the limited data set from Flint. A simple application of scientific principles to the circumstances in Flint along with the limited data are enough to know that there is a problem there. They have had no corrosion control treatment in place for over a year now and they have lead service lines. It's just basic chemistry on lead solubility. You will have high lead leaching into the water where you are doing nothing to mitigate that. We don't need to drop a bowling ball off every building in every town to know that it will fall to the ground in all of these places....The only reason we don't have more data is because the City of Flint is flushing away the evidence before measuring for it...there is zero chance or close to zero chance that you will ever capture any of the high lead.... the high lead levels we are seeing in Flint are mainly particulate lead, which is released sporadically in most cases, so unfortunately for Flint in their attempts to avoid capturing lead, these particles are being captured despite their attempts not to capture lead. **I understand that this is not a comfortable situation, but the State is complicit in this and the public has a right to know what they are doing because it is their children that are being harmed. At a MINIMUM, the City should be warning residents about the high lead, not hiding it telling them that there is no lead in the water. To me that borders on criminal neglect.** The only people that question the science are the ones that have a vested interest in not finding lead. When we look, we find it. When they look, they either don't find it or if they find it, they dismiss it as the resident's plumbing or use some other fabricated reason. (Emphasis added).

40.     Sometime between June 24, 2015 and June 30, 2015, Del Toral provided his Interim Report to Walters who shared it with Curt Guyette (Guyette) an investigative reporter with the ACLU of Michigan.

41.     Guyette confirmed the accuracy of the Del Toral Report by interviewing Del Toral who confirmed that the assertions contained in the Report were accurate.

42.     Guyette then approached Flint for comment. On June 30, 2015, Mayor Dayne Walling (Walling) notified EPA Region 5 Director Dr. Susan Hedman (Hedman) that an EPA Region 5 staff member was speaking publicly about the Flint environmental crisis.

43.     On July 1, 2015, Hedman informed Walling that the Del Toral Report "should not have been released outside the agency." She recommended to Walling that Flint retain two EPA experts on lead and drinking water and that Flint follow the lead of the MDEQ. Walling asked Hedman to advise the ACLU that Flint should follow the advice of the MDEQ.

44.     On July 2, 2015, Hedman said to Walling that "I am not inclined to have any further communication with the ACLU representative." She told Walling that he could tell Guyette that what he was given was a preliminary draft and that it would be premature to draw any conclusions based on that draft.

45.     On July 9, 2015, Michigan media outlets raised the serious environmental and public health issues discussed in the Del Toral Report – the serious issues which had been well known to the EPA from January, 2015. The threat to the public health of the citizens of Flint becomes nationwide news.

46.     On July 10, 2015, in response to the media reports of a public health crisis in Flint, Hedman issued a press statement which stated in part that the "EPA will work with the Michigan DEQ and the City of Flint to verify and assess the extent of lead contamination issues and to ensure that Flint's drinking water meets federal standards."

47.     On July 14, 2015, Guyette asked the EPA if phosphate should be used as corrosion control. Although the answer to this question is an unequivocal "YES," the EPA provided an evasive and convoluted response in an apparent desire to protect the MDEQ. When

Guyette asked the EPA to comment on whether the sampling methods were minimizing the lead readings, the EPA again provided an evasive response.

48.     On July 21, 2015, EPA representatives had a conference call with MDEQ representatives. The MDEQ argued with the EPA about the necessity of immediate corrosion control treatment in light of what it alleged was "compliant sampling." The EPA was concerned about the validity of the MDEQ position, because the EPA had doubts as to whether the sampling was done properly.

49.     At the July 21, 2015 meeting, the EPA informed the MDEQ that Flint should be instructed to "start corrosion control treatment as soon as possible." The MDEQ acknowledged that it had already been in contact with the EPA's experts (Lytle and Shock). The EPA did not establish any deadlines for the commencement of corrosion control.

50.     On August 10, 2015, EPA representatives asked the MDEQ for an update on the status of the corrosion control treatment. No information was forthcoming.

51.     On August 17, 2015, MDEQ sent a letter to Flint recommending that Flint implement corrosion control treatment as soon as possible, but no later than January 1, 2016, and to fully optimize its treatment within six months.

52.     On August 28, 2015, the EPA asked the MDEQ to provide Flint's corrosion control compliance plan.

53.     On August 31, 2015, the MDEQ continued to argue with the EPA about whether corrosion control is necessary because the sampling establishes compliance.

54.     On August 31, 2015, Dr. Edwards published the results of his water testing and reported that 20% of the samples were over the 15 ppb EPA Action Level. Dr. Edwards' report showed that 42% of the tested Flint homes had levels of 5 ppb or higher.

55.     On August 31, 2015, the EPA and MDEQ engaged in a conference call to respond to Dr. Edwards' report of an emerging major public health crisis. The EPA suggested that the participants could discredit Dr. Edwards' findings because his labs were not "certified." The EPA noted that Dr. Edwards' website "is putting added pressure on the MDEQ and EPA to ensure that Flint addresses their lack of optimized corrosion control treatment in an expedited manner in order to protect the residents from exposure to high lead levels." The EPA acknowledged in this call that "to delay installation of corrosion control treatment in Flint would likely cause even higher levels of lead over time as Flint's many lead service lines are continuously in contact with corrosive water."

56.     On September 3, 2015, media reports indicated that Dr. Edwards' reports showed that there is an immediate public health crisis at hand. The media reported that the highly corrosive Flint River water was causing lead contamination in Flint homes. The media reported that the corrosion control plan would be implemented in January, 2016.

57.     On September 9, 2015, Jessica Dupnack (Dupnack) of ABC Channel 12 asked the EPA if "there is any warning to citizens about drinking the water?" Peter Cassell (Cassell), Press Officer of the EPA, did not issue any warning and actually stated that the "lead monitoring shows Flint has not exceeded the lead action level ...." Cassell further adds that "Flint recently accepted EPA's offer to provide technical assistance to the City and MDEQ ...."

58.     Later that day, Dupnack asks Cassell to comment on the disparity between Flint's position (the City is in compliance) and Dr. Edwards' position (the City testing is invalid). She asks if the EPA's position is that "every single home falls below 15 ppb?" Cassell evaded the question by responding "I'm not sure how the sampling differs between the City of Flint and Virginia Tech and can't comment on that, specifically."

59.     On September 9, 2015, Congressman Dan Kildee asked the EPA if the findings in the Del Toral Report were accurate, if there was a public health emergency when did the EPA plan on telling citizens and, most importantly, is the water safe?

60.     On September 15, 2015, Susan Hedman provided a vague response to Congressman Kildee's correspondence. She did not address any issues that Kildee had raised regarding the accuracy of the Del Torel report.

61.     On September 11, 2015, Crooks wrote an email to MDEQ representatives stating: "Just to clarify; on our call, I wanted to remind you that Miguel's report had DEQ cc'd. So if the Legislature or whoever might say you all were cc'd, you can truthfully respond that it was EPA's request that the report not be sent to the ccs. Consequently, you all never received the report from Miguel." Crooks was fully aware that the MDEQ representatives had received the report from the public media when Guyette published his story about the Del Toral.

62.     On September 14, 2015, Debbie Baltazar, Water Division Branch Chief for EPA Region 5 wrote an email which stated that "perhaps [Hedman] already knows all of this, but I am not sure Flint is the community we want to go out on limb for."

63.     On September 18, 2015, EPA Director of Water Division, Tinka Hyde, made a formal request for EPA experts Lytle and Schock to be assigned to Flint to provide technical assistance.

64.     On September 20, 2015, Dr. Edwards sent an email to Lytle and Schock and other EPA officials.

65.     In this email, Dr. Edwards made a strong case that the Flint/MDEQ prior sampling should be rejected as non-compliant with basic testing protocol. He completed his communication by pointing out emphatically that:

> 1) FLINT HAS LOTS OF LEAD PIPE, NO CORROSION CONTROL TREATMENT, AND HAS NO LEGITIMATE LCR TESTING FOR AT LEAST A YEAR.
>
> 2) AMONGST LOW INCOME INFANTS, BREAST FEEDING RATES ARE LOWER, AND FORMULA USE IS HIGHER. MANY FLINT RESIDENTS CANNOT AFFORD TO FLUSH DUE TO HIGH WATER RATES, THEY CANNOT AFFORD BOTTLED WATER. THIS IS AN UNPRECEDENTED SITUATION AND EPA NEEDS TO TAKE THIS SERIOUSLY. NOW
>
> 3) WE HAVE ONE CHILD WITH ELEVATED BLOOD LEAD ALREADY....IN FACT, THAT IS THE ONLY REASON WE KNOW ABOUT ANY OF THE ABOVE.
>
> 4) MDEQ IS STILL PUBLICLY INSISTING FLINT WATER HAS TESTED SAFE, IS SAFE, AND THAT FLINT HAS **NO VIOLATIONS** OF ANY SORT. (Emphasis in text).

66. Dr. Edwards continued: "I believe that someone at HQ or in R5 should immediately take decisive action on this issue to protect the public."

67. On September 21, 2015, Dr. Edwards published on his website his advice to Flint water users: Drink or cook with the water only if a proper filter is used and flushing for 5 minutes before the water is used for drinking or cooking. Dr. Edwards shared this information with the EPA. The EPA responded by stating that the agency is "looking into the information you have provided." Elected Officials met with EPA and MDEQ representatives to review the situation and options.

68. On September 21, 2015, Dr. Mona Hanna-Attisha presented her study of elevated blood lead levels for children in Flint to Walling, Natasha Henderson, City Administrator and Howard Croft, Director of Flint Public works. Dr. Hanna-Attisha documented in her report increases which coincided with the exposure to the Flint River water. Dr. Edwards shared this information with the EPA

68.     Dr. Edwards also informed the EPA that Dr. Hanna-Attisha reported, according to Flint representatives, that the EPA had given the City a "blessing that they were in compliance and there was no corrosivity" issue. Dr. Hanna-Attisha pushed for a health advisory to be published to the citizens of Flint.

69.     On September 22, 2015, Dr. Edwards wrote an email to the EPA stating:

> MDEQ will go to their graves insisting Flint has met all Federal LCR standards...higher numbers of EBL kids be damned. They are also telling people that EPA has said that there is no absolutely no corrosion problem in Flint water.

70.     On September 24, 2015, Dr. Mona Hanna-Attisha held a press conference to release her study and recommendations. Her position was dramatic: every child in Flint is presumed to have ingested lead and has been harmed by this toxic metal.

71.     On September 25, 2015, the City of Flint issued a lead advisory which states in part:

> The City of Flint is issuing a lead advisory for residents to be aware of lead levels in drinking water after hearing concerns from the medical community. While the City is in full compliance with the Federal Safe Drinking Water Act, this information is being shared as part of a public awareness campaign to ensure that everyone takes note that no level of lead is considered safe.

72.     On September 27, 2015, Hedman called MDEQ Director Dan Wyant and discussed the need for expedited implementation of corrosion control treatment.

73.     On October 1, 2015, the Genesee County Health Department issued a "Do Not Drink the Water" Advisory. The Natural Resources Defense Council on behalf of Dr. Edwards, Coalition for Clean Water, and Concerned Pastors for Social Action and other interested groups

and individuals filed a Notice of Intent to Bring Suit against the EPA to force the EPA to take action to abate the imminent and substantial endangerment to the health of Flint residents.

74.    On October 8, 2015, the Governor announced that he had ordered the restoration of DWSD water to the Flint water system.

75.    On November 4, 2015, the Del Toral Report was finalized. The report noted that officials were implementing many of the recommendations contained in the Interim Report (Flint has switched back to Detroit water, filters have been provided to residents and additional corrosion control will be implemented).

76.    On January 16, 2016, the Governor declared a state of emergency.

77.    On January 21, 2016, the EPA issued its Emergency Administrative Order pursuant to Section 1431 of the Safe Drinking Water Act, 42 U.S.C.§ 300i stating in part:

> The presence of lead in the City water is principally due to lack of corrosion control treatment after the City's switch to the Flint River as a source hi April 2014. The river's water was corrosive and removed protective coating in the system. This allowed lead to leach into the drinking water, which can continue until the system's treatment is optimized.

> The City, MDEQ and the State have failed to take adequate measures to protect public health....there continue to be delays in responding to critical EPA recommendations...the EPA remains concerned that the City lacks the professional expertise and resources needed to carry out the recommended actions and to safely manage the City's PWS.

78.    On March 17, 2016, EPA Administrator McCarthy testified before Congress. She appeared before House Oversight and Government Reform Committee and admitted that the EPA tried but could not achieve corrosion control in a timely manner. Chairman Representative Jason Chaffetz asked her: "when did you know they [MDEQ] didn't do [corrosion control]?" Gina McCarthy said that

[W]e [EPA] knew on July 21st of a systemic problem. The state [MDEQ] agreed the next day and then all they did was slow walk [corrosion control]. That's why we had to do it the way we did. I wished we had gone further. I wish we had gone farther. I wished we had yelled from the tree tops but there is no way that my agency created this problem or there was ambiguity in the law that wouldn't have done the same that the governor said. Don't put people at risk just because we couldn't figure out in the life of us, in our guidance, we never thought anybody goes from a treated system to an untreated system and not treat it [with corrosion control]. I didn't think we ever had to say that because I never thought anyone would. That's where we are today.

## Count I: Negligence

79.     The United States shall be liable, respecting the provisions of this title relating to tort claims, *in the same manner and to the same extent as a private individual under like circumstances.* 28 USCS § 2674.

80.     All of the events which give rise to this cause of action occurred in the state of Michigan.

81.     The EPA is liable for the knowledge of and acts and omissions of its agents and employees, including but not limited to Jennifer Crooks and Dr. Susan Hedman.

### A.      Negligent Performance of Undertaking Regarding Corrosion Control

82.     This case involves a major failure of all levels of government to protect the health and safety of the public. Local, state and federal agencies and employees, working individually and at times in concert with each other, mismanaged this environmental catastrophe.

83.     The Michigan Supreme Court has recognized that a "private individual" is subject to the tort duties established by Section 324A of the Restatement of Torts, 2d. *See Smith v. Allendale Mut. Ins. Co.,* 410 Mich. 685, 705; 303 N.W.2d 702, 1981 Mich. LEXIS 251

(Mich. 1981) and more recently *Fultz v. Union-Commerce Assocs.,* 470 Mich. 460, 464; 683 N.W.2d 587, 2004 Mich. LEXIS 1523 (Mich. 2004) (noting that "Michigan courts have accepted the Restatement of Torts, 2d, § 324A, as an accurate statement of Michigan law and used the principles stated above in analyzing plaintiffs' claims in the past").

84.     This section of the Restatement provides:

§ 324A Liability to Third Person for Negligent Performance of Undertaking

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

> (a)     his failure to exercise reasonable care increases the risk of such harm, or

> (b)     he has undertaken to perform a duty owed by the other to the third person, or

> (c)     the harm is suffered because of reliance of the other or the third person upon the undertaking.

85.     The EPA undertook the task of rendering services to the MDEQ "for the protection" of the Flint water users. In February, 2015, the EPA rendered service to the MDEQ and responded to LeeAnne Walters' complaints about being exposed to contaminated Flint River water. By undertaking this task, the EPA owed a duty of care to prevent or reduce the risk of harm to Walters and the claimants.

86.     The Statement of Facts recited above establishes that the EPA was an active actor in the mismanagement of the unfolding environmental disaster.

87.     Crooks was aware that the Flint River was highly corrosive and that Flint had older corroded lead service pipes which required corrosion control treatment. She knew in

February 2015, that Del Toral observed lead based "black sediment" in the Walters water and that Jan Burgess reported in October 2014 floating particles in her water.

88.    Crooks in February 2015 was aware that exposure to the Flint River water was causing skin rashes and falling clumps to hair from a family member of the Flint Tech Advisory Board.

89.    In February 2015, EPA agent Del Toral informed Crooks that the absence of corrosion control treatment could explain the presence of lead particles floating in the water.

90.    Based on the facts supplied by Del Toral and Jan Burgess, Crooks knew or should have known that corrosion control treatment was essential for safe distribution of the Flint River water and that this treatment was likely absent from the treatment of the water.

91.    By April 25, 2015, the EPA was positive that corrosion control was not being used yet failed to suggest, direct or counsel the MDEQ and Flint to implement a corrosion control program until July 2015.

92.    By April 2015, the EPA had a firm belief that the MDEQ was either refusing or was incapable of managing the technical aspects of ensuring all environmental laws were adhered to.

93.    Even after directing the MDEQ and Flint to implement corrosion control in July 2015, the MDEQ and Flint "slow walked" the process as testified to by EPA Administrator McCarthy on March 17, 2016.

94.    The failure of the EPA to promptly require corrosion control treatment was unreasonable and unquestionably increased the risk of harm to claimants. Restatement of Torts, 2d § 324A (a).

95.     The EPA, rendering services to the MDEQ, undertook the duty owed by the MDEQ to claimants. Restatement of Torts, 2d § 324A (b).

96.     The EPA breached this duty to claimants when it unreasonably delayed in requiring Flint to promptly implement corrosion control.

**B.     Negligent Performance of Undertaking Regarding Timely Investigations**

97.     Jan Burgess and other residents submitted to the EPA complaints and notices of violations in connection with their exposure to poor quality water caused by the distribution of the highly corrosive Flint River water.

98.     The EPA undertook the task of timely investigating complaints and in so doing imposed upon itself a duty to investigate the complaints in a careful and reasonable manner so that if violations of law or regulation were detected a proper and prompt remedy could be pursued.

99.     Claimants relied on the EPA's non-negligent and timely undertaking of the task of investing complaints and fashioning the appropriate remedy. Restatement of Torts, 2d § 324A (c).

100.    If the investigation had been undertaken in a timely fashion, a violation of environmental law would have been detected and corrosion control treatment would have been imposed on Flint or another remedy developed so that the harm to claimants would have been prevented.

**C.     Negligent Undertaking of Duty to Warn the Public of Environmental Risks to Public Health**

101.    The EPA, in employing environmental safety experts like Del Toral, undertook the task of providing the MDEQ with environmental safety advice regarding the consequences of using the Flint River as a primary drinking water source.

22

102.   On June 24 and 25, 2015, Del Toral advised the EPA the public's exposure to lead was "widespread" and that the environmental catastrophe facing Flint should not be concealed and the citizens should be warned of the public health and safety risks.

103.   Del Toral advised the EPA that to conceal from the public the environmental risks and the failure to immediately warn them of the public health emergency "borders on criminal neglect."

104.   Notwithstanding this advice from its expert as to how to implement a mitigation of harm plan, the EPA remained silent when it should have spoken out and knowingly permitted and facilitated the MDEQ and City of Flint concealment of the environmental disaster identified by Del Toral. See Restatement of Torts, 2d § 324A (b).

105.   The failure to warn claimants and the citizens of Flint of the environmental disaster and ensuing cover-up significantly increased the harm to the Citizens of Flint for which the EPA is responsible. Restatement of Torts, 2d § 324A (a).

## **Damages**

106.   As a result of the EPA's negligence, claimants have experienced and will continue to experience physical injury, illness, lead poisoning, dermatological disorders, loss of hair, gastrointestinal disorders, out of pocket economic losses; claimants have experienced and will continue to experience pain and suffering, emotional distress, deprivation of a quality of life.